ORAL ARGUMENT NOT YET SCHEDULED

BRIEF AND ADDENDUM FOR APPELLEE

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 08-3033
(Consolidated with Nos. 10-3108 & 11-3031)

UNITED STATES OF AMERICA,                    Appellee,

    v.

JOSEPH LEON JONES, *et al.*,                  Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONALD C. MACHEN JR.
United States Attorney

ELIZABETH TROSMAN
ANN PETALAS
GILBERTO GUERRERO
\* STRATTON C. STRAND,
D.C. Bar #464992
Assistant United States Attorneys

\* Counsel for Oral Argument
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
(202) 252-6829

Cr. Nos. 05-100 (RWR)

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

### Parties and Amici

The parties to these consolidated appeals are appellants, Joseph Jones, Desmond Thurston, and Antwuan Ball, and appellee, the United States of America. The amici are the National Association of Criminal Defense Lawyers, the National Association of Federal Defenders, and the American Civil Liberties Union of the Nation's Capital.

### Rulings Under Review

These consolidated appeals challenge the sentences imposed by the Honorable Richard W. Roberts.

### Related Cases

The consolidated appeals of appellants' co-defendants, Gregory Bell and David Wilson, Nos. 08-3037 & 11-3032, currently are pending before this Court.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained either in the Addendum to the Main Brief for Appellants, or in the Addendum for Appellee, appended hereto.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................ 1

COUNTERSTATEMENT OF FACTS ................................................. 6

    I.   Overview of the Government's Trial Evidence ........................... 6

        A.   The Investigation ................................................. 6

        B.   The Conspiracy ................................................... 7

             1.   Concerted Activities ..................................... 10

             2.   Leadership ................................................. 21

        C.   The Controlled Buys ........................................... 25

    II.  Corroborating Information Presented to the Court at Sentencing .................................................................. 26

        A.   The Guilty Pleas ............................................... 26

        B.   Ball's Sworn Statements ....................................... 28

        C.   The Membership List ........................................... 28

    III. The Sentencing Proceedings ..................................... 29

        A.   Jones's Hearing ................................................ 32

        B.   Thurston's Hearing ............................................ 37

        C.   Ball's Hearing ................................................. 41

SUMMARY OF ARGUMENT ...................................................... 47

ARGUMENT ..................................................................... 48

    I.   The Court Did Not Violate Appellants' Sixth Amendment Jury-Trial Right by Considering their Acquitted Conduct at Sentencing. .................................................... 48

A.  Legal Principles ..................................................... 49

    1.  *Apprendi* and Its Progeny ............................. 49

    2.  Standard of Review .................................... 55

B.  Discussion ............................................................. 55

    1.  Under the Advisory Guidelines System, a District Court May Consider Acquitted Conduct at Sentencing. .............................................. 55

    2.  Appellants' "As-Applied" Theory Lacks Merit ............ 65

II.  The Doctrine of Constitutional Avoidance Is Inapplicable ....... 74

III.  Appellants' Sentences Are Reasonable. .................................. 75

A.  Standard of Review ............................................ 75

B.  The Court Committed No Significant Procedural Error. ................................................................. 76

    1.  Legal Principles ......................................... 76

    2.  The Court Did Not Clearly Err in Its Conspiracy Finding. .................................................... 80

    3.  The Court Made Adequate Findings. ................... 87

    4.  The Court Correctly Applied the Guidelines ........... 89

C.  Appellants' Sentences Are Substantively Reasonable ....... 90

IV.  The Court Did Not Violate Appellants' Presumed Right to Speedy Sentencing. ................................................... 92

A.  Background .......................................................... 92

B.  Discussion ............................................................ 94

CONCLUSION .................................................................. 98

iv

# TABLE OF AUTHORITIES*

PAGE

\* *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) ......... 78, 87

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................... 49, 50

*Barker v. Wingo*, 407 U.S. 514 (1972) ..................................................... 94

*Blakely v. Washington*, 542 U.S. 296 (2004) .......................................... 50

*Clark v. Martinez*, 543 U.S. 371 (2005) ................................................. 74

*Cunningham v. California*, 549 U.S. 270 (2007) ....................... 52, 53, 73

\* *Gall v. United States*, 552 U.S. 38 (2007) .......... 53, 66, 71, 72, 75, 76, 91

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) *(en banc)* ............. 58

*Maine v. Taylor*, 477 U.S. 131 (1985) ..................................................... 78

*Perez v. Sullivan*, 793 F.2d 249 (10th Cir. 1986) .................................... 95

*Pinkerton, v. United States*, 328 U.S. 640 (1946) ................................... 77

*Pollard v. United States*, 352 U.S. 354 (1957) ....................................... 94

*Rita v. United States*, 551 U.S. 338 (2007) ..................... 53, 66, 71, 72, 73

*Southern Union v. United States*, 132 S. Ct. 2344 (2012) ................ 54, 65

*United States v. Ashqar*, 582 F.3d 819 (7th Cir. 2010) ........................... 69

---

\*   Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Ashworth*, 139 F.App'x 525 (4th Cir. 2005) ................59

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008).......................69

*United States v. Blalock*, 571 F.3d 1282 (D.C. Cir. 2009) .....................75

*United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992)...........................55

\* *United States v. Booker*, 543 U.S. 220

(2005) .......................................50, 51, 52, 53, 56, 60, 61, 64, 71, 74

\* *United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007).....49, 57, 62, 68, 81

*United States v. Brockenborrugh*, 575 F.3d 726 (D.C. Cir. 2009) ..........78

\* *United States v. Brown*, 516 F.3d 1047 (D.C. Cir. 2008)......55, 56, 60, 67

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) ...........77, 84, 88

*United States v. Delaney*, 651 F.3d 15 (D.C. Cir. 2011)...........................79

\* *United States v. Dorcely*, 454 F.3d 366

(D.C. Cir. 2006)................................................ 55, 56, 60, 68, 74, 79

*United States v. Dozier*, 162 F.3d 120 (D.C. Cir. 1998) ....................88, 89

*United States v. Farias*, 469 F.3d 393 (5th Cir. 2006)............................59

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006) .........................59

*United States v. Gibson*, 353 F.3d 21 (D.C. Cir. 2003) ...............94, 95, 96

*United States v. Gobbi*, 471 F.3d 302 (1st Cir. 2006) .............................59

\* *United States v. Graham*, 317 F.3d 262 (D.C. Cir. 2003).................88, 89

\* *United States v. Graham*, 83 F.3d 1466 (D.C. Cir. 1996) ................. 77, 83

   *United States v. Harrison*, 103 F.3d 986 (D.C. Cir. 1997) ..................... 49

   *United States v. Hayward*, 177 F.App'x 214 (3d Cir. 2006) ................... 59

   *United States v. Henry*, 557 F.3d 642 (D.C. Cir. 2009) ........................... 55

   *United States v. Hernandez,* 633 F.3d 370 (5th Cir.), *cert. denied,*

      131 S. Ct. 3006 (2011) ................................................................. 69

   *United States v. High Elk*, 442 F.3d 622 (8th Cir. 2006) ........................ 59

   *United States v. Lawrence,* 662 F.3d 551 (D.C. Cir. 2011) ..................... 91

\* *United States v. Lawson*, 494 F.3d 1046 (D.C. Cir. 2007) .... 57, 67, 72, 92

   *United States v. Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013)...91

   *United States v. Magallanez*, 408 F.3d 672 (10th Cir. 2005) ................. 59

   *United States v. McCants*, 554 F.3d 155 (D.C. Cir. 2009) ...................... 78

   *United States v. McCormick*, 401 Fed. Appx. 29 (6th Cir. 2010) ........... 69

\* *United States v. Mejia*, 597 F.3d 1329 (D.C. Cir. 2010) ............. 67, 91, 92

   *United States v. Mercado*, 474 F.3d 654 (9th Cir. 2007) ........................ 59

   *United States v. Nelson-Rodriguez*, 319 F.3d 12 (1st Cir. 2003) ............ 95

   *United States v. Norman*, 465 Fed. Appx. 110 (3d Cir. 2012) ............... 68

   *United States v. Price*, 418 F.3d 771 (7th Cir. 2009) .............................. 59

   *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009) .................................. 94

vii

*United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008) ....................... 70

*United States v. Saro*, 24 F.3d 283 (D.C. Cir. 1994) ............................... 88

*United States v. Seiler*, 348 F.3d 265 (D.C. Cir. 2003) ........................... 76

\* *United States v. Settles*, 530 F.3d 920

      (D.C. Cir. 2008) ......................................... 55, 57, 60, 63, 64, 67, 79

*United States v. Tabron*, 437 F.3d 63 (D.C. 2006) .................................. 87

*United States v. Tann*, 532 F.3d 868 (D.C. Cir. 2008) ........................... 79

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ................. 77

\* *United States v. Toms*, 136 F.3d 176 (D.C. Cir. 1998) ...................... 80, 81

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) ...................... 69

*United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005) ........................... 59

*United States v. Waltower*, 643 F.3d 572 (2011) ............................... 61, 62

*United States v. Watts*, 519 U.S. 148 (1997) ................... 55, 58, 61, 63, 74

*United States v. White*, 551 F.3d 381 (6th Cir. 2008) (*en banc*) . 58, 59, 64

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) .......................... 75

\* *United States v. Yelverton*, 197 F.3d 531 (D.C. Cir. 1999) ............... 96, 97

*Williams v. New York*, 337 U.S. 241 (1949) ............................................ 55

# OTHER AUTHORITIES

**PAGE**

18 U.S.C. § 1962 ........................................................................ 2

18 U.S.C. § 3553 .......................................................... 31, 52, 72

18 U.S.C. § 3661 .............................................................. 60, 61

18 U.S.C. § 3742 .................................................................. 51

21 U.S.C. § 841 (2000 ed.) ................................................. 1, 5

21 U.S.C. § 846 ..................................................................... 1

Fed. R. App. P. 28 ............................................................... 49

Fed. R. Civ. P. 52 ................................................................ 78

USSG § 1B1.3 .............................................. 30, 72, 74, 76, 77, 90

USSG § 2D1.1 ...................................................................... 35

USSG § 3D1.2 ...................................................................... 77

USSG § 4B1.1 ................................................................. 35, 66

USSG Ch. 5 Pt. A (Sentencing Table) (2007) ...................... 36, 66

USSG Ch. 5 Pt. A (Sentencing Table) (2009) .......................... 41

USSG Ch. 5 Pt. A (Sentencing Table) (2010) .......................... 66

USSG App. C, Amend. 742 ................................................... 41

USSG App. C, Amend. 748 ................................................... 41

Policy Statement on En Banc Endorsement of Panel Decisions

(Jan. 17, 1996) ................................................................................. 70

## ISSUES PRESENTED

I.      Whether the court violated appellants' Sixth Amendment jury-trial right by considering their acquitted conduct at sentencing.

II.     Whether the United States Sentencing Commission's relevant-conduct guideline is ultra vires.

III.    Whether appellants' sentences are reasonable.

IV.     Whether the delays in sentencing Thurston and Ball violated all three appellants' presumed right to speedy sentencing.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 08-3033
(Consolidated with Nos. 10-3108 & 11-3031)

———————————

UNITED STATES OF AMERICA,                           Appellee,

v.

JOSEPH LEON JONES, *et al.*,                           Appellants.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

BRIEF FOR APPELLEE

———————————

## COUNTERSTATEMENT OF THE CASE

A total of 18 defendants were indicted in this case. On March 22,
2005, a grand jury charged 15 defendants with conspiracy to distribute
and possess with intent to distribute five kilograms or more of cocaine
and 50 grams or more of cocaine base ("crack"), in violation of 21 U.S.C.
§§ 841 and 846 ("narcotics conspiracy")); and with individual acts of

drug dealing, unlawful use of a communications facility, and weapons use and possession (3/22/05 Indictment). Three of the defendants -- Mary McLendon ("Nooney"), Burke Johnson, and Joseph Langley -- pleaded guilty to informations charging them with conspiracy to distribute and possess with intent to distribute crack (05-cr-307, Dkt.9; 05-cr-328, Dkt.7; 05-cr-416, Dkt.6). On November 29, 2005, the grand jury returned a superseding indictment against the remaining 12 defendants and three additional defendants (Dkt.173).[1] The superseding indictment charged the 15 defendants with narcotics conspiracy; conspiracy to participate in a Racketeer Influenced and Corrupt Organization, in violation of 18 U.S.C. § 1962(d) ("RICO conspiracy"); individual acts of drug dealing, unlawful use of a communications facility, and weapons use and possession; and individual acts of violence, including five murders (Dkt.173). On May 30, 2006, the grand jury returned a superseding indictment against the

---

[1] Unless otherwise specified, "Dkt." refers to the court's docket entries in No. 05-cr-100. Appellee will refer to the consecutively numbered transcript pages of the 2007 trial by page number and, where helpful, witness name, and to the sentencing-proceeding transcripts by date and page number.

2

same 15 defendants; this indictment included a RICO-forfeiture notice (Dkt.329).

On June 15, 2006, after a four-day trial before the Honorable Richard W. Roberts, a jury found one of the defendants, Newett Ford, guilty of narcotics conspiracy and two counts of distribution of crack (Dkt.340, 350).[2] During the period from August through October 2006, seven of the defendants -- Raymond Bell ("Santuce," "Santu"), Gerald Bailey ("Chow Chow"), Jasmine Bell ("Jazz"), Marcus Smith ("Mick"), Phillip Wallace ("Phil"), Lucious Fowler, and Daniel Collins ("DC") -- pleaded guilty to the RICO-conspiracy count of the May 2006 indictment (Dkt.392, 395, 398, 401, 404, 407, 512), and one of the defendants -- Arthur Handon ("Jay") -- pleaded guilty to an information charging him with RICO conspiracy (06-cr-258, Dkt.6).

Beginning on February 21, 2007, the six remaining defendants -- appellants Joseph Jones ("Jo-Jo"), Desmond Thurston ("Dazz"), and Antwuan Ball ("Twan," "Ant"), along with Gregory Bell ("Boy-Boy," "Bunga"), David Wilson ("Wop," "Cootie"), and Dominic Samuels ("Don,"

---

[2] The government had dismissed the RICO-conspiracy count against Ford (Dkt.328, 332).

3

"Dom") (hereafter referred to collectively as "the defendants") -- were tried jointly before Judge Roberts on narcotics-conspiracy, RICO-conspiracy, drug-distribution, murder, and related charges.[3]    On November 28, 2007, the jury found Jones guilty of two counts of distribution of crack; Thurston guilty of two counts of distribution of crack; Ball guilty of one count of distribution of five grams or more of crack; Bell guilty of three counts of distribution of crack; and Wilson guilty of six counts of distribution of crack, two counts of distribution of five grams or more of crack, two counts of first-degree murder, and one count of using a communications facility to facilitate a drug-trafficking offense (Dkt.1191; 11/28/07 Minute Entry).   The jury acquitted these five defendants of the remaining counts (Dkt.1191).   The jury found Samuels not guilty of certain counts, and could not agree on two counts: a first-degree murder charge, and a related weapons charge (id.).   On January 24, 2008, Samuels pleaded guilty to manslaughter while armed, a lesser-included offense of the murder charge (Dkt.1208-09).

---

[3] On November 16, 2006, the grand jury returned a superseding indictment against just these six defendants (Dkt.544).

4

On April 24, May 1, and May 8, 2008; October 29, 2010; and March 11 and 17, 2011, respectively (see Minute Entries), Judge Roberts sentenced these six defendants to the following terms of incarceration: Samuels, 84 months (Dkt.1271); Jones, concurrent terms of 180 months (Dkt.1269); Bell, concurrent terms of 192 months (Dkt.1272); Thurston, concurrent terms of 194 months (Dkt.1405); Wilson, concurrent terms of 188 months, and 48 months, respectively, on the drug-distribution and communications-facility convictions, and terms of 360 months to life (concurrent to each other but consecutive to the other terms) on the murder convictions (Dkt.1445); and Ball, 225 months (Dkt.1443).[4] All the defendants except Samuels noted appeals.

On April 13, 2011, this Court consolidated the appeals of Jones, Bell, Thurston, Ball, and Wilson. On December 10, 2012, this Court granted the motions of Jones, Thurston, and Ball to deconsolidate their appeals from those of Bell and Wilson.

---

[4] Each of Jones's convictions carried a maximum sentence of 30 years' imprisonment, given his prior felony drug conviction (Dkt.690; 5/1/08:55-56); each of Thurston's convictions carried a maximum of 20 years' imprisonment; and Ball's conviction, given the amount of crack involved, carried a minimum of five years', and maximum of 40 years', imprisonment. 21 U.S.C. §§ 841(b)(1)(B)(iii), (C) (2000 ed.).

5

## COUNTERSTATEMENT OF FACTS

### I.    Overview of the Government's Trial Evidence

#### A.    The Investigation

In January 2000, the FBI's Safe Streets Gang Task Force began
an investigation of drug activity in the Congress Park neighborhood of
Southeast Washington, D.C., an area bounded on the west by 13th
Street, on the north by Alabama Avenue, on the east by 15th Street,
and on the south by Mississippi Avenue (Lockhart:258, 260-63, 283-85;
Government Exhibit ("GX") 100.1).  The investigation revealed that the
neighborhood was an "open-air" crack market with primary distribution
points on 13th Place ("the Circle"); in front of "the Lincoln," a backward-
L-shaped apartment building whose parking lot fronted Congress Street
just east of 13th Place; 14th Place; the 1300 block of Savannah Street;
and "the Alley" (sometimes called "Boat Alley" because PCP, or "boat,"
had been sold there), an alley that connected to the 1300 block of
Savannah Street (Lockhart:263-66, 268, 292-328, 614; Wood:1042;
Barnett:7501-02, 7526, 7530-31; Powell:12180-84, 12202-07, 12214; GX
100.1).  The market operated 24 hours a day, seven days a week, and

6

channeled large quantities of crack, with some of the dealers making "in the thousands of dollars" of sales a day (Lockhart:609-11).

In the course of its investigation, the Task Force conducted scores of "controlled buys" in Congress Park, primarily using wired cooperating witnesses -- individuals "known in the neighborhood as [being] involved in either selling or purchasing drugs" (Lockhart:328-30, 334-39). Over 20 of the controlled buys involved crack sales by the defendants; those sales took place on dates ranging from May 16, 2000, to October 4, 2004 (Lockhart:371, 375-76, 385, 390-409, 414-34, 515-19, 545-55). In March and November 2005, the Task Force "took down" the Congress Park market, executing numerous arrest and search warrants (Lockhart:607-08, 642, 649-51, 735, 779).

### B.    The Conspiracy

The government presented its conspiracy case primarily through the testimony of a variety of participants in Congress Park's drug trade: (1) large-scale dealers who supplied wholesale quantities of crack or powder cocaine to the defendants and others in Congress Park,

7

including Larry Browne[5] (1384-95, 1411-14, 1427-30, 1442-44), Robert Crawford (7100-02, 7176, 7136-44), Cedric Conner (8101-04, 8160-95, 8222-26, 8281-86), and Steven Marsh (9182-87); (2) street vendors and brokers, including Season Wood (859-60, 871-77), Willis Campbell (2980, 2986-95, 3335-36), Bobby Capies ("Monya") (4796-4805),[6] Keith Barnett (7486-88, 7501-02), Kairi Kelliebrew ("Baby Kairi," "Baby Kai," "Kay-Bay") (10078-81, 10089-92, 10097), Robert Pough ("Ooney") (11635, 11640, 11652, 11658, 11743-44),[7] and Jacques Powell ("JT") (12178-84, 12201-07); and (3) users who regularly purchased crack in Congress Park, including Gail Parson (1804, 1810, 1813, 1821-35) and Edward Martin (3755-60, 3787-88).   Three of these witnesses, Steven Marsh, Robert Pough, and Edward Martin, testified without cooperation agreements (3799-3800, 9172-73, 11735-36).

---

[5] Browne was Jones's first cousin (1271-72).

[6] In the transcript, Capies's nickname generally is spelled "Munya," but the correct spelling is "Monya" (Capies:4876).

[7] Pough went to grade school with Samuels, Wilson, Raymond and Jasmine Bell, Thurston, and Phil Wallace (11643-48).   Pough sold primarily on Congress Street between 13th and 12th Streets, just outside the Congress Park neighborhood (11648, 11655-58).   He and his cohorts initially had a "beef" with Congress Park, but, in 1995, Wilson "squashed" the beef (11665-87).

The testimony of these witnesses showed that, from roughly 1992 through March 2005, the defendants were members of a loose-knit organization, sometimes called "the Congress Park Crew" (Capies:6528; Browne:1335-37), who worked together, often in small groups, to sell crack in the Congress Park neighborhood and to build and protect that market (Martin 3770-71; Capies:4802-05, 4818-21, 4829-31, 4833-34, 4900, 4970-80, 5169-70, 5191-93, 5335-38, 6603; Barnett:7526, 7530-31, 7545-47, 7572-76, 7599-7601; Conner:8255; Kelliebrew:10089-91, 10113-16, 10129-38, 10162-76; Pough:11658-65; Powell:12176-92, 12202-11, 12214-15, 12224-30, 12940; see also infra).    At various times, the organization comprised well over a dozen conspirators, most of whom lived in Congress Park, and several of whom were the defendants' relatives, including Ball's brothers, Kairi and Aman ("Bird") Ball; Ball's first cousin, Kelliebrew; Bell's brothers, Raymond and Jasmine Bell; Thurston's brother, Phillip Wallace; and Wilson's brother, Andre Wilson ("Boobie") (id.; see also Lockhart:324; Wood:888-89; Barnett:7530-31; Conner:8140-42, 8342; Kelliebrew:10079-81; Powell:12190).[8]

---

[8] Kairi Ball was killed in about 1995; Andre Wilson was killed in 2001 (Kelliebrew:10467-71; Capies:4826, 4931-32).

9

### 1.    Concerted Activities

The conspirators' concerted activities included:

*Sharing sales.*    Nine witnesses testified to the conspirators' method of "shar[ing] sales" by playing "doors," or "uno[], dos, tres, quatros" (Capies:5335-37).    As Barnett described it, the game was played "to get the sales when . . . a lot of us [were] out there": "If a crackhead walked up and we like 10 deep out there, the first two get the sale. The first one who call 'uno' get the majority of the sale. Who call 'doors' get the remain[der] of the sale." (7552.)    Powell described the game similarly: "It was like the way you got your sales. It was so many people hustling, you just couldn't say, 'oh, it's my turn, my turn.' So as soon as the sale come up on the scene, it's uno. Whoever call uno, that's the first person get the sale. Dos, you break the sale down with dos." (12215; see also Campbell:3342 (doors used by "[s]ometimes 10, sometimes 15 people")).    If the purchaser wanted a single $10 "dime" bag, whoever yelled "uno" first, "that's [his] sale" (Capies:5336).    A $20 sale would be split two ways (Wood:881-82; see also Parson:2013-14). Larger sales, such as purchases of 10 dimes, would be split among multiple conspirators (Capies:5336-37; Campbell:3341).    The purpose of

10

the game was to ensure that "everybody can get some money" (Barnett:7552).

Doors was played "[a]ll over Congress Park" (Conner:8745) and throughout the period of the conspiracy. Campbell purchased crack through the doors system in the early and mid-1990s (2994, 3335-36). According to Powell, who sold crack in Congress Park from "about '95, '96" to "[a]bout 2002," the game had "always [been] played since when . . . [he] first started hustling" (12182-84, 12205, 12215). Powell played doors in the Circle (12215). Others he saw playing it there were "Kairi [Ball], Don [Samuels], Wop [Wilson], Dazz [Thurston], Phil [Wallace], Terrence [Cooper], Jazz [Jasmine Bell], Santu [Raymond Bell], Kay-Bay [Kelliebrew], everybody" (id.; Lockhart:9638). Kelliebrew, who sold primarily on Savannah Street, in the Circle, and in the Alley during the period from February 1998 to November 2000, played doors with "everybody," including Samuels, Daniel Collins, Wilson, Thurston, Jones, and Bell (10162-68, 10172). Conner saw it being played in "'98, '99" and "[p]robably . . . before" that (8745). Pough saw doors being played in the Circle "around '99, 2000"; according to him, "[e]verybody basically used it around there" (11758-59). Barnett played doors "every

11

day" in "like 2000, 2001"; he played it "[i]n the circle, in the Lincoln, in the alley" with, among others, Samuels, Collins, Capies, Jones, Powell, Raymond Bell, Thurston, and Wallace (7552-55). According to Barnett, "the game was already established. Everybody respected the game." (7552-53.)

*Supplying, "wholesal[ing]" to, and "fronting" each other, and partnering.* Some conspirators, including Bell, Burke Johnson, Ball, Wilson, and Jones, sold "weight" to co-conspirators; weight included "eight-balls" (3.5 grams) (Capies:5210) and "seven grams [quarter ounces], halves [half ounces], ounces" (Capies:4813-15, 4924, 4970, 5194-97, 5207-10; Barnett:7501-02, 7529; Kelliebrew:10119-20, 10128, 10136, 10169-71, 10174-76, 10184, 10234-35; Powell:12201, 12207-10). Many conspirators provided each other "wholesales" -- packaged dimes at half their retail price (Barnett:7528-29; Powell:12184-85). As Kelliebrew explained, if his money was "messed up" such that he "needed wholesale," he would look to "anybody . . . like amongst us": "You run through the hood and be like, 'Let me get a wholesale,' from anybody, like -- if they had it, they'll sell you" (10136-37). And, "[v]ice versa," Kelliebrew would provide wholesales to other dealers "in the

12

hood," including Thurston, Phillip Wallace, Wilson, Samuels, Daniel Collins, Jones, and Aman Ball -- "[e]verybody" (10137-38). Barnett too would provide wholesales, if he had them, to "whoever needed them," and sometimes would do so if he needed "quick money" (7531-33). According to Powell, Bell was a "Wholesale King" during the 1995-1997 period, because he "had wholesale whenever you need[ed] it"; during the same period, Joseph Langley was even "more of a wholesale king" than Bell (12192, 12196-97, 12200; see also Capies:5201-02).

Conspirators also sometimes "fronted" each other, i.e., provided crack on consignment (Powell:12210; see also Crawford:7059-60). In late 1993 and early 1994, and again in 1995 after Kairi died, Ball fronted "halves" to Capies and Samuels, who were partnering during those periods by pooling their money to buy supplies of crack for resale (4813-14, 4817-19, 4894-97). In September 1994, Kelliebrew got his start selling crack in Congress Park when Bell fronted him 14 or 15 dimes (10112-13, 10089-91). From then until he was incarcerated in late 1996, Kelliebrew's main suppliers included Bell, Jones, Ball, and Burke Johnson (10113-16, 10129-30, 10162). Kelliebrew got "quarters" from Ball; if Kelliebrew "had some money, [he would] buy it. If

13

[Kelliebrew] didn't, [Ball]'d front [him]" (10119-20). During this same period, Ball was fronting Wilson "eighths," i.e., 125-gram quantities (10124-27). After Kelliebrew returned from his incarceration in February 1998 (10129-30, 10162), he and Powell started "hustling together": pooling their money to buy from halves to three or four ounces at a time, selling the crack together in the Circle, and splitting the proceeds "down the middle" regardless of how much each had contributed (Powell:12208-09). During this period, Ball fronted Powell and Kelliebrew "probably like four or five times" (12210). When Ball did so, Powell and Kelliebrew "ain't have long to pay Twuan back" because Ball "would press up on you for his money" (12210-11). After Kelliebrew returned from a second, year-long incarceration in November 2001, Ball first fronted him two ounces of crack and then three times fronted him an ounce of crack (Kelliebrew:10172, 10215-19, 10227-32; Powell:12211-13).[9]

---

[9] Conspirators also partnered to commit robberies. As Kelliebrew testified, during the period from 1994 to 2002, if "we was broke," he and other conspirators, including Jones, Wilson, and Thurston, robbed drug dealers who "wasn't amongst us" and split the proceeds (10195-97, 11121-23). Barnett and Powell also testified to committing robberies with Thurston (Dkt.1226:25-26).

14

*Retaliating, and protecting each other, against rival drug gangs.*
During the conspiracy, the conspirators had two major "beefs" with other crews: one with the "One-Five mob," which was run by Tommy Edelin in the 15th Place neighborhood of Southeast, just across Alabama Avenue from Congress Park (Lockhart:282-85; GX 103.1; Capies:5074-75, 5081-82); and one with the 10th Place crew, which operated in the 10th Place/Trenton Place neighborhood of Southeast, two blocks west of Congress Park (Lockhart:288-89; GX 105.1; Crawford:7479-80; Kelliebrew:10133). In late 1993 or early 1994, conspirator Maurice Doleman ("Reecy," "Reecey," "Reesy") was killed after he robbed the girlfriend of a One-Five member; Ball believed that Doleman had been killed by Ronnie Middleton ("Squid"), who was a "hit man" for Edelin (Capies:4927-28, 5080-82, 5088; Pough:11724). In retaliation for Doleman's murder, conspirators committed the following acts of violence: (1) on February 20, 1994, Jones shot Bradley Carter from a car driven by Ball (Dkt.1228:42-43); (2) on October 8, 1997, Thurston and Antonio Roberson ("LT") fired shots at James Faison, who was a close friend of Middleton's, and John Ewing (Dkt.1226:23-25; Capies:5163-69, 6034); and (3) on August 17, 2008, Wilson, Roberson,

15

and Antoine Draine ("Draino," "Drano") killed Middleton and Middleton's "baby mother," Sabrina Bradley (Dkt.1422:5-11; Kelliebrew:10458-61).[10]

The beef with 10th Place began in mid-1996, and resulted in the September 1996 killing of David Scott ("Head"), a friend of the conspirators, by 10th Place crew member James Davis ("Twin"); and in the October 1996 killing of conspirator Darryl Gibson ("Meatball"), who was killed while selling drugs on Savannah Street in a drive-by shooting by 10th Place associate Devar Chandler ("D-Lock") (Capies:4996-97, 5096-97, 5179-86, 5295-5304, 5626; Crawford:7176-77; Barnett:7496, 7603-08, 7611-14; Kelliebrew:10478-83). In retaliation for these killings: (1) in early 1997, Ball, Thurston, Wilson, and Antonio Roberson drove to 10th Place "to try to creep down on them guys," and got into a shoot-out with Steve, Patrick, and Redhead (Capies:5308-11); (2) on January 19, 1998, Antonio Roberson, assisted by Barnett and Capies, killed Chandler (Barnett:7617-35; Capies:5339-5356; Kelliebrew:10483-84); and (3) in mid-1998, Thurston and Roberson shot

---

[10] These killings were the basis for Wilson's two first-degree-murder convictions (Dkt.1191 (Counts 31, 33); 11/28/07 Minute Entry).

16

and wounded 10th Place associate Linwood Carpenter (Capies:5313-18; Kelliebrew:10484-86).

During the period of the 10th Place beef, conspirators no longer sold crack on Savannah Street, but instead congregated in the Circle and in front of the Lincoln, or in the Alley, to make their sales (Capies:5335-38; Kelliebrew:10167-68). Those congregating in the alley played "doors" at this time for safety reasons, i.e., so "no one would be racing out [onto Savannah Street] to try to make the sale" (Capies:5336). Eventually, Ball convened a meeting in the Circle with Steve, Patrick, and other 10th Place representatives, and "squashed" the beef (Kelliebrew:10492-502).

*Defending their turf.* Conspirators would not let an "outsider" sell crack in Congress Park (Browne:1766; see also Powell:12287). To sell there, "you had to really be from the area" (Conner:8342-43). Conner, who was a supplier to the conspirators but lived in Maryland (8160-64, 8181-95, 8220-26, 8280-84), experienced this first hand.[11]   Around

---

[11] Conner grew up in Congress Park but, by 1994 or 1995, had moved to Oxon Hill and begun supplying Congress Park dealers, distributing "whatever people wanted . . . and then leav[ing]" (8075-78, 8097-8100, 8103-06). By late summer 1999, he was living in Suitland (8220-21).

17

September 1999, Conner went to the Circle and began making hand-to-hand crack sales of "[d]imes and twenties" to make "extra money" for a trip to Cancun (8243-44, 8247). Thurston and Daniel Collins were standing with a group of men across the street (8244-47). After Conner had been selling for about 30 minutes, "getting a lot of sales," Collins came over and said Conner "couldn't come around there and take all the money because [Conner] don't be out there with them . . . when they beefing and stuff like that" (8247). Collins also said "they built that strip" (8248). When Collins returned to the other side of the street, Conner continued making sales (8249-50). About 25 minutes later, Ball pulled up and "conversed" with Thurston, Collins, and the other men (8250-51). Ball then came over to Conner and told him he "didn't really have to be out there and that was the way that they made their livelihood" (8252-53). Taking this as "a warning," Conner left (8254).

