USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1 of 500
7149

```
 1    Q.  Which is how many grams?

 2    A.  124 grams.

 3    Q.  So he bought a little bit more than half of that amount?

 4    A.  Yes.

 5    Q.  And what did you do with that amount when he gave it back to

 6    you?

 7    A.  I asked him, "Is it all there?"  And he explained to me that

 8    it wasn't.

 9    Q.  What did he say?

10    A.  Well, what happened was, if you let it sit long enough in

11    the freezer, it will get hard just enough you got to sell it

12    real quick.

13         So what he did, he let some of it get hard.  And he

14    gave it to Cheese, which is Andre Scott.  So I asked him, why

15    would he do that?  He was like, he going to sell it.

16         So he gave me the half back and I told him, what do he

17    want to do?  He trust me with his money.  He wasn't pressing me

18    to get his money back.  He wanted the product.  I told him, by

19    later on that day or tomorrow, I have some better product for

20    him.

21    Q.  And what did you do with the crack cocaine that he brought

22    back to you?

23    A.  I gave it back to my supplier, Michael Hall.

24    Q.  And before you gave it back to Michael Hall, did you store

25    it anywhere?
```

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 2 of 500
7150

1    A.  Yeah.

2    Q.  Tell us about that.

3    A.  I put it in the freezer so I can weigh it.  That's how I

4    come to really find out how much grams was really missing off of

5    it.

6    Q.  So when you put it back in the freezer, you let it do what?

7    A.  Let it harden up.

8    Q.  Did you take it out?

9    A.  Yeah.

10   Q.  When you took it out, what did you do with it?

11   A.  I put it on a scale.

12   Q.  And what did it weigh?

13   A.  It came out to be about 70-some grams.

14   Q.  And is that what you were referring to earlier, that it was

15   a little bit more than 120 --

16   A.  No, it was a little bit more than half.

17   Q.  A little bit more than half?

18   A.  Right.  A half would be 62.  It was around 77 grams.  So it

19   was a little bit more than half.

20   Q.  All right.  I think what I was referring to is, the total

21   amount of the eighth of a key was a hundred and?

22   A.  124 grams.

23   Q.  Now, did you talk to Mr. Ball about that, that he actually

24   brought you back more than half?

25   A.  Yes.

7151

```
1    Q.   When did that happen?
2    A.   Well, the same day, in the same day.  He understood
3    everything that was going on.  As a matter of fact, I picked him
4    up and we rode down Trenton Park that day.  How I found out that
5    Cheese was having a hard time selling it, when we pulled up down
6    Trenton Park, Antwuan got out the car and just started beating
7    Cheese to the body.
8    Q.   Where were you when that happened?
9    A.   I was getting out the car.
10   Q.   What kind of car were you in?
11   A.   A red 300ZX.
12   Q.   And did you hear Antwuan Ball say anything before he went to
13   Cheese?
14   A.   No.  He just got out the car, approached Cheese, said, "Give
15   me my money."
16   Q.   And you said you saw Antwuan Ball beat Cheese to the body?
17   A.   Yeah.
18   Q.   Literally, what did you see Antwuan Ball do?
19   A.   He was just punching him and beating him to the body.
20   Q.   What was Cheese doing?
21   A.   He was just standing there taking it.  It kind of had me by
22   surprise, because Cheese not a sucker, he not a punk.  So it
23   took me by surprise.
24   Q.   Where did this beating take place?
25   A.   Down Trenton Park.
```

# EXHIBIT   C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 30, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 9:15 a.m. |

. . . . . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 42 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

```
 1    Q.  Now I would like to get back, Mr. Marsh, and spend the

 2    remainder of my time talking about that two to three-year period

 3    from 1999 to May of 2001 in Congress Park.   Okay?

 4          I asked you earlier if back in the early 1990s you knew

 5    somebody by the name of Antwuan Ball.   Do you remember that

 6    question?

 7    A.  Repeat it.

 8    Q.  Sure.   I asked you a few moments ago about whether or not

 9    you knew someone named Antwuan Ball in the early '90s.

10    A.  No.

11    Q.  Okay.   Beginning in around 1999, did you get to know

12    Antwuan Ball?

13    A.  Sure.

14    Q.  And how did you meet him?

15    A.  Pretty much through Cody.   We both used to get our haircuts

16    in the same place, so our paths crossed there.

17    Q.  And when you first met him initially, just those first few

18    meetings, did you immediately become friends, or what was the

19    first few encounters you had with him?

20    A.  Acquaintances, you know.

21    Q.  Acquaintances?

22    A.  I don't remember that we went out and had drinks that day,

23    but I met him.

24    Q.  Were you introduced through Cody?

25    A.  That's what I said.
```

1    Q.  Okay.  And when you met Antwuan Ball through Cody, did you

2    meet anyone else at that initial time in addition to

3    Antwuan Ball when you got your hair cut?

4    A.  Sure.  I mean, I don't know if I met everybody the same day.

5    Q.  And when you say "everybody the same day," at some point did

6    you get to know other people who Antwuan Ball associated with in

7    Congress Park?

8    A.  Sure.

9    Q.  And who were those people, or some of those people?

10   A.  Jojo, Antwuan, Tony.  I mean, Jazz, Santu.  I'm sure there's

11   others.  I just can't -- not off the top of my head.

12   Q.  Yes or no, do you know somebody by the name of Dazz, Dazz

13   with a D?

14   A.  I'm familiar with him.

15   Q.  Okay.  And yes or no, are you familiar with somebody by the

16   name of Dom?

17   A.  Dom?  Yeah, I think I'm familiar with him.

18   Q.  And just yes or no, did you become familiar with someone by

19   the name of Wop or Cool Wop?

20   A.  I'm familiar with him.

21   Q.  Now, when you first got to know Antwuan Ball during these

22   first few encounters, did you end up deciding to spend more time

23   with him?

24        MS. WICKS:  Objection as to leading.

25        THE COURT:  I'll allow it.

```
 1    A.  He was a person of interest.

 2    BY MR. LEON:

 3    Q.  To you?

 4    A.  Sure.

 5    Q.  Why?

 6    A.  Because of his influence.

 7    Q.  What do you mean by that, because of his influence?

 8    A.  Well, when you're in a position like I was in at the time,

 9    you got to -- it's always good to align yourself with somebody

10    who has influence when you're dealing drugs, especially in the

11    neighborhood that I'm in.

12    Q.  You just said a couple of things I need to follow up on.

13            The first thing I think you said was referring to you,

14    to yourself, when you're a person, words of the effect of "in

15    the position you were in."  What did you mean by that?

16    A.  Well, we're all trading in illegal business, so if you're a

17    person who can get large quantities of drugs, you know, and you

18    running from an indictment in Virginia, you know, I'm looking at

19    trying to find somewhere else to unload these drugs.

20    Q.  At that time, 1999, when you were hanging out with Cody and

21    you go to the barbershop, did you drive any cars?

22    A.  I had quite a few cars.

23    Q.  What kind of cars did you have back then?

24            MS. WICKS:  Objection as to relevancy.

25            THE COURT:  As to what?
```

```
 1              MS. WICKS:  Relevancy.
 2              THE COURT:  Overruled.
 3   BY MR. LEON:
 4   Q.  What kind of cars?
 5   A.  Chevy truck, Trans Am, Ford, Ford truck, Acura Legends.
 6   Q.  And did you drive these vehicles -- I'm sorry, were you
 7   done?
 8   A.  I'm still thinking.  Yeah, I'm done.
 9   Q.  And did you drive these vehicles in Congress Park in 1999?
10   A.  Sure.
11   Q.  Did you -- just yes or no at this point, did you reach any
12   conclusions, yes or no, in your own mind, as to what position,
13   if any, Mr. Ball had in the Congress Park neighborhood in 1999?
14              MS. WICKS:  Objection.
15              MR. PURPURA:  Objection.
16              MR. ZUCKER:  Objection.
17              THE COURT:  Sustained.
18   BY MR. LEON:
19   Q.  You said that Mr. Ball was a person of interest to you.  Why
20   was he a person of interest to you?
21              MS. WICKS:  Objection.
22              THE COURT:  Basis?
23              MS. WICKS:  Asked and answered and relevancy.
24              MR. ZUCKER:  Also foundation.
25              THE COURT:  I'll sustain it as to asked and answered.
```

```
1    BY MR. LEON:

2    Q.  Did you ever -- once you reached the conclusions that you

3    did regarding Antwuan Ball, did you spend more or less time with

4    him?

5    A.  I guess we started spending more time together.

6    Q.  Did you, during that period, 1999, 2000, and 2001, until you

7    were locked up in May of 2001, during those two to three years,

8    did you develop a friendship with Antwuan Ball?

9    A.  I don't know if you call it that, but...

10        MS. WICKS:  Objection as to leading.

11   BY MR. LEON:

12   Q.  Well, would you call it a friendship?

13        THE COURT:  I'm sorry, was that an objection?

14        MR. TABACKMAN:  Objection as to leading.

15        MS. WICKS:  I'm sorry, Your Honor.  Yes, objection as

16   to leading at this point.

17        THE COURT:  Sustained.  But you can rephrase.

18   BY MR. LEON:

19   Q.  How would you describe your relationship with Antwuan Ball

20   as it developed during those years?

21   A.  I would say it was more a relationship of I could help him,

22   he could help me.

23   Q.  How do you mean?  What do you mean by that?

24   A.  I can get drugs and he can help me get rid of them, or make

25   it to where I can get rid of them.
```

1    much fly anywhere you wanted to go.  I think we just reimbursed

2    him.

3    Q.  How long did you stay in Dallas, Texas with Antwuan Ball?

4    A.  Couple of days.

5    Q.  And from '99 to 2000 and into 2001, did you ever socialize,

6    go out socially with Antwuan Ball?

7    A.  No.  I mean, we weren't the club types.

8    Q.  You weren't the club types?

9    A.  Naw.

10   Q.  Now, I believe you said that you had -- words to the effect

11   of you had drugs you wanted to get rid of, and you thought he

12   could help you.  Words to that effect.  Correct?

13   A.  Yeah.

14   Q.  Did Antwuan Ball ever help you move drugs?

15   A.  Sure.

16   Q.  Okay.  Let's focus first on your drugs that Antwuan Ball

17   helped you move.  Okay?

18          First of all, what type of drug are we talking about?

19   A.  Cocaine powder.  I never had any crack at that time.  And

20   Ecstasy pills.

21   Q.  Okay.  You mentioned two drugs.  Let's take them one at a

22   time.  You said that you had at that time cocaine powder?

23   A.  Yeah.

24   Q.  And that you tried to get Antwuan Ball to help you move the

25   cocaine powder?

```
 1              MR. ZUCKER:  Objection.  Leading.
 2              MR. LEON:  I'm just trying to set a foundation.
 3              THE COURT:  Go ahead.
 4   BY MR. LEON:
 5   Q.  Move the cocaine powder?
 6   A.  Sure.
 7   Q.  First of all, how much cocaine powder are we talking about,
 8   or are you talking about?
 9   A.  I mean, not a major quantity or nothing.  No kilos or
10   nothing like that.  Usually eighths of keys, which is like
11   four ounces.
12   Q.  Eighths of keys, four ounces?
13   A.  Four ounces and some change.
14   Q.  Okay.  How many times would you say you - you, Steve Marsh -
15   would use Antwuan Ball to help get rid of your powder cocaine?
16   A.  I wouldn't even -- a handful of times.
17   Q.  And each of those handful of times, was it approximately the
18   weight you just told us about, those four ounces or so?
19   A.  Yeah, I would say so.
20   Q.  Are you familiar with the term 62?
21   A.  Uh-huh.
22   Q.  Yes?
23   A.  Yeah.
24   Q.  And you've mentioned the term eighth.  Is, in your mind, if
25   you know, a 62 close to an eighth, or different --
```

```
 1    A.   It's half of an eighth.

 2    Q.   Half of an eighth.

 3              Did you ever use Antwuan Ball to -- well, withdrawn.

 4              MR. ZUCKER:  Objection.  Not to the withdrawal.

 5    BY MR. LEON:

 6    Q.   Just yes or no, did Antwuan Ball ever purchase 62s from you?

 7    A.   Yes.

 8    Q.   And yes or no, did Antwuan Ball purchase eighths from you?

 9    A.   Yes.

10    Q.   Do you remember reviewing your grand jury transcript in

11    preparation for your testimony today?

12    A.   Yes.

13    Q.   Roughly when was that?

14    A.   Last week.

15    Q.   Okay.  And other than that one time last week, did you

16    review it any other times?

17    A.   No.

18    Q.   And did you notice any errors in the actual transcription,

19    the words in the grand jury transcript?

20    A.   Yeah.  On one of those pages it said something about I had

21    sold Antwuan 80 62s, and I never said that.

22    Q.   Okay.  The transcript read 80 62s?

23    A.   That's what I said.

24    Q.   And you're saying you never said that in the grand jury?

25    A.   That's what I said.
```

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 14 of 500
9185

```
1    Q.  And did you reach any conclusions, yes or no, if that was an

2    error or -- yes or no, if that was an error?

3    A.  Had to be.

4    Q.  And as you read it and read the context of that, did you

5    reach a conclusion as to what that likely was?

6    A.  Whoever was doing the typing made a mistake.

7    Q.  And what was the mistake?

8    A.  They probably misinterpreted me saying eighth to 80.

9    Q.  Did you ever sell 80 62s to Antwuan Ball?

10   A.  Naw.

11   Q.  Did you ever sell eighths and 62s to Antwuan Ball?

12   A.  Sure.

13   Q.  Now, you also mentioned Ecstasy pills.  Correct?

14   A.  Yep.

15   Q.  And are those pills?

16   A.  Yeah.

17   Q.  And when you would sell the Ecstasy pills to Antwuan Ball,

18   how much would you sell him -- was this for personal use or was

19   this for future sales?

20            MR. ZUCKER:  Objection.

21            THE COURT:  Why don't you clarify that?

22            MR. LEON:  I'll rephrase.

23   BY MR. LEON:

24   Q.  When you sold Ecstasy pills to Antwuan Ball, how much did

25   you sell him at any one time?
```

1   drugs to Antwuan Ball.  Were there any times when Antwuan Ball

2   sold drugs to you?

3           MR. MARTIN:  Objection.  Sorry.  Withdrawn, Your Honor.

4   A.  Sure.

5   BY MR. LEON:

6   Q.  Okay.  What drugs did Antwuan Ball sell to you, Steve Marsh,

7   when he sold you drugs?

8   A.  Between crack cocaine and powder cocaine, whatever -- you

9   know, if I couldn't get my hands on anything, whatever he could

10  get his hands on.

11  Q.  Okay.  How many times, if you can estimate, did Antwuan Ball

12  sell to you crack cocaine?  Or I should say -- well, let's stay

13  with crack cocaine.  How many times did Antwuan Ball sell to

14  you, Steve Marsh, crack cocaine?

15  A.  A couple of times.

16  Q.  When you say a couple, how many?

17  A.  I would say no more than four times.  A couple, two or three

18  times.

19  Q.  And I think you also said powder cocaine.  Were there any

20  times when Antwuan would sell to you powder cocaine?

21  A.  Sure.

22  Q.  Can you estimate?

23  A.  I guess it would probably be the same, two, three times.  A

24  couple.

25  Q.  And I think you also said something along the lines of, "any

1    time we could get our hands on something," words to that effect.

2    Do you remember saying that?  Do you remember that?

3    A.  I said "he."

4    Q.  Okay.  And that was my question.  What would happen if --

5    well, withdrawn.

6            What did you mean by that, any time he could get his

7    hands on something?  Why was that of interest to you?

8    A.  Well, I usually got my drugs from far away.  So if I had

9    somebody who needed something and I couldn't get to mine, if he

10   can get his hands on something, then I used that to my

11   advantage.

12   Q.  Did you ever share drugs with Antwuan Ball?

13   A.  What do you mean by that?

14   Q.  Okay.  Did you ever -- you've talked about powder cocaine.

15   Correct?  Did you ever cook powder cocaine?

16   A.  I didn't.  I mean, I have in the past, but not with Antwuan.

17   Q.  Okay.  Do you know, yes or no, if Antwuan ever cooked powder

18   cocaine?

19           MR. ZUCKER:  Objection.  Basis.

20           THE COURT:  You can answer yes or no.

21   A.  Yes.

22   BY MR. LEON:

23   Q.  How do you know that?

24   A.  I saw him.

25   Q.  Saw him what?  Do what?

9191

```
 1    A.   Gate something, apartments.

 2    Q.   Do you remember the apartment number?

 3    A.   I think it was on the third floor, 30, 32.

 4    Q.   Whose apartment was this?

 5    A.   I believe it was a buddy of Antwuan's.

 6    Q.   What was his name?

 7    A.   Tony.

 8    Q.   And did Antwuan have a key to this apartment?

 9    A.   Yeah.

10    Q.   Did you have a key to this apartment?

11    A.   No.

12    Q.   Did Antwuan, if you know, sleep in this apartment, stay over

13    and sleep?

14    A.   Yeah.

15    Q.   Now, you've talked about Antwuan for a little bit this

16    morning.  Do you see Antwuan Ball in the courtroom here today?

17    A.   Yeah.

18    Q.   I'm going to ask if you could please point him out based on

19    his location and an article of clothing that he's wearing.

20    A.   He got the dreadlocks or something in his hair, the tie.

21    Q.   What color shirt?

22    A.   Right here, the guy right there.  Look like a white shirt.

23         MR. LEON:  Your Honor, may the record reflect the

24    in-court identification of Defendant Ball?

25         MR. TABACKMAN:  No objection.
```

```
 1              THE COURT:  Request is granted.

 2   BY MR. LEON:

 3   Q.  So you saw Antwuan Ball cook powder cocaine?

 4   A.  Yeah.

 5   Q.  And in this apartment?

 6   A.  That's what I said already.

 7   Q.  I need to establish the record.  That's why I'm doing it

 8   again.

 9              How many times would you say you've seen Antwuan Ball

10   cook up powder cocaine?

11   A.  Once, twice.  You know...

12   Q.  And the powder that he cooked up, was this his powder or

13   yours or someone else's?

14   A.  It was mine.

15   Q.  And how much powder cocaine did you give Antwuan Ball to

16   cook up?

17   A.  Oh, I don't remember no exact number.  But I'm sure, you

18   know, 50, 60 grams, try to make it into something more than it

19   was.

20   Q.  And did you see him do this?

21   A.  I already answered that like three times.  I said yeah every

22   time.

23   Q.  Okay.  What did you do, if anything, after he finished

24   cooking it up?

25   A.  Put it in bags and weighed it.
```

```
 1   Q.  I'm sorry.  And did you keep all of the crack cocaine that
 2   was cooked?
 3   A.  No.
 4   Q.  What if anything happened -- how much of it did you keep?
 5   A.  I don't remember all those defined details, you know.
 6   Q.  Okay.  Did you share the crack cocaine, yes or no?
 7   A.  I'm sure, yeah.
 8   Q.  And with whom?
 9   A.  With Antwuan.
10   Q.  Do you know if Antwuan Ball did any other things in this
11   apartment that you described off of Alabama Avenue?
12            MR. TABACKMAN:  Objection.  Foundation.
13            MS. WICKS:  Objection.
14            THE COURT:  You can answer yes or no.
15   A.  Yep.
16   BY MR. LEON:
17   Q.  What other things, other than what you described as cooking
18   crack cocaine, did Antwuan Ball do in this apartment?
19            MR. ZUCKER:  Objection.  Foundation.
20            THE COURT:  Sustained.
21   BY MR. LEON:
22   Q.  What, what --
23            MR. TABACKMAN:  Your Honor, he doesn't --
24            THE COURT:  Foundation.  Sustained as to foundation.
25   BY MR. LEON:
```

# EXHIBIT     D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | March 29, 2007 |
| DOMINIC SAMUELS, | : | 9:15 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 26 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                              Glenn S. Leon, Assistant United
                              States Attorney
                              Ann H. Petalas, Assistant United
                              States Attorney,
                              Gilberto Guerrero, Assistant
                              United States Attorney
                              555 4th Street
                              Washington, DC  20001
                              202.305.0174


For Defendant                 CARNEY & CARNEY
Antwuan Ball:                 John James Carney, Esq.
                              South Building
                              601 Pennsylvania Avenue, N.W.
                              Washington, DC  20004
                              202.434.8234

1  was something like '95.

2  Q.   Okay.  Why was the death of Kairi something that made you

3  and Don get back together?

4       MR. ZUCKER:  Objection.

5       THE COURT:  Sustained.  Rephrase.

6  BY MR. LEON:

7  Q.   Why do you remember that it was after the death of Kairi

8  that you and Don got back together?

9  A.   Because we started back hustling again.

10 Q.   Was there anything significant about the death that

11 caused you to get back with Don or no?

12 A.   Naw, it didn't have nothing to do with the death.  I

13 think it was that, man, I didn't have to jive, duck and hide to

14 hustle or nothing like that from my mother.  I was just out

15 there and I was starting to get some money, so he seen it and we

16 just started back, you know, hustling together.

17 Q.   Why didn't you have to duck and hide by that point in

18 1995?

19 A.   Because I was just basically grown.  I was doing whatever

20 I wanted to do.

21 Q.   And tell us about that.  In 1995 when you're not ducking

22 and hiding anymore, tell us what you and Don are doing.

23 A.   We started -- I started back with him getting coke from

24 Antwuan.

25 Q.   Okay.  And when you and Don would get coke from Antwuan,

1   who would get it?

2   A.    Don would go get it.

3   Q.    And do you know why that was?

4   A.    Because Antwuan already knew I was sluggish, too, trying

5   to get money, so he'd give it to Don for us to break down or

6   whatever.

7   Q.    Were you ever with Don when he got the coke from Antwuan?

8   A.    Yes, sir.

9   Q.    How many times would you say you were with Don when he

10  would get coke for the two of you from Antwuan?

11  A.    A few times, sir.

12  Q.    Okay.  And how much would Don get for the two of you when

13  he'd get from Antwuan in those cases?

14  A.    Like a half ounce.

15  Q.    And did -- for the record, how much would it cost you and

16  Don to get a half an ounce from Antwuan around this time?

17  A.    At the time, we did start buying something, but at the

18  time, we was getting fronted.

19  Q.    Okay.  And even if you get fronted, at some point you

20  have to pay it back, correct?

21  A.    Yes, sir.

22  Q.    So eventually when you had to pay it back, how much would

23  get paid back?

24  A.    For the half ounce, it's $500.

25  Q.    And again, for the record, a half is how much weight?

1    A.    It's 14 grams.

2    Q.    When you and Don would get fronted 14 grams, a half ounce

3    back in 1995, how quickly would it take you and Don to sell

4    that?

5    A.    At that time, we was speedy, so it wouldn't take long.

6    We might be finishing that night.

7    Q.    And when you got finished, what'd you do next?

8    A.    Go back.  Or sometimes the money that we make back for

9    ourselves, we put it together, get fronted a half and put some

10   together to get some more.

11   Q.    Now, was there anyone else other than Antwuan back around

12   this time, '95 or so, that you and Don got -- either bought from

13   or got fronted from, other than Antwuan?

14   A.    Not at that time, no.

15   Q.    Okay.  Was there any other place that you, Bobby Capies,

16   got your drugs around this time?

17   A.    I mean, naw, not at that time.

18   Q.    Do you know somebody by the name of Froggy?

19   A.    Yes, sir.

20   Q.    Who's Froggy?

21   A.    A friend of Antwuan's.

22   Q.    And a friend of Antwuan's at what time?

23   A.    '95.

24   Q.    Okay.  How do you know that Froggy and Antwuan were

25   friends?

1    A.    I used to see them together.

2    Q.    Okay.  And when you would see them together, where would

3    they be?

4    A.    He was sitting in his van, talking or sitting in Froggy

5    car, talking.

6    Q.    Okay.  Who had the van and who had the car?

7    A.    Antwuan had a van.

8    Q.    And Froggy had the car?

9    A.    Yes.

10   Q.    When you would see Antwuan and Froggy together in either

11   the van or the car, where would the van or the car be?  What

12   neighborhood?

13   A.    Around Congress Park.

14   Q.    And anywhere in particular in Congress Park?

15   A.    Sometimes in the circle around Mom's house or sometimes

16   around Savannah, the end of Savannah Place.

17   Q.    Okay.  Now, you said somewhere around the circle near

18   Mom's place -- Mom's house.  Can you see what you refer to as --

19   first of all -- well, withdraw that.

20         Who's Mom?

21   A.    A lady named Sharon.

22   Q.    And who was she to you back in 1995, if anyone?

23   A.    Somebody that smoked -- I mean, that people go in her

24   house, sell drugs and she buy coke.

25   Q.    And you said her name is Sharon?

1   A.      Yes, sir.

2   Q.      Have you been in Mom's house?

3   A.      Yes, sir.

4   Q.      A lot or a little?

5   A.      A lot.

6   Q.      When you were in there, did you see Antwuan in there?

7   A.      Yes, sir.

8   Q.      A lot or a little?

9   A.      A lot.

10  Q.      Who else would you see in Mom's house back around this

11  time?

12  A.      Jo-Jo, Boy-Boy, Geeka, Fat Tony.

13  Q.      Can you see Mom's house on this map?

14  A.      Yes, sir.

15  Q.      Can you tap on the approximate area were you see Mom's

16  house.

17  A.      (Indicating.)

18  Q.      Okay.  And for the record, you put a dot just above the 1

19  in 13th Place, which is a little north of the circle; is that

20  fair?

21  A.      Yes, sir.

22  Q.      Okay.  Is Mom's house on the left side of 13th Place or

23  the right side of 13th Place?

24  A.      What you mean, coming out?  If you coming out, it's on

25  the right side.

```
 1   Q.     Okay.  It's on the part closer towards 14th Place or
 2   towards 13th Street?
 3   A.     Naw, that's 13th, sir.
 4   Q.     Okay.  Is it on the side closer towards the Lincoln or
 5   the other side of the street?
 6   A.     The Lincoln side.
 7   Q.     Okay.  Did you ever sell to Mom?
 8   A.     Yes, sir.
 9   Q.     A lot or a little?
10   A.     A lot.
11   Q.     Do you know if anyone else sold to Mom?
12   A.     Yes, sir.
13   Q.     Who?
14   A.     Everybody around there that sell coke, that I knew was
15   serving coke.
16   Q.     I'm going to ask you to be more specific.  In your mind,
17   when you say everyone around there who sold coke, who are those
18   people?
19   A.     Wop, Twan, Jo-Jo, Don, Dazz, Jazz, Santu, Boy-Boy.
20   Q.     All of the people that you just mentioned who sold to
21   Mom, did you see all -- each of those people do that with your
22   own eyes?
23   A.     Yes, sir.
24   Q.     A lot or a little?
25   A.     A lot.
```

1    Q.    Now, let's get back to Froggy.  When you would see

2    Antwuan and Froggy together, did you ever see them -- other than

3    hang out together, did you ever see them do anything?

4    A.    Not face-to-face, I never see them do anything.

5    Q.    Okay.  Were you ever with Antwuan when he said something

6    to you about Froggy?

7    A.    Yes, sir.

8    Q.    Tell us -- first of all, tell us when this was.

9    A.    Me and Don was around on -- in the circle and he was

10   like, "In a minute, I want y'all to meet me around by Lulu house

11   on Savannah Place."

12   Q.    Who said this?

13   A.    Antwuan.

14   Q.    Okay.  And after Antwuan said, "I want you to meet me in

15   a few minutes near Lulu's house," what, if anything, did you see

16   Antwuan do?

17   A.    Ride up the street.

18   Q.    And then do what?

19   A.    To go meet the dude.

20   Q.    What dude?

21   A.    Froggy.

22   Q.    Did you see him meet up with Froggy?

23   A.    When I got there, Froggy was getting out his van.

24   Q.    And where was Antwuan in relation to Froggy when Froggy

25   was getting out of the van?

1    A.    Could you refer [sic] the question again, please.

2    Q.    Sure.  You saw Froggy get out of whose van?

3    A.    Antwuan's van.

4    Q.    And you're sure that was Antwuan's van?

5    A.    Yes, sir.

6    Q.    And after Froggy got out of Antwuan's van, what happened

7    next?

8    A.    Me and Don got in the van with him.

9    Q.    And then what happened?

10   A.    He showed me a -- some cocaine.  It was powder.

11   Q.    Antwuan did?

12   A.    Yes, sir.

13   Q.    Could you tell how much powder it was?

14   A.    He said it was a half a key.

15   Q.    And did you know at that point what a half a key looked

16   like?

17   A.    That was like -- that was my first time seeing a half a

18   key of coke.

19   Q.    Can you show us with your hands how much a half a key of

20   powder looks like?

21   A.    It's like about a block, about like that (indicating),

22   about this thick.

23   Q.    Okay.  For the record, first you put your hands --

24         Can you do that again?

25   A.    It was about like (indicating), and about this thick,

1    (indicating).

2    Q.    So it looks like you put your hands maybe about three or

3    four inches wide, is that fair?

4    A.    Yes, sir.

5    Q.    And then about maybe two inches high, is that what you

6    did?

7    A.    (Indicating) about right there, sir.

8    Q.    You said it was a box, was it hard or was it powder?

9    A.    It was powder.

10   Q.    Did you see the powder or was it wrapped in something?

11   A.    It was wrapped in something.

12   Q.    And after Antwuan showed you this half a key of powder,

13   what, if anything, did Antwuan say after that?

14   A.    He was like, I'm going to be nice in a minute, and I'm

15   going to come back and holler at y'all.

16   Q.    What did you understand, "I'm going to be nice in a

17   minute" to mean?

18   A.    Like he going to fix it up, so he can front me and Don

19   some more coke.

20   Q.    Fix it up how?

21   A.    Cook it.

22   Q.    And did you end up meeting up with Antwuan after this?

23   A.    Yes.

24   Q.    How much later?

25   A.    Like about two days, because it take some time to cook

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 31 of 500

1    the coke -- I mean for the coke to get hard.

2    Q.    Have you ever cooked powder into crack?

3    A.    Before, yes.

4    Q.    What do you mean "before"?

5    A.    I had cooked powder into crack.

6    Q.    Before you saw Antwuan in 1995 or what do you mean by

7    before?

8    A.    I mean, I said I did it before.

9    Q.    You mean as you sit here today?

10   A.    Yes, I've cooked coke before.

11   Q.    Okay.  And you said it takes a couple days to cool?

12   A.    Like about a -- like about a day or two.

13   Q.    Okay.  So about two days later when you see Antwuan, tell

14   us what happens?

15   A.    We get some more coke from him.

16   Q.    Who is we?

17   A.    Me and Don.

18   Q.    How much did you get from Antwuan those two days later?

19   A.    Normal stuff, like a half ounce.

20   Q.    Do you remember on this day if you paid for it or were

21   you fronted it?

22   A.    I mean, I couldn't remember specifically, but I know at

23   the time, we was getting fronted coke from him and we was buying

24   coke from him.

25         MR. LEON:  May I approach, Your Honor?

1          And Mr. Capies, for the record, I put on the screen what

2   we sublabeled 702.14 C1.  And is that the picture?

3   A.     Yes, sir.

4   Q.     And just, if you could tap for us who's who.  You said

5   Don's in the picture.  Where's Don?

6   A.     (Indicating).

7   Q.     For the record, you tapped on the taller gentleman in the

8   reddish-orange sweater?

9   A.     Yes, sir.

10  Q.     Okay.  You said Keith.  Which one is Keith?

11  A.     (Indicating).

12  Q.     And for the record, you tapped on the picture of the

13  person who's beside Don, standing in a winter coat?

14  A.     Yes, sir.

15  Q.     And then you said Kevin.  Where is Kevin?

16  A.     (Indicating).

17  Q.     And for the record, you tapped on the person seated in

18  the middle, bottom portion of that picture; is that correct?

19  A.     Yes, sir.

20  Q.     Is that the Kevin who you just tapped on, the same Kevin

21  who you would buy from back and around '95 or so?

22  A.     I never bought none from Kevin.

23  Q.     Okay.  Thank you for correcting me.  Is that the same

24  Kevin that you talked about earlier seeing sell drugs in

25  Congress Park?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 33 of 500

1   A.    Yes, sir.

2   Q.    Okay.  And what about Keith, I don't remember if I asked

3   you about Keith.  Did Keith sell in Congress Park as well?

4   A.    Yes, sir.

5   Q.    I'm going to ask you to clear the screen.

6         MR. LEON:  May I approach, Your Honor?

7         THE COURT:  Yes.

8   BY MR. LEON:

9   Q.    I'll also hand you another picture, also taken out of

10  714.C.  Do you recognize that?

11  A.    Yes, sir.

12  Q.    What is that?

13  A.    A picture at The Place.

14  Q.    What's The Place?

15  A.    Like this little place you go for, like, mic nights and

16  stuff like that.

17  Q.    Okay.  Can you tell when that picture was taken?

18  A.    In '99.

19  Q.    Why do you say that?

20  A.    Because that's when we was going to The Place.

21  Q.    And when you say "we," who was we?  Who is the "we" that

22  you're referring to that went to The Place in 1999?

23  A.    Me, Wop, Phil, DC, Don, EB, Antwuan, Fat Tony, JT, Baby

24  Kairee.

25  Q.    Okay.  And do you know where this picture was -- do you

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013     Page 34 of 500

1    have an understanding as to where this picture was taken from,

2    not when it was taken by a photographer, but where it was

3    retrieved from?  When is the last time you saw that picture?

4    A.    In my house.

5          MR. LEON:  Permission to publish, Your Honor.

6          THE COURT:  Yes.

7    BY MR. LEON:

8    Q.    This picture is actually also separately marked for

9    identification, separately as Government's 108.27, which is not

10   in evidence, even though the physical picture I hold in my hand

11   is part of the bag that is in evidence, so it's labeled twice.

12   So just to be careful, we would separately move for the

13   admission of Government's 108.27, and then we could -- if that's

14   granted, we could then publish it through the sanctions.

15         MS. WICKS:  No objection.

16   BY MR. LEON:

17   Q.    Mr. Capies, I'll ask you --

18         THE COURT:  Well, let's -- do you want to have that item

19   in evidence as 108.27 or do you want to keep it in evidence as a

20   part of 702.14 C?  It should bear only one exhibit

21   identification.

22         MR. LEON:  It doesn't matter to the government.  I think

23   it would be easier to view off of sanctions.  That's my only

24   request.  We don't care how it's labeled though, as long as we

25   can -- Your Honor, can I have a moment?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | March 29, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:00 p.m. |

. . . . . . . . . . . . . . : . . . . . . . . . . .

VOLUME 26 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                             TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013     Page 36 of 500 4969

```
 1    Q.  Where are you?

 2    A.  Right behind him.

 3    Q.  Can you please tap on you?

 4    A.  (Witness complies.)

 5    Q.  For the record, you tapped on the face and cap of somebody

 6    over the left shoulder of the person you identified as Jojo,

 7    with a blue cap.  That's you?

 8    A.  Yes, sir.

 9    Q.  Do you recognize anyone else in this photograph?

10    A.  Yes, sir.

11    Q.  Who?

12    A.  Boy-Boy.

13    Q.  Where is Boy-Boy?

14    A.  (Witness complies.)

15    Q.  For the record, you tapped on the person standing all the

16    way to the right of the photograph, but the second person from

17    the right.  Is that correct?

18    A.  Yes, sir.

19    Q.  Standing next to the person you identified as Jojo?

20    A.  Yes, sir.

21    Q.  Now, I believe earlier -- actually, I believe yesterday you

22    talked about buying, I believe you testified that you and Don

23    bought drugs from Boy-Boy during the earlier part, '92, '93 or

24    so.  Is that accurate?

25    A.  Yes, sir.
```

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 37 of 500

4970

```
1    Q.  Okay.  Did you personally buy from Boy-Boy during that time?

2    A.  Yes, sir.

3    Q.  Okay.  And did you -- when you and Don bought, did Don buy

4    separately or did you buy separately?  How did that work?

5    A.  We would go to him together and buy wholesales.  He has his

6    own money, I have my own money.

7    Q.  And what period of time is this?  How long did you and Don

8    buy wholesales from Boy-Boy.  And again, we're just in the '92

9    to '96 time period right now.

10   A.  Off and on, all the way up to '96.

11   Q.  Were there ever times you would buy from Boy-Boy on your

12   own, without Don there?

13   A.  Yes, sir.

14   Q.  And when you did that, how much would you buy from Boy-Boy?

15   A.  Just wholesale, like $200, 40 dimes or something like that.

16   $100, 20 dimes.

17   Q.  Of the people during this period of time, '92 to '96, that

18   you would mainly - you, Bobby Capies - would mainly get your

19   supply from, who were some of the main people you personally

20   would get your supply from, during this time period, '92 to '96?

21   A.  Boy-Boy, Kairi, and Antwuan.

22   Q.  Do you recognize anyone else in this photograph?

23   A.  Yes, sir.

24   Q.  Who?

25   A.  A dude named Terry.
```

1    Q.   Where is Terry?

2    A.   (Witness complies.)

3    Q.   For the record, you pointed to somebody standing in the back

4    row, in between the person -- standing in between and behind the

5    person you identified as Baby Ki and the person you identified

6    as Jojo.  Is that correct?

7    A.   Yes, sir.

8    Q.   Who is Terry?

9    A.   Somebody that lived around the Congress Park.

10   Q.   And to your knowledge, did Terry sell drugs in Congress Park

11   around that time?

12   A.   I never seen him sell drugs, sir.

13   Q.   Do you recognize anyone else in the photograph?

14   A.   Yes, sir.

15   Q.   Who?

16   A.   A dude named Fat Dog.

17   Q.   Fat Dog?

18   A.   Yes, sir.

19   Q.   Where is Fat Dog?

20   A.   (Witness complies.)

21   Q.   For the record, you indicated a person towards the lower

22   center portion of the photograph, in what appears to be a red

23   and black plaid, either jacket or a long shirt.  Is that

24   correct?  Is that fair?

25   A.   Yes, sir.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 39 of 500

4973

1    A.   (Witness complies.)

2    Q.   And for the record, you've indicated someone also squatting

3    or kneeling, wearing a baseball cap.  Of the three people

4    squatting or kneeling on this photograph, he's the one in the

5    center holding what appears to be a beer bottle in his left

6    hand.

7    A.   Yes, sir.

8    Q.   Okay.  What connection if any does Doo-Doo have to Congress

9    Park during the 1992 to 1996 period?

10   A.   He was hustling around there.

11   Q.   What do you mean by "hustling around there"?

12   A.   Selling drugs.

13   Q.   What part of Congress Park did Doo-Doo hustle in the '92 to

14   '96 period, if you know?

15   A.   I used to see him.  He used to be in the circle sometimes,

16   but I mainly used to see him in the Boat Alley.

17   Q.   When he was in the Circle, was he alone or with others?

18   A.   Yes, sir.

19   Q.   Which?  Was he alone or with others when he was hustling in

20   the circle?

21   A.   Oh, he was with others.

22   Q.   Who?

23   A.   Jojo, Antwuan, Kairi, Boy-Boy, Fat Tony.

24   Q.   Now, let me just stop there.  A few different times I've

25   asked you, when someone is in the circle, who else is there?

1  For example, right here you just said Doo-Doo, Jojo, Antwuan,

2  Kairi, and Boy-Boy I think you just said now.  You've mentioned

3  about, I think that's five people.

4        Were there -- other than the five people you just

5  identified in response to this question, how many more people

6  were there out there in the circle selling when you saw this

7  group of five people selling?

8  A.  I mean, that was they stationary spot --

9        MR. ZUCKER:  Objection.

10        THE COURT:  Hold on one second.

11        MR. ZUCKER:  Objection.  The question is so vague as to

12  time and association.

13        THE COURT:  Well, come on up.

14        (BENCH CONFERENCE ON THE RECORD.)

15        THE COURT:  Before we get to your objection, I thought

16  I heard his answer being, "Sometimes I would see him in the

17  circle, but most of the time I would see him in Boat Alley."

18        The predicate of your question was, "You've said, with

19  respect to the circle, the following people."  The names that

20  you named I thought were names that came out in connection with

21  Boat Alley.

22        MR. LEON:  I may have -- first, I may have

23  misunderstood his answer, so I can certainly take a step back

24  and clear that up.  That was not an intentional

25  misrepresentation.

1          THE COURT:  I thought his answer included a time

2    period.  His answer about when Kairi died included part of a

3    time period you were asking.  Maybe I misremember the answer.

4          MR. LEON:  I can try to clean it up.  I understand the

5    point.

6          (END BENCH CONFERENCE.)

7    BY MR. LEON:

8    Q.  Mr. Capies, I think you said that Kairi died, I think you

9    said sometime in '95?

10   A.  Yes, sir.

11   Q.  Okay.  So before Kairi passed, let's say 1994, did you, to

12   the best of your memory, see Doo-Doo sell crack cocaine in the

13   circle in, say 1994?

14   A.  Between them times, I could say I seen him roughly.  But I

15   knew some of the time too, he was in jail too, some of the time.

16   Q.  Okay.  So can you put a year on it or no?

17   A.  I don't understand what you say.

18   Q.  Sure.  You said at some point around then Doo-Doo was

19   incarcerated?

20   A.  Yes, sir.

21   Q.  Do you know exactly what parts of what years he was?

22   A.  Like '92, something like that.

23   Q.  Do you know if he was incarcerated in '94, if you know?

24   A.  No, sir.

25   Q.  Okay.  Can you, in your mind as you sit here, remember a

1   time you saw Doo-Doo selling crack in the circle?

2   A.   Yes, sir.

3   Q.   When you saw Doo-Doo selling crack in the circle, was it --

4   roughly, can you number the number of times that he was selling

5   crack in the circle?

6   A.   I don't know how many times, but I know it was like the end

7   of '95 going into '96.

8   Q.   Okay.  Do you know if, at that time, Kairi was alive or had

9   he already been killed?

10   A.   I don't know.  I know Kairi died in '95, but I don't know...

11   Q.   Okay.  And again, who are some of the people who you do

12   remember being around or near Doo-Doo when you saw Doo-Doo

13   selling crack cocaine in the circle area?

14   A.   Jojo, Antwuan, Fat Tony.  And like Kairi used to be in the

15   circle, too.

16   Q.   And you mentioned a few people just now:  Jojo, Antwuan,

17   Kairi, and Fat Tony.  Were there other people around the circle

18   at that time that you just can't remember, or is that more or

19   less the group?

20   A.   Boy-Boy.

21   Q.   Okay.  You mentioned Boy-Boy.  Other than these people as

22   well as Boy-Boy, anybody else that you can't remember but were

23   there, or is that pretty much the group?

24   A.   Is that time frame, Geeka used to come around there too.

25   Q.   Okay, Geeka.  Anybody else you can think of?

USCA Case #11-3031   Document #1445852      Filed: 07/10/2013    Page 43 of 500

4980

```
 1    A.  All the group that used to be across the street from 1313.

 2    I mean, it's like everybody used to come around there, but there

 3    was a certain group that was stationary right there.  Everybody

 4    had, back in that time, had like their own little group where

 5    they was at.

 6    Q.  And that's what I'm getting at.  You just --

 7            MR. ZUCKER:  Objection.

 8            MR. LEON:  Withdrawn.

 9            THE COURT:  Sustained.  Go ahead.

10    BY MR. LEON:

11    Q.  I want to pick up on your language, sir.  You said something

12    about a group being stationary at the circle.  What in your mind

13    did you mean when you said a group being stationary at the

14    circle.  Who are those people?

15    A.  Like Jojo, Antwuan, Kairi, Fat Tony.  Geeka was coming

16    around there.  He was really stationary around there with them.

17    They used to be like in the circle, in a lady named Mom's house.

18    Q.  That's the Mom's that you talked about earlier this morning?

19    A.  Yes, sir.

20            MR. LEON:  May I approach, Your Honor?

21            THE COURT:  Yes.

22    BY MR. LEON:

23    Q.  Mr. Capies, I'm handing you what's marked for identification

24    as Government 's 208.1.  Do you recognize the person who is

25    depicted on that exhibit?
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :  Docket No. CR 05-100
                                   :
     v.                            :
                                   :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  April 2, 2007
DOMINIC SAMUELS,                   :  9:15 a.m.
                                   :
          Defendants.              :
                                   :
                                   :
                                   :
                                   :


VOLUME 27 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*


APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                              Glenn S. Leon, Assistant United
                              States Attorney
                              Ann H. Petalas, Assistant United
                              States Attorney,
                              Gilberto Guerrero, Assistant
                              United States Attorney
                              555 4th Street
                              Washington, DC  20001
                              202.305.0174


For Defendant                 CARNEY & CARNEY
Antwuan Ball:                 John James Carney, Esq.
                              South Building
                              601 Pennsylvania Avenue, N.W.
                              Washington, DC  20004
                              202.434.8234

bit broad.

MR. LEON:  I thought I zeroed it in on '95, '96.  I apologize.

THE COURT:  Well, even during a two-year period.  What are you asking?

MR. LEON:  Okay.  I'll zero it in.

BY MR. LEON:

Q.   During the time period 1995 or so, around the time -- first of all, around that time period, 1995, in that time period, were you in Moms' apartment, yes or no?

A.   Yes, sir.

Q.   Okay.  So that year, when you were in Moms' apartment during that year or so, when you were in that apartment -- so in other words, based on your own eyes, not on what you heard but what you saw -- what you saw, tell us -- describe for us what you saw going on in Moms' apartment.

A.   People selling crack.

MR. TABACKMAN:  Still, Your Honor -- I mean, is that something going on the entire time?

THE COURT:  I'll allow it.  Go ahead.

THE WITNESS:  People was selling crack.

BY MR. LEON:

Q.   Okay.  Other than selling crack, were people storing crack in that apartment?

A.   Yes, sir.

Q.     How do you know that?

A.     Because I was seeing it.

Q.     What did you see with respect to storing crack in that
apartment?

A.     Sometimes I'd go in there, when I get fronted coke from
Antwuan, he have coke in there.

Q.     Did you ever see weapons in that apartment?

A.     Yes, sir.

Q.     And when you would see weapons in that apartment, who
would have the weapons or where would they be?

A.     Antwuan, Joe Geeka, Fat Tony.

Q.     Do you know if weapons were ever stored in that
apartment?

        MR. ZUCKER:  Objection.

        THE WITNESS:  I don't know if --

        MR. ZUCKER:  Is it asked based on what he saw?

        THE COURT:  Beg your pardon?

        MR. ZUCKER:  I ask that it be limited to what the witness
saw, not what he believed.

        THE COURT:  I think the question was "Do you know?"  And
he can answer yes or no.

BY MR. LEON:

Q.     Do you know if -- just yes or no, if weapons were stored
in the apartment?

A.     No, I don't know if they were stored in there, sir.

Q.    First Poobie and then Booby?

A.    I know somebody named Poobie.

Q.    Who's Poobie?

A.    That was a guy that used to be with Burke.

Q.    What do you remember about that?

A.    They used to hang out together.

Q.    Poobie hung out with Burke?

A.    Yes.

Q.    Did they just hang out or did Poobie have any drug

relationship with Burke, to your knowledge?

A.    Not that I never seen.  I never seen them.

Q.    Poobie a man or a woman?

A.    Huh?

Q.    Is Poobie, with a P, a man or a woman?

A.    A man, sir.

Q.    First just yes or no, during 1996 -- actually, let's say

1996 to 2001, that same period, did Antwuan Ball, just yes or

no, to your knowledge, sell crack to other people?

A.    Weight.  I ain't never seen him serve no hand-to-hand

crack to other people.

Q.    When you say "weight," what do you mean by "weight"?

A.    Quarters and halves.

Q.    How do you know that during this period of time, Antwuan

Ball sold weight to others?

A.    Because most of the time I be in the car with him.

Q.    With who?

A.    With Antwuan.

Q.    Tell us some of the people -- who were you in the car with -- withdrawn.

       First of all, what time period are we talking about?  Can you be more specific within '96 and 2001?

A.    This like '97, '98.

Q.    Okay.  Whose car are you in with Antwuan, when he's selling weight to people?

A.    In his car.

Q.    What kind of car was it at that time?

A.    I can't remember the kind of car at that time, what he was driving.

Q.    Okay.  And who were you with?  Who did Antwuan sell in your presence in his car?

A.    I don't know if he was selling to him or fronting it to him, but I seen him give crack to Doo-Doo, Lucious, S-Curl, and a dude named Rob.

Q.    Now, Rob, you mentioned earlier somebody by the name of Rob.  Is this the same Rob, a different Rob?

A.    A different Rob.

Q.    Who's this Rob?

A.    A guy named Rob.  He -- his sister name Charise.  I just know him.  I don't really know him all about his whereabouts, but I just know that's his sister.

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 49 of 500

**Q.**     Okay.  Did this Rob who Antwuan sold to, did he himself, Rob, sell in Congress Park or somewhere else, to your knowledge?

**A.**     I seen him hustling in the Boat Alley a few times, from what I seen.  That's in Congress Park.

**Q.**     And when Antwuan would, in your presence, supply these people, how much was it -- or front them, how much was it?

**A.**     I can't remember the quantity, but I seen him pass some coke.

**Q.**     You don't know how much?

**A.**     I don't remember the quantity, but I have seen him pass some coke.

**Q.**     Okay.  Now let's get to Boobie with a B.  Do you know somebody by the name of Boobie?

**A.**     Yes, sir.

**Q.**     Who is Boobie?

**A.**     He was a guy who was with me when he got killed.

**Q.**     Do you know if Boobie has any brothers?

**A.**     Yes, sir.

**Q.**     Who were Boobie's brothers?

**A.**     Wop.

**Q.**     Okay.  Is Boobie an older or younger brother than Wop's, if you know?

**A.**     It's his younger brother.

**Q.**     You said you were with Boobie when he was killed?

**A.**     Yes.

# EXHIBIT   E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 7, 2007 |
| DOMINIC SAMUELS, | : | 9:20 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 46 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:        UNITED STATES ATTORNEY'S OFFICE
                                Glenn S. Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174

  For Defendant               CARNEY & CARNEY
  Antwuan Ball:              John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 52 of 500

1    Q.    Was that a violation of your conditions of release?

2    A.    Yes, it was.

3    Q.    Have you used any other drugs, other than smoking weed?

4    A.    Nope.

5    Q.    And jumping back, talking about -- you talked about

6    getting drugs from Boy-Boy back in 1994.  What happened then?

7    How -- did you continue to sell drugs?  How often did you

8    continue to sell drugs after that time?

9          Once you got that drugs the first time from Boy-Boy, tell

10   us about your drug dealing after that.  How often?

11   A.    I mean, every day I just sold drugs around the park.

12   Q.    You said every day you sold drugs around the park?

13   A.    Like I say, not every day because one day I might not

14   have had nothing.  I might have been broke or -- but basically,

15   I was trying to come up in the drug world.

16   Q.    And in 1994, how old are you?

17   A.    Fourteen.  It's either --

18         MR. PURPURA:  Objection.

19         THE WITNESS:  -- 13 or 14, because my birthday is on

20   September 3rd, so it depends on if it was early or if it was

21   late.

22   BY MS. PETALAS:

23   Q.    You said you were either 13 or 14th because your birthday

24   is on September 3rd.  That's right around your birthday that you

25   started?

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 53 of 500

1  A.    Hum?

2  Q.    That you started getting the drugs from Boy-Boy?

3  A.    Okay.  Let me see.  My birthday -- if I was going back to

4  school, my birthday was coming up at least two to three days

5  after that, or something like that, going back to school.

6  Q.    So --

7  A.    Because my birthday is like -- ain't that Labor Day on

8  the September 2nd or something?  Or whatever holiday that is, my

9  birthday on the 3rd, so --

10  Q.    And so I just want to clarify.  Was this right around

11  when you turned -- either right before you turned 14 or right

12  after you turned 14?  Is that what you're trying to say?

13  A.    Yes, yes.

14  Q.    And who did you get drugs from after that first time you

15  got from Boy-Boy?

16  A.    Boy-Boy -- I mean, everybody, like it's -- I have to name

17  names?

18  Q.    Yes.

19  A.    Okay.

20  Q.    When you say "everybody," who do you mean?

21  A.    Up, Boy-Boy, Twan, Wop, Jo-Jo -- Twan, Jo-Jo, Wop --

22  Q.    Let me stop you right there.

23  A.    Hold on.  Hold on.  I'm going to go -- it's just so many

24  names.

25        THE COURT:  I think she wants you to hold on because she

```
 1    A.    Like -- okay.  At first Twan wouldn't fuck with me.  Twan
 2    was on my heels about going to school.  So like if I wouldn't --
 3    if Twan caught me out of school or something, it was like all of
 4    us at that period of time, so if he caught us not going to
 5    school, they used to fuck us up and beat our body and shit like
 6    that.
 7          But after school, it was cool to do whatever, so --
 8    Q.    Okay.  We'll go back to that in a minute.  Right now, I'm
 9    on Boy-Boy.  How often would you get from Boy-Boy?
10    A.    Periodically, like if I bought a wholesale, if I asked
11    him to hold some dimes or something like that.  Like when I
12    first -- '94, going on up, I wasn't really doing too much in
13    that.  I was in some bummy shit like wearing Boy-Boy clothes,
14    shit like that, you know, getting dimes from Boy-Boy.
15          MR. MARTIN:  Objection, Your Honor.  Non-responsive,
16    narrative.
17          THE COURT:  Sustained.  Put your question.
18    BY MS. PETALAS:
19    Q.    Well -- and when you said -- so you did say -- yes or no,
20    you were actually -- you did get drugs from Boy-Boy during this
21    period?
22          MR. BEANE:  Objection, your Honor.  Asked and answered.
23          THE COURT:  Sustained.
24    BY MS. PETALAS:
25    Q.    And if you could estimate what the amounts were, how
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 55 of 500

1    often would you -- would it be a weekly occurrence?  Monthly

2    occurrence?  How often could you get from Boy-Boy?  Or would you

3    get from Boy-Boy?

4         MR. BEANE:  Objection, Your Honor.  Asked and answered.

5         THE COURT:  I'll allow it.

6         You can answer it.

7         THE WITNESS:  It might be every day, every other day.  If

8    I had some money or if he wanted to give me something, he'd throw

9    me some dimes or --

10   BY MS. PETALAS:

11   Q.    You said if he wanted to give you something.  Would there

12   be times when he would give you coke?

13   A.    Yeah -- yes.

14   Q.    You also mentioned an individual named Meat.  Who's Meat?

15   A.    A friend of all of ours from down Good Hope Road.

16   Q.    And how was it that you met Meat?

17   A.    I met Meat like years ago on Good Hope Road, going down

18   there with Aman.

19   Q.    And what amounts of crack cocaine did you get from Meat?

20        MR. ZUCKER:  Objection -- withdrawn.

21   BY MS. PETALAS:

22   Q.    You can answer the question.

23   A.    I used to get ounces from him.

24   Q.    And do you know Meat's proper name?

25   A.    Dimitrius Spencer.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 56 of 500

1   Q.    I'm sorry.  What?

2   A.    Dimitrius Spencer.

3   Q.    And just for clarification, do you know an individual

4   named Meatball?

5   A.    Yes.

6   Q.    Is Meatball a different person from Meat?

7   A.    Yes.

8   Q.    You also talked about getting drugs from Antwuan and you

9   mentioned something about school, going to school and him not

10  messing with you.  Explain what you meant by that.  When did you

11  start getting from Antwuan?

12  A.    I can't recall -- I can't recall what year I started

13  getting from Antwuan or what specific date, but -- I'm trying to

14  remember.  Was it after my juvenile?  Before I did the --

15        It was before I did the 14 months.

16  Q.    And what amounts would you get from Antwuan before -- I'm

17  talking about time period before you did the 14 months?

18  A.    Like quarters.

19  Q.    When you say "quarters," you mean quarter of what?

20  A.    Quarter ounce, seven grams.  There was one particular

21  time, he gave me and Little Benny some quarters.

22  Q.    Let me stop you there.  We'll get to that in a minute.

23        Because you talked about going to school, explain what

24  you meant when you said they were trying to get you to go to

25  school.

1    A.    All right.  My mother had put me out, so I moved to

2    Sharrah house, so I was going to Johnson.

3    Q.    You moved to who's house?

4    A.    My cousin Sharrah house.  So I moved there.  I was going

5    to Johnson.  So like if I could -- it was just known in the

6    hood, like if you hook school, stuff like that, maybe Kairi and

7    Antwuan, Jo-Jo -- Boy-Boy, all them niggas would chase you

8    around the hood and tell you to go to school or beat you up, you

9    know what I'm saying, because you wasn't in school.

10   Q.    And once you got out of school, what could you do?

11   A.    Whatever you wanted to do.  I mean, you know, to this

12   day -- I mean, right now --

13        MR. PURPURA:  Objection.

14        THE COURT:  Sustained.

15   BY MS. PETALAS:

16   Q.    During this time period -- you talked about getting

17   quarter ounces from Antwuan before you went in.  Did -- would

18   you pay for them?  Did he front you?  How did that work?

19   A.    I might -- if I had some money, I'd buy it.  If I didn't,

20   he'd front me, you know.  But a lot of times, I used to fuck

21   Antwuan money up, so he really didn't like to fuck with me.

22   Q.    And what do you mean, you would screw up his money?

23   A.    Like he front me and I wouldn't pay him or I took too

24   long to pay him and then there'd be a problem between me and him

25   about the money.

1   Q.     What do you mean, it would take too long to pay him?

2   Explain how that worked.

3   A.     Like because -- I mean, I used to be tripping.  Like they

4   give niggas something, it be like -- they give niggas a quarter

5   and be like ride around, ride around, ride around, ride around.

6   They pull up on you, like, "When am I going to get my money?"

7   Like, "Damn, I ain't make no money," you know.

8   Q.     And how long would they give you to sell a quarter?

9          MR. ZUCKER:  Objection.

10         MR. MARTIN:  Objection to the "they," Your Honor.

11         THE COURT:  Sustained.

12   BY MS. PETALAS:

13   Q.     How long -- we're talking about Antwuan.  How long would

14   it be before he would come back to get the money?

15   A.     ASAP.  A-S-A-P.

16   Q.     What do you mean by "ASAP"?

17   A.     He want his money as soon as possible.  And if you didn't

18   have his money as soon as possible, he put his hands on you.

19   Q.     And you talked about -- you started to tell a story about

20   Little Benny, something that happened with Little Benny.  Could

21   you -- what happened -- what were you saying there?

22   A.     Well, one particular time, Twan had gave me and Little

23   Benny a quarter a piece.

24   Q.     And who's Little Benny?

25   A.     This is Lona's son.

10122
USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 59 of 500

1    Q.    And who's Lona?

2    A.    My Aunt Webaby, good friend of hers, son.

3    Q.    Was Little Benny -- did Little Benny live in Congress

4    Park?

5    A.    He didn't live in -- he came around the park.  He wasn't

6    staying around the park.

7          But he gave me and Little Benny some quarters.

8    Q.    Who gave you and Little Benny some quarters?

9    A.    Antwuan gave me and Little Benny some quarters, so he was

10   like -- it was like some minutes later, he was like, "Where my

11   money?  Y'all got my money?"

12   Q.    Who said that?

13   A.    Twan.  I was like, "Damn, I ain't sold nothing yet."

14         He said, "Don't let me have to fuck y'all up about my

15   money."

16         So me and little Benny went to, I think, one of those

17   stores to get a beer and came back and they said Twan was

18   looking for us.  So I was like, "Damn."

19         I forget where I went at, but Little Benny went in front

20   of the Lincoln and Twan had plucked him in his eye.  So when I

21   seen Little Benny early that day, he was like, "Man, you better

22   pay him his money, man.  He plucked me in my eye, man,

23   da-da-da-da.  I paid him his money.  You better pay him his

24   money."

25         And before that, he was like, "I'm going to fuck you up

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            :      Docket No. CR 05-100
                                     :
              Plaintiff              :
                                     :
v.                                   :      Washington, DC
                                     :
ANTWUAN BALL,                        :
DAVID WILSON,                        :
GREGORY BELL,                        :      May 7, 2007
DESMOND THURSTON,                    :
JOSEPH JONES,                        :
DOMINIC SAMUELS,                     :
                                     :
              Defendants             :      2:00 p.m.
. . . . . . . . . . . . . . . . :    . . . . . . . . . . .

VOLUME 46 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

```
 1    A.   Same day I got locked up, November 17th.

 2    Q.   This was one year later, so 2002?

 3    A.   Yes, ma'am.

 4    Q.   I'm going to focus on that time period for right now.   When

 5    you get out, do you start dealing with Antwuan at all?

 6    A.   We start doing business.

 7              MS. PETALAS:   Court's indulgence.

 8    BY MS. PETALAS:

 9    Q.   I'm sorry, I misspoke.   You said it was 2000 that you got

10    locked up, so I'm talking November of 2001.   Is that correct?

11    A.   When I got out?

12    Q.   Yes.

13    A.   Yes.   Same day I got locked up, same day I got released.

14    Q.   And how was it that you started dealing with Antwuan when

15    you get out of jail?

16    A.   I was at my -- all right.   How we started out dealing back

17    and forth then, he called me to his house and was like, "Ki, the

18    police raid run in here, the police raid run in here."

19    Q.   Let me stop you right there.   Who called you?

20    A.   Twuan.

21    Q.   And where was his house at that time?

22    A.   On Benning Road.

23    Q.   So when he called you, did you go over to his house?

24    A.   Yes.

25    Q.   And what happened when you got to his house?
```

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 62 of 500

10216

```
 1   A.  He was like, "Take this coke."  So he gave me two ounces.

 2            And I was like, "You want me to take this gun?"  He was

 3   like, "No, no, no, it's cool.  It's cool.  The gun cool."  I was

 4   like...

 5   Q.  So when you said, "You want me to take this gun," was there

 6   a gun there?

 7   A.  Yeah, he had a -- it was a 357, silver with a brown handle.

 8   Q.  I'm sorry, what?

 9   A.  It was silver with a brown handle.

10   Q.  Did you think it was unusual he didn't want you to take the

11   gun?

12   A.  Yeah.  I just run with the flow.

13   Q.  So did you take the two ounces?

14   A.  Uh-huh.

15   Q.  You have to answer yes or no, for the record.

16   A.  Yes.

17   Q.  And what did you do with those two ounces?

18   A.  I took them home.

19   Q.  And where was home?

20   A.  44 Falls Terrace.

21   Q.  Falls Terrace, where is that?

22   A.  In Simple City, right off Alabama Avenue.

23   Q.  And were you living there at the time?

24   A.  Yes.

25   Q.  Who were you living with?
```

10217

```
 1    A.  Me, my baby mother, and my mother.

 2    Q.  And after you took this home, at some point do you go to

 3    sell those two ounces?

 4            MS. WICKS:  Objection.

 5            THE COURT:  Sustained.

 6    BY MS. PETALAS:

 7    Q.  What do you do with the two ounces after that?

 8    A.  That morning, I went back around the way.  And I'm like,

 9    "You want your shit?"  He was like, "Shit, you might as well

10    sell them joints.  You might as well hold them joints."

11    Q.  Okay, let me stop you right there.  You said you went back

12    around the way.  When did you go back around the way?

13    A.  The next morning.

14    Q.  And when you say, "went back around the way," where were you

15    going?

16    A.  Congress Park.  So went back around the way, asked him did

17    he want his coke back.

18    Q.  Who were you talking to?

19    A.  Twuan.  He was like, "Dude, might as well keep it, Shorty.

20    You might as well sell it, Shorty.  You can get it off, you got

21    the money for it."

22            So I was stuck with two ounces.  So I sold the

23    two ounces.

24    Q.  You said you were stuck with two ounces?

25    A.  I wasn't stuck with them, but I sold them.
```

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 64 of 500

1   Q.  And when you went back around the way and he told you to

2   keep them, did you have to give him any money at that time

3   period?

4           MR. CARNEY:  Objection.  Leading, Your Honor.

5           THE COURT:  Sustained.

6   BY MS. PETALAS:

7   Q.  During that first conversation when you went back around the

8   way, that you just talked about, was there any money exchanged

9   at that point?

10  A.  I think I paid him for one, and I owed him for one.  No.

11  Did I pay him for one right there?  I can't remember.  I can't

12  remember if I -- I can't remember.

13          MS. PETALAS:  Court's indulgence.

14  BY MS. PETALAS:

15  Q.  Were you able to sell those two ounces?

16  A.  Yes.

17  Q.  And what happened when you sold the two ounces?

18  A.  He gave me some more.

19  Q.  He gave you two more what?

20  A.  O's, two more ounces.  I owed him -- no, I think I sold him.

21  He gave me -- I think he gave me two more or one more, then he

22  gave me another one, and I owed him like 24.

23  Q.  Okay.  Let me stop you right there.

24          MS. PETALAS:  Court's indulgence.

25  BY MS. PETALAS:

1    Q.  You said you can't remember how much -- if you paid him

2    after those first two ounces?

3    A.  No.

4    Q.  You have to answer yes or no.

5    A.  No.

6    Q.  Do you remember testifying in the grand jury about this?

7    A.  Yes, ma'am.

8    Q.  Would looking at the grand jury refresh your recollection?

9    A.  Yes.

10          MS. PETALAS:  I'm referring to February 1st, 2005,

11   page 40.

12          Actually, Your Honor, may we approach briefly?

13          THE COURT:  Yes.

14          (BENCH CONFERENCE ON THE RECORD.)

15          MS. PETALAS:  The reason I approached, I can place more

16   on the record because I haven't placed any on the record.  But

17   through his prior testimony, after talking to this witness, he

18   has some literacy problems.  So I can refresh his recollection,

19   but he has some reading issues.

20          So I can show it to him, kind of run into it

21   technically.  I don't know if there's a way I can place the

22   husher on and I can quietly read it to him, or -- his grand jury

23   testimony will refresh his recollection.  There's just kind of a

24   physical problem with him being able to read it.  And I don't

25   want to read it all out so the jury can hear it, but it is

1227

```
 1    Q.  Mr. Kellibrew, did that refresh your recollection?

 2    A.  Yes.

 3    Q.  Now I need my memory refreshed on what I asked you.

 4              MS. PETALAS:  Could you read back the last question?

 5              THE REPORTER:  Before the bench conference?

 6              MS. PETALAS:  Yes.

 7                        (The record is read.)

 8    BY MS. PETALAS:

 9    Q.  Well, after you -- let's just step back.  You testified

10    Antwuan Ball gave you two ounces.  When you sold those two

11    ounces, did you pay Antwuan anything?

12    A.  Paid him for one, he gave me another one, made it 22.

13    Q.  You said made it 22 what?

14    A.  2200 that I owed him.

15    Q.  You owed him $2,200?

16    A.  Yeah.  Yes.

17    Q.  And what happened then?

18    A.  He gave me another one.  I paid him for one, he gave me

19    another one.  It went 22, 22, then he gave me -- then he was,

20    like, "Oh, I'm almost done, I'm almost done.  Take these last

21    two."  I was, like, all right.  So I owed him 4400.

22    Q.  You said "take these last two."  What are you talking about

23    there?

24    A.  Ounces.

25    Q.  And you owed him how much?
```

 1    A.  I owed him 4400.  So like a couple days, like I think maybe

 2    two, three days, he was going to Philly --

 3    Q.  Let me stop you there.  So you said you owed him $4,400?

 4    A.  Yes.

 5    Q.  And at some point after you owe him $4,400, do you go on a

 6    trip with Antwuan Ball?

 7            MR. ZUCKER:  Objection.  Leading.

 8            THE COURT:  Sustained.

 9    BY MS. PETALAS:

10    Q.  Well, do you see Antwuan Ball again after you owe him this

11    $4,400?

12    A.  Yes.

13    Q.  And when do you see Antwuan Ball?

14    A.  I seen him in the circle.

15    Q.  And what happened when you saw him in the circle?

16    A.  He was saying he was ready to go to Philly or whatever for

17    this Prepaid Legal event or whatever.  I was, like, yeah --

18    Q.  Let me stop you right there.  You said he was getting ready

19    to go to Philly for a Prepaid Legal event.  What do you mean, a

20    Prepaid Legal event?

21    A.  I mean, that's what he was doing.  I know he was doing the

22    Prepaid Legal stuff by the girl, Micola (ph), and he said he was

23    going to a convention out there.  That's what he said, he was

24    going to a convention with the Prepaid Legal.

25            So it was me, Bird, and Black in my car, and I was,

# EXHIBIT   F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            :
                                     :
              Plaintiff,             :   Docket No. CR 05-100
                                     :
         v.                          :
                                     :
ANTWUAN BALL, DAVID WILSON,          :   Washington, DC
GREGORY BELL, DESMOND                :
THURSTON, JOSEPH JONES, and          :   March 5, 2007
DOMINIC SAMUEL,                      :   9:15 a.m.
                                     :
              Defendants.            :
                                     :
                                     :
                                     :

VOLUME 11 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:        UNITED STATES ATTORNEY'S OFFICE
                                Glenn Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174


  For Defendant                 CARNEY & CARNEY
  Antwuan Ball:                  John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

1   Q.   How do you know it's your gun?

2   A.   Because I popped the clip out, and I had four aluminum

3   hollow points in it -- well, three was left.

4   Q.   And how many were in it when you handed it to

5   David Wilson on February 6th?

6   A.   Four aluminums.

7   Q.   Did you recognize the ammunition?

8   A.   Yes, sir.

9   Q.   And did you recognize the gun?

10   A.   Yes, sir.

11   Q.   What, if anything did you do -- first of all --

12   withdrawn.

13       Do you know who that other person was who retrieved the

14   gun for David Wilson?

15   A.   I -- no, sir.

16   Q.   Did you see him before?

17   A.   No, sir.

18   Q.   So now you get the gun back -- your gun back from David

19   Wilson.  What, if anything, happens next?

20   A.   Well, I get the gun back and I pulled around -- well, I

21   pulled around the corner, an alley they call the Boat Alley, and

22   I was sitting in the back in the car, and just sitting there

23   smoking marijuana and --

24   Q.   Let me withdraw -- interrupt you there.

25       Why didn't you leave right then?  You have a murder

1   weapon with you.  Why are you hanging out in Congress Park

2   still?

3   A.     I was trying to catch a few marijuana sales.

4   Q.     What do you mean by that?

5   A.     I was just sitting in the back hoping that some sales

6   come through.

7   Q.     Were you able to make a few sales?

8   A.     Yes, sir.

9   Q.     Okay.  Tell us what happens next.  Actually, I apologize

10  again.

11         You said "Boat Alley."  Can you see the Boat Alley on

12  that map?

13  A.     Yes, sir.

14  Q.     Can you point it out with the pen?  Point to it.

15  A.     (Indicating).

16  Q.     Can you point a little harder.

17  A.     Point again?

18  Q.     I'm sorry.  I missed it.  I missed the arrow.  I got it.

19         For the record, you pointed to the -- it looks like an

20  alley that's not marked, that looks to be in-between the street

21  that's labeled Savannah Street and a street labeled Congress

22  Street; is that correct?

23  A.     Yes, sir.

24  Q.     You pointed kind of to the middle of that alley; is that

25  correct?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 72 of 500

1   A.      Yes, sir.

2   Q.      Do you know the address of that street or anything, or

3   you just know the alley?

4   A.      Just the alley.

5   Q.      Okay.  What kind of car were you in on that day?

6   A.      A white Crown Vic.

7   Q.      Okay.  Whose car was that?

8   A.      Rental car.

9   Q.      Who'd you rent it from?

10  A.      Union Station.

11  Q.      You got it from -- who'd you rent it from specifically,

12  do you remember?

13  A.      Yeah -- I don't know if it's Hertz.  It might be Hertz.

14  I can't remember exactly, but --

15  Q.      Okay.  And what happens next?  You're making some sales

16  and you're sitting there?

17  A.      Yeah, I'm sitting, and then I see Twan pull up.

18  Q.      You say "Twan."  Just for the record, do you see Twan in

19  the courtroom today?

20  A.      Yes, sir.

21  Q.      Can you please point him out based on his location and an

22  article of clothing that he's wearing.

23  A.      Yes, sir.  He has on a white shirt with a black tie.

24          MR. LEON:  May the record reflect the in-court

25  identification of Antwuan Ball.

USCA Case #11-3031     Document #1445852         Filed: 07/10/2013     Page 73 of 500

1    THE COURT:  Request is granted.

2    MR. LEON:  Thank you.

3  BY MR. LEON:

4  Q.    You say you see Twan.  What if anything happens when you

5  see him?

6  A.    Well, he pull up, and told me to come over to the car,

7  and I walked over to the car and he told me that he got

8  something that I might be interested in.

9  Q.    Were those his exact words?

10 A.    Yes, sir.

11 Q.    Did you -- what did you understand that to mean?

12 A.    He -- hopefully it was a gun.

13 Q.    What'd you say, you hoped it was a gun?

14 A.    Yeah.

15 Q.    Why'd you hope it was a gun?

16 A.    I mean, because -- that's what I was hoping he

17 implicated.  He didn't really talk because he had his mother

18 right there.

19 Q.    Okay.  His mother was in the car?

20 A.    Yes, sir.

21 Q.    What kind of car was this?  Do you remember?

22 A.    A Civic, gray little Civic.

23 Q.    Who was driving the car and who was in his car?

24 A.    Well, Twan was driving the car.

25 Q.    Okay.  So what, if anything, did you say to him when he

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 74 of 500

```
 1   said he had something for you.

 2   A.     He told me to wait right here, he be right back.

 3   Q.     And did you wait?

 4   A.     Yes, sir.

 5   Q.     Did he leave?

 6   A.     Yes, sir.

 7   Q.     Did he come back?

 8   A.     Yes, sir.

 9   Q.     How much later?

10   A.     Like 20 minutes later.

11   Q.     And did he come back walking or driving?

12   A.     Driving.

13   Q.     What was he driving?

14   A.     The same car, a Honda Civic.

15   Q.     Was his mother in the car?

16   A.     No, sir.

17   Q.     Tell us what happens once he gets back, alone in the car.

18   A.     Well, when he get back, he reached in the back and pulled

19   out an Uzi.

20   Q.     Okay.  Just for the record, what is an Uzi?

21   A.     A semiautomatic weapon.

22   Q.     Can you describe it for us?

23   A.     Well --

24   Q.     You can use your hands if you need to.

25   A.     About this big (indicating), box shape.
```

1   Q.     Keep your hands there.  Just for the record, you're

2   keeping your two hands approximately 8 to 10 inches apart.  Does

3   that sound about right?

4   A.     Yes.

5   Q.     Okay.  Go ahead.

6   A.     And --

7   Q.     You said "box"?

8   A.     Yeah, well, box-shape gun.  It had a 25-round clip in it,

9   and told me to give him 600 for it.

10  Q.     And what did you do or say?

11  A.     Well, I told him, yeah, I want it.  I went in my pocket

12  and pulled out some cash.

13  Q.     How much?

14  A.     I ended up giving him 500.

15  Q.     Why didn't you give him 6?

16  A.     Because I had some odd money in my pocket and I just told

17  him that I -- I'll either give him the hundred dollars later,

18  and he was like, "Well, do you got some marijuana on you?"  And

19  I said "Yeah," and I ended up giving him some marijuana for the

20  other hundred.

21  Q.     Okay.  And then you took -- and then what happened?

22  A.     Well --

23  Q.     Did you take the weapon from him?

24  A.     Yes, sir.

25  Q.     Okay.  Then what happens?

1   A.     I got back in the Crown Vic and I pulled off.

2   Q.     Okay.  Did -- you said there was ammunition -- was there

3   ammunition in the clip or was it a clip that could hold

4   ammunition?

5   A.     No, there was ammunition in there.

6   Q.     Do you know how much ammunition there was?

7   A.     No, sir.

8   Q.     Okay.  What happens next?

9   A.     Well, I pull off and drive back around Quarles.

10  Q.     And what do you do there?

11  A.     Well, there I took the Ruger -- well, I took both of the

12  guns and put them in an abandoned car.

13  Q.     Another car?

14  A.     Yes, sir.

15  Q.     What kind of an abandoned car is this?

16  A.     It was a Ford -- I can't remember exactly what type of

17  car.  It was a Ford, though, a Tempo or something like that.

18  Q.     Why did you put two guns in an abandoned car?

19  A.     Because I didn't want -- one of them was a murder weapon

20  and the other one was, you know, 25-round clip Uzi, you know,

21  so -- it was bulky, so I didn't really want to be riding around

22  with it.

23  Q.     Are you concerned that somebody's going to take these two

24  weapons out of this abandoned car?

25  A.     Naw, I was just concerned about the murder weapon,

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 77 of 500

```
1    A.     In the building they called the rental office, the same
2    place.
3    Q.     On the third floor?
4    A.     Third floor.
5    Q.     Now, you earlier testified about an eighth of a key.  Do
6    you remember that?
7    A.     Yes, sir.
8    Q.     And I think you said it was 124 grams?
9    A.     Yes, sir.
10   Q.     And you've been talking about these sales of 93 grams.
11   Is it fair to say that's less than an eighth of a key?
12   A.     Yes, sir.
13   Q.     Did David Wilson ever buy more than the 93 from you?
14   A.     No, sir.
15   Q.     Did you ever suggest to him that he should?
16   A.     Yes, sir.
17   Q.     Why?
18   A.     Because I told him he would save more money.
19   Q.     Explain that.  How would he save more money if he bought
20   an eighth of a key from you?
21   A.     Because you -- he would have got an extra 31 grams for
22   $700.
23   Q.     How much -- again, just for the record, how much were you
24   selling him the 93s for?
25   A.     3300.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 78 of 500

1  Q.    And how much would you have sold him the eighth of a key

2  for?

3  A.    4,000 powder.

4  Q.    Did he give you a reason why he didn't go up that extra

5  amount?

6  A.    Naw.  He said he trying to get there.

7  Q.    Okay.  Now, you talked about Antwuan Ball selling you

8  that Uzi a few days after the incident in Hope Village.  Do you

9  remember that testimony?

10 A.    Yes, sir.

11 Q.    Had you ever purchased any other weapons from Antwuan

12 Ball prior to that?

13 A.    Yes, I purchased a Ruger.

14 Q.    Okay.  Tell us when that sale happened.

15 A.    Summer of 2000.

16 Q.    How do you remember it was the summer of 2000?

17 A.    Because I just bought a '97 Lincoln.

18 Q.    So, who'd you buy that '97 Lincoln from?

19 A.    A car dealer down on South Dakota.

20 Q.    And whose idea was it for you to buy that gun from

21 Twan --

22       MR. ZUCKER:  Objection to whose idea it was.

23       MR. LEON:  I'll rephrase.

24 BY MR. LEON:

25 Q.    Where was the sale?

1   A.     In an alley off of Alabama Avenue turning into the

2   Congress Park area.

3   Q.     What, if anything, led you to meet up with Antwuan Ball

4   to sell him the gun?

5   A.     Well, because I was going around there to purchase some

6   Ecstasy pills and at the time Antwuan was standing right there

7   from the -- well, he had some Ecstasy -- the guy named Steve had

8   some Ecstasy pills, which was one of Twan's friends, and while I

9   was up there looking for some Ecstasy pills and some Hydro, Twan

10  told me that he had a gun for me.

11  Q.     And what, if anything, did you say to him?

12  A.     I asked him how much he want for it.

13  Q.     What, if anything, did he say to you?

14  A.     350.

15  Q.     And what happened?

16  A.     I went in my pocket and gave him 350.

17  Q.     And did he give you the gun right then?

18  A.     Yes, sir.

19  Q.     And what kind of a gun was it?

20  A.     A Ruger.

21  Q.     What kind?

22  A.     P-89 .9 millimeter.

23  Q.     Now, is this the same Ruger or a different Ruger than you

24  handed to David Wilson on February 6th?

25  A.     Same Ruger.

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 80 of 500

1   Q.     How do you know that?

2   A.     Because I passed it to him.

3   Q.     Was there ammunition in the Ruger when Antwuan Ball gave

4   it to you?

5   A.     Yes, sir.

6   Q.     Was it the same or different ammunition than was in the

7   Ruger that you handed to David Wilson on February 6th?

8   A.     No, it was different ammunition.

9   Q.     Now, you said you were there -- just quickly -- to buy

10  some Ecstasy and Hydro.  Was that for what purpose?

11  A.     Personal use.

12  Q.     Very quickly, what's Ecstasy?

13  A.     It's a pill formed of various drugs formed in one little

14  pill.

15  Q.     And what about Hydro, what's that?

16  A.     It's grade A marijuana.

17  Q.     Okay.  Other than this other incident you just described

18  about buying the Ruger from Antwuan Ball in the summer of 2000,

19  did you buy -- do you remember buying any other guns from him at

20  any other time other than the two you just described?

21  A.     No, sir, I don't.

22  Q.     Okay.  Now, you said you got locked up on March 5th of

23  2001, correct?

24  A.     Yes, sir.

25  Q.     And in Maryland, correct?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | March 5, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 2:10 p.m. |

. . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 11 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 82 of 500

1535

1    A.  No, I told them that I also bought a Beretta, but I didn't

2    buy it from Antwuan Ball.  So I guess Beretta got on the piece

3    of paper, but I told them that I bought a Rueger nine-millimeter

4    from Antwuan Ball.

5    Q.  So you told that to the government or to the judge or who?

6    A.  I just told them when I went over the plea agreement.

7    Q.  What?

8    A.  I told my lawyer when I went over the plea agreement that

9    that should say Rueger.

10   Q.  And so when the judge asked you about your plea in court,

11   you didn't correct it, or your lawyer didn't correct it?  Is

12   that what you're saying?

13   A.  Personally, I mean, Beretta, Rueger, it was a

14   nine-millimeter, so I didn't really -- I was nonchalant with it.

15   I didn't really pay it no attention.  Once I told them, I just

16   left it alone.

17   Q.  I see.  And today you're testifying that that

18   nine-millimeter Rueger, which you previously described as a

19   nine-millimeter Beretta, is the same gun that was used to shoot

20   and kill Sam Phillips.  Correct?

21   A.  Yes.  The nine-millimeter Rueger was used in the murder

22   case.  Yes, sir.

23   Q.  Right.  And you're now saying that that is the gun that you

24   previously pled in court before Judge Lamberth as a Beretta?

25   A.  Well, it was supposed to say Rueger, sir.

1    Q.  Did you ever tell your lawyer to correct this?

2    A.  Yes, sir.

3    Q.  And you told him to tell that to the judge in writing?

4    A.  Well, I just told him when we went over the papers that that

5    shouldn't say Beretta, it should say Rueger.

6    Q.  And did he correct that?

7    A.  No, sir.

8    Q.  Is it not true that when you were first asked about the

9    handgun, you stated that it actually belonged to Mr. Wilson?

10   A.  Yes, sir, I did state that it belonged to Mr. Wilson.

11   Q.  And you carried that lie from sometime in March all the way

12   through May 23rd of 2002?

13   A.  Yes, sir.

14   Q.  You didn't tell, in this proceeding on May 23rd, 2002, that

15   that was a gun that Mr. Antwuan Ball gave to you or sold to you.

16   Is that right?

17   A.  Well, I told them two, three months prior to the trial on

18   March 23rd (sic).

19   Q.  You didn't tell, on May 23rd, 2002, this proceeding, that

20   that gun came from Antwuan Ball through you?

21   A.  Oh, I never was asked the question in the trial.  No, sir, I

22   didn't.

23   Q.  Were you asked about where the gun came from with respect to

24   the shooting, where it was located in the car, who owned the

25   gun, and that?

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 84 of 500
1537

```
1    A.  Yes, sir.

2    Q.  You didn't tell in that trial proceeding where the gun

3    originally came from.  Correct?

4    A.  No, sir.  I wasn't asked.

5    Q.  Did you not also tell law enforcement that this gun, that

6    you purchased it from Mr. Wilson?

7    A.  Yes.  I told law enforcements that, yes, sir.

8    Q.  Did you not tell law enforcement that this gun was exchanged

9    for a .38 revolver with someone by the name of Tedrick?

10   A.  No, sir.

11   Q.  Did you not tell law enforcement that after the shooting,

12   you had purchased a gun from Wilson for $500, and sold it to a

13   friend who used to live in Laurel?

14   A.  I don't think I told them 500, I think I told them 250, that

15   I purchased it from Cool Wop for 250.

16   Q.  And did you not tell the grand jury in December of 2003 that

17   the friend lived in Fox Glen apartments, and that you didn't

18   tell him it was hot?

19   A.  No, I never told him -- I didn't know his apartment complex

20   was called Fox Glen, but I did tell him that the gun was hot

21   when I sold it to him.

22   Q.  You've indicated that you have met with law enforcement at

23   least 15 times since October of 2001.  Do you remember when you

24   first told law enforcement about the Beretta being a Rueger?

25   A.  Yes, sir.
```

USCA Case #11-3031       Document #1445852       Filed: 07/10/2013       Page 85 of 500

# EXHIBIT   G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :    Docket No. CR 05-100
                           :
          Plaintiff    :
                           :
v.                       :    Washington, DC
                           :
ANTWUAN BALL,              :
DAVID WILSON,             :
GREGORY BELL,             :    March 29, 2007
DESMOND THURSTON,        :
JOSEPH JONES,             :
DOMINIC SAMUELS,          :
                           :
          Defendants    :    1:00 p.m.

. . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

VOLUME 26 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                             GLENN S. LEON, ESQUIRE
                             GIL GUERRERO, ESQUIRE
                             UNITED STATES ATTORNEY'S OFFICE
                             555 Fourth Street, NW
                             Washington, D.C.  20530

For the Defendant      JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:           CARNEY & CARNEY
                             601 Pennsylvania Avenue, NW
                             Suite 900, South Building
                             Washington, DC  20004
                             (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

1    A.  Yes, sir.

2    Q.  I'm going to refer to page 12 of this.

3          Question:  "Okay.  What else in this conversation did

4    he say about the murder?  Did he say how he did it or anything

5    like that, or was that pretty much the whole conversation?"

6          Answer:  "No, he was like he came through to meet in

7    the back and came down the hill, and that's how he killed him,

8    like coming down.  It's a back -- in the back of

9    Congress Street, they can come out, you know, like on the blind

10   side part of where the Lincoln.  It's the Lincoln and it's the

11   cut, and he came down that.  He said he had a mask on and he

12   shot him coming out of that cut right there."

13         Question:  "Okay.  I'm going to ask you to point out on

14   a map later, but for now, was that in the same conversation he's

15   telling you about this about coming through the cut wearing the

16   mask?"

17         Answer:  "Yes.  Right."

18         Do you remember giving those answers to those

19   questions?

20   A.  Yes, sir.

21   Q.  And were those answers true?

22   A.  Yes, sir.

23   Q.  Now, around this time - and when I say around this time, I

24   mean 1995 and 1996 - do you know, yes or no, if Antwuan Ball

25   carried any weapons?

1    A.  Yes.

2    Q.  How do you know that?

3    A.  When his brother passed away, he was carrying two guns that

4    was alike called Sig-Sauers.

5    Q.  They both were Sig-Sauers?

6    A.  Yes, sir.

7    Q.  And do you know the caliber?

8    A.  Yes, sir.

9    Q.  What was the caliber?

10   A.  Nine-millimeter.

11   Q.  Both of them?

12   A.  Nine-millimeter, yes, sir.

13   Q.  Both guns were?

14   A.  Yes, sir.

15   Q.  And how do you know this?

16   A.  Because I seen him with them.

17   Q.  Do you know if Antwuan Ball was ever arrested around this

18   time for carrying a gun?

19   A.  Sometime around that time.

20   Q.  How do you know that?

21   A.  It was him and another guy.

22   Q.  Who is that other guy?

23   A.  A guy named Doo-Doo.

24   Q.  Have you mentioned Doo-Doo earlier today?

25   A.  Yes, sir.

1   Q.  Same Doo-Doo?

2   A.  Yes, sir.

3   Q.  Tell us how you know that Antwuan was arrested on a gun

4   charge with Doo-Doo.

5   A.  When he got out, I asked him what he got locked up for.

6   Q.  Who did you ask?

7   A.  Antwuan.

8   Q.  And what did Antwuan say to you?

9   A.  He said him and Doo-Doo was in the car or something like

10  that, and that he had to -- he had his gun on him.  And he asked

11  Doo-Doo to take the charge and he wouldn't take it.

12  Q.  Antwuan asked Doo-Doo to take the charge?

13  A.  Yes, sir.

14  Q.  And Doo-Doo said he wouldn't?

15  A.  Yes, sir.

16  Q.  And do you know what if anything happened as a result of

17  that?

18  A.  He whooped him.

19  Q.  Who whooped who?

20       MR. ZUCKER:  Objection.  Basis.

21  BY MR. LEON:

22  Q.  What else did Antwuan tell you about this charge?

23  A.  I just told you, sir, he told me that he whooped him.

24  Q.  Antwuan told you that?

25  A.  Yes.  Because he wouldn't take the charge.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 3, 2007 |
| DOMINIC SAMUELS, | : | 9:30 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 28 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:        UNITED STATES ATTORNEY'S OFFICE
                                Glenn S. Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174


  For Defendant                 CARNEY & CARNEY
  Antwuan Ball:                 John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

1   Q.    And just before he hit you, tell us what he said to you

2   about this 10th Place beef.

3   A.    Not -- it wasn't like just before he hit me.  It was like

4   back some time, in '97.

5         MR. TABACKMAN:  Your Honor, can we just have -- objection.

6   This is --

7         THE COURT:  Mr. Leon?

8         Mr. Leon?

9         MR. LEON:  I was just trying to reorient the witness.  I

10  agree it's a bit repetitive.  I was trying to reorient the

11  timeline.

12        THE COURT:  Well, do it without the repetition then.

13        MR. LEON:  Okay.

14  BY MR. LEON:

15  Q.    Let's just get to the time you got hit, okay?

16  A.    Yes, sir.

17  Q.    You said you got hit in January, you think it was 2001?

18  A.    No, 2000.

19  Q.    Okay.  Where were you when you got hit?

20  A.    In Wop house.

21  Q.    Where is that?

22  A.    1313 building.

23  Q.    Do you know the apartment?

24  A.    I don't know the door number.

25  Q.    And just where -- did he live with anyone in this

1    apartment?

2    A.    Yes.

3    Q.    Who?

4    A.    Dominique.

5    Q.    What floor was the apartment on?

6    A.    Third floor.

7    Q.    Where did Antwuan hit you?

8    A.    In the house.

9    Q.    Where on your body?

10   A.    In my mouth.

11   Q.    And do you have any permanent effects from that assault?

12   A.    Yes, sir.

13   Q.    What?

14   A.    My tooth gone.

15   Q.    And I'm going to ask you to just show us what you're

16   talking about.

17   A.    (Indicating.)

18   Q.    For the record, you're showing us -- it looks like you're

19   missing a front tooth?

20   A.    Yes, sir.

21   Q.    What about the tooth, the other front tooth?  Is there

22   anything with that?

23   A.    The nerve gone dead in it.

24   Q.    Who else was present, if anyone, when you got hit in the

25   mouth by Antwuan in Wop's apartment?

```
 1   A.      Me, Phil and Wop.

 2   Q.      You, Phil, Wop, Antwuan?

 3   A.      Yes.

 4   Q.      That's four people.  Anyone else?

 5   A.      No.

 6   Q.      When did this happen?  In other words, what time of day?

 7   A.      In the daytime, like in the evening.

 8   Q.      Was it light out or not?

 9   A.      It was light out.

10   Q.      Take us back just an hour or two before.  Before you were

11   in the apartment, where were you?

12   A.      I was outside.

13   Q.      Where?

14   A.      I think I was going to the truck.

15   Q.      What truck?

16   A.      Ice cream truck.

17   Q.      Whose ice cream truck?

18   A.      A guy name T-Bone truck.

19   Q.      And what were you going to do there?

20   A.      Get some Blunts -- I mean, not no Blunts.  Some Backwoods

21   and something to drink.

22   Q.      Okay.  Did you do that?

23   A.      Yes.

24   Q.      Were you with anyone or alone?

25   A.      When I got back in the hallway, Antwuan was coming
```

1   through the back.

2   Q.    Okay.  And what happened next?

3   A.    We went upstairs in Wop house.

4   Q.    Whose idea was it to go upstairs in Wop's house.

5   A.    He asked me what I was doing.  I said I'm going to go to

6   Wop's house and play the game.  He said, "Hold on.  I'm going to

7   park and go up there with you."

8   Q.    Okay.  And did he?

9   A.    Yes.

10  Q.    And was anyone with you and Antwuan when the two of you

11  went up to Wop's house?

12  A.    No.

13  Q.    When you got up to Wop's house, tell us who, if anyone,

14  was inside.

15  A.    Phil and Wop was playing the game.

16  Q.    What game?

17  A.    Football, the Madden.

18  Q.    And tell us what happens next.

19  A.    It was my turn on the game and I started playing Wop on

20  the game.

21  Q.    Okay.  And so where are you exactly in the apartment?

22  A.    I'm on like the right-hand side in the living room.

23  Q.    Okay.  And where is Wop?

24  A.    Like a little bit behind me on the left-hand side.

25  Q.    And Antwuan?

1    received.

2         (Government's Exhibit 403.1 admitted into the record.)

3    BY MR. LEON:

4    Q.    And before we show this, Mr. Capies, I'm just going to

5    note there are some letters an A, a P and a W and another circle

6    and just a couple marks there.

7         Do you have an understanding, just yes or no, as to what

8    those marks are?

9    A.    Yes, sir.

10   Q.    Okay.  And will you be able to explain those marks to us

11   once we show this to the jury?

12   A.    Yes, sir.

13        MR. LEON:  If we could use the ELMO.

14   BY MR. LEON:

15   Q.    For the record, Mr. Capies, I'm showing you what's now in

16   evidence as Government's 403.1 and I'm going to try to get as

17   much of this on as I can.

18        Do you see that in front of you?

19   A.    Yes, sir.

20   Q.    Okay.  Can you explain to us what those letters are and

21   other markings are?  And for the record -- actually, let me

22   point to them and tell us if you can tell us what they are, if

23   you know.

24        For the record, I'm going to refer to room B.  And first

25   I'm going to -- over here it says "TV."  Is it fair to say

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 96 of 500

1    that's where a television was?

2    A.    Yes, sir.

3    Q.    Okay.  I'm going to point next over here to what looks

4    like a circle, just a little bit to the right of and across from

5    the TV.  It's to the left on this photograph.

6    A.    Yes, sir.

7    Q.    What's that, if you know?

8    A.    That's where I was sitting.  It was a bean bag right

9    there.

10   Q.    You were here?

11   A.    Yes, sir.

12   Q.    Okay.  What does the W indicate?

13   A.    That's where Wop was sitting at.

14   Q.    What about P?

15   A.    Where Phil was sitting at.

16   Q.    And there's an A behind Phil and Wop.  Who's that?

17   A.    Antwuan was sitting right there.

18   Q.    And there are two X's right over there on the rectangle.

19   What is that?

20   A.    Two guns was right there.

21   Q.    Okay.  Whose guns were those?

22   A.    Me and Wop's.

23   Q.    Okay.  Tell us what kind of guns they were.

24   A.    A Ruger and a Taurus.

25   Q.    A Ruger and a Taurus?

1   A.      Yes, sir.

2   Q.      Whose was whose?

3   A.      The Ruger was Wop's and the Taurus was mine.

4   Q.      What caliber were they?

5   A.      Nines.

6   Q.      Okay.  Tell us what happened.  I think you said you were

7   playing -- were you on the bean bag when you're playing the --

8   A.      Yes, sir.

9   Q.      Okay.  And who else is playing it at this time?

10  A.      Me and Wop playing each other.

11  Q.      And what is Phil doing?

12  A.      Sitting right there, twisting up weed.

13  Q.      Okay.  And what was Antwuan doing initially?

14  A.      Sitting in the back watching the game, watching us play.

15  Q.      Okay.  Tell us what happens.

16  A.      Me and Wop was playing the game.  And it was some shells

17  and the two guns sitting up on the table and Antwuan started

18  messing with them, with the two guns.  And Wop was like, "Man,

19  stop playing with those guns behind our back."  And Phil was

20  like, "Put them guns up."

21          And Antwuan was like, "Man, I know what I'm doing."

22          And at one point in time, Antwuan asked Wop, can he use

23  the bathroom.  And he was like, "Go ahead."  He went to use the

24  bathroom while we was playing the game and then he came back and

25  sat down.

1          Then we was still playing the game.  He was like, "Can I
2     use the bathroom again?"
3          And he was like, "Why you keep asking me to use the
4     bathroom, man?  Go ahead and use the bathroom."
5     Q.     How much later was it when Antwuan asked to use the
6     bathroom a second time?
7     A.     It was like five minutes or so.
8     Q.     Did he say anything as to why he wanted to use the
9     bathroom again?
10    A.     He said like his wife fixed him some food and it got him
11    having the runs.
12    Q.     Did he go to the bathroom?
13    A.     Yes.
14    Q.     Tell us what happens.
15    A.     He came back.  And we just sitting there playing, just
16    sitting there.  Wasn't nothing going on.  And Phil said
17    something again about him playing with the guns.
18         And then I came by -- I could barely see him.  I was a
19    little bit to the right.
20    Q.     Barely see who?
21    A.     Antwuan.  But I could see Wop and Phil because they up on
22    stools, sitting down.  And then while we playing the game, I
23    heard someone go, "Fuck," like -- I didn't pay no attention to
24    it.  I heard Antwuan cuss.
25         So I don't say nothing.  I kept playing the game.  I seen

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 99 of 500

1    Wop jump up and run to the back.  And then I seen Phil race to

2    the back.  Then I was still sitting on the bean bag.  I said,

3    "Man, stop playing.  Man, come on, play the game."

4    Q.     Let me stop you there.  When you say "the back," can we

5    see on Government's 403.1 -- can you point to the direction?

6    Which rooms did Phil and Wop run towards?

7    A.     At that time, I didn't know exactly what room Wop ran to

8    until later, but Phil ran towards the bathroom.

9    Q.     Okay.  And for the record, can we see the bathroom here?

10   A.     Yes.

11   Q.     What room is the bathroom on this Government's 403.1?

12   You can just tell us, is it labeled with a letter?

13   A.     Room D.

14   Q.     Okay.  So continue.  So Phil and Wop run away at first.

15   And then what happens?

16   A.     I told them, I was like, "Man, stop running.  Y'all

17   playing."  And I turned around.

18          Antwuan had both of the guns in his hand.  And he was

19   like, "Get up."

20          I was like, "Man, go ahead with those guns.  Stop playing

21   like that, man."

22          He was like, "Aww, you think you got balls?"  And when I

23   turned back around, he smacked me with the gun.

24   Q.     Which gun?

25   A.     I can't remember which gun it was, but I know he smacked

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 100 of 500

1   me with the gun.

2   Q.     How many times?

3   A.     Once at that time.

4   Q.     Okay.  Where -- where exactly?  Which side of your mouth

5   or face did he hit?

6   A.     On the left side.

7   Q.     And tell us what happens when he smacks you on that left

8   side of your mouth?

9   A.     I was like, "Man, what you doing?  What you doing?"  I

10  asked him what he do it for.

11         He was like, "Oh, you know what's going on.  Y'all

12  supposed to be killing me."

13         I was like, "What?  I don't know what's going on, man.

14  What you talking about?"

15         He was like, "Really?"  He was like, "Get up."

16         I got up, got myself together.  He told me, walk towards

17  the back room.  He had the two guns behind my head.  And I

18  started walking to the back room and I was telling Wop -- you

19  know what I'm saying -- "I'm coming back here, it's me."  I

20  started walking back towards the room.

21  Q.     Why did you say that?  Did you know where Wop was when

22  you said, "I'm coming back here, it's me"?

23  A.     At that time, no, sir.

24  Q.     Did you know if Wop was somewhere in the apartment?

25  A.     Yes.  He had to be back there somewhere.

1    Q.    Why do you say that?

2    A.    Because that's the way he ran.

3    Q.    Okay.  Tell us what happens next.

4    A.    When he walked me back there, I'm telling Wop, "Man, it's

5    me coming back here, Wop," because I know there's a gun in the

6    house.

7    Q.    In other words, another gun?

8    A.    Yes.

9    Q.    Other than the two in Antwuan's hands?

10   A.    Yes, sir.

11   Q.    What other gun was in the house?

12   A.    An AK.

13   Q.    An AK?

14   A.    Yes, sir.

15   Q.    Where was that gun?

16   A.    It usually be under the mattress of the bed in Wop room.

17   Q.    And just for the record, which room is Wop's room, if we

18   can see it on this map?

19   A.    Room E, sir.

20   Q.    E?

21   A.    Yes, sir.

22   Q.    And whose gun was that, that AK?

23   A.    Wop's.

24   Q.    Had you seen it before?

25   A.    Yes, sir.

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 102 of 500

1    A.    He went to the door, to the bathroom door, where Phil was

2    at.

3    Q.    And?

4    A.    He was asking Phil something.  I couldn't hardly hear

5    him.  Then he came back to me and he said, "Phil said you know

6    where he be holding his money at."

7          I said, "I don't know."  And then he kicked me.

8    Q.    Where'd he kick you?

9    A.    In my mouth.

10   Q.    Which side?

11   A.    Like on this side of my mouth.

12   Q.    For the record, your right side?

13   A.    Yes, sir.

14   Q.    Which is not the side you were struck with the gun?

15   A.    Right.

16   Q.    When he struck you -- when he kicked you in the mouth,

17   what happened next?  Did you lose consciousness at any point?

18   A.    Yes, sir.

19   Q.    When?

20   A.    I was dazed when he was kicking me and hitting me.

21   Q.    When you said "dazed," were you passed out cold?

22   A.    I wasn't passed out cold, but I was dizzy.

23   Q.    Tell us what happens after Antwuan kicks you in the

24   mouth.

25   A.    He got one of the guns in his hand pointing, his left

1    side, pointing to me, going in the drawers, Wop's drawers.

2    Q.    Do you know what he was looking for?

3          MR. ZUCKER:  Objection.

4          THE WITNESS:  His money.  That's what he asked me about.

5    BY MR. LEON:

6    Q.    Okay.  At the time he's looking through the drawers, is

7    he saying anything to you?

8    A.    Naw.  He just looking in the drawers and watching me.

9    Q.    Did he take anything out of the drawers?

10   A.    Yes.

11   Q.    What?

12   A.    His money and some coke.

13   Q.    Could you tell how much money he took?  Could you tell at

14   that time how much money he took?

15   A.    No, sir.

16   Q.    Could you -- was it cash?

17   A.    Yes.

18   Q.    And could you tell how much drugs he took at that time?

19   A.    No, sir.

20   Q.    What kind of drugs was it?

21   A.    Crack.

22   Q.    What happens next?  You see him take the money and the

23   crack out of the drawer?

24   A.    He started stuffing it in his pants.

25   Q.    Okay.  What happens next?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 104 of 500

1   A.     Then he told me, turn over, because I was starting to

2   crimp, laying over when he had the gun pointed to me.   And I

3   turned over.

4          And he was like, "Man" --

5   Q.     Turn over which way?  Are you facing up or facing down

6   now?

7   A.     I was turned this way (indicating) and then I turned back

8   over facing him.

9   Q.     So where are you looking at this point?

10  A.     I'm looking at him.

11  Q.     Okay.

12  A.     And then he took his hands and clicked both of the

13  hammers back on the guns.

14  Q.     Where were the guns aimed?

15  A.     At me.

16  Q.     Where on you?

17  A.     At my face.

18  Q.     What happens next?

19  A.     He told me, grab the pillow.

20  Q.     Did you?

21  A.     Naw.

22  Q.     Why not?

23  A.     Because he told me to put the pillow on my head.

24  Q.     Why didn't you do that?

25  A.     Because I knew he was going to kill me.

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 105 of 500

1    Q.    What'd you do?

2    A.    I stood.  I said, "I ain't putting no pillow on my head."

3    I said, "Think about what you about to do.  You know what I'm

4    saying?  You ain't going to get away with it."

5          And he started crying.

6    Q.    He started crying?

7    A.    Yes, sir.

8    Q.    Did he say anything when he started crying?

9    A.    Nothing.  He was just looking at me.

10   Q.    What happens next?

11   A.    I closed my eyes.  I was like, "You gonna kill me."  You

12   know what I'm saying?  So I closed my eyes.  And when I started

13   looking back up, he was leaving out.

14   Q.    Did you see him leaving the room?

15   A.    Yeah, like his back, when he was leaving.

16   Q.    What happens next?

17   A.    When I hear the door close, I jump up and go in the

18   bathroom.  And Phil was like, "Damn, man, your face fucked up."

19   And I look in the mirror and my mouth was swollen up.

20   Q.    Was what?

21   A.    Swollen.  I started running the cold water and put my

22   face in the water, got myself together and I went outside.

23   Q.    Outside?

24   A.    Outside the building, outside the house, outside the

25   building.

1    Q.    What happened next.

2    A.    Wop told me to take him up the street, because he

3    couldn't take him up there because his mom would ask him what

4    happened to him, so he asked me to take him up there.

5    Q.    Take -- you were going to take Phil up where?

6    A.    To his house, so he could go to the hospital.

7    Q.    So did you do that?

8    A.    Yes.

9    Q.    How did you take Phil, did you carry him?

10   A.    Naw, I -- my car was parked out back.

11   Q.    So, did you --

12   A.    We jumped in the car.

13   Q.    Tell us what happened.

14   A.    I took him -- something was going on on Congress Street,

15   like traffic.  I can't remember what it was, so I went through

16   the back of the alley and came around.  When I got up to

17   Savannah and Congress, Phil was like, look who right there.  I

18   look up.  It was Antwuan standing on the corner.

19   Q.    Okay.

20        MR. LEON:  Your Honor, can we publish to the jury

21   Government's 100.1, in evidence?

22   BY MR. LEON:

23   Q.    So, where was Antwuan when you saw him this next day?

24        And for the record I'm asking you to point and indicate

25   on Government's 100.1.

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 107 of 500

1    A.    It's kind of hard to see it.

2    Q.    Is it on the map?

3    A.    Yes.

4    Q.    When you say it's kind of hard to see --

5    A.    It's right on the corner of Savannah Place.

6    Q.    Savannah Place.

7          MR. LEON:  Mr. Mazzitelli, can you enlarge that portion of

8    the map?

9    BY MR. LEON:

10   Q.    Can we see it now?

11   A.    Right.

12   Q.    Can you tap on the enlarged portion of Government's

13   100.1, where you saw Antwuan the next day?

14   A.    Yes, sir.  (Indicating.)

15   Q.    Okay.  For the record, you put a dot right on the first A

16   in Savannah Place.

17   A.    Yeah, it's more over the top of the first part of the V.

18   When I hit it, it went to the A.

19   Q.    Right around that intersection --

20   A.    Yes, sir.

21   Q.    -- of Congress Street and Savannah Place?

22   A.    Yes, sir.

23   Q.    Okay.  Tell us what happens when you see Antwuan?

24   A.    Me and Phil -- it's an alley right there.  We coming

25   right there.  He start walking towards the car and Phil was

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 108 of 500

1   like, "Keep going, man."  He had pulled out the two guns he took

2   from us that day, the day that he hit me in my mouth.

3   Q.    Who took the two guns?

4   A.    Antwuan -- and pulled them from out his coat pockets.

5   Q.    Did you see them?

6   A.    Yes, sir.

7   Q.    Did you recognize them?

8   A.    Yes, sir.

9   Q.    What did you recognize those two guns to be?

10  A.    Because they was me and Wop's guns.

11  Q.    The guns you had in the apartment the day before?

12  A.    Yes, sir.

13  Q.    Did Antwuan -- can you show us how he took them out of

14  his -- and if you need to stand, please do.

15  A.    He was standing on the corner, and he had a coat.

16        MS. WICKS:  I can't hear.

17        THE COURT:  Can you speak up so everyone can hear you?

18        THE WITNESS:  He came out of the coat with the guns like

19  this in his hand.

20  BY MR. LEON:

21  Q.    One was in each hand?

22  A.    Yes, sir.

23  Q.    And did he take them out of a pocket of a coat?

24  A.    It was like a maintenance man's coat he had on.

25  Q.    Okay.  What kind of coat?

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 109 of 500

1   A.      Maintenance.

2   Q.      Okay.  You can sit down.  Just so the record is clear,

3   did you say "maintenance man's"?

4   A.      Yes, sir.

5   Q.      Okay.  Go ahead.  So he takes the two guns out.  What

6   happens next?

7   A.      I tell Phil, "I ain't going to pull up, he might think we

8   trying to run him over and start firing at the car."

9   Q.      What happens next?

10  A.      I stop.  So, he come to my side of the window.  I rolled

11  the window down.

12  Q.      Does he have the guns in his hands at this point?

13  A.      Yes, sir.

14  Q.      And you don't drive away?

15  A.      Naw.

16  Q.      Why?

17  A.      Because I'm trying to figure out what happened, why I'm

18  the one that got hit in my mouth and what's going on.  And if I

19  pull off, he might start shooting.

20  Q.      Okay.  So, what happens?

21  A.      I stopped.  I asked him, I said, "Man, what's up man,

22  what's going on?"  "I'm trying to holler at you."  So he says --

23  Q.      I'm sorry, who says that?

24  A.      Antwuan.

25  Q.      Antwuan says that to you?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 110 of 500

1   Q.    What happened then?  Did you leave?

2   A.    Yes, I left.

3   Q.    And had you -- where'd you go?

4   A.    Back around the park.  Went up to Wop house.

5   Q.    And how'd you get there?

6   A.    In the car I was driving.

7   Q.    Did Birdman stay where he was or- --

8   A.    He stayed where he was at.

9   Q.    Now, you said you went to Wop's apartment?

10  A.    Yes.

11  Q.    During this conversation, just yes or no, was there a

12  discussion with Wop about Antwuan offering to return what was

13  taken?

14  A.    Yes, sir.

15  Q.    First of all, what was taken?

16  A.    Like, $3800, and like two ounces of crack.

17  Q.    And what about those guns?

18  A.    And the two guns.

19  Q.    And tell us what Wop said to you during this

20  conversation.

21  A.    He said Birdman told him that Antwuan said he was going

22  to give him his money back.

23  Q.    And what was your reaction to this?

24  A.    I was kind of mad.  I told him, you know --

25  Q.    Who's "him"?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :  Docket No. CR 05-100
                                   :
     v.                            :
                                   :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  April  4, 2007
DOMINIC SAMUELS,                   :  9:36 a.m.
                                   :
          Defendants.              :
                                   :
                                   :
                                   :

VOLUME 29 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                              Glenn S. Leon, Assistant United
                              States Attorney
                              Ann H. Petalas, Assistant United
                              States Attorney,
                              Gilberto Guerrerc, Assistant
                              United States Attorney
                              555 4th Street
                              Washington, DC  20001
                              202.305.0174


For Defendant                 CARNEY & CARNEY
Antwuan Ball:                 John James Carney, Esq.
                              South Building
                              601 Pennsylvania Avenue, N.W.
                              Washington, DC  20004
                              202.434.8234

1  doing it together.  But back then, it was like -- wasn't nobody,

2  you know, have a lot of coke like that, you know what I'm

3  saying?  They was getting like wholesales and stuff like that,

4  so you wouldn't know what they was doing.

5       And we was cruddy little dudes.  Back then, we would

6  steal from each other, so -- not really, I can't really recall

7  times that the other group of guys back from '92 was really

8  stashing their stuff because I ain't really seen it, but like

9  with me and Don, I knew where me and him was stashing stuff at

10 because we was doing it together.

11 Q.    Okay.  Now, let's go to '96 to 2001.  Same question:  Did

12 you ever see people, the people you've talked about -- just yes

13 or no -- where they would stash their drugs, if they would stash

14 their drugs?

15 A.    Yes.

16 Q.    And who would those people be?

17 A.    LT, Wop, Dazz, Terrance.  That's all I can remember was

18 stashing.

19 Q.    Okay.  Now, we've talked about stashing guns and drugs

20 just now, during this early part of the morning.  Did you ever

21 hold guns for Antwuan?

22 A.    Yes.

23 Q.    Okay.  What guns have you held for Antwuan?

24 A.    An SK-style rifle and a .45 machine gun.

25 Q.    Now, Mr. Capies, you testified a few different times

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 113 of 500

1    during your testimony that you've been locked up since July 3rd

2    of 2001, correct?

3    A.    Yes, sir.

4    Q.    Tell us the circumstances that led to your arrest on that

5    date, July 3rd of 2001.

6    A.    I got --

7    Q.    Where were you?

8    A.    I was in my baby mother house.

9    Q.    For the record, what's that address?

10   A.    3408 13th Place, Southeast.

11   Q.    What happened?

12   A.    What happened was the FBI came and kicked the door in.

13   Q.    Did they have a search warrant?

14   A.    Yes, sir.

15   Q.    What time of day was this, if you remember?

16   A.    Early in the morning.

17   Q.    And tell us what happened.

18   A.    They kicked the door in and searched the house.  And for

19   a minute, they searched the house and they didn't find the guns.

20   Q.    When you say "a minute," do you mean 60 seconds or do you

21   mean more than that?

22   A.    I mean -- that's a figure of speech.  I didn't mean to

23   say that.  They searched the house for a while.

24   Q.    Okay.  And tell us what happened.

25   A.    They searched the house for a while.  They didn't find

1    nothing.  They found -- yeah, they did.  They found one gun that

2    was broke.  That was a Ruger.  That's the gun I had.  And they

3    found some handcuffs and some court papers and stuff like that,

4    pictures.  And I had some weed that I was smoking and they found

5    that.

6           They was just -- then some lady asked them, did they

7    search the closet?  And this was after they numbered everything

8    or whatever.

9    Q.    So they first search for a while, they find a Ruger.

10   What caliber is that Ruger?

11   A.    A 9 millimeter.

12   Q.    Whose Ruger is that?

13   A.    It was mine.

14   Q.    Did they find some handcuffs?  Whose handcuffs were

15   those?

16   A.    This girl was about to get locked up one day and they had

17   her on the curb and she got away.  And Wop called this lady to

18   bring the handcuff key to get the handcuffs off her.  And I

19   forgot, they was on top of the shelf and I left them in there.

20   Q.    And you said pictures.  Whose pictures were those?

21   A.    Different pictures, some my baby mother's and some mine.

22   Q.    And you said weed.  Whose weed was that?

23   A.    It was mine.

24   Q.    How much weed was that?

25   A.    It was like two bags, something like that.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 115 of 500

# EXHIBIT   H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 16, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:55 p.m. |

. . . . . . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 34 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE*, and a jury


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 117 of 500 7158

1    Q.  And when you arrived at that location, what happened?

2    A.  He was standing -- there's some steps right there.  He was

3    standing on the steps when I pull up.  And he just had a

4    disturbed look on his face.

5    Q.  He had what type of look?

6    A.  A disturbed look, an angry look, like something was wrong.

7    Q.  In that posture or condition, what did he say to you?

8    A.  I rolled the window down and he came to the car.  And as he

9    was walking to the car, he had his hands in his pockets, so I

10   asked him, "What's up?"

11        And he was like, "I just had to fuck these young-uns up

12   around here."

13   Q.  Are those the words that Mr. Ball used?

14   A.  Yes.

15   Q.  And did you ask him what he meant?

16   A.  Yeah.  I was like, "What young-uns?"

17        He was like, "Man, these little young dudes around

18   here, man, they think they going to take over the strip."

19        I said, "What you mean, 'take over'?"

20        He said, "Ain't no problem.  Don't worry about it."

21        So I was like, "What happened?"

22        He was like, "I just had to knock this nigga Munya's

23   teeth out his mouth."  I just looked at him.  I didn't know who

24   Munya was.  And so I was like, "Is everything okay?"

25        He was like, "Yeah.  Wop and Munya, they supposed to be

USCA Case #11-3031      Document #1445852          Filed: 07/10/2013      Page 118 of 500 7159

1    planning on killing me."  He said somebody came and told him

2    that.

3              So I was like, "Killing you?  And you standing around

4    here?"  Because I have heard of Wop, and from what I heard --

5              MS. WICKS:  Objection.

6              MR. ZUCKER:  Objection.

7    BY MR. GUERRERO:

8    Q.  Without telling us what you heard, just tell us what else

9    Mr. Ball said in that conversation.

10   A.  I was looking at him like, "Why is you standing here, then?"

11   And he was looking like he ain't have a care in the world, like

12   it's nothing.

13   Q.  Did you ever get a chance to see what if anything Mr. Ball

14   had in his hands or his pockets?

15   A.  Yes, he had a gun in his pocket.

16   Q.  Can you recall which pocket it was?

17   A.  Yeah, his right pocket.

18   Q.  And what part of the gun if any did you see?

19   A.  The butt, the butt.  He had on a kind of trench coat like,

20   and I see the butt part sticking out.

21   Q.  And what happened next after that conversation?

22   A.  Nothing too much.  We just chatted for a minute.  I didn't

23   want to sit there, you know.  I mean, "You just telling me what

24   you done, and you standing there like you ain't got a care in

25   the world."  So I talked fast, and I left.

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :      Docket No. CR 05-100
                                 :
              Plaintiff          :
                                 :
v.                               :      Washington, DC
                                 :
ANTWUAN BALL,                    :
DAVID WILSON,                    :
GREGORY BELL,                    :      April 17, 2007
DESMOND THURSTON,                :
JOSEPH JONES,                    :
DOMINIC SAMUELS,                 :
                                 :
              Defendants         :      2:10 p.m.
. . . . . . . . . . . . . . . .  :      . . . . . . . . . . . .
```

                  VOLUME 35 - AFTERNOON SESSION
                 *TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
               *BEFORE THE HONORABLE RICHARD W. ROBERTS,*
                *UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                 TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 120 of 500

1    Mr. Tabackman was asking you about, a quarter key to a 62 that

2    you would sell on a weekly basis.  Do you remember that topic?

3    A.   Yes.

4    Q.   And you said that sometimes yes, sometimes no.  Was there a

5    particular quota that you met every week with your crack cocaine

6    sales?

7    A.   No.  Some days was better than others.  Sometimes I would do

8    more, sometimes I would do less.

9    Q.   And what factors kind of controlled what kind of sales you

10   had during any given week?

11   A.   No real factors.  It was depending upon who I was selling my

12   crack cocaine to, how fast they could sell theirs.

13   Q.   Mr. Tabackman was then also asking you about where you met

14   Michael Hall.  You made reference to your mother's house?

15   A.   Yes.

16   Q.   Where did your mother live?

17   A.   Congress Street.

18   Q.   Do you remember the address?

19   A.   Yes.   754.

20   Q.   754 what?

21   A.   Congress Street.

22   Q.   Was that an apartment, or is that a house?

23   A.   House.

24   Q.   And how long did she live there?  What years did she live

25   there?

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 121 of 500

7473

```
 1    A.   Maybe since '86.

 2    Q.   Was that the only location that you ever met Michael Hall?

 3    A.   No.

 4    Q.   And similar topic, you were asked about meeting John Richard

 5    Proctor, and Mr. Tabackman was asking you about what you said

 6    out in Maryland as opposed to what you're saying here.  Where

 7    was it that you recall you would meet John Richard Proctor?

 8    A.   Can you rephrase the question a little better?

 9    Q.   Sure.  Sure.  In your recollection, when you dealt with John

10    Richard Proctor, you were going to -- where would you meet him?

11    A.   Oh, at his house, my house, Geraldine's, anywhere that was

12    convenient for the both of us.

13    Q.   Was it ever only limited to one particular location?

14    A.   No.

15    Q.   And you were asked about Munya.  Do you remember that?

16    A.   Yes.

17    Q.   That person that you knew as Munya, and talking about the

18    topic where Mr. Tabackman asked you about you having a

19    conversation with Antwuan Ball either on the day of or the

20    following day after Antwuan Ball tells you what had just

21    happened.  Do you remember that?

22    A.   Yes.

23    Q.   And you described Antwuan Ball during your conversation as

24    disturbed?

25    A.   Yes.
```

USCA Case #11-3031   Document #1445852      Filed: 07/10/2013    Page 122 of 500

# EXHIBIT   I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 30, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 9:15 a.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . . .

VOLUME 42 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE,* and a jury

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 124 of 500

```
 1    Q.  How do you know that Antwuan Ball did other things in this

 2    apartment?

 3    A.  I saw him.

 4    Q.  What did you see Antwuan Ball do in this apartment?

 5    A.  He had a little computer lab set up there, entertained women

 6    there.

 7    Q.  Do you know -- just first yes or no, do you know, yes or no,

 8    if Antwuan Ball, during this time you knew him, '99 to 2001,

 9    ever possessed any guns?

10          MR. TABACKMAN:  Leading.  Objection.

11          THE COURT:  Overruled.

12    A.  Sure.

13    BY MR. LEON:

14    Q.  How do you know that?

15    A.  I saw with my own eyes.

16    Q.  What kind of guns with your own eyes did you see

17    Antwuan Ball possess?

18    A.  Handguns, semiautomatic weapons.

19    Q.  And when you saw Antwuan Ball with these weapons, where did

20    you see Antwuan Ball with these weapons?

21    A.  I mean, could have been in the apartment --

22          MR. TABACKMAN:  Objection --

23          MR. ZUCKER:  Objection.

24          MR. TABACKMAN:  -- speculation.  Move to strike.

25    A.  -- street.
```

1              THE COURT:  Why don't you clarify?

2    BY MR. LEON:

3    Q.  Did you see him, yes or no, possess guns, weapons, in the

4    apartment you just described?

5    A.  Yes.

6    Q.  Okay.  Did you see Antwuan Ball, yes or no, possess weapons

7    out on the street?

8    A.  Yes.

9    Q.  Did you ever supply any -- excuse me.  Did you ever supply

10   any guns yourself to Antwuan Ball?

11   A.  Yeah, I gave him a gun or two.

12   Q.  Okay.  What guns do you remember, you remember giving to

13   Antwuan Ball?

14   A.  I know an Uzi.  I remember giving him an Uzi.

15   Q.  You gave him an Uzi?

16   A.  Yeah.  It was once I gave him an Uzi.

17   Q.  Do you remember, yes or no, if you gave him any other guns

18   other than the Uzi that you can remember?

19   A.  Naw, not that I recall.

20   Q.  Did you -- through your contacts with Antwuan Ball buying

21   and selling crack cocaine and powder cocaine to each other, did

22   you get to know some of the people that Antwuan Ball sold his

23   drugs to?

24   A.  Yes.

25   Q.  Okay.  And how did you get --

9204

```
 1    A.  -- I learned it from Cody.

 2              MS. WICKS:  Objection.  Move to strike.

 3              MR. ZUCKER:  Renew the objection.

 4              THE COURT:  The substance of what was learned with

 5    respect to the person who is the subject of the question is not

 6    in the record.  The objection is overruled.

 7    BY MR. LEON:

 8    Q.  Now, you've mentioned several times this barbershop?

 9    A.  It's a house.

10    Q.  It's a house.  Just physically, what neighborhood was this

11    house in?

12    A.  Congress Park, man.

13    Q.  It was in Congress Park.

14              Now, you indicated that you sold -- well, that you gave

15    Antwuan Ball an Uzi.  Correct?

16    A.  That's what I said.

17    Q.  Did you sell it to him or just give it to him?

18    A.  I gave it to him.

19    Q.  Why did you just give Antwuan Ball an Uzi?

20    A.  He said he was having some problems and he needed a gun.

21    Q.  What problems did Antwuan Ball tell you he was having?

22    A.  He said he heard somebody was conspiring to do something to

23    him.

24    Q.  What specifically did Antwuan Ball tell you?

25    A.  Somebody was trying to kill him.
```

```
 1            MR. TABACKMAN:  Your Honor, may I approach the bench?

 2            THE COURT:  No.

 3    BY MR. LEON:

 4    Q.  Mr. Marsh, I think right before we just took this quick

 5    break, the question I asked you was what did -- how did -- what

 6    did Antwuan Ball tell you he did in resolving this problem about

 7    Wop and Munya?

 8    A.  He says he confronted them.

 9    Q.  Okay.  When Antwuan Ball -- we're going to get to what he

10    told you in just a moment.  But when Antwuan Ball told this to

11    you, how did he seem?  Was he calm or not?

12    A.  He was shooken up a little bit, it looked like.

13    Q.  When you say "it looked like," were you having this

14    conversation in person?

15    A.  Yeah.

16    Q.  What did Antwuan Ball tell you about the details of exactly

17    what he did when he dealt with it?

18    A.  He said he went in there and confronted Wop and Munya.  They

19    was in there playing a video game, and I think they had a pistol

20    on the table.  He took the pistol, smacked up Munya, Wop jumped

21    out the window, and that's pretty much what he told me.

22    Q.  Did Antwuan Ball tell you if other than Wop and Munya,

23    anyone else was in the apartment?

24    A.  Phil was in there.  Phil.

25    Q.  And at the time he told you this, did you know who Phil was?
```

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 128 of 500

9211

```
 1    A.   I was familiar with him.

 2    Q.   Excuse me?

 3    A.   I was familiar with him.

 4    Q.   And how were you familiar with Phil?

 5    A.   From the neighborhood.

 6    Q.   Did Antwuan Ball tell you if he took anything as a result of

 7    this incident in the apartment?

 8    A.   Took what money he found in there.  I believe there was some

 9    drugs in there.

10    Q.   You said money and drugs.  You indicated that there was a

11    gun that he took off of a table?

12    A.   Yeah.

13    Q.   Did he indicate to you whose gun this was?

14    A.   I can't recollect.  But it was the gun on the table.

15    Q.   Did he tell you what kind of gun it was?

16    A.   May have been a Ruger, if my memory serves me well.   Ruger.

17    Q.   Did he tell you if he kept that gun or not?

18    A.   He kept it.

19    Q.   Now, did Antwuan Ball tell you what his intention was when

20    he went to that apartment to confront Wop and Munya?

21    A.   I believe Antwuan was going there to kill them that day.

22    Q.   Did Antwuan Ball tell you if he did kill anyone in that

23    apartment that day?

24    A.   Yeah, he didn't kill nobody.

25    Q.   Did Antwuan Ball tell you why he did not kill anyone in that
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 129 of 500

9212

1    apartment that day?

2    A.   If my memory serves well, I believe Antwuan just -- he just

3    couldn't do it.

4    Q.   Now, you told us that you gave Antwuan Ball an Uzi.

5    Correct?

6    A.   Yes.

7    Q.   Did you give Antwuan Ball that Uzi before or after this

8    incident in the apartment where he smacked Munya with the

9    pistol?

10   A.   I believe it was before that.

11   Q.   Did Antwuan Ball tell you if he brought that Uzi with him to

12   confront them?

13   A.   I don't recall.

14   Q.   Now, you also told us a little while ago that you and

15   Antwuan went on a trip to Dallas, Texas.  Correct?

16   A.   Yes.

17   Q.   Was that trip to Dallas, Texas before or after this incident

18   with Antwuan smacking Munya with the pistol in the apartment?

19   A.   I think it was after that.

20   Q.   And when you were with Antwuan during this trip, where did

21   you stay, do you remember?

22   A.   Yeah, we stayed in a Studio Plus.  Like a motel, but we got

23   a full kitchenette, so...

24   Q.   And was the place called Studio Plus?

25   A.   Yeah.

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 130 of 500

# EXHIBIT   J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | March 29, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:00 p.m. |

. . . . . . . . . . . . . : . . . . . . . . . . . . .

VOLUME 26 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

```
1                          P R O C E E D I N G S

2              THE COURT:  Counsel, just so you know, what I'm going

3    to do for the afternoon is to take two shorter afternoon breaks

4    instead of one regular 15-minute break.  I'm not exactly sure

5    what time I'm going to do those, but we'll take two 10-minute

6    breaks.

7              MR. LEON:  Before the jury is called in, Your Honor, I

8    did want to make a short record, and then ask -- put something

9    on the record.

10              First is, after the jury was excused for their lunch

11   break but before the defendants and before Mr. Capies went back,

12   Mr. Ball, Antwuan Ball, audibly said several things loud enough

13   for not only all government counsel to hear, but also

14   Mr. Capies.  He reported that to government counsel in the

15   presence of the Marshals.  And I know that at the lunch break --

16   it's my understanding at the lunch break that at least one if

17   not more than one of the Marshals spoke to Mr. Capies about it.

18              So I first want to put that on the record.  My

19   understanding, without knowing the specifics because I wasn't

20   able and didn't talk to Mr. Capies directly, is that Mr. Capies

21   perceived both the words spoken by Mr. Ball, as well as body

22   language and eye contact, to be of a threatening nature.  I want

23   to put that on the record.  We're very concerned about that.

24              Mr. Ball specifically in this indictment, in this case,

25   is charged with witness tampering and threats against witnesses.
```

1    We have a man who's barely started his direct examination and is

2    being threatened, in the government's opinion, by Mr. Ball.

3    We're very concerned about it, first.  We want to put that on

4    the record first and foremost.

5              I would ask at this point -- I don't know more about

6    it, so I can't make any more representations about the

7    specifics, but I am not only concerned about it, but I think

8    it's a fair area inquiry of Mr. Capies during his direct

9    examination.  I want to put that on the record and make that

10   request of the Court.

11             But again, I'm in a position where I have certainly a

12   good-faith basis to make this representation and to make this

13   request.  But, not having spoken to Mr. Capies, I don't know

14   specifically, and I know that -- I believe that -- I don't know

15   if one of these Marshals -- but my understanding is at least one

16   Marshal did have some contact with Mr. Capies during the last

17   two hours.  So that's where I am right now.

18             THE COURT:  All right.  Just to supplement the record,

19   when I got back to chambers a short while, maybe about an hour

20   ago, I did learn about this reported incident and have been in

21   touch with the Marshals, to report it to them and to ask them to

22   follow their protocol for having a Marshal interview Mr. Capies

23   with respect to that.  And so I assume I will be getting a

24   report about that at some point.

25             But let me invite Mr. Carney, if he wanted to put

```
 1    anything on the record.

 2          MR. CARNEY:  Your Honor, if Mr. Capies was threatened,

 3    then I was threatened.  He was visibly upset with the testimony,

 4    but he was directing his conversation at me.  I was standing in

 5    front of Mr. Ball --

 6          THE COURT:  I'm sorry.  Could you repeat that?  You

 7    said "he," but I don't know who you were talking about.

 8          MR. CARNEY:  My client, Mr. Antwuan Ball, was visibly

 9    upset, but was not directing any conversation at anybody other

10    than me.  I was standing in front of him, he was stating, "You

11    need to check this out, you need to check that out."  I'm sure

12    that most of it must have been picked up at -- the tape recorder

13    was on, but I guess it's not tape-recorded proceedings, it's

14    just the transcript.

15          But he was visibly upset, he was directing his

16    conversation to me, and Mr. Capies has certainly been warned by

17    the U.S. Attorney's Office on two things:  When you come into

18    lockup, make sure you pick up anything on being threatened; and

19    when you're on the witness stand, if anything happens, report it

20    so you can make a record and make a possibility that you're

21    being threatened.

22          There was no threat to Mr. Capies.  The conversation

23    was simply directed at me as to what he expected me to do.  And

24    maybe he said it too loud, but it was not directed at

25    Mr. Capies.  And that's my belief on this.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 135 of 500 4953

```
 1            THE COURT:  All right.  Well, this is not a time or
 2    place to make any factual findings necessarily about what did or
 3    did not transpire or was said.  I am certain that the lawyers
 4    for all the defendants have spoken with their clients about this
 5    kind of an event, and the consequences of it.  I'll ask the
 6    lawyers to reinforce that with all of their clients.  But at
 7    this point we've -- I've dispatched the Marshals to conduct an
 8    interview, and once we're able to get whatever investigation
 9    they think is appropriate completed, we'll have some basis for
10    knowing what if anything needs to be done on this separate issue
11    about whether a witness has indeed been threatened.
12            With respect to the issue about fair inquiry, if the
13    witness does perceive that, that that happened, I think it would
14    be area fair to inquire about.  But it would also be fair for
15    cross-examination in connection with it.
16            MR. MARTIN:  Your Honor, I just wanted to --
17            THE COURT:  Let me invite Mr. Carney to come back up.
18            MR. CARNEY:  The problem with that, Your Honor, is then
19    I become a witness to that conversation, as does Ms. Wicks, who
20    was standing next to me.  And I think you're going to get into a
21    mini-hearing by going forward with that.
22            I think that this is something that's beyond the
23    typical cases, where somebody is actually walking by and they
24    stand up and say something to them.  He's over here, he hasn't
25    moved, and I'm in his face.  That's the way he looked at it, you
```

USCA Case #11-3031     Document #1445852         Filed: 07/10/2013     Page 136 of 500 4954

 1    know, talking to him.  I can't imagine how Mr. Capies, based on

 2    the circumstances -- we would have to have a hearing on it, and

 3    I'd ask for a full-scale hearing, and we'll go through with all

 4    the Marshals and everyone as to whether the government can go

 5    into that on their direct examination.  Because it just isn't

 6    right.

 7            THE COURT:  Well, what is wrong, if a witness is

 8    legitimately threatened while the witness is on the stand by a

 9    defendant who is in the courtroom, with having the government

10    inquire about that?

11            MR. CARNEY:  There's nothing wrong with that.

12            THE COURT:  Why is that not right, and why would it not

13    be relevant?

14            MR. CARNEY:  It is, and I would ask that we have a

15    hearing now and get this off to a good start, and get this

16    straight.

17            But as I've represented to the Court, it's a different

18    thing if he would be pointing at him or looking at him or saying

19    something out to him.  He was talking to me, he wasn't talking

20    to anyone else, and he was upset.  But whether he could hear it

21    or not, that's another thing.  And what he heard.

22            THE COURT:  I'm not sure what you're either asking for

23    or opposing.

24            MR. CARNEY:  I'm asking for a hearing.  If this is

25    going to be allowed to be inquired to, I want a full-scale

4955

```
 1   hearing.  I want to put Ms. Wicks on the stand, I want to put --
 2             MR. MARTIN:  I heard it.
 3             MR. CARNEY:  -- these other individual counsel that
 4   heard it, I want to call each of the Marshals, and we'll make a
 5   hearing of it and make a record.  Because I think this is so
 6   serious, to have a witness on the stand saying, "I was
 7   threatened actually in the courtroom."  I think that's really
 8   beyond the purview of a fair trial.  It just isn't right.
 9             THE COURT:  Well, are you saying it isn't right until a
10   hearing is held?  Or are you saying it wouldn't be right in any
11   circumstances?
12             MR. CARNEY:  I'm saying it's right once we have a
13   hearing and there's findings of fact.
14             THE COURT:  Well, we're not going to have a hearing
15   right now.  We have just begun the process of having the
16   investigation taking place.  And I'm not promising there is
17   going to be a hearing.
18             But if indeed the witness perceived himself as having
19   been threatened by a defendant, I don't know what could be more
20   probative of consciousness of guilt than something like that,
21   and it certainly would not be something irrelevant to inquire
22   into.
23             MR. MARTIN:  Your Honor, with all due respect, I need
24   to corroborate what Mr. Carney said --
25             THE COURT:  Okay, I'm not holding a fact-finding
```

4956

1    hearing now, so don't take my time up with respect to any

2    allegations about what did or didn't happen.

3        MR. MARTIN:  I just want the record to reflect that I

4    saw what happened, and at no time did Mr. Ball --

5        THE COURT:  Okay.  Mr. Martin, I am asking you to not

6    to proceed, because this is not a fact-finding hearing right now

7    and I'm not going to take any more proffers about facts.

8        MR. ZUCKER:  I'd like to make a proffer.

9        THE COURT:  Go ahead.

10       MR. ZUCKER:  I'm going to make a motion to sever if

11   that inquiry is allowed, because it will have prejudicial impact

12   on my client.

13       MR. MARTIN:  Mr. Jones joins in that.

14       MR. ZUCKER:  And I'm going to ask the Court to defer

15   until -- at least defer allowing the government to continue, or

16   to pursue that line of inquiry, at least until your Marshal

17   gives his report.

18       THE COURT:  Oh, I didn't say I'm going to let them

19   inquire into it right now.  I was just commenting that that, in

20   theory, is a fair line of inquiry.  There is no need today to

21   have that question put to the witness.  I understand the witness

22   has got a lot more to do and to say, and I take it that during

23   that time we'll be able to make, I hope, some progress in being

24   able to get further independent investigation of what did or did

25   not occur.

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 139 of 500
4957

1          So my judgment at the moment is, it is likely a fair

2     area of inquiry, but from my understanding that this witness'

3     direct testimony is far from completed, I will direct the

4     government not to make that inquiry right now.  We are waiting

5     to find out a little bit more about where we are so that we can

6     make some judgment about whether a hearing is appropriate,

7     whether we have any other issues, and so on.

8          MR. BEANE:  I just have, I guess, a technical issue

9     with regards to this.  Aside from joining in the motion to

10    sever, my --

11         THE COURT:  Let me just rule on the motion to sever.

12    The motion is denied without prejudice.

13         MR. BEANE:  Okay, I got that.  Here's my problem --

14         THE COURT:  Is this something that can wait until the

15    break?  Because we've got a jury waiting.

16         MR. BEANE:  Well, here's my problem --

17         THE COURT:  Is it something that can wait until the

18    break?

19         MR. BEANE:  I don't think so, given that he's still on

20    the stand.  My problem is this:  If the rule on witnesses is in

21    place and the Marshals heard it --

22         THE COURT:  It is in place.

23         MR. BEANE:  Okay, then I think we need to identify

24    which Marshals heard it so that we can excuse them from the

25    courtroom if we need to call them in our case to impeach

# EXHIBIT   K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 2, 2007 |
| DOMINIC SAMUELS, | : | 1:55 p.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 27 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

1   A.      Ten dime sales?

2   Q.      Yeah.

3   A.      It break down four ways.

4   Q.      And first of all, did you personally participate in this

5   *unos, dose, tres* system?

6   A.      Yes, sir.

7   Q.      How many times would you say you personally participated

8   in this system?

9   A.      So many times I can't recount.

10   Q.      Who did you share sales with?

11   A.      Wop, Dazz, Phil, Drano, Tweety, Ju-Ju, Jo-Jo, LT

12   Terrence, Cat Eye Tony.

13   Q.      I think you indicated that this system was done for

14   safety reasons?

15          MR. ZUCKER:  Objection.

16          THE WITNESS:  Yes, sir.

17   BY MR. LEON:

18   Q.      Explain what you mean by that.

19   A.      Like I was saying earlier, so you won't go out.  Meatball

20   and Head got shot in drive-byes, so we wouldn't go out in the

21   front line to try to make a purchase and a car come by and we

22   get shot up; whereas in the alley in the cut we could see what's

23   going on down on the street.

24   Q.      Through the *uno, dos* system, how would people actually go

25   out to make the sale itself?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 18, 2007 |
| DOMINIC SAMUELS, | : | 9:16 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 36 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            Gilberto Guerrero, Assistant
                            United States Attorney
                            555 4th Street
                            Washington, DC  20001
                            202.305.0174


For Defendant               CARNEY & CARNEY
Antwuan Ball:               John James Carney, Esq.
                            South Building
                            601 Pennsylvania Avenue, N.W.
                            Washington, DC  20004
                            202.434.8234

1    A.    Because the game was -- the game was already established.

2    Everybody respected the game.

3    Q.    And did you ever play the game doors with Don?

4    A.    Yes.

5    Q.    How about DC?

6    A.    Yes.

7    Q.    How about Munya?

8    A.    Yes.

9    Q.    How about -- well, who else would you play the game doors

10   with?

11   A.    Dion, Jo-Jo, JT, Santu, Dazz, Phil.

12   Q.    You mentioned Dazz a couple times.  Let me interrupt you.

13         MR. ZUCKER:  Objection.

14   BY MS. PETALAS:

15   Q.    You mentioned Dazz a couple --

16         MR. ZUCKER:  Misstates the evidence.  This is the first

17   mention of Dazz.

18         MS. PETALAS:  Actually, I don't believe that's true, but

19   I'll move on, Your Honor.

20   BY MS. PETALAS:

21   Q.    You just mentioned Dazz.  Do you see Dazz in the

22   courtroom today?

23   A.    Yes.

24   Q.    Would you please identify him by where he's sitting.

25   A.    To the left of me, with a yellow shirt on.

USCA Case #11-3031     Document #1445852      Filed: 07/10/2013     Page 145 of 500

1          MS. PETALAS:  Your Honor, may the record reflect an

2    in-court identification of Desmond Thurston?  I think he's the

3    only one wearing --

4          MR. ZUCKER:  I don't see any yellow shirt.  On the other

5    hand, I think --

6          Mr. Thurston, would you stand up, please.

7          THE WITNESS:  Yeah, that's Dazz right there.

8          MR. ZUCKER:  Thank you.  Stipulate to the identification.

9    BY MS. PETALAS:

10   Q.    You mentioned Dazz.  How often -- you said you played

11   doors with Dazz?

12   A.    Yes.

13   Q.    And where would you play doors with Dazz?

14   A.    In the circle, in the Lincoln, in the alley.

15   Q.    How about Wop?  Did you ever play doors with Wop?

16   A.    No.

17   Q.    Would you ever be playing the game doors when Wop was

18   around?

19   A.    Yes.

20   Q.    And why was it that you didn't play doors with Wop?

21         MS. WICKS:  Objection.

22         THE COURT:  Basis?

23         MS. WICKS:  Foundation.

24         THE COURT:  Overruled.

25   BY MS. PETALAS:

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 21, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 2:00 p.m. |

. . . . . . . . . . . . . . . . . . : . . . . . . . . . . .

VOLUME 53 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530


For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

```
1                MR. BALAREZO:  Your Honor, objection.  It's a

2      narrative, it's nonresponsive.

3                THE COURT:  Sustained.

4      BY MR. GUERRERO:

5      Q.  I want to now ask you a little bit more focused on the

6      circle, and then we'll go to other areas.

7                During the time period that you were selling crack

8      cocaine in the circle, did you become aware of what uno/dos, or

9      doors, is?

10     A.  Yes, sir.

11     Q.  And how did you become aware of that?

12     A.  I mean, it was just something that was always played since

13     when I way started -- from when I first started hustling,

14     uno/dos.  It was like the way you got your sales.  It was so

15     many people hustling, you just couldn't say, "oh, it's my turn,

16     my turn."

17               So as soon as the sale come up on the scene, it's uno.

18     Whoever call uno, that's the first person get the sale.  Dos,

19     you break the sale down with dos.

20     Q.  Who did you see playing this game in the circle?

21     A.  Oh, me, Kairi, Don, Wop, Dazz, Phil, Terrence, Jazz, Santu,

22     Kay-Bay, everybody.

23     Q.  Did you ever see Antwuan playing the game?

24     A.  No.

25     Q.  Did you ever play with Wop yourself?
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 148 of 500

# EXHIBIT   L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 2, 2007 |
| DOMINIC SAMUELS, | : | 1:55 p.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 27 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                              Glenn S. Leon, Assistant United
                              States Attorney
                              Ann H. Petalas, Assistant United
                              States Attorney,
                              Gilberto Guerrero, Assistant
                              United States Attorney
                              555 4th Street
                              Washington, DC  20001
                              202.305.0174


For Defendant                 CARNEY & CARNEY
Antwuan Ball:                 John James Carney, Esq.
                              South Building
                              601 Pennsylvania Avenue, N.W.
                              Washington, DC  20004
                              202.434.8234

USCA Case #11-3031      Document #1445852           Filed: 07/10/2013      Page 150 of 500

1    A.    It's like '97, early part.

2    Q.    Early part of '97?

3    A.    Yes, sir.

4    Q.    Did -- during these conversations in the early part of

5    '97 that you're having with Wop and Dazz, you said, I believe,

6    that Wop -- excuse me, that Dazz did not disagree with the talk

7    of retaliation.  Did Dazz ever say anything himself about

8    retaliation?

9    A.    Yes, sir.

10   Q.    Tell us what Dazz said about retaliation.

11   A.    That they went down there and got in a shootout with some

12   guys with 10th Place.

13   Q.    Who told you this?

14   A.    Dazz.

15   Q.    When did Dazz tell you this?

16   A.    I don't got no date on it, sir, but I remember him

17   telling me in the early part of '97.

18   Q.    Early part of?

19   A.    '97.

20         MR. ZUCKER:  Could I ask the witness to define what is the

21   early part of '97?  Is there any way to focus it?

22         THE COURT:  No.

23   BY MR. LEON:

24   Q.    What is the early part of '97 to you, Mr. Capies?

25   A.    January, February.

1   Q.    Okay.  Was this a specific conversation you can remember?

2   A.    Yes.

3   Q.    Tell us the specific conversation you remember having in

4   January, February, where Dazz told you about retaliating.

5   A.    He told me that him, Antwuan, LT, and Wop went down

6   10th Place to try to creep down on them guys, and somebody

7   opened fire on them, which they believe was Steve and Patrick,

8   and they stopped the car and jumped out and opened fire back.

9   Q.    Okay.  You've said a few things there.  Let's just follow

10  up.  First of all, Dazz told you about this?

11  A.    Yes, sir.

12  Q.    And he told you that Dazz was there and who else?

13  A.    LT, Twan, and Wop.

14  Q.    So four people in total?

15  A.    Yes, sir.

16  Q.    Okay.  And where did this shooting happen?

17  A.    On 10th Place.

18  Q.    Did he tell you where on 10th Place?

19  A.    No.  He just said 10th Place.

20  Q.    And did Dazz tell you who's idea it was to drive to

21  10th Place to do this shooting?

22  A.    I don't remember.

23  Q.    Okay.  And did he tell you how they got there?

24  A.    Yes.  By car.

25  Q.    Did he tell you whose car?

USCA Case #11-3031    Document #1445852      Filed: 07/10/2013    Page 152 of 500

1    A.    No, I don't remember, sir.

2    Q.    Okay.  And did he tell you who from Congress Park, who

3    from the group Dazz was with, actually fired weapons?

4    A.    All of them that was in the car that I named.

5    Q.    All four?

6    A.    Yes.

7    Q.    And I believe you said that they were firing at Steve and

8    Patrick?

9    A.    Yes.

10   Q.    Anybody else?

11   A.    A dude named Redhead.

12   Q.    Redhead.  And did Dazz indicate to you whether or not

13   either Redhead or Steve or Patrick, any of those three fired

14   back?

15   A.    Yes.

16   Q.    Did they?

17   A.    Yes.

18   Q.    Who?

19   A.    Steve and Patrick.

20   Q.    And?

21   A.    And Redhead.

22   Q.    So all three did fire back?

23   A.    Yes.

24   Q.    Did Dazz indicate to you if anyone, anyone from

25   Congress Park or anyone from 10th Place, was actually hit with

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 7, 2007 |
| DOMINIC SAMUELS, | : | 9:20 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 46 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:       UNITED STATES ATTORNEY'S OFFICE
                             Glenn S. Leon, Assistant United
                             States Attorney
                             Ann H. Petalas, Assistant United
                             States Attorney,
                             Gilberto Guerrero, Assistant
                             United States Attorney
                             555 4th Street
                             Washington, DC  20001
                             202.305.0174


For Defendant               CARNEY & CARNEY
Antwuan Ball:               John James Carney, Esq.
                             South Building
                             601 Pennsylvania Avenue, N.W.
                             Washington, DC  20004
                             202.434.8234

USCA Case #11-3031     Document #1445852      Filed: 07/10/2013     Page 154 of 500

 1    on Savannah, then, you know, you might have some here, some

 2    there, but everybody on the majority of the Savannah side.   Then

 3    towards the end of the 10th Place beef, everybody was more on

 4    the like -- more like on the Lincoln and The Circle, you know

 5    what I'm saying?  You still had Boy-Boy stayed in the alley,

 6    rolled around, did his thing, you know, but us, we was in front

 7    of the Lincoln or in The Circle, like we always stood in front

 8    of the Lincoln, but we was there.  If you wanted some coke, we

 9    were either in front of the Lincoln or in The Circle.  Nobody

10    was hanging around the Savannah side no more.

11    Q.    And you mentioned before, you said everybody used to

12    float through the neighborhood.  Did people sell in The Circle

13    prior to this?

14    A.    Yeah.

15    Q.    And how about the Lincoln?

16    A.    Yeah.  Yes.

17    Q.    Prior to this, I meant prior to this time you're talking

18    about, where you're now posting up in The Circle.

19    A.    Yes.

20    Q.    You used to, a lot of the time -- when you were talking

21    earlier, you talked about -- you said towards the end of 10th

22    Place, we were in front of the Lincoln and The Circle.  Who are

23    you talking about when you say "we"?

24    A.    Uhm, all the rest of the people in Congress Park, like

25    Wop, Drano, Don, DC, me, JT.  Jo-Jo may post up for a minute,

USCA Case #11-3031      Document #1445852            Filed: 07/10/2013      Page 155 of 500

1   but he would go back around the alley.  Dazz, Phil, all of us,

2   we was just right there.  We would circle the Lincoln.

3   Q.   Okay.  And you said -- you talked about Jo-Jo.  You said

4   he used to post up, but then he'd go back around the alley.

5   Where are you talking about there?

6   A.   It's right there.  (Indicating.)  They would be standing

7   right there.

8        MR. ZUCKER:  I'm sorry, we couldn't hear.

9   BY MS. PETALAS:

10  Q.   You need to talk in the microphone.

11  A.   They would be standing like -- they be posted up right

12  there, like they be sitting right there, drinking and just

13  chilling.

14  Q.   And you said -- for the record, you put a dot kind of --

15  A.   It's the alley.

16  Q.   The alley that's below Savannah Street, in-between

17  Savannah Street and Congress Street; is that correct?

18  A.   Yes.

19  Q.   And the dot you put was kind of at the end of that alley,

20  just kind of down below the two Ns in Savannah Street; is that

21  correct?

22  A.   Yes, like -- I'll see if I can press it again.

23  (Indicating).  Right there.

24  Q.   And earlier you had mentioned -- you talked about getting

25  drugs from Jo-Jo.  Roughly, what time was it that you got drugs

# EXHIBIT    M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
            Plaintiff,             :  Docket No. CR 05-100
                                   :
      v.                           :
                                   :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  April   4, 2007
DOMINIC SAMUELS,                   :  9:36 a.m.
                                   :
            Defendants.            :
                                   :
                                   :
                                   :

VOLUME 29 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            Gilberto Guerrerc, Assistant
                            United States Attorney
                            555 4th Street
                            Washington, DC  20001
                            202.305.0174


For Defendant               CARNEY & CARNEY
Antwuan Ball:               John James Carney, Esq.
                            South Building
                            601 Pennsylvania Avenue, N.W.
                            Washington, DC  20004
                            202.434.8234

1    Q.      What do you mean, "before"?  When?

2    A.      I can't remember the date, but I remember them taking

3    drugs off of me.

4    Q.      And when you -- you, Bobby Capies -- would hide drugs in

5    your shorts -- I'm going to ask you to be as specific as

6    possible -- where would you actually hide them?

7    A.      Under my nuts, part of my sack.

8    Q.      Would you -- you, Bobby Capies -- ever hide drugs in your

9    rectum?

10   A.      Before, I have.

11   Q.      You have?

12   A.      Yes, sir.

13   Q.      When you say "before," what do you mean by that?

14   A.      When they start really getting frisky, like going hard,

15   going down in and checking and stuff under your sacks.

16   Q.      Did you stop doing that or -- you said before, was there

17   a time you stopped hiding drugs there?

18   A.      No, not really, but you know, if you see them.  We always

19   be where you can see them or somebody would tell us they coming

20   and that's when we do it.

21   Q.      And when you say "someone would tell us they're coming,"

22   who do you mean by "us"?

23   A.      The guys that I was hanging with in '96 all the way up to

24   2001 area.

25   Q.      You're talking about 1996 to 2001?

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 159 of 500

# EXHIBIT   N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| **ANTWUAN BALL, DAVID WILSON,** | : | Washington, DC |
| **GREGORY BELL, DESMOND** | : | |
| **THURSTON, JOSEPH JONES, and** | : | April 3, 2007 |
| **DOMINIC SAMUELS,** | : | 9:30 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 28 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrerc, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 161 of 500

1    A.    I kind of had a little fear of him, because he -- I came

2    up under him, like before he did it, but after it, not no more.

3    Q.    Well, you said you're not afraid of him, did you ever

4    kill him?

5    A.    No.

6    Q.    Why not?

7    A.    Because once I seen Wop tried to have a little nod, like

8    he wasn't trying to do nothing about it, it would be me against

9    the park.  I would have got killed.

10   Q.    When you say you "against the park," who do you mean by

11   that?

12   A.    Everybody that I ever named in Congress Park.

13   Q.    Everyone you've named previously?

14   A.    Yes, sir.

15   Q.    Yes or no, does that include Jo-Jo?

16         MR. MARTIN:  Objection.

17         MR. TABACKMAN:  Objection.

18         THE COURT:  Yes, vague.

19         MR. TABACKMAN:  He did not ask --

20         THE COURT:  Sustained.

21         MR. LEON:  I'll withdraw it.

22   BY MR. LEON:

23   Q.    Did you ever -- you told us about two conversations with

24   Antwuan.

25         Have you ever talked to Antwuan, just you and Antwuan,

# EXHIBIT   O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 24, 2007 |
| DOMINIC SAMUELS, | : | 9:25 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 39 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*


APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            Gilberto Guerrero, Assistant
                            United States Attorney
                            555 4th Street
                            Washington, DC  20001
                            202.305.0174


For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                            South Building
                            601 Pennsylvania Avenue, N.W.
                            Washington, DC  20004
                            202.434.8234

1    A.     Correct.

2    Q.     At Kiki's, would that be in powder form or crack form?

3    A.     Crack cocaine.

4    Q.     All right.  In 1999, are you the same Cedric Conner who

5    was convicted of solicitation of a prostitute down in Fairfax,

6    Virginia?

7    A.     Yes.

8    Q.     And in '99 and 2000, did you continue to go to L.A. and

9    get more crack cocaine or powder cocaine?

10   A.     Yes.

11   Q.     Back in -- before we get into how many times you went, in

12   '99 or 2000, was there an incident that happened down in the

13   circle area between you and a person named DC?

14   A.     Yes.

15   Q.     When do you think that occurred?

16   A.     Somewhere near September, before I went to Cancun, so it

17   was after my first trip to L.A.

18   Q.     And DC we saw in one of the pictures yesterday, one of

19   those photos?

20   A.     That's correct.

21   Q.     And who was DC, again, to you?

22   A.     Just somebody that -- partially bought drugs from me at

23   times.

24   Q.     And where did this incident take place with you and DC?

25   A.     Right on 13th Place near where Kiki's house was.

1    Q.    Close to The Circle?

2    A.    Yes.

3    Q.    And what were you doing out there on that day?

4    A.    That particular day, I was outside going hand-to-hand,

5  which I called hand-to-hand, selling drugs, small quantities.

6    Q.    What kind of quantities were you selling?

7    A.    Dimes and twenties.

8    Q.    And why were you out there doing hand-to-hand if you had

9  been bringing in larger amounts of crack cocaine?

10   A.    To make extra money to take to Cancun.

11   Q.    Who were you going to go to Cancun with?

12   A.    Jimmy Wingate, a friend of mine.  Scooter.

13   Q.    So tell us what happened when you were out there?

14   A.    Incident occurred.  I was out there, out there probably a

15 good 30 minutes, and I was getting a lot of sales and --

16   Q.    Let me stop you right there.  When you're out there for

17 30 minutes getting a lot of sales, did you see anyone else out

18 there doing the same?

19   A.    Yes.

20   Q.    Who did you see out there doing the same?

21   A.    The only one I recall that was out there at that time --

22 a few other people.  I don't recall everybody, but the main two

23 that I recall was Dazz and DC.

24   Q.    Dazz and DC?

25   A.    Correct.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 166 of 500

1    A.    Correct.

2    Q.    There's an alley there in front of that building?

3    A.    Yes.

4    Q.    Is that the alley that you're referring to?

5    A.    Yes.

6    Q.    And what did you see DC doing in that alley?

7    A.    They were just over there, just a group of guys.  Like I

8    say, I don't remember everyone that was over there, but two that

9    I do recall that was over there.

10   Q.    And what do you particularly recall DC doing?

11   A.    Just being outside at that time.

12   Q.    And you said you were doing hand-to-hands?

13   A.    That's correct.

14   Q.    Did you see DC doing hand-to-hands?

15   A.    No, I didn't.  I wasn't paying attention, but I mean -- I

16   was paying attention, but I wasn't focussed on what they were

17   doing.  I was just on my side of the street.  They were on a

18   different side of the street.

19   Q.    And where was the side of the street that you were?  Can

20   you point for us?  Or would it be right across the street?

21   A.    Right near the building that I pointed to earlier.

22   Q.    All right.  So would that be to the left of where it says

23   13th Place, the number 13?

24   A.    Correct.

25   Q.    All right.  Now, you said you also saw Dazz there, too,

1    in that alley?

2    A.    That's correct.

3    Q.    What did you see Dazz doing?

4    A.    They were over there.  They were just having a

5    conversation, about what I do not know.

6    Q.    And after the 30 minutes, you said you were making some

7    sales.  Sales of what?

8    A.    Crack cocaine.

9    Q.    And approximately how much money do you recall making?

10   A.    I don't recall at that time.

11   Q.    What happened after you made the sales?

12   A.    I was getting a lot of sales.  A lot of people were, you

13   know, requesting my drugs at that time.  A few minutes later, I

14   was approached by DC.

15   Q.    And DC said what to you?

16   A.    He told me that I couldn't come around there and take all

17   the money because I don't be out there with them, you know, when

18   they beefing and stuff like that.

19   Q.    And what -- did DC say anything with reference to that

20   particular strip?

21   A.    The only thing --

22         MS. WICKS:  Objection --

23         MR. ZUCKER:  Objection to form, leading.

24         THE COURT:  Sustained.

25   BY MR. GUERRERO:

1   Q.    What else, if anything, did he say?

2   A.    He told me they built that strip.

3   Q.    DC said they built that strip?

4   A.    That's correct.

5   Q.    What did you understand he meant when he said they built

6   that strip?

7   A.    I guess him and --

8         MR. ZUCKER:  Objection, speculation.

9         THE COURT:  Overruled.

10  BY MR. GUERRERO:

11  Q.    Go ahead.  You may answer, sir.

12  A.    Okay.  I guess he meant by that was that --

13        THE COURT:  Sustained.

14        THE WITNESS:  Okay.

15        THE COURT:  Hold on.  You have to put the question.

16  BY MR. GUERRERO:

17  Q.    What you understood.  Don't guess for us.  What did you

18  understand DC meant when he said they built that strip?

19        THE COURT:  Well, sustained.

20  BY MR. GUERRERO:

21  Q.    What did you respond to DC?

22  A.    I did not make a comment at that.  A few minutes later --

23  Q.    Well, what had you just been doing before DC approached

24  you?

25        MR. ZUCKER:  Objection, asked and answered.

```
 1              THE COURT:  Overruled.

 2   BY MR. GUERRERO:

 3   Q.    What had you just been doing before DC approached you?

 4   A.    Distributing drugs.

 5   Q.    What kind of drugs?

 6   A.    Crack cocaine.

 7   Q.    Where?

 8   A.    Small quantities, right on 13th Place.

 9   Q.    And when DC approached you, he had that conversation.

10   What happened next?

11   A.    He then returned to the side of the street that he was

12   on.

13   Q.    The same alley you pointed to us earlier?

14   A.    That's correct.

15   Q.    What did you see in that alley?

16   A.    Small group of guy that was across the street from where

17   I was.

18   Q.    Who do you recall being in that alley at that time?

19   A.    The two people I mainly recall was Dazz and DC.

20   Q.    What happened next?

21   A.    A few minutes later, maybe half -- not a few minutes, but

22   20 to 25 minutes later, Mr. Ball pulled up.

23   Q.    Antwuan Ball?

24   A.    That's correct.

25   Q.    During the 25-minute period that you wait until Antwuan
```

1   Ball shows up, what are you doing?

2   A.      Still distributing my drugs.

3   Q.      What kind of drugs?

4   A.      Crack cocaine.

5   Q.      Where?

6   A.      On 13th Place, in front of Kiki's building.

7   Q.      Were you making sales?

8   A.      Yes.

9   Q.      How much, do you recall?

10  A.      No, I don't.

11  Q.      Was it a lot or a little?

12  A.      It wasn't that much.

13  Q.      What kind of quantities were you selling?

14  A.      I was selling all dimes.

15  Q.      Now, after the 25 minutes passed by, you saw Antwuan?

16  A.      That's correct.

17  Q.      Where did you see Antwuan?

18  A.      When he pulled up, he pulled into the back of the alley

19  across the street from where I was standing and he got out and

20  he conversed with the gentlemen that were standing over there.

21  Q.      You saw Antwuan converse with who?

22  A.      DC, Dazz and the other group of members that were over

23  there at that time.

24          MR. ZUCKER:  Objection.

25          THE COURT:  Basis?

1    MR. ZUCKER:  I must have misunderstood.  I think he said

2    the "other members" or "men"?

3    THE COURT:  "Group of men."  Overruled.

4    MR. ZUCKER:  All right.

5    BY MR. GUERRERO:

6    Q.    Where did you see Antwuan talk to Dazz and DC and the

7    other group of men?

8    A.    Generally across the street, where they were standing.

9    Q.    Was that in the same alley that you pointed to us

10   earlier?

11   A.    That's correct.

12   Q.    Right to the right of the 13th Place building?

13   A.    That's correct.

14   Q.    How long did you see Antwuan talk to Dazz and DC?

15   A.    I don't recall how long.  I don't recall exactly how long

16   it was.

17   Q.    What did you continue to do while Antwuan was talking to

18   Dazz and DC?

19   A.    I stayed on my side of the street.

20   Q.    Doing what?

21   A.    Distributing my drugs, but I wasn't getting any sales at

22   that time.

23   Q.    Distributing what kind of drugs?

24   A.    Crack cocaine.

25   Q.    Were you working with anybody then?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 172 of 500

1    A.    No.

2    Q.    What happened after you see Antwuan talk to Dazz and DC?

3    A.    He then approached me and he and I had a conversation.

4    Q.    Who approached you?

5    A.    Mr. Ball.

6    Q.    Antwuan Ball?

7    A.    Yes.

8    Q.    And where did Antwuan Ball and you have this

9    conversation?

10   A.    At the end of Sheila's mother because they have a fence

11   like gated around that community.  It was Sheila's mother -- my

12   daughter's mother's building is in the middle of that complex

13   and we were standing at the tip of the walkway.

14   Q.    Point to us, please, on 100.1.

15   A.    It's kind of hard to point to it because it's --

16   Q.    If you just point directly to the general area, maybe

17   that will work.

18   A.    (Indicating.)  That's as close as I can get it.

19   Q.    Just for the record, you made several attempts to mark

20   100.1, but they weren't successful?

21   A.    That's correct.

22   Q.    And now you've pointed to, on 100.1, again, to the left

23   of 13th Place, it looks like a building that's right to the left

24   of "P-L" of 13th Place?

25   A.    Right.

1   Q.     What else did Antwuan say?

2   A.     That was mainly the basis of it and he left.

3   Q.     And what happened to you?  What did you do?

4   A.     I then kind of saw that they went back to where he was

5   and I took that as a warning and I left.

6   Q.     Why'd you take that as a warning?

7          MR. ZUCKER:  Objection.

8          MR. GUERRERO:  Goes to state of mind, Judge.

9          THE COURT:  Overruled.

10         THE WITNESS:  I felt uncomfortable after that.

11  BY MR. GUERRERO:

12  Q.     You felt uncomfortable why?

13  A.     Best way to put that is that it could have got ugly.

14  Q.     It could have got ugly?

15  A.     If I would have continued to stay out there and do what I

16  was doing.

17  Q.     What does that mean, "It could have got ugly"?

18  A.     I don't want to speculate.

19         THE COURT:  Sustained.

20  BY MR. GUERRERO:

21  Q.     When you say, "It could have got ugly," it could have got

22  ugly between --

23         MR. ZUCKER:  Objection.

24         THE COURT:  Sustained.

25  BY MR. GUERRERO:

1   Capitol Street you had?

2   A.      Yep.   4509 South Capitol Street, apartment -- I think

3   it's 101 or 102.

4   Q.      Can you just repeat the address.   I'm sorry.

5   A.      It's 4509 South Capitol Street, Southwest, apartment 101

6   or 102.   I'm not sure what it was.   It was the first apartment

7   on the right when you go in the building -- on the left when you

8   go in the building.

9   Q.      How long had you had that apartment?

10  A.      That apartment was registered to me.   At that time, my

11  girlfriend at the time was living there, but I was staying with

12  another female, Carolyn Edwards.

13  Q.      And when you said you took your first shipment to that

14  apartment, what did you do at that apartment with the shipment?

15  A.      I cooked it up and started distributing it.

16  Q.      Did you say -- what quantity did you get the first

17  shipment?

18  A.      A kilo.   One kilo of cocaine.

19  Q.      And you cooked it up to what?

20  A.      I cooked it up an eighth at a time, one eighth at a time.

21  And I also fronted some of it out.

22  Q.      And where were you selling this crack cocaine?

23  A.      4th Street and Congress block -- Congress Street.

24  Q.      On that occasion, do you recall if you sold any eighth of

25  a key to anyone in particular?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 22, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:50 p.m. |

. . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

VOLUME 54 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:       ANN H. PETALAS, ESQUIRE
                             GLENN S. LEON, ESQUIRE
                             GIL GUERRERO, ESQUIRE
                             UNITED STATES ATTORNEY'S OFFICE
                             555 Fourth Street, NW
                             Washington, D.C.  20530


For the Defendant            JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:                CARNEY & CARNEY
                             601 Pennsylvania Avenue, NW
                             Suite 900, South Building
                             Washington, DC  20004
                             (202) 434-8234

                             STEVEN CARL TABACKMAN, ESQUIRE
                             TIGHE, PATTON, ARMSTRONG,
                                  TEASDALE, PLLC
                             1747 Pennsylvania Avenue, NW
                             Suite 300
                             Washington, DC  20006
                             (202) 454-2811

```
 1              THE COURT:  I'll sustain it.
 2   BY MR. BEANE:
 3   Q.   Okay.  Now, you did not plead to the robberies.  Right?
 4   A.   Right.
 5   Q.   Okay.  Now, you know that committing robbery -- well, who
 6   did you rob?  Other drug dealers?
 7   A.   Yes, sir.
 8   Q.   And you know that that's known as being really cruddy.
 9   Right?
10   A.   Being cruddy?
11   Q.   Cruddy.
12   A.   Okay.
13   Q.   Correct?
14   A.   Correct.
15   Q.   And you and Baby Ki did a lot of cruddy stuff together.
16   Right?
17   A.   True.
18   Q.   And as you sit here -- well, let me ask you this:  You were
19   talking about a time when you and Baby Ki went to rob someone,
20   and Baby Ki pulled a knife and the other person pulled a gun.
21   Right?
22   A.   We didn't go to rob him.  We didn't go to rob him.
23   Q.   What did you go to do?
24   A.   We was telling them that they had to leave.  They was out
25   there hustling in the neighborhood, and we was telling them they
```

```
 1    had to leave.

 2    Q.  You were telling them to get of the out of your

 3    neighborhood?

 4    A.  Right.

 5    Q.  And Baby Ki was trying to enforce that with a knife.  Right?

 6    A.  I don't know what he was trying to do, but he pulled out the

 7    knife.

 8    Q.  Okay.  Did he say anything when he pulled out the knife?

 9    A.  He pulled out the knife and the dude pulled out the gun.

10    Q.  And this is when you and Baby Ki are tight.  Right?

11    A.  Yeah.

12    Q.  And Baby Ki takes off and leaves you there facing the gun by

13    yourself.

14    A.  Sure did.

15    Q.  All right.  Now, although your brother and Greg Bell were

16    good friends, you don't like Greg, do you?

17    A.  I wouldn't say that.

18    Q.  But you got in a fight with him.  Right?

19    A.  So what?

20    Q.  You fight people you like often?

21    A.  I fight -- I got a best friend who I done fought twice.

22    Q.  Okay.

23    A.  And he's my best friend right now, to this day.

24    Q.  Okay.  That's fine.

25            Now, at some point your mother was being evicted from
```

# EXHIBIT    P

1169

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 17, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:15 p.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . . .

VOLUME 52 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530


For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

```
 1    A.   I can't remember how many, but a particular day he was

 2    saying to LT --

 3    Q.   I'll stop you there.  I just want to establish a time frame.

 4    Do you remember a particular conversation that you had with

 5    Antwuan about a conspiracy case?

 6    A.   Yes.

 7    Q.   And was LT there?

 8    A.   Yes.

 9    Q.   Anyone else there other than you, LT, and Antwuan?

10    A.   No.

11    Q.   And to the best of your memory, where was this conversation?

12    Where were you physically?

13    A.   We was driving.

14    Q.   In what vehicle?

15    A.   His Expedition.

16    Q.   Was this the same conversation when Antwuan said he was

17    going to smash Travonne?

18    A.   Yes.

19    Q.   And so again, you were driving that vehicle?

20    A.   Yes.  And he basically said -- told LT to hurry up, he

21    needed to hurry up and get out the halfway house so he could

22    start getting rid of some of the guys that he thought was going

23    to flip.

24    Q.   Who said that?

25    A.   Antwuan.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 181 of 500

01787

```
 1    Q.   Did Antwuan mention anyone in particular?

 2    A.   Naw, he basically thought that Jazz and Santuce and Dazz and

 3    them was going to be the first to flip.

 4    Q.   That's what Antwuan told you?

 5    A.   And Boy-Boy, yes.

 6    Q.   Now, who actually -- was the word "conspiracy" or

 7    "conspiracy case" used during this conversation?

 8    A.   Yes.  He said a guy by the name of Munya was calling home,

 9    saying that the feds was on they way, they was getting ready to

10    drop a conspiracy.

11    Q.   Do you know who Munya is?

12    A.   Yes.

13    Q.   Who is Munya?

14    A.   He's a guy that comes from around Congress Park.

15    Q.   How do you know Munya?

16    A.   Basically grew up with him too, around there.

17    Q.   Did you speak to Munya or did Antwuan speak to Munya?

18    A.   It was never said who spoke to him.  It was like he was

19    calling home saying it, to whoever, I don't know.

20    Q.   But who said that Munya is calling home?

21    A.   I don't know.  Antwuan said that he was calling out there

22    saying it, but he never said he had talked to him per se.

23    Q.   I see.  And let's focus on you.  When is the last time you

24    yourself have seen Munya?

25    A.   About two years -- yeah, about two years ago.
```

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013     Page 182 of 500

1   Q.   Where were you, where was he?

2   A.   We was in county jail.

3   Q.   County jail where?

4   A.   Arlington.

5   Q.   So two years ago would be about 2005 or so?

6   A.   Right.

7   Q.   How long were you and Munya together at Arlington?

8   A.   He was on two different blocks.  We was on two different

9   blocks for a minute, so --

10              MR. BALAREZO:  Objection, nonresponsive.

11              THE COURT:  Sustained.

12  A.   I don't know.

13  BY MR. LEON:

14  Q.   Okay.  How many times did you see, lay eyes on Munya when

15  you were in Arlington?

16  A.   It was a lot.

17  Q.   Did you hang out with him?

18  A.   No.

19  Q.   Did you ever talk to him about a conspiracy case?

20  A.   Yeah, he said it was a conspiracy case coming.

21  Q.   And that was in 2005 or so?

22  A.   Yes.  But he never got into the specifics of the case.

23  Q.   Why?

24              MR. BALAREZO:  Objection.

25              MR. ZUCKER:  Objection.  Actually, withdrawn.  I

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 183 of 500 1789

```
 1   withdraw mine.  I don't know about Balarezo.

 2           THE COURT:  I didn't hear two.  Were there two?

 3           THE REPORTER:  I didn't, either.

 4           THE COURT:  I didn't, either.  Go ahead.

 5   BY MR. LEON:

 6   Q.  Why didn't you get into specifics with him?

 7   A.  We wasn't that tight, you know.  I knew what he was out

 8   there for, you know, and he knew what I was out there for.  We

 9   wasn't that tight.

10   Q.  Now, in 2005, when you were in Arlington, had you and I ever

11   met before?

12   A.  No.

13   Q.  Had you talked -- well, withdrawn.  Withdraw that.

14           What else, if anything, did Antwuan say, just about the

15   conspiracy case, if anything?

16   A.  That was it.  That was it, that I can remember.

17   Q.  What else, if anything, did LT say in response to Antwuan

18   when Antwuan said words to the effect of, "You got to get out of

19   that halfway house soon so we can do these things"?

20   A.  He was like, "All right."  He was like, "Okay," you know.

21   Q.  Did you say anything?

22   A.  Naw, I was just listening.  I think it ain't really dawn on

23   him that I was -- I think he was more so venting at the time.  I

24   don't think it dawned on him that I was in the truck at the

25   time, you know.
```

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 184 of 500

# EXHIBIT   Q

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :   Docket No. CR 05-100
                                   :
     v.                            :
                                   :
ANTWUAN BALL, DAVID WILSON,        :   Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :   May 22, 2007
DOMINIC SAMUELS,                   :   9:17 a.m.
                                   :
          Defendants.              :
                                   :
                                   :
                                   :

VOLUME 54 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:        UNITED STATES ATTORNEY'S OFFICE
                                Glenn S. Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174


  For Defendant                 CARNEY & CARNEY
  Antwuan Ball:                 John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

1    Q.    Did he take any crack cocaine from you?

2    A.    He asked me for my coke, but I told him I ain't have no

3    more.

4    Q.    On any one of these occasions, was Baby Kairi around?

5    A.    No, sir.

6    Q.    Do you recall an incident that happened in The Circle

7    where Phil robbed you?

8    A.    Yes, sir.

9    Q.    And who was out there that day?

10   A.    It was a couple of people out there, but I can't remember

11   name for name who was out there, but I know Antwuan eventually

12   walked up on the scene.

13   Q.    Well, tell us what happened before you were robbed.  What

14   were you doing?

15   A.    I was making a sale.

16   Q.    Who was out there that day making sales in addition to

17   you?

18   A.    Phil, Jazz -- it was Phil, Jazz, me, Little Greg, Dre.

19   That night it wasn't too many people out there.  There wasn't a

20   whole lot of people out there.  I think that was one of the

21   nights when people went out to the clubs, the go-go's, whatever.

22   There wasn't a lot of people out there that night.

23   Q.    And did you say Twan was out there?

24   A.    He walked up.  I don't know where he came from, but he

25   wasn't out there while we was out there, but he came up on the

 1    scene.

 2    Q.    What happened with respect to the robbery?

 3    A.    Well, I was making a sale and Phil was riding down the

 4    street and I was getting out the car.  It was a car had pulled

 5    up.  As a matter of fact, I think it was the lady that used to

 6    come in the cab.

 7    Q.    Where exactly were you?  Why don't you clear the screen

 8    for us and then point to where you think you were.

 9    A.    I was like up in here somewhere (indicating), in The

10    Circle -- in the street, because I was in the street because I

11    was getting out of the car.

12    Q.    For the record, you marked 100.1, the exhibit, a line

13    right below 13th Place, right in The Circle?

14    A.    In The Circle.  I was trying to mark in the street, but

15    it was in The Circle.

16    Q.    All right.  So tell us again, what was happening?

17    A.    Well, I'm getting out the car, and as I'm getting out the

18    car, Phil riding down the street hollering, "Doors, doors,

19    doors."  And I'm like, "Doors?  The sale is over.  How you going

20    to get doors on the sale and the sale is over?"

21    Q.    Had you already made a sale?

22    A.    The sale was done.  The lady was pulling off.  I'm

23    getting out the car, got my money back in my pocket and

24    everything.

25    Q.    What had you sold the lady?

1   A.      I think it was like a 40 sale.

2   Q.      I'm sorry?

3   A.      A 40 sale.

4   Q.      A 40 sale of what?

5   A.      Crack cocaine.

6   Q.      Okay.  And then what happened after that?

7   A.      Well, after that, I'm getting out the car, he hollering

8   "Doors" or whatever.  So he pulled off and I walk back down to

9   the corner right there in front of 3401 and he come back, him,

10  Little Jazz and I think that was Dre that was with him.  I

11  believe it was.

12  Q.      Who's "him"?

13  A.      Phil, Little Jazz and Dre.  So I knew they was going to

14  try something, but I didn't know what he was going to try.  So

15  when he jumped out of the car, he walked up on me, he pulled his

16  gun out and was like, "Give me that shit."

17          I'm like, "Man, Phil, go ahead.  I ain't going to let you

18  rob me."  So he go to try to hit me with the gun.  He try to hit

19  me with the gun.

20  Q.      Were you hit?

21  A.      I think he hit me one time in my ear or something, so I

22  just went ahead and gave him my money.  And he was like, "Give

23  me your coat, too."  And I was like, "You ain't getting my

24  coat."

25          So Twan walked through the alley --

1   Q.      Is that Antwuan Ball?

2   A.      Yes, sir.

3   Q.      The person you identified yesterday?

4   A.      Yes, sir.  He was coming through the alley like behind

5   3402.  He was coming through this alley right here (indicating).

6   Q.      And for the record, you pointed a line to the right of

7   the number "13," right above the "1" on 13th Place?

8   A.      Yeah, right above the "1," but it's more like in the

9   alley.  It won't let me point exactly where I'm trying to point

10  at.

11          But Twan was coming through the alley and, you know, a

12  whole lot of commotion was going on.  I was mad.  I was cussing

13  and I was fussing and this and that and this and that and the

14  other.  And Twan called both of us over and asked what was going

15  on.

16  Q.      Twan called both of who over there?

17  A.      Me and Phil.  And I told Twan, Phil just robbed me.  And

18  Twan was like, "Phil, you got to give him that shit back because

19  that's my shit he got."

20  Q.      What did you understand Twan was talking about when he

21  said "that shit back"?

22  A.      My -- the coke, because I had -- he had fronted me the

23  coke.

24  Q.      Who had fronted you the coke?

25  A.      Antwuan.  He had fronted me some coke and so he told --

1    he told Phil to give me that shit back.  And Phil was like -- he

2    asked him how much he took.  Phil was like, "I only took a

3    hundred dollars from him," but he actually took 300 from me.

4    Q.    Who asked who about how much money they took?

5    A.    Twan asked Phil how much he took from me.  Phil was like,

6    "A hundred dollars," but he took 300.  So I tried to argue about

7    it and this, that, this and that.  And Twan was just like,

8    "Leave it alone."  So I left it alone.

9    Q.    Did Phil give you back the stuff?

10   A.    He gave me back the hundred dollars.

11   Q.    And that was after Antwuan told him to give it back to

12   you?

13   A.    Yes, sir.

14   Q.    How much had you gotten front from Twan before you were

15   robbed?

16   A.    I think I got like a quarter from him.

17   Q.    I'm sorry?

18   A.    A quarter.

19   Q.    A quarter of what?

20   A.    Cocaine.

21   Q.    And you said it was fronted?

22   A.    Yes, sir.

23   Q.    And again, was Baby Kairi around during that incident?

24   A.    I think he was locked up during this time, too.

25   Q.    How about LT?  Did there come a point when LT actually

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 21, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 2:00 p.m. |

. . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 53 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

```
 1              MS. WICKS:  No objection.
 2              THE COURT:  Request granted.
 3    BY MR. GUERRERO:
 4    Q.  Let's pause and focus on '95 to '97.  During that time
 5    period, did you ever sale crack cocaine with Don?
 6    A.  Yes, sir.
 7    Q.  And explain how that relationship started between you with
 8    Don, if any relationship happened.
 9    A.  Well, I had a little summer job.  When I first started
10    hustling, I wasn't consistently hustling.  I got a little summer
11    job --
12    Q.  I need you to speak up.  Okay?
13    A.  When I first started hustling, I wasn't hustling
14    consistently.  But I had got a summer job -- and, like I say, I
15    was pretty close with Jazz.  And I got a summer job, and around
16    that time I was working my summer job, Don had start coming back
17    around Congress Park.  And he was working out Boston Market,
18    and, you know, me, him, and Jazz used to hang out a lot, smoke
19    weed or whatever.
20              I had, like, my last check from my summer job, and I
21    think I got an eight-ball from Jazz, and then I was hustling,
22    you know.  It used to be me, Don, and Jazz together, so I guess
23    you can say I was hustling with them.
24    Q.  And how many times did you purchase crack cocaine from Jazz,
25    with a J?
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 193 of 500

191

```
 1    A.  Well, I think like one or two times when I first started,

 2    then I start putting my money with theirs.

 3    Q.  You started putting your money with whom?

 4    A.  Jazz and Don.

 5    Q.  And how often did you put your money with Jazz and Don?

 6    A.  I really can't give you a number offhand.  But it was just

 7    about any time I needed coke, I put my money with them.

 8    Q.  And would you three get wholesales or would you get a lump

 9    sum?

10    A.  We get a lump sum.  Well, it wasn't actually like -- I put

11    my money with them, because I don't know whether it was Jazz or

12    Don, one of them had the connect.  So I put my money with them,

13    they get their coke, and they just give me what I paid for.

14    Q.  And did you ever go with Don or Jazz to go get the crack

15    cocaine?

16    A.  No, sir.  No, sir.

17    Q.  Did Jazz ever tell you where it was coming from?

18    A.  No, sir.

19    Q.  How about Don?  Did he ever tell you where it was coming

20    from?

21    A.  No, sir.

22    Q.  And when you got the crack cocaine, where would you, Jazz,

23    and Don sell it?

24    A.  In the circle.

25    Q.  And is that 13th Place, where you mentioned before?
```

1    A.   Yes, sir.

2    Q.   How often in '95 to '97 would you sell crack cocaine in the

3    circle with Jazz and Don?

4    A.   Just about every day.  Every time that I had coke, I sell it

5    in the circle.

6    Q.   And would that be during the night, during the evening, or

7    both?

8    A.   Both.

9    Q.   What's the largest amount that you recall of crack cocaine

10   getting in conjunction with Jazz and Don?

11   A.   Well, back then I think the largest amount I ever got was

12   like a half ounce.

13   Q.   Back then, did you ever get any crack cocaine from Burke

14   when you were dealing with Jazz and Don?

15   A.   Naw, just that first time.

16   Q.   How long did you sell crack cocaine with Jazz and Don during

17   that time period?

18   A.   It wasn't long.  It was couple of months through the summer,

19   through the fall.  I think like around about that springtime we

20   kind of went our different ways.

21   Q.   And do you recall what year this was, or was it just in that

22   general time period?

23   A.   I don't recall what year it was.

24   Q.   You said earlier that you recall that Don had just come

25   back.  Do you recall that?

```
 1    Q.  And you said that earlier you saw a person named Wop?

 2    A.  Yes, sir.

 3    Q.  And relative to where Wop is, where is Boy-Boy?

 4    A.  Sitting behind him.

 5            MR. GUERRERO:  Note an in-court identification of

 6    Mr. Bell.

 7            MR. BEANE:  No objection.

 8            THE COURT:  Request is granted.

 9    BY MR. GUERRERO:

10    Q.  Okay.  During that time period, '95 to '97, did you ever get

11    any crack cocaine --

12            MR. BEANE:  Objection.  Leading.

13            THE COURT:  Finish the question.

14    BY MR. GUERRERO:

15    Q.  From anyone other than the persons that you just told us

16    about?

17            THE COURT:  Overruled.

18    A.  The question was kind of broken up.  I really didn't

19    understand.

20    BY MR. GUERRERO:

21    Q.  All right.  You told us that you were getting some crack

22    cocaine in conjunction with Jazz and Don.  Do you remember that?

23    A.  Yes, sir.

24    Q.  And during that same time period, '95 to '97, did you ever

25    get any crack cocaine from other persons?
```

1    A.  Eventually, yes.

2    Q.  All right.  And eventually you got crack cocaine from whom?

3    A.  Boy-Boy.

4    Q.  When did that start, do you think?

5    A.  It's like around about the time that I start really putting

6    my money with Jazz and Don.

7    Q.  And how much crack cocaine do you recall getting from

8    Boy-Boy?

9    A.  Well, at that time I was getting like wholesales,

10   eight-balls.  I believe back at that time I was only getting

11   wholesales from him.

12   Q.  How often would you get wholesales from Boy-Boy?

13   A.  At that time I really can't put a number on it, but I got it

14   from him a couple of times.

15   Q.  And in your experience, was Boy-Boy a good wholesale

16   supplier?

17   A.  Yes, sir.

18          MR. BEANE:  Objection.  Speculation.

19          THE COURT:  Overruled.

20   BY MR. GUERRERO:

21   Q.  And what was your answer?

22   A.  Yes, sir.

23   Q.  And did you term him something?

24   A.  Wholesale King.

25   Q.  The Wholesale King?

1    A.  Yes, sir.

2    Q.  And you mean by that what?

3    A.  He had wholesale whenever you need it.

4    Q.  Do you recall where Boy-Boy used to live back then?

5    A.  At that time, no.

6    Q.  All right.  After you stopped hanging around with Jazz and

7    Don, who did you then start to hang around with?

8    A.  Well, after that time I start hanging with Jazz and Don, I

9    basically was like by myself.  Me and Birdman was hanging out

10   for a minute.

11   Q.  You and Birdman?

12   A.  Yes, sir.

13   Q.  And do you know Birdman's real name?

14   A.  It's Aman.

15   Q.  And do you know if Aman or Birdman had any brothers?

16   A.  Yes, sir.

17   Q.  And which were the brothers that you knew of Birdman?

18   A.  Well, one was deceased and the other one was Antwuan Ball.

19   Q.  And if you saw Antwuan Ball again, would you recognize him?

20   A.  Yes, sir.

21   Q.  Please stand up and tell us if you see him.

22   A.  Yes, sir.

23   Q.  And what is he wearing?

24   A.  I think that's a black tie, tan, black pants.

25   Q.  Is that the gentleman who is just standing behind me?

USCA Case #11-3031      Document #1445852       Filed: 07/10/2013      Page 198 of 500

1    Q.  And Phil, would you see him often selling crack cocaine in

2    the circle?

3    A.  Yes, sir.

4    Q.  Little Terrence?

5    A.  Yes, sir.

6    Q.  And LT?

7    A.  Yes, sir.

8    Q.  While you were out there -- and now I would like to go a

9    little bit further, now, after you start -- after you hang

10   around with Birdman, who did you start to get crack cocaine from

11   after Birdman, after you were hanging around with Birdman?

12          MR. MARTIN:  Time frame, Your Honor, please.  Time

13   frame.

14   BY MR. GUERRERO:

15   Q.  When you were hanging around with Birdman, around what year

16   did that stop?

17   A.  What year did me and Birdman stop hanging around each other?

18   Q.  Yeah.

19   A.  I don't know.  Me and Birdman, we always kind of hung out

20   real tough.  Because Birdman was Baby Ki older cousin, you know,

21   and Baby Ki came home, and it had to be before '98.

22          So I'm going to say around about like '97, Baby Ki came

23   home like around about '97, the winter of '97, and, you know, so

24   I kind of always hung around Birdman.

25   Q.  And you said you clicked with Baby Ki?

1   A.  Yes, sir.

2   Q.  And what did you guys start to do once Baby Ki came home?

3   A.  We start hustling together.  We became like best friends.

4   I'm not going to just say we hustled together, because we became

5   real good friends.

6   Q.  And did that include getting crack cocaine together?

7   A.  Yes, sir.

8   Q.  And how often would you and Baby Ki get crack cocaine

9   together?

10  A.  Oh, it got to a point where we was putting our money in

11  together all the time getting crack cocaine.

12  Q.  Did you ever go with Baby Ki to get the crack cocaine?

13  A.  No, sir.

14  Q.  Did you ever give him money?

15  A.  Yes, sir.

16  Q.  How often would you give Baby Ki money?

17  A.  Every time we needed it.

18  Q.  And what would Baby Ki give you in return, if anything?

19  A.  Well, it started off -- well, it started off, I put my money

20  with him; whatever I paid for, that's what I got back.

21        Then it got to a point whereas though everything we

22  got, we was splitting it down the middle, whether I had the

23  majority of the money or whether he had a majority of the money.

24  Q.  So let's start with the beginning.  What kind of quantities

25  were you getting from Baby Ki when you first started to hang out

1      with him?

2      A.   When I first started hanging out with Baby Ki, we was

3      getting like halves.

4      Q.   Halves of what?

5      A.   Halves of coke, cocaine.

6      Q.   Crack cocaine?

7      A.   Crack.

8      Q.   And where would you sell that crack cocaine?

9      A.   In the circle.

10     Q.   And you said that your relationship grew into a friendship?

11     A.   Yes.

12     Q.   And then that you also started to split up quantities that

13     you bought?

14     A.   Yes.

15     Q.   And what was the largest quantity that you bought with

16     Baby Ki?

17     A.   Through the whole time I known him?

18     Q.   Yeah.

19     A.   Probably like three to four ounces.

20     Q.   Did you ever go with him to find out where he was buying it

21     from?

22     A.   Like when we was getting coke from Burke, I was probably

23     going with him a couple of times then.

24     Q.   Did Baby Ki ever tell you where he was getting it from,

25     apart from Burke?

1210

```
1    A.   Apart from Burke?  Not all the time.

2    Q.   Did Baby Ki ever reference Antwuan Ball?

3    A.   Yes, sir.

4    Q.   And what did Baby Ki say about Antwuan Ball?

5    A.   If he got his coke from Twuan, he'll say he got the coke

6    from Twuan.  If we got it fronted from Twuan, he be like, "Twuan

7    fronted this, so we need to hurry up and get him his money

8    back."

9    Q.   How often did you get crack cocaine from Twuan or Mr. Ball?

10   A.   I ain't get probably but like four times throughout.

11   Q.   Throughout the time period?

12   A.   Throughout the time period, probably like four or five

13   times.

14   Q.   And what was the largest quantity that you got from

15   Mr. Ball?

16   A.   I think it was about a half ounce.

17   Q.   Did you buy that alone or with Baby Ki?

18   A.   I bought it -- well, he got -- he fronted it to me, me and

19   Baby Ki.  He fronted it to us.

20   Q.   What does "fronted" mean?

21   A.   He gave it to us and we had to pay him back.

22   Q.   And how long did you have to pay Antwuan Ball back?

23   A.   Oh, you ain't have long to pay Twuan back.

24   Q.   Why not?

25   A.   It was just you knew to give Twuan his money ASAP.
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 202 of 500

```
 1    Q.  I don't understand.  Explain that.

 2    A.  Because, man, Twuan was like, he would press up on you for

 3    his money.  So if you ain't give him his money back, you was

 4    going to get pressed up for it.

 5    Q.  Did he ever press you up?

 6    A.  No.  Because I always got his money back.

 7    Q.  Did you ever see Antwuan Ball press up anybody else?

 8    A.  No, I ain't never seen him press up nobody else, but I seen

 9    Baby Ki --

10          MR. CARNEY:  Objection.

11          THE COURT:  Sustained.

12    BY MR. GUERRERO:

13    Q.  Did you ever seen anyone else who was being pressed by

14    Antwuan Ball?

15    A.  I never actually witnessed him press nobody, but --

16          MR. CARNEY:  Objection.

17          MR. MARTIN:  Objection.

18          THE COURT:  Sustained.

19    BY MR. GUERRERO:

20    Q.  Did you ever talk to Baby Ki about Baby Ki being pressed?

21    A.  Yes.

22    Q.  What did Baby Ki say?

23    A.  I remember a point -- I remember this was like around about

24    2002, he came in my mother house one day and he was like -- he

25    was real nervous.  He was like, "Man, I got to get Twuan" -- he
```

1212

```
 1    had got all this coke from --
 2              MR. BALAREZO:  Objection, Your Honor.  Objection.  I'm
 3    sorry, I should have done it earlier.
 4              THE COURT:  Beg your pardon?
 5              MR. BALAREZO:  Objection.
 6              THE COURT:  Basis?
 7              MR. BALAREZO:  602.  It's hearsay, it's not in
 8    furtherance.
 9              THE COURT:  Overruled.
10              MR. ZUCKER:  It's also a narrative at this point.
11              THE COURT:  Overruled.
12    BY MR. GUERRERO:
13    Q.  What did Baby Ki say?
14    A.  Baby Ki, he probably got like about a six-deuce from Twuan,
15    and he was like --
16              MR. ZUCKER:  Objection.  Speculation.
17    A.  -- he got to hurry up and give Twuan his money.
18              MR. ZUCKER:  Objection, speculation, "probably got a
19    six-deuce."
20              THE COURT:  Overruled.
21    BY MR. GUERRERO:
22    Q.  I need for you to speak nice and clear for us, okay, right
23    in the mic.
24    A.  Okay.
25    Q.  Tell us what it was that Baby Ki said about owing money.
```

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 204 of 500

2213

```
 1    A.  He got about a six-deuce from Twuan, and he was, like, "Man,
 2    I got to hurry up and get Twuan back his money."  I was, like,
 3    "Man, better you than me," my exact words to him.
 4    Q.  And what was Baby Ki's condition?
 5    A.  Well, he was high, for one, and he was just real nervous.
 6    Q.  Did you ever owe Antwuan Ball money for crack cocaine?
 7    A.  Yes.
 8    Q.  And how long did it take for you to pay him back?
 9    A.  Oh, it ain't take me long, probably two days, tops.  But I
10    never really got nothing too big from him whereas though I'm
11    going to have to worry about owing him a lot of money.  Probably
12    the most I ever owed him --
13              MR. BALAREZO:  Objection.  Narrative.
14              THE COURT:  Sustained.
15    BY MR. GUERRERO:
16    Q.  How about Boy-Boy?  Did you ever owe him money?
17    A.  Yes, sir.
18    Q.  And do you still owe him money?
19    A.  I believe I do still owe him $250.
20    Q.  You owe him $250 for what?
21    A.  I don't know whether -- I want to say --
22              MR. BEANE:  Objection, Your Honor.  Speculation.
23              THE COURT:  I'll let him answer.
24    A.  I want to say it was for a quarter, but I believe it was for
25    a half.  I think I gave him 250; he gave me a half he charged me
```

```
 1    500 for, and I just never gave his 250 back.
 2    BY MR. GUERRERO:
 3    Q.  So a quarter of what?
 4    A.  Crack cocaine.
 5    Q.  Or a half of?
 6    A.  Crack cocaine.
 7    Q.  And you haven't paid him back yet?
 8    A.  No, sir.
 9    Q.  Now I want to focus on that time period where you were
10    hanging around with Baby Ki.  And that's where we last left off.
11            Apart from the circle, was there anywhere else in
12    Congress Park that you would sell your crack cocaine?
13    A.  Throughout the park, in the alley, on the ho stroll.  We
14    rarely went around 14th Place, but I probably made one or two
15    sales on 14th Place.  Just guessing, but we barely went around
16    14th Place.  But in the Lincolns.
17    Q.  How often would you sell in the Lincoln?
18    A.  For a minute.  Like during, like, 2001, 2000, probably, we
19    was hanging in the front of the Lincoln, so...
20    Q.  Who was hanging in front of the Lincoln?
21    A.  Oh, me, Wop, Dazz, Santu, Jazz, Phil, Munya, Keith B, yeah.
22    DC and Don ain't hanging at the Lincolns all like that at this
23    time.
24    Q.  You said who wasn't hanging there at that time?
25    A.  DC and Don.
```

# EXHIBIT   R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 2, 2007 |
| DOMINIC SAMUELS, | : | 9:15 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 27 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:       UNITED STATES ATTORNEY'S OFFICE
                             Glenn S. Leon, Assistant United
                             States Attorney
                             Ann H. Petalas, Assistant United
                             States Attorney,
                             Gilberto Guerrero, Assistant
                             United States Attorney
                             555 4th Street
                             Washington, DC  20001
                             202.305.0174

For Defendant
Antwuan Ball:                CARNEY & CARNEY
                             John James Carney, Esq.
                             South Building
                             601 Pennsylvania Avenue, N.W.
                             Washington, DC  20004
                             202.434.8234

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 208 of 500

Q.      And during this time period, and I want to be clear on this -- during this time period, I'm referring to 1995 up until early 1996, when you said Troy Lewis was killed, around that time, what was your relationship -- you, Bobby Capies -- with Antwuan Ball?

A.      We was cool.

Q.      What do you mean by that?

A.      I was dealing with him.  I was getting drugs from him.

Q.      Beyond just buying drugs from him or getting fronted crack from him, did you have any further relationship with him?

A.      Friends.

Q.      And what do you mean by that?

A.      Friends, buddies, hanging out, you know, riding around, smoking, drinking.

Q.      Who was older, you or him?

A.      He was, sir.

Q.      Who had more friends -- withdrawn.

        In Moms' apartment, just staying there for the final few questions, how did Antwuan Ball carry himself?

        MR. TABACKMAN:  Objection.

        MR. ZUCKER:  Objection.

        THE COURT:  Do you understand the question?

        THE WITNESS:  Yes, sir.

        THE COURT:  Huh?

        THE WITNESS:  Yes, I understand.

THE COURT:  I'll allow it.

THE WITNESS:  He was a leader, sir.

BY MR. LEON:

Q.      What do you mean by that?

A.      What he say goes.

Q.      What do you mean by that?

A.      If he say, you know, make this move or take this, it
goes.

Q.      And if he would say something like that, who, if anyone,
would respond?

A.      I mean, Jo-Jo was like the type, he had his own mind, but
like the other guys that was in there and the younger group, we
listened to him.

Q.      When you say "like the younger group," who in your mind
do you mean, the younger group?

A.      Wop, Dazz, me, Baby Kai, Head, Truck, all those type of
guys, we listened to him; Drano, Doo-Doo.

Q.      Now, I'd like to jump ahead.  Do you remember, we talked
on Thursday about '92 to '96?  I'd like to now jump to beginning
in 1996 up until your incarceration in 2001, okay?

        So now the majority of my remaining questions are going
to be regarding this five or six-year period of time, okay?

A.      Yes, sir.

Q.      Okay.  I believe you testified on Thursday that around
some point, '96 or so -- well, let me withdraw that.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 23, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:50 p.m. |

. . . . . . . . . . . . . . : . . . . . . . . . . . . .

VOLUME 38 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C. 20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC 20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC 20006
                           (202) 454-2811

1146

1   Q.  And had you seen Antwuan in any area in specific, over in

2   Congress Park, right up until that point?

3   A.  Yeah.

4   Q.  Where had you seen him around?

5   A.  Same places, riding through 13th Place, 14th Place,

6   Boat Alley.

7   Q.  And when you saw Antwuan in those areas, what did you see

8   with respect to how he interacted with other people?

9   A.  Same demeanor.  I mean, to me, my observation of him, he was

10  always a serious individual.

11  Q.  Did you ever see any of the other individuals show him some

12  respect?

13  A.  Yeah.

14          MR. MARTIN:  Objection.  Leading.

15          MS. WICKS:  Objection.

16          THE COURT:  Sustained.

17  BY MR. GUERRERO:

18  Q.  Give us some more detail about the interactions you observed

19  of Antwuan with other people from Congress Park.

20  A.  Kind of like, like I said, he just demanded respect.  It's

21  like, say, for instance, if people were around and he come up,

22  like if you were around --

23          MR. BALAREZO:  Your Honor, objection to -- it seems to

24  be some kind of example, not some sort of fact that this witness

25  witnessed.

1147

```
 1              THE COURT:  Overruled.
 2    BY MR. GUERRERO:
 3    Q.  Tell us, please.
 4    A.  For instance, if it was like -- if we were outside giggling,
 5    running around, playing, if he came up, it got a little more
 6    serious.  Everybody would kind of cut out the playing.
 7    Q.  How often did you see that?
 8    A.  A few times.
 9    Q.  Now, in '95, back to you, who were you receiving your crack
10    cocaine from?
11    A.  '95, it was off and on with Quincy Thomas, mostly.
12    Q.  How about in '96?
13    A.  '96, I had a brief moment where I didn't do anything for
14    about six to eight months, something like that.
15    Q.  Why did you not do anything?
16    A.  I'd received a significant raise from my job.
17    Q.  And when you say didn't do anything, what are you talking
18    about?
19    A.  Distribute any drugs.
20    Q.  What kind of raise did you get from your work?
21    A.  I went from about 16 bucks an hour to about 22.50.
22    Q.  Was it a promotion or a financial increase?
23    A.  A promotion.
24    Q.  What kind of job did you get promoted to?
25    A.  Office manager.  And I overseen a naval warfare contract.
```

0107

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 16, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:55 p.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 34 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530


For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

1    Q.  All right.  Now, you said that you and Mr. Ball got kind of

2    tight?

3    A.  Yes, we got pretty close.

4    Q.  Pretty close is the word -- the phrases you used.

5    A.  Yeah.

6    Q.  What does that mean, you got pretty close?

7    A.  Like I say, I was trying to get to know him for

8    business-wise.  I seen the potential that he could make some

9    money.  And if he make some money, I make money.

10   Q.  What does that mean, you saw the potential?

11   A.  A few times I met him around Congress Park, I seen the

12   respect that he carried around there.

13   Q.  Let's break that down for a second.  When you met him in

14   Congress Park, where was it that you recall seeing Mr. Antwuan

15   Ball?

16   A.  In the alley.

17          MR. GUERRERO:  Mr. Mazzitelli, may we go back to 105.1,

18   please?

19   BY MR. GUERRERO:

20   Q.  Do you see Government's Exhibit 105.1, a close-up of

21   Congress Park?

22   A.  Yes.

23   Q.  And you said that you saw Mr. Antwuan Ball on occasions in

24   an alley.  Do you see the alley?

25   A.  Yes.

145

1   Q.  After the first occasion, is that when you used to go to

2   this area, the alley, to meet Mr. Ball?

3   A.  Yes.

4   Q.  And you used a term, "he," as in Mr. Ball, "had potential."

5   A.  Yes.

6   Q.  What would you see happen in that alley when you saw

7   Mr. Ball there?

8   A.  Well, when I pull up in the alley, I see he had a lot of

9   respect in the alley from a lot of the young guys around there.

10  Q.  What does that mean?  What would you see the young guys do

11  around Mr. Ball?

12  A.  The younger guys, just some of the ways wanted to be like

13  him, always wanted to be around him.

14  Q.  And did you talk -- excuse me.  Did you talk to Mr. Ball

15  about your interest in that alley?

16  A.  Yes.

17  Q.  What did you say?

18  A.  I was trying to get him to sell more crack cocaine.

19  Q.  And how did you approach him in that regard?

20  A.  Well, I asked him, if he can do better, we can have the park

21  in our park.

22  Q.  What was Mr. Ball's response?

23  A.  He was telling me he got the alley, that's his spot, that's

24  his strip.

25  Q.  He got the alley, that's his spot, that's his strip?

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 216 of 500

1146

```
 1    A.  Right.

 2    Q.  What did you understand he was talking about?

 3    A.  On the street level, when we say, "This is our spot, this is

 4    our strip," it mean we run the strip.  That's ours.

 5    Q.  You run the strip?

 6    A.  Yes.

 7    Q.  Doing what?

 8    A.  Selling all the drugs that come through there is pretty much

 9    mine's or yours.

10    Q.  Now, we talked about one occasion where you sold Mr. Ball

11    crack cocaine.  The second occasion that you sold Mr. Ball crack

12    cocaine, do you remember the quantity that it was?

13    A.  No, I don't remember.

14    Q.  How about the third occasion?  Do you recall?

15    A.  Anywhere from a 62 to a -- 62 to an eighth.

16    Q.  In comparison to the first time that you sold Antwuan Ball

17    crack cocaine towards the end of the sales, was he buying the

18    same, less, or more from you?

19    A.  Well, towards the end, he purchased an eighth of a key from

20    me.

21    Q.  And an eighth of a key is how much?

22    A.  It's 3,000.  At the time it was a shortage, so I had to

23    charge him 4,000 for it.

24    Q.  What does that mean, there was a shortage?

25    A.  It's when it's hard, when cocaine is hard to find in the
```

9090

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     :     Docket No. CR 05-100
                              :
            Plaintiff         :
                              :
v.                            :     Washington, DC
                              :
ANTWUAN BALL,                 :
DAVID WILSON,                 :
GREGORY BELL,                 :     April 30, 2007
DESMOND THURSTON,             :
JOSEPH JONES,                 :
DOMINIC SAMUELS,              :
                              :
            Defendants        :     9:15 a.m.
. . . . . . . . . . . . . . . :     . . . . . . . . . .

VOLUME 42 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE,* and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC 20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

1208

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 218 of 500
1177

```
 1   Q.  Okay.  And when you met Antwuan Ball through Cody, did you

 2   meet anyone else at that initial time in addition to

 3   Antwuan Ball when you got your hair cut?

 4   A.  Sure.  I mean, I don't know if I met everybody the same day.

 5   Q.  And when you say "everybody the same day," at some point did

 6   you get to know other people who Antwuan Ball associated with in

 7   Congress Park?

 8   A.  Sure.

 9   Q.  And who were those people, or some of those people?

10   A.  Jojo, Antwuan, Tony.  I mean, Jazz, Santu.  I'm sure there's

11   others.  I just can't -- not off the top of my head.

12   Q.  Yes or no, do you know somebody by the name of Dazz, Dazz

13   with a D?

14   A.  I'm familiar with him.

15   Q.  Okay.  And yes or no, are you familiar with somebody by the

16   name of Dom?

17   A.  Dom?  Yeah, I think I'm familiar with him.

18   Q.  And just yes or no, did you become familiar with someone by

19   the name of Wop or Cool Wop?

20   A.  I'm familiar with him.

21   Q.  Now, when you first got to know Antwuan Ball during these

22   first few encounters, did you end up deciding to spend more time

23   with him?

24            MS. WICKS:  Objection as to leading.

25            THE COURT:  I'll allow it.
```

9178

 1   A.  He was a person of interest.

 2   BY MR. LEON:

 3   Q.  To you?

 4   A.  Sure.

 5   Q.  Why?

 6   A.  Because of his influence.

 7   Q.  What do you mean by that, because of his influence?

 8   A.  Well, when you're in a position like I was in at the time,

 9   you got to -- it's always good to align yourself with somebody

10   who has influence when you're dealing drugs, especially in the

11   neighborhood that I'm in.

12   Q.  You just said a couple of things I need to follow up on.

13        The first thing I think you said was referring to you,

14   to yourself, when you're a person, words of the effect of "in

15   the position you were in."  What did you mean by that?

16   A.  Well, we're all trading in illegal business, so if you're a

17   person who can get large quantities of drugs, you know, and you

18   running from an indictment in Virginia, you know, I'm looking at

19   trying to find somewhere else to unload these drugs.

20   Q.  At that time, 1999, when you were hanging out with Cody and

21   you go to the barbershop, did you drive any cars?

22   A.  I had quite a few cars.

23   Q.  What kind of cars did you have back then?

24        MS. WICKS:  Objection as to relevancy.

25        THE COURT:  As to what?

9179

```
 1            MS. WICKS:  Relevancy.
 2            THE COURT:  Overruled.
 3   BY MR. LEON:
 4   Q.  What kind of cars?
 5   A.  Chevy truck, Trans Am, Ford, Ford truck, Acura Legends.
 6   Q.  And did you drive these vehicles -- I'm sorry, were you
 7   done?
 8   A.  I'm still thinking.  Yeah, I'm done.
 9   Q.  And did you drive these vehicles in Congress Park in 1999?
10   A.  Sure.
11   Q.  Did you -- just yes or no at this point, did you reach any
12   conclusions, yes or no, in your own mind, as to what position,
13   if any, Mr. Ball had in the Congress Park neighborhood in 1999?
14            MS. WICKS:  Objection.
15            MR. PURPURA:  Objection.
16            MR. ZUCKER:  Objection.
17            THE COURT:  Sustained.
18   BY MR. LEON:
19   Q.  You said that Mr. Ball was a person of interest to you.  Why
20   was he a person of interest to you?
21            MS. WICKS:  Objection.
22            THE COURT:  Basis?
23            MS. WICKS:  Asked and answered and relevancy.
24            MR. ZUCKER:  Also foundation.
25            THE COURT:  I'll sustain it as to asked and answered.
```

9180

1    BY MR. LEON:

2    Q.  Did you ever -- once you reached the conclusions that you

3    did regarding Antwuan Ball, did you spend more or less time with

4    him?

5    A.  I guess we started spending more time together.

6    Q.  Did you, during that period, 1999, 2000, and 2001, until you

7    were locked up in May of 2001, during those two to three years,

8    did you develop a friendship with Antwuan Ball?

9    A.  I don't know if you call it that, but...

10        MS. WICKS:  Objection as to leading.

11   BY MR. LEON:

12   Q.  Well, would you call it a friendship?

13        THE COURT:  I'm sorry, was that an objection?

14        MR. TABACKMAN:  Objection as to leading.

15        MS. WICKS:  I'm sorry, Your Honor.  Yes, objection as

16   to leading at this point.

17        THE COURT:  Sustained.  But you can rephrase.

18   BY MR. LEON:

19   Q.  How would you describe your relationship with Antwuan Ball

20   as it developed during those years?

21   A.  I would say it was more a relationship of I could help him,

22   he could help me.

23   Q.  How do you mean?  What do you mean by that?

24   A.  I can get drugs and he can help me get rid of them, or make

25   it to where I can get rid of them.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 17, 2007 |
| DOMINIC SAMUELS, | : | 9:15 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 52 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:       UNITED STATES ATTORNEY'S OFFICE
                             Glenn S. Leon, Assistant United
                             States Attorney
                             Ann H. Petalas, Assistant United
                             States Attorney,
                             Gilberto Guerrero, Assistant
                             United States Attorney
                             555 4th Street
                             Washington, DC  20001
                             202.305.0174

For Defendant                CARNEY & CARNEY
Antwuan Ball:                John James Carney, Esq.
                             South Building
                             601 Pennsylvania Avenue, N.W.
                             Washington, DC  20004
                             202.434.8234

```
 1    BY MR. LEON:

 2    Q.    And is Joseph Jones, to your knowledge, the same age,

 3    older or younger than you?

 4    A.    He's older than me.

 5    Q.    Now, when you saw Antwuan Ball hanging out with Jo-Jo and

 6    the other people you mentioned, what, if anything, did you see

 7    Antwuan do?

 8    A.    He used to be out there --

 9    Q.    In The Circle, I'm talking about.

10    A.    In The Circle?

11    Q.    Yes.

12    A.    Sell drugs.

13    Q.    What kind of drugs?

14    A.    Crack, weed, Ecstasy.

15    Q.    What impression, if any, did you get as to Antwuan Ball's

16    status in the neighborhood at that time?

17          MR. BALAREZO:  Objection.

18          MR. MARTIN:  Objection.

19          THE COURT:  Sustained.

20    BY MR. LEON:

21    Q.    Did you -- based on your observations, tell us what you

22    saw Antwuan doing in The Circle, other than selling drugs?

23    A.    He was running house, you know.  He ran Congress Park.

24    Q.    What do you mean by that?

25    A.    Basically, whatever a man -- a person -- whatever he
```

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 224 of 500

1    wanted somebody to do, they'd do.  If something was going down,

2    they'd go to Antwuan.

3            MR. CARNEY:  Objection, Your Honor, 602.

4            THE COURT:  Why don't you establish foundation.

5    BY MR. LEON:

6    Q.    Okay.  You told us "running house."  First of all, in

7    your own words, what does that mean?

8    A.    Basically, running the show.  I mean, everybody looked up

9    to him around there.

10   Q.    Okay.  And when you say "everybody looked up to him

11   around there," is that based on your own observations?

12   A.    Yes, from what I could see.

13   Q.    From what you could see, tell us what you mean when you

14   said everyone looked up to Antwuan.

15   A.    They looked up to him.  He was older.  I guess he was

16   putting in most of the work around there.

17           MS. WICKS:  Objection.

18           MR. ZUCKER:  Objection.

19           THE COURT:  Sustained.

20   BY MR. LEON:

21   Q.    Don't guess.  Just tell us what you saw, how you saw

22   Antwuan interact with others and others interact with Antwuan.

23   You can tell us about that.

24   A.    From what I could see, he -- at that time, he basically

25   man.  He was in charge.  I mean, the things he used to say to

2093

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :      Docket No. CR 05-100
                                   :
                Plaintiff          :
                                   :
v.                                 :      Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :      May 21, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
                Defendants         :      2:00 p.m.
. . . . . . . . . . . . . . . .    :      . . . . . . . . . . . . .

VOLUME 53 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

1217

```
 1   Q.  Let me talk to you about the interaction that you saw Wop do
 2   over in the circle.  Did you see Wop as he interacted with other
 3   people?
 4   A.  I don't understand the question.
 5   Q.  When you saw Wop, what would you notice him doing with the
 6   other guys?
 7            MS. WICKS:  Objection.
 8            THE COURT:  Overruled.
 9   BY MR. GUERRERO:
10   Q.  How did he carry himself?
11   A.  I mean, he carried hisself -- he had respect.  He had
12   respect amongst his friends, amongst other people in the hood.
13   He had respect.
14   Q.  How about Antwuan Ball?  How did he carry himself when you
15   saw him in the circle?
16   A.  Well, he had respect, too.  He had the most respect
17   throughout the hood.
18   Q.  What does that mean?
19   A.  He was like the man.
20   Q.  Let me show you some photographs here.  If we can pull up
21   108.70.
22            If I can ask you to clear the screen.  If you can touch
23   the lower right-hand corner.
24   A.  (Witness complies.)
25   Q.  Do you see Government's Exhibit 108.70?
```

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 227 of 500

# EXHIBIT   S

1

```
 1                           SUPERIOR COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   - - - - - - - - - - - - - -x
                                 :
 4   UNITED STATES OF AMERICA     :
                                 :
 5   VS.                          :    Case No. F-7920-02
                                 :
 6   DOMINIC SAMUELS              :
                                 :
 7   - - - - - - - - - - - - - -x

 8                                Grand Jury No. May 2
                                  555 4th Street, N.W.
 9                                Washington, D.C.  20001

10
                                  June 18, 2003
11

12           The testimony of ANTWAUN BALL was taken in the

13   presence of a full quorum of the Grand Jury, commencing at

14   2:55 p.m., before:

15

16           SETH WAXMAN
             Assistant United States Attorney
17

18

19

20

21

22

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1219

1     A.   Right.

2     Q.   And just to, just to clear this up, is Congress

3  Park, that part of the city, a fairly tight neighborhood?

4     A.   What you mean by tight?

5     Q.   In other words, do all the people kind of know

6  what's going on in the neighborhood generally, or --

7     A.   Yeah, that's a heavy neighborhood, yeah.

8     Q.   Okay.  So you go in the neighborhood.  Is that fair?

9     A.   Yeah.

10     Q.   Okay.  And said that Black shot Don?

11     A.   Uh-hum.

12     Q.   And what leads you to that conclusion?  In other

13  words, was there something specific said to you or was that

14  what just everybody was saying, or, or what?

15     A.   Well, that's, that's what everybody knew.

16     Q.   Okay.  Is there anything tangible?  In other words,

17  any specific conversation or -- especially with either Don or

18  Black that leads you to that conclusion?

19     A.   What, that Black shot Don?

20     Q.   Correct.

21     A.   Well, I mean, the reason why in the beginning I knew

22  he shot him is because the block told me.  The block was out

23  there.  And me and Don just shared the understanding, shared

24  the conversation, he told me that Black shot him, you know,

25  but he didn't have to, I already knew.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1220

1  was killed?

2       A.   It was, it was before you all had put out any type

3  of warrants or something on him.  He wasn't -- well, I didn't

4  see him around the neighborhood because my time in the

5  neighborhood is specifically set for things that I have to do.

6  So I don't get to walk around, and play, and eyeball the town.

7  But I did see him up Langston Lane where Woodland, same thing,

8  Langston Lane, Woodland is, when I was driving through I did

9  see him then.

10      Q.   Okay, did you talk to him?

11      A.   Yes.

12      Q.   And can you tell us about that conversation?

13      A.   When I saw him, I pulled up on him and asked him

14 just because -- just in case my little cousin was lying to me,

15 I asked him, I said, don't you think you owe me an apology,

16 you know, to see what he was coming from, because Don knows

17 that I'm not going to go in front of no -- go and tell no

18 police what he did, you know.  So I was feeling that he would

19 be comfortable with telling me whether or not he killed Black

20 or not.  So I was like, don't you think you owe me an apology

21 because Black got shot in my little cousin car.  He was like,

22 apology for what?  I was like, come on, man, you know what I'm

23 talking about man, you know.  He was like, man, everybody

24 think that I shot that dude.  I'm happy he did it, for what he

25 did to me, but I ain't shoot him.  He was like --

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1221

Case 1:05-cr-00100-RWR   Document 1228-19   Filed 02/29/08   Page 5 of 13
USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 231 of 500

32

1       Q.   So at that point in time Don denied shooting Black?

2       A.   Right.

3       Q.   Okay.  Aside from that conversation had you ever had

4  any other conversations with Don since the day Black was

5  killed?

6       A.   No.

7       Q.   It was just that one time?

8       A.   One -- yes, yes.

9       Q.   And I think I may have asked you this, but prior to

10  the day Black was killed, you've described two conversations

11  with Don.  One where he wasn't coherent enough for you to talk

12  to him, and another where you discussed his issue with Black.

13  Were there any other conversations prior to the day Black was

14  killed that you had with Don about the situation between him

15  and Don?

16       A.   No.

17       Q.   And also, the same question with regards to Black.

18  Aside from the one conversation you had with him in the

19  halfway house, did you have other conversations with Black

20  about the situation between him and Don?  To the best of your

21  memory?

22       A.   No.

23       Q.   No?

24       A.   Yes, I did, yes.  After Don pulled, after Don pulled

25  guns out, I spoke to Black and I apologized.  I didn't mention

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1222

1    this.  It was, you know -- but I spoke to Black.  And he was

2    like -- and he, he, he left the halfway house.  He said, man,

3    that man pulled guns out on me, man.  I can't go back to the

4    halfway house, you know, he's going to do this and do that.

5    And the brother did, so you know, I don't want too much

6    leaning to the bad things about Black, man, because it just --

7    it ain't right to me.  But yes, he did say that.  He left the

8    halfway house.  I asked him not to, you know, no, don't do

9    that, man.  You out here, how am I going to deal with you, if

10   you leave the halfway house?  So he left the halfway house.  I

11   don't know the word for leaving.

12        Q.    He escaped?

13        A.    Yes, he escaped.

14        Q.    Walked away from the halfway house?

15        A.    Yes.  And was saying that he going to have to do

16   what he got to do.  But I nipped that in the bud too.

17        Q.    Okay.  And in this conversation with Black where he

18   told you about Don pulling the guns out on him?

19        A.    Yes.

20        Q.    And I understand that, you know, Black has since

21   passed and you don't necessarily talk bad about him, but this

22   is a Grand Jury investigation, so I just ask that you tell us

23   exactly what Black said to you, if it meant retaliating, or

24   doing anything towards Don, just tell us specifically what

25   Black said.  The best of your memory.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1223

1    A.   No, I remember.

2    Q.   What did, what did Black say he was going to do?

3    A.   He said he was going to see him.

4    Q.   And what did that mean to you?

5    A.   He was going to kill him.

6    Q.   Okay.  And did he give you a reason for that, or he

7 just said that?

8    A.   Because Don pulled guns out on him.

9    Q.   Okay.  And so he was going to kill him in

10 retaliation for that or just for everything that was going on,

11 or did you not get into all that?

12    A.   No, just retaliation for that, because I had him

13 here for the rest of the stuff.  You know, I had Black with me

14 for shooting Don, you know, so I was dealing with him.  You

15 know, that was -- you know, on his behalf that was done, you

16 know.  But and it stirred back up when Don pulled the guns out

17 on him.

18    Q.   So let me just get this straight.  You're saying

19 that you had handled, at least in your mind, for Black the

20 1996 shooting.  In other words, you had at least calmed Black

21 down enough that he was okay with it, but that now that Don

22 had pulled out guns on him again -- not again, but had pulled

23 out guns on him, this revived the problems for Black.  Is that

24 what you're trying to say?

25    A.   Well, Black had no reason to be still pissed.  He

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1224

1    shot Don.

2        Q.    Right.

3        A.    I just -- he just -- you know, he was assuring me

4    that there's no problem with him, you know what I'm saying,

5    because of course he did the shooting.  He was just concerned

6    about the problem Don had with him.

7        Q.    Okay.  Now, you described your conversation with

8    Baby Kai shortly after the shooting as him describing a short

9    stocky guy?

10       A.    Uh-hum.

11       Q.    Correct?

12       A.    Yes.

13       Q.    Okay.  At any other time since that time has Kirie

14   identified somebody as the shooter to you?

15       A.    Yes.

16       Q.    Okay.  Why don't you tell us everything that led up

17   to that and what's been going on between you and him, Baby

18   Kai.

19       A.    Okay.  Now, I'm -- I've spent 28 years in the

20   streets and during that time we develop this code of silence

21   thing.  So -- well, let me just be straight up with you all.

22   I was -- I would have been disappointed if, if Don did kill

23   Black, I would have been disappointed at my little cousin for

24   saying that he killed him.  But I would not be in here risking

25   him getting purged and more time on his head if that wasn't

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1225

1    happening.  Now, Baby Kai called my house.  I hung up maybe

2    100 times.  And just so happened I answered the phone and

3    he --

4         Q.   Where was Baby Kai calling you from?

5         A.   From CTF.

6         Q.   From jail?

7         A.   Yes.

8         Q.   Okay.

9         A.   And he said -- I was like, what's up, man?  He was

10   like, man, I know you heard about what was going on, about

11   him, you know, telling.  And I was like -- he was like, I just

12   wanted to let you know that it's true.  I said, so exactly

13   what is you telling me that, you know what I'm saying, that --

14   that's true?  He was like, you know, I told them Don did it.

15   That's what he said, you know. Said, Don did it.  And I was

16   like, hold up, man, hold up, man.  You told me that a short

17   stocky dude with a mask killed Black, and now you're telling

18   me that Don did it.  Which one is the truth?  And his response

19   was, man, Don did it.  So you know, I mean, I still -- me

20   knowing my little cousin, man, him and my little brother is

21   exactly the same.  They grew up together.  And I know when my

22   little brother and my little cuz is lying to me.  When I said,

23   do not lie to me, man, who killed him, man, who pulled the

24   trigger?  And he said a short, stocky dude, that was it.

25   There was no other reason for me to ask any other questions.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1226

Case 1:05-cr-00100-RWR   Document 1228-19   Filed 02/29/08   Page 10 of 13
USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 236 of 500

37

1    Q.   Okay.  So that last part you were discussing, that's

2  the conversation you had had with him shortly after the

3  shooting.  Is that right?

4    A.   Yes.

5    Q.   Okay.  Now, what are you feeling about Kirie from

6  the time last fall to now?  In other words, what's going on

7  with him and his situation and the things that he's told you?

8  In other words, identifying a short, stocky guy at one point

9  and identifying Don at another point?

10    A.   Well, I'm -- once again, you good too.  I'm, I'm a

11  little -- I'm a lot uncomfortable with my little cousin.  Just

12  that the things that he's -- it's not good, and you know,

13  we're not, not saying that we're angels or nothing.  We was

14  brought up in certain situations now.  The things that, that

15  he's done to benefit hisself, which was the streets, you know,

16  you know, shouldn't be -- shouldn't have him in a situation

17  where as though when he get caught for doing what he benefited

18  from in the streets to, to act -- to involve somebody else in

19  his way of getting out of jail, you know. so yes, I'm

20  extremely disturbed and I would be -- to be honest with you, I

21  would be disturbed still if Don did kill Black and he told the

22  police.  That's just -- you know, and I'm not proud of it, but

23  that's just how, you know, how I was brought up.

24    Q.   Let me break that down.  You described something

25  called, like a code of silence.  What does that mean to you?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1227

1        A.    No telling.

2        Q.    In other words, you don't deal with the police, you

3   don't deal with the prosecutors?

4        A.    Exactly.

5        Q.    You handle your own business in the street yourself?

6        A.    I don't know where you got that from but --

7        Q.    All right, well, correct me as I'm saying these

8   things.  Please tell me when I'm wrong.

9        A.    I'm correcting you.  No, I didn't say that.  I'm

10  saying that you do not -- and then the dealing was on him.  It

11  wasn't his problem.  So you know --

12       Q.    Okay.  And I think the Grand Jury might be a little

13  bit in a vacuum here, so let me just go through with what

14  procedure was going on --

15       A.    Yes.

16       Q.    -- and maybe that will help out.  Did you -- are you

17  familiar with the fact that Kirie Kilabrew (ph.) picked up a

18  couple of unrelated drug charges --

19       A.    Yes.

20       Q.    -- sometime last summer?

21       A.    Yes.

22       Q.    And do you know if those are still pending?

23       A.    Yes.

24       Q.    Do you know where Kirie Kilabrew is locked up right

25  now?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1228

43

1    Q.    Being a snitch?

2    A.    Yeah.  When you say snitch, man, when you snitch,

3  you snitching on something that happened, so we can't -- we

4  got to be careful with calling him a snitch because he lied.

5    Q.    In other words, there's a difference between being

6  hot and being a snitch?

7    A.    No.

8    Q.    Okay.  Well, I'm sorry, explain --

9    A.    Snitch and hot is the same thing.

10    Q.    Okay.

11    A.    And when you lie, we haven't put a word together for

12  that yet.  We just call him hot.  I'm not -- I'm not trying to

13  be funny or anything but --

14    Q.    Oh, I understand.

15          GRAND JUROR.  We ain't put no word --

16          BY MR. WAXMAN:

17    Q.    All right.

18    A.    You want me to finish?

19    Q.    Yes, I'm sorry, go ahead.

20    A.    He told Geeka that, man, this ain't me, man, you

21  know, I ain't going like this, man.  I told them peoples Don

22  did this, that and the other.  I'm over here with all these

23  hot dudes, man.  This ain't me.  Basically, the Judge wouldn't

24  do him no favor, so now he's worrying about his name.  So now

25  he's ready to -- what's the word for it?  To take back his

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1229

1  well, I know you've described, based on what you've heard, and

2  that people have told you, that you heard that a short stocky

3  person with a mask on was the shooter.  You heard that one

4  time.  Correct?

5      A.   Yes.

6      Q.   And you've also heard at some other time that Don

7  was the shooter.  Is that correct?

8      A.   Yes.

9      Q.   Do you have any information that would help this

10 Grand Jury either pointing them towards either one of those

11 two people or a third person, besides what we've discussed

12 here today?

13     A.   Well, I maybe can give the Jury 130 people that may

14 have killed Black because although that's my man, and he's

15 passed, and I don't feel bad with saying this, man, the man

16 was an armed robber, before he went in.  When he came home, he

17 was a total different person.  You know, to my knowledge.  But

18 before he went in, man, he was, you know, he was just doing

19 too much, man.  He was a knucklehead.

20     Q.   So is it your understanding that Black made a lot of

21 enemies out there?

22     A.   Definitely.  But now, to be honest with the Jury,

23 not too many people going to come in our neighborhood and, you

24 know, and do nothing like that, you know, so just to be honest

25 with the Jury.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1230

# EXHIBIT   T

United States of America v.         CR 00-157 &         February 18, 2004
Kenneth Simmons, et al         CR 02-045         Volume 72

Page 1

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


       UNITED STATES OF AMERICA,    :  CR Number 00-157
                                    :  Group 2A
                       Government,  :  CR Number 02-045
                                    :
              v.                    :  Washington, D.C.
                                    :  Wednesday, February 18, 2004
       KENNETH SIMMONS,             :  9:43 a.m.
       RONALD ALFRED, JAMES ALFRED, :
       FRANKLIN SEEGERS,            :
       DEON OLIVER, KEITH McGILL,   :
                                    :
                       Defendants.  :
                                    :
       - - - - - - - - - - - - - - -x


                       DAY 72 - AM SESSION
                    TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE ROYCE C. LAMBERTH
            UNITED STATES DISTRICT JUDGE, and a jury



       APPEARANCES:
       For the Government:          FLORENCE PAN, ESQUIRE
                                    GLENN KIRSCHNER, ESQUIRE
                                    ARVIND LAL, ESQUIRE
                                    ASSISTANT UNITED STATES ATTORNEYS
                                    U.S. ATTORNEY'S OFFICE
                                    555-4th Street, N.W.
                                    Washington, D.C.  20001
                                    Ms. Pan - 202-353-3706
                                    florence.pan@usdoj.gov
                                    Mr. Kirschner - 202-514-7064
                                    glenn.l.kirschner@usdoj.gov
                                    Mr. Lal - 202-353-8833
                                    arvind.lal@usdoj.gov
       For Defendant               JOSEPH E. BESHOURI, ESQUIRE
            Kenneth Simmons:       419 Seventh Street, N.W.
                                    Suite 201
                                    Washington, D.C.  20004
                                    202-842-0420
                                    jbeshouri@aol.com


                        Pages 1 through 119


                                    THERESA M. SORENSEN,
       OFFICIAL COURT REPORTER
```

United States District Court      theresams@erols.com      Theresa M. Sorensen, CVR-CM
For The District of Columbia      202-273-0745      Official Court Reporter

1232

United States of America v.                CR 00-157 &                    February 18, 2004
Kenneth Simmons, et al                     CR 02-045                      Volume 72

---

Page 94

1   Q.   Do you recognize this person?
2   A.   Yes, ma'am.
3   Q.   Who is that?
4   A.   Moe.
5   Q.   And do you know Moe's last name?
6   A.   Brown.
7   Q.   You know him as Moe Brown?
8   A.   Yes, ma'am.
9   Q.   Where do you know him from?
10  A.   Fifteenth Place.
11  Q.   Okay.  So far as you know, so far as you could tell
12  from your friendship with Keith McGill, did Keith McGill
13  ever hang around with him?
14  A.   I wouldn't say hang around.  They was from the same
15  community, but not hang with.
16  Q.   Okay.  Did you ever see him riding around with Moe
17  Brown?
18  A.   Maybe when we played them in basketball, you know, to
19  come down and -- maybe, you know, but I can't really say yes
20  and I can't say no.
21  Q.   How many times did you ever see Moe Brown and Keith
22  McGill together, would you say?
23  A.   As just those two?
24  Q.   Uh-huh.
25  A.   Oh, no, that's not what you see.  You're not going to

---

Page 95

1   see just him and Keith.  They didn't hang together; they
2   just was around the same neighborhood.
3   Q.   Okay.  And after Mr. McGill came home, were you still
4   living in Congress Park?
5   A.   Not living.  Hanging.
6   Q.   Okay.  And are you still there --
7   A.   Yes, ma'am.
8   Q.   -- most of the day today?
9   A.   Yes, ma'am.
10  Q.   As in right up to today?
11  A.   Yes, ma'am.
12  Q.   Did you ever see Keith McGill selling drugs at
13  Congress Park?
14  A.   No.  That's not -- that's our -- that's where we
15  from, Congress Park.
16  Q.   And did you -- in your time see others selling drugs
17  there?
18  A.   At Congress Park?
19  Q.   Sure.
20  A.   Yes, ma'am.
21  Q.   And Keith McGill was not one of them?
22  A.   No, ma'am.
23  Q.   Did you ever know Keith McGill to serve every one in
24  Congress Park?
25  A.   No, ma'am.

---

Page 96

1   Q.   Is that a true statement?  If someone made that
2   statement, would it be true?
3   A.   No, ma'am.
4        MR. LAL:  Objection.
5        THE COURT:  Sustained.
6        MS. D'ANTUONO:  All right.  I will reformulate my
7   question.
8   BY MS. D'ANTUONO:
9   Q.   Did you ever see that?
10  A.   No, ma'am.
11  Q.   All right.  And are you in Congress Park with
12  sufficient frequency that if it had occurred, --
13       MR. LAL:  Objection.
14  BY MS. D'ANTUONO:
15  Q.   -- you believe you would have seen it?
16       THE COURT:  Sustained.
17  BY MS. D'ANTUONO:
18  Q.   Did Mr. McGill drive new cars?
19  A.   It depends on what you call new.
20  Q.   Okay, tell us.  As in late model.  If it's 1996,
21  would he be driving a '96?
22       MR. LAL:  Objection to the leading.
23       THE COURT:  Sustained.
24  BY MS. D'ANTUONO:
25  Q.   I'm just trying to understand what your answer is.

---

Page 97

1        THE COURT:  Well, give him a chance to answer it.
2        MS. D'ANTUONO:  Okay.
3        THE WITNESS:  No, ma'am.  If -- like Keith had a
4   Maxima, but it wasn't the up-to-date Maxima.  He'll get an
5   older date and try to make it look up-to-date, so -- and
6   that ain't -- he did that with a truck.  Of course, it
7   didn't work with the truck.
8   BY MS. D'ANTUONO:
9   Q.   Okay.  What truck do you mean?
10  A.   The Jeep.
11  Q.   Okay.  Did you ever know him to have a Bronco?
12  A.   A brown coat?  Oh, a Bronco.
13  Q.   You're as bad as I am.  Bronco.
14  A.   Yes, ma'am.
15  Q.   Okay.  Do you -- well, was that a brand new vehicle?
16  A.   Nah, and that also didn't look like a brand new
17  vehicle.  I mean, he made a few adjustments to it, but it
18  didn't work.  It didn't improve the look.
19  Q.   Okay.  Do you happen to know what year it was?
20  A.   No, ma'am.
21  Q.   All right.
22  A.   We're talking about the Bronco or the Wrangler?
23  Q.   The Bronco.
24  A.   Oh, no, ma'am; I didn't know.
25  Q.   Do you remember what color it was?

---

25 (Pages 94 to 97)

United States District Court                theresams@erols.com           Theresa M. Sorensen, CVR-CM
For The District of Columbia                202-273-0745                   Official Court Reporter

1233

USA VS SIMMONS                                                    February 18, 2004

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .   CR Number 00-157
                               .   Group 2A
            Government,        .   CR Number 02-045
                               .
    v.                         .   Washington, D.C.
                               .   February 18, 2004
KENNETH SIMMONS,               .   2:00 p.m.
RONALD ALFRED, JAMES ALFRED    .
FRANKLIN SEEGERS,              .
DEON OLIVER, KEITH McGILL,     .
                               .
            Defendants.        .
                               .

. . . . . . . . . . . . . . .
            DAY 71, AFTERNOON SESSION
               TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE ROYCE C. LAMBERTH
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        AMY JEFFRESS, ESQUIRE
                           FLORENCE PAN, ESQUIRE
                           GLENN KIRSCHNER, ESQUIRE
                           ARVIND LAL, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           555-4th Street, N.W.
                           Washington, D. C.  20001
                           Ms. Jeffress - 202: 514-7624
                           amy.jeffress@usdoj.gov
                           Ms. Pan - 202: 353-3706
                           florence.pan@usdoj.gov
                           Mr. Kirschner l- 202: 514-7064
                           glenn.l.kirschner@usdoj.gov
                           Mr. Lal - 202: 353-8833
                           arvind.lal@usdoj.gov

For Defendant
    Kenneth Simmons:       JOSEPH E. BESHOURI, ESQUIRE
                           419 Seventh Street, N.W.
                           Suite 201
                           Washington, D. C.  20004
                           202: 842-0420
                           jbeshouri@aol.com



            SUSAN PAGE TYNER, OFFICIAL COURT REPORTER

Page 14

1  Q.  Okay.  And at this particular time -- and I am talking
2  about when Keith came home now --
3  A.  Um-hum.
4  Q.  -- from Maryland.
5  A.  Um-hum.
6  Q.  Did you know Keith to be involved in any drug activity
7  whatsoever?
8  A.  No, ma'am.
9  Q.  Did Keith McGill ever express to you any sentiments
10 about illegal activity once he came home?
11        MR. LAL:  Objection.
12        THE COURT:  Sustained.
13        MS. D'ANTUONO:  State of mind, Judge.
14        MR. LAL:  Objection.
15        THE COURT:  Sustained.
16 BY MS. D'ANTUONO:
17 Q.  If you know, how did Keith feel about ever going back to
18 jail?
19        MR. LAL:  Objection.
20        THE COURT:  Sustained.
21 BY MS. D'ANTUONO:
22 Q.  Did Keith McGill ever express to you any fear about
23 going back to jail?
24        MR. LAL:  Objection.
25        THE COURT:  Sustained.

Page 16

1  that at this particular time when he had come home from
2  Maryland?
3  A.  Nah.  Keith -- I really -- if Keith sought I was, you
4  know, still a knucklehead, I don't think he would have been
5  nowhere around me.  So nah, he was away from all of that.  I
6  mean just -- he wasn't no where near none of that.  Too
7  scared.  And I don't mean that in a disrespectful way to
8  say a brother's scared, but he wasn't trying to go back to
9  jail.
10 Q.  Did you ever know Keith McGill to deal in counterfeit
11 money?
12 A.  No, ma'am.  We're from Washington.  I don't -- you know,
13 that's T.V.  No, ma'am.
14 Q.  Do you know whether or not Keith ever gambled, Keith
15 McGill?
16 A.  Occasionally.  We got taught how to shoot celo.
17 Q.  I don't know what that is.
18 A.  Three dices.  We used three dices.
19 Q.  And do you know how to spell it?
20 A.  You got me looking like I don't know how to spell now.
21 No, ma'am, I don't know how to spell it.
22 Q.  Well, we will just spell it c-e-l-o, whether that is
23 right or wrong, celo, okay.
24 A.  Yes, ma'am.
25 Q.  And celo is three dice you said?

Page 15

1  BY MS. D'ANTUONO:
2  Q.  From the moment Keith McGill came home from jail until
3  the time he was arrested in this case, did you ever see him
4  or know him to participate in any illegal activity?
5  A.  No.  When he first came home he was entirely too
6  scared.
7  Q.  Okay.  And if you know, who got Keith McGill started in
8  a profession and occupation when he came home?
9  A.  I think it was his sister.  I think I remember Keith
10 telling me something about Trina helping him out as far as
11 the ice cream truck.  I don't know about until the ice cream
12 truck.
13 Q.  Did you ever know Keith McGill to go to Kevin Gray to
14 get back on his feet?
15 A.  Nah.
16 Q.  Did you ever know him to go to Frank Howard to get back
17 on his feet?
18 A.  Nah.  There's nothing that Frank Howard or Kevin Gray
19 can do for Keith when he came home.
20 Q.  And did you ever know him to go to Quincy Thomas to get
21 back on his feet?
22 A.  Quincy is another Frog.  No, ma'am, to answer your
23 question.  No, ma'am.
24 Q.  Was Keith McGill, so far as you could see it, or
25 perceive it, or know it, close enough to any of them to do

Page 17

1  A.  Yes, ma'am.
2  Q.  Okay.
3  A.  And it was just fun.  We learned it, and it was, you
4  know, something to do.  Everybody know how to shoot two dice,
5  so even people that don't gamble would shoot celo.  It was
6  something new, you know, and I liked it personally.
7  Q.  Did you ever know him to gamble at a high level?
8  A.  No, ma'am.  With what?
9  Q.  Did you ever smack Keith McGill?
10 A.  No, ma'am.
11 Q.  Did you ever have any reason to smack Keith McGill?
12 A.  None at all.
13 Q.  Did you and Keith McGill ever have any beefs, or
14 controversies, or problems that would cause you to smack
15 him?
16 A.  No, ma'am.
17 Q.  Did you ever have any beefs, or controversies, or
18 problems that would cause him to want to kill you?
19 A.  No, ma'am.
20 Q.  Did you ever have any beefs, or controversies, or
21 problems that would cause him to want to hire someone to kill
22 you?
23 A.  No, ma'am.
24        MS. D'ANTUONO:  Could we see OV without the name,
25 please.

5 (Pages 14 to 17)

Case 1:05-cr-00100-RWR   Document 1228-20   Filed 02/29/08   Page 6 of 11

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 245 of 500

CR 00-157 &
CR 02-045

February 18, 2004
Volume 72

Page 94

1  Q.   Do you recognize this person?
2  A.   Yes, ma'am.
3  Q.   Who is that?
4  A.   Moe.
5  Q.   And do you know Moe's last name?
6  A.   Brown.
7  Q.   You know him as Moe Brown?
8  A.   Yes, ma'am.
9  Q.   Where do you know him from?
10 A.   Fifteenth Place.
11 Q.   Okay.  So far as you know, so far as you could tell
12 from your friendship with Keith McGill, did Keith McGill
13 ever hang around with him?
14 A.   I wouldn't say hang around.  They was from the same
15 community, but not hang with.
16 Q.   Okay.  Did you ever see him riding around with Moe
17 Brown?
18 A.   Maybe when we played them in basketball, you know, to
19 come down and -- maybe, you know, but I can't really say yes
20 and I can't say no.
21 Q.   How many times did you ever see Moe Brown and Keith
22 McGill together, would you say?
23 A.   As just those two?
24 Q.   Uh-huh.
25 A.   Oh, no, that's not what you see.  You're not going to

Page 95

1  see just him and Keith.  They didn't hang together; they
2  just was around the same neighborhood.
3  Q.   Okay.  And after Mr. McGill came home, were you still
4  living in Congress Park?
5  A.   Not living.  Hanging.
6  Q.   Okay.  And are you still there --
7  A.   Yes, ma'am.
8  Q.   -- most of the day today?
9  A.   Yes, ma'am.
10 Q.   As in right up to today?
11 A.   Yes, ma'am.
12 Q.   Did you ever see Keith McGill selling drugs at
13 Congress Park?
14 A.   No.  That's not -- that's our -- that's where we
15 from, Congress Park.
16 Q.   And did you -- in your time see others selling drugs
17 there?
18 A.   At Congress Park?
19 Q.   Sure.
20 A.   Yes, ma'am.
21 Q.   And Keith McGill was not one of them?
22 A.   No, ma'am.
23 Q.   Did you ever know Keith McGill to serve every one in
24 Congress Park?
25 A.   No, ma'am.

Page 96

1  Q.   Is that a true statement?  If someone made that
2  statement, would it be true?
3  A.   No, ma'am.
4  MR. LAL:  Objection.
5  THE COURT:  Sustained.
6  MS. D'ANTUONO:  All right.  I will reformulate my
7  question.
8  BY MS. D'ANTUONO:
9  Q.   Did you ever see that?
10 A.   No, ma'am.
11 Q.   All right.  And are you in Congress Park with
12 sufficient frequency that if it had occurred, --
13 MR. LAL:  Objection.
14 BY MS. D'ANTUONO:
15 Q.   -- you believe you would have seen it?
16 THE COURT:  Sustained.
17 BY MS. D'ANTUONO:
18 Q.   Did Mr. McGill drive new cars?
19 A.   It depends on what you call new.
20 Q.   Okay, tell us.  As in late model.  If it's 1996,
21 would he be driving a '96?
22 MR. LAL:  Objection to the leading.
23 THE COURT:  Sustained.
24 BY MS. D'ANTUONO:
25 Q.   I'm just trying to understand what your answer is.

Page 97

1  THE COURT:  Well, give him a chance to answer it.
2  MS. D'ANTUONO:  Okay.
3  THE WITNESS:  No, ma'am.  If -- like Keith had a
4  Maxima, but it wasn't the up-to-date Maxima.  He'll get an
5  older date and try to make it look up-to-date, so -- and
6  that ain't -- he did that with a truck.  Of course, it
7  didn't work with the truck.
8  BY MS. D'ANTUONO:
9  Q.   Okay.  What truck do you mean?
10 A.   The Jeep.
11 Q.   Okay.  Did you ever know him to have a Bronco?
12 A.   A brown coat?  Oh, a Bronco.
13 Q.   You're as bad as I am.  Bronco.
14 A.   Yes, ma'am.
15 Q.   Okay.  Do you -- well, was that a brand new vehicle?
16 A.   Nah, and that also didn't look like a brand new
17 vehicle.  I mean, he made a few adjustments to it, but it
18 didn't work.  It didn't improve the look.
19 Q.   Okay.  Do you happen to know what year it was?
20 A.   No, ma'am.
21 Q.   All right.
22 A.   We're talking about the Bronco or the Wrangler?
23 Q.   The Bronco.
24 A.   Oh, no, ma'am; I didn't know.
25 Q.   Do you remember what color it was?

25 (Pages 94 to 97)

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen, CVR-CM
Official Court Reporter

1236

United States of America v.
Kenneth Simmons, et al

CR 00-157 &
CR 02-045

February 19, 2004
Volume 73

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        :   CR Number 00-157
                                 :   Group 2A
                Government,       :   CR Number 02-045
                                 :
      v.                         :   Washington, D.C.
                                 :   Thursday, February 19, 2004
KENNETH SIMMONS,                 :   9:41 a.m.
RONALD ALFRED, JAMES ALFRED,:
FRANKLIN SEEGERS,                :
DEON OLIVER, KEITH McGILL,       :
                                 :
                Defendants.      :
                                 :
- - - - - - - - - - - - - - - x


DAY 73 - AM SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:
For the Government:         FLORENCE PAN, ESQUIRE
                           GLENN KIRSCHNER, ESQUIRE
                           ARVIND LAL, ESQUIRE
                           ASSISTANT UNITED STATES ATTORNEYS
                           U.S. ATTORNEY'S OFFICE
                           555-4th Street, N.W.
                           Washington, D.C.  20001
                           Ms. Pan - 202-353-3706
                           florence.pan@usdoj.gov
                           Mr. Kirschner - 202-514-7064
                           glenn.l.kirschner@usdoj.gov
                           Mr. Lal - 202-353-8833
                           arvind.lal@usdoj.gov
For Defendant              JOSEPH E. BESHOURI, ESQUIRE
  Kenneth Simmons:         419 Seventh Street, N.W.
                           Suite 201
                           Washington, D.C.  20004
                           202-842-0420
                           jbeshouri@aol.com


Pages 1 through 140


                                 THERESA M. SORENSEN,
OFFICIAL COURT REPORTER

United States District Court
For The District of Columbia

theresams@erols.com
202-273-0745

Theresa M. Sorensen
Official Court Reporter

United States of America v.                         CR 00-157 &                    February 19, 2004
Kenneth Simmons, et al                       CR 02-045                          Volume 73

Page 62

1  Q.   People -- part of being a human being, people lie to
2  each other, correct?
3  A.   I appreciate you saying that.  Yes, sir.
4  Q.   All right.  So the word on the street doesn't
5  necessarily come with a stamp of credibility.
6  A.   I agree, yes, sir.
7  Q.   Sir, we have talked about a group of different --
8  lots of names of individuals have been mentioned throughout
9  the course of your testimony, and you have talked about
10 yourself having engaged in crime and other people having
11 engaged in crime.  Have you ever testified against any of
12 those individuals?
13 A.   No, sir.
14 Q.   Have you ever broken your code of silence to provide
15 truthful information to the police or to the prosecutors to
16 bring the wrongdoers in our society to justice?
17 A.   Well, the prosecutors or the police never called me
18 in to bring anything on the wrongdoers of society.
19 Q.   Did you ever pick up the phone and say, "I have
20 information about this crime"?  Did you ever do that?
21 A.   No, sir.
22 Q.   Part of -- strike that.
23      Certainly, sir, with respect -- you testified
24 previously that you never saw Keith McGill selling on 15th
25 Place or in Congress Park.

Page 63

1  A.   Yes, but I can assume that in his younger days that,
2  you know, because of everybody.  Yes, sir, I testified to
3  that.
4  Q.   Certainly, though --
5      MS. D'ANTUONO:  I object to the compound question.
6  I object to its compound nature.
7      THE COURT:  You can break it down.
8  BY MR. LAL:
9  Q.   My question was that -- my question initially was
10 that you had never seen Keith McGill selling on 15th Place,
11 and if I understand your testimony, or, excuse me, your
12 answer, you indicated that you had not, but you were
13 assuming that he was.
14 A.   Yes, sir.  You're right.
15 Q.   Does that same hold true for Congress Park?
16 A.   As far as Keith in Congress Park?
17 Q.   Yes, sir.
18 A.   No, sir.  He has never sold at Congress Park.
19 Q.   At least that you observed.
20 A.   Well, no.  He had to hang in Congress Park in order
21 to sell in Congress Park, and he didn't hang in Congress
22 Park.
23 Q.   Congress Park, as we talked earlier this afternoon,
24 extends from approximately Alabama Avenue down a couple
25 blocks past Savannah -- what's the street below Savannah?

Page 64

1  Alabama, Savannah -- what's the street below Savannah?
2  A.   What's that?  Fourteenth?  Fourteenth Place?
3  Q.   No, 14th Place runs --
4  A.   Oh, you're talking about Mississippi.
5  Q.   Mississippi.
6  A.   Mississippi Avenue.
7  Q.   And Congress Park runs from -- pretty much from
8  Alabama down to Mississippi, right?
9  A.   Well, you have to make a left off of Alabama, and
10 then you're in Congress Park, yes.
11 Q.   Exactly.  Exactly.  But I'm talking about the
12 north-south border.  And then Congress Park runs from 14th
13 Place or maybe up to 15th Place over to what?  Eleventh or
14 12th?
15 A.   Fifteenth Street, not Place.
16 Q.   Fifteenth Street.  My apologies.
17 A.   Yes, sir.
18 Q.   And so there are parts of -- Congress Park is a big
19 area and you wouldn't necessarily know who was outside
20 everywhere in Congress Park; fair to say?
21 A.   Congress Park is a 471-unit apartment complex, and
22 yes, sir, I will.  It's only three places that people be --
23 the circle, the alley, and 14th -- and Keith didn't hang
24 anywhere on either one of them.
25 Q.   The alley meaning the boat alley?

Page 65

1  A.   You've been around there before.
2      (Laughter.)
3      THE WITNESS:  Yes, sir.  But I wasn't speaking --
4  well, that's the whole alley, yes, sir.
5  BY MR. LAL:
6  Q.   Okay.  Getting back to -- certainly during your, to
7  use, and I don't mean any disrespect, --
8  A.   Yes, sir.
9  Q.   -- but to use your phrase, your knucklehead days,
10 certainly during that time period, had you seen Keith McGill
11 telling drugs, you wouldn't have told the police about it.
12 A.   Not during them days, no, sir.
13 Q.   And today, if you had seen Keith McGill out there,
14 you wouldn't be telling us that.
15 A.   If I was in here, if the government had asked me to
16 come in here, subpoenaed me to come here, I would tell the
17 truth.  Of course, I must admit that I would have tried to
18 get out of coming in here, but I would have told the truth,
19 yes, sir.
20 Q.   You indicated that you had never had a beef or a
21 dispute with Keith McGill out on the street.
22 A.   Never.
23 Q.   You would agree, however, that friends -- people who
24 are friends on the street can, in fact, develop antagonisms
25 towards each other.

17 (Pages 62 to 65)

United States District Court        theresams@erols.com        Theresa M. Sorensen, CVR-CM
For The District of Columbia        202-273-0745        Official Court Reporter

1288

USCA Case #11-3031      Document #1445852 ·      Filed: 07/10/2013      Page 248 of 500

| United States of America v. | CR 00-157 & | February 19, 2004 |
|---|---|---|
| Kenneth Simmons, et al | CR 02-045 | Volume 73 |

**Page 70**

1  know, as a defense tactic to him not being, you know, like
2  that, but, you know.
3  Q.   You would agree that that kind of a rumor on an
4  individual is something that's serious in the streets.
5  A.   Yes, sir.
6  Q.   In fact, the mere existence of the rumor, whether
7  it's true or not, is sufficient to get the person named in
8  the rumor killed.
9  A.   That's not the way the streets work, no, sir.  People
10  don't want no part of another person's problem.  What
11  they'll do is just not deal with them at all.
12  Q.   So is it your testimony, then, that an individual who
13  may be suspected of cooperating with the police, and assume
14  for the purposes of this question, sir, that we're talking
15  about criminal activity, --
16  A.   Yes, sir.
17  Q.   -- that the people who he was involved with in that
18  criminal activity would just ignore him and not try to do
19  anything to him on the streets?  Is that your testimony?
20  A.   The first steps would be to get away from him, never,
21  ever be around him or anything.  Now, some people have crazy
22  ways of thinking, you know?  But if this man is known as
23  hot, then there's nothing -- if he's hot and from a certain
24  -- and being around a certain group, then that's group --
25  there's nothing that can happen to Keith because that group

**Page 71**

1  is getting charged with that.  If anything happened to him,
2  then that group will get charged with that.  So what they
3  would do is push him away, back up off him, no conversation
4  no anything.
5  Q.   Keith McGill, however, did not, I believe you
6  indicated a few moments ago, discuss this with you in
7  specifics other than perhaps mentioning it to you.
8  A.   Not specifics, no, sir.
9  Q.   You would agree that this is, frankly, a sufficiently
10  serious matter that if it was going to be discussed, it
11  would be discussed with somebody who was a close friend.
12  A.   Well, it wasn't that serious to Keith because he knew
13  who he was and he knew, you know, that that was false.
14  Q.   Whether he knew it was false or not, you would agree
15  that it is a sufficiently serious subject that it warrants
16  discussion with people who you can trust.
17  A.   Yes.
18      (Brief pause in proceedings.)
19      MR. LAL:  Your Honor, I'm trying to figure out
20  whether I am two minutes away or ten minutes away.  If I
21  could take a --
22      THE COURT:  We will take a recess and maybe you
23  will be two minutes away.
24      (Whereupon, a short recess was taken.)
25      THE COURT:  All right.  Mr. Lal, you may proceed.

**Page 72**

1      MR. LAL:  Thank you, Your Honor.
2  BY MR. LAL:
3  Q.   Mr. Ball, before we get back to the point we were
4  discussing, we were talking about -- and again, I'll use
5  your phrase -- your knucklehead days, --
6  A.   Yes.
7  Q.   -- when did those days stop, sir?
8  A.   I'd say maybe a little over five years, maybe six
9  years.
10  Q.   We're in February 2004, so 1999, 1998?
11      MR. DANIEL:  Objection, Your Honor.
12      THE COURT:  Overruled.
13      THE WITNESS:  Five or six years, sir.
14  BY MR. LAL:
15  Q.   Okay.  You would agree that five or six years ago
16  would be 1988, 1999, that ball park?
17  A.   Ninety-nine.
18  Q.   Okay.  We were talking before the break about the --
19  about the fact that the discussion of whether somebody was
20  hot would be a serious subject that one would only discuss
21  with close friends.  I would like you to listen, sir, to
22  what is MW3, the last call.
23      MS. D'ANTUONO:  Judge, may we approach for a
24  second?
25      THE COURT:  Yes.

**Page 73**

1      (Whereupon, a discussion was held at the bench on the
2  record.)
3      THE COURT:  What's the question you're going to
4  ask?
5      MR. LAL:  I'm going to have him listen to --
6      THE COURT:  I know.  What are you going to ask?
7      MR. LAL:  Just to confirm that Keith was
8  discussing the subject with Frank and with Melvin Wallace.
9      THE COURT:  He who?
10      MR. LAL:  That Keith McGill -- I'm going to get
11  him to identify the voices, and that Keith brings up the
12  subject with Melvin and with Frank.
13      THE COURT:  He's not a party to the call.
14      MR. LAL:  He is not a party.
15      THE COURT:  The objection is sustained.
16      MR. LAL:  Okay.
17      (End of discussion at the bench.)
18      THE COURT:  You don't need the headsets.
19      MR. LAL:  Your Honor, that's all the questions I
20  have.  Thank you.
21          CROSS-EXAMINATION
22  BY MR. DANIEL:
23  Q.   Good morning, Mr. Ball.  I'm Idus Daniel, I represent
24  Ronald Alfred.
25  A.   Good morning.

19 (Pages 70 to 73)

United States District Court          theresams@erols.com          Theresa M. Sorensen, CVR-CM
For The District of Columbia          202-273-0745                 Official Court Reporter

1239

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 249 of 500

United States of America v.                    CR 00-157 &                    February 19, 2004
Kenneth Simmons, et al                         CR 02-045                      Volume 73

Page 86

1   A.   Yes.
2   Q.   When were you speaking of?  What were you speaking of
3   at that time?
4   A.   Well, I have shaken his hand more than once, but when
5   I was speaking of that time was when -- this was after my
6   little brother had died.  Up Crystal Skating Rink at the
7   light in traffic, he jumped out of his car and came and said
8   -- but I seen him, and before he got to me, I was like, "I
9   already know, man.  I already know."  He was like, "Man, you
10  do know that's some bull," you know.
11  Q.   I don't want you telling what he said.
12  A.   Oh.
13  Q.   What did you say?
14  A.   You have to -- you have to, you know, tell me what I
15  can and can't say.  I don't want to be disrespectful.
16  Q.   Well, I'm asking you what you said when you saw Mr.
17  Alfred on this occasion.
18  A.   Well, it was traffic, so I was like, "I already know,
19  man.  You ain't even got to get into that, man.  I already
20  know."
21  Q.   And what is it that you already knew?
22       MR. LAL:  Objection.
23       THE COURT:  Sustained.
24  BY MR. DANIEL:
25  Q.   Were you riding around with Kevin Gray and others

Page 87

1   trying to do something to Mr. Alfred after Kairi's death?
2   A.   No, sir.
3   Q.   Did you ever ride around with Kevin Gray at any time
4   looking for Ronald Alfred?
5   A.   No, sir.
6   Q.   How about Froggy?  Ride around with Froggy?
7   A.   No, sir.  Well, I rode with Froggy before, but not
8   looking for Boo.
9   Q.   You also testified about the word "Omerta."
10  A.   Yes, sir.
11  Q.   And there was a question about it's dangerous for
12  people to come forward?  Do you remember that?
13  A.   Yes, sir.
14  Q.   And also you made some mention of the police, how
15  they come to the neighborhoods and it puts people in danger?
16  A.   Yes, sir.
17  Q.   Can you explain that?
18  A.   They ride through our neighborhood and in order to
19  get another witness, they tell them, the person that they're
20  talking to that, "Well, you know -- say for instance me --
21  "You know Antwaun is, you know, cooperating with us," and
22  then that person go spread it everywhere.
23  Q.   And when you say that, when you say they -- that the
24  police may say that you are cooperating, for instance, that
25  would be a falsehood --

Page 88

1   A.   Yes, sir.
2   Q.   -- to get someone else to testify?
3   A.   Well, if I say that, I wouldn't be -- that wouldn't
4   be completely the truth because I don't know if that's why
5   they're doing it, to get other people to testify, but, you
6   know, I would think they're doing it just to put it out
7   there because they don't know if this person will testify,
8   they just want it out there for the next person to get in
9   trouble, and they say that, "Well, you know, Antwaun is
10  testifying for us," you know.
11  Q.   Mr. Lal mentioned in his cross-examination that when
12  someone comes to court and testifies, it gives it a stamp of
13  credibility; is that correct?  Do you remember that?
14  A.   Yes, sir.
15  Q.   Does that mean that if they were here, that they
16  would tell the truth in court?
17       MR. LAL:  Objection.
18       THE COURT:  Sustained.
19  BY MR. DANIEL:
20  Q.   Well, you mentioned -- you had mentioned something
21  about your mom and her testimony, right?
22  A.   Yes, sir.
23  Q.   And that her testimony conflicts with your testimony;
24  is that correct?
25  A.   Yes, sir.

Page 89

1   Q.   Do you know why there is a conflict in your
2   testimony?
3   A.   Yes, I do.
4   Q.   Can you tell us that?
5   A.   My moms had got into -- since she been home, she got
6   into a little trouble and they threatened to take her
7   freedom and also my freedom, you know, and this is what my
8   moms told me, and, you know, she love us, you know?  Of
9   course, I don't agree with it, but, you know, she did what
10  she had to do, I guess, for her kids.  And that question
11  also made me uncomfortable.  Remember, this is my mother,
12  man.
13  Q.   You mentioned that you at one time were selling
14  shake.  You said that was like five or six years ago?
15  A.   No.  That was longer than that.
16  Q.   Longer than that?
17  A.   Yes.
18  Q.   Okay.  There was some mention of whether -- the most
19  recent question asked by Mr. Lal was how long ago when you
20  stopped dealing.
21  A.   Right.
22  Q.   You said like five or six years ago?
23  A.   Yes, sir.
24  Q.   It could have been six, could have been seven, maybe;
25  do you know exactly?

23 (Pages 86 to 89)

United States of America v.                    CR 00-157 &                    February 19, 2004
Kenneth Simmons, et al                          CR 02-045                          Volume 73

---

Page 90

1  A.   Well, I would say it's closer to six.
2  Q.   Six years?
3  A.   Five, six years, yes, sir.
4       MR. DANIEL:  The Court's indulgence, Your Honor.
5  (Brief pause in proceedings.)
6       MR. DANIEL:  I have nothing further, Judge.
7       THE COURT:  Any other counsel?
8       MR. WOLL:  Yes, Your Honor.
9            CROSS-EXAMINATION
10 BY MR. WOLL:
11 Q.   Good morning, Mr. Ball.
12 A.   Good morning.
13 Q.   My name is David Woll and I represent James Alfred.
14      I believe you knew Bam; is that correct?
15 A.   Yes, sir.
16 Q.   And he's the gentleman seated at the far right at
17 counsel table there.  Is that the person you know as Bam?
18 A.   Yes, sir.
19 Q.   Is it my understanding on cross-examination that you
20 knew him, but you didn't really know him very well?  Is that
21 a fair statement?
22 A.   Yes, sir.
23 Q.   And where was it that you would sometimes see him; do
24 you recall?
25 A.   Crystal Skating Rink.

---

Page 91

1  Q.   Okay.
2  A.   Or just passing by or something, you know.
3  Q.   Now, you were asked testimony -- or you were asked
4  questions on cross-examination by Mr. Lal concerning James
5  Alfred and his alleged involvement in your brother's
6  killing, correct?
7  A.   Yes.
8  Q.   Did you have any information of that, anything as he
9  stated to you or asked you in reference to James Alfred?
10 A.   Could you --
11 Q.   Yes.  Okay.  I believe his question was that James
12 Alfred -- did you know that James Alfred was allegedly or
13 was involved in the killing of your brother Carey Ball.  Do
14 you remember that question?
15 A.   Kairi.  And no, sir.  Yes, sir, I remember the
16 question.
17 Q.   And to your knowledge, did you have any information
18 or knowledge that he was involved in it?
19 A.   No, sir.
20      MR. WOLL:  Thank you, Your Honor.  That's all the
21 questions I have.
22      THE COURT:  All right.
23      Ms. D'Antuono?  Oh, I'm sorry.  All right.
24           CROSS-EXAMINATION
25 BY MR. BERNARD:

---

Page 92

1  Q.   Mr. Ball, I'm not going to ask you too much.  I just
2  want to get your explanation to a couple of the yes and nos
3  that you gave.
4       You wore a shirt yesterday and you brought it with
5  you today.
6  A.   Yes, sir.
7  Q.   Okay.  Explain what you have to explain about that
8  shirt, please?
9  A.   Well, this shirt really -- I'm patronizing a guy that
10 came up with a good idea to give us a voice because we have
11 no voice.  If we voice our opinion, we get, you know,
12 charged with all types of craziness.  So, I mean -- and the
13 shirt, I respect, and I have -- the reason why I wore this,
14 I'm not an unintelligent person, and that's the reason why I
15 wore this shirt, because of the impression that they think
16 we have -- that they think we have on people that testify in
17 court cases, and it's not that, you know, we just can't
18 fathom a person testifying; it's just that, like I said to
19 the prosecutor, that people that survive or for half of
20 their life do the wrong thing, you know, and then when get
21 caught for doing that thing decide that they want to come in
22 and lie or what have you, with all due respect to the
23 prosecution or whatever, lie and do whatever they have to do
24 to get out the situation that them themselves put theirself
25 into.  I'm a Muslim and I believe that no man bears the

---

Page 93

1  burden of another man's soul; so if this person under his
2  own individuality get himself in trouble, no other man
3  should bear the burden of his wrong mistakes.  That's why
4  I"m in favor of -- and Omerta, you gave me some knowledge,
5  because on a couple of my shirts, it has "honor, respect,
6  dignity" and stuff like that.  When he told me that it was
7  -- and, of course, yes, sir, I knew about the code of
8  silence thing, but that's not the part -- I like the way it
9  looks.  I have a whole sweatsuit.  That's why I got this,
10 because I understand that my code of silence is broke, you
11 know, because of who I am now, and I had to be who I was in
12 order to become who I am.
13 Q.   Now, Mr. Ball, do you have any gripe, when someone
14 sees a crime and is subpoenaed to appear, for them to appear
15 and tell the truth?
16 A.   When you say gripe, you --
17 Q.   Well, that's not what you're against, is it?
18 A.   No, sir.  No, sir.
19 Q.   I mean, you were subpoenaed to appear before a grand
20 jury once upon a time, right?
21 A.   Yes, sir.
22 Q.   And I take it it was the prosecutors, --
23 A.   Yes, sir.
24 Q.   -- not the defense that subpoenaed you.  Did you go?
25 A.   Yes, sir.

24 (Pages 90 to 93)

---

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 251 of 500

# EXHIBIT   U

151

# CONGRESS PARK CREW *

Lil Bitz — MARGO — Sheek — Moochie — Marche — Augie — Tarsha — Kee-Kee

Bunga — Ant — Cuma — Amon — bunty — Jazz — Dazz — Phil — Geeka

Lil Kim — Tom — Yonnie — Monie — Kia — Nita — Mary — Big Apple — Mia

Joe-Joe — K-bey — L.T — Monya — Taneal — T.T. — REGG — Brian — Pig

Kisha P — Janetta — Nita — Crazy Augie — 69 — T — Precious — DUCK — Dook

Curto — John — Tony — Tone — Lil Bobby — Don — Dookes — wop — Doo Doo

Daysha — Monica — Tiffany — Darrice — Ebony — Berehelle — Tiffany

Season — Marco — Malik — Dean — Lawson — Boobie — Jamal — Lil TC

Black — Harry — Milton — Steve — Taran — Quinton — Biracooda — Taneal

J.T — Joe-Joe — Tyb — D.C. — Daniel — Keith — Kevin — Lil Kevin — Sad

Raydra — K.C. — Lil DenBo — Debo — Jonny B — Jhone — Gerald

David — Boogie — Oomeg — Ron — Avery — Rell Dog — Kevin

Doe — D-Nice — Nook — Doe-Doe — Ukia — Pig — Bart — Dip

Redeye — Illbey — Funnion — Jessy — Lil Marcus — Kayron

Keviette — Kimma — Chris — Kale — TRUCK RIP — Reesy RIP — Tweety RIP

RIP Shalonda — Meat-ball RIP — Head RIP — Hibey RIP — Bruce —

Sharice — L-dog — tony — Paul — Radio — S — Wayne — Smoke

Benjamin — Candyman — Deke — Rob — Janetta — Calaway

Sharelle — Sharelle — Nia — Qoitta — Shamar — Lampatore

1243

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 253 of 500

# EXHIBIT   V

1

```
 1                        SUPERIOR COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    - - - - - - - - - - - - - - -x
                                   :
 4    UNITED STATES OF AMERICA     :
                                   :
 5    VS.                          :    Case No. F-7920-02
                                   :
 6    DOMINIC SAMUELS              :
                                   :
 7    - - - - - - - - - - - - - - -x

 8                              Grand Jury No. May 2
                                555 4th Street, N.W.
 9                              Washington, D.C.  20001

10
                                June 18, 2003
11

12         The testimony of ANTWAUN BALL was taken in the

13    presence of a full quorum of the Grand Jury, commencing at

14    2:55 p.m., before:

15

16         SETH WAXMAN
           Assistant United States Attorney
17

18

19

20

21

22

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1245

Case 1:05-cr-00100-RWR   Document 1228-22   Filed 02/29/08   Page 3 of 17
USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 255 of 500

25

1   cousin, Baby Kirie (ph.) is what we call him --

2        Q.   Do you know his real name?

3        A.   Kirie Kelly Brook -- excuse me.

4        Q.   And you call, and you call him Baby Kai (ph.)?

5        A.   Uh-hum.

6        Q.   Is that yes?

7        A.   Yes.

8        Q.   And why do you call him Baby Kai?

9        A.   Because he was named after my little brother that

10   passed.

11       Q.   Okay.  Your little brother has since -- has passed

12   away?

13       A.   Yes.

14       Q.   Sorry to hear that.

15       A.   Uh-hum.

16       Q.   And his name was --

17       A.   Kirie also.

18       Q.   So Baby Kai was named after your brother?

19       A.   Right.

20       Q.   Okay, go ahead.

21       A.   And he was -- Kirie was talking to Faison (ph.) who

22   is also a detective.

23       Q.   Is that Bruce Faison?

24       A.   Yes.

25       Q.   Okay.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1246

1      A.   But he's also a friend of everybody's, you know.

2    You know, everybody can talk to him or whatever.   And so I

3    waved -- had my hand up to tell Baby Kirie to come here, and

4    Faison saw me.   So I told Faison, point at Baby Kirie and tell

5    him to come here, and Faison did, and Baby Kai walked over to

6    me.   And my question was, because of the situation, did Don do

7    that?   That's what I asked him, you know.   And he said, no.   I

8    said, do not lie to me.   You know what I'm saying?   And he

9    said, no, man, it was a short stocky dude with a mask on.   And

10   you know, this is my little cuz so -- and I ain't the police,

11   he had no reason to lie to me so I left it alone.   I was like,

12   all right, you know, so --

13      Q.   Let me ask you.   Can you describe Dominic Samuels'

14   physical build?

15      A.   Tall, skinny.

16      Q.   Okay.   And I don't know what you can about Dominic,

17   but one thing is, would it be difficult to confuse him with a

18   short stocky guy?   Is that right?

19      A.   It would be difficult to confuse him with anybody

20   because he's from the block.

21      Q.   Okay.

22      A.   Whether he had on a mask or not, he -- you know.

23      Q.   In other words, let me ask you.   If you saw Dominic

24   Samuels walking down the street and you had something covering

25   his face, would you still know him?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1247

1     A.   Yeah, he got this little walk with him.  Yes, sir.

2     Q.   Okay.  And so you had this conversation with Kirie

3  down near the rental office.  Is that right?

4     A.   Yes.

5     Q.   And that's where -- well, let me ask you.  Did you

6  see Black down at the rental office?

7     A.   Yes, when he came out, he evidently ran into the

8  rental office, and when he came out, he was on a stretcher.

9     Q.   Okay.  And did you see the ambulance or police take

10  him away?

11     A.   Yes.

12     Q.   Okay.  And then after Black was taken away, this is

13  the point in time you had the conversation with Kirie?

14     A.   No, Black.  When Black came out on the stretcher,

15  that's when I got Baby -- that's when Faison pointed -- Baby

16  Kirie and pointed to me, so he wasn't able -- he may have said

17  a few words to Black, like, man, you all right, and then came

18  to mé, and then they put Black in the ambulance.

19     Q.   And it's at that point in time that you have the

20  conversation with Kirie?

21     A.   Yes.

22     Q.   After that time, was there a time on Malcolm X

23  Boulevard that you had a conversation with Kirie as well?

24     A.   Malcolm X School.

25     Q.   Oh, the school?

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1248

1

```
 1                    SUPERIOR COURT
                FOR THE DISTRICT OF COLUMBIA
 2
 3     - - - - - - - - - - - - - -x
                                   :
 4     UNITED STATES OF AMERICA    :
                                   :
 5     VS.                         :   Case No. F-7920-02
                                   :
 6     DOMINIC SAMUELS             :
                                   :
 7     - - - - - - - - - - - - - -x

 8

 9

10                              Grand Jury No. March 2
                                555 4th Street, N.W.
11                              Washington, D.C.  20001

12
                                April 14, 2003
13

14          The testimony of JOSEPH JONES was taken in the

15     presence of a full quorum of the Grand Jury, commencing at

16     2:30 p.m., before:

17

18          SETH WAXMAN
            Assistant United States Attorney
19

20

21

22

23

24

25
```

CASE NO. 05-100 (RWR) Exhib
No. 1227A
1249
US v. ANTWUAN BALL, ET Al

1   13th Place?

2        A.   Not far at all.  Like two minutes away.

3        Q.   Okay.  Two minutes walking?

4        A.   Yeah.

5        Q.   Okay.  So, you were up at Savannah Place at a

6   meeting, you said?

7        A.   Uh-huh.

8        Q.   Is that yes?

9        A.   Yes, sir.

10        Q.   That's okay.  And tell us what happened as you're at

11   this meeting?

12        A.   Well, after the meeting was over, my buddy Antoine

13   (phonetic sp.), that's Bird's brother, he was telling me that

14   Black had got shot.

15        Q.   Okay.  So, Antoine's last name is --

16        A.   Ball.

17        Q.   So, Antoine Ball, he came to Savannah Place?

18        A.   Yes, sir.

19        Q.   Savannah Street, rather?

20        A.   Yes, sir.

21        Q.   And he told you what?  What did he tell you?

22        A.   That Black had just got shot.

23        Q.   Did Antoine Ball see Black get shot?

24        A.   Uh-uh.

25        Q.   Is that no?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1250

1      A.   No, sir.

2      Q.   Okay.  And so, once he told you that, what happened?

3      A.   He was, he -- I was like what happened?  He was like

4  his cousin Kairi, Kairi Kellibrew told -- he, he had asked

5  Kairi did Don do it?  Because he knew about the altercation

6  they had.  And he was like no, it was short dude with a mask

7  on.  Kairi said this to Antoine and he told me.

8      Q.   Okay.  So, now it's your testimony that when

9  Antoine Ball came up to the Savannah Street location and told

10  you that Black had been shot, that -- so far, that's what's

11  happened, correct?

12      A.   Yes, sir.

13      Q.   And then after that, Antoine told you that he asked

14  Kairi if Dominic shot Black?

15      A.   Yes, sir.

16      Q.   And that Kairi responded to Antoine Ball -- what was

17  Kairi's response?

18      A.   That it was a short, a short guy with a mask on.

19      Q.   Okay.  And did -- who -- did Antoine Ball tell you

20  who was present when he had that conversation with

21  Kairi Kellibrew?

22      A.   No.  I think he pulled him to the side.  I think --

23  while the police was right there, he told me this on 13th

24  Street where they found Black at.

25      Q.   Okay.  So, you're saying that Antoine Ball pulled

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1251

1  Kairi Kellibrew to the side on 13th Street?

2       A.    Yeah.  While the police was right there.

3       Q.    And, and Kairi said to Antoine Ball, at that point,

4  it was a short -- I'm sorry, what --

5       A.    A short guy with a mask.

6       Q.    Short guy with a mask?

7       A.    Uh-huh.

8       Q.    Is that yes?

9       A.    Yes.

10      Q.    And in the last, say, two months or since the new

11 year, 2003, how often do you think you see Antoine Ball?

12      A.    Every day.

13      Q.    Okay.  And Amon Ball is his brother, is that right?

14      A.    Yeah.  We all work together.

15      Q.    Okay.  You all work at that 1313 Congress Street

16 location?

17      A.    Yes, sir.

18      Q.    Okay.  And have you all discussed the conversation

19 that Antoine Ball had with Kairi Kellibrew?

20      A.    No.  I mean, me and Antoine -- you know, he was

21 like -- because it's a rumor that he supposed to be a making a

22 statement against Don or whatever.  He just was telling me

23 that he don't know why that he lying on him or whatever.  But,

24 he, he told him face to face that it was guy with -- a short

25 guy with a mask on.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1252

1

```
1                    SUPERIOR COURT
              FOR THE DISTRICT OF COLUMBIA
2

3    - - - - - - - - - - - - -x
                             :
4    UNITED STATES OF AMERICA  :
                             :
5    VS.              .       :   Case No. F-7920-02
                             :
6    DOMINIC SAMUELS           :
                             :
7    - - - - - - - - - - - - -x

8

9

10                            Grand Jury No. April 5
11                            555 4th Street, N.W.
                             Washington, D.C.  20001
12

13                            May 1, 2003

14
          The testimony of STEVEN SUTTON was taken in the
15
     presence of a full quorum of the Grand Jury, commencing at
16
     3:37 p.m., before:
17

18
          SETH WAXMAN
19        Assistant United States Attorney

20

21

22

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1253

1    A.    Yeah.

2    Q.    Okay.  And what happened after that?

3    A.    I asked him what happened.  He said he had -- you

4 want me to see the map again or just tell you?

5    Q.    Go ahead.  You can just tell us and then we'll refer

6 to the map if we --

7    A.    He said he pulled in the circle in the back to go

8 upstairs and get something out of some girl house, some water

9 or something, get something.  And he ran upstairs and said he

10 heard some shots.  Said he ran back downstairs.  When he got

11 to the back door, he opened his door and he looked and he said

12 aye (phonetic sp.), because the guy was shooting in his car.

13 The guy looked at him and kept on shooting in his car.  He

14 said the guy was not cocky -- stocky with a T-shirt wrapped

15 around his head.

16    Q.    Okay.  And this is what Kairi is telling you?

17    A.    That's what he told me that day.  Yeah.

18    Q.    Okay.  And about how long after the shooting took

19 place do, do you know you were having this conversation with

20 Kairi?  Do you have any sense if it was hours or just minutes?

21    A.    I would say hours.

22    Q.    Okay.  And so, Kairi is telling you that it was a

23 stocky guy?  Is that yes?

24    A.    Yes.

25    Q.    And did he give you any other description about the

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1254

1   shooter?

2       A.   That he had two guns and a T-shirt wrapped around

3   his head.

4       Q.   Okay.  So, the T-shirt was wrapped around his head.

5   Is that right?

6       A.   Yes.

7       Q.   And he had two guns?

8       A.   Yeah.

9       Q.   And did Kairi say he saw fire -- both of those guns

10  being fired, or did he not tell you that much detail?

11      A.   No.  He said he seen the guns.  He said aye when he

12  seen the guy shooting in his car and the guy looked at him.

13  He said the guy had two guns and was shooting in the car.

14      Q.   Did you say anything to him about Don, at that

15  point?

16      A.   Don?

17      Q.   Yeah.

18      A.   No.

19      Q.   Did you ask him if it was Don?

20      A.   When he said it was short cocky guy, it couldn't

21  have been Don.

22      Q.   And you say cocky.  You use that word cocky and

23  stocky interchangeably --

24      A.   Yeah.

25      Q.   -- is that right?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1255

1    A.   How it make me feel?

2    Q.   Correct.

3    A.   I don't approve of it.

4    Q.   Well, by --

5    A.   I don't mean to -- hold on, let me take that back.

6  I don't approve of him lying.  I'll put it that way.

7    Q.   Okay.

8    A.   I don't approve of that.

9    Q.   Okay.  Well --

10    A.   The part with the Government, I say lying.

11    Q.   All right.  But, that's because you're testifying

12  that he told you that it was a short stocky guy?

13    A.   Yeah.

14    Q.   And based on things and that you've heard that, at

15  some point, he's saying that Don is the shooter.  Is that your

16  testimony?

17    A.   Yeah.

18    Q.   And you're saying that you don't approve of that.

19  And, again, what do you mean by that?

20    A.   I don't approve of him lying on somebody.

21    Q.   Okay.  And let me ask you this.  And I don't think

22  I've ever discussed this term with you, have you ever heard of

23  something called a street code or the way things are handled

24  on the street when you pick up a charge?

25    A.   I heard of it.  Yeah.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1256

1          MR. WAXMAN.   You do.  I'll take care of that with

2    you outside.

3          WITNESS.   Oh, okay.

4          MR. WAXMAN.   You been waiting here a long time.  I

5    know -- we'll make sure you get that.

6          GRAND JUROR.   Thank you.

7          MR. WAXMAN.   Appreciate that.

8          (Whereupon, the witness was excused at 4:17 p.m. and

9    recalled at 4:29 p.m.)

10          BY MR. WAXMAN:

11     Q.   Okay, Mr. Sutton, I'm, I'm reminding you that you're

12    still under oath.  Do you understand that?  You have to answer

13    out loud.

14     A.   Yes.

15     Q.   Okay.  And we do have just one follow up question.

16    You had testified earlier that Kairi Kellibrew told you on the

17    day Jamel Sills was shot that it was a short stocky or cocky

18    guy, is that correct?

19     A.   Yes.

20     Q.   And you've also testified that sometime later you

21    had learned either through a third person such as Gloria or

22    just discussion in the, in the neighborhood that Kairi has

23    been saying that it's now Dominic.  Is that correct?

24     A.   Yes.

25     Q.   Okay.  In your mind, what benefit could Kairi

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1257

1

SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
                           :
UNITED STATES OF AMERICA    :
                           :
VS.                        :     Case No. F-7920-03
                           :
DOMINIC SAMUELS            :
                           :
- - - - - - - - - - - - - -x

Grand Jury No. February 4
555 4th Street, N.W.
Washington, D.C.  20001

April 18, 2003

    The testimony of AMAN BALL was taken in the presence
of a full quorum of the Grand Jury, commencing at 11:12 a.m.,
before:

    SETH WAXMAN
    Assistant United States Attorney

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1258

Case 1:05-cr-00100-RWR   Document 1228-22   Filed 02/29/08   Page 16 of 17
USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 268 of 500

16

1    Black shot over there."  And so we rushed off on Detective

2    Faison.  And Kyree walked up, and that's when my brother

3    Antwaun asked Kyree, "Was it Dom who shot Black?"  And that's

4    when Kyree said, "No, it was a short, stocky dude who had on a

5    mask."  And that was it.

6        Q.    And so it's your testimony that your brother Antwaun

7    asked Kyree if Dom was the person that he saw shot Black, and

8    Kyree's response was, "No, it wasn't.  It was a short, stocky

9    guy with a mask on."

10       A.    Yes.

11       Q.    And who was present when that conversation took

12   place?

13       A.    Me, along with my brother.

14       Q.    Just the two of you?

15       A.    Like I said, like I said when we talking upstairs,

16   it was a lot of people outside, so, you know what I'm saying,

17   we don't affiliate with anybody.  We just branched off a

18   little bit and talked.

19       Q.    So based on your memory of that conversation, was

20   there anyone else besides you, Antwaun and Kyree that could

21   hear what you all were saying?

22       A.    No.

23       Q.    Was there anyone within a foot or two of you?

24       A.    No.  No.

25       Q.    Now did you say anything during this conversation?

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1259

1       A.      Uh-uh.

2       Q.      And you're saying, you're saying that Kyree told

3   both you and Antwaun that it was a short, stocky guy that was

4   the shooter?

5       A.      Yes.

6       Q.      Did he make any other statements about actually

7   seeing the shooting or anything like that?

8       A.      I mean, he had to see it because he wouldn't have

9   told us it was a guy, it was a short, stocky guy that had on a

10  mask, you know.

11      Q.      But he didn't actually describe, "I saw the short,

12  stocky guy with the mask do A, B and C," or he just said

13  simply, as you've testified, "It was a short, stocky guy."

14      A.      Right.

15      Q.      And just so the record's clear:  The only thing that

16  he told you that the person he saw did the shooting was a

17  short, stocky person.

18      A.      Yes.

19      Q.      And he didn't describe that shooting in any way

20  besides that.

21      A.      Right.

22      Q.      After that conversation, what happened?  Where did

23  you go?

24      A.      Well, after that conversation I think we stood right

25  there for a minute just to, like, to see the, the conditions

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1260

# EXHIBIT   W

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,             :
                                      :
          Plaintiff,                  :  Docket No. CR 05-100
                                      :
     v.                               :
                                      :
ANTWUAN BALL, DAVID WILSON,           :  Washington, DC
GREGORY BELL, DESMOND                 :
THURSTON, JOSEPH JONES, and           :  March 1, 2007
DOMINIC SAMUEL,                       :  920 a.m.
                                      :
          Defendants.                 :
                                      :
                                      :
                                      :

VOLUME 10 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                              Glenn Leon, Assistant United States
                              Attorney
                              Ann H. Petalas, Assistant United
                              States Attorney,
                              Gilberto Guerrero, Assistant United
                              States Attorney
                              555 4th Street
                              Washington, DC  20001
                              202.305.0174

For Defendant                 CARNEY & CARNEY
Antwuan Ball:                 John James Carney, Esq.
                              South Building
                              601 Pennsylvania Avenue, N.W.
                              Washington, DC  20004
                              202.434.8234

1   Q.      When your mother had the cordless phone back then in

2   September of 2003, was it customary for you to receive pre-trial

3   calls to that cordless phone?

4   A.      Yes.

5   Q.      And tell the jury where you would be when you were

6   receiving those calls from pre-trial?

7   A.      Outside.   Out back in the alley.

8   Q.      Is that something that you were supposed to do?

9   A.      No.

10  Q.      And what was it that allowed you to receive the calls out

11  in the alley even though you were supposed to be inside the

12  home?

13  A.      The cordless phone.

14  Q.      How far could you get?

15  A.      Within like 50, 60 feet.

16  Q.      Show us on Government's Exhibit 100.1 how far you could

17  get and still receive a call from pre-trial.

18  A.      (Indicating.)

19  Q.      I'll note for the record on Exhibit 100.1, to the right

20  of the building you circled earlier, you made a yellow mark at

21  the corner of that building still in the alley, indicating how

22  far you used to be able to get and still receive the calls from

23  pre-trial?

24  A.      Yes.

25  Q.      When's your birthday?

1    A.    September the 8th.

2    Q.    September the 8th?

3    A.    Yes.

4    Q.    And in September of 2003, right around your birthday, do

5    you recall an incident that happened in that alley?

6    A.    Yes, I do.

7    Q.    Was it before your birthday or after?

8    A.    Before my birthday.

9    Q.    And what was it about that incident that you can pinpoint

10   it to September of '03.

11   A.    It was a shooting.

12   Q.    Do you remember what time of day it was that this

13   shooting occurred?

14   A.    It was after 8:00.

15   Q.    Why do you think it was after 8:00?

16   A.    Because I was in the alley waiting to receive my phone

17   call.

18   Q.    What did you have in your hand?

19   A.    A cordless phone.

20   Q.    What were you getting ready to do that evening?

21   A.    Drink.  Start celebrating my birthday early.

22   Q.    Who were you with?

23   A.    Me, my aunt, her girlfriend, my sister's boyfriend and

24   myself.

25   Q.    Where were you exactly in the alley when you're starting

1   to get ready to celebrate your birthday?

2   A.    Right out underneath my mother's window, out in the back

3   of the alley.

4   Q.    Would you please show us on Exhibit 100.1.  Try to draw a

5   box where you were.

6   A.    (Indicating.)

7   Q.    I see for the record you made an attempt to draw a box.

8   There's another arrow now on the inside of the alley right below

9   the semi-circle you had circled indicating your mother's house?

10  A.    Yes.

11  Q.    Were you in the alley or close to the building?

12  A.    I was in the alley close to the building, right

13  underneath the window.

14  Q.    And in September of 2003, what were the lighting

15  conditions like then?

16  A.    It was bright.

17  Q.    Describe that alley.  What's in there as far as lighting?

18  A.    Just parked cars.

19  Q.    How about lighting?

20  A.    Yeah, lighting on the buildings.

21  Q.    How many lights on each building?

22  A.    One big light.

23  Q.    Where does it face?

24  A.    The alley.

25  Q.    Does the alley itself have any standalone lights?

1   A.   No.

2   Q.   Where you were standing, was there a light?

3   A.   Yes, there was.

4   Q.   You said you were getting ready to drink.  What were you

5   getting ready to drink?

6   A.   Remy.

7   Q.   Had you started already?

8   A.   Yes.

9   Q.   How much Remy had you started to drink before, as you

10  said, there was a shooting?

11  A.   I'd say around about two cups.

12  Q.   Had you drunk anything before?

13  A.   No.

14  Q.   How was your state of mind, your condition like?

15  A.   I wasn't intoxicated.  I was focused.

16  Q.   Had you been smoking marijuana?

17  A.   No.

18  Q.   Doing any other type of drugs?

19  A.   No.

20  Q.   When you're standing out there, tell the jury what you

21  saw.

22  A.   I was standing outside in the back of the alley and I was

23  out there drinking and three males came running from across 14th

24  Place and two of them were shooting.

25  Q.   Let's elaborate a little bit further.  You were standing

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 276 of 500

1   out there and you saw three males?

2   A.     Yes.

3   Q.     When you were looking at them, indicate on Government's

4   Exhibit 100.1 where they came from.

5   A.     (Indicating.)

6   Q.     I'll note for the record on Government's Exhibit 100.1 to

7   the far right, right around the center of the exhibit near like

8   a grass field, you've made a line?

9   A.     Yeah.

10  Q.     And where did you see these three guys heading?

11  A.     Towards our direction.

12  Q.     To the alley?

13  A.     Yes.

14  Q.     These males, were they white or black?

15  A.     Black.

16  Q.     And let's take them one by one.  The first person that

17  you saw, describe what he looked like.  We'll call him male

18  number 1.

19  A.     Tall, brown-skinned, long corn rows.

20  Q.     Do you remember what he was wearing?

21  A.     Black T-shirt, blue jeans.

22  Q.     Do you remember what, if anything, that person had on his

23  face?

24  A.     He had a shirt wrapped around his face.

25  Q.     Do you remember the color of the shirt?

1    A.    A black T-shirt.

2    Q.    Do you remember how the shirt was covered around that

3    male 1's face?

4    A.    Like a Ninja.

5    Q.    What does that mean?  Explain to the jury "like a Ninja."

6    A.    You could just see only his eyes and nose.

7    Q.    When you saw that person running into the alley, was that

8    person carrying anything?

9    A.    Yes.

10   Q.    What did you see that person carrying?

11   A.    He was carrying a gun.

12   Q.    One or more?

13   A.    Just one.

14   Q.    What kind of gun did you see?

15   A.    Like a fully automatic.

16   Q.    When you first saw that person come in with that gun, was

17   that person already shooting?

18   A.    Yes, he was.

19   Q.    Based on the physical characteristics that you saw of

20   that person, did you determine in your own mind who it was?

21   A.    Yes.

22   Q.    Who did you think it was?

23   A.    A little guy named Trevon.

24   Q.    What was it that made you conclude that person was

25   Trevon?

1    A.    Because of his height, his build and his long corn rows.

2    Q.    How long had you known this person named Trevon?

3    A.    For about eight years.

4    Q.    Where had you known him from?

5    A.    14th Place.

6    Q.    Let's go now with male 2.  You said there was another

7    person.  Describe what that person looked like.

8    A.    Short, dark-skinned, kind of stocky, a little guy.

9    Q.    Do you remember what that person was wearing?

10   A.    The same.  Black shirt, blue jeans.

11   Q.    Was this person walking in the same direction as Trevon?

12   A.    Yes, he was.

13   Q.    Just clarify for us, were these guys walking or were they

14   running to the alley?

15   A.    It was like a light jog.

16   Q.    This second person was ahead of Trevon or side by side or

17   behind him?

18   A.    Like a little distance from him, but like not too far

19   from him.

20   Q.    Did this person have anything covering or on his face?

21   A.    Yes.

22   Q.    What did you see?

23   A.    A black T-shirt covering his face.

24   Q.    In what manner?

25   A.    Like a Ninja also.

1   Q.      What could you see as -- from this person's face?

2   A.      Just his eyes and nose.

3   Q.      Did you see anything in that person, male number 2, in

4   that person's hands?

5   A.      Yes.

6   Q.      What did you see?

7   A.      A 12-gauge shotgun.

8   Q.      Was it a full barrel or cutoff?

9   A.      Cutoff.

10  Q.      When you saw this second person, was he already shooting

11  or not?

12  A.      Yes.

13  Q.      Based on the physical characteristics of that person, did

14  you conclude who that person was?

15  A.      Yes.

16  Q.      Tell us how you did that.

17  A.      Because of his build, short, small, kind of stocky and

18  dark-skinned.

19  Q.      Based on what you saw, who did you think it was?

20  A.      A little dude named Eyes.

21  Q.      "Eyes" as in eyes, physically the eyes?

22  A.      Yes.

23  Q.      How long had you known this, as you say, "little dude

24  named Eyes"?

25  A.      Around about seven years, seven to eight years.  Seven to

1    eight years.

2    Q.    Where had you known this little person or this little

3    dues Eyes from?

4    A.    From 14th Place.

5    Q.    Had you ever seen this guy Eyes and Trevon together?

6    A.    Yes.

7    Q.    How far is 14th Place from Congress Park?

8    A.    It's in Congress Park.

9    Q.    How close is it to the alley?

10   A.    Not far at all.

11   Q.    Walking distance?   Driving distance?

12   A.    Walking.

13   Q.    When you see these guys, like you say, like a light jog

14   coming into the alley, armed, tell the jury what you saw next.

15   A.    I seen them shooting at a group of males.

16   Q.    Did you recognize any of the group of males that these

17   guys were shooting at?

18   A.    Yes.

19   Q.    Who did you see that you recognize in this group of

20   males?

21   A.    Antwuan, Joe-Joe, Deuce, Foots, and another dude named

22   Fat Tony and some other individuals I didn't know.

23   Q.    Antwuan Ball, one of the defendants?

24   A.    Yes.

25   Q.    Joe-Joe, Joseph Jones, one of the defendants?

# EXHIBIT   X

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 17, 2007 |
| DOMINIC SAMUELS, | : | 9:15 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 52 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            Gilberto Guerrero, Assistant
                            United States Attorney
                            555 4th Street
                            Washington, DC  20001
                            202.305.0174


For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                            South Building
                            601 Pennsylvania Avenue, N.W.
                            Washington, DC  20004
                            202.434.8234

1    Q.    And how often?

2    A.    I was on -- I had to call in every day, and if your

3    number --

4    Q.    I'm asking just about urine tests.

5    A.    You had to call in.

6    Q.    For what reason?

7    A.    To see if I had to take a urine.

8    Q.    I see.  And if you learned you did, you would go take a

9    urine?

10   A.    Yes.

11   Q.    What part of the city would you have to go to to do that?

12   A.    It was over in Capitol Heights.  I'm not sure of the

13   exact neighborhood.

14   Q.    And yes or no, do you know if LT had similar drug testing

15   conditions when he got released?

16   A.    Well, he was in a halfway house at the time, so whatever

17   drug testing they did they did up there at the halfway house, I

18   guess.

19   Q.    And when you would go to drug tests, would you go alone

20   or sometimes would you go with LT or Antwuan?

21   A.    With LT and Antwuan.

22   Q.    And these would be for your own drug tests?

23   A.    Yes.

24   Q.    How often would you say you, LT and Antwuan would drive

25   together to do this test?

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 284 of 500

1    A.    Well, it was just one, like I said, one particular time

2    right there that I drove with them, that I drove over there with

3    them.

4    Q.    Okay.  Who was driving?

5    A.    I was driving Antwuan's truck at the time because he was

6    rolling up a joint.

7    Q.    Who's -- you said truck.  What kind of truck?

8    A.    Gray Expedition.

9    Q.    And it was Antwuan's truck?

10   A.    Yeah.

11   Q.    You're driving?

12   A.    Yes.

13   Q.    Where's Antwuan?

14   A.    He's in the back; LT in the front.

15   Q.    Anyone else in the truck?

16   A.    Just us three.

17   Q.    Tell us about that conversation.

18   A.    Basically we was riding over there to get ready to go

19   take my urine, and LT got to messing with Antwuan about the

20   bullet holes that was in his truck.

21   Q.    What do you mean by that, messing with him about bullet

22   holes?

23   A.    He was joking with him, like, asking him why he didn't

24   get it fixed.

25   Q.    Were there bullet holes in Antwuan's truck?

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 285 of 500

1    A.      Yes.  It had duct tape over them.

2    Q.      Did you see this?

3    A.      Yes.

4    Q.      And when LT is joking with Antwuan about this, what does

5    Antwuan say in response?

6    A.      Basically LT asked him who had did it, and he was like,

7    "Man, Travon."  As soon as he get a chance, man, he was going to

8    smash him.

9    Q.      Who said that?

10   A.      Antwuan.

11   Q.      And he said that about Travon.  Did you know who Travon

12   was?

13   A.      I knew he was a little guy around the neighborhood, but

14   he was younger than me.  I didn't know him, per se.

15   Q.      Would you know him to see him?

16   A.      Nope.

17   Q.      When you say a little guy, do you mean physically or

18   little in age?

19   A.      Young, much younger than I am, or was.

20   Q.      And what, if anything, did you say in response when

21   Antwuan says this?

22   A.      I didn't say nothing.  I don't think I said nothing.

23   Q.      Did Antwuan say why he wanted to do that?

24   A.      The guy had supposedly, man -- him and guy had a --

25           MR. CARNEY:  Objection, Your Honor.

1    BY MR. LEON:

2    Q.    Tell us, just so it's clear, tell us what Antwuan said.

3    A.    He just said that the guy had come up -- they had fought

4    or smacked him, one or the other.  I don't remember quite what

5    he said, but I know they was beefing.

6    Q.    And did Antwuan indicate if he was going to do this alone

7    or with other people?

8    A.    He didn't say if he was going to do it with other people

9    or not.

10         MR. CARNEY:  Your Honor, objection to the form of these

11   questions.

12         THE COURT:  Sustained.  Why don't we break.

13         MR. LEON:  Okay.

14         THE COURT:  Ladies and gentlemen, we're going to take that

15   abbreviated lunch break now.  It's 12:30.  Please be back at 1:15

16   so we can accomplish our scheduling interests.  Enjoy your break.

17   Don't talk about the case, and take your notes back with you into

18   the jury room.  See you back at 1:15.

19         (Jury out at 12:29 p.m.)

20         THE COURT:  All right.

21         (Thereupon, a luncheon break was taken at 12:30 p.m.)

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 17, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:15 p.m. |

. . . . . . . . . . . . . . :   . . . . . . . . . . . . .

VOLUME 52 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C. 20530


For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC 20004
                           (202) 434-8234


                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC 20006
                           (202) 454-2811

```
 1                    P R O C E E D I N G S

 2                 (Jury in at 1:17 p.m.)

 3            THE COURT:  Good afternoon, ladies and gentlemen.

 4   Welcome back, and thank you again for accommodating our schedule

 5   change.  Counsel?

 6            MR. LEON:  Thank you.

 7                 CONTINUED DIRECT EXAMINATION

 8   BY MR. LEON:

 9   Q.  Mr. Pough, when we last left off before our break, we were

10   talking about a conversation you had with Antwuan, with LT

11   present, in his Expedition.  Do you remember that?

12   A.  Yes.

13   Q.  Do you remember when in September this -- well, first of

14   all, was this in September?

15   A.  Yes.

16   Q.  Do you remember when?

17   A.  I don't remember the exact date.

18   Q.  Do you remember when in September approximately LT got

19   released?

20   A.  Naw, I don't.

21   Q.  Okay.  And can you -- you said you saw bullet holes on the

22   Expedition?

23   A.  Yes.

24   Q.  Do you remember where you saw them?

25   A.  I know for sure some of them was in the back, the back of
```

USCA Case #11-3031     Document #1445852         Filed: 07/10/2013     Page 289 of 500

1280785

```
 1    the truck, like in the trunk part.
 2    Q.  Did Antwuan Ball say why Antwuan wanted to smash Travonne?
 3    A.  He said the guy jumped out there with him or something, the
 4    guy wasn't respecting him, or something to that effect.
 5    Q.  October/November of 2003, did you spend time with
 6    Antwuan Ball?
 7    A.  I would say about probably lasted up until about October.
 8    Q.  October?
 9    A.  Yeah.
10    Q.  And during that time, what types of things would you do with
11    Antwuan?
12    A.  Basically, go and pick LT up from the halfway house, might
13    stop and grab something to eat, lunch or breakfast.
14    Q.  Was LT always with you and Antwuan, or would you sometimes
15    spend time alone with Antwuan?
16    A.  Sometimes we would drive back by ourself from dropping LT
17    off at the halfway house.  But other than that, naw, it was
18    basically with, LT always was around.
19    Q.  First just yes or no, did you and Antwuan ever talk about a
20    conspiracy case?
21    A.  Yes.
22    Q.  And who talked about it, you or Antwuan?
23    A.  Antwuan.
24    Q.  And when -- was this just one conversation, or more than
25    one, that you had with Antwuan about this?
```

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 290 of 500

1786

```
 1   A.  I can't remember how many, but a particular day he was
 2   saying to LT --
 3   Q.  I'll stop you there.  I just want to establish a time frame.
 4   Do you remember a particular conversation that you had with
 5   Antwuan about a conspiracy case?
 6   A.  Yes.
 7   Q.  And was LT there?
 8   A.  Yes.
 9   Q.  Anyone else there other than you, LT, and Antwuan?
10   A.  No.
11   Q.  And to the best of your memory, where was this conversation?
12   Where were you physically?
13   A.  We was driving.
14   Q.  In what vehicle?
15   A.  His Expedition.
16   Q.  Was this the same conversation when Antwuan said he was
17   going to smash Travonne?
18   A.  Yes.
19   Q.  And so again, you were driving that vehicle?
20   A.  Yes.  And he basically said -- told LT to hurry up, he
21   needed to hurry up and get out the halfway house so he could
22   start getting rid of some of the guys that he thought was going
23   to flip.
24   Q.  Who said that?
25   A.  Antwuan.
```

# EXHIBIT   Y

5741

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | June 18, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 9:15 a.m. |

. . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 68 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:      ANN H. PETALAS, ESQUIRE
                            GLENN S. LEON, ESQUIRE
                            GIL GUERRERO, ESQUIRE
                            UNITED STATES ATTORNEY'S OFFICE
                            555 Fourth Street, NW
                            Washington, D.C.  20530

For the Defendant           JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:               CARNEY & CARNEY
                            601 Pennsylvania Avenue, NW
                            Suite 900, South Building
                            Washington, DC  20004
                            (202) 434-8234

                            STEVEN CARL TABACKMAN, ESQUIRE
                            TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                            1747 Pennsylvania Avenue, NW
                            Suite 300
                            Washington, DC  20006
                            (202) 454-2811

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 293 of 500 15882

```
1    Q.  Would you recognize Boy-Boy if you saw him here today?

2    A.  Yes.

3    Q.  I'm going to ask if you can take a look, and you can stand

4    up if you have to.  Tell us if you see Boy-Boy.

5    A.  Yes.

6    Q.  Where is Boy-Boy?

7    A.  Right there.

8    Q.  Is that the gentleman who is standing up right now?

9    A.  Yes.

10   Q.  With the blue shirt?  Yes?

11   A.  Yes.

12           MR. LEON:  Your Honor, may the record reflect an

13   in-court identification of Mr. Bell?

14           MR. BEANE:  No objection.

15           THE COURT:  Request is granted.

16   BY MR. LEON:

17   Q.  Now, when you -- tell us, when you first saw this car,

18   Boy-Boy's car, where was it?  You can step down if you need to.

19   A.  Right there (indicating).

20   Q.  For the record, you pointed to a portion of what appears to

21   be an alley, and you pointed to a portion just directly below or

22   in front of the dot you indicated was where you and Kanisha

23   were.  Is that right?

24   A.  Yeah.

25   Q.  So the car was near you?
```

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 294 of 500

```
1    A.   Yes.

2    Q.   I'm going to ask you to hold this so we can hear you better.

3    Okay?

4              And the reason we need to do that is we need to make

5    sure the court reporter can make an accurate record.   Okay?

6              When you saw the car, was Boy-Boy in it?

7    A.   No.

8    Q.   Who was in it?

9    A.   Cool Wop.

10   Q.   Cool Wop?

11   A.   Yes.

12   Q.   And who is Cool Wop?

13   A.   David.

14   Q.   Do you see Cool Wop here in the courtroom today?

15   A.   Yes.

16   Q.   And I'm going to ask if you can also point him out based on

17   his location and anything he might be wearing?

18   A.   He have -- he have a blue and white stripe shirt with the

19   pretty eyes.

20   Q.   And for the record, what kind of tie is he wearing?  Is he

21   wearing a tie?

22   A.   Yes, he is.  It look like pink and burgundy.

23             MR. LEON:  Your Honor, may the record reflect an

24   in-court identification of Mr. Wilson?

25             MS. WICKS:  No objection.
```

USCA Case #11-3031    Document #1445852         Filed: 07/10/2013    Page 295 of 500

```
 1                THE COURT:  Request is granted.

 2    BY MR. LEON:

 3    Q.  You said something about him having pretty eyes?

 4    A.  Yes.

 5    Q.  Now, you said -- I think you said that Cool Wop was driving

 6    the car.  Did you see Boy-Boy in the car at all?

 7    A.  No, I didn't.

 8    Q.  And was anyone else in the car with Cool Wop?

 9    A.  No.

10    Q.  And was the car standing still or was it driving?

11    A.  It was circling around the block.

12    Q.  Now when you say it's circling around the block, could you

13    just show us with your finger the direction the car was

14    circling?

15    A.  (Witness complies.)

16    Q.  For the record, you made an indication starting from

17    beginning in the left portion, lower portion of the exhibit,

18    going around to the right and then coming back to the left and

19    back to the right?

20    A.  Yes.

21    Q.  Kind of like a clock, clockwise?

22    A.  Yes.

23    Q.  Why don't you sit down again?

24    A.  (Witness complies.)

25    Q.  How many times did the car circle that area?
```

USCA Case #11-3031      Document #1445852          Filed: 07/10/2013      Page 296 of 500

```
 1    A.   Three times.

 2    Q.   And let's take them one at a time.  The first time, did you

 3    see the car?

 4    A.   I didn't pay attention to it.

 5    Q.   Okay.  Did you pay attention to it at some point?

 6    A.   The second time I did.

 7    Q.   And why was that?

 8    A.   Because how he was looking.

 9    Q.   Who was looking?

10    A.   David.

11    Q.   And show us, how was he looking?

12    A.   Like he was riding around like (indicating).

13    Q.   For the record, you took out your -- I'm not going to do a

14    very good job of this but I'll try.  You held out your hand like

15    you're driving the steering wheel with your right hand?

16    A.   Like a mug, you know how to mug.

17    Q.   Mugging?

18    A.   Yes.

19    Q.   Was that what you were just doing?

20    A.   Yes.

21    Q.   Is that what David was doing?

22    A.   Yes.

23    Q.   Who was he mugging at?

24    A.   He was looking towards Travon.

25    Q.   How close was Travon to you when David was mugging?
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 297 of 500

```
 1    A.  Right next to me.

 2    Q.  And how close was -- well, withdrawn.

 3              How quickly or slowly is the car driving when it's

 4    circling like that?

 5    A.  Slow.

 6    Q.  Excuse me?

 7    A.  Slow.

 8    Q.  Slow.

 9              That second time when you noticed David mugging, what

10    if anything did you do or say?

11    A.  I asked Travon did he do something to somebody.

12    Q.  Did who do something to who?

13    A.  Did Travon do something to somebody.

14    Q.  Okay.  And why did you ask Travon that at that point?

15    A.  Because the way how he was looking.

16    Q.  The way he was looking what?

17    A.  The way how David was looking.

18    Q.  What about it?

19    A.  The car kept circling around the block.  The second time I

20    had asked Travon, I said, did you do something to somebody?  He

21    was like, why you say that?

22              MS. WICKS:  Objection.

23              THE COURT:  Hold on one second.

24              MS. WICKS:  Objection to hearsay.

25              THE COURT:  Overruled.  Go ahead, you can continue.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 298 of 501 5887

```
 1    A.   He was like, why you say that?   I was like, you know what,
 2    just turn my way.
 3    Q.   You said that to Travon?
 4    A.   Yes.
 5    Q.   Okay.
 6    A.   So I had turned him myself my way.
 7    Q.   And what do you mean by you turned him yourself, did you
 8    actually grab him, touch him?
 9    A.   The way how he was standing was his back like this and this
10    me, so I had turned him a little like -- I turned like this and
11    we was like this so he could see for hisself.   Like this me and
12    this him, so I turned him that way so he could see for hisself.
13    Q.   And when you turned him, where was he facing?
14    A.   We was both like this.   This him, this me.
15    Q.   And when you turned him, what direction was he facing?   You
16    don't have to point, but you can just tell us in words.   When
17    you got him to where you wanted him to look, if he was looking
18    straight ahead, where would he be looking?
19    A.   Up that alley.
20         MS. WICKS:   Objection.   Speculation.
21         THE COURT:   Overruled.
22    BY MR. LEON:
23    Q.   You can point.   Just step down and point to us the direction
24    you had him look.
25    A.   (Witness complies.)
```

1    Q.   For the record, you indicated the left portion of the map?

2    A.   Yes.   But the way how we was standing, it was like if he was

3    to turn his head, he can see this way, and if he was to turn his

4    head, he can see this way.

5            So this him and this me, so both our heads, we talking,

6    we looking at each other.   But if he was to look, he can look

7    this way or that way.

8    Q.   Okay.   And for the record, when you say this way or that

9    way, you pointed --

10   A.   Left and right.   Left and right.

11   Q.   Of that same alley where the car was driving?

12   A.   Yes.

13   Q.   Okay.   You can sit down.

14   A.   (Witness complies.)

15   Q.   And when you did this with Travon, had him turn, was this

16   after the second time the car went by?

17   A.   Yes.

18   Q.   When you said that to Travon, did you do something to

19   somebody, what if anything did Travon say back?

20           MS. WICKS:   Objection.   Asked and answered.

21           THE COURT:   Approach.

22           (BENCH CONFERENCE ON THE RECORD.)

23           THE COURT:   What's the answer going to be?

24           MR. LEON:   I expect the answer to be either no or words

25   to the effect of no or I don't know.   We're not offering it for

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 300 of 500

```
1    its truth, it's just going to be a question and a response just

2    to keep the story moving.

3            MS. WICKS:  I think she answered this -- I think she

4    actually explained this already, and at that point I objected to

5    the hearsay and the Court overruled me.

6            THE COURT:  Excuse me.  But an answer has already come

7    out to a question, so it wasn't hearsay.

8            MS. WICKS:  But it's a different answer than what he's

9    saying now.  The answer that he's saying now, unless it's being

10   offered for the truth, I don't see how it's relevant.

11   Particularly since it's different -- I mean, what the government

12   is proffering is different than what she's already said.

13           THE COURT:  All right.  I'll overrule it.

14           (END BENCH CONFERENCE.)

15   BY MR. LEON:

16   Q.  When you said this to Travon, what if anything do you

17   remember Travon saying back to you?

18   A.  Why?  Why you say that?

19   Q.  Why you what?

20   A.  Why you say that?

21   Q.  Okay.  And then he says that and you turn him.  Tell us what

22   happens next.  Does the car stop or does it keep going?

23   A.  It keep going.  It keep going.

24   Q.  Where?

25   A.  Around the block.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 301 of 500 15890

```
1    Q.   Okay.   And then what?

2    A.   And then we started back to talk, and then the third time,

3    the car came again, and it parked.

4    Q.   Okay.   So where did the car -- can we see on that map

5    approximately where that car finally stopped after the third

6    time?

7    A.   Yes.

8    Q.   And I'm going to ask if you can step down with that pen and

9    point to it.

10   A.   (Witness complies.)

11   Q.   For the record, can you make that a little darker?   You made

12   a mark there, I just want to make sure we can see it.

13   A.   (Witness complies.)

14   Q.   For the record, you made a mark with the pen in your hand

15   which is just to the right of that dot you showed us where you

16   and Kanisha were.   Correct?

17   A.   Yes.

18   Q.   And it looks like it's right about between the two cars

19   which appear to be just to the right of that red dot.   Correct?

20   A.   Yes.

21   Q.   And that's where -- you can sit down.

22   A.   (Witness complies.)

23   Q.   And that's where Boy-Boy's car stopped?

24   A.   Yes.

25   Q.   And when Boy-Boy's car stopped, where are you and Travon at
```

15891

```
1    that point?

2    A.   Still standing right there talking.

3    Q.   Are you talking near the tree or at the car?

4    A.   At the car.

5    Q.   And is Kanisha there at that point?

6    A.   Yes.

7    Q.   Tell us what happens next.  You're there with Travon talking

8    and then Boy-Boy's car stops.

9    A.   We go to the car and Kanisha asks him can she get a light.

10   So they was fussing over a cigarette, and...

11   Q.   Who was fussing?

12   A.   Travon and Kanisha.

13   Q.   How were they fussing?

14   A.   He was like, "Girl, you pregnant, and if that's my cousin's

15   baby, I'm going to hurt you."  She was like, "Boy, just give me

16   the light."  So they were like lighting the cigarette.

17            Then once he lit the cigarette, he came back to me.

18   Q.   So he did light a cigarette for Kanisha?

19   A.   Yes.

20   Q.   After that he did what?

21   A.   Came back to me.

22   Q.   And are you at the car or are you somewhere else?

23   A.   I'm at the car.

24   Q.   And when Travon comes back to you, tell us what happens

25   next.
```

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And what is he doing at that trunk? |
| 3 | A.   Trying to get into the trunk. |
| 4 | Q.   Did he get inside the trunk? |
| 5 | A.   No. |
| 6 | Q.   And then what happens? |
| 7 | A.   Once Travon said, oh, that's my song, turn it up.  So we |
| 8 | turned it up -- no, sorry. |
| 9 | We over there talking, so as we talking, David is |
| 10 | staring at us.  So I tapped Travon and I said, "Look."  And so |
| 11 | Travon looked and he was staring at us. |
| 12 | So Travon walked over there and was like, "What's up, |
| 13 | son?"  And David gave him five and he smarted back.  Then Travon |
| 14 | walked over to me. |
| 15 | Q.   So Travon walked over to David? |
| 16 | A.   Yes. |
| 17 | Q.   And said, "What's up, son"? |
| 18 | A.   Yes. |
| 19 | Q.   And you said gave him a five.  Can you show us what did he |
| 20 | do? |
| 21 | A.   (Witness complies.) |
| 22 | Q.   Are you mugging on me?  What did he do? |
| 23 | A.   Excuse me? |
| 24 | Q.   You just showed us the hands kind of slapped and grabbed |
| 25 | each other? |

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 304 of 500
1335894

```
 1    A.   Yeah.

 2    Q.   And when Travon said something like "What's up, son," did

 3    David say anything back?

 4    A.   No.

 5    Q.   What did David's face look like at that point?

 6    A.   Just staring.

 7    Q.   Just staring?

 8    A.   Yes.

 9    Q.   And then Travon came back to you?

10    A.   Yes.

11    Q.   And tell us what happens next.

12    A.   We was over there talking, and Kanisha played the Usher CD,

13    and he told me that he was going to April party.  And then I

14    said I didn't want him to go.  So once he said, "Turn the CD up,

15    that's my song," he went over there.

16    Q.   He went over where?

17    A.   Over there to the car.

18    Q.   Which car?

19    A.   My uncle.

20    Q.   Okay.  And so does Kanisha actually get the music going

21    louder?

22    A.   Yes.

23    Q.   And does Travon stay to listen to the song?

24    A.   Not all of it.

25    Q.   What happens -- at some point he doesn't stay for the rest
```

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 305 of 500
05895

```
 1    of the song?

 2    A.  No.

 3    Q.  Tell us what happens.

 4    A.  He listened to the song probably for two minutes, and he

 5    came back to me, and he was like I'm about to go get ready to

 6    April party.  And I got mad so I had pushed him.

 7    Q.  Did you hit him or just kind of push him?

 8    A.  I said (indicating).

 9    Q.  Why did you do that?

10    A.  Because I was mad because I didn't want him to go to the

11    party.

12    Q.  Did you want to go to the party with him?

13    A.  No.

14    Q.  You just didn't want him to go?

15    A.  No.

16    Q.  So what happens after you push him?  What happens next?

17    A.  He walks off.

18    Q.  When he walks off, which direction does he walk towards?

19    Can you show us?

20    A.  (Witness complies.)

21    Q.  And for the record, you said this way.  Grab the microphone

22    and talk into it if you can.  You said this way from the red

23    dot?

24    A.  Yes.

25    Q.  In the direction of that speed bump?
```

1    A.   Yes.

2    Q.   Now, the direction that you -- the kind of imaginary line

3    you drew from left to right walking towards that speed bump, you

4    passed right by that mark you made where --

5              MR. ZUCKER:   Objection.   Leading.

6              THE COURT:   Finish the question.

7    BY MR. LEON:

8    Q.   Would pass right by that mark you made, passed right by that

9    mark you made as to where David parked Boy-Boy's car?

10   A.   Yes.

11   Q.   And my question is, did Travon pass Boy-Boy's car?

12   A.   Yes.

13   Q.   And what if anything happened as he passed the car?   Was

14   David still there?

15   A.   Yes.

16   Q.   Where was he in relation to that car?

17   A.   In the back of the car.

18   Q.   He was in the back of the car?

19   A.   In the back of the white car trying to get in the trunk.

20   Q.   And how close is that white car that David is trying to get

21   in the trunk of to Boy-Boy's car?   Can you point to us in the

22   room like how close they are?   Can we see?

23   A.   This is the white car and he was parked in between here.

24   Q.   For the record, when you said this is the white car, you

25   pointed to the car on the map, Government's 122.2, which is

1    immediately to the right of the dot you indicated where you and

2    Kanisha were.  Correct?

3    A.  Yes.

4    Q.  So that was the white car?

5    A.  Yes.

6    Q.  Okay.  And the car that you indicated as Boy-Boy's car that

7    David parked, that appears to be -- you drew a horizontal line.

8    By horizontal, it looks like it's going in a different direction

9    from the white car you indicated.  Is that right?

10   A.  It was blocking two cars in.

11   Q.  Okay.  That was my question.

12          You can sit back down.

13   A.  (Witness complies.)

14   Q.  So what happens as Travon passes Boy-Boy's car?

15          MS. WICKS:  Objection.  Leading.

16          THE COURT:  Overruled.

17   BY MR. LEON:

18   Q.  You can answer.

19   A.  Can you repeat that again?

20   Q.  Sure.  You said that Travon told you he was going to April's

21   and then he walks away?

22   A.  Yes.

23   Q.  And you said, I believe, just a moment ago that he walked

24   right by Boy-Boy's car.  Correct?

25   A.  Yes.

USCA Case #11-3031     Document #1445852      Filed: 07/10/2013     Page 308 of 500   5898

1    Q.   Does he stop at Boy-Boy's car or does he continue?

2    A.   Continued to walk.

3    Q.   He continued.   And at that point as he continues, do you see

4    another vehicle?

5    A.   Yes.

6    Q.   And describe that vehicle for us.

7    A.   It's gray and it's an Expedition.

8    Q.   A gray Expedition?

9    A.   Yes.

10   Q.   And had you seen that gray Expedition before?

11   A.   Yes.

12   Q.   Whose gray Expedition was it?   Whose gray Expedition was it?

13   A.   It's Big Ant.

14   Q.   Big Ant?

15   A.   Yes.

16   Q.   Had you seen Big Ant in that gray Expedition before?

17   A.   Yes.

18   Q.   And how many times would you say you've seen Big Ant in that

19   gray Expedition?

20   A.   Every day.

21   Q.   And if you saw Big Ant, would you recognize him?

22   A.   Yes.

23   Q.   And I'm just going to ask you just one last time if you can

24   stand and point out Big Ant if you see him in the courtroom.

25   A.   He's the guy with the blue shirt with the yellow tie.

USCA Case #11-3031   Document #1445852     Filed: 07/10/2013    Page 309 of 500 5899

```
 1    Q.  The gentleman who is standing behind me?

 2    A.  Yes.

 3          MR. LEON:  Your Honor, may the record reflect an

 4    in-court identification of Mr. Ball?

 5          MR. TABACKMAN:  No objection.

 6          THE COURT:  The request is granted.

 7    BY MR. LEON:

 8    Q.  Now, can we see on this map, first just yes or no, where

 9    that gray Expedition was?

10    A.  Yes.

11    Q.  I'm going to give you another dot, maybe the last one, and

12    if you can just put the dot in the approximate area where that

13    gray Expedition was.

14    A.  (Witness complies.)

15    Q.  Okay.  And for the record, I'm going to give you this pen.

16    Why don't you put...

17    A.  (Witness complies.)

18    Q.  What did you put?  You wrote "Big Ant."  Is that right?

19    A.  Yes.

20    Q.  Why don't you sit down, and for the record, you put a red

21    dot and you wrote "Big Ant," and you wrote it on a red dot that

22    you put right on top of what appears to be a white car which is

23    near the approximate area where you previously indicated Travon

24    was killed.  Correct?

25    A.  Yes.
```

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 310 of 500

```
 1    Q.  Now, when you see this -- is Travon walking towards that

 2    truck?

 3    A.  Yes.  You mean towards like he going to it?

 4    Q.  Yeah, let's start there.  Did it look like he was walking to

 5    the truck?

 6    A.  No.

 7    Q.  Was he walking in the direction of the truck?

 8    A.  He was walking past the truck.

 9    Q.  And tell us what happens once Travon is walking past the

10    truck.

11    A.  Travon walked past the truck and the window dropped.

12    Q.  The window dropped?

13    A.  Yes.

14    Q.  Which window?

15    A.  Big Ant window.

16    Q.  Was that behind the steering wheel?

17    A.  Yes.

18    Q.  And then what happens?

19    A.  Then he fired the shot.

20    Q.  Then what?

21    A.  Then he fired the shot.

22    Q.  Who fired the shot?

23    A.  Big Ant.

24    Q.  Through that window?

25    A.  Yes.
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 311 of 500  15901

```
1    Q.  And when he fired that shot through the window, where did

2    that shot go?

3    A.  It hit Travon in the head.

4    Q.  And did you see this?

5    A.  Yes.

6    Q.  Did you see it hit Travon in the head?

7    A.  Yeah.

8    Q.  What did you see Travon -- what if anything happened to

9    Travon when that shot hit him in the head?

10   A.  He fell.

11   Q.  And did he fall in the area of where that red dot was you

12   indicated?

13   A.  Yes.

14   Q.  What happened next?  Take your time.

15   A.  Big Ant got out the car and shot him the second time.

16   Q.  Did you see Big Ant get out of that car?

17   A.  Yes.

18   Q.  And when Big Ant got out of that truck, where did he -- what

19   direction did he walk to?

20   A.  Towards Travon.

21   Q.  And how close did he get to Travon?

22   A.  Right beside him.

23   Q.  Right beside him?

24   A.  Yeah.

25   Q.  And was Travon on the ground at this point?
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 312 of 500  05902

1    A.   Yes.

2    Q.   And how many shots had been fired so far?

3    A.   Two.

4    Q.   That second shot, did you see that second shot fired?

5    A.   Yes.

6    Q.   When that second shot was fired, who fired it?

7    A.   Big Ant.

8    Q.   And was Big Ant in the truck behind the steering wheel or

9    now outside the truck when that second shot was fired?

10   A.   Outside the truck.

11   Q.   And was Travon on the ground when that second shot was

12   fired?

13   A.   Yes.

14   Q.   And describe that second shot.

15   A.   He went to him and shot him the second time in his head.

16   Q.   Did you see this?

17   A.   Yes.

18   Q.   Did Travon appear to be moving when Big Ant fired that

19   second shot?

20   A.   No.

21   Q.   Do you remember the gun that Big Ant had?  Do you remember

22   anything about it?

23   A.   Yes.

24   Q.   What do you remember?

25   A.   It was black like a police gun.

```
 1    Q.   I'm sorry?

 2    A.   It was black like a police gun.

 3    Q.   It was black like a police gun?

 4    A.   Yes.

 5    Q.   After that second shot is fired, tell us what you do?

 6    A.   I start screaming.

 7    Q.   And what happens next?  Take your time.

 8    A.   Then I seen David go over there.

 9    Q.   You saw David go over where?

10    A.   Over there by Travon body.

11    Q.   And what did you see David do when he goes over to Travon's

12    body?

13    A.   I heard a shot.

14    Q.   You heard what?

15    A.   I heard a third shot.

16    Q.   We're going to ask you to take your time but we do need you

17    to talk into that microphone.

18    A.   I can't do it.

19    Q.   Just take a minute.

20    A.   I seen David go over there, and when he went over there, I

21    heard the third shot.

22    Q.   And when you heard that third shot, where was David and

23    where was Travon?

24    A.   Travon was on the ground and David was by Travon.

25    Q.   When you say David was by Travon, how close was David to
```

```
 1   Travon?

 2   A.  Right by his face.

 3   Q.  Was David standing or doing something else?

 4   A.  He was kneeled over a little bit.

 5   Q.  Kneeled over whom?

 6   A.  Can you repeat that?

 7   Q.  Sure.  You said David was kneeled over a little bit.

 8   Kneeled over towards whom?

 9   A.  Travon.

10   Q.  And when David is kneeled over towards Travon, is that when

11   you hear the shot or is it before then?

12   A.  That's when I hear the shot.

13   Q.  Did Travon appear to be moving when you heard that third

14   shot?

15   A.  No.

16   Q.  What happens next?  Does David stay there or does he leave?

17   A.  No, he left.

18   Q.  Where did he go?

19   A.  Back to the car.

20   Q.  Walking in your direction?

21   A.  Yes.

22   Q.  And as David is walking back towards you in your direction,

23   do you see anything in either of David's hands?

24   A.  A gun.

25   Q.  He had a gun?
```

1    A.  Yes.

2    Q.  Talk right into that microphone if you can.

3    A.  Yes.

4    Q.  Describe that gun if you can.

5    A.  It's black and look like a police gun, but the handle was

6    bigger.

7    Q.  Black like a police gun but the handle was bigger?

8    A.  Yeah.

9    Q.  Do you say anything to Cool Wop, to David, at this point?

10    A.  Yes.

11    Q.  What do you say?

12    A.  When he came back, he said, "oh, man, he shot." I said,

13    "what?" He was like, "he shot." So he hurry up, he got in the

14    car and pulled off.

15    Q.  Who got in the car and pulled off?

16    A.  David.

17    Q.  David got in whose car?

18    A.  Boy-Boy car.

19    Q.  Did you see this?

20    A.  Yes.

21    Q.  And did you see the car drive off?

22    A.  Yes.

23    Q.  This was after that third shot?

24    A.  Yes.

25    Q.  Was anyone else in the car?

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 316 of 500 15906

```
 1    A.   No.

 2    Q.   And in what direction did David drive?

 3    A.   Towards Travon body.

 4    Q.   In the direction of the body?

 5    A.   Uh-huh.

 6    Q.   Did he pass the body?

 7    A.   Yes.

 8    Q.   Was the car driving slowly or quickly?

 9    A.   Fast.

10    Q.   When Cool Wop is standing near Travon, kneeling over, is

11    anyone else near Cool Wop?

12    A.   No.

13    Q.   You didn't see anybody else?

14    A.   No.

15    Q.   You mentioned previously that Big Ant was there, and then he

16    fired that second shot.  Do you remember that?

17    A.   Yes.

18    Q.   Do you know, first just yes or no, do you know where Big Ant

19    went after that second shot?

20    A.   Yes.

21    Q.   Where?

22    A.   Over there by the grass.

23    Q.   Over there by the what?

24    A.   Grass.

25    Q.   Can we see the grassy area where Big Ant went to?
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 317 of 500

15907

1    A.  Yes.

2    Q.  I'm going to ask if you can step down.  I think this will be

3    the last time.  Take a pen, please, and just make a mark for us

4    in the approximate area where that grass is where you saw Big

5    Ant after that second shot.

6    A.  (Witness complies.)

7    Q.  For the record, looks like you made a circle just about a

8    quarter of an inch, directly on top of where you wrote the TO,

9    the dot where you said Travon was killed.  Correct?

10   A.  Yes.

11   Q.  And it appears to be just a little bit to the right and

12   above that, what appears to be a speed bump.  Correct?

13   A.  Yes.

14   Q.  Okay.  You can sit down.

15   A.  (Witness complies.)

16   Q.  When Big Ant goes over to that grassy area, do you see what

17   he's doing?

18   A.  Looking in the grass.

19   Q.  Looking in the grass?

20   A.  Yes.

21   Q.  Is there anything near the grass that you saw?

22   A.  I know it's a -- I mean, a little sidewalk.

23   Q.  There's a sidewalk and there's grass?

24   A.  Yes.

25   Q.  Is there a fence around there?

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 318 of 500

# EXHIBIT   Z

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | June 20, 2007 |
| DOMINIC SAMUELS, | : | 9:16 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 70 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:       UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney,
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 320 of 500

1   A.     My son.

2   Q.     What's your son's name?

3   A.     Anthony O'Brien.

4   Q.     And what happened then when you were on the phone?

5   A.     I heard three gunshots.

6   Q.     What did you do when you heard the shots?

7   A.     I tried to get out the door to get to my daughter, but my

8   daughter was stuck.

9   Q.     So you said you tried to get out the door to get to your

10  daughter.  Where -- which door were you trying to get out of?

11  A.     The back door.

12  Q.     Okay.  And if I could just have you step down and kind of

13  show where -- which side of the building the back door is on.

14  A.     (Indicating.)

15  Q.     And again, you're pointing to that red dot right there at

16  the right of that horseshoe; is that correct?

17  A.     Yes.

18         MR. CARNEY:  Your Honor, I object to the leading exhibit.

19         THE COURT:  Overruled.

20  BY MS. PETALAS:

21  Q.     You may resume the stand.

22         And you said you heard shots and you went out the back

23  door?

24  A.     Yes.

25  Q.     Who -- was it just you?  Anybody else?

1    A.      My cousin, Gloria Bimbo.

2            THE COURT REPORTER:  I'm sorry.  Say the last name again.

3            THE WITNESS:  Gloria Bimbo.

4    BY MS. PETALAS:

5    Q.      And where were you trying to go when you went out the

6    door?

7    A.      To get to my daughter.

8    Q.      And where at that point, in your mind, did you think that

9    your daughter was?

10   A.      Beside the car.

11   Q.      Beside whose car?

12   A.      My brother's.

13   Q.      And where was your brother's car?

14   A.      Parked out back in the parking lot.

15   Q.      And how many shots did you hear?

16   A.      Three.

17   Q.      And when did you hear these three shots?  Were they all

18   in a row or were you still on the phone when you heard all three

19   of them or what happened?

20           MR. CARNEY:  Objection.

21           MR. TABACKMAN:  Objection.

22           THE COURT:  Sustained.

23   BY MS. PETALAS:

24   Q.      Tell us how you heard the shots and where you were when

25   you heard each of those shots?

1              MR. BALAREZO:  Objection, compound.

2              THE WITNESS:  I was standing --

3              THE COURT:  Why don't you rephrase.

4    BY MS. PETALAS:

5    Q.    You said you heard three shots.  Where were you when you

6    first started hearing the shots?

7    A.     In the front room.

8    Q.    Okay.  And where were you when you heard the second --

9    were you still on the phone at that point?

10             MR. BALAREZO:  Objection.

11             THE WITNESS:  No, I dropped the phone.

12             THE COURT:  Hold on a second.  What was the question?

13   BY MS. PETALAS:

14   Q.    Were you still on the phone at that point?

15             THE COURT:  Go ahead.

16             THE WITNESS:  Yes.

17   BY MS. PETALAS:

18   Q.    Okay.  And what did you do when you heard that shot?

19   A.     I dropped the phone.

20   Q.    Okay.  You said you heard a second shot.  How soon after

21   the first shot did you hear the second shot?

22             MR. TABACKMAN:  Objection, leading.

23             THE COURT:  Overruled.

24   BY MS. PETALAS:

25   Q.    You can answer.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 323 of 500

1    A.    Can you repeat that?

2    Q.    Sure.  You said you heard three shots.  I'm going through

3    each of the shots.  We talked about the first shot and you said

4    you heard the second shot.  How soon after the first shot did

5    you hear the second shot?

6    A.    A second.

7    Q.    And where were you when you heard that second shot?

8    A.    Trying to get out the back door.

9    Q.    And then finally you talked about a third shot.  How soon

10   after the second shot did you hear the third shot?

11   A.    About a second apart.

12   Q.    And where were you then when you heard this third shot?

13   A.    Still trying to get out the door.

14   Q.    You said trying to get out the door.  Did you have some

15   difficulty in getting out the door?

16   A.    Yes.  My door was stuck.

17   Q.    What do you mean, your door was stuck?

18   A.    My wood on my back door was swollen from the rain.

19   Q.    So were you able to get the door open?

20   A.    Yes.

21   Q.    And what happened after you got the door open?

22   A.    I ran down the steps.

23   Q.    And which direction are you running?

24   A.    Straight down the steps to make a right.

25   Q.    Okay.  I'm going to have you, if you could, just get off

1    the stand and show us where you were running.

2    A.    (Indicating.)

3    Q.    Okay.  And for the record, you pointed from that red dot

4    kind of down a walkway leading down, directly down the

5    photograph; is that correct?

6    A.    Yes.

7          MR. BALAREZO:  Your Honor, objection.  Can we approach?

8          THE COURT:  Beg your pardon?

9          MR. BALAREZO:  Could I approach?

10         THE COURT:  Yes.

11         (Following sidebar discussion had on the record:)

12         MR. BALAREZO:  Your Honor, I don't know what the exhibit

13   number is that's up there with this witness now.

14         THE COURT:  She listed what the exhibit number is.

15         MR. BALAREZO:  The thing -- I'm objecting to the use of

16   the exhibit number with this witness because they're going to be

17   talking about the same --

18         THE COURT:  Because what?

19         MR. BALAREZO:  She's going to be testifying about the same

20   subject matter that Brittany O'Brien testified about and she put

21   all these tags and red dots on the map and it's basically

22   suggesting to this witness things that the other witness has

23   testified about.  So what I would suggest is the government use a

24   clean exhibit to go over it with this witness.

25         THE COURT:  Anything else?

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 325 of 500

 1           MR. CARNEY:  She said 122.2 and my objection is it's

 2    leading because the witness has used and marked the location on

 3    the same thing, so it's a leading form of exhibit.  And I move

 4    for a mistrial because it's setting forth these central facts,

 5    which this is a critical case, critical witness, and it goes to

 6    the essential nature of her testimony.  So I object on use of

 7    that exhibit.

 8           THE COURT:  Anything else?

 9           MS. PETALAS:  No.

10           THE COURT:  The objection is overruled and motion for a

11    mistrial is overruled -- is denied, rather.

12           What else did you ask for?

13           MR. BALAREZO:  I just objected to the exhibit.

14           THE COURT:  All right.  And the government may use that

15    exhibit and all of those issues can be explored on cross, if

16    necessary.  The red dots have apparently some kind of a ballpoint

17    pen marking.  They're very small.  The witness was not asked to

18    read the dots.  The markings on the dots the previous witness was

19    able to see, and I think you all were able to see, only by going

20    right up and looking to see what was on the red dots.

21           But all that can be explored on cross-examination.  So the

22    motion for mistrial is denied.  It's baseless.  The request --

23    the objection to use of the exhibit is denied.

24           I think I've covered everything, right?

25           MR. BALAREZO:  Thank you.

 1              (Sidebar discussion concluded.)

 2      BY MS. PETALAS:

 3      Q.      Ma'am, you talked about -- you showed on the map where

 4      you went.  What happened when you went down that sidewalk that

 5      you showed us?  What did you see?

 6      A.      I seen Cool Wah leaving the body.

 7      Q.      Okay.  And you said "Cool Wah."  Who's "Cool Wah"?

 8      A.      He's behind you.  He's behind you.

 9      Q.      You said he's behind me?

10      A.      Yes.

11      Q.      Do you see him?

12      A.      Yes.

13      Q.      Could you identify by where he's sitting or an article of

14      clothing.

15      A.      He's with the blue shirt on, dark blue shirt, behind you.

16      Light-skinned fellow.

17      Q.      And what color tie?  What color tie, can you see?

18              You can stand up.

19      A.      I think that's beige or white.

20      Q.      You said a dark blue shirt?

21      A.      Um-hmm.

22      Q.      Is he wearing a suit jacket or no?

23      A.      No.

24              MS. PETALAS:  Your Honor, may the record reflect an

25      in-court identification of Mr. Wilson?

1          MS. WICKS:   No objection.

2          THE COURT:   Request is granted.

3     BY MS. PETALAS:

4     Q.     You said he was leaving the body.   What do you mean,

5     "leaving the body"?   What body?

6     A.     The body of a young man that was on the ground dead.

7     Q.     Okay.   Did you know the young man that was on the ground?

8     A.     No.

9     Q.     Did you know who he was?

10    A.     No, until later on that night.

11    Q.     Okay.   And we'll get to that later.   So you see --

12    where -- do you see the body when you come out?

13    A.     Not exactly, until I turned to go towards the alley part.

14    Q.     You said until you turned to go to the alley.   What do

15    you mean, "turn"?

16    A.     When I come down my steps and make a right.

17    Q.     I'm sorry to have you keep getting up, but if you could

18    just kind of point to on the map where you were when you said

19    you turned.

20    A.     (Indicating.)

21    Q.     Are you talking about the turn directly after the red dot

22    or down further in the alley?

23    A.     After the red dot.

24    Q.     Is that after the red dot or further down in the alley?

25    A.     About right here (indicating).

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 328 of 500

1   Q.    Okay.  And for the record, you've placed -- you're

2   pointing to, directly, right where the cars are parked there?

3   A.    Yes.

4   Q.    Okay.  You can resume the stand.  Okay.  And when -- how

5   close were you to where those parked cars are when you first saw

6   Cool Wah?

7   A.    I saw him before I got to the car.

8   Q.    Okay.  And what was he doing when you saw him?

9   A.    Going towards the car door?

10  Q.    Towards what car door?

11  A.    Boy-Boy's car.

12  Q.    You said Boy-Boy's car.  Could you describe the car?

13  A.    I don't know the model or name of the cars.

14  Q.    Do you remember what color it was?

15  A.    It was -- I ain't for sure.  I think it's gold.

16  Q.    Okay.  Is it a two-door?  Four-door?

17  A.    Four-door.

18  Q.    I'm sorry?

19  A.    Four-door.

20  Q.    Okay.  And you're saying "car."  A car as opposed to a

21  truck?

22  A.    No, it's a car.

23  Q.    Okay.  And you referred to it as "Boy-Boy's car."  Why do

24  you call it Boy-Boy's car?

25  A.    Because that's who I be seeing drive it.

1    Q.    And how -- you said -- how many times had you seen

2    Boy-Boy drive this car?

3    A.    Every day.

4    Q.    And what happens -- what is -- is Cool Wah, when you

5    first see him, is he in the car or is he -- what is he doing

6    exactly?

7    A.    He's walking towards the car.

8         MS. WICKS:  Objection.

9         THE COURT:  Hold on one second.  Let me hear the

10   objection.

11        MS. WICKS:  Asked and answered.

12        THE COURT:  Overruled.

13   BY MS. PETALAS:

14   Q.    What is he doing?

15   A.    Walking towards the car.

16   Q.    You say walking.  How fast was he walking?

17   A.    Not fast.

18   Q.    Did you see anything in his hand at that point?

19   A.    Yes.

20   Q.    What did you see in his hand?

21   A.    A gun.

22   Q.    Could you tell what kind of gun it was?

23   A.    I don't know the name of them guns.

24   Q.    Was it a revolver?  An automatic?  Do you know the

25   difference?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 330 of 500

```
 1    A.    No.

 2    Q.    What color was it?

 3    A.    I couldn't really tell what color it was.

 4    Q.    And what did you do when you saw Cool Wah walking?

 5    A.    I went towards the opposite way to go get my daughter

 6    Brittany.

 7    Q.    And how close did you get to -- how close did Cool Wah

 8    get to you?

 9    A.    Not that close.

10    Q.    Can you point to maybe a spot in the courtroom on the

11    distance?

12    A.    On the board?

13    Q.    Oh, no.  Just in the courtroom.  Like, was Cool Wah

14    closer -- closer than I am to you or further back?

15    A.    Further back.

16    Q.    Okay.  Do you see a point in the courtroom that you can

17    point to of how close Cool Wah got to you?

18    A.    About where the lady with the beige sitting at.

19    Q.    Right here (indicating)?

20    A.    Um-hmm.

21         MS. PETALAS:  Your Honor, may the record reflect -- I

22    don't know if there's a measurement for approximately the witness

23    stand, looks like to the front wall.

24         THE COURT:  Approximately 28 and a half feet.

25         MS. PETALAS:  Thank you, Your Honor.
```

```
 1    BY MS. PETALAS:

 2    Q.    And could you see Cool Wah's face?

 3    A.    Yes.

 4    Q.    Could you at any point see whether or not he appeared to

 5    be looking at you?

 6    A.    No.

 7    Q.    Did you make eye contact with Cool Wah?

 8    A.    Yes.

 9    Q.    And did you -- did he say anything to you?

10    A.    No.

11    Q.    Did you say anything to him?

12    A.    No.

13    Q.    And what then did you see him do?

14    A.    Get in the car.

15    Q.    And what -- did you see what he did after he got in the

16    car?

17          MS. WICKS:  Objection, leading.

18          THE COURT:  Overruled.

19    BY MS. PETALAS:

20    Q.    What happened after he got in the car?

21    A.    He pulled off.·

22    Q.    And which direction was the car facing?

23    A.    The (indicating) -- the alley, upwards.

24    Q.    Okay.  And I'm just going to take that a step back.  The

25    car that he got in, was it moving at the time that -- before he
```

1   got in it?

2   A.    No, it wasn't moving at all.

3   Q.    Okay.  And where was it parked?

4         I'm going to have you step down.  If you could just point

5   to us, where it was parked.

6   A.    (Indicating.)

7         MS. WICKS:  Same objection, Your Honor, for the record.

8         THE COURT:  Same as what?

9         MS. WICKS:  The previous objection at the bench.

10        THE COURT:  Overruled.

11  BY MS. PETALAS:

12  Q.    And you're pointing to a spot on the map.  I'm just going

13  to hand you a red dot.

14        MS. PETALAS:  May I approach, Your Honor?

15        THE COURT:  Yes.

16  BY MS. PETALAS:

17  Q.    I'm going to ask you just to place this where you were

18  pointing to right there.

19  A.    (Complied.)

20  Q.    I'm going to also hand you a pen.  If you could just

21  write on there "car" or -- maybe "car."  And then initial it at

22  the bottom.

23        And which direction -- was it in a parking space or --

24  A.    No.

25  Q.    Where was it?

1   A.   Facing towards the body.

2   Q.   Okay.  And if I could just have you use that microphone

3   so everybody can hear you.

4        You said it was facing towards the body.  Is that towards

5   the right, looking towards the right of the photograph or the

6   left as you're staring at it?

7   A.   The right.

8   Q.   Okay.  And you can get back -- resume the stand.  Thank

9   you.

10       And once it -- did you see it leave the alley?

11  A.   Yes.

12  Q.   And you said it was facing towards the body.  Which way

13  did it go?

14  A.   It went straight where I had just put that red dot.

15  Q.   Okay.  So did it go in the direction of the body?

16  A.   It went around the body.

17  Q.   And had you seen this individual Cool Wah before?

18  A.   Yes.

19  Q.   How often did you see him?

20  A.   Every other day.

21  Q.   And how -- where would you see him?

22  A.   I'd go to the truck or I'd go to the store or I'd go look

23  for my kids.

24  Q.   You said you would go to the truck.  What truck are you

25  referring to?

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 334 of 500

1    A.    The ice cream truck.

2    Q.    You also mentioned an individual Boy-Boy.  Who is

3    Boy-Boy?

4    A.    He's behind you.

5    Q.    Okay.  You can get up.  If you could identify --

6    A.    He's with the white shirt on.

7    Q.    What color tie?

8    A.    Red.

9    Q.    Is that the individual standing up?

10   A.    Yes.

11         MS. PETALAS:  Your Honor, may the record reflect an

12   in-court identification of Mr. Bell?

13         MR. BEANE:  No objection.

14         THE COURT:  Request is granted.

15   BY MS. PETALAS:

16   Q.    And how did you know Boy-Boy?

17   A.    His mother lived right behind me.

18   Q.    And when this occurred, was this during the day or at

19   night?

20   A.    At night.

21   Q.    And what was the lighting like back there?

22   A.    I mean, it had a little light, but you could see.

23   Q.    Could you see Cool Wah's face?

24   A.    Yes.

25   Q.    And how sure are you that it was Cool Wah?

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 335 of 500

# EXHIBIT   AA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 3, 2007 |
| DOMINIC SAMUELS, | : | 2:10 p.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 45 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

 For the United States:     UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            Gilberto Guerrero, Assistant
                            United States Attorney
                            555 4th Street
                            Washington, DC  20001
                            202.305.0174


 For Defendant             CARNEY & CARNEY
 Antwuan Ball:             John James Carney, Esq.
                            South Building
                            601 Pennsylvania Avenue, N.W.
                            Washington, DC  20004
                            202.434.8234

1        MR. TABACKMAN:  And that's my point.

2        THE COURT:  Anything else?

3        MR. LEON:  No.

4        THE COURT:  The point there is there's nothing wrong with

5   you going back and saying, just impeaching with, did he say X,

6   did he ask X.  Either he did or he didn't.  Either she remembers

7   or she doesn't.  Either she admits it or she denies it and then

8   you can -- then you can follow up, if necessary, after that.

9        But there's nothing wrong -- I think Mr. Tabackman's point

10  is simply that the broad question, did he say anything else

11  doesn't fairly allow her an opportunity to be confronted with her

12  prior statement that he also said to me, or he also said to

13  Tanay, did you see the -- whatever that says.  Is that a fair --

14       MR. TABACKMAN:  Yeah, and --

15       THE COURT:  So, put your -- put the question with greater

16  specificity, then simply, did he say anything else?

17       MR. TABACKMAN:  The question is, to say that -- there's no

18  answer to what did Shanay tell him.

19       THE COURT:  I know that.

20       MR. TABACKMAN:  Okay.

21       MR. LEON:  Okay.

22       (Sidebar discussion concluded.)

23  BY MR. LEON:

24  Q.   Ms. Ryals, during this first conversation that -- after

25  the shooting that you and Shanay and Tanay had with Big Ant,

1    still on that first conversation, do you remember if Big Ant

2    asked Shanay, in your presence, whether or not she, Shanay, saw

3    the shooting?

4    A.    Yes.

5    Q.    And did Big Ant ask Shanay if she witnessed the shooting?

6    A.    Yes.

7    Q.    And was this the same conversation when Big Ant told you

8    and Shanay and Tanay not to talk to nobody?

9    A.    Yes.

10   Q.    Did -- I believe the record's clear, but let me make sure

11   it is.  Did you, yourself, eyewitness this shooting?

12   A.    No.

13   Q.    Do you remember if you said that to Big Ant at any point?

14   A.    Yes.

15   Q.    And you told him you didn't see the shooting?

16   A.    Yes.

17   Q.    Now, do you remember approximately the next day having

18   another conversation with Big Ant and Tanay and Shanay regarding

19   the shooting?

20   A.    I don't know, maybe.

21   Q.    Okay.  I'm going to ask if you can turn to page 28 of

22   your transcript.  And I'm going to ask you to look first at page

23   28, line 16, and if you could look, start there and read all the

24   way down to the end of page 29.

25   A.    All the way to which number?

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 339 of 500

1   Q.    If you can keep reading all the way down to the end of

2   page 29, and then actually also read to page 30 and through page

3   30, if you could.

4        Okay.  Are you done?  Do you remember during this

5   conversation, the second conversation that you had with Big

6   Ant -- first of all, do you remember who else was present during

7   this conversation?

8   A.    Me and Shanay and Tanay.

9   Q.    Okay.  And was this a conversation that happened in

10  person?  In other words, not over the phone, but where

11  everyone's looking and listening at each other?

12  A.    Yes.

13  Q.    Okay.  And during this conversation, do you remember

14  Big Ant saying something to you, you Toya?

15  A.    Uhn-uhn, no.

16  Q.    Okay.  I'm going to ask if you could turn to page 29.

17  A.    I'm on page 29.

18  Q.    Okay.  And I'm going to start reading on line 13.  And

19  tell me if I'm reading correctly.

20        MR. TABACKMAN:  Which page is this?

21        MR. LEON:  Counsel, 29, line 13.

22  BY MR. LEON:

23  Q.    "Question:  Well, do you remember, did she -- did he ever

24  say to you, you know, don't say anything?"

25        "Answer:  He was telling me -- yeah, he told -- yeah, he

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013      Page 340 of 500

1   was telling her -- all of us, just don't -- just be quiet, don't

2   talk to people.  Yeah, like that, don't talk to people."

3           "Question:  Okay.  Did he say people as a whole or police

4   or prosecutors or just don't talk to anybody?"

5           "Answer:  No, he said 'don't talk to nobody'."

6           "Question:  Okay.  And when he was telling that to you,

7   it sounds like Shanay was with you; is that right?"

8           "Um-hmm."

9           "Question:  Is that "yes"?"

10          "Answer:  Yes."

11          "Question:  And were other people standing there with you

12   at that time?"

13          "Answer:  No.  Probably me, Shanay and Tanay."

14          "Question:  Okay.  So you think Tanay was present as

15   well?"

16          "Answer:  Yes."  And then there's a final question.

17          "Question:  Okay.  Did he actually ask Shanay and Tanay if

18   they saw the shooting?"

19          "Answer:  I don't remember."

20          And that finished up on page 30, line 8.  Did I read that

21   correctly?

22   A.     Yes.

23   Q.     And that was your grand jury testimony?  Yes?

24   A.     Yes.

25   Q.     Now, during this second conversation when Big Ant said

1    did stop going around Congress Park.  That's what I'm trying to

2    elicit.  And this witness is -- perhaps my predicate question

3    could have been clearer as is often the case, but that's all I'm

4    trying to go to.  She observed and she heard Shanay say, let's

5    not go back to Congress Park for a while, and that's where I'm

6    trying to go.

7         So that's where I'm trying to go.  So I think it is fair

8    to say, do you know if -- I could say it like, do you know if

9    they took that instruction seriously?  I mean, anyway I ask it,

10   it's going to be objected to.  I'm trying to think -- that's

11   where I'm trying to go.

12        THE COURT:  I think I'll allow you to ask a question that

13   would elicit from her, her perception of their demeanor, like

14   were they happy, sad, frightened, blah-blah-blah, rather than

15   their comment.  If you can do that, I'll let you do that.

16        MR. TABACKMAN:  Your Honor, that is grossly unfair.

17        THE COURT:  To elicit perception of their demeanor?

18        MR. TABACKMAN:  They had those witnesses on the stand.

19   They never asked them a question about Mr. Ball and their

20   interaction with Mr. Ball because they knew those witnesses were

21   not saying, you know, anything about this.

22        THE COURT:  There's no improper evidentiary basis for him

23   to ask this witness about their perception with these two other

24   witnesses.

25        MR. TABACKMAN:  But, Your Honor --

1          THE COURT:   Anything else?   Overruled.

2          (Sidebar discussion concluded.)

3    BY MR. LEON:

4    Q.    Okay, Ms. Ryals.   During this second conversation that

5    you had with Big Ant where Shanay and Tanay were present, after

6    Big Ant, Antwuan, said those things to you and them, how did

7    Shanay seem to you?

8    A.    Uhm, she was just -- she was the same as she was.   She

9    was just scared.

10   Q.    I couldn't --

11   A.    Scared.

12   Q.    And why do you say that?

13   A.    I don't know, maybe because she was back there.   I don't

14   know.   And people knew she was back there.

15   Q.    And what about Tanay, how did Tanay seem to you after

16   Big Ant said that?

17   A.    The same way.

18   Q.    Which is what?

19   A.    Scared.

20   Q.    After Big Ant, Antwuan, said these things to the three of

21   you, did -- do you know -- first just yes or no -- if Shanay

22   kept coming back to Congress Park?

23   A.    Kept coming back?

24   Q.    If you don't understand the question, I can ask a better

25   one.

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 343 of 500

```
1    A.    No, I understand.  I just don't -- I don't remember.  I

2    think so, yeah.  I can't remember.

3    Q.    Well, let me ask you this:  Do you know at that time,

4    August of 2002, where Shanay lived?  Did she live in Congress

5    Park?

6    A.    I can't remember.

7    Q.    You can't remember?  Okay.

8          What about Tanay?  Do you know if Tanay lived in Congress

9    Park?

10   A.    Yes.

11   Q.    And at the time that Big Ant, Antwuan, had this second

12   conversation with you, did the three of you, Shanay, Tanay and

13   yourself, spend time in Congress Park --

14   A.    Yes.

15   Q.    -- hanging out?

16   A.    Yes.

17   Q.    Do you know somebody -- or did you know somebody back in

18   August of 2002 named Ivy?

19   A.    Named who?

20   Q.    Ivy.  If the answer is no, you can say no.

21   A.    No.

22   Q.    Okay.  Do you know -- do you remember when we looked at

23   that map of Congress Park and we saw your house on it?

24   A.    Yes.

25   Q.    Was Tanay's house on that map?  Do you remember --
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 344 of 500

# EXHIBIT   BB

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 8, 2007 |
| DOMINIC SAMUELS, | : | 9:20 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 47 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:          UNITED STATES ATTORNEY'S OFFICE
                                Glenn S. Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174


For Defendant                   CARNEY & CARNEY
Antwuan Ball:                   John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 346 of 500

1          THE COURT:  I'll allow it.

2          THE WITNESS:  Uhm, I can't remember if I told him.  I

3    think I -- I can't remember -- I can't flat out -- to be honest,

4    I can't flat out remember if I told him I was cooperating, but I

5    told him dudes was cooperating on him.

6          MR. CARNEY:  Your Honor, objection, narrative answer.

7          THE COURT:  I'll allow it.

8          THE WITNESS:  And I was telling him the dudes was

9    cooperating on him.  And he was like --

10   BY MS. PETALAS:

11   Q.    After you told him that the people were cooperating on

12   him, what did he say?

13   A.    He was like, "You letting them people put words in your

14   mouth, you bitch ass nigga, I hope you die.  I'll blow your head

15   off when I see you."

16   Q.    Is this what he was saying to you on the phone?

17   A.    Yeah, "Don't call me no more.  You fucking with them

18   peoples."  And I was like, "Twan, man, I ain't even fucking with

19   the people.  I ain't saying nothing about you man."  He was

20   like, "Fuck you, die."  Click.  "Don't ever call me no more."

21   And that conversation, he blocked his number.

22   Q.    When you say "blocked his number," what do you mean by

23   that?

24   A.    I couldn't call his house no more.

25   Q.    And when you couldn't call his house anymore, did you

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :      Docket No. CR 05-100
                                   :
              Plaintiff            :
                                   :
v.                                 :      Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :      May 8, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
            Defendants             :      1:30 p.m.
. . . . . . . . . . . . . . . . . :   . . . . . . . . . . . . .

               VOLUME 47 - AFTERNOON SESSION
           *TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
        *BEFORE THE HONORABLE RICHARD W. ROBERTS,*
        *UNITED STATES DISTRICT JUDGE, and a jury*


APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530


For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

10557

```
 1    Q.   Okay.  You said up on the lane?

 2    A.   Kairi.

 3    Q.   Up in the lane, which lane?

 4    A.   Langston Lane.

 5    Q.   And how did you meet Deuce from Langston Lane?

 6    A.   I met Deuce from like way -- I met Deuce when Kairi was

 7    living.  The first time I met Deuce, the day Kairi -- as a

 8    matter of fact, me and my sister and Shara (ph) was riding down

 9    to go to her house, and Big Ki was in the car behind us.  That's

10    the first day I met Deuce.

11    Q.   Well, you said Big Ki was in the car behind you.  Was Deuce

12    with him?

13    A.   No, he was getting out of jail.

14    Q.   Who was getting out of jail?

15    A.   Big Ki was getting out of jail and we went to Wellington

16    Park.  That's the first day I met Deuce.

17    Q.   And when you met Deuce, who introduced you to Deuce?  How

18    did you meet Deuce?

19    A.   Big Ki.  They was right there.

20    Q.   And did you ever see -- you said Deuce was from the lane.

21    Did you ever see Deuce around Congress Park?

22    A.   Yes.

23    Q.   And who would you see him with when you saw him around

24    Congress Park?

25    A.   Twuan, Jojo, any of us.  He hang with any of us.
```

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013    Page 349 of 500

10558

```
 1    Q.  And when you had -- tell us about this conversation you had

 2    in the alley.  What was the conversation?  What if anything did

 3    Antwuan say?

 4    A.  He was like, "We going to have to kill anybody we think

 5    that's going to tell when they come, before they come."

 6    Q.  Well, what do you mean by that, "Anybody that's going to

 7    come, before they come."  What are you talking about?

 8    A.  Anybody we thought that was going to tell, Twuan was like,

 9    "We need to kill them before they bring this conspiracy."

10    Q.  And did anybody -- did anyone who was at that meeting

11    express any disagreement with that thought?

12              MR. ZUCKER:  Objection to the term "meeting."

13              THE COURT:  Overruled.

14    BY MS. PETALAS:

15    Q.  Did anybody express any disagreement with that idea?

16    A.  Nope.

17    Q.  Did you express any disagreement with the idea?

18    A.  Nope.

19    Q.  Were you okay with that idea?

20    A.  Yes.

21    Q.  And you mentioned the term "conspiracy."  What do you mean,

22    "if they bring the conspiracy."  Did you have information about

23    a conspiracy coming?

24    A.  Naw, I ain't have information then about a conspiracy.

25    Q.  You've talked about Boy-Boy, and referred to his alley.  Why
```

# EXHIBIT   CC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 17, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:15 p.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . .

VOLUME 52 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE,* and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

1    A.  I can't remember how many, but a particular day he was

2    saying to LT --

3    Q.  I'll stop you there.  I just want to establish a time frame.

4    Do you remember a particular conversation that you had with

5    Antwuan about a conspiracy case?

6    A.  Yes.

7    Q.  And was LT there?

8    A.  Yes.

9    Q.  Anyone else there other than you, LT, and Antwuan?

10   A.  No.

11   Q.  And to the best of your memory, where was this conversation?

12   Where were you physically?

13   A.  We was driving.

14   Q.  In what vehicle?

15   A.  His Expedition.

16   Q.  Was this the same conversation when Antwuan said he was

17   going to smash Travonne?

18   A.  Yes.

19   Q.  And so again, you were driving that vehicle?

20   A.  Yes.  And he basically said -- told LT to hurry up, he

21   needed to hurry up and get out the halfway house so he could

22   start getting rid of some of the guys that he thought was going

23   to flip.

24   Q.  Who said that?

25   A.  Antwuan.

1    Q.   Did Antwuan mention anyone in particular?

2    A.   Naw, he basically thought that Jazz and Santuce and Dazz and

3    them was going to be the first to flip.

4    Q.   That's what Antwuan told you?

5    A.   And Boy-Boy, yes.

6    Q.   Now, who actually -- was the word "conspiracy" or

7    "conspiracy case" used during this conversation?

8    A.   Yes.  He said a guy by the name of Munya was calling home,

9    saying that the feds was on they way, they was getting ready to

10   drop a conspiracy.

11   Q.   Do you know who Munya is?

12   A.   Yes.

13   Q.   Who is Munya?

14   A.   He's a guy that comes from around Congress Park.

15   Q.   How do you know Munya?

16   A.   Basically grew up with him too, around there.

17   Q.   Did you speak to Munya or did Antwuan speak to Munya?

18   A.   It was never said who spoke to him.  It was like he was

19   calling home saying it, to whoever, I don't know.

20   Q.   But who said that Munya is calling home?

21   A.   I don't know.  Antwuan said that he was calling out there

22   saying it, but he never said he had talked to him per se.

23   Q.   I see.  And let's focus on you.  When is the last time you

24   yourself have seen Munya?

25   A.   About two years -- yeah, about two years ago.

```
 1    Q.  Where were you, where was he?

 2    A.  We was in county jail.

 3    Q.  County jail where?

 4    A.  Arlington.

 5    Q.  So two years ago would be about 2005 or so?

 6    A.  Right.

 7    Q.  How long were you and Munya together at Arlington?

 8    A.  He was on two different blocks.  We was on two different

 9    blocks for a minute, so --

10           MR. BALAREZO:  Objection, nonresponsive.

11           THE COURT:  Sustained.

12    A.  I don't know.

13    BY MR. LEON:

14    Q.  Okay.  How many times did you see, lay eyes on Munya when

15    you were in Arlington?

16    A.  It was a lot.

17    Q.  Did you hang out with him?

18    A.  No.

19    Q.  Did you ever talk to him about a conspiracy case?

20    A.  Yeah, he said it was a conspiracy case coming.

21    Q.  And that was in 2005 or so?

22    A.  Yes.  But he never got into the specifics of the case.

23    Q.  Why?

24           MR. BALAREZO:  Objection.

25           MR. ZUCKER:  Objection.  Actually, withdrawn.  I
```

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 355 of 500

11789

```
1    withdraw mine.  I don't know about Balarezo.
2              THE COURT:  I didn't hear two.  Were there two?
3              THE REPORTER:  I didn't, either.
4              THE COURT:  I didn't, either.  Go ahead.
5    BY MR. LEON:
6    Q.  Why didn't you get into specifics with him?
7    A.  We wasn't that tight, you know.  I knew what he was out
8    there for, you know, and he knew what I was out there for.  We
9    wasn't that tight.
10   Q.  Now, in 2005, when you were in Arlington, had you and I ever
11   met before?
12   A.  No.
13   Q.  Had you talked -- well, withdrawn.  Withdraw that.
14              What else, if anything, did Antwuan say, just about the
15   conspiracy case, if anything?
16   A.  That was it.  That was it, that I can remember.
17   Q.  What else, if anything, did LT say in response to Antwuan
18   when Antwuan said words to the effect of, "You got to get out of
19   that halfway house soon so we can do these things"?
20   A.  He was like, "All right."  He was like, "Okay," you know.
21   Q.  Did you say anything?
22   A.  Naw, I was just listening.  I think it ain't really dawn on
23   him that I was -- I think he was more so venting at the time.  I
24   don't think it dawned on him that I was in the truck at the
25   time, you know.
```

# EXHIBIT   DD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 31, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 9:15 a.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 59 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006
                          (202) 454-2811

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 358 of 500   13708

```
 1                    MR. LEON:  Permission to approach?

 2                    THE COURT:  Yes.

 3     BY MR. LEON:

 4     Q.  Detective, you said that you conducted a photo

 5     identification procedure on March 8th, 1994 --

 6     A.  Yes.

 7     Q.  -- with Mr. Carter.  Is that correct?

 8     A.  Yes.

 9     Q.  And the exhibits that are now in evidence, you said were the

10     photographs you showed to him?

11     A.  That's correct.

12     Q.  I'm going to ask you -- I've got the exhibits here.  First

13     of all, on Government's 400.9, were they put in a certain order?

14     A.  Yes, they were.

15     Q.  And did you record that order?

16     A.  Yes, I did.

17     Q.  One through nine?

18     A.  Yes.

19     Q.  And is it possible for you, as you sit here today 13-plus

20     years later, to know the exact order that they were shown to

21     Mr. Carter?

22     A.  Yes.

23     Q.  Why is that?

24     A.  Because I documented the order they were shown.

25     Q.  Okay.  And recorded it in what way?
```

1    A.  From the numbers on the photograph, as well as the dates

2    that are on the photographs.

3    Q.  Okay.  Before we publish these to the jury, can you tell

4    us -- I apologize if you did already, I don't know if you did,

5    how you chose which photographs to put in this array?

6    A.  Basically sex, race, skin complexion, hair, some physical

7    descriptions.  It depends on how people are described.

8    Q.  And what is your goal, if any, in deciding which -- based on

9    those characteristics, which photographs to choose for these

10   nine photos?

11   A.  No, just that it's fair, that it's very fair and impartial,

12   that one photograph does not stand out more than the others.

13   That's your ultimate goal, that it's a very fair and impartial

14   set of photos.

15   Q.  I would like you to take us one by one.  And I put some

16   tacks in front of you.  If you could take each photograph out in

17   the order, and I'm going to ask if you can in each case put

18   them, top to bottom, one through nine, on the poster board which

19   is now in front of you on the easel which is right next to you.

20        And at the same time, if you could tell us which

21   photograph you're putting up, which exhibit number it is on the

22   back.

23        MR. LEON:  And at the same time I would ask, with the

24   court's permission, to publish also that photograph off of the

25   computer.

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 360 of 500 13710

```
 1    BY MR. LEON:

 2    Q.  So which is the first photograph you showed?

 3    A.  The first photograph would be --

 4         MS. WICKS:  Your Honor, objection to this procedure, if

 5    I understand correctly what the government is asking to do.  May

 6    we approach?

 7         THE COURT:  Yes.

 8         (BENCH CONFERENCE ON THE RECORD.)

 9         MS. WICKS:  If I understand, what they're asking to do

10    is display the exhibit on the monitors while he's putting it up,

11    so simultaneously two things are happening.  The jurors can't

12    pay attention to all of them at the same time.  We either need

13    it to be done one way or the other way.

14         THE COURT:  Overruled.

15         (END BENCH CONFERENCE.)

16    BY MR. LEON:

17    Q.  What's the first photograph, number one, of the nine that

18    you showed to Mr. Carter?

19    A.  As on the board?

20    Q.  Please stand and put them on the board.  But also, so we can

21    make a record and also display to the jury off the screen, tell

22    us what the Exhibit Number is on the back.

23         THE COURT:  Hand him the portable mic.

24         MR. LEON:  Yes.

25    A.  This first photograph is Exhibit 400.3N, as in Nancy; the
```

USCA Case #11-3031    Document #1445852         Filed: 07/10/2013    Page 361 of 500

```
 1    second one is Exhibit 400.3M, as in Mary; the second one is

 2    Exhibit 400.3O, O as in Oscar.

 3    Q.  I'm sorry, I think you said the second one.  Is that the

 4    third --

 5    A.  The third.  I apologize, the third one.

 6    Q.  Okay.

 7    A.  The fourth photograph is Exhibit 400.3L, as in Lima; the

 8    fifth photograph is 400.3Q; the sixth photograph is 400.3J; the

 9    seventh photograph is Exhibit 400.3P, as in Paul; the eighth

10    photograph is 400.3S; and the ninth photograph is 400.3R.

11    Q.  Just so the record is clear, I just don't know if it was

12    clear as to what the third photograph was.  Is this the third

13    photograph I'm pulling?

14    A.  Yes, it is.

15    Q.  Just for the record, that's Exhibit 400.3O?

16    A.  Yes.

17    Q.  3O?

18    A.  3O.

19    Q.  Now, tell us how you showed these photographs to Mr. Carter

20    on March 8th, '94?

21    A.  I pretty much told Mr. Carter take his time, look through

22    each photograph carefully.  And if he identified anybody, to let

23    me know who he identified in reference to this case.

24    Q.  And did he identify somebody?

25    A.  Yes, he did.
```

1    Q.  Which numbered photograph did he identify?

2    A.  He identified the sixth photograph.

3    Q.  And why don't you pull that off and tell us the exhibit

4    number.

5    A.  Exhibit Number 400.3J.

6    Q.  And when he identified that person, and if you need to refer

7    to your -- well, first of all, when he identified that person,

8    did he say something, yes or no?

9    A.  Yes, he did.

10   Q.  Did you record what he said?

11   A.  Yes, I did.

12   Q.  And is that recorded on Government's Exhibit 400.9, which

13   you've identified as your write-up from that day?

14   A.  Yes, it is.

15   Q.  Would reviewing that refresh your recollection as to exactly

16   what Mr. Carter said when he identified photo number six?

17   A.  Yes, please.

18   Q.  Tell us what Mr. Carter said.

19   A.  He looked at the sixth photograph and stated, "That's him.

20   He was the driver, and he was shooting."

21   Q.  During this identification procedure, did Mr. Carter

22   indicate the name of this person?

23   A.  Yes, he did.

24   Q.  And what was the name that he gave?

25   A.  Antwuan.

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013      Page 363 of 500   3713

```
1    Q.   Now, during these -- you can sit down just for a moment,
2    although I going to ask you to get up in a moment.
3              During this, staying with March 8th, 1994, this photo
4    identification procedure, was Mr. Carter cooperative?
5    A.   Initially he wasn't, but during this part he was.
6    Q.   What do you mean by that?
7    A.   Initially, when he was first spoken to, he couldn't remember
8    who shot him, just that he was shot, and didn't provide any
9    names.
10             Once he came down to our office, we interviewed him, he
11   then provided the name of the people who were responsible.
12   Q.   Did you tell him what names?
13   A.   No, I did not.
14   Q.   Who gave who the names on March 8th?
15   A.   Mr. Carter.
16   Q.   Gave them to whom?
17   A.   To myself and the other investigators.
18   Q.   How else did Mr. Carter appear?  Specifically, did he appear
19   to are under the influence of any drugs or alcohol?
20   A.   No, he did not.
21   Q.   Did he seem to understand the identification procedures that
22   you were conducting with him?
23   A.   Yes, he did.
24   Q.   Was he cooperative on this date?
25   A.   Yes, he was.
```

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 364 of 500 13714

1   Q.   Okay.   Now I would like to go two days later to March 10th

2   of 1994.   Was there another separate photo identification

3   procedure done with Mr. Carter this two days later?

4   A.   Yes, there was.

5   Q.   And where did this occur?

6   A.   This one occurred at his home.

7   Q.   Whose home?

8   A.   Mr. Carter's.

9   Q.   And tell us, did you go -- did you participate in this?

10  A.   Yes, I did.

11  Q.   Did you go alone or with anyone else?

12  A.   I went with another detective.

13  Q.   Who was that?

14  A.   I think it was Detective Dodson.

15  Q.   Is there something that would refresh your recollection, or

16  are you're pretty sure -- are you sure it was him?

17  A.   I can look at some of my paperwork to see, just to refresh.

18         MR. LEON:   May I approach?

19         THE COURT:   Yes.

20  BY MR. LEON:

21  Q.   I'm handing you what's marked for identification as

22  Government's 400.10.   Do you know what that is?

23  A.   This is a Metropolitan Police Department police form 123.

24  Q.   With respect to -- who prepared it?

25  A.   I did.

```
 1    Q.   And it relates to what date?

 2    A.   March the 10th, 1994.

 3    Q.   And does that memorialize the -- in part the identification

 4    procedures you conducted with Mr. Carter on that date, with

 5    respect to the second individual?

 6    A.   Yes, it did.

 7    Q.   And does that refresh your recollection as to who you were

 8    with when you conducted this photo identification procedure with

 9    Mr. Carter in his home?

10    A.   Yes.

11    Q.   Who was it?

12    A.   Detective Dodson, Tyrone Dodson.

13    Q.   And tell us about this photo identification procedure.  How

14    many photographs did you use on this date?

15    A.   The same:  Nine; one including eight fillers, one of the

16    suspect.

17    Q.   And just so we're clear -- well, withdrawn.

18              May I approach?

19              THE COURT:  Yes.

20    BY MR. LEON:

21    Q.   Detective, I'm handing you what's marked for identification

22    as Government's 400.3A, 400.3B, 400.3C, 400.3D, 400.3E, 400.3F,

23    400.3G, and 400.3I.

24              MR. LEON:  And Your Honor, the government would move

25    for their admission.  And we've already consulted with -- well,
```

```
 1    we would move for their admission.

 2              THE COURT:  That's eight photographs?

 3              MR. LEON:  It's nine, so perhaps I missed one.  I

 4    apologize.

 5              Government's 400.3A, 3B, 3C, 3D, 3E, 3F, 3G, 3H, and

 6    3I.

 7              MR. MARTIN:  No objection, Your Honor.

 8              THE COURT:  Without objection, they're received.

 9              (Government Exhibits 400.3A, 400.3B, 400.3C, 400.3D,

10    400.3E, 400.3F, 400.3G, 400.3H, and 400.3I were moved into

11    evidence.)

12    BY MR. LEON:

13    Q.   How did you choose those photographs?

14    A.   Same way, based on race, physical appearance, and age.

15    Q.   And what was your goal in putting --

16    A.   Once again, to see if a victim can identify a suspect in

17    reference to this case.

18    Q.   This is the last time I'm going to ask you to do it, but I'm

19    going to ask you to stand up and please show the order in which

20    you though showed these photographs to Mr. Carter.

21    A.   First one is going to be Exhibit 400.3A; second one will be

22    400.3B; third one will be Exhibit 400.3C; fourth one would be

23    Exhibit 400.3D; fifth one would be Exhibit 400.3E; sixth one

24    would be Exhibit 400.3F; seventh would be Exhibit 400.3G; eighth

25    one would be Exhibit 400.3H; and the ninth one would be
```

1    Exhibit 400.3I.

2    Q.  And how did you actually physically show these photographs

3    to Mr. Carter?

4    A.  Again, I handed it to him and asked him to take his time,

5    look through each photograph to see if there was anybody that

6    was involved in this offense.

7    Q.  You can sit down.

8         Actually, before you sit down, why don't you tell us,

9    did he identify someone from the photos?

10   A.  Yes, he did.

11   Q.  Which numbered photograph did he identify?

12   A.  The sixth photograph.

13   Q.  Why don't you pull that if you could, and then sit down.

14   A.  (Witness complies.)

15   Q.  And for the record, what is the exhibit number of the sixth

16   photograph that Mr. Carter positively identified?

17   A.  Exhibit 400.3F.

18   Q.  And did you memorialize in Government's 400.10 exactly what

19   Mr. Carter said when he positively identified that photograph?

20   A.  Yes, I did.

21   Q.  Tell us what Mr. Carter said, exactly.

22   A.  He stopped at the sixth photograph and stated, "There he is.

23   That's Jojo.  He was shooting from the back."

24   Q.  When he said this to you, did you record it just the way you

25   read it?

1    A.   Yes.

2    Q.   Did Mr. Carter appear to have any doubt as to what he told

3    you?

4    A.   No.

5    Q.   Did you suggest to him what to say?

6    A.   No, I did not.

7    Q.   Did you tell him the name Jojo at any point before he said

8    Jojo?

9    A.   No, I did not.

10   Q.   Did Mr. Carter appear to be under the influence of any drugs

11   or any alcohol when he made this positive identification of the

12   person he identified as Jojo?

13   A.   No, he was not.

14   Q.   On this date, March 10th, 1994, was Mr. Carter cooperative

15   with you?

16   A.   Yes, he was.

17            MR. LEON:   Can I just have one moment, Your Honor?

18            THE COURT:   Yes.

19   BY MR. LEON:

20   Q.   Just a couple of final questions, Detective.  Back then, in

21   February and March specifically of 1994, you said you were

22   working for -- where were you assigned within MPD?

23   A.   The Violent Crime and Gang Task Force.

24   Q.   At that time, back in 1994, March, did you know anything

25   about any beef between a group called One-Five and a group

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 369 of 500

# EXHIBIT   EE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :  Docket No. CR 05-100
                                   :
     v.                            :
                                   :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  May 31, 2007
DOMINIC SAMUELS,                   :  2:15 p.m.
                                   :
          Defendants.              :
                                   :
                                   :
                                   :

VOLUME 59 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:        UNITED STATES ATTORNEY'S OFFICE
                                Glenn S. Leon, Assistant United
                                States Attorney
                                Ann H. Petalas, Assistant United
                                States Attorney,
                                Gilberto Guerrero, Assistant
                                United States Attorney
                                555 4th Street
                                Washington, DC  20001
                                202.305.0174


  For Defendant                 CARNEY & CARNEY
  Antwuan Ball:                 John James Carney, Esq.
                                South Building
                                601 Pennsylvania Avenue, N.W.
                                Washington, DC  20004
                                202.434.8234

1   A.    When I got outside, he had walked -- he was walking away

2   from the window.  He was leaving to go out in the yard, so I was

3   like, "What's up?"  He was like, "Man" --

4   Q.    Before you tell me that, how was he acting then?

5   A.    He was shaking.  He was real hyped.  He was like he ain't

6   trying to go back to jail.

7   Q.    Now, in that condition, what did Brad say?

8         MR. TABACKMAN:  Objection.  Can we approach, Your Honor?

9         THE COURT:  Yes.

10        (Following sidebar discussion had on the record:)

11        MR. TABACKMAN:  We don't have any -- all we have is

12   shaking, basically, real hyped.  We don't have voices, what his

13   voice is like, that he's sweating.  The big thing is, I think, in

14   terms of the ability to reflect, the first words this witness

15   just said is, "I ain't -- I ain't going back to jail."

16        So this witness now -- so now we have Mr. Carter making an

17   excited utterance supposedly when what he's doing is he's

18   reflecting a clear indication of reflection here.  I think there

19   is just not a basis to make an excited utterance.  We don't have

20   the length of time between when Black got shot and --

21        I just think that -- I mean, the Court understands this,

22   so I don't need to go on.  I think it's clear that it's not

23   excited to the level that hearsay should come in.

24        THE COURT:  Were you going to ask anything more about his

25   condition or his appearance?

1     MR. GUERRERO:  I can, Judge, but I think the record

2  establishes that this witness saw Bradley Carter hyped, excited;

3  I think his own words were "shaking."  And I think the statement

4  that previously just came out was "Black just got shot," to

5  establish a close proximity to the excited utterance that we're

6  just about to hear.

7     THE COURT:  I'm not arguing with you.  I was just asking

8  if you were planning to ask anything more about his appearance.

9  There was some reference to blood and running.  I didn't know if

10 you were following up on that or not.

11    MR. GUERRERO:  I can follow up on that.

12    MR. TABACKMAN:  Your Honor -- I'm sorry.

13    Mr. Carter had been interviewed by the police.

14    THE COURT:  Say that again.

15    MR. TABACKMAN:  Mr. Carter had been interviewed by the

16 police by the time he's talking with this gentleman.

17    THE COURT:  That's not in the record.

18    MR. ZUCKER:  Your Honor, while he's reviewing something,

19 I'd like to respond.  I just note that I did check with some of

20 the people who are more familiar with the area and in fact to get

21 from 15th and Alabama, this approximate area, over to -- to get

22 there from greater Southeast, which is, I think, the hospital he

23 says he went to, as well as to get from the scene of the

24 shooting, which I think was 23rd -- I mean, each of those are

25 like 10, 15 minute rides, which I think, going from -- and they

1    went from the scene of the shooting to the hospital; while at the

2    hospital, he was there for a little while and was concerned about

3    being arrested because he knew there was an outstanding warrant,

4    so there's reflection on that, and then there's the additional

5    travel to the scene where the statement was made, all of which, I

6    think, undercuts the legitimacy of the excited utterance.

7         THE COURT:  I think that'll go to the weight and not the

8    admissibility.

9         (Sidebar discussion concluded.)

10   BY MR. GUERRERO:

11   Q.    All right.  I just want to follow up a little bit with

12   what you said was the physical appearance of Brad when you're

13   outside with him and you said "hyped" and you also said it

14   looked like he'd been running.  Describe that.  Tell us exactly

15   how he appeared?

16   A.    He was sweating, he was tired, he was just -- you could

17   tell he'd been running.

18   Q.    And in that condition, in addition to what you told us

19   earlier, what did Brad say to you?

20   A.    He said him, Black, Travis and Pooh, they was going to

21   the liquor store.  And he said that -- I think they stopped at a

22   stop sign or a light or something.

23        MR. CARNEY:  Objection.

24        MR. MARTIN:  Objection.

25        THE COURT:  Sustained.

 1   BY MR. GUERRERO:

 2   Q.   Tell us what you recall, what you recall Brad saying.

 3   A.   And he said a car pulled up beside them.  He said that

 4   when he looked over --

 5   Q.   Nice and loud.

 6   A.   He said a car pulled up beside him.  He said he looked

 7   over.  He said he seen Antwuan and Jo-Jo in the car.

 8   Q.   And did -- in that condition, did Brad tell you what, if

 9   anything, Antwuan and/or Jo-Jo did?

10   A.   He didn't say Jo-Jo did anything.  He said Antwuan

11   started shooting out the window of his car.

12   Q.   When you're talking to Brad, did you notice whether he

13   had any injuries?

14   A.   Yes.  He had -- he got shot in the hand.

15   Q.   What did you see in his hand?

16   A.   Blood.

17   Q.   And raise up your hand so the jury can see.  Which hand

18   are you talking about?

19   A.   This hand right here (indicating), the right hand.

20   Q.   The right hand?

21   A.   Yeah.

22   Q.   You said that Brad mentioned Jo-Jo.  Do you know who that

23   is?

24   A.   Yes.

25   Q.   And how do you know Jo-Jo?

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 375 of 500

# EXHIBIT   FF

1946

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :       Docket No. CR 05-100
                                   :
          Plaintiff                :
                                   :
v.                                 :       Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :       March 29, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
          Defendants               :       1:00 p.m.
. . . . . . . . . . . . . . . . . . :  . . . . . . . . . . . .

VOLUME 26 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE, and a jury*

APPEARANCES:

For the United States:   ANN H. PETALAS, ESQUIRE
                         GLENN S. LEON, ESQUIRE
                         GIL GUERRERO, ESQUIRE
                         UNITED STATES ATTORNEY'S OFFICE
                         555 Fourth Street, NW
                         Washington, D.C.  20530

For the Defendant        JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:            CARNEY & CARNEY
                         601 Pennsylvania Avenue, NW
                         Suite 900, South Building
                         Washington, DC  20004
                         (202) 434-8234

                         STEVEN CARL TABACKMAN, ESQUIRE
                         TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20006
                         (202) 454-2811

1    admission?

2         MR. ZUCKER:  Because it's only coming in against one

3    party, not against the rest of the defendants.

4         THE COURT:  And that's an instruction I would be giving

5    at the end of the case with respect to everything that's come

6    in.  But not every time an admission by only one party comes in

7    with respect to that one party am I going to be giving an

8    instruction.  That would just delay this trial tremendously.  So

9    your request is denied.

10        MR. ZUCKER:  But given the rulings previously that

11   everything that comes in comes in against the group, the jury

12   will have no way to distinguish at this point and six months

13   from now or five months from now, whenever we give the jury

14   instructions, we're not going to be able to reference this

15   specific statement.

16        THE COURT:  And why wouldn't you?

17        MR. ZUCKER:  Not unless I remember.

18        THE COURT:  I sympathize, but the request is denied.

19        (END BENCH CONFERENCE.)

20   BY MR. LEON:

21   Q.  Mr. Capies, you told us you heard the shots and you ran out

22   and saw Troy Lewis.  Correct?

23   A.  I heard the shots, came to the corner, yes, sir, and looked

24   down the street and saw.

25   Q.  Did you see with your own eyes who shot Troy Lewis?

```
 1    A.  No, sir.

 2    Q.  You said that it appeared that he was moving when you first

 3    laid eyes on him.  Correct?

 4    A.  Yeah, he was moving for a second, but not that long.

 5    Q.  And when you say "not that long," what happened -- what

 6    happened shortly after that?

 7    A.  He just stopped.  I guess he was dead right there.

 8    Q.  Now, earlier you stated that Antwuan killed Troy.

 9    A.  Yes.

10    Q.  How do you know that?

11    A.  He told me.

12    Q.  Who told you?

13    A.  Antwuan.

14    Q.  Tell us what Antwuan told you.

15    A.  One day I was -- well, actually, I was acting kind of like

16    funny.

17    Q.  You were acting funny?

18    A.  Towards him.

19    Q.  Towards who?

20    A.  Antwuan.

21    Q.  Why?

22    A.  Because Troy had a baby by my cousin.

23    Q.  What's your cousin's name?

24    A.  Sherry.

25    Q.  What's the baby's name?
```

5045

```
 1   A.   Little Troy.

 2   Q.   Okay.  So why were you acting funny towards Antwuan?

 3   A.   I mean, I was hearing stuff that Troy was doing, so I knew,

 4   you know, it was going to happen sooner or later, but me and him

 5   was cool.

 6   Q.   Who was cool?

 7   A.   Me and Troy.

 8   Q.   What kind of stuff were you hearing about Troy?

 9   A.   He was shooting at people feet and crying about small money

10   people owed him.

11   Q.   And these rumors you heard, where did you hear these rumors,

12   what neighborhood?

13   A.   Around Congress Park.

14   Q.   And when you said it was going to happen sooner or later,

15   what did you mean by that when you just said that?

16   A.   I mean, Antwuan was complaining about him.

17           MR. ZUCKER:  Objection, basis on Antwuan's complaining.

18           THE COURT:  And what?

19           MR. ZUCKER:  Basis as to Antwuan's complaint, unless

20   it's first person.

21           MR. LEON:  I'll ask.

22   BY MR. LEON:

23   Q.   Antwuan was complaining about him.  Did you hear Antwuan

24   complaining about Troy?

25   A.   Yes, sir.
```

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 380 of 500

1    Q.   With your own ears?

2    A.   Yes, sir.

3    Q.   Tell us about that.

4    A.   He was just like, "Man, he coming around here back in the

5    daytime, and we ain't going to be having that around here."

6    Q.   What is your understanding as to what that means, that "back

7    in the daytime"?

8    A.   He was known for -- Troy was known for being cruddy.

9    Q.   What do you mean by cruddy?

10   A.   Just robbing people and doing just little dumb stuff, like

11   robbing people and stuff.

12   Q.   Now, when Antwuan was complaining to you about Troy, was

13   this before or after Troy was killed?

14   A.   This was before Troy got killed.

15   Q.   How much before?

16   A.   I would say like some months, about two months.

17   Q.   And was this one particular conversation, complaint, or was

18   it more than one?

19   A.   This was one particular.

20   Q.   Okay.  And when you were with Antwuan and he was complaining

21   this one particular time, were you and he alone or was anyone

22   else there?

23   A.   There were several people around.

24   Q.   Who else was there?

25   A.   Smoke, Wop, Fat Tony.

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 381 of 500

1372047

```
1    Q.  And where were you-all when Antwuan was making this

2    complaint?

3    A.  In front of the Lincoln.

4    Q.  How long would you say this conversation took place?  How

5    long was it?

6    A.  It wasn't that long.  It was just like he coming around

7    here, you know what I'm saying, on some messed up time.

8    Q.  What do you mean by messed up time?

9    A.  I mean, you know, people owing him, and he looking for

10   them -- he looking for them for 40 and 50 dollars.

11   Q.  Now, you used the expression, "messed up time."  Is this

12   your expression or is this Antwuan Ball's word choice back then?

13   A.  That was his expression.

14   Q.  What else do you specifically remember Antwuan saying, his

15   words exactly, the best you can remember back then?

16   A.  He was like, "Man, we ain't going to have that around here,"

17   coming around here, you know what I'm saying, crying about 40 or

18   50 dollars about somebody owed him some money and he fronting

19   him coke.

20   Q.  And what if anything happened after Antwuan made this

21   complaint a few months before Troy was killed?

22   A.  It was a guy named Smoke that used to be around there, too.

23   Q.  Yeah.

24   A.  And Troy was looking for Truck, and Truck --

25          MR. PURPURA:  Objection.  Personal knowledge.  If
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 382 of 500

1048

1    there's a foundation.

2    BY MR. LEON:

3    Q.   Let me take a step back.  Let's just focus in on this

4    particular conversation that you're at, and these other people

5    and Antwuan.  At this meeting or this conversation, after

6    Antwuan makes the complaint that you just told us about, what if

7    anything happened at this meeting?

8    A.   What you mean?  Like, I mean, I don't understand.

9    Q.   Okay.  I'll ask again.  You said this meeting happened and

10   it lasted not too long?

11   A.   Yes.

12   Q.   Okay.  After Antwuan made his complaint, did anything else

13   happen at that time?

14   A.   Right there at that time, no.

15   Q.   Okay.  Did you ever talk to Antwuan, yes or no, before

16   Troy Lewis was killed at any other point about Troy Lewis?

17   A.   No.

18   Q.   Okay.  Now let's get to after Troy Lewis is killed.  I think

19   you said you were acting funny towards Antwuan.  Correct?

20   A.   Yes.

21   Q.   When is the next time -- well, first of all, describe funny.

22   Would you see Antwuan?

23   A.   Yes, I would see him.

24   Q.   When is the first time you saw Antwuan Ball after Troy Lewis

25   was killed?

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 383 of 500

```
 1    A.  I seen him that night.

 2    Q.  Where?

 3    A.  Just riding through, coming in the Circle.

 4    Q.  And tell us what happened when you saw Antwuan.  Was he

 5    riding in what?

 6    A.  He was driving in a car.  I can't remember what car it was.

 7    Q.  Was he alone or with anyone else?

 8    A.  He was by hisself.

 9    Q.  And did you see him?

10    A.  Yes.

11    Q.  Do you know if he saw you?

12    A.  Yes, he saw me.

13    Q.  How do you know?

14    A.  Because I was out there standing with everybody else.  He

15    waved.

16    Q.  He waved towards who?

17    A.  Everybody that was standing out there with me.

18    Q.  And were you acting funny towards him at that point?

19    A.  I mean, I wasn't really looking at him straight in his face.

20    Q.  Did you talk to Antwuan that night?

21    A.  No, sir.

22    Q.  When is the next time you talked to Antwuan?

23    A.  It was like a week.  Because I wasn't really staying around

24    there.  Like I was telling you, I was on the run and I was going

25    back and forth uptown.  So I seen him like a week later.
```

USCA Case #11-3031      Document #1445852          Filed: 07/10/2013      Page 384 of 500

1050

```
 1   Q.   Where was this?

 2   A.   In the Circle.

 3   Q.   And was he alone or with anyone else?

 4   A.   I can't remember.  But I remember talking to him.

 5   Q.   Tell us what you remember about this conversation.

 6   A.   I got -- he told me, "Come here for a minute."  He was like,

 7   "Come here for a minute and let me holler at you."  I got in the

 8   van with him and was talking to him.  He was, like, "Man, you

 9   know, man, sometimes little stuff happen, man, you know.  The

10   dudes around here, you know, on some cruddy time, man, you know

11   what I'm saying?  And he was going to any and everybody about

12   little stuff and keeping the mug on his face.

13            And he was like, "Man, and I found out that he had

14   something to do with my brother getting killed." --

15            MR. ZUCKER:  Objection.

16            MR. CARNEY:  Personal knowledge, 602.

17            MR. LEON:  It's -- I thought we discussed this at the

18   bench.

19            THE COURT:  I think it was "I found out that."  Why

20   don't you clarify how that happened, and then you can move on.

21   Or what that means.

22            MR. LEON:  Okay.

23   BY MR. LEON:

24   Q.   You said a few things.  Let's start in reverse order,

25   Mr. Capies.
```

5051

```
 1              I believe you said -- just the last thing you said is
 2    he, Antwuan, said to you that he, Antwuan, heard something about
 3    his brother being killed?
 4    A.  Yes, sir.
 5    Q.  Let's break that down.  First of all, his brother who?
 6    A.  Kairi.
 7    Q.  And at this point was Kairi already dead?
 8    A.  Yes, sir.
 9    Q.  And do you know -- don't go into the details, just first of
10    all, yes or no, do you know how Kairi was killed?  In other
11    words, did he die of natural causes or not natural causes?
12    A.  Not natural causes.
13    Q.  And tell us, just so the record is clear, what Antwuan said
14    to you about Kairi being killed.
15    A.  He was, like, a guy named Kevin told him that --
16              MR. ZUCKER:  Objection.  Actually, I withdraw the
17    objection.
18    BY MR. LEON:
19    Q.  Go ahead.
20    A.  He was, like, a guy named Kevin told him that some people
21    told him that Troy had something to do with his brother getting
22    killed.
23    Q.  And do you know Kevin's full name?
24    A.  Yes, sir.
25    Q.  What's Kevin's name?
```

5052

 1    A.   Kevin Gray.

 2    Q.   Okay.  You said a few other things.  I think earlier when

 3    you were describing this conversation, I think you said

 4    something like along the lines of "he was keeping mugging,"

 5    something along those lines.  Did you say something like that?

 6    A.   Yeah, that's just Troy, though.  He walking around with his

 7    face balled up.

 8    Q.   What does that mean?

 9    A.   I mean, like, he just walking around with his face balled

10    up.  I ain't know expression what he was feeling at that time or

11    not, but I just know he kept a mug on his face.

12    Q.   Now, he kept a mug on his face.  Is this what Antwuan said

13    or is this you describing what Antwuan was saying?

14    A.   I mean, it's what Antwuan said, and I seen him.  I always

15    seen Troy.  He always had his face balled up.

16    Q.   Did Antwuan, during this conversation, say anything else to

17    you about Troy specifically, problems he was having with Troy?

18         MR. ZUCKER:  Objection.  Leading.  Objection to the

19    form of that question.  It's leading.

20         THE COURT:  Overruled.

21    A.   He didn't say, you know what I'm saying, it's a personal

22    problem; he was, like, it's our problem.  I mean, he going to

23    come around here and front people coke, he shouldn't be shooting

24    at people's feet and all that.

25    BY MR. LEON:

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 387 of 500

5053

```
1    Q.  And with respect to what Kevin -- Antwuan told you that

2    Kevin told him about his brother being killed, what did Antwuan,

3    if anything, say to you about that, else say to you about that?

4    A.  He was just, like, "Kevin came to me and told me that Troy

5    got -- my people's say Troy got something to do with Kairi

6    getting killed."

7    Q.  And at that time did Antwuan indicate to you whether or not

8    he believed that Troy may have been behind Kairi's death?

9    A.  No, he didn't.

10   Q.  He didn't indicate to you, or he told you he didn't

11   believe --

12              MR. CARNEY:  Objection, Your Honor.

13              MR. LEON:  I just want to clarify the answer.

14              THE COURT:  Go ahead.

15   BY MR. LEON:

16   Q.  What do you mean by "he didn't"?  He didn't believe it or he

17   didn't indicate to you if he believed it?

18   A.  He didn't believe it.

19   Q.  Okay.  He told you he didn't believe it?

20   A.  Obviously he must have forgot that he told me beforehand,

21   before the conversation in the van, that his brother went out

22   with Kevin and got killed, and that he found out I guess his own

23   way - he ain't tell me how - that Kevin set Kairi up.

24   Q.  This is another conversation you had with Antwuan?

25   A.  Yes, sir.
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 388 of 500

```
1     Q.  This other conversation you had with Antwuan, was this
2     before or after the conversation you had with him when he's
3     talking about killing Troy Lewis?
4     A.  This before Troy Lewis.
5     Q.  Let's finish this conversation with Troy Lewis and then
6     we'll go back.  Okay?  Finish up this conversation where he
7     tells you he kills Troy Lewis.
8          What else, if anything, do you remember about this
9     conversation?
10    A.  That it was bull crap.
11    Q.  Were those his words or yours?
12    A.  I mean, I was thinking that in my Head when he was telling
13    me that.
14         MR. ZUCKER:  Your Honor, can I just request that the
15    witness be cautioned to repeat what the statements were.
16    Because we're melding the line between his interpretations and
17    the statements.
18         THE COURT:  No, I'm going to allow counsel to conduct
19    his inquiry, and it's in his interest to get the answers clear
20    as well.
21    BY MR. LEON:
22    Q.  What do you remember -- still with this conversation you had
23    with Antwuan about a week later, what else do you remember, if
24    anything, about what Antwuan said to you about why he killed
25    Troy Lewis?
```

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 389 of 500

3055

```
1    A.  He said at that time that Kevin told him that his peoples

2    said that Troy had something to do with Kairi getting killed.

3    Q.  What else, if anything, do you remember Antwuan saying to

4    you?

5    A.  I mean, that's just about it.

6    Q.  During this conversation, did Antwuan describe for you how

7    he did this or not?

8    A.  Yes, sir.

9    Q.  And tell us what he -- how he described how he did the

10   murder.

11   A.  He said that he came out the cut of the back where

12   Mika Murphy and them live at, and ran down on Troy getting in

13   his Truck.

14   Q.  And?

15   A.  He fired shots on him.

16   Q.  Now, Mr. Capies, I'm going to ask you to clear the screen by

17   tapping it on the lower right-hand portion.

18   A.  (Witness complies.)

19   Q.  Now, you've mentioned someone named Tamika Murphy?

20   A.  Yes, sir.

21   Q.  And did she live anywhere on the map that we're looking at?

22   A.  Yes, sir.

23   Q.  And for the record, we're looking at an enlarged portion of

24   Government's 100.1.

25         Where is Tamika Murphy's house?
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 390 of 500

```
1    A.   (Witness complies.)

2    Q.   For the record, you've put a line above looks like three

3    different roof tops.  Is it the left, the center, or the right

4    of where that line seems to be?

5    A.   It's the first one.

6    Q.   First one on the left or on the right?

7    A.   To the left.

8    Q.   You've mentioned several times the Lincoln.  Do you see the

9    Lincoln here?

10   A.   Yes, sir.

11   Q.   Don't touch it, but can you describe what the Lincoln is and

12   where it is?

13   A.   Yes, sir.

14   Q.   Describe it.

15   A.   It's a big old parking lot with buildings in the back.

16   Q.   And where is it on this picture we're looking at?

17   A.   On Congress Street.

18   Q.   There appears to be a big parking lot just to the left of

19   the line you drew.  Is that the parking lot you're referring to?

20   A.   Yes, sir.

21   Q.   And the house that's Tamika Murphy's is therefore the house

22   closest to that parking lot?

23   A.   Yes, sir.  No, sir, no, sir.  Correction.

24   Q.   Okay.  Okay.

25   A.   Because it's right there on the side.  It's an apartment
```

USCA Case #11-3031      Document #1445852           Filed: 07/10/2013      Page 391 of 500

```
 1   right there.  You can't hardly see it, but it's right there.

 2   Q.  Okay.  Tamika Murphy's house is -- do you see the three

 3   houses near the line you've made the mark?

 4   A.  Yes, sir.

 5   Q.  It's the one on the left of those three houses?

 6   A.  It's hard to explain.  It's too small.  It's joined

 7   together, and it's that one little building on the left right

 8   there.

 9   Q.  Okay.  Tell us -- when you said Antwuan told you that he cut

10   past -- I believe words to the effect of "cut past Tamika

11   Murphy's house," tell us what you understood Antwuan to tell you

12   as he described what he did.

13   A.  He said he ran out the cut, like the back of that right

14   there.

15   Q.  What cut?  Can you see it?

16   A.  (Witness complies.)

17   Q.  Okay.  For the record, you made another line parallel to the

18   line above.  Does that cut have any relationship to the Lincoln?

19   A.  Yes, sir.

20   Q.  Tell us in words what relationship that cut has to the

21   Lincoln.

22   A.  The Lincoln right on the left-hand side to that cut as well.

23   Q.  Okay.  Is it in front of or behind the Murphy's house,

24   Tamika Murphy's house?

25   A.  It's behind.
```

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 392 of 500

5058

1    Q.   Okay.   And what else does Antwuan tell you after he says

2    he's running from that cut?

3    A.   He said he ran out, ran down on him with a mask.

4    Q.   Okay.   What did he tell you he did?

5    A.   He say he ran into the street so he couldn't get away from

6    him, and he opened shots on him.

7    Q.   Did he tell you where he was when he opened shots on him?

8    A.   In the front driver, the front of the van.

9    Q.   Did he describe -- did he actually demonstrate, or he just

10   told you in words?

11   A.   He just told me in words.

12   Q.   Okay.   And when he said he came up on the front driver's

13   side, what else, if anything, did he say to you about what he

14   did?

15   A.   He was just making sure he didn't get away from him.

16   Q.   And then what else did he say?

17   A.   Nothing else.

18   Q.   Did he tell you where he ran after -- or if he ran after he

19   shot him?

20   A.   Oh, yes, sir.

21   Q.   What did he tell you?

22   A.   It's back right here.   It's an alley right here in the back.

23   He said he had a car right there.

24   Q.   For the record, you made another mark which appears to be an

25   alley a little bit behind and a little bit to the right of what

# EXHIBIT  GG

10431

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :      Docket No. CR 05-100
                               :
               Plaintiff       :
                               :
v.                             :      Washington, DC
                               :
ANTWUAN BALL,                  :
DAVID WILSON,                  :
GREGORY BELL,                  :      May 8, 2007
DESMOND THURSTON,              :
JOSEPH JONES,                  :
DOMINIC SAMUELS,               :
                               :
               Defendants      :      1:30 p.m.
. . . . . . . . . . . . . . . . :   . . . . . . . . . .

VOLUME 47 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE,* and a jury


APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530


For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013      Page 395 of 500 0477

```
 1    A.  I can't recall what date, but it was in the daytime.  The

 2    police opened up his truck door and his brains fell out with his

 3    gun in his hand.

 4    Q.  Were you there for the -- did you witness --

 5    A.  I didn't witness the murder.

 6    Q.  -- him getting shot?

 7    A.  I didn't witness the murder, but I was walking back around

 8    the corner, and the police is all and shit right there.

 9    Q.  And where was Troy Lewis?

10    A.  Dead in his truck.

11    Q.  And this conversation that you were talking about, that you

12    walked up with Antwuan on that -- where you marked on the map in

13    that alley back there, how long after this, when you witnessed

14    Troy Lewis in the truck, how long after that did the

15    conversation take place?

16    A.  Maybe two to three weeks.

17    Q.  And when you pulled up -- or when you came up on this

18    conversation, what if anything were the individuals doing?

19    A.  They was talking about it.  When I walked up, they shut up.

20    And Twuan was like, "Naw, that's my little cousin, man."

21    Q.  So when you pulled up, you said it got quiet?

22    A.  Yeah.

23    Q.  And what did Twuan say then?

24    A.  Like, "Naw, that's my little cousin."

25    Q.  And after Twuan said that, what else, if anything, did Twuan
```

```
 1    say?

 2    A.   He continued on what he was talking about.

 3    Q.   What did he say?

 4    A.   He was explaining how he killed Troy.

 5    Q.   And what specifically was he saying?

 6    A.   He was saying how he put two through the windshield and went

 7    to the other side.  And when he hitting it, he said he stuck his

 8    hand through the glass.  He kept saying, "I stuck my hand

 9    through the glass."

10    Q.   And he said he stuck his hand through the glass.  Did he say

11    what glass he was talking about?

12    A.   The driver's side.

13         MR. ZUCKER:  I'm sorry, I couldn't hear the answer.

14         THE WITNESS:  The driver's side.

15    BY MS. PETALAS:

16    Q.   Did he say to you why he did this?

17    A.   No.

18         MS. PETALAS:  Court's indulgence.

19    BY MS. PETALAS:

20    Q.   Turning now -- I think earlier you had -- yesterday in your

21    testimony you had talked about something, the 10th Place beef.

22    Do you recall that?

23    A.   Yes.

24    Q.   Did you ever have -- well, when did this 10th Place beef

25    start, if you know?
```

# EXHIBIT   HH

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          :
                                   :
          Plaintiff,               :    Docket No. CR 05-100
                                   :
     v.                            :
                                   :
ANTWUAN BALL, DAVID WILSON,        :    Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :    April 2, 2007
DOMINIC SAMUELS,                   :    1:55 p.m.
                                   :
          Defendants.              :
                                   :
                                   :
                                   :


VOLUME 27 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*


APPEARANCES:

 For the United States:        UNITED STATES ATTORNEY'S OFFICE
                               Glenn S. Leon, Assistant United
                               States Attorney
                               Ann H. Petalas, Assistant United
                               States Attorney,
                               Gilberto Guerrero, Assistant
                               United States Attorney
                               555 4th Street
                               Washington, DC  20001
                               202.305.0174


 For Defendant                 CARNEY & CARNEY
 Antwuan Ball:                 John James Carney, Esq.
                               South Building
                               601 Pennsylvania Avenue, N.W.
                               Washington, DC  20004
                               202.434.8234

1    A.    It's like '97, early part.

2    Q.    Early part of '97?

3    A.    Yes, sir.

4    Q.    Did -- during these conversations in the early part of

5    '97 that you're having with Wop and Dazz, you said, I believe,

6    that Wop -- excuse me, that Dazz did not disagree with the talk

7    of retaliation.  Did Dazz ever say anything himself about

8    retaliation?

9    A.    Yes, sir.

10   Q.    Tell us what Dazz said about retaliation.

11   A.    That they went down there and got in a shootout with some

12   guys with 10th Place.

13   Q.    Who told you this?

14   A.    Dazz.

15   Q.    When did Dazz tell you this?

16   A.    I don't got no date on it, sir, but I remember him

17   telling me in the early part of '97.

18   Q.    Early part of?

19   A.    '97.

20         MR. ZUCKER:  Could I ask the witness to define what is the

21   early part of '97?  Is there any way to focus it?

22         THE COURT:  No.

23   BY MR. LEON:

24   Q.    What is the early part of '97 to you, Mr. Capies?

25   A.    January, February.

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 400 of 500

1    Q.    Okay.  Was this a specific conversation you can remember?

2    A.    Yes.

3    Q.    Tell us the specific conversation you remember having in

4    January, February, where Dazz told you about retaliating.

5    A.    He told me that him, Antwuan, LT, and Wop went down

6    10th Place to try to creep down on them guys, and somebody

7    opened fire on them, which they believe was Steve and Patrick,

8    and they stopped the car and jumped out and opened fire back.

9    Q.    Okay.  You've said a few things there.  Let's just follow

10   up.  First of all, Dazz told you about this?

11   A.    Yes, sir.

12   Q.    And he told you that Dazz was there and who else?

13   A.    LT, Twan, and Wop.

14   Q.    So four people in total?

15   A.    Yes, sir.

16   Q.    Okay.  And where did this shooting happen?

17   A.    On 10th Place.

18   Q.    Did he tell you where on 10th Place?

19   A.    No.  He just said 10th Place.

20   Q.    And did Dazz tell you who's idea it was to drive to

21   10th Place to do this shooting?

22   A.    I don't remember.

23   Q.    Okay.  And did he tell you how they got there?

24   A.    Yes.  By car.

25   Q.    Did he tell you whose car?

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 401 of 500

1   A.      No, I don't remember, sir.

2   Q.      Okay.  And did he tell you who from Congress Park, who

3   from the group Dazz was with, actually fired weapons?

4   A.      All of them that was in the car that I named.

5   Q.      All four?

6   A.      Yes.

7   Q.      And I believe you said that they were firing at Steve and

8   Patrick?

9   A.      Yes.

10  Q.      Anybody else?

11  A.      A dude named Redhead.

12  Q.      Redhead.  And did Dazz indicate to you whether or not

13  either Redhead or Steve or Patrick, any of those three fired

14  back?

15  A.      Yes.

16  Q.      Did they?

17  A.      Yes.

18  Q.      Who?

19  A.      Steve and Patrick.

20  Q.      And?

21  A.      And Redhead.

22  Q.      So all three did fire back?

23  A.      Yes.

24  Q.      Did Dazz indicate to you if anyone, anyone from

25  Congress Park or anyone from 10th Place, was actually hit with

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

     v.                   Cr. No.  05-100-13 (RWR)

DESMOND THURSTON

            Defendant.

**DEFENDANT'S MEMORANDUM IN AID OF
SENTENCING**

After a ten month long trial in which the jury heard all of the evidence cited by the government in its Memorandum and after several weeks of deliberation, the jury acquitted Desmond Thurston of participating in a narcotics conspiracy alleged to be in existence from 1992 to 2005.   Thurston was also acquitted of RICO conspiracy and all but two substantive offenses which involved the distribution of small quantities of crack cocaine on October 17, 2000 and November 18, 2003 respectively.   Counts 11 and 24.

Sentencing defendant to an extra thirty years, as the government demands, based primarily on the government's interpretation of relevant conduct under the sentencing guidelines, is constitutionally repugnant and would not serve the other statutory sentencing factors set forth in 18 USC §3553(a).  For the following reasons, Thurston requests that the Court reject the government's position and sentence him to no more than 33 months.

1

**SENTENCING GUIDELINES 18 U.S.C. § 3553(a)(4)**

The two small sales of which Thurston was convicted, typically would result in a guideline range of incarceration of 27 to 33 months.[1]  The government contends, however, that Thurston should be held responsible for 1.5 kilograms of cocaine base[2] and possession of a firearm based on the unreliable testimony of crack addicts and cooperators, whose unreliable testimony was obviously discredited by the jury.  Doing so, dramatically increases the guideline range by 22 levels, a difference of 30 years.

**Heightened Standard of Proof Required**
**Due to Disproportionate Impact of Enhancement**
**on Thurston's Sentence**

Given the contested 22 level enhancement sought by the government in this case the heightened clear and convincing standard of proof is required. See, *United States v. Jordan*, 256 F.3d 922, 927-28 (9th Cir. 2001); See also *United States v. Dare*, 425 F.3d 634 (9th Cir. 2005).  Defendant does not dispute that the preponderance of the evidence standard ordinarily applies to sentencing determinations.  *United States v. Watts*, 519 U.S. 148, 156 (1997).

---

[1] That calculation is based on offense level 16 (see PSR ¶ 141) and criminal history category III.  Although the PSR calculates a criminal history score of IV, defendant contests *infra* the additional two points added to his criminal history points by probation report writer for committing the instant offense while under a criminal justice sentence.  See, PSR ¶ 86.

[2] This quantity is the same that the government has attributed to the charged narcotics conspiracy.  Each of the seven defendant's who entered guilty pleas in this case, admitting to their involvement in the charged narcotics conspiracy, also admitted that he was accountable for 1.5 kilograms of crack.  *Government's Memorandum in Aid of Sentencing for Desmond Thurston* ("Memo"), p. 2.  Thurston did not plead guilty because he did not participate in the conspiracy.  After being vindicated by the jury, the government, nevertheless, seeks to hold him accountable to the exact same degree as if he had been convicted.

Neither the Supreme Court nor the District of Columbia Circuit has ruled that a heightened standard of proof is not constitutionally required in cases, as here, where the relevant conduct substantially increases the sentence.  In *Watts*, the Supreme Court noted "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence."  *United States v. Watts*, 519 U.S. at 156, 156-57, & n.2 (1997).  The Supreme Court, however, did not resolve the circuit conflict.

In *United States v. Long*, 328 F.3d 655 (DC Cir. 2003), the DC Circuit held that an eight level enhancement was not a tail that wagged the dog and, therefore, did not present extraordinary circumstances requiring a heightened standard of proof.  It again recognized that the question of a heightened standard of proof was left open in *Watts*, more recently in *Dorcely*, but did not rule on the issue, since *Dorcely* "does not press this argument."  *United States v. Dorcely*, 454 F.3d 366, 373 n.2 (D.C. Cir 2006).

The Ninth Circuit, however, has ruled that in exceptional cases, application of the clear and convincing standard is required.   *United States v. Jordan*, 256 F.3d at 926.  In *Jordan*, a nine level enhancement that more than doubled the length of the sentence authorized by the initial guideline range, presented such an "exceptional case."

The instant case involves a ten fold increase in defendant's sentence for relevant conduct.  Accordingly, it cannot be disputed that the enhancement sought in this case is a tail that wags the dog requiring the government to establish any enhancement by clear and convincing evidence.

**Evidence Cited by the Government in Support of
Estimated Drug Quantity Has Insufficient Indicia
of Reliability to Support its Probable Accuracy**

Because the quantity of drugs attributable to a defendant is the single most

important determinant of sentence length under the guidelines, it is crucial that the

information the district court relies on in calculating the defendant's base offense level have

"sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a),

*United States v. Acosta*, 85 F.3d 275 (7th Cir. 1996).  Moreover, where as here, the PSR

is conclusory, the burden lies in the first instance with the government to produce evidence

from which the district court can make a reliable finding.  *United States v. Sumner*, 325

F.3d 884, 890 (7th Cir. 2003).   The government has failed to do this.

Each of the witnesses relied upon by the government to support a finding that

Thurston distributed 1.5 kilograms of crack were either crack addicts (Martin and Parsons)

at the time of their alleged transactions or were testifying pursuant to cooperation

agreements in the hope of receiving a 5K letter from the government (Capies and Conner).

 For the following reasons the testimony of none of these witnesses is sufficiently reliable

to establish the probable accuracy that Thurston distributed 1.5 kilograms of crack cocaine.

**Bobby Capies**

Capies pleaded guilty to participating in the charged RICO conspiracy for, among

other things, his admitted drug dealing, murder of Devar Chandler, and numerous other

acts of violence.  Tr. 4/3/07, p. 5626-5627.[3]  As he had done multiple times in the past to

avoid jail time, he agreed to cooperate with the government in the hope of avoiding the rest

---

[3] Copies of the cited transcript pages of Mr. Capies' trial testimony are attached as
Exhibit A.

1396

of his life in jail.  Tr. 4/4/07, p. 5825.  With a strong motivation to assist the government in this case, Capies testified extensively and in detail about each of the defendants' drug dealings and numerous acts of violence that occurred in Congress Park over a ten year period.[4]  The jury obviously discredited Capies' testimony in its entirety, when it returned verdicts of not guilty on Count 1 and Count 2 for each of the defendants.   Even if this Court does not reach the same conclusion as the jury regarding Capies' general lack of credibility, and discount his testimony in its entirety for sentencing purposes, a closer review of his testimony regarding Thurston demonstrates insufficient reliability to support the probable accuracy of attributing any drug quantity to Thurston.

The government asserts that, based on Capies testimony, 3 kilograms of crack cocaine may be attributed to Thurston.  Memo, p. 16.  This estimate is calculated by assuming that Thurston sold 20 ziplocks every day, 5 days per week, 50 weeks per year for six years.  *Id*.  Capies testimony, however, does not provide a reliable factual basis for any of this assumption.

Capies never testified that Thurston distributed drug on a regular basis for six years. Capies did testify that during the 1992 to 1996 period he observed Thurston sell  drugs in Congress Park "[j]ust about every day."  Tr. 3/29/07, p. 4923.  That testimony was allegedly based on his observation of Thurston while he was also selling drugs "just about every day."  Tr. 3/28/07, p. 4812.  Even for that four year period, Capies' "just about every day" testimony is unreliable.  During a substantial portion of that period either Thurston or Capies was incarcerated and obviously not selling drugs on a daily basis.

_____

[4]  Capies testified that from 1996 until 2001 participants in every murder that occurred in Congress Park confessed to him.  Tr. 4/11/07, p. 6438

Thurston was incarcerated for all but the first 23 days of 1995 and the entire last half of 1996.  Tr. 9/24/07, p.m., p. 21614.  Capies  was locked up for "some months" in 1992.  Tr.  4/4/07, p. 5754.  In 1993, he admitted that he was "real bad back then, I was in and out of jails."  Tr. 4/4/07, p. 5754.  In 1994 he was "back and forth in shelter homes."  Tr. 4/4/07, p. 5754.  For a portion of the period that Thurston was not incarcerated in 1996, Capies was locked up at Oak Hill.  Tr. 4/4/07 p, 5756-5757.  Moreover, during this time period Capies testified that he was not selling drugs exclusively in Congress Park but "back and forth" between Congress Park and "around 37."  Tr. 3/28/07, p. 4839.  With respect to the 1996-2001 period, Capies did not testify, even generally, regarding the frequency of Thurston's drug dealing.  Accordingly, there is no reliable basis to find that Thurston distributed drugs on a daily basis for six years.

Nor does Capies testimony provide a reliable factual basis for estimating that Thurston sold 20 ziplocks per day.   When specifically asked about the amount of drugs he observed Thurston selling, Capies testified "dimes.  I mean there was no certain weight."   Tr. 3/29/07, p. 4923-4924.   Nor did Capies know how much or how often Thurston got drugs from his supplier in the1992-1996 time period.  Tr. 3/29/07, p. 4924-4925.

He claimed to have observed Thurston purchase from several suppliers after that time period, but could not estimate a quantity or frequency.  He claimed that he saw Thurston purchase from Boy Boy but did not know how much he was getting.  Tr. 4/2/07, pp. 5208-5209.  He claimed to "know" Thurston got "coke" from Cedric Conner but did not explain how he knew and "couldn't remember" what he was getting.  Tr. 4/2/07, p. 5238.

6

1398

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 408 of 500

While Capies' testimony may, if credited at all, establish that Thurston sold drugs, it does not provide a reliable basis for arriving at a particular quantity of cocaine for purposes of applying  U.S.S.G. § 2D1.1(a)(3).  It certainly does not provide a reliable factual basis for the government's proposed estimate of 20 ziplocks a day, 250 days per year for six years.

**Cedric Conner**

Conner pleaded guilty to participating in a narcotics conspiracy.  Tr.  4/24/07, p. 8379.[5]  By pleading guilty, he understood that he faces a ten year mandatory minimum sentence of incarceration and a guideline range of 168 - 235 months.  Tr. 4/24/07, 8355-8356.  He testified pursuant to a cooperation agreement, admitting that he hoped to avoid any jail time.  Tr. 4/24/07, p. 8356.  To get that benefit he knew that the government had to file a 5K letter with the court and that the government was the one to determine whether his testimony was "truthful" before it would file the letter.  Tr. 4/24/07, pp. 8384-8386.  Despite the requirement to provide truthful testimony Conner provided, what can best be described as fantastic, a description of his drug purchasing trips to Spanish Harlem.[6]  The jury obviously discredited Conner's testimony regarding his claimed sales to Thurston and codefendants because they acquitted them all of participation in the narcotics conspiracy.

---

[5]  Copies of the cited transcript pages of Mr. Conner's trial testimony are attached as Exhibit B.

[6]   Conner claimed that he purchased a half kilo of cocaine by going to Spanish Harlem and when approached by a stranger, would give him $10,000.  He would then  wait around for someone to return later with the cocaine.  Tr. 4/25/07, p. 8623-8626.  Whether this story was told to protect his suppliers or to exaggerate the extent of his drug dealing, it is clear that he was not testifying truthfully.

1399

Even if the Court credits Conner's testimony in general, his testimony regarding transactions with Thurston fails to provide sufficient indicia of reliability to support the probable accuracy of an estimate that he sold "28 to 140 grams" to Thurston. See, Memo, p. 18. That estimate, proffered by the government, is based on Conner's direct testimony that he sold to Thurston 4 to 5 times in quantities of a quarter to a half each time in 1999/2000. *Id.*

On cross examination, however, Conner admitted that he couldn't recall exactly the quantity of his first sale to Thurston "somewhere in the neighborhood" of 1996. Tr. 4/25/07, p. 8628-8629.   Nor could he recall any general circumstances about the sale like what month it was, what season or whether it was day or nighttime. Tr. 4/25/07, p. 8630.   On further examination he admitted "I don't recall what he bought that time." Tr. 4/25/07, p. 8631.   When asked about the second transaction, he candidly explained,

> The question you're asking me is like asking me how many times I've been
> to the grocery store and how much money have I spent.   I mean, I can't
> recall that.

Tr. 4/25/07, p. 8631.   When asked about whether there even was a third sale, he testified "could have been, could have not been."   Tr. 4/25/07, p. 8631.   "It could have been maybe one to five times, at max."   Tr. 4/25/07, p. 8632.   Based on Conner's testimony, there is simply no reliable basis for estimating four of five sales to Thurston of 7 to 28 grams each.

**Ed Martin/Gail Parsons**

The government cites to the testimony of crack addicts Ed Martin and Gail Parsons as evidence from which to estimate that Thurston distributed 900 grams of crack cocaine. Memo p.13.   Martin and Parsons admittedly were crack cocaine addicts throughout the

period about which they were testifying.  In this regard, the court must subject the drug quantity information provided by them to special scrutiny.  *United States v. Miele*, 989 F.2d 659, 666 (3rd Cir. 1993), see also  *United States v. Kinnard*, 465 F.2d 566, 570-71 (D.C.Cir.1972)(general rule that addict informant testimony be received with caution and scrutinized with care).

The government asks the court to assume that Martin purchased an eight ball from Thurston every week for six years.  Memo, p. 13.  Neither Martin's nor Parsons' testimony, even if credited, provide sufficient indicia of reliability to support the probable accuracy of these assumptions.

There is no factual basis for assuming a six year period of drug dealing between Martin and Thurston.  The time period Martin testified about was from 1992, when he met Gail Parsons, until the later part of 2001, when he moved from the DC area.  Tr. 3/22/07, pp. 3759, 3746.[7]  From 1992 to the date of his testimony, Martin testified that he went into treatment for his addiction "like four times."  Tr. 3/22/07, p. 3755.  He explained that when he relapsed, as he did in 1992, he would go out [and use drugs] for about thirty days and then stop and "go back into my program and would stay clean again for two years."  Tr. 3/22/07, p. 3753.  There is no factual basis establishing that Martin was a continuous purchaser of crack cocaine in Congress Park throughout the 1992 to 2001 period.

Nor is there evidence as to when during this time period, Martin met Thurston.  Rather, the evidence is that "at some point" and "over time" Martin received drugs from Thurston.  Tr. 3/22/07, pp. 3767, 3826, 3852.  Because Martin was in treatment for some

---

[7] Copies of the cited transcript pages of Mr. Martin and Ms. Parsons' trial testimony are attached as Exhibit C.

of the 1992-2002 period, because Thurston was incarcerated during substantial periods of that time,[8] and because there is no evidence as to when Martin began purchasing from Thurston, there is no factual basis to support the probable accuracy that Martin purchased from Thurston for a six year period.

Nor is there a factual basis to assume that Martin purchased drugs from Thurston on a weekly basis either through Parsons or directly.  Martin testified that Congress Park was not the only neighborhood where he purchased crack.  Tr. 3/22/07, p. 3762.  He estimated that he went to Congress Park "[t]ons of times. Over 50" to hang out and party with Gail Parsons staying as short as one hour to as long as one week.   Tr. 3/22/07, p. 3761.  He gave Parsons money to purchase crack for both of them to use.  Tr. 3/22/07, pp. 3759-3760.    There were approximately nine individuals that were selling Martin crack in Congress Park.  Tr. 3/22/07, p. 3862.  Other than Thurston, he didn't know their names, but would purchase from "the guys that [Parsons] would bring in, whoever they were."  Tr. 3/22/07, p. 3768.  He made clear that "Gail would make all the transactions, no matter who they were. It wasn't always Dazz."  Tr. 3/22/07, p. 3826.  Sometimes Parsons would make "credit calls" to get crack and when it was time to pay, Martin would meet the people and pay them.  Tr. 3/22/07, p. 3761.

Parsons testified that she purchased drugs from Thurston but never testified to a time frame.  Tr. 3/7/07, p. 1900.  She admitted on cross examinationthat she couldn't remember how many times she purchased from Thurston, but estimated "about 10, 20, not

---

[8]  The parties stipulated that Thurston was incarcerated from 1/24/95 until 1/3/96 and from 6/29/96 until 7/28/97.  Tr. 9/24/07, p. 21614

many."[9]   Tr. 3/8/07, pp. 2176.   She didn't have Thurston's phone number.   Tr. 3/8/07, p. 2186.   She didn't know where he lived and never went to his house.   Tr. 3/8/07, p. 2186. The only time she purchased from him was when she couldn't get anybody on the phone to come to her house.   Tr. 3/8/07, p. 2186-2187.   Then, "I would go outside and look for him or stand in the door and wait and see who would come by."   Tr. 3/7/07, p. 1902.

Martin did not testify regarding the frequency of his purchases from Thurston, except to characterize it as "a lot."   Tr. 3/22/07, p. 3767.   Parsons testified that she made 10-20 purchases from Thurston ever.   Such generalized testimony is insufficient to reliably estimate that sales occurred on a weekly basis over a six year period.

Nor is there a sufficient factual basis to estimate that Martin and/or Parsons purchased eightball quantities of crack from Thurston.   Martin testified that when he purchased from Thurston "[i]t wouldn't be a whole lot."   Tr. 3/22/07, p. 3767.   On direct examination Parsons testified that the most she purchased was an eightball that would sometimes be in dime form "sometimes it would be in chunk" Tr. 3/7/07, p. 1900-1901. Unable to recall her direct testimony, on cross examination, however, she testified that she purchased "just dimes."   Tr. 3/8/07, p. 2178.   She testified that she never purchased a wholesale quantity or an eightball.   Tr. 3/8/07, p. 2178.   It is well established that when choosing between plausible estimates of drug amount, the court should "err on the side of caution" using the smallest amount.   *United States v. Hill*, 79 F.3d 1477, 1488 (6th Cir. 1996); *United States v. Acosta*, 85 F.3d 275, 282 (7th Cir. 1996).   For all of these reasons,

---

[9]   When pressed by the prosecutor on direct she testified that she purchased from Thurston "eighty" times.   Tr.  3/7/07, p. 1900.   She admitted on cross examination that an estimate of eighty times was not accurate.   Tr. 3/8/07, p. 2177.

neither Martin's nor Parson's testimony provides sufficient indicia of reliability to support the probable accuracy that Thurston distributed 900 grams of crack to them.

If the Court credits any of these witnesses and finds sufficient indicia of reliability to support the probable accuracy of some drug quantity, it still must make findings that any extraneous drug transactions are relevant conduct to the offenses of conviction. Neither the PSR not the government has established the required relatedness.

**Government Failed to Establish that Extraneous**
**Transactions are Relevant Conduct**

The mere fact that the defendant may have engaged in other drug transactions "is not sufficient to justify treating those transactions as relevant conduct for sentencing purposes." *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir 2005)(quoting *United States v. Crockett,* 82 F.3d 722, 730 (7th Cir. 1996)). Though relevant conduct includes more than just the conduct for which a defendant was convicted, it has limits: the conduct must relate to the offense of conviction. *United States v. Allen*, 488 F.3d 1244 (10th Cir. 2007). The relatedness principle is fundamental because of the commitment to sentencing based on the seriousness of the actual offense proven or admitted. See 18 U.S.C. § 3553(a)(1).

With respect to drug offenses, U.S.S.G. § 1B1.3(a)(2) provides that all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction" should be deemed "relevant conduct" by the sentencing court. See, *United States v. Jackson*, 161 F.3d 24 (DC Cir. 1998). By design, Section 1B1.3(a)(2) takes account of offenses that "involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of

sentencing." U.S.S.G. § 1B1.3, background. "Implicit in this purpose is the limitation that when illegal conduct does exist in 'discrete, identifiable units' apart from the offense of conviction, the Guidelines anticipate a separate charge for such conduct."  *United States v. Hill*, 79 F.3d 1477 (6th Cir. 1996)(and cases cited therein).

The guideline only applies if "there are distinctive similarities between the offense of conviction and the remote conduct" and cannot be used to sentence a defendant based on "isolated, unrelated events that happen only to be similar in kind."  *Id*. quoting  *United States v. Sykes*, 7 F.3d 1331, 1336 (7th Cir.1993).  It is reversible error to consider conduct which exists in discrete, identifiable units apart from the offense of conviction as relevant conduct. *See United States v. Marion*, Slip Copy, 2007 WL 678041 (M.D.Fla. 2007) citing *United States v. Maxwell*, 34 F.3d 1006, 1010-11 (11th Cir.1994).

Even if the witnesses are credited, their testimony does not provide a factual basis which would allow the Court to find that the sales by Conner, the purchases by Parsons and/or Martin or the transactions allegedly observed by Capies are either part of the same course of conduct or part of the same common scheme or plan.  See, USSG 1B1.3(a)(2). Rather, if credited, they establish that their transactions with Thurston are discrete, identifiable units apart from either of the offenses of conviction.

To the extent that the government's characterizations of Thurston's drug dealing as "routine" and "serial" suggests that it should be considered under the "same course of conduct,"[10] prong, the government has failed to establish the necessary relatedness.

---

[10]  Courts have distinguished between the terms "same course of conduct" and "common scheme or plan" by recognizing that a "common scheme or plan" requires that acts "be connected together by common participants or by an overall scheme" whereas the "same course of conduct" concept looks to "whether the defendant repeats the same type

Offenses are considered the "same course of conduct" if "they are sufficiently connected

or related to each other as to warrant the conclusion that they are part of a single episode,

spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, application note 9(B).

> The sentencing court must evaluate and balance several factors, including "the degree of similarity of the offenses and the time interval between the offenses." *Id*. Also relevant are the "nature of the offenses" and whether the offenses can "readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing." *Id*. comment. (n. 9(B)) & background. No single factor in this fact-based inquiry is dispositive. The absence of one factor requires a stronger presence of at least one of the other factors.

*United States v. Pinnick*, 47 F.3d 434 (DC Cir. 1995).

Capies testimony that Thurston sold regularly from 1992 to 1996, does not provide

a sufficient connection to the 10/27/00 or the 11/18/03 offenses of conviction.  During that

time period, Capies testified that Thurston was selling along 14th Place, SE.  Tr. 3/29/07,

pp. 4922-4923.   Those transactions are separated from the offenses of conviction by four

years and seven years respectively, occurred in different locations,[11] with no other

evidence linking them to the offenses of conviction.  The alleged activity during the 1992-

---

of criminal activity over time.  *United States v. Hill*, 79 F.3d 1477, 1482 (6th Cir. 1996). Moreover, where, as here the offenses of conviction and the extraneous transactions do not share common accomplices, common suppliers, or common buyers, nor a common purpose aside from the fact that they involved the distribution of drugs, they do not constitute a common scheme or plan.  See, *United States v. Kesee*, Slip Copy, 2007 WL 521364 (W.D.La. 2007)(February 15, 2007); See also *United States v. Sykes*, 7 F.3d 1331 (7th Cir. 1993)("sporadic acts over an extended time period generally do not permit the inference of a common scheme or plan but indicate independent acts that may lack the necessary link").

[11]  The 11/18/03 offense occurred at 1307 Congress Street, SE.  The 10/17/00 offense occurred inside Wilson's apartment.

1996 period of time necessarily constitutes a discrete, identifiable unit apart from either of the offenses of conviction and, therefore, can not be considered relevant conduct.

Martin and/or Parsons' general testimony that they purchased from Thuston between 1992 to 2002 without any testimony regarding the regularity of their purchases,[12] from Thurston nor Conner's testimony that he sold to Thurston one to five times in "1996 or later," establish a sufficient temporal proximity to either of the offenses of conviction.

**Government Has Not Established
That Thurston Possessed a Firearm
During the Commission of the Offense
Of Conviction or Relevant Conduct**

Defendant objects to the two level enhancement for possession of a firearm.  PSR ¶70.  Section 2D 1.1(b)(1) of the Guidelines provides that a two-level enhancement is warranted "if a dangerous weapon (including a firearm) was possessed" during the commission of a crime of conviction for which Guidelines section 2D1.1 is applicable. U.S.S.G. § 2D1.1(b)(1).  Here, there is absolutely no evidence that Thurston possessed a firearm during the 10/17/00 or 11/18/03 offenses for which he was convicted.

While the PSR and the government in its memorandum cite testimony regarding possession and use of firearms, neither connects the use or possession of firearms to any narcotics transactions that could possible qualify as relevant conduct to the offenses of conviction.  Although Capies testified that he and others, including Thurston, possessed weapons when committing robberies, robberies do not qualify as relevant conduct to the

---

[12]   Even if the transactions with Parsons and Martin might be considered part of a common scheme or plan, given the common participants, those transactions are not common to either of the offenses of conviction and necessarily constitute discrete identifiable units apart from the offenses of conviction.

offenses of conviction under §1B1.3(a)(2) because they are not offenses of a character for which §3D1.2(d) would require grouping of multiple counts.  USSG 1B1.3(a)(2).

Nor does the testimony of Keith Barnett, even if credited,[13] establish that Thurston possessed firearms during any relevant conduct.  Barnett testified about an armed robbery of a marijuana dealer at 6th and Florida Avenue that had nothing to do with drug dealing in Congress Park.  Tr. 4/19/07, p. 7901-7903.[14]   As previously stated, robbery does not qualify as relevant conduct to a drug offense under §1B1.2(d).   The government has not attempted to otherwise establish that Thurston's alleged participation in the robbery is relevant conduct to either of the offenses of conviction.

Similarly, Barnett also alleged that Thurston offered him a gun and crack cocaine while he was in the hospital as a peace offering when Jasmine Bell shot him while they were playing a dice game.   Even if Barnett is credited and it can be found that Thurston possessed a firearm, there is no evidence cited by the government nor argument made as to how that possession was during relevant conduct to either of the offenses of conviction.

Because the government has not met its burden to establish any guideline enhancements, Thurston's base offense level is 16.  See, PSR ¶141.

_____

[13] Barnett's testimony implicating Thurston should not be credited at all.  He testified pursuant to a cooperation agreement and with the understanding that the only way to get out from under a thirty year sentence was to truthfully testify about his own activities and help the government convict someone else.  Tr. 4/19/07, pp. 7811, 7814.  With respect to the robbery of the marijuana dealer, he admittedly lied to the grand jury.  Tr. 4/19/07, pp. 7904-7905, 7910.  At trial, he admitted that it was his idea to commit the robbery after he purchased marijuana near 6th and Florida Avenue and saw a trash bag full of marijuana.  Tr. 4/19/07, p. 7901.  It is only his testimony that implicates Thurston in this robbery.  Tr. 4/19/07, p. 7901.

[14] Copies of the cited transcript pages of Mr. Barnett's trial testimony are attached as Exhibit D.

**Criminal History Calculation**

Defendant objects to the addition of two points to his criminal history for committing the instant offense while under a criminal justice sentence. PSR ¶ 86. Thurston's criminal justice sentence for his 1996 Maryland conviction ended on March 23, 1998 when his supervision expired. See, PSR ¶ 81. Neither the offenses of conviction nor any relevant conduct occurred during that period. Thurston's criminal history points are therefore five, which places him in Category III. Accordingly, Thurston's guideline sentencing range is 27-33 months.

**OTHER SENTENCING FACTORS**

In imposing sentence, courts must consider the impact of the factors enumerated in §3553(a) in addition to the advisory guideline calculation. Of course, pursuant to 18 USC § 3553(a) the guiding principle in sentencing is that the court shall impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant. § 3553(a)(1)

"The offense" within the meaning of this sentencing factor must be the offenses which Thurston was found guilty of committing: distribution of small quantities of crack cocaine on October 17, 2000 to Sandra White and on November 18, 2003 to an undercover officer. Mr. Thurston accepts responsibility for his actions regarding these offenses. Due to the government's efforts to have the Court impose an overly punitive sentence, however, Mr. Thurston refutes the government's assertions in support of the proposed sentencing enhancements. Mr. Thurston's arguments in this regard should not

1409

be construed as an effort to diminish the seriousness of the offenses of conviction nor minimize his acceptance of responsibility.

Taking Thurston's prior criminal conduct into consideration to sentence Thurston to a Criminal History III is presumptively reasonable and accounts for his prior criminal conduct.

Thurston is thirty years old.  As a youth, he admittedly fell victim to the poverty and culture of the neighborhood in which he was reared.  While those circumstance undoubtedly contributed to some poor choices Thurston made in the past, the trial also showed glimpses of Thurston's character as someone who cares about others.  He was a friend who provided emotional support to Ed Martin when Martin was going through a difficult period with his wife.  He allowed Martin to stay with Thurston and helped Martin as he tried to beat his addiction to crack.  Tr. 3/22/07, p. 3832-3835.

During the three years that Thurston has been incarcerated in this case, he suffered a profound loss when his mother died in 2006.  He has also endured the stress of a nine month long federal court trial knowing that he effectively faced the rest of his life in prison.  These circumstances, which might have caused a person with less fortitude to become angry, bitter and resentful, allowed Thurston to reflect and mature.  With the support of his close friends, family and case manager he has changed his view of himself and his place in this world, as the attached letters demonstrate.  Exhibit F.

Sentencing Thurston for his conduct on 10/17/00 and 11/18/03, to an Offense Level 16, Criminal History Category III, to 27 to 33 months meets the needs of sentencing in §3553(a)(2) addressed *infra*.  It is also consistent with the nature and circumstances of the jury's verdict.

### 2.     § 3553(a)(2)(A) need to reflect the seriousness of the offense, and to provide just punishment for the offense

Although drug related crimes are serious offenses, they present a wide range of seriousness, depending upon the amount of drugs involved and the scope of transaction. Mr. Thurston's offenses concern two distinct sales of small quantities of crack more than three years apart, one to a confidential informant the other to an undercover officer.  The jury did not find these transaction part of a narcotics or RICO conspiracy, having acquitted Thurston of participation in those conspiracies.

This court is required to impose a "just punishment" for these offenses.  However, what the PSR and government asks this Court to do with respect to allegations regarding the Reginald Reid murder, 10th Place shooting, shooting of Linwood Carpenter, Ewing/Faison shooting, armed robberies and threats to security officers, is entirely inconsistent with this congressional mandate.  To increase Mr. Thurston's sentence by nearly thirty years based on uncharged and acquitted[15] criminal offenses unrelated to the offenses of conviction and not found by a jury beyond a reasonable doubt, but rather submitted to the Court for a mere preponderance finding, would result in an unjust punishment.

More specifically, it would be unjust to punish Thurston in this case for any conduct that was premised solely by the testimony of Bobby Capies.   Aside from Capies general lack of credibility, his testimony about Thurston's involvement in Reginald Reid's murder is suspect, at best.   For example, regarding the discussion the prompted "the move" on

---

[15]  Thurston was found not guilty of participating in a narcotics or RICO conspiracy after the jury heard and considered all of the evidence of violence that the government cites in its memorandum.

19

Roadie's house, Capies gave inconsistent testimony.  He initially testified that "me, Wop, Phil and Santu" were present.  Tr. 4/2/07, p. 5249.  He then changed his testimony claiming that he, Wilson and   Thurston were the only ones present during that conversation.  Tr. 4/2/07, p. 5249.   Having included Thurston in "the move," and despite Capies' vast experience in committing robberies, he claims that Thurston, rather than he went into the apartment because Thurston "had bigger feet than mine."   Tr. 4/2/07, p. 5254; Tr. 4/11/07, p. 6541.    Moreover, Capies role in the murder of Reid is strikingly similar to the murder of D-Lock in which Capies, not Wilson or Thurston, was involved.[16]   Because Capies is not credible and there is no corroborating evidence connecting Thurston to this uncharged murder, it should not be considered at all in sentencing.

It is Capies testimony alone that connects Thurston to a shooting on 10th Place and the shooting of Linwood Carpenter.   His testimony is not even based on his first hand knowledge of those events, but based on Thurston's alleged admissions to Capies about his involvement.   Thurston denies making any such admission to Capies, and the evidence demonstrates, with respect to the 10th Place shooting, that Capies' testimony was untruthful.  Capies repeated testified on direct and on cross examination that Thurston's admissions to him about the 10th Place shooting, occurred in the "early part of '97... "January or February."  Tr. 4/2/07, pp. 5308-5309, 6533-6534.    He testified that these conversations occurred not long after he was released from jail in December, 1996.  Tr. 4/11/07 p. 6531.  They occurred "around Congress Park."  Tr. 4/11/07, p. 6532.   The conversations "had to be" in January or February, 1997.  Tr. 4/11/07, p. 6532.

_____

[16] In both cases, Capies claimed he was involved but not the shooter.  In both cases the main shooter unloaded his gun into the victim.

These alleged conversations could not have occurred in January or February, 1997. Nor could they have occurred in December, 1996 when Capies was released, in March, April, May, June, or July, 1997, since Thurston was incarcerated. A stipulation was entered into by the parties, that Thurston was incarcerated from 6/29/96 until 7/28/97. Tr. 9/24/07 p.m., p. 21614.

With respect to the Linwood Carpenter shooting, the government chose to rely on Capies' witness to Thurston's alleged confession rather than calling Mr. Carpenter as a witness. Capies' false testimony of Thurston's alleged admission, in the absence of any corroborating evidence that Thurston had any connection to that incident, does not reasonably support an enhanced sentence.

The government also asks this court to consider in sentencing Mr. Thurston allegations that he was involved in the shooting of John Ewing and James Faison. It relies primarily on Ewing's consistent identification of Thurston as one of the shooters. Memo, p. 23-24. Ewings' identification is questionable at best.

Ewing had reason to provide inaccurate information to law enforcement regarding the incident. Tr. 6/6/07, p. 14286.[17] He was high at the time. He claimed he didn't want to be a snitch. *Id*. He testified that he didn't tell the police on the night it happened who shot him. Tr. 6/6/07, p. 14280-14281. Officer Duncan testified that when he responded to the scene, Ewing told him Thurston was one of the people involved. Tr. 6/6/07, 14370. The following day Ewing told Duncan the other person was LT. Tr. 6/6/07, pp. 14358-14359.

---

[17] Copies of the cited transcript pages of John Ewing and Officer Duncan's trial testimony are attached as Exhibit E.

Ewing testified at trial that the car drove past five or six time before heading towards Congress Street ten minutes before two guys came through the cut from about 50 or 60 feet away, approached the house and started shooting.  Tr. 6/6/07, p. 14284-14285.  He never told Officer Duncan on the night of the shooting that the gunmen walked through a cut and approached the house before shooting.  Tr. 6/6/07, 14387.  He never told Officer Duncan that a car drove up and down the block before the shooting occurred.  Tr. 6/6/07, p. 14387.  Ewing told Duncan that the people got out of a black Lincoln and started shooting.[18]  Tr. 6/6/07, p. 14387.   At trial Ewing testified that a statement to that effect wasn't true.  Tr. 6/6/07, p. 14286.   He testified that he had reason to provide the police inaccurate information at the time because he didn't want to snitch.  Tr. 6/6/07, p. 14286.  Nevertheless, he claimed that the identification of Thurston as one of the people involved, that he provided to Officer Duncan that night was accurate.

Based on Ewing's identification of Thurston, the government indicted Thurston regarding this offense  in Superior Court in 1997.  US v. Thurston, F-8106-97 That case, however, was dismissed in January, 1998 for want of prosecution.  This offense was again charged  in the instant case as an overt act of the narcotics conspiracy and racketeering act of the RICO conspiracy.   Thurston, however, was acquitted of both conspiracies.  Having failed to prosecute Thurston for this crime either at the time it occurred or in the instant case, the government nevertheless wants him sentenced for it.

### 3.  §3553(2)(A) The Need for the Sentence to Promote Respect for the Law

---

[18]  It was known that Kairi Kellibrew drove a black Lincoln at the time.

Sentencing Thurston for more than the two offenses of conviction, would promote disrespect for the law because it conflicts with the jury's verdict.   A sentence based primarily on uncharged and acquitted conduct undermines the public expectation that offenders are punished for the crimes of conviction.

Acquitted and uncharged conduct sentencing goes against virtually everything the public knows and respects about the American criminal justice system.  For instance, it is understood that a person may not be punished for a crime unless guilt has been proven to a jury beyond a reasonable doubt.  It is also understood that the American criminal justice system would rather free a guilty person than imprison an innocent one.  Substantial increases in sentences based on acquitted and uncharged crimes erode these principles and, with them, respect for the law.  Additionally, when laypersons see that the product of a jury's factfinding may be affirmatively set aside by a single judge, the civic value of jury service suffers.  This is particularly true in this case, as Juror #6 made clear in a post verdict letter to the court.  Exhibit G.

Sentencing Thurston to confinement for thirty three years for the two distributions of which he was convicted is inconsistent with typical punishment for a distribution of small quantities of cocaine base.  Sentencing Thurston for more than the offenses found by the jury would promote disrespect for the law as being contrary to the jury's verdict.

### 4.   The Need to Avoid Unwarranted Sentence Disparities § 3553(a)(2)(6)

A below guideline sentence is appropriate in this case to avoid unwarranted disparity for crack versus powder cocaine.  It is counsel's understanding that this Court has imposed sentences below the suggested guidelines on several occasions due to the 100:1 crack/powder ratio incorporated into the pre-amended guidelines.  As amended, the

guidelines now advance a crack/powder ratio that varies (at different offense levels) between 25 to 1 and 80 to 1.  At offense level 16, which is applicable in the present case, the amended guidelines impose the same offense level for 1 to 2 grams of crack cocaine as 50 to 100 grams of powder cocaine, creating a disparity of 50 to 1.  Eliminating the disparity would place Mr. Thurston at Offense Level 12.

The same reasons that the Court relied upon in not following the pre-amendment guidelines are equally applicable in the instant case given that the post amendment guidelines still result in a dramatic disparity.  Moreover, the Supreme Court has recently made clear that it is within the discretion of the District Court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve §3553(a)'s purposes.  *Kimbrough v. United States*, ____ S.Ct. __, 2007 WL 4292040 (December 10, 2007).

Even if the court does not remove the crack/powder disparity, sentencing Mr. Thurston, as the government requests, creates an unwarranted and substantial disparity among defendants with similar records who have been found guilty of guilty of distribution of crack cocaine.

## CONCLUSION

For the foregoing reasons and for others that may arise at the sentencing hearing in this matter, defendant respectfully requests that the Court sentence him for the offenses of conviction only to a term not to exceed 33 months.

1416

Respectfully submitted,

 /s/ _____
Jonathan Zucker, #384629
514 10th Street, N.W.
9th Floor
Washington, DC 20004
(202) 624-0784
Counsel for Defendant Thurston

1417

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 427 of 500

# EXHIBIT A

Page 4703

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :    Docket No. CR 05-100
                              :
           Plaintiff    :
                              :
v.                            :    Washington, DC
                              :
ANTWUAN BALL,               :
DAVID WILSON,               :
GREGORY BELL,               :    March 28, 2007
DESMOND THURSTON,          :
JOSEPH JONES,               :
DOMINIC SAMUELS,           :
                              :
          Defendants    :    1:45 p.m.
. . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 25 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                        GLENN S. LEON, ESQUIRE
                        GIL GUERRERO, ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        555 Fourth Street, NW
                        Washington, D.C.  20530

For the Defendant      JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:          CARNEY & CARNEY
                        601 Pennsylvania Avenue, NW
                        Suite 900, South Building
                        Washington, DC  20004
                        (202) 434-8234

                        STEVEN CARL TABACKMAN, ESQUIRE
                        TIGHE, PATTON, ARMSTRONG,
                            TEASDALE, PLLC
                        1747 Pennsylvania Avenue, NW
                        Suite 300
                        Washington, DC  20006

                        (202) 454-2811

Page 4811

1          THE COURT:  It's overruled and you can cross on it.

2          MR. PURPURA:  Certainly.

3          (END BENCH CONFERENCE.)

4          (Jury in at 4:26 p.m.)

5          THE COURT:  Thank you, ladies and gentlemen, for your

6 indulgence.  We're ready to resume.

7 BY MR. LEON:

8 Q.  Now, Mr. Capies, you talked about yourself and some other

9 people who you came up with in '92 and were selling drugs.  Is

10 that fair of what you said earlier?

11 A.  Yes, sir.

12          THE COURT:  I'm sorry to interrupt, but let me just

13 make sure we have clarified the 222.1 issue.

14          MR. LEON:  I believe so.  I believe it was in evidence

15 already.

16          THE COURT:  There is a 222.1 that is already in

17 evidence.  I just wanted to make sure you were in agreement that

18 that's what you were showing before.

19          MR. LEON:  Yes.

20          THE COURT:  Okay.

21 BY MR. GUERRERO:

22 Q.  So let's start there in '92.  Were you in school at this

23 point?

24 A.  Yes.

25 Q.  Okay.  And so when were you, Bobby Capies, selling drugs?

Page 4812

1 A.   In '92.

2 Q.   But when in the day?  In other words, how frequently or

3 infrequently were you selling drugs yourself in '92?

4 A.   Oh, like after school.

5 Q.   After school every day or after school once in a while?

6 A.   Just about every day.

7 Q.   And when you were doing that, was it in the area that you've

8 indicated just near 14th and Savannah?

9 A.   Yes, sir.

10 Q.   Okay.  Now, you mentioned other people.  Let's take them in

11 order.  You mentioned Don?

12 A.   Yes, sir.

13 Q.   Do you know if Don was selling as well at that time and in

14 that location?

15 A.   Yes, sir.

16 Q.   How do you know that?

17 A.   Because he was hustling around me, too.

18 Q.   Did you see him hustle?

19 A.   Yes, sir.

20 Q.   How frequently did you see Don hustle?

21 A.   Like after school.  We went to school together.

22 Q.   Same junior high school?

23 A.   Yes, sir.

24 Q.   And how long did you know Don before that, before '92?

25 A.   I knew him for a while before '92, about three or two years.

1421

Page 4839

1 Q.  Yes or no, do you know if Kairi fronted anyone else in 1994?

2 A.  No.

3 Q.  No, he didn't, or no, you don't know?

4 A.  No, I don't know.

5 Q.  Okay.  Were you still hanging out with Don around that time?

6 A.  Yeah.

7 Q.  1994?

8 A.  Yes.

9 Q.  To your knowledge, yes or no, was Don still hustling in

10 1994?

11 A.  Yes.

12 Q.  And where was he hustling at this time?  Physically where?

13 A.  He was still hanging around 14th Place hustling.

14 Q.  Okay.  How do you know that?

15 A.  Because I was hustling around in the same court with him.

16 Q.  And by the way, when you and he went to get money -- excuse

17 me, get drugs from Don's brother, Feet, did you sell in that

18 neighborhood, or where did you sell the drugs that you bought

19 from Feet?

20 A.  We sold them on 14th Place.

21 Q.  Did you ever sell crack anywhere other than that spot on

22 14th Place in '93, '94?

23 A.  Yes.

24 Q.  Where else?

25 A.  I was back and forth.  I used to go around 37.  I wasn't

4863

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
          Plaintiff,             :   Docket No. CR 05-100
                                 :
     v.                          :   Washington, DC
                                 :
ANTWUAN BALL, DAVID WILSON, DESMOND   :
GREGORY BELL,                    :
THURSTON, JOSEPH JONES, and      :   March 29, 2007
DOMINIC SAMUELS.                 :   9:15 a.m.
          Defendants.            :
                                 :
                                 :

VOLUME 26 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

4864

APPEARANCES (Cont.)

For Defendant         TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:         TEASDALE, PLLC
                      Steven Carl Tabackman, Esq.
                      1747 pennsylvania Avenue, NW
                      Suite 300
                      Washington, DC  20036
                      202.454.2811

For Defendant         LAW OFFICE OF JENIFER WICKS
David Wilson:         Jenifer Wicks, Esq.
                      503 D Street NW, Suite 250A
                      Washington, DC  20001
                      202.326.7100

                      GARY E PROCTOR, LLC
                      Gary E. Proctor, Esq.
                      6065 Harford Road
                      Baltimore, MD  21214
                      410.444.1500

For Defendant         LAW OFFICE OF JAMES W. BEANE
Gregory Bell:         James W. Beane, Jr., Esq.
                      2715 M Street, N.W.
                      Suite 200
                      Washington, DC  20007
                      202.333.5905

For Defendant         LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:     Jonathan Seth Zucker, Esq.
                      514 10th Street, NW
                      9th Floor
                      Washington, DC  20004
                      202.624.0784

For Defendant         LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:         Anthony Douglas Martin, Esq.
                      7841 Belle Point Drive
                      Greenbelt, MD  20770
                      301.220.3700

                      LAW OFFICE of ANTHONY ARNOLD
                      Anthony Darnell Arnold, Esq.
                      One Research Court
                      Suite 450
                      Rockville, MD  20852
                      301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

4865

APPEARANCES (Cont.)

For Defendant         LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:      A. Eduardo Balarezo, Esq.
                      400 Fifth Street, NW
                      Suite 300
                      Washington, DC  20001
                      202.639.0999
                      and
                      William B. Purpura, Esq.
                      8 East Mulberry Street
                      Baltimore, MD  21202
                      410.576.9351

Court Reporter:       Scott L. Wallace, RDR, CRR
                      Official Court Reporter
                      Room 6814, U.S. Courthouse
                      Washington, DC  20001
                      202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

4866

1        MORNING SESSION, MARCH 29, 2007

2    (9:13 a.m.)

3        THE COURT:  Good morning.  While the defendants are coming

4    out, I just wanted to pass on to you some generic feedback we're

5    getting from the jurors.  I don't know if all the lawyers are

6    here.

7        MR. ZUCKER:  I'll check the hallway.

8        THE COURT:  Don't go, don't go.  If they're right out

9    there, bring them in.  If they're not, they'll have to hear it

10   from you all.

11       MR. ZUCKER:  My eyes are so bad.  I think Mr. Guerrero was

12   at the end of the hall.

13       THE COURT:  Well, you all pass it on and share it among

14   your colleagues.

15       Generic feedback from the jurors I thought you might want

16   to hear.  Complaint:  Some lawyers are speaking much too quickly.

17   When that happens they cannot understand what the question is and

18   don't know or understand what the question is until they get a

19   sense of it from the answer that's given by the witness.  So it's

20   a complaint about not only speed, but audibility.  Sometimes

21   lawyers are not close enough to the mic or speaking loud enough

22   for them to hear.  So let me just pass that on to you:  Speed and

23   audibility are important.

24       They also are complaining that sometimes lawyers are

25   referring to exhibits in much too familiar a fashion with the

Scott L. Wallace, RDR, CRR
Official Court Reporter

4919

1   Q.   How'd you know him?

2   A.   From back in the day when I was small.

3   Q.   Who did you know, if anyone, Ju-Ju to associate with or

4   hang out with, back during that time period?

5   A.   Back then, a lot of people.

6   Q.   Who?

7   A.   We talking back then -- because he had went to jail for a

8   long time, but back like in the '80s, he used to be on 14th

9   Place with Antwuan.

10      MR. PURPURA:  Objection, Your Honor, we're now in the time

11  frame of the '80s and personal knowledge.

12      MR. LEON:  I can rephrase.

13      THE COURT:  Go ahead.

14  BY MR. LEON:

15  Q.   Did you know -- do you know what Ju-Ju looks like?

16  A.   Yes, sir.

17  Q.   Have you seen Ju-Ju?

18  A.   Yes, sir.

19  Q.   Have you talked to Ju-Ju?

20  A.   Before, I talked to him.

21  Q.   Okay.  But have you ever talked to him?

22  A.   Yes, sir.

23  Q.   Okay.  And did you know Ju-Ju or see Ju-Ju after 1992?

24  A.   Yes, sir.

25  Q.   And when you saw Ju-Ju after 1992, where did you see him?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4920

1   A.   Around Congress Park.

2   Q.   And when you saw Ju-Ju after '92 around Congress Park,

3   who, if anyone, did you see Ju-Ju with?

4   A.   Me, Wop, LT, Drano.  He used to hang in the alley with

5   us.

6   Q.   And when he would hang with you -- well, withdrawn.

7        Did you ever know Ju-Ju to sell drugs in Congress Park?

8   A.   Yes, sir.

9   Q.   Would he do it -- do you know, if you know, where Ju-Ju

10  got his drugs from?

11  A.   No, sir.

12  Q.   Now, you mentioned Kairi, Antwuan Ball's brother, around

13  this time, 94, 95 or so, and you said you were getting -- you

14  were getting from Kairi, I believe you said, for a period of

15  time; is that correct?

16  A.   Yes, sir.

17  Q.   Do you know where Kairi got his drugs?

18      MR. ZUCKER:  Objection, basis or foundation.

19  BY MR. LEON:

20  Q.   If you know.

21  A.   Yes, sir.

22      THE COURT:  Just yes or no.

23      THE WITNESS:  Yes.

24  BY MR. LEON:

25  Q.   You do know?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4921

1   A.   Yes.

2   Q.   Okay.  Did you ever see Kairi with your own eyes get his

3   drugs, before you got them from him?

4   A.   No, sir, just going on what he told me.

5   Q.   Off what who told you?

6   A.   Kairi.

7   Q.   What did Kairi tell you as to where Kairi got his drugs?

8   A.   A guy named Deuce.

9   Q.   Deuce?

10  A.   Yes, sir.

11  Q.   Do you know who Deuce is?

12  A.   Yes, sir.

13  Q.   Who's Deuce?

14  A.   Deuce is this Guy named -- Deuce, Rob.

15  Q.   What's that?

16  A.   He goes by the name Rob.

17  Q.   And have you ever personally gotten drugs from Deuce?

18  A.   Wholesale, but not no weight or nothing like that.

19  Q.   When Kairi told you that Kairi got drugs from Deuce, did

20  he ever tell you how much he got from Deuce?

21  A.   No, sir.

22  Q.   Do you know, just yes or no at this point, if anyone else

23  who sold drugs in Congress Park got their drugs from Deuce?

24      MR. ZUCKER:  Foundation.

25      THE COURT:  You can answer yes or no.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4922

1   BY MR. LEON:

2   Q.   You don't know?

3   A.   No, sir, I don't.

4   Q.   Now, you've also mentioned this morning, Dazz, and you've

5   identified him by photograph and in court yesterday.  Do you

6   remember talking about Dazz?

7   A.   Yes, sir.

8   Q.   Around this time, 1992 to 1996, did you ever see Dazz

9   sell drugs?

10  A.   Yes, sir.

11  Q.   With your own eyes?

12  A.   Yes, sir.

13  Q.   When Dazz would sell drugs in Congress Park, that you saw

14  with your own eyes, where would you see him do this?

15  A.   In my court, by his building, all on 14th Place.

16  Q.   Okay.

17      MR. LEON:  Your Honor, I would ask to publish again the

18  map of Congress Park which is 100.1.

19      THE COURT:  Yes.

20  BY MR. LEON:

21  Q.   And Mr. Capies, I would ask you to clear the screen by

22  tapping it.  So you said by your court?

23  A.   Yes, sir.

24  Q.   Okay.  Just quickly, just tap what you mean by your

25  court?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4923

1   **A.**   "In my court," just around in that 14th Place area.

2   **Q.**   Just quickly, if you could, put a dot or a circle in the

3   area that you're referring to.

4   **A.**   (Indicating.)

5   **Q.**   And do you know if Dazz lived in this area, around this

6   time?

7   **A.**   Yes, sir.

8   **Q.**   Where did Dazz live?

9   **A.**   A little behind me, to the right.

10   **Q.**   Can you tap where Dazz lived around this time.

11   **A.**   (Indicating.)

12   **Q.**   Okay.  For the record, you made two marks, the first one

13   to indicate where your court was, a little bit above the PL in

14   Savannah Place on the map, in the center-right portion, is that

15   fair?

16   **A.**   Yes, he lived in Savannah Place.

17   **Q.**   Okay.  And then the second dot you made indicating the

18   proximate area where Dazz lived is just below the AH in Savannah

19   Place?

20   **A.**   Yes, sir.

21   **Q.**   Okay.  When you saw Dazz with your own eyes sell drugs in

22   your court, how often are we talking about?

23   **A.**   Just about every day.

24   **Q.**   And how much would Dazz sell, if you know, around this

25   time?  Again, '92 to '96 or so?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4924

1   **A.**   I mean, dimes.  There was no certain weight.

2   **Q.**   Do you know, if you know, yes or no, how Dazz got his

3   drugs to sell?

4   **A.**   At that time, he was going to this guy named Burke.

5   **Q.**   Burke?

6   **A.**   Yes, sir.

7   **Q.**   And how do you know that?

8   **A.**   Because I used to always see him with him and he would

9   tell me.

10   **Q.**   Who'd tell you?

11   **A.**   Dazz.

12   **Q.**   What would Dazz tell you?

13   **A.**   That he get his coke from Burke.

14   **Q.**   Do you know who Burke is?

15   **A.**   Yes, sir.

16   **Q.**   And who is Burke?

17   **A.**   A buy house at the end of 14th Place.

18   **Q.**   And did Burke sell drugs in Congress Park?

19   **A.**   Yes, sir.

20   **Q.**   We'll get to Burke in a few moments.

21   Let's just stay with Dazz.  Did Dazz ever tell you who he

22   got his drugs from, other than that Burke?

23   **A.**   No, sir.

24   **Q.**   And do you know from Dazz how often he would get his

25   drugs from Burke, around this time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4925

1   **A.**   No, I don't know how often.

2   **Q.**   And when Dazz was selling in your court, were you selling

3   in your court at the same time?

4   **A.**   Yes, sir.

5   **Q.**   What about Don?

6   **A.**   Yes, sir.

7   **Q.**   I believe you also mentioned EB.  Was EB also selling in

8   your court at that time?

9   **A.**   Yes, sir.

10   **Q.**   And I believe -- who else, if anyone -- I don't want to

11   put words in your mouth, but I thought you mentioned one or two

12   other people who were selling around this time in your court.

13   Did you or not?

14   **A.**   Yes, sir.

15   **Q.**   Who?

16   **A.**   My brother.

17   **Q.**   Darryl?

18   **A.**   Yes, sir.

19   **Q.**   Who else?

20   **A.**   Like Dom, EB, Dazz.

21   **Q.**   And was there enough business for all of you?

22   **A.**   Yes, sir.

23   **Q.**   Did any of you have a problem with the others selling

24   right in the same court?

25   **A.**   No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4926

1   **Q.**   You all get along?

2   **A.**   Yes, sir.

3   **Q.**   Now, you mentioned some of the older people who were more

4   near the circle.  Do you remember that testimony?

5   **A.**   Yes, sir.

6   **Q.**   And again, just quickly, who were those people -- I don't

7   want to -- just quickly, for the record, just the names.

8   **A.**   Boy-Boy, Antwuan, Kairi, Fat Tony, Jo-Jo.

9   **Q.**   And did you ever -- you, when I say "you," Bobby Capies,

10   ever sell, occasionally, during this time '92 to '96, towards

11   the circle?

12   **A.**   Here and there, but it wasn't no stationary around there.

13   **Q.**   And at that time, why not -- why not do it where you did

14   it in that part of Congress Park?

15   **A.**   I mean, the older dudes was around there.  I mean you

16   going to make some sales around there, but they only going to

17   let you do so much at that time.

18   **Q.**   And when you say "at that time," was there a time when

19   you did end up selling at the circle?

20   **A.**   Yes, sir.

21   **Q.**   When was that?

22   **A.**   It was before -- it was after '96, sir.

23   **Q.**   Okay.  And we're going to get to that.

24   But before then, before it was more allowed, during '92,

25   '96, did you ever get in trouble with any of the older guys in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5121

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                Plaintiff,          :   Docket No. CR 05-100
            v.                      :
ANTWUAN BALL, DAVID WILSON,         :   Washington, DC
GREGORY BELL, DESMOND               :
THURSTON, JOSEPH JONES, and         :   April 2, 2007
DOMINIC SAMUELS.                    :   9:15 a.m.
                Defendants.         :
                                    :
                                    :
                                    :

VOLUME 27 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
                           Glenn S. Leon, Assistant United
                           States Attorney
                           Ann H. Petalas, Assistant United
                           States Attorney,
                           Gilberto Guerrero, Assistant
                           United States Attorney
                           555 4th Street
                           Washington, DC  20001
                           202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.,
                           South Building
                           601 Pennsylvania Avenue, N.W.
                           Washington, DC  20004
                           202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5122

APPEARANCES (Cont.)

For Defendant              TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:              TEASDALE, PLLC
                           Steven Carl Tabackman, Esq.
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20036
                           202.454.2811

For Defendant              LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                           503 D Street NW, Suite 250A
                           Washington, DC  20001
                           202.326.7100

                           GARY E PROCTOR, LLC
                           Gary E. Proctor, Esq.
                           6065 Harford Road
                           Baltimore, MD  21214
                           410.444.1500

For Defendant              LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                           2715 M Street, N.W.
                           Suite 200
                           Washington, DC  20007
                           202.333.5905

For Defendant              LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                           514 10th Street, NW
                           9th Floor
                           Washington, DC  20004
                           202.624.0784

For Defendant              LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                           7841 Belle Point Drive
                           Greenbelt, MD  20770
                           301.220.3700

                           LAW OFFICE of ANTHONY ARNOLD
                           Anthony Darnell Arnold, Esq.
                           One Research Court
                           Suite 450
                           Rockville, MD  20852
                           301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5123

APPEARANCES (Cont.)

For Defendant              LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                           400 Fifth Street, NW
                           Suite 300
                           Washington, DC  20001
                           202.639.0999
                           and
                           William B. Purpura, Esq.
                           8 East Mulberry Street
                           Baltimore, MD  21202
                           410.576.9351

Court Reporter:            Scott L. Wallace, RDR, CRR
                           Official Court Reporter
                           Room 6814, U.S. Courthouse
                           Washington, DC  20001
                           202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5124

MORNING SESSION, APRIL 2, 2007

(10:12 a.m.)

THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond Thurston, Joseph Jones and Dominic Samuels.*  For the government, Mr. Leon, Ms. Petalas and Mr. Guerrero.  For defendants, Mr. Carney, Mr. Tabackman, Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker, Mr. Martin, Mr. Arnold, Mr. Balarezo and Mr. Purpura.

THE COURT:  All right.  Good morning.  Let me report on a couple of things.  As I promised, we will take a break today at 4 and tomorrow at 4.

In addition, I wanted to let you know that on Thursday, April 19th, we will not sit in the morning; we will sit only in the afternoon.  So we'll start up at 1 on Thursday, the 19th of April.  We'll have no morning session, we'll just have an afternoon session and that will be at 1 p.m.

We had Juror Number 4 report this morning to Ms. Romero that someone at her workplace on Friday when she went to work asked her if she was serving on the Edelin trial and she said no and thought nothing of it.  She gave further thought to it, however, and said she recalled having supervised another employee or two who had been related to one or more of the Edelins, perhaps two Edelins, who had been involved as defendants in some other trial.

She's apparently reported that just in the interest of

Scott L. Wallace, RDR, CRR
Official Court Reporter

5205

(Thereupon, a break was had from 10:52 a.m. until 11:09 a.m.)

(Jury in at 11:09 a.m.)

THE COURT: Good morning, ladies and gentlemen.

THE JURY PANEL: Good morning.

THE COURT: Welcome back. We're ready to resume. Counsel.

BY MR. LEON:

Q.   Mr. Capies, I believe when we just broke we were talking about Boy-Boy. Do you remember that?

A.   Yes, sir.

Q.   And you said that you bought -- you personally bought from Boy-Boy on a number of occasions?

A.   Yes, sir.

Q.   From what periods of time did you buy from Boy-Boy?

A.   I mean, on and off since I started hustling.

Q.   Well, you testified that you started hustling back in -- I think you said '92 or '93, correct?

A.   '92, sir.

Q.   Okay. So since then, up until when you were incarcerated --

A.   Yes, sir.

Q.   -- I would like to focus, though, on '96 to 2001. Did you buy frequently or infrequently from Boy-Boy?

A.   Every now and then.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5206

Q.   Okay. And what do you mean by that?

A.   When there ain't no coke around.

Q.   Okay. And when there wasn't coke around, why would you -- first of all, what do you mean by that, when there wasn't coke around?

A.   Like, if Wop ain't have no coke, I go to Boy-Boy.

Q.   If Wop didn't have coke, you went to Boy-Boy?

A.   Yes, sir.

Q.   And if Wop didn't have coke, did Boy-Boy often have coke?

A.   Yes, sir.

Q.   If other people didn't have coke, did Boy-Boy often have coke?

A.   Yes, sir.

Q.   And so if you first needed to get coke, who would you go to?

A.   Boy-Boy.

Q.   Okay. And when you did, what amounts would you get from him?

A.   Just wholesale.

Q.   And give us an example of how much you would get from Boy-Boy?

A.   I spent like $200 with him.

Q.   For $200, how much would you get from him?

A.   Forty dimes.

Q.   First, just yes or no, do you know if other people in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5207

Congress Park were supplied crack cocaine by Boy-Boy?

A.   Yes, sir.

Q.   And who were those people, that you know to --

MR. ZUCKER: Objection, basis.

THE COURT: Sustained.

BY MR. LEON:

Q.   How do you know -- these other people you said yes about, how do you know that?

A.   I seen it with my own eyes, sir.

Q.   Let's take them one at a time, slowly. Well, first of all, just name all of them. '96 to 2001 are all my questions, with respect to this, okay? Who were the people you saw, with your own eyes, being supplied drugs with by Boy-Boy?

A.   JT, Baby Kai, me, Jazz, Santu, Phil, Terrence, LT, Drano, Doo-Doo, Fat Tony, Dazz, Wop.

Q.   Can you think of anyone else right now, or that's it?

A.   That's all I can think of.

Q.   Okay. I'm just going to ask about a few of them. I'm not going to go into all of them. You mentioned Jazz, with a J?

A.   Yes, sir.

Q.   First of all, does Jazz have any relation to any of the other people -- any of the other people you just mentioned, does he have any brothers?

A.   Yes, sir.

Q.   What's his brother's name?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5208

A.   Boy-Boy and Santu.

Q.   So Jazz would buy from Boy-Boy, his brother?

A.   Yes, sir.

Q.   And when you saw Jazz buying from Boy-Boy, tell us what you saw?

A.   I just saw -- I don't know the amount, but I just used to see him get crack from him, sir.

Q.   How often did you see Jazz getting crack from Boy-Boy?

A.   I seen him do it a couple of times. It wasn't a lot, that I seen him get it from him.

Q.   You mentioned Dazz, with a D?

A.   Yes, sir.

Q.   Tell us what you saw when you saw Dazz getting supplied crack cocaine from Boy-Boy?

A.   I seen him get crack from him numerous times, sir.

Q.   And do you know how much he was getting when he got the crack from Boy-Boy?

A.   No, sir.

Q.   Do you know if it was wholesale amounts or larger amounts?

A.   Wholesale amounts.

Q.   Do you know the specific amount of wholesales?

A.   No, sir.

Q.   And when you say "numerous times," can you put a number on that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5209

**A.** No, it was a lot.

**Q.** Same question with respect to 1996 to 2001. You also mentioned Wop. How many times did you see Wop get supplied crack cocaine from Boy-Boy?

**A.** A lot.

**Q.** Can you put a number on "a lot"?

**A.** No, sir.

**Q.** Was this wholesale amount, larger amounts, or do you know?

**A.** Wholesale and sometimes large amounts.

**Q.** Okay. Well, let's talk about the larger amounts. The times that you saw Wop getting larger amounts from Boy-Boy, what were these amounts?

**A.** I seen him, like, once get an ounce from him.

**Q.** An ounce being -- how much weight is an ounce?

**A.** Twenty-eight grams, sir.

**Q.** And how much does an ounce cost?

**A.** A thousand dollars.

**Q.** Did you actually see money exchange during this time?

**A.** No, sir.

**Q.** Did you see the drugs, the crack being exchanged?

**A.** Yes, sir.

**Q.** And how did you know it was an ounce?

**A.** Because I used to hang with Wop, and when he got it, he let me know what it was that he got from him, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5210

**Q.** When you -- when Wop -- did he show you the crack?

**A.** Yes, sir.

**Q.** And when Wop told you and then showed you the crack that he bought from Boy-Boy, what, if anything, did Wop do with that ounce of crack?

**A.** I didn't see him break it down, but he told me he was going to break it down and serve it in dimes.

**Q.** Do you know what an eight-ball is?

**A.** Yes, sir.

**Q.** What's an eight-ball?

**A.** 3.5 grams, sir.

**Q.** In your mind, is an eight-ball a wholesale or is it weight or is it neither?

**A.** I mean, you can break it down sell it in wholesale, any of it, but 3.5 is serving a weight also.

**Q.** I want to get back to Burke, just quickly, for a second. Did you ever -- just first, yes or no. Did you ever purchase Burke's crack from someone other than Burke directly?

MR. ZUCKER: Objection, basis of knowledge.

THE COURT: Overruled.

THE WITNESS: I can't remember that, sir.

BY MR. LEON:

**Q.** Okay. Do you know somebody by the name of Quincy?

**A.** Yes, sir.

**Q.** Whose Quincy?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5211

**A.** Somebody who be around Congress Park, but don't always be around in the Congress Park.

**Q.** Okay. Did Quincy sell drugs in Congress Park?

**A.** Certain people.

**Q.** Okay. When -- which people did Quincy serve?

**A.** KL.

MR. ZUCKER: Objection, basis or just clarify the basis.

MR. LEON: Let me even ask another foundational question.

BY MR. LEON:

**Q.** When Quincy sold crack in Congress Park, did he sell to actual users or did he supply to sellers?

THE WITNESS: Sellers.

BY MR. LEON:

**Q.** Did you ever know Quincy to actually sell hand-to-hand to users?

**A.** No, sir.

**Q.** So, when Quincy supplied people who then sold to users, do you know how much he would supply?

MR. ZUCKER: Objection, basis.

MR. LEON: Okay.

BY MR. LEON:

**Q.** You said Quincy -- you said yes to the question, Quincy supplied people in Congress Park, correct?

**A.** Yes, sir.

**Q.** Okay. How do you know that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5212

**A.** He used to give me crack and I used to serve and give other people crack.

**Q.** Let's talk about you. When you said Quincy gave you crack, did you pay for it?

**A.** No, sir.

**Q.** Did he front it for you and you paid him later?

**A.** No, sir.

**Q.** He just gave you crack?

**A.** Yes.

**Q.** Why'd he give you crack, if you know?

MR. ZUCKER: Objection, basis.

THE COURT: Overruled.

MR. ZUCKER: Speculating on someone else's state of mind.

BY MR. LEON:

**Q.** I believe you can answer the question.

**A.** He gave it to me -- like if rent due or I'm broke or something, I go to him and tell him, let me get something and he give it to me.

**Q.** How much -- first of all, how many times did this happen, where he gave you crack?

**A.** A lot of times.

**Q.** Can you put a number on that?

**A.** No, sir.

**Q.** And did you ever pay him back in any way for that --

**A.** No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5237

**Q.** How many times would you say you personally bought drugs from Roadie?

**A.** A lot.

**Q.** During 1996 to 2001, did you buy from Roadie?

**A.** Yes, sir.

**Q.** Can you be specific as to when in that time period?

**A.** It was in the early part of, like, '99 to, like, 2000.

**Q.** Do you know, yes or no, if other people from Congress Park bought drugs from Roadie?

**A.** Yes, sir.

**Q.** Okay. How do you know that other people from Congress Park bought from Roadie?

**A.** Because I be right there about to purchase some, too.

**Q.** Okay. So you would see it?

**A.** Yes, sir.

**Q.** When you saw Roadie supply to other people in Congress Park, who were those other people?

**A.** Dazz, Wop, Phil, a dude named Deon, another dude named Big Head Tony, DC, and EB.

**Q.** And you were with the people you just mentioned when Roadie supplied them?

**A.** Yes, I be right there. I wasn't with them, but sometimes I be right there, not all of them. I be with them.

**Q.** Say the last part again.

**A.** All of them, I wouldn't be with them at the time, we be

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5238

probably going there together, but most of them I was with, like Dazz and Wop and Phil, I be with them.

**Q.** Well, let's focus on them. When you would buy from Roadie, how much would you buy from Roadie?

**A.** Like a half or a quarter.

**Q.** When -- ever buy anything less than a half -- ever buy anything less than a quarter of an ounce from Roadie?

**A.** No.

**Q.** When you saw Wop buy from Roadie, what did he buy, what amounts?

**A.** Like a half or an ounce.

**Q.** Did you ever see Wop buy anything less than a half from Roadie?

**A.** No, sir.

**Q.** How many times would you say Wop bought from Roadie?

**A.** A couple of times that I saw. I can't put no number on it, but it wasn't a lot that I saw.

**Q.** Same question with respect to Dazz. When Dazz bought from Roadie, how much did you see Dazz buy from Roadie?

**A.** I know he used to get coke from him. I can't remember what he was getting, though, sir.

**Q.** Okay. Let's get back to Roadie and the conversation that you and Wop had about Roadie, okay? We're going back to Club U, but just before Club U --

MR. PURPURA: Objection, Your Honor, and we have to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5239

approach the bench briefly.

THE COURT: Say it again?

MR. PURPURA: Objection and can we approach the bench, briefly.

THE COURT: Yes.

(Following sidebar discussion had on the record:)

MR. PURPURA: Your Honor, it's obviously up to this point all the statements come in by the co-conspirators -- are coming in under 801(d)(2)(E). It's my understanding that as of May of 1999, this witness becomes a cooperating government witness.

THE COURT: This witness, meaning Mr. Capies?

MR. PURPURA: Yes, based on his plea agreement, May of '99. Therefore, any statements would not -- made directly to him without other co-conspirators present, would not be admissible under 801(d)(2)(E). They would be limited as an admission against the individual defendant who makes that statement and whose party makes that statement as an admission. We would all be entitled to a limited instruction under 105 at this point.

THE COURT: Are you talking about any statements that this witness testifies he heard from either Wop or from Roadie?

MR. PURPURA: That's correct.

THE COURT: That comes after the -- after the time that the witness had become a cooperating witness?

MR. PURPURA: Yes, sir.

THE COURT: All right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5240

MR. LEON: I can represent this: That he was a -- he became a cooperating witness for the government, the FBI, Safe Streets in this case in -- I believe the agreement was signed in April of 2002. But I can proffer that he was debriefing with the government as early as July of 2001 when he was arrested, 2001. But counsel's correct that there was an earlier agreement with the Superior Court division of our office, which we've turned over in the course of this, so it's unrelated to this investigation, but there was an agreement, which this witness will talk about. Part of his testimony will be that he took it seriously for a while and then he didn't and he was off doing his own thing independently, and basically ignoring his handler, which was a homicide detective at the time.

THE COURT: Well, I don't see how his changed status as a cooperator effects in any way a statement from someone else who was an ongoing member of a conspiracy.

MR. PURPURA: I agree with the Court. I believe it comes in only as an admission now. It doesn't come in as a co-conspirator statement against other parties.

THE COURT: That's what I'm saying. I don't see how this witness' changed status has any impact on statements made by other people who are continuing members of an ongoing conspiracy. What difference does it make? These other people believed him to be who he isn't, but they make statements during the course of an ongoing conspiracy, in theory, in an effort to further that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5249

**Q.** So what, if anything, did you say in response when he said "This would be a good time to make that move"?

**A.** "Let's do it."

**Q.** When Wop said this to you, did you have a gun with you?

**A.** No, sir.

**Q.** First of all, who else was there? It was you, Wop and who else?

**A.** Me, Wop, Phil and Santu.

**Q.** Was Dazz there when Wop said this?

**A.** Yes, sir.

**Q.** Was Santu there when Wop said this?

**A.** Not right there at the conversation.

**Q.** Okay. And what about Phil?

**A.** Not right there at the conversation.

**Q.** So it's just you, Dazz and Wop?

**A.** Yes, but they was still in the club. We was waiting for them to come out.

**Q.** Who was still in the club?

**A.** Phil and Santu.

**Q.** I want to focus in on who was there for the conversation, you Wop and Dazz?

**A.** Yes, sir.

**Q.** Did Dazz say anything once Wop said this would be a good time to make that move?

**A.** He -- Wop told -- told us, said, "Come on, man, let's get

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5250

Phil and let's go." And Dazz was like, "Naw, I don't want him going with us on the move."

**Q.** Did Dazz explain why he didn't want Phil to go on this move?

**A.** That's his little brother. I guess he had his reasons.

MR. TABACKMAN: Objection.

THE COURT: Sustained.

BY MR. LEON:

**Q.** Did Phil go on the move?

**A.** No, sir.

**Q.** What did -- if you know, where did Phil go that night?

**A.** Dazz told him to ride back with Santu.

**Q.** And did you see them leave?

**A.** We pulled out first. I didn't see them actually pull off.

**Q.** Okay. But when you say "We rolled out," who's we?

**A.** Me, Dazz and Wop.

**Q.** Now, you said you "rolled out." What did you roll out in?

**A.** In Wop's truck.

**Q.** Can you describe it?

**A.** It's like a '98, '99 or '99 Escalade truck.

**Q.** Color?

**A.** Black.

**Q.** Who was driving the truck?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5251

**A.** Wop.

**Q.** And you said you did not have a weapon at that time. Do you know if Wop had a weapon?

**A.** Yes.

**Q.** Do you know if Dazz had a weapon?

**A.** Naw, I don't think he had one, sir.

**Q.** Okay. And at that point when you get in Wop's black Escalade, at that moment, do you know where you're going?

**A.** Yes.

**Q.** Where were you going at that point?

**A.** I know we was going to make the move, but I didn't know exactly where it was at that moment, though.

**Q.** Do you know if Wop knew where the move would be?

**A.** Yes, it was his move, sir.

**Q.** What do you mean by that?

**A.** He knew the move. He knew where it was at. He had the ideas to go do it.

**Q.** Did anyone force you to go with them?

**A.** Naw, didn't nobody force me. I went on my own.

**Q.** Did you choose to go with them?

**A.** Yes, sir.

**Q.** Where did you go?

**A.** We went to South Capitol.

**Q.** Tell us, how long did it take you to get from Club U to the part of South Capitol that you ended up making this move?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5252

**A.** I'd say about 20 minutes.

**Q.** And do you remember where on South Capitol, what cross street it was near?

**A.** It was on South Capitol.

**Q.** Do you know where on South Capitol or no?

**A.** Naw, I just know it was on South Capitol, like Halley, Terrace and other streets, Galveston, down in that part.

**Q.** Okay. Tell us what happened once Wop drove you all to that location, tell us what happened.

**A.** He was like, we going to case it first, to see if his truck's out there.

**Q.** Whose truck?

**A.** My bad, I didn't mean to say truck, his car, Roadie's car.

**Q.** Okay. Wop said this?

**A.** Yes, sir.

**Q.** And what, if anything, did you all do once Wop said this?

**A.** We cased it to see if we seen his car out there.

**Q.** Did you?

**A.** No, it wasn't -- we didn't see it out there. It wasn't out there.

**Q.** What kind of car were you looking for?

**A.** A gray Crown Vic LTD.

**Q.** Was that the car you seen Roadie in before?

**A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5253

**Q.**   Did you see any cars?

**A.**   Yeah, there was cars out there.

**Q.**   Now when you say "out there," describe what you drove up to? Was this a home? Was this an apartment complex? What was it?

**A.**   It was an apartment complex.

**Q.**   How big?

**A.**   It was jive big.

**Q.**   How many floors would you say it was, if you remember?

**A.**   I can't remember.

**Q.**   Okay. Now, when you said you cased the area, did you all get out of Wop's Escalade or did stay in it?

**A.**   We stayed in it and we found a parking spot.

**Q.**   Where did you find a parking spot?

**A.**   Across the street from where the spot was at.

**Q.**   So once you cased it and decided that Roadie's car was not there, tell us what, if anything you did next?

**A.**   We went over -- it was like everyone said Halley Place or Halley Terrace, right there, and parked in the back alley on the other side of the street from where the spot was at.

**Q.**   Okay. And then what'd you do?

**A.**   We was trying to -- once we parked, we was going -- trying to come to the conclusion who was going in there.

**Q.**   And tell us what, if anything, was said. Who said what?

**A.**   Wop said, "I know what we going to do." He was like, "Me

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5254

and Dazz going to go in here, you stay here and have the car ready."

**Q.**   And did you agree with this?

**A.**   Yes, sir.

**Q.**   And did Dazz agree with this?

**A.**   Yes, sir.

**Q.**   And did Wop explain to you why he wanted to do it this way?

**A.**   Because he was, like, Dazz might have to kick the door in.

**Q.**   Why couldn't you kick the door in?

**A.**   Because his feet bigger than mine.

**Q.**   How big are your feet?

**A.**   I wear a nine and a half, sir.

**Q.**   Uhm, you said Wop had a gun. Do you remember the kind of gun it was?

**A.**   It was like a -- it had to be a Glock 40 or 45.

**Q.**   Why do you say it would have to be one of those?

**A.**   Because those were the only two guns he was carrying around at that time.

**Q.**   Do you know which of the two it was?

**A.**   I can't remember which one it was.

**Q.**   Did you see it that night?

**A.**   Yes, sir.

**Q.**   Did you see it before Wop went into this place?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5255

**A.**   Yeah, I seen it before. Yes.

**Q.**   Can you describe it, other than the --

**A.**   It was -- I don't know which one he had that night, sir.

**Q.**   Okay. Can you describe the color of each of the guns you're thinking of?

**A.**   It was a chrome -- the 45 was chrome. The Glock, like a creamy color.

**Q.**   Okay. So tell us what happens. Do Wop and Dazz leave the '99 Escalade?

**A.**   Yes.

**Q.**   And do you see them leave?

**A.**   Yes, sir.

**Q.**   And tell us what you saw.

**A.**   Wop got the gun from up under the driver's seat, and --

**Q.**   And then what happened?

**A.**   He was like, "have the car ready" and he was like "Don't be having the music up all loud," because he know I like to listen to the music loud and they got out and went to the spot.

**Q.**   Did you see them go to a particular spot?

**A.**   They was going in that area, sir.

**Q.**   Did you see exactly where they went?

**A.**   Naw. Where it's at, it's a building and the building is blocked off and it's a cutoff to the side and I was down some, sitting in the truck, where the cut at, where you go to get to the spot.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5256

**Q.**   And so at some point they leave your line of sight and you can't see them?

**A.**   Yes, sir.

**Q.**   Did there come a point after that when you saw them again?

**A.**   Yes. It was like ten minutes later.

**Q.**   And tell us what happened -- first of all, between those ten minutes, did you see or do anything?

**A.**   No.

**Q.**   Did you see Dazz or Wop?

**A.**   Not during the ten minutes that they was gone.

**Q.**   Okay. Let's go back to the ten minutes. After the ten minutes, tell us what you saw.

**A.**   They came back to the truck, sir.

**Q.**   And tell us what, if anything, Wop said?

**A.**   They jumped in. It was like -- I asked them what they get. They was, like, nothing. Pull off. And Wop was, like, I think I shot the dude.

**Q.**   And what, if anything, did he say after that?

MR. ZUCKER: Your Honor, objection, same basis as was discussed at the bench. No need to approach.

THE COURT: All right. Overruled.

THE WITNESS: He was, like, "Go ahead, man, pull off, pull off."

BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5287

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
        Plaintiff,                 :   Docket No. CR 05-100
                                   :
    v.                             :   Washington, DC
                                   :
ANTWUAN BALL, DAVID WILSON,        :
GREGORY BELL, DESMOND              :   April 2, 2007
THURSTON, JOSEPH JONES, and        :   1:55 p.m.
DOMINIC SAMUELS,                   :
                                   :
        Defendants.                :
                                   :
                                   :
                                   :

VOLUME 27 – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
                           Glenn S. Leon, Assistant United
                           States Attorney
                           Ann H. Petalas, Assistant United
                           States Attorney,
                           Gilberto Guerrero, Assistant
                           United States Attorney
                           555 4th Street
                           Washington, DC 20001
                           202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                           South Building
                           601 Pennsylvania Avenue, N.W.
                           Washington, DC 20004
                           202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5288

APPEARANCES (Cont.)

For Defendant              TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:              TEASDALE, PLLC
                           Steven Carl Tabackman, Esq.
                           1747 pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC 20036
                           202.454.2811

For Defendant              LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                           503 D Street NW, Suite 250A
                           Washington, DC 20001
                           202.326.7100

                           GARY E PROCTOR, LLC
                           Gary E. Proctor, Esq.
                           6065 Harford Road
                           Baltimore, MD 21214
                           410.444.1500

For Defendant              LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                           2715 M Street, N.W.
                           Suite 200
                           Washington, DC 20007
                           202.333.5905

For Defendant              LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                           514 10th Street, NW
                           9th Floor
                           Washington, DC 20004
                           202.624.0784

For Defendant              LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                           7841 Belle Point Drive
                           Greenbelt, MD 20770
                           301.220.3700

                           LAW OFFICE of ANTHONY ARNOLD
                           Anthony Darnell Arnold, Esq.
                           One Research Court
                           Suite 450
                           Rockville, MD 20852
                           301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5289

APPEARANCES (Cont.)

For Defendant              LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                           400 Fifth Street, NW
                           Suite 300
                           Washington, DC 20001
                           202.639.0999
                           and
                           William B. Purpura, Esq.
                           8 East Mulberry Street
                           Baltimore, MD 21202
                           410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                           Official Court Reporter
                           Room 6814, U.S. Courthouse
                           Washington, DC 20001
                           202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5290

1    AFTERNOON SESSION, APRIL 2, 2007

2    (1:00 p.m.)

3        THE COURT: Mr. Leon, are you ready for the jury?

4        MR. LEON: Yes.

5    (Jury in at 1:03 p.m.)

6        THE COURT: Good afternoon, ladies and gentlemen. Welcome

7    back. We're ready to resume. Mr. Leon?

8        MR. LEON: Thank you.

9    I just wanted to know if we could have the photograph

10   which is in front of the witness and counsel published to the

11   jury.

12       THE COURT: Is it in evidence?

13       MR. LEON: It is.

14       CONTINUED DIRECT EXAMINATION OF BOBBY CAPIES

15   BY MR. LEON:

16   Q.   Mr. Capies, you understand you're still under oath?

17   A.   Yes, sir.

18   Q.   When we broke for our lunch break, you were talking about

19   someone who you identified and recognized as Bo. Do you

20   remember that?

21   A.   Yes, sir.

22   Q.   And you identified the individual here depicted in

23   Government's 108.115 as the Bo you were referring to?

24   A.   Yes, sir.

25   Q.   How do you -- first of all, have you seen this person,

Scott L. Wallace, RDR, CRR
Official Court Reporter

5307

1   **Q.**   I'll ask also with respect to Terrence and Tweety.  When
2   they were present, did either of them indicate they weren't --
3   didn't agree with retaliation?
4   **A.**   No, they didn't.
5   **Q.**   Did Wop ever tell you that he did retaliate?
6   **A.**   Yes, sir.
7       MS. WICKS:  Objection to leading, Your Honor.
8       THE COURT:  All right.  Rephrase.
9       MS. WICKS:  Your Honor, I think previously the Court said
10  that he would narrow the focus down to when these conversations
11  occurred, and after he identified who he was with, and it hasn't
12  been done yet.
13      MR. LEON:  I will.  Okay.
14  BY MR. LEON:
15  **Q.**   Let's go back to the conversations you had.  Let's focus
16  on Dazz.  I believe you said that you had conversations -- tell
17  me if this is correct or not, with Wop, where Dazz was present
18  when the conversation was about retaliation towards 10th Place.
19  **A.**   Yes, sir.
20  **Q.**   Okay.  How many times would you say Dazz was present
21  during these conversations?
22  **A.**   A couple.  I don't have no number on it, sir.
23  **Q.**   Can you put a time frame on this?  In other words, when
24  did you have these conversations with Dazz and Wop regarding
25  retaliation?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5308

1   **A.**   It's like '97, early part.
2   **Q.**   Early part of '97?
3   **A.**   Yes, sir.
4   **Q.**   Did -- during these conversations in the early part of
5   '97 that you're having with Wop and Dazz, you said, I believe,
6   that Wop -- excuse me, that Dazz did not disagree with the talk
7   of retaliation.  Did Dazz ever say anything himself about
8   retaliation?
9   **A.**   Yes, sir.
10  **Q.**   Tell us what Dazz said about retaliation.
11  **A.**   That they went down there and got in a shootout with some
12  guys with 10th Place.
13  **Q.**   Who told you this?
14  **A.**   Dazz.
15  **Q.**   When did Dazz tell you this?
16  **A.**   I don't got no date on it, sir, but I remember him
17  telling me in the early part of '97.
18  **Q.**   Early part of?
19  **A.**   '97.
20      MR. ZUCKER:  Could I ask the witness to define what is the
21  early part of '97?  Is there any way to focus it?
22      THE COURT:  No.
23  BY MR. LEON:
24  **Q.**   What is the early part of '97 to you, Mr. Capies?
25  **A.**   January, February.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5309

1   **Q.**   Okay.  Was this a specific conversation you can remember?
2   **A.**   Yes.
3   **Q.**   Tell us the specific conversation you remember having in
4   January, February, where Dazz told you about retaliating.
5   **A.**   He told me that him, Antwuan, LT, and Wop went down
6   10th Place to try to creep down on them guys, and somebody
7   opened fire on them, which they believe was Steve and Patrick,
8   and they stopped the car and jumped out and opened fire back.
9   **Q.**   Okay.  You've said a few things there.  Let's just follow
10  up.  First of all, Dazz told you about this?
11  **A.**   Yes, sir.
12  **Q.**   And he told you that Dazz was there and who else?
13  **A.**   LT, Twan, and Wop.
14  **Q.**   So four people in total?
15  **A.**   Yes, sir.
16  **Q.**   Okay.  And where did this shooting happen?
17  **A.**   On 10th Place.
18  **Q.**   Did he tell you where on 10th Place?
19  **A.**   No.  He just said 10th Place.
20  **Q.**   And did Dazz tell you who's idea it was to drive to
21  10th Place to do this shooting?
22  **A.**   I don't remember.
23  **Q.**   Okay.  And did he tell you how they got there?
24  **A.**   Yes.  By car.
25  **Q.**   Did he tell you whose car?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5310

1   **A.**   No, I don't remember, sir.
2   **Q.**   Okay.  And did he tell you who from Congress Park, who
3   from the group Dazz was with, actually fired weapons?
4   **A.**   All of them that was in the car that I named.
5   **Q.**   All four?
6   **A.**   Yes.
7   **Q.**   And I believe you said that they were firing at Steve and
8   Patrick?
9   **A.**   Yes.
10  **Q.**   Anybody else?
11  **A.**   A dude named Redhead.
12  **Q.**   Redhead.  And did Dazz indicate to you whether or not
13  either Redhead or Steve or Patrick, any of those three fired
14  back?
15  **A.**   Yes.
16  **Q.**   Did they?
17  **A.**   Yes.
18  **Q.**   Who?
19  **A.**   Steve and Patrick.
20  **Q.**   And?
21  **A.**   And Redhead.
22  **Q.**   So all three did fire back?
23  **A.**   Yes.
24  **Q.**   Did Dazz indicate to you if anyone, anyone from
25  Congress Park or anyone from 10th Place, was actually hit with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 5560

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           :       Docket No. CR 05-100
                                    :
                Plaintiff           :
                                    :
v.                                  :       Washington, DC
                                    :
ANTWUAN BALL,                       :
DAVID WILSON,                       :
GREGORY BELL,                       :       April 3, 2007
DESMOND THURSTON,                   :
JOSEPH JONES,                       :
DOMINIC SAMUELS,                    :
                                    :
                Defendants          :       2:05 p.m.
. . . . . . . . . . . . . . . . . :     . . . . . . . . . . . . .

VOLUME 28 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:      ANN H. PETALAS, ESQUIRE
                            GLENN S. LEON, ESQUIRE
                            GIL GUERRERO, ESQUIRE
                            UNITED STATES ATTORNEY'S OFFICE
                            555 Fourth Street, NW
                            Washington, D.C.  20530

For the Defendant           JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:               CARNEY & CARNEY
                            601 Pennsylvania Avenue, NW
                            Suite 900, South Building
                            Washington, DC  20004
                            (202) 434-8234

                            STEVEN CARL TABACKMAN, ESQUIRE
                            TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                            1747 Pennsylvania Avenue, NW
                            Suite 300
                            Washington, DC  20006

                            (202) 454-2811

1434

Page 5626

1 Q.  What is 1104?

2 A.  My plea agreement.

3 Q.  What's the date on that?

4 A.  May 9th, 2002.

5 Q.  May 9th of 2002?

6 A.  Yes, sir.

7 Q.  And you mentioned that you had a lawyer, I believe her name

8 was Hoover-Hankerson, with respect to the other agreement you

9 had?

10 A.  Yes, sir.

11 Q.  Do you have the same lawyer in connection with this case?

12 A.  No, sir.

13 Q.  Who is your lawyer in this case?

14 A.  A guy named Paul Hunt.

15 Q.  And what did you plead to?

16 A.  Up to life in prison.

17 Q.  What was the charge you pled to?

18 A.  Oh.  One count of distributing cocaine.

19 Q.  Okay.  And what else?

20 A.  Aiding and abetting and -- first-degree to murder, aiding

21 and abetting Devar Chandler.

22 Q.  And for the record, who is Devar Chandler?

23 A.  D-Lock.

24 Q.  You said two things.  You said aiding and abetting the

25 murder of Devar Chandler, D-Lock, and you said distribution.

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 445 of 500

Page 5627

1 What kind of distribution?

2 A.   Crack cocaine and cocaine.

3 Q.   Do you understand what the general charge, the charge is

4 that you pled to?

5 A.   Yes, sir.

6 Q.   What is it?

7 A.   It's a RICO.

8 Q.   Where did you plead guilty?   Physically, where were you when

9 you pled guilty?

10 A.   In front of Judge Roberts.

11 Q.   His Honor?

12 A.   Yes, sir.

13 Q.   And before you pled guilty, did you have a chance to review

14 that document, Government's 1104, with your lawyer, Paul Hunt?

15 A.   Yes, sir.

16 Q.   And did you go over it thoroughly?

17 A.   Yes, he read it with me.

18 Q.   Did he explain things to you?

19 A.   Yes, sir.

20 Q.   Before you entered into that agreement, did you learn how

21 much time you could get as a result of pleading guilty to this

22 RICO?

23 A.   Yes, sir.

24 Q.   What is your understanding as to how much time you can get

25 for pleading guilty to this RICO?

5659

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
            Plaintiff,             :   Docket No. CR 05-100
    v.                             :
ANTWUAN BALL, DAVID WILSON,        :   Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :   April 4, 2007
DOMINIC SAMUELS,                   :   9:36 a.m.
            Defendants.            :
                                   :
                                   :
                                   :

VOLUME 29 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC 20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC 20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5660

APPEARANCES (Cont.)

For Defendant         TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:         TEASDALE, PLLC
                      Steven Carl Tabackman, Esq.
                      1747 Pennsylvania Avenue, NW
                      Suite 300
                      Washington, DC 20036
                      202.454.2811

For Defendant         LAW OFFICE OF JENIFER WICKS
David Wilson:         Jenifer Wicks, Esq.
                      503 D Street NW, Suite 250A
                      Washington, DC 20001
                      202.326.7100

                      GARY E PROCTOR, LLC
                      Gary E. Proctor, Esq.
                      6065 Harford Road
                      Baltimore, MD 21214
                      410.444.1500

For Defendant         LAW OFFICE OF JAMES W. BEANE
Gregory Bell:         James W. Beane, Jr., Esq.
                      2715 M Street, N.W.
                      Suite 200
                      Washington, DC 20007
                      202.333.5905

For Defendant         LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:     Jonathan Seth Zucker, Esq.
                      514 10th Street, NW
                      9th Floor
                      Washington, DC 20004
                      202.624.0784

For Defendant         LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:         Anthony Douglas Martin, Esq.
                      7841 Belle Point Drive
                      Greenbelt, MD 20770
                      301.220.3700

                      LAW OFFICE of ANTHONY ARNOLD
                      Anthony Darnell Arnold, Esq.
                      One Research Court
                      Suite 450
                      Rockville, MD 20852
                      301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5661

APPEARANCES (Cont.)

For Defendant         LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:      A. Eduardo Balarezo, Esq.
                      400 Fifth Street, NW
                      Suite 300
                      Washington, DC 20001
                      202.639.0999
                      and
                      William B. Purpura, Esq.
                      8 East Mulberry Street
                      Baltimore, MD 21202
                      410.576.9351

Court Reporter:       Scott L. Wallace, RDR, CRR
                      Official Court Reporter
                      Room 6814, U.S. Courthouse
                      Washington, DC 20001
                      202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

5662

1          MORNING SESSION, APRIL 4, 2007

2     (9:36 a.m.)

3          THE COURT:  Good morning.

4     ALL PARTIES PRESENT:  Good morning.

5          THE COURT:  Are you ready for the jury?

6     MR. LEON:  Yes.

7          MR. ZUCKER:  Your Honor, Mr. Thurston is still in the

8     back.  I think he needs a moment.

9          MR. PURPURA:  And I apologize, Your Honor, for being late.

10    I did take the 7:40 trying to be extra early and it was delayed

11    due to rain and all the trains coming in.

12         THE COURT:  All right.  Thanks.  I heard that your

13    co-counsel was about to do a sprint over here from Superior

14    Court.

15         MR. PURPURA:  I stopped him.

16    (Jury in at 9:38 a.m.)

17    THE COURT:  Good morning, ladies and gentlemen.

18    THE JURY:  Good morning.

19    THE COURT:  Welcome back.  We're all together and here,

20    ready to go.  We're ready to resume.

21    Mr. Leon.

22    MR. LEON:  Thank you.

23         CONTINUED DIRECT EXAMINATION OF BOBBY CAPIES

24    BY MR. LEON:

25    Q.   Good morning, Mr. Capies.

Scott L. Wallace, RDR, CRR
Official Court Reporter

5751

1    A.   Yes, sir -- I mean, yes, ma'am. I'm sorry.
2    Q.   Was that a lie or was that the truth?
3    A.   That was the truth.
4    Q.   I was a sir?
5    A.   No.
6    Q.   You testified on December 9th of 2003, correct?
7    A.   Yes, I did.
8         MR. LEON: I'm sorry, which date?
9         MS. WICKS: December 9th, 2003.
10        Court's indulgence.
11   BY MS. WICKS:
12   Q.   And when you testified, you were under oath when you
13   testified back on December 9th, 2003, correct?
14   A.   Yes, ma'am.
15   Q.   And when you testified against Mr. Wilson in December of
16   2003, it was after you pled guilty in May of 2002, correct?
17   A.   Yes, ma'am.
18   Q.   So, in your words, it was under the same cooperation
19   agreement, correct --
20   A.   Yes.
21   Q.   -- as you're testifying today, correct?
22   A.   Yes, ma'am.
23   Q.   And when you testified, you were asked the following
24   questions and gave the following answers --
25        MR. LEON: Can I have the page and line number?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5752

1         MS. WICKS: Sure. 451.
2         MR. LEON: Your Honor, can I talk with counsel, quickly?
3         THE COURT: Yes.
4         (Discussion had off the record.)
5    BY MS. WICKS:
6    Q.   And on that day, Mr. Beatrice was asking the questions,
7    correct?
8    A.   Yes, ma'am.
9    Q.   And Mr. Beatrice asked you, "The police" -- I'm sorry.
10   Ms. Lotze was representing Mr. Wilson, correct?
11   A.   Yes, ma'am.
12   Q.   And Ms. Lotze asked you "The police were the first people
13   to say David Wilson's name," and you answered "right"?
14   A.   May I see my transcript, please, ma'am?
15   Q.   Sure.
16        MS. WICKS: Your Honor, may I approach and show him
17   Defense 17 O.
18   BY MS. WICKS:
19   Q.   Looking at 17 O the first page indicates this is the
20   transcript from December 9th, 2003, the United States versus
21   David Wilson, correct?
22   A.   Yes, ma'am.
23   Q.   And on page 363, line 23, it indicates that you were
24   called as a witness, correct?
25   A.   Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5753

1         MR. LEON: Your Honor, can we just briefly approach?
2         THE COURT: Yes.
3         (Following sidebar discussion had on the record:)
4         MR. LEON: I understand what counsel is doing, but I want
5    to be clear. I believe the witness' answer was, "I don't
6    recall," so this should be refreshing and not impeaching.
7         THE COURT: Correct.
8         MS. WICKS: Sure. I'll have him look at the page again.
9         (Sidebar discussion concluded.)
10        MS. WICKS: And for the record, I'm directing your
11   attention to page 452, lines 4 through 6.
12   BY MS. WICKS:
13   Q.   That's what the question was and that was your answer,
14   correct?
15   A.   Yes.
16        MR. LEON: Objection.
17        THE COURT: Sustained, but it's delayed. Sustained.
18   BY MS. WICKS:
19   Q.   Well, looking at that, does that refresh your
20   recollection as to the question and answer that day?
21   A.   Yes. David Wilson.
22   Q.   And who brought up David Wilson?
23   A.   That day, I know they questioned me about David Wilson
24   and they asked me did I know David Wilson, and I told them "Yes,
25   I know David Wilson."

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5754

1    Q.   Okay. Well, when you talked to them that day, you didn't
2    walk in and volunteer, "Hey guys, I know David Wilson," correct?
3    A.   No.
4    Q.   The police asked you if you knew David Wilson, correct?
5    A.   Yes, ma'am.
6    Q.   Now, when was the first time you were locked up at Oak
7    Hill?
8    A.   Like '92.
9    Q.   Okay. And back in 1992, how much of 1992 did you spend
10   locked up at Oak Hill?
11   A.   I can't remember that. I know it wasn't that long.
12   Q.   When you say not "that long," do you mean a day, a week,
13   a month, half the year, or you just don't know?
14   A.   It was some months. It wasn't that long, though.
15   Q.   Back in '93, were you locked up in any portion of 1993 in
16   Oak Hill?
17   A.   I was real bad back then, I was in and out of jails,
18   ma'am.
19   Q.   Well, specifically in 1993, do you recall what portion of
20   1993 you spent locked up in Oak Hill?
21   A.   Naw, I can't remember.
22   Q.   1994. Can you recall what portion of 1994 you spent
23   locked up at Oak Hill?
24   A.   No, I was back and forth in shelter houses.
25   Q.   In 1994. Did you run from the shelter house?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5755

1  **A.**   I can't remember.  I remember running from Oak Hill,
2  sometime in '95.
3  **Q.**   Okay.  And specifically, when you ran from Oak Hill, you
4  had gotten a shackle key, correct?
5  **A.**   Yes.
6  **Q.**   And so when you were out in the community, but shackled
7  up, you escaped using that shackle key, correct?
8  **A.**   Yes, ma'am.
9  **Q.**   And do you recall when that was in 1995 that you escaped
10  from Oak Hill?
11  **A.**   I remember it was hot outside.  I don't remember what
12  month.
13  **Q.**   Do you recall -- pardon me.
14      Do you recall how long you had spent at Oak Hill prior to
15  escaping in 1995?
16  **A.**   Not that long.
17  **Q.**   Days, weeks, or months?
18  **A.**   Not that long.  I don't remember.
19  **Q.**   You didn't like it at Oak Hill, correct?
20  **A.**   No, ma'am.
21  **Q.**   Now, do you recall when it was -- when you got locked up
22  in '96, you went to Oak Hill, correct?
23  **A.**   Yes.
24  **Q.**   And do you recall if you were just locked up on the
25  custody order from escaping or were you locked up on a new

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5756

1  charge?
2  **A.**   From escaping.
3  **Q.**   And as a juvenile -- I'll withdraw that.
4      Do you recall what month it was that you got locked up
5  for escaping from Oak Hill?
6  **A.**   Rephrase the question, again, please, ma'am.
7  **Q.**   Well, in 1996, you got locked up and went back to Oak
8  Hill, correct?
9  **A.**   Yes, ma'am.
10  **Q.**   Do you recall when it was that you got locked up and went
11  back to Oak Hill?
12  **A.**   It was some months after this guy had died.  I remember,
13  because it was like a month or two after he died.
14  **Q.**   And which guy was that?
15  **A.**   It was Truck.
16  **Q.**   So, months after Truck got killed in 1996, you went back
17  to Oak Hill, correct?
18  **A.**   Yes, like a month.
19  **Q.**   So just one month, maybe?
20  **A.**   Yes, maybe like one month.
21  **Q.**   Do you remember if it was hot or cold outside?
22  **A.**   It was kind of hot.
23  **Q.**   So, springtime or summer?
24  **A.**   Maybe spring.  I'm not sure.
25  **Q.**   Well, do you recall spending the summer down in Oak Hill

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5757

1  in 1996?
2  **A.**   Yes.
3  **Q.**   So, sometime before -- sometime in May or June of '96?
4  **A.**   It's around that time.  I don't got no specific day.  I'm
5  not just going to tell you anything, ma'am.
6  **Q.**   Well, you were arrested as an adult in August '96,
7  correct?
8  **A.**   Yes.  I don't remember that.
9  **Q.**   You don't remember that?
10      Do you recall when you were arrested for distribution and
11  possession with intent to distribute marijuana in 1996?
12  **A.**   No, ma'am.  I know I was arrested as an adult in '96
13  sometime, but I don't remember.  I thought it was like -- it was
14  hot out.
15  **Q.**   And that was before or after you went to Oak Hill in
16  1996?
17  **A.**   It had to be before.
18  **Q.**   When you got arrested as an adult for the distribution
19  and possession with intent to distribute marijuana, where was
20  that?
21  **A.**   I was hanging uptown, back and forth.
22  **Q.**   Up on 14th and Gerard, correct?
23  **A.**   13th -- yeah, 14th and Gerard.
24  **Q.**   And that was with Cadoza Simms, correct?
25  **A.**   No, it was not with Cadoza Simms.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5758

1  **Q.**   Well, you knew Cadoza Simms from 14th and Gerard,
2  correct?
3  **A.**   Yes.
4  **Q.**   Did you ever have any problems with Cadoza Simms at 14th
5  and Gerard?
6      MR. LEON:  Objection.
7      THE WITNESS:  No, ma'am.
8      MR. LEON:  Objection, beyond the scope.
9      MS. WICKS:  May we approach?
10      THE COURT:  Yes.
11      (Following sidebar discussion had on the record:)
12      MR. LEON:  Your Honor, I asked a lot of questions.  I
13  didn't ask about that.
14      MS. WICKS:  He did talk about the portion of time when he
15  was staying uptown when he was on the run from Oak Hill, and
16  that's what I'm going into, that period of time.
17      THE COURT:  One second.  What's the relevance?
18      MS. WICKS:  Because the rumor at Oak Hill was that he was
19  hot and that he had talked to the police about Cadoza Simms, who
20  was locked up for a murder at 14th and Gerard.
21      THE COURT:  What's the relevance?
22      MS. WICKS:  What's the relevance of the rumor that he was
23  hot?
24      THE COURT:  What's the relevance of what you just told me,
25  yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 5802

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :          Docket No. CR 05-100
                                   :
                Plaintiff          :
                                   :
v.                                 :          Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :          April 4, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
                Defendants         :          2:00 p.m.
. . . . . . . . . . . . . . . . .  :          . . . . . . . . . . . . .

VOLUME 29 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                                TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006

                           (202) 454-2811

1440

Page 5825

1 Q.   Right.   But the guidelines tell him that he has to stay

2 within there.   Correct?

3 A.   Yes.

4 Q.   And if there's no 5(k) motion, he can't give you 10 years.

5 Correct?

6 A.   If that's what's on his mind.

7 Q.   If that's -- that's your understanding?

8 A.   If that's what's on the judge mind, whatever he want to give

9 me.   They could file a motion and I could still get life.

10 Q.   Okay.   My question as to do with, if the motion is not

11 filed.

12 A.   If they don't file, I can get life.

13 Q.   I understand that.   My question is, if they don't file it,

14 the judge cannot go below 30 years.   Correct?

15 A.   That's the judge.   He do what he want to do.

16 Q.   So he can do whatever he wants to do at sentencing, is what

17 you're saying?

18 A.   Yes.   He's the judge.

19 Q.   So it really doesn't matter if you have an agreement.

20 Correct?

21 A.   Yeah, it matter.   I want him to be lenient on me.

22 Q.   Okay.   So the fact that you have an agreement, you're hoping

23 he'll be lenient.   Correct?

24 A.   If they file the 5(k)(1) motion.

25 Q.   Okay.   But if they don't file the 5(k)motion, can he be

6343

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
          Plaintiff,             :  Docket No. CR 05-100
     v.                          :
                                 :  Washington, DC
ANTWUAN BALL, DAVID WILSON,      :
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and      :  April 11, 2007
DOMINIC SAMUELS,                 :  9:15 a.m.
          Defendants.            :
                                 :
                                 :
                                 :
                                 :

VOLUME 32 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney,
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC 20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC 20004
                         202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

6344

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC 20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC 20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD 21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC 20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC 20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD 20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD 20852
                         301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

6345

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC 20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD 21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

6346

1    MORNING SESSION, APRIL 11, 2007

2    (9:18 a.m.)

3        THE COURT:  This is a test to see if this is actually

4    going to work this time.  We'll see after a short while, after

5    the witness is on the stand and talks for about 30 minutes.

6        All right.  Mr. Balarezo, you're in the middle of your

7    cross?

8        MR. BALAREZO:  Yes, Your Honor.

9        THE COURT:  Are you ready for the jury?

10       MR. BALAREZO:  Your Honor, I am.  I was wondering if the

11   Court would allow me one minute ex parte at the bench so

12   Mr. Samuels can hear?

13       THE COURT:  Is it something that can wait till the break?

14       MR. BALAREZO:  Yes.

15       THE COURT:  All right.  Are you otherwise ready for the

16   jury?  I will take you ex parte at the break.

17       MR. BALAREZO:  Thank you.

18       THE COURT:  Are you ready for the jury?

19       Mr. Balarezo, are you ready for the jury otherwise?

20       MR. BALAREZO:  I am, Your Honor.  Thank you.

21       THE COURT:  Are you good to go today?

22       MR. TABACKMAN:  Yes.

23       THE COURT:  Okay.

24       (Jury in at 9:20 a.m.)

25       THE COURT:  Good morning, ladies and gentlemen.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1442

6435

1  **Q.**   The FBI had you under surveillance selling drugs when you
2  were supposed to be cooperating, right?
3  **A.**   Yes, sir.
4        MR. LEON: I just object to the time frame, Your Honor.
5  He was just talking about '99. I was talking about another time
6  frame. I object to the form.
7  BY MR. ZUCKER:
8  **Q.**   You were released in '99. You've seen yourself on tape
9  in 2000 here, heard yourself in this courtroom, selling drugs
10 with Sandra Wilson, right in this courtroom, two days ago,
11 right?
12 **A.**   Two days ago?
13 **Q.**   Well, four days ago; whatever it was last week.
14 **A.**   Yes, sir.
15 **Q.**   Okay. That was while you were supposed to be cooperating
16 with them, right?
17 **A.**   I didn't see myself; I heard myself.
18 **Q.**   Fine. You're acknowledging it was you, right?
19 **A.**   Yes, sir.
20 **Q.**   And you did that on the stand, right?
21 **A.**   Yes, sir.
22 **Q.**   The whole time you're supposed to be cooperating and not
23 breaking the law, you're out there breaking the law. You see
24 yourself on FBI -- or hear yourself on FBI transcripts and they
25 don't do anything about it, do they?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6436

1  **A.**   I told you I had bad blood with that homicide, sir. If
2  you want to know the reason, I would like to surely tell you.
3  **Q.**   That wasn't the question I asked you.
4  **A.**   I told you I had bad blood with the homicide.
5  **Q.**   Sir, what I'm asking you is this: You supposed to
6  be cooperating, supposed to not be breaking the law. The FBI
7  has you on tape, live, dealing drugs, and they don't do a thing
8  about it, do they?
9  **A.**   Yeah, I'm locked up. They did something about it. 2001,
10 I ain't been released since.
11 **Q.**   A year later, a year later, right?
12 **A.**   I guess so.
13 **Q.**   So they leave you out there, knowing you're breaking the
14 law, knowing you're robbing, dealing, stealing, when you're
15 supposed to be cooperating, and nothing happens for at least a
16 year, right?
17       MR. LEON: Objection to what people knew at that time.
18       THE COURT: Sustained.
19 BY MR. ZUCKER:
20 **Q.**   From 1996 until you're arrested in 2001, did anybody in
21 Congress Park commit a murder and not confess to you?
22       MR. LEON: Objection. Form. It's possible -- objection
23 to form and argumentative.
24       THE COURT: Why don't you rephrase?
25 BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6437

1  **Q.**   Do you know of anyone between 1996 and 2001 in Congress
2  Park who committed a murder that didn't confess to you?
3        MR. LEON: Same objection.
4        THE COURT: I'll let him answer yes or no.
5        People have confessed to me. I haven't seen it sir.
6  BY MR. ZUCKER:
7  **Q.**   That wasn't the question.
8  **A.**   Well, you got to break it down a little better, because
9  that's what I thought you were saying.
10 **Q.**   From 1996 until 2001, do you know of anyone who committed
11 a murder in the Congress Park neighborhood that did not confess
12 to you, did not tell you that they did it?
13       THE COURT: Do you understand the question?
14       THE WITNESS: I don't understand what he's saying.
15 BY MR. ZUCKER:
16 **Q.**   Okay. Let's take it step-by-step. 1996 to 2001. Those
17 refer to the years 1996 to 2001.
18 **A.**   I know that. You ain't got to --
19 **Q.**   I'm trying to break it down for you. I'm not trying to
20 insult you, sir?
21 **A.**   I don't care if you do, that's your job.
22 **Q.**   You know what commit murder means, right?
23 **A.**   Yes, I help commit a murder.
24 **Q.**   You know what confess murder means, right?
25 **A.**   Yes, saying you done it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6438

1  **Q.**   You know where Congress Park is, right?
2  **A.**   Yes.
3  **Q.**   Okay. So let's put that question together. From 1996,
4  the year 1996 to the year 2001, do you know of anyone who
5  committed a murder in Congress Park that did not confess to you?
6  **A.**   No.
7  **Q.**   Now, you described in great detail during the
8  government's direct who you associated with at different times,
9  different periods in Congress Park, right?
10 **A.**   Yes, sir.
11 **Q.**   And there was one period in '92 to '93 and then '94 to
12 '96, and I don't want to rehash all of that.
13       Never once did you ever identify a man named Dip as a
14 close confident or associate of yours, did you?
15 **A.**   I already testified in his case, sir.
16 **Q.**   I'm just trying to summarize.
17       You identified Dip in a photo, but you never identified
18 him as anybody you were close to in '92, '93, '94 to '96, any
19 time, he was not part of your little -- one of your running
20 buddies?
21 **A.**   He was cool.
22 **Q.**   That wasn't my question. That wasn't my question.
23       Everybody's cool. I mean, you're cool with everybody
24 you're not trying to kill, right -- you're not beefing with,
25 everybody else is cool, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 6499

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     :     Docket No. CR 05-100
                              :
              Plaintiff       :
                              :
v.                            :     Washington, DC
                              :
ANTWUAN BALL,                 :
DAVID WILSON,                 :
GREGORY BELL,                 :     April 11, 2007
DESMOND THURSTON,             :
JOSEPH JONES,                 :
DOMINIC SAMUELS,              :
                              :
              Defendants      :     1:50 p.m.
. . . . . . . . . . . . . . . . . :     . . . . . . . . . . . . .

VOLUME 32 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006

                           (202) 454-2811

USCA Case #11-3031    Document #1445852      Filed: 07/10/2013    Page 454 of 500

Page 6531

1 Q.  I take it you were locked up in the summer of '96.  Correct?

2 A.  Yes.

3 Q.  And then in September of '96, Head got killed.  Right?

4 A.  Yes.

5 Q.  And in October of '96, Meatball got killed.  Right?

6 A.  Yes, sir.

7 Q.  And then you got released the following -- well, two months

8 later, in December of '96.  Right?

9 A.  Yes, sir.

10 Q.  And you told us about conversations you had regarding

11 retaliation.

12 A.  Yes, sir.

13 Q.  All right.  And you had several of those conversations.

14 Right?

15 A.  Yes, sir.

16 Q.  And you had them with -- well, you claim you had them with

17 Wop and LT and my client, Dazz.  Right?

18 A.  Yes, sir.

19 Q.  And Dazz in particular you had a feud with, and he told you

20 how they tried to creep up on 10th Place and shoot them up.

21 Right?

22 A.  Yes, sir.

23 Q.  And that they got into a shoot-out with two guys named

24 Steven and Patrick.  Right?

25 A.  Yes, sir.

Page 6532

1 Q.  And these conversations occurred in early '97, shortly after

2 your release.  Right?

3 A.  Yes, sir.

4 Q.  And where did these conversations occur?

5 A.  I remember talking to him, like '97.

6 Q.  Well, let's talk about -- the question was, where?

7 A.  Around Congress Park.

8 Q.  Well, in particular you said it was shortly after you were

9 released.  And when we asked you, you said it was January or

10 February of '97.  Correct?

11 A.  It was sometime in '97.

12 Q.  You said January or February of '97, right after you were

13 released.

14 A.  That's when I was released, in '96 of December.  So it had

15 to be.

16 Q.  Had to be January or February of '97?

17 A.  Yes, sir.

18 Q.  Where did they occur, this conversation, particularly the

19 conversation with my client, Dazz?

20 A.  I can't remember, sir.  But I remember talking to him.

21 Q.  You don't remember the location?

22 A.  I can't remember right now.

23 Q.  Do you remember whether it was inside or outside?

24 A.  I remember talking to him.

25 Q.  I understand that.  The question is, where did you talk to

Page 6533

1 him, inside or outside?

2 A.  I can't remember right now, sir.

3 Q.  Night or day?

4 A.  I can't remember.

5 Q.  What was he wearing?

6 A.  I can't remember.

7 Q.  Who else was there?

8 A.  I can't remember that right now.  I remember talking to him,

9 sir.

10 Q.  All you can remember is that it was January or February of

11 '97 -- well, right after -- shortly after your release.  Right?

12 A.  Yes.  And I also talked to him again about other things,

13 too.

14 Q.  All right.  All right.  But you can't remember where, when,

15 what time of day, inside, out, about these conversations in

16 January or February of '97, sitting here today, can you?

17 A.  I'm testifying about a rack of stuff.  If I could remember

18 accurately every detail, then I wouldn't be right here.

19 Q.  Why not?

20 A.  I can't hear you.

21 Q.  I said, "Why not?"  Why wouldn't you be here?

22 A.  Because I would have made all these smart decisions not to

23 put myself into this situation if I was so perfect.

24 Q.  But you do recall speaking to Dazz in particular several

25 time in January and February of '97.  Right?

# EXHIBIT B

8235

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :
    Plaintiff,      :    Docket No. CR 05-100
    v.      :
ANTWUAN BALL, DAVID WILSON,      :    Washington, DC
GREGORY BELL, DESMOND      :
THURSTON, JOSEPH JONES, and      :    April 24, 2007
DOMINIC SAMUELS,      :    9:25 a.m.
    Defendants.      :
          :

VOLUME 39 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
    Glenn S. Leon, Assistant United
    States Attorney
    Ann H. Petalas, Assistant United
    States Attorney
    Gilberto Guerrero, Assistant
    United States Attorney
    555 4th Street
    Washington, DC 20001
    202.305.0174

For Defendant      CARNEY & CARNEY
Antwuan Ball:      John James Carney, Esq.
    South Building
    601 Pennsylvania Avenue, N.W.
    Washington, DC 20004
    202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8236

APPEARANCES (Cont.)

For Defendant      TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:      TEASDALE, PLLC
    Steven Carl Tabackman, Esq.
    1747 pennsylvania Avenue, NW
    Suite 300
    Washington, DC 20036
    202.454.2811

For Defendant      LAW OFFICE OF JENIFER WICKS
David Wilson:      Jenifer Wicks, Esq.
    503 D Street NW, Suite 250A
    Washington, DC 20001
    202.326.7100

    GARY E PROCTOR, LLC
    Gary E. Proctor, Esq.
    6065 Harford Road
    Baltimore, MD 21214
    410.444.1500

For Defendant      LAW OFFICE OF JAMES W. BEANE
Gregory Bell:      James W. Beane, Jr., Esq.
    2715 M Street, N.W.
    Suite 200
    Washington, DC 20007
    202.333.5905

For Defendant      LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:      Jonathan Seth Zucker, Esq.
    514 10th Street, NW
    9th Floor
    Washington, DC 20004
    202.624.0784

For Defendant      LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:      Anthony Douglas Martin, Esq.
    7841 Belle Point Drive
    Greenbelt, MD 20770
    301.220.3700

    LAW OFFICE of ANTHONY ARNOLD
    Anthony Darnell Arnold, Esq.
    One Research Court
    Suite 450
    Rockville, MD 20852
    301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8237

APPEARANCES (Cont.)

For Defendant      LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:      A. Eduardo Balarezo, Esq.
    400 Fifth Street, NW
    Suite 300
    Washington, DC 20001
    202.639.0999
    and
    William B. Purpura, Esq.
    8 East Mulberry Street
    Baltimore, MD 21202
    410.576.9351

Court Reporter:      Scott L. Wallace, RDR, CRR
    Official Court Reporter
    Room 6814, U.S. Courthouse
    Washington, DC 20001
    202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8238

1        **MORNING SESSION, APRIL 24, 2007**

2    (9:28 a.m.)

3    THE COURT: All right. Mr. Guerrero, are you ready for

4  the jury?

5    MR. GUERRERO: Yes, Your Honor, we are.

6    (Jury in at 9:29 a.m.)

7    THE COURT: Good morning, ladies and gentlemen.

8    THE JURY PANEL: Good morning.

9    THE COURT: Welcome back. We're ready to resume.

10  Counsel.

11    MR. GUERRERO: Thank you, Your Honor.

12    CONTINUED DIRECT EXAMINATION OF CEDRIC CONNER

13  BY MR. GUERRERO:

14  **Q.**  Good morning, sir.

15  **A.**  Good morning.

16  **Q.**  Would you please introduce yourself once again for the

17  record.

18  **A.**  Cedric Conner.

19  **Q.**  And, Mr. Conner, yesterday afternoon we left off with the

20  topic of your stash houses down in Congress Park and we were

21  about to start talking about a person named Kiki. Do you

22  remember that?

23  **A.**  That's correct.

24    MR. GUERRERO: Mr. Mazzitelli, if we may pull up 100.1,

25  please.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8355

1   **A.**   I understood.
2       MR. BALAREZO:  Can I put this up?
3   BY MR. BALAREZO:
4   **Q.**   1106, can you see that?  Is it showing?  Do you
5   understand that pursuant to the statute, the charge carries a
6   term of imprisonment of not less than ten years or more than
7   life, right?
8   **A.**   That's correct.
9   **Q.**   So, when I just asked you that, what you're looking at
10   right now is a mandatory -- at least a mandatory ten-year
11   sentence in prison, that's what you're facing right now, right?
12   **A.**   Yes.
13   **Q.**   And it could go as high as life, right?
14   **A.**   Life, correct.
15   **Q.**   And Mr. Guerrero, the prosecutor, also asked you a
16   question about the guidelines, and you're very familiar with the
17   guidelines, right?
18   **A.**   Yes.
19   **Q.**   You understood them, you're a smart man, correct?
20   **A.**   Yes.
21   **Q.**   Your guidelines at the level 38 that you're talking
22   about, I believe is about 168 to 235 months, correct?
23   **A.**   Correct.
24   **Q.**   Which is substantially more than the ten-year mandatory
25   minimum that the statute provides for, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8356

1   **A.**   Yes.
2   **Q.**   And, of course, you don't want to do any of that time,
3   right?
4   **A.**   That's correct.
5   **Q.**   And you've already done ten -- excuse me, 20 days, that's
6   enough for you, right?
7   **A.**   Yes.
8   **Q.**   And by your testimony here today, you're hoping to avoid
9   any prison time?
10   **A.**   Yes.
11   **Q.**   And you've been out since -- at least since around the
12   time that you pled guilty in 2003, right?
13   **A.**   That's correct.
14   **Q.**   And you have not been sentenced yet?
15   **A.**   That's correct.
16   **Q.**   Because basically, the government was waiting for you to
17   testify here, right?
18       MR. GUERRERO:  Objection form.
19       THE COURT:  Sustained.
20   BY MR. BALAREZO:
21   **Q.**   Well, part of your cooperation required that you testify,
22   right?
23   **A.**   Yes.
24   **Q.**   And that's what you're doing here today --
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8357

1   **Q.**   -- against these gentlemen over here, right (indicating)?
2   **A.**   Yes.
3   **Q.**   All right.  Now, yesterday you testified about an
4   individual by the name of Don.  I think you spelled it at one
5   time, D-O-N?
6   **A.**   Yeah, Dom, Don.  I wasn't sure.
7   **Q.**   Right.  Or D-O-M?
8   **A.**   Correct.
9   **Q.**   And to you, D-O-N -- or the person that goes by D-O-N or
10   on goes by D-O-M, like Mary, is one person, right?
11   **A.**   Correct.
12   **Q.**   And I think you pointed him out, the gentleman here with
13   the brown tie?
14   **A.**   That's correct.
15   **Q.**   And you've -- you're close friends with him?
16   **A.**   No, I'm not.
17   **Q.**   But yesterday, you said you grew up with him?
18   **A.**   Well, grew up in the same vicinity.
19   **Q.**   Well, you said you grew up with him.  Do you remember
20   that?
21   **A.**   I probably said that.
22   **Q.**   Okay.  Are you changing that today?
23   **A.**   Oh, no, I'm not.
24   **Q.**   You were testifying under oath yesterday, right?
25   **A.**   That's correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8358

1   **Q.**   And are you testifying under oath today?
2   **A.**   Yes, I am.
3   **Q.**   Now yesterday you were asked by the prosecutor -- well,
4   one of the things you said is, to get the 5K you had to tell the
5   truth, right?
6   **A.**   That's correct.
7   **Q.**   And the truth shall set you free, basically?
8       MR. GUERRERO:  Objection form.
9       THE COURT:  Sustained.
10   BY MR. BALAREZO:
11   **Q.**   Well, in your mind, you're hoping that the truth will set
12   you free, right?
13       MR. GUERRERO:  Same objection.
14       THE COURT:  I'll allow that.
15       THE WITNESS:  Yes.
16   BY MR. BALAREZO:
17   **Q.**   And this is the truth that you're telling this jury here
18   today?
19   **A.**   Yes.
20   **Q.**   And the truth, of course, is the truth, right?
21   **A.**   Yes.
22   **Q.**   It doesn't change because it's the truth?
23   **A.**   That's correct.
24   **Q.**   Is that correct?  Now, you were asked yesterday by the
25   prosecutor, how long did you know Don, D-O-N?  Do you remember

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8379

1  **A.**   Anyone else.
2  **Q.**   -- or --
3  **A.**   Nobody else.
4  **Q.**   -- or with Vernon, right?
5  **A.**   Right.
6  **Q.**   So, you basically had your own separate dealings with
7  each one of those three guys that we talked about, right?
8  **A.**   Yes.
9  **Q.**   And during your 19-year drug career, you probably had
10  more suppliers than just those three guys, correct?
11  **A.**   Correct.
12  **Q.**   About how many more did you have?
13  **A.**   Don't recall.
14  **Q.**   Too many to remember or --
15  **A.**   Yeah.
16  **Q.**   All right.  And your dealings with all these separate
17  suppliers, they were all kept separate, correct?
18  **A.**   Yes.
19  **Q.**   You were just buying from them?
20  **A.**   Yes.
21  **Q.**   Now, your plea agreement, Government's 1106, you pled
22  guilty in paragraph 1 to conspiracy to distribute and possess
23  with intent to distribute cocaine, cocaine base, and marijuana.
24  **A.**   That's correct.
25  **Q.**   That's the charge that you're facing, that mandatory ten

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8380

1  years under the statute?
2  **A.**   Correct.
3  **Q.**   And under the guidelines, the amount that we mentioned?
4  **A.**   Correct.
5  **Q.**   Well, which conspiracy did you plead guilty to?  The one
6  with Joe, the one with Vernon, the one with Courtney, the one
7  with your many other suppliers you don't remember?  What did you
8  plead guilty to?
9  **A.**   Conspiracy.
10  **Q.**   With whom?
11  **A.**   Whoever was involved.  Whoever I had to identify.
12  **Q.**   Whoever they wanted you to identify, right?
13       MR. GUERRERO:  Objection, form.
14       THE COURT:  Sustained.
15  BY MR. BALAREZO:
16  **Q.**   Well, you know Dom is sitting here on trial for
17  conspiracy, right?
18  **A.**   Yes.
19  **Q.**   And you know the other gentlemen are sitting here on
20  trial also?
21  **A.**   That's correct.
22  **Q.**   And you know your testimony -- and I'll talk about Dom,
23  because he's my client -- your testimony against him helps the
24  government, right?
25       MR. GUERRERO:  Objection, form.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8381

1       THE COURT:  Sustained.
2  BY MR. BALAREZO:
3  **Q.**   Well, do you think that your testifying here that you
4  sold drugs to Don helps or hurts the government?
5       MR. GUERRERO:  Objection, form.
6       THE COURT:  Sustained.
7       MR. BALAREZO:  Can I approach, Your Honor?  I don't
8  understand.
9       (Following sidebar discussion had on the record:)
10       MR. GUERRERO:  Your Honor, my objection is that Mr.
11  Balarezo is going to a topic that other defense counsel will also
12  go into, which is these witnesses under these plea agreements
13  don't have to help the government do anything.  All they have to
14  do is cooperate and tell the truth, and whatever happens with the
15  case happens with the case.
16       But for the witness to be posed a question that he has to
17  help the government, that language is just -- it's not good form,
18  so we object to that.
19       MR. BALAREZO:  That's not what I'm asking.  I'm asking, if
20  in his mind, whether his testimony against my client, that he
21  dealt drugs to my client, does he think it helps or hurts the
22  client?
23       THE COURT:  Neither of you actually asked the question the
24  way you asked it.  That question I'll allow.
25       MR. BALAREZO:  Okay.  I don't remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8382

1       THE COURT:  Is there something else?
2       MR. GUERRERO:  No, sir.
3       (Sidebar discussion concluded.)
4  BY MR. BALAREZO:
5  **Q.**   Sir, as you're sitting here -- first of all, you're
6  testifying as a result of this deal you got from the government,
7  right?
8  **A.**   Yes.
9  **Q.**   And testifying, as you already said, is part of your
10  cooperation?
11  **A.**   Correct.
12  **Q.**   Right.  As you sit here today testifying, and again in
13  particular only to Dom, you've testified that you dealt drugs to
14  him, right?
15  **A.**   Yes.
16  **Q.**   In your mind, does that testimony, does it help or hurt
17  the government?
18  **A.**   I'm testifying truthfully to help myself.
19  **Q.**   Sir, you said here already that you understood the
20  English language and you understood me.
21       My question is:  Do you think it helps or hurts the
22  government?
23       MR. GUERRERO:  Asked and answered.
24       THE COURT:  Sustained as to argumentative.  You may
25  rephrase.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8383

1   BY MR. BALAREZO:
2   **Q.**   Your testimony that you've given here, where you
3   testified that you sold drugs to Don, right?
4   **A.**   Yes.
5   **Q.**   Either beginning in '96 or '97 or whenever, in your mind,
6   do you think it helps or hurts the government?  I'm not asking
7   you about you.  I'm not asking the truth.  I'm asking:  Do you
8   think it helps their prosecution of my client?
9          MR. GUERRERO:  Objection, form.
10         THE COURT:  As compound?
11         MR. GUERRERO:  And compound, yes.
12         THE COURT:  I'll let you rephrase.
13         MR. BALAREZO:  Let me think over that one for one second.
14  I'll give it one more shot.
15  BY MR. BALAREZO:
16  **Q.**   All right.  Do you think your testimony here today, that
17  my client -- that you sold drugs to Mr. -- to Dom, do you think
18  it helps the government's case?
19  **A.**   Do I think it helps?  Yes.
20  **Q.**   And that's because you're providing evidence against him,
21  right?
22  **A.**   Yes.
23  **Q.**   And the evidence you're providing against him, are your
24  words?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8384

1   **Q.**   And according to you, your words here is -- or are the
2   truth?
3   **A.**   That's correct.
4   **Q.**   And under your plea agreement, do you know who determines
5   whether or not you're telling the truth?
6   **A.**   Yes.
7   **Q.**   Who, in your mind, under your plea agreement --
8   **A.**   Under my plea agreement?
9   **Q.**   Yes.
10  **A.**   I guess the jury, the Judge.
11  **Q.**   Let me --
12         MR. BALAREZO:  Can I approach, Your Honor?
13         THE COURT:  Yes.
14  BY MR. BALAREZO:
15  **Q.**   I'm showing you Exhibit 1106.  And I'll point -- well,
16  let me ask you another question first and then I'll point you to
17  a specific point.
18         What you're trying to do here today is get that 5K Letter
19  that you talked about, right?
20  **A.**   That's correct.
21  **Q.**   And you know that the 5K Letter or motion is the only way
22  that the Judge will be able to sentence you below that ten-year
23  mandatory minimum?
24  **A.**   That's correct.
25  **Q.**   You agree with that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8385

1   **A.**   Yes.
2   **Q.**   So, the government has to file that motion or that letter
3   with the Judge, right?
4   **A.**   Yes.
5   **Q.**   And you said that the Judge can take it or leave it after
6   that, right?
7   **A.**   Yes.
8   **Q.**   But you're hoping that the Judge will go below the ten
9   years?
10  **A.**   Yes.
11  **Q.**   Now, the way you get the 5K Letter is if the government
12  determines that you've provided substantial assistance to them,
13  right?
14  **A.**   Yes.
15  **Q.**   And substantial assistance means a whole heck of a lot of
16  help to their case, right?
17  **A.**   Correct.
18         MR. GUERRERO:  Objection, form.
19         THE COURT:  Overruled.
20  BY MR. BALAREZO:
21  **Q.**   What's your answer?
22  **A.**   That's correct.
23  **Q.**   And you already indicated here today that your testimony
24  here today helps the government's case, right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8386

1   **Q.**   Now, let me point your attention to page 4, paragraph 6
2   of your plea agreement, which states "Your client understands
3   that the determination of whether your client has provided
4   substantial assistance pursuant to either Section 5K1.1 of the
5   sentencing guidelines or 18 U.S.C. Section 3553 E, is within the
6   sole discretion of the United States Attorney's Office for the
7   District of Columbia and is not reviewable by the Court."
8          Do you see that?
9   **A.**   Yes.
10  **Q.**   You understand what that means, right?
11  **A.**   Yes.
12  **Q.**   Basically, they're the ones that are going to say, did
13  you or did you not provide substantial assistance, right?
14  **A.**   Correct.
15  **Q.**   The jury has nothing to do with that, correct?
16  **A.**   That's correct.
17  **Q.**   So if they think you're telling the truth, that could be
18  substantial assistance, as you testify here today, right?
19  **A.**   Yes.
20  **Q.**   Because it's their discretion?
21  **A.**   That's correct.
22  **Q.**   Not the Judge's.  Again, not reviewable by the Court, you
23  understand that?
24  **A.**   I understand that.
25  **Q.**   So, again, they're the ones that you have to satisfy in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8555

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

Plaintiff,          : Docket No. CR 05-100

v.          :

ANTWUAN BALL, DAVID WILSON,          : Washington, DC
GREGORY BELL, DESMOND
THURSTON, JOSEPH JONES, and          : April 25, 2007
DOMINIC SAMUELS,          : 9:25 a.m.

Defendants.          :
                                   :
                                   :

VOLUME 40 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
                           Glenn S. Leon, Assistant United
                           States Attorney
                           Ann H. Petalas, Assistant United
                           States Attorney
                           Gilberto Guerrero, Assistant
                           United States Attorney
                           555 4th Street
                           Washington, DC 20001
                           202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                           South Building
                           601 Pennsylvania Avenue, N.W.
                           Washington, DC 20004
                           202.434.8234

Scott A. Wallace, RDR, CRR
Official Court Reporter

---

8556

APPEARANCES (Cont.)

For Defendant              TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:              TEASDALE, PLLC
                           Steven Carl Tabackman, Esq.
                           1747 pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC 20036
                           202.454.2811

For Defendant              LAW OFFICE OF JENIFER WICKS
David Wilson:              Jenifer Wicks, Esq.
                           503 D Street NW, Suite 250A
                           Washington, DC 20001
                           202.326.7100

                           GARY E PROCTOR, LLC
                           Gary E. Proctor, Esq.
                           6065 Harford Road
                           Baltimore, MD 21214
                           410.444.1500

For Defendant              LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                           2715 M Street, N.W.
                           Suite 200
                           Washington, DC 20007
                           202.333.5905

For Defendant              LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                           514 10th Street, NW
                           9th Floor
                           Washington, DC 20004
                           202.624.0784

For Defendant              LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                           7841 Belle Point Drive
                           Greenbelt, MD 20770
                           301.220.3700

                           LAW OFFICE of ANTHONY ARNOLD
                           Anthony Darnell Arnold, Esq.
                           One Research Court
                           Suite 450
                           Rockville, MD 20852
                           301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

8557

APPEARANCES (Cont.)

For Defendant              LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                           400 Fifth Street, NW
                           Suite 300
                           Washington, DC 20001
                           202.639.0999
                           and
                           William B. Purpura, Esq.
                           8 East Mulberry Street
                           Baltimore, MD 21202
                           410.576.9351

Court Reporter:            Scott L. Wallace, RDR, CRR
                           Official Court Reporter
                           Room 6814, U.S. Courthouse
                           Washington, DC 20001
                           202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

8558

1          MORNING SESSION, APRIL 25, 2007

2     (9:17 a.m.)

3          THE COURT:  All right, Ms. Wicks.  Are you ready for the

4     jury?

5          MS. WICKS:  Yes.  Thank you, Your Honor.

6     (Jury in at 9:22 a.m.)

7          THE COURT:  Good morning, ladies and gentlemen.

8          THE JURY PANEL:  Good morning.

9          THE COURT:  Welcome back.  We're ready to resume.

10          Ms. Wicks.

11          MS. WICKS:  Thank you, Your Honor.

12          CONTINUED CROSS-EXAMINATION OF CEDRIC CONNER

13     BY MS. WICKS:

14     Q.   Good morning, Mr. Conner.

15     A.   Good morning.

16     Q.   When you -- after meeting with Mr. Beatrice, then you met

17     with Mr. Guerrero?

18     A.   Yes.

19     Q.   About testifying in this case?

20     A.   Yes.

21     Q.   And I believe your testimony was that you met with Mr.

22     two times?

23     A.   Yes.

24     Q.   Approximately how much time did you spend with Mr.

25     Guerrero with him asking -- essentially preparing for testimony

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

8623

1  know, they come back in about a half hour, 30 to 45 minutes with
2  your drugs.
3  **Q.**  Wait a second.
4  **A.**  Give your money to one person.
5  **Q.**  Huh?
6  **A.**  Give your money to one person.
7  **Q.**  I see. So you're standing on a corner or a street
8  somewhere in Spanish Harlem --
9  **A.**  Once you go up and meet with someone --
10  **Q.**  No, no, no. Please answer the question I ask you.
11  You're telling us you went up there, not knowing anyone?
12  **A.**  That's correct.
13  **Q.**  A guy you don't know comes up to you; you give a guy you
14  don't know $10,000 and hope that 45 minutes later, he comes back
15  with a half a kilo?
16  **A.**  Yes. That's the way it happened.
17  **Q.**  And you weren't worried about him ripping you off, right?
18  **A.**  Nope.
19  **Q.**  And of course you can't tell us this guy's name?
20  **A.**  Nope.
21  **Q.**  You can't tell us where he lives?
22  **A.**  Nope.
23  **Q.**  You have -- if he walked away with your $10,000, there's
24  absolutely nothing you could do about it, right?
25  **A.**  That's correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8624

1  **Q.**  And he, of course, didn't give you a phone number?
2  **A.**  Nope.
3  **Q.**  He didn't give you a name?
4  **A.**  Nope.
5  **Q.**  So if you go --
6  **A.**  They all look alike.
7  **Q.**  -- if he goes off with your $10,000 and he doesn't come
8  back, you're kind of wandering around, trying to talk English to
9  people who speak Spanish, right?
10  **A.**  It was a gamble, I agree.
11  **Q.**  You're a big gambler, huh?
12  **A.**  Yes, I am.
13  MR. ZUCKER: Moment to consult.
14  (Discussion had off the record.)
15  BY MR. ZUCKER:
16  **Q.**  I'm not sure. I might have missed it. Did you just say
17  they all look alike?
18  **A.**  They do.
19  MR. BALAREZO: Objection, Your Honor.
20  MR. ZUCKER: I don't know if it was Mr. Balarezo or
21  Mr. Guerrero that made the objection.
22  BY MR. ZUCKER:
23  **Q.**  So, you don't even know who to go look for for your
24  $10,000?
25  **A.**  I told you that already, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8625

1  **Q.**  Where in Spanish Harlem were you?
2  **A.**  Spanish Harlem. I don't know.
3  **Q.**  What street were you on?
4  **A.**  100-and-something. I don't recall.
5  **Q.**  100 and what?
6  **A.**  I don't recall. It was 100-and-something, though.
7  **Q.**  Was it 110?
8  **A.**  Higher than that. It was in the mid 100s.
9  **Q.**  The mid 100s. Like 150 is the mid 100s?
10  **A.**  Yeah, I believe.
11  **Q.**  What's the cross street?
12  **A.**  I don't recall.
13  **Q.**  How'd you get there?
14  **A.**  Taxicab.
15  **Q.**  And where did you tell the taxicab to take you to?
16  **A.**  Spanish Harlem.
17  **Q.**  You got in a cab and said "Spanish Harlem"? How big is
18  Spanish Harlem?
19  **A.**  I don't know.
20  **Q.**  Was it on the East Side or West Side?
21  **A.**  Don't know.
22  **Q.**  You just got in a cab and said, "Take me to Spanish
23  Harlem"?
24  **A.**  Yes, I did.
25  MR. GUERRERO: Objection, asked and answered.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8626

1  THE COURT: Sustained. Go ahead.
2  BY MR. ZUCKER:
3  **Q.**  Did you tell the cab driver to take you to Spanish Harlem
4  to where they sell drugs?
5  **A.**  No, I did not.
6  **Q.**  Okay. But it was in the mid 150s, right?
7  **A.**  I believe so.
8  **Q.**  Spanish Harlem goes from about 96, 98 up to 125th.
9  **A.**  Okay. Then you're asking me and I said I thought it was
10  150s or something. I don't know.
11  **Q.**  You weren't even in Spanish Harlem, were you, sir?
12  **A.**  Yes, I was.
13  **Q.**  You don't even know where Spanish Harlem is?
14  **A.**  You're asking me ten, 15 -- almost ten, 15 years ago
15  where Spanish Harlem is. I haven't been there since.
16  **Q.**  I thought you went back there?
17  **A.**  In the early 90s, sir.
18  **Q.**  Sir, this story about going up to the mid 150s and you
19  can't tell us West Side, East Side, Lexington, Broadway,
20  nothing, right?
21  **A.**  Can't tell you.
22  **Q.**  And giving a complete stranger $10,000 and him coming
23  back with half a kilo of cocaine 45 minutes later -- this is as
24  truthful as the rest of your testimony, isn't it?
25  **A.**  That is the truth, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8627

1  Q.   I see.  You're not making up this story because you don't
2  want to give up your real suppliers and protect them, do you?
3  A.   I gave up my real suppliers.
4  Q.   You said they were Dominicans?
5  A.   They were Dominicans, yes.
6  Q.   How did you know they were Dominicans?
7  A.   Darker skin.
8  Q.   Dominicans are darker than Puerto Ricans?
9  A.   Some of them are.
10  Q.   Are they darker than Cubans?
11  A.   I don't know.  I don't know many Cubans.
12  Q.   Are they darker than people from Peru?
13  A.   I don't know, sir.
14  Q.   Well, how do you know they were Dominicans?  Because they
15  were darker?
16  A.   Well --
17  Q.   That's the only way?
18  A.   That's based on conversations I've had with people who
19  told me where to go when I went to New York.
20  Q.   Well, I thought they told you where to go, all they said
21  was Spanish Harlem, right?
22  A.   A guy named Fats told me, "Go to Spanish Harlem."  He
23  said, "All you have to do is go there.  Everything will take
24  care of itself."
25  Q.   The Dominicans are primarily on the Upper West Side in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8628

1  the 140s, aren't they, sir?
2       MR. GUERRERO:  Objection, assumes facts not in evidence.
3       THE COURT:  Overruled.
4  BY MR. ZUCKER:
5  Q.   Where's the Little Dominica?  Where's that in Manhattan?
6  A.   I don't know New York that well, sir.
7  Q.   Well, Spanish Harlem is predominantly Puerto Rican, isn't
8  it?
9       MR. GUERRERO:  Objection, not in evidence.
10       THE COURT:  Overruled.
11       THE WITNESS:  I don't know.
12  BY MR. ZUCKER:
13  Q.   You don't know who you were dealing with, do you, sir?
14  A.   I thought they were Dominicans, sir.
15       MR. ZUCKER:  All right.  I'm moving into a new area.  I
16  could keep going.  If you want to break at 11 or whatever, if you
17  want to break.
18       THE COURT:  The break time will be 10:50 unless you want
19  to break earlier.
20       MR. ZUCKER:  I'll keep going.
21  BY MR. ZUCKER:
22  Q.   Now, you told us earlier that you said you started
23  selling to Dazz in 1996, correct?
24  A.   Somewhere in that neighborhood, yeah.
25  Q.   Well, which neighborhood?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8629

1  A.   When he was hanging with Jermaine.  He's familiar with
2  that.
3  Q.   Well, when the prosecutor asked you, you said it was in
4  '96, okay?
5  A.   It could have been '96 or later.
6  Q.   And it continued for a while, right?
7  A.   Yes.  A few times, not many.
8  Q.   Not many?
9  A.   I think I said that.
10  Q.   You weren't selling to him regularly, huh?
11  A.   That's correct.
12  Q.   Okay.  When is the first time you sold to him?
13  A.   It was one time he was with Jermaine in the back of his
14  Moms' building.
15  Q.   How much did you sell him?
16  A.   Somewhere between a quarter and a half.
17  Q.   You can't recall?
18  A.   Nope, not exactly.
19  Q.   Well, didn't you recall last time it was seven grams?
20  A.   I said a quarter.  That's a quarter.
21  Q.   Now you just said a quarter to a half, you can't
22  remember, right?
23  A.   I said a quarter.  A quarter is seven grams.
24  Q.   Did you just say "A quarter or a half, I can't remember,"
25  30 seconds ago?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8630

1       MR. GUERRERO:  Objection, misstates the evidence.
2       THE COURT:  I'll allow it.
3       THE WITNESS:  I said a quarter or somewhere between a
4  quarter and a half.  A quarter is seven grams.
5  BY MR. ZUCKER:
6  Q.   I'm just trying to be sure, sir.  You said to me, "The
7  first sale was somewhere between a quarter and a half, I cannot
8  remember"; isn't that correct, not one minute ago in this chair?
9  A.   That's correct.
10       MR. GUERRERO:  Asked and answered.
11       THE COURT:  Sustained.
12  BY MR. ZUCKER:
13  Q.   When the prosecutor asked you two days ago, do you
14  remember it was seven grams?
15  A.   I said somewhere between a quarter and a half.
16  Q.   What month was it?
17  A.   Don't know.
18  Q.   What season?
19  A.   Don't recall.
20  Q.   Can't tell us if it was summer, winter, spring, fall?
21  A.   Nope.  Can't remember.
22  Q.   Nighttime?  Daytime?
23  A.   Can't remember, sir.
24  Q.   What was he wearing?
25  A.   Don't remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8631

1 **Q.** How did he pay you?
2 **A.** Cash money.
3 **Q.** How much? What quantities?
4 **A.** Like I said, I don't recall what he bought that time.
5 **Q.** What was the second time he bought from you?
6 **A.** It was like -- the question you're asking me is like
7 asking me how many times I've been to the grocery store and how
8 much money have I spent. I mean, I can't recall that.
9 **Q.** Well, wait. You just told us you only sold to Dazz a few
10 times, right?
11 **A.** And I know I went to the grocery store before as well.
12 **Q.** You've been to the grocery store more times, right?
13 **A.** I've been to the grocery store more times than I've
14 served Dazz, yes.
15 **Q.** And yesterday when the prosecutor was asking you -- or
16 two days ago, you were able to recall each sale, weren't you?
17 **A.** I don't think I recalled each sale. I said a few, a few
18 times. I said not many, I believe.
19 **Q.** You can't recall the quantity the first time. Can you
20 recall the quantity the second time?
21 **A.** Anywhere between a quarter and a half.
22 **Q.** How about a third time?
23 **A.** I don't recall.
24 **Q.** Was there a third time?
25 **A.** Could have been, could have not been.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8632

1 **Q.** It might have been --
2 **A.** It could have been maybe one to five times, at a max.
3 **Q.** And you can't tell us the quantities on any given
4 occasion except between a quarter and an ounce?
5 **A.** That's correct.
6 **Q.** Are you sure?
7 **A.** That's correct.
8 **Q.** Never more than a half?
9 MR. GUERRERO: Objection, asked and answered.
10 THE COURT: Sustained.
11 BY MR. ZUCKER:
12 **Q.** Didn't you testify that he bought up to 28 grams from
13 you?
14 **A.** I don't recall. It could have been.
15 **Q.** And you said you received shipments of cocaine at the DC
16 Public Schools when you were employed there; is that correct?
17 **A.** Yes.
18 **Q.** Do you remember the quantity?
19 **A.** It was a kilo of cocaine.
20 **Q.** How many times?
21 **A.** One time.
22 **Q.** And you were -- only one time at DC Public Schools?
23 **A.** Yes.
24 **Q.** And you're an accounts payable specialist, right?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8633

1 **Q.** Use a DC account to pay for the shipment?
2 **A.** No.
3 **Q.** Now, you also talked about making fake high school
4 diplomas; is that correct?
5 **A.** Yes, I have.
6 **Q.** And making fake check stubs, right?
7 MR. GUERRERO: Objection, asked and answered, the topic.
8 THE COURT: Overruled.
9 THE WITNESS: Yes.
10 BY MR. ZUCKER:
11 **Q.** And these were favors you did for friends, not for
12 financial reward?
13 **A.** That's correct.
14 **Q.** Now, the friends took the pay stubs to provide to courts
15 as proof of their employment, correct?
16 MR. GUERRERO: Objection, assumes what someone else was
17 doing with them.
18 THE COURT: Sustained.
19 BY MR. ZUCKER:
20 **Q.** What did you know them to be doing with them?
21 MR. GUERRERO: Same objection; calls for hearsay.
22 THE COURT: Sustained.
23 BY MR. ZUCKER:
24 **Q.** What was your understanding of what those fake check
25 stubs were to be used for?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8634

1 MR. GUERRERO: Same objection.
2 THE COURT: Sustained.
3 BY MR. ZUCKER:
4 **Q.** Did you have an understanding of what they were to be
5 used for?
6 **A.** Apartments, things of that nature.
7 **Q.** And the high school diplomas?
8 **A.** Gain employment.
9 **Q.** How many of them did you make?
10 **A.** One, for Sheila Teasley.
11 **Q.** I'm sorry?
12 **A.** One, for Sheila Teasley.
13 **Q.** Just one?
14 **A.** For Sheila Teasley. That's the only one I needed to make
15 one for.
16 **Q.** No one else?
17 **A.** Not that I recall. It could have been maybe two or
18 three, but I don't recall who.
19 **Q.** Were these diplomas you took from the school system that
20 you filled out?
21 **A.** From something that I corrected. Not from DC Public
22 Schools. I didn't have access to diplomas.
23 **Q.** Where'd you get them from?
24 **A.** Copied diplomas from my only personal youth -- from my
25 high school diploma, I mean.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| | : | |
| v. | : | |
| | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | March 7, 2007 |
| DOMINIC SAMUEL, | : | 9:49 a.m. |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

VOLUME 13 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

For the United States:        UNITED STATES ATTORNEY'S OFFICE
                             Glenn Leon, Assistant United
                             States Attorney
                             Ann H. Petalas, Assistant United
                             States Attorney,
                             Gilberto Guerrero, Assistant
                             United States Attorney
                             555 4th Street
                             Washington, DC  20001
                             202.305.0174

For Defendant                CARNEY & CARNEY
Antwuan Ball:                John James Carney, Esq.
                             South Building
                             601 Pennsylvania Avenue, N.W.
                             Washington, DC  20004
                             202.434.8234

Case 1:05-cr-00100-RWR   Document 1229-3   Filed 03/03/08   Page 3 of 21
USCA Case #11-3081   Document #1445852      Filed: 07/10/2013      Page 468 of 500

1900

1    I believe you testified earlier, yesterday for sure, and

2   maybe as well today.  Let me not guess?

3    You testified at some point you know somebody by the name

4   of Dazz; is that correct?

5   A.    Yes.

6   Q.    Did you ever buy drugs from Dazz?

7   A.    Yes.

8   Q.    Can you estimate for us, approximately, as you sit here

9   today, how many times you bought drugs from Dazz?

10  A.    Like I said, a number of times.  It's hard to put a

11  number on it, an exact number.

12  Q.    I know it's hard, but I'm going to ask:  Can you put a

13  rough number on it, even a range?

14  A.    Eighty.

15  Q.    Okay.  When you would buy drugs from Dazz, would -- what

16  would the amounts be?  Would there be a range or would it be the

17  same amount every time?

18  A.    No, there would be a range.

19  Q.    What would the range be?

20  A.    Anywhere from dime bags to 20s.

21  Q.    What's the most that you'd say you bought from Dazz at

22  any one time, if you can remember?

23  A.    An eight-ball.

24  Q.    And when you would buy an eight-ball, would you actually

25  buy the chunk or would it be in dime form?

Case 1:05-cr-00100-RWR   Document 1229-3   Filed 03/03/08   Page 4 of 21
USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 469 of 500

1901

1   A.      It depends.  Sometimes it would be in dime form,

2   sometimes it was in chunk.

3          MR. LEON:  May I approach, Your Honor?

4          THE COURT:  Yes.

5   BY MR. LEON:

6   Q.      Ms. Parson, I'm handing you what's in evidence as

7   Government's 314.  And I'm going to take out the contents of

8   314.  Tell me if you recognize that.

9   A.      Yes.

10  Q.      What's that?

11  A.      It's a disk of purchases -- it's a disk made of a

12  purchases I made.

13  Q.      That you made?

14  A.      Yes.

15  Q.      How do you know that?

16  A.      I listened to it.  It has my signature and date on it.

17  Q.      Okay.  Now, was this -- I think you said earlier that you

18  agreed with the Agent Kyle and another agent to wear wires.  Was

19  this one of the times you wore a wire?

20  A.      Yes.

21  Q.      I'm going to ask if Mr. Mazzitelli could play -- tee up

22  314.1.  And I'll ask you if you could -- make sure the headset

23  is on -- and make sure while you're listening, face the

24  receiver.  Before we tee it up, let me ask you these questions.

25          When you buy from Dazz, how would you start that

Case 1:05-cr-00100-RWR   Document 1229-3   Filed 03/03/08   Page 5 of 21
USCA Case #11-3031     Document #1445852      Filed: 07/10/2013      Page 470 of 500

1902

1   transaction?

2   A.    I would go outside and look for him or stand in the door

3   and wait and see who would come by.

4   Q.    Do you know if you would ever call him?  Do you remember

5   if you would ever call him?

6   A.    No.

7   Q.    Okay.

8         (Audiotape played.)

9   BY MR. LEON:

10  Q.    Do you remember -- did you have a particular meet

11  location that you had with Kyle or was it different places at

12  different times?

13  A.    Different places at different times.

14  Q.    Do you remember the particular meet location on this day?

15  A.    No.

16  Q.    Okay.

17        (Audiotape played.)

18  BY MR. LEON:

19  Q.    What's that rustling we could hear?

20  A.    The sound of my coat.

21        (Audiotape played.)

22  BY MR. LEON:

23  Q.    Let me just stop there.  What did we just hear?

24  A.    Me making a drug transaction with Dazz.

25  Q.    Keep your voice up, please, if you could.

2093

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              :

        Plaintiff,                     :  Docket No. CR 05-100

        v.                             :

ANTWUAN BALL, DAVID WILSON,            :  Washington, DC
GREGORY BELL, DESMOND
THURSTON, JOSEPH JONES, and            :  March 8, 2007
DOMINIC SAMUELS,                          9:23 a.m.
                                       :
        Defendants.
                                       :
                                       :

VOLUME 14 — MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney,
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC 20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC 20004
                         202.434.8234

2094

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC 20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC 20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD 21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC 20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC 20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD 20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD 20852
                         301.519.8024

2095

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC 20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD 21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

2096

THURSDAY MORNING SESSION, MARCH 8, 2007

1      THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United*
2  *States versus Antwuan Ball, David Wilson, Gregory Bell, David*
3  *Wilson, Joseph Jones and Dominic Samuels.*
4
5      For the government, Mr. Leon, Ms. Petalas and
6  Mr. Guerrero.  For defendants, Mr. Carney, Mr. Tabackman,
7  Ms. Wicks, Mr. Beane, Mr. Zucker, Mr. Martin, Mr. Balarezo and
8  Mr. Purpura.
9      THE COURT:  All right.  Good morning, counsel.  We just
10  got a call that Juror 16 has called in to say he's going to be
11  delayed by one hour.  So there's really nothing we can do to
12  proceed at this point and I suggest we just recess for an hour.
13  That will give you, perhaps, some time to do some things.
14      Mr. Martin, did you have something?
15      MR. MARTIN:  Good morning, sir.
16      THE COURT:  Good morning.
17      MR. MARTIN:  I was just going to ask if the Court would
18  give me permission to go out of turn.  You have a list of
19  examinations for Ms. Parson and I would like to go ahead of --
20      THE COURT:  Yes.  Have you all agreed to it?  I'm sorry to
21  interrupt you.
22      MR. MARTIN:  Yes.
23      THE COURT:  Where would you like to go?
24      MR. MARTIN:  Before Mr. Zucker.
25      THE COURT:  So you would be after Mr. Balarezo?

2173

1  people who you bought drugs from during the relevant time of the
2  inquiry, were you?
3  **A.**   No.
4  **Q.**   Okay.  And you've already gone over some of the names
5  with some of the other lawyers, and they're all listed in
6  paragraph 4, aren't they?  Well, actually, two in paragraph 5,
7  and the rest in paragraph 4, right?
8  **A.**   Yes.
9  **Q.**   And it's approximately 19, 20 people, correct?
10  **A.**   Yes.
11  **Q.**   And those are the people that you had bought drugs from
12  prior to pleading guilty, as far as -- during that ten-year
13  period you lived in -- ten-year period you were addicted in
14  Congress Park, correct?
15  **A.**   Yes.
16  **Q.**   Desmond Thurston's name or his nickname Dazz doesn't
17  appear anywhere on that list, does it?
18  **A.**   No, it doesn't.
19  **Q.**   And you weren't trying to protect Dazz, were you?
20  **A.**   No.
21  **Q.**   You just didn't recall ever buying drugs from him; is
22  that a fair statement?
23  **A.**   No.
24  **Q.**   Well, you prepared it when it was fresher in your mind
25  and you were as thorough, complete and accurate as could be,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2174

1  correct?
2  **A.**   Yes.
3  **Q.**   And at that time, you didn't recall buying drugs from
4  Desmond Thurston or Dazz and that's why he was left out, right?
5       MR. LEON:  Objection.
6       THE COURT:  Sustained as to form.
7  BY MR. ZUCKER:
8  **Q.**   All right.  You agree that his name isn't included,
9  right?
10  **A.**   Yes.
11  **Q.**   And you agree that you hadn't told them, "them" being the
12  prosecutors or the FBI at that point, that you had ever bought
13  drugs from Mr. Thurston; isn't that correct?
14  **A.**   Yes.
15  **Q.**   And so some years later, you remembered it?
16  **A.**   Yes.
17  **Q.**   Okay.  Now, you've discussed at length how drugs affected
18  you, right?
19  **A.**   Yes.
20  **Q.**   And they affected you in -- well, when you get high, it
21  affects perception, right?
22  **A.**   Yes.
23  **Q.**   It affects one's ability to recall events, correct?
24  **A.**   Yes.
25  **Q.**   And during that period of time, you were staying up for

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2175

1  days on end and doing drugs and then crashing, right?
2  **A.**   Yes.
3  **Q.**   And it would be fair to characterize your recollection
4  during that period as fuzzy, correct?
5  **A.**   Yes.
6  **Q.**   Now, yesterday you were asked a couple of questions about
7  how many times you estimated you bought drugs from several
8  people.  Do you recall that?
9  **A.**   Yes.
10  **Q.**   And they were only people in this room, right?
11  **A.**   Yes.
12  **Q.**   Do you recall what you said yesterday?
13       MR. LEON:  Objection, form.
14       THE COURT:  Sustained.  Why don't you --
15  BY MR. ZUCKER:
16  **Q.**   You testified yesterday, with regards to those people you
17  bought drugs from in this room?
18  **A.**   I said a lot of things.  I don't remember the same
19  question.
20  **Q.**   Specifically you were asked about the number -- well,
21  Mr. Leon asked you to estimate how many times you bought drugs
22  and he named a few people who were in this room, did he not?
23  **A.**   Yes.
24  **Q.**   Do you recall which ones he named?
25  **A.**   No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2176

1  **Q.**   Do you recall whether or not he asked of you about
2  Mr. Thurston?
3  **A.**   No.
4  **Q.**   You can't recall what you said here yesterday?
5  **A.**   No.
6  **Q.**   Sitting here today, can you recall approximately how many
7  times you bought drugs from Mr. Thurston, in your life?
8  **A.**   No -- about 10, 20, not many.
9  **Q.**   Ten or 20?
10  **A.**   Um-hmm.
11  **Q.**   Is that your best estimate, sitting here today?
12  **A.**   Yes, it is.
13  **Q.**   Do you recall yesterday estimating it was 80?
14  **A.**   No.
15  **Q.**   So you can't remember what you said -- and you're not
16  high today, right?
17  **A.**   No, I'm not.
18  **Q.**   You're a little bit nervous, probably, because you don't
19  like being on the stand, if I understand you right, right?
20  **A.**   Repeat the question.
21  **Q.**   Are you a little bit nervous because you don't like
22  being -- testifying in a courtroom?
23  **A.**   I didn't understand the last part.  Being nervous?
24  **Q.**   Is there anything that's affecting your memory, sitting
25  here today?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2177

1   **A.**   No.
2   **Q.**   Is there anything that's making you uncomfortable,
3   sitting here today?
4   **A.**   No.
5   **Q.**   Okay. So, today at 12:00, your estimate is that you
6   bought drugs from Mr. Thurston 10 or 20 times, and you don't
7   recall saying yesterday, approximately -- I don't know, 3 or
8   4:00 in the afternoon, maybe 2:30, that your estimate was 80
9   times, wasn't it?
10  **A.**   No.
11  **Q.**   That would be inaccurate, right, the 80 times estimate?
12  **A.**   Yes.
13  **Q.**   Do you generally have trouble with your memory?
14  **A.**   On occasion.
15  **Q.**   Well, certainly you would agree that your memory
16  regarding events that occurred yesterday after you stopped using
17  drugs is probably better than your memory of events that
18  happened 15 years ago, 1992 to 2002 in Congress Park, right,
19  while you were using drugs?
20  **A.**   Yes.
21  **Q.**   Okay. So, something that happened yesterday should be
22  fresher in your mind than something that happened 10 years ago?
23  **A.**   No.
24  **Q.**   No?
25  **A.**   No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2178

1   **Q.**   Okay. Now, in those 10 or 20 times -- incidentally, what
2   quantities did you -- what quantities do you recall buying from
3   Mr. Thurston?
4   **A.**   Anywhere from dimes to -- dimes.
5   **Q.**   Just dimes?
6   **A.**   Yes.
7   **Q.**   Might have been a 20 on occasion or not even that big?
8   **A.**   Well, they were dimes, but they added up to different
9   amounts.
10  **Q.**   All right. Might have been multiple dimes, right?
11  **A.**   Yes.
12  **Q.**   But only dimes, and possibly multiple times, right?
13  **A.**   Yes.
14  **Q.**   You certainly never bought a large wholesale quantity
15  from Thurston, did you?
16  **A.**   No.
17  **Q.**   Have you ever -- the largest amount you ever bought in
18  your life was an eight-ball, right?
19  **A.**   Uh.
20  **A.**   At once.
21  **A.**   Yes.
22  **Q.**   And you certainly never bought one of those from Mr. --
23  from Dazz, did you?
24  **A.**   No.
25  **Q.**   You're sure of that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2179

1   **A.**   No.
2   **Q.**   Do you recall yesterday saying that you bought anywhere
3   from a dime up to an eight-ball from Mr. -- from Dazz? I'll
4   call him Dazz so there's no confusion.
5   **A.**   Yes.
6   **Q.**   You recall saying that yesterday?
7   **A.**   Yes.
8   **Q.**   But having thought about it overnight, you realized it
9   was wrong?
10  **A.**   No.
11  **Q.**   Well, why did you just tell us that the largest amount
12  you ever bought from Mr. -- Dazz, a couple minutes ago, was a
13  dime?
14  **A.**   Because they were dimes. It wasn't a solid piece. It
15  was dimes.
16  **Q.**   Okay. But yesterday you said you bought eight-balls from
17  him, up to an eight-ball, right?
18  **A.**   In dime form.
19  **Q.**   That's not what you said yesterday, is it? You said an
20  eight-ball.
21  **A.**   It still adds up to an eight-ball, even in dime form.
22  **Q.**   Well, yesterday we asked you how big an eight-ball -- how
23  much did an eight-ball weigh and you didn't know, did you?
24  **A.**   No, I didn't.
25  **Q.**   How many dimes in an eight-ball?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2180

1   **A.**   Twenty.
2        MR. ZUCKER:   Court's indulgence.
3   BY MR. ZUCKER:
4   **Q.**   About 20, you think?
5        MR. LEON:   Twenty what?
6   BY MR. ZUCKER:
7   **Q.**   Twenty dimes in an eight-ball?
8   **A.**   Yes.
9   **Q.**   That's what you just said, right?
10  **A.**   Yes.
11  **Q.**   Okay. Have you ever bought an eight-ball and cut it up
12  into dimes?
13  **A.**   Yes.
14  **Q.**   And you got about 20?
15  **A.**   Twenty, 30.
16  **Q.**   Okay. You're the same Gail Parson that testified --
17  well, you saw the transcript Mr. Balarezo showed you -- on
18  June 14th, 2006. May I approach, Judge?
19       THE COURT:   Yes.
20  BY MR. ZUCKER:
21  **Q.**   I'm using Balarezo 16.
22       THE COURT:   What 16?
23       MR. ZUCKER:   Balarezo 16.
24       THE COURT:   There is no Balarezo 16.
25       MR. ZUCKER:   Sorry. Okay. I plead guilty. Mr. Samuels,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2185

1  different, and different than the quality you got from anybody
2  else, right?
3  **A.**   Yes.
4  **Q.**   So in your experience as a cocaine user for many years,
5  it was pretty clear that they were not coming from the same
6  source?
7        MR. LEON:  Objection.
8        THE COURT:  Sustained.
9  BY MR. ZUCKER:
10  **Q.**   Either they were coming from different sources or they
11  were using different quantities of cut?
12        MR. LEON:  Objection.
13        THE COURT:  Sustained.
14  BY MR. ZUCKER:
15  **Q.**   Well, what do you attribute the difference in quality of
16  cocaine to different users to be from, if you know?
17  **A.**   I don't know.
18  **Q.**   Did it seem to you -- well, you could taste differences
19  in, for instance, flavor?
20  **A.**   Yes.
21  **Q.**   You could taste different -- you could feel differences
22  in effect, correct?
23  **A.**   Yes.
24  **Q.**   And you could observe differences in quantity, right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2186

1  **Q.**   Incidentally, you talked about putting your number into
2  people's pagers and phones, but you never did that with Mr. --
3  Dazz, right?
4  **A.**   No.
5  **Q.**   Because you never even had his number, right?
6  **A.**   Correct.
7  **Q.**   You never went to his house, right?
8  **A.**   No.
9  **Q.**   You never knew where he lived even, right?
10  **A.**   No.
11  **Q.**   You and he weren't like that, right?
12  **A.**   No.
13  **Q.**   The only time you saw Dazz was if you went out -- if you
14  couldn't get anybody on the phone to come to your house, you
15  said you would go out and stand on the steps, right?
16  **A.**   Yes.
17  **Q.**   And Dazz was basically a street corner guy, right?
18  **A.**   Yes.
19  **Q.**   He wandered through the neighborhood; if he had drugs, he
20  sold them, but --
21        MR. LEON:  Objection as to what Dazz did.
22        THE COURT:  Sustained as to form.
23  BY MR. ZUCKER:
24  **Q.**   But that's how you -- that's the only times you bought
25  from Dazz, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2187

1  **A.**   Yes.
2  **Q.**   Now, were you also treated for depression?
3  **A.**   Yes.
4  **Q.**   Does that affect your memory?
5  **A.**   Yes.
6  **Q.**   I assume it adversely affects it.  It hampers it
7  somewhat?
8  **A.**   I'm sorry, say it again.
9  **Q.**   When you say it affects your memory, how does it affect
10  your memory?
11  **A.**   Certain events and things it takes time for me to
12  remember.  It takes time for me to remember.
13  **Q.**   I see.  It takes time to remember?
14  **A.**   Certain things.
15  **Q.**   Is that another way of saying you have difficulty
16  remembering things, some things?
17  **A.**   Some things, yes.
18  **Q.**   Were you taking any medications for the depression?
19  **A.**   Yes, I am.
20  **Q.**   Are you taking them now?
21  **A.**   Yes.
22  **Q.**   Uhm, do they affect your ability to recall events, if you
23  know?
24  **A.**   I don't know.
25  **Q.**   Now --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2188

1        THE COURT:  Mr. Zucker, forgive me for interrupting, but
2  we're close to the lunch break, so signal me when you think we
3  can do that.
4        MR. ZUCKER:  Any time that's convenient for the Court.  I
5  can stop right now or keep on going, whatever is your preference.
6        THE COURT:  All right, ladies and gentlemen, we're ready
7  to take our lunch break.  Please remember my admonition not to
8  talk about the case amongst yourselves or with anyone else.
9  Leave your notes in the jury room until you come back.  I would
10  ask that you come back promptly at 1:35.  Enjoy your lunch.
11        (Jury out at 12:22 p.m.)
12        THE COURT:  All right, counsel, we'll see you back at
13  1:35.
14        (Thereupon, a luncheon recess was had beginning at
15  12:23 p.m.)
16
17        **C E R T I F I C A T E**
18        I, Scott L. Wallace, RDR-CRR, certify that the
foregoing is a correct transcript from the record of proceedings
19  in the above-entitled matter.
20  ------------------------------
**Scott L. Wallace, RDR, CRR**
21  **Official Court Reporter**
22
23
24
25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3742

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
          Plaintiff,               :   Docket No. CR 05-100
     v.                            :
                                   :   Washington, DC
ANTWUAN BALL, DAVID WILSON,        :
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :   March 22, 2007
DOMINIC SAMUELS,                   :   9:20 a.m.
                                   :
          Defendants.              :
                                   :
                                   :

VOLUME 22 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC 20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC 20004
                         202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3743

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC 20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC 20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD 21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC 20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC 20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD 20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD 20852
                         301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3744

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC 20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD 21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3745

1        MORNING SESSION, MARCH 22, 2007

2    (9:21 a.m.)

3        (Jury in at 9:21 a.m.)

4    THE COURT:  Good morning, ladies and gentlemen.

5    THE JURY PANEL:  Good morning.

6    THE COURT:  Welcome back.  We're ready to resume.

7    Counsel, announce your next witness.

8    MR. LEON:  The United States calls Edward Martin.

9    (EDWARD LEWIS MARTIN, JR., GOVERNMENT'S WITNESS, SWORN)

10       DIRECT EXAMINATION OF EDWARD MARTIN

11   BY MR. LEON:

12   Q.   Good morning, sir.  In a loud voice so we can all hear

13   you, and please make good use of the microphone in front of

14   you --

15   A.   Okay.

16   Q.   -- please state your full name for the record and spell

17   your full name for the benefit of our court reporter.

18   A.   Edward Lewis Martin, Junior.  E-D-W-A-R-D, Lewis,

19   L-E-W-I-S, Martin, M-A-R-T-I-N, junior.

20   Q.   Mr. Martin, may I ask how old you are?

21   A.   46.

22   Q.   And where were you born?

23   A.   Philadelphia, Pennsylvania.

24   Q.   And did you ever live in the greater Washington, D.C.

25   area?

Scott L. Wallace, RDR, CRR
Official Court Reporter

3746

1   A.   Yes, I did.

2   Q.   For roughly what periods of your life?

3   A.   From roughly 1985 to about 2001.

4   Q.   So roughly 15 to 16 years or so?

5   A.   Yes.

6   Q.   And did you ever live within D.C. itself or just around

7   D.C.?

8   A.   Just around D.C.

9   Q.   And without telling us where you live today, do you live

10  in the greater D.C. area today?

11  A.   No.

12  Q.   When did you move out of the greater D.C. area?

13  A.   The latter part of '01.

14  Q.   Why did you move out of D.C., the greater D.C. area

15  around that time?

16  A.   Change of environment.

17       MR. ZUCKER: I'm sorry. I couldn't here the last

18  statement.

19       THE WITNESS: Change of environment.

20  BY MR. LEON:

21  Q.   And could you be a little more specific? What

22  specifically?

23  A.   Well, what I had was I had a problem of addiction and I

24  moved down to rehabilitate myself.

25  Q.   And when you say addiction, what kind of addiction?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3747

1   A.   Drug addiction.

2   Q.   And when you say drug addiction, what kind of drugs?

3   A.   Mostly cocaine.

4   Q.   You said mostly cocaine. Were there other drug you were

5   addicted to?

6   A.   I wasn't addicted to any other thing but cocaine.

7   Q.   What other drugs did you use in addition to coke?

8   A.   I used marijuana.

9   Q.   Okay. Now, let's talk about cocaine. When you say

10  cocaine, are you familiar with cocaine being in a powder and a

11  hard crack form?

12  A.   Crack form.

13  Q.   That was the kind you used?

14  A.   That was it.

15  Q.   When did you start using crack cocaine?

16  A.   I started back in the early '80s, around about '86, '87.

17  Q.   And was this before or after you moved to D.C. -- or the

18  D.C. area, I should say?

19  A.   After.

20  Q.   Okay. And how did you get introduced to it?

21  A.   I got introduced to it through a young lady that I knew

22  when I was in California, training. And then when I came back

23  here, I got introduced to a young lady working off the rib

24  stand, actually.

25  Q.   Okay. Well, you touched on my next couple of questions.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3748

1   You said -- you made a reference to training. Back in 1985,

2   1986, what type of employment did you have?

3   A.   I worked for the Navy. I was a mechanical engineer for

4   the Navy.

5   Q.   And how long did you work -- was this --

6   A.   15 years.

7   Q.   Okay. Was this the reserves or was this --

8   A.   No. I was actually a civilian, working for the Navy

9   Surface Warfare Center down in Indian Head.

10  Q.   Do you still work for the Navy?

11  A.   No.

12  Q.   When did you stop working for the Navy?

13  A.   I lost that job for dirty urine.

14  Q.   For a dirty urine?

15  A.   Yes. Back in early 2001.

16  Q.   So you had that job until 2001?

17  A.   Yes.

18  Q.   And that dirty urine was for what type of substance?

19  A.   Cocaine.

20  Q.   Okay. Back around 1985, 1986, when you were working as

21  an engineer for the Navy, did you have any other jobs?

22  A.   I had businesses.

23  Q.   Tell us about that. What kind of business?

24  A.   I had a mobile rib business and we were selling neutral

25  supplements, me and my ex-wife.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3749

1   Q.   Okay. Let's take that one at a time. The rib business

2   was yours?

3   A.   It was me and two -- some other -- I had one other

4   partner.

5   Q.   And did that supplement the income you had from the Navy?

6   A.   Oh, yeah. Oh did very well.

7   Q.   Okay. How long did you have that -- do you still have

8   that business?

9   A.   No, I sold it.

10  Q.   When did you sell it?

11  A.   I could say probably around about '92-93.

12  Q.   Okay. And then you also made a reference to a business

13  you had with your ex-wife?

14  A.   Yes.

15  Q.   Tell us just generally what kind of business that was.

16  A.   It was a multi-level market neutral supplemental company.

17  Q.   I'm going to ask you to slow down.

18  A.   Okay. It's a multi-level marketing neutral supplement

19  company where we also did retail. We did weight loss products,

20  cleansing products, body wraps, things of that sort.

21  Q.   Was this your company or your wife's?

22  A.   It was her company, but I was a distributor.

23  Q.   So how much did the Navy job -- how many hours a week did

24  you work there?

25  A.   We worked a 40-hour week.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3750

| | |
|---|---|
| 1 | **Q.** So you did these two jobs on top? |
| 2 | **A.** Well, I did the rib job -- 40 hours a week; then I did |
| 3 | the rib job seven days a week and then also assisted in that, so |
| 4 | I did a lot of work. I worked a lot. |
| 5 | **Q.** Okay. Now, you said you got introduced -- I want to go |
| 6 | back to 1986, when you said you were introduced to crack cocaine |
| 7 | through a lady, you said? |
| 8 | **A.** Yes. |
| 9 | **Q.** Was this the woman who's now your ex-wife or was this |
| 10 | somebody else? |
| 11 | **A.** No, somebody else. |
| 12 | **Q.** Were you married at the time or no? |
| 13 | **A.** No. |
| 14 | **Q.** Okay. And when you were first introduced to crack, after |
| 15 | that, how frequently or infrequently, shortly after that, did |
| 16 | you use crack? |
| 17 | **A.** When I first was introduced to it, I was hooked the first |
| 18 | night and then it -- you know, once every week, twice -- it just |
| 19 | progressed until I was at the point where I was out there weeks |
| 20 | at a time. |
| 21 | **Q.** Okay. When would you say you got to that point when you |
| 22 | were out, as you put it, weeks at a time? |
| 23 | **A.** The worst time was in '89. Then I went to treatment |
| 24 | after that. |
| 25 | **Q.** Okay. And was that -- what kind of treatment was that? |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3751

| | |
|---|---|
| 1 | **A.** Rehabilitation. |
| 2 | **Q.** Was that inpatient or outpatient? |
| 3 | **A.** Inpatient, California. |
| 4 | **Q.** How long were you inpatient? |
| 5 | **A.** I went there for 30 days. |
| 6 | **Q.** And was it successful on any -- was it successful? |
| 7 | **A.** Yeah. I came back and I stayed clean for three years. |
| 8 | **Q.** So that would put us from 1989 to about 2002 (sic)? |
| 9 | **A.** Yeah. |
| 10 | **Q.** And then tell us what happened in 2002. |
| 11 | **A.** Well, I relapsed. |
| 12 | **Q.** Any particular reason or -- |
| 13 | **A.** Frustration. It was just an excuse. I just wanted to |
| 14 | get high, really. |
| 15 | **Q.** Okay. And when you started up again, where were you -- |
| 16 | just generally, where were you living at that time? |
| 17 | **A.** I was living in the Oxon Hill, Maryland, Fort Washington, |
| 18 | right there off of -- 2114 Bottomly Field Road. I was living |
| 19 | there. |
| 20 | **Q.** What's the road again? |
| 21 | **A.** 2114 Bottomly Field Road. It's a townhouse that we had |
| 22 | at the time. |
| 23 | **Q.** Okay. Now, you made a reference to an ex-wife. Were you |
| 24 | married at this time, 1992? |
| 25 | **A.** Yes. |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3752

| | |
|---|---|
| 1 | THE COURT: What was the date you quoted? |
| 2 | MR. LEON: I said 1992. I'm sorry. I meant -- I'll |
| 3 | withdraw it. I said the wrong -- |
| 4 | BY MR. LEON: |
| 5 | **Q.** Let me backtrack. I think everyone's on the same page |
| 6 | but me. |
| 7 | When did you -- did you mention 1992? |
| 8 | **A.** No, no. |
| 9 | **Q.** Okay. You mentioned 2002? |
| 10 | **A.** No, you did. |
| 11 | **Q.** Okay. Let me take one more step back. When did you |
| 12 | relapse again? |
| 13 | **A.** Okay. When I went to treatment, it was '89. |
| 14 | **Q.** Right. |
| 15 | **A.** I came back and stayed clean for three years and I |
| 16 | started relapsing again in like 1992. |
| 17 | **Q.** Okay. And that was -- |
| 18 | **A.** Right. |
| 19 | **Q.** Okay. |
| 20 | THE COURT: What date did you just say? |
| 21 | THE WITNESS: 1992. |
| 22 | BY MR. LEON: |
| 23 | **Q.** In 1992 -- |
| 24 | **A.** 1989 is when I went to treatment and I stayed clean three |
| 25 | years after that. |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3753

| | |
|---|---|
| 1 | **Q.** Right. So that gets us to 1992? |
| 2 | **A.** Right. |
| 3 | **Q.** Okay. In 1992 -- |
| 4 | **A.** I relapsed again. |
| 5 | **Q.** So that was about 15 years ago, 1992? |
| 6 | **A.** Yes. |
| 7 | **Q.** Okay. At that time you relapsed? |
| 8 | **A.** I relapsed again. |
| 9 | **Q.** And my question about that time, where were you living? |
| 10 | Was that Oxon Hill? |
| 11 | **A.** I was still in Oxon Hill. |
| 12 | **Q.** Okay. And at that time were you married? |
| 13 | **A.** Yes. |
| 14 | **Q.** Okay. You made a reference to relapsing. When you |
| 15 | relapsed, how frequently or infrequently did you use crack |
| 16 | cocaine at that time? |
| 17 | **A.** Well, at that time, I probably was out there no longer |
| 18 | than 30 days and I came back in. I wasn't out there 30 days, |
| 19 | but I would go out there three or four days, stop, three or four |
| 20 | days or two or three days or an hour and stop and come back. |
| 21 | You know, I did that for about 30 days, off and on like that. |
| 22 | **Q.** Okay. What would happen at the end of that 30-day |
| 23 | period? |
| 24 | **A.** I would go back into my program and I would stay clean |
| 25 | again two years. |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1468

3754

1   **Q.**   Okay.  Well, let's break that down, going back to 1992.
2   In 1992, did the three jobs you mentioned, did you still have
3   those three jobs?
4   **A.**   Yes, I did.
5   **Q.**   You were still working for the Navy?
6   **A.**   Yes, I was.
7   **Q.**   And you had the rib business?
8   **A.**   Yes, I did.
9   **Q.**   And you were working with your wife and her company?
10  **A.**   Yes, I did.
11  **Q.**   If you took 30 days off to do what you just said you did,
12  how did you keep these jobs?
13  **A.**   Well, I was a functional addict.
14  **Q.**   Okay.  So you would actually still go to work and then --
15  **A.**   Oh, yeah.
16  **Q.**   Did you sleep?
17  **A.**   Sometimes.
18  **Q.**   And during these 30-day periods, other than going to
19  work, did you go home to Oxon Hill or did you --
20  **A.**   I went home to Oxon Hill.
21  **Q.**   Okay.  And then you made -- you've made references --
22  let's see if we can speed this along.
23        You made a reference to at least one other time when you
24  tried to stop your addiction and you said you got clean.  From
25  1992 through the present, how many times would you say you've

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3755

1   tried to break your addiction by --
2   **A.**   Well, like I said --
3   **Q.**   My question is how many times during that period of time,
4   1992 to the present, the 15-year period, would you say you tried
5   to stop your addiction by entering a program?
6   **A.**   I went to treatment like four times.
7   **Q.**   And are you an addict today?
8   **A.**   Yes.
9   **Q.**   Are you using crack cocaine today?
10  **A.**   No.
11  **Q.**   Okay.  So you're not using, but you're in recovery?
12  **A.**   Yes.
13  **Q.**   Okay.  How long have you been in recovery?
14  **A.**   I've been in recovery since 1989.
15  **Q.**   Okay.  When's -- a better question might be when is the
16  last time you used crack cocaine?
17  **A.**   Three years ago.
18  **Q.**   And have you used since then?
19  **A.**   No, I'm clean.
20  **Q.**   Okay.  Now, in 1992, when you wanted to get crack cocaine
21  to use, where did you get it back in 1992?
22  **A.**   I would go to Congress Park.
23  **Q.**   Okay.  And you are -- are you familiar with Congress
24  Park?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3756

1   **Q.**   Let's go back.  Beginning -- when did you first become
2   familiar with Congress Park?  What period of time would you say?
3   **A.**   Probably around about '90, '91, '92 time frame.
4   **Q.**   Okay.  And tell us the first -- tell us how you got to
5   know the Congress Park neighborhood.
6   **A.**   Well, my habit was that I actually like to go out and
7   trick with girls and I was riding around, trying to pick up one
8   and I met a young lady off of Southern Avenue and she ended up
9   taking me into Congress Park.
10  **Q.**   Did you know who that particular lady was that you picked
11  up?
12  **A.**   Yes.
13        No, I didn't know her.  No.
14  **Q.**   Okay.  And she took you to Congress Park, is what you
15  said?
16  **A.**   Yes.
17  **Q.**   As you sit here today, do you know that lady's name?
18  **A.**   No.
19  **Q.**   Okay.  So when she took you to Congress Park, tell us
20  what happened.
21  **A.**   We went back into an apartment building in the back of
22  Congress Park and that's when we smoked and, you know, had drugs
23  and did whatever we did.
24  **Q.**   And was this just for one night or was this one of those
25  periods where you would stay for long stretches, this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3757

1   particular -- this first time that you went to Congress Park?
2   **A.**   Yeah, that was a long stretch.  I stayed three or four
3   days.
4   **Q.**   Now, when you say you would stay for three or four days,
5   would you actually leave Congress Park for those three or four
6   days?
7   **A.**   No.
8   **Q.**   Where would you stay?  Or where did you stay on this
9   occasion?
10  **A.**   I stayed in an apartment in the back of Congress Park, in
11  her house.
12  **Q.**   And on this particular occasion, how much -- in those
13  three or four days, how much crack would you say you purchased?
14  **A.**   A lot.  You know, about $40 at a time sometimes.
15  Probably about 4- or $500 on every two hours, so I probably
16  spent about $3,000 that week, on average.
17  **Q.**   And this would be in increments; in other words, not all
18  at once?
19  **A.**   Yes, yes.
20  **Q.**   Would you consume this alone and was this -- alone or
21  were there other people there?
22  **A.**   With other people.
23  **Q.**   How many other people would you say would be there -- or
24  were there on this occasion?
25  **A.**   Shoot, at that time that house was in and out.  It was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3758

1  probably five or six that I remember in the house.
2  Q.  And who is buying the crack for yourself and these five
3  or six people?
4  A.  They would always send somebody.  I didn't know who it
5  was.  Or somebody would come to the house.
6  Q.  Who had the money to buy the crack?
7  A.  A lot of times I had the money.  Most of the time.
8  Q.  Okay.  And what -- other than smoking and partying with
9  you, what did the other people do?  Did they contribute towards
10  the purchase of the crack?
11  A.  No.
12  Q.  Now, did you come back to Congress Park after this
13  occasion?
14  A.  Yes.
15  Q.  With this particular lady or somebody else?
16  A.  I would come by myself.
17  Q.  Okay.  After now knowing about Congress Park, when you
18  went by yourself, tell us what you did when you would go there
19  by yourself.  What would you do?
20  A.  Well, I would go -- this is what happened.  When I ended
21  up in that back apartment, I was there for a few days and then I
22  ended up -- I was afraid because there was a guy there that
23  acted like -- they were telling me he would rob me and
24  everything.  And I told them I didn't want to be in their house
25  no more.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3759

1  So the guy I met down there, who was actually in
2  Narcotics Anonymous with me, took me up --
3  MR. ZUCKER:  I'm sorry.  I couldn't understand the last
4  thing.
5  THE COURT:  He was in what with you?
6  THE WITNESS:  He was in Narcotics Anonymous with me.  But
7  I knew a guy that was out there, so he took me up to another
8  house, which ended up to be Gail's house.  And that's where I
9  would come back to all the time.
10  BY MR. LEON:
11  Q.  Okay.  Do you know -- do you know Gail's name, other than
12  Gail?  Do you know her last name?
13  A.  I only know her by Gail.
14  Q.  Okay.  And when would you say this was when you met Gail?
15  Roughly when?
16  A.  I guess it was around that time, '92 -- yeah.
17  Q.  Okay.  And once you met with Gail -- tell us that first
18  time you met with Gail, tell us what happened with her?
19  A.  Well, we commenced to smoking and tricking.
20  Q.  You and she would -- she would trick for you?
21  A.  Yes.
22  Q.  And how would you get crack to smoke with Gail?
23  A.  She would go get it.  I would give her the money and she
24  would go out and get it.
25  Q.  And when you would hang out with Gail during this time

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3760

1  period, how long of a time would you spend with her?
2  A.  Oh, man, I would stay over there for days, sometimes a
3  week.  Mostly I stayed -- the longest I stayed was a week.
4  Q.  What's the shortest you would stay?
5  A.  An hour.
6  Q.  Okay.  And for the longer period of time -- let's take a
7  time in between.  You said an hour and you said a week.  Were
8  there times were you spent maybe two or three days?
9  A.  Yes.
10  Q.  During a time when you spent two or three days, how much
11  crack would you buy through Gail?
12  A.  Thousands of dollars.
13  Q.  Would Gail contribute -- you had the money?
14  A.  Yeah, I had the money.
15  Q.  You mentioned a couple of jobs, but it does sound like
16  you're mentioning a lot of money.  How'd you pay for all this?
17  A.  Well, I had jobs, money from the jobs.  I had multiple
18  credit cards.  I had -- you know, I had a lot of money in the
19  account.  My business was making a lot of money.
20  Q.  Well, when you say multiple credit cards, is it fair to
21  say that when you buy crack --
22  MR. ZUCKER:  Objection, form.
23  THE COURT:  Sustained.
24  BY MR. LEON:
25  Q.  Okay.  Did you purchase crack with credit cards?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3761

1  A.  Well, sometimes I would buy them -- you know, buy things
2  where I have to pay.  She would make the deal, say, "Okay.
3  Basically, you're going to have to pay them later."
4  And I'd tell her, "Well, I can buy them stuff from Sears"
5  and stuff like that, and they would go for it and I would have
6  to pay through credit cards.
7  And then at some point, I would actually go get the cash.
8  Q.  Off of your credit card or off of --
9  A.  Off of the credit card.  Whatever means necessary.
10  Q.  Okay.  We'll get to that in a minute, but let's stay with
11  your first few encounters with Gail.
12  As you sit here today, beginning with when you first met
13  her in the early or so '90s, how many times would you say you
14  have hung out and partied with Gail, roughly?
15  A.  Tons of times.  Over 50.  I mean, I probably can't even
16  count them.  I don't even remember, it was so many times.
17  Q.  And during the times that you would hang out and party
18  with Gail, did you become familiar with some of the people who
19  she would purchase crack from?
20  A.  Yeah.  When I had to make or pay my debts, yeah.
21  Q.  What do you mean by that?
22  A.  Well, sometimes she would make credit calls for me.  She
23  would get the credit and when it was the time to pay it, that's
24  when I would meet the people that I would have to pay it to.
25  Q.  Were there any other neighborhoods, other than Congress

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3762

1  Park, that you would buy crack from during this time?
2  **A.**  I did venture out, yes.
3  **Q.**  Say it again.
4  **A.**  I did venture out other than Congress Park before.
5  **Q.**  What other neighborhoods?
6  **A.**  I was in -- I don't know the name of the streets, but off
7  of Martin Luther King.  You know, different -- always in that
8  area, you know, within walking distance of 13th Place, Congress
9  Park.
10  **Q.**  Now, you've made a reference to Gail and Congress Park.
11  And I think you said earlier that you got connected with Gail
12  because you were concerned for your safety.  Is that fair or
13  not?
14  **A.**  That's right.
15  **Q.**  Okay.  When you got comfortable with Gail, did you become
16  more comfortable for your safety?
17  **A.**  Well, she told me who was the heavy hitters and who not
18  to mess with.
19  **Q.**  Okay.  Did -- through your dealings with Gail, did you
20  then become comfortable with who you could deal with and who you
21  shouldn't deal with in Congress Park?
22  **A.**  Yeah.  I know I had to do what I had to do.
23  **Q.**  What do you mean by that?
24  **A.**  Because they told me who -- you know, what they -- these
25  people are known to do this.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3763

1  MR. ZUCKER:  Objection.
2  MS. WICKS:  Objection.
3  MR. PURPURA:  Objection.  It's a hearsay response.
4  MR. ZUCKER:  And it's also unknown declarant.
5  MR. LEON:  I was just following up on the question.  I can
6  ask another question.
7  THE COURT:  Do that.
8  BY MR. LEON:
9  **Q.**  I'll follow up, but try not to tell us what anyone said
10  to you.  But I am going to ask still about your understanding
11  and your comfort level at Congress Park, okay?
12  **A.**  Um-hmm.
13  **Q.**  But try to do so without telling us what anyone else
14  said.
15  Next question is this:  Over time, through your dealings
16  with Gail, did you become comfortable, yes or no, with who you
17  could or couldn't deal with in Congress Park, other than Gail?
18  **A.**  Did I become comfortable with them?
19  **Q.**  Let me ask it differently.
20  **A.**  I was never comfortable with anybody else.
21  **Q.**  Okay.
22  **A.**  I wasn't even totally comfortable with Gail, but I was
23  getting high.
24  **Q.**  What do you mean by you weren't totally comfortable with
25  Gail?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3764

1  **A.**  Well, I mean, I felt some security in her house, you
2  know.  And you know, in the process of getting high, you never
3  know what's going to happen.  Somebody could have robbed her
4  house.  So you're not always totally comfortable.
5  **Q.**  Would you get high -- you said you would get high in her
6  house.  Would you ever get high in Congress Park somewhere other
7  than her house?
8  **A.**  I have before, yes.
9  **Q.**  And where else?
10  **A.**  Down farther on the right, when you go like towards
11  Alabama Avenue, I believe.
12  **Q.**  Okay.
13  **A.**  A couple buildings down.
14  **Q.**  Mr. Martin, do you remember -- I think it was yesterday,
15  you and I looked at a map of Congress Park.  Do you remember
16  that?
17  **A.**  Yes.
18  **Q.**  And did you recognize that map?
19  **A.**  Yes.
20  **Q.**  What did you recognize it to be?
21  **A.**  13th Place, Congress Park, where I was at.
22  MR. LEON:  Your Honor, with the Court's permission, could
23  we publish Government's Exhibit 100.1 to the witness, which is in
24  evidence?
25  BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3765

1  **Q.**  Can you see that on your screen right there?
2  **A.**  Yes.
3  MR. LEON:  For the record, we published 100.1.
4  BY MR. LEON:
5  **Q.**  Is that the map you and I looked at yesterday?
6  **A.**  Yes.
7  **Q.**  Do you recognize it?
8  **A.**  Yes.
9  **Q.**  And what do you recognize it to be?
10  **A.**  It's where I used to get high at.
11  **Q.**  Okay.  Now, you made reference to Gail.  Do you see on
12  that map the building that Gail lived in?
13  **A.**  Yes.
14  **Q.**  Okay.  Do you have --
15  May I approach, Your Honor?
16  THE COURT:  Yes.
17  BY MR. LEON:
18  **Q.**  I'm going to hand you this pen -- there's a pen there,
19  too.  Without using the ink portion, can you just touch the part
20  of the screen where Gail's apartment building is depicted.
21  **A.**  Okay (indicating).
22  I'm messing it up.  I didn't know the whole thing was
23  going to go red.
24  **Q.**  You can clear the screen by touching the lower right-hand
25  portion and why don't you just touch it once.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3766

1   **A.**   Right there, where the arrow is pointing at, basically.
2   **Q.**   Just for the record, you made a diagonal line at the
3   intersection a little to the left of the intersection of
4   Congress Street and 13th Place?
5   **A.**   That's right.
6   **Q.**   And sort of looks like an arrow pointing sort of
7   downward?
8   **A.**   Yeah.  The arrow, that's it.
9   **Q.**   So for the record, and tell me if this is accurate,
10   you're pointing and you're indicating the building that is in
11   the -- at the intersection of Congress Street and 13th Place, in
12   the lower left-hand portion of that intersection?
13   **A.**   Yes.
14   **Q.**   Okay.  And that's the building Gail live in?
15   **A.**   Yes.
16   **Q.**   Okay.  How many times would you say you've been in that
17   building?
18   **A.**   Hundreds.
19   **Q.**   Now, getting back to Gail, and you said you were not
20   completely with her, but you were getting high,
21   something like that?
22   **A.**   Yes, um-hmm.
23   **Q.**   My next question is this:  Over time, did you get to know
24   other people, other than Gail, who sold crack in Congress Park?
25   **A.**   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3767

1   **Q.**   And over time, other than Gail, did you purchase, from
2   time to time, crack from other people in Congress Park?
3   **A.**   Yes, I did.
4   **Q.**   Who would you mostly buy your crack from, though,
5   however?
6   **A.**   You want to know by name?
7   **Q.**   Well, let me -- if you know by name, yeah.  Other than
8   Gail -- other than -- let me -- yes.
9        I don't know if the question is clear.  Did you
10   understand the question?  If you did, answer the question.
11   **A.**   Well, I bought from Gail and I had another guy that I
12   used to buy from.
13   **Q.**   Who was that guy?
14   **A.**   His name was Dazz.
15   **Q.**   Okay.  And let's start with Dazz.  Other than Gail, you
16   mentioned Dazz.  How many times would you say while in Congress
17   Park you purchased from Dazz?
18   **A.**   A lot.  It was, you know, uncountable probably.
19   **Q.**   And when you would buy from Dazz, how much would you buy
20   from him at a time?
21   **A.**   You know, it would be like 50s, $50 worth.  It wouldn't
22   be a whole lot.  He would come back in multiples.  Every time I
23   would want some more, they would come back and get it for me.
24        MR. PURPURA:  Objection to "they" unless we can identify
25   who we're talking about.  Move to strike.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3768

1        MR. LEON:  I'm happy to follow up with "they."
2   BY MR. LEON:
3   **Q.**   Other than Dazz, you said "they."  Who else -- who do you
4   mean by "they"?
5   **A.**   Well, I don't know them specifically by name, but they --
6   you know, the guys that she would bring in, whoever they were.
7   Do you want me to -- I don't know their names.
8   **Q.**   Okay.  If you don't know their names, you don't know
9   their names.
10   **A.**   Right.
11   **Q.**   But let's stay with Dazz.  Did you become familiar with
12   any of the people that Dazz dealt with?
13        MR. ZUCKER:  Objection, basis.
14        THE COURT:  Was the question:  Did you know -- did you
15   become familiar with people he dealt with?  Is that what you
16   asked?
17        MR. LEON:  Yes.
18        THE COURT:  And the basis is?
19        MR. ZUCKER:  The basis is the basis.  Is it personal
20   knowledge?  Is it hearsay?  How is he to know what --
21        THE COURT:  I'll let him answer yes or no and then you can
22   follow up.  Go ahead.
23        THE WITNESS:  Yeah.  Some of the people I did get familiar
24   with, yes.
25   BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3769

1   **Q.**   Okay.  When you would deal with Dazz directly, would you
2   also, with your own eyes, see people that he was with?
3   **A.**   Yes.
4   **Q.**   Okay.  Did you become familiar with any of his -- any
5   people that Dazz was related to?
6   **A.**   His brother.
7   **Q.**   He had a brother?
8   **A.**   Yes.
9   **Q.**   Do you remember his brother's name?
10   **A.**   No.
11   **Q.**   Would you recognize a picture of his brother if you saw a
12   picture of his brother?
13   **A.**   Yes.
14   **Q.**   And -- okay.  Do you remember looking through some
15   photographs a few weeks ago with an FBI agent?
16   **A.**   Yes.
17   **Q.**   And do you remember reviewing a photograph of Dazz?
18   **A.**   Yes.
19   **Q.**   And was that the Dazz that you're referring to right now?
20   **A.**   Yes.
21   **Q.**   And do you remember reviewing a photograph -- some
22   photographs, one of those photographs being a photograph of the
23   brother?
24   **A.**   Yes.
25   **Q.**   Dazz's brother?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1472

3826

1  Q.   And she was introduced to you as somebody who you could
2  basically go to her apartment, party, she'd range for you to get
3  drugs, and sex was involved too, right?
4  A.   She would help me get whatever I wanted or participate.
5  Q.   I'm sorry?
6  A.   Or participate.
7  Q.   And through her, you met my client, Dazz, right?
8  A.   Exactly.
9  Q.   And initially she would make the purchases for you and
10 then she introduced you to Dazz and then you would make the
11 purchases yourself, right?
12 A.   Yes.
13 Q.   And when you dealt with Dazz, you said you bought
14 basically $50 worth at a time, generally, right, somewhere in
15 that neighborhood?
16 A.   In the beginning, um-hmm.
17 Q.   And when you did that, you would give Dazz the money and
18 he will give you or Gail the drugs, right?
19 A.   At some point, I started giving him money, yes.
20 Q.   Okay.  Now, no one else -- it was basically you and Gail
21 involved in those transactions with Dazz and no one else, right?
22 A.   Well, Gail would make all the transactions, no matter who
23 they were.  It wasn't always Dazz.
24 Q.   Okay.  But when Dazz -- when you bought from Dazz or Gail
25 bought from Dazz, Dazz didn't consult with somebody else about

Scott L. Wallace, RDR, CRR
Official Court Reporter

3827

1  what he was going to charge you, in front of you, did he?
2  A.   No.
3  Q.   Okay.  And you gave the money, and Dazz, from what you
4  could see, put the money in his pocket or did what he wanted
5  with it?
6  A.   I mean, if he was out -- if I wanted a $100 worth, he
7  would give me a $100 worth of crack.  If I wanted $200 he would
8  give me $200 worth, you know, whatever I wanted.
9  Q.   Right.  But he wasn't part of a group coming to deal with
10 you; it was Dazz and you or Dazz, Gail and you, right?
11 A.   On the most part, yes.
12 Q.   Okay.  And from what you could observe, he didn't
13 share -- he didn't have to consult with anybody else about
14 setting prices, right?
15      MR. LEON:  Objection, form.
16      THE WITNESS:  I don't know.
17      THE COURT:  Hold on a second.  When there's an objection,
18 let me hear it.
19      MR. LEON:  Objection, form, speculation.
20 BY MR. ZUCKER:
21 Q.   From what you observed?
22      THE COURT:  All right.
23      THE WITNESS:  I don't know.
24 BY MR. ZUCKER:
25 Q.   And when you dealt, you dealt with a couple other people

Scott L. Wallace, RDR, CRR
Official Court Reporter

3828

1  there, right?
2  A.   Yes.
3  Q.   And when you dealt with them, you gave them the money or
4  gave the money to Gail and you got the drugs from them, right?
5  A.   Yes.
6  Q.   And again, there was no one else that they had to go and
7  consult with, right?  You dealt with the individual sellers?
8  A.   I don't know.
9  Q.   Well, from what you observed?
10 A.   I wasn't observing.  I just got it and went to the back
11 room.
12 Q.   Okay.  Now, Dazz never said to you, "you have to buy from
13 me" did he?
14 A.   He had suggested for my safety that I buy from him.
15 Q.   Okay.  For your safety?
16 A.   Yeah.  Because reality wasn't on the up and up.
17 Q.   And that's how your relationship with Dazz began, was as
18 buyer and seller, right, of crack cocaine?
19 A.   Basically.
20 Q.   Okay.  But over the course of time, it developed and
21 became a little closer and a little more -- there were other
22 contacts; is that fair to say?
23 A.   Like what?
24 Q.   Well, like you told us that he will come to your house,
25 right?

Scott L. Wallace, RDR, CRR
Official Court Reporter

3829

1  A.   Um-hmm.
2  Q.   And at some point he was even coming to your house every
3  day, right?
4  A.   That's right.
5  Q.   To checkup on you?
6  A.   He did do that.
7  Q.   To watch TV with you?
8  A.   He did do that.
9  Q.   To socialize with you?
10 A.   He did do that.
11 Q.   And when he came to your house, he never put a gun in
12 your face and took anything, did he?
13 A.   No.
14 Q.   He never stole from you in the house?
15 A.   No, not in my house.
16 Q.   He never attacked you in your house?
17 A.   No.
18 Q.   He never threatened you?
19 A.   No.
20 Q.   And he never did any of that stuff in front of you with
21 anyone else, did he?
22 A.   Well, no.
23 Q.   Okay.  And as a matter of fact, you talked about a
24 business that your wife owned, but you participated in, right?
25 A.   That's right.

Scott L. Wallace, RDR, CRR
Official Court Reporter

3830

1  Q.   Selling weight loss and basically health products, right?
2  A.   Yes.
3  Q.   And that was out in Rivertowne, Maryland, right?
4  A.   Oxon Hill.
5  Q.   Okay.  You had a store out there?
6  A.   Um-hmm.
7  Q.   And you were a distributor, right?
8  A.   That's right.
9  Q.   And Dazz worked with you in that, too, sometimes, didn't
10 he?
11 A.   Well, he became a distributor.
12 Q.   Well, he worked for you in that business as a distributor
13 for these health products, right?
14 A.   No.
15 Q.   Where did he work at?
16 A.   He came to a couple trainings at the office, and that was
17 it.
18 Q.   And didn't he work in the store sometimes?
19 A.   No, we actually had him to witness and help us in some --
20 we were doing body wraps, so we had a large.
21 Q.   I'm sorry, "body" what?
22 A.   Body wraps.  And he had a lot of clients and he actually
23 helped me add up some weight chart sheets, you know, behind the
24 counter, and I wanted him to see what the business could do.
25 That's all we did.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3831

1  Q.   So you helped train him?
2  A.   No, I didn't help, that was just a task.  He came to
3  training on the nights we had training.
4  Q.   Okay.  Okay.
5  A.   That wasn't done by me.
6  Q.   I'm sorry.  The conversations in court are kind of not
7  like normal.
8  A.   I'm sorry.
9  Q.   I know what you mean.  He's got to be able to take down
10 my question and your answer, so I'll try not to talk over you
11 and you try -- even when you see what question I'm asking you,
12 and you know where I'm going, wait until I finish and I'll try
13 to show you the same courtesy.
14 A.   Not a problem.
15 Q.   It's a court thing.
16 A.   Not a problem.
17 Q.   So he came to the trainings, and he worked in the store
18 sometimes?
19 A.   No.
20 Q.   For certain tasks?
21 A.   No, he came to the training a couple times, him and his
22 girlfriend.
23 Q.   Okay.
24 A.   I had him to help me one time --
25 Q.   Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3832

1  A.   -- at the store and then that was to write down some
2  numbers.  That was it.
3  Q.   Okay.  Well, didn't he also work under your license
4  selling these healthcare products?
5  A.   He worked for Full Life Research, Full Life Research.
6  Q.   I guess I'm not so much concerned with whether he works
7  for you or for the corporation.
8  A.   Right.
9  Q.   But you did legitimate work in that business that you
10 helped train him in?
11 A.   I didn't see him do no legitimate work.
12 Q.   You said he worked for Full Life?
13 A.   He was a distributor for Full Life.  I don't know what
14 his sales was.  I didn't see him make any sales.
15 Q.   Okay.  He was given --
16 A.   A distributor ID number.
17 Q.   And you don't know how active he was, but he was --
18 A.   I didn't see any numbers on his records, when I get the
19 records every month.
20 Q.   Now, in addition, you were going through some domestic
21 relations proceedings that ultimately led to your divorce in, I
22 think, it was PG, right?
23 A.   That's right.
24 Q.   Okay.  And Dazz was a friend to you throughout that time,
25 wasn't he?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3833

1  A.   Yes.
2  Q.   As a matter of fact, he took you out to some lawyer, I
3  think, on 8th and H, Northeast, D.C., and helped you arrange for
4  a lawyer to help arrange for those proceedings, made a
5  recommendation?
6  A.   He gave me a ride.  I made the recommendation -- I made
7  the arrangements.
8  Q.   Okay.  So he gave you a ride, took you out, and helped
9  you make arrangements when you were going through a difficult
10 period with your wife, correct?
11 A.   Yes.
12 Q.   And he was a friend for you throughout that, right?
13 A.   I would say he was there, yeah.
14 Q.   He supported you when you were going through that
15 difficult time?
16 A.   I mean, yeah -- if I wanted some crack, I could get
17 crack.
18 Q.   I'm talking about --
19 A.   That's the support I would get, whatever I needed.
20 Q.   And when you needed other favors as a friend, he would do
21 them as well?
22 A.   That's right.
23 Q.   And that included taking you to a lawyer?
24 A.   That's right.
25 Q.   And that included giving you rides to court?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3834

1   **A.**   If need be, yes.
2   **Q.**   And, you know, kind of sitting around being emotionally
3   supportive when you were going through a difficult time?
4   **A.**   Yes.
5   **Q.**   Okay.  And similarly, you've -- well, you even stayed at
6   his house for a while, didn't you?
7   **A.**   Yeah, I stayed at his house.
8   **Q.**   And that's a house he lived in on 9th Street with his
9   wife and children?
10  **A.**   Girlfriend and children.
11  **Q.**   Nina?
12  **A.**   Yes, that's her name.
13  **Q.**   The mother of his child, the woman he's been with for
14  years?
15  **A.**   That's her name.
16  **Q.**   And you stayed on the couch there when you were going
17  through some difficult times?
18  **A.**   Sure did.
19  **Q.**   Okay.  And so certainly your relationship with him --
20  well, actually when you were going through some difficult times,
21  he even helped you out financially a couple of times, didn't he?
22  **A.**   No.
23  **Q.**   Didn't he buy a PlayStation for your kids?
24  **A.**   That was my money.
25  **Q.**   That was your money he used?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3835

1   **A.**   Yes.
2   **Q.**   He made the purchase for you?
3   **A.**   Well, I was trying to slowly stop smoking and I asked him
4   to hold $200 for me to make sure I paid for Christmas and I gave
5   him the money.  That was my money.
6   **Q.**   Okay.  And when you -- he would certainly sell you crack
7   cocaine when you wanted to use it, right?
8   **A.**   Yes.
9   **Q.**   But when you were trying to quit crack cocaine, he
10  actually tried to help you through that, too, didn't he?
11  **A.**   He did.
12  **Q.**   And that was going on part of the time while you were
13  staying at his house, right?
14  **A.**   That's right.
15  **Q.**   And as a matter of fact, you would sneak out on occasion
16  and he would pull you out of crack houses, didn't he?
17  **A.**   He'd come and get me out of crack houses.
18  **Q.**   He pulled you out of crack houses when you were trying to
19  stop?
20  **A.**   Yes.
21  **Q.**   Tried to support you emotionally?
22  **A.**   Yes.
23  **Q.**   Okay.  And as a matter of fact, in some of those
24  instances, you bought crack on credit from other people, right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3836

1   **Q.**   And he basically intervened on your behalf and said,
2   "Hey, look, that's my uncle, I'll take care of it," when you
3   were threatened --
4   **A.**   Yes.
5   **Q.**   -- when people were trying to collect debts for money you
6   owed them for your crack cocaine, right?
7   **A.**   That's right.
8   **Q.**   Okay.  So he was a friend that way, looked out for you,
9   right?
10  **A.**   Well, I guess so -- you could look at it like that.
11  **Q.**   Well, he referred to you -- in front of you, he said
12  "Look, that's my uncle, I'll take care of it.  Leave him be,"
13  that kind of thing?
14  **A.**   He would say he would take care of it.
15  **Q.**   Okay.  So your relationship with him was much more than
16  just buyer and seller; is that a fair statement?
17  **A.**   Yeah.
18  **Q.**   I want to turn to this incident you told us about when
19  the money was taken out of your car?
20  **A.**   Okay.
21  **Q.**   Do you remember that?
22  **A.**   Yes.
23  **Q.**   Okay.  Do you remember what year that was?
24  **A.**   No, not exactly.
25  **Q.**   And when that happened, you went over -- you were at

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3837

1   Gail's apartment, right?
2   **A.**   That's right.
3   **Q.**   You were getting high?
4   **A.**   I was in the commencing of getting high, yes.
5   **Q.**   And you were on -- what do you want to call it, a bender
6   or a binge, spent a few hours if not a few days staying high and
7   having fun?
8   **A.**   Well, I had just got impulses.  I was supposed to make a
9   deposit and just went.
10  **Q.**   When you're on a tear, it's a tear?
11  **A.**   It can be a tear.  Yes, it could.
12  **Q.**   You're out of control, right?
13  **A.**   Well, I wasn't out of control, but I was, you know --
14  once you start getting high, you want to continue.
15  **Q.**   Crack has that effect on people, once you start, it's
16  hard to stop.  It's hard to put that pipe down?
17  **A.**   It's hard to put the pipe down, but it's not a fact that
18  you don't know what you're doing.
19  **Q.**   Okay.  As a matter of fact, you went -- on one instance,
20  you went through over $7,000, you estimated, in one binge?
21  **A.**   Sure did.
22  **Q.**   All right.  Let's move back for a moment to the time with
23  the keys -- your testimony -- you don't know what year this
24  happened, right?
25  **A.**   It was the year Mercedes built that new style truck,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3850

1  Q.  I'm not trying to pin an exact date, but roughly how long
2  did this last?  From '91, '92 until what date?
3  A.  I left here in -- when he went to jail, that's pretty
4  much -- a little bit after that, I left here and that was 2001,
5  early 2-- I left here in about 2002, some time frame like
6  that.
7  Q.  So from --
8  A.  January.
9  Q.  Approximately ten years; is that correct?
10  A.  About that time.
11  Q.  And during that ten-year period of time, how often, just
12  roughly, ballpark, how often would you go down to Congress Park?
13  A.  Uhm, a lot, almost every weekend, almost -- three or four
14  times a day.
15  Q.  And is it fair to assume that for a recovering addict,
16  this testimony is not easy for you; is that correct?
17  A.  That's right.
18  Q.  Now keeping that in mind, I'll move as quick as I can.
19  Just as far as the people that supplied you during this
20  ten-year period of time with crack cocaine in Congress Park, the
21  individuals who supplied you, the amounts varied from these
22  different people; is that correct?
23  A.  Right.
24  Q.  Some people supplied you often, right?
25  A.  Whenever I asked for it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3851

1  Q.  And then you mentioned others who were maybe three times,
2  four times, up to maybe ten times, correct?
3  A.  That's right.
4  Q.  Now you indicated that Gail supplied you crack cocaine
5  for a period of time; is that correct?
6  A.  Gail never supplied me with crack.  She went and got it
7  for me.
8  Q.  She went and obtained crack from someone?
9  A.  That's right.
10  Q.  And then you would receive the crack from her?
11  A.  That's right.
12  Q.  So she actually gave you the crack cocaine?
13  A.  That's right, she would bring it to the back room.
14  Q.  And you would give her the money for it?
15  A.  I would give her the money.
16  Q.  And you would share the crack cocaine --
17  A.  No, I would give her the money.  She didn't have it when
18  I got there, she had to go get it.  She never had it when I got
19  to the house.  She had to go get it.
20  Q.  You gave her money?
21  A.  I gave her money.
22  Q.  She'd go out and get crack?
23  A.  That's right.
24  Q.  She'd bring crack back to you?
25  A.  That's right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3852

1  Q.  And then you would smoke the crack?
2  A.  That's right.
3  Q.  And Gail would partake with you?
4  A.  That's right.
5  Q.  And at times, other people would partake with you?
6  A.  That's right, sometimes.
7  Q.  And it would be all on you?
8  A.  I was footing the bill.
9  Q.  You were footing the bill?
10  A.  Basically.
11  Q.  And you indicated you had four to five, maybe six people
12  sometimes, at Gail's house smoking the crack, which you paid
13  for?
14  A.  No, I never liked crowds.  I wasn't a crowd person.
15  Q.  I thought you indicated that you had about four or five
16  people over to Gail's do you remember that?
17  A.  There would be four or five people coming in and out.  I
18  might share something with them, but I would always ask the
19  crowds to leave.  I never liked crowds.
20  Q.  Fair enough.  So you received crack from Gail, right?
21  She handed you crack?
22  A.  She got the crack and handed it to me.
23  Q.  And as you already indicated, you received crack from
24  Dazz; is that correct?
25  A.  At some point, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3853

1  Q.  And he's the second person?
2  A.  Um-hmm.
3  Q.  And you received a small amount from his brother,
4  correct?
5  A.  I got crack from his brother.
6  Q.  And you indicated that was on very rare occasions?
7  A.  Very rare.
8  Q.  Over a ten-year period of time?
9  A.  That's right.
10  Q.  And that would be the third person you actually received
11  crack from in the Congress Park area; is that correct?
12  A.  So far.
13  Q.  Okay.  Good.  And you also indicated that, at least as
14  far as Dazz was concerned, that he tried to keep the sales to
15  himself at one point, right?
16  A.  Yeah, he wanted me to contact him as the person who --
17  because you know, they knew I was spending money, so they wanted
18  my business -- he wanted my business.
19  Q.  And you're a salesperson, too, right?
20  A.  That's right.
21  Q.  And if someone is -- has money and their money is there
22  to spend, you want to corner that person as a salesperson, don't
23  you?
24  A.  That's right.
25  MR. LEON:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3862

1  **Q.**   And you would have direct contact with a lot of these
2  individuals when you went to purchase crack cocaine; is that
3  correct?
4  **A.**   Those main ones, I had direct contact with.
5  **Q.**   And how about -- did Gail have a roommate during this
6  period of time, a Cary Kellibrew, (sic) do you remember him?
7  **A.**   Kairi?
8  **Q.**   Kairi.
9  **A.**   I remember a guy.
10 **Q.**   I'm being whispered a nickname.  It's Baby Kai?
11 **A.**   The light-skinned -- yeah, um-hmm.
12 **Q.**   And Baby Kai, he would also --
13 **A.**   Yeah, I forgot about him.
14 **Q.**   He also sold you crack; is that correct?
15 **A.**   Yeah.
16 **Q.**   Was he actually staying at Gail Parson's house for a
17 period of time?
18 **A.**   Yeah, he was staying on the couch, yeah.
19 **Q.**   So that's approximately 9 individuals that you can
20 remember that were selling you crack cocaine over this ten-year
21 period of time; is that correct?
22 **A.**   That's right.
23 **Q.**   And -- just one second.
24      MR. PURPURA:  Your Honor, if I could have just one moment,
25 please.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3863

1      (Discussion had off the record.)
2      MR. PURPURA:  Thank you, no further questions.
3      THE COURT:  Mr. Beane?
4      CROSS-EXAMINATION OF EDWARD MARTIN
5  BY MR. BEANE:
6  **Q.**   Thank you, Your Honor, just briefly.  I just have a
7  couple of questions.
8      You talked about the effects of crack and I don't
9  understand that.  If you smoke one crack -- 1 piece of crack
10 cocaine, what was the effect on you?
11 **A.**   It felt good.
12 **Q.**   And when you say you "felt good," could you drive okay?
13 **A.**   Sometimes I could, sometimes I couldn't.
14 **Q.**   What times couldn't you drive okay, when you smoked one
15 rock?
16 **A.**   When I stayed out there for over four or five days, I
17 would be --
18 **Q.**   Okay.  I want to focus on each rock crack at a time,
19 okay.
20      After one rock of crack, could you drive?
21 **A.**   Yeah.
22 **Q.**   After two rocks, could you drive?
23 **A.**   Yeah.
24 **Q.**   Three rocks?
25 **A.**   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3864

1  **Q.**   Four rocks?
2  **A.**   Yeah.
3  **Q.**   Five rocks?
4  **A.**   Yeah.
5  **Q.**   What amount of rocks did you have to reach before you
6  couldn't drive --
7  **A.**   It wasn't an amount of rocks.  I couldn't even count
8  them.  I would do so much and if I was up three or four days,
9  time, no rest, no food, that's when it would deplete the body.
10 **Q.**   Let me ask you this:  You talked about being frightened
11 when you were smoking crack cocaine.  Are you saying that
12 smoking crack made you paranoid?
13 **A.**   Oh, yeah.
14 **Q.**   Okay.  How -- and when would you first start to feel
15 paranoid, after the first rock, the second rock?
16 **A.**   Sometimes the first one.
17 **Q.**   And would the paranoia increase with each rock?
18 **A.**   It would never lose sometimes.  Sometimes I didn't get
19 paranoid, I could calm down.  All depends on my environment.
20 **Q.**   So let's say you're smoking and you smoke the first rock
21 and you get paranoid.
22 **A.**   Um-hmm.
23 **Q.**   And you remember your feelings, right?
24 **A.**   Yeah.
25 **Q.**   Okay.  So now you're smoking the second rock.  Doesn't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3865

1  your level of paranoia increase?
2  **A.**   Paranoia is paranoia.  It doesn't go up or down.
3  **Q.**   Okay.  Now, I want to ask you about this truck and these
4  payments.
5  **A.**   Um-hmm.
6  **Q.**   You indicated that you owed somebody $2,500, right?
7  **A.**   That's right.
8  **Q.**   And because you owed them $2,500, you went to buy a
9  $34,000 truck?
10 **A.**   I didn't -- I didn't go to buy him that for that $2,500.
11 I went to buy him that because he asked me could I do that for
12 him and his girlfriend, so they could take their kids back and
13 forth to school.
14 **Q.**   So you didn't do it because you owed him $2,500, you did
15 it out of the kindness of your heart?
16 **A.**   I did it, yeah.
17 **Q.**   Out of the kindness of your heart?
18 **A.**   It wasn't all kindness.  It's just that when Dazz asked
19 for something, I did it.
20 **Q.**   Okay.  But it had nothing to do with you owing him
21 $2,500?
22 **A.**   Well, it could have.  I don't know.  I didn't know at the
23 time if the $2500 would come into play at the time or not, but
24 knowing what I know about Dazz --
25      MR. ZUCKER:  Objection.  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | April 19, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:00 p.m. |

. . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . .

VOLUME 37 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                             TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006

                           (202) 454-2811

Page 7901

1 Florida, Mike wasn't there, who you usually bought from, so you

2 bought from some other guys.  Right?

3 A.  Yes.

4 Q.  Mike usually sets up in the alley; these other guys, or some

5 young-uns, had set up right on the street.  Is that right?

6 A.  Yes.

7 Q.  And they had a trash bag full of marijuana.  Right?

8 A.  Yes.

9 Q.  And you bought some.  Right?

10 A.  Yes.

11 Q.  And on the way back to Congress Park, were you thinking

12 about robbing them?

13 A.  Yes, I was.

14 Q.  Because it was pretty sweet.  Right?

15 A.  Yes.

16 Q.  And you came back and you saw Dazz.  Right?

17 A.  Yes.

18 Q.  And you told him what happened.  Right?

19 A.  Yes.

20 Q.  And then you and he went back up there to rob them.  Right?

21 A.  Yes.

22 Q.  You didn't go up there to buy weed with Dazz, did you?

23 A.  No, I didn't.

24 Q.  So those are two separate events.  One was you went and

25 bought the weed, concocted the plan, went and got Dazz and

Page 7902

1 executed the robbery.  Right?

2 A.  Yes.

3 Q.  And you said Dazz took the money and then you both split the

4 weed.  Right?

5 A.  Yes.

6 Q.  How much weed did you take?

7 A.  I don't recall how much weed it was.

8 Q.  Did you recall yesterday?

9 A.  It was a couple of bags -- it was like 30 bags, 40 bags,

10 dime bags.

11 Q.  Do you recall saying 40 bags yesterday?

12 A.  Yes.

13 Q.  But you told the grand jury -- first off, what did you do

14 with those bags?

15 A.  We smoked them.

16 Q.  Right.

17 A.  While we was together.

18 Q.  Right.  And then what did you do with the rest?

19 A.  Then we went our separate ways, he kept some and I kept

20 some, half and half of whatever we had left.

21 Q.  And what did you do with those 15 -- you would have had

22 about 15 left.  Right?

23 A.  Yes.

24 Q.  And he would have had an equal number?

25 A.  About 15.

1481

Page 7903

1 Q.   What did you do with those, the 15?

2 A.   What I did with mine?

3 Q.   Yes.

4 A.   I smoked most of them and I sold most of them.

5 Q.   You did not share them with all the other supposed members

6 of the Congress Park crew, did you?

7 A.   No, I didn't.

8 Q.   You kept them for yourself, and what you didn't smoke, the

9 money you sold went to you.   Right?

10 A.   Yes.

11 Q.   It had nothing to do with anybody in Congress Park except

12 you and Dazz.   Right?

13 A.   Yes.

14 Q.   Now, you told a different version of events to the grand

15 jury, didn't you, sir?

16 A.   Repeat your question.

17 Q.   Sure.   You told the grand jury -- when you told them about

18 the incident, you told them a different version of events, did

19 you not?

20 A.   I don't recall.

21 Q.   Do you recall telling them that you and Dazz both went up

22 there to buy weed, and decided to rob the guys instead?

23 A.   No, I don't.

24 Q.   Turn to page 52 of the grand jury transcript, please.

25 A.   (Witness complies.)

Page 7904

1 Q.  Beginning on line five, question from Mr. Beatrice to you:

2 "Okay.  Were you involved in another robbery that you committed

3 with the person you previously identified as Dazz?"

4          Answer:  "Yeah, up 6th and Florida, some weed boys.  I

5 mean, we went up there to buy some weed, but at the same time,

6 the dudes just showed us too much, and me and Dazz got out of

7 the car and got them, meaning got them, meaning Dazz whipped out

8 and I took the weed and got in the car and left."

9          That's what you told the grand jury.  Right?

10 A.  Yes.  That was a lie.

11 Q.  That was a lie?

12 A.  Yes, it was.

13 Q.  Why did you tell the grand jury that lie?

14 A.  Because I went up there first and I bought weed first, then

15 I left and came back to pick Dazz up, then we went up there to

16 rob them.

17 Q.  The question was, why did you lie to the grand jury about

18 that?

19 A.  It probably was a misunderstanding.

20 Q.  Well, a misunderstanding or a lie?

21 A.  A misunderstanding.

22 Q.  So it wasn't a lie, or was it a lie, or do you know?

23          MS. PETALAS:  Objection, Your Honor.  Asked and

24 answered.

25          THE COURT:  Sustained.

Page 7905

1 BY MR. ZUCKER:

2 Q.  Now, you told us that Dazz kept the money.  Right?

3 A.  Yes.

4 Q.  Did you tell the grand jurors that you and he just wanted

5 the weed and left the money?

6 A.  Repeat your question.

7 Q.  Sure.  Did you tell the grand jurors that you and he just

8 wanted the weed and left the money?

9          MS. PETALAS:  Objection, Your Honor.  May I get a page

10 and line number?  Your Honor, I would request a page and line

11 reference.

12          MR. ZUCKER:  Right now I'm just asking a question.  If

13 we get to that, I would be glad to.

14          THE COURT:  Provide the page and line number.

15          MR. ZUCKER:  All right.  52, lines 22 up until the next

16 page.

17 BY MR. ZUCKER:

18 Q.  Starting with line 22, same questions from Mr. Beatrice, or

19 later on in the sequence:  "When you say they showed you too

20 much, what do you mean?  They showed too much weed or too much

21 money or both or -- "

22          Answer:  "Just the weed.  They -- they showed the

23 money, but we didn't want the money.  We just wanted the weed."

24          Question:  "And is that what you robbed them of, weed?"

25          Answer:  "Yeah."

1484

Page 7910

1 Q.  Why did you lie about the amount you stole?

2 A.  Because it was in bags, it wasn't no just a pound.  It was

3 in -- we got bags.

4 Q.  The question was, why did you lie?

5 A.  Just a misunderstanding.

6 Q.  Well, basically what you've told this jury was about

7 40 dimes; what you told the grand jury was roughly 400 dimes

8 worth.  Right?

9 A.  Yes.

10 Q.  A pound.

11        Did this robbery ever happen?

12 A.  Yes, it did.

13 Q.  Who was robbed?

14 A.  Repeat your question.

15 Q.  Who was robbed?

16 A.  Two dudes.

17 Q.  You can't identify them, can you?

18 A.  No, I can't.

19 Q.  So we can't bring them in here, can we?

20        MS. PETALAS:  Objection, Your Honor.

21        THE COURT:  Sustained.

22 BY MR. ZUCKER:

23 Q.  How do I find these two dudes?

24        MS. PETALAS:  Objection, Your Honor.

25        THE COURT:  I'll allow it, if he knows.

Page 7811

1          THE COURT:  Sustained.

2 BY MR. ZUCKER:

3 Q.  Well, if the truth is:  I don't know anything about what

4 anybody else did, and therefore I can't help you --

5          MS. PETALAS:  Same objection, Your Honor.

6          THE COURT:  Let him finish the question.

7 BY MR. ZUCKER:

8 Q.  Do you expect, would you be entitled to a motion from the

9 government saying you provided substantial assistance in the

10 prosecution of others?

11          THE COURT:  Sustained.  But you can rephrase.

12 BY MR. ZUCKER:

13 Q.  All right.  Why don't you tell us what you think the

14 substantial assistance means, in your own words?

15 A.  To tell the truth.

16 Q.  About what?

17 A.  About my involvements in this case.

18 Q.  What about other people's involvement?

19 A.  And their involvements also.

20 Q.  And if you don't know anything about their involvement, do

21 you expect to get a motion for a departure based on substantial

22 assistance?

23          MS. PETALAS:  Objection, Your Honor.

24          THE COURT:  Basis?

25          MS. PETALAS:  Calls for speculation if he doesn't know

Page 7814

1          MR. BALAREZO:  Your Honor, I object to the objection.

2          THE COURT:  The question began with his understanding,

3 and I'll allow it.  Please repeat the question.

4 BY MR. ZUCKER:

5 Q.  It is your understanding that, in order to get a substantial

6 assistance motion, you have to help them convict someone else.

7 Right?  Plain English.

8 A.  Yes.

9 Q.  And that's the only way you get out from spending 360 months

10 to life in prison.  Right?

11 A.  Yes.

12 Q.  So as you sit here today, testifying against these men, it

13 basically comes down to them or you, in your mind.  Right?

14 A.  Yes.

15 Q.  And you've not testified in any other cases to date as a

16 government witness, have you?

17 A.  Repeat your question.

18 Q.  Sure.  Thus far, since beginning your cooperation, you have

19 not testified in any other cases.  Right?

20 A.  You right.

21 Q.  And you do not expect to, at least at this point, to testify

22 in any other cases, do you?

23 A.  No, I don't.

24 Q.  So it's either -- this is your shot to stay out of prison.

25 Right?  For the rest of your life?

# EXHIBIT E

14223

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
          Plaintiff,             : Docket No. CR 05-100
     v.                          :
ANTWUAN BALL, DAVID WILSON,      : Washington, DC
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and      : June 6, 2007
DOMINIC SAMUELS,                 : 9:20 a.m.
          Defendants.            :
                                 :
                                 :
                                 :

VOLUME 62 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney,
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC  20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.,
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC  20004
                         202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

14224

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC  20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD  21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC  20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC  20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD  20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD  20852
                         301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

14225

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC  20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD  21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC  20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

14226

1        MORNING SESSION, JUNE 6, 2007

2    (9:16 a.m.)

3        MR. CARNEY:  Your Honor, I have something at --

4        THE COURT:  Hold on one second.

5        Okay.

6        MR. CARNEY:  Your Honor, I have something at 10:45, 11:00

7    with Judge Robertson, and I expect Mr. Tabackman to be here, but

8    I haven't heard from him, so I would ask to be excused at 10:45

9    if he doesn't show up.

10       THE COURT:  All right.  If he hasn't arrived at that

11   point, perhaps you'll need to -- and you still have to go, you

12   may need to make some representation about someone standing in

13   for you, with your client's consent.

14       MR. CARNEY:  I'll do that, Your Honor.  Your Honor, I'll

15   have Ms. Wicks stand in for me in case he's not here.

16       MR. MARTIN:  Your Honor, on the issue of the clothes,

17   Mr. -- I think his last name is McCain -- he didn't have a key so

18   there was a delay in getting the clothes to the clients this

19   morning.  However, we've resolved that issue.  And the way we've

20   done it is we've left a key to that room in a central location

21   that only Mr. McCain knows where it is.

22       And I think that that should resolve any issues about the

23   clothing getting down in time to the defendants.

24       THE COURT:  All right.  Thank you.

25   I guess we can bring the jury in.

Scott L. Wallace, RDR, CRR
Official Court Reporter

14279

1    10:58 a.m.)
2            THE COURT: All right. You ready for the jury?
3            MR. ZUCKER: Yes, sir.
4    (Jury in at 10:59 a.m.)
5            THE COURT: Good morning, ladies and gentlemen.
6            THE JURY PANEL: Good morning.
7            THE COURT: Welcome back. We're ready to resume.
8    Mr. Zucker.
9            MR. ZUCKER: Thank you, Judge.
10   BY MR. ZUCKER:
11   **Q.**   Mr. Ewing, before we broke, I was asking you some
12   questions.
13           Now, as I recall, on the tape you told the dispatcher you
14   had no idea why these guys had shot at you; is that correct?
15   **A.**   Yes.
16   **Q.**   That's a true statement, isn't it?
17   **A.**   Yeah, pretty much.
18   **Q.**   As far as you were concerned -- I mean, you never had any
19   run-ins with Dazz, had you?
20   **A.**   No.
21   **Q.**   There was no bad blood between you him, right?
22   **A.**   No.
23   **Q.**   You never had bad words or bad exchanges, right?
24   **A.**   No.
25   **Q.**   You were not part of any group that was beefing with any

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14280

1    group that he was a part of, were you?
2    **A.**   No, I wasn't a part of a group.
3    **Q.**   Okay. And you had in the past -- well, you told
4    Officer Duncan, in the past you had been beefing with some guys
5    from Congress Park, but Dazz wasn't part of that, right?
6    **A.**   No.
7    **Q.**   No, you didn't say that or --
8    **A.**   Yeah, I said it, but, no, he wasn't part of anything.
9    **Q.**   Okay. And whatever problem you had with some other guys
10   from Congress Park, didn't involve Dazz one bit, right?
11   **A.**   No.
12   **Q.**   And whatever problem you had with some guys from Congress
13   Park, that was years before, and as far as you were concerned it
14   was ancient history, right?
15   **A.**   Yes.
16   **Q.**   At the time this shooting happened, right?
17   **A.**   Yes.
18   **Q.**   And whatever it was about, it was resolved, it wasn't an
19   ongoing thing between you and whoever those guys were, right?
20   **A.**   Right.
21   **Q.**   Now, you told us that on the night this happened, you
22   didn't tell the police who had shot you; is that correct?
23   **A.**   Yes.
24   **Q.**   And that was because you didn't want to be thought of as
25   a snitch, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14281

1    **A.**   Yes.
2    **Q.**   And that's why you didn't mention Dazz to the police, or
3    anyone else on the night this happened, right?
4    **A.**   Yes.
5    **Q.**   And you told the police you didn't know who shot you and
6    didn't recognize anybody, right, or words to that effect?
7    **A.**   Yes.
8    **Q.**   And you're sure of that, right?
9    **A.**   Yes.
10   **Q.**   Positive?
11   **A.**   Yeah.
12   **Q.**   As positive of that as you are that Desmond Thurston was
13   the person you saw that night, right?
14   **A.**   Naw.
15   **Q.**   That's not what I'm saying, I think we misunderstood each
16   other?
17   **A.**   Right.
18   **Q.**   Are you as sure of that fact, what you just testified to,
19   as everything else in your testimony?
20   **A.**   Yeah.
21   **Q.**   Okay. Do you have any idea why Officer Duncan would say
22   you gave him the name Dazz that night, then?
23   **A.**   No.
24   **Q.**   Officer Duncan was one of the first officers on the
25   scene, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14282

1    **A.**   Right.
2    **Q.**   And you couldn't have given him the name Dazz that
3    evening, could you?
4    **A.**   That was 11 years ago, maybe.
5    **Q.**   Well, wait a minute. A minute ago you were absolutely,
6    positively sure you had not.
7    **A.**   Uhm.
8    **Q.**   Do you now want to change that answer?
9    **A.**   No. I mean --
10   **Q.**   So you're still positive?
11   **A.**   Yeah. Yeah.
12   **Q.**   So you couldn't have given Officer Duncan the name Dazz
13   as the person you saw that evening, right?
14   **A.**   Naw.
15   **Q.**   And you are as sure of that fact as you are of the fact
16   that Desmond Thurston was the person you saw -- one of the
17   persons you saw pull the gun that evening, correct?
18   **A.**   No.
19   **Q.**   Which fact are you more sure of?
20   **A.**   That I seen Dazz.
21   **Q.**   So now you're not so sure of what you told the police
22   that night --
23   **A.**   No.
24   **Q.**   -- because it was 11 years ago?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14283

| | |
|---|---|
| 1 | **Q.** And you were high? |
| 2 | **A.** Yeah, I was. |
| 3 | **Q.** And you were scared, understandably? |
| 4 | **A.** Yes. |
| 5 | **Q.** And at the time the shots came off, what was your primary |
| 6 | focus? |
| 7 | **A.** To get away. |
| 8 | **Q.** Okay. It wasn't to make an identification, was it? |
| 9 | **A.** No. |
| 10 | **Q.** It was to save your life, as anybody would, right? |
| 11 | **A.** Yes. |
| 12 | **Q.** Okay. And as you dove in that house to get away from the |
| 13 | first shooter, you weren't focusing on who was behind him, were |
| 14 | you? |
| 15 | **A.** I was focusing on them as they were coming up the street. |
| 16 | **Q.** And you said you saw them come through a cut? |
| 17 | **A.** Yeah. |
| 18 | **Q.** And how far away from your house was that cut? |
| 19 | **A.** I'm really not sure, maybe 50 feet. |
| 20 | **Q.** Is there anything that would help you, car lengths, |
| 21 | building lengths, to estimate? |
| 22 | Actually, can you -- was it on that photo you looked at? |
| 23 | **A.** Naw, I really couldn't tell you where the cut was on the |
| 24 | photo. |
| 25 | **Q.** So it was past whatever was on the photo? |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14284

| | |
|---|---|
| 1 | **A.** No, it wasn't past, but it wouldn't be accurate if I was |
| 2 | to show you, because I can't see from over top like that. |
| 3 | **Q.** You can't identify the cut -- |
| 4 | **A.** No. |
| 5 | **Q.** -- from the aerial photo? |
| 6 | **A.** No. |
| 7 | **Q.** I see. But can you point to something to the room, or is |
| 8 | it further away than that back wall? |
| 9 | **A.** Yeah, it's a little further than the back wall. |
| 10 | **MR. ZUCKER:** Judge, if I could, could I get an estimate, |
| 11 | please. |
| 12 | **THE COURT:** The distance from the back wall to the witness |
| 13 | stand appears to be 52 feet, approximately. |
| 14 | BY MR. ZUCKER: |
| 15 | **Q.** So it's something further away than that back wall, |
| 16 | right? |
| 17 | **A.** Yeah, maybe a little further away. |
| 18 | **Q.** Okay. And you watched them as they walked towards you, |
| 19 | right? |
| 20 | **A.** Um-hmm. |
| 21 | **Q.** But you said you didn't recognize them as they approached |
| 22 | you, did you? |
| 23 | **A.** No. |
| 24 | **Q.** How long did it take for them to walk from that cut to |
| 25 | the front of your house, roughly? |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14285

| | |
|---|---|
| 1 | **A.** Five seconds, five, ten seconds. |
| 2 | **Q.** Well, 50, 60 feet, about 12, 15 paces, something like |
| 3 | that? |
| 4 | **A.** Something like that. |
| 5 | **Q.** And during that whole time, you didn't recognize them, |
| 6 | right? |
| 7 | **A.** No, I didn't recognize the guy in the front, no. |
| 8 | **Q.** Well, you told us a minute ago you didn't recognize |
| 9 | either of them as they walked up, right? |
| 10 | **A.** Right. |
| 11 | **Q.** But you're sure that that happened, aren't you? |
| 12 | **A.** Yeah. |
| 13 | **Q.** That you watched them as they walked forward from the |
| 14 | Nope? |
| 15 | **A.** Yeah. |
| 16 | **Q.** Okay. This was 11 years ago, though, wasn't it? |
| 17 | **A.** Um-hmm. |
| 18 | **Q.** Are you absolutely sure? |
| 19 | **A.** Yeah. |
| 20 | **Q.** Would it surprise you to find out that you never |
| 21 | mentioned that in the grand jury? |
| 22 | **A.** Uhm, well -- |
| 23 | **Q.** Would you like to see your grand jury transcript? |
| 24 | **A.** No. |
| 25 | **Q.** Okay. Would it surprise you to find out that you never |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

14286

| | |
|---|---|
| 1 | mentioned that to the police? |
| 2 | **MR. GUERRERO:** Objection, asked and answered. |
| 3 | **THE COURT:** Overruled. |
| 4 | **THE WITNESS:** No. |
| 5 | BY MR. ZUCKER: |
| 6 | **Q.** Would it surprise you to find out that you told |
| 7 | Officer Duncan you saw them get out of a black Lincoln and shoot |
| 8 | you? |
| 9 | **A.** No. |
| 10 | **Q.** That wouldn't be true, though, that they got out of a |
| 11 | black Lincoln and shot you; that you watched them, they got out |
| 12 | of a black Lincoln before they shot you? |
| 13 | **A.** No. |
| 14 | **Q.** That would be inaccurate, right? |
| 15 | **A.** No. |
| 16 | **Q.** Would you have any reason to provide the police with |
| 17 | inaccurate information on the night this occurred? |
| 18 | **A.** Yeah. |
| 19 | **Q.** Why would you provide them -- well, with that inaccurate |
| 20 | information? Why would you provide them with that inaccurate |
| 21 | information on the night that it occurred? |
| 22 | **A.** Well, I didn't want to -- I already said I didn't want to |
| 23 | snitch at all. |
| 24 | **Q.** Well, why did you mention the black Lincoln? |
| 25 | **A.** Honestly, I don't remember. |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*