Similarly, in 1998 or 1999, Powell and Kelliebrew were selling crack in the Circle when they saw two "dudes" they did not recognize selling crack on the other side of the street (12280-82). Powell and Kelliebrew approached the men and told them, "'Y'all can't hustle around here,'" because "it was our neighborhood" (12282-83). When the

men ignored them, Kelliebrew pulled a knife (12283). The confrontation escalated, and ended with Kelliebrew firing a gun at the men (12283-86).[12]

*Identifying themselves as crew members.* A number of conspirators socialized together at clubs, where bands would give them shout-outs for "Congress Park" (Capies:4909-18; Barnett:7572-76, 7579-80, 7584-85; GX 108.14, 108.27, 108.106). Both at the clubs and at their sales venues in Congress Park, conspirators posed for photographs together (id.; see also infra). The FBI seized many such photographs (788), and the government introduced scores of them at trial. In GX 108.95, which was taken in summer 1998 and shows, inter alia, Jones, Wilson, Terrence Cooper, Antonio Roberson, and Antoine Draine, Jones is wearing a headband with the words "Congress Park" printed on it (Capies:5161-63). According to Capies, "that's the headbands they was

_____

[12] Donneatrice Brown, who patrolled Congress Park as a Special Police Officer from 1999 to 2002, was threatened by several conspirators, including Jones, Thurston, and Bell (17698-99). Jones threatened to kill her, telling her and her colleagues, "we'll kill y'all, y'all need to get away from here" (17783-84). Thurston threatened to kill Brown "many times" (17781-82). Bell threatened Brown "[a]ll over the property," making hand gestures at her as if shooting a gun (17789-90).

wearing" at the time to identify themselves as Congress Park Crew members: "[T]hat's how you claim your crew. You got your headband on[,] Congress Park Crew." (6527-28.) Barnett, too, had a "Congress Park headband" (8071).

*Protecting each other against law enforcement, and threatening harm against witnesses.* During the period from 1992 to 2001, Capies and his fellow conspirators frequently would warn each other about police "jump-outs" (5689-95). In August 2002, after Samuels killed Jamel Sills ("Black"),[13] Ball pressured two 14-year-old girls who had witnessed the murder, Shenay Glenn and Tanay Gross (Glenn:9733, 9746-50, 9753, 9756-57; Gross:9873, 9881-84), not to talk; Ball spoke to the girls about the murder three times, asking them whether they had seen it and telling them, "'[D]on't talk to nobody'" (Ryals:10006-08, 10014-17, 10152). When Ball said that, Glenn and Gross seemed "scared" (Ryals:10021). Kelliebrew, too, had witnessed Samuels's killing of Sills (infra n.13). When Kelliebrew was incarcerated shortly

---

[13] The jury hung on the murder count related to this killing, and Samuels later pleaded guilty to manslaughter while armed (Dkt.1209). His proffer (Dkt.1208) corroborated the testimony of Kelliebrew (10316-53), Pough (11794-804), and Powell (12357-78) about the murder.

thereafter (10585), Ball warned him over the telephone: "'I hope you're not doing that Munya shit'", i.e., "turn[ing] state's" evidence (10405).[14]

In September 2003, Pough spent a lot of time with Ball and Antonio Roberson after Roberson had been released into a halfway house (11773-74). One day, Roberson and Ball drove Pough to a drug test (11774-75). On the way there, Ball mentioned that Capies had been calling, saying that the government was going to be bringing a conspiracy case (11785-87). Ball told Roberson that Roberson "needed to hurry up and get out [of] the halfway house so he could start getting rid of some of the guys that [Ball] thought was going to flip" (11786). Ball speculated that Thurston and the three Bell brothers would be "the first to flip" (11787).

## 2.  Leadership

Ball was "a leader" of the conspiracy: "What he say goes" (Capies:5175-76). As Pough put it, Ball "ran Congress Park"; "whatever he wanted somebody to do, they'd do. If something was going down,

---

[14] Later, Kelliebrew warned Ball that the police were "coming for him" and that "dudes was cooperating on him" (10406-08). Ball responded: "'You letting them people put words in your mouth, you bitch ass nigga, I hope you die. I'll blow your head off when I see you.'" (10408.)

they'd go to Antwuan" (11662-63; see also Powell:12217 (Ball "had the most respect throughout the hood. . . . He was like the man"); Conner:8146-47 (Ball "demanded respect")). Ball demonstrated his leadership by maintaining unity within, and exerting control over, the organization.

*Maintaining Unity.* Ball resolved a number of disputes involving conspirators. For instance, when Kelliebrew and Powell robbed a drug dealer named Harry Settles of his money and coat, Ball made them give the coat back so that Settles's girlfriend would not call the police (Kelliebrew:10192-95; Powell:12316-20). When Kelliebrew had his stash stolen out of a car and was looking for a gun to get revenge, Ball told him, "'[C]hill out, Shorty. Let me get your shit back'"; shortly thereafter, Antonio Roberson and Terrence Cooper returned the majority of the crack that had been stolen (10198-99). And, when Phillip Wallace robbed Powell of $300 after Powell had sold crack fronted to him by Ball, Ball arrived in the Circle and told Wallace to give Powell's money back (12255-59). Ball said, "'Phil, you got to give him that shit back because that's my shit'" (12258). Wallace gave

22

Powell $100; Powell protested that Wallace had taken $300, but Ball told Powell, "'Leave it alone,'" "[s]o [Powell] left it alone" (12258-59).

*Exerting Control.* Crawford met Ball "[m]aybe in 2000" (7136-37). Thereafter, Crawford regularly spent time with Ball in "Boat Alley" -- trying to get to know him "business-wise" because of "the respect that [Ball] carried around there" -- and sold him crack four or five times, in amounts ranging from 62 to 125 grams (7138-44). When Crawford tried to get Ball to buy greater quantities, suggesting that, "if [Ball] can do better, we can have the park [be] our park," Ball declined (7145). Ball explained: "[H]e got the alley, that's his spot, that's his strip" (7145).

On January 10, 2000, Capies was in the living room of Wilson's apartment with Wilson, Phillip Wallace, and Ball (5451-54, 5471-75). Capies and Wilson were playing a video game and Wallace was twisting up marijuana; Ball was standing behind them, "messing with" Capies's and Wilson's two handguns, which were on a table (5454-58). When Capies heard swearing and saw Wilson and Wallace rush from the room, he turned to find Ball holding the two guns (5459-60). Ball told Capies to get up, said, "you think you got balls?," and then "smacked" Capies in the mouth with one of the guns (5460-61). Capies asked Ball

23

what Ball was doing, and Ball replied: "'Oh, you know what's going on. Y'all supposed to be killing me'" (5461). Ball then took Capies to the bedroom, where he stole crack and money from Wilson's dresser; repeatedly pistol-whipped and kicked Capies; and pointed both guns at Capies's face before leaving the apartment (5461-70). During the assault, Ball knocked out one of Capies's teeth (5452).

Both Crawford and Marsh saw Ball after this incident. Crawford pulled up in his car to find Ball standing on the steps of Wilson's building[15] with a "disturbed, . . . angry look" on his face (7156-58). Ball had his hands in his pockets, and Crawford could see the butt of a gun in Ball's right pocket (7158-59). When Crawford asked Ball what was up, Ball said he had "'just had to fuck these young-uns up around here'" because "'they think they going to take over the strip'" (7158). Ball specified that "'Wop and Munya, they supposed to be planning on killing me,'" and that he "'just had to knock this nigga Munya's teeth out his mouth'" (7158-59). Marsh, too, had a conversation with Ball in which Ball appeared "shooken up" and said he had confronted Capies

---

[15] Wilson lived at 1313 Congress Street in the old rental-office building (Lockhart:266-68; Capies:5451; Barnett:7586-87; GX 101.1, 105.1).

and Wilson about conspiring to kill him (9204-05, 9210).  Ball explained that he had taken a pistol from a table and "smacked up" Capies with it; that Wilson had jumped out a window; and that Ball had taken money, drugs, and the pistol from the apartment (9210-11).

### C.    The Controlled Buys

The government presented both surveillance and testimonial evidence of over 20 of the crack sales by the defendants and others (Lockhart:375-76, 385, 390-409, 414-34, 515-19, 545-55; Wood:888-93, 901-04, 920-34, 944-52; Parson:1879-87, 1901-05, 1908-12, 1919-37, 1950-62, 1965-72, 1972-79; White 2496-2500, 2516-38, 2546-71; Campbell 3038-48, 3053-56), including the sales for which appellants were convicted:  Jones's August 30, 2000, sale of 1.5 grams of crack, and his January 9, 2001, sale of .27 grams of crack (Dkt.1191:29; Dkt.1246:9); Thurston's October 17, 2000, sale of 1.5 grams of crack, and his November 18, 2003, sale of .16 grams of crack (Dkt.1191:26; Dkt.1232:5-6; Dang:4004, 4018); and Ball's July 26, 2001, sale of 11.6 grams of crack (Dkt.1191:6; Dkt.1228:11).  A number of the controlled buys about which the government presented evidence involved cooperation among the conspirators (see, e.g., 1/24/01 -- Wilson and

25

Phillip Wallace working together (Lockhart:425-26; Wood:885-93); 3/20/01 -- Gerald Bailey obtaining crack from Bell's van (Lockhart:430-31; Parson:1924-35); 11/18/03 -- Thurston working with Bell and Marguita Giles (Dkt.1232:6; Walls:4440-50; Guice:4467-73; Anderson:4485-94; Eppinger:4509-13)).

## II. Corroborating Information Presented to the Court at Sentencing

### A. The Guilty Pleas

Joseph Langley pleaded guilty to narcotics conspiracy, acknowledged that he was accountable for the distribution of at least 500 grams of crack, and identified the conspirators to whom he wholesaled crack as including Jones, Samuels, Season Wood, Keith Barnett, Raymond Bell, Kairi Kelliebrew, Lucious Fowler, and Antonio Roberson (05-cr-416, Dkt.2:1, Dkt.6:1-2). Burke Johnson pleaded guilty to narcotics conspiracy, acknowledged that he was accountable for the distribution of at least 1.5 kilograms of crack, and identified the conspirators to whom he wholesaled crack as including Ball, Thurston, Wilson, Gregory and Jasmine Bell, Joseph Langley, Newett Ford, Phillip Wallace, and Mary McClendon (05-cr-328, Dkt.2:1, Dkt.6:3, Dkt.7:2). Mary McClendon pleaded guilty to narcotics conspiracy,

acknowledged that she was accountable for the distribution of at least 500 grams of crack, and admitted, inter alia, to brokering crack sales on behalf of Bell, Wilson, Jacques Powell, Marcus Smith, Burke Johnson, Gerald Bailey, and others  (05-cr-307, Dkt.2:1, Dkt.6:2, Dkt.9:1-2).

Arthur Handon pleaded guilty to RICO conspiracy involving appellants and the other indicted defendants, acknowledged that he was accountable for the distribution of at least 1.5 kilograms of crack, and admitted to obtaining crack supplies from, and/or supplying crack to, inter alia, Thurston, Bell, Wilson, Burke Johnson, Joseph Langley, Daniel Collins, Raymond Bell, and Phillip Wallace -- including, on one occasion, fronting two eight-balls of crack to Thurston (Dkt.06-cr-258, Dkt.2:1-3, Dkt.6:1-2, Dkt.7:4-7).  Raymond Bell, Gerald Bailey, Jasmine Bell, Marcus Smith, Phillip Wallace, Lucious Fowler, and Daniel Collins each pleaded guilty to RICO conspiracy involving appellants and the other indicted defendants, and acknowledged that he was accountable for the distribution of at least 1.5 kilograms of crack; the first six  of these defendants also admitted to often working together in smaller groups to sell crack through, inter alia, the "doors" method of sharing sales (Dkt.329:31-36; Dkt.392:1-2, Dkt.393:3; Dkt.395:1-2, Dkt.396:2;

27

Dkt.398:1-2, Dkt.399:2; Dkt.401:1-2, Dkt.402:2; Dkt.404:1-2, Dkt.405:2; Dkt.407:1-2, Dkt.408:2; Dkt.512:1-2).

### B.    Ball's Sworn Statements

During his February 18-19, 2004, testimony in the Kevin Gray II case, Ball was asked whether Keith McGill sold cocaine in Congress Park. Ball responded: "Well, no. He had to hang in Congress Park in order to sell in Congress Park, and he didn't hang in Congress Park." (Dkt.1228:32.) Ball later reiterated that McGill did not sell cocaine in Congress Park: "No. That's not -- that's our -- that's where we from, Congress Park" (id.). Throughout his two days of testimony, at a time when Kelliebrew, Capies, and Barnett were known to be cooperating with the government, Ball wore his "Omerta" sweatshirt (id. at 33, 41). Omerta was a code that advocated doing harm to "snitches" (id.; Lockhart:9598-9600, 9624-34).

### C.    The Membership List

The FBI found in Raymond Bell's bedroom a one-page handwritten roster of names entitled "Congress Park Crew" (Dkt.1228:33; see also Stallings:816-22, 825-28, 839-51). The roster included the nicknames of each of the six defendants, "Bunga," "Ant,"

"Dazz," "Joe-Joe," "Don," and "Wop," as well as many other names of persons the government's witnesses identified as participants in the conspiracy, including:  "Aman" (Aman Ball), "Jazz," (Jasmine Bell), "Phil" (Phillip Wallace), "K-Bey" (Kairi Kelliebrew), "LT" (Antonio Roberson), "Monya" (Capies), "Boobie" (Andre Wilson), "Black" (Jamel Sills), "J.T." (Jacques Powell), "DC" (Daniel Collins), "Keith - Kevin" (Keith and Kevin Barnett), "Marcus" (Marcus Smith), "Reesy" (Maurice Doleman), "Meat-ball" (Darryl Gibson), and "Head" (David Scott) (Dkt.1228 Ex. U, lines 2, 4, 6, 8, 10, 14-16).[16]

## III.  The Sentencing Proceedings

In its presentence investigation reports ("PSRs"), the probation office concluded that each appellant's relevant conduct involved conspiring with others to distribute at least 1.5 kilograms of crack in Congress Park (Jones PSR¶¶20, 56; Thurston PSR¶¶19, 69; Ball PSR¶¶18, 90).  Taking into account certain offense-level adjustments, and each appellant's criminal history category, the probation office

---

[16] The roster appears to date from between October 1996 and March 2001:  Several names are annotated "RIP," including that of "Meatball," who was killed October 1996 (Barnett:7603-04); there is no such annotation for "Boobie," who was killed March 2001 (Capies:4931-32).

calculated appellants' recommended Guidelines sentences as follows: Jones, 360 months' to life imprisonment (PSR¶114); Thurston, 324 to 405 months' imprisonment (PSR¶124); and Ball, 480 months' imprisonment (PSR¶141-42).

The government asked that Jones and Thurston receive sentences at the low ends of these ranges, and that Ball receive the recommended sentence of 480 months' imprisonment (Dkt.1246:7-8; Dtk.1226:7; Dtk. 1228:7-8). In its sentencing memoranda, the government described in exhaustive detail the evidence that: appellants participated in a "chain conspiracy" to distribute narcotics in Congress Park; the conspiracy resulted in the distribution of well over 1.5 kilograms of crack, which was attributable to appellants under USSG §1B1.3(a)(2);[17] and appellants' relevant conduct also included gun possession (all three), obstruction of justice (Jones and Ball), and leading the conspiracy (Ball) (Dkt.1246:7-22; Dkt.1226:7-19; Dkt.1228:7-35). The government argued that it had proved the conduct in question by a preponderance of the

---

[17] The government also showed that Jones himself had distributed at least 150 grams of crack, and that both Thurston and Ball themselves had distributed at least 1.5 kilograms of crack (Dkt.1246 at 9-13; Dkt.1226 at 9-18; Dkt.1228 at 10-20).

evidence, and that the proposed Guidelines ranges not only were correct (id.) but also were appropriate in light of the other 18 U.S.C. § 3553(a) sentencing factors (Dkt.1246:22, 26; Dkt.1226:20, 27; Dkt.1228:36, 45). In this connection, the government described the substantial evidence that appellants had committed a host of crimes not taken into account by the Guidelines calculations, including: Jones's attempted murder of Bradley Carter, stabbing of Michael Smallwood, and armed robbery of Robert Crawford (Dkt.1246:22-26); Thurston's felony murder of Reginald Reid, three attempted murders, and many armed robberies (Dkt.1226:20-26); and Ball's murders of Trevon Shaw and Troy Lewis, attempted murder of Bradley Carter, and various acts of perjury and witness intimidation (Dkt.1228:35-44).

Appellants objected to consideration of their conspiracy conduct and any other conduct not found by the jury, arguing that their offense levels should be determined solely on the basis of the quantities of drugs they distributed in their crimes of conviction (Dkt.1250:16; Dkt.1229:1-2 and n.2; Dkt.1252:20). In support of this argument, appellants claimed primarily that the government's witnesses were

31

unreliable.[18] Jones's and Ball's claims of unreliability consisted mainly of attacks on certain witnesses' general credibility, and of attacks on the testimony about Jones's and Ball's acts of violence (Dkt.1250:7-14; Dkt.1252:3-13).    Thurston's reliability challenges focused on the testimony about the amount of drugs he personally distributed and the testimony about his acts of violence (Dkt.1229:4-12, 19-22).

### A.    Jones's Hearing

The court began the May 1, 2008, sentencing hearing by ruling upon the parties' objections to the PSR (5/1/08:2-26).    In addressing Jones's objection to the drug amount attributed to him, the court first observed that Jones could be held accountable for 1.5 kilograms of crack "only if reliable information shows by a preponderance of the evidence that Mr. Jones joined in [the narcotics] conspiracy, that the scope of what the defendant agreed to included cooperating and distributing crack[,] and that [the] volume of crack sales among all the conspirators

---

[18] Jones acknowledged that a sentencing court has "license" to consider acquitted conduct (Dkt.1250:14).    By contrast, Thurston and Ball argued that consideration of acquitted conduct would violate the Sixth Amendment, and asked that their relevant conduct be found by clear and convincing evidence (Dkt.1229 at 2-3; Dkt.1231 at 1-2; Dkt.1426 at 2; 3/17/11:22).

32

exceeded 1.5 kilograms and was reasonably foreseeable" (id. at 20). The court then observed that the government had presented both direct and circumstantial evidence of Jones's "knowing membership" in the narcotics conspiracy (id. at 20-21), "includ[ing]":

- the testimony of "countless witnesses" who saw Jones associating with the charged conspirators in Congress Park, as corroborated by "the countless photographs showing Mr. Jones and the others together in Congress Park venues";

- the testimony of Larry Browne, Gail Parson, Bobby Capies, Keith Barnett, and Kairi Kelliebrew that they "saw Jones and charged co-conspirators selling crack in Congress Park during the charged period";

- the testimony of Browne, Capies, and Cedric Conner that they saw Jones "obtain supplies of crack for resale";

- the testimony of Barnett and Capies that they saw Jones "cooperate with other charged conspirators in selling crack in Congress Park during the charged period by participating in the unos, dos[], tres method of sharing in sales"; and

- Conner's testimony that Daniel Collins told him he "couldn't sell [crack] at their sale locations in Congress Park," and that Ball "reinforced that message by [telling Conner] that this group makes its livelihood by selling there." (Id. at 21-22.)

Crediting the government's witnesses "as to those details," the court found "by a preponderance of the evidence" that: (1) "a conspiracy to distribute crack in the Congress Park area did exist among the defendant and others, including the eight others convicted of conspiracy

33

by plea or after trial, and Antwuan Ball, David Wilson, Gregory Bell, Desmond Thurston, and Dominic Samuels"; and (2) "the scope of what Mr. Jones agreed to do included buying supplies of crack and selling it or helping others to resell it in Congress Park" (id. at 22). Consistent with these findings, the court also determined that Jones's conspiracy conduct was "conduct rel[evant] to his counts of conviction" (id. at 23).

Turning to the foreseeability determination, the court first found that Jones personally had distributed "roughly 400 grams" of crack, and that he had been "involved with at least another 100 grams" (5/1/08:22-23). The court relied for this finding on the quantity estimates provided by Browne, Capies, Conner, and Kelliebrew (as described in the government's sentencing memorandum (Dkt.1246:10-13)), and on Capies's testimony that he saw Jones buying and selling crack in Congress Park during the period from 1992 to 2001, as corroborated by the testimony of Browne, Conner, and Kelliebrew that they, too, saw Jones buying and selling within this timeframe (id. at 22-23). The court noted, however, that the government's itemization of the amounts handled by both Jones and his co-conspirators "ended short of the 1.5

34

kilograms" (id. at 23).  Accordingly, the court found that only an amount "exceed[ing] 500 grams" was reasonable foreseeable to Jones (id. at 23).

The court resolved the parties' remaining objections to the PSR by determining that (1) Jones was subject to a two-level gun enhancement for his 1994 shooting of Bradley Carter; (2) "err[ing] on the side of lenity," Jones was not subject to an enhancement for obstruction of justice; and (3) Jones qualified as a career offender given his felony convictions of August 1990 and June 2000 (5/1/08:23-26).  The court calculated Jones's base-offense level as 34, *see* USSG 2D1.1(c)(3) (2007); his total-offense level as 36; his criminal history category as VI, *see* USSG §4B1.1(b); and his Guidelines range as 324 to 405 months' imprisonment (id. at 25-26, 50).

After the parties' allocutions (5/1/08:26-45), the court addressed each of the § 3553(a) sentencing factors (id. at 47-52).  The court observed that Jones deserved "substantial punishment" for his "hustling crack with many others in a neighborhood held hostage to the violence and addiction [which Jones's] group felt free to continue to line [its] own pockets to live the fast life"; the court also found "quite troubling" Jones's "sporadic acts of violence" (id. at 50-51).  The court

35

considered the following circumstances, however, to merit "mitigation": the "unfair disparity between [Guidelines] punishments for crack and powder cocaine"; the nature and timing of Jones's prior felonies, which the court viewed as meriting a lower criminal history category than the "automatic" category VI mandated by the career-offender guideline; Jones's history and characteristics, including his having been unsupervised much of his childhood and his recent attempt to "settle down" by getting married, starting a family, and obtaining lawful employment for "a fairly good clip"; and the "gross disparity" between the applicable Guidelines range of 324 to 405 months and "the far lower range [that would be] applicable solely to the 2 grams of crack the jury found that you sold" (id. at 47-50). Considering all these circumstances, the court determined that a sentence in the range prescribed for an offense level of 31 and a criminal history category of V (168 to 210 months' imprisonment), see USSG Ch. 5 Pt. A (Sentencing Table) (2007), would be "sufficient but not greater than necessary" to achieve § 3553(a)(2)'s sentencing goals, and imposed concurrent sentences of 180 months' imprisonment on each of Jones's convictions (id. at 52).[19]

---

[19] At Bell's May 8, 2008, sentencing, the court found that Bell
(continued . . . )

36

## B.     Thurston's Hearing

The court calculated Thurston's total offense level as 36, finding that 1.5 kilograms of crack was attributable to him as relevant conduct; his criminal history category as IV; and his Guidelines range as 262 to 327 months' imprisonment (10/29/10:22, 25).     In support of its attribution determination, the court found, "by clear and convincing evidence," that:     (1) "[t]here was a common agreement and understanding among the defendant and over a dozen named conspirators" to "engage in a concerted effort to make money by selling crack[,] and to build their market for crack sales[,] in Congress Park"; (2) the concerted effort began in 1992 and lasted "for over 10 years"; (3) Thurston made the sales of which he was convicted "as part of the same common understanding and agreement"; and (4) the amount of crack distributed "in furtherance of the agreement exceeded 1.5 kilograms and was reasonably foreseeable to Mr. Thurston" (id. at 18,

_____

(. . . continued)

personally had distributed over 1.5 kilograms of crack as a member of the Congress Park conspiracy (5/8/08:18).

37

23).    The court based these findings on a wide range of evidence it

explicitly found to be "reliable" (id. at 18), including:

- the testimony of "countless" witnesses, as corroborated by "countless" photographs, that Thurston associated in Congress Park with many of the named conspirators "during the charged period";

- Capies's testimony that he saw Thurston (a) sell "dimes" of crack "almost every day over several years";[20] (b) sell crack "along with other named conspirators"; (c) obtain wholesale amounts of crack "numerous times from Boy-Boy [Bell]"; and (d) buy crack "from Joe Langley, who supplied wholesale amounts";

- Parson's testimony that Thurston sold her crack "many times";[21]

- Edward Martin's testimony that he bought crack from Thurston "countless times over many years, in amounts initially costing $50 and then increasing to $100 and $200," and that Martin "once owed [Thurston] $2,500" for crack;

- Martin's testimony that Thurston "brought in [Thurston's] brother[ ,Phillip Wallace,] from whom Martin bought crack a number of times";

[20] Capies testified that, during the period "[a]round . . . 1992 to 1996," when he saw Thurston selling dimes, it would be "[j]ust about every day" (4805, 4922-24).    The court disagreed with Thurston's assertion (Dkt.1229:5-6) that this testimony was unreliable because both Capies and Thurston were incarcerated for portions of the 1992-1996 period; as the court explained, it "took Capies's overall testimony to show that[,] when he and the defendant were together in Congress Park, he saw the defendant selling dimes of crack almost daily" (10/29/10:19).

[21] The court found this testimony "credible," "even if the exact number of times was undermined on cross-examination" (10/29/10:19).

- Conner's testimony that he sold crack to Thurston, that he saw Thurston selling crack, and that some of the conspirators prevented Conner from selling in the Circle because that was where they "made their livelihood";

- the testimony of Capies, Barnett, and Jacques Powell that Thurston and other named conspirators "cooperated with each other in selling crack in Congress Park during the charged period by participating in the uno, dos, tres, or [']doors[',] method of sharing sales";

- the testimony of Capies, Marilyn Proctor, Barnett, Kelliebrew, Conner, and Powell establishing that Gregory Bell personally distributed at least 1.5 kilograms of crack in Congress Park during the period from roughly 1993 to 2003;

- Conner's testimony that he supplied the conspiracy "an estimated quantity in excess of 1 kilogram between 1999 and 2000";

- Capies's testimony that he bought over 500 grams of crack from 1992 to 2001 -- separate from the amounts supplied by Conner;

- the proffers of Joe Langley and Burke Johnson, adopted "under oath" in their plea proceedings, that, during the charged conspiracy period, they distributed wholesale quantities of crack in Congress Park, including to many of the named conspirators; and that Langley and Johnson were accountable, respectively, for distributing between 500 and 1.5 kilograms, and more than 1.5 kilograms, of crack;

- Johnson's proffer that Thurston was among the conspirators who purchased wholesale quantities of crack from him;

- the guilty pleas of Gerald Bailey, Jasmine Bell, Raymond Bell, Marcus Smith, Arthur Handon, Lucious Fowler, Phillip Wallace, and Daniel Collins, all of whom pleaded guilty to conspiring to distribute crack with Thurston and other named conspirators, and only one of whom (Handon) had a cooperation agreement; and

- the plea proffers, adopted under oath, of these eight defendants, all of whom admitted that the conspirators used the "doors" method of sharing sales, and all of whom admitted that "at least 1.5 kilograms of crack" was distributed in furtherance of the conspiracy. (Id. at 18-22.)

In addressing the § 3553(a) factors, the court noted that Thurston deserved "substantial punishment" in light of his "hustling crack" "[f]or many years" with "many others" to "line[] [their] own pockets"; the sustained, damaging effect this concerted activity had on the residents of Congress Park; Thurston's "long history in the criminal justice system," which should have made him "kn[o]w better"; and his "repeated acts of violence and gun play" (10/29/10:32-34). The court concluded, however, that imposing a sentence within the recommended Guidelines range would not "honor th[e] command" of § 3553(a) to impose a sentence "sufficient but not greater than necessary" to achieve the applicable sentencing goals (id. at 35). As the court explained, a number of factors exerted "downward influence[]" on the appropriate sentence, including: the fact that Thurston grew up with a learning disorder "in a community starved for helpful resources and productive outlets for children"; the fact that, had Thurston been sentenced one day later, his criminal history category would have been III rather than

40

IV (see USSG App. C, Amend. 742 (effective Nov. 1, 2010) (eliminating "recency" provision of §4A1.1)); the "gross disparity" between the applicable Guidelines range and the "far lower" range that corresponded solely to Thurston's offenses of conviction; and the "unduly disparate and still too harsh" Guidelines crack punishments (id. at 33-35).  Accordingly, the court determined that Thurston's sentence should fall within the range prescribed by an offense level 33 and a criminal history category III (168 to 210 months' imprisonment), USSG Ch. 5 Pt. A (Sentencing Table) (2009), and, after granting a 12-month reduction to remedy any prejudice from the delay in sentencing, imposed concurrent sentences of 194 months' imprisonment on each of his convictions (id. at 36-37).

## C.    Ball's Hearing

The court calculated Ball's base-offense level as 34, finding that 1.5 kilograms of crack was attributable to him as relevant conduct;[22] his total-offense level as 40, finding that he was subject to two- and four-

---

[22] When Ball was sentenced on March 17, 2011, the base-offense level for 1.5 kilograms of crack had been reduced to 34.  USSG App. C, Amend. 748 (effective Nov. 1, 2010).

level enhancements, respectively, for gun possession and for his leadership role in a criminal activity involving five or more participants; his criminal history category as I; and his Guidelines range as 292 to 365 months' imprisonment (3/17/11:37-39, 42, 68). In support of its attribution determination, the court found, "by clear and convincing evidence," that Ball agreed with "over a dozen named conspirators" to "engage in a concerted effort to make money by selling crack and to build and protect their market for crack sales in designated locations of Congress Park"; during the over-10-year period of their concerted activity, the conspirators distributed more than 1.5 kilograms of crack in furtherance of that agreement, and that amount was reasonably foreseeable to Ball; and Ball made the sale of which he was convicted "as part of the same . . . agreement" (id. at 31). The court relied for these findings on much of the same evidence -- as it related to Ball -- that the court had cited in Thurston's hearing (id. at 31-32, 35-37); in addition, the court relied on the following evidence, which it "credit[ed] as to these details":

- Season Wood's testimony that Ball sold him a half-ounce of crack on July 26, 2001;

- Robert Crawford's testimony that, between 1999 and 2001, he sold crack to Ball through an intermediary, and also made four or five sales of 62 to 125 grams of crack directly to Ball;

- Parson's testimony that she bought "some dimes" of crack from Ball, and once tried to cook his powder cocaine into crack;

- Capies' testimony that (a) between 1992 and 1996, he "regularly" bought half-ounce quantities of crack from Ball and saw Ball "hustling" crack in the Circle; (b) two days after Ball showed Capies a half kilogram of powder cocaine, saying he intended to cook it into crack, Capies bought a half ounce of crack from Ball; (c) in 1997 or 1998, Capies saw Ball "front" crack to four different individuals; (d) in 2001, after pistol-whipping Capies in Wilson's apartment, Ball stole two ounces of crack from the apartment;

- Steven Marsh's testimony that Ball sold him crack "a couple times," that he and Ball sold each other supplies of powder cocaine, and that Marsh saw Ball cooking powder cocaine into 50 to 60 grams of crack "on two occasions"; and

- Kelliebrew's testimony that he saw Ball sell crack in the family's home; when Kelliebrew first began selling crack in Congress Park in 1994 and 1995, he bought some of it from Ball in quarter-ounce quantities, and Ball sometimes fronted it to him; and, in 2001, Ball fronted him four ounces of crack. (Id. at 32-34.)[23]

Addressing Ball's "challenges to these witnesses' credibility," the court

explained why it disagreed with those challenges as to the testimony of

---

[23] The court further found that Ball personally had distributed 1.5 kilograms of crack cocaine during the period from "roughly 1992 to just 2001" (3/17/11:34).

Crawford[24] and Marsh;[25] the court further observed that, even if it were to give "full effect" to Ball's claims of impeachment, those claims could not undermine "the mutually corroborative evidence" of the conspiracy that the court had identified and credited (id. at 34-35).

In support of its leadership finding, the court cited:

---

[24] Ball had argued that Crawford could not have seen him almost every day after they met in "late 1999 or early 2000" (as Ball described Crawford's testimony), given Crawford's supposed acknowledgment on cross-examination that, during the period from 1998 through 2000, Crawford spent almost every moment of every day in Maryland with Jon Proctor (Dkt.1252:10-11). In response, the court noted that (1) Crawford actually testified that he spent most days, not every day, with Proctor, and also that he was unsure whether that pattern continued into 2000; and (2) Crawford actually testified that he met Ball in 2000 (3/17/11:34; see:7137, 7312). Thus, the court concluded, Ball was incorrect in asserting that Crawford's description of his spending time with Ball was "impossible" (id.).

[25] Marsh testified that, in 1999, he learned that he had been indicted for narcotics conspiracy in the Eastern District of Virginia, at which point he fled to Maryland and then began staying with a friend in Congress Park, where he met Ball (9151, 9164-67, 9176, 9317-21). Ball had argued that this testimony could not be true, given Marsh's acknowledgment on cross-examination that he was not indicted in Virginia until March 29, 2001 (Dkt.1252:12-13). In response, the court noted that Marsh had clarified that "his associates had been indicted in 1999," causing him to "assum[e] that he would also be indicted" (3/17/11:34; see 9321-25, 9407-14). Thus, the court concluded, "[t]he fact that [Marsh] was not actually indicted until 2001 does not prove that Marsh could not believe that he would be indicted as early as 1999" (3/17/11:34-35).

44

- the testimony of Crawford and Marsh that Ball said he had pistol-whipped Capies "to keep Capies and Wilson from taking away [Ball's] control of the crack sales in the strip";

- Conner's testimony that, when Thurston and Daniel Collins failed in their attempt to stop Conner from selling crack in their area, they appealed to Ball, "whose warning to Conner succeeded";

- Powell's testimony that, when he complained to Ball about Phillip Wallace having robbed him, Ball directed Wallace to give the money back and Wallace complied; and

- the testimony of "numerous witnesses" that Ball claimed leadership of the conspiracy, including Capies's testimony that, "'What he says goes'"; Crawford's testimony that Ball had "a lot of respect in the alley from a lot of the young guys"; and Robert Pough's testimony that, "'If something was going down, they would go to Antwuan. He was in charge.'" (3/17/11:39-40.)

After calculating Ball's recommended Guidelines sentence and hearing allocution, the court addressed the § 3553(a) factors. The court noted that Ball had sold Season Wood 11 grams of crack in 2001, but that Ball had done "so much more than that, both before and after" (3/17/11:66). Despite having seen how crack addiction ravaged his own family, he had chosen at an adult age to lead a narcotics conspiracy that "spread[] freely" that same "poison . . . on the streets of [his] community" (id. at 67). In the process, he had "show[n] no respect for human life" and had "not hesitate[d] to use violence" (id.). Even after he ostensibly had begun helping the community, he had, in 2001, sold

45

crack to Wood, stolen Wilson's crack, and "viciously pistol-whipped Bobby Capies [to deter him from] try[ing] to take over [Ball's] crack market"; in 2002, "pressured teenaged girls not to tell anyone about the murder that they saw Dominic Samuel[s] . . . commit[]," one Samuels later "admit[ted] that he committed"; in 2003, "testified in a grand jury that [he did not] believe in reporting crimes, even murders"; and, in 2004, "imposed" his "Omerta message" during his testimony in the Kevin Gray case (id. at 67-68).

The court nevertheless determined that a Guidelines sentence would be inappropriate in light of the uneven crack-powder ratio and the need to avoid an unwarranted disparity between Ball's sentence and those of his co-conspirators (3/17/11:68-70). The court imposed a sentence of 225 months' imprisonment, which included a 15-month reduction to remedy any prejudice from the delay in sentencing, and gave Ball credit for time served since his April 2004 arrest on the Trevon Shaw murder charge (id. at 71-72; see also Dkt.1189:2).[26]

---

[26] The court ended each appellant's hearing by confirming that there was nothing else the parties wished to address (5/1/08:54; 10/29/10:39-40; 3/17/11:73).

46

## SUMMARY OF ARGUMENT

The court did not violate appellants' Sixth Amendment rights by considering their acquitted conspiracy conduct when calculating their advisory guidelines ranges, where the court found the conduct proved by at least a preponderance of the evidence and imposed sentences within the U.S. Code maximum for appellants' crimes of conviction. Moreover, because the Supreme Court has construed the Sentencing Reform Act to authorize consideration of acquitted conduct in sentencing, the relevant-conduct guideline is not ultra vires.

Appellants' sentences are procedurally and substantively reasonable. The court did not clearly err in finding that they participated in the charged conspiracy and attributing to them the reasonably foreseeable conduct of their co-conspirators in furtherance of that conspiracy. Further, appellants have failed to rebut the strong presumption that their below-Guidelines sentences were substantively reasonable.

Even assuming there is a right to speedy sentencing, the delays in sentencing Thurston and Ball do not require a greater remedy than that the court provided -- reducing their sentences by 12 and 15 months,

47

respectively -- where the delays were not the result of prosecutorial misconduct and Thurston and Ball have failed to demonstrate any meaningful prejudice. Jones's sentencing was not delayed.

## ARGUMENT

### I.    The Court Did Not Violate Appellants' Sixth Amendment Jury-Trial Right by Considering their Acquitted Conduct at Sentencing.

Appellants argue (9-45) that the court violated their "Sixth Amendment right to trial by jury" by sentencing them, in part, on the basis of the narcotics-conspiracy conduct of which they were acquitted. Appellants further argue (45-51) that, even if considering acquitted conduct at sentencing generally is permissible, the court's doing so here

violated their Sixth Amendment rights on an "as-applied" theory.[27]
Appellants are incorrect on both scores.[28]

## A.   Legal Principles

### 1.   *Apprendi* and Its Progeny

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme
Court construed the Sixth Amendment to require that, "[o]ther than the
fact of a prior conviction, any fact that increases the penalty for a crime
beyond the prescribed statutory maximum must be submitted to a jury,
and proved beyond a reasonable doubt." *Id.* at 490.[29]  In *Blakely v.*

---

[27] Appellants have not raised, and therefore have abandoned, see Fed.
R. App. P. 28(a)(9), any claim that, even if their sentences conformed to
the Sixth Amendment, the court violated their Fifth Amendment due-
process rights by finding their conspiracy conduct under a standard of
proof less stringent than proof beyond a reasonable doubt.  Jones also
waived any such claim (infra n.28).  In any event, such a claim is
foreclosed by *United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007).

[28] Jones waived any Sixth Amendment challenge by acknowledging at
sentencing that the court "can consider acquitted and uncharged and
alleged misconduct," and that the court "can find [such conduct] by a
lower standard than the jury did" (5/1/08:3, 5; see also supra n.18).  He
may not take a contradictory position on appeal.  *See United States v.
Harrison*, 103 F.3d 986, 992 (D.C. Cir. 1997).

[29] *Apprendi* emphasized that "nothing in [the Sixth Amendment's]
history suggests that it is impermissible for judges to exercise discretion
-- taking into account various factors relating both to offense and
(continued . . . )

49

*Washington*, 542 U.S. 296 (2004), the Court clarified that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303 (emphasis omitted); *id.* at 299-300, 303-05 (invalidating determinate sentencing scheme under which, notwithstanding higher statutory maxima, judges were forbidden to sentence above prescribed "standard" ranges unless they found aggravating facts not found by jury).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court assessed the Federal Sentencing Guidelines in light of *Apprendi* and *Blakely*. *Booker* consisted of two separate majority opinions. In the first, "substantive" opinion, the Court held that the Guidelines violated the Sixth Amendment because, like the Washington scheme at issue in *Blakely*, they were "mandatory," and they generally did not permit judges to sentence above the range corresponding to the base-offense level for the crime of conviction -- regardless of the applicable statutory

---

(. . . continued)

offender -- in imposing a judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original).

maximum -- unless the judges found additional facts. *Id.* at 233-35, 243-44. The Court emphasized in reaching this conclusion that:

> If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges . . . . For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

543 U.S. at 233 (internal citations omitted).

In the second, "remedial" opinion, the Court corrected the constitutional infirmity by excising from the Sentencing Reform Act of 1984 ("SRA") the two provisions that made the Guidelines mandatory, 18 U.S.C. §§ 3553(b)(1) and 3742(e), leaving the Guidelines in place as "effectively advisory." 543 U.S. at 245, 259. "So modified," the Court held, the SRA would continue to require judges to "consider Guidelines ranges," but it also would permit judges to "tailor" sentences in light of the sentencing goals of § 3553(a). *Id.* at 245. The Court emphasized that, without the provisions making "'the relevant sentencing rules . . .

51

mandatory,' . . . the statute falls outside the scope of *Apprendi*'s requirement." *Id.* at 259 (quoting *id.* at 233 (substantive opinion)).

Having excised § 3742(e), the provision directing appellate courts to apply a de novo standard of review to departures from the Guidelines, the remedial opinion substituted a reasonableness standard of review. 543 U.S. at 261. The Court described the standard as follows: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, . . . in determining whether a sentence is unreasonable." *Id.*

In *Cunningham v. California*, 549 U.S. 270 (2007), the Court invalidated California's "determinate sentencing law (DSL)," which prescribed for most offenses three precise terms of imprisonment -- a lower-, middle-, and upper-term sentence -- and directed judges to impose the middle term unless they found circumstances in aggravation or mitigation; such circumstances could not include an element of the charged offense. *Id.* at 274, 277-79. The Court held that, under this system, "the middle term . . . is the relevant statutory maximum," and that the judicial fact-finding required for upper-term sentences therefore violated *Apprendi*'s "bright-line" rule. *Id.* at 288-89. In

distinguishing the DSL from the post-Booker federal system, the Court observed that federal judges "no longer [are] tied to the sentencing range indicated in the Guidelines," but instead are "free to exercise their 'discretion to select a specific sentence within a defined range.'" *Id.* at 286, 292 (quoting *Booker*, 543 U.S. at 233 (substantive opinion)).

In *Rita v. United States*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), the Court provided further guidance on the nature of appellate "reasonableness" review. *Rita* held that appeals courts may apply a presumption of reasonableness to a sentence imposed within a properly calculated Guidelines range. 551 U.S. at 341. *Gall* held that appeals courts "must review all sentences -- whether inside, just outside, or significantly outside the Guidelines range -- under a deferential abuse-of-discretion standard." 552 U.S. at 41. Such review, the Court explained, entails (1) ensuring that the district court committed no "significant procedural error," such as "failing to calculate (or improperly calculating) the Guidelines range," and (2) "consider[ing] the substantive reasonableness of the sentence imposed," giving "due deference" to the district court's decision that the § 3553(a) factors justify the sentence. *Id.* at 51.

53

In *Southern Union v. United States*, 132 S. Ct. 2344 (2012), a jury found Southern Union guilty of violating the Resource Conservation and Recovery Act (RCRA) by storing liquid mercury without a permit, and a judge sentenced the company to pay a fine of $18,000,000. *Id.* at 2349. The sole issue on appeal was whether the rule of *Apprendi* "applies to sentences of criminal fines." *Id.* at 2348-49. The Court answered that question in the affirmative, reasoning that there was no principled basis for treating fines differently from punishments involving imprisonment or death. *Id.* at 2350, 2357. Reaffirming the principle that *Apprendi* "permits courts to impose judgment *within the range* prescribed by statute," the Court described the fine imposed on Southern Union as "exemplary" of an *Apprendi* violation. *Id.* at 2352-53 (internal quotation marks omitted; emphasis in original). Although RCRA prescribed a maximum penalty of $50,000 for each day of violation, the judge, not the jury, had determined the number of days the company violated the statute; thus, "judicial factfinding . . . enlarg[ed] the maximum punishment [Southern Union] face[d]" under the statute. *Id.* at 2352; *see also id.* at 2349.

54

## 2.   Standard of Review

Preserved sentencing challenges raising "purely legal questions," are reviewed "de novo." *United States v. Henry*, 557 F.3d 642, 644-45 (D.C. Cir. 2009) (internal editing and quotation marks omitted).

## B.   Discussion

### 1.   Under the Advisory Guidelines System, a District Court May Consider Acquitted Conduct at Sentencing.

As appellants concede (9, 12), long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in determining an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence imposed does not exceed the statutory maximum for the crime of conviction. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (citing *United States v. Watts*, 519 U.S. 148, 156-57 (1997); *United States v. Brown*, 516 F.3d 1047, 1050-51 (D.C. Cir. 2008); *United States v. Dorcely*, 454 F.3d 366, 371 (D.C. Cir. 2006); *United States v. Boney*, 977 F.2d 624, 636 (D.C. Cir. 1992); and *Williams v. New York*, 337 U.S. 241, 247 (1949)). As

*Settles* noted, under these cases, "there is no Fifth Amendment due process problem with this long-standing sentencing practice." *Id.* As to the Sixth Amendment, a district court's reliance on acquitted conduct in calculating a defendant's Guidelines range "no longer poses a problem" because, under *Booker*, the Guidelines are now "only advisory." *Id.* As *Settles* explained:

> For Sixth Amendment purposes, the relevant upper sentencing limit established by the jury's finding of guilt is thus the *statutory* maximum, not the advisory Guidelines maximum corresponding to the base offense level. And the Supreme Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."

*Id.* (emphasis in original) (quoting *Booker*, 543 U.S. at 233). *See also Brown*, 516 F.3d at 1050 ("a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury") (internal quotation marks omitted); *Dorcely*, 454 F.3d at 371-72 ("Under *Booker*, consideration of acquitted conduct violates the Sixth Amendment only if the judge imposes a sentence that exceeds what the jury verdict authorizes").[30]    Here, appellants'

---

[30] Similarly, a court does not violate the Sixth Amendment by enhancing a sentence within the statutory maximum based on untried
(continued . . . )

narcotics-conspiracy conduct was proved by at least a preponderance of the evidence, and their sentences -- concurrent terms of 15 years (Jones), concurrent terms of 16 years and two months (Thurston), and a term of 18 years and nine months (Ball) -- were well under the statutory maxima (respectively, 30, 20, and 40 years) for their crimes of conviction (supra n.4). Thus, the court did not err in considering appellants' narcotics-conspiracy conduct, along with other factors, in fashioning their sentences.

Although appellants acknowledge (12) the holdings of *Settles* and *Dorcely*, they contend that those cases were wrongly decided.[31] Appellants reason (9, 12; also 27-37) that: (1) both decisions allegedly

---

(. . . continued)

conduct, *Bras*, 483 F.3d at 106-08, or conduct on which the jury has deadlocked, *United States v. Lawson*, 494 F.3d 1046, 1055-56 (D.C. Cir. 2007).

[31] Appellants also suggest (n.13) that the Sixth Amendment issue was not squarely presented in *Settles* because the appellant in that case "(mistakenly) conceded that the Sixth Amendment allowed consideration of acquitted conduct." Appellants are incorrect. As this Court stated in *Settles*, "Settles argues that the District Court violated the Fifth and Sixth Amendments . . . by considering conduct of which he had been acquitted in calculating the advisory Guidelines range and determining his sentence." 530 F.3d at 923. Settles conceded only that long-standing precedents of the Supreme Court and this Court were to the contrary. *Id.*

"relied on the Supreme Court's 1997 decision in *United States v. Watts*," which did not present "the Sixth Amendment issue";[32] and (2) *Booker* and other Supreme Court decisions since *Watts* allegedly have established that "in a[n] [ostensibly] determinate sentencing system such as the Sentencing Guidelines," the Sixth Amendment proscribes punishment "beyond the offense of conviction's presumptive guideline range" -- *i.e.*, the Guidelines range corresponding to that offense's base-offense level -- based on judicial fact-finding.[33]

These arguments are unavailing. At the outset, *Settles*, *Brown*, and *Dorcely* are binding on this Court, see *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*), and appellants have not

---

[32] In *United States v. Watts*, 519 U.S. 148, 156-57 (1997), the Supreme Court held that, under the Fifth Amendment, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."

[33] Although appellants frame their argument in terms of acquitted conduct, their reasoning would apply equally to any fact not found by the jury, whether acquitted, the subject of a deadlock, untried, or uncharged. *See United States v. White*, 551 F.3d 381, 384 (6th Cir. 2008) (*en banc*) (discerning no reason "why sentences based on acquitted conduct differ for Sixth Amendment purposes from any other sentence driven by judge-found facts but falling within the statutorily defined sentencing range").

even claimed, let alone shown, that "an intervening Supreme Court decision" or "the combined weight of authority from other circuits"[34] has rendered the holdings of *Settles*, *Brown*, and *Dorcely* a "clearly incorrect statement of current law."   *See* Policy Statement on En Banc Endorsement of Panel Decisions 1 (Jan. 17, 1996).   In any event, appellants' arguments are incorrect.

---

[34] To the contrary, post-*Booker*, every other Circuit also has held that a sentencing court does not violate the Sixth Amendment by enhancing a sentence, within the maximum prescribed by statute, based on acquitted conduct. *See White*, 551 F.3d at 384-86 (6th Cir. 2008) (*en banc*) (holding that Sixth Amendment does not "prevent[] a district court from relying on acquitted conduct in applying an advisory guidelines system" because, "[i]n the post-Booker world, the relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code") (emphasis in original) (citing *Settles* with approval). *See also United States v. Gobbi*, 471 F.3d 302, 313–14 (1st Cir. 2006) (*Watts* survives *Booker*); *United States v. Vaughn*, 430 F.3d 518, 525-27 (2d Cir. 2005) (Sotomayor, J.) (same); *United States v. Hayward*, 177 F.App'x 214, 215 (3d Cir. 2006) (same); *United States v. Ashworth*, 139 F.App'x 525, 527 (4th Cir. 2005) (no Sixth Amendment violation); *United States v. Farias*, 469 F.3d 393, 399 (5th Cir. 2006) (*Watts* survives *Booker*); *United States v. Price*, 418 F.3d 771, 787–88 (7th Cir. 2009) (same); *United States v. High Elk*, 442 F.3d 622, 626 (8th Cir. 2006) (post-*Booker*, acquitted conduct still may be considered); *United States v. Mercado*, 474 F.3d 654, 656-58 (9th Cir. 2007) (no Sixth Amendment violation); *United States v. Magallanez*, 408 F.3d 672, 684-85 (10th Cir. 2005) (same); *United States v. Faust*, 456 F.3d 1342, 1347–48 (11th Cir. 2006) (same).

First, both *Settles* and *Dorcely* relied in large part on *Booker*.[35] As described *supra*, *Settles* reasoned that *Booker* made the relevant upper sentencing limit the maximum penalty prescribed by statute, and that, under *Booker*, a judge enjoys "broad discretion in imposing a sentence within a statutory range." 530 F.3d at 923 (internal quotation marks omitted). *Dorcely* held that *Booker* did not undermine this Court's earlier precedents, which had approved the consideration of acquitted conduct. 454 F.3d at 371. *Dorcely* based this holding on both the substantive and remedial opinions of *Booker*. *Id.* at 372. As *Dorcely* explained, the substantive opinion stated that, "'when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant'"; that language, *Dorcely* observed, was "broad enough to allow consideration of acquitted conduct so long as the court 'deems [it] relevant.'" *Id.* (quoting *Booker*, 543 U.S. at 233; internal editing in original). The remedial opinion, *Dorcely* observed, "expressly endorsed 18 U.S.C. § 3661, concluding that it poses no Sixth

---

[35] *Brown* relied on *Dorcely*. 516 F.3d at 1050.

60

Amendment problem." *Id.*[36] Thus, contrary to appellants' argument, neither *Settles* nor *Dorcely* failed to confront "the Sixth Amendment issue" in light of *Booker*.[37]

---

[36] Section 3661 provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." In *Watts*, the Supreme Court construed § 3661 as permitting consideration at sentencing of "conduct of which a defendant has been acquitted." 519 U.S. at 151-54. The *Booker* remedial opinion, having excised the provisions of the SRA that made the Guidelines mandatory, held that "the remainder of the Act," including § 3661, "satisfies the Court's constitutional requirements." 543 U.S. at 251, 259.

[37] The foregoing also shows that, contrary to amici's suggestion (6-7), this Court did not view *Booker* as having "held that *Watts* once and for all decided that reliance upon acquitted conduct is consistent with the Sixth Amendment." Nor is amici's suggestion a fair characterization of other Circuits' reasoning. In *United States v. Waltower*, 643 F.3d 572 (2011), for instance, the Seventh Circuit explained that it viewed *Booker* as "suggest[ing] that *Watts* is still good law" because:

> In articulating requirements for district court judges who mete out sentences, Justice Breyer's portion of the opinion of the Court directs district judges to "take account of" the guidelines range, which we know from *Watts* may properly include acquitted conduct. More importantly, in defending the remedy that the Court elected in *Booker* -- excising the portion of the Sentencing Reform Act that made the guidelines mandatory, rather than striking down the statute -- the Court indicated that *Watts* furthered Congress's "basic statutory goal" of diminishing sentencing disparity by basing punishment on "the *real conduct* that underlies the crime of conviction." It would have been odd indeed for the Supreme

(continued . . . )

61

Second, appellants simply are incorrect in suggesting that, under *Booker*, the relevant statutory maximum is the Guidelines base-offense level corresponding to the facts found by the jury or admitted by the defendant. As this Court explained in rejecting the identical argument in *Bras*, *Booker*'s substantive opinion held that the Sixth Amendment is violated "when a court imposes a sentence under a set of mandatory guidelines" based on its own determination of any fact (other than a prior conviction) not established by a plea of guilty or a jury verdict. 483 F.3d at 106-07. The *Booker* remedial opinion, however, rendered the Guidelines advisory and "made clear" that, "so modified, . . . the Sixth Amendment's bar against judicial fact-finding does not apply to Guidelines sentencing," even if such fact-finding "yield[s] a sentence above that based on a plea or verdict alone." *Id.* at 107.

Appellants' remaining arguments (38-45) -- that consideration of acquitted conduct denigrates the role of the jury and invites disrespect

---

(. . . continued)

Court to invoke *Watts* as justification for the remedy the Court adopted in *Booker* if some aspect of the latter had rendered infirm the holding of the former.

643 F.3d at 576-77 (internal citations omitted) (emphasis in original).

for the law[38] -- likewise plow no new ground.  This Court recognized in

*Settles* that "[m]any judges and commentators have . . . argued that

using acquitted conduct to increase a defendant's sentence undermines

respect for the law and the jury system."  530 F.3d at 924.  This Court

answered that argument by observing that, to the extent such concerns

were justified, the proper remedy lay with Congress or the Sentencing

Commission, not the courts: "Congress or the Sentencing Commission

certainly could conclude as a matter of policy that sentencing courts

may not rely on acquitted conduct.  But under binding precedent, the

---

[38] In the same vein, appellants suggest (40-43) that consideration of acquitted conduct is tantamount to relitigating "the truth" of an issue "rejected by the jury."  This suggestion sounds in Double Jeopardy Clause principles, and is foreclosed by *Watts*.  As *Watts* explained:

> [A]n acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.  Without specific jury findings, . . . the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty.  For these reasons, an acquittal in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent action [including a sentencing hearing] governed by a lower standard of proof.

519 U.S. at 155-56 (internal quotation marks omitted).

63

Constitution does not prohibit a sentencing court from relying on acquitted conduct." *Id.*[39]

Amici's suggestion (3, 9, n.4) that *Settles* and *Dorcely* "cannot survive" *Southern Union* requires little discussion. As shown *supra*, *Southern Union* was not a Guidelines case, and it did not purport to overturn the *Booker* remedial opinion's holding that judicial fact-finding under the advisory Guidelines system "falls outside the scope of *Apprendi*'s requirement." 543 U.S. at 259. *Southern Union* simply extended *Apprendi* to criminal fines, and observed that, where a statute

---

[39] As the Sixth Circuit, sitting *en banc*, emphasized in *White*, "the best response" to the juror who expresses frustration that the court system does not seem to respect the juror's contribution "is not to confirm the misunderstanding":

> [I]t is to explain that indeed the juror's contribution is being faithfully acted upon, that under our system judges have the power within a statutory range to determine the punishment for the crime that the juror did find beyond a reasonable doubt, and that the judge may take into account facts about the defendant that the judge determines to be more probable than not, even though the jurors could not find those facts beyond a reasonable doubt. That difference is a cornerstone of criminal procedure, and it is the distinction that has been embedded in our common law legal tradition for hundreds of years.

551 F.3d at 385-86.

64

specifies a particular fact that increases the maximum fine a defendant faces, *Apprendi* requires that fact to be found by the jury. 132 S. Ct. at 2352, 2357. This straightforward application of *Apprendi* is perfectly consistent with the holdings of *Settles* and *Dorcely* that, once the jury finds the facts that authorize the maximum penalty prescribed by the statute in question, the judge is free to engage in fact-finding that determines the defendant's sentence within the statutory range. *See also Southern Union*, 132 S. Ct. at 2352-53 and n.5 (recognizing that *Apprendi* "permits courts to impose judgment within the range prescribed by statute," and stating that "the routine practice of judges' imposing fines from within a range authorized by jury-found facts . . . poses no problem under *Apprendi* because the penalty does not exceed what the jury's verdict permits") (internal quotation marks and emphasis omitted).

### 2. Appellants' "As-Applied" Theory Lacks Merit.

Claiming (7, 45-51) that the court's consideration of their narcotics-conspiracy conduct resulted in "three- and four-fold" increases in their sentences, appellants argue in the alternative that their sentences violated the Sixth Amendment on an "as-applied" theory of

65

substantive reasonableness, because their sentences allegedly could not be upheld as reasonable absent the judge-found conspiracy. Even if the premise of their argument were correct,[40] the as-applied theory they advance -- one advocated by Justice Scalia in his concurrences in *Rita* and *Gall*[41] -- is contrary to the law.

---

[40] Because, for each appellant, the court not only varied downward from the applicable Guidelines range but also based the sentence on a wide variety of factors, the effect of the court's narcotics-conspiracy findings on appellants' sentences cannot be quantified. In addition, even focusing only on the calculation of appellants' Guidelines ranges, as to Jones and Ball those findings had less impact than appellants suggest. The court calculated Jones's Guidelines range as 324-405 months, and Ball's as 292-365 months. Had the court eliminated the narcotics-conspiracy conduct from its calculations, Jones's Guidelines range would have been 262-327 months, given his status as a career offender (USSG §4B1.1(b) (offense level 34, criminal history category VI); USSG Ch. 5 Pt. A, Sentencing Table (2007)); and Ball's would have been 151-188 months, given the court's finding that he personally distributed at least 1.5 kilograms of crack (USSG Ch. 5 Pt. A, Sentencing Table (2010) (offense level 34, criminal history category I)).

[41] *Rita*, 551 U.S. at 372 (Scalia, J., concurring in part and concurring in the judgment) ("*Every* sentence higher than [the maximum sentence that will be upheld as reasonable based only on the facts found by the jury] is legally authorized only by some judge-found fact, in violation of the Sixth Amendment.") (emphasis in original); *see also id.* at 375; *Gall*, 552 U.S. at 60-61 (Scalia, J., concurring). Justice Scalia's theory does not distinguish between facts underlying an acquitted count and facts on which a jury has not passed; the theory also does not distinguish between within- and above-Guidelines sentences.

Like their acquitted-conduct claim, appellants' "as-applied" claim is foreclosed by this Court's precedents. As described *supra*, this Court repeatedly has held, including three times since *Rita* and *Gall*, that judicial fact-finding by a preponderance standard does not violate the Sixth Amendment as long as the sentence imposed is within the maximum prescribed by statute. *See United States v. Mejia*, 597 F.3d 1329, 1334, 1343 (D.C. Cir. 2010) (sentencing court may impose sentence based on facts it finds by preponderance as long as sentence "does not exceed the statutory maximum for the crime of conviction") (internal quotation marks omitted); *Settles*, 530 F.3d at 923 ("[B]ecause the conduct in question was proved by a preponderance of the evidence and because Settle's sentence did not exceed the statutory maximum of 10 years, the District Court's consideration of acquitted conduct did not violate the Fifth or the Sixth Amendment."); *Brown*, 516 F.3d at 1050 ("a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury") (internal quotation marks omitted); *Lawson*, 494 F.3d at 1055 ("Under *Booker*, the Guidelines are advisory, not mandatory. No Sixth Amendment issue is raised unless a sentence exceeds its *statutory*

67

maximum.") (emphasis in original); *Bras*, 483 F.3d at 107 (post-*Booker*, "the Sixth Amendment's bar against judicial fact-finding does not apply to Guidelines sentencing"); *Dorcely*, 454 F.3d at 371-72 ("Under *Booker*, consideration of acquitted conduct violates the Sixth Amendment only if the judge imposes a sentence that exceeds [the U.S. Code maximum] the jury verdict authorizes").[42] This categorical rule obviously is inconsistent with the as-applied theory; as long as a sentencing court's legal discretion extends to the maximum established by the United States Code, any as-applied challenge must fail.

Every Circuit to have specifically addressed an as-applied challenge has rejected it on this same ground. *See United States v. Norman*, 465 Fed. Appx. 110, 120-21 (3d Cir. 2012) (as-applied theory inconsistent with *Booker* rule that "the only facts a jury must determine are those that increase the [U.S. Code] maximum punishment"; noting that as-applied theory "has been uniformly and unequivocally rejected by the federal circuit courts") (internal quotation marks omitted);

---

[42] In *Dorcely*, the acquitted conduct increased the defendant's Guidelines range from 0-6 to 24-30 months imprisonment, and the court sentenced the defendant to 24 months -- what this Court described as a "fourfold increase." 454 F.3d at 370, 376.

*United States v. Hernandez*, 633 F.3d 370, 373-74 (5th Cir.) (as-applied theory inconsistent with *Booker* rule that "sentencing court is entitled to find by a preponderance of the evidence all facts relevant to the determination of a sentence below the [U.S. Code] maximum"), *cert. denied*, 131 S. Ct. 3006 (2011); *United States v. McCormick*, 401 Fed. Appx. 29, 33-34 (6th Cir. 2010) (rejecting as-applied challenge because judge found enhancement facts by preponderance of evidence, understood that Guidelines are advisory only, and sentenced defendant within U.S. Code maximum); *United States v. Treadwell*, 593 F.3d 990, 1017 (9th Cir. 2010) (rejecting as-applied theory because, "[i]n *Booker*, the Supreme Court rendered the Guidelines advisory, permitting a district court to impose a sentence anywhere within the range established by the statute of conviction without violating the Sixth Amendment"); *United States v. Ashqar*, 582 F.3d 819, 825 (7th Cir. 2010) (as-applied theory "is not the law"; "So long as the Guidelines are advisory, the maximum a judge may impose is the *statutory* maximum.") (emphasis in original); *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008) (as-applied theory is "too creative for the law as it stands. Sentencing judges may find facts relevant to determining a

69

Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict."); *United States v. Redcorn*, 528 F.3d 727, 745-46 (10th Cir. 2008) (as-applied theory "carries no weight under the remedial opinion in []*Booker*").

Because appellants' argument would require a reversal of binding Circuit precedent, the argument can succeed only if that precedent has been shown to be a "clearly incorrect statement of current law," either by "an intervening Supreme Court decision" or by "the combined weight of authority from other circuits." *See* Policy Statement on En Banc Endorsement of Panel Decisions 1 (Jan. 17, 1996). As appellants acknowledge (48), no Supreme Court majority opinion has endorsed Justice Scalia's theory, and as shown *supra*, the other Circuits to have considered the theory uniformly have rejected it. Accordingly, appellants' as-applied argument must fail.

Nor do the Supreme Court's majority opinions suggest that an as-applied claim is even a theoretical possibility. At the outset, Justice Scalia's theory is inconsistent not only with the *Booker* substantive opinion's holding that judicial fact-finding does not "implicate the Sixth

70

Amendment" when judges are "bound only by the statutory maximum," 543 U.S. at 233-34, but also with the *Booker* remedial opinion, which held that excising the mandatory provisions of the SRA "remed[ied]" the Sixth Amendment violation. *Id.* at 245. As the Court put it, without the provisions making "the relevant sentencing rules . . . mandatory, . . . the statute falls outside the scope of *Apprendi*'s requirement." *Id.* at 259 (internal quotation marks omitted); *see also id.* ("the remainder of the Act satisfies the Court's constitutional requirements").[43]

The as-applied theory also is inconsistent with the nature of substantive-reasonableness review. *Booker* and *Gall* make clear that substantive-reasonableness review asks "only" whether the sentencing court abused its discretion in applying the § 3553(a) factors. *Gall*, 552 U.S. at 49-51, 56; *see also Booker*, 543 U.S. at 261 (remedial opinion)

---

[43] Recognizing an as-applied theory, of course, would upend the *Booker* sentencing regime, because sentences under that regime depend heavily on judge-made findings. *See Booker*, 543 U.S. at 250-51 (remedial opinion) (such findings "particularly important" given broad definitions of federal crimes). As Justice Scalia himself acknowledged in *Rita*, accepting a constitutional component to substantive-reasonableness review would "threaten[] . . . yet another major revision of Guidelines practices." 551 U.S. at 384 (Scalia, J., concurring in part and concurring in the judgment).

("Section 3553(a) . . . will guide appellate courts . . . in determining whether a sentence is unreasonable"). One of the § 3553(a) factors, of course, is the applicable Guidelines range, which the sentencing court must calculate on the basis of all relevant conduct, USSG §1B1.3, and which must be "the starting point and the initial benchmark" for the sentence. *Gall*, 552 U.S. at 49; 18 U.S.C. § 3553(a)(4). In assessing the reasonableness of a sentence, an appellate court may consider the extent of any variance from the correctly calculated Guidelines range, *id.* at 49, 51, and may presume that a sentence within that range is reasonable, *Rita*, 551 U.S. at 352-53. Where judge-found relevant conduct is necessary to the Guidelines calculation itself, and where the Guidelines range produced by consideration of such conduct may in turn be the basis for presuming a sentence within that range to be reasonable (or for finding a sentence too far outside that range to be unreasonable), a judge's reliance on relevant conduct cannot logically render a sentence unreasonable. *Cf. Lawson*, 494 F.3d at 1056-57 (consideration of "the appropriate Guidelines range for [a defendant's] crimes *and his [unconvicted] misconduct*," if latter proved by

72

preponderance of evidence, is "a necessary threshold inquiry for our reasonableness review") (emphasis added).[44]

Finally, even if Justice Scalia's theory were viable, proving an as-applied claim would require "a comparison of the facts in [appellants'] case[s] with the facts of *all* of the previously decided *appellate cases*" to show that appellants' sentences would not have been upheld as reasonable based solely on the facts supporting the jury verdicts. *Rita*, 551 U.S. at 377 (Scalia, J., concurring in part and concurring in the judgment) (emphases added). Appellants have not even attempted, and therefore have abandoned any attempt, to make such a showing.[45]

---

[44] Appellants also are incorrect in suggesting (48) that the as-applied theory finds support in Justice Alito's dissenting opinion in *Cunningham*. To the contrary, in *Cunningham*, Justice Alito stated that, under the advisory Guidelines system, judicial fact-finding to justify sentences above "the maximum sentence that could reasonably be imposed solely on the basis of the facts reflected in the jury verdict . . . is consistent with the Sixth Amendment." *Cunningham*, 549 U.S. at 310-11 (Alito, J., dissenting) (internal quotation marks omitted).

[45] In any event, appellants' sentences readily could be upheld as reasonable, even without consideration of their conspiracy conduct, given the seriousness of their crimes of conviction and their long histories of drug-dealing and violent crime. *See* 18 U.S.C. § 3553(a)(2) (sentence should be sufficient, inter alia, to "reflect the seriousness of the offense," "promote respect for the law," and "protect the public from further crimes of the defendant").

## II.  The Doctrine of Constitutional Avoidance Is Inapplicable.

The relevant-conduct guideline, USSG §1B1.3, "directs sentencing courts to consider all other related conduct, whether or not it resulted in a conviction," when determining the applicable Guidelines range. *Watts*, 519 U.S. at 153-54.  Adverting to the doctrine of constitutional avoidance, appellants invite this Court (7, 51-53) to refrain from deciding their Sixth Amendment claims by "strik[ing] down" §1B1.3 as inconsistent with the SRA.  *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (when construing statute that admits of "two plausible . . . constructions," construction that does not raise "multitude of constitutional problems" should prevail).  But the Supreme Court and this Court already have rejected this argument.  As this Court noted in *Dorcely*, "the Supreme Court has interpreted the language of section 3661 [of Title 18,]," which is part of the SRA, *Booker*, 543 U.S. at 251, to "authorize . . . consideration of acquitted conduct in sentencing."  454 F.3d at 375 (citing *Watts*, 519 U.S. at 151-52).  Accordingly, §1B1.3 cannot be ultra vires.

74

## III.  Appellants' Sentences Are Reasonable.

Appellants argue (53-97) that their sentences are both procedurally and substantively unreasonable.  Appellants are incorrect.

### A.    Standard of Review

Appellate review of sentencing decisions "is limited to determining whether they are 'reasonable.'"  *Gall*, 552 U.S. at 46.  This Court reviews the reasonableness of a sentence in two steps.  The Court first "ensure[s] that the district court committed no significant procedural error," such as "improperly calculating[] the Guidelines range," "selecting a sentence based on clearly erroneous facts," or "failing to adequately explain the chosen sentence."  *Id.* at 51.  If the sentence is procedurally sound, the Court then "consider[s] the substantive reasonableness of the sentence."  *Id.*; *see also United States v. Blalock*, 571 F.3d 1282, 1285 (D.C. Cir. 2009).  Both procedural soundness and substantive reasonableness are assessed under an "abuse of discretion" standard.  *United States v. Wilson*, 605 F.3d 985, 1033-34 (D.C. Cir. 2010).  A claim of procedural error not raised at sentencing is reviewed for plain error.  *Id.* at 1034.

### B. The Court Committed No Significant Procedural Error.

As described *supra*, the court found that each appellant's relevant conduct included knowingly participating in the charged conspiracy to distribute crack in Congress Park.   Appellants challenge the court's relevant-conduct determination on a variety of overlapping grounds, all of which reduce to claims that the court (1) clearly erred in finding "the existence" of the charged conspiracy; (2) failed to make adequate findings;[46] and (3) misapplied the Guidelines.

### 1. Legal Principles

"In determining the proper sentence in a criminal case, a district court takes into account all relevant conduct." *United States v. Seiler*, 348 F.3d 265, 268 (D.C. Cir. 2003).   For "jointly undertaken criminal activity," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," if those acts and omissions occurred "during the commission of the offense of conviction."   USSG §1B1.3(a)(1)(B).   This standard of

---

[46] Although appellants characterize these first two claims as both substantive-reasonableness and procedural-error claims, the claims in fact are purely procedural. *See Gall*, *supra* at 75.

vicarious liability incorporates "the well-settled principles of conspiracy law enunciated in *Pinkerton, [v. United States*, 328 U.S. 640, 647 (1946)]." *United States v. Childress*, 58 F.3d 693, 723 (D.C. Cir. 1995) (internal quotation marks omitted). For offenses of a character that require grouping under §3D1.2(d) (including drug offenses), relevant conduct includes any acts described in §1B1.3(a)(1)(B) "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG §1B1.3(a)(2).

"The essential element of conspiracy is an agreement with at least one other person to violate the law." *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996). In determining whether a single conspiracy existed, as opposed to separate, unrelated activities or multiple conspiracies, this Court looks to a variety of factors, including, "most important[ly]," whether participants "share[d] a common goal, such as the possession and distribution of narcotics for profit"; "the degree of dependence" among the alleged participants in the conspiracy; and, "of lesser significance," any "overlap of participants in the various operations" of the alleged conspiracy. *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988); *see also Graham*, 83 F.3d at 1471.

77

This Court reviews a sentencing court's factual determinations, including determinations of whether a defendant "participated in a criminal conspiracy," only for "clear error." *United States v. McCants*, 554 F.3d 155, 161 (D.C. Cir. 2009). Under the clear-error standard, this Court "affirm[s]" unless it is "left with the definite and firm conviction that a mistake has been committed." *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009) (internal quotation marks omitted). As the Supreme Court explained in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985):

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573-74 (construing Fed. R. Civ. P. 52(a)); *see also Maine v. Taylor*, 477 U.S. 131, 145 (1985) (adopting Rule 52(a)'s clearly erroneous standard for appellate review of factual findings by district court in criminal cases on issues other than those that determine guilt). A district court's credibility determinations are "entitled to the greatest

78

deference from this court on appeal." *United States v. Delaney*, 651 F.3d 15, 18 (D.C. Cir. 2011) (internal quotation marks omitted).[47]

This Court gives "due deference" to a district court's application of the Guidelines to the facts. *United States v. Tann*, 532 F.3d 868, 874 (D.C. Cir. 2008).

---

[47] Appellants do not appear to argue that the district court was required to make its conspiracy finding by clear and convincing evidence, asserting only (n.168) that "the cases are divided" on whether such a standard should govern when consideration of acquitted conduct results in a large increase in sentence. In any event, *Dorcely* approved the use of a preponderance standard where consideration of acquitted conspiracy conduct resulted in a four-fold increase in the sentence imposed. 454 F.3d at 369-70, 372-73, 376; *see also id.* at 373 (noting that, "before *Booker*, we rejected the argument that facts at sentencing must be proved by a more stringent standard than preponderance of the evidence," and that, "[n]othing in *Booker* suggests a contrary result"). And, in *Settles*, this Court stated categorically that consideration of acquitted conduct does not violate either the Fifth or Sixth Amendments so long as the conduct is "proved by a preponderance of the evidence" and does not exceed the U.S. Code maximum. 530 F.3d at 923. Thus, Thurston's and Ball's suggested approach to clear-error review -- that, for them, this Court should reverse if it finds clearly erroneous the district court's determination that there was clear and convincing evidence of their conspiracy conduct -- is incorrect; such an approach would find error on the basis of a standard of proof the law does not require.

## 2.    The Court Did Not Clearly Err in Its Conspiracy Finding.

Appellants argue (58-60, n.168) that the court's conspiracy finding was clearly erroneous primarily because "the cooperators' testimony on which [the finding] relied [was] so untrustworthy." Specifically, appellants claim (61-80) that 10 of the witnesses whose testimony the court credited simply were "unworthy of credence" because, variously, they had criminal records, had been drug addicts, had lied in other contexts, had otherwise behaved poorly, had been impeached on other subjects, had spent time with other witnesses in the same prison facility, or had incentives to cooperate with the government.[48] Whether these witnesses generally were believable, however, "is not for [this Court] to decide, given that [a witness's] credibility can be assessed only by judging his demeanor on the stand." *United States v. Toms*, 136 F.3d 176, 187 (D.C. Cir. 1998). In any event, the court specified the points on which it credited each of the witnesses, and, on those points, the witnesses' accounts not only were "mutually corroborative" (3/17/11:35),

---

[48] Although appellants list Steven Marsh as one of the "cooperators," Marsh did not testify pursuant to a cooperation agreement (3799-3800).

but also were corroborated by: the testimony of two witnesses -- Robert Pough and Edward Martin -- whose credibility appellants do not challenge; the controlled buys, which showed cooperation among various members of the conspiracy; the guilty pleas and sworn plea proffers of the eleven co-defendants who acknowledged participating in the conspiracy;[49] Newett Ford's conviction for participating in the conspiracy; Ball's testimony in the Kevin Gray II case acknowledging that outsiders were not permitted to sell drugs in "our" neighborhood; and the "Congress Park Crew" membership list. Thus, the court's credibility determinations should not be disturbed on appeal. *See Toms*, 136 F.3d at 187.

Appellants argue in the alternative (80-84) that the witnesses' testimony, even if believed, was insufficient to support the court's finding of a single conspiracy. This argument fails for two reasons.

---

[49] Contrary to appellants' suggestion (84-86), a sentencing court properly may consider information that has not been subjected to cross-examination. *See Bras*, 483 F.3d at 108 ("The sentencing judge is not restricted . . . to evidence derived from the examination and cross-examination of witnesses in open court") (internal quotation marks omitted). Nor, as shown *supra* at 26-28, were the guilty pleas and proffers so vague as to lack corroborative value.

First, it ignores the host of evidence that appellants and their co-conspirators shared a common unlawful objective, i.e., the distribution of crack in Congress Park, and that they were dependent on each other to achieve that objective. Such evidence, described in greater detail *supra* at 6-29, included testimony that: (1) the conspirators concentrated their sales efforts in specific Congress Park venues, including the Circle, the Lincoln, the Alley, 14th Place, and Savannah Street (2) many conspirators, including Jones and Thurston, played "doors," a method of sharing sales that was used in Congress Park from the early 1990s through at least 2002; (3) many conspirators, including appellants, supplied crack to each other for resale, fronted each other, or provided each other half-price "wholesales"; (4) some conspirators pooled their money to obtain crack supplies (e.g., Capies and Samuels), some split their proceeds (Kelliebrew and Powell), and several -- as confirmed by the controlled-buys evidence -- assisted each other in individual sales; (5) the conspirators jointly defended their turf, both against outside drug dealers and against Congress Park security; (6) the conspirators protected each other from, and retaliated against, rival drug crews; (7) some conspirators at one time identified

82

themselves as crew members by wearing "Congress Park" headbands; (8) conspirators warned each other about jump-outs; (9) Ball pressured witnesses not to provide information about co-conspirator Samuels's murder of Jamel Sills, and threatened to kill Kelliebrew for cooperating with police; (10) the conspirators recognized Ball as a leader and accepted his resolution of various disputes; and (11) Ball himself claimed leadership of the conspiracy, and further demonstrated guilty knowledge of its existence when he expressed concern to Pough and Roberson about the impending "conspiracy" charges, said that cooperators would need to be killed, and speculated that Thurston and the three Bell brothers would be the first to "flip." *Cf.*, *e.g.*, *Graham*, 83 F.3d at 1471-72 (evidence sufficient to support finding of single Newton Street conspiracy, where, although three "cliques" operated on Newton Street, did not share profits with each other, and sometimes competed for sales, inter alia, (1) cliques operated under same boss who sold or fronted them crack to distribute on street, (2) cliques shared common goal of distributing crack on Newton Street, and (3) cliques were interdependent, providing "police look-outs" for each other, supplying crack to other cliques that had run out, and sometimes working

together to store, bag, and distribute crack). *Cf. also Childress*, 58 F.3d at 712-13 (factor supporting sufficiency of evidence that Rachelle Edmond agreed to further purposes of single conspiracy was that, in wiretapped conversation, Edmond "discussed the pending police investigation and efforts of herself and others to avoid surveillance and detection," in process revealing her "detailed knowledge of the scope of the conspiracy").

Second, the testimony appellants cite as undermining the existence of a single conspiracy does not, in fact, do so. Although Capies testified that, during the 1992-96 period, there were "older dudes" (including Ball and Jones) who tended to sell in the Circle (4923, 4926) and "younger dudes" (including Thurston) who tended to sell on 14th Place or in front of the Lincoln (4802-05, 4829-31, 4990, 5176), Capies's testimony made clear that, even then, the groups were interdependent. For instance, during the 1992-96 period, Capies got his supply mainly from "Boy-Boy [Bell], Kairi, and Antwuan [Ball]," including "wholesales" from Bell (4970), and Thurston got his supply from Burke Johnson (4923-24); in 1992-93, Capies and Samuels bought "quarter[]" ounces of crack together from Bell (4813-17); in late 1993 or early 1994,

84

and again in 1995 after Kairi died, Ball fronted Capies and Samuels half ounces of crack (4818-21, 4836, 4894-97); and, in 1995, Ball carried himself as "a leader," and "the younger group, we listened to him" (5175-76).[50]  Similarly, although Powell testified that, during the period from 1996 to 2002, there were "little groups" or "cliques" in Congress Park that "hung with" each other (12505-07, 12936-41), he, too, testified to numerous examples of interdependence.  He testified that  the "doors" game had "always [been] played since when . . . [he] first started hustling" as "the way you got your sales" (12215);[51] when he first started hustling, he was "putting [his] money" with Jasmine Bell's and Samuels's to buy crack (12190-92); he later obtained crack from others,

---

[50] Appellants' description (81, 81-82, 84) of Capies's testimony is incorrect in three respects.  First, when Capies testified that Bell "wasn't with us" during the 1992-96 period, he was referring to the fact that Bell "was hanging in the circle" rather than with Capies' "little group" on 14th Place (4815); indeed, it was at that very time that Capies and Samuels were obtaining quarter ounces of crack from Bell (id.).  Second, pages 5843-45 of the transcript do not contain testimony that Capies was "basically out of the 'Circle' (allegedly the open-air market) after 1996."  Third, Capies testified that he personally shared sales with Wilson and many others using the "doors" game, not that he saw Wilson play doors with Barnett (5335-37).

[51] Wilson and Samuels, whom Powell said "hung" in different "little groups" (12507), were among the people Powell saw playing doors in the Circle (12215).

85

including Bell and Joseph Langley, both of whom he described as "Wholesale King[s]" (12195-201); he pooled his money, and "hustl[ed] together," with Kelliebrew "[t]hroughout the park" (12207-09, 12214); both Ball and Bell fronted crack to Powell (12209-10, 12213-14); Samuels and Daniel Collins "hustl[ed] together" (12229); Powell and Kelliebrew once told two outside dealers they could not sell crack in the Circle "[b]ecause it was our neighborhood" (12280-82); and Ball, whom Powell described as "the man" (12217), once made Phillip Wallace return money Wallace had stolen from Powell (12255-59). Finally, although Parson testified that, "as far as [she] knew," the people from whom she bought crack were "doing their own thing" (2099-100, 2135-36), she, too, testified to instances of interdependence. She testified that she brokered deals between outside buyers and Congress Park dealers, including Bell (1821-26, 1863-66, 2280-82); she had heard dealers in Congress Park use the term "doors" to "split a sale" (2013-14); some dealers fronted her crack (1960-62); in one controlled buy, she bought crack from Gerald Bailey, who got the crack from Bell's van (1924-35); and, in another controlled buy, Bailey arrived in response to her page to Bell and sold her the crack she had requested -- Parson told

Bailey during the buy that Bell should give Bailey the pager because Bailey was "always answering the call" (1972-79).

In short, there is no basis upon which to disturb the court's credibility determinations, and abundant evidence supported the court's finding that appellants participated in a single conspiracy to distribute crack in Congress Park. Because the court's conspiracy finding was "plausible in light of the record viewed in its entirety," *Bessemer City*, 470 U.S. at 573-74, it cannot have been clearly erroneous.

### 3.    The Court Made Adequate Findings.

Appellants argue (87-88, 92, 95-97) that the court failed to make explicit findings about the scope of each appellant's conspiratorial agreement, and failed adequately to explain why it credited the cooperators' testimony about the Congress Park conspiracy.

A district court must make "explicit findings as to the scope of a defendant's conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts." *United States v. Tabron*, 437 F.3d 63, 66 (D.C. 2006). The court fully satisfied this requirement. It explicitly found that the "scope" of each appellant's agreement was to join the overall scheme to jointly distribute crack in Congress Park

87

(5/1/08:22; 10/29/10:18; 3/17/11:31), and it supported those findings with detailed citations to the record (supra at 33-34, 38-40, 42-45).[52] *See United States v. Graham*, 317 F.3d 262, 270 (D.C. Cir. 2003) (scope-finding adequate where court "understood that the attributable drugs had to be . . . within the scope of [Graham's] agreement to join the . . . conspiracy" and "made more than a generalized or conclusory finding of Graham's involvement" in conspiracy); *United States v. Saro*, 24 F.3d 283, 289 (D.C. Cir. 1994) ("In some conspiracies, . . . each participant has joined (implicitly or explicitly) in the overall scheme, so that the scope of the conspiracy is identical for each") (emphasis omitted).

As to appellants' second claim, which they make for the first time on appeal, the court had no duty to explain in greater detail why it credited the government's witnesses on the points it identified. *See United States v. Dozier*, 162 F.3d 120, 125 (D.C. Cir. 1998) (where defendant argued that court should not credit witness Shipp regarding

---

[52] Appellants did not challenge the sufficiency of these findings at sentencing. Because a scope finding is a "strict procedural mandate," *Childress*, 58 F.3d at 722, which a court apparently must satisfy *sua sponte* when a defendant objects to an attribution determination founded on jointly undertaken activity, *id.* at 721, 724, we assume arguendo that this claim is preserved.

defendant's obstructing justice, court met obligation to explain sentence by stating, "'there is sufficient evidence here that that is what happened'"; "[a]lthough it did not go further and explain *why* it believed Shipp, . . . there is little mystery on that point: the court heard Shipp testify first-hand and hence was able to judge his credibility directly") (emphasis in original). In any event, the court made clear that it found the witnesses' conspiracy testimony to have been corroborated in various ways, and it expressly addressed the few challenges appellants made on the basis of alleged contradictions (supra n.20-21, 24-25), rather than on the basis of general-credibility attacks. Thus, the court did not err, let alone plainly err. *See Dozier*, 162 F.3d at 125 and n.4; *cf. Graham*, 317 F.3d at 270-71 (where defendant challenged factual basis for witness Andrews's assertion that Gray gave defendant crack on two occasions, court adequately addressed challenge by "referr[ing to] Andrews' testimony in making its ruling, implicitly indicating that it was crediting Andrews' testimony").

### 4. The Court Correctly Applied the Guidelines.

Appellants argue (91-95) that the court erred by attributing to them conduct that was neither jointly undertaken nor connected to

their offenses of conviction. These arguments require little discussion. As shown *supra*, the court did not clearly err in finding that each appellant knowingly participated in the overall scheme to distribute crack in Congress Park, and such conspiracy conduct is, by definition, "jointly undertaken criminal activity." *See* USSG §1B1.3(a)(2), comment. (n.2) ("A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy."). In addition, because the court found that appellants' offenses of conviction were committed pursuant to the conspiracy (5/1/08:23; 10/29/10:18; 3/17/11:31), the conspiracy obviously qualified under §1B1.3(a)(2) as conduct that was "part of the same . . . common scheme or plan as the offense of conviction." *See* §1B1.3(a)(2), comment. (n.9(A)) (offenses qualify as part of same common scheme or plan if they are "substantially connected to each other by at least one common factor, such as . . . common accomplices [or] common purpose").

## C.  Appellants' Sentences Are Substantively Reasonable.

This Court applies a rebuttable presumption of reasonableness to sentences within the applicable Guidelines range. *United States v.*

*Lawrence,* 662 F.3d 551, 563 (D.C. Cir. 2011). Appellants' sentences, of course, were significantly lower -- Jones's by 144 months, Thurston's by 68 months, and Ball's by 67 months -- than the bottom of the applicable Guidelines ranges. As this Court repeatedly has observed, "it is 'hard to imagine' how a sentence '*below* the range we ordinarily view as reasonable' could be unreasonably high." *United States v. Lopesierra-Gutierrez,* 708 F.3d 193, 208 (D.C. Cir. 2013) (quoting *Mejia,* 597 F.3d at 1343) (emphasis in original)).

Without acknowledging this presumption, appellants assert (88) that their sentences are substantively unreasonable because they are "far higher" than the Guidelines ranges that would ostensibly (supra n.40) have been applicable to their offenses of conviction. Appellants misapprehend the nature of substantive-reasonableness review. As both the Supreme Court and this Court have made clear, the substantive reasonableness of a sentence is judged by reference to, inter alia, the applicable Guidelines range, the correct calculation of which requires consideration of relevant conduct. *See Gall,* 552 U.S. at 49, 51 (in reviewing substantive reasonableness, appellate court must "take into account . . . the extent of any variance from the Guidelines range");

*Lawson*, 494 F.3d at 1056 (consideration of "the appropriate Guidelines range for [a defendant's] crimes and his misconduct" is "a necessary threshold inquiry for our reasonableness review"). Here, the court properly considered appellants' conspiracy conduct in calculating their Guidelines ranges, and the sentences the court imposed were reasonable in light of those ranges. *See, e.g., Mejia*, 597 F.3d at 1334, 1343 (rejecting substantive-reasonableness claim where sentence was two years below Guidelines range calculated on basis of judge's drug-quantity finding).

## IV.  The Court Did Not Violate Appellants' Presumed Right to Speedy Sentencing.

Appellants claim (98-104) that the court violated their presumed right to speedy sentencing. Appellants are incorrect.

### A.  Background

Appellants were convicted on November 28, 1997. Having originally scheduled their sentencing hearings for February 2008, the court continued those hearings to March 2008 when the probation office requested more time to complete the PSRs (10/29/10:35-36). The court then vacated Thurston's March 7, 2008, sentencing hearing when

92

sentencing briefing was not completed until the close of business on March 6, 2008 (id. at 36; Dkt.1231 (Thurston's reply)). The court vacated Ball's March 14, 2008, sentencing hearing at the request of Ball's counsel, who underwent surgery in early March (Dkt.1290 at 1). On May 1, 2008, the court sentenced Jones.

Meanwhile, on March 7, 2008, Wilson filed a motion for new trial, alleging *Brady* violations (Dkt.1233). Briefing was not completed on Wilson's motion until December 30, 2009 (Dkt.1352); during that briefing period, both Thurston and Ball requested prompt sentencing (Dkt.1290, 1297, 1340, 1342). On July 3, 2010, in a 46-page memorandum opinion and order, the court denied Wilson's motion (Dkt.1377). The court thereafter requested updated PSRs for Thurston and Ball (10/29/10:36; 3/17/11:71), and held their sentencing hearings on October 29, 2010,[53] and March 17, 2011. At each hearing, the court apologized for the delay, explaining that it had wished to resolve Wilson's *Brady* motion before sentencing Thurston and Ball to satisfy

---

[53] The court had scheduled Thurston's hearing for August 4, 2010, but that date conflicted with defense counsel's schedule (10/29/10:36; Dkt.1375, 1396).

itself that the motion did not have "broader implications for the integrity of the remaining convictions" (10/29/10:36; 3/17/11:71). The court acknowledged, however, that the delays were "too long, mostly not due to you," and, to remedy any prejudice, reduced Thurston's and Ball's sentences by 12 and 15 months, respectively (10/29/10:36-37; 3/17/11:71).

### B.    Discussion

Both the Supreme Court and this Court have assumed, without deciding, that the Sixth Amendment's speedy trial right extends to sentencing. *United States v. Gibson*, 353 F.3d 21, 26-27 (D.C. Cir. 2003) (citing *Pollard v. United States*, 352 U.S. 354, 361-62 (1957)).[54] In analyzing speedy sentencing claims, this Court has applied the test enunciated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), which balances four factors: the length of the delay, the reason for the delay,

---

[54] "Most . . . courts of appeal have adopted the same approach . . . -- assuming the existence of the right before denying the claim on the merits." *United States v. Ray*, 578 F.3d 184, 192-93 (2d Cir. 2009) (citing cases). In *Ray*, the Court addressed the question squarely, holding that the Sixth Amendment speedy trial right does *not* extend to sentencing, but that the Fifth Amendment confers a speedy sentencing right. *Id.* at 193-99. This Court has not addressed the latter issue.

the defendant's assertion of his right, and prejudice to the defendant. *Gibson*, 353 F.3d at 27. "Because the rights of society proportionately increase [after a defendant is convicted], the prejudice claimed by the defendant [objecting to a sentencing delay] must be substantial and demonstrable." *Perez v. Sullivan*, 793 F.2d 249, 256 (10th Cir. 1986); *see also United States v. Nelson-Rodriguez*, 319 F.3d 12, 61 (1st Cir. 2003) (in the context of speedy sentencing claim, stating that "the courts have great reluctance to find a speedy trial deprivation where there is no substantial and demonstrable prejudice").

Jones never claimed below, and does not claim here, that his sentencing -- which occurred five months after he was convicted -- was untimely; accordingly, he has failed to show error, much less plain error.[55] As to Thurston and Ball, two of the four factors weigh in their favor; they asserted their right below, and the court itself acknowledged that the length of time between their convictions and sentences, 35 and

_____

[55] Jones's assertion (98, 101) that the delays in the sentencing of *Thurston and Ball* "impeded" his ostensible "right to a speedy appeal" because his appeal "languished as [their] cases stalled below" obviously is incorrect. He has no claim if his own speedy sentencing right was observed; further, he did not seek to have his appeal decided while Thurston and Ball were awaiting sentencing.

39 months, respectively, was too long. The reason for the delays, however, was unrelated to "any misconduct by the government," *United States v. Yelverton*, 197 F.3d 531, 538 (D.C. Cir. 1999); indeed, as appellants acknowledge (99), the government did not oppose their requests to set their cases for sentencing and at all times indicated its readiness to proceed (Dkt.1290:1; Dkt.1298:¶7; 1344:¶4; Dkt.1361:¶1).[56] Thus, as in *Yelverton*, the "key factor" is prejudice. *Id.* Appellants have failed to demonstrate any prejudice whatsoever, much less "meaningful" prejudice. *Id.* at 539.[57] They have not challenged the validity of their

---

[56] Nor was the delay the product of any abuse by the court. In an abundance of caution, the court reasonably could have been concerned, as it stated, that the *Brady* issues raised by Wilson might have implications for the integrity of the trial as a whole -- particularly when Wilson claimed that the undisclosed (and late-disclosed) information undermined the credibility of several key witnesses, including Capies and Kelliebrew, not just regarding the double murder but also regarding the case's "'historical facts'" (Dkt.1377:18-19, 24-25, 28, 30, 34-35). The fact that Thurston and Ball "did not seek mandamus from this [C]ourt to compel the district court to impose sentence" suggests that they "saw no misconduct afoot." *Yelverton*, 197 F.3d at 538.

[57] Appellants claim only (103) that, as a general proposition, delayed sentencing has a detrimental effect on rehabilitation, and that there is an unspecified "degree of prejudice in unduly delayed appeals." Such generalized assertions will not suffice to establish prejudice. *Cf. Gibson*, 353 F.3d at 28 (rejecting asserted prejudice to rehabilitation from incarceration at D.C. Jail during seven-year delay in sentencing, (continued . . . )

96

convictions on appeal, and they have not shown that the sentencing delays affected their ability to present their positions on their sentences[58] or "adversely affected the sentence[s] [they] received." *Id.*[59] Absent such a showing, their status as convicted defendants "weighs more heavily," and they cannot demonstrate that any greater remedy is required than that the court provided: 12- and 15-month reductions in their sentences. *See id.* at 538-39 (no speedy sentencing violation where, although 33 months between conviction and sentencing was "too long," district court reduced defendant's sentence by "several months" in view of delay; delay was inadvertent rather than result of prosecutorial misconduct; and defendant failed to show any "serious prejudice").

---

(. . . continued)

where defendant made "no claim that the delay in sentencing deprived him of programmatic and other rehabilitative benefits for which he would have been eligible as a federal prisoner").

[58] Although Thurston suggests (n.339) that he was deprived of the opportunity to have the mother of his youngest child testify at sentencing, he does not describe what testimony she would have given or how that testimony could have affected his sentence.

[59] Thurston and Ball suggest (101) that the court sentenced them on the basis of their conspiracy conduct only to "place a fig leaf" over the delays in their sentencing. This unwarranted speculation is refuted by the record. As shown *supra* at 32-35, on May 1, 2008, the court sentenced Jones, too, on the basis of his conspiracy conduct.

## CONCLUSION

WHEREFORE, appellee respectfully requests that the judgments of the District Court be affirmed.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

ELIZABETH TROSMAN
ANN PETALAS
GILBERTO GUERRERO
Assistant United States Attorneys

_____/s/_____
STRATTON C. STRAND
D.C. Bar #464992
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, D.C. 20530
(202) 252-6829

98

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains 19,939 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____

STRATTON C. STRAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, this 16th day of May, 2013, I caused two copies of the foregoing Brief and Addendum for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for the parties and the amici:

Anthony D. Martin (appellant Joseph Jones)
Jonathan Zucker (appellant Desmond Thurston)
Stephen C. Leckar (appellant Antwuan Ball)
Jeffrey T. Green (Amici)

/s/
_____

STRATTON C. STRAND
Assistant United States Attorney

# ADDENDUM FOR APPELLEE

# INDEX

PAGE

18 U.S.C. § 1962.................................................................A-1

18 U.S.C. § 3661...............................................................A-3

18 U.S.C. § 3742...............................................................A-4

21 U.S.C. § 841 (2000 ed.)...............................................A-9

21 U.S.C. § 846...............................................................A-16

Fed. R. App. P. 28...........................................................A-17

Fed. R. Civ. P. 52............................................................A-21

USSG § 1B1.3...................................................................A-23

USSG § 2D1.1...................................................................A-33

USSG § 3D1.2...................................................................A-38

USSG § 4B1.1...................................................................A-45

USSG Ch. 5 Pt. A (Sentencing Table) (2007)................A-49

USSG Ch. 5 Pt. A (Sentencing Table) (2009)................A-52

USSG Ch. 5 Pt. A (Sentencing Table) (2010)................A-55

USSG App. C, Amend. 742................................................A-58

USSG App. C, Amend. 748................................................A-61

Policy Statement on En Banc Endorsement of Panel Decisions
     (Jan. 17, 1996).........................................................A-73

Westlaw.

18 U.S.C.A. § 1962                                                                                     Page 1

▷

Effective:[See Text Amendments]

United States Code Annotated Currentness
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 96. Racketeer Influenced and Corrupt Organizations (Refs & Annos)
            → → § 1962. Prohibited activities

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

CREDIT(S)

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 942; amended Pub.L. 100-690, Title VII, § 7033, Nov. 18, 1988, 102 Stat. 4398.)

Current through P.L. 113-3 approved 2-4-13

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 1962                                                    Page 2


Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-2

Westlaw.

18 U.S.C.A. § 3661    Page 1

C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    🗒 Part II. Criminal Procedure
      🗒 Chapter 232. Miscellaneous Sentencing Provisions
        →→ **§ 3661. Use of information for sentencing**

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

CREDIT(S)

(June 25, 1948, c. 645, § 1, 62 Stat. 683, § 3577 as added Pub.L. 91-452, Title X, § 1001(a), Oct. 15, 1970, 84 Stat. 951, § 3577, and renumbered Pub.L. 98-473, Title II, § 212(a)(1), Oct. 12, 1984, 98 Stat. 1987.)

Current through P.L. 113-3 approved 2-4-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

18 U.S.C.A. § 3742                                                                 Page 1

**Effective: April 30, 2003**

United States Code Annotated Currentness
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 235. Appeal (Refs & Annos)
        → → § 3742. Review of a sentence

**(a) Appeal by a defendant.**--A defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence--

  **(1)** was imposed in violation of law;

  **(2)** was imposed as a result of an incorrect application of the sentencing guidelines; or

  **(3)** is greater than the sentence specified in the applicable guideline range to the extent that the sentence includes a greater fine or term of imprisonment, probation, or supervised release than the maximum established in the guideline range, or includes a more limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the maximum established in the guideline range; or

  **(4)** was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

**(b) Appeal by the Government.**--The Government may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence--

  **(1)** was imposed in violation of law;

  **(2)** was imposed as a result of an incorrect application of the sentencing guidelines;

  **(3)** is less than the sentence specified in the applicable guideline range to the extent that the sentence includes a lesser fine or term of imprisonment, probation, or supervised release than the minimum established in the guideline range, or includes a less limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the minimum established in the guideline range; or

  **(4)** was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 3742                                                          Page 2

The Government may not further prosecute such appeal without the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General.

**(c) Plea agreements.**--In the case of a plea agreement that includes a specific sentence under rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure--

  **(1)** a defendant may not file a notice of appeal under paragraph (3) or (4) of subsection (a) unless the sentence imposed is greater than the sentence set forth in such agreement; and

  **(2)** the Government may not file a notice of appeal under paragraph (3) or (4) of subsection (b) unless the sentence imposed is less than the sentence set forth in such agreement.

**(d) Record on review.**--If a notice of appeal is filed in the district court pursuant to subsection (a) or (b), the clerk shall certify to the court of appeals--

  **(1)** that portion of the record in the case that is designated as pertinent by either of the parties;

  **(2)** the presentence report; and

  **(3)** the information submitted during the sentencing proceeding.

**(e) Consideration.**--Upon review of the record, the court of appeals shall determine whether the sentence--

  **(1)** was imposed in violation of law;

  **(2)** was imposed as a result of an incorrect application of the sentencing guidelines;

  **(3)** is outside the applicable guideline range, and

    **(A)** the district court failed to provide the written statement of reasons required by section 3553(c);

    **(B)** the sentence departs from the applicable guideline range based on a factor that--

      **(i)** does not advance the objectives set forth in section 3553(a)(2); or

      **(ii)** is not authorized under section 3553(b); or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 3742                                                                                              Page 3

     **(iii)** is not justified by the facts of the case; or

     **(C)** the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or

    **(4)** was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreason- able.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

**(f) Decision and disposition.**--If the court of appeals determines that--

    **(1)** the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate;

    **(2)** the sentence is outside the applicable guideline range and the district court failed to provide the required statement of reasons in the order of judgment and commitment, or the departure is based on an impermissible factor, or is to an unreasonable degree, or the sentence was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable, it shall state specific reasons for its conclusions and--

     **(A)** if it determines that the sentence is too high and the appeal has been filed under subsection (a), it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate, subject to subsection (g);

     **(B)** if it determines that the sentence is too low and the appeal has been filed under subsection (b), it shall set aside the sentence and remand the case for further sentencing proceedings with such instructions as the court considers appropriate, subject to subsection (g);

    **(3)** the sentence is not described in paragraph (1) or (2), it shall affirm the sentence.

**(g) Sentencing upon remand.**--A district court to which a case is remanded pursuant to subsection (f)(1) or (f)(2) shall resentence a defendant in accordance with section 3553 and with such instructions as may have been

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 3742                                                                    Page 4

given by the court of appeals, except that--

(1) In determining the range referred to in subsection 3553(a)(4), the court shall apply the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that were in effect on the date of the previous sentencing of the defendant prior to the appeal, together with any amendments thereto by any act of Congress that was in effect on such date; and

(2) The court shall not impose a sentence outside the applicable guidelines range except upon a ground that--

(A) was specifically and affirmatively included in the written statement of reasons required by section 3553(c) in connection with the previous sentencing of the defendant prior to the appeal; and

(B) was held by the court of appeals, in remanding the case, to be a permissible ground of departure.

**(h) Application to a sentence by a magistrate judge.**--An appeal of an otherwise final sentence imposed by a United States magistrate judge may be taken to a judge of the district court, and this section shall apply (except for the requirement of approval by the Attorney General or the Solicitor General in the case of a Government appeal) as though the appeal were to a court of appeals from a sentence imposed by a district court.

**(i) Guideline not expressed as a range.**--For the purpose of this section, the term "guideline range" includes a guideline range having the same upper and lower limits.

**(j) Definitions.**--For purposes of this section--

(1) a factor is a "permissible" ground of departure if it--

(A) advances the objectives set forth in section 3553(a)(2); and

(B) is authorized under section 3553(b); and

(C) is justified by the facts of the case; and

(2) a factor is an "impermissible" ground of departure if it is not a permissible factor within the meaning of subsection (j)(1).

CREDIT(S)

(Added Pub.L. 98-473, Title II, § 213(a), Oct. 12, 1984, 98 Stat. 2011; amended Pub.L. 99-646, § 73(a), Nov. 10, 1986, 100 Stat. 3617; Pub.L. 100-182, §§ 4 to 6, Dec. 7, 1987, 101 Stat. 1266, 1267; Pub.L. 100-690, Title

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

18 U.S.C.A. § 3742                                                                 Page 5


VII, § 7103(a), Nov. 18, 1988, 102 Stat. 4416, 4417; Pub.L. 101-647, Title XXXV, §§ 3501, 3503, Nov. 29, 1990, 104 Stat. 4921; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 103-322, Title XXXIII, § 330002(k), Sept. 13, 1994, 108 Stat. 2140; Pub.L. 108-21, Title IV, § 401(d) to (f), Apr. 30, 2003, 117 Stat. 670, 671.)


UNCONSTITUTIONALITY OF SUBSEC. (E)

   <Mandatory aspect of subsec. (e) of this section held unconstitutional by United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).>


Current through P.L. 113-3 approved 2-4-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT


© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


A-8

chapter 9 (§301 et seq.) of this title. For complete classification of this Act to the Code, see section 301 of this title and Tables.

This subchapter, referred to in subsec. (b)(3)(D)(vi), (E), was in the original "this title", meaning title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, as amended, and is popularly known as the "Controlled Substances Act". For complete classification of title II to the Code, see second paragraph of Short Title note set out under section 801 of this title and Tables.

Subchapter II of this chapter, referred to in subsecs. (b)(3)(D)(iv), (E) and (c)(2)(A), (B), was in the original "title III", meaning title III of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1285, as amended. Part A of title III comprises subchapter II of this chapter. For classification of Part B, consisting of sections 1101 to 1105 of title III, see Tables.

The customs laws, referred to in subsec. (c)(2)(A), (B), are classified generally to Title 19, Customs Duties.

### AMENDMENTS

2000—Subsec. (b)(3). Pub. L. 106–310 added subpars. (A), (D), and (E), redesignated former subpars. (A) and (B) as (B) and (C), respectively, and inserted "or who engages in an export transaction" after "nonregulated person" in introductory provisions of subpar. (B).

1996—Subsec. (a)(1). Pub. L. 104–237, §208, substituted "for two years after the date of the transaction," for the dash after "record of the transaction" and struck out subpars. (A) and (B) which read as follows:

"(A) for 4 years after the date of the transaction, if the listed chemical is a list I chemical or if the transaction involves a tableting machine or an encapsulating machine; and

"(B) for 2 years after the date of the transaction, if the listed chemical is a list II chemical."

Subsec. (b)(3). Pub. L. 104–237, §402, added par. (3).

1993—Subsec. (a)(1). Pub. L. 103–200, §2(c)(1), substituted "list I chemical" for "precursor chemical" in subpar. (A) and "a list II chemical" for "an essential chemical" in subpar. (B).

Subsec. (b). Pub. L. 103–200, §10, designated existing provisions as par. (1), redesignated former pars. (1) to (4) as subpars. (A) to (D), respectively, in concluding provisions, substituted "subparagraph (A)" for "paragraph (1)" in two places, "subparagraph (B)" for "paragraph (2)", and "subparagraph (C)" for "paragraph (3)", and added par. (2).

Subsec. (c)(2)(D). Pub. L. 103–200, §2(c)(2), substituted "chemical control laws" for "precursor chemical laws".

1988—Pub. L. 100–690 amended section generally, substituting provisions relating to regulation of listed chemicals and certain machines for provisions relating to reporting by any person who distributes, sells, or imports any piperidine.

### EFFECTIVE DATE OF 1993 AMENDMENT

Amendment by Pub. L. 103–200 effective on date that is 120 days after Dec. 17, 1993, see section 11 of Pub. L. 103–200, set out as a note under section 802 of this title.

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–690 effective 120 days after Nov. 18, 1988, see section 6061 of Pub. L. 100–690, set out as a note under section 802 of this title.

### EFFECTIVE DATE; TIME TO SUBMIT PIPERIDINE REPORT; REQUIRED INFORMATION

Section 203(a) of title II of Pub. L. 95–633 provided that:

"(1) Except as provided under paragraph (2), the amendments made by this title [enacting this section and amending sections 841 to 843 of this title] shall take effect on the date of the enactment of this Act [Nov. 10, 1978].

"(2) Any person required to submit a report under section 310(a)(1) of the Controlled Substances Act [subsec. (a)(1) of this section] respecting a distribution,

sale, or importation of piperidine during the 90 days after the date of the enactment of this Act [Nov. 10, 1978] may submit such report any time up to 97 days after such date of enactment.

"(3) Until otherwise provided by the Attorney General by regulation, the information required to be reported by a person under section 310(a)(1) of the Controlled Substances Act (as added by section 202(a)(2) of this title) [subsec. (a)(1) of this section] with respect to the person's distribution, sale, or importation of piperidine shall—

"(A) be the information described in subparagraphs (A) and (B) of such section, and

"(B) except as provided in paragraph (2) of this subsection, be reported not later than seven days after the date of such distribution, sale, or importation."

### REPEALS

Pub. L. 96–359, §8(b), Sept. 26, 1980, 94 Stat. 1194, repealed section 203(d) of Pub. L. 95–633, which had provided for the repeal of this section effective Jan. 1, 1981.

### REGULATIONS FOR PIPERIDINE REPORTING

Section 203(b) of Pub. L. 95–633 required the Attorney General to publish proposed interim regulations for piperidine reporting under section 830(a) of this title not later than 30 days after enactment, and final interim regulations not later than 75 days after enactment, such final interim regulations to be effective on and after the ninety-first day after enactment.

### REPORT TO PRESIDENT AND CONGRESS ON EFFECTIVENESS OF TITLE II OF PUB. L. 95–633

Section 203(c) of Pub. L. 95–633 required the Attorney General to analyze and evaluate the impact and effectiveness of the amendments made by title II of Pub. L. 95–633, and report to the President and Congress not later than Mar. 1, 1980.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 802, 827, 841, 842, 843, 958 of this title.

## PART D—OFFENSES AND PENALTIES

### §841. Prohibited acts A

#### (a) Unlawful acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

#### (b) Penalties

Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of a violation of subsection (a) of this section involving—

(i) 1 kilogram or more of a mixture or substance containing a detectable amount of heroin;

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

(iv) 100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(v) 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(vi) 400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[ 1-(2-phenylethyl)-4-piperidinyl ] propanamide or 100 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(vii) 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 1,000 or more marihuana plants regardless of weight; or

(viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $8,000,000 if the defendant is an individual or $20,000,000 if the defendant is other than an individual, or both. If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence. Any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on proba-

tion or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(B) In the case of a violation of subsection (a) of this section involving—

(i) 100 grams or more of a mixture or substance containing a detectable amount of heroin;

(ii) 500 grams or more of a mixture or substance containing a detectable amount of—

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 5 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

(iv) 10 grams or more of phencyclidine (PCP) or 100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP);

(v) 1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

(vi) 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[ 1-(2-phenylethyl)-4-piperidinyl ] propanamide or 10 grams or more of a mixture or substance containing a detectable amount of any analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide;

(vii) 100 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 100 or more marihuana plants regardless of weight; or

(viii) 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provi-

Page 1133                          TITLE 21—FOOD AND DRUGS                          §841

sions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(C) In the case of a controlled substance in schedule I or II, gamma hydroxybutyric acid (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000), or 1 gram of flunitrazepam, except as provided in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

(D) In the case of less than 50 kilograms of marihuana, except in the case of 50 or more marihuana plants regardless of weight, 10 kilograms of hashish, or one kilogram of hashish oil or in the case of any controlled substance in schedule III (other than gamma hydroxybutyric acid), or 30 milligrams of flunitrazepam, such person shall, except as provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in

accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment.

(2) In the case of a controlled substance in schedule IV, such person shall be sentenced to a term of imprisonment of not more than 3 years, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 6 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $500,000 if the defendant is an individual or $2,000,000 if the defendant is other than an individual, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least one year in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment.

(3) In the case of a controlled substance in schedule V, such person shall be sentenced to a term of imprisonment of not more than one year, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $100,000 if the defendant is an individual or $250,000 if the defendant is other than an individual, or both. If any person commits such a violation after one or more convictions of him for an offense punishable under this paragraph, or for a crime under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 2 years, a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $200,000 if the defendant is an individual or $500,000 if the defendant is other than an individual, or both.

A-11

(4) Notwithstanding paragraph (1)(D) of this subsection, any person who violates subsection (a) of this section by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of title 18.

(5) Any person who violates subsection (a) of this section by cultivating a controlled substance on Federal property shall be imprisoned as provided in this subsection and shall be fined any amount not to exceed—

(A) the amount authorized in accordance with this section;

(B) the amount authorized in accordance with the provisions of title 18;

(C) $500,000 if the defendant is an individual; or

(D) $1,000,000 if the defendant is other than an individual;

or both.

(6) Any person who violates subsection (a) of this section, or attempts to do so, and knowingly or intentionally uses a poison, chemical, or other hazardous substance on Federal land, and, by such use—

(A) creates a serious hazard to humans, wildlife, or domestic animals,

(B) degrades or harms the environment or natural resources, or

(C) pollutes an aquifer, spring, stream, river, or body of water,

shall be fined in accordance with title 18 or imprisoned not more than five years, or both.

(7) PENALTIES FOR DISTRIBUTION.—

(A) IN GENERAL.—Whoever, with intent to commit a crime of violence, as defined in section 16 of title 18 (including rape), against an individual, violates subsection (a) of this section by distributing a controlled substance or controlled substance analogue to that individual without that individual's knowledge, shall be imprisoned not more than 20 years and fined in accordance with title 18.

(B) DEFINITION.—For purposes of this paragraph, the term "without that individual's knowledge" means that the individual is unaware that a substance with the ability to alter that individual's ability to appraise conduct or to decline participation in or communicate unwillingness to participate in conduct is administered to the individual.

### (c) Offenses involving listed chemicals

Any person who knowingly or intentionally—

(1) possesses a listed chemical with intent to manufacture a controlled substance except as authorized by this subchapter;

(2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter; or

(3) with the intent of causing the evasion of the recordkeeping or reporting requirements of section 830 of this title, or the regulations issued under that section, receives or distributes a reportable amount of any listed chemical in units small enough so that the making of records or filing of reports under that section is not required;

shall be fined in accordance with title 18 or imprisoned not more than 20 years in the case of a violation of paragraph (1) or (2) involving a list I chemical or not more than 10 years in the case of a violation of this subsection other than a violation of paragraph (1) or (2) involving a list I chemical, or both.

### (d) Boobytraps on Federal property; penalties; "boobytrap" defined

(1) Any person who assembles, maintains, places, or causes to be placed a boobytrap on Federal property where a controlled substance is being manufactured, distributed, or dispensed shall be sentenced to a term of imprisonment for not more than 10 years and shall be fined not more than $10,000.

(2) If any person commits such a violation after 1 or more prior convictions for an offense punishable under this subsection, such person shall be sentenced to a term of imprisonment of not more than 20 years and shall be fined not more than $20,000.

(3) For the purposes of this subsection, the term "boobytrap" means any concealed or camouflaged device designed to cause bodily injury when triggered by any action of any unsuspecting person making contact with the device. Such term includes guns, ammunition, or explosive devices attached to trip wires or other triggering mechanisms, sharpened stakes, and lines or wires with hooks attached.

### (e) Ten-year injunction as additional penalty

In addition to any other applicable penalty, any person convicted of a felony violation of this section relating to the receipt, distribution, manufacture, exportation, or importation of a listed chemical may be enjoined from engaging in any transaction involving a listed chemical for not more than ten years.

### (f) Wrongful distribution or possession of listed chemicals

(1) Whoever knowingly distributes a listed chemical in violation of this subchapter (other than in violation of a recordkeeping or reporting requirement of section 830 of this title) shall be fined under title 18 or imprisoned not more than 5 years, or both.

(2) Whoever possesses any listed chemical, with knowledge that the recordkeeping or reporting requirements of section 830 of this title have not been adhered to, if, after such knowledge is acquired, such person does not take immediate steps to remedy the violation shall be fined under title 18 or imprisoned not more than one year, or both.

(Pub. L. 91–513, title II, §401, Oct. 27, 1970, 84 Stat. 1260; Pub. L. 95–633, title II, §201, Nov. 10, 1978, 92 Stat. 3774; Pub. L. 96–359, §8(c), Sept. 26, 1980, 94 Stat. 1194; Pub. L. 98–473, title II, §§224(a), 502, 503(b)(1), (2), Oct. 12, 1984, 98 Stat. 2030, 2068, 2070; Pub. L. 99–570, title I, §§1002, 1003(a), 1004(a), 1005(a), 1103, title XV, §15005, Oct. 27, 1986, 100 Stat. 3207–2, 3207–5, 3207–6, 3207–11, 3702–192; Pub. L. 100–690, title VI, §§6055, 6254(h), 6452(a), 6470(g), (h), 6479, Nov. 18, 1988, 102 Stat. 4318, 4367, 4371, 4378, 4381; Pub. L. 101–647, title X, §1002(e), title XII, §1202, title XXXV, §3599K, Nov. 29, 1990, 104 Stat. 4828, 4830, 4932; Pub. L. 103–322, title IX, §90105(a), (c), title XVIII,

Page 1135                TITLE 21—FOOD AND DRUGS                §841

§180201(b)(2)(A), Sept. 13, 1994, 108 Stat. 1987, 1988, 2047; Pub. L. 104–237, title II, §206(a), title III, §302(a), Oct. 3, 1996, 110 Stat. 3103, 3105; Pub. L. 104–305, §2(a), (b)(1), Oct. 13, 1996, 110 Stat. 3807; Pub. L. 105–277, div. E, §2(a), Oct. 21, 1998, 112 Stat. 2681–759; Pub. L. 106–172, §§3(b)(1), 5(b), 9, Feb. 18, 2000, 114 Stat. 9, 10, 13.)

REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a), (b)(1) to (3), (c)(1), (2), and (f)(1), was in the original "this title", meaning title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, as amended, and is popularly known as the "Controlled Substances Act". For complete classification of title II to the Code, see second paragraph of Short Title note set out under section 801 of this title and Tables.

Schedules I, II, III, IV, and V, referred to in subsec. (b), are set out in section 812(c) of this title.

Subchapter II of this chapter, referred to in subsec. (b)(1) to (3), was in the original "title III", meaning title III of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1285, as amended. Part A of title III comprises subchapter II of this chapter. For classification of Part B, consisting of sections 1101 to 1105 of title III, see Tables.

Section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Prohibition Act of 2000, referred to in subsec. (b)(1)(C), is section 3(a)(1)(B) of Pub. L. 106–172, which is set out in a note under section 812 of this title.

AMENDMENTS

2000—Subsec. (b)(1)(C). Pub. L. 106–172, §3(b)(1)(A), inserted "gamma hydroxybutyric acid (including when scheduled as an approved drug product for purposes of section 3(a)(1)(B) of the Hillory J. Farias and Samantha Reid Date-Rape Drug Prohibition Act of 2000)," after "schedule I or II," in first sentence.

Subsec. (b)(1)(C). Pub. L. 106–172, §3(b)(1)(B), substituted "(other than gamma hydroxybutyric acid), or 30" for ", or 30".

Subsec. (b)(7)(A). Pub. L. 106–172, §5(b), inserted "or controlled substance analogue" after "distributing a controlled substance".

Subsecs. (c) to (g). Pub. L. 106–172, §9, redesignated subsecs. (d) to (g) as (c) to (f), respectively.

1998—Subsec. (b)(1). Pub. L. 105–277 in subpar. (A)(viii) substituted "50 grams" and "500 grams" for "100 grams" and "1 kilogram", respectively, and in subpar. (B)(viii) substituted "5 grams" and "50 grams" for "10 grams" and "100 grams", respectively.

1996—Subsec. (b)(1)(C). Pub. L. 104–305, §2(b)(1)(A), inserted ", or 1 gram of flunitrazepam," after "schedule I or II".

Subsec. (b)(1)(D). Pub. L. 104–305, §2(b)(1)(B), inserted "or 30 milligrams of flunitrazepam," after "schedule III,".

Subsec. (b)(7). Pub. L. 104–305, §2(a), added par. (7).

Subsec. (d). Pub. L. 104–237, §302(a), in concluding provisions, substituted "not more than 20 years in the case of a violation of paragraph (1) or (2) involving a list I chemical or not more than 10 years in the case of a violation of this subsection other than a violation of paragraph (1) or (2) involving a list I chemical," for "not more than 10 years,".

Subsec. (f). Pub. L. 104–237, §206(a), inserted "manufacture, exportation," after "distribution," and struck out "regulated" after "engaging in any".

1994—Subsec. (b). Pub. L. 103–322, §180201(b)(2)(A), inserted "849," before "859," in introductory provisions.

Subsec. (b)(1)(A). Pub. L. 103–322, §§90105(c), 180201(b)(2)(A), in concluding provisions, inserted "849," before "859," and struck out "For purposes of this subparagraph, the term 'felony drug offense' means an offense that is a felony under any provision of this subchapter or any other Federal law that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances or a felony under any law of a State or a foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, or depressant or stimulant substances." before "Any sentence under this subparagraph".

Subsec. (b)(1)(B). Pub. L. 103–322, §90105(a), in sentence in concluding provisions beginning "If any person commits", substituted "a prior conviction for a felony drug offense has become final" for "one or more prior convictions for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final".

Subsec. (b)(1)(C). Pub. L. 103–322, §90105(a), in sentence beginning "If any person commits", substituted "a prior conviction for a felony drug offense has become final" for "one or more prior convictions for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final".

Subsec. (b)(1)(D). Pub. L. 103–322, §90105(a), in sentence beginning "If any person commits", substituted "a prior conviction for a felony drug offense has become final" for "one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final".

1990—Subsec. (b). Pub. L. 101–647, §1002(e)(1), substituted "section 859, 860, or 861" for "section 845, 845a, or 845b" in introductory provisions.

Subsec. (b)(1)(A). Pub. L. 101–647, §1002(e)(1), substituted "section 859, 860, or 861" for "section 845, 845a, or 845b" in concluding provisions.

Subsec. (b)(1)(A)(ii)(IV). Pub. L. 101–647, §3599K, substituted "any of the substances" for "any of the substance".

Subsec. (b)(1)(A)(viii). Pub. L. 101–647, §1202, substituted "or 1 kilogram or more of a mixture or substance containing a detectable amount of methamphetamine" for "or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine".

Subsec. (b)(1)(B)(ii)(IV). Pub. L. 101–647, §3599K, substituted "any of the substances" for "any of the substance".

Subsec. (c). Pub. L. 101–647, §1002(e)(2), directed amendment of subsec. (c) by substituting "section 859, 860, or 861 of this title" for "section 845, 845a, or 845b of this title". Subsec. (c) was previously repealed by Pub. L. 98–473, §224(a)(2), as renumbered by Pub. L. 99–570, §1005(a), effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of such amendment. See 1984 Amendment note and Effective Date of 1984 Amendment note below.

1988—Subsec. (b)(1)(A). Pub. L. 100–690, §§6452(a), 6470(g), 6479(1), inserted ", or 1,000 or more marihuana plants regardless of weight" in cl. (vii), added cl. (viii), substituted "a prior conviction for a felony drug offense has become final" for "one or more prior convictions for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final" in second sentence, and added provisions relating to sentencing for a person who violates this subpar. or section 485, 485a, or 485b of this title after two or more prior convictions for a felony drug offense have become final and defining "felony drug offense".

Subsec. (b)(1)(B). Pub. L. 100–690, §§6470(h), 6479(2), inserted ", or 100 or more marihuana plants regardless of weight" in cl. (vii) and added cl. (viii).

Subsec. (b)(1)(D). Pub. L. 100–690, §6479(3), substituted "50 or more marihuana plants" for "100 or more marihuana plants".

§ 841                    TITLE 21—FOOD AND DRUGS                    Page 1136

Subsec. (b)(6). Pub. L. 100-690, § 6254(h), added par. (6).

Subsec. (d). Pub. L. 100-690, § 6055(a), amended subsec. (d) generally. Prior to amendment, subsec. (d) read as follows: "Any person who knowingly or intentionally—

"(1) possesses any piperidine with intent to manufacture phencyclidine except as authorized by this subchapter, or

"(2) possesses any piperidine knowing, or having reasonable cause to believe, that the piperidine will be used to manufacture phencyclidine except as authorized by this subchapter,

shall be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both."

Subsecs. (f), (g). Pub. L. 100-690, § 6055(b), added subsecs. (f) and (g).

1986—Pub. L. 99-570, § 1005(a), amended Pub. L. 98-473, § 224(a). See 1984 Amendment note below.

Subsec. (b). Pub. L. 99-570, § 1103(a), substituted ", 845a, or 845b" for "or 845a" in introductory provisions.

Subsec. (b)(1)(A). Pub. L. 99-570, § 1002(2), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "In the case of a violation of subsection (a) of this section involving—

"(i) 100 grams or more of a controlled substance in schedule I or II which is a mixture or substance containing a detectable amount of a narcotic drug other than a narcotic drug consisting of—

"(I) coca leaves;

"(II) a compound, manufacture, salt, derivative, or preparation of coca leaves; or

"(III) a substance chemically identical thereto;

"(ii) a kilogram or more of any other controlled substance in schedule I or II which is a narcotic drug;

"(iii) 500 grams or more of phencyclidine (PCP); or

"(iv) 5 grams or more of lysergic acid diethylamide (LSD);

such person shall be sentenced to a term of imprisonment of not more than 20 years, a fine of not more than $250,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 40 years, a fine of not more than $500,000, or both".

Subsec. (b)(1)(B). Pub. L. 99-570, § 1002(2), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "In the case of a controlled substance in schedule I or II except as provided in subparagraphs (A) and (C),, such person shall be sentenced to a term of imprisonment of not more than 15 years, a fine of not more than $125,000, or both. If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 30 years, a fine of not more than $250,000, or both. Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 6 years in addition to such term of imprisonment."

Subsec. (b)(1)(C). Pub. L. 99-570, § 1002(2), added subpar. (C). Former subpar. (C) redesignated (D).

Subsec. (b)(1)(D). Pub. L. 99-570, § 1004(a), substituted "term of supervised release" for "special parole term" in two places.

Pub. L. 99-570, §§ 1002(1), 1003(a)(1), redesignated former subpar. (C) as (D), substituted "a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual" for "a fine of not more than $50,000" and "a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $500,000 if the defendant is an individual or $3,000,000 if the defendant is other than an individual" for "a fine of not more than $100,000", and inserted "except in the case of 100 or more marihuana plants regardless of weight,".

Subsec. (b)(2). Pub. L. 99-570, § 1004(a), substituted "term of supervised release" for "special parole term" in two places.

Pub. L. 99-570, § 1003(a)(2), substituted "a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual" for "a fine of not more than $25,000" and "a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $500,000 if the defendant is an individual or $3,000,000 if the defendant is other than an individual" for "a fine of not more than $50,000".

Subsec. (b)(3). Pub. L. 99-570, § 1003(a)(3), substituted "a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $100,000 if the defendant is an individual or $250,000 if the defendant is other than an individual" for "a fine of not more than $10,000" and "a fine not to exceed the greater of twice that authorized in accordance with the provisions of title 18 or $200,000 if the defendant is an individual or $500,000 if the defendant is other than an individual" for "a fine of not more than $20,000".

Subsec. (b)(4). Pub. L. 99-570, § 1003(a)(4), which directed the substitution of "1(D)" for "1(C)" was executed by substituting "(1)(D)" for "(1)(C)" as the probable intent of Congress.

Subsec. (b)(5). Pub. L. 99-570, § 1003(a)(5), amended par. (5) generally. Prior to amendment, par. (5) read as follows: "Notwithstanding paragraph (1), any person who violates subsection (a) of this section by cultivating a controlled substance on Federal property shall be fined not more than—

"(A) $500,000 if such person is an individual; and

"(B) $1,000,000 if such person is not an individual."

Subsec. (c). Pub. L. 99-570, § 1004(a), substituted "term of supervised release" for "special parole term" wherever appearing, effective Nov. 1, 1987, the effective date of the repeal of subsec. (c) by Pub. L. 98-473, § 224(a)(2). See 1984 Amendment note below.

Pub. L. 99-570, § 1103(b), substituted ", 845a, or 845b" for "845a" in two places.

Subsec. (d). Pub. L. 99-570, § 1003(a)(6), substituted "a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual" for "a fine of not more than $15,000".

Subsec. (e). Pub. L. 99-570, § 15005, added subsec. (e).

1984—Subsec. (b). Pub. L. 98-473, § 503(b)(1), inserted reference to section 845a of this title in provisions preceding par. (1)(A).

Pub. L. 98-473, § 224(a)(1)-(3), (5), which directed amendment of this subsection effective Nov. 1, 1987 (see section 235(a)(1) of Pub. L. 98-473 set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure) was repealed by Pub. L. 99-570, § 1005(a), and the remaining pars. (4) and (6) of Pub. L. 98-473, § 224(a), were redesignated as pars. (1) and (2), respectively.

Subsec. (b)(1)(A). Pub. L. 98-473, § 502(1)(A), added subpar. (A). Former subpar. (A) redesignated (B).

Subsec. (b)(1)(B). Pub. L. 98-473, § 502(1)(A), (B), redesignated former subpar. (A) as (B), substituted "except as provided in subparagraphs (A) and (C)," for "which is a narcotic drug", "$125,000" for "$25,000", and "$250,000" for "$50,000", and inserted references to laws

of a State and a foreign country. Former subpar. (B) redesignated (C).

Subsec. (b)(1)(C). Pub. L. 98–473, § 502(1)(A), (C), redesignated former subpar. (B) as (C), substituted "less than 50 kilograms of marihuana, 10 kilograms of hashish, or one kilogram of hashish oil" for "a controlled substance in schedule I or II which is not a narcotic drug", "and (5)" for ", (5), and (6)", "$50,000" for "$15,000", and "$100,000" for "$30,000", and inserted references to laws of a State and a foreign country.

Subsec. (b)(2). Pub. L. 98–473, § 502(2), substituted "$25,000" for "$10,000" and "$50,000" for "$20,000", and inserted references to laws of a State or of a foreign country.

Subsec. (b)(3). Pub. L. 98–473, § 502(3), substituted "$10,000" for "$5,000" and "$20,000" for "$10,000", and inserted references to laws of a State or of a foreign country.

Subsec. (b)(4). Pub. L. 98–473, § 502(4), substituted "(1)(C)" for "(1)(B)".

Pub. L. 98–473, § 224(a)(1), as renumbered by Pub. L. 99–570, § 1005(a), substituted "in section 844 of this title and section 3607 of title 18" for "in subsections (a) and (b) of section 844 of this title".

Subsec. (b)(5). Pub. L. 98–473, § 502(5), (6), added par. (5) and struck out former par. (5) which related to penalties for manufacturing, etc., phencyclidine.

Subsec. (b)(6). Pub. L. 98–473, § 502(5), struck out par. (6) which related to penalties for violations involving a quantity of marihuana exceeding 1,000 pounds.

Subsec. (c). Pub. L. 98–473, § 224(a)(2), as renumbered by Pub. L. 99–570, § 1005(a), struck out subsec. (c) which read as follows: "A special parole term imposed under this section or section 845, 845a, or 845b of this title may be revoked if its terms and conditions are violated. In such circumstances the original term of imprisonment shall be increased by the period of the special parole term and the resulting new term of imprisonment shall not be diminished by the time which was spent on special parole. A person whose special parole term has been revoked may be required to serve all or part of the remainder of the new term of imprisonment. A special parole term provided for in this section or section 845, 845a, or 845b of this title shall be in addition to, and not in lieu of, any other parole provided for by law."

Pub. L. 98–473, § 503(b)(2), inserted reference to section 845a of this title in two places.

1980—Subsec. (b)(1)(B). Pub. L. 96–359, § 8(c)(1), inserted reference to par. (6) of this subsection.

Subsec. (b)(6). Pub. L. 96–359, § 8(c)(2), added par. (6).

1978—Subsec. (b)(1)(B). Pub. L. 95–633, § 201(1), inserted ", except as provided in paragraphs (4) and (5) of this subsection," after "such person shall".

Subsec. (b)(5). Pub. L. 95–633, § 201(2), added par. (5).

Subsec. (d). Pub. L. 95–633, § 201(3), added subsec. (d).

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by section 6055 of Pub. L. 100–690 effective 120 days after Nov. 18, 1988, see section 6061 of Pub. L. 100–690, set out as a note under section 802 of this title.

EFFECTIVE DATE OF 1986 AMENDMENT

Section 1004(b) of Pub. L. 99–570 provided that: "The amendments made by this section [amending this section and sections 845, 845a, 960, and 962 of this title] shall take effect on the date of the taking effect of section 3583 of title 18, United States Code [Nov. 1, 1987]."

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 224(a) of Pub. L. 98–473 effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of such amendment, see section 235(a)(1) of Pub. L. 98–473, set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure.

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–633 effective Jan. 10, 1979, see section 203(a) of Pub. L. 95–633 set out as an Effective Date note under section 830 of this title.

REPEALS

Pub. L. 96–359, § 8(b), Sept. 26, 1980, 94 Stat. 1194, repealed section 203(d) of Pub. L. 95–633, which had provided for the repeal of subsec. (d) of this section effective Jan. 1, 1981.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 844a, 846, 849, 859, 860, 861, 886 of this title; title 16 sections 559c, 559d; title 18 sections 36, 3553, 3599, 3663, 5032, 5038; title 28 section 994; title 42 section 14052.

## § 842. Prohibited acts B

### (a) Unlawful acts

It shall be unlawful for any person—

(1) who is subject to the requirements of part C to distribute or dispense a controlled substance in violation of section 829 of this title;

(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration;

(3) who is a registrant to distribute a controlled substance in violation of section 825 of this title;

(4) to remove, alter, or obliterate a symbol or label required by section 825 of this title;

(5) to refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter;

(6) to refuse any entry into any premises or inspection authorized by this subchapter or subchapter II of this chapter;

(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 824(f) or 881 of this title or to remove or dispose of substances so placed under seal;

(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this subchapter or subchapter II of this chapter, any information acquired in the course of an inspection authorized by this subchapter concerning any method or process which as a trade secret is entitled to protection, or to use to his own advantage or reveal (other than as authorized by section 830 of this title) any information that is confidential under such section;

(9) who is a regulated person to engage in a regulated transaction without obtaining the identification required by 830(a)(3) of this title;

(10) negligently to fail to keep a record or make a report under section 830 of this title; or

(11) to distribute a laboratory supply to a person who uses, or attempts to use, that laboratory supply to manufacture a controlled substance or a listed chemical, in violation of this subchapter or subchapter II of this chapter, with reckless disregard for the illegal uses to which such a laboratory supply will be put.

As used in paragraph (11), the term "laboratory supply" means a listed chemical or any chemi-

Westlaw.

21 U.S.C.A. § 846                                                              Page 1


C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
    Title 21. Food and Drugs (Refs & Annos)
        Chapter 13. Drug Abuse Prevention and Control (Refs & Annos)
            Subchapter I. Control and Enforcement
                Part D. Offenses and Penalties
                    → → **§ 846. Attempt and conspiracy**


Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.


CREDIT(S)

(Pub.L. 91-513, Title II, § 406, Oct. 27, 1970, 84 Stat. 1265; Pub.L. 100-690, Title VI, § 6470(a), Nov. 18, 1988, 102 Stat. 4377.)


Current through P.L. 113-3 approved 2-4-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Federal Rules of Appellate Procedure Rule 28, 28 U.S.C.A.                                        Page 1


United States Code Annotated Currentness
  Federal Rules of Appellate Procedure (Refs & Annos)
    🏛 Title VII. General Provisions
    ➡➡ **Rule 28. Briefs**

**(a) Appellant's Brief.** The appellant's brief must contain, under appropriate headings and in the order indicated:

  **(1)** a corporate disclosure statement if required by Rule 26.1;

  **(2)** a table of contents, with page references;

  **(3)** a table of authorities--cases (alphabetically arranged), statutes, and other authorities--with references to the pages of the brief where they are cited;

  **(4)** a jurisdictional statement, including:

    **(A)** the basis for the district court's or agency's subject-matter jurisdiction, with citations to applicable statutory provisions and stating relevant facts establishing jurisdiction;

    **(B)** the basis for the court of appeals' jurisdiction, with citations to applicable statutory provisions and stating relevant facts establishing jurisdiction;

    **(C)** the filing dates establishing the timeliness of the appeal or petition for review; and

    **(D)** an assertion that the appeal is from a final order or judgment that disposes of all parties' claims, or information establishing the court of appeals' jurisdiction on some other basis;

  **(5)** a statement of the issues presented for review;

  **(6)** a statement of the case briefly indicating the nature of the case, the course of proceedings, and the disposition below;

  **(7)** a statement of facts relevant to the issues submitted for review with appropriate references to the record (see Rule 28(e));

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(8) a summary of the argument, which must contain a succinct, clear, and accurate statement of the arguments made in the body of the brief, and which must not merely repeat the argument headings;

(9) the argument, which must contain:

(A) appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues);

(10) a short conclusion stating the precise relief sought; and

(11) the certificate of compliance, if required by Rule 32(a)(7).

(b) **Appellee's Brief.** The appellee's brief must conform to the requirements of Rule 28(a)(1)-(9) and (11), except that none of the following need appear unless the appellee is dissatisfied with the appellant's statement:

(1) the jurisdictional statement;

(2) the statement of the issues;

(3) the statement of the case;

(4) the statement of the facts; and

(5) the statement of the standard of review.

(c) **Reply Brief.** The appellant may file a brief in reply to the appellee's brief. Unless the court permits, no further briefs may be filed. A reply brief must contain a table of contents, with page references, and a table of authorities--cases (alphabetically arranged), statutes, and other authorities--with references to the pages of the reply brief where they are cited.

(d) **References to Parties.** In briefs and at oral argument, counsel should minimize use of the terms "appellant" and "appellee." To make briefs clear, counsel should use the parties' actual names or the designations used in the lower court or agency proceeding, or such descriptive terms as "the employee," "the injured person," "the taxpayer," "the ship," "the stevedore."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Appellate Procedure Rule 28, 28 U.S.C.A.                                      Page 3

**(e) References to the Record.** References to the parts of the record contained in the appendix filed with the appellant's brief must be to the pages of the appendix. If the appendix is prepared after the briefs are filed, a party referring to the record must follow one of the methods detailed in Rule 30(c). If the original record is used under Rule 30(f) and is not consecutively paginated, or if the brief refers to an unreproduced part of the record, any reference must be to the page of the original document. For example:

• Answer p. 7;

• Motion for Judgment p. 2;

• Transcript p. 231.

Only clear abbreviations may be used. A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected.

**(f) Reproduction of Statutes, Rules, Regulations, etc.** If the court's determination of the issues presented requires the study of statutes, rules, regulations, etc., the relevant parts must be set out in the brief or in an addendum at the end, or may be supplied to the court in pamphlet form.

**(g) [Reserved]**

**(h) [Deleted]**

**(i) Briefs in a Case Involving Multiple Appellants or Appellees.** In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief. Parties may also join in reply briefs.

**(j) Citation of Supplemental Authorities.** If pertinent and significant authorities come to a party's attention after the party's brief has been filed--or after oral argument but before decision--a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally. The body of the letter must not exceed 350 words. Any response must be made promptly and must be similarly limited.

CREDIT(S)

(As amended Apr. 30, 1979, eff. Aug. 1, 1979; Mar. 10, 1986, eff. July 1, 1986; Apr. 25, 1989, eff. Dec. 1, 1989; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 29, 1994, eff. Dec. 1, 1994; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 25, 2005, eff. Dec. 1, 2005.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Appellate Procedure Rule 28, 28 U.S.C.A.                                        Page 4

Amendments received to 2-19-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-20



**C**

United States Code Annotated Currentness
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title VI. Trials
      → → **Rule 52. Findings and Conclusions by the Court; Judgment on Partial Findings**

**(a) Findings and Conclusions.**

(1) *In General.* In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

(2) *For an Interlocutory Injunction.* In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

(3) *For a Motion.* The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion.

(4) *Effect of a Master's Findings.* A master's findings, to the extent adopted by the court, must be considered the court's findings.

(5) *Questioning the Evidentiary Support.* A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings.

(6) *Setting Aside the Findings.* Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

**(b) Amended or Additional Findings.** On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59.

**(c) Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA Case #08-3033    Document #1436409    Filed: 05/16/2013    Page 135 of 188

court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

CREDIT(S)

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; April 28, 1983, effective August 1, 1983; April 29, 1985, effective August 1, 1985; April 30, 1991, effective December 1, 1991; April 22, 1993, effective December 1, 1993; April 27, 1995, effective December 1, 1995; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

Amendments received to 2-19-13

Westlaw. (C) 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

*of one count of robbery but, as part of a plea agreement, admits to having committed two additional robberies, the guidelines are to be applied as if the defendant had been convicted of three counts of robbery. Subsection (d) provides that a conviction on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been convicted of a separate conspiracy count for each offense that he conspired to commit. For example, where a conviction on a single count of conspiracy establishes that the defendant conspired to commit three robberies, the guidelines are to be applied as if the defendant had been convicted on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery, and one count of conspiracy to commit the third robbery.*

4.    *Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under §3D1.2(d) (e.g., a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because §1B1.3(a)(2) governs consideration of the defendant's conduct.*

Historical Note: Effective November 1, 1987. Amended effective January 15, 1988 (see Appendix C, amendment 2); November 1, 1989 (see Appendix C, amendments 73-75 and 303); November 1, 1991 (see Appendix C, amendment 434); November 1, 1992 (see Appendix C, amendment 438); November 1, 2000 (see Appendix C, amendment 591); November 1, 2001 (see Appendix C, amendments 613 and 617).

## §1B1.3.    Relevant Conduct (Factors that Determine the Guideline Range)

(a)    Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

– 22 –

(2)     solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline.

(b)     **Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence).**  Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

*Commentary*

*Application Notes:*

1.    *The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.*

2.    *A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy.*

*In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:*

(i)     *in furtherance of the jointly undertaken criminal activity; and*

(ii)    *reasonably foreseeable in connection with that criminal activity.*

*Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in*

*furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.*

*In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.*

*Note that the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).*

*With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.*

*The requirement of reasonable foreseeability applies only in respect to the conduct (i.e., acts and omissions) of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes; such conduct is addressed under subsection (a)(1)(A).*

*A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level). The Commission does not foreclose the possibility that there may be some unusual set of circumstances in which the exclusion of such conduct may not adequately reflect the defendant's culpability; in such a case, an upward departure may be warranted.*

<u>*Illustrations of Conduct for Which the Defendant is Accountable*</u>

(a)    <u>*Acts and omissions aided or abetted by the defendant*</u>

        (1)    *Defendant A is one of ten persons hired by Defendant B to off-load a ship containing marihuana. The off-loading of the ship is interrupted by law enforcement officers and one ton of marihuana is seized (the amount on the ship as well as the amount off-loaded). Defendant A and the other off-loaders are arrested and convicted of importation of marihuana. Regardless of the number of bales he personally unloaded, Defendant A is accountable for the entire one-ton quantity of marihuana. Defendant A aided and abetted the off-loading of the*

*entire shipment of marihuana by directly participating in the off-loading of that shipment (i.e., the specific objective of the criminal activity he joined was the off-loading of the entire shipment). Therefore, he is accountable for the entire shipment under subsection (a)(1)(A) without regard to the issue of reasonable foreseeability. This is conceptually similar to the case of a defendant who transports a suitcase knowing that it contains a controlled substance and, therefore, is accountable for the controlled substance in the suitcase regardless of his knowledge or lack of knowledge of the actual type or amount of that controlled substance.*

*In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. As noted in the preceding paragraph, Defendant A is accountable for the entire one-ton shipment of marihuana under subsection (a)(1)(A). Defendant A also is accountable for the entire one-ton shipment of marihuana on the basis of subsection (a)(1)(B) (applying to a jointly undertaken criminal activity). Defendant A engaged in a jointly undertaken criminal activity (the scope of which was the importation of the shipment of marihuana). A finding that the one-ton quantity of marihuana was reasonably foreseeable is warranted from the nature of the undertaking itself (the importation of marihuana by ship typically involves very large quantities of marihuana). The specific circumstances of the case (the defendant was one of ten persons off-loading the marihuana in bales) also support this finding. In an actual case, of course, if a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established.*

(b)   *Acts and omissions aided or abetted by the defendant; requirement that the conduct of others be in furtherance of the jointly undertaken criminal activity and reasonably foreseeable*

    (1)   *Defendant C is the getaway driver in an armed bank robbery in which $15,000 is taken and a teller is assaulted and injured. Defendant C is accountable for the money taken under subsection (a)(1)(A) because he aided and abetted the act of taking the money (the taking of money was the specific objective of the offense he joined). Defendant C is accountable for the injury to the teller under subsection (a)(1)(B) because the assault on the teller was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).*

    *As noted earlier, a defendant may be accountable for particular conduct under more than one subsection. In this example, Defendant C also is accountable for the money taken on the basis of subsection (a)(1)(B) because the taking of money was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable (as noted, the taking of money was the specific objective of the jointly undertaken criminal activity).*

(c)     *Requirement that the conduct of others be in furtherance of the jointly undertaken*
        *criminal activity and reasonably foreseeable; scope of the criminal activity*

   (1)     *Defendant D pays Defendant E a small amount to forge an endorsement on an
           $800 stolen government check. Unknown to Defendant E, Defendant D then uses
           that check as a down payment in a scheme to fraudulently obtain $15,000 worth
           of merchandise. Defendant E is convicted of forging the $800 check and is
           accountable for the forgery of this check under subsection (a)(1)(A). Defendant
           E is not accountable for the $15,000 because the fraudulent scheme to obtain
           $15,000 was not in furtherance of the criminal activity he jointly undertook with
           Defendant D (i.e., the forgery of the $800 check).*

   (2)     *Defendants F and G, working together, design and execute a scheme to sell
           fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000.
           Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud.
           Defendants F and G each are accountable for the entire amount ($55,000). Each
           defendant is accountable for the amount he personally obtained under subsection
           (a)(1)(A). Each defendant is accountable for the amount obtained by his
           accomplice under subsection (a)(1)(B) because the conduct of each was in
           furtherance of the jointly undertaken criminal activity and was reasonably
           foreseeable in connection with that criminal activity.*

   (3)     *Defendants H and I engaged in an ongoing marihuana importation conspiracy
           in which Defendant J was hired only to help off-load a single shipment.
           Defendants H, I, and J are included in a single count charging conspiracy to
           import marihuana. Defendant J is accountable for the entire single shipment of
           marihuana he helped import under subsection (a)(1)(A) and any acts and
           omissions in furtherance of the importation of that shipment that were reasonably
           foreseeable (see the discussion in example (a)(1) above). He is not accountable
           for prior or subsequent shipments of marihuana imported by Defendants H or I
           because those acts were not in furtherance of his jointly undertaken criminal
           activity (the importation of the single shipment of marihuana).*

   (4)     *Defendant K is a wholesale distributor of child pornography. Defendant L is a
           retail-level dealer who purchases child pornography from Defendant K and
           resells it, but otherwise operates independently of Defendant K. Similarly,
           Defendant M is a retail-level dealer who purchases child pornography from
           Defendant K and resells it, but otherwise operates independently of Defendant
           K. Defendants L and M are aware of each other's criminal activity but operate
           independently. Defendant N is Defendant K's assistant who recruits customers
           for Defendant K and frequently supervises the deliveries to Defendant K's
           customers. Each defendant is convicted of a count charging conspiracy to
           distribute child pornography. Defendant K is accountable under subsection
           (a)(1)(A) for the entire quantity of child pornography sold to Defendants L and
           M. Defendant N also is accountable for the entire quantity sold to those
           defendants under subsection (a)(1)(B) because the entire quantity was within the
           scope of his jointly undertaken criminal activity and reasonably foreseeable.
           Defendant L is accountable under subsection (a)(1)(A) only for the quantity of
           child pornography that he purchased from Defendant K because the scope of his*

*jointly undertaken criminal activity is limited to that amount. For the same reason, Defendant M is accountable under subsection (a)(1)(A) only for the quantity of child pornography that he purchased from Defendant K.*

(5)     *Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not in furtherance of her jointly undertaken criminal activity (i.e., the one delivery).*

(6)     *Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.*

(7)     *Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R.*

(8)     *Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity. In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported (subsection (a)(1)(A)). As this example illustrates, in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband*

– 27 –

> *that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.*

3.  *"Offenses of a character for which §3D1.2(d) would require grouping of multiple counts," as used in subsection (a)(2), applies to offenses for which grouping of counts would be required under §3D1.2(d) had the defendant been convicted of multiple counts. Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts. For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level even if the defendant is convicted of a single count charging only one of the sales. If the defendant is convicted of multiple counts for the above noted sales, the grouping rules of Chapter Three, Part D (Multiple Counts) provide that the counts are grouped together. Although Chapter Three, Part D (Multiple Counts) applies to multiple counts of conviction, it does not limit the scope of subsection (a)(2). Subsection (a)(2) merely incorporates by reference the types of offenses set forth in §3D1.2(d); thus, as discussed above, multiple counts of conviction are not required for subsection (a)(2) to apply.*

    *As noted above, subsection (a)(2) applies to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, had the defendant been convicted of multiple counts. For example, the defendant sells 30 grams of cocaine (a violation of 21 U.S.C. § 841) on one occasion and, as part of the same course of conduct or common scheme or plan, attempts to sell an additional 15 grams of cocaine (a violation of 21 U.S.C. § 846) on another occasion. The defendant is convicted of one count charging the completed sale of 30 grams of cocaine. The two offenses (sale of cocaine and attempted sale of cocaine), although covered by different statutory provisions, are of a character for which §3D1.2(d) would require the grouping of counts, had the defendant been convicted of both counts. Therefore, subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level.*

4.  *"Harm" includes bodily injury, monetary loss, property damage and any resulting harm.*

5.  *If the offense guideline includes creating a risk or danger of harm as a specific offense characteristic, whether that risk or danger was created is to be considered in determining the offense level. See, e.g., §2K1.4 (Arson; Property Damage by Use of Explosives); §2Q1.2 (Mishandling of Hazardous or Toxic Substances or Pesticides). If, however, the guideline refers only to harm sustained (e.g., §2A2.2 (Aggravated Assault); §2B3.1 (Robbery)) or to actual, attempted or intended harm (e.g., §2B1.1 (Theft, Property Destruction, and Fraud); §2X1.1 (Attempt, Solicitation, or Conspiracy)), the risk created enters into the determination of the offense level only insofar as it is incorporated into the base offense level. Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred. In a case in which creation of risk is not adequately taken into account by the applicable offense guideline, an upward departure may be warranted. See generally §1B1.4 (Information to be Used in Imposing Sentence); §5K2.0 (Grounds for Departure). The extent to which harm that was attempted or intended enters into the determination of the offense level should be determined in accordance with §2X1.1 (Attempt, Solicitation, or Conspiracy) and the applicable offense guideline.*

6.  *A particular guideline (in the base offense level or in a specific offense characteristic) may expressly direct that a particular factor be applied only if the defendant was convicted of a particular statute. For example, in §2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity), subsection (b)(2)(B) applies if the defendant "is convicted under 18 U.S.C. § 1956". Unless such an express direction is included, conviction under the statute is not required. Thus, use of a statutory reference to describe a particular set of circumstances does not require a conviction under the referenced statute. An example of this usage is found in §2A3.4(a)(2) ("if the offense was committed by the means set forth in 18 U.S.C. § 2242").*

*Unless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy, attempt, solicitation, aiding or abetting, accessory after the fact, or misprision of felony in respect to that particular statute. For example, §2S1.1(b)(2)(B) (which is applicable only if the defendant is convicted under 18 U.S.C. § 1956) would be applied in determining the offense level under §2X3.1 (Accessory After the Fact) in a case in which the defendant was convicted of accessory after the fact to a violation of 18 U.S.C. § 1956 but would not be applied in a case in which the defendant is convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957. See Application Note 3(C) of §2S1.1.*

7.  *In the case of a partially completed offense (e.g., an offense involving an attempted theft of $800,000 and a completed theft of $30,000), the offense level is to be determined in accordance with §2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both. See Application Note 4 in the Commentary to §2X1.1. Note, however, that Application Note 4 is not applicable where the offense level is determined under §2X1.1(c)(1).*

8.  *For the purposes of subsection (a)(2), offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is not considered as part of the same course of conduct or common scheme or plan as the offense of conviction.*

*Examples: (1) The defendant was convicted for the sale of cocaine and sentenced to state prison. Immediately upon release from prison, he again sold cocaine to the same person, using the same accomplices and modus operandi. The instant federal offense (the offense of conviction) charges this latter sale. In this example, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction. The prior state prison sentence is counted under Chapter Four (Criminal History and Criminal Livelihood). (2) The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence; see §4A1.2(a)(1).*

**A-30**

*Note, however, in certain cases, offense conduct associated with a previously imposed sentence may be expressly charged in the offense of conviction. Unless otherwise provided, such conduct will be considered relevant conduct under subsection (a)(1), not (a)(2).*

9.    *"Common scheme or plan" and "same course of conduct" are two closely related concepts.*

    (A)    <u>*Common scheme or plan.*</u>  *For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus operandi</u>. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of <u>modus operandi</u> (the same or similar computer manipulations were used to execute the scheme).*

    (B)    <u>*Same course of conduct.*</u>  *Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).*

10.    *In the case of solicitation, misprision, or accessory after the fact, the conduct for which the defendant is accountable includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant.*

<u>*Background*</u>*:  This section prescribes rules for determining the applicable guideline sentencing range, whereas §1B1.4 (Information to be Used in Imposing Sentence) governs the range of information that the court may consider in adjudging sentence once the guideline sentencing range has been determined. Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined.*

    *Subsection (a) establishes a rule of construction by specifying, in the absence of more explicit instructions in the context of a specific guideline, the range of conduct that is relevant to determining the applicable offense level (except for the determination of the applicable offense guideline, which*

A-31

is governed by §1B1.2(a). No such rule of construction is necessary with respect to Chapters Four and Five because the guidelines in those Chapters are explicit as to the specific factors to be considered.

Subsection (a)(2) provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as assault, robbery and burglary. The distinction is made on the basis of §3D1.2(d), which provides for grouping together (i.e., treating as a single count) all counts charging offenses of a type covered by this subsection. However, the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged. Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction. Similarly, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction. On the other hand, in a robbery case in which the defendant robbed two banks, the amount of money taken in one robbery would not be taken into account in determining the guideline range for the other robbery, even if both robberies were part of a single course of conduct or the same scheme or plan. (This is true whether the defendant is convicted of one or both robberies.)

Subsections (a)(1) and (a)(2) adopt different rules because offenses of the character dealt with in subsection (a)(2) (i.e., to which §3D1.2(d) applies) often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. For example, a pattern of embezzlement may consist of several acts of taking that cannot separately be identified, even though the overall conduct is clear. In addition, the distinctions that the law makes as to what constitutes separate counts or offenses often turn on technical elements that are not especially meaningful for purposes of sentencing. Thus, in a mail fraud case, the scheme is an element of the offense and each mailing may be the basis for a separate count; in an embezzlement case, each taking may provide a basis for a separate count. Another consideration is that in a pattern of small thefts, for example, it is important to take into account the full range of related conduct. Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses. Conversely, when §3D1.2(d) does not apply, so that convictions on multiple counts are considered separately in determining the guideline sentencing range, the guidelines prohibit aggregation of quantities from other counts in order to prevent "double counting" of the conduct and harm from each count of conviction. Continuing offenses present similar practical problems. The reference to §3D1.2(d), which provides for grouping of multiple counts arising out of a continuing offense when the offense guideline takes the continuing nature into account, also prevents double counting.

Subsection (a)(4) requires consideration of any other information specified in the applicable guideline. For example, §2A1.4 (Involuntary Manslaughter) specifies consideration of the defendant's state of mind; §2K1.4 (Arson; Property Damage By Use of Explosives) specifies consideration of the risk of harm created.

Historical Note: Effective November 1, 1987. Amended effective January 15, 1988 (see Appendix C, amendment 3); November 1, 1989 (see Appendix C, amendments 76-78 and 303); November 1, 1990 (see Appendix C, amendment 309); November 1, 1991 (see Appendix C, amendment 389); November 1, 1992 (see Appendix C, amendment 439); November 1, 1994 (see Appendix C, amendment 503); November 1, 2001 (see Appendix C, amendments 617 and 634); November 1, 2004 (see Appendix C, amendments 674).

A–32

## PART D - OFFENSES INVOLVING DRUGS AND NARCO-TERRORISM

Historical Note: Effective November 1, 1987. Amended effective November 1, 2007 (see Appendix C, amendment 711).

1.    UNLAWFUL MANUFACTURING, IMPORTING, EXPORTING, TRAFFICKING, OR POSSESSION; CONTINUING CRIMINAL ENTERPRISE

§2D1.1.    **Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy**

(a)    Base Offense Level (Apply the greatest):

(1)    **43**, if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C. § 960(b)(1), (b)(2), or (b)(3), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense; or

(2)    **38**, if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C. § 960(b)(1), (b)(2), or (b)(3), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance; or

(3)    the offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under §3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is (i) level **32**, decrease by 2 levels; (ii) level **34** or level **36**, decrease by 3 levels; or (iii) level **38**, decrease by 4 levels.

(b)    Specific Offense Characteristics

(1)    If a dangerous weapon (including a firearm) was possessed, increase by **2** levels.

(2)    If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, or (B) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by **2** levels. If the resulting offense level is less than level 26, increase to level **26**.

(3)    If the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility, increase by **2** levels.

(4)    If (A) the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully, and (B) the defendant is not subject to an adjustment under §3B1.2 (Mitigating Role), increase by **2** levels.

(5)    If the defendant is convicted under 21 U.S.C. § 865, increase by **2** levels.

(6)    If the defendant, or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service, increase by **2** levels.

(7)    If the offense involved the distribution of an anabolic steroid and a masking agent, increase by **2** levels.

(8)    If the defendant distributed an anabolic steroid to an athlete, increase by **2** levels.

(9)    If the defendant was convicted under 21 U.S.C. § 841(g)(1)(A), increase by **2** levels.

(10)   (Apply the greatest):

    (A)    If the offense involved (i) an unlawful discharge, emission, or release into the environment of a hazardous or toxic substance; or (ii) the unlawful transportation, treatment, storage, or disposal of a hazardous waste, increase by **2** levels.

    (B)    If the defendant was convicted under 21 U.S.C. § 860a of distributing, or possessing with intent to distribute, methamphetamine on premises where a minor is present or resides, increase by **2** levels. If the resulting offense level is less than level **14**, increase to level **14**.

    (C)    If—

        (i)    the defendant was convicted under 21 U.S.C. § 860a of manufacturing, or possessing with intent to manufacture, methamphetamine on premises where a minor is present or resides; or

        (ii)   the offense involved the manufacture of amphetamine or methamphetamine and the offense created a substantial risk of harm to (I) human life other than a life described in subdivision (D); or (II) the environment,

    increase by **3** levels. If the resulting offense level is less than level **27**, increase to level **27**.

– 136 –

A-34

       (D)     If the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to the life of a minor or an incompetent, increase by **6** levels. If the resulting offense level is less than level **30**, increase to level **30**.

    (11)    If the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of §5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by **2** levels.

[Subsection (c) (Drug Quantity Table) is set forth on the following pages.]

(d)    Cross References

    (1)    If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder) or §2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

    (2)    If the defendant was convicted under 21 U.S.C. § 841(b)(7) (of distributing a controlled substance with intent to commit a crime of violence), apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to the crime of violence that the defendant committed, or attempted or intended to commit, if the resulting offense level is greater than that determined above.

(e)    Special Instruction

    (1)    If (A) subsection (d)(2) does not apply; and (B) the defendant committed, or attempted to commit, a sexual offense against another individual by distributing, with or without that individual's knowledge, a controlled substance to that individual, an adjustment under §3A1.1(b)(1) shall apply.

## (c) DRUG QUANTITY TABLE

**Controlled Substances and Quantity\***          **Base Offense Level**

(1)  ● 30 KG or more of Heroin;                                    **Level 38**
    ● 150 KG or more of Cocaine;
    ● 4.5 KG or more of Cocaine Base;
    ● 30 KG or more of PCP, or 3 KG or more of PCP (actual);
    ● 15 KG or more of Methamphetamine, or 1.5 KG or more of
      Methamphetamine (actual), or 1.5 KG or more of "Ice";
    ● 15 KG or more of Amphetamine, or 1.5 KG or more of Amphetamine (actual);
    ● 300 G or more of LSD;
    ● 12 KG or more of Fentanyl;
    ● 3 KG or more of a Fentanyl Analogue;
    ● 30,000 KG or more of Marihuana;
    ● 6,000 KG or more of Hashish;
    ● 600 KG or more of Hashish Oil;
    ● 30,000,000 units or more of Ketamine;
    ● 30,000,000 units or more of Schedule I or II Depressants;
    ● 1,875,000 units or more of Flunitrazepam.

(2)  ● At least 10 KG but less than 30 KG of Heroin;                **Level 36**
    ● At least 50 KG but less than 150 KG of Cocaine;
    ● At least 1.5 KG but less than 4.5 KG of Cocaine Base;
    ● At least 10 KG but less than 30 KG of PCP, or at least 1 KG but less than 3
      KG of PCP (actual);
    ● At least 5 KG but less than 15 KG of Methamphetamine, or at least 500 G but
      less than 1.5 KG of Methamphetamine (actual), or at least 500 G but less than
      1.5 KG of "Ice";
    ● At least 5 KG but less than 15 KG of Amphetamine, or at least 500 G but less
      than 1.5 KG of Amphetamine (actual);
    ● At least 100 G but less than 300 G of LSD;
    ● At least 4 KG but less than 12 KG of Fentanyl;
    ● At least 1 KG but less than 3 KG of a Fentanyl Analogue;
    ● At least 10,000 KG but less than 30,000 KG of Marihuana;
    ● At least 2,000 KG but less than 6,000 KG of Hashish;
    ● At least 200 KG but less than 600 KG of Hashish Oil;
    ● At least 10,000,000 but less than 30,000,000 units of Ketamine;
    ● At least 10,000,000 but less than 30,000,000 units of Schedule I or II
      Depressants;
    ● At least 625,000 but less than 1,875,000 units of Flunitrazepam.

(3)  ● At least 3 KG but less than 10 KG of Heroin;                 **Level 34**
    ● At least 15 KG but less than 50 KG of Cocaine;
    ● At least 500 G but less than 1.5 KG of Cocaine Base;
    ● At least 3 KG but less than 10 KG of PCP, or at least 300 G but less than 1
      KG of PCP (actual);
    ● At least 1.5 KG but less than 5 KG of Methamphetamine, or at least 150 G but
      less than 500 G of Methamphetamine (actual), or at least 150 G but less than
      500 G of "Ice";

- At least 1.5 KG but less than 5 KG of Amphetamine, or at least 150 G but less than 500 G of Amphetamine (actual);
- At least 30 G but less than 100 G of LSD;
- At least 1.2 KG but less than 4 KG of Fentanyl;
- At least 300 G but less than 1 KG of a Fentanyl Analogue;
- At least 3,000 KG but less than 10,000 KG of Marihuana;
- At least 600 KG but less than 2,000 KG of Hashish;
- At least 60 KG but less than 200 KG of Hashish Oil;
- At least 3,000,000 but less than 10,000,000 units of Ketamine;
- At least 3,000,000 but less than 10,000,000 units of Schedule I or II Depressants;
- At least 187,500 but less than 625,000 units of Flunitrazepam.

(4)    - At least 1 KG but less than 3 KG of Heroin;            **Level 32**
- At least 5 KG but less than 15 KG of Cocaine;
- At least 150 G but less than 500 G of Cocaine Base;
- At least 1 KG but less than 3 KG of PCP, or at least 100 G but less than 300 G of PCP (actual);
- At least 500 G but less than 1.5 KG of Methamphetamine, or at least 50 G but less than 150 G of Methamphetamine (actual), or at least 50 G but less than 150 G of "Ice";
- At least 500 G but less than 1.5 KG of Amphetamine, or at least 50 G but less than 150 G of Amphetamine (actual);
- At least 10 G but less than 30 G of LSD;
- At least 400 G but less than 1.2 KG of Fentanyl;
- At least 100 G but less than 300 G of a Fentanyl Analogue;
- At least 1,000 KG but less than 3,000 KG of Marihuana;
- At least 200 KG but less than 600 KG of Hashish;
- At least 20 KG but less than 60 KG of Hashish Oil;
- At least 1,000,000 but less than 3,000,000 units of Ketamine;
- At least 1,000,000 but less than 3,000,000 units of Schedule I or II Depressants;
- At least 62,500 but less than 187,500 units of Flunitrazepam.

(5)    - At least 700 G but less than 1 KG of Heroin;             **Level 30**
- At least 3.5 KG but less than 5 KG of Cocaine;
- At least 50 G but less than 150 G of Cocaine Base;
- At least 700 G but less than 1 KG of PCP, or at least 70 G but less than 100 G of PCP (actual);
- At least 350 G but less than 500 G of Methamphetamine, or at least 35 G but less than 50 G of Methamphetamine (actual), or at least 35 G but less than 50 G of "Ice";
- At least 350 G but less than 500 G of Amphetamine, or at least 35 G but less than 50 G of Amphetamine (actual);
- At least 7 G but less than 10 G of LSD;
- At least 280 G but less than 400 G of Fentanyl;
- At least 70 G but less than 100 G of a Fentanyl Analogue;
- At least 700 KG but less than 1,000 KG of Marihuana;
- At least 140 KG but less than 200 KG of Hashish;
- At least 14 KG but less than 20 KG of Hashish Oil;
- At least 700,000 but less than 1,000,000 units of Ketamine;
- At least 700,000 but less than 1,000,000 units of Schedule I or II Depressants;
- At least 43,750 but less than 62,500 units of Flunitrazepam.

2.    *Subsection (b)(1) applies if a statute (A) specifies a term of imprisonment to be imposed; and (B) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment. See, e.g., 18 U.S.C. § 924(c) (requiring mandatory minimum terms of imprisonment, based on the conduct involved, to run consecutively). The multiple count rules set out under this Part do not apply to a count of conviction covered by subsection (b). However, a count covered by subsection (b)(1) may affect the offense level determination for other counts. For example, a defendant is convicted of one count of bank robbery (18 U.S.C. § 2113), and one count of use of a firearm in the commission of a crime of violence (18 U.S.C. § 924(c)). The two counts are not grouped together pursuant to this guideline, and, to avoid unwarranted double counting, the offense level for the bank robbery count under §2B3.1 (Robbery) is computed without application of the enhancement for weapon possession or use as otherwise required by subsection (b)(2) of that guideline. Pursuant to 18 U.S.C. § 924(c), the mandatory minimum five-year sentence on the weapon-use count runs consecutively to the guideline sentence imposed on the bank robbery count. See §5G1.2(a).*

*Unless specifically instructed, subsection (b)(1) does not apply when imposing a sentence under a statute that requires the imposition of a consecutive term of imprisonment only if a term of imprisonment is imposed (i.e., the statute does not otherwise require a term of imprisonment to be imposed). See, e.g., 18 U.S.C. § 3146 (Penalty for failure to appear); 18 U.S.C. § 924(a)(4) (regarding penalty for 18 U.S.C. § 922(q) (possession or discharge of a firearm in a school zone)); 18 U.S.C. § 1791(c) (penalty for providing or possessing a controlled substance in prison). Accordingly, the multiple count rules set out under this Part do apply to a count of conviction under this type of statute.*

*Background:  This section outlines the procedure to be used for determining the combined offense level. After any adjustments from Chapter 3, Part E (Acceptance of Responsibility) and Chapter 4, Part B (Career Offenders and Criminal Livelihood) are made, this combined offense level is used to determine the guideline sentence range. Chapter Five (Determining the Sentence) discusses how to determine the sentence from the (combined) offense level; §5G1.2 deals specifically with determining the sentence of imprisonment when convictions on multiple counts are involved. References in Chapter Five (Determining the Sentence) to the "offense level" should be treated as referring to the combined offense level after all subsequent adjustments have been made.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1990 (see Appendix C, amendment 348); November 1, 1998 (see Appendix C, amendment 579); November 1, 2000 (see Appendix C, amendment 598); November 1, 2005 (see Appendix C, amendments 677 and 680); November 1, 2007 (see Appendix C, amendment 707) .

## §3D1.2.    Groups of Closely Related Counts

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

(a)    When counts involve the same victim and the same act or transaction.

(b)    When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

–350–

(c)    When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)    When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

§2A3.5;
§§2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
§§2C1.1, 2C1.2, 2C1.8;
§§2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
§§2E4.1, 2E5.1;
§§2G2.2, 2G3.1;
§2K2.1;
§§2L1.1, 2L2.1;
§2N3.1;
§2Q2.1;
§2R1.1;
§§2S1.1, 2S1.3;
§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, 2T3.1.

Specifically excluded from the operation of this subsection are:

all offenses in Chapter Two, Part A (except §2A3.5);
§§2B2.1, 2B2.3, 2B3.1, 2B3.2, 2B3.3;
§2C1.5;
§§2D2.1, 2D2.2, 2D2.3;
§§2E1.3, 2E1.4, 2E2.1;
§§2G1.1, 2G2.1;
§§2H1.1, 2H2.1, 2H4.1;
§§2L2.2, 2L2.5;
§§2M2.1, 2M2.3, 2M3.1, 2M3.2, 2M3.3, 2M3.4, 2M3.5, 2M3.9;
§§2P1.1, 2P1.2, 2P1.3;
§2X6.1.

For multiple counts of offenses that are not listed, grouping under this subsection may or may not be appropriate; a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level.

Exclusion of an offense from grouping under this subsection does not necessarily preclude grouping under another subsection.

*Commentary*

*Application Notes:*

1.  Subsections (a)-(d) set forth circumstances in which counts are to be grouped together into a single Group. Counts are to be grouped together into a single Group if any one or more of the subsections provide for such grouping. Counts for which the statute (A) specifies a term of imprisonment to be imposed; and (B) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment are excepted from application of the multiple count rules. *See §3D1.1(b)(1); id., comment. (n.1).*

2.  The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (*e.g.,* drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. Where one count, for example, involves unlawfully entering the United States and the other involves possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related. In contrast, where one count involves the sale of controlled substances and the other involves an immigration law violation, the counts are not grouped together because different societal interests are harmed. Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, *i.e.,* to identify and group "counts involving substantially the same harm."

3.  Under subsection (a), counts are to be grouped together when they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim.

    When one count charges an attempt to commit an offense and the other charges the commission of that offense, or when one count charges an offense based on a general prohibition and the other charges violation of a specific prohibition encompassed in the general prohibition, the counts will be grouped together under subsection (a).

    *Examples:* (1) The defendant is convicted of forging and uttering the same check. The counts are to be grouped together. (2) The defendant is convicted of kidnapping and assaulting the victim during the course of the kidnapping. The counts are to be grouped together. (3) The defendant is convicted of bid rigging (an antitrust offense) and of mail fraud for signing and mailing a false statement that the bid was competitive. The counts are to be grouped together. (4) The defendant is convicted of two counts of assault on a federal officer for shooting at the same officer twice while attempting to prevent apprehension as part of a single criminal episode. The counts are to be grouped together. (5) The defendant is convicted of three counts of unlawfully bringing aliens into the United States, all counts arising out of a single incident. The three counts are to be grouped together. *But:* (6) The defendant is convicted of two counts of assault on a federal officer for shooting at the officer on two separate days. The counts <u>are not</u> to be grouped together.

4.  Subsection (b) provides that counts that are part of a single course of conduct with a single criminal objective and represent essentially one composite harm to the same victim are to be

*grouped together, even if they constitute legally distinct offenses occurring at different times. This provision does not authorize the grouping of offenses that cannot be considered to represent essentially one composite harm (e.g., robbery of the same victim on different occasions involves multiple, separate instances of fear and risk of harm, not one composite harm).*

*When one count charges a conspiracy or solicitation and the other charges a substantive offense that was the sole object of the conspiracy or solicitation, the counts will be grouped together under subsection (b).*

*Examples: (1) The defendant is convicted of one count of conspiracy to commit extortion and one count of extortion for the offense he conspired to commit. The counts are to be grouped together. (2) The defendant is convicted of two counts of mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme. The counts are to be grouped together, even if the mailings and telephone call occurred on different days. (3) The defendant is convicted of one count of auto theft and one count of altering the vehicle identification number of the car he stole. The counts are to be grouped together. (4) The defendant is convicted of two counts of distributing a controlled substance, each count involving a separate sale of 10 grams of cocaine that is part of a common scheme or plan. In addition, a finding is made that there are two other sales, also part of the common scheme or plan, each involving 10 grams of cocaine. The total amount of all four sales (40 grams of cocaine) will be used to determine the offense level for each count under §1B1.3(a)(2). The two counts will then be grouped together under either this subsection or subsection (d) to avoid double counting. But: (5) The defendant is convicted of two counts of rape for raping the same person on different days. The counts are not to be grouped together.*

5.    *Subsection (c) provides that when conduct that represents a separate count, e.g., bodily injury or obstruction of justice, is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor. This provision prevents "double counting" of offense behavior. Of course, this rule applies only if the offenses are closely related. It is not, for example, the intent of this rule that (assuming they could be joined together) a bank robbery on one occasion and an assault resulting in bodily injury on another occasion be grouped together. The bodily injury (the harm from the assault) would not be a specific offense characteristic to the robbery and would represent a different harm. On the other hand, use of a firearm in a bank robbery and unlawful possession of that firearm are sufficiently related to warrant grouping of counts under this subsection. Frequently, this provision will overlap subsection (a), at least with respect to specific offense characteristics. However, a count such as obstruction of justice, which represents a Chapter Three adjustment and involves a different harm or societal interest than the underlying offense, is covered by subsection (c) even though it is not covered by subsection (a).*

*Sometimes there may be several counts, each of which could be treated as an aggravating factor to another more serious count, but the guideline for the more serious count provides an adjustment for only one occurrence of that factor. In such cases, only the count representing the most serious of those factors is to be grouped with the other count. For example, if in a robbery of a credit union on a military base the defendant is also convicted of assaulting two employees, one of whom is injured seriously, the assault with serious bodily injury would be*

*grouped with the robbery count, while the remaining assault conviction would be treated separately.*

*A cross reference to another offense guideline does not constitute "a specific offense characteristic ... or other adjustment" within the meaning of subsection (c). For example, the guideline for bribery of a public official contains a cross reference to the guideline for a conspiracy to commit the offense that the bribe was to facilitate. Nonetheless, if the defendant were convicted of one count of securities fraud and one count of bribing a public official to facilitate the fraud, the two counts would not be grouped together by virtue of the cross reference. If, however, the bribe was given for the purpose of hampering a criminal investigation into the offense, it would constitute obstruction and under §3C1.1 would result in a 2-level enhancement to the offense level for the fraud. Under the latter circumstances, the counts would be grouped together.*

6.   *Subsection (d) likely will be used with the greatest frequency. It provides that most property crimes (except robbery, burglary, extortion and the like), drug offenses, firearms offenses, and other crimes where the guidelines are based primarily on quantity or contemplate continuing behavior are to be grouped together. The list of instances in which this subsection should be applied is not exhaustive. Note, however, that certain guidelines are specifically excluded from the operation of subsection (d).*

*A conspiracy, attempt, or solicitation to commit an offense is covered under subsection (d) if the offense that is the object of the conspiracy, attempt, or solicitation is covered under subsection (d).*

*Counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. In such cases, the offense guideline that results in the highest offense level is used; see §3D1.3(b). The "same general type" of offense is to be construed broadly.*

*Examples: (1) The defendant is convicted of five counts of embezzling money from a bank. The five counts are to be grouped together. (2) The defendant is convicted of two counts of theft of social security checks and three counts of theft from the mail, each from a different victim. All five counts are to be grouped together. (3) The defendant is convicted of five counts of mail fraud and ten counts of wire fraud. Although the counts arise from various schemes, each involves a monetary objective. All fifteen counts are to be grouped together. (4) The defendant is convicted of three counts of unlicensed dealing in firearms. All three counts are to be grouped together. (5) The defendant is convicted of one count of selling heroin, one count of selling PCP, and one count of selling cocaine. The counts are to be grouped together. The Commentary to §2D1.1 provides rules for combining (adding) quantities of different drugs to determine a single combined offense level. (6) The defendant is convicted of three counts of tax evasion. The counts are to be grouped together. (7) The defendant is convicted of three counts of discharging toxic substances from a single facility. The counts are to be grouped together. (8) The defendant is convicted on two counts of check forgery and one count of uttering the first of the forged checks. All three counts are to be grouped together. Note, however, that the uttering count is first grouped with the first forgery count under subsection (a) of this guideline, so that the monetary amount of that check counts only once when the rule in §3D1.3(b) is*

applied. *But:* (9) *The defendant is convicted of three counts of bank robbery. The counts* are *not to be grouped together, nor are the amounts of money involved to be added.*

7.    *A single case may result in application of several of the rules in this section. Thus, for example, example (8) in the discussion of subsection (d) involves an application of §3D1.2(a) followed by an application of §3D1.2(d). Note also that a Group may consist of a single count; conversely, all counts may form a single Group.*

8.    *A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. See §1B1.2(d) and accompanying commentary. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature. Example: The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C. Count (1) and count (2) are grouped together under §3D1.2(b). Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.*

*Background:* Ordinarily, the first step in determining the combined offense level in a case involving multiple counts is to identify those counts that are sufficiently related to be placed in the same Group of Closely Related Counts ("Group"). This section specifies four situations in which counts are to be grouped together. Although it appears last for conceptual reasons, subsection (d) probably will be used most frequently.

A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together. Counts involving different victims (or societal harms in the case of "victimless" crimes) are grouped together only as provided in subsection (c) or (d).

Even if counts involve a single victim, the decision as to whether to group them together may not always be clear cut. For example, how contemporaneous must two assaults on the same victim be in order to warrant grouping together as constituting a single transaction or occurrence? Existing case law may provide some guidance as to what constitutes distinct offenses, but such decisions often turn on the technical language of the statute and cannot be controlling. In

*interpreting this Part and resolving ambiguities, the court should look to the underlying policy of this Part as stated in the Introductory Commentary.*

Historical Note: Effective November 1, 1987. Amended effective June 15, 1988 (see Appendix C, amendment 45); November 1, 1989 (see Appendix C, amendments 121, 253-256, and 303); November 1, 1990 (see Appendix C, amendments 309, 348, and 349); November 1, 1991 (see Appendix C, amendment 417); November 1, 1992 (see Appendix C, amendment 458); November 1, 1993 (see Appendix C, amendment 496); November 1, 1995 (see Appendix C, amendment 534); November 1, 1996 (see Appendix C, amendment 538); November 1, 1998 (see Appendix C, amendment 579); November 1, 2001 (see Appendix C, amendments 615, 617, and 634); November 1, 2002 (see Appendix C, amendment 638); January 25, 2003 (see Appendix C, amendment 648); November 1, 2003 (see Appendix C, amendment 656); November 1, 2004 (see Appendix C, amendment 664); November 1, 2005 (see Appendix C, amendments 679 and 680); November 1, 2007 (see Appendix C, amendment 701).

### §3D1.3.    Offense Level Applicable to Each Group of Closely Related Counts

Determine the offense level applicable to each of the Groups as follows:

(a)    In the case of counts grouped together pursuant to §3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.

(b)    In the case of counts grouped together pursuant to §3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. When the counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level.

*Commentary*

*Application Notes:*

1.   *The "offense level" for a count refers to the offense level from Chapter Two after all adjustments from Parts A, B, and C of Chapter Three.*

2.   *When counts are grouped pursuant to §3D1.2(a)-(c), the highest offense level of the counts in the group is used. Ordinarily, it is necessary to determine the offense level for each of the counts in a Group in order to ensure that the highest is correctly identified. Sometimes, it will be clear that one count in the Group cannot have a higher offense level than another, as with a count for an attempt or conspiracy to commit the completed offense. The formal determination of the offense level for such a count may be unnecessary.*

3.   *When counts are grouped pursuant to §3D1.2(d), the offense guideline applicable to the aggregate behavior is used. If the counts in the Group are covered by different guidelines, use the guideline that produces the highest offense level. Determine whether the specific offense characteristics or adjustments from Chapter Three, Parts A, B, and C apply based upon the combined offense behavior taken as a whole. Note that guidelines for similar property offenses have been coordinated to produce identical offense levels, at least when substantial property*

## PART B - CAREER OFFENDERS AND CRIMINAL LIVELIHOOD

§4B1.1.    **Career Offender**

(a)    A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

(b)    Except as provided in subsection (c), if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply. A career offender's criminal history category in every case under this subsection shall be Category VI.

| Offense Statutory Maximum | | Offense Level* |
|---|---|---|
| (A) | Life | 37 |
| (B) | 25 years or more | 34 |
| (C) | 20 years or more, but less than 25 years | 32 |
| (D) | 15 years or more, but less than 20 years | 29 |
| (E) | 10 years or more, but less than 15 years | 24 |
| (F) | 5 years or more, but less than 10 years | 17 |
| (G) | More than 1 year, but less than 5 years | 12. |

*If an adjustment from §3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

(c)    If the defendant is convicted of 18 U.S.C. § 924(c) or § 929(a), and the defendant is determined to be a career offender under subsection (a), the applicable guideline range shall be determined as follows:

(1)    If the only count of conviction is 18 U.S.C. § 924(c) or § 929(a), the applicable guideline range shall be determined using the table in subsection (c)(3).

(2)    In the case of multiple counts of conviction in which at least one of the counts is a conviction other than a conviction for 18 U.S.C. § 924(c) or § 929(a), the guideline range shall be the greater of—

(A)    the guideline range that results by adding the mandatory minimum consecutive penalty required by the 18 U.S.C. § 924(c) or § 929(a) count(s) to the minimum and the maximum of the otherwise applicable guideline range determined for the count(s) of conviction other than the 18 U.S.C. § 924(c) or § 929(a) count(s); and

      (B)     the guideline range determined using the table in subsection (c)(3).

    (3)    Career Offender Table for 18 U.S.C. § 924(c) or § 929(a) Offenders

| §3E1.1 Reduction | Guideline Range for the 18 U.S.C. § 924(c) or § 929(a) Count(s) |
|---|---|
| No reduction | 360-life |
| 2-level reduction | 292-365 |
| 3-level reduction | 262-327. |

*Commentary*

*Application Notes:*

1.    *"Crime of violence," "controlled substance offense," and "two prior felony convictions" are defined in §4B1.2.*

2.    *"Offense Statutory Maximum," for the purposes of this guideline, refers to the maximum term of imprisonment authorized for the offense of conviction that is a crime of violence or controlled substance offense, including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record (such sentencing enhancement provisions are contained, for example, in 21 U.S.C. § 841(b)(1)(A), (B), (C), and (D)). For example, in a case in which the statutory maximum term of imprisonment under 21 U.S.C. § 841(b)(1)(C) is increased from twenty years to thirty years because the defendant has one or more qualifying prior drug convictions, the "Offense Statutory Maximum" for that defendant for the purposes of this guideline is thirty years and not twenty years. If more than one count of conviction is of a crime of violence or controlled substance offense, use the maximum authorized term of imprisonment for the count that has the greatest offense statutory maximum.*

3.    *Application of Subsection (c).—*

    (A)    *In General.—Subsection (c) applies in any case in which the defendant (i) was convicted of violating 18 U.S.C. § 924(c) or § 929(a); and (ii) as a result of that conviction (alone or in addition to another offense of conviction), is determined to be a career offender under §4B1.1(a).*

    (B)    *Subsection (c)(2).—To determine the greater guideline range under subsection (c)(2), the court shall use the guideline range with the highest minimum term of imprisonment.*

    (C)    *"Otherwise Applicable Guideline Range".—For purposes of subsection (c)(2)(A), "otherwise applicable guideline range" for the count(s) of conviction other than the 18 U.S.C. § 924(c) or 18 U.S.C. § 929(a) count(s) is determined as follows:*

        (i)    *If the count(s) of conviction other than the 18 U.S.C. § 924(c) or 18 U.S.C. § 929(a) count(s) does not qualify the defendant as a career offender, the otherwise applicable guideline range for that count(s) is the guideline range*

determined using: (I) the Chapter Two and Three offense level for that count(s); and (II) the appropriate criminal history category determined under §§4A1.1 (Criminal History Category) and 4A1.2 (Definitions and Instructions for Computing Criminal History).

   (ii)   If the count(s) of conviction other than the 18 U.S.C. § 924(c) or 18 U.S.C. § 929(a) count(s) qualifies the defendant as a career offender, the otherwise applicable guideline range for that count(s) is the guideline range determined for that count(s) under §4B1.1(a) and (b).

(D)   *Imposition of Consecutive Term of Imprisonment.*—In a case involving multiple counts, the sentence shall be imposed according to the rules in subsection (e) of §5G1.2 (Sentencing on Multiple Counts of Conviction).

(E)   *Example.*—The following example illustrates the application of subsection (c)(2) in a multiple count situation:

The defendant is convicted of one count of violating 18 U.S.C. § 924(c) for possessing a firearm in furtherance of a drug trafficking offense (5 year mandatory minimum), and one count of violating 21 U.S.C. § 841(b)(1)(B) (5 year mandatory minimum, 40 year statutory maximum). Applying subsection (c)(2)(A), the court determines that the drug count (without regard to the 18 U.S.C. § 924(c) count) qualifies the defendant as a career offender under §4B1.1(a). Under §4B1.1(a), the otherwise applicable guideline range for the drug count is 188-235 months (using offense level 34 (because the statutory maximum for the drug count is 40 years), minus 3 levels for acceptance of responsibility, and criminal history category VI). The court adds 60 months (the minimum required by 18 U.S.C. § 924(c)) to the minimum and the maximum of that range, resulting in a guideline range of 248-295 months. Applying subsection (c)(2)(B), the court then determines the career offender guideline range from the table in subsection (c)(3) is 262-327 months. The range with the greatest minimum, 262-327 months, is used to impose the sentence in accordance with §5G1.2(e).

*Background:* Section 994(h) of Title 28, United States Code, mandates that the Commission assure that certain "career" offenders receive a sentence of imprisonment "at or near the maximum term authorized." Section 4B1.1 implements this directive, with the definition of a career offender tracking in large part the criteria set forth in 28 U.S.C. § 994(h). However, in accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f), and its amendment authority under 28 U.S.C. § 994(o) and (p), the Commission has modified this definition in several respects to focus more precisely on the class of recidivist offenders for whom a lengthy term of imprisonment is appropriate and to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B). The Commission's refinement of this definition over time is consistent with Congress's choice of a directive to the Commission rather than a mandatory minimum sentencing statute ("The [Senate Judiciary] Committee believes that such a directive to the Commission will be more effective; the guidelines development process can assure consistent and rational implementation for the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers." S. Rep. No. 225, 98th Cong., 1st Sess. 175 (1983)).

*Subsection (c) provides rules for determining the sentence for career offenders who have been convicted of 18 U.S.C. § 924(c) or § 929(a). The Career Offender Table in subsection (c)(3) provides a sentence at or near the statutory maximum for these offenders by using guideline ranges that correspond to criminal history category VI and offense level 37 (assuming §3E.1.1 (Acceptance of Responsibility) does not apply), offense level 35 (assuming a 2-level reduction under §3E.1.1 applies), and offense level 34 (assuming a 3-level reduction under §3E1.1 applies).*

Historical Note: Effective November 1, 1987. Amended effective January 15, 1988 (see Appendix C, amendments 47 and 48); November 1, 1989 (see Appendix C, amendments 266 and 267); November 1, 1992 (see Appendix C, amendment 459); November 1, 1994 (see Appendix C, amendment 506); November 1, 1995 (see Appendix C, amendment 528); November 1, 1997 (see Appendix C, amendments 546 and 567); November 1, 2002 (see Appendix C, amendment 642).

### §4B1.2.    Definitions of Terms Used in Section 4B1.1

(a)    The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that --

   (1)    has as an element the use, attempted use, or threatened use of physical force against the person of another, or

   (2)    is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

(b)    The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

(c)    The term "two prior felony convictions" means (1) the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense (i.e., two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony conviction of a crime of violence and one felony conviction of a controlled substance offense), and (2) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of §4A1.1(a), (b), or (c). The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

*Commentary*

*Application Notes:*

*1.    For purposes of this guideline—*

-- 383 --

## CHAPTER FIVE - DETERMINING THE SENTENCE

### *Introductory Commentary*

For certain categories of offenses and offenders, the guidelines permit the court to impose either imprisonment or some other sanction or combination of sanctions. In determining the type of sentence to impose, the sentencing judge should consider the nature and seriousness of the conduct, the statutory purposes of sentencing, and the pertinent offender characteristics. A sentence is within the guidelines if it complies with each applicable section of this chapter. The court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a).

<u>Historical Note</u>: Effective November 1, 1987.

### PART A - SENTENCING TABLE

The Sentencing Table used to determine the guideline range follows:

# SENTENCING TABLE
### (in months of imprisonment)

| Offense Level | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|
| | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| **Zone A** 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| **Zone B** 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| **Zone C** 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| **Zone D** 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| 43 | life | life | life | life | life | life |

*Commentary to Sentencing Table*

*Application Notes:*

1.   *The Offense Level (1-43) forms the vertical axis of the Sentencing Table. The Criminal History Category (I-VI) forms the horizontal axis of the Table. The intersection of the Offense Level and Criminal History Category displays the Guideline Range in months of imprisonment. "Life" means life imprisonment. For example, the guideline range applicable to a defendant with an Offense Level of 15 and a Criminal History Category of III is 24-30 months of imprisonment.*

2.   *In rare cases, a total offense level of less than 1 or more than 43 may result from application of the guidelines. A total offense level of less than 1 is to be treated as an offense level of 1. An offense level of more than 43 is to be treated as an offense level of 43.*

3.   *The Criminal History Category is determined by the total criminal history points from Chapter Four, Part A, except as provided in §§4B1.1 (Career Offender) and 4B1.4 (Armed Career Criminal). The total criminal history points associated with each Criminal History Category are shown under each Criminal History Category in the Sentencing Table.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 270); November 1, 1991 (see Appendix C, amendment 418); November 1, 1992 (see Appendix C, amendment 462).

# CHAPTER FIVE - DETERMINING THE SENTENCE

## *Introductory Commentary*

*For certain categories of offenses and offenders, the guidelines permit the court to impose either imprisonment or some other sanction or combination of sanctions. In determining the type of sentence to impose, the sentencing judge should consider the nature and seriousness of the conduct, the statutory purposes of sentencing, and the pertinent offender characteristics. A sentence is within the guidelines if it complies with each applicable section of this chapter. The court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a).*

<u>Historical Note:</u> Effective November 1, 1987.

## PART A - SENTENCING TABLE

The Sentencing Table used to determine the guideline range follows:

# SENTENCING TABLE
## (in months of imprisonment)

| Offense Level | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|
| | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| 43 | life | life | life | life | life | life |

Zone A: levels 1–8
Zone B: levels 9–10
Zone C: levels 11–12
Zone D: levels 13–43

### *Commentary to Sentencing Table*

*Application Notes:*

1.  *The Offense Level (1-43) forms the vertical axis of the Sentencing Table. The Criminal History Category (I-VI) forms the horizontal axis of the Table. The intersection of the Offense Level and Criminal History Category displays the Guideline Range in months of imprisonment. "Life" means life imprisonment. For example, the guideline range applicable to a defendant with an Offense Level of 15 and a Criminal History Category of III is 24-30 months of imprisonment.*

2.  *In rare cases, a total offense level of less than 1 or more than 43 may result from application of the guidelines. A total offense level of less than 1 is to be treated as an offense level of 1. An offense level of more than 43 is to be treated as an offense level of 43.*

3.  *The Criminal History Category is determined by the total criminal history points from Chapter Four, Part A, except as provided in §§4B1.1 (Career Offender) and 4B1.4 (Armed Career Criminal). The total criminal history points associated with each Criminal History Category are shown under each Criminal History Category in the Sentencing Table.*

Historical Note: Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendment 270); November 1, 1991 (see Appendix C, amendment 418); November 1, 1992 (see Appendix C, amendment 462).

# CHAPTER FIVE - DETERMINING THE SENTENCE

### *Introductory Commentary*

*For certain categories of offenses and offenders, the guidelines permit the court to impose either imprisonment or some other sanction or combination of sanctions. In determining the type of sentence to impose, the sentencing judge should consider the nature and seriousness of the conduct, the statutory purposes of sentencing, and the pertinent offender characteristics. A sentence is within the guidelines if it complies with each applicable section of this chapter. The court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a).*

Historical Note: Effective November 1, 1987.

## PART A - SENTENCING TABLE

The Sentencing Table used to determine the guideline range follows:

# SENTENCING TABLE
**(in months of imprisonment)**

| | Offense Level | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
|---|---|---|---|---|---|---|---|
| **Criminal History Category (Criminal History Points)** | | | | | | | |
| Zone A | 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| | 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| | 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| | 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| | 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| | 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| | 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| | 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| Zone B | 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| | 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| | 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| Zone C | 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| | 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| | 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| | 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| | 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| | 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| | 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| | 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| | 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| | 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| | 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| | 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| | 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| | 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| | 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| Zone D | 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| | 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| | 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| | 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| | 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| | 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| | 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| | 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| | 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| | 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| | 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| | 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| | 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| | 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| | 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| | 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| | 43 | life | life | life | life | life | life |

*Commentary to Sentencing Table*

*Application Notes:*

1.   *The Offense Level (1-43) forms the vertical axis of the Sentencing Table. The Criminal History Category (I-VI) forms the horizontal axis of the Table. The intersection of the Offense Level and Criminal History Category displays the Guideline Range in months of imprisonment. "Life" means life imprisonment. For example, the guideline range applicable to a defendant with an Offense Level of 15 and a Criminal History Category of III is 24-30 months of imprisonment.*

2.   *In rare cases, a total offense level of less than 1 or more than 43 may result from application of the guidelines. A total offense level of less than 1 is to be treated as an offense level of 1. An offense level of more than 43 is to be treated as an offense level of 43.*

3.   *The Criminal History Category is determined by the total criminal history points from Chapter Four, Part A, except as provided in §§4B1.1 (Career Offender) and 4B1.4 (Armed Career Criminal). The total criminal history points associated with each Criminal History Category are shown under each Criminal History Category in the Sentencing Table.*

Historical Note:  Effective November 1, 1987.  Amended effective November 1, 1989 (see Appendix C, amendment 270); November 1, 1991 (see Appendix C, amendment 418); November 1, 1992 (see Appendix C, amendment 462); November 1, 2010 (see Appendix C, amendment 738).

476 (6th Cir. 2006) (district court "still required to consider . . . whether a Chapter 5 departure is appropriate"); United States v. Hawk Wing, 433 F.3d 622, 631 (8th Cir. 2006) ("the district court must decide if a traditional departure is appropriate", and after that must consider a variance (internal quotation omitted)); United States v. Robertson, 568 F.3d 1203, 1210 (10th Cir. 2009) (district courts must continue to apply departures); United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir. 2005) (stating that "the application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered"). But see United States v. Johnson, 427 F.3d 423, 426 (7th Cir. 2006) (stating that departures are "obsolete").

The amendment resolves the circuit conflict and adopts the three-step approach followed by a majority of circuits in determining the sentence to be imposed. The amendment restructures §1B1.1 into three subsections to reflect the three-step process. As amended, subsection (a) addresses how to apply the provisions in the Guidelines Manual to properly determine the kinds of sentence and the guideline range. Subsection (b) addresses the need to consider the policy statements and commentary to determine whether a departure is warranted. Subsection (c) addresses the need to consider the applicable factors under 18 U.S.C. § 3553(a) taken as a whole in determining the appropriate sentence. The amendment also adds background commentary referring to the statutory requirements of 18 U.S.C. § 3553(a) and defining the term "variance" as "a sentence that is outside the guidelines framework".

**Effective Date: The effective date of this amendment is November 1, 2010.**

742.    **Amendment:** Section 4A1.1 is amended by striking "items (a) through (f)" and inserting "subsections (a) through (e)"; in subsection (c) by striking "item" and inserting "subsection"; by striking subsection (e) as follows:

"(e)    Add 2 points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b) or while in imprisonment or escape status on such a sentence. If 2 points are added for item (d), add only 1 point for this item.";

and redesignating subsection (f) as (e); and in subsection (e) (as so redesignated) by striking "item" and inserting "subsection".

The Commentary to §4A1.1 captioned "Application Notes" is amended by striking "item" and inserting "subsection" each place it appears; by striking Note 5 as follows:

"5.    §4A1.1(e). Two points are added if the defendant committed any part of the instant offense (i.e., any relevant conduct) less than two years following release from confinement on a sentence counted under §4A1.1(a) or (b). This also applies if the defendant committed the instant offense while in imprisonment or escape status on such a sentence. Failure to report for service of a sentence of imprisonment is to be treated as an escape from such sentence. See §4A1.2(n). However, if two points are added under §4A1.1(d), only one point is added under §4A1.1(e).";

and redesignating Note 6 as Note 5; and in Note 5 (as so redesignated) by striking "(f)" and

inserting "(e)" each place it appears.

The Commentary to §4A1.1 captioned "Background" is amended by striking "Subdivisions" and inserting "Subsections"; by striking "implements one measure of recency by adding" and inserting "adds"; and

by striking the paragraph that begins "Section 4A1.1(e)" as follows:

> "      Section 4A1.1(e) implements another measure of recency by adding two points if the defendant committed any part of the instant offense less than two years immediately following his release from confinement on a sentence counted under §4A1.1(a) or (b). Because of the potential overlap of (d) and (e), their combined impact is limited to three points. However, a defendant who falls within both (d) and (e) is more likely to commit additional crimes; thus, (d) and (e) are not completely combined.".

Section 4A1.2 is amended in subsection (a)(2) by striking "(f)" and inserting "(e)"; in subsection (k)(2) by striking subparagraph (A) as follows:

> "(A)      Revocation of probation, parole, supervised release, special parole, or mandatory release may affect the points for §4A1.1(e) in respect to the recency of last release from confinement.";

and by striking "(B)"; in subsection (l) by striking "(f)" and inserting "(e)", and by striking "; §4A1.1(e) shall not apply"; in subsection (n) by striking "and (e)"; and in subsection (p) by striking "(f)" and inserting "(e)".

The Commentary to §4A1.2 captioned "Application Notes" is amended in Note 12(A) by striking "subdivision" and inserting "subsection".

**Reason for Amendment:** This amendment addresses a factor included in the calculation of the criminal history score in Chapter Four of the Guidelines Manual. Specifically, this amendment eliminates the "recency" points provided in subsection (e) of §4A1.1 (Criminal History Category). Under §4A1.1(e), one or two points are added to the criminal history score if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under subsection (a) or (b) or while in imprisonment or escape status on such a sentence. In addition to recency, subsections (a), (b), (c), (d), and (f) add points to the criminal history score to account for the seriousness of the prior offense and the status of the defendant. These other factors remain included in the criminal history score after the amendment.

The amendment is a result of the Commission's continued review of criminal history issues. This multi-year review was prompted in part because criminal history issues are often cited by sentencing courts as reasons for imposing non-government sponsored below range sentences, particularly in cases in which recency points were added to the criminal history score under §4A1.1(e).

As part of its review, the Commission undertook analyses to determine the extent to which recency points contribute to the ability of the criminal history score to predict the

defendant's risk of recidivism. See generally USSG Ch. 4, Pt. A, intro. comment ("To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered."). Recent research isolating the effect of §4A1.1(e) on the predictive ability of the criminal history score indicated that consideration of recency only minimally improves the predictive ability.

In addition, the Commission received public comment and testimony suggesting that the recency of the instant offense to the defendant's release from imprisonment does not necessarily reflect increased culpability. Public comment and testimony indicated that defendants who recidivate tend to do so relatively soon after being released from prison but suggested that, for many defendants, this may reflect the challenges to successful reentry after imprisonment rather than increased culpability.

Finally, Commission data indicated that many of the cases in which recency points apply are sentenced under Chapter Two guidelines that have provisions based on criminal history. The amendment responds to suggestions that recency points are not necessary to adequately account for criminal history in such cases.

**Effective Date: The effective date of this amendment is November 1, 2010.**

743.    **Amendment:** The Commentary to §2H1.1 captioned "Statutory Provisions" is amended by inserting "249," after "248,".

The Commentary to §2H1.1 captioned "Application Notes" is amended in Note 4 by inserting "gender identity," after "gender,".

Section 3A1.1(a) is amended by inserting "gender identity," after "gender,".

The Commentary to §3A1.1 captioned "Application Notes" is amended in Note 3 by inserting "gender identity," after "gender,"; and by adding after Note 4 the following:

> "5.    For purposes of this guideline, 'gender identity' means actual or perceived gender-related characteristics. See 18 U.S.C. § 249(c)(4).".

The Commentary to §3A1.1 captioned "Background" is amended in the first paragraph by striking the following:

> "(i.e., a primary motivation for the offense was the race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of the victim)";

and by adding at the end of that paragraph the following:

> "In section 4703(a) of Public Law 111–84, Congress broadened the scope of that directive to include gender identity; to reflect that congressional action, the Commission has broadened the scope of this enhancement to include gender identity.".

(1)    Amendment 745 expanded the scope of §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources) to cover not only cultural heritage resources, but also paleontological resources.    To reflect this expanded scope, conforming changes are made to §2B1.1 (Theft, Property Destruction, and Fraud), Application Notes 1 and 3.

(2)    Amendment 746 made a technical change to §2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition), Application Note 10, to correct an inaccurate citation.    To address a parallel inaccurate citation in §2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), Application Note 9, a parallel technical change is made there.

(3)    Amendment 742 eliminated the use of "recency" points in calculating the criminal history score.    A conforming change is made in §2P1.1 (Escape, Instigating or Assisting Escape), Application Note 5, to delete an obsolete reference to "recency."

Second, the amendment makes certain other stylistic and clerical changes to commentary in the Guidelines Manual. It amends §3A1.2 (Official Victim), Application Note 3, to provide an accurate reference to an enhancement in the robbery guideline. It amends §3C1.1 (Obstructing or Impeding the Administration of Justice), Application Note 4, to replace the obsolete term "magistrate" with the term "magistrate judge." It amends §5E1.5 (Costs of Prosecution), Background, to correct a typographical error in a statutory citation. It amends §7B1.4 (Term of Imprisonment), Application Note 2, and §8A1.2 (Application Instructions - Organizations), Application Note 2, to provide accurate references to guideline titles. Finally, it makes certain other stylistic changes to promote stylistic consistency and gender neutrality.

**Effective Date: The effective date of this amendment is November 1, 2010.**

748.    **Amendment:** Section 2D1.1(a)(5) is amended by adding at the end the following:

"If the resulting offense level is greater than level 32 and the defendant receives the 4-level ('minimal participant') reduction in §3B1.2(a), decrease to level 32.".

Section 2D1.1(b) is amended by redesignating subdivisions (10) and (11) as subdivisions (13) and (16); by redesignating subdivisions (2) through (9) as subdivisions (3) through (10); by inserting after subdivision (1) the following:

"(2)    If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels.";

by inserting after subdivision (10), as redesignated by this amendment, the following:

"(11)    If the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense, increase by 2 levels.

(12)    If the defendant maintained a premises for the purpose of manufacturing or

distributing a controlled substance, increase by 2 levels.";

by inserting after subdivision (13), as redesignated by this amendment, the following:

"(14)  If the defendant receives an adjustment under §3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors:

   (A)  (i) the defendant used fear, impulse, friendship, affection, or some combination thereof to involve another individual in the illegal purchase, sale, transport, or storage of controlled substances, (ii) the individual received little or no compensation from the illegal purchase, sale, transport, or storage of controlled substances, and (iii) the individual had minimal knowledge of the scope and structure of the enterprise;

   (B)  the defendant, knowing that an individual was (i) less than 18 years of age, (ii) 65 or more years of age, (iii) pregnant, or (iv) unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct, distributed a controlled substance to that individual or involved that individual in the offense;

   (C)  the defendant was directly involved in the importation of a controlled substance;

   (D)  the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense;

   (E)  the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood,

   increase by 2 levels.

(15)  If the defendant receives the 4-level ('minimal participant') reduction in §3B1.2(a) and the offense involved all of the following factors:

   (A)  the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense;

   (B)  the defendant received no monetary compensation from the illegal purchase, sale, transport, or storage of controlled substances; and

   (C)  the defendant had minimal knowledge of the scope and structure of the enterprise,

   decrease by 2 levels.".

**A-62**

Section 2D1.1(c) is amended in subdivision (1) in the third entry by striking "4.5" and inserting "8.4"; in subdivision (2) in the third entry by striking "1.5" and inserting "2.8"; by striking "4.5" and inserting "8.4"; in subdivision (3) in the third entry by striking "500" and inserting "840"; by striking "1.5" and inserting "2.8"; in subdivision (4) in the third entry by striking "150" and inserting "280"; by striking "500" and inserting "840"; in subdivision (5) in the third entry by striking "50" and inserting "196"; by striking "150" and inserting "280"; in subdivision (6) in the third entry by striking "35" and inserting "112"; by striking "50" and inserting "196"; in subdivision (7) in the third entry by striking "20" and inserting "28"; by striking "35" and inserting "112"; in subdivision (8) in the third entry by striking "5" and inserting "22.4"; by striking "20" and inserting "28"; in subdivision (9) in the third entry by striking "4" and inserting "16.8"; by striking "5" and inserting "22.4"; in subdivision (10) in the third entry by striking "3" and inserting "11.2"; by striking "4" and inserting "16.8"; in subdivision (11) in the third entry by striking "2" and inserting "5.6"; by striking "3" and inserting "11.2"; in subdivision (12) in the third entry by striking "1" and inserting "2.8"; by striking "2" and inserting "5.6"; in subdivision (13) in the third entry by striking "500 MG" and inserting "1.4 G"; by striking "1" and inserting "2.8"; and in subdivision (14) in the third entry by striking "500 MG" and inserting "1.4 G".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 3 by inserting:

> "Application of Subsections (b)(1) and (b)(2).—
>
> (A)    Application of Subsection (b)(1).—" before "Definitions";

by inserting "in subsection (b)(1)" after "weapon possession"; by striking "adjustment" and inserting "enhancement"; by striking "his" and inserting "the defendant's"; and by adding at the end the following:

> "(B)    Interaction of Subsections (b)(1) and (b)(2).—The enhancements in subsections (b)(1) and (b)(2) may be applied cumulatively (added together), as is generally the case when two or more specific offense characteristics each apply. See §1B1.1 (Application Instructions), Application Note 4(A). However, in a case in which the defendant merely possessed a dangerous weapon but did not use violence, make a credible threat to use violence, or direct the use of violence, subsection (b)(2) would not apply.".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 8 in the last paragraph by striking "(2)" and inserting "(3)".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 10(B) in the first paragraph by striking "(Except Cocaine Base)" after "Differing Controlled Substances"; and by striking the sentence beginning "To determine".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 10(C) by striking "(Except Cocaine Base)" after "Differing Controlled Substances"; and in subdivision (C)(iii) by striking "five kilograms of marihuana" and inserting "2 grams of cocaine base"; by inserting ", and the cocaine base is equivalent to 7.142 kilograms of marihuana" after "16 kilograms of marihuana"; and by striking "21" and inserting "23.142".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 10 by striking subdivision (D) as follows:

"(D)    <u>Determining Base Offense Level in Offenses Involving Cocaine Base and Other Controlled Substances.</u>—

    (i)    <u>In General.</u>—Except as provided in subdivision (ii), if the offense involves cocaine base ("crack") and one or more other controlled substance, determine the combined offense level as provided by subdivision (B) of this note, and reduce the combined offense level by 2 levels.

    (ii)    <u>Exceptions to 2-level Reduction.</u>—The 2-level reduction provided in subdivision (i) shall not apply in a case in which:

        (I)    the offense involved 4.5 kg or more, or less than 250 mg, of cocaine base; or

        (II)    the 2-level reduction results in a combined offense level that is less than the combined offense level that would apply under subdivision (B) of this note if the offense involved only the other controlled substance(s) (<u>i.e.</u>, the controlled substance(s) other than cocaine base).

    (iii)    <u>Examples.</u>—

        (I)    The case involves 20 gm of cocaine base, 1.5 kg of cocaine, and 10 kg of marihuana. Under the Drug Equivalency Tables in subdivision (E) of this note, 20 gm of cocaine base converts to 400 kg of marihuana (20 gm x 20 kg = 400 kg), and 1.5 kg of cocaine converts to 300 kg of marihuana (1.5 kg x 200 gm = 300 kg), which, when added to the 10 kg of marihuana results in a combined equivalent quantity of 710 kg of marihuana. Under the Drug Quantity Table, 710 kg of marihuana corresponds to a combined offense level of 30, which is reduced by two levels to level 28. For the cocaine and marihuana, their combined equivalent quantity of 310 kg of marihuana corresponds to a combined offense level of 26 under the Drug Quantity Table. Because the combined offense level for all three drug types after the 2-level reduction is not less than the combined base offense level for the cocaine and marihuana, the combined offense level for all three drug types remains level 28.

        (II)    The case involves 5 gm of cocaine base and 6 kg of heroin. Under the Drug Equivalency Tables in subdivision (E) of this note, 5 gm of cocaine base converts to 100 kg of marihuana (5 gm x 20 kg = 100 kg), and 6 kg of heroin

converts to 6,000 kg of marihuana (6,000 gm x 1 kg = 6,000 kg), which, when added together results in a combined equivalent quantity of 6,100 kg of marihuana. Under the Drug Quantity Table, 6,100 kg of marihuana corresponds to a combined offense level of 34, which is reduced by two levels to 32. For the heroin, the 6,000 kg of marihuana corresponds to an offense level 34 under the Drug Quantity Table. Because the combined offense level for the two drug types after the 2-level reduction is less than the offense level for the heroin, the reduction does not apply and the combined offense level for the two drugs remains level 34.";

and by redesignating subdivision (E) as subdivision (D).

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 10(D), as redesignated by this amendment, in the table captioned "Cocaine and Other Schedule I and II Stimulants (and their immediate precursors)*" in the line referenced to Cocaine Base by striking "20 kg" and inserting "3,571 gm".

The Commentary to §2D1.1 captioned "Application Notes" is amended in Note 18 by striking "(2)" and inserting "(3)", and by striking "(4)" and inserting "(5)";

in Note 19 by striking "(10)" and inserting "(13)" in both places;

in Note 20 by striking "(10)" and inserting "(13)" in both places;

in Note 21 by striking "(11)" and inserting "(16)" each place it appears;

in Note 23 by striking "(6)" and inserting "(7)" each place it appears;

in Note 25 by striking "(7)" and inserting "(8)" in both places;

and in Note 26 by striking "(8)" and inserting "(9)" in both places.

The Commentary to §2D1.1 captioned "Application Notes" is amended by adding at the end the following:

"27. Application of Subsection (b)(11).—Subsection (b)(11) does not apply if the purpose of the bribery was to obstruct or impede the investigation, prosecution, or sentencing of the defendant. Such conduct is covered by §3C1.1 (Obstructing or Impeding the Administration of Justice) and, if applicable, §2D1.1(b)(14)(D).

28. Application of Subsection (b)(12).—Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a 'building, room, or enclosure,' see §2D1.8, comment. (backg'd.)) for the purpose of manufacturing or distributing a controlled substance.

Among the factors the court should consider in determining whether the defendant 'maintained' the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

29.    Application of Subsection (b)(14).—

    (A)    Distributing to a Specified Individual or Involving Such an Individual in the Offense (Subsection (b)(14)(B)).—If the defendant distributes a controlled substance to an individual or involves an individual in the offense, as specified in subsection (b)(14)(B), the individual is not a 'vulnerable victim' for purposes of §3A1.1(b).

    (B)    Directly Involved in the Importation of a Controlled Substance (Subsection (b)(14)(C)).—Subsection (b)(14)(C) applies if the defendant is accountable for the importation of a controlled substance under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)), i.e., the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the importation of a controlled substance.

        If subsection (b)(3) or (b)(5) applies, do not apply subsection (b)(14)(C).

    (C)    Pattern of Criminal Conduct Engaged in as a Livelihood (Subsection (b)(14)(E)).—For purposes of subsection (b)(14)(E), 'pattern of criminal conduct' and 'engaged in as a livelihood' have the meaning given such terms in §4B1.3 (Criminal Livelihood).".

The Commentary to §2D1.1 captioned "Background" is amended by inserting after the paragraph that begins "For marihuana plants" the following:

"       The last sentence of subsection (a)(5) implements the directive to the Commission in section 7(1) of Public Law 111–220.

       Subsection (b)(2) implements the directive to the Commission in section 5 of Public Law 111–220.";

in the paragraph that begins "Specific Offense Characteristic" by striking "Specific Offense Characteristic (b)(2)" and inserting "Subsection (b)(3)";

by inserting after the paragraph that begins "The dosage weight" the following:

> "        Subsection (b)(11) implements the directive to the Commission in section 6(1) of Public Law 111–220.
>
>                Subsection (b)(12) implements the directive to the Commission in section 6(2) of Public Law 111–220.";

in the paragraph that begins "Subsection (b)(10)(A)" by striking "(10)" and inserting "(13)";

in the paragraph that begins "Subsections (b)(10)(C)(ii)" by striking "(10)" and inserting "(13)";

and by adding at the end the following:

> "        Subsection (b)(14) implements the directive to the Commission in section 6(3) of Public Law 111–220.
>
>                Subsection (b)(15) implements the directive to the Commission in section 7(2) of Public Law 111–220.".

Section 2D1.14(a)(1) is amended by striking "(11)" and inserting "(16)".

Section 2D2.1(b) is amended by striking "References" and inserting "Reference"; by striking subdivision (1) as follows:

> "(1)    If the defendant is convicted of possession of more than 5 grams of a mixture or substance containing cocaine base, apply §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking) as if the defendant had been convicted of possession of that mixture or substance with intent to distribute.";

and by redesignating subdivision (2) as subdivision (1).

The Commentary to §2D2.1 captioned "Background" is amended by striking "five" and inserting "three"; and by striking the last paragraph as follows:

> "        Section 2D2.1(b)(1) provides a cross reference to §2D1.1 for possession of more than five grams of a mixture or substance containing cocaine base, an offense subject to an enhanced penalty under 21 U.S.C. § 844(a).  Other cases for which enhanced penalties are provided under 21 U.S.C. § 844(a)(e.g., for a person with one prior conviction, possession of more than three grams of a mixture or substance containing cocaine base; for a person with two or more prior convictions, possession of more than one gram of a mixture or substance containing cocaine base) are to be sentenced in accordance with §5G1.1(b).".

Section 2K2.4 captioned "Application Notes" is amended in Note 4 by inserting after the first paragraph the following:

> "A sentence under this guideline also accounts for conduct that would subject the defendant to an enhancement under §2D1.1(b)(2) (pertaining to use of violence, credible threat to use violence, or directing the use of violence). Do not apply that enhancement when determining the sentence for the underlying offense.".

The Commentary to §3B1.4 captioned "Application Notes" is amended in Note 2 by adding at the end as the last sentence the following: "For example, if the defendant receives an enhancement under §2D1.1(b)(14)(B) for involving an individual less than 18 years of age in the offense, do not apply this adjustment.".

The Commentary to §3C1.1 captioned "Application Notes" is amended in Note 7 by adding at the end the following new paragraph:

> "Similarly, if the defendant receives an enhancement under §2D1.1(b)(14)(D), do not apply this adjustment.".

**Reason for Amendment:** This amendment implements the emergency directive in section 8 of the Fair Sentencing Act of 2010, Pub. L. 111–220 (the "Act"). The Act reduced the statutory penalties for cocaine base ("crack cocaine") offenses, eliminated the statutory mandatory minimum sentence for simple possession of crack cocaine, and contained directives requiring the Commission to review and amend the guidelines to account for specified aggravating and mitigating circumstances in certain drug cases. The emergency amendment authority provided in section 8 of the Act required the Commission to promulgate the guidelines, policy statements, or amendments provided for in the Act, and to make such conforming changes to the guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law, not later than 90 days after the date of enactment of the Act.

First, the amendment amends the Drug Quantity Table in §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy) to account for the changes in the statutory penalties made in section 2 of the Act. Section 2 of the Act reduced the statutory penalties for offenses involving manufacturing or trafficking in crack cocaine by increasing the quantity thresholds required to trigger a mandatory minimum term of imprisonment. The quantity threshold required to trigger the 5-year mandatory minimum term of imprisonment was increased from 5 grams to 28 grams, and the quantity threshold required to trigger the 10-year mandatory minimum term of imprisonment was increased from 50 grams to 280 grams. See 21 U.S.C. §§ 841(b)(1)(A), (B), (C), 960(b)(1), (2), (3).

To account for these statutory changes, the amendment conforms the guideline penalty structure for crack cocaine offenses to the approach followed for other drugs, i.e., the base offense levels for crack cocaine are set in the Drug Quantity Table so that the statutory minimum penalties correspond to levels 26 and 32. See generally §2D1.1, comment. (backg'd.). Accordingly, using the new drug quantities established by the Act, offenses involving 28 grams or more of crack cocaine are assigned a base offense level of 26, offenses involving 280 grams or more of crack cocaine are assigned a base offense level of

32, and other offense levels are established by extrapolating upward and downward. Conforming to this approach ensures that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table.

To provide a means of obtaining a single offense level in cases involving crack cocaine and one or more other controlled substances, the amendment also establishes a marihuana equivalency for crack cocaine under which 1 gram of crack cocaine is equivalent to 3,571 grams of marihuana. (The marihuana equivalency for any controlled substance is a constant that can be calculated using any threshold in the Drug Quantity Table by dividing the amount of marihuana corresponding to that threshold by the amount of the other controlled substance corresponding to that threshold. For example, the threshold quantities at base offense level 26 are 100,000 grams of marihuana and 28 grams of crack cocaine; 100,000 grams divided by 28 is 3,571 grams.) In the commentary to §2D1.1, the amendment makes a conforming change to the rules for cases involving both crack cocaine and one or more other controlled substances. The amendment deletes the special rules in Note 10(D) for cases involving crack cocaine and one or more other controlled substances, and revises Note 10(C) so that it provides an example of such a case.

Second, the amendment amends §2D1.1 to add a sentence at the end of subsection (a)(5) (often referred to as the "mitigating role cap"). The new provision provides that if the offense level otherwise resulting from subsection (a)(5) is greater than level 32, and the defendant receives the 4-level ("minimal participant") reduction in subsection (a) of §3B1.2 (Mitigating Role), the base offense level shall be decreased to level 32. This provision responds to section 7(1) of the Act, which directed the Commission to ensure that "if the defendant is subject to a minimal role adjustment under the guidelines, the base offense level for the defendant based solely on drug quantity shall not exceed level 32".

Third, the amendment amends §2D1.1 to create a new specific offense characteristic at subsection (b)(2) providing an enhancement of 2 levels if the defendant used violence, made a credible threat to use violence, or directed the use of violence. The new specific offense characteristic responds to section 5 of the Act, which directed the Commission to "ensure that the guidelines provide an additional penalty increase of at least 2 offense levels if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense."

The amendment also revises the commentary to §2D1.1 to clarify how this new specific offense characteristic interacts with subsection (b)(1). Specifically, Application Note 3 is amended to provide that the enhancements in subsections (b)(1) (regarding possession of a dangerous weapon) and (b)(2) may be applied cumulatively. However, in a case in which the defendant merely possessed a dangerous weapon but did not use violence, make a credible threat to use violence, or direct the use of violence, subsection (b)(2) would not apply.

In addition, the amendment makes a conforming change to the commentary to §2K2.4 (Use of Firearm, Armor-Piercing Ammunition, or Explosive During or in Relation to Certain Crimes) to address cases in which the defendant is sentenced under both §2D1.1 (for a drug trafficking offense) and §2K2.4 (for an offense under 18 U.S.C. § 924(c)). In such a case, the sentence under §2K2.4 accounts for any weapon enhancement; therefore, in determining

the sentence under §2D1.1, the weapon enhancement in §2D1.1(b)(1) does not apply. See §2K2.4, comment. (n. 4). The amendment amends this commentary to similarly provide that, in a case in which the defendant is sentenced under both §§2D1.1 and 2K2.4, the new enhancement at §2D1.1(b)(2) also is accounted for by §2K2.4 and, therefore, does not apply.

Fourth, the amendment amends §2D1.1 to create a new specific offense characteristic at subsection (b)(11) providing an enhancement of 2 levels if the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense. The new specific offense characteristic responds to section 6(1) of the Act, which directed the Commission "to ensure an additional increase of at least 2 offense levels if . . . the defendant bribed, or attempted to bribe, a Federal, State, or local law enforcement official in connection with a drug trafficking offense".

The amendment also revises the commentary to §2D1.1 to clarify how this new specific offense characteristic interacts with the adjustment at §3C1.1 (Obstructing or Impeding the Administration of Justice). Specifically, new Application Note 27 provides that subsection (b)(11) does not apply if the purpose of the bribery was to obstruct or impede the investigation, prosecution, or sentencing of the defendant because such conduct is covered by §3C1.1.

Fifth, the amendment amends §2D1.1 to create a new specific offense characteristic at subsection (b)(12) providing an enhancement of 2 levels if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. The new specific offense characteristic responds to section 6(2) of the Act, which directed the Commission to "ensure an additional increase of at least 2 offense levels if . . . the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in section 416 of the Controlled Substances Act (21 U.S.C. 856)".

The amendment also adds commentary in §2D1.1 at Application Note 28 providing that among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises. Application Note 28 also provides that manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses of the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

Sixth, the amendment amends §2D1.1 to create a new specific offense characteristic at subsection (b)(14) that provides an enhancement of 2 levels if the defendant receives an adjustment under §3B1.1 (Aggravating Role) and the offense involved one or more of five specified factors. The new specific offense characteristic responds to section 6(3) of the Act, which directed the Commission "to ensure an additional increase of at least 2 offense levels if . . . (A) the defendant is an organizer, leader, manager, or supervisor of drug trafficking activity subject to an aggravating role enhancement under the guidelines; and (B) the offense involved 1 or more of the following super-aggravating factors:

    (i)    The defendant--

            (I)    used another person to purchase, sell, transport, or store controlled substances;

            (II)    used impulse, fear, friendship, affection, or some combination thereof to involve such person in the offense; and

            (III)    such person had a minimum knowledge of the illegal enterprise and was to receive little or no compensation from the illegal transaction.

    (ii)    The defendant--

            (I)    knowingly distributed a controlled substance to a person under the age of 18 years, a person over the age of 64 years, or a pregnant individual;

            (II)    knowingly involved a person under the age of 18 years, a person over the age of 64 years, or a pregnant individual in drug trafficking;

            (III)    knowingly distributed a controlled substance to an individual who was unusually vulnerable due to physical or mental condition, or who was particularly susceptible to criminal conduct; or

            (IV)    knowingly involved an individual who was unusually vulnerable due to physical or mental condition, or who was particularly susceptible to criminal conduct, in the offense.

    (iii)    The defendant was involved in the importation into the United States of a controlled substance.

    (iv)    The defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense.

    (v)    The defendant committed the drug trafficking offense as part of a pattern of criminal conduct engaged in as a livelihood."

The amendment also revises the commentary to §2D1.1 to provide guidance in applying the new specific offense characteristic at §2D1.1(b)(14). Specifically, new Application Note 29 provides that if the defendant distributes a controlled substance to an individual or involves an individual in the offense, as specified in subsection (b)(14)(B), the individual is not a "vulnerable victim" for purposes of subsection (b) of §3A1.1 (Hate Crime Motivation or Vulnerable Victim). Application Note 29 also provides that subsection (b)(14)(C) applies if the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the importation of a controlled substance. Subsection (b)(14)(C), however, does not apply if subsection (b)(3) or (b)(5) (as redesignated by the amendment) applies because the defendant's involvement in importation is adequately accounted for by those subsections. In addition, Application Note 29 defines "pattern of criminal conduct" and "engaged in as a livelihood" for purposes of subsection (b)(14)(E) as those terms are defined in §4B1.3 (Criminal Livelihood).

The amendment also revises the commentary in §3B1.4 (Using a Minor To Commit a Crime) and §3C1.1 (Obstructing or Impeding the Administration of Justice) to specify how those adjustments interact with §2D1.1(b)(14)(B) and (D), respectively. Specifically, Application Note 2 to §3B1.4 is amended to clarify that the increase of two levels under this section would not apply if the defendant receives an enhancement under §2D1.1(b)(14)(B).

Similarly, Application Note 7 to §3C1.1 is amended to clarify that the increase of two levels under this section would not apply if the defendant receives an enhancement under §2D1.1(b)(14)(D).

Seventh, the amendment amends §2D1.1 to create a new specific offense characteristic providing a 2-level downward adjustment if the defendant receives the 4-level ("minimal participant") reduction in subsection (a) of §3B1.2 (Mitigating Role) and the offense involved each of three additional specified factors: namely, the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense when the defendant was otherwise unlikely to commit such an offense; was to receive no monetary compensation from the illegal purchase, sale, transport, or storage of controlled substances; and had minimal knowledge of the scope and structure of the enterprise. The specific offense characteristic responds to section 7(2) of the Act, which directed the Commission to ensure that "there is an additional reduction of 2 offense levels if the defendant—

(A)    otherwise qualifies for a minimal role adjustment under the guidelines and had a minimum knowledge of the illegal enterprise;

(B)    was to receive no monetary compensation from the illegal transaction; and

(C)    was motivated by an intimate or familial relationship or by threats or fear when the defendant was otherwise unlikely to commit such an offense."

Eighth, to reflect the renumbering of specific offense characteristics in §2D1.1(b) by the amendment, technical and conforming changes are made to the commentary to §2D1.1 and to §2D1.14 (Narco-Terrorism).

Ninth, the amendment amends §2D2.1 (Unlawful Possession; Attempt or Conspiracy) to account for the changes in the statutory penalties for simple possession of crack cocaine made in section 3 of the Act. Section 3 of the Act amended 21 U.S.C. § 844(a) to eliminate the 5-year mandatory minimum term of imprisonment (and 20-year statutory maximum) for simple possession of more than 5 grams of crack cocaine (or, for certain repeat offenders, more than 1 gram of crack cocaine). Accordingly, the statutory penalty for simple possession of crack cocaine is now the same as for simple possession of most other controlled substances: for a first offender, a maximum term of imprisonment of one year; for repeat offenders, maximum terms of 2 years or 3 years, and minimum terms of 15 days or 90 days, depending on the prior convictions. See 21 U.S.C. § 844(a). To account for this statutory change, the amendment deletes the cross reference at §2D2.1(b)(1) under which an offender who possessed more than 5 grams of crack cocaine was sentenced under the drug trafficking guideline, §2D1.1.

**Effective Date: The effective date of this amendment is November 1, 2010.**

749.    **Amendment:** Section 2B1.1(b) is amended by redesignating subdivisions (8) through (17) as subdivisions (9) through (18); and by inserting after subdivision (7) the following:

"(8)    If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.".

– 385 –

## POLICY STATEMENT ON *EN BANC* ENDORSEMENT OF PANEL DECISIONS

January 17, 1996

As the court has long recognized, *see, e.g., Irons v. Diamond,* 670 F.2d 265, 267-68 and n.11 (D.C. Cir. 1981), cases occasionally arise in which action by the court *en banc* may be called for, but the circumstances of the case or the importance of the legal questions presented do not warrant the heavy administrative burdens of full *en banc* hearing. The members of the court continue to subscribe to the view that, provided that certain safeguards are maintained, a panel of the court may seek for its proposed decision the endorsement of the *en banc* court, and announce that endorsement in a footnote to the panel's opinion.

The kinds of panel decisions the full court has endorsed in the past by means of this substitute for *en banc* hearing, and for which the court reaffirms the propriety of its use, include, but are not necessarily limited to:

(1)     resolving an apparent conflict in the prior decisions of panels of the court;

(2)     rejecting a prior statement of law which, although arguably dictum, warrants express rejection to avoid future confusion;

(3)     overruling an old or obsolete decision which, although still technically valid as precedent, has plainly been rendered obsolete by subsequent legislation or other developments; and

(4)     overruling a more recent precedent which, due to an intervening Supreme Court decision, or the combined weight of authority from other circuits, a panel is convinced is clearly an incorrect statement of current law.

Prior to seeking the endorsement of its decision by the *en banc* court, a panel

should satisfy itself that no further briefing or argument on the question presented would benefit the court in disposing of the question. The panel also should be satisfied that deciding the question is necessary to an adequate disposition of the case. And, finally, the panel must determine that the parties have had a fair opportunity to address the question in their submissions to the panel; if not, the panel should ask for supplemental briefing.

When a panel has decided to seek *en banc* endorsement for a proposed decision, the opinion shall be circulated to the full court, along with a substantive memorandum explaining the factual and legal background of the panel's decision and the need for *en banc* action. In order to ensure that the court has an adequate opportunity to consider the panel request, the time for circulation of the proposed opinion shall be extended from one week to one month. Before publishing its opinion, the panel must obtain the affirmative agreement of every member of the court not recused. Finally, regardless of the number of recusals, those voting to endorse the panel's decision must constitute an absolute majority of the active members of the court. Upon obtaining the agreement of the court, the panel shall announce the *en banc* court's endorsement of its decision as in the past, by means of a footnote citing *Irons v. Diamond.*

Nothing in the foregoing statement of the court's policy is intended to affect other established procedures or rules allowing for *en banc* review, or to limit a panel's discretion to decide a case without resort to *en banc* endorsement. In other words, a panel may always decide a case under existing precedent, leaving to the parties the determination whether to seek *en banc* review. A panel may also determine that a  statement in a prior

2

decision was dictum, not requiring *en banc* action to reject; that a prior holding has been superseded, and hence is no longer valid as precedent; or that the panel's decision is within its authority to extend existing law.  Finally, a panel of the court retains its authority to seek full *en banc* hearing and disposition of an appeal in lieu of issuing a panel decision.

3

A-75