ORAL ARGUMENT NOT YET SCHEDULED

JOINT APPENDIX VOLUME III OF III

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 08-3033
(Consolidated with Nos. 10-3108 & 11-3031)

————————————

UNITED STATES OF AMERICA,                                                    Appellee,

v.

JOSEPH LEON JONES, *et al.*,                                                    Appellants.

————————————

APPEALS FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

————————————

Stephen C. Leckar, #281691
1850 M St., NW
Suite 240
Washington, D.C. 20036
202.742.4242
*Counsel for Antwuan Ball*

Anthony D. Martin, #362537
Maryland Trade Center, III
7501 Greenway Center Drive
Suite 460
Greenbelt, MD 20770
301.220.3700
*Counsel for Joseph Jones*

Crim. No. 05-100 (RWR)

Jonathan Zucker, #384629
Patricia A. Daus, #412174
1350 Connecticut Ave., NW
Suite 202
Washington, D.C. 20036
202.624.0784
*Counsel for Desmond Thurston*

Stratton C. Strand, #464992
Assistant United States Attorney
555 Fourth Street, NW
Washington, D.C. 20530
202.252.6829
*Counsel for the United States*

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————

No. 08-3033
(Consolidated with Nos. 10-3108 & 11-3031)
————————————


UNITED STATES OF AMERICA,                                          Appellee,

v.

JOSEPH LEON JONES, *et al.*,                                       Appellants.


————————————

APPEALS FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
————————————

JOINT APPENDIX
————————————

In accordance with D.C. Circuit Rule 30, appellants and appellee

hereby submit the following appendix materials on which they rely:


VOLUME III

| Date | Pages | TAB |
|------|-------|-----|

### Trial Transcripts

| Date | Pages | TAB |
|------|-------|-----|
| 2/22/07 | 212, 258, 260-68, 282-85, 288-89, 292-330, 334-39, 371, 375-76, 385, 390-409, 414-34 | 1 |

2/27/07     502, 515-19, 545-55, 607-11, 614, 638-51, 707, 735 ................ 2

2/28/07     746, 779, 816-22, 825-28, 839-51, 859-60, 871-78, 881-
            82, 884-93, 901-04, 920-34, 944-52, 965-67 ........................... 3

3/1/07      1006, 1012, 1021, 1028-32, 1042, 1076-1080, 1086,
            1090-92, 1096-97, 1106-07, 1109-10, 1128-29, 1141-43,
            1161, 1163, 1173-74, 1179, 1182, 1203-04, 1208, 1216-
            17, 1227-28, 1270-72 .................................................... 4

3/5/07      1298, 1321, 1335-37, 1384-95, 1411-14, 1427-30, 1442-
            44, 1447-48, 1451-52, 1454, 1457-58, 1487-89, 1493-95,
            1516-17, 1534-39, 1544-45 ........................................... 5

3/6/07      1552, 1583-88, 1610-13, 1620, 1645, 1654-55, 1665-66,
            1684-85, 1689, 1694, 1713-15, 1720-25, 1766, 1804,
            1809-10, 1813, 1815, 1818-35, 1839-41 ................................ 6

3/7/07      1846, 1863-68, 1870, 1879-87, 1901-05, 1908-12, 1919-
            37, 1950-62, 1965-79, 1985-86, 1990, 2013-14, 2019,
            2023-25, 2028-33, 2039, 2041, 2044, 2046, 2059-60 .............. 7

3/8/07      2093, 2099-2105, 2108-09, 2116, 2120-21, 2135-37,
            2145-53, 2155, 2160, 2167, 2178, 2183-84, 2187, 2208-
            09, 2215-17, 2220-23, 2225-26, 2280-82 ................................ 8

3/12/07     2347, 2496-2500, 2516-38 ............................................... 9

3/13/07     2541, 2546-71 ............................................................ 10

3/15/07     2932, 2980, 2986-95, 3038-48, 3053-56 ................................ 11

3/19/07     3196, 3335-36, 3341-42 ................................................. 12

3/22/07    3742, 3755-60, 3767, 3770-71, 3787-88, 3799-3800, 4004, 4018 ............................................................................ 13

3/27/07    4281, 4425-27 ...................................................................... 14

3/27/07    4433, 4440-50, 4467-73, 4485-94, 4509-13, 4794, 4796-4805, 4813-21, 4826, 4829-31, 4833-34, 4836, 4839 ............ 15

3/29/07    4863, 4876, 4894-97, 4900-07, 4909-18, 4922-24, 4926-28, 4931-32, 4970-80, 4988, 4990, 4994-97, 5004, 5020-27, 5074-75, 5080-82, 5088, 5096-97, 5109 ........................... 16

4/2/07     5121, 5161-70, 5175-76, 5179-86, 5191-97, 5201-02, 5207-10, 5225-33, 5295-5304, 5308-11, 5313-18, 5335-56 ...................................................................................... 17

4/3/07     5385, 5451-75, 5625-28, 5637-40 ......................................... 18

4/4/07     5659, 5689-95, 5721, 5748-49, 5754-57, 5766-71, 5774-75, 5781, 5789, 5814-22, 5825, 5843-45, 5848, 5856-57, 5872-73, 5892, 5895-99 ........................................................ 19

4/5/07     5916, 5922-26, 5956-57, 5972-75, 5986-98, 6007-08, 6011, 6016, 6023, 6034, 6043-48, 6068-77, 6081, 6087-89, 6092-94, 6099-6101, 6114, 6121-24, 6127-29, 6165-72, 6178-79 ........................................................................ 20

4/11/07    6343, 6392-93, 6406-09, 6420-26, 6442-47, 6462-64, 6469, 6477-78, 6490-92, 6503-11, 6527-36, 6566-70, 6580-82, 6587, 6598-6603 ................................................... 21

4/12/07    6664, 6668, 6675-82, 6697-99, 6765-67, 6770, 6774-76, 6779-84 ............................................................................. 22

3

4/16/07    6967, 7059-60, 7100-02, 7136-48, 7156-60, 7164-68, 7176-77, 7181-84, 7194-97, 7199, 7201-05, 7223-24, 7229-34 ................................................................. 23

4/17/07    7268, 7275-86, 7293-7301, 7308-14, 7356-58, 7369-70, 7375-76, 7383, 7393-96, 7418, 7422-24, 7427-31, 7479-80, 7486-88, 7496, 7501-02.................................... 24

4/18/07    7517, 7526, 7528-33, 7545-47, 7552-55, 7572-76, 7579-80, 7584-87, 7599-7601, 7603-08, 7611-14, 7617-35, 7643-55, 7679 ....................................................... 25

4/19/07    7785, 7799-7800, 7811-19, 7821-22, 7826-33, 7843-49, 7854-56, 7870-73, 7881-91, 7900-11, 7915, 7922-24, 7928-29 ................................................................. 26

4/23/07    7961, 7970-71, 7974-79, 7984-86, 7991-96, 8008-16, 8030, 8034-35, 8071, 8075-78, 8097-8106, 8139-42, 8146-47, 8160-95, 8220-26 .................................... 27

4/24/07    8235, 8243-55, 8276-77, 8280-86, 8332, 8335-36, 8342-43, 8347-49, 8352-56, 8373-74, 8379, 8384-86, 8407-09, 8412-14, 8416-17, 8421-25, 8432, 8437-39, 8457, 8462-63, 8466-70, 8480-84, 8490-96, 8503-04, 8510-15, 8519-22, 8529-30 ............................................................ 28

4/25/07    8555, 8560, 8573-77, 8580-81, 8620-26, 8631-37, 8647-48, 8651-55, 8658-61, 8745.................................... 29

4/30/07    9090, 9150-52, 9155-57, 9164-67, 9172-73, 9176, 9182-87, 9204-05, 9210-11 ............................................ 30

5/1/07     9275, 9281-86, 9293-95, 9297-99, 9301-02, 9317-25, 9331-34, 9337-45, 9347-51, 9361, 9370-72, 9388-89, 9407-14 ................................................................. 31

4

5/2/07      9528, 9553-57, 9598-9600, 9624-34, 9638, 9733, 9746-50, 9753, 9756-57 ................................................................ 32

5/3/07      9777, 9873, 9881-84, 10006-08, 10014-17, 10021 ................. 33

5/7/07      10070, 10078-81, 10089-92, 10097-103, 10109, 10112-16, 10119-20, 10124-38, 10152, 10162-76, 10184, 10192-99, 10210-19, 10227-32, 10234-35 ............................. 34

5/8/70      10307, 10316-53, 10384-86, 10405-08, 10458-61, 10467-72, 10478-86, 10492-502, 10547-49....................................... 35

5/9/07      10571, 10585, 10592-96, 10599, 10601-09, 10617-19, 10621, 10625-31, 10635-39, 10646, 10656-57, 10659-70, 10678-79, 10692-95, 10698-704, 10723-25, 10727-29, 10731-45, 10748-52, 10774-75, 10786-88, 10791-93, 10829-30, 10835 .................................................................. 36

5/14/07     10841, 10867-69, 10871-88, 10899, 10922, 10932-39, 10945-51, 10969-79, 10983-11004, 11012-13, 11015-16, 11019-22, 11030-36, 11042, 11057, 11082-86, 11091, 11093-99, 11114, 11121-23.................................................... 37

5/17/07     11629, 11635, 11640, 11643-48, 11652, 11655-58, 11662-63, 11665-87, 11724, 11735-36, 11743-44, 11758-59, 11773-75, 11785-87, 11794-804, 11827-30, 11835-41, 11843, 11852, 11854-63, 11868-74, 11887-88, 11915, 11933-34 .................................................................. 38

5/21/07     11939, 11948, 11964-65, 11989-90, 12021-22, 12068, 12104-06, 12148-49, 12176-92, 12195-215, 12224-30........... 39

5/22/07     12243, 12255-59, 12263-64, 12271-72, 12280-87, 12316-20, 12357-78, 12415, 12434-37, 12447-48, 12457-58, 12464-66, 12505-07, 12555.................................................... 40

5/23/07     12562, 12564, 12593-95, 12615-18, 12707-12, 12741-42 ...... 41

5/24/07     12853, 12878-79, 12891-93, 12900-06, 12911-12, 12921-
            22, 12936-41 ................................................................. 42

7/16/07     17584, 17698-99, 17781-84, 17789-90 .................................. 43

8/1/07      18665, 18668 .................................................................. 44

9/24/07     21471, 21614 .................................................................. 45

10/3/07     22631, 22665 .................................................................. 46

<u>Sentencing Transcripts</u>

5/1/08      Jones Sentencing Hearing, pp. 1-58 .................................... 47

5/8/08      Bell Sentencing Hearing, pp. 1-72 ...................................... 48

10/29/10    Thurston Sentencing Hearing, pp. 1-41 .............................. 49

3/17/11     Ball Sentencing Hearing, pp. 1-75 ...................................... 50

Respectfully submitted,

/s/ *Stephen C. Leckar*
Stephen C. Leckar, #281691
1850 M St., NW
Suite 240
Washington, D.C. 20036
202.742.4242
*Counsel for Antwuan Ball*

/s/ *Jonathan Zucker*
Jonathan Zucker, #384629
Patricia A. Daus, #412174
1350 Connecticut Ave., NW
Suite 202
Washington, D.C. 20036
202.624.0784
*Counsel for Desmond Thurston*

/s/ *Anthony D. Martin*
Anthony D. Martin, #362537
Maryland Trade Center, III
7501 Greenway Center Drive
Suite 460
Greenbelt, MD 20770
301.220.3700
*Counsel for Joseph Jones*

/s/ *Stratton C. Strand*
Stratton C. Strand, #464992
Assistant United States Attorney
555 Fourth Street, NW
Washington, D.C. 20530
202.252.6829
*Counsel for the United States*

7

# Tab 1

Page 212

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :      Docket No. CR 05-100
                               :
            Plaintiff          :
                               :
v.                             :      Washington, DC
                               :
ANTWUAN BALL,                  :
DAVID WILSON,                  :
GREGORY BELL,                  :      February 22, 2007
DESMOND THURSTON,              :
JOSEPH JONES,                  :
DOMINIC SAMUELS,               :
                               :
            Defendants         :      9:15 p.m.
. . . . . . . . . . . . . . . . :      . . . . . . . . . . . .

VOLUME 6
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:   ANN H. PETALAS, ESQUIRE
                         GLENN S. LEON, ESQUIRE
                         GIL GUERRERO, ESQUIRE
                         UNITED STATES ATTORNEY'S OFFICE
                         555 Fourth Street, NW
                         Washington, D.C.  20530

For the Defendant        JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:            CARNEY & CARNEY
                         601 Pennsylvania Avenue, NW
                         Suite 900, South Building
                         Washington, DC  20004
                         (202) 434-8234


                         STEVEN CARL TABACKMAN, ESQUIRE
                         TIGHE, PATTON, ARMSTRONG,
                             TEASDALE, PLLC
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20006

                         (202) 454-2811

1 A.  I'm currently assigned as a supervisor in the Violent Crimes

2 Unit, FBI headquarters, here in Washington, D.C.

3 Q.  And how long have you been there?

4 A.  Just a little under four months.

5 Q.  And what was your position prior to being at headquarters?

6 A.  The previous seven years prior to that, I was assigned to

7 the FBI/MPD Safe Streets Gang Task Force out of the Washington

8 Field Office.  I had been assigned to the Washington Field

9 Office of the FBI for pretty much the other three years prior to

10 that.

11 Q.  Okay.  So just take that back a notch.  You said you've been

12 with the FBI for about -- for 10 years.  Where did you start?

13 A.  Officially, I started at our training at Quantico, Virginia.

14 But again, I started at the Washington Field Office a little

15 over 10 years ago as an agent.  And short of the last

16 four months, the past -- the last seven years that I spent at

17 the Washington Field Office was on the Safe Streets Task Force.

18 Q.  And where were you within the Washington Field Office before

19 you were assigned seven years ago to Safe Streets?

20 A.  My first assignment was a national security squad for

21 probably, I guess about the first year and a half.  And then I

22 was on an administrative squad after that, until being assigned

23 to the Safe Streets Task Force.

24 Q.  Okay.  And you talk about the Safe Streets Task Force.  When

25 was that created?

1 out with that squad often.  Probably before even officially

2 being assigned there, I had been on several hundred warrants,

3 probably well in excess of 100 or 200 controlled drug purchases.

4         So all told, in over 10 years I've been involved in

5 hundreds of drug- and/or firearm-related arrests, participated

6 in hundreds of controlled drug purchases, pretty much summarizes

7 what I've been doing.

8 Q.  And what types of drugs did that involve?

9 A.  Pretty much the whole gamut, whether it be drugs that we

10 were buying in a controlled purchase, or drugs seized during a

11 search warrant.  Everything from cocaine, crack cocaine,

12 marijuana, PCP, Ecstasy, heroin.  Basically, the whole gamut.

13 Q.  Okay.  And in conjunction with your duties at the Safe

14 Streets Task Force, were you involved in an investigation of

15 Congress Park?

16 A.  Yes, I was.

17 Q.  And where is Congress Park?

18 A.  It's in southeast Washington, D.C.

19 Q.  I'm going to show you what's been marked as Government's

20 Exhibit 100.1.  Is that coming up for you?

21         Well, first of all, do you recognize that?

22 A.  Yes.

23 Q.  And what is that?

24 A.  That is an overhead shot of part of southeast Washington,

25 D.C., and included basically the center portion of the photo,

1 basically, is the neighborhood known as Congress Park.

2 Q.  Is that a fair and accurate depiction of Congress Park?

3 A.  For the most part.  It's an older photograph.  You can see

4 at the top portion of the photograph, that's actually where the

5 Congress Heights Metro stop is.  So this was obviously older,

6 because it's still under construction at this point.

7          Kind of near the center of the photograph there's kind

8 of an open field --

9 Q.  Well, before we get into descriptions, other than the

10 changes that you can describe, is that a fair and accurate

11 depiction of layouts of the streets and the area considered

12 Congress Park?

13 A.  Yes.  In terms of the streets and the way the streets are

14 laid out, yes.

15          MS. PETALAS:  Your Honor, at this time I move

16 Government's Exhibit 100.1 into evidence.

17          MS. WICKS:  No objection, Your Honor.

18          THE COURT:  Exhibit 100.1 is received.

19          (Government Exhibit 100.1 was moved into evidence.)

20          JUROR:  Are we supposed to be able to see this?  We

21 can't see it.

22          THE COURT:  Once I receive an exhibit in evidence, then

23 we'll be able to put it on the screen.  When an exhibit is not

24 yet received in evidence, you won't be seeing it.  It should be

25 displayed on the screen now.  If there's anyone whose screen is

1 not showing it, please raise.  I'll have Ms. Romero help you out

2 with it.

3 BY MS. PETALAS:

4 Q.  Agent Lockhart, I've zoomed in on that.  Can you see that?

5 A.  Yes.

6 Q.  You said this is an area of Congress Park.  Could you just

7 describe for the jury the -- Congress Park, where Congress Park

8 is, and the areas that your investigation focused on?

9 A.  Basically, the entire Congress Park neighborhood, kind of

10 the outer borders would be there.  You can see running top to

11 bottom or north to south would be 13th Street off to the left.

12 And up at the top of the photograph you can kind of see that

13 kind of dirt area again.  That's an older photograph.  That's

14 when the Metro stop was being constructed.  That's Alabama

15 Avenue, so the neighborhood would be bordered on the north by

16 Alabama Avenue.

17 Q.  I'm sorry to interrupt.  I also believe that you have a

18 touch screen, so if you touch the screen, you'll be able to

19 point to certain areas.

20        THE COURT:  Ms. Romero, are you able to determine

21 whether the touch screen device is turned on?

22        COURTROOM DEPUTY:  I'll have to check with Mr. Cramer,

23 Your Honor.  I'm not sure.

24        THE COURT:  You'll need to shut the back so that the

25 screen is not visible that way.  Go ahead.

1 BY MS. PETALAS:

2 Q.  If you could just then continue.  I think you were

3 describing the parameters of Congress Park.  You can continue

4 with that.

5 A.  Yeah.  Just to kind of summarize and make it a square on the

6 neighborhood, you can see there up around the top, that's

7 Alabama Avenue.  You can see just north of there, it's an older

8 photograph, so they were building the metro stop.

9 St. Elizabeth's, you can see some of the red buildings there up

10 to the top left corner.

11       But basically, the top portion of Alabama Avenue there

12 would be the top or north portion.  13th Street to the left-hand

13 side, over along the far right of the photograph, 15th street,

14 and then down you can see Mississippi Avenue.  But they would

15 basically be the four streets that would form a square, and

16 basically that general area would represent Congress Park.

17       Although, the heart of the neighborhood would be more

18 the streets there in the center, the 1300 block of Congress

19 Street, 3400 block of 13th Place, or the circle.  And up there

20 you can see Savannah Street, 14th Place and Savannah Place.

21 They would be the core streets, right in the heart of the

22 neighborhood.

23 Q.  In the course of your investigation, did you become familiar

24 with a property known as the Lincoln?

25 A.  Yes.

1 Q.  Could you describe that on the map, if you see it?

2 A.  That would be, it's almost dead center in the photograph.

3 It's kind of the -- it's like a backwards "L," if you can see

4 that.  It has a kind of rectangle-shaped parking lot in front of

5 it, and it's the only roof that's kind of a different color.

6 That's like a separate apartment complex from the rest of the

7 Congress Park housing complex, but it's right there in the heart

8 of the neighborhood.

9        But during the course of this case, and as we learned,

10 when someone refers to the Lincoln, that's what they're talking

11 about.

12 Q.  And also, I think earlier you had made reference to an area

13 called the circle.  Could you describe -- in reference to the

14 Lincoln which you just described, where is the circle?

15 A.  If you can see where Congress Street is, you can see the

16 street labels off there to the left-hand side, where Congress

17 Street winds kind of up through the center of the photograph and

18 bends up.  But just prior to where it would be there, there's a

19 little entranceway to the Lincoln parking lot.  The street just

20 prior to that is 13th Place.  And it's the circle because it's

21 one way in and one way out.  There's a circle at the end of it,

22 and you kind of the buildings there, or they kind of form almost

23 a "U," and that's the circle.

24 Q.  And I'm showing you what --

25        MR. PURPURA:  There's no objection to the photograph.

1        MS. PETALAS:  Having been no objection, may we publish

2 Government's Exhibit 101.1?  I'm sorry.  I still need to move it

3 into evidence.  At this time I would move Government's

4 Exhibit 101.1 into evidence.

5        THE COURT:  Without objection, Exhibit 101.1 will be

6 received.

7        (Government Exhibit 101.1 was moved into evidence.)

8 BY MS. PETALAS:

9 Q.  I'm showing you what has been marked as 101.1, which is in

10 evidence.  What is that, and describe it for the record?

11 A.  That's just a close-up version of a portion of that Congress

12 Park neighborhood, just a portion of that same photograph, just

13 closer up.  It shows in more detail the 13th Place that I was

14 just describing, and also the Lincoln apartment complex right

15 next to it.

16 Q.  And how is it you became familiar with the circle in Lincoln

17 and the Lincoln?

18 A.  I mean, early on in the case, many of our witnesses and

19 sources --

20        MR. PURPURA:  Objection.  It calls for hearsay at this

21 point.

22        THE COURT:  It doesn't necessarily call for it, but I

23 direct you not to elicit hearsay.

24        MS. PETALAS:  Yes, Your Honor.

25 BY MS. PETALAS:

1 Q.  How often would you ride through Congress Park?

2 A.  I would say pretty regularly.

3 Q.  And did you -- and through that riding, did you become

4 familiar with 13th Place and the Lincoln?

5 A.  Yes.

6 Q.  As part of the investigation, did you -- you mentioned

7 controlled purchases.  Did you participate in controlled

8 purchases that took place in Congress Park?

9 A.  Yes.

10 Q.  And where did those controlled purchases often take place?

11 A.  In the Congress Park neighborhood.  And many of those

12 purchases happened in the area of 13th Place, and also in the

13 vicinity of the Lincoln.

14 Q.  And did you also become familiar with a building known as

15 the rental office building?

16 A.  Yes.

17 Q.  And where is that, if you can see that?

18 A.  If you can see the -- it would be the building -- I guess I

19 can't point at it on here, but the building there where the

20 letters Congress Street are, it would be that building that's, I

21 guess facing Congress Street, just past the mouth of 13th Place

22 there.  So basically, the building in between the entrance to

23 13th Place and before you get to the entrance to the Lincoln

24 parking lot, it would be that building that's running horizontal

25 along with Congress Street.  And that would be 1313 Congress

1 Street, the rental office, the old rental office, it used --

2 Q.  If I can just interrupt you.

3        MS. PETALAS:  Your Honor, if I may ask...

4 BY MS. PETALAS:

5 Q.  I'm showing you what's been marked as Government's

6 Exhibit 100.  Do you recognize that?

7 A.  Yes.

8 Q.  And what is that?

9 A.  It's just the same version of the photograph I believe we

10 had on the screen, but it's on that giant board.

11        MS. PETALAS:  Your Honor, at this time I move

12 Government's Exhibit 100 into evidence.

13        MS. WICKS:  No objection.

14        MR. TABACKMAN:  No objection.

15        MS. PETALAS:  And Agent Lockhart, if I could --

16        THE COURT:  Government's Exhibit 100 will be admitted.

17        (Government Exhibit 100 was moved into evidence.)

18 BY MS. PETALAS:

19 Q.  Agent Lockhart, if I could, since the touch screen is not

20 working, if I could ask you to step down and just kind of point

21 to things on the map for the jury that we've talked about.

22        If you could -- I know you've talked about a few of the

23 areas.  If you could just point to where those are, the Lincoln

24 and the circle and the rental office building.

25 A.  Yeah.  Again, this area here coming off of Congress Street,

1 this would just be the circle.  As you can see here, this is

2 13th Place.  Just past there would be the Lincoln, kind of the

3 backwards "L," and this is the Lincoln's parking lot.  There's

4 an entrance right off of Congress Street here.

5         The rental office or the old rental office is right

6 here at 1313 Congress, and the reason I call it the old rental

7 office is that currently there's actually a new rec center up

8 here off of Savannah Street, where the rental office has been

9 relocated.  But during the early portion of this case, the

10 rental office was actually inside of that building.

11 Q.  And while you're down there, are you familiar, through the

12 course of your investigation, of an area referred to as

13 Boat Alley?

14 A.  Yes.  The Boat Alley would be this stretch right up in here,

15 kind of tucked in off of Savannah.  There's this other main

16 alley that runs between Savannah and Congress Street, and Boat

17 Alley would be the portion up in here.

18 Q.  And for the record, if you could just explain where that is

19 on the map.

20 A.  Just tucked off of Savannah Street, I guess running next

21 to -- in this photo, this empty field.  Currently, like I said,

22 there's a rec center there.  But there's an alleyway, and it

23 kind of wraps around, heading towards this other alley that runs

24 in between the 1300 block of Savannah street and the 1300 block

25 of Congress Street.

1        (Jury in at 11:36.)

2        THE COURT:  Good morning, ladies and gentlemen.  We're

3 looking to make some adjustments on the technical equipment

4 here.  While we're doing that, I should mention to you, there

5 was an exhibit that was displayed to you that was into evidence.

6 It was Number 108.107.  I overruled the objection and allowed

7 its admission.

8        Part of what we were doing was revisiting that

9 question, in connection with legal arguments that have been

10 raised.  I have reversed my ruling.  I am sustaining the

11 objection to the admission of 108.107.  It is not in evidence,

12 and I will direct you the disregard that photograph that was

13 admitted, and anything that it did depict.

14 BY MS. PETALAS:

15 Q.  Agent Lockhart --

16        THE COURT:  Let's allow Mr. Cramer to see if he can

17 make those adjustments.  I think we'll be able to complete, or

18 at least address those screen markings at the lunch break.  So

19 we'll just proceed with the testimony.  Ms. Petalas?

20        MS. PETALAS:  Yes, Your Honor.  Thank you.

21 BY MS. PETALAS:

22 Q.  Before the break, Agent Lockhart, you were talking about

23 Congress Park and said that you worked on an investigation of

24 Congress Park.  How did that investigation begin?

25 A.  Myself and two other agents assigned to the task force,

1 Agent Kyle Fulmer and Agent James or Jay Burton, we were three

2 of the co-case agents on two other investigations that were in

3 similar sections of the city, one of them specifically the Tommy

4 Edelin One-Five mob investigation.

5         And through the course of that investigation, we had

6 developed a lot of information regarding the narcotics --

7         MR. PURPURA:  Objection.  It seems we're getting into a

8 hearsay area at this point.

9         THE COURT:  I'll sustain that.  You can put another

10 question.

11 BY MS. PETALAS:

12 Q.  You say that -- well, what did you do -- without telling us

13 any of that information, what did you do after receiving that

14 information?

15 A.  Based upon information we had, we opened an investigation in

16 the Congress Park area of Washington, D.C., which would be

17 myself, Agent Burton, and Agent Fulmer.  And officially, through

18 bureau paperwork, Agent Fulmer was at the time listed as the

19 case agent, with myself and Agent Burton as the co-case agents.

20 Q.  You said, at the time Agent Fulmer was the lead agent?

21 A.  The way the bureau paperwork works, you can only have one

22 official case agent.  So on paper, he was a case agent, we were

23 the two co-case agents.  But basically we functioned as one

24 team, the three of us together.

25 Q.  And when did that investigation begin?

1 A.  January of 2000.

2 Q.  You said you were also working on an investigation that was

3 in a similar area of the city, the Edelin investigation.  Is

4 that correct?

5 A.  That's correct.  I was a co-case agent on that case, as

6 well.

7 Q.  I'm showing you what's been marked as Government's

8 Exhibit 103.1.

9        MS. PETALAS:  I'm showing defense counsel.

10        MS. WICKS:  Your Honor, no objection to the admittance

11 of this exhibit.

12        THE COURT:  You're moving its admission?

13        MS. PETALAS:  Yes, Your Honor.

14        THE COURT:  Without objection, 103.1 will be received.

15        (Government Exhibit 103.1 was moved into evidence.)

16 BY MS. PETALAS:

17 Q.  I'm showing you what's been admitted now as 103 --

18 Government's Exhibit 103.1.  Do you recognize that?

19 A.  Yes.

20 Q.  And what is that?

21 A.  It's another overhead map, shows a slightly larger area.

22 And included in that area on the top portion would be the main

23 focus area of the One-Five, Tommy Edelin investigation.

24 Q.  And could you just describe -- you said the top area.  Could

25 you give us an intersection or some streets where that was

1 involved?

2 A.  It would basically be up there, north of Alabama Avenue,

3 where you 15th Place, Stanton Road, Congress Place.  The

4 investigation basically centered around that neighborhood.

5 Q.  And since we're unable to move the -- so that's up at

6 15th Place, Stanton Road, and Congress Place, those streets that

7 are marked on the map?

8 A.  Yes, that's the basic area.  I'll try to put a mark on it.

9        It's not working, but it would be up again towards that

10 top portion, that general area of Congress Place, 15th Place,

11 Stanton Road, Alabama Avenue on the north side.

12 Q.  And for the record, could you just indicate, was Congress

13 Park also on that map?

14 A.  Yes, it is.

15 Q.  And where is that on the map?

16 A.  Congress Park would be down there, more towards the bottom

17 left-hand corner, again, where the markings are.  Basically,

18 Alabama Avenue now cuts between these two neighborhoods.  But

19 coming from the area where the Tommy Edelin investigation was,

20 you would just slightly go down Alabama Avenue to Congress

21 Street there, just short of the elementary school that we've

22 referred to, and make a left on Congress Street, and that would

23 bring you into the Congress Park neighborhood.

24        THE COURT:  Counsel, let me ask you to approach,

25 please.

1 you have 13th Place down below.  Is that the area you're

2 referring to of Congress Park?

3 A.  Yes.  That's a large portion of the Congress Park

4 neighborhood, yes.

5 Q.  You stated that there was also -- just, if you could

6 familiarize us with the area a little more.  You talked about

7 15th Place that was the focus of Edelin, and Congress Park.

8           Was there another neighborhood that was also an area

9 that your task force, and you particularly investigated?

10           MS. WICKS:  Objection.  Relevancy.

11           MS. PETALAS:  If I may proceed to -- I could ask a more

12 direct leading question that might show the relevancy to that.

13           THE COURT:  If you want to rephrase your question, you

14 can.  I'm not giving you license to ask a leading question.

15           MS. PETALAS:  Okay.

16 BY MS. PETALAS:

17 Q.  In conjunction with the investigation of just the Congress

18 Park Crew, was there another neighborhood that your Safe Streets

19 Task Force also looked at as part of that investigation?

20 A.  Yes.

21 Q.  And what neighborhood was that?

22 A.  It was the 10th Place/Trenton Place neighborhood.

23           MS. PETALAS:  I'll call up Government's Exhibit 105.1.

24 It should be on defense counsel's screen.

25           MR. PURPURA:  No objection.

1          MS. PETALAS:  Your Honor, at this time we move to admit

2 Government's Exhibit 105.1.

3          THE COURT:  Without objection, that exhibit is

4 received.

5          (Government Exhibit 105.1 was moved into evidence.)

6 BY MS. PETALAS:

7 Q.  Do you see that map, Agent Lockhart?

8 A.  Yes.

9 Q.  And what does that depict?

10 A.  Again, it's an overhead map, although this map includes not

11 only the Congress Park neighborhood, but off to the left-hand

12 side is the general area of 10th Place and Trenton Place, which

13 is the other portion of the investigation that we worked under

14 the large Congress Park case.

15 Q.  For the record, still on that exhibit, we've zoomed in to an

16 area that says, "Trenton Place," and the yellow arrows are at a

17 curve.  Is that the area you're referring to as

18 10th Place/Trenton?

19 A.  Right.  The top left corner, where you have the small white

20 arrow pointing at, that's where Congress Street runs into

21 10th Place.  10th Place then kind of winds down the hill and

22 runs into Mississippi Avenue.  And actually there where the two

23 yellow arrows are on the screen is a bend.  And right there is

24 the 1100 block of Trenton Place, and it winds around into the

25 1200 block of Trenton Place.

1 neighborhood where it became obvious early on in the case, it

2 was very difficult to conduct surveillance undetected.

3 Q.  During the course of your investigation, did you become

4 familiar with the people that were charged in this case?

5 A.  Yes.

6 Q.  And do you see any of them in the courtroom today?

7 A.  Yes, I do.

8 Q.  Could you please identify -- well, are you familiar with an

9 individual named Antwuan Ball?

10 A.  Yes.

11 Q.  Do you see that person in the courtroom today?

12 A.  Yes, I do.

13 Q.  Could you please identify that person by where they're

14 sitting, or an item of clothing he's wearing?

15 A.  Mr. Ball is seated at defense table.  And he's wearing, I

16 guess a sky-blue dress shirt.

17        MR. CARNEY:  No objection, Your Honor.

18        MS. PETALAS:  Your Honor, may the record reflect an

19 in-court identification of Defendant Ball?

20        THE COURT:  Without objection, the identification is

21 granted.

22 BY MS. PETALAS:

23 Q.  Did you become familiar with an individual, David Wilson?

24 A.  Yes.

25 Q.  Do you see that person in the courtroom today?

1 A.  Yes.

2 Q.  And could please identify him by where he's sitting or an

3 item of clothing he's wearing?

4 A.  Mr. Wilson is seated next to Mr. Ball.  He has on a

5 dark-colored suit, with a blue dress shirt on underneath.  I

6 think it's a red tie.

7 Q.  And during the course of the investigation, were you

8 familiar with Mr. Wilson by any other names?

9 A.  Yes.

10 Q.  And what were those names?

11 A.  Cool Wop, Wop, or Cootie.

12 Q.  And what about Mr. Ball?

13 A.  Yes.

14 Q.  What were the names you were familiar with him?

15 A.  Big Ant or Ant, or Twuan.

16 Q.  And also during the course of your investigation, did you

17 become familiar with an individual by the name of Gregory Bell?

18 A.  Yes.

19 Q.  Do you see him in the courtroom today?

20 A.  Yes, I do.

21 Q.  Would you please describe him by where he's sitting or an

22 article of clothing he's wearing?

23 A.  Yes.  He's sitting at the defense table behind Mr. Wilson.

24 I think it's a burgundy dress shirt that he has on.

25          MS. PETALAS:  Your Honor, may the record reflect an

1 in-court identification of Mr. Bell?

2          MR. BEANE:  No objection.

3          THE COURT:  The request is granted.

4 BY MS. PETALAS:

5 Q.  Were you familiar with Mr. Bell through the course of your

6 investigation by any other names?

7 A.  Yes.

8 Q.  What was that?

9 A.  Boy-boy and Bunga.

10 Q.  Also through the course of your investigation, did you

11 become familiar with an individual named Desmond Thurston?

12 A.  Yes.

13          MR. ZUCKER:  Stipulate to the identification.

14 BY MS. PETALAS:

15 Q.  Is that Mr. Thurston that's standing right now?

16 A.  Yes, it is.

17          MS. PETALAS:  Your Honor, may the record reflect an

18 in-court identification?

19          THE COURT:  Yes.

20 BY MS. PETALAS:

21 Q.  Also, did you become familiar with an individual by the name

22 of Joseph Jones?

23 A.  Yes.

24 Q.  Could you please identify him by where he's sitting or an

25 article of clothing he's wearing?

1 A.   Mr. Jones is seated in, I guess the rearmost portion of the

2 defense table.   He has on a dark-blue dress shirt and

3 eyeglasses.

4          MS. PETALAS:   Your Honor, may the record reflect an

5 in-court identification of Joseph Jones?

6          MR. MARTIN:   No objection, Your Honor.

7          THE COURT:   The request is granted.

8          MR. PURPURA:   Your Honor, we'll stipulate that

9 Dominic Samuels can be identified by the agent as well.

10 Mr. Samuels, would you stand?   Thank you, sit down.

11 BY MS. PETALAS:

12 Q.   During the course of the investigation, did you come to

13 learn of Joseph Jones by any other name?

14 A.   Yes.

15 Q.   What is that?

16 A.   Jojo.

17 Q.   What about as to Mr. Samuels?

18 A.   Either Don or Dom.

19 Q.   Finally, what about Mr. Thurston?

20 A.   Yes.   He was also known as Daz.

21 Q.   Were there other people through the course of this

22 investigation that you became familiar with that were arrested

23 in this investigation?

24 A.   Yes.

25          MS. PETALAS:   Your Honor, may I approach?

1           THE COURT:  Yes.

2           MS. PETALAS:  Your Honor, I'm handing the witness a

3  series of photographs that have been labeled Government's

4  Exhibit 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, and at

5  the bottom is 201.  It's been previously shown to defense

6  counsel.

7  BY MS. PETALAS:

8  Q.  Actually, if you can just start in order.

9           MR. CARNEY:  Your Honor, there's no objection by the

10 defense on the identification.

11          MR. PURPURA:  As to the identification, there's no

12 objection.  There is a 401 relevancy objection, and there's also

13 a 602 basis of knowledge.

14          THE COURT:  I'll let you ask whatever question you were

15 getting ready to ask.

16 BY MS. PETALAS:

17 Q.  Agent Lockhart, starting with Exhibit 201, do you recognize

18 that?

19 A.  Yes.

20 Q.  And what is that?

21 A.  This is a photograph of Gerald Bailey, also known as

22 Chow-wow.

23          MR. PURPURA:  Objection, based on the same reasons I

24 set forth before.

25          THE COURT:  Overruled without prejudice.

Page 297

1 BY MS. PETALAS:

2 Q.  And how are you familiar with Mr. Bailey?

3 A.  He was one of the targets of this investigation.

4 Q.  Was he -- what happened with --

5        MR. PURPURA:  Objection.  I'm sorry, Judge.  Again,

6 it's the same basis, the basis of knowledge and hearsay.  Is it

7 based on his direct observations?  Where eventually are we

8 going?

9        THE COURT:  The question was, what happened?  Is that

10 what you were asking him?  I'm not sure I heard the question.

11        MS. PETALAS:  Yes, Your Honor.  I was asking

12 furthermore -- I was asking more about his basis of knowledge.

13 He said he was the target of the investigation, and I was having

14 him explain.

15        THE COURT:  What was the question?

16        MS. PETALAS:  It was:  What happened?  When you said he

17 was a target of the investigation, how --

18        MR. ZUCKER:  Your Honor, the question was, was he

19 arrested?

20        THE COURT:  Is that what you asked?

21        MS. PETALAS:  What happened?

22        THE COURT:  Here's what we'll do.  Put your question,

23 and then I'll entertain any objections if there are any.

24        MS. PETALAS:  Yes, Your Honor.

25 BY MS. PETALAS:

1 Q.  What happened with Mr. Bailey?  You said he was a target of

2 the investigation.

3          MR. PURPURA:  Objection.

4          THE COURT:  All right.  Rephrase your question.

5 BY MS. PETALAS:

6 Q.  Explain what you mean when you say he was a target of the

7 investigation.

8 A.  Along with a number of other individuals, including the

9 defendants in the courtroom --

10          MR. PURPURA:  Objection.

11          THE COURT:  How do you know Mr. Bailey?

12          THE WITNESS:  One thing is, he was indicted and charged

13 in this case.

14          MR. PURPURA:  Objection.  Move to strike.

15          THE COURT:  All right, that's sustained.  What you have

16 offered the witness is a picture purporting that to be of Gerald

17 Bailey.  You should elicit, if you want to get this in, the

18 basis of the witness' knowledge that this is Mr. Bailey in the

19 photograph.

20 BY MS. PETALAS:

21 Q.  What is your basis of knowledge that that is Mr. Bailey?

22 A.  I've met Mr. Bailey and spoken to him on numerous occasions.

23 Q.  And is Mr. Bailey -- under what circumstances did you --

24 where would Mr. Bailey, if you know, where did he reside?

25 A.  In Congress Park.

1 Q.  And what were the circumstances -- when you said you met

2 Mr. Bailey -- how do you know Mr. Bailey?

3 A.  Actually, the first time that I got his name, I knew him by

4 his nickname.  I was driving through Congress Park early on in

5 the investigation.  He worked in Congress Park as a maintenance

6 man for Congress Park.  And I drove up to him and asked him

7 directions to the rental office, and he told me where it was.

8        And then I said, "What's your name?"  And he said,

9 "Gerald Bailey."

10 Q.  And through the course of the investigation, did you learn

11 Mr. Bailey to go by any other name as well?

12        MR. PURPURA:  Judge, I apologize.  I'm going the object

13 again.  Again, it's hearsay unless there's a basis.

14        THE COURT:  Is all of this foundation for getting an

15 exhibit in?

16        MS. PETALAS:  No, Your Honor.

17        THE COURT:  You're not trying to get that in?

18        MS. PETALAS:  No, I am trying to get it in.

19        MR. PURPURA:  I'll withdraw the objection to the

20 identification.  Because he's given us a basis for the exhibit,

21 that comes in.

22        THE COURT:  All right.  Go ahead.

23 BY MS. PETALAS:

24 Q.  Through the course of the investigation, did you also learn

25 Mr. Bailey to go by another name?

1          THE COURT:  That could be answered yes or no.

2 A.  Yes.

3 Q.  And how did you learn -- what was that name?

4          MR. PURPURA:  Objection.

5          THE COURT:  Sustained.

6 BY MS. PETALAS:

7 Q.  How did you learn what that other name was?

8          MR. PURPURA:  Object.

9          THE COURT:  Overruled.

10 A.  We learned that name through conducting controlled drug

11 purchases, and numerous sources referred to him --

12          MR. PURPURA:  Objection.

13          MR. ZUCKER:  Objection.

14          THE COURT:  Overruled.

15 BY MS. PETALAS:

16 Q.  Did you participate in controlled drug purchases?

17 A.  Yes.

18 Q.  And through that course of your participation, did you learn

19 the other name that he went by?

20 A.  Yes.

21 Q.  And what was that name?

22          MR. ZUCKER:  Objection.

23          THE COURT:  Well, from whom?

24 BY MS. PETALAS:

25 Q.  Did you monitor those investigations?  Did you participate

Page 301

1 in surveillance of those controlled purchases?

2 A.  Yes.

3 Q.  And through the course of this surveillance, did you learn

4 that individual went by a different name?

5        MR. ZUCKER:  Same objection, Judge.  It all goes to

6 basis.

7        THE COURT:  Counsel, approach.

8        (BENCH CONFERENCE ON THE RECORD.)

9        MR. PURPURA:  Perhaps I can just shorten this.  The

10 only thing we're trying to elicit this is his nickname.  Is that

11 it?

12        MS. PETALAS:  That's correct.  During the opening we

13 talked a lot about the total investigation.  Part of what we

14 were presenting of people who are in the Congress Park Crew, I

15 think through the investigation that he learned of other people

16 who are alleged to be part of this crew.  We have to prove the

17 contours and the membership of this agreement.  And simply,

18 that's all I'm trying to.

19        THE COURT:  What's the objection?

20        MR. PURPURA:  We don't disagree.  They do have to prove

21 that, but they got to prove it the proper way.  We can't do it

22 all through this agent, is the bottom line, through hearsay.

23        THE COURT:  Well, I still don't know -- all you're

24 getting him to say is that he learned about it through

25 controlled buys.  How is that relevant if they were controlled

1 buys from people who have nothing to do with the investigation,

2 or are co-conspirators in this case?  You have to have an

3 evidentiary basis for the admission of some statement that

4 so-and-so said, this guy's nickname is X.  You haven't

5 established that.

6        I don't know who the controlled buys were with.  I

7 don't know who was involved in the controlled buy.  You haven't

8 had him testify about the participants in it, you haven't linked

9 them as co-conspirators, you haven't established it as an

10 801(D)(2)(e) basis for his testimony about what somebody else

11 said his name was.  You haven't done that.

12        MS. PETALAS:  Your Honor, basically what I'm trying to

13 elicit --

14        THE COURT:  I know what you're trying to elicit.  I'm

15 telling you, you have to get into the proper evidentiary basis.

16        MS. PETALAS:  I understand the court.  What I'm saying,

17 as part of this investigation, they put at issue who was even

18 arrested in this case.  They said, we moved in, we arrested all

19 these people.  The investigation itself is at issue.  This was a

20 takedown, where they are arrested 15 individuals.  I'm not

21 trying to elicit that they pled guilty.  I'm just simply going

22 to have him say they disposed of other matters.

23        But as far as the takedown, the contours of the

24 investigation which is at issue, and who was alleged to be

25 members of the crew, is basically what I'm trying to elicit.

1           THE COURT:  The last thing that you said is the

2  problem.  Who is alleged to have been a member of the crew?  Who

3  is alleging, who's saying?  If it is some Joe Blow off the

4  street who is not a co-conspirator, what is the evidentiary

5  basis for Joe Blow's statement coming in through this witness as

6  a matter of asserting the truth that Gerald Bailey's nickname

7  was X?  You can't get that in unless you establish that Gerald

8  Bailey is a co-conspirator.  And then you can get him in as a

9  co-conspirator statement in furtherance of the conspiracy,

10 presumably.

11          But all I'm saying is that you have asked, "How did you

12 learn the name?"  His answer is, "Through controlled buys."

13 Fine.  But who is making the controlled buys, and who's making

14 the statement that you're trying to get in for the truth of what

15 it asserts?  If it is somebody who's not a co-conspirator, it

16 doesn't come in unless there's some other evidentiary basis for

17 it.  That's all I'm trying to direct you to.

18          MS. PETALAS:  Yes, Your Honor.

19          THE COURT:  Now, are the controlled buys involved with

20 people who were co-conspirators in this case?

21          MS. PETALAS:  Yes.

22          THE COURT:  And is he going to say that, I heard the

23 nickname of Gerald Bailey during the course of controlled buys

24 made with co-conspirators in this case, who he will name?

25          MS. PETALAS:  Yes.

1        THE COURT:  And the names of the alleged

2 co-conspirators, I take it, are all known to the defense.  So if

3 he identifies the names of who the co-conspirators are, of who

4 the people are participating in the controlled buys, who uttered

5 the nickname, they will be known as co-conspirators alleged in

6 this case?

7        MS. PETALAS:  He --

8        THE COURT:  In other words, what's the answer to the

9 question:  Who told him what Gerald Bailey's nickname was?

10        MS. PETALAS:  I believe several co-conspirators

11 throughout debriefings of informants.  But also joining the

12 controlled, the individual who bought, Sandra White identified

13 who she made the buy from, and -- by face, which is what led him

14 to find out his true name by driving through Congress Park.

15        THE COURT:  So he learned the nickname of Gerald Bailey

16 first by having some other person who was not a co-conspirator

17 say, I bought stuff from Gerald Bailey, and here is his

18 nickname?

19        MS. PETALAS:  Through Sandra White, yes.  I have

20 evidence.

21        THE COURT:  I don't know who Sandra White is.  Forgive

22 me.  Maybe I should know.

23        MS. PETALAS:  No, she's a cooperator who purchased

24 drugs from the informants.  But he also learned the name --

25        MR. ZUCKER:  Excuse me.  I think it's alleged that

1 Sandra White is a co-conspirator.

2          MS. WICKS:  What's her name?

3          MR. ZUCKER:  Sandra -- I do not think it is alleged --

4          THE COURT:  What's her first name, is her question.

5          MR. ZUCKER:  Oh.  Sandra White is a co-conspirator.  I

6 think she was brought in as a cooperating witness to make

7 purchases.  And therefore, it cannot be a co-conspirator's

8 statement.

9          THE COURT:  Did you have over here where Bailey used

10 his own nickname, or a buyer from Bailey used Bailey's nickname?

11          MS. PETALAS:  I believe so, Your Honor.  But I can move

12 on.  The only thing that I wanted to get out was the parameters

13 of this investigation, that these were the people that he

14 arrested as part of the takedown in this investigation.

15          (Simultaneous conversation.)

16          MS. WICKS:  I said I would object to -- who he arrested

17 in the takedown is irrelevant to any of the counts in this case.

18 I mean, these are the people that he was targeting.  You know, I

19 don't have an objection to that, who he was targeting.  But

20 whether or not other people that aren't on trial here were ever

21 arrested, unless they're coming in here to testify, I don't see

22 how that's relevant.

23          THE COURT:  Well, what he did in the course of the

24 investigation, namely arresting Gerald Bailey, who is a

25 co-conspirator --

1          MS. WICKS:  If he did.

2          THE COURT:  Huh?

3          MS. WICKS:  If he did.

4          THE COURT:  I don't know if he did or didn't.

5          MS. WICKS:  I don't know either.

6          THE COURT:  Excuse me.  I don't have a problem with you

7 having him testify about things he physically did that are

8 relevant to the case.  Having him testify that he learned some

9 hearsay way about Gerald Bailey's nickname is the problem.  We

10 just got stuck on this nickname, eliciting this nickname.

11          MS. PETALAS:  Right.

12          THE COURT:  So if what you're eliciting is hearsay,

13 that's not covered by any definition of non-hearsay under 801.

14 It is not an exception to the hearsay rules anyplace else under

15 Article 8.  That's the problem.

16          MS. PETALAS:  I understand the court's point.  I

17 believe I can elicit it, but it's going to take several steps,

18 and there's going to be several people who come in who identify

19 him as Chow-wow.  So I can move on.

20          THE COURT:  All right.

21          (END BENCH CONFERENCE.)

22          MS. PETALAS:  Court's indulgence.

23          Your Honor, I believe -- I don't know if 201 has been

24 admitted.

25          THE COURT:  You haven't moved it in.

 1          MS. PETALAS:  I would move to admit Government's

 2 Exhibit 201.

 3          THE COURT:  Without objection, 201 will be received.

 4          (Government Exhibit 201 was moved into evidence.)

 5          MS. PETALAS:  At this point, though, I would have to

 6 redact part of it.

 7          THE COURT:  Sorry?

 8          MS. PETALAS:  I'll have to ask to redact part of at

 9 this point, before I publish it to the jury.

10 BY MS. PETALAS:

11 Q.  If you can look at Government's Exhibit 202.  Is that up

12 there?

13 A.  Yes.

14 Q.  Do you recognize that?

15 A.  Yes.

16 Q.  And what is that?

17 A.  It's a photograph of Antwuan Ball.

18          MS. PETALAS:  Your Honor, at this time I move

19 Government's Exhibit 202 into evidence.

20          THE COURT:  Any objection?

21          MR. CARNEY:  No, Your Honor.

22          THE COURT:  Without objection, 202 is received.

23          (Government Exhibit 202 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  Turning to Government's Exhibit 203, do you recognize that?

Page 308

1  A.  Yes.

2  Q.  And what is that?

3  A.  It's a photograph of Gregory Bell.

4        MS. PETALAS:  Your Honor, at this time I move

5  Government's Exhibit 203 into evidence.

6        MR. BEANE:  No objection.

7        THE COURT:  Without objection, 203 is received.

8        (Government Exhibit 203 was moved into evidence.)

9  BY MS. PETALAS:

10  Q.  Turning to Government's Exhibit 204, do you recognize that?

11  A.  Yes.

12  Q.  What is that?

13  A.  It's a photograph of Jasmine Bell.

14  Q.  And who is Jasmine Bell?

15  A.  It's Gregory Bell and Raymond Bell's brother.

16  Q.  And through the course of your investigation, through

17  monitoring -- how did you learn about Jasmine Bell?

18  A.  He was identified early on as one of the targets --

19        MR. PURPURA:  Objection.

20        THE COURT:  Sustained.

21  BY MS. PETALAS:

22  Q.  And during the course of your monitoring of controlled

23  purchases, have you heard anybody else refer to Jasmine Bell

24  as --

25        MR. ZUCKER:  Objection.

1 BY MS. PETALAS:

2 Q.  Have you monitored any controlled purchases involving

3 Mr. Bell?

4 A.  Yes.

5 Q.  And on those controlled purchases, were other individuals --

6 were there other individuals involved in those controlled

7 purchases?

8 A.  Yes.

9 Q.  And who were some of those other individuals?

10       MR. PURPURA:  Objection.  602, as I said, basis of

11 knowledge.  Is it direct knowledge, is it hearsay knowledge?

12 That's what I need to know at this point for purposes of

13 objection.

14       THE COURT:  I'll allow it.

15 BY MS. PETALAS:

16 Q.  Who were the other people involved in some of those

17 purchases?

18       THE COURT:  If you know.

19 A.  David Wilson, Desmond Thurston.

20 Q.  And in the course of monitoring those purchases, did you

21 ever hear Jasmine Bell -- either of those individuals refer to

22 Jasmine Bell by another name?

23 A.  Yes.

24       MS. WICKS:  Objection, Your Honor.

25 BY MS. PETALAS:

Page 310

1 Q.  And what was that name?

2          THE COURT:  Before you go on, by whom?

3          MS. PETALAS:  I said, by either of the individuals,

4 David Wilson or Desmond Thurston.

5          MS. WICKS:  Objection.

6          THE COURT:  Did you want to argue anything further?

7          MS. WICKS:  Foundation.

8          THE COURT:  Overruled.

9 A.  Yes, they referred to him as Jazz.

10 BY MS. PETALAS:

11 Q.  Have you turned to the next exhibit?

12          MS. PETALAS:  I'm sorry, Your Honor.  Was that exhibit

13 moved into evidence?  At this time I would move that exhibit.

14          THE COURT:  204?

15          MS. PETALAS:  204 into evidence.

16          THE COURT:  I think that had been received.

17          (GOVERNMENT Exhibit 204 was moved into evidence.)

18          MS. PETALAS:  Thank you, Your Honor.

19 BY MS. PETALAS:

20 Q.  Turning to Government's Exhibit 205, do you recognize that?

21 A.  Yes.

22 Q.  And what is that?

23 A.  It's a photograph of Raymond Bell.

24 Q.  And how do you know Mr. Raymond Bell?

25 A.  Again, he was one of the targets of this investigation.

1 Q.  And during the course of your investigation, did you monitor

2 controlled purchases that involved Mr. Raymond Bell?

3 A.  Yes.

4 Q.  And did that involve other individuals, as well?

5 A.  Yes.

6 Q.  And who were some of those other individuals?

7         MR. PURPURA:  Same objection.  Basis of knowledge,

8 unless --

9         THE COURT:  If you know.

10 A.  Yes, he was involved in purchases that involved Gregory

11 Bell, his brother.

12 BY MS. PETALAS:

13 Q.  During the course of monitoring those investigations, did

14 you ever hear Raymond Bell referred to by another name?

15 A.  Yes.

16 Q.  And what is that -- I'm sorry.  And who did you hear him --

17 refer to him --

18         Who did you hear refer to Mr. Raymond Bell by another

19 name?  Who used another name to refer to Mr. Bell?

20 A.  A cooperating witness, during the course of the buy.

21 Q.  And who was that cooperating witness?

22 A.  And actually, also Mr. Gregory Bell, during the course of a

23 phone call, referred to his brother by the nickname.

24 Q.  And what was that nickname that Mr. Gregory Bell used to

25 refer to his brother?

Page 312

1 A.  Santoo or Santoos.

2          MS. PETALAS:  Your Honor, at this time I move

3 Government's Exhibit 205 into evidence.

4          THE COURT:  Any objection?  Without objection, 205 is

5 received.

6          (Government Exhibit 205 was moved into evidence.)

7 BY MS. PETALAS:

8 Q.  And Agent Lockhart, referring to Exhibit 207, do you

9 recognize that?

10 A.  Yes.

11 Q.  And what is that?

12 A.  207 is a photograph of Newett Vincent Ford.

13 Q.  And how do you know Mr. Ford?

14 A.  Again, he was a target of this investigation.

15 Q.  Is that a fair and accurate picture of Mr. Ford?

16 A.  Yes.

17          MS. PETALAS:  Your Honor, at this time I move

18 Government's Exhibit 207 into evidence.

19          MS. WICKS:  No objection.

20          THE COURT:  Without objection, Exhibit 207 is received.

21          (Government Exhibit 207 was moved into evidence.)

22 BY MS. PETALAS:

23 Q.  Turning -- do you have Government's Exhibit 208 up there?

24 A.  Yes.

25 Q.  Turning to that, do you recognize that?

Page 313

1 A.  Yes.

2 Q.  What is that?

3 A.  It's a photograph of Lucious Fowler.

4 Q.  And how do you recognize Mr. Fowler?

5 A.  Again, he was a target of this investigation.

6       MR. PURPURA:  Your Honor, I apologize for keeping

7 objecting.  I'm going the object as to the "target of the

8 investigation."  It's insufficient basis of knowledge under

9 Rule 602.  It's just not appropriate.  There's a probably simple

10 foundation that he's seen the person, talked to him, but...

11       THE COURT:  Do you want to round out your question for

12 foundation?

13       MS. PETALAS:  Yes, Your Honor.

14 BY MS. PETALAS:

15 Q.  When you say you're familiar with him and he's the target of

16 the investigation, could you explain how you are familiar with

17 him?  Did you have any interactions with him, controlled

18 purchases, or search warrants?

19 A.  All of the above.  And I've personally spoken to Mr. Fowler.

20       MS. PETALAS:  Your Honor, at this time I would move

21 Government's Exhibit 208 into evidence.

22       THE COURT:  Without objection, 208 is received.

23       (Government Exhibit 208 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  And I think I skipped one, Agent Lockhart.  If you could go

1 back to Government's Exhibit 206.  Do you recognize that?

2 A.  Yes.

3 Q.  How do you recognize that?

4 A.  That's a photograph of Daniel Collins.

5 Q.  And how are you -- are you -- how are you familiar with

6 Daniel Collins?

7 A.  Again, we've made controlled purchases from Mr. Collins,

8 I've spoken to Mr. Collins on several occasions in person.  I

9 know Mr. Collins.

10        MS. PETALAS:  Your Honor, at this time --

11 BY MS. PETALAS:

12 Q.  Through the course of your investigation, did you -- you

13 said you -- your participation in controlled purchases.  Did you

14 ever -- any of those controlled purchases -- I don't want to put

15 word in your mouth.

16        Did you ever monitor controlled purchases with

17 Daniel Collins?

18 A.  Yes.

19 Q.  During the course of those controlled purchases, did you

20 ever hear -- did they involve any other individuals that were

21 the targets of your investigation?

22 A.  Yes.

23 Q.  During the course of monitoring those controlled purchases,

24 did any of those other targets refer to Daniel Collins by

25 another name?

Page 315

1  A.  Yes.

2          MR. ZUCKER:  Objection.  Foundation.

3          THE COURT:  Overruled.

4  BY MS. PETALAS:

5  Q.  And what was the other name of that --

6          THE COURT:  Well --

7  BY MS. PETALAS:

8  Q.  Who was the other -- I'm sorry.

9          Who was the person that referred to Daniel Collins by

10 another name?

11 A.  During the course of a controlled drug purchase from a woman

12 by the name of Gail Parson, who at the time was a target of the

13 investigation, she's now a cooperating witness.  During the

14 course of a controlled purchase from Ms. Parson, she referred to

15 Daniel Collins as DC.

16         MR. ZUCKER:  Objection, Judge.  Foundation on -- I

17 don't think it's sufficient.

18         THE COURT:  I agree.  Sustained, but you can continue

19 to develop it.

20 BY MS. PETALAS:

21 Q.  You were talking about -- did you monitor this controlled

22 purchase?

23         MR. ZUCKER:  Objection.  That doesn't go to the

24 foundation.

25         THE COURT:  Well, it's asked and answered, but I'll

1 allow it.  Go ahead.

2 A.  Yes, the purchase was monitored.  Yes.

3 Q.  And at that time, did you later -- did you personally hear

4 Ms. Parsons refer to Daniel Collins as DC?

5        MR. ZUCKER:  Objection.

6        THE COURT:  Sustained.

7 BY MS. PETALAS:

8 Q.  During the course --

9        THE COURT:  You can ask if he heard Ms. Parson refer to

10 Daniel Collins by a nickname --

11        MS. PETALAS:  Oh, I'm sorry.  I apologize, Your Honor.

12        THE COURT:  -- and what if any response Daniel Collins

13 provided with respect to use of that nickname.

14        MS. PETALAS:  I'm sorry.

15 BY MS. PETALAS:

16 Q.  Did you hear Ms. Parsons refer to Daniel Collins by a

17 nickname?

18 A.  I heard her refer to him by a nickname, yes.

19 Q.  And how did he respond to that, if at all?

20 A.  I don't believe it was in a situation where she -- the

21 instance I'm referring to, she was describing him referring to

22 him, to the person making the purchase from her and Mr. Collins.

23 And she referred to him, "That's DC."

24 Q.  And was there --

25        MR. ZUCKER:  Your Honor, I renew the objection.

1        THE COURT:  Sustained.

2 BY MS. PETALAS:

3 Q.  During the course of the controlled purchases, did that

4 individual, Daniel Collins, ever refer to himself or respond

5 using another name?

6        MR. ZUCKER:  Objection.  Compound.

7        THE COURT:  I'll allow it.

8 A.  I can't recall at this time if there was ever a give and

9 take between the cooperating witness or, then, the target

10 Ms. Parson, where she said his name DC, and then he responded

11 back.  I know she referred to him as DC during the course of

12 that transaction.

13 BY MS. PETALAS:

14 Q.  Looking at Government's Exhibit 206, is that a fair and

15 accurate picture of Daniel Collins?

16 A.  Yes.

17        MS. PETALAS:  Your Honor, at this time I move

18 Government's Exhibit 206 into evidence, subject to redaction of

19 the final line.

20        MR. ZUCKER:  As long as the redaction is completed,

21 there's no objection.

22        THE COURT:  Sorry?

23        MR. ZUCKER:  So long as the redaction is completed,

24 there's no objection.

25        THE COURT:  Is that the case?

Page 318

1          MS. PETALAS:  Yes, Your Honor.

2          THE COURT:  All right.  Exhibit 206 is received.

3          (Government Exhibit 206 was moved into evidence.)

4 BY MS. PETALAS:

5 Q.  Turning to Government's Exhibit 209, do you recognize that?

6 A.  Yes.

7 Q.  And what is that?

8 A.  It's a photograph of Arthur Handon.

9 Q.  Have you spoken to -- well, how do you know Mr. Handon?

10 A.  Again, he was a target of the investigation, and I

11 personally have spoken to him on a number of occasions as well.

12 Q.  And in speaking to Mr. Handon, was there -- did you learn of

13 another nickname for Mr. Handon?

14 A.  Yes.

15          MR. ZUCKER:  Basis.  Can we clarify whether it's from

16 Mr. Handon or --

17 A.  I've called him Jay to his face, and he responded.  So

18 that's his nickname.

19          MS. PETALAS:  Your Honor, at this time I move

20 Government's Exhibit 209 into evidence.

21          MR. ZUCKER:  No objection.

22          THE COURT:  Without objection, 209 is received.

23          (Government Exhibit 209 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  And turning to Government's Exhibit 210, do you recognize

1 that?

2 A.  Yes.

3 Q.  And what is that?

4 A.  It's a photograph of Burke Johnson.

5 Q.  How do you know Mr. Johnson?

6 A.  Again, he's a target of this investigation.  And I, again,

7 personally have spoken to Mr. Johnson.

8 Q.  Turning to Government's Exhibit 211, do you recognize that?

9 A.  Yes.

10 Q.  And what is that?

11 A.  This is a photograph of Joseph Jones.

12          MR. MARTIN:  We'll stipulate that his nickname is Jojo.

13          MS. PETALAS:  Your Honor, at this time I move

14 Government's Exhibit 211 into evidence.

15          THE COURT:  All right.  Without objection, 211 is

16 received.

17          (Government Exhibit 211 was moved into evidence.)

18          MS. PETALAS:  Your Honor, may I approach the put the

19 pictures on the board, publish them?

20          THE COURT:  Yes.  Which pictures are you putting up?

21          MS. PETALAS:  I'm sorry, I failed to actually move into

22 evidence Government's Exhibit 210.  It would be Government's

23 Exhibit 202, 203, 205, 206 -- I'm sorry, 207, 208, 209, 210, and

24 211 at this time.  And it will be Government's Exhibit 201 and

25 206, subject to redaction.

1        THE COURT:  All right.  210 is being moved into

2 evidence.  Any objection?

3        MS. WICKS:  No, Your Honor.

4        THE COURT:  Without objection, 210 is received.

5        (Government Exhibit 210 was moved into evidence.)

6        MR. PURPURA:  Your Honor, could we approach the bench?

7        (BENCH CONFERENCE ON THE RECORD.)

8        MR. PURPURA:  Your Honor, of course the pictures can be

9 displayed, and they should be displayed to the jury.  But right

10 now, it appears as if the government set up an organizational

11 type chart up there.  And we're so far removed from that at this

12 point that it's objectionable.  There's no basis for it

13 whatsoever.

14        THE COURT:  I'll allow you to cross-examine on it if

15 you'd like to, but I'll allow the display as they put it up.

16        (END BENCH CONFERENCE.)

17        MS. PETALAS:  May I approach, Your Honor?

18        THE COURT:  Yes.

19 BY MS. PETALAS:

20 Q.  I'm showing you what's been marked as Government's

21 Exhibit 206.1 and 201.1.  Do you recognize that?

22 A.  Yes.

23 Q.  And what is that?

24 A.  201.1 is another photograph of Gerald Bailey, and 206.1 is a

25 photograph of Daniel Collins.

1          MS. PETALAS:  Your Honor, at this time I move

2 Government's Exhibit 201.1 and 206.1 into evidence.

3          MS. WICKS:  No objection.

4          THE COURT:  Without objection, 206.1 is received and

5 201.1 is received.

6          (Government Exhibits 206.1 and 201.1 were moved into

7 evidence.)

8          MS. PETALAS:  May I approach, Your Honor?

9          THE COURT:  Yes.

10 BY MS. PETALAS:

11 Q.  I'm handing you what's been marked as Government's Exhibit

12 212, 213, 214, 215, 216, 217, 218, 222, 223, 224, and 225.

13          Can you look, starting at 212, can you look at that and

14 tell us if you recognize that?

15 A.  Yes, I do.

16 Q.  And what is that?

17 A.  That's Joe Langley, a photograph of Joe Langley.

18 Q.  And how are you familiar with Joe Langley?

19 A.  Again, he was a target of this investigation.  I've

20 personally spoken to Mr. Langley.

21          MS. PETALAS:  Your Honor, at this time I move

22 Government's Exhibit 212 into evidence.

23          MS. WICKS:  No objection.

24          THE COURT:  212 will be received.

25          (Government Exhibit 212 was moved into evidence.)

Page 322

1 BY MS. PETALAS:

2 Q.  Looking at Government's Exhibit 213, do you recognize that?

3 A.  Yes.

4 Q.  And what is that?

5 A.  That's a photograph of Mary McClendon.

6 Q.  How do you recognize Mary McClendon?

7 A.  Again, she was a target of this investigation, and I've

8 spoken to Ms. McClendon on numerous occasions.

9 Q.  And in your conversations with Ms. McClendon, has she

10 indicated that she goes by another name as well?

11 A.  Yes.  When we speak we always use her nickname.

12 Q.  And what is that?

13 A.  Noony.

14        MS. PETALAS:  Your Honor, at this time I move

15 Government's Exhibit 213 into evidence.

16        THE COURT:  Without objection, 213 is received.

17        (Government Exhibit 213 was moved into evidence.)

18 BY MS. PETALAS:

19 Q.  Turning to Government's Exhibit 214, do you recognize that?

20        MR. PURPURA:  We'll stipulate that 214 is Dominic

21 Samuels, also the nickname of Dom.

22        MS. PETALAS:  Your Honor, I move Government's 214 into

23 evidence.

24        THE COURT:  Without objection, 214 will be received.

25        (Government Exhibit 214 was moved into evidence.)

1 BY MS. PETALAS:

2 Q.  And Government's Exhibit 215, do you recognize that?

3 A.  Yes.

4 Q.  And what is that?

5 A.  It's a photograph of Marcus Smith.

6 Q.  How do you know Marcus Smith?

7 A.  Again, he was a target of this investigation.  I've spoken

8 to Mr. Smith.

9 Q.  In your conversations with Mr. Smith, did he ever refer to

10 himself by another name?

11 A.  I believe when I was speaking to him, I called him by his

12 nickname.  Also, during the course of a controlled purchase, he

13 was referred to by his nickname.

14 Q.  And what was that nickname?

15 A.  Mick.

16        MS. PETALAS:  Your Honor, at this time I move

17 Government's Exhibit 215 into evidence.

18        THE COURT:  Without objection, 215 is received.

19        (Government Exhibit 215 was moved into evidence.)

20 BY MS. PETALAS:

21 Q.  Turning to Government's Exhibit 216, do you recognize that?

22        MR. ZUCKER:  Stipulate that it's a photograph of

23 Desmond Thurston, and the nickname is accurate.

24        COURT REPORTER:  So the nickname is?

25        MR. ZUCKER:  Is accurate.  It's Daz.

1           THE COURT:  Desmond Thurston is the name you mentioned?

2           MR. ZUCKER:  Yes.  The photo of Desmond Thurston,

3 nicknamed Daz, is accurate.

4           MS. PETALAS:  Your Honor, with that I would move

5 Government's 216 into evidence.

6 BY MS. PETALAS:

7 Q.  Looking at Government's 217 --

8           THE COURT:  Do you want it received?

9           MS. PETALAS:  I'm sorry.  Yes.

10          THE COURT:  Without objection, 216 is received.

11     (Government's Exhibit 216 was moved into evidence.)

12 BY MS. PETALAS:

13 Q.  Looking at Government's Exhibit 217, do you recognize that?

14 A.  Yes.

15 Q.  What is that?

16 A.  It's a photograph of Phillip Wallace.

17 Q.  And who is Phillip Wallace?

18 A.  Phillip Wallace is another target of this investigation.

19 He's Desmond Thurston's brother.

20          MS. PETALAS:  Your Honor, at this time I move

21 Government's Exhibit 217 into evidence.

22          THE COURT:  Court, 217 will be received.

23          (Government Exhibit 217 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  Agent Lockhart, if you could look at Government's

1 Exhibit 218.  Do you recognize that?

2 A.  Yes.

3 Q.  And what is that?

4        MS. WICKS:  Your Honor, we'll stipulate.

5 A.  It's a photograph of David Wilson.

6 Q.  Is there also a nickname included on that?

7 A.  Yes.

8 Q.  What is that nickname?

9 A.  Cool Wop.

10       MS. PETALAS:  Your Honor, at this time I move

11 Government's Exhibit 218 into evidence.

12       MS. WICKS:  No objection.

13       THE COURT:  Without objection, 218 is received.

14       (Government Exhibit 218 was moved into evidence.)

15 BY MS. PETALAS:

16 Q.  Looking at Government's Exhibit 222.

17 A.  Yes.

18 Q.  Do you recognize that?

19 A.  Yes, I do.

20 Q.  And what is that?

21 A.  It's a photograph of Alphonso Walker.

22 Q.  And how do you know Mr. Walker?

23 A.  Again, he was a target of this investigation, made some

24 controlled purchases from him.

25       MS. PETALAS:  Your Honor, at this time I move

Page 326

1 Government's Exhibit 222 into evidence.

2         THE COURT:  Without objection, 222 will be received.

3         (Government Exhibit 222 was moved into evidence.)

4 BY MS. PETALAS:

5 Q.  Turning to Government's Exhibit 223, do you recognize that?

6 A.  Yes.

7 Q.  And what is that?

8 A.  It's a photograph of Bobby Capies.

9 Q.  And how do you know Mr. Capies?

10 A.  Again, he was a target of this investigation.  I've

11 personally spoken to Mr. Capies.

12 Q.  Through your conversations with Mr. Capies, did he refer to

13 himself by another name?

14 A.  Yes.

15 Q.  And what is that name?

16 A.  Munya.

17         MS. PETALAS:  Your Honor, at this time I move

18 Government's Exhibit 223 into evidence.

19         MR. ZUCKER:  No objection.

20         THE COURT:  Without -- who was it that made the

21 objection?  All right, without objection, 223 --

22         MR. ZUCKER:  No objection.

23         THE COURT:  I'm sorry.  223 will be received.

24         (Government Exhibit 223 was moved into evidence.)

25         MS. PETALAS:  Thank you, Your Honor.

1 BY MS. PETALAS:

2 Q.  And Agent Lockhart, if you could look at Government's

3 Exhibit 224, do you recognize that?

4 A.  Yes, I do.

5 Q.  And what is that?

6 A.  It's a photograph of Kairi Kellibrew.

7 Q.  How do you know Mr. Kellibrew?

8 A.  Again, he was a target of this investigation.  Again, I've

9 spoken to him personally.

10 Q.  And through your conversations with Mr. Kellibrew, did he

11 refer to himself by a nickname?

12 A.  Yes.

13 Q.  And what was that nickname?

14 A.  Baby Kairi.

15        MS. PETALAS:  Your Honor, at this time I move

16 Government's Exhibit 224 into evidence.

17        THE COURT:  Without objection, 224 will be received.

18        (Government Exhibit 224 was moved into evidence.)

19 BY MS. PETALAS:

20 Q.  Finally, turning to Government's Exhibit 225, do you

21 recognize that?

22 A.  Yes.

23 Q.  What is that?

24 A.  It's a photograph of Keith Barnett.

25 Q.  And how do you know Mr. Barnett?

1 A.   Again, Mr. Barnett was a target of this investigation.   And

2 I also personally have spoken to Mr. Barnett.

3         MS. PETALAS:   Your Honor, at this time I move

4 Government's Exhibit 225 into evidence.

5         THE COURT:   Without objection, 225 is received.

6         (Government Exhibit 225 was moved into evidence.)

7         MS. PETALAS:   May I approach, Your Honor?

8         THE COURT:   Yes.

9 BY MS. PETALAS:

10 Q.   Now, Agent Lockhart, we've talked a little bit about the

11 individuals who were the targets of this investigation.   I want

12 to talk to you about some things you did to develop this case.

13         Could you tell us about the methods you used to learn

14 about the activities of the defendants and other targets of the

15 case?

16 A.   Yes.   I would say at the outset, early on, we would utilize

17 surveillance.   Since the drug activity was one of the primary

18 aspects of the case, we worked to try to develop cooperating

19 witnesses in an attempt to make controlled drug purchases.

20         MR. PURPURA:   Judge, I apologize.   Just to the extent

21 of my objection, just as to the conduct of this particular

22 officer versus what everyone else is doing, then it becomes

23 hearsay at that point.   What he did, he supervised directly.

24         THE COURT:   I'll let him testify about what he did and

25 what he knows from his personal knowledge about having done and

1 seen.

2 A.  Again, myself, Agent Burton, Jay, and Kyle Fulmer and myself

3 at the outset of the case, again, we already had some

4 intelligence about the neighborhood that had been developed in

5 our other cases.  But early on we again conducted surveillance,

6 what surveillance we could in the area, and then early on

7 attempted to start to make controlled drug purchases.

8           And then again, that would lead to search warrants,

9 arrests, attempting to develop additional information through

10 cooperating witnesses and confidential informants.

11 BY MS. PETALAS:

12 Q.  You talked about developing sources.  Are there different

13 types of sources that you personally utilized?

14 A.  Yes.

15 Q.  And what are those types of sources?

16 A.  The two types of sources in this case would have been,

17 there's cooperating witnesses or CW, and when there's a

18 confidential informant, or a CI.

19 Q.  And what is the difference?

20 A.  A cooperating witness is going to be someone who is willing

21 to testify.  They're oftentimes going to wear a wire if they're

22 doing a controlled drug buy.  So at some point their identity is

23 likely to be revealed, and there's a good chance they're going

24 to have to testify.

25           Oftentimes, though not in every case, I know personally

1 I've had a couple that were not facing criminal charges.  But

2 oftentimes someone what has agreed to cooperate with the police

3 or the FBI, they themselves are facing criminal charges.  And in

4 an attempt to help lessen the impact of the time they're facing,

5 the jail time, they'll agree to work with us.  And in some cases

6 that involves wearing a wire or a body recorder to buy -- to

7 make a controlled drug purchase.  We also have cooperating

8 witnesses who are arrested, and then will cooperate from jail.

9 They will not be released.

10        A confidential informant or CI is someone whose

11 identity we do not want to reveal.  They will provide

12 information and it can be used to help make an arrest, to get a

13 search warrant and affidavits.  But that person's identity will

14 be kept -- and all attempts would be made to keep that person's

15 identity a secret.  They will not be expected to testify.

16 Q.  When they give you information, what do you do with this

17 information?

18 A.  Well, initially, if it's a new confidential informant, one

19 of the first things we have to do is try to build up the

20 reliability of that informant.  We're not just going to respond

21 with a new informant.  That's one of the first things you have

22 to do, is build up their credibility and show that you can trust

23 the information that they they're providing.  And there's many

24 ways that we can do that.

25 Q.  And what are those ways?

1 giving it.

2          THE COURT:  It hadn't been offered at that point.

3          Why don't you rephrase your question, or repeat your

4 question?

5          MS. PETALAS:  Yes, Your Honor.

6 BY MS. PETALAS:

7 Q.  Agent Lockhart, you stated as one of the case agents in this

8 case, part of the investigation, you participated in controlled

9 purchases.  Without offering your opinion, please explain why

10 you made the decision as part of this investigation to use

11 controlled purchases.

12          MR. PURPURA:  Your Honor, there's a relevancy, and

13 again we're going right back into the why.  And that's why it's

14 objectionable.

15          THE COURT:  Why is different from opinion.  That's not

16 admissible.  I'll allow the why.  Go ahead.

17 A.  In order to show that the group of individuals were involved

18 in narcotics sales, we wanted to make controlled drug purchases

19 directly from those individuals, to show that they indeed were

20 involved in the selling, in this case, of crack cocaine.

21 BY MS. PETALAS:

22 Q.  And making those controlled buys, who do you use for those

23 controlled buys?

24 A.  In this case we utilized cooperating witnesses.

25 Q.  And when you say in this case, why?  Why in this case --

1          MR. ZUCKER:  Objection.  If the question is going to

2 be, what was done in other cases, there's an objection to that.

3 I'm not sure that was the end of it.

4          THE COURT:  Why don't you repeat the question, or

5 rephrase it so I know what exactly the question is that you're

6 getting to.

7          MS. PETALAS:  The question is:  Why did you use

8 cooperating witnesses in this case to make the controlled

9 purchases?

10          MR. ZUCKER:  No objection to that.

11          THE COURT:  Go ahead.

12 A.  Because our decision was that to try to utilize an

13 undercover officer, which is another way you can make a

14 controlled purchase with an undercover officer, as I stated

15 before, this neighborhood was tight knit, everyone seemed to

16 know each other --

17          MR. PURPURA:  Objection.

18          MS. WICKS:  Objection.

19          THE COURT:  Sustained.

20          MS. WICKS:  Move to strike.

21          THE COURT:  That's not necessary.  Go ahead.

22 A.  We wanted to use cooperating witnesses because the

23 cooperating witnesses were individuals who were known in the

24 neighborhood as individuals that were involved in either selling

25 or purchasing drugs, and had dealt with many of these

1 individuals in the past.  And to try to introduce an undercover

2 would have been very difficult in this investigation.

3 BY MS. PETALAS:

4 Q.  Could you -- you talked about controlled purchases.  Could

5 you explain briefly how they would work, how they worked in this

6 case?

7 A.  We basically have a standard procedure we'll go through.

8 And again, once someone has agreed to work with us as a

9 cooperating witness, we will meet with that individual somewhere

10 out of the area.  We'll pick like a neutral site, and we will

11 write down a request where we've requested a certain amount of

12 cash, currency to provide to that person.  We've already made

13 copies of the bills so we the serial numbers on the bills.

14        And we then will meet with the individual, we'll

15 discuss what the operation, what's about to happen.  They'll be

16 searched, and then we will wire the person with both some type

17 of body recorder, and also a transmitter.  The body recorder is

18 self-explanatory.  It's going to record once we turn it on.  It

19 will record, from start to finish, the entire transaction.

20        The transmitter is so we can listen in.  It's for the

21 cooperating witness' safety.  Because obviously we can't go with

22 in an area like Congress Park.  It was very difficult that we

23 got as close as we could get without being detected.  But it's

24 so that we can hear what's going on, and we'll give them a code

25 phrase if something was go to go wrong and they were in some

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013     Page 69 of 1954

1 kind of trouble, so that we could come in and provide the help

2 that they need.

3 Q.  Once you give them the code phrase and you monitor, what

4 happens then?

5 A.  Basically, like I said, there's different ways.  In this

6 case we did have -- there were several buys where we did have a

7 cooperating witness, it was actually a husband and wife team,

8 where we were able to put them in an undercover FBI car that was

9 wired with cameras.

10          In most of the cases, the purchases in this case,

11 especially early on, you kind of have to adjust to the level

12 of -- or to the particular person that you're dealing with as

13 your cooperating witness.  In other words, we had several

14 cooperating witnesses who were from the neighborhood, who were

15 known in the neighborhood, who either didn't have a car or

16 didn't drive.  So in other words, you're not going to take that

17 person, meet them out of the area, and send them in in a car.

18 That's going to jump right out and it's not going to look right.

19          So in most of the cases we would meet the cooperating

20 witness out of the area, we would put the body wire and the

21 transmitter on them, provide them with the money, they would be

22 searched to make sure they had no other contraband on them.  And

23 then, once that recorder is turned on, we would send them in.

24 Oftentimes we would drop them somewhat close to the

25 neighborhood, maybe pick an alleyway a block or two away, and

1 allow them to walk in so that we're not seen dropping them off.

2          Again, like I stated, there were other occasions where,

3 because we had some cooperating witnesses who didn't live in the

4 area and were known to drive into the area, we were able on a

5 few occasions to get a vehicle in.  But in most cases they would

6 walk in after being dropped off, and then after the purchase

7 takes place, they would walk back out of the area and meet with

8 us.

9 Q.  And what happened when they would walk back out of the are

10 and meet with you?  What would you do then?

11 A.  If a purchase indeed did happen, we would take possession of

12 the suspected narcotics or crack.  Any unused money we would

13 take back.  We would turn off the body recorder and the

14 transmitter at that time.  Again, just like we do at the

15 beginning, we just put a little preamble on the tape just

16 stating the date, the time, what was about to happen.  And then

17 we would put a post-amble on the recording again, just giving

18 the time, the date, and ending the tape.

19          We would take possession of the drugs, and then they

20 would be searched again, make sure that they didn't have any

21 contraband on them.  And then we would usually do like a quick

22 debrief, just kind of summarize what just happened.

23 Q.  Once this happened and somebody would -- in the

24 investigation, did you then go in and arrest those individuals

25 that had just been identified as making the purchase --

1 A.  No.

2 Q.  -- or making the sale, I should say?

3 A.  No.

4 Q.  And why is that?

5 A.  One of the first reasons is, if this person is working with

6 us, and at this point we're trying to keep their identity hidden

7 from the fact that they're working with us, if they've just made

8 a purchase from somebody and we immediately run in and grab that

9 person, not to say it's a guarantee, but there's a good chance

10 that the individual that gets arrested is going to suspect that

11 that person is working with the police.

12         The other reason is that cooperating witnesses, there's

13 only so many that you can get.  You don't have an unlimited

14 supply of cooperating witnesses that agree to work with you.

15 And in a large case like the this they're going to be making

16 multiple cooperating witnesses -- I'm sorry, making multiple

17 controlled purchases from a variety of targets in this case.

18 And therefore, to utilize their ability to make these purchases,

19 we of course didn't want to reveal the fact that they were

20 working with us.

21         And in fact, in this case I know we have had some

22 cooperating witnesses who have made in excess of 15 to 20

23 purchases from different targets in the case.

24 Q.  Just stepping back a notch, before you talked about how you

25 would try and get as close as possible without being detected in

1 testimony, aggregate is the basis of the objection.

2          THE COURT:  Overruled.

3 BY MS. PETALAS:

4 Q.  Looking at that chart, can you indicate how many controlled

5 purchases -- does that refresh your recollection of how many

6 controlled purchases were conducted?

7 A.  It would, yes.  I could count them quickly if you need an

8 exact number.

9 Q.  Yes, if you could.

10          MR. ZUCKER:  Your Honor, that's not refreshing

11 recollection, that's adopting.

12          THE COURT:  Overruled.

13          THE WITNESS:  There are 21, but of the 21, there are

14 two of those 21 where both Mr. Thurston and Mr. Wilson are

15 charged together.

16          But 21 by my count actual controlled purchases.

17 BY MS. PETALAS:

18 Q.  Thank you, Agent Lockhart.

19          And we were discussing -- well, as far as looking at

20 defendant Antwuan Ball, did you participate in controlled

21 purchases that involved defendant Antwuan Ball?

22 A.  Yes.

23 Q.  And directing your attention to July 20th, 2001, did you

24 participate in a controlled purchase on that date?

25 A.  It was an attempted controlled purchase.

1          (GOVERNMENT Exhibit 319.1 was moved into evidence.)

2 BY MS. PETALAS:

3 Q.  Agent Lockhart, turning to 319.T, do you recognize that?

4 A.  Yes.

5 Q.  And what is that?

6 A.  This is a transcript that was prepared of the conversations

7 that are on NT 102.

8 Q.  And did you review that?

9 A.  Yes.

10 Q.  And was that an accurate transcript of 319?

11 A.  Yes.

12 Q.  Directing your attention also to July 26th, 2001, did you

13 participate in and conduct a controlled purchase on that date?

14 A.  Yes.

15 Q.  And who was the -- what cooperating witness did you utilize

16 for that?

17 A.  Again, it was Season Wood.

18 Q.  And what was your role?

19 A.  Again, I was the handling agent running the operation.

20 Q.  And on that date was Season Wood wearing a wire?

21 A.  Yes, he was.

22 Q.  And was that recorded?

23 A.  Yes, it was.

24 Q.  And did you review that wire, the recording of that wire?

25 A.  Yes.

1           MS. PETALAS:  May I approach, Your Honor?

2           THE COURT:  Yes.

3 BY MS. PETALAS:

4 Q.  Looking at 320, do you recognize that?

5 A.  Yes.

6 Q.  And what is that?

7 A.  This is the audio CD of the body wire or body recorder that

8 Season Wood wore, labeled NT 104, and it's from the controlled

9 purchase made from Antwuan Ball July 26th of '01.

10 Q.  And is that a true and accurate -- have you reviewed that

11 recording?

12 A.  Yes.

13 Q.  And is that a true and accurate recording of what was

14 captured on the body wire worn by Season Wood on that day?

15 A.  Yes.

16           MS. PETALAS:  Your Honor, at this time I would move

17 Government's Exhibit 320.

18           MS. WICKS:  Your Honor, I do have an objection.  Can we

19 briefly approach?

20           THE COURT:  Yes.

21           (BENCH CONFERENCE ON THE RECORD.)

22           MS. WICKS:  There is a motion that I've filed that

23 relates to three of these tapes that relate to Mr. Ball and two

24 of them relate to Mr. Wilson.  I understand that they go from

25 the beginning to the end.  I don't think I actually have -- I

1          THE COURT:  All right.  Any other objections?  The

2 objection is overruled and 320 will be received.

3          (GOVERNMENT Exhibit 320 was moved into evidence.)

4 BY MS. PETALAS:

5 Q.  Agent Lockhart, looking at Government's Exhibit 320.1, do

6 you recognize that?

7 A.  Yes.

8 Q.  And what is that?

9 A.  This is an abridged version or cut-down version of that same

10 NT 104, the controlled drug purchase on 7/26/01.

11 Q.  And have you reviewed that?

12 A.  Yes.

13 Q.  And is everything on that CD included in Government's

14 Exhibit 320?

15 A.  Yes.

16          MS. PETALAS:  Your Honor, at this time I move

17 Government's Exhibit 320.1 into evidence.

18          THE COURT:  Without objection, 320.1 is received.

19          (GOVERNMENT Exhibit 320.1 was moved into evidence.)

20 BY MS. PETALAS:

21 Q.  Agent Lockhart, looking at 320.T, do you recognize that?

22 A.  Yes.

23 Q.  What is that?

24 A.  This is a transcript of the entire transaction on NT 104.

25 Q.  And have you reviewed that transcript?

1          (GOVERNMENT Exhibit 321.V was moved into evidence.)

2 BY MS. PETALAS:

3 Q.  Looking back at 321.T as in Tom, do you have that in front

4 of you?

5 A.  Yes.

6 Q.  And what is that?

7 A.  This is a transcript of the attempted transaction on

8 10/23/01, of NT 107.

9 Q.  And did you review that transcript?

10 A.  Yes.

11 Q.  And did you compare that with NT 107?

12 A.  Yes.

13 Q.  Is that a fair and accurate transcript of what was recorded

14 on NT 107?

15 A.  Yes.

16 Q.  Agent Lockhart, did you also participate in any controlled

17 purchases from a Gregory Bell?

18 A.  Yes.

19 Q.  Directing your attention to June 5th, 2000, did you conduct

20 a controlled purchase from Gregory Bell at that point?

21 A.  Yes.

22          MS. PETALAS:  Court's indulgence.

23          May I approach, Your Honor?

24          THE COURT:  Yes.

25 BY MS. PETALAS:

Page 391

1  Q.  Agent Lockhart, I've handed you 302, 302.1, and 302.T.  If

2  you can look at 302, do you recognize that?

3  A.  Yes.

4  Q.  And what is that?

5  A.  This is a CD copy of the audio recording from the body wire

6  NT 23, June 5th of 2000; it's a buy by cooperating witness

7  Sandra White from Gregory Bell.

8  Q.  And did you participate in that controlled purchase?

9  A.  Yes.

10  Q.  And did you review that 302 exhibit that you just described?

11  A.  Yes.

12  Q.  And is that a true and accurate recording of what was

13  captured on the wire of Sandra White back on that date?

14  A.  Yes.

15  Q.  Your Honor, at this time I move Government's Exhibit 302

16  into evidence.

17        THE COURT:  All right.  Without objection, Exhibit 302

18  will be received.

19        (GOVERNMENT Exhibit 302 was moved into evidence.)

20  BY MS. PETALAS:

21  Q.  Turning to Government's Exhibit 302.1, do you recognize

22  that?

23  A.  Yes, I do.

24  Q.  What is that?

25  A.  That's an abridged version of NT 23.

Page 392

1 Q.  And did you listen to that 302.1?

2 A.  Yes.

3 Q.  And does everything that's on 302.1 come from Government's

4 Exhibit 302?

5 A.  Yes.

6        MS. PETALAS:  Your Honor, at this time I move

7 Government's Exhibit 302.1 into evidence.

8        THE COURT:  Without objection, 302.1 is received.

9        (GOVERNMENT Exhibit 302.1 was moved into evidence.)

10 BY MS. PETALAS:

11 Q.  Finally turning to 302.T.  Do you have that?

12 A.  Yes.

13 Q.  What is that?

14 A.  This is a transcript of NT 23.

15 Q.  And did you review that?

16 A.  Yes.

17 Q.  And did you compare that with Government's Exhibit 302?

18 A.  Yes.

19 Q.  Is that a true and accurate transcript of Government's

20 Exhibit 302?

21 A.  Yes.

22 Q.  Turning your attention to July 27th, 2000.  Did you

23 participate in a controlled purchase from Gregory Bell on that

24 date?

25 A.  Yes.

Page 393

1        MS. PETALAS:  Court's indulgence.

2        May I approach, Your Honor?

3        THE COURT:  Yes.

4 BY MS. PETALAS:

5 Q.  Agent Lockhart, I've handed you Government's Exhibit 306,

6 306.1, and 306.T.  Do you recognize that?

7 A.  Yes.

8 Q.  And what is that?

9 A.  This is an audio CD of the body wire from July 27th, 2000,

10 NT 31, cooperating witness Sandra White, controlled purchase

11 from Gregory Bell.

12       THE COURT:  Which exhibit number is that?

13       THE WITNESS:  306, Your Honor.

14 BY MS. PETALAS:

15 Q.  And did you review and listen to Government's Exhibit 306?

16 A.  Yes.

17 Q.  Is that a true and accurate recording of what was captured

18 on the wire by Sandy White on July 27th, 2000?

19 A.  Yes.

20       MS. PETALAS:  Your Honor, at this time I move

21 Government's Exhibit 306 into evidence.

22       THE COURT:  Without objection, 306 is received.

23       (GOVERNMENT Exhibit 306 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  Turning to Government's Exhibit 306.1, do you recognize

Page 394

1 that?

2 A.  Yes.

3 Q.  And what is that?

4 A.  This is an abridged version of NT 31.

5 Q.  And did you listen to 306.1?

6 A.  Yes.

7 Q.  Did you compare that to Government's Exhibit 306?

8 A.  Yes.

9 Q.  Is everything on 306.1 included in 306?

10 A.  Yes.

11        MS. PETALAS:  Your Honor, at this time I move

12 Government's Exhibit 306.1 into evidence.

13        THE COURT:  Without objection, 306.1 will be received.

14        (GOVERNMENT Exhibit 306.1 was moved into evidence.)

15 BY MS. PETALAS:

16 Q.  Turning to Government's Exhibit 306.T, do you recognize

17 that?

18 A.  Yes.

19 Q.  What is that?

20 A.  That's a transcript of NT 31.

21 Q.  Did you review that?

22 A.  Yes, I did.

23 Q.  Did you compare that with NT 31, Government's Exhibit 306?

24 A.  Yes.

25 Q.  Is that a true and accurate transcript?

1 A.  Yes.

2 Q.  Turning your attention to November 16th, 2000, did you

3 review an audio recording of a controlled purchase from

4 November 16th, 2000?

5 A.  Yes.

6          MS. PETALAS:  Court's indulgence.

7          May I approach, Your Honor?

8          THE COURT:  Yes.

9 BY MS. PETALAS:

10 Q.  For the record, I've shown you Government's Exhibit 309,

11 309.1, and 309.T.  Do you recognize those?

12 A.  Yes.

13 Q.  And Agent Lockhart, did you or did other agents participate

14 in that controlled purchase?

15 A.  On this one in particular, I can't say for sure if I was

16 there.  There were a couple of these where, when we prepare a

17 write-up of what happened that day, it's actually called an

18 FD-302.  And that's -- normally we would list the participating

19 agents or the handling agents.

20          There are a couple of these where either my name is not

21 listed in the 302, and the other way I would know if I was there

22 is if I'm heard on the transaction.  But this is one of the ones

23 that my name is not listed on the 302 and I'm not heard on the

24 audiotape, so I cannot say for certain.  There's only a couple

25 of these that I can't say for certain that I was not there.

1          Odds are I was, because I was one of the case agents,

2 but I believe there's six that I cannot verify if I was there or

3 not.  I most likely was there, but I can't say with certainty.

4 Q.  Okay.  And did you review -- have you reviewed Government's

5 Exhibit 309?

6 A.  Yes.

7 Q.  And turning to Government's Exhibit 309.1, have you reviewed

8 that?

9 A.  Yes.

10 Q.  And what is Government's Exhibit 309.1?

11 A.  309.1 is just an abridged version of NT 55, which is the

12 body wire worn by Sandra White during a narcotics purchase from

13 Gregory Bell on 11/16 of 2000.

14 Q.  And did you compare 309.1 to 309?

15 A.  Yes.

16 Q.  And is everything that's on 309.1, is that also on 309?

17 A.  Yes.

18 Q.  And looking at Government's Exhibit 309.T, do you recognize

19 that?

20 A.  Yes, I do.

21 Q.  What is that?

22 A.  That's a transcript of NT 55.

23 Q.  Did you review that transcript?

24 A.  Yes.

25 Q.  Did you compare that with NT 55, Government's Exhibit 309?

1 A.  Yes, I did.

2 Q.  Is that a true and accurate transcript of what is captured

3 on NT 55?

4 A.  Yes.

5 Q.  And directing your attention to November 16th, 2000, was a

6 controlled purchase conducted from Gregory Bell on that date?

7 A.  We just did that one.

8 Q.  Oh, I'm sorry.  January 9th, 2001, was a controlled purchase

9 done from Gregory Bell on that date?

10 A.  Yes.

11        MS. PETALAS:  Court's indulgence.

12        May I approach, Your Honor?

13        THE COURT:  Yes.

14 BY MS. PETALAS:

15 Q.  Agent Lockhart, I've handed you Government's Exhibit 310,

16 310.1 and 310.T.  Do you recognize those items?

17 A.  Yes.

18 Q.  And what are those items, Government's 310?

19 A.  310 is an audio CD of the body wire recording of NT 66, and

20 this is --

21 Q.  Okay.  I'm sorry.  Continue.

22 A.  This is a recording of the controlled drug purchases made by

23 cooperating witness Gail Parson from both Gregory Bell and

24 Joseph Jones on 1/9/2001.

25 Q.  And did you participate in that purchase?

1 A.  Again, this is one of the situations where there's a --

2 likely I was out there, but my name is not listed in the 302 and

3 I'm not heard on the audio, so I can't say for certain.

4 Q.  Looking at 310.1, do you recognize that?

5 A.  Yes.

6 Q.  And what is that?

7 A.  Again, this is just an abridged version of NT 66.

8 Q.  Did you compare 310.1 with 310?

9 A.  Yes.

10 Q.  Is everything that's on 310.1 included in 310?

11 A.  Yes.

12 Q.  And that's a fair and accurate abridgment of 310?

13 A.  Yes.

14 Q.  Looking at 310.T, do you have that?

15 A.  Yes, I do.

16 Q.  What is that?

17 A.  This is a transcript of NT 66.

18 Q.  Did you review that transcript?

19 A.  Yes.

20 Q.  Did you compare it with what was captured on NT 66?

21 A.  Yes.

22 Q.  Is that true and accurate?

23 A.  Yes.

24 Q.  And directing your attention now to January 18th, 2001.

25 Have you reviewed a recording from January 18th, 2001 of a

1 controlled purchase?

2 A.  Yes.

3 Q.  And did you participate in that buy?

4 A.  Again, it would be the same as the previous two.  I believe

5 probable, but my name isn't listed and I'm not heard on the

6 audiotape.

7 Q.  In that purchase...

8        MS. PETALAS:  Your Honor, may I approach?

9        THE COURT:  Yes.

10 BY MS. PETALAS:

11 Q.  I'm handing you 311, 311.1, 311.T.  Looking at 311, without

12 describing it, do you recognize that?

13 A.  Yes.

14 Q.  Looking at 311.1, do you recognize that?

15 A.  Yes, I do.

16 Q.  And what is 311.1?

17 A.  An abridged version of 311.

18 Q.  And have you reviewed 311.1?

19 A.  Yes.

20 Q.  And compared it to 311?

21 A.  Yes.

22 Q.  And is everything that's on 311.1 included in 311?

23 A.  Yes.

24 Q.  Is 311.1 a true and accurate abridgment of 311?

25 A.  Yes, it is.

1 Q.  Referring to 311.T, do you see that?

2 A.  Yes.

3 Q.  And what is that?

4 A.  Again, this is a transcript of 311, which is NT 68, from

5 January 18th of '01.

6 Q.  And did you review that transcript?

7 A.  Yes.

8 Q.  Did you compare it with NT 68?

9 A.  Yes.

10 Q.  Is that a true and accurate transcript?

11 A.  Yes, it is.

12 Q.  Skipping ahead to August 30th, 2004, directing your

13 attention to that date, did you participate in a controlled

14 purchase from a Gregory Bell on that date?

15 A.  Yes.

16 Q.  Did you personally participate in that controlled purchase?

17 A.  Yes.  I was the handling agent.

18 Q.  And who did that -- which cooperating witness did you use

19 for that controlled purchase?

20 A.  Willis Earl Campbell.

21        MS. PETALAS:  Court's indulgence.

22        May I approach, Your Honor?

23        THE COURT:  Yes.

24 BY MS. PETALAS:

25 Q.  Agent Lockhart, I've handed you several exhibits.  If you

1 could just state which exhibit you're looking at and whether or

2 not you recognize it.

3 A.  Okay.

4 Q.  Starting -- I believe I've handed you 323.  Do you have

5 that?

6 A.  Yes, I do.

7 Q.  What is that?

8 A.  This is NT 176, which is the CD audio of the body wire that

9 Earl Campbell wore on August 30th of '04 during a controlled

10 drug purchase from Gregory Bell.

11 Q.  Did you review that CD?

12 A.  Yes.

13 Q.  And is that a true and accurate recording of what was

14 captured on that body wire worn by the cooperating witness?

15 A.  Yes.

16       MS. PETALAS:  Your Honor, at this time I move

17 Government's Exhibit 323 into evidence.

18       THE COURT:  Without objection, 323 is received.

19       (GOVERNMENT Exhibit 323 was moved into evidence.)

20 BY MS. PETALAS:

21 Q.  Turning your attention to 323.1, do you have that?

22 A.  Point 1 I do not have.

23       MS. PETALAS:  May I approach, Your Honor?

24       THE COURT:  Yes.

25       MS. PETALAS:  Court's indulgence.

Page 402

1 BY MS. PETALAS:

2 Q.  Looking at 323.T, do you have that?

3 A.  Yes.

4 Q.  And what is that?

5 A.  This is a transcript of the transaction that day, 8/30/04,

6 it's NT 176.

7 Q.  And did you -- you said that's a transcript of NT 176?

8 A.  Yes.

9 Q.  Did you compare that with NT 176?

10 A.  Yes.

11 Q.  Is that a true and accurate transcript of what is captured

12 on Government's Exhibit 323?

13 A.  Yes.

14        MS. PETALAS:  May I approach, Your Honor?

15        THE COURT:  Yes.

16 BY MS. PETALAS:

17 Q.  Agent Lockhart, I've just handed you what's now been labeled

18 as Government's Exhibit 323.1.  Do you recognize that?

19 A.  Yes, I do.

20 Q.  And what is that?

21 A.  This is an audio -- a CD recording of a phone call made by

22 cooperating witness Earl Campbell to Gregory Bell on 8/30 of

23 '04.  It's labeled T 113.

24 Q.  And that's labeled 323.1?

25 A.  Yes.

1        THE COURT:  Do you need to retrieve that?

2        MS. PETALAS:  I do, Your Honor.  Thank you.

3        THE WITNESS:  It's actually, as I look at it, it's an

4 abridged version of T 113.  So this is going to be the cut-down

5 version of T 113, the phone calls.

6        MS. PETALAS:  Court's indulgence.

7 BY MS. PETALAS:

8 Q.  Turning your attention to Government's Exhibit 323.2, do you

9 have that?

10        THE COURT:  Let me just make sure we have on the record

11 what the witness has and has not testified to, and what if

12 anything you need to withdraw at the moment either for

13 relabeling or other testimony about.

14        MS. PETALAS:  Yes, Your Honor.  If I actually could

15 withdraw that last 323.1 for a moment for relabel.

16        If I may approach?

17        THE COURT:  Yeah.

18        MS. PETALAS:  Thank you.

19        THE COURT:  The last testimony was that 323.1 was an

20 abridged version of T 113.

21        MS. PETALAS:  That's correct, Your Honor.  I'm not

22 moving it -- that is the last testimony.  I'm not moving it into

23 evidence at this point.

24        THE COURT:  I'm asking if that is something you wanted

25 to withdraw or is that something that should reflect a change in

1 the exhibit list.

2          MS. PETALAS:  I believe that is something that should

3 reflect a change in the exhibit list.

4          Your Honor, if I may approach.

5          THE COURT:  Yes.

6 BY MS. PETALAS:

7 Q.  I'm showing you what's been marked as 323.V.  Do you

8 recognize that?

9 A.  Yes.

10 Q.  And what is that?

11 A.  This is a CD containing the audio and video image from NTV

12 177, which is the video and audio, like I said, from an

13 undercover, FBI undercover car from the transaction, same

14 transaction on 8/30 of '04.  And this is an abridged version.

15 Q.  Did you review that?

16 A.  Yes.

17 Q.  Is that a true and accurate depiction of what you saw -- or

18 what happened on that date, on August 30th, 2004?

19 A.  Yes.

20 Q.  Did you participate in that surveillance?

21 A.  Yes.

22          MS. PETALAS:  Your Honor, at this time I move

23 Government's Exhibit 323.V into evidence.  Your Honor, if I may

24 have a moment.

25          Your Honor, may I approach?

1          THE COURT:  Did you still want to move that in?

2          MS. PETALAS:  Yes, I'm sorry.  At this time I move

3 Government's Exhibit 323.V into evidence.

4          THE COURT:  Without objection, 323.V is received.

5          (GOVERNMENT Exhibit 323.V was moved into evidence.)

6          MS. PETALAS:  May I approach the witness, Your Honor?

7          THE COURT:  Yes.

8 BY MS. PETALAS:

9 Q.  Directing your attention to 323.2, do you recognize that?

10 A.  Yes.

11 Q.  And what is that?

12 A.  This is the full version of T 113, which is the phone calls

13 made by cooperating witness Earl Campbell on 8/30 of '04.

14 Q.  And were you present for that phone call?

15 A.  Yes.

16 Q.  And did you review 323.2?

17 A.  Yes.

18 Q.  And is that an accurate recording of that phone call that

19 took place on August 30th, 2004?

20 A.  Yes.

21          MS. PETALAS:  Your Honor, at this time I move

22 Government's Exhibit 323.2 into evidence.

23          THE COURT:  Without objection, 323.2 is received.

24          (GOVERNMENT Exhibit 323.2 was moved into evidence.)

25

Page 406

1 BY MS. PETALAS:

2 Q.  Agent Lockhart, I've handed you an exhibit that you seem to

3 be reviewing.  Could you review that exhibit and let us know

4 what exhibit number it is.

5 A.  This top transcript is 323.2T, and this is a transcript of

6 T 113, the phone calls that were made by the cooperating witness

7 on 8/30 of '04.

8 Q.  Did you review that transcript?

9 A.  Yes.

10 Q.  Did you compare it with Government's Exhibit 323.2?

11 A.  Yes.

12 Q.  Is that a true and accurate transcript of that recording?

13 A.  Yes.

14 Q.  You said there's a top transcript.  Is there a bottom

15 transcript in there?

16 A.  There's one in the middle that is 323.VT.

17 Q.  You said there was one in the middle.  Does that imply

18 there's one on the bottom as well?

19 A.  The one on the bottom I believe is the one I've already

20 spoken about.  That's 323.T, which is a transcript of the body

21 wire, NT 176.  And the one in the middle is a transcript -- I

22 believe this is basically the same transcript.  In other words,

23 the NTV 177 and NT 176 are basically the same, the only

24 difference being on 176, I do the preamble at the start, and I

25 believe the only difference on NTV 177, in the camera car, is my

1 partner, Kevin Ashby, does the preamble.

2 Q.  Did you review that 323.3VT, the middle one that you just

3 referred to?

4 A.  This actual transcript I don't believe I did.  I reviewed

5 the one, NT 176.

6 Q.  Okay.  Explain to us -- you've told us about NT.  What is

7 NTV?

8 A.  NTV, it's nontelephonic video, so it's just going to be a

9 recording that's on video but it has nothing to do with

10 telephones.

11 Q.  And you've been talking about how NT 176 and NTV 177 were

12 similar.  Explain to us the difference between those two.  What

13 are these two recordings from?

14 A.  The only difference -- they're both from the same

15 transaction on August 30th of '04.  The only difference is as

16 I'm putting the body wire and turning it on to the cooperating

17 witness, I basically speak into the recorder and say the time

18 and the date and what we're about to do.

19        At the same time that I'm doing that, literally right

20 next to us my partner jumps into the camera car where we've

21 powered up the recording, and he jumps in and basically does the

22 same thing.  He says time, date, what we're about to do.  And

23 the cooperating witness is standing basically right there, I've

24 activated the recorder, they get in, and then as they drive in,

25 conduct the transaction, and drive back, both the recorders in

1 the car and the body wire are recording exactly the same thing.

2          And the only difference being then again at the end, as

3 I meet with the cooperating witness and take the body wire off

4 and put a postamble, just basically again time, date, what just

5 happened, again my partner jumps in the car, does the same

6 thing, and turns the switch off on those cameras.

7 Q.  So just then to clarify, NT 176 is a recording from the body

8 wire?

9 A.  NT 176 is the body wire, yes.

10 Q.  And NTV, that's a recording from what?

11 A.  An undercover FBI car that was wired with videotape

12 machines.

13 Q.  Finally -- may I approach, Your Honor?

14          THE COURT:  Yes.

15 BY MS. PETALAS:

16 Q.  I'm showing you what's been marked as Government's

17 Exhibit 323.V2.

18 A.  Yes.

19 Q.  Do you recognize that?

20 A.  Yes.

21 Q.  And what is that?

22 A.  This is a CD that contains NTV 177.  Basically on this CD is

23 the full version, start to finish, of the undercover car with

24 the cooperating witnesses in it from beginning of the

25 transaction to the end.

1          THE COURT:  Would you tell me again how that's marked,

2 how that's labeled?

3          THE WITNESS:  Judge, this has 323.V as in victor, 2.

4          MS. PETALAS:  Your Honor, that would be an add-in on

5 the exhibit list.

6          I'm sorry.  It will reflect a change on the exhibit

7 list of 323.V is now the redacted video that's already been

8 moved into evidence.  And 323.V2 is the unredacted, the entire

9 video, that is an add-on, and that is what Agent Lockhart has.

10          Your Honor, at this time I move Government's

11 Exhibit 323.V2 into evidence.

12          THE COURT:  Without objection, 323.V2 will be received.

13          (GOVERNMENT Exhibit 323.V2 was moved into evidence.)

14 BY MS. PETALAS:

15 Q.  Agent Lockhart, directing your attention to December 19th,

16 2001, did you participate in a controlled purchase on that date?

17          MR. PURPURA:  Your Honor, I'm going to have an

18 objection.  Can we approach the bench or I can --

19          (BENCH CONFERENCE ON THE RECORD.)

20          MR. PURPURA:  Your Honor, if we're going along the

21 questions that have been asked so far, I don't believe there's

22 personal knowledge on this agent's part.  The objection's based

23 on Rule 602, unless we can establish personal knowledge.  I

24 think at best he's going to be able to say that he heard

25 something and it's been recorded, and what he's heard and was

1          THE COURT:  All right.  We'll see you in 15 minutes.

2          (Recess 3:55 p.m.)

3          MR. PURPURA:  The transcript identifies Dominic Samuels

4 as one of the participants.  This is one of the issues that we

5 wanted to avoid.  We can just admit it subject to objection or

6 subject to connection later on.

7          THE COURT:  You said the transcript?

8          MR. PURPURA:  Yes, sir.

9          THE COURT:  The transcript is not being moved into

10 evidence.

11          MR. PURPURA:  Oh, I apologize.  That's it.

12          (Jury in at 4:07 p.m.)

13          THE COURT:  Good afternoon again, ladies and gentlemen.

14 Welcome back.  We're ready to resume.

15          Counsel?

16          MS. PETALAS:  Yes, Your Honor.  May I approach the

17 witness?

18          THE COURT:  Yes.

19 BY MS. PETALAS:

20 Q.  Agent Lockhart, I've handed you Government Exhibit 322,

21 322.1, and 322.T.  Do you recognize that, starting with 322?

22 A.  Yes.

23 Q.  And what is that?

24 A.  322 is the CD of the audio of the body wire, it's labeled

25 NT 112, from December 19th, 2001.

1 Q.  Did you participate in that controlled purchase?

2 A.  Yes.

3 Q.  And did you review that transcript -- or I'm sorry, that CD?

4 A.  Yes.

5 Q.  Is that a true and accurate recording of what was captured

6 on the body wire on that date, on 12/19/2001?

7 A.  Yes.

8         MS. PETALAS:  Your Honor, at this time I move

9 Government's Exhibit 322 into evidence.

10         THE COURT:  Without objection, 322 is received.

11         (GOVERNMENT Exhibit 322 was moved into evidence.)

12 BY MS. PETALAS:

13 Q.  Turning your attention to Government's Exhibit 322.1.  Do

14 you recognize that?

15 A.  Yes.

16 Q.  And what is that?

17 A.  It's an abridged version of NT 112 from 12/19/01.

18 Q.  Did you compare that with Government's Exhibit 322?

19 A.  Yes.

20 Q.  Is that a true and accurate abridged version of Government's

21 322?

22 A.  Yes, it is.

23         MS. PETALAS:  Your Honor, at the time I move

24 Government's Exhibit 322.1 into evidence.

25         THE COURT:  Without objection, 322.1 is received.

1           (GOVERNMENT Exhibit 322.1 was moved into evidence.)

2 BY MS. PETALAS:

3 Q.   Turning to Government's Exhibit 322.T, do you see that?

4 A.   Yes.

5 Q.   And what is that?

6 A.   This is a transcript of NT 112.

7 Q.   Did you review that?

8 A.   Yes.

9 Q.   Is that a true and accurate transcript of what was captured

10 on NT 112?

11 A.   Yes.

12          MS. PETALAS:  Your Honor, Court's indulgence.

13          May I approach, Your Honor?

14          THE COURT:  Yes.

15 BY MS. PETALAS:

16 Q.   I've handed you what's been marked as Government's Exhibit

17 300, 308, and 314.  Turning to Government's Exhibit 300, do you

18 recognize that?

19 A.   Yes.

20 Q.   And what is that?

21 A.   This is a CD of the body wire from May 16th of 2000, NT 117.

22 Q.   Did you participate in that purchase, that controlled

23 purchase?

24 A.   Again, this is one of the ones where my voice is not heard

25 on the tape, nor am I listed in the 302.  I believe I most

1 likely was there, but I can't say with certainty.

2 Q.  Looking at Government's Exhibit 300.1, do you recognize

3 that?

4 A.  Yes.

5 Q.  And what is that?

6 A.  This is an abridged version of NT 17 from May 16th, 2000.

7 Q.  And did you review 300.1?

8 A.  Yes.

9 Q.  Did you compare it with Government's Exhibit 300?

10 A.  Yes.

11 Q.  Is that a true and accurate abridged version of Government's

12 Exhibit 300?

13 A.  Yes, it is.

14 Q.  And looking at 300.T, do you see that?

15 A.  Yes.

16 Q.  And do you recognize that?

17 A.  Yes.

18 Q.  And what is that?

19 A.  This is a transcript of NT 17.

20 Q.  And did you review that transcript?

21 A.  Yes.

22 Q.  And is that a true and accurate transcript of what was

23 recorded and contained in NT 17?

24 A.  Yes.

25 Q.  And directing your attention to Government's Exhibit 308, do

Page 418

1 you recognize that?

2 A.  Yes.

3 Q.  And what is that?

4 A.  This is a CD of the audio of the body wire from

5 October 17th, 2000, NT 48.

6 Q.  And did you participate in that controlled purchase?

7 A.  Yes, I did.

8 Q.  And who was the cooperating witness that --

9 A.  Sandra White.

10 Q.  And did you review NT 48, Government's Exhibit 308?

11 A.  Yes.

12 Q.  And is that a true and accurate recording of what was

13 captured on Ms. White's body wire on October 17th, 2000?

14 A.  Yes.

15       MS. PETALAS:  Your Honor, at this time I move

16 Government's Exhibit 308 into evidence.

17       THE COURT:  Without objection, 308 is received.

18       (GOVERNMENT Exhibit 308 was moved into evidence.)

19 BY MS. PETALAS:

20 Q.  Turning to Government's Exhibit 308.1, do you have that?

21 A.  Yes, I do.

22 Q.  And what is that?

23 A.  This is an abridged version of NT 48.

24 Q.  Did you review that?

25 A.  Yes, I did.

1 Q.  Is that a true and accurate abridged version of Government's

2 Exhibit 308?

3 A.  Yes.

4         MS. PETALAS:  Your Honor, at this time I move

5 Government's Exhibit 308.1 into evidence.

6         THE COURT:  Without objection, 308.1 is received.

7         (GOVERNMENT Exhibit 308.1 was moved into evidence.)

8 BY MS. PETALAS:

9 Q.  I'm looking at Government's Exhibit 308.T.  Do you have

10 that?

11 A.  Yes.

12 Q.  Do you recognize that?

13 A.  Yes.

14 Q.  What is that?

15 A.  This is a transcript of NT 48.

16 Q.  Did you review that?

17 A.  Yes.

18 Q.  Is that a true and accurate transcript of what is captured

19 in Government's Exhibit 308?

20 A.  Yes, it is.

21 Q.  Turning to that last series, if you could just stay with

22 that, 300 -- I believe it's 314.

23 A.  Yes.

24 Q.  Looking at Government's 314, do you recognize that?

25 A.  Yes.

1 Q.  And what is that?

2 A.  This is a copy of the audio, the body wire NT 71 from

3 1/26/01.

4 Q.  Do you recognize -- did you participate in that controlled

5 purchase?

6 A.  Yes.

7 Q.  And you said NT 71.  I'm sorry, from what date is that?

8 A.  1/26 of '01.

9 Q.  And who was the cooperating witness who participated in

10 that?

11 A.  Gail Parson.

12 Q.  And is that a true and accurate recording of what was

13 captured on Ms. Parson's wire on that date?

14 A.  Yes.

15        MS. PETALAS:  Your Honor, at this time I move

16 Government's Exhibit 314 into evidence.

17        THE COURT:  Without objection, 314 is received.

18        (GOVERNMENT Exhibit 314 was moved into evidence.)

19 BY MS. PETALAS:

20 Q.  Turning to 314.1, do you have that?

21 A.  Yes.

22 Q.  Do you recognize that?

23 A.  Yes.

24 Q.  What is that?

25 A.  This is an abridged version of NT 71 from 1/26/01.

Page 421

1 Q.  Did you review that?

2 A.  Yes, I did.

3 Q.  Is that a true and accurate abridged version of 314?

4 A.  Yes.

5       MS. PETALAS:  Your Honor, at this time I move

6 Government's Exhibit 314.1 into evidence.

7       THE COURT:  Without objection, it's received.

8       (GOVERNMENT Exhibit 314.1 was moved into evidence.)

9 BY MS. PETALAS:

10 Q.  Finally looking at 314.T.  Do you recognize that?

11 A.  Yes.

12 Q.  And what is that?

13 A.  Again, it's the transcript of NT 71.

14 Q.  And did you review that?

15 A.  I did.  Although I have to state, I have the same concern

16 that I have with the one that you handed me for the

17 December 19th of '01 version.  I'm not sure if the one you

18 handed me for that one was the final version, and I actually

19 cannot say that this is the final version.

20       MS. PETALAS:  May I approach, Your Honor?

21       THE COURT:  Yes.

22 BY MS. PETALAS:

23 Q.  Looking at -- Court's indulgence.

24       MS. PETALAS:  I'm showing defense counsel Government's

25 Exhibits 301, 303, and 312.

1          May I approach, Your Honor?

2          THE COURT:  Yes.

3 BY MS. PETALAS:

4 Q.  Agent Lockhart, looking at Government's Exhibit 301, do you

5 recognize that?

6 A.  Yes.

7 Q.  And what is that?

8 A.  This is an audio CD of the body wire worn on May 25th, 2000,

9 NT 22.

10 Q.  And who was the cooperating witness in that controlled

11 purchase?

12 A.  Sandra White.

13 Q.  Did you participate in that controlled purchase?

14 A.  Yes.

15 Q.  Did you review Government's Exhibit 301?

16 A.  Yes, I did.

17 Q.  Is that a true and accurate recording of what was captured

18 on Ms. White's body wire on that date?

19 A.  Yes.

20 Q.  Looking at Government's Exhibit --

21          MS. PETALAS:  Your Honor, at this time I move

22 Government's Exhibit 301 into evidence.

23          THE COURT:  Without objection, it's received.

24          (GOVERNMENT Exhibit 301 was moved into evidence.)

25 BY MS. PETALAS:

Page 423

1 Q.  Turning to Government's Exhibit 301.1, do you recognize

2 that?

3 A.  Yes.

4 Q.  And what is that?

5 A.  This is an abridged version of NT 22.

6 Q.  And did you review that and compare that with Government's

7 Exhibit 301?

8 A.  Yes.

9 Q.  Is that true and accurate?

10 A.  Yes.

11        MS. PETALAS:  At this time I move Government's

12 Exhibit 301.1 into evidence.

13        THE COURT:  Without objection, it's received.

14        (GOVERNMENT Exhibit 301.1 was moved into evidence.)

15 BY MS. PETALAS:

16 Q.  Looking at Government's Exhibit 301.2, do you recognize

17 that -- 301.T.  I'm sorry.

18 A.  Yes.

19 Q.  What is that?

20 A.  It's a transcript of NT 22.

21 Q.  Did you review that transcript?

22 A.  Yes.

23 Q.  Did you compare it with NT 22?

24 A.  Yes.

25 Q.  Is it a fair and accurate transcript?

Page 424

1 A.  Yes.

2 Q.  Directing your attention to Government's Exhibit 303.

3 A.  Okay.

4 Q.  Do you recognize that?

5 A.  Yes.

6 Q.  And what is that?

7 A.  This is NT 27, controlled purchase, the body wire worn on

8 June 28th, 2000.

9 Q.  Did you participate in that controlled purchase?

10 A.  Yes.

11 Q.  And who was the cooperating witness?

12 A.  Again, Sandra White.

13 Q.  Did you review that CD, Government's Exhibit 303?

14 A.  Yes.

15 Q.  Is that a true and accurate recording of what was captured

16 on Ms. White's body wire that day?

17 A.  Yes.

18      MS. PETALAS:  Your Honor, at this time I move

19 Government's Exhibit 303 into evidence.

20      THE COURT:  Without objection, it's received.

21      (GOVERNMENT Exhibit 303 was moved into evidence.)

22 BY MS. PETALAS:

23 Q.  Turning to Government's 303.1, did you review that?  Do you

24 recognize that?

25 A.  Yes.

Page 425

1 Q.  And what is that?

2 A.  It's an abridged version of NT 27.

3 Q.  Is that a true and accurate abridged version?

4 A.  Yes.

5        MS. PETALAS:  Your Honor, at this time I move

6 Government's Exhibit 303.1 into evidence.

7        THE COURT:  Without objection, it's received.

8        (GOVERNMENT Exhibit 303.1 was moved into evidence.)

9 BY MS. PETALAS:

10 Q.  Turning to 303.T, do you recognize that?

11 A.  Yes.

12 Q.  And what is that?

13 A.  This is a transcript of NT 27.

14 Q.  Did you review that?

15 A.  Yes.

16 Q.  Is that a true and accurate transcript of what is recorded

17 on NT 27?

18 A.  Yes, it is.

19 Q.  Turning to Government's Exhibit 308, do you recognize that?

20 A.  I don't have 308.

21 Q.  I'm sorry, I already did 308.

22        Turning to Government's Exhibit 312, do you have that?

23 A.  Yes.

24 Q.  And what is Government's Exhibit 312?

25 A.  It's NT 69, an audio CD from the body wire on January 24th,

1 '01.

2 Q.  And who was the cooperating witness for that?

3 A.  It was Season Wood.

4 Q.  Did you participate in that?

5 A.  Yes.  I was the handling agent.

6 Q.  NT 69, is that true and accurate?

7 A.  Yes.

8        MS. PETALAS:  Your Honor, at this time I move

9 Government's Exhibit 312 into evidence.

10       THE COURT:  Without objection, it's received.

11       (GOVERNMENT Exhibit 312 was moved into evidence.)

12 BY MS. PETALAS:

13 Q.  Government's Exhibit 312.1, do you recognize that?

14 A.  Yes.

15 Q.  And what is that?

16 A.  That's an abridged version of NT 69.

17 Q.  Did you review that?

18 A.  Yes, I did.

19 Q.  Is that a true and accurate abridged version?

20 A.  Yes.

21       MS. PETALAS:  Your Honor, at this time I move

22 Government's Exhibit 312.1 into evidence.

23       THE COURT:  Without objection, it's received.

24       (GOVERNMENT Exhibit 312.1 was moved into evidence.)

25 BY MS. PETALAS:

1 Q.  Finally turning to 312.T.  Do you have that?

2 A.  Yes, I do.

3 Q.  What is that?

4 A.  This is a transcript of NT 69.

5 Q.  Did you review that?

6 A.  Yes.

7 Q.  Is that a true and accurate transcript of what was captured

8 on NT 69?

9 A.  Yes.

10 Q.  Directing your attention to February 14th, 2001, did you

11 participate in a controlled purchase on that date?

12 A.  Yes.

13 Q.  And who was the cooperating witness on that?

14 A.  Season Wood.

15          MS. PETALAS:  May I approach, Your Honor?

16          THE COURT:  Yes.

17 BY MS. PETALAS:

18 Q.  I'm showing you what's been marked as Government's

19 Exhibit 315, and 315.1.  Turning to 315, do you recognize that?

20 A.  Yes.

21 Q.  And what is that?

22 A.  This is NT 74.  It's the body wire, a CD, audio CD of the

23 body wire worn by Season Wood.

24          THE COURT:  Which exhibit is that?

25          THE WITNESS:  315, Judge.

1 BY MS. PETALAS:

2 Q.  Is that a true and accurate recording of what was captured

3 on Season Wood's body wire on that day?

4 A.  Yes.

5        MS. PETALAS:  Your Honor, at this time I move

6 Government's Exhibit 315 into evidence.

7        MS. WICKS:  Just my previous objection, Your Honor.

8        THE COURT:  All right.  The objection is overruled and

9 315 is received.

10        (GOVERNMENT Exhibit 315 was moved into evidence.)

11 BY MS. PETALAS:

12 Q.  I'm looking at 315.1.  What is that?

13 A.  This is the abridged version of NT 74 from 2/14/01.

14 Q.  Did you review that?

15 A.  Yes, I did.

16 Q.  Is that a true and accurate abridged version?

17 A.  Yes.

18        MS. PETALAS:  May I approach, Your Honor?

19        THE COURT:  Yes.

20 BY MS. PETALAS:

21 Q.  I'm handing you what's been marked as Government's

22 Exhibit 315.T.  Do you recognize that?

23 A.  Yes.

24 Q.  And what is that?

25 A.  This is the transcript of NT 74.

Page 429

1 Q.  And did you review that and compare that with Government's

2 Exhibit 315?

3 A.  Yes.

4 Q.  Is that a true and accurate transcript?

5 A.  Yes.

6        MS. PETALAS:  Your Honor, I apologize.  I don't recall

7 if I moved 315.1 into evidence.

8        THE COURT:  You did not.

9        MS. PETALAS:  If not, I would do so now.

10        MS. WICKS:  Just my previous objection, Your Honor.

11        THE COURT:  All right.  The objection is overruled and

12 the exhibit is received.

13        (GOVERNMENT Exhibit 315.1 was moved into evidence.)

14 BY MS. PETALAS:

15 Q.  Agent Lockhart, I handed you 315.2 and 315.2T.  Looking at

16 315.2, do you recognize that?

17 A.  Yes.

18 Q.  And what is that?

19 A.  This is a phone call made on 2/14/01 by Season Wood, a phone

20 call labeled T 38.  This is an audio CD of that call.

21 Q.  Were you present for that call?

22 A.  Yes.

23 Q.  And is that a true and accurate recording of that call?

24 A.  Yes.

25        MS. PETALAS:  Your Honor, at this time I move 315.2

Page 430

1 into evidence.

2          MS. WICKS:  No objection.

3          THE COURT:  315.2 will be received.

4          (GOVERNMENT Exhibit 315.2 was moved into evidence.)

5 BY MS. PETALAS:

6 Q.  Agent Lockhart, looking at 315.2T, do you recognize that?

7 A.  Yes.

8 Q.  What is that?

9 A.  This is a transcript of that call, of T 38.

10 Q.  Directing your attention to March 20th, 2001, did you

11 participate in a controlled -- actually, strike that.

12          MS. PETALAS:  May I approach, Your Honor?

13          THE COURT:  Yes.

14 BY MS. PETALAS:

15 Q.  Agent Lockhart, I handed you Government's Exhibit 316.

16 A.  Okay.

17 Q.  Do you recognize that?

18 A.  Yes.

19 Q.  And what is that?

20 A.  It's an audio CD of a body wire from March 20th of '01,

21 NT 84.

22 Q.  And did you participate in that?

23 A.  Again, this is one of the ones I can't say absolutely for

24 certain.  My voice isn't on there and I'm not listed in the 302,

25 but -- likely, but I can't say for certain.

1 Q.   And looking at 316.1, do you recognize that?

2 A.   Yes.

3 Q.   And what is that?

4 A.   This is an abridged version of NT 84.

5 Q.   And is that a true and accurate abridged version of what is

6 contained in 316?

7 A.   Yes.

8 Q.   Looking at 316.T, what is that?

9 A.   This is a transcript of NT 84.

10 Q.   Did you review that?

11 A.   Yes.

12 Q.   Is that a true and accurate transcript of what's contained

13 in NT 84; Government's Exhibit 316?

14 A.   Yes.

15        MS. PETALAS:  May I approach, Your Honor?

16        THE COURT:  Yes.

17 BY MS. PETALAS:

18 Q.   Finally Agent Lockhart I'm showing you what's been marked as

19 Government's Exhibit 317.  Do you recognize that?

20 A.   Yes.

21 Q.   What is that?

22 A.   This is an audio CD of the body wire from April 5th of '01,

23 NT 88.

24 Q.   And did you participate in that controlled buy?

25 A.   Yes, I did.

Page 432

1 Q.  And who was the cooperating witness on that day?

2 A.  Gail Parson.

3 Q.  And is Government's Exhibit 317 a true and accurate

4 recording of what was captured on Ms. Parson's wire on that

5 date?

6 A.  Yes.

7        MS. PETALAS:  Your Honor, at this time I move

8 Government's Exhibit 317 into evidence.

9        THE COURT:  Without objection, it's received.

10       (GOVERNMENT Exhibit 317 was moved into evidence.)

11 BY MS. PETALAS:

12 Q.  Looking at 317.1, do you recognize that?

13 A.  Yes.

14 Q.  And what is that?

15 A.  This is just an abridged version of NT 88.

16 Q.  And did you compare that with Government's Exhibit 317?

17 A.  Yes.

18 Q.  And is that a true and accurate abridged version?

19 A.  Yes.

20       MS. PETALAS:  Your Honor, at this time I move 317.1

21 into evidence.

22       THE COURT:  Without objection, it's received.

23       (GOVERNMENT Exhibit 317.1 was moved into evidence.)

24 BY MS. PETALAS:

25 Q.  Looking at Government's Exhibit 317.T, do you recognize

Page 433

1 that?

2 A.  Yes.

3 Q.  What is that?

4 A.  This is a videotape, a surveillance videotape from the

5 transaction on April 5th of '01.

6 Q.  Is that point T or point V as in Victor?

7 A.  NTV, T as in Tom.

8 Q.  The label, is that 317.T as in Tom or V as in Victor?

9 A.  I'm sorry, the exhibit number is actually 317.V.

10 Q.  Sticking with that, did you participate in the surveillance

11 of that?

12 A.  Yes.  I'm actually the one who shot this video.

13 Q.  Is that a true and accurate recording of the video that was

14 shot on that day?

15 A.  Yes, it is.

16        MS. PETALAS:  Your Honor, at this time I move

17 Government's Exhibit 317.V as in Victor into evidence.

18        THE COURT:  Without objection, it's received.

19        (GOVERNMENT Exhibit 317.V moved into evidence.)

20 BY MS. PETALAS:

21 Q.  Turning finally to 317.T, do you recognize that?

22 A.  Yes.

23 Q.  And what is that?

24 A.  This is a transcript of NT 88.

25 Q.  And did you review that and compare that with NT 88?

Page 434

1 A.  Yes.

2 Q.  Is that a true and accurate transcript?

3 A.  Yes.

4 Q.  Going back to Government's Exhibit 308, directing your

5 attention back to October 17th, 2000, you previously talked

6 about a controlled purchase that was made on that date.  Is that

7 correct?

8 A.  That's correct.

9 Q.  And you participated in that controlled purchase?

10 A.  Yes.

11 Q.  Agent Lockhart, we're not going to play for you each and

12 every one of these controlled purchases through you, but

13 directing your attention just to that date, if you could --

14      MS. PETALAS:  Your Honor, Government's Exhibit 308 is

15 in evidence.  We propose to play -- as well as Government's

16 Exhibit 308.1.  At this time I would like to publish it to the

17 jury, if we may hand out --

18      MS. WICKS:  Objection at this point, Your Honor.

19      THE COURT:  If you may hand out what?

20      MS. PETALAS:  I'm sorry, the headphones.

21      MS. WICKS:  I think we would join the objection.

22      MR. ZUCKER:  We may or may not.  But I think we

23 probably need to still approach to clarify.

24      THE COURT:  You probably should what?

25      MR. ZUCKER:  Approach to clarify.

# Tab 2

09:33AM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : February 27, 2007 |
| DOMINIC SAMUEL, | : 9:20 a.m. |
| Defendants. | : |

VOLUME 8 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
Glenn Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney,
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant          CARNEY & CARNEY
Antwuan Ball:          John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

---

*503*

APPEARANCES (Cont.)

For Defendant          TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:          TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 Pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant          LAW OFFICE OF JENIFER WICKS
David Wilson:          Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant          LAW OFFICE OF JAMES W. BEANE
Gregory Bell:          James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant          LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:      Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant          LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:          Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

---

*504*

APPEARANCES (Cont.)

For Defendant          LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:       A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:        Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

*505*

1    TUESDAY MORNING SESSION, FEBRUARY 27, 2007

2        THE DEPUTY CLERK:  Criminal Case 05-100, *United States*

3    *versus Antwuan Ball, David Wilson, Gregory Bell, Desmond*

4    *Thurston, Joseph Jones Dominic Samuels.*  For the government,

5    Mr. Leon, Ms. Petalas and Mr. Guerrero; for defendants,

6    Mr. Carney, Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker,

7    Mr. Martin, Mr. Balarezo and Mr. Purpura.

8        THE COURT:  All right.  Good morning.

9        Mr. Leon, let me hear from you.

10       Mr. Leon, are you prepared to proceed on the subpoena

11   matter?

12       MR. LEON:  Yes, Your Honor, we could, if that's something

13   the Court would prefer to do in open court.

14       THE COURT:  As opposed to what?

15       MR. LEON:  Without the defendants and --

16       THE COURT:  The defendants are not here and --

17       MR. LEON:  Okay.  It would be our preference -- I'm trying

18   to think if I have a basis, but it would be our preference to do

19   it without the defense attorneys present because I do think that

20   some of the reasons some of these --

21       Can I make representations at the bench first and then --

22       THE COURT:  All right.  Any objection to that?

23       MS. WICKS:  I'm not sure what he's talking about.

24       MR. BALAREZO:  Your Honor, what is this concerning?  I'm

25   just a little lost as to what this is all about so I can't object

514

1  permission of the Court first?

2      THE COURT: You can do it once at the beginning of each

3  witness's testimony and that's enough.

4      MR. PURPURA: Thank you, Your Honor.

5      (Jury in at 9:49 a.m.)

6      THE COURT: Good morning, ladies and gentlemen.

7      THE JURY: Good morning.

8      THE COURT: It's good to have all of you back. It's good

9  to see you and I hope you enjoyed your evening and survived the

10  snow.

11      We're ready to resume. Counsel.

12      MS. PETALAS: Thank you, Your Honor.

13      The United States calls Agent Lockhart to the stand.

14      THE COURT: I'll remind you you're still under oath.

15      THE WITNESS: Good morning.

16      CONTINUED DIRECT EXAMINATION OF ROBERT LOCKHART

17  BY MS. PETALAS:

18  Q.    Would you please state your name again for the record.

19  A.    Yes. Again, I'm Robert, middle initially is C, last name

20  is Lockhart, L-O-C-K-H-A-R-T.

21  Q.    Before we broke on Thursday, we were discussing a

22  controlled purchase on October 17th, 2000. Do you recall that?

23  A.    Yes.

24  Q.    And did you participate in that search -- I mean that

25  controlled purchase?

515

1  A.    Yes, I did.

2      MS. PETALAS: And, Your Honor, at this time we would like

3  to play the tape of that controlled purchase. If I could

4  instruct the jurors, the headphones have been handed out. You

5  can just --

6      THE COURT: Have Ms. Romero give them the instructions if

7  they need further instructions.

8      MS. PETALAS: Yes, Your Honor.

9      (Discussion had off the record.)

10      THE COURT: Ladies and gentlemen, let me give you one

11  instruction. Videotaped recordings of conversations identified

12  by witnesses have been received in evidence. Transcripts of

13  these tape-recorded conversations are being furnished to you on

14  the screen for your convenience and guidance as you listen to the

15  tapes to clarify portions of the tape which may be difficult to

16  hear and to help you identify speakers. The transcripts are not

17  themselves evidence. If you perceive any variation between the

18  transcript and the audible sounds on the tapes, you must be

19  guided solely by the audible sounds on the tapes and not by the

20  transcripts. If you cannot, for example, determine from the

21  audio recording that particular words were spoken or if you

22  cannot determine from the audio recording who said a particular

23  word or words, then you must disregard the transcript insofar as

24  those words and that speaker are concerned.

25      All right. Counsel.

516

1      (Audiotape played.)

2  BY MS. PETALAS:

3  Q.    Agent Lockhart, just for the record, when we heard that

4  tape back, was this -- is this the entire tape now or is this

5  redacted parts of the tape?

6  A.    This is an abridged version. It's not the entire tape.

7  It's cut down into portions because the tape obviously -- the

8  original stays on from start to finish.

9  Q.    And so was there a period of time from when we heard

10  Ms. White get out of the car until the time she met up with this

11  individual identified as Munya?

12  A.    Exactly. You heard initially, it was Agent Burton you

13  heard on the tape. And then you could actually hear our vehicle

14  driving, the engine revving as we were driving into the area and

15  we would have dropped her off somewhere nearby and she would

16  have walked into the area. And I believe the next time on the

17  tape is when she actually starts a conversation with Bobby

18  Capies, also known as Munya.

19      THE COURT: Let me ask Ms. Petalas to identify the exhibit

20  number that you have been playing.

21      MS. PETALAS: Yes, Your Honor. This is 308.1.

22  BY MS. PETALAS:

23  Q.    And just for the record, I believe earlier you testified

24  last week you compared 308.1 with 308?

25  A.    Yes.

517

1  Q.    And what was 308?

2  A.    308 is the full version. And what we're hearing hear is

3  the abridged or -- these are portions of that full, original

4  tape.

5      (Audiotape played.)

6  BY MS. PETALAS:

7  Q.    And, Agent Lockhart, in the course of your observations,

8  did you ever witness -- did you ever see David Wilson with a

9  dog?

10  A.    Yes.

11  Q.    What kind of dog was that?

12  A.    It's a white pit bull.

13  Q.    Do you know the name of that dog?

14  A.    Psycho.

15  Q.    Also are you familiar with where David Wilson resided at

16  the time of this controlled purchase?

17  A.    Yes.

18  Q.    Where was that?

19      MS. WICKS: Objection, Your Honor.

20      THE COURT: Basis?

21      MS. WICKS: Hearsay.

22      THE COURT: If you know, you may answer.

23      THE WITNESS: I know that David Wilson was living in what

24  we called the Rental Office or now the Old Rental Office of 1313

25  Congress Street on the third floor, living with Dominique

1  Thurston, Desmond Thurston's sister.
2    (Audiotape played.)
3  BY MS. PETALAS:
4  Q.   Agent Lockhart, for the record, what we're listening to
5  now, is that directly after -- what is this portion of the tape?
6  A.   This is outside, after the cooperating witness has left
7  David Wilson's apartment after making the purchase and is now
8  outside, heading back to meet with us, with the agents.
9    (Audiotape played.)
10 BY MS. PETALAS:
11 Q.   Agent Lockhart, are you familiar with the individual that
12 she was talking to in that portion of the tape?
13 A.   Yes.
14 Q.   And who is that?
15 A.   That's Burke Johnson.
16 Q.   How are you familiar with him?
17 A.   He was arrested as part of this case and I've spoken to
18 him on numerous occasions.
19   (Audiotape played.)
20 BY MS. PETALAS:
21 Q.   Agent Lockhart, we just listened to that portion of the
22 tape.  What is that portion?
23 A.   That's just when the cooperating witness has met back
24 with us in our vehicle and that's Agent Burton putting up what
25 we call just a post-amble, giving the time, basically ending the

1  transaction.  And that's when we would take possession of any of
2  the drugs purchased, turn off the recorders, turn off the
3  transmitter.  The CW would be searched.  If any money was left
4  unspent, we'll take that back and then we'll just do a quick
5  debrief of what just happened.
6  Q.   Okay.  And you said that's what we would do.  Is that
7  what you did on this occasion?
8  A.   That's what we did on this occasion, yes.
9  Q.   And the cooperator -- who was the cooperator in this
10 occasion?
11 A.   Sandra White.
12 Q.   And how are you familiar with Sandra White?
13 A.   She's been a cooperating witness since early in the
14 investigation so I know her quite well.
15 Q.   And earlier you were talking about different types of
16 informants.  What kind of informant was Sandra White?
17 A.   She's a cooperating witness.
18 Q.   What do you mean by that?
19 A.   Basically, as we just heard here, she was willing to wear
20 a wire and do proactive things where, obviously, the chance of
21 her identity would be revealed, which, of course, it has been,
22 and of course there's the potential that she's going to have to
23 testify, which she will do in this case.
24 Q.   You said that Ms. White then returned to your vehicle
25 after that, after the purchase?

---

*520*

1  A.   Yes.
2  Q.   And what happened when Ms. White came to your vehicle?
3  A.   She was again -- she turned over the drugs, the crack
4  cocaine she had purchased or suspected crack cocaine she had
5  purchased.  She was searched.  We turned off the body recorders
6  and the transmitter and then we just, again, did a quick debrief
7  of what had just occurred.
8      But again, you just kind of go over it because we've been
9  listening in and we can hear what's happening, but you just
10 basically go over what you just heard.
11 Q.   When she handed over the drugs to you, did she identify
12 where she had gotten those drugs from?
13 A.   Yes.
14 Q.   Who did she identify that she had gotten the drugs from?
15   MS. WICKS:  Objection.
16   THE COURT:  Sustained.
17 BY MS. PETALAS:
18 Q.   After listening in -- you also talked about how you were
19 listening in.  Were you able to identify by listening in who she
20 had gotten those drugs from?
21   MS. WICKS:  Objection.
22   MR. ZUCKER:  Ability to draw an inference.
23   THE COURT:  Why don't you bring out the foundation before
24 the answer is given, if there is one.
25 BY MS. PETALAS:

---

*521*

1  Q.   Were you able -- were you listening in to that
2  conversation as it took place?
3  A.   Yes.
4  Q.   And listening to that conversation, were you able to hear
5  who she obtained the drugs from?
6    MS. WICKS:  Objection.
7    MR. ZUCKER:  Objection.
8    THE COURT:  Get a little bit more into the foundation.
9  BY MS. PETALAS:
10 Q.   And as you were listening in, did she identify who she
11 was talking to when you heard her -- were you able to hear a
12 transaction take place?
13   MS. WICKS:  Objection.
14   MR. ZUCKER:  Objection.
15   THE COURT:  "Were you able to hear"?  Was that the
16 question.
17   MR. ZUCKER:  No.  "Were you able to hear the transaction
18 take place" was the question.  We're not challenging that he was
19 able to hear the conversation.  It's the last point.
20   THE COURT:  I'll let you answer if you were able to hear
21 over the receiver that you had at the time that Ms. White was
22 inside the building.
23   THE WITNESS:  From what I recall, Judge, yes, we were able
24 to hear.  That's --
25   MS. PETALAS:  Your Honor, may we approach?

542

1   **Q.**   Now, Agent Lockhart, I'm showing you what's been marked
2   as Government's Exhibit 308.2, 308.2A, and 308.6.  Do you
3   recognize that?
4   **A.**   Which one?
5   **Q.**   Looking at 308.2A, do you recognize that?
6   **A.**   Yes, I do.
7   **Q.**   And what is that?
8   **A.**   This is the D.E.A.-7 for one of these two drug exhibits,
9   D.E.A. Exhibit 67.
10  **Q.**   You say D.E.A. Exhibit Number 67.  What is that D.E.A.
11  exhibit number?  Where does that come from?
12  **A.**   Basically, in a case like this, we keep a log starting at
13  number 1 and then throughout the case, we'll, in sequential
14  order as we have drug exhibits that are seized, regardless of
15  what it may be -- suspected crack cocaine, cocaine, marijuana,
16  whatever it may be, but we will keep a log, and actually on the
17  label itself when we seal the drugs, we'll put that number down
18  there.  There will also be the same number that will go in the
19  D.E.A. exhibit -- go on the actual D.E.A.-7 -- D.E.A.-7 -- I'm
20  sorry -- which is this form.  And it's also when we submit the
21  paperwork into our internal system, it just basically helps keep
22  track of the item.
23  **Q.**   So is that a number that the FBI assigns or the D.E.A.
24  assigns?
25  **A.**   It's a number we assign and then the D.E.A. -- again,

543

1   because we put it onto the exhibit label, they then will pick up
2   and, on their paperwork, will refer to it as that exhibit number
3   that we've assigned it.
4   **Q.**   And is that a unique number?  Do you assign that --
5   **A.**   It's a unique number to that particular exhibit.
6   **Q.**   And turning to 308.2, do you recognize that?
7   **A.**   Yes.
8   **Q.**   And what is that?
9   **A.**   This is the actual crack cocaine and then the bag that it
10  was in, in a separate heat seal bag that would have come back
11  from our fingerprint lab, the FBI fingerprint lab.
12  **Q.**   Okay.  And you said that's the bag of crack cocaine.  Is
13  that in the same form as it was when you took that picture back
14  on October 17th?
15  **A.**   No.  Again, as I stated, it's inside of a smaller bag and
16  it's been crushed down as part of their analysis process.
17  **Q.**   And you said the bag is separate.  Explain that.
18  **A.**   What we'll do when we prepare -- when we ask the D.E.A.
19  to analyze our drugs, we will put in the request -- in fact, it
20  says right here on the form:  "Please conduct qualitative and
21  quantitative tests on items submitted and forward packaging
22  material for examination to the FBI fingerprint laboratory."
23       And that's our standard language that we use if there is
24  packaging.  If a drug exhibit happens to just be a loose item
25  and there's no packaging at all, then there's nothing really to

544

1   be printed.  But the standard, normally it's in some type of
2   container, in this case like a plastic baggy.  So what we'll do,
3   when we prepare the D.E.A.-7, the drugs are taken to the lab;
4   the D.E.A. will analyze the drugs themselves and at a later
5   date, we will pick those drugs back up.  And what happens is the
6   packaging then has been forwarded to the FBI lab for fingerprint
7   analysis and it will come back at a later date.  And then it is,
8   based upon the lab numbers matching up, it is married up or
9   matched up with the original drugs.  And that's why there are
10  now two heat seal bags here.
11  **Q.**   And just to be clear, who is it that separates the
12  packaging?  Is that the FBI or is that done at the D.E.A., for
13  fingerprints?
14  **A.**   The D.E.A. chemists do that.  And then the FBI
15  fingerprint analyst is the one who does any print work.
16  **Q.**   Turning to Government's Exhibit 308.6, do you recognize
17  that?
18  **A.**   Yes.
19  **Q.**   And what is that?
20  **A.**   These are the two zips and the crack cocaine that was
21  inside of those.  Again, it's crushed down.  It's not in the
22  original form.
23  **Q.**   Agent Lockhart, last week we discussed some controlled
24  purchases that you participated in.  I'm just going to ask about
25  a few more controlled purchases.

545

1        Did you participate in a controlled purchase on
2   August 30th, 2000?
3   **A.**   Again, I believe that was one of the ones that we
4   referred to that my name is not on the paperwork and I can't
5   hear my voice on the tape, so --
6   **Q.**   And as case agent, did you review an audiotape of a
7   controlled purchase on October 30th, 2000?
8   **A.**   August 30th?
9   **Q.**   August 30th, 2000.
10  **A.**   Yes, I did.
11       MS. PETALAS:  Your Honor, may I approach.
12  BY MS. PETALAS:
13  **Q.**   I'm handing you Government's Exhibit 307, 307.1 and
14  307.T.  Do you recognize those?
15  **A.**   Yes.
16  **Q.**   And what is that.  Starting with 307, what is that?
17  **A.**   307 is an abridged or cut-down version of NT-37, the
18  transaction on 8-30-2000.
19  **Q.**   I'm sorry.  Is that 307 or 307.1?
20  **A.**   That's 307.
21  **Q.**   And what is, then, 307.1?
22  **A.**   307.1 is the full version of NT-37.
23  **Q.**   Did you compare 307, the abridged version, with 307.1,
24  the full version?
25  **A.**   Yes.

*546*

1   Q.   And is everything in 307 included in 307.1?

2   A.   Yes.

3   Q.   And did you review the -- looking at 307.T, what is that?

4   A.   This is a transcript of NT-37.

5   Q.   And did you compare that transcript to NT-37?

6   A.   Yes.

7   Q.   And was that a fair and accurate transcript of NT-37?

8   A.   Yes.

9   Q.   Agent Lockhart, I'm handing you what's been marked as

10  Government's Exhibit 313, 313.1, and 313.T.  Do you recognize

11  that?

12  A.   Yes.

13  Q.   And I'm sorry.  Starting with 313, what is that?

14  A.   313 is a full version of NT-70, which is a tape from

15  1-26-01.

16  Q.   And did you participate in that controlled purchase on

17  that date or attempted controlled purchase on that date?

18  A.   Yes.  I --

19       MS. WICKS:  Your Honor, I think we already discussed this

20  and this is in evidence.  I believe we already discussed these

21  exhibits on Thursday.

22       MS. PETALAS:  Your Honor, my records show it's not in.  If

23  the Court's records are contrary, then --

24       MS. WICKS:  They were marked with this witness on the

25  22nd.

*547*

1        THE COURT:  No, I don't have that.

2   You may proceed.

3   BY MS. PETALAS:

4   Q.   And did you participate in an attempt controlled purchase

5   on that date, January 26th, 2001?

6   A.   Yes.  I was the handling agent, yes.

7   Q.   And looking at Government's Exhibit 313, did you review

8   that?

9   A.   Yes, I did.

10  Q.   Is that a true and accurate recording of that attempt to

11  purchase on January 26th, 2001?

12  A.   Yes.

13       MS. PETALAS:  Your Honor, at this time I move Government's

14  Exhibit 313 into evidence.

15       MS. WICKS:  Just my previous objection, Your Honor.

16       THE COURT:  Well, approach, please.

17       (Following sidebar discussion had on the record:)

18       THE COURT:  What was your previous objection?  I don't

19  know that you had one.

20       MS. WICKS:  It's the objection that I filed in my motion

21  last Monday or Tuesday that had to do with the hearsay and the

22  relevant portions of those tapes.  These are the purchases with

23  Mr. Wood, who spends a lot of time talking about unidentified

24  people about irrelevant things.

25       THE COURT:  All right.  I'm not sure -- this was -- you

*548*

1   raised this when?  In a written motion or --

2        MS. WICKS:  It was a written motion that I filed

3   electronically either Monday or Tuesday of last week.  We

4   discussed it at the bench last week.  It pertains to both -- I

5   have an objection; I don't think Mr. Ball's lawyer does, but to

6   the tapes pertaining to Season Wood regarding the alleged

7   transactions with Mr. Ball and Mr. Wilson.

8        THE COURT:  I purported to rule at that point?

9        MS. WICKS:  Yes, Your Honor.

10       THE COURT:  On a particular exhibit?

11       MS. WICKS:  You denied my motion, but I'm just raising it

12  for each exhibit for the record.

13       THE COURT:  Okay.  But when you raised the motion, was

14  your motion directed toward a particular exhibit?

15       MS. WICKS:  Yes, Your Honor.  My motion put the NT numbers

16  because I didn't yet have the Government's Exhibit list.

17       THE COURT:  All right.

18       (Sidebar discussion concluded.)

19       THE COURT:  Exhibit 313 will be received.

20       (Government's Exhibit 313 admitted into the record.)

21  BY MS. PETALAS:

22  Q.   And looking at Government's Exhibit 313.1, do you

23  recognize that?

24  A.   Yes, I do.

25  Q.   And what is that?

*549*

1   A.   This is an abridged version of NT-70.

2   Q.   Did you compare 313.1 to Government's Exhibit 313?

3   A.   Yes.

4   Q.   Is 313.1 a true and accurate abridgement of 313?

5   A.   Yes.

6        MS. PETALAS:  Your Honor, at this time I move 313.1 into

7   evidence.

8        MS. WICKS:  Just the previous objection.

9        THE COURT:  All right.  That will be overruled and 313.1

10  will be received.

11       (Government's Exhibit 313.1 admitted into the record.)

12  BY MS. PETALAS:

13  Q.   And looking at Government's Exhibit 313.T, do you see

14  that?

15  A.   Yes.

16  Q.   And what is that?

17  A.   It's a transcript of NT-70.

18  Q.   And did you review that transcript?

19  A.   Yes.

20  Q.   Is that a true and accurate transcript of NT-70?

21  A.   Yes.

22  Q.   And, Agent Lockhart, turning to Government's Exhibit 318,

23  do you have that?

24  A.   Yes.

25  Q.   And what is that?

*550*

1  **A.**   This is an original CD of a transaction NT-92 from
2  April 26th, '01.
3  **Q.**   And did you review that?
4  **A.**   Yes.
5  **Q.**   You said it's a CD of a controlled purchase on April 26th
6  of '01?
7  **A.**   That's correct.
8  **Q.**   Did you participate in that controlled purchase?
9  **A.**   Yes.
10  **Q.**   And after reviewing Government's Exhibit 318, is that a
11  true and accurate recording of what was depicted on the wire on
12  that day?
13  **A.**   Yes.
14        MS. PETALAS:  Your Honor, at this time I move Government's
15  Exhibit 318 into evidence.
16        THE COURT:  All right.  Without objection, 318 is
17  received.
18        (Government's Exhibit 318 admitted into the record.)
19  BY MS. PETALAS:
20  **Q.**   Turning to Government's Exhibit 318.V, do you have that?
21  **A.**   Yes.
22  **Q.**   And what is that?
23  **A.**   This is a surveillance or a CD of a surveillance
24  videotape that was shot that day.
25  **Q.**   Did you did you review that surveillance video?

*551*

1  **A.**   Yes.
2  **Q.**   Is that a true and accurate depiction of what was
3  captured on that day?
4  **A.**   Yes, it is.
5        MS. PETALAS:  Your Honor, at this time I move Exhibit
6  318.V as in Victor into evidence
7        THE COURT:  All right.  318.V is received.
8        (Government's Exhibit 318.V admitted into the record.)
9  BY MS. PETALAS:
10  **Q.**   Looking at 318.T as in Tom, do you have that?
11  **A.**   Yes, I do.
12  **Q.**   What is that?
13  **A.**   It's a transcript of NT-92.
14  **Q.**   And did you review that transcript?
15  **A.**   Yes, I did.
16  **Q.**   Is that a fair and accurate transcript of what appears on
17  NT-92?
18  **A.**   Yes.  Yes, it is.
19        MS. PETALAS:  May I approach, Your Honor?
20        THE COURT:  Yes.
21  BY MS. PETALAS:
22  **Q.**   Agent Lockhart, I've handed you Government's Exhibit 324.
23  Do you recognize that?
24  **A.**   Yes.
25  **Q.**   And what is that?

*552*

1  **A.**   This is NT-186.  It's an audio of a controlled drug
2  purchase on October 4th of '04.
3  **Q.**   Did you participate in that controlled purchase?
4  **A.**   Yes, I did.
5  **Q.**   Did you review Government's Exhibit 324?
6  **A.**   Yes.
7  **Q.**   Is that a true and accurate recording of what was
8  captured on the wire on that date?
9  **A.**   Yes.
10        MS. PETALAS:  Your Honor, at this time I move Government's
11  Exhibit 324 into evidence.
12        THE COURT:  Without objection, 324 is received.
13        (Government's Exhibit 324 admitted into the record.)
14  BY MS. PETALAS:
15  **Q.**   Turning to Government's Exhibit 324.1, do you recognize
16  that?
17  **A.**   Yes, I do.
18  **Q.**   And what is that?
19  **A.**   It is an abridged version of NT-186.
20  **Q.**   And did you review Government's Exhibit 324.1 and compare
21  it with 324?
22  **A.**   Yes.
23  **Q.**   Is that a true and accurate abridged version of 324?
24  **A.**   Yes, it is.
25        MS. PETALAS:  Your Honor, at this time I move Government's

*553*

1  Exhibit 324.1 into evidence.
2        THE COURT:  Without objection, that's received.
3        (Government's Exhibit 324.1 admitted into the record.)
4  BY MS. PETALAS:
5  **Q.**   Turning to Government's Exhibit 324.T as in Tom, do you
6  recognize that?
7  **A.**   Yes, I do.
8  **Q.**   And what is that?
9  **A.**   This is a transcript of NT-186.
10  **Q.**   And did you review that transcript?
11  **A.**   Yes, I did.
12  **Q.**   Was that a true and accurate transcript of Government's
13  Exhibit 324?
14  **A.**   Yes.
15  **Q.**   Finally turning to Government's Exhibit 325, do you
16  recognize that?
17  **A.**   Yes.
18  **Q.**   And what is that?
19  **A.**   This is a CD copy of NT-44, a transaction on 9-26-2000.
20  **Q.**   And did you participate in that transaction?
21  **A.**   Yes.
22  **Q.**   And did you review Government's Exhibit 325?
23  **A.**   Yes, I did.
24  **Q.**   Is that a fair and accurate recording of what was
25  captured during that transaction?

*554*

1  **A.**    Yes.

2        MS. PETALAS:  Your Honor, at this time I move Government's

3  Exhibit 325 into evidence.

4        THE COURT:  Without objection, it's received.

5        (Government's Exhibit 325 admitted into the record.)

6  BY MS. PETALAS:

7  **Q.**    Turning to Government's Exhibit 325.1, do you have that?

8  **A.**    Yes, I do.

9  **Q.**    And what is that?

10 **A.**    This is an abridged version of NT-44.

11 **Q.**    And did you review that?

12 **A.**    Yes, I did.

13 **Q.**    Is that a fair and accurate abridgement of Government's

14 Exhibit 325?

15 **A.**    Yes.

16        MS. PETALAS:  Your Honor, at this time I move Government's

17 Exhibit 325.1 into evidence.

18        THE COURT:  Without objection, it's received.

19        (Government's Exhibit 325.1 admitted into the record.)

20 BY MS. PETALAS:

21 **Q.**    Finally, looking at Government's Exhibit 325.T, do you

22 recognize that?

23 **A.**    Yes, I do.

24 **Q.**    And what is that?

25 **A.**    It's a transcript of NT-44.

---

*555*

1  **Q.**    Did you review that transcript?

2  **A.**    Yes, I did.

3  **Q.**    Is that a true and accurate transcript of what was

4  recorded on Government's Exhibit 325?

5  **A.**    Yes.

6  **Q.**    Agent Lockhart, you've talked about the transcripts that

7  you've reviewed in this case.  When you reviewed those

8  transcripts, were you able to recognize any of the voices on

9  those transcripts?

10 **A.**    On these or on all of the transcripts?

11 **Q.**    Well, let me be more specific.  Were you able to

12 recognize the voice of J. Burton?

13 **A.**    Yes.

14 **Q.**    And how is that?

15 **A.**    I worked with him for several years.

16 **Q.**    How about Kyle Fulmer?

17 **A.**    Same thing.  He was one of my original partners in the

18 case.

19 **Q.**    How about an individual by the name of Phil Wallace?

20 **A.**    Yes.

21 **Q.**    Were you able to recognize his voice?

22 **A.**    Yes.

23 **Q.**    And how is that?

24 **A.**    I've spoken to Mr. Wallace in person.

25 **Q.**    How about an agent Eowan?  Do you recognize his voice?

---

*556*

1  **A.**    Yes.

2  **Q.**    How about -- are you familiar with an individual by the

3  name Bird?

4  **A.**    I know it's the nickname of someone.

5  **Q.**    And who is it a nickname of?

6  **A.**    Aman Ball.

7  **Q.**    How about an individual named JT?

8  **A.**    Yes.

9  **Q.**    Who is that?

10 **A.**    Jacques Powell.

11 **Q.**    Are you familiar with individual name EB?

12 **A.**    Yes.

13 **Q.**    Who's that?

14 **A.**    That's Alphonso Walker.

15 **Q.**    Are you familiar with the voice of an individual named

16 Keith Barnett?

17 **A.**    Yes.

18 **Q.**    And how is that?

19 **A.**    Again, I've spoken to him in person.

20 **Q.**    Are you familiar with an individual -- are you able to

21 recognize the voice of an individual named Gerald Bailey?

22 **A.**    Yes.

23 **Q.**    And how is that?

24 **A.**    Again, I've spoken to him on a number of occasions.

25 **Q.**    Are you familiar with an individual named -- well, a

---

*557*

1  couple named Debra and Earl?

2  **A.**    Yes.

3  **Q.**    Who are Debra and Earl?

4  **A.**    Two cooperating witnesses in this case.

5  **Q.**    And through your investigations, are you familiar with

6  their voice?

7  **A.**    Yes.

8  **Q.**    And how is that?

9  **A.**    Again, they were arrested early on in this case and

10 they've been cooperating witnesses since early on, so I've met

11 with them numerous times.

12 **Q.**    How about an individual -- are you familiar with the

13 voice of Gregory Bell?

14 **A.**    Yes.

15 **Q.**    And how is that?

16 **A.**    Again, I've heard him on tape numerous times and I've

17 also spoken to him personally.

18 **Q.**    Are you familiar with the voice of an individual named

19 Joseph Jones or Joe-Joe?

20 **A.**    Yes.

21 **Q.**    And how is that?

22 **A.**    Again, same thing.  I'm heard him on tape and I've spoken

23 to him in person.

24 **Q.**    How about are you familiar with an individual through the

25 course of your investigation named Red Eye or Big Red Eye?

---

**606**

1   MR. PURPURA: Your Honor, I'll move on. It's my
2   understanding that the government will call Agent Burton.
3   BY MR. PURPURA:
4   Q.   You actually did author some affidavits, didn't you, in
5   this case?
6   A.   Yes, search warrant affidavits.
7   Q.   And that brings us up to 2005; is that correct?
8   A.   Uhm -- regarding?
9   Q.   Did you author search warrants in 2005?
10  A.   Yes.
11  Q.   Thank you. I'm going to show you what has been marked as
12  Samuels 2 and 3.
13       MR. PURPURA: Permission to approach.
14       (Defendant's Exhibit 2 and 3 marked.)
15  BY MR. PURPURA:
16  Q.   The information -- these are two -- strike that.
17       In 2005, you had the opportunity to be the affiant on at
18  least two search warrants for dwellings within the District of
19  Columbia; is that correct, sir?
20  A.   Yes.
21  Q.   Now, when you give information to a judge, you must
22  supply probable cause for the search warrant; is that correct,
23  sir?
24  A.   That's correct.
25  Q.   And the year of these search warrants is 2005; is that

**607**

1   correct, sir?
2   A.   That's correct.
3   Q.   And so by at least 2005, you had your whole historical
4   investigation; you had your information from your subpoenas for
5   cellular phones; you had a Title III wiretap; you had interviews
6   with confidential informants and confidential witnesses; you had
7   literally the vast majority of your investigation completed
8   then; would that be right?
9   A.   Again, the investigation continues even now, so I would
10  say a large portion of it was completed, but it continued after
11  that.
12  Q.   In 2005, you issued a -- requested a subpoena to be
13  issued for -- and you can turn to page 5, please.
14  A.   In which affidavit?
15  Q.   Samuels 2. Now, I'm going to ask you a specific
16  question. You issued -- or you requested by way of an
17  affidavit, that 10 locations within the District of Columbia be
18  searched; is that correct?
19  A.   That's correct.
20  Q.   And in your affidavit marked Samuels 3, also in 2005,
21  you've listed two more locations within the District of Columbia
22  to be searched; is that correct? It's on page 5.
23  A.   Yes.
24  Q.   That's a total of 12 locations; is that correct?
25  A.   Yes.

**608**

1   Q.   Now, based on your investigation to date in 2005, those
2   12 locations to be searched were not Dominic Samuels' residence;
3   is that correct?
4   A.   That's correct.
5   Q.   In 2005, did you know where Dominic Samuels was living?
6   A.   I know we learned at some point that he was down in
7   Virginia. I don't know at this time that we knew exactly where
8   he was living.
9   Q.   Based on your investigation as the then case agent, do
10  you have any recollection or any information as to when Dominic
11  Samuels moved down to Virginia?
12  A.   No, I'm not aware of when he moved.
13  Q.   Now, as part of your investigation, you indicated there
14  were numerous sales in the Congress Park area; is that correct?
15  Q.   Obviously, based on your experience and your
16  investigation, there is money to be made from the sale of
17  illegal drugs; is that correct?
18  
19  A.   Yes.
20  Q.   As a matter of fact -- strike that.
21       Do you have a background in accounting?
22  A.   Yes.
23  Q.   So is it fair to say that in an investigation that, at
24  times, assets can play a part in the investigation?
25  A.   I guess that would be fair to say.

**609**

1   Q.   And is it also fair to say you indicated -- at least it
2   was your thought, that based on your information received, that
3   a person -- people were making $2,000 a day in sales in
4   Congress Park, hand-to-hand sales?
5   A.   There were a lot of sales being made, if that's what
6   you're asking.
7   Q.   I'm asking you specifically, based on your investigation
8   as the case agent, did you opine, come to the opinion that
9   people were making upwards of $2,000 a day selling drugs in
10  Congress Park?
11  A.   They were making various amounts. In some cases, yes,
12  they were making, I think, in the thousands of dollars.
13  Q.   And that's based on your investigation, right?
14  A.   Yes.
15  Q.   Now, if a person was making a -- and I believe you've
16  actually told the grand jury that you had information of people
17  making 2000 plus a day.
18  A.   Again, based on what some of our cooperating witnesses
19  have told us, yes.
20  Q.   Did you ever crunch the numbers on this at all. If
21  someone is making $1,000, and let's say they work five days a
22  week, because you take off Saturday and Sunday, and they work 50
23  weeks out of the year, because you need two weeks for a
24  vacation, you'd have approximately 250 days?
25       MS. PETALAS: Objection, Your Honor. It assumes facts not

**610**

1  in evidence. He's asking a hypothetical.
2      MR. PURPURA: I am asking a hypothetical.
3      THE COURT: Sustained.
4  BY MR. PURPURA:
5  **Q.** All right. Were people out there, based on your
6  information, your investigation, selling drugs on a daily basis?
7  **A.** I would say yes, there were people selling drugs in
8  Congress Park on a daily basis.
9  **Q.** And that's not only what you said here, you said that at
10  the United States grand jury, right?
11  **A.** I probably did, yes.
12  **Q.** And you also said it here and to the United States grand
13  jury that people were making upwards of $2,000 a day, correct?
14  **A.** Again, certain individuals at certain times, from what
15  our cooperating witnesses have told us, have made that kind of
16  money.
17  **Q.** One of the ways, as an investigator, to verify the
18  information, is to look at the person's assets, right?
19  **A.** That would be one thing to do.
20  **Q.** If you're getting $2,000 a day and you're working --
21  strike that, we'll make a better basis.
22      Did they shut down Congress Park Saturday and especially
23  Sundays, the whole day?
24  **A.** Shut it down for what?
25  **Q.** Selling drugs?

**611**

1  **A.** I don't believe so.
2  **Q.** Drugs were sold in Congress Park 24/7, right?
3  **A.** That's probably a fair statement.
4  **Q.** Now, if a person is making $1,000 a day and they're
5  working five days a week for 50 weeks, how much money is that?
6  **A.** Say that again.
7      MS. PETALAS: Same objection.
8      THE COURT: Sustained.
9      MR. PURPURA: May I have the basis, Your Honor?
10      THE COURT: The objection is sustained, put your next
11  question. We've gone over this.
12  BY MR. PURPURA:
13  **Q.** Did you ever do an asset check on Mr. Samuels?
14  **A.** On Mr. Samuels, I personally didn't do an asset check,
15  no.
16  **Q.** As the co-case agent, did you ask anyone if they did an
17  asset check on Mr. Samuels?
18  **A.** Again, we had an asset forfeiture squad. That probably
19  would have been the squad that would have done it, but I'm not
20  sure if they did one on Mr. Samuels.
21  **Q.** Obviously, when drugs are sold, money is incurred, right?
22  **A.** You make money selling drugs, yes.
23  **Q.** And you don't pay tax on that money, do you?
24  **A.** Not that I'm aware of.
25  **Q.** So there's a lot of cash?

**612**

1  **A.** I would say it's a cash business, yes.
2  **Q.** And sometimes cash can leave a trail, right?
3  **A.** In some cases.
4  **Q.** And as an investigator, as a trained investigator,
5  especially with your background, you would try to follow that
6  trail, wouldn't you?
7  **A.** Would I try to follow the money they're making selling
8  drugs?
9  **Q.** Yes. Would you?
10  **A.** I'm not sure, I don't know.
11  **Q.** Okay. Let's say you do a search warrant on a house and
12  you have $10,000 in the house, are you taking that money?
13  **A.** If it's a house that I believed --
14  **Q.** A target house?
15  **A.** A target house involved in narcotic sales, yes, we seize
16  it.
17  **Q.** You take that money, right?
18  **A.** That's correct.
19  **Q.** Because that money would be some evidence of drug sales,
20  right, to you?
21  **A.** I would believe so, yes.
22  **Q.** Okay. Now, to your knowledge, did anyone do any type of
23  investigation or asset check on Mr. Samuels?
24  **A.** Again, as I stated, I personally didn't.
25  **Q.** As the case agent, I would assume that people kind of

**613**

1  report up to you with information, right?
2      MS. PETALAS: Your Honor, I object. This is asked and
3  answered. He's already answered. I believe he already answered
4  to his knowledge.
5      THE COURT: The question was: Do people report to you
6  with that kind of information? I'm not sure that was asked and
7  answered. So your objection is overruled without prejudice.
8      THE WITNESS: Again, I didn't really have people -- I
9  guess the way you term it -- reporting to me -- I didn't have a
10  bunch of underlings under me.
11  BY MR. PURPURA:
12  **Q.** Just to cut it short, are you aware of any type of
13  investigation involving assets of Mr. Samuels --
14  **A.** Not that I'm aware of, no.
15  **Q.** Let me finish the question.
16      -- from 1992 to 2005?
17  **A.** I'm not aware of one, no.
18  **Q.** Based on your surveillance, did you ever see him go to
19  the airport?
20  **A.** No.
21  **Q.** Did you ever check for passports for him?
22  **A.** I personally did not, no.
23  **Q.** Did you ever check to see if he took vacations anywhere?
24  **A.** I personally did not, no.
25  **Q.** Did you ever check to see if he had any bank accounts?

614

1  **A.**   Me, personally, I don't recall checking to see if he had
2  bank accounts, no.
3  **Q.**   Cars?
4  **A.**   I'm sure we had things in the file referring to cars he
5  was driving, but without having the file in front of me ...
6  **Q.**   Based on your investigation, Congress Park, the area
7  we've pointed to over there, was a 24/7 open-air drug market; is
8  that correct?
9  **A.**   I guess that would be a fair statement.  I mean, when you
10  say "24/7," I mean, obviously there's going to be periods when
11  it's going to be down.  But yes, for the most part, yes, it's an
12  open-air drug market where people could get drugs pretty much at
13  any time.
14  **Q.**   And it's not only crack, which is sold in Congress Park;
15  is that correct?
16  **A.**   There are other things sold there.  That's the main thing
17  sold there.
18  **Q.**   You also have -- I believe you indicated a boat alley as
19  well, right?
20  **A.**   Yes, I believe PCP or as they call it on the street, boat
21  has been sold there.
22  **Q.**   Now, is it -- did you, as the investigator, as when you
23  became the case agent, did you investigate to determine whether
24  the evidence showed there was a conspiracy or did you try to
25  build a conspiracy?

615

1  **A.**   When I became the case agent, did I attempt to build a
2  conspiracy?  Is that what you are asking?
3  **Q.**   Yes, through your investigation.
4  **A.**   At the outset when we opened the investigation, based on
5  the investigation we already had, we believed there was likely
6  already a conspiracy underway, and during the course of the
7  entire investigation, we've built, I believe, a strong case that
8  shows there was a conspiracy in that neighborhood.
9  **Q.**   That's the word I want to concentrate on.  Did you, as
10  the case agent, when you became involved as the co-case agent
11  and/or as the case agent, did you investigate or did you
12  basically begin to build a drug conspiracy?
13  **A.**   We investigated what was already an ongoing drug
14  conspiracy.
15  **Q.**   Let me refer your attention to your grand jury testimony
16  dated January 26th, 2006 -- and I'll give you the exhibit.  That
17  is September 26th, 2006.  Defendant Samuels 5.  I'll show you
18  what's been marked as Samuels 5.  It purports to be a redacted,
19  which means a shortened version of your grand jury testimony; is
20  that correct, sir?
21  **A.**   It appears to be a few pages of my testimony from that
22  day.
23  **Q.**   And I'm going to direct your attention to page 7.
24      Did you tell the United States grand jury, line 11:
25  "Well, like I said, with drug activity, the normal way we build

616

1  our -- our -- our baseline investigations, we'll start focusing
2  on the drugs.  Along the same time, we're looking into the
3  violence, but we basically will begin to build a drug
4  conspiracy."
5      Did you tell the grand jury that?
6  **A.**   Yes, I did.
7  **Q.**   Now, in building a drug conspiracy, you didn't focus on
8  the pen register records, at least you didn't, did you?
9  **A.**   We've utilized pen register records in this case, if
10  that's what you're asking.
11  **Q.**   I'm asking what your knowledge is, you, yourself.  I
12  can't ask about other people.  Concentrate on you.  As the case
13  agent, what did you do with the pen register records?
14  **A.**   I've utilized them.
15  **Q.**   And the subpoenaed records, what did you do with those?
16  **A.**   I've used those as well.
17  **Q.**   And focusing on Dominic Samuels, you don't have any
18  recollection about his connection to the target phones we talked
19  about before?
20  **A.**   In terms of those phones you talked about earlier, no.
21  Again, Agent Burton, that's his affidavit.  He was focusing on
22  that part of the investigation at that point.
23  **Q.**   In building a drug conspiracy, did you use surveillance?
24  **A.**   Yes.
25  **Q.**   You had some limited surveillance; is that correct?

617

1  **A.**   That would be fair to say.
2  **Q.**   You had some limited surveillance, even involving cameras
3  and video, correct?
4  **A.**   That's correct.
5  **Q.**   In building a drug conspiracy, you don't have any
6  surveillance of Dominic Samuels, do you?
7  **A.**   I've seen him in the neighborhood, when you say I don't
8  have any surveillance of him.
9  **Q.**   When you saw him, you personally saw him in the
10  neighborhood, right?
11  **A.**   Yes.
12  **Q.**   And you would write a report once you saw him, if there
13  was something going on, right, something illegal going on?
14  **A.**   On some occasions, yes, I will do a report.
15  **Q.**   And based on your personal knowledge when you saw him --
16  when you saw him in the neighborhood, you didn't write any
17  reports about him, did you?
18  **A.**   Again, I don't recall writing any specific reports.  I
19  may or may not have, with regard to Mr. Samuels.
20  **Q.**   Do you have any video surveillance of Mr. Samuels doing
21  anything, such as -- let's be crazy, selling drugs?
22  **A.**   Do we have a video of him selling drugs?
23  **Q.**   Yes.
24  **A.**   I don't believe we have that, no.
25  **Q.**   Do you have any type of surveillance, such as the

1 Q.  And for analysis, I meant fingerprint analysis with the FBI.

2 Is that correct?

3 A.  Right.  As I said, we'll send the drugs to the lab and ask

4 that they forward the packaging material to the FBI fingerprint

5 laboratory for analysis.

6 Q.  And let me just talk a second about Sandra White.  She has a

7 nickname?

8 A.  She had a code name that we had given her.

9 Q.  And this transaction we heard occurred on October 17th of

10 2000?

11 A.  Yes.

12 Q.  How long was she working with you before that date?

13 A.  Again, Agent Burton opened her as a cooperating witness in

14 this case, I believe it was in May of 2000.

15 Q.  June, July, August, September, October.  Roughly

16 five months?

17 A.  Roughly.

18 Q.  Now, I assume that on October 17th, 2000 you were present

19 when she was being used?

20 A.  On that particular day, yes.

21 Q.  And I assume that you are or were aware on October 17th of

22 2000 that she has a crack cocaine addiction?

23 A.  I know at times, yes, she's been addicted to crack cocaine.

24 Yes.

25 Q.  Well, we heard her speak earlier this morning.  Do you

Page 639

1 remember listening to her speak on the tape?

2 A.  Yes.

3 Q.  And did she sound like that when you talked to her normally

4 on other days?

5 A.  That pretty much is how she sounds, yes.

6 Q.  And based on your experience as a narcotics investigator,

7 was it your belief at least that at five months into the

8 investigation, five months of using her, that she was still

9 using crack cocaine?

10 A.  I can't say whether or not she was using at that time.

11 Q.  Well, I would assume that as an investigating officer,

12 someone who is using a person to do undercover work, or using

13 them to build the conspiracy, you would inquire whether they

14 were still using crack cocaine.

15 A.  Again, any cooperating witness that we are using, we

16 admonish them on numerous occasions they are not to be using

17 drugs.  But obviously we're not with them 24/7.

18 Q.  Did she sound to you, when you listened to this tape today,

19 as if she was still using crack and perhaps under the influence

20 of some sort of drug when she was doing this undercover work to

21 build the conspiracy?

22 A.  When I heard the tape today?

23 Q.  Yes.

24 A.  That's how she sounds.

25 Q.  Well, but how she sounds, does that sound as if she was

1 under the influence, based on your experience of crack cocaine

2 and drugs?

3 A.  I would say that's how Sandra White sounds.  I can't say if

4 that's how Sandra White sounds on drug.

5 Q.  Did you make any attempt to introduce Sandra White to any

6 drug treatment programs while you were using her to build the

7 conspiracy in October of 2000?

8 A.  Did I attempt to put her into a drug program?

9 Q.  Yes, sir.

10 A.  No.

11 Q.  To your knowledge, did anyone try to help her at that point

12 to get into some sort of drug intervention program?

13         MS. PETALAS:  Objection, Your Honor, as to what other

14 people did.

15         THE COURT: If you know, you may answer.

16 BY MR. PURPURA:

17 Q.  If you know.

18 A.  Again, during the course of this investigation, I know she's

19 had some other arrests, and I believe she may have even tested

20 positive.  I think through her Court issues, I believe she's

21 probably been in the pretrial program --

22         MS. WICKS:  Objection.  I think he's speculating, Your

23 Honor, at this point.

24         THE COURT: Sustained.  Put your next question.

25 BY MR. PURPURA:

1 Q.  Let me be more specific.  You indicated that you never

2 directed her into a drug intervention program.  Is that correct?

3 A.  I had suggested it at times, yes.

4 Q.  Did you ever follow up and see that she went into it,

5 specifically as of October of 2000?

6 A.  In October of 2000?

7 Q.  Yes.

8 A.  Again, I wasn't her handling agent, so I can't say that at

9 that time I would have been the one that recommended it, no.

10 Q.  You were a case agent.  Is that correct?

11 A.  I was one of the case agents, yes.

12 Q.  Was it any concern that you had for her individually, based

13 on her cocaine or crack cocaine use?

14 A.  Was there any concern?

15 Q.  Yes, sir.  For her safety, for her health?

16 A.  Again, just like we tell every one of our witnesses, they

17 shouldn't be using illegal drugs.  But again, I can't always

18 control someone's own personal actions.

19 Q.  Almost finished.

20      Directing your attention to your affidavit of 2005, for

21 the search of a premise known as 6602 Greg Street,

22 apartment 102, Seat Pleasant, Maryland, and an address:  1113

23 Castle Haven Court, Capitol Heights, Maryland.  You're familiar

24 with that affidavit.  Is that correct?

25 A.  Yes.

Page 642

1 Q.  And in fact, you were the affiant on that affidavit.  Is

2 that correct?

3 A.  Correct.  I wrote that affidavit.

4 Q.  And that affidavit was written sometime in 2005.  Is that

5 correct?

6 A.  That's correct.

7 Q.  Do you remember when it was written -- when it was signed by

8 you in 2005?

9 A.  It would have been shortly before March 22nd, sometime

10 probably a week or so before that, that I saw the judge.

11 Q.  And when you write that affidavit, when you wrote that

12 affidavit, you indicated that you had an ongoing investigation.

13 Is that correct?

14 A.  That's correct.

15 Q.  You indicated this ongoing investigation went from 1992

16 through the present of 2005.  Is that correct?

17 A.  That's correct.

18 Q.  You indicated to this judge that you had used confidential

19 witnesses, that you had consensually monitored phone

20 conversations, that you had telephone and pager subscriber

21 information, you had toll records, you had surveillance, and

22 other investigative tools.  Isn't that correct?

23 A.  That's correct.

24 Q.  And based on all that, you told the judge that you had

25 certain individuals who you thought were dealing in this

1 particular area in large scale.  Is that correct?

2        Without naming names, you had listed with the judge

3 that you had certain individuals who were dealing in large

4 scale.  Is that correct?

5 A.  I'm sure I listed individuals that yes, had been involved in

6 the distribution of crack cocaine for a number of years.

7 Q.  And that individual, the individuals was not Dominic

8 Samuels.  Is that correct?

9 A.  In that particular affidavit, no, I don't believe his name

10 was mentioned.

11 Q.  And in addition, in that affidavit through the investigation

12 of 2005, you also identified persons who had purchased or

13 received narcotics from distributors in this particular area.

14 Is that correct, sir?

15 A.  I identified people that -- state that again.

16 Q.  You identified people, persons who had purchased and/or

17 received narcotics from distributors for further distribution.

18 A.  Okay, yes.

19 Q.  Turn to page six, if you don't recall this.  Do you recall

20 this?

21 A.  I don't have my affidavit in front of me.

22 Q.  I believe you have Defense Exhibit 3 up there.

23 A.  Okay.

24 Q.  You should have page six.  It should be there.  And I'm just

25 directing your attention to paragraph six.  I'm not asking for

1 you to name names.  I'm just specifically asking you, first of

2 all, you already indicated that as the large-scale distributor,

3 that Dominic Samuels was not mentioned.  Is that correct?

4 A.  In this particular paragraph, that's correct.  He was not

5 mentioned.

6 Q.  And in addition, sir, he was also not mentioned as

7 someone -- as an individual who has been identified as a person

8 who has purchased and/or received narcotics from the

9 above-mentioned distributors.  Isn't that correct?

10 A.  That's correct.  In this affidavit, he's not mentioned.

11 Q.  Just one minute, please.

12        Now, we spoke briefly about surveillance before.

13 Obviously, there were other people -- or strike that.

14        Were there other people assigned by you or another case

15 agent to do surveillance in the area?

16 A.  When you say assigned, I mean, myself and my partners

17 obviously did surveillance.  When we were doing controlled

18 purchases, for instance, we would have other members of our

19 squad out there assisting us.  So if you want to say we were

20 directing them to do surveillance, I guess in those cases we

21 did.

22 Q.  But the only person you have any actual personal knowledge

23 is your own surveillance.  Is that correct?

24 A.  Again, that's what I could testify to.  And I've been with

25 my partners on many occasions.

1 Q.  And you've indicated before that there was no surveillance

2 by you of Mr. Samuels doing anything other than being in a

3 neighborhood over here where he lives.  Is that correct?

4 A.  That's correct.  I've seen him in that neighborhood.

5          MR. PURPURA:  Just one second, Your Honor.

6 BY MR. PURPURA:

7 Q.  Last question.  We talked about Agent Burton's affidavit,

8 and that was for a wiretap.  Is that correct?

9 A.  That's correct.

10 Q.  Wire intercept.  Right?

11 A.  Right.

12 Q.  And that was in 2001.  Is that correct?

13 A.  That's correct.

14 Q.  And as the co-case agent, you were privy to the outcome of

15 that wire intercept.  Is that correct?

16 A.  That's correct.

17 Q.  You could have listened to the various individuals who were

18 intercepted.  Is that correct?

19 A.  That's correct.

20 Q.  And you did do that.  Is that fair to say?

21 A.  That's correct.

22 Q.  And to the best of your knowledge, Dominic Samuels was not

23 intercepted on that target phone and the wire intercept.  Is

24 that correct?

25 A.  On those few days of calls, no, he was not intercepted.

1          MR. PURPURA:  Thank you.  I have no further questions.

2          THE COURT: Do you want to retrieve your exhibits from

3 the stand?

4          MR. PURPURA:  I do, Your Honor.

5          THE COURT: All right.  Mr. Carney?

6          MR. CARNEY:  Yes, Your Honor.

7                    CROSS-EXAMINATION

8 BY MR. CARNEY:

9 Q.  Good morning, Agent.  Or afternoon, really.

10 A.  Good afternoon, Mr. Carney.

11 Q.  I would like to ask you, how did you prepare to testify the

12 last couple of days?

13 A.  The last couple of days before I actually took the stand?

14 Q.  Yeah.

15 A.  I guess a combination of things.  Reviewing some of our

16 charts, reviewing the indictment, general things like that.

17 Q.  Did you review, like, the affidavits you did in the case and

18 grand jury testimony and those kind of things?

19 A.  In the last few days, I don't think I've looked at the

20 search warrant affidavit.  I know I looked at some of my

21 testimony from an earlier trial this past summer.

22 Q.  How about, did you do 302's and review those?

23 A.  In the last few days?

24 Q.  Well, before you testified.

25 A.  Obviously, over the last few years I've done a lot of 302's.

Page 647

1 Q.  Well, within two weeks, before you took the stand?

2 A.  Not that I can recall, I have not done a 302 in the last

3 two weeks.

4 Q.  Did you go over what you would be testifying with the

5 prosecutors?

6 A.  I've sat down and prepared for my testimony with them, yes.

7 Q.  Right.  And did you go through like the opening statements

8 of the defense as to what the issues are?

9 A.  I don't believe so, no.

10 Q.  You didn't review the transcripts or anything like that?

11 A.  Transcripts of your opening statements?

12 Q.  Yes.

13 A.  No.

14 Q.  I would like to direct your attention to the 200 series

15 photographs that you had testified to.  These were photographs

16 of various individuals, this was on Thursday of last week.  You

17 had mentioned that Antwuan Ball was known as Twuan or Big Ant.

18 Do you remember that?

19 A.  Right.  The photos that were on the board.

20 Q.  Right.

21 A.  Yes.

22 Q.  And these are essentially nicknames, aren't they?

23 A.  That's correct.

24 Q.  Twuan is a shortened form of Antwuan.  Is that correct?

25 A.  That's correct.

1 Q.  And Big Ant is a description of his physical size, and

2 shortened form of Antwuan for Ant?

3 A.  I would say that's probably where it came from, yes.

4 Q.  And you yourself have a nickname.  It's Rob?

5 A.  That would be a shortening of my name, right.

6 Q.  And you may have other names called by your employees.  We

7 may not want to reveal them, but your other nicknames.  Is that

8 right?

9 A.  Mine is either Rob or Lock.  That's about it.

10 Q.  So you agree that this isn't the technical form of AKA.

11 It's just nicknames that people may call each other.  Is that

12 right?

13 A.  Right.  Just during the course of the investigation, all the

14 different witnesses, people we've interviewed, many people have

15 referred to Antwuan by those nicknames or names.

16 Q.  You've mentioned various weights in your testimony, and you

17 looked at a chart where you had some weights listed.  If you

18 could help the jury, I would like to just kind of run through

19 quickly, some of them.

20       One kilogram is 1000 grams?

21 A.  I believe so, yes.

22 Q.  And a gram is a thousand weight of a kilogram?

23 A.  Yes.

24 Q.  And then a kilogram is roughly 2.205 pounds?

25 A.  Somewhere in that vicinity.  I think that's approximately

1 what it is.

2 Q.  And an ounce is roughly 28.34 grams?

3 A.  Again, around 28 grams is what, as far as I know, is an

4 ounce.

5 Q.  And a quarter key would be what?

6 A.  250 grams.

7 Q.  Okay.  And other units that may be mentioned are eight ball.

8 What's that?

9 A.  That's approximately three grams.

10 Q.  And what's the weight of a dime bag?

11 A.  Usually about .1 gram.

12 Q.  In this case, was there any controlled purchase of a

13 kilogram or more of powder or crack?

14 A.  No.

15 Q.  And was there any seizure of a kilogram or more of powder or

16 crack done, I guess in a search warrant?

17 A.  From these particular defendants, no.

18 Q.  And there were -- I believe you mentioned there were like 12

19 search warrants.  Is that right?

20 A.  On that particular day in March of '05, there were 12 search

21 warrants, yes.

22 Q.  Right.  Okay.  And would you agree that the chart that you

23 looked at, and in this case the controlled purchases were only

24 crack and not powder.  Is that right?

25 A.  On that chart they're all crack cocaine purchases, yes.

1 Q.  And you've already explained, crack cocaine is a further

2 process taking a larger amount of powder cocaine and breaking it

3 down.  Is that right?

4 A.  That's fair to say, yes.

5 Q.  Right.  Usually the amount that's broken down from is a

6 kilogram.  Is that right?  They start with a kilogram of powder,

7 they cook it up and then break it down.  Is that right?

8 A.  You could cook up much smaller amounts of that into crack

9 cocaine.

10 Q.  Okay.  Now, you stated that the Safe Streets Task Force has

11 been around since about '92.  It could be even earlier than

12 that.  Right?

13 A.  I believe the actual task force was started in '91.

14 Q.  And you stated that the officers that had been assigned to

15 the task force have ranged from Park Police, MPD, FBI over the

16 years.  Is that right?

17 A.  Right.  It's always been FBI and MPD.  We at times have had,

18 currently I know they have Park Police assigned, an ATF agent.

19 We've also had DEA agents and a U.S. Marshal at times has been

20 assigned to the task force.

21 Q.  And then if you needed extra officers on particular

22 situations, you could get them.  Right?

23 A.  Right.  Especially if we're doing, for instance in that

24 March of '05, obviously executing 12 search warrants, yes, we

25 would reach out and use officers and agents from different

1 agencies.

2 Q.  So you had essentially enough manpower to do the job.  Is

3 that right?

4 A.  Depends what day you're talking about.

5 Q.  You also could get specialists to help you.  Like if you

6 needed a firearms examiner, you could get one from FBI.  Is that

7 right?

8 A.  We've sent firearms and ballistics sent to the FBI lab,

9 right, that we have examiners down there.

10 Q.  Right.  And that's considered one of the finest labs in the

11 country, right?

12 A.  I would think so, yes.

13 Q.  And if there were problems with it, you could send firearm

14 examination to MPD or other locations.  Is that right?

15 A.  I personally would prefer to send the stuff to the FBI lab.

16 Q.  And that would also be true in terms of anything like DNA or

17 any of that fiber or hair, you have FBI, you could have it sent

18 and checked by them.  Right?

19 A.  I mean, the FBI lab does have the ability to analyze those

20 items, yes.

21 Q.  And then on the task force, there are a number of officers

22 that have been assigned to the task force that predate your

23 assignment.  Is that right?

24 A.  Currently, no.  But definitely during the course of this

25 investigation, yes, there were detectives and agents who had

1 they're under the influence of narcotics?

2 A.  Again, I think someone that's using drugs, yes, that could

3 affect their -- it could have that effect, yes.

4 Q.  And you told us you were aware that Sandra White, as with

5 most of the cooperating witnesses, was a drug addict?

6 A.  I guess you could call her that.  She's had, I think, a

7 long-running problem with drugs, yes.

8 Q.  What do you mean, you could call her that?  Is there any

9 dispute that she was addicted to crack cocaine along with other

10 drugs?

11 A.  Right.  I guess that's the term you would use, she's a drug

12 addict, yes.

13 Q.  You're saying it's a term I would use.  It's an accurate

14 term, isn't it?  She was a crack cocaine addict?

15 A.  Yes.

16 Q.  For many years.  Right?

17 A.  Yes.  For many years, yes.

18 Q.  And someone else asked you whether or not you knew if she

19 was using crack cocaine while she was cooperating with you,

20 while you were putting her out on the street as your eyes and

21 ears, and you said you didn't know.  Right?

22 A.  Right.  Again, in terms of when we're sending her out there

23 wired up, I can't say that she was high or not.

24 Q.  Now, you also said earlier that part of that time she was

25 under court supervision.  Right?

1 Q.  Right.  In the confines of what you've delineated as the

2 Congress Park --

3        MS. PETALAS:  Objection, Your Honor.

4        THE COURT:  Sustained.

5 BY MR. ZUCKER:

6 Q.  You would agree that -- or I think you've testified that the

7 people who you attribute as members of the Congress Park

8 enterprise did not share money.  Is that correct?

9 A.  They didn't share money?

10 Q.  Yeah.  If one of the members got -- okay.  For sake of

11 argument, if I, as a member of this group, go out and buy

12 cocaine in a wholesale quantity, I pay for it myself.  Right?

13 A.  That depends.  Or you could pool your money.

14        MS. PETALAS:  Objection, Your Honor.  This calls for

15 speculation and hypothetical.  If he wants to ask him about this

16 investigation and the individuals sharing money, then he can

17 pose that question.

18        THE COURT:  Sustained as to that.  And scope.

19 BY MR. ZUCKER:

20 Q.  The supposed members of this organization did not all buy

21 from the same source, did they?

22 A.  No, they used different sources.

23 Q.  And each person was allowed the buy from whoever they chose.

24 Correct?

25 A.  Again, yes, they could buy from different suppliers.

# Tab 3

09:20AM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :

    Plaintiff,      :      Docket No. CR 05-100

    v.      :

ANTWUAN BALL, DAVID WILSON,      :      Washington, DC
GREGORY BELL, DESMOND
THURSTON, JOSEPH JONES, and      :      February 28, 2007
DOMINIC SAMUEL,      :      9:15 a.m.

    Defendants.      :
                    :

VOLUME 9 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
Glenn Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney,
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant
Antwuan Ball:      CARNEY & CARNEY
John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

---

747

APPEARANCES (Cont.)

For Defendant
Antwuan Ball:      TIGHE, PATTON, ARMSTRONG,
TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant
David Wilson      LAW OFFICE OF JENIFER WICKS
Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant
Gregory Bell:      LAW OFFICE OF JAMES W. BEANE
James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant
Desmond Thurston:      LAW OFFICE OF JONATHAN ZUCKER
Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant
Joseph Jones:      LAW OFFICE OF ANTHONY MARTIN
Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

---

748

APPEARANCES (Cont.)

For Defendant
Dominic Samuels:      LAW OFFICES OF A. EDUARDO BALAREZO
A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:      Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

749

1      **MORNING SESSION, FEBRUARY 28, 2007**

2      (9:20 a.m.)

3           THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United*

4      *States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond*

5      *Thurston, Joseph Jones and Dominic Samuels.*  For the government,

6      Mr. Leon, Ms. Petalas and Mr. Guerrero.  For defendants,

7      Mr. Carney, Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker,

8      Mr. Martin, Mr. Balarezo and Mr. Purpura.

9           THE COURT:  All right.  Good morning.  We're missing one

10      juror.

11           Did you ask them, by the way, to knock on the door when

12      the juror arrives?

13           THE DEPUTY CLERK:  Yes.

14           THE COURT:  Mr. Carney.

15           MR. CARNEY:  Your Honor, I have one preliminary matter.

16           THE COURT:  Let me just ask -- I take preliminary matters

17      at the end of the day.  Because we have one juror missing, I'm

18      happy to hear you now, but let me make sure you all have read my

19      pre-trial order that says I do not keep the jury waiting when

20      they're all here with preliminary matters at the beginning of the

21      day.  If there are any, I'll take them at the end of the day.

22      I'll stay as long as you need me to, but I do not keep the jury

23      waiting.

24           But since we have to wait for the last juror, I'll be

25      happy to hear you, but I don't want people to get in the habit of

778

1    MS. PETALAS:  Objection, Your Honor.
2    THE COURT:  Sustained.
3    MR. MARTIN:  Your Honor, the other questions I have will
4  have to wait until this agent takes the stand again because
5  they're beyond the scope of his testimony thus far.
6    THE COURT:  All right.
7    MR. MARTIN:  Thank you for your patience, agent.
8    THE COURT:  Do you have redirect?
9    MS. PETALAS:  Yes.
10    THE COURT:  All right.  Give me one minute.
11    (Brief pause in proceedings.)
12    THE COURT:  Ms. Petalas, when you're ready.
13    MS. PETALAS:  Thank you, Your Honor.
14    REDIRECT EXAMINATION OF ROBERT LOCKHART
15  MS. PETALAS:
16  Q.    Good morning, Agent Lockhart.
17  A.    Good morning.
18  Q.    Do you remember -- do you recall yesterday, Mr. Purpura
19  was talking to you a little bit about the historical and
20  proactive investigation?
21  A.    Yes.
22  Q.    And this conspiracy began around the early to mid-90s; is
23  that correct?
24    MS. WICKS:  Objection.
25    THE COURT:  Sustained.

779

1  BY MS. PETALAS:
2  Q.    When did your investigation begin?
3  A.    Our investigation began in January of 2000.
4  Q.    Prior to that investigation, your investigation
5  beginning, did you -- was there historical information that you
6  had about Congress Park?
7  A.    Yes.
8  Q.    When we're talking about your proactive investigation,
9  your ability to conduct surveillance on these individuals here,
10  when did that begin?
11  A.    Basically, at the time in January 2000 and soon after.
12  Q.    And you talked a little bit about your investigation
13  continuing.  When did your ability to investigate and surveil
14  these individuals at this table end?
15  A.    Again, we took the case down in two different phases, one
16  in March of '05 and one in November of '05.  Again, the case is
17  obviously bigger than just these individuals at the table.  Some
18  of the individuals were already in custody on other matters, but
19  overall, basically, our proactive doing things on the street I
20  would say ended November of '05, but obviously, the case --
21    MS. WICKS:  Objection; non-responsive, Your Honor.
22    THE COURT:  Sustained.  Put your next question.
23  BY MS. PETALAS:
24  Q.    You recall Mr. Purpura asked you about a time when you
25  testified in the grand jury where you were talking about

780

1  building a conspiracy.  Do you recall that?
2  A.    Yes.
3  Q.    At that time, Mr. Purpura showed you your grand jury
4  testimony.  Do you recall that?
5  A.    Yes.
6    MS. PETALAS:  May I approach, Your Honor?
7    THE COURT:  Yes.
8  BY MS. PETALAS:
9  Q.    Handing you what's been marked as Defendant Samuels
10  Exhibit Number 5.  Do you recall that?
11  A.    Yes, I recall this.
12  Q.    I believe he was asking you about page 7; is that
13  correct?
14  A.    Yes.
15  Q.    Agent Lockhart, when you were talking about building a
16  drug conspiracy, what question -- what question were you
17  answering at that point?
18    MR. ZUCKER:  Objection; form.
19    MS. WICKS:  Objection.
20    THE COURT:  Overruled.
21    THE WITNESS:  I was responding to a question that was
22  posed to me in the grand jury.
23  BY MS. PETALAS:
24  Q.    And what was that question?
25    MS. WICKS:  Objection, Your Honor.

781

1    THE COURT:  Basis?
2    MS. WICKS:  At this point the witness is reading from the
3  exhibit.  I'm not quite sure if he's refreshing his recollection
4  or reading a page.
5    THE COURT:  All right.  That's valid.
6  BY MS. PETALAS:
7  Q.    Agent Lockhart, do you recall what question you were
8  asked in the grand jury that you were responding to before?
9  A.    I mean, without reading it, I can say generally what it
10  was about.
11  Q.    Well, will reading that grand jury testimony refresh your
12  recollection about what question you were being asked?
13  A.    Yes.
14  Q.    If you could go ahead and read it and let us know.
15    THE COURT:  Read it to yourself.
16  BY MS. PETALAS:
17  Q.    I'm sorry.  Read it to yourself and let us know when
18  you're finished.
19  A.    Okay.
20  Q.    And what was that question?
21  A.    The question basically is:  What did we begin to do when
22  we started our investigation in Congress Park.
23  Q.    When you answered the question you were talking about,
24  what were you referring to when you said "build a drug
25  conspiracy"?

814

1  **Q.**    What types of things would you assist him on from time to
2  time in the Congress Park case?
3  **A.**    If they were going to do an undercover narcotics
4  purchase, they would need security, they would need maybe moving
5  around some of the vehicles, we would perform those duties.  If
6  they were doing a search warrant, especially if it's multiple
7  search warrants, they're going to need team leaders, experienced
8  agents to run the teams and do the search warrants at different
9  locations.  We'll pull from the squad to make those agents team
10  leaders in that instance.  So I did those operations for him.
11  **Q.**    Now I'd like to focus on one of those instances.  I would
12  like to focus you specifically on March 22nd of 2005.
13      Did you assist Agent Lockhart in the capacity you just
14  described on that date?
15  **A.**    Yes.  On that date I was a team leader for a search
16  warrant that was being conducted.  I don't know how many search
17  warrants, but it was multiple search warrants being conducted on
18  the same day.  I was a team leader for one of the warrants.
19  **Q.**    Okay.  I'd like to break that down.  You used the
20  expression "team leader".  But before you even get to that
21  expression, you referred to a search warrant on March 22nd of
22  '05; is that correct?
23  **A.**    Yes, sir.
24  **Q.**    And you said there were multiple search warrants?
25  **A.**    Yes.

815

1  **Q.**    Do you know how many others were done?
2  **A.**    No.
3  **Q.**    Okay.  Was it more than five if you know?
4  **A.**    I think it was.
5  **Q.**    Okay.  But you only were involved with one?
6  **A.**    I had one team, yes.
7  **Q.**    Okay.  And when you say team, how many people are on a
8  team for your search warrant on this day?
9  **A.**    I can't recall the exact number on my team.  That day I
10  had it in my paperwork.  Usually we go with 10 or 12, is a good
11  number we go with.
12  **Q.**    And can you just explain to us why that number of people,
13  10 to 12 are needed for one particular search warrant?
14  **A.**    If you're going to do a search warrant on a residence,
15  the safety and security of the agents conducting the search
16  warrant is very important, and also the safety and security of
17  anybody around the search warrant or in the residence is of
18  importance.  So you want to make sure the perimeter of the
19  search warrant is secured and once you go into the house you
20  have enough agents to move through the house and secure the
21  house itself and anybody that might be in there safely.  So you
22  use enough agents to execute that.
23  **Q.**    Okay.  And you've used the expression "team leader," and
24  you said you were the team leader on this day?
25  **A.**    Yes.

816

1  **Q.**    First of all, this particular search warrant, do you know
2  the address that we're talking about?
3  **A.**    Uhm, 1327 Savannah.
4  **Q.**    Okay.  I don't want you to guess.  If you're not sure --
5  **A.**    I'm not exactly sure.
6  **Q.**    -- is there something that would refresh your
7  recollection as to the exact address of the warrant that you
8  helped Mr. Lockhart out with?
9  **A.**    Yes.  At the completion of the warrant there's always a
10  document written, a 302.  On that 302 it will show the team that
11  I took, when we made entry, how we made entry, who was there,
12  and some of the particulars of the search warrant.
13  **Q.**    And is this a 302 that you wrote?
14  **A.**    Yes, I did.
15      MR. LEON:  Your Honor, may I approach the witness?
16      THE COURT:  Yes.
17  BY MR. LEON:
18  **Q.**    Agent Stallings, I'm handing you what's been marked for
19  identification as Government's 711.2.  Is that the 302 you're
20  referring to?
21  **A.**    This is a copy of the 302 I wrote in relation to the
22  warrant on March 22nd, '05.
23  **Q.**    I'm going to just ask you to look down at that,
24  and when you're done look up.  Tell us if that helps refresh
25  your recollection of the exact address of the warrant that you

817

1  assisted Agent Lockhart with?
2  **A.**    Yes, it does.
3  **Q.**    What is the exact address?
4  **A.**    1327 Savannah Street, Number 4, Southeast Washington,
5  D.C.
6  **Q.**    Number 4 being an apartment?
7  **A.**    Yes.
8  **Q.**    And you've referred to the expression -- you can just put
9  that to the side now.  You referred to the expression team
10  leader, and I think you said you were a team leader for this
11  particular execution of this particular warrant?
12  **A.**    Yes, I was.
13  **Q.**    Tell us what that means.
14  **A.**    Team leader is that address -- I would be in charge of
15  assembling the team, making sure the team members are
16  identified, they know where to meet, that they are briefed prior
17  to the execution of the search warrant, they understand what
18  they're role is in the warrant, why we're doing the warrant, and
19  then the whole execution of the warrant is my responsibility;
20  meeting in the morning, briefing, driving out there, making sure
21  the perimeter is secured, knocking at the door.  Once we're in
22  the house, a lot of things come under there.
23      Marking the rooms with A, B, C and D so each room is
24  identified, in addition to having a photographer, somebody to
25  make a sketch, searching agents, everyone understanding that

818

1  when evidence is found, there's photographs taken and I am the
2  seizing agent who will do the final document to record all the
3  evidence we're receiving from that location.
4       And then I will, when we close out, make sure all the
5  team members are accounted for and leaving the residence and
6  that the residence has a copy of the warrant and a copy of the
7  receipt of evidence we've taken before departing.  And at the
8  conclusion, the team leader will make sure the evidence is
9  placed into the evidence room at FBI and the reports are written
10 afterwards.
11 Q.    And all of the things that you just described for us as
12 the team leader for this particular warrant, did you do that on
13 March 22nd of 2005?
14 A.    Yes, I did.
15 Q.    With respect to this particular address?
16 A.    Yes, I did.
17 Q.    I would like you to just briefly talk about the roles of
18 the other people on the search warrant.  You've described
19 yourself as the team leader and the seizing agent, but there are
20 ten or so other people.  What are their particular roles once at
21 the particular location?
22 A.    Several of the agents on entry will be tasked with
23 securing the perimeter, which means they'll be on the side
24 windows, back doors.  Once we make entry, some will be assigned
25 for going immediately up a pair of stairs as a team so they

819

1  don't go alone; some members will be identified as arrest team
2  members.  If there's an arrest being made, they will take charge
3  of the individual being arrested and go through those
4  procedures.  Somebody will be charged with photographs and
5  labeling the room, all of the rooms.  Somebody will be tasked
6  with the photographs and the sketch.  After that, every team
7  member becomes a search member.  They come in and the whole
8  residence is then searched.  Once the residence is searched, I'm
9  the one who makes a decision that -- well, the team leader is
10 the one that makes the decision that we're done, evidence is
11 accounted for, and we depart.
12 Q.    Now, let's get to this particular warrant on this
13 particular day, 1327 Savannah Street, Southeast, Unit Number 4.
14 Okay.
15      What time of day was the warrant executed?
16 A.    Early morning.
17 Q.    Do you remember --
18 A.    Right after 6:00.
19 Q.    Okay.  Is there a reason why warrants are often done
20 around that time?
21 A.    There's -- we usually try to get them at that time.
22 People are usually still in bed, usually still not out and
23 about, so it's easier to -- one, if there's somebody we're
24 trying to arrest or there's something we're trying to find on
25 the warrant, they'll probably be home.  Two, there's not a lot

820

1  of in and out.  People aren't really moving around that much in
2  the morning.  So we can get in and do what we have to do safely
3  without a lot of people -- if you do it at night, there might be
4  people that's up and about, as opposed to somebody in their bed.
5  So it's easier for us.  It's safer.
6  Q.    Now, walk us through what happened.  You go to this
7  residence shortly after 6 a.m., I think you said.
8  A.    This residence was just after 6.  The door had to be
9  forced open.
10 Q.    Why is that?  Tell us what happens once you get to the
11 door, first of all.
12 A.    At the door you have your team that's -- we call that in
13 a stack.  Everyone's lined up to come in through the door.  You
14 knock on the door, you wait, you listen, you watch the windows,
15 knock on the door, announce, "police, search warrant," and then
16 you're waiting.  You wait the adequate amount of time.  In this
17 case, I don't remember the exact amount of time, but knowing --
18 without knowing exactly how long we waited -- I would say it's a
19 minute or longer.
20 Q.    Well, let me just clear that up.  Do you have an
21 independent memory of how long you waited on that day?
22 A.    No, no.  But you wait a long enough time.  The door had
23 to be breached because there was no real activity in the house.
24 You couldn't see the door was being answered.  We were waiting
25 outside.  We knew we were trying to get in to recover evidence

821

1  and we wanted to wait, and then the door was breached and we
2  entered.
3  Q.    Okay.  And what do you mean by "breached"?  What
4  physically had to be done?
5  A.    It's a tool, it's a heavy ram that is then slammed onto
6  the door to open it forcefully.
7  Q.    What -- you've made reference earlier to the fact that
8  this was a warrant.  Do you know who -- this was a search
9  warrant?
10 A.    Yes.
11 Q.    Was it only for a search warrant or an arrest warrant, as
12 well?
13 A.    There was also an arrest warrant for an individual that
14 was possibly at that location.
15 Q.    Do you know who that individual was?
16 A.    Raymond Bell.
17 Q.    Raymond Bell.  Now, today, as you sit here today, would
18 you recognize a picture of Raymond Bell?
19 A.    No.
20 Q.    At the time, to get ready for this, were you given
21 identification or photographs?
22 A.    Yes, and we had individuals on our team that were more
23 familiar with Raymond Bell.  But right now I would not recognize
24 Raymond Bell.
25 Q.    And why would a search warrant be needed for this

1 particular location as well as an arrest warrant for Raymond

2 Bell?

3 **A.** We believed Raymond Bell was at that location, is the

4 reason we had the arrest warrant with us. The residence was

5 being searched for evidence in association with the criminal

6 conspiracy that Raymond Bell was charged in.

7 **Q.** And do you know if this particular date, March 22nd of

8 2005, coincided with -- you made a reference to a charged

9 conspiracy. Do you know if there was a -- that date is

10 significant with respect to that or not?

11 **A.** I believe all the warrants that day were in conjunction

12 with that same conspiracy --

13 **Q.** Okay.

14 **A.** -- investigation.

15 **Q.** So let's get back to the door. You breach the door and

16 you enter. Tell us what happens next.

17 **A.** The -- we entered the residence, one team went upstairs,

18 and Dorothy Bell was found upstairs. She was in the bathroom in

19 the shower. That was the only resident in the house. She was

20 allowed to get herself together. She was brought down to the

21 living room area of the house where -- so she's not walking

22 around while we're doing the warrant, so she stayed right in the

23 living room. The house was labeled, photographs were taken, the

24 search was conducted.

25 **Q.** Was Ms. Bell cooperative?

---

1 **A.** Yes.

2 **Q.** And did you, as the team leader, explain to her what was

3 going on?

4 **A.** Yes.

5 **Q.** And -- but you kept her in one location the entire time?

6 **A.** Yes.

7 **Q.** Was she handcuffed or anything like that?

8 **A.** Initially she may have been, but not throughout the

9 warrant.

10 **Q.** Why would she initially be handcuffed?

11 **A.** That's just for her safety, our safety. You're not sure

12 how people are going to react. You don't know who they are;

13 they're not really sure how you're going to act. So we contain

14 the adults in a search warrant just until we can establish that,

15 okay, everyone will be safe if this person is not restrained.

16 **Q.** And then was she restrained for the entire time?

17 **A.** No.

18 **Q.** And how long does it take -- first of all, you mentioned

19 this is two levels?

20 **A.** Yes.

21 **Q.** Was this an apartment or a townhouse or how would you

22 describe it?

23 **A.** More of a townhouse than an apartment.

24 **Q.** And you said -- how long did the entire search take once

25 you got in and you labeled each room?

---

1 **A.** I think at the time we left on the document, I would say

2 two hours.

3 MR. LEON: Your Honor, may I approach?

4 THE WITNESS: Yes.

5 BY MR. LEON:

6 **Q.** Actually before I do that, agent, you mentioned among the

7 things that are done in a case like this, you mentioned sketches

8 are done; is that right?

9 **A.** Yes, sir.

10 **Q.** Was one done in this case?

11 **A.** Yes, sir.

12 **Q.** I'm showing you what's been marked for identification as

13 Government's 711.4. Can you take a look at that, please.

14 THE COURT: While he's doing that, I should mention we've

15 reached our mid-morning break point, so you can put one or two

16 more questions if you would like or we can break now.

17 MR. LEON: We could break now.

18 THE COURT: All right, ladies and gentlemen, we'll take

19 our mid-morning break. Please remember my admonition not to

20 discuss the case amongst yourselves or with anyone else. Please

21 turn off your headsets and leave them in your seats, but take

22 your notes and pencils back into the jury room with you. We'll

23 see you back at 11:20. And let me just note -- tell you, if you

24 haven't noticed it already, the clock on the wall is off. So

25 please know that I'm relying upon that clock that's above the

---

1 door over there. This clock over there is just not working

2 right, so don't rely on that one. Thank you. We'll see you back

3 at 11:20.

4 (Jury out at 11:07 a.m.)

5 THE COURT: All right, agent, you may have a break.

6 Please be back in your seat ready to testify at 11:20.

7 THE WITNESS: All right.

8 THE COURT: Counsel, we'll see you at 11:20.

9 (Thereupon, a break was had from 11:08 a.m. until

10 11:20 a.m.)

11 BY MR. LEON:

12 THE COURT: Mr. Leon, are you ready for the jury?

13 MR. LEON: Yes, Your Honor.

14 (Jury in at 11:24 a.m.)

15 THE COURT: All right, good morning again, ladies and

16 gentlemen.

17 THE JURY PANEL: Good morning.

18 THE COURT: Welcome back. We're ready to resume.

19 Counsel.

20 MR. LEON: Thank you, Your Honor.

21 CONTINUED DIRECT EXAMINATION OF RICHARD R. STALLINGS

22 BY MR. LEON:

23 **Q.** Agent, I think where we left off is I showed you an

24 exhibit and a number I don't have in front of me, can you just

25 read for the record, the sketch -- the document in front of you.

---

*826*

1　And is there an exhibit number in front of that or on the back?
2　**A.**　The exhibit on this is 711.4, and it is a sketch of a
3　search warrant that I conducted on March 22nd.
4　**Q.**　Who did that sketch?
5　**A.**　Rick Crow -- Krause.
6　**Q.**　Do you know who that is?
7　**A.**　He's an agent in our office.  I don't know him
8　personally.
9　**Q.**　Was that his assignment for this warrant on that day?
10　**A.**　He was assigned once we were in and everything was
11　secured, to go through and make a diagram or a sketch of the
12　residence.
13　**Q.**　And did you have a chance, prior to this, to take a look
14　at that sketch?
15　**A.**　Yes.
16　**Q.**　Does that sketch, to your eye, look to -- fairly and
17　accurately depict the general layout of the residence, Unit
18　Number 4 at 1327 Savannah Street, Southeast?
19　**A.**　Yes, it's not to scale, and he's not an architect, so
20　it -- it accurately reflects the apartment or the residence.
21　　　MR. LEON:  Your Honor, at this time, Your Honor, the
22　government would move for the admission of the exhibit.
23　　　MR. ZUCKER:  No objection.
24　　　THE COURT:  Without objection, 711.4 is received.
25　　　(Government's Exhibit 711.4 admitted into the record.)

*827*

1　　　MR. LEON:  With the Court's permission, if Ms. Romero
2　could publish that to the jury as well.
3　　　Okay.  May I inquire of the Court, does the Court know if
4　the touch screen is working or it's not?
5　　　THE COURT:  It probably is, but why don't you try it out
6　with the witness.
7　BY MR. LEON:
8　**Q.**　We'll find out.
9　　　Agent, do you have a pen?  I can give you one.  Without
10　using the ink, obviously, if you could point -- first of all,
11　can you just, generally, show us the sketch and walk us through,
12　just quickly, the different parts to the unit?
13　**A.**　The left-hand side of the sketch is -- just kind of
14　depicts numbers that are labeled within the apartment or complex
15　itself, as a chair, a table, a couch.  The two block figures on
16　the right-hand side, the top block area is the first floor where
17　the entry level floor of the residence is.
18　**Q.**　Is that the top right of the exhibit we're looking at?
19　**A.**　Top right of the exhibit.  It says "first floor" above
20　it.  Room A, B, are depicted on there.  The bottom or the second
21　block down is the second floor of the apartment, rooms G, H, I,
22　F are in that section there.
23　**Q.**　Okay.  I'd like you to -- I'd like to focus on two of the
24　letters there for two of the rooms on this exhibit.  The first
25　one being A.  Can you just show us and point or circle where the

*828*

1　A is?
2　**A.**　(Indicating).
3　**Q.**　Okay.  And the other room I would like to focus on is G.
4　**A.**　G would be on the second floor (indicating).
5　**Q.**　Okay.  And just for the record, you put what appears to
6　be circles around the letter A and the letter G; is that right?
7　**A.**　Yes.
8　**Q.**　Two different rooms in the apartment.  What is A exactly,
9　if you recall?
10　**A.**　A is -- if I could make one more mark here -- the front
11　door, just to depict the front door in relation.
12　**Q.**　Sure.  Where is the front door?
13　**A.**　The front to enter into the apartment is here
14　(indicating), so we made entry into the apartment through that
15　door.  That is the foyer/living room area of the apartment for
16　the first floor, which leads back to the kitchen and the stairs
17　are off of that room.  And G depicts a bedroom that is up on the
18　second floor of the residence?
19　**Q.**　And just for the record, you made a straight, horizontal
20　line on the right part of what appears to be the first floor, to
21　indicate the front door, the front door of the first floor of
22　the unit?
23　**A.**　Yes.
24　**Q.**　And again, what is A --
25　**A.**　A is --

*829*

1　**Q.**　-- is that a room or what is that?
2　**A.**　Living room.
3　**Q.**　Okay.  Now, you also mentioned -- excuse me --
4　photographs that were taken, do you know who took the
5　photographs?
6　　　For the record, you're looking at your 302?
7　**A.**　Yes, sir.
8　**Q.**　Would that refresh your recollection as to who took
9　photographs?
10　**A.**　Yes.
11　**Q.**　I would ask you to look at the 302 and then look up when
12　you're done.
13　**A.**　The photographer for the photographs is going to be
14　annotated on the photograph log itself.
15　**Q.**　Okay.
16　**A.**　Not my 302.
17　　　MR. LEON:  With the Court's permission -- may I approach,
18　Your Honor?
19　　　THE COURT:  Yes.
20　BY MR. LEON:
21　**Q.**　Agent, I'm going to hand you what's been marked for
22　identification as a series of documents marked for
23　identification as government's number 711.3 A, 711.3 W, 711.3 P,
24　711.3 T, 711.3 U, 711.3 V, 711.3 D, and 711.3 LL.  They are a
25　bit out of order, but I did put them in an order to help us with

*838*

1   **Q.**   A knife. Do you know if the knife was near the ASP or

2   just in the same room as the ASP?

3   **A.**   I think it was in the same room. It was found outside of

4   the closet, but they were both collected from room G.

5   **Q.**   And were they both recovered as evidence in this case?

6   **A.**   Yes, sir.

7       MR. LEON: Your Honor, may I approach?

8       THE COURT: Yes.

9   BY MR. LEON:

10   **Q.**   Agent, I'm showing you what's been marked for

11   identification as Government's 711.7.

12       First of all, I'll ask you if you recognize the

13   handwriting on that bag?

14   **A.**   Not the handwriting, but the locating agent, I recognize

15   the name.

16   **Q.**   Okay. And do you know if the -- is there an identifying

17   case number on that bag as well?

18   **A.**   Yes.

19   **Q.**   And does that correspond to the search we're talking

20   about?

21   **A.**   Yes, it's the same case, date, and location of the search

22   warrant photograph.

23   **Q.**   And tell us what is inside the exhibit.

24   **A.**   The exhibit is a plastic evidence bag, has an ASP within

25   it and a collapsable or a closed knife.

*839*

1   **Q.**   And what you have in front of you in that exhibit, does

2   that correspond to what you just told us about -- the ASP and

3   the knife that you just told us about?

4   **A.**   Yes, sir.

5   **Q.**   How do they relate?

6   **A.**   Both found at that search warrant, room G.

7   **Q.**   And how do you know that what you've got in front of you,

8   that ASP and that knife are what we just looked at in the

9   photograph and was seized from the residence?

10   **A.**   The evidence bag, ASP found, closet room G.

11       MR. LEON: Your Honor, at this time the government would

12   move for the admission of the exhibit.

13       THE COURT: Without objection, Exhibit 711.7 will be

14   received.

15       (Government's Exhibit 711.7 admitted into the record.)

16   BY MR. LEON:

17   **Q.**   Now if we can turn back to the photograph, the next

18   photograph where I jumped ahead, could you read that on the

19   record, please. What exhibit is it?

20   **A.**   711.3 T.

21   **Q.**   And I'm going to ask if it can be published to the jury

22   and just tell us what that is.

23   **A.**   From room G, there was a dresser, and we located and

24   seized some mail matter from that room. This is a photograph of

25   the mail matter located from that room.

*840*

1   **Q.**   You used the expression "mail matter." What's "mail

2   matter"?

3   **A.**   "Mail matter" is paper, written documentation found

4   within a search warrant. It could be correspondence, could be

5   handwritten letters, envelopes, basically paperwork within a

6   residence.

7   **Q.**   And is mail matter something that is often seized in

8   connection with search warrants?

9   **A.**   Yes. It shows -- it will show a name and an address, if

10   somebody is receiving mail at that location. The names on the

11   mail or the paperwork is important, and just the names and what

12   the paperwork is, is usually important to -- especially a

13   conspiracy case.

14   **Q.**   Okay.

15       MR. LEON: May I approach, Your Honor?

16       THE COURT: Yes.

17   BY MR. LEON:

18   **Q.**   Agent, I'm handing you what's been marked for

19   identification as government's 711.10. Can you tell us what

20   that is?

21   **A.**   This is mail matter and documents seized from a dresser

22   in room G, from a search warrant of 1327 Savannah Street,

23   Apartment 4.

24   **Q.**   And how do you know that -- is what you're holding in

25   your hand, that exhibit, corresponds to the photograph we're

*841*

1   looking at now?

2   **A.**   Yes.

3   **Q.**   How?

4   **A.**   There's a printout in the photograph, in the stack of

5   papers that is removed from the dresser, which matches the

6   printout within the bag.

7   **Q.**   Okay. And were there any other items taken from any

8   other dresser in room G, to your knowledge? In other words --

9   **A.**   Not from within a dresser, no. This was the items from

10   the dresser.

11   **Q.**   And the notations from that indicate it was taken from a

12   dresser in room G?

13   **A.**   Yes.

14       MR. LEON: Your Honor, at this time the government would

15   move for admission of this exhibit.

16       MR. BALAREZO: Your Honor, if I could just have one

17   moment. I have no objection.

18       THE COURT: Without objection, 711.10 will be received.

19       (Government's Exhibit 711.10 admitted into the record.)

20   BY MR. LEON:

21   **Q.**   Agent, I'm going to ask you to open that exhibit. I'm

22   not going to ask you to go through every piece of paper, but I

23   am going to ask you to read -- take out, if you could, its

24   contents and, actually, with the Court's permission, maybe I

25   could clear what's already in front of the witness.

1  I'm asking you to take out all the contents of that
2  exhibit and read for us some of the names that appear on some of
3  the paperwork or all of the names.  I'm just trying to expedite
4  matters, but don't -- you don't have to go through every single
5  piece of paper and characterize every single piece of paper, but
6  I'm asking for the name on the papers.
7  **A.**  Pre-trial service document, name, Raymond Bell.  Title
8  with the name David Wilson.  Vehicle title, District of
9  Columbia.  It's an income maintenance administration,
10  Raymond Bell.
11      Notice from the Superior Court District of Columbia,
12  Raymond Bell.
13      Handwritten number for Cooper.  These are Maryland
14  citations, Raymond Bell.  Raymond Bell, numerous citations for
15  Maryland for Raymond Bell.
16      Comcast bill.
17      This is Airman (sic) Bell, District Court.
18      Superior Court District of Columbia, Raymond Bell.
19      Handwritten note to Raymond Bell.
20      Mail matter, District Court, Raymond Bell.  Pre-trial,
21  Raymond Bell.
22      This is a handwritten note to Santu.
23  **Q.**  Can you spell that, Santu?
24  **A.**  S-A-N-T-U.
25      Reporting instructions, pre-trial service, Raymond Bell.

1  Superior Court District of Columbia, Raymond Bell.  Pre-trial
2  services, Raymond Bell.  And this is a printout, District
3  Court -- District of Columbia in relation to the United States
4  versus Raymond Bell.
5  **Q.**  Okay.  I'm going to ask you now to put the contents you
6  just reviewed for us back in the exhibit bag before we go to the
7  next exhibit.
8      When you're ready, I'd ask you to look at the next
9  photograph in front of you, read the exhibit number on the
10  record, and tell us what that is.
11  **A.**  Exhibit number 711.3 U.
12  **Q.**  Okay.  We're going to publish that, and if you could tell
13  us what that is.
14  **A.**  These are additional mail matter documents, a knife, a
15  Palm Pilot.
16      THE COURT:  Excuse me one second.  711.3 U?  Is that what
17  the item is?  Is that what you're --
18      MR. LEON:  If I could ask --
19      THE COURT:  Okay.  Because you did not include 711.3 U in
20  your list earlier.
21      MR. LEON:  I apologize.  At this time the government would
22  move for the admission of this exhibit as well.
23      THE COURT:  All right, without objection, 711.3 U will be
24  received.
25      (Government's Exhibit 711.3 U admitted into the record.)

---

**844**

1  BY MR. LEON:
2  **Q.**  Can you tell us what we're looking at there?
3  **A.**  This is additional mail matter documentation, a knife, a
4  Palm Pilot, an item seized from room G, the same search warrant.
5  **Q.**  Now, the knife we're looking at from this exhibit, does
6  that match with the knife that was in with the ASP?
7  **A.**  Yes, sir.
8  **Q.**  Why was the ASP and the knife put in one bag when they're
9  in two different photographs, if you know?
10  **A.**  Just because of the type items they are.  Those being
11  weapons, we consolidate it into one bag as opposed to putting it
12  in with the mail matter.
13  **Q.**  Other than the ASP and that one knife, is there any other
14  knife or just one we're talking about?
15  **A.**  Just one.
16  **Q.**  Any other weapons in the apartment at all?
17  **A.**  No, sir.  That was it.
18  **Q.**  All right.  And --
19      MR. LEON:  May I approach?
20      THE COURT:  Yes.
21  BY MR. LEON:
22  **Q.**  Handing you what's been marked for identification as
23  Government's Exhibit 711.6.
24      If you could, first tell us what that is, if you
25  recognize it?

---

**845**

1  **A.**  This is the mail matter documents from room G.
2  **Q.**  And do what your -- does that, what you're holding in
3  your right hand and what you just characterized to us, at all
4  relate to what we're looking at in the photograph?
5  **A.**  Yes.
6  **Q.**  How?
7  **A.**  The items that were recovered from room G that were not
8  in the dresser drawer were then photographed before placing in
9  the envelope.
10  **Q.**  Where were the items that we we're looking at in this
11  photograph, were they assembled exactly as they were in the
12  photograph or not?
13  **A.**  They were collected from room G, placed for this
14  photograph in one location.
15  **Q.**  Why was it done that way?
16  **A.**  Just to consolidate them for one photograph.
17  **Q.**  And they were consolidated in the bag you looked at?
18  **A.**  Yes, sir.
19  **Q.**  I'm going to ask -- first of all, those items were seized
20  after the photograph was taken?
21  **A.**  Yes.
22  **Q.**  And, Your Honor, at this time the government would move
23  for the admission of this exhibit.
24      THE COURT:  Is this 711.6?
25      MR. LEON:  Yes.

**846**

1    MR. BALAREZO:  Your Honor, could I have one moment?

2    (Discussion had off the record.)

3    MR. BALAREZO:  No objection.

4    THE COURT:  All right, without objection, 711.6 will be

5  received.

6    (Government's Exhibit 711.6 admitted into the record.)

7  BY MR. LEON:

8    Q.    Agent, I'm going to just quickly ask you to do the same

9  with this.  Generally, can you just characterize this?  Did you

10  say it's mail matter that's in this?

11    A.    Yes.

12    Q.    If you could just quickly take the contents out and read

13  for us the names, the various names that are included in that

14  mail matter.

15    A.    This is a -- it's a Metro sales, of a vehicle sales, to

16  Robert Philson.  State of Maryland, vehicle title for

17  Mordecia Meza.

18    Q.    Can you just spell that for the benefit of our court

19  reporter?

20    A.    M-O-R-D-E-C-I-A, Meza, M-E-Z-A.  State of Maryland notice

21  of security interest filing for Mordecia Meza, again.  Maryland

22  certificate of title for Anthony Cassidy.  D.C. learner's permit

23  for Benjamin Thornton.  District of Columbia capital access for

24  Raymond Bell.

25    Government of the District of Columbia and Department of

---

**847**

1  Human Services, Raymond Bell, photo ID.

2    Washington, D.C. driver's license for Jerome Martin.

3    And two attorneys' business cards.

4    Q.    All right.  I'll ask you to put all those contents back

5  in the bag before we get to the next exhibit.

6    Okay.  Can you please turn to the next exhibit, the next

7  photograph in front of you, and read for us what exhibit number

8  we're looking at.

9    A.    711.3 V.

10    Q.    I'll ask if we can have it published.

11    And do you know what we're looking at there?

12    A.    These are documents, again, placed for a photograph,

13  before seizing.

14    Q.    Okay.  And let's look at the next photograph, if we

15  could.

16    A.    Item 711.3 D.

17    Q.    Okay.  Once we get that up on the screen.  What's that,

18  we're looking at there?

19    A.    That's room A of the search warrant that we're talking

20  about on the 22nd.

21    Q.    And does that room A that we're looking at in the

22  photograph, 711.3 D correspond to the letter A we looked at on

23  that sketch a while back?

24    A.    Yes, sir.

25    Q.    The same?

---

**848**

1    A.    Yes.

2    MR. LEON:  May I approach, Your Honor?

3    THE COURT:  Yes.

4  BY MR. LEON:

5    Q.    Agent, I'm handing you what's been marked for

6  identification as Government's 711.11.  Can you tell us what you

7  know that is.

8    A.    These are, again, mail matter documents seized from room

9  A, March 22nd, '05 at the Savannah address, seized by Rick

10  McCaulsky.

11    Q.    Is that a colleague of yours?

12    A.    Yes.

13    Q.    And do you know if what you're holding in your hand,

14  711.11, was actually seized on the day in the search warrant

15  that we're talking about?

16    A.    Yes, it was.

17    Q.    How do you know that?

18    A.    This is an item number from the documents that were

19  seized.  It's the same case number, same date, same address,

20  same search warrant that we've been talking about.

21    Q.    Finally, this will be the last time I'll ask you to do

22  that.

23    MR. LEON:  Your Honor, at this time the government would

24  move for admission of 711.11.

25    MR. BEANE:  One second.  No objection, Your Honor.

---

**849**

1    THE COURT:  711.11 will be received without objection.

2    (Government's Exhibit 711.11 admitted into the record.)

3  BY MR. LEON:

4    Q.    And finally, I'll ask you to remove the contents and

5  quickly walk us through the names on the mail matter there, as

6  well.

7    A.    Again, it's mail matter, Gregory Bell, name Gregory Bell.

8  Gregory Bell.  Gregory Bell.  Greg Bell.  Raymond Santu Bell

9  from District of Columbia pre-trial service.  Gregory Bell.

10  Greg Bell.  Greg Bell.  Gregory Bell.  Greg Bell.  They're all

11  Greg Bell.  Greg Bell.  Raymond Bell.  G Bell.  Raymond Bell.

12  Raymond Bell.  Greg Bell and Raymond Bell.

13    Q.    Okay.  I was just going to ask you to just put that back

14  in 711.11 and I just have a final question for you.

15    A.    The address is 1327 Savannah Street, Number 4,

16  Washington, D.C.

17    Q.    When you say on these, on all the mail matter you

18  reviewed -- I should have asked you that you, I apologize.  I'm

19  going to ask you to look at -- and is there anything on the mail

20  matter that you just read that's not to that address?

21    A.    There's one to Raymond Bell, 1324 Congress Street, Number

22  6, Washington, D.C.

23    Q.    Okay.

24    A.    Another one to Gregory Bell, 1324 Congress Street, Number

25  6, Washington, D.C.  Several to Gregory Bell at the 1324

---

850

address.

**Q.** Okay. Other than the 1324 address that you just read into the record, other than with those exceptions, all the other addresses came back to where?

**A.** Yes, 1327.

**Q.** Is Savannah Street, Southeast?

**A.** Savannah Street, Southeast, Number 4.

**Q.** Finally, I'll ask you to turn to the next photograph and tell us what it is a photograph of?

**A.** 711.3 LL.

**Q.** And if you could tell us what we're looking at here.

**A.** It's a document. In the picture is Dorothy Bell and on the table is the copy of the search warrant. She was reviewing a copy of the receipt, a handwritten document where I record everything that we are seizing. She reviews it and signs it as I'm taking it, she's receiving it -- or I'm receiving it and she's just acknowledging on the form.

**Q.** And where in the -- from the beginning to the end of the search warrant process, where does this happen?

**A.** This is at the end.

**Q.** And did she sign the document?

Yes, sir.

**Q.** And was she given a receipt for the items taken?

**A.** Yes, sir.

**Q.** Do you know who Dorothy Bell is?

851

**A.** No.

**Q.** Do you know if she has any relation to either Raymond Bell or Gregory Bell?

**A.** From her own admission to me, she is the mother of Raymond Bell. She refers to him as her son.

**Q.** And did you ask her any questions about Gregory Bell?

**A.** Gregory Bell?

**Q.** Yes.

**A.** I don't remember any questions on Gregory Bell.

**Q.** And, again, what was the purpose of the search warrant on this day?

**A.** We're doing a search warrant in relation to -- hopefully identifying Raymond Bell being in and executing an arrest and searching the residence in relation to evidence for Raymond Bell.

MR. LEON: May I just have one moment, Your Honor?

THE COURT: Yes.

MR. LEON: Thank you, Your Honor, I have no further questions at this time.

THE COURT: All right.

Counsel for Mr. Ball?

MR. CARNEY: Your Honor, no questions.

THE COURT: Counsel for Mr. Wilson?

MS. WICKS: No questions, Your Honor.

THE COURT: Counsel for Mr. Bell?

852

MR. BEANE: No questions.

THE COURT: All right. Counsel for Mr. Thurston?

MR. ZUCKER: Just briefly, Your Honor.

CROSS-EXAMINATION OF RICHARD R. STALLINGS

BY MR. ZUCKER:

**Q.** Agent, I just want to make sure I understand something. Thirteen agents went out and executed a search warrant, right, your team?

**A.** I don't know exactly the number, but agents went out and executed that warrant.

**Q.** Did you review that with the search warrant team earlier that day?

**A.** Yes.

**Q.** With approximately all 12 or 13?

**A.** Approximately, yes.

**Q.** And you recovered one bag of marijuana and no other contraband, right?

**A.** I'm not sure of the lab results of the bag, but it was suspected marijuana. One bag.

**Q.** Suspected marijuana and the quantity was, what? What commonly would be about a $10 bag, $20 bag?

**A.** If that.

**Q.** If that. And the only resident there was a woman in her 50s, right?

**A.** Correct.

853

**Q.** Okay. And the T-shirts we've seen, any indication that anybody who's part of this case ever wore any of those T-shirts, in your investigation?

**A.** I don't have any knowledge they did.

MR. LEON: Objection. He wasn't the person involved in the investigation.

THE COURT: Sustained.

MR. ZUCKER: Nothing further.

THE COURT: All right. Counsel for Mr. Jones.

CROSS-EXAMINATION OF RICHARD R. STALLINGS

BY MS. MARTIN:

**Q.** If I could just segue on to what Mr. Zucker was asking you.

When you went into the apartment, did you see any photographs of any of the gentlemen seated at this table, wearing any of those T-shirts?

**A.** No photographs of anyone wearing the T-shirts.

**Q.** Have you seen photographs involved in this case?

**A.** I've seen --

**Q.** Outside of --

**A.** I couldn't recall them, but no.

**Q.** I'm sorry, I talked over you. Would you repeat that?

**A.** I don't recall any photographs from this case, no.

**Q.** You've not seen any other photographs involving this case?

**858**

1  you recall specifically?

2  **A.**    I don't recall which it was, but that being a car title,

3  I would have seized it without any conversation.  I may have

4  talked to the case agent in relation to the name, I don't know,

5  but I would have seized that in relation anyhow.

6  **Q.**    Okay.  Thank you.

7  THE COURT:  All right.  Anything else?  Anything else?

8  MR. LEON:  No.  Thank you, Your Honor.

9  THE COURT:  All right.  Thank you.  You may be excused.

10  You need to retrieve your exhibits.  And you may call your

11  next witness.

12  MR. GUERRERO:  Your Honor, the government's next witness

13  is Season Wood.

14  (SEASON KADI WOOD, WITNESS IN THE CASE, SWORN)

15  DIRECT EXAMINATION OF SEASON KADI WOOD

16  BY MR. GUERRERO:

17  **Q.**    Sir, could I just ask you to please identify yourself,

18  your first name, your middle name and your last name.

19  **A.**    Season Kadi Wood.

20  MR. ZUCKER:  We can't hear.

21  THE WITNESS:  Season Kadi Wood.

22  BY MR. GUERRERO:

23  **Q.**    Repeat that, please.

24  **A.**    Season Kadi Wood.

25  MR. ZUCKER:  Sir, if you could keep your voice up, we

**859**

1  still can't hear you back here.

2  THE WITNESS:  Season Kadi Wood.

3  BY MR. GUERRERO:

4  **Q.**    You're kind of soft spoken, Mr. Wood.  I need you to

5  speak nice and loud and clear so everybody in this courtroom,

6  including the back row can hear you.

7  I would like you to please spell your first name, your

8  middle name and your last name.

9  **A.**    First name is Season, S-E-A-S-O-N.  Middle name Kadi,

10  K-A-D-I, Wood, W-O-O-D.

11  **Q.**    Mr. Wood, how old are you?

12  **A.**    Twenty-eight years old.

13  **Q.**    Where were you born?

14  **A.**    In Texas.

15  **Q.**    I need you to speak just a little bit louder for us.

16  **A.**    Texas.

17  **Q.**    At what age did you come to D.C.?

18  **A.**    Around about 10.

19  **Q.**    And after you came to D.C., where did you live at, around

20  that age, 10:00 -- not 10:00 -- years, at 10 years old, where

21  did you live?

22  **A.**    Congress Park.

23  **Q.**    Who in particular lived in Congress Park, from your

24  family?

25  **A.**    My mother and my father.

**860**

1  **Q.**    How long did you live in Congress Park?

2  **A.**    Eighteen years.

3  **Q.**    Where did you go to school?

4  **A.**    Malcolm X.

5  **Q.**    Is that elementary school?

6  **A.**    Malcolm X Elementary, Johnson Junior High and Ballou High

7  School.

8  **Q.**    What was the last grade you finished in high school at

9  Ballou?

10  **A.**    Tenth.

11  **Q.**    Did you ever get a GED?

12  **A.**    Yes.

13  **Q.**    When you quit school in the 10th grade, what did you

14  start to do?

15  **A.**    Hustling.

16  **Q.**    You just said "hustling"?

17  **A.**    Selling drugs.

18  **Q.**    What kind of drugs would you sell?

19  **A.**    Crack cocaine.

20  **Q.**    Where would you principally sell the crack cocaine?

21  **A.**    Congress Park and 10th Place.

22  **Q.**    You said that you've known Congress Park for about 18

23  years?

24  **A.**    Yes.

25  **Q.**    Did you familiarize yourself with that neighborhood?

**861**

1  **A.**    Yes.

2  **Q.**    Did you make friends from that neighborhood?

3  **A.**    People I grew up with, yes.

4  **Q.**    Who were some of the guys that you grew up with?

5  **A.**    Cootie, Dom, Joe-Joe, Antwuan, Boy-Boy, a few other

6  people.

7  **Q.**    Let's start with Cootie.  Could you spell that?

8  **A.**    No.

9  **Q.**    Did you know Cootie by any other name?

10  **A.**    David Wilson.

11  **Q.**    Did you know David Wilson by any other nickname?

12  **A.**    Cool Wop.

13  **Q.**    Do you see Mr. Wilson in the courtroom today?

14  MR. GUERRERO:  If I could ask the witness to stand up so

15  he can get a clearer view of the courtroom.

16  THE WITNESS:  Yes, I see him standing up now.

17  BY MR. GUERRERO:

18  **Q.**    There's a gentleman that just stood up.  Is that the

19  person you just identified as David Wilson?

20  **A.**    Yes.

21  MR. GUERRERO:  All right.  I'll ask for an in-court

22  identification of Mr. Wilson.

23  THE COURT:  Any objection?

24  MS. WICKS:  No, Your Honor.

25  THE COURT:  All right.  The request is granted.

*870*

1  Exhibit 100.1, there are two arrows and the one that's circled
2  you recognize to be what area?
3  **A.**  The circle.
4  **Q.**  As you were growing up, did you ever become familiar with
5  an area in Congress Park known as the L or the Lincoln?
6  **A.**  Yes.
7  **Q.**  And indicate for the jury on Government's Exhibit 100.1
8  where that area is.
9  **A.**  (Indicating).
10  **Q.**  I note for the record on Government's Exhibit 100.1,
11  you've circled what appeared to be a backward L building?
12  **A.**  Yes.
13  **Q.**  Did you ever become familiar with an area known as
14  Boat Alley?
15  **A.**  Yes.
16  **Q.**  Indicate for the jury where Boat Alley was when you were
17  growing up?
18    For the record, I note you made a circle with a line
19  through it on the upper right-hand corner of Government's
20  Exhibit 100.1, to the right of Savannah Street.
21  **A.**  Yes.
22  **Q.**  You mentioned earlier when we started, that your mother
23  used to live in that area.  Would you circle the building where
24  your mother used to live?
25  **A.**  (Indicating).

*871*

1  **Q.**  And for the record, you've drawn a circle with two arrows
2  on a building, what appears to be on Government's Exhibit 100.1
3  below Savannah Street, not the first one but the second one.
4  Did I document that correctly, Mr. Wood?
5  **A.**  Yes, it's the first one, like in the back of the alley,
6  right there.
7  **Q.**  And the first one in the back of the alley?
8  **A.**  That's where she used to live.
9  **Q.**  What kind of alley is that?
10  **A.**  It's just an alley.  It's really a parking lot, but they
11  call it an alley.
12  **Q.**  Now, Mr. Wood, you mentioned that as you were growing up
13  in the 10th grade, you dropped out of school and you started to
14  hustle.  Why did you drop out?
15  **A.**  Too much trouble, staying in too much trouble in school.
16  **Q.**  And when you first started to hustle, you said, dealing
17  crack cocaine, tell the jury, what quantity amounts did you
18  sell?
19  **A.**  Five to 20 grams.
20  **Q.**  Five or 20 grams of what?
21  **A.**  Crack cocaine.
22  **Q.**  Are you familiar with what a dime bag is?
23  **A.**  Yes.
24  **Q.**  And what is a dime bag?
25  **A.**  A single rock that you sell for $10.

*872*

1  **Q.**  And would you package that single?
2   MR. ZUCKER:  Objection.
3   THE WITNESS:  Yes.
4   MR. ZUCKER:  Objection, Your Honor.
5   THE COURT:  Hold on one second.
6   MR. ZUCKER:  He didn't say he dealt in five to 20 grams.
7   THE COURT:  The question was:  And would you package that
8  single?  What was your objection to?
9   MR. ZUCKER:  The man said he dealt in five to 20 grams and
10  he's now asking about dime bags.
11   THE COURT:  What is the question?
12   MR. ZUCKER:  The --
13   THE COURT:  I was asking him.  What question have you just
14  put to him?
15   MR. GUERRERO:  How would you package a dime bag?  And I
16  prefaced that by asking him are you familiar with what a dime bag
17  is.
18   THE COURT:  I'll allow it.  Go ahead.
19  BY MR. GUERRERO:
20  **Q.**  How would you package a dime bag?
21  **A.**  Just cut it up and put it in a small plastic Ziploc bag.
22  **Q.**  Now, you said that you would also -- well, strike that.
23  What quantity is contained in a dime bag?
24  **A.**  What quantity?
25  **Q.**  How many grams is it?

*873*

1  **A.**  I can't -- I know it's a small amount of grams, nothing
2  too much.
3   MR. TABACKMAN:  I can't hear him, Your Honor.
4   THE WITNESS:  A small quantity.  It's not too much of
5  anything.
6  BY MR. GUERRERO:
7  **Q.**  When you were selling -- well, did you ever sell dime
8  bags yourself?
9  **A.**  Yes.
10  **Q.**  And what quantities of crack cocaine would you buy in
11  order to break it down into dime bags?
12  **A.**  Crack cocaine.
13  **Q.**  What quantity?  How much would you get in order to break
14  it down into dime bags?
15  **A.**  About a half an ounce or something like that, to break it
16  down to dimes and sell them $10 a piece.
17   MR. TABACKMAN:  I apologize.  I only heard --
18   THE COURT:  Would you repeat it louder?
19   THE WITNESS:  I said you could buy a nice quantity, cut it
20  up and put it in Ziploc bags and sell them for $10 a piece.
21  BY MR. GUERRERO:
22  **Q.**  All right.  You mentioned a half an ounce is something
23  that you would buy?
24  **A.**  Yes, a half an ounce.
25  **Q.**  And how would you buy a half an ounce, in what type of

**874**

1  quantities?

2  **A.**  Hard, crack cocaine.

3  MR. ZUCKER: Objection. How would you buy a half an

4  ounce? In what type of quantities. A quantity is a half an

5  ounce.

6  THE WITNESS: Meaning --

7  THE COURT: Hold on one second. Do you want to rephrase?

8  BY MR. GUERRERO:

9  **Q.**  When you purchased a half an ounce, would you buy it hard

10  in 1 piece or separated?

11  **A.**  I would buy it in one chunk of hard crack cocaine.

12  **Q.**  Did you ever buy a half an ounce in smaller than one

13  chunk piece?

14  **A.**  Yes, I have.

15  **Q.**  And when you would purchase an ounce that's smaller than

16  a one chunk piece, what type of chunks would you get?

17  **A.**  You'd probably get them in eight-balls.

18  **Q.**  What's an eight-ball?

19  **A.**  An eight-ball is 3.5 grams of crack cocaine.

20  **Q.**  How many eight-balls in a half an ounce?

21  **A.**  How many eight-balls are in a half an ounce? It's four.

22  **Q.**  And an eight-ball contains how many grams?

23  **A.**  Three point five.

24  **Q.**  What would be a sale price of 3.5 grams or an eight-ball

25  of crack cocaine?

**875**

1  **A.**  125 or 150.

2  **Q.**  $125?

3  **A.**  Yes.

4  **Q.**  Or $150?

5  **A.**  Between them two.

6  **Q.**  So a half an ounce to you, back when you were hustling,

7  would be purchased by you for how much?

8  **A.**  600.

9  **Q.**  How about an ounce, how much would you purchase an ounce

10  for?

11  **A.**  1200.

12  **Q.**  When you were hustling back in the day in Congress

13  Park -- and you can use the map if you would like to -- where

14  would you commonly sell your drugs in that neighborhood?

15  MS. WICKS: Objection, leading.

16  THE COURT: I'll allow it.

17  THE WITNESS: (Indicating).

18  BY MR. GUERRERO:

19  **Q.**  I'll note for the record on Government's Exhibit 100.1,

20  you've pointed to the left of the building, in that parking

21  alley as you described it, where your mother used to live?

22  **A.**  Right. All through that alley, right there.

23  **Q.**  And you said that earlier, that that's like a parking

24  lot, really?

25  **A.**  Yes.

**876**

1  **Q.**  How old were you when you were starting to hustle?

2  **A.**  Around about 15.

3  **Q.**  And this was right around the age when you -- right

4  around the time that you dropped out of 10th grade?

5  **A.**  Yes.

6  **Q.**  So between, like, the ages of 15 to 19, did you become

7  familiar with other areas in Congress Park where they were

8  hustling or selling crack cocaine?

9  **A.**  Yes.

10  **Q.**  And where did you see, with your own eyes, that taking

11  place?

12  **A.**  Savannah Street, the circle, and the Lincoln.

13  **Q.**  And you mentioned some guys that you grew up with,

14  including the six defendants behind me. Did you see any of

15  those guys during that time period selling crack cocaine, in

16  that neighborhood?

17  **A.**  Yes.

18  **Q.**  Who in particular?

19  **A.**  Uhm, Joe-Joe and Cool Wop.

20  **Q.**  And later on, did you actually ever purchase any drugs

21  from anyone in particular, of those six defendants?

22  **A.**  Yes.

23  **Q.**  Who was that?

24  **A.**  Twan and Cool Wop.

25  **Q.**  Where would you see Wop or David Wilson sell his drugs?

**877**

1  **A.**  On Savannah, in the circle.

2  **Q.**  Where would you see Joe-Joe or Joseph Jones sell his

3  drugs?

4  **A.**  Probably in the alley.

5  **Q.**  Which alley are you talking about?

6  **A.**  The one where my mother used to live.

7  **Q.**  Now, at some point you actually get arrested, didn't you?

8  **A.**  Yes.

9  **Q.**  That was in 1999?

10  **A.**  Yes.

11  **Q.**  How old were you then?

12  **A.**  I was 21.

13  **Q.**  What did you get arrested for?

14  **A.**  Distribution of crack cocaine.

15  **Q.**  And are you the same Season Wood who was convicted in

16  F 695199 for distribution of crack cocaine?

17  **A.**  Yes.

18  **Q.**  That was over in Superior Court?

19  **A.**  Yes.

20  **Q.**  And what happened as a result of that case? Did you go

21  to prison or did you go on probation?

22  **A.**  Yes, I went on probation.

23  **Q.**  I need to speak louder, okay?

24  **A.**  Probation.

25  **Q.**  And when you were on probation from that case, what did

*878*

1  you continue to do?

2  **A.**   To sell drugs.

3  **Q.**   Where?

4  **A.**   10th Place.

5  **Q.**   And what was your connection to 10th Place?

6  **A.**   I had a cousin that lived down there.

7  **Q.**   You had a cousin that lived down there?

8  **A.**   Yes.

9  **Q.**   On Government's Exhibit 100.1, can you see 10th Place?

10  **A.**   No, I cannot.

11  **Q.**   Where -- to what direction would it be?

12  **A.**   It would be to my left.

13  **Q.**   Using Government's Exhibit 100.1, point to the direction

14  where 10th Place would be.

15  **A.**   (Indicating.)

16  **Q.**   You just pointed off the screen to the lower left-hand

17  corner of Exhibit 100.1.

18  **A.**   Yes.

19  **Q.**   If you saw an area of 10th Place, would you recognize it?

20  **A.**   Yes.

21  **Q.**   Pull up Government's Exhibit 105.1, please,

22  Mr. Mazzitelli.

23       Referring to Government's Exhibit 105.1 which has been

24  marked and admitted, do you see that on the screen?

25  **A.**   Yes, but that's not 10th Place.

*879*

1  **Q.**   Do you see an area on 105.1 indicating 10th Place?

2  **A.**   Yes.

3  **Q.**   Is that the 10th Place you're talking about?

4  **A.**   Yes.

5  **Q.**   Okay.  I believe you could, for the record, clear the

6  screen by pointing on the lower right-hand corner of the

7  monitor.  Would you try that for us?

8       On Government's Exhibit 105.1, using that pen again,

9  Mr. Wood, please circle the area of 10th Place that you were

10  talking about.  And for the record, on Government's

11  Exhibit 105.1, you've circled an area close to Savannah Street

12  and the intersection of 10th Place?

13  **A.**   Yes.

14  **Q.**   What was your connection to that area?

15  **A.**   Selling drugs.

16  **Q.**   And why was it that you had decided to go to 10th Place

17  rather than stay in Congress Park to sell your drugs?

18  **A.**   Less competition.

19  **Q.**   Less competition.  What does that mean, with respect to

20  Congress Park?

21  **A.**   Well, I did -- you know, it was too many people hustling

22  in one area, so down on 10th Place, everybody was fairing even

23  down there, so I decided to hustle down at 10th Place.

24  **Q.**   When you were hustling over in Congress Park, did you

25  ever become familiar with the word *"uno"* and then the second

*880*

1  word *"dose"*?

2  **A.**   Yes, I heard that saying before.

3  **Q.**   What does that saying mean to you?

4  **A.**   That mean you had to share one of your sales if it came.

5  **Q.**   Did you ever see either Mr. Wilson, Mr. Ball, Mr. Jones,

6  Mr. Bell, or Mr. Samuels?

7       MR. ZUCKER:  Objection, Your Honor, compound.

8       THE COURT:  Finish the question.

9  BY MR. GUERRERO:

10  **Q.**   Any of the defendants in this courtroom exercise a uno,

11  *dose* transaction?

12  **A.**   Yes.

13  **Q.**   Who in particular?

14  **A.**   Cool Wop and Joe-Joe.

15  **Q.**   Let's start with Cool Wop, Mr. Wilson.

16       Describe for the jury what an *uno, dose* transaction would

17  mean if you had seen it?

18       MS. WICKS:  Objection.

19       THE COURT:  Basis?

20       MS. WICKS:  May we approach?

21       THE COURT:  Yes.

22       (Following sidebar discussion had on the record:)

23       MS. WICKS:  I think the problem with this question, Your

24  Honor, is it starts out by saying as to Cool Wop and then goes on

25  to a very general statement about what an uno, dose transaction

*881*

1  is.  If this witness has -- I mean, the question starts out with,

2  do you have specific knowledge of him involved in a transaction?

3  I think the follow up to that is:  You know, when, where,

4  specifics.  But the question that the prosecutor followed up with

5  is:  As to Cool Wop, can you describe such a transaction?  I

6  don't even understand what that means.

7       MR. ZUCKER:  I'll object on hearsay grounds.  It's also

8  speculation as to what's in the speaker's mind or the hearer's

9  mind.  He can describe what he saw.

10       THE COURT:  Your question is what do you mean -- the

11  question ended by saying if you had seen it.  What do you mean by

12  uno, dose if you had seen it?  Why don't you clarify the

13  question, but otherwise I'll overrule the objection.

14       MR. GUERRERO:  Okay.  I'll clarify.

15       (Sidebar discussion concluded.)

16  BY MR. GUERRERO:

17  **Q.**   Let me withdraw that last question and clarify, Mr. Wood.

18       Did you actually see an *uno, dose* transaction yourself,

19  with your own eyes?

20  **A.**   Yes, I have.

21  **Q.**   And describe what you saw when an uno, *dose* transaction

22  took place.

23  **A.**   That means somebody come with $20, whoever say uno,

24  whoever say dose, they've got to split the money, $10 a piece.

25  **Q.**   So if someone came with $20, $20 to buy what?

**882**

1   **A.**   Crack cocaine.  You got to give them one dime.  The other
2   person give them one dime and y'all split the $20, $10 a piece.
3   **Q.**   Is that something that you saw Mr. Wilson do with your
4   own eyes?
5   **A.**   Yes.
6   **Q.**   And do you remember how many times you saw Mr. Wilson do
7   that?
8   **A.**   I seen him do it a few times.
9   **Q.**   Who else did you see participate in uno, *dose*
10  transactions?
11  **A.**   Joe-Joe.
12  **Q.**   I need you to speak louder, okay?
13  **A.**   Joe-Joe.
14  **Q.**   And how many times did you see Joe-Joe participate in an
15  *uno, dose* transaction?
16  **A.**   A few times as well.
17  **Q.**   I'm sorry.
18  **A.**   A few times as well.
19  **Q.**   With respect to Mr. Wilson, when you saw him do an uno,
20  *dose* transaction, where did that take place in Congress Park?
21  **A.**   On Savannah Street.
22  **Q.**   With respect to Mr. Jones or Joe-Joe, when you saw him do
23  an *uno,* dose transaction, where did that take place in
24  Congress Park?
25  **A.**   On Savannah Street.

**883**

1   **Q.**   Now, when you were -- when you went to 10th Place and
2   started to sell your crack cocaine, how long did that last
3   before you get in trouble again?
4   **A.**   Not long.
5   **Q.**   A year, less than a year?
6   **A.**   Less than a year.
7   **Q.**   What happened in September of 2000?
8   **A.**   They ran in to my cousin's house.
9   **Q.**   Who ran in your cousin's house?
10  **A.**   The FBI.
11  **Q.**   That was September 25th of 2000?
12  **A.**   Yes.
13         MR. ZUCKER:  Objection, form -- objection, leading.
14         THE COURT:  Sustained.
15  BY MR. GUERRERO:
16  **Q.**   Do you remember the exact date?
17  **A.**   No.  I just know it was some time in September.
18  **Q.**   And whose house was it again?
19  **A.**   My cousin's.
20  **Q.**   And what did they find in your cousin's house?
21         MR. ZUCKER:  Could we identify the cousin, Judge?
22         MR. GUERRERO:  Relevance, Your Honor.
23         THE COURT:  If that's an objection, it's overruled.
24  BY MR. GUERRERO:
25  **Q.**   What did they find in your cousin's house?

**884**

1   **A.**   A few chunks of crack cocaine, some money and two guns.
2   **Q.**   Were you there when that raid took place?
3   **A.**   Yes.
4   **Q.**   What happened to you?
5   **A.**   I get arrested.
6   **Q.**   And all the while you were on probation?
7   **A.**   Yes.
8   **Q.**   Now, that case, then, went where, do you recall?
9   **A.**   I got out.
10         MS. WICKS:  Objection, foundation.
11  BY MR. GUERRERO:
12  **Q.**   I can ask a foundation.  Did you get arrested?
13  **A.**   Yes.
14  **Q.**   Where did you go?
15  **A.**   They locked us up.
16  **Q.**   And do you remember going to a courthouse?
17  **A.**   Yes, I remember coming to District Court.
18  **Q.**   And after you went to District Court, do you remember
19  meeting up with an agent called Rob Lockhart?
20  **A.**   Yes.
21  **Q.**   And who is Rob Lockhart to you?
22  **A.**   An FBI agent.
23  **Q.**   Was that the first time you had seen him?
24  **A.**   Yes.
25  **Q.**   And what, if anything, did you decide to do with

**885**

1   Mr. Lockhart or Special Agent Lockhart?
2   **A.**   I started working with the government.
3   **Q.**   And what does that mean, you started working with the
4   government?
5   **A.**   It consists of anything they ask you to do in
6   cooperation.
7   **Q.**   Had you entered a plea agreement yet?
8   **A.**   No.
9   **Q.**   So what motivated you, at that point, to start working
10  with the government?
11  **A.**   Uhm, to get a lesser sentence when the time came.
12  **Q.**   What kind of things did you do with Mr. Lockhart, with
13  Special Agent Lockhart?
14  **A.**   Drug buys.
15  **Q.**   And where did you go to do these drug buys?
16  **A.**   In Congress Park.
17  **Q.**   I want to focus your attention to January the 24th of
18  2001.  Do you recall doing a drug buy with Special Agent
19  Lockhart from David Wilson?
20  **A.**   Yes.
21  **Q.**   Where did that drug buy take place?
22  **A.**   In Congress Park, in the old rental office building.
23         MR. GUERRERO:  Mr. Mazzitelli, can you pull up 100.1,
24  please.
25         THE COURT:  What exhibit is it?

*886*

1  MR. GUERRERO: Your Honor, 100.1, if we can pull that up.

2  It's been marked and entered.

3  BY MR. GUERRERO:

4  Q.  Can you see 100.1 up on the screen, Mr. Wood?

5  A.  Yes.

6  Q.  All right. And I'm going to ask you, please, to clear

7  the screen again by touching the lower right-hand corner.

8  A.  (Indicating.)

9  Q.  All right. Can you, on 100.1, can you indicate for us

10  where it was that this particular controlled buy took place?

11  A.  (Indicating.)

12  Q.  I note for the record you've done what appears to be like

13  a triangle on 100.1, and the lower right-hand triangle is

14  touching a building.

15  A.  Yes.

16  Q.  And what building is that?

17  A.  The old rental office building.

18  Q.  Did you know where Mr. Wilson was living back in January

19  of 2001?

20  A.  He was living upstairs in the old rental office building.

21  Q.  In the same building that you just identified in 100.1?

22  A.  Yes.

23  Q.  Who was Mr. Wilson living in that building with?

24  A.  A female named Dom.

25  Q.  A female named what?

*887*

1  A.  Dom.

2  Q.  Can you spell it?

3  A.  D-O-M.

4  Q.  Was it short for something?

5  A.  I think Dominique.

6  MS. WICKS: Objection, leading.

7  THE COURT: Overruled.

8  MR. ZUCKER: I didn't hear what he said.

9  THE COURT: Would you stand please when you address the

10  Court.

11  MR. TABACKMAN: I'm sorry, Your Honor. Did he answer the

12  question, was it short for something? It sounded like he may

13  have. I couldn't hear.

14  THE COURT: Would you repeat that answer, please.

15  THE WITNESS: Short for Dominique.

16  MR. TABACKMAN: Thank you, Your Honor.

17  BY MR. GUERRERO:

18  Q.  Did you, yourself, know what the relationship was between

19  Mr. Wilson and Dominique?

20  A.  Naw, I just thought they was close friends.

21  Q.  How long had Mr. Wilson been living there with Dominique

22  in the old rental office?

23  A.  I'd say about two, three years.

24  Q.  Well, describe that purchase. How did it occur?

25  A.  I called him on the cell phone, we talked.

*888*

1  Q.  You called who on the cell phone?

2  A.  I called Cool Wop on the cell phone, and we met up with

3  each other and talked about it. I told him I wanted to buy half

4  an ounce from him.

5  Q.  A half an ounce of what?

6  A.  Of crack cocaine.

7  Q.  Do you remember what time of day it was?

8  A.  During the daytime.

9  Q.  What did Mr. Wilson or Cool Wop say to you when you

10  called him asking for crack cocaine?

11  A.  He said it would be ready. When he ready, he'll call me

12  and let me know when to come meet him.

13  Q.  Did he call you back?

14  A.  Yes.

15  Q.  And what did he say when he called you back?

16  A.  He was ready.

17  Q.  What happened next?

18  A.  I went in the old rental office building. Him and a dude

19  named Phil was in the hallway.

20  Q.  Did you recognize who Phil was?

21  A.  Yes.

22  Q.  And who is Phil to you?

23  A.  Who is he to me?

24  Q.  Yeah.

25  A.  He's somebody I knew that grew up in the neighborhood.

*889*

1  Q.  Do you know his last name?

2  A.  I think Thurston.

3  Q.  Why do you think it's Thurston?

4  A.  Because it's Dazz's little brother.

5  Q.  I'm sorry?

6  A.  Because it's Dazz's little brother.

7  Q.  It's Dazz's little brother?

8  A.  Yes.

9  Q.  This person Phil is Dazz or Desmond Thurston's little

10  brother?

11  A.  Yes.

12  Q.  So that's why you think Phil's last name might be

13  Thurston?

14  A.  Yes.

15  Q.  Had you seen Phil before?

16  A.  Yes.

17  Q.  And where exactly did this transaction take place inside

18  the building?

19  A.  As soon as you come through the door of the old rental

20  office building.

21  Q.  Did you go inside an apartment or did you stay in a

22  hallway?

23  A.  Stayed in a hallway.

24  Q.  Who else was there, apart from you, Mr. Wilson and Phil?

25  A.  Just us three.

*890*

1  **Q.**   What -- describe what happened next when you guys met in
2  the hallway.
3  **A.**   Phil had gave Cool Wop four eight-balls for me, and I
4  purchased the crack cocaine from him.
5  **Q.**   And when Cool Wop hands the four eight-balls to Phil,
6  does Cool Wop go anywhere?
7  **A.**   No, he didn't.
8  **Q.**   What happened?
9  **A.**   We made the purchase right there.
10  **Q.**   Who did you give the money to?
11  **A.**   Cool Wop.
12  **Q.**   How much money did you give him?
13  **A.**   I gave him $500.
14  **Q.**   Who had given you the money?
15  **A.**   Rob Lockhart.
16  **Q.**   Special Agent Lockhart?
17  **A.**   Yes.
18  **Q.**   And where was he?
19  **A.**   He was in the area.
20      MS. WICKS:  Your Honor, the time frame.
21      THE COURT:  You can rephrase.  I'll let you rephrase.
22  BY MR. GUERRERO:
23  **Q.**   At the time of the sale that you are making for
24  Mr. Wilson, did you know where Mr. Lockhart was?
25  **A.**   No, but I know he was in the area somewhere.

*891*

1  **Q.**   Were you maintaining contact with Mr. Lockhart?
2  **A.**   Yes.
3  **Q.**   Or Special Agent Lockhart?
4  **A.**   Yes.
5  **Q.**   How would you do that?
6  **A.**   Cell phone.
7  **Q.**   Were you equipped with anything on your person?
8  **A.**   Yes.
9      MS. WICKS:  Objection.  Leading, Your Honor.
10      THE COURT:  Overruled.
11      THE WITNESS:  A wire.
12  BY MR. GUERRERO:
13  **Q.**   What's a wire?  Explain that for the jury.
14  **A.**   It's a device that you wear so they can hear everything
15  that's going on, as far as your conversation.
16  **Q.**   Who had equipped you with this wire?
17  **A.**   Robert Lockhart.
18  **Q.**   And when did that take place?
19  **A.**   Before I went and made the buy.
20  **Q.**   So, when you walk into the hallway, where was the wire on
21  your person?
22  **A.**   On my back.
23  **Q.**   When you handed the money to David Wilson?
24      MS. WICKS:  Objection, foundation.
25      THE COURT:  Overruled.

*892*

1  BY MR. GUERRERO:
2  **Q.**   I believe that's what you said.  Is that what you said?
3  That -- when you made the transaction, you handed the money to
4  David Wilson?
5  **A.**   Yes.
6  **Q.**   All right.  What was the sale price for that particular
7  transaction?
8  **A.**   600.
9  **Q.**   How much did you hand?
10  **A.**   500.
11  **Q.**   What arrangements, if any, did you make with Mr. Wilson
12  about the missing $100?
13  **A.**   I told him.
14      MS. WICKS:  Objection.
15      THE COURT:  Overruled.
16      THE WITNESS:  I told him the next time when I come and
17  purchase something else from him, I'd pay him the other 100.
18  BY MR. GUERRERO:
19  **Q.**   Was he okay with that?
20  **A.**   Yes.
21  **Q.**   Showing you, for the record, Government's Exhibit 312.1.
22  It's been marked and entered.
23      Do you recognize what this is?
24  **A.**   Yes.
25  **Q.**   What is it?

*893*

1  **A.**   It's an audio of the conversation of me and David Wilson
2  containing the buy.
3  **Q.**   Have you heard this tape?
4  **A.**   Yes.
5  **Q.**   And how do you know it's on this particular audio?
6  **A.**   Because of my signature.
7  **Q.**   And where do you see your signature on it?
8  **A.**   On the left-hand side of it.
9  **Q.**   What does it say?
10  **A.**   It has the date, which is 2-16-07 and my two initials,
11  SW.
12      MR. GUERRERO:  Your Honor, at this time I would move to
13  publish Government's Exhibit 312.1, play it for the jury.  It's
14  been marked and entered.
15      THE COURT:  All right.  For timing purposes, we'll be
16  taking our lunch break at 12:55.  That's in 5 minutes.
17      (Audiotape played.)
18      MR. GUERRERO:  We can take a break now, Your Honor.
19      THE COURT:  All right ladies and gentlemen, we'll take a
20  break right now.  Please turn off your headsets and leave them in
21  the seat, but remember to take your notes and pencils back to the
22  jury room, and remember my admonition not to talk about the case
23  amongst yourselves or with anyone else.  We'll see you back here
24  at 2:15.  Enjoy your lunch break.
25      (Jury out at 1:02 p.m.)

1                CONTINUED DIRECT EXAMINATION

2 BY MR. GUERRERO:

3 Q.  Good afternoon, Mr. Wood.

4 A.  Good afternoon.

5 Q.  I believe we left off playing Government's Exhibit 312.1,

6 which was a purchase that happened on January 24th, 2001.

7           MR. GUERRERO:  And I would ask Mr. Mazzitelli to play

8 the last portion of that exhibit.

9           THE COURT:  That's in evidence?

10          MR. GUERRERO:  That's in evidence, Your Honor, yes.

11          (Audiotape played in open court.)

12 Q.  All right.  Mr. Wood, I would just like to go over a little

13 bit in detail 312.1, which was a tape that we just heard.

14          Had you had the opportunity to listen to the entire

15 audiotape documenting that particular purchase?

16 A.  Yes.

17 Q.  And who did you do that with?

18 A.  With you.

19 Q.  Anybody else?

20 A.  The agent.

21 Q.  I need you to speak loud.  Okay?

22 A.  And the agent.

23 Q.  And what we just heard is like a shortened version, we call

24 it an abridged version.  I want to ask you a couple of questions

25 on that exhibit.

1          On Government's Exhibit 312.1, you mentioned, "There's

2 Keith Barnett right there."  Do you remember hearing that?

3 A.  Yes.

4 Q.  Who were you talking to when you said, "There's Keith

5 Barnett right there"?

6 A.  Rob Lockhart.

7 Q.  Is that Agent Lockhart?

8 A.  Yes.

9 Q.  And why were you indicating to Agent Lockhart where Keith

10 Barnett was?

11 A.  Because they had asked about him.

12 Q.  Who had asked about him?

13 A.  Rob Lockhart.

14 Q.  You also mentioned on Government's Exhibit 312.1, you

15 mentioned someone by name, Joe.  "What's up, Joe?"  Do you

16 remember hearing that?

17 A.  Yes.

18 Q.  Who were you referring to?

19 A.  Jojo.

20 Q.  Is that Joseph Jones, the defendant in this courtroom?

21 A.  Yes.

22 Q.  On Government's Exhibit 312.1, you asked Mr. Jones or Jojo

23 about his leg.  Do you remember that?

24 A.  Yes.

25 Q.  Tell the jury what observations you made of Jojo that caused

Page 903

1 you to ask him about his leg.

2 A.  Because he was on crutches.

3 Q.  Did you notice anything else about his leg?

4 A.  I heard he got shot in his leg --

5          MR. ZUCKER:  Objection.

6          THE COURT:  Sustained.

7 BY MR. GUERRERO:

8 Q.  Without telling us what you heard, just tell us what you

9 saw.

10 A.  Just him standing outside with crutches.

11 Q.  Do you recall which leg it was that you saw -- well, strike

12 that.

13          Was there an injured leg that you saw?

14 A.  Yeah, he had a cast on his leg.

15 Q.  Do you recall which leg it was?

16 A.  No, I can't recall that.

17 Q.  And in response to, "What's up with your leg," what did

18 Mr. Jones say to you?

19 A.  He said it's doing better.

20 Q.  Did he say how he had gotten injured?

21 A.  No.

22          MS. WICKS:  Objection.  Leading.

23          THE COURT:  Overruled.

24 BY MR. GUERRERO:

25 Q.  The question was, Mr. Wood, did Mr. Jones say to you how he

1 had gotten injured?

2          THE COURT:  He's answered the question.

3          MR. GUERRERO:  I didn't hear it, Judge.

4          THE COURT:  He said no.

5          MR. GUERRERO:  I'll move on.

6 BY MR. GUERRERO:

7 Q.  Also on Government's Exhibit 312.1, Mr. Wood, you call

8 someone out by the name Dazzie.  Do you remember hearing that?

9 A.  Yes.

10 Q.  And who are you referring to?

11 A.  Dazz.

12 Q.  Is that Mr. Desmond Thurston in the courtroom?

13 A.  Yes.

14 Q.  And then you also referred to someone, Phil.  Do you

15 remember hearing that?

16 A.  Yes.

17 Q.  And who was Phil that you're referring to?

18 A.  That's Dazz's little brother.

19 Q.  After you -- well, let's back up here for a second.

20          What quantity of crack cocaine did you purchase that

21 day?

22 A.  Heart crack cocaine.

23          MS. WICKS:  Objection.  Nonresponsive.

24          THE COURT:  Overruled.

25

Page 920

1 Q.  What did he mean by that?

2 A.  I guess it's another person that was coming to cook the coke

3 for him.

4 Q.  What did you do after that?

5 A.  I went and met back up with Agent Rob Lockhart, gave him the

6 rest of the funds, then I left.

7         (Audiotape played in open court.)

8 Q.  Mr. Wood, I would like to now focus your attention to

9 Valentine's Day in 2001.  Do you recall trying to make a

10 purchase that day, February 14, 2001?

11 A.  Yes.

12 Q.  Who were you trying to make the purchase from?

13 A.  Cool Wop.

14 Q.  Before I go there, let me just rewind a little bit.  I

15 jumped ahead of myself.

16         When you got back and met with Agent Lockhart after you

17 had paid Mr. Wilson the $100, what happened?

18 A.  They took the device off me, which is the wire, searched me

19 again, searched my vehicle, and I went on about my business.

20 Q.  Did you give them any money?

21 A.  Yes.

22 Q.  How much?

23 A.  $1,200.

24 Q.  Now I would like to move forward to February 14th,

25 Valentine's Day, 2001.  What arrangements if any did you make

1 that day to hook up with Mr. Wilson?

2 A.  I was trying to buy an ounce from him that day.

3 Q.  Did you call him that day?

4 A.  Yes.

5 Q.  Do you remember Agent Lockhart being around when you called

6 Mr. Wilson?

7 A.  Yes.

8        MR. GUERRERO:  Permission to publish Government's

9 Exhibit 315.2T, marked and admitted.

10        (Audiotape played in open court.)

11        MR. GUERRERO:  Just for the record, ensure Government's

12 Exhibit 315.2T, the government has that as marked and admitted.

13        THE COURT:  You said 315.2T?

14        MR. GUERRERO:  "T" as in Tom, yes, sir.

15        THE COURT:  That is marked.  It is not admitted.  315.2

16 is admitted.

17        MR. GUERRERO:  That's what I meant.  315.2, the

18 audiotape.  I'm sorry.  Not the tape.  Just to clarify, my

19 mistake again, Your Honor.  It's 315.2, which is an audio call

20 that we just heard.

21        COURTROOM DEPUTY:  315.2 is marked and admitted on

22 2/22.

23        MR. GUERRERO:  And admitted.  That was my error in the

24 labeling.

25 BY MR. GUERRERO:

1 Q.  All right.  Mr. Wood, we just heard 315.2.  Who did you

2 call?

3 A.  Cool Wop.

4 Q.  And you told him to meet you at your mother's house for what

5 purpose?

6 A.  So we could talk, discuss business about me buying an ounce

7 from him.

8 Q.  When you called him, where were you?

9 A.  With Agent Rob Lockhart.

10 Q.  What happened after you hung up the phone?

11 A.  After I hung up the phone, they put the device on me, which

12 is a wire, and gave me the $1,200.  Then I went around Congress

13 Park.

14 Q.  Did you actually meet anyone face to face that day?

15 A.  Yes.

16 Q.  Who did you meet?

17 A.  Cool Wop.

18 Q.  Mr. Wilson, David Wilson?

19 A.  Yes.

20 Q.  Where did you meet him?

21 A.  Around in the alley.

22 Q.  And you said you had $1,200 in cash that day?

23 A.  Yes.

24 Q.  What amount did you want to buy of crack cocaine?

25 A.  An ounce.

Page 923

1 Q.  This is Government's Exhibit 315.1.  Do you recognize this?

2 A.  Yes.

3 Q.  What is it?

4 A.  It's a recording of me and Cool Wop discussing business.

5 Q.  Do you see your initials anywhere?

6 A.  Yes.  On the far left-hand side.

7        MR. GUERRERO:  Permission to publish Government's

8 Exhibit 315.1 at this time.

9        (Audiotape played in open court.)

10 Q.  Mr. Wood, on that particular portion of Government's

11 Exhibit 315.1, you can hear, like, paper being counted.

12        MS. WICKS:  Objection, Your Honor.

13        THE COURT:  Sustained.

14 BY MR. GUERRERO:

15 Q.  There's some noise on that --

16        MS. WICKS:  Objection.

17        THE COURT:  Overruled.

18 BY MR. GUERRERO:

19 Q.  There's noise on that tape that we just heard.  And just

20 tell us what was going on.

21 A.  That was Agent Rob Lockhart counting the money.

22 Q.  How much did he count?

23 A.  $1,200.

24        (Audiotape played in open court.)

25 Q.  Mr. Wood, on that portion of Government's Exhibit 315.1 you

1 made reference to Dazzie.  Who was that?

2 A.  Dazz.

3 Q.  Is that Dazz, Desmond Thurston, who's in the courtroom

4 today?

5 A.  Yes.

6 Q.  Marco, who is that?

7 A.  I said Cardo.

8 Q.  I'm sorry?

9 A.  Cardo.

10 Q.  Cardo?

11 A.  Yeah, Shicardo (ph).

12 Q.  Is that a person you saw that day?

13 A.  Yes.

14 Q.  And who was that person?

15 A.  A little dude in the neighborhood.  And there was Margo, a

16 female.

17 Q.  So it was a woman?

18 A.  Yes.

19 Q.  How about Chow-Wow?  Was that the same person we showed you

20 earlier in one of the photographs?

21 A.  Yes.

22         (Audiotape played in open court.)

23 Q.  We're still listening to Government's Exhibit 315.1,

24 Mr. Wood, and I paused it there.  You can be heard saying, "I'm

25 knocking on the door."  When you're saying that, were you on the

Page 925

1  phone?

2  A.  Yes.

3  Q.  Who were you talking to?

4  A.  Cool Wop.

5  Q.  And where were you physically?

6  A.  Going up the steps in the old rental office building.  Going

7  up the steps in the old rental office building.

8  Q.  Whose apartment were you going to?

9  A.  Dominic's.

10 Q.  And when you knocked on the door, who answered?

11 A.  A dude named Mick.

12 Q.  Had you seen that person Mick before?

13 A.  Yes.

14 Q.  Where was he from?  Where had you seen him before?

15 A.  Congress Park.

16 Q.  Anybody else that you saw inside the apartment?

17 A.  The dog and Cool Wop.

18 Q.  Whose dog?

19 A.  Cool Wop's dog.

20 Q.  Did you physically step inside the apartment?

21 A.  Yes.

22 Q.  I'm going to resume playing Government's Exhibit 315.1.

23          (Audiotape played in open court.)

24 Q.  Just for the record, we're listening to 313 -- I'm sorry.

25 Strike that.  315.1.  It appears that we're having some

1 difficulty with the monitor.

2          I wanted to pause it and ask you, who were you talking

3 to right now, that we just heard?

4 A.  Cool Wop.

5 Q.  And there was someone who just said, "What was it you're

6 trying to get?"  Who said that?

7 A.  Cool Wop.

8 Q.  And what did you say in response?

9 A.  An ounce.

10 Q.  An ounce of what?

11 A.  Crack cocaine.

12 Q.  Who else is in the apartment at that point?

13 A.  Mick and that dog.

14 Q.  You said there's someone nibbling on you.  Was that the dog?

15 A.  Yes.

16 Q.  Was that -- whose dog was that again, I'm sorry?

17 A.  Cool Wop's dog.

18          (Audiotape played in open court.)

19 Q.  Mr. Wood, on that portion of that same exhibit, Government's

20 315.1, there was a person who made a telephone call to -- and

21 said, "L, what's up?"  Did you see who made that call?

22          MS. WICKS:  Objection, Your Honor.

23          THE COURT:  Overruled.

24 A.  Cool Wop.

25 MR. GUERRERO:

1 Q.  And after you made that call -- after you see Mr. Wilson,

2 Cool Wop, make that call to L, on the audio we just heard,

3 Mr. Wilson asked you to get baking soda.  Do you recall hearing

4 that?

5 A.  Yes.

6 Q.  Now, I want you to draw on your own experience.  You said

7 you had been hustling for a while right around that time.  This

8 is February 14th of 2001.  Do you know personally what baking

9 soda is used for?

10         MR. ZUCKER:  Objection.

11         THE COURT:  I'll sustain it.

12 BY MR. GUERRERO:

13 Q.  In your own experience, have you ever cooked powder cocaine

14 into crack cocaine?

15 A.  Yes.

16 Q.  And when you cook powder cocaine into crack cocaine, tell

17 the jury how you do that.

18 A.  With water, powder.

19 Q.  I need you to speak up.

20 A.  With water, powder cocaine, and baking soda.

21 Q.  What do you put it in?

22 A.  I put it in a glass jar or a glass pan and cook it.

23 Q.  And you then do what?

24 A.  You stir it, set it in water, and after it cool off, set it

25 on the counter and let it air dry.

1 Q.  What happens to the powder cocaine after you do that

2 process?

3 A.  Turn into a rock, crack cocaine, hard.

4 Q.  When you were talking to -- now, back to this date,

5 February 14th of 2001 when you were talking to Mr. Wilson inside

6 the apartment.  What did he tell you that L was going to do for

7 him?

8 A.  Cook it up for him.

9 Q.  And for what reason did Mr. Wilson say he needed the baking

10 soda?

11 A.  So already --

12          MR. ZUCKER:  Objection.

13          MS. WICKS:  Objection, Your Honor.

14          THE COURT:  Rephrase.

15 BY MR. GUERRERO:

16 Q.  Let's go back to this person L.  Had Mr. Wilson made

17 reference to this person L before on any other previous

18 purchase?

19 A.  Yes.

20 Q.  And what did Mr. Wilson say that day about what L would do?

21          MS. WICKS:  Objection, Your Honor.

22          THE COURT:  Rephrase.

23 BY MR. GUERRERO:

24 Q.  Let's just move on here for a second.  What did you do next?

25 When Mr. Wilson asked you to get the baking soda, what did you

Page 929

1 do?

2 A.  I went to go purchase the baking soda.

3 Q.  Where did you do that?

4 A.  At the store right down the street, on Willow Road.

5 Q.  Could repeat your answer, please?

6 A.  I said, I went and purchased the baking soda down on

7 Willow Road.

8 Q.  Did you walk or go in a car?

9 A.  I drove.

10 Q.  And as you're going to get the baking soda, do you see this

11 person L?

12        MS. WICKS:  Objection.

13        THE COURT:  Overruled.

14 A.  No.

15 BY MR. GUERRERO:

16 Q.  Did you ever see that person L between the time that you go

17 get the baking soda and the time you come back?

18 A.  Yes.

19 Q.  When was that?  On the way to get the baking soda or on the

20 way back?

21 A.  Yes, on the way.

22 Q.  And what if anything were you doing when you saw that

23 person, L?

24 A.  I seen him getting out of a little hatchback --

25        MS. WICKS:  Objection.  Nonresponsive.  Maybe I

1 misheard the question, but I thought the question was what was

2 the witness doing when he observed L.

3        THE COURT:  I think that's true.

4        MR. GUERRERO:  I'll rephrase.

5 BY MR. GUERRERO:

6 Q.  Were you letting anybody know that you were seeing L?

7 A.  Yes, I was.

8 Q.  Who were you letting know?

9 A.  Agent Rob Lockhart.

10        (Audiotape played in open court.)

11 Q.  Mr. Wood, you just were talking to Agent Lockhart in that

12 conversation.

13 A.  Yes, I was.

14 Q.  And you made reference to a Bama who just showed up.  Who

15 were you referring to?

16 A.  I was referring to L.

17        (Audiotape played in open court.)

18 Q.  Mr. Wood, on that portion of this Exhibit 315.1, you make

19 reference to "YTY 1451."  What were you referring to?

20 A.  I was referring to the license plate.  I was referring to

21 the license plate that the car that L was riding in.

22 Q.  And who were you trying to let know that that was the

23 license plate?

24 A.  Agent Lockhart.

25        (Audiotape played in open court.)

1 Q.  In that brief portion, what did you just do?

2 A.  I just gave Cool Wop the baking soda.

3 Q.  And where did that conversation take place?

4 A.  At the door.

5 Q.  Did you see who was inside the door?

6 A.  No.

7        (Audiotape played in open court.)

8 Q.  Mr. Wood, on that portion of Government's Exhibit 315.1, who

9 were you talking to?

10 A.  Agent Lockhart.

11 Q.  Before that, though, before you talked to Agent Lockhart,

12 you had a conversation with David Wilson?

13 A.  Yes.

14 Q.  How were you keeping in contact with Mr. Wilson?

15 A.  Cell phone.

16 Q.  When you then start talking to Agent Lockhart, it appears

17 that you're giving Agent Lockhart directions to an apartment?

18 A.  Yes.

19 Q.  Whose apartment were you directing Agent Lockhart to?

20 A.  Dominic's.

21 Q.  And who was inside that apartment?

22 A.  Cool Wop, L, and some other dude.

23        (Audiotape played in open court.)

24 Q.  In that portion of Government's Exhibit 315.1, who did you

25 just let know you were "going at them right now"?

Page 932

1  A.  Cool Wop.

2  Q.  How did you keep in contact with him?

3  A.  Cell phone.

4          (Audiotape played in open court.)

5  BY MR. GUERRERO:

6  Q.  Mr. Wood, this portion of Government's Exhibit 315.1, where

7  were you?

8  A.  Inside the apartment.

9  Q.  Who was inside the apartment?

10 A.  Cool Wop, Larry, and some other dude I don't know.

11 Q.  And the brief portion that we've heard so far, someone says

12 to you, I think it's Mr. Wilson, says that, "The shit is still a

13 little bit wet."

14 A.  Yes.

15 Q.  And what was Mr. Wilson referring to?

16 A.  The crack cocaine, because it just got finished being

17 cooked.

18 Q.  I can't hear you.

19 A.  The crack cocaine, it just got finished being cooked.  So it

20 was still wet, hadn't had time to dry out.

21 Q.  And there was before that a reference to, "It looks better

22 than the other shit."  Who said that?

23 A.  L.

24          (Audiotape played in open court.)

25 Q.  How much did you purchase that day?

1 A.  An ounce of crack cocaine.

2 Q.  Was it a chunk or was it different pieces?

3 A.  It was in a chunk.

4 Q.  Where did you proceed to go next?

5 A.  Back to meet with Rob Lockhart.

6        (Audiotape played in open court.)

7 Q.  How much had you paid for the amount of crack cocaine that

8 you bought that day?

9 A.  1,200.

10 Q.  And who specifically handed you the crack cocaine while you

11 were inside the apartment?

12 A.  Cool Wop.

13        (Audiotape played in open court.)

14 Q.  You were asked in that portion of Government's Exhibit 315.1

15 if something was dripping.  What were you talking about?

16 A.  He was talking about the crack cocaine, was it dripping in

17 the plastic from it being wet.

18 Q.  And then you also mentioned that you were driving slow.  Why

19 were you driving slow?

20 A.  Because the police was out there pulling people over, so I

21 was taking my time.

22 Q.  Who were you going to go meet?

23 A.  Agent Rob Lockhart.

24        (Audiotape played in open court.)

25 Q.  When you met up with Agent Lockhart, what did he do?

1 A.  He got the drugs from me, took the device off me, searched

2 me and my vehicle again, and then I went on about my business.

3 Q.  Now, Mr. Wood, that was February of 2001.  And you had also

4 met with Mr. Wilson in January 2001, as well.

5         Before that, had you ever purchased any crack cocaine

6 from Mr. Wilson?

7 A.  No.

8 Q.  Had Mr. Wilson ever offered to sell you any type of drugs?

9 A.  No.

10 Q.  In the summer of 2000, were you out and about in Congress

11 Park?

12 A.  Excuse me?

13 Q.  In the summer of 2000, were you out and about in Congress

14 Park?

15         MS. WICKS:  I'm sorry, I didn't hear the question, Your

16 Honor.

17 BY MR. GUERRERO:

18 Q.  In the summer of 2000, were you hanging out in Congress

19 Park?

20 A.  Sometimes, yes.

21 Q.  Did you happen to see David Wilson or Cool Wop?

22 A.  Yes.

23 Q.  Did you happen to see what type of car he was driving in

24 2000?

25 A.  A Cadillac truck.

1 A.   I gave him the money back, he took the wire off and searched

2 me, just searched me because I walked to him that day.   And I

3 went on about my business.

4 Q.   How much money did you give him back, or Agent Lockhart

5 back?

6 A.   $600.

7 Q.   How did you maintain contact that afternoon with Mr. Ball?

8 A.   Cell phone.

9 Q.   Did you happen to notice what if any vehicle Mr. Ball was

10 driving that day?

11 A.   Yeah, at that time he was driving an Acura Legend.

12 Q.   Six days later on July 26th of 2001, do you try to make a

13 purchase from Mr. Ball again?

14 A.   Yes.

15 Q.   And what amount were you trying to purchase that day?

16 A.   The same, half an ounce.

17 Q.   For what sale price?

18 A.   $600.

19 Q.   Did you get in contact with Mr. Ball?

20 A.   Yes.

21 Q.   How did you do that?

22 A.   Cell phone.

23 Q.   Where did you arrange to meet?

24 A.   In the alley.

25 Q.   Whose alley?

Page 945

1 A.   Where my mother used to live.

2 Q.   Back in Congress Park?

3 A.   Yes.

4 Q.   The same alley that you identified for us in Government's

5 Exhibit 100.1?

6 A.   Yes.

7 Q.   Did you meet up with Agent Lockhart that day?

8 A.   Yes, I did.

9 Q.   Before you were going to make the attempted purchase?

10 A.   Yes.

11 Q.   What if anything did he do?

12 A.   What did he do?  He strapped a device on me, gave me $600,

13 and made a phone call.  Then I went in the area of Congress Park

14 to meet Twuan.

15 Q.   Twuan, Antwuan Ball?

16 A.   Yes.

17 Q.   This is Government's Exhibit 320.1.  Do you recognize what

18 this is?

19 A.   Yes.

20 Q.   What is 320.1?

21 A.   A conversation of me and Mr. Ball discussing business about

22 me buying a half an ounce of crack cocaine.

23 Q.   Have you listened to this before?

24 A.   Yes.

25 Q.   Do you see your initials anywhere?

1 A.  On the far left-hand side.

2        MR. GUERRERO:  At this time government would ask

3 permission to publish 320.1.

4        THE COURT:  Yes.

5        (Audiotape played in open court.)

6 Q.  Mr. Wood, in that portion of Government's Exhibit 320.1, who

7 were you just speaking to?

8 A.  Twuan.

9 Q.  Antwuan Ball?

10 A.  Yes.

11 Q.  And how did you make contact with him?

12 A.  Cell phone.

13        (Audiotape played in open court.)

14 Q.  In that portion of Government's Exhibit 320.1, who are you

15 speaking to?

16 A.  Agent Lockhart.

17 Q.  And what were you letting him know?

18 A.  That I was over there in the alley to meet Twuan.

19        (Audiotape played in open court.)

20 Q.  Who did you just call in that portion of Government's

21 Exhibit 320.1?

22 A.  Twuan.

23 Q.  Did you talk to Mr. Ball or did you leave him a message?

24 A.  I left him a message on his answering machine.

25        (Audiotape played in open court.)

1 Q.  Mr. Wood, in that portion of Government's Exhibit 320.1, who

2 were you speaking to?

3 A.  Agent Lockhart.

4 Q.  And before you spoke to Agent Lockhart, who did you call?

5 A.  Twuan.

6 Q.  Were you successful in reaching him?

7 A.  No.

8         (Audiotape played in open court.)

9 Q.  Mr. Wood, in that portion of Government's Exhibit 320.1, who

10 did you actually speak to face to face?

11 A.  I was talking to Twuan.

12 Q.  And where did you see Mr. Ball?

13 A.  In his car.

14 Q.  And what kind of car was he in that day?

15 A.  An Acura Legend.

16 Q.  What did Mr. Ball say to you?

17 A.  He said he would be back in a few minutes.

18 Q.  And then you start talking to whom?

19 A.  Some little young boys out there playing basketball.

20 Q.  On the audiotape, too, you make reference to Rob?

21 A.  I was talking to Agent Lockhart.

22 Q.  What were you letting him know?

23 A.  That he'll be back shortly.

24 Q.  Who were you referring to when you said, "He's hauling ass"?

25 A.  Talking about Twuan.

1 Q.  Did Mr. Ball let you know where he was going to?

2 A.  No.

3         (Audiotape played in open court.)

4 Q.  Mr. Ball -- Mr. Wood, I'm sorry.  Mr. Wood, I paused it here

5 so you can clarify.  Where are you at this point?

6 A.  Inside of his vehicle.

7 Q.  Inside of whose vehicle?

8 A.  Twuan's vehicle.

9 Q.  Is that the same Acura that you mentioned earlier?

10 A.  Yes.

11 Q.  Who was driving?

12 A.  Twuan.

13 Q.  Anyone else in the car?

14 A.  Somebody else was in the front seat.

15 Q.  Do you know who that was?

16 A.  I can't recall at this time.

17 Q.  Male or female?

18 A.  A male.

19         (Audiotape played in open court.)

20 Q.  In that conversation, we're talking Government's

21 Exhibit 320.1, Mr. Ball had just mentioned 3.1.  What was he

22 referring to?

23 A.  He was referring to the crack cocaine which was in

24 eight-balls.

25 Q.  And an eight ball, you testified earlier, generally contains

Page 949

1 how many grams?

2 A.   3.5.

3 Q.   So the ones that Mr. Ball were -- well, who was handing you

4 these 3.1s?

5 A.   Twuan.

6 Q.   Antwuan Ball?

7 A.   Yes.

8 Q.   And how much quantity did you want to buy that day?

9 A.   A half an ounce.

10 Q.   And how many eight-balls would be in a normal purchase of a

11 half an ounce?

12 A.   Four.

13 Q.   And each eight-ball would contain how many grams?

14 A.   3.5.

15 Q.   So when Mr. Ball was referring to each eight-ball being 3.1,

16 what was he letting you know?

17 A.   He was letting me know that they was short.

18 Q.   Each one was short?

19 A.   Yes.

20 Q.   Had you given him any money at that point?

21 A.   Yes.

22 Q.   How much did you give him?

23 A.   $600.

24           (Audiotape played in open court.)

25 Q.   You just mentioned on this particular portion when Mr. Ball

1 asked you, "Do you know what this is," you said "Butter."  What

2 did you mean by "butter"?

3 A.  That means that the product was good.

4          (Audiotape played in open court.)

5 Q.  There was some mumbling that just went on there in this

6 portion of Government's 320.1 between you and Mr. Ball.  Let's

7 just go over that.  You said to Mr. Ball, "When you get done

8 with that batch," you would be ready for what?

9 A.  An ounce.

10 Q.  An ounce of what?

11 A.  Crack cocaine.

12 Q.  Mr. Ball then responds what to you?

13 A.  He said okay.

14 Q.  He then makes reference, Mr. Ball does, to "my car has been

15 in the shop."  Do you remember hearing that?

16 A.  Yes.

17 Q.  What does that mean?

18 A.  That means it's been out of his possession and the police

19 could have bugged his car or something, so he don't want to talk

20 too much business inside the car.

21 Q.  Did Mr. Ball indicate to you how long his car had been out

22 of his possession?

23 A.  No.

24 Q.  So he was telling you -- basically sending you a message?

25 A.  Right.

1          MR. TABACKMAN:  Objection.

2          THE COURT:  Sustained.

3          (Audiotape played in open court.)

4 Q.  What did you do at that point, Mr. Wood?

5 A.  I went to go meet Agent Lockhart.

6          (Audiotape played in open court.)

7 Q.  When you met with Agent Lockhart, as we've just heard on

8 Government's 320.1, what did he do?

9 A.  He got the drugs, took the wiretap off, and searched me and

10 my vehicle.  Then I went on about my business.

11 Q.  The drugs that you had just purchased, who specifically gave

12 them to you?

13 A.  Twuan.

14 Q.  Antwuan Ball?

15 A.  Yes.

16 Q.  And who specifically did you hand the $600 in cash?

17 A.  Twuan.

18 Q.  Antwuan Ball?

19 A.  Yes.

20 Q.  Is this other person who was in the car, did he participate

21 at all in this transaction?

22 A.  No, he was just riding with him.

23 Q.  Had you ever seen that person before?

24 A.  Yes.

25 Q.  From where?

1 A.  Congress Park.

2 Q.  When Mr. Ball was letting you know about his car being in

3 the shop, how common would it be for you to talk over the phone

4 with Mr. Ball about making a crack purchase?

5 A.  It would be blunt, not too much talking about it.  He would

6 rather talk about it in person.

7 Q.  Why would you not talk too much about it?

8 A.  Because you don't do good business like that, talking over

9 phones, because they could be tapped.

10 Q.  Is that something that you would generally do, not talk a

11 whole lot about it?

12 A.  Yes.

13 Q.  I want to fast forward your attention now to October of

14 2001, October 23rd.  Do you remember meeting up with Mr. Ball

15 that day to purchase --

16 A.  Yes.

17 Q.  Before you met up with Mr. Ball, did you meet up with

18 Agent Lockhart?

19 A.  Yes, I did.

20 Q.  And what did Agent Lockhart do?

21 A.  Strapped me up for me to go around Congress Park and see

22 Mr. Ball.

23 Q.  Were you given any money?

24 A.  No, not on that occasion.

25 Q.  Why not?

Page 965

1  videotape, Government's Exhibit 321.V, as in Victor.

2  BY MR. GUERRERO:

3  Q.  Did you make any purchase at all that day from Mr. Ball?

4  A.  No, I didn't.

5  Q.  What did you do next?

6  A.  I went to go meet back up with Agent Lockhart.

7  Q.  What happened when you met with Agent Lockhart?

8  A.  I went there, they took the wire off of me, and I went on

9  about my business.

10  Q.  Mr. Wood, at this point we're talking October of 2001.  Had

11  you entered a plea agreement at all?

12  A.  No.

13  Q.  But you had still had this case that was from September of

14  2000 where you were arrested at your cousin's house?

15  A.  Yes, I did.

16  Q.  What happens to you during this time?  What's going on with

17  you?

18  A.  Nothing.  I'm just in the streets.

19  Q.  And --

20  A.  Nothing.  I'm just on the streets and I'm on probation.

21  Q.  I need you to speak louder.  Okay?

22  A.  Okay.

23  Q.  You're on probation for which case?

24  A.  My first case.

25  Q.  The distribution?

1 A.  Yes.

2 Q.  And you had also been subsequently arrested in September of

3 2000 in that search warrant of your cousin's house?

4 A.  Yes.

5 Q.  So what is motivating you, Mr. Wood, at this point to have

6 already made all these controlled buys, if you hadn't gotten a

7 plea agreement yet?

8 A.  So I could benefit.

9 Q.  In fact, you hadn't been charged yet with the arrest that

10 took place in September of 2000 when they arrested you at your

11 cousin's house?

12 A.  No, I hadn't.

13        MR. TABACKMAN:  Objection.  Leading.

14        THE COURT:  Sustained.

15 BY MR. GUERRERO:

16 Q.  So Mr. Wood, time goes on now, 2002.  What happens to you in

17 2002?

18 A.  I get arrested again.

19 Q.  And you get arrested again for what?

20 A.  Distribution of crack cocaine.

21 Q.  That was in felony 328-02?

22 A.  Yes.

23 Q.  What happened to you in that case?

24 A.  I get arrested, go to a halfway house, and --

25        THE COURT:  Would you repeat that, please?

1          THE WITNESS:  I say I got arrested and I got sent to a

2 halfway house.

3 BY MR. GUERRERO:

4 Q.  What were the circumstances of that arrest?

5 A.  That I take a plea agreement -- they took the case out of

6 Superior Court --

7          MS. WICKS:  Objection, nonresponsive, Your Honor.

8          THE COURT:  Overruled.

9 BY MR. GUERRERO:

10 Q.  Maybe I can narrow the question.

11          What were the facts that led to your arrest?

12 A.  Oh, my facts?

13 Q.  Yeah.

14 A.  For selling drugs again.

15 Q.  All right.  So all the while you've been working with the

16 FBI, but you're back out hustling?

17 A.  Yes.

18 Q.  And at that point when you pick up that case in 2002, what

19 do you decide to do?

20 A.  Take a plea.

21 Q.  Who was your lawyer?

22 A.  Mona Asner.

23 Q.  Your Honor, I'm about to go into a big other topic.  I just

24 want to let the Court know.

25          THE COURT:  All right.  Ladies and gentlemen, we'll

# Tab 4

1006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,        :
                                 :
          Plaintiff,             : Docket No. CR 05-100
                                 :
     v.                          :
                                 :
ANTWUAN BALL, DAVID WILSON,      : Washington, DC
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and      : March 1, 2007
DOMINIC SAMUEL,                  : 920 a.m.
                                 :
          Defendants.            :
                                 :
                                 :
```

VOLUME 10 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn Leon, Assistant United States
                          Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant United
                          States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant
Antwuan Ball:             CARNEY & CARNEY
                          John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

---

1007

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

---

1008

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

---

1009

**MORNING SESSION, MARCH 1, 2007**

1
2    (9:18 a.m.)
3        THE COURT:  Mr. Guerrero, are you ready?
4        MR. GUERRERO:  Yes, Your Honor.  Can we check with the
5    marshal?  Is Mr. Wood in the back?
6        THE DEPUTY MARSHAL:  No, we have to bring them out first.
7        THE COURT:  Let's do that.
8        All right, counsel.  Let me just mention that the Court
9    Security Officer noted that one or two jurors had wandered into
10   the front of the courtroom -- outside of the courtroom to look at
11   the calendar out there because, apparently, Ms. Romero reports,
12   they were trying to associate counsel with clients and they were
13   having some difficulty following that.
14       The CSO advised them it's not wise for them to be walking
15   about the courthouse in the near vicinity of the outer hallways
16   of this courtroom and if they had any issues, they can bring them
17   up with Ms. Romero.  I asked Ms. Romero to go back and the
18   juror -- one or more jurors said that's exactly what happened;
19   they were trying to look at the list to be able to associate the
20   lawyers with their clients.
21       She repeated the advice of the CSO, that standing about
22   the hallway in the vicinity of this courtroom is not advised and
23   that if they have any questions, they should feel free to raise
24   them with her or with me.
25       Having heard that now from the jurors, what -- I certainly

*Scott L. Wallace, RDR, CRR*
Official Court Reporter

**1010**

1 ask Ms. Romero to repeat the advice not to hang out in that

2 corridor, but what I will do is when I call upon counsel for

3 cross-examination, what I may do is call upon you by name, but

4 also say, "Counsel for Mr. Thurston, Mr. Zucker, would you like

5 to cross-examine," or "Counsel for Mr. Wilson, Ms. Wicks, would

6 you like to cross-examine," and so on.

7       I may at some point not do that -- remember to do that, so

8 let me ask counsel to help the jurors out. When you come up to

9 the podium, in some way put on the record who you are and whom

10 you represent. Perhaps in starting out your cross, say "I'm

11 Jonathan Zucker and I represent Mr. Thurston" or something like

12 that.

13       The other comment we heard, I'm just reporting to you, is

14 the comment that sometimes they are having some difficulty seeing

15 the people in the -- the defendants. And I told the jurors

16 themselves they can stand up and look if they like. Ms. Romero

17 repeated that to them, so they may be standing up to look because

18 they can't easily see.

19       All right. Otherwise, are you ready, Mr. Guerrero?

20       MR. GUERRERO: Yes, Your Honor.

21       THE COURT: We'll be at ease. There's one juror still

22 missing.

23       (Jury in at 9:30 a.m.)

24       THE COURT: Good morning, ladies and gentlemen.

25       THE JURY PANEL: Good morning.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1011**

1       THE COURT: Welcome back. I hope you had a restful

2 evening. We're ready to resume.

3       Mr. Guerrero.

4       <u>CONTINUED DIRECT EXAMINATION OF SEASON KADI WOOD</u>

5 BY MR. GUERRERO:

6   **Q.**    Good morning, Mr. Wood.

7   **A.**    Good morning.

8   **Q.**    It's kind of early in the morning here. I would just

9 like you to speak nice and loud for us. Again, introduce

10 yourself, first name and last name, for the record.

11   **A.**    My name is Season Wood.

12   **Q.**    Mr. Wood, we've been talking about a series of controlled

13 buys that you did on yesterday's date in your testimony and I

14 believe we left off with your plea agreement.

15       In September of 2002, were you arrested?

16   **A.**    Yes.

17   **Q.**    And describe for the jury the facts that caused you to

18 get arrested.

19   **A.**    The FBI had a search warrant and they ran up on my

20 cousin's apartment.

21       MR. BALAREZO: Your Honor, I'm sorry. We can't hear.

22       THE WITNESS: I said the FBI had a search warrant and ran

23 up in my cousin's apartment.

24 BY MR. GUERRERO:

25   **Q.**    Okay. I think you're talking about the September 2000

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1012**

1 arrest.

2   **A.**    Yes.

3   **Q.**    Okay. And what I was referring to was later in 2002, in

4 January of 2002, did you also get arrested again?

5   **A.**    Yes.

6   **Q.**    And that's what I would like you to focus on, Mr. Wood.

7 What were the facts that caused you to get arrested then?

8   **A.**    Selling crack cocaine again.

9   **Q.**    And all the while, who had you been working for or were

10 supposed to be working for?

11   **A.**    Agent Lockhart.

12   **Q.**    And that case was felony 328-02 in Superior Court?

13   **A.**    Yes.

14   **Q.**    Did you receive a court-appointed lawyer for that case?

15   **A.**    Yes, I did.

16   **Q.**    Do you remember that person's name?

17   **A.**    Mona Asner.

18   **Q.**    And once you and Ms. Asner get together, what do you

19 decide to do?

20   **A.**    Decide to do? I took a cop and got a plea offer.

21   **Q.**    You just said you "took a cop"?

22   **A.**    Yes.

23   **Q.**    And in slang terms, what does that mean?

24   **A.**    I pled guilty.

25   **Q.**    Who did you meet with from our office in order to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1013**

1 negotiate your plea offer?

2   **A.**    Beatrice.

3   **Q.**    Does the name Jeffrey Beatrice sound right?

4   **A.**    Yes.

5   **Q.**    And as a result of your plea agreement, where was your

6 guilty plea taken, in District Court or in Superior Court?

7   **A.**    It was taken out of Superior Court and put in District

8 Court.

9   **Q.**    Do you remember meeting with Mr. Beatrice and Ms. Asner

10 to discuss the terms of your plea agreement?

11   **A.**    Yes.

12       MR. GUERRERO: Court's indulgence.

13       May I approach, Your Honor?

14       THE COURT: Yes.

15 BY MR. GUERRERO:

16   **Q.**    All right, Mr. Wood. I just put in front of you

17 Government's Exhibit 1141. Please take the time to look at the

18 front page of Government's Exhibit 1141.

19       Do you recognize what it is?

20   **A.**    Yes, I do.

21   **Q.**    Again, Mr. Wood, I know you're soft-spoken. We do need

22 you to speak up.

23   **A.**    Yes, I do.

24   **Q.**    What do you recognize Government's Exhibit 1141 to be?

25   **A.**    My plea agreement.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1018

1   objection, which is -- this has not been discussed and I don't --
2   I'm objecting to the introduction of the proffer into evidence.
3   I believe that was made in anticipation of litigation and that
4   it's inadmissible as part of the plea agreement, the guilty plea.
5   It's just, you know, to establish for the Court under Rule 11.
6   So I'm also objecting to the proffer as being admitted as part of
7   the plea agreement.
8       THE COURT:  Well, it is a part of the plea agreement.  In
9   the Second Circuit, where I was cutting my teeth in practice,
10  plea agreements didn't come in.  To my great surprise, I came
11  down to this circuit and this circuit says it's just the
12  opposite.
13      MR. CARNEY:  As far as --
14      THE COURT:  In the Second Circuit, I would not have let
15  this in, but it comes in.  The proffer being part of the plea
16  agreement -- in this circuit, I'm not aware of any basis for
17  separating it out.
18      MR. CARNEY:  In the past, usually the only way that the
19  proffer -- at least what I've seen is that the proffer only comes
20  in if counsel for the defense opens up that when you pled guilty,
21  you didn't plead to this, you didn't plead to that, or some
22  particular portion that they admitted to in the proffer.
23      I would object to -- unless we open the door on what was
24  done in the proffer, I would object to it being introduced.
25      THE COURT:  Do you have authority from this circuit to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1019

1   support that proposition?
2       MR. CARNEY:  No.  This has all been custom, I guess.
3       THE COURT:  Custom is one thing and authority is another.
4       MR. CARNEY:  Right.
5       THE COURT:  My understanding is that it's part of the plea
6   agreement in this circuit and comes in.  So that's overruled.
7       MR. CARNEY:  Okay.
8       THE COURT:  Now, I'm not sure if we want to go ahead and
9   move this into evidence right now since it's not redacted, or
10  wait until after you have a redacted exhibit that we can finally
11  say is in evidence before it's actually moved in.  So I may defer
12  ruling on its admission unless you plan to have him try to read
13  contents.  Are you expecting to have him read contents of it now
14  or display contents of it to the jury?
15      MR. GUERRERO:  I am not intending to have him read any
16  context.  I don't anticipate -- if -- displaying a whole lot of
17  context.  I certainly will not display the context that the
18  defense has objected to and we've agreed to redact.  And I could
19  very well just redact it with a marker right now.  It's not much
20  text.
21      THE COURT:  No, I don't want marker redactions.  I want
22  redactions done in such a way that there's no possibility of
23  holding it up to the light in the jury room and seeing what it is
24  that's marked out, so you'll have to recopy it with some kind of
25  other kind redactive method that doesn't allow someone to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1020

1   unredact.
2       MR. CARNEY:  You can still go through it without --
3       THE COURT:  If we're finished.
4       MS. WICKS:  Your Honor, I apologize.  I stepped down to
5   let Mr. Balarezo be up here.
6       But as to the proffer, I think it's -- for almost every
7   single one of these witnesses --
8       THE COURT:  For what?
9       MS. WICKS:  As to the proffer portion, it's a prior
10  consistent statement and I don't think it's admissible because of
11  that.
12      THE COURT:  Go ahead.
13      MS. WICKS:  So --
14      THE COURT:  He can make all kinds of statements in the
15  plea agreement that says, "I agree that I did X, Y and Z and I
16  agree to plead guilty to A, B and C as part of the plea
17  agreement."  What difference does that make in this circuit?
18      MS. WICKS:  Because without some evidentiary basis, a
19  prior consistent statement is not admissible.
20      THE COURT:  If it is a plea agreement and it shows what he
21  agreed to do and what he has accepted responsibility for as part
22  of the plea agreement, in this circuit, it comes in.  All kinds
23  of stuff can come in in the plea agreement.
24      And I agree that there is a theoretical issue, at least in
25  the Second Circuit, where they acknowledged that when I was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1021

1   growing up, having plea agreements come in; and were I on the
2   D.C. Circuit, I might rule differently.  But I think the D.C.
3   Circuit lets these things in.
4       Whether I agree with that, I can't tell you either way,
5   but this circuit lets it in.  So it's overruled.
6       (Sidebar discussion concluded.)
7       THE COURT:  In any event, I believe you moved in evidence
8   Exhibit 1141, over objection.  That will be received once proper
9   redactions have been made.
10      MR. GUERRERO:  Yes, sir.  Thank you.
11      (Government's Exhibit 1141 admitted into the record.)
12  BY MR. GUERRERO:
13  Q.   Mr. Wood, with respect to Government's Exhibit 1141
14  that's in front of you, what do you remember pleading guilty to?
15  A.   Distribution of crack cocaine.
16  Q.   Speak loud, okay.
17  A.   Distribution of crack cocaine.
18  Q.   Do you remember what quantity of crack cocaine you
19  admitted distributing?
20  A.   Five to 20 grams.
21  Q.   And under your plea agreement and under the law, what's
22  your maximum exposure to prison, that you understand?
23  A.   Five to 40 years.
24  Q.   When you went over that plea agreement, who did you go
25  over it with?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1026**

```
1   your understanding of who gets that letter?
2   A.   The judge.
3   Q.   Now, you have already pled guilty, haven't you?
4   A.   Yes.
5   Q.   And when you pled guilty, do you remember who the judge
6   was that you pled guilty before?
7   A.   Judge Roberts.
8   Q.   His Honor in the courtroom today?
9   A.   Yes.
10  Q.   So the 5K Letter would be going to who?
11  A.   Judge Roberts.
12  Q.   And what's your understanding as to what His Honor can do
13  with or without that 5K Letter?
14  A.   He could sentence me to whatever he wants to.
15  Q.   And whatever is permissible would be what range of prison
16  for you?
17  A.   Between --
18       MS. WICKS:  Objection, Your Honor.
19       THE COURT:  What did you say?
20       MS. WICKS:  Objection to this question, Your Honor.
21       THE COURT:  Overruled.
22  BY MR. GUERRERO:
23  Q.   Whatever is permissible would be what range of prison for
24  you?
25       THE COURT:  As far as you understand.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1027**

```
1   BY MR. GUERRERO:
2   Q.   As far as you understand.
3   A.   Five to 40 years.
4   Q.   In prison?
5   A.   Yes.
6   Q.   All right.  Let's talk now a little bit about when you
7   pled guilty.  Take a look at Government's Exhibit 1141 that's
8   before you.  What's the date on Government's Exhibit 1141?
9   A.   April the 30th, 2002.
10  Q.   Nice and loud, okay.
11  A.   April 30th, 2002.
12  Q.   By April 30th, 2002, what had you already done in
13  connection with Agent Lockhart?
14  A.   I had already had done prerecorded buys for them.
15  Q.   Once you signed your plea agreement in April of 2002,
16  what did you continue to do for Agent Lockhart?
17  A.   To cooperate with him.
18  Q.   When you entered your guilty plea before Judge Roberts,
19  did you walk out the front door or did you go back to jail?
20  A.   I went out the front door.
21  Q.   And you were put on --
22  A.   House arrest.  I was on home monitoring.
23  Q.   What does that mean, "on home monitoring"?  Explain for
24  the jury.
25  A.   It consists of a curfew call between 8 at night and 6 in
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1028**

```
1   the morning.  I had to be in the house to catch the phone call
2   from pre-trial service.
3   Q.   What types of things would they ask you?
4   A.   My lawyer's name --
5       MR. BALAREZO:  Objection.
6       THE COURT:  Overruled.
7       THE WITNESS:  My lawyer's name, my social security number,
8   my file case, all types of personal questions.
9   BY MR. GUERRERO:
10  Q.   What's your understanding as to why they were asking you
11  those personal questions?
12  A.   Because only I know the personal questions that they ask
13  me.
14  Q.   Were you on any other type of restrictions with respect
15  to alcohol and drugs?
16  A.   Yes.  I was on urines.
17  Q.   What do "urines" mean?  Explain to the jury.
18  A.   That means you got to go down there twice a week and give
19  a urine sample so they can test you for drugs and alcohol.
20  Q.   Once you entered your plea agreement -- and just for the
21  record, do you remember when it was that you entered your guilty
22  plea?
23  A.   Yes.
24  Q.   What was the month and year?
25  A.   June 2002.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1029**

```
1   Q.   After June of 2002, how long did you stay on this home
2   monitoring?
3   A.   Until I got arrested again in 2004.
4   Q.   Do you remember the month of 2004 that you got arrested?
5   A.   Yes.
6   Q.   What month was it?
7   A.   March of 2004.
8   Q.   So from June of 2002, when you enter your guilty plea, to
9   March of 2004 you were out on the street?
10  A.   Yes.
11  Q.   On home monitoring?
12  A.   Yes.
13  Q.   Were you working?
14  A.   No.
15  Q.   What were you doing?
16  A.   Hustling.
17  Q.   You say that with a grin on your face.  You were getting
18  in trouble again?
19  A.   Yes.
20  Q.   Where were you living?
21  A.   Around Congress Park.
22  Q.   With whom?
23  A.   My mother.
24  Q.   Is that the same residence that you indicated for us
25  yesterday on Government's Exhibit 100?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1030

```
1   A.   Yes.
2   Q.   The one that's in the alley?
3   A.   Yes.
4   Q.   How long were you successful with your compliance on
5   pre-trial release?
6   A.   I'd say about a year and a half.
7   Q.   So from June of 2002, a year and a half later, the
8   beginning of 2004?
9   A.   Yes.
10  Q.   In the beginning of 2004, was there something in your
11  personal life that caused you distress?
12  A.   Yes.
13  Q.   What was that?
14  A.   My brother had got killed at the beginning of the new
15  year.
16  Q.   Did that have anything at all to do with this case?
17  A.   No.
18  Q.   Were you still on home monitoring?
19  A.   Yes, I was.
20  Q.   What was your brother's name?
21  A.   Marlow Williams.
22  Q.   Once that happened to you, what happened to you as far as
23  your compliance with pre-trial conditions?
24  A.   I stopped complying.
25  Q.   You stopped complying?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1031

```
1   A.   Yes.
2   Q.   What exactly does that mean?
3   A.   I stopped getting my phone calls and I stopped going to
4   pre-trial services to take my urines.
5   Q.   Did you take alcohol and drugs?
6   A.   Yes.
7   Q.   So even if you were giving your urines, they would have
8   been dirty?
9   A.   Yes.
10  Q.   And that caused what to happen in March of 2004?
11  A.   I got arrested.
12  Q.   For what?
13  A.   For noncompliance.
14  Q.   For violating your conditions of release?
15  A.   Yes.
16  Q.   From March 2004 until the present date, March 1st, 2007,
17  where have you been?
18  A.   Incarcerated.
19  Q.   Now, under your plea agreement, again, Government's
20  Exhibit 1141, there's been certain benefits that you have
21  received, haven't there?
22  A.   Yes.
23  Q.   What are some of the benefits that you've received thus
24  far?
25  A.   When I was on the streets, the FBI used to give me money
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1032

```
1   to help me pay my phone bills and stuff.
2   Q.   How much money did the FBI get you?
3   A.   I'd say probably about 1,500 dollars.
4   Q.   How would they give you that money?
5   A.   I would meet with them, they would give me some money and
6   I had to sign a paper for it, which is a receipt.
7   Q.   Would it be a check or cash money?
8   A.   Cash.
9   Q.   You need you to speak loud, okay?
10  A.   Cash.
11  Q.   How about when you met and were interviewed by the FBI?
12  Were you ever provided any meals?
13  A.   Yes, I was.
14  Q.   Once you got arrested, were you placed in a different
15  type of facility?
16  A.   Yes.
17  Q.   What facility are you in now?
18  A.   CTF.
19  Q.   Do you know what that stands for?
20  A.   Correctional Treatment Facility.
21  Q.   And is CTF -- what is CTF?  What does it look like?
22  A.   It's a building connected to the jail.
23  Q.   And inside, is it a jail?
24  A.   Yes.
25  Q.   Is that where you've been for -- since March of 2004?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1033

```
1   A.   Yes, I have.
2   Q.   In the summer of 2005, you received a benefit with Agent
3   Lockhart, a special visit.  Do you remember that?
4   A.   Yes.
5   Q.   What was that visit for?
6   A.   I went to a funeral because my son had got killed.
7   Q.   Who escorted you out of the jail?
8   A.   Lockhart.
9   Q.   Agent Lockhart?
10  A.   Yes.
11  Q.   Where did you go?
12  A.   I went to a viewing of his body.
13  Q.   I need you to speak louder.
14  A.   I went to a viewing of his body.
15  Q.   Whose body?
16  A.   My son.
17  Q.   How long did you stay?
18  A.   No more than about 10 minutes.
19  Q.   Who was with you?
20  A.   Agent Lockhart.
21  Q.   Were you in handcuffs?
22  A.   Yes, I was.
23  Q.   Where did you go after the viewing?
24  A.   After the viewing, straight back to CTF.
25  Q.   Back to jail?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1042*

1  out there and you saw three males?

2  **A.**  Yes.

3  **Q.**  When you were looking at them, indicate on Government's

4  Exhibit 100.1 where they came from.

5  **A.**  (Indicating.)

6  **Q.**  I'll note for the record on Government's Exhibit 100.1 to

7  the far right, right around the center of the exhibit near like

8  a grass field, you've made a line?

9  **A.**  Yeah.

10  **Q.**  And where did you see these three guys heading?

11  **A.**  Towards our direction.

12  **Q.**  To the alley?

13  **A.**  Yes.

14  **Q.**  These males, were they white or black?

15  **A.**  Black.

16  **Q.**  And let's take them one by one.  The first person that

17  you saw, describe what he looked like.  We'll call him male

18  number 1.

19  **A.**  Tall, brown-skinned, long corn rows.

20  **Q.**  Do you remember what he was wearing?

21  **A.**  Black T-shirt, blue jeans.

22  **Q.**  Do you remember what, if anything, that person had on his

23  face?

24  **A.**  He had a shirt wrapped around his face.

25  **Q.**  Do you remember the color of the shirt?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1043*

1  **A.**  A black T-shirt.

2  **Q.**  Do you remember how the shirt was covered around that

3  male 1's face?

4  **A.**  Like a Ninja.

5  **Q.**  What does that mean?  Explain to the jury "like a Ninja."

6  **A.**  You could just see only his eyes and nose.

7  **Q.**  When you saw that person running into the alley, was that

8  person carrying anything?

9  **A.**  Yes.

10  **Q.**  What did you see that person carrying?

11  **A.**  He was carrying a gun.

12  **Q.**  One or more?

13  **A.**  Just one.

14  **Q.**  What kind of gun did you see?

15  **A.**  Like a fully automatic.

16  **Q.**  When you first saw that person come in with that gun, was

17  that person already shooting?

18  **A.**  Yes, he was.

19  **Q.**  Based on the physical characteristics that you saw of

20  that person, did you determine in your own mind who it was?

21  **A.**  Yes.

22  **Q.**  Who did you think it was?

23  **A.**  A little guy named Trevon.

24  **Q.**  What was it that made you conclude that person was

25  Trevon?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1044*

1  **A.**  Because of his height, his build and his long corn rows.

2  **Q.**  How long had you known this person named Trevon?

3  **A.**  For about eight years.

4  **Q.**  Where had you known him from?

5  **A.**  14th Place.

6  **Q.**  Let's go now with male 2.  You said there was another

7  person.  Describe what that person looked like.

8  **A.**  Short, dark-skinned, kind of stocky, a little guy.

9  **Q.**  Do you remember what that person was wearing?

10  **A.**  The same.  Black shirt, blue jeans.

11  **Q.**  Was this person walking in the same direction as Trevon?

12  **A.**  Yes, he was.

13  **Q.**  Just clarify for us, were these guys walking or were they

14  running to the alley?

15  **A.**  It was like a light jog.

16  **Q.**  This second person was ahead of Trevon or side by side or

17  behind him?

18  **A.**  Like a little distance from him, but like not too far

19  from him.

20  **Q.**  Did this person have anything covering or on his face?

21  **A.**  Yes.

22  **Q.**  What did you see?

23  **A.**  A black T-shirt covering his face.

24  **Q.**  In what manner?

25  **A.**  Like a Ninja also.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1045*

1  **Q.**  What could you see as -- from this person's face?

2  **A.**  Just his eyes and nose.

3  **Q.**  Did you see anything in that person, male number 2, in

4  that person's hands?

5  **A.**  Yes.

6  **Q.**  What did you see?

7  **A.**  A 12-gauge shotgun.

8  **Q.**  Was it a full barrel or cutoff?

9  **A.**  Cutoff.

10  **Q.**  When you saw this second person, was he already shooting

11  or not?

12  **A.**  Yes.

13  **Q.**  Based on the physical characteristics of that person, did

14  you conclude who that person was?

15  **A.**  Yes.

16  **Q.**  Tell us how you did that.

17  **A.**  Because of his build, short, small, kind of stocky and

18  dark-skinned.

19  **Q.**  Based on what you saw, who did you think it was?

20  **A.**  A little dude named Eyes.

21  **Q.**  "Eyes" as in eyes, physically the eyes?

22  **A.**  Yes.

23  **Q.**  How long had you known this, as you say, "little dude

24  named Eyes"?

25  **A.**  Around about seven years, seven to eight years.  Seven to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1074**

1   has a duplicate paper copy of what they have, why don't we just
2   have it set out and just have it marked.
3       THE COURT:  Why don't you all confer.  I don't want to be
4   a part of the conference.  I just want to know what the ultimate
5   answer is.
6       MR. BALAREZO:  I think this -- it doesn't affect me now or
7   Mr. Samuels, but it might in the future.  These drawings we're
8   doing on the screen on top of pictures, we're going to need to
9   preserve some of these things for an appellate record if need be,
10   and I don't know if we can do that the way it's being done at
11   this time.
12       THE COURT:  And the best you'll have to do is put on the
13   record your representation of what that screen shows, if this
14   machine doesn't have a printer to print it out.  Alternatively,
15   if you take your own copy of whatever that exhibit was, is it
16   101.1 or 100 or something and have the witness do a marking on
17   paper, if you want to have something to submit up.  So it's not
18   like there's no way to make a record for appeal, but this is a
19   John Madden screen, and it is what it is.
20       MR. BALAREZO:  Is there any way to attach a printer to the
21   device?
22       THE COURT:  That's what I was asking.  This does not have
23   a printer attachment.  It may be the other newer electronic
24   courtrooms have a printer attachment to theirs, but this one
25   apparently doesn't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1075**

1       MS. WICKS:  Your Honor, I think we've given you one
2   proposal and I'm handing you up another one.  I'm going after
3   Mr. Martin and Mr. Tabackman.
4       THE COURT:  All right.  Is everybody here?  Mr. Zucker,
5   you're still going first.  Are you ready for the jury?
6       MR. ZUCKER:  Yes, Your Honor.
7       THE COURT:  All right.  Let's bring the jury in.
8       (Jury in at 11:13 a.m.)
9       THE COURT:  Good morning again, ladies and gentlemen.
10   THE JURY PANEL:  Good morning.
11       THE COURT:  Welcome back.  We're ready to resume.
12   Mr. Zucker, you represent Mr. Thurston, would you like to
13   cross-examine?
14       MR. ZUCKER:  I would.  Thank you, Judge.
15       <u>CROSS-EXAMINATION OF SEASON KADI WOOD</u>
16   <u>MR. ZUCKER</u>:
17   **Q.**   Mr. Wood, good morning.  My name is Jonathan Zucker.  I
18   represent the person named Dazz, represented as Desmond
19   Thurston, in the corner over there.  I'm going to be asking you
20   some questions.  If you don't understand any of my questions,
21   just tell me and I'll try to rephrase it.  Okay?
22       Now, you told us -- how old are you now, 28?
23   **A.**   Yes.
24   **Q.**   And you started hustling when you were 13 -- 15,
25   approximately, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1076**

1   **A.**   Yes.
2   **Q.**   All right.  So that was 13 years ago, 1994; is that
3   correct?
4   **A.**   Yes.
5   **Q.**   And up until the time you were arrested, you hustled --
6   and by "hustling," we're talking about dealing in crack cocaine,
7   street level sales, right?
8   **A.**   Yes.
9   **Q.**   You did that consistently until 2000, when you were
10   arrested; is that correct?
11   **A.**   Yes.
12   **Q.**   And then occasionally since then, right?
13   **A.**   Yes.
14   **Q.**   All right.  Now, in 1994 when you started hustling in
15   Congress Park, did you join any organization?
16   **A.**   No.
17   **Q.**   Did you become a member of any group?
18   **A.**   No.
19   **Q.**   Did you ask anybody's permission to start hustling?
20   **A.**   No, I didn't.
21   **Q.**   You just went out and got some drugs and sold them,
22   right?
23   **A.**   Yes.
24   **Q.**   You bought them yourself from people?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1077**

1   **Q.**   Did you have to buy from anyone in particular?
2   **A.**   Yes.
3   **Q.**   And -- well, you told us that you started dealing with
4   two of the gentlemen at this table, in 2000, after you were
5   arrested, but never dealt with them before, right?
6   **A.**   Right.
7   **Q.**   And you never, in your entire life, ever got any drugs
8   from my client, Desmond Thurston, did you?
9   **A.**   No.
10   **Q.**   And you were allowed to go out and buy drugs -- who was
11   your supplier back then?
12   **A.**   Who was my supplier?
13   **Q.**   Yeah.
14   **A.**   Joe Langley.
15   **Q.**   Who?
16   **A.**   Joe Langley.
17   **Q.**   Joe Langley.  And you could get drugs from Joe Langley,
18   and once you bought them, paid for them, whose drugs were they?
19   **A.**   Mines.
20   **Q.**   Okay.  And you decided where and when you would sell
21   them, right?
22   **A.**   Yes.
23   **Q.**   You decided what price you would charge?
24   **A.**   Yes.
25   **Q.**   And you were free to sell to anybody who wanted to buy

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1078*

1  from you, weren't you?

2  **A.**  Yes.

3  **Q.**  Did you share your profits with anyone else?

4  **A.**  No, I didn't.

5  **Q.**  You kept that money yourself?

6  **A.**  Yes.

7  **Q.**  Did anyone else -- you said there were a lot of other

8  hustlers out there, right, in Congress Park?

9  **A.**  Yes.

10  **Q.**  And basically throughout southeast D.C. or within a

11  five-block radius of that area, going in any direction, there

12  were people hustling, weren't there?

13    MR. BALAREZO:  Objection, relevance.

14    THE COURT:  Well, compound.  Sustained.

15  BY MR. ZUCKER:

16  **Q.**  Were there people selling throughout a five-block radius

17  of Congress Park?

18    MR. GUERRERO:  Objection, relevance.

19    THE COURT:  Overruled.

20    THE WITNESS:  Yes.

21  BY MR. ZUCKER:

22  **Q.**  And none of them shared their profits with you, did they?

23    MR. GUERRERO:  Objection, calls for speculation.

24    THE COURT:  Overruled.

25    THE WITNESS:  No.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*1079*

1  BY MR. ZUCKER:

2  **Q.**  And you shared your profits with none of them, right?

3  **A.**  No.

4  **Q.**  And incidentally, you know my client and you know his

5  brother, Phil, right?

6  **A.**  Yes.

7  **Q.**  And you know their sister, too, Dominic, don't you?

8  **A.**  Yes.

9  **Q.**  And that was the Dominic Thurston that Mr. Wilson lived

10  with, right?

11  **A.**  Yes.

12  **Q.**  Okay.  You said at one point you moved out of -- you

13  switched your sales from Congress Park to 10th Place; is that

14  correct?

15  **A.**  Yes.

16  **Q.**  Where on 10th Place was that, roughly?

17  **A.**  3401 10th Place.

18  **Q.**  What's a cross street?

19  **A.**  Excuse me?

20  **Q.**  What was the cross street?

21  **A.**  10th Place.

22  **Q.**  10th place and where, by Trenton?

23  **A.**  Yes.

24  **Q.**  Okay, 10th and Trenton?

25  **A.**  Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*1080*

1  **Q.**  When you went down there to sell at 10th and Trenton, did

2  you join any organization?

3  **A.**  No, I did not.

4  **Q.**  Did you swear allegiance to anyone else?

5  **A.**  No.

6  **Q.**  Okay.  Did you ask anybody else's permission to go down

7  to 10th Place and Trenton and sell?

8  **A.**  No, I did not.

9  **Q.**  And the operation on 10th Place and Trenton, you went

10  there because there was less competition than there was up in

11  Congress Place, right?

12  **A.**  Right.

13  **Q.**  And both Congress Place and 10th Place, every hustler was

14  on their own, in terms of buying and selling, and keeping their

15  profits, right?

16    MR. BALAREZO:  Objection, calls for speculation.

17    THE COURT:  Sustained.

18  BY MR. ZUCKER:

19  **Q.**  Well, you certainly were on your own, right?

20  **A.**  Yes.

21  **Q.**  And you had occasion to observe other people out there

22  selling, right?

23  **A.**  Yes.

24  **Q.**  If you had to estimate, how many other people between

25  1994 -- no, let's go back, 1992.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*1081*

1    Did you observe the action out there even before you

2  started hustling?

3  **A.**  Yes, I did.

4  **Q.**  Okay.  And you were familiar with what was going on as a

5  younger kid, right?

6  **A.**  Yes.

7  **Q.**  You saw the action?

8  **A.**  Yes.

9  **Q.**  You knew what was going on, right?

10  **A.**  Yes.

11  **Q.**  Okay.  And you're familiar with it -- well, throughout

12  your life, up until -- you've been locked up since 2004, right?

13  **A.**  Yes.

14  **Q.**  Okay.  And from what you observed -- well, let's back up

15  a second.

16    Can you give us an estimate of how many people you saw

17  out there hustling in Congress Park from 1992 until 2004, when

18  you were arrested?

19    MR. GUERRERO:  Objection, speculation.

20    THE COURT:  Overruled.

21    THE WITNESS:  Basically the same people that live around

22  there.

23  BY MR. ZUCKER:

24  **Q.**  Right.  The people that live around there.  My question

25  was a number.  If you had to estimate, was it over a hundred

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1086

1 you would commit no crimes if you were released on probation,
2 right?
3 **A.** Yes.
4 **Q.** Did you keep that promise to the judge?
5 **A.** No, I did not.
6 **Q.** Now, were you aware of what increased penalties you were
7 subject to when you were arrested in 2000 because of your prior
8 conviction, and your being on probation?
9 **A.** Yes.
10 **Q.** And what were those increased penalties, if you know?
11 **A.** That I could do a lot of time.
12 **Q.** A lot more time?
13 **A.** Yes.
14 **Q.** Okay. And as part of your plea with the government, they
15 agreed not to request that you do that more time, right?
16     MR. BALAREZO: Objection. That's assumes a fact not in
17 evidence.
18 BY MR. ZUCKER:
19 **Q.** Did you not?
20     MR. GUERRERO: May we approach?
21     THE COURT: Yes.
22     (Following sidebar discussion had on the record:)
23     MR. BALAREZO: Mr. Zucker is asking him specifically about
24 a September 2000 arrest, which is the first time this particular
25 witness gets arrested after his first conviction. At that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1087

1 point -- at that time, there is no plea agreement at all with
2 this witness. This witness starts cooperating with the FBI
3 independent of the U.S. Attorney's Office. The plea agreement
4 with this witness does not occur until 2002, two years later,
5 after he's already working with the Federal Bureau of
6 Investigation. So Mr. Zucker's question that the government
7 agreed to not ask for any increased penalties is a fact that's
8 not in evidence. There is no evidence of that.
9     THE COURT: You mean there's no foundation for the
10 question?
11     MR. GUERRERO: Right, there's no foundation.
12     MR. ZUCKER: I don't recall what my last question was.
13 Can I look at your monitor?
14     THE COURT: What would your next question be?
15     MR. ZUCKER: He knew he was eligible -- he knew as part of
16 his agreement he was --
17     THE COURT: He didn't have an agreement at that point.
18 That's the point that Mr. Guerrero is making. It's a question
19 about timing. So just get the timing straight.
20     MR. ZUCKER: Okay.
21     THE COURT: I think that's all it is.
22     MR. ZUCKER: I think that's right.
23     MR. TABACKMAN: Is there a foundation as to what the
24 government might do at that point? I assume that would be okay.
25     MR. ZUCKER: I can ask if he discussed that with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1088

1 Mr. Lockhart, Agent Lockhart.
2     MR. GUERRERO: I would object to that, Judge, as hearsay.
3 I mean ...
4     THE COURT: Those questions are usually not hearsay, but
5 this is all going to bias anyway, even what Mr. Lockhart told him
6 goes to bias.
7     (Sidebar discussion concluded.)
8 BY MR. ZUCKER:
9 **Q.** When -- you agreed to start cooperating with the FBI when
10 you were arrested in 2000, right?
11 **A.** Yes.
12 **Q.** All right. I'm sorry, can you keep your voice up?
13 **A.** Yes.
14 **Q.** And that was based on conversations you had with
15 Agent Lockhart, as well as others?
16 **A.** Yes.
17 **Q.** Okay. Did you have discussions with them about how much
18 time you might be looking at in prison if you didn't cooperate?
19 **A.** Yes, I did.
20 **Q.** And did you have conversations with them about what
21 benefits you might receive if you did cooperate?
22 **A.** Yes.
23 **Q.** Did you want to go to prison for a longer or lesser
24 period of time?
25 **A.** For a lesser period.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1089

1 **Q.** What was your understanding, after you spoke to
2 Agent Lockhart, about whether or not -- how much time you would
3 be looking at?
4 **A.** He never said. He just said if I cooperate, at the end
5 it should pay off. But it's still up to the judge.
6 **Q.** All right. Incidentally, when you were arrested in 2000
7 and you were on probation, were you released?
8 **A.** Yes.
9 **Q.** Okay. So -- and who arranged for your release, if you
10 know?
11 **A.** Beatrice.
12 **Q.** Jeff Beatrice?
13 **A.** Yes.
14 **Q.** And that's Jeff Beatrice, U.S. Attorney?
15 **A.** Yes.
16 **Q.** Okay. And you were aware that that's a violation of your
17 condition of probation, to be caught dealing drugs, right?
18 **A.** Yes.
19 **Q.** And you were aware that they were releasing you. Were
20 you aware whether your release was based upon your agreement
21 that you would cooperate with them?
22 **A.** Yes.
23 **Q.** Now, you've told us about in 2002, you were arrested for
24 distribution of cocaine as well, right?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1090

1     Q.    While you were cooperating, right?

2     A.    Yes.

3     Q.    Now, one of the terms of your cooperation was that you

4     were not to commit additional crimes; isn't that correct?

5     A.    Correct.

6     Q.    And that's a promise you made to the FBI?

7     A.    Yes.

8     Q.    Did you keep that promise?

9     A.    No, I did not.

10    Q.    Okay.  You continued to deal in cocaine, correct?

11    A.    Yes, I did.

12    Q.    And, of course, the time you were arrested was not a sole

13    incident, when you broke that promise, was it?

14    A.    Excuse me?

15    Q.    It was not the sole time you broke that promise, in terms

16    of dealing drugs while you were cooperating, was it?

17    A.    Naw, I was just selling drugs.

18    Q.    You were just selling drugs on a regular thing, right?

19    A.    Yes.

20    Q.    Were you selling anything besides cocaine?

21    A.    No, I wasn't.

22    Q.    You weren't selling marijuana?

23    A.    No.

24    Q.    Are you sure?

25    A.    Positive.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1091

1     Q.    And is that the -- you're as positive of that as you are

2     of the accuracy of everything else you've testified to?

3     A.    Yes.

4     Q.    Were you smoking marijuana?

5     A.    No.

6     Q.    So you had nothing to do with marijuana during the period

7     of your cooperation?

8           MR. GUERRERO:  Objection, asked and answered.

9           THE COURT:  Overruled.

10          THE WITNESS:  No, I haven't.

11    BY MR. ZUCKER:

12    Q.    And you never even bought any, right, during the period

13    of your cooperation?

14    A.    As far as buying it for the FBI or personal use?

15    Q.    Well, you never bought any for the FBI, in connection

16    with this investigation, did you?

17    A.    No.

18    Q.    And you told us you weren't using it, right?

19    A.    Right.

20    Q.    And you're certain you weren't selling it, right?

21    A.    Yes.

22    Q.    Okay.

23          MR. ZUCKER:  Court's indulgence.

24    BY MR. ZUCKER:

25    Q.    What's it mean to chop down a pound?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1092

1     A.    What it mean?

2     Q.    Um-hmm.

3     A.    To break it down.

4     Q.    What are stems and seeds, in connection with marijuana?

5     A.    It's part of the weed.

6     Q.    It's part of the weed?

7     A.    Yes.

8     Q.    Okay.  But you weren't doing any of that, were you?

9     A.    No.

10    Q.    Now you heard part of the tape of February 14th, 2001,

11    yesterday, didn't you?

12    A.    Yes, I did.

13    Q.    Did you review the transcript or listen to that whole

14    tape?

15    A.    Yes.

16    Q.    Okay.  And as a matter of fact, you reviewed that

17    transcript with the prosecution, either the FBI or these agents,

18    these attorneys here, did you not?

19    A.    Yes.

20    Q.    Was it accurate?

21    A.    Yes.

22    Q.    Okay.  The words said to you, and the words you spoke

23    were accurately recorded on that transcript, were they not?

24    A.    Yes.

25    Q.    Okay.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1093

1           MR. ZUCKER:  Your Honor, do you want me to approach?  I'm

2     just going to use a transcript, but I understand there might have

3     been some prior discussion about that.  If the Court doesn't need

4     me to approach, I'll proceed.

5           THE COURT:  I don't know what you're going to approach

6     about, but why don't you proceed and if there's an objection,

7     I'll deal with it.

8           MR. TABACKMAN:  Your Honor, to accommodate -- I'm sorry --

9     because I don't want to come back.  I'll change the screen if --

10          MR. ZUCKER:  No, I think I can do it this way.

11          MR. GUERRERO:  Your Honor, can we approach?

12          THE COURT:  Is there an objection?

13          MR. GUERRERO:  There is an objection.

14          THE COURT:  All right.  Come on up.

15          (Following sidebar discussion had on the record:)

16          MR. GUERRERO:  The objection is going to be just where we

17    left off yesterday, where Mr. Zucker -- I think where he's going

18    is going to attempt to extract certain portions of the transcript

19    that are not in evidence yet, that have not been played, the full

20    transcript audio version to the jury, so what they're going to

21    be -- he's going to be reading off text that's not been published

22    yet to the jury.  So the only other solution would be to play

23    that audio.  And I think that's where we left off yesterday.

24          MR. ZUCKER:  I mean, frankly, I would prefer to play the

25    audio, but I don't want to have to lose the screen for other

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1094

1   counsel.

2       THE COURT: You don't want to what?

3       MR. ZUCKER: I don't want to have the problem with the

4   screen by playing the audio. This man has already acknowledged

5   that the transcript is an accurate recording, the transcript is

6   an accurate transcription, so I'm going to ask him to read the

7   part that proceeds stems and seeds.

8       THE COURT: So you're going to ask him to read it out loud

9   to the jury? I'm not going to allow you to do that.

10      MR. ZUCKER: That's what I was asking before. This is the

11  part in deference to other counsel. I can wait and do this when

12  they're done, if they need the screen.

13      MR. TABACKMAN: Your Honor, I'll let the screen go. I

14  didn't realize it was going to cause this much problem. I

15  assumed -- I never used this equipment. If there was a printer

16  and somehow you could press the button and print the screen --

17  apparently you can't, and it's more aggravation than it's worth

18  to everybody, I think.

19      THE COURT: Well, you all can do whatever you want. You

20  can play the tape with the transcript scrolling and just center

21  some of those yellow markings on it, but the portion that's

22  supposed to show the contemporaneous words that are being spoken,

23  generally is at the top of the screen, so that portion is not

24  even going to be obliterated when the transcript is scrolling,

25  but I'm not going to tell you how to do your case.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1095

1       MR. TABACKMAN: Your Honor makes a good point, that it's

2   probably that -- how about that -- if it's going to cause a

3   problem, I'll live without them.

4       MR. ZUCKER: I don't think it disrupts anything one iota,

5   listening to the tapes. I don't care if they're left in.

6       MS. WICKS: Your Honor, my understanding from the

7   paralegal is what he thinks is going to happen is if he plays the

8   tape, he will not be able to reproduce where -- how they're

9   zoomed in on the map.

10      THE COURT: I understand. I understand the problem.

11  That's right. He has now apparently got the 101 zoomed in and

12  fixed in place in the laptop now, and for him to be able to play

13  the tape, he's going to have to take that off -- he's going to

14  have to close that file and open up another file, so he can't get

15  back the same file with the same zoom in as he had before, but.

16      MR. TABACKMAN: That's fine, close the file. He'll redo

17  it. We can just redo it.

18      THE COURT: All right. So is there an objection now?

19  What are we doing? Are we all ready?

20      MR. ZUCKER: I would just ask Mr. Mazzitelli to cue up

21  that part of the tape and we're ready to go.

22      (Sidebar discussion concluded.)

23      MR. ZUCKER: Moment to consult.

24      Mr. Wood, bear with us, we're just going to bring up the

25  section of the tape.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1096

1       MR. CARNEY: Your Honor, I think he has to tap the screen

2   with the pen to remove the markings.

3       THE COURT: I don't know if Mr. Zucker has asked him to

4   remove the markings, it's his examination.

5       MR. ZUCKER: I would ask more learned counsel to explain

6   to you how to clear the screen.

7       MR. GUERRERO: Mr. Wood, if you can touch the lower

8   right-hand portion of the screen to clear it.

9       (Audiotape played.)

10  BY MR. ZUCKER:

11  Q.    The guy says to you -- an unidentified man says to you on

12  the street, twice, when you chop that next pound, man, let me

13  get them stalks and seeds, right?

14  A.    Um-hmm.

15  Q.    Did you hear that?

16  A.    Yeah, I heard it.

17  Q.    That's what you heard someone say to you, right?

18  A.    Yes.

19  Q.    Twice, right?

20  A.    Yes.

21  Q.    Chop down that next pound means to break up marijuana.

22  Let me get them stalks and seeds from you, right?

23  A.    Right.

24  Q.    And what's your response to him?

25  A.    I laughed at him.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1097

1   Q.    What did you say next? Please continue.

2       You agreed, you said "You bet. All right, I'll

3   remember," right?

4   A.    Um-hmm.

5   Q.    But your sworn testimony is that you weren't dealing in

6   marijuana?

7   A.    Not when I was working with FBI, I wasn't.

8   Q.    Not when you were working with the FBI?

9   A.    No.

10  Q.    But this conversation was Valentine's Day 2001, right?

11  A.    Right.

12  Q.    You were working for the FBI for several months, if not a

13  year already, right?

14  A.    Right.

15  Q.    And I think, as you said, you were certain that you

16  weren't buying and selling or using marijuana as you were --

17  about the accuracy of everything else you said today; isn't that

18  correct, sir?

19      MR. GUERRERO: Objection asked and answered.

20      THE COURT: Sustained. By the way, did you identify the

21  Government's Exhibit from which you had an excerpt played?

22      MR. ZUCKER: I thought I did. It's 315. NT-315 -- I'm

23  sorry. Government's Exhibit 315 T, page 29.

24  BY MR. ZUCKER:

25  Q.    In one of the tapes yesterday, there was a conversation

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1106

1   **Q.**   Now, with respect to your plea agreement, you also agreed
2 to plead to distribution, and I want to ask you a few questions
3 in that regard.
4       You said you grew up in Congress Park, right?
5   **A.**   Yes.
6   **Q.**   You said you pled to distribution and you also said, if I
7 heard you correctly, that you didn't deal with anybody else
8 other than Joe Langley, who was your supplier, right?
9   **A.**   Right.
10   **Q.**   So would it be fair to say that you weigh your own
11 product?
12   **A.**   That I weigh my own product?
13   **Q.**   Yeah.
14   **A.**   At times, yes, I did.
15   **Q.**   You cut your own product?
16   **A.**   Yes.
17   **Q.**   You packaged your own product?
18   **A.**   Yes.
19   **Q.**   And you didn't comingle your money with anybody else's
20 money to buy that product, right?
21   **A.**   No.
22   **Q.**   That was your money, right?
23   **A.**   Right.
24   **Q.**   And you grew up in the Congress Park area, right?
25   **A.**   Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1107

1   **Q.**   And you know everybody sitting over here at this table,
2 right?
3   **A.**   Yes, I do.
4   **Q.**   But you didn't plead to a RICO charge, did you?
5   **A.**   No.
6   **Q.**   And you didn't plead to a conspiracy charge, did you?
7   **A.**   No, I did not.
8   **Q.**   You said you had children.
9   **A.**   Yes.
10   **Q.**   You have four kids?
11   **A.**   Yes.
12   **Q.**   Do they live in the Congress Park area as well, sir?
13     MR. GUERRERO:  Objection, relevance.
14     THE COURT:  Sustained.
15   MR. MARTIN:  It was asked on -- I believe it was asked on
16 direct, Your Honor, by the government.
17     Thank you, Your Honor.  Thank you, sir.
18     THE COURT:  All right, Mr. Balarezo, do you care to
19 cross-examine on behalf of Mr. Samuels?
20     MR. BALAREZO:  I do, Your Honor, thank you.
21     <u>CROSS-EXAMINATION OF SEASON KADI WOOD</u>
22 <u>BY MR. BALAREZO:</u>
23   **Q.**   Good morning, Mr. Wood.
24     Good morning.
25   **Q.**   I represent the gentleman who you've identified as Dom,

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1108

1 whose real name you didn't know, the gentleman right there.
2   **A.**   Yes.
3   **Q.**   Now, on direct examination when Mr. Guerrero asked you
4 some questions, you indicated that you've been hustling in
5 Congress Park for a number of years, right?
6   **A.**   Yes.
7   **Q.**   Approximately how many years did you hustle out there?
8   **A.**   From then until the time I got locked up.
9   **Q.**   Let me ask you to speak up, number 1.
10   **A.**   From the time when I started, which is 15 till, I would
11 say, around about 20, until I started hustling down 10th Place.
12   **Q.**   So you hustled for about five years in Congress Park,
13 right?
14   **A.**   Yes.
15   **Q.**   And your testimony here today in front of this jury about
16 what took place and who you saw when you were hustling deals
17 with that time frame, right?
18   **A.**   Yes.
19   **Q.**   Now, you indicated that you knew Mr. Samuels for over ten
20 years; is that right?
21   **A.**   Yes.
22   **Q.**   And I think you said this morning on direct examination,
23 that your relationship with Mr. Samuels, when you were out
24 hustling, was that you were -- when you just spoke, I think is
25 what you said?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

1109

1   **A.**   Yes.
2   **Q.**   Right?  And since your cooperation agreement came into
3 being, your relationship with him is basically nonexistent,
4 because you haven't seen him, right?
5   **A.**   Right.
6   **Q.**   Okay.  Now, those five years when you were out there
7 hustling -- some of this you've answered already, I'll try to be
8 very brief -- you hustled for yourself, right?
9   **A.**   Yes.
10   **Q.**   You didn't answer to anybody, right?
11   **A.**   No.
12   **Q.**   You didn't ask for permission from anybody?
13   **A.**   No.
14   **Q.**   You didn't ask for permission to sell?
15   **A.**   No.
16   **Q.**   Where to sell?
17   **A.**   No.
18   **Q.**   When to sell?
19   **A.**   No.
20   **Q.**   Or what to sell, correct?
21   **A.**   Correct.
22   **Q.**   The money that you used to buy the drugs that you were
23 hustling was your own money, right?
24   **A.**   Yes.
25   **Q.**   The drugs that you bought to hustle were your own drugs,

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1110

1 right?
2 **A.**   Yes.
3 **Q.**   And you had your supplier, Joe Langley, right?
4 **A.**   Yes.
5 **Q.**   And sometimes you bought from other people, correct?
6 **A.**   Not really, not often, because he always had product.
7 **Q.**   Langley was your main guy, right?
8 **A.**   Yes.
9 **Q.**   And whenever you sold anything out there in
10 Congress Park, you never gave the money that you made selling to
11 Joe Langley, right?
12 **A.**   No, it was mines.
13 **Q.**   It was your money?
14 **A.**   Yes.
15 **Q.**   And you decided what to do with it, how to spend it and
16 that sort of thing, right?
17 **A.**   Yes.
18 **Q.**   Now, you also indicated that at some point you moved over
19 to the 10th Place?
20 **A.**   Yes.
21 **Q.**   To hustle over there, right?
22 **A.**   Yes.
23 **Q.**   And the reason you moved over to 10th Place was because
24 there was too much competition in Congress Park, right?
25 **A.**   Yes.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1111

1 **Q.**   Too many people hustling out there, right?
2 **A.**   Yes.
3 **Q.**   And all those people were out there hustling for
4 themselves, too, correct?
5 **A.**   Yes.
6 **Q.**   None of them were answering to you, right?
7 **A.**   No.
8 **Q.**   And as far as you knew, none of them were asking for
9 permission from anybody about where or what or when to sell,
10 correct?
11       MR. GUERRERO:  Objection, speculation.
12       THE COURT:  Sustained.
13 BY MR. BALAREZO:
14 **Q.**   Do you have any knowledge of that?
15 **A.**   To my knowledge, no.
16 **Q.**   Okay.  Now, if you had been working with those people,
17 then it wouldn't have been competition, correct?
18       MR. GUERRERO:  Speculation.
19       THE WITNESS:  Correct.
20       THE COURT:  Overruled.
21 BY MR. BALAREZO:
22 **Q.**   Sir?
23 **A.**   Yes.
24 **Q.**   All right.  You couldn't compete so you went somewhere
25 else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1112

1 **A.**   Right.
2 **Q.**   And when you went somewhere else, again it was your money
3 that you spent, right?
4 **A.**   Yes.
5 **Q.**   Your drugs that you sold?
6 **A.**   Yes.
7 **Q.**   You didn't ask for permission from anybody over there?
8       MR. GUERRERO:  Objection, asked and answered.
9       THE COURT:  Sustained.
10       THE WITNESS:  No.
11 BY MR. BALAREZO:
12 **Q.**   I'm talking about 10th Place.
13 **A.**   Right.
14       MR. BALAREZO:  Not Congress Park, Your Honor.
15       THE COURT:  Sustained, that's been covered.
16 BY MR. BALAREZO:
17 **Q.**   Now, you indicated a few minutes ago that you saw about
18 30 people in Congress Park that were hustling out there
19 regularly, right?
20 **A.**   Yes.
21 **Q.**   And that was your number, 30?  Somebody asked you if it
22 was a 100, 50, but you said about 30, correct?
23 **A.**   Right.
24 **Q.**   And of those people, were they the ones who were out
25 there hustling when there was too much competition for you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1113

1 **A.**   Yes, they were.
2 **Q.**   Now, you indicated also that -- I think Mr. Guerrero
3 asked you a question yesterday about people that you had seen
4 hustling out there, specifically in Congress Park.  Do you
5 remember those questions?
6 **A.**   Yes.
7 **Q.**   And you named three people in particular that are here
8 today, correct?
9 **A.**   I named two, if I ain't mistaken.
10 **Q.**   Well, you named two of the defendants, right?
11 **A.**   Right.
12 **Q.**   And Dominic Samuels was not one of those people, right?
13 **A.**   No.
14 **Q.**   Now, you've known Dominic Samuels for ten years, right,
15 at least?
16 **A.**   Yes.
17 **Q.**   And when you were out there hustling for those five years
18 in Congress Park, you were out there pretty often, right?
19 **A.**   Right.
20 **Q.**   Sometimes 24/7, if you could, right?
21 **A.**   Right.
22 **Q.**   Because you're trying to make as much money as you could?
23 **A.**   Right.
24 **Q.**   And during those entire five years, you can't tell this
25 jury that you saw Dominic Samuels hustling out there even once,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1126**

1 It's all in your hands. You're the only one who can provide the
2 kind of cooperation that will give the government the key to
3 unlock my handcuffs when you come back in front of me at
4 sentencing."
5      Do you remember that?
6 A.   Now that you read it, I --
7 Q.   So you understood that the only way that the judge could
8 do something good for you is if the government asked him to,
9 right?
10 A.   Yeah.
11 Q.   And the only way that the government was going to ask him
12 to is if you did what they wanted you to do; isn't that right?
13 A.   Yes.
14 Q.   And what they wanted you to do was to get Antwuan Ball
15 and these other gentlemen at this table; isn't that right?
16 A.   Yes.
17 Q.   And Mr. Lockhart told you that on September the 25th,
18 2000; isn't that right?
19 A.   Yes.
20 Q.   Because he took you out of that room at 3401 10th Place,
21 Southeast, and he took you down to the FBI, didn't he?
22 A.   Yes.
23 Q.   And he said to you, "Don't say a word, just listen to
24 what I'm going to say to you." Didn't he say something like
25 that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1127**

1 A.   No.
2 Q.   What?
3 A.   No.
4 Q.   He told you -- he talked to you; isn't that right?
5 A.   Yes.
6 Q.   He advised you of your rights?
7 A.   Yes, he did.
8 Q.   And you filled out one of those cards and you said,
9 "Yeah, I'll waive all my rights, I'll talk to you"?
10 A.   Yes.
11 Q.   And Lockhart, he explained to you what was going on,
12 right?
13 A.   Yes.
14 Q.   He told you that 5 grams that was in there in your room
15 was one thing, but 20 grams in the kitchen was something else,
16 right?
17 A.   Yes, but it was also something else in my room.
18 Q.   I'm sorry?
19 A.   It was a Ziploc bag full of dimes in there also.
20 Q.   Right. But there was a big chunk of 20 grams in that
21 kitchen, right?
22 A.   Yes.
23 Q.   And there were two guns in the house, too, right?
24 A.   Yes.
25 Q.   And there was ammo in your bedroom where they found you;

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1128**

1 isn't that right?
2 A.   Yes, it was.
3 Q.   And that ammo went to one of those guns; isn't that
4 right?
5 A.   Yes.
6 Q.   And Lockhart explained to you, he says, "You know, it
7 looks like that ammo and that gun might be yours"; isn't that
8 right?
9      MR. GUERRERO: Objection, speculation.
10      THE COURT: I'll allow it.
11 BY MR. TABACKMAN:
12 Q.   I'm asking the question: Didn't Lockhart say that to
13 you?
14 A.   No, he asked me.
15      MR. GUERRERO: Objection.
16      THE COURT: I'll allow it.
17      THE WITNESS: Naw, he asked me if the gun was mines.
18 BY MR. TABACKMAN:
19 Q.   He asked you if the gun was yours?
20 A.   Yes.
21 Q.   And what did you say?
22 A.   No.
23 Q.   You said it wasn't?
24 A.   Yes.
25 Q.   Was that the truth?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1129**

1 A.   Yes.
2 Q.   How do we know? Because you said it?
3 A.   Yes.
4 Q.   It's not on tape, is it?
5 A.   Excuse me?
6 Q.   He didn't tape it when you said it; isn't that right? We
7 don't know whose gun it was?
8 A.   No, he didn't tape it.
9 Q.   Whose gun was it?
10 A.   It's my cousin's.
11 Q.   What's his name?
12      MR. GUERRERO: Objection, relevance.
13      THE COURT: I'll allow it.
14      THE WITNESS: Lorenzo Crump.
15 BY MR. TABACKMAN:
16 Q.   Lorenzo Crump. Did he get a beef out of that raid?
17      MR. GUERRERO: Objection, relevance.
18      THE COURT: Sustained.
19 BY MR. TABACKMAN:
20 Q.   Did Lockhart ask you to provide information against
21 Lorenzo Crump?
22 A.   No, he did not.
23 Q.   Did Lorenzo Crump get locked up that day, the same as you
24 did?
25      MR. GUERRERO: Objection, relevance.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1138

1     MR. TABACKMAN: I'll tie it up, Your Honor. Just a
2 moment, I'll come up and tell Your Honor.
3     THE COURT: Come on up.
4     (Following sidebar discussion had on the record:)
5     MR. TABACKMAN: The case on which he was convicted in
6 Superior Court in 1999 occurred with a sale on Atlantic Avenue,
7 southeast, which is not in Congress Park. And he said everything
8 he did up until the time he moved to 10th Place was in
9 Congress Park. And he was selling up on Atlantic Avenue,
10 Southeast, which is where he was arrested and where he was
11 convicted of selling crack. It's not in Congress Park.
12     THE COURT: The relevance of his conviction is to impeach
13 his credibility. You can't go into all the details beyond that
14 for impeachment purposes.
15     MR. TABACKMAN: Well, I can go to -- I hope Your Honor
16 would let me --
17     THE COURT: Only when he was selling drugs.
18     MR. TABACKMAN: He said he was out there watching all the
19 people and the reason he moved up to 10th Place was all the
20 business that was taking place in Congress Park. He was
21 basically pushed out, and he had to go to someplace that was less
22 competition, and meanwhile we find out that's not where he was
23 selling at all.
24     THE COURT: I'm sorry, go ahead.
25     MR. TABACKMAN: This was 1999, this was when he was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1139

1 arrested the first time and convicted, and he said he had been
2 selling for -- since he was 15 years old in Congress Park at 19,
3 and that he was doing that for all the years -- from the years he
4 began selling, up until the time he was arrested at 3401 10th
5 Place.
6     THE COURT: Anything else?
7     MS. PETALAS: No, Your Honor.
8     THE COURT: All right. I'll allow it.
9     (Sidebar discussion concluded.)
10 BY MR. TABACKMAN:
11 **Q.**   Rather than bother the reporter, I'll just put the
12 question to you again: Where in Congress Park will I find the
13 100 block of Atlantic Avenue, Southeast?
14 **A.**   You won't.
15 **Q.**   And yet you were selling crack in the 100 block of
16 Atlantic Avenue, Southeast; isn't that right?
17 **A.**   That's not correct.
18 **Q.**   You weren't arrested in 1999 for selling crack to an
19 undercover police officer on Atlantic Avenue, Southeast?
20 **A.**   No, I was caught with marked money for gambling, that's
21 why I took it to trial. I said I was caught with marked money
22 and that was while I was gambling and that's why I took it to
23 trial.
24 **Q.**   You didn't sell the drugs on Atlantic Avenue, Southeast?
25 **A.**   No, I did not.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1140

1 **Q.**   And how did you get caught with the marked money?
2 **A.**   Gambling.
3 **Q.**   Gambling. And somebody -- a police officer just came
4 along and noted you had marked money from a drug sale?
5     MR. GUERRERO: Objection.
6     THE COURT: Overruled.
7     THE WITNESS: Naw, when they searched everybody when we
8 was gambling, I was the one with the marked money.
9 BY MR. TABACKMAN:
10 **Q.**   And the police -- do you recall -- you went to trial in
11 that case; isn't that right?
12 **A.**   Yes, I did.
13 **Q.**   And you went to trial on a charge of distributing crack
14 cocaine; isn't that right?
15 **A.**   Yes.
16 **Q.**   And it was a charge of distributing crack cocaine on
17 Atlantic Avenue, Southeast; isn't that right?
18 **A.**   That's what they said.
19 **Q.**   Isn't that correct?
20 **A.**   Yes.
21 **Q.**   And you went to trial and you were convicted of that?
22 **A.**   Yes.
23 **Q.**   So is it your testimony today that the police were lying
24 when they said they bought it from you on 10th Avenue or
25 Atlantic Avenue, Southeast?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1141

1     MR. GUERRERO: Objection, improper impeachment.
2     THE COURT: Sustained.
3     THE WITNESS: I would say yes.
4     THE COURT: I said sustained. That means you don't have
5 to answer the question.
6 BY MR. TABACKMAN:
7 **Q.**   You testified that you were not smoking marijuana while
8 you were on release, after you pled guilty in front of
9 Judge Roberts.
10 **A.**   Right.
11 **Q.**   That's correct?
12 **A.**   Right.
13 **Q.**   Did you have to submit to urine tests?
14 **A.**   Yes, I did.
15 **Q.**   And you know the results of the urine tests?
16 **A.**   Yes.
17 **Q.**   And isn't it a fact, sir, that the results of your urine
18 test, on at least 10 different times, show that you tested
19 positive for marijuana?
20 **A.**   That was probably at the time that I stopped cooperating,
21 and I stopped going to pre-trial.
22 **Q.**   Now, when did your -- I'm sorry, when did your brother
23 die?
24 **A.**   When did he die?
25 **Q.**   Let me back up.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1142

1 I think I understood you to say that it was the death of
2 your brother --
3   A.   Yes.
4   Q.   -- that put you into a bad state and that was when you
5 started using again?
6   A.   Yes, but a few months during that, I just stopped caring,
7 so I wasn't fully cooperating with --
8   Q.   Right.  And when did that occur?
9   A.   I can't think.  I know it's before the new years.
10   Q.   I'm sorry, what's that?
11   A.   I know it's before January.  I know that.
12   Q.   January of what?
13   A.   2004.
14   Q.   So sometime in 2003 is when your brother died?
15   A.   No, he died in January.
16   Q.   Of 2004?
17   A.   Yes.  I said I stopped being in compliance a couple of
18 months before he got killed.
19   Q.   Was it the fact that he got killed that caused -- I
20 thought you said to Mr. Guerrero, in response to one of his
21 questions, that it was the -- your brother getting killed that
22 caused you to fall out of compliance?
23   A.   Right, that's when I completely fell out of compliance.
24   Q.   But you were already out of compliance before your
25 brother was killed?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1143

1   A.   At times, yes.
2   Q.   Right.  And have you looked -- did you look over the drug
3 status report that's in the court file?
4   A.   No.
5   Q.   So, if your brother died in January of 2004, it wouldn't
6 surprise you to find out that you were out of compliance in
7 September of 2003, a few months before that; is that right?
8   A.   Right.
9   Q.   And you were out of compliance by smoking marijuana,
10 right?
11   A.   Yes.
12   Q.   And were smoking marijuana every day, right?
13   A.   Naw, not every day.
14   Q.   Almost every day?
15   A.   No.
16   Q.   How often were you smoking marijuana?
17   A.   Probably about -- maybe once or twice out of a week.
18      THE COURT:  You have to speak louder so they can hear you.
19      THE WITNESS:  Maybe once or twice out of a week, maybe.
20 BY MR. TABACKMAN:
21   Q.   You said you weren't cooperating with the government
22 anymore?
23   A.   I wasn't talking to Rob Lockhart like I supposed to, like
24 a every day thing like I was supposed to.
25   Q.   So, when the other lawyer asked you if you were smoking

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1144

1 marijuana back when you were cooperating with the government,
2 that's why you said no, because you had also stopped
3 cooperating; is that right?
4   A.   I just wasn't in compliance like I was supposed to.
5   Q.   But you did smoke marijuana?
6   A.   Here and there.
7   Q.   And you smoked marijuana enough that when you came to
8 court and they checked your urine, they found marijuana, right?
9   A.   Yes.
10   Q.   And they found some boat, too, didn't they?
11   A.   No.
12   Q.   You weren't smoking any boat?
13   A.   No.
14   Q.   How about some crack?
15   A.   Yes.
16   Q.   You were smoking crack?
17   A.   No, I wasn't smoking crack.  I was touching crack.
18   Q.   You were touching crack, because you were selling it?
19   A.   Yes.
20   Q.   And Mr. Wood, you never stopped selling crack, did you?
21   A.   No.
22   Q.   From the time in 1999 on Atlantic Avenue, Southeast, all
23 the way up until you got locked up in 2000 -- was it 4?
24   A.   Yes.
25   Q.   You were selling crack that whole time, weren't you?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1145

1   A.   I wasn't selling crack down on Atlantic Street, but yes,
2 I was selling crack.
3   Q.   So, in 1999 you were selling crack?
4   A.   Yes, I was.
5   Q.   And you got convicted of distributing crack; isn't that
6 right?
7      MR. GUERRERO:  Objection, asked and answered.
8      THE COURT:  Sustained.
9 BY MR. TABACKMAN:
10   Q.   And you got probation for that, right?
11   A.   Yes.
12   Q.   That was with Judge Green, a lady judge over in Superior
13 Court?
14   A.   Yes.
15   Q.   And they gave you the Youth Act; isn't that right?
16   A.   Yes, they did.
17   Q.   What was your understanding of what the District of
18 Columbia code has as a penalty for distributing crack in the
19 district?
20   A.   Meaning?
21   Q.   Let me see if I can help you.  You understand that this
22 is the Federal Court over here, right?
23   A.   Right.
24   Q.   And there's what's called the United States code, that's
25 what you pled guilty under in front of Judge Roberts?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1 Isn't that right?

2 A.  Yeah.

3 Q.  And you were wired up for the actual encounter face to face

4 with Mr. Ball.  Isn't that right?

5 A.  Yes.

6 Q.  But you had called Mr. Ball at some point to talk about

7 getting together before you had a body wire on.  Isn't that

8 right?

9 A.  No, Mr. Ball had gave me his cell phone number.

10 Q.  And you called that number.  Is that right?

11 A.  Yeah, I did.  Yes.

12 Q.  And when did Mr. Ball give you his cell phone number?

13 A.  In the alley one day.

14 Q.  In the alley one day?

15 A.  Yes.

16 Q.  And you called that number.  Is that right?

17 A.  Yes.

18 Q.  And you called that number at a time when you weren't

19 wearing a body wire.  Isn't that right?

20 A.  No, I called him when I was with Agent Lockhart.

21 Q.  Did you not call him that day, on July 20th of 2001, at a

22 time earlier in the day before you met with Lockhart, to talk

23 about getting together later?

24 A.  No.

25 Q.  Did not happen that way?

1 Q.  But you testified yesterday that Mr. Ball called you or

2 spoke to you one day and told you to call him because he had

3 crack to sell?

4 A.  He told me outside in the alley.

5 Q.  He told you in the alley.  Do you remember when that was?

6 A.  It was before I tried to attempt to buy from him.

7 Q.  Well, okay.  Was it after you had met Lockhart?

8 A.  Yes.

9 Q.  So the first time that Antwuan Ball ever mentioned trying to

10 sell you drugs was after you had met Lockhart?

11 A.  Yes.

12 Q.  And the whole 10 years that you had been knowing him before

13 that, he had never mentioned selling you drugs?

14 A.  No.

15 Q.  And you had never mentioned selling him drugs?

16 A.  No.

17 Q.  Well, that was convenient, wasn't it?

18 A.  Yeah, it was.

19 Q.  Do you think that Mr. Ball knew that Mr. Lockhart was

20 looking for him, trying to help him out?

21 A.  No.

22 Q.  So you get together with Mr. Ball on that day.  Is that

23 right?

24 A.  Yes.

25 Q.  And I believe you said it was -- did you say to Mr. Lockhart

1 A.  No.

2 Q.  You and Rob Lockhart got to be friends, didn't you?

3 A.  I don't call him no friend.

4 Q.  Well, you called him Rob, didn't you, on some of these

5 tapes?

6 A.  Yeah.

7 Q.  Not Agent Lockhart all the time.  Isn't that right?

8 A.  Right.

9 Q.  And you share a little crack on somebody who you've been

10 trying to talk to on the street with Lockhart.  Isn't that

11 right?  Share a laugh with him about what somebody did or didn't

12 do?

13 A.  I don't recall that.

14 Q.  So why didn't you tell Agent Lockhart what you were doing on

15 the days you weren't with him?

16        MR. GUERRERO:  Objection.  Asked and answered.

17        THE COURT:  Sustained.

18 BY MR. TABACKMAN:

19 Q.  At the time that you were doing -- meeting with Mr. Ball on

20 July 20th, you were still on probation for the case in

21 Superior Court from Judge Greene.  Isn't that right?

22 A.  Yes.

23 Q.  You didn't get your probation revoked because of your arrest

24 at 3401 10th Place.  Isn't that right?

25 A.  Right.

1 Q.  And that was something that Mr. Lockhart did for you.  Isn't

2 that right?

3 A.  Yes.

4 Q.  And that was one of the reasons that you agreed to cooperate

5 with Mr. Lockhart.  That was part of your motivation, wasn't it?

6 A.  Probably so.

7 Q.  Probably so or definitely so?

8 A.  So.

9 Q.  Pardon?

10 A.  So.

11 Q.  Now, on July 26th of 2001, you arranged to meet with

12 Mr. Ball near your mother's house.  Is that right?

13 A.  Yes.

14 Q.  And how did you arrange to meet with Mr. Ball?

15 A.  A phone call.

16 Q.  And that phone call was before you met with Mr. Lockhart.

17 Isn't that right?

18 A.  It might have been.  I probably called him and just told him

19 I was on my way, and I was.

20 Q.  You called him and told him a story, didn't you?

21 A.  Told who a story?

22 Q.  Antwuan Ball.

23 A.  Story about what?

24 Q.  About why you needed to see him.

25 A.  Yes.

1 A.  Yes.

2 Q.  How much did you give her?

3 A.  Whatever she needed at the moment.

4 Q.  If she asked you, she got some?

5 A.  Yes.

6 Q.  Did you ever have a job other than hustling, selling crack

7 cocaine?

8 A.  Once before.

9 Q.  Once before?

10 A.  Yes.

11 Q.  When was that?

12 A.  Like in '90s --

13 Q.  In the '90s?

14 A.  Yeah.

15 Q.  For how long?

16 A.  About a year.

17 Q.  Now, when you talk about on the tape going back to work, you

18 weren't going back to work anywhere except for selling drugs.

19 Isn't that right?

20 A.  No, back then I was doing renovation.  We was remodeling an

21 apartment building.

22 Q.  So your stepfather is standing there.  And his name is Earl.

23 Right?

24 A.  Yes.

25 Q.  And there's a guy named Bernie in the truck?

Page 1182

1 days.  Isn't that right?

2 A.  I just tell him it's about business.

3 Q.  I'm sorry?

4 A.  I actually telling him it's about business.

5 Q.  But other than that one day, you didn't do any transactions

6 with Mr. Ball, did you?

7 A.  Excuse me?

8 Q.  You did one transaction with Mr. Ball on July 26th.  That's

9 the only one you did.  Is that right?

10 A.  Right.

11 Q.  In three tries?

12 A.  Right.

13 Q.  And they were the only ones that you've ever done -- that's

14 the only one that you've ever done with him in the entire time

15 you've known him?

16 A.  Yes.

17 Q.  And it's your testimony that you didn't give him a story so

18 that he would come and try and help you out?

19        MR. GUERRERO:  Objection.  Asked and answered.

20        THE COURT:  Sustained.

21 BY MR. TABACKMAN:

22 Q.  You never told him that there was a guy that was looking for

23 you, and could he get the drugs for you to keep you from getting

24 killed.  You never told him that?

25        MR. GUERRERO:  Objection.  Asked and answered.

1          Between trial and sentencing, you've been locked up for

2 a brief period of time.  Correct?

3 A.  I was out during my trial, but when they found me guilty I

4 was -- she had held me until sentencing.

5 Q.  But then she gave you a break at sentencing.  Correct?

6 A.  Yes.

7 Q.  How much time was hanging over your head if you violated

8 probation.  Do you know?

9 A.  She gave me a Youth Act for four years.

10 Q.  And that was four years of probation.  Correct?

11 A.  Yes.

12 Q.  But how much -- if you violated -- if at any time you

13 violated that probation, what was the maximum amount of time

14 that that judge could give you.  Do you know?

15 A.  They said between zero to 30 years.

16 Q.  Okay.  So when you're arrested by the FBI in September of

17 2000, you have that 30 years hanging over your head.  Correct?

18 A.  Yes.

19 Q.  In addition to that 30 years, you could get charged with,

20 and you knew you could get charged with, the drugs.  Correct?

21 A.  Yes.

22 Q.  Also, in your room at your cousin's apartment, the police

23 found a box of ammunition.  Correct?

24 A.  Yes.

25 Q.  And you knew you could get charged for that ammunition as

1 well?

2 A.  Right.

3 Q.  Because it's in your room in the apartment.  Correct?

4 A.  Yes.

5 Q.  You've never been charged for that box of ammunition.

6 Correct?

7 A.  Correct.

8 Q.  When you got arrested in September of 2000, did you tell

9 your probation officer you had been arrested by the FBI?

10 A.  Yes, I had.

11 Q.  Was your probation -- did you have to go see the judge about

12 the fact that you had been arrested by the FBI?

13 A.  No.

14 Q.  In fact, you didn't actually have to go back and see the

15 judge until the next year.  Correct?

16 A.  Right.

17 Q.  And at that point you had been arrested -- well, in the year

18 2001, while you're cooperating for the FBI, you were arrested

19 two more times.  Correct?

20 A.  Probably was on domestic or something, probably so.

21 Q.  Well, that's a criminal arrest.  Right?

22 A.  Yes.

23 Q.  And that's a violation of your probation.  Correct?

24 A.  Yes.

25 Q.  In addition to being arrested twice, you had 13 positive

1 FBI, you yourself never bought drugs from Mr. Ball.  Correct?

2 A.  Correct.

3 Q.  And back in 2000 and 2001, where were you selling your

4 drugs?

5 A.  Down 10th Place.

6 Q.  So prior to -- how long prior to your arrest in September of

7 2000 are you selling your drugs on 10th Place?

8 A.  I was selling them the whole time.

9 Q.  The whole time?

10 A.  Yes.

11 Q.  So from when you were 15 years old?

12 A.  Oh, no.  I was around -- I started hanging out 10th Place

13 like the end of '99.

14 Q.  And actually, at that point you're on release in your

15 Superior Court case.  Correct?

16 A.  Yes.

17 Q.  And as a condition of your Superior Court case, when you're

18 on release, you're also not supposed to be selling drugs.

19 Correct?

20 A.  Correct.

21 Q.  So while on release, you make a promise not to break the

22 law.  Correct?

23 A.  Right.

24 Q.  And what happens if you get caught breaking the law while

25 you're on release in your Superior Court case?

1 A.   No.   Correct.

2 Q.   And when the warrant squad picks you up, you are taken in

3 front of both judges.   Correct?

4 A.   Yes.

5 Q.   You're taken in front of a judge over here in Federal

6 Court --

7 A.   Yes.

8 Q.   -- and held without bond.   Correct?

9 A.   Correct.

10 Q.   And you're taken in front of the probation judge in Superior

11 Court.   Correct?

12 A.   Yes.

13 Q.   And there's a number of court hearings that you have in the

14 spring of '04.   Correct?

15 A.   Correct.

16 Q.   The result of all of those hearings is that your probation

17 is terminated as successful.   Correct?

18 A.   Yes.

19 Q.   And the government came in there, and they asked the court

20 to terminate your probation as successful.   Correct?

21 A.   I don't know about that last one.   My lawyer --

22 Q.   You don't know?

23 A.   When they had terminated my probation, I never went to court

24 that day.   My lawyer came and told me what they said.

25 Q.   Okay.   But to your knowledge, the government was there.

1 Correct?

2 A.  I can't say because I wasn't there.

3 Q.  You have no idea?

4 A.  No.  She just told me that it was successful.

5 Q.  Okay.  But you know that the Court terminated your probation

6 as successful, and actually set aside that Youth Act conviction.

7 Correct?

8 A.  Yes.

9 Q.  And what does that mean to you?

10 A.  Nothing.

11 Q.  Well, you're not facing 30 years over there anymore.

12 Correct?

13 A.  No.  Correct.

14 Q.  And that's not a conviction anymore?

15 A.  Right.  They said it supposed to get expunged off my record.

16 Q.  And that's because the Court found that you had successfully

17 completed your probation.  Correct?

18 A.  Correct.

19          MS. WICKS:  Court's indulgence.

20 BY MS. WICKS:

21 Q.  Now, back when you pled guilty in 2002, at that point you

22 had actually applied for a job.  Correct?

23 A.  Yes.

24 Q.  And you had applied to Safeway to work.  Correct?

25 A.  Right.

1 that I believe he was on the unit with at CTF on the fourth

2 floor, who are none of the people in this courtroom.

3          THE COURT:  Just let me ask you to be very vigilant

4 about it.

5          MS. WICKS:  Sure.

6          MR. GUERRERO:  That last question was not specific,

7 Your Honor.  That last question was very broad and open-ended.

8 I would suggest that she be very specific as to people's names

9 that she has a good faith basis to believe.

10          THE COURT:  One of the reasons I had wanted to make

11 sure you-all come up was because that question really was -- I

12 take it you were trying to lay some foundation, but it was very

13 broad, which might have been an invitation in his mind to

14 mention residents of Congress Park whom this jury should not be

15 hearing about.

16          MS. WICKS:  I understand, Your Honor.

17          THE COURT:  So please skip all of the foundational

18 stuff that might be broad and go right to who you're asking

19 about, just to be safe for everybody.

20          MS. WICKS:  Sure.

21          (END BENCH CONFERENCE.)

22 BY MS. WICKS:

23 Q.  So Mr. Wood, you're saying since you've been locked up in

24 the last three years, you have never been on a unit on the

25 fourth floor of CTF with Arthur Handon, also known as J?

1 A.  Yes.

2 Q.  Yes, you have?

3 A.  Yes, I have.

4 Q.  Okay.  And you know that person from Congress Park.

5 Correct?

6 A.  Yes.

7 Q.  Okay.  The other person that you've also been on the unit

8 with is Joe Langley.  Correct?

9 A.  Correct.

10 Q.  And he's also someone that you associate with Congress Park.

11 Correct?

12 A.  Correct.

13 Q.  Mr. Wood, do you have a nickname?

14 A.  Yes.

15 Q.  What's your nickname?

16 A.  Little Seas or Sea-Wop.

17 Q.  Sea-Wop is your nickname?

18 A.  Yes.

19 Q.  When you pled guilty in 2002, you signed an agreement --

20      MS. WICKS:  Court's indulgence.

21 BY MS. WICKS:

22 Q.  -- in May of 2002 with the government.  Correct?

23 A.  Yes.

24 Q.  And part of that agreement is that you will not -- one of

25 the benefits that you are getting in that agreement is that you

1 Q.  Don't tell us what any judge said.  But you started out with

2 a charge of assault with intent to kill?

3 A.  Yes, sir.

4 Q.  Did you end up pleading to any charges as a result of this

5 incident?

6 A.  Well, yeah.  Two years later, about 18 months later.

7 Q.  And what charges did you finally plead guilty to?

8 A.  Threats to injure a person with serious bodily harm.

9 Q.  And you said you were held without bond initially?

10 A.  Yes.

11 Q.  And I think you also said you were in D.C. jail when you had

12 the injuries?

13 A.  Yes, sir.

14 Q.  Did you stay in jail for that entire two-year period?

15 A.  No, sir.  I stayed in almost two months, and got released to

16 electric home monitoring.

17 Q.  And do you remember when you finally pled guilty to the

18 threats charge?

19 A.  I think it was sometime around -- I'm really not sure.  It

20 was '93.  I would say '93 or '94.

21 Q.  When you pled guilty to threats, were you in jail at the

22 time?

23 A.  No, I was still on house monitoring.

24 Q.  After you pled guilty, did you go to jail?

25 A.  Yes, for another charge.  I had actually got probation on

1 the threatening to injure a person.

2 Q.  We're going to take them one at a time.  I just want to

3 start with this one charge, the threats.

4         Did you get sentenced to any more jail time as a result

5 of that plea?

6 A.  No, sir.

7 Q.  Did you end up -- as a result of this injury, were you able

8 to follow through on your scholarship?

9 A.  No, sir.  For one, coach said if I was --

10 Q.  Don't tell us what the coach said, just tell us first of

11 all, yes or no, were you able to go to Georgia on the

12 scholarship?

13 A.  No, sir.

14 Q.  And was it a result of -- why is that?  Without telling us

15 what anyone said, why could you not go on the scholarship?

16 A.  Because my hand was inoperable, and I was placed on house

17 arrest.

18 Q.  Sir, do you know somebody by the name of Joseph Jones?

19 A.  Yes, sir.

20 Q.  Do you see Joseph Jones in the courtroom here today?

21 A.  Yes, sir.

22 Q.  Can you please point him out based on his location and an

23 article of clothing that he's wearing?

24 A.  Yellow T-shirt, necktie, glasses.

25 Q.  The gentleman who just stood up behind me?

1 A.  Yes, sir.

2         MR. LEON:  Your Honor, may the record reflect the

3 in-court identification of Mr. Jones?

4         MR. MARTIN:  No objection.

5         THE COURT:  Request is granted.

6 BY MR. LEON:

7 Q.  How long have you known Joseph Jones?

8 A.  All my life, sir.

9 Q.  Do you have any connection to him?

10 A.  Yes.

11 Q.  What?

12 A.  That's my first cousin.

13 Q.  Does he have any nicknames?

14 A.  Jojo.

15 Q.  And when you say he's your first cousin, explain the

16 relationship.  How are you related by family?

17 A.  My father is his mother's brother; you know, my father is

18 his uncle.

19 Q.  And just for the record, what's your father's name?

20 A.  Larry Phillip Browne, Senior.

21 Q.  Do you know where Joseph Jones, Jojo, grew up?

22 A.  Congress Park, Southeast area.

23 Q.  And you said earlier you are familiar with Congress Park?

24 A.  Yes.

25         MR. LEON:  Your Honor, I would ask to show the witness

Tab 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : March 5, 2007 |
| DOMINIC SAMUEL, | : 9:15 a.m. |
| Defendants. | : |

VOLUME 11 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE<br>Glenn Leon, Assistant United<br>States Attorney<br>Ann H. Petalas, Assistant United<br>States Attorney,<br>Gilberto Guerrero, Assistant<br>United States Attorney<br>555 4th Street<br>Washington, DC  20001<br>202.305.0174 |
| For Defendant<br>Antwuan Ball: | CARNEY & CARNEY<br>John James Carney, Esq.<br>South Building<br>601 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>202.434.8234 |

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

1299

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Antwuan Ball: | TIGHE, PATTON, ARMSTRONG,<br>TEASDALE, PLLC<br>Steven Carl Tabackman, Esq.<br>1747 pennsylvania Avenue, NW<br>Suite 300<br>Washington, DC  20036<br>202.454.2811 |
| For Defendant<br>David Wilson: | LAW OFFICE OF JENIFER WICKS<br>Jenifer Wicks, Esq.<br>503 D Street NW, Suite 250A<br>Washington, DC  20001<br>202.326.7100 |
| | GARY E PROCTOR, LLC<br>Gary E. Proctor, Esq.<br>6065 Harford Road<br>Baltimore, MD  21214<br>410.444.1500 |
| For Defendant<br>Gregory Bell: | LAW OFFICE OF JAMES W. BEANE<br>James W. Beane, Jr., Esq.<br>2715 M Street, N.W.<br>Suite 200<br>Washington, DC  20007<br>202.333.5905 |
| For Defendant<br>Desmond Thurston: | LAW OFFICE OF JONATHAN ZUCKER<br>Jonathan Seth Zucker, Esq.<br>514 10th Street, NW<br>9th Floor<br>Washington, DC  20004<br>202.624.0784 |
| For Defendant<br>Joseph Jones: | LAW OFFICE OF ANTHONY MARTIN<br>Anthony Douglas Martin, Esq.<br>7841 Belle Point Drive<br>Greenbelt, MD  20770<br>301.220.3700 |
| | LAW OFFICE of ANTHONY ARNOLD<br>Anthony Darnell Arnold, Esq.<br>One Research Court<br>Suite 450<br>Rockville, MD  20852<br>301.519.8024 |

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

1300

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Dominic Samuels: | LAW OFFICES OF A. EDUARDO BALAREZO<br>A. Eduardo Balarezo, Esq.<br>400 Fifth Street, NW<br>Suite 300<br>Washington, DC  20001<br>202.639.0999<br>and<br>William B. Purpura, Esq.<br>8 East Mulberry Street<br>Baltimore, MD  21202<br>410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR<br>Official Court Reporter<br>Room 6814, U.S. Courthouse<br>Washington, DC 20001<br>202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

1301

**MORNING SESSION, MARCH 5, 2007**

1
2  (9:16 a.m.)
3      (Juror No. 13 approached the bench.)
4      THE COURT:  Good morning.  How are you?  I did get your
5  note.  Thank you for sending me the note.
6      JUROR NO. 13:  I appreciate you talking to me.
7      I went to my supervisor on the job.  I talked to my
8  supervisor, the supervisor next to the big supervisor.  Okay.
9  She told me that I have to work every Friday.  I can't do that
10 because I would be working 12 straight days.  I'm here from --
11 let me show you.
12     THE COURT:  Hold on a second.  Let me move this.
13     JUROR NO. 13:  I didn't want to do this, but I had to go
14 over their head.  This was a long schedule.  This goes all the
15 way to the 17th, but I couldn't copy the whole thing because it
16 was about that long (indicating.)  So this is my name right here,
17 and you see it right there --
18     THE COURT:  What does "D" mean?
19     JUROR NO. 13:  Those are the days that I work.
20     THE COURT:  Okay.  What, in the evenings?
21     JUROR NO. 13:  No, days.  Those are days.  This is all --
22 this is me right here.  I'm working here Monday through --
23 Monday, Tuesday, Wednesday, Thursday, Friday and --
24     THE COURT:  Is that easier for you?
25     JUROR NO. 13:  And that's my weekend off, right there.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1318

1 hooked me up with the job.
2 **Q.** So who did you actually work for?
3 **A.** His name is Mr. Jacobs.
4 **Q.** And what company did you work for? Did you work for a
5 team or did you work for a stadium? Who did you work for?
6 **A.** Well, he's self-employed, but he has his own vendoring
7 company.
8 **Q.** Okay. Now, putting aside the vending, which you
9 mentioned in my earlier answer -- putting aside the vending,
10 back to the selling of the cocaine between 15 and 18, your years
11 15 to 18, how frequently or infrequently would you sell crack
12 cocaine during those three years or so?
13 **A.** I would say several times. It wasn't very often back
14 then.
15 **Q.** And did you also -- let me withdraw that.
16 How much money would you say you would be able to make
17 when you were selling crack cocaine, again, during this period
18 of time when you would go out to sell crack cocaine?
19 **A.** Well, I wouldn't profit no more than probably -- it
20 depends what I brought, but most times I would profit -- I would
21 double my money.
22 **Q.** And how often would you go out to do it?
23 **A.** I did it a handful of times, but you know, back then my
24 friends wasn't really letting me really sell the drugs, so what
25 they would do is, you know, whatever I spent, they would go

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1319

1 ahead and just sell the cocaine for me.
2 **Q.** What do you mean by that?
3 **A.** I mean they didn't want me in the streets.
4 **Q.** And what do you mean by that?
5 **A.** They wanted me to play basketball. You know, they didn't
6 want me ripping and running the streets.
7 **Q.** So, walk us through that just quickly. Who would
8 actually buy the cocaine?
9 **A.** Well, you know, my friend Chuckie would purchase the
10 cocaine --
11 MR. PURPURA: Same objection to relevancy and continuing.
12 THE COURT: Overruled.
13 BY MR. LEON:
14 **Q.** You can go ahead.
15 **A.** My buddy Chuckie would buy the cocaine for me and, you
16 know, hold it and everything for me, cut it up for me. And I'd
17 be sitting right there watching him and he'd just be like later
18 on, at the end of the day, he'd probably just -- or the next
19 morning, just bring me my money or tell me to come up the street
20 and get it.
21 **Q.** How often would you say your friend Chuckie did this for
22 you?
23 **A.** I can remember three times.
24 **Q.** I'd like to now move -- jump ahead a little bit, if we
25 could, starting at the age of 18 and going to where we are

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1320

1 today.
2 Can you just remind us, how old are you today, as you sit
3 here today?
4 **A.** 33.
5 **Q.** You're currently incarcerated; is that correct?
6 **A.** Yes, sir.
7 **Q.** How long have you been in jail?
8 **A.** Today makes exactly six years.
9 **Q.** Today?
10 **A.** Yes, sir.
11 **Q.** Have you been out of jail for any day in the last six
12 years?
13 **A.** No, sir.
14 **Q.** So you were how old when you were incarcerated?
15 **A.** 27.
16 **Q.** I would like to focus on those years from the time you
17 were 18 years old until the time you were 27. Okay?
18 **A.** Um-hmm.
19 **Q.** Okay?
20 **A.** Yes, sir.
21 **Q.** On Thursday, you mentioned an incident were you ended up
22 pleading guilty to threats in -- I believe it was 1992.
23 Remember that testimony?
24 **A.** That's correct. Yes, sir. That was '92.
25 **Q.** That's a charge you picked up here in Washington, D.C.?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1321

1 **A.** Yes, sir.
2 **Q.** Did you also pick up a charge for attempted possession of
3 cocaine in 1993?
4 **A.** Yes, sir.
5 **Q.** And that was a charge that was your charge?
6 **A.** Yes, sir.
7 **Q.** In Washington, D.C.?
8 **A.** Yes, sir.
9 **Q.** And did you also pick up a charge of carrying a dangerous
10 substance in Maryland in 1996?
11 **A.** Yes, sir.
12 **Q.** And did you also pick up a charge that you pled guilty to
13 of attempted possession with intent to distribute marijuana in
14 Washington, D.C. in 1998?
15 **A.** Yes, sir.
16 **Q.** And did you also plead guilty -- pick up a charge of
17 escape in Washington, D.C. in 1998?
18 **A.** Yes, sir.
19 **Q.** And finally, did you also pick up a charge of possession
20 of marijuana in Washington, D.C. in 2001?
21 **A.** Yes, sir.
22 **Q.** Now, you said that you were actually locked up --
23 arrested in March. Was it March 6th?
24 **A.** March the 5th.
25 **Q.** Of what year?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1334**

1  other people that he hung out with?"

2  **A.**  Well, I come around and hang out with all of them.

3  **Q.**  When you say "all of them," who do you mean, "all of

4  them"?

5  **A.**  I mean all of the defendants and plenty more people.

6      MR. PURPURA:  Objection.

7  BY MR. LEON:

8  **Q.**  I'll ask you to be specific.  When you say "all of them,"

9  do you have certain people in your own mind?

10  **A.**  I mean, it's so many to name.

11  **Q.**  Tell us the names you remember.

12  **A.**  Boy-Boy, my cousin Jo-Jo, Twan.

13      MR. PURPURA:  Your Honor, I can't hear.  The witness went

14  too fast.  If he could slow down a little bit.

15      THE WITNESS:  Yes, sir.

16  BY MR. LEON:

17  **Q.**  Repeat again the people that David Wilson hung out with.

18      MS. WICKS:  Objection, your Honor.

19      MR. ZUCKER:  That wasn't the question initially.

20      THE COURT:  That's correct.  Rephrase.

21  BY MR. LEON:

22  **Q.**  Okay.  I think you said a question ago --

23  Can I ask the court reporter to read the question I

24  asked?  I don't remember it.

25      THE COURT:  The answer was "I came to hang out with all of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1335**

1  them.

2      "And when you say 'all of them,' what do you mean, 'all of

3  them'?"

4  BY MR. LEON:

5  **Q.**  What do you mean by "all of them"?

6  **A.**  Well, Congress Park, you know.  The crew.

7  **Q.**  Can you put names or nicknames to those people you're

8  referring to?

9  **A.**  Yes, sir.  My cousin Jo-Jo, Dazz, Boy-Boy, Twan, Wop,

10  Kairi, Munya, Tone.

11  **Q.**  I'm sorry.  Did you say "Tony"?

12  **A.**  Tone; yes, sir.  Those are some of the names.  Truck,

13  Santu, Jazz.  There's some more.  I really --

14  **Q.**  We're going to ask to keep your voice up, please.

15  **A.**  Okay.  Yes, sir.

16      That's basically it, the ones I can remember.

17  **Q.**  Okay.  Now, when you said you -- in '97, '98 when you

18  started spending more time with David Wilson, where was this

19  time?  Where did you actually hang out with him?  What

20  neighborhood?

21  **A.**  I used to come through Congress Park and hang out with

22  them.

23  **Q.**  Did you ever hang out with them in any other area other

24  than Congress Park?

25  **A.**  No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1336**

1  **Q.**  And when you said you came through Congress Park, why

2  would you come through Congress Park in '97, '98?

3  **A.**  Selling marijuana.

4  **Q.**  Is that the main neighborhood you sold marijuana in '97,

5  '98?

6  **A.**  No, sir.

7  **Q.**  Where did you mainly sell marijuana?

8  **A.**  Around 49th and Quarles.

9  **Q.**  And around this time, '97, '98, were you still vending?

10  **A.**  No, sir.  No, sir.

11  **Q.**  Around that time, '97, '98, how were you making -- were

12  you making money?

13  **A.**  Yes, sir.

14  **Q.**  How were you making money?

15  **A.**  Hustling.

16  **Q.**  When you say "hustling," what do you mean?

17  **A.**  Selling drugs.

18  **Q.**  And when you say "drugs," what drugs?

19  **A.**  Cocaine and marijuana.

20  **Q.**  Did you sell -- in this period of time in the '90s now,

21  '97, '98, did you sell more marijuana or did you sell more

22  cocaine?

23  **A.**  More marijuana.

24  **Q.**  Why?

25  **A.**  It was a lesser charge.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1337**

1  **Q.**  Say it again.

2  **A.**  I would say marijuana is a lesser charge, plus it was

3  selling faster, too.

4  **Q.**  Explain -- you gave two answers so let's take them one at

5  a time.  What do you mean, "lesser charge"?

6  **A.**  Marijuana was a misdemeanor.

7  **Q.**  So?

8  **A.**  I would rather take a misdemeanor than a felony.  Cocaine

9  is a felony.

10  **Q.**  Okay.  And the other part of your answer had something to

11  do with money?

12  **A.**  Yes.  Marijuana was selling quicker at the time.

13  **Q.**  And around this time, let's say 1997, 1998, around this

14  period of time, how much marijuana would you say you were

15  selling on a given, say, week, if you can estimate it in that

16  way?

17  **A.**  I'd say at least five pounds.

18  **Q.**  Five pounds?

19  **A.**  In a week, yes.

20  **Q.**  Can you explain that for us, what that means.  How

21  much -- first of all where would you get those five pounds?

22  Would someone supply that to you?

23  **A.**  Yes, sir.

24  **Q.**  What's that person's name?

25  **A.**  Well, my supplier used to be -- his name was Neil.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1382*

1  **Q.**  Did you give Te money to actually buy that marijuana?
2  **A.**  Yes, sir.
3  **Q.**  How much?
4  **A.**  I gave him 500.
5  **Q.**  Excuse me?
6  **A.**  500.
7  **Q.**  And did the marijuana that you got from Te for that $500,
8  that half a pound, did it -- did you look at it?
9  **A.**  Yes, sir.
10  **Q.**  Did it appear -- can you compare it in any way to the
11  marijuana that you bought directly from David Wilson prior?
12  **A.**  Still looked the same.
13  **Q.**  What do you mean by that?  Can you tell the difference
14  between marijuana?
15  **A.**  Yes.
16  **Q.**  Describe that for us.  How can you describe the
17  difference between one type of marijuana and another type?
18  **A.**  Because you have different grades.  You have grade A, you
19  have regular marijuana, you have Ses, you know, there's
20  different marijuana.
21  **Q.**  What kind of marijuana did you directly buy from
22  David Wilson?  How would you describe it?
23  **A.**  It was good.  It was fair.
24  **Q.**  It was what?
25  **A.**  It was fair.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1383*

1  **Q.**  I'm going to ask you to keep your voice up.
2  **A.**  It was fair.
3  **Q.**  And this marijuana that you got from Te for that $500,
4  did it appear to be the same quality?
5  **A.**  Yes, sir.
6  **Q.**  Do you remember any other times directly or -- directly
7  that you purchased marijuana from David Wilson?
8     MS. WICKS:  Objection, asked and answered.
9     THE COURT:  I'll allow it.
10  BY MR. LEON:
11  **Q.**  Do you remember any other times that you directly bought
12  marijuana from David Wilson, other than the times you just
13  described for us?
14  **A.**  Those the only times sir.
15  **Q.**  Excuse me?
16  **A.**  Them the only times.
17  **Q.**  Now, did you ask David Wilson where he got the marijuana
18  from?
19  **A.**  No, sir.
20  **Q.**  Did he tell you or you didn't ask him or he didn't say?
21  **A.**  No, sir, he didn't say.  I didn't ask.
22  **Q.**  Okay.  Now I want to jump forward, continuing.  You said
23  this happened in the summer of 2000, correct?
24  **A.**  Yes, sir.
25  **Q.**  Now, I would like to go further into 2000.  I believe you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1384*

1  testified just before the break that no time prior to mid-2000
2  did you ever buy or sell cocaine to or from David Wilson, is
3  that what you said about any time prior to the summer of 2000?
4  **A.**  Correct, sir.
5  **Q.**  Now, I'd like to go forward.
6     Did there come a time when you had any cocaine dealings
7  with David Wilson?
8  **A.**  Yes, sir.
9  **Q.**  When did these begin?
10  **A.**  The end of 2000.
11  **Q.**  Who initiated those dealings?  In other words, who called
12  who?
13  **A.**  Well, I was standing in the Congress Park area, and
14  Mr. Wilson asked me, could I get him some powder cocaine?
15  **Q.**  Had he ever asked you to do this before that period of
16  time?
17  **A.**  No, sir.
18  **Q.**  And what, if anything, did you say in return?
19  **A.**  I told him sure.
20  **Q.**  And did you talk any further about what amounts you and
21  he were talking about?
22  **A.**  I asked him how much he was trying to purchase.
23  **Q.**  What, if anything, did Mr. Wilson say?
24  **A.**  He said he wanted to try 62 grams of powder first.
25  **Q.**  And what if anything, did you say?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1385*

1  **A.**  I told him whenever he ready.
2  **Q.**  Tell us, was anything else said between you and him
3  during this conversation?
4  **A.**  No, sir.  It was --
5  **Q.**  Did you end up selling him powder cocaine?
6  **A.**  Yes, sir.
7  **Q.**  How much?
8  **A.**  Sixty-two grams.
9  **Q.**  And roughly, when was this?  When was this, if you
10  remember?  What period of time?
11  **A.**  It was before New Year's Eve of 2000.  So it was like
12  December -- 20s -- after Christmas, though, too.
13  **Q.**  I believe you testified earlier, though, you were in the
14  hospital that month.  Do you remember that testimony?
15  **A.**  Yes, sir.
16  **Q.**  Was it before or after you were put -- you were in the
17  hospital?
18  **A.**  After I got out the hospital.
19  **Q.**  Tell us, did you end up completing that sale, doing that
20  sale with David Wilson?
21  **A.**  Yes, sir.
22  **Q.**  Where?
23  **A.**  Around Congress Park.
24  **Q.**  Tell us what happened.  How did you do the sale?
25  **A.**  Well, first I came and picked up the money.  He gave me

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1386

1   2100.
2   **Q.**   Who gave who 2100?
3   **A.**   Mr. Wilson gave me 2100.
4   **Q.**   Okay.  And did you give him the drugs right away?
5   **A.**   No, sir.
6   **Q.**   Why don't you give him the drugs when he gives you the
7   money?
8   **A.**   Because that's -- I don't conduct business like that.  I
9   pick up the money first.
10  **Q.**   What did you do once you received the $2100?
11  **A.**   I told him I'd be back.
12  **Q.**   And what'd you do?
13  **A.**   I went and got him 62 grams of powder cocaine.
14  **Q.**   And did you -- where did you have to go to get that
15  62 grams of powder?
16  **A.**   Beltsville.
17  **Q.**   Who'd you get it from?
18  **A.**   Neil.
19  **Q.**   Same Neil that you mentioned earlier?
20  **A.**   Yes, sir.
21  **Q.**   And what happened after you got the powder from Neil?
22  **A.**   I drove back to Congress Park.
23  **Q.**   And what happened next?
24  **A.**   And I gave Wop his 62 grams of powder.
25  **Q.**   Do you remember where this happened?  In other words,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1387

1   where you actually gave Wop -- excuse me, David Wilson the
2   powder.
3   **A.**   Yes.  He said he was going to be in the building called
4   the rental office, but he wasn't there.  So he was on Malcolm X
5   school property, is where I gave it to him.
6   **Q.**   Okay.  Do you see Government's 100.1 in front of you?
7   **A.**   Yes, sir.
8   **Q.**   Can you see what you said -- you said Malcolm X, can you
9   see on that, just yes or no, at first.  Can you see on that
10  picture where you handed the 62 grams of powder to David Wilson?
11  **A.**   Yes, sir.
12  **Q.**   Okay.  Do you have that pen still in front of you?
13  **A.**   Yes, sir.
14  **Q.**   Make sure the ink part is not out, but if you could just
15  point and touch the screen in the approximate area were you met
16  up with David Wilson.
17  **A.**   (Indicating) in this area?
18  **Q.**   You can touch it harder.
19  **A.**   In this area right here (indicating).
20  **Q.**   All right.  For the record, it looks like you made a
21  marking just a little bit above and a little bit to the left of
22  the first A in Alabama Avenue; is that correct?
23  **A.**   Yes.
24  **Q.**   Okay.  What happened -- did you do this -- you're still
25  looking at the picture, is there anything else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1388

1   **A.**   No, I mean the arrow is a little high up, but it's off of
2   Alabama Avenue.
3   BY MR. LEON:
4   **Q.**   Okay.  It's in that general area?
5   **A.**   Yes, sir.
6   **Q.**   Did you have any other -- did you have any other sales of
7   cocaine to David Wilson after this one you just described?
8   **A.**   Yes, sir.
9   **Q.**   What's the next one you remember.
10  **A.**   Uhm, the next one happened after New Year's.  It was
11  2001.
12  **Q.**   How do you know it was after new years?
13  **A.**   Uhm, because it was a couple days after New Year's Eve.
14  **Q.**   Okay.  Tell us what happened.  Who called who?
15  **A.**   He called me and said that he needed some more.
16  **Q.**   What if anything did you say?
17  **A.**   I told him I be around there.
18  **Q.**   And tell us what happened next.
19  **A.**   I went and picked up the money and I told him I be back.
20  **Q.**   And did you go pick up the money?
21  **A.**   Yes, sir.
22  **Q.**   How much did you agree to sell him on the second
23  occasion?
24  **A.**   2100 -- 62 grams.
25  **Q.**   And do you remember where you met him to pick up the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1389

1   cash?
2   **A.**   Yes.
3   **Q.**   Where?
4   **A.**   In a building they called the rental office.
5   **Q.**   And what, if anything, did you do once he gave you the
6   $2100 in cash?
7   **A.**   I left.
8   **Q.**   Where -- where'd you go?
9   **A.**   To Beltsville.
10  **Q.**   To see whom?
11  **A.**   Neil.
12  **Q.**   And what did you do?  Did you get the cocaine from Neil?
13  **A.**   Yes, sir.
14  **Q.**   And then what'd you do?
15  **A.**   Took it back to Wop, around the Congress Park area.
16  **Q.**   Do you remember where you saw Wop the second time, to
17  give him the powder?
18  **A.**   Yes, sir.
19  **Q.**   Where was he?
20  **A.**   In front of the building called the rental office.
21  **Q.**   First of all, just so the record is clear, what form
22  was -- what was he actually buying from you the second time,
23  what form was the cocaine in?
24  **A.**   Powder, still powder.
25  **Q.**   And you say the rental office, can you see this building

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1390**

1  on this map?

2  A.    Yes, sir.

3  Q.    Can you just point to the general area where you see the

4  rental office, where you made the second sale?

5  A.    (Indicating).

6  Q.    For the record, you put a mark that created a double

7  arrow.  Looks like it's on top of a building that's on the right

8  side of the intersection of 13th Place and Congress Street, is

9  that fair?

10  A.    Yes, sir.

11  Q.    Okay.  This was the second purchase you just described.

12  Do you remember any other purchases that happened after?

13  A.    Yes, sir.

14  Q.    Okay.  What's the next one that you remember?

15  A.    The third one was for another 62.

16  Q.    Another 62.  Who called who?

17  A.    He called me.

18  Q.    And do you remember what he said to you?

19  A.    He needs some more.

20  Q.    And did he say a specific amount or did you just know

21  what he meant?

22  A.    I just told him I be around there.

23  Q.    Did he actually say a 62 or --

24  A.    No, sir.

25  Q.    And then tell us what happened?  Did you complete -- did

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1391**

1  you do this sale?

2  A.    Yes, sir.

3  Q.    Where -- just again, you see the questions I'm going to

4  ask.  Where did you go?  Where'd you go?

5  A.    Same, Beltsville.

6  Q.    Okay.

7  A.    Out to Beltsville.

8  Q.    Did you meet with David Wilson before you went to

9  Beltsville?

10  A.    Yes, sir.

11       MS. WICKS:  Objection, leading.  Leading, Your Honor.

12       THE COURT:  I'm allowing it.  Go ahead.

13  BY MR. LEON:

14  Q.    Did you see him before you went to Beltsville?

15  A.    Yes, sir.

16  Q.    What, if anything, did you and he do when you met him

17  before you went to Beltsville?

18  A.    Just gave me the money.

19  Q.    How much?

20  A.    2100.

21  Q.    And then you went to Beltsville?

22  A.    Yes, sir.

23  Q.    Who'd you meet with in Beltsville?

24  A.    Neil.

25  Q.    And what, if anything, did you do once you left Neil?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1392**

1  A.    Took the powder cocaine back to Wop in the Congress Park

2  area.

3  Q.    Do you remember -- and did you give it to him?

4  A.    Yes, sir.

5  Q.    Do you remember roughly when this third purchase that you

6  just described, when, roughly, this happened?

7  A.    Middle of January.

8  Q.    Okay.  Do you remember any other sales of powder cocaine

9  to David Wilson after that?

10  A.    Yes, sir.

11  Q.    Do you remember how much that was for?

12  A.    Yes, sir.

13  Q.    How much?

14  A.    93 grams of powder cocaine.

15  Q.    And who's idea, if anyone's, to have this purchase be for

16  more?

17       MR. ZUCKER:  Objection.

18       THE COURT:  Basis.

19       MR. ZUCKER:  To the extent it asks him to speculate on

20  somebody else's mind when he says who's idea, yours or someone

21  else's.

22       THE COURT:  Do you want to rephrase it?  I'll allow it if

23  you rephrase it.

24  BY MR. LEON:

25  Q.    Sure.  How did you know this purchase was going to be for

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1393**

1  93 grams?

2  A.    Because I told him this is some good powder and he needs

3  to buy as much as he can.

4  Q.    Was that your exact language?  What were the words you

5  used?

6  A.    That this was some good powder.

7  Q.    And what, if anything, did David Wilson say to you?

8  A.    He brought an extra 31 grams of powder.

9  Q.    And tell us how this sale occurred.  Did you meet with

10  him ahead of time, like last time?

11  A.    Yes, sir.

12  Q.    Where?

13  A.    Around the Congress Park area.

14  Q.    How much money did you need to get from him for this

15  sale?

16  A.    I got 3300 this time from him.

17  Q.    Dollars?

18  A.    Yes, sir.

19  Q.    And what, if anything, happened next?

20  A.    Same routine, I went and picked the powder up from Neil,

21  and I brought it back to the Congress Park area to Wop.

22  Q.    Do you remember where this sale -- this sale for

23  93 grams, do you remember where you actually handed it off to

24  him?

25  A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1394

1  **Q.**    Where?
2  **A.**    Yes, sir.  In the building called the rental office, on
3  the third floor.
4  **Q.**    And can we see the rental office on this picture we're
5  looking at?
6  **A.**    Yes, you can see the top of the building.
7  **Q.**    Okay.  And just for the record, did you previously point
8  out the rental office?
9  **A.**    Yes, sir.
10 **Q.**    Okay.  Same building that you pointed out earlier?
11 **A.**    Yes, sir.
12 **Q.**    Yes or no?
13 **A.**    Yes, sir.
14 **Q.**    And where in the rental office did you actually meet up
15 with David Wilson?
16 **A.**    On the third floor, in an apartment to the far-right
17 corner.
18 **Q.**    Whose apartment was this?
19 **A.**    Uhm, I really didn't know.
20 **Q.**    But you said it was the third floor?
21 **A.**    Yes, sir.
22 **Q.**    Do you know the apartment number?
23 **A.**    No, sir.
24 **Q.**    When you went in there, was he alone or with anyone else?
25 **A.**    Yes, he was alone.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1395

1  **Q.**    Okay.  Did it appear to be an apartment, meaning that
2  people lived there or was it more like a stash house, like the
3  one you described?
4      MS. WICKS:  Objection.
5      THE COURT:  Sustained.
6  BY MR. LEON:
7  **Q.**    Did it appear somebody lived there?
8  **A.**    Yes, sir.
9  **Q.**    You first described this purchase of 93, do you remember
10 roughly when this occurred?
11 **A.**    It was getting towards the end of January.
12 **Q.**    Was there another time that you actually bought -- excuse
13 me -- sold cocaine to David Wilson?
14 **A.**    Yes, sir.
15 **Q.**    Do you remember when this was?
16 **A.**    Yes, sir.
17 **Q.**    Okay.  Do you remember anything about that day?
18     Do you remember the date or do you remember anything
19 about the day?
20 **A.**    Well, yes, sir, I remember the day.
21 **Q.**    Okay.  Do you remember the date or not?
22 **A.**    Yes, sir, I remember the date.
23 **Q.**    What's the date?
24 **A.**    February the 6th.
25 **Q.**    Why do you remember that date?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1396

1  **A.**    Because that's the day of the murder.
2  **Q.**    The murder you mentioned earlier?
3  **A.**    Yes, sir.
4  **Q.**    Okay.  Let's start at the beginning of that day.
5      Where did you wake up that day, where were you?
6  **A.**    Suitland, Maryland.
7  **Q.**    Okay.  And did you -- that day, had you already agreed to
8  have a sale of cocaine with David Wilson or you didn't even know
9  you were going to do that yet that day?
10 **A.**    Yes, we had an agreed sale.  Yes.
11 **Q.**    When did you agree to that sale?
12 **A.**    Uhm, February the 5th.  I just told him I'd be over there
13 tomorrow.
14 **Q.**    Okay.  Did you and he on February 5th agree to how much
15 that sale was going to be for?
16 **A.**    Yes, sir.
17 **Q.**    How much?
18 **A.**    Ninety-three grams.
19 **Q.**    Okay.  And tell us -- now, let's jump to the 6th.  You
20 wake up.  Tell us what happens that morning.
21 **A.**    Well, routine, I went around Congress Park area and was
22 hanging out with Mr. Wilson, waiting for a phone call from my
23 connect to come and pick up the coke.  And we was just sitting
24 there smoking marijuana.  We was, you know, just hanging out.
25 **Q.**    Let me stop you there for just a minute.  I told you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1397

1  got to Congress Park.  Roughly what time of day did you get to
2  Congress Park, initially?
3  **A.**    It was around 10:00 a.m.
4  **Q.**    And how did you get there?
5  **A.**    Car.
6  **Q.**    Whose car?
7  **A.**    My daughter's mother's car.
8  **Q.**    What's her name?
9  **A.**    Tameka Edlin.
10 **Q.**    And what kind of car was that?
11 **A.**    A '97 Geo.
12 **Q.**    And what color?
13 **A.**    White.
14 **Q.**    How many doors?
15 **A.**    Two.
16 **Q.**    And you said you got in about 10:00.  And where did you
17 go when you got to Congress Park at about 10:00 in the morning?
18 **A.**    Well, I went to the building they called the rental
19 office and we was just standing out front smoking weed, you
20 know.
21 **Q.**    When you say "we was standing out front," who is "we?"
22 Who was there?
23 **A.**    Well, at the time, it was me, Cool Wop, and his brother.
24 **Q.**    Whose brother?
25 **A.**    Cool Wop's brother.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1410**

1  Q.   Okay.  Did he stay with you or did you separate?
2  A.   No.  Well, once I parked the car, I went in the back of
3  the rental office in the parking lot.
4  Q.   What'd you do there?
5  A.   Just smoking some weed.
6  Q.   Why?
7  A.   Because I was stressed out.  I mean, about the situation
8  and the situation that I was already in.
9  Q.   What do you mean by that?
10  A.   I mean, trouble was piling up on trouble, so I was just
11  like, now, you know, I got -- I just got into some more trouble.
12  And you know, we in a car that's going to be traced back to me.
13  So, you know, I was just really back there thinking about the
14  situation that just happened.
15  Q.   Now, when you say "more trouble," what in your mind was
16  the trouble that you already had before this incident?
17  A.   Because I was already on the run for the APO.
18  Q.   From --
19  A.   From Quarles Street.
20  Q.   Okay.  So, you're behind the rental office smoking
21  marijuana.  What happens next?
22  A.   I mean, basically I'm sitting back there just sitting,
23  and I think probably an hour or two later I get the phone call
24  from my connect to come pick up the powder.
25  Q.   And who is that connect?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1411**

1  A.   Neil.
2  Q.   And what, if anything, did you do when you got that call
3  from Neil?
4  A.   Well, I went and told Wop, I'm about to leave and pick
5  the powder up and he gave me the money.
6  Q.   How much money did he give you?
7  A.   3300.
8  Q.   Dollars?
9  A.   Yes, sir.
10  Q.   And what, if anything, did you do next?
11  A.   I went -- I went and picked the powder up from Neil, but
12  dropped the car back off around -- I parked the car around
13  Quarles Street and got a ride from a user back around Congress
14  Park area, later on that night.
15  Q.   Why didn't you come back in the Geo?
16  A.   Because it was just used in a murder.
17  Q.   So, who drove you -- I'm sorry, what car did you come
18  back to Congress Park in?
19  A.   I can't recall the car, but the user named Dan gave me a
20  ride around to Congress Park.
21  Q.   Please keep your voice up.
22  A.   A user named Dan gave me a car around Congress Park, I
23  can't recall what car he was driving.
24  Q.   What do you mean "a user named Dan."  Why would a user
25  give you a ride?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1412**

1      MS. WICKS:  Objection, relevancy.
2      THE COURT:  Did you have an objection?
3      MS. WICKS:  Relevancy.
4      MR. LEON:  I can rephrase.
5  BY MR. LEON:
6  Q.   Did you know Danny?
7  A.   Yes, sir.
8  Q.   Had he given you rides before?
9  A.   Yes, sir.
10  Q.   Was it his car or yours?
11  A.   It was his car.
12  Q.   Were you friends?
13  A.   Yes, sir.  He's like an uncle to me.
14  Q.   He's an older man?
15  A.   Yes, sir.
16  Q.   Did you tell him why you didn't want to drive your Geo in
17  the neighborhood?
18      MS. WICKS:  Objection, relevancy.
19      THE COURT:  Overruled.
20  BY MR. LEON:
21  Q.   Did you explain to him why you didn't want to go in your
22  Geo?
23  A.   No, sir.
24  Q.   And do you know why he agreed to drive you to Congress
25  Park?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1413**

1  A.   Yes, sir.
2  Q.   Why?
3  A.   Because I was paying him.
4  Q.   What'd you pay him?
5  A.   I gave him $20 worth of cocaine.
6  Q.   Uhm, do you know what time of day it was when you
7  returned to Congress Park with Danny?
8  A.   It was nighttime.
9  Q.   Do you know roughly what time?
10  A.   No, sir.
11  Q.   Was it dark out or light out?
12  A.   It was dark.
13  Q.   And what happened when you got back to Congress Park in
14  that other car with Danny?
15  A.   I told him, park in front of the building, in front of
16  the rental office.  And I got out the car and went up to the
17  third floor and gave Wop the powder.
18  Q.   What happened next?  Did you stay in the apartment?
19  A.   No, sir.
20  Q.   When you went up to -- you said the apartment on the
21  third floor, had you been to that apartment previously?
22  A.   Yes, sir.
23  Q.   How often had you been to that apartment previously?
24  A.   Like two or three times before.
25  Q.   And -- I'm sorry.  When you saw David Wilson on the third

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1414**

1  floor of that building, was it ever in any other apartment?
2  **A.**  Yes, sir, before, yes.
3  **Q.**  Okay.  Before -- on the third floor?
4  **A.**  Yes, sir.
5  **Q.**  What other apartments?
6  **A.**  Well, one time I brought him some powder and he went
7  across the hallway to cook it up.
8  **Q.**  Was this before or after the day we're talking about,
9  February 6th?
10  MS. WICKS:  Objection, leading.
11  THE COURT:  Overruled.  Go ahead.
12  BY MR. LEON:
13  **Q.**  Is it before or after the day we're talking about?
14  **A.**  After.
15  **Q.**  Okay.  We'll get to that after.  Let's stay on the day
16  we're on.
17  **A.**  Okay.
18  **Q.**  How long did you stay with David Wilson on -- when you
19  brought the powder up to the apartment?
20  **A.**  Just about two minutes, just gave him the powder.
21  **Q.**  Did you see if he was with anyone else?
22  **A.**  No, he was alone.
23  **Q.**  Okay.  And then what, if anything, did you do after those
24  two or three minutes?
25  **A.**  I went back downstairs and got in the car.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1415**

1  **Q.**  Now, earlier I had asked you about the gun.
2  **A.**  Yes, sir.
3  **Q.**  At this point, as you get back in the car with Danny, do
4  you have the gun back, your gun back, your Ruger?
5  **A.**  No, sir.
6  **Q.**  Okay.  Let's leave, now, this day that you just
7  described, February 6th and let's move ahead.  Did you have any
8  other -- focusing on cocaine, did you have any other cocaine
9  sales with David Wilson after this day?
10  **A.**  Yes, sir.
11  **Q.**  How many more would you say you had after this.  How many
12  more would you say you had after this, approximately?
13  **A.**  I can remember two.
14  **Q.**  Okay.  Now, again, just remind us, when did you actually
15  get incarcerated?
16  **A.**  March the 5th of 2 --
17  **Q.**  I'm sorry.
18  **A.**  March 5th, 2001.
19  **Q.**  So I want to focus on that month or so period between
20  February 6th and March 5th, okay?
21  **A.**  Yes, sir.
22  **Q.**  Okay.  The next drug sale that you remember with
23  David Wilson, do you remember roughly when that is, after the
24  shooting you described?
25  **A.**  Uhm, yes.  The next one was on Valentine's Day.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1416**

1  **Q.**  Okay.  Tell us what you remember about that incident.
2  First of all, do you remember how much the sale was for?
3  **A.**  Yes, sir.
4  **Q.**  How much?
5  **A.**  Ninety-three grams.
6  **Q.**  And walk us through this sale again.  Do you remember who
7  called who about the sale?
8  **A.**  Yes.  Wop called me.
9  **Q.**  And do you remember what he said to you?
10  **A.**  That he need some more.
11  **Q.**  And what -- did he tell you how much or did you just know
12  what that meant?
13  **A.**  No, I just assumed it would probably be 93 grams.
14  **Q.**  And this was a sale that happened on Valentine's Day?
15  **A.**  Valentine's Day.
16  **Q.**  I want to stop there for a minute.  I want to go back to
17  before this period of time.  We're on Valentine's Day and you
18  described the shooting on February 6th.  We'll get back to that,
19  but I want to stay in this one-week period first.  I want to get
20  back to that gun.
21  Did you ever get that gun back from -- did you ever get
22  that gun back?
23  **A.**  Yes, sir.
24  **Q.**  Do you remember -- who gave it to you?  Who gave it back
25  to you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1417**

1  **A.**  Well, Wop walked me over to the apartment complex called
2  the Lincoln.
3  **Q.**  Let me interrupt you.  When is this, if you remember,
4  roughly?
5  **A.**  Probably like five days after the murder.  Four or five
6  days after the murder.
7  **Q.**  Was it before or after this Valentine's Day sale you were
8  about to talk to us?
9  **A.**  It was before.
10  **Q.**  Okay.  So the day -- let's focus on that day.  How'd you
11  get the gun back?
12  **A.**  Well, I called him and told him I'm going to pick that up
13  so he already had a heads up that I was coming, so when I got
14  around there, I parked the car and walked over to the building
15  complex called the Lincoln with him, and we went in a building,
16  all the way up on the top floor and went into the first door.
17  Going up the steps, the first door to my left, and went in there
18  and sat down and he talked to some guy and some guy went in the
19  back room and brought my gun out and passed it to him -- passed
20  it to Wop and Wop passed it to me.
21  **Q.**  And did -- was any money exchanged or it was just a
22  return of the gun?
23  **A.**  No, just a return of the gun.
24  **Q.**  Do you know if that was the same gun that was your gun?
25  **A.**  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1426**

1  apartment, and I just laid the gun on the table and told him --

2  with the two clips -- and told him that it's hot, you know what

3  I'm saying, so be careful with it.

4  **Q.**  What does that mean when you tell somebody a gun is

5  "hot"?

6  **A.**  I mean, basically it could be stolen, used in violence or

7  anything.

8  **Q.**  Did you tell him it was used in a murder?

9  **A.**  No, sir.

10  **Q.**  Did he ask -- did he ask you what you meant by "hot"?

11  **A.**  Naw, he just -- I assumed he already knew when I said

12  it's hot.

13  **Q.**  But he didn't ask?

14  **A.**  No, he didn't ask.

15  **Q.**  Okay.  What happens when you put it down with the two

16  clips, on the table?

17  **A.**  He goes in the back and he gets some money and he came

18  out and gave me $500.

19  **Q.**  What happened next?

20  **A.**  Well, I sat there and -- we just sat there and was

21  drinking and talking, and, you know, before I had to head back

22  down BWI.  I stayed up there for like an hour -- almost

23  two hours with him, talking.

24  **Q.**  And then did you finally leave that evening?

25  **A.**  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1427**

1  **Q.**  And where'd you go after that?

2  **A.**  I went back around Quarles to swing through to see if I

3  could catch some weed sales --

4  **Q.**  Did you?

5  **A.**  -- and I headed home.

6  **Q.**  Did you?

7  **A.**  Yes.

8  **Q.**  After you're done making your weed sales, where'd you go

9  after that?  Where'd you lay your head that night?

10  **A.**  A hotel.

11  **Q.**  Where was the hotel?

12  **A.**  Down Crystal City.

13  **Q.**  Okay.  Now I'd like to jump back to Valentine's Day and

14  that next incident you told us about.

15  How do you remember it was Valentine's Day?

16  **A.**  February 14th.  I had just bought my friend some little

17  gifts and I was supposed to drop them off over at her house.

18  **Q.**  What's the friend's name?

19  **A.**  It was Dana.

20  **Q.**  Dana.

21  **A.**  Yes, sir.

22  **Q.**  Was this a lady you were dating at the time?

23  **A.**  Yes, sir.

24  **Q.**  Let's focus on the drug sale.

25  Do you remember what time of day it was that you ended up

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1428**

1  meeting up with David Wilson?

2  **A.**  Uh, it was still -- it was evening.  It was still evening

3  time.

4  **Q.**  Do you remember if -- do you remember the time or you

5  just remember the general time?

6  **A.**  No, because it was still sunlight out.

7  **Q.**  You said evening and then you said sunlight, so can you

8  give us some sort of -- can you specify a little more, or

9  probably not?

10  **A.**  Probably around 5 or 6:00 in the evening.

11  **Q.**  Okay.  And I apologize.  And I know it's because I jumped

12  around, but if you already testified, I apologize.  I'm going to

13  just ask again.

14  Where did you -- who initiated that sale?  In other

15  words, did he call you that day or the day earlier to make the

16  sale?

17  **A.**  No, he called me that day.

18  **Q.**  And did he -- did you have an understanding as to how

19  much the sale was going to be for?

20  **A.**  Yes, sir.

21  **Q.**  How much?

22  **A.**  Ninety-three grams.

23  **Q.**  Okay.  And did you -- what did you do once the call was

24  made and ended?  What did you do next?

25  **A.**  I went around there earlier that day and picked up the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1429**

1  money.

2  **Q.**  Okay.  From whom?

3  **A.**  From Cool Wop.

4  **Q.**  And how much?

5  **A.**  It was 3100.

6  **Q.**  What did you do once he gave you that cash?

7  **A.**  Went to see Neil.

8  **Q.**  And after you saw Neil, what did you do?

9  **A.**  I brought the -- well, I stopped back around Quarles

10  before I left this time, and went around there, because a buddy

11  of mine told me he was going to give me a ride around there.

12  And I didn't feel like driving that day.

13  **Q.**  Who's that buddy?

14  **A.**  We call him Dex.

15  **Q.**  Dex?

16  **A.**  Yes.

17  **Q.**  And why -- who -- he drove you there?

18  **A.**  Yes, sir.

19  **Q.**  In what, what kind of a vehicle?

20  **A.**  A Honda Accord.  It was a Honda, a Civic or Accord.

21  **Q.**  Do you know if Dex knew why you were going to Congress

22  Park?

23  **A.**  Yes, sir.

24  **Q.**  Did you tell him?

25  **A.**  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1430

1 **Q.** Now, as you're driving to Congress Park to complete the
2 sale, tell us what, if anything, happens.
3 **A.** Well, I told him to pull up in front of the rental
4 office, and we parked on the right-hand side, and I got out of
5 the car as usual, and walked up the steps of the office rental
6 office and gave Wop the 93 grams in the apartment again, and he
7 had --
8 **Q.** When you say "apartment again," which apartment?
9 **A.** The apartment, all the way to the far right.
10 **Q.** On which floor?
11 **A.** On the third floor.
12 **Q.** Okay. When you got up there and met up with
13 David Wilson, was anyone with him?
14 **A.** No, sir.
15 **Q.** In the apartment, it was just you two?
16 **A.** Yes, sir.
17 **Q.** And tell us what happens. You give him the cocaine?
18 **A.** Yes, sir.
19 **Q.** What if anything happens next?
20 **A.** Well, I give him the cocaine and he says he was waiting
21 for a sale to give me the other $200 that he had owed me. So he
22 was like -- the sale was about to come up now, probably like
23 five, ten minutes, if I want to hang out. So I said, "All
24 right." And --
25 **Q.** Okay. So you're hanging out for five or ten minutes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1431

1 Where were you hanging out?
2 **A.** We were in the apartment building on the far right, and
3 then he said, come with him, because he got to go across the
4 hall to cook it up.
5 **Q.** And did you go with him?
6 **A.** Yes, sir.
7 **Q.** Tell us what happened when you walked across the hall.
8 **A.** Well, when I went in there, it was a lady and a man. I
9 had suggested they probably was users, and you know they said
10 they was going to leave out for a while, while we was in there,
11 and he said he was still waiting for the guy to come cook the
12 coke up, so he finally came.
13 **Q.** Who's he? Who finally came?
14 **A.** I don't -- I never seen his face before. I don't know
15 him.
16 **Q.** Okay. And then what happens?
17 **A.** We sitting there and -- it's like me, Wop, a guy named
18 Terrance, and it was a couple of other people in there, and we
19 was sitting there smoking weed while they was cooking the coke
20 up, and Wop was still waiting for the sale to come. He said
21 the sale was coming, that they was going to buy an ounce, and he's
22 going to give me the $200 off the sale.
23     So, you know, we sitting there, and then we hear a knock
24 at the door, and some guy walk in and purchase the ounce from
25 Wop.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1432

1 **Q.** Did you actually see the sale happen?
2 **A.** Yes, sir.
3 **Q.** And tell us what you saw.
4 **A.** The guy came in, you know, spoke to everyone, and then he
5 went over to talk to Wop, and Wop already had the cocaine
6 sitting on the table beside a scale, and, you know, the dude
7 gave him -- well, I don't know how much money it was, but I seen
8 a wad of money. He passed it to Cool Wop, and Wop gave him the
9 cocaine and the dude left.
10 **Q.** Did anything about that sale seem unusual to you at that
11 time?
12 **A.** Yes. It seemed kind of odd.
13     MS. WICKS: Objection. Leading, Your Honor.
14     THE COURT: Overruled.
15     THE WITNESS: Yes, it seemed kind of odd because, you
16 know, the guy walked in and -- due to the fact that you know he
17 sitting up there cooking the coke right there, you know, the coke
18 still wet, plus there was a scale right there, you know, the guy
19 paying $1200 for an ounce, and he didn't even weigh it, you know,
20 he just took the coke and left, and I was like -- it just, to me,
21 it just didn't seem right.
22 BY MR. LEON:
23 **Q.** Did the -- to your eyes, based on your personal
24 experience, to your eyes, did that appear to be an ounce worth
25 of --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1433

1     MS. WICKS: Objection, leading.
2     THE COURT: Overruled.
3 BY MR. LEON:
4 **Q.** Did that appear to be an ounce worth of crack?
5 **A.** No, because Wop's specific words was, "I'm about to give
6 this nigga 23 grams."
7 **Q.** He said that to whom?
8 **A.** He was just saying it out loud.
9 **Q.** Did he say it near that person who was buying?
10 **A.** Oh, no, sir, before he came.
11 **Q.** And how much is an ounce?
12 **A.** Twenty-eight grams.
13 **Q.** And you said something about it being wet?
14 **A.** Yes.
15 **Q.** Explain that. Does moisture affect the weight of crack?
16 **A.** Yes.
17 **Q.** How?
18 **A.** Because -- I mean, when you put it on the scale, if it's
19 damp, you know what I'm saying -- so it's not the actual weight,
20 because it's going to dry out and it's going to lose grams.
21 **Q.** When it dries?
22 **A.** Yes, sir.
23 **Q.** And after that sale was completed, did you see the sale
24 completed for that ounce or that 23-or-so grams?
25 **A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1442

1 listened to on that portion?
2 A.  While they was cooking it up.
3 Q.  Okay.  Any question in your mind that that's your voice
4 that we just heard on this tape?
5 A.  That's my voice.
6 Q.  Okay.  I want to go forward.  It's now Valentine's Day
7 and you get locked up March 5th of '01.  We have just a couple
8 weeks left.  Do you remember any other cocaine sales that you
9 had with David Wilson during this three-week or so period?
10 A.  Yes, sir.
11 Q.  How many do you remember?
12 A.  I do remember one more.
13 Q.  Okay.  Tell us about the one more that you remember.
14 A.  It was for 93 grams.
15 Q.  And just quickly, tell us where the sale happened.
16 A.  Same place, in a building called the rental office.
17 Q.  And did you use the same supplier?
18 A.  Yes, sir.
19 Q.  And did you do it in the same way where you would get the
20 money up front and then get the product?
21 A.  Yes, sir.
22 Q.  And then return?
23 A.  Yes, sir.
24 Q.  Do you remember where this sale, if you can remember,
25 happened?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1443

1 A.  In the building they called the rental office, the same
2 place.
3 Q.  On the third floor?
4 A.  Third floor.
5 Q.  Now, you earlier testified about an eighth of a key.  Do
6 you remember that?
7 A.  Yes, sir.
8 Q.  And I think you said it was 124 grams?
9 A.  Yes, sir.
10 Q.  And you've been talking about these sales of 93 grams.
11 Is it fair to say that's less than an eighth of a key?
12 A.  Yes, sir.
13 Q.  Did David Wilson ever buy more than the 93 from you?
14 A.  No, sir.
15 Q.  Did you ever suggest to him that he should?
16 A.  Yes, sir.
17 Q.  Why?
18 A.  Because I told him he would save more money.
19 Q.  Explain that.  How would he save more money if he bought
20 an eighth of a key from you?
21 A.  Because you -- he would have got an extra 31 grams for
22 $700.
23 Q.  How much -- again, just for the record, how much were you
24 selling him the 93s for?
25 A.  3300.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1444

1 Q.  And how much would you have sold him the eighth of a key
2 for?
3 A.  4,000 powder.
4 Q.  Did he give you a reason why he didn't go up that extra
5 amount?
6 A.  Naw.  He said he trying to get there.
7 Q.  Okay.  Now, you talked about Antwuan Ball selling you
8 that Uzi a few days after the incident in Hope Village.  Do you
9 remember that testimony?
10 A.  Yes, sir.
11 Q.  Had you ever purchased any other weapons from Antwuan
12 Ball prior to that?
13 A.  Yes, I purchased a Ruger.
14 Q.  Okay.  Tell us when that sale happened.
15 A.  Summer of 2000.
16 Q.  How do you remember it was the summer of 2000?
17 A.  Because I just bought a '97 Lincoln.
18 Q.  So, who'd you buy that '97 Lincoln from?
19 A.  A car dealer down on South Dakota.
20 Q.  And whose idea was it for you to buy that gun from
21 Twan --
22      MR. ZUCKER:  Objection to whose idea it was.
23      MR. LEON:  I'll rephrase.
24 BY MR. LEON:
25 Q.  Where was the sale?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1445

1 A.  In an alley off of Alabama Avenue turning into the
2 Congress Park area.
3 Q.  What, if anything, led you to meet up with Antwuan Ball
4 to sell him the gun?
5 A.  Well, because I was going around there to purchase some
6 Ecstasy pills and at the time Antwuan was standing right there
7 from the -- well, he had some Ecstasy -- the guy named Steve had
8 some Ecstasy pills, which was one of Twan's friends, and while I
9 was up there looking for some Ecstasy pills and some Hydro, Twan
10 told me that he had a gun for me.
11 Q.  And what, if anything, did you say to him?
12 A.  I asked him how much he want for it.
13 Q.  What, if anything, did he say to you?
14 A.  350.
15 Q.  And what happened?
16 A.  I went in my pocket and gave him 350.
17 Q.  And did he give you the gun right then?
18 A.  Yes, sir.
19 Q.  And what kind of a gun was it?
20 A.  A Ruger.
21 Q.  What kind?
22 A.  P-89 .9 millimeter.
23 Q.  Now, is this the same Ruger or a different Ruger than you
24 handed to David Wilson on February 6th?
25 A.  Same Ruger.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1446

1  Q.  How do you know that?
2  A.  Because I passed it to him.
3  Q.  Was there ammunition in the Ruger when Antwuan Ball gave
4  it to you?
5  A.  Yes, sir.
6  Q.  Was it the same or different ammunition than was in the
7  Ruger that you handed to David Wilson on February 6th?
8  A.  No, it was different ammunition.
9  Q.  Now, you said you were there -- just quickly -- to buy
10 some Ecstasy and Hydro.  Was that for what purpose?
11 A.  Personal use.
12 Q.  Very quickly, what's Ecstasy?
13 A.  It's a pill formed of various drugs formed in one little
14 pill.
15 Q.  And what about Hydro, what's that?
16 A.  It's grade A marijuana.
17 Q.  Okay.  Other than this other incident you just described
18 about buying the Ruger from Antwuan Ball in the summer of 2000,
19 did you buy -- do you remember buying any other guns from him at
20 any other time other than the two you just described?
21 A.  No, sir, I don't.
22 Q.  Okay.  Now, you said you got locked up on March 5th of
23 2001, correct?
24 A.  Yes, sir.
25 Q.  And in Maryland, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1447

1  A.  Yes, sir.
2  Q.  Okay.  When you get locked up -- and I just want to
3  reorient you.  This isn't a question.  I believe you testified
4  earlier that you then got sent around March 15th to Washington,
5  D.C.?
6  A.  Yes, sir.
7  Q.  Okay.  At some point, do you meet with people in
8  Washington, D.C. who work at the homicide section of the
9  Metropolitan Police Department?
10 A.  Yes, sir.
11 Q.  And what did they want -- did they want to talk to you?
12 A.  Yes, sir.
13 Q.  What did they want to talk to you about?
14 A.  About a homicide.
15 Q.  Which?
16 A.  Samuel Philips.
17 Q.  And did you right away agree to talk to them?
18 A.  No, sir.
19 Q.  Do you eventually agree to talk to them?
20 A.  Not for a while.
21 Q.  Okay.  But did you eventually talk to them?
22 A.  Yes, sir.
23 Q.  And when you initially talked to them, were you truthful?
24 A.  No, sir.
25 Q.  And why -- what weren't you truthful about?  What kind of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1448

1  questions were you asked and what kind of things did you say?
2  A.  Well, I was just asked about the murder, was I there, who
3  was the shooter, and I just simply lied to them about
4  everything.
5  Q.  Say that again.  I'm sorry.
6  A.  I said I was asked about, you know, the shooter, was I at
7  the scene, just a whole lot of questions, and I just really lied
8  and denied them all.
9  Q.  When you were asked if you were at the scene, what did
10 you say?
11 A.  I told them no.
12 Q.  And was that the truth?
13 A.  No, sir.
14 Q.  And when you were asked if you knew anything about it,
15 what'd you say?
16 A.  Just -- I can't really remember because they were all
17 lies.
18 Q.  Do you remember if they initially even asked you if you
19 knew someone by the name of Cool Wop?
20 A.  Yes, sir.
21 Q.  And what did you say initially about that?
22 A.  I told them I don't know Cool Wop.
23 Q.  Did they give you other names for Cool Wop like his true
24 name David Wilson?
25 A.  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1449

1  Q.  And do you know, for any versions of that name, if you
2  ever even said you knew him at that time?
3  A.  I denied it.
4  Q.  Do you remember if they asked you questions about a white
5  Geo, your white Geo?
6  A.  Yes, sir.
7  Q.  And do you know why they were asking about the Geo?  Did
8  they explain why?
9        MR. ZUCKER:  Objection.
10       MR. LEON:  I'll rephrase.
11       THE COURT:  Rephrase.
12 BY MR. LEON:
13 Q.  Did the people at homicide explain to you --
14       MR. CARNEY:  Objection, Your Honor.
15       MR. LEON:  All right.  I'll rephrase again.
16 BY MR. LEON:
17 Q.  Do you have -- did you have an understanding in your own
18 mind why they were asking about a white Geo?
19 A.  Yes, sir.
20 Q.  What was your understanding in your own mind?
21 A.  It was used in a murder.
22 Q.  And when you were asked about that white Geo, what did
23 you say?
24 A.  I told them that that's my daughter's mother's car.
25 Q.  Did you tell them if you were in a white Geo on the day

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1450

1   of the murder?
2   **A.**   No, sir.
3   **Q.**   What did you say?
4   **A.**   I lied and said I wasn't driving the car that day.
5   **Q.**   Did you tell them who might have been driving the car
6   that day?
7   **A.**   Uhm, I told them that I lent it to Wop and my cousin
8   Jo-Jo.
9   **Q.**   Was that the truth?
10  **A.**   No, it was a lie.
11  **Q.**   Why did you say Wop and Jo-Jo may have been in that car
12  that day?
13  **A.**   Because I just was like -- to be honest, I don't -- I
14  just was lying.
15  **Q.**   And my question was why were you lying?
16  **A.**   Because I didn't want to be put with the murder and --
17  you know he, was asking me who I let used my car, and I said
18  sometimes I let my cousin use it, so maybe my cousin let Wop use
19  it that day.  I told them I lent my car to my cousin Jo-Jo and
20  he might have let Wop use it.
21  **Q.**   And do you remember -- I'm going to see if I can break
22  this down.  The first time you met with homicide and told them
23  these lies, do you remember having a meeting where you gave them
24  this false story?
25  **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1451

1   **Q.**   Yes or no, do you remember the date or the month, or no?
2   **A.**   Naw, I can't remember the month.
3   **Q.**   Do you remember after that initial meeting when you told
4   them things that were not true, did you have any other meetings
5   after that with homicide?
6   **A.**   Yes, sir.
7   **Q.**   And let's -- during those other meetings -- first of all,
8   how many other times did you meet with homicide, if you
9   remember?
10  **A.**   Uhm, like four times.
11  **Q.**   During any of those times, did you have a lawyer present?
12  **A.**   Uhm, yes, sir, yes.
13  **Q.**   Do you remember which of the times -- and if you do, you
14  do; if you don't, you don't.
15  **A.**   He was present all the times, yeah.
16  **Q.**   Okay.  And the next time you met with homicide after that
17  first meeting when you weren't truthful and the second meeting
18  that you can remember, were you fully truthful then?
19  **A.**   No, sir.
20  **Q.**   And why not?
21  **A.**   Because I still wasn't willing to cooperate and tell them
22  the truth or implicate me in that murder.
23  **Q.**   Do you remember -- do you remember giving them any
24  details about the murder, what you may have heard about the
25  murder?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1452

1   **A.**   Yes, sir.
2   **Q.**   And what do you generally remember telling them about
3   what you heard about the murder?
4   MS. WICKS:  Objection, Your Honor.
5   THE COURT:  Basis?
6   MS. WICKS:  Hearsay.
7   THE COURT:  I'll allow it.
8   THE WITNESS:  I basically told them that I heard it from
9   Antwuan Ball's cousin, Baby Kairi, he had told me exactly what
10  the murder was about and things that I really didn't know what
11  was going on.
12  BY MR. LEON:
13  **Q.**   Well, did you know what was going on or you were making
14  believe you didn't know what was going on?
15  **A.**   No, I really didn't know what the -- Wop told me that the
16  dude was supposed to rob him and kill him, but that wasn't the
17  truth.
18  **Q.**   Did you really have a conversation with Baby Kairi?
19  **A.**   Yes, sir.
20  **Q.**   Okay.  Did you really have a conversation -- okay.
21  Withdrawn.  Were you asked questions about the murder weapon?
22  **A.**   Yes, sir.
23  **Q.**   And what did you -- were you truthful about the weapon
24  that was being -- that was used?
25  **A.**   Yes, I lied -- no, I lied about the weapon, too, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1453

1   **Q.**   What did you say about the weapon at first?
2   **A.**   I lied and told them that Wop -- that was Wop gun.
3   **Q.**   And --
4   **A.**   -- that he already had it on him.
5   **Q.**   Okay.  At some point, did you say anything else about
6   that weapon?
7   **A.**   Uhm, I basically just made it seem like it was his
8   weapon, that I didn't pass it to him.
9   **Q.**   Why'd you lie about that?
10  **A.**   Because -- at the time I was just -- I just tried to take
11  all the pressure off of me, and I just didn't want nothing -- I
12  didn't even want to be a part of the crime or the murder, and I
13  just was trying to take off all the weight and not accepting my
14  responsibilities and my actions in the crime.
15  **Q.**   During a later meeting, did you end up talking about --
16  First of all, do you know David Wilson by any other nicknames?
17  What are the nicknames you know David Wilson by?
18  **A.**   Wop and -- I hear people call him Cootie.
19  **Q.**   Did there come a point when you said that Wop was in your
20  car?
21  MS. WICKS:  Objection, leading.
22  THE WITNESS:  Yes.
23  THE COURT:  I'll allow it.
24  MR. ZUCKER:  Could we ask for a time frame on this?
25  MR. LEON:  Sure.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1454

1 THE COURT: Beg your pardon?
2 MR. ZUCKER: I asked for a time frame. Mr. Leon said yes.
3 BY MR. LEON:
4 Q.   I think you talked about two different meetings you had
5 with police that were not true.  Do you remember?  Is that fair?
6 A.   Yes, sir.
7 Q.   Now I'm going to move ahead to other meetings.  Did you
8 have other meetings with the police and your attorney that were
9 not truthful?
10 A.   Yes, sir.
11 Q.   Okay.  During these other meetings, were you asked
12 questions regarding the white Geo and Cootie being in the white
13 Geo.  Do you remember questions about that?
14 A.   Yes, sir.
15 Q.   And what, if anything, did you say initially about that?
16 A.   About the white Geo and Cootie?
17 Q.   Yeah.
18 A.   Well, basically I just told them that I wasn't the
19 driver; I didn't know who he got to drive him to the halfway
20 house.
21 Q.   Did there come a time, Mr. Browne, when you decided to
22 stop lying about this incident?
23        MS. WICKS: Objection.
24        THE WITNESS: Yes, sir.
25        THE COURT: Basis?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1455

1 MS. WICKS: May we approach?
2 THE COURT: Yes.
3 (Following sidebar discussion had on the record:)
4 MS. WICKS: I think this question is bolstering what this
5 witness is now going to say about what happened.  I mean, that
6 assumes that he's telling the truth.  That's for the jury to
7 determine, whether or not he's now telling the truth.
8        THE COURT: I'll let you argue that in cross.
9        (Sidebar discussion concluded.)
10 BY MR. LEON:
11 Q.   Did there come a time, sir, that you decided to stop
12 lying about this incident?
13 A.   Yes, sir.
14 Q.   How did that come about?  How did you come to that
15 decision?
16 A.   Because I really realized my lies was just getting me
17 more and more deeper in trouble.
18 Q.   How did you come to that understanding, realization?
19 A.   That, you know, my lie wasn't going to get me out of this
20 one.  If I kept lying, it wasn't going to help me.
21 Q.   Did you meet with or consult with anyone to discuss
22 telling the truth about this incident?
23        MS. WICKS: Objection, leading.
24        THE COURT: Why don't you rephrase.
25        MR. LEON: Sure.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1456

1 BY MR. LEON:
2 Q.   Uhm, you said that you came to your own understanding in
3 your own mind.  Did anyone help you come to that understanding?
4 A.   No, sir.
5        MS. WICKS: Objection.
6        THE COURT: Overruled.
7 BY MR. LEON:
8 Q.   What's that?
9 A.   No, sir, I came to my own conclusion.
10 Q.   Okay.  And what came at the end of that decision to tell
11 the truth?  Did there -- was there an agreement that you entered
12 into?
13        MS. WICKS: Objection, assumes facts not in evidence.
14        THE COURT: Rephrase.
15 BY MR. LEON:
16 Q.   Sir, you testified earlier that you're cooperating with
17 the government, correct?
18 A.   Yes, sir.
19 Q.   Okay.  Is there -- how did that come about?
20 A.   Well, that didn't come about until October of 2001.
21 Q.   Okay.  And what happened in October of 2001?
22 A.   I signed a plea agreement to cooperate.
23 Q.   Okay.  And before you signed that plea agreement to
24 cooperate, did you meet with people to come to that decision?
25 A.   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1457

1 Q.   Who?
2 A.   Detectives and a prosecutor named Alan Boyd.
3 Q.   Okay.  Any other prosecutors you can remember?
4 A.   And Neil Gallagher.
5 Q.   And did you have a lawyer?  Were you represented by an
6 attorney?
7 A.   Yes, sir.
8 Q.   What was his or her name?
9 A.   To be honest, I can't even remember his name.
10 Q.   Okay.  But you did have a lawyer?
11 A.   Yes, sir.
12 Q.   Okay.  And before you entered into this plea agreement,
13 did you have a chance to consult with a lawyer?
14 A.   Yes, sir.
15 Q.   Did you have a chance to meet with him privately?
16 A.   Yes, sir.
17 Q.   And when you entered into the agreement, did you feel
18 comfortable doing that?
19 A.   Not at first.
20 Q.   Why not?
21 A.   Because I still -- I was just trying to really limit
22 myself really from being a part of that murder, so I still
23 was -- I still was lying.
24 Q.   What do you mean by that?  What were you still lying
25 about?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1458

1  **A.**  I was still lying about I didn't pass Cool Wop the gun.

2  **Q.**  Well, explain that to us.  What, at that point, even when

3  you signed this agreement in October of '01, were you lying

4  about the gun?

5  **A.**  Because when I got sworn in in the Grand Jury, I -- you

6  know, I still stated that I purchased the gun from Cool Wop,

7  which I never did.  It was already my gun.  I just was trying to

8  make it seem like he already had the gun so I wouldn't be

9  putting more -- that with the murder saying I passed him the

10  gun.  I was limiting my actions in the crime.

11  **Q.**  And you said this in the Grand Jury?

12  **A.**  Yes, sir.

13  **Q.**  Do you remember when this was?

14  **A.**  December.

15  **Q.**  Of what?

16  **A.**  Of 2001.

17  **Q.**  And this was after you entered into the plea agreement?

18  **A.**  Yes, sir.

19  **Q.**  And that was -- was that under oath like you're under

20  oath today?

21  **A.**  Yes, sir.

22  **Q.**  And did you understand that you took an oath to tell the

23  full truth under penalty of perjury at that time?

24  **A.**  Yes, sir.

25  **Q.**  Why did you lie under penalty of perjury at that time in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1459

1  the Grand Jury about the gun?

2  **A.**  Because I still wasn't comfortable with cooperating and I

3  wasn't comfortable with the situation that I put myself in, and

4  I was still -- I was still in denial about my responsibilities

5  and my actions.

6  **Q.**  When did you finally come to terms with the fact -- about

7  the gun and telling the truth about the gun?

8  **A.**  Like, three months before his trial date, two to three

9  months before Wop's trial date.

10  **Q.**  And this is another proceeding in another court?

11  **A.**  Yes, sir.

12  **Q.**  Okay.  After you finally came to terms -- well,

13  withdrawn.

14      MR. LEON:  May I approach, Your Honor?

15      THE COURT:  Yes.

16      MR. LEON:  Thank you.

17      MS. WICKS:  Your Honor, can we approach?

18      THE COURT:  Yes.

19      (Following sidebar discussion had on the record:)

20      MS. WICKS:  Your Honor, I just wanted to raise an

21  objection again to the proffer of evidence, specifically his

22  proffer of evidence where he talks about things that he wouldn't

23  even have knowledge of that he hasn't testified about today and

24  doesn't have personal knowledge of.

25      THE COURT:  The proffer meaning a part of the plea

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1460

1  agreement to which the -- which contains a proffer of evidence to

2  which he pled guilty?

3      MS. WICKS:  Yes.

4      THE COURT:  Okay.  We're actually near the lunch break

5  time.  Is this a good time to do that?

6      MR. LEON:  Yes.

7      THE COURT:  So you object to having that come in evidence?

8      MS. WICKS:  Yes.

9      THE COURT:  That's not in evidence, right?

10      MR. LEON:  No.

11      THE COURT:  But it's part of the plea agreement.

12      MS. WICKS:  He's showing it to him, so before it gets to

13  the point where he's showing him, I want to raise that objection.

14      THE COURT:  Okay.

15      (Sidebar discussion concluded.)

16      THE COURT:  Ladies and gentlemen, we'll go ahead and take

17  our lunch break at this point.  Please remember not to talk about

18  the case amongst yourselves or with anyone else, and leave your

19  notes in the jury room.  Please come back in an hour and

20  15 minutes.  That would be roughly -- here goes my math again --

21  2:07.  Enjoy your lunch break and we'll see you back in an hour

22  and 15 minutes.

23      (Jury out at 12:54 p.m.)

24      THE COURT:  All right, counsel, we'll see you back in an

25  hour and 15 minutes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1461

1      (Thereupon, a luncheon recess was had beginning at

2  12:55 p.m.)

3

4      **C E R T I F I C A T E**

5      I, Scott L. Wallace, RDR-CRR, certify that the

foregoing is a correct transcript from the record of proceedings

in the above-entitled matter.

6

7      ----------------------------

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 Q.  And do you remember you giving them a lot of information

2 regarding this same incident, the shooting?

3 A.  Yes, sir.

4 Q.  And do you remember giving them information that wasn't true

5 during this meeting, that was a lie?

6 A.  Yes, it was.

7 Q.  And do you remember being confronted by the police during

8 that meeting, as well?

9 A.  Yes, sir.

10 Q.  Do you remember then into June, the next month, June of

11 2001, sitting down with officers again and being interviewed

12 further?  Do you remember that?

13 A.  Yes, sir.

14 Q.  And do you remember being asked additional questions by them

15 in June of '01?

16 A.  Yes, sir.

17 Q.  And specifically one of those questions was -- well, let me

18 withdraw that question first.

19        Is it your understanding that during these different

20 meetings, one in June -- excuse me, one in April, one in May,

21 then one in June, did the police officers or detectives tell you

22 that they were continuing to investigate this incident, this

23 shooting?

24 A.  Yes, sir.

25 Q.  And did you have an understanding that they were learning

1 more information about the incident?

2 A.  Yes, sir.

3 Q.  Now let's jump to June, June of 2001.  Did you have a

4 meeting with detectives at a that time, as well?

5 A.  Yes, sir.

6 Q.  And do you remember being asked questions during that time?

7 A.  Yes, sir.

8 Q.  And do you remember, were you fully truthful during those

9 meetings?

10 A.  No, sir.

11 Q.  Do you remember specifically being asked the following

12 question:  "Before driving to the halfway house, do you know --

13 did you know Cootie was going to shoot that man?"  And you said

14 no.  Do you remember that question and answer?

15 A.  Yes, sir.

16 Q.  Was that the truth?

17 A.  No, it was a lie.

18 Q.  And do you also remember specifically being asked:  "Before

19 Cootie got out of the car, did you know he was going to shoot

20 that man," and saying no at that point?  Was that the truth?

21 A.  Can you repeat that question, please?

22 Q.  Sure, let me break it down.  First, do you remember being

23 asked the question:  "Before Cootie got out of your car, did you

24 know he was going to shoot that man?"  And do you remember that

25 question, and then you saying no?

1 A.   Yes, sir.

2 Q.   And was that the truth?

3 A.   No, it was a lie.

4 Q.   And do you remember after that meeting the police telling

5 you they didn't believe you at that point?  Do you remember

6 that?

7 A.   Yes, sir.

8 Q.   Now we're getting closer to October, we're passing June into

9 July.  Did you have meetings with your lawyer during that

10 period, July to -- July of 2001 to October of 2001?  Did you

11 have a lawyer?

12 A.   Yes, sir.

13 Q.   And I think you said earlier, you don't remember his name?

14 A.   No, sir.

15 Q.   Okay.  Did you meet with him?

16 A.   I can remember two occasions.

17 Q.   Okay.  Did you also meet with other people in addition to

18 your lawyer during this period of time, the summer and then into

19 the fall of 2001?

20 A.   Yes, sir.

21 Q.   And I think you -- well, without telling us the names of the

22 people, do you remember where those people worked, where they

23 were employed?

24 A.   FBI agents and homicide detectives.

25 Q.   Do you remember the names of any of the FBI agents?

Page 1493

1 Q.  What's his name?

2 A.  Allen Orenberg.

3 Q.  And was that your lawyer at the time?

4 A.  No, sir.

5 Q.  Okay.  That wasn't your lawyer at the time that the

6 agreement was signed?

7 A.  Oh, yes.  At the time that agreement was signed, yes, sir.

8 Q.  Did you have another lawyer at some other point?

9 A.  During the FBI debriefings, I had another lawyer.

10 Q.  And do you remember that lawyer's name?

11 A.  No, sir, I can't remember his name.

12 Q.  Okay.  Now, on this agreement that you signed with your

13 lawyer on October -- in October of 2001, do you know what you

14 pled guilty to?

15 A.  Yes, sir.

16 Q.  What did you plead guilty to?

17 A.  Two racketeering acts, selling 50 grams or more of cocaine,

18 and first degree murder while armed.

19 Q.  And that first degree murder while armed, what did that

20 relate to?

21 A.  Samuel Phillips.

22 Q.  And just for the record, I don't know if we've heard that

23 name yet.  Who was Samuel Phillips?

24 A.  I never knew him.

25 Q.  Okay.  Is that the incident you told us about that happened

Page 1494

1 on February 6th of 2001?

2 A.  Yes, sir.

3 Q.  Okay.  Do you know which judge you pled guilty in front of?

4 A.  Yes, sir.

5 Q.  Which judge?

6 A.  Lamberth.

7 Q.  Do you know if Judge Lamberth is in this courthouse or

8 another courthouse?

9 A.  I think he's in another courtroom.

10 Q.  Another courtroom, but is it in the same building?

11 A.  Oh, yes, sir.

12 Q.  And it's not his honor, Judge Roberts?

13 A.  No, sir.

14 Q.  Do you know, have you been sentenced yet?

15 A.  No, sir.

16 Q.  And do you know if you will be sentenced at some point?

17 A.  Yes, sir.

18 Q.  Do you know when that's going to happen?

19 A.  No, sir.

20 Q.  And do you know the judge who will sentence you?

21 A.  Yes, sir.

22 Q.  Who is the judge that's going to sentence you?

23 A.  Honorable Judge Roberts.

24 Q.  And when you entered into this plea agreement, did you have

25 a chance to review it with your attorney at the time,

1 Mr. Orenberg?

2 A.  Yes, sir.

3 Q.  Did you have a chance to review it yourself?

4 A.  Yes, sir.

5 Q.  And did you have a chance to review it with the prosecutor

6 who also signed the agreement?

7 A.  Yes, sir.

8 Q.  And did you -- before entering into the agreement, did you

9 learn how much time that you could receive as a result of

10 pleading guilty to the charges in that agreement?

11 A.  Yes, sir.

12 Q.  What is your understanding of what sentence you could

13 receive for the charges you've pled guilty to?

14 A.  30 years to life.

15 Q.  Did anyone pressure you to sign this agreement?

16 A.  No, sir.

17 Q.  Did you enter it into your own free will?

18 A.  Yes, sir.

19 Q.  Now, do you understand -- have you heard of the sentencing

20 guidelines?

21 A.  Yes, sir.

22 Q.  And do you have an understanding, a general understanding of

23 how the sentencing guidelines may or may not relate to the

24 document that you have in front of you?

25 A.  Yes, sir.

1 you?

2 A.  No, sir, I sold it.

3 Q.  Okay.  And were you told by anyone that you had to sell on

4 Quarles Street?

5 A.  No, sir.

6 Q.  This is just something that you did on your own?

7 A.  Yes, sir.

8 Q.  And was there anyone that said that you couldn't sell your

9 cocaine that you were selling on Quarles Street on

10 Congress Park?

11 A.  No, sir.

12 Q.  And were there other areas that you sold at --

13 A.  Excuse me?

14 Q.  -- besides Quarles and Congress Park?

15 A.  No, sir.  Just Quarles Street.

16 Q.  Did you ever sell on Robinson Place?

17 A.  No, sir.

18 Q.  Now, essentially you were acting as your own man.  Right?

19 You were your own boss?

20 A.  Yes, sir.

21 Q.  You didn't have to give a commission to anybody.  Is that

22 right?

23          MR. LEON:  Objection.  Relevance, beyond the scope.

24          THE COURT:  I'll overrule it.

25 A.  May you repeat the question, please?

Page 1517

1 BY MR. CARNEY:

2 Q.  You were essentially your own man; you didn't have to give a

3 commission to anyone when you sold your crack?

4 A.  Yes, sir, I didn't have to give nothing.

5 Q.  Now, you talked about Dante.

6 A.  Yes, sir.

7 Q.  Was Dante your partner in marijuana selling?

8 A.  No, sir.

9 Q.  You indicated that he picked up marijuana for you on

10 occasion?

11 A.  Yes.  On one occasion, yes, sir.

12 Q.  Did you give him a commission for doing that?

13 A.  No, sir.

14 Q.  Now, did you ever sell crack out in Maryland?

15 A.  No, sir.  Well, when I was young, yes, sir.

16 Q.  Now, you indicated that you had cousins who also supplied

17 you with crack.  Is that right?

18 A.  No, sir, I never said that.

19 Q.  Now, what I would like to do is make a chart, and maybe it

20 will help the jury follow your testimony a little bit better.

21       MR. CARNEY:  And this will be for demonstrative

22 purposes, Your Honor, rather than as a formal exhibit.  And I

23 would label it Exhibit 29.

24 BY MR. CARNEY:

25 Q.  What I would like to do, Mr. Browne, is ask you to recall

Page 1534

1 federal court here.  Correct?

2 A.  Yes, sir.

3 Q.  And that was before Judge Lamberth.  Is that right?

4 A.  Yes, sir.

5 Q.  And part of your plea agreement, Government's Exhibit

6 Number 1102, encompassed a discussion about a gun that Mr. Ball

7 allegedly gave you in the summer of 2000.  Do you remember that?

8 A.  May I see that, please?

9        MR. CARNEY:  Your Honor, this is Government's

10 Exhibit 1102.

11 A.  Yes, sir.

12 BY MR. CARNEY:

13 Q.  You indicated to Judge Lamberth that Mr. Ball gave you a

14 Beretta nine-millimeter gun.  Correct?

15 A.  Yes, sir.

16 Q.  And you lied to Judge Lamberth?

17 A.  No, sir, I just -- that was a Rueger, and --

18 Q.  Did you lie to Judge Lamberth and tell him that you were

19 given a gun by -- or you purchased a Beretta nine-millimeter

20 semiautomatic pistol from Antwuan Ball?

21 A.  No, sir.  At that time I explained to them that it was a

22 Rueger.  And that one time they said Beretta, but it was

23 supposed to be Rueger on there.

24 Q.  So Judge Lamberth accepted a plea where you said this, and

25 you told the government or law enforcement something different?

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 252 of 1954

1 A.  No, I told them that I also bought a Beretta, but I didn't

2 buy it from Antwuan Ball.  So I guess Beretta got on the piece

3 of paper, but I told them that I bought a Rueger nine-millimeter

4 from Antwuan Ball.

5 Q.  So you told that to the government or to the judge or who?

6 A.  I just told them when I went over the plea agreement.

7 Q.  What?

8 A.  I told my lawyer when I went over the plea agreement that

9 that should say Rueger.

10 Q.  And so when the judge asked you about your plea in court,

11 you didn't correct it, or your lawyer didn't correct it?  Is

12 that what you're saying?

13 A.  Personally, I mean, Beretta, Rueger, it was a

14 nine-millimeter, so I didn't really -- I was nonchalant with it.

15 I didn't really pay it no attention.  Once I told them, I just

16 left it alone.

17 Q.  I see.  And today you're testifying that that

18 nine-millimeter Rueger, which you previously described as a

19 nine-millimeter Beretta, is the same gun that was used to shoot

20 and kill Sam Phillips.  Correct?

21 A.  Yes.  The nine-millimeter Rueger was used in the murder

22 case.  Yes, sir.

23 Q.  Right.  And you're now saying that that is the gun that you

24 previously pled in court before Judge Lamberth as a Beretta?

25 A.  Well, it was supposed to say Rueger, sir.

Page 1536

1 Q.  Did you ever tell your lawyer to correct this?

2 A.  Yes, sir.

3 Q.  And you told him to tell that to the judge in writing?

4 A.  Well, I just told him when we went over the papers that that

5 shouldn't say Beretta, it should say Rueger.

6 Q.  And did he correct that?

7 A.  No, sir.

8 Q.  Is it not true that when you were first asked about the

9 handgun, you stated that it actually belonged to Mr. Wilson?

10 A.  Yes, sir, I did state that it belonged to Mr. Wilson.

11 Q.  And you carried that lie from sometime in March all the way

12 through May 23rd of 2002?

13 A.  Yes, sir.

14 Q.  You didn't tell, in this proceeding on May 23rd, 2002, that

15 that was a gun that Mr. Antwuan Ball gave to you or sold to you.

16 Is that right?

17 A.  Well, I told them two, three months prior to the trial on

18 March 23rd (sic).

19 Q.  You didn't tell, on May 23rd, 2002, this proceeding, that

20 that gun came from Antwuan Ball through you?

21 A.  Oh, I never was asked the question in the trial.  No, sir, I

22 didn't.

23 Q.  Were you asked about where the gun came from with respect to

24 the shooting, where it was located in the car, who owned the

25 gun, and that?

1 A.  Yes, sir.

2 Q.  You didn't tell in that trial proceeding where the gun

3 originally came from.  Correct?

4 A.  No, sir.  I wasn't asked.

5 Q.  Did you not also tell law enforcement that this gun, that

6 you purchased it from Mr. Wilson?

7 A.  Yes.  I told law enforcements that, yes, sir.

8 Q.  Did you not tell law enforcement that this gun was exchanged

9 for a .38 revolver with someone by the name of Tedrick?

10 A.  No, sir.

11 Q.  Did you not tell law enforcement that after the shooting,

12 you had purchased a gun from Wilson for $500, and sold it to a

13 friend who used to live in Laurel?

14 A.  I don't think I told them 500, I think I told them 250, that

15 I purchased it from Cool Wop for 250.

16 Q.  And did you not tell the grand jury in December of 2003 that

17 the friend lived in Fox Glen apartments, and that you didn't

18 tell him it was hot?

19 A.  No, I never told him -- I didn't know his apartment complex

20 was called Fox Glen, but I did tell him that the gun was hot

21 when I sold it to him.

22 Q.  You've indicated that you have met with law enforcement at

23 least 15 times since October of 2001.  Do you remember when you

24 first told law enforcement about the Beretta being a Rueger?

25 A.  Yes, sir.

1 Q.  What date was that?

2 A.  I don't know exactly what date, but I told them two to

3 three months prior to the trial.  So it was around February, I

4 would say, month of February of 2002.

5 Q.  Do you know someone by the name of Bobby Capies?

6 A.  Yes, sir.

7 Q.  He goes by a nickname?

8 A.  Yes, sir.

9 Q.  What is it?

10 A.  Munya.

11 Q.  And I see from your green outfit there that you're from

12 Arlington County jail?

13 A.  Yes, sir.

14 Q.  Is Mr. Capies at Arlington County jail with you?

15 A.  Yes, sir.

16 Q.  How long has he been there with you?

17 A.  Well, I've only been there for nine months, nine, 10 months

18 now.

19 Q.  Did you have any falling out with Bobby Capies at the

20 Arlington County jail?

21 A.  No, sir.

22 Q.  You didn't have a fight with him?

23 A.  No, sir.

24 Q.  Have you talked to him about your testimony?

25 A.  No, sir.

Page 1539

1 Q.  Are you on the same wing with him?

2 A.  Yes, sir.  We're in the same unit.

3 Q.  In the same unit you have free range.  That means you're not

4 constantly locked in a cell.  Right?

5 A.  Yes, sir.

6 Q.  Do you have access to a telephone at Arlington County jail

7 to make outside calls?

8 A.  Yes, sir.

9 Q.  When you were first asked about the murder of Sam Phillips

10 sometime in March of 2001, did you advise law enforcement that

11 you didn't know anything about the murder, but you had heard it

12 from an individual by the name of K, or K-Bay, something like

13 that?

14 A.  I don't remember telling them that in March, but I do

15 remember telling them that in a debriefing before.

16 Q.  And you had indicated that this individual -- is it K?  Is

17 that the name of the individual you told them about?

18 A.  No, his name is Baby Ki (ph).

19 Q.  Did you tell law enforcement that Antwuan Ball said he heard

20 something about it and told Baby K (sic) about it?

21 A.  No, Baby Ki told me that he heard it from Twuan.

22 Q.  Right.  And you were advised by law enforcement that phone

23 calls are recorded from the jail.  Is that right?

24          MR. LEON:  Objection.  Time period.

25          MR. CARNEY:  At this time period.

1 exhibit which is Defense Exhibit Number 30.

2          Your Honor, could I borrow that back?

3          THE COURT:  Is this the original?

4          MR. CARNEY:  Yes, sir.  I have an extra one if you want

5 one.  I'm sorry, here's an extra copy.

6          COURTROOM DEPUTY:  You want this marked as the

7 original?

8          MR. CARNEY:  Yes, please.

9 BY MR. CARNEY:

10 Q.  Mr. Browne, are you the same Larry Browne that was convicted

11 in 1992 for felony threats to injure a person?

12 A.  Yes, sir.

13 Q.  And are you the same Larry Browne that was convicted in 1992

14 for attempted possession of cocaine in case M-17010-2?

15 A.  Yes, sir.

16 Q.  Are you the same Larry Browne in 1996 that was convicted in

17 Maryland for a controlled dangerous substance?

18 A.  Yes, sir.

19 Q.  Are you the same Larry Browne that was convicted in 1997 in

20 case F-1748-97 for attempted possession with intent to

21 distribute marijuana?

22 A.  Yes, sir.

23 Q.  Are you the same Larry Browne in 1997 that was convicted of

24 F-8189-97, escape?

25 A.  Yes, sir.

1 Q.  Are you the same Larry Browne that was convicted in 1998 in

2 case M-7352-00, attempted possession with intent to distribute

3 marijuana?

4 A.  Yes, sir.

5 Q.  In 2000, case M-7352-00, possession of marijuana, same

6 Larry Browne convicted of that?

7 A.  Yes, sir.

8        MR. CARNEY:  Your Honor, if I could display this to the

9 jury.

10 BY MR. CARNEY:

11 Q.  It's Exhibit 30.  Does that appear to be correct?

12 A.  Yes, sir.

13 Q.  Mr. Browne, going back to Exhibit Number 1102, this is the

14 plea agreement.  One of the provisions in the plea agreement is

15 that "Your client shall submit a full and complete accounting of

16 all your client's financial assets, whether such assets are in

17 your client's name or the name of a third party."  Do you recall

18 that provision?

19 A.  Yes, sir.

20 Q.  Have you sat down and met with the government or their

21 financial litigation unit to list all your assets and all your

22 bank accounts, and sign release for records and that kind of

23 thing?

24 A.  No, sir.

25 Q.  Is it your expectation that the government is not going to

# Tab 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
          Plaintiff,       :  Docket No. CR 05-100
     v.                    :
ANTWUAN BALL, DAVID WILSON, :  Washington, DC
GREGORY BELL, DESMOND      :
THURSTON, JOSEPH JONES, and :  March 6, 2007
DOMINIC SAMUEL,            :  9:15 a.m.
          Defendants.      :
                           :

VOLUME 12 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC  20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC  20004
                         202.434.8234

---

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC  20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD  21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC  20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC  20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD  20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD  20852
                         301.519.8024

---

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC  20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD  21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

**MORNING SESSION, MARCH 6, 2007**

1
2   (9:24 a.m.)
3        THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United*
4   *States versus Antwuan Ball, David Wilson, Gregory Bell, David*
5   *Wilson, Joseph Jones and Dominic Samuels.*  For the government,
6   Mr. Leon, Ms. Petalas and Mr. Guerrero.  For the defendants,
7   Mr. Carney, Mr. Tabackman, Ms. Wicks, Mr. Beane, Mr. Zucker,
8   Mr. Martin, Mr. Balarezo and Mr. Purpura.
9        THE COURT:  All right.  Good morning.  Are you ready for
10  the jury?
11       MR. CARNEY:  Your Honor, the government advised me they're
12  coming in with a 302 this morning -- the government's coming in
13  this morning with a 302 on the -- anyway, it's something to
14  impeach with and I still haven't gotten it yet.
15       THE COURT:  You still haven't gotten it, you said?
16       MR. CARNEY:  Right.  They're getting it now.
17       THE COURT:  Right.  So are you ready for the jury?
18       MR. CARNEY:  I guess I could have somebody else do it.
19  I'll let Ms. Wicks get the document and I'll go forward.
20       THE COURT:  So was that a Yes?
21       Was that a Yes?  Are you ready for the jury.
22       MR. CARNEY:  Yes, Your Honor.
23       THE COURT:  All right.  Let's bring them in.
24       (Jury in at 9:29 a.m.)
25       THE COURT:  Good morning, ladies and gentlemen.

---

*1580*

1  **Q.**  And you told the detectives on that day in April of 2001
2  that no one mentioned anything to you about the Geo being driven
3  while you were gone, correct?
4  **A.**  Correct.
5  **Q.**  The other thing that you claimed on that day is that at
6  various points, you had loaned the Geo to someone named Birdman
7  and someone named Twan, correct?
8  **A.**  No, ma'am.
9  **Q.**  You never told them that in April 2001?
10  **A.**  No, ma'am.
11  **Q.**  You know that -- you did not tell them that, correct?
12  **A.**  Correct, ma'am.
13  **Q.**  During another point in that interview, Special Agent
14  Sparks and Detective Jackson told you that you were lying,
15  correct?
16  **A.**  I can't recall them telling me to my face that I was
17  lying.  They probably just didn't believe me, didn't say
18  nothing.
19  **Q.**  So you're saying that they didn't believe you, but they
20  never told you that you didn't believe you?
21  **A.**  No.  They probably was just -- you know.
22  **Q.**  I'm not asking about probably.  I'm asking what you
23  recall from this interview in April of 2001.
24  **A.**  Yeah, that's what I said.  They never told me straight
25  out their mouth that "you lying."

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1581*

1  **Q.**  Well, they showed you some pictures that day, correct?
2  **A.**  They could have, ma'am.
3  **Q.**  There was a day in the spring of 2001 when they showed
4  you three pictures, correct?
5  **A.**  I can't recall, but they probably did, you know.
6  **Q.**  Do you ever recall in this interview in April of 2001
7  being shown a picture of someone that you said was Cootie?
8  **A.**  No, ma'am, I don't remember.
9  **Q.**  Now, in this interview back in April of 2001, you claimed
10  that someone at the jail had told you that Cool Wop was in the
11  Geo on the day of the homicide, correct?
12  **A.**  Ma'am, I could have.  You know, so many lies, it's just
13  so hard to remember.  I could have, yes, ma'am.
14  **Q.**  The truth is no one at the jail ever told you this,
15  correct?
16  **A.**  No.  The truth is Baby Kairi did tell me over at the jail
17  what the whole incident was about.  I never knew --
18  **Q.**  So you're --
19        MR. LEON:  Your Honor, may he finish?
20        MS. WICKS:  I apologize.
21        THE COURT:  Go ahead.  Finish your answer.
22        THE WITNESS:  I forgot that quick, Your Honor.  She can go
23  on.  She can go on.
24  BY MS. WICKS:
25  **Q.**  Well, what is the lie?  Is the lie sitting here today you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1582*

1  don't recall when you told them about this?
2  **A.**  No.  The truth is it's hard for me to sit up here and
3  remember all the lies that I have told when I was going through
4  the procedures.  I was asked millions and millions of questions.
5  It's really hard to remember all them questions.
6  **Q.**  Okay.  But what you're saying today is you did -- at some
7  point since you got locked up, you're claiming today that you
8  did have a conversation with Kairi Ball, correct?
9  **A.**  Yes, ma'am.
10  **Q.**  And --
11  **A.**  I didn't know Kairi's last name then.
12  **Q.**  I apologize.  You referred to this person as Baby Kairi?
13  **A.**  Baby Kairi, yes, ma'am.
14  **Q.**  And you don't know this person's last name, correct?
15  **A.**  No, ma'am.
16  **Q.**  But you're saying in 2001, you were locked up with this
17  person, correct?
18  **A.**  Yes, ma'am.  I do know his last name.  It's Kellibrew.
19  Yes, ma'am.
20  **Q.**  So Kairi Kellibrew, you're saying you did have a
21  conversation with him, correct?
22  **A.**  Yes, ma'am.
23  **Q.**  And so if you did have a conversation with him, it's not
24  a lie to have told somebody you had a conversation with him,
25  correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1583*

1  **A.**  Right, ma'am.  Yes, ma'am.
2  **Q.**  But sitting here today, you don't recall when it was that
3  you told the homicide detectives about the conversation?
4  **A.**  It had to be after I talked to him, which was -- we was
5  over in the jail together in April.
6  **Q.**  Okay.  So it could have been that you told the homicide
7  detectives about a conversation with Kairi in April of 2001,
8  correct?
9  **A.**  Well, yes, ma'am.
10  **Q.**  Shortly after that interview, you're interviewed at
11  another location; you're interviewed at the Cold Case Squad on
12  May 3rd of 2001.  Do you recall that interview?
13  **A.**  Yes, ma'am.
14  **Q.**  And at that interview, you had a lawyer there by the name
15  of Lee Christian, correct?
16  **A.**  Yes, ma'am.
17  **Q.**  Now, on that day -- one thing that you told the homicide
18  detectives on that day is that the first time that you had ever
19  learned of this homicide of Sam Philips was when the police --
20  when you had learned that the police had contacted the woman
21  whose name was on the car, correct?
22  **A.**  I don't recall that, ma'am.  I don't recall saying that.
23  **Q.**  Well, you were -- you don't recall lying to them about
24  not knowing anything about the homicide on the day it occurred?
25  **A.**  No, I lied to them and told them I didn't know.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

### 1584

1　Q.　Okay. And you lied to them and told them you didn't know
2　anything about it until the police had contacted the owner of
3　the car, correct?
4　A.　I could have said it, you know.
5　Q.　And you could have said to them on that day that you have
6　no idea who was involved in the shooting of Sam Philips,
7　correct?
8　A.　Yes, ma'am.
9　Q.　Now, when was -- well, did the police ever tell you what
10　date it was that Sam Philips was killed?
11　A.　Yes, ma'am.
12　Q.　Do you recall when it was that they first told you the
13　date that Sam Philips was killed?
14　A.　Can I recall -- can you repeat that, please?
15　Q.　Well, do you recall when it was that you learned the date
16　that Sam Philips was killed?
17　A.　No, ma'am. I can't recall when he told me. I can recall
18　the date myself.
19　Q.　I'm saying on the calendar, in terms of it being
20　February 6th of 2001, you don't have an independent recollection
21　that it was February 6th of 2001, do you?
22　　　THE COURT: Do you have an independent recollection of
23　what?
24　BY MS. WICKS:
25　Q.　Independent of what the homicide detectives told you.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 1585

1　A.　I can't remember everything that they told me, but I knew
2　that it was February the 6th.
3　Q.　But during the interview on May 3rd, you claimed that you
4　somehow knew that you had purchased the murder weapon from Cool
5　Wop, correct?
6　A.　Ma'am, can you give me the question so I can understand
7　it? I don't --
8　Q.　On May 3rd of 2001, you're in the Cold Case Squad with
9　your lawyer, correct?
10　A.　Yes, ma'am.
11　Q.　And you're being interviewed by the homicide detectives,
12　correct?
13　A.　Yes, ma'am.
14　Q.　And you tell them that you knew you had purchased the
15　murder weapon, correct?
16　A.　Yes, ma'am.
17　Q.　And you describe the gun to them on that date, correct?
18　A.　Yes, ma'am.
19　Q.　And you claimed that you had purchased the gun from Cool
20　Wop for $250 towards the end of February, correct?
21　A.　Yes, ma'am.
22　Q.　And you claimed that you had bought the gun in the
23　apartment around the corner from the building that you thought
24　Mr. Wilson's apartment was in, correct?
25　A.　Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 1586

1　Q.　And you told them that you had purchased the murder
2　weapon and two magazines, correct?
3　A.　Yes, ma'am.
4　Q.　And you claimed that on that day at the end of February
5　of 2001, when selling you this gun, that Cool Wop told you that
6　the gun was hot, correct?
7　A.　Yes, ma'am.
8　Q.　And when you were interviewed by the homicide detectives
9　on May 3rd in 2001, you claimed that you then traded that Ruger
10　for a .38 and $500 to this person Bay, Mark from Laurel,
11　correct?
12　A.　Well, I never said nothing about an exchange for a .38,
13　but I sold it to him for $500, yes, ma'am.
14　Q.　So you're saying you never told the homicide detectives
15　that there was ever any gun trade, correct?
16　A.　Correct.
17　Q.　On that day, did you tell the homicide detectives that
18　you had sold a .38 to Tedrick on Quarles Street?
19　A.　No, ma'am.
20　Q.　When was the first time that -- well, the first time that
21　you were interviewed by Lockhart and Kyle Fulmer from the FBI
22　was in July of '01, correct?
23　A.　I can't recall the date, ma'am, but --
24　Q.　Well, sitting in the Cold Case Squad, that's a different
25　environment than the B-1 level, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 1587

1　A.　I can't recall the B-1 level, but I do remember Cold
2　Case.
3　Q.　And do you recall Agent Lockhart and Agent Fulmer being
4　there in May 2001 when you were interviewed and your attorney
5　Lee Christian was there?
6　A.　I remember my attorney there. I've been dealing with a
7　lot of agents. I can't remember all their names, ma'am.
8　Q.　But on the day that you were interviewed in the Cold Case
9　Squad, again, the law enforcement agents that were there told
10　you that they thought you were lying, correct?
11　A.　Yes, I do remember -- recall an agent telling me to just
12　be honest, be truthful.
13　Q.　Well, on that day after he told you that, you told them
14　that Cootie had asked to borrow the car to pick up his daughter,
15　correct?
16　A.　I could have said that, ma'am.
17　Q.　And you told them that you gave the keys to Cootie and
18　thought nothing of it, correct?
19　A.　Yes, ma'am.
20　Q.　And again, you told them that you left Congress Park on
21　that day and went to lunch in Maryland with Deuce, correct?
22　A.　Correct.
23　Q.　And again that day, you told them that when you got back
24　from lunch, the car did not appear to be moved, correct?
25　A.　Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 263 of 1954

1 Q. And on that day, you claimed that when you learned about
2 the homicide from Tameka after the police had contacted her
3 friend who was the owner of the car, that then you went around
4 Congress Park and asked Cootie about the homicide, correct?
5 A. Correct.
6 Q. And you told the police that day that Cootie said that he
7 was in possession of the Geo when he shot Sam Philips, correct?
8 A. I can't recall that statement, but I could have said it.
9 Q. Do you recall lying on Cootie that day to homicide?
10 A. I recall lying on him through the whole -- some of the
11 FBI interrogation.
12 Q. And on that day, you said that Cootie told you that he
13 had seen Sam with a "fake-ass Coogi hat," correct?
14 A. Yes, ma'am.
15 Q. And based on that, the homicide agents told you, "You're
16 lying, and we think you know more about the murder," correct?
17 A. Correct, ma'am.
18 Q. They told you that you knew too much not to have been
19 there, correct?
20 A. Correct, ma'am.
21 Q. And after that, you claimed you were there, correct?
22 A. Yes, ma'am.
23 Q. You said you were driving, but you had no idea what was
24 going to happen, correct?
25 A. Correct.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 Q. You claimed on that day that you were very, very close
2 with this person Cootie, correct?
3 A. I could have said "close."
4 Q. Could have said "close"?
5 A. Yes, ma'am.
6 Q. But you definitely said that he shot Sam Philips with a
7 Ruger, correct?
8 A. Correct.
9 Q. And on that day, you started getting concerned that you
10 would be facing charges, correct?
11 A. Yes, ma'am.
12 Q. And you were told by the law enforcement people that day
13 that they just wanted to identify and prosecute the shooter,
14 correct?
15 A. Yes, ma'am.
16 Q. And you were told by them that things would work out?
17 A. They didn't never tell me that, ma'am.
18 Q. They never told you that?
19 A. I just can't recall them saying it. They might have said
20 it or I'm going to be all right or -- but they didn't say things
21 was going to work out.
22 Q. And they told you that your liability for this shooting
23 would be dependent on what the actual truth is, correct?
24 A. Yes, ma'am.
25 Q. And that meant whether or not you were ignorant to what

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 was going to happen or you were an active participant, correct?
2 A. Yes, ma'am.
3 Q. In June -- on June 25th of 2001, you were interviewed
4 again, correct?
5 A. Still can't recall the date, but June --
6 Q. Well, before the debriefing, you were interviewed another
7 time, correct?
8 A. Yes, ma'am.
9 Q. Okay. And that is the first time that you told them this
10 story about -- that you were spending the whole day there
11 because you were waiting to hear from the cocaine supplier,
12 correct?
13 A. Correct, ma'am.
14 Q. You also told them that day that you had seen Mr. Wilson
15 with a gun in Maryland when you took him out there to get the
16 money, correct?
17 A. Correct.
18 Q. You didn't know where you had taken Mr. Wilson to get the
19 money, correct?
20 A. Correct.
21 Q. You just knew what area of Maryland, correct?
22 A. Yes, ma'am.
23 Q. Mr. Browne, when you pled guilty, there was a proffer of
24 evidence as part of your plea agreement, correct?
25 A. Correct, ma'am.

Scott L. Wallace, RDR, CRR
Official Court Reporter

1 Q. And that proffer is part of Government's Exhibit 1102,
2 correct?
3 A. Yes, ma'am.
4 Q. And you were shown this yesterday by -- and today by
5 Mr. Carney and the government, correct?
6 A. Yes, ma'am.
7 Q. Okay. Now, in this proffer of evidence, it indicates an
8 address that you drove to on February 6th, correct?
9 A. Yes, ma'am.
10 Q. You don't know the address, though, correct?
11 A. Correct.
12 Q. The government told you that address, correct?
13 A. No, it was just in -- they didn't tell me. It was just
14 in a -- in my proffer of evidence.
15 Q. Okay. But the proffer of evidence is not -- that part of
16 the proffer of evidence is not based on anything that you know,
17 correct?
18 A. Well, not the full address, but the area.
19 Q. Okay. So you just know Oxon Hill, correct?
20 A. Yes, ma'am.
21 Q. Did they ever take you to look and see if this was the
22 correct address?
23 A. No, ma'am. They never took me.
24 Q. Do you have -- other than the fact that it's written in
25 this proffer of evidence that you agreed to, you don't have your

Scott L. Wallace, RDR, CRR
Official Court Reporter

*1608*

1    club, correct?

2  **A.**   Yes, ma'am.

3  **Q.**   And that's the Beretta that you claimed you had bought

4  from Antwuan in the summer of 2000, correct?

5  **A.**   Naw, I never claimed I bought that Beretta from Antwuan.

6  **A.**   You never told the FBI that?

7  **A.**   No, ma'am.

8  **Q.**   But you told them that that gun was stolen, correct?

9  **A.**   Yes, ma'am.

10  **Q.**   And back in July of 2001, you were still maintaining --

11  well, back in July of 2001, you had not said anything to the FBI

12  about a Ruger, correct?

13  **A.**   You said -- can you repeat that, because --

14  **Q.**   Back in July of 2001, when you met with the FBI and were

15  talking to them about guns, they were asking about the gun that

16  was used in the homicide, correct?

17  **A.**   Correct.

18  **Q.**   You never told them -- well, back on that date, you

19  weren't claiming that it was your Ruger, correct?

20       MR. LEON:  Objection to what date?

21       MS. WICKS:  July of 2001.

22       THE WITNESS:  Oh, yes, ma'am.  I wasn't claiming that it

23  was my Ruger.

24  BY MS. WICKS:

25  **Q.**   Back in July of 2001, did they ask you about -- well,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1609*

1  back in July of 2001, did they ask you about the incident in

2  December of 2000 that you were on the run from the police for?

3  **A.**   No, ma'am.  I don't recall -- I don't think they never

4  asked me -- I mean, they did eventually ask me, but I don't

5  think they asked me that early.

6       MS. WICKS:  Court's indulgence.

7  BY MS. WICKS:

8  **Q.**   Now, back on Thursday, you were asked about this incident

9  that occurred in April of 1992 when you got shot.  Do you recall

10  those questions?

11  **A.**   No, ma'am, I don't recall them.

12  **Q.**   Do you recall -- but you recall the incident when you got

13  shot, correct?

14  **A.**   Yes, ma'am.

15  **Q.**   And you know that the officers told a different story

16  about what happened, correct?

17  **A.**   Told a different story about what?

18  **Q.**   About what happened when you got shot.

19  **A.**   I didn't know they told a different story.

20  **Q.**   So you never reviewed any of the discovery?

21  **A.**   Yes, ma'am.  I've reviewed Officer Raymond Mead's police

22  report.

23  **Q.**   Okay.  And you had a preliminary hearing, correct?

24  **A.**   Yes, ma'am.

25  **Q.**   And at that preliminary hearing, someone testified about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1610*

1  what the police version was of what happened that day, correct?

2  **A.**   Fifteen years ago, I can't really remember if they did.

3  **Q.**   So you don't recall that the police version was that you

4  were seen getting out of a car with a gun in your hand and

5  ordered to drop the gun?

6  **A.**   No, ma'am.  The police never identified itself and like I

7  said, I climbed out of the car and the gun fell onto the

8  ground -- onto the streets.

9  **Q.**   But the police version was that you turned towards the

10  officer and pointed the gun at him, correct?

11  **A.**   It could have said that.  I don't -- that's not true.

12  **Q.**   But it is true that the officer fired at you, correct?

13  **A.**   Yes, ma'am.

14  **Q.**   And it is true that the officer was never charged,

15  correct?

16  **A.**   Correct.

17  **Q.**   And it is true that you were charged with assault on a

18  police officer, assault with a dangerous weapon, possession of a

19  firearm during a crime of violence and threatening to injure a

20  person, correct?

21  **A.**   Correct.

22  **Q.**   And it is true that you pled guilty to the threats

23  charge, correct?

24  **A.**   Correct.

25  **Q.**   And it is true that when you were released in that case,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1611*

1  you were arrested for possession with intent to distribute

2  cocaine, correct?

3  **A.**   Correct.

4  **Q.**   And that was a search warrant where the police came into

5  the house you were in, correct?

6  **A.**   Correct.

7  **Q.**   And the police, when they arrested you, promised you

8  leniency if you talked to them, correct?

9  **A.**   Correct.

10  **Q.**   And you pled guilty to attempted simple possession of

11  that crack cocaine, correct?

12  **A.**   Correct.

13  **Q.**   But you had told them that you were going to sell those

14  drugs, correct?

15  **A.**   Naw, I don't recall telling them I was going to sell

16  them.

17  **Q.**   That's what you were going to do, correct?

18  **A.**   But that's what I was going to do, yes, ma'am.

19  **Q.**   You told them you were selling drugs back then to support

20  yourself, correct?

21  **A.**   Yes, ma'am.

22  **Q.**   And even when you were arrested for that charge while on

23  release in the first charge, you still violated the conditions

24  of your release, correct?

25  **A.**   Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1612**

1  Q.   And you got locked back up, correct?
2  A.   Correct.
3  Q.   But ultimately, you got probation in that case, in the
4  threats case, correct?
5  A.   Correct.
6  Q.   And you promised to abide by the conditions of probation,
7  correct?
8  A.   Correct.
9  Q.   And you promised to pay a fine and the costs -- the court
10  costs in that case, but you never did, correct?
11  A.   I remember paying it, but probably not on their time.
12  Eventually, I paid it.
13  Q.   Well, you know you didn't do it on time, correct?
14  A.   Yes, ma'am.
15  Q.   And the reason you know you didn't do it on time is
16  because you had to keep coming back to court, correct?
17  A.   Yes, ma'am.
18  Q.   And while you were on probation in 1993, you were
19  rearrested, correct?
20  A.   No, I wasn't rearrested. I was placed in incarceration
21  on a sentence.
22  Q.   Okay. You were rearrested in November of 1993 for your
23  UV, correct?
24  A.   Oh -- yes, ma'am. Yes, ma'am, yes.
25  Q.   And you also had to come back to court because you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1613**

1  weren't doing the community service that was ordered as a
2  condition of your probation, correct?
3  A.   Correct.
4  Q.   And you also had to come back to court when you violated
5  the curfew, correct?
6  A.   Yes, ma'am, yes. I was on house arrest, yes.
7  Q.   And you were on house arrest on November 21st, 1994 and
8  you left the house on a night that you had a curfew, correct?
9  A.   Yes, ma'am.
10  Q.   And you told the probation officer that the reason you
11  left is because your mother kicked you out, correct?
12  A.   I could have said that.
13  Q.   And you could have said to the probation officer that the
14  reason she kicked you out is because she found crack and a
15  handgun in your bedroom, correct?
16  A.   Yes, ma'am.
17  Q.   And it could -- that all could have been a lie, correct?
18  A.   No. She did find crack and a handgun in the house.
19  Q.   Well, when the probation officer called your mother, she
20  told them it was a lie, correct?
21  A.   I don't recall her calling them.
22  Q.   You don't recall the probation officer checking out the
23  story with your mother?
24  A.   No, ma'am.
25  Q.   And you don't recall the probation officer sending a memo

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1614**

1  to the judge indicating she had talked to your mother?
2  A.   No, ma'am, I don't recall that.
3       MS. WICKS: Court's indulgence.
4       Your Honor, could I have a moment to show the government
5  something?
6       (Brief pause in proceedings.)
7       MR. LEON: Your Honor, may we approach?
8       THE COURT: Yes.
9       (Following sidebar discussion had on the record:)
10       MR. LEON: I have a couple of objections to this.
11       THE COURT: What?
12       MR. LEON: One is the line of questioning and two is the
13  specific document that she wants to show the witness. The line
14  of questioning is -- I didn't object to it at first because I
15  thought there was going to be a tie-in. I don't see the tie-in.
16  This is all stuff that happened in the 1990s before this witness
17  had any agreements with the government, so this is just going
18  into bad acts of a person ten years ago. I don't see any tie-in.
19  I waited to object for a few questions and we've gone on for
20  several and this is just basically smearing somebody about things
21  he did ten years ago.
22       We could do this -- so there's a general objection to the
23  line of question. There's no agreement with the government at
24  all at this time. This is just somebody who was knocking around
25  Superior Court, like a lot of people did in the 1990s, so I don't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1615**

1  see the tie-in to the general line of questioning.
2       With respect to this particular document, what I
3  understand it to be is a copy of the court jacket on one of the
4  particular incidents that Ms. Wicks has just been asking the
5  witness about. And she -- my understanding, she now wants to
6  confront him with a letter written to a judge by somebody else
7  about him. I mean, there's just no connection that he knows
8  about this, he's seen it or --
9       MS. WICKS: And my first question would be --
10       THE COURT: Hold on.
11       MR. LEON: And that's it.
12       MS. WICKS: And my first question would be -- is showing
13  him the document and asking if he ever saw it. If he's never
14  seen it, then there's nothing else to go into.
15       MR. LEON: But relevance is always -- whether the answer
16  is yes or no, it still, I submit, is irrelevant to -- just
17  smearing somebody about some stuff he was doing 12 years ago.
18  What is the connection to this case and his testimony and his
19  agreement with the government here?
20       MS. WICKS: Because it goes directly to his credibility
21  and the fact that apparently, according to the document that I
22  have, that he lied on his mother. The document indicates that
23  what he told the probation officer that his mother did, his
24  mother said was not the truth.
25       MR. LEON: So you have a hearsay statement in a letter --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1620**

1    MR. LEON:  Objection on relevancy grounds.

2    THE COURT:  Overruled.

3    THE WITNESS:  Can you repeat that for me?

4  BY MS. WICKS:

5    **Q.**    In December 1994, you received -- you -- because you

6  violated probation, because you violated that promise not to

7  violate the conditions of probation, you received four more

8  months in jail, correct?

9    **A.**    Yes, ma'am.

10    **Q.**    And more probation, correct?

11    **A.**    Yes, ma'am.

12    **Q.**    When you were arrested for selling marijuana on

13  March 1st, 1997, you were released with the condition that you

14  drug test, correct?

15    **A.**    Yes, ma'am.

16    **Q.**    And you violated that condition by trying to cheat on a

17  drug test, correct?

18    **A.**    Yes, ma'am.

19    **Q.**    You submitted a sample of urine that was not your own,

20  correct?

21    **A.**    Yes, ma'am.

22    **Q.**    And the reason you did that is because -- also a

23  violation of your conditions of release -- you were still using

24  marijuana, correct?

25    **A.**    Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1621**

1    **Q.**    And because of that violation, you were then sent to the

2  halfway house, correct?

3    **A.**    Yes, ma'am.  Yes.

4    **Q.**    And you continued to use marijuana while you were at the

5  halfway house, correct?

6    **A.**    Yes, ma'am.

7    **Q.**    And you escaped from the halfway house on September 7th

8  of 1997, correct?

9    **A.**    I can't remember the date, but I did escape from Hope

10  Village.

11    **Q.**    Okay.  And the halfway house that you were placed in was

12  Hope Village, correct?

13    **A.**    Yes, ma'am.

14    **Q.**    And that's the halfway house on Langston Lane, correct?

15    **A.**    Yes, ma'am.

16    **Q.**    When you were picked up because of that escape, you had

17  not come back to court in the pending drug case, correct?

18    **A.**    Correct.

19    **Q.**    And you were then charged with escape and failing to come

20  back to court, correct?

21    **A.**    Yes, ma'am.

22    **Q.**    Now, when you were picked up in March of 2001, you had a

23  number of court matters hanging over your head, correct?

24    **A.**    Yes, ma'am.

25    **Q.**    At that point you were still on probation in the escape

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1622**

1  case, correct?

2    **A.**    Yes, ma'am.

3    **Q.**    And you had five years hanging over your head in that

4  case, correct?

5    **A.**    Yes, ma'am.

6    **Q.**    You had not come to court in January of 2001, correct?

7    **A.**    I had a -- I remember I had a December court date, but I

8  called and let them know that I was in the hospital.

9    **Q.**    Okay.  And you talked about that yesterday.

10    Court's indulgence.

11    Now, the incident that you were wanted by the police for

12  in December, January, February and March of '01 was the incident

13  that actually occurred on December 1st, 2000, correct?

14    **A.**    I thought it was December the 3rd, but you say it's

15  December 1st?

16    **Q.**    Well, if you looked at the indictment, would that refresh

17  your recollection as to the date?

18    **A.**    Yes, ma'am.  May I see it?

19    MS. WICKS:  Court's indulgence.

20    I'll show Mr. Browne what's marked as defense 4-I.

21  BY MS. WICKS:

22    **Q.**    Mr. Browne, this is the indictment in case F-166701

23  regarding the assault with a dangerous weapon on December 1st,

24  2000, correct?

25    **A.**    Yes, ma'am.  That's what it says on this paper.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1623**

1    **Q.**    And in looking at that court jacket, if you look at the

2  front of the court jacket, that reflects that you were arrested

3  on the warrant on that case on March 15th, correct?

4    **A.**    Yes, ma'am.

5    **Q.**    Well, essentially, it was actually papered in court on

6  March 15th, correct?

7    **A.**    Yes, ma'am.

8    **Q.**    So that's when you were brought from Maryland to D.C.,

9  correct?

10    **A.**    That's when I was extradited, yes, ma'am.

11    **Q.**    And this is the incident that the government was asking

12  you about that occurred in December of 2000, correct?

13    **A.**    Well, I really don't remember them asking me about this,

14  ma'am.  They was more focused on the homicide than this.

15    THE COURT:  For timing purposes, we'll be breaking at 11.

16    MS. WICKS:  Your Honor, this would be a good time to

17  break.

18    THE COURT:  All right.  Ladies and gentlemen, we'll take

19  our mid-morning break.  Please remember not to talk about the

20  case amongst yourselves or with anyone else and to take your

21  notes and pencils back to the room.  And please come back at

22  11:15.

23    Enjoy your break.

24    (Jury out at 11:02 a.m.)

25    THE COURT:  All right, counsel.  We'll be back in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1644*

BY MS. WICKS:

1   Q.   The actual charge in F-6440-00, which is a distribution
2 of cocaine and distribution of marijuana, that's essentially
3 conduct that this plea agreement covers, correct?
4   A.   Yes, ma'am.
5   Q.   Because you have this plea agreement, the government
6 can't also prosecute you in Superior Court for those charges,
7 correct?
8   A.   Correct.
9   Q.   And because you have this plea agreement, anything that
10 you told them about that's nonviolent, you cannot be prosecuted
11 for once you signed this plea agreement, correct?
12   A.   To my understanding, yes, ma'am.
13   Q.   Well, it says that in the agreement, correct?
14   A.   Can you show me?
15   Q.   Sure.
16       MS. WICKS: Court's indulgence.
17 BY MS. WICKS:
18   Q.   Looking at paragraph 18.
19   A.   I understand. Yes, ma'am.
20   Q.   Okay. And there are -- so there's both -- all this --
21 well, all these drug sales that you've testified about from when
22 you were 15 years old, the pounds of marijuana and all of this
23 crack, there are no other charges that are going to be brought
24 against you for that conduct, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1645*

1   A.   I hope not, ma'am.
2   Q.   Well, pursuant to that paragraph of the plea agreement,
3 they're not, correct?
4   A.   Yes, ma'am.
5   Q.   And I believe you indicated yesterday, you're hoping that
6 you don't have to do 30 to life, correct?
7   A.   Correct.
8   Q.   And you're hoping that you still have the plea agreement,
9 correct?
10   A.   Correct.
11   Q.   But by your own admission, you've violated the plea
12 agreement, correct?
13   A.   Correct.
14   Q.   You've lied numerous times about the gun that was used to
15 kill Sam Philips, correct?
16   A.   Correct.
17   Q.   You lied in the grand jury, correct?
18   A.   Correct.
19   Q.   You lied when you pled guilty, correct?
20   A.   Correct.
21   Q.   You lied when you met with the police, correct?
22   A.   Correct.
23   Q.   But you're -- now, to your knowledge, as to the homicide
24 of Sam Philips, you can't be charged with anything else about
25 that, now that you have the plea agreement, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1646*

1   A.   I don't understand. I'm already being charged with it.
2 I don't understand.
3   Q.   Right. You admitted under one statute your involvement
4 in an organization, correct?
5   A.   Yes, ma'am.
6   Q.   Okay. The government is not going to prosecute you for
7 any other charges arising from that homicide, correct?
8   A.   Correct.
9   Q.   Okay. But to date, you have perjured yourself in the
10 grand jury, correct?
11   A.   Yes, ma'am.
12   Q.   You perjured yourself when you pled guilty, correct?
13   A.   Uh, I don't -- can you tell me how I perjured myself?
14   Q.   Well, you pled -- when you pled guilty, you were under
15 oath correct?
16   A.   Yes, ma'am.
17   Q.   And you said everything in the proffer of evidence was
18 correct, right?
19   A.   Yes, ma'am.
20   Q.   And that everything in the proffer of evidence is what
21 happened, correct?
22   A.   Yes, everything except for the name of the gun.
23   Q.   Well, up until the point when you pled guilty, you still
24 had not told the government that it was your gun used to kill
25 Sam Philips, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1647*

1   A.   That's not what was in the proffer of evidence. It's the
2 type of gun.
3   Q.   Okay. And you had lied about the type of gun, correct?
4   A.   No, I -- it should have been Ruger. I don't know how
5 Beretta got on the paper.
6   Q.   Well, you reviewed it when you pled guilty, correct?
7   A.   Yes, ma'am.
8   Q.   And you agreed under oath to the Court that that was
9 correct?
10       MR. LEON: Objection asked and answered.
11       THE COURT: Sustained.
12 BY MS. WICKS:
13   Q.   Have you been charged for obstruction of justice for
14 lying in the grand jury?
15   A.   No, ma'am.
16   Q.   Have you been charged with lying to the police?
17   A.   No, ma'am.
18   Q.   Has the government told you -- has anybody told you that
19 you no longer have a plea agreement?
20   A.   No, ma'am.
21   Q.   And you're here testifying today because you're still
22 cooperating with the government, correct?
23   A.   Yes, ma'am.
24   Q.   And you're still doing whatever you can so you don't
25 have to do 30 to life, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1652*

1  anything.

2  MS. WICKS: Because he doesn't indicate in there that it's

3  his .9 millimeter.

4  MR. LEON: It doesn't say.

5  MS. WICKS: I'll move on to another time when he admits to

6  that lie.

7  THE COURT: Is there anything else?

8  MR. LEON: No.

9  THE COURT: Do I need to rule on the objection?

10  MR. LEON: I would like that, yeah.

11  THE COURT: And the objection then is?

12  MR. LEON: The objection is it's improper impeachment.

13  MS. WICKS: It's lying by omission that he admits at

14  another point under oath.

15  THE COURT: You're asking him whether he had indicated any

16  problem with what he had been -- with what had been contained in

17  a proffer.

18  MS. WICKS: Right.

19  THE COURT: But you had brought out before -- the jury

20  before said something about a Beretta. Now, if that transcript

21  does not say anything about a Beretta, how is this proper

22  impeachment?

23  MS. WICKS: Then I'll start over. I mean -- it's proper

24  impeachment because he lies by omission, Your Honor.

25  THE COURT: What is he omitting?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*1653*

1  MS. WICKS: The fact that it was his gun.

2  THE COURT: Well, you haven't set that up at all.

3  MS. WICKS: Then I'll start over.

4  THE COURT: It's misleading. Totally misleading. The

5  point of the impeachment, I thought, based on what you had set

6  up, had to do with some business about saying Beretta versus

7  Ruger.

8  MS. WICKS: No, I'm talking about the -- the lie is

9  that he never told them that it was his gun.

10  THE COURT: Well, you have totally misled the jury.

11  MS. WICKS: Then I will start over.

12  (Sidebar discussion concluded.)

13  BY MS. WICKS:

14  Q.    Mr. Browne, when you pled guilty, at that point you had

15  never told the government that it was your .9 millimeter that

16  was used to kill Sam Philips, correct?

17  A.    Correct.

18  Q.    When you testified in the grand jury on December 10th of

19  2001, you did not tell the grand jury, in response to any

20  question, that it was your .9 millimeter that had killed

21  Sam Philips, correct?

22  A.    Correct.

23  Q.    And in the grand jury, portions of the facts of your

24  proffer were read to them, correct?

25  A.    Correct.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*1654*

1  Q.    And the fact that you were cooperating and the fact that

2  you had pled guilty to aiding and abetting in the homicide was

3  brought out in the grand jury, correct?

4  A.    Correct.

5  Q.    And at no point in the grand jury did you indicate, in

6  response to any question, that it was your gun that was used to

7  kill Sam Philips, correct?

8  A.    Correct.

9  Q.    In the grand jury, you indicated that you had purchased

10  the gun for $250, correct?

11  A.    Correct.

12  Q.    And that was a lie, correct?

13  A.    Correct. It was a lie.

14  MS. WICKS: Court's indulgence.

15  BY MS. WICKS:

16  Q.    And in the grand jury, you indicated that you sold that

17  same gun for $500, correct?

18  A.    Correct.

19  MS. WICKS: Court's indulgence.

20  BY MS. WICKS:

21  Q.    You were also asked about selling the gun when you

22  testified before the grand jury in February of 2005, correct?

23  A.    Correct.

24  Q.    And when you testified in the grand jury on page 46 --

25  and when you testified in the grand jury on February 24th of

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*1655*

1  2005, you were asked the following question and gave the

2  following answer:

3  "Question: And how much did you sell Dave the Ruger

4  for?"

5  "Answer: 402 clips."

6  That was your testimony, correct?

7  A.    I don't know where they got Dave from, but --

8  Q.    Pardon me?

9  A.    I don't know where the name Dave came up, it should have

10  been Bay.

11  Q.    Well, you're saying -- the thing that the court reporter

12  got wrong was the name of the person, correct?

13  A.    I don't know who got it wrong, but the name should have

14  been Bay.

15  Q.    So you might have gotten it wrong in the grand jury,

16  correct?

17  A.    No, ma'am.

18  Q.    When you described the gun that you purchased from

19  Antwuan in July of 2001 to the FBI, you indicated that it had a

20  wood handle, correct?

21  A.    No, ma'am.

22  MR. LEON: Objection, outside the scope.

23  MS. WICKS: May we approach?

24  THE COURT: Yes.

25  (Following sidebar discussion had on the record:)

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**1664**

1  this connects.

2  MS. WICKS: Your Honor, as he indicated and as I know,

3  numerous times he's been in SMU at the jail --

4  THE COURT: He's been what?

5  MS. WICKS: In SMU, which is the lockdown unit of the

6  jail. And if you're there -- if you get locked down for an

7  incident at CTF -- and based on my investigation he was told he

8  was under investigation because there was marijuana coming in,

9  according to CTF, on his visitors.

10  THE COURT: Well, whether or not he was under

11  investigation, how is that relevant?

12  MS. WICKS: If he's committing criminal conduct --

13  THE COURT: Well, that may be relevant.

14  MS. WICKS: That's where I'm going with this.

15  THE COURT: Well, the question has to be rephrased,

16  whether you've been under investigation is not necessarily

17  relevant. You can ask him, did you bring marijuana in?

18  MS. WICKS: Okay.

19  THE COURT: Go to whatever the criminal conduct is.

20  MS. WICKS: Okay. Okay.

21  THE COURT: Anything else?

22  MR. LEON: Yeah. So, counsel will be allowed to ask if he

23  committed that particular crime, if he had marijuana in the jail

24  in CTF?

25  THE COURT: Do you have a good faith basis for asking?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1665**

1  MS. WICKS: Yes, Your Honor.

2  THE COURT: Yes, why?

3  MS. WICKS: And if the answer is -- let's say the -- I

4  don't know what the answer will be. If the answer is no, will

5  there be any --

6  THE COURT: I guess we have to cross that.

7  MR. LEON: I'm trying avoid the bridge.

8  THE COURT: Trying to avoid what?

9  MR. LEON: The bridge.

10  MS. WICKS: I don't think there's much else I can do about

11  it today.

12  THE COURT: Okay.

13  (Sidebar discussion concluded.)

14  BY MS. WICKS:

15  Q.  Mr. Browne, when you were at CTF, you used marijuana,

16  correct?

17  A.  Yes, ma'am.

18  Q.  When you were at CTF, you had marijuana brought in for

19  you, correct?

20  A.  I used to purchase in the unit.

21  Q.  Pardon me?

22  A.  I used to purchase marijuana in the unit.

23  Q.  Okay. How many times did you purchase marijuana when you

24  were at CTF?

25  A.  Uhm, I would say my first two, three years there.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1666**

1  Q.  Okay. And -- well, the first two, three, years, how many

2  times in that time?

3  A.  I really -- at least once a week, twice a week.

4  Q.  For two or three years, correct?

5  A.  Yes, ma'am.

6  Q.  You never told the government about that, did you?

7  A.  Yes, I did, I did tell them.

8  Q.  When did you tell the government that you were purchasing

9  marijuana at CTF?

10  A.  Naw, I told them I was getting high over at CTF.

11  Q.  When did you tell them you were getting high at CTF?

12  A.  In a debriefing at one time.

13  Q.  Who was present?

14  A.  Uhm, a couple of agents and -- you know, they told me to

15  chill out.

16  Q.  Have you ever been prosecuted for having this marijuana

17  at CTF?

18  A.  No, I never got caught with it, ma'am.

19  Q.  Why did you get locked down at CTF on numerous occasions?

20  A.  Well, two fights, and -- I had got into an altercation

21  with an officer.

22  Q.  One of these fights was with Bobby Capies?

23  A.  Well, I didn't get locked down for that.

24  Q.  But you did have a fight with him, correct?

25  A.  I threw a couple of punches, but it wasn't really a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1667**

1  fight.

2  MS. WICKS: Court's indulgence.

3  BY MS. WICKS:

4  Q.  You were asked about this fight when you testified

5  against Mr. Wilson in December of 2003, correct?

6  A.  Yes, ma'am.

7  Q.  And at that point, Mr. Wilson had a different lawyer,

8  correct?

9  A.  Yes, ma'am.

10  Q.  And you testified on February -- I'm sorry, December 9th

11  of 2003 that the fight was over testifying in this case,

12  correct?

13  A.  Not this case, but the first murder trial.

14  Q.  Well, against -- testifying against Mr. Wilson, correct?

15  A.  Yes, ma'am.

16  Q.  And at that point, Mr. Capies was also at CTF with you,

17  correct?

18  A.  Correct.

19  Q.  And now you're at Arlington with Mr. Capies, correct?

20  A.  Correct.

21  Q.  You have a cousin named Michael Copeland, correct?

22  A.  Yes, ma'am.

23  Q.  What is Michael Copeland's nickname?

24  A.  Mega.

25  Q.  And Mega hung with you on Quarles Street, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1684**

1  A.   No, sir.

2  Q.   He was just a guy -- as far as you know, he was a guy

3  that lived in the same neighborhood as your cousin, right,

4  that's about it?

5  A.   I don't even know if he lived around there, sir.

6  Q.   A guy you saw around there on occasion, right?

7  A.   Yes, sir.

8  Q.   Now, you told us you've been locked up with Season Wood

9  for approximately two years, right?

10  A.   Not approximately, around about.

11  Q.   Fair enough.  And you're locked up on the fourth floor of

12  CTF, right, central treatment facility?

13  A.   Yes, sir.

14  Q.   Now the central treatment facility at CTF, fourth floor

15  is called the hot wing in CTF parlance, in jail parlance,

16  correct?

17  A.   The street call it the hot floor.

18  Q.   The street calls it the hot floor?

19  A.   Yes, sir.

20  Q.   What does that mean?

21  A.   Hot means you working with the government.

22  Q.   Okay.  So if you and Season Wood are both on the same

23  floor, just by virtue of being there, each of you knows the

24  other is working with the government, right?

25  A.   Well, it's different forms of work.  I'm here testifying

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1685**

1  truthfully.  He was actually an informer.

2  Q.   But you knew he was working with the government in this

3  case?

4  A.   No, I assumed.

5  Q.   Okay.  And you and he, as you acknowledged yesterday,

6  spoke with each other frequently; isn't that correct?

7  A.   Yes, sir.

8  Q.   But you never discussed the one thing you had in common,

9  did you?

10  A.   No, sir.

11  Q.   You only talked about -- I think you called it positive

12  things?

13  A.   Kids, yes, sir.

14  Q.   Kids.  Never what you were doing, never how the

15  government was treating you, never what you were hoping to get?

16       MR. LEON:  Objection.

17       MR. ZUCKER:  What, compound?

18       MR. LEON:  Yes.

19       MR. ZUCKER:  Okay.  Fine.

20  BY MR. ZUCKER:

21  Q.   Did you ever discuss with him how the government was

22  treating you?

23  A.   No, sir, just always have to be patient.  That's all we

24  used to tell each other, be patient, these things take time.

25  Q.   What are the things that take time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1686**

1  A.   Just the trial, whatever needed to be done, the

2  procedures.

3  Q.   Okay.  So the procedures around the trial, you discussed

4  with him and being patient about that, right?

5  A.   No, sir, we just --

6  Q.   Isn't that what you just said?

7  A.   We didn't discuss that, we told each other to be

8  patient when we looked sad or we not feeling good for the day.

9  We don't actually discuss the case.

10  Q.   Why don't you discuss the case?

11  A.   I mean, we both cooperating.  It's no sense in discussing

12  the case.  He did what he have to do and I'm going to do what I

13  have to do.

14  Q.   Okay.  It would be inappropriate to discuss the testimony

15  with each other.  You agree with that, right?

16  A.   Agree.

17  Q.   And had you done that, you would tell us the truth about

18  that, right?

19  A.   Yes, sir.

20  Q.   You weren't discussing things with Season Wood to try to

21  get an angle to play, were you?

22  A.   No, sir.

23  Q.   Now, you knew that Season Wood was from that

24  neighborhood, right?

25  A.   I don't know what neighborhood he was from, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1687**

1  Q.   Well, you knew he was a around the way guy from Congress

2  Park, whether he lived there or not, right?

3  A.   I never seen Season Wood in Congress Park before, sir.

4  Q.   You never saw Season Wood in Congress Park?

5  A.   No, sir.

6  Q.   How is it that you saw everybody else in Congress Park

7  and never saw Season Wood?

8       MR. LEON:  Objection.

9       THE COURT:  Sustained.

10  BY MR. ZUCKER:

11  Q.   Well, you identified how many people -- yesterday or two

12  days ago, whenever you started -- as being guys you recognized

13  from Congress Park.

14  A.   I can't remember how many I said, but I know a few -- I

15  mean, pass a few.  Probably I could name ten guys from Congress

16  Park.

17  Q.   Well, you certainly got the six guys here and said they

18  were all the way around guys in Congress Park, right?

19  A.   No, sir.  I said five.

20  Q.   Okay.  And you named at least seven, eight, ten others?

21  A.   Maybe.

22  Q.   And similarly, although not at CTF, you're now

23  incarcerated with Bobby Capies, right, Munya?

24  A.   Munya, yes, sir.

25  Q.   You know he's cooperating in this case, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 271 of 1954

**Page 1688**

1  **A.**   Yes, sir.

2  **Q.**   He knows you're cooperating, as far as you know, right?

3  **A.**   Yes, sir.

4  **Q.**   It's public knowledge, right?

5         MR. LEON:  Objection.

6         THE COURT:  Sustained.

7         THE WITNESS:  I don't know about public.

8  BY MR. ZUCKER:

9  **Q.**   I'll withdraw that, actually.  I apologize for that

10  question.

11        How long have you and Munya been locked up together?

12  **A.**   Uh, I don't -- well, I've been locked up six years --

13  what, you mean together?

14  **Q.**   Together?  Right now you're in Arlington County together,

15  right?

16  **A.**   Yes, sir.

17  **Q.**   You certainly have contact with him, right?

18  **A.**   Yes, sir.

19  **Q.**   And you discuss things with him, correct?

20  **A.**   No, sir.

21  **Q.**   Well, you had enough contact to get into a fist fight

22  with him, right?

23  **A.**   Yes, because words were exchanged.

24  **Q.**   What was the subject -- well, I'll withdraw that.

25        So words were exchanged between you and Munya, you at

Scott L. Wallace, RDR, CRR
Official Court Reporter

**Page 1689**

1  least have -- you have as much contact with Munya as you and he

2  want, right?

3  **A.**   Yes, sir.

4  **Q.**   But of course you never discussed cooperating in this

5  case with him, right?

6  **A.**   He already knew.

7  **Q.**   That wasn't my question.

8  **A.**   Well, can you repeat it for me?

9  **Q.**   Sure.  Did you discuss what you were going to tell the

10  police with him?

11  **A.**   Tell the police?

12  **Q.**   Yes.

13  **A.**   No, sir.

14  **Q.**   Did you not understand that question?  Why did you look

15  so confused?

16  **A.**   Because you said tell the police.

17  **Q.**   Yeah.

18  **A.**   You mean talk to the detectives?

19  **Q.**   Yeah.

20  **A.**   Oh, no, sir.

21  **Q.**   You never discussed that with Bobby Capies, right?

22  **A.**   Right.

23  **Q.**   And you never discussed what he was going to tell the

24  police, right?

25  **A.**   Right.

Scott L. Wallace, RDR, CRR
Official Court Reporter

**Page 1690**

1  **Q.**   And you never sought to find information from him that

2  you could use to your advantage in this case, did you?

3  **A.**   No, because that wouldn't be telling the truth.

4  **Q.**   Oh, that's very important to you, telling the truth,

5  isn't it?

6  **A.**   Yeah, just facts.

7  **Q.**   Just facts, just the truth?

8  **A.**   Things that I know.

9  **Q.**   Well, you got an awful long history of lying to the

10  police and the government, don't you, sir?

11  **A.**   I've been lying the majority of my life.

12  **Q.**   You're a good liar, aren't you sir?

13  **A.**   I don't -- I mean, couldn't have been, didn't get out of

14  this one.

15  **Q.**   You what?

16  **A.**   I couldn't have been, I didn't get out of this situation.

17  **Q.**   Well, you're -- you certainly gave it your best effort,

18  didn't you?

19  **A.**   I tried.

20  **Q.**   Okay.  And you lied and lied and lied, correct?

21  **A.**   Yes, sir.

22  **Q.**   Until you fell upon some lies that they were willing to

23  listen to?

24  **A.**   No, they just was leading to more lies and it wasn't

25  going to help me unless I be truthful.

Scott L. Wallace, RDR, CRR
Official Court Reporter

**Page 1691**

1  **Q.**   Now, you told Ms. Wicks that you had never told the

2  government you got the Beretta from Mr. Ball; isn't that

3  correct?

4  **A.**   Yes, sir.

5  **Q.**   But you -- you don't recall telling them that?

6  **A.**   No, I don't, sir.

7  **Q.**   Well, now, you met with the FBI July 18th, 2001, didn't

8  you, sir?

9  **A.**   I can't recall every date, but around July area, I do

10  recall.

11  **Q.**   Are you -- that was when you were being truthful, right?

12  **A.**   What year?

13  **Q.**   2001.

14  **A.**   No, sir.  I was still lying.

15  **Q.**   Oh, okay, okay.  But do you now recall telling a lie that

16  you bought the Beretta from Mr. Ball?

17  **A.**   No, sir.

18  **Q.**   You never told that lie?

19  **A.**   No, I never told them I bought the Beretta from Mr. Ball.

20        MR. ZUCKER:  Court's indulgence.

21  BY MR. ZUCKER:

22  **Q.**   Would it refresh your recollection -- actually, right now

23  you're saying you don't recall saying that, right?

24  **A.**   Yes, sir.

25  **Q.**   And if you had said that, it would have been a lie,

Scott L. Wallace, RDR, CRR
Official Court Reporter

**1692**

1  right?
2  A.    Yes, because I have seen it on paper.
3  Q.    So you have seen the report where the FBI wrote down that
4  you claimed, at one point, you bought a Beretta from Mr. Ball,
5  right?
6  A.    Yes, sir.
7  Q.    But you just told us a minute ago you never told them
8  that?
9  A.    Yes, I never told them that.
10 Q.    So you have seen it on the paper?
11 A.    And discussed it with them and let them know that I did
12 not buy a Beretta from Antwuan Ball.  I bought a Ruger.
13 Q.    So, the FBI got it wrong in a debriefing, right, and you
14 told them and corrected it, right?
15 A.    A common mistake, yes, sir.
16 Q.    And then the prosecutors who wrote up your plea agreement
17 got it wrong and put it in a plea in front of the judge, right?
18 A.    Yes, sir.
19 Q.    And when you met with the judge and he asked you about
20 it, you didn't correct it then, right?
21 A.    I really thought it was something small, sir, you know,
22 so I did tell my lawyer about it, but after he said he was going
23 to correct it, I just left it alone.
24 Q.    Now, you said when you saw Mr. Ball in the alley a couple
25 days after the murder, he said something to the effect of --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1693**

1  that "I have something for you" or something like that, right?
2  A.    Yes, sir.
3  Q.    And you said, "I hoped it was a gun," right?
4  A.    Yes, sir.
5  Q.    Now, this is a couple of days after the murder of
6  Sam Philips, right?
7  A.    Yes, sir.
8  Q.    And there was a body -- that was your gun.
9  A.    That was used in the murder, yes, sir.
10 Q.    And you wanted a new gun, right?
11 A.    Yes, sir.
12 Q.    Because there was a body on that gun, right?
13 A.    Yes, sir.
14 Q.    Even though you just -- did you regret being involved in
15 that murder?
16 A.    Every day, sir.
17 Q.    But nonetheless, even though you regretted it -- well,
18 did you regret being involved or did you be regret being caught?
19 A.    I just regret helping him take someone's life, sir.
20 Q.    And you regretted it so much that a couple days later,
21 you wanted a new gun?
22 A.    Yes, to protect myself.  That's why I carry a gun.
23 Q.    To protect yourself?
24 A.    Yes, I'm in the drug game.
25 Q.    You weren't planning on killing somebody else with that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1694**

1  new gun?
2  A.    No, sir.
3  Q.    Well, you already had the other gun to protect yourself
4  with, right?
5  A.    It was hot.
6  Q.    And what did you do with that gun?
7  A.    I sold it to my friend Bay.
8  Q.    For a few hundred bucks, right?
9  A.    Yes, sir.
10 Q.    Knowing that it was hot, right?
11 A.    Yes, sir.
12 Q.    Knowing that if that gun was ever traced ballistically,
13 it was going to come back to the Sam Philips murder, right?
14 A.    Yes, sir.
15 Q.    So, if Bay gets caught with that gun and there's a body
16 on it, who's it coming back to?
17       MR. LEON:  Objection, hypothetical.
18       THE COURT:  Sustained.
19 BY MR. ZUCKER:
20 Q.    Well, did it concern you that the gun that you were going
21 to get a few hundred dollars for had a body on it and come back
22 to you?
23 A.    The majority of the guns that you buy on the street are
24 already hot.  That's a chance you take.
25 Q.    That's not the question I asked you, sir.  I didn't ask

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1695**

1  you to give me an opinion about guns on the street.
2  A.    Repeat your question, sir.
3  Q.    The question is this:  Did it concern you that the gun
4  that you were going to make a few hundred dollars for, if it
5  ever got recovered and traced, ballistically, was going to trace
6  back to a murder?
7  A.    At that time, no, I didn't.
8       THE COURT:  We've reached the lunch point.  Did you want
9  to put one or more two questions?
10 BY MR. ZUCKER:
11 Q.    You were willing to take that risk for a couple hundred
12 bucks, right?
13 A.    Not just the risk; I was trying to get rid of it, sir,
14 out of my possession.
15 Q.    Well, you could have gotten rid of it by destroying it,
16 throwing it in the river, throwing it in the garbage where it's
17 not going to come up, right?
18 A.    At the time, Bay said he needed a gun.
19 Q.    So, you were trying to look out for Bay?
20 A.    He said he needed a gun.
21 Q.    You were just trying to be a good citizen, a good friend?
22 A.    Couldn't be a good citizen.  I was selling drugs.
23 Q.    Well, you were trying to be a good friend to your buddy
24 who needed a gun?
25 A.    Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 A.  Yes, sir.  Or I could have went to trial.

2 Q.  Huh?

3 A.  I said, "Or I could have went to trial."

4 Q.  It was stacked up pretty deep against you in terms of the

5 number of charges you were facing.  Right?

6 A.  Pretty much.

7 Q.  I mean, forgetting about RICO and conspiracies, you had a

8 murder that they had you dead on.  Right?

9 A.  I wouldn't know, but...

10 Q.  Why did you plead to it if you didn't think you were going

11 to be convicted?

12 A.  Because I accepted my responsibilities in that murder.

13 Q.  And they also had you on a couple of assault -- two assaults

14 with a dangerous weapon against police officers.  Right?

15 A.  Which was a car, yes, sir.

16 Q.  Okay.  Two times you tried to run over police officers with

17 a car?

18 A.  Not two times.

19 Q.  One time, two police officers?

20 A.  If that's what you say.  But I wasn't trying to even hit the

21 police officers, sir.

22 Q.  You were just trying to get away?

23 A.  Yes, sir.

24 Q.  And the police officers were between you and safety, or you

25 and an escape.  Right?

1 A.   No, because I went around them and drove the car up the

2 sidewalk.   So...

3 Q.   Well, you know that they claim you drove right at them and

4 they had to jump out of the way, and you ended up driving over

5 their motorcycles.   Right?

6 A.   I didn't really get to read the police report, but that's

7 what they might have wrote.

8 Q.   So they lied on you, huh?

9 A.   Yes, sir.

10 Q.   And then there were the other two police officers you

11 discussed, I think it was out on Atlantic Avenue.   Right?

12 A.   One police officer.

13 Q.   That was the time you were supposedly jumping out of the car

14 with a gun?

15 A.   No.   I did climb out the window of a car, and the gun fell

16 on the ground.

17 Q.   Right.   And that police officer accused you of assaulting

18 him with intent -- well, you were indicted on assault with

19 intent to kill.   Right?

20 A.   Well, I didn't get to see the indictment.

21 Q.   What do you mean, you didn't get to see the indictment?   You

22 pled guilty to it, sir.

23 A.   No, because it didn't say assault with intent to kill.

24 Q.   That's what you were charged with, wasn't it?   You knew

25 that.

1 A.   No, that's what they was trying to charge me with.

2 Q.   Had a grand jury indicted you?  Had probable cause been

3 found that you had assaulted, with intent to kill, a police

4 officer?

5 A.   I don't understand your statement.

6 Q.   Sir, you've been charged in countless -- well, at least 10

7 charges.  Right?  And you don't know what an indictment is?

8 A.   I know what an indictment is.  But I still don't understand

9 your statement, what you're saying.

10 Q.   Was there an indictment in your case?

11 A.   It could have been.  15 years ago, I remember AWDs.  AWD --

12 Q.   ADW stands for assault with dangerous -- deadly weapon.

13 Right?

14 A.   Yes, sir.

15 Q.   I'm sorry.  I don't mean to cut you off.  I've got to finish

16 my question, and then you can answer and I'll try not to cut off

17 your answer.  Otherwise, we make her life horrible.  All right?

18        ADW is assault with a deadly weapon.  Right?

19 A.   Yes, sir.

20 Q.   That was what was charged in the incident when you ran over

21 the police officers' motorcycles.  Right?

22 A.   Yes, sir.

23 Q.   The time on Atlantic Avenue was assault, with intent to

24 kill, a police officer.  Right?

25 A.   That's what they tried to charge me with.

1 Q.  My name is Anthony Martin and I represent your cousin,

2 Joseph Jones.

3       Now, we've already established that Mr. Jones is your

4 cousin.  He's your first cousin, in fact.  Right?

5 A.  Yes, sir.

6 Q.  And your father and his mother are siblings.  Right?

7 A.  Yes, sir.

8 Q.  And when you grew up you often spent time at your

9 grandmother's house with Mr. Jones.  Right?

10 A.  Yes, sir.

11 Q.  And Mr. Jones is not only your cousin.  Would it be fair to

12 say he's your friend?

13 A.  Yes, sir.

14 Q.  You like him, don't you?

15 A.  Love him.

16 Q.  And you care a lot about him.  Right?

17 A.  Yes, sir.

18 Q.  Now, I want to that call your attention to the February 6th

19 incident that's been talked about quite a bit here.  And I'm

20 going to ask you to bear with me.

21       It's already been established that there was a white

22 Geo seen leaving the scene of that particular crime.  Right?

23 A.  Yes, sir.

24 Q.  And you had access to that car on that day.  Right?

25 A.  Yes, sir.

1 Q.  And you were in that car; in fact, you were driving.  Isn't

2 that correct, Mr. Browne?

3 A.  Yes, sir.

4 Q.  And you had a gun in your possession at that time.  Correct?

5 A.  Not in my possession.  I passed it to Cool Wop two blocks

6 before that.

7 Q.  But it was your gun.  Right?

8 A.  It was my gun, yes, sir.

9 Q.  And there came a time, sometime in May, when you were taken

10 down to the Violent Crimes Unit at the 7th District and you

11 spoke with Special Agent Steve Sparks and Detective Robert

12 Jackson.  Do you remember that?

13 A.  I was never taken to 7th District police station, sir.

14 Q.  So it's your testimony that you were never taken to the

15 7th District and spoke with Detective Jackson of the Homicide

16 Unit?

17 A.  No, sir.  Yes -- no, sir, I never was taken to 7th District.

18 Q.  Well, would you agree that you met with those police

19 officers, or those law enforcement officers?

20 A.  I met with a lot of FBI and law enforcement officers.  I

21 can't recall all their names.

22 Q.  You don't remember Robert Jackson at all?

23 A.  No, sir.

24 Q.  But you do recall being interviewed by several police

25 officers regarding this incident.  That's clear?

Page 1722

1  A.  Yes, sir.

2  Q.  And on one of the first interviews you had, you remember

3  being questioned about that white Geo.  Right?

4  A.  Yes, sir.

5  Q.  And the reason you were questioned was because the vehicle

6  was seen leaving the scene of that incident on February 6th.

7  Right?

8  A.  Yes, sir.

9  Q.  And you told the police officers in one of those early

10  meetings that you didn't own the vehicle.  Is that correct?

11  A.  Yes, sir.

12  Q.  In fact, you gave them Tamika's name.  Right?

13  A.  Well, I told them I brought it for Tamika.

14  Q.  And Tamika is the mother of your children.  Right?

15  A.  Yes, sir.

16  Q.  But Tamika isn't actually the one who that car is registered

17  to.  It's registered to Mrs. Asafa (ph).  Right?

18  A.  Yes.  That's Tamika's best friend.

19  Q.  And you never told Tamika that the car was used in a crime,

20  did you?

21  A.  No, sir.

22  Q.  And you allowed Tamika to continue to drive that vehicle.

23  Right?

24  A.  No, I told her to really park it, you know.  But she was

25  still using it anyway.

1 Q.  You told her to park it, but you didn't tell her why.

2 Right?

3 A.  Right.

4 Q.  And you didn't tell Mrs. Asafa either, did you?

5 A.  No, sir.

6 Q.  And you knew either one of them might be using that car at

7 any time.  Right?

8 A.  No, sir.  I told her to park it.

9 Q.  But you knew that they might be using the car at any time.

10 Right?

11 A.  They could have.  But I was hoping that they'd really

12 listened to me and parked it.

13 Q.  And you knew that if they were driving the car, that the

14 police were looking for that car.  Right?

15 A.  Yes, sir.

16 Q.  And you told the police in one of those early meetings that

17 there were 10 people who had access to that car on February 6th,

18 2001.  Right?

19 A.  Could have.

20 Q.  You could have?

21 A.  Yes, sir.  If it was 10 or...

22 Q.  And one of the first people, in fact the very first person

23 that you told the police had access to that vehicle, was your

24 cousin who you just sat here and said you cared about deeply.

25 Right?

1 A.   Yes.  I was asked the question, do I let him use my car?

2 And I lied on him and said, yes.

3 Q.   And not only did you tell them that Joseph Jones, your blood

4 cousin, had access to that car.  You also told them that your

5 other cousin, EJ, also had access to that car, didn't you?

6 A.   No, I don't remember saying EJ.

7 Q.   Did you tell them that Earl -- do you have a cousin named

8 Earl?

9 A.   That's EJ's name, yes, sir.

10 Q.   And what's Earl's full name?

11 A.   I don't know EJ's last name.

12 Q.   But he is your cousin.  Right?

13 A.   Yes, sir.

14 Q.   And that was another name that you gave to the police, to

15 indicate that somebody might have had access to that car on

16 February 6th.  Right?

17 A.   No, I don't remember.  But if I did, it was a lie.

18 Q.   And in addition to EJ, you also gave the police David

19 Browne's name, did you not?

20 A.   Yes, sir.

21 Q.   And David Browne is another blood cousin, is he not?

22 A.   Yes, sir.

23 Q.   And this is another person that you care about, isn't it?

24 A.   Yes, sir.  But I do let David Browne drive that Geo.

25 Q.   That wasn't the question, though.  You cared about

Page 1725

1 David Browne, didn't you?

2 A.  I love David Browne.  That's my cousin.

3 Q.  And you knew that David Browne had nothing to do with that

4 February 6th incident.  Right?

5 A.  Yes, sir.

6 Q.  But again, you were trying to divert attention away from

7 you.  Right?

8 A.  Not really.  I was just answering the question truthfully,

9 that I did let him use the car before.

10 Q.  On February 6th, 2001 you knew he hadn't used the car.

11 Right?

12 A.  Yes, sir.

13 Q.  But notwithstanding that, you told the police that these are

14 the people who had access, when you knew they were inquiring

15 about February 6th, 2001.  Right?

16 A.  No, that wasn't a direct question.  They just asked me, who

17 did I ever let use the car?

18 Q.  Well, when they called you down to the police station and

19 started questioning you about February 6th, 2001, didn't you

20 think they were talking about the Sam Phillips murder?

21 A.  I don't remember getting questioned at a police station.

22          MR. LEON:  Do you want to go up to the bench?

23          MR. MARTIN:  Your Honor, may we approach?

24          THE COURT:  Yes.

25          (BENCH CONFERENCE ON THE RECORD.)

1 Q.  You were also asked questions by Mr. Zucker regarding the

2 one occasion that you sold those 60 dimes of crack in Congress

3 Park.  Do you remember that?

4 A.  Yes, sir.

5 Q.  First of all, other than that one time selling those 60 zips

6 of crack, did you ever sell crack in Congress Park any other

7 time?

8 A.  No, sir.

9 Q.  And in response to his question, you said something along

10 the lines of, "No one could come in there and make any sales."

11        Do you remember saying that?

12 A.  Yes, sir.

13 Q.  What did you mean by that?

14 A.  I mean, just general red zones or strips, you know, you

15 just -- basically, the community don't even want you out there,

16 so --

17        MR. ZUCKER:  Objection to what the community wants.

18        THE COURT:  Overruled.

19 A.  Basically, the community don't even want you out there, and

20 you live around there.  So in a lot of areas, they're just not

21 going to let an outsider -- I know on Quarles Street, we not

22 just going to let --

23        MR. ZUCKER:  Objection to "who" and "outsiders," and

24 what they were going to let.

25        MS. WICKS:  Objection.

1 Q.  And then what did you do after you were 18?

2 A.  Moved back to Southeast.

3 Q.  And after 18 when you moved back to Southeast, where did you

4 move to then, what neighborhood?

5 A.  I didn't move in Congress Park until 1991.

6 Q.  We're going to get to Congress Park.  I want you to go in

7 order.

8 A.  Okay.  It was like on Benning Road.  It was no particular

9 development.

10 Q.  Okay.  And I think you just said that you did move to the

11 Congress Park neighborhood at some point?

12 A.  Yes.

13 Q.  And what year was that?

14 A.  1991.

15 Q.  And how old were you in 1991, approximately?

16 A.  31.

17 Q.  Excuse me?

18 A.  31.

19 Q.  31 years old.

20        And may I ask if you have any children?

21 A.  Yes.

22 Q.  How many?

23 A.  One.

24 Q.  What is his or her name?

25 A.  Chanel.

1 late teens?

2 A.  No.  No.

3 Q.  How long did you use powder cocaine?

4 A.  About two years.

5 Q.  And when you say recreationally, how often would you use

6 powder cocaine?

7 A.  At parties.

8 Q.  How often would that be?

9 A.  Every other weekend.

10 Q.  Okay.  Did there come -- are you familiar with crack

11 cocaine?

12 A.  Yes.

13 Q.  Did you ever get addicted to crack cocaine?

14 A.  Yes.

15 Q.  When did you first start using crack cocaine?

16 A.  '89, '90, somewhere around that time.

17 Q.  How old were you around then?

18 A.  30.

19 Q.  And what neighborhood did you live in when you started using

20 crack cocaine?

21 A.  Actually, I lived on Mississippi Avenue when I started.

22 Q.  Okay.  And was this use initially recreational?

23 A.  Yes.

24 Q.  Did it lead to an addiction?

25 A.  Yes, it did.

Page 1810

1 Q.  When would you say you became addicted to crack cocaine?

2 A.  '95.

3 Q.  Okay.  And when you say addicted, what do you mean by that?

4 How often would you use crack cocaine when you were addicted?

5 A.  Every day.

6 Q.  Every day, how often?

7 A.  Sometimes all day, sometimes two or three days at a time.

8 Q.  We're going to ask you to keep your voice up.  It know it's

9 hard, but try to talk into the microphone if you can.

10 A.  Okay.

11 Q.  I think you said you moved to Congress Park in 1991?

12 A.  Yes.

13 Q.  Are you familiar with a map of Congress Park, if we showed

14 you a map of Congress Park?

15 A.  Yes.

16 Q.  Do you remember the address that you lived in when you first

17 moved to Congress Park?

18 A.  Yes.

19 Q.  What was the address?

20 A.  3401 13th Place.

21 Q.  Okay.  3401 13th Place, Southeast?

22 A.  Yes.

23 Q.  And was there an apartment?

24 A.  Yes, there was.

25 Q.  What was the number of that apartment?

Page 1813

1 A.  Yes.

2 Q.  Were you addicted at that time?

3 A.  No.

4 Q.  How often were you using crack cocaine in 1991?

5 A.  Occasionally.  It was recreational.

6 Q.  And when you bought crack cocaine in Congress Park in 1991,

7 in that early period of the 1990s, where did you buy it?

8 A.  I didn't buy it in Congress Park.

9 Q.  Where did you buy it?

10 A.  I had my own connections.

11 Q.  And what was his or her name?

12 A.  I can't even remember.

13 Q.  Was it a man or a woman?

14 A.  It was a man.

15 Q.  And what neighborhood did this connection come from?

16 A.  He came from the old neighborhood I lived in.

17 Q.  Which was what?

18 A.  On Mississippi Avenue.

19 Q.  Did there come a time when you began buying crack cocaine in

20 Congress Park?

21 A.  Yes.

22 Q.  When was this?

23 A.  I'm not sure of the exact date.  It was in '95, somewhere

24 around that time.

25 Q.  Okay.  And I believe you said in 1995 is when you became

1          MR. ZUCKER:  I'm sorry, ma'am.  We're having

2 difficulty --

3 A.  I wanted to run my own program.

4 BY MR. LEON:

5 Q.  What do you mean by that?

6 A.  I wanted to do things my way instead of the way it was

7 suggested by the program, and I failed.

8 Q.  And by failed, you mean what, went back to crack?

9 A.  I went back, yes.

10 Q.  And you said there was a third time?

11 A.  Yes.

12 Q.  Was that successful?

13 A.  Yes.

14 Q.  When did you successfully -- are you an addict today?

15 A.  No.

16 Q.  When is the last time that you can remember using crack?

17 A.  2000.

18 Q.  Sometime in 2000?

19 A.  Uh-huh.  2000, 2001, somewhere around that time.

20 Q.  Do you remember when -- the circumstances as to how you

21 entered that program?

22 A.  I was court-ordered.

23 Q.  Court-ordered?

24 A.  Yes.

25 Q.  Do you remember what court?

1 A.  He said that it's up to me to determine my fate at the end

2 of this, if I wanted to be set free or if I want to go to jail.

3 If I wanted to be set free, I would have to complete the program

4 successfully.

5 Q.  And what kind of program was it?  How long was the program?

6 A.  It was an inpatient program.  It was for three months.

7 Q.  And did you -- inpatient, meaning you had to stay inside?

8 A.  I stayed there, yes.

9 Q.  And when you got out of that program, whenever that was, did

10 you use drugs, crack, after that?

11 A.  No.

12 Q.  Without telling us where you live today, do you live in D.C.

13 today?

14 A.  No, I do not.

15 Q.  Do you live outside of the greater D.C. area?

16 A.  Yes, I do.

17 Q.  Without telling us where you live, do you live near D.C. or

18 not near D.C.?

19 A.  Not near D.C.

20 Q.  And tell us how you ended up leaving the D.C. area.

21 A.  Because I'm a cooperating witness for the FBI.

22 Q.  And?

23 A.  And I had to be moved for my safety.

24         MR. ZUCKER:  Objection.  Withdrawn.  Withdrawn.

25 BY MR. LEON:

Page 1819

1 Q.  And do you know who moved you?

2 A.  Yes.

3 Q.  Who?

4 A.  The FBI.  I'm in the Protective Witness Program.

5 Q.  Keep your voice up, please.

6 A.  The Protective Witness Program.

7 Q.  Do you know who paid for you to get moved?

8 A.  The FBI.

9 Q.  Okay.  And do you know exactly how much money was involved

10 in getting you moved from --

11 A.  No.

12 Q.  -- D.C. to where you are now?

13 A.  No.

14 Q.  Did you directly receive some money in connection with that

15 move?

16 A.  Yes.

17 Q.  Tell us about the money that you directly received in

18 connection with you moving to where you are now.

19 A.  Because I had to move so abruptly, I left everything.  I

20 didn't have anything where I moved to, where I am now, and I

21 needed to start over.

22 Q.  So what --

23 A.  So they gave me money to start over, to buy furniture,

24 clothing, things like that.

25 Q.  Were you given assistance in --

Page 1820

1 A.  Assistance in my rent, yes.

2 Q.  Does the FBI pay for your rent today?

3 A.  No.

4 Q.  Did the FBI pay for your rent initially when you moved?

5 A.  They paid the first month's rent and security deposit, yes.

6 Q.  After that, did they pay the second month?

7 A.  No.

8 Q.  Do you remember how much money you were given for the

9 furniture and things like that?

10 A.  All together, I think I received $3,000.

11 Q.  In connection with that?

12 A.  Yes.

13 Q.  Do you remember the day that you moved out of Congress Park?

14 A.  Yes.

15 Q.  What was the day?

16 A.  March the 24th, 5th, somewhere around there.

17 Q.  Of what year?

18 A.  2005.

19 Q.  And why do you remember that it was around that time in

20 March of 2005?

21 A.  Because I was coming up on three years on my job.

22 Q.  And what job were you working at that time?

23 A.  At D.C. Public Schools.

24 Q.  And at that time what job were you working at D.C. Public

25 Schools?

Page 1821

1 A.  As a food service worker.

2 Q.  And after you moved in March, late or so March of 2005, did

3 you keep that job?

4 A.  No.

5 Q.  Why not?

6 A.  I relocated.

7 Q.  To the place that you moved to?

8 A.  Yes.

9 Q.  Okay.  Now let's get back to you living in Congress Park in

10 the mid-90s.  Okay?

11 A.  Yes.

12 Q.  I think you said you became an addict in 1995.  Is that

13 correct?

14 A.  Yes.  Somewhere around there, yes.

15 Q.  At that time when you were addicted, I believe you said you

16 were using crack cocaine every day?

17 A.  Yes.

18 Q.  On a given day, how much would you consume?  How much would

19 you use?

20 A.  It's hard to say.  I could smoke anywhere from a 20 to 120.

21 Q.  Please keep your voice up.

22 A.  I could smoke anywhere from a 20 to 120.  So it varied.

23 Q.  What's a 20?

24 A.  Two dimes.  Two dimes.

25 Q.  And you said up to 120.  That would be how much?

Page 1822

1 A.   12 10-dollar bags.

2 Q.   And what would decide whether or not on a given day you

3 would smoke 20, two zips, or 12 zips?

4 A.   It depends on if I had company or if I had money.

5 Q.   Let's break that down.  How would the company you had

6 determine whether or not -- how much you consumed on a given

7 day?

8 A.   Yes.

9 Q.   How?  How would the company make a difference?

10 A.   Because they would have money to spend, and that's how I got

11 high.

12 Q.   And what kind of company -- when you say "company," what

13 kind of company do you mean?

14 A.   Male, female, it didn't matter.

15 Q.   And would those people be the people bringing the money?

16 A.   Yes.

17 Q.   And I think you also said it also depended on how much money

18 you had yourself at the time?

19 A.   Sometimes I didn't have any.

20 Q.   Well, let me ask you about that.  Did you have money at

21 times?

22 A.   Yes.

23 Q.   And where would you get the money to buy crack for yourself?

24 A.   I got a check every month.

25 Q.   What kind of check?

1 A.  A welfare check.

2 Q.  Okay.  And when would you get that welfare check, what time

3 of the month?

4 A.  The 1st of the month.

5 Q.  Did you have any other ways of getting money at that time?

6 A.  Yes.

7 Q.  What?

8 A.  Sex.

9 Q.  What do you mean by that?

10 A.  I would exchange sex for money.

11 Q.  Anything else other than the two things you just mentioned?

12 A.  I mean, I was an addict.  I stole, I mean...

13 Q.  What kind of things would you steal?

14 A.  Money.

15 Q.  Did you ever steal before you were an addict?

16 A.  No.

17 Q.  Now, the company that you talked about, males or females

18 would come over, I think you said they had money.  Tell us what

19 would happen.  If they came with money, how would that help you

20 get drugs?

21 A.  I would go purchase it for them.

22 Q.  And why would you purchase their drugs for them?

23 A.  Because a lot of times they didn't know the person or they

24 didn't know -- they were outsiders.

25 Q.  And so what does that mean?

1 A.  That they didn't know anybody in the neighborhood.

2 Q.  And did you at that point -- let's talk about the mid-1990s.

3 Did you know people in Congress Park?

4 A.  Yes.

5 Q.  Did you know people who sold drugs in Congress Park?

6 A.  Yes.

7 Q.  And did you become familiar with people who sold drugs in

8 Congress Park in the mid-90s?

9 A.  Yes.

10 Q.  How did you become familiar with the people who sold drugs

11 in Congress Park in the mid-90s?

12 A.  Just asked different people.  I had a couple of girlfriends

13 that lived in Congress Park that knew.

14 Q.  Okay.  Let's focus on that period of time, the mid-90s or

15 so.  Who were those girlfriends?  What were their names or

16 nicknames?

17 A.  Lona and Carol.

18 Q.  Was the first name Lona, L-O-N-A?

19 A.  Yes.

20 Q.  And Carol?

21 A.  Carol.

22 Q.  Anybody else?

23 A.  There's quite a few.  Angie.  But I met them through Carol

24 and Lona, so... basically it was just us two.

25 Q.  And what about men?  Did you become familiar with any of the

1 men who sold drugs in Congress Park around that time?

2 A.  Yes.

3 Q.  Tell us some of the names of people you remember who sold

4 drugs in Congress Park at that time in the mid-1990s that you

5 dealt with.

6 A.  I mean, it's quite a few of them.  Boy-Boy.

7 Q.  We're going to ask you to keep your voice up and please take

8 your time.  But please keep your voice up.

9 A.  Cool Wop, Jojo.  Like I said, it's just a lot of them.

10 Q.  Okay.  Well, we're going to ask you -- you said a lot, so we

11 want to know who they are.  Take your time, and I'm going to ask

12 you who you mean.

13        You've mentioned three people.  You said Boy-Boy,

14 Cool Wop, and Jojo.

15 A.  Burt.

16 Q.  Say that name again.

17 A.  Burt.

18 Q.  Burt.  You said a lot, and you just named four people.  Are

19 there more people than that?

20 A.  Yes.

21 Q.  Okay.  You're hesitating.  Is there a reason you're

22 hesitating?

23 A.  I'm tired, really.  I'm really not feeling well, so I'm

24 doing the best I can.

25 Q.  Okay.  That's all we're asking right now.  But are there

1 other people that you're not mentioning?

2 A.  Yes, there are.

3 Q.  Well, I'm going to ask you to give it some time right now as

4 best you can to try to remember those other people.  Just take

5 your time.

6 A.  Santuce (ph), Jazz, DC, Don.

7 Q.  As you sit here, can you think of other names right now?

8 A.  No, not at this time.

9 Q.  Are there other names?

10 A.  Yes, there are.

11 Q.  Well, let's start with the people you did mention.  You

12 mentioned Boy-Boy.  In, let's start in mid-1990s, 1995, did you

13 have -- did you buy drugs from Boy-Boy?

14 A.  Yes.

15 Q.  You also mentioned somebody by the name of Cool Wop.  In the

16 mid-90s, did you ever buy drugs from Cool Wop?

17 A.  Yes.

18 Q.  And each time I'm using the word "drugs," I'm referring to

19 crack cocaine.

20 A.  Crack cocaine.

21 Q.  Is that what you're referring to?

22 A.  Yes.

23 Q.  You also mentioned the name Jojo.  In the mid-1990s, did you

24 purchase crack cocaine from Jojo?

25 A.  Yes.

Page 1827

1 Q.  And you said Burt, yes?

2 A.  Yes.

3 Q.  And in the mid-1990s, did you buy crack cocaine from Burt?

4 A.  Yes.

5 Q.  You mentioned the same Santuce?

6 A.  Yes.

7 Q.  And in the mid-1990s, did you buy drugs from Santuce?

8 A.  Yes.

9 Q.  Same question for Jazz.

10 A.  Yes.

11 Q.  You bought drugs from Jazz?

12 A.  Yes.

13 Q.  And DC?

14 A.  Yes.

15 Q.  And Dom?

16 A.  Yes.  And Dazz.

17        MR. BALAREZO:  Objection, Your Honor.  Can we approach?

18        THE COURT:  Yes.

19        (BENCH CONFERENCE ON THE RECORD.)

20        MR. BALAREZO:  Your Honor, the witness testified Don,

21 not Dom.

22        MR. LEON:  It was not intentional.

23        MR. BALAREZO:  Well, so I ask that that be stricken,

24 because that was not her testimony and it's putting something in

25 front of the jury that was not brought out by this witness.

1          MR. LEON:  I'll definitely clear it up.  It wasn't

2 intentional.

3          (END BENCH CONFERENCE.)

4          THE COURT:  Ladies and gentlemen, I'm going to strike

5 the very last question and answer, but I'll let the prosecutor

6 proceed.  With respect to the very last question and answer,

7 please do not consider it at any point.

8 BY MR. LEON:

9 Q.  Ms. Parson, you're not the only one who's tired today.

10 A.  I'm sure.

11 Q.  Did you say Don with an "N"?

12 A.  Yes.

13 Q.  Thank you.  And did you buy drugs, crack cocaine, from Don?

14 A.  Yes.

15 Q.  Well, let's start there.  You said Don.  Do you see Don in

16 the courtroom today?  And if you need to get up, I know it may

17 be difficult, but I'm going to ask you to stand if you need to.

18 A.  Yes.

19          THE COURT:  If you want to stand, and can, you may.

20 A.  Yes.

21 BY MR. LEON:

22 Q.  Do you see him in the courtroom?

23 A.  Yes.

24 Q.  Can you please point Don out based on his location and an

25 article of clothing that he's wearing?

1 A.  He's wearing a blue shirt and a tie, right back there.

2 Q.  For the record, you pointed towards a man who's wearing a

3 blue shirt and a tie, and he has his hand on his chin?

4 A.  Yes.

5        MR. LEON:  Your Honor, may the record reflect the

6 in-court identification of the defendant, Dominic Samuels?

7        MR. BALAREZO:  No objection.

8        THE COURT:  Request is granted.

9 BY MR. LEON:

10 Q.  I'm going to try not to make you yo-yo.  I apologize.  You

11 mentioned someone by the name of Jojo.  Do you see Jojo here in

12 the courtroom today?

13 A.  Yes.

14 Q.  Can you please point him out based on his location and an

15 article of clothing he's wearing?

16 A.  He's wearing a black shirt, tie, and glasses, a black shirt,

17 tie, and glasses.

18 Q.  The gentleman who just stood up behind me?

19 A.  Who stood up, yes.

20        MR. MARTIN:  No objection.

21        MR. LEON:  May the record reflect the in-court

22 identification of Mr. Joseph Jones?

23        THE COURT:  Request is granted.

24 BY MR. LEON:

25 Q.  You mentioned somebody by the name of Cool Wop.  Do you see

1 Cool Wop here in the courtroom today?

2 A.   Yes.   He has on --

3 Q.   Where is he?

4 A.   He has on a beige sweater and a green shirt.

5 Q.   The gentleman who's standing up right now?

6 A.   Yes.

7         MR. LEON:   Your Honor, may the record reflect the

8 in-court identification of the defendant David Wilson?

9         MS. WICKS:   No objection, Your Honor.

10        THE COURT:   Request is granted.

11 BY MR. LEON:

12 Q.   You also mentioned somebody by the name of Boy-Boy.   Is that

13 correct?

14 A.   Yes.

15        MR. BEANE:   Your Honor, we will stipulate that this is

16 Mr. Bell here at the table.

17 BY MR. LEON:

18 Q.   Is that right?   Is that the person you know to be Boy-Boy?

19 A.   Yes.

20        MR. LEON:   Your Honor, may the record reflect the

21 in-court identification of defendant Gregory Bell?

22        THE COURT:   Request is granted.

23 BY MR. LEON:

24 Q.   Now, I believe you also mentioned -- do you know somebody by

25 the name of Dazz?

1 A.  Yes.

2 Q.  Did you mention Dazz earlier?

3 A.  Yes.

4 Q.  Do you see the person you know to be Dazz here in the

5 courtroom today?

6 A.  Yes.

7 Q.  Can you please point Dazz out based on --

8        MR. ZUCKER:  Stipulate to the identification of

9 Mr. Thurston as Dazz.

10 BY MR. LEON:

11 Q.  Is that right?  Is that Dazz?

12 A.  Yes.

13        MR. LEON:  Your Honor, may the record reflect the

14 in-court identification of Mr. Thurston?

15        THE COURT:  Request is granted.

16 BY MR. LEON:

17 Q.  Do you know somebody by the name of Antwuan Ball?

18 A.  Yes.

19 Q.  Do you see Antwuan Ball here in the courtroom today?

20 A.  Yes.

21 Q.  Where is he?

22 A.  He's standing right there with the beige shirt, white shirt

23 on, and tie.

24 Q.  The man who's standing?

25 A.  The man who's standing, yes.

1          MR. LEON:  Your Honor, may the record reflect the

2 in-court identification of Mr. Antwuan Ball?

3          THE COURT:  Any objection?

4          MR. CARNEY:  No, Your Honor.

5          THE COURT:  Request is granted.

6 BY MR. LEON:

7 Q.  Now, did there come time, Ms. Parson, in late 2000 when you

8 were approached by people who worked for the FBI?

9 A.  Yes.

10 Q.  Who were the people who approached you in late 2000?

11 A.  Kyle.  An agent by the name of Kyle Fuller (sic).

12 Q.  Kyle Fuller?

13 A.  Yes.

14 Q.  Anybody else with him, or was he alone?

15 A.  It was two other agents.  I can't remember their name right

16 now.

17 Q.  Okay.  But he was with another agent?

18 A.  Yes.

19 Q.  Do you know an agent named Rob Lockhart?

20 A.  Yes.

21 Q.  Was it Rob Lockhart or someone else?

22 A.  Someone else.

23 Q.  Okay.  And did you know who these people were when they

24 first approached you?

25 A.  No, I did not.

1 Q.  Where were you and where were they when they approached you?

2 A.  I was at home, and they knocked on my door and told me that

3 I needed to come with them.  It was something concerning a

4 shooting that took place outside my window.

5 Q.  Was there a shooting that happened outside --

6 A.  Yes, there was.

7 Q.  How earlier was that shooting in relation to them coming to

8 your home?

9 A.  Within a week.

10 Q.  And did you know anything about that shooting?

11 A.  No.

12 Q.  And did you tell them that?

13 A.  Yes.

14 Q.  Did you tell them that in your apartment or --

15 A.  Yes, I did.  I told them I didn't know anything about it,

16 and they said, well, you still need to come with us.

17 Q.  And did you go with them?

18 A.  Yes.

19 Q.  And were you handcuffed?

20 A.  No.

21 Q.  And where did you go?  Do you know where you went?

22 A.  To the FBI building.

23 Q.  And do you know generally where that is in -- is it in D.C.?

24 A.  Yes, it is.

25 Q.  Do you know where?

1 A.  Down the street.  I'm not sure.  I don't know exactly the

2 address.

3 Q.  Okay.  Tell us what happened once you got down to the FBI

4 building with those two agents.

5 A.  They carried me in a room and they told me that they had

6 pictures, audio, and video of me selling -- buying and selling

7 crack cocaine.

8 Q.  And?

9 A.  And that I was being charged with conspiracy.

10 Q.  Did you get charged that day?

11 A.  Yes, I did.

12 Q.  You got charged by the FBI agents that day?

13 A.  Yes.

14 Q.  Did you go to jail that day?

15 A.  No.

16 Q.  Did you go to a judge that day?

17 A.  No.

18 Q.  Did you get fingerprinted or a photograph taken of you that

19 day?

20 A.  No.

21 Q.  Did you go home that day?

22 A.  Yes.

23 Q.  How long were you at the FBI that day when you met up with

24 Kyle and the other agent whose name you can't remember?  How

25 many hours were you there?

1 A.  I really can't tell you.  I was in shock.

2 Q.  Why were you in shock?

3 A.  I just never thought that the FBI would knock on my door and

4 charge me with conspiracy.

5 Q.  Okay.  And when you learned that they were going to bring

6 these charges, what if anything did they say to you?

7 A.  They told me that if I became a cooperating witness and to

8 help them take down some of the drug activity in my

9 neighborhood, that it wouldn't guarantee me no time, but it

10 would -- they would talk in favor towards the judge and me

11 serving less time.

12 Q.  And what if anything did you say to them at that time?

13 A.  I agreed.  But it was awhile before it actually took place,

14 because I was ducking them.

15 Q.  You were what?

16 A.  Ducking them.

17 Q.  Why were you ducking them?

18 A.  Because it was something that I didn't really want to do --

19 Q.  Why not?

20 A.  -- but I didn't want to go jail, neither.

21 Q.  Well, why didn't you want to help the FBI?

22 A.  Because I was afraid.

23 Q.  Of what?

24 A.  Afraid of a lot.  I mean, I was an addict.  I wasn't

25 thinking clearly like I am now, so, I mean, I really can't tell

1 A.  No.

2 Q.  And you said there were about 20 times you wore a wire.  Was

3 it more towards the end or the middle or the very beginning of

4 when you finally entered into that plea agreement before the

5 judge?

6 A.  Towards the end.

7 Q.  During this initial time that you agreed to wear the wire

8 and agreed to cooperate, did the FBI, Kyle and that other agent

9 whose name you can't remember, did they give you anything?  Did

10 they help you out at all?

11 A.  Yes.

12 Q.  Tell us how they helped you out.

13 A.  I had an outstanding electric bill, about four thousand,

14 five thousand dollars, and PEPCO had came to turn it off and

15 take the meter.  And I was in need of two thousand something

16 dollars to get it back on, so I called and they helped me out.

17 Q.  How did you run up an electric bill of four or five thousand

18 dollars?

19 A.  They turned it off, I turned it back on.

20 Q.  Did you have permission to turn it back on?

21 A.  Huh-uh.

22 Q.  You have to say yes or no.

23 A.  No.  I'm sorry, no.

24 Q.  And how long was it on unauthorized?

25 A.  Oh, it went at that point for about two or three years

1 before they caught up with me.

2 Q.  And who is "they"?

3 A.  PEPCO.

4 Q.  And what happened when PEPCO caught up with you?

5 A.  They took the meter.

6 Q.  Did you have electricity then?

7 A.  Yes.

8 Q.  How did you get electricity then?

9 A.  How?

10 Q.  Yeah.  After PEPCO got wind of what you were doing, how did

11 you get the electricity back?

12 A.  I called Kyle and told him what had happened, and he asked

13 me how much did I need and I told him.  And he made arrangements

14 for me to get the money to pay the bill.

15 Q.  Did he give you the money directly?

16 A.  Yes.

17 Q.  Did he give you $4,000 all at once?

18 A.  No.

19 Q.  What did he give you?

20 A.  I think I needed 1,500 to get it back on, between 15 and two

21 thousand.  He gave me that much.

22 Q.  And then did you get the electricity back on?

23 A.  Yes.

24 Q.  And then did you pay off that bill eventually?

25 A.  Little by little, yes.

1 Q.  Did you pay it or did Kyle pay it for you?

2 A.  Both.  I paid some on it and he paid some on it.

3 Q.  In addition to this electric bill problem you had, did Kyle

4 or any of the other agents help you out in any other ways with

5 money around this time?

6 A.  Yes.

7 Q.  What other money did you get from --

8 A.  For phone, for telephone.

9 Q.  What kind of telephone?

10 A.  House phone.

11 Q.  Not a cell phone?

12 A.  No.  House phone.

13 Q.  What did you -- were you using that phone for any reason?

14 A.  Yes.

15 Q.  What?

16 A.  To contact them.  I had to make a daily call.

17 Q.  And did you make daily calls to Kyle?

18 A.  Yes.

19 Q.  Did you use that phone for any of the purchases you made?

20 A.  Yes.

21 Q.  How did you use that phone to make the purchases you made

22 for the FBI?  That's a silly question.  Let me withdraw that.

23        Did you have a cell phone at that time?

24 A.  No.

25 Q.  Okay.  So you've mentioned paying your phone bill, you've

# Tab 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                :
          Plaintiff,                     :  Docket No. CR 05-100
          v.                             :
ANTWUAN BALL, DAVID WILSON,              :  Washington, DC
GREGORY BELL, DESMOND                    :
THURSTON, JOSEPH JONES, and              :  March 7, 2007
DOMINIC SAMUEL,                          :  9:49 a.m.
          Defendants.                    :
                                         :
                                         :
                                         :
                                         :

VOLUME 13 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **WEDNESDAY MORNING SESSION, MARCH 7, 2007**

2   (9:49 a.m.)

3        THE COURT:  Is your witness present?

4        MR. LEON:  Yes, Your Honor.

5        THE COURT:  Let's get her in the witness stand.

6        MR. LEON:  I was going to ask, actually, if we don't have

7   any preliminary issues, I was going to ask if we could actually

8   try to get her in the witness stand today.

9        THE COURT:  All right.  Mr. Leon, are you ready for the

10  jury?

11       MR. LEON:  Yes.

12       (Jury in at 9:53 a.m.)

13       THE COURT:  Good morning, ladies and gentlemen.

14       THE JURY PANEL:  Good morning.

15       THE COURT:  Welcome back.  We're ready to resume.

16       Counsel.

17       MR. LEON:  Thank you, Your Honor.

18       CONTINUED DIRECT EXAMINATION OF GAIL PARSON

19  BY MR. LEON:

20  **Q.**    Good morning, ma'am.  In a loud voice again, so we can

21  hear you, and for the benefit of our other court reporter this

22  morning, can you please state your full name loudly and spell

23  your full name loudly for the record.

24  **A.**    Gail Parson.  G-A-I-L, P-A-R-S-O-N.

25  **Q.**    And, Ms. Parson, do you understand that you are still

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1862**

1  **A.**  Yes.

2  **Q.**  Can you point to the approximate area where you see where

3  he lived.

4  **A.**  (Indicating.)

5  **Q.**  Okay.  Looks like an upside down T.

6  **A.**  (Indicating.)

7  **Q.**  Okay.  Try not to clear the screen again because we need

8  to make a record.

9  **A.**  All right.

10  **Q.**  It looks like you made a line -- where did you point to?

11  **A.**  It's an apartment building.  It's closest to the corner.

12  **Q.**  Okay.  So is it at the top or the bottom of the line you

13  drew?

14  **A.**  At the bottom of it.

15  **Q.**  Okay.  And is it fair to say it's also at the corner of

16  13th Place and Congress Street on the lower right-hand portion

17  of that intersection?

18  **A.**  Yes.

19  **Q.**  Okay.  Was there another name for that building?

20  **A.**  It was the Rental Office at one time.

21  **Q.**  Okay.  Do you know where inside the Rental Office David

22  Wilson lived?

23  **A.**  On the third floor.

24  **Q.**  Do you know the exact apartment number?

25  **A.**  303.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1863**

1  **Q.**  Had you been inside that apartment?

2  **A.**  Maybe once or twice.

3  **Q.**  Had you been outside of that apartment?

4  **A.**  Yes.

5  **Q.**  How many times had you been just outside of that

6  apartment?

7  **A.**  Ten, 20.  I don't know.

8  **Q.**  Do you know somebody by the name of Ed Martin?

9  **A.**  Yes.

10  **Q.**  Who is Ed Martin to you?

11  **A.**  He's a friend of mine.

12  **Q.**  Whether did you first know -- get to know Ed Martin?

13  **A.**  Late '90s.

14  **Q.**  Okay.  And for how long of a period of time did you know

15  Ed Martin?

16  **A.**  Many years.

17  **Q.**  Many?

18  **A.**  Um-hmm.

19  **Q.**  You have to say "yes" or "no."

20  **A.**  Yes.

21  **Q.**  And what was the nature of your relationship with him?

22  **A.**  We got high together.

23  **Q.**  Anything else?

24  **A.**  I mean, we were intimate with one another.

25  **Q.**  And when you say you "got high together," did he -- was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1864**

1  he also an addict?

2  **A.**  Yes.

3  **Q.**  Did he -- did you ever buy drugs from him?

4  **A.**  No.

5  **Q.**  But you would use drugs with him?

6  **A.**  Yes.

7  **Q.**  Approximately -- did you -- withdrawn.

8     Did you get high with him frequently or infrequently?

9  **A.**  Frequently.

10  **Q.**  And were you ever with Ed Martin when he would get drugs

11  for the two of you?

12  **A.**  No.

13     MS. WICKS:  Objection; assumes facts in evidence.

14     THE COURT:  Sustained.

15  BY MR. LEON:

16  **Q.**  Okay.  When you and he would get high, who would get the

17  drugs?

18  **A.**  Either one of us.  Either me or him.

19  **Q.**  And to your -- in your mind, do you know who he got his

20  drugs from?

21     MR. ZUCKER:  Objection, basis.  It has to be hearsay.

22     MR. LEON:  I can ask a foundational.

23  BY MR. LEON:

24  **Q.**  Where you ever with him when he got drugs for the two of

25  you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1865**

1  **A.**  No.

2  **Q.**  Okay.  Did you -- when you were with him, who would

3  usually be more likely to buy the drugs, you or him?

4  **A.**  Me.

5  **Q.**  Okay.  And do you know -- and who would usually be --

6  between you and Ed Martin, between the two of you, who would be

7  the more likely to have the money to get the drugs, you or him?

8  **A.**  He would.

9  **Q.**  And when you and he would get high together, where would

10  you do that physically?  Where would you be to get high?

11  **A.**  Either my apartment or motel.

12  **Q.**  And when you and he would get high together, how long

13  would that last?  Hours or more?  How long would you be together

14  during the time you would get high with him?

15  **A.**  Sometimes days, sometimes weeks.

16  **Q.**  Did you ever -- in your mind, did Ed Martin have a lot of

17  money?

18  **A.**  Yes.

19  **Q.**  Why'd you think that?

20  **A.**  I was the one making the purchases and I knew about how

21  much money he have.

22  **Q.**  How much money would he give you for a typical session

23  when you would get high together?

24  **A.**  Anywhere from 3 to $500.

25  **Q.**  Do you know if he had a job?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1866

1   MR. BALAREZO:  Your Honor, I'm going to object to this
2   line as irrelevant.
3       THE COURT:  I'll allow it.
4   BY MR. LEON:
5   Q.   Do you know?
6   A.   Yes.
7   Q.   And not based on anything that he said -- is it only
8   based on something that he said to you or do you know otherwise
9   how he got a job?
10  A.   Yes, I knew he had a job.  I would call him at work
11  sometimes.
12  Q.   Did you ever take anything from Ed Martin?
13  A.   Yes.
14  Q.   Tell us about that.
15  A.   He came over my house and he gave me his bank card, which
16  he would do often to go to the bank to withdraw money.  And I
17  went to the bank to withdraw the money and there wasn't any
18  money in the bank, but I knew he had money because I'd seen it
19  earlier that day.
20  Q.   Where'd you see it earlier that day?
21  A.   He had it on him in my apartment.
22  Q.   So what'd you do?
23  A.   He spent some and then left because he was looking for
24  somebody to spend time with him.  And he came back and that's
25  when he gave me the bank card to go to the bank, so I knew he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1867

1   had money.
2   Q.   So first of all, how much money did you take on this time
3   you're talking about?
4   A.   It was $3,000, I think.
5   Q.   And just so the record's clear, was this money you got
6   off of the bank card or money you got physically somewhere else?
7   A.   Physically somewhere else.
8   Q.   And where was this physical place somewhere else that you
9   got the money, this $3,000?
10  A.   Out of his car.
11  Q.   Okay.  What kind of car was this?
12  A.   A Mercedes.
13  Q.   What kind of Mercedes?
14  A.   I don't know the difference between sizes.
15  Q.   Neither do I.
16      MR. ZUCKER:  I'm sorry.  I can't --
17      THE WITNESS:  I was saying I don't know the difference.
18  BY MR. LEON:
19  Q.   I'm sorry.  Finish your answer.
20  A.   I don't know the difference between sizes.  It was a
21  Mercedes.
22  Q.   Was it a car or not a car?
23  A.   It was like a little minivan.
24  Q.   Okay.  Do you remember when this was, roughly?
25  A.   No, I can't remember that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1868

1   Q.   Okay.  And how did you get in the car?
2   A.   He gave me the keys.
3   Q.   Was anyone with you when you did this?
4   A.   Yes.
5   Q.   Who?
6   A.   Dazz.
7   Q.   And did you keep all that $3,000?
8   A.   No, we split it.
9   Q.   You and Dazz?
10  A.   Yes.
11  Q.   Do you know if Dazz knew Ed Martin?
12  A.   Yes.
13  Q.   How do you know that?
14  A.   I introduced them.
15  Q.   Now, I believe we also, when we last left off --
16      Actually, before we do that, I'm going to ask and see if
17  I can show you a couple of things.
18      May I approach, Your Honor?
19      THE COURT:  Yes.
20  BY MR. LEON:
21  Q.   Ms. Parson, I'm going to show you what's marked for
22  identification as 108.40.  I'm going to ask you to take a look
23  at that, tell me if you recognize any of the people in that
24  photograph.
25      First just yes or no, do you recognize the people in the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1869

1   photo?
2   A.   Yes.
3   Q.   And why don't we go from -- how many people are in the
4   photo?
5   A.   Four.
6   Q.   Do you recognize all four?
7   A.   I recognize two, three.
8   Q.   Three?
9   A.   Yes.
10  Q.   From left to right, which three do you recognize?
11  A.   The three that are standing together.
12  Q.   Okay.  And who are the -- for the record, who are the
13  three that are standing together?
14  A.   Antwuan, Cool Wop and Phil.
15  Q.   Okay.  And the person that you don't recognize is on
16  which side of the photograph?
17  A.   The left.
18  Q.   Okay.  And do the three people you recognize, the people
19  you just identified, are they -- is Antwuan the same Antwuan you
20  recognized and identified yesterday?
21  A.   Yes.
22  Q.   And is Cool Wop the same person you identified for us
23  yesterday?
24  A.   Yes.
25  Q.   I'm not sure if you talked about Phil yesterday, so why

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1870

1   don't you just tell us, who is Phil?
2   **A.**   Dazz's brother.
3       MR. LEON: Your Honor, at this time I move for the
4   introduction of Government's 108.40.
5       MR. BEANE: There's an objection. I don't think she
6   identified two other people in the photograph.
7       THE COURT: Any other objection?
8       MR. BEANE: No.
9       MR. TABACKMAN: Your Honor, we don't have a time or place
10   that's relevant. We object on relevance.
11       THE COURT: All right. Any other objection?
12       MR. TABACKMAN: Lack of foundation.
13       THE COURT: Are you going to connect up the relevance?
14       MR. LEON: I think I already have, but I'm going to
15   continue to talk about the three people she's identified.
16       THE COURT: All right. I'll overrule the objection and
17   admit 108.40.
18       (Government's Exhibit 108.40 admitted into the record.)
19   BY MR. LEON:
20   **Q.**   Ms. Parson, do you remember I said I'm going to ask you
21   not to clear the screen? I'm going to ask you to clear the
22   screen now. Can you push that.
23       Okay. I think you said there were three people together
24   and the three people together you could recognize?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1871

1   **Q.**   Okay. Without -- is it fair to say there are three
2   people together on the right side of the photograph we're
3   looking at?
4   **A.**   Yes.
5   **Q.**   From left -- from right to left, can you tell us who
6   we're looking at, first on the right side in the -- looks like
7   an orange top.
8   **A.**   Phil.
9   **Q.**   Okay. Who's next?
10   **A.**   Cool Wop.
11   **Q.**   And who's next?
12   **A.**   Antwuan.
13   **Q.**   And the person on the left you don't recognize?
14   **A.**   No.
15   **Q.**   Do you know where that picture was taken?
16   **A.**   It's taken in Congress Park.
17   **Q.**   Do you recognize the neighborhood? Withdrawn.
18       How do you know it's taken in Congress Park?
19   **A.**   I recognize the building.
20       MR. LEON: May I approach, Your Honor?
21       THE COURT: Yes.
22   BY MR. LEON:
23   **Q.**   Ms. Parson, I'm going to show you another photograph and
24   I'll ask you the same question and tell us who you recognize and
25   who you don't. For the record, I've handed you Government's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1872

1   108.80. Take a careful look at that. Tell us if you recognize
2   any of the people in that photograph.
3       THE COURT: What is the number of the exhibit?
4       MR. LEON: 108.80, Your Honor.
5   BY MR. LEON:
6   **Q.**   Do you recognize some of the people in that picture?
7   **A.**   Yes.
8   **Q.**   Okay. First of all, do you know where that picture is
9   taken?
10   **A.**   Looks like the parking lot of the Lincoln.
11   **Q.**   All right. Do you recognize that to be the parking lot
12   of the Lincoln?
13   **A.**   Yes.
14   **Q.**   And tell us -- just with the names you know, tell us who
15   in the picture you recognize first.
16   **A.**   Don, Jo-Jo, Boobie -- I can't make out the other face.
17   **Q.**   Okay. You mentioned Don, Jo-Jo and Boobie. Anybody else
18   you recognize in that photo?
19   **A.**   No.
20   **Q.**   Okay.
21   **A.**   D.C. I'm sorry, yes.
22   **Q.**   D.C.?
23   **A.**   Um-hmm.
24   **Q.**   Is that a "yes"?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1873

1   **Q.**   Okay. Okay. And do those three (sic) people you
2   recognize, Don, Jo-Jo, Boobie and D.C. --
3       First of all, I don't know if you mentioned Boobie
4   before, so first let me ask you, who is Boobie?
5   **A.**   Cool Wop's brother.
6   **Q.**   Do you know if Boobie's alive today?
7   **A.**   No, he's not.
8   **Q.**   Did you know him when he was alive?
9   **A.**   Yes.
10   **Q.**   And I believe yesterday you did mention D.C. Tell us how
11   you know D.C.
12   **A.**   He lived in the neighborhood. He was --
13       MR. GUERRERO: Your Honor, I'm sorry. I can't hear.
14       THE WITNESS: Him and Don are friends.
15       THE COURT: Can you hold the microphone any closer to your
16   mouth.
17       THE WITNESS: Yes.
18       THE COURT: Can you keep it there.
19       THE WITNESS: Yes.
20       THE COURT: Okay. That would be great. Thank you.
21   BY MR. LEON:
22   **Q.**   Can you repeat your answer, please.
23   **A.**   He was -- D.C. was a person that lived in the
24   neighborhood and a friend of Don's.
25   **Q.**   Did you ever buy drugs from D.C.?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1878*

1  talked about making controlled purchases for the FBI. Do you
2  remember that?
3  **A.**   Yes.
4  **Q.**   Now, first of all, do you know somebody by the name of
5  Peg?
6  **A.**   Yes.
7  **Q.**   Who's Peg?
8  **A.**   She was someone I met through another person.
9  **Q.**   Well --
10 **A.**   We got high together.
11 **Q.**   You and Peg got high together?
12 **A.**   Yes.
13 **Q.**   Who is the person you met Peg through?
14 **A.**   Sherrie.
15 **Q.**   And who is Sherrie?
16 **A.**   A friend of mine.
17 **Q.**   Did you get high with Sherrie?
18 **A.**   Yes.
19 **Q.**   And did -- do you know where Peg lived?
20 **A.**   No.
21 **Q.**   Did she live in Congress Park?
22 **A.**   No.
23 **Q.**   And when Peg would get high, where would you get high?
24 **A.**   In my apartment.
25 **Q.**   Would you get high anywhere else or in your apartment?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1879*

1  **A.**   Always in my apartment.
2  **Q.**   And when you got high with Peg, who brought the money?
3  **A.**   Peg did.
4  **Q.**   And when you would get high with Peg, who would get the
5  drugs?
6  **A.**   I would.
7       MR. LEON:  May I approach?
8       THE COURT:  Yes.
9  BY MR. LEON:
10 **Q.**   I'm handing you what's in evidence as Government's 325.
11 Would you take a look at what's inside that and tell us if you
12 know what 325 is.
13 **A.**   This is a disk that I listened to of me making a
14 purchase, a drug purchase.
15 **Q.**   How do you know that?
16 **A.**   Because I initialed -- dated and initialed it.
17 **Q.**   And -- okay.
18      Your Honor, at this time we would ask to publish and play
19 portions of Government's 325.1 to the jury and also ask for
20 Ms. Romero's assistance with the headsets.
21      Mr. Mazzitelli, I would ask you to skip the first
22 sections on the abridged tape.
23      For the record, that second portion would begin what
24 would be the unabridged tape at time stamp 19 and 20 seconds.
25      Ms. Parson, if you need this, this is available for you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1880*

1  as well.  You can put it on your ears and you have to face the
2  receiver, which is over to the right of His Honor.
3  **A.**   Okay.
4       MR. LEON:  Okay.
5       (Audiotape played.)
6  BY MR. LEON:
7  **Q.**   Ms. Parson, who are the voices we just heard on the
8  excerpt?
9  **A.**   My voice and Peggy's.
10 **Q.**   Whose is the louder, more animated voice?
11 **A.**   Peggy.
12 **Q.**   Do you recognize her voice?
13 **A.**   Yes, yes.
14 **Q.**   Do you know why she's there?
15 **A.**   To purchase drugs.
16 **Q.**   Did she end up purchasing drugs that day?
17 **A.**   Yes.
18 **Q.**   Did you know at the time you were -- she came over that
19 she was --
20      Well, first of all, do you have an understanding as to
21 how this tape is now in this courtroom?
22 **A.**   Yes.
23 **Q.**   What's your understanding?
24 **A.**   That she wore a wire.
25 **Q.**   Did you know it at the time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1881*

1  **A.**   No, I did not.
2  **Q.**   Would you have sold her drugs if you did?
3  **A.**   No.
4       MR. LEON:  Okay.  Let's jump to the next excerpt,
5  Mr. Mazzitelli, if we could.  Thank you.
6       (Audiotape played.)
7  BY MR. LEON:
8  **Q.**   Okay, Ms. Parson.  First of all, you made a reference
9  earlier in this portion to Chanell?
10 **A.**   Yes.
11 **Q.**   Who is that?
12 **A.**   My daughter.
13 **Q.**   There's also -- sounds to be a discussion between you and
14 Peg regarding Kentucky.  What's your understanding -- what's
15 your memory or understanding of that?
16 **A.**   She told me she had moved to Kentucky.
17 **Q.**   Okay.
18      (Audiotape played.)
19 BY MR. LEON:
20 **Q.**   And just finally, before we go further, she's in
21 Kentucky; there's also a reference, though, earlier to being in
22 Arlington, a couple weeks, having her come to Arlington.  What
23 was your understanding of what that meant?
24 **A.**   She told me she had --
25      MR. ZUCKER:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*1882*

1  THE COURT:  Basis?
2  I'm sorry.  Your response?
3  MR. LEON:  It's -- the witness's understanding.  It's not
4  offered for its truth, Your Honor.  It's state of mind.
5  THE COURT:  What's the relevance of her understanding of
6  that comment from the witness?
7  MR. LEON:  It's relevant to having her understanding why
8  she would be comfortable making a sale to somebody who's living
9  in Kentucky and showing up who's otherwise in Kentucky.
10  THE COURT:  Anything else?
11  MR. BALAREZO:  Your Honor, I object on hearsay
12  and relevance grounds.
13  THE COURT:  I'll allow it.  Go ahead.
14  BY MR. LEON:
15  Q.  What's your understanding about why she would need to be
16  in Arlington every once in a while?
17  A.  To take urines.
18  Q.  And why would she need, in your mind, to be in Arlington
19  to take urines?
20  A.  I'm not sure.  I guess she was --
21  MR. BALAREZO:  Objection.
22  THE COURT:  Hold on a second.
23  Are you trying to go forward or withdraw the question?
24  MR. LEON:  It seemed like she was in the middle of --
25  continuing the answer.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1883*

1  THE COURT:  Whose objection is it?
2  MR. BALAREZO:  She was in the middle of saying "I guess."
3  I don't think she can testify to anything she's guessing to.
4  THE COURT:  I'm not sure I heard that.  I heard "I'm not
5  sure."  But if what was coming next was "I guess," I'll sustain
6  that.
7  BY MR. LEON:
8  Q.  Do you have anything -- I'll ask another question.
9  When she was in Arlington -- well, withdrawn.
10  Before this incident, did she -- had you seen a lot of
11  her before that?
12  A.  Yes.
13  Q.  Okay.  And did you know where she lived at that time?
14  A.  No.
15  Q.  Did you -- is this the first time you heard that she may
16  be in Kentucky?
17  A.  Yes.
18  MR. LEON:  Now, let's keep going.
19  (Audiotape played.)
20  BY MR. LEON:
21  Q.  First of all, there's a reference to $500.  Did you
22  actually see $500 that day?
23  A.  Yes.
24  Q.  From whom?
25  A.  Peggy.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1884*

1  Q.  And did you see it right then?
2  A.  Yes.
3  Q.  She took it out?
4  A.  Yes.
5  Q.  And there's a reference to "EB shit either."  Do you
6  remember hearing that?
7  A.  Yes.
8  Q.  What, in your mind, if anything, did you understand that
9  to mean?
10  A.  She didn't want me to purchase anything from EB.
11  Q.  Do you know who EB is?
12  A.  Yes.
13  Q.  Did you buy drugs from EB?
14  A.  Yes.
15  Q.  Did you ever buy drugs from EB for Peg?
16  A.  Yes.
17  Q.  In your mind, had you ever smoked EB's drugs?
18  A.  Yes.
19  Q.  In your mind, was EB's -- were EB's drugs of good
20  quality?
21  A.  Sometimes.
22  Q.  And who, if anyone, did EB associate with in Congress
23  Park?
24  MR. ZUCKER:  Objection, basis.
25  THE COURT:  Did she have personal knowledge?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*1885*

1  MR. LEON:  I can ask a foundational question.
2  BY MR. LEON:
3  Q.  Where did you buy drugs from EB in Congress -- withdrawn.
4  Where did you buy drugs from EB?
5  A.  In Congress Park.
6  Q.  Anywhere else?
7  A.  No.
8  Q.  And did -- did you ever see EB in Congress Park?
9  A.  Yes.
10  Q.  When you saw EB in Congress Park, was he always alone?
11  A.  Yes.
12  Q.  Did you ever see him with anyone else?
13  A.  No.
14  A.  He was always alone.
15  Q.  Now, later on you say, "I know he's going to see Dom."
16  Is that what you said?
17  A.  Yes.
18  Q.  What did you mean by -- who's Dom?
19  A.  It's "Don."
20  Q.  It's "Don," not -- with an N, not an M?
21  A.  Right.
22  Q.  And for the record, who's Don, D-O-N?
23  A.  He lived in the building, 3401.
24  Q.  Your building?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1886

1  **A.**   Yes.

2  **Q.**   And the person you described earlier being on the third

3  floor?

4  **A.**   Yes.

5  **Q.**   And is that the person you identified yesterday in this

6  courtroom?

7  **A.**   Yes.

8  **Q.**   Why did you tell Peg, "Don't" -- why did you tell her

9  that you were going to see Don?

10 **A.**   I knew he had some cocaine.

11 **Q.**   And then finally in that excerpt we heard -- well, first

12 of all, how'd you know that?

13 **A.**   From sometime earlier, maybe a day or two before she came

14 over.

15 **Q.**   And finally during that excerpt, you said, "Yeah, but I

16 can't get no weight.  I got to get bags from him."

17     What did you mean by that?

18 **A.**   I was referring to Burke.  He didn't sell weight.  He

19 would only sell dime bags.

20 **Q.**   And who's Burke?

21 **A.**   He was another drug dealer in the neighborhood.

22 **Q.**   And did Burke -- did you buy drugs from Burke?

23 **A.**   Yes.

24     (Audiotape played.)

25 BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1887

1  **Q.**   Okay.  And, Ms. Parson, the earlier portion of the

2  excerpt we just listened to, did you hear Peg making a reference

3  to "I want the butter, baby"?

4  **A.**   Yes.

5  **Q.**   Did you have an understanding of what that meant?

6  **A.**   Yes.

7  **Q.**   What?

8  **A.**   She wanted some good crack.

9  **Q.**   What does the word "butter" mean in that context?

10 **A.**   It's good.

11     MR. LEON:  Let's go to the next excerpt, if we could.

12     (Audiotape played.)

13 BY MR. LEON:

14 **Q.**   Who were the voices we heard on that?

15 **A.**   My voice and Peggy's.

16 **Q.**   Was there another voice you heard or no?

17 **A.**   Yes, but it's faint.

18 **Q.**   Okay.  Did you recognize the voice or not?

19 **A.**   No.

20     MR. LEON:  Okay.  Let's go to the next -- to the one

21 that -- okay.

22     May I have a moment, Your Honor?

23     THE COURT:  We'll take a ten-minute break at this

24 point, ladies and gentlemen.

25     Excuse me.  Please remember not to discuss the case

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1888

1  amongst yourselves or with anyone else and take your notes back

2  into the jury room.  Leave your headsets in place and please turn

3  them off while you leave them in your seat.

4      We'll take a ten-minute break.  Thank you.

5      (Jury out at 10:46 a.m.)

6      THE COURT:  Mr. Leon, if you could have your assistant

7  come in.

8      All right.  We'll take a ten-minute break.

9      (Thereupon, a break was had from 10:46 a.m. until

10 11:01 a.m.)

11     THE COURT:  All right.  Are you ready for the jury?

12     MR. LEON:  Yes.

13     (Jury in at 11:03 a.m.)

14     THE COURT:  Good morning again, ladies and gentlemen.

15 THE JURY PANEL:  Good morning.

16     THE COURT:  Welcome back.  We're ready to resume.

17     MR. LEON:  Thank you.

18 CONTINUED DIRECT EXAMINATION OF GAIL PARSON

19 BY MR. LEON:

20 **Q.**   Good morning, Ms. Parson.  I think we were in the middle

21 of listening to Exhibit 325.1.  That was the purchase that you

22 did with Peg; is that correct?

23 **A.**   Yes.

24 **Q.**   Okay.  I'd like to ask Mr. Mazzitelli to pick up at the

25 next portion of the tape.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1889

1      (Audiotape played.)

2  BY MR. LEON:

3  **Q.**   Do you recognize the man's voice that we just listened

4  to?

5  **A.**   No.

6  **Q.**   Did you hear a man's voice?

7  **A.**   Yes, I did.

8  **Q.**   Did you recognize it?

9  **A.**   No.

10 **Q.**   Okay.

11     (Audiotape played.)

12 BY MR. LEON:

13 **Q.**   Ms. Parson, at the very end of that, I think we heard, "I

14 know shit got me dizzy, Woo."  Did you hear that?

15     MR. ZUCKER:  I would like to object and approach before

16 further inquiry.

17     THE COURT:  All right.

18     (Following sidebar discussion had on the record:)

19     MR. ZUCKER:  The objection is based on -- the witness just

20 said she doesn't know who DC -- she does not recognize the voice.

21 At this point we have a transaction between -- apparently a

22 transaction between this witness and a cooperating witness yet,

23 with no involvement by a member of the conspiracy identified yet,

24 unless I'm missing something.

25     THE COURT:  What is your objection?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1898**

1  **Q.**   And had you, at that point, purchased bulk from Don
2  before?
3  **A.**   Maybe once or twice.
4  **Q.**   And was he always upstairs when you did that?
5  **A.**   No.
6  **Q.**   Where else was he?
7  **A.**   He be out front, sometimes.
8  **Q.**   So, after Dom was not upstairs, do you remember what you
9  did to get the rest of the dimes?
10  **A.**   Uhm, no, I'm not sure.  I called someone.
11  **Q.**   Do you remember who?
12  **A.**   No.
13  **Q.**   There are references on this tape to DC and EB, do you
14  remember if you got the remainder from him, or if you don't
15  know, you don't know.
16  **A.**   I don't know.
17  **Q.**   Had you bought from EB in the past?
18  **A.**   Yes.
19  **Q.**   Had you bought from DC in the past?
20  **A.**   Yes.
21  **Q.**   Now you bought dimes from Dom before, you said you bought
22  bulk from him a couple of times, one or two times, you said.
23  Had you bought dime bags from Dom before?
24  **A.**   Yes.
25  **Q.**   In your -- as you sit here today, how many times,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1899**

1  approximately, would you say you bought dime bags from Don?
2  **MR. BALAREZO:**  Your Honor, objection.  Can we approach?
3  **THE COURT:**  Yes.
4  **MR. BALAREZO:**  Your Honor, unless my hearing is failing,
5  she keeps referring to Don.  I know she identified my client as
6  Don.  That's another issue, but I think Mr. Leon keeps mentioning
7  a Dom, unless I'm just miss hearing it.
8  **MR. LEON:**  You're probably not.  It's not intentional.  I
9  can use her word with this witness.  It kind of keeps reinforcing
10  something that's not there.
11  **THE COURT:**  That's true.
12  **MR. LEON:**  It's not intentional, but I understand the
13  request and I'll do my best to say Don with this witness.
14  **THE COURT:**  I would ask that you do that.
15  **MR. LEON:**  Okay.
16  **BY MR. LEON:**
17  **Q.**   Let me rephrase the question.  My question is:  With
18  respect to Don and with respect to dime bags, as you sit here
19  today, how many times would you say you purchased dime bags from
20  Don?
21  **A.**   I can't put an exact number, but a number of times.
22  **Q.**   Well, when you say a "number of times," can you put any
23  number?
24  **A.**   Twenty, fifty, something.  Fifty times.
25  **Q.**   Okay.  I would like to go to another tape now.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1900**

1  I believe you testified earlier, yesterday for sure, and
2  maybe as well today.  Let me not guess?
3  You testified at some point you know somebody by the name
4  of Dazz; is that correct?
5  **A.**   Yes.
6  **Q.**   Did you ever buy drugs from Dazz?
7  **A.**   Yes.
8  **Q.**   Can you estimate for us, approximately, as you sit here
9  today, how many times you bought drugs from Dazz?
10  **A.**   Like I said, a number of times.  It's hard to put a
11  number on it, an exact number.
12  **Q.**   I know it's hard, but I'm going to ask:  Can you put a
13  rough number on it, even a range?
14  **A.**   Eighty.
15  **Q.**   Okay.  When you would buy drugs from Dazz, would -- what
16  would the amounts be?  Would there be a range or would it be the
17  same amount every time?
18  **A.**   No, there would be a range.
19  **Q.**   What would the range be?
20  **A.**   Anywhere from dime bags to 20s.
21  **Q.**   What's the most that you'd say you bought from Dazz at
22  any one time, if you can remember?
23  **A.**   An eight-ball.
24  **Q.**   And when you would buy an eight-ball, would you actually
25  buy the chunk or would it be in dime form?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1901**

1  **A.**   It depends.  Sometimes it would be in dime form,
2  sometimes it was in chunk.
3  **MR. LEON:**  May I approach, Your Honor?
4  **THE COURT:**  Yes.
5  **BY MR. LEON:**
6  **Q.**   Ms. Parson, I'm handing you what's in evidence as
7  Government's 314.  And I'm going to take out the contents of
8  314.  Tell me if you recognize that.
9  **A.**   Yes.
10  **Q.**   What's that?
11  **A.**   It's a disk of purchases -- it's a disk made of a
12  purchases I made.
13  **Q.**   That you made?
14  **A.**   Yes.
15  **Q.**   How do you know that?
16  **A.**   I listened to it.  It has my signature and date on it.
17  **Q.**   Okay.  Now, was this -- I think you said earlier that you
18  agreed with the Agent Kyle and another agent to wear wires.  Was
19  this one of the times you wore a wire?
20  **A.**   Yes.
21  **Q.**   I'm going to ask if Mr. Mazzitelli could play -- tee up
22  314.1.  And I'll ask you if you could -- make sure the headset
23  is on -- and make sure while you're listening, face the
24  receiver.  Before we tee it up, let me ask you these questions.
25  When you buy from Dazz, how would you start that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1902**

1  transaction?
2  **A.**   I would go outside and look for him or stand in the door
3  and wait and see who would come by.
4  **Q.**   Do you know if you would ever call him? Do you remember
5  if you would ever call him?
6  **A.**   No.
7  **Q.**   Okay.
8      (Audiotape played.)
9  BY MR. LEON:
10  **Q.**   Do you remember -- did you have a particular meet
11  location that you had with Kyle or was it different places at
12  different times?
13  **A.**   Different places at different times.
14  **Q.**   Do you remember the particular meet location on this day?
15  **A.**   No.
16  **Q.**   Okay.
17      (Audiotape played.)
18  BY MR. LEON:
19  **Q.**   What's that rustling we could hear?
20  **A.**   The sound of my coat.
21      (Audiotape played.)
22  BY MR. LEON:
23  **Q.**   Let me just stop there. What did we just hear?
24  **A.**   Me making a drug transaction with Dazz.
25  **Q.**   Keep your voice up, please, if you could.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1903**

1  **A.**   Purchasing drugs from Dazz.
2  **Q.**   Okay. Explain exactly what happened, what did we hear
3  exactly in that purchase.
4  **A.**   I'm not sure what you're asking me.
5  **Q.**   Okay. Let me ask a better question. First of all, you
6  mentioned Dazz. Did you recognize the voice on that tape to be
7  Dazz?
8  **A.**   Yes.
9  **Q.**   Is that the Dazz that you identified yesterday?
10  **A.**   Yes.
11  **Q.**   And how much was that transaction for?
12  **A.**   I can't remember.
13  **Q.**   Okay. Did you -- do you remember saying, on the portion
14  we listened to, "It is to travel for this lousy hundred
15  dollars"?
16  **A.**   Yes.
17  **Q.**   So does that refresh your memory as to whether or not --
18  **A.**   Yes.
19  **Q.**   What was the amount of the transaction for?
20  **A.**   A $100.
21  **Q.**   And do you remember or can you tell us from this tape how
22  much you received in return?
23  **A.**   No, I can't.
24  **Q.**   Okay. Do you know what you did with the drugs once you
25  got them -- well, first of all, withdrawn. You said there was a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1904**

1  transaction. What, if anything, did you do with the $100?
2  **A.**   I spent it on crack.
3  **Q.**   With whom?
4  **A.**   With Dazz.
5  **Q.**   Okay. And then what, if anything, did Dazz do when you
6  gave him the $100?
7  **A.**   He gave me crack.
8  **Q.**   Okay. And you don't remember the exact amount?
9  **A.**   No.
10  **Q.**   What did you do with that crack once he gave it to you?
11  **A.**   I took it back to Kyle.
12  **Q.**   Okay. Did you give it to anybody else?
13  **A.**   No.
14  **Q.**   Did you ever take the wire off at any point before you
15  gave it to Kyle?
16  **A.**   No.
17  **Q.**   And once you gave that crack to Kyle, did you see that
18  ever again?
19  **A.**   No.
20  **Q.**   At one point on this, we can hear you say "Turn back
21  around like you was. Count my money, 40, 50, 60, 70, 80, should
22  be a hundred," do you remember that?
23  **A.**   Yes.
24  **Q.**   What did you mean by that "turn...around," let me "count
25  my money"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1905**

1  **A.**   Apparently, he was staring in my hand.
2  **Q.**   And why didn't you want him to?
3  **A.**   No particular reason, really. I was just -- I don't
4  know. No particular reason.
5  **Q.**   Okay. Also on the portion we listened to, you said "That
6  don't got no weight on it. I'm tired as shit." Do you know
7  what you meant by that?
8  **A.**   The dimes was small.
9  **Q.**   And when you complained to Dazz about the dimes being
10  small, do you remember if he did anything about it?
11  **A.**   I can't remember.
12      (Audiotape played.)
13  BY MR. LEON:
14  **Q.**   And is that the portion at the end where you said you
15  gave the drugs to the agent?
16  **A.**   Yes.
17  **Q.**   And did you see the drugs at any point after that?
18  **A.**   No.
19  **Q.**   Do you know when you did these purchases, was there one
20  agent, more than one, do you know?
21  **A.**   More than one.
22  **Q.**   Was there always more than one?
23  **A.**   Yes.
24  **Q.**   Do you have, in your own mind, an idea why that was?
25      MR. ZUCKER: Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**1906**

1    THE COURT:  Sustained.
2  BY MR. LEON:
3    **Q.**    When you did these transactions with the agents, more
4  than one agent, at the beginning of the transactions when they
5  put the wire on you for the first time, did they do anything
6  with you?  In other words, make sure that you had or didn't have
7  anything on you?
8    **A.**    Yes, they would search me.
9    **Q.**    Okay.  And could you just tell me, generally, how --
10  well, withdraw that.
11    They search you for what, if you know?
12    **A.**    To see if I had drugs on me.
13    **Q.**    And when you had that wire on and then you left the
14  vehicle, when they would drop you off, did you have an ability
15  to turn that recorder off?
16    **A.**    No.
17    **Q.**    Did you ever take it off of you?
18    **A.**    No.
19    **Q.**    Now, I believe yesterday you also talked about somebody
20  by the name of Boy-Boy, correct?
21    **A.**    Yes.
22    **Q.**    And you pointed him out yesterday, correct?
23    **A.**    Yes.
24    **Q.**    Have you bought drugs from Boy-Boy?
25    **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1907**

1    **Q.**    Can you estimate for us, as you sit here today, how many
2  times have you bought drugs from Boy-Boy?
3    **A.**    Over a 100 times.
4    **Q.**    And during that number of times, what would be the range
5  of drugs you would buy from Boy-Boy?
6    **A.**    Uhm, anywhere from 20 to --
7    THE COURT:  Keep the mic up close to your mouth, okay?
8    THE WITNESS:  Okay, sorry.  Anywhere from 20 to -- around
9  3 or 400.
10  BY MR. LEON:
11    **Q.**    Three or 400 what?
12    **A.**    Dollars.
13    **Q.**    And I believe you testified earlier today that you did
14  have a pager number for him?
15    **A.**    Yes.
16    **Q.**    And when you would try to have one of these transactions
17  with Boy-Boy, can you estimate for us how often you would use
18  the pager and how often you would just bump into him and just
19  make it happen that way?
20    **A.**    Uhm, no I can't tell you how many.
21    **Q.**    Okay.  Of all the people you would buy from, who would be
22  the first person you would go to if you had money?
23    **A.**    Bert.
24    **Q.**    Bert?
25    **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1908**

1    **Q.**    Was that the Bert we heard about on the earlier tape?
2    **A.**    Yes.
3    **Q.**    Okay.  How often would you say you went to Bert?
4    **A.**    About a 100 times; more than a 100.
5    **Q.**    After Bert, who would you go to after Bert?
6    **A.**    Boy-Boy or Joe Langley.
7    **Q.**    Okay.  Between Joe Langley, Bert and Boy-Boy, did they
8  have, to your mind, to you as a crack user, did they have the
9  same quality crack?
10    **A.**    No.
11    **Q.**    Who had the better crack of those three?
12    **A.**    Uhm, most the time Bert.
13    **Q.**    Okay.  And after Bert -- Bert, you said, B-e-r-t?
14    **A.**    Yes.
15    **Q.**    And after Bert -- between Boy-Boy and Joe Langley, as a
16  user, who would then have the next best?
17    **A.**    Boy-Boy.
18    **Q.**    And what about Joe Langley?
19    **A.**    It was so-so.
20    MR. LEON:  May I approach, Your Honor?
21    THE COURT:  Yes.
22  BY MR. LEON:
23    **Q.**    Ms. Parson, I'm handing you what's in evidence as
24  government's 306.  Can you take a look at that and tell me if
25  you recognize it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**1909**

1    **A.**    Yes.
2    **Q.**    What do you recognize that to be?
3    **A.**    A CD, a recording of drug purchases that I made.
4    **Q.**    And how do you know that it's one that you made?
5    **A.**    Because it has my initials and the date on it.
6    **Q.**    And have you previously reviewed this and initialed it
7  after you reviewed it?
8    **A.**    Yes.
9    MR. LEON:  Your Honor, at this time we'll publish 304.1
10  at this time.
11    THE COURT:  All right.
12  BY MR. LEON:
13    **Q.**    And I would ask Mr. Mazzitelli just to start at the
14  beginning of the portion.
15    (Audiotape played.)
16  BY MR. LEON:
17    **Q.**    Can I ask you -- I apologize.  I'm going to jump to a
18  middle portion and try to speed this up.
19    If I could ask Mr. Mazzitelli, my time stamp says 11 and
20  14 minutes.  Is that not going to help?
21    MR. BEANE:  Your Honor, can we approach?
22    THE COURT:  Yes.
23    May I ask you to remove your headsets.
24    THE WITNESS:  Yes.
25    THE COURT:  And the jurors as well.  Thank you.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1910

1    (Following sidebar discussion had on the record:)
2       MR. BEANE:  Ms. Parson -- my objection is hearsay as to
3    Sandra White.  This is Sandra White acting -- Ms. Parson is on
4    this one, and so my question is:  What is the relevance of
5    Ms. Parson's testimony if this is Ms. Sandra White's buy or
6    purchase.
7       THE COURT:  Are you playing Exhibit 306.1?
8       MR. LEON:  I'm playing a portion of 306.1 and I don't
9    disagree at all with what Mr. Beane said.  That's why I actually
10   stopped at the beginning portion, because the beginning portion
11   is Sandra White being wired up.  And what happened here,
12   Sandra White did a buy.  It's a buy with Sandra White.  I only
13   want to play a few minutes of the middle of this where this
14   witness is helping to broker Sandra White's sale.  So, she will
15   be able to identify her own voice, Ms. White's voice, but I'm not
16   going to play A to Z, because Mr. Beane is correct, it's not her
17   controlled purchase; it's one that she is captured on brokering
18   the sale.
19      THE COURT:  Anything else?
20      MR. BEANE:  No.
21      THE COURT:  All right.
22      (Sidebar discussion concluded.)
23   BY MR. LEON:
24   Q.   Okay.  At this time, I would ask Mr. Mazzitelli just to
25   play the middle portion of this excerpt, which begins at 11:14

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1911

1    and 15 seconds.
2    Q.   Do you recognize the two voices we just heard on that?
3    A.   Yes.
4    Q.   Whose voices did we just hear?
5    A.   My voice and Sandra's.
6    Q.   Whose Sandra?
7    A.   She was another addict that was in the neighborhood.
8    Q.   And were you friends with her?
9    A.   Not exactly, we just got high together.
10   Q.   Okay.  How often would you get high with Sandy -- Sandra,
11   excuse me?
12   A.   Not very often.
13   Q.   Do you recognize her voice?
14   A.   Yes.
15      (Audiotape played.)
16   BY MR. LEON:
17   Q.   Who is the man's voice on that tape?
18   A.   Boy-Boy.
19   Q.   Are you sure?
20   A.   Yes.
21   Q.   And when you and Sandra would get high together, where
22   would that be?  Where would that be?
23   A.   In my apartment.
24   Q.   And can you tell from this tape where this incident
25   happened?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1912

1    A.   In my living room.
2    Q.   How do you know it happened in your living room?
3    A.   Because I could hear the TV in the background.
4    Q.   Now, yesterday you also mentioned somebody by the name --
5    I believe the name you used was Twan; is that right?
6    A.   Yes.
7    Q.   How long have you known Twan?  When did you first get to
8    know him?  Can you estimate?
9    A.   Late '90s.
10   Q.   In the late '90s?
11   A.   Yes.
12   Q.   When did you move to Congress Park?
13   A.   '91.
14   Q.   And you said you started using -- getting addicted in the
15   mid-'90s, '95 or so?
16   A.   Yes.
17   Q.   Okay.  Have you ever bought drugs from Antwuan Ball --
18   excuse me, from Twan?
19   A.   Yes.
20   Q.   How many times?
21   A.   Once or twice, a couple times.
22   Q.   And those one or two times, what amounts did you buy from
23   him?
24   A.   Dimes.
25   Q.   Okay.  Was there an incident -- did you ever cook cocaine

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1913

1    for Antwuan Ball?
2    A.   Yes.
3    Q.   How many times?
4    A.   Once.
5    Q.   Tell us -- first of all, where did that instance happen?
6    A.   In my apartment.
7    Q.   And this would be in 103, 3401?
8    A.   103, yes.
9    Q.   How did it come about that Antwuan Ball -- that you were
10   cooking for him on this one occasion?
11   A.   He asked me if I knew how to cook crack out of powder,
12   and I said "yes."
13   Q.   Did you?
14   A.   Yes.
15   Q.   How many times prior to that -- had you -- well,
16   withdrawn.
17      Had you prior to that actually cooked powder into crack?
18   A.   Yes.
19   Q.   How many times?
20   A.   Not many, maybe once or twice.
21   Q.   And -- so he asked and you, you said "yes," and then
22   what, if anything, happened next?
23   A.   It didn't go as well as I thought it would.  I messed it
24   up, in other words.
25   Q.   How did you mess it up?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1918

1    **A.**    No.

2    **Q.**    Why not?

3    **A.**    I just -- because he wouldn't be around.  I mean, not

4    like the rest of the guys I bought from, and I just never

5    approached him.

6    **Q.**    Why didn't you approach him?

7    **A.**    I just didn't.  I don't -- I don't have an answer for

8    that, why.

9    **Q.**    Okay.  You also mentioned somebody by the name of

10   Cool Wop.  Do you remember that?

11   **A.**    Yes.

12   **Q.**    And you identified him yesterday, do you remember that?

13   **A.**    Yes.

14   **Q.**    Did you ever buy drugs from Cool Wop?

15   **A.**    Yes.

16   **Q.**    As you sit here today, can you estimate how many times

17   you bought drugs from Cool Wop?

18   **A.**    Fifty, 60.

19   **Q.**    Is that an estimate?

20   **A.**    Yes.

21   **Q.**    And when you would buy drugs from Cool Wop, what would be

22   the range of amounts of crack you would buy from Cool Wop?

23   **A.**    Anywhere from a dime to an eight-ball.

24          MR. LEON:  May I approach, Your Honor?

25          THE COURT:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1919

1    BY MR. LEON:

2    **Q.**    I'm going to hand you what's in evidence as Government's

3    316 and I'll ask if you recognize that?

4    **A.**    Yes.

5    **Q.**    What's that?

6    **A.**    It's another CD with me on it, making a drug purchase.

7    **Q.**    And how do you know that?

8    **A.**    Because there's my initials and the date on it.

9    **Q.**    And did you listen to this on the date that we have

10   there?

11   **A.**    Yes.

12          MR. LEON:  At this time, I would ask Mr. Mazzitelli to

13   play Government's 316.1.

14          THE COURT:  I don't have that in evidence.

15          MR. LEON:  Oh, you don't?

16          THE COURT:  No.

17          MR. LEON:  Do you have 316?

18          THE COURT:  No.

19          MR. LEON:  Could I have a moment, Your Honor?

20          THE COURT:  Yes.

21   BY MR. LEON:

22   **Q.**    Ms. Parson, I'm going walk up 316 again.  You said you

23   played -- you listened to that?

24   **A.**    Yes.

25   **Q.**    Do you remember listening to the entire tape?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1920

1    **A.**    Yes.

2    **Q.**    Is that on?

3    **A.**    Yes, -- no.  Okay.

4    **Q.**    And did you recognize the voices on that tape?

5    **A.**    Yes.

6    **Q.**    We'll go through -- we'll likely go through it in a

7    minute, but I just want to establish a few things.

8          And was that a tape that you listened to on -- for one of

9    these times you did the purchases with the agents?

10   **A.**    Yes.

11          MR. LEON:  Your Honor, at this time the government would

12   move for admission of 316.

13          THE COURT:  Without objection, 316 will be received.

14          MR. LEON:  Your Honor, based on the prior testimony of

15   Agent Lockhart, we would also move for admission of Government's

16   316.1 and 316-T.

17          MS. WICKS:  Your Honor, can we approach?

18          THE COURT:  Yes.

19          (Following sidebar discussion had on the record:)

20          MS. WICKS:  Your Honor, I apologize, but there are -- this

21   is one of the tapes where there are other individuals other than

22   Mr. Wilson and the agent, so I don't think he's actually

23   established -- I understand Lockhart identified that he listened

24   to the transcript, but the -- and these have all been marked by

25   them previously, but this is one of the transcripts where it's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1921

1    not just Mr. Wilson, so I don't actually think there was a

2    foundation for the CD to coming in.  She hasn't been able to

3    identify everybody that's on it.

4          THE COURT:  Let me make sure why you're here, is this a

5    belated objection to the admission of Exhibit 316?

6          MS. WICKS:  Yes, Your Honor, there are other people on

7    this tape that --

8          THE COURT:  What I had said was:  Is this a belated

9    objection to the admission of Exhibit 316?

10          MS. WICKS:  Yes, Your Honor.  I just double-checked the

11   transcript.  There are other people on this tape that she has not

12   identified yet in her testimony that she even has knowledge of,

13   much less identified that she hears the people on the tape.

14          THE COURT:  All right.  My records also reflect that

15   Agent Lockhart said on February 22nd, in his testimony, that he

16   could not say for sure that he was present during the

17   transaction.  He could say that Exhibit 316.1 is a fair and

18   accurate abridgement of what appears to be reflected in 316, but

19   316 was not in evidence.  Anyway, so, I'm being asked to revisit

20   my ruling.

21          MR. LEON:  If I understand the objection correctly, the

22   objection -- I would submit has legs, perhaps with respect to the

23   transcript, because we're talking about names in the transcripts.

24   But the only thing that we need to do to establish -- to get 316

25   in is just -- is this a true and accurate copy of what was played

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1922

1  when you wore that wire?  I think we've established that to get
2  316 in -- or 316.1.  I think Ms. Wicks' objection, if it's well
3  placed at all, it would be to the transcript.
4        THE COURT:  Well, you're not moving the transcript in.
5        MR. LEON:  No, I'm not.  I'm frankly -- as long as we're
6  here, frankly, as I think it through, I may need to -- may be
7  strange and out of order, but we may need to -- I have to figure
8  that out because I don't know if we can play this transcript with
9  this witness.
10       THE COURT:  You actually didn't ask the final foundational
11 question for getting it in.  You asked if she recognized all the
12 voices on the tape, but that's all.
13       MR. LEON:  Okay.  Then I would need -- I would agree, I
14 need to ask an additional question or two to lay that foundation.
15 But the tape itself, 316, should be able to come in with this
16 witness if she can say, this is a copy of what I wore and was
17 played on the day I did a controlled purchase, I would say.  The
18 name is another issue.  I would agree with that.
19       MS. WICKS:  Right, and so I'm also objecting to the way
20 that this has been played in the past, at this point being played
21 with this witness, because she can't verify what the transcript
22 that would be shown to the jury --
23       MR. LEON:  Okay.  I could see my colleague has --
24       THE COURT:  You could see what?
25       MR. LEON:  I could see Ms. Petalas has something that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1923

1  probably I should be saying that I'm not, so --
2        THE COURT:  Okay.  Go ahead.
3        (Discussion had off the record.)
4        THE COURT:  Please have Ms. Petalas go to the assistant to
5  ask him to bring her a candy bar or something, because she's
6  diabetic.
7        MS. WICKS:  Mr. Zucker has candy bars in the courtroom for
8  Mr. Thurston.
9        THE COURT:  All right.
10       MS. WICKS:  So I think he's getting her one.
11       THE COURT:  All right.  Does your assistant also have one?
12 Ms. Petalas, can you get your assistant to bring some candy bars
13 quickly?
14       Go ahead.
15       MR. LEON:  Ms. Petalas reminded me that during the direct
16 exam of Agent Lockhart's testimony, she did go through all the
17 names that are captured on 316 and 316-T, so --
18       THE COURT:  He went through all the names?
19       MR. LEON:  Yes.  My memory is refreshed that he testified
20 over two days, that there was an objection from certain counsel
21 about a bunch of names that he -- and then we actually went --
22 overnight, went through every transcript and made a long list.
23 And the second day, Ms. Petalas established all the names on the
24 record, including all the names on 316 that he knew personally.
25 So I would submit, based on the record, albeit a bit of a jigsaw,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1924

1  that we do have a basis in this record to get in all 316, with
2  one or two more foundational questions, 316.1 and then the
3  transcript.
4        Just hand it to her.
5        THE COURT:  There was a long list, I don't know if the
6  list that he gave corresponds to the names that are on this tape.
7  What names are on this tape?
8        MR. LEON:  I would have to pull the transcript.  I can
9  generally represent to the Court that the names on the -- any
10 additional names on this transcript were covered.
11       THE COURT:  All right.  I'll take your representation.
12 There was his testimony on the 27th -- yeah the 27th in the
13 morning, a long list of names of people whose voices he
14 recognized.
15       MS. WICKS:  Your Honor, if I could just double-check.
16       THE COURT:  Go ahead.
17       MS. WICKS:  Thank you.
18       (Discussion had off the record.)
19       THE COURT:  Any challenge?
20       MS. WICKS:  Your Honor, I think he did.
21       THE COURT:  All right.
22       (Sidebar discussion concluded.)
23 BY MR. LEON:
24 Q.    All right.  We're now on 316.1.  I would ask
25 Mr. Mazzitelli to begin playing it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1925

1        Ms. Parson, please listen along carefully.
2        THE COURT:  Mr. Leon, you didn't put your final
3  foundational question.
4        MR. LEON:  Thank you, Your Honor.
5  BY MR. LEON:
6  Q.    The tape that's in front of you, 316, Ms. Parson, that I
7  asked you some questions about?
8  A.    Yes.
9  Q.    Do you -- when you made that -- when you wore the wire
10 that became that tape, on the day you did, did you have the wire
11 on you at all times?
12 A.    Yes.
13 Q.    Did you ever take it off?
14 A.    No.
15 Q.    Did you -- were you there when the wire was turned on by
16 the agents?
17 A.    Yes.
18 Q.    And did you return when the wire was taken off of you and
19 turned off?
20 A.    Yes.
21 Q.    And at any point during the beginning and end of that on
22 and off, did you yourself turn it on or off?
23 A.    No.
24 Q.    And when you listened to it earlier on the day that's
25 dated on that, did you recognize that, your voice to be the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1926

```
 1    person at the beginning and end of that tape?
 2    A.    Yes.
 3          MR. LEON:  Your Honor, at this time the government would
 4    move for admission of 316.
 5          MS. WICKS:  No objection.
 6          THE COURT:  316 will be received.
 7          (Government's Exhibit 316 admitted into the record.)
 8          THE COURT:  Ms. Romero, we might need a new battery.
 9          In the meantime, if you would pull that mic closer to you.
10          THE DEPUTY CLERK:  It's working, but it might be a little
11    low, though.
12          THE COURT:  Do you want to return it?  Let's return it.
13    BY MR. LEON:
14    Q.    Okay.  And we would also move for admission of 316.1,
15    Your Honor, 316.1.
16          THE COURT:  All right.  Without objection, 316.1 is
17    received.
18          (Government's Exhibit 316.1 admitted into the record.)
19          MR. LEON:  And at this time I would ask Mr. Mazzitelli
20    play 316.1.
21          (Audiotape played.)
22    BY MR. LEON:
23    Q.    Did you listen to that carefully?
24    A.    Yes.
25    Q.    Just to be safe, why don't you pull that microphone in
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1927

```
 1    front of you as well, just to have both.
 2    A.    Um-hmm.
 3    Q.    Do you need -- if you need any more -- if you need
 4    anything else, it's here, okay?
 5    A.    Okay.
 6    Q.    The -- whose voices did we hear on there?
 7    A.    My voice and Wayne's.
 8    Q.    Wayne's?
 9    A.    Yes.
10    Q.    And can you describe Wayne?
11    A.    He's in a wheelchair.
12    Q.    Okay.  And did he sell drugs as well?
13    A.    Yes.
14    Q.    Was he selling drugs to you on this -- what we just
15    listened to?
16    A.    Yes.
17    Q.    How much?
18    A.    Uhm, I think I got about five dimes from him.
19    Q.    Okay.  You can be heard, at one point, making a reference
20    to 200.
21    A.    Yes.
22    Q.    Do you remember that?
23    A.    Yes.
24    Q.    Did you try to buy 200 from him?
25    A.    Yes.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1928

```
 1    Q.    And was he able?
 2    A.    No.
 3    Q.    And what happened when he wasn't able to make a full $200
 4    sale to you?
 5    A.    I purchased what he had and went to find someone else.
 6    Q.    Okay.  Let's go to the next segment.
 7          (Audiotape played.)
 8    BY MR. LEON:
 9    Q.    Who is -- did you hear somebody referred to as Care Bear?
10    A.    Yes.
11    Q.    Who's Care Bear?
12    A.    A girl named Sherrie.
13    Q.    Who is she to you?
14    A.    A friend of mines.
15    Q.    Did she use drugs as well?
16    A.    Yes.
17    Q.    And there's also a reference to you referring to Lucious.
18    A.    Yes.
19    Q.    Who's Lucious?
20    A.    One of the guys that lives in the neighborhood.
21    Q.    Please keep your voice up.
22    A.    One of the guys who lives in the neighborhood.
23    Q.    And did Lucious -- yes or no, did Lucious sell drugs in
24    the neighborhood?
25    A.    Yes.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1929

```
 1    Q.    Did you ever buy drugs from Lucious?
 2    A.    Yes.
 3    Q.    Were you looking for Lucious at that time?
 4    A.    Yes.
 5    Q.    And so far, what we've heard -- did you meet up with him?
 6    A.    No.
 7    Q.    Okay.
 8          (Audiotape played.)
 9    BY MR. LEON:
10    Q.    Now, we heard a reference -- you making a reference to
11    Chow Wow?
12    A.    Yes.
13    Q.    Now, on the portion we just listened to --
14    A.    Yes.
15    Q.    -- who's Chow Wow?
16    A.    He was a guy that lived -- well, he worked in the
17    neighborhood.
18    Q.    What kind of work did he do?
19    A.    Maintenance work for Congress Park.
20    Q.    I'm sorry.
21    A.    Maintenance work for Congress Park.
22    Q.    And did he also sell drugs?
23    A.    Yes.
24    Q.    Did you ever buy drugs from Chow Wow?
25    A.    Yes.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1930

1  **Q.**  Do you know -- if you know, yes or no, if Chow Wow ever
2  sold -- let me withdraw that.
3      And there was a reference to Jay Jay, did you hear that
4  at the very end?
5  **A.**  Yes.
6  **Q.**  Do you know who you were referring to when you said
7  Jay Jay?
8  **A.**  No.
9  **Q.**  At this point, the part we just listened to, have you
10  found anyone else to sell you drugs at that point?
11  **A.**  No.
12  **Q.**  Okay.
13      (Audiotape played.)
14  BY MR. LEON:
15  **Q.**  Let's just stop there.
16      On the portion that we just listened to, Ms. Parson, we
17  heard a few things.  We heard you referring to Chow Wow.  Did
18  you hear that?
19  **A.**  Yes.
20  **Q.**  And did you come to any arrangement with Chow Wow on the
21  portion we heard?
22  **A.**  Yes.
23  **Q.**  What was it?
24  **A.**  I spent half the money that I had with him.
25  **Q.**  So how much did you spend with Chow Wow?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1931

1  **A.**  $80.
2  **Q.**  And did you complete the sale with Chow Wow on the
3  portion we just heard?
4  **A.**  Yes.
5  **Q.**  Do you remember exactly how much you got from Chow Wow
6  for that $80?
7  **A.**  Uh --
8  **Q.**  Don't guess.  You don't remember exactly?
9  **A.**  No.
10  **Q.**  Okay.  You said you spent half.  Did we learn, on this
11  portion that we just listened to, what happened to the other
12  half?
13  **A.**  Yes.
14  **Q.**  What?
15  **A.**  I spent it with Wop.
16  **Q.**  Okay.  And when you referred to -- was that the Wop that
17  you were referring to by the name Wop on the tape?
18  **A.**  Yes.
19  **Q.**  At one point on the portion we just heard, you were heard
20  to hear "How's your brother doing?"
21  **A.**  Yes.
22  **Q.**  Do you remember that?
23  **A.**  Yes.
24  **Q.**  Do you remember what you meant by that?
25  **A.**  I was asking Wop how was his brother, Boobie?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1932

1  **Q.**  That was the Boobie you identified earlier?
2  **A.**  Yes.
3  **Q.**  And why were you asking about Boobie at that point?
4  **A.**  I don't understand the question.
5  **Q.**  Okay.  My question is just this:  Do you know, as you sit
6  here today, yes or no, why you at this point asked Wop how his
7  brother was doing?
8  **A.**  No.
9  **Q.**  Okay.  Now, at this point, did you actually get the drugs
10  from Wop, the point that we've heard so far?
11  **A.**  No.
12  **Q.**  We heard you knocking towards the end of this portion; is
13  that right?
14  **A.**  Yes.
15  **Q.**  Where were you knocking at that point?
16  **A.**  On his door.
17  **Q.**  Whose?
18  **A.**  Cool Wop's.
19  **Q.**  Okay.  So let me see if I can quickly break it down.
20      The portion on the sale that you made with Chow Wow,
21  where did that physically happen?
22  **A.**  Uhm --
23  **Q.**  If you remember.
24  **A.**  In the rental office building where I was waiting on
25  Cool Wop.  In the rental office building where I was waiting on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1933

1  Cool Wop.
2  **Q.**  Do you know, physically, on what floor?
3  **A.**  On the third floor.
4  **Q.**  Third floor?
5  **A.**  Yes.
6  **Q.**  And then when you go to knock on Wop's, where did you
7  actually knock?
8  **A.**  303.
9  **Q.**  And whose apartment was that?
10  **A.**  That's the apartment where Wop was staying.
11      (Audiotape played.)
12  BY MR. LEON:
13  **Q.**  Just there at the end when you said, "80, I broke it down
14  with you," and a male voice said "Good, I got it."  Who are
15  those people?
16  **A.**  One person is myself, and the other one is Cool Wop.
17  **Q.**  And what happened right there?
18  **A.**  I gave him $80 to purchase crack cocaine for me.
19  **Q.**  And did you get anything in return?
20  **A.**  Yes.
21  **Q.**  What?
22  **A.**  Uh, crack cocaine.
23  **Q.**  Do you know -- as you sit here, do you know exactly how
24  much you got?
25  **A.**  A solid piece.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 325 of 1954

1   Q.    Excuse me?
2   A.    A solid piece.
3   Q.    As opposed to Ziplocs?
4   A.    Exactly.
5   Q.    And what did you do once you finished this deal with
6   Cool Wop?
7   A.    I went back to meet with Kyle.
8         (Audiotape played.)
9   BY MR. LEON:
10  Q.    Did you hear the portion we just listened to?
11  A.    Yes.
12  Q.    Are you still waiting?
13  A.    Yes.
14  Q.    And who are you talking to?  You're saying some stuff.
15  Who are you talking to?
16  A.    Kyle.
17  Q.    Okay.  Why -- is Kyle right there with you?
18  A.    No.
19  Q.    So how were you talking to Kyle?
20  A.    Through the microphone.
21  Q.    You knew that he was listening or you thought he was
22  listening?
23  A.    Yes.
24  Q.    Now you're heard to say, "I don't like this.  I don't
25  like this.  Still standing.  Still standing.  Wayne got his

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   stuff out of his glove, left hand."  Do you remember saying
2   that?
3   A.    Yes.
4   Q.    And then you said, "Chow Wow got his stuff from Boy-Boy,"
5   it says "right hand," is that what you heard?
6   A.    No, no.
7   Q.    What did you hear?
8   A.    Out of Boy-Boy's van.
9   Q.    Out of Boy-Boy's van?
10  A.    Yes.
11  Q.    So you believe that's -- the transcript's in error there?
12  A.    Yes.
13  Q.    And you heard your voice to say "van," not "right hand"?
14  A.    Yes.
15  Q.    Do you know if Boy-Boy and Chow Wow knew each other?
16  A.    Yes.
17  Q.    How do you know that?
18  A.    Uhm, they had an apartment together in the Lincoln.
19  Q.    They had an apartment together in the Lincoln?
20  A.    Yes, and I seen Chow Wow in his apartment several times.
21  Q.    When you said "they had an apartment together," did they
22  actually live together under the same roof?
23  A.    Yes.
24  Q.    Okay.  And can you describe for us the Lincoln.  It's
25  kind of like that L, that backwards L.  Do you know where, if

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   you saw a picture of the Lincoln, would you recognize where
2   their apartment was, roughly?
3   A.    Yes.
4   Q.    First of all, what floor was it on?
5   A.    Third floor.
6   Q.    Third floor?  Had you been in the apartment before?
7   A.    Yes.
8         MR. LEON:  May I approach, Your Honor?
9         THE COURT:  Yes.
10  BY MR. LEON:
11  Q.    Ms. Parson, I'm handing you what's been marked for
12  identification as Government's 111-J, which is actually three
13  photographs combined trying to make one long photograph.  Do you
14  recognize 111-J?
15  A.    Yes.
16  Q.    What do you recognize 111-J to be?
17  A.    The Lincoln.
18  Q.    The Lincoln.  And does that picture, 111-J, fairly and
19  accurately depict what the Lincoln looked like around the time
20  period we're talking about?
21  A.    Yes.
22        MR. LEON:  Your Honor, at this time the government would
23  move for admission of 111-J.
24        MS. WICKS:  No objection, your Honor.
25        THE COURT:  Without objection, 111 will be received.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1         (Government's Exhibit 111-J admitted into the record.)
2         THE COURT:  And we reached the lunch break.  Did you
3   want -- did you need to put one or two more questions before we
4   broke?
5         MR. LEON:  I can stop here.
6         THE COURT:  Ladies and gentlemen, we'll break for lunch
7   now.  Please remember, don't talk about the case amongst
8   yourselves or with anyone else, and leave your notes back in the
9   jury room.
10        Please turn off your headsets, leave them in your chairs.
11  Come back in an hour and 15 minutes.  That would be roughly 1:47
12  or so.  Enjoy your lunch break.
13        (Jury out at 12:36 p.m.)
14        THE COURT:  All right.  We'll break until 1:47.
15  Can you summon Ms. Parson's assistant?
16        MR. LEON:  Yes.
17        (Thereupon, a luncheon recess was had beginning at
18  12:36 p.m.)
19
20        **C E R T I F I C A T E**
21        I, Scott L. Wallace, RDR-CRR, certify that the
22  foregoing is a correct transcript from the record of proceedings
    in the above-entitled matter.
23        ----------------------------
          **Scott L. Wallace, RDR, CRR**
24        **Official Court Reporter**
25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 1950

1 A.  (Witness complies.)

2 Q.  Okay.  And where you just pointed, you put a green dot in

3 the approximate place where Chow-Wow and Boy-Boy lived?

4 A.  Yes.

5 Q.  And for the record, you pointed to what appears to be the

6 third floor, on the right side of what we're looking at.  Is

7 that right?

8 A.  Yes.

9 Q.  And it appears to be where the two buildings meet in the

10 middle, kind of to form the elbow, the 90 degrees.  It's on the

11 right side of where they meet?  Is that fair or not?

12 A.  Yes.

13 Q.  Okay.  Thank you.  Okay, let's get back --

14        MR. LEON:  May I approach?

15        THE COURT:  Yes.

16 BY MR. LEON:

17 Q.  Ms. Parson, I'm handing you what's in evidence as

18 Government's 317.  Do you recognize the contents of 317?

19 A.  Yes.

20 Q.  What is that?

21 A.  It's a disc of a transaction that I made.

22 Q.  And how do you know that?

23 A.  Because the date and the signature are on it.

24        MR. LEON:  Your Honor, at this time the government

25 would ask to publish 317.1 to the witness and the jury.

 1            (Audiotape played in open court.)

 2 BY MR. LEON:

 3 Q.  Did you recognize the voices -- did you recognize the voice?

 4 A.  Yes.

 5 Q.  Whose voice was that?

 6 A.  Kyle's.

 7 Q.  And there was a reference at the very end to Rob.  Do you

 8 know who that is?

 9 A.  Another agent, Rob Lockhart.

10            (Audiotape played in open court.)

11 BY MR. LEON:

12 Q.  What did we just hear right there?

13 A.  A lot of different voices.

14 Q.  Did you recognize any of them?

15 A.  My own.

16 Q.  Okay.  Did you recognize any other voices?

17 A.  No.

18 Q.  No?  Okay, keep going.

19            (Audiotape played in open court.)

20 BY MR. LEON:

21 Q.  Actually, before we go further, did you catch earlier when

22 there was a number, there was somebody giving a number?  Did you

23 hear that?

24 A.  Yes.

25 Q.  Do you know what the number was?

1 A.  No.

2 Q.  Who was giving the number?  Was it you or somebody else?

3 A.  Somebody else.

4 Q.  Were you speaking to that person?

5 A.  Was I speaking to them?  No.

6 Q.  Okay.

7        (Audiotape played in open court.)

8 BY MR. LEON:

9 Q.  Did you recognize your voice on that portion we heard?

10 A.  Yes.

11 Q.  Did you recognize the other voice we heard?

12 A.  Yes.

13 Q.  Whose voice was that?

14 A.  It sounds like Cool Wop.

15 Q.  And you heard a reference to Anthony, "Hey Anthony"?

16 A.  Yes.

17 Q.  Do you know who Anthony is?

18 A.  Yes.

19 Q.  Who is Anthony?

20 A.  My neighbor's little boy.

21 Q.  What's the neighbor?  What's his or her name, the neighbor's

22 name?

23 A.  Gloria.

24 Q.  Do you know where this -- what we just listened to, where

25 this is happening?

Page 1953

1 A.   In my apartment building.

2 Q.   And Anthony lived in your apartment building?

3 A.   Yes.

4 Q.   With Gloria?

5 A.   Yes.

6 Q.   We can hear you also on this portion counting:  Two, four,

7 five, six, seven, eight, nine, 10.  What are you counting?

8 A.   Twenties.

9 Q.   $20 bills?

10 A.   $20 bills, yes.

11 Q.   And why were you counting -- are you about to say something?

12 A.   No.

13 Q.   You were counting money.  Why are you counting money at that

14 point?

15 A.   I don't understand the question.  What you mean, why?

16 Q.   You said that you're counting $20 bills?

17 A.   Yes.

18 Q.   And I think you said -- how many $20 bills were you

19 counting?

20 A.   I counted out 10.

21 Q.   So that's $200?

22 A.   Yes.

23 Q.   Why are you counting out $200?  What are you going to do

24 with that $200?

25 A.   I'm going to spend it to buy crack cocaine.

Page 1954

1  Q.  Did we hear you doing that yet on the tape, or not yet?

2  A.  Yes.

3  Q.  And what happened?  How much crack did you buy?

4  A.  $200 worth.

5  Q.  And who did you buy it from?

6  A.  Cool Wop.

7  Q.  Okay.

8         (Audiotape played in open court.)

9  BY MR. LEON:

10 Q.  Okay.  I would just like to quickly go through that portion.

11        At the beginning of the portion you're heard to say,

12 "320?  Shit, that's going to leave me broke, but you know I'll

13 make mine back, don't you?"

14        Do you remember hearing that?

15 A.  Yes.

16 Q.  What did you mean when you said that?  First of all, what's

17 320?

18 A.  $320.

19 Q.  Do you know what you men when you said, "but I'll make mine

20 back"?

21 A.  Yes.

22 Q.  What did you mean?

23 A.  With the extra that I get, I make my money off of.  If I'm

24 given extra dimes, I make money off of it by selling it.

25 Q.  You're making a purchase for the FBI at this point.  Right?

1 A.  Yes.

2 Q.  Were you going to sell that crack right there?

3 A.  No.

4 Q.  So why did you say, "I'll make mine back," with respect to

5 that purchase that you intended --

6 A.  Oh, no, I wasn't going to sell back what I was buying for

7 them.

8 Q.  Say again?

9 A.  I wasn't going to sell back what I was buying for them.

10 Q.  Buying for who?

11 A.  FBI.

12 Q.  So my question is, why did you say, then, "I'll make mine

13 back" if you didn't intend to?

14 A.  Because I kept some for myself.

15 Q.  On that occasion you did?

16 A.  Yes.

17 Q.  Did you do that from time to time?

18 A.  Yes.

19 Q.  Why?

20 A.  I was an addict.

21 Q.  And were you told that you could keep some crack for

22 yourself by the FBI?

23 A.  No.

24       MR. MARTIN:  Your Honor, I object.  This goes to what

25 we discussed a couple of days ago.

1          THE COURT:  Come on up.

2          (BENCH CONFERENCE ON THE RECORD.)

3          MR. MARTIN:  I think what the government is doing here

4 again is bolstering her testimony.  They're vouching for her

5 honesty and credibility, and I think it's impermissible.

6          I know you said under 607 that they could do that, they

7 could impeach their own witnesses.  But I don't think it's

8 impeachment.  I think it's bolstering, and that's what's taking

9 place here.

10          THE COURT:  I disagree.  It's overruled.

11          (END BENCH CONFERENCE.)

12 BY MR. LEON:

13 Q.  Were you given -- were you told by the FBI whether or not

14 you could keep some drugs for yourself?

15 A.  No.

16 Q.  They never said anything to you or -- let me ask a better

17 question.

18          Did the FBI explain to you, yes or no, if you could

19 keep some of the drugs you were buying for yourself?

20 A.  That I could keep them?

21 Q.  Yeah.

22 A.  No.

23 Q.  They told you?

24 A.  No.

25 Q.  And why did you do this anyway?

1 A.  I was an addict.

2 Q.  And what does that mean?

3 A.  I mean that I wanted to get high, so I would keep some of

4 the drugs sometimes.

5 Q.  Were you concerned that the FBI may catch on and figure out

6 that you were taking some for yourself?

7 A.  Yes.

8 Q.  And did you keep doing it anyway?

9 A.  Yes.

10 Q.  Why?

11 A.  Like I said, I was an addict.  I didn't care.

12 Q.  Did you think at all, yes or no, back then, what might

13 happen if you got caught taking a few off the top for yourself?

14 A.  No.

15 Q.  Why not?

16 A.  Just at the time, like I said, I wanted to get high.  So I

17 just did it anyway.

18 Q.  Now, did you actually get high while you're still on the

19 tape before you get back to Kyle?

20 A.  No.

21 Q.  When do you get high?

22 A.  Afterwards.

23 Q.  So what do you do with those few zips that you're taking off

24 the top for yourself?  Where do they go?

25 A.  I hide them in various places.

1 Q.  Well, I believe you've told us earlier that you were

2 searched before and after these transactions.  Correct?

3 A.  Yes, I am.

4 Q.  Were you searched at the end of all the transactions that

5 you can remember?

6 A.  Yes.

7 Q.  Were you searched at the end of this transaction?

8 A.  Yes.

9 Q.  So where would you hide this that it didn't get -- well,

10 withdrawn.

11          Did you ever get searched afterwards, on the times when

12 you did hide stuff, and they caught it, they found it?

13 A.  No.

14 Q.  Where did you hide this stuff?

15 A.  In my underwear.

16 Q.  Okay.  Also on this tape, this same portion we just listened

17 to, there's somebody that's heard -- a man's voice that's heard

18 to say, "That's 320."  And then that same voice is heard to say,

19 "I owe you eight dimes, I'm a bring the rest of them to you."

20          Do you remember hearing that?

21 A.  Yes.

22 Q.  Who said that?

23 A.  Cool Wop.

24 Q.  What did that mean?  What did you understand that to mean?

25 A.  That he owed me some more dimes.

1 Q.  And when did he give this to you?

2 A.  The same day, five, 10 minutes later.

3 Q.  And later on in that same portion, that voice can be heard

4 saying, "26, but I'm going to give you something extra."  What

5 did you understand that to mean?

6 A.  That he was going to give me extra dimes.

7          (Audiotape played in open court.)

8 BY MR. LEON:

9 Q.  Okay.  The portion that we just listened to, did you hear a

10 male voice say, "Whatever, whatever you want.  You ain't got no

11 money.  You can come holler at me, you hear me?"

12          Do you remember hearing that?

13 A.  Yes.

14 Q.  Whose voice was that?

15 A.  Cool Wop.

16 Q.  And what did you understand that to mean?

17 A.  If I didn't have any money and I wanted something, then I

18 could get it.

19 Q.  Why would -- in your mind -- well, withdrawn.

20          Previous to this purchase, did Cool Wop ever give you

21 drugs up front without money?

22 A.  Sometimes, yes.

23 Q.  And would you then pay him back at some point?

24 A.  No.  It would often be like testers.

25 Q.  Explain what that means.  What do you mean by that?

1 A.  An individual give you some crack to try it and --

2        THE COURT:  Keep your voice up.

3 A.  The individual gives you crack, to try to see if it's good

4 or bad.

5 BY MR. LEON:

6 Q.  And Cool Wop would do that with you from time to time?

7 A.  Yes.

8 Q.  How often would you say he did that?

9 A.  Not often.

10 Q.  Are you familiar with the expression "fronting"?

11 A.  Yes.

12 Q.  To front somebody?

13 A.  Yes.

14 Q.  What do you understand that term to mean?

15 A.  To get crack on credit.  You can get the crack now, and the

16 then pay them later.

17 Q.  Did you ever get crack on credit in Congress Park?

18 A.  Yes.

19 Q.  Who would give you crack on credit?

20 A.  You just want me to name the individual?

21 Q.  I want you to name --

22 A.  I mean...

23 Q.  I want you to name any person in Congress Park who gave you

24 crack on credit, that you can remember.

25 A.  DC.  I'm drawing a blank right now.

1 Q.  Okay.  That's fine.

2        MR. ZUCKER:  I'm sorry, Judge.  It's hard for us to

3 hear back here.

4 A.  I said I'm drawing a blank right now.

5 Q.  You're drawing a blank?

6 A.  Yes.

7 Q.  Does that mean there are others who you can't remember --

8 A.  Yes.

9 Q.  -- or there are no others?

10 A.  No.  There are others, but I'm just drawing a blank.

11 Q.  Okay.  Would there be certain times of the month that you

12 would be more able to get crack on credit?

13 A.  Yes.

14 Q.  What times of the month would that be?

15 A.  Just before the 1st of the month.

16 Q.  And why is that?

17        MR. ZUCKER:  Objection.

18        THE COURT:  Overruled.

19 BY MR. LEON:

20 Q.  Why would it be easier to get crack on credit towards the

21 end of the month?

22 A.  Because the guys knew that checks come out on the 1st of the

23 month.

24 Q.  Were you receiving checks on a monthly basis when you were

25 an addict in Congress Park?

1 A.   Yes.

2 Q.   Okay.  And just to complete that section we listened to, you

3 said earlier, in the earlier portion we listened to, that you

4 still had a few more -- some more crack to get to complete the

5 deal from Cool Wop?

6 A.   Yes.

7 Q.   Did you complete it yet or not, on the portion we just

8 heard, the recent portion?

9 A.   Yes.

10 Q.   Do you know how much more you got from Cool Wop on that

11 portion we just heard?

12 A.   Ten more dimes.

13 Q.   And do you know if you kept any of those for yourself on

14 this particular occasion?

15 A.   I can't remember.

16 Q.   Okay.

17          (Audiotape played in open court.)

18 BY MR. LEON:

19 Q.   Do you know -- you hear at the very end someone said, "I got

20 the numbers"?

21 A.   Yes.

22 Q.   Who said that?

23 A.   I did.

24 Q.   Do you know what numbers you're referring to?

25 A.   Pager number, telephone.

1 A.  No.

2 Q.  You don't know either way, or he didn't?

3 A.  I don't know either way.

4          MR. LEON:  I'm sorry, Your Honor.  Can I have just one

5 moment?

6 BY MR. LEON:

7 Q.  Do you know if he had any friends in Congress Park, he being

8 Jojo?

9 A.  Yes, I'm sure he did.

10 Q.  We don't want you to guess.

11 A.  Yes.

12 Q.  What's that?

13 A.  Yes.

14 Q.  Well, who did you know his friends to be?

15 A.  A lot of times I saw him, he was by his self.

16 Q.  Did you ever see him with other people?

17 A.  Yes.

18 Q.  Who were those people when you saw him with other people?

19 A.  Dazz, Antwuan, and other guys.

20          MR. LEON:  May I approach?

21 BY MR. LEON:

22 Q.  Ms. Parson, I'm handing you what's in evidence as

23 Government's 310.  Do you recognize that?

24 A.  Yes, I do.

25 Q.  What is it?

1 A.  It's a disc of a drug transaction that I made.

2 Q.  And how do you know that?

3 A.  I listened to it, and I dated and signed it.

4 Q.  Ms. Parson, you said you listened to this previously?

5 A.  Yes.

6 Q.  Did you listen to the entire tape?

7 A.  Yes.

8 Q.  And did you recognize -- what did you recognize this tape to

9 be of, just generally right now?

10 A.  A drug transaction.

11 Q.  Did you recognize the voices on there?

12 A.  Yes.

13 Q.  Did you recognize your voice on there?

14 A.  Yes.

15 Q.  And just yes or no:  To the best of your knowledge, was the

16 tape always running the entire time?

17 A.  Yes.

18 Q.  And did the tape record the entire time you were working for

19 the FBI on that tape?

20 A.  Yes.

21 Q.  And is what you heard on this tape, Government's 310, did it

22 seem to fairly and accurately describe what you did on that day

23 for the FBI?

24 A.  Yes.

25        MR. LEON:  Your Honor, at this time the government

Page 1967

1 would move for admission of 310.

2        MR. MARTIN:  No objection.  I checked with the clerk

3 earlier.  I think it was already admitted.  No objection, Your

4 Honor.

5        THE COURT:  Without objection, 310 is received.

6        (Government's Exhibit 310 was moved into evidence.)

7        MR. LEON:  And the government would also, based on this

8 testimony as well as the prior testimony of Agent Lockhart, move

9 for admission of Government's 310.1.

10        THE COURT:  Without objection, 310.1 is received.

11        (Government's Exhibit 310.1 was moved into evidence.)

12        BY MR. LEON:  At this time I'm going to ask

13 Mr. Mazzitelli to play 310.1.  There may be a portion cut off

14 too soon, so we may have to jump back to 310.  But we'll see if

15 we can get it all on 310.1.  From the beginning.

16        (Audiotape played in open court.)

17 BY MR. LEON:

18 Q.  Who are the voices we heard there?

19 A.  My voice and Kyle's.

20        (Audiotape played in open court.)

21 Q.  Okay.  What are you doing there?

22 A.  Walking towards Congress Park.

23 Q.  Okay.

24        (Audiotape played in open court.)

25 BY MR. LEON:

1 Q.   Okay.  And you made a reference -- well, first of all, who

2 is the female's voice on that tape?

3 A.   Mine.

4 Q.   And you can be heard referring to somebody named Jojo.  Who

5 is that?

6 A.   Jojo.

7 Q.   The same Jojo you identified yesterday in Court?

8 A.   Yes.

9 Q.   And you're counting out -- sounds like you're counting 10,

10 20, 30 --

11        MR. ZUCKER:  Objection.  Withdrawn.  Withdrawn.

12 BY MR. LEON:

13 Q.   Sounds like you're counting 10, 20, 30, 50.  Did you hear

14 that?

15 A.   Yes.

16 Q.   What are you counting?

17 A.   Money.

18 Q.   And what are you talking to Jojo about right there?

19 A.   Purchasing crack.

20        (Audiotape played in open court.)

21 BY MR. LEON:

22 Q.   Okay.  Who is the man's voice that we heard on that portion?

23 A.   Jojo.

24 Q.   And who is the female's voice?

25 A.   Mine.

1 Q.  And you can be heard on that portion saying, "You only got

2 four?"  Do you remember that?

3 A.  Yes.

4 Q.  What were you referring to?

5 A.  Crack.

6 Q.  Four what?

7 A.  Four dimes.

8 Q.  And the man's voice -- Jojo's voice can be heard saying,

9 "Give me 25"?

10        MR. MARTIN:  Objection.

11        THE COURT:  Sustained.

12 BY MR. LEON:

13 Q.  What if anything do you remember Jojo saying after you said,

14 "You only got four?"

15 A.  I asked him, how much he would let them go for.

16 Q.  What did he say?

17 A.  25.

18 Q.  25 what?

19 A.  $25.

20 Q.  And what did you and he do, if anything?

21 A.  I got the four for the 25 from him.

22 Q.  And was that on the portion that we just heard?

23 A.  Yes.

24 Q.  And at one point also, before that's completed, you're heard

25 to say, "They're little, they little."  Do you remember that?

Page 1970

1  A.  Yes.

2  Q.  What did you mean by that, if you remember?

3  A.  The dimes were small.

4  Q.  And so the fact that they're small meant what to you in

5  terms -- if anything, in terms of the sale price?

6  A.  I wasn't going to pay full price for them.

7  Q.  What would full price be for four zips?

8  A.  $40.

9  Q.  Now, also earlier on this same portion that we just listened

10 to, you can be heard saying, "I'm ready to get 50 from him, and

11 I paged Boy-Boy to the house."  Do you remember hearing that?

12 A.  Yes.

13 Q.  Was Boy-Boy one of the people whose pager you had?

14 A.  Yes.

15 Q.  At that time?

16 A.  Yes.

17 Q.  Okay.

18        (Audiotape played in open court.)

19 BY MR. LEON:

20 Q.  Did you recognize the voices we just heard on that portion?

21 A.  Yes.

22 Q.  Whose voice was the female voice?

23 A.  My voice.

24 Q.  And whose was the male voice?

25 A.  Boy-Boy.

1 Q.  And you can be heard to say, "I just hit you."  What do you

2 remember meaning by that?

3 A.  I paged him.

4 Q.  And tell us what happened once -- what we heard just once

5 you and he met up.

6 A.  Exchanging money for drugs.

7 Q.  Do you remember specifically how much money for how much

8 drugs, as you sit here?

9 A.  No.

10 Q.  I'm going to --

11        MR. LEON:  There's a portion, unfortunately, Your

12 Honor, that was cut off from the redacted.  So I'm going to ask

13 to play just a portion, which Mr. Mazzitelli is teeing up, of

14 the un-redacted right after that.

15        THE COURT:  And that's Exhibit 310?

16        MR. LEON:  Yes.

17 BY MR. LEON:

18 Q.  Okay.  Ms. Parson, I just want you to listen to this

19 remaining portion, which wasn't captured on the redacted, but

20 we're going to play for you now from 310, the un-redacted

21 version.

22        (Audiotape played in open court.)

23 BY MR. LEON:

24 Q.  I think we got that in the record.  Did you hear on the

25 tape -- first of all, whose voice was that, that we were

1 listening to?

2 A.  Mine.

3 Q.  Did I hear correctly you say, "I did the ball with Jojo, I

4 mean the ball 50 with Boy-Boy."

5 A.  Yes.

6 Q.  What does that mean, "the ball 50 with Boy-Boy"?

7 A.  That's $150.

8 Q.  Okay.  And that was $150 what?

9 A.  $150 bill -- I mean, money.

10        MR. LEON:  And then if we could just go back to the end

11 of the NT 310.1, just to wrap that up, please.  Thank you.  The

12 very last section.  Thank you.

13        (Audiotape played in open court.)

14 BY MR. LEON:

15 Q.  And what do we hear, just quickly, at the very end of that

16 portion?

17 A.  I had met back up with Kyle.

18        MR. LEON:  May I approach?

19        THE COURT:  Yes.

20 BY MR. LEON:

21 Q.  Ms. Parson, I'm finally handing you what's been in evidence

22 as 311.  Can you tell us if you recognize that?

23 A.  Yes.  It's a disc that's a recording of me doing a drug

24 deal.

25 Q.  Excuse me?  I'm sorry, what is it?

1 A.  It's a disc with a recording of me doing a drug deal.

2 Q.  And how do you know that?

3 A.  I listened to it, dated and signed it.

4        MR. BALAREZO:  Your Honor, we're having problems

5 hearing again.

6        THE COURT:  Could you repeat your answer, please?

7        THE WITNESS:  I listened to it, dated, and signed it.

8 BY MR. LEON:

9 Q.  Okay.  We're really going to need you to keep your voice up.

10 I know it's hard.  Just talk right into that, if you can.

11 A.  Okay.

12 Q.  And did you listen to this entire tape?

13 A.  Yes.

14 Q.  And when you listened to it, did you recognize your voice on

15 it throughout?

16 A.  Yes.

17 Q.  And did it, to your ear, appear to be a true and accurate

18 recording of what you did for the FBI on the day it was

19 recorded?

20 A.  Yes.

21 Q.  And was the recording on at all times and turned off at the

22 end?

23 A.  Yes.

24        MR. LEON:  Your Honor, at this time the government

25 would move for admission of 311.

1          THE COURT:  Without objection, 311 will be received.

2          (Government's Exhibit 311 was moved into evidence.)

3          MR. LEON:  And based on the admission of 311, and the

4  prior testimony of Agent Lockhart, we would also move for the

5  admission of 311.1.

6          THE COURT:  Without objection, 311 will be received.

7  I'm sorry.  311.1.

8          (Government's Exhibit 311.1 was moved into evidence.)

9  BY MR. LEON:

10  Q.  And we're now going to play 311.1.  And just listen

11  carefully, Ms. Parson, and I'll ask you some questions.

12          (Audiotape played in open court.)

13  BY MR. LEON:

14  Q.  Did you hear the portion we just played?

15  A.  Yes.

16  Q.  Did you recognize your voice on that?

17  A.  Yes.

18  Q.  Did you recognize a man's voice on that?

19  A.  Yes.

20  Q.  Who was that?

21  A.  Keith Barnett.

22  Q.  And was Keith Barnett somebody who you bought drugs from

23  prior to this day?

24  A.  Yes.

25  Q.  Did he sell drugs in Congress Park?

1 A.  Yes.

2 Q.  How many times would you say you bought drugs from

3 Keith Barnett, as you sit here today?

4 A.  30, 40.

5 Q.  What would be the range of prices -- excuse me, range of

6 amounts you would get from Keith Barnett?

7 A.  Anywhere from a dime to 200.

8        MR. ZUCKER:  Volume, please.

9 A.  From a dime to 200.

10 Q.  We're almost done.  I'm going to ask you to use the

11 microphone, either one.

12 A.  Okay.  All right.

13 Q.  Okay, use both.

14 A.  Like that?

15 Q.  Yes.

16 A.  Okay.

17 Q.  Do you remember hearing you say on this portion we just

18 listened to, "Security riding around," and then the response,

19 "You know I learned my lesson about that."  Did you hear that

20 portion?

21 A.  Yes.

22 Q.  Do you remember, as you sit here today, what you were

23 referring to?

24 A.  Keith Barnett and I were in the hallway one night making a

25 transaction, and security ran in the building.

1 Q.  And what happened?

2 A.  And I took and threw the crack in their face and walked

3 away.

4 Q.  Please speak up.

5 A.  I took and threw the crack in his face and walked away.

6 Q.  Did you get caught by security?

7 A.  No.

8 Q.  Did you get arrested?

9 A.  No.

10 Q.  What kind of security was this?

11 A.  Congress Park.  They had hired a security company.

12 Q.  Was this a private security company?

13 A.  Yes.

14 Q.  Do you know the name of it?

15 A.  I can't remember, no.

16 Q.  Did they have uniforms?

17 A.  Yes.

18 Q.  Were any of the people in this courtroom members of that

19 security at that time?

20 A.  No.

21 Q.  Did any of the people in this courtroom later become members

22 of security?

23        MR. ZUCKER:  Objection.  Basis of knowledge.

24 BY MR. LEON:

25 Q.  If you know.

1            THE COURT:  If she knows, I'll let her answer.

2 BY MR. LEON:

3 Q.  If you know.

4 A.  I'm not sure, no.

5 Q.  But at the time that this transaction happened, there was

6 private security in Congress Park?

7 A.  Yes, there was.

8 Q.  And you can be heard saying, "50, 10, 20, 30, 40, 50."

9            Do you remember that?

10 A.  Yes.

11 Q.  And do you know what you were doing?

12 A.  Counting money.

13 Q.  And what did you do after you counted the money, if

14 anything, with Keith Barnett?

15 A.  I gave him the money and he gave me crack.

16 Q.  Finally, you can be heard on the end of this portion saying,

17 "I'm trying to use somebody's phone so I can page Boy-Boy."  Do

18 you remember hearing that?

19 A.  Yes.

20 Q.  Do you know if you did page Boy-Boy?

21 A.  I can't remember.

22 Q.  Okay.

23            (Audiotape played in open court.)

24 BY MR. LEON:

25 Q.  Did you hear your voice on that portion we just heard?

1 A.  Yes.

2 Q.  Did you recognize the other voice we heard?

3 A.  Yes.

4 Q.  Whose voice did you recognize that to be?

5 A.  Chow-Wow.

6 Q.  And what if anything did you understand you and Chow-Wow to

7 be doing at that time?

8 A.  I was purchasing crack cocaine from him.

9 Q.  And do you remember, or can you tell from that, how much you

10 bought from him?

11 A.  $150 worth.

12 Q.  And there was also a reference to you saying, "I paged -- I

13 don't know why he don't give you the pager if he's, if he's not

14 going to be, you know, waiting on him, carrying on."  Do you

15 remember hearing that?

16 A.  Yes.

17 Q.  What do you remember, if anything -- withdrawn.

18       Let me start again.  What do you understand that to

19 mean, if anything?

20 A.  I paged Boy-Boy, but Chow-Wow came.  And I was just saying,

21 he should give him the pager since he the one that answers the

22 calls.

23       MR. ZUCKER:  I'm sorry, we're still having difficulty

24 hearing.

25       THE COURT:  Let me ask you, if you can, hold that mic

1 up closer to you.

2          THE WITNESS:  Okay.

3          THE COURT:  The mic is working all right.  You can sit

4 back.  Just hold it as close to your mouth as you can.

5          THE WITNESS:  This one?  Okay.  All right.  Again?

6 BY MR. LEON:

7 Q.  I'm going to ask you to repeat your answer.  What did you

8 mean by what you said --

9 A.  I would page Boy-Boy, and Chow-Wow would come in instead.

10 And I was just saying that Boy-Boy should give Chow-Wow the

11 pager since he's always answering the call.

12          (Audiotape played in open court.)

13 BY MR. LEON:

14 Q.  And just quickly, what do we hear at the very end there?

15 A.  I was returning to the van.

16 Q.  And what did you do with the drugs that you bought from

17 those two people, Keith Barnett and Chow-Wow?

18 A.  I gave them to Kyle.

19 Q.  Okay.  We have just a few more questions, but we're done

20 with the tapes.  Okay?

21 A.  Okay.

22 Q.  I'm going to ask you to just keep the microphone as close to

23 your mouth as you can.

24          (OFF THE RECORD.)

25 Q.  Now, I believe yesterday, Ms. Parson, you told us about how

1 A.  Judge Roberts.

2 Q.  His Honor, this judge?

3 A.  Yes.

4 Q.  And before you entered into that agreement, did you learn --

5 did you have an understanding in your mind how much jail time

6 you could possibly receive as a result of pleading guilty to

7 what you pled guilty to?

8 A.  Yes.

9 Q.  What was your understanding?

10 A.  No less than 10 years, and no more than life.

11 Q.  So why did you enter into that plea agreement that would

12 face that potential sentence and the serious charge you pled to?

13 A.  I didn't want to go to jail.

14      MR. LEON:  May I approach, Your Honor?

15      THE COURT:  Yes.

16      MR. LEON:  Your Honor, I have two requests.  One is to

17 approach the witness, and the other is if I could ask the Court

18 if it would be okay if Ms. Romero turned the screens off.

19      THE COURT:  Yes.

20      MR. LEON:  Thank you.

21 BY MR. LEON:

22 Q.  Ms. Parson, I'm handing you what's marked for identification

23 as Government's 1125.  Do you see that?

24 A.  Yes.

25 Q.  Take a careful look at that, and tell us if you know what

Page 1986

1 that is.

2 A.  It's a copy of -- looks like a copy of the agreement I

3 signed.

4 Q.  Well, I'm going to ask you to turn the pages and make sure

5 that that's what it is.  And why don't I direct you to a couple

6 of quick pages.  The first page would be page nine of the

7 agreement.

8 A.  Yes.

9 Q.  Do you recognize the signatures on that page?

10 A.  Yes.

11 Q.  Whose signatures are there?

12 A.  My signature and my lawyer's.

13 Q.  Is there another one at the top?

14 A.  Yes.  The U.S. Attorney's signature.

15 Q.  Do you know who that is?

16 A.  Yes, Jeff Beatrice.

17 Q.  Did you meet him?

18 A.  Yes.

19 Q.  And do you remember signing into this agreement?

20 A.  Yes, I do.

21 Q.  And the date on the first page appears to be April 16th of

22 2002.  Does that sound about the time that you entered into this

23 agreement?

24 A.  Yes.

25        MR. LEON:  Your Honor, at this time the government

Page 1990

1 Your Honor.

2          MR. ZUCKER:  Exception.

3          THE COURT:  You want to repeat the question?

4          MR. LEON:  I'll ask another one.  I don't think I

5 should repeat it.

6          MR. TABACKMAN:  In the sense, Your Honor, that I think

7 he said "would" as if it were a certainty.

8          MR. LEON:  I'll rephrase.

9 BY MR. LEON:

10 Q.  Do you have an understanding in your mind, your own mind,

11 what might happen if you were found to be lying under oath?

12 A.  Yes.

13 Q.  What is your understanding in your own mind?

14 A.  I would go to jail.

15 Q.  How long could you go to jail?

16 A.  No less than 10, no more than life.

17 Q.  And do you have an understanding as to how lying would

18 affect that agreement that's right in front of you,

19 Government's 1125?

20 A.  Yes.

21 Q.  What is your understanding as to how lying would affect that

22 agreement?

23 A.  I could go to jail.

24 Q.  Now, I think during one of your -- the answers you just gave

25 us, you said you were hoping not to go to jail.  Is that right?

1 think can be resolved after the jury leaves today.

2          THE COURT:  Thank you.  Did you have any more

3 questions?

4          MR. LEON:  I actually have just a couple.

5          THE COURT:  All right.  Are you ready for the jury?

6          MR. LEON:  Yes.

7          THE COURT:  Let's bring the jury in.

8          (Jury in at 4:00 p.m.)

9          THE COURT:  Good afternoon again, ladies and gentlemen.

10 Welcome back.  We had a matter that didn't require your

11 attention that we wanted to take care of, and we have taken care

12 of it.  So thank you for your indulgence and your patience, but

13 we are now ready to resume.

14          Counsel?

15          MR. LEON:  Thank you.

16 BY MR. LEON:

17 Q.  Ms. Parson?

18 A.  Yes.

19 Q.  In the time that you lived in Congress Park, did you ever

20 hear the phrase "doors"?

21 A.  Yes.

22 Q.  Do you have an understanding in Congress Park what "doors"

23 means?

24 A.  Yes.

25 Q.  What's your understanding?

Page 2014

1 A.  It's when two dealers would split a sale.

2 Q.  Have you ever heard people in Congress Park use that to

3 split a sale?

4 A.  Yes.

5         MR. LEON:  Thank you, Your Honor.  I have no further

6 questions.

7         THE COURT:  All right.  Mr. Beane, do you care to

8 cross-examine on behalf of Mr. Bell?

9         MR. BEANE:  Yes, I do, Your Honor.

10         THE COURT:  All right.  You may proceed.

11                    CROSS-EXAMINATION

12 BY MR. BEANE:

13 Q.  Good afternoon, Ms. Parson.

14 A.  Good afternoon.

15 Q.  I want to start with, if we can, establishing a time line

16 for your drug use and drug addiction.  Can we do that?

17 A.  Yes.

18 Q.  You indicated -- when did you say you actually started using

19 crack cocaine?

20 A.  The late '80s, early '90s.

21 Q.  Okay.

22 A.  When it first came out.

23 Q.  And then at some point you said you became addicted to the

24 crack.  Correct?

25 A.  My addiction became more progressive as the years went on.

1 you promised that you were going to help them out.  Right?

2 A.  Yes.

3 Q.  But you had no intention of keeping that promise.  Right?

4 A.  Yes.

5 Q.  You did or you didn't?

6 A.  I didn't.

7 Q.  In fact, I believe you said you started ducking them almost

8 right away?

9 A.  Yes.

10 Q.  When you say you started ducking them, did you actually move

11 to a different location?

12 A.  No, I just wouldn't answer the door.  If someone would come

13 to the door, I would just be very still in the house.

14 Q.  Did they ever call you?

15 A.  No.

16 Q.  You gave them your number, though.  Right?

17 A.  I can't remember if I had a phone then or not.

18 Q.  You mean when you left the FBI headquarters?

19 A.  I'm sorry?

20 Q.  When you left the FBI headquarters, you don't know whether

21 you had a number?

22 A.  No, I can't remember if I had a phone.

23 Q.  How long did it take -- well, how long did you duck them?

24 A.  About a week or two.

25 Q.  Okay.  And so in that week or two -- after that week or two,

1 Q.  You sought them out?

2 A.  Yes.

3 Q.  And then you paid them money for crack?

4 A.  Yes.

5 Q.  Now, at some point I believe you indicated that you used to

6 throw parties.  Right?

7 A.  I'm sorry, say that again.

8 Q.  You used to have parties where crack addicts came?

9 A.  Parties, yes.

10 Q.  And at these parties you would invite other crack addicts.

11 Right?

12 A.  Yes.

13 Q.  And people would come to your house to sell crack to the

14 crack addicts.  Right?

15 A.  Yes.

16 Q.  These people who came, it's true that they competed with

17 each other.  Right?

18 A.  Yes.

19 Q.  So this wasn't any gathering of people who said, let's go

20 sell crack to these addicts?

21 A.  No.

22 Q.  In fact, I believe you indicated that somebody threatened

23 somebody if they didn't buy crack?

24 A.  Yes.

25 Q.  All right.  So you told the agents about these parties.

1 Right?

2 A.  Yes.

3 Q.  How often would you have these parties?

4 A.  Sometimes three or four times a month.

5 Q.  And how long -- I mean, when did you first start having

6 these parties?

7 A.  I can't remember the exact date or year.

8 Q.  Estimate.

9 A.  '99, '98.  Well, a little before then.  '96.

10 Q.  So maybe '96?

11 A.  Yes.

12 Q.  And after late 2000 when the FBI came to you at your home,

13 did you stop having the parties?

14 A.  Nope.

15 Q.  So you continued to have the parties for how long?

16 A.  Up until the time I went into -- I was court-ordered to go

17 into the program.

18 Q.  And when was that?

19 A.  July the 22nd, 2002.

20 Q.  2002.  So that's about seven years?

21 A.  Yeah.

22 Q.  Seven years, two or three times a month?

23 A.  (Witness nods.)

24 Q.  Okay.  When you had these parties, what would you get in

25 return?

Page 2025

1 A.  Drugs.

2 Q.  From who?

3 A.  Whomever was there.  I would either get it from the person

4 that came to sell or the person that came to buy.

5 Q.  So basically these people were paying you to use your

6 apartment?

7 A.  Yes.

8 Q.  Could you estimate the number of people that typically came

9 to these parties?

10 A.  Sometimes it would be four, it might be two people, might be

11 six people.

12 Q.  And so if there were six people, you would get six dime

13 bags?

14 A.  Something like that.

15 Q.  And I think we talked for a while, or you talked for a while

16 about dime bags, but my math isn't that great.  How many grams

17 are in a dime bag?

18 A.  I have no idea.

19 Q.  How many grams are in an eight-ball?

20 A.  I have no idea.

21 Q.  So in all of this time that you are selling or taking in

22 this crack, you don't really have any idea how much you took in.

23 Right?

24 A.  No.

25 Q.  While we're on -- let's move, then, to the actual -- how

1 Q.  Did your daughter help take care of you while you were

2 addicted to crack?

3 A.  No.

4 Q.  Who took care of your daughter while you were addicted?

5 A.  Her father.

6 Q.  Isn't it true that Mr. Bell also helped you with that?

7 A.  Yes, he did.

8 Q.  He would buy you groceries sometimes?

9 A.  Yes, he would.

10 Q.  And sometimes he would actually take your daughter into his

11 house?

12 A.  Yes.

13 Q.  And you knew that he actually lived in Maryland at that

14 time.  Right?

15 A.  No, I didn't.  No.

16 Q.  So when Mr. Bell would take your daughter to take care of,

17 you didn't know where she was going?

18 A.  She was going to the Lincoln, to the Lincoln apartments.

19 Q.  Okay.  After Mr. Bell -- after she went to go with Mr. Bell,

20 did you actually see her?  Did you actually see where she went?

21 A.  No.

22 Q.  Now, you were asked questions, I think, about where -- you

23 were asked questions about skimming off the top, meaning you

24 were taking crack that the FBI didn't know about.  Right?

25 A.  Yes.

1 Q.  And I think you indicated that you would hide the drugs in

2 your underwear?

3 A.  Yes.

4 Q.  But the FBI would search you, wouldn't they?

5 A.  They never went that far.  We got to know each other real

6 well to go down in my underwear.  Excuse me.  I'm sorry.

7 Q.  Did they tell you why they were searching you?

8 A.  Yes.

9 Q.  They were looking for drugs?

10 A.  Yes.

11        MR. BEANE:  I think we need a second, Your Honor.

12 BY MR. BEANE:

13 Q.  Excuse me.  How do I put this?  The drugs that you had were

14 very small.  Correct?

15 A.  Yes.

16 Q.  The bags were small?

17 A.  Yes.

18 Q.  But they didn't search in all the places that you could put

19 a small bag.  Correct?

20 A.  Exactly.

21 Q.  So you were able to hide these drugs from them?

22 A.  Yes, I was.

23 Q.  When you were working with the FBI, you would also agree

24 that you weren't going to use drugs anymore.  Right?

25 A.  I agreed to that, yes.

1 Q.  When you would use these -- how often would you use drugs

2 while you were working with the FBI?

3 A.  Up until the time I went into detox and into the program.

4 Q.  And that was in July 2002?

5 A.  Correct.

6 Q.  So from late 2000, when you first started working with them,

7 until July 2002, you were still getting high?

8 A.  Yes.

9 Q.  When you went on these -- when you went to purchase drugs,

10 were you high?

11 A.  Sometimes.

12 Q.  And did the FBI agents ever say anything to you about being

13 high?

14 A.  Unless I had been up two or three days and was jumping

15 around, you really wouldn't know unless I told.

16 Q.  Well, was that ever the case when you went to make buys,

17 that you had been up for two or three days?

18 A.  No.

19 Q.  On the tapes you were speaking I guess a little louder than

20 you are now.

21 A.  Yes.

22        MR. LEON:  Objection to form.  He's characterizing all

23 the tapes with that one question.

24        THE COURT:  Do you want to specify?

25 BY MR. BEANE:

1 Q.  On any of the tapes were you speaking loudly?

2 A.  Was I speaking loud?

3 Q.  Loudly, yes.  Louder than you are now.

4 A.  Yes.

5 Q.  It's fair to say that on some of the tapes you were kind of

6 animated?

7 A.  Yes.

8 Q.  And is it fair to say that sometimes when you're high on

9 crack, you are very animated?

10 A.  Yes.

11 Q.  All right.  Now, you're in poor health now.  Correct?

12 A.  Yes.

13 Q.  Back then were you also in poor health?

14 A.  No.

15 Q.  So over time your health deteriorated?

16 A.  Yes.

17 Q.  And when you were working for the FBI, your health was

18 deteriorating then as well.  Correct?

19 A.  It began to, yes.

20 Q.  Okay.  Some of the tapes we can hear you breathing hard

21 because you're walking.

22 A.  Yes.

23 Q.  And that's part of your problem now, right, that you have

24 difficulty breathing?

25 A.  Yes.

1 Q.  Over time, if you know, could the agents tell that your

2 health was deteriorating?

3 A.  Yes.

4 Q.  Did they mention anything to you about it?

5 A.  No.

6 Q.  At some point, though, Mr. Bell mentions something, doesn't

7 he?

8          MR. LEON:  Objection.  Where, when?

9          THE COURT:  I'll let you answer yes or no.

10 A.  Yes.

11 BY MR. BEANE:

12 Q.  Do you remember when that was?

13 A.  No.

14 Q.  But he asked that you go get treatment.  Right?

15 A.  Yes.

16 Q.  And he identified somebody that you could go to, right,

17 Ms. Ballard?

18 A.  Ms. Bailey, yes.

19 Q.  And did you go to her?

20 A.  Yes.

21 Q.  And did you try to get treatment?

22 A.  Yes.

23 Q.  And what happened?

24 A.  I went into the program, but it didn't work.  I was trying

25 to run my own program.  I thought I had it, and I didn't, and I

Page 2033

1 went back out for a short time.

2 Q.  Okay.  Now, when you were talking to the -- in late 2000

3 when you first talked to the FBI, you told them some of your

4 prior drug dealing.  Right?

5 A.  Yes.

6 Q.  But as time went on, did you continue to tell them about

7 your drug dealing?

8 A.  My drug dealings?

9 Q.  Yeah, your drug selling.

10 A.  Selling, no.

11 Q.  How about your drug purchasing?

12 A.  No.

13 Q.  Did you ever tell them exactly how much drugs, how much

14 crack you had bought over the years?

15 A.  No.

16 Q.  But you were permitted to plead guilty to conspiracy.

17 Correct?

18 A.  Yes.

19 Q.  Conspiracy to distribute 100 grams?  Do you remember what it

20 was exactly?  Is it 150 grams, less than 500 grams?

21 A.  500 grams, yes.

22 Q.  But in reality, you've purchased more than that over the

23 years, haven't you?

24 A.  Yes.

25 Q.  You don't know how much more.  Right?

1 Q.  And at that point after your confession, you felt obligated

2 to help them out?

3 A.  Yes.

4 Q.  And in the week or two intervening, or in between those two

5 meetings, you did not help the FBI out?

6 A.  No.

7 Q.  But after they put you in handcuffs, you did help them out?

8 A.  Yes.

9 Q.  And that's because you were afraid of going to jail?

10 A.  Yes.

11 Q.  And when you began helping them out, you told them that you

12 weren't going to use drugs anymore.  Right?

13 A.  Yes.

14 Q.  But you used drugs?

15 A.  No, they told me I wasn't going to use drugs anymore.

16 Q.  You didn't agree not to use drugs?

17 A.  I agreed not to, yes.

18 Q.  So you agreed that you weren't going to use drugs anymore?

19 A.  Yes.

20 Q.  But you continued to use drugs?

21 A.  Yes.

22 Q.  So you lied to the FBI?

23 A.  No.

24 Q.  Okay.

25           MR. BEANE:  Your Honor, that's all I have.

1 I had a job, and paydays we would -- me and my girlfriend would

2 get together and we would buy and get high.

3 Q.  Well, you told Mr. Beane that you in effect became addicted

4 to crack cocaine from the first hit you took?

5 A.  Most addicts do.

6 Q.  So that's when you became addicted.  Right?

7 A.  Yes.

8 Q.  So crack is not really a recreational drug.  Right?  You're

9 addicted from the get-go?

10 A.  Exactly.

11 Q.  And at some point you began using crack very regularly?

12 A.  On a more regular -- yes.

13 Q.  And a more regular basis means daily?

14 A.  Daily.

15 Q.  Twice, three, four, five times a day, if you can get your

16 hands on it?

17 A.  All day, all night.

18 Q.  Days on end.  Right?

19 A.  Days, yes.

20 Q.  And crack really took ahold of your life.  Right?

21 A.  Yes, it did.

22 Q.  And basically it got to the point where you would do

23 anything to get another high.  Right?

24 A.  Exactly.

25 Q.  And I think you indicated to the jury that the anything

1 Q.  And one of the reasons you took crack cocaine was because it

2 altered your mind.  Right?

3 A.  You said one reason I did?

4 Q.  One of the reasons.

5 A.  No.

6 Q.  Well, would you agree that crack cocaine, when you ingested

7 it, messed with your mind?

8 A.  No.

9 Q.  It didn't make you high?

10 A.  Yes.

11 Q.  It didn't make you see spots, as you said on one of those

12 videos, or one of the tapes?

13 A.  That was just that particular batch, yeah.

14 Q.  That was the only time you ever saw spots when you smoked

15 crack?

16 A.  Oh, no, huh-uh.

17 Q.  Well, so it did mess with your mind.  Right?

18 A.  Yes.

19 Q.  And in fact, when you were on these benders, when you were

20 doing crack cocaine for days on end, staying up all night, doing

21 God knows what you were doing, you don't remember half of the

22 things you did during those days, do you?

23 A.  That's true.

24 Q.  And in fact, given that you used and abused crack cocaine

25 for so long, as you sit here today, your memory is not too clear

Page 2046

1 Q.  I don't mean a sexual relationship or anything like that, I

2 just mean you have a rapport with them.

3 A.  A rapport with them, yes.

4 Q.  You're comfortable with them.  Right?

5 A.  Sometimes.

6 Q.  In your mind, they want to help you.  Right?

7 A.  Yes.

8 Q.  And you want to help them?

9 A.  Yes.

10 Q.  And more importantly, you want to help yourself.  Correct?

11 A.  Exactly.

12 Q.  Now, 2000, when they first approach you, you indicated that

13 you were still a crack addict?

14 A.  Yes.

15 Q.  And you were using a lot and heavily in those days?

16 A.  Yes.

17 Q.  And around that time you were also selling crack cocaine.

18 Right?

19 A.  Yes.

20 Q.  And I know to Mr. Beane you indicated that you didn't

21 consider yourself a dealer.  Right?

22 A.  Exactly.

23 Q.  But you do understand that if you give somebody else crack

24 cocaine --

25 A.  You're a dealer.

1 Q.  So going back, you didn't know Mr. Daum at that time?

2 A.  No, I did not.

3 Q.  And of course you couldn't consult with him or any other

4 attorney to see, hey, is this right for me, for Gail Parson.

5 Right?

6 A.  That's right.

7 Q.  So you did what they wanted you to do?

8 A.  Yes.

9 Q.  Now, you started working with them in late 2000, and it was

10 not until 2002, almost two years later, that they actually

11 charged you.  Right?  That you actually appeared before the

12 judge?

13 A.  Yes.

14 Q.  And right before you appeared before the judge is when you

15 were appointed Mr. Daum.  Correct?

16 A.  Yes.

17 Q.  Because you didn't pay for him.  Right?

18 A.  No.

19 Q.  So he showed up one day and said, I'm your lawyer.  Right?

20 A.  Yes.

21 Q.  And I'm going to represent you?

22 A.  Yes.

23 Q.  And don't tell me what you and he talked about or what you

24 said to each other, but you discussed the case.  Right?

25 A.  Yes.

Page 2060

1  Q.  You told him that FBI came to your house twice, you

2  confessed, they had you tied up in a neat little bow.  Right?

3  A.  Yes.

4  Q.  So your only option at that point was what, to take the

5  plea.  Right?

6  A.  Yes.

7  Q.  The plea that they gave you?

8  A.  Yes.

9  Q.  Right.  And that -- the plea agreement that has been

10 discussed that we talked about was a document that they drafted,

11 that they wrote.  Right?

12 A.  Yes.

13 Q.  And although you might have had the opportunity --

14         MR. BALAREZO:  May I approach, Your Honor?

15         THE COURT:  Yes.

16 BY MR. BALAREZO:

17 Q.  And although you may have had the opportunity to review

18 Government's 1125 with Mr. Daum, you really didn't have a lot of

19 input into this, did you?

20 A.  I'm not quite sure what you're asking me.

21 Q.  Well, conspiracy, what you pled guilty to --

22 A.  Yes.

23 Q.  -- that was the only offer they made you.  Right?

24 A.  Yes.

25 Q.  It's not like they came back and said -- or they said

# Tab 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       :
        Plaintiff,              :  Docket No. CR 05-100
        v.                      :
ANTWUAN BALL, DAVID WILSON,     :  Washington, DC
GREGORY BELL, DESMOND           :
THURSTON, JOSEPH JONES, and     :  March 8, 2007
DOMINIC SAMUELS,                :  9:23 a.m.
        Defendants.             :
                                :

VOLUME 14 – MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2094

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2095

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2096

1    THURSDAY MORNING SESSION, MARCH 8, 2007

2         THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United*

3    *States versus Antwuan Ball, David Wilson, Gregory Bell, David*

4    *Wilson, Joseph Jones and Dominic Samuels.*

5         For the government, Mr. Leon, Ms. Petalas and

6    Mr. Guerrero.  For defendants, Mr. Carney, Mr. Tabackman,

7    Ms. Wicks, Mr. Beane, Mr. Zucker, Mr. Martin, Mr. Balarezo and

8    Mr. Purpura.

9         THE COURT:  All right.  Good morning, counsel.  We just

10   got a call that Juror 16 has called in to say he's going to be

11   delayed by one hour.  So there's really nothing we can do to

12   proceed at this point and I suggest we just recess for an hour.

13   That will give you, perhaps, some time to do some things.

14        Mr. Martin, did you have something?

15        MR. MARTIN:  Good morning, sir.

16        THE COURT:  Good morning.

17        MR. MARTIN:  I was just going to ask if the Court would

18   give me permission to go out of turn.  You have a list of

19   examinations for Ms. Parson and I would like to go ahead of --

20        THE COURT:  Yes.  Have you all agreed to it?  I'm sorry to

21   interrupt you.

22        MR. MARTIN:  Yes.

23        THE COURT:  Where would you like to go?

24        MR. MARTIN:  Before Mr. Zucker.

25        THE COURT:  So you would be after Mr. Balarezo?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2097

1    MR. MARTIN:  Yes, sir.

2        THE COURT:  That's fine.  Anything else?

3    MR. MARTIN:  Not from me, sir.

4    MR. TABACKMAN:  Good morning, Your Honor.  I have

5    something on a matter unrelated to this case that Mr. Leon will

6    come to the bench with.  It doesn't need to be on the record at

7    this point, but just with the prosecutor.  But we can wait until

8    you're finished with your matters here.

9        THE COURT:  I'll take it.  We'll be in recess for an hour

10   anyway.  We'll have Ms. Romero inform the jurors while they're

11   back there now that one of the jurors called in to alert us he's

12   delayed by an hour so they should come back at -- let's tell them

13   to come back at -- let's ask them to come back at 10:10,

14   Ms. Romero.  Does that make sense?

15       THE DEPUTY CLERK:  Yes.

16       THE COURT:  What time did he call in, by the way, assuming

17   he just called?

18       THE DEPUTY CLERK:  Mark just called me from the Jury

19   Office.

20       THE COURT:  Let's say 10:10.

21       Off the record.

22       (Thereupon, a discussion was had off the record

23   between Court and counsel.)

24       (Thereupon, a break was had from 9:28 a.m. until

25   10:41 a.m.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2098

1    (Juror No. 16 approached the bench.)

2        THE COURT:  Hi, Juror Number 16, right?  Are you okay?

3    JUROR NO. 16:  Yeah.  I got this -- some kind of little

4    knot thing right there on my ear and I took some Tylenol last

5    night because I bumped it last night and it was aching and I kind

6    of overslept.

7        THE COURT:  All right.  The medicine you took made you

8    oversleep?

9    JUROR NO. 16:  Yeah.  Tylenol, probably.

10       THE COURT:  All right.  Do you think you'll have to take

11   it again, Tylenol?

12   JUROR NO. 16:  I'll probably take a couple of them during

13   the day, but if it's not gone down by the morning, I'll go to the

14   doctor because I don't know what it is.  It's been there for

15   about a day and a half.

16       THE COURT:  All right.  Do you think it would have

17   helped -- do you have an alarm clock or anything?

18   JUROR NO. 16:  Yeah.  It was going off.

19       THE COURT:  But you slept through it?

20   JUROR NO. 16:  Yeah.

21       THE COURT:  Would it help if you got a call, someone

22   called in the morning to make sure you're awake?

23   JUROR NO. 16:  That would be fine, but it should be okay

24   in a day or two, I hope.  I'm going to go to the doctor tomorrow

25   if it's not gone down.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2099

1        THE COURT:  All right.  Okay.  Thank you.

2    JUROR NO. 16:  Thank you.

3    (Juror No. 16 left the bench.)

4        THE COURT:  All right.  Is your witness here?

5    MR. LEON:  She's coming, yes.

6    (Jury in at 10:44 a.m.)

7        THE COURT:  Good morning, ladies and gentlemen.  Welcome

8    back.

9        THE JURY PANEL:  Good morning.

10       THE COURT:  Thank you for your indulgence.  We're ready to

11   resume.

12       MR. BALAREZO:  May I proceed, Your Honor?

13       THE COURT:  Yes.

14       <u>CONTINUED CROSS-EXAMINATION OF GAIL PARSON</u>

15   BY MR. BALAREZO:

16   Q.   Good morning, Mrs. Parson.

17   A.   Good morning.

18   Q.   Ms. Parson, when we left off yesterday, we talked briefly

19   about your time in Congress Park and the people that you said

20   that you had bought from.  Do you remember that?

21   A.   Yes.

22   Q.   Bought drugs, of course?

23   A.   Yes.

24   Q.   And I -- the last couple questions right before the

25   break, I asked you specifically -- the people that you say you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2100

1    bought drugs from, as far as you know, they were working

2    independently and doing their own thing, right?

3    A.   Yes.

4    Q.   And that's the same thing that you were doing?

5    A.   Yes.

6    Q.   And the time came in 2000 when you ended up pleading to a

7    conspiracy, correct?

8    A.   Yes.

9        MR. BALAREZO:  Your Honor, may I approach?

10       THE COURT:  Yes.

11   BY MR. BALAREZO:

12   Q.   Ms. Parson, I'm going to show you that same copy of the

13   plea agreement and I'm going to put the original on the ELMO so

14   you can see it on the screen if you would like.

15   A.   Okay.

16   Q.   So on the ELMO now, I have Government's Exhibit 1125.  Do

17   you see that, ma'am?

18   A.   Yes.

19   Q.   Or you can look at the copy if you would like.

20       Now, this was the plea agreement that you entered into

21   with the government that's dated April the 16th, 2002; is that

22   correct?

23   A.   Yes.

24   Q.   And some time before you entered into this plea

25   agreement, you did obtain the services, through the court, of an

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**2101**

1  attorney, Charles Daum, right?

2  **A.** Yes.

3  **Q.** And by the time that you signed this plea agreement -- do

4  you remember when you signed it?  It's not clear on the

5  agreement itself.  I think it was sometime in May of '02.  Do

6  you remember?

7  **A.** No, I don't.

8  **Q.** But it was sometime after April the 16th that you signed

9  the agreement, correct?

10  **A.** I can't be sure because I can't make out the date.

11  **Q.** But that is your signature --

12  **A.** Yes.

13  **Q.** -- in the back there, right?

14  **A.** Yes.

15  **Q.** Where it says "Defendant's Acceptance," right there?

16  **A.** Yes.

17  **Q.** Okay.  Now, it was approximately May 17th.  Does that

18  ring a bell?

19  **A.** No.

20  **Q.** Now, by the time you signed this plea agreement, you had

21  already cooperated or began your cooperation with the

22  government, right?

23  **A.** Yes.

24  **Q.** Doing those controlled buys where they put the wire on

25  you and send you out to buy drugs, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2102**

1  **A.** Yes.

2  **Q.** And by that time, you had also told them of all your

3  prior criminal activity, correct?

4  **A.** Yes.

5  **Q.** So as you said, by the time you got this plea agreement

6  from the government, that was really your only option?

7  **A.** Yes.

8  **Q.** Now, did you have the opportunity to review the plea

9  agreement before you signed it?

10  **A.** Yes.

11  **Q.** And you had the opportunity to speak to your lawyer,

12  Mr. Daum, about what it meant, right?

13  **A.** Yes.

14  **Q.** And not to be funny, but you do read, right?

15  **A.** Yes.

16  **Q.** And did you read it yourself?

17  **A.** Yes.

18  **Q.** The agreement itself has a lot of legal terminology,

19  correct?

20  **A.** Yes.

21  **Q.** And that's where Mr. Daum was able to explain to you what

22  these things meant; is that right?

23  **A.** Yes.

24  **Q.** Okay.  Now, I'm just going to go through some of the

25  provisions of this agreement just to make sure we understand

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2103**

1  what they are.

2  The first part, paragraph 1, do you see that?

3  **A.** Yes.

4  **Q.** We're here.  Paragraph 1, beginning here, where it says

5  what you're pleading guilty to is one count of conspiracy to

6  distribute and possess with intent to distribute cocaine --

7  cocaine base and cocaine, right?

8  **A.** Yes.

9  **Q.** And you understood what that meant, correct?

10  **A.** Yes.

11  **Q.** So you were pleading guilty to a conspiracy with other

12  individuals, although you've indicated that you were working by

13  yourself?

14  **A.** Yes.

15  **Q.** And the individuals that you were purchasing drugs from

16  were working by themselves and independently of you?

17  **A.** Yes.

18  **Q.** And of each other, correct?

19  **A.** Yes.

20  **Q.** All right.  Now, you didn't choose to plead guilty to

21  conspiracy; that's what they told you you were going to plead

22  guilty to, right?

23  **A.** Yes.

24  **Q.** Because your other option would have been to go to trial,

25  perhaps, and be sitting here at this table, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2104**

1  **A.** Yes.

2  **Q.** And when you got this agreement, you didn't want to do

3  that because you wanted to be free, right?

4  **A.** Yes.

5  **Q.** Now, you do understand that that particular charge that

6  they put before you to plead guilty to carries a ten-year

7  mandatory minimum sentence?

8  Do you understand that?

9  **A.** Yes.

10  **Q.** It's in the agreement, right?

11  **A.** Yes, it is.

12  **Q.** And the maximum, of course, is life in prison?

13  **A.** Yes.

14  **Q.** Now, you understand that the ten-year mandatory minimum

15  means if you plead guilty to that charge, that's the amount of

16  time you have to do, right?

17  **A.** I'm not sure -- yes.

18  **A.** If it's mandatory --

19  **A.** I'm not sure -- yes.

20  **Q.** -- that means you have to do it?

21  **A.** Have to do it, um-hmm.

22  **Q.** But you also understand that because you're cooperating

23  with the government, and because your lawyer explained it to

24  you, you understand that there are ways to get around that

25  mandatory minimum, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2105

1   A.   Yes.
2   Q.   And one of the ways to get around that mandatory minimum
3   is by cooperating, right?
4   A.   Yes.
5   Q.   By helping them out, right?
6   A.   Yes.
7   Q.   Now, the -- one of the things in this particular
8   agreement that they also had you agree to is paragraph 2, that
9   you were going to plead guilty to being accountable for more
10  than 150 grams but less than 500 grams of cocaine base.
11       Do you remember that?
12  A.   Yes.
13  Q.   Now, you said that you moved to Congress Park in 1991 and
14  you were living there for about 15 years, right?
15  A.   Yes.
16  Q.   And for most of that time, you were using and/or selling
17  drugs, right?
18  A.   Yes.
19  Q.   And you were also doing other activities that we talked
20  about yesterday, right?
21  A.   Yes.
22  Q.   And during those 15 years that you were using and/or
23  selling drugs -- I mean, it's fair to say that you sold or used
24  more than 500 grams of crack, correct?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2106

1   Q.   And you do understand that by putting in this agreement
2   that you're only responsible for 150 to 500 grams of crack
3   cocaine, that's limiting your potential exposure to jail time,
4   correct?
5   A.   Yes.
6   Q.   Because didn't your attorney and the judge when you pled
7   guilty, they explained to you what the Sentencing Guidelines
8   meant, correct?
9   A.   Yes.
10  Q.   And the Sentencing Guidelines are something that's
11  separate from the United States Code, which says a ten-year
12  mandatory minimum is what you would be facing, correct?
13  A.   Yes.
14  Q.   And the Sentencing Guidelines relies on -- specifically
15  for drug cases, relies on quantity of drugs to determine a
16  sentencing range, correct?
17  A.   Yes.
18  Q.   So the lower the amount of drugs that you take
19  responsibility for, the lower your possible sentence under the
20  Guidelines; is that your understanding?
21       MR. LEON:  Object to the form.
22       THE COURT:  Sustained.
23  BY MR. BALAREZO:
24  Q.   Well, is it your understanding that under the Guidelines,
25  that if you take responsibility for a lower amount of drugs,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2107

1   that that would lower the possible sentence that you would be
2   facing?
3        MR. LEON:  Same objection.
4        THE COURT:  Sustained.  You can rephrase, though.
5        MR. BALAREZO:  Just the basis.  Maybe I missed --
6        THE COURT:  Beg your pardon?
7        MR. BALAREZO:  Maybe I missed --
8        THE COURT:  I think it was an objection to the way you
9   phrased the question.
10  BY MR. BALAREZO:
11  Q.   Okay.  What is your understanding --
12       THE COURT:  The premise was not accurately put in the
13  question.
14       MR. BALAREZO:  I'm sorry?
15       THE COURT:  The premise was not accurately put in the
16  question.  You can rephrase it with an accurate premise.
17       MR. BALAREZO:  Thank you.
18  BY MR. BALAREZO:
19  Q.   Ms. Parson, what is your understanding of how the
20  Guidelines work?
21  A.   I don't understand.
22  Q.   You didn't understand them?
23  A.   No.
24  Q.   Did you understand them at the time that you signed this
25  plea agreement?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2108

1   A.   No.
2   Q.   But you went ahead and signed it?
3   A.   I had my lawyer, he explained it to me, but I can't
4   remember everything that was said.
5   Q.   So you don't remember -- well, pleading guilty was
6   probably one of the biggest things you've done in your life; one
7   of the most important things you've done in your life, right?
8   A.   Yes.
9   Q.   And that happened in 2002?
10  A.   Yes.
11  Q.   And you don't remember something very important about
12  pleading guilty, right?
13  A.   No.
14  Q.   So is that like what we were talking about yesterday,
15  that your memory and your recollection of things is affected and
16  has been affected by your extensive drug use?
17  A.   Yes.
18  Q.   And also by the time that has passed?
19  A.   Um-hmm.
20  Q.   Is that a "yes"?
21  A.   Yes.
22  Q.   We'll move on.  Let's look at paragraph 4 just briefly,
23  this paragraph (indicating.)  Do you see that?
24  A.   Yes.
25  Q.   In that particular paragraph, the first sentence:  "The

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 380 of 1954

1  United States" -- the government -- "will agree to you -- your
2  client's" -- meaning you -- "release pending sentencing for a
3  limited time period and solely for the purpose of engaging in
4  investigative activity under the direction of law enforcement."
5      Do you see that?
6  **A.**  Yes.
7  **Q.**  Now, you already indicated that you admitted committing
8  crimes and engaged in various criminal conduct, right?
9  **A.**  Yes.
10 **Q.**  And you pled guilty under this agreement, right?
11 **A.**  Yes.
12 **Q.**  And yet they say:  Hey, we're not going to ask that you
13 be locked up," right?
14 **A.**  Yes.
15 **Q.**  And that was very important to you, right?
16 **A.**  Yes.
17 **Q.**  And you didn't want to go to jail, right?
18 **A.**  Yes.
19 **Q.**  And so from the get-go, they're saying we're not going to
20 ask that you be locked up?
21     Do you agree?
22 **A.**  Yes.
23 **Q.**  Now, after you sign your plea agreement in 2002, you
24 weren't out there doing any more of these buys, were you?
25     MR. LEON:  Objection to the form.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1      THE COURT:  Do you understand the question?
2      THE WITNESS:  Yes.
3      THE COURT:  All right.  You can answer.
4      THE WITNESS:  I can't -- no.
5  BY MR. BALAREZO:
6  **Q.**  Because you had stopped doing the buys before you pled
7  guilty, correct?
8  **A.**  Yes.
9  **Q.**  Now, what investigative activity did you do after you
10 pled guilty?  And again, solely for the purpose of engaging in
11 those activities, what did you do for the government?
12 **A.**  They called and asked about various people's locations
13 and I would tell them or --
14 **Q.**  Could you keep your voice up a little bit.
15 **A.**  They would call -- they would ask me about certain
16 individuals' locations and I would tell them.
17 **Q.**  So you were just giving them information, right?
18 **A.**  Exactly.
19 **Q.**  But you yourself were not involved in anything yourself
20 like the undercover buys and that sort of thing, right?
21 **A.**  No.
22 **Q.**  And you also understood if you --
23     Do you see this sentence here, begins with "Your client"?
24 **A.**  Yes.
25 **Q.**  "Your client understands and agrees that at any time the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1  government can ask that your client be detained pending
2  sentencing and your client agrees not to oppose such a request
3  for detention."
4      Now, the government is basically telling you that they
5  could have come before the Court at any time and say, "Lock her
6  up," right?
7  **A.**  Yes.
8  **Q.**  And you couldn't do anything about that?
9  **A.**  That's right.
10 **Q.**  Right?  So given that you didn't want to go to jail for
11 what you pled guilty to and what you had admitted to doing, that
12 weighed heavily on you, right?
13 **A.**  Yes.
14 **Q.**  Because if you stepped out of line or did something that
15 they didn't like, they could come in front of the judge and say,
16 "Hey, Judge, lock her up," right?
17 **A.**  Yes.
18 **Q.**  So you basically had to do what they wanted you to do,
19 correct?
20 **A.**  Yes.
21 **Q.**  You see the -- this sentence here (indicating):  "Your
22 client further agrees the determination of your client's
23 involvement in any investigation is a matter committed to the
24 sole discretion of the government and that this decision is not
25 judicially reviewable."

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1      Do you see that?
2  **A.**  Yes.
3  **Q.**  Did you understand that when you signed the agreement?
4  **A.**  Yes.
5  **Q.**  And basically, what that meant is that they decide when
6  you're done, right?
7  **A.**  Yes.
8  **Q.**  You couldn't go to them and say, "I'm done, I don't want
9  to cooperate anymore," right?
10 **A.**  Yes.
11 **Q.**  Because if you did that, they would ask that you be
12 locked up, right?
13 **A.**  Yes.
14 **Q.**  And the fact that they can decide when you're done is not
15 something that you can come to the judge and say, "Judge, I'm
16 done.  Help me out," because it says "is not judicially
17 reviewable," meaning the judge cannot review that decision,
18 right?
19 **A.**  Yes.
20 **Q.**  Now, you also indicated that one of your main
21 responsibilities under the plea agreement is to come here and
22 tell the truth, right?
23 **A.**  Yes.
24 **Q.**  Let's look at paragraph 5(a), which says:  "Your client
25 shall cooperate fully" -- this paragraph -- "fully, truthfully,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2113

1 completely and forthrightly with the office -- with this office
2 and other federal, state, and local law enforcement authorities
3 identified by this office in any and all matters as to which the
4 government deems the cooperation relevant."
5      Did you understand that when you signed the agreement?
6 **A.**   Yes.
7 **Q.**   And that meant they tell you what you need to cooperate
8 about, right?
9 **A.**   Yes.
10 **Q.**   It's their -- what they deem relevant.  You couldn't come
11 to them and say, "I want to tell you about this or that."  They
12 would tell you what you cooperate about; is that correct?
13 **A.**   Yes.
14 **Q.**   This line beginning with "Any refusal" -- "Any refusal by
15 your client to cooperate fully, truthfully, completely and
16 forthrightly as directed by this office and other federal, state
17 and local enforcement authorities identified by this office in
18 any and all matters in which the government deems your client's
19 assistance relevant will constitute a breach of this agreement
20 by your client and will relieve the government of its
21 obligations under this agreement," et cetera, et cetera.
22      Do you see that?
23 **A.**   Yes.
24 **Q.**   So again, if you had come to Mr. Leon, Ms. Petalas,
25 Mr. Guerrero, Mr. Beatrice or any of the prosecutors you dealt

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2114

1 with and said, "I don't want to do this anymore," what would
2 they have done?
3 **A.**   Had me locked up.
4 **Q.**   They would have pulled the agreement, right?  At least
5 they could have, right?
6      MR. LEON:  Objection; calls for speculation.
7      THE COURT:  Sustained.
8 BY MR. BALAREZO:
9 **Q.**   Well, under the agreement, if you did that, it would
10 relieve the government from its obligations, correct?
11 **A.**   Yes.
12 **Q.**   And if the government didn't have the obligations that
13 they say, that we're going to go into, that means you could have
14 been locked up, right?
15 **A.**   Yes.
16 **Q.**   And they didn't have to give you any benefits or anything
17 of that nature, right?
18 **A.**   Yes.
19 **Q.**   And again, you didn't want to get locked up so you have
20 to make them happy, right?
21 **A.**   Yes.
22 **Q.**   Let's look down here at this paragraph, 5(c) down here
23 (indicating):  "Your client understands and acknowledges that
24 nothing in this agreement allows your client to commit any
25 criminal violation of local, state and federal law during the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2115

1 period of your cooperation with law enforcement authorities or
2 at any time prior to the sentencing in this case."
3      Do you see that?
4 **A.**   Yes.
5 **Q.**   "The commission of a criminal offense during the period
6 of your client's cooperation or at any time prior to sentencing
7 will constitute a breach of this plea agreement and will relieve
8 the government of all its obligations under this agreement,"
9 et cetera, et cetera, right?
10 **A.**   Yes.
11 **Q.**   And after you pled guilty -- and we'll discuss this in a
12 little more in detail later, but after you pled guilty, you
13 continued using drugs, right?
14 **A.**   For a short time.
15 **Q.**   Is that a "Yes"?
16 **A.**   Yes.
17 **Q.**   Okay.  And when you used drugs, of course you possessed
18 drugs, right?
19 **A.**   Yes.
20 **Q.**   You had to.  And you also purchased drugs, right?
21 **A.**   Yes.
22 **Q.**   And you would agree that that is a criminal offense,
23 right?
24 **A.**   Yes.
25 **Q.**   Now, although you continued doing that and although they

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2116

1 knew you were doing this, they didn't pull the agreement, did
2 they?
3      MR. LEON:  Objection to what people did.
4      THE COURT:  Sustained.
5 BY MR. BALAREZO:
6 **Q.**   When you came to court after you pled guilty, the
7 government was here, right?
8 **A.**   Yes.
9 **Q.**   A prosecutor was here, right?
10 **A.**   Yes.
11 **Q.**   And there was discussion with the judge and the
12 prosecutor and your lawyer in open court about how you were
13 testing positive for drugs, right?
14 **A.**   Yes.
15 **Q.**   So do you have any reason to think that the government
16 didn't hear that, that you were testing positive for drugs?
17 **A.**   No.
18 **Q.**   And the government never pulled your agreement, did they?
19 **A.**   No.
20 **Q.**   But you know that they could if they wanted to, right?
21 **A.**   Yes.
22 **Q.**   Let's look at paragraph 6, which begins here
23 (indicating).
24      Do you see that?
25 **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2117**

1   Q.   It's on page 4 if you're reading the copy:  "Your client
2   understands that the determination of whether your client has
3   provided substantial assistance pursuant to either Section 5K1.1
4   of the Sentencing Guidelines or section 18 U.S.C. 3553(e) is
5   within the sole discretion of the United States Attorney's
6   Office for the District of Columbia and is not reviewable by the
7   Court."
8        Do you see that?
9   A.   Yes.
10  Q.   So that means that they have the sole discretion to
11  determine whether your cooperation is enough; is that right?
12  A.   Yes.
13  Q.   The judge can't say, "Hey, I think she did a good job,
14  give her a break," right?  They make that decision?
15  A.   No.
16  Q.   No?  You signed the agreement, right?
17  A.   Yes.
18  Q.   "Sole discretion of the United States Attorney's Office."
19  Do you see that?
20  A.   Yes.
21  Q.   It's their discretion; it's their decision whether or not
22  you provide substantial assistance, right?
23  A.   Yes.
24  Q.   And then it's their discretion, their decision whether or
25  not they file that 5K1 motion to the judge, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2118**

1   A.   Yes.
2   Q.   Or file that 3553 request with the judge, correct?
3   A.   Yes.
4   Q.   And if they file those things, that's the only thing that
5   would allow the judge to sentence you under the ten-year
6   mandatory minimum; is that correct?
7   A.   Yes.
8   Q.   So they control it all, right?
9   A.   Yes.
10  Q.   And just so we have it clear, that next sentence:  "Your
11  client understands that if the government does not file a motion
12  for a downward departure, the court has no authority to grant a
13  downward departure either under Section 5K1.1 of the Sentencing
14  Guidelines or under 18 U.S.C. 3553," right?
15  A.   Yes.
16  Q.   That's what we just said.  They don't file it, the judge
17  has to give you ten years, right?
18  A.   Yes.
19  Q.   But once again, they're the ones you've got to make
20  happy, right?
21  A.   Yes.
22  Q.   You've got to satisfy them?
23  A.   Yes.
24  Q.   We're not going to go through the whole thing, but I just
25  have a few more questions regarding this.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2119**

1        Paragraph 11:  "You understand that you will not be
2   allowed to withdraw the guilty plea entered under this agreement
3   solely because of the harshness of the sentence imposed."  So if
4   you get sentenced to something more than you think you should
5   get, you can't do anything about it, right?
6   A.   Yes.
7   Q.   You can't ask the judge to take it back, right?
8   A.   Yes.
9   Q.   Paragraph 22:  "After the entry of your client's plea of
10  guilty in the offense identified in Paragraph Number 1 above" --
11  which is the conspiracy charge -- "your client would not be
12  charged with any nonviolent criminal offense in violation of
13  federal or District of Columbia law which was committed within
14  the District of Columbia" -- excuse me -- "by your client prior
15  to the execution of this agreement and about which the United
16  States Attorney's Office for the District of Columbia was made
17  aware," et cetera, et cetera, right?
18  A.   Yes.
19  Q.   So after you pled guilty, if you told them you had
20  committed nonviolent crimes, you weren't going to be charged for
21  that, right?
22  A.   No.
23  Q.   So those drug offenses that you committed by -- when you
24  tested positive for drugs, when you possessed the drugs and
25  bought them, you knew you weren't going to be charged for that,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2120**

1   right?
2   A.   I didn't know.  I don't --
3   Q.   It's in the agreement that you said you understood and
4   you read, right?
5   A.   Yes.
6   Q.   Now, you pled guilty sometime in May, or you don't
7   remember the exact date, but when you pled guilty, that was the
8   second time you had to appear before the Court, right?
9   A.   Yes.
10  Q.   And the first time you appeared before the Court, you
11  came here and the government asked and the judge agreed to keep
12  you out of jail, right?
13  A.   Yes.
14  Q.   You've never spent a day in jail, right?
15  A.   No.
16  Q.   And at that time the judge, when he released you, did he
17  not mention to you that you have to follow the law, that you
18  have to follow the conditions that were set for your release?
19  A.   Yes.
20  Q.   And of course one of the conditions that were set for
21  your release was don't use drugs, right?
22  A.   Yes.
23  Q.   And of course you wanted to go home, you didn't want to
24  go to jail, so you promised them that you would not use drugs,
25  right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2121**

1  A.   Yes.

2  Q.   And you would follow what he asked of you?

3  A.   Yes.

4  Q.   But you didn't keep your word, right, because you kept

5  using drugs, right, at least at first, as you said?

6  A.   Yes.

7  Q.   Okay.  And even though -- even when you told the judge

8  that you were going to follow his directions, you knew that you

9  were going to use them?  You were an addict, as you said many

10  times, right?

11  A.   Yes.

12  Q.   And all you wanted to do at that time was get out of here

13  and go home, right?

14  A.   Yes.

15  Q.   And you would have said anything to get out of here and

16  go home, right?

17  A.   No.

18  Q.   Well, you said it that day, right, although you knew it

19  wasn't true?

20  A.   There's no way of knowing what my mindset was at that

21  time.

22       MR. LEON:  The volume, please.

23       THE COURT:  Can you stay closer to the mic for us.

24       THE WITNESS:  Yes.

25       THE COURT:  Thank you.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2122**

1  BY MR. BALAREZO:

2  Q.   What was your last answer?  I don't think we all heard

3  it.

4  A.   I really can't tell you what I was thinking that day

5  because I don't remember.

6  Q.   Do you remember if you were high on that day, by any

7  chance?

8  A.   No, I wasn't.

9  Q.   You would remember that?

10  A.   Yes.

11  Q.   Now, the first day of your examination here, I think

12  Mr. Leon asked you some questions about the mid-'90s; do you

13  remember that?

14  A.   Yes.

15  Q.   This was around -- well, sometime after you moved to

16  Congress Park, right?

17  A.   Yes.

18  Q.   And in particular, he asked you if you had bought drugs

19  in the mid-'90s from these gentlemen over here, right?

20  A.   Yes.

21  Q.   And in particular for me, he asked you if you bought

22  drugs from this gentleman here with the white shirt.  Do you see

23  him, the one you've identified as Don?

24  A.   Yes.

25  Q.   And as you've already said, though, the mid-'90s was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2123**

1  maybe what, ten years ago?

2  A.   Yes.

3  Q.   And you've already said that your recollection is

4  affected and your memory is affected by your extensive drug use

5  and the passage of time; would you agree?

6  A.   Yes.

7  Q.   Now, do you recall in the mid-'90s how many times you

8  bought drugs from Don?

9  A.   No.

10  Q.   You have no idea, right?

11  A.   No.

12  Q.   And do you recall where you bought drugs from Don?

13  A.   Different locations.  My apartment, the hallway --

14       My apartment, the hallway.

15  Q.   Do you specifically remember this or is this something

16  that --

17  A.   No, this is what I remember.

18  Q.   And do you remember how much drugs you bought from him?

19       MR. LEON:  Objection to the form.  A general question

20  about all drug sales?

21       MR. BALAREZO:  I'm talking about in the mid-'90s here.

22       THE COURT:  I'll allow the question.

23       THE WITNESS:  Repeat the question, please.

24  BY MR. BALAREZO:

25  Q.   In the mid-'90s -- that's the only period of time I'm

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2124**

1  talking about right now -- do you remember how much drugs you

2  bought from him?

3  A.   No.

4  Q.   And back there in the mid-'90s, was he still living

5  two stories above you?

6  A.   I can't remember.  I don't know.

7  Q.   You don't remember that?

8  A.   No.

9  Q.   Okay.  And were you close to him at that time?

10  A.   I mean, I was an addict.  No.

11  Q.   You weren't close to him?

12  A.   No.

13  Q.   Did he ever provide any assistance to your family, your

14  daughter, when you were high, giving them food, clothing, money,

15  anything like that?  Do you remember anything like that?

16  A.   No.

17  Q.   You don't remember?

18  A.   I do remember.

19  Q.   And what's the answer?

20  A.   The answer is no.

21  Q.   You did not.  Okay.  And you said, though, you did

22  remember his fiance, Martina?

23  A.   Yes.

24  Q.   And did she ever provide any assistance to your

25  daughter --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2133

1  Q.  Okay.  Let's go to paragraph 5, right below it -- excuse
2  me -- paragraph 4, the middle part.  Do you see where your name
3  is in capital letters right in the middle?
4  A.  Yes.
5  Q.  It says:  "Parsons regularly purchased smaller but still
6  wholesale quantities, 10 to 15 Ziploc bags of crack cocaine at
7  the approximate cost of $100 from" -- and then it names several
8  other people, right?
9  A.  Yes.
10  Q.  How many people did you name there?
11  A.  Approximately 14.
12  Q.  Okay.  So approximately 14 names.  And nowhere amongst
13  those 14 names as having sold you smaller wholesale quantities
14  of 10 to 15 Ziploc bags do you name Dominic Samuels, or Don, as
15  you call him do you?
16  A.  No.
17  Q.  So now, 14 and 8, that's about 22 names.  Of the 22 names
18  of individuals that you say that you purchased drugs from,
19  Samuels is not amongst them, correct?
20  A.  Yes.
21  Q.  Why don't you turn to the next page, page 3.  And at the
22  top it says "Limited Nature of a Proffer."  Do you see that?
23  A.  Yes.
24  Q.  This is something that you will be asked about probably
25  later on redirect.  It talks about how this proffer of evidence,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2134

1  this document is not intended to constitute a complete statement
2  of all the facts known by you, right?
3  A.  Yes.
4  Q.  But it is a minimum statement of facts intended to
5  provide the necessary factual predicate for the guilty plea,
6  right?
7  A.  Yes.
8  Q.  Basically saying you just gave them a little bit, enough
9  to plead guilty to conspiracy, right?
10  A.  No.
11  Q.  What's it saying?
12  A.  Um -- I really don't know.
13  Q.  Okay.
14      MR. ZUCKER:  I'm sorry, Your Honor.
15      THE COURT:  Would you say that louder, please.
16      THE WITNESS:  I really don't know.
17  BY MR. BALAREZO:
18  Q.  But yet you signed off on it, right?
19  A.  Yes.
20  Q.  And you came before the judge and said, "I'm guilty and
21  this is what I did"?
22  A.  Yes.
23  Q.  Now, in that particular proffer, if you go back to page
24  2, paragraph 5 -- do you see that?  The one that says,
25  "Beginning in 1996"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2135

1  A.  Yes.
2  Q.  About -- well, that paragraph talks about those parties
3  that you would have, right?
4      Why don't you read it just so we're all on the same page.
5      Have you read it?
6  A.  Yes.
7  Q.  And that paragraph does talk about those parties that you
8  would have at your place where you'd invite other drug users and
9  addicts to come and use, right?
10  A.  Yes.
11  Q.  And it talks about how individuals would sell at that
12  party, correct?
13  A.  Yes.
14  Q.  And do you not, in that proffer that you signed when you
15  pled guilty, five lines up where it says -- and I'll put it on
16  the ELMO.
17      Do you see that "The individual drug sellers listed
18  above," meaning those 22 names that we've talked about, "all
19  were aware of Parson's practice and would compete with each
20  other, with one another to supply crack cocaine at Parson's
21  gatherings."  Do you see that?
22  A.  Yes.
23  Q.  So, these individuals, the 22 names that you said you
24  were -- at least when you pled guilty, you agreed that you
25  conspired with them -- in that proffer, you said that when they

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2136

1  came to sell drugs at your parties, they were competing with one
2  another, right?
3  A.  Yes.
4  Q.  And that's true, right?
5  A.  Yes.
6  Q.  And that's because they were all doing their own thing
7  and they were working independently of each other, right?
8      MR. LEON:  Objection, speculation.
9      THE COURT:  Sustained.
10  BY MR. BALAREZO:
11  Q.  To your knowledge, were they working independently --
12  A.  Yes.
13  Q.  -- and not having anything to do with one another, they
14  were just selling drugs at your parties, right?
15  A.  Yes.
16  Q.  And they were competing with each other?
17  A.  Yes.
18  Q.  Because one guy wanted to sell for himself, another guy
19  wanted to sell for himself, right?
20      MR. LEON:  Objection, speculation.
21      THE COURT:  Beg your pardon?
22      MR. LEON:  Speculation.  He's asking the witness to guess
23  what one seller would do and what another one would do.
24      THE COURT:  I'll let you ask what she knows.
25      THE WITNESS:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2137**

1    THE COURT:  Well, let him put the question to you.
2    BY MR. BALAREZO:
3    Q.    Do you know in those situations, when you say these
4    dealers were competing with one another, whether or not one guy
5    was making a sale for himself and the other guy was making a
6    sale for himself, right?
7    A.    Yes.
8    Q.    They weren't sharing the drugs; they weren't sharing the
9    money, right?
10   A.    No.
11   Q.    They were all independent, correct?
12   A.    Yes.
13   Q.    And that's what you mean by compete, right?
14   A.    Yes.
15   Q.    Just like you were independent before you pled guilty to
16   a conspiracy, right?
17   A.    Yes.
18   Q.    Now, ma'am, do you remember testifying at a separate
19   trial previously?
20   A.    Yes.
21   Q.    And in that trial you were asked to name people that you
22   were -- that you purchased drugs from.  Do you remember that?
23   A.    Yes.
24   Q.    I believe this was testimony that you gave on June 14th,
25   2004 before Judge Roberts, in another trial.  Do you remember

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2138**

1    that?
2    A.    Yes.
3    Q.    And Mr. Leon was the prosecutor in that case, or
4    Ms. Petalas was the prosecutor in that case, right?
5    A.    Yes.
6    Q.    Same people that are here?
7    A.    Yes.
8    Q.    All right.  And one of the questions they asked you then
9    was -- and this is page 173, line 14.  Ms. Petalas says:
10        "Question:  Let's take a step back and talk about when
11   you were in Congress Park and you said -- and you were making
12   buys.  This was for your own use.  Who would you buy from in
13   Congress Park?"
14        Your answer was "several people," and then she asked you:
15   "Who were some of the people you would buy from?"
16        And your answer on June 14th of 2006 was "Boy-Boy,
17   Newett, Newby, Kairi, Antwuan and someone named Celeste," right?
18        Do you remember saying that?
19   A.    No.
20        MR. BALAREZO:  Your Honor, then I would show the witness
21   what I should have marked -- I apologize -- as defense Exhibit
22   Number 16.
23        MR. BALAREZO:
24   Q.    Ms. Parson, let me show you Samuels Exhibit Number 16.
25   Do you see the front?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2139**

1    A.    Yes.
2    Q.    The date that I mentioned?
3    A.    Yes.
4    Q.    Judge Roberts?
5    A.    Yes.
6    Q.    Do you see here beginning at page 158, "Direct
7    examination of Gail Parson"?
8    A.    Yes.
9    Q.    That's you, correct?
10   A.    Yes.
11   Q.    And on page 173 at line 14, those questions and answers I
12   just read.  Do you see that?
13   A.    Yes.
14   Q.    Would reading the transcript of your testimony, is that
15   going to refresh your recollection as to what you testified to
16   in court that day?
17   A.    Yes.
18   Q.    And those names that I mentioned, those were the only
19   names that you gave that day, correct?
20   A.    Yes.
21   Q.    And that day when you testified, you were under oath like
22   you are here in front of this jury, right?
23   A.    Yes.
24   Q.    And when you were asked that day, who would you buy from
25   in Congress Park, Dominic Samuels, or Don as you call him, was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2140**

1    not one of the people you named, correct?
2        MR. LEON:  Objection, that's not what the question asks.
3    BY MR. BALAREZO:
4    Q.    Let me repeat the question for you.
5        THE COURT:  Approach, please.
6        (Following sidebar discussion had on the record:)
7        THE COURT:  I didn't hear you read the question.  What was
8    the question?  Where did you buy from?
9        MR. BALAREZO:  The question is:  Who would you buy from in
10   Congress Park, several people?  Who are some of the people you
11   would buy from?
12        MR. LEON:  You didn't say some of the people, you said who
13   are the people?
14        MR. BALAREZO:  I'll rephrase if I said that.
15        MR. LEON:  It's an important distinction.
16        (Sidebar discussion concluded.)
17   BY MR. BALAREZO:
18   Q.    Ms. Parson, I'll read that question again, just so -- are
19   you okay?
20   A.    Yes.
21   Q.    I thought you were trying to tell me something.
22        The question is on line 19:  "Who were some of the people
23   you would buy from?"  And you gave those names, right?
24   A.    Yes.
25   Q.    Don or Dominic Samuels was not one of the names of some

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2145

1   **A.**   Yes.
2   **Q.**   Now -- and you're hoping that once you get sentenced by
3 Judge Roberts, that you will get to go home, right?
4   **A.**   Yes.
5   **Q.**   Well, not to go home, but to stay at home, because you
6 haven't -- you haven't been locked up ever, right?
7   **A.**   Yes.
8   **Q.**   So, when I said you have a big investment in this case,
9 that's what I meant, your continued freedom, right?
10   **A.**   Yes.
11   **Q.**   And would it be fair to say that the government also has
12 a big investment in you?
13       MR. LEON: Objection.
14       THE COURT: Rephrase.
15 BY MR. BALAREZO:
16   **Q.**   They have a large interest in your testimony; is that
17 right?
18       THE COURT: Sustained.
19 BY MR. BALAREZO:
20   **Q.**   You testified on direct examination that some years ago
21 you had a problem with the Pepco bill; is that correct?
22   **A.**   Yes.
23   **Q.**   This was a situation where you didn't have enough money
24 to pay your electric bill and you were basically stealing
25 electricity, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2146

1   **A.**   Yes.
2   **Q.**   You tapped into the meter?
3   **A.**   Yes.
4   **Q.**   And the FBI, the government, whatever you want to call
5 them, they paid your $4,000 Pepco bill, right?
6   **A.**   Not all at once, but yes.
7   **Q.**   Not all at once, but they did pay the $4,000 bill?
8   **A.**   Part of it, yes.
9   **Q.**   Well, most of it; isn't that true?
10   **A.**   Yes.
11   **Q.**   And during the time that you've been cooperating with the
12 government, they've also provided you with quite a lot of money,
13 haven't they?
14   **A.**   Yes.
15   **Q.**   And do you know how much money total they have given to
16 you directly or -- they have given to you in exchange for your
17 cooperation and assistance?
18   **A.**   No.
19   **Q.**   Would the number $33,213.86 ring a bell?
20   **A.**   No.
21   **Q.**   You didn't keep track of it, right?
22   **A.**   No.
23   **Q.**   All right. But you began receiving money as far back as
24 April of 2001; is that not right?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2147

1   **Q.**   And, in fact, you would get money almost -- on a very
2 regular basis, weekly, sometimes biweekly, usually about $500,
3 right?
4   **A.**   Yes.
5   **Q.**   And some of that money that you got was from agent --
6 from Kyle, the agent that you talked about earlier?
7   **A.**   Yes.
8   **Q.**   Some of that money you got through Rob Lockhart, right?
9   **A.**   Yes.
10   **Q.**   Or other agents?
11   **A.**   Yes.
12   **Q.**   Or directly from their office, correct?
13   **A.**   No.
14   **Q.**   Well, we'll get to that. And a lot of the money that you
15 got was for expenses, right?
16   **A.**   Yes.
17   **Q.**   And when you -- when they gave you this money, you didn't
18 have to show up with a receipt, right, and say hey, I spent $500
19 cooperating with you, give me $500 reimburse me, right?
20   **A.**   No.
21   **Q.**   You just basically showed up and they gave you $500,
22 right?
23   **A.**   No.
24   **Q.**   Well, they gave you the 500. Do we agree on that?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2148

1   **Q.**   And back in 2001 you were still a crack addict, correct?
2   **A.**   Yes.
3   **Q.**   So this $500 was coming in pretty handy, right?
4   **A.**   Yes.
5   **Q.**   And there were times when they gave you more than $500;
6 is that right?
7   **A.**   Yes.
8   **Q.**   In fact, there was a time back in January of '02 where
9 they gave you -- well, 400 is less. Excuse me. October of 02
10 they gave you a $1,000. Do you remember that?
11   **A.**   Yes.
12   **Q.**   There was a time on March 31st of '05, just about two
13 years ago, where they gave you 2,000 and then July 22nd of '05
14 they gave you another 2,000 for expenses. Do you remember that?
15   **A.**   Yes, um-hmm.
16   **Q.**   And once you moved -- well, they helped you move out of
17 town, right?
18   **A.**   Yes.
19   **Q.**   And, in fact, they paid for your travel, right?
20   **A.**   Yes.
21   **Q.**   And I think you testified on direct examination the first
22 day, that they went as far as paying for your furniture, I think
23 you said. Do you remember that?
24   **A.**   Yes.
25   **Q.**   And you still received some money since you moved out of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2149

1  town, correct?
2  **A.**  No.
3  **Q.**  No money at all?
4  **A.**  No.
5  **Q.**  When did you move out of town?  Do you remember the date?
6  **A.**  No, I don't remember the exact date.
7  **Q.**  Do you remember the year?
8  **A.**  2005.
9  **Q.**  And do you remember the month, approximately, summer,
10  winter, fall, spring?
11  **A.**  The summer.
12  **Q.**  So mid -- I'm sorry.  Are you finished?
13  **A.**  Yes.
14  **Q.**  So mid-2005?
15  **A.**  Yes.
16  **Q.**  Okay.  And do you recall June 8th, 2005, having received
17  $3,000 from them?
18  **A.**  Yes.
19  **Q.**  So that was after you moved?
20  **A.**  Yes.
21  **Q.**  And in September of '05 you received $625?
22       MR. LEON:  Your Honor, I would only object to using the
23  word them.  I would ask for the distinction be made as to where
24  the money is coming from.  Them could be --
25  BY MR. BALAREZO:

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

2150

1  **Q.**  I'll clarify.  The FBI?
2  **A.**  Yes.
3  **Q.**  So you did receive 625 in September of '05?
4  **A.**  Yes.
5  **Q.**  And then in April of '06, you received another $1400?
6  **A.**  Yes.
7  **Q.**  So at this point in time, you were no longer doing
8  undercover purchases, right?
9  **A.**  No.
10  **Q.**  You weren't living in the neighborhood, so you weren't
11  providing them with information, right?
12  **A.**  Right.
13  **Q.**  Do you know what that money was for that they were giving
14  to you?
15  **A.**  It was for --
16  **Q.**  For what?
17  **A.**  For expenses that I had since I moved.
18  **Q.**  For expenses, like the furniture and that kind of stuff?
19  **A.**  Yes.
20  **Q.**  Now, would it be fair to say that -- well, I'll come back
21  to that.  And just to get you here to testify, the government
22  did pay for your travel, right?
23  **A.**  Yes.
24  **Q.**  And they put you up in a nice hotel, right?
25  **A.**  Yes.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

2151

1  **Q.**  And because of your medical condition, you couldn't fly,
2  so they paid for your train travel, right?
3  **A.**  Yes.
4  **Q.**  And you didn't come alone.  I think they also paid for
5  your mother to come with you, right, to assist you?
6  **A.**  Yes.
7  **Q.**  So they paid for her train fare, for her hotel, her food
8  and all of that, right?
9  **A.**  Yes.
10  **Q.**  And, in fact, I think you have a little pet dog where you
11  live now, that they even put up in a kennel for you, right?
12  **A.**  Yes.
13  **Q.**  And are you aware that just to get you here they paid
14  over $7,000?
15  **A.**  No.
16  **Q.**  Would you have a dispute with that figure?
17  **A.**  No.
18  **Q.**  Now, ma'am, would you agree that at the time that you
19  were living in Congress Park when you were still addicted to
20  crack, your living situation wasn't that good, was it?
21  **A.**  No, it wasn't.
22  **Q.**  I'm sorry?
23  **A.**  No.
24  **Q.**  You were short of money, right?
25  **A.**  Yes.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

2152

1  **Q.**  You couldn't pay the utilities sometimes, like the Pepco
2  bill, right?
3  **A.**  Yes.
4  **Q.**  Your phone got cut off sometimes?
5  **A.**  Yes.
6  **Q.**  There were times when you didn't have enough to buy food,
7  so some people helped you and your family with food, right?
8  **A.**  Yes.
9  **Q.**  It was pretty bad, right?
10  **A.**  Yes.
11  **Q.**  Now, would it be also accurate to say that after you
12  started cooperating with the government, your life got better
13  all of a sudden, right?
14  **A.**  No.
15  **Q.**  You got off drugs, right?
16  **A.**  Yes.
17  **Q.**  They moved you to another state, another location, right?
18  **A.**  Yes.
19  **Q.**  They helped you find a home, right?
20  **A.**  No.
21  **Q.**  No?  Did you find one by yourself?
22  **A.**  Yes, I did.
23  **Q.**  Fair enough.  They helped you with furniture, paying for
24  furniture, right?
25  **A.**  Yes.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

2153

1 **Q.** And they were still paying you for expenses, whatever
2 they were, even after you moved, right?
3 **A.** Yes.
4 **Q.** So comparing your life today to what it was in Congress
5 Park, it's a lot better, is it not?
6 **A.** Yes, it is.
7 **Q.** So they've put a lot of time, effort and money in you to
8 get to you this point, right?
9 **A.** Yes.
10 **Q.** Now, yesterday when I asked you some questions about the
11 first time the FBI came to pick you up at your house, do you
12 remember they took you to the FBI building?
13 **A.** Yes.
14 **Q.** I asked you if you had been charged and you said -- well,
15 I asked you -- excuse me, I asked you if you had ever been
16 locked up and you said something like "They took my freedom."
17 Do you remember that?
18 **A.** Yes.
19 **Q.** Now, cooperating with the government and pleading guilty
20 to that conspiracy charge, although you did it voluntarily in
21 front of the Judge, would you say that that's really what you
22 wanted to do?
23 **A.** I can't say at the time. I can't tell you. I don't
24 remember.
25 THE COURT: Stay close to the mic.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2154

1 THE WITNESS: I can't say at the time because I really
2 can't remember what I was thinking.
3 BY MR. BALAREZO:
4 **Q.** Okay. And given that they ran into your house -- let me
5 rephrase that.
6 The FBI came into your house and took you to the FBI
7 building and all those things, did you ever feel used by them?
8 **A.** Yes.
9 **Q.** By the FBI, right?
10 **A.** Yes.
11 **Q.** And you began cooperating with them before you even had a
12 lawyer, as you said already, right?
13 **A.** Yes.
14 **Q.** And do you feel used by having to do that without knowing
15 all your rights and what all your other options were?
16 **A.** Yes.
17 **Q.** And you don't really want to be here today, do you?
18 **A.** No.
19 **Q.** Do you feel used today?
20 **A.** Yes.
21 **Q.** Now, would it be fair to say that you feel like they're
22 using you to build their case?
23 **A.** No.
24 **Q.** Why do you feel used?
25 **A.** Uhm, it's -- like you said, because I really just don't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2155

1 want to be here.
2 MR. MARTIN: I'm sorry?
3 THE WITNESS: I just don't really want to be here, and to
4 me this is all a bad dream.
5 BY MR. BALAREZO:
6 **Q.** And back in the day when you were still an addict, you
7 would do anything for that next high, wouldn't you?
8 **A.** Just about, yes.
9 **Q.** You did a lot of bad things, right?
10 **A.** Yes.
11 **Q.** And at that point, I mean it got so bad that you were
12 trading yourself for drugs sometimes, or for money?
13 **A.** Yes.
14 **Q.** Because you had to have the drugs, you had to have the
15 high, right?
16 **A.** Yes.
17 **Q.** And now you've moved on in years, your health has
18 declined, sex and money isn't that important to you anymore,
19 right?
20 **A.** No.
21 **Q.** What's really important to you right now is your freedom,
22 correct?
23 **A.** Yes.
24 **Q.** And that's more important to you than anything else. You
25 want to stay out of prison, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2156

1 **A.** Yes.
2 **Q.** So what you're trading now is your testimony, your
3 information, for freedom, right?
4 **A.** Yes.
5 **Q.** That's what you're doing here today?
6 **A.** Yes.
7 **Q.** And like when you were addicted to crack, when you would
8 do anything to get that next high, you'd do anything to maintain
9 your freedom, correct?
10 MR. LEON: Objection, argumentative.
11 THE COURT: I'll allow it.
12 THE WITNESS: Would you repeat the question?
13 BY MR. BALAREZO:
14 **Q.** Just like when you were out there still doing drugs,
15 getting high on crack and you would do anything for that next
16 high, you'd do anything to keep your freedom, right?
17 **A.** Yes.
18 **Q.** And just like you said, you feel used by the government.
19 As you sit here today, you're using these gentlemen for your own
20 purposes, right?
21 **A.** No.
22 **Q.** To maintain your freedom, right?
23 **A.** No.
24 **Q.** Because you'd do anything to keep your freedom, right?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2157**

1    MR. BALAREZO: I have nothing further, Your Honor.

2    THE COURT: All right, Mr. Martin, would you like to

3  cross-examine on behalf of Mr. Jones?

4    MR. MARTIN: With the Court's permission, Your Honor.

5    THE COURT: You may proceed.

6        <u>CROSS-EXAMINATION OF GAIL PARSON</u>

7  BY MR. MARTIN:

8  **Q.**   Good morning, Ms. Parson. My name is Anthony Martin and

9  I represent Mr. Jones, who you've identified as Jo-Jo, seated

10  right over there in the gray shirt.

11    Ms. Parson, just briefly, you've talked about your plea

12  agreement, and I'm not going to go into it in great detail

13  because I think you've already explained what your understanding

14  was, but just to make it clear, you did plead or sign that on

15  May 17th, 2002, correct?

16  **A.**   Yes.

17  **Q.**   And at the time that you signed that plea agreement, as

18  Mr. Balarezo pointed out, there was a proffer attached to that,

19  right?

20  **A.**   Yes.

21  **Q.**   And by proffer, I mean a statement of facts, right?

22  **A.**   Yes.

23  **Q.**   And those statement of facts was in support of your

24  pleading to the conspiracy charge, right?

25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2158**

1  **Q.**   Okay.

2    MR. MARTIN: Your Honor, may I approach?

3    THE COURT: Yes.

4  BY MR. MARTIN:

5  **Q.**   Showing Ms. Parsons what's been marked as Joseph Jones

6  Defendant's Exhibit Number 16.

7    Ma'am, I call your attention to the second page,

8  specifically paragraphs 4 and 5, and ask you to count the number

9  of people there, if you don't already know, how many people you

10  named in paragraph 25, count the number of names that are there,

11  please.

12    MR. LEON: Objection, asked and answered.

13    MR. MARTIN: Not with respect to Mr. Jones, it never was,

14  Your Honor.

15    THE COURT: Well, it was -- approach.

16    (Following sidebar discussion had on the record:)

17    THE COURT: The point isn't whether she was asked is

18  Mr. Jones in the list of names. The point is whether she was

19  asked with respect to this specific paragraph how many names

20  appear there? Is that true or no?

21    MR. MARTIN: I think she was asked to -- the two

22  paragraphs were broken down and I got a different number. I got

23  22 names, but it doesn't matter. I can ask her if she --

24    THE COURT: You can ask her if Jones' name appears on any

25  place, but I think the two locations where names were listed has

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2159**

1  already been asked and answered.

2    MR. MARTIN: Okay. Well, this is going to be a very

3  truncated issue.

4    THE COURT: All right. Is that it? Did you have

5  something else?

6    MR. LEON: To that, she actually miscounted, but that's

7  for me to clear up on redirect, but that was my objection. I

8  think all the counting of the names that could be done on cross

9  has been done. That was my only objection.

10    THE COURT: If there was -- I don't have the document in

11  front of me. If there was miscounting, I think he's entitled to

12  inquire about the miscount.

13    MR. LEON: If that's what he was going to do, I have no

14  objection.

15    MR. MARTIN: I got a different number.

16    THE COURT: Then you can proceed.

17    (Sidebar discussion concluded.)

18  BY MR. MARTIN:

19  **Q.**   Ma'am, again, would you be so kind as to look at the two

20  paragraphs that I pointed out to you earlier and count the

21  number of names that you see that appear in those paragraphs?

22    THE COURT: Just to be clear, can you identify the

23  paragraph, either by paragraph number or page number so we know

24  which one you're mentioning?

25    MR. MARTIN: If I might approach, Your Honor?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**2160**

1    THE COURT: Yes.

2  BY MR. MARTIN:

3  **Q.**   Specifically, ma'am, I'm looking at page 2, paragraphs 4

4  and 5.

5  **A.**   Eight in the first paragraph.

6  **Q.**   Please keep your voice up.

7  **A.**   Eight in the first paragraph.

8  **Q.**   And how many in the second paragraph, ma'am?

9  **A.**   Four in the second paragraph.

10  **Q.**   Without going into argument over the number of names

11  there, would you agree that Joseph Jones' name did not appear in

12  either one of those photographs?

13  **A.**   Yes.

14  **Q.**   And that was the agreement, again, that you signed on

15  May 17th, 2002, right?

16  **A.**   Yes.

17  **Q.**   And it was your testimony yesterday, in fact, that with

18  respect to Mr. Jones, you had only bought cocaine from him one

19  or two times, correct?

20  **A.**   Yes.

21  **Q.**   And it's also true that one of those occasions was on

22  August 30th, 2000, right?

23  **A.**   Yes.

24  **Q.**   And at that time you purchased $30 worth of cocaine from

25  Mr. Jones, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2165

1  **Q.**  And he didn't finance your crack parties, did he?
2  **A.**  No.
3  **Q.**  And he never told you who you could sell to, did he?
4  **A.**  No.
5  **Q.**  And he never told you who you could buy from, did he?
6  **A.**  No.
7  **Q.**  Now, with respect to the $30 purchase that you made with
8  Mr. Jones, would you agree with me that that is not a wholesale
9  quantity of drugs?
10  **A.**  You said it's not a wholesale?
11  **Q.**  That was for personal use; that's a personal use
12  quantity; wouldn't you agree?
13  **A.**  Yes.
14  **Q.**  Now, you also talked a little bit during your testimony
15  about somebody name EB.  Do you remember that?
16  **A.**  Yes.
17  **Q.**  And if I heard you correctly, you said that EB was never
18  with anyone else either, that he was usually by himself; is that
19  correct?
20  **A.**  Yes.
21  **Q.**  Would it be fair to say or to characterize EB as a lone
22  wolf?
23  **A.**  Yes.
24  **Q.**  And he sold in the area, right?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2166

1  **Q.**  Would it also be fair to say that a lot of people sold in
2  that area?
3  **A.**  No.
4  **Q.**  But you bought and sold drugs in Congress Park?
5  **A.**  Yes.
6  **Q.**  And you brokered deals for people in Congress Park,
7  right?
8  **A.**  Yes.
9  **Q.**  Now with respect to the drugs that you used yourself, you
10  would agree that the quality differed between the different
11  drugs that you bought from different people, would you not?
12  **A.**  Yes.
13  **Q.**  And the quality -- is it fair to say the quality affects
14  the intensity of the high?
15  **A.**  Yes.
16  **Q.**  So the better the quality, the better the feeling; is
17  that correct?
18  **A.**  Yes.
19  **Q.**  And would you also agree that some drugs have a different
20  flavor than others, depending on who you buy it from?
21  **A.**  Yes.
22  **Q.**  And the flavors would also differ depending on who you
23  purchase it from, right?
24  **A.**  Yes.
25  **Q.**  You were not a member of a gang, were you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2167

1  **A.**  No.
2  **Q.**  And you were not a member of a crew, were you?
3  **A.**  No.
4  **Q.**  And you didn't report to anyone regarding your purchases
5  or sales of drugs, did you?
6  **A.**  No.
7  **Q.**  You never went through any initiation with respect to a
8  group?
9  **A.**  No.
10  **Q.**  Okay.  Never swore allegiance to anyone?
11  **A.**  No.
12  **Q.**  Did you ever swear allegiance to Mr. Jones?
13  **A.**  No.
14  **Q.**  Now, with respect to your drug sales, did you ever keep a
15  log or a record of your sales?
16  **A.**  No.
17  **Q.**  And nobody required you to do that, did they?
18  **A.**  No.
19  **Q.**  And again, the money that you used to purchase drugs on
20  August 30th, 2000, was money that was given to you by the FBI,
21  correct?
22  **A.**  Yes.
23  **Q.**  And if I heard you correctly, although it was four
24  separate bags, the pieces were so small that you weren't going
25  to pay $40 for it, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2168

1  **A.**  Yes.
2  **Q.**  And that's why you only gave him $30, right?
3  **A.**  Yes.
4  **Q.**  Now, you've pled to a conspiracy charge.  At any time did
5  the government or any of its agents ever mention to you that if
6  you didn't plead to a conspiracy, you could be charged with more
7  than just the conspiracy that you pled to?
8  **A.**  No.
9  **Q.**  Did you understand that you could be charged with more,
10  if you didn't plead to the conspiracy?
11      MR. LEON:  Objection, speculation.
12      THE COURT:  Overruled.
13  BY MR. MARTIN:
14  **Q.**  Did you believe that you could be charged with more if
15  you did not plead to the conspiracy?
16  **A.**  No.
17  **Q.**  You didn't?
18  **A.**  Yes.
19  **Q.**  You did?
20  **A.**  Yes.
21  **Q.**  And would it be fair to say that it was your
22  understanding that if you were charged with other crimes, that
23  your exposure or your time would be higher?
24  **A.**  Yes.
25  **Q.**  And you don't want to go to jail for even a single day,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2177

1  **A.**  No.

2  **Q.**  Is there anything that's making you uncomfortable,

3  sitting here today?

4  **A.**  No.

5  **Q.**  Okay.  So, today at 12:00, your estimate is that you

6  bought drugs from Mr. Thurston 10 or 20 times, and you don't

7  recall saying yesterday, approximately -- I don't know, 3 or

8  4:00 in the afternoon, maybe 2:30, that your estimate was 80

9  times, wasn't it?

10  **A.**  No.

11  **Q.**  That would be inaccurate, right, the 80 times estimate?

12  **A.**  Yes.

13  **Q.**  Do you generally have trouble with your memory?

14  **A.**  On occasion.

15  **Q.**  Well, certainly you would agree that your memory

16  regarding events that occurred yesterday after you stopped using

17  drugs is probably better than your memory of events that

18  happened 15 years ago, 1992 to 2002 in Congress Park, right,

19  while you were using drugs?

20  **A.**  Yes.

21  **Q.**  Okay.  So, something that happened yesterday should be

22  fresher in your mind than something that happened 10 years ago?

23  **A.**  No.

24  **Q.**  No?

25  **A.**  No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2178

1  **Q.**  Okay.  Now, in those 10 or 20 times -- incidentally, what

2  quantities did you -- what quantities do you recall buying from

3  Mr. Thurston?

4  **A.**  Anywhere from dimes to -- dimes.

5  **Q.**  Just dimes?

6  **A.**  Yes.

7  **Q.**  Might have been a 20 on occasion or not even that big?

8  **A.**  Well, they were dimes, but they added up to different

9  amounts.

10  **Q.**  All right.  Might have been multiple dimes, right?

11  **A.**  Yes.

12  **Q.**  But only dimes, and possibly multiple times, right?

13  **A.**  Yes.

14  **Q.**  You certainly never bought a large wholesale quantity

15  from Thurston, did you?

16  **A.**  No.

17  **Q.**  Have you ever -- the largest amount you ever bought in

18  your life was an eight-ball, right?

19  **A.**  Uh.

20  **A.**  At once.

21  **A.**  Yes.

22  **Q.**  And you certainly never bought one of those from Mr. --

23  from Dazz, did you?

24  **A.**  No.

25  **Q.**  You're sure of that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2179

1  **A.**  No.

2  **Q.**  Do you recall yesterday saying that you bought anywhere

3  from a dime up to an eight-ball from Mr. -- from Dazz?  I'll

4  call him Dazz so there's no confusion.

5  **A.**  Yes.

6  **Q.**  You recall saying that yesterday?

7  **A.**  Yes.

8  **Q.**  But having thought about it overnight, you realized it

9  was wrong?

10  **A.**  No.

11  **Q.**  Well, why did you just tell us that the largest amount

12  you ever bought from Mr. -- Dazz, a couple minutes ago, was a

13  dime?

14  **A.**  Because they were dimes.  It wasn't a solid piece.  It

15  was dimes.

16  **Q.**  Okay.  But yesterday you said you bought eight-balls from

17  him, up to an eight-ball, right?

18  **A.**  In dime form.

19  **Q.**  That's not what you said yesterday, is it?  You said

20  eight-ball.

21  **A.**  It still adds up to an eight-ball, even in dime form.

22  **Q.**  Well, yesterday we asked you how big an eight-ball -- how

23  much did an eight-ball weigh and you didn't know, did you?

24  **A.**  No, I didn't.

25  **Q.**  How many dimes in an eight-ball?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2180

1  **A.**  Twenty.

2      MR. ZUCKER:  Court's indulgence.

3  BY MR. ZUCKER:

4  **Q.**  About 20, you think?

5      MR. LEON:  Twenty what?

6  BY MR. ZUCKER:

7  **Q.**  Twenty dimes in an eight-ball?

8  **A.**  Yes.

9  **Q.**  That's what you just said, right?

10  **A.**  Yes.

11  **Q.**  Okay.  Have you ever bought an eight-ball and cut it up

12  into dimes?

13  **A.**  Yes.

14  **Q.**  And you got about 20?

15  **A.**  Twenty, 30.

16  **Q.**  Okay.  You're the same Gail Parson that testified --

17  well, you saw the transcript Mr. Balarezo showed you -- on

18  June 14th, 2006.  May I approach, Judge?

19      THE COURT:  Yes.

20  BY MR. ZUCKER:

21  **Q.**  I'm using Balarezo 16.

22      THE COURT:  What 16?

23      MR. ZUCKER:  Balarezo 16.

24      THE COURT:  There is no Balarezo 16.

25      MR. ZUCKER:  Sorry.  Okay.  I plead guilty.  Mr. Samuels,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2181

1   Mr. Balarezo's client.  Thank you.
2   BY MR. ZUCKER:
3   Q.    You recall him showing you this, right?
4   A.    Yes.
5   Q.    And this was a trial in front of Judge Roberts in this
6   courtroom, June 14th, 2006.  Less than a year ago, right?
7   A.    Yes.
8   Q.    And it was a trial where you were a government witness
9   and the prosecutors were Mr. Leon and Ms. Petalas, right?  Do
10  you remember them being in the courtroom?
11  A.    Yes.
12  Q.    They were the prosecutors, right?
13  A.    Yes.
14  Q.    There was a different defendant, but he was part of the
15  same investigation, Mr. Newett Ford, right?
16  A.    Yes.
17  Q.    Do you recall testifying in that trial that if you bought
18  an eight-ball, you would cut it up into about 50 dimes?
19  A.    No.
20  Q.    All right.  Page 164, for the benefit of counsel.  And
21  this is your testimony.  Question from one of the prosecutors.
22  I'm not sure.  "And you said you would buy amounts for resale.
23  How much would you buy?"
24        "Uhm, if I bought like an eight-ball, I would cut it up
25  into dimes.  I would cut up about 50 dimes."

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2182

1   That's what you said that day, right?
2   A.    Yes.
3   Q.    Well, which is true, what you said that day, what you
4   said today or don't you know?
5   A.    What's the question?
6   Q.    Which is true, what you said that day.  If you bought an
7   eight-ball, you would cut it up into about 20 dimes, maybe 30
8   dimes or 50 dimes?
9   A.    Yes.
10  Q.    It's an either or, ma'am, or do you just not know?
11  A.    I'm --
12        MR. LEON:  I object to the form of the question.
13        THE COURT:  Sustained.  Why don't you rephrase the
14  question.
15  BY MR. ZUCKER:
16  Q.    Which is true, what you said a year ago or what you said
17  today?
18  A.    Both.
19  Q.    So, a dime could be 20 eight-balls -- excuse me -- an
20  eight-ball could be cut up into 20 or 30 dimes, or maybe 50
21  dimes, right?
22  A.    Yes.
23  Q.    And Mr. Thurston, you might have bought from 10 or 20
24  times; it might have been 80 times, you don't know?
25  A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2183

1   Q.    And you might have bought dimes from him, but you never
2   bought an eight-ball from him, even though that's what you said
3   in here yesterday?
4        MR. LEON:  Objection.
5        THE COURT:  What was the basis?
6        MR. LEON:  Argumentative.
7        THE COURT:  I'll allow it.
8        THE WITNESS:  Repeat the question.
9        MR. ZUCKER:  I'd ask the court reporter to read it back,
10  if that's all right, Judge.
11        (Court reporter read back the last question as requested.)
12        THE COURT:  I'll reverse my ruling.  Sustained.  Rephrase.
13  BY MR. ZUCKER:
14  Q.    Ma'am, I apologize if it's offensive, but are you just
15  making it up as you go along here?
16  A.    No, I'm not.
17  Q.    You're testifying from your accurate memory, as best as
18  you can?
19  A.    As best as I can.
20  Q.    Okay.  Now, Mr. Dazz never shared his money with anybody,
21  as far as you know, when he made sales, did he?
22  A.    No.
23  Q.    And you've already said -- you acknowledge that people
24  out in this neighborhood competed for sales, right?
25  A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2184

1   Q.    Matter of fact, the sales even that were made in your
2   house, different dealers competed for them.  They weren't
3   cooperating with one another, were they?
4   A.    Yes.
5   Q.    Yes?  Which?
6   A.    No, they weren't cooperating with one another.
7   Q.    As a matter of fact, one of the guys even went so far as
8   to threaten people if they didn't buy from him rather than the
9   competitors, right?
10  A.    Yes.
11  Q.    That was Jazz, right?
12  A.    Yes.
13  Q.    That's what you put in your proffer and told the
14  government, right?
15  A.    Yes.
16  Q.    Okay.  But the gentlemen, the rest of the sellers out
17  there competed with one another, but they didn't engage in those
18  kinds of threats that you saw; isn't that correct?
19  A.    That's correct.
20  Q.    You've already established that different people had
21  different qualities and sold different quantities.  Purchasing a
22  dime from one guy was not the same size as a dime from another
23  guy, right?
24  A.    Exactly.
25  Q.    And whatever the quality of drugs you got from Burke was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2185

1  different, and different than the quality you got from anybody
2  else, right?
3  **A.**   Yes.
4  **Q.**   So in your experience as a cocaine user for many years,
5  it was pretty clear that they were not coming from the same
6  source?
7        MR. LEON:  Objection.
8        THE COURT:  Sustained.
9  BY MR. ZUCKER:
10  **Q.**   Either they were coming from different sources or they
11  were using different quantities of cut?
12        MR. LEON:  Objection.
13        THE COURT:  Sustained.
14  BY MR. ZUCKER:
15  **Q.**   Well, what do you attribute the difference in quality of
16  cocaine to different users to be from, if you know?
17  **A.**   I don't know.
18  **Q.**   Did it seem to you -- well, you could taste differences
19  in, for instance, flavor?
20  **A.**   Yes.
21  **Q.**   You could taste different -- you could feel differences
22  in effect, correct?
23  **A.**   Yes.
24  **Q.**   And you could observe differences in quantity, right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2186

1  **Q.**   Incidentally, you talked about putting your number into
2  people's pagers and phones, but you never did that with Mr. --
3  Dazz, right?
4  **A.**   No.
5  **Q.**   Because you never even had his number, right?
6  **A.**   Correct.
7  **Q.**   You never went to his house, right?
8  **A.**   No.
9  **Q.**   You never knew where he lived even, right?
10  **A.**   No.
11  **Q.**   You and he weren't like that, right?
12  **A.**   No.
13  **Q.**   The only time you saw Dazz was if you went out -- if you
14  couldn't get anybody on the phone to come to your house, you
15  said you would go out and stand on the steps, right?
16  **A.**   Yes.
17  **Q.**   And Dazz was basically a street corner guy, right?
18  **A.**   Yes.
19  **Q.**   He wandered through the neighborhood; if he had drugs, he
20  sold them, but --
21        MR. LEON:  Objection as to what Dazz did.
22        THE COURT:  Sustained as to form.
23  BY MR. ZUCKER:
24  **Q.**   But that's how you -- that's the only times you bought
25  from Dazz, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2187

1  **A.**   Yes.
2  **Q.**   Now, were you also treated for depression?
3  **A.**   Yes.
4  **Q.**   Does that affect your memory?
5  **A.**   Yes.
6  **Q.**   I assume it adversely affects it.  It hampers it
7  somewhat?
8  **A.**   I'm sorry, say it again.
9  **Q.**   When you say it affects your memory, how does it affect
10  your memory?
11  **A.**   Certain events and things it takes time for me to
12  remember.  It takes time for me to remember.
13  **Q.**   I see.  It takes time to remember?
14  **A.**   Certain things.
15  **Q.**   Is that another way of saying you have difficulty
16  remembering things, some things?
17  **A.**   Some things, yes.
18  **Q.**   Were you taking any medications for the depression?
19  **A.**   Yes, I am.
20  **Q.**   Are you taking them now?
21  **A.**   Yes.
22  **Q.**   Uhm, do they affect your ability to recall events, if you
23  know?
24  **A.**   I don't know.
25  **Q.**   Now --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2188

1        THE COURT: Mr. Zucker, forgive me for interrupting, but
2  we're close to the lunch break, so signal me when you think we
3  can do that.
4        MR. ZUCKER:  Any time that's convenient for the Court.  I
5  can stop right now or keep on going, whatever is your preference.
6        THE COURT:  All right, ladies and gentlemen, we're ready
7  to take our lunch break.  Please remember my admonition not to
8  talk about the case amongst yourselves or with anyone else.
9  Leave your notes in the jury room until you come back.  I would
10  ask that you come back promptly at 1:35.  Enjoy your lunch.
11        (Jury out at 12:22 p.m.)
12        THE COURT:  All right, counsel, we'll see you back at
13  1:35.
14        (Thereupon, a luncheon recess was had beginning at
15  12:23 p.m.)
16
17        **C E R T I F I C A T E**
18        I, Scott L. Wallace, RDR-CRR, certify that the
foregoing is a correct transcript from the record of proceedings
19  in the above-entitled matter.
20        ----------------------------
        **Scott L. Wallace, RDR, CRR**
21        **Official Court Reporter**
22
23
24
25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 been any clearer.  I said, "Was that the first time you told the

2 government this?"

3           THE COURT:  If you want to try to clear it up, you can.

4 But there's no basis now for Brady, based upon the confused

5 state of the record.  Not even close.

6           (END BENCH CONFERENCE.)

7 BY MR. ZUCKER:

8 Q.  Ms. Parson, I want to be real clear here, and if you don't

9 understand my question, tell me and I'll clarify it.  Okay?

10 A.  Okay.

11 Q.  Yesterday you walked -- when Mr. Leon was examining you, he

12 asked you whether, during the course of your cooperation, and I

13 forget his exact words, "You concealed from the government that

14 you were continuing to use drugs while you were cooperating."

15 A.  Yes.

16 Q.  And you acknowledged that point yesterday.  Is that correct?

17 A.  Yes.

18 Q.  Was that the first time you ever told anybody in law

19 enforcement that?

20 A.  Yes.

21 Q.  So you had never disclosed that to them before?  I'm not

22 talking about on the stand.  I'm talking about in meetings with

23 prosecutors, meetings with agents.

24 A.  No.

25 Q.  You had never said that to them before?

Page 2209

1 A.  No.

2 Q.  Similarly, he asked you --

3        MR. ZUCKER:  Let me consult.

4 BY MR. ZUCKER:

5 Q.  Similarly, you were asked yesterday about whether or not you

6 concealed drugs from the government in connection with these

7 undercover purchases.  Do you recall that?

8 A.  Yes.

9 Q.  And yesterday you acknowledged, in response to Mr. Leon's

10 questions, that in fact yes, you had concealed, or kept for your

11 own personal use, some drugs you purchased during these

12 controlled purchases.  Is that correct?

13 A.  Yes.

14 Q.  Had you told the government that, and by "government" I mean

15 any of the prosecutors or any of the agents, had you told them

16 that before you took the stand yesterday?

17 A.  Yes.

18 Q.  And notwithstanding that you've acknowledged those breaches,

19 you're still here testifying hoping to get benefits.  Right?

20 A.  Yes.

21 Q.  So all this talk about:  If you breach the plea agreement

22 it's taken away, isn't true, is it?

23        MR. LEON:  Objection.

24        THE COURT:  Would you repeat the question?

25 BY MR. ZUCKER:

 1 A.  Yes.

 2 Q.  And no one else?

 3 A.  No.

 4 Q.  Did you see Jojo with other people equally, frequently?

 5 A.  No.

 6 Q.  So you weren't just trying to give the government the

 7 answers that you thought they wanted?

 8 A.  No.

 9 Q.  And sitting here today, a couple of minutes ago, you

10 couldn't remember who you ever saw Jojo with, or who you usually

11 saw Jojo with.  Right?

12 A.  Yes.

13 Q.  Let's turn to the house -- or the place that you lived.  You

14 described it as, parties were had there, and people from the

15 neighborhood could come and use drugs and buy drugs.  Right?

16 A.  Not necessarily people from the neighborhood, but yes.

17 Q.  All right.  People?

18 A.  People.

19 Q.  Didn't have to be from the neighborhood?

20 A.  Exactly.

21 Q.  You called them parties, but it was essentially a crack

22 house you ran.  Isn't that right, ma'am?

23 A.  No.

24 Q.  Well, people who wanted to buy crack could come there and

25 buy crack, assuming you knew them.  Right?

Page 2216

1 A.  Yes.

2 Q.  People who wanted to sell crack could come there and sell

3 their crack to those customers, assuming you knew them and they

4 gave you a little piece.  Right?

5 A.  Yes.

6 Q.  And the FBI was paying -- and I'm sorry.

7         That went on for a while in that apartment, did it not,

8 ma'am?

9 A.  Yes.

10 Q.  As a matter of fact, not only if they wanted -- people who

11 wanted to have sex in exchange for crack could come to your

12 apartment.  Correct?

13 A.  Yes.

14 Q.  And they could have sex with you or other people who were

15 willing, in exchange for crack.  Right?

16 A.  Yes.

17 Q.  All assuming they knew you, and that you got a piece.

18 Right?  Piece of crack cocaine.  Right?

19 A.  Yes.

20 Q.  And that house was in danger of being shut down because you

21 had -- you couldn't pay the electricity bill and the other

22 utility bills.  Right?

23         MR. LEON:  Objection.  Time period.  There's no time

24 period on the question.

25         THE COURT:  Do you want to clarify a time period?

Page 2217

1 BY MR. ZUCKER:

2 Q.  Do you recall testifying yesterday, there was a point in

3 time when the utilities were shut off, you side-stepped the

4 meter by hooking them back up, and then all of a sudden you got

5 a PEPCO bill for about 4,000.  Do you recall that?

6 A.  Yes.

7 Q.  And those activities I just discussed with you were going on

8 around and throughout that period.  Is that correct?

9 A.  Yes.

10 Q.  And then the FBI came in and paid -- basically paid the

11 bill, though they did so over a period of time.  Right?

12 A.  Yes.

13 Q.  And so the FBI was paying the expenses on a crack house that

14 you were running.  Right?

15 A.  No.

16 Q.  It wasn't a crack house?

17 A.  No.

18 Q.  Okay.  The apartment in which these activities were going

19 on, the FBI was paying the expenses.  Right?

20 A.  Yes.

21 Q.  And did you -- did the FBI know -- well, let me strike that.

22       Did you tell the FBI this is what was going on in your

23 apartment?

24 A.  No.

25 Q.  Now, when they gave you the money, they gave it to you in

1 Q.  All right.  Let's shift for a moment.  Do you remember an

2 incident you talked about involving Ed Martin?

3 A.  Yes.

4 Q.  Now, Ed Martin was one of the people who came to your house

5 and partied with you, basically paid for drugs and sex.  Right?

6 A.  Yes.

7 Q.  Now, at one point Ed Martin gave you the keys to his car and

8 told you to go to the bank and get money out.  Right?

9 A.  Yes.

10 Q.  That's the incident you talked about yesterday?

11 A.  Yes.

12 Q.  And there was no money in that bank.  Right?

13 A.  Yes.

14 Q.  Or you couldn't get it out on his card?

15 A.  Correct.

16 Q.  But you knew there was money in the car someplace, or

17 suspected it.  Is that correct?

18 A.  Yes.

19 Q.  And he actually had, I think it was a Mercedes truck?

20 A.  Yes.

21 Q.  Now, that truck was parked somewhere near your house, I

22 think on 13th, when the money was taken?  Where was the money

23 taken from?  Where was the truck physically?

24 A.  En route to my house.

25 Q.  Was it moving?

1 A.  Yes.

2 Q.  Now, Ed Martin gave the keys to you.  Right?

3 A.  Yes.

4 Q.  Not Desmond Thurston.  Right?

5 A.  Correct.

6 Q.  And the money was -- his money, Ed Martin's money, was

7 inside the glove compartment.  Right?

8 A.  I can't recall where I found it, but it was in the car.

9 Q.  Okay.  Well, you just said, "where I found it."  You found

10 the money.  Right?

11 A.  Yes.

12 Q.  Now, when you found the money, you decided to take the

13 money.  Right?

14 A.  Yes.

15 Q.  And Desmond Thurston saw that, did he not?

16 A.  Yes.

17 Q.  But you were the one who actually took the money out of the

18 car.  Right?

19 A.  Yes.

20 Q.  And you gave some of the money to Desmond Thurston.  Right?

21 A.  Yes.

22 Q.  Desmond is Dazz.  Right?

23 A.  Yes, Dazz.

24 Q.  But you were the one who actually physically took the money

25 out of the car, right?  Not Dazz?

1 A.  Yes.

2 Q.  And then you gave him some of the money to shut him up.

3 Right?

4 A.  No.

5 Q.  Well, the money was not -- you took the money, not him.

6 You've just told us that.  Right?

7 A.  Yes.

8 Q.  And you gave him some of the money.  Right?

9 A.  Yes.

10 Q.  Even though it was your theft, not his.  Right?

11 A.  Yes.

12 Q.  So once you had acquired possession by stealing it, taking

13 it, then you voluntarily gave it to him.  Right?

14 A.  We agreed.

15 Q.  He agreed to not say anything to Ed, in exchange for you

16 sharing the money you stole.  Isn't that correct?

17 A.  No.

18 Q.  Well, he didn't take it out of the car, did he?

19 A.  No, he didn't.

20 Q.  Ed Martin didn't trust him with the keys, did he?

21 A.  Not on that occasion, no.

22 Q.  And there was also, I think a motorcycle or a four-wheeler

23 in the back of the truck?

24 A.  No.

25 Q.  All right.  You didn't tell Ed Martin what you did.  Right?

1 A.  No.

2 Q.  You left the keys -- you left the car unlocked.  Right?

3 A.  I can't remember.

4 Q.  Well, didn't you leave the car unlocked so you could pretend

5 to Ed that someone else went in there?

6 A.  No.

7 Q.  What did you say to Ed?

8 A.  I didn't say anything to him.

9 Q.  You just returned his car minus $3,000?

10 A.  Uh-huh.

11 Q.  Didn't say a word?

12 A.  No.

13 Q.  He didn't ask?

14 A.  No.

15 Q.  And you didn't care about covering your tracks?

16 A.  No.

17 Q.  Now, that money, that was not turned over to any

18 organization or group, was it?

19 A.  No.

20 Q.  You kept it and used it for whatever you wanted.  Right?

21 A.  Correct.

22 Q.  And you don't know what Dazz did with his money, do you?

23 A.  No.

24 Q.  As far as you know, he never shared it with any group, did

25 he?

1 A.  No, I'm not.

2 Q.  And you've been relocated to wherever you currently live,

3 and again, we don't need to know, at FBI expense or expenses

4 they've arranged for payment of.  Correct?

5 A.  Yes.

6 Q.  And you heard the figure of, I think, 33,000, or something

7 over 30,000 in benefits you received?

8 A.  Yes.

9 Q.  You wouldn't quarrel if that's the number that the FBI puts

10 on it, would you?

11 A.  I'm sorry, repeat that question.

12 Q.  You don't know the full amount, do you?  You never tabulated

13 them?

14 A.  No.

15 Q.  But if that's the amount the government says you received,

16 something over $30,000, you wouldn't quarrel with their

17 calculations, would you?

18 A.  I'm not understanding the question.

19 Q.  Quarrel means you wouldn't say, no, no, no, that can't be

20 right.

21 A.  Correct.

22 Q.  And they paid your first month's rent and your moving

23 expenses, and you're currently on disability.  Right?

24 A.  Yes.

25 Q.  And you're currently living on subsidized housing?

1 A.  Yes.

2 Q.  All of which was assistance from -- either the FBI or the

3 Marshal Service helped arrange all that.  Correct?

4 A.  No.

5 Q.  Well, you have to apply for those benefits from other

6 government agencies.  Right?

7 A.  Yes.

8 Q.  When you were relocated, did the FBI or the Marshal -- I

9 think you went into the Witness Protection Program.  Right?

10 A.  Yes.

11 Q.  Did they help make the arrangements so that you can get

12 those benefits?

13 A.  No.

14 Q.  Did they take you to the agencies and help you with the

15 forms?

16 A.  No.

17 Q.  You did that on your own?

18 A.  Yes.

19        MR. LEON:  Your Honor, can we approach briefly?

20        THE COURT:  Yes.

21        (BENCH CONFERENCE ON THE RECORD.)

22        MR. LEON:  This isn't quite an objection, but I just

23 wanted to flag the issue.  The witness did say yesterday,

24 "witness protection," so their cross is understandable.  She's

25 not in witness protection, but her understanding -- she's

1 you provided in the Newett Ford trial?  Do you remember that?

2 A.  Yes.

3 Q.  Did you at that time give all the names of people you dealt

4 with in Congress Park in that trial?

5 A.  No.

6 Q.  Do you know if you were asked to give all of the names of

7 people who you dealt with in Congress Park?

8 A.  No.

9 Q.  No, you don't know, or no, you weren't asked?

10 A.  No, I wasn't asked.

11 Q.  Do you know why?

12        MR. ZUCKER:  Objection.

13        MR. BALAREZO:  Objection.

14 BY MR. LEON:

15 Q.  If you know.  I'll withdraw the question.

16        Now, do you remember listening to another tape, and

17 there was also a question regarding this, I believe on

18 cross-exam, regarding a tape where you heard yourself in your

19 apartment dealing with Sandra or Sandy.  Do you remember those

20 questions?

21 A.  Yes.

22 Q.  And do you remember listening to that, again whether it was

23 today or yesterday?

24 A.  Yes.

25 Q.  And where did that tape occur, again?

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 406 of 1954

1 A.  In my apartment.

2 Q.  And who was actually setting up the sale, if you remember?

3 A.  I was.

4 Q.  For who?

5 A.  For Sandy.

6 Q.  And how did you do that?

7 A.  She came in and asked me to call Boy-Boy.

8 Q.  And did you?

9 A.  Yes.

10 Q.  And then was the sale completed after you called Boy-Boy?

11 A.  Yes.

12 Q.  Now, you were asked some questions, I believe it was from

13 Mr. Martin, where he asked you whether or not you, I believe the

14 word he used was "brokered" sales.  Do you remember that

15 question, or those questions?

16 A.  Yes.

17 Q.  Did you have an understanding, or do you -- withdrawn.

18      Do you have an understanding as to what somebody means

19 when they ask you if you've brokered sales?

20 A.  No.

21 Q.  In your own words, if Sandy -- when Sandy came to the

22 apartment asking to set up a sale, how would you, in your own

23 words, describe what happened?

24 A.  She knocked on the door and she came in and she asked me to

25 call --

1          MR. ZUCKER:  Volume, please.

2 A.  She came in -- she knocked on the door, she came in, and

3 asked me to call a certain person, and I called the person and

4 the person responded.  And it went from there.

5 BY MR. LEON:

6 Q.  And when you say "it went from there," did Sandra get what

7 she wanted?

8 A.  Yes.

9 Q.  Was that drugs?

10 A.  Yes.

11 Q.  Did you get anything?

12 A.  I can't remember, but I'm pretty sure I did.

13 Q.  And pretty sure you got what?

14 A.  Something for it.

15 Q.  What would "something" be?

16 A.  Crack.

17 Q.  And do you know if Boy-Boy got anything?

18 A.  Yes.

19 Q.  What did he get?

20 A.  Money.

21 Q.  Now, you were also asked questions, a lot of questions, I

22 believe, from several attorneys regarding the proffer that's the

23 statement of facts that's part of the plea agreement.  Do you

24 remember those questions?

25 A.  Yes.

Tab 9

```
                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,          :
                                      :
            Plaintiff,                : Docket No. CR 05-100
                                      :
        v.                            :
                                      :
   ANTWUAN BALL, DAVID WILSON,        : Washington, DC
   GREGORY BELL, DESMOND              :
   THURSTON, JOSEPH JONES, and        : March 12, 2007
   DOMINIC SAMUELS,                   : 9:20 a.m.
                                      :
            Defendants.               :
                                      :
                                      :
```

           VOLUME 15 - MORNING SESSION
      TRANSCRIPT OF JURY TRIAL PROCEEDINGS
     BEFORE THE HONORABLE RICHARD W. ROBERTS
   UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

```
For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2348

APPEARANCES (Cont.)

```
For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100


                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2349

APPEARANCES (Cont.)

```
For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351


Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC  20001
                          202.326.0566
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2350

**MONDAY MORNING SESSION, MARCH 12, 2007**

(9:30 a.m.)

THE DEPUTY CLERK:  *Criminal Case Number 05-100, the United States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond Thurston, Joseph Jones and Dominic Samuels.  For the government, Mr. Leon, Ms. Petalas, Mr. Guerrero.  For defendants, Mr. Carney, Mr. Tabackman, Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker, Mr. Martin, Mr. Balarezo and Mr. Purpura.*

THE COURT:  Good morning.  Is your witness here?

MR. GUERRERO:  Yes, Your Honor.

THE COURT:  I think when we left off, you moved in Exhibit 310.5 and had agreed to redact out everything but the identification on there of the purported seller.  I will require that that entire text be redacted.  This was not an identification procedure that was the subject of Rule 801, so I will not allow it in in its current form, but if you redact out all the rest of the text --

I don't remember if there was an objection other than that.  Mr. Beane?

MR. BEANE:  I don't believe there was, Your Honor.  The only question that I have remaining was exactly what the government could leave on.

THE COURT:  What what?

MR. BEANE:  What writing the government could leave on the exhibit.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2495

1    THE COURT: And you can always cross-examine about this
2  color mixup, and this color issue she has concerning the color of
3  the shirt, switching from beige to black. But I am satisfied
4  that he's the only one who is wearing a shirt -- it appears to my
5  eye, my poor eye perhaps -- to be closer to a gray, darker in
6  color than any of the other shirts of any of the other
7  defendants. And most of the counsel at the table have jackets,
8  such that the shirts aren't showing.
9         But his shirt, to my eye, is the only one that has a strip
10  of white appearing at the tip of the collar that's about an inch
11  thick, stretching from the top to the bottom of the edge of the
12  shirt. And I can understand the witness describing the way she
13  did that shirt, so --
14    MR. ZUCKER: Very well. I won't object further. I'll
15  just cross-examine. Thank you.
16    THE COURT: So, the government wants me to put on the
17  record that he's been identified, and I can hold off doing that
18  until she asks more questions.
19    MR. ZUCKER: I don't think that's necessary.
20    THE COURT: All right.
21    MR. MARTIN: Your Honor, if counsel be so kind enough not
22  to point with her body facing in the direction of the particular
23  witness that she wants -- I mean, that she wants the witness to
24  identify, it would be appreciated.
25    THE COURT: I'm not sure that she did that, but I'll

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2496

1  certainly ask her to abide by your request.
2    MR. MARTIN: Thank you, sir.
3    (Sidebar discussion concluded.)
4    THE COURT: The request is granted.
5    MS. PETALAS: I'm sorry, Your Honor?
6    THE COURT: The request is granted.
7    MS. PETALAS: Thank you. May I approach, Your Honor?
8    THE COURT: Yes.
9  BY MS. PETALAS:
10   Q.   Ms. White, I'm showing you what's been marked as
11  Government's Exhibit 300. Do you recognize that?
12   A.   Yes.
13   Q.   And what is that?
14   A.   Uhm, a tape, DVD with my initials and the date on it.
15   Q.   And did I play that for you?
16   A.   Yes.
17   Q.   And is that a true and accurate recording of the
18  controlled purchase that you did?
19   A.   Yes.
20   Q.   I'm showing you what's been marked as 300.1. Do you
21  recognize that?
22   A.   Yes.
23   Q.   Did I play that for you, as well?
24   A.   Yes.
25   Q.   And are your initials on that, as well?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2497

1   A.   Yes.
2   Q.   Is that an abridged version of the -- of that same
3  controlled purchase that we just talked about?
4   A.   Yes.
5    MS. PETALAS: Your Honor, at this time I would move to
6  publish Government's Exhibit 300.1. I believe it's already in
7  evidence.
8    THE COURT: It is not in evidence.
9    MS. PETALAS: Okay.
10  BY MS. PETALAS:
11   Q.   Ms. White, when I played that, was that a fair and
12  accurate recording of that controlled purchase that you did on
13  May 16th?
14   A.   Yes.
15    MS. PETALAS: Your Honor, at this time I move Government's
16  Exhibit 300 and 300.1 into evidence.
17    THE COURT: What exhibit did you just ask her about?
18    MS. PETALAS: I asked her about 300 and 300.1.
19    THE COURT: You just asked her: When you played that, was
20  it a fair and accurate recording? What exhibit did you show her
21  at that point?
22    MS. PETALAS: Actually, I was not showing her one. I will
23  be more specific when I ask her that.
24  BY MS. PETALAS:
25   Q.   I showed you earlier 300 and -- Government's Exhibit 300.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2498

1  Do you recall that?
2   A.   Yes.
3  BY MS. PETALAS:
4   Q.   Is that -- Government's Exhibit 300, is that a fair and
5  accurate recording, full recording of the controlled purchase on
6  May 16th?
7   A.   Yes.
8   Q.   I also showed you 300.1. Do you recall that?
9   A.   Yes.
10   Q.   And when I -- when you -- and you said that you initialed
11  that. Do you recall that?
12   A.   Yes.
13   Q.   Was that a fair and accurate shortened version of that
14  controlled purchase?
15   A.   Yes, it was.
16    MS. PETALAS: And Your Honor, at this time I move
17  Government's Exhibit 300 and 300.1 into evidence.
18    THE COURT: All right. Without objection, both exhibits
19  will be received.
20    (Government's Exhibit 300 and 300.1 admitted into the
21  record.)
22    MS. PETALAS: At this time, I move to publish
23  Government's -- and I apologize. I don't believe the jury has
24  headsets.
25    THE COURT: All right.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2499

1   MS. WICKS:  Your Honor, may I speak with Ms. Petalas for a
2   moment?
3       (Discussion had off the record.)
4       MS. WICKS:  Thank you.
5       THE COURT:  And what exhibit are you playing?
6       MS. PETALAS:  Your Honor, I'm now moving to play
7   Government's Exhibit 300.1.
8       (Audiotape played.)
9   BY MS. PETALAS:
10  **Q.**   Ms. White, were you able to hear that?
11  **A.**   Yes, ma'am.
12  **Q.**   Okay.  And did you recognize that voice on there?
13  **A.**   Yes.
14  **Q.**   And who was the woman's voice on that tape?
15  **A.**   Mine.
16  **Q.**   And who were you talking to right there?
17  **A.**   The agent.
18  **Q.**   Okay.  And --
19  **A.**   The FBI agent.
20  **Q.**   And prior to -- on that date, prior to this recording,
21  how had you met up with him?
22  **A.**   Uhm, he would call me or I'd call him, and we'd meet
23  somewhere.
24  **Q.**   And would you meet in Congress Park or somewhere near
25  Congress Park?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2500

1   **A.**   Near.
2   **Q.**   And what happened when you met with him?
3   **A.**   He would just tell me what need to be done.
4   **Q.**   Would he give you anything?
5   **A.**   He give me money and told me to buy, purchase or get a
6   cell number.
7   **Q.**   You say buy, purchase.  What were you going to buy or
8   purchase?
9   **A.**   Cocaine.
10      (Audiotape played.)
11  BY MS. PETALAS:
12  **Q.**   Okay.  Ms. White, were you able to hear that?
13  **A.**   Yes.
14  **Q.**   And the point where you said, "175," what are you talking
15  about there?
16  **A.**   170 -- $175.
17  **Q.**   And what was that?
18  **A.**   Money.
19  **Q.**   And earlier when you were talking about an eight-ball.
20  What were you referring to in an eight-ball?
21  **A.**   An eight-ball of cocaine, hard rock cocaine.
22  **Q.**   And who were you talking to -- who were you talking to at
23  that time?
24  **A.**   I was talking to Cool Wop.
25  **Q.**   And do you see Cool Wop in the courtroom today?  You need

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2501

1   to get up and look around.  You can't --
2   **A.**   Right there (indicating).
3   **Q.**   You're pointing where?  If you could describe where
4   they're sitting or an article of clothing.
5   **A.**   Hum?
6   **Q.**   You were pointing somewhere.  If you could just --
7   **A.**   Right there (indicating).
8   **Q.**   And describe an article of clothing.
9   **A.**   Beige --
10  **Q.**   Is it hard for you to see at this distance?
11      MS. PETALAS:  Your Honor, with the permission of the Court
12  and the Marshals, could she get closer?
13      THE COURT:  Very well.  Yes.
14  BY MS. PETALAS:
15  **Q.**   You seem to be pointing over in that direction.
16      THE COURT:  Let me ask you if you would hand her the
17  portable mike, Ms. Petalas.  And make sure it's on before you
18  hand it to her.
19  BY MS. PETALAS:
20  **Q.**   If I can hand that to you, Ms. White.  If you can
21  describe maybe an article of clothing, a shirt or --
22  **A.**   He got on a white shirt with, I guess those are like
23  lines or something, with a dark tie.
24  BY MS. PETALAS:
25  **Q.**   Okay.  And you said dark tie?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2502

1   **A.**   Yes.
2   **Q.**   Okay.  And now, you seem to hesitate.  Has it been a
3   while --
4       MR. PURPURA:  Objection, Your Honor.  Objection, Your
5   Honor.  Objection to the characterization.  It's not -- she's not
6   testifying.
7       THE COURT:  Put a question.
8       MR. PURPURA:  Thank you.
9   BY MS. PETALAS:
10  **Q.**   How long has it been -- if you can resume, take the
11  stand.
12  **A.**   Thank you.
13  **Q.**   The person again that you identified, where exactly are
14  they sitting at the table?
15  **A.**   The second row; like second row, four people over.  The
16  table is right there.  It's the first row, that's the second
17  row.  Right there (indicating), behind that guy.
18  **Q.**   Okay.  And you said it's a dark tie.  What do you mean by
19  a dark tie.
20  **A.**   It's a dark tie.  Color-wise, it's black.
21      MS. PETALAS:  Your Honor, may we approach briefly?
22      THE COURT:  Yes.
23      (Following sidebar discussion had on the record:)
24      MS. PETALAS:  Your Honor, the record should reflect that
25  she does appear to be identifying the wrong person.  And I didn't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2515**

1  MS. WICKS: Your Honor, I would ask to voir dire her
2  outside of the presence of the jury.  This is a video, and
3  obviously she wasn't -- she wasn't wearing a video recorder, so
4  this video is not shot from her perspective during this incident.
5  So, I'm objecting to the admission and asking to voir dire
6  outside of the presence of the jury.
7        MS. PETALAS: Two things. The first thing is that she
8  viewed it, was there, she can say it's a true and accurate video.
9  The second thing, I'm not moving to publish it to the jury at
10  this point. I'm happy to introducing it and playing it through
11  Agent Fulmer, who was actually there at the video.
12        THE COURT: All right. Anything else?
13        MS. WICKS: Then I would just wait. I mean, assuming he
14  ties it up, I don't have an objection at that point. But from
15  this witness' perspective, I have an objection to its admission
16  at this point.
17        THE COURT: All right. I'll overrule the objection.
18        (Sidebar discussion concluded.)
19  MS. PETALAS: The government moves 300.V into evidence.
20        THE COURT: 300.V will be received, over objection.
21        (Government's Exhibit 300.V admitted into the record.)
22        MS. PETALAS: Court's indulgence.
23  BY MS. PETALAS:
24  Q.  Ms. White, I'm showing you what's been marked as
25  Government's -- in evidence as Government's Exhibit 301.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2516**

1  Do you recognize that?
2  A.  Yes.
3  Q.  Is that a recording that occurred on March 25th, 2000?
4  A.  Yes.
5  Q.  Did you review that?
6  A.  Yes.
7  Q.  Are your initials on that?
8  A.  Yes.
9  Q.  Is that a true and accurate recording of that controlled
10  purchase?
11  A.  Yes.
12  Q.  I'm showing you what's been marked as Government's
13  Exhibit 301.1.  Do you recognize that?
14  A.  Yes.
15  Q.  Is that the shorter, abridged version of that tape?
16  A.  Yes.
17  Q.  Did you review that?
18  A.  Yes.
19  Q.  Is that true and accurate?
20  A.  Yes.  My initials are on it.
21        MS. PETALAS:  I believe Government's Exhibit 301 and 301.1
22  are already in evidence.  I would move to publish 301.1 to the
23  jury at this time.
24        THE COURT:  All right.
25        (Audiotape played.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2517**

1  BY MS. PETALAS:
2  Q.  Ms. White, did you hear the voices on that tape?
3  A.  Yes.
4  Q.  Okay.  And on this controlled purchase, did you follow
5  the same procedure as the last one?
6  A.  Yes.
7  Q.  And did they search you prior to sending you out for the
8  purchase?
9  A.  Yes.
10        (Audiotape played.)
11  BY MS. PETALAS:
12  Q.  Ms. White, you talk about Phil.  Who's Phil?
13  A.  Dash's brother.
14  Q.  Is it Dash's brother?
15  A.  Yes.
16  Q.  Earlier, did you hear where, "I'll give it to you, but if
17  you want an eight-ball, I'm going to let him sell all this
18  shit"?  Did you hear that?
19  A.  Yes.
20  Q.  Who was he referring to when he said that?
21  A.  To Phil.
22  Q.  And who was that talking?
23  A.  Cool Wop.
24  Q.  You said, "He just went in the building." Who's building
25  was that he went into?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2518**

1  A.  In Cool Wop's building.
2        (Audiotape played.)
3  BY MS. PETALAS:
4  Q.  What are you doing there?
5  A.  Counting the money.
6  Q.  And how much money?
7  A.  $150.
8  Q.  What did you do once you counted it?
9  A.  I gave it to him.
10  Q.  Who's "him"?
11  A.  Phil.
12  Q.  And what, if anything, did Phil give you then?
13  A.  He gave me an eight-ball of crack cocaine.
14  Q.  And where are you, if you can recall right now, during
15  this tape?
16        MS. WICKS:  Objection.  Compound.
17        THE COURT:  Overruled.
18  BY MS. PETALAS:
19  Q.  At this point -- I will rephrase it.  At this point in
20  the tape, where are you?
21  A.  In the rental office in Cool Wop building.
22        (Audiotape played.)
23  BY MS. PETALAS:
24  Q.  You say, "Shoot, Phil, you need to come on." Who were
25  you talking to at that point?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2519**

1  **A.**  I was talking to Cool Wop.

2  (Audiotape played.)

3  BY MS. PETALAS:

4  **Q.**  Ms. White, you said, "Oh, please don't let him jump."

5  What are you talking about there?

6  **A.**  He had a dog.

7  **Q.**  Who had a dog?

8  **A.**  Cool Wop.

9  **Q.**  What kind of dog was it?

10  **A.**  A pit.

11  (Audiotape played.)

12  BY MS. PETALAS:

13  **Q.**  And Ms. White, you said, "Three for 25."  Going back

14  before, you said, "Three for 25."  What were you talking about

15  there?

16  **A.**  Three dimes, rocks of cocaine, for $25.

17  **Q.**  And did you have $25?

18  **A.**  Yes.

19  **Q.**  And what did you do with it?

20  **A.**  I gave it to Wop.

21  **Q.**  And what did he do?

22  **A.**  He gave me crack cocaine, three dimes.

23  (Audiotape played.)

24  BY MS. PETALAS:

25  **Q.**  Ms. White, where were you at that point in the tape?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2520**

1  **A.**  Where was I?

2  **Q.**  Yes.

3  **A.**  With the FBI.

4  **Q.**  And what did you do when you met back up with the FBI?

5  **A.**  When I met back up with them, they would take me --

6  **Q.**  I'll be more specific.  The drugs that you talked about

7  that you got, what did you do with those?

8  **A.**  I gave them to the FBI.

9  **Q.**  And what did they do?

10  **A.**  Put it in two different bags, Ziploc bags, and put names

11  on it.

12  **Q.**  And you talked about drugs you got from Phil and drugs

13  you got from Wop.  Did you keep those separate?

14  **A.**  Yes, always.

15  **Q.**  And did they search you when you got back to the --

16  **A.**  Yes.

17  **Q.**  And showing you what's been marked as Government's

18  Exhibit 301.V, do you recognize that?

19  **A.**  Yes.  That's my initials on it.

20  **Q.**  Is that a video of the controlled purchase that we just

21  talked about?

22  **A.**  Yes.

23  **Q.**  Did you review that?

24  **A.**  Yes.

25  **Q.**  Was that a true and accurate video of the controlled

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2521**

1  purchase?

2  **A.**  Yes.

3  **Q.**  And were you able to recognize yourself on that?

4  **A.**  Yes.

5  MS. PETALAS:  At this time, I move Government's

6  Exhibit 301.V into evidence.

7  MS. WICKS:  Same objection, Your Honor.

8  THE COURT:  All right.  Over objection, 301.V will be

9  received.

10  (Government's Exhibit 301.V admitted into the record.)

11  MS. PETALAS:  Court's indulgence.

12  BY MS. PETALAS:

13  **Q.**  Ms. White, I'm handing you what's been marked as

14  Government's Exhibit 303.  Do you recognize that?

15  **A.**  Yes.

16  **Q.**  What is that?

17  **A.**  It's a tape with my initials on it.

18  **Q.**  Is that -- did you review that?

19  **A.**  Yes.

20  **Q.**  Did you initial that after you reviewed it?

21  **A.**  Yes.

22  **Q.**  Is that a true and accurate recording of the controlled

23  purchase on June 28th, 2000?

24  **A.**  Yes.

25  **Q.**  I'm also handing you what's been marked as 303.1.  Do you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2522**

1  recognize that?

2  **A.**  Yes.

3  **Q.**  And did you review that?

4  **A.**  Yes.

5  **Q.**  And is that a true and accurate abridged version of

6  Government's Exhibit 303?

7  **A.**  Yes.

8  MS. PETALAS:  Your Honor, at this time I move to publish

9  Government's Exhibit 303.1.  I believe it's already in evidence.

10  (Audiotape played.)

11  BY MS. PETALAS:

12  **Q.**  Ms. White, I apologize.  I'm going to go back to the last

13  controlled purchase you talked about.  You referred to the

14  rental office building, and Wop's building.  Do you recall that?

15  **A.**  Yes.

16  **Q.**  If I can show you -- I believe it's already in evidence.

17  THE DEPUTY CLERK:  Is it being shown to the jury?

18  MS. PETALAS:  No.

19  BY MS. PETALAS:

20  **Q.**  Ms. White, if you look at your screen, do you see what's

21  been marked as Government's Exhibit 101.1 up there?

22  **A.**  Yes.

23  **Q.**  Do you recognize that?

24  **A.**  Yes.

25  **Q.**  And what is that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2523**

1  **A.**  It's a map showing the area of Congress Park.

2  MS. PETALAS: And Your Honor at this time, I move to

3  publish to the jury. I believe it's already in evidence,

4  Government's Exhibit 101.1.

5  THE COURT: Yes.

6  MS. PETALAS: May I approach, Your Honor?

7  THE COURT: Yes.

8  BY MS. PETALAS:

9  **Q.**  Ms. White, I'm handing you a pen. If you could -- with

10  not the ink side of the pen, but the other side, if you could --

11  when you referred to the rental office building and Wop's

12  building, do you see that on that map?

13  **A.**  Yes.

14  **Q.**  Could you point to that? And if you touch the screen

15  with the blunt side of your pen, it should make a mark.

16  MR. PURPURA: Your Honor, I'm going to object this

17  procedure. Could I advise the Court as to why?

18  THE COURT: Yes.

19  (Following sidebar discussion had on the record:)

20  MR. PURPURA: Your Honor, as the Court is well aware, we

21  cannot preserve what she marks at this time. I'm going to

22  suggest that we do it -- the only way properly to preserve the

23  record would be the old-fashioned way: To get a copy of the

24  diagram, have them mark it in pen, and then it can be published

25  on the machine at that time, the marking of it so we can all use

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2524**

1  it. We have a hard copy as a reference of it. Otherwise, it's

2  impossible to duplicate it.

3  THE COURT: Well, if you want to get something that you

4  want to have the witness use on cross, you can do that. But the

5  government can proceed the way it wants.

6  MR. PURPURA: Again, the only problem is, it's not

7  preserved as pristine as it should be at this point, which makes

8  it difficult.

9  THE COURT: I know it's not as pristine as you wanted, but

10  the government has no obligation to preserve the markings. You

11  can ask to have it properly identified on the record just like it

12  was in the old days. Unfortunately, there is no point -- there's

13  no -- we'll just have to make the record how and where the items

14  are marked. And if there's any inaccuracy now, then counsel can

15  make a record of it.

16  But I won't prevent the government from going forward with

17  this witness.

18  MR. PURPURA: Thank you, Judge.

19  THE COURT: Why don't we go ahead and break. Well, you

20  can finish with this witness, but before you get to the next

21  transaction.

22  (Sidebar discussion concluded.)

23  BY MS. PETALAS:

24  **Q.**  Ms. White, if you could just -- I don't know if you can

25  with your injured hand, but hopefully if you can reach over

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2525**

1  there and try to point just to that building, and make a mark on

2  it. It helps if you use the pen.

3  **A.**  Right here (indicating).

4  **Q.**  For the record, there's a red arrow -- there's actually

5  two red arrows pointing basically to a building that's in the --

6  on Congress Street, just to the right of the intersection of

7  13th Place and Congress Street; is that correct?

8  **A.**  Yes.

9  **Q.**  And it's facing Congress Street. It appears to be on

10  Congress Street, a little bit away from the intersection of 13th

11  and Congress?

12  **A.**  13th Place and Congress, yes.

13  **Q.**  Okay.

14  MS. PETALAS: Your Honor, I believe you mentioned a break

15  at this point.

16  THE COURT: Ladies and gentlemen, we'll take our

17  mid-afternoon break. Please remember, don't talk about the case,

18  take your notes back into the jury room, and we'll see you back

19  in 15 minutes.

20  (Jury out at 3:48 p.m.)

21  THE COURT: All right. We'll be back in 15 minutes.

22  (Thereupon, a break was had from 3:49 p.m. until 4:09

23  p.m.)

24  THE COURT: Are you ready for the jury?

25  MS. PETALAS: Yes, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2526**

1  THE COURT: Good afternoon, ladies and gentlemen.

2  THE JURY PANEL: Good afternoon.

3  THE COURT: Welcome back. We're ready to resume.

4  Counsel.

5  BY MS. PETALAS:

6  **Q.**  Ms. White, I believe when we left off earlier, we had

7  been beginning to play the controlled purchase from June 28th,

8  Government's Exhibit 303.1. If I could just ask Mr. Mazzitelli

9  to resume that.

10  THE COURT: What are you going to publish now?

11  MS. PETALAS: Yes, I'm going to publish that now, yes,

12  303.1.

13  BY MS. PETALAS:

14  **Q.**  But before be we do that, Ms. White, if you touch the

15  lower right corner with the pen on that screen, you can go ahead

16  and clear that. You have the pen in front of you. On the

17  screen at the lower right corner.

18  **A.**  Here? (Indicating)

19  **Q.**  Yes. Thank you. Now, I would like to publish

20  Government's Exhibit -- continue publishing Government's

21  Exhibit 303.1 to the jury.

22  (Audiotape played.)

23  BY MS. PETALAS:

24  **Q.**  Ms. White, the knocking on the tape, who is that

25  knocking?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 2527

1  **A.**  Me.
2  (Audiotape played.)
3  BY MS. PETALAS:
4  **Q.**  Ms. White, there you referred to a person JT.  Who is JT?
5  **A.**  Somebody who lived around there that was selling crack
6  cocaine.
7  (Audiotape played.)
8  BY MS. PETALAS:
9  **Q.**  Ms. White, you say "your dog gonna bite me."  What are
10  you referring to there?
11  **A.**  His pit bull.
12  **Q.**  Whose pit bull?
13  **A.**  Cool Wop's.
14  **Q.**  Ms. White, you heard earlier when it said "got 200?"  And
15  you said "yeah."  What are you referring to there?
16  **A.**  $200.
17  **Q.**  Ms. White, did you hear when he said "move, psych?"  Did
18  you hear that?
19  **A.**  Yes.
20  **Q.**  Who is psych?
21  **A.**  His pit bull dog.
22  (Audiotape played.)
23  BY MS. PETALAS:
24  **Q.**  Ms. White, you said "that's 20."  What are you referring
25  to there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 2528

1  **A.**  20 dimes.
2  **Q.**  And what you are doing -- what's going on at that time?
3  **A.**  He was counting out the Ziploc bags of dimes.  He
4  didn't -- he had it already cut up, I guess.
5  MS. WICKS:  Objection as to her speculation, Your Honor.
6  THE COURT:  Sustained.  Go ahead.
7  BY MS. PETALAS:
8  **Q.**  You said he was counting out the Ziploc bags.  How big
9  were these Ziploc bags?
10  **A.**  About the size of my finger.
11  **Q.**  You say your finger?
12  **A.**  The tip, the tip of it.  It's just a piece of rock,
13  cocaine.
14  **Q.**  And what did you do with the $200?
15  **A.**  I gave it to Cool Wop.
16  **Q.**  And what did he give you?
17  **A.**  20 bags of crack cocaine, dimes -- in dimes.
18  (Audiotape played.)
19  BY MS. PETALAS:
20  **Q.**  Ms. White, here where you said "you got me off the top,"
21  what are you talking about there?
22  **A.**  Him fronting me cocaine.  I mean, what I purchased or
23  more.
24  **Q.**  What do you mean, what you purchased or more?
25  **A.**  If I gave him 200, I would expect a little bit more.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 2529

1  **Q.**  More than what?
2  **A.**  Than what I'm spending because that's a big -- that's a
3  lot of money.
4  **Q.**  I heard you saying "right, that's 24."  And earlier you
5  were talking about -- well, you say, "right, that's 24."  What
6  are you talking about there?
7  **A.**  Well, it was 20 he counted, then he said, "that's 24."  I
8  say, "you said 25."  Then he took back the five talking about
9  he'll get me later.
10  **Q.**  What do you mean, he'll get you later?
11  **A.**  Come and see him later, he got me.
12  **Q.**  So, how many Ziplocs did you get from Wop -- Cool Wop at
13  that point?
14  **A.**  20.
15  **Q.**  Did you go see him later?
16  **A.**  Yes.
17  **Q.**  How much later was that?
18  **A.**  It was late.
19  **Q.**  And what -- did you get any other drugs from him at that
20  point?
21  **A.**  Uhm, yeah.
22  **Q.**  And how many -- how many drugs -- how much drugs did you
23  get?
24  **A.**  I think I got a 50, and then he gave me some more.
25  **Q.**  He gave you some more drugs?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 2530

1  **A.**  Yeah.
2  **Q.**  Now, was this when you were -- were you still wired up at
3  that point?
4  **A.**  No, ma'am.
5  **Q.**  Were those drugs -- the drugs that you went back to
6  later, later that -- did you give those to the FBI?
7  **A.**  No.
8  **Q.**  What did you do with those?
9  **A.**  Went around the corner and sold them or whatever.
10  **Q.**  You said "sold them or whatever."  What did you do?  Did
11  you sell them or --
12  **A.**  Or gave them to somebody, or -- I was using back then,
13  you know.
14  (Audiotape played.)
15  BY MS. PETALAS:
16  **Q.**  Ms. White, where were you when this sale took place?
17  **A.**  In Cool Wop's house.
18  **Q.**  Is that in the same building that you already identified?
19  **A.**  Yes.
20  (Audiotape played.)
21  BY MS. PETALAS:
22  **Q.**  And who are you talking to right there?
23  **A.**  My cousin Red Eye.
24  **Q.**  When you said, "Then I had to just now go get $200 worth
25  of shit from him," what were you talking about?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2531**

1  **A.**  $200 worth of crack cocaine from Cool Wop.

2    (Audiotape played.)

3  BY MS. PETALAS:

4  **Q.**  Now, that last part of the tape, where are you at that

5  point?

6  **A.**  Walking down 13th Street.

7  **Q.**  Okay.  And that last voice we heard on the tape, who was

8  that?

9  **A.**  The FBI.

10  **Q.**  And have you met up with the FBI at that point?

11  **A.**  Yes.

12  **Q.**  Okay.  And what did you do with the drugs that you got

13  from Cool Wop once you met up with the FBI?

14  **A.**  I gave it to the FBI.

15  **Q.**  And did they search you?

16  **A.**  Yes.

17  **Q.**  Did you give them all the drugs that Wop gave you?

18  **A.**  Yes.

19  **Q.**  Mr. White, showing you what's been marked as Government's

20  Exhibit 308 and 308.1 -- I'll start with 308.  Do you recognize

21  that?

22  **A.**  Yes.

23  **Q.**  Is that a -- what is that?

24  **A.**  It's a tape with my initials on it.

25  **Q.**  And did you review this tape?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2532**

1  **A.**  Yes.

2  **Q.**  And is this a tape of the controlled purchase you did on

3  October 17th, 2000?

4  **A.**  Yes.

5  **Q.**  And when you reviewed it, is it true and accurate?

6  **A.**  Yes.

7  **Q.**  Also showing you what's marked as Government's

8  Exhibit 308.1, do you recognize that?

9  **A.**  Yes.

10  **Q.**  What is that?

11  **A.**  Shorter version.

12  **Q.**  Did you review that?

13  **A.**  Yes.

14    MS. PETALAS:  Your Honor, at this time we move to publish

15  Government's Exhibit 308.1.  I believe it's already in evidence.

16    THE COURT:  Yes.

17    (Audiotape played.)

18  BY MS. PETALAS:

19  **Q.**  And Ms. White, were you in this tape -- The portion of

20  the tape we just heard, who are you with?

21  **A.**  The FBI.

22  **Q.**  And did you follow the same procedures for this

23  controlled purchase as you talked about earlier?

24  **A.**  Yes.

25  **Q.**  And did they search you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2533**

1  **A.**  Yes.

2    (Audiotape played.)

3  BY MS. PETALAS:

4  **Q.**  Ms. White, here where you said, "Hey, Munya, the truck

5  ain't out here," who were you talking to at that point?

6  **A.**  Another individual that sell crack cocaine.

7  **Q.**  And what were you referring to "by the truck"?

8  **A.**  The ice cream truck.

9    (Audiotape played.)

10  MS. PETALAS:

11  **Q.**  Ms. White, when you said "two for 15," what are you

12  talking about there?

13  **A.**  Two dimes for 15, two dimes of crack cocaine for $15.

14  **Q.**  And what, if anything, then did you give Munya?

15  **A.**  I gave him, Munya the $20, I think.  Well, I gave it to

16  him, and he gave me -- he bought the cigarettes with the $5.

17  **Q.**  I'm sorry, what?

18  **A.**  He bought the cigarettes with the $5 he had.

19  **Q.**  He bought cigarettes for you or for him?

20  **A.**  For me.

21  **Q.**  And then did he give you anything else besides

22  cigarettes?

23  **A.**  Two for 15.

24  **Q.**  Two what?

25  **A.**  Two dimes for 15.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2534**

1    (Audiotape played.)

2  BY MS. PETALAS:

3  **Q.**  When you say, "I do owe Jazz some money," what did you

4  owe Jazz money for?

5  **A.**  Crack cocaine.

6  **Q.**  Was that in conjunction with working with the FBI or was

7  that --

8  **A.**  No, on my own.

9  **Q.**  Did you give him any money at that time on the tape?

10  **A.**  No.

11    (Audiotape played.)

12  BY MS. PETALAS:

13  **Q.**  And where are you now at this portion of the tape?

14  **A.**  At Cool Wop's apartment.

15  **Q.**  Okay.  And where is that?

16  **A.**  Uhm, over top of the rental office on Congress Street.

17  **Q.**  You said the top of the rental office.  Is that the same

18  building you showed us earlier on the map?

19  **A.**  Yes.

20  **Q.**  And where is -- you heard, "Next time you gonna get bit

21  by the dog."  Did you hear that?

22  **A.**  Yes.

23  **Q.**  What did you take him to mean?

24  **A.**  That the dog was going to bite me.

25  **Q.**  And which dog was that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2535

1   **A.**   Psycho.
2       (Audiotape played.)
3   BY MS. PETALAS:
4   **Q.**   Okay.  And when you first -- you talked about being in
5   Wop's apartment.  When you first got there, who was in Wop's
6   apartment?
7   **A.**   His sister, Catrice-- uhm, I forgot her name now.
8   **Q.**   Was there anybody else?
9   **A.**   The dog.
10  **Q.**   And after that, at some point did somebody else come in
11  the apartment?
12  **A.**   Dash.
13  **Q.**   Okay.  And is that -- is there anybody else in the
14  apartment at this time?
15  **A.**   No, just me, Dash, his sister, and the dog, Psycho.
16  **Q.**   Okay.  And where is Wop?
17      MS. WICKS:  Objection, leading.
18      THE WITNESS:  He was standing by me.
19      THE COURT:  Hold on a second.  You said leading?
20      MS. WICKS:  Yes, Your Honor.
21      THE COURT:  Overruled.
22  BY MS. PETALAS:
23  **Q.**   Where is Cool Wop?
24  **A.**   Standing beside me.
25      (Audiotape played.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2536

1   BY MS. PETALAS:
2   **Q.**   This portion of the tape, where are you?
3   **A.**   Still in the living room.
4   **Q.**   Where is Wop, Cool Wop?
5   **A.**   He had walked from the kitchen to his bedroom.
6   **Q.**   Where is Dazz -- Dash at this point?
7   **A.**   He was by the dog.  He walked to the bedroom where Cool
8   Wop went.
9   **Q.**   I'm sorry?
10  **A.**   He was standing in the living room.  He walked from the
11  dog to the bedroom.
12  **Q.**   And you said -- who was he with?
13  **A.**   Cool Wop.
14      (Audiotape played.)
15  BY MS. PETALAS:
16  **Q.**   Could you see what they were doing, what Wop and Dash
17  were doing when they went back there?
18  **A.**   No.
19      (Audiotape played.)
20  BY MS. PETALAS:
21  **Q.**   What are you doing right there?
22  **A.**   He was putting the cocaine on the scale and he was saying
23  don't rock the scale.
24  **Q.**   Who was putting the cocaine on the scale?
25  **A.**   Dash.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2537

1   **Q.**   And why was -- what did he mean -- what did you think he
2   meant when he said don't rock it?
3   **A.**   It will mess the scale up, I don't know.
4       (Audiotape played.)
5   BY MS. PETALAS:
6   **Q.**   So, what happened there?  Did you have money when you
7   went into Wop's apartment?
8   **A.**   Yes.
9   **Q.**   And what did you do with that money?
10  **A.**   I gave it to Dash.
11  **Q.**   And what happened then?
12  **A.**   Well, before he gave me the coke, and then I gave him the
13  money.
14  **Q.**   Okay.  So Dash gave you coke and you gave him money?
15  **A.**   Yeah.
16      (Audiotape played.)
17  BY MS. PETALAS:
18  **Q.**   And where are you now?  Have you left Wop's apartment?
19  **A.**   Yes.
20  **Q.**   And where are you?
21  **A.**   On my way back to the FBI.
22      (Audiotape played.)
23  BY MS. PETALAS:
24  **Q.**   And who are you talking to right there?
25  **A.**   Burke.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2538

1   **Q.**   And who is Burke?
2   **A.**   Another individual that sell cocaine.
3       (Audiotape played.)
4   BY MS. PETALAS:
5   **Q.**   Ms. White, you talked about drugs that you got from
6   Munya.  What did you do with those drugs?
7   **A.**   I gave it to the FBI.
8   **Q.**   And you talked about drugs you got from Dash.  What did
9   you do with those drugs?
10  **A.**   I gave it to the FBI.
11  **Q.**   And did you keep them separate?
12  **A.**   Yes, always.
13  **Q.**   And did you see what the FBI did with it when you gave it
14  to them?
15  **A.**   He always put it in a Ziploc bag and put their name --
16  write something on it, on the Ziploc, the name or something.
17  **Q.**   And did he -- did the FBI search you at that point?
18  **A.**   Yes.
19  **Q.**   And where -- where would you meet back up with the FBI?
20  **A.**   Up 13th Street.
21  **Q.**   You say up 13th Street.  Was it in Congress Park or
22  outside of Congress Park?
23  **A.**   Outside Congress Park.
24      MS. PETALAS:  Court's indulgence.
25      THE COURT:  Let me just ask, are you going to be moving to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : March 13, 2007 |
| DOMINIC SAMUELS, | : 9:26 a.m. |
| Defendants. | : |

VOLUME 16 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE<br>Glenn S. Leon, Assistant United<br>States Attorney<br>Ann H. Petalas, Assistant United<br>States Attorney,<br>Gilberto Guerrero, Assistant<br>United States Attorney<br>555 4th Street<br>Washington, DC 20001<br>202.305.0174 |
| For Defendant<br>Antwuan Ball: | CARNEY & CARNEY<br>John James Carney, Esq.<br>South Building<br>601 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>202.434.8234 |

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2542

| | |
|---|---|
| For Defendant<br>Antwuan Ball: | TIGHE, PATTON, ARMSTRONG,<br>TEASDALE, PLLC<br>Steven Carl Tabackman, Esq.<br>1747 pennsylvania Avenue, NW<br>Suite 300<br>Washington, DC 20036<br>202.454.2811 |
| For Defendant<br>David Wilson: | LAW OFFICE OF JENIFER WICKS<br>Jenifer Wicks, Esq.<br>503 D Street NW, Suite 250A<br>Washington, DC 20001<br>202.326.7100 |
| | GARY E PROCTOR, LLC<br>Gary E. Proctor, Esq.<br>6065 Harford Road<br>Baltimore, MD 21214<br>410.444.1500 |
| For Defendant<br>Gregory Bell: | LAW OFFICE OF JAMES W. BEANE<br>James W. Beane, Jr., Esq.<br>2715 M Street, N.W.<br>Suite 200<br>Washington, DC 20007<br>202.333.5905 |
| For Defendant<br>Desmond Thurston: | LAW OFFICE OF JONATHAN ZUCKER<br>Jonathan Seth Zucker, Esq.<br>514 10th Street, NW<br>9th Floor<br>Washington, DC 20004<br>202.624.0784 |
| For Defendant<br>Joseph Jones: | LAW OFFICE OF ANTHONY MARTIN<br>Anthony Douglas Martin, Esq.<br>7841 Belle Point Drive<br>Greenbelt, MD 20770<br>301.220.3700 |
| | LAW OFFICE of ANTHONY ARNOLD<br>Anthony Darnell Arnold, Esq.<br>One Research Court<br>Suite 450<br>Rockville, MD 20852<br>301.519.8024 |

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2543

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Dominic Samuels: | LAW OFFICES OF A. EDUARDO BALAREZO<br>A. Eduardo Balarezo, Esq.<br>400 Fifth Street, NW<br>Suite 300<br>Washington, DC 20001<br>202.639.0999<br>and<br>William B. Purpura, Esq.<br>8 East Mulberry Street<br>Baltimore, MD 21202<br>410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR<br>Official Court Reporter<br>Room 6814, U.S. Courthouse<br>Washington, DC 20001<br>202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2544

**MORNING SESSION, MARCH 13, 2007**

1    
2    (9:17 a.m.)
3       (Juror 12 approached the bench.)
4    THE COURT:  Good morning.
5    JUROR NO. 12:  Good morning, Your Honor.
6    THE COURT:  Are you okay?
7    JUROR NO. 12:  Yeah, I'm fine.
8    THE COURT:  I notice that you were late today and
9  yesterday.  Are you having trouble getting in on time?
10    JUROR NO. 12:  For my job, unfortunately, just -- I'm the
11  manager of a hotel and we had a fire alarm go off today and the
12  same problem yesterday.  I'm the only one in the morning and so
13  if it goes off, I have to respond.  It's not a usual situation,
14  but this is one of the things I was concerned about being here
15  because that job is a little unique in that, you know, I've got
16  to be there and it's overnight, so if anything goes on overnight
17  and it carries on into the morning, I possibly could be late
18  here.
19       I don't perceive it to be a continuing problem, but
20  there's nothing that I can predict.
21    THE COURT:  Is there any way that you would be able to
22  discuss with the other management some backup system for you so
23  that if the alarm goes off or some other contingency occurs,
24  there will be some backup you can call into place so we can
25  proceed on time?

Scott L. Wallace, RDR, CRR
Official Court Reporter

**2545**

1    JUROR NO. 12: I can discuss it with them.
2    THE COURT: I appreciate that. Because we really need to
3    be starting -- I like to have everybody in the box at 9:15 so we
4    can start up with the evidence and not lose a lot of time of our
5    trial date.
6    JUROR NO. 12: I understand.
7    THE COURT: I would be grateful if you could explore that.
8    JUROR NO. 12: I'll do that.
9    THE COURT: All right. Go.
10   (Prospective juror left the bench.)
11   THE COURT: Let's bring them in.
12   (Jury in at 9:28 a.m.)
13   THE COURT: Good morning, ladies and gentlemen.
14   THE JURY PANEL: Good morning.
15   THE COURT: Welcome back. We're ready to resume.
16   Counsel.
17   CONTINUED DIRECT EXAMINATION OF SANDRA WHITE
18   BY MR. PETALAS:
19   Q.    Good morning, Ms. White.
20   A.    Good morning.
21   Q.    Just for the record, if you could just state your name
22   for the record.
23   A.    Sandra White.
24   Q.    I'm going to ask to keep your voice up so everybody can
25   hear. I know it's early in the morning.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2546**

1    THE WITNESS: Good morning, sir.
2    THE COURT: Good morning. Can you speak into the mike.
3    THE WITNESS: Yes, sir.
4    THE COURT: Would you tap your mike with your finger.
5    Let me ask you to do a "testing, testing" into the Mike.
6    The system is a little bit low. I'm not quite sure why.
7    We'll try to make an adjustment. But if you do me a favor and
8    try to speak a little louder, that will help us.
9    And, Ms. Petalas, the same thing.
10   MS. PETALAS: Yes, Your Honor.
11   BY MS. PETALAS:
12   Q.    Ms. White, when we left off yesterday, we were talking
13   about a controlled purchase that you did from an individual
14   named Boy-Boy. Do you recall that?
15   A.    Yes.
16   MS. PETALAS: Court's indulgence.
17   May I approach, Your Honor?
18   THE COURT: Yes.
19   BY MS. PETALAS:
20   Q.    Ms. White, I'm showing you what's been marked as
21   Government's Exhibit 302. Do you recognize that?
22   A.    Yes.
23   Q.    What is that?
24   A.    It's a tape with my initials on it.
25   Q.    Okay. And is this a tape of a purchase you did on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2547**

1    June 5th, 2000 with the FBI?
2    A.    Yes.
3    Q.    And you said your initials are on it. Did you review
4    this tape?
5    A.    Yes.
6    Q.    And was it a true and accurate recording of that?
7    A.    Yes.
8    Q.    I'm also showing you what's been marked as 302.1. Do you
9    recognize that?
10   A.    Yes.
11   Q.    What is that?
12   A.    A short version.
13   Q.    Of 302?
14   A.    Yes.
15   Q.    And did you review that?
16   A.    Yes.
17   Q.    And initial that?
18   A.    Yes.
19   Q.    Is that a true and accurate short version?
20   A.    Yes.
21   MS. PETALAS: Your Honor, at this time I move to publish
22   302.1 to the jury. I believe it's already in evidence.
23   THE COURT: Yes.
24   (Audiotape played.)
25   BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2548**

1    Q.    And, Ms. White, just so you know, there's headphones in
2    front of you. If you want to put them on and have them face
3    that receiver there, you might be able to hear better.
4    And, Ms. White, you might want to make sure they're
5    actually on, too.
6    May I approach, Your Honor?
7    THE COURT: Yes.
8    (Audiotape played.)
9    BY MS. PETALAS:
10   Q.    Ms. White, we heard knocking earlier on the tape. Where
11   were you knocking at that time?
12   A.    At Cool Wop's door.
13   Q.    You also on the tape ask about Jay. Who's Jay?
14   A.    I can't recall right now.
15   Q.    Okay.
16   (Audiotape played.)
17   BY MS. PETALAS:
18   Q.    And, Ms. White, that last time when you were saying "Give
19   me a few more minutes, y'all," who were you talking to at that
20   point?
21   A.    The FBI.
22   Q.    And you said you were going to attempt to mess with Jo-Jo
23   and Bird. What were you talking about there?
24   A.    Buying weight from them, crack cocaine.
25   Q.    What do you mean by "weight"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2549

1  A.   An eight-ball.
2       (Audiotape played.)
3  BY MS. PETALAS:
4  Q.   Ms. White, who are you talking to right there?
5  A.   Boy-Boy.
6  Q.   And you indicate you just knocked on Cool Wop's door.
7  Where was that?
8  A.   Over top of the Rental Office.
9  Q.   Is that the building that you showed us on the map
10 yesterday?
11 A.   Yes.
12      (Audiotape played.)
13 BY MS. PETALAS:
14 Q.   And who were you talking to right there?
15 A.   Chow Wow.
16 Q.   And who's Chow Wow?
17 A.   A guy that was selling coke.
18 Q.   And when you talk about butter, what are you talking
19 about there?
20 A.   Crack cocaine.
21 Q.   And --
22      (Audiotape played.)
23 BY MS. PETALAS:
24 Q.   Ms. White, when you're talking about having you sitting
25 down waiting so long, who were you waiting for?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2550

1  A.   Cool Wop or Jazz.  They just have me waiting.
2  Q.   On this particular day, have you talked to -- are you
3  waiting for somebody in particular?
4  A.   No, I just got -- saw Chow Wow and Boy-Boy and got it
5  from them.
6  Q.   Okay.  And who are you with right now?
7  A.   Boy-Boy and Chow Wow.
8       (Audiotape played.)
9       MS. PETALAS:  Your Honor, at this time, I would move to
10 publish a portion and switch over to Government's Exhibit 302,
11 starting at minute 28:30.
12      (Audiotape played.)
13 BY MS. PETALAS:
14 Q.   Ms. White, on that tape when you talk about, "I get him
15 and Cool Wop mixed up," who are you talking about?  Who's "him"?
16 A.   Boy-Boy.
17 Q.   And a couple lines before that, you talk about "How much
18 does he do for his quarters," who are you talking about there?
19 A.   I was talking about Cool Wop and Boy-Boy, you know, when
20 I get them mixed up.  Sometimes I ask them about which one had
21 the weight of crack cocaine.
22 Q.   Who are you talking to at this point?
23 A.   I was talking to, I think, Chow Wow.
24 Q.   And do you recall where you say, "I get them mixed up.
25 Where his van at?  Over there parked.  It got a flat tire,"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2551

1  whose van were you talking about there?
2  A.   Boy-Boy's.
3  Q.   And then when you say, "Man, he taking too long.  I don't
4  need him to bag up nothing," who are you talking about there?
5  A.   I was talking about Boy-Boy.
6  Q.   And what did you mean, "He's taking too long.  I don't
7  need him to bag up nothing"?
8  A.   He was just taking too long, the time -- I mean, the time
9  that he was spending away, it was just too long.
10 Q.   And why -- what were you waiting for?
11 A.   The crack cocaine, the eight-ball.
12 Q.   From who?
13 A.   From Boy-Boy.
14 Q.   And what did you mean by, "I don't need him to bag up
15 nothing"?  What are you talking about there?
16 A.   Because if it's a solid piece, all he do is just put it
17 in some wrap and that's it.
18      MS. PETALAS:  Your Honor, at this time I would like to
19 move back to Government's Exhibit 302.1.
20      (Audiotape played.)
21 BY MS. PETALAS:
22 Q.   Ms. White, when you say you got "200 worth," what are you
23 talking about there?
24 A.   Crack cocaine, $200 worth.
25      (Audiotape played.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2552

1  BY MS. PETALAS:
2  Q.   Ms. White, when you were talking about -- when you say,
3  "That's 200," what are you talking about there?
4  A.   $200.
5  Q.   Okay.  And when you said -- do you recall you said, "200,
6  that small," what are you talking about?  What do you mean,
7  "That small"?
8  A.   Crack cocaine.  It just looked small.
9  Q.   And what looked small?
10 A.   The crack cocaine.
11 Q.   And did he -- did he give you anything?
12 A.   He just gave me the coke.
13 Q.   And did you give him anything?
14 A.   The money.
15 Q.   How much money?
16 A.   200.
17 Q.   And later, we're talking about -- you were talking about
18 having -- writing down the number.  Do you recall that?
19 A.   Yes.
20 Q.   Did he write down the number?
21 A.   Yes.
22      MS. PETALAS:  Court's indulgence.
23      May I approach, Your Honor?
24      THE COURT:  Yes.
25 BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2553

1    Q.    I'm handing you what's been marked as Government's
2    Exhibit 302.3.  Do you recognize that?
3    A.    Yes.
4    Q.    And what is that?
5    A.    His number.
6    Q.    Is that the number that he wrote down for you?
7    A.    Yes.
8    Q.    And what did you do with that number?
9    A.    I gave it to the FBI.
10         MS. PETALAS:  Your Honor, at this time I move Government's
11   Exhibit 302.3 into evidence.
12         THE COURT:  Without objection, 302.3 is received.
13         (Government's Exhibit 302.3 admitted into the record.)
14   BY MS. PETALAS:
15   Q.    Ms. White, you were talking about 350; you said, "That
16   will work for a quarter."  What are you talking about?
17   A.    I was talking about a quarter of cocaine for $350.
18   Q.    Okay.
19         (Audiotape played.)
20         MS. PETALAS:  Court's indulgence.
21         Your Honor, at this time I'm moving back to Government's
22   Exhibit 302, the unredacted copy.
23   BY MS. PETALAS:
24   Q.    Ms. White, do you hear there where you saying, "I'm on
25   the move, y'all"?  Who are you talking to?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2554

1    A.    The FBI.
2    Q.    You say, "Apartment 30."  What is the apartment you're
3    talking about?
4    A.    That was the apartment I came out of.
5    Q.    Came out of when?
6    A.    When I got the crack cocaine from Boy-Boy.
7    Q.    And where -- apartment 30, what building was that in?
8    Would you recognize it on a map?
9    A.    Yeah.
10         MS. PETALAS:  I would ask to pull up Government's
11   Exhibit 101.1.  It's already in evidence.
12   BY MS. PETALAS:
13   Q.    Ms. White, do you see that map on your screen?
14   A.    Yes.
15   Q.    Do you recognize that?  That map?
16   A.    Yes.
17   Q.    Can you see there the building that you're referring to?
18   Is it on that map?
19   A.    Yes.
20   Q.    Could you again -- you have a pen in front of you.  If
21   you could use the blunt side of the pen and just kind of point
22   to that building.
23   A.    (Indicating.)
24   Q.    Okay.  You're pointing to -- is this the Rental Office
25   Building?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2555

1    A.    Yes.
2          MS. PETALAS:  For the record, she pointed to the building
3    on Congress Street just to the right of 13th and Congress Street.
4    BY MS. PETALAS:
5    Q.    Is that the same building that Wop's building (sic) was
6    in?
7    A.    Yes.
8          MS. WICKS:  Objection, your Honor.
9          THE COURT:  Sustained.
10   BY MS. PETALAS:
11   Q.    Is that the same building you pointed to yesterday and
12   referred to as Cool Wop's building?
13   A.    Yes.
14         MS. WICKS:  Objection.
15         THE COURT:  Sustained.
16         MS. PETALAS:  Court's indulgence.
17   BY MS. PETALAS:
18   Q.    Showing you what's been marked, Ms. White, as
19   Government's Exhibit 306, do you recognize that?
20   A.    Yes.
21   Q.    And did you review that?
22   A.    Yes.
23   Q.    Are your initials on that?
24   A.    Yes.
25   Q.    Is that a controlled purchase on tape that you did on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2556

1    July 7th, 2000?
2    A.    Yes.
3    Q.    Is that true and accurate?
4    A.    Yes.
5    Q.    I'm also showing you what's marked as Government's
6    Exhibit 306.1.  Do you recognize that?
7    A.    Yes.
8    Q.    And what is that?
9    A.    A shorter version with my initials on it.
10   Q.    And did you review that?
11   A.    Yes.
12   Q.    Is that true and accurate?
13   A.    Yes.
14   Q.    I'll ask you, Ms. White, to clear the screen again at the
15   bottom.  If you could just hit it again on the bottom right
16   corner.
17         Yes.  Thank you.
18         Your Honor, at this time we move to publish Government's
19   Exhibit 306.1.
20         THE COURT:  Yes.
21         MS. PETALAS:  I believe it's already in evidence.
22         (Audiotape played.)
23   BY MS. PETALAS:
24   Q.    Ms. White, do you recognize -- is that your voice on the
25   tape?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2557

1   A.   Yes.
2   Q.   And who's "Gail"?
3   A.   A girl that live in Congress Park.
4   Q.   And I'm just going to take a step back.  Earlier -- well,
5   on this controlled purchase, did you follow the same procedures
6   that you did on the other controlled purchases?
7   A.   Yes.
8   Q.   Did you meet with the FBI?
9   A.   Yes.
10  Q.   Did they search you?
11  A.   Yes.
12       MR. MARTIN:  Objection, leading.
13       THE COURT:  Sustained.
14  BY MS. PETALAS:
15  Q.   What, if anything, happened when you met with the FBI
16  prior to the controlled purchase?
17  A.   When I met with them, first of all, they searched me and
18  made sure I don't have anything on me.
19  Q.   And we talked about that June 5th buy that we just
20  discussed.  On that buy, were those same procedures followed?
21  A.   Yes.
22  Q.   And earlier you talked about the crack cocaine that
23  Boy-Boy gave you in exchange for the $200.  What did you do with
24  that crack cocaine?
25  A.   I took it back to the FBI.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2558

1   Q.   And did they search you after that?
2   A.   Yes.
3        (Audiotape played.)
4   BY MS. PETALAS:
5   Q.   Ms. White, where were you during that buy?
6   A.   At Gail's house.
7   Q.   And why did you go to Gail's house?
8   A.   Because he said that whenever I needed to see him, and if
9   he at work, to go ask Gail to call him.
10  Q.   Okay.  And who's "he"?
11  A.   Boy-Boy.
12  Q.   And did you give Boy-Boy money?
13  A.   Yes.
14  Q.   And what did he give you?
15  A.   Cocaine, crack cocaine.
16  Q.   And what do you do with that crack cocaine?
17  A.   I took it back to the FBI.
18  Q.   Did you have to go give anything to Gail at that point?
19  A.   No.
20  Q.   Did you ever see or do you know whether or not Boy-Boy
21  gave anything to Gail, if you know?
22  A.   I don't know.
23  Q.   And at the end of that, where he says "I'm at work, don't
24  go out when I go out," what did you think he meant by that?
25  A.   He didn't want to be seen with anybody because they

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2559

1   knew -- some people knew that he was at work and his --
2        MR. BEANE:  Objection, objection.
3        THE COURT:  Hold on one second.
4        MR. BEANE:  Speculation as to what other people knew.
5        THE COURT:  All right.  Is this what he said?
6        What is it that you're eliciting?
7        MS. PETALAS:  I'm eliciting what she took him to mean when
8   he said, "Don't go out when I go out."
9        THE COURT:  All right.  Sustained.
10  BY MS. PETALAS:
11  Q.   And did you hear on that tape where he indicated that
12  "the 30 you owe me"?  Did you owe him $30?
13  A.   Yes.
14  Q.   What did you owe him $30 for?
15  A.   For something I had brought -- well, got from him a while
16  before I came to purchase something from him.
17  Q.   And was that when you were with the FBI?
18  A.   No.
19  Q.   And you said "for something."  What are you talking about
20  when you say "something"?
21  A.   Crack cocaine.
22       MS. PETALAS:  Court's indulgence.
23  BY MS. PETALAS:
24  Q.   Ms. White, I'm showing you what's been marked as
25  Government's Exhibit 309.  Do you recognize that?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

2560

1   A.   Yes.
2   Q.   And what is that?
3   A.   A tape that has my initials on it that I listened to.
4   Q.   And is this the tape of a controlled purchase you did on
5   November 16th, 2000?
6   A.   Yes.
7   Q.   You said you listened to it.  Is it a true and accurate
8   recording?
9   A.   Yes.
10  Q.   So handling you 309.1.  Do you recognize that?
11  A.   Yes.
12  Q.   And what is that?
13  A.   A shorter version with my initials on it.
14  Q.   And is that -- did you listen to that?
15  A.   Yes.
16  Q.   Is that a true and accurate recording of the drug buy?
17  A.   Yes.
18  Q.   Is that a true and accurate of the buy?
19  A.   Yes.
20       MS. PETALAS:  Your Honor, at this time I move Government's
21  Exhibit 309 and 309.1 into evidence.
22       THE COURT:  All right.  Without objection, both exhibits
23  are received.
24       (Government's Exhibit 309 and 309.1 admitted into the
25  record.)

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**2561**

1  MS. PETALAS: At this time I would ask to publish
2  Government's Exhibit 309.1 to the jury.
3  (Audiotape played.)
4  BY MS. PETALAS:
5  Q.  Ms. White, you say, "It looks like it's flavored." What
6  are you talking about there?
7  A.  The cocaine.
8  Q.  What do you mean by "flavored"?
9  A.  The color of it. You could tell whether it's good or not
10  and you know, the thickness of it, you could tell if it's
11  chalk -- too chalky or wasn't right.
12  Q.  And you said "flavor," you can tell the quality. Is
13  "flavor" good quality, medium quality, bad quality?
14  A.  Good quality.
15  (Audiotape played.)
16  BY MS. PETALAS:
17  Q.  Ms. White, there we hear you knocking. Where were you
18  knocking?
19  A.  I went to Cool Wop's door.
20  Q.  And you're referring to an individual named Harry. Who's
21  Harry?
22  A.  Another individual who sells crack cocaine.
23  (Audiotape played.)
24  BY MS. PETALAS:
25  Q.  Ms. White, you're talking -- hear there where you're

Scott L. Wallace, RDR, CRR
Official Court Reporter

**2562**

1  talking about Red Eye and then Little Red Eye. Are they
2  related?
3  A.  Yes.
4  Q.  Are there are two different Red Eyes?
5  A.  Yes.
6  Q.  And when you ask for -- "Where's your son," who are you
7  referring to there?
8  Well, who are you talking to?
9  A.  His father, Red Eye. Big Red Eye.
10  Q.  And what does his son go by?
11  A.  Little Red Eye.
12  (Audiotape played.)
13  BY MS. PETALAS:
14  Q.  Now, when you say, "Stay with me," who are you talking to
15  right there?
16  A.  My cousin Red Eye.
17  Q.  And he responds, "I know -- man, he's all right, he's my
18  man."
19  MR. PURPURA: Objection, Your Honor. Can we approach the
20  bench?
21  THE COURT: Yes.
22  (Following sidebar discussion had on the record:)
23  MR. PURPURA: Your Honor, obviously it's very early in
24  this case, but this has to be a co-conspirator statement. We
25  know that the one person there is a cooperating witness. She

Scott L. Wallace, RDR, CRR
Official Court Reporter

**2563**

1  can't be an 801(d)(2)(E).
2  And the other person is Jenkins. I have no idea who this
3  Mr. Jenkins is at this point and what, if anything -- this would
4  be a hearsay statement.
5  I'm sorry. I don't see how it comes in under
6  801(d)(2)(E).
7  MS. PETALAS: Your Honor, I believe the circumstances
8  themselves show that this is a conspiracy. But also, this is --
9  also, I'm simply asking her -- the tape is already in evidence
10  and this is a transaction that she is involved with and I'm
11  having her simply explain what's going on in the transaction.
12  This isn't -- but I also think that the circumstances do
13  show that this is a conspiracy, the statement of a co-conspirator
14  in furtherance of the conspiracy. It's in Congress Park. He's
15  talking about -- she's out to purchase drugs and he's saying,
16  "Holler at my man here."
17  I mean, I think the circumstances do show that this is a
18  statement in furtherance of the conspiracy, but on the other
19  hand, I also think that it's not necessary. This is in evidence.
20  She's explained what is in evidence and what took place here.
21  MR. PURPURA: The objection -- the government's response
22  that it's in evidence is perhaps a good response, so perhaps I
23  was sleeping on the switch to not review all of the transcripts
24  and not know exactly what the conspiracy is.
25  But my objection still holds to any explanation at this

Scott L. Wallace, RDR, CRR
Official Court Reporter

**2564**

1  point as to what this person needs, what this person is saying.
2  THE COURT: I think the question started out -- the
3  preface was simply "You heard him say," and was about to repeat
4  what she heard him say.
5  MR. PURPURA: And my thought, "What did that mean," and
6  going into an explanation as to what that meant was --
7  THE COURT: What was the next question going to be? What
8  was the question going to end up being?
9  MS. PETALAS: Who did you take her to be referring to --
10  him to be referring to?
11  THE COURT: Is there going to be some foundation for her
12  taking "him" to mean anything at all?
13  MS. PETALAS: She's just explaining her actions on how
14  she -- she's part of the conversation and she's explaining the
15  conversation, what was going on, what she understood in her mind
16  for "him" to be referring to.
17  MR. PURPURA: Judge, let me be more particular with my
18  objection. It really becomes a *Crawford* issue at this point. We
19  don't have Mr. Jenkins to cross-examine. We have Ms. White. And
20  we don't know what Mr. Jenkins, in this "This is my man" -- what
21  does he mean by that? "My man" could mean a lot of things: My
22  friend, my brother or my supplier. And that's part of the
23  problem. That's what generated the objection.
24  THE COURT: Well, what -- for what purpose are you
25  offering her interpretation of his terminology?

Scott L. Wallace, RDR, CRR
Official Court Reporter

2565

1    MS. PETALAS:  It's actually a minor point.  I can move on
2    to her next statement.  I can have her explain her statement.  I
3    was basically leading in where she says, "I know Boy-Boy's all
4    right."  She can explain her own statement about "I know
5    Boy-Boy's all right."  She can explain what she was responding
6    to.  She was responding to him saying it's -- "That's my man."
7    That's her statement and she can explain.  And I can move on to
8    that next line and ask it from there.  It's really --
9        THE COURT:  All right.  With that proposal, I'll overrule
10   the objection.
11       (Sidebar discussion concluded.)
12   BY MS. PETALAS:
13   Q.    Ms. White, when you say "I know Boy-Boy all right," what
14   are you talking about?  Who are you talking to at that point?
15   A.    Red Eye.
16   Q.    And then you say, "Going in there to get it, right," what
17   are you talking about?  To get what?
18   A.    The crack cocaine.
19   Q.    And who are you -- who are you referring to?  Who's going
20   to get the crack cocaine?
21   A.    Boy-Boy.
22       (Audiotape played.)
23   BY MS. PETALAS:
24   Q.    Ms. White, you say, "Why the bag is tore open?"  What are
25   you talking about there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2566

1    A.    The eight-ball, the crack cocaine.
2    Q.    And who gave you the eight-ball?
3    A.    Boy-Boy.
4        (Audiotape played.)
5    BY MS. PETALAS:
6    Q.    Ms. White, you said you went in 1327, "the second one in
7    the top."  What is that?  What are talking about there?
8    A.    The apartment.
9    Q.    You said, "I couldn't get the number because Red Eye --
10   everybody was watching me."  What did you mean by that?
11   A.    I mean I couldn't go back over there.  All I got was an
12   address.
13   Q.    Had the agents given you any instructions about trying to
14   get addresses?
15   A.    Yes.
16   Q.    And what were those instructions?
17   A.    Pay attention to the door, get an address, phone number,
18   a door number, the color of the door, stuff like that.
19   Q.    And when you were able to do that, did you give that
20   information to the agents?
21   A.    Most of the time, yes.
22   Q.    When would you give that information?
23   A.    When I make the purchase or I would go back, you know,
24   when it was kind of clear and get it and call back.
25   Q.    And you said -- earlier you testified that Boy-Boy gave

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2567

1    you crack cocaine.  What did you do with that crack cocaine?
2    A.    I gave it to the FBI.
3    Q.    And did you give Boy-Boy anything in exchange for that
4    crack cocaine?
5    A.    Money.
6    Q.    And what did the FBI -- what did you see the FBI do with
7    it when you gave it to the FBI?
8    A.    They always put it in Ziploc bags.
9    Q.    Did they search you after you gave it to them?
10   A.    Yes.
11   Q.    And prior to this purchase, did the FBI search you?
12   A.    Yes.
13       MS. PETALAS:  Court's indulgence.
14   BY MS. PETALAS:
15   Q.    Ms. White, I'm showing you what's been marked as
16   Government's Exhibit 307.1.  Do you recognize that?
17   A.    Yes.
18   Q.    And did you -- are your initials on that?
19   A.    Yes.
20   Q.    Did you review that?
21   A.    Yes.
22   Q.    And is this a recording of a controlled purchase you did
23   on August 30th, 2000?
24   A.    Yes.
25   Q.    I'm also handing you what's been marked as Government's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2568

1    Exhibit 307.  Do you recognize that?
2    A.    Yes.
3    Q.    Did you initial that?
4    A.    Yes.
5    Q.    And is this a shorter version of that August 30th, 2000
6    purchase?
7    A.    Yes.
8    Q.    And is 307.1 a true and accurate recording of your
9    purchase?
10   A.    Yes.
11   Q.    And is 307 a true and accurate shortened version?
12   A.    Yes.
13       MS. PETALAS:  Your Honor, at this time I move Government's
14   Exhibit 307 and 307.1 into evidence.
15       MR. MARTIN:  No objection.
16       MS. PETALAS:  I would also note for the record --
17       THE COURT:  I'm sorry.  Did you say "No objection"?
18       MR. MARTIN:  No objection.
19       THE COURT:  All right.  Both exhibits will be received.
20       (Government's Exhibit 307 and 307.1 admitted into the
21   record.)
22       MS. PETALAS:  Your Honor, at this time I move to publish
23   Government's Exhibit 307 to the jury.  And again, I should note
24   to the jury that this is actually the abridged version, 307.
25       (Audiotape played.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2569**

```
 1   BY MS. PETALAS:
 2      Q.   Ms. White, you were talking about -- who are you talking
 3   to there?
 4      A.   Keith.
 5      Q.   And who's Keith?
 6      A.   Keith is another individual that was selling crack
 7   cocaine.
 8      Q.   You say, "Give it to me here."  What if anything did you
 9   get from Keith?
10      A.   A dime bag of crack cocaine.
11      Q.   What did you give him?
12      A.   $10.
13           (Audiotape played.)
14   BY MS. PETALAS:
15      Q.   Ms. White, when you say, "What's this," and says "10,"
16   what are you referring to there?
17      A.   Ten bags of crack -- I mean $10 bag of crack cocaine.
18      Q.   I'm sorry.  What?
19      A.   They were $10 bags of crack cocaine, not a 20.
20           (Audiotape played.)
21   BY MS. PETALAS:
22      Q.   Ms. White, what are you doing right there?
23      A.   Getting in the car.
24      Q.   With who?
25      A.   With Jo-Jo.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2570**

```
 1      Q.   And why are you getting in the car with Jo-Jo?
 2      A.   To get the -- to go around to his house to get some more
 3   coke.
 4      Q.   And earlier you said, "I got 190."  What are you talking
 5   about there?
 6      A.   $190.
 7           (Audiotape played.)
 8           MR. PURPURA:  Objection, objection.  One more objection.
 9   Can we approach for a second?
10           (Following sidebar discussion had on the record:)
11           MR. PURPURA:  I know the tape's in evidence, but there's
12   always a relevancy objection.  I object as this being not
13   relevant and very prejudicial at this point and we can just skip
14   by this.  I mean, even if it's in evidence, there still comes an
15   issue of balancing whether it's probative or prejudicial and this
16   is certainly not probative of anything.  If anything, it's
17   prejudicial to all defendants.
18           THE COURT:  Overruled.  It's in evidence already.
19   Overruled.
20           (Sidebar discussion concluded.)
21           (Audiotape played.)
22   BY MS. PETALAS:
23      Q.   Ms. White, you talk about "later on today, owing two."
24   What were you guys referring to when you're talking about "two"?
25      A.   Two dime bags of crack cocaine.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2571**

```
 1      Q.   And when you say, "later on today," did you go back later
 2   that day?
 3      A.   No.
 4      Q.   Had you gotten -- what, if anything, had you gotten at
 5   that point from Jo-Jo?
 6      A.   Ten 20s.
 7      Q.   And what did you -- what, if anything, did you give him?
 8      A.   I gave him $190.
 9           (Audiotape played.)
10   BY MS. PETALAS:
11      Q.   And, Ms. White, what did you do with the items that Jo-Jo
12   gave you?
13      A.   I took them back to the FBI.
14      Q.   And did you see what they did with them?
15      A.   They put it in a Ziploc bag.
16      Q.   Did they search you?
17      A.   Yes.
18      Q.   Ms. White, I'm going to move -- jump back to a period
19   before you made these controlled purchases.
20           I'm sorry.  Move to a period actually after you made
21   these controlled purchases.  Are you the same Sandy White that
22   was arrested on January 22nd of 2001 for distribution of
23   cocaine?
24      A.   Yes.
25           MS. WICKS:  Objection as to form, Your Honor.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2572**

```
 1           THE COURT:  Sustained.
 2           MS. PETALAS:  Your Honor, I'm impeaching, which is --
 3           THE COURT:  Not under 609.
 4   BY MS. PETALAS:
 5      Q.   Are you the same Sandy White that was convicted in
 6   F 44701 of distribution of cocaine?
 7      A.   Yes.
 8      Q.   Are you the same Sandy White that was then convicted in
 9   2002 in F 7716 for attempted distribution of cocaine?
10      A.   Yes.
11      Q.   You talked about -- earlier you mentioned you were facing
12   the Parole Board.  Do you recall that?
13      A.   Yes.
14      Q.   Okay.  And you -- who decides your sentence once you face
15   the Parole Board?
16      A.   The Parole Board.
17      Q.   Are you hoping they give you a break for your
18   cooperation?
19      A.   Yes.
20      Q.   Have they already offered you a deal?
21      A.   Yes.
22      Q.   And what was that?
23      A.   Eight to twelve months.
24      Q.   And how long have you been in jail?
25      A.   Four, going on five.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Tab 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
          Plaintiff,               :  Docket No. CR 05-100
          v.                       :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  March 15, 2007
DOMINIC SAMUELS,                   :  9:41 a.m.
          Defendants.              :
                                   :
                                   :
                                   :
                                   :

VOLUME 18 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2933

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2934

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

2935

**MORNING SESSION, MARCH 15, 2007**

1
2    (9:42 a.m.)
3         THE COURT:  Ready for the jury?  Who's up?  Who's on
4    first?
5         MR. GUERRERO:  Good morning, Your Honor.  Yes, sir.
6         THE COURT:  You have further questions, right?
7         MR. GUERRERO:  Yes.
8    (Jury in at 9:43 a.m.)
9         THE COURT:  Good morning, ladies and gentlemen.
10        THE JURY PANEL:  Good morning.
11        THE COURT:  Welcome back.  Glad you're all back safely.
12   Good to see you.  We're ready to resume.
13        MR. GUERRERO:  Your Honor, before I begin, may we approach
14   on an issue?
15        (Following sidebar discussion had on the record:)
16        MR. GUERRERO:  Your Honor --
17        THE COURT:  I wish you had brought this up before we
18   brought the jury in.
19        MR. GUERRERO:  It came up late.  I just wanted --
20   Ms. Wicks does have the records.  We have turned those over.  She
21   wants to refresh his recollection and I just wanted to ask the
22   Court if I continue my redirect and then she's permitted to do a
23   recross, will I be able to do a redirect or should I allow her to
24   pursue it now?
25        THE COURT:  We're interrupt your redirect now and let

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

*2980*

1  **Q.**    And let's talk about you brokering deals.  When you would
2  broker these deals, would you make any money as a result of
3  those deals?
4  **A.**    Yes.
5  **Q.**    Describe for us how you would make money yourself when
6  you would broker these deals.  What money did you end up with?
7  **A.**    Well, most of the time when I brokered a deal, I may have
8  gotten 15 bags for a hundred.  That means that I got to keep
9  five.  Or I may have -- I may have gotten, say, ten bags and
10  pocketed 30, $40, stuff like that.
11  **Q.**    And if you -- let's take the first example you gave where
12  you would actually pocket some bags.  Is that what you said?
13  **A.**    Correct.
14  **Q.**    I think you said five bags would be an example?
15  **A.**    Sometimes, yes.
16  **Q.**    What would you do with those five bags you would pocket
17  for yourself?
18  **A.**    I would give her a few of them and I might resell the
19  other two to maybe the same person or somebody else who came
20  along.
21  **Q.**    Now, I want to get back to something you also said
22  earlier.  You talked about other people from other neighborhoods
23  coming in.  How did -- if you know, how did these people come in
24  contact with Debra?  How did she -- well, how did these people
25  come in contact with Debra or how did Debra come in contact with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*2981*

1  these people?
2            MR. BALAREZO:  Objection, 602.
3            THE COURT:  What's that?
4            MR. BALAREZO:  602, personal knowledge.
5            THE COURT:  Establish foundation, if you can.
6  BY MR. LEON:
7  **Q.**    Do you know how -- just yes or no, do you know how Debra
8  got hooked up -- got connected with the people you're talking
9  about?
10  **A.**    No, I don't.
11  **Q.**    Did you yourself ever establish people from other
12  neighborhoods who you yourself would juggle or broker those
13  deals?
14  **A.**    Can you repeat that again?
15  **Q.**    Sure.  You yourself -- did you ever have your own
16  connections who you would broker for as well?
17  **A.**    Yes.
18  **Q.**    Tell us about those people.  How did you come in contact
19  with them?  How'd you meet them?
20  **A.**    Through her people and through other people who I had
21  already brokered deals with.
22  **Q.**    Other than the debts that you said Ms. Martin had, did
23  Ms. Martin have any other problems, other than the financial
24  debts as a result from her continuing addiction during this
25  time?  To your knowledge, your personal knowledge.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*2982*

1  **A.**    Any problems --
2            MR. MARTIN:  Objection, Your Honor.  Foundation.
3            THE COURT:  Well, why don't you establish that there was
4  personal knowledge.
5  BY MR. LEON:
6  **Q.**    Okay.  First of all, just yes or no, do you have any
7  personal knowledge whether or not Debra Martin had any other
8  problems other than financial problems as a result of her crack
9  cocaine addiction?
10            MR. BALAREZO:  Objection, Your Honor, relevance.
11            THE COURT:  Overruled.
12  BY MR. LEON:
13  **Q.**    Did you understand the question?
14  **A.**    Yes.  I was wondering if I could answer it.
15  **Q.**    You can answer that one, yeah.
16  **A.**    Okay.  Yeah, she had several other problems.
17  **Q.**    What were some of the other problems?
18            MS. WICKS:  Objection, Your Honor.  May we approach?
19            THE COURT:  What's the basis of the objection?
20            MS. WICKS:  It's still a 602 problem.
21            THE COURT:  Overruled.
22  BY MR. LEON:
23  **Q.**    You can answer.
24  **A.**    I'm trying to figure -- kind of like -- some of the
25  problems she had was with violence.  She had got assaulted --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*2983*

1            MR. BALAREZO:  Objection.
2            THE COURT:  Sustained, unless he has personal knowledge of
3  it.
4            MR. BALAREZO:  Move to strike.
5            THE COURT:  Not yet.
6            THE WITNESS:  Continue?
7            THE COURT:  You can put your next question.
8  BY MR. LEON:
9  **Q.**    Did you ever personally witness her be assaulted?
10  **A.**    One time.
11  **Q.**    Okay.  We don't need you to go into all the details.  Can
12  you tell us generally the nature of the assault?
13  **A.**    She was being robbed of $10 by one particular guy.  And
14  then another time --
15            MS. WICKS:  Objection.
16            MR. ZUCKER:  The basis is other than observation.
17  BY MR. LEON:
18  **Q.**    Let's focus on the one time and the $10.
19  **A.**    Okay.
20  **Q.**    You personally saw that?
21  **A.**    Yes.
22  **Q.**    Okay.  Where -- what neighborhood did that happen in?
23  **A.**    In Congress Park.
24  **Q.**    And we're still just talking about this initial period,
25  those four years when you were living --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2984

1  **A.**  Right, at 1397.

2  **Q.**  Okay. You mentioned assaults. You mention the debts.

3  Were there any other problems that you can think of that

4  Ms. Martin had as a result of her continuing addiction?

5  **A.**  Yes. She had an incident where --

6      MR. BALAREZO: Objection, Your Honor, again.

7      THE COURT: Do you want to rephrase?

8  BY MR. LEON:

9  **Q.**  To your personal knowledge that you know because you've

10  seen it, any other problems that Ms. Martin has had as a result

11  of her continuing addiction during that time?

12  **A.**  Yes.

13  **Q.**  Tell us.

14  **A.**  Her food stamp card was held and I went to retrieve it

15  and the price of it went up. In order to get it back, I had to

16  pay three times as much to get it back.

17  **Q.**  Now, I'd like to move -- still during this period of

18  time, this four or so year period of time, the early '90s, late

19  '80s, to the early to mid-'90s, okay? That period of time?

20  **A.**  Okay.

21  **Q.**  Did you continue to work during that entire time?

22  **A.**  No.

23  **Q.**  When did you stop working?

24  **A.**  I stopped working when Debra got raped.

25      MR. BALAREZO: Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2985

1  BY MR. LEON:

2  **Q.**  Did you end up -- I'll --

3      MR. BALAREZO: Move to strike, Your Honor.

4      MR. LEON: I think there is some personal knowledge on

5  this. I would like to explore that.

6      THE COURT: Not yet.

7  BY MR. LEON:

8  **Q.**  Just yes or no, did Ms. Martin end up going to the

9  hospital as a result of a --

10  **A.**  No. She --

11  **Q.**  Just yes or no.

12  **A.**  She ended up calling the police. I don't know if she

13  went to the hospital or not.

14  **Q.**  Okay. And were you with her when the police arrived?

15  **A.**  No.

16  **Q.**  Okay. Okay.

17      MR. BALAREZO: Move to strike, Your Honor.

18      MR. LEON: I'll move on.

19      THE COURT: Anything further?

20      MR. LEON: No.

21      THE COURT: The request is granted.

22      The comment about the incident -- characterization of the

23  incident will be stricken.

24  BY MR. LEON:

25  **Q.**  At some point, you stopped working?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2986

1  **A.**  Yes.

2  **Q.**  Why did you stop working?

3  **A.**  Because of the incident that was --

4  **Q.**  Okay. Putting aside the incident, was there any other

5  reason, other than this particular one incident? Was there a

6  general reason why you stopped?

7  **A.**  It was constant, constant robberies, threats.

8      MR. BALAREZO: Objection. Objection, personal knowledge

9  again. There's no foundation.

10      THE COURT: He hasn't finished his answer.

11  BY MR. LEON:

12  **Q.**  Are you finished?

13  **A.**  Yes. Well, like I said, it was a lot of things going on.

14  Robberies, assaults and stuff like that.

15  **Q.**  Were you ever -- you yourself ever robbed or assaulted

16  around that time?

17  **A.**  Yes.

18  **Q.**  How many times, would you say?

19  **A.**  Not at 1397. At 1325.

20  **Q.**  Okay. We'll get to that in a few minutes, but right now

21  just on this initial period, this four years or so, your first

22  in Congress Park, were you personally ever robbed or assaulted?

23  **A.**  No. Attempted robberies.

24  **Q.**  Attempted?

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

2987

1  **Q.**  How many times did somebody attempt to rob you?

2  **A.**  Once.

3  **Q.**  Where did that happen?

4  **A.**  1397.

5  **Q.**  Was it inside your home or outside?

6  **A.**  We were inside the home. They put a gun in the home and

7  Debra was at the door and I was in the bedroom.

8      MS. WICKS: Objection, Your Honor. 602.

9      THE COURT: Overruled.

10      MR. TABACKMAN: I would also object on relevance grounds.

11  I don't know who -- it hasn't been tied up to anything related to

12  this case.

13      THE COURT: Overruled.

14  BY MR. LEON:

15  **Q.**  As a result of you stopping the work at the Post Office

16  Pavilion and the other work you had, what -- did you make a

17  living anymore?

18  **A.**  I made a living after I lost -- after I stopped work, I

19  made a living brokering deals, drug deals.

20  **Q.**  Okay. And when was that, if you know the year? If you

21  don't, you can just give us an approximation.

22  **A.**  I can't really -- well, I was living at 1397, so I think

23  maybe -- a year after being at 1397.

24  **Q.**  Okay. And when you said you started to work these deals

25  yourself, how often would you -- you, Earl Campbell --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2988**

1  personally work these deals?
2  A.   Basically, I took over the deals.
3  Q.   What do you mean by that?
4  A.   Because it was -- it was just a problem for her to take
5  them, so I took over.
6  Q.   Okay.  My question is, when you took over working these
7  deals, how frequently would you work these deals?  How often
8  would you go out and do it?
9  A.   All day and all night, depending on the people who was
10  coming and when they came.
11  Q.   When you say "all day," how many times a day are we
12  talking about?
13  A.   Sometimes ten times a day.
14  Q.   And when you say -- and ten times a day; seven days are
15  in a week.  How many days a week would you be doing this?
16  A.   Seven days a week.
17  Q.   And when you started doing this, you said you took over
18  from Debra.  What do you mean exactly by that?
19  A.   Because of her getting hurt and things like that, I took
20  over to basically -- you know, I think it was the last place --
21  if it was going to be done, I just started doing it myself.
22  Q.   Did you ever try to get her help?  In other words, get
23  her off of the addiction?
24      MR. BALAREZO:  Objection.
25      THE WITNESS:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2989**

1      MR. BALAREZO:  Relevance, Your Honor.
2      THE COURT:  Overruled.
3  BY MR. LEON:
4  Q.   Did you ever try to do -- to do that so she didn't -- so
5  nobody had to go out and broker deals?
6      MR. ZUCKER:  Objection.
7      THE COURT:  Form?
8      MR. ZUCKER:  The why, as to why he -- because it refers to
9  her basis.
10      THE COURT:  Do you want to repeat the question?
11      MR. LEON:  I don't think I could.  I'll just ask another
12  one.
13      THE COURT:  Put your next one.
14  BY MR. LEON:
15  Q.   My question is, Mr. Campbell, did you, yes or no, ever
16  try to get Ms. Martin treatment for her addiction?
17  A.   Yes.
18  Q.   Did she actually seek treatment?
19  A.   No.
20  Q.   Okay.  And -- okay.  And as a result of you taking over
21  the brokering, as you put it, did you have more contact with the
22  people that you would broker for?
23  A.   Yes.
24  Q.   And at this time, you said it could be up to ten times a
25  day and almost every day a week?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2990**

1  A.   Yes.
2  Q.   Where did these clients -- I'll use the word "clients"; I
3  shouldn't use the word "clients."
4      Where did these people come from?
5  A.   Virginia.
6  Q.   Always Virginia?
7  A.   Mostly Virginia.  Mostly Virginia, some Maryland.
8  Q.   Where in Virginia, if you know?
9  A.   They was always 15 minutes away.
10  Q.   Did any of these people who came who you brokered for
11  ever -- did any of them live in Congress Park itself?
12  A.   No.
13  Q.   Did any of them live in other neighborhoods other than
14  the 15 minutes away in Virginia you're talking about?
15      MR. BALAREZO:  Objection.  602 again, Your Honor.
16      THE COURT:  Overruled.
17      THE WITNESS:  No.
18  BY MR. LEON:
19  Q.   Now, I think you made a reference a little earlier to the
20  fact that you moved at some point; is that right?
21  A.   Yes.  After being at 1397 about four years, we moved and
22  got a place at 1325 Savannah.
23  Q.   Okay.  And if we put that picture back up on the screen,
24  would you be able to point out that address for us?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**2991**

1  Q.   Okay.
2      THE COURT:  What's the exhibit?
3      MR. LEON:  For the record, the exhibit that's just been
4  put before the witness is 100.1.
5  BY MR. LEON:
6  Q.   And take a look at that and see if you see where you
7  moved to.
8  A.   Around in here (indicating).
9  Q.   Okay.  For the record, there's now another mark that you
10  put, looks like it's on the upper right-hand corner of the
11  intersection between 13th Street and Congress Street.  Is that
12  about right?
13  A.   We're on the other end, by Savannah.  I'm sorry.
14  Q.   Okay.  Why don't we do this?  If you touch the -- is that
15  marking not exactly right that you just made?
16  A.   Yes, it's not right.
17  Q.   Why don't you do this.  If you touch with the pen the
18  lower right-hand corner of the screen, just do that and it will
19  clear the screen.
20      Touch it a little harder, I think.  A little harder.
21      If you could try to take another crack at where you moved
22  to.
23  A.   More on this end (indicating).
24  Q.   Okay.  And for the record, you put a circular mark a
25  little north of Congress Street, a little bit to the left of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2992

1  where it intersects with Savannah Place.

2  Is that about right?

3  A.  Right, I think.  It's on the end.

4  Q.  Are you sure or --

5  A.  Yes.  I can't really read this map too good.

6  Q.  Okay.

7  A.  But it's 13-- we at 13th and this is -- Savannah Street

8  run along, like you got Savannah right here.  Here's Savannah.

9  We're on 13th, 13th and Savannah.  We would be like here

10 (indicating), right here.  That's where we would be, 13th and

11 Savannah.  Savannah runs across -- is this 14th?  I think.

12 No, 13th and Savannah.

13 Q.  You just made a few other marks, so let me -- that's

14 okay.  Let me see if I can just make a quick record.

15 A.  All right.

16 Q.  You put a few markings, all of them seem to be right at

17 or right near what looks like to be the intersection of 13th

18 Street and Savannah Street?

19 A.  Correct.

20 Q.  Let me ask a better question:  Do you remember the

21 address of where you lived?

22 A.  1325.

23 Q.  What?

24 A.  Savannah Street.

25 Q.  Okay.  Was that a house or an apartment?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2993

1  A.  Apartment.

2  Q.  Okay.  And if you were driving around in Congress Park

3  today, could you get to that -- could you actually get to the --

4  could you find the house?  Could you drive up to it?

5  A.  Yes.

6  Q.  Okay.  Why did you move from where you were up near

7  Alabama and Congress Street and why did you move down to

8  Savannah Street?

9  A.  Well, her daughter wanted her own place, so her daughter

10 moved to -- got her own place on Congress.  Her daughter got her

11 own place on Congress so we had to get a smaller place so we

12 moved to 1325 --

13 Q.  Okay.

14 A.  -- Savannah.

15 Q.  And for the record, what is Ms. Martin's daughter's name?

16 A.  Latrice Martin.

17 Q.  Does she have a nickname?

18 A.  Lucy.

19 Q.  What's her last name?

20 A.  Martin.

21 Q.  Lucy Martin?

22 A.  Yes.

23 Q.  Okay.  And when you moved to this -- do you remember

24 roughly when you moved to 1325 Savannah?

25 A.  Four years after we -- we only stayed at 1325 (sic) about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2994

1  four years and then like the following four years was spent

2  on -- or four or five years was spent at 1325 Savannah.

3  (Discussion had off the record.)

4  THE WITNESS:  I said we were living at 1397 for four years

5  and then the remaining five years was spent at 1325 Savannah.  I

6  mean -- yeah, Savannah.

7  BY MR. LEON:

8  Q.  Okay.  And did you actually move out of 1325 Savannah at

9  some point?

10 A.  Yes.

11 Q.  Do you remember approximately when?

12 A.  I think it was 2000.

13 Q.  Okay.  So for my next questions now, I want to focus on

14 the -- I think you said five or so years you lived at 1325

15 Savannah, okay?

16 A.  Okay.

17 Q.  My next series of questions is going to be about that

18 time.  During that time, did you have a regular job that wasn't

19 related to drug dealing?

20 A.  No.

21 Q.  Okay.  Did Ms. Martin?

22 A.  No.

23 Q.  Did Ms. Martin still have the addiction that you referred

24 to earlier?

25 A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

2995

1  Q.  What about you?  Were you using drugs at this time?

2  A.  On occasions.

3  Q.  Would you say you were addicted or not?

4  A.  No.

5  Q.  When you say "on occasion," what do you mean?

6  A.  I was partying maybe once, once a week, maybe once a

7  month.  I could take it or leave it.

8  Q.  And did you still have the customers that you talked

9  about earlier, in your earlier residence?  Did you have the same

10 customers --

11 A.  Yes, I did.

12 Q.  -- when you moved?  And how often would you broker sales

13 for them during this period of time when you moved to 1325

14 Savannah Street?

15 A.  Every day, all day.

16 Q.  And when you say "every day," how many times a day are we

17 talking about?

18 A.  Sometimes ten times a day.

19 Q.  What would be a low number?  What would be the least

20 amount of times you would go out, leave your door to broker a

21 sale?

22 A.  Might be on a Sunday, might be like six times.

23 Q.  When you say "every day," you mean how much?

24 A.  Seven days a week.

25 Q.  What would be -- during this period of time, what would

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3036

1  **Q.**  Did you ever do that with respect -- withdrawn.
2  Do you know anyone by the name of Don?
3  **A.**  Yes.
4  **Q.**  How do you know Don?
5  **A.**  From Congress Park.
6  **Q.**  And how do you know Don from Congress Park, what was your
7  relationship with him in Congress Park?
8  **A.**  Don just like everybody else in Congress Park, you get to
9  meet just about everybody when you live in Congress Park.
10  **Q.**  Were you friends? I'm sorry.
11  MR. MARTIN: Objection.
12  THE COURT: Did you finish your answer?
13  THE WITNESS: No. What was the question?
14  BY MR. LEON:
15  **Q.**  I'll ask another question. Were you done --
16  You have friends?
17  **Q.**  That's my next question, were you friends?
18  MR. BALAREZO: Objection, Your Honor.
19  THE COURT: Overruled.
20  BY MR. LEON:
21  **Q.**  Were you?
22  **A.**  I was friends with just about everybody in Congress Park.
23  MR. GUERRERO: Non-responsive.
24  BY MR. LEON:
25  **Q.**  Were you friends with Don, specifically?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

3037

1  **A.**  Yes.
2  **Q.**  What was the nature of that friendship?
3  **A.**  Well, I got to know him and maybe purchase drugs from
4  him, from time to time.
5  **Q.**  Well, maybe or did you?
6  **A.**  Yes, I purchased drugs.
7  **Q.**  I'm sorry?
8  **A.**  I purchased drugs from him from time to time.
9  **Q.**  Are you sure about that?
10  **A.**  Yes.
11  **Q.**  If you saw Don again, would you recognize him?
12  **A.**  Yes.
13  **Q.**  Do you see Don here in the courtroom today?
14  **A.**  Yes.
15  **Q.**  Okay. Can you please point Don out, based on his
16  location and an article of clothing that he's wearing?
17  **A.**  Second from the left.
18  **Q.**  Can you be more specific?
19  **A.**  One, two -- second from the left, Jo-Jo.
20  **Q.**  Excuse me?
21  **A.**  Jo-Jo, he is Don.
22  MR. GUERRERO: We'll stipulate this is Mr. Samuels.
23  BY MR. LEON:
24  **Q.**  Is that the gentleman standing up over my right shoulder?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

3038

1  MR. LEON: Your Honor, may the record reflect the in-court
2  identification of the defendant, Dominic Samuels.
3  THE COURT: Yes.
4  BY MR. LEON:
5  **Q.**  Did you ever wear a wire and buy drugs from Don?
6  **A.**  Yes.
7  MR. LEON: May I approach, Your Honor?
8  THE COURT: Yes.
9  BY MR. LEON:
10  **Q.**  Mr. Campbell, I'm handing you what's been marked for
11  identification as Government's 322. I'm taking out the contents
12  and ask you if you recognize 322?
13  **A.**  Yes.
14  **Q.**  What is that?
15  **A.**  This is a disk from the -- I believe the drug buy that I
16  made with Don.
17  **Q.**  And why do you say that?
18  **A.**  Because I initialed it. My initials are on it and my
19  name is on it.
20  **Q.**  Did you review this?
21  **A.**  Yes.
22  **Q.**  Did you recognize voices on it?
23  **A.**  Yes.
24  MR. LEON: If I can just have one moment, Your Honor.
25  THE COURT: Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

3039

1  BY MR. LEON:
2  **Q.**  And just for the record, there's a WC dated 2-7-07; is
3  that correct?
4  **A.**  Yes.
5  **Q.**  Who's WC?
6  **A.**  That's me, Willis Campbell.
7  **Q.**  Is that one of -- that your -- you said --
8  **A.**  The initials, those are my initials.
9  **Q.**  Is your name Earl or Willis?
10  **A.**  Willis.
11  **Q.**  Is Earl part of your name?
12  **A.**  Yes.
13  **Q.**  What part of your name?
14  **A.**  Middle name.
15  **Q.**  Okay.
16  MR. LEON: Your Honor -- requesting permission to publish
17  Government's 322.1.
18  THE COURT: Yes.
19  BY MR. LEON:
20  **Q.**  Mr. Campbell, I'm going to ask first, to put on -- do you
21  see the headset right in front of you? There isn't one.
22  MR. LEON: May I approach?
23  THE COURT: Yes.
24  BY MR. LEON:
25  **Q.**  Mr. Campbell, I'm handing you a headset. It has to face

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3040**

1  that server, and I'm going to ask you to put that on, to get the
2  volume to a level that you're comfortable with, and listen to
3  what we're about to hear.
4      You know what, the other way, have it face the other way.
5  **A.**  This way?
6  **Q.**  There you go.
7      MR. LEON:  Actually, Your Honor, if we could -- just to be
8  safe, I'm going to use the unabridged, so I would ask to publish
9  322 rather than 322.1, both of which are in evidence, I believe.
10      THE COURT:  You're going to call up 322, you say?
11      MR. LEON:  Yes.
12      I would ask if Mr. Mazzitelli could play just first the
13  first minute or so of 322 --
14  BY MR. LEON:
15  **Q.**  Mr. Campbell, before we do that, can I ask you to clear
16  the screen by touching that right corner again.  Thank you.
17      (Audiotape played.)
18  BY MR. LEON:
19  **Q.**  Okay.  I would ask you to stand by, Mr. Campbell.  We're
20  going to find another excerpt.
21      Okay.  Just for the record, we've jumped ahead about
22  three minutes, but before we go to that, first of all, did you
23  recognize the voices we heard or the voice we heard?
24  **A.**  Yes.
25  **Q.**  Who did you recognize?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3041**

1  **A.**  My voice and Kyle Fulmer.
2  **Q.**  And was Kyle one of the people who came in initially
3  and -- on that search warrant?
4  **A.**  Right, he's one of the ones.
5  **Q.**  Tell us, before we get to the rest of this tape, I want
6  to ask you this:  Before you went out that day, did you know who
7  you were actually going to buy drugs from?
8  **A.**  No.
9  **Q.**  What -- we heard -- well, we heard, I believe the person
10  you identified as Kyle, saying "We're going to attempt to make a
11  drug purchase of crack cocaine from individuals in that area"
12  did you have an understanding as to which individuals you were
13  going to try to buy from that day?
14      MR. BALAREZO:  Objection, Your Honor, it's asked and
15  answered already.
16      THE COURT:  Overruled.
17  BY MR. LEON:
18  **Q.**  Did you have an understanding?
19  **A.**  Anybody in the area.
20  **Q.**  Okay.  Did you -- you said you know Don and you've
21  identified Don.
22  **A.**  Yes.
23  **Q.**  Did you see him before this day that you -- that we're
24  about to hear?  Did you see him any days prior to this?
25  **A.**  I believe I did.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3042**

1  **Q.**  Okay.  Did you see him the day before?
2  **A.**  Yes.
3      MR. BALAREZO:  Objection, Your Honor, leading.
4      THE COURT:  Sustained.
5  BY MR. LEON:
6  **Q.**  Did you -- had you seen Don before this day of the
7  purchase?
8  **A.**  Yes, one time.
9  **Q.**  Okay.  And when was that?
10  **A.**  Prior to the drug buy.
11  **Q.**  Okay.  Did you have an understanding, yes or no, if Don
12  was going to be out -- one of the people who might be out that
13  day?
14  **A.**  No, he told me he might be, but if he wasn't, other
15  people like DC or whatever, whatever, might be out there, DC
16  or -- I think it was Al.
17  **Q.**  Okay.  Well, I want you to not guess.  Do you remember
18  having a conversation with Don prior to this drug purchase, yes
19  or no?
20  **A.**  Yes, that's the only conversation that I had.
21  **Q.**  Regarding -- before this drug purchase?
22  **A.**  Right.
23  **Q.**  And tell us -- the "whatever, whatever," is that what Don
24  said or what you're saying now?
25  **A.**  That's what Don told me, you know, if he wasn't out there

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3043**

1  the next day, to see these other couple of people.
2  **Q.**  Okay.  And who were those couple of other people, you
3  said DC?
4  **A.**  DC or Al.  I don't believe Don had anything at that time.
5  **Q.**  Okay.  And you said DC.  Do you know DC?
6  **A.**  Yes.
7  **Q.**  And did you have any dealings with DC prior to this
8  conversation you're talking about?
9  **A.**  No.
10  **Q.**  And -- first of all, you can take them off if they're not
11  comfortable right now.
12  **A.**  Okay.
13      MR. LEON:  Thank you, Ms. Romero.
14  BY MR. LEON:
15  **Q.**  And who is DC to you?
16  **A.**  DC is just one of the guys being in the park I used to
17  buy dimes from.
18  **Q.**  And to your knowledge, did DC know Don?
19  **A.**  Yes.
20  **Q.**  And to your knowledge did Don know DC?
21  **A.**  Yes.
22      MR. BALAREZO:  Objection, Your Honor, 602.
23      THE COURT:  Establish a foundation.
24  BY MR. LEON:
25  **Q.**  How do you know that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 435 of 1954

## 3044

1  A.   I -- I may have seen them together or --
2       MR. GUERRERO:  Objection, "may"?
3  BY MR. LEON:
4  Q.   Did you see them together or not see them together?
5  A.   I know each one of them.
6  Q.   Okay.
7       MR. BALAREZO:  Objection, non-responsive.
8       THE COURT:  Put your next question.
9  BY MR. LEON:
10 Q.   Did you ever see Don and DC together with your own eyes?
11 A.   No.
12 Q.   Okay.  You said earlier that you mentioned the -- that
13 Don said see DC or words to that effect?
14 A.   DC or Al.
15 Q.   Okay.  Did -- do you know of any other DC, other than the
16 one you're talking about?
17 A.   That's the only one.  That's the only DC that I know.
18 Q.   Okay.  And when Don said to you, "See DC," did you have
19 an understanding as to who he was referring to?
20 A.   Yes.
21 Q.   Okay.  You also mentioned somebody by the name of Al.
22 Who is Al?
23 A.   Al is another guy that be out there who sells crack.
24 Q.   And have you ever bought from Al?
25 A.   Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

## 3045

1  Q.   And have you ever seen Al with either DC or Don?
2  A.   No.
3  Q.   When you -- when Don said "See DC or Al," focusing on the
4  Al --
5  A.   Yes.
6  Q.   -- did you have an understanding who Don was referring
7  to?
8  A.   Yes.
9  Q.   Okay.  When you talked to Don, prior to this sale --
10 excuse me, withdrawn.
11      When you talked to Don, prior to what we're about to
12 listen to, where did the conversation take place, if you
13 remember?
14 A.   In Congress Park.
15 Q.   Okay.  Was it over the phone or in person?
16 A.   In person.
17 Q.   And where were you and where was Don, if you remember?
18 A.   In the circle of Congress Park.
19 Q.   And did you go up to Don or did Don come up to you?
20 A.   I believe I went up to Don.
21 Q.   And what, if anything, did you say to Don?
22 A.   I asked, "Was anything happening?"  Something in
23 reference that "Who got something?"  Or -- it was.
24      MR. BALAREZO:  Your Honor, objection to the extent that he
25 does not know what was said.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

## 3046

1       THE COURT:  I'll allow him to give his best recollection.
2  Go ahead.
3  BY MR. LEON:
4  Q.   As best you can remember.
5  A.   As best I can remember, I was asking him about drugs.
6  Q.   Okay.  Do you remember the exact words you used?
7  A.   No.
8  Q.   Do you remember the exact words Don used?
9  A.   I can't recall.
10 Q.   Okay.  Did Don, yes or no, say anything back to you at
11 that time, before what we're about to listen to?
12 A.   He just told me if he wasn't in the area, DC or Al would
13 be in the area.
14 Q.   Okay.  I'd like to now get back to 322, if we could, and
15 just for the record, it's -- we're going to listen to about five
16 or so minutes and I'm going to stretch -- starting on the time
17 stamp, counsel, beginning at 2 minutes and 39 seconds.
18      (Audiotape played.)
19 BY MR. LEON:
20 Q.   Mr. Campbell, I think you have to turn it the other way
21 and make sure the volume is up, if you could.
22 A.   All right.
23      (Audiotape played.)
24 BY MR. LEON:
25 Q.   I'm going to ask some questions.  You can keep those on

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

## 3047

1  if you would like, but I'm going to ask you to put them back on
2  in a minute, so you may want to keep them on.
3  A.   Okay.
4  Q.   Do you remember how much money you were given by Kyle
5  that day?
6  A.   I believe $300.
7  Q.   Okay.  And do you know why you were given that much money
8  on that particular day?
9  A.   To buy as much -- to spend the whole $300 in drugs.
10 Q.   You have no understanding --
11 A.   For drugs.
12 Q.   Okay.
13      (Audiotape played.)
14 BY MR. LEON:
15 Q.   We're going to continue in a moment.  What are you doing
16 right now, right before you -- right now?
17 A.   I'm reporting back to Kyle, letting him know where I'm
18 at.
19 Q.   What were you doing just before reporting back to him?
20 A.   Walking in the area.
21 Q.   Do you remember where you were dropped off?
22 A.   I believe it was in the alley of Congress -- one of the
23 alleys of Congress.
24 Q.   You said "report to Kyle."  Why would you do that?
25 A.   This is something you had to do every time they put you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

3048

1  out to buy drugs.  You had to let them know where you was, if
2  you were in trouble, if you saw any trouble.  You had to let
3  them know everything that was going on.
4          (Audiotape played.)
5          THE COURT:  Mr. Leon, we've actually reached the point
6  where we'll have to break for lunch at this point.
7          MR. LEON:  Okay.
8          THE COURT:  Ladies and gentlemen, we'll take a lunch
9  break.  Let me ask you to come back at 1:40.  Please remember,
10 don't talk about the case.  Leave your notes in the jury room and
11 turn off your headsets and leave them in your seats.  Enjoy your
12 lunch break and we'll see you back at 1:40.
13         (Jury out at 12:26 p.m.)
14         THE COURT:  All right, the witness can be excused until
15 1:40.
16         Counsel, we'll see you at 1:40.
17         (Thereupon, a luncheon recess was had beginning at
18 12:27 p.m.)
19
20         **C E R T I F I C A T E**
21         I, Scott L. Wallace, RDR-CRR, certify that the
   foregoing is a correct transcript from the record of proceedings
22 in the above-entitled matter.
23         ----------------------------
   **Scott L. Wallace, RDR, CRR**
24 **Official Court Reporter**
25

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

3049

1                    **I N D E X**
2
3
4
5  <u>EXAMINATIONS</u>                              <u>Page</u>
6
7  RESUMED CROSS-EXAMINATION OF KYLE FULMER      2936
   BY MS. WICKS
8
   CONTINUED REDIRECT EXAMINATION OF KYLE FULMER 2938
9  BY MR. GUERRERO
10 DIRECT EXAMINATION OF WILLIS EARL CAMPBELL     2954
   BY MR. LEON
11
12         <u>EXHIBITS</u>
13
14 <u>DESCRIPTION</u>
15 Government's Exhibit 1103 admitted             3026
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :
                               :
      Plaintiff,               : Docket No. CR 05-100
                               :
   v.                          :
                               :
ANTWUAN BALL, DAVID WILSON,    : Washington, DC
GREGORY BELL, DESMOND          :
THURSTON, JOSEPH JONES, and    : March 15, 2007
DOMINIC SAMUELS,               : 1:44 p.m.
                               :
      Defendants.              :
                               :
                               :

VOLUME 18 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, RMR*
*Official Court Reporter*

---

3051

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

3052

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

3053

1     **AFTERNOON SESSION, MARCH 15, 2007**

2     (1:45 p.m.)

3          THE COURT:  Let's bring them in.

4          (Jury in at 1:47 p.m.)

5          THE COURT:  Good afternoon, ladies and gentlemen.

6          THE JURY PANEL:  Good afternoon.

7          THE COURT:  Welcome back.  We're ready to resume, counsel.

8          MR. LEON:  Thank you, Your Honor.

9     CONTINUED DIRECT EXAMINATION OF WILLIS EARL CAMPBELL

10    BY MR. LEON:

11    Q.    Mr. Campbell, do you remember when we last left off at

12    the lunch break; we were in the middle of listening to a

13    controlled purchase?

14    A.    Yes.

15         MR. LEON:  I would, with the Court's permission, ask if

16    Mr. Mazzitelli could just pick up where we left off.

17    BY MR. LEON:

18    Q.    But right before we do that, do you remember where we

19    were in the -- in where we were listening?  Had you bought any

20    drugs yet?

21    A.    No, I hadn't bought any.  I was on my way to buy some.

22    Q.    Okay.  Do you know -- from where we left off, do you know

23    roughly where you were, physically?

24    A.    I was at the end of 13th and Congress.

25    Q.    Okay.  Okay.  Mr. Mazzitelli -- I'm sorry.  Could you put

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3054**

1  the headset back on?
2  **A.**  Okay.
3  **Q.**  Thank you.  Is it on?
4  **A.**  Yes.
5  (Audiotape played.)
6  BY MR. LEON:
7  **Q.**  Mr. Campbell, did you listen along?
8  **A.**  Yes.
9  **Q.**  Okay.  Tell us what happened.  What did we just hear?
10  **A.**  I just bought a $100 worth of -- I bought 12 dimes of
11  crack cocaine.  I just bought 12 dimes of crack cocaine.
12  **Q.**  Okay.  I'm going to ask you to speak up.  And I'm going
13  to ask you:  From whom did you buy the crack?
14  **A.**  From Don.
15  **Q.**  Same Don that you identified earlier before the lunch
16  break?
17  **A.**  Yes.
18  **Q.**  Now, do you remember at the beginning of the portion we
19  just listened to you, you first saying, "He not here, Kyle"?
20  **A.**  Yes.
21  **Q.**  Who were you talking to at that time?
22  **A.**  I was talking to Kyle Fulmer.
23  **Q.**  Okay.  And who?  If you remember, who was "he" that
24  you're referring to when you said, "He's not here, Kyle"?
25  **A.**  Don.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3055**

1  **A.**  And that after that you were heard to say, "What's up,
2  dog?"
3  **A.**  Right.
4  **Q.**  Who were you talking to at that time?
5  **A.**  I believe I was talking to Don.
6  **Q.**  Okay.  And then there was something else that that person
7  said; and then in response you said, "You got a hundred."  Do
8  you remember that?
9  **A.**  Yes.
10  **Q.**  Did you listen -- were you able to make out what was said
11  before you said, "You got a hundred?"
12  **A.**  No.
13  **Q.**  Okay.  Would it help to listen to it again?
14  **A.**  Yes.
15  **Q.**  Okay.  I'm going to ask if Mr. Mazzitelli can just remind
16  us back.  I believe my time stamp -- I'm going to ask you to
17  keep the headset on.
18  (Audiotape played.)
19  BY MR. LEON:
20  **Q.**  Okay.  That's the portion I was referring to.  Could you
21  make out what was said there?
22  **A.**  Not too clearly, but I was asking what was up, and he
23  must have told me --
24  MR. BALAREZO:  Objection.
25  BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3056**

1  **Q.**  Don't guess.  If you know it, that's fine.  If you don't,
2  just say so.
3  **A.**  Okay.  I don't know it.
4  **Q.**  Okay.  When you said, "You got a hundred."  What were you
5  referring to at the time?
6  **A.**  Crack cocaine.
7  **Q.**  A hundred what?
8  **A.**  A hundred dimes -- $100 worth.
9  **Q.**  A hundred dimes or $100 worth?
10  **A.**  $100 worth.
11  **Q.**  And shortly after that when you said, "What you doing for
12  me for this hundred," what did you mean by that?
13  **A.**  What kind of deal could I get for the hundred?
14  **Q.**  And when the response was, "Most I can do is 12," what
15  did you understand that to mean?
16  **A.**  12 dime bags.
17  **Q.**  And how many dime bags did you receive?
18  **A.**  12 dime bags.
19  **Q.**  What did you do with those dime bags?
20  **A.**  I bought them and took them back to the FBI agent.
21  **Q.**  And what did you do with them once you met up with the
22  FBI?
23  **A.**  I gave -- once I met up with the FBI, I gave them the
24  drugs.  They told me to get in, they searched me, took the
25  additional money that I had, and started to search me and take

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3057**

1  the things off of me, the wires and stuff.
2  **Q.**  Okay.  Shortly after, "Most I can do is 12" was said, the
3  same person who said that was heard to say, "Ice cream powder,
4  too."  Do you remember that?
5  **A.**  Yes.
6  **Q.**  What's your understanding of what that means, ice cream
7  powder?
8  **A.**  That the coke was good.
9  **Q.**  And shortly after that, the same person could be heard to
10  say, "That's that bomb shit there."  What is your
11  understanding -- what's your understanding of what that means?
12  **A.**  Yes.  It's the good stuff.
13  **Q.**  And shortly after that, you were heard to say, "It looks
14  like it; it looks like it -- it look like, it look like."
15  Do you remember saying that?
16  **A.**  Yeah, it looks like a nickel instead of a dime." I was
17  paying $10 for each bag, but I was getting two additional -- two
18  additional dimes for a nickel bag.  I was getting 12 dime.
19  **Q.**  And nickel, what's the street value of a nickel bag?
20  **A.**  Well, a nickel bag is basically -- street value is like
21  maybe two, three dollars -- one hit.
22  **Q.**  Is a nickel bag -- I'm sorry.
23  **A.**  A nickel bag is basically one hit of crack cocaine if you
24  are smoking crack cocaine.
25  **Q.**  And in relation to a dime bag, is a nickel bag bigger or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Tab 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, :
    Plaintiff, : Docket No. CR 05-100
    v. :
ANTWUAN BALL, DAVID WILSON, : Washington, DC
GREGORY BELL, DESMOND :
THURSTON, JOSEPH JONES, and : March 19, 2007
DOMINIC SAMUELS, : 9:23 a.m.
    Defendants. :
     :

**VOLUME 19 - MORNING SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE RICHARD W. ROBERTS**
**UNITED STATES DISTRICT COURT JUDGE, and a JURY**

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
    Glenn S. Leon, Assistant United
    States Attorney
    Ann H. Petalas, Assistant United
    States Attorney
    Gilberto Guerrero, Assistant
    United States Attorney
    555 4th Street
    Washington, DC 20001
    202.305.0174

For Defendant    CARNEY & CARNEY
Antwuan Ball:    John James Carney, Esq.
    South Building
    601 Pennsylvania Avenue, N.W.
    Washington, DC 20004
    202.434.8234

---

3197

APPEARANCES (Cont.)

For Defendant    TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:    TEASDALE, PLLC
    Steven Carl Tabackman, Esq.
    1747 pennsylvania Avenue, NW
    Suite 300
    Washington, DC 20036
    202.454.2811

For Defendant    LAW OFFICE OF JENIFER WICKS
David Wilson:    Jenifer Wicks, Esq.
    503 D Street NW, Suite 250A
    Washington, DC 20001
    202.326.7100

    GARY E PROCTOR, LLC
    Gary E. Proctor, Esq.
    6065 Harford Road
    Baltimore, MD 21214
    410.444.1500

For Defendant    LAW OFFICE OF JAMES W. BEANE
Gregory Bell:    James W. Beane, Jr., Esq.
    2715 M Street, N.W.
    Suite 200
    Washington, DC 20007
    202.333.5905

For Defendant    LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:    Jonathan Seth Zucker, Esq.
    514 10th Street, NW
    9th Floor
    Washington, DC 20004
    202.624.0784

For Defendant    LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:    Anthony Douglas Martin, Esq.
    7841 Belle Point Drive
    Greenbelt, MD 20770
    301.220.3700

    LAW OFFICE of ANTHONY ARNOLD
    Anthony Darnell Arnold, Esq.
    One Research Court
    Suite 450
    Rockville, MD 20852
    301.519.8024

---

3198

APPEARANCES (Cont.)

For Defendant    LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:    A. Eduardo Balarezo, Esq.
    400 Fifth Street, NW
    Suite 300
    Washington, DC 20001
    202.639.0999
    and
    William B. Purpura, Esq.
    8 East Mulberry Street
    Baltimore, MD 21202
    410.576.9351

Court Reporter:    Scott L. Wallace, RDR, CRR
    Official Court Reporter
    Room 6814, U.S. Courthouse
    Washington, DC 20001
    202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

3199

**MORNING SESSION, MARCH 19, 2007**

1
2    (9:23 a.m.)
3        (Discussion had off the record.)
4        THE DEPUTY CLERK: Criminal Case Number 05-100, *The United*
5    *States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond*
6    *Thurston, Joseph Jones and Dominic Samuels.* For the government,
7    Mr. Leon, Ms. Petalas and Mr. Guerrero.
8        For defendants, Mr. Carney, Mr. Tabackman, Ms. Wicks, Mr.
9    Proctor, Mr. Beane, Mr. Zucker, Mr. Arnold, Mr. Balarezo and
10    Mr. Purpura.
11        THE COURT: Good morning.
12        ALL PARTIES PRESENT: Good morning, Your Honor.
13        MR. ZUCKER: Good morning, Judge. To pick up where we
14    left off off the record, we were just addressing problems about
15    the clothing and I don't really have a good excuse for the Court.
16    It's not just style; it's actually fit.
17        Mr. Thurston has advised me that the clothes that I picked
18    out for him on Thursday, which were in the section in the war
19    room, I'll call it, where I have the clothing the family sent
20    down, do not fit. Mr. Mackey went to get substitute clothing. I
21    expect him to be back momentarily.
22        I apologize to the Court. And it's a recurring problem
23    and I frankly don't know what the problem is. I think sometimes
24    what happens is the clothing between defendants gets commingled
25    down in the cell block. And I'm not saying it's the marshals'

**3332**

1  Q.  Do you ask the questions?
2  A.  No.
3  Q.  Do you get to choose what questions are asked of you?
4  A.  No.
5  Q.  Now, do you remember also being asked about testimony
6  that you gave about a year ago in a matter -- a trial involving
7  someone named Newett Ford?
8  A.  Correct.
9  Q.  How many defendants were on trial in that case?  Do you
10  remember?
11  A.  I don't recall.
12  Q.  Okay.  Were any of these defendants on trial in that
13  case?
14  A.  No.
15  Q.  And do you remember all the questions you were asked in
16  connection with that case?
17  A.  No.
18  Q.  Do you remember all of the answers you gave with respect
19  to that case?
20  A.  No.
21  Q.  Who asked the questions in that case, do you remember?
22  A.  I don't remember.
23  Q.  Did you get to decide what questions you answered?
24  A.  No.
25  Q.  Were you allowed to answer any questions that you were

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3333**

1  weren't asked?
2  A.  No.
3  Q.  Now, back on Thursday, three days ago, when you testified
4  and you were asked some questions by Mr. Balarezo, Don's
5  attorney, do you remember about three days ago you were asked
6  some questions by him?
7  A.  Correct.
8  Q.  I believe at one point when you were asked by him
9  regarding different ways you bought drugs, you were asked
10  generally, questions about that, and I believe you said at one
11  point, "I bought as a group, they had two ways of selling their
12  drugs," do you remember giving that answer?
13  A.  I don't recall, but --
14  Q.  Okay.  Let me see if I can just ask you generally.  How
15  would you buy back in -- when you were at the two different
16  addresses in the '90s, would you always buy your drugs the same
17  way?
18  A.  No.
19  Q.  Okay.  How would you buy your drugs back in the '90s,
20  when you were at those two different addresses?
21  A.  Sometimes I would go outside, depending on how much I
22  wanted, and they had a system called "doors" where.
23        MR. ZUCKER:  Objection, scope.
24        THE COURT:  Who's objecting?  What is the basis?
25        MR. ZUCKER:  Scope.  We're getting into a completely

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3334**

1  different area.  That was never covered on direct nor on cross.
2        THE COURT:  I'll allow it.
3        MR. BALAREZO:  Your Honor, I object to the vague answer,
4  "they."  Who is "they?"
5        THE COURT:  You may continue.
6  BY MR. LEON:
7  Q.  Okay.  Tell us what you -- continue.
8  A.  They would have a system called doors.  The doors would
9  be whoever was out there would throw in X amount of bags to make
10  up.
11        MS. WICKS:  Objection, Your Honor.  This testimony is
12  incredibly nonspecific.  He's saying "they" and "whoever's out
13  there."
14        THE COURT:  I'll allow it.
15  BY MR. LEON:
16  Q.  You can continue.
17  A.  They would throw in -- whoever was out the front or the
18  back, whichever door that I came out of.
19        MR. MARTIN:  Your Honor, could we have a relevant time
20  frame, then?
21        THE COURT:  Beg your pardon?
22        MR. MARTIN:  Objection, relevant time frame.
23        MR. TABACKMAN:  And objection to relevance without
24  specifying.
25        THE COURT:  The question I believe was framed with respect

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3335**

1  to two specific addresses, so it may not be specific enough with
2  regard to time frame, so let me ask you to do that.
3        MR. LEON:  Okay.
4  BY MR. LEON:
5  Q.  Mr. Campbell, you said you're not great with dates.  So
6  let's break it down by the two different locations you lived at
7  in Congress Park, okay?
8  A.  Okay.
9  Q.  I believe one was 1397 Congress Street?
10  A.  Correct.
11  Q.  And the other was on Savannah?
12  A.  1325.
13  Q.  Savannah?
14  A.  Savannah.
15  Q.  And is it correct that 1397 Congress Street was where you
16  first lived?
17  A.  1397 is where I first lived.
18  Q.  Okay.  And then Savannah was were you lived later in the
19  mid-'90s correct?
20  A.  Correct.
21  Q.  Let's start with the first address on Congress Street,
22  okay?
23  A.  Correct.
24  Q.  The "doors" that you were about to tell us about, do you
25  remember back in that earlier period seeing or hearing doors?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3336

1  **A.**   Yes.

2  **Q.**   Okay.  And then that second period when you're at

3  Savannah, do you remember seeing or hearing doors?

4  **A.**   Yes.

5  **Q.**   Okay.  Now, let me get back to your answer, which was:

6  What do you mean by doors and --

7  **A.**   Doors means that, depending on what I was purchasing out

8  of my door, whatever individuals who were out there were able to

9  throw in two bags, three bags, two bags, one bag, anything that

10  would make up the $100 that I was spending.  Sometimes an

11  additional bag would be added, say 11 bags for a hundred, and

12  that was doors, but everyone that threw in a bag would break

13  down the $100.

14          MR. ZUCKER:  Objection as to how -- objection, basis of

15  this.

16          THE COURT:  Objection what?

17          MR. ZUCKER:  Now it's basis.  He's about to tell us what

18  other people did.

19          THE COURT:  Well come on up.

20          (Following sidebar discussion had on the record:)

21          THE COURT:  I think in the middle Mr. Martin's objection,

22  Mr. Tabackman had begun to raise a relevance objection.  I assume

23  I was about to hear that as well, because the identity of the

24  dealers has not been established, and it would not be relevant if

25  whoever he's talking about was either not a party of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3337

1  conspiracy or co-conspirator in some way.

2          So, assuming I'm about to hear this relevance objection,

3  you probably need to establish at some point in your questions

4  who it is he's talking about.

5          MR. LEON:  Okay.

6          MR. TABACKMAN:  And since the Court has already gotten

7  into that, if I can step ahead of Mr. Zucker to finish the

8  thought on that, because the Court did read my mind on that.

9          THE COURT:  No, I thought I heard you.

10          MR. TABACKMAN:  I did say relevance.

11          THE COURT:  Go ahead.

12          MR. TABACKMAN:  Additionally, it's particularly

13  problematic with respect to Mr. Ball, who was not been mentioned

14  in direct examination as one of "they" who was out there, and so,

15  you know, talking about "they," the jury is going to actually

16  think it's these guys at the table.

17          THE COURT:  I understand that.  That's a part of the

18  problem, and I'm telling the government that that's a problem

19  that's got to be addressed for this to continue.  You can do

20  it -- I'm sorry, go ahead.

21          MR. LEON:  No, I'm sorry.  At some point -- I can do it

22  now, just ask him who he remembers participating in doors, or

23  just ask an open-ended question.

24          THE COURT:  Which is -- I'm sorry, I didn't hear you.

25          MR. LEON:  Who he recalls -- maybe break it down by time

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3338

1  period, but I'll just ask him an open-ended question, who does he

2  recall?

3          MS. WICKS:  Your Honor, on behalf of Mr. Wilson, I didn't

4  ask any questions, so if he's eliciting that Mr. Wilson is out

5  there, it's clearly beyond the scope of my zero questions.

6          MR. ZUCKER:  And it's also beyond the scope of -- and

7  certainly Mr. Thurston never asked any -- I, on behalf of

8  Mr. Thurston, never asked anything that would have opened the

9  door about this.  You know, you made a sale one time of a $100.

10  He never mentioned the doors in connection with that.  He never

11  claimed anyone else participated.  And frankly, we're also

12  hamstrung because we can't come back on this now.  The government

13  is eliciting it for the first time in redirect.

14          MR. TABACKMAN:  And to finish the thought before Mr. Leon

15  responds -- because I was going to make the same objection also

16  with respect to how the money is divided up.  There's a lack of

17  foundation.  He doesn't know how they divided up the money unless

18  he saw it.  If he can testify that he saw people doing it,

19  then -- you know, pursuant to this "doors" process.  But if he

20  testified whoever threw in a pack or two got to split up the

21  hundred dollars, we don't have a foundation for that.

22          THE COURT:  Well, I think we've gotten ahead of what he's

23  going to testify to, so I'm not going rule.

24          MR. LEON:  I understand counsel's point.  I'll do my best

25  to clarify what he knows personally and what he knows -- and I'm

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3339

1  sure counsel will object where appropriate.

2          To respond to Mr. Zucker's point, it was very clear,

3  Mr. -- I thought -- I don't take a lot of notes, but I wrote that

4  down very clearly.  On Mr. Balarezo's direct exam, he asked

5  questions about how -- the manner in which the drug sales were

6  made.  This witness did say there were two different ways.  He

7  actually did say "I bought as a group."  Mr. Balarezo clearly

8  moved right on to another area, but that was raised on direct, no

9  doubt.

10          THE COURT:  The basis of foundation is proper for that

11  area of inquiry, and there's no basis for restricting the

12  witness's answer about whom he's talking about concerning these

13  sales, so those objections to that extent are overruled.

14          MR. ZUCKER:  And I'm not going to stand here and argue.  I

15  move to sever based on -- if Mr. Balarezo opened the door and

16  that's the basis for going into it, because Mr. Thurston

17  certainly stayed away from that.

18          MS. WICKS:  We join in that request.

19          MR. TABACKMAN:  I would join in that also, Your Honor.

20          THE COURT:  Motion denied.

21          (Sidebar discussion concluded.)

22  BY MR. LEON:

23  **Q.**   Okay, Mr. Campbell, let me just try to ask you some

24  specific questions with respect to doors.  First of all, did you

25  hear the word "doors" with your own ears?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3340**

1  A.  Yes.

2  Q.  Okay.  As you sit here -- well, let's break it down with

3  time periods, okay?  Let's start with the earlier time period

4  first, when you're at Congress Street, okay, 1397 Congress

5  Street.

6      In that period of time, would you mainly buy your drugs

7  with individuals or through the doors system.  I'll use the word

8  system, but through doors?

9  A.  No, I bought it from individuals.

10  Q.  Okay.  So less times you would use it with doors; is that

11  correct?

12  A.  Correct.

13  Q.  As you sit here, do you remember all the people who used

14  the doors, whether you bought it through doors in that first

15  time period?

16  A.  Most of them.

17  Q.  Most.  Who were the people that you remember, as you sit

18  here today?

19  A.  Most of them were the younger group.

20  Q.  Okay.  Back then, who was part of the younger group?

21  A.  Keith Barnett, Munya -- it was a lot.  There was a lot of

22  them.  I'm trying to think of all their names, but -- Drano.

23  It's quite a few -- but I can't remember all their names.

24  Q.  Okay.  Let me break it down with the second period now,

25  the time when you were at Savannah Street.  Was it Savannah?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3341**

1  A.  Yes.

2  Q.  Same question.  With your own ears, did you hear the term

3  "doors" being used?

4  A.  Yes.

5  Q.  And did you buy the drugs individually -- were you more

6  likely to buy them individually or were you more likely to buy

7  them in the doors manner in this later period?

8  A.  Sometimes doors, doors and individually.

9  Q.  Okay.

10  A.  Most of the time I did a doors to pacify everybody that

11  was on the front.

12  Q.  What do you mean by that?

13  A.  I pacify them by letting them breakdown whatever they

14  wanted to breakdown from the $100, because I was spending much

15  more when I went out maybe the other door or after I had made

16  the buy from them.

17  Q.  So, these times when you would pacify them, how much

18  would you actually go out and spend in this way, in the doors

19  way?

20  A.  A $100.

21  Q.  Okay.  And in the second period when you were over --

22  living at Savannah -- actually, I've been mixing up the

23  addresses, haven't I?  I think I have.  Well, let me forget what

24  I'm doing.

25      This later period of time, okay, who are you -- do you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3342**

1  remember all the people that you dealt with in the doors way, in

2  that period of time?

3  A.  Yeah, I believe -- I remember a lot of them.

4  Q.  Okay.  Who were some of the people, as you sit here --

5  who were all the people, as you sit here, that you remember in

6  that period of time?

7  A.  Marquee, Drano, Munya, Keith Barnett, Taneil, LT -- I

8  can't think of the rest of their names.

9  Q.  Were there others, even if you don't remember the names,

10  were there others?

11  A.  Yes.

12      MR. TABACKMAN:  Your Honor, I'm going to object to the

13  relevance of "others."  It has no relevance to what's going on

14  here.

15      THE COURT:  Overruled.

16  BY MR. LEON:

17  Q.  Just so the record is clear, I think I did get it right.

18  You were at the Congress Street address first and then you moved

19  to Savannah, correct?

20  A.  Correct.

21  Q.  Okay.  I just wanted to make sure the record was clear.

22      And when you would see and hear doors with your own eyes

23  and ears, how many people were involved, that you saw?

24  A.  Sometimes 10, sometimes 15 people.

25  Q.  And do you know with your own eyes and ears if all of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3343**

1  them were actually getting a piece of the profit or did you just

2  see ten or 15 people together?

3  A.  I let them work that out amongst themselves.

4      MR. LEON:  If I could just have a moment, Your Honor.

5      (Brief pause in proceedings.)

6  BY MR. LEON:

7  Q.  And finally, you were asked some questions by Mr. Martin,

8  I believe, regarding the proffer, and Mr. Zucker, I believe, the

9  proffer; that is, the statement of facts that's attached to your

10  plea agreement.  Do you remember those questions?

11  A.  Correct.

12  Q.  Do you know if all the information that you had at the

13  time that you entered into the agreement was contained in the

14  proffer?

15  A.  Would you say it again?

16  Q.  Sure.  Do you know if the proffer of facts contained

17  everything that you knew about drug dealing in Congress Park?

18  A.  No.

19  Q.  Okay.  And no, you don't know, or no it didn't?

20  A.  No, it didn't.

21  Q.  Do you know why that is?

22      MR. ZUCKER:  Objection.

23      MR. TABACKMAN:  Your Honor, may we approach?

24      (Following sidebar discussion had on the record:)

25      THE COURT:  Was it your objection?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                :

　　　　Plaintiff,     : Docket No. CR 05-100

　　v.                :

ANTWUAN BALL, DAVID WILSON,     : Washington, DC
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and     : March 22, 2007
DOMINIC SAMUELS,                 : 9:20 a.m.
　　　　　　　　　　　　　　　　 :
　　　　Defendants.    :
　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　 :

VOLUME 22 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　 Glenn S. Leon, Assistant United
　　　　　　　　　　　　 States Attorney
　　　　　　　　　　　　 Ann H. Petalas, Assistant United
　　　　　　　　　　　　 States Attorney
　　　　　　　　　　　　 Gilberto Guerrero, Assistant
　　　　　　　　　　　　 United States Attorney
　　　　　　　　　　　　 555 4th Street
　　　　　　　　　　　　 Washington, DC  20001
　　　　　　　　　　　　 202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
　　　　　　　　　　　　 South Building
　　　　　　　　　　　　 601 Pennsylvania Avenue, N.W.
　　　　　　　　　　　　 Washington, DC  20004
　　　　　　　　　　　　 202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3743

APPEARANCES (Cont.)

For Defendant           TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:           TEASDALE, PLLC
　　　　　　　　　　　　Steven Carl Tabackman, Esq.
　　　　　　　　　　　　1747 pennsylvania Avenue, NW
　　　　　　　　　　　　Suite 300
　　　　　　　　　　　　Washington, DC  20036
　　　　　　　　　　　　202.454.2811

For Defendant           LAW OFFICE OF JENIFER WICKS
David Wilson:           Jenifer Wicks, Esq.
　　　　　　　　　　　　503 D Street NW, Suite 250A
　　　　　　　　　　　　Washington, DC  20001
　　　　　　　　　　　　202.326.7100

　　　　　　　　　　　　GARY E PROCTOR, LLC
　　　　　　　　　　　　Gary E. Proctor, Esq.
　　　　　　　　　　　　6065 Harford Road
　　　　　　　　　　　　Baltimore, MD  21214
　　　　　　　　　　　　410.444.1500

For Defendant           LAW OFFICE OF JAMES W. BEANE
Gregory Bell:           James W. Beane, Jr., Esq.
　　　　　　　　　　　　2715 M Street, N.W.
　　　　　　　　　　　　Suite 200
　　　　　　　　　　　　Washington, DC  20007
　　　　　　　　　　　　202.333.5905

For Defendant           LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:       Jonathan Seth Zucker, Esq.
　　　　　　　　　　　　514 10th Street, NW
　　　　　　　　　　　　9th Floor
　　　　　　　　　　　　Washington, DC  20004
　　　　　　　　　　　　202.624.0784

For Defendant           LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:           Anthony Douglas Martin, Esq.
　　　　　　　　　　　　7841 Belle Point Drive
　　　　　　　　　　　　Greenbelt, MD  20770
　　　　　　　　　　　　301.220.3700

　　　　　　　　　　　　LAW OFFICE of ANTHONY ARNOLD
　　　　　　　　　　　　Anthony Darnell Arnold, Esq.
　　　　　　　　　　　　One Research Court
　　　　　　　　　　　　Suite 450
　　　　　　　　　　　　Rockville, MD  20852
　　　　　　　　　　　　301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3744

APPEARANCES (Cont.)

For Defendant           LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:        A. Eduardo Balarezo, Esq.
　　　　　　　　　　　　400 Fifth Street, NW
　　　　　　　　　　　　Suite 300
　　　　　　　　　　　　Washington, DC  20001
　　　　　　　　　　　　202.639.0999
　　　　　　　　　　　　and
　　　　　　　　　　　　William B. Purpura, Esq.
　　　　　　　　　　　　8 East Mulberry Street
　　　　　　　　　　　　Baltimore, MD  21202
　　　　　　　　　　　　410.576.9351

Court Reporter:         Scott L. Wallace, RDR, CRR
　　　　　　　　　　　　Official Court Reporter
　　　　　　　　　　　　Room 6814, U.S. Courthouse
　　　　　　　　　　　　Washington, DC 20001
　　　　　　　　　　　　202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

3745

1    **MORNING SESSION, MARCH 22, 2007**

2    (9:21 a.m.)

3         (Jury in at 9:21 a.m.)

4         THE COURT:  Good morning, ladies and gentlemen.

5         THE JURY PANEL:  Good morning.

6         THE COURT:  Welcome back.  We're ready to resume.

7         Counsel, announce your next witness.

8         MR. LEON:  The United States calls Edward Martin.

9    (EDWARD LEWIS MARTIN, JR., GOVERNMENT'S WITNESS, SWORN)

10        DIRECT EXAMINATION OF EDWARD MARTIN

11   BY MR. LEON:

12   Q.   Good morning, sir.  In a loud voice so we can all hear

13   you, and please make good use of the microphone in front of

14   you --

15   A.   Okay.

16   Q.   -- please state your full name for the record and spell

17   your full name for the benefit of our court reporter.

18   A.   Edward Lewis Martin, Junior.  E-D-W-A-R-D, Lewis,

19   L-E-W-I-S, Martin, M-A-R-T-I-N, junior.

20   Q.   Mr. Martin, may I ask how old you are?

21   A.   46.

22   Q.   And where were you born?

23   A.   Philadelphia, Pennsylvania.

24   Q.   And did you ever live in the greater Washington, D.C.

25   area?

Scott L. Wallace, RDR, CRR
Official Court Reporter

**3754**

1  Q.  Okay.  Well, let's break that down, going back to 1992.
2  In 1992, did the three jobs you mentioned, did you still have
3  those three jobs?
4  A.  Yes, I did.
5  Q.  You were still working for the Navy?
6  A.  Yes, I was.
7  Q.  And you had the rib business?
8  A.  Yes, I did.
9  Q.  And you were working with your wife and her company?
10  A.  Yes, I did.
11  Q.  If you took 30 days off to do what you just said you did,
12  how did you keep these jobs?
13  A.  Well, I was a functional addict.
14  Q.  Okay.  So you would actually still go to work and then --
15  A.  Oh, yeah.
16  Q.  Did you sleep?
17  A.  Sometimes.
18  Q.  And during these 30-day periods, other than going to
19  work, did you go home to Oxon Hill or did you --
20  A.  I went home to Oxon Hill.
21  Q.  Okay.  And then you made -- you've made references --
22  let's see if we can speed this along.
23       Made a reference to at least one other time when you
24  tried to stop your addiction and you said you got clean.  From
25  1992 through the present, how many times would you say you've

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3755**

1  tried to break your addiction by --
2  A.  Well, like I said --
3  Q.  My question is how many times during that period of time,
4  1992 to the present, the 15-year period, would you say you tried
5  to stop your addiction by entering a program?
6  A.  I went to treatment like four times.
7  Q.  And are you an addict today?
8  A.  Yes.
9  Q.  Are you using crack cocaine today?
10  A.  No.
11  Q.  Okay.  So you're not using, but you're in recovery?
12  A.  Yes.
13  Q.  Okay.  How long have you been in recovery?
14  A.  I've been in recovery since 1989.
15  Q.  Okay.  When's -- a better question might be when is the
16  last time you used crack cocaine?
17  A.  Three years ago.
18  Q.  And have you used since then?
19  A.  No, I'm clean.
20  Q.  Okay.  Now, in 1992, when you wanted to get crack cocaine
21  to use, where did you get it back in 1992?
22  A.  I would go to Congress Park.
23  Q.  Okay.  And you are -- are you familiar with Congress
24  Park?
25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3756**

1  Q.  Let's go back.  Beginning -- when did you first become
2  familiar with Congress Park?  What period of time would you say?
3  A.  Probably around about '90, '91, '92 time frame.
4  Q.  Okay.  And tell us the first -- tell us how you got to
5  know the Congress Park neighborhood.
6  A.  Well, my habit was that I actually like to go out and
7  trick with girls and I was riding around, trying to pick up one
8  and I met a young lady off of Southern Avenue and she ended up
9  taking me into Congress Park.
10  Q.  Did you know who that particular lady was that you picked
11  up?
12  A.  Yes.
13       No, I didn't know her.  No.
14  Q.  Okay.  And she took you to Congress Park, is what you
15  said?
16  A.  Yes.
17  Q.  As you sit here today, do you know that lady's name?
18  A.  No.
19  Q.  Okay.  So when she took you to Congress Park, tell us
20  what happened.
21  A.  We went back into an apartment building in the back of
22  Congress Park and that's when we smoked and, you know, had drugs
23  and did whatever we did.
24  Q.  And was this just for one night or was this one of those
25  periods where you would stay for long stretches, this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3757**

1  particular -- this first time that you went to Congress Park?
2  A.  Yeah, that was a long stretch.  I stayed three or four
3  days.
4  Q.  Now, when you say you would stay for three or four days,
5  would you actually leave Congress Park for those three or four
6  days?
7  A.  No.
8  Q.  Where would you stay?  Or where did you stay on this
9  occasion?
10  A.  I stayed in an apartment in the back of Congress Park, in
11  her house.
12  Q.  And on this particular occasion, how much -- in those
13  three or four days, how much crack would you say you purchased?
14  A.  A lot.  You know, about $40 at a time sometimes.
15  Probably about 4- or $500 on every two hours, so I probably
16  spent about $3,000 that week, on average.
17  Q.  And this would be in increments; in other words, not all
18  at once?
19  A.  Yes, yes.
20  Q.  Would you consume this alone and was this -- alone or
21  were there other people there?
22  A.  With other people.
23  Q.  How many other people would you say would be there -- or
24  were there on this occasion?
25  A.  Shoot, at that time that house was in and out.  It was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3758**

1  probably five or six that I remember in the house.

2  **Q.**    And who is buying the crack for yourself and these five

3  or six people?

4  **A.**    They would always send somebody. I didn't know who it

5  was. Or somebody would come to the house.

6  **Q.**    Who had the money to buy the crack?

7  **A.**    A lot of times I had the money. Most of the time.

8  **Q.**    And what -- other than smoking and partying with

9  you, what did the other people do? Did they contribute towards

10  the purchase of the crack?

11  **A.**    No.

12  **Q.**    Now, did you come back to Congress Park after this

13  occasion?

14  **A.**    Yes.

15  **Q.**    With this particular lady or somebody else?

16  **A.**    I would come by myself.

17  **Q.**    Okay. After now knowing about Congress Park, when you

18  went by yourself, tell us what you did when you would go there

19  by yourself. What would you do?

20  **A.**    Well, I would go -- this is what happened. When I ended

21  up in that back apartment, I was there for a few days and then I

22  ended up -- I was afraid because there was a guy there that

23  acted like -- they were telling me he would rob me and

24  everything. And I told them I didn't want to be in their house

25  no more.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3759**

1        So the guy I met down there, who was actually in

2  Narcotics Anonymous with me, took me up --

3        MR. ZUCKER: I'm sorry. I couldn't understand the last

4  thing.

5        THE COURT: He was in what with you?

6        THE WITNESS: He was in Narcotics Anonymous with me. But

7  I knew a guy that was out there, so he took me up to another

8  house, which ended up to be Gail's house. And that's where I

9  would come back to all the time.

10  BY MR. LEON:

11  **Q.**    Okay. Do you know -- do you know Gail's name, other than

12  Gail? Do you know her last name?

13  **A.**    I only know her by Gail.

14  **Q.**    Okay. And when would you say this was when you met Gail?

15  Roughly when?

16  **A.**    I guess it was around that time, '92 -- yeah.

17  **Q.**    Okay. And once you met with Gail -- tell us that first

18  time you met with Gail, tell us what happened with her?

19  **A.**    Well, we commenced to smoking and tricking.

20  **Q.**    You and she would -- she would trick for you?

21  **A.**    Yes.

22  **Q.**    And how would you get crack to smoke with Gail?

23  **A.**    She would go get it. I would give her the money and she

24  would go out and get it.

25  **Q.**    And when you would hang out with Gail during this time

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3760**

1  period, how long of a time would you spend with her?

2  **A.**    Oh, man, I would stay over there for days, sometimes a

3  week. Mostly I stayed -- the longest I stayed was a week.

4  **Q.**    What's the shortest you would stay?

5  **A.**    An hour.

6  **Q.**    Okay. And for the longer period of time -- let's take a

7  time in between. You said an hour and you said a week. Were

8  there times were you spent maybe two or three days?

9  **A.**    Yes.

10  **Q.**    During a time when you spent two or three days, how much

11  crack would you buy through Gail?

12  **A.**    Thousands of dollars.

13  **Q.**    Would Gail contribute -- you had the money?

14  **A.**    Yeah, I had the money.

15  **Q.**    You mentioned a couple of jobs, but it does sound like

16  you're mentioning a lot of money. How'd you pay for all this?

17  **A.**    Well, I had jobs, money from the jobs. I had multiple

18  credit cards. I had -- you know, I had a lot of money in the

19  account. My business was making a lot of money.

20  **Q.**    Well, when you say multiple credit cards, is it fair to

21  say that when you buy crack --

22        MR. ZUCKER: Objection, form.

23        THE COURT: Sustained.

24  BY MR. LEON:

25  **Q.**    Okay. Did you purchase crack with credit cards?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3761**

1  **A.**    Well, sometimes I would buy them -- you know, buy things

2  where I have to pay. She would make the deal, say, "Okay.

3  Basically, you're going to have to pay them later."

4        And I'd tell her, "Well, I can buy them stuff from Sears"

5  and stuff like that, and they would go for it and I would have

6  to pay through credit cards.

7        And then at some point, I would actually go get the cash.

8  **Q.**    Off of your credit card or off of --

9  **A.**    Off of the credit card. Whatever means necessary.

10  **Q.**    Okay. We'll get to that in a minute, but let's stay in

11  your first few encounters with Gail.

12        As you sit here today, beginning with when you first met

13  her in the early or so '90s, how many times would you say you

14  have hung out and partied with Gail, roughly?

15  **A.**    Tons of times. Over 50. I mean, I probably can't even

16  count them. I don't even remember, it was so many times.

17  **Q.**    And during the times that you would hang out and party

18  with Gail, did you become familiar with some of the people who

19  she would purchase crack from?

20  **A.**    Yeah. When I had to make or pay my debts, yeah.

21  **Q.**    What do you mean by that?

22  **A.**    Well, sometimes she would make credit calls for me. She

23  would get the credit and when it was the time to pay it, that's

24  when I would meet the people that I would have to pay it to.

25  **Q.**    Were there any other neighborhoods, other than Congress

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3766**

1   **A.**   Right there, where the arrow is pointing at, basically.

2   **Q.**   Just for the record, you made a diagonal line at the

3   intersection a little to the left of the intersection of

4   Congress Street and 13th Place?

5   **A.**   That's right.

6   **Q.**   And sort of looks like an arrow pointing sort of

7   downward?

8   **A.**   Yeah.  The arrow, that's it.

9   **Q.**   So for the record, and tell me if this is accurate,

10   you're pointing and you're indicating the building that is in

11   the -- at the intersection of Congress Street and 13th Place, in

12   the lower left-hand portion of that intersection?

13   **A.**   Yes.

14   **Q.**   Okay.  And that's the building Gail live in?

15   **A.**   Yes.

16   **Q.**   Okay.  How many times would you say you've been in that

17   building?

18   **A.**   Hundreds.

19   **Q.**   Now, getting back to Gail, and you said you were not

20   completely comfortable with her, but you were getting high,

21   something like that?

22   **A.**   Yes, um-hmm.

23   **Q.**   My next question is this:  Over time, did you get to know

24   other people, other than Gail, who sold crack in Congress Park?

25   **A.**   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3767**

1   **Q.**   And over time, other than Gail, did you purchase, from

2   time to time, crack from other people in Congress Park?

3   **A.**   Yes, I did.

4   **Q.**   Who would you mostly buy your crack from, though,

5   however?

6   **A.**   You want to know by name?

7   **Q.**   Well, let me -- if you know by name, yeah.  Other than

8   Gail -- other than -- let me -- yes.

9        I don't know if the question is clear.  Did you

10   understand the question?  If you did, answer the question.

11   **A.**   Well, I bought from Gail and I had another guy that I

12   used to buy from.

13   **Q.**   Who was that guy?

14   **A.**   His name was Dazz.

15   **Q.**   Okay.  And let's start with Dazz.  Other than Gail, you

16   mentioned Dazz.  How many times would you say while in Congress

17   Park you purchased from Dazz?

18   **A.**   A lot.  It was, you know, uncountable probably.

19   **Q.**   And when you would buy from Dazz, how much would you buy

20   from him at a time?

21   **A.**   You know, it would be like 50s, $50 worth.  It wouldn't

22   be a whole lot.  He would come back in multiples.  Every time I

23   would want some more, they would come back and get it for me.

24        MR. PURPURA:  Objection to "they" unless we can identify

25   who we're talking about.  Move to strike.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3768**

1        MR. LEON:  I'm happy to follow up with "they."

2   BY MR. LEON:

3   **Q.**   Other than Dazz, you said "they."  Who else -- who do you

4   mean by "they"?

5   **A.**   Well, I don't know them specifically by name, but they --

6   you know, the guys that she would bring in, whoever they were.

7   Do you want me to -- I don't know their names.

8   **Q.**   Okay.  If you don't know their names, you don't know

9   their names.

10   **A.**   Right.

11   **Q.**   But let's stay with Dazz.  Did you become familiar with

12   any of the people that Dazz dealt with?

13        MR. ZUCKER:  Objection, basis.

14        THE COURT:  Was the question:  Did you know -- did you

15   become familiar with people he dealt with?  Is that what you

16   asked?

17        MR. LEON:  Yes.

18        THE COURT:  And the basis is?

19        MR. ZUCKER:  The basis is the basis.  Is it personal

20   knowledge?  Is it hearsay?  How is he to know what --

21        THE COURT:  I'll let him answer yes or no and then you can

22   follow up.  Go ahead.

23        THE WITNESS:  Yeah.  Some of the people I did get familiar

24   with, yes.

25   BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3769**

1   **Q.**   Okay.  When you would deal with Dazz directly, would you

2   also, with your own eyes, see people that he was with?

3   **A.**   Yes.

4   **Q.**   Okay.  Did you become familiar with any of his -- any

5   people that Dazz was related to?

6   **A.**   His brother.

7   **Q.**   He had a brother?

8   **A.**   Yes.

9   **Q.**   Do you remember his brother's name?

10   **A.**   No.

11   **Q.**   Would you recognize a picture of his brother if you saw a

12   picture of his brother?

13   **A.**   Yes.

14   **Q.**   And -- okay.  Do you remember looking through some

15   photographs a few weeks ago with an FBI agent?

16   **A.**   Yes.

17   **Q.**   And do you remember reviewing a photograph of Dazz?

18   **A.**   Yes.

19   **Q.**   And was that the Dazz that you're referring to right now?

20   **A.**   Yes.

21   **Q.**   And do you remember reviewing a photograph -- some

22   photographs, one of those photographs being a photograph of the

23   brother?

24   **A.**   Yes.

25   **Q.**   Dazz's brother?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3770**

1 A. Yes.
2 Q. And was that a photograph you recognized?
3 A. Yes.
4 Q. Did you ever buy drugs from Dazz's brother?
5 A. Yes.
6 Q. How --
7 A. Not a lot of times.
8 Q. Okay. What do you mean by that?
9 A. You know, probably a handful of times, ten, maybe. Not a
10 lot.
11 Q. Okay. So you mentioned Gail, you mentioned Dazz and you
12 mentioned Dazz's brother.
13 A. Yes.
14 Q. Other than those three people, is there anyone else that
15 you can tell us that you remember -- first yes or no -- that you
16 bought drugs from?
17 A. In the photos, there were some other people.
18 Q. Okay. We'll get to the photos in a minute.
19 A. Yes.
20 Q. But first just -- so is that a yes?
21 A. Yes.
22 Q. Okay. Do you remember the names as you sit here of
23 anybody else that you bought drugs from?
24 A. No, I didn't know their names.
25 Q. Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3771**

1 A. I can't remember their names anyway.
2 Q. How did you get to know these people? How did you meet
3 them?
4 A. Through Gail.
5 Q. Okay. Do you know, yes or no, if those people also knew
6 Dazz?
7 A. Yeah, they knew him.
8 Q. How do you know that?
9 A. Because they would all come in the house sometimes at the
10 same time.
11 Q. Do you know if -- and you said you looked at some photos
12 of those people whose names you don't know, but you recognize
13 the photographs?
14 A. Yes.
15 Q. And was that also that one time you met with the FBI
16 agent?
17 A. Yes.
18 Q. Do you know if those other people, other than Dazz's
19 brother and Gail, the other people -- if any of those people had
20 a relationship with each other?
21 A. They were all in the same circle, but I don't know what
22 kind of relationship they had.
23 Q. Do you know if any of them were related to each other?
24 A. Yes. Some of them were brothers.
25 Q. And in your mind, you said some of them are brothers.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3772**

1 How many were brothers?
2 A. Three.
3 Q. Three?
4 A. Three of them.
5 Q. Of these -- let's start just with the three brothers.
6 The three brothers that you're thinking of, did you buy drugs
7 from them?
8 A. Two of them.
9 Q. Two of them? Do you know -- let's see if we can
10 describe -- you can describe them.
11 A. I know one of them by name.
12 Q. What's that person's name?
13 A. His name is Jazz.
14 Q. Jazz?
15 A. Yeah.
16 Q. Okay. And you don't know his full -- you just know --
17 A. I don't know him. I just know him by the name that they
18 gave me.
19 Q. Now, with Jazz, how many times would you say you bought
20 from Jazz?
21 A. Lots of times. I mean, over 20 times or more.
22 Q. Okay. And when you would buy from Jazz, how much would
23 you buy from Jazz?
24 A. It would be small quantities, $40, $50 maybe.
25 Q. Now, you've identified Jazz and, if I understand

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3773**

1 correctly, he has two brothers, one of whom you've purchased
2 from?
3 A. Yes, his older brother.
4 Q. Okay. Do you know that person's name as you sit here
5 today?
6 A. I don't know his name. I can't remember his name.
7 Q. Okay. But he's older than Jazz?
8 A. Yes.
9 Q. And then you mentioned a third brother who you did not
10 purchase from, but you believe he's a brother?
11 A. Yes.
12 Q. Okay. So now we've identified Jazz and his two brothers?
13 A. Yes.
14 Q. You've identified Dazz and his brother and Gail?
15 A. Yes.
16 Q. Were there any other people who you, Ed Martin, purchased
17 from in Congress Park?
18 A. There are two other guys that I remember.
19 Q. Okay. Do you remember their names -- or do you know
20 their names?
21 A. Well, one of them was tall and dark-skinned and the other
22 one was tall and kind of light-skinned. One of them lived above
23 Gail's apartment.
24 Q. Okay. Well, let's talk about that person.
25 The building that you've identified as Gail's apartment

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3786

1   **A.**   Dazz's brother.  There wasn't that many.
2   **Q.**   Okay.
3   **A.**   The other guy, like I said, that I bought the -- I got
4   the motorcycle for, I don't remember his name.  He was one of
5   them.
6   **Q.**   Okay.
7   **A.**   And the tall, dark-skinned guy, he used my car before.
8   **Q.**   The tall dark-skinned guy -- which one?
9   **A.**   The one with the van.
10  **Q.**   Okay.  You mentioned a person earlier, a tall, slim man
11  who lived above Gail?
12  **A.**   Yeah, he used it, too.  That's right.
13  **Q.**   How many times would you say he -- you arranged the sale
14  of crack with that person?
15  **A.**   We did it off and on --
16  **Q.**   I'm sorry.  Go ahead.
17  **A.**   We did it off and on, about three or four times.
18  **Q.**   I think you understood my question.  What I meant was
19  arranged the sale of crack with the vehicle.  That was my
20  question.
21  **A.**   They would ask me sometimes, could they use my vehicle?
22  And I told them yeah.
23  **Q.**   Okay.  But just --
24  **A.**   And at other times, I arranged it with them.
25  **Q.**   Let me ask a more focused question.  I asked a bad

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3787

1   question.
2       The person above Gail who you said you bought from a few
3   times --
4   **A.**   Yeah.
5   **Q.**   -- did you ever have that arrangement to rent the truck
6   for the crack sales with that person?
7   **A.**   No, he only used my Jetta.
8   **Q.**   But with the Jetta, did you have that arrangement?
9   **A.**   Yes.
10  **Q.**   How many times would you say?
11  **A.**   About three times.
12  **Q.**   Were you ever -- well, withdrawn.
13      You said you started up in Congress Park with Gail, is it
14  fair to say around '92 or so?  Is that accurate?
15  **A.**   Yes.
16  **Q.**   Okay.  And I think you also said earlier that on and off,
17  you would try to stop your addiction and you would stop, right?
18  **A.**   That's right, um-hmm.
19  **Q.**   And I think you also said you left the greater D.C. area
20  in about 2001, did you say?
21  **A.**   2002 -- 2002.  The first part of 2002.
22  **Q.**   Okay.  So that's roughly a ten-year period; is that fair?
23  **A.**   That's right.
24  **Q.**   During that ten-year period while you were using the
25  drugs, now putting aside the times when you were trying to stop,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3788

1   but while you're using drugs during that ten-year period, was
2   there ever a period where you stopped going to Congress Park?
3   **A.**   In the second half of when I was addicted, I always went
4   to Congress Park.
5   **Q.**   Did you ever have any problems with Dazz where you had
6   something stolen or taken from you?
7   **A.**   He never stole anything from me that I can remember.
8   **Q.**   Okay.  Let me ask you the same question with respect to
9   Gail.  Was there ever a time when Gail took something?
10  **A.**   Oh, yes, yes.  I'm sorry.  Sure did.
11  **Q.**   Tell us what you remember.
12  **A.**   What happened was I came into Congress Park with any
13  service truck.  I just got off work.  I had a deposit and I went
14  and got high and I had some money in a compartment underneath
15  the -- it was a hidden compartment under the right seat.  And
16  when I came in to Gail's house, that's when -- you know, they
17  knew I was coming -- Dazz knew I was coming --
18      MR. ZUCKER:  Objection.
19  BY MR. LEON:
20  **Q.**   Let me jump in with a question.
21  **A.**   Okay.
22  **Q.**   Let me ask a question.  I think there's an objection, but
23  let's see if we can break it down.
24      You came to the apartment; is that correct?
25  **A.**   I came into the apartment.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

3789

1   **Q.**   Okay.  Did you tell Gail why you were coming to the
2   apartment?
3   **A.**   She knew why I was coming.  I didn't have to tell her.
4   **Q.**   Did you tell her before you came or did you just show up?
5   **A.**   No.  When I showed up, I told her, you know --
6   **Q.**   What did you tell her?
7   **A.**   You know, I want a girl and to get high.
8   **Q.**   And when you told that to Gail, was she alone or was
9   anyone else there?
10  **A.**   Dazz came in right behind me.
11  **Q.**   Okay.  Was Dazz there when you told Gail that you want to
12  get a girl and get high?
13  **A.**   Yes.
14  **Q.**   Okay.  Tell us what happened.
15  **A.**   He went and got me one.
16  **Q.**   Okay.  And then tell us what happened?
17  **A.**   Well, I wanted to be alone with the girl and I gave them
18  my keys to my truck.
19      MR. PURPURA:  I'm going to object.  Relevance and perhaps
20  we should have a proffer as to the relevance.
21      THE COURT:  Overruled.
22      MR. PURPURA:  Certainly.
23      THE WITNESS:  I wanted to be alone with the girl and I
24  told them, you know, here's the keys -- they want the keys to my
25  trunk.  They want to go to the store.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3798**

1  over to sit down and watch TV.
2  Q.    Do you know if -- did you ever tell anybody that you were
3  related to Dazz?
4  A.    No.
5  Q.    Are you related to Dazz?
6  A.    No.
7  Q.    Do you know -- during the time that you dealt with Dazz,
8  do you know what kind of vehicles he drove, that you remember
9  seeing him drive?
10  A.    He had one Cadillac car, black, with tinted windows.
11  Q.    Okay.  Any other cars you remember him driving?
12  A.    He had -- in the early part, he had a -- I think it was
13  like some type of SUV.
14  Q.    When you say the early part, that would be the '90s?
15  A.    Yeah, when I first started going over there, in the '80s,
16  '89, '90s.  Yeah, whenever that was.  '92, yeah.
17  Q.    Are you familiar with the expression "tick," a "tick" in
18  relation to crack buying?
19  A.    Yeah.
20  Q.    What does that mean to you?
21  A.    That means they give it to you on time.  You have to pay
22  them later.
23  Q.    And did you buy on ticks?
24  A.    Yeah.  That's what I did with the car or the merchandise
25  I had to buy.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3799**

1  Q.    Now, a final few questions.  You said that you had --
2  tried for a change of -- I think a change of scenery or change
3  of lifestyle in 2001, 2002; is that correct?
4  A.    That's right.
5  Q.    You mentioned that you have an ex-wife.  Did you get
6  divorced at some point?
7  A.    Yeah.  I lost my whole family.
8  Q.    Roughly, when was that?
9  A.    It's been over five years.  I mean -- yeah, it was
10  roughly 2000.  My last -- when I went to treatment, about 2002
11  sometime, like February, January, something like that.  That's
12  when I actually moved out.
13      I don't know -- I don't remember the exact divorce date
14  because I had to be separated from her for a year, so I think
15  that happened in like 2003.
16  Q.    And did the drug use and the purchases that you talked to
17  us about this morning have any effect on you financially?
18  A.    Yeah.  It drained me, yes.  Of course.
19  Q.    Did it have --
20  A.    I lost my government job.  I ended up selling my rib
21  business because I couldn't functionally run it.  And then with
22  the divorce, I actually lost the ability to be in partnership in
23  the Wellness Company.
24  Q.    Mr. Martin, you and I obviously are talking and we've met
25  today, obviously.  Do you remember us meeting yesterday?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3800**

1  A.    Yes.
2  Q.    Other than today and yesterday, how many times have you
3  and I met?
4  A.    Once.
5  Q.    And was that the time when you looked at the photographs
6  with the FBI agent?
7  A.    Yes.
8  Q.    Other than today, yesterday and that time a few weeks
9  ago, have you and I ever met before?
10  A.    No.
11  Q.    Have you ever met with any other FBI agents, other than
12  those three days we're talking about?
13  A.    No.
14  Q.    Anyone given you any promises for coming here today?
15  A.    No.
16      MR. LEON:  Thank you, Your Honor.  I have no other
17  questions.
18      THE COURT:  All right.  Mr. Zucker?
19      MR. ZUCKER:  Thank you, Judge.
20      MR. PURPURA:  Your Honor, can counsel approach the bench
21  prior to Mr. Zucker's testimony -- Mr. Zucker's cross?  Excuse
22  me.
23      THE COURT:  Yes.
24      (Following sidebar discussion had on the record:)
25      MR. PURPURA:  Your Honor, thank you.  I did object to the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**3801**

1  introduction of the theft of the $3,000 as well as the theft of
2  the motorcycles by, allegedly, Desmond Thurston and another
3  party.  I would assume it's admission is either predicated under
4  404(b).  If it is so, we didn't receive appropriate notice for
5  that and at the very least, we would be entitled to a limiting
6  instruction.  That's why I objected on relevance.  I don't know
7  what the relevance is in this conspiracy.  That's -- at the very
8  least, I'm asking the Court for a limiting instruction.  If it's
9  to be assessed, it's to be assessed against Desmond Thurston.
10      MR. LEON:  This issue came up after or during the
11  testimony of Gail Parson.  They made proffers at the time.  It
12  was discussed and subsequently, it was counsel for David Wilson
13  that filed a motion and the government responded to that motion.
14  So I incorporate by reference what we put on the record
15  previously.
16      We think it's clearly not 404(b) evidence.  We think it's
17  intrinsic to -- these are men, as charged in the four corners of
18  the indictment, who have been charged with attempting to enrich
19  themselves by, among other things, selling crack cocaine as well
20  as committing acts of robbery and burglary.  And clearly --
21  clearly, it's not 404(b), I would submit.
22      But putting that aside, I would submit it's intrinsic to
23  and in furtherance of this conspiracy.  To put it another way,
24  that this man enriched himself.
25      And in addition, one of the other things that comes out of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1        THE COURT:  Without objection, those exhibits will be

2 received subject to appropriate redactions.

3        (GOVERNMENT Exhibits 308.2, 308.2A were moved into

4 evidence.)

5 BY MR. LEON:

6 Q.  Mr. Dang, if you could just hold up and quickly tell us what

7 we're looking at in Government's Exhibit 308.2.

8 A.  Government's 308.2 is evidence analyzed by me in 2000.  This

9 is the submitting evidence bag; also the reserve material

10 appears inside.

11 Q.  Okay.  And quickly, we've just put on the screen before all

12 of us an enlarged portion of Government's 308.2A.  Could you

13 tell us what conclusions you reached with respect to the

14 contents of Government's 308.2?

15 A.  Certainly.  Net weight received, 1.5 grams; Exhibit 67, one

16 plastic bag contains cocaine base at 77 percent purity.

17        MR. LEON:  May I approach?

18        THE COURT:  Yes.

19 BY MR. LEON:

20 Q.  Mr. Dang, I'm going to take from you the exhibits you've

21 looked at and hand you two more.  For the record, I've handed

22 you what's marked for identification as Government's 309.2 and

23 309.2A.  And I'm going to ask you first to look at 309.2 and

24 tell us if you know what that is.

25 A.  Yes.  Government's Exhibit 309.2 contains evidence analyzed

1 Q.   Okay.  And I'm going to ask for you to look at Government's

2 Exhibit 608.1A and tell us if you know what that is.

3 A.   Yes.  Government's Exhibit 608.1A is the analysis summary

4 for Government's Exhibit 608.1.

5 Q.   And do the two exhibits correspond?

6 A.   They do.

7         MR. LEON:  Your Honor, at this time, subject to

8 appropriate redactions, government would move for admission of

9 Government's 608.1 and corresponding Government's 608.1A.

10         THE COURT:  Without objection, they'll be received

11 under those conditions.

12         (GOVERNMENT Exhibits 608.1, 608.1A were moved into

13 evidence.)

14 BY MR. LEON:

15 Q.   And Mr. Dang, I'm going to ask you to just quickly hold up

16 608.1 and tell us what we're looking at.

17 A.   Government's Exhibit 608.1 is evidence analyzed by me in

18 2004.  My handwriting and signature appears on the heat seal bag

19 and also on the reserve material.

20 Q.   And I'm going to ask you now to take a look at 608.1A and

21 tell us what conclusions you reached with respect to the

22 contents of 608.1.

23 A.   That's the analysis summary for Government's Exhibit 608.1.

24 Net weight, 0.16 grams; Exhibit 1, two Ziplocs contains cocaine

25 base at 60 percent purity.

# Tab 14

09:22AM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

            Plaintiff,             : Docket No. CR 05-100

      v.                           :

ANTWUAN BALL, DAVID WILSON,        : Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        : March 27, 2007
DOMINIC SAMUELS,                   : 9:22 a.m.

            Defendants.            :
                                   :

VOLUME 24 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
                           Glenn S. Leon, Assistant United
                           States Attorney
                           Ann H. Petalas, Assistant United
                           States Attorney,
                           Gilberto Guerrero, Assistant
                           United States Attorney
                           555 4th Street
                           Washington, DC  20001
                           202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                           South Building
                           601 Pennsylvania Avenue, N.W.
                           Washington, DC  20004
                           202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4282

APPEARANCES (Cont.)

For Defendant          TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:          TEASDALE, PLLC
                       Steven Carl Tabackman, Esq.
                       1747 pennsylvania Avenue, NW
                       Suite 300
                       Washington, DC  20036
                       202.454.2811

For Defendant          LAW OFFICE OF JENIFER WICKS
David Wilson:          Jenifer Wicks, Esq.
                       503 D Street NW, Suite 250A
                       Washington, DC  20001
                       202.326.7100

                       GARY E PROCTOR, LLC
                       Gary E. Proctor, Esq.
                       6065 Harford Road
                       Baltimore, MD  21214
                       410.444.1500

For Defendant          LAW OFFICE OF JAMES W. BEANE
Gregory Bell:          James W. Beane, Jr., Esq.
                       2715 M Street, N.W.
                       Suite 200
                       Washington, DC  20007
                       202.333.5905

For Defendant          LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:      Jonathan Seth Zucker, Esq.
                       514 10th Street, NW
                       9th Floor
                       Washington, DC  20004
                       202.624.0784

For Defendant          LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:          Anthony Douglas Martin, Esq.
                       7841 Belle Point Drive
                       Greenbelt, MD  20770
                       301.220.3700

                       LAW OFFICE of ANTHONY ARNOLD
                       Anthony Darnell Arnold, Esq.
                       One Research Court
                       Suite 450
                       Rockville, MD  20852
                       301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4283

APPEARANCES (Cont.)

For Defendant          LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:       A. Eduardo Balarezo, Esq.
                       400 Fifth Street, NW
                       Suite 300
                       Washington, DC  20001
                       202.639.0999
                       and
                       William B. Purpura, Esq.
                       8 East Mulberry Street
                       Baltimore, MD  21202
                       410.576.9351

Court Reporter:        Scott L. Wallace, RDR, CRR
                       Official Court Reporter
                       Room 6814, U.S. Courthouse
                       Washington, DC 20001
                       202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4284

1    **MORNING SESSION, MARCH 27, 2007**

2    (9:22 a.m.)

3        THE COURT:  Counsel, are you ready for the jury?

4        MR. GUERRERO:  Yes, Your Honor.

5        THE COURT:  Let's bring them in.

6    (Jury in at 9:23 a.m.)

7        THE COURT:  Good morning, ladies and gentlemen.

8        THE JURY PANEL:  Good morning.

9        THE COURT:  Welcome back.  We're ready to resume.

10   Ms. Wicks.

11   CONTINUED CROSS-EXAMINATION OF ANTHONY COMMODORE

12   BY MS. WICKS:

13   Q.    Good morning, detective.

14   A.    Good morning, counselor.

15   Q.    Now, how long have you been in the Homicide Branch?  The

16   Violent Crimes Branch?

17   A.    Since January of this year, 2007.

18   Q.    And in the Violent Crimes Branch, are you assigned to a

19   certain district?

20   A.    Yes.

21   Q.    What district are you assigned to?

22   A.    I'm assigned to both the Sixth and the Seventh District.

23   Q.    And you're aware of the homicide charges pending against

24   my client in this case?

25   A.    No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4425

1  Department?

2  **A.**  For seven years and three months.

3  **Q.**  And what are your current duties with the Metropolitan

4  Police Department?

5  **A.**  Okay.  At this time, ma'am, I'm assigned to the Focus

6  Mission Unit with the search warrant squad.

7  **Q.**  And how long have you done that?

8  **A.**  Since October of 2006.

9  **Q.**  And prior to that, what were your duties at the

10  Metropolitan Police Department?

11  **A.**  Prior to that, ma'am, I was assigned, again, to the Focus

12  Mission Unit, back in July of 2002, as an undercover officer,

13  again, for the Focus Mission Unit.

14  **Q.**  Okay.  And what is the Focus Mission Unit?

15  **A.**  It's just another name for vice which, again, we conduct

16  several operations.  A lot of those operations can be buy-bust

17  operations, can be prostitution operations, and also we can

18  conduct search warrants.

19  **Q.**  And in connection with your duties, have you been

20  involved in what you referred to as buy-bust operations?

21  **A.**  Yes, I have.  Several.

22  **Q.**  When you say "several," approximately how many?

23  **A.**  I would say hundreds.

24  **Q.**  And directing your attention to November 18th, 2003, were

25  you working on that evening?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4426

1  **A.**  Yes, I was.

2  **Q.**  And what were your duties on that evening?

3  **A.**  On that evening, ma'am, again, I was working as an

4  undercover in an undercover capacity, and my role was to go and

5  buy illegal narcotics.

6  **Q.**  And was this part of a buy-bust operation?

7  **A.**  Yes, it was, ma'am.

8  **Q.**  And if you could just explain for the jury, briefly, what

9  is a buy-bust operation?

10  **A.**  Again, a buy-bust operation is when you utilize your

11  undercovers to go inside of a -- I would say high drug area, and

12  you take your UC's, again, to buy, like I said, narcotics.

13  **Q.**  And once the narcotics are bought, what do you do?

14  **A.**  What we do, we can buy anything from marijuana to PCP.

15  **Q.**  Okay.  And that evening, you said you were an undercover?

16  **A.**  Yes, I was.

17  **Q.**  So what were you wearing?

18  **A.**  Just regular, plain clothes.

19  **Q.**  Okay.  And how -- were you driving or walking?

20  **A.**  I was in an undercover vehicle, unmarked police vehicle.

21  **Q.**  And who, if anybody, were you with?

22  **A.**  I was with my partner, which is Officer Al Myers.

23  **Q.**  And was he dressed in plain clothes as well?

24  **A.**  Yes, ma'am, he was.

25  **Q.**  And on that evening, did you go into the 1300 block of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4427

1  Congress Street, Southeast?

2  **A.**  Yes, I did.

3  **Q.**  And prior to going out on to the street, what, if

4  anything, do you do as part of this buy-bust operation?

5  **A.**  Before we go out -- normally what we will do, we would

6  have a list of any listed locations.

7  MR. ZUCKER:  Objection, Judge, and I ask that it be

8  limited to this case.

9  MS. PETALAS:  I can move on.

10  THE COURT:  Put your question for that purpose.

11  BY MS. PETALAS:

12  **Q.**  On that evening, November 18, 2003, did you have any

13  money with you when you went out to the 1300 block of Congress

14  Street?

15  **A.**  Yes, ma'am, I did.

16  **Q.**  And what, if anything, had been done with that money

17  prior to going out to that area?

18  **A.**  The money was Xeroxed and we used that to, again, buy

19  illegal narcotics, it's called MPD prerecorded funds.

20  MS. PETALAS:  Court's indulgence.

21  (Brief pause)

22  THE COURT:  Now that you've conferred, we actually have

23  reached our break point.  Do you need to put one or two more

24  questions?

25  MS. PETALAS:  I do not.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4428

1  THE COURT:  Ladies and gentlemen, we'll break for lunch

2  now.  Please remember, don't talk about the case.  Leave your

3  notes in the jury room.  I would ask that you come back at 1:55.

4  Enjoy your lunch break.

5  (Jury out at 12:41 p.m.)

6  (Discussion had off the record.)

7  THE COURT:  All right.  You may take a lunch break.  I

8  would ask that you be back in your seat at 1:55, ready to resume

9  your testimony.

10  THE WITNESS:  Yes, sir.  Thank you, sir.

11  THE COURT:  Counsel, why don't you all come up.  Actually,

12  that's okay.  I was about to mention to you, and I just had

13  confirmation, that Juror 14 mentioned to the deputy courtroom

14  clerk a little while ago and has now just handed a note to the

15  deputy courtroom clerk saying that she has just recently moved to

16  Forestville, Maryland.

17  We put in a call to the Jury Office, and I want to make

18  sure I have my research right.  I think that disqualifies the

19  juror from being able to continue to serve.  Let me confirm that.

20  I do have at least confirmation from Juror 14 that she has moved,

21  in a note that she's given us, but let me confirm with the Jury

22  Office and otherwise, that that does mean she would be

23  disqualified from continuing to serve.  And then if that's

24  correct, I'll just ask the juror to confirm on the record that

25  her moving did happen.  And then we'll have to proceed from

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | March 27, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:55 p.m. |

. . . . . . . . . . . . . . . . . : . . . . . . . . . . . . .

VOLUME 25 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234


                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006

                          (202) 454-2811

1 A.  Yes, ma'am.

2 Q.  And what do you do once you -- what did you do on that date

3 once you made the purchase?

4 A.  Normally what we do, my partner and I, or depending on how

5 many UCs are involved, we normally just divide the money up.

6 Q.  Okay.  And on that date, did you mark which -- well,

7 withdraw the question.

8        At that point did you go to -- what did you do when you

9 went that night, on November 18th, 2003?  Where did you go?

10 A.  On that particular night, ma'am, I went to the 1300 block of

11 Congress Street, Southeast.

12 Q.  And again, were you in a car or on foot?

13 A.  I was in the car, in an unmarked police vehicle.

14 Q.  And who was with you?

15 A.  I couldn't hear you, ma'am.

16 Q.  Who was with you?

17 A.  Officer Al Myers.

18 Q.  And what happened when you got to the 1300 block of Congress

19 Street?

20 A.  When I got to the 1300 block of Congress Street, I took $20

21 of the MPD prerecorded funds.  And just before I make a buy, I

22 always mark my U.S. currency as to which particular funds I'm

23 about to make my transaction with.

24 Q.  And did you mark it on 608.3?

25 A.  Yes, I did, ma'am.

Page 4441

1 Q.  And what were the denominations of the money that you used?

2 A.  I used two fives and one 10, $10 bill.

3        MS. PETALAS:  Asking to pull up Government's Exhibit

4 already in evidence 101.1.

5 BY MS. PETALAS:

6 Q.  And Officer Myers (sic), if you can look on your screen up

7 there, showing you what's in evidence as Government's

8 Exhibit 101.1.  Do you see that?

9 A.  Yes, I do, ma'am.

10 Q.  And do you recognize that?

11 A.  Yes, I do.

12 Q.  And what is that?

13 A.  That's the -- a map of the Congress Street and the

14 13th Place area.

15 Q.  And does that depict where you went back on November 18th,

16 2003?

17 A.  Yes, ma'am.

18 Q.  And if you could just -- there's a pen up there.  Just use

19 the non-ink side of the pen and just touch the screen to where

20 you went on that location -- on that occasion.

21 A.  Yes, ma'am.  (Witness complies.)  In this area here.

22 Q.  Okay.  And for the record, you put two red arrows on a

23 parking lot right beside a backwards L-looking building.  Is

24 that correct?

25 A.  Yes, ma'am.

1 Q.  And once you got to that parking lot, what happened?

2 A.  Once we got to the parking lot, I rolled down my window.

3 And at that time I was approached by a black unidentified

4 female.  And at that time, I asked her, "Have you got two

5 dimes?"  She said, "Pull over."

6           And at that time, my partner and I, we pulled over.

7 And she walked away from the vehicle and she approached a black,

8 unidentified black male.  And at that time they engaged in a

9 brief conversation.

10 Q.  Could you hear what they were saying?

11 A.  No, I could not.

12 Q.  What if anything happened after they engaged in a brief

13 conversation?

14 A.  What I observed was, again, the black male handing the black

15 female a small object in her hand, at which point she comes back

16 to the vehicle, hands me two small clear Ziplocs containing a

17 white rock substance.

18           And at that point is when I gave her $20 of MPD

19 prerecorded funds.

20 Q.  So you gave her $20.  Is that the 10 and the two fives you

21 were talking about earlier?

22 A.  Yes.

23           MR. ZUCKER:  Objection.  Leading.

24           THE COURT:  Sustained.

25 BY MS. PETALAS:

1 Q.  What was the denominations of that $20 you handed her?

2 A.  Again, it was one $10 bill and two five-dollars.

3 Q.  And you said she walked over to another male, and they

4 engaged in a brief conversation.  Is that correct?

5 A.  That is correct.

6 Q.  And where -- how far away was the male when they had this

7 conversation?

8 A.  I would say they were both about 15 feet from us.

9 Q.  And what were the lighting conditions like?

10 A.  It was nighttime out.  There was street lights, and also

11 lights from off of the buildings, on top of the buildings.

12 Q.  And was there anything obstructing your view of this

13 conversation with the female and the male?

14 A.  No.

15 Q.  You also talked about him handing her an object.  Was there

16 anything obstructing your view of that?

17 A.  No, ma'am.

18 Q.  Could you tell what that object was?

19 A.  Not at that time, no.

20 Q.  And after he handed the female the object, how long did it

21 take for that female then to come back to you?

22 A.  I would say maybe 10 seconds or so.

23 Q.  And at that time did you -- was there anything obstructing

24 your view of the female?

25 A.  No, ma'am.

1 Q.  And when she handed you the two zips --

2         MR. ZUCKER:  Objection, leading.

3         MS. PETALAS:  I believe she testified to it earlier,

4 but I can rephrase the question.

5 BY MS. PETALAS:

6 Q.  What did that female do when she came back to you?

7 A.  Again, the black female handed me the two clear Ziploc bags

8 containing white rock substance.

9 Q.  And from the time that she left that unidentified male and

10 came back to you, did she reach into her pockets for anything?

11 A.  No, she did not.

12 Q.  Did you see her hands from the time she had the

13 conversation -- she received the object from the male to the

14 time that she came back to you?

15 A.  Yes, I did.

16 Q.  And at any time did she reach into pockets or any other

17 areas at all?

18 A.  No, ma'am.

19 Q.  And the male that she talked to, do you recall what he was

20 wearing?

21 A.  I do remember one thing that I can never forget, was a tan

22 coat.

23 Q.  Tan coat.  Why does that stick out in your mind?

24 A.  Because usually, a lot of times when we're conducting buy

25 /bust operations, a lot of the lookouts may be a black coat or

Page 4445

1 something of a dark color.  But again, it was just that tan coat

2 again that stuck out from everyone else in the parking lot.

3 Q.  And the male with the tan coat, did he ever come towards

4 your vehicle at all?

5 A.  No, ma'am, he did not.

6 Q.  I'm going to take a step back.  After you talked to the

7 female and she went over to talk to that man in the tan coat,

8 did you remain in your car or what did you do?

9 A.  No, I remained in the area, remained in my car, until we --

10 well, my partner gave the lookout and then the arrest team moved

11 in.

12 Q.  And you said your partner gave a lookout.  Were you able to

13 hear that lookout?

14 A.  Yes, ma'am.

15 Q.  Did that lookout match what you had seen?

16 A.  Yes.  Yes.

17 Q.  And after the woman handed you the objects, you said -- you

18 were in a car.  Where were you at that point?

19 A.  At that point?  May I use my pen?

20 Q.  Yes.  And if you want, you can tap the bottom right screen

21 to clear the screen.

22 A.  At that point we was about to move out when the arrest teams

23 were coming in.  So again, we just stepped aside to let the

24 arrest teams move in.  And we were sort of like in the beginning

25 of the parking lot area.  (Indicating.)

1 Q.  Okay.  For the record, you've made a red squiggly line and

2 an arrow, kind of at the entrance to that parking lot right off

3 of Congress Street.  Is that correct?

4 A.  That is correct, ma'am.

5 Q.  And where were you while you were watching the female

6 approach the man in the tan coat?

7 A.  Again, I remained in my vehicle for safety reasons, and I

8 wanted to make sure that the arrest teams had stopped the

9 correct people.

10 Q.  Okay.  I'm going to go back.  I'm actually stepping back a

11 little bit.  Before the sale, after you spoke to the female and

12 while you were waiting for her to return to your car, where was

13 your car at that point?

14 A.  At that point, again, we was just parked right there in

15 front of 1307 Congress Street, Southeast.

16 Q.  And where was the male?

17 A.  From what I can recall, he was again in the parking lot area

18 between 1305 or 1307 area.

19 Q.  Was he standing near any vehicle?

20 A.  Yes, he was.

21 Q.  And what was he standing near?

22 A.  It was a light colored van.

23 Q.  And you said, then after she hands you those two Ziplocs of

24 white rock-like substance, you talked about the arrest teams

25 moving in.  Where were you when the arrest teams moved in?

Page 4447

1 A.  Again, ma'am, what I just put down on the map of the area

2 right there, by the entrance of the parking lot area.

3 Q.  Okay.  So were you still in the parking lot area when the

4 arrest teams moved in?

5 A.  Yes, ma'am.

6 Q.  Did you see the arrest teams actually move in?

7 A.  Yes, I did.

8 Q.  Did you see them stop two individuals?

9 A.  Yes, I did.

10 Q.  And who were the two individuals that they stopped?

11 A.  Again, it was the two individuals that sold me illegal

12 narcotics on that day.

13 Q.  Okay.  And did they arrest the man you referred to in the

14 tan coat?

15 A.  That is correct.

16 Q.  And did you observe them do that?

17 A.  Yes, I did.

18 Q.  And did you I.D. that individual back on that date?

19 A.  Yes.

20 Q.  Did you observe them stopping the woman that handed you the

21 two Ziplocs?

22 A.  Yes, ma'am.

23 Q.  And did you positively I.D. them back on that date?

24 A.  Yes, I did.

25 Q.  And again, was there anybody in the area in that parking lot

Page 4448

1 or in the area that you saw that -- anybody else wearing a tan

2 coat?

3 A.  No, there was no one else out there that particular night

4 wearing a tan coat at all.

5 Q.  Anyone else matching the description of the female that

6 handed you the objects?

7 A.  No, ma'am.

8 Q.  What was the approximate time between the time that she

9 handed you those two Ziplocs and the time that you identified

10 the female and the male?

11 A.  Approximately about a minute or so.

12 Q.  And once you do that, do you do anything with those

13 prerecorded funds that you talked about, Government's

14 Exhibit 608.3?

15 A.  Yeah.  What I always do once I've completed my transaction,

16 I always mark the location where the transaction took place,

17 always put the time of the buy and the time the person was

18 identified.  And also make sure I put my initials on any U.S.

19 currency that I use.

20        MS. PETALAS:  Court's indulgence.

21        May I approach, Your Honor?

22        THE COURT:  Yes.

23 BY MS. PETALAS:

24 Q.  Officer Walls, I'm handing you what I believe is already in

25 evidence as Government's Exhibit 608.1, 608.1A.  Do you

Page 4449

1 recognize those items?

2 A.  Yes, I do.

3 Q.  And turning to Government's Exhibit 608.1, what is that?

4 A.  This is a property bag which is considered our heat seal

5 when we have any illegal narcotics.  This is where we place the

6 drugs in.

7 Q.  And how do you recognize that?

8 A.  From my handwriting.

9 Q.  And is that a heat seal from -- what does that bag contain?

10 A.  This bag contains the two clear Ziplocs with the white rock

11 substance, where this time it's loose.

12 Q.  And is that the white rock substance you received on

13 November 18th, 2003?

14 A.  Yes, ma'am.

15 Q.  And did you place that items into that -- is there an inner

16 seal in there?

17 A.  Yes, that's correct.

18 Q.  And did you place the items into that inner seal?

19 A.  Yes, I did.

20 Q.  And did you seal those items?

21 A.  Yes.

22 Q.  What did you do once you sealed those items?

23 A.  Once I seal the items, then that's when I drop them in the

24 property -- in the property -- for the property, to be picked up

25 for the next day.  The mailbox is what I was trying to say.  The

Page 4450

1 property mailbox.

2 Q.  Is that a secure mailbox?

3 A.  Yes, it is, ma'am.

4 Q.  And it's picked up -- and moving to Government's

5 Exhibit 608.1A, do you see that?

6 A.  Yes.

7 Q.  If you could turn to the second page of that.  Do you see

8 your handwriting on that?

9 A.  Yes, I do.

10 Q.  And what is 601.1A (sic)?

11 A.  This is the DEA report that we have to fill out, again when

12 we have obtained any drugs.

13 Q.  And did you fill that out?

14 A.  Yes, I did.

15 Q.  And how does that correspond with 608.1?

16 A.  Again, it's my handwriting.

17 Q.  Is there a lab number on 608.1?

18 A.  Yes, ma'am, there is a lab number.

19 Q.  Is there a lab number on 608.1A?

20 A.  Yes.

21 Q.  And do they match?

22 A.  Yes, they do.

23       MS. PETALAS:  I have no further questions at this time.

24       THE COURT:  All right.  Mr. Carney?

25       MR. CARNEY:  No questions, Your Honor.

Page 4467

1 form -- you were talking about it up there when you -- in the

2 exhibit, but what was the form when you got it on that night?

3 A.  It was in -- again, it was white rock substance.

4       MS. PETALAS:  No further questions at this time.

5       THE COURT:  Thank you.  You may be excused.

6       THE WITNESS:  Okay.  Thank you, Your Honor.

7       THE COURT:  You may announce your next witness, and you

8 may want to retrieve the exhibits.

9       MS. PETALAS:  Yes, thank you.  The United States calls

10 Officer Anthony Guice to the stand.

11            (Oath administered by Courtroom Deputy.)

12  (OFFICER ANTHONY GUICE, GOVERNMENT witness, having been duly

13              sworn, testified as follows:)

14                  DIRECT EXAMINATION

15 BY MS. PETALAS:

16 Q.  Good afternoon, Officer Guice.  Could you please state and

17 spell your name for the record?

18 A.  Officer Anthony Guice.  Last name is spelled G-U-I-C-E.

19 Q.  And where do you work?

20 A.  I'm employed with the Metropolitan Police Department,

21 assigned to the 7th District Focus Mission Unit.

22 Q.  And how long have you worked with Metropolitan Police

23 Department?

24 A.  A total of 10 years of police experience.

25 Q.  And how long have you been in the 7th District?

Page 4468

1 A.   The whole time.  Seven years, I'm sorry.

2 Q.   And finally, how long have you been assigned to the Focus

3 Mission Unit?

4 A.   Roughly four years now.

5 Q.   I'm sorry?

6 A.   Four years now.

7 Q.   And the Focus Mission Unit, is that focused on a particular

8 area of 7-D, or is that all of the 7th District?

9 A.   All of 7th District.

10 Q.   And directing your attention to November 18th, 2003, were

11 you working on that night?

12 A.   Yes, ma'am.

13 Q.   What were your duties that night?

14 A.   That night our unit, we were conducting a buy-bust

15 operation.  I was part of the arrest team.

16 Q.   And what are your duties as part of the arrest team?

17 A.   As part of the arrest team, as stated, we were conducting a

18 buy-bust operation.  When we move in on an individual, we're

19 generally the ones who are going to stop them, detain them until

20 they're identified, or to see if they might engage in any type

21 of illegal activities.

22 Q.   And in conjunction with your duties that night, did you come

23 in contact with a Marguita Giles?

24 A.   Yes.

25 Q.   And did you come in contact with a Desmond Thurston?

Page 4469

1 A.  Yes, ma'am.

2 Q.  And how did you come in contact with them?

3 A.  In reference to a lookout that was provided by an undercover

4 officer.

5 Q.  And where was it that you came in contact with them?

6 A.  I was in the parking lot in the 1300 block of

7 Congress Street, Southeast.

8 Q.  And you said as part of a lookout.  Tell us how that

9 happened.  Where were you when you received this lookout?

10 A.  We were in the area.

11 Q.  And when you're in the area, what happens then?  You receive

12 a lookout.  What is a lookout?

13 A.  The lookout provided was --

14      MR. ZUCKER:  Objection.

15 BY MS. PETALAS:

16 Q.  Well, just tell us generally what you mean by a lookout.

17 A.  It gave us clothing descriptions, whether male or female,

18 approximate height, things of that nature.

19 Q.  And were you provided a lookout for -- well, were you

20 provided a lookout on that evening of November 18th, 2003?

21 A.  Yes, ma'am.

22 Q.  And was that for how many individuals?

23 A.  Two.

24 Q.  And what did you do once you got this lookout?

25 A.  After receiving the lookout, myself along with other members

1 responded to the location, which was the parking lot.

2 Q.  And did you see any individuals there who matched the

3 lookout description?

4 A.  Yes.

5 Q.  And who did you see?

6 A.  When we were en route to the parking lot, we observed

7 defendant Thurston and Giles standing in the parking lot.

8 Q.  And how far apart were they from each other?

9 A.  About maybe five feet apart.

10 Q.  And were they standing next to any vehicles of any kind?

11 A.  Defendant Thurston was near a white Chevy van.

12 Q.  And those individuals, did they match the lookout

13 description?

14 A.  Yes.

15 Q.  And did you stop them?

16 A.  Yes, ma'am, they were stopped.

17 Q.  And what happened after they were stopped?

18 A.  After they were stopped, the undercover officers then

19 conducted a showup of the individuals, and positively identified

20 them as individuals who they engaged in a narcotics transition

21 (sic) with.

22          MR. ZUCKER:  Objection.

23          MS. PETALAS:  Your Honor, I can move on.  But I believe

24 he's identified -- he's just describing the process of

25 identification and how -- who they identified them to be.

Page 4471

1         THE COURT:  Well, if you've finished, then move on to

2 the next question.  Go ahead.

3 BY MS. PETALAS:

4 Q.  And were those two individuals then arrested after this

5 positive ID?

6 A.  Yes.  Yes, ma'am.

7         MS. PETALAS:  May I approach, Your Honor?

8         THE COURT:  Yes.

9 BY MS. PETALAS:

10 Q.  I'm showing you what's been marked as Government's

11 Exhibit 608.7 and 608.8.  Do you recognize those?

12 A.  Yes, ma'am.

13 Q.  Turning to 608.7, what is that?

14 A.  It would be a photo, live-scan photo of defendant Thurston

15 on the night he was arrested.

16 Q.  And was that the individual you referred to that you --

17         MR. ZUCKER:  Objection.  Leading.

18         THE COURT:  Sustained.

19 BY MS. PETALAS:

20 Q.  And who is defendant Thurston?

21 A.  I'm sorry?

22 Q.  You said that's --

23 A.  Yes, he was one of the defendants that a lookout was

24 provided to the arrest teams.

25 Q.  Is that a fair and accurate picture of how he appeared that

Page 4472

1 night?

2 A.  Yes, ma'am.

3         MS. PETALAS:  Your Honor, at this time I move

4 Government's Exhibit 608.7 into evidence.

5         MR. ZUCKER:  No objection, subject to agreed-upon

6 redaction.

7         THE COURT:  Is there an agreed-upon redaction?

8         MS. PETALAS:  Yes, Your Honor.

9         THE COURT:  All right.  608.7 will be received as

10 redacted.

11        (Government's Exhibit 608.7 was moved into evidence.)

12 BY MS. PETALAS:

13 Q.  And turning to Government's Exhibit 608.6, do you recognize

14 that?

15 A.  Yes, ma'am.  It's a live-scan photo of defendant Giles on

16 the night she was arrested.

17 Q.  And what night was that, that she was arrested?

18 A.  November 19th, 2003.

19 Q.  You said November 19th.  Does that say what time of the

20 morning it was?

21 A.  I'm sorry, it was 4:26 in the morning.

22 Q.  So was that photo taken in the early morning hours of

23 November 19th --

24         (Simultaneous conversation.)

25 A.  -- early morning hours of November 19th.  She was arrested

Page 4473

1 on the 18th.

2 Q.  I'm sorry.  We can't talk at the same time, for the court

3 reporter.

4          What were you saying?  I apologize.  If you could

5 repeat what you said.

6 A.  This was the early morning of the 19th.  She was arrested on

7 the 18th.

8 Q.  Is that a fair and accurate picture of how Ms. Giles

9 appeared on that night?

10 A.  Yes, ma'am.

11          MS. PETALAS:  Your Honor, at this time I move

12 Government's Exhibit 608.6 into evidence.

13          MR. ZUCKER:  Same representations, Your Honor.

14          THE COURT:  All right.  It will be received as

15 redacted.

16          (Government's Exhibit 608.6 was moved into evidence.)

17          MS. PETALAS:  Court's indulgence.  I would ask if we

18 can switch.  Permission to publish Government's Exhibit 608.7.

19          THE COURT:  All right.

20          MS. PETALAS:  Your Honor, actually at this point I

21 would move to publish government's exhibit that's already in

22 evidence, Government's Exhibit 216, which is actually

23 Government's Exhibit 608.7 redacted without the information in

24 it.

25          Your Honor, may I retrieve the exhibits?

Page 4485

1 A.  He was standing near the front of the van.

2 Q.  And where was Ms. Giles?

3 A.  Right probably five feet away from him.

4 Q.  And who was closer to the van?

5 A.  Mr. Thurston.

6           MS. PETALAS:  No further questions.

7           THE COURT:  All right.  Thank you.  You may be excused.

8           You may announce your next witness.

9           MS. PETALAS:  United States calls Officer Howard

10 Anderson to the stand.

11               (Oath administered by Courtroom Deputy.)

12  (OFFICER HOWARD ANDERSON, GOVERNMENT witness, having been duly

13               sworn, testified as follows:)

14                    DIRECT EXAMINATION

15 BY MS. PETALAS:

16 Q.  Good afternoon, Officer Anderson.  Could you please state

17 and spell your name for the record?

18 A.  Officer Howard Anderson, A-N-D-E-R-S-O-N.

19 Q.  Where do you work?

20 A.  D.C. Metropolitan Police Department, currently assigned to

21 7th District Focus Mission Unit.

22 Q.  And how long have you been assigned to the 7th District

23 Focus Mission Unit?

24 A.  Approximately three years.

25 Q.  How long have you been with the Metropolitan Police

1 Department?

2 A.  Just under nine years.

3 Q.  What was your assignment prior to the Focus Mission Unit?

4 A.  I was assigned to the Power Shift, but I was detailed to

5 what at that time was the Vice Office, which is the Focus

6 Mission now, Unit now, off and on.

7 Q.  And directing your attention to November 18th, 2003,

8 approximately 8:45 p.m., were you working at that time?

9 A.  Yes.

10 Q.  And what were your duties then?

11 A.  I was detailed to the Vice Office at the 7th District.  I

12 was part of the arrest team.

13 Q.  What are your duties as the arrest team?

14 A.  When we have operations in place, the arrest team is just

15 there in case something goes wrong or we need to stop somebody.

16 Q.  Okay.  And on that night, did you have occasion to encounter

17 an individual named Gregory Bell?

18 A.  Yes.

19 Q.  Tell us how that took place.

20 A.  We were conducting a buy-bust operation on Congress Place.

21 Undercover officers were sent into the area, they conducted a

22 narcotics buy.  Once they conducted the buy, they gave a lookout

23 and had the arrest teams move in.

24          Once those individuals for that buy were stopped, I was

25 standing nearby next to a van, just waiting for the showups and

1 the arrest to finish being -- taking place, and I realized there

2 was an individual ducked down in the van next to me.

3 Q.  And you said -- at that time had individuals been arrested?

4 A.  I'm not sure if the actual showup and arrest had taken

5 place, but they were stopped and in handcuffs.

6 Q.  And how many individuals had been stopped?

7 A.  Two at that time.

8 Q.  And what happened when you saw the individual ducked down in

9 the van?

10 A.  I turned around, and I told him to sit up.  And then I

11 noticed he had money in his right hand.  I asked him if he had

12 anything on him that I should know about, and he stated he had a

13 little weed and he gestured with his head, a nod toward his

14 right.

15          I then asked him to step out of the van.  And as he

16 went to open the door, he changed some of the money from his

17 right hand to his left hand.  And once he stepped out of the

18 vehicle, he only had money in his right hand.

19          Officer Guice then went around to the --

20 Q.  Let me stop you there.  When you asked him to get -- are you

21 still out -- going back to when you asked him, you saw him

22 ducking down and you told him to get up, was the door open or

23 closed?

24 A.  It was closed.

25 Q.  Was the window open or closed?

1 A.  I believe the window was part down, maybe not all the way.

2 Q.  And at some point do you get him out of the van?

3 A.  Yes.

4 Q.  And when is that?

5 A.  After he stated he had a little bit of weed on him.

6 Q.  And would you recognize that individual if you saw him

7 today?

8 A.  I believe so.

9 Q.  If you could just -- do you see that person in the courtroom

10 today?

11 A.  I need to compare a photo.  I'm not sure.

12 Q.  You said you need to compare a photo?

13 A.  Yes.

14 Q.  When you arrested him, as part of that arrest, do you take a

15 photo?

16 A.  Sometimes we take them on scene, but they are all

17 live-scanned later on and photographed at the station later on.

18          MS. PETALAS:  Court's indulgence.

19          May I approach, Your Honor?

20          THE COURT:  Yes.

21 BY MS. PETALAS:

22 Q.  I'm showing you what's been marked as Government's

23 Exhibit 608.6.  Do you recognize that?

24 A.  Yes.

25 Q.  And what is that?

1 A.  It's what we refer to as a live-scan photo.

2 Q.  And what is a live-scan photo?

3 A.  It's a photo taken back at the station, when people are

4 fingerprinted and photographed and...

5 Q.  And when was that photo taken?

6 A.  This one states photo date 11/19/2003.

7 Q.  And is that a true and accurate photo of the person you

8 arrested on November 18th, 2003?

9 A.  Yes.

10 Q.  How do you recognize that?

11 A.  He was the person that was in the van.

12        MS. PETALAS:  And at this time, Your Honor, I move

13 Government's Exhibit 608.6 into evidence.

14        THE COURT:  608.6 is already received as redacted.

15 BY MS. PETALAS:

16 Q.  I'm sorry.  Officer Anderson, if you could just tell me what

17 that exhibit list on that is.

18 A.  608.6.

19        MS. PETALAS:  Your Honor, may I approach just to change

20 that?

21        THE COURT:  Yes.

22 BY MS. PETALAS:

23 Q.  And Officer Anderson, I'm handing you what I've now changed

24 to Government's Exhibit 608.8.  For the record, is that the same

25 thing that I just handed you before?

1 A.  Yes.

2 Q.  The exhibit number has just been changed.  Is that correct?

3 A.  Yes.

4        THE COURT:  Well, where is 608.6?

5        MS. PETALAS:  I believe 608.6 may have been the photo

6 of Ms. Giles.

7        THE COURT:  I said, where is it?

8        MS. PETALAS:  I misspoke last time.  Court's

9 indulgence.  The photo of Ms. Giles actually is listed --

10       THE COURT:  I'm asking you:  Where is it?  I'm not

11 asking you to tell me what it is.

12       MS. PETALAS:  Your Honor, I thought that was 608.6.

13 There's some confusion with the exhibit list.  I don't know

14 where 608 --

15       THE COURT:  Had that been marked as 608.6 when you

16 handed it to him?

17       MS. PETALAS:  It had.

18       THE COURT:  Let me see it.  Counsel, come up.

19       (BENCH CONFERENCE ON THE RECORD.)

20       THE COURT:  You just had the last witness,

21 Officer Guice, identify a photograph as 608.6.  It's now in

22 evidence as 608.6.  I will not permit you to take what is now in

23 evidence as 608.6 and change it to some other exhibit number.

24 So what is it that Officer Guice identified and we received in

25 evidence as 608.6?

1          MS. PETALAS:  It was this photo.  I misspoke.  Because

2 I handed him two exhibits, and I said 608.8 and 608.6.  But it

3 was wrong.  I should have said 608. -- I handed him these two

4 photos, and it was my mistake.

5          THE COURT:  Who is him?  Guice?

6          MS. PETALAS:  Officer Guice.

7          THE COURT:  You handed him what?

8          MS. PETALAS:  These two photos, 608.8 and 608.7.  And

9 what probably happened is, I misspoke once I got back to the

10 podium.  I know these are the photos that I handed him.

11          THE COURT:  Ms. Romero, do you have 608.6 identified

12 and marked in evidence?

13          COURTROOM DEPUTY:  That's in evidence yes.

14          MS. PETALAS:  And that was me misspeaking.  This is

15 what I handed Guice.  I did not hand him this.  So it was my

16 error in what I thought I handed him, in just mixing up the

17 exhibit numbers.  I apologize to the Court.  And I can now tell

18 the Court what happened -- I'm sorry.

19          THE COURT:  All right.  You apparently identified them

20 yourself in your first question, including number -- it appears

21 that you identified the two exhibit numbers, when you first

22 handed these photographs to Mr. Guice, by incorrect numbers.

23 But by the time you moved them in evidence, they came in as

24 608.6, which is a photo of Giles; and 608.7, which is a photo of

25 Thurston.

1        So there appears not to be a 608.8 in evidence.  So

2 now, what exhibit have you just handed this witness?

3        MS. PETALAS:  It was 606.6.

4        THE COURT:  6-0 what?

5        MS. PETALAS:  It was originally 608.6.  I can explain

6 to the Court what happened.  I handed up what was labeled as

7 608.7 and 608.8.  I was right when I handed it up to him.  I

8 started with 608.7, and then moved on.

9        And when I moved -- and had him explain what it was and

10 moved it into evidence.  I then moved on to the next one I

11 handed him up, and accidentally called it 608.6 because it was

12 still up there with him.  So I moved that in, but it was

13 referring to -- that's what caused the confusion, and that's why

14 this is labeled 608.8.  But when I moved it in, I actually moved

15 it in as Government's Exhibit 608.6, the photo of Ms. Giles.

16        THE COURT:  What have you just handed the witness now?

17        MS. PETALAS:  I handed up to him what was originally

18 608.6, because this was originally 608.8.  I inadvertently

19 referred to it as 608.6 when I moved it in, which is why it was

20 moved in as 608.6.  So this has been moved in now as

21 Government's Exhibit 608.6.

22        THE COURT:  I guess the government is now asking to be

23 able to relabel what is now marked as 608.8, and relabel it as

24 608.6, as the exhibit that the witness had looked at.  Does any

25 counsel have any objection to that renumbering?

1          Nobody is listening.  Would you alert counsel for me?

2          Counsel, what we were discussing is the fact that

3 government counsel had apparently misidentified one of the

4 photographs shown to Officer Guice as 608.6 or 608.8.

5          They have been moved into evidence now as 608.6 as a

6 photograph of Giles, and 608.7 as a photograph of Thurston.  I

7 guess -- well, what are you asking to do, now?  Change 608.8 to

8 608.6?

9          MS. PETALAS:  Yes, Your Honor.

10          THE COURT:  And then to mark what you had originally

11 had marked as 608.6, and change that to 608.8?

12          MS. PETALAS:  Yes, sir.

13          THE COURT:  Is there any objection from any counsel?  I

14 see them all shaking their head, so we'll go ahead and do that.

15          MS. PETALAS:  I apologize for the confusion.

16          THE COURT:  So we'll let you change the marking of

17 608.8, which is a photograph of Ms. Giles that the witness Guice

18 had identified, but it was called at the time 608.6.  So we're

19 now changing that marking to 608.6, and I'll now let the

20 government change the exhibit marking on what had been 608.8

21 over to 608 -- well, what had been 608.6 over to 608.8.  All

22 right?

23          MS. PETALAS:  Thank you, Your Honor.

24          (END BENCH CONFERENCE.)

25 BY MS. PETALAS:

Page 4494

1 Q.  Officer Anderson, just to clarify, I've handed you what's

2 been marked as Government's Exhibit 608.8.  Do you recognize

3 that?

4 A.  Yes.

5 Q.  And is that -- I believe before you testified that that was

6 a photo that was taken of Mr. Bell the night of his arrest?

7 A.  From the date on it, I believe it's a few days later.

8 Q.  Is that a fair and accurate photo?

9 A.  Yes.

10        MS. PETALAS:  Your Honor, at this time I move

11 Government's Exhibit 608.8 into evidence.

12        MR. BEANE:  No objection.

13        THE COURT:  Without objection, it's received.

14        (Government's Exhibit 608.8 was moved into evidence.)

15        MS. PETALAS:  I have no further questions at this time.

16        THE COURT:  Just a moment, and let's see if Mr. Carney

17 has any questions.

18        MR. CARNEY:  No questions, Your Honor.

19        THE COURT:  Ms. Wicks?

20        MS. WICKS:  No questions, thank you, Your Honor.

21        THE COURT:  Mr. Beane?

22        MR. BEANE:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24 BY MR. BEANE:

25 Q.  I just have a couple of questions.  You indicated that you

1 going into the tag number is outside the scope of

2 cross-examination.

3          As far as past recollection recorded is concerned, I'm

4 trying to scratch my brain.  It may well be that past

5 recollection recorded can be allowed without the document being

6 sent to the jury.  I am confusing that, frankly, with treatises,

7 where treatises can be read but the treatises aren't really sent

8 back.  One of those rules allows you to read something into the

9 record and not send it to the jury.

10         But I'm not even going to reach that, because I think

11 this is outside the scope of cross.

12         MS. PETALAS:  Okay.

13         (END BENCH CONFERENCE.)

14         MS. PETALAS:  No further questions at this time, Your

15 Honor.

16         THE COURT:  All right.  Thank you.  You may be excused.

17         You may announce your next witness.

18         MS. PETALAS:  Call Shaun Eppinger to the stand.

19         (Oath administered by Courtroom Deputy.)

20  (SHAUN EPPINGER, GOVERNMENT witness, having been duly sworn,

21                     testified as follows:)

22                       DIRECT EXAMINATION

23 BY MS. PETALAS:

24 Q.  Good afternoon.  Can you please state and spell your name

25 for the record?

Page 4510

1 A.  My first name is Shaun, S-H-A-U-N, last name is Eppinger,

2 E-P-P-I-N-G-E-R.

3 Q.  And where do you work now?

4 A.  I'm currently a real estate agent.

5 Q.  Directing your attention back to November 18th of 2003,

6 where were you working at that time?

7 A.  The Metropolitan Police Department.

8 Q.  And how long did you work for the Metropolitan Police

9 Department?

10 A.  Approximately four and a half years.

11 Q.  And when did you leave?

12 A.  I left there in July of 2004.

13 Q.  And going back to November 18th of 2003, that evening, were

14 you working that evening?

15 A.  I was.

16 Q.  And what were your duties that evening?

17 A.  I was assigned to the 7th District Focus Mission Unit.  We

18 were conducting buy-busts that evening.

19 Q.  And what was your role in part of the buy-bust?

20 A.  I was one of the individuals who after the undercovers went

21 in and bought narcotics, that we went in to place the

22 individuals under arrest after they would give the lookout.

23 Q.  And on that date did you have an opportunity to go into the

24 area of 1307 Congress Street, Southeast?

25 A.  I did.  While in there -- the undercover had bought

1 narcotics, gave a lookout for individuals. When we went into

2 the block, they were standing in front of a white van. By the

3 time I had gotten there, both a male and a female were already

4 placed under arrest.

5        Once I exited the vehicle, Officer Howard Anderson was

6 having another individual step from the van, and once he did,

7 the driver's side door was open. Laying on the floorboard was a

8 $5 bill which matched the money used --

9        MR. ZUCKER:  Objection.

10 A.  -- by the undercover officer.

11        MR. BEANE:  Objection.

12        THE COURT:  Sustained.

13 BY MS. PETALAS:

14 Q.  Did you recover the $5 bill?

15 A.  I did.

16 Q.  Where did you recover that $5 bill from?

17 A.  From the floorboard of the front of the vehicle.

18 Q.  And what if anything did you do with that $5 bill?

19 A.  Actually, I had given it to Officer Martin, who placed it on

20 the evidence book.

21 Q.  And did you or Officer Martin -- well, did you compare that

22 $5 bill to anything?

23 A.  Yes.  We have -- before we leave the police department, we

24 photocopy the money that the undercover officers take with them

25 in order to buy the narcotics.  In our vehicles we carry with us

1 a photocopy of that, and it has all the bills that the officers

2 used, the currency, and it has all the serial numbers on there

3 as well.

4          So once we find that money, we can compare the two,

5 that we know that it was money issued by the police department

6 used by the undercover officers.

7 Q.  And when you recovered that $5, did you compare it to the

8 copy of prerecorded funds?

9 A.  I did.

10 Q.  And what did you compare?

11 A.  A $5 bill, I compared the serial number, which matched a

12 serial number of one of the $5 bills that was photocopied.

13 Q.  And at that time do you make any markings on the copies?

14 A.  No, I did not.

15 Q.  And what do you do with the $5 bill?

16 A.  The five dollar --

17          MR. ZUCKER:  Objection.  I ask it be limited to this

18 case, what was done with it.

19          THE COURT:  Why don't you rephrase?

20 BY MS. PETALAS:

21 Q.  What did you do with this $5 bill?

22 A.  I had given it to Officer Martin, who placed it on the

23 evidence book.

24 Q.  And you said the $5 was recovered from the front of the van.

25 Was it inside the van?

Page 4513

1 A.  Yes, it was.

2 Q.  And where in relation to the driver's side door?

3 A.  It would be under the steering wheel, to the left a little

4 bit, almost closer to the door.

5          MS. PETALAS:  I have no further questions at this time.

6          THE COURT:  Mr. Carney?

7          MR. CARNEY:  No questions.

8          THE COURT:  Ms. Wicks?

9          MS. WICKS:  No questions.  Thank you, Your Honor.

10          THE COURT:  Sure.  Mr. Beane?

11          MR. BEANE:  Court's indulgence.

12                    CROSS-EXAMINATION

13 BY MR. BEANE:

14 Q.  Mr. Eppinger?

15 A.  Yes, sir.

16 Q.  Good afternoon.

17 A.  Good afternoon.

18 Q.  I have some very brief questions for you.

19          You indicated that you were out there on the night of

20 November, what was it?

21 A.  18th.

22 Q.  18th, 2003?

23 A.  No, that would be -- yes, I believe it was 2003, yes.

24 Q.  Okay.  And you are now a real estate agent?

25 A.  That's correct.  I've left the police department.

1 Q.  And where is that?

2 A.  In Northwest.

3 Q.  Okay.  And you said you're 29 years old.  Have you lived in

4 the greater D.C. area since you were born?

5 A.  Yes.

6 Q.  How far did you get in school?

7 A.  I dropped out in the 7th, sir.

8 Q.  In what?

9 A.  7th grade, I dropped out.

10 Q.  And so that would make it high school -- excuse me, junior

11 high school?

12 A.  Junior high school.

13 Q.  What junior high school were you in when you dropped out?

14 A.  Johnson Junior High.

15 Q.  Where is that?

16 A.  Southeast.

17 Q.  Where in Southeast?

18 A.  Like Bruce and Jasper Place.

19 Q.  Have you ever used drugs before?

20 A.  Yes, sir.

21 Q.  What types?

22 A.  Marijuana and E pills.

23 Q.  E pills, is that Ecstasy?

24 A.  Yes, sir.

25 Q.  What about cocaine?  Have you ever used cocaine?

Page 4796

1 grandmother house.

2 Q.  Okay.  So if I understand correctly, you first lived at 10th

3 and T near Riggs.  Is that correct?

4 A.  No.  Riggs and 10th and T is two different places, sir.

5 Q.  So those are two different places you lived?

6 A.  Right.

7 Q.  And what quadrant of the city were they in?

8 A.  Northwest and Southeast.

9 Q.  Okay.  You lived at 10th and T, Southeast?

10 A.  No, Riggs is Northwest, 10th and T is Northwest.  Then my

11 mother moved out of there with my grandmother, and we moved to

12 Savannah Terrace.  That's Southeast, sir.

13 Q.  Let's start here.  Savannah Terrace, when did you live in

14 Savannah Terrace?

15 A.  I'd say we moved up there when I was like four or something

16 like that, four or three.

17 Q.  Did you ever live in the Congress Park area?

18 A.  Yes, sir.

19 Q.  How old were you, approximately, when you moved to the

20 Congress Park area?

21 A.  About nine or eight.  I moved in there like '86.

22 Q.  Okay.  So let's start with 1986.  Okay?

23 A.  Uh-huh.

24 Q.  And you said you were about eight or nine years old?

25 A.  Yes, sir.

1 Q.   Okay.  And where did you live -- first of all, who did you

2 live with when you were eight or nine when you moved to

3 Congress Park?  Who did you live with?

4 A.   My mother.

5 Q.   And what's her name?

6 A.   Veronica Teller.

7 Q.   And other than you and your mother, did you live with anyone

8 else at that time?

9 A.   Yes.

10 Q.   Who?

11 A.   My two sisters and my brother.

12 Q.   And for the record, what are your sisters' names?

13 A.   Myonica Capies and Myquette Teller.

14 Q.   And what are their approximate ages?

15 A.   Like 22 and 26.

16 Q.   And you said a brother.  What's his name and approximate

17 age?

18 A.   Anthony.  Anthony Darrell Stanton.

19 Q.   How old is he, about?

20 A.   About 33.

21 Q.   So it's you, your mom, your two sisters, and your brother

22 living when you're about eight years old in Congress Park.  Is

23 that correct?

24 A.   Right.

25 Q.   Anybody else living with you in your household?

1 A.  My sisters' father.

2 Q.  What's his name?

3 A.  Michael.

4 Q.  Do you know his last name?

5 A.  Michael Mason.

6 Q.  Now, Congress Park, when you're eight or nine years old,

7 where exactly in Congress Park did you-all live?

8 A.  3329 14th Place.

9 Q.  Now, this is 1986.  Is it fair to say you're currently

10 incarcerated?

11 A.  Yes.

12 Q.  When did you get incarcerated?

13 A.  2001, July 3rd.

14 Q.  July 3rd, 2001?

15 A.  Yes, sir.

16 Q.  Have you been out of jail at any point since July 3rd of

17 2001?

18 A.  No, sir.

19 Q.  Beginning in 1986 when you're eight or nine years old until

20 July 3rd of 2001, during that period of time, did you live in

21 any neighborhood other than in the Congress Park neighborhood?

22 A.  No.

23 Q.  Okay.  Did you live always at the same location or different

24 locations during that period of time in the Congress Park

25 neighborhood?

1 A.  No.

2 Q.  No what?  Was it always one location?

3 A.  One location, around the park.

4 Q.  Now, during that time that you lived in the Congress Park

5 neighborhood from roughly 1986 through 2001, were there times

6 that you were not at home because you were incarcerated?

7 A.  Yes.

8 Q.  Would you recognize a map of Congress Park if you saw one?

9 A.  Yes, sir.

10      MR. GUERRERO:  Your Honor, I would ask to publish off

11 of the computer Government's 100.1.

12 BY MR. LEON:

13 Q.  Do you see that map, Mr. Capies?

14 A.  Yes, sir.

15 Q.  Do you recognize it?

16 A.  Yes, sir.

17 Q.  Can you see on that map where you lived when you moved with

18 your family to Congress Park in about 1986?

19 A.  Yes, sir.

20 Q.  Is there a pen up there or no?  Do you see one?

21 A.  Yeah.

22 Q.  I'm going to ask if you could take that pen, make sure not

23 to use the ink part of it.  Take it with your hand and touch the

24 portion of that map with the pen where -- the approximate area

25 where you lived with your family.

1 A.  (Witness complies.)

2 Q.  For the record, you put a couple of arrows right what

3 appears to be the intersection of Savannah Street and

4 14th Place.  Is that correct?

5 A.  Savannah Place and 14th Place.

6 Q.  Okay.  Do you remember the address of where you actually

7 lived?

8 A.  3329 14th Place.

9 Q.  Now, I think you said earlier that you were arrested on

10 July 3rd of 2001.  Is that correct?

11 A.  Yes.

12 Q.  We're not going to go into the details right now.  We will

13 later.

14       But just generally, were you at a location in Congress

15 Park when you were arrested?

16 A.  Yes, sir.

17 Q.  And was that a residence where you lived, or somebody lived?

18 A.  I was staying with somebody.  Yes, sir.

19 Q.  And do you know the address of where you were arrested on

20 July 3rd of 2001 when you were arrested?

21 A.  Yes, sir.

22 Q.  What's the address?

23 A.  3408 13th Place.

24 Q.  And you said it was the residence of somebody else.  Who is

25 that other person?

Page 4801

1  A.  My baby mother.

2  Q.  And what's her name?

3  A.  Thomasina.

4  Q.  And can we see that on the map, the map that we just looked

5  at earlier?

6  A.  Yes, sir.

7  Q.  I'm going to ask you to do the same thing.  If you could,

8  just take the pen and touch on the screen where you were

9  arrested on July 3rd of 2001.

10  A.  (Witness complies.)

11  Q.  And for the record, you made a mark -- okay.  It looks like

12  you made a mark initially and then the line got long.  But the

13  initial spot where you indicated was just a little bit to the

14  right of the P-L, a little bit to the right and below the P-L in

15  13th Place, just off of a circular driveway.  Is that right?

16  A.  Yeah.  That's 13th Place.  I was pointing to the building.

17  Q.  Okay.  And are you familiar with the term, "the circle"?

18  A.  Yes, sir.

19  Q.  And is that the circle?

20  A.  Yes, sir.

21  Q.  Okay.  Now let's get back to 1986 when you were living up on

22  14th Place.  Okay?

23       You indicated earlier that there was a point in time

24  when you began selling drugs, I believe you said.  Is that

25  correct?

Page 4802

1 A.  Yes, sir.

2 Q.  How old were you when you first started selling drugs?

3 A.  Like 14.  13, 14, around that area.

4 Q.  That would place us roughly what year, would you say?

5 A.  '92.

6 Q.  So let's start right there.  And just so you know, for the

7 majority of my questions from this point on, I'm going to focus

8 on 1992 when you started selling drugs, and the majority of them

9 will span about nine to 10 years until you got arrested on

10 July 3rd of 2001.  Okay?  Most of my questions from now on are

11 going to be about that period of time.  Okay?

12 A.  All right.

13 Q.  Let's start in 1992.  How did you get introduced to selling

14 drugs?

15 A.  I was buying wholesales.  My brother was hustling, so I used

16 to watch him do little stuff like sell drugs, whatever.  And

17 then that little whole street, 14th, you had other guys

18 hustling, so I was watching them, you know.  So I started

19 selling drugs and I started buying wholesales.

20 Q.  Well, let's stop there.  First of all, you said your brother

21 was hustling?

22 A.  Yes.

23 Q.  Was your brother older or younger than you when he was

24 hustling?

25 A.  He was older than me.

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013      Page 500 of 1954

1 Q.  And again, his name was?

2 A.  Darrell.

3 Q.  Darrell.  And when you said you saw what he did, tell us

4 what you saw him do before you actually did it yourself.

5 A.  I mean, he was selling drugs, making sales, serving

6 crackheads.

7 Q.  And where was this when you saw him do this?

8 A.  Our court.  We hustle right in front of our court on

9 14th Place.

10 Q.  And "our court" is 14th Place.  Can you see what you've

11 referred to as "our court" on the map?  Don't touch it yet, but

12 just can you see it on the map?

13 A.  No, I can't see it.

14 Q.  No?  Is it off the map?

15 A.  Oh, no.  That's because the thing covering 14th Place up,

16 sir.

17 Q.  Why don't you do this?  If you take the pen and just touch

18 the bottom right-hand corner of the screen, it will clear the

19 map.  If you can just tap the lower right-hand portion of the

20 screen.

21 A.  (Witness complies.)

22 Q.  Can you see the court now, the area where your brother and

23 you did this?

24 A.  Yes, sir.

25 Q.  Okay.  And why don't you just put a general circle in that

1 area?

2 A. (Witness complies.)

3 Q. Looks like you put kind of a blob or a big dot right above

4 and a little to the -- a little bit above the A-H in

5 Savannah Place, on the center right-hand portion of the map. Is

6 that fair?

7 A. Where I'm pointing out is jive. Like I'm pointing in front,

8 but it's blocking the building, though.

9 Q. The general area you've marked up. Is that fair?

10 A. Yes.

11 Q. Now, how long was it that you saw your brother hustling

12 before you started doing it yourself?

13 A. Like '89, '88.

14 Q. Okay. '89, '88 was what, when he was hustling or when you

15 were hustling?

16 A. When he was hustling, sir.

17 Q. My question is, when did you -- I think you said earlier you

18 started yourself in '92?

19 A. Yes, sir.

20 Q. My question is -- maybe you answered it. How long was he

21 out doing it and you seeing him before you did it yourself?

22 A. Like four years.

23 Q. Okay. Now, when you started doing it in '92, you mentioned

24 something called wholesales. What do you mean by wholesales?

25 A. Like a small guy. You know, you buy dimes, you spend $50 or

1 something, and you get, like, 10 dimes for the $50.  It double

2 your money.

3 Q.  Explain how that would work.

4 A.  All right.  If I go to somebody, like I got $50, they give

5 me 10 dimes.  That's an extra $50.

6 Q.  And what can you then do with those 10 dimes that you just

7 bought for $50?

8 A.  Sell it to the crackheads in the neighborhood.

9 Q.  For how much total?

10 A.  $10 a dime, sometimes eight, nine.

11 Q.  Now, you said in 1992 you started to hustle.  Who else was

12 part of the group of people that you hustled with in that area

13 just off Savannah that you indicated?

14 A.  Like the group that I was coming up with?

15 Q.  Yes.

16 A.  EB, Don, Man-Man, Dazz, and like my brother be out there

17 with us, too.

18 Q.  Your brother Darrell?

19 A.  Yes, sir.

20 Q.  Okay.  First of all, you mentioned Don.  The person that you

21 started hustling with named Don, do you see him here in the

22 courtroom today?  If you need to, you can stand up.

23 A.  Yeah, I see him.

24 Q.  Can you please point him out based on his location and an

25 article of clothing he's wearing?

1 Q.  Okay.  And when you saw Don hustling, how frequently or

2 infrequently would you see Don hustling back then in '92 or so?

3 A.  I mean, we hustled in the same court, so it was like around

4 the same time.

5 Q.  And my question is, was it every day, was it once a week?

6 How frequently or infrequently?

7 A.  Like every day.

8 Q.  And when you and -- when you were hustling every day, how

9 much would you sell on a given day at that time?

10 A.  I mean, we was selling dimes, so it was like wholesales we

11 was getting around that time.  It wasn't really no quarters or

12 halves or nothing like that.

13 Q.  Now, when you say "we were hustling," who do you mean by

14 "we"?  You said "we."

15 A.  Me, Don, Dazz, my brother, EB.

16 Q.  Now, when you - you, Bobby Capies - would be hustling around

17 this time, '92, and let's expand it, '92, '93, during that year

18 or two or so, did you buy your drugs alone, by yourself?

19 A.  No.

20 Q.  Who did you buy with?

21 A.  Me and Don would get some coke together.

22 Q.  And when you say you and Don would get some coke together,

23 what's some coke, in your mind?

24 A.  A quarter.  We start -- like when '93 started to come up,

25 started getting like little quarters and stuff like that,

1 halves.

2 Q.  Okay.  Let's break that down.  You said "little quarters."

3 What's, in your mind, little quarters?  How much is that?

4 A.  Seven grams.

5 Q.  And how much would you and Don pay to get that little

6 quarter, that seven grams?

7 A.  We'll put in like 125 a piece.  It's a quarter, 250.

8 Q.  So it would cost a total of $250?

9 A.  Yes, sir.

10 Q.  And you said 125 each.  What do you mean by that, you would

11 each -- what do you mean by that?

12 A.  He would come up with 125 and I would come up with 125.

13 Q.  And you each come up with money, you put it together, you've

14 got $250.  Where do you go with that $250, you and Don?

15 A.  Back then, like '93, we go to Boy-Boy and get a quarter.

16 Q.  Boy-Boy?  And where was he?

17 A.  Which --

18 Q.  What was the last part of your answer, in the quarter?

19 A.  To get a quarter, seven grams of coke.

20 Q.  I'm sorry.  And first of all, you said Boy-Boy.  Do you see

21 that person, Boy-Boy, here in the courtroom today?

22 A.  Yes, sir.  I only can see his face, though.

23 Q.  Okay.  Do you see his face?  Can you see who he's sitting

24 near, or around?  Who's around him?

25 A.  Don and Antwuan.

1 Q.  Is he the gentleman who just stood up?

2 A.  Yes.

3          MR. LEON:  Your Honor, may the record reflect the

4 in-court identification of the defendant Gregory Bell?

5          MR. BEANE:  No objection, Your Honor.

6          THE COURT:  Request is granted.

7 BY MR. LEON:

8 Q.  And that's the Boy-Boy you're referring to who you and Don

9 would put your money together to get your quarter?

10 A.  Yes, sir.

11 Q.  Now, you mentioned you had a group around this area, 14th

12 and Savannah.  Was Boy-Boy part of this click, this little group

13 over here, or was he somewhere else?

14          MR. BEANE:  Objection.

15          MR. ZUCKER:  Objection.  Objection.  Assumes facts not

16 in evidence.

17          THE COURT:  Overruled.

18 BY MR. LEON:

19 Q.  You can answer.

20 A.  No, he wasn't with us.

21 Q.  Where was he at that time?

22 A.  He was hanging in the circle, sir.

23 Q.  Okay.  And I think you already did, but just quickly can you

24 put a mark near the circle that you're referring to?

25 A.  (Witness complies.)  I'm pointing right to it, but it's

1 going in the back of it.

2 Q.  You put a mark it looks like just a little bit to the left

3 of what looks like a circular dead-end.  Is that fair?

4 A.  Yes, sir.

5 Q.  And is that circular dead-end what you mean as the circle?

6 A.  Yes, sir.

7 Q.  First of all, when you and Don would put your money together

8 to buy from Boy-Boy, how often would you do this back then in

9 '92, '93?

10 A.  It wasn't like we was going back frequently, because I was

11 like always the one, you know what I'm saying, messing my money

12 up.

13 Q.  What do you mean by that, you would mess your money up?

14 A.  Blow it.

15 Q.  What do you mean by that?

16 A.  Like when I got the money and I spent it on dumb stuff.

17 Q.  What do you mean by dumb stuff?

18 A.  Like games and clothes, shoes, stuff like that.  Still

19 young.

20 Q.  And to your knowledge, did Don mess his money up?

21 A.  No, he wasn't the type to always mess his money up.  He jive

22 like he was taking care of hisself because he was staying with

23 his aunt.

24 Q.  And where did his aunt live, if you know?

25 A.  Where now?

Page 4817

1 Q.   No.  When you said he was living with his aunt at the time

2 around '92, '93, do you know where that was at the time?

3 A.   Oh, yeah, that was right across the street from my house.

4 Q.   The house that you indicated earlier at 14th and Savannah?

5 A.   Yes, sir.

6 Q.   Okay.  So let me get back to my initial question.  When you

7 and Don would go to Boy-Boy, how often would you do it back then

8 in '92, '93?

9          THE REPORTER:  I'm sorry, can you repeat?

10 BY MR. LEON:

11 Q.   When you and Don pooled your money together and bought from

12 Boy-Boy, how frequently would you do that back then?

13 A.   I mean, it wasn't frequently like we was getting wholesales,

14 at the time when we was getting little bits and pieces here and

15 there.  But it was every now and then.

16 Q.   Can you put a number on that or not?  What is every now and

17 then, if you can?

18 A.   Like every week, once at least every week, or probably on

19 the weekends or something like that.

20 Q.   And you said on a weekend.  Now, how quickly would you and

21 Don be able to sell those seven grams that you bought for $250

22 on a weekend?

23 A.   That week.

24 Q.   How long would it take?

25 A.   Over the weekend?

1 Q.   Yeah.

2 A.   We would be finished probably like by Monday.

3 Q.   Okay.  Other than those quarters, those seven grams that you

4 talked about, did you and Don ever put your money together to

5 buy any other amounts other than the quarters?

6 A.   We start jive -- like we'll get like a half, but we start

7 jive like getting a little flash, you know, when polo clothes

8 was coming out and stuff like that, so we wanted to fit in with

9 everybody else.  But there wasn't enough money, so it was like

10 we was burning that, too.

11         So it came to a point where we started to -- you know,

12 wanted to put on good clothes, so we had to start getting

13 fronted.

14 Q.   Started getting fronted, what do you mean by that?

15 A.   Like somebody give us a half or something, know what I'm

16 saying, and he bring back 250 and I bring back 250 of the money.

17 Q.   And what period of time are we talking about?  You're

18 looking for nicer clothes, you're trying to now get fronted by

19 halves.  What period of time is this?

20 A.   We in '93 now, and it's like almost at the end of '93, going

21 up into '94.

22 Q.   And when you would get fronted these halves -- first of all,

23 what's a half?

24 A.   It's 14 grams of cocaine.

25 Q.   Who would front you a half?

1 A.  Antwuan.

2 Q.  And the person you know to be Antwuan, do you see Antwuan in

3 the courtroom today?

4 A.  Yes, sir.

5 Q.  Can you please point him out based on his location and an

6 article of clothing that he's wearing?

7 A.  He got on a white shirt and a black and gray tie.

8 Q.  Is he sitting near anyone?

9 A.  He right beside Wop.

10 Q.  And just for the record, what's Wop wearing?

11 A.  A blue shirt, sir.

12 Q.  What kind of tie?

13 A.  Like it look burgundy.

14        MR. LEON:  Your Honor, may the record reflect the

15 in-court identification of the defendant Antwuan Ball first, and

16 then also to save some time, also the in-court identification of

17 defendant David Wilson?

18        MR. CARNEY:  No objection.

19        MS. WICKS:  No objection, Your Honor.

20        THE COURT:  Request is granted.

21 BY MR. LEON:

22 Q.  Now, when you would get fronted these halves, you and Don,

23 by Antwuan, was Antwuan -- where would Antwuan be?  Where did

24 you have to go to get the halves?

25 A.  We would go around the circle.

1 Q.   The same circle where you said Boy-Boy was?

2 A.   Yes, sir.

3 Q.   Now, is Antwuan older than you or younger than you or your

4 age?

5 A.   He older than me.

6 Q.   Do you know exactly how much older?

7 A.   About five years, something like that.  I ain't sure,

8 though.  It's about five years.

9 Q.   And what about Boy-Boy?  Do you know if he's older, younger,

10 or the same age?

11 A.   He older.

12 Q.   Do you know how much older Boy-Boy is than you?

13 A.   About six, five, something like that.

14 Q.   Now, you've mentioned Antwuan at the circle and Boy-Boy at

15 the circle.  Anyone else at the circle with Boy-Boy and Antwuan,

16 to your knowledge?

17 A.   Yes, sir.

18 Q.   Who?

19 A.   Jojo.

20 Q.   Okay.  And would you recognize Jojo if you saw Jojo again?

21 A.   Yes.

22 Q.   Do you see Jojo here in the courtroom today?

23 A.   Yes, sir.

24 Q.   Where is Jojo?  And please point out his location and an

25 article of clothing that he's wearing.

1 A.  He's to my left.  He got on some glasses and a white shirt.

2 Q.  Is he sitting next to anyone?

3 A.  He's sitting next to Don, sir.

4        MR. LEON:  Your Honor, may the record reflect the

5 in-court identification of defendant Joseph Jones?

6        MR. MARTIN:  No objection.

7        THE COURT:  The request is granted.

8 BY MR. LEON:

9 Q.  You've mentioned Jojo, you've mentioned Boy-Boy, you've

10 mentioned Antwuan.  Anyone else that hung out with those three

11 men at the circle around this time, let's say '93 or so?

12 A.  Fat Tony.

13 Q.  Fat Tony, anyone else?

14 A.  Kairi, a guy named Geeka.

15 Q.  Geeka?

16 A.  That's all my memory can think of, sir.

17 Q.  Okay.  And you mentioned someone named Fat Tony and you

18 mentioned someone named Geeka.  Let me start with Kairi.  You

19 said Kairi.  Do you know if Kairi had any relationship to either

20 Boy-Boy or Antwuan or Jojo or any of these guys?

21 A.  That's Antwuan brother, sir.

22 Q.  Do you know if he was an older brother or a younger brother?

23 A.  He younger.

24 Q.  Would you recognize a picture of him if you saw him at some

25 point?

1 A.  It had to be before '95.

2 Q.  And why do you say that?

3 A.  Because Kairi was dead.

4 Q.  Do you know when Kairi died?

5 A.  I know it was like '95.

6 Q.  Okay.  Mr. Capies, I'm going to ask you to clear that

7 screen?

8       MR. LEON:  And Mr. Mazzitelli, with the Court's

9 permission, I'll ask you to put back Government's 100.1.

10       May I approach, Your Honor?

11       THE COURT:  Yes.

12 BY MR. LEON:

13 Q.  Mr. Capies, I'm going to try to do this a little quicker, so

14 I'm going to show you three at once.  I'm showing you what's in

15 evidence as Government's 211.1, 202.1, and 203.1.

16       Let's take them one at a time.  Do you know who is

17 depicted in Government's 211.1?

18       THE COURT:  211.1 or 211?

19       MR. LEON:  Excuse me.  211.1.

20       THE COURT:  Which is not in evidence.

21       MR. LEON:  It's not?  Okay.

22 BY MR. LEON:

23 Q.  Do you know, what's in 211.1?

24 A.  Jojo.

25 Q.  And does that picture look like the Jojo that you know?

1 Q.   Okay.  And what about somebody by the name of Santuce?  Did

2 you know somebody by the name of Santuce back then?

3 A.   Yes.

4 Q.   And same question.  What relationship, if any, did you have

5 with Santuce back around '93 or so?

6 A.   I mean, all of us was jive cool back then at that time, but

7 we wasn't really hanging together.  But we see each other in

8 school, after school, kick it, know what I'm saying.  We had our

9 little group on 14th Place and they had their little group

10 around the corner where they be.

11 Q.   And when you say "around the corner," can we see the spot

12 that you mean by around the corner on this map?

13 A.   Where they was hanging at?

14 Q.   Yes.

15        MS. WICKS:  Objection.  Clarify who "they" is.  If he

16 can specify who the "they" is that he's talking about right now.

17        MR. LEON:  I'm happy to clarify.

18 BY MR. LEON:

19 Q.   We've talked about Wop.  Let's start with Wop.  In your

20 mind, back in 1993, when you saw Wop, was he usually at a

21 particular part of Congress Park?

22 A.   Yes, sir.

23 Q.   And can you see that particular part of Congress Park on the

24 map that we're looking at?

25 A.   Yes, sir.

1 Q.  And I'm going to ask you just to tap or point to that part

2 of Congress Park.

3 A.  (Witness complies.)

4 Q.  Okay.  Looks like you made a mark, is it fair to say,

5 somewhere between the circle and the other area you indicated as

6 14th and Savannah?

7 A.  Like 13th, right in front of -- in the middle of the

8 Lincoln, in the middle of 13th Place.

9 Q.  Okay.  And you said Wop, when you would see him around that

10 time, you would usually see him around there?

11 A.  Yes, sir.

12 Q.  When you saw Wop around that time at that location, did you

13 see other people as well in that spot?

14 A.  Yes, sir.

15 Q.  Who?

16 A.  Wop, Head, Drano, Santuce, Jazz, Tenille.

17 Q.  Okay.  Anyone else you can think of right now?

18 A.  Truck.

19 Q.  Okay.  And do you know what they would do in that spot?

20 A.  They was hustling right there.

21        MS. WICKS:  Objection, Your Honor.  Objection as

22 leading.

23        MR. ZUCKER:  Objection as foundation.

24        THE COURT:  Overruled.

25 BY MR. LEON:

Page 4831

1 Q.  You said hustling.  How do you know that?

2 A.  Because I come around there and holler at them sometimes,

3 and I see them right there making sales when I'm hollering at

4 them.

5 Q.  And when you say "they" making sales, let's break that down.

6 Who did you see making sales at that point just off the Lincoln

7 back in '93?

8 A.  Wop, Truck, Head, Jazz, Santuce, Drano, Tenille.

9 Q.  Now, when you said you would go to that area to holler at

10 them, what do you mean by "holler at them"?

11 A.  I mean, like, kick it; what's up, man, what y'all doing,

12 this and that?  Or might smoke a little bit.  But we wasn't

13 hanging exactly with them at that time.

14 Q.  When you say "at that time," was there a time after that

15 that you did hang with them more as a group?

16 A.  Oh, yeah.

17 Q.  We'll get do that, but I want to talk about '93 right now.

18        Did you ever buy or were fronted or buy any crack

19 cocaine from these people we're talking about at that time,

20 1993?

21 A.  No.

22 Q.  Okay.  Now I know we're jumping around -- well, let's not

23 jump around.  Let's stay here.

24        MR. LEON:  May I approach?

25        THE COURT:  Yes.

Page 4833

1 BY MR. LEON:

2 Q.  And Mr. Capies, I'm going to hand you three final items for

3 today; for the record, in evidence, Government's 206.1 -- first

4 of all, 206.1, do you know what that is?

5 A.  Yes, sir.

6 Q.  What's that?

7 A.  That's DC.

8 Q.  And do you recognize that to be the same -- the DC you

9 referred to earlier?

10 A.  I didn't refer to him earlier, sir.

11 Q.  Oh, you didn't?  Okay.  Fair enough.

12          Who is DC?

13 A.  DC like a guy that grew up around there too.

14 Q.  When you say "grew up around there too," what time period

15 are we talking about?

16 A.  He went to school with us, but he was hanging with another

17 little group at that time, sir.

18 Q.  And what little group was that around that time?

19 A.  Keith B, Kevin B, Little Darrell, Quentin, Big Head Tony.

20 Q.  Okay.  And when you say another little group around then,

21 where did that little group hang out, what neighborhood?

22 A.  I think Savannah Street.

23          MR. MARTIN:  Objection.

24          THE COURT:  Basis?

25          MR. MARTIN:  "I think."

Page 4834

1           THE COURT:  I'll allow it.

2 BY MR. LEON:

3 Q.  The area that you believe or think that DC hung out at that

4 time -- first of all, I'm talking about 1993.  Is that what

5 you're referring to?

6 A.  Yes, sir.

7 Q.  Can we see the area that DC hung out in on the map that

8 we've been looking at this afternoon?

9 A.  Yes, sir.

10 Q.  Can you please tap that area that you're talking about?

11 A.  (Witness complies.)

12 Q.  Looks like you made a long line and there's also an arrow.

13 Is the arrow accurate?

14 A.  Yes, sir.

15 Q.  And what street is that?

16 A.  Savannah Street.

17 Q.  Okay.  Now let's turn next to Government's 205.1.  Do you

18 know what that is?

19 A.  Yes, sir.

20 Q.  What's 205.1?

21 A.  That's Santuce.

22 Q.  And does that picture fairly and accurately depict Santuce?

23 A.  Yes.

24 Q.  Is that the Santuce that you referred to earlier this

25 afternoon?

1          And let's get back to you in 1993.  I believe you said

2 you and Don were buying or getting fronted various drugs.  Do

3 you remember that?

4 A.  Yes, sir.

5 Q.  I believe you said -- well, just to be clear, what drugs are

6 we talking about?

7 A.  Crack cocaine.

8 Q.  Ever any other drugs, or just crack?

9 A.  Just crack.

10 Q.  You've mentioned getting fronted by Antwuan.  Correct?

11 A.  Yes, sir.

12 Q.  And you also mentioned buying from Boy-Boy.  Correct?

13 A.  Yes, sir.

14 Q.  Anyone else that you and Don bought from around this time,

15 let's say in '93 or so?

16 A.  We go down -- sometimes we go down Hunter Pines and buy

17 stuff from his brother.

18 Q.  Whose brother?

19 A.  Don's.

20 Q.  What's his name?

21 A.  Feet.

22 Q.  Feet?

23 A.  Yeah.

24 Q.  And this would be another neighborhood you would go to get

25 the drugs?

1 Q.  Yes or no, do you know if Kairi fronted anyone else in 1994?

2 A.  No.

3 Q.  No, he didn't, or no, you don't know?

4 A.  No, I don't know.

5 Q.  Okay.  Were you still hanging out with Don around that time?

6 A.  Yeah.

7 Q.  1994?

8 A.  Yes.

9 Q.  To your knowledge, yes or no, was Don still hustling in

10 1994?

11 A.  Yes.

12 Q.  And where was he hustling at this time?  Physically where?

13 A.  He was still hanging around 14th Place hustling.

14 Q.  Okay.  How do you know that?

15 A.  Because I was hustling around in the same court with him.

16 Q.  And by the way, when you and he went to get money -- excuse

17 me, get drugs from Don's brother, Feet, did you sell in that

18 neighborhood, or where did you sell the drugs that you bought

19 from Feet?

20 A.  We sold them on 14th Place.

21 Q.  Did you ever sell crack anywhere other than that spot on

22 14th Place in '93, '94?

23 A.  Yes.

24 Q.  Where else?

25 A.  I was back and forth.  I used to go around 37.  I wasn't

# Tab 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : March 29, 2007 |
| DOMINIC SAMUELS, | : 9:15 a.m. |
| Defendants. | : |

VOLUME 26 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE |
| | Glenn S. Leon, Assistant United |
| | States Attorney |
| | Ann H. Petalas, Assistant United |
| | States Attorney |
| | Gilberto Guerrero, Assistant |
| | United States Attorney |
| | 555 4th Street |
| | Washington, DC 20001 |
| | 202.305.0174 |
| For Defendant | CARNEY & CARNEY |
| Antwuan Ball: | John James Carney, Esq. |
| | South Building |
| | 601 Pennsylvania Avenue, N.W. |
| | Washington, DC 20004 |
| | 202.434.8234 |

---

**4864**

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | TIGHE, PATTON, ARMSTRONG, |
| Antwuan Ball: | TEASDALE, PLLC |
| | Steven Carl Tabackman, Esq. |
| | 1747 pennsylvania Avenue, NW |
| | Suite 300 |
| | Washington, DC 20036 |
| | 202.454.2811 |
| For Defendant | LAW OFFICE OF JENIFER WICKS |
| David Wilson: | Jenifer Wicks, Esq. |
| | 503 D Street NW, Suite 250A |
| | Washington, DC 20001 |
| | 202.326.7100 |
| | |
| | GARY E PROCTOR, LLC |
| | Gary E. Proctor, Esq. |
| | 6065 Harford Road |
| | Baltimore, MD 21214 |
| | 410.444.1500 |
| For Defendant | LAW OFFICE OF JAMES W. BEANE |
| Gregory Bell: | James W. Beane, Jr., Esq. |
| | 2715 M Street, N.W. |
| | Suite 200 |
| | Washington, DC 20007 |
| | 202.333.5905 |
| For Defendant | LAW OFFICE OF JONATHAN ZUCKER |
| Desmond Thurston: | Jonathan Seth Zucker, Esq. |
| | 514 10th Street, NW |
| | 9th Floor |
| | Washington, DC 20004 |
| | 202.624.0784 |
| For Defendant | LAW OFFICE OF ANTHONY MARTIN |
| Joseph Jones: | Anthony Douglas Martin, Esq. |
| | 7841 Belle Point Drive |
| | Greenbelt, MD 20770 |
| | 301.220.3700 |
| | |
| | LAW OFFICE of ANTHONY ARNOLD |
| | Anthony Darnell Arnold, Esq. |
| | One Research Court |
| | Suite 450 |
| | Rockville, MD 20852 |
| | 301.519.8024 |

---

**4865**

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | LAW OFFICES OF A. EDUARDO BALAREZO |
| Dominic Samuels: | A. Eduardo Balarezo, Esq. |
| | 400 Fifth Street, NW |
| | Suite 300 |
| | Washington, DC 20001 |
| | 202.639.0999 |
| | and |
| | William B. Purpura, Esq. |
| | 8 East Mulberry Street |
| | Baltimore, MD 21202 |
| | 410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR |
| | Official Court Reporter |
| | Room 6814, U.S. Courthouse |
| | Washington, DC 20001 |
| | 202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

**4866**

**MORNING SESSION, MARCH 29, 2007**

1
2    (9:13 a.m.)
3       THE COURT:  Good morning.  While the defendants are coming
4    out, I just wanted to pass on to you some generic feedback we're
5    getting from the jurors.  I don't know if all the lawyers are
6    here.
7       MR. ZUCKER:  I'll check the hallway.
8       THE COURT:  Don't go, don't go.  If they're right out
9    there, bring them in.  If they're not, they'll have to hear it
10   from you all.
11      MR. ZUCKER:  My eyes are so bad.  I think Mr. Guerrero was
12   at the end of the hall.
13      THE COURT:  Well, you all pass it on and share it among
14   your colleagues.
15      Generic feedback from the jurors I thought you might want
16   to hear.  Complaint:  Some lawyers are speaking much too quickly.
17   When that happens they cannot understand what the question is and
18   don't know or understand what the question is until they get a
19   sense of it from the answer that's given by the witness.  So it's
20   a complaint about not only speed, but audibility.  Sometimes
21   lawyers are not close enough to the mic or speaking loud enough
22   for them to hear.  So let me just pass that on to you:  Speed and
23   audibility are important.
24      They also are complaining that sometimes lawyers are
25   referring to exhibits in much too familiar a fashion with the

**4875**

1  spelling, J-I-M. Last name is Mazzitelli. You think Mr. Beane

2  had a hard time. It's M-A-Z as in zebra, Z as in zebra, I-T as

3  in Thomas, E-L-L-I.

4        A JUROR: Thank you.

5        THE COURT: Yes, ma'am.

6        A JUROR: When Anthony Arnold -- he introduced his

7  co-counsel's name as Anthony Arnold. Is he here?

8        THE COURT: He's not present today, no.

9        A JUROR: I don't remember what he looks like.

10       THE COURT: He was here on the first day and has come in

11  intermittently, but is not here today. You also heard Mr. Carney

12  introduce Mr. Tabackman. Mr. Tabackman has been here. He's not

13  here today.

14       A JUROR: Yeah. He sits over there.

15       THE COURT: Correct.

16       All right. With that, let's go forward.

17       CONTINUED DIRECT EXAMINATION OF BOBBY CAPIES

18  BY MR. LEON:

19  **Q.**    Good morning, sir. For the record, could you please

20  state your name again and for this court reporter, could you

21  please spell your full name for the benefit of the record.

22  **A.**    Bobby Capies. First name B-O-B-B-Y, last name,

23  C-A-P-I-E-S.

24  **Q.**    Now, Mr. Capies, do you understand that you're still

25  under oath from yesterday?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**4876**

1  **A.**    Yes, sir.

2  **Q.**    Okay. Do you have any nicknames?

3  **A.**    Yes, sir.

4  **Q.**    What's your nickname?

5  **A.**    Monya.

6  **Q.**    Monya?

7  **A.**    Yes, sir.

8  **Q.**    How do you spell that?

9  **A.**    M-O-N-Y-A.

10  **Q.**    Monya?

11  **A.**    Yes, sir.

12  **Q.**    How long have you had that nickname?

13  **A.**    For a long time, since I was a kid.

14  **Q.**    How'd you get it?

15  **A.**    My grandmother gave it to me.

16  **Q.**    Did you have that nickname -- I believe you said

17  yesterday, we were talking about how you moved to Congress Park

18  in 1986 or so. Do you remember that testimony?

19  **A.**    Yes, sir.

20  **Q.**    Did you have it at that time?

21  **A.**    Yes, sir.

22  **Q.**    Now, do you remember yesterday we talked about the

23  majority of your testimony -- the questions I'm going to ask are

24  going to be between 1992 and 2001. Do you remember us talking

25  about that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**4877**

1  **A.**    Yes, sir.

2  **Q.**    Okay. What I want to do for our morning session is

3  actually break that down even a little further, still beginning

4  in 1992 when you began, as you said, selling drugs in Congress

5  Park, and take it until just about 1996, about a four-year

6  period, okay?

7  **A.**    All right.

8  **Q.**    So my questions for you this morning are going to largely

9  focus on that four-year period, okay?

10  **A.**    Yes, sir.

11  **Q.**    Now --

12       MR. LEON: Your Honor, may we publish what's in evidence

13  as Government's Exhibit 100.1?

14       THE COURT: Yes.

15  BY MR. LEON:

16  **Q.**    Do you remember looking at this map yesterday,

17  Mr. Capies? I asked you a bunch of questions about that map.

18  **A.**    Yes, sir.

19  **Q.**    Okay. I likely will be referring to that map again

20  during these questions. During your testimony yesterday, you

21  talked about somebody you know as Don. Do you remember that?

22  **A.**    Yes, sir.

23  **Q.**    And tell us again -- I think you said at one point that

24  you knew him because he lived near you. Did you say something

25  along those lines?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**4878**

1  **A.**    Yes, sir.

2  **Q.**    Where did he live?

3  **A.**    He was staying with his aunt across the street from my

4  house.

5  **Q.**    Can we see that on this map?

6  **A.**    Yes, sir.

7  **Q.**    Do you have a pen up there?

8  **A.**    Yeah.

9  **Q.**    I'll ask you to take that pen and tap a portion of the

10  screen, without the ink, where you see the approximate area

11  where his aunt lived.

12  **A.**    (Indicating.)

13  **Q.**    Okay. And can you tap the screen again in -- well,

14  before I ask you to tap it again, for the record, you made a

15  mark and it looks like there's an arrow along the right-hand

16  portion of the map which is labeled 14th Place, and it's the

17  portion of that which is closer to the intersection that reads

18  Savannah Place.

19       Is that a fair representation of where you put the mark?

20  **A.**    Yes, sir.

21  **Q.**    And where -- first of all, do you know what his aunt's

22  name was? Don's aunt's name?

23  **A.**    Yes.

24  **Q.**    What was it?

25  **A.**    Pam.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4891

1   A.   Yes, sir.
2   Q.   Can you tap that portion of the screen you're talking
3   about.
4   A.   (Indicating.)
5   Q.   Okay.  And for the record, you put a mark just to the
6   left of -- just to the left of the S in Savannah Street, which
7   is just off center on our map; is that fair?
8   A.   Yes, sir.
9   Q.   Okay.  Do you know if Keith lived in that general area?
10  A.   No, he didn't live right there, sir.
11  Q.   Did he live anywhere on the map that we're looking at?
12  A.   Yes, sir.
13  Q.   Where did Keith live?
14  A.   On Congress Street and Alabama.
15  Q.   Congress and Alabama, so towards the upper right-hand
16  portion of the map?
17  A.   Yes, sir.
18  Q.   Okay.  What about Kevin, his brother?  Did Kevin, to your
19  knowledge, sell drugs in Congress Park around this time?
20  A.   Yes, sir.
21  Q.   And how do you know that?
22  A.   Around this time, like in the early part of '95, I was
23  getting coke from Kairi.  And when I get coke from Kairi, you
24  know, I break it down with him.  Like whatever I get, I tell
25  him, sell some part of it, and I sell -- we was like partners on

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

4892

1   it.
2   Q.   And just for the record, you identified yesterday
3   somebody by the name of Kairi.  Is that the same Kairi you're
4   referring to now?
5   A.   Yes, sir.
6   Q.   Is that the person who's now deceased who was the brother
7   of Antwuan Ball?
8   A.   Yes, sir.
9   Q.   Okay.  Okay.  So you said in '95, you personally got from
10  Kairi?
11  A.   Yes, sir.
12  Q.   Tell us how often you personally got from Kairi back in
13  around '95.
14  A.   A lot.
15  Q.   Can you put a number on it or no?
16  A.   Naw, I can't put a number on it, sir.
17  Q.   When you would go to Kairi to get, on a given occasion,
18  drugs, how much would you get at a given time?
19  A.   He be giving me quarters.
20  Q.   And how much would you pay Kairi for a quarter?
21  A.   I wouldn't pay.  He front it to me.  I wouldn't pay him.
22  I bring the money back when I finished.
23  Q.   And how long would it take you to get back to Kairi with
24  the money that you owed him?
25  A.   Probably about a week.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

4893

1   Q.   And did you do that?  Did you pay him back?
2   A.   Yes, sir.
3   Q.   And then after you paid him back, did you get fronted
4   again?
5   A.   Yes, sir.
6   Q.   Now, when you got fronted by Kairi around this time,
7   1995, did you -- did you do this alone or did you get fronted
8   and then share those drugs with anybody else?
9   A.   I go get it myself and me and Kevin was cool, so when I
10  get it, I be like, "Man, I got to make sure you bring the money
11  back.  You take this part.  I got to give this man back his
12  money."
13  Q.   Okay.  And did you -- other than with Kevin, did you
14  share the drugs that you were fronted by Kairi with anybody else
15  around that time?
16  A.   Naw, not around that time.
17  Q.   Now, earlier you talked about Don and I believe you said
18  earlier this morning that in '92-93, you were working with Don?
19  A.   Yes, sir.
20  Q.   And then stopped for a while, because why?
21  A.   Because I was sluggish.
22  Q.   And I believe you said he was less sluggish?
23  A.   Yes, sir.
24  Q.   Now, when you were getting sluggish and Don wasn't, in
25  your mind, did you see Don sell drugs?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

4894

1   A.   Yes, sir.
2   Q.   Tell us what you saw when you saw Don sell drugs around
3   this time?
4   A.   I seen him making sales, different sales.
5   Q.   Describe that.
6   A.   Like he'll -- a crack sale come up, he go up to the sale
7   and make the sale.
8   Q.   How -- what time of day are we talking about?
9   A.   Night, day, whenever.  Mainly -- yeah, night and day.
10  Q.   And how many days a week are we talking about?
11  A.   All through the week.
12  Q.   Do you know if Don was still in junior high school at
13  this time or not?  Or high school at this time?
14  A.   I know like junior high, it was like '92-93.  I ain't
15  sure when he be -- dropped out or -- you know.
16  Q.   Okay.  Was he still living with his aunt around this
17  time?
18  A.   Yes, sir.
19  Q.   Okay.  Now, I believe you said that at some point you and
20  Don got back together and -- is that correct or not?
21  A.   Yes, sir.
22  Q.   Tell us about that.  When did that happen?
23  A.   After Kairi died.
24  Q.   Okay.  And when, to your memory, did Kairi die?
25  A.   I ain't got no date on it, sir, or a month, but I know it

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

4895

1   was something like '95.

2   Q.    Okay.  Why was the death of Kairi something that made you
3   and Don get back together?

4        MR. ZUCKER:  Objection.

5        THE COURT:  Sustained.  Rephrase.

6   BY MR. LEON:

7   Q.    Why do you remember that it was after the death of Kairi
8   that you and Don got back together?

9   A.    Because we started back hustling again.

10  Q.    Was there anything significant about the death that
11  caused you to get back with Don or no?

12  A.    Naw, it didn't have nothing to do with the death.  I
13  think it was that, man, I didn't have to jive, duck and hide to
14  hustle or nothing like that from my mother.  I was just out
15  there and I was starting to get some money, so he seen it and we
16  just started back, you know, hustling together.

17  Q.    Why didn't you have to duck and hide by that point in
18  1995?

19  A.    Because I was just basically grown.  I was doing whatever
20  I wanted to do.

21  Q.    And tell us about that.  In 1995 when you're not ducking
22  and hiding anymore, tell us what you and Don are doing.

23  A.    We started -- I started back with him getting coke from
24  Antwuan.

25  Q.    Okay.  And when you and Don would get coke from Antwuan,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4896

1   who would get it?

2   A.    Don would go get it.

3   Q.    And do you know why that was?

4   A.    Because Antwuan already knew I was sluggish, too, trying
5   to get money, so he'd give it to Don for us to break down or
6   whatever.

7   Q.    Were you ever with Don when he got the coke from Antwuan?

8   A.    Yes, sir.

9   Q.    How many times would you say you were with Don when he
10  would get coke for the two of you from Antwuan?

11  A.    A few times, sir.

12  Q.    Okay.  And how much would Don get for the two of you when
13  he'd get from Antwuan in those cases?

14  A.    Like a half ounce.

15  Q.    And did -- for the record, how much would it cost you and
16  Don to get a half an ounce from Antwuan around this time?

17  A.    At the time, we did start buying something, but at the
18  time, we was getting fronted.

19  Q.    Okay.  And even if you get fronted, at some point you
20  have to pay it back, correct?

21  A.    Yes, sir.

22  Q.    So eventually when you had to pay it back, how much would
23  get paid back?

24  A.    For the half ounce, it's $500.

25  Q.    And again, for the record, a half is how much weight?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4897

1   A.    It's 14 grams.

2   Q.    When you and Don would get fronted 14 grams, a half ounce
3   back in 1995, how quickly would it take you and Don to sell
4   that?

5   A.    At that time, we was speedy, so it wouldn't take long.
6   We might be finishing that night.

7   Q.    And when you got finished, what'd you do next?

8   A.    Go back.  Or sometimes the money that we make back for
9   ourselves, we put it together, get fronted a half and put some
10  together to get some more.

11  Q.    Now, was there anyone else other than Antwuan back around
12  this time, '95 or so, that you and Don got -- either bought from
13  or got fronted from, other than Antwuan?

14  A.    Not at that time, no.

15  Q.    Okay.  Was there any other place that you, Bobby Capies,
16  got your drugs around this time?

17  A.    I mean, naw, not at that time.

18  Q.    Do you know somebody by the name of Froggy?

19  A.    Yes, sir.

20  Q.    Who's Froggy?

21  A.    A friend of Antwuan's.

22  Q.    And a friend of Antwuan's at what time?

23  A.    '95.

24  Q.    Okay.  How do you know that Froggy and Antwuan were
25  friends?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4898

1   A.    I used to see them together.

2   Q.    Okay.  And when you would see them together, where would
3   they be?

4   A.    He was sitting in his van, talking or sitting in Froggy
5   car, talking.

6   Q.    Okay.  Who had the van and who had the car?

7   A.    Antwuan had a van.

8   Q.    And Froggy had the car?

9   A.    Yes.

10  Q.    When you would see Antwuan and Froggy together in either
11  the van or the car, where would the van or the car be?  What
12  neighborhood?

13  A.    Around Congress Park.

14  Q.    And anywhere in particular in Congress Park?

15  A.    Sometimes in the circle around Mom's house or sometimes
16  around Savannah, the end of Savannah Place.

17  Q.    Okay.  Now, you said somewhere around the circle near
18  Mom's place -- Mom's house.  Can you see what you refer to as --
19  first of all -- well, withdraw that.

20        Who's Mom?

21  A.    A lady named Sharon.

22  Q.    And who was you back in 1995, if anyone?

23  A.    Somebody that smoked -- I mean, that people go in her
24  house, sell drugs and she buy coke.

25  Q.    And you said her name is Sharon?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4899*

1  **A.**  Yes, sir.
2  **Q.**  Have you been in Mom's house?
3  **A.**  Yes, sir.
4  **Q.**  A lot or a little?
5  **A.**  A lot.
6  **Q.**  When you were in there, did you see Antwuan in there?
7  **A.**  Yes, sir.
8  **Q.**  A lot or a little?
9  **A.**  A lot.
10 **Q.**  Who else would you see in Mom's house back around this
11 time?
12 **A.**  Jo-Jo, Boy-Boy, Geeka, Fat Tony.
13 **Q.**  Can you see Mom's house on this map?
14 **A.**  Yes, sir.
15 **Q.**  Can you tap on the approximate area were you see Mom's
16 house.
17 **A.**  (Indicating.)
18 **Q.**  Okay.  And for the record, you put a dot just above the 1
19 in 13th Place, which is a little north of the circle; is that
20 fair?
21 **A.**  Yes, sir.
22 **Q.**  Okay.  Is Mom's house on the left side of 13th Place or
23 the right side of 13th Place?
24 **A.**  What you mean, coming out?  If you coming out, it's on
25 the right side.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4900*

1  **Q.**  Okay.  It's on the part closer towards 14th Place or
2  towards 13th Street?
3  **A.**  Naw, that's 13th, sir.
4  **Q.**  Okay.  Is it on the side closer towards the Lincoln or
5  the other side of the street?
6  **A.**  The Lincoln side.
7  **Q.**  Okay.  Did you ever sell to Mom?
8  **A.**  Yes, sir.
9  **Q.**  A lot or a little?
10 **A.**  A lot.
11 **Q.**  Do you know if anyone else sold to Mom?
12 **A.**  Yes, sir.
13 **Q.**  Who?
14 **A.**  Everybody around there that sell coke, that I knew was
15 serving coke.
16 **Q.**  I'm going to ask you to be more specific.  In your mind,
17 when you say everyone around there who sold coke, who are those
18 people?
19 **A.**  Wop, Twan, Jo-Jo, Don, Dazz, Jazz, Santu, Boy-Boy.
20 **Q.**  All of the people that you just mentioned who sold to
21 Mom, did you see all -- each of those people do that with your
22 own eyes?
23 **A.**  Yes, sir.
24 **Q.**  A lot or a little?
25 **A.**  A lot.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4901*

1  **Q.**  Now, let's get back to Froggy.  When you would see
2  Antwuan and Froggy together, did you ever see them -- other than
3  hang out together, did you ever see them do anything?
4  **A.**  Not face-to-face, I never seen them do anything.
5  **Q.**  Okay.  Were you ever with Antwuan when he said something
6  to you about Froggy?
7  **A.**  Yes, sir.
8  **Q.**  Tell us -- first of all, tell us when this was.
9  **A.**  Me and Don was around on -- in the circle and he was
10 like, "In a minute, I want y'all to meet me around by Lulu house
11 on Savannah Place."
12 **Q.**  Who said this?
13 **A.**  Antwuan.
14 **Q.**  Okay.  And after Antwuan said, "I want you to meet me in
15 a few minutes near Lulu's house," what, if anything, did you see
16 Antwuan do?
17 **A.**  Ride up the street.
18 **Q.**  And then do what?
19 **A.**  To go meet the dude.
20 **Q.**  What dude?
21 **A.**  Froggy.
22 **Q.**  Did you see him meet up with Froggy?
23 **A.**  When I got there, Froggy was getting out his van.
24 **Q.**  And where was Antwuan in relation to Froggy when Froggy
25 was getting out of the van?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4902*

1  **A.**  Could you refer [sic] the question again, please.
2  **Q.**  Sure.  You saw Froggy get out of whose van?
3  **A.**  Antwuan's van.
4  **Q.**  And you're sure that was Antwuan's van?
5  **A.**  Yes, sir.
6  **Q.**  And after Froggy got out of Antwuan's van, what happened
7  next?
8  **A.**  Me and Don got in the van with him.
9  **Q.**  And then what happened?
10 **A.**  He showed me a -- some cocaine.  It was powder.
11 **Q.**  Antwuan did?
12 **A.**  Yes, sir.
13 **Q.**  Could you tell how much powder it was?
14 **A.**  He said it was a half a key.
15 **Q.**  And did you know at that point what a half a key looked
16 like?
17 **A.**  That was like -- that was my first time seeing a half a
18 key of coke.
19 **Q.**  Can you show us with your hands how much a half a key of
20 powder looks like?
21 **A.**  It's like about a block, about like that (indicating),
22 about this thick.
23 **Q.**  Okay.  For the record, first you put your hands --
24      Can you do that again?
25 **A.**  It was about like (indicating), and about this thick,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

4903

1  (indicating).

2  **Q.**   So it looks like you put your hands maybe about three or

3  four inches wide, is that fair?

4  **A.**   Yes, sir.

5  **Q.**   And then about maybe two inches high, is that what you

6  did?

7  **A.**   (Indicating) about right there, sir.

8  **Q.**   You said it was a box, was it hard or was it powder?

9  **A.**   It was powder.

10  **Q.**   Did you see the powder or was it wrapped in something?

11  **A.**   It was wrapped in something.

12  **Q.**   And after Antwuan showed you this half a key of powder,

13  what, if anything, did Antwuan say after that?

14  **A.**   He was like, I'm going to be nice in a minute, and I'm

15  going to come back and holler at y'all.

16  **Q.**   What did you understand, "I'm going to be nice in a

17  minute" to mean?

18  **A.**   Like he going to fix it up, so he can front me and Don

19  some more coke.

20  **Q.**   Fix it up how?

21  **A.**   Cook it.

22  **Q.**   And did you end up meeting up with Antwuan after this?

23  **A.**   Yes.

24  **Q.**   How much later?

25  **A.**   Like about two days, because it take some time to cook

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4904

1  the coke -- I mean for the coke to get hard.

2  **Q.**   Have you ever cooked powder into crack?

3  **A.**   Before, yes.

4  **Q.**   What do you mean "before"?

5  **A.**   I had cooked powder into crack.

6  **Q.**   Before you saw Antwuan in 1995 or what do you mean by

7  before?

8  **A.**   I mean, I said I did it before.

9  **Q.**   You mean as you sit here today?

10  **A.**   Yes, I've cooked coke before.

11  **Q.**   Okay.  And you said it takes a couple days to cool?

12  **A.**   Like about a -- like about a day or two.

13  **Q.**   Okay.  So about two days later when you see Antwuan, tell

14  us what happens?

15  **A.**   We get some more coke from him.

16  **Q.**   Who is we?

17  **A.**   Me and Don.

18  **Q.**   How much did you get from Antwuan those two days later?

19  **A.**   Normal stuff, like a half ounce.

20  **Q.**   Do you remember on this day if you paid for it or were

21  you fronted it?

22  **A.**   I mean, I couldn't remember specifically, but I know at

23  the time, he was getting fronted coke from him and we was buying

24  coke from him.

25        MR. LEON:  May I approach, Your Honor?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4905

1        THE COURT:  Yes.

2  BY MR. LEON:

3  **Q.**   Mr. Capies, I'm handing you what's marked for

4  identification as Government's 225.1.  Do you recognize the

5  picture depicted there?

6  **A.**   Yes, sir.

7  **Q.**   Who's that?

8  **A.**   Keith.

9  **Q.**   Keith who?

10  **A.**   Barnett.

11  **Q.**   And is that the same Keith Barnett that you talked to us

12  about earlier this morning, the same Keith you mentioned

13  earlier?

14  **A.**   Yes, sir.

15  **Q.**   Okay.  And does that picture fairly and accurately depict

16  what Keith looked like when you knew Keith?

17  **A.**   Yes, sir.

18        MR. LEON:  Your Honor, the government would move for

19  admission of 225.1.

20        THE COURT:  Without objection, it's received.

21        (Government's Exhibit 225.1 admitted into the record.)

22  BY MR. LEON:

23  **Q.**   Now, I believe you testified yesterday that -- excuse me,

24  yesterday that on July 3rd of 2001, you were arrested.  Do you

25  remember that testimony?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4906

1  **A.**   Yes, sir.

2  **Q.**   And are you aware as to whether or not certain evidence

3  or property was taken out of your home at that time?

4  **A.**   Yes, sir.

5  **Q.**   Do you know what that property included?

6  **A.**   Yes, sir.

7  **Q.**   What?

8  **A.**   Two rifles, a gun, some pictures, a phone -- some phones,

9  little miscellaneous -- other little stuff.

10  **Q.**   Now you mentioned some pictures.  Would you recognize

11  those pictures if you saw them again today?

12  **A.**   Yes, sir.

13        MR. LEON:  May I approach, Your Honor?

14        THE COURT:  Yes.

15  BY MR. LEON:

16  **Q.**   Mr. Capies, I'm handing you a bag which is in evidence,

17  which is marked 702.14 C.

18        And in that bag are three items.  Two photographs, which

19  I just took out, and a piece of paper.  I'm going to focus on

20  the photographs and I'm going to turn to this one first, which

21  we have labeled, additionally, 702.14 C1, just for

22  identification, but it is contained within the bag that is in

23  evidence, okay?

24        Do you recognize the picture, first of all?

25  **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 4907

1   **Q.**   Before telling us who's in the picture, do you recognize
2 that picture -- do you know where that picture came from?
3   **A.**   Yes, sir.
4   **Q.**   Where?
5   **A.**   Out of my baby's mother's house that I was staying in.
6   **Q.**   And is that the home that you were arrested in on July
7 3rd of 2001?
8   **A.**   Yes, sir.
9   **Q.**   How long -- so that picture -- whose picture in 2001,
10 July, whose was it?  Whose picture was it?
11   **A.**   At that time, I think it was my baby's mother's.  She had
12 that picture.
13   **Q.**   Okay.  Do you know how long she's had that picture?
14   **A.**   Naw, I don't know how long.
15   **Q.**   Can you tell from the picture when it was taken?
16   **A.**   Look like a little bit after '97.
17   **Q.**   Why do you say that?
18   **A.**   Because of the clothes.
19   **Q.**   Okay.  Who's in the picture?
20   **A.**   Keith, Don, and Kevin.
21   **Q.**   Okay.
22      MR. LEON:  Permission to publish, Your Honor.
23      THE COURT:  Yes.
24 BY MR. LEON:
25   **Q.**   Mr. Capies, I'll ask you to tap and clear that screen.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 4908

1      And Mr. Capies, for the record, I put on the screen what
2 we sublabeled 702.14 C1.  And is that the picture?
3   **A.**   Yes, sir.
4   **Q.**   And just, if you could tap for us who's who.  You said
5 Don's in the picture.  Where's Don?
6   **A.**   (Indicating).
7   **Q.**   For the record, you tapped on the taller gentleman in the
8 reddish-orange sweater?
9   **Q.**   Okay.  You said Keith.  Which one is Keith?
10   **A.**   (Indicating).
11   **Q.**   And for the record, you tapped on the picture of the
12 person who's beside Don, standing in a winter coat?
13   **A.**   Yes, sir.
14   **Q.**   And then you said Kevin.  Where is Kevin?
15   **A.**   (Indicating).
16   **Q.**   And for the record, you tapped on the person seated in
17 the middle, bottom portion of that picture; is that correct?
18   **A.**   Yes, sir.
19   **Q.**   Is that the Kevin who you just tapped on, the same Kevin
20 who you would buy from back and around '95 or so?
21   **A.**   I never bought none from Kevin.
22   **Q.**   Okay.  Thank you for correcting me.  Is that the same
23 Kevin that you talked about earlier seeing sell drugs in
24 Congress Park?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 4909

1   **A.**   Yes, sir.
2   **Q.**   Okay.  And what about Keith, I don't remember if I asked
3 you about Keith.  Did Keith sell in Congress Park as well?
4   **A.**   Yes, sir.
5   **Q.**   I'm going to ask you to clear the screen.
6      MR. LEON:  May I approach, Your Honor?
7      THE COURT:  Yes.
8 BY MR. LEON:
9   **Q.**   I'll also hand you another picture, also taken out of
10 714.C.  Do you recognize that?
11   **A.**   Yes, sir.
12   **Q.**   What is that?
13   **A.**   A picture at The Place.
14   **Q.**   What's The Place?
15   **A.**   Like this little place you go for, like, mic nights and
16 stuff like that.
17   **Q.**   Okay.  Can you tell when that picture was taken?
18   **A.**   In '99.
19   **Q.**   Why do you say that?
20   **A.**   Because that's when we was going to The Place.
21   **Q.**   And when you say "we," who was we?  Who is the "we" that
22 you're referring to that went to The Place in 1999?
23   **A.**   Me, Wop, Phil, DC, Don, EB, Antwuan, Fat Tony, JT, Baby
24 Kairee.
25   **Q.**   Okay.  And do you know where this picture was -- do you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 4910

1 have an understanding as to where this picture was taken from,
2 not when it was taken by a photographer, but where it was
3 retrieved from?  When is the last time you saw that picture?
4   **A.**   In my house.
5      MR. LEON:  Permission to publish, Your Honor.
6      THE COURT:  Yes.
7 BY MR. LEON:
8   **Q.**   This picture is actually also separately marked for
9 identification, separately as Government's 108.27, which is not
10 in evidence, even though the physical picture I hold in my hand
11 is part of the bag that is in evidence, so it's labeled twice.
12 So just to be careful, we would separately move for the
13 admission of Government's 108.27, and then we could -- if that's
14 granted, we could then publish it through the sanctions.
15      MS. WICKS:  No objection.
16 BY MR. LEON:
17   **Q.**   Mr. Capies, I'll ask you --
18      THE COURT:  Well, let's -- do you want to have that item
19 in evidence as 108.27 or do you want to keep it in evidence as a
20 part of 702.14 C?  It should bear only one exhibit
21 identification.
22      MR. LEON:  It doesn't matter to the government.  I think
23 it would be easier to view off of sanctions.  That's my only
24 request.  We don't care how it's labeled though, as long as we
25 can -- Your Honor, can I have a moment?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 528 of 1954

1    (Discussion had off the record.)
2    MR. LEON:  We would ask to separately renumber this
3  particular photograph as Exhibit 108.27.
4    THE COURT:  All right, without objection, it will be
5  received.
6    (Government's Exhibit 108.27 admitted into the record.)
7    MR. LEON:  And then ask for permission to publish through
8  the computer.
9    THE COURT:  Yes.
10  BY MR. LEON:
11  Q.    Mr. Capies, you'll have to tap and clear the screen
12  again.
13    Okay.  I'm going to ask you to identify for us the people
14  in this photograph, and I'm going to ask if you can go in some
15  sort of order, so why don't you, if you can, pick a side, start
16  either on the left or right, if you could, or on the bottom or
17  top and then we'll go in order.  Who's the first person you
18  recognize there?
19  A.    Phil.
20  Q.    Where's Phil?
21  A.    (Indicating).
22  Q.    Okay.  For the record you tapped on the person on the
23  left, standing on the left most portion of the picture; is that
24  correct?
25  A.    Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.    Okay.  When did you first get to know Phil?
2  A.    First, since he was little.  He's younger than us.
3  Q.    How much younger than Phil is you, if you know?
4  A.    I would say five or four years younger.
5  Q.    Is Phil, does he have any brothers?
6  A.    Yes, sir.
7  Q.    Who are Phil's brothers?
8  A.    Dazz.
9  Q.    Dazz is Phil's brother?
10  A.    Yes, sir.
11  Q.    And you said you got to know Phil.  How old would you say
12  you were when you first got to know Phil?
13  A.    I was about eight or nine.  They lived right on the side
14  of me.
15  Q.    Did -- to your knowledge, did Phil ever sell drugs in
16  Congress Park?
17  A.    Yes, sir.
18  Q.    When's the first time you remember seeing Phil sell drugs
19  in Congress Park?
20  A.    Like the end of '96, going into '97.
21  Q.    Okay.  Before then, you don't remember him selling drugs?
22  A.    Naw.
23  Q.    Okay.  And beginning in '96, '97, how old were you?
24  A.    About 18, something like that.
25  Q.    So that would have made Phil about how old?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.    About 14 or 13.
2  Q.    Okay.  Who's the next person you recognize in the
3  picture?
4  A.    Wop.
5  Q.    Can you tap on where you see Wop?
6  A.    (Indicating).
7  Q.    For the record, you made a mark to the person just next
8  to Dazz, the second from the left.
9  A.    That's not Dazz, that's Phil, sir.
10  Q.    Right next to Phil, just second from the left -- second
11  from the left on the photo, correct?
12  A.    Yes, sir.
13  Q.    Okay.  And Wop is the same Wop you've talked about
14  earlier today and yesterday?
15  A.    Yes, sir.
16  Q.    Okay.  Who's the next person that you recognize in this
17  picture?
18  A.    DC.
19  Q.    Okay.  Can you show us where DC is?
20  A.    Yes, sir.  (Indicating).
21  Q.    Okay.  For the record, it looks like you put a red mark
22  right near the chin of somebody who seems to be wearing a --
23  looks like an M and M jacket.
24  A.    I was pointing to the shoulder, but it went up.  It's
25  behind the guy with the M & M jacket on, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.    Okay.  Is that person's face partially covered with a
2  hand?
3  A.    Yes, but DC in the back of him.
4  Q.    Okay.  So DC is the person -- is it fair to say, between
5  the dot you just made and the heavy-set person?
6  A.    Yes, sir.
7  Q.    The person all the way in the back?
8  A.    Yes, sir.
9  Q.    Is there anything on that person's head?
10  A.    Something like -- look like a black daub or a hat.
11  Q.    Now we talked about DC a little bit yesterday.  When did
12  you first get to know DC?
13  A.    I knew DC since junior high school.
14  Q.    Okay.  And did you ever know DC to sell drugs in Congress
15  Park?
16  A.    Yes, sir.
17  Q.    When's the first time you knew that DC sold drugs in
18  Congress Park?
19  A.    Like the end of the '90s.
20  Q.    End of the '90s?
21  A.    Yes, sir.
22  Q.    And before then, did you know D.C.?
23  A.    Yes, sir.
24  Q.    We're going to get to the end of the '90s later on in
25  your testimony.  Let's stay with the time period we are.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4915

1   Anyone else you recognize in the picture?
2   **A.**   Yes, sir.
3   **Q.**   Who?
4   **A.**   Don, sir.
5   **Q.**   Can you point out to us where Don is?
6   **A.**   Yes, sir.  (Indicating).
7   **Q.**   And for the record, you tapped on a gentleman also
8   standing in the back of the picture, looks like he is third from
9   the right, standing also with something that appears to be black
10  on his head?
11  **A.**   Yes, sir.
12  **Q.**   And appears to have some sort of a blue shirt as well?
13  **A.**   Yes, sir.
14  **Q.**   And this is the Don that we've been talking about this
15  morning, same Don?
16  **A.**   Yes, sir.
17  **Q.**   Do you recognize anyone else in the photograph?
18  **A.**   Yes, sir.
19  **Q.**   Who?
20  **A.**   Antwuan.
21  **Q.**   Can you please identify Antwuan.
22  **A.**   (Indicating).
23  **Q.**   And for the record, you put a dot on the person who's
24  standing on the second from the right in the photograph?
25  **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4916

1   **Q.**   Okay.  Same Antwuan you've talked about earlier this
2   morning?
3   **A.**   Yes, sir.
4   **Q.**   Okay.  Do you recognize anyone else in the photograph?
5   **A.**   Yes, sir.
6   **Q.**   Who?
7   **A.**   Fat Tony.
8   **Q.**   Where is he?
9   **A.**   (Indicating).
10  **Q.**   And for the record, you put a dot on the person standing
11  all the way on the right side of this photograph; is that
12  correct?
13  **A.**   Yes, sir.
14  **Q.**   Do you know how old Fat Tony is in relation to how old
15  you are?
16  **A.**   He got some years on me.  He older than me.
17  **Q.**   Do you know -- who did Fat Tony, if you know, largely
18  hang out with in Congress Park?
19  **A.**   Antwuan, Kairi, Jo-Jo, Boy-Boy.
20  **Q.**   Did you ever know Fat Tony to sell drugs in Congress
21  Park?
22  **A.**   Yes, sir.
23  **Q.**   When did you first know Fat Tony to sell drugs in
24  Congress Park?
25  **A.**   Like '93 on up.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4917

1   **Q.**   Is there anyone else in this photograph that you
2   recognize?
3   **A.**   Yes, sir.
4   **Q.**   Who?
5   **A.**   EB.
6   **Q.**   Can you please point out EB in the photograph?
7   **A.**   (Indicating).
8   **Q.**   For the record, you put a dot on an individual who's
9   kneeling.  The person kneeling towards the bottom left of the
10  photograph; is that correct?
11  **A.**   Yes, sir.
12  **Q.**   And looks like he's wearing a baseball cap?
13  **A.**   Yes, sir.
14  **Q.**   And is this the same EB that you talked about earlier
15  this morning?
16  **A.**   Yes, sir.
17  **Q.**   Do you recognize anyone else in the photograph?
18  **A.**   Yes, sir.
19  **Q.**   Who?
20  **A.**   Fat Tony's brother.
21  **Q.**   And where is Fat Tony's brother?
22  **A.**   (Indicating).
23  **Q.**   And for the record, you pointed right in the middle of
24  the picture to a heavy-set gentleman who has, like, a white
25  sweatshirt of some sort?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

4918

1   **A.**   Yes, sir.
2   **Q.**   Okay.  Do you know his name?
3   **A.**   I don't know his name.
4   **Q.**   Okay.  And do you know if he lived with Fat Tony or --
5   **A.**   Before.
6   **Q.**   What do you mean by "before"?
7   **A.**   He also stayed across the street from my mom's house
8   before.
9   **Q.**   I see.  Anyone else you recognize in this photograph?
10  **A.**   No, sir.
11  **Q.**   Okay.  Can you see the person's whose hand -- who's
12  wearing the M & M jacket with the hand covering the face, can
13  you see the whole face?
14  **A.**   It looks like somebody, but I ain't for sure if that's
15  the person.
16  **Q.**   Okay.  Then, don't guess.  And what about the person
17  kneeling or I should say sitting, kind of near the leg of the
18  person you identified as Fat Tony's brother, with the baseball
19  cap backwards?
20  **A.**   I don't know him, sir.
21  **Q.**   Okay.  Do you know somebody named Ju-Ju?
22  **A.**   Yes, sir.
23  **Q.**   Then again, I apologize.  I'm still referring to the '92
24  to '96 time period.  Did you know Ju-Ju back around that time?
25  **A.**   I knew him.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*4919*

1   **Q.**   How'd you know him?

2   **A.**   From back in the day when I was small.

3   **Q.**   Who did you know, if anyone, Ju-Ju to associate with or

4   hang out with, back during that time period?

5   **A.**   Back then, a lot of people.

6   **Q.**   Who?

7   **A.**   We talking back then -- because he had went to jail for a

8   long time, but back like in the '80s, he used to be on 14th

9   Place with Antwuan.

10      MR. PURPURA: Objection, Your Honor, we're now in the time

11   frame of the '80s and personal knowledge.

12      MR. LEON: I can rephrase.

13      THE COURT: Go ahead.

14   BY MR. LEON:

15   **Q.**   Did you know -- do you know what Ju-Ju looks like?

16   **A.**   Yes, sir.

17   **Q.**   Have you seen Ju-Ju?

18   **A.**   Yes, sir.

19   **Q.**   Have you talked to Ju-Ju?

20   **A.**   Before, I talked to him.

21   **Q.**   Okay. But have you ever talked to him?

22   **A.**   Yes, sir.

23   **Q.**   Okay. And did you know Ju-Ju or see Ju-Ju after 1992?

24   **A.**   Yes, sir.

25   **Q.**   And when you saw Ju-Ju after 1992, where did you see him?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4920*

1   **A.**   Around Congress Park.

2   **Q.**   And when you saw Ju-Ju after '92 around Congress Park,

3   who, if anyone, did you see Ju-Ju with?

4   **A.**   Me, Wop, LT, Drano. He used to hang in the alley with

5   us.

6   **Q.**   And when he would hang with you -- well, withdrawn.

7      Did you ever know Ju-Ju to sell drugs in Congress Park?

8   **A.**   Yes, sir.

9   **Q.**   Would he do it -- do you know, if you know, where Ju-Ju

10   got his drugs from?

11   **A.**   No, sir.

12   **Q.**   Now, you mentioned Kairi, Antwuan Ball's brother, around

13   this time, 94, 95 or so, and you said you were getting -- you

14   were getting from Kairi, I believe you said, for a period of

15   time; is that correct?

16   **A.**   Yes, sir.

17   **Q.**   Do you know where Kairi got his drugs?

18      MR. ZUCKER: Objection, basis or foundation.

19   BY MR. LEON:

20   **Q.**   If you know.

21   **A.**   Yes, sir.

22      THE COURT: Just yes or no.

23      THE WITNESS: Yes.

24   BY MR. LEON:

25   **Q.**   You do know?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4921*

1   **A.**   Yes.

2   **Q.**   Okay. Did you ever see Kairi with your own eyes get his

3   drugs, before you got them from him?

4   **A.**   No, sir, just going on what he told me.

5   **Q.**   Off what who told you?

6   **A.**   Kairi.

7   **Q.**   What did Kairi tell you as to where Kairi got his drugs?

8   **A.**   A guy named Deuce.

9   **Q.**   Deuce?

10   **A.**   Yes, sir.

11   **Q.**   Do you know who Deuce is?

12   **A.**   Yes, sir.

13   **Q.**   Who's Deuce?

14   **A.**   Deuce is this Guy named -- Deuce, Rob.

15   **Q.**   What's that?

16   **A.**   He goes by the name Rob.

17   **Q.**   And have you ever personally gotten drugs from Deuce?

18   **A.**   Wholesale, but no weight or nothing like that.

19   **Q.**   When Kairi told you that Kairi got drugs from Deuce, did

20   he ever tell you how much he got from Deuce?

21   **A.**   No, sir.

22   **Q.**   Do you know, just yes or no at this point, if anyone else

23   who sold drugs in Congress Park got their drugs from Deuce?

24      MR. ZUCKER: Foundation.

25      THE COURT: You can answer yes or no.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4922*

1   BY MR. LEON:

2   **Q.**   You don't know?

3   **A.**   No, sir, I don't.

4   **Q.**   Now, you've also mentioned this morning, Dazz, and you've

5   identified him by photograph and in court yesterday. Do you

6   remember talking about Dazz?

7   **A.**   Yes, sir.

8   **Q.**   Around this time, 1992 to 1996, did you ever see Dazz

9   sell drugs?

10   **A.**   Yes, sir.

11   **Q.**   With your own eyes?

12   **A.**   Yes, sir.

13   **Q.**   When Dazz would sell drugs in Congress Park, that you saw

14   with your own eyes, where would you see him do this?

15   **A.**   In my court, by his building, all on 14th Place.

16   **Q.**   Okay.

17      MR. LEON: Your Honor, I would ask to publish again the

18   map of Congress Park which is 100.1.

19      THE COURT: Yes.

20   BY MR. LEON:

21   **Q.**   And Mr. Capies, I would ask you to clear the screen by

22   tapping it. So you said by your court?

23   **A.**   Yes, sir.

24   **Q.**   Okay. Just quickly, just tap what you mean by your

25   court?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4923*

1  **A.**  "In my court, just around in that 14th Place area.
2  **Q.**  Just quickly, if you could, put a dot or a circle in the
3  area that you're referring to.
4  **A.**  (Indicating.)
5  **Q.**  And do you know if Dazz lived in this area, around this
6  time?
7  **A.**  Yes, sir.
8  **Q.**  Where did Dazz live?
9  **A.**  A little behind me, to the right.
10  **Q.**  Can you tap where Dazz lived around this time.
11  **A.**  (Indicating).
12  **Q.**  Okay. For the record, you made two marks, the first one
13  to indicate where your court was, a little bit above the PL in
14  Savannah Place on the map, in the center-right portion, is that
15  fair?
16  **A.**  Yes, he lived in Savannah Place.
17  **Q.**  Okay. And then the second dot you made indicating the
18  proximate area where Dazz lived is just below the AH in Savannah
19  Place?
20  **A.**  Yes, sir.
21  **Q.**  Okay. When you saw Dazz with your own eyes sell drugs in
22  your court, how often are we talking about?
23  **A.**  Just about every day.
24  **Q.**  And how much would Dazz sell, if you know, around this
25  time? Again, '92 to '96 or so?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*4924*

1  **A.**  I mean, dimes. There was no certain weight.
2  **Q.**  Do you know, if you know, yes or no, how Dazz got his
3  drugs to sell?
4  **A.**  At that time, he was going to this guy named Burke.
5  **Q.**  Burke?
6  **A.**  Yes, sir.
7  **Q.**  And how do you know that?
8  **A.**  Because I used to always see him with him and he would
9  tell me.
10  **Q.**  Who'd tell you?
11  **A.**  Dazz.
12  **Q.**  What would Dazz tell you?
13  **A.**  That he get his coke from Burke.
14  **Q.**  Do you know who Burke is?
15  **A.**  Yes, sir.
16  **Q.**  And who is Burke?
17  **A.**  A buy that lived at the end of 14th Place.
18  **Q.**  And did Burke sell drugs in Congress Park?
19  **A.**  Yes, sir.
20  **Q.**  We'll get to Burke in a few moments.
21    Let's just stay with Dazz. Did Dazz ever tell you who he
22  got his drugs from, other than that Burke?
23  **A.**  No, sir.
24  **Q.**  And do you know from Dazz how often he would get his
25  drugs from Burke, around this time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*4925*

1  **A.**  No, I don't know how often.
2  **Q.**  And when Dazz was selling in your court, were you selling
3  in your court at the same time?
4  **A.**  Yes, sir.
5  **Q.**  What about Don?
6  **A.**  Yes, sir.
7  **Q.**  I believe you also mentioned EB. Was EB also selling in
8  your court at that time?
9  **A.**  Yes, sir.
10  **Q.**  And I believe -- who else, if anyone -- I don't want to
11  put words in your mouth, but I thought you mentioned one or two
12  other people who were selling around this time in your court.
13  Did you or not?
14  **A.**  Yes, sir.
15  **Q.**  Who?
16  **A.**  My brother.
17  **Q.**  Darryl?
18  **A.**  Yes, sir.
19  **Q.**  Who else?
20  **A.**  Like Dom, EB, Dazz.
21  **Q.**  And was there enough business for all of you?
22  **A.**  Yes, sir.
23  **Q.**  Did any of you have a problem with the others selling
24  right in the same court?
25  **A.**  No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*4926*

1  **Q.**  You all get along?
2  **A.**  Yes, sir.
3  **Q.**  Now, you mentioned some of the older people who were more
4  near the circle. Do you remember that testimony?
5  **A.**  Yes, sir.
6  **Q.**  And again, just quickly, who were those people -- I don't
7  want to -- just quickly, for the record, just the names.
8  **A.**  Boy-Boy, Antwuan, Kairi, Fat Tony, Jo-Jo.
9  **Q.**  And did you ever -- you, when I say "you," Bobby Capies,
10  ever sell, occasionally, during this time '92 to '96, towards
11  the circle?
12  **A.**  Here and there, but it wasn't no stationary around there.
13  **Q.**  And at that time, why not -- why not do it where you did
14  it in that part of Congress Park?
15  **A.**  I mean, the older dudes was around there. I mean you
16  going to make some sales around there, but they only going to
17  let you do so much at that time.
18  **Q.**  And when you say "at that time," was there a time when
19  you did end up selling at the circle?
20  **A.**  Yes, sir.
21  **Q.**  When was that?
22  **A.**  It was before -- it was after '96, sir.
23  **Q.**  Okay. And we're going to get to that.
24    But before then, before it was more allowed, during '92,
25  '96, did you ever get in trouble with any of the older guys in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*4927*

1 the circle for selling in the circle when you did?

2    A.    Naw, but I got robbed by one of the older guys.

3    Q.    Who'd you get robbed by?

4    A.    A guy named Reesey.

5    Q.    Okay. Who's Reesey?

6    A.    Maurice's -- a dude named Maurice Dolman.

7    Q.    Is Maurice Dolman, also known as Reesey, alive or dead?

8    A.    He dead.

9    Q.    Do you know when he died?

10    A.    Like end of '93, '94. I don't when -- I know it was

11 around that time.

12    MR. LEON: Could I just have one moment, Your Honor?

13    THE COURT: Yes.

14    (Discussion had off the record.)

15    MR. LEON: May I approach, Your Honor?

16    THE COURT: Yes.

17 BY MR. LEON:

18    Q.    Mr. Capies, I'm handing you what's marked for

19 identification as Government's Exhibit 210.1. Do you recognize

20 that?

21    A.    Yes, sir.

22    Q.    Who's that?

23    A.    That's Burke.

24    Q.    And is that the Burke that you were referring to, who

25 supplied Dazz?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4928*

1    A.    Yes, sir.

2    Q.    Does this picture fairly and accurately depict what Burke

3 looked like?

4    A.    Yes, sir, that's Burke.

5    MR. LEON: Your Honor, the government would move for

6 admission of 210.1.

7    THE COURT: Without objection, it's received.

8    (Government's Exhibit 210.1 admitted into the record.)

9 BY MR. LEON:

10    Q.    Mr. Capies, I just want to ask you about a few other

11 names and then we're going to move on to another area, okay?

12    Do you know somebody by the name of Rome?

13    A.    Yes, sir.

14    Q.    Who's Rome?

15    A.    It's a guy that ran with a dude, Maurice Dolman.

16    Q.    And this person that you said was Reesey?

17    A.    Yes, sir.

18    Q.    How do you know that they ran together?

19    A.    Because I used to see them always together.

20    Q.    And when you saw them together, where would you see them?

21    A.    I seen them him when I was robbed, when Reesey robbed me.

22    Q.    He was with Reesey?

23    A.    Yes, sir.

24    Q.    And when you got robbed by Reesey, where were you?

25    A.    In my -- the EB building, across from my building.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4929*

1    Q.    What did he take?

2    A.    Some coke and some money.

3    Q.    Did you ever see Reesey after that?

4    A.    Yes, sir.

5    Q.    And did you do anything about it?

6    A.    No, sir.

7    Q.    Why not?

8    A.    Cause, there was nothing I could do at that time. I

9 mean, I wasn't into shooting no gun or nothing like that, or

10 retaliating.

11    Q.    Did you -- how old were you when this happened?

12    A.    I couldn't put no age on it. I was young. I was a

13 teenager.

14    Q.    At that point when you got robbed, did you carry guns?

15    A.    Yes, sir.

16    Q.    So you said you didn't want to retaliate, did you think

17 about it?

18    A.    I mean, at that time -- yeah, I thought about it, but you

19 know, it cross your mind. You go around there shooting, you can

20 get killed.

21    Q.    Did Reesey have a gun when he robbed you?

22    A.    Yes, sir.

23    Q.    Did you see it?

24    A.    I seen the gun. I can't remember the gun, though.

25    Q.    Other than that time that Rome was with Reesey when you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*4930*

1 got robbed, did you ever see Rome at other times in Congress

2 Park?

3    A.    Yes, sir.

4    Q.    Did you ever know Rome to -- first of all, other than

5 Reesey, who, if anyone, did Rome more closely associate with in

6 Congress Park?

7    A.    He was cool with Wop.

8    Q.    How do you know that?

9    A.    Because I used to see them together sometimes.

10    Q.    And when you saw Rome with Wop, where would you see Rome

11 and Wop?

12    A.    I mean, just in spots. I didn't really see them grouped

13 up hanging with them, but I used to see them in spots, hanging

14 with him.

15    Q.    Okay. Other than the time Reesey robbed you, did you

16 ever know Reesey to sell drugs in Congress Park?

17    A.    I know -- I didn't really see Rob selling drugs. I know

18 him for like robbing, stuff like that.

19    Q.    Just what you know personally, did you personally, with

20 your own eyes, see Reesey selling drugs in Congress Park?

21    A.    No, sir.

22    Q.    Did you personally, with your own eyes, ever see Reesey

23 rob anyone else other than you?

24    A.    No, sir.

25    Q.    Okay. What about somebody by the name of Tommy Murphy,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**4931**

1  do you know somebody by the name of Tommy Murphy?
2  **A.**  Yes, sir.
3  **Q.**  Who's Tommy Murphy?
4  **A.**  He's -- he this dude that used to hang around the circle,
5  too.
6  **Q.**  And when he hung out at the circle, who, if anyone, did
7  he more closely associate with near the circle?
8  **A.**  Him and Antwuan.  He come, but he always had his own
9  little thing.
10  **Q.**  Tommy Murphy did?
11  **A.**  Yes, sir.
12  **Q.**  What do you mean by that "he had his own little thing"?
13  **A.**  He was hanging with some dudes that he was associating
14  with from, like, up there by the Avenue, and stuff like that.
15  **Q.**  When you say out "there by the Avenue," where's that?
16  **A.**  That's up there by MLK, Martin Luther King Avenue.
17  **Q.**  Is that part of the Congress Park neighborhood?
18  **A.**  Naw, it ain't part of it.  It's a little way from it, by
19  Saint Elizabeth.
20  **Q.**  And Boobie, do you know who Boobie is?
21  **A.**  Yes, sir.
22  **Q.**  Who's Boobie?
23  **A.**  Wop's brother.
24  **Q.**  Is Boobie older or younger than Wop?
25  **A.**  He younger.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**4932**

1  **Q.**  And is Boobie alive or not today?
2  **A.**  He dead.
3  **Q.**  Do you know when he died?
4  **A.**  Yes, sir.
5  **Q.**  When?
6  **A.**  March -- some time in March, 2001.
7  **Q.**  How do you remember the month and year?
8  **A.**  Me and him -- he was with me when he got shot up.
9  **Q.**  Okay.
10
11      MR. LEON:  Mr. Mazzitelli -- well, Your Honor, I would ask
12  to show to the witness what's marked for identification as
13  Government's 108.110.
14      THE COURT:  108 point.
15      MR. LEON:  110.
16      And Mr. Capies, I'll ask you to clear the screen again.
17  And can you clear the screen?  Can you just tap it?
18  BY MR. LEON:
19  **Q.**  Do you see that picture?
20  **A.**  Yes, sir.
21  **Q.**  Okay.  Do you recognize the people in the picture that
22  you're looking at right now?
23  **A.**  Yes, sir.
24  **Q.**  Do the people that you recognize in the picture fairly
25  and accurately look like the people that you recognize them to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**4933**

1  be?
2  **A.**  Yes, sir.
3      MR. LEON:  Your Honor, at this time the government would
4  move for the admission of Government's 108.110, subject to any
5  redactions which will be made.
6      MS. WICKS:  No objection, with the redactions, Your Honor.
7      THE COURT:  All right.  Without objection, it will be
8  received under those conditions.
9      (Government's Exhibit 108.110 admitted into the record.)
10  **Q.**  And at this time, we would ask to publish to the jury.
11      THE COURT:  Yes.
12  BY MR. LEON:
13  **Q.**  Okay.  Do you see the picture, Mr. Capies?
14  **A.**  Yes, sir.
15  **Q.**  I'm going to ask you to do the same thing, go in some
16  sort of order.  Tap on a person and tell us if you recognize
17  somebody.  Tap on that picture, and then I'm going to ask how
18  you know that person.  Why don't we start maybe at the left?
19  **Q.**  Who's the first person you recognize?
20  **A.**  Boobie.
21  **Q.**  Who?
22  **A.**  Boobie.
23  **Q.**  Can you tap on where you see Boobie?
24  **A.**  (Indicating).
25  **Q.**  And for the record you tapped on a person sitting.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**4934**

1  Bottom -- towards the bottom left-hand portion of the picture.
2  Looks like he's wearing some boots and some jeans and looks like
3  he has some glasses on; is that correct?
4  **A.**  Yes, sir.
5  **Q.**  And this is the Boobie who you said died in March of
6  2001?
7  **A.**  Yes, sir.
8  **Q.**  When did you first know Boobie?
9  **A.**  I knew him for a long time.
10  **Q.**  When did you first know Boobie?
11  **A.**  For like -- since like '89.
12  **Q.**  Okay.  So it's fair to say you knew him in '92?
13  **A.**  Yes, sir.
14  **Q.**  And when you knew him, again in '92 to '96 or so, did you
15  know him during that time period?
16  **A.**  Yes, sir.
17  **Q.**  During that time period, did you ever know Boobie to sell
18  drugs?
19  **A.**  Like -- I'm going to say, like, '94.  He was also, you
20  know, going to school and working at one point in time, like
21  '92, '93.
22  **Q.**  Okay.
23  **A.**  So like '94.
24  **Q.**  What happened in '94?
25  **A.**  That's when I started noticing him selling drugs.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 Q.   Okay.  Did you personally buy from Boy-Boy during that time?

2 A.   Yes, sir.

3 Q.   Okay.  And did you -- when you and Don bought, did Don buy

4 separately or did you buy separately?  How did that work?

5 A.   We would go to him together and buy wholesales.  He has his

6 own money, I have my own money.

7 Q.   And what period of time is this?  How long did you and Don

8 buy wholesales from Boy-Boy.  And again, we're just in the '92

9 to '96 time period right now.

10 A.   Off and on, all the way up to '96.

11 Q.   Were there ever times you would buy from Boy-Boy on your

12 own, without Don there?

13 A.   Yes, sir.

14 Q.   And when you did that, how much would you buy from Boy-Boy?

15 A.   Just wholesale, like $200, 40 dimes or something like that.

16 $100, 20 dimes.

17 Q.   Of the people during this period of time, '92 to '96, that

18 you would mainly - you, Bobby Capies - would mainly get your

19 supply from, who were some of the main people you personally

20 would get your supply from, during this time period, '92 to '96?

21 A.   Boy-Boy, Kairi, and Antwuan.

22 Q.   Do you recognize anyone else in this photograph?

23 A.   Yes, sir.

24 Q.   Who?

25 A.   A dude named Terry.

1 Q.  Where is Terry?

2 A.  (Witness complies.)

3 Q.  For the record, you pointed to somebody standing in the back

4 row, in between the person -- standing in between and behind the

5 person you identified as Baby Ki and the person you identified

6 as Jojo.  Is that correct?

7 A.  Yes, sir.

8 Q.  Who is Terry?

9 A.  Somebody that lived around the Congress Park.

10 Q.  And to your knowledge, did Terry sell drugs in Congress Park

11 around that time?

12 A.  I never seen him sell drugs, sir.

13 Q.  Do you recognize anyone else in the photograph?

14 A.  Yes, sir.

15 Q.  Who?

16 A.  A dude named Fat Dog.

17 Q.  Fat Dog?

18 A.  Yes, sir.

19 Q.  Where is Fat Dog?

20 A.  (Witness complies.)

21 Q.  For the record, you indicated a person towards the lower

22 center portion of the photograph, in what appears to be a red

23 and black plaid, either jacket or a long shirt.  Is that

24 correct?  Is that fair?

25 A.  Yes, sir.

Page 4972

1  Q.  He's kneeling?

2  A.  Yes, sir.

3  Q.  Or squatting?  Who is Fat Dog?

4  A.  He was a guy that lived around there.  Around that time, he

5  was just coming home.  He had done a long -- he did a lot of

6  time.

7  Q.  And when you say that, not for Wop, but when you say, "a lot

8  of time," what do you mean by that?

9  A.  He did about seven or eight years, something like that.

10  Q.  In jail?

11  A.  Yes, sir.

12  Q.  And did Fat Dog live in Congress Park, to your knowledge?

13  And I'm specifically talking '92 to '96.

14  A.  I don't know when he went in, but at the time his mother was

15  still living around there.  But before he got locked up, he was

16  staying with her.

17  Q.  But you don't know if he was still in jail during the '92 to

18  '96 period?

19  A.  Yeah, he was locked up, but I don't know if he was still

20  located with her, as far as that's his stationary address.

21  Q.  I see.  Do you recognize anyone else in the photograph?

22  A.  Yes, sir.

23  Q.  Who?

24  A.  Doo-Doo.

25  Q.  Do-Do.  Where is Doo-Doo?

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013     Page 537 of 1954

1 A.  (Witness complies.)

2 Q.  And for the record, you've indicated someone also squatting

3 or kneeling, wearing a baseball cap.  Of the three people

4 squatting or kneeling on this photograph, he's the one in the

5 center holding what appears to be a beer bottle in his left

6 hand.

7 A.  Yes, sir.

8 Q.  Okay.  What connection if any does Doo-Doo have to Congress

9 Park during the 1992 to 1996 period?

10 A.  He was hustling around there.

11 Q.  What do you mean by "hustling around there"?

12 A.  Selling drugs.

13 Q.  What part of Congress Park did Doo-Doo hustle in the '92 to

14 '96 period, if you know?

15 A.  I used to see him.  He used to be in the circle sometimes,

16 but I mainly used to see him in the Boat Alley.

17 Q.  When he was in the Circle, was he alone or with others?

18 A.  Yes, sir.

19 Q.  Which?  Was he alone or with others when he was hustling in

20 the circle?

21 A.  Oh, he was with others.

22 Q.  Who?

23 A.  Jojo, Antwuan, Kairi, Boy-Boy, Fat Tony.

24 Q.  Now, let me just stop there.  A few different times I've

25 asked you, when someone is in the circle, who else is there?

1 For example, right here you just said Doo-Doo, Jojo, Antwuan,

2 Kairi, and Boy-Boy I think you just said now.  You've mentioned

3 about, I think that's five people.

4         Were there -- other than the five people you just

5 identified in response to this question, how many more people

6 were there out there in the circle selling when you saw this

7 group of five people selling?

8 A.  I mean, that was they stationary spot --

9         MR. ZUCKER:  Objection.

10         THE COURT:  Hold on one second.

11         MR. ZUCKER:  Objection.  The question is so vague as to

12 time and association.

13         THE COURT:  Well, come on up.

14         (BENCH CONFERENCE ON THE RECORD.)

15         THE COURT:  Before we get to your objection, I thought

16 I heard his answer being, "Sometimes I would see him in the

17 circle, but most of the time I would see him in Boat Alley."

18         The predicate of your question was, "You've said, with

19 respect to the circle, the following people."  The names that

20 you named I thought were names that came out in connection with

21 Boat Alley.

22         MR. LEON:  I may have -- first, I may have

23 misunderstood his answer, so I can certainly take a step back

24 and clear that up.  That was not an intentional

25 misrepresentation.

1            THE COURT:  Okay, now let me take your objection.

2            MR. ZUCKER:  My objection is lack of specificity.

3 We've got probably 15, 20 names kicking around during a

4 four-year period, and so how is the witness to answer that

5 question?  You know:  On this day is it this one?  On this day

6 is it someone else?  That's it.

7            THE COURT:  I think you can take care of that when you

8 back up and rephrase your questions.  Right?

9            MR. LEON:  I think I can.

10            THE COURT:  Okay.

11            (END BENCH CONFERENCE.)

12 BY MR. LEON:

13 Q.  Mr. Capies, let me rephrase my question.  Let's go to the

14 circle, okay?

15 A.  Yes, sir.

16 Q.  I believe you testified that -- well, let me ask you again.

17 Doo-Doo, where would you see him sell crack cocaine when he sold

18 crack cocaine in Congress Park?

19 A.  In the Boat Alley and in the circle.

20 Q.  Okay.  Let's break that down.  Did you see Doo-Doo -- when

21 you saw Doo-Doo sell crack cocaine, did you see him do it more

22 in the Boat Alley or in the circle?

23 A.  I see him do it more in the Boat Alley.

24 Q.  Okay, let's start with the Boat Alley.  When you saw Doo-Doo

25 sell crack cocaine in the Boat Alley, was he alone or were other

Page 4976

1 people around him?

2 A.  It was other people around.

3 Q.  When you saw Doo-Doo sell crack cocaine in the Boat Alley

4 during this time period, 1992 to 1969, who were those other

5 people that you can remember?

6 A.  Like Lucious, a couple of other older people.

7 Q.  Like who?

8 A.  I can't remember they names like that.

9 Q.  Is it one or two other older people, or is it like 20 older

10 people?  How many roughly are we talking about, even if you

11 can't remember their names?

12 A.  It was a lot of older people.

13 Q.  Can you put a number on it or no?

14 A.  No, sir.

15 Q.  Okay.  Now let's get to the circle.  When you saw Doo-Doo

16 selling crack cocaine in the circle, was he alone or were other

17 people near him when he was selling in the circle?

18 A.  Other people was near him.

19 Q.  Who were those other people?

20 A.  Jojo, Boy-Boy, Antwuan, Kairi, Fat Tony.

21 Q.  Okay.  So I understand you to be saying when you saw

22 Ju-Ju during 1992 to 1996 --

23         MR. ZUCKER:  I think counsel meant to say "Doo-Doo,"

24 not Ju-Ju.

25         MR. LEON:  Thank you.  He's correct.

1          THE COURT:  Have to get those names straight.

2          MR. LEON:  I'm working on it.

3          MR. CARNEY:  May I approach?

4          THE COURT:  Yes.

5          (BENCH CONFERENCE ON THE RECORD.)

6          THE COURT:  Let's not be calling Ju-Ju "Doo-Doo."  I'm

7 sorry, go ahead.

8          MR. CARNEY:  The problem with these type of questions

9 is, "Who else did you see out there and that?"  He says from '92

10 to '96.  Kairi was dead in this time period, '96.  He should

11 just be more specific:  Who specifically -- you know, in other

12 words, I'm faulting the question because it's opening up so

13 much.  It should be more precise as to who he's after.  That's

14 my basis of the objection.

15          THE COURT:  That is a fair comment with respect to at

16 least one person he said is dead.

17          MR. LEON:  Right.  It is, although I understand the

18 point.  Believe it or not, I'm trying to go as quickly as

19 possible.  I know we're going slowly, but part of it was just to

20 speed things on a bit.  And part of it was, I was working off

21 the witness' answer.  I mean, it's to cross-examine.  You're

22 putting people who are dead out there.  I didn't say Kairi was

23 hustling in 1996, but that's how the witness answered the

24 question.  So I'm kind of stuck with his answer.

25          I understand Mr. Carney's point, but --

1          THE COURT:  I thought his answer included a time

2 period.  His answer about when Kairi died included part of a

3 time period you were asking.  Maybe I misremember the answer.

4          MR. LEON:  I can try to clean it up.  I understand the

5 point.

6          (END BENCH CONFERENCE.)

7 BY MR. LEON:

8 Q.  Mr. Capies, I think you said that Kairi died, I think you

9 said sometime in '95?

10 A.  Yes, sir.

11 Q.  Okay.  So before Kairi passed, let's say 1994, did you, to

12 the best of your memory, see Doo-Doo sell crack cocaine in the

13 circle in, say 1994?

14 A.  Between them times, I could say I seen him roughly.  But I

15 knew some of the time too, he was in jail too, some of the time.

16 Q.  Okay.  So can you put a year on it or no?

17 A.  I don't understand what you say.

18 Q.  Sure.  You said at some point around then Doo-Doo was

19 incarcerated?

20 A.  Yes, sir.

21 Q.  Do you know exactly what parts of what years he was?

22 A.  Like '92, something like that.

23 Q.  Do you know if he was incarcerated in '94, if you know?

24 A.  No, sir.

25 Q.  Okay.  Can you, in your mind as you sit here, remember a

1 time you saw Doo-Doo selling crack in the circle?

2 A.  Yes, sir.

3 Q.  When you saw Doo-Doo selling crack in the circle, was it --

4 roughly, can you number the number of times that he was selling

5 crack in the circle?

6 A.  I don't know how many times, but I know it was like the end

7 of '95 going into '96.

8 Q.  Okay.  Do you know if, at that time, Kairi was alive or had

9 he already been killed?

10 A.  I don't know.  I know Kairi died in '95, but I don't know...

11 Q.  Okay.  And again, who are some of the people who you do

12 remember being around or near Doo-Doo when you saw Doo-Doo

13 selling crack cocaine in the circle area?

14 A.  Jojo, Antwuan, Fat Tony.  And like Kairi used to be in the

15 circle, too.

16 Q.  And you mentioned a few people just now:  Jojo, Antwuan,

17 Kairi, and Fat Tony.  Were there other people around the circle

18 at that time that you just can't remember, or is that more or

19 less the group?

20 A.  Boy-Boy.

21 Q.  Okay.  You mentioned Boy-Boy.  Other than these people as

22 well as Boy-Boy, anybody else that you can't remember but were

23 there, or is that pretty much the group?

24 A.  Is that time frame, Geeka used to come around there too.

25 Q.  Okay, Geeka.  Anybody else you can think of?

Page 4980

1 A.  All the group that used to be across the street from 1313.

2 I mean, it's like everybody used to come around there, but there

3 was a certain group that was stationary right there.  Everybody

4 had, back in that time, had like their own little group where

5 they was at.

6 Q.  And that's what I'm getting at.  You just --

7          MR. ZUCKER:  Objection.

8          MR. LEON:  Withdrawn.

9          THE COURT:  Sustained.  Go ahead.

10 BY MR. LEON:

11 Q.  I want to pick up on your language, sir.  You said something

12 about a group being stationary at the circle.  What in your mind

13 did you mean when you said a group being stationary at the

14 circle.  Who are those people?

15 A.  Like Jojo, Antwuan, Kairi, Fat Tony.  Geeka was coming

16 around there.  He was really stationary around there with them.

17 They used to be like in the circle, in a lady named Mom's house.

18 Q.  That's the Mom's that you talked about earlier this morning?

19 A.  Yes, sir.

20          MR. LEON:  May I approach, Your Honor?

21          THE COURT:  Yes.

22 BY MR. LEON:

23 Q.  Mr. Capies, I'm handing you what's marked for identification

24 as Government 's 208.1.  Do you recognize the person who is

25 depicted on that exhibit?

1          (Government's Exhibit 108.104 was moved into evidence.)

2          MR. LEON:  And ask to publish.

3 BY MR. LEON:

4 Q.  Mr. Capies, who do you recognize in this photograph?

5 A.  I recognize all of them.

6 Q.  Why don't we go left to right.  Who is on the left part of

7 the picture?

8 A.  A guy named Dammon.

9 Q.  Dammon?  And how do -- how did you know Dammon?

10 A.  He used to live in this apartment, it's like in the basement

11 coming off 14th Place, going into a alley.

12 Q.  Okay.  The map of Congress Park that we've been looking at

13 over the last day and a half, that apartment you're referring

14 to, is that on that map, if you remember?

15 A.  I'm not sure, but it was the guy he was staying there with,

16 it was the guy's house.  He was staying there with the guy.

17 Q.  Who was he staying with?

18 A.  I can't remember the guy's name, off.

19 Q.  Did you know Dammon to sell crack cocaine in Congress Park?

20 A.  Yes.  Yes, sir.

21 Q.  And when -- did you see this with your own eyes?

22 A.  Yes, sir.

23 Q.  And when you saw Dammon sell crack cocaine in Congress Park,

24 where was he selling crack cocaine, what part of Congress Park?

25 A.  The part I just was talking about, it's called the Dope

Page 4990

1 stuff.  Like, when he came home like the late '92, '91, stuff

2 like that.

3 Q.  Wholesales of what?

4 A.  He had 50s.

5 Q.  50s of what?

6 A.  Crack cocaine.

7 Q.  Who would he sell those 50s of crack cocaine to?

8 A.  Just about everybody that I knew.

9          MR. MARTIN:  Objection.  602.

10          THE COURT:  Beg your pardon?

11          MR. MARTIN:  Objection.  602.

12          THE COURT:  Establish your foundation, and then you can

13 ask the question.

14 BY MR. LEON:

15 Q.  Did you see with your own eyes Fat Frank supply wholesales

16 or 50s to people in Congress Park?

17 A.  Yes, sir.

18 Q.  Who were the people you saw with your own eyes Fat Frank

19 sell crack cocaine to in Congress Park?

20 A.  Mainly, that I seen was the younger dudes.

21 Q.  Who were they?

22 A.  Jazz, Santuce, me, Drano, Truck, Wop, Booby.

23 Q.  And during what period of time was this?

24 A.  Like the early '92.

25 Q.  Okay.  And did it continue or did it stop at some point?

1 with you until around that time?

2 A.  I mean, he real young.  I mean, he didn't start hanging

3 around there -- I would say he was hanging around there like '96

4 in the summer.  And then, when I came home in December, that's

5 when I was seeing him out there.  He was hanging with us.

6 Q.  Did you know who Terrence was before you came home?

7 A.  Yes, sir.

8 Q.  After '96, when you came home and Terrence started hanging

9 out with you, did you know if Terrence sold drugs in Congress

10 Park?

11 A.  After '96?

12 Q.  Yes, sir.

13 A.  Yes, sir.

14 Q.  How do you know that?

15 A.  Because he sold drugs around me and with me.  We sold drugs

16 in the same area.

17 Q.  What area is that?  Again, now we're talking a little bit

18 after '96.

19 A.  That's Savannah Street.

20 Q.  Okay, we'll get to that later.

21        A little more quickly, but let's just identify the

22 other people in this photograph.  You've identified Moms leaning

23 against the railing.  Who else do you recognize in the

24 photograph?  And just tap the person so we can make a quick

25 record.

Page 4995

1  A.   (Witness complies.)

2  Q.   Who is that?  You made an indication on the person standing

3  left-most on the photograph.

4  A.   That's Terran.

5  Q.   Do you know Terran's last name?

6  A.   No, sir.

7  Q.   Do you know if Terran is related to anyone else you know in

8  Congress Park?

9  A.   Yes, sir.

10  Q.   Who?

11  A.   He got a brother named Harron.  He got a brother named Tony.

12  Q.   And did Terran, if you know, have any connection to Congress

13  Park?

14  A.   Yes, sir.

15  Q.   And what connection was that?

16  A.   Selling drugs.

17  Q.   How do you know that?

18  A.   Because I sold drugs with him.

19  Q.   When you sold drugs with Terran in Congress Park, when was

20  this?

21  A.   Like coming in '96.

22  Q.   And any year other than '96?  You said you got out of jail

23  towards the end of '96, I think you said?

24  A.   Yes, sir.  Like December.

25  Q.   December of '96, any other times that you sold with Terran?

1 A.  Yes, sir.

2 Q.  What other periods, or for what periods?

3 A.  All the way until I got incarcerated, sir.

4 Q.  And incarcerated when?

5 A.  2001.

6 Q.  And when you say you sold drugs with Terran, what do you

7 mean by that?

8 A.  We made the same sales.

9 Q.  What do you mean by that?

10 A.  I mean, hanging out together and all that, selling drugs

11 side by side.  He's selling drugs, I'm selling drugs.

12 Q.  Tell us how that works.

13 A.  We hang in the same area.  A sale come, he get a sale, I get

14 a sale.  Or we might serve the same person at the same time.

15 Q.  Well, how does that work?  If you're both trying to make

16 money, why would you share the same sale?

17 A.  At one point in time, we had a beef.

18 Q.  A beef?

19 A.  Not me and Terran, but a beef as in Congress Park.

20 Q.  Who is "we"?

21 A.  Me, Wop, Twuan, Drano, LT.

22 Q.  And this beef was with who?

23 A.  10th Place.

24 Q.  Is 10th Place another neighborhood?

25 A.  Yes, sir.

1 Q.  When did this beef begin?

2 A.  I heard over the phone --

3          MR. PURPURA:  Objection.  Again, basis of knowledge.  I

4 think we have to get into this.  What's his -- as to the beef.

5          THE COURT:  Overruled.

6 BY MR. LEON:

7 Q.  You can answer the question.  Do you remember the question?

8 A.  Yes, sir.  It happened like in middle part of '96.

9 Q.  Okay.  We're going to get do that in just a little bit.  But

10 there was a beef beginning around that time?

11 A.  Yes, sir.

12 Q.  Okay.  Before that beef, did you sell drugs with Terran?

13 A.  I ain't going to say with him, but I seen him sell drugs.

14 But I wasn't with him when he was selling drugs at that time.

15 Q.  Okay.  We're going to get more to the period after '96 in a

16 little bit, but I just do want you to finish that answer since

17 you started to answer it.

18          Just explain how you and Terran would share a sale when

19 you --

20          MR. ZUCKER:  Objection.

21 BY MR. LEON:

22 Q.  Shared a sale?

23          THE COURT:  Basis?

24          MR. ZUCKER:  Objection.  He's leading the witness.

25          THE COURT:  Overruled.

Page 5004

1 Q.  Okay.

2         Now, Mr. Capies, still around this time, '92 to '96,

3 when you were out, you yourself, Bobby Capies, did you carry

4 guns?

5 A.  Yes, sir.

6 Q.  How often?

7 A.  Frequently.

8 Q.  Frequently?  What does that mean?  Every day?  What does

9 frequently mean?

10 A.  Just about every day.

11 Q.  Why did you carry guns?

12 A.  I was running around knucklehead.  I was bad.

13 Q.  What do you mean by that?

14 A.  I was doing little cruddy little robberies, and stuff like

15 that.

16 Q.  What do you mean by that?

17 A.  Robbing somebody, taking they money.

18 Q.  When you did this, where would you do this?

19 A.  Different areas.

20 Q.  Did you ever do it in Congress Park?

21 A.  Yes, sir.

22 Q.  Did you do it in other areas?

23 A.  Yes, sir.

24 Q.  Did you do it more in a certain area, or was it pretty much

25 all over?

Page 5020

1  A.  He's dead.

2  Q.  Do you know when he died?

3  A.  Yes, sir.

4  Q.  When?

5  A.  Like the early part of '96.

6  Q.  And do you know how he died?

7  A.  Yes, sir.

8  Q.  How did he die?  Did he die by natural causes?

9  A.  No, sir.

10  Q.  How did he die?

11  A.  Antwuan killed him.

12        MR. ZUCKER:  Objection.  I object on basis.

13        MR. CARNEY:  Personal knowledge.

14        THE COURT:  Let's establish it.

15  BY MR. LEON:

16  Q.  Okay.  First of all, you said Troy was killed in, I think

17  you said early '96?

18  A.  Yes, sir.

19  Q.  Okay.  Were you out the day Troy was killed?

20  A.  Yes, sir.

21  Q.  Where were you the day Troy was killed?

22  A.  Me and another guy that we was talking about earlier, named

23  Tenille, we was in this lady named Mom's house, shooting dice.

24  Q.  Same Moms we talked about earlier?

25  A.  Yes, sir.

1 Q.   And where is her house?

2 A.   In the Circle, on 13th Place.

3        MR. LEON:   I would ask if Mr. Mazzitelli can zoom in on

4 the area on Government's 100.1, right around 13th Place.

5        For the record, we have enlarged a portion of

6 Government's 100.1.

7 BY MR. LEON:

8 Q.   Is that fair, Mr. Capies?

9 A.   Yes, sir.

10 Q.   Can you see, on this enlarged portion of the map, Mom's

11 house?

12 A.   Yes, sir.

13 Q.   I'm going to ask you to take your pen and tap on where Mom's

14 house was, where you were shooting dice that day.

15 A.   (Witness complies.)

16 Q.   For the record, you've put an arrow just above the "one" in

17 "13th Place," it looks like it's in the middle of the street

18 between two buildings.  Did you mean to tap on one of the two

19 buildings?

20 A.   I tried to hit the building, sir, but...

21 Q.   That's fine.  Which building, the one to the left of the

22 arrow or the right of the arrow?

23 A.   Coming out the Circle, it's to the right.

24 Q.   Why don't you clear the screen and tap it again.

25 A.   (Witness complies.)

1 Q.   Okay.  And for the record, you tapped -- put a mark what

2 appears to be on a building right at the corner, lower

3 right-hand corner of the intersection of 13th and Congress

4 Street?

5 A.   Yes, sir.

6 Q.   And is that the building you meant to be Mom's?

7 A.   Yes, sir.

8 Q.   Okay.  You're inside.  Did she live in a house or an

9 apartment?

10 A.   An apartment.

11 Q.   And do you remember which apartment it was?

12 A.   No.  I know as soon as -- I remember, but I don't remember

13 the door number.

14 Q.   What floor was it on?

15 A.   Second floor.

16 Q.   And who were you in there with?

17 A.   A guy named Tenille.

18 Q.   And was anyone else in there other than you and Tenille?

19 A.   No, it was kind of nice outside.  Everybody else was

20 outside.

21 Q.   What time of day or evening was it, if you remember?

22 A.   It was like jive in the evening time.

23 Q.   Was it still light out or not?

24 A.   It was still light out.

25 Q.   Do you remember -- okay.  So it's you and Tenille shooting

1 dice?

2 A.  Yes, sir.

3 Q.  What are you doing exactly?  Are you gambling?

4 A.  We gambling.

5 Q.  How long were you -- was Moms in there?

6 A.  No, sir.

7 Q.  Do you know where she was?

8        MR. ZUCKER:  Objection.  If not from what he saw.

9        THE COURT:  You can answer yes or no.

10 A.  Yes, I knew where she was.

11 BY MR. LEON:

12 Q.  Okay.  Did Moms let you in her apartment?

13 A.  Yes, sir.

14 Q.  And when she let you in the apartment, did you come with

15 Tenille?

16 A.  Yes, sir.

17 Q.  Okay.  And then did she stay for awhile, or did she leave

18 right away?

19 A.  She was in there for a minute.  We had to pay her to shoot

20 dice in there.

21 Q.  Why did you have to pay her?

22 A.  She smoked.  She wasn't going to just let us just come up in

23 there and just shoot dice for free.

24 Q.  How much did you pay her?

25 A.  Probably like a dime or something.  I know it wasn't no more

Page 5024

1 than a dime.

2 Q.  When you say "dime," a dime of what?

3 A.  Crack cocaine.

4 Q.  And once you paid her that dime, did she stay or did she

5 leave?

6 A.  She left.

7 Q.  And did anyone else come in the apartment after she left?

8 A.  No, sir.

9 Q.  Okay.  How long were you in the apartment until you heard

10 something, if you heard something?

11 A.  We was in there for quite awhile.  I can't put no -- over an

12 hour.

13 Q.  Okay.  And after that over an hour, what if anything did you

14 hear?

15 A.  A rack of shots.

16 Q.  What's a rack of shots?  How many?

17 A.  I would say about 10.

18 Q.  And what did you think that they were at the time?

19 A.  Just somebody shooting around the park.

20 Q.  Did you see who fired those shots at that time?

21 A.  No, sir.

22 Q.  And when you heard that rack of shots, what if anything did

23 you do next?

24 A.  I kept gambling for a minute.

25 Q.  Why did you keep gambling?

1 A.  Because I was losing my money.

2 Q.  Okay.  And when you say a minute, do you mean 60 seconds or

3 do you mean more than that?

4 A.  About a minute or two.

5 Q.  Okay.  What did you do after that minute or two?

6 A.  I told Tenille, "Man, that was jive close, man.  Let's go

7 check and see what happened."  Because you could hear people,

8 because the windows was up, outside jive talking.

9 Q.  So what did you do next?

10 A.  We walked outside.

11 Q.  Where did you go?

12 A.  To the corner of 13th Place, where everybody else was

13 walking at.

14 Q.  And what did you do next?

15 A.  It was a lot of people crowded, and police coming down the

16 street.  We went to the corner to look to see what's happening.

17 Q.  What did you see?

18 A.  I seen Troy, MPV van door open, with him laying outside of

19 it.

20 Q.  And you said you've dealt with Troy before.  Would you

21 recognize a picture of Troy?

22 A.  Yes, sir.

23          MR. LEON:  May I approach, Your Honor?

24          THE COURT:  Yes.

25 BY MR. LEON:

1 Q.  Mr. Capies, I'm handing you what's marked for identification

2 as Government's 500.2.  Do you know what that is?

3 A.  Yes, sir.

4 Q.  What's depicted on Government's 500.2?

5 A.  That's Troy.

6 Q.  And is that what he looked like around 1995 or 6 or so?

7 A.  Yes, sir.

8         MR. LEON:  Your Honor, government would move for

9 admission of Government's 500.2.

10        THE COURT:  Without objection, it's received.

11        (Government's Exhibit 500.2 was moved into evidence.)

12        MR. LEON:  If I could ask just to briefly switch to the

13 Elmo to publish briefly, and then we'll get back to the map.

14        For the record, I'm putting in front

15 Government's 500.2.

16 BY MR. LEON:

17 Q.  And is that the photograph of Troy Lewis that you've just

18 identified?

19 A.  Yes, sir.

20 Q.  Okay.

21        MR. LEON:  Ms. Romero, if we could go back to the

22 computer.  Thank you.

23 BY MR. LEON:

24 Q.  Now, you said you went out and you saw Troy.  Where was he

25 exactly?

1 A.  He was on Congress Street.

2 Q.  Was he -- where was he other than on Congress Street?  Where

3 was he?  Was he in something or was he lying on the street?

4 A.  When I seen him, a car door was open.  I couldn't see him at

5 first because the crowd was jive looking out to the street.

6 When I went out some more, he was laying outside of his car

7 door, on the ground.

8 Q.  So he was actually on the ground?

9 A.  Yes, sir.

10 Q.  When you say, "his car door," did you recognize the car?

11 A.  Yes, sir.

12 Q.  Had you seen him in that car before?

13 A.  Yes, sir.  I used to get in it with him sometime.

14 Q.  That was his car?

15 A.  That was his -- to my knowledge, yes, sir.

16 Q.  Can we see on this map where Troy was lying next to his car?

17 And if so --

18 A.  Actually, it was like a van, sir.

19 Q.  Okay.  Do you know what kind?

20 A.  An MPV van.

21 Q.  Say it again.

22 A.  An MPV van.

23 Q.  Okay.  Do you remember anything else about it:  Color, make,

24 anything else?  Or year, anything?

25 A.  It was like silver.

Page 5074

1 A.  Yes, sir.

2 Q.  Okay.  First of all, can you see Congress Park anywhere on

3 this map?

4 A.  Yes, sir.

5 Q.  Why don't you just put a general Circle around what you

6 recognize the Congress Park neighborhood to be on this map.

7 A.  (Witness complies.)

8 Q.  Okay.  You've put kind of an oblong Circle in the left-hand

9 center to lower left-hand portion of this exhibit.  Is that

10 fair?

11 A.  Yes, sir.

12 Q.  Okay.  Now, you've mentioned the 15th Place neighborhood

13 that you knew to be one of the neighborhoods that Tommy Edelin

14 hung out in.  Do you see that on this map?

15 A.  Yes, sir.

16 Q.  Can you please Circle that neighborhood for us?

17 A.  (Witness complies.)

18 Q.  Okay.  And for the record, you've put a Circle towards the

19 upper right-hand portion of the map, touching on what's labeled

20 15th Place and Stanton Road.  Is that fair?

21 A.  Yes, sir.

22 Q.  Okay.  Now, as you got to know Tommy Edelin, did you get to

23 know any of the people, first just yes or no, that he hung out

24 with in that 15th Place area?

25 A.  Yes.

1 Q.  And how did you get to know who Tommy Edelin hung out with

2 in that area?

3 A.  I was seeing him with those people.

4 Q.  Okay.  Who are some of those people?  What are their names

5 or nicknames?

6 A.  Deon, Lonnie, Tech, Tinkerman, Tall Eric, Squid.

7 Q.  Let's -- anyone else you can think of right now?

8 A.  JJ, Mussy.

9 Q.  Now, you mentioned Squid.  Did you say -- what was the word

10 you used?

11 A.  Squid.

12 Q.  Okay.  Did you know him?

13 A.  Yes.

14 Q.  How did you know him?

15 A.  From seeing him.  He used to come around Congress Park.

16 Q.  And when he came around Congress Park, when was this?

17 Roughly when?

18 A.  Like '92 to '93.

19 Q.  And when he came around this time period, '92, '93, Squid,

20 what did he do when you saw him?

21 A.  He was cool with Antwuan, Reecy.  He was cool with them,

22 Jojo.

23 Q.  And is this the Reecy you mentioned earlier?

24 A.  Yes, sir.

25 Q.  And when you say these people are cool with each other, just

1 Q.  Did you ever learn whether or not Reecy robbed other people?

2      MR. ZUCKER:  Objection.  Basis.

3      THE COURT:  Sustained.  I'm sorry, I'll let you answer

4 yes or no.

5 BY MR. LEON:

6 Q.  Yes or no, did you form an opinion as to whether or not --

7 okay.

8      MR. LEON:  What was the question?

9      THE COURT:  The question was, "Did you learn."

10 BY MR. LEON:

11 Q.  Did you learn, yes or no, if Reecy robbed other people?

12 A.  Yes.

13 Q.  And I believe you said that you understood Reecy to have

14 been killed back in, did you say, late '93, early '94?  When did

15 you say?

16 A.  Late '93, early '94, sir.

17 Q.  Okay.  And did you come to learn who killed Reecy, just yes

18 or no first?

19 A.  Yes.

20 Q.  Who told you who killed Reecy, just the name of the person

21 or persons?

22 A.  When I go, like, around Mom's house, I hear, like, Antwuan

23 and Kairi and them talking about it.

24 Q.  What did Antwuan and Kairi tell you about who killed Reecy?

25      MR. PURPURA:  Objection, please.  It 's --

1          THE COURT:  Objection what?

2          MR. PURPURA:  -- 801(D)(2)(e).  It's not in the course

3 of the conspiracy, in furtherance of that, and ask for a

4 limiting instruction as to that.

5          THE COURT:  Overruled.

6 BY MR. LEON:

7 Q.  You said you were in Mom's house?

8 A.  Yes, sir.

9 Q.  And tell us what you remember Antwuan and Kairi saying.

10          MR. ZUCKER:  Objection.  Compound.

11          MR. LEON:  I can break it up.

12 BY MR. LEON:

13 Q.  Tell us what you remember Antwuan saying.

14 A.  Tall Eric paid Squid to kill Reecy.

15 Q.  And do you remember when Antwuan told you this?

16 A.  Not the date --

17 Q.  I'm sorry.  Finish your answer.  I interrupted.

18 A.  Not the date, but roughly between that time when he got

19 killed, like after he got killed.

20 Q.  How much after when -- how much after?

21 A.  It was like some months when they started feuding with him.

22 Q.  Well, let's -- we'll get to that in a minute, but let's go

23 back to Kairi.

24          Do you remember Kairi saying something about this?

25 A.  Yes, sir.

1 Q.  What do you remember Kairi saying about who killed Reecy?

2 A.  The same things to it, but, like, they beefing with them

3 because they killed Reecy.

4 Q.  Who is beefing with who over this murder?

5 A.  They beefing with Tall Eric and his friends over Reecy's

6 murder.

7 Q.  Let me ask again, who is "they"?  Who is the "they" that's

8 beefing with Tall Eric?

9 A.  Kairi and them.

10 Q.  And who do you mean by "Kairi and them"?  Who is part of

11 "them"?

12 A.  Kairi, Antwuan, Jojo, Geeka.

13      MR. ZUCKER:  I'm going to object.  I'm objecting unless

14 Kairi used those names.  Right now we're getting his

15 interpretation of what Kairi means by "we."

16      THE COURT:  That's not what I heard.  Overruled.

17 BY MR. LEON:

18 Q.  And when you said beefing with Tall Eric, was it just

19 Tall Eric?

20 A.  No, sir.

21 Q.  Who else was with Tall Eric as part of that side of the

22 beef?

23      MR. ZUCKER:  Can we clarify whether this is the

24 statement from Kairi or not, or just his interpretation?

25      THE COURT:  Fair.

1          THE COURT:  Yes.  Go ahead.

2 BY MR. LEON:

3 Q.  Did you hear from those people during that conversation you

4 overheard why Reecy was killed?

5 A.  Yes, sir.

6 Q.  What did you hear?

7 A.  That Reecy robbed, I think it's Tall Eric's baby mother.

8          MR. MARTIN:  Objection to the speculation.

9          THE COURT:  Overruled.

10 BY MR. LEON:

11 Q.  Go ahead.

12 A.  I know he was dating a girl, but I don't know for sure if

13 that's his baby mother.

14 Q.  Whose baby's mother?

15 A.  Tall Eric's.

16 Q.  So Reecy robbed who?

17 A.  Tall Eric's girlfriend.

18 Q.  And what else, if anything?

19 A.  He robbed her uncle, sir.

20 Q.  And if you remember, what's the uncle's name?

21 A.  Alfred.

22 Q.  And why would that robbery -- well, withdrawn.

23          Other than the robbery of the uncle named Alfred, was

24 there any other reason that you heard during this conversation

25 that you overheard as to why Reecy was killed?

Page 5096

1  Q.   Okay.  When did you have -- when can you remember having

2  this first conversation with Wop about this?

3  A.   This is like when me and him really got close, like after I

4  came home in like '96.

5  Q.   Were you close to Wop before '96?

6  A.   I ain't going to say close.  We was cool.

7  Q.   And then did you get closer after you got home in '96?

8  A.   Yes.

9  Q.   So when Wop talked to you about getting back at Squid, was

10 it before or after '96?

11 A.   It was like after '96, like going in '97, early '97.  I came

12 home in December '96.

13 Q.   Tell us how you got closer to Wop.

14 A.   I had a friend and he had a friend, we both -- a guy named

15 Head.  He stayed in the next building from me.  I was cool with

16 him, we was real close, and he was real cool with him and real

17 close, too.

18 Q.   So you and Wop both have this friend named Head.  So how

19 does that make you and Wop close?

20 A.   Head get killed.

21 Q.   When?

22 A.   I'm going to say like September '96.

23 Q.   And how did your relationship change with Wop, if at all,

24 after Head is killed in September of '96?

25 A.   I came home, I think it was like December '96, and we had a

1 little conversation.  Because when I was in, I had got the

2 information that Head and another guy had got killed.

3          MR. PURPURA:  Objection.  Objection.

4          THE COURT:  Overruled.

5 A.  That Head and another guy got killed.

6          And Wop was basically -- I was, like, what happened,

7 man?  You know, Head my man.  He was, like, Head and Jamel went

8 down on 10th Place to get some dope, and Jamel end up robbing

9 this dude.

10 Q.  What's that dude's name?

11 A.  James.

12 Q.  Does he have a nickname?

13 A.  Twin.

14 Q.  Okay.  So finish the conversation you had with Wop.

15 A.  He was, like -- Wop was telling me that Head and Jamel went

16 down 10th Place to get some dope, and he said Head was popped on

17 the side of the street out there on, what's that, Congress,

18 Congress Street, while he went around on 10th Place, Jamel, to

19 get the dope.  And he said Head was trying to find out what was

20 taking Jamel so long, and he rolled up on Jamel robbing Twin.

21 Q.  And he was killed?

22 A.  No, he wasn't killed right there, sir.

23 Q.  When did he die?

24 A.  He end up dying September of '96.

25 Q.  When Wop told you what had happened, were you in jail or did

Page 5109

1 Q.  Anything else you can remember?

2 A.  That they was driving a pipehead's car.

3 Q.  Excuse me?

4 A.  A pipehead's car.

5 Q.  Who said this?

6 A.  This is what LT was telling me.

7 Q.  And what understanding did you have as to what that meant,

8 he was driving a pipehead's car?

9 A.  You give a person that smoke crack cocaine coke, they rent

10 their car out.

11 Q.  Do you remember him saying anything else, again, just on

12 this conversation?

13 A.  No, sir.

14 Q.  Do you remember when you had this conversation; in other

15 words, what year, what month, if you remember?

16 A.  It was, like, I'm going to say the summertime.

17 Q.  Do you remember what year?

18 A.  Yes, sir.

19 Q.  What year?

20 A.  '98.

21 Q.  Okay.  And were you serving time on a charge?

22 A.  Yes, sir.

23 Q.  What kind of charge?

24 A.  Escape from a halfway house.

25 Q.  And was this a charge you picked up as a grownup, as an

# Tab 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
        Plaintiff,               :  Docket No. CR 05-100
        v.                       :
ANTWUAN BALL, DAVID WILSON,      :  Washington, DC
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and      :  April 2, 2007
DOMINIC SAMUELS,                 :  9:15 a.m.
        Defendants.              :
                                 :
                                 :
                                 :

VOLUME 27 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5122

APPEARANCES (Cont.)

For Defendant          TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:          TEASDALE, PLLC
                       Steven Carl Tabackman, Esq.
                       1747 pennsylvania Avenue, NW
                       Suite 300
                       Washington, DC  20036
                       202.454.2811

For Defendant          LAW OFFICE OF JENIFER WICKS
David Wilson:          Jenifer Wicks, Esq.
                       503 D Street NW, Suite 250A
                       Washington, DC  20001
                       202.326.7100

                       GARY E PROCTOR, LLC
                       Gary E. Proctor, Esq.
                       6065 Harford Road
                       Baltimore, MD  21214
                       410.444.1500

For Defendant          LAW OFFICE OF JAMES W. BEANE
Gregory Bell:          James W. Beane, Jr., Esq.
                       2715 M Street, N.W.
                       Suite 200
                       Washington, DC  20007
                       202.333.5905

For Defendant          LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:      Jonathan Seth Zucker, Esq.
                       514 10th Street, NW
                       9th Floor
                       Washington, DC  20004
                       202.624.0784

For Defendant          LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:          Anthony Douglas Martin, Esq.
                       7841 Belle Point Drive
                       Greenbelt, MD  20770
                       301.220.3700

                       LAW OFFICE of ANTHONY ARNOLD
                       Anthony Darnell Arnold, Esq.
                       One Research Court
                       Suite 450
                       Rockville, MD  20852
                       301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5123

APPEARANCES (Cont.)

For Defendant          LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:       A. Eduardo Balarezo, Esq.
                       400 Fifth Street, NW
                       Suite 300
                       Washington, DC  20001
                       202.639.0999
                       and
                       William B. Purpura, Esq.
                       8 East Mulberry Street
                       Baltimore, MD  21202
                       410.576.9351

Court Reporter:        Scott L. Wallace, RDR, CRR
                       Official Court Reporter
                       Room 6814, U.S. Courthouse
                       Washington, DC 20001
                       202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5124

**MORNING SESSION, APRIL 2, 2007**

(10:12 a.m.)

        THE DEPUTY CLERK:  Criminal Case Number 05-100, *The United States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond Thurston, Joseph Jones and Dominic Samuels.*  For the government, Mr. Leon, Ms. Petalas and Mr. Guerrero.  For defendants, Mr. Carney, Mr. Tabackman, Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker, Mr. Martin, Mr. Arnold, Mr. Balarezo and Mr. Purpura.

        THE COURT:  All right.  Good morning.  Let me report on a couple of things.  As I promised, we will take a break today at 4 and tomorrow at 4.

        In addition, I wanted to let you know that on Thursday, April 19th, we will not sit in the morning; we will sit only in the afternoon.  So we'll start up at 1 on Thursday, the 19th of April.  We'll have no morning session, we'll just have an afternoon session and that will be at 1 p.m.

        We had Juror Number 4 report this morning to Ms. Romero that someone at her workplace on Friday when she went to work asked her if she was serving on the Edelin trial and she said no and thought nothing of it.  She gave further thought to it, however, and said she recalled having supervised another employee or two who may be related to one or more of the Edelins, perhaps two Edelins, who had been involved as defendants in some other trial.

        She's apparently reported that just in the interest of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5161

(Government's Exhibit 108.95 admitted into the record.)

MR. LEON: And ask to publish.

THE COURT: Yes.

BY MR. LEON:

Q. First of all, Mr. Capies, we're looking at this on the screen. First of all, can you tell us approximately when this was taken? Can you tell?

A. I'd say about the summer of '98.

Q. Why do you say that?

A. Because of the headband.

Q. What headband are you referring to?

A. The one Jo-Jo's wearing.

Q. Okay. For the record -- just quickly, for the record, which of the people we're looking at is Jo-Jo? What part of the screen is he on?

A. The left side.

Q. Is he the person all the way on the left?

A. Yes, sir.

Q. Now, why does that -- first of all, what does the headband say?

A. "Congress Park."

Q. Why does that headband make you think that this was taken -- this photograph was taken in the summer of '98?

A. Because that's the headbands they was wearing, sir.

Q. Did you ever wear one of those headbands?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

5162

A. Naw. I was locked up at the time.

Q. Okay. So that's Jo-Jo all the way on the left?

A. Yes, sir.

Q. Can you tell us, just going left to right, who the other people are. And I'm going to ask you to just -- each person you're describing, just tap the picture.

A. (Indicating.)

Q. Okay. For the record, you tapped the person you identified as Jo-Jo?

A. Yes, sir.

Q. Who's the next person right next to him?

A. (Indicating.)

Q. Who's that?

A. Little Terrence.

Q. Okay. Who's the next person, the lady, the young woman next to Terrence?

A. I can't really tell who that is.

Q. Okay. Who's the next person?

A. Wop.

Q. Okay. Can you just tap on him.

A. (Indicating.)

Q. Okay. And who are the two people on the lower level of the photograph?

A. LT and Drano.

Q. Can you tell us who's who?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

5163

A. Yes, sir. (Indicating.)

Q. Okay, for the record you tapped on somebody on the lower left-hand -- actually lower center of the picture. Looks like he's wearing a -- maybe a New York Knicks baseball cap or some sort of a cap and a white T-shirt.

A. Yes, sir.

Q. Who's that?

A. That's LT, sir.

Q. And who's the other person on the lower right-hand portion, pointing, with a blue cap?

A. That's Drano.

Q. Now, did you learn -- withdrawn.

Do you know somebody by the name of JJ?

A. Yes, sir.

Q. Who's JJ?

A. A close friend of Squid's.

Q. How do you know that?

A. Because I used to always see them together.

Q. Did you come to learn, just first yes or no, if JJ was ever shot at during this beef with the Edelin Group and the Congress Park Group?

A. Yes, sir.

Q. How did you learn that JJ was shot at?

A. Through Dazz and LT, sir.

Q. From Dazz and LT?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

5164

A. Yes, sir.

Q. Did -- well, tell us what you learned.

MR. ZUCKER: Objection. Can we clarify who the declarant is rather than another "they."

THE COURT: Rather than what?

MR. ZUCKER: A "they."

THE COURT: All right.

MR. ZUCKER: If he's going to --

MR. LEON: I'll clarify.

THE COURT: When you put your next question, make sure the speaker is clear.

BY MR. LEON:

Q. Okay. First of all, you said Dazz and LT. Did you have conversation with the two of them or separately? Who did you talk to?

A. I just remember talking to both of them.

Q. And when you talked to both of them, was it during the same conversation or two different conversations you're putting together?

A. I remember talking to them separately.

Q. Okay. First of all, when did this shooting happen?

A. I'm not sure, sir.

Q. Okay. Do you know if it happened before or after Squid and Sabrina were murdered?

A. I'm going to say after, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

5165

**Q.** Okay. What did you learn?

**A.** That --

MR. ZUCKER: Objection, basis.

THE COURT: Focus on the speaker.

BY MR. LEON:

**Q.** Okay. Let's focus on Dazz. What did you learn about this shooting from Dazz?

**A.** That they was riding through there, you know, like to see who was around there and they seen JJ and some other couple of people sitting on the front.

**Q.** Okay. First of all, they were riding around where? You said "there." Where's "there"?

**A.** In the neighborhood of Stanton Road.

**Q.** Okay. And is Stanton Road part of Congress Park?

**A.** No, sir.

**Q.** What neighborhood is Stanton Road part of?

**A.** 15th Place.

**Q.** Okay. And when Dazz told you they're driving around Stanton Road, who is Dazz telling you he's with?

**A.** LT.

MR. ZUCKER: Objection --

BY MR. LEON:

**Q.** LT?

**A.** Yes, sir.

**Q.** Did Dazz tell you if Dazz and LT were with anyone else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5166

**A.** No, it was just them two, sir.

**Q.** Did Dazz tell you what they were driving in?

**A.** I can't remember.

**Q.** Okay. So Dazz tells you that Dazz and LT are driving on Stanton Road. Tell us what Dazz told you next.

**A.** They parked the car and came off the side of the building, where they were sat at on the porch, and him and LT opened fire on the group.

**Q.** And did Dazz tell you what time of day this was?

**A.** I can't remember.

**Q.** Okay. And you said something about a porch. Did Dazz tell you how many people were on the porch?

**A.** A couple of people. He also said there was a guy name Cooler on the front with them.

**Q.** Cooler?

**A.** Yes, sir.

**Q.** So Dazz tells you that Cooler's there and who else did Dazz tell you was on this porch?

**A.** I just remember him saying JJ and Cooler, but it was other people in the front.

**Q.** Did Dazz tell you if Squid was one on the people there?

MR. ZUCKER: Objection.

THE WITNESS: No, he didn't tell me that, sir.

THE COURT: Sustained.

BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5167

**Q.** Okay. Did Dazz tell you tell you why they were driving around Stanton Road?

**A.** They was beefing.

**Q.** So?

**A.** They was trying to get at them.

MR. ZUCKER: Objection.

THE COURT: Overruled.

MR. ZUCKER: The "so" was speculation. I'd ask it be limited to what Dazz said.

THE COURT: Overruled.

You can focus on the next question, with direction to focus on the speaker.

BY MR. LEON:

**Q.** Okay. Did Dazz tell you why they shot -- well, let me withdraw that for a moment.

They get up on the porch. Are they in their car, according to Dazz, when they shoot at the porch or did they get out of the car?

**A.** They got out the car.

**Q.** Both Dazz and LT?

**A.** Yes, sir.

**Q.** Did Dazz tell you if he, Dazz, had a gun?

**A.** Yes, sir.

**Q.** Did Dazz tell you if LT had a gun?

**A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5168

**Q.** Yes, that -- who had guns?

**A.** Dazz and LT, sir.

**Q.** Did Dazz tell you what kind of gun he had?

**A.** No, sir.

**Q.** Did Dazz tell you what kind of gun LT had?

**A.** No, sir.

**Q.** And tell us what Dazz told you.

**A.** That they came on the corner of Stanton Road and Congress Place and opened fire on the front.

**Q.** And what did he say next?

**A.** I don't really recall him saying nothing else, but that they shot the front up and that they got back in the car and left.

**Q.** Did Dazz tell you if he knew if they hit anybody?

**A.** Yes, sir, later.

**Q.** Okay. What did Dazz tell you that he learned later?

**A.** Shot JJ.

**Q.** Did Dazz tell you if he learned that he hit anybody else?

**A.** No, he didn't tell me nothing else.

**Q.** Did you learn from Dazz -- you said he was hit. Did you learn from Dazz that JJ was alive?

**A.** Yes, he was alive.

**Q.** Did he die?

**A.** No, sir.

**Q.** Did Dazz tell you why they did this?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5169

**A.** Yes, sir.

**Q.** What did Dazz tell you?

**A.** They beefing with 15th Place.

**Q.** So why would that beef --

MR. ZUCKER: Objection, if it's other than what Dazz said.

MR. LEON: I'll rephrase.

BY MR. LEON:

**Q.** Did Dazz explain to you why the beef would cause them to shoot up at this porch?

**A.** Because they was cool -- he was cool with Squid.

**Q.** Who was cool with Squid?

**A.** JJ, sir.

MR. LEON: May I just have one moment, Your Honor?

THE COURT: Yes.

BY MR. LEON:

**Q.** And you said that JJ was cool with Squid. Squid, again, is from what neighborhood?

**A.** 15th Place, sir.

**Q.** And a couple of times in your testimony this morning you referred to "the park." When you say "the park," what do you mean by that?

**A.** Congress Park.

**Q.** And around this time, 1997 or 1998 or so, who was part of the park? What people?

**A.** Wop, Dazz, Phil, Terrence, LT, Drano, Antwuan, Jo-Jo,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5170

Boy-Boy, Baby Kai --

**Q.** Okay.

**A.** -- Lucious, DC, Don.

MR. LEON: May I approach, Your Honor?

THE COURT: Yes.

BY MR. LEON:

**Q.** Mr. Capies, I'm handing you two exhibits. Let's take them one at a time. Both -- the first one is Government's 219.1, marked for identification. Do you know who's depicted in 219.1?

**A.** Yes, sir.

**Q.** Who's that?

**A.** Doo-Doo.

**Q.** And is that the Doo-Doo you were referring to on Thursday?

**A.** Yes, sir.

MR. LEON: Your Honor, the government would move for admission of Government's 219.1.

THE COURT: Without objection, it's received.

(Government's Exhibit 108.95 admitted into the record.)

BY MR. LEON:

**Q.** And for the record, showing you what's marked for identification as Government's 221.1, do you know who that is?

**A.** Yes, sir.

**Q.** Who is that in Government's 221.1?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5171

**A.** Geeka.

**Q.** And is that the Geeka that you were referring to on Thursday as well?

**A.** Yes, sir.

**Q.** Okay.

THE COURT: Let me ask you, 221.1 --

MR. LEON: Yes.

THE COURT: -- is the exhibit number, which doesn't appear on the list.

MR. LEON: Okay.

THE COURT: I wanted to make sure that was the right number you were using.

MR. LEON: I believe the exhibit list that the Court has says 221.4. That's a typographical error. It should be 221.1.

THE COURT: All right. Proceed.

BY MR. LEON:

**Q.** Okay. Now, Mr. Capies, I just want to jump back just for a couple of quick minutes in the time period of 1995, 1996. You talked about that a bit on Friday -- excuse me -- Thursday as well. Do you remember the general testimony regarding that?

**A.** Yes, sir.

**Q.** You mentioned, I believe, Moms' house or Moms' apartment. Do you remember that?

**A.** Yes, sir.

**Q.** I would like to focus you in on Moms' apartment in 1995

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5172

into 1996. And just to orient you, this would be around the time, according to your testimony, when Kairee, Antwuan Ball's younger brother, was killed, and also as another benchmark, around the time when you said that Troy Lewis was killed. Okay?

**A.** Yes, sir.

**Q.** Around this time, were you in Moms' apartment, just during that time frame?

**A.** You mean going in there?

**Q.** Yes.

**A.** Yes, sir.

**Q.** A lot or a little?

**A.** Every now and then.

**Q.** Okay. And when you were in there, who would you see in there?

**A.** Antwuan, Jo-Jo, Boy-Boy, Fat Tony, Geeka.

**Q.** Was there a leader in that group?

MR. ZUCKER: Objection.

THE COURT: Sustained.

MR. LEON: Sustained?

BY MR. LEON:

**Q.** Do you know what happened inside of Moms' apartment?

**A.** Yes.

MR. TABACKMAN: Objection as to when.

MR. LEON: I thought I zeroed the time frame.

THE COURT: What happened during a four-year period is a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

bit broad.

MR. LEON: I thought I zeroed it in on '95, '96. I apologize.

THE COURT: Well, even during a two-year period. What are you asking?

MR. LEON: Okay. I'll zero it in.

BY MR. LEON:

Q. During the time period 1995 or so, around the time -- first of all, around that time period, 1995, in that time period, were you in Moms' apartment, yes or no?

A. Yes, sir.

Q. Okay. So that year, when you were in Moms' apartment during that year or so, when you were in that apartment -- so in other words, based on your own eyes, not on what you heard but what you saw -- what you saw, tell us -- describe for us what you saw going on in Moms' apartment.

A. People selling crack.

MR. TABACKMAN: Still, Your Honor -- I mean, is that something going on in the entire time?

THE COURT: I'll allow it. Go ahead.

THE WITNESS: People was selling crack.

BY MR. LEON:

Q. Okay. Other than selling crack, were people storing crack in that apartment?

A. Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

Q. How do you know that?

A. Because I was seeing it.

Q. What did you see with respect to storing crack in that apartment?

A. Sometimes I'd go in there, when I get fronted coke from Antwuan, he have coke in there.

Q. Did you ever see weapons in that apartment?

A. Yes, sir.

Q. And when you would see weapons in that apartment, who would have the weapons or where would they be?

A. Antwuan, Joe Geeka, Fat Tony.

Q. Do you know if weapons were ever stored in that apartment?

MR. ZUCKER: Objection.

THE WITNESS: I don't know if --

MR. ZUCKER: Is it asked based on what he saw?

THE COURT: Beg your pardon?

MR. ZUCKER: I ask that it be limited to what the witness saw, not what he believed.

THE COURT: I think the question was "Do you know?" And he can answer yes or no.

BY MR. LEON:

Q. Do you know if -- just yes or no, if weapons were stored in the apartment?

A. No, I don't know if they were stored in there, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

Q. And during this time period, and I want to be clear on this -- during this time period, I'm referring to 1995 up until early 1996, when you said Troy Lewis was killed, around that time, what was your relationship -- you, Bobby Capies -- with Antwuan Ball?

A. We was cool.

Q. What do you mean by that?

A. I was dealing with him. I was getting drugs from him.

Q. Beyond just buying drugs from him or getting fronted crack from him, did you have any further relationship with him?

A. Friends.

Q. And what do you mean by that?

A. Friends, buddies, hanging out, you know, riding around, smoking, drinking.

Q. Who was older, you or him?

A. He was, sir.

Q. Who had more friends -- withdrawn.

In Moms' apartment, just staying there for the final few questions, how did Antwuan Ball carry himself?

MR. TABACKMAN: Objection.

MR. ZUCKER: Objection.

THE COURT: Do you understand the question?

THE WITNESS: Yes, sir.

THE COURT: Huh?

THE WITNESS: Yes, I understand.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

THE COURT: I'll allow it.

THE WITNESS: He was a leader, sir.

BY MR. LEON:

Q. What do you mean by that?

A. What he say goes.

Q. What do you mean by that?

A. If he say, you know, make this move or take this, it goes.

Q. And if he would say something like that, who, if anyone, would respond?

A. I mean, Jo-Jo was like the type, he had his own mind, but like the other guys that was in there and the younger group, we listened to him.

Q. When you say "like the younger group," who in your mind do you mean, the younger group?

A. Wop, Dazz, me, Baby Kai, Head, Truck, all those type of guys, we listened to him; Drano, Doo-Doo.

Q. Now, I'd like to jump ahead. Do you remember, we talked on Thursday about '92 to '96? I'd like to now jump to beginning in 1996 up until your incarceration in 2001, okay?

So now the majority of my remaining questions are going to be regarding this five or six-year period of time, okay?

A. Yes, sir.

Q. Okay. I believe you testified on Thursday that around some point, '96 or so -- well, let me withdraw that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5177

Still staying in 1996, before Troy Lewis -- you said Troy Lewis was killed in early '96?

**A.**  Yes, sir.

**Q.**  Okay.  Right before then or right at that point, what was your relationship with Wop at that point?

**A.**  We was all right.  We wasn't hanging together, but I'd see him.  We respect each other, speak, smoke some time, drink, but we wasn't close.  I was still hanging in the 14th Place and he was still hanging across from the 1313 building.

**Q.**  Okay.  And in 1996 or so, did your relationship with Wop change?

**A.**  Yes, sir.

**Q.**  How?

**A.**  We got cool when Head got killed.

**Q.**  Were you -- I'm sorry.

**A.**  This was like '96, or December, when I came out.

**Q.**  Okay.  Let me ask you that.  In 1996, were you in jail?

**A.**  Yes, sir.

**Q.**  Tell us what portions of 1996 you were in jail?

**A.**  Like, the early part of the summer till December.

**Q.**  And what were you in jail for?

**A.**  I can't even remember, sir.

Oh, yes I could.  I don't know what the charge exact was, but I know I ran in '95 and I end up getting caught in '96, but I forgot what the charge was that I had.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5178

**Q.**  You remember picking up a charge around that time for distribution of marijuana?

**A.**  Yes, sir.

**Q.**  Do you know when you picked up that charge?

**A.**  No, sir.

**Q.**  Do you know if that was the charge you were locked up for or it could have been another?

**A.**  It could have been another one, sir.

**Q.**  But did you in fact pick up a charge, meaning were you found guilty or pled guilty, to distribution of marijuana?

**A.**  Yes, sir.

**Q.**  Okay.  So first of all, were you in jail or not in jail when Head was killed?

**A.**  I was out -- I mean, no, when Head got killed, I was locked up.

**Q.**  And how did you learn how Head was killed?

**A.**  Calling home.  I think my mother told me and another girl that I was dating told me.

**Q.**  And then after you learned that Head was killed, did you ever talk to anyone else about how Head was killed?

**A.**  Yes, sir.

**Q.**  Who?

**A.**  Wop.

**Q.**  And when you had this first conversation with Wop about how Head was killed, where were you and where was he?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5179

**A.**  I was at home.

**Q.**  You were at home?

**A.**  Yes, sir.

**Q.**  And so was this conversation in person?

**A.**  Yes, sir.

**Q.**  Do you remember when this conversation was?

**A.**  About a week after I was home.

**Q.**  And do you know when that was, what month in 1996?

**A.**  December.

**Q.**  December of '96?

**A.**  Yes, probably like the end part of December.

**Q.**  Tell us what Wop told you.

**A.**  He was telling me that Jamel and Head had went down to 10th Place to get some boat and Jamel went out to get the boat from a guy named James.  And Head rolled up on it, Jamel robbing James.  And Head was known for going down there, seeing another dude, which is Head's cousin named Tye.

And so Head later, after Jamel had robbed James, later, another time -- I don't know when it happened exact --

MR. PURPURA:  Objection.  Unless this is still what he's stating.  It sound more like a -- objection, unless it's coming from Mr. Wilson.

THE COURT:  Okay.  It might be safer to break up the narrative a little bit.

MR. LEON:  Sure.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5180

BY MR. LEON:

**Q.**  Let's break that up.  You mentioned somebody by the name of Head and we've been talking about Head.  Do you know his true name?

**A.**  Yes, sir.

**Q.**  What's his true name?

**A.**  David Scott.

**Q.**  And you mentioned somebody by the name of Jamel?

**A.**  Yes, sir.

**Q.**  Did he have another name or nickname?

**A.**  Yes, sir.

**Q.**  What was that?

**A.**  Black.

**Q.**  Okay.  And you also mentioned somebody by the name or nickname of Tye?

**A.**  Yes, sir.

**Q.**  Who's that?

**A.**  That's Head's cousin.

**Q.**  And do you know Tye's -- any other part of his name or version of his name?

**A.**  No, sir.

**Q.**  Okay.  So let's break it down.  Wop tells you that Head and Jamel and Tye are together?

**A.**  No, sir.

**Q.**  Who's together?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** Head and Jamel.

**Q.** Okay. And what does Wop tell you head and Jamel do?

**A.** Head parked the car while Jamel went to go get some boat.

**Q.** In what neighborhood are they?

**A.** 10th Place, sir.

**Q.** Now, where is 10th Place in relation to Congress Park?

**A.** About two blocks down from Congress.

**Q.** And did you know people from 10th Place?

**A.** Yes.

**Q.** Were people from 10th Place -- were they able to come into Congress Park and sell drugs?

**A.** No, sir.

**Q.** Did people in 10th Place -- some people in 10th Place sell drugs, to your knowledge?

**A.** One person.

**Q.** Who?

**A.** A guy named Clyde.

**Q.** Clyde? Other than Clyde, was anyone from 10th Place, to your knowledge, able to come into Congress Park and sell drugs?

**A.** Not that I know of.

**Q.** So Head and Jamel go into 10th Place?

**A.** Yes, sir.

**Q.** And tell us what Wop tells you they do.

**A.** They go buy some boat from a guy named James.

**Q.** Okay. Does James have any other names or nicknames?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** Twin.

**Q.** Okay. And what does Wop tells you happens when they're buying boat from Twin?

**A.** That Head rolled up on Jamel robbing James and that's how he seen Head.

**Q.** I'm sorry. Who robbed who?

**A.** Jamel robbed James, sir.

**Q.** Jamel robbed James. And what does Wop tell you Head's doing at this time?

**A.** He ride up on it, I guess to see what's taking so long.

MR. ZUCKER: Objection.

THE COURT: Sustained.

BY MR. LEON:

**Q.** Don't guess. Just tell us what Wop told you, but don't add anything or guess anything, okay?

So what did Wop tell you with respect to what Head did at this time when James -- when Jamel is robbing James?

**A.** He rode up on Jamel robbing James.

**Q.** And then what does Wop tell you?

**A.** They pull off and left him, come back around the park.

**Q.** Now, you used the term "boat"?

**A.** Yes.

**Q.** Tell us what "boat" is.

**A.** PCP.

**Q.** And have you ever smoked boat?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** Yes, sir.

**Q.** Okay. So you know what that is?

**A.** Yes, sir.

**Q.** Did you ever -- have you ever sold boat?

**A.** No, sir.

**Q.** Could you -- was boat sold in Congress Park?

**A.** Yes, sir.

**Q.** Was more boat sold in Congress Park than crack or which was sold more in Congress Park?

MR. ZUCKER: Objection.

THE WITNESS: I don't know the amount.

THE COURT: Hold on a second.

MR. ZUCKER: Basis of knowledge for which is sold more.

MR. LEON: I'll withdraw the question. Let's get back to 10th Place.

BY MR. LEON:

**Q.** Okay. So during this robbery that Wop tells you about of Jamel, Black, robbing James, Twin, what else does he tell you? Was anything actually taken?

**A.** Yes.

**Q.** What?

**A.** Some money.

**Q.** Did he tell you how much?

**A.** No, sir.

**Q.** Did he tell you if anyone was hurt during this robbery?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** Yes.

**Q.** Was somebody hurt?

**A.** Yes.

**Q.** Who?

**A.** James.

**Q.** How?

**A.** He hit him with the gun.

**Q.** Who hit who with the gun?

**A.** Jamel hit James with the gun.

**Q.** Hit him with a bullet or hit him with the gun itself?

**A.** The gun itself.

**Q.** And what did Wop tell you happened to James as a result of getting hit with the gun?

**A.** I can't remember, sir.

**Q.** Okay. And after -- first of all, did Wop tell you when this robbery happened?

**A.** Exact date, no.

**Q.** Did James, also known as Twin -- who was he with respect to 10th Place at that time?

MR. ZUCKER: Objection, basis.

THE COURT: If he knows.

BY MR. LEON:

**Q.** If you know.

**A.** He was hustling around there, sir.

**Q.** Okay. And by "hustling," you mean drug dealing?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5185

**A.** Yes, sir.

**Q.** Do you know what kinds of drugs Twin sold in 10th Place?

**A.** At the time when I was home, when I was going down there, I used to buy weed from him, but I don't know exactly what he was selling, other than that.

**Q.** Now, you said James's name is Twin. Do you know if he has a twin?

**A.** Yes.

**Q.** And do you know his name?

**A.** Jack.

**Q.** Jack?

**A.** Yes, sir.

**Q.** And what connection, if any, did Jack have to 10th Place?

MR. ZUCKER: Basis, objection.

THE COURT: If he knows.

BY MR. LEON:

**Q.** If you know.

**A.** Hustling.

**Q.** Selling drugs?

**A.** Yes, sir.

**Q.** First of all -- withdrawn.

What connection, if any, if you know, did Jack and James have with respect to 10th Place?

**A.** They was out there hustling.

MR. TABACKMAN: Objection, asked and answered.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5186

THE COURT: Sustained.

BY MR. LEON:

**Q.** Okay. So, does Wop tell you what happens after Head and Black rob Twin?

**A.** Yes, sir.

**Q.** What does Wop tells you happens after this robbery?

**A.** I'm not going to say right after it, but the results of Head getting killed, he told me.

**Q.** Okay. So what did Wop tell you -- what do you mean by that, "the results of Head getting killed"? What do you mean by that exactly?

**A.** That Head and another guy named Ian Day went down to 10th Place to follow the ice cream truck to get some Blunts. And Head seen his cousin out there, a dude name Tye.

**Q.** Okay.

**A.** And when Head went out there to get the Blunts, he was talking to Tye. Jack came out this alley part and Head asked him what he doing -- why he looking at him. And when Head was going across the street, he want Ian Day to get in the car, Jack ran down on him and chased him and shot him in the back of his head.

**Q.** And killed him?

**A.** Yes, sir.

**Q.** And you learned this from Wop?

**A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5187

**Q.** Now, you just told us about two incidents. You told us about Jamel and Head robbing James?

**A.** Naw, Jamel robbed James, sir.

**Q.** Right. Jamel robbing James with Head being there, and then you told us another incident where Head and Ian Day --

**A.** Yes, sir.

**Q.** -- are chased and then Head getting shot by the other Twin, Jack.

Did Wop tell you these two incidents, how close in time they happened to each other?

**A.** No. He just told me why -- that was the reason why Head got killed. He was explaining it to me, sir.

**Q.** Okay. When you learned that Head got killed, you, Bobby Capies, how did you feel?

**A.** Wanted to do something about it.

**Q.** What do you mean by that?

**A.** I wanted to kill Jack, sir.

**Q.** Why?

**A.** Because I had love for Head.

**Q.** What was -- how did you have this close of a friendship with Head at that time? How did that come about?

**A.** He was like the first person I met when I moved in Congress Park. I used to stay over his house.

**Q.** And when you say you would have killed Jack, you would have killed him?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5188

**A.** Yes, sir.

**Q.** And if you know, what relationship did Wop have with Head at the time that Head was killed?

**A.** They was cool, sir. They was close.

**Q.** How do you know that?

**A.** I used to always see them together.

**Q.** Did you and Wop hang out together with Head or were your relationships separate, if you know?

**A.** We hung out separate. I mean, like I see them sometimes, I go holler at them, smoke, drink or be around them a little bit, but I wasn't close with them. But me and Head always had a real close bond.

**Q.** Now, you just told us about this conversation you had with Wop regarding how Head died. We'll move on from that in a moment, but did you learn from anyone else other than Wop about Head getting killed?

**A.** Yes. I can't know the specific. It was different people telling me.

**Q.** Without getting into the specifics, you said yes. Who else just told you generally about Head being killed?

**A.** Ian Day used to also live in the next building with me -- I mean, right across from my mother -- and me and him had a conversation after I found out that Wop told me that Ian Day was with Head. So I went to him and had a conversation with him, you know, asked him what happened, because he was there as well.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5189

**Q.** Okay. Can you think of anyone else you talked to other than Wop and Ian Day right around this time when Head -- when you learned that Head was murdered and you were in jail?

**A.** It was a lot of people. I can't remember the names, though.

**Q.** Okay. Now, when Wop tells you how Head ended up being killed, did you and he talk further about doing anything?

MS. WICKS: Objection, leading.

THE COURT: Rephrase.

BY MR. LEON:

**Q.** What else, if anything, did you and Wop talk about in the end of 1996 when you learned from Wop that Head was killed?

**A.** I mean, it was talks of retaliating and stuff like that.

**Q.** There was talk of retaliating. Who talked about this?

**A.** Me and Wop.

**Q.** What did you and Wop talk about specifically?

**A.** Killing Jack.

**Q.** Did you -- other than just talking about it -- what specifically did you talk about with respect to killing Jack?

**A.** I mean, that's all I can really remember as far as, you know -- that was the main fact, was to get him.

**Q.** Okay. And what -- are we still now in the end of 1996, this same conversation?

**A.** Yes, sir.

**Q.** Okay. Did you ever talk -- well, withdrawn.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5190

Just first, yes or no. Do you know if Antwuan knew about the circumstances of Head being killed?

MR. TABACKMAN: Objection.

THE WITNESS: Yes, sir.

MR. LEON: I asked yes or no, if he knows.

THE COURT: That's all right.

BY MR. LEON:

**Q.** And you said yes and I'll ask how you know that Antwuan knew about Head -- the circumstances of head being killed?

**A.** Later on, going down -- we still in '96, but it was later he told me.

**Q.** Who told you?

**A.** Antwuan.

**Q.** Tell us what Antwuan told you about Head being killed.

**A.** That the dudes down there did it, you know -- basically, I don't know all the details right offhand without one-on-one talk, but it was basically details that he knew that Head got killed by the dude Jack.

**Q.** And did you -- you said that you talked to Wop about trying to get back and kill Jack. Did you tell Antwuan that you were thinking of this?

**A.** No.

**Q.** Did Antwuan -- why not?

**A.** I mean, it was like everybody was growing up and, you know, they had their own little section of the group and we go

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5191

do what we do on our own.

**Q.** So at this point now, in 1996, let's turn it into early 1997; right around this period of time, who were you getting closer to around this time -- you Bobby Capies.

**A.** It was me, Dazz, LT, Terrence, Drano, Wop, a guy named Tweety.

**Q.** Tweety?

**A.** Yes, sir.

**Q.** Now, what was your relationship with Antwuan -- let's say 1996 into 1997 or so when you get out, what's your relationship with Antwuan at this time?

**A.** We was real cool. We was all right.

**Q.** Did you hang out with him as much as you hung out with Wop?

**A.** No, but I have hung out with him.

**Q.** Okay. Were you still dealing drugs if 1996 into 1997 after you got out of jail?

**A.** Yes, sir.

**Q.** Where were you selling drugs at this point?

**A.** In Congress Park.

**Q.** Anywhere in particular? You told us earlier you sold with Dom -- excuse me -- Don in the Savannah, 14th Place area. Were you are still selling in that area?

**A.** I was hustling in the alley like, in the middle of Savannah Street and Congress Place -- Congress Street, I meant,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5192

sir.

**Q.** We're going to pull the map and see if it shows.

For the record, we're asking to publish to the jury Government's 100.1 and also, if I could ask you, Mr. Capies, to tap and clear the screen.

Okay. Do you see the map, Government's 100.1, which is in evidence?

**A.** Yes, sir.

**Q.** Can you just tap on the general area where this time, let's just say 1997, just to pick a year, where you were now dealing crack cocaine.

**A.** (Indicating.)

**Q.** Okay. For the record, you made two taps. The first or the second is the one -- did you mean both?

**A.** Yes, sir.

**Q.** Okay. So you made two marks, both of which are right just about in the center, a little bit away from each other, but right in the center of Government's 100.1.

Is that the general area where you were selling at that time?

**A.** Yes, sir.

**Q.** Now, when you were selling at that time -- you, Bobby Capies -- was anyone else selling in that area, that particular part of Congress Park?

**A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5193*

**Q.** Who?

**A.** Me, Wop, Dazz, LT, Terrence, another guy named Ju-Ju, Jo-Jo, Dazz, Santu, Jazz, Boy-Boy.

**Q.** Now, what about the circle? We've talked about the circle earlier. First of all, were you selling at the circle?

**A.** Yeah, I was going in the circle hustling, but I mainly was at those two spots.

**Q.** Were there other people who were selling at the circle or -- well, first of all, yes or no, were there other people selling crack cocaine at the circle?

**A.** Yes, sir.

**Q.** Who?

**A.** Antwuan and another guy named Torran and another guy named Burke.

**Q.** Burke?

**A.** Yes, sir.

**Q.** And at that time when you and the people you just mentioned were selling in the area you just mentioned and Antwuan and Burke and Torran were selling near the circle, what was your relationship with the people that you indicated were selling at the circle?

**A.** It was cool.

**Q.** You mentioned Burke being one of the people selling near the circle. Did you yourself ever get drugs from Burke around this time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5194*

**A.** Around that time, no, sir.

**Q.** Did you ever get drugs from Burke?

**A.** Yes, sir.

**Q.** When?

**A.** I'm going to say like 2000 and early part of 2001.

**Q.** Okay. When you bought from Burke, 2000, 2001, how many times?

**A.** Twice.

**Q.** And how much did you buy from Burke on those two occasions?

**A.** The first time like in 2000, it was like a wholesale. And then like in 2001, I got a quarter from him and then I bought a half from him.

**Q.** How much -- did you actually buy it or was it fronted to you?

**A.** I bought it.

**Q.** How much did you by a quarter from Burke for?

**A.** Like 250.

**Q.** And a half, is that half an ounce?

**A.** Yes, sir.

**Q.** How much did you buy a half an ounce from Burke for?

**A.** 500.

**Q.** Was the quality -- can you describe the quality of Burke's crack?

**A.** It was good.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5195*

**Q.** Was it -- did you buy crack from other people in Congress Park?

**A.** Yes, sir.

**Q.** Was his -- "his" being Burke's quality as good or better or worse than other crack you bought from people in Congress Park?

**A.** It was better, sir.

**Q.** First of all, just yes or no, do you know if Burke supplied crack to other people in Congress Park?

**A.** Yes, sir.

**Q.** Okay. Who?

**A.** A guy named Newett.

MR. TABACKMAN: Objection.

THE COURT: Sustained.

MR. LEON: Okay.

BY MR. LEON:

**Q.** You said yes. How do you know -- when you say yes, why do you say yes? What's the reason for saying yes?

**A.** Because like sometimes if I run down on a sale or something that's going on in his building, I see him giving Newett crack.

**Q.** You'd see who give what?

**A.** I see Burke giving Newett crack.

MR. TABACKMAN: Who crack?

THE WITNESS: Newett.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5196*

BY MR. LEON:

**Q.** You would see that with your eyes?

**A.** Yes, sir.

**Q.** And was Newett somebody who sold crack in Congress Park?

**A.** Yes. He was like a runner, too.

**Q.** A runner. What do you mean by that?

**A.** Like he give him coke to go make the sale so he ain't got to come out the building or go around the corner to make a sale for him.

**Q.** For who? Newett was a runner for who?

**A.** Burke.

**Q.** Did anyone else ever come back and tell you that they -- first just yes or no, did anyone else ever come back and tell you that they bought crack from Burke?

**A.** Yes, sir.

**Q.** Who?

**A.** JT.

THE COURT: Who told him or who bought?

MR. LEON: I was asking for who told.

THE WITNESS: JT --

BY MR. LEON:

**Q.** JT?

**A.** -- DC and Don.

**Q.** Let's take those one at a time. You said JT. What did JT tell you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5197*

**A.**    One time we was down in his house playing a game, me, him and Baby Kai, and he was like, "I'm about to get some coke from Burke."

And I was like, "You get coke from Burke?"

And he was like, "Yeah." He stay right next door from him, because Burke ain't known for serving everybody, but he served JT and he came back with it and showed it to me and told me he just got it from him.

**Q.**    How much crack cocaine did JT show you after he told you he was going to get some from Burke?

**A.**    It was like a quarter.

**Q.**    Quarter ounce?

**A.**    Yes, sir.

**Q.**    You mentioned DC told you that he, DC, got crack cocaine from Burke. Tell us exactly what DC told you.

**A.**    I knew DC for buying like halves from Burke.

**Q.**    How do you know that?

**A.**    From him telling me.

**Q.**    Who?

**A.**    DC.

**Q.**    And what did DC tell you specifically?

**A.**    That he was buying his half ounces from Burke.

**Q.**    Did DC tell you how often he would buy from Burke?

**A.**    Just when he got crack and I asked him where he get his coke from and he tell me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5198*

**Q.**    How often would you say you had those conversations with DC?

**A.**    He served him regularly.

MR. TABACKMAN:  Objection, non-responsive.

BY MR. LEON:

**Q.**    How often did DC tell you that DC bought from Burke?

**A.**    Every time he got crack and I asked him where he get it from, he would say, "I got it from Burke." It was a lot of times.

**Q.**    Okay. And I believe you also said Don told you he got from Burke?

**A.**    Yes, sir.

**Q.**    Tell us specifically what Don --

MR. PURPURA:  The objection based on relevancy to the time frame.

THE COURT:  I think you focused on that, but if you want to repeat it, go ahead.

MR. LEON:  Sure.

BY MR. LEON:

**Q.**    First of all, let's break it down. First of all, how many times did Don tell you he bought crack cocaine from Burke?

**A.**    He didn't tell me how many times.

**Q.**    Okay. When Don would tell you, when were these conversations that you had with Don?

**A.**    I can remember like in his building, in his baby mother

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5199*

building, and I asked him who he get crack from, because they -- like the sellers want to come to him and they don't want to deal with me or nobody else. And I say, "Where you get crack from?"

And he be like, "Burke."

**Q.**    Okay. And this conversation was where?

**A.**    In his baby mother's building.

**Q.**    Can we see that on the map here?

**A.**    Yes, sir.

**Q.**    I'm going to ask you to tap on the portion of Government's 100.1 where you had this conversation with Don about him buying crack from Burke.

**A.**    It's a little bit up from the dot (indicating).

**Q.**    For the record, you made another mark that looks like it's in the lower -- excuse me -- lower left-hand portion of the intersection of Congress Street and 13th place?

**A.**    Yes, sir.

**Q.**    Do you know the address of the building you meant to tap on?

**A.**    No, sir. It's in the circle. I don't know. It's the first building on the right-hand side.

**Q.**    Okay. That was my question. The dot you just made -- is the building you meant to hit to the right, left, up or down from that dot?

**A.**    If you coming up Congress Street, it's to the right.

**Q.**    Is the building facing -- the building's facing what

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5200*

street?

**A.**    13th Place.

**Q.**    Okay. Did anyone else live in that building that you know of?

**A.**    Yes.

**Q.**    Who?

**A.**    A girl named Gail. Crackhead.

**Q.**    This conversation that you had with Don was where exactly?

**A.**    In that building.

**Q.**    And when do you remember having this conversation?

**A.**    I remember asking him about it in the hallway.

**Q.**    And my question is when in time. In other words --

**A.**    This is like 2001, the early part of 2001.

**Q.**    Okay. Other than this one conversation you said you had in early 2001 with Don, did you ever talk to Don any other times regarding Burke?

**A.**    No, sir.

**Q.**    Okay. And I think you were saying something about somebody not serving you, words to that effect. Did you saying something like that?

**A.**    I said Burke don't sell to everybody.

**Q.**    Okay. You mentioned it a couple times, Burke served you -- well, withdrawn.

How did it come -- how did you end up having this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

conversation with Don about Don getting from Burke?

**A.**    It was sales coming and they was coming directly to him and I asked him where he get coke from and he said Burke.

**Q.**    Where physically were these sales taking place?

**A.**    13th Place.

**Q.**    Was it in the building or outside the building?

**A.**    They was coming to the building to come in to make -- to buy crack.

**Q.**    Were the sales in a hallway or were they in an apartment?

**A.**    In a hallway, sir.

**Q.**    What floor?

**A.**    As soon as you come through the door, there's like a little area right there.

**Q.**    Where in the building did Don live, if you know?

**A.**    All the way upstairs, the first apartment on the left.

**Q.**    Do you know what floor?

**A.**    I think it's the third floor.

**Q.**    Do you know somebody by the name of Joe Langley?

**A.**    Yes, sir.

**Q.**    How do you know Joe Langley?

**A.**    I used to buy wholesales from him.

**Q.**    Okay.  And when did you buy wholesales from Joe Langley?

**A.**    Like early part of 2001, 2000.

**Q.**    You said 2000 and early part of 2001.  Did you ever buy from Joe Langley, say, between 1996 and 2000, during the mid to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

late --

**A.**    I'd say '99, too, sometimes I used to get wholesale from him.

**Q.**    How often frequently or infrequently would you buy wholesales from Joe Langley?

**A.**    I dealt with him a lot, but off and on.

**Q.**    Okay.  And when you say "wholesales," how much would you get from Joe Langley?

**A.**    I would spend like 150 or $200 with him.

**Q.**    If you spent 150 with Joe Langley, how much would you get in return?

**A.**    About 30 dimes.

**Q.**    30 dimes?

**A.**    Yes, sir.

**Q.**    First of all, yes or no, do you know if other people in Congress Park bought crack cocaine from Joe Langley?

**A.**    Yes, sir.

**Q.**    Who?

**A.**    Jo-Jo, Santu, Jazz, Dazz, LT, Terrence, Drano, Fat Tony.

**Q.**    Okay.  Is the first person you said Jo-Jo?

**A.**    Yes, sir.

**Q.**    How do you know that Jo-Jo bought wholesales from Joe Langley?

**A.**    I seen it, sir.

**Q.**    What'd you see exactly?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.**    Him buying wholesales from Joe Langley.

**Q.**    How often would you see that?

**A.**    A few times, not a whole lot.

**Q.**    And when you saw that, tell us exactly what you saw.

**A.**    Him buying crack from him.  I can't say the amount, sir, I don't know.

**Q.**    Okay.

MR. MARTIN:  Objection, then, Your Honor.  Move to strike if he can't say the amounts.

THE COURT:  Overruled.

BY MR. LEON:

**Q.**    How do you know it was crack?

**A.**    Because I seen it.

**Q.**    And when was this?

**A.**    This was like '99 when I seen him buying wholesales from him.

**Q.**    Now, Joe Langley, the crack that you personally bought from Joe Langley, what quality of crack was that?

**A.**    It wasn't no good, sir.

**Q.**    What do you mean by that?  How do you know?  You told Joe you didn't smoke crack.  How did you know it wasn't that good?

**A.**    Because fiends would come up and say they didn't want it no more because it wasn't no good.

**Q.**    "Fiends"?  What are "fiends"?

**A.**    Crackheads, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Q.**    Did fiends ever tell you that the times that you sold the crack you bought from Burke?

**A.**    No, sir.

**Q.**    Now, you've identified and talked to us earlier about Boy-Boy.  Do you remember identifying Boy-Boy?

**A.**    Yes, sir.

**Q.**    Did you ever buy crack from Boy-Boy?

**A.**    Yes, sir.

**Q.**    A lot or a little?

**A.**    A whole lot.

**Q.**    Of the people during 1996 to 2001 until you were locked up, during that five or so, six-year period, of the people you personally got your crack from, who did you get the most crack from?

**A.**    Boy-Boy.

**Q.**    How often did you deal with Boy-Boy?

**A.**    A lot.

THE COURT:  We've actually reached the break point.

MR. LEON:  Okay.

THE COURT:  Ladies and gentlemen we'll take our mid-morning break.  Please be back at 11:05.  Remember not to talk about the case and leave your notes in the jury room.

Have a good break and we'll see you back in 15 minute.

(Jury out at 10:52 a.m.)

THE COURT:  All right.  We'll be back in 15 minutes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5205*

(Thereupon, a break was had from 10:52 a.m. until 11:09 a.m.)

(Jury in at 11:09 a.m.)

THE COURT: Good morning, ladies and gentlemen.

THE JURY PANEL: Good morning.

THE COURT: Welcome back. We're ready to resume. Counsel.

BY MR. LEON:

**Q.** Mr. Capies, I believe when we just broke we were talking about Boy-Boy. Do you remember that?

**A.** Yes, sir.

**Q.** And you said that you bought -- you personally bought from Boy-Boy on a number of occasions?

**A.** Yes, sir.

**Q.** From what periods of time did you buy from Boy-Boy?

**A.** I mean, on and off since I started hustling.

**Q.** Well, you testified that you started hustling back in -- I think you said '92 or '93, correct?

**A.** '92, sir.

**Q.** Okay. So since then, up until when you were incarcerated --

**A.** Yes, sir.

**Q.** -- I would like to focus, though, on '96 to 2001. Did you buy frequently or infrequently from Boy-Boy?

**A.** Every now and then.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5206*

**Q.** Okay. And what do you mean by that?

**A.** When there ain't no coke around.

**Q.** Okay. And when there wasn't coke around, why would you -- first of all, what do you mean by that, when there wasn't coke around?

**A.** Like, if Wop ain't have no coke, I go to Boy-Boy.

**Q.** If Wop didn't have coke, you went to Boy-Boy?

**A.** Yes, sir.

**Q.** And if Wop didn't have coke, did Boy-Boy often have coke?

**A.** Yes, sir.

**Q.** If other people didn't have coke, did Boy-Boy often have coke?

**A.** Yes, sir.

**Q.** And so if you first needed to get coke, who would you go to?

**A.** Boy-Boy.

**Q.** Okay. And when you did, what amounts would you get from him?

**A.** Just wholesale.

**Q.** And give us an example of how much you would get from Boy-Boy?

**A.** I spent like $200 with him.

**Q.** For $200, how much would you get from him?

**A.** Forty dimes.

**Q.** First, just yes or no, do you know if other people in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5207*

Congress Park were supplied crack cocaine by Boy-Boy?

**A.** Yes, sir.

**Q.** And who were those people, that you know to --

MR. ZUCKER: Objection, basis.

THE COURT: Sustained.

BY MR. LEON:

**Q.** How do you know -- these other people you said yes about, how do you know that?

**A.** I seen it with my own eyes, sir.

**Q.** Let's take them one at a time, slowly. Well, first of all, just name all of them. '96 to 2001 are all my questions, with respect to this, okay? Who were the people you saw, with your own eyes, being supplied drugs with by Boy-Boy?

**A.** JT, Baby Kai, me, Jazz, Santu, Phil, Terrence, LT, Drano, Doo-Doo, Fat Tony, Dazz, Wop.

**Q.** Can you think of anyone else right now, or that's it?

**A.** That's all I can think of.

**Q.** Okay. I'm just going to ask about a few of them. I'm not going to go into all of them. You mentioned Jazz, with a J?

**A.** Yes, sir.

**Q.** First of all, does Jazz have any relation to any of the other people -- any of the other people you just mentioned, does he have any brothers?

**A.** Yes, sir.

**Q.** What's his brother's name?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5208*

**A.** Boy-Boy and Santu.

**Q.** So Jazz would buy from Boy-Boy, his brother?

**A.** Yes, sir.

**Q.** And when you saw Jazz buying from Boy-Boy, tell us what you saw?

**A.** I just saw -- I don't know the amount, but I just used to see him get crack from him, sir.

**Q.** How often did you see Jazz getting crack from Boy-Boy?

**A.** I seen him do it a couple of times. It wasn't a lot, that I seen him get it from him.

**Q.** You mentioned Dazz, with a D?

**A.** Yes, sir.

**Q.** Tell us what you saw when you saw Dazz getting supplied crack cocaine from Boy-Boy?

**A.** I seen him get crack from him numerous times, sir.

**Q.** And do you know how much he was getting when he got the crack from Boy-Boy?

**A.** No, sir.

**Q.** Do you know if it was wholesale amounts or larger amounts?

**A.** Wholesale amounts.

**Q.** Do you know the specific amount of wholesales?

**A.** No, sir.

**Q.** And when you say "numerous times," can you put a number on that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5209

**A.** No, it was a lot.

**Q.** Same question with respect to 1996 to 2001. You also mentioned Wop. How many times did you see Wop get supplied crack cocaine from Boy-Boy?

**A.** A lot.

**Q.** Can you put a number on "a lot"?

**A.** No, sir.

**Q.** Was this wholesale amount, larger amounts, or do you know?

**A.** Wholesale and sometimes large amounts.

**Q.** Okay. Well, let's talk about the larger amounts. The times that you saw Wop getting larger amounts from Boy-Boy, what were these amounts?

**A.** I seen him, like, once get an ounce from him.

**Q.** An ounce being -- how much weight is an ounce?

**A.** Twenty-eight grams, sir.

**Q.** And how much does an ounce cost?

**A.** A thousand dollars.

**Q.** Did you actually see money exchange during this time?

**A.** No, sir.

**Q.** Did you see the drugs, the crack being exchanged?

**A.** Yes, sir.

**Q.** And how did you know it was an ounce?

**A.** Because I used to hang with Wop, and when he got it, he let me know what it was that he got from him, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5210

**Q.** When you -- when Wop -- did he show you the crack?

**A.** Yes, sir.

**Q.** And when Wop told you and then showed you the crack that he bought from Boy-Boy, what, if anything, did Wop do with that ounce of crack?

**A.** I didn't see him break it down, but he told me he was going to break it down and serve it in dimes.

**Q.** Do you know what an eight-ball is?

**A.** Yes, sir.

**Q.** What's an eight-ball?

**A.** 3.5 grams, sir.

**Q.** In your mind, is an eight-ball a wholesale or is it weight or is it neither?

**A.** I mean, you can break it down sell it in wholesale, any of it, but 3.5 is serving a weight also.

**Q.** I want to get back to Burke, just quickly, for a second.

Did you ever -- just first, yes or no. Did you ever purchase Burke's crack from someone other than Burke directly?

MR. ZUCKER: Objection, basis of knowledge.

THE COURT: Overruled.

THE WITNESS: I can't remember that, sir.

BY MR. LEON:

**Q.** Okay. Do you know somebody by the name of Quincy?

**A.** Yes, sir.

**Q.** Whose Quincy?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5211

**A.** Somebody who be around Congress Park, but don't always be around in the Congress Park.

**Q.** Okay. Did Quincy sell drugs in Congress Park?

**A.** Certain people.

**Q.** Okay. When -- which people did Quincy serve?

**A.** KL.

MR. ZUCKER: Objection, basis or just clarify the basis.

MR. LEON: Let me even ask another foundational question.

BY MR. LEON:

**Q.** When Quincy sold crack in Congress Park, did he sell to actual users or did he supply to sellers?

THE WITNESS: Sellers.

BY MR. LEON:

**Q.** Did you ever know Quincy to actually sell hand-to-hand to users?

**A.** No, sir.

**Q.** So, when Quincy supplied people who then sold to users, do you know how much he would supply?

MR. ZUCKER: Objection, basis.

MR. LEON: Okay.

BY MR. LEON:

**Q.** You said Quincy -- you said yes to the question, Quincy supplied people in Congress Park, correct?

**A.** Yes, sir.

**Q.** Okay. How do you know that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5212

**A.** He used to give me crack and I used to serve and give other people crack.

**Q.** Let's talk about you. When you said Quincy gave you crack, did you pay for it?

**A.** No, sir.

**Q.** Did he front it for you and you paid him later?

**A.** No, sir.

**Q.** He just gave you crack?

**A.** Yes.

**Q.** Why'd he give you crack, if you know?

MR. ZUCKER: Objection, basis.

THE COURT: Overruled.

MR. ZUCKER: Speculating on someone else's state of mind.

BY MR. LEON:

**Q.** I believe you can answer the question.

**A.** He gave it to me -- like if rent due or I'm broke or something, I go to him and tell him, let me get something and he give it to me.

**Q.** How much -- first of all, how many times did this happen, where he gave you crack?

**A.** A lot of times.

**Q.** Can you put a number on that?

**A.** No, sir.

**Q.** And did you ever pay him back in any way for that --

**A.** No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

October of 2000, would he sell to crackheads a lot or a little?

**A.**    A lot.

**Q.**    When you say a "lot," was this -- how many days a week would you say?

**A.**    Every day.  That was our job, sir.

**Q.**    Did you make money in any other way?

**A.**    Well, petty robberies and stuff like that, but...

**Q.**    Okay.  You said "petty robberies"?

**A.**    Yes.

**Q.**    Drug dealing?

**A.**    Yes, sir.

**Q.**    Did you, Bobby Capies, make any other money during this period of time?

**A.**    Yes, sir.

**Q.**    How else?

**A.**    I used to rob people.

**Q.**    Okay.  Tell us about that.  Where would you rob these people?

**A.**    I mean, different spots, in the area, uptown, Maryland.

**Q.**    Did you do these robberies alone or with anyone else?

**A.**    Mainly some of them by myself, but not all the time.

**Q.**    And when you did them with other people, who were these people?

**A.**    Me, Dazz, LT, Wop, Terrence, Phil.

**Q.**    And when you robbed these people with -- you said Dazz,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

LT, Wop and Phil, what would you rob?

    MS. WICKS:  Objection, Your Honor.

    THE COURT:  Basis?

    MS. WICKS:  I think the question assumes a fact not in evidence.  Grouping everybody together.

    THE COURT:  Overruled.

BY MR. LEON:

**Q.**    What, if anything, did you take?

**A.**    Money.

**Q.**    And when you would take money and do these robberies with other people, what did you do with the money once you got it?

**A.**    Broke it down.

**Q.**    How?

**A.**    Whatever we get, break it down with each other.

**Q.**    Who decided, if anyone, who got what, when you broke it down?

**A.**    We was cool, make sure everything come out even with everybody.

**Q.**    When you did these robberies, did you, you, Bobby Capies, bring a gun with you?

**A.**    Yes, sir.

**Q.**    And the -- when you did robberies with Wop, did he bring a gun with him?

**A.**    Yes, sir.

**Q.**    When you did robberies with Dazz, did Dazz bring a gun

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

with him?

**A.**    Yes, sir.

**Q.**    When you did robberies with LT, did LT bring a gun with him?

**A.**    Yes, sir.

**Q.**    Same question, with respect to Phil, when you did these robberies with Phil, did you -- did Phil bring a gun with him?

**A.**    Yes, sir.

**Q.**    Why?

**A.**    Because you need a gun to rob somebody, on the strip, anyway.

**Q.**    When you say "on the strip," what do you mean by "the strip"?

**A.**    Different neighborhoods, sir.

**Q.**    Why would you need a gun to rob somebody in a different neighborhood?

**A.**    Because they got guns in they neighborhood, too.

**Q.**    What were some of the neighborhoods you would go to, to do these robberies?

**A.**    Georgia Avenue.

    MR. ZUCKER:  Your Honor, I would ask that we specify which neighborhoods with which people.

    THE COURT:  I'll let you cross on it.

BY MR. LEON:

**Q.**    Let's break it down.  What neighborhoods did you go into

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

with Dazz to do robberies?

**A.**    Hobart.

**Q.**    Hobart?  Okay.  Is that in Washington, D.C.?

**A.**    Yes, sir.

**Q.**    What quadrant, if you know?

**A.**    Northwest.

**Q.**    Okay.  Is this one robbery in particular, you're thinking of, or others.

**A.**    Just one of them, that I can remember.

**Q.**    Tell us about that one.

**A.**    Just go up there and rob for weed.

**Q.**    Tell us what happened.

**A.**    Robbed some people for weed.  I can't really -- it's been so long, I can't really remember the specs of what happened.  I know we took weed.

**Q.**    Was it just you and Dazz or was anyone else with the two of you?

**A.**    Just me and him.

**Q.**    Okay.  Did you both have weapons on that occasion?

**A.**    Yes, sir.

**Q.**    Did either of you use the weapon, meaning fire the weapon?

**A.**    No, we didn't have to.

**Q.**    What did you take?

**A.**    Weed, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**5229**

**Q.**   Weed, marijuana?

**A.**   Yes, sir.

**Q.**   Any money?

**A.**   Yeah, small amount, though.  I can't remember.

**Q.**   Who actually took the weed?  Meaning, who actually got it first from the person you robbed?

**A.**   It could have been me or him.  I can't remember.

MR. ZUCKER:  Objection.

THE COURT:  Basis?

MR. ZUCKER:  Actually, withdrawn.

BY MR. LEON:

**Q.**   What about -- can you remember any other robberies that you did with Dazz alone?

**A.**   I can't remember.  But there have been.

**Q.**   Okay.  What about Wop.  Did you ever do any robberies with Wop alone?

**A.**   Alone, no.

**Q.**   Did you ever do any robberies with Wop and others?

**A.**   Yes, sir.

**Q.**   How many can you think of right now, as you sit here?

**A.**   A lot.

**Q.**   Okay.  Tell us first the neighborhoods -- first, tell us the neighborhoods that you could remember doing robberies with Wop and others?

**A.**   Gainsville.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

---

**5230**

**Q.**   Maryland?

**A.**   Naw, Gainsville.

**Q.**   Oh, I'm sorry.  Where is that?

**A.**   Southeast, sir.

**Q.**   What's the cross street where you did the robbery?

**A.**   I can't understand what you say sir.

**Q.**   What's the cross street?  Gainsville?  Can you be more specific?

**A.**   It's in southeast.

**Q.**   Can you be more specific than that?

**A.**   Across the parkway from where we be at.

**Q.**   Okay.  Who did you do that robbery with?

**A.**   Me, Wop, LT.

**Q.**   Okay.  What did you take on that robbery?

**A.**   Money and weed.

**Q.**   Do you remember how much?

**A.**   No, sir.

**Q.**   And what -- do you remember who actually took -- where was this?  Was this outside or in a --

**A.**   This was outside.

**Q.**   How did you decide who to rob on that occasion?

**A.**   I mean we go around there we bought weed, we know who selling weed.

**Q.**   And?

**A.**   Come back and rob the person.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

---

**5231**

**Q.**   Do you remember how much you got on that occasion?

**A.**   No, sir.

**Q.**   Do you remember what you did with the -- you got weed or money or both?

**A.**   Weed and money.

**Q.**   Do you remember what you did with the weed and money, once you got it?

**A.**   Kept the money, broke it down between us and we smoked the weed.

**Q.**   What other neighborhoods do you remember doing robberies in with Wop and others?

**A.**   Langston Lane, Galveston.  Uh, it was other spots, but that's all I can remember.

**Q.**   Okay.  Let's talk about those two.  You said "Langston Lane"?

**A.**   Yes, sir.

**Q.**   Was that a neighborhood other than Congress Park?

**A.**   Yes, sir.

**Q.**   Is that in Washington, D.C.?

**A.**   Yes, sir.

**Q.**   What quadrant of the city, if you know?

**A.**   Southeast.

**Q.**   Who were you and Wop with when you did that robbery in Langston Lane?

**A.**   It was me, Wop, Terrence and Phil.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

---

**5232**

**Q.**   Terrence and who?

**A.**   Terrence and Phil.

**Q.**   Phil?

**A.**   Yes, sir.

**Q.**   And who did you rob?

**A.**   The guys in the crap game.

**Q.**   What time of day was this?

**A.**   This was day -- in the evening.  It was day out.

**Q.**   I'm sorry?

**A.**   It was day out.

**Q.**   And was this crap game happening outside?

**A.**   Yes, sir.

**Q.**   And tell us what happened.

**A.**   Wop drove on, like, the other side -- I think it was Harvard Street and me Phil and Terrence walked up on the crap game and robbed them.

**Q.**   Did you have a weapon?

**A.**   Yes, sir.

**Q.**   Did Phil have a weapon?

**A.**   Yes, sir.

**Q.**   Did Terrence?  Did he have a weapon?

**A.**   Yes, sir.

**Q.**   And who did you rob?

**A.**   Some guys from the crap game.  I ain't really sure of their names.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

---

**5233**

Q.   Did you get money from all of them?

A.   Yes, sir.

Q.   Did you take any drugs?

A.   No, sir.

Q.   What did you do once you, Terrence and Phil robbed this crap game?  What'd you do once you got the money?

A.   We got the money, went over my baby's mother's house and broke the money down.

Q.   At the time -- first of all, when did this happen?

A.   This is like the early part of the summer of -- naw, this is, like, April of 2001, April or May.

Q.   April or May of 2001?

A.   Yes, sir.

Q.   And at the time you said you went into your baby's mother's house to break it down, where was this?

A.   In the circle.

Q.   And you also mentioned doing a robbery with Wop and others at Galveston, correct?

A.   Yes, sir.

Q.   Do you remember where that was exactly?

A.   Yes.

Q.   Where?

A.   South Capitol.

Q.   Who were you and Wop with when you did that robbery?

A.   It was me, Wop and Dazz, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5234**

Q.   When did this robbery take place, approximately?

A.   Like December 2000.

Q.   December of 2000.  Whose idea was it to do this robbery?

A.   Wop, sir.

Q.   Okay.  And were you with him when he shared this idea with you?

A.   Yes, sir.

Q.   Where were you and he when Wop shared this idea with you?

A.   At a club.

Q.   What club?

A.   Club U, sir.

Q.   Club U?  Where is that?

A.   Uptown by U Street.

Q.   What quadrant of the city?

A.   Northwest.

Q.   And you and Wop are at Club U.  Were you and Wop with anybody else at this time at Club U?

A.   Yes, sir.

Q.   Who?

A.   Dazz, Santu and Phil.

    MR. ZUCKER:  I'm sorry, if the witness could repeat the last three words, I couldn't hear them.

    THE COURT:  Could you repeat the names?

    THE WITNESS:  Dazz, Santu and Phil.

BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5235**

Q.   Okay.  Are you inside the club?

A.   Yes, sir.

Q.   And tell us what Wop says to you in the presence of Dazz, Santu and Phil at Club U, about doing a robbery.

A.   It was about to -- it was time to leave, and it was drizzling outside, and Wop was like, this would be a good time to make that move.

Q.   And when he said "this would be a good time to make that move," what, if anything, did you understand that to mean?

A.   To make the move on -- the move that he had got from another dude.

Q.   What do you mean by that?

A.   It's a guy named Tye.

Q.   Tye?

A.   Yeah, he on Livingston Road, and he got a friend and lady that stay on Galveston and LA came in town and told him he had to move.

    MS. WICKS:  Your Honor, hearsay.  It's from Wop and not offered for the truth.

    THE COURT:  Let's make it clear that this is Wop telling it.

    THE WITNESS:  Yes, sir.

BY MR. LEON:

Q.   This is from Wop -- this is what Wop's telling you?

A.   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5236**

    THE COURT:  Overruled.

BY MR. LEON:

Q.   Is Wop -- let's break it down to be clear.  Is what you're telling us right now about Tye and LA, is that part of the conversation you're having at Club U, or is that something that happened earlier?

A.   That's something that happened earlier, that we talked about already.

Q.   Let's break it down further.  What's the first time before Club U, that talked to Wop about making a move?

A.   Wop came to me and was telling me that -- well, actually, the guy that we was trying to get was a guy named Roadie.

Q.   Okay.  Let's stop right there.  Before -- who's Roadie?

A.   A guy that used to hang out in Congress Park.

Q.   When you say "hang out," what did he do when Roadie hung out in Congress Park?

A.   Sell drugs.

Q.   Serve drugs?

A.   Yes, sir.

Q.   And when he would serve drugs, would he serve to suppliers -- to dealers like yourself, or would he supply to users?

A.   He sell to suppliers like myself.

Q.   Okay.  Did you ever buy drugs from Roadie?

A.   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5295**

1  A.  I went in jail; I came back out, though.

2  Q.  Okay.  And were you in jail at any point in 1998?

3  A.  Yes, sir.

4  Q.  What portions of 1998 were you in jail?

5  A.  February to September of '98, sir.

6  Q.  Now, let's get back to the end of 1996 when you learned

7  from Wop about this beef with 10th Place, okay?

8  A.  Yes, sir.

9  Q.  Do you know somebody by the name of Meatball, or did you

10  know somebody by the name of Meatball?

11  A.  Yes, sir.

12  Q.  Who is Meatball?

13  A.  He like -- he went to school with me.  I came up with

14  him, too, sir.

15  Q.  What do you mean by you came up with him, too?

16  A.  I know him not from doing nothing with him, but I know

17  him.  I came up with him.

18  Q.  Did you ever deal drugs with Meatball?

19  A.  No, sir.

20  Q.  Did you ever know Meatball to deal drugs?

21  A.  Yes, I had seen him make sales.

22  Q.  A lot or a little?

23  A.  A little.

24  Q.  Okay.  And what neighborhood did Meatball live in?

25  A.  Congress Park.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**5296**

1  Q.  And other than you, do you know if other people in

2  Congress Park, just first yes or no, were friends or friendly

3  with Meatball?

4  A.  Yes, sir.

5  Q.  Who?

6  A.  DC.

7      MR. ZUCKER:  Objection.

8      THE COURT:  Sustained.

9  BY MR. LEON:

10  Q.  How do you know that Meatball was friends with other

11  people in Congress Park?

12  A.  From seeing it and hanging around them at times.

13  Q.  Who would you see Meatball hanging with at Congress Park?

14  A.  DC, Keith and Kevin, Boobie, a guy named Quinton.

15  Q.  Did you learn that Meatball died?

16  A.  Yes, sir.

17  Q.  Did you learn how he died?

18  A.  Yes, sir.

19  Q.  And who did you -- how'd you learn about Meatball dying?

20  A.  Wop told me about it.

21  Q.  Did -- tell us -- well, first of all, when did Meatball

22  die?  Were you still in jail?

23  A.  Yes, sir.

24  Q.  Do you remember when this happened?

25  A.  October, '96.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**5297**

1  Q.  October, 1996?

2  A.  Yes, sir.

3  Q.  October, 1996, Meatball dies.  Is this before or after

4  your friend Head died?  Was it before or after that?

5  A.  It was after, sir.

6  Q.  So who died first?

7  A.  Head died first, and then Meatball.

8  Q.  How much before Meatball was Head killed?

9  A.  Like a month away.

10  Q.  So that would make Head being killed in September?

11  A.  Yes, sir.

12  Q.  What did Wop tell you about Meatball being killed?

13  A.  He told me --

14      MR. TABACKMAN:  Objection, Your Honor.  Hearsay.  Can we

15  approach?

16      MR. LEON:  Can I explain at the bench?

17      THE COURT:  Yes.

18      (Following sidebar discussion had on the record:)

19      MR. LEON:  I guess the first point is it's not offered for

20  its truth, it's offered to explain, A, the state of mind of this

21  person as well as other people, like why the 10th Place beef not

22  only began, but how it perpetrated.  So regardless of whether

23  Meatball was killed by a member of 10th Place or somebody else,

24  as long as they thought it, it explains why the beef continued.

25  So that's the first reason.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**5298**

1      And the second is --

2      THE COURT:  Well, you're getting him to explain why

3  Meatball was killed for the purpose of showing why Meatball was

4  killed, and that purpose being that there was some kind of

5  ongoing beef.  So that's why it's --

6      MR. LEON:  Right.  Well, I understand what the Court and

7  counsel are saying.  I would take that a step further to say

8  we're trying to establish that to explain why D-Lock was then

9  killed, and others, because word on the street was that D-Lock

10  was behind the Meatball murder and that explains why this man

11  killed D-Lock.  So I'm -- it's really an early foundational

12  question as to why this man, in his mind, had to kill D-Lock,

13  because this man, in his mind, thought that D-Lock was behind

14  Meatball.

15      And he learns it from a fellow co-conspirator, which ties

16  to my other response, which is I would say it's a statement by a

17  co-conspirator in furtherance of the conspiracy, and that it

18  explains -- it explains why they're going to go and do other

19  violence.  So it's predicate for why Wop and Dazz and Mr. Capies

20  and others do what they do after that.

21      MR. TABACKMAN:  Number one, as I read the grand jury

22  testimony, Mr. Capies, although when D-Lock was killed,

23  isn't the person who actually shoots him.  And I think he denies

24  having done that.  But --

25      THE COURT:  You're saying Capies denies shooting?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**5299**

1    MR. TABACKMAN:  He says he was there, but it was somebody
2  else who killed D-Lock.
3        THE COURT:  Well, let me just ask you to address -- I
4  think you had objected that this was hearsay before the answer.
5        MR. TABACKMAN:  And I don't think, Your Honor, that simply
6  advising him of some historical fact that we need to --
7        THE COURT:  Cool Wop invited Capies.
8        MR. TABACKMAN:  -- of a historical fact is something that
9  is in furtherance of this conspiracy and -- I'm having difficulty
10  articulating it.  It becomes so attenuated and so nebulous,
11  that -- his state of mind can be gotten at without that level of
12  detail.
13        I mean, the fact that we were beefing, that Cool Wop can
14  say we were beefing with 10th Place, that's -- it seems to me
15  that that's satisfactory and achieves the government's purpose,
16  without getting involved in a whole other story about how
17  somebody else got killed for all of these defendants who weren't
18  there.
19        The conversations are consistently -- there's no date,
20  there's no time, there's no place.  There's numbers of times.
21  And I just think that it becomes -- in addition to a 403 problem.
22        THE COURT:  All right.  Well, I think you can cross on all
23  of that.  But if the explanation is that this statement made by a
24  co-conspirator during the existence of the conspiracy was for
25  some purpose to further the alleged violence, that the violence

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5300**

1  was part of the way of carrying out the conspiracy for whatever
2  purposes are alleged in the indictment, it overcomes the hearsay
3  hurdle.  So I'll overrule the objection.
4        (Sidebar discussion concluded.)
5        MR. LEON:  Could the reporter read back the last question?
6        (Court reporter read back the last question as requested.)
7        THE WITNESS:  He told me that D-Lock -- a dude named -- I
8  forgot his name.  I forgot the other names.  I know D-Lock was
9  one of the guys was in there.
10  BY MR. LEON:
11    Q.    D-Lock was one of the guys in where?
12    A.    Driving the car when Meatball got shot.
13    Q.    When Wop mentioned the name D-Lock to you, did you know
14  who D-Lock was?
15    A.    Yes, sir.
16    Q.    When Wop told you about D-Lock being involved in this
17  murder, who in your mind was D-Lock?
18    A.    A guy from 10th Place.
19    Q.    Had you seen him before?
20    A.    Yes, sir.
21    Q.    And when you say 10th Place, at this point -- and when I
22  say "this point," end of 1996, you mentioned D-Lock, you
23  mentioned two different -- Jack and James, two men who went by
24  the nickname of Twin.  Who else, if anyone, was part of
25  10th Place, in your mind, other than D-Lock and Twin, Jack and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5301**

1  James?
2    A.    A dude named Harvey.
3    Q.    Harvey.  Who else, if anyone?
4    A.    Steve and Patrick.
5    Q.    Steve and Patrick?
6    A.    Yes, sir.
7    Q.    Anyone else?
8    A.    Linwood, and a dude named Clyde.
9    Q.    Clyde?  Anyone else you can think of right now?
10    A.    No, sir.
11    Q.    Okay.  So you learned that -- what exactly did you learn
12  from Wop -- withdrawn.
13        What did you learn from Wop that D-Lock did, exactly?
14    A.    That they did -- that D-Lock and some other guys in the
15  car did a drive-by, and shot Meatball and shot another dude
16  named Big Head Tony.
17    Q.    Big Head Tony?
18    A.    Yes, sir.
19    Q.    Where did this shooting happen?
20    A.    On Savannah Street, sir.
21    Q.    What portion?
22    A.    Right there at the alley in front of like some apartments
23  at Congress Park.
24    Q.    And you learned this from Wop?
25    A.    Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5302**

1    Q.    Did Wop tell you who else was in the car with D-Lock, you
2  just can't remember the names?
3    A.    I can't remember the names.
4    Q.    But did he mention other people at some point?
5    A.    Yes, sir.
6    Q.    Do you remember how many other people he mentioned?
7    A.    It was like two more people.
8        MR. LEON:  Your Honor, I would ask if we could publish
9  Government's 100.1 to the jury and to the witness.
10  BY MR. LEON:
11    Q.    Mr. Capies, looking at Government's 100.1, can we see on
12  this map where Wop told you Meatball was shot and killed?
13    A.    (Indicating.)
14    Q.    And for the record, you put a mark right at the
15  intersection of Savannah Street and an alley that looks like
16  it's just parallel to and just east of 13th Street; is that
17  correct?
18    A.    Yes, sir.
19    Q.    Do you know if that alley that runs parallel to
20  13th Street has a name?
21    A.    The Alley.
22    Q.    Okay.  Mr. Capies, I'm going to ask if you can tap and
23  clear the screen.
24        MR. LEON:  And I'm going to ask, Your Honor, if we could
25  publish what is in evidence, Government's 105.1, to the witness

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5303**

1   and to the jury.
2       THE COURT:  Yes.
3   BY MR. LEON:
4   **Q.**   Do you see Government's 105.1, Mr. Capies?
5   **A.**   Yes, sir.
6   **Q.**   Tell us what that is, or what you understand that to be.
7   **A.**   A map of Congress Park and 10th Place.
8   **Q.**   Okay.  I'm going to ask you to quickly circle generally
9   around the Congress Park neighborhood.
10   **A.**   Ain't nothing happening.
11   **Q.**   Can you try that again?  I don't think it showed.
12       I still don't think it showed.  Why don't I ask you to do
13   this:  Why don't I ask you to put a circle around what you
14   consider to be the 10th Place neighborhood.  Just tap -- you can
15   even just put a mark, if you can just tap a little harder.
16   **A.**   (Indicating).
17   **Q.**   For the record, it looks like you put a circle around a
18   three or four-block radius or -- bordering around
19   Mississippi Avenue and Congress Street, north and south and east
20   and west on 13th Street, and either 9th Place or 10th Place.  Is
21   that about right?
22   **A.**   Yes, and Trenton Place.
23   **Q.**   And Trenton Place.  Okay.  And Trenton Place is right in
24   the middle of the area, correct?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5304**

1   **Q.**   Okay.  When Wop told you that Meatball was killed by
2   D-Lock and others, what else, if anything, did he say to you
3   about that?
4   **A.**   He said he was shooting back.
5   **A.**   Who was shooting back?
6   **A.**   Wop.
7   **Q.**   During this incident?
8   **A.**   Yes.
9   **Q.**   Okay.  And did Wop tell you if he struck anyone?
10   **A.**   No, sir.
11   **Q.**   Did Wop tell you what -- you said October.  Did he tell
12   you what time of day or night or morning this occurred?
13   **A.**   No, sir.
14   **Q.**   Did Wop tell you who else, if anyone, was out there along
15   with him and Meatball, and I think you set Fathead Tony?
16   **A.**   Yes, he said they was up in the alley part, him, LT, a
17   dude named Milton, Cat Eye Tony, some other people I can't
18   remember.  And he was, like, Fathead Tony, Meatball, and Wop was
19   in the front part of the line.
20   **Q.**   Other than -- was Fathead Tony struck?
21   **A.**   Yes, sir, he was shot.
22   **Q.**   Do you know if -- did you learn from Wop if Fathead Tony
23   was killed?
24   **A.**   No, he didn't say he got killed.  He didn't -- Fathead
25   Tony did not die.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5305**

1   **Q.**   Did you ever talk to Wop after this conversation?
2   Withdrawn.
3       You told us you learned from Wop about Head being killed
4   and Meatball being killed, okay.  Is that right?
5   **A.**   Yes, sir.
6   **Q.**   Did you ever talk to Wop after this, after you first
7   learned of this, with Wop about this violence?
8   **A.**   Yes, numerous times.
9   **Q.**   And when you say numerous times, what did Wop say to you
10   about -- during these numerous conversations?
11   **A.**   He was telling me that we beefing with them, we got to
12   retaliate.  They going to keep coming through there shooting.
13   **Q.**   What if anything did you say in response?
14   **A.**   I was with it.
15   **Q.**   What do you mean by that, "I was with it"?
16   **A.**   Going back to retaliate.
17   **Q.**   And when you and Wop had these conversations, was there
18   ever anyone else -- just yes or no right now, was there ever
19   anyone else with you and Wop when you had these conversations
20   about retaliation?
21   **A.**   Yes.
22   **Q.**   And tell us who you remember being present for these
23   conversations when you and Wop had them.
24       MR. ZUCKER:  Objection.  Could we specify which
25   conversations, instead of this broad...

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5306**

1       THE COURT:  I'll let you narrow it down.
2       MR. LEON:  Can we get a response, and then I'll narrow it?
3       THE COURT:  Yes.
4   BY MR. LEON:
5   **Q.**   First tell us who else you remember being there in
6   addition to Wop when you and Wop would talk about retaliation.
7   **A.**   LT, Dazz, Drano, Terrence, and another guy named Tweety.
8   **Q.**   You mentioned LT.  First of all, how many times would you
9   say LT was present when you and Wop talked about retaliation?
10   **A.**   I ain't got no number on it, but I remember him being
11   there sometimes.
12   **Q.**   Did LT ever indicate that he didn't agree with
13   retaliation?
14   **A.**   Naw, he didn't never say he didn't agree.
15   **Q.**   What about Dazz?  How many times was Dazz present when
16   you and Wop talked about retaliation towards 10th Place?
17   **A.**   A number of times.
18   **Q.**   Did Dazz ever indicate he didn't agree with retaliation?
19   **A.**   Naw, he ain't never say he didn't agree.
20   **Q.**   Same question with respect to Drano.  Did Drano -- how
21   many times would you say Drano was present for these
22   conversations?
23   **A.**   Many times.
24   **Q.**   Did Drano ever indicate he didn't agree with retaliation?
25   **A.**   Naw, he didn't never say that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5307

1  **Q.**  I'll ask also with respect to Terrence and Tweety.  When
2  they were present, did either of them indicate they weren't --
3  didn't agree with retaliation?
4  **A.**  No, they didn't.
5  **Q.**  Did Wop ever tell you that he did retaliate?
6  **A.**  Yes, sir.
7      MS. WICKS:  Objection to leading, Your Honor.
8      THE COURT:  All right.  Rephrase.
9      MS. WICKS:  Your Honor, I think previously the Court said
10  that he would narrow the focus down to when these conversations
11  occurred, and after he identified who he was with, and it hasn't
12  been done yet.
13     MR. LEON:  I will.  Okay.
14  BY MR. LEON:
15  **Q.**  Let's go back to the conversations you had.  Let's focus
16  on Dazz.  I believe you said that you had conversations -- tell
17  me if this is correct or not, with Wop, where Dazz was present
18  when the conversation was about retaliation towards 10th Place.
19  **A.**  Yes, sir.
20  **Q.**  Okay.  How many times would you say Dazz was present
21  during these conversations?
22  **A.**  A couple.  I don't have no number on it, sir.
23  **Q.**  Can you put a time frame on this?  In other words, when
24  did you have these conversations with Dazz and Wop regarding
25  retaliation?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5308

1  **A.**  It's like '97, early part.
2  **Q.**  Early part of '97?
3  **A.**  Yes, sir.
4  **Q.**  Did -- during these conversations in the early part of
5  '97 that you're having with Wop and Dazz, you said, I believe,
6  that Wop -- excuse me, that Dazz did not disagree with the talk
7  of retaliation.  Did Dazz ever say anything himself about
8  retaliation?
9  **A.**  Yes, sir.
10  **Q.**  Tell us what Dazz said about retaliation.
11  **A.**  That they went down there and got in a shootout with some
12  guys with 10th Place.
13  **Q.**  Who told you this?
14  **A.**  Dazz.
15  **Q.**  When did Dazz tell you this?
16  **A.**  I don't got no date on it, sir, but I remember him
17  telling me in the early part of '97.
18  **Q.**  Early part of?
19  **A.**  '97.
20     MR. ZUCKER:  Could I ask the witness to define what is the
21  early part of '97?  Is there any way to focus it?
22     THE COURT:  No.
23  BY MR. LEON:
24  **Q.**  What is the early part of '97 to you, Mr. Capies?
25  **A.**  January, February.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5309

1  **Q.**  Okay.  Was this a specific conversation you can remember?
2  **A.**  Yes.
3  **Q.**  Tell us the specific conversation you remember having in
4  January, February, where Dazz told you about retaliating.
5  **A.**  He told me that him, Antwuan, LT, and Wop went down
6  10th Place to try to creep down on them guys, and somebody
7  opened fire on them, which they believe was Steve and Patrick,
8  and they stopped the car and jumped out and opened fire back.
9  **Q.**  Okay.  You've said a few things there.  Let's just follow
10  up.  First of all, Dazz told you about this?
11  **A.**  Yes, sir.
12  **Q.**  And he told you that Dazz was there and who else?
13  **A.**  LT, Twan, and Wop.
14  **Q.**  So four people in total?
15  **A.**  Yes, sir.
16  **Q.**  Okay.  And where did this shooting happen?
17  **A.**  On 10th Place.
18  **Q.**  Did he tell you where on 10th Place?
19  **A.**  No.  He just said 10th Place.
20  **Q.**  And did Dazz tell you who's idea it was to drive to
21  10th Place to do this shooting?
22  **A.**  I don't remember.
23  **Q.**  Okay.  And did he tell you how they got there?
24  **A.**  Yes.  By car.
25  **Q.**  Did he tell you whose car?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5310

1  **A.**  No, I don't remember, sir.
2  **Q.**  Okay.  And did he tell you who from Congress Park, who
3  from the group Dazz was with, actually fired weapons?
4  **A.**  All of them that was in the car that I named.
5  **Q.**  All four?
6  **A.**  Yes.
7  **Q.**  And I believe you said that they were firing at Steve and
8  Patrick?
9  **A.**  Yes.
10  **Q.**  Anybody else?
11  **A.**  A dude named Redhead.
12  **Q.**  Redhead.  And did Dazz indicate to you whether or not
13  either Redhead or Steve or Patrick, any of those three fired
14  back?
15  **A.**  Yes.
16  **Q.**  Did they?
17  **A.**  Yes.
18  **Q.**  Who?
19  **A.**  Steve and Patrick.
20  **Q.**  And?
21  **A.**  And Redhead.
22  **Q.**  So all three did fire back?
23  **A.**  Yes.
24  **Q.**  Did Dazz indicate to you if anyone, anyone from
25  Congress Park or anyone from 10th Place, was actually hit with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5311

1    any bullets?
2    **A.**    Dude named Redhead.
3    **Q.**    Was hit?
4    **A.**    Yes, sir.
5    **Q.**    And who told you this?
6    **A.**    Dazz.
7    **Q.**    Did Dazz tell you if Redhead was killed?
8    **A.**    No, he didn't get killed.
9    **Q.**    How do you know that?
10   **A.**    Because he told me that.
11   **Q.**    Who told you?
12   **A.**    Dazz, sir.
13   **Q.**    Were Steve, Patrick, or Redhead in -- were they on the
14   street or in a car?  Did he tell you where they were?
15   **A.**    He said when they was driving through, they came out of
16   nowhere firing at the car.  He didn't say where they was at.
17   They was in the streets.  He didn't say where they came from, I
18   meant, sir.
19   **Q.**    Now, you mentioned Antwuan being part of this group of
20   four who went into 10th Place.  Around this time, and by that I
21   mean early '97 or so, did you ever speak to Antwuan about the
22   10th Place beef?
23   **A.**    Not at that time, I don't remember.
24   **Q.**    Okay.  Did you ever speak to Antwuan about the 10th Place
25   beef?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

5312

1    **A.**    Yes.
2    **Q.**    When's the first time you can remember talking to Antwuan
3    about the 10th Place beef?
4    **A.**    When I came home in '98.
5    **Q.**    In 1998?
6    **A.**    Yes, sir.
7    **Q.**    And this would be coming home from jail?
8    **A.**    Yes.
9    **Q.**    And I believe you testified earlier you got home in 1998,
10   around September of '98?
11   **A.**    Yes, sir.
12   **Q.**    Is that when you mean?
13   **A.**    Yes, sir.
14   **Q.**    Tell us about the conversation you had with Antwuan after
15   you got home in 1998 about the 10th Place beef.
16   **A.**    After I came home, I seen him like two days later and I
17   seen him driving down the street.  And he said he heard I was
18   home, and I got in the car with him and he was telling me about
19   how he was trying to get it squashed between 10th Place and
20   Congress Park.  He told me that he brought Steve and Patrick and
21   a guy named Clyde behind the 1313 building and called Wop
22   outside to squash it.
23   **Q.**    And what else did Antwuan tell you about this when he
24   tried to broker peace around this time?
25   **A.**    He called Wop out there and was like, "Somebody dead from

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

5313

1    around there and somebody dead from up here.  Y'all need to go
2    and let it go." He said Wop said, "My man's dead.  I ain't
3    letting nothing go."
4    **Q.**    Who did you understand Antwuan to mean when he said Wop
5    said his man's dead?
6    **A.**    Head.
7    **Q.**    What else did Antwuan tell you, if anything, about this
8    incident where he tried to slow down or end the 10th Place beef?
9    **A.**    He said Wop walked off.  And he said, "That's what's
10   wrong with y'all now, y'all getting too big-headed."
11   **Q.**    You mentioned earlier someone by the name of Linwood.  Do
12   you remember that?
13   **A.**    Yes.
14   **Q.**    And Linwood was associated with Congress Park or
15   10th Place?
16   **A.**    10th Place.
17   **Q.**    First just yes or no, did you ever learn if Linwood was
18   ever shot at in the course of this beef?
19   **A.**    Yes, sir.
20   **Q.**    And how did you learn that Linwood was shot at in the
21   course of this beef?
22   **A.**    Through Dazz and LT.
23   **Q.**    What did you learn from Dazz -- first of all, was this
24   Dazz and LT together or separately?
25   **A.**    I can't remember, but I know I learned it from both of

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

5314

1    them, sir.
2    **Q.**    Okay.  Did -- when was Linwood shot at?
3    **A.**    I don't know, but I know it was in '98 when I was locked
4    up.
5    **Q.**    Okay.  So this would be sometime between what months in
6    1998?
7    **A.**    It had to be between February and September.
8    **Q.**    Okay.  And tell us what you learned from Dazz and LT
9    about this shooting.
10             MR. ZUCKER:  Your Honor, could I ask for a time frame on
11   this conversation?
12   BY MR. LEON:
13   **Q.**    When did this conversation happen?
14   **A.**    When I came home.
15   **Q.**    Okay.  Can you put a -- you said you came home in
16   September of 1998.  Do you know how much after you getting
17   released from jail you had this conversation?
18   **A.**    Naw.  But I know it was after I got out, sir.
19   **Q.**    Okay.  So it wasn't over the phone from jail?
20   **A.**    Naw, not this conversation.
21   **Q.**    Okay.  Tell us what you learned about -- with respect to
22   Linwood being shot.
23   **A.**    I forgot what Dazz and LT told me they was coming from,
24   but they was coming from somewhere like Naylor Road and
25   Alabama Avenue at the top of the hill, and they said they seen

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5315*

1  them coming from grocery shopping and they followed them to
2  Galveston.
3    Q.    Okay.
4    A.    And they said they followed this guy in this tow truck,
5  and they said once they got to Galveston, they seen him putting
6  on his brake lights to park.  So they eased their stop, they
7  slowed up a little bit.
8    Q.    They saw who hitting his brake lights?
9    A.    Linwood.
10   Q.    And Linwood was driving what?
11   A.    A tow truck.
12   Q.    Had you ever seen Linwood in a tow truck before?
13   A.    Yes, sir.
14   Q.    Okay.  So go ahead.  They see him slowing up around
15  Galveston.  Go ahead.
16   A.    They let him park, and once he got out with his bags,
17  they ran down on him.
18   Q.    And when you say "bag," what do you mean by a bag?
19   A.    Bags, grocery bags.
20   Q.    And when you say they jumped out, what did Dazz -- what
21  do you mean by that?
22   A.    They jumped out and opened fire on him.
23   Q.    Did Dazz tell you if he was firing a weapon?
24   A.    Yes.
25   Q.    Did he tell you if LT was firing a weapon?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*5316*

1    A.    Yes, sir.
2    Q.    Were they each firing weapons or no?
3    A.    Both of them.
4    Q.    Did Dazz tell you what he, Dazz, was firing?
5    A.    Yes, sir.
6    Q.    What was Dazz firing?
7    A.    A .357.
8    Q.    Is that a revolver, or was that an auto or semiautomatic
9  pistol, if you know?
10   A.    Revolver.
11   Q.    Had you ever seen Dazz with that weapon before?
12   A.    I don't remember.
13   Q.    Okay.  And what about LT?  Did you learn from Dazz what
14  weapon LT was carrying?
15   A.    A Ruger.
16   Q.    What kind of Ruger?
17   A.    A 9-millimeter.
18   Q.    Had you seen LT with a 9-millimeter Ruger before?
19   A.    Yes, sir.
20   Q.    Had you shared a 9-millimeter Ruger with LT before?
21   A.    No, sir.
22   Q.    Had you shared any weapons with LT before?
23   A.    Yes.
24   Q.    What?
25   A.    A Glock and a Ruger.  But the Ruger wasn't his.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*5317*

1    Q.    So the Ruger you shared with LT was another Ruger?
2    A.    Yes, sir.
3    Q.    Okay.  And you also said a Glock; is that right?
4    A.    Yes, sir.
5    Q.    What caliber was the Glock that you shared with LT?
6    A.    9-millimeter.
7    Q.    So, finish the conversation with Dazz.  Dazz tells you
8  that he, Dazz, and LT get out of their car?
9    A.    Yes.
10   Q.    What were they driving?  Did Dazz tell you?
11   A.    I can't remember.
12   Q.    Okay.  Tell us what Dazz said next.
13   A.    That they jumped out the car, opened fire on them.  They
14  said they would have killed them, but they ran out of bullets.
15   Q.    So, did Dazz indicate that they didn't kill him?
16   A.    Yes, he indicated they didn't kill him.
17   Q.    Tell us what, if anything, you remember Dazz saying else
18  with respect to this shooting.
19   A.    The revolver held six shots, and that LT, the whole clip
20  wasn't full in his Ruger.
21   Q.    And other than -- well first of all, do you remember Dazz
22  saying anything else regarding this shooting?
23   A.    I can't remember.
24   Q.    Okay.  And do you remember talking -- was this a
25  conversation you had with Dazz, Dazz and LT?  Were Dazz and LT

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*5318*

1  together when you had this conversation or were they separate?
2    A.    I can't remember if they were together or separate, but I
3  remember having a conversation with both of them about the same
4  incident.
5    Q.    Okay.  And did LT say anything to you different or in
6  addition than what Dazz said?
7    A.    I do remember him saying something about he fell down
8  with his bags like in a little ditch or something.
9    Q.    That who fell down?
10   A.    Linwood.
11   Q.    In a ditch?
12   A.    Yes.
13   Q.    Okay.  Do you remember anything else that Dazz or LT told
14  you about this shooting?
15   A.    No, sir.
16   Q.    You also indicated earlier when you told us about Wop
17  first telling you about Twin killing Head.  Okay?  Do you
18  remember that first conversation you told us about when you
19  learned from Wop that Twin killed Head?
20   A.    Yes.
21   Q.    Okay.  And I believe you testified earlier that at that
22  point Wop wanted to get at Twin?
23   A.    Yes, sir.
24   Q.    And I believe you said words to the effect of you agreed,
25  and you wanted to as well?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

5335

1  MS. WICKS: The question was "from anyone". I can't
2  imagine that that's necessarily relevant or admissible.
3      THE COURT: Why don't you repeat the question.
4  BY MR. LEON:
5  Q.   Yes or no, did you learn if any of the younger people who
6  were struck were involved in drug dealing in Congress Park?
7  A.   No.
8  Q.   No, you didn't learn, or no they weren't?
9  A.   No, I didn't learn.
10 Q.   Okay.  And for the record you put -- I asked you to
11 indicate where Tameka Murphy's house is.  You put a dot what
12 appears to be on a building facing Congress Street just in front
13 of the Lincoln; is that fair?
14 A.   Yes.
15 Q.   Do you know the address of that building?
16 A.   No, sir.
17 Q.   Mr. Capies, do you know what the expression "doors"
18 means?
19 A.   Like house doors or doors?
20 Q.   Well, not house doors.  Well, withdrawn.  Have you ever
21 heard the expression doors in the context of drug dealing in
22 Congress Park?
23 A.   Yes.
24 Q.   That's what I'm talking about, okay.  So how have you
25 heard that expression used in drug -- with respect to drug

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5336

1  dealing in Congress Park?
2  A.   Unos, *dos, tres, quatros, nu*mbers in Spanish.
3  Q.   Explain exactly what "doors" means in this context.
4      MR. PURPURA:  I apologize.  I'm sure it's simple, but
5  basis of personal knowledge on this as well.
6      THE COURT:  Overruled.
7      THE WITNESS:  When you making a drug sale around the time
8  when the beef was going on with 10th Place and Congress Park --
9      MR. PURPURA:  Objection again just on relevancy, time
10 frame.  I'm not sure exactly when we're talking about in this
11 period of time.
12     MR. LEON:  The witness just said what period of time.
13     THE COURT:  Overruled.
14 BY MR. LEON:
15 Q.   During the 10th Place beef; is that correct?
16 A.   Yes, sir.
17 Q.   Okay.  Go ahead.
18 A.   We was hanging on Savannah Street alley, and no one
19 wanted to come out to the front line because it was a drive-by,
20 so calling *unos, dos, tres, quatros* so the sale would come out
21 and no one would be racing out there to try to make the sale.
22 Q.   So, if a sale would drive up to Congress Park and
23 somebody yelled *uno*, tell us what would happen.
24 A.   They get first.  If it's a dime sale, that's they sale.
25 Q.   What if it was a ten dime sale?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5337

1  A.   Ten dime sales?
2  Q.   Yeah.
3  A.   It break down four ways.
4  Q.   And first of all, did you personally participate in this
5  *unos, dose, tres* system?
6  A.   Yes, sir.
7  Q.   How many times would you say you personally participated
8  in this system?
9  A.   So many times I can't recount.
10 Q.   Who did you share sales with?
11 A.   Wop, Dazz, Phil, Drano, Tweety, Ju-Ju, Jo-Jo, LT
12 Terrence, Cat Eye Tony.
13 Q.   I think you indicated that this system was done for
14 safety reasons?
15     MR. ZUCKER:  Objection.
16     THE WITNESS:  Yes, sir.
17 BY MR. LEON:
18 Q.   Explain what you mean by that.
19 A.   Like I was saying earlier, so you won't go out.  Meatball
20 and Head got shot in drive-byes, so we wouldn't go out in the
21 front line to try to make a purchase and a car come by and we
22 get shot up; whereas in the alley in the cut we could see what's
23 going on down on the street.
24 Q.   Through the uno, *dos sy*stem, how would people actually go
25 out to make the sale itself?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5338

1  A.   I mean, how far can it be broke down?
2  Q.   Let's say it broke down with four people, one two, three,
3  four, and four people agree to share the sale, would all four
4  people go out and make the sale?
5  A.   Naw, we make the sale come up in the alley to us.
6  Q.   Okay.  And then how many of the four of you would
7  actually make the sale?  How many people would -- how many
8  people would actually make the hand-to-hand with the customer at
9  that point?
10 A.   It comes down to how many people -- how much crack the
11 person want.
12 Q.   And when you say the alley -- did you say the alley?
13 A.   Yes.
14 Q.   Can we see the alley on this map?
15 A.   Yes.
16 Q.   Can you please tap on it?
17 A.   (Indicating).
18 Q.   Now, Mr. Capies, I think you told us earlier, perhaps
19 even on Thursday, that you would from time to time sell crack in
20 neighborhoods other than Congress Park; is that correct?
21 A.   Yes, sir.
22 Q.   What other neighborhoods did you sell crack, other than
23 Congress Park?
24 A.   37 and Gerard Street.
25 Q.   37th and Gerard?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5339

1   A.   37 Place, Southeast and Gerard Street, Southwest.
2   Q.   Okay.  Two different neighborhoods?
3   A.   Yes, sir.
4   Q.   Did you ever use that "unos-doors" system in either of
5   those two neighborhoods?
6   A.   No, sir.
7   Q.   Now, Mr. Capies, I believe it was on Thursday you told us
8   there was a 9 millimeter pistol you were very familiar with
9   because you've done a murder yourself with that same pistol.  Do
10  you remember that same testimony?
11  A.   Yes, sir.
12  Q.   What murder did you do with that 9 millimeter pistol?
13  A.   D-Lock.
14  Q.   Is that the same D-Lock from 10th Place?
15  A.   Yes, sir.
16  Q.   When did you kill D-Lock?
17  A.   '98.
18  Q.   When?
19  A.   January, '98.
20  Q.   Did you do it alone?
21  A.   No, sir.
22  Q.   Who was with you -- who did you kill D-Lock with?
23  A.   LT.
24  Q.   Anybody else there?
25  A.   Keith B.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5340

1   Q.   Keith B?
2   A.   Yes, sir.
3   Q.   Is that Barnett?
4   A.   Yes, sir.
5   Q.   You, LT and Keith Barnett.  Anybody else with -- anyone
6   else other than the three of you?
7   A.   We the ones that went down there.
8   Q.   Why did you kill D-Lock?
9   A.   It wasn't meant for him, but he was there when it
10  happened.
11  Q.   Well, who was it meant for?
12  A.   Jack.
13  Q.   Jack Davis?
14  A.   Yes, sir.
15  Q.   One of the twins?
16  A.   Yes, sir.
17  Q.   Why was it meant for Jack?
18  A.   Because he killed Head.
19  Q.   Now, what time of day did this murder happen?
20  A.   In the daytime, like after school.
21  Q.   Okay.  I'd like to go before the murder itself, okay.
22  Let's go a few hours earlier.  Tell us where you were.  Let's
23  go, let's say, three or four hours before this murder happened.
24  I'm sorry.  Let's go to the morning of that day.  Where were
25  you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5341

1   A.   In the house.
2   Q.   Who's house?
3   A.   My mother's house.
4   Q.   Okay.  And were you alone?
5   A.   Yes.
6   Q.   Okay.  Did you leave the house at some point?
7   A.   Yes, sir.
8   Q.   Where do you go?
9   A.   To the alley.
10  Q.   The alley that you just pointed to where you did the
11  *unos*-doors?
12  A.   Yes, like in the middle part.
13  Q.   Okay.  And when you got to the alley, what time of day
14  was this?
15  A.   Like, after school.
16  Q.   Okay.  Who's there?
17  A.   LT, Taneil, Wop, dude named Geeka, Keith B, me and him
18  end up shaking up there together.
19  Q.   Okay.  You said LT, Taneil, Geeka, Wop, and Keith B and
20  yourself?
21  A.   It was a few more little people, but I can't remember
22  who.
23  Q.   Was Antwuan Ball there?
24  A.   Naw, I don't remember him being back there.
25  Q.   Okay.  Prior to this time you met up in the alley the day

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5342

1   you killed D-Lock, had you talked to Antwuan prior to this
2   regarding the 10th Place beef?
3   A.   Yes, before.
4   Q.   Okay.  And what did you talk to Antwuan about?  Or I
5   should say, what did Antwuan say to you?
6   A.   It was just basically what I told you earlier.
7   Q.   Which was what?
8   A.   When he was talking about squashing it with Wop.
9   Q.   And I believe you told us that that conversation with
10  Antwuan happened after you got out of jail in '98?
11  A.   Right.
12  Q.   So I'm -- we're in January of '98, correct?
13  A.   Right.
14  Q.   So my question is, prior to this conversation, January of
15  '98 or even December of '97, yes or no, did you ever talk to
16  Antwuan about what we're about to talk about?
17  A.   Yes.
18  Q.   You did?
19  A.   Not about this specific incident, but about the beef.
20  Q.   Okay.  What did you talk to Antwuan about prior to the
21  D-Lock murder, generally, about the beef?
22       MR. CARNEY:  Your Honor, objection, asked and answered.
23       THE COURT:  I'll allow it.
24  BY MR. LEON:
25  Q.   Do you understand the question?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5343**

1  A.  Naw.

2  Q.  Okay.  I apologize if I'm confusing you.  I'm not

3  interested in conversations you had after you got out of jail,

4  I'm only interested -- first of all, just yes or no, did you

5  have conversations with Antwuan Ball prior -- about the 10th

6  Place beef prior to the time, before the time you killed D-Lock?

7  A.  Yes, but it wasn't about D-Lock, per se.

8  Q.  Okay.  What was it about?

9  A.  Him going with Dazz, LT and Wop to go down there to

10 retaliate when he shot against Patrick, Steve and them.

11 Q.  So that was the Patrick and Steve shooting you told us

12 about?

13 A.  Yes.

14 Q.  Okay.  Let's get back to the day of the D-Lock murder,

15 okay?

16 A.  Yes, sir.

17 Q.  Okay.  You meet up with -- in the alley with the people

18 you just told us about.  Tell us what happens.

19 A.  Well, me and L, we was like, man,

20 let's go down there, you know.  Taneil said that Jack was out

21 there, too, on Trenton Place.  And I was like, "all right."  And

22 he said, "We can't let Keith know where we going because he

23 ain't going to take us."  So when LT ran to get his gun, Geeka

24 told me I could use his Ruger, and me and Geeka got in the car

25 and went down there to like 3rd and South Capitol to where he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5344**

1  was staying to retrieve the Ruger.  And when we got back, me and

2  LT was scheming on, "We can't let Keith know what's going on."

3  So once we got in the car, we told him we going to get something

4  to drink and some weed, and we ended up going to get something

5  to drink and some weed, and once we got like coming back home,

6  we told him to go through Trenton Place.

7  Q.  Let me stop you right there.  Who is in the car right now

8  where I just stopped you?

9  A.  Me, Keith and LT.

10 Q.  And you're coming from where?

11 A.  Going to get some weed and something to drink.

12 Q.  I believe you indicated that you got a gun from Geeka?

13 A.  Yes.

14 Q.  Did you personally get the gun before Geeka?

15 A.  Yes, sir.

16 Q.  Where did you get this gun from Geeka?

17 A.  In the back of the alley.

18 Q.  Whose gun was it?

19 A.  Geeka's.

20 Q.  What kind of gun was it?

21 A.  A Ruger.

22 Q.  What caliber?

23 A.  9 millimeter.

24 Q.  And I believe you testified that somebody else had a gun?

25 A.  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5345**

1  Q.  Who?

2  A.  LT.

3  Q.  What kind of gun was that?

4  A.  A Glock.

5  Q.  What kind of Glock?

6  A.  9 millimeter.

7  Q.  Whose gun was that?

8  A.  LT's.

9  Q.  To your knowledge, did Keith have a gun at that time?

10 A.  No, sir, to my knowledge I didn't see him with no gun.

11 Q.  And when you, LT and Keith got in that car, where did you

12 tell Keith you were going at first?

13 A.  To get something to drink and get some weed.

14 Q.  Did you go get something to drink and get some weed?

15 A.  Yes, sir.

16 Q.  Where?

17 A.  I knew -- I can't remember the weed spot, but I remember

18 going on the Maryland side of Wheeler Road to get something to

19 drink.

20 Q.  And when you come back from getting that drink, tell us

21 where you go?

22 A.  We go to 10th Place and come up the hill.  And I told him

23 to go through Trenton Place so I could let -- so I could show LT

24 who Jack is.

25 Q.  Okay.  I'm going to stop you right there, and I'm going

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5346**

1  to ask you to clear the screen and ask if we can publish

2  Government's 105.1.

3        Mr. Capies, if you could just tap the screen, the lower

4  right.  Thank you.  For the record, we put in front of you

5  Government's Exhibit 105.1.  Do you see that?

6  A.  Yes, sir.

7  Q.  I think you said something about driving up on 10th

8  Place?

9  A.  Yes, sir.

10 Q.  Can we see that portion of 10th Place here on this map?

11 A.  Yes, sir.

12 Q.  Okay.  Tell us where you go once you're on 10th Place.

13 A.  We come up -- we coming down Mississippi, make a left on

14 10th Place.  Before you get to the top of 10th Place there's an

15 alley right there to come off Trenton Place.

16 Q.  Okay.  I'm going to ask you if you can start on

17 Mississippi Avenue and with your pen draw for us the route that

18 you all took to get to where you told us you just went to.

19 A.  (Indicating).

20 Q.  For the record, you made a more or less continuous line

21 beginning at the lower left-hand portion of the map on

22 Mississippi Avenue, making a left on what appears to be 10th

23 Place, and then going east on an alley which appears to be

24 parallel to Congress Street and Mississippi Avenue, and then

25 turning right on 11th Place leading to Trenton?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5347

1  **A.**  Yes, sir.

2  **Q.**  Okay.  Where did the shooting itself happen?  Can we see

3  it on this map?

4  **A.**  The -- it's taking up the space, the line.

5  **Q.**  Okay.  Why don't you clear the screen, tap it, and show

6  us where the shooting happened.  Draw a circle around it.

7  **A.**  I messed up.

8  **Q.**  Why don't you tap it up hard to clear it and then put a

9  dot in the general area.

10  **A.**  (Indicating).

11  **Q.**  Okay.  For the record, you put a dot where it appears

12  that 10th Place going south on 10th Place turns and then turns

13  into what's labeled Trenton Place?

14  **A.**  Yes, sir.

15  **Q.**  Okay.  So tell us what happens.  Who's driving the car?

16  **A.**  Keith.

17  **Q.**  Whose car is it?

18  **A.**  Keith's.  I sold it to him.  Keith.

19  **Q.**  You sold him the car that he was driving?

20  **A.**  Yes, sir.

21  **Q.**  And what kind of car was it?

22  **A.**  It was a LTD gray station wagon.

23  **Q.**  Where are you seated?

24  **A.**  In the back seat.

25  **Q.**  And where is LT seated?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5348

1  **A.**  In the passenger seat.

2  **Q.**  Anyone else in the car?

3  **A.**  No, just me, him and Keith.

4  **Q.**  Tell us what happened when you get to the spot you

5  indicated?

6  **A.**  We come down out of the alley coming from off Trenton --

7  I mean 10th Place onto Trenton, and I was pointing at Jack,

8  showing LT where he was sitting at.  And he had on like a navy

9  blue jacket.  And then Keith was like, "what's up," like,

10  "what's up, man, tell me something."  And I was like, "nothing,"

11  and I was like, "drive around again."  And we came down 13th

12  Place off of -- I mean, 13th Street off of Trenton Place and

13  came down Mississippi and just circled the block and made it

14  over.

15  **Q.**  I'm sorry.  So you continued to 13th Street and then went

16  back to Mississippi and then circled the area?

17  **A.**  Yeah.

18  **Q.**  Why?

19  **A.**  Because we had to get ready and talk about how we was

20  going to do it.

21  **Q.**  At this point did you explain to Keith what was going to

22  happen?

23  **A.**  No.  We was at the tip of the alley, Trenton Place at

24  this time.

25  **Q.**  Okay.  Continue.  Then what happens.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5349

1  **A.**  We started putting on bird masks.

2  **Q.**  Putting on what?

3  **A.**  Bird masks.

4  **Q.**  Tell us what that is.  Describe that.

5  **A.**  It's a strap that goes around your face.

6  **Q.**  How much of your face does it cover?

7  **A.**  (Indicating).

8  **Q.**  For the record, you made an indication just under your

9  eyes?

10  **A.**  Right, and we had hoods on.

11  **Q.**  So you can see your eyes?

12  **A.**  Yes.

13  **Q.**  And can you see anything below the eyes?

14  **A.**  No.

15  **Q.**  And you said you had hoods on?

16  **A.**  Yes.

17  **Q.**  When you say "we," who's we?

18  **A.**  Me and LT.

19  **Q.**  Did Keith do this?

20  **A.**  No.

21  **Q.**  Did Keith see you do this?

22  **A.**  Yes, he seen us do it.  He was about to turn off on -- to

23  the left instead of going right.

24  **Q.**  And did he?

25  **A.**  No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5350

1  **Q.**  Why not?

2  **A.**  Because LT told him he was going to leave him down there

3  if he turn off.

4  **Q.**  What'd you understand that to mean?

5  **A.**  Kill him.

6  **Q.**  Leave Keith there?

7  **A.**  Yeah.

8  **Q.**  Kill Keith if Keith doesn't come with?

9  **A.**  Yes.

10  **Q.**  And what, if anything, does Keith say?

11  **A.**  He couldn't say nothing.  He had to go.

12  **Q.**  So what happens?

13  **A.**  As we about to pull off, L is like, "let me see that, the

14  gun."  And I was like, "you got your own gun," and he was like,

15  "I wanna bust that one."  We trade guns, made that right and

16  went down on Trenton Place.

17  **Q.**  Why did you trade guns with LT at that point?

18  **A.**  He asked me to.

19  **Q.**  Did he explain why?

20  **A.**  He said he ain't never shot that one before, he wanted to

21  shoot it.

22  **Q.**  Was Keith there when you and LT traded guns?

23  **A.**  Yes, sir.

24  **Q.**  Did he say anything?

25  **A.**  Naw, he was too scared.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**5351**

1 Q. Tell us what happens next.
2 A. Make a right on Trenton Place and we come down, and as we
3 going down, we ain't going fast, we driving going slow, and LT
4 was telling Keith, "man, when you get by the truck, slow the car
5 down, we going to get out." And he was like, "you better not
6 pull off." We got out, we opened fire.
7 Q. Where did -- did the car stop at some point?
8 A. Yes.
9 Q. Can we see on this map where the car stopped?
10 A. Right in front of the building.
11 Q. Is -- you made a mark earlier. Is that the area or --
12 A. The building, the next building over from the mark where
13 I put the pen right there. It went right there.
14 Q. So, when you say a little bit up from the mark, toward
15 what direction, more toward 13th or more toward 10th?
16 A. More toward 13th, the next building.
17 Q. Okay. You see the T-R in Trenton Place?
18 A. Yes.
19 Q. Is it in that general area?
20 A. It's in the middle of the red spot and the T, that
21 building sitting right there.
22 Q. Mr. Capies, I'm going to ask you to actually clear the
23 screen and we're going to try to zoom in on that area.
24 Do you see the area that's been enlarged?
25 A. Yes, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**5352**

1 Q. I'm going to ask you to tap in the area where the car
2 stopped.
3 A. (Indicating).
4 Q. And for the record, you made a mark just a little bit to
5 the left of the T in Trenton Place?
6 A. Yes, sir.
7 Q. Tell us what happens once Keith stops that car.
8 A. We stopped the car. It's like a tow truck sitting right
9 there. We open the door and we got out and we started firing.
10 Q. And when you say, "we started firing," were you firing
11 your weapon?
12 A. Yes, sir.
13 Q. And at this point, what weapon are you firing?
14 A. I'm firing the Glock.
15 Q. And is LT firing his weapon?
16 A. Yes, sir.
17 Q. And what weapon is that again?
18 A. A Ruger.
19 Q. Where is Keith?
20 A. In the car waiting.
21 Q. And who are you firing your weapon at?
22 A. When I first get out the car, I'm firing straight at the
23 door where the people are at.
24 Q. Who's there?
25 A. It was a rack of guys out there.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**5353**

1 Q. Did you recognize any of them?
2 A. Yes.
3 Q. Who'd you recognize?
4 A. Jack and D-Lock.
5 Q. Were you firing at anyone in particular?
6 A. Yes.
7 Q. Who?
8 A. Jack.
9 Q. And did you hit him?
10 A. No. It's a cut right there that lead to the back of the
11 alley down right there. It was like fenced off down there. He
12 jumped that, him and two other dudes.
13 Q. Can you put a dot right in the area where that fence is?
14 A. (Indicating).
15 Q. Okay. For the record, you made a mark in-between two
16 buildings which are a little to the left of the initial dot you
17 made?
18 A. Yes, sir.
19 Q. All right. So, you saw Jack jump that fence?
20 A. Yes.
21 Q. Okay. Did you see at this point what LT's doing?
22 A. Naw, but I hear shots. We shooting, pace shooting.
23 Q. Say it again?
24 A. We pace shooting.
25 Q. What does that mean?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**5354**

1 A. Not just running wild shooting, but taking our time.
2 Q. Pace shooting?
3 A. Yes.
4 Q. Were you pace shooting?
5 A. Yes, sir.
6 Q. Was LT?
7 A. Yes, sir.
8 Q. Did you see where he was shooting, like at whom?
9 A. When I turned back around, it was like a guy across the
10 street trying to come back across the street, and I started
11 firing at him.
12 Q. And did you hit that person?
13 A. Not that I know of.
14 Q. Okay. Did you see LT and -- did you see LT shooting at
15 anyone in particular?
16 A. Yes. When I come back down the street, coming back down
17 the street on the same side I fired some more shots at the
18 building, and there was, like, a little -- I can't hardly see it
19 right here, but there's like a little cut, a little dip in the
20 hill right there, and I seem him firing like -- towards in the
21 grass. When I got right there by him, I seen a guy with a green
22 EB on.
23 Q. A green EB, Eddie Bauer?
24 A. Yes, sir.
25 Q. You said -- you said you can hardly see it. Can we see

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**5355**

1  the area where that cut is?
2  **A.**  I can't tell.
3  **Q.**  Okay.  Is it -- you made an indication where the cut is
4  that --
5  **A.**  It's more to the right where the T at.
6  **Q.**  Okay.  And somebody was -- what were they wearing?  You
7  said a sweatshirt?
8  **A.**  An EB coat, an Eddie Bauer coat.
9  **Q.**  Coat?
10  **A.**  Yeah.
11  **Q.**  Do you remember the color?
12  **A.**  Green.
13  **Q.**  And who was that person?
14  **A.**  D-Lock.
15  **Q.**  Did you recognize that to be D-Lock?
16  **A.**  Yeah, once I went up over there up on him.
17  **Q.**  Well, tell us what you saw LT do.
18  **A.**  When I was coming back down the street, I seen him firing
19  like down in the ground to where the coat was at, like unloading
20  the gun.  And I came up on him, I looked, we jumped in the car
21  and pulled off.  I told him -- I was like, "man, we hit the
22  wrong person, man."  He was like, "what you mean?"  I was like,
23  "man, you know, that's D-Lock."  He was like, "so what, he
24  killed Meat," and we pulled off, went up the hill right to the
25  left going up to Trenton where the R and the E at.  There's a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5356**

1  hill right there.
2  **Q.**  When you said -- well, withdrawn.  Can you clear the
3  screen, Mr. Capies?  And we can get back to normal size.  Right.
4    Where did you drive after this shooting?
5  **A.**  (Indicating).  We go up some more past where it say
6  Savannah Place to Alabama Avenue.
7  **Q.**  So, you kept driving out of Congress Park?
8  **A.**  Yes.
9  **Q.**  Why?
10  **A.**  Not Congress Park; it was Trenton Place.
11  **Q.**  Okay.  Where did you go?
12  **A.**  We went to Martin Luther King Avenue, turned down Alabama
13  Avenue, hit Martin Luther King Avenue, went down to Barry Farm.
14    THE COURT:  We're going to take a short break.  Do you
15  need to put another question before we break?
16    MR. LEON:  No, Your Honor.
17    THE COURT:  Ladies and gentlemen, we're taking an
18  abbreviated break.  Just 10 minutes, so please come back at 3:30.
19  Remember, don't talk about the case, take your notes back into
20  the jury room, please come back at 3:30.  Thank you.
21    (Jury out at 3:20 p.m. )
22    THE COURT:  All right, we'll take a ten-minute break.
23    (Thereupon, a break was had from 3:20 p.m. until 3:30
24  p.m.)
25    THE COURT:  Mr. Leon, are you ready?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5357**

1    MR. LEON:  Yes.
2    (Jury in at 3:33 p.m.)
3    THE COURT:  Good afternoon, ladies and gentlemen.
4    THE JURY PANEL:  Good afternoon.
5    THE COURT:  Welcome back.  We're going to resume.
6  Counsel?
7    MR. LEON:  Thank you.
8  BY MR. LEON:
9  **Q.**  Mr. Capies, before we leave the spot of the murder -- and
10  I'm going to ask you about what you did with that car in a
11  minute.  But before we go there, I want to stay right here when
12  D-Lock is shot.  How many times did you see LT actually fire
13  into D-Lock?
14  **A.**  It was a lot.  I ain't got no rough number on it.
15  **Q.**  Now, when he shot into D-Lock, I thought I heard you say
16  something about a dip or a ditch.  Did you say something like
17  that?
18  **A.**  It was something like a little dip going down.
19  **Q.**  What was D-Lock doing before he got to that dip?
20  **A.**  When I turned around, when I was coming back down the
21  street, he was already in it.
22  **Q.**  He was already in it?
23  **A.**  Yeah.
24  **Q.**  And was he on the ground?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5358**

1  **Q.**  Was he trying to get up?
2  **A.**  Yeah.  He was trying to get away.
3  **Q.**  Was he able to get up on his feet again?
4  **A.**  No, sir.
5  **Q.**  And with the Court's permission, I'll ask if you could
6  step down and show us what you saw D-Lock doing exactly when
7  D-Lock -- excuse me, that you saw LT doing when you saw D-Lock
8  in that dip.
9  **A.**  He was standing over the top of him firing like this
10  (indicating).
11  **Q.**  For the record, you took your right hand -- I'm going to
12  ask you to keep your voice up since you're not near the
13  microphone.
14    For the record, you took your right hand and you pulled
15  your index finger a number of times?
16  **A.**  Yes.
17  **Q.**  You saw LT do this?
18  **A.**  Yes, sir.
19  **Q.**  How far were you from LT when you saw him do this over
20  D-Lock?
21  **A.**  I was coming down towards him.
22  **Q.**  Can you point to a spot in this room between where you
23  and he were from each other?
24  **A.**  Over where that table at (indicating).
25  **Q.**  About over here?  About where I am right now?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Tab 18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : April 3, 2007 |
| DOMINIC SAMUELS, | : 9:30 a.m. |
| Defendants. | : |
|  | : |
|  | : |

VOLUME 28 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| For the United States: | UNITED STATES ATTORNEY'S OFFICE |
|---|---|
|  | Glenn S. Leon, Assistant United |
|  | States Attorney |
|  | Ann H. Petalas, Assistant United |
|  | States Attorney |
|  | Gilberto Guerrero, Assistant |
|  | United States Attorney |
|  | 555 4th Street |
|  | Washington, DC  20001 |
|  | 202.305.0174 |
|  |  |
| For Defendant | CARNEY & CARNEY |
| Antwuan Ball: | John James Carney, Esq. |
|  | South Building |
|  | 601 Pennsylvania Avenue, N.W. |
|  | Washington, DC  20004 |
|  | 202.434.8234 |

---

APPEARANCES (Cont.)

| For Defendant Antwuan Ball: | TIGHE, PATTON, ARMSTRONG, TEASDALE, PLLC |
|---|---|
|  | Steven Carl Tabackman, Esq. |
|  | 1747 pennsylvania Avenue, NW |
|  | Suite 300 |
|  | Washington, DC  20036 |
|  | 202.454.2811 |
|  |  |
| For Defendant David Wilson: | LAW OFFICE OF JENIFER WICKS |
|  | Jenifer Wicks, Esq. |
|  | 503 D Street NW, Suite 250A |
|  | Washington, DC  20001 |
|  | 202.326.7100 |
|  |  |
|  | GARY E PROCTOR, LLC |
|  | Gary E. Proctor, Esq. |
|  | 6065 Harford Road |
|  | Baltimore, MD  21214 |
|  | 410.444.1500 |
|  |  |
| For Defendant Gregory Bell: | LAW OFFICE OF JAMES W. BEANE |
|  | James W. Beane, Jr., Esq. |
|  | 2715 M Street, N.W. |
|  | Suite 200 |
|  | Washington, DC  20007 |
|  | 202.333.5905 |
|  |  |
| For Defendant Desmond Thurston: | LAW OFFICE OF JONATHAN ZUCKER |
|  | Jonathan Seth Zucker, Esq. |
|  | 514 10th Street, NW |
|  | 9th Floor |
|  | Washington, DC  20004 |
|  | 202.624.0784 |
|  |  |
| For Defendant Joseph Jones: | LAW OFFICE OF ANTHONY MARTIN |
|  | Anthony Douglas Martin, Esq. |
|  | 7841 Belle Point Drive |
|  | Greenbelt, MD  20770 |
|  | 301.220.3700 |
|  |  |
|  | LAW OFFICE of ANTHONY ARNOLD |
|  | Anthony Darnell Arnold, Esq. |
|  | One Research Court |
|  | Suite 450 |
|  | Rockville, MD  20852 |
|  | 301.519.8024 |

---

APPEARANCES (Cont.)

| For Defendant Dominic Samuels: | LAW OFFICES OF A. EDUARDO BALAREZO |
|---|---|
|  | A. Eduardo Balarezo, Esq. |
|  | 400 Fifth Street, NW |
|  | Suite 300 |
|  | Washington, DC  20001 |
|  | 202.639.0999 |
|  | and |
|  | William B. Purpura, Esq. |
|  | 8 East Mulberry Street |
|  | Baltimore, MD  21202 |
|  | 410.576.9351 |
|  |  |
| Court Reporter: | Scott L. Wallace, RDR, CRR |
|  | Official Court Reporter |
|  | Room 6814, U.S. Courthouse |
|  | Washington, DC 20001 |
|  | 202.326.0566 |

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

**MORNING SESSION, APRIL 3, 2007**

1
2      (9:30 a.m.)
3          THE DEPUTY CLERK:  Criminal case number 05-100, *The United*
4   *States versus Antwuan Ball, David Wilson, Gregory Bell, Desmond*
5   *Thurston, Joseph Jones, Dominic Samuels.*
6          For the government, Mr. Leon, Ms. Petalas and
7   Mr. Guerrero.  For the defendants, Mr. Carney, Mr. Tabackman,
8   Ms. Wicks, Mr. Proctor, Mr. Beane, Mr. Zucker, Mr. Arnold,
9   Mr. Balarezo and Mr. Purpura.
10         MR. TABACKMAN:  I just have one brief matter, Your Honor.
11   In the interest of intellectual honesty or professional honesty,
12   I'm going to withdraw the objection that we made that we came to
13   the bench on yesterday, the hearsay objection regarding -- I
14   think it was on the basis of not in furtherance.  The one that I
15   made was to a statement by Mr. Ball because, clearly, it was not
16   hearsay as to him.  I just wanted the Court -- I hadn't really
17   thought it through when I made the objection and I just wanted to
18   put that on the record.
19         THE COURT:  All right.  Is the witness ready?
20         THE DEPUTY MARSHAL:  Yes.
21         THE COURT:  Okay.  Let's bring him in.
22         And are you otherwise ready for the jury?  While he's
23   coming out, any thoughts about the question about having a
24   laptop?  I reminded you yesterday that a juror asked about using
25   a laptop to take notes and I told you I'm disinclined, but if you

**Q.** But you said you guys were cool?

**A.** We was cool, but not that cool to tell him nothing like that.

**Q.** What about Dazz? Did you ever tell Dazz about the fact that you were working off this escape charge by talking to Mike Will?

**A.** No, sir.

**Q.** Why not?

**A.** Same thing, sir.

**Q.** Tell anybody?

**A.** No, sir.

**Q.** Tell your mother?

**A.** No, sir.

**Q.** Tell anyone?

**A.** No, sir.

**Q.** Why?

**A.** Because I wasn't going to tell nobody that.

**Q.** Why?

**A.** Because don't nobody want to hear that. I mean, I just lost my family in this situation I'm in now.

**Q.** What do you mean by that?

**A.** Don't nobody want to have nothing to do with this, sir.

MR. TABACKMAN: Objection.

THE COURT: Sustained.

BY MR. LEON:

---

**Q.** Okay. Let's get back to 1999 into 2000, late '99 early 2000. What was your relationship, if you can describe it, with Antwuan at that time?

**A.** We was cool.

**Q.** Were you the same kind of cool you were with Wop or was it a different relationship?

**A.** It was almost similar.

**Q.** Okay. Did that relationship with Antwuan change at some point?

**A.** Yes, sir.

**Q.** Did there come a time that Antwuan hit you?

**A.** Yes, sir.

**Q.** When did this happen?

**A.** Early part of 2001, like January.

**Q.** It was early January?

**A.** Yes, sir.

**Q.** Okay. And we're going to get to that in just a moment, but before he hit you, let's say the weeks and months before, did you ever talk to Antwuan -- first just yes or no -- about the 10th Place beef that you talked about earlier?

MS. WICKS: Objection, asked and answered.

THE WITNESS: Yes, sir.

THE COURT: I'll allow it.

THE WITNESS: Yes, sir.

BY MR. LEON:

---

**Q.** And just before he hit you, tell us what he said to you about this 10th Place beef.

**A.** Not -- it wasn't like just before he hit me. It was like back some time, in '97.

MR. TABACKMAN: Your Honor, can we just have -- objection. This is --

THE COURT: Mr. Leon?

Mr. Leon?

MR. LEON: I was just trying to reorient the witness. I agree it's a bit repetitive. I was trying to reorient the timeline.

THE COURT: Well, do it without the repetition then.

MR. LEON: Okay.

BY MR. LEON:

**Q.** Let's just get to the time you got hit, okay?

**A.** Yes, sir.

**Q.** You said you got hit in January, you think it was 2001?

**A.** No, 2000.

**Q.** Okay. Where were you when you got hit?

**A.** In Wop house.

**Q.** Where is that?

**A.** 1313 building.

**Q.** Do you know the apartment?

**A.** I don't know the door number.

**Q.** And just where -- did he live with anyone in this

---

apartment?

**A.** Yes.

**Q.** Who?

**A.** Dominique.

**Q.** What floor was the apartment on?

**A.** Third floor.

**Q.** Where did Antwuan hit you?

**A.** In the house.

**Q.** Where on your body?

**A.** In my mouth.

**Q.** And do you have any permanent effects from that assault?

**A.** Yes, sir.

**Q.** What?

**A.** My tooth gone.

**Q.** And I'm going to ask you to just show us what you're talking about.

**A.** (Indicating.)

**Q.** For the record, you're showing us -- it looks like you're missing a front tooth?

**A.** Yes, sir.

**Q.** What about the tooth, the other front tooth? Is there anything with that?

**A.** The nerve gone dead in it.

**Q.** Who else was present, if anyone, when you got hit in the mouth by Antwuan in Wop's apartment?

---

5453

1   A.   Me, Phil and Wop.
2   Q.   You, Phil, Wop, Antwuan?
3   A.   Yes.
4   Q.   That's four people.  Anyone else?
5   A.   No.
6   Q.   When did this happen?  In other words, what time of day?
7   A.   In the daytime, like in the evening.
8   Q.   Was it light out or not?
9   A.   It was light out.
10  Q.   Take us back just an hour or two before.  Before you were
11  in the apartment, where were you?
12  A.   I was outside.
13  Q.   Where?
14  A.   I think I was going to the truck.
15  Q.   What truck?
16  A.   Ice cream truck.
17  Q.   Whose ice cream truck?
18  A.   A guy name T-Bone truck.
19  Q.   And what were you going to do there?
20  A.   Get some Blunts -- I mean, no not Blunts.  Some Backwoods
21  and something to drink.
22  Q.   Okay.  Did you do that?
23  A.   Yes.
24  Q.   Were you with anyone or alone?
25  A.   When I got back in the hallway, Antwuan was coming

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5454

1   through the back.
2   Q.   Okay.  And what happened next?
3   A.   We went upstairs in Wop house.
4   Q.   Whose idea was it to go upstairs in Wop's house.
5   A.   He asked me what I was doing.  I said I'm going to go to
6   Wop's house and play the game.  He said, "Hold on.  I'm going to
7   park and go up there with you."
8   Q.   Okay.  And did he?
9   A.   Yes.
10  Q.   And was anyone with you and Antwuan when the two of you
11  went up to Wop's house?
12  A.   No.
13  Q.   When you got up to Wop's house, tell us who, if anyone,
14  was inside.
15  A.   Phil and Wop was playing the game.
16  Q.   What game?
17  A.   Football, the Madden.
18  Q.   And tell us what happens next.
19  A.   It was my turn on the game and I started playing Wop on
20  the game.
21  Q.   Okay.  And so where are you exactly in the apartment?
22  A.   I'm on like the right-hand side in the living room.
23  Q.   Okay.  And where is Wop?
24  A.   Like a little bit behind me on the left-hand side.
25  Q.   And Antwuan?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5455

1   A.   Behind him.
2   Q.   And Phil?
3   A.   On the left-hand side of Wop.
4        MR. LEON:  Your Honor, may I approach?
5        THE COURT:  Yes.
6   BY MR. LEON:
7   Q.   And, Mr. Capies, I'm going to ask if you can tap and
8   clear the screen.
9        Mr. Capies, I'm handing you what's marked for
10  identification as government 403.1.  Do you recognize
11  Government's 403.1?
12  A.   Yes, sir.
13  Q.   What do you recognize it to be?
14  A.   The same house I got hit in.
15  Q.   The same house that -- when Antwuan hit you?
16  A.   Yes, sir.
17  Q.   Okay.  And does this sketch fairly and accurately show
18  the general layout of that apartment?
19  A.   Yes, sir.
20       MR. LEON:  Your Honor, at this time the government would
21  move for admission of 403.1.
22       MR. TABACKMAN:  No objection.
23       THE COURT:  Was there an objection?
24       MR. TABACKMAN:  I said, "No objection," Your Honor.
25       THE COURT:  Oh, okay.  Excuse me.  Exhibit 403.1 is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5456

1   received.
2        (Government's Exhibit 403.1 admitted into the record.)
3   BY MR. LEON:
4   Q.   And before we show this, Mr. Capies, I'm just going to
5   note there are some letters an A, a P and a W and another circle
6   and just a couple marks there.
7        Do you have an understanding, just yes or no, as to what
8   those marks are?
9   A.   Yes, sir.
10  Q.   Okay.  And will you be able to explain those marks to us
11  once we show this to the jury?
12  A.   Yes, sir.
13       MR. LEON:  If we could use the ELMO.
14  BY MR. LEON:
15  Q.   For the record, Mr. Capies, I'm showing you what's now in
16  evidence as Government's 403.1 and I'm going to try to get as
17  much of this on as I can.
18       Do you see that in front of you?
19  A.   Yes, sir.
20  Q.   Okay.  Can you explain to us what those letters are and
21  other markings are?  And for the record -- actually, let me
22  point to them and tell us if you can tell us what they are, if
23  you know.
24       For the record, I'm going to refer to room B.  And first
25  I'm going to -- over here it says "TV."  Is it fair to say

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5457

1  that's where a television was?
2  **A.**   Yes, sir.
3  **Q.**   Okay. I'm going to point next over here to what looks
4  like a circle, just a little bit to the right of and across from
5  the TV. It's to the left on this photograph.
6  **A.**   Yes, sir.
7  **Q.**   What's that, if you know?
8  **A.**   That's where I was sitting. It was a bean bag right
9  there.
10  **Q.**   You were here?
11  **A.**   Yes, sir.
12  **Q.**   Okay. What does the W indicate?
13  **A.**   That's where Wop was sitting at.
14  **Q.**   What about P?
15  **A.**   Where Phil was sitting at.
16  **Q.**   And there's an A behind Phil and Wop. Who's that?
17  **A.**   Antwuan was sitting right there.
18  **Q.**   And there are two X's right over there on the rectangle.
19  What is that?
20  **A.**   Two guns was right there.
21  **Q.**   Okay. Whose guns were those?
22  **A.**   Me and Wop's.
23  **Q.**   Okay. Tell us what kind of guns they were.
24  **A.**   A Ruger and a Taurus.
25  **Q.**   A Ruger and a Taurus?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5458

1  **A.**   Yes, sir.
2  **Q.**   Whose was whose?
3  **A.**   The Ruger was Wop's and the Taurus was mine.
4  **Q.**   What caliber were they?
5  **A.**   Nines.
6  **Q.**   Okay. Tell us what happened. I think you said you were
7  playing -- were you on the bean bag when you're playing the --
8  **A.**   Yes, sir.
9  **Q.**   Okay. And who else is playing it at this time?
10  **A.**   Me and Wop playing each other.
11  **Q.**   And what is Phil doing?
12  **A.**   Sitting right there, twisting up weed.
13  **Q.**   Okay. And what was Antwuan doing initially?
14  **A.**   Sitting in the back watching the game, watching us play.
15  **Q.**   Okay. Tell us what happens.
16  **A.**   Me and Wop was playing the game. And it was some shells
17  and the two guns sitting up on the table and Antwuan started
18  messing with them, with the two guns. And Wop was like, "Man,
19  stop playing with those guns behind our back." And Phil was
20  like, "Put them guns up."
21      And Antwuan was like, "Man, I know what I'm doing."
22      And at one point in time, Antwuan asked Wop, can he use
23  the bathroom. And he was like, "Go ahead." He went to use the
24  bathroom while we was playing the game and then he came back and
25  sat down.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5459

1      Then we was still playing the game. He was like, "Can I
2  use the bathroom again?"
3      And he was like, "Why you keep asking me to use the
4  bathroom, man? Go ahead and use the bathroom."
5  **Q.**   How much later was it when Antwuan asked to use the
6  bathroom a second time?
7  **A.**   It was like five minutes or so.
8  **Q.**   Did he say anything as to why he wanted to use the
9  bathroom again?
10  **A.**   He said like his wife fixed him some food and it got him
11  having the runs.
12  **Q.**   Did he go to the bathroom?
13  **A.**   Yes.
14  **Q.**   Tell us what happens.
15  **A.**   He came back. And we just sitting there playing, just
16  sitting there. Wasn't nothing going on. And Phil said
17  something again about him playing with the guns.
18      And then I came by -- I could barely see him. I was a
19  little bit to the right.
20  **Q.**   Barely see who?
21  **A.**   Antwuan. But I could see Wop and Phil because they up on
22  stools, sitting down. And then while we playing the game, I
23  heard someone go, "Fuck," like -- I didn't pay no attention to
24  it. I heard Antwuan cuss.
25      So I don't say nothing. I kept playing the game. I seen

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5460

1  Wop jump up and run to the back. And then I seen Phil race to
2  the back. Then I was still sitting on the bean bag. I said,
3  "Man, stop playing. Man, come on, play the game."
4  **Q.**   Let me stop you there. When you say "the back," can we
5  see on Government's 403.1 -- can you point to the direction?
6  Which rooms did Phil and Wop run towards?
7  **A.**   At that time, I didn't know exactly what room Wop ran to
8  until later, but Phil ran towards the bathroom.
9  **Q.**   Okay. And for the record, can we see the bathroom here?
10  **A.**   Yes.
11  **Q.**   What room is the bathroom on this Government's 403.1?
12  You can just tell us, is it labeled with a letter?
13  **A.**   Room D.
14  **Q.**   Okay. So continue. So Phil and Wop run away at first.
15  And then what happens?
16  **A.**   I told them, I was like, "Man, stop running. Y'all
17  playing." And I turned around.
18      Antwuan had both of the guns in his hand. And he was
19  like, "Get up."
20      I was like, "Man, go ahead with those guns. Stop playing
21  like that, man."
22      He was like, "Aww, you think you got balls?" And when I
23  turned back around, he smacked me with the gun.
24  **Q.**   Which gun?
25  **A.**   I can't remember which gun it was, but I know he smacked

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5461**

1     me with the gun.

2    **Q.**   How many times?

3    **A.**   Once at that time.

4    **Q.**   Okay. Where -- where exactly? Which side of your mouth

5   or face did he hit?

6    **A.**   On the left side.

7    **Q.**   And tell us what happens when he smacks you on that left

8   side of your mouth?

9    **A.**   I was like, "Man, what you doing? What you doing?" I

10   asked him what he do it for.

11     He was like, "Oh, you know what's going on. Y'all

12   supposed to be killing me."

13     I was like, "What? I don't know what's going on, man.

14   What you talking about?"

15     He was like, "Really?" He was like, "Get up."

16     I got up, got myself together. He told me, walk towards

17   the back room. He had the two guns behind my head. And I

18   started walking to the back room and I was telling Wop -- you

19   know what I'm saying -- "I'm coming back here, it's me." I

20   started walking back towards the room.

21    **Q.**   Why did you say that? Did you know where Wop was when

22   you said, "I'm coming back here, it's me"?

23    **A.**   At that time, no, sir.

24    **Q.**   Did you know if Wop was somewhere in the apartment?

25    **A.**   Yes. He had to be back there somewhere.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**5462**

1    **Q.**   Why do you say that?

2    **A.**   Because that's the way he ran.

3    **Q.**   Okay. Tell us what happens next.

4    **A.**   When he walked me back there, I'm telling Wop, "Man, it's

5   me coming back here, Wop," because I know there's a gun in the

6   house.

7    **Q.**   In other words, another gun?

8    **A.**   Yes.

9    **Q.**   Other than the two in Antwuan's hands?

10    **A.**   Yes, sir.

11    **Q.**   What other gun was in the house?

12    **A.**   An AK.

13    **Q.**   An AK?

14    **A.**   Yes, sir.

15    **Q.**   Where was that gun?

16    **A.**   It usually be under the mattress of the bed in Wop room.

17    **Q.**   And just for the record, which room is Wop's room, if we

18   can see it on this map?

19    **A.**   Room E, sir.

20    **Q.**   E?

21    **A.**   Yes, sir.

22    **Q.**   And whose gun was that, that AK?

23    **A.**   Wop's.

24    **Q.**   Had you seen it before?

25    **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**5463**

1    **Q.**   Had you seen him put it under that bed before?

2    **A.**   Yes, sir.

3    **Q.**   Okay. Go ahead.

4    **A.**   I'm walking back there. I go to the room. Antwuan tell

5   Phil to open the door. So Phil was like -- he didn't say

6   nothing, he just stay there. So he hit me with the gun again,

7   smacked me with the gun.

8     So I kicked a hole in the door and told Phil, "Man, open

9   the door."

10    **Q.**   To which room?

11    **A.**   The D room.

12    **Q.**   The bathroom?

13    **A.**   Yes, sir.

14    **Q.**   Okay. You kick a hole in the door. Do you open the

15   door?

16    **A.**   No. I just put a foot hole in the door.

17    **Q.**   What happens next?

18    **A.**   Then Phil don't open the door. So then he cracked the

19   door a little bit and he told Phil, "Man, you better not be

20   around here running your mouth." Told them don't be saying

21   nothing about this.

22    **Q.**   Who said that?

23    **A.**   Antwuan.

24    **Q.**   And he said that to Phil?

25    **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**5464**

1    **Q.**   Do you see Phil or is Phil still on the other side of the

2   bathroom door?

3    **A.**   I mean, I seen him crack the door. He don't open it all

4   the way.

5    **Q.**   Phil?

6    **A.**   Yes, sir.

7    **Q.**   Okay. What happens next after Antwuan says that to Phil?

8    **A.**   He -- I go in the room. He hit me again with the gun.

9    **Q.**   Which room?

10    **A.**   In E room.

11    **Q.**   Okay.

12    **A.**   And I sat down on the floor. I was dazed. I sat down on

13   the floor. And then he was like -- tell me to lift the bed up.

14   And he looking out the window. He was like, "Fuck, man, he

15   jumped out the window."

16    **Q.**   Who says this?

17    **A.**   Antwuan.

18    **Q.**   Jumps out which window?

19    **A.**   E room window.

20    **Q.**   Was the E room window open?

21    **A.**   Yeah, it was wide open.

22    **Q.**   Do you know if anyone did jump out the window?

23     MR. ZUCKER: Objection.

24     THE COURT: You can answer yes or no.

25     THE WITNESS: No, I don't know.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5465*

BY MR. LEON:

2   **Q.**   Okay.  Was Wop in that room E?

3   **A.**   No.

4        MR. ZUCKER:  Objection.

5        THE WITNESS:  I learned that he wasn't in there.

6   BY MR. LEON:

7   **Q.**   Don't tell us what you learned.  When Antwuan takes you

8   into that room E, do you see Wop?

9   **A.**   No, sir.

10  **Q.**   Do you see anyone else in the room?

11  **A.**   No, sir.  Just me and Antwuan.

12  **Q.**   Okay.  After Antwuan says something about somebody

13  jumping out the window, tell us what happens next.

14  **A.**   I'm laying down.

15  **Q.**   Where?

16  **A.**   On the floor, facing the door entry to the room E.

17  **Q.**   Why are you lying down on the floor?

18  **A.**   I'm dazed, sir.

19  **Q.**   Okay.

20  **A.**   And then the hallway right here, you can see the shadow

21  from the door is open and stuff.

22  **Q.**   Shadow coming from what room?

23  **A.**   Like because the house had light in it and you can see

24  the shadow from the C room door opening.

25  **Q.**   Okay.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*5466*

**A.**   Antwuan was facing in E room and I was faced looking out

2   E room, in E room.

3   **Q.**   Tell us what you saw yourself when you were looking out

4   the door of room E.

5   **A.**   I seen the shadow.

6   **Q.**   Coming from where?

7   **A.**   Out of room C.

8   **Q.**   And can you describe the shadow?  Was it a -- describe

9   it.

10  **A.**   I know it was Wop.

11  **Q.**   How do you know that?

12  **A.**   Because it was his shadow size, sir.

13  **Q.**   Okay.  And what is the next thing you saw?

14  **A.**   I ain't see nothing.  He left.

15  **Q.**   Who left?

16  **A.**   Wop.

17  **Q.**   Okay.  Well, let's get back to E and Antwuan.  Tell us

18  what happens next.  You're lying on the floor and Antwuan's

19  facing you.

20  **A.**   He asked me where his money at.

21  **Q.**   Whose money?

22  **A.**   Wop money.

23  **Q.**   What, if anything, did you say?

24  **A.**   I was like, "I don't know where he keep his money at."

25  **Q.**   What happened next?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*5467*

**A.**   He went to the door, to the bathroom door, where Phil was

2   at.

3   **Q.**   And?

4   **A.**   He was asking Phil something.  I couldn't hardly hear

5   him.  Then he came back to me and he said, "Phil said you know

6   where he be holding his money at."

7   I said, "I don't know."  And then he kicked me.

8   **Q.**   Where'd he kick you?

9   **A.**   In my mouth.

10  **Q.**   Which side?

11  **A.**   Like on this side of my mouth.

12  **Q.**   For the record, your right side?

13  **A.**   Yes, sir.

14  **Q.**   Which is not the side you were struck with the gun?

15  **A.**   Right.

16  **Q.**   When he struck you -- when he kicked you in the mouth,

17  what happened next?  Did you lose consciousness at any point?

18  **A.**   Yes, sir.

19  **Q.**   When?

20  **A.**   I was dazed when he was kicking me and hitting me.

21  **Q.**   When you said "dazed," were you passed out cold?

22  **A.**   I wasn't passed out cold, but I was dizzy.

23  **Q.**   Tell us what happens after Antwuan kicks you in the

24  mouth.

25  **A.**   He got one of the guns in his hand pointing, his left

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*5468*

side, pointing to me, going in the drawers, Wop's drawers.

2   **Q.**   Do you know what he was looking for?

3        MR. ZUCKER:  Objection.

4        THE WITNESS:  His money.  That's what he asked me about.

5   BY MR. LEON:

6   **Q.**   Okay.  At the time he's looking through the drawers, is

7   he saying anything to you?

8   **A.**   Naw.  He just looking in the drawers and watching me.

9   **Q.**   Did he take anything out of the drawers?

10  **A.**   Yes.

11  **Q.**   What?

12  **A.**   His money and some coke.

13  **Q.**   Could you tell how much money he took?  Could you tell at

14  that time how much money he took?

15  **A.**   No, sir.

16  **Q.**   Could you -- was it cash?

17  **A.**   Yes.

18  **Q.**   And could you tell how much drugs he took at that time?

19  **A.**   No, sir.

20  **Q.**   What kind of drugs was it?

21  **A.**   Crack.

22  **Q.**   What happens next?  You see him take the money and the

23  crack out of the drawer?

24  **A.**   He started stuffing it in his pants.

25  **Q.**   Okay.  What happens next?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

5469

1  **A.** Then he told me, turn over, because I was starting to
2  crimp, laying over when he had the gun pointed to me. And I
3  turned over.
4       And he was like, "Man" --
5  **Q.** Turn over which way? Are you facing up or facing down
6  now?
7  **A.** I was turned this way (indicating) and then I turned back
8  over facing him.
9  **Q.** So where are you looking at this point?
10 **A.** I'm looking at him.
11 **Q.** Okay.
12 **A.** And then he took his hands and clicked both of the
13 hammers back on the guns.
14 **Q.** Where were the guns aimed?
15 **A.** At me.
16 **Q.** Where on you?
17 **A.** At my face.
18 **Q.** What happens next?
19 **A.** He told me, grab the pillow.
20 **Q.** Did you?
21 **A.** Naw.
22 **Q.** Why not?
23 **A.** Because he told me to put the pillow on my head.
24 **Q.** Why didn't you do that?
25 **A.** Because I knew he was going to kill me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5470

1  **A.** What'd you do?
2  **A.** I stood. I said, "I ain't putting no pillow on my head."
3  I said, "Think about what you about to do. You know what I'm
4  saying? You ain't going to get away with it."
5       And he started crying.
6  **Q.** He started crying?
7  **A.** Yes, sir.
8  **Q.** Did he say anything when he started crying?
9  **A.** Nothing. He was just looking at me.
10 **Q.** What happens next?
11 **A.** I closed my eyes. I was like, "You gonna kill me." You
12 know what I'm saying? So I closed my eyes. And when I started
13 looking back up, he was leaving out.
14 **Q.** Did you see him leaving the room?
15 **A.** Yeah, like his back, when he was leaving.
16 **Q.** What happens next?
17 **A.** When I hear the door close, I jump up and go in the
18 bathroom. And Phil was like, "Damn, man, your face fucked up."
19 And I look in the mirror and my mouth was swollen up.
20 **Q.** Was what?
21 **A.** Swollen. I started running the cold water and put my
22 face in the water, got myself together and I went outside.
23 **Q.** Outside?
24 **A.** Outside the building, outside the house, outside the
25 building.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5471

1  **Q.** Okay. And tell us what you did once you got outside.
2  **A.** I seen EB, a guy named EB.
3  **Q.** Is that the guy you identified for us a day or so ago?
4  **A.** Yes, sir.
5  **Q.** Tell us what happened once you see EB.
6  **A.** He was like, "Man, what's wrong? What's going on? I see
7  Twan racing out of here, I see Wop racing out here. What's
8  going on?"
9       I said, "Nothing."
10      He was like, "What happened to your face?"
11      I was like, "Nothing."
12 **Q.** Why did you tell EB "Nothing"?
13 **A.** Because I didn't want him to know what was going on.
14 **Q.** Why?
15 **A.** Because I wanted to get back.
16 **Q.** What do you mean by that?
17 **A.** I wanted to kill him at that time.
18 **Q.** Who?
19 **A.** Antwuan.
20 **Q.** Okay. So what happens after you tell EB "Nothing"?
21 **A.** I get in my car. I was driving a station wagon at the
22 time and I went to the hospital.
23 **Q.** Did you go alone or with anyone else to the hospital?
24 **A.** I went with this girl I was messing with at the time.
25 **Q.** What was her name?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5472

1  **A.** I can't -- I was messing with two girls at the time. I
2  can't remember her name at this time, sir.
3  **Q.** Can you describe her?
4  **A.** Dark-skinned, kind of skinny.
5  **Q.** And did she live in Congress Park?
6  **A.** No, sir.
7  **Q.** Do you know where she lived?
8  **A.** In Maryland.
9  **Q.** In Maryland?
10 **A.** Yes, sir.
11 **Q.** Where?
12 **A.** Fort Washington at the time.
13 **Q.** Okay. And you get in your station wagon?
14 **A.** Yes.
15 **Q.** And where do you go exactly?
16 **A.** To Haley Hospital.
17 **Q.** Haley Hospital?
18 **A.** Yes.
19 **Q.** Where's that?
20 **A.** Southwest side.
21 **Q.** Why'd you go to Haley?
22 **A.** Because that was -- I don't have no Medicaid and that was
23 the closest place to go.
24 **Q.** Before you get in that station wagon to go to the
25 hospital, other than EB, did you talk to anyone else before you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5473

1   got to the hospital?
2   **A.**   Yes, sir.  I do remember the girl that I took with me
3   now.
4   **Q.**   Okay.  What's her name?
5   **A.**   Margo.
6   **Q.**   Margo?
7   **A.**   Yes, sir.
8   **Q.**   Other than EB and Margo, did you talk to anyone else
9   before you got in that station wagon and went to the hospital?
10  **A.**   No, sir.
11          THE COURT:  We've actually reached the mid-morning break
12  point, but if you want to finish this line, we can.
13          MR. LEON:  We can stop here.
14          THE COURT:  Ladies and gentlemen, we'll break for the
15  mid-morning break.  Please remember not to talk about the case.
16  Carry your notes back into the jury room and we'll see you back
17  in 15 minutes.
18          (Jury out at 11:02 a.m.)
19          THE COURT:  All right.
20          (Thereupon, a break was had from 11:02 a.m. until
21  11:20 a.m.)
22          THE COURT:  Mr. Leon, are you ready for the jury?
23          MR. LEON:  Yes, sir.
24          (Jury in at 11:20 a.m.)
25          THE COURT:  Good morning, ladies and gentlemen.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5474

1          THE JURY:  Good morning.
2          THE COURT:  Welcome back.  We're ready to resume.
3          Counsel.
4          MR. LEON:  Thank you.
5   BY MR. LEON:
6   **Q.**   Mr. Capies, when we broke for our break, you indicated
7   that you went to Hadley hospital?
8   **A.**   Yes, sir.
9   **Q.**   How long did you stay there?
10  **A.**   Till nighttime.
11          MR. LEON:  May I approach, Your Honor?
12          THE COURT:  Yes.
13  BY MR. LEON:
14  **Q.**   Mr. Capies, I'm handing you what's marked for
15  identification as Government's 403.
16          I'll ask you to just look through the document and tell
17  me if you know what that is.
18  **A.**   Yes, sir.
19  **Q.**   What's Government's 403?
20  **A.**   Hadley hospital papers that I signed.
21  **Q.**   Okay.  And you said you signed.  Is this -- did you see
22  your signature on the document?
23  **A.**   Yes, sir.
24  **Q.**   And what's -- does it indicate on the second page of the
25  document the admittance date?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5475

1   **A.**   Yes, sir.
2   **Q.**   What is it?
3   **A.**   January 10th, 2000.
4   **Q.**   And does that date fit with your memory as to when this
5   incident happened?
6   **A.**   Yes, in the beginning of January, sir.
7          MR. LEON:  Your Honor, the government would move for
8   admission of Government's 403.
9          MR. ZUCKER:  Objection.
10         THE COURT:  Basis?
11         MR. ZUCKER:  No objection to the admission date and that
12  type of stuff.  I'm not sure what else is in there.
13         THE COURT:  You haven't seen it?
14         MR. ZUCKER:  I do not recall it.
15         THE COURT:  You can show it to him.
16         MR. LEON:  For the record, it was made available to
17  counsel, all counsel.
18         MS. WICKS:  Your Honor, may we approach?
19         THE COURT:  What did you say?
20         MS. WICKS:  May we approach?
21         THE COURT:  Yes.
22         (Following sidebar discussion had on the record:)
23         MS. WICKS:  Your Honor, first I would just object as --
24  the portions of the records that are his statements, although I
25  don't think -- I don't think there's anything that's his

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5476

1   statement; that is, the date, as a prior consistent statement.  I
2   would object on that basis.  I don't think that the actual injury
3   itself is an issue as to the element, so, other than as a prior
4   consistent statement, I don't see any relevancy and I don't think
5   there's any issue that's been raised to call for the government
6   to be able to use his prior consistent statement.
7          MR. ZUCKER:  I'll defer.  Frankly, most of it's illegible,
8   and what's in there is fairly innocuous, that I could read, so
9   I'll defer to Ms. Wicks.
10         MR. LEON:  First of all, with respect to relevance, this
11  man just talked about --
12         THE COURT:  The objection is overruled as to relevance.
13         MR. LEON:  Prior consistent statement.  Nowhere in that
14  document -- I agree with counsel's representation, most of it is
15  illegible.  To the extent I could read anything, it does not
16  identify anyone by name, Jo-Jo, Antwuan, Phil, nobody by name,
17  and to the extent -- and there's a clearly established exception
18  to the hearsay rule about statements in the course of --
19         MR. ZUCKER:  Medical diagnosis --
20         MR. LEON:  -- yeah, medical diagnosis, but these are
21  general statements, and nothing specific about what I would call
22  prior consistent statements about Antwuan smacked me type of
23  thing.  So I would say the objection is not just what counsel
24  says it is -- the reason isn't there.
25         THE COURT:  Any answer to the exception to the hearsay

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 A.  His cousin.

2 Q.  Ayo's cousin is Sinquon?

3 A.  Yes.

4 Q.  Any other relatives you're aware of that Ayo has?

5 A.  I don't know the rest of them.

6 Q.  Now, what connection did Ayo have with Sam, if you know?

7 A.  That was his baby mother.

8 Q.  And what connection if any, if you know, did Ayo have with

9 Wop?

10 A.  She was pregnant by him at the time.

11 Q.  By Wop?

12 A.  Yes, sir.

13 Q.  Now, Mr. Capies, you've alluded to it a few times, but let's

14 talk about it now, that you've entered into a cooperation

15 agreement in this case.  Correct?

16 A.  Yes.

17        MR. LEON:  May I approach?

18        THE COURT:  Yes.

19 BY MR. LEON:

20 Q.  Mr. Capies, I'm handing you what's marked for identification

21 as Government's 104.  I'm going to ask you to take a careful

22 look at that and tell us if you know what that is.

23        MR. LEON:  I'm sorry, 1104.  I apologize.  I misspoke.

24 A.  Yes, sir.

25 BY MR. LEON:

Page 5626

1 Q.  What is 1104?

2 A.  My plea agreement.

3 Q.  What's the date on that?

4 A.  May 9th, 2002.

5 Q.  May 9th of 2002?

6 A.  Yes, sir.

7 Q.  And you mentioned that you had a lawyer, I believe her name

8 was Hoover-Hankerson, with respect to the other agreement you

9 had?

10 A.  Yes, sir.

11 Q.  Do you have the same lawyer in connection with this case?

12 A.  No, sir.

13 Q.  Who is your lawyer in this case?

14 A.  A guy named Paul Hunt.

15 Q.  And what did you plead to?

16 A.  Up to life in prison.

17 Q.  What was the charge you pled to?

18 A.  Oh.  One count of distributing cocaine.

19 Q.  Okay.  And what else?

20 A.  Aiding and abetting and -- first-degree to murder, aiding

21 and abetting Devar Chandler.

22 Q.  And for the record, who is Devar Chandler?

23 A.  D-Lock.

24 Q.  You said two things.  You said aiding and abetting the

25 murder of Devar Chandler, D-Lock, and you said distribution.

1 What kind of distribution?

2 A.  Crack cocaine and cocaine.

3 Q.  Do you understand what the general charge, the charge is

4 that you pled to?

5 A.  Yes, sir.

6 Q.  What is it?

7 A.  It's a RICO.

8 Q.  Where did you plead guilty?  Physically, where were you when

9 you pled guilty?

10 A.  In front of Judge Roberts.

11 Q.  His Honor?

12 A.  Yes, sir.

13 Q.  And before you pled guilty, did you have a chance to review

14 that document, Government's 1104, with your lawyer, Paul Hunt?

15 A.  Yes, sir.

16 Q.  And did you go over it thoroughly?

17 A.  Yes, he read it with me.

18 Q.  Did he explain things to you?

19 A.  Yes, sir.

20 Q.  Before you entered into that agreement, did you learn how

21 much time you could get as a result of pleading guilty to this

22 RICO?

23 A.  Yes, sir.

24 Q.  What is your understanding as to how much time you can get

25 for pleading guilty to this RICO?

1 A.  360 months to life.

2 Q.  And before signing that agreement and reviewing it with your

3 lawyer, you went through it with your lawyer?

4 A.  Yes.  He wrote the things that I couldn't understand.

5 Q.  Did anyone force you to plead guilty to this agreement?

6 A.  No, sir.

7 Q.  Anyone pressure you?

8 A.  No, sir.

9 Q.  And I'm going to ask you just to turn and tell us if you see

10 your signature and his signature on that agreement.  And if so,

11 just tell us what page it's on.

12 A.  Page nine.

13 Q.  And you can turn to that page.  Are there signatures on page

14 nine?

15 A.  Yes, sir.

16 Q.  Whose?

17 A.  Jeff Beatrice.

18 Q.  Anyone else?

19 A.  Mine's, and Paul Hunt.

20      MR. LEON:  May I approach briefly?

21      THE COURT:  Yes.

22 BY MR. LEON:

23 Q.  For the record, that's page nine of the agreement?

24 A.  Yes, sir.

25 Q.  And do you see a six-page document which is attached to

1 Q.   Who is that?  Do you know his full name?

2 A.   Rob Lockhart.

3 Q.   And I think you said Art?

4 A.   Yes, sir.

5 Q.   And anybody else you can remember?

6 A.   Kevin and Kyle Fulmer.

7 Q.   And are those -- in your mind, who do they work for?

8 A.   FBI.

9 Q.   Okay.  Now, before you entered into your plea agreement in

10 May of 2002, but while you're having meetings and interviews

11 with the FBI, generally, first of all just generally, what types

12 of things were you discussing, just the general subject matters?

13 A.   Murders.

14 Q.   Were you asked about Congress Park generally?

15 A.   Yes, sir.

16 Q.   Were you asked about drug dealing in Congress Park?

17 A.   Yes, sir.

18 Q.   And you also said murders?

19 A.   Yes, sir.

20 Q.   Now, let's focus on the murders first.  During this time,

21 before you entered into the plea agreement and signed it but

22 while you're having those initial meetings --

23          MS. WICKS:  Objection as to relevancy of this line of

24 questioning, Your Honor.

25          MR. LEON:  It will be clear in one question.

1          THE COURT:  Go ahead.

2 BY MR. LEON:

3 Q.  Were you completely truthful with the people you met with

4 regarding all of the questions you were asked about the murders?

5 A.  No, sir.

6 Q.  Okay.  Were you asked questions about D-Lock?

7 A.  Yes, sir.

8 Q.  And this is the D-Lock that you helped kill.  Correct?

9 A.  Yes, sir.

10 Q.  When you were asked questions regarding D-Lock before you

11 entered into that plea agreement, were you completely truthful

12 with the FBI?

13 A.  No, sir.

14 Q.  What did you say to them?

15 A.  I can't remember a lie, sir, but I know I lied to them.

16 Q.  When you say -- and tell us generally, when you said you

17 generally lied, did you -- what did you tell them generally?

18 A.  That I had nothing to do with it.

19 Q.  Did you understand, first yes or no, if it was important to

20 tell the truth to the FBI when you're sitting down and meeting

21 them before a plea agreement is entered into?

22 A.  No, sir.

23 Q.  You didn't understand that was important?

24 A.  I didn't understand that was important.

25 Q.  Do you think it wasn't important?

1 A.   I knew they wanted some information that was important, but

2 I ain't -- to my knowledge, it wasn't important to me.

3 Q.   The murder of D-Lock wasn't important to you?

4 A.   At that time, no, it wasn't.

5 Q.   What do you mean by that?

6 A.   Because I was still thinking street life.

7 Q.   What do you mean by that?

8 A.   Don't tell.

9 Q.   Well, then, why are you sitting down with the FBI if your

10 mentality is don't tell?

11 A.   Because I was in a lot of trouble.

12 Q.   So?

13 A.   Tell them something and get them away from me.

14 Q.   Well, you're in jail.  Right?

15 A.   Yes, sir.

16 Q.   Did anyone tell you you're going to get out of jail?

17 A.   No, sir.

18 Q.   So how are you going to get out of this if you're telling

19 lies?

20 A.   In the beginning, sir, I thought if I just tell them

21 something, they let me go.

22 Q.   Did anyone say they would?

23 A.   No.

24 Q.   So why did you think this?

25 A.   Because that was what I was thinking.

1 Q.  Were you ever asked any questions -- the day you're locked

2 up, July 3rd of 2001, either that day or within a day or so

3 after that, did you have a meeting with the FBI?

4 A.  Yes.

5 Q.  And during that meeting, were you asked about Sam Phillips?

6 A.  Yes, sir.

7 Q.  And did you tell them the full truth about Sam Phillips?

8 A.  No, sir.

9 Q.  What did you tell them initially about Sam Phillips?

10 A.  I can't remember.  But I know I lied to them.

11 Q.  Well, what was the general lie you told them?

12 A.  I told them Wop ain't had nothing to do with it.  I remember

13 that.

14 Q.  Why did you tell the FBI on that first meeting that Wop had

15 nothing to do with Sam Phillips?

16 A.  Because that was my man.  I didn't want to tell on him.

17 Q.  Did you eventually tell the FBI the truth about

18 Sam Phillips?

19 A.  Yes.  That same day.

20        MR. TABACKMAN:  Objection.

21 BY MR. LEON:

22 Q.  That same meeting?

23 A.  Yes, sir.

24 Q.  How did that come about?  How did you decide during the very

25 same meeting to first lie about Sam Phillips and then tell the

Tab 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,               :
        Plaintiff,        :  Docket No. CR 05-100
                                        :
    v.                                  :
                                        :
ANTWUAN BALL, DAVID WILSON,   :  Washington, DC
GREGORY BELL, DESMOND          :
THURSTON, JOSEPH JONES, and    :  April 4, 2007
DOMINIC SAMUELS,               :  9:36 a.m.
                                        :
        Defendants.        :
                                        :

VOLUME 29 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5660*

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5661*

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5662*

1       **MORNING SESSION, APRIL 4, 2007**

2       (9:36 a.m.)

3       THE COURT:  Good morning.

4       ALL PARTIES PRESENT:  Good morning.

5       THE COURT:  Are you ready for the jury?

6       MR. LEON:  Yes.

7       MR. ZUCKER:  Your Honor, Mr. Thurston is still in the

8  back.  I think he needs a moment.

9       MR. PURPURA:  And I apologize, Your Honor, for being late.

10 I did take the 7:40 trying to be extra early and it was delayed

11 due to rain and all the trains coming in.

12      THE COURT:  All right.  Thanks.  I heard that your

13 co-counsel was about to do a sprint over here from Superior

14 Court.

15      MR. PURPURA:  I stopped him.

16      (Jury in at 9:38 a.m.)

17      THE COURT:  Good morning, ladies and gentlemen.

18      THE JURY:  Good morning.

19      THE COURT:  Welcome back.  We're all together and here,

20 ready to go.  We're ready to resume.

21      Mr. Leon.

22      MR. LEON:  Thank you.

23      CONTINUED DIRECT EXAMINATION OF BOBBY CAPIES

24 BY MR. LEON:

25      Q.   Good morning, Mr. Capies.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5687

1   **A.**   In the morning.
2   **Q.**   When I say "what period of time," I mean years.  Can you
3   give us a range of years or more narrowly?
4   **A.**   Ever since I been hanging with him, beginning of '96.
5   **Q.**   '96 until when?
6   **A.**   Until he got locked up in 2001.
7   **Q.**   Okay.  And during that period of time, '96 to 2001, how
8   frequently or infrequently would you see Wop out during the
9   daytime hustling crack cocaine?
10  **A.**   Every day.
11  **Q.**   And during those days between 1996 and 2001 when you saw
12  Wop hustling, how many times would he take the gun, put it near
13  a tire and then go out and hustle?
14  **A.**   Just about every day.
15  **Q.**   First just yes or no, did you know anyone else -- yes or
16  no -- to stash guns near tires in Congress Park?
17  **A.**   Yes.
18  **Q.**   Who?
19  **A.**   Dazz, LT, Drano.
20  **Q.**   Anyone else you can think of?
21  **A.**   Terrance.  Phil.
22  **Q.**   Last person was Phil?
23  **A.**   Yes, sir.
24  **Q.**   Let's just focus on Dazz.  First of all, when -- and when
25  I say "when," I mean what time range, years or months, any time

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5688

1   range you can give us -- did you see Dazz out in Congress Park
2   stashing guns near tires?
3   **A.**   Since I been hustling with him.
4   **Q.**   Which would be when?
5   **A.**   Since me and him really started hang around each other,
6   '92.
7   **Q.**   '92?
8   **A.**   Yes.
9   **Q.**   Until when?
10  **A.**   Up until I got locked up.
11  **Q.**   That would be 2001?
12  **A.**   Yes, sir.
13  **Q.**   And just quickly, same questions:  When you saw Dazz
14  stashing guns near tires, what would he do after he stashed the
15  gun near the tire?
16  **A.**   Be with us hustling.
17  **Q.**   Hustling what?
18  **A.**   Cocaine.
19  **Q.**   And when you say "be with us hustling" cocaine, who's
20  "us"?
21  **A.**   It would be different groups because I didn't always hang
22  with Wop and them.
23  **Q.**   Okay.  Let's break it down.  I think you said Dazz, you
24  started hanging with him in '92 and you said up until 2001?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5689

1   **Q.**   So, let's take -- let's break it down.  Before '96,
2   during '92 to '96, when you saw Dazz stash a gun, what would you
3   see him do next?
4   **A.**   Stand out there with us and sell crack.
5   **Q.**   And who's "us" at that point, from '92 to '96?  Who's
6   "us" with you and Dazz?
7   **A.**   Dazz, Don.
8   **Q.**   Anybody else?
9   **A.**   EB.
10  **Q.**   Anybody else or no?
11  **A.**   My brother.
12  **Q.**   Again, for the record, your brother's name is?
13  **A.**   Darryl.  Me.
14  **Q.**   Okay.  Anybody else from '92 to '96?
15  **A.**   A few more.  I can't really remember.
16  **Q.**   From '96 to 2001, when you would see Dazz stashing
17  guns near tires, would you then see -- what would you see him
18  then do next?
19       MR. ZUCKER:  Objection.  I would ask if the witness could
20  specify -- it's an awful broad range in the period.
21       THE COURT:  Overruled.
22       THE WITNESS:  I would see him come out there and stand
23  with us and sell crack.
24  BY MR. LEON:
25  **Q.**   And during '96 to 2001, who is the "us" that you're

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5690

1   referring to that you and Dazz would hang out with?
2   **A.**   Me, Wop, Phil, Drano, Terrance, LT, a dude named Tweety.
3       MR. LEON:  Could I have a moment, Your Honor?
4       THE COURT:  Yes.
5       MR. LEON:  Thank you.
6   BY MR. LEON:
7   **Q.**   Just a final few questions regarding jump-outs.  You
8   talked about jump-outs?
9   **A.**   Yes, sir.
10  **Q.**   Did you ever have a concern, first just yes or no,
11  that -- you said you were out hustling, correct?
12  **A.**   Yes.
13  **Q.**   Did you ever have a concern that if a jump-out came and
14  you had drugs on you, that you would get locked up?
15  **A.**   Yes, sir.
16  **Q.**   Did you take any precautions to -- did you take any
17  precautions because of that?
18  **A.**   Yes, sir.
19  **Q.**   What kind?
20  **A.**   To hide them where they can't find them.
21  **Q.**   Hide what?
22  **A.**   Your cocaine.
23  **Q.**   Where would you hide your cocaine when -- in order to
24  protect yourself from the jump-outs?
25  **A.**   Under your private part of your drawers.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5691

1  **Q.**   Inside your underwear?
2  **A.**   Yes.
3  **Q.**   Why would you do that?
4  **A.**   So when they come search you, they won't find it.
5  **Q.**   Okay. Can you describe for us -- and if you need to
6  stand up, I'd ask that you do that.
7       What would a jump-out do when they would actually -- when
8  they jump out on you? How would they search you or how would
9  they pat you down?
10 **A.**   They pat you down (indicating), your sleeves and under
11 your legs and stuff like that, your waist and behind you.
12 **Q.**   You can sit down.
13      For the record, you made various motions on the outer
14 side of your clothing, front and back; is that more or less
15 correct? And arms?
16 **A.**   Yes, sir.
17 **Q.**   Did jump-outs ever go inside of pockets?
18 **A.**   Yes, sir.
19 **Q.**   Did jump-outs ever go inside your shorts?
20 **A.**   Yes, sir.
21 **Q.**   They have?
22 **A.**   You have some of them that would do it.
23 **Q.**   Okay. And did they ever get any drugs off of you when
24 they did that?
25 **A.**   Before, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5692

1  **Q.**   What do you mean, "before"? When?
2  **A.**   I can't remember the date, but I remember them taking
3  drugs off of me.
4  **Q.**   And when you -- you, Bobby Capies -- would hide drugs in
5  your shorts -- I'm going to ask you to be as specific as
6  possible -- where would you actually hide them?
7  **A.**   Under my nuts, part of my sack.
8  **Q.**   Would you -- you, Bobby Capies -- ever hide drugs in your
9  rectum?
10 **A.**   Before, I have.
11 **Q.**   You have?
12 **A.**   Yes, sir.
13 **Q.**   When you say "before," what do you mean by that?
14 **A.**   When they start really getting frisky, like going hard,
15 going down in and checking and stuff under your sacks.
16 **Q.**   Did you stop doing that or -- you said before, was there
17 a time you stopped hiding drugs there?
18 **A.**   No, not really, but you know, if you see them. We always
19 be where you can see them or somebody would tell us they coming
20 and that's when we do it.
21 **Q.**   And when you say "someone would tell us they're coming,"
22 who do you mean by "us"?
23 **A.**   The guys that I was hanging with in '96 all the way up to
24 2001 area.
25 **Q.**   You're talking about 1996 to 2001?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5693

1  **A.**   Yes, sir.
2  **Q.**   The same "us" that you were talking about earlier, '96 to
3  2001?
4  **A.**   Yes, sir.
5  **Q.**   Now, you said, "someone would tell us." So who would be
6  the someone who would tell you?
7  **A.**   I can't really recall. It used to be different people,
8  like "Police coming down the street." Jump-outs --
9  **Q.**   I'm sorry.
10 **A.**   Jump-outs in the Boat Alley -- jump-outs be on the other
11 side of the alley. Or I was just saying, jump-outs was leaving
12 from up 15th Place, like somebody might be driving to the store;
13 on their way back, like "Jump-outs." I seen them in different
14 spots. You know, they sit different strips.
15 **Q.**   Let's focus on you. If you, Bobby Capies, would see a
16 jump-out over on 15th Place, first just yes or no, would you do
17 or say anything in Congress Park?
18 **A.**   That's when I come back to Congress Park, I be like
19 "Jump-outs on 15th." And I ask them, "Do they come down here?"
20 They like, "Naw," so they must be coming down here next.
21 **Q.**   And when you say "Jump-outs," would you say that in a
22 conversation like you are with me or how would you say it?
23 **A.**   Sometimes I pull up, I say it fast. Sometimes I walk up,
24 like, "Jump-outs, they coming down the street" or something like
25 that. It depends on how close they are or how far they are.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5694

1  **Q.**   How many times would you say you, Bobby Capies, tell
2  others about jump-outs?
3  **A.**   At least three times out of the week. They normally come
4  on Tuesdays and Thursdays.
5  **Q.**   They come on the same days?
6  **A.**   Not all the time, but that's when they normally come.
7  **Q.**   What time on Tuesdays and Thursdays would they come?
8  **A.**   Any time.
9  **Q.**   Okay. So how often in a given week? Would it be every
10 Tuesday, every Thursday or would it be once in a while?
11 **A.**   Tuesday and Thursday, you was knowing jump-outs was going
12 to come through there, but you don't know what time. But they
13 come through there any time. But mainly on Tuesdays and
14 Thursdays, you knew they were coming.
15 **Q.**   You said mainly on Tuesdays and Thursdays. Would there
16 be a day, say a Friday, they would surprise you and come on
17 another day?
18 **A.**   Yes, it could be any other day, they would surprise and
19 just come up.
20 **Q.**   Other than you, did you -- other than you giving the
21 warning about jump-outs, did you ever receive a warning about
22 jump-outs?
23 **A.**   Yes, sir.
24 **Q.**   Who would warn you that jump-outs were coming? Who were
25 some of the people?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5695*

1   **A.**    Just about all the guys I named in this case.

2   **Q.**    And just so the record is clear, you've talked about a

3 good nine or ten-year period, from '92 to 2001. Was it during

4 that entire time or can you break it down at all?

5   **A.**    It was during that entire time.

6   **Q.**    Did jump-outs come out on Tuesdays and Thursdays for that

7 entire time?

8   **A.**    I mean, sometimes I won't see them. Sometimes somebody

9 would tell me they came through.

10   **Q.**    Other than on your person, you personally on your --

11 somewhere -- you said in your private areas, would you ever

12 stash drugs -- you, Bobby Capies -- off of your person, but just

13 in another spot when you're hustling?

14   **A.**    I never really tote heavy drugs, but if I have -- if I've

15 got like a half ounce and I'm going to sell half of it, I take

16 half outside with me and I hide the other half.

17   **Q.**    And where would the other half be?

18   **A.**    In the house somewhere, outside.

19   **Q.**    What do you mean by that, "outside"? Where would you

20 stash -- first of all, this is a half an ounce?

21   **A.**    Yes. I'm just saying just in general, like if that's

22 what I have on me.

23   **Q.**    Okay. Just quickly, I think you previously told us that

24 a half an ounce is about 14 ounces -- excuse me -- half an ounce

25 is 14 grams?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5696*

1   **A.**    Yes, sir.

2   **Q.**    So you take half of that, meaning seven grams, and keep

3 that with yourself?

4   **A.**    Yes.

5   **Q.**    And you take the other seven grams and put it where?

6   **A.**    Hide it somewhere.

7   **Q.**    And that's my question. Where?

8   **A.**    I mean, different places, in the house or outside

9 somewhere.

10   **Q.**    Where would you stash seven grams of crack cocaine

11 outside?

12   **A.**    Sometimes in the laundromat.

13      MR. PURPURA: Your Honor, I'm going to object to the

14 question for relevance and basis of knowledge. Is it where would

15 you -- where did you? We have to have his personal knowledge or

16 is this theoretical? I'm not sure.

17      THE COURT: Overruled.

18 BY MR. LEON:

19   **Q.**    Where?

20   **A.**    Outside, in laundry rooms, under the washing machines and

21 stuff, in the woods, in cars that don't move.

22   **Q.**    Would you stash drugs in cars that don't move?

23   **A.**    Yes. It's stuck. Ain't going nowhere. In buildings.

24   **Q.**    Same question. Did you -- you, Bobby Capies -- ever have

25 concerns that someone was going to go up in that, say, abandoned

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5697*

1 car and take your seven grams of crack cocaine?

2   **A.**    No, because most the times I hide it. I just know that

3 I -- ain't nobody around. I hid it to where as I could find it,

4 or at least I think ain't nobody else going to find it.

5   **Q.**    First just yes or no, do you know if anyone else hustling

6 crack cocaine in Congress Park would stash their crack cocaine

7 outside in areas?

8   **A.**    Sometimes, sometimes not, because like -- it's different

9 from a gun. You know, you share guns, but your crack, that's

10 your money. That's what you got to make a living off of.

11 That's what you got to eat and get clothes off. So all the

12 time, dudes, evenly though y'all close, he ain't going to tell

13 you every time where he stash his stuff at unless it's just that

14 what he got on him for the day.

15   **Q.**    Would you ever see, just yes or no -- you said

16 "sometimes." Would you ever see, just yes or no, people stash

17 crack cocaine in Congress Park?

18   **A.**    Sometimes.

19   **Q.**    Okay. Let's focus on those sometimes. Who?

20   **A.**    The group of guys that I hang with.

21   **Q.**    And again, just quickly, for the record, we've identified

22 two basic time periods, one '92 to '96 and one '96 to 2001. Can

23 you be more specific?

24   **A.**    In '92, I can't really say, but like when me and Don was

25 getting coke, that we was hiding stuff together because we was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5698*

1 doing it together. But back then, it was like -- wasn't nobody,

2 you know, have a lot of coke like that, you know what I'm

3 saying? They was getting like wholesales and stuff like that,

4 so you wouldn't know what they was doing.

5      And we was cruddy little dudes. Back then, we would

6 steal from each other, so -- not really, I can't really recall

7 times that the other group of guys back from '92 was really

8 stashing their stuff because I ain't really seen it, but like

9 with me and Don, I knew where me and him was stashing stuff at

10 because we was doing it together.

11   **Q.**    Now, let's go to '96 to 2001. Same question: Did

12 you ever see people, the people you've talked about -- just yes

13 or no -- where they would stash their drugs, if they would stash

14 their drugs?

15   **A.**    Yes.

16   **Q.**    And who would those people be?

17   **A.**    LT, Wop, Dazz, Terrance. That's all I can remember was

18 stashing.

19   **Q.**    Okay. Now, we've talked about stashing guns and drugs

20 just now, during this early part of the morning. Did you ever

21 hold guns for Antwuan?

22   **A.**    Yes.

23   **Q.**    Okay. What guns have you held for Antwuan?

24   **A.**    An SK-style rifle and a .45 machine gun.

25   **Q.**    Now, Mr. Capies, you testified a few different times

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5719

1  A.   He had the duffel bags in the back of the seat.
2  Q.   Okay.  And then what happens?
3  A.   We was talking.  And he was like, "I got these two big
4  joints for you right here, who going to go with you"?
5  Q.   What was the last part of what he said?
6  A.   "Two big joints," talking about the guns.
7  Q.   Yeah.
8  A.   He was like, "Who going to go with you?"  I was like, I
9  don't know yet.  Phil."  He was like, "You can get DC to drive."
10  Q.   And did you tell Antwuan that Phil -- you mentioned to
11  Antwuan Phil?
12  A.   Yes.
13  Q.   And whose idea was it for DC to drive?
14  A.   Antwuan.
15  Q.   Were any other names discussed during this conversation?
16  A.   Not that I remember.
17  Q.   What, if anything, did Antwuan say after Antwuan said,
18  "You can get DC to drive"?
19  A.   He gave -- he told me go in the back, get the guns.
20  Q.   Back -- where were the guns exactly?
21  A.   In the back seat of the car.
22  Q.   And what, if anything, did you do?
23  A.   Got out, opened the back seat [sic] and got the duffel
24  bags.
25  Q.   Okay.  How many duffel bags were there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5720

1  A.   Two.
2  Q.   And how many guns were there?
3  A.   There was two in each bag.
4  Q.   Two in each?
5  A.   Yes.
6  Q.   Okay.
7  A.   Not two in each, one in each bag.
8  Q.   One in each?
9  A.   Yes, sir.
10  Q.   Okay.  And what else, if anything, did you and Antwuan
11  talk about at this point during this conversation?
12  A.   He was like, "Don't let nothing happen to them."  I was
13  like, "They in good hands," and I got out the car.
14  Q.   Did you tell Antwuan where you were going to put the
15  guns?
16  A.   Yes.  He did say something, though.  He was like, "You
17  going to get a ride?"  And I was like, "Yeah, I'm going to get a
18  ride."  And he was like, "you know the little youngin that live
19  in the circle be stealing cars."  I was like, "all right, I'm
20  going to go holla at him."
21  Q.   Why were you going to go holler at this youngin who
22  steals cars?
23  A.   Because he steals cars.  We wasn't going to use no car
24  that we drive to go do any shooting in.
25  Q.   Why not?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5721

1  A.   Because the police or somebody catch the tags, they call
2  it in, they call the car in.
3  Q.   You told us earlier in your testimony, a day or so ago,
4  about the use of a crackhead's car.  Do you remember that
5  testimony?
6  A.   Yes.
7  Q.   Have you, you Bobby Capies, ever used a crackhead's car
8  to do a crime?
9  A.   Robberies.
10  Q.   Why would you do that?
11  A.   Because you ain't gonna use your car.
12  Q.   Why?
13  A.   Because if somebody see it or the police chasing you, you
14  get away, you still going to get caught because they got the tag
15  number, or whoever let you used the car, they ain't going to say
16  I done it; they gonna say whoever I let use my car done it.
17  Q.   Okay.  Well, let's get back to this conversation with
18  Antwuan.  Whose idea was it to have -- to get the crack -- to
19  get the youngin to steal -- withdrawn.
20        Whose idea was it to go to the youngin to get a stolen
21  car?
22  A.   Antwuan told me to go holla at him.
23  Q.   Who is the youngin?
24  A.   I can't remember.
25  Q.   Did you know who it was at the time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5722

1  A.   Yes.
2  Q.   And tell us the rest of the conversation.  Did you and
3  Antwuan talk about the guns itself?
4  A.   Not that I remember.
5  Q.   Did you tell him where you were going to stash them or
6  keep them?
7  A.   I remember telling him I'm going to put them someplace
8  else, but not to take them in the house.
9  Q.   Okay.  Did Antwuan tell you he was going to go on this
10  caper with you?
11  A.   Naw, he ain't tell me that.
12  Q.   Okay.  Did you and Antwuan discuss specifics of what you
13  were going to do with those guns?
14  A.   Yes.
15  Q.   What?
16  A.   I told him.  He already knew.
17  Q.   Well --
18  A.   He said something to me about them.
19  Q.   What did Antwuan say to you about it?
20  A.   He said that, "The youngins came through Barry Farms,
21  y'all need to take care of that or they going to keep coming
22  through here."
23  Q.   And what did you understand Antwuan to mean when he said
24  you've got to take care of that?
25  A.   Go shoot back.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5747

1  **Q.**    So during those ten months, when you're meeting with the
2  FBI, when you're meeting with the government, how did you feel
3  at that time, during those 10 months, about doing what you're
4  doing now, cooperating?
5  **A.**    I was feeling jive, like messed up and bad about it.
6  **Q.**    What do you mean by that?
7  **A.**    I was having to tell my family what was going on with me
8  and stuff like that.
9  **Q.**    Did you tell your family?
10 **A.**    Yes.
11 **Q.**    Did you tell them during those 10 months?
12 **A.**    Yes.
13 **Q.**    And how did that make you feel, that you're telling them
14 that you're talking to the government?
15 **A.**    Everything started turning off.
16 **Q.**    What do you mean by that?
17 **A.**    Like, as far as visits and stuff like that and the
18 conversations wasn't going nowhere.
19 **Q.**    Okay.  How'd that make you feel?
20 **A.**    Down.
21 **Q.**    And during those 10 months or so, during those 10 months,
22 putting us back about five or six years ago, did you imagine
23 yourself sitting here testifying against these men?
24 **A.**    Naw.
25 **Q.**    Why not?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5748

1  **A.**    Because some of the dudes that I'm testifying today, I
2  still -- I still love them.
3  **Q.**    Did you think about it back then, five or six years ago,
4  that you might have to do this?
5  **A.**    Yes.
6  **Q.**    And back then, five, six years ago, if you were asked
7  five, six years ago to do this, could you have done that?
8         MS. WICKS:  Objection.
9         THE COURT:  Sustained.
10 BY MR. LEON:
11 **Q.**    When you had that conversation with Paul Hunt, before you
12 entered into the plea agreement in May of 2002 --
13        MR. CARNEY:  Your Honor, asked and answered.
14        THE COURT:  The question hasn't been finished.
15        Go ahead.
16 BY MR. LEON:
17 **Q.**    At that time, could you have seen yourself, just yes or
18 no, doing what you're doing now, testifying against these men?
19        MR. ZUCKER:  Objection.
20        MS. WICKS:  Objection.
21        THE COURT:  I'll allow it.
22        THE WITNESS:  Can you rephrase the question again?
23 BY MR. LEON:
24 **Q.**    Sure.  In May of 2002, when you came before His Honor,
25 pled guilty to the RICO and told him about the D-Lock murder and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5749

1  the other things that you did, before His Honor at that time,
2  May of 2002, could you have seen yourself today testifying
3  against these men?
4         MS. WICKS:  Objection.
5         THE WITNESS:  No.
6  BY MR. LEON:
7  **Q.**    Let's talk about today.  You've been testifying for
8  several days.  How do you feel about testifying today?
9         MS. WICKS:  Objection, relevancy.
10        THE COURT:  Overruled.
11        THE WITNESS:  I feel as though, like, I took somebody, you
12 know what I'm saying?  I took somebody life.  I learned a lot of
13 stuff, you know what I'm saying, during this five and a half
14 years, that it wasn't worth it, and you know what I'm saying?
15 It's -- I feel good personally, coming clean, you know what I'm
16 saying, about everything that I done.
17 BY MR. LEON:
18 **Q.**    You've told us that you still love some of these men.
19 How do you feel about testifying today against some of these
20 men?
21 **A.**    Hurt.
22 **Q.**    What do you mean by that?
23 **A.**    I don't want to do it, but it ain't no hard feeling
24 against them or nothing, but I got to tell the truth or I'm
25 going to jail for the rest of my life.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5750

1  **Q.**    What do you mean by that?
2  **A.**    If I tell a lie, I'm going to jail for the rest of my
3  life.
4         MR. LEON:  May I have one moment, Your Honor?
5         THE COURT:  Yes.
6         MR. LEON:  Thank you, Your Honor.  No further questions.
7         THE COURT:  All right.  Ms. Wicks.
8         MS. WICKS:  Thank you, Your Honor.
9                CROSS-EXAMINATION OF BOBBY CAPIES
10 BY MS. WICKS:
11 **Q.**    Good morning, Mr. Capies.
12 **A.**    Good morning.
13 **Q.**    Now, when you were arrested back in July of 2001, before
14 you even went to court, you agreed to talk to the FBI, correct?
15 **A.**    Yes.
16 **Q.**    And the police that you talked to that day were the first
17 people to say David Wilson's name, correct?
18 **A.**    Yes.
19 **Q.**    You didn't bring up Cool Wop, they brought up Cool Wop,
20 correct?
21 **A.**    I don't remember who brought it up.
22        MS. WICKS:  Court's indulgence.
23 BY MS. WICKS:
24 **Q.**    Mr. Capies, you've testified against Mr. Wilson before,
25 correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5751**

1  A.  Yes, sir -- I mean, yes, ma'am. I'm sorry.
2  Q.  Was that a lie or was that the truth?
3  A.  That was the truth.
4  Q.  I was a sir?
5  A.  No.
6  Q.  You testified on December 9th of 2003, correct?
7  A.  Yes, I did.
8      MR. LEON:  I'm sorry, which date?
9      MS. WICKS:  December 9th, 2003.
10     Court's indulgence.
11 BY MS. WICKS:
12 Q.  And when you testified, you were under oath when you
13 testified back on December 9th, 2003, correct?
14 A.  Yes, ma'am.
15 Q.  And when you testified against Mr. Wilson in December of
16 2003, it was after you pled guilty in May of 2002, correct?
17 A.  Yes, ma'am.
18 Q.  So, in your words, it was under the same cooperation
19 agreement, correct --
20 A.  Yes.
21 Q.  -- as you're testifying today, correct?
22 A.  Yes, ma'am.
23 Q.  And when you testified, you were asked the following
24 questions and gave the following answers --
25     MR. LEON:  Can I have the page and line number?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5752**

1      MS. WICKS:  Sure. 451.
2      MR. LEON:  Your Honor, can I talk with counsel, quickly?
3      THE COURT:  Yes.
4      (Discussion had off the record.)
5  BY MS. WICKS:
6  Q.  And on that day, Mr. Beatrice was asking the questions,
7  correct?
8  A.  Yes, ma'am.
9  Q.  And Mr. Beatrice asked you, "The police" -- I'm sorry.
10 Ms. Lotze was representing Mr. Wilson, correct?
11 A.  Yes, ma'am.
12 Q.  And Ms. Lotze asked you "The police were the first people
13 to say David Wilson's name," and you answered "right"?
14 A.  May I see my transcript, please, ma'am?
15 Q.  Sure.
16     MS. WICKS:  Your Honor, may I approach and show him
17 Defense 17 O.
18 BY MS. WICKS:
19 Q.  Looking at 17 O the first page indicates this is the
20 transcript from December 9th, 2003, the United States versus
21 David Wilson, correct?
22 A.  Yes, ma'am.
23 Q.  And on page 363, line 23, it indicates that you were
24 called as a witness, correct?
25 A.  Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5753**

1      MR. LEON:  Your Honor, can we just briefly approach?
2      THE COURT:  Yes.
3      (Following sidebar discussion had on the record:)
4      MR. LEON:  I understand what counsel is doing, but I want
5  to be clear. I believe the witness' answer was, "I don't
6  recall," so this should be refreshing and not impeaching.
7      THE COURT:  Correct.
8      MS. WICKS:  Sure. I'll have him look at the page again.
9      (Sidebar discussion concluded.)
10     MS. WICKS:  And for the record, I'm directing your
11 attention to page 452, lines 4 through 6.
12 BY MS. WICKS:
13 Q.  That's what the question was and that was your answer,
14 correct?
15 A.  Yes.
16     MR. LEON:  Objection.
17     THE COURT:  Sustained, but it's delayed. Sustained.
18 BY MS. WICKS:
19 Q.  Well, looking at that, does that refresh your
20 recollection as to the question and answer that day?
21 A.  Yes. David Wilson.
22 Q.  And who brought up David Wilson?
23 A.  That day, I know they questioned me about David Wilson
24 and they asked me did I know David Wilson, and I told them "Yes,
25 I know David Wilson."

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5754**

1  Q.  Okay. Well, when you talked to them that day, you didn't
2  walk in and volunteer, "Hey guys, I know David Wilson," correct?
3  A.  No.
4  Q.  The police asked you if you knew David Wilson, correct?
5  A.  Yes, ma'am.
6  Q.  Now, when was the first time you were locked up at Oak
7  Hill?
8  A.  Like '92.
9  Q.  Okay. And back in 1992, how much of 1992 did you spend
10 locked up at Oak Hill?
11 A.  I can't remember that. I know it wasn't that long.
12 Q.  When you say not "that long," do you mean a day, a week,
13 a month, half the year, or you just don't know?
14 A.  It was some months. It wasn't that long, though.
15 Q.  Back in '93, were you locked up in any portion of 1993 in
16 Oak Hill?
17 A.  I was real bad back then, I was in and out of jails,
18 ma'am.
19 Q.  Well, specifically in 1993, do you recall what portion of
20 1993 you spent locked up in Oak Hill?
21 A.  Naw, I can't remember.
22 Q.  1994. Can you recall what portion of 1994 you spent
23 locked up at Oak Hill?
24 A.  No, I was back and forth in shelter houses.
25 Q.  In 1994. Did you run from the shelter house?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5755**

1 **A.** I can't remember. I remember running from Oak Hill,
2 sometime in '95.
3 **Q.** Okay. And specifically, when you ran from Oak Hill, you
4 had gotten a shackle key, correct?
5 **A.** Yes.
6 **Q.** And so when you were out in the community, but shackled
7 up, you escaped using that shackle key, correct?
8 **A.** Yes, ma'am.
9 **Q.** And do you recall when that was in 1995 that you escaped
10 from Oak Hill?
11 **A.** I remember it was hot outside. I don't remember what
12 month.
13 **Q.** Do you recall -- pardon me.
14 Do you recall how long you had spent at Oak Hill prior to
15 escaping in 1995?
16 **A.** Not that long.
17 **Q.** Days, weeks, or months?
18 **A.** Not that long. I don't remember.
19 **Q.** You didn't like it at Oak Hill, correct?
20 **A.** No, ma'am.
21 **Q.** Now, do you recall when it was -- when you got locked up
22 in '96, you went to Oak Hill, correct?
23 **A.** Yes.
24 **Q.** And do you recall if you were just locked up on the
25 custody order from escaping or were you locked up on a new

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5756**

1 charge?
2 **A.** From escaping.
3 **Q.** And as a juvenile -- I'll withdraw that.
4 Do you recall what month it was that you got locked up
5 for escaping from Oak Hill?
6 **A.** Rephrase the question, again, please, ma'am.
7 **Q.** Well, in 1996, you got locked up and went back to Oak
8 Hill, correct?
9 **A.** Yes, ma'am.
10 **Q.** Do you recall when it was that you got locked up and went
11 back to Oak Hill?
12 **A.** It was some months after this guy had died. I remember,
13 because it was like a month or two after he died.
14 **Q.** And which guy was that?
15 **A.** It was Truck.
16 **Q.** So, months after Truck got killed in 1996, you went back
17 to Oak Hill, correct?
18 **A.** Yes, like a month.
19 **Q.** So just one month, maybe?
20 **A.** Yes, maybe like one month.
21 **Q.** Do you remember if it was hot or cold outside?
22 **A.** It was kind of hot.
23 **Q.** So, springtime or summer?
24 **A.** Maybe spring. I'm not sure.
25 **Q.** Well, do you recall spending the summer down in Oak Hill

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5757**

1 in 1996?
2 **A.** Yes.
3 **Q.** So, sometime before -- sometime in May or June of '96?
4 **A.** It's around that time. I don't got no specific day. I'm
5 not just going to tell you anything, ma'am.
6 **Q.** Well, you were arrested as an adult in August '96,
7 correct?
8 **A.** Yes. I don't remember that.
9 **Q.** You don't remember that?
10 Do you recall when you were arrested for distribution and
11 possession with intent to distribute marijuana in 1996?
12 **A.** No, ma'am. I know I was arrested as an adult in '96
13 sometime, but I don't remember. I thought it was like -- it was
14 hot out.
15 **Q.** And that was before or after you went to Oak Hill in
16 1996?
17 **A.** It had to be before.
18 **Q.** When you got arrested as an adult for the distribution
19 and possession with intent to distribute marijuana, where was
20 that?
21 **A.** I was hanging uptown, back and forth.
22 **Q.** Up on 14th and Gerard, correct?
23 **A.** 13th -- yeah, 14th and Gerard.
24 **Q.** And that was with Cadoza Simms, correct?
25 **A.** No, it was not with Cadoza Simms.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**5758**

1 **Q.** Well, you knew Cadoza Simms from 14th and Gerard,
2 correct?
3 **A.** Yes.
4 **Q.** Did you ever have any problems with Cadoza Simms at 14th
5 and Gerard?
6 MR. LEON: Objection.
7 THE WITNESS: No, ma'am.
8 MR. LEON: Objection, beyond the scope.
9 MS. WICKS: May we approach?
10 THE COURT: Yes.
11 (Following sidebar discussion had on the record:)
12 MR. LEON: Your Honor, I asked a lot of questions. I
13 didn't ask about that.
14 MS. WICKS: He did talk about the portion of time when he
15 was staying uptown when he was on the run from Oak Hill, and
16 that's what I'm going into, that period of time.
17 THE COURT: One second. What's the relevance?
18 MS. WICKS: Because the rumor at Oak Hill was that he was
19 hot and that he had talked to the police about Cadoza Simms, who
20 was locked up for a murder at 14th and Gerard.
21 THE COURT: What's the relevance?
22 MS. WICKS: What's the relevance of the rumor that he was
23 hot?
24 THE COURT: What's the relevance of what you just told me,
25 yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5763

1  talking about the fact that he was not going to court even though
2  he left Oak Hill.
3      THE COURT: So you are approaching me for what purpose?
4      MS. WICKS: I'm just putting on the record, part of the
5  basis for why I was requesting the Court to review Mr. Capies'
6  juvenile records, because I think it is relevant and probative in
7  this matter.
8      THE COURT: You haven't given me any records. You've
9  asked for the records, apparently, from Superior Court. They've
10  denied it. You've given me no authority that I can go behind
11  them and tell them they have to release them to me, and you
12  haven't told me whether you've even asked them to release them
13  to me, so are you giving me any new information?
14      MS. WICKS: No. The authority I provided you is *Davis*
15  *versus Alaska*, which specifically goes to the issue of the
16  juvenile records, if they're probative of bias, are relevant for
17  inquiry. I put down the reasons why I wanted them to the
18  Superior Court. Since you're the judge presiding over this
19  matter, it's my understanding that this Court can call over their
20  and ask to review them. I wasn't even asking for you to get them
21  for me, I was asking for you to review them, to see if there's
22  anything pertinent to my defense of Mr. Wilson.
23      THE COURT: Well, you've put nothing in your motion that
24  you asked them to release them to me, have you?
25      MS. WICKS: My motion was asking -- my motion was asking

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5764

1  this Court to get the records from family court and review them.
2      THE COURT: You're not answering my question. Did you ask
3  them to release the records to me for my review?
4      MS. WICKS: No, I filed a petition for me to be able to
5  review them and that's why I was asking this Court to get them
6  from them.
7      THE COURT: If you have not asked the Superior Court what
8  you're asking me, if you have not asked them to release the
9  records to me, if all you asked them was to release them to you,
10  your motion is denied. I'm not doing your work for you. If you
11  haven't asked them to release them to me and you have given me no
12  authority that I can go to them and tell them they need to
13  release them to me, or should release them to me, or must release
14  them to me, before you have even asked them to release them to
15  me, for whatever purposes, I'm not doing your work for you. So
16  the motion is denied.
17      MS. WICKS: I'm not asking the Court -- Your Honor, for
18  the record, my motion did provide the authority for the fact that
19  the Court presiding over a criminal trial can ask the other
20  tribunal for the records to review them, to see if it's relevant.
21  That's the authority I provided to this Court.
22      THE COURT: I've already answered that. Is there anything
23  else?
24      MS. WICKS: No, not at this point.
25      (Sidebar discussion concluded.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5765

1  BY MS. WICKS:
2      Q.    Mr. Capies, back in 1996, I believe in direct at some
3  point, you indicated that you were released from Oak Hill in
4  1996; is that correct?
5      A.    Yes.
6      Q.    And when you were released from Oak Hill in 1996, in
7  adult court, you had received a Youth Act probation for
8  distribution of marijuana from November 1996, correct?
9      A.    I don't remember probation.
10      Q.    You don't remember being on probation?
11      A.    Yes, yes, I had probation, you're right. Yes, ma'am.
12      Q.    Okay. So back in 1996 when you're released, you're on
13  probation in adult court, correct?
14      A.    Yes.
15      Q.    And at that point, did you still have any juvenile
16  matters pending when you were released from Oak Hill, or that
17  was it?
18      A.    Yes, that was it.
19      Q.    So after 1996, you never went back to Oak Hill, correct?
20      A.    No, ma'am, I never went back.
21      Q.    And when you were on probation back in 1996 and 1997, you
22  received a notice to come to court because you had violated
23  probation, correct?
24      A.    Sometime in '97.
25      Q.    Okay. And you didn't come to court, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5766

1      A.    No.
2      Q.    When you did show up to court, that's when the judge sent
3  you to Hope Village, before you went to the -- before you were
4  supposed to go to the boot camp, correct?
5      A.    I don't remember nothing about no boot camp.
6      Q.    You don't remember anything about a boot camp?
7      A.    No, ma'am.
8      Q.    But you remember going to Hope Village, correct?
9      A.    Yes, but that was for an adult matter. Boot camp, I only
10  remember, that was a juvenile facility.
11      Q.    And when you were sent to Hope Village, you left Hope
12  Village on May 27th, 1997, correct?
13      A.    Sometime around that time.
14      Q.    And at that point, you were on probation but on the run,
15  correct?
16      A.    Yes.
17      Q.    And not -- one of the conditions of your probation was
18  that you didn't use drugs, correct?
19      A.    Yes.
20      Q.    In 1997, you violated that condition of probation while
21  you were on the run, correct?
22      A.    Yes, I smoked a lot when I was out.
23      Q.    How much did you smoke back in 1997?
24      A.    So much I can't even tell you, ma'am.
25      Q.    Every day, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5767

1  **A.**   Every day.

2  **Q.**   And what were you smoking back in 1997?

3  **A.**   Marijuana.

4  **Q.**   Now, Mr. Leon had asked you some questions about drug

5  use, at the beginning of your testimony, and you indicated that

6  you used Ecstasy, E pills and marijuana, correct?

7  **A.**   Yes, ma'am.

8  **Q.**   But later on in your testimony, I believe it was Thursday

9  or Monday of this week, you indicated that you had also used

10  PCP, correct?

11  **A.**   Before.

12  **Q.**   Were you using PCP in 1997?

13  **A.**   I wasn't using it, but I have tried it.

14  **Q.**   You have smoked PCP, correct?

15  **A.**   Yes.

16  **Q.**   And when was it that you smoked PCP?

17  **A.**   I can't remember.  I know it was -- it was in my juvenile

18  days that I tried it.

19  **Q.**   And during this period when you're on the run -- on

20  probation but on the run from Hope Village, it's your testimony

21  that you killed D-Lock in 1998, correct?

22  **A.**   Yes, ma'am.

23  **Q.**   And you're picked up on that warrant in February 1998,

24  correct?

25  **A.**   Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5768

1  **Q.**   And when you're picked up on that warrant, you get

2  sentenced in the distribution of marijuana to 150 days, correct?

3  **A.**   Yes, ma'am, you right.

4  **Q.**   And you're paroled from the youth center to a halfway

5  house in September 1998, correct?

6  **A.**   Yes, ma'am.

7  **Q.**   And you escape from the halfway house, Hope Village,

8  again, September 27th, '98, correct?

9  **A.**   Yes, ma'am.

10  **Q.**   At no point in '98, after you went to the youth center,

11  did you go to D.C. jail, correct?

12  **A.**   In '99, yes, I went to the jail first, and then I went to

13  youth center.

14  **Q.**   Okay.  You go from the jail to the youth center to Hope

15  Village, correct?

16  **A.**   Yes, ma'am.

17  **Q.**   And then you're locked up again in February 1999,

18  correct?

19  **A.**   Yes, ma'am.

20  **Q.**   And charged with escape again, correct?

21  **A.**   Yes, ma'am.

22  **Q.**   And at that point, you agree for what you called this

23  first cooperation, correct?

24  **A.**   Yes, ma'am.

25       MS. WICKS:  Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5769

1  BY MS. WICKS:

2  **Q.**   Now, after you entered this first plea agreement, you got

3  out of jail, correct?

4  **A.**   Yes, ma'am.  I didn't know it was a plea agreement.  I

5  was told it was something that I'm going to talk to the

6  government.

7       MS. WICKS:  May I approach the witness, Your Honor?

8       THE COURT:  Yes.

9  BY MS. WICKS:

10  **Q.**   I'm showing you 1104.1.

11       THE COURT:  This is the Government's Exhibit?

12       MS. WICKS:  Yes.

13       THE COURT:  All right.

14  BY MS. WICKS:

15  **Q.**   Looking at page 6, there's your signature and the date of

16  May 17th, 1999, correct?

17  **A.**   Yes, ma'am.

18  **Q.**   And you're saying when you signed this, you didn't read

19  anything on that page, correct?

20  **A.**   No, my lawyer explained to me that it was something that

21  I would talk to the police, but never said nothing about a plea

22  agreement.

23  **Q.**   Okay.  So when you went to court and pled guilty, you

24  told the judge you hadn't read it, but you were just going along

25  with it, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5770

1  **A.**   My lawyer -- that's my lawyer, so I'm supposed to believe

2  in my lawyer.

3  **Q.**   I'm saying, when you went to court and pled guilty, it's

4  similar to pleading guilty in Federal Court, in terms of the

5  judge asked you questions and made sure that you understood what

6  was going on, right?

7  **A.**   It was way different till now.

8  **Q.**   It was way different?

9  **A.**   Way.

10  **Q.**   Do you recall the judge asking about this agreement?

11  **A.**   I remember the judge asking me, did I sign something

12  willing to cooperate with the police and I told him yeah.

13  **Q.**   Okay.  So the judge over in Superior Court specifically

14  asked you about cooperation, right?

15  **A.**   Right.

16  **Q.**   And you're saying -- today you're saying, back then you

17  didn't know what that meant?

18  **A.**   The judge asked me did I understand what I was doing, and

19  I said yeah, my lawyer explained it to me.  I remember that.

20  **Q.**   Okay.  But now you're saying at that point, your lawyer

21  hadn't explained it to you, correct?

22  **A.**   No, she just told me it was something that I'm signing --

23  I asked her what I'm signing and she said something, saying

24  you're talking to them and I'll talk to you about it later.

25  **Q.**   Okay.  So when the judge asked you and you told the judge

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5771

1  that your lawyer had explained it to you, was that the truth or
2  was that a lie?
3  **A.**  It was the truth from the way she was telling me.
4  **Q.**  Well, you're saying she told you she was going to explain
5  it to you later, correct?
6  **A.**  I'm talking about based on knowledge what she explained
7  to me right then and there.  This is something saying that
8  you're going to talk to them.  I told the judge, yes, I knew
9  about that.
10  **Q.**  Okay.  But I believe your answer was, she said sign this
11  because this is about talking to the police and I'll explain it
12  to you later?
13  **A.**  Right.
14  **Q.**  Okay.  Did she explain it to you before you went before
15  the judge and pled guilty?
16  **A.**  To my knowledge -- my knowledge, that was explaining it
17  to me, that you going to talk to the police, you sign this right
18  here, and I signed it.
19  **Q.**  Did she show you this six-page agreement?
20  **A.**  No, she just told me to sign right here.  This is
21  something saying you're going to talk to the police and I signed
22  it.
23  **Q.**  Okay.  So you're saying back in 1999, before you pled
24  guilty or during the court proceeding where you pled guilty, you
25  had not read this document.  That's what you're saying?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5772

1  **A.**  Right.
2  **Q.**  And your understanding at that point was -- getting out
3  of jail meant you had to talk to the police, correct?
4  **A.**  Yes, ma'am.
5  **Q.**  And it's your testimony that you only did that four
6  times, correct?
7  MR. LEON:  Objection to the form.
8  THE WITNESS:  What you mean, then or now?
9  THE COURT:  Overruled.
10  BY MS. WICKS:
11  **Q.**  Back in 19 -- after you got out of jail on June 1st 1999,
12  before you got arrested on July 3rd of 2001, you only met with
13  the police four times, correct?
14  **A.**  Naw, I didn't tell you that.  I said in '99 that I only
15  met with Mike Will four times, ma'am.
16  **Q.**  Okay.  So there's other times you met with police, other
17  than those four times?
18  **A.**  After 2001.
19  **Q.**  Right.  My question is:  Between June 1st, 1999 and when
20  you were arrested on July 3rd, 2001, between those two time
21  periods, from '99 to 2001 when you got locked up by the FBI, did
22  you meet with any police other than the four times with
23  Detective Will?
24  **A.**  I met with Will, like, four times, ma'am.  That's all I
25  remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5773

1  **Q.**  So it could have been other times, you just don't
2  remember?
3  **A.**  I remember four times meeting with Detective Will, ma'am.
4  **Q.**  Now, the time that you were facing in the second escape
5  case could have been more because you were a repeat offender,
6  correct?
7  **A.**  Yes, ma'am.
8  **Q.**  It could have been ten years in the second escape case,
9  correct?
10  **A.**  I don't know nothing about no ten years, ma'am.
11  **Q.**  Well, what was your understanding of how much time you
12  were facing if you didn't have the plea agreement?
13  **A.**  Five years.
14  **Q.**  And how much time were you facing -- I'll withdraw that.
15  When you were released June 1st, 1999, you were pending
16  sentencing in that case, correct?  In the second escape case?
17  **A.**  Yes, ma'am.
18  **Q.**  And that's when you kept going back to court in 2000 --
19  in 1999, 2000 and 2001, correct?
20  **A.**  Yes, ma'am, but I don't remember going into 2001.  I may
21  have, but I don't remember.
22  **Q.**  How much time -- back in 1999 when you were released,
23  what was your understanding of how much time you were facing
24  when you went to sentencing in that case?
25  **A.**  From my understanding, it was five years.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5774

1  **Q.**  Since -- well, Government's 1104.1, which is the letter
2  to Cecelia Hoover-Hankerson regarding you, dated May 17th,
3  1999 -- have you ever read this?
4  **A.**  No, ma'am.  If that's my plea agreement, no, I have never
5  read it in '99.
6  **Q.**  I'm just going to approach you and show you 1104.1.  This
7  is the plea agreement from May 17th, 1999, correct?
8  **A.**  Yes, ma'am.
9  **Q.**  Okay.  And this is the document with your signature on
10  the sixth page, correct?
11  **A.**  Yes, ma'am.
12  **Q.**  And you're saying, sitting here today, you've never read
13  this document, correct?
14  **A.**  I never read it, ma'am.  My lawyer was explaining it to
15  me that if I cooperate with the police, that's what this is to
16  sign for.
17  **Q.**  And -- but your understanding was that you -- before you
18  went to sentencing, you had to keep meeting with the police,
19  correct?
20  **A.**  Yes, they had told me that.
21  **Q.**  Pardon me?
22  **A.**  Yes, they had told me that.
23  **Q.**  Who had told that you?
24  **A.**  Mike Will.
25  **Q.**  And you violated that agreement, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**   Yes, ma'am.

2   **Q.**   You lied to Mike Will, correct?

3   **A.**   Yes, ma'am.

4   **Q.**   And you simply stopped meeting with him, correct?

5   **A.**   Yes, ma'am.

6   **Q.**   But -- at what point did you stop meeting with him?

7   **A.**   It was sometime in 2000.

8   **Q.**   And you weren't ever locked up in that case until --

9   well, you weren't ever held in that case ever again, correct?

10   You went to jail -- I'll withdraw that.

11        You went to jail on the new case, correct?

12   **A.**   Yes, ma'am.

13        MS. WICKS: Court's indulgence.

14   BY MS. WICKS:

15   **Q.**   And back in -- when you were released in June of 1999,

16   you went to court -- you were supposed to go to court for

17   sentencing on September 17th, 1999, correct?

18   **A.**   I don't remember the date, but I know it was a sentence

19   they set and they was going to see how I was doing with them,

20   and --

21   **Q.**   Okay.

22   **A.**   Go ahead.

23   **Q.**   I'm sorry, go ahead.

24   **A.**   And they kept setting it off because he wouldn't show up

25   with me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   And it was set off a couple of times in 1999, correct?

2   **A.**   Yes, ma'am.

3   **Q.**   And it was -- well, you had a date in 2000 where you

4   failed to appear, correct?

5   **A.**   I don't ever -- I always went to court, ma'am.  I don't

6   remember --

7        MS. WICKS: Court's indulgence.

8        THE WITNESS: I would have had a warrant on me, and I had

9   a ID and I was going places.

10   BY MS. WICKS:

11   **Q.**   Would it refresh your recollection as to whether or not

12   you got a warrant in the case, if you looked at the court jacket

13   for F-131699?

14        MR. LEON: Objection.  He didn't say he can't remember.

15        THE COURT: Overruled.

16        THE WITNESS: I never had no warrant on me, ma'am.

17        MS. WICKS: Okay.  May I approach, Your Honor?

18        THE COURT: Yes.

19        MS. WICKS: I'm showing him 17-C.

20   BY MS. WICKS:

21   **Q.**   Mr. Capies, on March 21st, 2000, didn't you walk in with

22   your lawyer to resolve the bench warrant that was issued on

23   February 22nd, 2000?

24   **A.**   I don't remember that.  It could have been.  I got shot

25   in March.  Naw, that was 2001.  I don't remember no --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5777

1   **Q.**   I'll show you 17-C, and directing your attention to two

2   pieces of paper, if you could look at these.  And the Court

3   jacket reflects a walk-in for a bench warrant on March 21st,

4   2000 at 12:30, correct?  And this is regarding Bobby Capies,

5   date of birth 10/25/77.

6   **A.**   I don't remember having no warrant, though, ma'am.

7   **Q.**   Do you remember going to court on March 21st, 2000?

8   **A.**   I remember going back and forth to court.  I don't

9   remember that it was about a warrant.

10   **Q.**   Okay.  Does this refresh your recollection that you did

11   go to court that day?

12   **A.**   I see the date.  I don't see my signature nowhere.

13   **Q.**   Okay.  Well, do you see your name in the upper left-hand

14   corner of this piece of paper?

15   **A.**   I see my name, but that's not my signature.  It's not --

16   it's printed.

17   **Q.**   My question is:  Do you see your name in the upper

18   left-hand portion of this piece of paper?

19   **A.**   Yes, ma'am.

20        MS. WICKS: Court's indulgence.

21   BY MS. WICKS:

22   **Q.**   And this piece of paper has your case number on it,

23   correct, F-131699?

24   **A.**   Yes, I still don't see my signature, ma'am.

25   **Q.**   Okay.  And looking at the page before that, this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5778

1   indicates a bench warrant in F-131699 issued on the 22nd of

2   February, 2000, for Bobby Capies, Jr. that lives at 3329 14th

3   Place, Southeast, Apartment 301, correct?

4   **A.**   Yes, ma'am.  That's what it says.

5   **Q.**   Okay.  And at the bottom of this piece of paper, it

6   indicates the arrest is by, and then it indicates "walk in,"

7   correct?

8   **A.**   Yes, ma'am.

9   **Q.**   When in 2000 -- in the year 2000, you recall going to

10   court in the same case, correct?

11   **A.**   Yes, but never for a warrant.  I never recalled going to

12   court for a warrant.

13   **Q.**   That wasn't my question, Mr. Capies.

14        My question is:  In the year 2000, do you recall going to

15   court in the same case?

16   **A.**   Yes, ma'am.

17   **Q.**   And you went to court several times in 2000, correct?

18   **A.**   A couple of times that I can remember, yes, ma'am.

19   **Q.**   When you were talking to Detective Will, these four times

20   that you talked to him, you never told him about this enterprise

21   that you're saying that you were involved in, because there

22   wasn't any enterprise, correct?

23        MR. LEON: Objection, objection to the form.

24        THE COURT: Sustained.

25   BY MS. WICKS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5779

1  **Q.**  When you spoke with Detective Will, you didn't tell him
2  what you were out there doing, correct?
3  **A.**  Yes, I told him what I was out there doing. I just ain't
4  tell him I had something to do with D-Lock. I told him -- he
5  knew I was out there selling drugs, but at that time, he
6  didn't -- he told me while I'm under him, I can't sell drugs,
7  but I told him I have sold drugs.
8  **Q.**  Okay. Back in 1999 -- you testified here today in this
9  proceeding that in 1999 you had guns, correct?
10  **A.**  Yes.
11  **Q.**  Did you tell Detective Will in 1999 that you had guns?
12  **A.**  I told him that I have carried guns. I didn't tell him I
13  have them.
14  **Q.**  In 2000, did you -- well, the four times that you met
15  with Detective Will, were they in 1999, 2000, or 2001?
16  **A.**  I met him like '99, like the end -- like December. He
17  was still calling me, and he was making bad meetings, so I just
18  stopped seeing him. He kept calling me. I got rid of the
19  phone. I know it was going into 2000.
20  **Q.**  And so the four times that you met with Detective Will
21  were in 1999, correct?
22  **A.**  That I remember, yes, ma'am.
23  **Q.**  You never told them -- you never told Detective Will that
24  there was some group that you were with, correct?
25  **A.**  Yes. He knew the guys that I hung out with. I told him.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5780

1  **Q.**  You told him you were involved in a conspiracy?
2  MR. LEON: Objection.
3  THE WITNESS: I didn't know nothing about no --
4  THE COURT: Sustained.
5  BY MS. WICKS:
6  **Q.**  Now, this cooperation that you did do in 1999 got you out
7  of jail, correct?
8  **A.**  Yes, ma'am.
9  **Q.**  And this cooperation that you did in 1999 kept you out of
10  jail, correct?
11  MR. LEON: Objection.
12  THE WITNESS: Yes, ma'am.
13  THE COURT: Overruled.
14  BY MS. WICKS:
15  **Q.**  And this cooperation taught you you're going to get a
16  benefit and you're going to get out of jail if you do what the
17  government wants, correct?
18  **A.**  They ain't teach me that. I don't understand, can you
19  rephrase the question?
20  **Q.**  You just knew that?
21  **A.**  I mean, he told me that I was going to meet out with him.
22  He ain't tell me this is something you going to learn or
23  something like that, he didn't say that.
24  **Q.**  Now --
25  MS. WICKS: Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5781

1  BY MS. WICKS:
2  **Q.**  Sitting here today, you've never have been prosecuted for
3  lying to the police back in 1999, correct?
4  **A.**  No, ma'am, I never been prosecuted.
5  **Q.**  But you know that lying when you have a cooperation
6  agreement means that the agreement's a failure, correct?
7  **A.**  Not back then. I know now.
8  **Q.**  But no one, to your knowledge -- no one ever took away
9  this old agreement, correct?
10  **A.**  My knowledge back then, I didn't even know about that
11  agreement. I just seen it and I was told if I talk to the
12  police -- sign this if I'm going to talk to them.
13  **Q.**  Okay. But even after you lied to the police, you never
14  went to jail in this other case, correct?
15  **A.**  Not in the '99 case.
16  **Q.**  And when you talked to the police back then, you told
17  them what you heard, the rumor was about who killed D-Lock,
18  correct?
19  **A.**  Yes, ma'am.
20  **Q.**  You didn't tell them what you actually knew, correct?
21  **A.**  You right, I didn't tell them. I lied to them, ma'am.
22  **Q.**  This agreement -- whatever's contained in these pieces of
23  paper, in this plea agreement, got you out of jail, correct?
24  **A.**  I can't say that. At that time, I didn't know what was
25  going on in that agreement. Now I can say that --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5782

1  **Q.**  Once you signed this agreement and went to court, you got
2  out of jail, correct?
3  **A.**  Yes.
4  MS. WICKS: Court's indulgence.
5  BY MS. WICKS:
6  **Q.**  And it's your testimony that when you had this first
7  agreement and got out of jail and were meeting with the police,
8  you didn't tell anybody, correct?
9  **A.**  Naw, I ain't tell nobody.
10  **Q.**  And when you went to go meet with Detective Will, you'd
11  make up a story about what you were doing, to the people in your
12  life, correct?
13  **A.**  What you mean? Rephrase the question. I ain't
14  understand.
15  **Q.**  Well, when you went to go meet with Detective Will, you
16  testified you'd walk in the back entrance of 7-D, right?
17  **A.**  Yes, ma'am.
18  **Q.**  Okay. And you wouldn't tell your mother, your baby's
19  mother or anybody, "Hey, I'm going up to 7-D to talk to
20  Detective Will," correct?
21  **A.**  No, ma'am.
22  **Q.**  You would make up a story about what you were doing,
23  correct?
24  **A.**  Not to them. They didn't know that I was going. I ain't
25  have to tell them nothing, because they ain't know where I was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5787

1  you met with the FBI numerous times in 2001 and 2002, correct?
2  **A.**    Yes, ma'am.
3  **Q.**    And I believe you testified yesterday about this meeting
4  where Mr. Beatrice told you that you had to tell the truth,
5  correct?
6  **A.**    Yes, ma'am.
7  **Q.**    And after that you have a meeting with your lawyer,
8  correct?
9  **A.**    Yes, ma'am.
10  **Q.**    And at that point, to your knowledge, none of them know
11  you killed D-Lock, correct?
12  **A.**    Not until after.  I took the -- I mean, before I took the
13  plea agreement -- I met with Beatrice after I talked to my
14  lawyer, then I said something to him, and then that's when I
15  took the plea agreement, ma'am.
16  **Q.**    Okay.  And my question is:  During all the meetings in
17  2001 and 2002, until you -- well, I'll withdraw that.
18         There are many meetings when you continue to lie about
19  the D-Lock murder, correct?
20  **A.**    Yes.
21  **Q.**    And at any point, up until this meeting that you
22  described yesterday, with your lawyer, had they confronted you
23  with putting your name in the D-Lock murder?
24  **A.**    No.  Wasn't nobody forcing me to do that.  I did it on my
25  own.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5788

1  **Q.**    Okay.  But I'm saying you talked about -- at some point
2  this week, you talked about Agent Lockhart coming to you about
3  another situation that someone had put your name in, correct?
4  **A.**    Which situation you talking about?
5  **Q.**    Back in October of last year, Agent Lockhart came to you
6  and said your name had come up in something else, correct?
7  **A.**    Yes.
8  **Q.**    My question is:  Back in 2001 and 2002, have they told
9  you that your name came up in D-Lock?
10  **A.**    Not that I remember.  I came out on my own and told them.
11  **Q.**    Now, this plea agreement, the May 9th 2002 plea
12  agreement, in terms of crimes of violence, it only covers what
13  you had told them about prior to reaching the plea agreement,
14  correct?
15  **A.**    I told them about a lot of things.  I don't tell them
16  what to write down.
17         MS. WICKS:  Your Honor, I object to the answer as
18  non-responsive.
19         THE COURT:  Well, put your next question.
20  BY MS. WICKS:
21  **Q.**    Put it this way:  Prior to May 9th of 2002 when you pled
22  guilty, you hadn't told them about this night you were in the
23  truck and you and Wop go into the apartment, right?
24  **A.**    Right.
25  **Q.**    But they asked you about robberies, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5789

1  **A.**    Right.
2  **Q.**    They asked you about breaking into people's houses,
3  correct?
4  **A.**    I don't remember them asking me about no breaking into
5  houses.  They asked me, did I ever do robberies and I told them
6  yes.
7  **Q.**    Okay.
8  **A.**    I told them it was a lot.
9  **Q.**    In your mind, that was a robbery, correct?
10  **A.**    In my mind -- back then, when I was robbing, if I ain't
11  get nothing, it wasn't no robbery.  You didn't get nothing,
12  ain't nothing happen.
13  **Q.**    Okay.  So, ain't nothing happen if you didn't get
14  anything, correct?
15  **A.**    Or anybody else who was with me.
16  **Q.**    And it's your testimony that, to your knowledge, nobody
17  got anything that night that you're sitting in the truck,
18  correct?
19  **A.**    Right, from what I was told.
20         MS. WICKS:  Court's indulgence.
21  BY MS. WICKS:
22  **Q.**    And this plea agreement is an agreement to cooperate,
23  correct?
24  **A.**    Yes, ma'am, fully and truthfully.
25  **Q.**    Well, to you, cooperation means testifying, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5790

1  **A.**    Not only just testifying, talking to the government and
2  other police.
3         MS. WICKS:  Court's indulgence.
4  BY MS. WICKS:
5  **Q.**    You testified for the government in the Uni*ted States*
6  *versus Vincent Honeycut* back on July 3rd of 2002, correct?
7  **A.**    Yes, ma'am.
8  **Q.**    And Mr. Beatrice was the prosecutor in that case,
9  correct?
10  **A.**    Yes, ma'am.
11  **Q.**    And Mr. Beatrice, page 69, asked you what is -- what does
12  cooperation mean to you, correct?
13  **A.**    Yes, ma'am.
14  **Q.**    And you answered "testimony," correct?
15  **A.**    Yes.
16  **Q.**    And since you've had this cooperation agreement, you've
17  also testified against Byron Dorsey on July 15th of 2002,
18  correct?
19  **A.**    Yes, ma'am.
20  **Q.**    And you've also testified for the government in the
21  *United States versus Lamont Johnson* in November of 2002,
22  correct?
23  **A.**    May I see my transcript, ma'am, please.
24         MS. WICKS:  Sure.  Court's indulgence.
25         MR. LEON:  Your Honor, I would just object as to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 5814

1          THE COURT:  Yes.

2 BY MS. WICKS:

3 Q.  I'm showing you 1104.1.  And if I could direct your

4 attention to look at paragraph eight on page three.  Paragraph

5 eight, subsection A.

6 A.  (Witness complies.)  Yes, ma'am.

7 Q.  That's what it says.  Correct?

8 A.  Yes, that's what it says.

9 Q.  Okay.  And what that means, is prior to -- and I believe you

10 testified you were arrested in that case number in February '99.

11 Correct?

12 A.  Yes, ma'am.

13 Q.  And so prior to February 1999, other than crimes of

14 violence, pursuant to this plea agreement, the government would

15 not charge you with anything.  Correct?

16 A.  Yes, ma'am.

17 Q.  And looking at page six of this agreement, above your

18 signature in the first of the three paragraphs entitled,

19 "Defendant's acceptance," it indicates, "I have read this

20 cooperation agreement and have discussed it with my attorney."

21 A.  That's what it says.

22 Q.  Okay.  And this same agreement, looking on page two, the

23 first paragraph, paragraph B at the top of the page -- actually,

24 let me withdraw that.

25          This agreement also indicates that your agreement to

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 632 of 1954

1 cooperate includes the fact that you "Will cooperate truthfully,

2 completely, and forthrightly with this office and any other

3 federal, state, and local law enforcement," and I'm reading from

4 page one, paragraph 2A, "and that you will cooperate in any

5 manner as to which the government deems his cooperation

6 relevant."

7         That's what the agreement said.  Correct?

8 A.  I'm still reading.  When you told me page two, I went back

9 to one.

10 Q.  Take your time.  I'm on page one, paragraph 2A.

11 A.  That's what it says.

12 Q.  And again, this is the same document that has your signature

13 on it.  Correct?

14 A.  Yes, ma'am.

15 Q.  It goes on to indicate that you "would promptly turn over to

16 the law enforcement authorities evidence of crime, contraband,

17 and illegal controlled substances."  Correct?

18 A.  Where that say it, ma'am?  I can't correct something I don't

19 see.

20 Q.  The next sentence.

21 A.  On page two?

22 Q.  On page one, the third sentence, paragraph 2A.

23 A.  Yes, it's in the same paragraph.

24 Q.  Okay.  And you didn't do any of that.  Correct?

25 A.  No.

1 Q.  No, you didn't.  Correct?

2 A.  Yes, ma'am.

3        MS. WICKS:  Court's indulgence.

4 BY MS. WICKS:

5 Q.  Now, this agreement also indicates that you can't break the

6 law.  Correct?

7 A.  Yes.

8 Q.  Once this agreement was in place, it wasn't allowed that you

9 go out and sell drugs.  Correct?

10 A.  I don't know.  I ain't...

11 Q.  Well, you told Detective Will -- during the time period in

12 1999, when you met with Detective Will, I believe you indicated

13 this morning that you told him about some drug selling.

14 Correct?

15 A.  Yes.  Before I got -- before I started talking to him, but

16 not after.  I didn't tell him I was selling drugs.

17 Q.  Okay.  So when you were on the street, did you tell him that

18 you were selling drugs?

19 A.  No, of course I ain't tell him that.

20 Q.  And of course you didn't, because you know this agreement

21 wouldn't protect you.  Correct?

22 A.  I didn't know that then, ma'am.

23 Q.  Well, you knew that what you were doing was breaking the

24 law.  Correct?

25 A.  Yes.

1 Q.  And you knew that it wasn't allowed just by the fact that

2 the government let you out.  Correct?

3 A.  Right.

4 Q.  And so you didn't tell him.  Right?

5 A.  Right.  Of course I ain't tell him.  But you said what the

6 agreement said.  You ain't say what he said at first.

7 Q.  Well, prior to getting out of jail on June 1st, 1999, you

8 realized then that you couldn't get out of jail and break the

9 law and not be charged for it.  Correct?

10 A.  I knew I couldn't break the law when I first started selling

11 drugs, ma'am.

12 Q.  But you did it anyway.  Right?

13 A.  Yes.

14 Q.  And as a matter of fact, I believe you told us your mother

15 didn't want you selling drugs.  Correct?

16 A.  Yes, ma'am.

17 Q.  But you didn't care about what she had to say.  Correct?

18 A.  I was bad.  I was doing whatever I wanted to do.

19 Q.  And you continued to do that until you -- well, you

20 continued to do that.  Correct?

21 A.  Until I got locked up in 2001.

22 Q.  Okay.  So do you recall -- well, specifically I think you

23 said it was 1992 when you first sold drugs?

24 A.  Yes, ma'am.

25 Q.  Okay.  And earlier today you talked about when the jump-outs

1 had stopped you.  Do you recall if that was when you were a

2 juvenile or an adult?

3 A.  All through the time I was hustling.

4 Q.  Okay.  But as an adult, you were charged the one time with

5 the marijuana.  Correct?

6 A.  Before, yes.

7 Q.  And that was as an adult.  Correct?

8 A.  Yes, ma'am.

9 Q.  As an adult, had you been stopped by the police and they

10 found drugs?

11 A.  I just told you, ma'am, from '92 all the way up to 2001, I

12 been getting stopped by the police.

13 Q.  And my question is, when you were stopped by the police as

14 an adult, at any point in there did they find drugs?  Did a

15 police officer find drugs on you?

16 A.  Yes.  Before.

17 Q.  But you weren't charged with it.  Correct?

18 A.  I got locked up for marijuana and crack cocaine before,

19 ma'am.

20 Q.  But you don't have any convictions from that.  Correct?

21 A.  No, ma'am.

22 Q.  Were there times that you got stopped by the police, and

23 they found drugs and you didn't get locked up?

24 A.  I don't never remember that happening.

25 Q.  But you're saying, as an adult you got locked up and charged

1 with crack cocaine?

2 A.  Yes, and a juvenile.  I got locked up before.

3 Q.  And this happened in the District of Columbia?

4 A.  Yes, ma'am.

5 Q.  And you went to court and were released?

6 A.  No, sometime I had to stay and wait.

7 Q.  Okay.  As an adult, do you remember being locked up and

8 sitting at D.C. Jail, having been charged with possession of

9 crack cocaine?

10 A.  Yes.  I went down Lorton before.

11 Q.  Well, you went down to Lorton for the marijuana.  Correct?

12 A.  Right.  The marijuana came from the escape charge, escape

13 charge, crack cocaine.  I been catching charges when I was doing

14 the escape charge.

15 Q.  And I believe you've actually -- previously when you've

16 testified, you've indicated that you had --

17         MS. WICKS:  Court's indulgence.

18 BY MS. WICKS:

19 Q.  -- a conviction in November 2001 for attempted distribution

20 of cocaine.  Correct?

21 A.  I think that was -- that charge that was dismissed.  It was

22 from the escape charge.  I don't...

23 Q.  Well, you've testified to that, though.  Correct?

24 A.  May I see my --

25 Q.  The transcript?

Page 5820

1 A.  Yes, ma'am.

2 Q.  Sure.  Hold on one second.

3 A.  And my records with my charges on it.

4        MS. WICKS:  May I approach the witness, Your Honor?

5        THE COURT:  Yes.

6 BY MS. WICKS:

7 Q.  Mr. Capies, I'm showing you what's marked as 17-L.  And

8 looking at page 124 -- well, looking at that, and then directing

9 your attention to 124 --

10        THE COURT:  I'm sorry.  What is this exhibit number

11 marked as?

12        MS. WICKS:  I'll double-check, Your Honor.  17-L, as in

13 Lucy.

14        THE COURT:  Is this trial testimony transcript?

15        MS. WICKS:  Yes.

16 A.  You say yesterday's testimony.  This is from 2003.

17 BY MS. WICKS:

18 Q.  I know.  I apologize.  This is the United States versus

19 Byron Dorsey from July 15th, 2002.  Correct?

20 A.  Yes, ma'am.

21 Q.  And looking at -- and on page 123 it indicates that you're

22 the witness.  Correct?  Line nine.  Correct?

23 A.  I don't see the year.  I see my name.

24 Q.  My question at this point -- okay.

25 A.  You said the year and the witness.

Page 5821

1 Q.  The year:  Monday, July 15th, 2002.  Correct?

2 A.  Yes, that's on the front page.

3 Q.  Okay.  Page 123, line nine, indicates "Bobby Capies," and

4 then goes on to say, "is called as a witness for and on behalf

5 of the government.  Right?

6 A.  Yes, ma'am.

7 Q.  And then directing your attention to page 124, lines four to

8 seven, does that refresh your recollection as to whether or not

9 you indicated that you had a conviction for attempted

10 distribution of cocaine from November of 2001?

11 A.  Yes.  And I had it when I was charged.

12 Q.  That's not my question, Mr. Capies.  My only question is,

13 does that refresh your recollection as to whether or not you

14 testified previously that you have a conviction for attempted

15 distribution of cocaine from November of 2001?

16 A.  Yes.  And the cocaine charge is at the bottom of it, going

17 all the way through the sentence, ma'am.

18 Q.  Right.  I asked you to read four lines there, I believe.

19 A.  No, you said right here, you said four.  You didn't say four

20 lines.

21 Q.  I believe I said lines four through seven.  That is the

22 question and the answer.  Correct?

23 A.  I remember you saying four.

24 Q.  Okay.  Well, my question now is, lines four through seven

25 are the question and then the answer that you gave under oath

1 about your conviction for attempted distribution of cocaine.

2 A.  Yes.

3 Q.  And back on July 15th of 2002 you answered, "Yes."  Correct?

4 A.  Yes.

5 Q.  And looking at that, that's when the government is asking

6 you questions.  Correct?

7 A.  Yes, ma'am.

8 Q.  And that was Mr. Beatrice at that point.  Correct?

9 A.  No, ma'am.

10 Q.  Who was the prosecutor asking you questions -- I'm sorry,

11 David Deitch on that day.  Correct?

12 A.  Yes, ma'am.

13       MS. WICKS:  Court's indulgence.

14 BY MS. WICKS:

15 Q.  Mr. Capies, I'm going to be asking you some questions about

16 your May 9th, 2002, so I'm going to give you a copy of the

17 government's exhibit.

18       MS. WICKS:  May I approach, Your Honor?

19       THE COURT:  Yes.

20 BY MS. WICKS:

21 Q.  For the record, I've handed you 1104.

22       Now --

23       MS. WICKS:  Court's indulgence.

24 BY MS. WICKS:

25 Q.  You've talked about these guns that were found in the

1 Q.  Right.  But the guidelines tell him that he has to stay

2 within there.  Correct?

3 A.  Yes.

4 Q.  And if there's no 5(k) motion, he can't give you 10 years.

5 Correct?

6 A.  If that's what's on his mind.

7 Q.  If that's -- that's your understanding?

8 A.  If that's what's on the judge mind, whatever he want to give

9 me.  They could file a motion and I could still get life.

10 Q.  Okay.  My question as to do with, if the motion is not

11 filed.

12 A.  If they don't file, I can get life.

13 Q.  I understand that.  My question is, if they don't file it,

14 the judge cannot go below 30 years.  Correct?

15 A.  That's the judge.  He do what he want to do.

16 Q.  So he can do whatever he wants to do at sentencing, is what

17 you're saying?

18 A.  Yes.  He's the judge.

19 Q.  So it really doesn't matter if you have an agreement.

20 Correct?

21 A.  Yeah, it matter.  I want him to be lenient on me.

22 Q.  Okay.  So the fact that you have an agreement, you're hoping

23 he'll be lenient.  Correct?

24 A.  If they file the 5(k)(1) motion.

25 Q.  Okay.  But if they don't file the 5(k)motion, can he be

1         MS. WICKS:  Court's indulgence.

2 BY MS. WICKS:

3 Q.  Now, when you pled guilty, there was a proffer of evidence

4 that you swore was the truth.  Correct?

5 A.  Yes.

6 Q.  And in that proffer it indicates that, from in or about

7 sometime in 1997 is when you joined the racketeering enterprise.

8 Correct?

9         MR. LEON:  Objection.  Misstates the record.

10        THE COURT:  Ms. Wicks?

11 BY MS. WICKS:

12 Q.  Well, I'm going to show you again 1104.

13        MS. WICKS:  Actually, court's indulgence.

14 BY MS. WICKS:

15 Q.  Mr. Capies, I'm going to show you page -- attached to your

16 plea agreement in evidence is the proffer of evidence.

17 A.  Yes, ma'am.

18 Q.  And I'm going to show you paragraph six.

19        In your proffer, the first sentence, page three,

20 paragraph six, is, "Beginning sometime in 1997, Bobby Capies

21 became a member of the enterprise."

22        That's what it says.  Correct?

23 A.  Yes, ma'am.

24 Q.  Okay.  Do you recall when you became a member of the

25 enterprise?

Page 5844

1         MR. LEON:  Objection.

2         THE COURT:  Basis?

3         MR. LEON:  Asks for a legal conclusion.

4         THE COURT:  Overruled.

5 A.  I started hanging with Wop in the early '97, coming from '96

6 in December.

7 BY MS. WICKS:

8 Q.  When you pled guilty --

9         MR. LEON:  Objection.  The witness didn't finish his

10 answer.

11 BY MS. WICKS:

12 Q.  I apologize.  I didn't mean to cut you off.  Go ahead.

13 A.  My understanding was that it was enough for me to plead

14 guilty.  And if you read on paragraph 12, it tell you everything

15 is not in there.

16 Q.  Okay.  But my question -- it says here, "Beginning sometime

17 in 1997 Bobby Capies became a member of the enterprise."

18 Correct?

19 A.  Yes, ma'am.

20 Q.  So it would be quite different to say, "Beginning some other

21 year, Bobby Capies became a member of the enterprise."  Correct?

22 A.  I'm not trying to tell you to say that.

23 Q.  Okay.  To your understanding, this means, and you agreed,

24 that you became a member of an enterprise in 1997.  Correct?

25 A.  Yes, ma'am.

1 Q.  And so my question to you is, do you recall in 1997 when it

2 was that you became a member?

3 A.  Yes, ma'am.

4 Q.  When was that?

5 A.  Going into 1997.

6 Q.  January 1997?

7 A.  Yes, ma'am.

8 Q.  Okay.  And I believe earlier, just a few moments ago you

9 said, that's when you started hanging with Wop.  Correct?

10 A.  Yes, ma'am.

11 Q.  So you're saying, by hanging out and being friends with Wop,

12 you joined the enterprise?

13 A.  That's when I start shooting guns and stuff like that.

14 Q.  But you had been selling drugs before that.  Correct?

15 A.  Yes, ma'am.

16 Q.  And you had been selling drugs in Congress Park since 1992.

17 Correct?

18 A.  Yes, ma'am.

19 Q.  And so you're saying you were not the member of the

20 enterprise when you were simply selling drugs in Congress Park.

21 Correct?

22 A.  You got to explain that to me again.  I ain't understand

23 what you're saying.

24 Q.  Well, you just made a differentiation between -- well, prior

25 to 1997 you sold drugs.  Correct?

1 A.  No, he wasn't.

2 Q.  And you talked about an incident either yesterday or the day

3 before where you said Wop told you he went down to 6th Street,

4 he was going down to 6th Street to try to kill Jack Davis.

5 Correct?

6 A.  Yes, ma'am.

7 Q.  And you didn't go.  Correct?

8 A.  No, ma'am.

9 Q.  And you don't know why you didn't go.  Correct?

10 A.  No, ma'am.  I don't remember.

11 Q.  And when you went to kill Jack Davis, that was retaliation.

12 Correct?

13 A.  Yes, ma'am.

14 Q.  And when you heard about Wop -- well, when you say that Wop

15 said that he was going to go try to kill jack Davis, that was

16 retaliation.  Correct?

17 A.  Yes, ma'am.

18 Q.  So when you're saying that Wop told you he was going to go

19 retaliate, you weren't there.  Correct?

20 A.  You right.

21 Q.  You did say -- well, in this plea agreement you pled guilty

22 to aiding and abetting in the murder of Devar Chandler, also

23 known as D-Lock to you.  Correct?

24 A.  Yes, ma'am.

25 Q.  And on that day, when you went to kill Jack Davis, you

Page 5856

1  A.  Yes, ma'am.

2  Q.  Back then, on Trenton Place, people sold drugs?

3  A.  Yes, ma'am.

4  Q.  You pulled -- you drove on 10th Place and then turned on to

5  Trenton Place.  Correct?

6  A.  Yes, ma'am.

7  Q.  And there were people out there on 10th Place and

8  Trenton Place.  Correct?

9  A.  Yes, ma'am.

10  Q.  Selling drugs.  Correct?

11  A.  I seen them shooting dice.  I ain't seen them selling drugs

12  out there.

13  Q.  They weren't back in the cut.  Right?

14  A.  What cut?

15  Q.  They were right there on the sidewalk.  Correct?

16  A.  Yes, ma'am.  In front of the building.

17        MS. WICKS:  Court's indulgence.

18  BY MS. WICKS:

19  Q.  After you go and try to kill Jack Davis, and D-Lock gets

20  killed, you try to get rid of the car.  Correct?

21  A.  Yes, ma'am.

22  Q.  And part of the reason that you burn the car is to get rid

23  of fingerprints in the car.  Correct?

24  A.  Yes.  And any evidence that was in the car.

25  Q.  What other evidence was in the car?

Page 5857

1  A.  Old shirts, hoods and stuff.  It was a wagon.

2  Q.  So all sorts of stuff.  Right?

3  A.  Yes, ma'am.

4  Q.  And you testified earlier this week that when you -- after

5  the shooting, you go down to Berry Farms looking for Pusshead,

6  and that Pusshead is there and gives you a ride back to

7  Congress Park.  Correct?

8  A.  Yes, ma'am.

9  Q.  You previously testified that when you went looking for

10 Pusshead, Pusshead wasn't there.  Correct?

11 A.  That he wasn't there?

12 Q.  Yes.

13 A.  I don't remember saying he wasn't there.  I remember saying

14 he gave us a ride back around the block.

15      MS. WICKS:  Court's indulgence.

16 BY MS. WICKS:

17 Q.  You testified before the grand jury on October 4th of 2005.

18 Correct?

19 A.  Yes, ma'am.

20      MS. WICKS:  Page 53.

21 BY MS. WICKS:

22 Q.  And in the grand jury you were asked about the shooting of

23 D-Lock and what happened that day.  Correct?

24 A.  Yes, ma'am.

25 Q.  And at one point, page 53, you indicated under oath, "Once

Page 5872

1 Congress Park.  Correct?

2 A.  Yes, ma'am.

3 Q.  And when you're talking about the group that you hung with

4 from '97 to 2001, that's what group you're talking about?

5 A.  From '97 to 2001, yes, ma'am.

6 Q.  Okay.  And the only time that you shot someone prior to 1997

7 was this woman on 15th Place?

8 A.  Yes, ma'am.

9 Q.  But you did carry guns prior to 1997.  Correct?

10 A.  Yes, ma'am.

11 Q.  And you carried guns during each of the years that you were

12 dealing drugs.  Correct?

13 A.  Yes, ma'am.

14 Q.  And you carried guns to protect yourself.  Correct?

15 A.  Yes.  And the guys that I hung with.

16 Q.  Back in 1992, '93, '94, and '95 and '96, you were not

17 hanging with David Wilson.  Correct?

18 A.  I was explaining when I was -- when you said "all the way up

19 until," I thought you was talking all the way until I got locked

20 up, ma'am.

21 Q.  Okay.  Listen to my question.  My question is, from 1992 to

22 1996, you were not hanging with David Wilson.  Correct?

23 A.  No.  But I was kicking it with him, smoking with him, cool

24 with him, but not hanging with him.

25 Q.  And my question is, from 1992 to 1996, were you hanging with

Page 5873

1 David Wilson?

2 A.  No.

3 Q.  When you first learned that this guy Squid had been

4 killed -- the person that told you when you were down at Lorton

5 in the youth center you said was a guy that you knew as Blue.

6 Correct?

7 A.  Yes, ma'am.

8 Q.  And this person Blue was not from Congress Park.  Correct?

9 A.  No, he was from 15th Place, ma'am.

10 Q.  And you had previously apparently shot somebody from

11 15th Place.  Correct?

12 A.  Yes.  That had nothing to do with Blue or none of that.  I

13 was 14 or something.

14 Q.  What did it have to do with?

15 A.  Me and another guy from 37th Place that I also was jive cool

16 with, it was a guy from 37th Place, he had -- his wife was like

17 tomboy/rugged like, and we robbed his place.  And when we robbed

18 it, the lady swung an iron and went in the closet, and I shot at

19 the closet door and she got shot in the leg, ma'am.

20 Q.  And this was back when you were a juvenile.  Correct?

21 A.  Yes, ma'am.

22 Q.  And this guy Blue, when you saw him down at Lorton, in your

23 mind you associated him with 15th Place.  Correct?

24 A.  That's where I seen him at when I seen him on the streets.

25 Q.  Okay.  So when you saw him down at Lorton, you're thinking

Page 5892

1 A.   That's what we was talking about, my baby mother's house, at

2 the time.

3 Q.   And the question was, "Did you always keep your guns there

4 or did you ever keep them anywhere else", and you indicated when

5 you had them, you put them in her house.  Correct?

6 A.   Yes.  But I wasn't messing with her for the whole time, only

7 like -- when I was out there, only like two years.

8 Q.   And which two years were those?

9 A.   '99 to 2001.

10 Q.   Now, do you recall when you first started using drugs?

11 A.   I was smoking weed like in '93 here and there, probably '92,

12 but not regularly like I was.

13 Q.   And when did you start smoking regularly?

14 A.   Like '93.

15 Q.   And what do you mean by regularly?

16 A.   Just about every day.

17 Q.   And that continued until you got locked up.  Correct?

18 A.   Yes.  And some portion I use E pills, but only since 2000

19 until I got locked up.

20 Q.   So in 2000 and 2001, you used E pills?

21 A.   Yes, ma'am.

22 Q.   But you used marijuana from -- at least regularly since

23 1993.  Correct?

24 A.   All the way up until 2001.

25 Q.   When you were using marijuana regularly, it affected your

1 girl.

2          But I was back and forth because I couldn't stay

3 stationary around the park.  But I was back and forth.  So at

4 night I catch a cab back to Congress Park, and in the daytime,

5 sometimes when I don't feel it's as hot around the park, I hang

6 around the park.

7 Q.  And the reason why you can't hang around the park when

8 you're on the run in the daytime is because the police might be

9 out and see you.  Correct?

10 A.  I mean, I was around there, but I wasn't around there

11 regularly like I was from '97 all the way up until when I got

12 locked up.

13 Q.  Okay.  But what's the reason, when you're on the run, that

14 you can't hang out in the park?

15 A.  I mean, you can hang out in the park, but you can't hang out

16 there regularly.  You know the police looking for you, you're on

17 the run.

18 Q.  Now, the police uptown at that point didn't really know you.

19 Correct?

20 A.  You're right.

21 Q.  And so that's why you would hang out uptown.  Correct?

22 A.  You're right.

23 Q.  When you were cooperating with Detective Will, you lied to

24 him about the homicide of Jerry Hayes.  Correct?

25 A.  Yes, ma'am.

Page 5896

1 Q.  And you told him that you were actually an eyewitness to

2 William Truesdale, who you knew as Smoke, shooting Jerry Hayes.

3 Correct?

4 A.  Yes, ma'am.

5 Q.  And that was a complete lie.  Correct?

6 A.  Yes, I have lied.  But I'm not lying today, ma'am.

7 Q.  But you lied about that homicide.  Correct?

8 A.  Yes, ma'am.

9 Q.  And since then, you backed off that story.  Correct?

10 A.  Yes, ma'am.

11 Q.  You told the police, you told the FBI that you had lied

12 about that homicide back in 1999.  Correct?

13 A.  Yes, ma'am.

14 Q.  And that's also when you had told the police the rumor that

15 you heard about the homicide that you knew you had committed.

16 Correct?

17 A.  Yes, ma'am.

18 Q.  When David Wilson, who you called Wop, told you he killed

19 Sam Phillips, he told you that he killed Sam Phillips with his

20 .40-caliber cream colored Glock.  Correct?

21 A.  Yes, that's what he told me.

22 Q.  And in fact, he gave you a sweatshirt and asked you to hold

23 it for him.  Correct?

24 A.  Yes.  A black and gray Versace sweatshirt.

25 Q.  And it wasn't denim.  Correct?

Page 5897

1 A.  It was denim?

2 Q.  It was not denim.  Correct?

3 A.  No, it was not denim.

4 Q.  And your understanding of the reason why he gave you the

5 sweatshirt is because he had worn the black sweatshirt with gray

6 hood and the gray patches that was a Versace sweatshirt when he

7 shot and killed Sam Phillips in front of the halfway house.

8 Correct?

9 A.  Yes, that's what he --

10        MR. LEON:  Objection to this witness' understanding.

11 If it's based on something told to him, that's another thing.

12        THE COURT:  Sustained.

13 BY MS. WICKS:

14 Q.  Why did he give you the sweatshirt?

15        THE COURT:  Sustained.

16 BY MS. WICKS:

17 Q.  Did he say anything to you when he gave you the sweatshirt?

18        THE COURT:  You can give a yes or no answer.

19 A.  Yes.

20 BY MS. WICKS:

21 Q.  And what did he say to you?

22        THE COURT:  Sustained.

23 BY MS. WICKS:

24 Q.  And you essentially stashed that sweatshirt for Mr. Wilson.

25 Correct?

Page 5898

1 A.  I ain't going to say I stashed it.  I put it in the closet.

2 Q.  You hid it out of view.  Correct?

3 A.  Yes.  My view of stashing and hiding is two different

4 things, ma'am.

5 Q.  Well, when you're stashing something, you're hiding it from

6 somebody.  Correct?

7 A.  So won't nobody see it.

8 Q.  Okay.  But when you put the sweatshirt in the closet, you

9 didn't want the police to see it.  Correct?

10 A.  Of course.  That was my man.  I didn't want him to get

11 caught.

12 Q.  And you didn't give it to the police.  Correct?

13 A.  No, I didn't.

14 Q.  And when you were first asked about a shooting at the

15 halfway house, you told the police that you thought it might be

16 Little Jim.  Correct?

17 A.  I remember telling them something.  I can't remember

18 exactly, but I know I lied.

19        MS. WICKS:  Court's indulgence.

20 BY MS. WICKS:

21 Q.  When you were interviewed by the FBI when you were arrested

22 on July 3rd of 2001, they asked you about the murder of

23 Sam Phillips in front of the Hope Village halfway house a couple

24 of months before that.  Correct?

25 A.  Yes, ma'am.

1 Q.  And you told them that a man called Little Jim had been

2 arguing with Sam Phillips, and may have killed him, as well as

3 another man down at a club called Tradewinds.  Correct?

4 A.  May I see my transcript?  I can't remember a lie.  I only

5 can remember the truth, ma'am.

6         MS. WICKS:  Your Honor, may I approach the witness?

7         THE COURT:  Yes.

8         MS. WICKS:  And I'm showing him 17-Y, which I believe

9 is an add-on.  I apologize.

10         MR. LEON:  Your Honor, I would just ask that the record

11 be clarified.  The witness is not looking at a transcript.

12         MS. WICKS:  Sure.  Your Honor, 17-Y is an FBI 302 of

13 the interview of Mr. Capies -- or portion of the interview of

14 Mr. Capies in July of 2001.

15 BY MS. WICKS:

16 Q.  Did that refresh your recollection of what you told the FBI?

17 A.  I'm not going to argue with you, ma'am.  If it's right

18 there, I must have said it.

19 Q.  You must have said it.  Correct?

20 A.  Yes.  I remember I lied about it.  I don't remember the

21 exact words I lied about.

22 Q.  It's hard to keep track of the lies.  Correct?

23 A.  Yes, ma'am.

24         MS. WICKS:  Court's indulgence.

25 BY MS. WICKS:

# Tab 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | :   Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | :   Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | :   April 5, 2007 |
| DOMINIC SAMUELS, | :   9:30 a.m. |
| Defendants. | : |
| | : |

VOLUME 30 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant    CARNEY & CARNEY
Antwuan Ball:    John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5917

APPEARANCES (Cont.)

For Defendant    TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:    TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant    LAW OFFICE OF JENIFER WICKS
David Wilson:    Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant    LAW OFFICE OF JAMES W. BEANE
Gregory Bell:    James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant    LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:    Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant    LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:    Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5918

APPEARANCES (Cont.)

For Defendant    LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:    A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William H. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:    Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5919

**MORNING SESSION, APRIL 5, 2007**

1

2   (9:30 a.m.)

3      THE COURT: Good morning. Counsel, forgive the delay. I

4 am told by Ms. Romero that one of the jurors was upset about the

5 policy that cell phones with cameras are seized and seized with

6 driver's licenses. The driver's licenses are apparently taken as

7 well so they can be kept with the seized phones and returned to

8 the proper owner. Apparently, the juror, in retrieving yesterday

9 the cell phone, put both in a pocket or thought both were put in

10 a pocket and ended up losing the driver's license and was angry

11 that that was a result of the fact of the policy of seizing cell

12 phones and driver's licenses.

13      I was conferring with Ms. Romero about whether it seemed

14 that the juror just wanted to vent or whether the juror wanted to

15 talk to me. Her conclusion was the juror just wanted to vent.

16 I'm going to leave it alone unless you all have some request. It

17 is what it is.

18      All right. Again, sorry for the delay. Any reason not to

19 call the jury in?

20      Where's the witness? Did you have something?

21      MR. ZUCKER: It will be very quick and you can bring the

22 witness out while I'm doing it. I just wanted to alert the

23 Court, next Wednesday there's a funeral. I don't know the time.

24 I would like to attend. I'll raise it with you and if you can

25 accommodate me, great, when I know.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5920

1    THE COURT: All right. Are you otherwise ready for the
2  jury?
3        Let's just go ahead and bring them in.
4        (Jury in at 9:34 a.m.)
5        THE COURT: Good morning, ladies and gentlemen.
6        THE JURY PANEL: Good morning.
7        THE COURT: Welcome back. I regret the delay. I
8  apologize for that. But thank you for your indulgence. We're
9  ready to resume.
10       Counsel.
11       MS. WICKS: Thank you.
12       CONTINUED CROSS-EXAMINATION OF BOBBY CAPIES
13  BY MS. WICKS:
14  Q.    Mr. Capies, before this past week, you've testified four
15  times for the government in court and about seven times in the
16  grand jury; is that correct?
17  A.    It was a lot of times. I can't remember how many times,
18  ma'am.
19  Q.    Okay. And there were a lot of times when you met with
20  the government and answered questions, correct?
21  A.    Yes, ma'am.
22  Q.    And there were a lot of times when you sat with the
23  government and prepared for your testimony in court, correct?
24  A.    Yes, ma'am.
25  Q.    Now, prior to yesterday, you -- I have not asked you any

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5921

1  questions prior to yesterday, correct?
2  A.    To what you just asked me just now?
3  Q.    No. I'm saying prior to yesterday, you and I didn't meet
4  to -- before yesterday, you and I didn't meet to -- for me to
5  ask you questions and you to give me answers, correct?
6  A.    Yes. I never met you before.
7  Q.    You never met me before?
8  A.    Yesterday. I'm talking before that, ma'am.
9  Q.    Okay. And when --
10       MS. WICKS: Court's indulgence.
11  BY MS. WICKS:
12  Q.    -- on Monday, Mr. Leon asked you the following question
13  and you gave the following answer, and my question to you is:
14  Was your answer the truth or a lie?
15       The question was: "Tell us what you learned from Wop
16  about him trying to kill Head."
17       And your answer was: "It was in '97, like the middle of
18  '97. Him, Drano and LT had rode down to this place called Sixth
19  Street."
20  Q.    Head?
21  Q.    Yes.
22  A.    I never said Wop tried to kill Head.
23  Q.    You never heard from Wop that he tried to kill Head,
24  correct?
25  A.    That Wop was trying to kill Head?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5922

1  Q.    Yes.
2  A.    No.
3  Q.    You were sentenced in the previous -- in the last escape
4  case that you had, you were sentenced in November of 2001 to
5  time served, correct?
6  A.    Yes, ma'am.
7  Q.    And prior to that, you had intentionally provided false
8  information to the police, correct?
9  A.    Yes, ma'am.
10  Q.    You had intentionally lied to them about the murder of
11  Jerry Hayes, correct?
12  A.    Yes, ma'am, I have lied. I don't remember how long -- I
13  know before I took my plea agreement, I stopped lying to the
14  government, ma'am.
15  Q.    Okay. Well, my question was: Prior to November of 2001,
16  you had lied to them about the murder of Jerry Hayes, correct?
17  A.    I remember lying to them. I don't know if it was that
18  exact date you're saying.
19  Q.    Well, you -- during the time period that you were meeting
20  with Detective Will, you discussed the murder of Jerry Hayes,
21  correct?
22  A.    Yes, ma'am.
23  Q.    And you discussed the murder of D-Lock, correct?
24  A.    Yes, ma'am.
25  Q.    And you lied about both of those murders to Detective

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5923

1  Will, correct?
2  A.    Yes, ma'am.
3  Q.    In fact, all you told the police about the murder of
4  D-Lock was the rumor you had heard about who was involved,
5  correct?
6  A.    Yes, ma'am.
7  Q.    And that rumor was wrong?
8  A.    Yes, ma'am.
9  Q.    And to your knowledge -- well, when you went to court in
10  November of 2001 after these lies, you got time served and
11  didn't have to go to jail, correct?
12  A.    Yes, ma'am.
13  Q.    Now, before you were locked up on July 3rd of 2001, my
14  client, David Wilson, had already been locked up, correct?
15  A.    Yes, ma'am, like two months or so.
16  Q.    He had been locked up for about two months?
17  A.    Yes, ma'am.
18  Q.    And between the time he was locked up and you were
19  locked up, you had heard a rumor that he was telling about
20  something, correct?
21  A.    Yes, I was hearing rumors like that.
22  Q.    Okay. And back then, you found it hard to believe that
23  he would be telling, but that's what you heard on the street,
24  correct?
25  A.    Yes, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5924*

1   **Q.**   Now, this guy Larry Browne, who you knew as L, he's
2   not -- in your mind, he's not a Congress Park guy, correct?
3   **A.**   Yes, ma'am. He just came around.
4   **Q.**   Okay. And he is not part of any group that you were a
5   part of, correct?
6   **A.**   No, but he served crack cocaine to a guy that I was
7   hanging with.
8   **Q.**   Right. It's your testimony that he served crack cocaine
9   to David Wilson, correct?
10   **A.**   Yes, ma'am.
11   **Q.**   Now, is this something that you saw yourself or that Wop
12   told you?
13   **A.**   I seen him pass Wop crack cocaine before, but not money.
14   **Q.**   Did you weigh it? I mean did you have any idea of how
15   much it was?
16   **A.**   Wop would tell me that he was getting quarter keys to
17   eighth keys.
18   **Q.**   Okay. And did you ever have any discussions with Mr.
19   Browne about the crack?
20   **A.**   He wasn't doing business with me, ma'am.
21   **Q.**   Well, my question is, did you ever have any discussions
22   with Larry Browne about the crack?
23   **A.**   No not that I remember, ma'am.
24   **Q.**   Now, in the beginning when you discussed the murder of
25   Sam Philips with law enforcement, you told law enforcement that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5925*

1   Mr. Wilson told you that he was going to kill Sam because Sam
2   had threatened Ayo, correct?
3   **A.**   Yes, ma'am, and also him.
4   **Q.**   Well, the first thing you told him was that he was going
5   to kill Sam because Sam had threatened Ayo, correct?
6   **A.**   Yes. That's what Wop told me.
7   **Q.**   Okay. And then you moved on to saying that Mr. Wilson
8   told you that he was going to kill Sam because Sam was
9   threatening him, correct?
10   **A.**   I remember -- I don't remember how, apart from what I
11   said it was Ayo and Wop, but I remember Wop telling me that he
12   threatened her and threatened him.
13   **Q.**   Okay.
14   **A.**   I can't --
15   **Q.**   So what you're recalling today is that Mr. Wilson, who
16   you knew as Wop, told you that Sam threatened Ayo and that he
17   threatened Mr. Wilson, correct?
18   **A.**   Yes, ma'am.
19   **Q.**   Now, you've testified this week that you would recognize
20   Sam if you saw a picture of him, correct?
21   **A.**   Yes, ma'am.
22   **Q.**   Prior to February 6th of 2001, you never met Mr. Philips,
23   correct?
24   **A.**   I met him before.
25      MS. WICKS: Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5926*

1   BY MS. WICKS:
2   **Q.**   You testified against Mr. Wilson in December of 2003?
3   **A.**   Yes, ma'am.
4   **Q.**   And you were under oath when you testified against
5   Mr. Wilson on that date, correct?
6   **A.**   Yes, ma'am.
7   **Q.**   And you were asked the following question and gave the
8   following answer. Page --
9      MR. LEON: Could I have a page and line, please.
10      MS. WICKS: -- 373, line 15. I'll start on line 12.
11   "Question: Prior to that murder, did you know Sam
12   Philips?
13   "Answer: I knew him from hearing about him, but I ain't
14   knew him.
15   "Question: Well, had you ever met Mr. Philips prior to
16   February 6th, 2001?
17   "Answer: No."
18   BY MS. WICKS:
19   **Q.**   That was your answer back in January -- I'm sorry --
20   December of 2003, correct?
21   **A.**   I met him before, but I never met him in no 2001.
22   **Q.**   Well, the question was: "Had you ever met Mr. Philips
23   prior to February 6th, 2001?" And your answer was "No,"
24   correct?
25   **A.**   I remember -- I remember me meeting him, but it wasn't in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5927*

1   2001. That's what I'm giving you the answer to.
2   **Q.**   I'm saying that to your knowledge, Mr. Philips was
3   killed. Did you meet him that day?
4   **A.**   No. It was a long, long time ago, before I even knew he
5   had a baby by Ayo or whatever.
6   **Q.**   Today what you're saying is it would have been prior to
7   February 6th; it would have been prior to 2001 that you met
8   Mr. Philips? That's what you're saying today?
9   **A.**   Before he got killed, I knew who he was.
10   **Q.**   And my question is: Today, sitting here today, while
11   you're under oath today, you're indicating that you had met him
12   in person, correct?
13   **A.**   Yes, I have seen him.
14   **Q.**   When -- yesterday I asked you some questions about the
15   time frame, about when Mr. Wilson started to tell you about Sam
16   Philips. And my question today is -- and I think the answer was
17   around August of 2000 is when he started talking to you about
18   Sam Philips; is that correct?
19   **A.**   I mean, yes. That's when he started telling me about he
20   had an altercation, it was like around that time.
21   **Q.**   He said there was an actual altercation?
22   **A.**   That him and him had, you know -- he threatened him and
23   he threatened Ayo. This was around that time.
24   **Q.**   Okay. And when he told you about those threats, he told
25   you that Mr. Philips was over at the jail, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5956*

1  Congress Park and hanging out in Congress Park, there was this
2  guy that would come in during the daytime and get paid to take
3  pictures, right?
4  **A.**    Yes, ma'am.
5  **Q.**    And there would be other times, like this picture, that a
6  group of individuals would be together and take a picture,
7  right?
8  **A.**    Yes, ma'am.
9  **Q.**    And sometimes they're celebrating something and they take
10  a picture, right?
11  **A.**    It ain't got to be no celebrating.  He just pull up and
12  they ask for a picture.
13  **Q.**    I understand that.  My question is, sometimes when these
14  photographs were taken, people would be celebrating, right?
15  **A.**    I don't remember taking no pictures with nobody
16  celebrating nothing.
17  **Q.**    Okay.  Do you remember taking pictures when people went
18  to someone's funeral?
19  **A.**    I wasn't out there, ma'am.  I don't go to funerals.
20  **Q.**    You don't go to funerals?
21  **A.**    No, ma'am.
22  **Q.**    You didn't go to Boobie's funeral, correct?
23  **A.**    No, ma'am.
24  **Q.**    You were friends with Boobie and you didn't go to his
25  funeral, correct?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5957*

1  **A.**    I know my grandfather and I didn't go to his funeral.  I
2  don't go to funerals, period.  You will never see me at a
3  funeral.
4  **Q.**    When you were arrested on July 3rd of 2001, we talked
5  about there were some guns that the police seized and some
6  handcuffs, correct?
7  **A.**    Yes, ma'am.
8  **Q.**    And the 9 millimeter -- it's your testimony that that 9
9  millimeter, to your knowledge, did not work when the police
10  seized it, correct?
11  **A.**    Yes, ma'am.
12  **Q.**    Did it ever work?
13  **A.**    Before, yes, ma'am.
14  **Q.**    And you know because you shot that gun, correct?
15  **A.**    I don't remember shooting it.  I remember robbing with it
16  and stuff like that, ma'am.
17  **Q.**    Well, how would you know that the gun worked because
18  you're robbing somebody?
19  **A.**    The chamber on the gun was -- when you move the chamber
20  like this (indicating) on the gun to put bullets in it, it gets
21  stuck.  That's how I know it was broke, ma'am.  It kept
22  dropping.
23  **Q.**    Okay.  And my question is, how did you know at one point
24  it worked?
25  **A.**    Because it wasn't getting stuck.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5958*

1  **Q.**    Now, the other day you talked about how you came -- you
2  got these handcuffs, you're saying, had something to do with a
3  girl that the police were trying to arrest who got away and
4  Mr. Wilson got the handcuffs -- handcuff key and somehow you got
5  the handcuffs; is that correct?
6  **A.**    You want me to explain it to you, ma'am?  I can explain
7  it to you, ma'am.
8  **Q.**    I'm saying after -- you told a story about the girl the
9  police were trying to arrest and she gets away and Mr. Wilson
10  gets a handcuff key, right?
11  **A.**    Yes, ma'am.
12  **Q.**    So she can get out of the handcuffs, right?
13  **A.**    Yes, ma'am.
14  **Q.**    But somehow you end up with the handcuffs, correct?
15  **A.**    He took the handcuffs off at my baby mother house, ma'am.
16  **Q.**    So you're saying he left them there?
17  **A.**    Naw, she had them -- they was on her.  She stayed there,
18  too.  It was up to her to get rid of them.  I take them and put
19  them on top of the cabinet, kitchen cabinet, and forgot about
20  them.
21  **Q.**    Well, you had the handcuffs for sex, right?
22  **A.**    For sex?
23  **Q.**    Yeah, for sex.  Correct?
24  **A.**    I don't remember that, ma'am.
25  **Q.**    You don't remember that?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5959*

1        MS. WICKS:  Court's indulgence.
2  BY MS. WICKS:
3  **Q.**    You testified against Byron Dorsey on July 15th of 2002?
4  **A.**    Yes, ma'am.
5        MS. WICKS:  Court's indulgence.
6  BY MS. WICKS:
7  **Q.**    And you were asked the following questions and gave the
8  following answers.
9        "Question:  What were the handcuffs for?
10        "Answer:  Just had them.
11        "Question:  Well, what were you going to use them for?
12        "Answer:  Sex."
13        That's what you said back in July of 2002, correct?
14  **A.**    I ain't never said that I used them for sex.
15  **Q.**    That's why you had them, right?
16  **A.**    That ain't why I had them, ma'am.
17  **Q.**    That's what you said under oath back in July of 2002,
18  correct?
19  **A.**    Can I see my transcript, please --
20  **Q.**    Sure.
21  **A.**    -- because I don't remember.
22        MS. WICKS:  May I approach, Your Honor?
23        THE COURT:  Yes.
24        THE WITNESS:  I ain't going to argue with you, ma'am.
25  It's right there, but I don't remember saying it.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

5972

1  he got locked up with in '96 was from Burke?
2  **A.**  Yes, ma'am.  He didn't say '96.
3  **Q.**  But you know he was locked up in '96, correct?
4  **A.**  Sometime in '96.
5  **Q.**  And you're saying whatever drugs he got locked up for,
6  that was from Burke?
7  **A.**  Yes, from what he told me.
8  **Q.**  And how close were you with Boobie?
9        Well, prior to him getting locked up, were you close with
10  Boobie?
11  **A.**  No, ma'am.
12  **Q.**  Were you friends with him?
13  **A.**  We was cool.
14  **Q.**  Did you hang out with him?
15  **A.**  No, ma'am, I didn't hang out with him.
16  **Q.**  Did you have any contact with him during the time period
17  that he was locked up?
18  **A.**  I think I spoke to him a couple of times on the phone,
19  but not --
20  **Q.**  And during -- well, prior to getting locked up, at any
21  point were you close with Burke?
22  **A.**  Naw.  No way, naw.
23  **Q.**  No way.  Why no way?
24  **A.**  Because Burke was Burke.  He stayed to his self.  I
25  mean --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5973

1  **Q.**  And you were close with Boobie once he got out of jail?
2  **A.**  Yes, we started being cool.
3  **Q.**  Okay.  And until he got killed in March 2001, correct?
4  **A.**  Yes.  Me and him was together.
5  **Q.**  And how off would you be together with Boobie between
6  when he came home in 2000 and when he got killed in March 2001?
7  **A.**  He was like -- he hung around us, but he was doing his
8  thing.  Me and him was messing with these girls that stayed in
9  the same house.
10  **Q.**  And what are those girls' names?
11  **A.**  Darlene and -- Darlene and Lisa.
12  **Q.**  And it was in that house, Darlene and Lisa's house, that
13  Boobie got killed, correct?
14  **A.**  Yes.  And I got shot.
15  **Q.**  And you got shot, correct?
16  **A.**  Yes, ma'am.
17  **Q.**  And Boobie was your friend, correct?
18  **A.**  Yes, ma'am.
19  **Q.**  And when you got shot and left the house, you didn't call
20  9-1-1, correct?
21  **A.**  I'm shot too and I'm bleeding.  I laid down.  Somebody in
22  the house called 9-1-1 or went and got someone to call 9-1-1.  I
23  came outside.
24  **Q.**  Mr. Capies, my question is -- my question is when you got
25  shot and left the house, did you call 9-1-1?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5974

1  **A.**  Naw.  I went to got somebody to call 9-1-1.
2  **Q.**  Who did you go to get to call 9-1-1?
3  **A.**  I had laid down on the fence.  The first person I seen
4  was Jo-Jo.
5  **Q.**  Now, when you got out of that apartment -- well, your
6  response -- at the point that you get shot and then you're
7  coming out of the apartment, the person that shot you is no
8  longer in the apartment, correct?
9  **A.**  Yes, they left.
10  **Q.**  Boobie's in the apartment, correct?
11  **A.**  Yes.
12  **Q.**  Was there a phone in the apartment?
13  **A.**  It wasn't no house phone in there.
14  **Q.**  Okay.  Do you know if anyone in that house had a phone
15  that night?
16  **A.**  I can't remember.
17  **Q.**  But you got out of that apartment and away from that
18  scene, correct?
19  **A.**  Yes, ma'am.
20  **Q.**  And that day -- that night when you were interviewed in
21  the hospital, you lied to the police, correct?
22  **A.**  Of course I did.
23  **Q.**  Of course you did.  And you told the officer that some
24  guys had jumped from behind the bushes over the gate and robbed
25  you and Boobie, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5975

1  **A.**  Yes, ma'am.
2  **Q.**  And that was a lie, correct?
3  **A.**  Yes, ma'am.
4  **Q.**  Your friend got killed and you're lying to the police,
5  correct?
6  **A.**  He wasn't dead right then and there, ma'am.  He died like
7  two, three days later.
8  **Q.**  Okay.  Your friend got shot and you got shot and you lied
9  to the police, correct?
10  **A.**  Yes, ma'am.
11  **Q.**  And you didn't go to his funeral, correct?
12  **A.**  Naw.  I don't go to no funerals.  I don't go to my own
13  family funerals, ma'am.
14  **Q.**  When you were friends with Boobie, did he ever talk to
15  you about the fact that Burke had shot at his mother and his
16  father?
17  **A.**  Burke shot at his mother and father?
18  **Q.**  Yes.  Did he ever talk to you about that?
19  **A.**  He never talked to me about that.
20        MR. LEON:  Objection, relevance, beyond the scope, hearsay
21  about what somebody else said about --
22        MS. WICKS:  Bias, Your Honor.
23        THE COURT:  Come on up.
24        (Following sidebar discussion had on the record:)
25        MS. WICKS:  Your Honor, Mr. Capies allegiance changes

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5984

1  **A.**   Mr. Wilson?

2  **Q.**   Yes.  David Wilson, my client.

3  **A.**   I remember talking to him when he asked me what happened.

4  I don't -- I might have had.  I'm not going to say I didn't.

5  **Q.**   And when he asked you what happened, he suspected you had

6  something to do with the events that unfolded that led to Boobie

7  being killed, correct?

8  **A.**   He think that he -- how he was acting to me, what I was

9  thinking, that he thought something like I did something, like

10 started something or something like that for it to occur.

11 **Q.**   Okay.  And the three men that were in that house that

12 night that you said one of them shot Boobie, those men were from

13 uptown, correct?

14 **A.**   No, they wasn't.

15 **Q.**   Where were they from?

16 **A.**   Northeast.

17 **Q.**   Not Southeast, correct?

18 **A.**   No.  That's Northeast.  "Uptown" is Northwest, ma'am.

19 **MS. WICKS:**  Thank you.

20 Your Honor, I don't have any additional questions.

21 **THE COURT:**  All right.  Mr. Purpura?

22 **MR. PURPURA:**  Yes, sir.  Do you want to take a break at

23 this point or do you want me to go first?

24 **THE COURT:**  We're going to take a break at 11:10.  Would

25 you prefer to have the break taken now?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5985

1  **MR. Purpura:**  Yes, I would.

2  **THE COURT:**  All right.  Ladies and gentlemen, we'll take

3  our break.  That clock, by the way, is not working properly at

4  the moment.  This one is closer to accurate (indicating).

5  So we'll take our 15-minute break and come back in 15

6  minutes after what that clock says.  Please remember, don't talk

7  about the case and take your notes back with you to the jury

8  room.  And we'll see you in 15 minutes.

9  (Jury out at 11:00 a.m.)

10 **THE COURT:**  All right.

11 (Thereupon, a break was had from 11:00 a.m. until

12 11:16 a.m.)

13 **THE COURT:**  Are you ready for the jury?

14 **MR. PURPURA:**  Yes.  Thank you, Your Honor.  There might be

15 a change of order after myself, as well, because Mr. Tabackman is

16 not here.  He'll probably be here after lunch.  Mr. Beane will go

17 next.

18 **THE COURT:**  Good morning, ladies and gentlemen.

19 **THE JURY PANEL:**  Good morning.

20 **THE COURT:**  Welcome back.  We're ready to resume.

21 Mr. Purpura.

22 **MR. PURPURA:**  Yes.  Thank you, Your Honor.

23 <u>CROSS-EXAMINATION OF BOBBY CAPIES</u>

24 BY MR. PURPURA:

25 **Q.**   Mr. Capies, I won't be as lengthy as the other --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5986

1  **A.**   I can't hardly hear you.

2  **Q.**   It will not be as lengthy as the other questioning, I can

3  assure you.  We're going to start with guns, though.  You are

4  familiar with guns; is that right?

5  **A.**   Yes, sir.

6  **Q.**   And refresh my recollection.  You are what, 29 years old

7  now?

8  **A.**   Yes, sir.

9  **Q.**   And your time with guns go back literally to teenage

10 years; is that correct?

11 **A.**   Yes, sir.

12 **Q.**   Can you give us an idea -- when was the first time you

13 had a gun?

14 **A.**   I can't remember the first time.  I remember I was a

15 teenager.

16 **Q.**   All right.  You seem to have a pretty good recollection

17 as to what people told you ten years ago.  Would you agree with

18 that?

19 **A.**   I remember when I was a teenager, I was carrying guns.  I

20 don't remember what time.

21 **Q.**   What were you, 16, 15, 17?

22 **A.**   Fourteen, 15.

23 **Q.**   A young teenager, right?

24 **A.**   Yes, sir.

25 **Q.**   And you started telling us about one of the first

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5987

1  incidents when you actually used the gun.  Do you remember that?

2  **A.**   Yes, sir.

3  **Q.**   And that incident, that was when you shot a woman; is

4  that correct?

5  **A.**   Yes, sir.

6  **Q.**   And how old were you -- is this the first woman you shot?

7  **A.**   That's the only woman I ever shot.

8  **Q.**   Okay.  That's good to hear.  And how old were you when

9  you did this?

10 **A.**   About 15, 16.

11 **Q.**   And you indicated you were with another person at that

12 time; is that correct?

13 **A.**   Yes, sir.

14 **Q.**   And help me with this.  When you're 15 and 16 years old,

15 what year are we talking about?

16 **A.**   Like '92, '93, something like that.

17 **Q.**   Okay.  So that time period of '92, '93 when you're 15, 16

18 years old, you and -- what was this other person's name?

19 **A.**   A guy named Landow.  He doing life for prison now.

20 **Q.**   That's reassuring, but that wasn't the question.

21 His name is Landow?

22 **A.**   Yes, sir.

23 **Q.**   And where is Landow from?  Where'd he grow up at?

24 **A.**   Congress Park.

25 **Q.**   Okay.  And how old was Landow?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

5988

1       MR. LEON:  Objection to relevance.
2       MR. PURPURA:  It's during the time period of the obviously
3   charged indictment.  We're talking about people he's associated
4   with and the participants.  And I'm going to show, there's no
5   connection to my client.
6       THE COURT:  I'll give you some leeway.
7       MR. PURPURA:  Thank you, Your Honor.
8   BY MR. PURPURA:
9   Q.   Is he about your age?
10  A.   No, sir, he's way older than me.
11  Q.   And you were committing robberies; is that correct?
12  A.   Yes, sir.
13  Q.   And you were robbing at that time.  Were you robbing for
14  money, robbing for drugs, what were you doing?
15  A.   For crack.
16  Q.   So you were robbing someone for crack; is that correct?
17  A.   Yes, sir.
18  Q.   And what happened was this woman ended up in a closet; is
19  that correct?
20  A.   Yes, sir.
21  Q.   And before that -- is this in Congress Park or outside of
22  Congress Park?
23  A.   Outside of Congress Park.
24  Q.   So during this time period of '92, 93 when you're 15 and
25  16, you would also rob people outside of Congress Park; is that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5989

1   correct?
2   A.   Yes, sir.
3   Q.   And you were robbing her for crack, to sell or to use.
4   Which was it?
5   A.   To sell.
6   Q.   And you and this person were going to sell that crack?
7   A.   Yes, sir.
8   Q.   And she went in the closet; is that right?
9   A.   Yes, sir.  Actually, we was robbing her boyfriend, but
10  she was there, and she went in the closet.  We told her to get
11  in the closet.
12  Q.   You told her to get in the closet?
13  A.   Yes, sir.
14  Q.   And she did?
15  A.   Yes, sir.
16  Q.   And you shot her?
17  A.   No, she swung an iron at me, and I shot in the closet
18  door.
19  Q.   I'm sorry.  Just, was she inside the closet and the
20  closet door was shut when you shot through the door?
21  A.   Yes, sir.
22  Q.   So she's locked in a closet at this point?
23  A.   She wasn't locked in there, sir.
24      MR. LEON:  Your Honor, same objection.
25      THE COURT:  Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5990

1   BY MR. PURPURA:
2   Q.   Closet door is shut, you're outside, and you shoot in the
3   closet?
4   A.   Yes, sir.
5   Q.   What was your intent when you shot in the closet?
6   A.   When she came out, she was swinging at me.
7   Q.   Excuse me.  What was your intent when you shot this woman
8   in the closet?
9   A.   To stop her from swinging the iron.
10  Q.   Now, during this time period when you're 15 and 16, when
11  you're committing robberies and selling drugs, you had guns,
12  right?
13  A.   I had a gun.  I didn't have guns.
14  Q.   Okay.  You had a gun?
15  A.   Yes, sir.
16  Q.   And as you got older, you also possessed either a gun on
17  you or one near by you; is that fair to say?
18  A.   Yes, sir.
19  Q.   And you indicated already that you also -- I believe you
20  held guns sometimes, even at your mother's house?
21  A.   Yes, sir.
22  Q.   And at perhaps a girlfriend's house as well; is that
23  correct?
24  A.   Yes, sir.
25  Q.   Is it also fair to say that you, Mr. Capies, Bobby

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

5991

1   Capies, you have an affinity, a liking for guns?
2   A.   At one point I did.  Not no more, sir.
3   Q.   What year was that, roughly?  Was that '92 through the
4   time you got arrested in 2001, your affinity for guns?
5   A.   Yes, sir.
6   Q.   And you have such an affinity for guns, you actually --
7   let me guess, you tattooed a gun and holster on your right
8   shoulder; is that correct?  You have a tattoo of your gun and
9   holster on your right shoulder?
10  A.   On my right shoulder?  No, sir.
11  Q.   Where do you have it tattooed?  Where is it?
12  A.   It's on my arm.
13  Q.   And that's because you again have used guns, right?
14  A.   Yes, sir.
15  Q.   And you have -- you like guns, right?
16  A.   I have liked guns; I don't like guns anymore, sir.
17  Q.   From '92 to 2001, that's when you liked guns, right?
18  A.   Yes, sir.
19  Q.   So much so that you tattooed a gun on your body, right?
20  A.   Yes, I have a tattoo on my arm, sir.
21  Q.   We're going to jump a little bit now and we're going to
22  jump to July 3rd, 2001.  And on July 3rd, 2001, just before you
23  got arrested -- just before you got arrested, you still just like
24  guns at that point?
25  A.   Before I got arrested?  Yeah, I was carrying guns.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*5992*

1   MR. PURPURA: And with the Court's permission, I'm going
2   to retrieve some exhibits. I'll put them right here.
3   Q.   Now, I'm going to put up Government's Exhibit 702.5,
4   which is a handgun, right?
5   A.   Yes, sir.
6   Q.   And you recognize this handgun, you testified about it;
7   is that correct?
8   A.   Yes, sir.
9   Q.   Okay. I'll put this down. And where were you living on
10  July 3rd, 2001?
11  A.   I was staying at my baby's mother's house at 3408 13th
12  Place, Southeast.
13  Q.   And how long had you lived there before July 3rd, 2001?
14  A.   I was going in there spending the night before I started
15  living there, in, like, the middle -- almost to the end of 2000.
16  Q.   So, a year and some change?
17  A.   That's about right, sir.
18  Q.   And obviously you had some of your belongings there; is
19  that correct?
20  A.   I didn't understand the question. Can you say it again?
21  Q.   You had clothes that belonged to you there; is that
22  right?
23  A.   I can't hardly here your voice, sir.
24  Q.   I'm sorry. You had belongings, clothes in that house; is
25  that correct?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5993*

1   A.   Yes, sir.
2   Q.   And you had some personal items in that house; isn't that
3   correct?
4   A.   Yes, sir.
5   Q.   This is Government's Exhibit 702.6. And you recognize
6   this exhibit; is that correct?
7   A.   Yes, sir.
8   Q.   And this is Government's Exhibit 702.7, and you recognize
9   this exhibit as well; is that correct?
10  A.   Can I see the first one, again, please, sir.
11  Q.   Sure.
12       MR. PURPURA: Court's permission to approach the exhibit,
13  please.
14       THE COURT: With 702.6, and we'll leave 702.7 in the box
15  for a second.
16       THE WITNESS: Yes, I recognize that, sir.
17  BY MR. PURPURA:
18  Q.   It was taken from your house on July 3rd?
19  A.   Out my baby's mother's house, where I was staying, yes
20  sir.
21  Q.   I'm sorry? Your baby's mother's house where you were
22  staying?
23  A.   Yes sir.
24  Q.   Your baby's mother don't use this gun, does she?
25  A.   No, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5994*

1   Q.   And you recognize this gun as well; is that correct, sir?
2   A.   Yes, sir.
3   Q.   What kind of gun is it?
4   A.   It's like an SK rifle.
5   Q.   What's the other gun like?
6   A.   It's a .45 machine gun, sir.
7   Q.   Now, Mr. Capies, you testified that the only gun in your
8   baby's mother's apartment that belonged to you was this gun
9   right here, this little handgun, which is Government's Exhibit
10  702.5, which don't really work too well.
11  A.   It don't work, sir.
12  Q.   It don't work?
13  A.   You're right.
14  Q.   But you're fessing up to this gun, right?
15  A.   If all of them was mine, I would fess up, it don't matter
16  if it's broke or not.
17  Q.   Here's my question: This is the one you're telling the
18  jury and you told the police was your gun, right, this one, the
19  one that doesn't work?
20  A.   Yes, sir.
21  Q.   But the Bobby Capies who has a gun tattooed on his body
22  did not possess the machine gun or the other assault rifle; is
23  that right?
24  A.   I had them, but they wasn't mine, sir.
25  Q.   They weren't yours, right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5995*

1   A.   Yes, sir.
2   Q.   It's easier for you to say they belong to this gentleman
3   right here (indicating) Antwuan Ball, right?
4   A.   They were his.
5   Q.   And that's what you're saying, right?
6   A.   He gave them to me, sir.
7   Q.   And they were loaded, right?
8   A.   I can't remember, but I remember he gave me ammunition
9   with them. I can't remember if they were loaded.
10  Q.   The ammunition was to put in the gun, correct?
11  A.   Yes, sir.
12  Q.   Okay. So he gave you a machine gun and an assault gun
13  and they were his, Antwuan Ball's, which he gave you, that's
14  your testimony, right?
15  A.   Yes, sir.
16  Q.   And the only gun that was yours was this broken,
17  nonworking, dirty little handgun, right?
18  A.   Yes, but I have dealt with guns that work, sir.
19  Q.   Okay. Now, let me see your face again, you have the
20  teeth, where's your tooth missing. Can all the jury see that?
21  Okay. We got that. Good.
22  A.   (Indicating.)
23  Q.   And that's the same Antwuan Ball that gave you the
24  machine gun and this assault rifle with full magazines. That's
25  the same man that pistol whipped you, kicked you like a little

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*5996*

1   puppet.
2      A.   Yes, sir, he did.
3      Q.   And that's the truth, after that he gave you these loaded
4   weapons?
5      A.   Yes, sir.  It wasn't right after, sir, but -- it was a
6   year later that he gave them to me.
7      Q.   And that's the same man that you told this jury you were
8   planning on killing?
9      A.   Yes, sir.
10     Q.   Let's get away from your apartment for a second, and
11  we'll move back to 1995, 1996.
12          You testified about Dom Samuels, or Don Samuels, as you
13  call him, Samuels, about an incident involving a gun.  Do you
14  remember that testimony?
15     A.   Yes, sir, yesterday, sir.
16     Q.   And this -- the information you received came, according
17  to you, right from Don; is that correct?
18     A.   Not Don, Dominic Samuels, sir.
19     Q.   What do you mean, call him Don?
20     A.   His nickname Don, his real name Dominic Samuels.
21     Q.   So you referenced him yesterday as Don, D-O-N, right?
22     A.   Yes, sir.
23     Q.   But we definitely mean Dominic Samuels, right?
24     A.   Yes, sir.
25     Q.   And apparently, according to you, a gentleman with the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5997*

1   nickname of Black -- and a gun was missing after some incident,
2   right?
3      A.   Yes, sir.
4      Q.   And at that time, according to you, Wop and Boobie told
5   Black, who's Jamel Sills?
6      A.   That's what Don told me, sir.
7      Q.   That Black should kill Don, right?
8      A.   That's what Don told me, sir.
9      Q.   And according to you, that's what Wop was saying, right?
10     A.   What Don was telling me.
11     Q.   That's '95 and '96, right, approximately?
12     A.   It's like the early part of '95.  I don't remember saying
13  '96, sir.
14     Q.   When was this?
15     A.   Early part of '95.  I can remember it was around that
16  time.  You can look back yesterday.  That's what I said, sir.
17     Q.   And how soon after the incident was Don shot by
18  Mr. Sills?
19     A.   I can't remember that, but I remember him coming to me
20  about it.
21     Q.   You don't remember that?
22     A.   I don't remember -- he got out the hospital and he said
23  something to me about the incident, and Black shot him in his
24  legs.
25     Q.   What year was it that Black shot him?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5998*

1      A.   I'm not going to give you on no straight year, I'd say it
2   was around '95, sir, the beginning.
3      Q.   Based on your memory, and you have a good memory, right,
4   of these incidents?
5      A.   Sir, I testify about a lot of stuff, I don't remember
6   everything.
7      Q.   I know, I know you testified.  You definitely testified
8   about a lot of stuff.
9      A.   That's what I supposed to do, tell the truth.
10     Q.   You don't know if it was '95.  How about '96, was it '96
11  when he got shot?
12     A.   It couldn't have been '96, sir.
13     Q.   And you're sure of that?
14     A.   I'm not sure of that.  But from my memory, I'm thinking
15  it couldn't have been '96.
16     Q.   Just one second.
17          If Mr. Samuels' medical records indicate that he was shot
18  in June of 1996, would you argue with that?
19     A.   No, because his medical records are going to say when he
20  got shot.  I said it was around about '95.  That's what I can
21  remember, sir.
22     Q.   Fair enough.  Fair enough.  Now, during that time,
23  apparently 1996, then, before this shooting, Wop was trying to
24  have Mr. Samuels, Dom, shot?
25     A.   That's what Don told me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*5999*

1      Q.   Okay.  Now, that doesn't seem like two people working
2   together, does it, when one wants to have the other person shot?
3          MR. LEON:  Objection to the form.
4          THE COURT:  Sustained.
5   BY MR. PURPURA:
6      Q.   They were not working together, were they?
7      A.   I don't know what was going on.  I don't even know what
8   Don told me, sir.  That's all I can tell you is what he told me.
9      Q.   Based on all your observations in that time period, '95
10  and '96, they were not working together were they, sir?
11     A.   What you mean, "working together"?
12     Q.   Selling drugs together.
13     A.   No, not that I know of.
14     Q.   Thank you.  Now, just take us back.  Now we're in 1996.
15          When was it that Don actually showed you his wounds?  Now
16  we know he's shot in June of '96, what does your memory tell
17  you -- when did he come up and show you these wounds?
18     A.   The year that I remember was '95.  I didn't remember '96.
19  I could be wrong, sir, I'm not going to sit right here and say I
20  know exactly when he got shot or exactly when he got out of the
21  hospital.  I remember him getting shot and him showing me the
22  wounds, and I said it was around about, probably about '95.
23     Q.   We know that's wrong now, so in your mind when was it
24  that he came and showed you his wounds?  Do you have any idea?
25  What year?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6004

1 **Q.** Okay. Now we will get back to '92 and '96, okay. Just
2 briefly.
3 You indicated -- we'll get back to more detail in a
4 moment, but you indicated you were working, at least your
5 testimony is, with Dominic Samuels, correct?
6 **A.** '92 to -- it probably started for a while and then it
7 started again, sir.
8 **Q.** So there was an off and on period of time, sometime
9 between 1992 and '95, probably, right?
10 **A.** I'd say like '94, and then it stopped and then we started
11 back up.
12 **Q.** Right. And during that time, you indicated that you
13 shared drugs; is that right?
14 **A.** Yes, sir. Me and Dominic.
15 **Q.** Now, as far as other people in the area -- and we'll get
16 to it in more detail in a moment -- but you were -- when you had
17 your drugs in '92, and you were a young man back then, you were
18 younger, right?
19 **A.** Yes, sir.
20 **Q.** From '92 to '94 when you had your little bit of drugs,
21 and they were a small amount of drugs, right?
22 **A.** Yes.
23 **Q.** You would hide those drugs, right?
24 **A.** Yes.
25 **Q.** And at that point, you wouldn't let anybody know where

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6005

1 those drugs were, because a lot of people would be taking your
2 drugs, right?
3 **A.** Me and Don was getting crack together around them times,
4 sir, and he would take.
5 **Q.** How about other people?
6 **A.** They might see right then, a stash -- I'm talking about
7 leaving and stashing something and holding something is two
8 different things to me, sir.
9 **Q.** That's what I'm talking about. Whether you would stash
10 or hide your drugs -- maybe Don would have known during that
11 period, but no one else would know, right, according to you?
12 **A.** Yes, sir.
13 **Q.** And again, that's because other people in Congress Park
14 would take your drugs, right?
15 **A.** I ain't going to say take it. If you take your eye off
16 it, taking it is coming up on you, taking it from you or right
17 in front of your face "this is mines." Now, stealing it, you
18 ain't looking, they taking it like that.
19 **Q.** Other people may steal your drugs -- I shouldn't say take
20 your drugs, steal your drugs, right?
21 **A.** Yes, sir.
22 **Q.** And they'd either steal them to sell them to other people
23 or steal them to use them?
24 **A.** Crackheads would use them and the guys, if around,
25 they'll sell them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6006

1 **Q.** Now, Sam Philips, you talked about him, right?
2 **A.** Yes, sir.
3 **Q.** Approximately when was Sam Philips shot?
4 **A.** This was like February.
5 **Q.** Of what year?
6 **A.** 2001.
7 **Q.** Right. Now, we're jumping back to 2001, February, when
8 we know you're arrested July 3rd of 2001.
9 When Sam Philips was killed, where were you?
10 **A.** I was on the streets.
11 **Q.** And who were you with on the streets?
12 **A.** It was me -- you mean the day that it happened?
13 **Q.** Yeah, if you remember.
14 **A.** Me and Phil was in my baby's mother's house playing a
15 game.
16 **Q.** And you also indicated, I believe, that you were hustling
17 that day; is that right?
18 **A.** Yes, earlier that morning.
19 **Q.** And where were you hustling?
20 **A.** In Congress Park.
21 **Q.** And by "hustling," you mean you were selling crack
22 cocaine; is that right?
23 **A.** Yes, sir.
24 **Q.** And I'm going use the word "with," who were you selling
25 with at that point, February 2001?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6007

1 **A.** What you mean like "with"? Who I had crack with
2 together, or by myself?
3 **Q.** Strike that.
4 You were on the streets February of 2001 in Congress
5 Park, and you're selling, right?
6 **A.** Yes, sir.
7 **Q.** Are you doing hand-to-hand at that time?
8 **A.** Yes, sir. I always been hand-to-hand.
9 **Q.** And is someone out there directing you where to go?
10 **A.** No, sir.
11 **Q.** Is someone out there telling you how much you have to
12 sell your crack for?
13 **A.** No, sir.
14 **Q.** And when you got the money, what would you do with the
15 money?
16 **A.** I spent it.
17 **Q.** It was your money, right?
18 **A.** Yes, sir.
19 **Q.** And it was your crack that you were selling, right?
20 **A.** Yes, sir.
21 **Q.** You know the word "independent contractor," do you know
22 what that means? Have you ever heard of that before?
23 **A.** Naw, explain it to me, sir, please.
24 **Q.** You were independent, you were doing what you wanted to
25 do in February, on this particular day, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6008*

1   **A.**   I was doing what I wanted to do when I was out there.
2   Ain't nobody force me to do nothing.
3   **Q.**   That's right.  And no one was bossing you either, right?
4   **A.**   No, sir.
5   **Q.**   Now, I will take you back to 1992.
6          And we'll be as brief as we can.  1992, you only went
7   through, what, 7th grade, a formal education?
8   **A.**   Yes, sir, I dropped out.
9   **Q.**   But you did receive an education on the street; is that
10  correct?
11  **A.**   Yes, sir.
12  **Q.**   And part of that education, unfortunately, came from your
13  brother; is that correct?
14  **A.**   Not all of it.
15  **Q.**   Just a part of it?
16  **A.**   I learned how to sell drugs through my brother, sir.
17  **Q.**   That's what I'm talking about now.  You were out there at
18  that young age, 13, 14 years old, probably, and you've watching
19  him and others sell drugs; is that right?
20  **A.**   You're right, sir.
21  **Q.**   And when the time came when you could drop out of school,
22  you dropped out of school, right?
23  **A.**   Yes, sir, I dropped out.
24  **Q.**   Now, when your brother was out there selling -- and you
25  told us -- I apologize for jumping on you -- in 1992, what area

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6009*

1   of Congress Park were you starting to sell drugs in?
2   **A.**   In my court.
3   **Q.**   And what's your court?
4   **A.**   14th Place, sir.  3329 14th Place.
5   **Q.**   And in that court, were you able to watch your brother in
6   that court?
7   **A.**   Yes, I seen him a lot.
8   **Q.**   And where was your brother selling his drugs?
9   **A.**   In that same court.
10  **Q.**   And at that -- what year is this, 1992?
11  **A.**   '92, '93, '94.
12  **Q.**   And when your brother was selling drugs, what kind of
13  education -- what was he doing, give me a description of what
14  was going on.
15  **A.**   Well actually he was trying to keep me from doing it, but
16  I was just hard headed.
17  **Q.**   I'm not blaming your brother.  I'm asking you to describe
18  what your brother was doing.  What did you see through your
19  eyes?
20  **A.**   He was selling drugs.
21  **Q.**   How'd he do it?  He was teaching you, so how'd he do it?
22  **A.**   He was hustling.
23  **Q.**   What does that mean?
24  **A.**   I'm not going to say that he was teaching it, he was
25  hustling to make his money -- I don't understand where you are

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6010*

1   going.
2   **Q.**   He was hustling and he was making money, right?
3   **A.**   Yes, sir.
4   **Q.**   And he was putting that money in his pocket, right?
5   **A.**   Yes, sir.
6   **Q.**   And he was hustling right out in front of the house,
7   right?
8   **A.**   Yes, sir.
9   **Q.**   And he had customers coming back and forth, right?
10  **A.**   Yes, sir.
11  **Q.**   And he could move and go to -- strike that.
12         It was his choice to sell the drugs close to the house,
13  right?
14  **A.**   He ain't -- that was the choice he had to have.
15  **Q.**   Now, when -- strike that.
16         Then you went out and started selling drugs; is that
17  correct?
18  **A.**   Yes.
19  **Q.**   And you were selling, obviously -- when you begin, it was
20  small quantities, right?
21  **A.**   It was always small quantities.  I never sold weight,
22  sir.
23  **Q.**   In particular, I'm talking again from '92 through '95, up
24  through '96.  In particular during that period of time, it was
25  fairly small quantities, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6011*

1   **A.**   Yes, sir.
2   **Q.**   And you started selling right in that same neighborhood
3   your brother was, right?
4   **A.**   Yes, sir.
5   **Q.**   Was your brother out there when you were selling?
6   **A.**   Some of the times, yes, he was.
7   **Q.**   And your brother might be selling to one customer and you
8   might be selling to another customer, right?
9   **A.**   Yes, sir.
10  **Q.**   And there might be other people out there in this section
11  of Congress Park where you lived doing the same thing, right?
12  **A.**   It was guys I was hanging with, doing the same thing,
13  too, sir.
14  **Q.**   We're going to get to that.
15         And then you have a group, as things happen, coming up
16  with you, the same age, right?  Approximately the same age?
17  **A.**   Yes, sir.
18  **Q.**   And Don was one of those people?
19  **A.**   Yes, sir.
20  **Q.**   And you indicated Don has an older brother, too, right?
21  **A.**   Yes, sir.
22  **Q.**   And you both, according to you, eventually bought some
23  drugs from the older brother, right?
24  **A.**   Yeah, not that much, but every now and then.
25  **Q.**   Every now and then, as you're testifying to?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.** It's different from giving me, and buying. I bought

2  drugs from Roadie. Quincy gave it to me.

3  **Q.** And you bought drugs from Roadie, and Roadie was not from

4  Congress Park, was he?

5  **A.** He was from around. He be around every now then. He not

6  a part of what we do. He come around to sell his weight and

7  then leave.

8  **Q.** Okay. But he wasn't living in Congress Park, I guess?

9  **A.** From my understanding, no, he wasn't.

10  **Q.** And Burke also sold you drugs; is that correct?

11  **A.** Yes. At one time he did get a chance to sell me.

12  **Q.** And you mentioned Joe Langley as well; is that right?

13  **A.** Yes, sir.

14  **Q.** And he sold you drugs too, right?

15  **A.** Yes, sir.

16  **Q.** So, did anyone tell you where you had to buy your drugs

17  from?

18  **A.** No, sir.

19  **Q.** You were free to buy your drugs inside of Congress Park

20  or outside of Congress Park; is that correct?

21  **A.** Yes, sir.

22  **Q.** And that's from the whole period of time, taking you from

23  '92 through 2001; is that right?

24  **A.** Yes, sir.

25  **Q.** I'm going to show you a photograph from Government's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Exhibit 702.14 C, which is in evidence.

2  **MR. PURPURA:** And may I please have the ELMO.

3  BY MR. PURPURA:

4  **Q.** Tap the screen again, please.

5  And you've already identified this photograph; is that

6  right?

7  **A.** Yes, sir.

8  **Q.** Thank you. And can you just briefly identify the man

9  who's standing up, the tallest gentleman in the -- looks like an

10  orange, pinkish sweater.

11  **A.** It's kind of dull, but I seen the picture before and I

12  know who it is.

13  **THE COURT:** Mr. Purpura, would you identify that exhibit

14  again, what the number is?

15  **MR. PURPURA:** The number on the Government's Exhibit that

16  I just took the item from was 702.14 C.

17  **THE COURT:** I have that identified on the list as

18  something that's not --

19  **MR. PURPURA:** Judge, it's got a separate marking on the

20  back. Let me read the marking to you on the back. 702.14 C1. I

21  apologize.

22  **THE COURT:** Do you have that in evidence, Ms. Romero?

23  **THE DEPUTY CLERK:** I have 702.14 C in evidence.

24  **THE COURT:** I do, too.

25  **MR. LEON:** Actually, we don't, but I have no objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **THE COURT:** Well, I'm not sure he's moving it in.

2  **MR. PURPURA:** It is in evidence -- Judge, I can tell you

3  702.14 C is in evidence. This is a photograph from that bag.

4  **THE COURT:** Counsel, approach.

5  (Following sidebar discussion had on the record:)

6  **THE COURT:** 702.14 C purported to be a photograph of some

7  paper with writing on it that was identified by Agent Burton and

8  moved into evidence on March the 26th, subject to redaction.

9  **MR. PURPURA:** This is 702.14 C1.

10  **THE COURT:** This is not on the list. I don't have it

11  marked --

12  **MR. PURPURA:** Judge.

13  **THE COURT:** -- at all.

14  **MR. PURPURA:** This photograph was displayed by

15  government's counsel. The participants were all identified

16  during direct examination, and it came from a bag, which is a

17  different label on the bag, which I read to the Court before, and

18  I don't remember what the label said. And if my memory is

19  correct, government counsel at that point put another sticker on

20  the back and said this is an add-on, 702.14 C1.

21  **MR. LEON:** I think that's correct. I -- I think all of

22  that's correct. Certainly -- this is off of the search warrant.

23  The bag that contained the two photographs was admitted into

24  evidence and then I probably complicated matters by separately

25  putting the additional identifying sticker on each of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  photographs because I did show -- I do have a memory of showing

2  this photograph to the witness, and my memory was that it was

3  shown to the jury as well.

4  And just for the record, the bag -- the entire bag is

5  702.14 C, which, for the record, contained three items inside.

6  One being the item we're talking about, which is sublabeled

7  702.14 C1, and then the other two items -- the other items is a

8  handwritten piece of paper which was never, certainly, identified

9  or labeled. And then the third item, unfortunately, to

10  complicate things further, is a photograph which is in evidence,

11  but which has a different series number on it, 108.27. So, it's

12  admittedly a bit confusing, probably because of the way I had

13  things labeled.

14  **THE COURT:** That's in evidence by it's own exhibit.

15  Ms. Romero?

16  **THE DEPUTY CLERK:** Yes, Your Honor.

17  **THE COURT:** What is the -- do you have a description of

18  702.14 C?

19  **THE DEPUTY CLERK:** Multiple photographs, Your Honor.

20  **THE COURT:** All right.

21  **MR. LEON:** Which would be these. (Indicating.)

22  **THE COURT:** Where is the photograph of the paper with

23  writing on it?

24  **MR. LEON:** There is no photograph. It's actually a piece

25  of paper with writing, but nobody's used this in the trial. I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6020*

1  think what happened was when Ms. Petalas put -- I believe it was
2  Agent Fulmer on -- for this search warrant, the entire bag was
3  admitted into evidence, 702.14 C.  So therefore, the bag, as well
4  as the three contents, were all in evidence, and then to make
5  clear which of the three items we're working with, additional
6  labels were put on two of the items.
7      THE COURT:  All right.
8      MR. PURPURA:  Thank you, Your Honor.  May I continue?
9      THE COURT:  What is it that was subject to redaction?
10     MR. LEON:  I don't think any of these -- I don't think any
11 of these three items had any redactions that were needed.
12     THE COURT:  Ms. Romero, do you have anything marked beside
13 702.14 C as being admitted, subject to redaction?
14     THE DEPUTY CLERK:  I don't, just 702.14 C, multiple
15 photographs admitted in evidence.
16     MR. LEON:  There might -- there might have been, when
17 Ms. Petalas had all this evidence put in initially, there may
18 have been some redactions requested on this piece of paper, but I
19 don't remember that.
20     THE COURT:  So the record is clear, I now have 702.14 C
21 consisting of a plastic bag that contains in it 702. -- a
22 photograph that's now sublabeled as 702.14 C1, another piece of
23 paper with writing on it that has no label on it.
24     MR. LEON:  Right.
25     THE COURT:  And you all have now stored a separate

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6021*

1  exhibit, separately admitted as 108.27, inside the 702.14 C bag?
2      MR. LEON:  Correct.
3      THE COURT:  All right.
4      (Sidebar discussion concluded.)
5  BY MR. PURPURA:
6   Q.   Sir, I'm now going to show you what's been previously
7  marked as 702.14 C1, which I displayed briefly before, and
8  that's a photograph, and you've already -- do you remember
9  already identifying the people in this photograph?
10  A.   Yes, sir.
11  Q.   Okay.  And now, do you recall who the larger gentleman is
12 in the orange shirt, which I'm pointing to right now?
13  A.   Yes, sir.
14  Q.   Who is that?
15  A.   That's Don.
16  Q.   And this gentleman here (indicating)?
17  A.   That's Keith.
18  Q.   Keith who?
19  A.   Barnett.
20  Q.   And this gentleman here?
21  A.   That's Kevin.
22  Q.   And last name is?
23  A.   Barnett.
24  Q.   Okay.  And this photograph was a photograph that was
25 taken from your apartment; is that correct?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6022*

1   A.   My baby's mother's apartment, where I was staying at.
2   Q.   I'm sorry.  Your baby's mother's apartment where you were
3  staying.  That's where it was taken?
4   A.   Yes, sir.
5   Q.   And this photograph actually belonged to Thomasine, who
6  is, as you referred to, your baby's mother; is that correct?
7   A.   Yes, sir.
8   Q.   And this photograph, apparently, also, the gentlemen
9  seated down, at one point he had a relationship with Thomasine;
10 is that correct?
11  A.   Yes, sir, he had a baby by her.  Her daughter.
12  Q.   Now, you also, aside from the guns which you already
13 talked about, you indicated you had a cell phone.  Do you
14 remember, you said you had some phones in the apartment?
15  A.   I can't remember saying it, but it was some cell phones
16 taken out of there.
17  Q.   And how many cell phones did you have?
18  A.   I had one of them.  The other ones was other people --
19 that was people that was staying in there, too.
20  Q.   So you had a cell phone, too; is that correct?
21  A.   Yes, sir.
22  Q.   And this is 2001; is that correct?
23  A.   Yes, sir.
24  Q.   Do you know if Dominic Samuels had a cell phone in 2001?
25  A.   I can't remember.  I remember seeing him with a cell

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6023*

1  phone, but I can't remember if it was 2001.
2   Q.   On your cell phone, you didn't have Dominic Samuels'
3  number, did you?
4   A.   Me and Don wasn't getting along at one time.  I had
5  robbed Don.
6   Q.   We're going to get to that in a second, but you did rob
7  Don, too, right?
8   A.   Yes, sir.
9   Q.   And that's the same day you shot at DC, right?  Do you
10 remember?  Don's coming home from work, real work, not Congress
11 Park work, but real work, in the year 2000.  He's getting out of
12 his car, you show up with a gun?
13  A.   Don wasn't coming home from work.  He was out there
14 hustling, sir.
15  Q.   Okay.  And you put a gun to him, right?  And you took $75
16 cash from him, from real work?
17  A.   I took more than $75 cash, sir.
18  Q.   And that's in 2000, right?
19  A.   I can't remember.  I know it was close in that range,
20 2000, 2001.
21  Q.   So certainly you don't go out and rob one of your boys,
22 do you?
23  A.   Me and Don wasn't together.  I wasn't hanging with his
24 group.  I was hanging with a different group from Don, sir.
25  Q.   From 1997, as you admitted in your plea agreement that

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**6032**

1   THE COURT: Mr. Purpura, let me ask you to position those
2   exhibits so they're not blocking the aisle.
3           MR. PURPURA: Certainly, Your Honor. If you give me an
4   moment, I'll put them away.
5   BY MR. PURPURA:
6   Q.   These guns have any clips in them or without clips?
7   A.   They have them with clips in them, sir.
8   Q.   Now, Mr. Capies, I'm going to read from Government's
9   Exhibit 1104, which is your May 9th, 2002 plea agreement, and
10  there's a -- we've been referring to what's called a proffer of
11  evidence, and you're familiar with that, right?
12  A.   Yes, sir.
13  Q.   And we're going to read from page 4 of that proffer of
14  evidence, just portions of it.
15          In the proffer of evidence, before we put it down, you're
16  talking about -- the majority of it is about the murder of one
17  Devar M. Chandler; is that correct?
18  A.   Yes, sir.
19  Q.   And Mr. Chandler has a nickname, right?
20  A.   Yes, sir.
21  Q.   And we know Mr. Chandler now as D-Lock; is that correct?
22  A.   Yes, sir.
23  Q.   And in this proffer, you tell the Court and you tell
24  everyone that D-Lock was the target of the murder on this
25  particular day; is that correct, sir?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**6033**

1   A.   Naw, I don't tell ya'all -- I didn't tell you the target
2   was Jack.
3   Q.   Excuse me?
4   A.   The target was Jack Davis, sir. I never told you that.
5   Q.   You're right. The target was -- the target was not
6   D-Lock but the target was Twin; is that correct?
7   A.   Yes, sir.
8   Q.   Right there, almost in the middle of the page, where it
9   starts "they." Do you see that there, right? It says, "They
10  discussed going to the 10th Place Crew area with the intent of
11  killing a leader of the 10th Place Crew known to Capies as Jack
12  or Twin, right"?
13  A.   Yes, sir.
14  Q.   And that's the truth, correct?
15  A.   Yes, sir.
16  Q.   So Twin was the target, correct?
17  A.   Yes, sir.
18  Q.   Not D-Lock; is that correct?
19  A.   Yes, sir.
20  Q.   And if you said D-Lock was the target, that would have
21  been a lie, correct?
22  A.   Yes, sir.
23  Q.   Because D-Lock was kind of shot by mistake, right?
24  A.   Something like that, sir.
25  Q.   And it goes on to say, that "Geeka and Capies drove to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**6034**

1   Geeka's house and Geeka retrieved a Ruger 9 millimeter
2   semiautomatic handgun while Capies waited in the car," right?
3   A.   Yes, sir.
4   Q.   And that's what happened, correct?
5   A.   Yes, sir.
6   Q.   And then it says, "At one point LT and Capies switched
7   weapons." You testified to that, right?
8   A.   Yes, sir.
9   Q.   And then it says "They eventually arrived at the 1100
10  block of Trenton Place," right?
11  A.   Yes, sir.
12  Q.   Who's the "they" we're talking about. Let's be very
13  specific, very slow.
14  A.   Me, LT.
15  Q.   Okay, who's LT, what's his given name? Do you know what
16  his given name is?
17  A.   Antonio Roberson.
18  Q.   Roberson?
19  A.   Yes, sir.
20  Q.   So you, LT, Roberson, and who else?
21  A.   Keith Barnett.
22  Q.   Keith Barnett. And then it says that "Capies recognized
23  Jack or Twin among a group of eight or nine men standing outside
24  of an apartment building," right?
25  A.   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**6035**

1   Q.   So you pointed out the victim, right?
2   A.   Yes, sir.
3   Q.   And the target again was Twin, correct?
4   A.   I meant to say the victim, sir. I meant to say I pointed
5   out Twin. D-Lock ended up being the victim, sir.
6   Q.   You're right, D-Lock was killed. Twin was not, right?
7   A.   Yes, sir.
8   Q.   But Twin was the intended victim. You wanted him to be
9   dead, right?
10  A.   Yes, sir.
11  Q.   And then paragraph 11 says that Capies and LT got out of
12  the car and began firing at a group of individuals, including
13  D-Lock, right?
14  A.   Yes, sir.
15  Q.   And it says Capies shot at Jack or Twin, right?
16  A.   Yes, sir.
17  Q.   And that's what you did, right, you actually shot at him,
18  correct?
19  A.   Yes, sir.
20  Q.   And if you told someone else that you didn't shoot at
21  him, that would be a lie, right?
22  A.   Yes, sir.
23  Q.   And again, we agree that this statement was taken on May
24  9th, 2002, right?
25  A.   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6040

1 **Q.** If you told them that, that would be a lie, correct?

2 **A.** Yes, it would, because I was on the scene, shooting.

3 **Q.** What's Jazz's last name?

4 **A.** Bell.

5 **Q.** Bell. Jasmine Bell, right?

6 **A.** Yes, sir.

7 **Q.** Jasmine Bell wasn't even there at the scene when the

8 shooting occurred, was he?

9 **A.** No, sir.

10 **Q.** You were putting an innocent man at the scene of a murder

11 that involved you, weren't you?

12 **A.** I'm not going to say he's an innocent man, but I did put

13 the wrong man on the scene, sir.

14 **Q.** Was he there shooting with you, sir?

15 **A.** No, he wasn't.

16 **Q.** Was he there driving you, sir?

17 **A.** No, sir. Could you please talk to me in a nice tone of

18 voice, like I'm talking to you.

19 **Q.** I apologize.

20 **A.** Thank you.

21 **Q.** I apologize, much nicer.

22     Do you remember telling your lawyer, an Assistant United

23 States Attorney, and two FBI agents, that LT, Mr. Roberson, told

24 you that he and Jazz were wearing funny hats with straps on

25 them? Do you remember telling them that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6041

1 **A.** I never told them. I was not dealing with them at the

2 time, sir. And like I told you, I remember lying about the

3 situation. I can't remember a lie. I only can remember the

4 truth.

5 **Q.** And if you told them that Jazz was wearing a funny hat

6 when he was involved with the murder, that would be a lie,

7 wouldn't it, sir?

8 **A.** Yes, it would, because I was on the scene, shooting,

9 myself, sir.

10 **Q.** And Jasmine Bell who got arrested for this wasn't on the

11 scene, sir?

12 **A.** He been got arrested for this. I'm not the reason he got

13 arrested, sir.

14 **Q.** Wasn't on the scene, was he, sir?

15 **A.** No, he wasn't.

16 **Q.** And you put an innocent man at the scene, didn't you,

17 sir?

18 **A.** I ain't going to say he was innocent, sir, but -- an

19 innocent person like you saying it, but he was not on the scene.

20 **Q.** That's not all the times you lied about individuals

21 involved in this one murder, is it, sir?

22 **A.** I lied all the way up until I found out I was facing

23 life, and I had to tell the truth, sir.

24 **Q.** Let's talk about that for a second.

25 **A.** Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6042

1 **Q.** The more you tell -- the more you tell, the more

2 information you have, in your mind, the more help you get,

3 right?

4 **A.** As long as it's telling the truth, because if I tell one

5 little lie, sir, I could spend the rest of my life in jail.

6 **Q.** The more you can point at these individuals and say they

7 did this, they did that, in your mind, the more help you're

8 going to get from the government?

9 **A.** I only know if I tell the truth, sir, and don't tell a

10 lie, that the government will file a 5K, a motion to the Judge,

11 and it's still not up to them. It's up to Your Honor whether or

12 not -- what happens to me, sir, and I have no reason to

13 lie on them, sir. And I'm telling the truth about myself and --

14 **Q.** Excuse me, I'm sorry. Did you finish? I apologize, Your

15 Honor.

16 **A.** No, I was not finished.

17 **Q.** Go ahead, please.

18 **A.** I'm not saying you supposed to do this, but I did what

19 was right, sir, and they had the opportunity, too, but they

20 chose otherwise. That's not my fault. I'm telling the truth,

21 sir.

22 **Q.** And you wouldn't today lie under oath to get out of this,

23 would you?

24 **A.** No, I wouldn't, I would spend the life in my jail. Why

25 lie about something and spend the rest of my life in jail?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6043

1 **Q.** And of course we have Bobby Capies' word on that; is that

2 correct?

3     MR. LEON: Objection, argumentative.

4     THE COURT: Overruled.

5 BY MR. PURPURA:

6 **Q.** Now, sir, let's talk about more lies involving this one,

7 not any other murders, just this one murder. Let's go back?

8 **A.** Yes, sir.

9 **Q.** Do you remember back in 1999, and just for a point of

10 reference, Mr. Chandler or D-Lock, was shot in 1998, January of

11 1998. You are interviewed in 1999, December of 1999 by the

12 Metropolitan Police Department. You're interviewed maybe four

13 or five times, right?

14 **A.** Yes, sir.

15 **Q.** And Detective Wills is one of the interviewing

16 detectives; is that correct?

17 **A.** Yes, sir.

18 **Q.** And do you remember one of the very first interviews with

19 Detective Wills? He asked you -- he asked you what you knew

20 about the Devar Chandler, D-Lock, murder?

21 **A.** Yes, he did, sir.

22 **Q.** And you told him that you were talking with Antonio

23 Robinson, LT?

24 **A.** Roberson, sir.

25 **Q.** Excuse me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 671 of 1954

1    A.    Roberson.

2    Q.    And this Roberson, LT, told you that he and Keith Barnett

3    and Barnett's cousin, Tim, were involved in shooting Chandler.

4    Do you remember telling that, sir?

5    A.    I remember lying, sir.  Like I told you, I can't remember

6    a lie.  I only can remember the truth.

7    Q.    And if you told them that, that would be another lie; is

8    that correct, sir?

9    A.    Yes, sir.

10   Q.    And if you told him, sir, that Barnett's cousin, Tim, Tim

11   Barnett, was present, you're putting another innocent man at the

12   scene, aren't you, sir?

13   A.    Yes, sir.

14   Q.    And that didn't stop you, did it, sir?

15   A.    No, sir.

16   Q.    And do you remember when they -- they didn't quite

17   believe you.  They confronted you.  Do you remember that?

18   A.    I can't remember.  I remember they kept asking me about

19   the situation, sir.

20   Q.    And you continued to say that you didn't have anything to

21   do with the Chandler, D-Lock, murder.  Right?

22   A.    Of course, I did, sir.

23   Q.    And that, again, was a lie, right?

24   A.    Yes, it was, because I was on the scene, shooting.

25   Q.    They interviewed you another time, and again you denied

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    being involved in any way with the death of Chandler, D-Lock.

2    Do you remember that, sir?

3    A.    Yes.

4    Q.    And do you remember telling them again that LT told

5    you -- sound familiar, other people telling you something?

6    A.    Sir, I remember that.

7         MR. LEON:  Objection.

8         THE COURT:  Hold on one second.

9    BY MR. PURPURA:

10   Q.    LT told you that Roberson -- strike that.

11        That LT, Roberson, told you that he was involved in

12   Chandler's death.  Do you remember telling them that?

13   A.    I remember lying about the situation, sir.  I can't

14   remember the details about what I lied about.

15   Q.    And you remember telling them, but you're not sure if

16   Bell was involved.  Do you remember telling them that?

17   A.    I just gave you the answer, sir.  I can't remember a lie,

18   sir.

19        MR. LEON:  Objection.

20        THE COURT:  Sustained.

21   BY MR. PURPURA:

22   Q.    I apologize.  And if you said that, that would be a lie,

23   right, sir?

24   A.    Yes, sir, because I was on the scene, shooting.

25   Q.    Again, you're putting a man, Mr. Bell, Jasmine Bell, who

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    was not at the scene, shooting; you're putting him there, right?

2    A.    Yes, sir.

3    Q.    And then they still didn't believe you, so they push you

4    more, and they gave you very specific questions.  They said "Did

5    you shoot a gun at D-Lock?"

6         And your answer was:  "No."  Do you remember saying that?

7    A.    I remember telling them every time they asked me about

8    it, that I didn't have nothing to do with it, sir.

9    Q.    And that would be another lie, sir?

10   A.    Yes, sir, because I was on the scene, shooting.

11   Q.    And they asked you another very specific question:  "Did

12   you help anyone shoot D-Lock?"  And your answer again was "No."

13   Do you remember that, sir?

14   A.    Yes, sir.

15   Q.    And that was another lie, correct?

16   A.    I always told them I ain't have nothing to do with it,

17   sir.  It was a lie because I was on the scene, shooting.

18   Q.    Okay.  And then after that series of questions, you were

19   asked something very specific about Mr. Bell who we know wasn't

20   on the scene.  You were asked "Tell us about Mr. Bell," and you

21   later admitted that Bell also told you that he was involved in

22   the shooting of D-Lock.  Do you remember that?

23   A.    Again, sir, I told you I can't remember a lie, but I

24   remember saying I had nothing to do with it.

25   Q.    But if you said that, that would be a big lie, wouldn't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    it?

2    A.    Yes, it would, sir, because I was on the scene, shooting.

3    Q.    You're saying that an innocent man who wasn't on the

4    scene confessed to you that he did the murder and that's what

5    you are telling the police?

6    A.    He didn't do the murder, but I wouldn't say innocent,

7    sir.

8    Q.    And finally, finally, there's two more.  They ask you

9    again, where were you?  And again you repeated, you were inside

10   an apartment when you heard gunshots.  If you said that, that

11   would be another lie, right, sir?

12   A.    Yes, sir.  They're charging somebody else with the

13   charge.  I was not going to confess up to it, you right.

14   Q.    All right.  And the last was, you admitted that both --

15   that both Roberson, who's LT, and Bell, confessed to you that

16   they committed the murder.

17   A.    You right, sir, I have lied to them.  I can't remember a

18   lie, but I have lied to them, sir.

19   Q.    Your lie was that someone confessed to a murder, right?

20   A.    Sir, I can't remember a lie, sir.  I just remember I lied

21   to them and said I ain't have nothing to do with it.

22   Q.    You know that Donte Jenkins, Jasmine Bell and

23   Taneal Wilson were not present with you when you were shooting

24   at D-Lock and others; is that correct, sir?

25   A.    Sure.  I know, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6048

1  Q.   And you know that all three of those men were charged in

2  Washington, D.C. for the murder of Devar Chandler; isn't that

3  correct, sir?

4  A.   Yes, sir.

5  Q.   And when Mr. Leon asked you why didn't you say something,

6  I believe your response was "I wasn't going to step up to it,"

7  is that about right?

8  A.   You right, I wasn't at that time, sir.

9  Q.   Did you know Donte Jenkins?

10 A.   Yes, sir.

11 Q.   Did you know Jasmine Bell?

12 A.   Yes, sir.

13 Q.   You talked about Taneal Wilson, right, already?

14 A.   Yes, sir, I know him too. I used to hang with him, sir.

15 Q.   Do you remember Mr. Leon asked you, was it difficult to

16 testify, do you remember that?

17 A.   Yes, sir.

18 Q.   And you said, "Yeah, because you loved these guys"?

19 A.   I didn't say I love all of them, sir. I said I got love

20 for some of them, sir.

21 Q.   Did you love any of these people you lied on in the

22 Chandler murder?

23 A.   I mean, what you mean by "love," sir, I don't love

24 everybody.

25      MR. PURPURA: I have no further questions.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6049

1      THE COURT: Mr. Tabackman here?

2      MR. BEANE: He's not back yet, Your Honor. He's in the

3  audience.

4      THE COURT: I'm sorry?

5      MR. TABACKMAN: I didn't want to disturb Mr. Purpura, but

6  I believe one of the other attorneys will go before me.

7      THE COURT: All right. Mr. Beane.

8      Mr. Beane, I should alert you, we'll be breaking in about

9  seven minutes.

10     I'll afford you the same opportunity.

11     MR. BEANE: I think I would prefer to start after lunch if

12 I could.

13     THE COURT: Very well. Ladies and gentlemen, we'll take

14 our lunch. Please be back in an hour and 15 minutes. Don't talk

15 about the case. Leave your notes in the jury room. It's

16 actually -- the correct time is, by that clock, just about 20 of

17 1, so please come back at about 1:55 by that clock. Enjoy your

18 lunch break.

19     (Jury out at 12:40 p.m.)

20     THE COURT: All right. We'll see you back after lunch.

21     (Thereupon, a luncheon recess was had beginning at

22 12:41 p.m.)

23

24

25

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6050

1      **C E R T I F I C A T E**

2      I, Scott L. Wallace, RDR-CRR, certify that the

   foregoing is a correct transcript from the record of proceedings

3  in the above-entitled matter.

4

5      ----------------------------
       **Scott L. Wallace, RDR, CRR**

6      **Official Court Reporter**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6051

1      **I N D E X**

2

3

4      **EXAMINATIONS**                    **Page**

5      CONTINUED CROSS-EXAMINATION OF BOBBY CAPIES 5920
       BY MS. WICKS

6      CROSS-EXAMINATION OF BOBBY CAPIES           5985
       BY MR. PURPURA

7

8      **EXHIBITS**

9

10     **NO.   DESCRIPTION**                  **Page**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6068

1 police.  Right?

2 A.  Yes, sir.

3 Q.  When the jump-outs come quickly, as in this example, people

4 who have drugs -- you say they hide the drugs.  Right?

5 A.  Yes.

6 Q.  You said they hide them in their groin or somewhere like

7 that.  Right?

8 A.  Yes, sir.

9 Q.  Now, when you're out there selling drugs, how many dimes --

10 how much do you sell in a day?

11        MR. LEON:  Objection to form and time period.  And

12 hypothetical.

13        THE COURT:  All right.  Sustained.  Focus.

14 BY MR. BEANE:

15 Q.  Let's go back to a specific date.  Can you remember a day

16 when you are dealing drugs in Congress Park?

17        MR. LEON:  Same objection with respect to time, at

18 least.

19        MR. BEANE:  I'm asking if he can remember.

20        THE COURT:  I'll allow it.

21 A.  I mean, not no memory, no specific day.  I was hustling

22 every day.

23 BY MR. BEANE:

24 Q.  So let's go to hustling every day.  You said you started

25 hustling what year?

1 A.  '92.

2 Q.  In 1992, how often would you be outside in Congress Park

3 selling drugs?

4 A.  Frequently, when I'm out there.

5 Q.  Like once a week, twice a week?

6 A.  If I got -- whenever I got crack cocaine, or one time I sold

7 weed, whenever I'm out there, I'm serving it.  It's not, I'm

8 just standing out there for nothing.

9 Q.  When you're standing out there serving crack, you had to go

10 buy this crack from somebody who is selling it.  Right?

11 A.  Yes, sir.

12 Q.  When you go and you buy the crack, how much do you buy in

13 general?

14 A.  I mean, it was different times.  So like when I was younger,

15 I was buying wholesale or getting fronted, it wasn't that -- I

16 mean...

17 Q.  Okay, let's go to '92.  All right?  This is when you're

18 younger.  Right?

19 A.  Yes, sir.

20 Q.  You're buying wholesale.  Right?

21 A.  Yes, sir.

22 Q.  How much would you buy when you purchased wholesale?

23 A.  Sometimes I spend $200, $125.

24 Q.  When you spent $200, how many dime rocks could you make out

25 of $200 back in 1992?

Page 6070

1 A.   I mean, I'd get like 40 dimes, might make like 350.  It

2 depends.   If the stuff good, I want straight money for it.

3 Q.   Let's say you're dealing 40 dimes.  Right?

4 A.   Yes, sir.

5 Q.   And you used to deal -- back in 1992, you were standing on

6 the corner.  Right?

7 A.   I was in the court at the time.

8 Q.   So you would be in the court?

9 A.   Right.  It's like a complex, a court.

10 Q.   Courtyard?

11 A.   Yes, sir.

12 Q.   But even though you're standing in the courtyard, you're

13 still worried about the jump-outs coming.  Right?

14 A.   Of course.

15 Q.   So you're standing in the courtyard, you have 40 rocks.

16 Right?

17 A.   I mean, it depends what...

18 Q.   Well, in my example, going back to 1992, you've given me

19 that sometimes you had 40 rocks.  Right?

20 A.   Yes, sir.

21 Q.   Okay.  When you had 40 rocks, would you keep them like in

22 individual dime bags in your pocket, did you wrap them up in

23 something?  How would you keep those dime bags when you were

24 selling them?

25 A.   It depends.  I mean, sometimes I put them in my groin,

1 sometimes I had them by the heat pump.  Like I said, car might

2 not be moving.

3 Q.  You said you had them by what?

4 A.  It's some heat pumps.  It's some pumps that be the side of

5 the wall in the court.  I had them under there, under the bush.

6 It depends.

7 Q.  Okay.  So you would keep in what we call stashes from time

8 to time?

9 A.  Yes.

10 Q.  Let's focus on when you had them on your person.  Okay?  You

11 understand what I mean?

12 A.  Yes, sir.

13 Q.  Okay.  Were there times when you would take the 40 dimes and

14 just put them in your pocket?

15 A.  If I'm in the building.  The only time I will put them in my

16 pocket around the park, some of the middle buildings got doors

17 that go out the back way, or some of them got crack houses with

18 the doors that's open, you know you can get in there and lock

19 the door.

20         If I'm looking out the door, I got the crack in my

21 pocket.  If I'm outside, I'm hiding it in my drawers pocket,

22 around this time, in my drawers pocket.

23 Q.  Let's say you got them in your drawers pocket.  Do you have

24 them contained within another plastic bag, or do you have

25 40 dime bags just stuck loosely in your groin pocket?

1 A.  No, they be in this thing called like -- it's like some

2 bags.  They about this small, and the pouch that the bags come

3 in, I put them in there.

4 Q.  Okay.  How big is the pouch?

5 A.  Oh, like this (indicating), about that wide.

6 Q.  Okay.  Now, you would carry this pouch when you're outside

7 in the court sometime.  Right?

8 A.  Yes, sir.

9 Q.  And this is the pouch that you say you would stick in your

10 groin.  Right?

11 A.  Yes, sir.

12 Q.  Is this also the pouch that you told the government you

13 would stick in your rectum?

14 A.  The way -- you saying my rectum, like you putting it like

15 between your butt.  You not putting it in your butthole, you

16 laying it between your butt cheeks.  And the pouch ain't that

17 big, and you ain't got -- it's about like this (indicating).

18 Q.  So I got you now.  I'm sorry.  I misunderstood your direct.

19 What you're saying is, you just put it in the crack of your

20 butt.  Right?

21 A.  Yes, sir.

22 Q.  Got you.  Okay.

23        Now, before I move off the drug stash, when you were

24 out there with your drug stash, your drug stash was typically

25 very close to you.  Right?

1 A.  Yeah, it was nearby.  Of course.

2 Q.  Because crackheads hung out in there, in that area.  Right?

3 A.  Yes.

4 Q.  And crackheads would go steal your stash if you didn't watch

5 it.  Right?

6 A.  Yes, sir.

7 Q.  Now, the guns that you kept with you out there, when the gun

8 was in a car or under a car, somebody comes into the

9 neighborhood to rob, how do you go get your gun?

10 A.  I mean it's like, if you don't notice it, if somebody come

11 up and you don't notice it, you can't run to your gun, you know

12 what I'm saying?  If some dudes walk up like it's a robbery, or

13 "Let me get that up off you," you ain't going to be able to run

14 to your gun.

15         Now, when you see some suspicious dudes walking up you

16 don't know, or a car, and you close by, you going to grab it.

17 Q.  Okay.

18         MR. BEANE:  Court's indulgence.

19 BY MR. BEANE:

20 Q.  Okay.  Now, you were talking about robbery.  You talked

21 about doing cruddy stuff.  Right?

22 A.  Yes, sir.

23 Q.  And when you say "cruddy stuff," included in doing cruddy

24 stuff is lying.  Right?

25 A.  Yes.

1 Q.  And included in cruddy stuff is robbing people.  Right?

2 A.  Yes, sir.

3 Q.  And so you did a lot of cruddy things.  Right?

4 A.  Yes.

5 Q.  When you were out on the street, did you know if people did

6 a lot of cruddy things?

7 A.  Yes, sir.

8 Q.  Did you trust those people?

9 A.  I mean, it depends on if I was with them or they wasn't with

10 me.  If they was from another hood, a neighborhood, I ain't

11 trust them.  But if they was around me, I basically know what

12 they do or what they won't do, what to have around them and not

13 to have around.  I mean, being in the streets and around certain

14 types of dudes and growing up like that, you going to know your

15 boundaries, who you're around.  You going to know who will pop

16 your head and who ain't.

17 Q.  So basically, when you're dealing with people who even don't

18 do cruddy stuff, you can look at them and evaluate them and know

19 whether or not they're going to do cruddy stuff against you.

20 Right?

21 A.  Yeah.  I mean, if you been around them.  Now, if you ain't

22 been around that person, you don't know.

23 Q.  Let's say you've been around them all your life.

24 A.  Yeah, I know them.

25 Q.  Like Mr. Wilson has been around you all your life.  Right?

1 A.  Not all my life.

2 Q.  Well, Mr. Bell, Antwuan Bell, has been around you all your

3 life.  Right?

4 A.  Not all my life.

5 Q.  A long time?

6 A.  A long time.

7 Q.  Is that a person who, if he had done cruddy stuff, you would

8 know whether or not you could trust him?

9 A.  Yeah, I could know if I could trust him.

10 Q.  Okay.  And because you've been around them as long as you

11 have, in order to learn whether or not you could trust them,

12 they also would learn whether or not they could trust you?

13 A.  Yes, sir.

14          MR. LEON:  Objection.  Speculation.

15          MR. BEANE:  I think he answered the question.

16          THE COURT:  Was there an objection?

17          MR. LEON:  There was.  But there was an answer.

18          THE COURT:  I didn't hear it.

19          MR. LEON:  It's okay.  Withdrawn.

20 BY MR. BEANE:

21 Q.  Your answer was yes?

22 A.  Yes, sir, I wouldn't have.

23          MR. BEANE:  Thank you.

24          THE COURT:  Are you finished?

25          MR. BEANE:  Yes.  I'm sorry.  I said, "Thank you."

1          THE COURT:  But you didn't say you were finished.

2          MR. BEANE:  I apologize.  I'm finished.

3          THE COURT:  Mr. Tabackman?

4          MR. TABACKMAN:  Mr. Martin.

5          THE COURT:  Sorry?

6          MR. TABACKMAN:  Mr. Martin.

7          THE COURT:  Counsel, approach.

8          (BENCH CONFERENCE ON THE RECORD.)

9          THE COURT:  This list has Ms. Wicks, Mr. Purpura,

10 Mr. Beane, Mr. Tabackman, Mr. Martin, and Mr. Zucker.

11         MR. TABACKMAN:  Your Honor, because of the fact that I

12 got pulled over into Arlington this morning, unexpectedly,

13 unscheduled by me, an order from the Court against a client who

14 I moved back to next to last.

15         THE COURT:  That's not what I was told.  I was told you

16 would be moving, that Mr. Beane would first and that you would

17 be following.  So this is just a warning.  I will accommodate

18 the change this time.  I will not do it in the future.  When

19 you-all give me a list, I'm sticking to it, period.

20         Where are you going to be questioning, then, before

21 Mr. Zucker?

22         MR. TABACKMAN:  Before Mr. Zucker, Your Honor.  We also

23 have another matter -- I don't know what I'm going to be allowed

24 to do with respect to the Lewis murder.

25         THE COURT:  Mr. Martin, you're next?

1          MR. MARTIN:  Yes, sir.

2          THE COURT:  Go ahead.

3          (END BENCH CONFERENCE.)

4          MR. MARTIN:  With the Court's permission.

5                      CROSS-EXAMINATION

6 BY MR. MARTIN:

7 Q.  Mr. Capies, good afternoon, sir.

8 A.  Good afternoon, sir.

9 Q.  My name is Tony Martin.  I represent Joseph Jones, who you

10 know as Jojo.

11         Now, as I understand your direct examination, you told

12 the jurors that you've been selling drugs since you were just a

13 kid.  Right?

14 A.  A teenager.

15 Q.  Teenager.  That goes back to the time when you were about

16 what, 14, 15 years old?

17 A.  Yes, sir.

18 Q.  And you started selling drugs out there in the courtyard

19 with your brother Darrell?

20 A.  Yes, sir.

21 Q.  And at some point you decided that this was a way to

22 survive.  Right?  By selling drugs?

23 A.  Yes, sir.

24 Q.  And I think by your testimony you said this was how you

25 would pay your bills.  Right?

1 possible for you to deal drugs out in the street.  Correct?

2 A.  Yes, sir.

3 Q.  And you're, what -- you're almost 30 years old now.  Right?

4 A.  I'm 29, sir.

5 Q.  29.  When will you be 30?

6 A.  I be 30 in October.

7 Q.  So you're close to 30 years old.  Right?

8 A.  Yes.

9 Q.  Okay.

10 A.  I thought you said something about 38 or something.

11 Q.  No, no, no.  You'll have to forgive me.  Sometimes I slur my

12 words.

13         Now, would you agree that the kind of life you were

14 living, that hardened you?

15 A.  To a point.  Now?  Naw, that's gone.

16 Q.  When you were on the street, you were hard, weren't you?

17 A.  I mean, at least that's what I thought.  I was thinking dumb

18 at the time, sir.

19 Q.  So you were a tough guy on the street.  Right?

20 A.  That's what I thought I was.

21 Q.  And you had to be.  Right?

22 A.  That's what you had to be.

23 Q.  Because if you're not tough and people sense you're weak,

24 given the game you were in, you could get hurt.  Right?

25 A.  I mean, I got hurt anyway.  Different people get hurt.  Even

1 case.

2 Q.  I didn't ask you about this case.  I said about other things

3 in general.

4 A.  What you mean?  I mean, I talk to them about stuff.

5 Q.  Well, you're learning also something about the Federal

6 Bureau of Prisons system.  Aren't you?

7 A.  Yes, sir.

8 Q.  And all of that goes into your overall knowledge about the

9 game, doesn't it?

10          MR. LEON:  Objection to relevance, Your Honor.

11 A.  I don't...

12          THE COURT:  Hold on a second.

13          Mr. Martin?

14          MR. MARTIN:  I'll move on.

15 BY MR. MARTIN:

16 Q.  How long have you been at Arlington County Jail?

17 A.  Since 2004, June 28th, sir.

18 Q.  And let me ask you.  Aside from Larry Browne, who else from

19 Congress Park have you seen at Arlington County Jail?

20 A.  I mean, I need to know if I'm allowed, because these people

21 are government witness, to say they names.  I'm not going to

22 just say their names without being allowed, sir.

23 Q.  Well, I tell you what.  Without saying their names, why

24 don't you tell us how many people involved in this case you've

25 seen at Arlington County Jail.

Page 6088

1 A.  A lot.

2 Q.  Well, let's put a number on that.  Would you say more than

3 five?

4 A.  No, sir.

5 Q.  Less than five?

6 A.  Yes, sir.

7 Q.  So less than five is a lot?

8 A.  It's about two.

9 Q.  About two?  And you said you've been there since 2004?

10 A.  Yes, sir.

11 Q.  And of those people that you saw at the Arlington County

12 Jail, how many of them did you have a chance to talk to?

13 A.  I speak to all of them.

14 Q.  And they're from the hood.  Right?

15 A.  If that's what you want to call it.  I don't look at it like

16 that no more, sir.

17 Q.  What do you call it, your neighborhood?  How do you refer to

18 it?

19 A.  You a just said it.  You said the neighborhood.

20 Q.  And they're from the neighborhood.  Right?

21 A.  Yes, sir.

22 Q.  Than you were also at the CTF.  Right?

23 A.  Yes, sir.

24 Q.  And what is the CTF?

25 A.  It's a place where you be locked up at, jail facility.

1 Q.  It's the Correctional Treatment Facility?

2 A.  Yes, sir.

3 Q.  It's next door to D.C. Jail?

4 A.  Yes, sir.

5 Q.  And when did you go there?

6 A.  Sometime almost at the end of 2001.

7 Q.  And in 2001, that's where you saw Larry Browne?

8 A.  I remember seeing him in 2001, yeah, I have seen him.  I

9 seen him outside, sir.

10 Q.  And who else from the neighborhood did you see at the CTF?

11       MR. LEON:  Your Honor, I'm going to object for a

12 specific name.

13       THE COURT:  Approach, please.

14       (BENCH CONFERENCE ON THE RECORD.)

15       MR. LEON:  Just to pick up on Mr. Capies' objection, I

16 think he's right and I just fell asleep.  First, I don't know

17 what the -- I guess I do have an idea what the relevance is.

18 He's saying it's considered relevant -- to single out specific

19 people who the government may or may not call, who are on the

20 fourth floor of the cooperation wing, does pose safety concerns

21 for a lot of people.

22       So I think whether or not it's relevant is one

23 consideration, but to actually put the names of those people on

24 a public record right now, any balancing should weigh in the

25 favor of not disclosing any names.

1 Congress Park neighborhood you had seen there.  Now, I don't

2 want you to give me any names, but what I would like you to do

3 is go through the same exercise we did before.

4          Did you see more than five people there that you knew

5 from the Congress Park neighborhood?

6 A.  No, I don't remember seeing more than five people.

7 Q.  Was it less than five people?

8 A.  A little less.

9 Q.  How many less?

10 A.  I would say about three.

11 Q.  And without naming the names, the first of the three, do you

12 remember how long after you arrived at the CTF you first saw

13 that individual?  Again, without naming names.

14 A.  When I arrived?

15 Q.  Yeah.

16 A.  I ain't see none of them when I arrived, sir.

17 Q.  Well, there came a time after you arrived when you saw at

18 least one of the three individuals that you're thinking about.

19          And my question to you is:  How long after you arrived

20 did you first see somebody from the Congress Park neighborhood?

21 A.  The person I seen, he was coming around there but he not

22 from the neighborhood.

23 Q.  All right.  I thought you said that you had seen three

24 people from the Congress Park neighborhood in the CTF.

25 A.  I have.  You said when I first arrived, when I got there,

1 like when I got there.

2 Q.  After you arrived -- disregard that.

3        How long after you arrived did you see the first of the

4 three people you're thinking about from Congress Park?

5 A.  I can't -- I can't give you no how long and all that.  I

6 wasn't too worried about them.  But I remember seeing them.

7 Q.  I'm not asking you for an exact date.  Was it a week after,

8 was it a month after?

9 A.  I don't know.  I can't give you an answer to that.  I

10 remember seeing them.

11 Q.  You don't remember?

12 A.  I remember seeing people.

13 Q.  And these three people that you saw, where were they located

14 within the CTF?

15 A.  On the fourth floor.

16 Q.  And you were on the fourth floor.  Is that correct?

17 A.  Yeah, after I arrived and I seen them.

18 Q.  Now, how long were you at the CTF?

19 A.  I say three years.

20 Q.  Three years.  So that would be from 2001 to 2004?

21 A.  Yes, sir.

22 Q.  And then at some point you moved over to the

23 Arlington County Jail?

24 A.  Yes, sir.

25 Q.  And again, you don't have to tell me when, but tell me how

1 long you were at the Arlington County Jail.

2 A.  Like two and a half years.

3 Q.  So we've got three years at CTF, and we've got two and a

4 half years at Arlington.  And how long was Mr. Browne with you

5 at the CTF?

6 A.  Well, when I first got there, he was already there.

7 Q.  So was he there the entire three years you were there?

8 A.  Yes, sir.

9 Q.  And the other people that you saw from the neighborhood who

10 were at the CTF, were they there the entire three years that you

11 were there, as well?

12 A.  No, sir.

13 Q.  How long was the first of the three there with you there at

14 the CTF?

15 A.  I mean, it wasn't no more than a year.  I wasn't keeping up

16 with they time or nothing.

17 Q.  Okay, okay.  So you were there the longest of the four of

18 you?

19 A.  Naw.

20 Q.  Somebody was there longer than you?

21 A.  Yes.

22 Q.  And were they also involved in this case?

23          MR. LEON:  Objection.  Calls for speculation.

24 BY MR. MARTIN:

25 Q.  If you know.

1 October 17th, 2006?

2 A.   I remember going to the grand jury in 2006 of October, sir.

3 Q.   And do you remember testifying before the grand jury on

4 February 28th, 2006?

5 A.   I went to the grand jury a lot, sir.

6 Q.   And each time you went to the grand jury, prior to doing

7 that, and/or prior to testifying in Superior Court, you met with

8 the prosecutors.  Correct?

9 A.   Yes, I have met with them.  I ain't going to say every time

10 it was prior to me going to court, though.

11 Q.   And what you did prior to testifying in each one of those

12 instances was, you went over the questions that the prosecutor

13 was going to ask you during the trial.  Correct?

14 A.   They asked me, do I remember a date.  And I tell them.  And

15 they asked me what I would -- tell me to tell them what I

16 remember, sir.

17 Q.   And in all of those times that you had an opportunity to

18 prepare for your testimony, you and I have never had an occasion

19 to do that.  Correct?

20 A.   Naw, I don't know you, sir.

21 Q.   Okay.  Thank you, Mr. Capies.

22          Now, getting back to Larry Browne, how often did you

23 see Larry Browne at the CTF?

24 A.   Like every other day.  He was in another part.

25 Q.   And you said in direct examination that the two of you

Page 6100

1 discussed a gun.  Remember that?

2 A.  Yes, I said something to him, sir.

3 Q.  And that was a Ruger, I think?

4 A.  Yes, sir.

5 Q.  And let me ask you, how did that conversation come up?

6 A.  I said something to him about it, sir.

7 Q.  So you initiated the conversation?

8 A.  Yes, I said something to him about it.

9 Q.  And you did that in what year?

10 A.  It was like 2002.  Yeah, it was 2002.

11 Q.  And by that time, in 2002, you had already met with the

12 government attorneys several times.  Right?

13 A.  Yes, I have.

14 Q.  And you knew that you weren't supposed to discuss this case

15 with anyone.  Right?

16 A.  I ain't know nothing about that gun being in no case.  I

17 didn't even know this gun was in that case, sir.

18 Q.  Well, you knew Larry Browne was from the Congress Park

19 neighborhood.  Right?

20 A.  He's not from Congress Park, sir.

21 Q.  He's not.  But you knew that he knew people in Congress

22 Park.  Right?

23 A.  Yes, his cousin is from around there.

24 Q.  And you knew that he dealt drugs in Congress Park.  Right?

25 A.  I knew he served one person.  I ain't going to say he dealt,

1 like he was out there every day selling drugs.

2 Q.  But you still discussed the case with him.  Right?

3 A.  I didn't discuss no case with him.  We talked about the gun.

4 I didn't even know the gun had nothing to do with our case.

5 Q.  Well, in talking about the gun, didn't you talk about

6 David Wilson?

7 A.  I ain't say nothing -- what you mean, like talk about

8 David Wilson?

9 Q.  In discussing the gun, didn't you mention Wop?

10 A.  Oh, yeah, I mentioned Wop.

11 Q.  Okay.  And Wop is part of this case.  Right?

12 A.  Yes, sir.

13 Q.  And you started that conversation.  Right?

14 A.  Yes, sir.

15 Q.  And you did that despite the fact that the government told

16 you not to discuss the case with anyone.  Right?

17 A.  I didn't know that gun had nothing to do with no case, sir.

18 Q.  And that wasn't the first time you and Larry Browne had

19 talked about this case.  Right?

20 A.  That's the first time.  We never talked about nothing else

21 about this case, sir.

22 Q.  Would it be fair to say that Larry Browne is not the only

23 person that you discussed this case with at the CTF?

24 A.  I ain't talked to nobody else about this case.  And all I

25 was talking to Larry about was the gun, and I didn't know the

Page 6114

1 Q. Now, let's talk about your memory a little bit, Mr. Capies.

2 Remember the Byron Dorsey case?

3 A. Yes, sir.

4 Q. You testified to events in that particular case, too, didn't

5 you?

6 A. Yes, sir.

7 Q. And there were three people involved in the shooting in that

8 case. Right?

9 A. Yes, sir.

10 Q. And Andre Wilson was shot. Right?

11 A. Yes, he was shot and later died.

12 Q. And later died. And that's Boobie. Right?

13 A. Yes, sir.

14 Q. And Boobie was your good friend, wasn't he?

15 A. Yes, sir.

16 Q. And on 19 March, 2001, you went over to Darlene and Lisa's

17 house. Right?

18 A. You said March 19th? I got shot March 16th, sir. I know

19 that for sure.

20 Q. Okay. March 16th, 2001. Let's agree that it was March 2001

21 that the shooting occurred. How is that?

22 A. March 16th, 2001.

23 Q. If you say March 16th, I'll go with March 16th. And you

24 went into the apartment where Darlene and Lisa were. Correct?

25 A. Yes, sir.

Page 6121

1 that it happened.

2 Q.  Now, you were questioned about that shooting that same

3 evening, weren't you, by the police?

4 A.  That night, yes, sir.

5 Q.  And again, Andre Wilson was your good friend.  Right?

6 A.  Yes, sir.

7 Q.  And you weren't facing life imprisonment for that incident.

8 Right?

9 A.  Yes, sir.

10 Q.  But you lied to the police regarding that, too, didn't you?

11 A.  I was in the street, sir.  I ain't going to tell the police

12 if I'm trying to find out and retaliate.

13 Q.  So there was really no reason for you to lie, was there,

14 Mr. Capies?

15 A.  Sir, listen.  If you going to wherever you going, I don't

16 understand, like, what you trying to say.

17 Q.  Let's have an understanding.  You were a victim that night.

18 Right?

19 A.  Yes, sir.

20 Q.  You didn't commit any crime that night.  Right?

21 A.  Yes, sir.

22 Q.  And the police wanted to find out the same thing that you

23 wanted to find out; that is, who shot you.  Right?

24 A.  Yes, and I wasn't going to tell them.

25 Q.  And you lied to them.  Right?

1 A.  Yes, I did.

2 Q.  Okay.  And you didn't just lie to one police officer that

3 night, you lied to two, didn't you?

4 A.  I remember talking to one police officer that night, sir,

5 the homicide detective.

6 Q.  There was a police officer in a uniform who questioned you.

7 Do you remember that?

8 A.  I remember a homicide detective questioning me.  I don't

9 remember a police uniform.

10 Q.  Well, do you remember giving a story about some people

11 jumping from behind a bush?  Do you remember that story?  And

12 trying to rob you?

13 A.  I remember I told them that somebody was trying to rob us.

14 I don't remember about the bush.  I'm not saying I ain't said

15 it.  I said I don't remember.

16 Q.  You don't remember.

17      You don't remember what you said, Mr. Capies?

18 A.  I don't remember.  I remember telling them that somebody

19 tried to rob us.  I don't remember nothing about no bush.

20      MR. MARTIN:  If the Court would just give me a moment.

21 BY MR. MARTIN:

22 Q.  Mr. Capies, I want to bring your attention to page 201,

23 lines 23 through 24, of your July 15th, 2002 testimony in

24 Superior Court.

25      MR. MARTIN:  For the record, I'm showing Mr. Capies

1 Jones Exhibit Number 31.

2 BY MR. MARTIN:

3 Q.  Again, Mr. Capies, page 201, lines 23 through 24.

4 A.  You said 201.  Right?

5 Q.  Yes, sir.

6 A.  Lines what, again?

7 Q.  23 and 24.

8 A.  (Witness complies.)  Yes, it says.

9 Q.  All right.  And does that refresh your recollection now,

10 Mr. Capies, as to what you said back on July 15th, 2002?

11 A.  Yes, it do say something about being robbed.  I couldn't

12 remember the part about the bush.

13 Q.  That wasn't my question, Mr. Capies.  My question was, does

14 it now refresh your recollection about some guys jumping from

15 behind bushes and robbing you?

16 A.  Yes, sir.

17 Q.  Okay.  And when you made that statement, you made that

18 statement under oath, didn't you?

19 A.  Yes, sir.

20 Q.  And again, you were a victim of that offense.  Right?

21 A.  Yes, sir.

22 Q.  And you were under oath before that grand jury, just like

23 you're under oath here today.  Right, Mr. Capies?

24 A.  Yes, sir.

25          MR. LEON:  Your Honor, I would just ask to clarify the

Page 6124

1 record.  I think he said, "grand jury."  I think counsel might

2 have meant jury instead of grand jury.

3           MR. MARTIN:  I stand corrected, Your Honor.  I did mean

4 jury.  It was in the Superior Court, July 15th, 2002.

5 BY MR. MARTIN:

6 Q.  So getting back to what brought all of that up, your memory

7 isn't as good as you would like it to be, is it, Mr. Capies?

8 A.  My memory is good, sir.

9 Q.  But you didn't even remember what you said on July 15th,

10 2002, under oath, did you?

11 A.  I testified about a lot of stuff, sir.  I can't remember

12 every last thing, sir.

13 Q.  Because even when you testify under oath, you don't always

14 tell the truth.  Right?

15 A.  I always tell the truth, sir.

16 Q.  You always tell the truth under oath?

17 A.  Yes, sir.

18 Q.  This business about being jumped from behind the bushes

19 wasn't the truth, though, was it?

20 A.  No, sir.

21 Q.  And that was under oath, wasn't it?

22 A.  Yes, sir.

23 Q.  Now, you talked about guns at length.  And you also talked

24 about jump-outs.  Remember that, Mr. Capies?

25 A.  Yes, sir.

Page 6127

1 A.  Yes.

2         THE COURT:  Hold on a second.

3         MR. LEON:  Objection to form.  Time, people.

4         THE COURT:  Please rephrase.

5 BY MR. MARTIN:

6 Q.  Well, let's go in the latter part of what you testified to.

7 Let's start with 1995, up to 2001.  Would it be fair to say that

8 there were people out there on the circle who were really not

9 part of the Congress Park Crew or organization, as you put it?

10        MR. LEON:  Objection.  I don't think the witness ever

11 said, "organization."

12        THE COURT:  Rephrase.

13 BY MR. MARTIN:

14 Q.  Were there people out on the circle dealing drugs who didn't

15 run with you?

16 A.  Yes.

17 Q.  And some of those people included Quincy Thomas?

18 A.  I never seen Quincy running hand to hand out in the circle.

19 Q.  And Burke didn't run hand to hand in the circle either, did

20 he?

21 A.  At that time, I can't remember seeing him run a hand to hand

22 in the circle.  On 14th place, maybe.

23 Q.  He was his own man.  Is that correct?

24 A.  Yes.

25 Q.  And that's true also of Burke.  He was his own man, too.

1 Right?

2 A.   Yes.

3 Q.   And Joe Langley was his own man, too.   Right?

4 A.   Yes, sir.

5 Q.   And so was Larry Browne.   He did his own thing, as well.

6 Right?

7 A.   As far as I know.   I ain't really know too much of his

8 business.

9 Q.   Would it be fair to characterize these men as being lone

10 wolves?

11 A.   I don't understand.

12 Q.   Well, there were people out there on the circle who were

13 dealing, and they weren't necessarily dealing as part of a group

14 or team, were they?

15 A.   Not everybody.

16 Q.   So you would agree that there were people out there on the

17 circle who were just out there independent, by themselves.

18 Right?

19 A.   That was out there serving drugs.

20 Q.   And you don't know, as you sit here today, exactly who the

21 suppliers were for each and every person who was out there on

22 the circle, do you?

23 A.   Most of them.

24 Q.   But you don't know who the suppliers were for everybody, do

25 you?

1 A.   Not everybody.   I don't know where Quincy was getting his

2 coke from, or Burke getting his coke from.   I wasn't for sure of

3 that or not.

4 Q.   Let's move on to this business about your getting assaulted,

5 when the unfortunate incident happened and you lost your tooth.

6 Do you remember that?

7 A.   Yes, sir.

8 Q.   Now, when that happened, Jojo wasn't in that apartment, was

9 he?

10 A.   He wasn't in there, no, sir.

11 Q.   And after the incident, Jojo didn't show you any animosity,

12 did he?

13 A.   No, he showed me love.

14 Q.   He didn't show you any hatred?

15 A.   No, he never did.

16 Q.   In fact, he was trying to smooth over whatever differences

17 you might have had with Mr. Ball.   Right?

18 A.   Yes, sir.

19 Q.   Would it be fair to say that he was trying to be a

20 peacemaker?

21 A.   Yes, sir.

22 Q.   And so Jojo wasn't trying to be an enforcer for anybody

23 after that incident, was he?

24 A.   He did say something, but he wasn't like -- he told me, "I

25 know you mad.   Think about what you going to do before you do

1 one of those days where she had left?

2 A.  Yes, sir.

3 Q.  And it was just you and Tenille Wilson.  Right?

4 A.  Yes, sir.

5 Q.  And you recall -- I believe you testified that you heard a

6 number of shots?

7 A.  Yes, sir.

8 Q.  About nine or 10 of them?

9 A.  Yes, sir.

10 Q.  A whole bunch?

11 A.  Yes, sir.

12 Q.  And they were pretty loud?

13 A.  Yes, sir.  It was nearby.

14 Q.  Right.  You realized it was nearby, which is why you decided

15 to go outside.  Isn't that right?

16 A.  Yes, sir.

17 Q.  And do you recall testifying the other day that when you

18 went outside, it was like "jive evening time"?

19 A.  Yes, sir.

20 Q.  And Mr. Leon asked you whether it was light or dark, and you

21 said it was light out?

22 A.  Yes, sir.

23 Q.  Now, are you aware, sir, that Mr. Lewis was shot at quarter

24 of 8:00 in the evening?

25 A.  No.  But I know it was kind of like -- it was like, I knew

1 it was past after school, sir.

2 Q.  If it was quarter of 8:00 in the evening on January 23rd,

3 1996, the day Mr. Lewis was killed, that would be dark out,

4 wouldn't it?

5 A.  Yes.  It was jive, like after school, sir.

6 Q.  Pardon?

7 A.  Sometime after school.

8 Q.  School?  What time does school get out?

9 A.  3:30, to my knowledge.

10 Q.  3:30.  And if he was killed at 7:45, or the police got a

11 report of the shooting at 7:45, that's about four hours and

12 15 minutes after school is out.  Isn't that right?

13 A.  I said sometime after school.  I didn't say after school,

14 sir.

15 Q.  No, I said that.  But I'm just trying to establish, it's

16 about four hours and 15 minutes after school if it was quarter

17 of 8:00 in the evening.  Right?

18 A.  Yes, sir.

19 Q.  And you know, sir, don't you, that at quarter of 8:00 in the

20 evening on January 23rd, in January of any year, but

21 particularly 1996, it's dark out, isn't it?

22 A.  Yes, it's getting dark.

23 Q.  Getting dark?  Do you know what time the sun set, sir, on

24 that day?

25 A.  No, I don't.  I don't remember.

1 Q.  If I told you the sun set at 5:15 on that day, would you

2 have any reason to dispute that, sir?

3 A.  No, sir.

4 Q.  So the sun had been down for two and a half hours, and is it

5 your testimony that it was still light out?

6 A.  That's what I remember, sir.

7 Q.  You remember it, and therefore it's true?

8 A.  I said that's what I remember.

9 Q.  And what do you remember about the temperature?

10 A.  It was cold.

11 Q.  Do you recall testifying the other day, sir, that it was

12 nice out and everybody was outside?

13 A.  Yes, sir.

14 Q.  You recall that?

15 A.  Yes, sir.

16 Q.  And if I told you it was 39 degrees at 7:45, is that your

17 definition of being nice out?

18 A.  Nice out.  Not freezing, sir.

19 Q.  Not freezing.  What's freezing, Mr. Capies?

20 A.  Cold, cold outside, where you got to wear a coat.

21 Q.  You don't wear a coat when it's 39 degrees?

22 A.  Yes.

23 Q.  You do wear a coat?

24 A.  Yes.

25 Q.  And when it's nighttime and it's 39 degrees and the clouds

1 are completely covering things, it's pretty cold out, isn't it?

2 A.  Yes, sir.

3 Q.  That's not the kind of weather that you like to be outside

4 in, is it?

5 A.  I never said it was sunny out, sir.

6 Q.  You said it was --

7 A.  Nice outside.

8 Q.  Well, let me read back to you:  "And was everyone else" --

9 this is about who was in the house with you, and Mr. Leon asked

10 you:  "And was anyone else" -- and this is at page 5022 of the

11 testimony of March 29th, 2007.

12       "And was anyone else in there," meaning in Mom's house,

13 "other than you and Tenille?"

14       "No, it was kind of nice outside.  Everybody else was

15 outside."

16       Question:  "What time of day or evening was it, if you

17 remember?"

18       "It was like jive in the evening time."

19       Question:  "Was it still light out or not?"

20       Answer:  "It was still light out."

21 A.  Yes, that's what I remember.

22 Q.  What?

23 A.  I say, yes, that's what I remember.

24 Q.  And you have a clear memory of that?

25 A.  That's what I remember, sir.

1 Q.  I asked you a question.  You have a clear memory of that?

2 A.  Yes, sir.

3 Q.  You remember that night, and you're sure that when you

4 walked outside and saw the shots -- or heard the shots, that it

5 was light outside?

6 A.  It was still light outside, sir.

7 Q.  It was still light outside at quarter of 8:00?

8 A.  I don't know what time it was, but I remember when I came

9 outside, it was still light outside, sir.

10 Q.  You don't have any information that it was other than

11 quarter of 8:00, do you?

12 A.  No, sir.

13 Q.  And in fact, Mr. Capies, you didn't go out there at all that

14 night, did you?

15 A.  Yes, I was outside that night, sir.

16 Q.  You were outside that night?  And you saw Mr. Lewis, did

17 you?

18 A.  I remember going outside, and it was light out, and I saw

19 Mr. Lewis laying on the ground outside in the street.

20 Q.  And you saw his hands?

21 A.  I seen him like he was clutching for a gun, when he was kind

22 of still moving, sir.

23 Q.  Kind of still moving.  You saw all those things?

24 A.  Yes.  You could see him like from the side of the street I

25 was on, looking out into the street.

Page 6170

1 Q.  And that was because it was light outside, so it was easy

2 for you to see those things?

3 A.  When I came outside, I told you, sir, it was still light

4 out.

5 Q.  Because if you didn't remember that it was light outside, if

6 that wasn't really your memory, then you would say you didn't

7 remember.  Right?

8 A.  Right.

9 Q.  You wouldn't just make it up?

10 A.  No, I wouldn't just make it up.

11 Q.  Because the things you remember are true?

12 A.  Yes, sir.

13 Q.  And you don't remember lies?

14 A.  Yes, sir.

15 Q.  With respect to Mr. Lewis' murder, just let me clear up a

16 couple of things.  You didn't see the shooting?

17 A.  No, sir, I didn't.

18 Q.  You didn't see anyone approach his car?

19 A.  No, sir, I didn't.

20 Q.  You didn't see whether that person was in a car or by foot?

21 A.  No, sir, I didn't.

22 Q.  You didn't see their clothing?

23 A.  I didn't see it, sir.

24 Q.  You didn't see the gun they had?

25 A.  No, sir.

1 Q.   You didn't see the ammunition they had?

2 A.   No, sir.

3 Q.   You didn't see the height of the person?

4 A.   No, sir.

5 Q.   The weight of the person?

6 A.   No, sir.

7 Q.   Build of the person?

8 A.   No, sir.

9 Q.   You didn't see the complexion of the person?

10 A.  No, sir.

11 Q.  You didn't see the direction that they came from?

12 A.  No, I didn't see it with my own eyes, sir.

13 Q.  Right.  And you didn't see the direction that they went to?

14 A.  No, sir.

15 Q.  You didn't see how long they were out there before Mr. Lewis

16 was shot, did you?

17 A.  No, sir.

18 Q.  So you, as of the time that Mr. Lewis was shot, didn't

19 really have any information other than that you saw him dead.

20 Is that right?

21 A.  You right, sir, at that time.

22 Q.  That's right.  And after you left there at quarter of 8:00,

23 did you stand out there for a while?

24 A.  I don't remember what time it was, sir.  I just told you I

25 remember it was day out.

1 Q.  Well, if the police report said that they got a report at

2 quarter of 8:00 in the evening, would you doubt that?

3 A.  But you said do I remember quarter of 8:00, and I already

4 told you I didn't.

5 Q.  Well, but if I said to you that the police report says they

6 got a report of the shooting at quarter of 8:00, you wouldn't

7 doubt that?

8 A.  If that's what you got, sir, I ain't going to argue with

9 you.

10 Q.  Right.  So at quarter of 8:00 when you went out there -- by

11 the way, you didn't go directly out there, did you?  You played

12 your craps for a little while, didn't you?

13 A.  For a little while.

14 Q.  Couple of minutes?

15 A.  Couple of minutes.  Not that long.

16 Q.  You weren't all that interested?

17 A.  I was losing my money, sir.  I was looking at it as a

18 shooting around the park again.

19 Q.  Another shooting around the park?

20 A.  Yes, sir.

21 Q.  But when you discovered it was Troy Lewis, that was

22 important to you.  Right?

23 A.  I didn't discover it in the house, I discovered that the

24 shots was close so I should go out there.

25 Q.  Right.  That's what I'm saying, sir.  And when you

Page 6178

1 other than when he was on the ground, sir.

2 Q.  Do you remember seeing him within the last days previous to

3 that?

4 A.  I remember seeing him and letting him know that I was on the

5 run.  I don't remember --

6 Q.  You were on the run at the time?

7 A.  Yes, sir.

8 Q.  And because you were on escape?

9 A.  Yes, sir.

10 Q.  From the halfway house?

11 A.  No, sir.

12 Q.  Where were you on escape from?

13 A.  Juvenile facility.

14 Q.  And you had walked away?

15 A.  No.  Actually, I was going -- I had a hole in my arm.  I got

16 stabbed in my arm and I went to go to a clinic.  They took me to

17 a clinic, and I had a shackle key and I jumped out the van.

18 Q.  You jumped out of the van while they were taking you for

19 medical care?

20 A.  Yes.

21 Q.  You weren't supposed to do that, weren't you?

22 A.  Well, actually, it wasn't when they was taking me there, it

23 was actually when we was coming back.

24 Q.  You had already gotten the medical care?

25 A.  Yes, sir.

Page 6179

1 Q.  So you had allowed them to take you to where they could get

2 you medical attention, and then on the way back, you jumped out?

3 A.  Yes, sir.

4 Q.  And ran away?

5 A.  Yes, sir.

6 Q.  Even though the Court had told you to stay there?

7 A.  Yes, sir.

8 Q.  Now, do you recall seeing Troy Lewis in the presence of

9 Marlon Washington in the days just before his death?

10 A.  I don't recall seeing him in his presence.  I remember at

11 some point in time, though, this was way before he got killed,

12 though, I asked him -- he asked, was them young-uns pumping out

13 there, and I told him yeah.

14 Q.  Pumping, meaning?

15 A.  Selling drugs.

16 Q.  And part of the "young-uns" that you were referring to

17 included Marlon Washington.  Right?

18 A.  Yes, sir.

19 Q.  And that was Truck?

20 A.  Yes, sir.

21 Q.  And he was one of your friends?

22 A.  Yes, he was cool with me.

23 Q.  Right.  And he was Reecy's brother.  Isn't that right?

24 A.  Yes, sir.

25 Q.  Okay.  And he was part of the group, the small group that

# Tab 21

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : April 11, 2007 |
| DOMINIC SAMUELS, | : 9:15 a.m. |
| Defendants. | : |

VOLUME 32 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE |
| | Glenn S. Leon, Assistant United |
| | States Attorney |
| | Ann H. Petalas, Assistant United |
| | States Attorney |
| | Gilberto Guerrero, Assistant |
| | United States Attorney |
| | 555 4th Street |
| | Washington, DC  20001 |
| | 202.305.0174 |
| | |
| For Defendant | CARNEY & CARNEY |
| Antwuan Ball: | John James Carney, Esq. |
| | South Building |
| | 601 Pennsylvania Avenue, N.W. |
| | Washington, DC  20004 |
| | 202.434.8234 |

---

6344

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | TIGHE, PATTON, ARMSTRONG, |
| Antwuan Ball: | TEASDALE, PLLC |
| | Steven Carl Tabackman, Esq. |
| | 1747 pennsylvania Avenue, NW |
| | Suite 300 |
| | Washington, DC  20036 |
| | 202.454.2811 |
| | |
| For Defendant | LAW OFFICE OF JENIFER WICKS |
| David Wilson: | Jenifer Wicks, Esq. |
| | 503 D Street NW, Suite 250A |
| | Washington, DC  20001 |
| | 202.326.7100 |
| | |
| | GARY E PROCTOR, LLC |
| | Gary E. Proctor, Esq. |
| | 6065 Harford Road |
| | Baltimore, MD  21214 |
| | 410.444.1500 |
| | |
| For Defendant | LAW OFFICE OF JAMES W. BEANE |
| Gregory Bell: | James W. Beane, Jr., Esq. |
| | 2715 M Street, N.W. |
| | Suite 200 |
| | Washington, DC  20007 |
| | 202.333.5905 |
| | |
| For Defendant | LAW OFFICE OF JONATHAN ZUCKER |
| Desmond Thurston: | Jonathan Seth Zucker, Esq. |
| | 514 10th Street, NW |
| | 9th Floor |
| | Washington, DC  20004 |
| | 202.624.0784 |
| | |
| For Defendant | LAW OFFICE OF ANTHONY MARTIN |
| Joseph Jones: | Anthony Douglas Martin, Esq. |
| | 7841 Belle Point Drive |
| | Greenbelt, MD  20770 |
| | 301.220.3700 |
| | |
| | LAW OFFICE of ANTHONY ARNOLD |
| | Anthony Darnell Arnold, Esq. |
| | One Research Court |
| | Suite 450 |
| | Rockville, MD  20852 |
| | 301.519.8024 |

---

6345

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | LAW OFFICES OF A. EDUARDO BALAREZO |
| Dominic Samuels: | A. Eduardo Balarezo, Esq. |
| | 400 Fifth Street, NW |
| | Suite 300 |
| | Washington, DC  20001 |
| | 202.639.0999 |
| | and |
| | William B. Purpura, Esq. |
| | 8 East Mulberry Street |
| | Baltimore, MD  21202 |
| | 410.576.9351 |
| | |
| Court Reporter: | Scott L. Wallace, RDR, CRR |
| | Official Court Reporter |
| | Room 6814, U.S. Courthouse |
| | Washington, DC 20001 |
| | 202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

6346

**MORNING SESSION, APRIL 11, 2007**

1
2    (9:18 a.m.)
3        THE COURT:  This is a test to see if this is actually
4    going to work this time.  We'll see after a short while, after
5    the witness is on the stand and talks for about 30 minutes.
6        All right.  Mr. Balarezo, you're in the middle of your
7    cross?
8        MR. BALAREZO:  Yes, Your Honor.
9        THE COURT:  Are you ready for the jury?
10        MR. BALAREZO:  Your Honor, I am.  I was wondering if the
11    Court would allow me one minute ex parte at the bench so
12    Mr. Samuels can hear?
13        THE COURT:  Is it something that can wait till the break?
14        MR. BALAREZO:  Yes.
15        THE COURT:  All right.  Are you otherwise ready for the
16    jury?  I will take you ex parte at the break.
17        MR. BALAREZO:  Thank you.
18        THE COURT:  Are you ready for the jury?
19        Mr. Balarezo, are you ready for the jury otherwise?
20        MR. BALAREZO:  I am, Your Honor.  Thank you.
21        THE COURT:  Are you good to go today?
22        MR. TABACKMAN:  Yes.
23        THE COURT:  Okay.
24        (Jury in at 9:20 a.m.)
25        THE COURT:  Good morning, ladies and gentlemen.

6391

1    THE COURT: I think we had actually heard that yesterday
2  and I think we put it on the record. Thank you for mentioning
3  it.
4        (Sidebar discussion concluded.)
5        CROSS-EXAMINATION OF BOBBY CAPIES
6  BY MR. ZUCKER:
7    Q.   Good morning, Mr. Capies.
8    A.   Good morning.
9    Q.   My name is John Zucker. I represent Desmond Thurston.
10  You know him as Dazz.
11       Mr. Capies, I want to return to 1996 and an incident you
12  discussed both in your direct and some of your examination with
13  Mr. Purpura, counsel for Mr. Samuels. And particularly -- well,
14  to put it back in time, you were on the run from Oak Hill,
15  correct, the juvenile facility?
16   A.   Yes.
17   Q.   Okay. And you had escaped by secreting a key when they
18  let you out for medical treatment, right?
19   A.   Yes, sir.
20   Q.   And then you used that hidden key to escape, right?
21   A.   Yes, sir.
22   Q.   And you were on the run and you committed what you
23  described as a robbery of a drug dealer, correct?
24       Do you recall that incident? I'll give a minute to
25  recall.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6392

1    A.   I mean --
2    Q.   Do you recall discussing robbing a drug dealer?
3    A.   Yes.
4    Q.   Okay. Do you recall which one or were there multiple
5  robberies? Is that why you're having -- you look confused, like
6  you don't know what I'm talking about?
7    A.   Naw, I don't understand what you're talking about.
8    Q.   Do you recall testifying both in your direct and on the
9  cross-examination about robbing a drug dealer and during the
10  course of robbing the drug dealer, shooting a woman in a closet?
11   A.   Yes. That wasn't in '96.
12   Q.   Okay. That was in '97?
13   A.   No, sir.
14   Q.   What year was that?
15   A.   That was like '92-93, something like that.
16   Q.   Okay. And how old were you when that incident occurred?
17   A.   Like 14 or 15.
18   Q.   Like 14 or 15. All right. And what you told us was that
19  you had -- well, Mr. Purpura asked you why you shot the woman,
20  right?
21   A.   Yes, sir.
22   Q.   And your response was that you shot her because you
23  didn't want her to swing an iron at you; is that correct?
24   A.   No. She swung the iron and I -- she closed the door and
25  I shot in the closet door, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6393

1    Q.   Well, didn't you tell us that you told her to get in the
2  closet or you pushed her in the closet? That was in response to
3  things that you did that she went into that closet, correct?
4    A.   Yes, I told her to get in the closet.
5    Q.   I see. So -- and the closet door was closed, correct,
6  either by you or her?
7    A.   It was closed by her.
8    Q.   Okay. So when you shot at her in that closet, at that
9  moment she presented no threat to you; is that a fair statement?
10   A.   Yes, sir.
11   Q.   And so your intent to shoot her had nothing to do with
12  her swinging an iron at you or protecting yourself from future
13  swinging? It was because you were angry that she swung earlier,
14  correct?
15   A.   Yes, sir.
16   Q.   So you robbed a woman who tried to defend herself and
17  notwithstanding the fact that she was in a hopeless position,
18  you chose to shoot through the door, right?
19   A.   Yes, sir.
20   Q.   Okay. And your intent when you shoot someone is to kill
21  them, is it not?
22   A.   Not all of the time, sir.
23   Q.   All right. But you recognize that as a significant
24  possibility, if not probability, correct, that when you shoot
25  someone, you're going to take their life?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6394

1        MR. LEON: Objection to which incident this is; objection
2  to the form.
3        THE COURT: I'll let you rephrase the question.
4  BY MR. ZUCKER:
5    Q.   When you shot through the door, you recognized there was
6  a reasonable possibility, if not probability, that you would
7  have killed that woman?
8    A.   At the time I wasn't thinking like that, sir.
9    Q.   Do you recognize it sitting here today?
10       Not recognize her -- I'm sorry. Not recognize her in the
11  courtroom.
12       Do you recognize that there was a significant probability
13  that you could have killed that woman when you shot through the
14  door?
15   A.   Now I recognize that, yes, sir.
16   Q.   How many times did you shoot through that door?
17   A.   I believe it was once.
18   Q.   Now, you told us that you were committing that robbery
19  with Orlando, correct?
20   A.   Yes, sir.
21   Q.   And you described Orlando as someone you knew from
22  Congress Park, correct?
23   A.   Yes, sir.
24   Q.   He was a Congress Park guy?
25   A.   He was a -- he was really a type of guy to hang to his

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6403

1  **Q.**   That's fine.  Now, look at this.  Do you recognize this
2  document as the presentence -- I'm sorry Pretrial Services
3  Agency report?
4        And I'll direct your attention to the first third of that
5  page and see whether or not it refreshes your recollection as to
6  whether or not in fact you got probation originally in that
7  marijuana case?
8        Do you now recall receiving probation as your original
9  sentence in that marijuana case?
10 **A.**   Yes, sir.
11 **Q.**   In fact, that is true, correct?  That is what you
12 initially received?
13 **A.**   Yes, sir.
14 **Q.**   Okay.  And of course that happened at the time you were
15 already cooperating against Cadoza Simms or at least telling the
16 police, no, no, no, it was him, not me?
17 **A.**   It wasn't -- I only talked to them one time and that was
18 in '96 and his lawyer came to see me in '97, when I was in Hope
19 Village.
20 **Q.**   And when you spoke with them -- and by "them," I mean law
21 enforcement -- you told them no, it wasn't me that did the
22 murder, it was Cadoza Simms?
23 **A.**   Yes, because that was what was true, sir.
24 **Q.**   Oh, you told them that because it was true?
25 **A.**   That was true.  I didn't do it.  He done it.  That's what

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6404

1  he told me.
2  **Q.**   Did you tell them that because it was true?
3  **A.**   It was true.  That's what he told me.
4  **Q.**   Well, but that was back in the days before you started
5  telling the truth, wasn't it, sir?
6  **A.**   What you mean?  I don't understand.
7  **Q.**   Well, you told us that you used to routinely lie to the
8  police and you only started being truthful after you had a
9  meeting with your defense lawyer, Paul Hunt, sometime in 2001,
10 right?
11 **A.**   We was talking about a different case, sir.
12 **Q.**   No.  I'm asking you, sir, why did you tell them the truth
13 that time -- I thought you only started telling the truth after
14 this incident you had in this case?
15 **A.**   Sir, I thought you were talking about this case, sir.
16 You're talking about another case.
17 **Q.**   Did you understand my question?
18 **A.**   I understand your question clearly.
19 **Q.**   So why in that one instance did you tell the police the
20 truth back in '97 when you told us -- or '96, whenever it
21 occurred?
22 **A.**   He confessed to me and told me.  And I told the truth in
23 this case, sir.  I'm facing the rest of my life in this case.
24 **Q.**   Did anyone ask you whether or not you're telling the
25 truth in this case yet?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6405

1  **A.**   I am.  I'm telling you.
2  **Q.**   Did I ask you that?
3  **A.**   I'm telling you, sir.
4  **Q.**   Why?
5  **A.**   Because you said something about Paul Hunt.  Paul Hunt is
6  my lawyer in this case.
7  **Q.**   Why are you telling me you're telling the truth in this
8  case?  Did I ask you?
9  **A.**   You said something about my lawyer.  Paul Hunt was not my
10 lawyer then.  He's my lawyer in this case.  That's why I said
11 something.
12 **Q.**   Well, it was fortunate for you that Cadoza Simms had
13 confessed to you, isn't it?
14       MR. LEON:  Objection, argumentative.
15       THE COURT:  Sustained.
16 BY MR. ZUCKER:
17 **Q.**   That set the pattern for what you've done ever since,
18 didn't it, sir?
19 **A.**   What you mean?  Explain it to me better, sir.
20 **Q.**   Well, since that time, every time you get arrested, you
21 cooperate with the police or the prosecutors and get a deal.
22 For the last ten years, that's what you've been doing, right?
23       MR. LEON:  Objection, mischaracterizes the record, the
24 testimony, et cetera.
25       THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6406

1  BY MR. ZUCKER:
2  **Q.**   Have you cooperated with the police every time you've
3  been arrested since?
4  **A.**   Not every time I've been arrested.
5  **Q.**   All right.  You were arrested subsequently -- all right.
6        On that probation, you were released, right?
7  **A.**   I'm sorry.  What did you say?  I couldn't hear you.
8  **Q.**   When you were put on probation for that 1996 case, you
9  were released, weren't you, sir?  Into the community on
10 probation?
11 **A.**   Yes, sir.
12 **Q.**   And when you were released on probation, it's based on
13 your promise to the Court that you will comply with the
14 conditions of probation, right?
15 **A.**   Yes, sir.
16 **Q.**   Okay.  And those conditions are, of course, reporting to
17 your probation officer, right?
18 **A.**   Yes, sir.
19 **Q.**   Not using drugs?
20 **A.**   Yes, sir.
21 **Q.**   Not committing crimes, right?
22 **A.**   Yes, sir.
23 **Q.**   Either going to school or gaining employment, right?
24 **A.**   Yes, sir.
25 **Q.**   And those are promises you make to a judge in exchange

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 6407

1  for being released back into the community, right?
2  **A.**  Yes, sir.
3  **Q.**  And those are promises you made, but, of course, did not
4  keep, right?
5  **A.**  You're right, sir.
6  **Q.**  And so you were -- your probation was violated, right?
7  **A.**  Yes.
8  **Q.**  And you were sentenced to 150 days, is that correct, on
9  April 8th, 1998?
10  **A.**  Yes, sir.
11  **Q.**  Actually, even before that, you were sent to a halfway
12  house in connection with another case, isn't that correct, in
13  '97?
14  **A.**  Yes. Hope Village.
15  **Q.**  And that was on May 9th, 1997?
16  **A.**  I don't know the exact date, sir, but I remember sometime
17  in '97.
18  **Q.**  And when you go to a halfway house, it's much like being
19  put on probation in that you make promises to the Court about
20  how you're going to conduct yourself, right?
21  **A.**  I ain't going to say it's like probation, but it's a
22  promise to return and stay there until your court.
23  **Q.**  Promise to not commit crimes while you're released into
24  the community, right?
25  **A.**  Yes, sir.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

### 6408

1  **Q.**  Promise to not use drugs, right?
2  **A.**  Yes, sir.
3  **Q.**  Promise to go to work or go to school, right?
4  **A.**  Yes, sir.
5  **Q.**  Promise to comply with conditions of the halfway house,
6  including coming back on time, right?
7  **A.**  Yes, sir.
8  **Q.**  And those are the promises you made on May -- you don't
9  recall the date -- May 1997, right?
10  **A.**  I remember it was in '97.
11  **Q.**  Okay. And you broke those promises as well, right?
12  **A.**  Yes, sir.
13  **Q.**  Okay. As a matter of fact, you lasted about -- you went
14  on escape status like 16 days after you got to the halfway
15  house, May 9th to May 27, 1997, right?
16  **A.**  I don't remember the day, but I remember going on escape.
17  MR. ZUCKER: Court's indulgence.
18  BY MR. ZUCKER:
19  **Q.**  Would it refresh your recollection to look at the arrest
20  warrant in that same case?
21  **A.**  Yes, sir.
22  **Q.**  All right. 17 -- Defendant Wilson's 17 B again.
23  Do you recognize this again as the same document you
24  looked at before, right? Same case file?
25  **A.**  Yes, sir.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

### 6409

1  **Q.**  Take a look at that arrest warrant. See if it refreshes
2  your recollection.
3  **A.**  Yes, sir. It says May 27th, 1997.
4  **Q.**  May 9th you were released and you made those promises to
5  the court. May 27th you went on escape status and fled, right?
6  **A.**  Yes, sir.
7  **Q.**  Okay. And in the interim, you were using drugs and
8  committing crimes, right?
9  **A.**  Yes, sir.
10  **Q.**  And did you commit any robberies or were you just dealing
11  drugs again? Or do you not even recall?
12  **A.**  I can't remember. I know I was selling drugs.
13  **Q.**  So once again we see that your promise to the court means
14  absolutely nothing, right?
15  MR. LEON: Objection.
16  THE COURT: Sustained.
17  BY MR. ZUCKER:
18  **Q.**  Well, did you keep your promise to the court?
19  **A.**  No, sir.
20  **Q.**  Did you ever intend to keep that promise to the court?
21  **A.**  I intended, but the environment I was in, sir, you had to
22  survive.
23  **Q.**  You had to survive?
24  **A.**  Yes, sir.
25  **Q.**  Sir, you were in a halfway house, right?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

### 6410

1  **A.**  Yes, sir.
2  **Q.**  Your room is free, right?
3  **A.**  Yes, sir. Money is not free, sir.
4  **Q.**  Your food is free?
5  **A.**  Yes, sir. One meal.
6  **Q.**  Well, they actually give you three meals a day in the
7  halfway house, don't they, sir?
8  **A.**  Not in Hope Village. I was getting one meal, sir, that I
9  remember. Lunch.
10  **Q.**  So they were starving you to death and you had to sell
11  drugs to eat. Is that what you're telling this jury?
12  **A.**  No. I had the opportunity to get a job.
13  **Q.**  That was not something you were ever going to consider
14  doing, was it?
15  **A.**  I mean, it wasn't on my mind. It was getting money
16  quick. That's what I was into, sir.
17  **Q.**  So it wasn't survival. It was getting money quick from
18  hustling and robbery, right?
19  **A.**  Surviving. That's the only way I knew to survive at the
20  time. It was the dumb way, but that's the way I knew at the
21  time.
22  **Q.**  Well, was it survival, sir? I mean survival is living,
23  eating, breathing, right?
24  **A.**  I just told you, that was the dumb way of me thinking at
25  the time.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

6419

1    that may be an issue.
2        Mr. Samuels is obviously fairly distraught because he was
3    not aware of all of this and I had the unfortunate task of
4    telling him this morning.  So I just wanted to make you aware of
5    that, so we'll see.
6        THE COURT:  Okay.  You -- this is not under seal at the
7    moment.  It doesn't seem to me it needs to be under seal.
8        I would suggest you raise this with the government as well
9    because I'm certainly going to be allowing them to put in their two
10   cents.
11       MR. BALAREZO:  That's fine.
12       THE COURT:  So I suggest you consult with them.
13       MR. BALAREZO:  And I asked her to call me with additional
14   information, doctors and hospitals, so I can try to confirm some
15   of the information before I file anything.
16       THE COURT:  Well, if you file something that will require
17   some research into transportation, security and all that, now's
18   the time to start that process.
19       MR. BALAREZO:  That's what I figured.
20       THE COURT:  Because I'm certainly going to be asking you
21   all kinds of questions about what the marshals can and can't do,
22   what the policies accommodate, all that stuff.
23       They are so stretched now, you know, if she's some
24   distance, there may be some difficulty in having transportation
25   issues.  So you all need to start that research now and even

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6420

1    inquire of the marshals what the logistics could be, you know, if
2    you made the request and it was granted and so on.
3        MR. BALAREZO:  All right.  I'll contact the government
4    now.
5        THE COURT:  All right.
6        (Sidebar discussion concluded.)
7        (Thereupon, a break was had from 10:54 a.m. until
8    11:09 a.m.)
9        THE COURT:  All right.  Are you ready for the jury, Mr.
10   Zucker?
11       MR. ZUCKER:  Yes, sir.
12   BY MR. ZUCKER:
13       THE COURT:  Good morning, again, ladies and gentlemen.
14   Welcome back.  We're ready to resume.
15       Counsel.
16       MR. ZUCKER:  Thank you, Judge.
17   BY MR. ZUCKER:
18   Q.    Sir, before we broke, you said you do not recall being
19   released shortly after your arrest in the '98 escape, not the
20   '99 escape, the '98 escape; is that correct?
21   A.    I remember, sir.
22   Q.    You now remember?
23   A.    Yes.
24   Q.    Does that have anything to do with me holding the file,
25   did that jog your memory?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6421

1    A.    Naw.
2    Q.    Well, you were originally held without bond, right?
3    A.    Yes, sir.
4    Q.    Four days later you were released?
5    A.    In '98, four days later?
6    Q.    No, three.  You don't recall that?
7    A.    I remember getting locked up February '98 and then
8    getting released in September of '98.
9    Q.    Sir, you were originally arrested on February 22nd, and
10   then on February 23rd -- I'll show you this to see if this
11   refreshes your recollection.
12       The Court file and the commitment pending disposition.
13   Judge Lee saying on February 28th, 1999, you were held without
14   bond.  No bond, right?  Does that refresh your recollection?
15   A.    No bond, yes, sir.
16   Q.    Turn the page.  Look at the next page, please.  The other
17   way.  Does that refresh your recollection?
18   A.    Yes, sir.
19   Q.    You were released on February 26th, correct, in that
20   case?
21   A.    I don't remember it, but I remember going to jail until
22   September.
23   Q.    Well, that's because you violated once you were released,
24   because, as always, your promises to the Court about how you
25   would conduct yourself on release meant nothing, but you were

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6422

1    released three days after your arrest, right?
2    A.    I don't remember being released.  It was right there.
3    I'm not going to argue with you, but I don't remember being
4    released.
5    Q.    But if you were released, you certainly remember that you
6    didn't comply with any of the promises you made to the Court
7    about not using drugs, not stealing, not robbing, et cetera,
8    right?
9    A.    I never completed no probation or none of that.  I always
10   messed up.
11   Q.    And then subsequently, because as you say you "always
12   messed up," you were arrested again, sent to a halfway house and
13   then in 1999 escaped from that halfway house as well, right?
14   A.    Yes, sir.
15   Q.    Well, first of all --
16   A.    Not in '99, I didn't escape from no halfway house.  I got
17   released in '99 and was working with Mike Will at the time, in
18   '98, and I ran from the halfway house, and I'm sure of that,
19   sir.
20   Q.    Actually, you were sent to another halfway house, after
21   you were released from the first one and then you violated --
22   you were sent to a second one.
23   A.    '97 and '98.
24   Q.    In '98, right?
25   A.    Yes, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 717 of 1954

1  **Q.**   And you escaped from that halfway house again, right?
2  **A.**   Yes, sir, '98.
3  **Q.**   And in that case -- and you weren't arrested until '99,
4  that's why it has a '99 jacket number, right?
5  **A.**   I don't know if that's why it got a jacket number, but I
6  know that's when I was released, in '99.
7  **Q.**   Well, you were released in February, you messed up, you
8  came back, you were released to another halfway house, this
9  time -- or the same halfway house on September 17th, 1998; isn't
10  that correct?
11  **A.**   Yes, that's when I went to the halfway house.
12  **Q.**   And again, that was making the same promises you violated
13  in the first one, about how you complied with conditions, not
14  use drugs, not commit robberies, not sell drugs, go to work, go
15  to school, right?
16  **A.**   At the time, I wasn't in school no more, but that was --
17  I didn't go to work.
18  **Q.**   All right.  You made all those promises, and that time
19  you went on escape status -- the first time it took you 16, 17
20  days; the second time it took you 10; isn't that right?
21  **A.**   I'm not sure of the days when I escaped.  I just remember
22  leaving, sir, in September.
23  **Q.**   Would it refresh your recollection to look at the
24  warrant?
25  **A.**   Sure.

1  MR. ZUCKER:  Would the record reflect that I'm showing the
2  witness what's been previously marked as Defendant Wilson's
3  Exhibit 17 C.  Do you recognize that as your other escape court
4  jacket, don't you, sir?
5  THE WITNESS:  Yes, sir.
6  BY MR. ZUCKER:
7  **Q.**   Directing your attention to the last page, you recognize
8  that as the warrant in support of your arrest, do you not, sir?
9  **A.**   Yes, sir.
10  **Q.**   And in fact, in that case, you were released to the
11  halfway house, based on your promises to the Court on September
12  17th, correct, sir, '98?
13  **A.**   Yes, sir.
14  **Q.**   And in fact, you escaped from that halfway house on
15  September 27th, 10 days later, correct?
16  **A.**   Yes, sir.
17  **Q.**   And why was it you broke your promises to that court?
18  **A.**   Because I was running the streets, sir.  I was into the
19  streets.
20  **Q.**   Okay.  So you chose to be into the streets.  You now
21  acknowledge it wasn't a question of surviving, right?
22  **A.**   I was surviving, sir.  That was my way of surviving.
23  **Q.**   So you couldn't survive in a halfway house with free room
24  and board, you had to get out on the streets and hustle and
25  steal, right?

1  **A.**   If you know what Hope Village has on the strip, sir, and
2  at the time I was into a beef.  I wasn't planning on staying in
3  no halfway house.
4  **Q.**   You were into a beef?
5  **A.**   Yes, I was.
6  **Q.**   A beef on the streets?
7  **A.**   Yes, I was.
8  **Q.**   So you had to get back there and do some killing?
9  **A.**   If that's what it took, if somebody was trying to kill me
10  at the time, that's what I was into, sir.
11  **Q.**   Well, nobody tried to kill you in Hope Village, did they?
12  **A.**   Naw, but they would have if they would have seen me in
13  there.
14  **Q.**   So you had to get back out on the streets and do some
15  killing, right?
16  **A.**   Whatever it took for me to have to kill.
17  **Q.**   Sir?
18  **A.**   I'm about to explain it to you, if you let me, sir.  If
19  it took the time for somebody to try to do something to me and I
20  had to, that's probably what would have ended up happening, sir.
21  **Q.**   Well, you gave a pretty long answer now, the question was
22  this:  No one tried to kill you in Hope Village, but you had to
23  get back out on the street to do some killing, right?
24  **A.**   I ain't had to go on the street to do no killing.
25  **Q.**   You chose to?

1  **A.**   I was beefing, sir, at the time.
2  **Q.**   You chose to make -- did you tell the judge when he --
3  when they asked you if you would go into a halfway house and
4  comply with the conditions, did you say yes, Your Honor, I
5  promise to not use drugs and keep the curfews and not steal, but
6  there is one exception, because I'm in a beef and I got to get
7  out there and do some killing.
8  Did you tell that to the judge?
9  **A.**   I didn't tell you I was going out there to kill.  I said
10  if I had to, sir, I was beefing, and if someone was trying to do
11  something to me, I would have did it.
12  **Q.**   Well, the judge asked you some questions.  If I let you
13  out on release, will you promise to keep these conditions of
14  release, right?
15  **A.**   Yes.  And I said yes.
16  **Q.**   And you lied to the judge, right?
17  **A.**   Yes.
18  **Q.**   Because you knew as soon as you got the chance, you
19  couldn't resist the opportunity to get out there, steal, deal,
20  hustle, and kill, could you?
21  **A.**   I wasn't thinking about killing at the time, sir.  I was
22  thinking about hustling, but if somebody would have attacked me,
23  I don't know what I would have done.  I can't speak on that.
24  **Q.**   Well, wait a second.  You said you had to leave the
25  halfway house because you were in a beef, right?

*6439*

1  **A.**   If that's how you trying to put it.  Everybody ain't
2  cool.
3  **Q.**   When you listed your associates from '92 to 2001, you
4  never listed -- let me back up a second.
5      Do you know Dip's real name, Honeycutt?
6  **A.**   Honeycutt.
7  **Q.**   You know who I'm talking about, right?
8  **A.**   I know who you're talking about.
9  **Q.**   You identified him in a photo during your direct, right?
10  **A.**   When was this?  I don't remember.
11  **Q.**   We'll move on.  That's not significant right now.
12      You never listed him as being one of your close
13  associates?
14      MR. LEON:  Objection to form, where, when?
15  BY MR. ZUCKER:
16  **Q.**   At any time.
17      THE COURT:  Sustained.
18      MR. LEON:  Same objection.
19  BY MR. ZUCKER:
20  **Q.**   At any time during your direct, in relation to any year
21  you've testified, do you acknowledge you never listed Dip as one
22  of your close associates?
23  **A.**   He was cool.  I mean, what you mean associate to you
24  might be something different to me.
25  **Q.**   Fair enough.  You listed at different times -- for

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6440*

1  instance, when you were a young child, you were close to
2  Dominic Samuels for a while, right?
3  **A.**   Yes.
4  **Q.**   Then you drifted apart from him, and I don't know, you
5  were close with some other people for a while, right?
6  **A.**   Right.
7  **Q.**   And then you drifted away from them and you were close
8  with some other people for a while, right?
9  **A.**   You're right.
10  **Q.**   Okay.  When you were listing the people you were close
11  with, you never included Honeycutt, Dip, as being someone who's
12  close to you at any time?
13  **A.**   I wasn't happening with him like that.  We wasn't no
14  hand-to-hand -- he wasn't my boy.  I see him, we was cool.
15  **Q.**   Just another guy you knew from the street you had no
16  problems with, but no particular love for; is that a fair
17  statement?
18  **A.**   He was all right.
19  **Q.**   And Honeycutt, even though, as you've acknowledged, you
20  weren't hanging with him, he wasn't your man.  He supposedly
21  confessed a murder to you, didn't he?
22  **A.**   Yes.
23  **Q.**   He confessed, even though you weren't close, that he
24  supposedly killed Poopie?
25  **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6441*

1  **Q.**   And just for clarification, we're not talking about the
2  murder of Boobie, where you were also a witness, right?  You
3  were a witness in both of those murders, right?
4  **A.**   Yes.
5  **Q.**   So Honeycutt confesses his murder, even though you're not
6  close, right?
7  **A.**   I mean, you're close -- like I told you, your closeness
8  might be different from what I'm saying, cool with him, we talk.
9  I mean, he ain't my man.  I wasn't being with him every day.  I
10  was cool with a lot of people.  That don't mean that's my man.
11  I got to be with him every day or --
12  **Q.**   But even though he's not your man, he supposedly chose
13  you as his confidant to confess a murder to, right?
14  **A.**   Not supposedly, he did.
15  **Q.**   Let's go around the room.  There's Mr. Ball, right?
16  **A.**   Um-hmm.
17  **Q.**   Right?  Antwuan Ball, you know him, obviously?
18  **A.**   Yeah, I know him.  He smack my tooth out my mouth.  I
19  know him.  Period.
20  **Q.**   And of course, he supposedly confessed to you, too,
21  didn't he?
22  **A.**   Yes.
23  **Q.**   Okay.  And as a matter of fact, he supposedly confessed
24  to you about Troy Lewis, right?
25  **A.**   Yes, he did.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6442*

1  **Q.**   Now, Troy Lewis was like family to you, wasn't he?
2  **A.**   He was -- he had a baby by my cousin.  He was cool.
3  **Q.**   Cool is a little bit -- cool is broader than close,
4  right?
5  **A.**   You want me to explain what I mean by "cool," so we
6  can --
7  **Q.**   No, I'll ask you a question.
8      Troy had a child through your cousin, right?
9  **A.**   Yes.
10  **Q.**   Yes.  When he was locked up, Troy used to call your
11  mother, correct?  Right?
12  **A.**   Looking for my cousin.
13  **Q.**   He called your mother collect.  He called your family
14  when he was locked up, right?
15  **A.**   He called my mother.
16  **Q.**   Your mother took those collect calls from Troy when he
17  was in jail, right?
18  **A.**   Yes.
19  **Q.**   Troy was welcome in your family's house, right?
20  **A.**   Yes, he was cool.
21  **Q.**   Okay, because he had a child with your cousin, right?
22  **A.**   Yes, sir.
23  **Q.**   You cared about him, didn't you?
24  **A.**   Yeah, he was cool.  I mean, at the time, I didn't have no
25  strong bond with him, where as though -- I was more tight with

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6443*

1 Antwuan I was with him, but I was learning, you know, to
2 get that closeness with him.
3 **Q.** Well, Troy was like family to you. Troy also gave you
4 drugs on credit, right?
5 **A.** Yes, sir.
6 **Q.** He trusted you?
7 **A.** Yes.
8 **Q.** You trusted him?
9 **A.** Yes.
10 **Q.** You cared about each other?
11 **A.** I don't know what that -- that caring didn't really get
12 to get that strong, but I cared enough to know I was messed up
13 when he got killed.
14 **Q.** And you didn't make no bones about the fact that you were
15 messed up when he was killed, right?
16 **A.** Naw, why would I do that?
17 **Q.** Right. I mean, you didn't hide --
18 **A.** -- trying to get me killed --
19 **Q.** -- the fact that you were emotionally upset that he was
20 murdered?
21 **A.** Was I emotionally?
22 **Q.** No, no, no. You didn't hide the fact that emotionally it
23 hurt you?
24 **A.** I wasn't running around crying or nothing like that, no.
25 **Q.** Well, you're not afraid to show your emotions, sir?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6444*

1 **A.** I mean, it's how you do it.
2 **Q.** You did it like a man, right? And you already told us
3 you're very proud of your manhood and you did it like a man, but
4 you weren't afraid to show that you were hurt by Troy's murder?
5 **A.** I mean, I wasn't walking around all pouting with my head
6 down and tucked, not like that, but I was kind of upset to see
7 he had to go.
8 **Q.** And notwithstanding the fact that you were upset, and
9 notwithstanding the fact that he had a child with your cousin,
10 who you were very close with, your cousin at that time, right?
11 **A.** Yes.
12 **Q.** Okay. Notwithstanding all that, supposedly Antwuan
13 confessed to you that, in fact, he did it, right?
14 **A.** Not supposedly. He did confess to me, sir.
15 **Q.** As a matter of fact, not only did he confess, he told you
16 two months before, according to your testimony, that he was
17 likely to do it, right?
18 **A.** I mean, he was giving, you know -- you know that he was
19 on that type of time.
20 **Q.** What's that mean on "that type of time"?
21 **A.** To touch him, to kill him.
22 **Q.** So, two months before he's going to kill your cousin, or
23 your cousin's baby's father, Antwuan Ball announces his intent
24 to kill, to you, right?
25 **A.** After he done it, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6445*

1 **Q.** No, no, no. You just told us two months before.
2 **A.** I thought you were saying after he done it.
3 **Q.** Well, you're telling us it was both.
4 All right. He confessed to you after the fact, even
5 though you were somewhat messed up about it. But two months
6 before it occurred, he came to you and told you Troy was on
7 some -- back in the day -- "Troy was doing some back in the day
8 cruddy stuff and he was on some messed up time," right?
9 **A.** Yes, sir.
10 **Q.** "Back in the day cruddy stuff" means betraying people,
11 right?
12 **A.** Robbing them or whatever.
13 **Q.** Stuff you used to do, right?
14 **A.** Yes.
15 **Q.** And so Antwuan Ball takes it upon himself to be the
16 sheriff of Congress Park?
17 MR. LEON: Objection to form.
18 THE COURT: Sustained.
19 BY MR. ZUCKER:
20 **Q.** All right. Antwuan Ball tells you the man's on some back
21 in the day cruddy stuff. I'm going to have to take care of it,
22 right?
23 **A.** Yes.
24 **Q.** And to you, that meant kill him, right?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6446*

1 **Q.** Of course, you did nothing to stop Antwuan Ball when he
2 announced his plans to kill Mr. Lewis, did you?
3 **A.** What you want me -- you going to try and get me killed.
4 What was I going to do? What could I have done about it? You
5 tell me what I could have done about it.
6 **Q.** Well, I don't know, you've killed other people?
7 **A.** Huh.
8 **Q.** You've killed other people?
9 **A.** Other people.
10 **Q.** Yeah. I mean, you've shot people, killed people, you'll
11 do anything to stop them.
12 **Q.** People or are we speaking one person?
13 **Q.** You only killed one person?
14 **A.** I helped kill a person, sir.
15 **Q.** But you shot at lots of others, right?
16 **A.** Yes, sir.
17 **Q.** So this man announces his intent to kill your cousin's
18 baby's father and you do nothing to stop him, right?
19 **A.** I think you got the streets messed up to where it's a
20 type of general business. I mean, me getting in the way, what
21 you think would have happened.
22 **Q.** The question was: You did nothing to stop him?
23 **A.** I couldn't, I'm trying to explain it to you.
24 **Q.** So you're explaining -- correct me if I'm wrong, sir,
25 you're giving me your excuse right now, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6447

1   **A.**   I'm not giving you no excuse, I'm telling you there's
2   nothing I could have done to stop it.
3   **Q.**   And you did nothing to warn Troy, who was like family to
4   you, right?
5   **A.**   No, sir.
6   **Q.**   And, of course, after it's done, Antwuan comes back and
7   confesses to you, right?
8   **A.**   Yes, sir.
9   **Q.**   You also claim someone else confessed to committing that
10  murder, didn't you, sir?
11  **A.**   Before, but I knew he ain't do it.
12  **Q.**   Well, at one time you claim that a guy named Smoke
13  confessed to you that he had committed that murder, not
14  Antwuan Ball, right?
15  **A.**   Yeah, but I also said that I knew that he was lying,
16  because I knew who done it.
17  **Q.**   But people just can't help themselves, they have to come
18  up and confess when they commit murders to you, don't they?
19  **A.**   He was the one who got his foot shot at when we was down
20  at the youth center.
21  **Q.**   The question was: People can't help themselves?
22      MR. LEON:   Objection.
23      THE COURT:   Is there an objection?
24      MR. LEON:   I was -- the witness is not allowed to finish
25  his answer.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6448

1      THE COURT:   Did you finish?
2      THE WITNESS:   Naw, he -- every time, you know.
3   BY MR. ZUCKER:
4   **Q.**   I'm not asking --
5      THE COURT:   You can finish.
6      THE WITNESS:   If I finish.  Sir.
7      THE COURT:   I'm saying if you haven't finished your
8   answer, go ahead and finish it, you may, if you want to.
9      THE WITNESS:   I'm sorry, I didn't hear you.
10     Smoke told me, you know what I'm saying, I was like man,
11  he shot at your foot, huh, and he was like yeah, man, I jive,
12  took care of that.  But I knew he didn't.  That was like a boost
13  to him, because who Troy was, and Troy had shot at his foot
14  looking for Truck.
15  BY MR. ZUCKER:
16  **Q.**   So now people come to you and confess murders to you that
17  they haven't really done?
18  **A.**   I was into the streets.
19  **Q.**   Sir, the question was this --
20  **A.**   People ran all the time.  I'm out there trying -- every
21  time I try to tell you something.
22  **Q.**   I want you to answer -- and I'm trying not to be rude
23  with you, sir, but I want you to answer the question I ask you.
24     The question I asked you was:  Not only are people
25  confessing to you when they commit murders, but now you're

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6449

1   claiming people confess to you to murders they hadn't even
2   committed, right?
3   **A.**   That's what he told me.
4   **Q.**   Now, of course -- well, let's talk about David Wilson
5   next.  Wop, you know him, right?
6   **A.**   Yeah, I know Wop.
7   **Q.**   Okay.  Prior to Squid being killed -- you know who Squid
8   is right, Middleton?
9   **A.**   Yeah, I know Squid.
10  **Q.**   You told us that prior to his being killed, Wilson comes
11  to you and tells you in advance that he's going to get him,
12  right?
13  **A.**   Yes.
14  **Q.**   And of course -- well, you were all with that, you were
15  ready to jump in on it, too, right?
16  **A.**   Yep.
17  **Q.**   Because -- what had Middleton ever done to you?
18  **A.**   I was into the streets, sir, and that's what we did.  We
19  together; we stick together.  I was going to go with him.
20  **Q.**   The question was, what had Middleton ever done to you,
21  and the answer is nothing, right?
22  **A.**   He got a beef with him.  At the time, he was my man; he
23  got a beef with me.
24  **Q.**   So you're ready to kill Middleton, and of course, Wop
25  tells you he's going kill him, right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6450

1   **A.**   Yes, sir.
2   **Q.**   And the murder actually happens.  Unfortunately for you,
3   you could play no part of it because you were locked up, right?
4   **A.**   Yes, I was locked up.
5   **Q.**   Okay.  And somebody -- you learned about it while you're
6   locked up, right?
7   **A.**   Yes, sir.
8   **Q.**   From a guy named Blue, right?
9   **A.**   Yes, sir.
10  **Q.**   Now, of course, Blue is on the other side of this beef,
11  right, according to you?
12  **A.**   I never know he had nothing to do with it, but I never
13  heard of his name or having something to do with the beef, but I
14  knew him and Squid was cool.
15  **Q.**   Well, they were both 15th Street guys?
16  **A.**   Yes.
17  **Q.**   So they were part of the same -- let's call it "team,"
18  they were part of the same team?
19  **A.**   I don't know what they -- just because he was cool with
20  him, it doesn't mean he was with his team or whatever.
21  **Q.**   But some guy who isn't a friend of yours, who's over on
22  15th Street, he's supposedly coming to you?
23  **A.**   15th Place.
24  **Q.**   15th Place.  Thank you.
25     He's supposedly coming to you and giving you information,

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6459

1  Q.  He drove people there who would commit it at his -- not
2  at his request, in conjunction with him, with his approval?
3  A.  He didn't say people committed it.  He said a person
4  committed it, sir.
5  Q.  A person?
6  A.  Yes.
7  Q.  Did he tell you who?
8  A.  You said he committed it, like who did the shooting.  One
9  person did the shooting.
10 Q.  One person did the shooting, but all three were in on it,
11 right?
12 A.  Yes, sir.
13 Q.  All three are guilty, right?
14     MR. LEON:  Objection.
15     THE COURT:  Sustained.
16 BY MR. ZUCKER:
17 Q.  All three -- Mr. Wilson put himself with that murder?
18 A.  Told me he drove, sir.
19 Q.  Knowing it was going to occur?
20 A.  Yes, sir.
21 Q.  All right.  So once again, just like Mr. Ball -- sorry --
22 he tells you before and after that he's going to commit the
23 murder, right?
24 A.  Yes, sir.  Sir, let me tell you, we a part of the
25 streets.  It's like -- it's like a lawyer, you tell your friends

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6460

1  at the firm that you going to do sometimes.  I'm in the streets,
2  that's what we do.  We explain to each other stuff, when we
3  close like that.  That's our territory right there.  We talk
4  about stuff like that.  It might sound crazy to you because you
5  not into that type of stuff, but we were.
6  Q.  Even though as early as 1998, before this happened,
7  rumors were flying around that you were hot, they trusted you
8  like that?
9  A.  Who?  Who said I was hot?
10 Q.  You said to people that someone at least was saying that?
11 A.  You said they.  One person said that.
12 Q.  Just one person?
13 A.  Yeah, but you said "they."
14 Q.  Well, you acknowledge that the rumor was flying around
15 that you were hot, right?
16 A.  A guy came to me that used to be up Gerard and said,
17 "Cadoza said that, "Man, you told on him, that's why he took a
18 cop."  I said, "Naw, he took a cop because he wanted to take a
19 cop."  They wasn't running around --
20 Q.  Mr. -- that was actually two murders Mr. Wilson confessed
21 to you, because he told you all about Sabrina, too, right?
22 A.  In '98, he told me about Squid and Sabrina.
23 Q.  Right.  Okay.  So we have Mr. Ball telling you before and
24 after on one murder.  We have Mr. Honeycutt telling you about a
25 murder.  We have Mr. Simms confessing a murder, and Mr. Ball

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6461

1  doing one.  And so far, Mr. Wilson's done two, and now we've
2  moved to the next murder, Sam Philips, right?
3  A.  Yes, sir.
4     MR. LEON:  Objection.  I apologize to the reference to
5  Mr. Wilson doing two.  I don't -- in 1998 -- I object to the
6  form.  It misstates the record.
7     THE COURT:  Objection to form is sustained.
8  BY MR. ZUCKER:
9  Q.  All right.  Mr. Wilson told you he was planning on
10 killing Sam Philips before it ever happened, right?
11 A.  Yes, sir.
12 Q.  Incidentally, as you told us, the reason had to do with a
13 woman named Ayo, correct?
14 A.  Yes.
15 Q.  Sam Philips had a baby with -- or had a child with Ayo
16 and was abusing her, and Ayo was at that point pregnant with
17 Mr. Wilson's child, right?
18 A.  You mean verbal abusing?
19 Q.  I don't know, you tell me.
20 A.  It had to be verbal.  He was locked up.
21 Q.  So, before Wilson does anything, he tells you he's going
22 to do it, right?
23 A.  Yes, sir.
24 Q.  Incidentally, those are the reasons -- and they have
25 absolutely nothing to do with any drug distributions going on in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6462

1  Congress Park, right?  It was strictly a personal matter
2  regarding both of them being involved romantically with the same
3  woman?
4  A.  Man, I don't know if it was his reason, but he said that
5  she was having a dispute with him.  Whether it's about -- I
6  wasn't all into all that.
7  Q.  It had nothing to do with any drug distributions that
8  occurred in Congress Park, right?
9     MR. LEON:  Objection, asked and answered.
10    THE COURT:  Sustained.
11 BY MR. ZUCKER:
12 Q.  Now, you weren't there when the murder happened, right?
13 A.  No, sir.
14 Q.  But you saw Mr. Wilson that day, right?
15 A.  Yes, sir.
16 Q.  You just happened to come by his apartment after the
17 murder, right?
18 A.  Naw, after -- it didn't just happen, he sent his cousin
19 to come get me, sir.
20 Q.  So he sent somebody to come get you so he could confess
21 to you?
22 A.  Yes, that was my man, he going to tell me what's going
23 on.
24 Q.  I see, I see.  And of course, the only other person
25 that's in that apartment that day with Mr. Wilson, that you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6463

1   recall, Larry Browne, right?
2   **A.**   Yes, he was in there.
3   **Q.**   And so the only -- you can corroborate that Browne was
4   there, right?
5            MR. LEON:  Objection to the form.
6            THE COURT:  Why don't you rephrase the question.
7            MR. ZUCKER:  I'll withdraw and move on.
8   BY MR. ZUCKER:
9   **Q.**   That's the same Larry Browne you've been incarcerated
10  with at CTF on the fourth floor in the cooperators wing, haven't
11  you?
12  **A.**   Yes, and in Arlington.
13  **Q.**   Also a cooperator's area, right?
14  **A.**   Yeah, the whole floor is cooperators.
15  **Q.**   So, two guys who are cooperating together are housed in
16  the cooperating wing, right?
17  **A.**   He was in one block.  I was in the other.  We go to the
18  gym together.
19  **Q.**   So you have contact with him, right?
20  **A.**   Yes, sir.
21  **Q.**   In fact, it says Arlington County on the back of this
22  green jumpsuit you're wearing, right?
23  **A.**   Yes.  He's in my block.
24  **Q.**   So you and he were in the same block over at CTF?
25  **A.**   No, sir.  I told you he was in another block over at CTF,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6464

1   sir.
2   **Q.**   In CTF, you weren't in the same block, but you could go
3   to the gym together, right?
4   **A.**   Yes, and outside.
5   **Q.**   And outside together?
6   **A.**   Yes, sir.
7   **Q.**   Okay.  And in Arlington, you have access to each other,
8   right?
9   **A.**   Yes, I see him every day.
10  **Q.**   And, of course, you've never -- you, when you saw him,
11  knew or figured out, as you already acknowledged, that he was
12  probably cooperating in this case against Mr. Wilson, right?
13  **A.**   I knew he was probably cooperating against someone on the
14  Sam's case, but I didn't know he was going to be on this case.
15  **Q.**   But you and he never talked about anything, did you?
16  **A.**   I said to him about the gun that he bought from Antwuan,
17  that Antwuan took from him, not about this case.
18  **Q.**   You knew he was there when Sam -- or believed he was in
19  when Sam Philips was killed and he knew you were in the
20  apartment that day, too, right?
21  **A.**   Yeah, he was in the apartment that day, sir.
22  **Q.**   And the two of you never discussed what each other was
23  going to say?
24  **A.**   All right.  You going to let me explain it to you or when
25  I explain.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6465

1   **Q.**   Just answer my question.
2   **A.**   I'm about to, if you let me.
3   **Q.**   If you want to give a response, go right ahead.
4   **A.**   He a government witness.  I'm a government witness.  I'm
5   not putting my trust of my life in his hands to go back and say
6   oh, Bobby told me this.  It ain't going down like this.  This is
7   my life on the line.  I ain't leaving my life in his hands to
8   say he telling me this.  Everybody up there cooperating.  That's
9   what they doing, they talking, so it's obvious that they would
10  go back and say something.
11  **Q.**   So you and he had a chance to get together and get your
12  stories to mesh, but you chose not to because you didn't trust
13  him and he didn't trust you?
14           MR. LEON:  Objection.
15           THE COURT:  Sustained.
16  BY MR. ZUCKER:
17  **Q.**   Okay.  You didn't trust him?
18  **A.**   In this situation, I trust myself, you know what I'm
19  saying?  I lost everybody.  It's me.  And I trust my daughter.
20  I don't trust --
21  **Q.**   The question was this:  You had the chance to get
22  together with him, make sure your stories meshed and chose not
23  to because you didn't trust him?
24  **A.**   I don't know -- I'm not worried about Bobby.  I don't
25  care what his story is or whatever he has to testify about.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6466

1   that's his business.  Bobby's business is Bobby's business, so
2   whatever he trying to put together, that's on him.  I ain't got
3   nothing to do with him.  I ain't got to deal with what Bobby got
4   to do.
5   **Q.**   Of course, if you had told -- discussed the case with
6   him, to make sure your stories were in line, you would tell us,
7   this jury, wouldn't you?
8   **A.**   Tell him -- what I need to talk to him for?
9   **Q.**   Please answer the question I asked you.
10  **A.**   I'm answering.  You won't let me answer.  I'm telling --
11  **Q.**   The question I asked --
12           THE COURT:  Let him answer the question.  Given the form
13  you used, you're going to let him answer the question.
14           You may answer.
15           MR. ZUCKER:  Very well.
16           THE WITNESS:  I answered to him the first time.  I'm the
17  government witness.  I don't care what he's doing.  I was told,
18  don't talk to nobody about the case.  Whatever he doing is what
19  he doing.  What I'm doing is what I'm doing.  It's none of his
20  business what I'm doing or what he's doing is none of my
21  business.  I have nothing to do with that.
22  BY MR. ZUCKER:
23  **Q.**   So you felt compelled to follow the government's
24  instructions, right?
25  **A.**   Yes, sir, I'm facing the rest of my life.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6467*

1  Q.   And had you not, you would have told us, right?
2  A.   It wouldn't have never been -- have you not -- I'm facing
3  the rest of my life.  My life is more important than explaining
4  to him about something.  It never would have -- that ain't even
5  a subject, sir.
6  Q.   Sir, you've been facing your life in prison basically
7  since the day of your arrest in 2001.
8  A.   Naw, I didn't know that at the time.
9  Q.   Sir, that night you were sitting in a police car after
10  you were arrested and Dominique Thurston walked by, my client's
11  sister, didn't she?
12  A.   That night, it was daytime, sir.
13  Q.   Well, whatever time of day it was, Dominique Thurston
14  walked by after you were arrested and put into custody, right?
15  A.   Yes, she, did she -- as a matter of fact, she came up to
16  the car.
17  Q.   And she talked to you, right?
18  A.   Talked to me?
19  Q.   You had a quick conversation, right?
20  A.   I don't remember having no conversation with her while
21  I'm in custody.
22  Q.   You don't remember telling her.  "Man, I ain't never
23  getting out of this one.  I ain't never getting out of this
24  one."
25  A.   I don't remember that.  Would you refresh my memory,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6468*

1  showing me something that shows I said that?
2  Q.   Why do you need to see something?
3  A.   Because I'm saying, you're saying I said this.  I'm
4  saying I never said -- I never told her I'm not coming out.  I
5  don't remember telling her that.
6  Q.   Well, you remember the truth, don't you, sir?
7  A.   Yes, sir.
8       MR. LEON:  Objection to the form.
9  BY MR. ZUCKER:
10  Q.   Why do you need to look at something to refresh your
11  recollection if it's true?  I thought it was only the lies you
12  don't recall?
13  A.   Sir, I testify about a lot of stuff.  I'm not going to
14  sit right here and say I didn't say it.  If it was something I
15  said, I maybe said it.  I don't remember saying nothing to her
16  like that.
17  Q.   So now you're saying maybe you said it, right?
18       MR. LEON:  Okay.
19       THE WITNESS:  I don't know.  I don't know.  I'm saying
20  maybe I did.
21       THE COURT:  What was it?
22       MR. LEON:  Objection, misstates the record.  The witness
23  has always said that.
24       THE COURT:  Rephrase your question.
25  BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6469*

1  Q.   You now acknowledge that maybe you said it, but don't
2  recall?
3       MR. LEON:  Same objection.
4       THE COURT:  I'll allow the answer.
5       THE WITNESS:  I don't remember what you're talking about,
6  sir.
7  BY MR. ZUCKER:
8  Q.   But you do acknowledge that you may have said it?
9  A.   I mean, I remember her coming to the car.
10  Q.   So you knew when you were on -- I think you were on
11  parole, or were you on parole and probation in 2001, when this
12  happened?
13  A.   Parole and probation?
14  Q.   Which were you on, both or just parole?
15  A.   I wasn't on parole or probation, not to my knowledge.
16  Q.   All right.  Sir, you knew there were machine guns found
17  in your house, right?
18  A.   Yes, but they don't take the rest of your life.
19  Q.   How much of your life do they take?
20  A.   Machine guns -- that's about 15 years.  Five years a gun,
21  from my knowledge.  I might be wrong.
22  Q.   And how many convictions did you have at that point?
23  A.   I don't even remember, sir.
24  Q.   You had -- that would have been your third felony, right?
25  A.   Yes, you right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6470*

1  Q.   Three time loser, life?
2  A.   Ain't nobody say anything to me about I was a three time
3  loser.
4  Q.   Well, you had two prior felonies, right, at least --
5  several felonies, right?
6  A.   I don't remember nobody saying nothing to me about being
7  a three time felon.
8  Q.   Did you have at least two prior felonies?
9       MR. LEON:  Objection asked and answered.
10       THE COURT:  Sustained.
11  BY MR. ZUCKER:
12  Q.   You were convicted of a felony -- you pled guilty to the
13  two felonies we discussed earlier today, didn't you, sir?
14       MR. LEON:  Objection.
15       THE COURT:  Sustained.
16       MR. ZUCKER:  May I approach for a second?  I'm not sure I
17  understand.
18       THE COURT:  No, no.  It's asked and answered.  It's
19  sustained.  Move forward.
20  BY MR. ZUCKER:
21  Q.   You knew you were looking at, if not life, substantially
22  the rest of your life in prison.
23       MR. LEON:  Objection, asked and answered.
24       THE COURT:  Sustained.
25  BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6475

1 killed Squid -- or he was involved in the murder of Squid,
2 right?
3 **A.** Yes, sir.
4 **Q.** David Wilson announced, and he also admitted his
5 involvement in the murder of Sabrina, correct?
6 **A.** Yes, sir.
7 **Q.** David Wilson supposedly told you before and after of his
8 plans to kill Sam Philips, correct?
9 **A.** Yes, sir.
10 **Q.** And Dominic Samuels, years before the murder actually
11 happened, tells you of his plans to commit murder for Jamal,
12 correct?
13 **A.** I don't remember him telling me a plan. I remember him
14 telling me he going to kill him.
15 **Q.** Okay. Fair enough. And you've been able to take each of
16 those confessions and play them to your advantage in deals with
17 the government, haven't you?
18 **A.** I just told the truth, sir, about what they told me.
19 **Q.** Have you used them to seek benefits from the government?
20 MR. LEON: Objection asked and answered.
21 THE COURT: Sustained.
22 BY MR. ZUCKER:
23 **Q.** Are you using them now?
24 **A.** I'm here to tell the truth, sir.
25 **Q.** Well, it's certainly lucky for you that everybody

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6476

1 confesses to you, so that you have something to trade when
2 you're looking at life in prison, isn't it, sir?
3 MR. LEON: Objection.
4 THE COURT: Sustained.
5 BY MR. ZUCKER:
6 **Q.** Let's turn to the D-Lock murder, sir?
7 **A.** Yes, sir.
8 **Q.** Right?
9 **A.** Yes, sir.
10 **Q.** That's the one that you admit you played some role in and
11 pleaded guilty to, correct?
12 **A.** Some role. I played a role in it.
13 **Q.** And that, of course, occurred back in 1999, correct?
14 **A.** No, sir.
15 **Q.** What year did it occur?
16 **A.** '98.
17 **Q.** Okay. You were -- were you cooperating at that time, as
18 well?
19 **A.** No, sir.
20 **Q.** You weren't working with Wills back then?
21 **A.** No, sir. '99.
22 **Q.** And when you started to cooperate with Wills, I think
23 that was '99?
24 **A.** Yes, sir.
25 **Q.** And is Mike Wills a homicide detective out of 7-D?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6477

1 **A.** Yes, sir.
2 **Q.** He's now retired?
3 **A.** I don't know nothing about that.
4 **Q.** At that point, three people were charged by police; isn't
5 that correct?
6 **A.** Yes, sir.
7 **Q.** The three people were Jasmine Bell, Taneal Wilson, Donte
8 Jenkins, right?
9 **A.** Yes, sir.
10 **Q.** Now, because you were in the murder -- involved in that
11 murder, you knew they were completely innocent; isn't that
12 correct?
13 **A.** Yes, I knew, sir.
14 **Q.** Right?
15 **A.** Yes, sir.
16 **Q.** And nonetheless, when it came time for you to cooperate,
17 you said that they had committed the murder, didn't you,
18 initially?
19 **A.** I remember saying they had something to do with it. I
20 don't remember exactly what I said, sir.
21 **Q.** What does it mean, "they had something to do with it"?
22 **A.** I said.
23 **Q.** That means they did it, right?
24 **A.** I remember -- not in detail, sir, but I remember them
25 saying they had something to do with it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6478

1 **Q.** So you told the police that three innocent men committed
2 a murder that you knew you had done, right?
3 **A.** They ain't have nothing to do with that, but I wouldn't
4 say they was innocent.
5 **Q.** But we're only talking about the murder of D-Lock. You
6 knew they were innocent of that, right?
7 **A.** Oh, yes, sir.
8 **Q.** They may not have been morally without sin, but they
9 hadn't committed the murder that was being charged, right?
10 **A.** Yes, sir.
11 **Q.** You knew you had done that, right?
12 **A.** Yes, sir.
13 **Q.** They were innocent of that, right?
14 **A.** I was innocent of that, sir.
15 **Q.** You were innocent of that murder?
16 **A.** I had something to do with it, sir.
17 **Q.** But innocent means not guilty, you didn't do it, right?
18 **A.** I'm sorry. I apologize for that. Rephrase it.
19 **Q.** You knew they had not committed that murder, right?
20 **A.** Yes, sir.
21 **Q.** You knew the police had already accused them of that
22 murder, right?
23 **A.** Somebody accused them.
24 **Q.** Somebody accused them and the police arrested them and
25 was prosecuting, charging three innocent men, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6487

1  talk about the fact of the dismissal, because that doesn't
2  matter.  What matters is what's in his head, what's motivating
3  his behavior.
4      MR. ZUCKER:  Okay.  I'll use the word "thought."
5      (Sidebar discussion concluded.)
6  BY MR. ZUCKER:
7  Q.  When you were cooperating, you knew that my client,
8  Mr. Thurston, had previously been accused -- or charged with
9  that murder, correct?
10 A.  Charged with what murder?
11 Q.  Not murder, shooting.
12 A.  Oh, yes.
13 Q.  And you thought those cases had been -- those charges had
14 been dismissed; isn't that correct?
15 A.  Yes, from what he told me.
16 Q.  And so, then you came forward to the government and
17 basically offered to fill in the blank by saying Mr. Thurston
18 confessed?
19     MR. LEON:  Objection to the form.
20     THE COURT:  Well, do you understand the question?
21     THE WITNESS:  Yes, I understand.
22     THE COURT:  I'll let you answer.
23     THE WITNESS:  It wasn't about no filling in the blanks, it
24 was just what he told me.  And I was told to tell the truth about
25 the things that I know.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6488

1  BY MR. ZUCKER:
2  Q.  Sir, you were never told to lie, were you?
3  A.  No.
4  Q.  Okay.  You were always told by your lawyer, by the
5  government, by the police, to tell the truth, right?
6  A.  I was always told to tell the truth, sir.
7  Q.  Okay.  You chose to lie in the past, right?
8  A.  Yes, sir.
9  Q.  You chose to lie repeatedly, frequently, and virtually
10 every time you met with the government prior to --
11     MR. LEON:  Objection.
12 BY MR. ZUCKER:
13 Q.  -- prior to this supposed conversation with Mr. Hunt,
14 right?
15     THE COURT:  Hold on one second.
16     What?
17     MR. LEON:  Compound, argumentative and inaccurate.
18     THE COURT:  Let me ask you to rephrase your question and
19 make it noncompound and nonargumentative.
20 BY MR. ZUCKER:
21 Q.  You had many meetings with the government, prosecutors,
22 detectives, police, correct?
23 A.  Yes, sir.
24 Q.  You had meetings going back from '96 till today or
25 yesterday, or whenever you started to testify, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6489

1  A.  I had a lot of meetings, sir.
2  Q.  And at every meeting, the government always told you to
3  tell the truth, right?
4  A.  Yes, sir.
5  Q.  Your lawyer, all the lawyers who represented you
6  throughout all your cooperation agreements, have always told you
7  to tell the truth, right?
8  A.  Yes, sir.
9  Q.  Okay.  You tell us, you acknowledge that in your first
10 meetings with law enforcement in this case, you lied repeatedly,
11 right?
12 A.  Yes, sir.
13 Q.  And you claim that now you're telling the truth, right?
14 A.  Yes, it's my life on the line, it's important.
15     THE COURT:  I'm sorry, did you object?
16     MR. LEON:  No.
17     THE COURT:  All right.
18 BY MR. ZUCKER:
19 Q.  Let's return to Mr. Thurston and your accusation -- your
20 claim that he confessed the Faison shooting to you, all right?
21 A.  I'm sorry, but I ain't know his name by Faison.
22 Q.  JJ, you knew him as?
23 A.  Yes.
24 Q.  Incidentally, you used the name JJ and Cooler?
25 A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6490

1  Q.  You know Cooler's real name?
2  A.  No, sir.
3  Q.  And you claim -- to back up a second, and I'm not trying
4  to be repetitive, but you already acknowledged that you knew my
5  client had been charged with that shooting and you thought those
6  charges had been dismissed?
7      MR. BALAREZO:  Objection, asked and answered.
8      THE COURT:  Sustained.
9  BY MR. ZUCKER:
10 Q.  All right.  When you came forward with that information
11 that my client supposedly confessed, you were seeking to gain a
12 benefit, right?
13 A.  Yes.
14 Q.  And basically, you were doing the exact same thing as you
15 had done with Mr. Bell, Jasmine Bell, Taneal Wilson and
16 Donte Jenkins, right?
17 A.  Yes, sir.
18     MR. BALAREZO:  Objection to the form.
19     THE COURT:  Overruled.
20     THE WITNESS:  Yes, sir.
21 BY MR. ZUCKER:
22 Q.  And those were, of course, the three people who were
23 innocent, and you sought to gain an advantage by saying they had
24 confessed to you, or at least one of them had?
25 A.  Yes, I have lied, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6491

1  **Q.**  Now, you told the police several different versions

2  regarding the -- I'm sorry, there are so many -- the D-Lock

3  murder; isn't that correct?

4  **A.**  I remember lying to them.  I don't remember how many

5  times.

6  **Q.**  Well, you told them repeated lies, didn't you, sir?

7  **A.**  Yes, sir.

8  **Q.**  The first lie you told them was, the three guys they had

9  accused of doing it, actually did it, right?

10  **A.**  Yes, sir.

11  **Q.**  Then later you told them another lie, right?

12  **A.**  Yes.

13  **Q.**  You told them it was LT, who's Antonio Robinson?

14  **A.**  Roberson.

15  **Q.**  Huh?

16  **A.**  Roberson.

17  **Q.**  Thank you.  It's pronounced Roberson, not Robinson?

18  **A.**  Yes, sir.

19  **Q.**  All right.  Thank you.  LT and Tony Roberson, Keith

20  Barnett and Barnett's cousin, Tim, who did that shooting, right?

21  **A.**  I remember telling them something, but I don't remember

22  every detail about what I told them, sir.

23  **Q.**  You do recall telling them -- first you told them the one

24  version of the three people who they accused had done it, then

25  you told them another version that three other people done it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6492

1  **A.**  I remember lying to them.  I'm not going to sit here and

2  tell you I remember every version that I lied to them about.

3  **Q.**  Do you recall how many lies you told them?  How many

4  versions you told them?

5  **A.**  No, sir.

6  **Q.**  You don't recall telling them -- you recall the first

7  lie, you don't recall the second version I just said to you,

8  right?

9  **A.**  Well, they were being charged with it, so I'm going to,

10  of course, remember I kind of lied to them about it.

11  **Q.**  But you don't remember the second group of guys you lied

12  to, huh?

13  **A.**  I remember lying.

14  **Q.**  You don't remember who you put in it?

15  **A.**  I remember saying some names.  I don't remember the

16  details about the lies.

17  **Q.**  And then you had another meeting in 1999 with the

18  police -- I'm sorry.  The lies were initially told to the

19  police, and then in February -- correct that, December 1999, you

20  had a pretty significant meeting where the FBI was involved,

21  right?

22  **A.**  I don't remember the FBI being involved in '99.  I don't

23  remember.

24  MR. ZUCKER:  I'm sorry.  Court's indulgence.

25  Could we approach for a second, Judge?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6493

1  THE COURT:  Yes.

2  (Following sidebar discussion had on the record:)

3  MR. ZUCKER:  I want to proceed delicately in view of your

4  ruling about the polygraph.  December 14th, 1999 was the meeting

5  with the FBI, where he took the polygraph and was confronted with

6  the fact that they didn't believe him.  I don't want to elicit

7  the polygraph, given your ruling.  I want to approach and I'll

8  try to lead him, as much as I can, about this meeting without

9  eliciting that, but I wanted to show him this document and see if

10  it refreshes his recollection that in December 1999 that he met

11  with the FBI and they confronted him.  I am in line with your 401

12  ruling yesterday, that I can lead him into -- they didn't believe

13  him.  They told him they didn't believe him, that kind of

14  questioning.  I just want to do it so everybody knows before I

15  step over any lines.

16  MR. LEON:  I guess I have a couple of concerns and

17  objections.  One is --

18  THE COURT:  Well, we've actually reached the lunch break

19  point.  So let's break.  I'll hear you after the jury leaves,

20  briefly, so everybody can have a full hour and 15 minutes.

21  MR. ZUCKER:  Okay.

22  (Sidebar discussion concluded.)

23  THE COURT:  Ladies and gentlemen, we've reached the lunch

24  break point anyway, so let me release you for lunch.  Please come

25  back in 1 hour and 15 minutes.  That would be 1:50.  And so,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6494

1  please don't talk about the case.  Take your notes back to the

2  jury room.  Thank you very much.

3  (Jury out at 12:35 p.m.)

4  THE COURT:  All right.  Let's release the witness.

5  All right, Mr. Zucker, why don't you come on back up.

6  Mr. Leon, you were going to respond.

7  MR. LEON:  I guess a couple things.  I don't know if

8  there's a basis yet for refreshing recollection.  There may be or

9  not.

10  THE COURT:  He said I don't remember meeting with the FBI

11  in '99.  That's when Mr. Zuker asked to approach, so I take it

12  this exhibit is some kind of a 99 FBI report.

13  MR. LEON:  I'm sorry.  Actually, I think -- my

14  understanding is that the witness' answer was quite correct.  He

15  didn't meet with the FBI in '99.  He met with Detective Mike

16  Wills, who is MPD.  This witness listens very carefully to the

17  question.  I think the question was technically correct -- the

18  answer was correct.  He didn't meet with the FBI in '99.  He

19  never worked with the FBI in '99.

20  THE COURT:  Who did the exam?

21  MR. LEON:  MPD.

22  THE COURT:  Okay.

23  MR. ZUCKER:  And maybe I misread it.  He met at the

24  Washington field office.  I assumed it was an FBI headquarters --

25  you're saying there was no FBI agent there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1                    P R O C E E D I N G S

2          THE COURT:  Mr. Zucker, are you ready for the jury?

3          MR. BALAREZO:  Your Honor, very briefly, I had asked

4 the Court to allow me to re-open the cross --

5          THE COURT:  Let's take it up...

6               (OFF THE RECORD.)

7               (Jury in at 1:53 p.m.  )

8          THE COURT:  Good afternoon, ladies and gentlemen.

9 Welcome back.  We're ready to resume.  Mr. Zucker?

10          MR. ZUCKER:  Thank you, Judge.

11               CONTINUED CROSS EXAMINATION

12 BY MR. ZUCKER:

13 Q.  Before we broke for lunch, Mr. Capies, I was directing your

14 attention to a meeting in December of 1999.  And it was a

15 meeting that you had with primarily Metropolitan Police

16 Department officers, but it was at the Washington field office

17 for the FBI.

18          Do you recall that now?

19 A.  Yes.

20 Q.  Okay.  And in that meeting, this was after you had given --

21 well, you had given -- and this was, primarily I'm asking you

22 questions about the D-Lock murder.  You gave the original, what

23 you concede lie, where you accused the three people the police

24 accused.  And then you gave the subsequent lie where you talked

25 about LT, Keith Barnett, and Keith Barnett's cousin Tim.  Right?

1 A.  I remember lying to them.

2 Q.  Okay.  You had that subsequent meeting in the FBI

3 headquarters with Metropolitan Police Department officers where,

4 without going into what they said, they made it very clear to

5 you that they did not believe you, that they knew you were being

6 untruthful, and they suspected that you played a role in this

7 offense.  Isn't that correct?

8 A.  I can't remember, but I remember they said they thought I

9 had something to do with it.

10 Q.  They said that -- you remember that they said they thought

11 you had something to do with it.  Right?

12 A.  Yes, sir.

13 Q.  And they made it very clear they did not believe the second

14 version of events you had given.  Right?

15 A.  No, they didn't.  They didn't make it clear that they --

16 they didn't say nothing.  They just was like, "We got

17 speculation that you had something to do with it."

18 Q.  And when you had that information, you told them yet another

19 version.  Isn't that correct, sir?

20 A.  I don't remember.

21 Q.  All right.  Sir, I'm going to show you a document that's

22 been shown to government counsel and previously marked as

23 Defendant Wilson 14E, or 17E?  17E.  And I'm just going to show

24 it to you, and I'm going to direct your attention to it.

25          And I'm going to ask you -- we don't need to go through

1 exactly what it is.  I'm just going to show you some portions

2 and ask you to read it, and see if that refreshes your

3 recollection.  Okay?

4 A.  Yes, sir.

5 Q.  Why don't you take a look at the top of page two, the first

6 two paragraphs.

7 A.  (Witness complies.)

8 Q.  Really, the second paragraph.

9         THE COURT:  I'm sorry, did you say 17E or D?

10         MR. ZUCKER:  Yes.  Wilson, 17E, as in Edward.

11         THE COURT:  Thank you.

12 BY MR. ZUCKER:

13 Q.  Is your recollection now refreshed?

14 A.  Yes, sir.

15 Q.  And in fact, at that point you told them a third version

16 where again you denied playing any role in the murder, but said

17 that the car which was used was one that you had owned months

18 before.  Correct?

19 A.  Yes, sir.

20 Q.  And that all you did was, when you heard that the car you

21 had used -- I'm sorry, owned months before was used, you took

22 that car and burned it.  Right?

23 A.  Yes, sir.

24 Q.  So this is now the third version of events you've told them.

25 Right?

1 A.  Yes.  I lied to them, sir.

2 Q.  And then in that same interview you told them a fourth

3 version of events.  Isn't that correct, sir?  Take a look at the

4 bottom of the page and see if that refreshes your recollection.

5 A.  (Witness complies.)  Yes, sir.

6 Q.  And in that version you claimed a completely different

7 person confessed his role in that event, didn't you?

8 A.  Yes.  I lied, sir.

9 Q.  You lied and you claimed that Jasmine Bell now confessed his

10 involvement in this murder.  Take a look at the last paragraph

11 if you need to.

12 A.  (Witness complies.)  Yes, sir.

13 Q.  And you provided an excuse for your prior lies by claiming

14 that Jasmine Bell's brother was still on the street.  Right?

15 A.  I don't see that, sir.

16 Q.  Well, we're asking about whether or not your recollection is

17 refreshed, telling them that.  If it isn't, it isn't.

18 A.  I remember lying to them.  What it was done, I'm not going

19 to argue with you, sir.

20 Q.  Take a look at the top of the next page and see if that

21 refreshes your recollection.

22 A.  (Witness complies.)  Yes, sir.

23 Q.  Okay.  So then, I don't know if it was your fourth or fifth

24 version, you claimed Jasmine Bell confessed to it, but you were

25 reluctant to put Jasmine Bell's name in it because his brother

1 was on the street.  Right?

2 A.  I see it down there.  I don't remember saying it, though,

3 sir.

4 Q.  I'm sorry?

5 A.  It's down there.  I ain't going to argue with you.  It's

6 what I did, sir.

7 Q.  And you also claimed that you were afraid of him because his

8 brother was friends with a police officer.  Right?

9 A.  I was afraid at certain point about his brother, though,

10 sir, when I was cooperating with Mike Will.

11 Q.  So that was the fifth version.

12      Now, you also told the police earlier that day, not

13 only were you not there, but you were in an apartment and heard

14 some shots.  Do you recall that?

15 A.  I don't remember, sir.  But I remember lying to them.

16 Q.  I understand.  I'm trying to refresh your recollection about

17 the lies, some of the lies you told.

18      Take a look at the next paragraph and see if your

19 recollection is refreshed.

20 A.  (Witness complies.)  Yes, sir.  I see it, sir.

21 Q.  And you said you were in an apartment, heard some shots,

22 waited a little time, and then walked out.  Right?

23 A.  That's what it says, sir.

24 Q.  Well, that's what you had said.  That was, I guess the fifth

25 or sixth version?

1 A.  I don't remember saying it.  But if it's down there, I'm not

2 going to argue with you about it, sir.

3 Q.  And then when you walked out, you then saw the victim.

4 Right?

5          MR. LEON:  Your Honor, I would just ask that the record

6 reflect the witness is now reading the document.  He hasn't said

7 that he doesn't remember.  It's unclear if we're refreshing

8 recollection, or if the witness is being asked just to read a

9 document that someone else wrote.

10 BY MR. ZUCKER:

11 Q.  Well, see -- if you would, just see if that refreshes your

12 recollection, and lift your head up when you've had a chance.

13 A.  (Witness complies.)  I remember seeing the victim.

14 Q.  Well, anyway, let me back up a second.  You recall -- the

15 lie you told that day, or I guess we're up to the fifth or

16 sixth, was that you were in an apartment, you heard some shots,

17 and once you heard the shots, you went outside.  Is that

18 correct?

19          MR. LEON:  Objection.  Asked and answered.

20          THE COURT:  Sustained.

21 BY MR. ZUCKER:

22 Q.  That's a lot like the story you told in relation to the Troy

23 Lewis shooting, isn't it, sir?

24          MR. LEON:  Objection.  Assumes facts not in evidence.

25          THE COURT:  Sustained.

1 BY MR. ZUCKER:

2 Q.  Well, the claim that you were in an apartment and heard

3 shots and went outside, is that how you recalled, or that's how

4 you recounted what happened in the Troy Lewis incident.  Isn't

5 it?

6 A.  That's what happened, sir.

7 Q.  And you made that same or a very similar claim in relation

8 to this D-Lock shooting.  Isn't that correct, sir?

9          MR. LEON:  Objection.

10          THE COURT:  Sustained.

11 BY MR. ZUCKER:

12 Q.  Now, years later, in 2002, January 17th, January 18th, and

13 January 28th, '02, you met with other police officers.  Isn't

14 that correct?

15 A.  I don't remember the date.  I remember meeting with a lot of

16 them.

17 Q.  It was actually officers.  And then that meeting was also

18 Agent Fulmer, Agent Lockhart, Assistant U.S. Attorney Jeff

19 Beatrice, and your lawyer Paul Hunt.  Isn't that correct?

20 A.  I remember meeting with them.  The exact date, I don't know.

21 Q.  Fair enough.  But you also, at this point you're three years

22 down the road, having told five or six lies, and you discuss

23 this event with them again.  Isn't that correct?

24 A.  You got to rephrase that.  I didn't catch that.

25 Q.  Sure.  This is after the 1999 five versions, six versions

Page 6510

1 you gave, you met with the police and the FBI at this point,

2 again.  Isn't that correct?

3 A.  Yes, sir.

4 Q.  And when you met with them, you told them additional lies

5 about what had happened.  Isn't that correct?

6 A.  Additional lies.  What you mean?

7 Q.  Right.  Well, you told them it was Keith Barnett driving, LT

8 shooting, and Jazz was in the car but froze.

9 A.  I remember lying to them, sir.  I don't know the specifics

10 on it.

11          MR. ZUCKER:  Court's indulgence.

12          Let the record reflect I'm showing the witness what has

13 been marked as Defendant Wilson 17G, one-seven-G, not admitted.

14 BY MR. ZUCKER:

15 Q.  First of all, have you ever seen this document before, sir?

16 A.  I don't remember.  I've seen a lot of documents.  I don't

17 remember seeing this, sir.

18 Q.  Take a look at page two of that document.  Read it to

19 yourself and see if it refreshes your recollection as to what

20 you told the FBI during those three days of debriefing.

21 A.  (Witness complies.)

22 Q.  Have you had a chance to review it, sir?  If you want more

23 time, we'll give you more time.

24 A.  No.  Yes, sir, I read it.

25 Q.  Okay.  Having your recollection refreshed, do you now recall

1 telling a different series of lies for the FBI on that day?

2 A.  Yes, sir.

3 Q.  And that day you claimed it was Keith Barnett driving, LT,

4 Antonio Robinson as the primary shooter; and Jazz, who was also

5 in the car and got out, but you thought he didn't shoot.

6         Do you recall telling that lie?  In the interest of

7 time, I direct you to the bottom of that page.

8 A.  I don't remember telling them that, sir.  But I remember me

9 talking to them and lying to them.

10 Q.  You've told so many lies, you can't keep them straight?

11 A.  I remember lying to them, sir.

12 Q.  And sir, you're still lying about what happened that night,

13 aren't you?

14 A.  No, sir.  I had something to do with it, sir.  I was

15 involved in it.

16 Q.  Well, you've acknowledged you're involved in it and saying

17 you had something to do with it.  But Devon Chandler was shot a

18 bunch of times, wasn't he?

19 A.  Yes, sir.

20 Q.  Somebody stood over him, after he was wounded and down on

21 the ground, and basically emptied the clip into him, didn't

22 they?

23 A.  Yes, sir.

24 Q.  He was helpless, wounded, completely incapable of doing

25 anything to anyone.  And someone just stood over him and shot

1 about a couple of minutes ago.  Right?

2 A.  You said something about 10th Place.

3 Q.  Okay, okay.  You do remember there being a Congress Park

4 team that Lonnie Pharrell, Jojo, Boy-Boy, Antwuan, Zoe, and

5 Keith B played on, don't you?

6 A.  Yes.  Is you going let me explain?

7 Q.  Why not?

8 A.  Remember, I was telling you that LT was trying to tell me

9 over the phone about somebody balling?  That's why I couldn't

10 get, because they was playing then.  But afterwards, they wasn't

11 playing them in no ball.  They was playing them at one point in

12 time.

13 Q.  And you recognize this headband as being part of that team's

14 uniform, do you not?

15 A.  I never seen their uniforms.  I knew they was playing in a

16 team.  I never seen their uniforms.  Lonnie, Dazz, everybody

17 went.  That's claiming your crew, since, you know...

18 Q.  I'm sorry.  Repeat the last thing you said.

19 A.  That's claiming your crew.  Like, when you on a crew, that's

20 how you claim your crew.  You got your headband on Congress Park

21 Crew.  It ain't got nothing to do with no basketball, man, we

22 gone keep it real.

23 Q.  They played, all those guys from that neighborhood played on

24 the same team.  Right?

25 A.  All what guys?

1 Q.  The guys that we just listed that you acknowledged were on

2 the team:  Jojo, Lonnie, Boy-Boy, Antwuan, Birdman, Zoe, Keith.

3 A.  They played on them.  I was locked up when they played on

4 the team.

5 Q.  But you knew about it.

6 A.  The team wasn't going on when I was home.  So it wasn't no

7 team.  It's real, man.  They was headbands, they from the

8 Congress Park Crew.  That's why they're wearing a headband.

9 Q.  And Lonnie Pharrell played on that team as well, as you've

10 acknowledged.  Right?

11 A.  Yes, sir.

12 Q.  And he played for Georgetown.  Right?

13 A.  Yes, sir.

14 Q.  And he played -- he still plays in the one-on-one, I

15 think --

16 A.  And-One.

17 Q.  And-One League, the Three-on-Three League.  Right?

18 A.  Yes, sir.

19 Q.  Plays on TV and tournaments?

20 A.  I don't know about no Three-on-Three.

21 Q.  Isn't the And-One league a three-on-three?

22 A.  It's a five-on-five, from what I see on Sports Center.

23          MR. LEON:  Object to the scope and relevance.

24          THE COURT:  I'll allow it.

25 BY MR. ZUCKER:

1 Q.  You also were telling us last week that you never go to

2 funerals.  Right?

3 A.  Nope, never went to a funeral.  I don't want to see nobody

4 in a casket.

5 Q.  You don't want to see anybody dead?

6 A.  If I want to remember somebody that I love, I want to see

7 them -- remember how I seen them.

8 Q.  I see.  So you never wanted to see anybody in a casket.  Is

9 that correct?

10 A.  Can't nobody ever tell you they seen me at a funeral.

11 Nobody.

12 Q.  Ah, but when you grandmother died, you did request to go to

13 her viewing, did you not, sir?

14 A.  Yes, I did.

15 Q.  I thought you didn't want to see anybody in a casket?

16 A.  That's who raised me, sir.  I wanted to see her.

17 Q.  I thought you never wanted to see anyone in a casket,

18 especially someone you loved.

19 A.  I wanted to see her, sir.  She raised me.

20 Q.  So that wasn't just -- and when I say you filled out a

21 request, that was when you were locked up.  Right?

22 A.  Yes, sir.

23 Q.  So even though you don't want to ever see anybody in a

24 casket, and never want to go to a funeral, when your grandmother

25 died you requested to be released from jail to go to her

1 viewing.  Correct?

2 A.  I wasn't going to be released.  Somebody was going to be

3 with me.

4 Q.  But you were going to come out of the jail.  Right?

5 A.  Yes, sir.

6 Q.  That wasn't just some scam you were trying to pull, was it?

7 A.  I'm going to say it to you like this:  My grandmother raised

8 me.  She raised me.  I wanted to see her.  I don't go to

9 funerals, but I would have went to my grandmother's funeral,

10 sir.

11 Q.  You would have.  You would have made an exception for her?

12 A.  Yes, sir.

13 Q.  So when you were locked up, you were willing to make an

14 exception for your grandmother but not for anyone else, even

15 though you're opposed to funerals?

16 A.  Yes, sir.  I would have went to my grandmother's funeral.

17 Q.  Okay.  Let's turn for a moment to what you talked about, the

18 shoot-out on 10th Place.  Do you recall that, when you were

19 locked up?

20 A.  Turned to what?

21 Q.  All right, just by way of context.  You spoke about, last

22 week, having conversations with my client as well as other

23 people, Wop, LT, about a shoot-out on 10th Place when you were

24 locked up.  Do you recall that?

25 A.  Yes, sir.

1 Q.  I take it you were locked up in the summer of '96.  Correct?

2 A.  Yes.

3 Q.  And then in September of '96, Head got killed.  Right?

4 A.  Yes.

5 Q.  And in October of '96, Meatball got killed.  Right?

6 A.  Yes, sir.

7 Q.  And then you got released the following -- well, two months

8 later, in December of '96.  Right?

9 A.  Yes, sir.

10 Q.  And you told us about conversations you had regarding

11 retaliation.

12 A.  Yes, sir.

13 Q.  All right.  And you had several of those conversations.

14 Right?

15 A.  Yes, sir.

16 Q.  And you had them with -- well, you claim you had them with

17 Wop and LT and my client, Dazz.  Right?

18 A.  Yes, sir.

19 Q.  And Dazz in particular you had a feud with, and he told you

20 how they tried to creep up on 10th Place and shoot them up.

21 Right?

22 A.  Yes, sir.

23 Q.  And that they got into a shoot-out with two guys named

24 Steven and Patrick.  Right?

25 A.  Yes, sir.

1 Q.  And these conversations occurred in early '97, shortly after

2 your release.  Right?

3 A.  Yes, sir.

4 Q.  And where did these conversations occur?

5 A.  I remember talking to him, like '97.

6 Q.  Well, let's talk about -- the question was, where?

7 A.  Around Congress Park.

8 Q.  Well, in particular you said it was shortly after you were

9 released.  And when we asked you, you said it was January or

10 February of '97.  Correct?

11 A.  It was sometime in '97.

12 Q.  You said January or February of '97, right after you were

13 released.

14 A.  That's when I was released, in '96 of December.  So it had

15 to be.

16 Q.  Had to be January or February of '97?

17 A.  Yes, sir.

18 Q.  Where did they occur, this conversation, particularly the

19 conversation with my client, Dazz?

20 A.  I can't remember, sir.  But I remember talking to him.

21 Q.  You don't remember the location?

22 A.  I can't remember right now.

23 Q.  Do you remember whether it was inside or outside?

24 A.  I remember talking to him.

25 Q.  I understand that.  The question is, where did you talk to

1 him, inside or outside?

2 A.  I can't remember right now, sir.

3 Q.  Night or day?

4 A.  I can't remember.

5 Q.  What was he wearing?

6 A.  I can't remember.

7 Q.  Who else was there?

8 A.  I can't remember that right now.  I remember talking to him,

9 sir.

10 Q.  All you can remember is that it was January or February of

11 '97 -- well, right after -- shortly after your release.  Right?

12 A.  Yes.  And I also talked to him again about other things,

13 too.

14 Q.  All right.  All right.  But you can't remember where, when,

15 what time of day, inside, out, about these conversations in

16 January or February of '97, sitting here today, can you?

17 A.  I'm testifying about a rack of stuff.  If I could remember

18 accurately every detail, then I wouldn't be right here.

19 Q.  Why not?

20 A.  I can't hear you.

21 Q.  I said, "Why not?"  Why wouldn't you be here?

22 A.  Because I would have made all these smart decisions not to

23 put myself into this situation if I was so perfect.

24 Q.  But you do recall speaking to Dazz in particular several

25 time in January and February of '97.  Right?

Page 6534

1 A.  Yes, sir.

2 Q.  And you can't remember what he was wearing, or where?

3         MR. LEON:  Objection.  Asked and answered.

4         THE COURT:  Sustained.

5 BY MR. ZUCKER:

6 Q.  Was he wearing a green jumpsuit like yours when you spoke

7 with him?

8 A.  No, sir.

9 Q.  Sir, when you spoke with him in January and February of

10 1997, you said it in Congress Park?

11 A.  It had to be.  That's where we from.  It wasn't uptown or

12 nothing.

13 Q.  And that's the truth, isn't it?

14 A.  That's what I remember speaking with him, sir.

15 Q.  Well, tell us how you had those conversations with him in

16 January and February of '97, when in January and February of

17 '97, he was incarcerated in Virginia.

18 A.  I remember talking to him, sir.

19 Q.  Sir, how did you have those conversations with him in

20 Congress Park, in January and February, when he was incarcerated

21 in Virginia?

22 A.  I remember talking to your client about shooting, sir.

23 Q.  Yes, you remembered it.  You've testified that you remember

24 it, and you've testified it was the truth, and that it happened

25 in January and February of '97 in Congress Park.

1 A.  I remember talking to him, sir.

2 Q.  Well, tell us how you spoke with him when he was

3 incarcerated in Virginia.

4         MR. LEON:  Objection.  Asked and answered, and

5 argumentative.

6         THE COURT:  Sustained.

7 BY MR. ZUCKER:

8 Q.  You're lying about that, aren't you, sir?

9 A.  I'm not lying to you about nothing, sir.  Sir, you want me

10 to be lying.

11 Q.  You would accommodate us?

12 A.  I say, you want me to be lying.

13 Q.  Sir, my client was locked up June 29th, 1996.

14 A.  He probably was.  I remember talking to your client, sir.

15 Q.  He remained locked up --

16         MR. LEON:  Your Honor, this isn't a question, this is

17 counsel --

18         MR. ZUCKER:  Court's indulgence.

19         THE COURT:  It is testimony.

20 A.  We was in Culpeper.

21 BY MR. ZUCKER:

22 Q.  It was in Culpeper, Virginia --

23         THE COURT:  Excuse me.  The objection is sustained.

24 BY MR. ZUCKER:

25 Q.  Do you now recall that my client was locked up from

Page 6536

1 June 29th, 1996 until July 28th of 1997 in Virginia?

2 A.  I remember he was locked up, sir.  I also remember talking

3 to him about shooting stuff, sir.

4 Q.  Well, no, you've told us, sir, that you remember talking

5 with him shortly after you were released in December of 1996,

6 and that you believed -- actually, you were certain, both when

7 the government examined you and when I examined you that it was

8 January/February of 1997.

9 A.  I remember talking to him, sir.

10 Q.  That wasn't just something you made up?

11 A.  No, it ain't.

12 Q.  Okay.

13 A.  I knew he was locked up --

14 Q.  How many --

15          THE COURT:  Did you finish your answer?

16          THE WITNESS:  No, sir, I never be finishing my answer.

17 Do him.

18          THE COURT:  You said you didn't finish?

19          THE WITNESS:  No, I didn't.

20          THE COURT:  Did you want to finish?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Go ahead.

23 A.  I said, how did I know?  You didn't tell me he was locked up

24 in Culpeper.

25 BY MR. ZUCKER:

1 A.   Yes, sir.

2 Q.   And so you came on the street around 1992?

3 A.   Yes, sir.

4 Q.   And at that time, the robbery activity was going on.  Is

5 that right?

6 A.   Yes, sir.

7 Q.   And there was a substantial amount of drug activity going

8 on.  The jury has heard about that, and you wouldn't disagree

9 with that.  Is that right?

10 A.   Yes, sir.

11 Q.   There were lots of folks out there who were dealing crack

12 cocaine?

13 A.   Yes, sir.

14 Q.   And marijuana?

15 A.   Yes, sir.

16 Q.   There was a Boat Alley, where PCP was being dealt?

17 A.   Yes, sir.

18 Q.   And different people, different groups of people would

19 gather to sell those drugs in those different locations.  Is

20 that right?

21 A.   Yes, sir.

22 Q.   Some people would have a primary location, and then other

23 people might drift back and forth between locations.  Is that

24 right?

25 A.   Yes, sir.

1 Q.  Your location was basically around 14th Place and

2 Savannah Street?

3 A.  Yes, sir.

4 Q.  And you had a group that you had come up with in school that

5 you were particularly close with among all the folks that were

6 there.  Isn't that right?

7 A.  Yes, sir.

8 Q.  And correct me if I've got it wrong.  I'm going to try to

9 include as many as I think I've heard over the course of your

10 testimony.  But there's Drano.  Right?

11 A.  Yes, sir.

12 Q.  And his name is Antwuan Draine.  I believe that's spelled

13 D-R-A-I-N-E?

14 A.  Yes, sir.

15 Q.  And you sometimes referred to him as Little Drano?

16 A.  Yes, sir.

17 Q.  And he went to school with you?  He was roughly your age?

18 A.  Yes, sir.

19 Q.  And when you were out on the street sellings in

20 Congress Park, Antwuan Draine was one of the guys that you were

21 particularly tight with?

22 A.  No, I ain't going to say I was tight with him.  We was cool

23 at that time.

24 Q.  Okay.  Just so we can get like a little dictionary set up

25 here, the difference between being cool and being tight, could

1 you explain that?

2 A.  Tight is me and this person, we be together every day.  Cool

3 is I see him, we speak, we might smoke, but we don't do nothing

4 together.  He go back to where he be at and I go where I go.

5 Q.  So in 1992, when you first hit the street in Congress Park,

6 who were you tight with, if anybody?  You might not have been

7 tight with anybody.  But anybody, if you could tell us that.

8 A.  '92, when I was hustling?

9 Q.  When you first came out, first couple of years.

10 A.  Don.

11 Q.  That would be Mr. Samuels?

12 A.  Yes, sir.

13 Q.  Anybody else you were tight with?

14 A.  Dazz.

15 Q.  Dazz, Mr. Thurston?

16 A.  Yes, sir.  A guy named EB.

17 Q.  EB.  Okay.  Do you remember his name?

18 A.  Alphonso Walker.

19 Q.  Is he still alive, as far as you know?

20 A.  As far as I know, yes.  My brother used to be with us.

21 Q.  What's your brother's name?

22 A.  We basically used to be with him.  He older.

23 Q.  I'm sorry, who used to be with him?

24 A.  We did, the guys I just named.

25 Q.  And he had a nickname of Feet.  Right?

Page 6569

1 A.  No, Darrell.  That's my brother.

2 Q.  Oh, I'm sorry.  That's right.  Somebody else's brother in

3 the neighborhood's nickname is Feet.  Is that right?

4 A.  Yes, sir.

5 Q.  So is Darrell an older brother of yours or a younger brother

6 of yours?

7 A.  He's older than me.

8 Q.  Okay.  Anybody else that you were tight with that you would

9 name when you first came out and started hanging out on the

10 street?

11 A.  Me and Head was always tight, we had a bond, but he be with

12 who he be with and I be with who I be with.

13 Q.  Now, the guys that you were -- anybody else?

14 A.  That's what I could remember.

15 Q.  Now, at that point, focusing on 1992, 1993, the folks that

16 you just named, were you guys all roughly the same age?

17 A.  A little years difference, probably a little under and a

18 little over.  Not by no five or nothing like that.

19 Q.  And that would be different, then, say, for Mr. Ball, who

20 was more than five years older than you.  Right?

21 A.  Yes, sir.  He wasn't with that group.

22 Q.  Right.  And then Mr. Gregory Bell, he was more than

23 five years older.  He wasn't with that group either.  Right?

24 A.  No, sir.

25 Q.  And Mr. Wilson wasn't with that group at that time, 1992,

1 '93?

2 A.  No, sir.

3 Q.  And I'm sorry, of course.  And Mr. Jones wasn't with that

4 group, because he was also more than five years older than

5 you-all?

6 A.  Yes, sir.

7 Q.  And just sticking with the notion of being tight, did that

8 change -- that group that you were tight with, did that change a

9 lot in the next, say -- focus on the next two, three,

10 four years, say up until 1996?

11 A.  I mean, me and Don had fell off for a while.  He went and

12 did his own thing.  I was still cool, we'll see each other, but

13 everybody branch off.

14 Q.  So he moved from the tight category to the cool category?

15 A.  I mean, he was still -- we wasn't doing no dealings together

16 no more.

17 Q.  Let me see if I understand.  If you were tight with guys,

18 you might go to a club, or those would be the guys that you

19 would go to parties with together, is that right, pretty much?

20 A.  All guys don't party.  You know, some people ain't -- just

21 because you don't go to a party with a person don't mean you

22 ain't tight with them.

23 Q.  But the tight guys were the guys who were your primary, your

24 number one -- if you're going to put them in groups, they're the

25 number one group of friends, right, your closest group of

1 A.   Yes, sir.

2 Q.   If we talk about lots, that's 10 years.  Okay?  That's

3 roughly 3,600 days.

4 A.   I didn't rob the whole 10 years.

5 Q.   Well, I understand that.  I wasn't suggesting that you did.

6 Out of those 3,600 days, would you rob somebody once or twice a

7 week?

8 A.   I ain't got no roughly time on it.  It wasn't like that was

9 my job; get up in the morning, wake up, brush my teeth, it's

10 time to rob.

11 Q.   Well, I understand.  But I'm asking you, sir, how often

12 would you rob?  Would you rob somebody once a week?

13 A.   I can't --

14 Q.   On average -- I'm sorry.

15 A.   No, go ahead, you finish talking.

16 Q.   I said on average.

17 A.   I can't really call it -- I was robbing a lot, but it wasn't

18 no -- I wasn't stationary just robbing.  That wasn't my thing,

19 that wasn't like something I was addicted to, but if I had to, I

20 had to.

21 Q.   And you didn't have any hesitancy to do that?

22 A.   I mean, it was times you did; you know, you run down on the

23 right person and you can get what you came for.  Other than

24 that...

25 Q.   Well, I'm not talking about -- you said what "you did."

1 We're not talking about what I did, we're talking about what you

2 did.

3 A.  That's what I'm talking about, sir.

4 Q.  Okay.  And what you did is when you felt the need to, you

5 would rob somebody?

6 A.  Yes, sir.

7 Q.  And you would either rob them of drugs, is that right, or

8 money?

9 A.  Yes, sir.

10 Q.  Okay.  And sometimes you would rob other drug dealers?

11 A.  Most of the time, yes, sir.

12 Q.  And sometimes you would rob non-drug dealers?

13 A.  Not that much, but I have.

14 Q.  You have.  Okay.

15         And I think looking back through some of the testimony,

16 you describe these robberies as petty little robberies.  Do you

17 recall that?  Is that a description?  Am I right on that?

18 A.  Yes, sir.

19 Q.  That's your expression.

20         Now, in these robberies you would have a gun.  Isn't

21 that right?

22 A.  Yes, sir.

23 Q.  And you would take that gun and you would -- that gun would

24 be loaded.  Isn't that right?

25 A.  Most of the times.

1 Q.  Most of the time.  Okay.

2          That's because you might have to fire at somebody?

3 A.  You right.

4 Q.  Right.  And they may have a gun.  Isn't that right?

5 A.  Yes, sir.

6 Q.  So you had to be ready for their gun?

7 A.  Yes, sir.

8 Q.  So you would carry a loaded gun.  Did you have a favorite

9 kind of gun that you used, a nine-millimeter or a .357?

10 A.  I wasn't no gun specialist or nothing, but whatever I had to

11 survive with, that's what I was holding on to.

12 Q.  And you would just -- how would you get your guns?

13 A.  Streets trade, sometimes go to go-go's, break in cars and

14 take them.

15 Q.  So you would -- in addition to robberies and selling drugs,

16 you would break in cars and take things from cars?

17 A.  A gun.

18 Q.  A gun?  Only a gun?

19 A.  From other drug dealers.

20 Q.  Did you ever steal a car?

21 A.  I ain't never steal a car.  I drove a stolen car.

22 Q.  Have you ever broken into somebody's house when they weren't

23 there and taken valuable items from it?

24 A.  I remember on occasion, a crackhead owed me money, and he

25 left and I couldn't get to him, so I went in his house to get

1 that right?

2 A.  Yes, at that moment.

3 Q.  Pardon?

4 A.  I say, yes, sir, at that moment.

5 Q.  Right.  And it's fair to say that you did that, took away

6 all that somebody had at a particular moment, more than one time

7 in your life.  Isn't that right?

8 A.  Yes, sir.

9 Q.  Probably more than 50 or 60 times.  Isn't that right?

10 A.  I don't know no count on it or nothing.  I told you that

11 earlier.  But I had robbed people.

12 Q.  Now --

13        MR. TABACKMAN:  Court's indulgence.

14 BY MR. TABACKMAN:

15 Q.  You had to develop a toughness inside of you to survive in

16 Congress Park and in Southeast altogether, didn't you, when you

17 were growing up?

18 A.  I didn't have to.  I choose to.

19 Q.  You chose to?

20 A.  Yes.

21 Q.  And you made that choice so that you could have a life that

22 you got some enjoyment out of.  Isn't that right?

23 A.  Yeah, I had fun doing it at that time, sir.

24 Q.  You had fun doing it at the time.  And you didn't think

25 about getting any other regular jobs from 9:00 to 5:00 instead

Page 6598

1 Q.  Mr. Ball was a street leader among the guys that you hung

2 out with.  Is that right?

3 A.  Yes, sir.  We listened to him.

4 Q.  You listened to him.  Do you recall, sir, testifying in the

5 Byron Dorsey case --

6 A.  Yes, sir.

7 Q.  -- in July of 2002?

8 A.  Yes, sir.

9 Q.  Do you recall that?

10 A.  I don't remember the month.  I remember testifying in the

11 case in 2002.

12 Q.  And that was a case in which you were a witness about

13 somebody who had shot and killed Boobie Wilson.  Is that right?

14 A.  Yes, sir.  Andre Wilson, sir.

15 Q.  And Andre Wilson's nickname was Boobie.  Isn't that right?

16 A.  Yes, sir.

17 Q.  And do you recall being asked the following questions and

18 being given (sic) the following answers?  This was in 2002.

19 This is after you were locked up.  Isn't that right?

20      MR. LEON:  Your Honor, can I just ask for a page?

21      MR. TABACKMAN:  I'm sorry, page 175 to 176.

22 A.  Yes, sir.

23 BY MR. TABACKMAN:

24 Q.  That was after you had gotten locked up in 2001?

25 A.  Yes, sir.

1 Q.  And your testimony is you've been locked up every day since

2 2001, July 3rd.  Isn't that right?

3 A.  Yes.  Five and a half years, sir.

4 Q.  And do you recall being asked the following questions and

5 giving the following answers:  "You were selling drugs with a

6 lot of other people, weren't you?"

7           Answer:  "I mean, I had my own thing going on."

8           Question:  "Your own thing going on?  Your own thing

9 going on was you were selling crack cocaine.  Right?"

10           "Yes."

11           "And the own thing you had going on was being a member

12 of the Congress Heights crew or Congress Street crew.  Right?"

13           Answer:  "Yes."

14           Question:  "And what was the name of your -- and that

15 was the name of your crew.  Right?"

16           Answer:  "It wasn't my crew."

17           Question:  "Who was the head of the crew?"

18           Answer:  "I don't know."

19           Question.  "You don't know?"

20           Question:  "No" -- answer:  "No."

21           "Well, can you give me some of the names of the other

22 members of this crew?"

23           "Yeah."  And then there was an objection from the

24 prosecutor.

25           Do you remember being asked those questions and giving

Page 6600

1 those answers?

2 A.  Yes.  Who is the head of the crew?

3 Q.  Pardon?

4 A.  Who is the head of the crew?

5 Q.  So you testified that there was no -- in 2002, you were

6 under oath.  Isn't that right?

7 A.  Yes.  It was only a leader that people listened up to --

8          MR. BALAREZO:  Objection, nonresponsive.

9          MR. MARTIN:  Move to strike, Your Honor.

10         THE COURT:  Denied.

11 BY MR. TABACKMAN:

12 Q.  Mr. Capies, please listen to the question.

13 A.  I'm listening.

14 Q.  Did you testify under oath that there was no leader of the

15 crew?

16 A.  Yes.

17 Q.  And you were trying to tell the truth in that trial.

18 Correct?

19 A.  And I did tell the truth, sir.

20         MS. WICKS:  Objection.

21         THE COURT:  Basis?

22         MS. WICKS:  Nonresponsive.

23         THE COURT:  Overruled.

24 BY MR. TABACKMAN:

25 Q.  You were telling the truth, then, when you said in 2002

1 under oath that there was no leader of the Congress Street crew.

2 Is that right?

3 A.   Yes.

4           MR. LEON:  Objection.  That's not what the question --

5           THE COURT:  Just a second.  Huh?

6 BY MR. TABACKMAN:

7 Q.  Who was the head of the crew, that there was no head of the

8 crew.

9           THE COURT:  Sustained.

10 BY MR. TABACKMAN:

11 Q.  You testified that there was no head of the crew.  Isn't

12 that right?

13           THE COURT:  That's not what you had asked him.  Do you

14 want to approach?  I don't have the transcript in front of me,

15 but that is not what I heard as the questions and answers.

16           MR. LEON:  Could we approach?

17           MR. TABACKMAN:  The questions and answers that I quoted

18 from the transcript here?

19           THE COURT:  Yes.  Why don't you approach?

20           (BENCH CONFERENCE ON THE RECORD.)

21           THE COURT:  Tell me what the transcript portion is that

22 you're making reference to.

23           MR. TABACKMAN:  "Who was the head of the crew."

24           Answer:  "I don't know."

25           "You don't know?"

1          "No."

2          THE COURT:  And what did you just ask him?

3          MR. TABACKMAN:  I thought I just asked him who was the

4 head of the crew.  I used the word "leader," and Mr. Leon

5 objected, so I modified it to "head."

6          MR. LEON:  There are at least two reasons for the

7 objection.  One was certainly that reason, that it was probably

8 unintentional, juxtaposing the word "leader" and "head."

9          The other is, as I read the answer, he says "I don't

10 know."  I don't know is different than saying under oath that

11 there is no leader of a crew.  It's a distinction, but it's an

12 important one, obviously, as this counsel is going there hard.

13          THE COURT:  Right.  That's what I was hearing as well.

14          MR. TABACKMAN:  Okay.

15          (END BENCH CONFERENCE.)

16 BY MR. TABACKMAN:

17 Q.  What does the word "leader" mean to you, Mr. Capies?

18 A.  A leader is somebody you look up to.

19 Q.  And when you say that someone was the head of a crew, is

20 that like being the leader of the crew?

21 A.  A head of the crew to me, sir -- are we talking streets?  I

22 mean, lawyer talk --

23 Q.  What I'm talking about, sir, the notion of -- what I'm

24 asking you is --

25          MR. LEON:  I object.  The witness was in the middle of

1 an answer.

2          THE COURT:  I'll sustain the objection to the question

3 "When you say the head of the crew."  The witness hasn't said

4 that.

5 BY MR. TABACKMAN:

6 Q.  In 2002, who was the head of the -- I'm sorry.  At the time

7 that you were arrested in 2001, and just before that, in the

8 year or so before that, who was the head of the crew in

9 Congress Park?

10 A.  I'm not going to say it was a head of a crew because it was

11 a head of the crew.  Everybody that was all in groups in

12 Congress Park would have been all together.

13          MR. BALAREZO:  Objection, nonresponsive, Your Honor.

14          THE COURT:  Overruled.

15 BY MR. TABACKMAN:

16 Q.  So are you saying there was no head of the crew?

17 A.  No.  But it was like a leader person, you know.  Say, for

18 instance -- that's what I'm about to tell you.  A guy that come

19 from, okay, you know been doing a lot of stuff, they been doing

20 a lot of stuff for years to come, and he up now, you look up to

21 him, like, man, this dude been through a lot, he know about the

22 game, listen to him.  But you got your own little group.  There

23 isn't no head unless this person, do what I tell you.

24          Me, I chose to do it.  Ain't nobody make me do nothing.

25 I'm not going to say -- he was a leader, to whereas though from

# Tab 22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : April 12, 2007 |
| DOMINIC SAMUELS, | : 9:20 a.m. |
| Defendants. | : |

VOLUME 33 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE |
| | Glenn S. Leon, Assistant United |
| | States Attorney |
| | Ann H. Petalas, Assistant United |
| | States Attorney |
| | Gilberto Guerrero, Assistant |
| | United States Attorney |
| | 555 4th Street |
| | Washington, DC  20001 |
| | 202.305.0174 |
| For Defendant | CARNEY & CARNEY |
| Antwuan Ball: | John James Carney, Esq. |
| | South Building |
| | 601 Pennsylvania Avenue, N.W. |
| | Washington, DC  20004 |
| | 202.434.8234 |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6665

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | TIGHE, PATTON, ARMSTRONG, |
| Antwuan Ball: | TEASDALE, PLLC |
| | Steven Carl Tabackman, Esq. |
| | 1747 pennsylvania Avenue, NW |
| | Suite 300 |
| | Washington, DC  20036 |
| | 202.454.2811 |
| For Defendant | LAW OFFICE OF JENIFER WICKS |
| David Wilson: | Jenifer Wicks, Esq. |
| | 503 D Street NW, Suite 250A |
| | Washington, DC  20001 |
| | 202.326.7100 |
| | GARY E PROCTOR, LLC |
| | Gary E. Proctor, Esq. |
| | 6065 Harford Road |
| | Baltimore, MD  21214 |
| | 410.444.1500 |
| For Defendant | LAW OFFICE OF JAMES W. BEANE |
| Gregory Bell: | James W. Beane, Jr., Esq. |
| | 2715 M Street, N.W. |
| | Suite 200 |
| | Washington, DC  20007 |
| | 202.333.5905 |
| For Defendant | LAW OFFICE OF JONATHAN ZUCKER |
| Desmond Thurston: | Jonathan Seth Zucker, Esq. |
| | 514 10th Street, NW |
| | 9th Floor |
| | Washington, DC  20004 |
| | 202.624.0784 |
| For Defendant | LAW OFFICE OF ANTHONY MARTIN |
| Joseph Jones: | Anthony Douglas Martin, Esq. |
| | 7841 Belle Point Drive |
| | Greenbelt, MD  20770 |
| | 301.220.3700 |
| | LAW OFFICE of ANTHONY ARNOLD |
| | Anthony Darnell Arnold, Esq. |
| | One Research Court |
| | Suite 450 |
| | Rockville, MD  20852 |
| | 301.519.8024 |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6666

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant | LAW OFFICES OF A. EDUARDO BALAREZO |
| Dominic Samuels: | A. Eduardo Balarezo, Esq. |
| | 400 Fifth Street, NW |
| | Suite 300 |
| | Washington, DC  20001 |
| | 202.639.0999 |
| | and |
| | William B. Purpura, Esq. |
| | 8 East Mulberry Street |
| | Baltimore, MD  21202 |
| | 410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR |
| | Official Court Reporter |
| | Room 6814, U.S. Courthouse |
| | Washington, DC 20001 |
| | 202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6667

**MORNING SESSION, APRIL 12, 2007**

1
2    (9:15 a.m.)
3        MR. BALAREZO:  Excuse me, Your Honor.  May I address the
4    Court?  This is in the matter of one of the confessionals, but I
5    think it's a little more than the other ones in fact.
6        I just got off the elevator.  When I got on, there was a
7    lady that I kind of recognized.  I thought it was a lady that's
8    been in the audience throughout the trial.  She said to me, "I'm
9    glad I'm not the last one in."
10       And I said, "I think there's someone else behind me."  And
11   we kind of exchanged pleasantries.  But then it hit me that she
12   was a juror, so there was a communication, more than others, and
13   I just want to let the Court be aware of that.  And that was
14   basically it.
15       THE COURT:  Okay.  Thank you for the disclosure.  Any
16   comments or requests with regard to that?
17       MR. BALAREZO:  And Mr. Zucker was the one that was behind
18   us.
19       THE COURT:  He must have been way behind you.
20       MR. ZUCKER:  I plan to stay there.
21       THE COURT:  All right.  Thank you for the disclosure.  I
22   don't -- thank you for the disclosure.  I don't see any need to
23   take any further action on that.
24       MR. BALAREZO:  Thank you.
25       THE COURT:  Mr. Tabackman, are you ready for the jury?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6668

```
1      MR. TABACKMAN:  Yes, Your Honor.
2      (Jury in at 9:20 a.m.)
3      THE COURT:  Good morning, ladies and gentlemen.  Welcome
4  back.  Good to see you.  We're ready to resume.
5  Mr. Tabackman.
6      MR. TABACKMAN:  Thank you, Your Honor.
7        CONTINUED CROSS-EXAMINATION OF BOBBY CAPIES
8  MR. TABACKMAN:
9  Q.    Good morning, Mr. Capies.
10 A.    Good morning.
11 Q.    When we ended up yesterday, we were talking about your
12 conversation with a gentleman, Mr. Truesdale, also known as
13 Smoke?
14 A.    Yes, sir.
15 Q.    And I believe you said that you had a conversation with
16 Smoke at the detention center or down at Lorton; is that
17 correct?
18 A.    Yes, sir.
19 Q.    Okay.  And the subject of that was the murder of Troy
20 Lewis; is that right?
21 A.    Yes, sir.
22 Q.    And Smoke told you that he killed Troy Lewis?
23 A.    Yes.  And he didn't straight come out and say "I'm the
24 one that killed him," but, you know, like "that's my work" --
25 basically saying that.  But I knew he was lying about it.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6669

```
1  Q.    I understand that you said what you know, but you were
2  left with the impression that he had killed him; is that right?
3  He told you he had done it?
4  A.    Yes, in so many words.
5  Q.    And you told Mr. Ball that Smoke had done it; isn't that
6  right?
7  A.    I remember saying something to him about it.
8  Q.    Right.  And you also told the police -- I'm sorry -- the
9  FBI, Agent Lockhart, Agent Fulmer, and Assistant United States
10 Attorney Beatrice that Smoke had told you that he had done it;
11 isn't that right?
12 A.    Yes, sir.
13 Q.    And that was in July of -- I'm sorry.  That was in
14 January of 2002, wasn't it?
15 A.    I don't remember the exact date, but I remember talking
16 to them about it.
17 Q.    But if there was a series -- do you recall having three
18 days' worth of interviews with the people I just named in which
19 you discussed a lot of the subjects that have come up here in
20 this trial; isn't that right?
21 A.    Yes, sir.
22 Q.    And if the memorandum of that, or a piece of it,
23 indicates that it was -- that it took place in January of 2002
24 on three different dates, the 17th, the 18th and the 28th, you
25 wouldn't dispute that?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6670

```
1  A.    No.  If you was to show it to me, no, sir.
2  Q.    I can do that in a moment.
3      Now, do you recall when you went down to Lorton in
4  1998 -- 1996, rather?
5  A.    No, it wasn't '96.  It was '98.  I was a juvenile in '96.
6  Q.    Okay.  Where was it that you had your conversation with
7  Smoke?
8  A.    It was in a Youth Center.  It was in '98.
9  Q.    You had a conversation with Smoke in 1998 about the
10 murder of Troy Lewis in 1996?
11 A.    '96?  I talked to him in '98.
12 Q.    You talked to Smoke in '98, but you told the police --
13 I'm sorry -- the FBI and the Assistant United States Attorney
14 Beatrice, didn't you, that you spoke with Smoke before you spoke
15 with Mr. Ball about who killed Troy Lewis?
16 A.    It must be misinterpreted somewhere, sir.  I spoke with
17 him down at the Youth Center about that.
18 Q.    And you're certain about that?
19 A.    I'm certain about that.
20     MR. TABACKMAN:  Court's indulgence.  I'm sorry, Your
21 Honor, I had this just a moment ago.
22     Your Honor, this is an add-on exhibit, Defendant Ball's
23 Number 50.  I believe there is a --
24     THE COURT:  Are you giving me the exhibit?
25     MR. TABACKMAN:  If Your Honor wanted a copy of it because
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6671

```
1  I'm going to ask some questions from it.  I'm giving a copy to
2  the government.
3      May I approach, Your Honor, please?
4      THE COURT:  Yes.
5  BY MR. TABACKMAN:
6  Q.    I'll give you a copy, Mr. Capies, of what's been marked
7  as Defendant Ball's Exhibit Number 50.  Why don't you read that
8  to yourself, please, and let me know when you're done, if you
9  would.
10 A.    Yes, I see it, sir.
11 Q.    Let's move back away from the exhibit for a moment.  We
12 need to establish a few things.
13     You've testified here at trial that you spoke with
14 Mr. Ball approximately a week after the death of Troy Lewis; is
15 that correct?
16 A.    Yes, sir.
17 Q.    And it's been your testimony, as I understand it, that
18 you saw Mr. Ball in a van; is that right?
19 A.    Yes, sir.
20 Q.    And what kind of van did he drive, do you recall?
21 A.    I don't remember the name of it.
22 Q.    Do you remember what it looked like?
23 A.    It was like a goldish-brown color.
24 Q.    Goldish-brown?  And you saw him and you were by the
25 circle; is that right?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6672

1  **A.**   Yes, sir.
2  **Q.**   And he waved to you?
3  **A.**   Yes, sir.  He told me to come here.
4  **Q.**   He told you to come here or he asked you to come here?
5  **A.**   He told me, "Come here, let me holler at you."
6  **Q.**   And you weren't concerned about going over and talking to
7  him in '96; is that right?
8  **A.**   No, sir.
9  **Q.**   And I believe it's been your trial testimony also that
10 Mr. Samuels was in the car?
11 **A.**   Yes, sir.
12 **Q.**   All right.  And you had a conversation with Mr. Ball, is
13 that right, about Mr. Lewis?
14 **A.**   Yes, sir.
15 **Q.**   And he told you, according to you, that he was sort of
16 relieving himself of some information, wanted to share it with
17 you; is that right?
18 **A.**   Yes, sir.
19 **Q.**   And he chose you, apparently, to share it with as a
20 particular person?
21 **A.**   I don't know who else he shared it with, but I know he
22 told me.
23 **Q.**   He told you about it.  He called you over to the car and
24 said he wanted to tell you that he had been the person that had
25 killed Kevin Gray?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6673

1  **A.**   Kevin Gray?
2  **Q.**   Troy Lewis.
3  **A.**   Yes, sir.
4  **Q.**   How did he start that conversation, if you recall?  What
5  was one of the first things he said?
6  **A.**   I mean, it was like he was explaining to me, you know, it
7  ain't good what Troy was doing and stuff like that around there
8  as far as, you know, shooting at people feet and stuff like
9  that.
10 **Q.**   And had you ever discussed that with Mr. Ball before
11 then?
12 **A.**   I remember him saying that -- it was like -- it was a
13 crowd of people out there.  Not like a crowd, but amongst a
14 group of dudes that are around there.  He was like, he don't
15 respect that, you know, he back in the day time.
16 **Q.**   That he was "back in the day time," meaning --
17 **A.**   Yeah, over 30, 40, 50 dollars.
18 **Q.**   In other words, Mr. Ball, it's your testimony, told you
19 that Mr. Lewis was acting badly; is that right?
20 **A.**   Yes, sir.
21 **Q.**   And the fact that -- and the way he was acting was like
22 people acted back in the day; is that right?
23 **A.**   Yes, sir.
24 **Q.**   He wasn't with the way people were supposed to be acting
25 in 1996; is that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6674

1  **A.**   I mean, it was cruddy to be -- Truck owed him some short
2  money and he was going crazy about it.
3  **Q.**   Troy Lewis was going crazy about it?
4  **A.**   Yes.
5  **Q.**   And Truck is your friend, Marlon Washington?
6  **A.**   Yes.  We was very cool.
7  **Q.**   Right.  And Troy Lewis used to front you and Marlon
8  Washington drugs; isn't that right?
9  **A.**   It wasn't together, but I remember him telling me that he
10 gave him some stuff.
11 **Q.**   You used to get drugs from Troy Lewis, fronted?
12 **A.**   Yes, sir.
13 **Q.**   And you knew from Mr. Washington that he got drugs
14 fronted from Mr. Lewis?
15 **A.**   Yes, he had told me he got drugs from him, sir.
16 **Q.**   Right.  And you knew -- you had heard other than from
17 Mr. Ball, hadn't you, that Mr. Lewis was upset about
18 Mr. Washington owing him some money; isn't that right?
19 **A.**   Yes.  I can't recall, but I remember hearing that.
20 **Q.**   You heard it or you saw it?
21 **A.**   I heard it.
22 **Q.**   You didn't see an encounter between Mr. Washington,
23 Truck, and Mr. Lewis?
24 **A.**   I don't remember seeing no encounter.
25 **Q.**   I'm sorry?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6675

1  **A.**   I don't remember seeing them encounter.
2  **Q.**   You don't remember seeing Mr. Lewis fire a shot at Truck,
3  at his feet?
4  **A.**   I remember him firing a shot at Smoke feet.
5  **Q.**   But not at Truck's feet?
6  **A.**   No, sir.
7  **Q.**   So it's incorrect, then, that Lewis had shot at Truck's
8  foot and Ball said he was tired of Lewis coming around, running
9  his mouth?
10 **A.**   I remember Ball saying that, but what I told you in the
11 beginning, like this, too.  I wasn't fully honest with the
12 government at the time, sir.
13 **Q.**   But you heard that from Ball; is that what your testimony
14 is?
15 **A.**   Yes, sir.
16 **Q.**   But you saw Mr. Lewis shoot at Smoke?
17 **A.**   I didn't see him.  I heard about it, sir.
18 **Q.**   You heard about that and you were reporting this?
19 **A.**   Yes, sir.
20 **Q.**   And you were reporting it to the FBI?
21 **A.**   Yes, sir.
22 **Q.**   And you were reporting it to Assistant United States
23 Attorney Beatrice?
24 **A.**   Yes, sir.
25 **Q.**   And your lawyer was present?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6676

1   A.   Yes, sir.
2   Q.   Did you tell them that before you made your report to
3   them in 2002, that you weren't going to tell them the truth?
4   A.   I told them.
5   Q.   You were just going to tell them a story?
6   A.   I explained to Mr. Beatrice and the FBI before I took my
7   plea agreement, there was a lot of things that I lied about and
8   that I need to come forward with.
9   Q.   That's not my question.  My question was, at the time
10  that you were sitting down for the interview in January of 2002,
11  you didn't tell them that you weren't going to tell them the
12  truth; isn't that right?
13  A.   Naw, I told them I was going to tell them the truth, but
14  I was lying at the time, sir.
15  Q.   So you told them -- you made them think you were telling
16  the truth and you were lying to them?
17  A.   I was lying to them at the time.
18  Q.   Right.  And is that like the situation that you had when
19  you were sentenced to the halfway house back in 1998 and you
20  said yesterday, I believe your testimony was, you had no
21  intention of going to the halfway house, but you didn't tell the
22  judge that; is that right?
23  A.   I went to the halfway house, sir.  I stayed in there for
24  a little while.
25  Q.   And then you went on escape?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6677

1   A.   Yes, sir.
2   Q.   And it was your testimony yesterday in response to the
3   questions from Mr. Zucker, "I had no" -- I don't know if this is
4   a quote; I can get you the quote -- "I had no intention of ever
5   staying at that halfway house"?
6   A.   I mean, not that long.  I stayed there, but --
7   Q.   For a few days?
8   A.   I had my plans of what I was going to do, but it wasn't
9   to be there until -- I'll wait till my time to go back to court
10  or nothing.
11  Q.   Right.  But you didn't tell the judge that you were going
12  to leave before your sentence was up, did you?
13  A.   Of course not, sir.
14  Q.   You swore in the court that you were going to follow the
15  instructions and be honest and do what the judge had told you to
16  do; isn't that right?
17  A.   Yes, sir.
18  Q.   And you lied?
19  A.   I lied.  You right, sir.
20  Q.   And in 1999, you met with Detective Mike Will, didn't
21  you?
22  A.   Yes, sir.
23  Q.   And you asked for a meeting with them, didn't you, the
24  detectives down in 7-D?
25  A.   It wasn't -- I can't remember.  I wasn't like -- I can't

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6678

1   remember how it went down.  I can't say.
2   Q.   In any event, you offered to give them what you said was
3   information about some homicides that they were still interested
4   in, right?
5   A.   Yes, sir.
6   Q.   And you met with the detectives down in 7-D on
7   Mississippi Avenue?
8   A.   No, sir, it was on Alabama Avenue.
9   Q.   I'm sorry, Alabama Avenue.  But you met with -- we're
10  talking about the same detectives, right?
11  A.   Mike Will, yes, sir.
12  Q.   And in 1999, did you have any idea whether he was a
13  rookie detective or a long-time detective?
14  A.   Naw, I wasn't -- I wasn't asking him those questions,
15  sir.
16  Q.   Right.  But he was interested in homicides and you were
17  giving him the impression that you were going to tell him about
18  homicides, right?
19  A.   Yes, sir.  I lied to him, sir.
20  Q.   You lied to him.  You tricked him?
21  A.   I lied to him.  If that's what you want to call it.  I'm
22  not going to say I tricked him because he was still on my back.
23  Evidently, I didn't do that good at tricking him.
24  Q.   You thought -- you led him to believe that you were
25  telling the truth, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6679

1   A.   Yes.  That's why he kept questioning me, sir.
2   Q.   But you were lying?
3   A.   I just told you I was lying to him, sir.
4   Q.   Now, in 2002 when you interviewed with the FBI and the
5   AUSA, you were lying again.
6   A.   Yes, sir.
7   Q.   And you were lying because you told them -- well, strike
8   that.
9        You didn't mention to them anything about a conversation
10  with Mr. Truesdale, Smoke, down in Lorton, did you?
11  A.   I can't remember at that time.  I was lying to him about
12  so much stuff, sir.
13  Q.   You just made up the fact that you had a conversation
14  with Smoke?
15  A.   I mean, at the time, I'm honest with you that I was kind
16  of nervous with some of the things that I was giving up, knowing
17  that I still had family around there, too.  I gained their
18  trust, sir.
19       MR. TABACKMAN:  Excuse me, Your Honor.
20  BY MR. TABACKMAN:
21  Q.   You've been locked up since 2001; is that right, sir?
22  A.   Yes, sir.
23  Q.   And no one has threatened your family since -- during
24  that period, have they?
25  A.   Nobody threatened my family, but they --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6680

1   **Q.**   That's fine, sir.  You're not implying that somebody in
2   this room has threatened your family since you've been locked
3   up, have they?
4   **A.**   No, ain't nobody threatened my family.
5   **Q.**   Okay.  I just want to be clear about that.
6   **A.**   I would tell you the truth.
7   **Q.**   People might get the wrong impression if you say those
8   things.
9   **A.**   Naw.  If somebody threatened my family --
10          MR. MARTIN:  Objection.  There's no question pending, Your
11  Honor.
12  BY MR. TABACKMAN:
13  **Q.**   Now --
14          THE COURT:  Put your next question.
15  BY MR. TABACKMAN:
16  **Q.**   You testified this morning that you had a conversation
17  with Mr. Smoke in 1998 about who killed -- about the fact that
18  he took credit for killing Troy Lewis?
19  **A.**   Yes, sir.
20  **Q.**   And when you told the police in 19- -- I'm sorry -- the
21  FBI and the Assistant United States Attorney in 1996 that you
22  had had a -- I mean in 2002 that you had had that conversation
23  shortly after Mr. Lewis was killed, that was a lie?
24  **A.**   Yes, sir.  I had told you, I lied to them a lot, sir.
25  **Q.**   And when you told them that Mr. Ball -- that when you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6681

1   told Mr. Ball about what Smoke had said, Mr. Ball said, "No, I
2   did it," that was a lie, too?
3   **A.**   Yes, sir.
4   **Q.**   And -- but what you're saying today in the court is the
5   truth?
6   **A.**   I told you, sir, until I took my plea agreement, I was
7   lying about a lot of things until I knew I was facing the rest
8   of my life.
9   **Q.**   But you -- well, until you took your plea agreement, your
10  plea agreement made you tell the truth?
11  **A.**   No.  It was around the time that my lawyer came to see me
12  and told me that I need to tell them everything about me and
13  everything that I know and don't lie because it might be other
14  people that know me that might come in and say I was involved
15  with something or I knew about this or that, and that you don't
16  want the government to think you lying, so you need to go ahead
17  and tell them the truth.  And then I took a plea agreement in
18  front of Mr. Roberts, sir.
19  **Q.**   So that was the day that everything changed in your life?
20  **A.**   Of course.  I'm facing the rest of my life.  My life's on
21  the line.
22  **Q.**   Well, you said that if you don't tell the truth, you
23  won't get the letter, is that right, from the government that
24  you want?
25  **A.**   If the government feels as though I lied to them, sir,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6682

1   they will not file a 5K1 motion.
2   **Q.**   Right.  And so therefore, it's your testimony that you're
3   telling the truth?
4   **A.**   Yes, sir.
5   **Q.**   Right.  But -- and you're not telling lies that you just
6   can't get caught at?
7   **A.**   I don't understand.  Could you say it better?
8   **Q.**   If you don't get caught at a lie, you still get your
9   letter, right?
10  **A.**   Why lie when I know this --
11  **Q.**   I asked you a question.  If you don't get caught at a
12  lie, you would still get your letter; isn't that right?
13  **A.**   You're right, sir.  But I'm not lying.
14  **Q.**   And so when you testified that you switched guns with
15  Mr. -- LT during the killing of Devar Chandler, that was the
16  truth?
17  **A.**   Yes, sir.
18  **Q.**   And you never thought about the fact that you might get
19  away with a lie there?
20  **A.**   It was the truth.  Why would I -- what do you mean, "get
21  away with a lie"?
22  **Q.**   So your answer is no, you didn't think that?
23  **A.**   I have lied to them in the beginning about the whole
24  situation.
25  **Q.**   And that was after -- that was before your plea

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6683

1   agreement, but after you were arrested, now; is that right?
2   **A.**   Yes, sir.  It was before my plea agreement.
3   **Q.**   Now, my question, though, sir, is that -- and you were
4   asked this yesterday by Mr. Zucker -- you told the police or the
5   FBI, rather, that LT and you switched guns just before the
6   shooting started that resulted in the death of Devar Chandler;
7   isn't that right?
8   **A.**   Yes, sir.
9   **Q.**   And by that point in time, by the time you were telling
10  them that, you had already lied several times to them; isn't
11  that right?
12  **A.**   Before I have, yes, sir.
13  **Q.**   And you knew which gun -- they told you which gun had
14  killed Devar Chandler; isn't that right?
15  **A.**   Naw.  Why would they tell me that?
16  **Q.**   I'm asking you a question.  Did they tell you that, sir?
17  **A.**   No, sir.
18  **Q.**   Never said -- to ask you about the kinds of guns that
19  were there and maybe suggested to you what kind they had found?
20  **A.**   No, sir.  They asked me what kind of guns was used and I
21  told them.
22  **Q.**   And you told them that the one that LT had was the one
23  that was the one that killed Devar Chandler; is that right?
24  **A.**   Yes.  I told him that he stand over top of him, sir.
25  **Q.**   Right.  He stood over top of him and fired into him

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6696*

1  A.   I ain't trying to trick nobody.  For what?  I told you, I
2  just pleaded to murder.  Who is it I'm tricking?
3  Q.   In 1998, it's your testimony that you talked to Smoke
4  about who shot Troy Lewis?
5  A.   Yes, sir.
6  Q.   Two years after it had happened?
7  A.   Yes, sir.
8  Q.   And you told the police that -- I'm sorry -- the FBI and
9  the Assistant United States Attorney, who you were beginning to
10 deal with, that you talked to him before you ever talked to
11 Mr. Ball; is that right?
12 A.   In '98, I wasn't talking to the FBI.
13 Q.   In 2002 -- I'm sorry -- in 2002, when you sat down with
14 the FBI, didn't you tell them that the way you got Mr. Ball to
15 talk about the fact that he killed Mr. Lewis, according to you,
16 was that you had said to him, "Well, Smoke is saying he got away
17 with it, with killing Lewis"?
18      Didn't you tell the FBI that?
19 A.   Yes.  I told you in the beginning, sir, I told them a lot
20 of lies, sir.
21 Q.   And you told them that that's what got Mr. Ball talking
22 about the fact that he supposedly told you he supposedly killed
23 Mr. Lewis; is that right?
24 A.   I don't remember the exact details, but I remember lying
25 to them, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6697*

1  Q.   You went to an interview room up on the sixth floor;
2  isn't that right?  Isn't that where your interviews with the FBI
3  and the Assistant United States Attorneys were in 2002, January?
4  A.   Yes, sir.
5  Q.   And everybody was in there and they thought they were
6  going to hear what you had to say; isn't that right?
7  A.   Yes, sir.
8  Q.   And you had already talked to Gus, one of the detectives,
9  the one you called "Segal," Gus Segal?
10 A.   Yes, sir.
11 Q.   You had already talked to him about telling the truth,
12 right?
13 A.   Yes, sir.
14 Q.   And he had already told you that this was serious
15 business, right?
16 A.   Yes, sir.
17 Q.   And you already heard -- excuse me.
18      That took place on the day you were arrested, July 3rd of
19 2001?
20 A.   Yes, sir.
21 Q.   And so this was six or seven months later now; isn't that
22 right?
23 A.   I don't know how many months later, but it was some
24 months after.
25 Q.   Well, between July of 2001 and January of 2002.  It's

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6698*

1  about a half a year, isn't it?
2  A.   Just about, sir.  You're right.
3  Q.   Okay.  And you had been locked up during that time?
4  A.   Yes, sir.
5  Q.   And you had talked to your lawyer during that time?
6  A.   Yes, sir.
7  Q.   And you had heard that you were in a lot of trouble
8  during that time?
9  A.   Yes.  My lawyer explained that they might be coming to me
10 with a conspiracy, sir.
11 Q.   Right.  And they weren't letting you out of jail for
12 sure?
13 A.   Oh, no.
14 Q.   And a lawyer told you that you better be thinking about
15 cooperating; isn't that right?
16 A.   Naw, he didn't say nothing right then and there about
17 cooperating.  He already knew I was talking to them, so why he
18 going to have to tell me to cooperate?
19 Q.   In the six months between July of 2001 and January of
20 2002, your lawyer never talked to you about cooperating?
21 A.   I thought you was talking about -- you said something
22 about Segal, sir.  He already knew I was cooperating with them.
23 Q.   Who already knew you were cooperating with them?
24 A.   My lawyer.  I told him I had talked to the police.
25 Q.   You told him you had talked to the police.  And your

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*6699*

1  lawyer set up this meeting with Fulmer and Lockhart and Beatrice
2  because everybody thought you were going to come in there and
3  tell the truth; isn't that right?
4       MR. LEON:  Objection.
5       THE COURT:  Sustained.
6  BY MR. TABACKMAN:
7  Q.   Did you talk to your lawyer about why he set up the
8  meeting, sir?
9  A.   I said something to him.
10 Q.   You asked him to set up a meeting?
11 A.   I said something to him.  Then he asked me, am I going to
12 continue to talk to them?  It's on me.  And I told him yeah.
13 Q.   Right.  And so the meeting was set up?
14 A.   However they do it, sir.  I don't know how they put it
15 together.
16 Q.   There was a meeting that resulted.  After you told your
17 lawyer that you were going to continue to talk to them, a
18 meeting was set up?
19 A.   Right.
20 Q.   And then -- did you think, sir, that people were going to
21 sit down and expect you to lie to them the way you say that you
22 did?
23 A.   No, sir.  They was expecting to hear the truth.
24 Q.   Right.  And they didn't?
25 A.   Not at that time, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6764

1 or ever made the assertion that Mr. Ball broke Mr. Sykes's jaw
2 in connection with Mr. Sykes smoking boat, had you?
3 **A.** No, sir.
4 **Q.** And before you went into the grand jury on all those
5 different dates, you hadn't told the government that Mr. Ball
6 broke Mr. Sykes's jaw over smoking boat, had you?
7 **A.** No. I told you sir, that I misinterpreted it.
8 **Q.** So, is that, yes, you had not told them that?
9 **A.** No, not at that time, but I eventually told them.
10 **Q.** But after ten years and testimony in front of the grand
11 jury, you remembered about the boat incident?
12 **A.** Yes, I remembered. I was like, dag, it didn't come from
13 that. I forgot. Boom. And I said something to them about it.
14 **Q.** And I'm asking you, sir, what is it after ten years that
15 caused you to remember the boat incident?
16     MR. LEON: Objection, asked and answered.
17     THE COURT: Sustained.
18     MR. TABACKMAN: I don't think I got an answer, Your Honor.
19     THE COURT: You did get an answer.
20 BY MR. TABACKMAN:
21 **Q.** Did somebody ask you again after you testified in the
22 grand jury about the jaw being broken?
23 **A.** No. I told you, I told them.
24 **Q.** And you had never told them about the boat incident
25 before that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6765

1 **A.** No, I didn't remember that, sir.
2 **Q.** All right.
3     MR. TABACKMAN: Court's indulgence.
4 BY MR. TABACKMAN:
5 **Q.** In fact, Mr. -- strike that -- not in fact.
6     After Kairi died, Mr. Ball began not having as much
7 authority in Congress Park as you say he did before Kairi died;
8 isn't that right?
9 **A.** He had some authority, but wasn't nobody really listening
10 to him that much; some people was, some people wasn't.
11 **Q.** You weren't listening to him?
12 **A.** I took his advice on some things.
13 **Q.** You weren't generally listening to him; isn't that
14 correct?
15 **A.** Sir, he don't even ask me to do moves and stuff with him.
16 Yes.
17 **Q.** He did not ask you to do moves with him?
18 **A.** I said he have.
19 **Q.** He did not after 1995, did he?
20 **A.** Yes, he did.
21 **Q.** You began forming a group that was of different people;
22 isn't that true?
23 **A.** We were still cool, sir.
24 **Q.** Isn't it a fact that you began forming a group of your
25 own; isn't that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6766

1 **A.** In '95? '96. I didn't have my own group. I told you
2 that yesterday. It was a group of us.
3 **Q.** Right. And it was a group that did not have Mr. Ball in
4 it?
5 **A.** Mr. Ball was cool. I'll show you --
6 **Q.** Mr. Ball -- didn't you testify in the grand jury that you
7 had a group that included Drano --
8 **A.** I keep telling you yesterday me and Drano is cool, sir.
9 You keep putting Drano with the group.
10 **Q.** Drano is not with your group?
11 **A.** In '96, I told you that's when I got tight with him and
12 started really hanging with him. He was cool. I want tight
13 with him then.
14 **Q.** In 1996, you got tight with Drano?
15 **A.** Yes, when I came home.
16 **Q.** And LT?
17 **A.** Yes, sir.
18 **Q.** And Wop?
19 **A.** Yes, sir.
20 **Q.** And?
21 **A.** Terrance and Taneal.
22 **Q.** Tweety; is that right? Edgar Watson, right?
23 **A.** Yes, sir.
24 **Q.** And Terrance?
25 **A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6767

1 **Q.** And those were the guys you were tight with?
2 **A.** Yes, sir.
3 **Q.** And that was your group?
4 **A.** It wasn't my group.
5 **Q.** Not your group, I'm not saying you owned the group. That
6 was the group you were part of; is that right?
7 **A.** Yes, sir.
8 **Q.** And those were the guys who were part of the group with
9 you?
10 **A.** Yes, sir.
11 **Q.** And Mr. Ball wasn't part of that group?
12 **A.** No, he wasn't hanging with us, but we all was cool, sir.
13 **Q.** Mr. Ball was not part of that group. I didn't say you
14 didn't get along. Mr. Ball wasn't part of that group, was he?
15 **A.** No, sir. Why you got to -- hollering. I mean, we
16 talking.
17 **Q.** I'm sorry my voice is loud, Mr. Capies.
18 **A.** You weren't hollering at first.
19 **Q.** I'm trying to get an answer, Mr. Capies.
20     Mr. Ball -- and then you began to get further away from
21 Mr. Ball over the question of having the beef with 10th Place;
22 isn't that right?
23 **A.** Yes.
24 **Q.** And you began to get further from Mr. Ball because he had
25 a child with Thomasina; isn't that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*6768*

1   A.   Naw, that didn't have nothing to do with her.

2   Q.   That didn't bother you at all?

3   A.   I mean, he was asking me little questions, but it ain't

4   have nothing to do with her.  He had a baby by her first.  He

5   wasn't thinking about her, but he was asking me questions.

6   Q.   We're talking about what you were thinking, Mr. Capies.

7   That in 1998, you had a conversation with Wop in which you agree

8   that you weren't part of Mr. Ball's group any longer; isn't that

9   right?

10  A.   Yes, sir.

11  Q.   Right.  And you didn't want to be listening to Mr. Ball

12  any longer; isn't that right?

13  A.   Yes, because Head got killed and he wanted it to be over

14  with.

15  Q.   And he wanted it to be over with?

16  A.   Yes.

17  Q.   And because he was moving in another direction; isn't

18  that right?

19  A.   Come on, man, what direction was that?

20  Q.   And Mr. Ball was -- and it wasn't in the direction that

21  you were moving in, was it?

22  A.   He was in the direction, but it wasn't in the direction

23  we was moving in.

24  Q.   That's right, because you were moving in -- you were

25  still into beefing, weren't you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6769*

1   A.   Yeah, he had his beefs, too.

2   Q.   I asked you, sir:  You were moving in the direction,

3   continuing to do the beefing; isn't that right?

4   A.   Yes, sir, and you asked me about Mr. Ball and I told you,

5   sir.

6   Q.   I'm sorry?

7   A.   You asked me about me and Mr. Ball and I gave you the

8   answer to it, and now you're saying I'm talking about you.

9   Q.   I'm asking about, you were moving in a direction that

10  continued to do beefing; isn't that right?

11  A.   Yes, sir.

12  Q.   And Mr. Ball was moving in a direction of the people who

13  were coming in and doing jobs; isn't that right?

14  A.   If that's what you want to say.

15  Q.   I'm asking you, sir:  Wasn't he moving in the direction

16  of Edgar Kahn?

17  A.   In '98?  I mean, I seen them talking.  I don't even

18  remember talking to him in '98.  It wasn't until like 2000, I

19  seen him talking to them.

20  Q.   Right.  And by that point, you were definitely going in

21  different directions, weren't you?

22  A.   Yeah, I was trying to get him, sir.

23  Q.   You were trying to get him.  And he knew that; isn't that

24  right?

25       MR. LEON:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6770*

1        THE COURT:  Sustained.

2   BY MR. TABACKMAN:

3   Q.   Did you make that clear that you were trying to get him?

4   A.   Of course not, it would be me against all them.

5   Q.   Well, Mr. Ball -- you against all who, sir?

6   A.   All the people around Congress Park that was scared of

7   Mr. Ball.  Did you know that?

8   Q.   All the -- you had the group, a group of people we just

9   talked about, didn't you?

10  A.   I mean, I had them -- they was scared.  I was going to

11  Wop about doing something to them.  He kept saying, "Stop

12  talking about it."  He was showing me he was scared.  So I was

13  basically letting it go.  He let me know.  He keep trying to get

14  his money back and this dude beat his man teeth out his mouth.

15  That show me something different, sir.

16  Q.   Mr. Ball beat --

17  A.   No, I said beat my teeth out my mouth.

18  Q.   And you were continuing, during that time, to do

19  stickups; isn't that right?

20  A.   Yes.

21  Q.   And you were sticking up the youngins, weren't you?

22  A.   What "youngins," I never robbed no youngins.

23  Q.   You didn't rob the younger guys in Congress Park?

24  A.   Naw, I didn't rob no younger guys in Congress Park.

25  Q.   You didn't rob John John and Davonne?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*6771*

1   A.   I never in my life robbed them.

2   Q.   And weren't you -- and you weren't willing to do any kind

3   of changing, were you?

4   A.   What you mean?  I was doing me, but I wasn't robbing no

5   little -- no youngins.  They younger than us.  What I'm going to

6   rob them for?  They ain't got nothing I'm trying to get.

7   Q.   You only robbed people that were your age?

8   A.   My age and older; not no youngins.  Fifteen and 16?  Come

9   on, man.

10  Q.   You robbed drug dealers who had drugs to be robbed,

11  didn't you?

12  A.   Yes, sir.  I told you that, sir.

13  Q.   Didn't you rob Travis Honesty?

14  A.   Who is that?

15  Q.   That's not a name that you're familiar with?

16  A.   Travis Honesty?  Give me a nickname.

17  Q.   You remember you didn't rob Travis?

18  A.   Who's Travis?

19  Q.   You didn't know a Travis in the neighborhood?

20  A.   Travis?  I don't know anybody named Travis.  I know one

21  Travis.

22  Q.   You know little Travis?

23  A.   He not from around our way.

24  Q.   You robbed him didn't you?

25  A.   Come on, man, I would never rob no little Travis.  He was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6772

1  cool. What would I rob him for. If I robbed him, I would tell
2  you I robbed him.
3  **Q.**  You thought that the people that were coming in Congress
4  Park were going to stop you from doing the life-style that you
5  were used to; isn't that right?
6  **A.**  Who was that?
7  **Q.**  I asked you a question. Well, the people -- Edgar Kahn
8  from the University of the District of Columbia?
9  **A.**  How they going to stop something that people that's
10  working with him still hustling me? You tell me that.
11  **Q.**  I'm asking you a question.
12  **A.**  You asked it?
13  **Q.**  Weren't you concerned about the fact that you were --
14  that your life-style was not going to be followed any longer in
15  Congress Park?
16  **A.**  My "life style"? My life style? What I was doing, other
17  people was doing, too.
18  **Q.**  Your group; isn't that right, Drano and those folks?
19  **A.**  My group, them (indicating), whoever else was hanging
20  around. That stunt about a job, that was nothing.
21  **Q.**  Weren't you -- didn't you rob Don?
22  **A.**  Yes. Don ain't no youngin. He my age.
23  **Q.**  You were cool with Don; isn't that right?
24  **A.**  No, we had -- we had -- it was a misunderstanding, sir.
25  **Q.**  Another misunderstanding. You robbed Don; isn't that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6773

1  right?
2  **A.**  I robbed him.
3  **Q.**  And Don was a guy that you were cool with?
4  **A.**  No, at the time, we wasn't, sir.
5  MR. LEON: Your Honor, I just object. This was gone over
6  extensively during other cross-examination, days ago. Objection.
7  THE COURT: I'll allow it for transitional purposes, but
8  if it gets repetitive, I'll sustain an objection.
9  BY MR. TABACKMAN:
10  **Q.**  And you robbed -- you continued robbing all the way up
11  through the time of 2001, isn't that right, when you were
12  finally put in jail?
13  **A.**  The last time I robbed was in 2000, sir.
14  **Q.**  And you continued dealing drugs up through 2001, isn't
15  that right?
16  **A.**  Yes, sir.
17  **Q.**  And the only reason you stopped was because you got
18  arrested; isn't that right?
19  **A.**  Yes, sir.
20  **Q.**  And you got arrested. And when you got arrested, there
21  were guns -- where did you keep them, in the woods?
22  **A.**  Naw, they was in the house, sir.
23  **Q.**  And they were in your house?
24  **A.**  My baby mother's house.
25  **Q.**  The house that you lived in?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6774

1  **A.**  Yes, sir.
2  MR. LEON: Objection, asked and answered.
3  THE COURT: Beg your pardon?
4  MR. LEON: Asked and answered.
5  THE COURT: I'll allow it.
6  BY MR. TABACKMAN:
7  **Q.**  And Mr. Ball wasn't living in there; isn't that right?
8  **A.**  No, sir.
9  **Q.**  And you put the guns on Mr. Ball?
10  **A.**  I ain't put nothing on him. He gave me -- I told you, I
11  didn't put nothing on him. You saying like I lied on him or
12  something. He gave me the guns, sir. I told you that.
13  **Q.**  And he gave you guns, just like he told you he had broken
14  Mr. Sykes's jaw over a gun charge?
15  MR. LEON: Objection, form.
16  THE COURT: Sustained.
17  BY MR. TABACKMAN:
18  **Q.**  And he had given you the guns to hold, is that your
19  testimony?
20  **A.**  He said that he heard that the youngins around the farms
21  was coming through there. He was, like, man, I know your man
22  locked up. I got something for you, and he brung the guns to
23  me.
24  **Q.**  And this was a year after he -- six months after he had
25  broken your jaw?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

6775

1  **A.**  He didn't break my jaw. I never told you that.
2  **Q.**  I'm sorry, knocked your teeth out?
3  **A.**  Yes, sir, we was cool.
4  **Q.**  And he turned around and you -- according to you, you had
5  turned down apologies or attempts to talk to you by his mother;
6  isn't that right?
7  **A.**  I didn't turn her down. I turned his brother down. I
8  respect his mother. When I seen her, I answered the questions
9  that she asked me, sir.
10  **Q.**  And you still -- you admitted that you still wanted to
11  kill him?
12  **A.**  Sir, he tried to kill me.
13  **Q.**  I asked you a question. You still wanted to kill him?
14  **A.**  Yes, sir.
15  **Q.**  And on the day that you were arrested, you still wanted
16  to kill him; isn't that right?
17  **A.**  Yes, sir.
18  **Q.**  And it continued on past that, didn't it?
19  **A.**  I learned that it's nothing I can do. It's out of my
20  hands, sir.
21  **Q.**  And that's because you were locked up?
22  **A.**  I mean, that's because I'm not into that situation. If I
23  was still into that situation, of course, my head -- I'm in the
24  streets, of course my head going to be still into that, sir.
25  **Q.**  And because you're locked up is why you're not trying to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**6776**

1  kill Mr. Ball; isn't that right?

2  **A.**    I just told you, if I was still into the streets, I would

3  probably still be thinking that way, but I'm no longer into the

4  streets.  I could be out there and not be into the streets,

5  ain't no telling what would happen.  I could have not been in

6  the streets and left it alone.  I can't work and try to beef

7  with somebody.

8  **Q.**    But you didn't give it up when you were in the streets,

9  did you?

10      MR. LEON:  Objection to the form.

11      THE COURT:  Do you understand the question?

12      THE WITNESS:  Yeah, he said I didn't give up trying to

13  kill Mr. Ball when I was in the streets.

14      I told him no before, sir.

15  BY MR. TABACKMAN:

16  **Q.**    And you can't get to him now, can you, to kill him?

17  **A.**    Right now, sir, I don't even want to touch him.

18  **Q.**    I didn't ask you about that.  I said you can't get to him

19  now, can you?

20  **A.**    No, sir.

21  **Q.**    And the only way you can get to him is by your testimony;

22  isn't that right?

23  **A.**    I told you, sir, it's no hard feelings, it's just I got

24  to tell the truth, sir.

25  **Q.**    And the only way that you can get to him now is by your

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**6777**

1  testimony; isn't that right?

2      MR. LEON:  Objection, asked and answered.

3      THE COURT:  Sustained.

4  BY MR. TABACKMAN:

5  **Q.**    And so, based on your word that you say you've changed,

6  the jury should trust you?

7      MR. LEON:  Objection.  Form, argumentative.

8      THE COURT:  Sustained, but I'll let you rephrase.

9  BY MR. TABACKMAN:

10  **Q.**    It's your testimony that you've changed; is that correct?

11  **A.**    Yes, sir.

12  **Q.**    And so, the lying that you did to the judge who put you

13  in the halfway house, that's not you, anymore, correct?

14  **A.**    No, sir.  I'm facing the rest of my life, sir.

15  **Q.**    And the lying you did to Mike Will in 1999 when you

16  misled him, that's not you anymore?

17  **A.**    No, sir.  I'm facing the rest of my life, sir.

18  **Q.**    The lying that you did to the FBI when you told them that

19  false information about D-Lock originally, that's not you

20  anymore?

21  **A.**    No, sir.

22  **Q.**    And the lying that you did to the FBI when you first told

23  them about the killing of Jerry Hayes, that's not you anymore?

24  **A.**    No, sir.

25  **Q.**    And the lying that you did to the FBI when you told them

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**6778**

1  the stories that you told them about the death of Troy Lewis,

2  that's not you anymore?

3  **A.**    No, sir.

4  **Q.**    And we have your word on that?

5  **A.**    Yes, sir.

6  **Q.**    And is your history a reflection of your word, Mr.

7  Capies?

8      MR. LEON:  Objection.

9      THE COURT:  Sustained.

10      THE WITNESS:  You got something on your mouth.

11  BY MR. TABACKMAN:

12  **Q.**    Can't quite get rid of it.

13      Is your testimony that because you are facing a long jail

14  tense you've changed?

15  **A.**    Yes, sir, and I got a baby out there that love me, sir.

16  **Q.**    So it's because of your baby and the long jail sentence

17  that you've changed?

18  **A.**    Yes, sir.

19  **Q.**    And it's -- but it's the desire to get away from that

20  long jail sentence that's brought you here today?

21  **A.**    Yes, sir.

22  **Q.**    And so you'll trade your time for somebody else's time;

23  isn't that right, Mr. Capies?

24      MR. LEON:  Objection form.

25      THE COURT:  I'll allow it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**6779**

1      THE WITNESS:  I'm not here to trade no time.  I told you

2  it's not no hard feelings.  I'm here to tell the truth to save my

3  life, sir.

4  BY MR. TABACKMAN:

5  **Q.**    You killed Devar Chandler?

6  **A.**    Yes, I helped murder him, sir.

7  **Q.**    And you pleaded guilty to being part of a RICO

8  conspiracy?

9  **A.**    Yes, sir.

10  **Q.**    And you sold more drugs than you can remember?

11  **A.**    Yes, sir.

12  **Q.**    And you've done more robberies than you can remember?

13  **A.**    Yes, sir.

14  **Q.**    And you -- it's your desire to get out of the sentence

15  that -- excuse me.

16      And the reason that you have decided to testify is to get

17  out of the sentence for those crimes that you admit; is that

18  right?

19  **A.**    To save my life, sir, and tell the truth.

20  **Q.**    To -- the reason that you have decided to testify is to

21  get out of the sentence for those crimes that you committed?

22      MR. LEON:  Objection, asked and answered.

23      THE COURT:  I'll allow it.

24      THE WITNESS:  I told you, to tell the truth, sir, and I'm

25  facing the rest of my life.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6780

BY MR. TABACKMAN:

1   **Q.**   And you want -- while you've been locked up, you've
2 talked to other people, haven't you, about their testimony?
3   **A.**   No, sir, that's none of my business.
4   **Q.**   At CTF, weren't you locked up with Kairi Kellibrew?
5   **A.**   Yes, sir.
6   **Q.**   And weren't you locked up with Robert Crawford?
7   **A.**   I don't know nobody by that last name Crawford. I know a
8 Rob, sir.
9   **Q.**   Yeah.
10   **A.**   I was locked up with a couple of Robert's.
11   **Q.**   And you haven't talked to them about their testimony in
12 this case?
13   **A.**   I think I told you, what, was it yesterday, sir, we
14 government witnesses. They telling, and I'm telling. I'm not
15 going to give them something to go back and tell the government,
16 what the government told me not to do. That's crazy. That's my
17 life. To tell another dude that's telling about my business?
18 I'm not doing that. I don't know what they do. I know what I
19 do.
20   **Q.**   And so your testimony is, you haven't talked to them
21 about the events that you've testified to?
22   **A.**   No. I haven't talked to them.
23   **Q.**   And you haven't talked to them about the events that
24 they're going to testify to?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6781

1   **A.**   No, sir.
2   **Q.**   Even though you talked to Larry Brown about some of the
3 things that he was going to testify to?
4   **A.**   I told you, we talked about the gun. We didn't know
5 nothing about no gun being testified about or nothing that
6 somebody took or none of that, sir.
7   **Q.**   You knew that you were going to testify about the gun
8 that you talked to Larry Brown about; isn't that right?
9   **A.**   No, sir.
10   **Q.**   You didn't know you were going to testify about that?
11   **A.**   I knew I was going to testify about the guns being took,
12 but not saying Larry this your gun, and this and that and that.
13 It was just a conversation, sir.
14   **Q.**   Didn't you testify that Wop had specifically showed you
15 that the gun that Larry Browne head was the gun that was taken.
16 That was your testimony, wasn't it?
17   **A.**   Yes, but I didn't know I was going to testify about that,
18 sir.
19   **Q.**   You didn't know you were going to testify about the gun
20 being taken?
21   **A.**   At the time, when me and Larry was talking? No.
22   **Q.**   You said that the gun was taken when your teeth got
23 knocked out.
24   **A.**   Yes, but I did not know I was going to be testifying
25 about the gun, at the time that me and Larry was talking about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6782

1 it, sir.
2   **Q.**   You knew that you were going to testify about the
3 incident when your teeth got broken?
4   **A.**   Yes, but not about selling Larry no gun and coming from
5 Antwuan.
6   **Q.**   And part of the event was the fact that you had talked to
7 Larry about the fact that it was the same gun on the street,
8 when you were still on the street; isn't that right?
9   **A.**   Yes, sir, but it had nothing to do with the testimony,
10 that what happened in the house. I didn't think it had nothing
11 to do with me and Larry talking about it.
12   **Q.**   And you were told not to talk to Larry Browne?
13   **A.**   I was not told. I was told not to talk to nobody, sir.
14   **Q.**   Right. And Larry Browne's somebody?
15   **A.**   Yes, sir.
16   **Q.**   So Larry Browne was one of the people you were not
17 supposed to talk to?
18   **A.**   Yes, sir.
19   **Q.**   But you did it anyway?
20   **A.**   I told you that the gun -- I did not know that the gun
21 that he bought from Antwuan and Antwuan took from us had nothing
22 to do with it. It was never said about nothing talked about
23 that happened in the house. I wouldn't testify that Larry took
24 the gun and did all of this, no, sir.
25   **Q.**   You had been asked about that, hadn't you, by the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6783

1 government?
2   **A.**   Yes.
3   **Q.**   And you knew that the things that they asked you about
4 were the things that you were going to testify about, didn't
5 you?
6   **A.**   Yes, but it didn't happen in the house, about the guns,
7 sir.
8   **Q.**   And you talked to Larry Browne about something that you
9 knew you would testify about?
10   **A.**   I just told you, I didn't know -- you trying to get me to
11 say I knew I was testifying about the gun, and I told you I
12 didn't.
13   **Q.**   Well, you testified -- I believe you just -- didn't you
14 just answer, sir?
15   **A.**   About Larry and me talking about the gun, sir.
16   **Q.**   Could I finish my question?
17   **A.**   Go ahead. I'm sorry.
18   **Q.**   You were asked by the prosecutors and the FBI, one or the
19 other, at least, about the Ruger gun; isn't that right?
20   **A.**   Yes, sir.
21   **Q.**   And you just testified that you knew that the things they
22 were asking you about were things that you could testify --
23 might be testifying to, correct?
24   **A.**   Yes, sir.
25   **Q.**   And you talked to Larry Browne about that, didn't you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

6784

1  A.    And I just told you the gun -- when me and Larry was
2  talking, I didn't know I was going to be talking about me and
3  him talking about the gun that happened in the house.  That did
4  not happen in the house.  That happened in some street time.  I
5  never went to the grand jury.  I talked to him about crack in
6  the streets --
7  Q.    You didn't --
8  A.    -- crack in the streets.
9  Q.    You didn't talk to the jury about the gun?
10 A.    I talked to the grand jury about the gun, but not about
11 the gun -- about how Larry had it.  I don't remember that.
12 Q.    And you talked to the grand jury about the incident at
13 Wop's, where he brought you in and showed you the gun and said
14 it was the same gun, didn't you?
15 A.    Yes, sir.
16 Q.    Right.  So, when you just said that you didn't talk to
17 the grand jury about that, that wasn't true, was it?
18 A.    I'm talking about me and Larry talking about the gun,
19 sir.
20 Q.    You've never talked to the grand jury about the fact that
21 you and Larry talked about the gun in jail, did you?
22 A.    No, sir.
23 Q.    That came up for the first time in trial?
24 A.    That's the truth.  You wanted to know the truth, I told
25 you.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6785

1  Q.    And so what I'm asking you sir:  When you said you had
2  not -- you didn't think you were going to testify about the gun
3  and Larry, that wasn't true?  You knew you were going to testify
4  about the gun and Larry?
5  A.    That he bought it?
6  Q.    And you knew that he testified in the grand jury about
7  the fact that he bought it.
8  A.    I told you at that time, I didn't know that I was going
9  to testify about that, sir.  I came out and told you.  You
10 didn't even know I talked to Larry about the gun.  I came out
11 and told you that.  I could have said something else, but that
12 wouldn't have been the truth.
13 Q.    So you thought about not telling the truth?
14 A.    No, I told you that if I wouldn't have told you, that
15 would have been not telling the truth.  You didn't know I talked
16 to Larry.  I could have told you anything, but I told you.
17        MS. WICKS:  Objection, non-responsive.
18        THE COURT:  Put your next question.
19 BY MR. TABACKMAN:
20 Q.    Did you think about not telling the truth on other
21 matters, sir?
22 A.    No, sir.
23 Q.    Have you thought -- you haven't thought about not telling
24 the truth on anything?
25 A.    Before I have lied to the government.  We talking about

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6786

1  afterwards, sir.
2        MR. TABACKMAN:  I have no further questions.
3        MR. BALAREZO:  Your Honor, while he clears up, can we
4  approach?
5        THE COURT:  Yes.
6        (Following sidebar discussion had on the record:)
7        MR. BALAREZO:  Your Honor, this goes to my request to
8  reopen the cross.  Mr. Tabackman has, I think, touched upon one
9  or two little issues that I wanted to cross on, but I don't think
10 he covered them the way I wanted to cover them, so -- it's not --
11 it dealt specifically with my client on some things that were
12 mentioned, but -- I think I would like to reopen my cross.  It
13 would be five minutes, probably five or ten minutes.
14        THE COURT:  How is the reopening about your client linked
15 to the information that's been disclosed?
16        MR. BALAREZO:  Because -- I don't have the 302 in front of
17 me, but the -- I believe that's the line, Your Honor.  For
18 example, there's a part where Mr. Capies testified here in trial
19 that my client was present -- for example, Your Honor, I think in
20 the 302, there's information that Mr. Capies told the FBI that
21 when Mr. Ball initially told them that he wanted to kill
22 Mr. Troy Lewis, that there were other individuals in the van with
23 him.  In trial, he testified that the only individual in the van
24 was my client.  But I think that's very important for my client,
25 because it puts him here as part of this conspiracy, where

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

6787

1  Mr. Ball is supposedly talking about wanting to kill somebody.
2        MR. LEON:  That may actually be right.  I'm just thinking.
3        MR. BALAREZO:  In the 302, there's no mention of Don,
4  where as he comes into trial and points out Don is with Antwuan
5  Ball.
6        MR. LEON:  Everything counsel says is correct, so I'm not
7  trying -- everything he says is correct.  The only question I
8  have is, nowhere in the submitted or redacted 302 is Don or Dom
9  or Dominic Samuels mentioned.  So this isn't new information.  I
10 believe -- I'll defer to the record, that the issue of Don being
11 present for that meeting was either in -- the grand jury,
12 submitted a while back, and testimony during direct examination.
13 So I don't have -- if there's a reason to go into it on the
14 record, I don't object to it in principle, but I just don't
15 think -- I think that Don being present was something that --
16 it's not new information.  It's not part of any new information,
17 so that's my only.
18        MR. BALAREZO:  Your Honor, I believe it's new and it's
19 new, based on what's not in the 302.  I can assure you, if we had
20 known about it, Mr. Purpura would have impeached him with it.
21        THE COURT:  Known about what?  Something not newly
22 disclosed in the 302?  That's what I'm trying to find out.
23        MR. BALAREZO:  If the government had previously disclosed
24 that Capies said something different about Don or about other
25 people being in the van, not Don, then Purpura would have

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

# Tab 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
        Plaintiff,                 : Docket No. CR 05-100
                                   :
    v.                             :
                                   :
ANTWUAN BALL, DAVID WILSON,        : Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        : April 16, 2007
DOMINIC SAMUELS,                   : 9:20 a.m.
                                   :
        Defendants.                :
                                   :
                                   :
                                   :

VOLUME 34 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney,
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC  20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC  20004
                         202.434.8234

---

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:           Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC  20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD  21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:           James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC  20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:       Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC  20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:           Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD  20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD  20852
                         301.519.8024

---

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:        A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC  20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD  21202
                         410.576.9351

Court Reporter:         Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

1    **MORNING SESSION, APRIL 16, 2007**

2    (9:25 a.m.)

3    THE COURT:  Let's bring the jury in.

4    MR. LEON:  Should the witness take the stand?

5    THE COURT:  Yes.

6    (Jury in at 9:26 a.m.)

7    THE COURT:  Good morning, ladies and gentlemen.

8    THE JURY PANEL.  Good morning.

9    THE COURT:  Good to have you back.  We're ready to resume.

10   Counsel.

11   CONTINUED DIRECT EXAMINATION OF RICHARD PANE

12   BY MR. LEON:

13   Q.    Good morning, sir.

14   A.    Good morning.

15   Q.    In a loud voice and so we can all hear you and for the

16   benefit of our court reporter, with you please state your full

17   name and spell your full name for the record.

18   A.    My name is Richard Martin Pane.  The last name is spelled

19   P-A-N-E.

20   Q.    And, Mr. Pane, you understand you're still under oath

21   from your testimony from last Thursday?

22   A.    Yes, I do.

23   Q.    Now, I believe when we last broke off at the end of the

24   day Thursday, you walked us through a sketch that you prepared.

25   A.    That's correct.

7059

1   A.   Yes.
2   Q.   And you first started talking between '90 to '93, you get
3   arrested, and now we're talking post-Lorton 1993.
4        When you get back to 10th Place, what did you start doing
5   for work?
6   A.   First thing I did was try to find me some crack cocaine.
7   Q.   And who did you go to see to find crack cocaine?
8   A.   Rodney Robertson.
9   Q.   And did you find him?
10  A.   Yes.
11  Q.   Is that the first day or a couple of days after?
12  A.   Within hours of me being released that first day.
13  Q.   And what, if anything, did you buy from Mr. Robertson?
14  A.   I didn't have no money, so he fronted me ten dimes.
15  Q.   He fronted you ten dimes?
16  A.   Yes.
17  Q.   What does "fronting" mean?
18  A.   When somebody give you something on consignment.
19  Q.   When somebody gives you something on consignment?
20  A.   Yes.
21  Q.   And then you have to do what in return?
22  A.   I have to pay him back half.
23  Q.   So ten dimes on consignment costs you how much?
24  A.   $50.
25  Q.   Ten dimes would have been worth how much total?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7060

1   A.   A $100.
2   Q.   And you would only have to pay him back 50?
3   A.   Yes.
4   Q.   Seems generous.
5   A.   Yes.
6   Q.   Why so?
7        MR. ZUCKER:  Objection.
8   BY MR. GUERRERO:
9   Q.   In your experience?
10  A.   I'm making a $50 profit.  I mean, it's a deal.
11  Q.   Had you had these type of deals with Mr. Robertson
12  before?
13  A.   Yes.
14  Q.   On that very first day when you get back to 10th Place,
15  did you see anybody in the neighborhood selling crack cocaine?
16  A.   Yes.
17  Q.   Who did you see?  Now, we're talking post-Lorton, you
18  come back, who did you see selling crack cocaine?
19  A.   I seen pretty much the same group of guys that I seen
20  before I went in.  The same guys I named.
21  Q.   Earlier you said Jazz?
22  A.   Yes.
23  Q.   Did you see him out there?
24  A.   Yes.
25  Q.   Now, when you come back out, which area did you go to, to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7061

1   sell crack cocaine?
2   A.   The top of 10th Place.  A little further up than where I
3   pointed to earlier.
4   Q.   And how long did it take you to sell your 100 dimes of
5   crack cocaine?
6   A.   Minutes.  About 10, 15 minutes.
7   Q.   You said you saw Jazz?
8   A.   Yes.
9   Q.   Did you see him out there that day or within like a
10  week's time?
11  A.   I can't recall seeing him that day, but he was out there.
12  Q.   And what did you see him doing when you returned from
13  Lorton?
14  A.   Selling crack cocaine.
15  Q.   How about Rodney Robertson, the person that you got
16  fronted your 100 dimes --
17  A.   Ten dimes.
18  A.   I'm sorry, ten dimes.
19  A.   I'm sorry.  He was out there every day selling crack
20  cocaine.
21  Q.   Tony Royer?
22  A.   Yes.
23  Q.   And how about Doney?
24  A.   He was out there selling crack cocaine.
25  Q.   How about Tony?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7062

1   A.   Selling crack cocaine.
2   Q.   I'd like you now to focus your attention now between,
3   like, 1993, now post-Lorton, to, like, 1996.
4   A.   Okay.
5   Q.   That three-year period.
6   A.   Okay.
7   Q.   During that three-year period -- let's start first with,
8   who was it that you were -- what were you doing for a living
9   during that time period?
10  A.   I was pretty much working the job, and at the same time
11  selling crack cocaine.
12  Q.   What kind of job did you have?
13  A.   Driving trucks for Everfresh.
14  Q.   How much would you make a week for that?
15  A.   Maybe 500 a week.
16  Q.   Was it a steady job or something you did on and off?
17  A.   It was a steady job.
18  Q.   How about the income that you made from crack cocaine,
19  how much would you make on a weekly basis?
20  A.   I moved up to a much higher level by then, so I was
21  making anywhere from -- I'd say a thousand to 2,000 a week.
22  Q.   Well, let's back -- let's take it slow here for a second.
23       When you get out of Lorton, you said the first thing you
24  did was, you got dimes on consignment?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 777 of 1954

1  Q.  Before you start with Michael Hall.
2  A.  I was buying 31s.  I was still selling dimes and I was
3  selling also, eight-balls.
4  Q.  How about Jazz now?  I want to talk about Jazz again now.
5  Is he still around during that time period?
6  A.  Yes.
7  Q.  And where would you see Jazz during that time period?
8  A.  Still around the bottom of 10th and on Trenton, Trenton
9  Place area.
10  Q.  And what, if anything, would you see Jazz do?
11  A.  Selling crack cocaine.
12  Q.  And did you ever see who it was that Jazz was getting his
13  crack cocaine from?
14  A.  No.  Sometimes he would come and buy from me.
15  Sometimes he would come to you?
16  A.  Yes.
17  Q.  And what would you sell Jazz?
18  A.  Eight-balls.
19  Q.  Eight-balls of what?
20  A.  Crack cocaine.
21  Q.  And you would sell an eight-ball of crack cocaine to Jazz
22  for how much money?
23  A.  $125.
24  Q.  How often during this time period were you supplying
25  crack cocaine to Jazz?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.  He probably was buying -- maybe once a week.
2  Q.  Would you do it on consignment or was it pay up front?
3  A.  Naw, he had to pay up front.
4  Q.  Did Jazz -- did the business that Jazz had with you, did
5  that ever increase at all?
6  A.  Later on over the years it has.
7  Q.  And again, was that before or after Michael Hall?
8  A.  Before.
9  Q.  And what kind of quantities did you start to sell to Jazz
10  as he's going up in weight?
11  A.  He started buying quarters.
12  Q.  A quarter of what?
13  A.  Crack cocaine, which is 7 grams.
14  Q.  And how much would you sell a quarter of crack cocaine to
15  Jazz for?
16  A.  $250.
17  Q.  And was that on consignment or was that pay up front?
18  A.  He had to pay up front.
19  Q.  Did you ever get to meet anyone during that time period
20  that Jazz was hanging out with?
21  A.  No, not other than the guys on 10th Place.  No.
22  Q.  Did there come a point in time, then, where Jazz is not
23  hanging around 10th Place, that you saw?
24  A.  Yes.
25  Q.  When did that happen?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.  He stopped coming around maybe -- '97, '98 Jazz stopped
2  coming around.
3  Q.  And at this point in time, who are you receiving or --
4  who's supplying you with your crack cocaine?
5  A.  Michael Hall.
6  Q.  Now, Michael Hall -- let's pause on him for a second.
7  When did you first meet Michael Hall?
8  A.  I first met Michael Hall maybe -- around in '92 -- '91,
9  '92.
10  Q.  And where did you meet Michael Hall?
11  A.  He was Rodney Robertson's supplier back then.
12  Q.  How do you know that?
13  A.  I used to be around him when he used to buy from him.
14  Q.  You used to be around who?
15  A.  Rodney Robertson.
16  Q.  When Rodney Robertson would get what from Michael Hall?
17  A.  Crack cocaine.
18  Q.  What quantities would you see Rodney Robertson get from
19  Michael Hall?
20  A.  At the time, it's hard to see.  They did business within
21  closed rooms.
22  Q.  And what is it that caused you to get into a working
23  relationship with Michael Hall?
24  A.  I got beyond Rodney Robertson.  He couldn't no longer
25  supply what I wanted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  What kind of quantities caused you to go beyond
2  Rodney Robertson?
3  A.  Half a keys.
4  Q.  Half a key again is what?
5  A.  Half a key is 500 grams.
6  Q.  And how much were you buying a half a key of crack
7  cocaine back in '95, '96?
8  A.  Maybe 11, 12,000.
9  Q.  Were you getting it in crack cocaine form or powder form?
10  A.  Sometimes both.  It depends on how Michael Hall felt.
11  Q.  Up to that point, had you ever bought any powder cocaine?
12  A.  Yeah.
13  Q.  Did you ever purchase any crack cocaine from Rodney
14  Robertson?
15  A.  No.
16  Q.  So the first person that you actually start to buy powder
17  cocaine from was whom?
18  A.  Michael Hall.
19  Q.  And what quantity of powder cocaine did you purchase?
20  What was the first quantity that you purchased from Michael
21  Hall?
22  A.  Maybe an 8th, 124 grams.
23  Q.  And what's -- what if anything did you do to the powder
24  cocaine to make it crack cocaine?
25  A.  Well, I cook it up.  You had to add the baking soda, boil

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 person that you believe is Dazz?

2 A.  No.

3 Q.  All right.  Now back to what's going on with your life.

4        MR. ZUCKER:  I'm sorry, Your Honor.  I request that the

5 discussion at the bench be followed up.

6        MR. GUERRERO:  May we approach?

7        THE COURT:  Yes.

8        (BENCH CONFERENCE ON THE RECORD.)

9        MR. ZUCKER:  I just ask that Mr. Guerrero, or the Court

10 or anybody, identify Mr. Bell as the person that he's identified

11 as Dazz.  I mean, it's clear, but I think the record needs to be

12 cleared up.  You said, "The person who stood up."  That person

13 isn't identified, for record purposes.

14        THE COURT:  He's identified it at the bench for the

15 record.  He's not going to do that in front of a jury.

16        MR. ZUCKER:  Okay.

17        (END BENCH CONFERENCE.)

18 BY MR. GUERRERO:

19 Q.  Mr. Crawford, I would like you now to go back into your

20 relationship during this time with Andre Scott, or Cheese.

21 A.  Yes.

22 Q.  And we are talking now like '99 to 2000, 2001.

23        The quantities that you would sell to that person

24 during that time period were what amounts?

25 A.  Anywhere from 62 to an eighth of a key.

1 Q.  And how often would Cheese come and see you to purchase

2 crack cocaine?

3 A.  Oh, man, maybe --

4 Q.  During that time period, '99 to 2001.

5 A.  Maybe two, three times a week.

6 Q.  Did you ever see where Cheese would go after he purchased

7 the crack cocaine from you?

8 A.  No.

9 Q.  And through Cheese, did there come a person that you met

10 through Cheese that also wanted to buy crack cocaine from you?

11 A.  Yes.

12 Q.  Who was that?

13 A.  Mr. Antwuan Ball.

14 Q.  And when was it that this happened?  When was it that

15 Mr. Antwuan Ball and you met?

16 A.  Maybe in 2000.

17 Q.  And describe the circumstances of that encounter.

18 A.  Cheese, which is Andre Scott, came to me one day.  And he

19 told me that he had been coming to me with Antwuan' money to buy

20 crack cocaine.

21 Q.  Had you seen this person, Antwuan Ball, before?

22 A.  No, I haven't seen him before.  No.

23 Q.  You hadn't seen him before that encounter?

24 A.  No.

25 Q.  And did you actually meet Antwuan Ball then?

1 A.  Yes.

2 Q.  And where did you meet him?

3 A.  Well, one day after Andre told me he wanted to meet him, I

4 seen him driving a car that I wanted to buy.

5 Q.  What kind of car was it that you saw Mr. Ball driving?

6 A.  It was a '92 Acura Legend.

7 Q.  What color?

8 A.  Black on black.

9 Q.  And "black on black" means what?

10 A.  Black inside, black outside.

11 Q.  And how did you know that that was a car you wanted to buy?

12 A.  I had a conversation with Cheese's brother, Cuz.  And Cuz

13 let me know that he sold a car to Antwuan.

14 Q.  Did you know what the sale price for that car was?

15 A.  I don't know what it was for Antwuan.  But for me, Cuz

16 wanted a 62 and $1,000.

17 Q.  So he wanted $1,000 of cash money?

18 A.  Yes.

19 Q.  And 62 --

20 A.  Crack cocaine.

21 Q.  Powder or crack?

22 A.  Crack.

23 Q.  And when did that happen?  In other words, when was it that

24 you had talked to Cuz about buying that particular car before

25 you see Antwuan in it?

1 A.  It was in the late part of '99, going into 2000.

2 Q.  So when you met Antwuan Ball, where did this meeting occur?

3 A.  We met down Trenton Park in front of Cheese' building.

4 Q.  And can we see that at all on Government's Exhibit 105.1?

5 A.  No, it's not on the map.

6 Q.  And when you met Mr. Ball, tell us what happened.

7 A.  We had a conversation, around --

8 Q.  Where did this conversation take place?  Inside of an

9 apartment or out in the park?

10 A.  No, we just standing outside in front of the apartment

11 building talking.  After we got --

12 Q.  And who was there for this conversation?

13 A.  Cheese.

14 Q.  And what if anything did Mr. Ball say to you?

15 A.  He just letting me know that he been buying crack cocaine

16 from me through Cheese for some time, and he feel as though

17 Cheese was charging him too much.

18 Q.  And what amounts did Mr. Ball say that he was aware -- or

19 rather, strike that.

20        What amounts, during this conversation, did Mr. Ball

21 say he had been purchasing through you by the way of Cheese?

22 A.  He was giving Cheese anywhere from 1,750 to 1,800 for a 62.

23 Q.  All right.  What does that mean?  You were giving him 1,750

24 or 1,800 for a 62?

25 A.  Well, he was giving Cheese 1,750, or sometimes 1,800, to

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013      Page 782 of 1954

1 come to me and purchase a 62.

2 Q.  Who was giving Cheese 1,750 or 1,800?

3 A.  Antwuan Ball.

4 Q.  And you would then sell Cheese what amount of crack cocaine

5 for that money?

6 A.  Well, I would give Cheese a 62 for around 1,600.  So Cheese

7 was making a profit of whatever Antwuan was giving him.

8 Q.  And how often did Antwuan say this was going on, that he was

9 purchasing crack cocaine from you by the way of Cheese?

10 A.  He let me know it had been going on for quite some time.  He

11 never gave me how long, but he said it was for some time.  He

12 said he been trying to meet me but Cheese wouldn't let him.

13 Q.  And on that first occasion what arrangements if any did you

14 and Mr. Ball make about more crack cocaine?

15 A.  We made some arrangements to meet later on that day for a 62

16 of crack cocaine.

17 Q.  Who said to you that he wanted a 62 of crack cocaine?

18 A.  Mr. Ball.

19 Q.  And what was the price that you were going to sell 62 grams

20 of crack cocaine to Mr. Ball for?

21 A.  At that time, 1,600.

22 Q.  Was Cheese still there?

23 A.  Yes.

24 Q.  Did you have the crack cocaine on you at the time?

25 A.  No.

1 Q.  And so how were you going to give it to him?

2 A.  I left -- after we exchanged numbers, I left.  He called me

3 later on, and we met up.

4 Q.  Did he call you on a home phone or a cell phone?

5 A.  Cell phone.

6 Q.  Did he call you the same day or a day after?

7 A.  Same day.

8 Q.  And during the conversation, what did Mr. Ball say?

9 A.  Well, we just talked.  We had already discussed what we was

10 going to do before we parted ways earlier, so I knew.  We just

11 came up with a meeting place.

12 Q.  Do you recall where you met?

13 A.  In front of my mother' house.

14 Q.  And where was that?

15 A.  Congress Street.

16 Q.  And when you met Antwuan Ball, what was your purpose in

17 meeting him then in front of your mother's house?

18 A.  Just to sell him the 62 of crack cocaine.

19 Q.  What did you give him?

20 A.  A 62 of crack cocaine.

21 Q.  What did he give -- what did Mr. Ball give you in return?

22 A.  $1,600.

23 Q.  Cash money?

24 A.  Yes.

25 Q.  Was Mr. Ball in the company of anyone else?

1 A.  No.

2 Q.  Were you in the company of anyone else?

3 A.  No.

4 Q.  After that first sale, did you ever see Mr. Ball again?

5 A.  Yes.

6 Q.  How often would you see Mr. Ball?

7 A.  We became pretty much acquainted.  I wanted to get to know

8 him on a business level, and we met almost every day.

9 Q.  And if you saw Mr. Ball again, would you recognize him?

10 A.  Yes.

11 Q.  Do you see Mr. Ball in the courtroom today?

12 A.  Yes.

13 Q.  Please stand up and point him out.

14 A.  (Witness complies.)

15 Q.  Describe what he's wearing, sir, please.

16 A.  Mr. Ball have on a white dress shirt, a tie with burgundy in

17 it, and he have plats in his hair.

18 Q.  Did you say what about his hair?

19 A.  He have plats on his hair.

20        MR. GUERRERO:  An in-court identification, for the

21 record, of Mr. Ball.

22        THE COURT:  Any objection?

23        MR. TABACKMAN:  No objection.

24        THE COURT:  Request is granted.

25 BY MR. GUERRERO:

1 Q.  All right.  Now, you said that you and Mr. Ball got kind of

2 tight?

3 A.  Yes, we got pretty close.

4 Q.  Pretty close is the word -- the phrases you used.

5 A.  Yeah.

6 Q.  What does that mean, you got pretty close?

7 A.  Like I say, I was trying to get to know him for

8 business-wise.  I seen the potential that he could make some

9 money.  And if he make some money, I make money.

10 Q.  What does that mean, you saw the potential?

11 A.  A few times I met him around Congress Park, I seen the

12 respect that he carried around there.

13 Q.  Let's break that down for a second.  When you met him in

14 Congress Park, where was it that you recall seeing Mr. Antwuan

15 Ball?

16 A.  In the alley.

17        MR. GUERRERO:  Mr. Mazzitelli, may we go back to 105.1,

18 please?

19 BY MR. GUERRERO:

20 Q.  Do you see Government's Exhibit 105.1, a close-up of

21 Congress Park?

22 A.  Yes.

23 Q.  And you said that you saw Mr. Antwuan Ball on occasions in

24 an alley.  Do you see the alley?

25 A.  Yes.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 786 of 1954

1 Q.   Please -- why don't you clear the screen first by pointing

2 at the lower right-hand corner.

3 A.   (Witness complies.)

4 Q.   Where is the alley that you recall you met up with Antwuan

5 Ball on occasion?

6 A.   (Witness complies.)

7 Q.   I note for the record you're pointing to an alley in the

8 center of 105.1, which has been zoomed in to the Congress Park

9 area, an alley to the left of Savannah Place?

10 A.   Yes.

11 Q.   Between, appears to be two apartment building complexes?

12 A.   Yes.

13 Q.   All right.  How often would you go to that alley?

14 A.   Almost every time we called and met.  I would say once a

15 day.

16 Q.   And why is it that Mr. Ball was calling you pretty

17 regularly?

18 A.   To get to know each other.  And a lot of times he wanted to

19 purchase crack cocaine.

20 Q.   How many times do you think you purchased -- how many times

21 do you think you sold crack cocaine to Antwuan Ball between the

22 periods of like '99 up until 2002, 2003?

23 A.   Personally, anywhere from four to five times.

24 Q.   And we've already talked about the first occasion.  Right?

25 A.   Yes.

1 Q.  After the first occasion, is that when you used to go to

2 this area, the alley, to meet Mr. Ball?

3 A.  Yes.

4 Q.  And you used a term, "he," as in Mr. Ball, "had potential."

5 A.  Yes.

6 Q.  What would you see happen in that alley when you saw

7 Mr. Ball there?

8 A.  Well, when I pull up in the alley, I see he had a lot of

9 respect in the alley from a lot of the young guys around there.

10 Q.  What does that mean?  What would you see the young guys do

11 around Mr. Ball?

12 A.  The younger guys, just some of the ways wanted to be like

13 him, always wanted to be around him.

14 Q.  And did you talk -- excuse me.  Did you talk to Mr. Ball

15 about your interest in that alley?

16 A.  Yes.

17 Q.  What did you say?

18 A.  I was trying to get him to sell more crack cocaine.

19 Q.  And how did you approach him in that regard?

20 A.  Well, I asked him, if he can do better, we can have the park

21 in our park.

22 Q.  What was Mr. Ball's response?

23 A.  He was telling me he got the alley, that's his spot, that's

24 his strip.

25 Q.  He got the alley, that's his spot, that's his strip?

1 A.  Right.

2 Q.  What did you understand he was talking about?

3 A.  On the street level, when we say, "This is our spot, this is

4 our strip," it mean we run the strip.  That's ours.

5 Q.  You run the strip?

6 A.  Yes.

7 Q.  Doing what?

8 A.  Selling all the drugs that come through there is pretty much

9 mine's or yours.

10 Q.  Now, we talked about one occasion where you sold Mr. Ball

11 crack cocaine.  The second occasion that you sold Mr. Ball crack

12 cocaine, do you remember the quantity that it was?

13 A.  No, I don't remember.

14 Q.  How about the third occasion?  Do you recall?

15 A.  Anywhere from a 62 to a -- 62 to an eighth.

16 Q.  In comparison to the first time that you sold Antwuan Ball

17 crack cocaine towards the end of the sales, was he buying the

18 same, less, or more from you?

19 A.  Well, towards the end, he purchased an eighth of a key from

20 me.

21 Q.  And an eighth of a key is how much?

22 A.  It's 3,000.  At the time it was a shortage, so I had to

23 charge him 4,000 for it.

24 Q.  What does that mean, there was a shortage?

25 A.  It's when it's hard, when cocaine is hard to find in the

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013      Page 789 of 1954

1 city.  And you go out of the city to buy it, you pay more.  You

2 have to come back, and you have to charge more.

3 Q.  So who were you getting your cocaine from if there was a

4 shortage at the time that Antwuan Ball, you had sold him an

5 eighth?

6 A.  Michael Hall.

7 Q.  Michael Hall?

8 A.  Yes.

9 Q.  And you said you sold the eighth of a key for how much?

10 A.  4,000.

11 Q.  $4,000?

12 A.  Yes.

13 Q.  And what were the arrangements of that sale?  Was that on

14 consignment, or was that cash up front?

15 A.  No, he gave me 4,000, cash up front.

16 Q.  Where did you and Mr. Ball meet?

17 A.  On 7th Street.  That's right on my mother' block.  My mother

18 live on Congress, and it runs around to 7th Street.  So if I

19 say, "my mother' house," that's what I mean:  Right on my

20 mother' block.

21 Q.  And do you recall what kind of car, if anything -- or what

22 kind of car it was that Mr. Ball was driving at the time?

23 A.  A Ford Expedition.

24 Q.  What happened after that sale between you and Mr. Ball, when

25 you sold him the eighth of a key?

1 A.  Well, the cocaine, it wasn't no good.  It was bad.

2 Q.  What does that mean, it was bad?

3 A.  I sold him powder.  And when he went to cook it up, it

4 didn't -- when you cook crack cocaine up, it's supposed to get

5 hard.  It wouldn't get hard.  So he called me back and let me

6 know it wouldn't get hard.

7 Q.  Did he call you back on the same day that you sold him the

8 crack cocaine or the following day?

9 A.  No, the same day, within hours.

10 Q.  And what was it that Mr. Ball said to you about the sale of

11 an eighth of a key?

12 A.  He just said, "It won't get hard."

13 Q.  What was your response?

14 A.  "Bring it back."

15 Q.  Did you and Mr. Ball meet?

16 A.  Yes.

17 Q.  What happened when you met?

18 A.  Well, he brung back a portion of it, a little more than half

19 he brung back.

20 Q.  And how much of a portion did he bring, do you recall?

21 A.  No, I don't recall.  It was a little more than half.  It was

22 supposed to have been the whole thing, but he brung a little

23 more than just half of it.

24 Q.  What was the total amount, again, that you sold him?

25 A.  Eighth of a key.

1 Antwuan Ball?

2 A.  I couldn't get my hands on no more cocaine, so I bought some

3 marijuana and I sold him a quarter pound of marijuana.

4 Q.  Who did you get your marijuana from?

5 A.  Delroy Green.

6 Q.  One of the persons that we talked about earlier?

7 A.  Yes.

8 Q.  And how much marijuana did you buy from Delroy Green?

9 A.  I mean, about three or four pounds.

10 Q.  And you said you sold how much to Antwuan?

11 A.  A quarter pound.

12 Q.  For what price?

13 A.  Maybe about 300.

14 Q.  Was that cash up front or on consignment?

15 A.  Yes, cash.

16 Q.  Mr. Crawford, I want to talk to you also about an incident

17 with Antwuan Ball where you saw -- or he made some reference to

18 you about beating someone with a gun.

19 A.  Yes.

20 Q.  Do you know what I'm talking about?

21 A.  Yes.

22 Q.  And when in time did this encounter occur?  At the beginning

23 when you sold him the 62, or towards the end when you're trying

24 to make up for the bad crack cocaine?

25 A.  Towards the end.

1 Q.  And where was it that you actually met Antwuan on that

2 occasion?

3 A.  I pull up --

4 Q.  Yeah, why don't we clear the screen first, and we're back on

5 105.1.  You've cleared it.

6        And where do you recall meeting up with Antwuan?

7 A.  Right in front of the building right there.

8 Q.  All right.  And for the record, you've pointed to

9 Government's Exhibit 105.1 on Congress Street, to the right of

10 the intersection of 13th Place and Congress Street, right at

11 that building there?

12 A.  Yes.

13 Q.  Describe the circumstances of that encounter.  Were you

14 walking, driving?

15 A.  I was pulling up in my Z once again, and I pulled in front

16 of the building.  He called me.

17 Q.  He had called you when?

18 A.  He called me that day, maybe minutes.  And I was coming

19 around to holler at him.

20        I pulled up --

21 Q.  Let me just pause you right there for a second.  What did

22 you and he, Mr. Ball, talk about when he called you that day

23 earlier?

24 A.  Nothing in particular.  We was just -- it was a typical day,

25 I ain't have no cocaine, and I was just going to see him.

1 Q.  And when you arrived at that location, what happened?

2 A.  He was standing -- there's some steps right there.  He was

3 standing on the steps when I pull up.  And he just had a

4 disturbed look on his face.

5 Q.  He had what type of look?

6 A.  A disturbed look, an angry look, like something was wrong.

7 Q.  In that posture or condition, what did he say to you?

8 A.  I rolled the window down and he came to the car.  And as he

9 was walking to the car, he had his hands in his pockets, so I

10 asked him, "What's up?"

11       And he was like, "I just had to fuck these young-uns up

12 around here."

13 Q.  Are those the words that Mr. Ball used?

14 A.  Yes.

15 Q.  And did you ask him what he meant?

16 A.  Yeah.  I was like, "What young-uns?"

17       He was like, "Man, these little young dudes around

18 here, man, they think they going to take over the strip."

19       I said, "What you mean, 'take over'?"

20       He said, "Ain't no problem.  Don't worry about it."

21       So I was like, "What happened?"

22       He was like, "I just had to knock this nigga Munya's

23 teeth out his mouth."  I just looked at him.  I didn't know who

24 Munya was.  And so I was like, "Is everything okay?"

25       He was like, "Yeah.  Wop and Munya, they supposed to be

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 794 of 1954

1 planning on killing me."  He said somebody came and told him

2 that.

3          So I was like, "Killing you?  And you standing around

4 here?"  Because I have heard of Wop, and from what I heard --

5          MS. WICKS:  Objection.

6          MR. ZUCKER:  Objection.

7 BY MR. GUERRERO:

8 Q.  Without telling us what you heard, just tell us what else

9 Mr. Ball said in that conversation.

10 A.  I was looking at him like, "Why is you standing here, then?"

11 And he was looking like he ain't have a care in the world, like

12 it's nothing.

13 Q.  Did you ever get a chance to see what if anything Mr. Ball

14 had in his hands or his pockets?

15 A.  Yes, he had a gun in his pocket.

16 Q.  Can you recall which pocket it was?

17 A.  Yeah, his right pocket.

18 Q.  And what part of the gun if any did you see?

19 A.  The butt, the butt.  He had on a kind of trench coat like,

20 and I see the butt part sticking out.

21 Q.  And what happened next after that conversation?

22 A.  Nothing too much.  We just chatted for a minute.  I didn't

23 want to sit there, you know.  I mean, "You just telling me what

24 you done, and you standing there like you ain't got a care in

25 the world."  So I talked fast, and I left.

1 Q.  Did you see whether or not Mr. Ball had any crack cocaine on

2 him, on his person that day?

3 A.  No.

4 Q.  Did Mr. Ball tell you whether or not he had taken anything

5 from anyone?

6 A.  Yeah.  He told me, in the process of him knocking Munya'

7 teeth out, he took their money and some crack cocaine from them.

8 Q.  And which names in particular did Mr. Ball say that he took

9 their money and their cash?

10 A.  It was Munya, Wop.  And he said another name, but I can't

11 recall.

12 Q.  Did you and Mr. Ball go anywhere after that?

13 A.  No.

14 Q.  Why not?

15 A.  No, I had to get away from there.  I mean...

16 Q.  Along the same topic, did there come a point, too, where you

17 encountered Antwuan Ball and there were some shots that had just

18 been fired?

19 A.  Yes.  This was before.

20 Q.  When did that happen?  Was that before or after this

21 incident about the teeth knocking out?

22 A.  This is before the incident.

23 Q.  And again, why don't we clear the screen here on 105.1.

24 A.  (Witness complies.)

25 Q.  And where was it, if this picture even depicts it, that this

1 Q.  Now, flip the pages on Government's Exhibit 1107, and there

2 should be a page three that follows.

3 A.  (Witness complies.)  Okay.

4 Q.  Do you see that?

5 A.  Yes.

6 Q.  It's like an attachment to the plea agreement.  Do you see

7 that?

8 A.  Yes.

9 Q.  And do you see any signatures on that attachment of 1107?

10 A.  Yes.

11 Q.  Whose signatures do you see?

12 A.  My signatures and my lawyer.

13 Q.  What's the date of your signature?

14 A.  9/11/03.

15 Q.  And what's the date of your lawyer's signature?

16 A.  9/11/03.

17 Q.  And does Government's Exhibit 1107 fairly and accurately

18 contain your plea agreement and then the proffer of evidence in

19 support of your plea agreement?

20 A.  Yes.

21 Q.  Does it appear to be altered in any way?

22 A.  No.

23       MR. GUERRERO:  Your Honor, at this time the government

24 would move to enter Government's Exhibit 1107.

25       MR. TABACKMAN:  May we approach, Your Honor?

1          THE COURT:  Yes.

2          (BENCH CONFERENCE ON THE RECORD.)

3          MR. TABACKMAN:  The copy that was given to me still has

4 reference to the polygraph in it.  So I don't know exactly --

5 oh, their copy does not.

6          MR. GUERRERO:  Mr. Tabackman is correct that the

7 un-redacted copies are the ones that are circulating.  But the

8 ones that have been marked as the exhibits, I'm looking at page

9 two, we've redacted the language about the polygraph.

10          MR. TABACKMAN:  Just making sure.

11          MR. PROCTOR:  Your Honor, same objection that Ms. Wicks

12 has made in regards to every other proffer.

13          THE COURT:  Any other objection?

14          MR. TABACKMAN:  We will join Ms. Wicks' objection.

15          THE COURT:  All right.

16          (END BENCH CONFERENCE.)

17          THE COURT:  Over objection, 1107 will be received.

18          (Government's Exhibit 1107 was moved into evidence.)

19 BY MR. GUERRERO:

20 Q.  Mr. Crawford, will you please clear the screen, again

21 touching the lower right-hand corner of the exhibit, or the

22 monitor.

23 A.  (Witness complies.)

24 Q.  Mr. Crawford, do you see Government's Exhibit 1107 on the

25 screen?

1 A.   Yes.

2 Q.   And do you see your name up at the top there, "United States

3 V. Robert Crawford"?

4 A.   Yes.

5 Q.   Your plea agreement, do you recall when it was you were

6 arrested?

7 A.   Yes.  August 21st, '03.

8 Q.   And when you were -- after you were arrested, where have you

9 physically been for the last almost four years?

10 A.   In Washington, D.C.

11 Q.   And at home or in jail?

12 A.   Excuse me.  After my arrest?

13 Q.   Yes.

14 A.   Oh, I've been incarcerated.  I've been in jail.

15 Q.   So you're going on close to four years in jail?

16 A.   Yes.

17 Q.   Were you ever let out at all pursuant to this agreement?

18 A.   No.  No.

19 Q.   And what was it, Mr. Crawford -- do you see paragraph one

20 there, Mr. Crawford?

21 A.   Yes.

22 Q.   It says there in paragraph one that you pled guilty to what?

23 A.   One count indictment, "Conspiracy to distribute, and possess

24 with intent to distribute, cocaine base."

25 Q.   And as part of your plea agreement, what's your

1 understanding as to the exposure in prison that you face because

2 you entered that guilty plea?

3 A.  I could face from 10 to life in prison.

4 Q.  And I'm just going to move over to page two of this exhibit.

5 Do you see paragraph number two?

6 A.  Yes.

7 Q.  And under paragraph number two, you took accountability for

8 selling what quantity of crack cocaine or cocaine base?

9 A.  1.5 kilograms.

10 Q.  And that's under your plea agreement?

11 A.  Yes.

12 Q.  But at the time that you were out there, you had been

13 selling more than that?

14 A.  Yes.

15 Q.  Now, your obligations under this particular agreement are to

16 do what, sir?

17 A.  Tell the truth, cooperate with the law enforcements.

18 Q.  And as part of telling the truth and cooperating with law

19 enforcement, I mean, what does that mean to you, Robert

20 Crawford?

21 A.  It means I have to come in and tell the truth, be truthful

22 about what I have done.

23 Q.  And how about with respect to any questions that may be

24 asked of you?

25 A.  I have to answer all the questions truthfully.

1 Q.  What is it that you want in return from the government under

2 this agreement?

3 A.  I'm hoping that the government write a letter to the judge.

4 Q.  Do you know what the term of that letter is?

5 A.  It's called a 5(k).

6 Q.  And under a 5(k) letter, in your understanding, is what?

7 A.  The judge can -- it's up to the judge to sentence me, give

8 me what kind of time.  It's completely out of the prosecutor's

9 hands.  It's up to the judge.

10 Q.  Do you see paragraph number six of your agreement?

11 A.  Yes.

12 Q.  Do you see where it says "5(k)" there?

13 A.  Yes.

14 Q.  Who's in charge of giving you a 5(k) letter?

15 A.  It goes through a committee.

16 Q.  And that committee belongs to whom?  I mean, what agency?

17 A.  The government.

18 Q.  And what's your understanding as to whether or not you

19 automatically get a 5(k) letter, even if you do cooperate under

20 the agreement?

21 A.  Can you repeat the question?

22 Q.  Do you automatically -- are you automatically entitled to a

23 5(k) letter because you do everything under your agreement?

24 A.  No.

25 Q.  So what's your understanding as to how that process works?

1 time they went up in there, it was gone.

2 Q.  You've used that terminology in your testimony.  How would

3 you describe what was going on over at 10th Place?

4        MR. ZUCKER:  Objection.  Foundation.  He can only

5 describe what he saw.

6        THE COURT:  Do you understand what the question is?

7        THE WITNESS:  No.

8 A.  Can you repeat it?

9 BY MR. GUERRERO:

10 Q.  You were out there in 10th Place, right, from the years of

11 '92 to 2003 when you got locked up?

12 A.  Yes.

13 Q.  And what were you doing out there during that time period?

14 A.  I was selling crack cocaine.

15 Q.  And what would you see the other guys, some of the guys that

16 is we named here in your plea agreement, do in that area?

17 A.  Selling crack, crack cocaine.

18        MR. GUERRERO:  Court's indulgence.

19        Thank you, Your Honor.

20 BY MR. GUERRERO:

21 Q.  Mr. Crawford, I would like to ask you an additional

22 question.  Did you know a James Davis?

23 A.  Yes.

24 Q.  How did you know James Davis?

25 A.  He lived on 10th Place.

1 Q.  And did you ever have any interaction with James Davis?

2 A.  Yes.

3 Q.  What kind of interaction did you have with James Davis?

4 A.  We sold crack cocaine together on 10th Place.

5 Q.  Would that be up in the area where you sold crack cocaine,

6 the top part, or the bottom part?

7 A.  Top and bottom.

8 Q.  Did you buy crack cocaine from James Davis, or did he sell

9 to you?  I mean, did you sell to him or he sold to you?

10 A.  One time or two I sold to him.

11 Q.  What kind of quantities did you sell to Jack?

12 A.  Maybe 62.

13         MR. TABACKMAN:  Objection, Your Honor.  He asked about

14 James Davis, and then he just asked about Jack Davis.  Just so

15 we're clear.

16         MR. GUERRERO:  If I misspoke, it's James I'm talking

17 about.  James Davis, focus on that.

18 BY MR. GUERRERO:

19 Q.  Did James have a nickname that you know?

20 A.  Naw.  Twin.

21 Q.  Twin?

22 A.  Twin.

23 Q.  Do you know why they called him Twin?

24 A.  Yes.  He had a twin brother.

25 Q.  So I'm just talking about twin, James Davis.

1 Q.  Was that the same house that you kept money under the bed

2 in?

3 A.  No.

4 Q.  It was a different house?

5 A.  I never kept money under no bed.

6 Q.  You haven't kept money under the bed during the time that

7 you've been a drug dealer?

8 A.  No.

9 Q.  You testified in a trial out in Maryland, didn't you?

10 A.  Yes.

11 Q.  And that was the United States versus John Richard Proctor?

12 A.  Yes.

13 Q.  And Mr. Proctor was your business partner, wasn't he?

14 A.  Yes.

15 Q.  He was your business partner in 1998?

16 A.  Yes.

17 Q.  1999?

18 A.  If I can remember.

19 Q.  And 2000?

20 A.  Maybe so.

21 Q.  You don't remember, you're not sure?

22 A.  I don't remember.  I'm not sure.

23 Q.  Well, we can get to that in a few minutes.

24         And you testified, do you recall it was on January 5 of

25 2005?

1 A.  I can't recall if that was the date.

2 Q.  But you'll accept that if I -- you don't have any question

3 about that, do you?

4 A.  If I can see what you're reading, I can make sure.

5        MR. TABACKMAN:  Your Honor, this would be an add-on

6 exhibit to Mr. Ball's.  I'll check with Mr. Carney.  I believe

7 this would be Exhibit 68.

8        Mr. Proctor tells me Ms. Wicks already has it marked as

9 an exhibit marked for her.  I don't know if the Court has a

10 preference as to which way we go.  It would be 18-D.

11        THE COURT:  You said it's 18-D, as in David?

12        MR. TABACKMAN:  Yes, Your Honor.

13        THE COURT:  All right.  I don't have a list of 18

14 series.

15        MR. TABACKMAN:  I believe that would be -- I'm looking

16 at the list here.  I thought that Ms. Wicks had given the Court

17 a copy of an exhibit list.

18        Well, why don't we just add it on to -- it will be

19 Wilson 18-D, D as in David.

20        May I approach, Your Honor?  May I approach the

21 witness?

22        THE COURT:  Yes.

23 BY MR. TABACKMAN:

24 Q.  I'm going to show you what's been marked as Wilson

25 Exhibit 18-D.  Do you recognize that transcript in the case of

1 United States versus John Richard Proctor?

2 A.  Yes.

3 Q.  And do you see here at the beginning, the index indicates

4 that this has your testimony in it?

5 A.  Yes.

6 Q.  And the date of that is January 5th, 2005.  Is that right?

7 A.  Yes.

8 Q.  And that was in Greenbelt, Maryland.  Is that right?

9 A.  Yes.

10 Q.  In the United States District Court?

11 A.  Yes.

12 Q.  That's a federal court like this one?

13 A.  Yes.

14 Q.  And do you recall with respect to your house and your money

15 being asked the following questions --

16      MR. GUERRERO:  What page, counsel?

17      MR. TABACKMAN:  I'm sorry.  Page 46, I believe then 47.

18 BY MR. TABACKMAN:

19 Q.  Describing your relationship with Mr. Proctor, you were

20 asking the following questions and gave the follows answers

21 regarding your money:

22      "I want you to explain" -- Question:  "I want you to

23 explain how you put it together."

24      MR. TABACKMAN:  That's line eight, counsel.

25

1 BY MR. TABACKMAN:

2 Q.  "You put it together where?"

3        Answer:  "We would either keep it at his house or my

4 house."

5        Question:  "What do you remember being the largest

6 quantity of money you kept at your house?"

7        Answer:  "Can you repeat the question?"

8        Question:  "How much money did you keep at your house?

9 What's the largest amount of money you kept at your house?"

10        Answer:  "It's hard to tell.  I kept a lot of money.  I

11 kept all my profits at my house."

12        Question:  "When you say, quote, 'hard to tell,' closed

13 quote, could you give us -- was it a few dollars or a hundred

14 dollars?"

15        Answer:  "Thousands of dollars at my house, thousands

16 of dollars.  Thousands of dollars.  I can't think how much, but

17 it was a lot."

18        Answer (sic):  "Where would you keep it in your house?"

19        Answer:  "In my bedroom under the bed, under the couch.

20 I had money everywhere."

21        Do you recall being asked those questions and giving

22 those answers?

23 A.  I don't recall being asked them questions.  It been some

24 time now.  But if it states that I said that, then I said it.

25 Q.  So you did keep money in your house?

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013    Page 807 of 1954

1 A.  Well, it was a few of us that got locked up that day.

2 Q.  Who else got locked up that day?

3 A.  Myself, Mr. Proctor, Donnie, Charles Thomas, Brian Jenkins.

4 That's all I can recall at this moment.

5 Q.  You weren't locked up with Antwuan Ball, though, on that

6 day?

7 A.  No.

8 Q.  No?

9 A.  No.

10 Q.  The people that you were locked up with were some of the

11 other people that you named during the course of your testimony.

12 Is that right?

13 A.  Yes.

14 Q.  Now, Mr. Guerrero had asked you about the plea agreement.

15 You -- I would like to ask you some questions about that, if I

16 might.

17 A.  Uh-huh.

18 Q.  You stated in your direct testimony that the sentence that

19 you faced was from 10 years to life.  Is that right?

20 A.  Yes.

21 Q.  And the 10 years is known as a mandatory minimum.  Isn't

22 that right?

23 A.  Yes.

24 Q.  And because it's a mandatory minimum, mandatory meaning you

25 have to serve a certain minimum amount of time of 10 years?

1 A.  Yes.

2 Q.  And Judge Roberts explained that to you when you took your

3 guilty plea in front of him.  Isn't that right?

4 A.  Yes.

5 Q.  And he said that unless you cooperate and the government

6 gives you a 5(k) letter, he has handcuffs on.  Isn't that right?

7 Do you recall him saying something like that?

8 A.  Something like that, yes.

9 Q.  Explained to you that the only way you could get out of that

10 10 years on the bottom, automatic mandatory, was through your

11 cooperation with the government.  Isn't that right?

12 A.  No, that's not right.

13 Q.  What is your understanding, sir?

14 A.  No, that's not right.

15 Q.  What is right, sir?

16 A.  I still face 10 to life with the 5(k) letter.  It's totally

17 up to the judge.

18 Q.  I'm sorry.  Let me repeat the question.

19 A.  Okay.

20 Q.  The only way that you have any chance of not serving that

21 mandatory minimum is through getting the letter?

22 A.  Yes.

23 Q.  You still might serve the mandatory minimum.  Isn't that

24 right?

25 A.  Yes.

1 Q.  But having the letter, the 5(k) letter, gives you a chance

2 to get out of that mandatory minimum?

3 A.  It helps, yes.

4 Q.  Well, it doesn't just help, does it?  It is the only way you

5 can get out of that mandatory minimum, isn't it?

6 A.  Yes.

7 Q.  And the government specifically has to ask for that, not

8 just under Section 5(k).  Isn't that right?

9 A.  Repeat the question.

10 Q.  Well, your plea agreement -- you had your plea agreement

11 read to you.  Is that correct?

12 A.  Yes.

13 Q.  You read it over yourself?

14 A.  Yes.

15 Q.  You discussed it with your lawyer?

16 A.  Yes.

17 Q.  And the judge asked you lots of questions about it when you

18 came to court, didn't he?

19 A.  Yes.

20 Q.  And that was all to establish that you understood it

21 clearly.  Is that right?

22 A.  Yes.

23 Q.  One of the things that your plea agreement talks about is a

24 statute, 18 United States Code, Section 3553(e).  Does that ring

25 a bell with you, sir?

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013      Page 810 of 1954

1 A.  I can't recall.

2 Q.  Do you have a recollection, sir, that the government, in

3 addition to saying that you substantially cooperated, has to

4 specifically ask that the judge go below the mandatory minimum

5 because that's what Section 3553(e) requires?  Do you recall

6 that?

7 A.  No.  If you can show me in writing, I can pretty much read

8 it out to you.

9 Q.  Let's go through this.  Rather than jump around, let's go

10 through the plea agreement.

11        In paragraph one, it has the statute, do you recall

12 that, that you violated.  It just says the long statutory

13 number.  Do you recall that?

14 A.  Can I see what you reading, please?

15 Q.  Sure.

16        MR. TABACKMAN:  May I?

17 BY MR. TABACKMAN:

18 Q.  Take a look again -- here, you can keep that right in front

19 of you.  That will make it easier.

20 A.  Appreciate it.  Thank you.

21 Q.  Do you see a -- I believe it's in the third line, it says

22 that you will "admit guilt and enter a plea of guilty to count

23 one of the indictment pending in the United States District

24 Court for the District of Columbia that charges with conspiracy

25 to distribute and possess with intent to distribute cocaine

1 jail, you'll be under supervision, and if you violate certain

2 rules, you could go back to jail and do the rest of your

3 sentence.  Is that right?

4 A.  Yes.

5 Q.  And you can also be hit with having to pay the money -- the

6 cost of imprisonment.  Isn't that right?

7 A.  Yes.

8 Q.  And it also says that you will agree, in paragraph two, that

9 you "are accountable for having distributed more than

10 1.5 kilograms of cocaine base, also known as crack, which

11 quantity represents the total amount in your client's relevant

12 criminal conduct."  Do you see that?

13 A.  Yes.

14 Q.  Now, you were accountable for distributing a lot more than

15 1.5 kilograms of cocaine base.  Isn't that right?

16 A.  Yes.

17 Q.  In fact, throughout 1998 and 1999 and 2000, you were

18 distributing anywhere from a quarter kilogram of cocaine base up

19 to a half a kilogram of cocaine base every week.  Isn't that

20 right?

21 A.  Sometimes, yes.

22 Q.  Well, do you recall testifying in the case of Mr. Proctor

23 that that's how much you distributed?

24 A.  I don't recall that testimony.

25 Q.  Again, referring to the transcript of your testimony at

Page 7201

1 A.  I said pretty much the same.

2 Q.  Do you recall on page 32 of that testimony at line nine,

3 being asked the following question and giving the following

4 answer:

5        Question:  "Now, in 1998, what do you recall to be the

6 quantities of crack cocaine or crack that you were selling per

7 week?"

8        Answer:  "We were selling anywhere from nine ounces,

9 which is a quarter of a key, to a half a key a week, which is

10 18 ounces."

11       Question:  "Could you repeat that again?"

12       Answer:  "We would sell anywhere from a quarter key, is

13 nine ounces of crack cocaine, to a half a key, which is

14 18 ounces of crack cocaine."

15       Do you recall being asked those questions and giving

16 those answers in regard to 1998?

17 A.  I mean, I don't recall.  If I can see what you're reading,

18 then maybe I can help you out a little bit.

19 Q.  Mr. Crawford, I'll be more than happy to show it to you.

20 A.  All right.

21 Q.  If you would take a look, sir, at the question at line nine

22 on page 32 regarding 1998.

23 A.  (Witness complies.)  Yes.

24 Q.  So in fact, you testified under oath in the United States

25 District Court in Maryland that you were selling in 1998 a

1 quarter of a key to a half a key of crack cocaine per week.

2 Isn't that right?

3 A.  Yes.

4 Q.  And you did the same thing in 1999.  Isn't that right?

5 A.  Maybe so.

6 Q.  You're not sure?

7 A.  Not sure.

8 Q.  Well, let's take a look, then, at page 37 -- I'm sorry.

9 It's on page 43.  You may turn to it if you would like.

10        Question at line five, do you remember being asked the

11 following questions and giving the following answers:  "Now, in

12 1998 I asked you to give me a low range quantity, the best you

13 could recall, that you sold of crack per week.  Can you give me

14 for 1999 what you recall as a low range that you and Mr. Proctor

15 sold per week in 1999?"

16        Answer:  "About the same.  About the same."

17        Question:  "What was the same?"

18        Answer:  "Nine ounces, which is a quarter key, to a

19 half key, which is 18 ounces."

20        So I ask you, sir, wasn't the amount of cocaine that

21 you sold in 1998 -- 1999 the same as you sold in 1998?

22 A.  Yes.  That clearly states two people, me and Mr. Proctor.

23 Q.  Sir, my question, though, is about you.  The amount of crack

24 cocaine that you were responsible for in your conspiracy was a

25 quarter kilogram of cocaine to a half a kilogram of cocaine per

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 814 of 1954

1 week for 1999.  Isn't that right?

2 A.  Yes.

3 Q.  And that was the same as for 1998?

4 A.  Yes.

5 Q.  And it was the same for 2000?

6 A.  Yes.

7 Q.  And when did you and Mr. Proctor break up your partnership?

8 A.  I can't recall.  Somewhere around 2000.

9 Q.  We'll check on that.

10        But three years at either a quarter to a half a

11 kilogram a week add up to more than 1.5 kilograms of cocaine all

12 together, doesn't it?

13 A.  Yes.

14 Q.  In fact, if you sold a quarter kilogram per week for 1998,

15 that would be 13 kilograms in that year, isn't it?

16 A.  Yes.

17 Q.  And if you did a half a kilogram a week, it would be

18 26 kilograms just for 1998.  Isn't that right?

19 A.  Yes.

20 Q.  And if you did the same thing for 1999 at 13 per week,

21 that's another -- a half -- a quarter per week, that's another

22 13.  Is that right?

23 A.  Yes.

24 Q.  So '98 and '99 is 26 on the bottom and 52 kilograms if you

25 were doing a half.  Isn't that right?

1 A.  Yes.

2 Q.  And the same for 2000.  So that's another 13 and 26; now

3 we're up to 39 and 78.  Isn't that right?

4        MR. GUERRERO:  Objection, Your Honor.  Speculation.

5        THE COURT:  Overruled.

6 BY MR. TABACKMAN:

7 Q.  Somewhere between 39 kilograms of crack cocaine and

8 78 kilograms is what you sold over just that three-year period.

9 Isn't that right?

10 A.  I can't recall, sir.

11 Q.  That's what you testified to, isn't it, sir?

12 A.  I mean, some days be better than others.

13 Q.  I asked you a question, sir.  Isn't what you testified to --

14 A.  Yes.

15 Q.  Yes.  And you don't deny the truth of that testimony, do

16 you?

17 A.  No, sir.

18 Q.  You were trying to be truthful there, weren't you?

19 A.  Yes.

20 Q.  Just like you're trying to be truthful here.  Isn't that

21 right?

22 A.  I am being truthful.

23 Q.  You are.  Okay.

24        So you sold between 39 kilograms and 78 kilograms of

25 cocaine during this period of time, but you only have to take

1 responsibility for one and a half kilograms.  Isn't that right?

2 A.  Yes.

3 Q.  And that includes -- according to your plea agreement, that

4 includes the amounts your client distributed or possessed with

5 intent to distribute, that 1.5.  Is that right?

6 A.  Repeat the question, please.

7 Q.  According to paragraph two of your plea agreement, it says

8 that this 1.5 kilograms is the entire amount that you're going

9 to be responsible for?

10 A.  Yes.

11 Q.  So you're not going to have to be responsible for somewhere

12 between 37 and a half kilograms of crack cocaine and 77 and a

13 half -- 76 and a half kilograms of crack cocaine.  Isn't that

14 right?

15          MR. GUERRERO:  Objection, Your Honor.  Misstates the

16 plea agreement.

17          THE COURT:  Sustained.

18 BY MR. TABACKMAN:

19 Q.  Now, let's continue down.  Paragraph three talks about

20 certain other things the government is going to do under the

21 sentencing guidelines.  Isn't that right?

22 A.  Yes.

23 Q.  And you understood that the sentencing guidelines are what

24 control the sentence, what Judge Roberts is supposed to look at

25 when he makes a sentence.  Isn't that right?

1 BY MR. TABACKMAN:

2 Q.  Would you please read paragraph six to yourself, please?

3 A.  (Witness complies.)

4 Q.  Let me know when you're finished.

5 A.  Yes.

6 Q.  It states that you understand that "the determination of

7 whether your client has provided substantial assistance pursuant

8 to Section 5(k)1.1 of the Sentencing Guidelines, or 18 United

9 States Code, Section 3553, is within the sole discretion of the

10 United States Attorney's Office for the District of Columbia,

11 and is not reviewable by the Court."

12 A.  Yes.

13 Q.  What is your understanding of what that means, sir?

14 A.  It's totally up to the government to file for the downward

15 departure.

16 Q.  And it's totally up to the government, isn't it, to decide

17 whether or not you're entitled to that letter?

18 A.  Yes.

19 Q.  And if they decide that -- that's what sole discretion

20 means.  Right?

21 A.  Yes.

22 Q.  And if they decide that you're not, then there's nothing you

23 can do about it?

24 A.  Yes.

25 Q.  And you agreed to that provision, that they get to decide,

1 because you knew they had you on all -- on the charges in that

2 indictment.  Isn't that right?

3          MR. GUERRERO:  Objection.  Calls for witness'

4 speculation.

5          THE COURT:  Speak up, please.

6          MR. GUERRERO:  Speculation.

7          MR. TABACKMAN:  Calls for state of mind of what he

8 knew, what he believed.

9          THE COURT:  Overruled.

10 A.  Can you repeat the question?

11 BY MR. TABACKMAN:

12 Q.  And you agreed to the provision where the government gets to

13 have sole discretion, unreviewable, because you knew that they

14 had you and it was -- this was your only hope.  Isn't that

15 right?

16 A.  I knew I was guilty.

17 Q.  You knew it was your only hope, wasn't it?

18 A.  It's not my only hope.  I knew I was guilty.

19 Q.  You knew you were guilty, sir, and you knew, therefore, that

20 you were going to get convicted.  Isn't that right?

21 A.  Yes.

22 Q.  And if you got convicted, you were going to go away to jail

23 for basically the rest of your life.  Isn't that right?

24          MR. GUERRERO:  Objection, Your Honor.

25          THE COURT:  Sustained.  But you can rephrase.

1 A.  Yes.

2 Q.  And that was also because you didn't really have any choice,

3 did you?

4 A.  I had a choice.

5 Q.  You had a choice to go to trial?

6 A.  Yes.

7 Q.  Or to agree to this agreement?

8 A.  Yes.

9 Q.  And they got to write the agreement, didn't they?

10 A.  Yes.

11 Q.  You didn't get to negotiate over all the terms of the

12 agreement, did you?

13 A.  No.

14 Q.  And your lawyer didn't get to negotiate over all the terms

15 of the agreement, did he?

16 A.  Yes.

17 Q.  Yes, he did?

18 A.  Yes, he did.

19 Q.  And do you know what provisions were changed as a result?

20 A.  No.

21 Q.  Were there any --

22 A.  Yes.

23 Q.  -- that you know of?

24 A.  Well, part of my plea agreement was for me to cop to

25 1.5 kilograms cocaine.

1 Q.  And that was something that your lawyer negotiated for you?

2 A.  That was something that the government and myself

3 negotiated.

4 Q.  The government gave you that because they wanted to give you

5 that.  Isn't that right?

6        MR. GUERRERO:  Objection.  Speculation.

7        THE COURT:  Sustained.

8 BY MR. TABACKMAN:

9 Q.  Sir, weren't you made aware that under the sentencing

10 guidelines, anything over 1.5 kilograms, that's what the

11 guidelines say, the number is just above that?

12 A.  Yes, I understand that.

13 Q.  And after that, it's just up to the judge as to how much of

14 that other amount he takes into account.  Isn't that right?

15 A.  Yes.

16 Q.  So that's why it says 1.5, doesn't it?

17 A.  Yes.

18 Q.  You didn't negotiate for that 1.5, did you?

19 A.  That was part of my plea agreement.

20 Q.  I asked you a different question, sir.  You didn't negotiate

21 and say, I'm only going to take 1.5, so I'm not going to sign

22 the agreement if you don't give me 1.5.  That didn't happen, did

23 it?

24 A.  No.

25 Q.  Right.  And you weren't trying to say just now that that is

1 what happened?

2 A.  No, sir.

3 Q.  Because if you tried to say that, that wouldn't be true,

4 would it?

5 A.  Right.

6 Q.  Take a look at paragraph 10, sir, if you would, please.

7 A.  (Witness complies.)

8 Q.  Have you had a chance to look it over?

9 A.  Yes.

10 Q.  It says -- now, it says in paragraph 10, "Your client

11 understands that even if the office informs the Court of the

12 nature and extent of your client's cooperation, this office

13 reserves its full right of allocution for the purpose of

14 sentencing in this matter."

15        What's your understanding of what that means, sir?

16 A.  The government can hand down any sentence that -- they can

17 recommend any sentence that they want.

18 Q.  Right.  That means even if they go and say you substantially

19 assisted, they can still ask that you be locked up for whatever

20 period they want to.  Isn't that right?  The judge doesn't have

21 to follow it, but they can ask for it?

22 A.  Yeah.

23 Q.  And you agreed to that, because the substantial assistance

24 was the most important part for you.  Isn't that right?

25 A.  Repeat that question, please.

1 Q.  You agreed to the provision that allowed them to still go

2 ahead and ask for any sentence they wanted to, even with

3 substantial assistance, because that was really -- the

4 substantial assistance was the only choice you had?

5 A.  Yes.

6           MR. GUERRERO:  Objection as to form.

7           THE COURT:  Well, just a moment.  Do you understand the

8 question?

9           MR. TABACKMAN:  He answered the question, Your Honor.

10          THE COURT:  I asked him a question.

11          MR. TABACKMAN:  I'm sorry.  I apologize.

12          THE COURT:  Let him answer it.  I'm not asking you to

13 answer it.

14          Did you understand the question?

15          THE WITNESS:  No, Your Honor.  Can you have him

16 rephrase it for me, please?

17          THE COURT:  The objection is sustained.

18 BY MR. TABACKMAN:

19 Q.  Let me ask you this:  There are in this plea agreement a

20 number of provisions that are very tough on you.  Isn't that

21 right?

22 A.  What I agreed to do, I have to do, just tell it truthfully.

23 Q.  There are a number of provisions that are very difficult on

24 you.  Isn't that right?

25 A.  No, sir, they're not difficult.

1 Q.  The government has the right to ask for whatever period of

2 time they want to --

3 A.  Yes.

4 Q.  -- even if you substantially assist.  Isn't that right?

5 A.  Yes.

6 Q.  And you agreed to that provision.  Isn't that right?

7 A.  Yes.

8 Q.  And you agreed to the provision that they don't have to file

9 anything after you've been sentenced to ask for more time off if

10 you've assisted some more, do they?

11 A.  No.

12 Q.  Right.  And if the judge gives you a sentence other than the

13 one that you think you might get, you don't have any right to

14 question that, do you?

15 A.  No.

16 Q.  And you agreed to that provision as well?

17 A.  Yes.

18 Q.  And that's because that's what you had to do to be able to

19 have a chance with substantial assistance.  Isn't that right?

20 A.  That's what I chose to do.

21 Q.  And you chose to do that, sir, because -- you had to do

22 those things because otherwise you wouldn't have a chance for

23 the substantial assistance?

24 A.  Yes.

25 Q.  And so, isn't it fair to say that pretty much your future

1 depends upon their letter?

2          MR. GUERRERO:  Objection.  Misstates the plea

3 agreement.

4          THE COURT:  I'll allow it.

5 A.  My future don't depend upon their letter, no.  My future

6 depends upon what kind of time the judge is going to give me.

7 BY MR. TABACKMAN:

8 Q.  And we already established - you agreed, didn't you - that

9 the judge has to give you at least 10 years if you don't get the

10 letter?

11 A.  Yes.

12 Q.  And you understand that the guidelines call for closer to

13 20 years if you don't get the letter?

14 A.  Yes.

15 Q.  And you understand that you can't ask the judge, you

16 can't -- your lawyer can't ask the judge to go below that

17 210 months, can he?

18 A.  No.

19          MR. GUERRERO:  Objection, Your Honor.  Asked and

20 answered.

21 BY MR. TABACKMAN:

22 Q.  So that the only way to get down below that 210 months is

23 the letter?

24 A.  Yes.

25 Q.  Do you understand, sir, if you look at page --

# Tab 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : April 17, 2007 |
| DOMINIC SAMUELS, | : 9:15 a.m. |
| Defendants. | : |

VOLUME 35 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States: UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant
Antwuan Ball: CARNEY & CARNEY
John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant
Antwuan Ball: TIGHE, PATTON, ARMSTRONG,
TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant
David Wilson: LAW OFFICE OF JENIFER WICKS
Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant
Gregory Bell: LAW OFFICE OF JAMES W. BEANE
James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant
Desmond Thurston: LAW OFFICE OF JONATHAN ZUCKER
Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant
Joseph Jones: LAW OFFICE OF ANTHONY MARTIN
Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant
Dominic Samuels: LAW OFFICES OF A. EDUARDO BALAREZO
A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter: Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**MORNING SESSION, APRIL 17, 2007**

1
2   (9:15 a.m.)
3   THE COURT:  I don't think we need to bring the defendants
4   out just yet if what I heard is accurate.  Do I understand we
5   don't have the witness with us and he's on his way?
6   THE DEPUTY MARSHAL:  Yes.
7   THE COURT:  Do you have a time projection?
8   THE DEPUTY MARSHAL:  Not as of yet.  The O.C. is going to
9   pick him up right now.
10  THE COURT:  Okay.  And the government doesn't have anybody
11  on stand-by at the moment?
12  MR. GUERRERO:  Not yet, Your Honor.
13  THE COURT:  I think the best thing for me to do is simply
14  go back and tell the jury that we've encountered some
15  transportation delays and not everybody's here that we need to
16  have here and we'll tell them to come back in X period.  Let me
17  get your recommendations about when.
18  THE DEPUTY MARSHAL:  I would say half hour, 45 minutes.
19  THE COURT:  Okay.  We can do that.  All right.  We'll be
20  at ease and I'll ask the jury to be in place at 10.  All right?
21  All right.  Counsel, I'm just going to go back there and
22  tell them, unless you have any objection to that.
23  (Thereupon, a break was had from 9:16 a.m. until 10:00
24  a.m.)
25  THE COURT:  Mr. Tabackman, are you ready for the jury?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7272

1  MR. TABACKMAN: I am, Your Honor.  Thank you.
2  THE COURT:  All right.  We'll bring the jury in.
3  (Jury in at 10:03 a.m.)
4  THE COURT:  Good morning, ladies and gentlemen.
5  THE JURY PANEL:  Good morning.
6  THE COURT:  Thanks for your patience.  We're all here and
7  ready to go.
8  Counsel.
9  MR. TABACKMAN: Thank you, Your Honor.
10  CONTINUED CROSS-EXAMINATION OF ROBERT CRAWFORD
11  BY MR. TABACKMAN:
12  Q.  Good morning, Mr. Crawford.
13  A.  Good morning.
14  Q.  Yesterday you testified about your obligation to be
15  truthful.
16  A.  Yes.
17  Q.  Do you recall that?
18  A.  Yes.
19  Q.  And you understand that that requires truthfulness in all
20  parts of your testimony?
21  A.  Yes.
22  Q.  And it requires truthfulness in all places where you
23  testify?
24  A.  Yes.
25  Q.  And that you can't pick and choose what you're truthful

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7273

1  about?
2  A.  Yes.
3  Q.  You understand that it's an obligation that you can't say
4  you did something that you didn't do?
5  A.  Yes.
6  Q.  And you understand that being truthful means that you
7  can't say that you didn't do something that you did do?
8  A.  Yes.
9  Q.  And that applies to others, too; isn't that right?
10  A.  Yes.
11  Q.  And so you can't say something, that somebody did
12  something that they didn't do?
13  A.  Yes.
14  Q.  Or that they didn't do something that you know they did
15  do?
16  A.  Yes.
17  Q.  You can't protect somebody?
18  A.  Yes.
19  Q.  You can't accuse somebody untruthfully?
20  A.  That's correct, yes.
21  Q.  And you understand that that goes for big things and
22  little things?
23  A.  Yes.
24  Q.  Okay.  And you can't decide finally that, well, I may not
25  get caught so I can tell a little lie?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7274

1  A.  Yes.
2  Q.  Now, prior to your testifying, did you meet with the
3  prosecutors --
4  A.  Yes.
5  Q.  -- to go over your questions?
6  A.  Yes.
7  Q.  And Mr. Guerrero went through the questions that he would
8  ask you?
9  A.  Yes.
10  Q.  Make sure you understood them?
11  A.  Yes.
12  Q.  And would he make suggestions on the way you might want
13  to phrase something?
14  A.  Yes.
15  Q.  And he made suggestions about asking for transcripts and
16  things like that if somebody was reading from something?
17  A.  Yes.
18  Q.  Did he also go through and talk about the kinds of
19  questions that the defense lawyers might ask?
20  A.  Yes.
21  Q.  And they told you about listening closely and things like
22  that?
23  A.  Yes.
24  Q.  Did anybody get up and play the role of a defense lawyer
25  and cross-examine you so they could help prepare you for that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7275

1  A.  No.
2  Q.  Now, you recall yesterday, I believe it was first on
3  direct examination, that Mr. Guerrero asked you about whether
4  you had any legitimate -- that is, nondrug-related -- income
5  during the period of 1988 forward?
6  A.  Yes.
7  Q.  And you stated that you owned a barbershop; isn't that
8  right?
9  A.  Yes.
10  Q.  I believe you said it was on Florida Avenue?
11  A.  Yes.  Fifth and Florida Avenue.
12  Q.  When did you buy that?
13  A.  When?
14  Q.  Yes.
15  A.  I can't recall.  Around '98, '99.
16  Q.  And did you get a loan for that?
17  A.  No, I was renting it.
18  Q.  You were renting it?
19  A.  Yes.
20  Q.  And you had employees?
21  A.  Yes.
22  Q.  How many employees?
23  A.  Three.
24  Q.  And did you do any work?
25  A.  From time to time, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7276

1   Q.   Cut hair?
2   A.   Yes.
3   Q.   And did this just begin in '98?
4   A.   Around '98, '99.  I don't know the exact date.
5   Q.   And can you give us an idea, how often would you go in
6   and do this?
7   A.   I was in the shop every day.
8   Q.   You were in the shop every day?
9   A.   Yes.
10  Q.   For an hour every day?  Two hours?
11  A.   Sometimes one hour, sometimes four hours.
12  Q.   Okay.  Would you spend a whole day there sometimes?
13  A.   Sometimes.
14  Q.   This was in 1998?
15  A.   Yes.
16  Q.   And in 1999, would you also go to the barbershop and work
17  there?
18  A.   I didn't have the barbershop that long.  The shop wasn't
19  open that long, if a year.  I lost the shop.
20  Q.   Okay.  So you had the shop from sometime in 1998 to
21  sometime in 1999?
22  A.   It was between '98 and '99, yes.
23  Q.   And in the period of 1999, did you continue to do what
24  you just described with respect to 1998, going into the shop
25  once in a while?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7277

1   A.   Yes.
2   Q.   Sometimes for several hours at a time?
3   A.   Yes.
4   Q.   At least sometimes, some weeks, several days?
5   A.   Every day.
6   Q.   Every day?
7   A.   Yes.
8   Q.   And that continued until you -- you said you lost it?
9   A.   Yes.
10  Q.   Did you sell it to somebody?
11  A.   No.
12  Q.   Go bankrupt?
13  A.   No.
14  Q.   Did you go through a court proceeding?
15  A.   No, sir.
16  Q.   And you said that -- you told Mr. Guerrero in response to
17  his questions that you also had a cleaning business?
18  A.   Yes.
19  Q.   And did you buy that also in 1998?
20  A.   Maybe 2000.
21  Q.   Maybe 2000?
22  A.   Yes.
23  Q.   Okay.  And did you -- was that -- did you own that?
24  A.   It's part of a franchise, yes.
25  Q.   What was the name of that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7278

1   A.   On-Time Cleaning.
2   Q.   On-Time Cleaning.  You had employees?
3   A.   Yes.
4   Q.   And how many employees did you have?
5   A.   Maybe ten.
6   Q.   And you had contracts in buildings?
7   A.   Yes.
8   Q.   And how many buildings did you have?
9   A.   At one point, maybe 20.
10  Q.   20 buildings.  And where were those buildings?
11  A.   Virginia, Gaithersburg, Bowie.
12  Q.   And did you spend time managing that business?
13  A.   Yes.
14  Q.   How much time would you say you spent managing that
15  business?
16  A.   A lot of nights.  Anywhere from six to seven hours a
17  night.
18  Q.   And you would go out to the locations of the business?
19  A.   Yes.
20  Q.   And did you also -- and you would go to different ones on
21  different evenings?
22  A.   Yes.
23  Q.   Gaithersburg?
24  A.   Yes.
25  Q.   Virginia?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7279

1   A.   Yes.
2   Q.   Do you recall where in Virginia?
3   A.   On Route 1.  I had a few -- I had a few locations.
4   Q.   Down by Fort Belvoir, that area?
5   A.   Yes.
6   Q.   Below Fort Belvoir, Woodbridge?
7   A.   No.  I don't recall one in Woodbridge, no.
8   Q.   Quantico?
9   A.   No.
10  Q.   But in Virginia?
11  A.   Yes.
12  Q.   Did you have any out in Fairfax County, out in that
13  direction?
14  A.   No, I don't recall.
15  Q.   Any in P.G. County?  Prince George's County in Maryland?
16  A.   Yes.
17  Q.   You did?
18  A.   Yes.
19  Q.   And Montgomery County, in Gaithersburg?
20  A.   Yes.
21  Q.   Anywhere else in Montgomery County?
22  A.   No.
23  Q.   In DC?
24  A.   Yes.
25  Q.   Have a number in DC?  Several?  More than one location

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7280**

1   that you were doing work?

2   **A.**   Maybe three or four.

3   **Q.**   And do you recall what areas they were in?

4   **A.**   In the downtown area, Southwest area.

5   **Q.**   And you would go around to these various locations?

6   **A.**   Yes.

7   **Q.**   Make sure the people were working?

8   **A.**   Yes.

9   **Q.**   Make sure they were doing what they were supposed to do?

10   **A.**   Yes.

11   **Q.**   Make sure supplies were all there?

12   **A.**   Yes.

13   **Q.**   Make sure the customers were happy?

14   **A.**   Yes.

15   **Q.**   And you did that in 2000?

16   **A.**   Yes.  2001 to 2003, yes.

17   **Q.**   From 2001 to 2003?

18   **A.**   Excuse me.  From 2000 to 2003.  I'm sorry.

19   **Q.**   So you had those -- one business you had from 1998 to

20   1999; the other one you had from 2000 to 2003?

21   **A.**   Yes.

22   **Q.**   Okay.  Now, in cross-examination, you recall -- I think

23   that you would recall that we were talking about how you paid

24   for those businesses?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7281**

1   **Q.**   And you said that you had a job driving -- I'm sorry --

2   no, furniture assembly?

3   **A.**   Yes.

4   **Q.**   And you got paid $650 a week?

5   **A.**   Around that area, yes.

6   **Q.**   And then you said that was a salary?

7   **A.**   Yes.

8   **Q.**   And that was how you were able to remember how much you

9   got --

10   **A.**   Yes.

11   **Q.**   -- because it was regular?

12   **A.**   Yes.

13   **Q.**   And what was the name of the company you were working

14   for?

15   **A.**   Advanced Office Furniture.

16   **Q.**   Advanced Office Furniture.  And when you say "assembling

17   furniture," that means you would take the office furniture and

18   take it to places and help set it up?

19   **A.**   Yes.

20   **Q.**   And that would be desks and things?

21   **A.**   Yes.

22   **Q.**   Bookshelves?

23   **A.**   Yes.

24   **Q.**   And that would be to businesses primarily or to homes?

25   **A.**   Homes, businesses, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7282**

1   **Q.**   In all -- in Montgomery County?

2   **A.**   No, all over.

3   **Q.**   All over?

4   **A.**   Yes

5   **Q.**   So all the counties in this area and the District?

6   **A.**   Yes.

7   **Q.**   And you would characterize those businesses as legitimate

8   sources of income?

9   **A.**   Yes.

10   **Q.**   And you would characterize that work, wouldn't you, as a

11   legitimate source of income?

12   **A.**   Yes.

13   **Q.**   And by "legitimate," meaning nondrug-dealing?

14   **A.**   Yes.

15   **Q.**   Okay.  And there's no question about that in your mind?

16   **A.**   Yes.

17   **Q.**   Do you recall testifying, sir, in United States District

18   Court for the District of Maryland, when you were asked by the

19   Assistant United States Attorney, Mrs. McFerrin, about whether

20   you had legitimate income in 1998, you said you did not?

21   **A.**   I don't recall saying that.

22   **Q.**   You don't recall saying that?

23   **A.**   No, sir.  Maybe if I can see what you're reading, I can

24   help you out.

25   **Q.**   You can help me out?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7283**

1   **A.**   Yes, sir.

2   **Q.**   Okay.  And you're certain -- do you think -- if you did

3   testify to that, that would be untrue, right?

4   **A.**   Yes, it would be.

5   **Q.**   Because -- so -- because you did have legitimate sources

6   of income?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  Let me read to you, sir, from page 37.  Do you

9   recall being asked the following questions and giving the

10   following answers --

11   MR. GUERRERO:  Objection, Your Honor.  The witness said he

12   couldn't recall.  You have to refresh recollection first before

13   impeaching.

14   THE COURT:  I'll allow it.  Go ahead.

15   MR. TABACKMAN:

16   **Q.**   "Question:  I'm sorry.  I meant to ask you a couple of

17   more questions.  Did you have employment in 1998?  I mean,

18   legitimate job other than your drug dealing?

19   "Answer:  No, ma'am.

20   "Question:  What about the defendant, Mr. Proctor?  Did

21   he have any employment in 1998 that you're aware of?

22   "Answer:  No."

23   Do you recall being asked those questions and giving

24   those answers?

25   **A.**   Maybe that's around the time before I opened the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 7284

1  barbershop or around the time when I lost the barbershop.
2  Q.    So when someone said -- when she asked you in 1998, you
3  thought that the prosecutor was only talking about part of 1998?
4  A.    That was a misunderstanding.  That's all.
5  Q.    You misunderstood what "1998" meant?
6  A.    No, sir.
7  Q.    What part did you misunderstand?
8  A.    It was a misunderstanding about the time between the
9  jobs.  That's all.
10  Q.    So when you said you had no -- answered the question that
11  you had no legitimate employment in 1998, that was a truthful
12  answer?
13  A.    I was wrong for that.
14  Q.    You were wrong?
15  A.    I was wrong for answering "No."
16  Q.    You did answer "No"?
17  A.    May I see what you're reading, first of all?
18      MR. GUERRERO:  Counsel, do you have a page number.
19      MR. TABACKMAN:  We have page 37; we have lines 20 through
20  25, going over to page 38, lines 1 through 4.  Just for the
21  record, that's Wilson's Exhibit 18, transcript of -- we
22  identified it yesterday, Your Honor.  That's the transcript of
23  Mr. Crawford's testimony in *United States versus Proctor.*
24      THE WITNESS:  Yes, that's what it says.
25  MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 7285

1      You didn't say, "I had employment for part of 1998," did
2  you?
3  A.    No, sir.
4  Q.    You didn't say, "I had a barbershop for a while," did
5  you?
6  A.    No, sir.
7  Q.    You didn't say, "I had a cleaning business," did you?
8  A.    No, sir.
9  Q.    You didn't forget that you had those things, did you?
10  A.    I didn't have the cleaning business back then anyway.
11  Q.    I'm sorry.  That's correct.  You didn't say you had --
12  that you were working on furniture assembly?
13  A.    No, sir.
14  Q.    You were working on furniture assembly to get help to get
15  the money to buy the barbershop, isn't that what you testified
16  to yesterday?
17  A.    That's not what I said, no, sir.
18  Q.    It's not what you said, sir, that the money that went --
19  that you bought the barbershop with came from working on
20  furniture assembly?
21  A.    No, sir, I did not say that.
22  Q.    Do you recall, sir, on cross-examination, I asked you
23  whether or not you bought the barbershop with the drug money?
24  Do you recall that?
25  A.    Yes, you did.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 7286

1  Q.    And do you recall, sir, that I suggested that you bought
2  the barbershop with the drug money as a way to make the money to
3  hide the source -- to make the money look legitimate?  Do you
4  remember that I said that to you?
5  A.    That's what you said, yes.
6  Q.    And you said, didn't you, no, the money for the
7  barbershop came from the furniture assembly, the salary?
8  A.    No, sir, I did not say that.
9  Q.    What did you say?
10  A.    I said the barbershop money came from my drug proceeds.
11  Q.    And you didn't first say it came from the barbershop?
12      THE COURT:  Say that again?
13      THE WITNESS:  From the barbershop?
14  MR. TABACKMAN:
15  Q.    I'm sorry.  You didn't say -- I misspoke -- from the
16  furniture assembly salary?
17  A.    No, sir.
18  Q.    I'll take a moment and I'll dig that out.
19      Do you recall -- this was yesterday, sir, at page 7213,
20  being asked the following questions and giving the following
21  answers, beginning with -- I'm sorry -- 7212:
22      "Question:  Did you have an understanding, sir, as to
23  whether or not when you took the money -- your state of mind,
24  sir -- when you took that money and put it into the barbershop,
25  that that could be money laundering?"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 7287

1      There was an objection and you answered:  "No.
2      "Question:  You didn't have that understanding?
3      "Answer:  No.
4      "Did you put that money -- you put that money into the
5  barbershop in order to make it look like you were making money
6  legally; isn't that right?
7      "Answer:  I was making money legally, sir.
8      "Question:  Excuse me?
9      "Answer:  I was making money legally.
10      "Question:  Did you have any other job, other than
11  selling crack cocaine with Mr. Proctor in 1998, '99 and 2000?
12      "Answer:  Yes.
13      "Question:  You did?
14      "Answer:  Yes."
15      And in giving those answers, you weren't saying that that
16  money went into the barbershop; that was the barbershop money?
17      MR. GUERRERO:  Objection, Your Honor.  Improper
18  impeachment.
19      THE COURT:  Sustained.
20  MR. TABACKMAN:
21  Q.    Do you recall hearing those questions and giving those
22  answers?
23      MR. GUERRERO:  Same objection.
24      THE COURT:  Objection sustained.
25  MR. TABACKMAN:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7292**

1  A.    '99, no.

2  Q.    When did you stop working at furniture assembly?

3  A.    I can't recall the exact time and date.

4  Q.    How long did you work at furniture assembly?

5  A.    Maybe -- almost a year.

6  Q.    And when did you begin working at furniture assembly?

7  A.    I can't recall the starting time.  It's been a while.

8  Q.    Was it 1998?

9  A.    I don't know.  It's been a while.  I don't know.

10  Q.    Was it before 1998?

11  A.    Sir, I don't know.

12  Q.    You can't give any -- you can't say at all when you

13  started doing the furniture assembly?

14  A.    I'd say between '97 and '98, around that time.

15  Q.    So by 1999, you were done working furniture assembly?

16  A.    Maybe so, yes.

17  Q.    Maybe so or definitely so?

18  A.    I can't tell you definitely because I don't know the

19  exact time I started.

20  Q.    Well, did you or did you not have legitimate employment

21  in 1999?

22  A.    Yes, I have.

23  Q.    You did have legitimate employment in 1999?

24  A.    Yes, yes.

25  Q.    And that was the barbershop?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7293**

1  A.    Maybe so.  I had employment in '99.

2  Q.    Legitimate employment?

3  A.    Yes.

4  Q.    Do you recall being asked the following question and

5  giving the following answer in the United States District Court

6  for the District of Maryland on January 5th, 2005:

7      "Question:  In 1999, what employment did you have?

8      "Answer:  None."

9      Do you recall that, sir?

10  A.    Yes.

11  Q.    That was untrue?

12  A.    Yes.

13  Q.    So you -- and you were under oath at the time; isn't that

14  right?

15  A.    It was a misunderstanding, yes.  Yes, I was under oath.

16  Q.    You misunderstood the question, "Did you have an

17  employment in 1999?"

18  A.    Yes, sir.

19  Q.    Which part of the question did you misunderstand?

20  A.    It's been a while.  I mean, it's been a long time since I

21  had employment.  About '99.

22  Q.    It's been longer today, hasn't it, sir?

23  A.    Yes, sir.

24  Q.    But your testimony today is that you did have employment

25  in 1999?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7294**

1  A.    Yes.

2      MR. GUERRERO:  Objection, Your Honor, misstates the

3  evidence.  The answer was "Maybe so."

4      THE COURT:  I'll allow it.

5      MR. TABACKMAN:  I beg to differ with counsel's

6  characterization.

7      THE COURT:  No speeches, please.  Put your next question.

8  MR. TABACKMAN:

9  Q.    When -- so your testimony in this Court is the truthful

10  testimony?

11  A.    Yes, sir.

12  Q.    And the testimony in Maryland was mistaken testimony?

13  A.    I wouldn't say "mistaken."  It was just a

14  misunderstanding, yes, sir.

15  Q.    And I ask you again, sir, what part of the question that

16  I read to you did you misunderstand?

17  A.    I mean, you asked me, did I have a job in '99?  At the

18  time, I didn't know.

19  Q.    But you now -- and what have you done to refresh your

20  recollection that you now remember that you did?

21  A.    I talked to my wife about our taxes.

22  Q.    You talked to your -- between 2005 when you testified in

23  Maryland and your testimony here today, you talked to your wife

24  about your taxes?

25  A.    Yes, sir.  Yes, I have.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7295**

1  Q.    About your 1999 taxes?

2  A.    Yes, sir.

3  Q.    And what was the reason for that, sir?

4  A.    She was looking for my tax information.  It had something

5  to do with purchasing our house.

6  Q.    And your wife -- I'm sorry.  It had something to do with

7  what, sir?

8  A.    Purchasing our house.

9  Q.    And you had -- and which house is that, sir?

10  A.    The house that I live in now.

11  Q.    You bought -- the house that she lives in now is the

12  house that you were living in in 2003, right?

13      MR. GUERRERO:  Objection, relevance.

14      THE COURT:  Overruled.

15  MR. TABACKMAN:

16  Q.    Was the house that you were living in 2003 --

17  A.    Yes.  We were renting at the time, yes.

18  Q.    You were renting the house at the time?

19  A.    Yes.

20  Q.    And have you bought it, sir?

21  A.    My wife has purchased the house since I've been

22  incarcerated, yes.

23  Q.    And when did she buy it, sir?

24  A.    Maybe 2004.

25  Q.    In 2004, she bought it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7296

1  A.   Yes.

2  Q.   You testified that you didn't have legitimate income in

3  1999 on January 5th of 2005.

4  A.   Um-hmm.

5  Q.   Is it your testimony here today that your wife's question

6  about your taxes in 2004 --

7  A.   Yes.

8  Q.   -- is what's caused you to remember today, but not to

9  remember in 2005 about '99?

10  A.   She inquired about my back taxes.  She wanted my name on

11  the house, too.

12  Q.   And you said she made that inquiry in 2004?

13  A.   Yes, before --

14  Q.   And that was before you testified in Maryland that you

15  didn't have -- I'm sorry.

16       And that inquiry in 2004 is what helps you to remember

17  today that you actually had a job in 1999?

18  A.   No.  I was just -- we talk about it all the time.  That's

19  all.

20  Q.   I'm sorry?

21  A.   We talked about it one point in time.  That's all.

22  Q.   You talked about it in 2004?

23  A.   Yes.  I have a lot of time on my hands to think.

24  Q.   And you talked -- and talking about the legitimate job

25  you had in '99, if I understood your testimony, is what helps

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7297

1  you remember today that you had a legitimate job in 1999?

2  A.   Not only that.  We just talk about the positive things

3  I've done in my life.

4  Q.   And the conversation that you had in 2004 about your

5  taxes so that you could buy the house, that didn't remind you in

6  2005 when you testified that you actually had a legitimate job

7  in 1999?

8  A.   No, because I didn't know at the time.  All my tax

9  information was taken out of my house.

10  Q.   You testified that you remember today, 2007 --

11  A.   Yes.

12  Q.   -- that you had a legitimate job in 1999; is that right?

13  A.   Yes.

14       MR. GUERRERO:  Objection, asked and answered.

15       THE COURT:  I'll give you a little leeway, but you're

16  replowing ground.

17       MR. TABACKMAN:  I understand.

18  MR. TABACKMAN:

19  Q.   And you testified that the reason that you remember it

20  today is because of the conversation you had in 2004 when you

21  were buying the house?

22  A.   I had -- I talks about this all the time with my wife,

23  not just 2004.  I talk about it with her now.

24  Q.   So it wasn't just in connection with purchasing the

25  house?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7298

1  A.   No.

2  Q.   You've had other conversations between 2005 and 2007

3  about your job in 1999?

4  A.   Yes.

5  Q.   And what brought those conversations up about 1999

6  between 2005 and 2007?

7  A.   Just the positive things I've done in my life.  I go all

8  the way back to when I had a job in '89-90.  We talk about those

9  things.

10  Q.   And in '89 or '90, is that when you were driving

11  Everfresh?

12  A.   No.  I was working at the Farmers Market then.  I was

13  younger.

14  Q.   Do you recall who brought up the subject of your job in

15  1999 between 2005 and 2007?

16  A.   Who are you talking about?

17  Q.   You said you and your wife between 2005 and 2007 were

18  reflecting about the positive things in life?

19  A.   Yes.

20  Q.   And who brought up the job that you had in 1999?

21  A.   Sir, I see my wife every week and we talk about that

22  every week.  Sometimes I bring it up; she bring it up.

23  Q.   Every week either you or she brings up the 1999 job you had in

24  1999?

25  A.   We talk about everything.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7299

1  Q.   I asked you a question.  Every week she'll bring up --

2  one of you will bring up the job that you had in 1999?

3  A.   No, not every week, no.

4  Q.   How -- how often does that come up, sir?

5       MR. GUERRERO:  Objection, relevance.

6       THE COURT:  I'll allow it.

7       THE WITNESS:  Not often.  Sometimes we talk.  Sometimes we

8  go back and sometimes we talk about now.

9  MR. TABACKMAN:

10  Q.   And when you testified in Maryland, it was just a

11  mistake?

12       MR. GUERRERO:  Objection, asked and answered.

13  MR. TABACKMAN:

14  Q.   Not an untruthful answer?

15       MR. GUERRERO:  Objection, asked and answered.

16       THE COURT:  Sustained.  Move on.

17  MR. TABACKMAN:

18  Q.   You've been incarcerated since 2003; is that correct?

19  A.   Yes.

20  Q.   Did your wife bring up the subject of your job in 1999

21  when you were thinking about the good things in 2003 or 2004?

22  A.   Repeat the question for me, please.

23  Q.   Yes.  Did your wife bring up the 1999 job when you would

24  see her in 2003 and 2004?

25  A.   She inquired about it a time two.  I couldn't remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7300

1   **Q.**   In 2003 and 2004, your wife inquired about your job from
2   1999?
3            MR. GUERRERO:  Objection, asked and answered.
4            THE COURT:  Overruled.
5            THE WITNESS:  Yes.
6   MR. TABACKMAN:
7   **Q.**   And you spoke about it?
8   **A.**   Yes.
9   **Q.**   In 2003 and 2004?
10  **A.**   Yes.
11  **Q.**   But when you testified in 2005, you said that you didn't
12  have a job in 1999; isn't that right?
13  **A.**   I couldn't remember when she asked me then.
14  **Q.**   But you've -- but the conversations you've had since 2005
15  would help you remember here in this courtroom?
16  **A.**   Yes.  We go back -- I have an accountant and the
17  accountant went back for my employment for me.
18  **Q.**   You hired an accountant?
19  **A.**   I had an accountant when I had my cleaning company, yes.
20  **Q.**   And you have spoken to the accountant between 2005 and
21  2007?
22  **A.**   I've spoken with her sometime last year.
23  **Q.**   And in 2005 and 2007, you spoke with your accountant from
24  the cleaning company about your business in 1998 and 1999?
25  **A.**   No -- well, yes, yes.  She had my track record because

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7301

1   she filed my taxes for me.
2   **Q.**   She found your --
3   **A.**   She filed my taxes for me so she had my track record from
4   back then.
5   **Q.**   And were you discussing -- did you owe taxes in 1998 and
6   1999?
7            MR. GUERRERO:  Objection, relevance.
8            THE COURT:  Sustained.
9   MR. TABACKMAN:
10  **Q.**   Why did your accountant bring up -- strike that.
11           Your testimony is that you discussed your 1999 taxes with
12  your accountant from then between the time you testified in
13  Maryland and the time you're testifying here?
14  **A.**   Yes.
15  **Q.**   And that's what helped you remember your 1999 job?
16  **A.**   Yes.
17  **Q.**   And I ask you, sir, what brought that subject up?
18  **A.**   Well, my wife was trying to refinance.  We have a cap on
19  our house.  She was trying to refinance to add my name on, once
20  again.
21  **Q.**   So, the first -- your wife was trying to buy it in 2004?
22  **A.**   Yes.
23  **Q.**   And then was trying to refinance?  When was that, sir?
24  **A.**   We have to refinance -- the kind of loan we have, we have
25  to refinance every two years.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7302

1   **Q.**   And is it your testimony that that required you to get
2   information from 1999?
3   **A.**   Yes.  I was trying to get my name on the house, yes.
4   **Q.**   In 2006?
5   **A.**   Yes.
6   **Q.**   And the application -- it's your testimony that the
7   application required you to get information from 1999?
8   **A.**   No, the application did not require that.
9   **Q.**   Then I'll ask you again, sir:  What was the reason that
10  you were talking about your 1999 business with your accountant
11  between 2005 and 2007?
12           MR. GUERRERO:  Objection, asked and answered.
13           THE COURT:  Sustained.
14  MR. TABACKMAN:
15  **Q.**   In 1998, you met Mr. Proctor; isn't that right?
16  **A.**   Around that time, yeah.
17  **Q.**   What is your recollection, sir?
18  **A.**   I can't remember exactly when I met him.  I mean, it's
19  dating a little too far back for me.  I can't remember.  It was
20  around that time.
21  **Q.**   And you met him at the Auto Source car dealership; is
22  that correct?
23  **A.**   Yes, that's correct.
24  **Q.**   You were there because you were purchasing a Toyota Land
25  Cruiser; isn't that correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7303

1   **A.**   Yes.
2   **Q.**   And he was there because he was purchasing a Lexus; isn't
3   that right?
4   **A.**   Yes.
5   **Q.**   And it was a 1992 Lexus, wasn't it?
6   **A.**   I can't recall the year the Lexus it was.
7   **Q.**   Would looking at your transcript from the trial in
8   Maryland refresh your recollection?
9   **A.**   Yes.
10           MR. TABACKMAN:  Page 18.
11           THE WITNESS:  Yes, it's a '92 Lexus.
12  MR. TABACKMAN:
13  **Q.**   And you struck up a conversation; is that correct?
14  **A.**   Yes.
15  **Q.**   And the reason you struck up a conversation was because
16  you had heard each other's name as drug dealers; isn't that
17  correct?
18  **A.**   Yes.
19  **Q.**   And you enjoyed that conversation?
20  **A.**   We spoke.  I can't recall if I enjoyed it.  We talked.
21  **Q.**   Did you call Mr. Proctor within hours after that
22  conversation, sir?
23           MR. GUERRERO:  Objection, relevance.
24           MR. TABACKMAN:  May we approach?
25           THE COURT:  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 834 of 1954

1  at it again and he read it and then the witness said, "Yes,
2  that's how I answered your question."
3      So he was conceding that that's what he said out in
4  Maryland.  Now what Mr. Tabackman wants to do is go back before
5  that even to get the impeachment again where it -- I just don't
6  see how this is -- how he's going to read the record back to
7  impeach him on something that he's conceded.
8      THE COURT:  No.  He's conceded what he said in Maryland.
9  He has not conceded that the way he answered Mr. Tabackman's
10  question is consistent with how he testified in Maryland, so he's
11  getting the court reporter to read back the answer that preceded
12  the transcript version.  So I'll allow it.
13      MR. TABACKMAN:  Okay.
14      (Sidebar discussion concluded.)
15      (Court reporter read back previous questions and answers.
16  MR. TABACKMAN:
17  Q.  So do you recall in Maryland when you testified two years
18  ago about meeting Mr. Proctor in 1998?
19  A.  Yes.
20  Q.  And you recall that it was -- the kind of car he was
21  looking for?
22  A.  Yes.
23  Q.  And you recall it was several hours after you met that
24  you spoke on the phone?
25  A.  Before I read the transcript, I didn't know if it was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  several hours after.  I read the transcript, yes.
2  Q.  So you spoke with Mr. Proctor several hours later?
3  A.  Yes.
4  Q.  You went out and you bought cocaine -- you met with him?
5  A.  Yes.
6  Q.  You told him that you wanted some cocaine?
7  A.  Yes.
8  Q.  You said you wanted 125 grams of cocaine?
9  A.  Yes.
10  Q.  You went out and you got that cocaine?
11  A.  Yes.
12  Q.  Now, all of that is clear in your mind now?
13  A.  Yes.
14  Q.  No doubt about that?
15  A.  Yes.
16  Q.  Now, after that, you became a very close friend of
17  Mr. Proctor's, didn't you?
18  A.  Yes.
19  Q.  You first had a business relationship; isn't that right?
20  A.  Yes.
21  Q.  And that your business relationship developed into an
22  extremely close -- extremely close friends; isn't that right?
23  A.  Yes.
24  Q.  And it was a wonderful friendship, wasn't it?
25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  And you, in fact, over the rest of 1998 would spend every
2  day with Mr. Proctor; isn't that right?
3  A.  Yes.
4  Q.  And in 1999, you also would spend every day with
5  Mr. Proctor, wouldn't you?
6  A.  Yes.
7  Q.  And when you -- that would begin at 9 a.m. in the
8  morning; isn't that right?
9  A.  Early in the morning, yes.  I don't recall the exact
10  time, but early in the morning, yes.
11  Q.  You don't dispute that it was around 9 a.m. in the
12  morning?
13  A.  Yes.
14  Q.  You would pick him up?
15  A.  Or he would pick me up.
16  Q.  One or the other?
17  A.  Yes.
18  Q.  And you would then spend the rest of that day together?
19  A.  Yes.
20  Q.  Every day?
21  A.  Yes.
22  Q.  And that would be until 2:30, 3:00 in the morning?
23  A.  Yes.  Sometimes we had break in between.  He had to get
24  his kids and I had to get mine.  Other than that, yes.
25  Q.  All right.  And you would spend the day drinking Remy?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.  Yes.
2  Q.  And drinking Moet?
3  A.  Yes.
4  Q.  And going to clubs?
5  A.  Yes.
6  Q.  And buying people drinks?
7  A.  Yes.
8  Q.  And being with women?
9  A.  Yes.
10  Q.  And you would spend as much as $300 a day on liquor,
11  wouldn't you?
12  A.  Yes.  Sometimes more, yes.
13  Q.  Sometimes more.  And you and Mr. Proctor were
14  inseparable; isn't that right?
15  A.  Yes.
16  Q.  And that continued, just as we described it, in 1999,
17  didn't it?
18  A.  Yes.
19  Q.  Every day one of you would pick the other up --
20  A.  Yes.
21  Q.  -- in the morning; you'd spend the whole day together
22  except for picking up kids?
23  A.  Yes.
24  Q.  You'd drink, do business?
25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7312**

1 **Q.** It extended until 2:30 or 3:00 in the morning?

2 **A.** Yes.

3 **Q.** Next day, it would start all over again?

4 **A.** Yeah. I mean, not every single day, but the majority of

5 our days, yes.

6 **Q.** Well, was it just the majority or was it virtually -- was

7 it pretty much every day?

8 **A.** It was pretty much every day. Not every single day, yes.

9 **Q.** And that also continued in 2000, didn't it?

10 **A.** I can't recall if it went all the way into 2000. I can't

11 recall.

12 **Q.** What do you recall, sir?

13 **A.** Sometime down the line, Mr. Proctor got arrested and he

14 came to jail for sometime.

15 **Q.** And do you recall when that was?

16 **A.** No.

17 **Q.** And until the time that he was arrested, what we've

18 described for 1998 and 1999 continued in 2000?

19 **A.** Yes.

20 **Q.** And also in 2000, you got a girlfriend; is that right?

21 **A.** I always had a woman in my life.

22 **Q.** Did the women change if your life?

23 **A.** I got married in 2000.

24 **Q.** And in 2000, you got married?

25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7313**

1 **Q.** And was it your wife who gave you the ultimatum that you

2 had to stop hanging out with Mr. Proctor till all hours of the

3 night?

4 **A.** Not just Mr. Proctor. Just hanging out, period.

5 **A.** I'm sorry, sir?

6 **A.** Not just Mr. Proctor. Just hanging out in the streets,

7 period.

8 **Q.** Did your wife give you an ultimatum about hanging out

9 with Mr. Proctor until 2:30 or 3 in the morning?

10 **A.** Hanging out, period. I can't recall if Mr. Proctor per

11 se, but period, hanging out.

12 **Q.** Do you recall being asked the following question and

13 giving the following answer.

14 Excuse me, let me strike that.

15 That was in 2000 or 2001, sir?

16 **A.** I got married in 2000.

17 **Q.** You got married in 2000?

18 **A.** Yes.

19 **Q.** And so it was in 2000 that the relationship with

20 Mr. Proctor changed?

21 **A.** I can't recall exactly when did me and Mr. Proctor, the

22 relationship change. I can't recall that.

23 **Q.** Well, do you recall testifying to that in Maryland and

24 being asked about your relationship with Mr. Proctor?

25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7314**

1 **Q.** And do you recall testifying that in 2000, it was the

2 same as it was in 1998 or 1999?

3 **A.** I don't recall. If it's in writing, I can read it.

4 **Q.** And do you recall that your testimony was that in 2001,

5 you got an ultimatum?

6 **A.** I can't recall if it was 2001 or 2000.

7 **Q.** Okay. Let me show you the transcript, sir.

8 **A.** Okay.

9 **Q.** At page 47, down at the bottom. "Now, let's turn" --

10 where it says "Now, let's turn." Read that to yourself and go

11 over to the next page.

12 **A.** And your question is, sir?

13 **Q.** Did your relationship with Mr. Proctor change in 2000?

14 **A.** No.

15 **Q.** Thank you. And so in 2000, you were still hanging out

16 all day from 9 a.m. in the morning till 3 a.m.?

17 MR. GUERRERO: Objection, Your Honor. Misstates the

18 transcript.

19 MR. TABACKMAN: I'm not reading from the transcript.

20 THE COURT: I'll allow the question.

21 MR. TABACKMAN:

22 **Q.** In 2000, you were still hanging out with Mr. Proctor all

23 day from 9 a.m. in the morning until 3 a.m. in the morning, as

24 you were in 1998 and 1999?

25 **A.** We were probably still hanging out pretty much.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7315**

1 **Q.** In fact, then -- you had a stash house during that time;

2 isn't that right?

3 **A.** Yes.

4 **Q.** And your money was pooled during that time?

5 **A.** Yes.

6 **Q.** And you would buy your drugs together during that time?

7 **A.** Yes.

8 **Q.** And you would use two different sources to get your

9 drugs; isn't that right?

10 **A.** Yes.

11 **Q.** One was his source, Unc; is that right?

12 **A.** Yes.

13 **Q.** And one was your source, Michael Hall --

14 **A.** Yes.

15 **Q.** -- the man that you testified about yesterday?

16 **A.** Yes.

17 **Q.** And one or the other of you would go to the stash house

18 and get the money?

19 **A.** Yes.

20 **Q.** And it didn't matter because you trusted each other

21 completely?

22 **A.** Yes.

23 **Q.** And you had this friendship and business relationship?

24 **A.** Yes.

25 **Q.** And during this time, you were selling your drugs in Oxon

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7356

1  you were with Mr. Proctor every day?
2  **A.**   Yes.  But at a point in time, Mr. Proctor got arrested.
3  He might have been arrested at the time.
4  **Q.**   You can't remember -- you don't know when he got
5  arrested?
6  **A.**   No, sir.
7  **Q.**   You don't know what day you saw Mr. Ball?
8  **A.**   No, sir.
9  **Q.**   But it was sometime in 2000?
10 **A.**   Yes.
11 **Q.**   And it's your testimony that after this time, you had a
12 meeting with Mr. Ball?
13 **A.**   Yes.
14 **Q.**   Do you know Munya?
15 **A.**   Do I know him?  No, not since -- I met him, being locked
16 up, yes.
17 **Q.**   Where did you meet him being locked up?
18 **A.**   CTF back in 2003.
19 **Q.**   And how did you meet him?
20 **A.**   When I came in, he was in the same block I was in.
21 **Q.**   And was he -- were you in cells there?
22 **A.**   Yes.
23 **Q.**   And how often would you see Munya?
24 **A.**   Every day, until the time he left.
25 **Q.**   And you recall when -- what months you were over there in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7357

1  2003?
2  **A.**   When I came in August 2003, I been over to CTF ever
3  since.
4  **Q.**   And was he already there when you got there?
5  **A.**   Yes.
6  **Q.**   And how did you -- how did you learn his name?
7  **A.**   He and other guys speak to him, that's all.
8  **Q.**   And you learned his name -- his given name was Bobby
9  Capies?
10 **A.**   I found that out later on, yes.
11 **Q.**   And you found out his name was -- nickname was Munya?
12 **A.**   Yes.
13 **Q.**   And you asked him about his losing his teeth?
14 **A.**   No.
15 **Q.**   You didn't?
16 **A.**   Not at that point in time, no.
17 **Q.**   When did you?
18 **A.**   Maybe a few months later.
19 **Q.**   So sometime in 2003, you asked him about how he lost his
20 teeth?
21 **A.**   I didn't ask him.  I told him how he lost his teeth.
22 **Q.**   He didn't know?
23 **A.**   I mean, of course he knew.  I told him.  I just told him.
24 **Q.**   You told him that you knew?
25 **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7358

1  **Q.**   How'd that conversation come up, sir?
2  **A.**   I kept hearing people calling his name, and at first I
3  wasn't going to say nothing because I didn't really know too
4  many people there, and one day we was sitting in the TV room and
5  I asked him, "You the one they keep calling Munya?"  He said,
6  "Yeah."  I said, "You know Twan was my man."
7  **Q.**   I'm sorry?
8  **A.**   I said, "You know, Twan was my man?"
9        He was like, "Yeah."
10       I said, "Yeah, ain't nothing like that, though."
11       He was like, "Well, you know."
12       I said, "I know the incident that happened with your
13 teeth."
14       And he just -- he didn't speak nothing else of it, he
15 just walked off like he had a problem with me at first.
16 **Q.**   He didn't confirm to you that that happened?
17 **A.**   Not right then and there, no.
18 **Q.**   And did he tell you when it happened?
19 **A.**   No.
20 **Q.**   Did he tell you how it happened?
21 **A.**   Later on I talked to him about it.
22 **Q.**   And do you know when it happened?
23 **A.**   It had to happen around between 2001, 2002, around that
24 time, if I'm not mistaken.
25 **Q.**   And how do you know that, sir?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7359

1  **A.**   Mr. Ball told me himself.
2  **Q.**   Mr. Ball told you -- you saw Mr. Ball the day it
3  happened; isn't that right, isn't that your testimony?
4  **A.**   Either that day it happened or that next following -- I
5  didn't say that happened.  Either the day that happened or the
6  next following day, I saw Mr. Ball.
7  **Q.**   You said -- it was your testimony it was either that day
8  or the next following day?
9  **A.**   Yes.
10 **Q.**   And he was angry?
11 **A.**   Oh, yes.
12 **Q.**   And in 2001 or 2002, you saw him, but -- didn't you
13 testify that the incident had just been finished with?
14 **A.**   Yeah, it just happened.  I said it had just happened,
15 yes.
16 **Q.**   But it wasn't necessarily the same day?
17 **A.**   Right.  Exactly.
18 **Q.**   And at that point, you had seen Mr. Ball how many times,
19 sir?
20 **A.**   I can't count how many times, but pretty much we see each
21 other almost every day.
22 **Q.**   You saw Mr. Ball every day.  And what year was that?
23 **A.**   Or mostly every day, from 2000 to 2001.  The exact date,
24 I don't know.
25 **Q.**   Well, was it early in 2000?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7368

1   **A.**   Like I said, sometimes he goes pick up his kids,
2   sometimes I be with mine.  I mean, we also got family time.
3   **Q.**   And he wasn't with you on any of the days that you met
4   Mr. Ball?
5          MR. GUERRERO:  Objection, asked and answered.
6          THE COURT:  Sustained.
7   BY MR. TABACKMAN:
8   **Q.**   And when you met Mr. Ball with Cheese, when was that?
9   **A.**   Probably around the end of 2000.
10  **Q.**   Mr. Proctor wasn't there for that meeting?
11  **A.**   No, sir, we're still talking about the same meeting.
12  **Q.**   And what changed about your relationship with Mr. Proctor
13  in 2001?
14         MR. GUERRERO:  Objection, Your Honor, asked and answered.
15         THE COURT:  Sustained.
16  BY MR. TABACKMAN:
17  **Q.**   You got married in the middle of 2001; is that correct?
18  **A.**   I got married in 2000.
19  **Q.**   So, if you testified it was 2001 in Maryland, that would
20  in error?
21  **A.**   Forgive me, maybe I got married in 2001.  It's been a
22  long time.
23  **Q.**   You're not sure?
24         MR. GUERRERO:  Objection, Your Honor.
25         THE COURT:  I'll allow it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7369

1   BY MR. TABACKMAN:
2   **Q.**   And Mr. Proctor went into the halfway house; is that
3   right?
4   **A.**   Yes.
5   **Q.**   And do you recall testifying that your relationship with
6   him went to the end of 2001.
7   **A.**   I don't remember.
8   **Q.**   You don't remember that?
9          When did your relationship end with him?
10         MR. GUERRERO:  Objection, Your Honor, asked and answered.
11         MR. TABACKMAN:  I don't believe it has been, Your Honor.
12         THE COURT:  I'll allow it.
13  BY MR. TABACKMAN:
14  **Q.**   When did your relationship end with Mr. Proctor?
15  **A.**   Sometime -- sometime maybe in 2002, 2001.
16  **Q.**   So toward the end of 2001, beginning of 2002?
17  **A.**   Around that area.
18  **Q.**   And -- Court's indulgence.
19         Do you recall being videoed with Mr. Proctor out at the
20  Star Market parking lot?
21  **A.**   Yes.
22  **Q.**   And were you doing drug transactions at that time?
23  **A.**   Yes.  Mr. Proctor was doing drug transactions, yes.
24  **Q.**   You were in the car with him; isn't that right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7370

1   **Q.**   And you got half the money that resulted from the
2   transaction?
3   **A.**   Yes.
4   **Q.**   And the car was there for some period of time, wasn't it?
5   You were parked there?
6   **A.**   I can't recall.
7   **Q.**   And they videotaped you?
8   **A.**   Yes.
9   **Q.**   Right.
10  **A.**   Yes.
11  **Q.**   And they showed -- okay.
12         And at the time, do you recall the videotape, sir?
13  **A.**   Yes.
14  **Q.**   Do you recall seeing the videotape?
15  **A.**   Yes.
16  **Q.**   And your car wasn't moving at the time; is that right?
17  **A.**   No.
18  **Q.**   It was just parked there?
19  **A.**   Yes.
20  **Q.**   Waiting for a transaction to happen?
21  **A.**   Waiting on Mr. Proctor's customer, yes.
22  **Q.**   And sometimes you would use that parking lot as a place
23  just to stay; isn't that right?
24  **A.**   No, sir.
25  **Q.**   And didn't you also, on some other occasions, go down to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7371

1   the park, down on Mississippi Avenue?
2   **A.**   Yes.
3   **Q.**   And you would sit there and drink; isn't that right?
4   **A.**   Yes.
5   **Q.**   And people would come up to you?
6   **A.**   Yes.
7   **Q.**   And you would do transactions?
8   **A.**   Yes.
9   **Q.**   And you would keep the drugs in a stash nearby?
10  **A.**   I don't recall saying that, no.
11  **Q.**   I didn't ask you if you recalled.  Did you or did you not
12  keep the drugs in a stash near by?
13  **A.**   Not that I can remember, no.
14  **Q.**   Where did you keep the drugs?
15  **A.**   In my stash house.
16  **Q.**   And where was your stash house?
17  **A.**   Across from Greater Southeast Hospital.
18  **Q.**   Was that on Southern Avenue?
19  **A.**   Yes.
20  **Q.**   And how far away was that from the park on Mississippi
21  Avenue?
22  **A.**   About five minutes.
23  **Q.**   So if someone would come up to you at the park on
24  Mississippi Avenue, you would go to the stash house and get the
25  drugs?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7372

1   **A.**   Sometimes they would call before they come.
2   **Q.**   When they didn't -- sometimes they didn't; is that right?
3   **A.**   Nobody would walk up to me at the park. They would call.
4   **Q.**   People never just walked up to you and asked you for
5   drugs?
6   **A.**   Not that I can recall, no.
7   **Q.**   From your customers?
8   **A.**   No.
9   **Q.**   You have no recollection of that. Is that your
10  testimony?
11  **A.**   I can't recall saying that, sir.
12  **Q.**   Pardon?
13  **A.**   I can't recall saying that, sir.
14  **Q.**   I'm asking you, sir: Is that your testimony today that
15  that didn't happen?
16  **A.**   I can't recall that.
17  **Q.**   You can't recall any of that ever happening?
18  **A.**   No.
19  **Q.**   Okay. Now, when you would get fronted drugs by Unc, how
20  soon would you have to pay him, sir?
21  **A.**   Well, he never gave us no time limit. We would pay him
22  that same day, get him out of the way.
23  **Q.**   You would pay him the same day?
24  **A.**   A lot of times, yes.
25  **Q.**   You would just turn the drugs over that quickly?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7373

1   **A.**   Yes, just to make that quick profit. Yes.
2   **Q.**   And in order to create confidence in him that you could
3   do it; isn't that right?
4   **A.**   Yes.
5   **Q.**   And how often would you get fronted drugs by Unc?
6   **A.**   I can't recall, but not quite often, not a whole lot.
7   **Q.**   And did that concern you, sir, that you might not be able
8   to turn the drugs over quickly enough?
9   MR. GUERRERO: Objection, relevance.
10  THE COURT: I'll allow it.
11  THE WITNESS: No, that's never been a concern.
12  BY MR. TABACKMAN:
13  **Q.**   And you would front drugs to people; isn't that right?
14  **A.**   Yes.
15  **Q.**   And when you would do that, would they always be able to
16  pay you within the time frame that you --
17  **A.**   No.
18  **Q.**   Would you specify a time frame?
19  **A.**   No.
20  **Q.**   Did you ever have to go after anybody for the money?
21  **A.**   No.
22  **Q.**   Did anybody ever have to come after you for money from
23  when they fronted you drugs?
24  **A.**   Not come after me, violent me, but come asking for their
25  money, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7374

1   **Q.**   And did you ever have to -- did you ever get into a
2   dispute with somebody about that?
3   **A.**   No.
4   MR. TABACKMAN: Your Honor, I think I'm close to finished.
5   I just need to check on one thing.
6   BY MR. TABACKMAN:
7   **Q.**   When you would get rid of Unc's drugs fast, he would sell
8   to you a cheaper price; isn't that right?
9   **A.**   No.
10  **Q.**   He would not?
11  **A.**   No.
12  **Q.**   You're certain of that?
13  **A.**   Yes.
14  **Q.**   Isn't it true that you did that to build confidence,
15  because the faster you sell, the more drugs you get for a
16  cheaper price? If you sell fast, you get it at a cheaper price?
17  **A.**   I don't recall getting it at a cheaper price.
18  **Q.**   I'm asking you, sir, did you, in fact, get it at a
19  cheaper price?
20  MR. GUERRERO: Objection, asked and answered.
21  THE COURT: Sustained.
22  BY MR. TABACKMAN:
23  **Q.**   Do you recall testifying in Maryland that you could get
24  it at a cheaper price if you could turn it over fast?
25  **A.**   From Unc, no.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7375

1   **Q.**   And you wouldn't hurry up and get it to pay Unc his
2   $4,000 to build confidence?
3   **A.**   Yes.
4   **Q.**   And so you would get the drugs at a cheaper price, right?
5   **A.**   No.
6   MR. TABACKMAN: One second, Your Honor. Court's
7   indulgence.
8   BY MR. TABACKMAN:
9   **Q.**   Did you ever have -- did your relationship with Munya
10  ever change after he walked away that time, sir?
11  MR. GUERRERO: Objection, time frame.
12  THE COURT: I'll allow it.
13  BY MR. TABACKMAN:
14  **Q.**   You testified that you met Munya in the correctional
15  treatment facility; is that right?
16  **A.**   Yes.
17  **Q.**   And you said the first time that you met him, you made a
18  reference to his teeth being knocked out and he walked away; is
19  that right?
20  **A.**   Not the first time I met him, no. A little later on,
21  yes.
22  **Q.**   When you brought up -- the first time you spoke to him
23  about the teeth, he walked away --
24  **A.**   Yes.
25  **Q.**   -- is that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7376

1   And did you ever have more of a conversation with him?
2       MR. GUERRERO:  Objection, asked and answered.
3       THE COURT:  Overruled.
4   BY MR. TABACKMAN:
5   **Q.**   Did you ever have more of a conversation with him?
6   **A.**   We have talked, yes.
7   **Q.**   How many -- talked more than once?
8   **A.**   Yeah, quite a few -- we lived together.  We was in the
9   same jail -- housing unit.
10  **Q.**   Sure.  Talk about the case?
11  **A.**   No, not a lot.
12  **Q.**   Some?
13  **A.**   Yeah.  Some things, yes.
14  **Q.**   What did you talk about?
15  **A.**   Nothing.  Just me dealing with Antwuan and how I know
16  Antwuan, that's about it.
17  **Q.**   What did you tell him -- and you told him how you knew
18  Antwuan?
19  **A.**   Yeah.
20  **Q.**   And he told you about how he knew Antwuan?
21  **A.**   Naw, I never even asked him that.
22  **Q.**   I didn't ask you if you asked him.  He didn't tell you
23  how he knew Antwuan?
24      MR. GUERRERO:  Objection.
25      THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7377

1   Go ahead.
2   BY MR. TABACKMAN:
3   **Q.**   What else did you talk about?
4   **A.**   That's about it.  His family, that's about all.
5   **Q.**   I'm sorry?
6   **A.**   His family, about his girlfriend.
7   **Q.**   What else did you talk about, about the case?
8   **A.**   That's nothing.  Nothing.
9   **Q.**   You didn't talk about anything else with Mr. Munya about
10  the case, just how he knew Antwuan?
11      MR. GUERRERO:  Objection, asked and answered.
12      THE COURT:  I'll allow it.
13      THE WITNESS:  No.
14  BY MR. TABACKMAN:
15  **Q.**   Did you talk with Kairi Kellibrew?
16  **A.**   No.
17  **Q.**   Was he also in your unit?
18  **A.**   He was in the next unit, but we see each other every day
19  in gym.
20  **Q.**   But you never talked to him?
21  **A.**   No.
22  **Q.**   You never spoke to him?
23  **A.**   No.
24  **Q.**   About anything?
25  **A.**   Naw, just hi, what's up, that's it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7378

1   **Q.**   You never mentioned about the case at all?
2   **A.**   No.
3   **Q.**   How about Larry Brown?  L?
4   **A.**   L.
5   **Q.**   Did you speak with Larry Brown in your unit?
6   **A.**   I don't know a Larry Brown.
7   **Q.**   Okay.
8       MR. TABACKMAN:  Your Honor, there was a reference to
9   Mr. Proctor and Mr. Crawford that I was just trying to locate.
10  BY MR. TABACKMAN:
11  **Q.**   When Mr. Proctor was locked up, you made sure his lawyer
12  was paid; is that right?
13  **A.**   Yes.
14  **Q.**   You made sure his wife's bills were paid?
15  **A.**   Yes.
16  **Q.**   Made sure his notes were paid?
17  **A.**   Yes.
18  **Q.**   But you didn't do -- you didn't sell any drugs to his
19  customers?
20  **A.**   No.
21  **Q.**   So, did you use your money to make sure these were paid?
22  **A.**   Yes.
23  **Q.**   And you didn't get any new money coming in from his
24  customers?
25  **A.**   No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7379

1   **Q.**   Not any?
2   **A.**   I never trusted any of Mr. Proctor's customers, no.
3   **Q.**   Weren't there some customers you knew and trusted, sir --
4   **A.**   Yes.
5   **Q.**   -- of his?
6   **A.**   No.
7   **Q.**   There were none of his that you had dealt with?
8       MR. GUERRERO:  Objection, asked and answered.
9       THE COURT:  Sustained.
10  BY MR. TABACKMAN:
11  **Q.**   Do you recall being asked the following questions and
12  giving the following answers:
13      "What happened to his -- to the business when he was
14  unavailable, while he was incarcerated?"
15      "Well, I was still keeping the business going for both of
16  us, me and Richard.  I made sure everything was okay.  I made
17  sure his bills and everything was fine, his car notes paid."
18      "Question:  Now, did you-all have the same service, the
19  same customers?"
20      "Answer:  No, we lost a few customers, because I would
21  never deal with Richard's customers one-on-one, but I kept the
22  business going.  A few of his customers I knew and I had dealt
23  with, but a few I didn't, so business dropped a little."
24      Do you recall being asked those questions and giving
25  those answers?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7380

1  **A.**   Yes, those few customers were mutual customers of both of
2  ours, yes.
3  **Q.**   So there were some customers that were his customers that
4  would still deal with?
5  **A.**   If they were both of our customers, yes.
6  **Q.**   Do you recall being asked the following question and
7  giving the following answer:
8       "You said you had distinct customers, so from the time
9  period 1999 to 2001, did you and Richard have distinct
10  customers?"
11      "Answer: Yeah, he had his own customers and I had my
12  own."
13  **A.**   Yes.
14  **Q.**   Is it your testimony today, though, that that wasn't
15  true, you had joint customers?
16  **A.**   No, sir, that is true, if you go back and read what you
17  read, some customers I didn't trust, those were his main
18  customers that I was speaking of.
19  **Q.**   Sir, did you have your own -- did you have customers in
20  common?
21  **A.**   Yes.
22  **Q.**   So, when you said that he had his own customers and I had
23  my own, that wasn't true?
24  **A.**   Yes, it was true. I was speaking of customers outside of
25  the neighborhood.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7381

1  **Q.**   You were speaking of customers outside of the
2  neighborhood?
3  **A.**   Yes.
4  **Q.**   So, when you said he had his own customers and I had my
5  own, you weren't talking about all of them?
6  **A.**   No. He was talking about the weight, the big weight
7  customers.
8  **Q.**   The question was: "Did you and Richard have distinct
9  customers?"
10  **A.**   Yes.
11  **Q.**   You didn't say anything about weight, customers.
12  **A.**   That's correct.
13  **Q.**   And you didn't say anything about customers outside the
14  neighborhood.
15  **A.**   That's correct.
16  **Q.**   You testified that you had distinct customers.
17  **A.**   That's correct.
18  **Q.**   Under oath?
19  **A.**   Yes.
20  **Q.**   And you testified today that you had joint customers.
21  **A.**   We had a few customers we served together.
22  **Q.**   So, they weren't distinct?
23  **A.**   No.
24  **Q.**   So if you said they were distinct under oath, that was
25  untrue?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7382

1       MR. GUERRERO: Objection, mischaracterizes the evidence.
2       THE COURT: Sustained.
3  BY MR. TABACKMAN:
4  **Q.**   Did you testify, sir -- didn't you say, sir, under oath,
5  in response to the question: "Did you and Richard have distinct
6  customers?"
7       "Yeah, he had his own customers, and I had my own?"
8       MR. GUERRERO: Objection, asked and answered.
9       THE COURT: Did you finish the question?
10       MR. TABACKMAN: Yes.
11       THE COURT: Sustained.
12  BY MR. TABACKMAN:
13  **Q.**   But, in fact, you had joint customers?
14  **A.**   We had a few customers that we knew of.
15  **Q.**   And, in fact, the joint customers, you took care of?
16  **A.**   Yes.
17  **Q.**   And when you said you didn't take care of any of his
18  customers in this Court, that wasn't true?
19       MR. GUERRERO: Objection, misstates the evidence.
20       THE COURT: Sustained.
21  BY MR. TABACKMAN:
22  **Q.**   You took care of the customers of your business; is that
23  right?
24       MR. GUERRERO: Objection, asked and answered.
25       THE COURT: I'll allow it.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7383

1       THE WITNESS: Yes, sir.
2  BY MR. TABACKMAN:
3  **Q.**   And that was in 2001?
4  **A.**   Between 2001, 2002, yeah.
5  **Q.**   And that was the only time, in the period that you dealt
6  with Richard Proctor -- I'm sorry, John Richard Proctor, up
7  until the time that this ended, that you weren't together just
8  about all of the time; isn't that right?
9  **A.**   Rephrase that question for me, please.
10  **Q.**   Between the time you started with him in 1998, up until
11  the time that the relationship completely ended in 2002, the
12  only time that you weren't with him virtually every day, all
13  day, was when he was in the halfway house?
14  **A.**   No, that's not true.
15       MR. GUERRERO: Objection, misstates the evidence.
16       THE WITNESS: No, that's not true. Some days we wasn't
17  together.
18  BY MR. TABACKMAN:
19  **Q.**   You weren't together every day drinking Remy?
20  **A.**   We were together every day, but like I said, we have
21  family time. We have time apart, yes.
22  **Q.**   So you weren't together every day?
23       MR. GUERRERO: Objection, Your Honor, asked and answered.
24       MR. TABACKMAN: Your Honor, he said he was and then he
25  said he wasn't.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1 when that happened.  Right?

2 A.  Yes.

3 Q.  You might even recall where you were on 9/11 when you first

4 heard about it.  Right?

5 A.  Yes.

6 Q.  And now I want to call your attention to 1994.  Another

7 memorable date was the date you said that Joseph Jones allegedly

8 robbed you.  Right?

9 A.  Yes.

10 Q.  And that was memorable because, during the span of your

11 career, you didn't get robbed very often, did you?

12 A.  Yes, I have.

13 Q.  But you remember that particular robbery.  Right?

14 A.  Yes.

15 Q.  Because you testified to it here in court.  Right?

16 A.  Yes.

17 Q.  And that was around 1994.  Right?

18 A.  Yes.

19 Q.  Now, do you remember what month that was?

20 A.  No, sir.

21 Q.  Do you remember what you were wearing at the time that you

22 were robbed?

23 A.  No, sir.

24 Q.  Do you remember what the weather was like at the time you

25 were robbed?

1 A.  No.

2 Q.  Do you remember what the car, the kind of car you saw

3 Mr. Jones come out of on that date?

4 A.  No, I don't remember.

5 Q.  Had you seen the car before?

6 A.  Not that I remember, no.

7 Q.  Do you remember what he was wearing?

8 A.  No.

9 Q.  Do you remember what time of day it was?

10 A.  It was at night, sometime at night.

11 Q.  Was it before midnight?

12 A.  Yes.

13 Q.  And you were selling coke back in 1994.  Right?

14 A.  Selling marijuana and crack cocaine.

15 Q.  And was Michael Hall your supplier at that time?

16 A.  No.

17 Q.  Who was your supplier then?

18 A.  Rodney Robertson.

19 Q.  Mr. Robertson.  Did he have a nickname, Mr. Robertson?

20 A.  Yes.  Ty.  Jamaican Ty.

21 Q.  Would you spell that?

22 A.  Jamaican Ty, T-Y.

23 Q.  T-Y?

24 A.  Yes.

25 Q.  So you were selling coke and marijuana in 1994.  And you

1 said on the date that this alleged robbery took place, no money

2 have taken from you.  Right?

3 A.  That's correct.  Yes.

4 Q.  And there was no report to the police.  Right?

5 A.  No.

6 Q.  And did you tell Ty?

7 A.  Well, he knew.  I mean, I ain't tell him.  He found out.

8 Q.  He knew?

9 A.  Yeah.

10 Q.  And you never retaliated for that.  Right?

11 A.  No.

12 Q.  And it's your testimony that you knew who Joseph Jones was.

13 Right?

14 A.  Yes.

15 Q.  And you knew him from Congress Park?

16 A.  Yes.

17 Q.  Okay.  You had seen him around.  Right?

18 A.  Yes.

19 Q.  Sometimes you would see him at the liquor store?

20 A.  Yes.

21 Q.  But you weren't really associated with him.  Right?

22 A.  No.

23 Q.  And you also testified, still we're in 1994, that Jojo was

24 in a car.  Remember, you testified about a car coming down

25 Congress Street?

1 A.  10th Place, yes.

2 Q.  Oh, 10th Place.  I'm sorry, sir.  And you said shots were

3 fired from that car.  Right?

4 A.  Yes.

5 Q.  And you said that you saw Jojo in that car.  Right?

6 A.  Yes.

7 Q.  And you said he was a passenger.  Right?

8 A.  Yes.

9 Q.  But you did not say that he was shooting.  Correct?

10 A.  That's correct.

11 Q.  Now, who else was in that car?

12 A.  I don't know.

13 Q.  Couldn't see anybody else?

14 A.  No.

15 Q.  Couldn't see the driver?

16 A.  No.

17 Q.  Couldn't tell me if there were passengers in the back?

18 A.  No.

19 Q.  Just Jojo?

20 A.  I seen Jojo, yes.

21 Q.  Now, what time of day did this alleged shooting take place?

22 A.  This was around evening time.

23 Q.  Evening time?

24 A.  Yes.  It was still light out.

25 Q.  Do you remember if this was -- was this in January?

1        MR. GUERRERO:  Objection, Your Honor.  Form.

2        THE COURT:  Sorry?

3        MR. GUERRERO:  Form.

4        THE COURT:  Sustained.  I'll let you rephrase.

5 BY MR. ZUCKER:

6 Q.  When you testified against Mr. Proctor in Maryland and you

7 talked about your history in Maryland, you talked about drug

8 dealing in Maryland and barely mentioned D.C.  Right?

9 A.  Yes.

10 Q.  When you talked about defendants who were on trial in D.C.,

11 it's like Maryland and Proctor, none of that stuff existed in

12 your direct, did it?

13        MR. GUERRERO:  Objection, Your Honor.  Form.

14        THE COURT:  Sustained.

15 BY MR. ZUCKER:

16 Q.  You never mentioned it.  Right?

17        THE COURT:  Sustained.

18 BY MR. ZUCKER:

19 Q.  What you choose to describe in your history when the

20 government calls you is dependent upon who the defendant is.

21        MR. GUERRERO:  Same objection.  Form.

22        THE COURT:  Sustained.

23 BY MR. ZUCKER:

24 Q.  When you testified in Maryland -- well, withdraw that.

25        When you -- when the government called you as their

1 on this witness list?

2          MR. GUERRERO:  I see how that would be fair game.

3          THE COURT:  All right.  Well, I'll sustain in part and

4 deny in part the objection.  I'll let you lead -- I'll ask you

5 to lead, and you may lead with names of people who are on the

6 government's witness list so that you don't invade any names or

7 investigations that have nothing to do with this case.

8          MR. ZUCKER:  Okay.

9          (END BENCH CONFERENCE.)

10 BY MR. ZUCKER:

11 Q.  Moving backwards for a moment, sir.  In this trial you were

12 never asked about Mr. Proctor.  Right?  Specifically?

13 A.  That's correct.

14 Q.  But you were asked:  Tell us what you did from, say, '96 to

15 '98, and '98 to 2000, and 2000 to 2001.  Right?

16 A.  Yes.

17 Q.  And those were periods when you claim that Proctor and

18 you -- in another trial you claimed that Proctor and you were

19 essentially joined at the hip?

20 A.  Yes.

21 Q.  Moving back to where I was before.  At CTF -- you know Keith

22 B.  Right?  Keith Barnett?

23 A.  I know him now, yes.

24 Q.  Okay.  You didn't know him on the street?

25 A.  No.

1 Q.  But you came to know him in CTF?

2 A.  Yes.

3 Q.  Right?

4       And of course he was there when you and Munya were

5 there.  Right?

6 A.  No.

7 Q.  When was he there?

8 A.  I just met Keith about two, three months ago.

9 Q.  Is he there now?

10 A.  Yes.

11 Q.  So you've had contact with him.  Right?  Some social

12 contact, at least?

13 A.  When we go to the gym, yes.

14 Q.  And similarly -- well, you know Season.  Right?

15 A.  Yes.

16 Q.  C?

17 A.  Yes.

18 Q.  Okay.  You have contact with him?

19 A.  Yes.

20 Q.  Was he there -- was he there when Munya was there, if you

21 recall?

22 A.  No, I don't think so.

23 Q.  What day did he come?

24 A.  I can't recall.

25 Q.  Huh?

1 A.  I can't recall what day Season came.

2 Q.  Was it within the last two years, three years?

3 A.  Maybe two years.

4 Q.  You know Burke Johnson.  Right?  Burke?

5 A.  Burt?

6 Q.  Yeah.

7 A.  Oh, yeah, I know Burt.  I remember.

8 Q.  All right.  You have contact with Burke?

9 A.  No, not at all.

10 Q.  Not at all?

11 A.  No, maybe once or twice.

12 Q.  Well, I mean --

13 A.  We not in the same unit.

14 Q.  I understand.  But even though you're not in the same unit,

15 everybody comes out for rec at the same time.  Right?

16 A.  Burt don't come to rec.

17 Q.  He stays in his cell?

18 A.  He stays in his unit.

19 Q.  All right.  He doesn't go to the gym?

20 A.  No.

21 Q.  He doesn't go to the -- you guys --

22       MR. GUERRERO:  Objection, Your Honor.  Scope.

23       THE COURT:  Come on up.

24       (BENCH CONFERENCE ON THE RECORD.)

25       MR. GUERRERO:  Your Honor, I would just also add an

1 Q.  Wasn't he downstairs with you this afternoon, this morning?

2 A.  No.

3        MR. GUERRERO:  Objection, Your Honor.

4        THE COURT:  Overruled.

5 BY MR. ZUCKER:

6 Q.  He was not -- Burke Johnson is not on the cell block as we

7 speak, just as you were here before you came up here to testify?

8 A.  I haven't seen Burke today.

9 Q.  Okay.  Well, you know certainly Baby Ki was there,

10 Kairi Kellibrew.  Right?

11 A.  CTF?

12 Q.  Yeah.

13 A.  Yes.

14 Q.  And Jay was there, Arthur Hanley (sic)?

15 A.  Yes.

16 Q.  And Quincy Thomas, Tip?

17 A.  Yes.

18 Q.  And Joe Langley?

19 A.  Yes.

20 Q.  Okay.  These are all guys that you -- most of them you knew

21 on the street, though you might not have been friends with them.

22 Right?

23 A.  I knew none of them on the streets.  I knew of them, a

24 couple of them, yeah.

25 Q.  You knew of them?

Page 7428

1 A.   Yeah.

2 Q.   And what you knew of them was, they were from Congress Park

3 or 10th Place.  Right?  One or the other?

4 A.   Yes.

5 Q.   And when you run into them at CTF, you're on the fourth

6 floor.  Right?

7 A.   Yes.

8 Q.   Which, everybody on the fourth floor knows that everybody

9 else on the fourth floor is a cooperator.  Right?

10        MR. GUERRERO:  Objection.  Speculation.

11        THE COURT:  Sustained.

12 BY MR. ZUCKER:

13 Q.   What is the fourth floor of CTF?

14 A.   It's the witness protection block.

15 Q.   What does that mean, "witness protection block"?

16 A.   We status.  We're not allowed to have contact with other

17 inmates.

18 Q.   Because you're all what?

19 A.   Cooperating government witnesses.

20 Q.   So you-all know -- anybody on that block is a cooperating

21 government witness?

22 A.   Yes.

23 Q.   And you knew them as Congress Park guys, or 10th Place guys.

24 Right?

25 A.   Yes.

1 Q.   Pretty clear to you:  Why they were there was the same

2 reason you were there.  Right?

3 A.   Yes.

4 Q.   But you of course never spoke with them about this case?

5 A.   We don't talk about our case.  A lot of them guys, I don't

6 know.

7 Q.   I said you never spoke with any of them about anything that

8 happened, on either Congress place or 10th Place, between 1992

9 and 2006 or 2003?

10 A.   Yes.  One or two of them, yes.

11        MR. GUERRERO:  Objection.  Asked and answered.

12        THE COURT:  I'll allow it.

13 BY MR. ZUCKER:

14 Q.   You said one or two of them?

15 A.   One or two of them, yes.

16 Q.   Which two?

17 A.   I had a conversation with Munya one time before.  And Q, we

18 talk about just things that we done out there in the streets.

19 That's all.

20 Q.   Those are the only two?

21 A.   Yeah.

22 Q.   You're not hostile with the other guys, are you?

23 A.   Naw.

24        MR. ZUCKER:  A moment to consult, Judge.

25 BY MR. ZUCKER:

1 Q.  Oh, do you know whether or not you're supposed to talk with

2 them, or allowed to talk with them about what happened out on

3 the street?

4 A.  I mean, we could talk about certain things, but we're not

5 allowed the talk about our case.

6 Q.  You're not allowed to talk about the case, but you're

7 allowed to talk about certain things?

8 A.  Yes.

9 Q.  I mean, shared history?

10 A.  Yeah.

11 Q.  And you know a lot of the same people they know.  Right?

12 A.  Naw.

13        MR. ZUCKER:  Moment to consult, Judge.

14 BY MR. ZUCKER:

15 Q.  I'm sorry, it wasn't today you were downstairs with Keith.

16 It was actually on Wednesday, wasn't it?

17 A.  No, I was downstairs with -- Keith is downstairs today, yes.

18 Q.  Didn't you just tell us -- I'm sorry.

19        You and Keith were both downstairs today.  Burke

20 Johnson and you came over on Wednesday together, didn't you?

21 A.  It was probably Wednesday, yes.

22 Q.  It was last week you traveled with him from CTF?

23 A.  Yes.

24 Q.  And you were held together downstairs all day Wednesday,

25 waiting to testify.  Right?

1 A.  Yes.

2 Q.  And neither of you got to testify.  Right?

3 A.  That's correct.

4 Q.  Were you in the same cell or cells that were next to each

5 other?

6 A.  Same cell.

7 Q.  So you and Keith passed the day, all day Wednesday here

8 waiting to testify.  Right?

9 A.  I was in there with Burke.

10        MR. GUERRERO:  Objection, Your Honor.

11 BY MR. ZUCKER:

12 Q.  I'm sorry.  Burke, Burke.  Thank you.  Burke.  Right?

13 A.  Yes.

14 Q.  What about Tuesday?  Were you both here on Tuesday together,

15 too?

16 A.  I don't recall Burke being with me Tuesday.

17 Q.  And you're both downstairs in a cell block, waiting to come

18 up here to testify in the same case.  Right?

19 A.  Yes.

20 Q.  You know that, he knows that.  Right?

21 A.  Yes.

22 Q.  Waiting to testify against the same guys.  Right?

23 A.  Yes.

24 Q.  And of course there was no conversation whatsoever about any

25 of these six defendants.  Right?

Page 7479

1 Q.  Did you have a chance to defend yourself?

2 A.  No.

3 Q.  Why not?

4 A.  By the time I grabbed my gun, the car was gone.

5 Q.  Mr. Martin then asked you about the following day, remember

6 that, with Mike?

7 A.  Yes.

8 Q.  Did you have a gun then?

9 A.  I had a gun out there, yes.

10 Q.  Who had the gun?

11 A.  Mike.

12 Q.  And when you saw Jojo that day, the following day after you

13 had been robbed at gunpoint, what did you see Jojo do the

14 following day?

15 A.  He got out the car and was going in the cut, I guess, to buy

16 some drugs or to rob Mike.

17 Q.  Who did you see Jojo go in the cut with?

18 A.  Mike.

19 Q.  Did you ever see whether Jojo had anything in his hands?

20 A.  At that time, no.

21 Q.  Did you at any point as they're going into the cut see Jojo

22 with anything in his hands?

23 A.  Yes.  Once I hollered out, "that's Jojo," he turned around

24 and he saw me and he pulled his gun out.

25 Q.  Did you have your gun on your person?

Page 7480

1 A.  No.

2 Q.  Did you try to retaliate?

3 A.  No.

4 Q.  Why not?

5 A.  Well, I really didn't have a chance to.  And at the time,

6 10th Place and Congress Park was already going through certain

7 things.

8 Q.  Did you see Mike try to retaliate at all?

9 A.  No.

10 Q.  Now, was that the last time you saw Jojo?

11 A.  No, I seen him one other time after that.

12 Q.  When did you next see Jojo?

13 A.  I think it's probably around 2001, or maybe 2002.

14 Q.  Where did you see him?

15 A.  In the alley of Congress Park.

16        MR. MARTIN:  Your Honor, I'm going to object.  This is

17 beyond the scope at this point of cross.

18        THE COURT:  Mr. Guerrero?

19        MR. GUERRERO:  May we approach on this, briefly?

20        THE COURT:  Yes.

21        (BENCH CONFERENCE ON THE RECORD.)

22        MR. GUERRERO:  I think it goes just to -- we would be

23 offering this evidence just simply to show that later in 2001,

24 Mr. Crawford does see Jojo again in Congress Park and doesn't

25 retaliate.

1 witness be subject to recall.

2          THE COURT:  You can negotiate that with the government.

3          MS. PETALAS:  The United States calls Keith Barnett to

4 the stand.

5          (Oath administered by Courtroom Deputy.)

6  (KEITH BARNETT, GOVERNMENT witness, having been duly sworn,

7                     testified as follows:)

8                  DIRECT EXAMINATION

9 BY MS. PETALAS:

10 Q.  Good afternoon, Mr. Barnett.  I'm going to ask you just to

11 state your name and spell it for the record, and I need you to

12 speak loudly so everyone can hear you.  If you need to adjust

13 the microphone, go ahead.

14 A.  Keith Barnett, K-E-I-T-H, B-A-R-N-E-T-T.

15 Q.  And how old are you?

16 A.  28.

17 Q.  Where did you grow up?

18 A.  In Congress Park.

19 Q.  Were you born and moved -- well, was there a certain point

20 where you moved into Congress Park?

21 A.  Yeah, probably when I was like 16.

22 Q.  And where did you live before Congress Park?

23 A.  In Maryland, PG County.

24 Q.  When you moved into Congress Park, why did you move to

25 Congress Park?

1 A.  Basically to get a feel of the --

2          MR. PURPURA:  Your Honor, excuse me.  It's difficult to

3 hear.  If he could just move up to the microphone.

4          THE COURT:  Mr. Barnett, please get as close as you can

5 to the mic.  If you want to put your hand on it to hold it

6 closer to you, that's fine.

7 A.  I moved away because there was more activities going on

8 around my grandmother on the southeast side.

9 BY MS. PETALAS:

10 Q.  What do you mean by "more activities"?

11 A.  Meaning that it was boring in Maryland.

12 Q.  And you said your grandmother.  Who did you move in with?

13 A.  My grandmother.

14 Q.  Was anyone else living there?

15 A.  My father and my uncle.

16 Q.  And was it just you that moved in with your grandmother, or

17 did someone else move in with you?

18 A.  No, me and my brother.

19 Q.  And what's your brother's name?

20 A.  Kevin Barnett.

21 Q.  Is he older or younger than you?

22 A.  He older than me.

23 Q.  How much older?

24 A.  We 10 months apart.

25 Q.  And how far did you go in school?

1 A.  To the 10th grade.

2 Q.  And where did you go to school?

3 A.  Ballou, Ballou Senior High School.

4 Q.  You said you moved to Congress Park with your grandmother

5 and your father.  Is that correct?

6 A.  Yes.

7 Q.  And who were you living with before that?

8 A.  My mother.

9 Q.  And at some point do you start selling drugs?

10 A.  Yes.

11 Q.  And when is that?

12 A.  Right after I came out of Johnson Junior High School.

13 Q.  And how old were you at that point?

14 A.  About 16.

15 Q.  And are you in Congress Park at this point, or are you still

16 in Maryland?

17 A.  I'm in Congress Park.

18 Q.  And how was it that you started selling drugs?

19 A.  My brother was selling drugs first, and I just -- I wanted

20 to get some money like he was getting money, so I just was

21 interested.

22 Q.  Where do you reside right now?

23 A.  In CCA.

24 Q.  What's CCA?

25 A.  Jail.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 859 of 1954

1 Q.  And roughly how old were you then?

2 A.  My late 17.

3 Q.  And you said at some point you started selling drugs in

4 Congress Park.  How old were you at that point?

5 A.  Probably about 15, going on 16.

6 Q.  And where were you first selling drugs?

7 A.  On Savannah Street.

8 Q.  Okay.  And were you selling with anybody else?

9 A.  Yeah, me, my brother, DC, Meatball, and Quentein.

10 Q.  And where were you selling at that point?  Yes, if you could

11 point to it on the map.

12 A.  (Witness complies.)

13 Q.  For the record, you put an arrow at the intersection of

14 13th Street and Savannah Street.  Is that correct?

15 A.  Yes.

16 Q.  When you first started selling drugs, how did you start

17 selling?  Who did you get your drugs from first?

18 A.  First person I ever got some drugs from was Kay-Bay.

19 Q.  And is Kay-Bay alive or dead today?

20 A.  He deceased.

21 Q.  And does Kay-Bay have any brothers?

22 A.  Yes.

23 Q.  Who are Kay-Bay's brothers?

24 A.  Aman and Antwuan.

25 Q.  And was Kay-Bay a nickname?

1 back in '93, '94?

2 A.  His brother, Antwuan, Fat Tony, other couple of dudes I

3 don't even know.

4 Q.  You mentioned Antwuan.  Do you see Antwuan in the courtroom

5 today?  If you need to get up and look around, you can.

6 A.  Yeah, I see him.  I see him.

7 Q.  Could you please identify him by where he's sitting and an

8 article of clothing he's wearing?

9 A.  Sitting to my left with a blue shirt on.

10 Q.  Could you describe his tie, or hair?

11 A.  Blue with gray stripes, hair dreadlocks.

12        MS. PETALAS:  Your Honor, may the record reflect an

13 in-court identification of Antwuan Ball?

14        MR. CARNEY:  No objection, Your Honor.

15        THE COURT:  Request is granted.

16 BY MS. PETALAS:

17 Q.  You said you got from Kay-Bay approximately three times?

18 A.  Yes.

19 Q.  And starting from '93 to '94, did you continue selling drugs

20 after that time period?

21 A.  Yes.

22 Q.  From the time period '93, '94, until you were arrested back

23 in January of 2003 --

24 A.  Yeah.

25 Q.  -- did you sell drugs that entire time?

1 A.  Yes.

2 Q.  What neighborhood did you sell drugs in that entire time?

3 A.  Congress Park.

4 Q.  Did you eventually -- after you got from Kairi, did you get

5 from other people, drugs from other people in Congress Park?

6 A.  Yes.

7 Q.  And who were some of the people you got drugs from in

8 Congress Park?

9 A.  Joe Langley, Burke Johnson, Boy-Boy, DC, Red Eye, Tony.

10 Q.  You said Boy-Boy.  Do you see Boy-Boy in the courtroom

11 today?  If you need to get up...

12 A.  Yes, I see him.

13 Q.  Would you identify him by where he's sitting and an article

14 of clothing he's wearing?

15 A.  He sitting to the right of me with a light blue shirt on.

16 Q.  And could you describe any other --

17 A.  He standing up.

18       MS. PETALAS:  Your Honor, may the record reflect an

19 in-court identification of Boy-Boy?

20       MR. BEANE:  No objection.

21       THE COURT:  The request is granted.

22 BY MS. PETALAS:

23 Q.  And generally what kind of amounts -- well, let's start with

24 Boy-Boy.  What kind of amounts would you get from Boy-Boy?

25 A.  Wholesales.

# Tab 25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              :
              Plaintiff,               :  Docket No. CR 05-100
         v.                            :
                                       :
ANTWUAN BALL, DAVID WILSON,            :  Washington, DC
GREGORY BELL, DESMOND                  :
THURSTON, JOSEPH JONES, and            :  April 18, 2007
DOMINIC SAMUELS,                       :  9:16 a.m.
                                       :
              Defendants.              :
                                       :

VOLUME 36 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

7518

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

7519

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

7520

**MORNING SESSION, APRIL 18, 2007**

1
2    (9:16 a.m.)
3         MR. ZUCKER:  Your Honor, before the jury comes in, can I
4    raise one quick matter?  We were given as part of the *Jencks*
5    disclosure a redacted version of a noncustodial interview.  I
6    would ask the Court to do an in-camera view, and I'll proffer up
7    my redacted version.  I've checked with the prosecutors.  They
8    have an unredacted one.  I would ask the Court to do an in-camera
9    review.
10        THE COURT:  For what?
11        MR. ZUCKER:  *Jencks*.  It was a three-page document titled
12   "Noncustodial Interview," of which everything except about two,
13   three lines was whited out.  And I'm just concerned that we're
14   not getting complete *Jencks* disclosures and I would ask the Court
15   to review it.
16        THE COURT:  Of this witness?
17        MR. ZUCKER:  Yes.
18        THE COURT:  And why should I do it before this witness
19   finishes testimony?
20        MR. ZUCKER:  You can do it -- I'm raising it now.  You can
21   do it whenever you want.
22        THE COURT:  I can?  Thank you.  That's very generous of
23   you.  And why would the government's review of it not be
24   sufficient?
25        MR. ZUCKER:  I'm skeptical that we're not getting complete

Scott L. Wallace, RDR, CRR
Official Court Reporter

**7525**

1 **A.** Being cautious who he was serving.

2 **Q.** Had you bought directly from Burke before?

3 **A.** Naw.

4 **Q.** Did you ever buy directly from Burke?

5 **A.** No.

6 **Q.** And you talked about Baby Kairi. Is that the same person

7 or a different person from Kay-Bay that you talked about

8 yesterday?

9 **A.** Different person.

10 **Q.** Is Baby Kairi, is he younger or older than Kay-Bay?

11 **A.** He younger.

12 **Q.** Are they related at all?

13 **A.** I don't know.

14 **Q.** And roughly what time was it when you went to -- what

15 year was it when you went to JT to get crack cocaine from Burke?

16 **A.** Like '99.

17 **Q.** And what about when you went to Baby Kai?

18 **A.** Same year, '99.

19 **Q.** And yesterday, you mentioned an individual named DC; is

20 that correct?

21 **A.** Yes.

22 **Q.** And who is DC?

23 **A.** Another -- another friend of mine that used to be out

24 there.

25 **Q.** Be out where?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7526**

1 **A.** Around Congress Park.

2 **Q.** Did you ever get crack cocaine from DC?

3 **A.** Yes.

4 **Q.** Did you ever sell with DC?

5 **A.** Yes.

6 **Q.** Where would you sell crack cocaine with DC?

7 **A.** In the Lincoln, in the circle, Savannah, in the alley.

8 **Q.** And you said -- when did you start getting crack cocaine

9 from DC?

10 **A.** Whenever he had it. If he had it and I needed it, I'd

11 get it from him.

12 **Q.** When did you -- approximately what year did you first

13 meet DC?

14 **A.** Like '93.

15 **Q.** And when you -- you talked about yesterday selling -- you

16 showed us on the map that place on Savannah. Was DC selling out

17 with you at that time?

18 **A.** Yes.

19 **Q.** I'm sorry --

20 **A.** Yes.

21 **Q.** Was he selling when you first started?

22 **A.** Yes.

23 **Q.** And when did you start getting crack cocaine from him,

24 then?

25 **A.** Like, '99, '98.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7527**

1 **Q.** And did you ever have any conversations with DC about

2 where he got his crack cocaine?

3 **A.** Naw.

4 **Q.** Did you have any conversations with DC about Burke?

5 **A.** Yes.

6 **Q.** What were those -- did you ever ask Burke to -- did you

7 ever ask DC to get cocaine from Burke for you?

8 **A.** Yes.

9 **Q.** And when was that?

10 **A.** '99.

11 **Q.** Tell us about that.

12 **A.** Well, I mean, I knew that Burke had some good coke and,

13 you know, I was known for having not so good of a coke.

14 **Q.** Let me stop you right there. You said you were known for

15 not having not so good coke. Where were you normally getting

16 your coke from?

17 **A.** Joe Langley.

18 **Q.** So -- continue.

19 **A.** So I knew Burke kept some good coke and I knew DC was

20 getting his coke through Burke, so I asked DC a couple times,

21 can he get some coke -- can I get some coke through him from

22 Burke?

23 **Q.** And what did DC say?

24 **A.** He told me yeah.

25 **Q.** So how much -- how many times did you get cocaine through

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7528**

1 DC that he said was from Burke?

2 **A.** Once.

3 **Q.** And how much did you get?

4 **A.** Half an ounce.

5 **Q.** How much did you pay for that half ounce?

6 **A.** 600.

7 **Q.** And when you got a half ounce, how much would you break

8 that down to?

9 **A.** Probably a hundred, probably a hundred dimes.

10 **Q.** You talked about an individual named Red Eye?

11 **A.** Yes.

12 **Q.** And how often would you get crack from Red Eye?

13 MR. ZUCKER: Objection, assumes facts not in evidence.

14 THE COURT: Rephrase. Sustained.

15 MS. PETALAS: I'll rephrase, Your Honor, but I believe

16 actually yesterday he testified -- he named Red Eye in

17 conjunction with people he got crack from. But I'll rephrase.

18 BY MS. PETALAS:

19 **Q.** Did you ever get crack from Red Eye?

20 **A.** Yes.

21 **Q.** And how often would you get crack from Red Eye?

22 **A.** Whenever I needed it.

23 **Q.** And how often would that be?

24 **A.** Probably -- if I ran out, I'd get a wholesale from him,

25 meaning I'd give him a hundred dollars and he'd give me double

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7529**

1  that, like 20 dime rocks.
2  **Q.**   Explain -- I think you testified yesterday from about
3  '96 -- '95, '96 to 2003, you were selling crack cocaine in
4  Congress Park for most of that time?
5  **A.**   Yes.
6  **Q.**   Did you ever have another job other than that?
7  **A.**   No.
8  **Q.**   And where -- how often -- would you get your crack
9  cocaine from -- would you ever get your crack cocaine from
10  outside Congress Park?
11  **A.**   No.
12  **Q.**   And during that time, what amounts -- from '96 to 2003,
13  did the amounts change?  Did you move up in amounts that you
14  would purchase from other individuals?
15  **A.**   Not really, naw.
16  **Q.**   What was the most you ever bought?
17  **A.**   An ounce.
18  **Q.**   And who did you buy that ounce from?
19  **A.**   Burke.
20  **Q.**   And when did you buy that ounce from Burke?
21  **A.**   2000, 2001.
22  **Q.**   And how was it that you bought the ounce from Burke?
23  **A.**   Through JT.
24  **Q.**   And what would you usually -- what amounts would you
25  usually buy?  You talked about wholesales.  Would you buy

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7530**

1  wholesales a lot?
2  **A.**   Yeah.
3  **Q.**   Explain how that worked.  Why would you buy wholesales?
4  **A.**   I bought wholesales a lot so I can see all my money.  As
5  far as buying rocked up, I'd fall short a lot.  So I bought
6  wholesales mainly.
7  **Q.**   And you said you would buy wholesales -- how often would
8  you buy wholesales from Joe Langley?
9  **A.**   Frequently.
10  **Q.**   What do you mean by -- how many times per week would you
11  buy?
12  **A.**   Might be ten times, might be 20 times.
13  **Q.**   And how about Boy-Boy?  You talked about getting crack
14  cocaine from Boy-Boy.  How often did you buy from Boy-Boy?
15  **A.**   Probably once out of a blue moon.
16  **Q.**   And does Boy-Boy -- does Boy-Boy have any brothers?
17  **A.**   Yes.
18  **Q.**   And who are his brothers?
19  **A.**   Santu and Jazz.
20  **Q.**   And how do you know Santu and Jazz?
21  **A.**   Grew up with them.
22  **Q.**   Start with Santu.  Did you ever sell crack cocaine with
23  Santu?
24  **A.**   Yes.
25  **Q.**   And where would you sell crack cocaine with Santu?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7531**

1  **A.**   In the Lincoln, in the circle, in the alley, on Savannah,
2  14th Place.
3  **Q.**   And did you ever buy crack cocaine from Santu?
4  **A.**   Yes.
5  **Q.**   What amounts did you buy from Santu?
6  **A.**   Wholesales.
7  **Q.**   And what about Jazz?  How do you know Jazz?
8  **A.**   Grew up with him.
9  **Q.**   Did you ever sell crack cocaine with Jazz?
10  **A.**   Yes.
11  **Q.**   Did you ever buy wholesales from Jazz?
12  **A.**   No.
13  **Q.**   Did you ever buy any crack cocaine from Jazz?
14  **A.**   No.
15  **Q.**   And did you ever -- you talked about selling crack
16  cocaine.  Did you ever sell wholesales?
17  **A.**   Yes.
18  **Q.**   And who would you sell wholesales to?
19  **A.**   Like vice versa, whoever needed them, if I had them.
20  **Q.**   Well, explain that.  You said, "Vice versa, whoever
21  needed them."  What do you mean by that?
22  **A.**   Like Red Eye, Tony, Santu, DC, Munya.
23  **Q.**   Do you know an individual named Wop?
24  **A.**   Yes.
25  **Q.**   How do you know Wop?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7532**

1  **A.**   Grew up with him.
2  **Q.**   And did you ever get crack cocaine from Wop?
3  **A.**   No.
4  **Q.**   Did you ever sell crack cocaine to Wop?
5  **A.**   No.
6  **Q.**   Did you ever sell crack cocaine along with Wop?
7  **A.**   Yes.
8  **Q.**   And where would you sell crack cocaine with Wop?
9  **A.**   In the alley, in the Lincoln, circle, Savannah, 14th.
10  **Q.**   And did you ever see Wop sell crack cocaine?
11  **A.**   Yes.
12  **Q.**   Did he have a primary location or was he selling in all
13  those areas you listed?
14  **A.**   He -- I mean, it really wasn't no spot he stayed.  He can
15  go anywhere around there.
16  **Q.**   I'll jump back a little bit to where you were talking
17  about vice versa, selling wholesales to Santu.
18  **A.**   Yes.
19  **Q.**   So how many times would you sell -- when would you sell
20  wholesales to Santu?
21  **A.**   If there was a crack game going on, if I was trying to go
22  get something, some clothes, some liquor, some weed and needed
23  some money real quick.
24  **Q.**   And you also talked about DC.  So how often did you sell
25  wholesales to DC?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7533**

1  A.   Whenever I needed some quick money.

2  Q.   So explain how that worked.  You said sometimes you

3  bought from DC or sometimes you sold wholesales to DC; Is that

4  correct?

5  A.   Yes.

6  Q.   And how did that work?

7  A.   Sometimes he might have some coke and I probably don't

8  have none and then I get it from him.  As far as if I sell him

9  wholesale, he might still got drugs.  I just need some quick

10  money real quick so I just serve him wholesale buy.

11  Q.   And what about Munya?  Did you ever get wholesales from

12  Munya?

13  A.   Yes.

14  Q.   Did you ever sell wholesales to Munya?

15  A.   Yes.

16  Q.   How about -- did you know an individual named Drano?

17  A.   Yes.

18  Q.   How did you know Drano?

19  A.   Grew up with him.

20  Q.   Did you ever get crack cocaine from Drano?

21  A.   Yes.

22  Q.   Did you ever sell crack cocaine to Drano?

23  A.   No.

24  Q.   What about an individual named Juney?  Did you know a

25  Juney?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7534**

1  A.   Yes.

2  Q.   And where was Juney?  Where was Juney from?

3  A.   Trenton block.

4  Q.   And how did you know Juney?

5  A.   Through Wop.

6       MS. WICKS:  Objection, relevancy.

7       Objection, relevancy, Your Honor.

8       MS. PETALAS:  He talked about getting crack cocaine from

9  Juney, so I'm just asking how he got to know him.

10       THE COURT:  I know, but the objection was as to relevance.

11       MS. PETALAS:  He's talking about the people he got crack

12  cocaine from as part of the --

13       THE COURT:  Go ahead.  I'll allow it.  Overruled.

14  BY MS. PETALAS:

15  Q.   How did you meet up with Juney?

16  A.   He went to Ballou for a short period of time and I knew

17  him through there, and then I knew him through Wop.

18  Q.   I'm sorry.  What was the last part?

19  A.   And I met him through Wop.

20  Q.   And when did you meet him through Wop?

21  A.   When he started coming around the park.

22  Q.   When who started coming around the park?

23  A.   Juney.

24  Q.   So you saw Juney coming around the park?

25  A.   Yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7535**

1  Q.   And where would you see Juney when he came to the park?

2  A.   In the circle.

3  Q.   Did you ever see him with Wop?

4  A.   Yes.

5  Q.   And did you ever -- what do you mean, you met him through

6  Wop?  Was there a time that you talked to Juney and Wop?

7       MS. WICKS:  Objection, leading.

8       THE WITNESS:  No.

9       THE COURT:  Overruled.

10  BY MS. PETALAS:

11  Q.   What do you mean, then, when you said you met him through

12  Wop?

13  A.   Meaning -- I mean he went to Ballou for a period of time,

14  but I really wasn't -- I really didn't know him, but I knew who

15  he was.  But when he started coming around the park, that's when

16  I really started knowing him and kicking it with him.

17  Q.   And when he started coming around the park, you said

18  that's when you started kicking it with him?

19  A.   Yes.

20  Q.   And when he first started coming around the park, did you

21  see him hang out with people in the park?

22  A.   Yes.  He used to hang in the circle with everybody.

23  Q.   And who's "everybody"?

24  A.   Me, Munya, Wop, Terrance, JT, Baby Kairi, Dazz, Phil,

25  Santu, Jazz.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7536**

1  Q.   And how much -- how much crack cocaine would you get from

2  Juney?

3  A.   I just bought -- I bought a half from him one time.

4  Q.   And how much did you pay for the half ounce?

5  A.   550.

6  Q.   And did you ever see Juney give crack cocaine to -- sell

7  crack cocaine to anybody else?

8  A.   Naw.

9  Q.   Did you ever talk to anybody else about getting crack

10  cocaine from Juney?

11  A.   Naw.

12  Q.   How much -- when you got this crack cocaine, generally

13  how much would you sell in a week?

14  A.   In a week?

15  Q.   Yes.

16       MR. ZUCKER:  Request a time frame, Judge.

17  BY MS. PETALAS:

18  Q.   Well, start out, when you first started.  How much were

19  you selling in a week back in, I believe you said '96, '97?

20  A.   It took me like two weeks to sell 30 rocks back when I

21  first started.

22  Q.   And then did that eventually change?  Were you able to

23  sell more?

24  A.   Yes.

25  Q.   And how long did it take for that to change?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7545**

1  just to the right of who you identified as Boy-Boy; is that
2  correct?
3  **A.**  Yes.
4  **Q.**  And who's that?
5  **A.**  DC.
6  **Q.**  Is that the DC you were talking about earlier?
7  **A.**  Yes.
8  **Q.**  Now you just placed an arrow to the person to the right
9  of DC.  Do you recognize that person?
10  **A.**  Yes.
11  **Q.**  Who's that?
12  **A.**  Jo-Jo.
13  **Q.**  Do you see Jo-Jo in the courtroom today?
14  **A.**  Yes.
15  **Q.**  Would you please identify him by where he's sitting, item
16  of clothing.
17  **A.**  To the left of me with a black shirt on, beige little
18  jacket.
19      MS. PETALAS:  Your Honor, may the record reflect an
20  in-court identification of Jo-Jo -- Mr. Jones?
21      MR. MARTIN:  We'll stipulate.
22      THE COURT:  Request is granted.
23  BY MS. PETALAS:
24  **Q.**  And did you ever see Jo-Jo selling?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7546**

1  **Q.**  And where would you see him selling?
2  **A.**  On Savannah.
3  **Q.**  You said on Savannah.  Where on Savannah?
4  **A.**  Like up there where the alley at, the Boat Alley.
5  **Q.**  Did you ever sell with Jo-Jo?
6  **A.**  Naw.
7  **Q.**  Did you ever get crack cocaine from Jo-Jo?
8  **A.**  Naw.
9  **Q.**  Did you ever give him crack cocaine?
10  **A.**  Naw.
11  **Q.**  Who would you see him selling in the alley with, if
12  anybody?
13  **A.**  Doo-Doo, Kell.
14      MR. MARTIN:  Your Honor, I'm going to object to the form
15  of the question, "with."
16      THE COURT:  Sustained.
17  BY MS. PETALAS:
18  **Q.**  When you saw him selling cocaine, would there be other
19  people up in the alley selling cocaine?
20  **A.**  Yes.
21  **Q.**  And who would those people be?
22  **A.**  Lucious.
23  **Q.**  And did you see Lucious selling in Boat Alley?
24  **A.**  Yes.
25  **Q.**  Did you ever see Doo-Doo selling in Boat Alley?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7547**

1  **A.**  Yes.
2  **Q.**  Did you ever see Kell selling in Boat Alley?
3  **A.**  Yes.
4  **Q.**  And when you saw Doo-Doo selling in Boat Alley, did you
5  ever see him with Jo-Jo?
6      MR. ZUCKER:  Objection.
7      THE COURT:  Basis?
8      MR. ZUCKER:  Same objection as before.
9      THE COURT:  Overruled.
10  BY MS. PETALAS:
11  **Q.**  Did you ever see him standing with Jo-Jo?
12  **A.**  Naw.
13  **Q.**  How about Lucious?  Did you ever see him with Jo-Jo in
14  the Boat Alley?
15  **A.**  Yes.
16      MR. MARTIN:  Your Honor, I'm going to continue to object.
17  I don't want to keep jumping up, but every time the word "with"
18  is used, I object.
19      THE COURT:  Come on up.
20      (Following sidebar discussion had on the record:)
21      THE COURT:  Did you say objection initially because it
22  assumes facts not in evidence, that he had been selling with
23  anybody, which she changed to say, "Did you see him with anybody"
24  alone.  I don't know that the question was, "Did you see him
25  selling?"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7548**

1      But there's nothing wrong with her asking who, if anyone,
2  did you see him with.  It may have been a leading aspect in some
3  way if it didn't say "Who, if anyone, did you see him with?"  And
4  I don't know what your objection is just because the word "with"
5  is used.
6      MR. MARTIN:  Well, "with" seems to suggest, Your Honor,
7  that somehow they've either pooled resources, they're out there
8  together actually selling the same items to the same market.
9  Just because somebody's out there at the same time doesn't mean
10  they're with each other.  You can have three kids on a corner
11  selling newspapers, the *Washington Post*, the *Washington Times* and
12  the *Gazette*, and just because they're on that same corner and
13  they've been supplied by three different media and they're
14  targeting the same market doesn't mean they're with each other.
15  It just happens they're co-located.
16      Would there be anybody else out there?  Yes.  Who else
17  would be out there?  But to say that they're with each other
18  suggests that they're being supplied by the same people, they're
19  working together and they're supplying the same customers in
20  unison.
21      THE COURT:  I'll let you explore that on cross if
22  necessary, but there's nothing wrong with the question.
23  Overruled.
24      (Sidebar discussion concluded.)
25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7549

1  **Q.**  Mr. Barnett, if you could just continue on in the photo.
2  **A.**  (Indicating.)
3  **Q.**  For the record, you made an arrow to the person standing
4  to the right of Jo-Jo. Who is that individual?
5  **A.**  Boobie.
6  **Q.**  And how do you know Boobie?
7  **A.**  Grew up with him.
8  **Q.**  And did you ever sell drugs with Boobie?
9  **A.**  Yes.
10  **Q.**  And where would you sell drugs with Boobie?
11  **A.**  On Savannah Street.
12  **Q.**  Anywhere else?
13  **A.**  In the Lincoln.
14  **Q.**  And did Boobie have a brother?
15  **A.**  Yes.
16  **Q.**  And who is Boobie's brother?
17  **A.**  Wop.
18  **Q.**  Did you ever get crack cocaine from Boobie?
19  **A.**  No.
20  **Q.**  Continue on with the picture.
21  **A.**  (Indicating.)
22  **Q.**  Finally, you placed a dot on the person to the far right;
23  is that correct?
24  **A.**  Yes.
25  **Q.**  And who is that individual?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7550

1  **A.**  Don.
2  **Q.**  Do you see Don in the courtroom today?
3  **A.**  Yes.
4  **Q.**  Would you please identify by where he's sitting.
5  MR. BALAREZO: Your Honor, we'll stipulate that the
6  handsome young man in the leather jacket is Mr. Samuels.
7  MR. CARNEY: Your Honor, could I have a time frame?
8  THE COURT: Let's take one thing at a time. Have you
9  finished, Ms. Petalas?
10  MS. PETALAS: Yes, but the record -- well, Your Honor, let
11  the record reflect that he hasn't -- I guess he hasn't because he
12  was -- let the record reflect an in-court identification of
13  Dominic Samuels, Don.
14  THE COURT: Well, the record doesn't reflect that. The
15  record reflects a defense offer of a stipulation.
16  MS. PETALAS: We'll accept the stipulation, Your Honor.
17  THE COURT: All right. All right.
18  Mr. Carney, did you have something?
19  MR. CARNEY: Yes, Your Honor. I asked for a time frame on
20  this, where he's talking --
21  THE COURT: On the identification?
22  MR. CARNEY: No, on this photograph with some of these
23  individuals.
24  THE COURT: Overruled.
25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7551

1  **Q.**  And how do you know Dominic Samuels?
2  **A.**  Grew up with him.
3  **Q.**  Did you ever see Dominic Samuels selling crack cocaine?
4  MR. BALAREZO: Objection, leading.
5  THE COURT: I'll allow it.
6  THE WITNESS: Yes.
7  BY MS. PETALAS:
8  **Q.**  And where would you see Dominic Samuels selling crack
9  cocaine?
10  **A.**  In the circle.
11  **Q.**  I'm sorry. Where?
12  **A.**  In the circle.
13  **Q.**  Anywhere else besides the circle?
14  **A.**  In the Lincoln.
15  **Q.**  Anywhere else?
16  **A.**  Naw.
17  **Q.**  You said you grew up with Dominic Samuels. Did you
18  ever -- did you ever see who he hung out with or who his friends
19  were?
20  **A.**  Yes.
21  **Q.**  And who were some of his friends?
22  **A.**  DC and EB.
23  **Q.**  And do you know, looking at this picture, approximately
24  when it was taken?
25  **A.**  Naw.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7552

1  **Q.**  Mr. Barnett, when you were selling in Congress Park, did
2  ever hear the term "doors"? The term "doors"?
3  **A.**  Yes.
4  **Q.**  And what is "doors"?
5  **A.**  It was a game we was playing to get the sales when it was
6  a lot of us out there, like *uno* and *dos*. If a crackhead walked
7  up and we like 10 deep out there, the first two get the sale.
8  The first one who call "*uno*" get the majority of the sale. Who
9  call "doors" get the remaining of the sale.
10  **Q.**  And where are some of the places that you would play this
11  game?
12  **A.**  In the circle, in the Lincoln, in the alley.
13  **Q.**  And why is it that you guys would play this game?
14  **A.**  So everybody can get some money.
15  MR. BALAREZO: Objection, Your Honor. I think he can only
16  testify as to why he played the game.
17  THE COURT: Do you want to rephrase the question?
18  BY MS. PETALAS:
19  **Q.**  In your mind, why did you play the game?
20  **A.**  So that I can get some money.
21  **Q.**  Well, if -- were there times when you called "uno"  *and*
22  somebody else called "doors"?
23  **A.**  Yes.
24  **Q.**  And why is it then that you would let that person have
25  part of the sale?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7553**

1  **A.**   Because the game was -- the game was already established.
2  Everybody respected the game.
3  **Q.**   And did you ever play the game doors with Don?
4  **A.**   Yes.
5  **Q.**   How about DC?
6  **A.**   Yes.
7  **Q.**   How about Munya?
8  **A.**   Yes.
9  **Q.**   How about -- well, who else would you play the game doors
10  with?
11  **A.**   Dion, Jo-Jo, JT, Santu, Dazz, Phil.
12  **Q.**   You mentioned Dazz a couple times.  Let me interrupt you.
13       MR. ZUCKER:  Objection.
14  BY MS. PETALAS:
15  **Q.**   You mentioned Dazz a couple --
16       MR. ZUCKER:  Misstates the evidence.  This is the first
17  mention of Dazz.
18       MS. PETALAS:  Actually, I don't believe that's true, but
19  I'll move on, Your Honor.
20  BY MS. PETALAS:
21  **Q.**   You just mentioned Dazz.  Do you see Dazz in the
22  courtroom today?
23  **A.**   Yes.
24  **Q.**   Would you please identify him by where he's sitting.
25  **A.**   To the left of me, with a yellow shirt on.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7554**

1       MS. PETALAS:  Your Honor, may the record reflect an
2  in-court identification of Desmond Thurston?  I think he's the
3  only one wearing --
4       MR. ZUCKER:  I don't see any yellow shirt.  On the other
5  hand, I think --
6       Mr. Thurston, would you stand up, please.
7       THE WITNESS:  Yeah, that's Dazz right there.
8       MR. ZUCKER:  Thank you.  Stipulate to the identification.
9  BY MS. PETALAS:
10  **Q.**   You mentioned Dazz.  How often -- you said you played
11  doors with Dazz?
12  **A.**   Yes.
13  **Q.**   And where would you play doors with Dazz?
14  **A.**   In the circle, in the Lincoln, in the alley.
15  **Q.**   How about Wop?  Did you ever play doors with Wop?
16  **A.**   No.
17  **Q.**   Would you ever be playing the game doors when Wop was
18  around?
19  **A.**   Yes.
20  **Q.**   And why was it that you didn't play doors with Wop?
21       MS. WICKS:  Objection.
22       THE COURT:  Basis?
23       MS. WICKS:  Foundation.
24       THE COURT:  Overruled.
25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7555**

1  **Q.**   You can answer the question.
2  **A.**   I mean, because Wop had his sales, his customers that
3  didn't care for no games or none of that.  They just came to
4  Wop.
5  **Q.**   And how long have you known Wop?
6  **A.**   I grew up with him.
7  **Q.**   How often -- once you started selling in Congress Park,
8  how long after that did you start playing the game doors?
9  **A.**   I think that uno *and* doors game came like 2000, 2001.
10  **Q.**   And how often per week would you play doors?
11  **A.**   Every day.
12  **Q.**   You mentioned Wop had his own customers.  Were there ever
13  times that you saw Wop help other people get some money for
14  cocaine sales?
15       MS. WICKS:  Objection.  It sounded like a very vague
16  question.
17       THE COURT:  Did you understand the question?
18       THE WITNESS:  Yes.
19       THE COURT:  I'll let him answer it.
20  BY MS. PETALAS:
21  **Q.**   You said yes.  What do you mean by that?  I mean,
22  describe that, when you say Wop help others get --
23  **A.**   Meaning if I had some garbage coke or if I needed some
24  money --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7556**

1       MS. WICKS:  Objection as to speculation at this point,
2  Your Honor.
3       THE COURT:  He said, "If I had some garbage coke"?
4       MS. WICKS:  Yes.
5       THE COURT:  Overruled.
6  BY MS. PETALAS:
7  **Q.**   Continue.
8  **A.**   When I had garbage coke or if I needed some money or
9  whatever and the sales come and they come to Wop, I tell Wop,
10  "Man, let me get half of that sale."  He give it to me.
11  **Q.**   And did you ever see him do this for other people?
12  **A.**   Yes.
13  **Q.**   Who were some on the other people you saw him do this to?
14  **A.**   Dazz, Phil, Munya.
15  **Q.**   You said Phil.  Who's Phil?
16  **A.**   Dazz little brother.
17  **Q.**   Did you ever see Dazz selling crack cocaine?
18  **A.**   Yes.
19  **Q.**   And where would you see him sell crack cocaine?
20  **A.**   In the Lincoln, 14th Place, in the alley, the circle,
21  Savannah.
22  **Q.**   Did you ever see Phil sell something that was not crack
23  cocaine?
24  **A.**   Yes.
25       MR. ZUCKER:  Objection, foundation.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7569**

1    MR. ZUCKER:  Objection.
2    THE COURT:  Sustained.
3  BY MS. PETALAS:
4    **Q.**    What, if anything, would you give Pinky in exchange for
5  cutting up in her apartment?
6    **A.**    Probably some -- a couple dimes and the crumbs on the
7  plate.
8    **Q.**    And how about Gail?  Who's Gail?
9    **A.**    Crackhead.
10    **Q.**    And did she live in Congress Park?
11    **A.**    Yes.
12    **Q.**    And where in Congress Park did she live?
13    **A.**    (Indicating.)
14    **Q.**    For the record, you placed a red arrow on the building
15  below the C in Congress Street.  It's actually on 13th Place; is
16  that correct?
17    **A.**    Yes.
18    **Q.**    And what, if anything, would you give Gail for cutting up
19  in her apartment?
20    **A.**    A couple rocks.
21    **Q.**    I'm sorry.  What'd you say?
22    **A.**    A couple rocks.
23    **Q.**    What do you mean, "a couple of rocks"?  Like how much
24  would that be?
25    **A.**    $20.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7570**

1    **Q.**    You also mentioned an individual, Nooney; is that
2  correct?
3    **A.**    Yes.
4    **Q.**    And who is Nooney?
5    **A.**    A crackhead.
6    **Q.**    And where did Nooney live?
7    **A.**    (Indicating.)
8    **Q.**    For the record, you put a dot on the -- looks like the
9  same building that you pointed to for Kena?
10    **A.**    Yes.
11    **Q.**    So she lived -- does she live in the same building as
12  Kena?
13    **A.**    Yes.
14    **Q.**    Did they live in that building at the same time?
15    **A.**    Yes.
16    **Q.**    And what, if anything, would you give Nooney in exchange
17  for cutting up?
18    **A.**    A couple rocks, too.
19    **Q.**    And why is it that you would cut up in these other
20  people's houses as opposed to your own house?
21    **A.**    You say why would I cut up in other people's houses
22  except my house?
23    **Q.**    Yes.
24    **A.**    I just ain't never had that thought in my mind to do
25  that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7571**

1    **Q.**    The times that you were out selling drugs at the places
2  that you mentioned, where would you keep your drugs?
3    **A.**    In my car, on me, my pocket.
4    **Q.**    I'm sorry.  You said car, on you?
5    **A.**    Yes.
6    **Q.**    In your pocket?
7    **A.**    And in my sock.
8    **Q.**    Anywhere else?
9    **A.**    My little watch, my little stash --
10    **Q.**    You said in your watch?
11    **A.**    Yeah.
12    **Q.**    What do you mean by "your watch"?
13    **A.**    I had a little watch that the whole top pop open and I
14  could put drugs in my watch.
15    **Q.**    Anywhere else you would keep the drugs?
16    **A.**    Naw.
17    **Q.**    You talked about how much you would sell in a week.  Not
18  in the first couple months when you were learning how to sell
19  drugs, but after that time period, how much generally then would
20  you make in a week?
21    **A.**    Probably 500.
22    **Q.**    Was it always 500 or would it sometimes be more or less?
23    **A.**    Sometimes it be more, sometimes it be less.
24    **Q.**    And then when you got that money, what would you do with
25  it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7572**

1    **A.**    Blow it gambling.
2    **Q.**    Anything else other than gambling?
3    **A.**    Go to the mall, spend it.
4    **Q.**    You said go to the mall?
5    **A.**    Go to the mall.
6    **Q.**    Did you ever go in any clubs?
7    **A.**    Yeah, went to the club.
8    MS. PETALAS:  Court's indulgence.
9    Ms. Romero, I would like to show the witness what I
10  believe is not in evidence, Government's Exhibit 108.106.
11  BY MS. PETALAS:
12    **Q.**    Mr. Barnett, if you could clear the screen again.
13    THE COURT:  What's the exhibit number?
14    MS. PETALAS:  108.106.
15  BY MS. PETALAS:
16    **Q.**    Mr. Barnett, can you see that screen?
17    **A.**    Yes.
18    **Q.**    Do you recognize that?
19    **A.**    Yes.
20    **Q.**    And is that a photo?
21    **A.**    Yes.
22    **Q.**    Is that a fair and accurate photo?
23    **A.**    Yes.
24    MS. PETALAS:  Your Honor, at this time I move Government's
25  Exhibit 108.106 into evidence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7573

1  THE COURT: Without objection, it's received.
2  (Government's Exhibit 108.106 admitted into the record.)
3  MS. PETALAS: And I ask, may it be published to the jury?
4  MR. BALAREZO: Your Honor, before it is, it's an accurate
5  photo of what? I don't think the proper foundation was --
6  THE COURT: It's kind of late. It's in now.
7  MR. BALAREZO: All right.
8  BY MS. PETALAS:
9  Q.  What is that a photo of?
10 A.  We was in the club.
11 Q.  And if you could, again, use the pen and just -- do you
12 recognize the people in that photo?
13 A.  Yes.
14 MR. ZUCKER: Objection. Can we ask that he identify the
15 club.
16 THE COURT: Overruled.
17 THE WITNESS: The Ritz.
18 BY MS. PETALAS:
19 Q.  If you could just point to the -- start -- point to one
20 of the individuals that you recognize and tell us who that is.
21 A.  (Indicating.)
22 Q.  You pointed to the person wearing a black shirt on the
23 far left on the top; is that correct?
24 A.  Yes.
25 Q.  And who is that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7574

1  A.  Terrance.
2  Q.  And who is Terrance?
3  A.  Individual that sold drugs with me.
4  Q.  And if you could point to somebody else.
5  A.  (Indicating.)
6  Q.  For the record, you pointed to an individual just to the
7  right of Terrance.
8  A.  Dazz.
9  Q.  And for the record, now you pointed to somebody to the
10 right of Dazz; is that correct?
11 A.  Yes. EB.
12 Q.  I'm sorry?
13 A.  EB.
14 Q.  Did EB go by any other names?
15 A.  Al.
16 Q.  And is EB somebody -- did you ever see EB sell drugs?
17 A.  Yes.
18 Q.  Did you ever play doors with EB?
19 A.  Naw.
20 Q.  Okay. Continue on.
21 A.  (Indicating.)
22 Q.  For the record, you've pointed to the individual to the
23 right of EB; is that correct?
24 A.  Yes.
25 Q.  And who is that person?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7575

1  A.  Wop.
2  MS. PETALAS: Court's indulgence.
3  BY MS. PETALAS:
4  Q.  Do you see Wop in the courtroom today?
5  A.  Yes.
6  Q.  Can you identify him by where he's sitting and an article
7  of clothing he's wearing.
8  A.  To my right, with a white shirt on, a colorful little
9  tie, black, yellow.
10 Q.  And where is he sitting?
11 A.  Straight ahead to me. Standing up.
12 MS. PETALAS: May the record reflect an in-court
13 identification of David Wilson, Your Honor?
14 MS. WICKS: No objection, Your Honor.
15 THE COURT: Request is granted.
16 BY MS. PETALAS:
17 Q.  And if you could continue on with the picture.
18 A.  (Indicating.)
19 Q.  And for the record, you pointed to somebody sitting down
20 in front with a white shirt and black bar across the chest; is
21 that correct?
22 A.  Yes.
23 Q.  And who is that?
24 A.  That's me.
25 Q.  And for the record -- I'm sorry. Continue on.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7576

1  A.  (Indicating.)
2  Q.  And you pointed now to a person to the left of you. Who
3  is that?
4  A.  DC.
5  Q.  And finally, you pointed to somebody crouching down in
6  the far left hand of the --
7  A.  Phil.
8  Q.  Is that the Phil you talked about earlier?
9  A.  Yes.
10 Q.  And you said -- well, what club were you at?
11 A.  The Ritz.
12 Q.  And do you have any idea of roughly the time frame of
13 this photo?
14 A.  No.
15 Q.  You talked about going to the mall. What would you buy
16 when you went to the mall?
17 MR. BALAREZO: Objection, Your Honor, relevance.
18 THE COURT: Overruled.
19 THE WITNESS: Clothes, shoes, hats, sweaters, jackets.
20 BY MS. PETALAS:
21 Q.  And looking at this picture here, what are you wearing
22 there?
23 A.  Iceberg T-shirt, Iceberg sweat pants.
24 Q.  And how much would the Iceberg T-shirt cost?
25 A.  A hundred dollars.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7577**

1    MR. ZUCKER: Objection. Iceberg T-shirts generally or
2  this T-shirt?
3        THE COURT: Overruled.
4  BY MS. PETALAS:
5    **Q.**    And do you know roughly when -- you said a hundred
6  dollars. How much would that -- how about the pants?
7    **A.**    250.
8    **Q.**    And how often would you buy nice clothes back then?
9        MR. BALAREZO: Your Honor, objection. Again, relevance.
10       THE COURT: Overruled.
11       THE WITNESS: Probably every other day.
12  BY MS. PETALAS:
13   **Q.**    How about -- would you ever -- were other people -- would
14  you buy expensive clothes with other people in Congress Park?
15       MR. BALAREZO: Objection, "with."
16       MS. PETALAS: I'll rephrase the question.
17  BY MS. PETALAS:
18   **Q.**    Did you ever see Wop in other -- in Iceberg?
19       MR. BALAREZO: Objection, leading.
20       THE COURT: Rephrase.
21  BY MS. PETALAS:
22   **Q.**    Looking at that photo, what is Wop wearing there?
23   **A.**    Versace.
24   **Q.**    And did you have any Versace shirts back then?
25   **A.**    Naw.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7578**

1    **Q.**    Did you know how much Versace shirts costs?
2    **A.**    Naw.
3        MR. BALAREZO: Objection.
4        THE COURT: Sustained.
5  BY MS. PETALAS:
6    **Q.**    Looking at that photo, it appears you're wearing a watch;
7  is that correct?
8    **A.**    Yes.
9    **Q.**    Is that the watch you were talking about?
10   **A.**    Yes.
11   **Q.**    What happened to that watch?
12   **A.**    I stopped going out so I passed it down to Wop.
13   **Q.**    What do you mean by you stopped going out so you passed
14  it down to Wop? What connection to stop going out and giving
15  away -- does that have to giving away the watch?
16   **A.**    Well, I was using the watch to get weed in the club, so
17  we could smoke in the club, but I stopped going out and I gave
18  the watch to Wop.
19   **Q.**    And you said you stopped going out. Prior to you
20  stopped -- when approximately did you stop going out?
21   **A.**    Like 2002.
22   **Q.**    Mr. Barnett, if you can clear the screen.
23       MS. PETALAS: I'll call up what is not in evidence as
24  Government's Exhibit 108.14.
25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7579**

1    **Q.**    Mr. Barnett, looking at your screen, do you see
2  Government's Exhibit 108.14?
3    **A.**    Yes.
4    **Q.**    And do you recognize that?
5    **A.**    Yes.
6    **Q.**    And what is that?
7    **A.**    A picture of us at the -- Brown Manor.
8    **Q.**    And is that a fair and accurate picture --
9        You said "us." Does that include you?
10   **A.**    Yes.
11   **Q.**    Is that a fair and accurate picture of you and the people
12  you were with at the Brown Manor?
13   **A.**    Yes.
14       MS. PETALAS: Your Honor, at this time I move Government's
15  Exhibit 108.14 into evidence.
16       THE COURT: Without objection, it's received.
17       (Government's Exhibit 108.14 admitted into the record.)
18  BY MS. PETALAS:
19   **Q.**    Again, Mr. Barnett, if you could just quickly point to
20  the individuals in the photograph and let us know who they are.
21   **A.**    That's Dazz (indicating.)
22   **Q.**    And for the record, you're pointing to the individual on
23  the upper left hand of the photograph; is that correct?
24   **A.**    Yes.
25   **Q.**    And if you could just kind of work clockwise around.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7580**

1    **A.**    (Indicating) Santu, (indicating) me, (indicating) DC and
2  (indicating) EB.
3    **Q.**    And when you guys went to the club, was there a band that
4  you used to go see?
5    **A.**    Yes.
6    **Q.**    And who was that?
7    **A.**    Rare Essence.
8    **Q.**    I'm sorry. What?
9    **A.**    Rare Essence.
10   **Q.**    And when you went to go see Rare Essence, was there ever
11  a time that you would refer to Congress Park when you were
12  seeing Rare Essence or is it --
13       MR. ZUCKER: Objection.
14       THE COURT: Sustained.
15  BY MS. PETALAS:
16   **Q.**    When you saw Rare Essence -- would you ever go to the
17  clubs to see Rare Essence? Would Wop ever be there?
18   **A.**    Yes.
19   **Q.**    And to your knowledge, did Wop know anybody in Rare
20  Essence?
21   **A.**    Yes.
22   **Q.**    And who did he -- how did he know that person?
23       MS. WICKS: Objection as to --
24       THE COURT: Sustained.
25       I'm sorry. I didn't mean to cut you off.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7581**

1  MS. WICKS: Relevance.
2  THE COURT: Sustained as to foundation.
3  BY MS. PETALAS:
4  Q.  Well, when you went to go see Rare Essence, would Rare
5  Essence ever say anything about Congress Park?
6  MR. ZUCKER: Objection. Rare Essence is a band.
7  MS. WICKS: Hearsay.
8  MS. PETALAS: May I approach, Your Honor?
9  THE COURT: Yes.
10  (Following sidebar discussion had on the record:)
11  MS. PETALAS: It's relevant to association. What I'm
12  simply trying to elicit, leading, is that Congress Park -- I'm
13  showing association. When these individuals went to the club,
14  they would call out "Congress Park" and they would all respond
15  "Yes" and they would call out individual names.
16  THE COURT: Who is "they" who would call out "Congress
17  Park"?
18  MS. PETALAS: The band would. And they would, through --
19  THE COURT: The band would call out "Congress Park"?
20  MS. PETALAS: Through this individual when they went to
21  the band and Wop got -- the band would call generally and then
22  they would call out individual names.
23  They started going to the band (sic) and basically,
24  through talking to this witness earlier in earlier debriefings,
25  they would go to these clubs. They started having the band call

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7582**

1  out "Congress Park" to essentially -- and his words earlier put
2  Congress Park on the map. And they would go as a group. They'd
3  call out "Congress Park," these individuals would together.
4  And it continues -- it just shows association, that
5  these -- that they went to these clubs together and associated
6  with Congress Park and they went as a group and announced
7  themselves in the club as a group.
8  THE COURT: Okay. Well, that's not hearsay so that's not
9  a problem. But you asked if Wop knew -- excuse me -- you asked
10  if Wop knew anybody in the band. I don't know if you moved off
11  that or not, but you haven't established any foundation first,
12  before he answers that question.
13  Have you move moved away from that? You're not seeking to
14  elicit that?
15  MS. PETALAS: It was ultimately just to get to the point
16  to announce to the Court that Wop was stating he knew -- speaking
17  to this witness, Wop was dating an individual in the band and
18  that's how the band came to start yelling "Congress Park" and
19  they got, basically, the Congress Park shout-outs.
20  THE COURT: Okay. Well, it's your examination; you do
21  what you want. But if what you're trying to get him to say is he
22  knows that Wop knew somebody in the band, then you've got to get
23  foundation before he announces that.
24  The shout-outs are not offered for the truth, so that's
25  overruled as to hearsay. Did you have something else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7583**

1  MS. WICKS: Your Honor, I think it is offered for the
2  truth, because it's the people in the band saying something and
3  what he's talking about is the other individuals' response to
4  this --
5  THE COURT: What is the truth component? What is the
6  assertion?
7  MS. WICKS: That they're from Congress Park and that
8  they're part of the Congress Park Crew. I mean, that's what the
9  government is trying to prove here.
10  THE COURT: I'll -- that's overruled. Anything else?
11  MR. ZUCKER: We don't know who in the band is supposedly
12  yelling this out.
13  THE COURT: Who cares? What difference does it make?
14  MR. ZUCKER: Because that's the declarant.
15  THE COURT: If it doesn't have a truth component, there's
16  no hearsay. Who cares who the declarant is?
17  MR. ZUCKER: But the truth component is that somebody in
18  the band is supposedly identifying these people as being Congress
19  Park and they're affirming it by saying "Yeah, we're Congress
20  Park."
21  THE COURT: I'm not persuaded. That's overruled.
22  Any other basis for an objection?
23  MS. WICKS: Your Honor, just on the record, what she was
24  saying was when they would go, this was happening because they
25  were there, so I think it does matter -- the declarant's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7584**

1  knowledge of the people who are there in order to say "Congress
2  Park." And that's what I'm objecting to as hearsay.
3  THE COURT: Okay. I'm not persuaded. The association is
4  what's being proved. It doesn't require a truth component.
5  There is no truth component in what the proffer is. So that's
6  overruled.
7  Yes?
8  MR. BEANE: I think you might have just answered my
9  objection. My objection was going to be relevance. What does it
10  help -- I think the last clause of the Court's sentence dealt
11  with that.
12  THE COURT: Okay.
13  (Sidebar discussion concluded.)
14  BY MS. PETALAS:
15  Q.  When you would go to these clubs, did they ever shout out
16  for Congress Park?
17  A.  Yes.
18  Q.  Tell us about that.
19  A.  About the shout-out?
20  Q.  Yes.
21  A.  You know how the bands say everybody neighborhoods? When
22  we first started going to the clubs, we wasn't getting no
23  shout-outs. We wasn't getting no love in the clubs.
24  So I started making it my business to go holler at the
25  dude, one of the dudes in the band, and tell him, "Get us." So

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7585

1   eventually, he started getting us, but it was like he kept

2   forgetting about us.

3        So eventually, I mean, as the years went on, Wop started

4   messing with one of the females in the band and --

5   **Q.**   In which band?

6   **A.**   In Rare Essence.

7   **Q.**   And what happened after that?

8   **A.**   We ain't never have to worry about getting shout-outs no

9   more.

10  **Q.**   And when you said "We wouldn't have to worry about

11  getting shout-outs," who were you referring to?

12  **A.**   All of us who used to go to the club.  Me, Wop, Dazz,

13  Phil, Terrance, Munya, Santu, Jazz.

14  **Q.**   And you said there was a time you stopped going to the

15  club?

16  **A.**   Yes.

17  **Q.**   Prior the that time, how often -- when you're talking

18  about these shout-outs, how often would you go to the clubs?

19  **A.**   Three times a week.

20  **Q.**   And how much money would you spend at the club?

21  **A.**   300, 200.

22  **Q.**   I'm sorry?

23  **A.**   Between 2- and $300.

24  **Q.**   And was that a week or a night?

25  **A.**   A night.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

7586

1   **Q.**   And you talked about Wop.  Did you know where Wop lived?

2   **A.**   Yes.

3   **Q.**   And where did he live?

4   **A.**   1313.

5        MS. PETALAS:  For the record, I'm showing the witness

6   what's in evidence already as Government's Exhibit 101.1.

7   BY MS. PETALAS:

8   **Q.**   Mr. Barnett, if you could just clear the screen.

9        I'm showing you what's marked in evidence as Government's

10  Exhibit 101.1.  Can you see what's referred to as 1313 on there?

11  **A.**   Yes.

12  **Q.**   Could you please point to that.

13  **A.**   (Indicating.)

14  **Q.**   And for the record, you put a dot directly below the two

15  S's in Congress Street; is that correct?

16  **A.**   Yes.

17  **Q.**   And do you see -- do you remember the photograph I showed

18  you earlier that you said was taken in front of the Lincoln?

19  **A.**   Yes.

20  **Q.**   Do you see on this map where that -- where you were in

21  that photograph?

22  **A.**   (Indicating.)

23  **Q.**   For the record, you put an arrow just -- looks like a

24  driveway into a parking lot just to the right of that building,

25  1313; is that correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

7587

1   **A.**   Yes.

2   **Q.**   And you said Wop lived in 1313.  Do you know -- did he

3   live by himself?  With anybody else?

4   **A.**   Yeah, he lived with Dazz sister.

5   **Q.**   And what's Dazz's sister's name?

6   **A.**   Dominique.

7        THE COURT:  Ms. Petalas, we've almost reached the break

8   point.

9        MS. PETALAS:  That's fine, Your Honor.

10       THE COURT:  All right.  Ladies and gentlemen, we'll take

11  our mid-morning break.  It's 10 of 11.  Please come back at

12  11:05.

13       Don't talk about the case.  Leave your notes in the jury

14  room and enjoy your break.

15       (Jury out at 10:49 a.m.)

16       THE COURT:  All right.  Let's excuse the defendants.

17       (Thereupon, a break was had from 10:50 a.m. until 11:07

18  a.m.)

19       (Jury in at 11:07 a.m.)

20  THE COURT:  Good morning again, ladies and gentlemen.

21  THE JURY PANEL:  Good morning.

22  THE COURT:  Welcome back.  We're going to resume.

23  Counsel.

24       MS. PETALAS:  Thank you, Your Honor.

25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

7588

1   **Q.**   Mr. Barnett, if you could clear the screen.  I'm going to

2   show you what's not in evidence as Government's Exhibit 108.59.

3        THE DEPUTY CLERK:  I'm sorry, could you say that again?

4        MS. PETALAS:  Not in evidence, 108.59.

5   BY MS. PETALAS:

6   **Q.**   Do you -- can you see Government's Exhibit 108.59?

7   **A.**   Yes.

8   **Q.**   And what is that?

9   **A.**   Me and Wop at the gas station.

10  **Q.**   Is that a fair and accurate picture?

11  **A.**   Yes.

12       MS. PETALAS:  Your Honor, at this time I move Government's

13  Exhibit 108.59 into evidence.

14       MR. BALAREZO:  Objection.  Foundation, accurate picture of

15  what, Your Honor?

16       THE COURT:  Of him and Wop at the gas station.

17       Overruled.  108.59 will be received.

18       (Government's Exhibit 108.59 admitted into the record.)

19       MS. PETALAS:  Ask permission to publish it.  Thank you.

20  BY MS. PETALAS:

21  **Q.**   And if you could, just point to where you are in the

22  picture.

23  **A.**   (Indicating.)

24  **Q.**   And whose car is that -- and for the record, you are on

25  the right, on the driver's side of the car?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7597**

1  in.

2     Overruled.

3     MR. BALAREZO:  But all of this goes towards what they went

4  to do with Kairi Ball, and if Kairi Ball is dead, then how does

5  this become a part of the conspiracy if they're talking about

6  going to see Kairi Ball so he could do something about the

7  robberies.  So that's why they need to establish a time frame of

8  when the conversation was.

9     MS. WICKS:  And, Your Honor, also because the -- and one

10  of the government's theory as to the creation of the Congress

11  Park conspiracy is that Antwuan Ball is a member of the Edelin

12  organization because of the death of his brother.  That's part of

13  the impetus to sort of separating from the Edelin organization,

14  so the fact that Kairi Ball -- the point of Kairi Ball's death is

15  an important distinction, regardless, I think, of the point of

16  the charged indictment, just in terms of laying the foundation to

17  be a statement in furtherance of this conspiracy, there's

18  apparently evidence that Kairi Ball -- I think there's an

19  assertion by the government to a certain extent, that the

20  Congress Park conspiracy didn't start until after that death and

21  problems with the Edelin organization.

22     THE COURT:  All right.  That's not my understanding.  But

23  in any event, the evidence as I understand it from the

24  government, is that even if that's the case, your theory about --

25  or your explanation about their theory does not exclude time that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7598**

1  occurred between those events.  But this witness testified that

2  he had begun selling drugs with his brother at the time his

3  brother was selling, within the time frame charged in this

4  conspiracy.  I doubt that the government is going to try to

5  elicit from this witness that they were open to go speak to Kairi

6  after he was already dead.

7     MS. WICKS:  And I agree about that, Your Honor, but my

8  concern is, just because someone is being fronted drugs by Kairi

9  and they live in Congress Park and they're selling drugs in

10  Congress Park doesn't mean that they are part of the conspiracy,

11  and that's what the government is basing this on at this point.

12     THE COURT:  I understand that argument.

13     It's overruled.

14     I'll let you ask the questions.

15     (Sidebar discussion concluded.)

16  BY MS. PETALAS:

17  Q.   Can I inquire what my last question was?

18     (Court reporter read back last question as requested.)

19  BY MS. PETALAS:

20  Q.   Mr. Barnett, you were talking about having a conversation

21  with your brother about going to talk to somebody about your

22  robberies.  What was that conversation?

23  A.   I told my brother that I'm not going -- I'm not keeping

24  on going for them dudes keep robbing me.  He was like, don't

25  worry about it.  I'm going to holler at Kay-Bay for you, and he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7599**

1  hollered at Kay-Bay and Kay-Bay called me over there and told

2  me -- he had me right there and had them right there.  He had

3  Drano and Head right there and told them, don't rob me no more,

4  because I got his coke -- meaning, I'm hustling for him, that my

5  money is his money.

6  Q.   And after you had this conversation, did you have any

7  more problems with Drano or Head?

8  A.   Naw.

9  Q.   Mr. Barnett, are you familiar with an individual named

10  Geeka?

11  A.   Yes.

12  Q.   And who is Geeka?

13  A.   An individual that came around there and was hustling,

14  hustling with us.

15  Q.   And did you ever have any problems with Geeka?

16  A.   Naw.  Eventually he had a problem with me.

17  Q.   You said "eventually he had a problem with" you.  When

18  was this?

19  A.   I can't recall the date, but it was like -- it was like

20  he ain't like me for some reason.  I don't know.

21  Q.   You said you can't recall the date.  Was it --

22  Mr. Barnett, are you the same Keith Barnett that was convicted

23  of theft out in Prince George's County?

24  A.   Yes.

25  Q.   In 1998?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7600**

1  A.   Yes.

2  Q.   The problems that you had with Geeka, was that before or

3  after that conviction, if you can recall?

4  A.   I can't recall.

5  Q.   Do you recall, roughly, how old you were at the time?

6  A.   Probably about 19.

7  Q.   And you said he didn't like you.  Did he do anything to

8  make you think he didn't like you?

9  A.   I mean, he -- it's just how he used to just -- I mean,

10  because one, when he came around there, I didn't know who he

11  was, and for him to come on the Savannah side and hustle where

12  we was hustling at, we didn't know who he was, so we --

13     MS. WICKS:  Objection.  No foundation for "we."

14     THE COURT:  Sustained.

15  BY MS. PETALAS:

16  Q.   Well, did you know who he was?

17  A.   Naw, I didn't know who he was.

18  Q.   And earlier, when you said "we," who else were you

19  referring to?

20     MS. WICKS:  Objection.

21     MR. ZUCKER:  Foundation.

22     THE COURT:  I'll let him answer who the "we" is he's

23  referring to, but there will have to be foundation after that

24  before eliciting any further testimony.

25     THE WITNESS:  My brother, Meatball, Quentin.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7601**

1  BY MS. PETALAS:
2  **Q.**    You said your brother.  Yes or no, did you have any
3  conversations with your brother about Geeka?
4  **A.**    No.
5       MS. WICKS:  Same objection as previously, Your Honor.
6       THE COURT:  Overruled.
7  BY MS. PETALAS:
8  **Q.**    You said no?
9  **A.**    No.
10  **Q.**    How about Meatball?  Yes or no, did you have any
11  conversations with Meatball about who Geeka was?
12  **A.**    Yes.
13  **Q.**    And what was that conversation?
14       MS. WICKS:  Objection.
15       MR. ZUCKER:  Objection.
16       THE COURT:  Basis.
17       MR. BALAREZO:  Hearsay, Your Honor, there's been no
18  foundation as to the furtherance aspect.
19       THE COURT:  Overruled.
20       THE WITNESS:  I asked him, did he know who the dude was?
21  He told me naw, and he said he think he be with Twan and them
22  around the circle side.
23  BY MS. PETALAS:
24  **Q.**    And after you have these conversations, do you ever run
25  into Geeka one on one?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7602**

1  **A.**    Yes.
2  **Q.**    And what happens?
3  **A.**    I had previously shot myself in the foot, and I had a
4  cast on, so I was out there selling drugs.
5  **Q.**    And where were you selling drugs?
6  **A.**    On Savannah Street.  So, a sale was coming to my car, and
7  he was like, naw, Shorty, I got that sale.
8  **Q.**    Who said that?
9  **A.**    Geeka said that.
10  **Q.**    And what happened after he said that?
11  **A.**    So I said, man, I don't know who you talking to.  I don't
12  know you.  You don't know me.  Then we got to arguing.  He said
13  some words.  I said some words.  Then he pulled out a gun and
14  smacked me with the gun.
15  **Q.**    And what, if anything, did you do when he smacked you
16  with the gun?
17  **A.**    By the time I went to my car, he ran through the alley.
18  **Q.**    And you said by the time you went to your car.  Why did
19  you go to your car?
20  **A.**    Because I was ready to pull off and go clean my face up.
21  **Q.**    You said clean your face up?
22  **A.**    Yes.
23  **Q.**    Did you have an injury?
24  **A.**    Yes.
25  **Q.**    What was that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7603**

1  **A.**    Above my eye, it was split open.
2  **Q.**    And did you ever have any conversations with Geeka after
3  this incident?
4  **A.**    No.
5  **Q.**    Did you ever have any more problems with Geeka?
6  **A.**    No.
7  **Q.**    Why is that?  Did you ever see Geeka again after this?
8  **A.**    Yes.
9  **Q.**    And what happened when you saw Geeka again?
10  **A.**    He came to me like a couple months later and apologized
11  to me and said he didn't know who I was.  He apologized to me.
12  **Q.**    Before you talked about an individual, Meatball.  Were
13  you close with Meatball?
14  **A.**    Yes.
15  **Q.**    And do you know whether or not Meatball is alive or dead?
16  **A.**    He's deceased.
17  **Q.**    And how long ago did he die?
18  **A.**    In '96.
19  **Q.**    And were you with him on the day that he died?
20  **A.**    Yes.
21  **Q.**    Do you know Meatball's real name?
22  **A.**    Darryl Gibson.
23  **Q.**    What were you doing with -- you said you were with him on
24  the day that he died.  Tell us about that.  What was he doing?
25  **A.**    His birthday was on October 15th, and he got killed

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7604**

1  October 26th.  From his birthday on the 15th, all the way to the
2  night he got killed, we was partying, and the night he got
3  killed, me and him was in a car.  We just came back from a strip
4  club, and both of us was drunk, so I dropped him off, told him
5  to go in the house, man, I see you tomorrow.  He was like, naw,
6  I ain't going to go in the house.  I'm going to stand out here
7  with Tony and Red Eye, because they was right there when he was
8  about to go in the house.
9  **Q.**    You said he was going to stand out there with Tony and
10  Red Eye?
11  **A.**    Yes.
12  **Q.**    And who's Tony?
13  **A.**    An individual who was selling drugs out there with us --
14  with me.
15  **Q.**    Did he have another -- do you know his full name?
16  **A.**    Tony Forte.
17  **Q.**    Did he have another nickname?
18  **A.**    Big Head Tony.
19  **Q.**    And you said Tony and Red Eye?
20  **A.**    Yes.
21  **Q.**    Is Red Eye the individual that you talked about
22  earlier --
23  **A.**    Yes.
24  **Q.**    -- that you got cocaine from?
25  **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7605

1   **Q.** Did you ever sell cocaine with Red Eye?
2   **A.** Yes.
3   **Q.** And just to clarify, did Red Eye have a father or son?
4   **A.** Yeah, Red Eye had a father. That's Big Red Eye. I'm
5   talking about Little Red Eye.
6   **Q.** So the Red Eye you've been referring to is Little Red
7   Eye?
8   **A.** Little Red Eye.
9       MS. PETALAS: Court's indulgence.
10  BY MS. PETALAS:
11  **Q.** Mr. Barnett, if you could clear the screen again. And
12  I'm showing you what's in evidence as Government's Exhibit
13  100.1.
14      And, again, just for the record, do you recognize that?
15  **A.** Yes.
16  **Q.** And you were talking about -- you said you dropped off
17  Meatball. Where was that that you dropped him off?
18  **A.** (Indicating).
19  **Q.** For the record, you put a red arrow just a little bit
20  above the intersection of -- well, Savannah Street, and it looks
21  like an alley to the right of 13th Street; is that correct?
22  **A.** Yes.
23  **Q.** Is that -- did you drop him off above that intersection
24  or at that intersection?
25  **A.** I dropped him off, like, right before that alley.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7606

1   **Q.** Right before the alley --
2   **A.** Where the last housing complex at.
3   **Q.** Okay. And did you see -- when you dropped him off, did
4   you see Tony there?
5   **A.** Yes.
6   **Q.** Did you see Red Eye?
7   **A.** Yes.
8   **Q.** And what did you -- what happened when you dropped him
9   off?
10  **A.** I told him, go in the house. He told me he going to
11  stand out there with them and sell his drugs. I told him, man,
12  he too drunk, man, go in the house. So, Red Eye and Tony was
13  like, they got him, so I was like, all right. I told him I see
14  him tomorrow, and I went in the house. By the time I was going
15  in my door, I heard the shots. I ain't pay no attention to it,
16  I just went in the house.
17  **Q.** You said you heard shots?
18  **A.** Yes.
19  **Q.** And how many shots did you hear?
20  **A.** About four.
21  **Q.** You said you went in the house. What did you do then?
22  **A.** I went to sleep.
23  **Q.** What happened the next -- what happened the next day?
24  **A.** I got a call in the morning. They woke me up and said
25  little Darryl got killed last night.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7607

1   **Q.** Who called you?
2   **A.** His little cousin called me.
3   **Q.** And after you got a call, after you got this call that
4   morning, what did you do?
5   **A.** I went down to his grandmother's house.
6   **Q.** And what did you do when you went down to the
7   grandmother's house?
8   **A.** I learned that little Darryl got shot, the first shot,
9   and Tony got shot on the second two shots.
10      MR. BALAREZO: Your Honor, objection again. Foundation.
11  Hearsay.
12  BY MS. PETALAS:
13  **Q.** Was there anybody else at his grandmother's house?
14  **A.** Naw.
15  **Q.** Okay. Without telling us, then, what you learned from
16  the grandmother, what did you do after that? Did you have a
17  conversation with the grandmother?
18  **A.** Yes.
19  **Q.** And based on that conversation, did you go anywhere that
20  day?
21  **A.** No.
22  **Q.** Did you ever go to the hospital?
23  **A.** No.
24  **Q.** You said Tony. Did you ever talk to Tony after this
25  incident?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7608

1   **A.** Yes.
2   **Q.** And where was that?
3   **A.** When he came out the hospital.
4   **Q.** Did Tony tell you what happened?
5   **A.** Yes. He told me that --
6       MR. BALAREZO: Objection. Same reason.
7       THE COURT: What's that?
8       MR. BALAREZO: Same reasons. Hearsay, 602.
9       THE COURT: Well, do you want to rephrase or approach?
10      MS. PETALAS: If we can approach, Your Honor.
11      THE COURT: Come on.
12      (Following sidebar discussion had on the record:)
13      THE COURT: I think it's both a hearsay and a foundation.
14  I'm not sure what the foundation problem is, but what is the
15  hearsay answer?
16      MS. PETALAS: That big Tony is -- Tony is somebody that he
17  sold with, and I can elicit more, that he participated indoors
18  with him. He's going to tell him about -- I mean, he's going to
19  tell him that they thought it was 10th Place, which goes into
20  later his state of mind, as far as what this witness is going to
21  testify about the D-Lock murder, that he drove there as part of
22  the beef. I argue that this is a statement in furtherance of the
23  conspiracy, that they're letting them know that this was at the
24  10th Place that they came by and shot at him. I also think it's
25  his state of mind exception, because he learns from somebody,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7609

1  regardless of whether or not it was 10th Place. I would even
2  argue it's not hearsay. Because I'm -- the relevance of it is a
3  year later he is participating in this murder, retaliating
4  against 10th Place, based on what he heard, regardless of whether
5  or not it's true. We're not trying to prove that D-Lock or 10th
6  Place killed his friend, but we're trying to prove this was part
7  of a beef that he heard about through somebody he sold drugs with
8  in Congress Park.
9      THE COURT: So you're not offering it to prove the truth?
10     MS. PETALAS: No, the fact that D-Lock killed -- right,
11 the fact that 10th Place and D-Lock is the person who killed
12 Meatball is not something that we have to prove. What's
13 probative is what's in his mind, that this is part of a beef
14 that's going on which is considered retaliation. But even if it
15 was part of the truth, I would argue it's furtherance of the
16 conspiracy, that 10th Place is -- the guy he's selling drugs with
17 in Congress Park has been indoors and he's telling him 10th Place
18 came down and got one of our guys.
19     MR. ZUCKER: Can we consult?
20     THE COURT: Yes.
21     MR. ZUCKER: Your Honor, the problem I'm having with this
22 is that the government is eliciting a lot of information up front
23 without connecting the dots, and I know they can do that later,
24 but there should be at least a minimal connecting at this point,
25 because you know if this information comes out or other

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7610

1  information like this comes out, and then later they don't
2  connect it up, then this stuff is out there already. So there
3  needs to be a little order in the way they're presenting this
4  case. I know it's a long case and a lot of evidence to come out,
5  but, you know, basically, what Ms. Petalas is saying is we want
6  to get this out because we're going to go X, Y, Z, God knows
7  when, and it's prejudicial, because the information just sits out
8  there.
9      THE COURT: So that's different from the foundation
10 objection that you lodged.
11     MS. WICKS: Your Honor, I'm making the same objection to
12 Big Tony as --
13     THE COURT: To foundation?
14     MS. WICKS: Well --
15     THE COURT: I'm asking about foundation. Do I have to
16 address foundation? Is that still being asserted?
17     MR. BALAREZO: No, not from me.
18     THE COURT: Go ahead. You're joining Mr. Balarezo's
19 objection?
20     MS. WICKS: I'm joining Mr. Balarezo's objection. And the
21 problem with the co-conspirator statement is that -- on behalf of
22 Mr. Wilson and similar to the statements from Kevin Barnett
23 through Keith Barnett, just because someone's in Congress Park
24 selling drugs does not mean they're a member of this conspiracy,
25 and that's what we're getting about Tony Forte now.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7611

1      And, obviously, just because you -- if you don't play
2  doors, apparently you're still a member of the conspiracy because
3  this testimony from this witness is that my client didn't play
4  the game, but --
5      THE COURT: Well, that doesn't get around the government's
6  argument that whether or not the assertion of a particular
7  individual did the shooting isn't relevant. What it's relevant
8  to is the motivation for the continuing beef, pre-existing beef
9  or continuing beef.
10     MS. WICKS: But the problem with that with this witness is
11 that this witness, in his proffer, is he essentially -- he claims
12 that he is essentially told by -- Munya and LT essentially
13 urged -- to go drive the car down there, urged to do that,
14 because it's his friend that got killed and that's personal.
15 That doesn't have to do with a beef, that has to do with his
16 personal feelings about his best friend getting killed, so I'll
17 continually object to this.
18     THE COURT: Anything else?
19     MS. WICKS: No.
20     THE COURT: Overruled.
21     (Sidebar discussion concluded.)
22 BY MS. PETALAS:
23     Q.  Mr. Barnett, I believe you were telling us about a
24 conversation that you had with Tony about the shooting; is that
25 correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7612

1      A.  Yes.
2      Q.  And tell us what that conversation was.
3      A.  He told me that little Darryl got shot, first shot. He
4  got shot on the second, the second and third shot, and that a
5  burgundy Camry came through there and just started shooting, a
6  drive-by on them, and that he recognized one of the dudes in the
7  car that was a -- D-Lock, a little dude who was from down the
8  hill, down on Trenton, around 10th Place.
9      Q.  And did you know who D-Lock was?
10     A.  Yes.
11     Q.  And just yes or no, had you heard -- prior to this
12 incident, had you heard of problems between people on Trenton
13 Place and people on Congress Park?
14     A.  Yes.
15     Q.  And who were some of the -- who had you heard about those
16 problems with?
17     MR. ZUCKER: Objection to the form of that question.
18     THE COURT: Overruled as to that question.
19     THE WITNESS: Repeat the question.
20 BY MS. PETALAS:
21     Q.  If you could just tell us -- you said you heard of some
22 comments -- well, you heard of some problems.
23     Just names only, who were some of the people you heard
24 about, the problems with between Trenton Place and Congress
25 Park?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7613

1    MR. ZUCKER: I object to only -- on confusion. Is it who
2    have you heard it from, or who have you heard it about?
3        THE COURT: Do you want to repeat the question?
4        MS. PETALAS: Yes.
5    BY MS. PETALAS:
6    Q.    You had said that you had heard about problems between
7    Trenton Place and Congress Park before, correct?
8    A.    Yes.
9    Q.    And who are some of the people you had heard about those
10   problems from?
11       THE COURT: The question ended with from?
12       MS. PETALAS: Yes.
13   BY MS. PETALAS:
14   Q.    From whom have you heard some of those problems about?
15   A.    I heard through Munya. Munya had told me that they've
16   been beefing back and forth with -- down at 10th Place
17   because --
18       MR. BALAREZO: And Your Honor, objection as to the "they,"
19   then.
20       THE COURT: Overruled.
21   BY MS. PETALAS:
22   Q.    You said Munya said there was beefing back and forth.
23   Continue what you were saying.
24   A.    Because Head had went down there and robbed an individual
25   down there and they came up there -- I mean, it was like a back

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7614

1    and forth thing was going on. I guess I could call it
2    beefing --
3        MR. MARTIN: Objection.
4        THE WITNESS: -- between 10th Place and Congress Park.
5        THE COURT: When there's an objection, I need to hear it.
6        MR. BALAREZO: With respect to "guess," we're in
7    speculation.
8        THE COURT: Overruled. That's a colloquialism. Go ahead.
9    BY MS. PETALAS:
10   Q.    You said you would call it what?
11   A.    Beefing between 10th Place and Congress Park.
12   Q.    You said Munya told you Head had robbed an individual?
13   A.    Yes.
14   Q.    Did he tell who you that individual was?
15   A.    Yes.
16   Q.    And who was that?
17   A.    One of the Twins.
18   Q.    Did you ever have a conversation or overhear a
19   conversation with Jazz about this beefing, as you call it?
20   A.    Yes.
21   Q.    And tell us about that.
22   A.    Jazz used to hang down 10th Place, and when the beefing
23   was going on, it was a couple of individuals who was telling
24   him.
25       MR. ZUCKER: Objection.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7615

1        THE COURT: Is this what Dazz (sic) is telling you?
2        THE WITNESS: Naw. I said --
3        THE COURT: Sustained.
4    BY MS. PETALAS:
5    Q.    Were you ever with Jazz when he was having a conversation
6    about --
7    A.    Yes.
8    Q.    And tell us what Jazz said during that conversation.
9        MR. ZUCKER: Objection to what Jazz said about other
10   unidentified individuals as only within the exception.
11   BY MS. PETALAS:
12   Q.    I'll clarify.
13   Who was Jazz talking to?
14   A.    Naw, somebody was talking to Jazz.
15   Q.    And who was it that was talking to Jazz?
16   A.    His brother.
17   Q.    Which brother?
18   A.    Santu.
19   Q.    And what did Santu say to Jazz?
20       THE COURT: Well, were you present?
21       THE WITNESS: Yes, I was in the car with Jazz.
22       THE COURT: I'm sorry, go ahead.
23       THE WITNESS: I was in the car with Jazz and Santu had
24   came to the car and was like, man, you need to stop hanging down
25   there, because Head just robbed the dude down there, and it's

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7616

1    going to cause some problems, so you need to stay from down
2    there.
3    BY MS. PETALAS:
4    Q.    You talked about Head. Who's Head?
5    A.    An individual I grew up with.
6    Q.    Is this the same Head you were referring to that had
7    robbed you when you -- that had robbed you?
8    A.    Yes.
9    Q.    You said you grew up with him?
10   A.    Yes.
11   Q.    Was Head from Congress Park?
12   A.    Yes.
13   Q.    Did you ever see Head selling drugs in Congress Park?
14   A.    No.
15   Q.    Is Head -- do you know whether or not Head is alive or
16   dead today?
17   A.    Deceased.
18   Q.    And do you know when he died?
19   A.    I don't recall the date.
20   Q.    Was it before or after Meatball was killed?
21   A.    Before.
22   Q.    And how long before, if you know?
23   A.    Probably a year, year or two.
24   Q.    When you said there were problems going back and forth,
25   what are you talking about? When you were talking about the

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

### 7617

1 beef, the beefing, what were the problems going back and forth?

2     MR. ZUCKER: Objection, basis.

3     THE COURT: Sustained.

4 BY MS. PETALAS:

5 **Q.** Well, did you ever -- I'm going to jump forward a little

6 bit to January 19th, 1998. Do you recall that date?

7 **A.** Yes.

8 **Q.** And did you see Munya on that day?

9 **A.** Yes.

10 **Q.** And tell us about that. What happened on that day?

11 **A.** I was sitting in the alley in my car.

12 **Q.** Which alley?

13 **A.** Savannah Street alley. I was sitting in my car smoking,

14 and Munya walked up to my car and told me that he trying to go

15 down the hill and get some weed.

16     So I said, "All right."

17     So he say, "Go pick up L first."

18     I was like, "All right." I picked up L, and then when LT

19 got in the car, he had a gun in his hand and I said, where you

20 going with that?

21     So Munya was like, "Man, we about to go down the hill,

22 man, and see D-Lock -- and see D-Lock and the Twin."

23 **Q.** Okay.

24 **A.** The Twin had killed Head -- supposed to have killed Head.

25 **Q.** Okay. Let me stop you right there. I'll show you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 7618

1 Government's Exhibit 105.1, which is in evidence.

2     And Mr. Barnett, if you could just clear the screen

3 again. I'm showing you what's in evidence as Government's

4 Exhibit 105.1.

5     Do you recognize that?

6 **A.** Yes.

7 **Q.** And what is that?

8 **A.** That's Congress Park.

9 **Q.** Okay.

10 **A.** And a little bit of 10th Place.

11 **Q.** And you talked about, you were in an alley. Which alley

12 were you in?

13 **A.** (Indicating).

14 **Q.** And for the record, you're pointing to -- it's actually a

15 building you're pointing to, right there. Is that right above

16 an alley that's parallel and just above Savannah Street --

17 in-between Savannah and Congress Street; is that correct?

18 **A.** Yes.

19 **Q.** And that alley, just below the arrow, is that the alley

20 you're referring to?

21 **A.** Yes.

22 **Q.** Were you by yourself in the car?

23 **A.** Yes.

24 **Q.** Do you recall whether or not there were other people in

25 that alley at all?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 7619

1 **A.** Not that I recall.

2 **Q.** And you said you went to go pick up L. Where is L?

3 **A.** (Indicating).

4 **Q.** And for the record, you put an arrow on Savannah Street,

5 about a block to the right of the intersection of 13th and

6 Savannah Street, near that alley; is that correct?

7 **A.** Yes.

8 **Q.** Okay. Where is Munya in the car?

9 **A.** Where he sitting at?

10 **Q.** Yes.

11 **A.** In the back.

12 **Q.** And you said Munya got -- who got in the car first?

13 **A.** Munya got in the car first.

14 **Q.** Okay. And again, now tell us when Munya gets in the car,

15 what's the first conversation you have with him?

16 **A.** Going down the hill to get some weed.

17 **Q.** Going down where?

18 **A.** Down 10th Place, to get some weed.

19 **Q.** And then what happens after Munya gets in the car? When

20 you start picking up L, when is -- just tell us what happens

21 after Munya gets in the car and you have the conversation about

22 getting weed?

23 **A.** He told me to go pick up L, because L got some money on

24 the weed, so I went around the corner and picked up L. And when

25 L got in the car, he had a gun in his hand. I asked him, where

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 7620

1 he going with that? He said, "I'm just going down the hill. I

2 got to keep my gun with me, you know."

3     So I said "All right."

4     So when he got in the car, then L started talking.

5 Man -- then again, "The dude Twin might be out there, let's go

6 ahead and ride down there and see what's up."

7     First I was like "Naw, I ain't trying to go." Then he

8 started stressing.

9     "Man, one of them dudes killed Meatball."

10     So then I said "Fuck it, let's go ahead down there."

11     And we went down there. We went down there. As soon as

12 we pulled up --

13 **Q.** Are you driving?

14 **A.** Yes, I'm driving. When I pulled up, I don't recall which

15 one said, "There go his man right there."

16     So I pulled over. When I pulled over, the back door

17 opened first. Once the back door opened, that's when I heard

18 all these shots.

19 **Q.** And where are you, at this point?

20 **A.** I'm in the driver's seat.

21 **Q.** And where is the car?

22 **A.** Not in the middle of the street, but it's pulled to the

23 side so that cars can still get past.

24 **Q.** And which street is that?

25 **A.** On Trenton Street.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   Can you see that on the map?
2   **A.**   Yes.
3   **Q.**   Can you show us where on the map that is?
4   **A.**   (Indicating).
5   **Q.**   For the record, you placed an arrow above the L in
6   Trenton Place; is that correct?
7   **A.**   Yes.
8   **Q.**   And is that where on Trenton Place you were?
9   **A.**   Yes, a little bit up at the last building, though.
10   **Q.**   You said "a little bit up at the last building"?
11   **A.**   Yeah.  Right here (indicating).
12   **Q.**   Okay.  For the record, you now put an arrow just to the
13   right of that; is that correct?
14   **A.**   Yes.
15   **Q.**   And you said that Munya got in the car first?
16   **A.**   Yes.
17   **Q.**   And so it was you and Munya who went to go pick up LT?
18     MR. ZUCKER:  Objection leading.
19     THE COURT:  Sustained.
20   BY MS. PETALAS:
21   **Q.**   So, who's in the car when you go to pick up LT?
22   **A.**   Me and Munya.
23   **Q.**   Is anybody else in the car?
24   **A.**   No.
25   **Q.**   And where is Munya sitting?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **A.**   In the back.
2   **Q.**   And what happens, then, when you -- you said you get to
3   Trenton Place.  Do you see -- and who do you see when you get to
4   Trenton Place?
5   **A.**   I seen a lot of dudes in front of this hallway -- in
6   front of this building.
7   **Q.**   And you talked about the conversation that you had on the
8   way over to Trenton Place.  Was that -- who was part of that
9   conversation?  Was Munya part of that conversation?
10   **A.**   Yes.
11   **Q.**   And was L part of that conversation?
12   **A.**   Yes.
13   **Q.**   And who's L?
14   **A.**   An individual who used to sell drugs with me.
15   **Q.**   Does he go by any other names?
16   **A.**   LT.
17   **Q.**   And you said they referred to Meatball; is that correct?
18   **A.**   Yes.
19   **Q.**   Who was closer to Meatball, of the three of you?
20   **A.**   Me.
21   **Q.**   And who was closer to Head, out of the three of you?
22     MR. ZUCKER:  Objection, assumes facts not in evidence.
23   BY MS. PETALAS:
24   **Q.**   Well, did you know whether -- yes or no, do you know
25   whether or not Munya was close to Head?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **A.**   Yes.
2   **Q.**   How do you know that?
3   **A.**   They used to be together.
4   **Q.**   Same question for LT.  Yes or no, do you know whether or
5   not LT was close to Head?
6   **A.**   Naw, not really.
7   **Q.**   No, you don't know or, no, they weren't that close?
8   **A.**   I don't know how close they was.
9   **Q.**   And what happens once you -- you said the door opens and
10   you hear gunshots?
11   **A.**   Yes.
12   **Q.**   And what happens -- how many gunshots do you hear?
13   **A.**   About 20.
14   **Q.**   And where were you when you heard these gunshots?
15   **A.**   Sitting in the car.
16   **Q.**   Did you have a gun with you that day?
17   **A.**   No.
18   **Q.**   Yes, no, do you know if Munya had a gun with him that
19   day?
20   **A.**   Yes.
21   **Q.**   Did you see him with a gun?
22   **A.**   Yes.
23   **Q.**   And what happens when you hear the 20 gunshots?  What are
24   you doing at that point?
25   **A.**   Well, when they get out the car, I was looking at them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   Once they got out the car, they was just shooting, so --
2   **Q.**   Did you see both of them shooting?
3   **A.**   Naw, I didn't see both of them shoot.
4   **Q.**   Who did you see shooting?
5   **A.**   I seen LT shooting.
6   **Q.**   At -- where was your attention focused when they first
7   get out the car?
8   **A.**   Straight ahead.
9   **Q.**   And why were you looking straight ahead?
10   **A.**   Because I ain't -- I mean, the car had -- it was tinted
11   window on the car, but I ain't want to be seen.
12   **Q.**   And what was going through your mind at that point?
13   **A.**   What I got myself into?
14   **Q.**   What do you mean by what do you have yourself into?
15   **A.**   Meaning that I'm on the scene where somebody getting
16   killed, basically.
17   **Q.**   And prior to the time -- you talked about a conversation
18   where they were talking about Meatball.  Did you have that
19   conversation prior to the time you got to Trenton Place?
20   **A.**   Yes.
21   **Q.**   From that point, did you have an idea of what they were
22   going to do?
23   **A.**   Yes.
24   **Q.**   So you said you were looking straight ahead.  What, if
25   anything, do you see?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**7625**

1  **A.**   Once Munya ran back to the car, once he opened the door
2  and was trying to get back in, that's when I looked and noticed
3  that LT was standing over the top of D-Lock shooting him.
4  **Q.**   And you said LT was standing over the top of D-Lock?
5  **A.**   Yes.
6  **Q.**   And what was D-Lock doing?
7  **A.**   He was laying on the ground.
8  **Q.**   And how close was LT to D-Lock when he was laying on the
9  ground?
10  **A.**   How close was he up on him?
11  **Q.**   Yes.
12  **A.**   He was standing right over the top of him.
13  **Q.**   And when he was standing over the top, did -- was
14  D-Lock -- could you see D-Lock moving at all?
15  **A.**   No.
16  **Q.**   And was he still shooting at this point?
17  **A.**   Yes.
18  **Q.**   When you first pulled up in Trenton Place, you said you
19  saw some individuals in front of the building. Approximately
20  how many people did you see in front of the building?
21  **A.**   About seven.
22  **Q.**   And where -- when you saw -- you talked about seeing
23  D-Lock on the ground. Were any of these other individuals you
24  had seen around D-Lock at that point?
25  **A.**   No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7626**

1  **Q.**   Had you seen where they had gone?
2  **A.**   They ran in the building and locked the door and D-Lock
3  tried to get in the building, but they locked the door, and he
4  tried to run around the back, and that's when he fell.
5  **Q.**   And did you see D-Lock fall?
6  **A.**   Yes.
7  **Q.**   And where was -- could you see Munya at this point when
8  you saw D-Lock fall?
9  **A.**   No.
10  **Q.**   And what happens then, when you see -- well, you said you
11  see LT. Can you see --
12  MR. ZUCKER: Objection. Unless I'm mistaken, I don't
13  think that was --
14  THE COURT: Let her put a question.
15  BY MS. PETALAS:
16  **Q.**   When you saw D-Lock on the ground and LT over him,
17  what -- how was LT's body positioned compared to you? Could you
18  see his side, his back, his face?
19  **A.**   His side.
20  **Q.**   Could you see the gun?
21  **A.**   Yes.
22  **Q.**   You talked about Twin before. Do you know who Twin is?
23  **A.**   Yes.
24  **Q.**   Did you see Twin out there?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7627**

1  **Q.**   And you talked about Twin. Is there one or two Twins?
2  **A.**   It's two.
3  **Q.**   Did you know which Twin it was?
4  **A.**   No.
5  **Q.**   And who came back to the car first?
6  **A.**   Munya.
7  **Q.**   And how long after that does Munya come back?
8  **A.**   Probably about ten seconds after that.
9  **Q.**   And how long -- how long was it from the time that you
10  pulled up and stopped at Trenton Place to the time that LT and
11  Munya get back in the car?
12  **A.**   About three minutes.
13  **Q.**   And what happens when LT gets back in the car?
14  **A.**   He got in the car. I pulled off. As soon as I pulled
15  off, he asked Munya, did he get his man?
16  Munya, he say, he "don't know."
17  He said, "Well, I got my man."
18  **Q.**   And did you say anything at this point?
19  **A.**   Naw.
20  **Q.**   And what did you do once LT and Munya got back in the
21  car?
22  **A.**   What did I do?
23  **Q.**   Yes.
24  **A.**   I pulled off.
25  **Q.**   And where did you go?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7628**

1  **A.**   I drove down Barry Farms.
2  **Q.**   And why did you drive down to Barry Farms?
3  **A.**   I don't recall which one of them, but one of them said
4  drive down there.
5  **Q.**   Why didn't you just go back to Congress Park?
6  **A.**   I don't know.
7  **Q.**   And what car were you driving?
8  **A.**   My car.
9  **Q.**   What kind of car was that?
10  **A.**   A gray LTD station wagon.
11  **Q.**   And where had you gotten that car?
12  **A.**   I bought it from Munya.
13  **Q.**   And how long had it been since you had bought the car
14  from Munya, before?
15  **A.**   Probably about a week and a half.
16  **Q.**   And what happened when you went down to Barry Farms?
17  **A.**   We seen -- we seen a couple little dudes out there, and
18  they jumped -- they jumped out --
19  **Q.**   You said they "jumped out." Who jumped out?
20  **A.**   Munya and LT -- all three of us got out the car, and
21  Munya was telling the little dude, Alvin, that they needed to
22  stash the car or something, and he told us to park it around the
23  back. He told me and Munya to --
24  MR. ZUCKER: Objection. Alvin is saying this?
25  THE COURT: Who's speaking now?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7629

1  THE WITNESS: Alvin.
2  MS. PETALAS: Your Honor, it's not offered for the truth
3  of the matter asserted.
4  THE COURT: Anything else?
5  MR. ZUCKER: It makes a difference.
6  THE COURT: Why don't you approach?
7  (Following sidebar discussion had on the record:)
8  THE COURT: What little has come out so far appears to be
9  an instruction from the little dude to go park a car somewhere.
10  What is the truth -- is that what the witness is going to say?
11  MS. PETALAS: Yes.
12  THE COURT: And what is the truth component?
13  MR. ZUCKER: That the little dude said go park the car
14  somewhere. That's what they did.
15  THE COURT: Beg your pardon?
16  MR. ZUCKER: That they followed the little dude's
17  instruction, I think.
18  MS. PETALAS: It's not an assertion.
19  THE COURT: Correct. It's not an assertion. It's a
20  direction. There's no truth involved, if that's what's going to
21  happen.
22  MS. PETALAS: Yes.
23  THE COURT: I'll overrule the objection. If there's
24  something more than that, I'm sure I'll hear from you.
25  BY MS. PETALAS:

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7630

1  Q.  What did the little dude tell you?
2  A.  He told us to park the car in the alley. So I parked the
3  car in the alley, came back around the front side, and they was
4  saying -- and --
5  MR. ZUCKER: Objection.
6  MS. WICKS: Objection.
7  THE WITNESS: -- and Al.
8  THE COURT: Hold on a second. When there's an objection,
9  I need to hear it before you answer.
10  Did you object?
11  MR. ZUCKER: I objected to the "they" being an unknown
12  declarant, and I think the witness was actually trying to
13  establish who the declarant was.
14  MS. PETALAS: I can follow up and see who the "they" is,
15  then.
16  THE COURT: Re-approach it, then.
17  BY MS. PETALAS:
18  Q.  You said "they" were saying. Who's "they"?
19  A.  Alvin and a couple other little dudes out there. I
20  wasn't too sure about they names, but I knew Alvin. And he
21  said --
22  THE COURT: Just a minute.
23  MS. WICKS: Objection.
24  MR. ZUCKER: Ask to approach for a proffer.
25  THE COURT: Well, we've stopped the answer, but you can

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7631

1  put your next question.
2  BY MS. PETALAS:
3  Q.  I'll put the next question.
4  After you had this conversation with Alvin, without
5  telling us what it is he said, did Munya say anything?
6  A.  To me?
7  Q.  Well, did he say -- yes, or to LT?
8  A.  He told -- he got the gun from LT and gave them the guns.
9  He gave Alvin the gun -- both of the guns that they had, and
10  told him, hold them.
11  Q.  Did you see this?
12  A.  Yes.
13  Q.  Had you met Alvin -- this Alvin before?
14  A.  Yes, I used to go to school with him.
15  Q.  I'm sorry, what?
16  A.  I used to go to school with him.
17  Q.  And based on your observations between Munya and Alvin,
18  did Munya appear to know Alvin?
19  A.  Yes.
20  Q.  And how about L?
21  A.  No.
22  Q.  And you said there were other individuals with Alvin?
23  A.  Yes.
24  Q.  Approximately, how many?
25  A.  Two.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7632

1  Q.  Had you seen those individuals before?
2  A.  Yes.
3  Q.  Do you know their names?
4  A.  No.
5  Q.  And -- what happens after you see Munya give Alvin the
6  guns?
7  A.  Alvin told one of his little friends to go.
8  MR. ZUCKER: Objection.
9  BY MS. PETALAS:
10  Q.  Without telling us what Alvin said, what did you do --
11  what happened after -- well, who did Alvin have a conversation
12  with?
13  A.  One of his friends.
14  Q.  And after that conversation, what happens?
15  A.  A car pulled up and they got in it and was like, come on,
16  we going back around the way.
17  I told them naw, go ahead.
18  Q.  You said a car pulled up. Did you see who was driving
19  the car?
20  A.  One of Alvin's buddies.
21  Q.  Did you know his name?
22  A.  Naw.
23  Q.  You said they got in. Who got into the car?
24  A.  Alvin's buddy, Munya, LT.
25  Q.  And who was it that told you to get in the car?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7633

1   A.   Munya.
2   Q.   And where did he say they were going?
3   A.   Back around the park.
4        MR. ZUCKER:  Objection -- actually, withdrawn.
5   BY MS. PETALAS:
6   Q.   Where did Munya say they were going?
7   A.   Back around the park.
8   Q.   And you said you didn't get in the car with them,
9   correct?
10  A.   Right.
11  Q.   Why was it that you didn't get in the car with them?
12  A.   I ain't want to be around them -- I ain't want to be
13  around them after what I just witnessed.
14  Q.   And what do you mean by that?
15  A.   Meaning, they just did a shooting and I ain't really want
16  to be around them, so I told them to go ahead and I get around
17  there on my own.  I see them later.
18  Q.   And do you recall how you got back to Congress Park?
19  A.   Yes.  I got on the subway.
20  Q.   Was that that same day?
21  A.   Yes.
22  Q.   And did you see Munya after that?
23  A.   Yes.
24  Q.   Was that the same day or the next day?
25  A.   Same day.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7634

1   Q.   Did you see L after that?
2   A.   Yes.
3   Q.   And when was that?
4   A.   Same day.
5   Q.   And when you saw them, where did you see them next
6   time, that same day?
7   A.   On Congress Street.
8   Q.   And did you have a conversation about the -- what had
9   just happened?
10  A.   Naw.  Munya came to me and told me to see if I can get --
11  see if I can get my brother a car, so we can go burn the car up
12  that we just was in, the gray station wagon.  And I told him,
13  hold fast, because I don't know where my brother at, so I got to
14  wait till he come around, wherever he at.  When he came around,
15  I got the car.
16  Q.   And when did your brother come around, that day or the
17  next?
18  A.   The next day.
19  Q.   And why is it that you are going to go with Munya to burn
20  the car?
21  A.   Because it was my car.
22  Q.   If it was your car, why did you want to burn it?
23  A.   Because it was just involved in a murder.
24  Q.   Okay.  So did you get your brother's car?
25  A.   Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7635

1   Q.   And what kind of car was that?
2   A.   A silver Thunderbird.
3   Q.   And what happens when you get your brother's car?
4   A.   We went to the gas station first, got some gas, went
5   down -- went down to Farms.
6   Q.   You said you got some gas, you got some gas for your car
7   or what do you mean?
8   A.   Naw, I had a jug and we put some gas in, and then we went
9   back down to the Farms and Munya got in the station wagon and I
10  followed him.  He drove way over northeast somewhere and pulled
11  over.  When he pulled over, I kept going, but I stopped in front
12  of him some.  And I was watching through the rearview mirror.
13  He poured the gas in the car while he was still in the car and
14  lit the fire while he was still in the car and jumped out and
15  his shirt was on fire, ran, put it out and got in the car with
16  me and we pulled off.
17       THE COURT:  Ms. Petalas, we're going to have to break in a
18  minute or two, did you want to put one more question or two?
19       Ladies and gentlemen, there's a matter I'm going to need
20  to attend to, so we're going break a little bit early for lunch
21  today, it's about 10:20.  Let me ask you to come back at 1:35
22  ready to resume.  Please take your notes into the jury room and
23  leave them there and don't talk about the case.  Enjoy your
24  lunch.
25       (Jury out at 12:18 p.m.)

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

7636

1        THE COURT:  All right.  We'll see you at 1:35.
2        (Thereupon, a luncheon recess was had beginning at
3   12:18 p.m.)
4
5        **C E R T I F I C A T E**
6
7        I, Scott L. Wallace, RDR-CRR, certify that the
    foregoing is a correct transcript from the record of proceedings
    in the above-entitled matter.
8
9        ----------------------------
    **Scott L. Wallace, RDR, CRR**
10       **Official Court Reporter**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

Page 7679

1 Q.  And what did you tell?

2 A.  That we about to go with the 15th Place dudes to get some

3 jackets.

4         MR. CARNEY:  Your Honor, can I have a time period for

5 this?

6         THE COURT:  Sorry?

7         MR. CARNEY:  A time period for this.

8 BY MS. PETALAS:

9 Q.  Do you remember roughly how old you were when this took

10 place?

11 A.  No, I don't.

12 Q.  You talked about earlier that you're the same Keith Barnett

13 that was convicted in 1998 of a theft out in Maryland.  Is that

14 correct?

15 A.  Yes.

16 Q.  Did this take place before or after that?

17 A.  Before.

18 Q.  Was it a long period of time before or shortly before, if

19 you can recall?

20 A.  Shortly before.

21 Q.  And when you said you were going to get some -- told them

22 that you were going to get some jackets, did you give them any

23 money to go get the jackets?

24 A.  No, I didn't.

25 Q.  Did you ever see them with any money to pay for the jackets?

# Tab 26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   :    Docket No. CR 05-100
                            :
           Plaintiff     :
                            :
v.                        :    Washington, DC
                            :
ANTWUAN BALL,               :
DAVID WILSON,               :
GREGORY BELL,               :    April 19, 2007
DESMOND THURSTON,           :
JOSEPH JONES,               :
DOMINIC SAMUELS,            :
                            :
          Defendants    :    1:00 p.m.
. . . . . . . . . . . . . . . . . . . :  . . . . . . . . . . . . .

VOLUME 37 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:   ANN H. PETALAS, ESQUIRE
                       GLENN S. LEON, ESQUIRE
                       GIL GUERRERO, ESQUIRE
                       UNITED STATES ATTORNEY'S OFFICE
                       555 Fourth Street, NW
                       Washington, D.C.  20530

For the Defendant      JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:          CARNEY & CARNEY
                       601 Pennsylvania Avenue, NW
                       Suite 900, South Building
                       Washington, DC  20004
                       (202) 434-8234

                       STEVEN CARL TABACKMAN, ESQUIRE
                       TIGHE, PATTON, ARMSTRONG,
                           TEASDALE, PLLC
                       1747 Pennsylvania Avenue, NW
                       Suite 300
                       Washington, DC  20006

                       (202) 454-2811

1 Q.  And where did you go?

2 A.  CTF.

3 Q.  And why did you go to CTF?

4 A.  I can't recall.  They just called me one day and told me,

5 pack my stuff and moved me.

6 Q.  Were you on a particular floor of CTF?

7 A.  No, I wasn't.

8 Q.  And where did you go after that?

9 A.  After CTF?

10 Q.  Yes.

11 A.  To Arlington, Virginia.

12 Q.  And then at some point were you moved out of Arlington?

13 A.  Yes.

14 Q.  And why was that?

15 A.  I got in a little trouble out there.

16 Q.  And what was that trouble?

17 A.  I had oral sex and vaginal sex with a female.

18 Q.  Was that another female inmate?

19 A.  Yes.

20 Q.  And was that against the regulations out there?

21 A.  Yes, it was.

22 Q.  And so where did they send you?

23 A.  Back to CTF.

24 Q.  And you've talked about earlier -- earlier you talked about

25 Antwuan, and I believe you testified that you never got cocaine

Page 7800

1 from Antwuan.  Is that correct?

2 A.  Yes.

3 Q.  Yes or no:  Did you ever talk to anybody about the quality

4 of cocaine Antwuan had?

5        MR. BALAREZO:  Objection as to "anybody," Your Honor.

6        THE COURT:  You can answer yes or no.

7 A.  Yes.

8 BY MS. PETALAS:

9 Q.  And who was that person that you talked to?

10 A.  EB.

11 Q.  And what did EB say?

12 A.  That the coke wasn't what it was supposed to be, meaning it

13 wasn't good.

14 Q.  And do you recall when this was?

15 A.  No, I don't.

16 Q.  Do you recall whether or not it was before or after you got

17 out of jail?

18        MR. CARNEY:  Objection, Your Honor.  Objection.  He

19 said he didn't know when.

20        THE COURT:  Overruled.

21 BY MS. PETALAS:

22 Q.  Do you recall whether or not it was before or after you got

23 out of jail in Maryland?

24 A.  It was after.

25        MR. BALAREZO:  Your Honor, I'm sorry.  I don't know if

1           THE COURT:  Sustained.

2 BY MR. ZUCKER:

3 Q.  Well, if the truth is:  I don't know anything about what

4 anybody else did, and therefore I can't help you --

5           MS. PETALAS:  Same objection, Your Honor.

6           THE COURT:  Let him finish the question.

7 BY MR. ZUCKER:

8 Q.  Do you expect, would you be entitled to a motion from the

9 government saying you provided substantial assistance in the

10 prosecution of others?

11          THE COURT:  Sustained.  But you can rephrase.

12 BY MR. ZUCKER:

13 Q.  All right.  Why don't you tell us what you think the

14 substantial assistance means, in your own words?

15 A.  To tell the truth.

16 Q.  About what?

17 A.  About my involvements in this case.

18 Q.  What about other people's involvement?

19 A.  And their involvements also.

20 Q.  And if you don't know anything about their involvement, do

21 you expect to get a motion for a departure based on substantial

22 assistance?

23          MS. PETALAS:  Objection, Your Honor.

24          THE COURT:  Basis?

25          MS. PETALAS:  Calls for speculation if he doesn't know

1 anything.

2          THE COURT:  Overruled.

3 BY MR. ZUCKER:

4 Q.  Can you answer the question?

5 A.  Repeat the question.

6               (The record is read.)

7          MS. PETALAS:  Your Honor, I'm just going to object as

8 to vagueness of who "they" is.

9          THE COURT:  Say it again?

10          MS. PETALAS:  I was going to object as to vagueness on

11 who he's talking about when he says, "their involvement."

12          THE COURT:  Do you want to rephrase it?

13 BY MR. ZUCKER:

14 Q.  Other people.

15 A.  Other people like who?

16 Q.  Anybody.

17          THE COURT:  Why don't you put the whole question?

18          MR. ZUCKER:  All right.

19 BY MR. ZUCKER:

20 Q.  You understand, do you not, that the only -- that in order

21 to get a motion for substantial assistance in the prosecution of

22 other criminal activity by other persons, you have to testify or

23 provide information about other people's criminal activities.

24 Correct?

25 A.  Yes.

1 Q.  And if you have no information and provide no assistance

2 about other people's criminal activities, you do not get a

3 substantial assistance motion, do you, in your opinion?

4 A.  Correct.

5 Q.  So basically, bottom line is, the only way for you to get

6 out from doing all this time is to help them convict someone

7 else.

8        MS. PETALAS:  Objection, Your Honor.  Misstates the

9 law.

10        THE COURT:  Sustained.

11 BY MR. ZUCKER:

12 Q.  Is that your understanding of what you have to do, provide

13 substantial assistance in the prosecution of other people?

14 Right?

15 A.  Yes.

16 Q.  And substantial assistance in the prosecution of other

17 people means, plain English, means help them get convicted.

18 Right?

19        MS. PETALAS:  Your Honor, again, I'm going to object.

20 It misstates the law.

21        THE COURT:  Speak up, please.

22        MS. PETALAS:  Objection.

23        THE COURT:  Basis?

24        MS. PETALAS:  Again, misstates the law on "help them

25 get convicted."

1          MR. BALAREZO:  Your Honor, I object to the objection.

2          THE COURT:  The question began with his understanding,

3 and I'll allow it.  Please repeat the question.

4 BY MR. ZUCKER:

5 Q.  It is your understanding that, in order to get a substantial

6 assistance motion, you have to help them convict someone else.

7 Right?  Plain English.

8 A.  Yes.

9 Q.  And that's the only way you get out from spending 360 months

10 to life in prison.  Right?

11 A.  Yes.

12 Q.  So as you sit here today, testifying against these men, it

13 basically comes down to them or you, in your mind.  Right?

14 A.  Yes.

15 Q.  And you've not testified in any other cases to date as a

16 government witness, have you?

17 A.  Repeat your question.

18 Q.  Sure.  Thus far, since beginning your cooperation, you have

19 not testified in any other cases.  Right?

20 A.  You right.

21 Q.  And you do not expect to, at least at this point, to testify

22 in any other cases, do you?

23 A.  No, I don't.

24 Q.  So it's either -- this is your shot to stay out of prison.

25 Right?  For the rest of your life?

Page 7815

1 A.  Yes.

2 Q.  Them or you, somebody is going.  Right?

3         MS. PETALAS:  Objection, Your Honor.

4         THE COURT:  Sustained.  Go ahead.

5 BY MR. ZUCKER:

6 Q.  This is not the first case you've had, though, is it?

7 A.  What you mean by that?

8 Q.  Other criminal charges.

9 A.  Right.

10 Q.  Okay.  And you've lied to courts in the past in order to

11 gain your freedom, have you not?

12 A.  Repeat your question.

13 Q.  You've lied to courts in the past in order to get your

14 freedom, have you not?

15 A.  No, I haven't.

16 Q.  Well, you were arrested in a case the government referred

17 to, it was F-6840201 in 2001, charged with distribution of

18 cocaine.  Correct?

19 A.  Yes.

20 Q.  You were released by the court on your promise to appear.

21 Correct?

22 A.  Yes.

23 Q.  You were released by the court based on your promise to --

24 I'm sorry, to not commit other offenses while released.

25 Correct?

1 A.  You right.

2 Q.  Released on your promise not to use drugs while you were

3 released.  Correct?

4 A.  Correct.

5 Q.  You broke all those promises to that court, didn't you, sir?

6 A.  Yes, I did.

7 Q.  So you used drugs.  Right?

8 A.  Yes.

9 Q.  You continued to deal drugs.  Right?

10 A.  Yes.

11 Q.  You actually committed other robberies and other acts of

12 violence while on release.  Correct?

13 A.  Yes.

14 Q.  Okay.  And you failed to appear for court when you promised

15 to appear.  Isn't that correct?

16 A.  No, it's not.

17       MS. WICKS:  Your Honor, may I consult with counsel?

18       MR. ZUCKER:  Please.

19           (OFF THE RECORD.)

20 BY MR. ZUCKER:

21 Q.  Well, you failed to appear, but you were actually

22 incarcerated in another case.  Is that correct?

23 A.  Yes.

24 Q.  And you do admit that you -- well, you committed a robbery

25 when that court had released you, based on your promise to not

1 commit crimes.  Right?  At least -- well, at least one?

2 A.  Yes.

3 Q.  There was a neighbor of yours on January 3rd, 2002, Mildred

4 Ingram.  Do you recall her?

5        Do you recall a female from your neighborhood who asked

6 you for a ride to the ATM machine?

7 A.  Yes.

8 Q.  And you did give her that ride so she could get money.

9 Right?

10 A.  Yes.

11 Q.  And she got back in your car to get a ride back.  Right?

12 A.  Yes, she did.

13 Q.  And as you drove her back, you stopped the car, choked her,

14 and attempted to rob her.  Actually did rob her, didn't you?

15 A.  No, I didn't.

16 Q.  Well, you were arrested and accused of that, weren't you?

17 A.  Yes, I was.

18 Q.  Did you try and take money from her?

19 A.  Yes, I did.

20 Q.  So you tried to take money.  But what was wrong with my

21 statement?  You didn't actually try and choke her?

22 A.  I didn't choke her.

23 Q.  You just took it by force?

24 A.  Naw, I just reached in her pocket and took the card.

25 Q.  You took the card?

1 A.  Yes, I did.

2 Q.  Didn't you also try and take the money?

3 A.  No, I didn't.

4 Q.  Did you put your hands around her neck and apply pressure?

5 A.  No, I didn't.

6 Q.  And what did you do with that card?  Was it your card?

7 A.  No, it wasn't.

8 Q.  Whose card was it?

9 A.  I guess it was hers.

10 Q.  And you went to an ATM machine and withdrew someone else's

11 money.  Correct?

12 A.  Yes, I did.

13 Q.  So you robbed her of the card, and then you used the card to

14 commit another theft at a bank.  Right?

15 A.  Yes, I did.

16 Q.  So those were two crimes you committed while you were on

17 release based on your promise that you would not commit crimes.

18 Right?

19 A.  Yes.

20 Q.  Now, you got arrested for that offense, that was on

21 January 3rd, 2002.  Correct?

22 A.  Yes.

23 Q.  And seven days later the police came to your apartment to

24 arrest you.  Correct?

25 A.  Yes.

Page 7819

1 Q.  And when they did, you consented to allow them to search

2 your apartment, did you not?

3 A.  Yes.

4 Q.  And when they searched your apartment, they found a quantity

5 of cocaine.  Right?

6 A.  Yes.

7 Q.  Packaged for distribution.  Correct?

8 A.  Yes.

9 Q.  And they charged you with possession with intent to

10 distribute that cocaine.  Correct?

11 A.  Yes.

12 Q.  And you made, I think a videotaped confession, did you not,

13 sir, in that case?

14 A.  No, I didn't.

15 Q.  You made a confession, though?

16 A.  To the cocaine?

17 Q.  Yeah.

18 A.  Yes.

19 Q.  So you confessed to the cocaine.  You also confessed to the

20 robbery that day, didn't you?

21 A.  Yes.

22 Q.  So at this point you have four charges pending against you.

23 Correct?  On January 9th, 2002 or shortly thereafter, the next

24 day?

25         Do you want me to go over them?

1 Q.  And it makes it -- is it one and a half or double, if you

2 recall?  You don't recall?

3 A.  I don't recall.

4 Q.  And then -- and that's 2 to 15 years, not months.  Right?

5 A.  Yes.

6 Q.  Before the enhancement applies.  Right?

7 A.  Yes.

8 Q.  And then you also have the theft for use of the credit card.

9 Right?  That's a separate charge, wasn't it, that you were

10 indicted on?

11 A.  Naw, they just charged me for robbery.  Not theft, not

12 strong-arm, just robbery.

13         MR. ZUCKER:  Court's indulgence.

14 BY MR. ZUCKER:

15 Q.  All right.  We'll move off of that.

16         You also have now the cocaine that's found in your

17 apartment.  Right?  The possession with intent to distribute?

18 A.  Yes.

19 Q.  And that's another 30 before the enhancements apply.  Right?

20 A.  They didn't charge me with the cocaine because they didn't

21 have no search warrant, they had an arrest warrant.  So they

22 charged me with robbery, nothing else.

23 Q.  Well, you consented to the search, didn't you, sir?

24 A.  No, I didn't.

25 Q.  Didn't you just tell us you did?  I asked you that question

1 here 10 minutes ago.

2 A.  I don't recall.

3 Q.  You don't recall my saying to you, you consented to the

4 police searching your apartment when they came in to arrest you

5 for the robbery?

6 A.  No, I don't.

7 Q.  And you don't recall saying that, once they searched, they

8 found cocaine?

9 A.  Yes.

10 Q.  But you don't recall saying yes when I asked you if they

11 said, could they search?

12 A.  No, I don't.

13          MR. ZUCKER:  Moment to consult.

14          Ms. Romero, if I could have this marked as an add-on, I

15 think it's Thurston 3.  I'm sorry, we already have it marked.  I

16 apologize.

17          For record purposes, Judge, I'll be using Defendant

18 Wilson's 19-N.

19 BY MR. ZUCKER:

20 Q.  Take a look at this document, sir, and see if you recognize

21 it.  Feel free to look through it if you need to.

22 A.  (Witness complies.)

23 Q.  Do you recognize it?

24 A.  Yes, I do.

25 Q.  In fact -- well, for record purposes it's U.S. versus Keith

1 Q.  So you got arrested, appeared in court, I don't know, eight,

2 nine times.  And a couple of minutes ago you don't even remember

3 being charged with it.  Right?

4 A.  You right.

5 Q.  But somehow -- and you weren't high all those times in

6 court, were you?

7 A.  No, I wasn't.

8 Q.  And you weren't high the whole time you were in lockup, were

9 you?

10 A.  No, I wasn't.

11 Q.  But you forgot about that up until a few minutes ago, huh?

12       MS. PETALAS:  Objection, Your Honor.  Asked and

13 answered.

14       THE COURT:  Overruled.

15 BY MR. ZUCKER:

16 Q.  Right?

17 A.  Yes.

18 Q.  But somehow you can remember events that happened in 1996

19 and 1997 and 1998 when you were high.  Right?

20 A.  Yes.

21 Q.  With such clarity.  Right?

22       MS. PETALAS:  Objection, Your Honor.  Argumentative.

23       THE COURT:  I'll allow it.  Go ahead.

24 A.  Yes.

25 BY MR. ZUCKER:

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 902 of 1954

1 Q.  So your memory for events in 2003, regarding a case where

2 you appeared 10 times, is not as good as what you might have

3 seen other people do or might have heard other people say seven,

4 eight years earlier when you were high.  Right?

5 A.  Yes.

6 Q.  Do drugs enhance your memory?

7 A.  Yes.

8 Q.  You used PCP, didn't you?

9 A.  No, I haven't.

10 Q.  Didn't you test positive for PCP in 2003?

11 A.  Yes, I have.

12 Q.  So you didn't use it, but you tested positive for it.

13 Right?

14 A.  Yes.

15 Q.  And that was based on a urinalysis, urine sample you gave.

16 Right?

17 A.  Yes.

18 Q.  Why don't you tell us how you tested positive but didn't use

19 it.

20 A.  I smoked a laced joint of weed that had PCP on it.

21 Q.  And you didn't know it?

22 A.  That I ain't know it.

23 Q.  Okay.  And is that the only time you've used PCP in your

24 life?

25 A.  Yes.

1 Q.  How do you know?

2 A.  I know the difference between PCP and marijuana.

3 Q.  Well, wait.  A minute ago when I asked you:  How did you

4 use -- how did PCP end up in your system if you never used it,

5 you said I smoked a marijuana joint laced with PCP, but I didn't

6 know it.  Right?

7 A.  Right.

8 Q.  So how do you know the other marijuana you've been smoking

9 for years wasn't laced with PCP?

10 A.  Because once I smoked the marijuana joint with the PCP on it

11 and hit it a couple of times, that's all it took for me to get a

12 dirty urine.  And I ain't hit it no more.

13 Q.  That wasn't the question.

14 A.  I'm just explaining to you how I got the dirty urine from

15 the PCP.

16 Q.  I appreciate your candor.  Now I'm asking a different

17 question.  The question is this:  A few minutes ago, when I

18 asked you about it, you said you smoked a marijuana cigarette

19 laced with PCP but didn't know there was PCP on it.  Right?

20 A.  Right.

21 Q.  How do you know all that other marijuana you've been smoking

22 for years wasn't laced with PCP if you couldn't tell the time it

23 was?

24 A.  Because I know the difference between marijuana and PCP.

25 Q.  But you didn't when I asked you a few minutes ago.  You said

USCA Case #11-3031     Document #1445852          Filed: 07/10/2013     Page 904 of 1954

1 you smoked a marijuana cigarette laced with PCP but didn't know

2 it.  Right?

3 A.  You right.

4 Q.  So you don't know, do you?

5 A.  Yes, I do know.

6 Q.  And actually, in addition -- I'm going to move off of the

7 PCP for a minute.

8         In addition to all these four cases you had in D.C.,

9 you were still on probation in Maryland, were you not?

10 A.  No, I wasn't.

11 Q.  You were placed on probation in Maryland on August 12th,

12 1999, were you not?

13 A.  Yes, I was.

14 Q.  You were placed on two and a half years' probation, were you

15 not?

16 A.  Yes, I was.

17 Q.  So that would have taken you up until '99, 2000, 2001.  Five

18 more months takes you into the beginning of '2002.  Correct?

19 A.  Yes.

20 Q.  All right.  So certainly, when you were arrested -- well,

21 for the drug case in '99 -- I'm sorry, the drug case in 2001,

22 you were still on probation.  Right?  The original distribution

23 of cocaine?

24 A.  Yes.

25 Q.  Okay.  And of course you had backup time because -- so

1 you're admitting now you were mistaken a minute ago?

2          MS. PETALAS:  Objection, Your Honor.  Misstates --

3          THE COURT:  Overruled.

4          MS. PETALAS:  His question didn't ask when he was on --

5          THE COURT:  Sorry?

6          MS. PETALAS:  The question actually didn't refer to

7 which case he was talking about when he asked him if he was

8 still on probation.

9          THE COURT:  Overruled.

10 BY MR. ZUCKER:

11 Q.  Certainly, the '99 case you were on probation.  Right?  And

12 then the 2001?  I take that back.  The 2001 case, the original

13 distribution of cocaine that prosecutor showed you.  Right?  You

14 were still on probation?

15 A.  Yes.

16 Q.  And of course, if you get convicted -- well, before we even

17 get there, there's another enhancement in D.C. if you're on

18 probation.  Right?

19 A.  Yes.

20 Q.  So whatever the sentences were, you're looking at two

21 enhancements:  One because you're on release in the second

22 three, the robbery, the theft -- well, the robbery and the

23 possession with intent to distribute you forgot about.  Right?

24          MS. PETALAS:  Objection, Your Honor.

25          THE COURT:  Sustained.  Why don't you rephrase.

1          MR. ZUCKER:  Sure.

2 BY MR. ZUCKER:

3 Q.  You were looking at enhance -- you know what I mean by

4 enhancements.  Right?

5 A.  Explain it.

6 Q.  Enhancements means more time because of your status when

7 you're on release.  Right?

8 A.  Yes.

9 Q.  You knew that a few minutes ago.  Right?

10 A.  Yes.

11 Q.  That if you committed an offense while you're on release,

12 the amount of exposure to a potential sentence is increased.

13 Right?

14 A.  Yes.

15 Q.  Similarly, if you commit an offense while you're on

16 probation or parole, the potential exposure is greater as well,

17 is it not?

18 A.  Yes, it is.

19 Q.  And similarly, if you were convicted of any of those

20 offenses, you were looking at your backup time in Maryland, too.

21 Right?  Because you were on probation?

22          MS. PETALAS:  Objection, Your Honor, as to any of those

23 offenses, as to which offenses he's referring to:  The 2001 or

24 the ones in 2003.

25          THE COURT:  Sustained.

1 BY MR. ZUCKER:

2 Q.  Were you ever -- well, let's start with the 2001.  You

3 acknowledge you were still on probation when that occurred.

4 Right?

5 A.  Yes.

6 Q.  So if you were convicted based -- of that offense here in

7 D.C., it would have served for your revocation.  You would have

8 had to do time for your probation robbery in Maryland.  Right?

9 A.  Yes.

10 Q.  Now, those charges you had in D.C. all disappeared, didn't

11 they?

12 A.  You asking me, did my charges in D.C. disappear?

13 Q.  Uh-huh.  For you?

14 A.  For what?  From what?

15 Q.  Well, you entered into a cooperation agreement with the

16 government in this case, didn't you, sir?

17 A.  Yes, I did.

18 Q.  And all those cases were dismissed as part of that

19 cooperation agreement.  Right?

20 A.  Yes.

21 Q.  So you didn't have to worry about them any more.  Right?

22 A.  Yes.

23 Q.  The distribution of cocaine you had with, I think it was

24 Judge Weisberg in 2001, that you were looking at 30 plus

25 enhancements; gone.  You don't have to do a day on that one.

Page 7833

1 Right?

2 A.  Yes.

3 Q.  The robbery; gone.  You don't have to do a day on that one.

4 It's dismissed.  Right?

5 A.  Yes.

6 Q.  The possession with intent to distribute cocaine, the one

7 that you confessed to; gone.  You don't have to worry about that

8 one.  Right?

9 A.  Yes.

10 Q.  Dismissed by the government, were they not?

11 A.  Yes.

12 Q.  So you got away with all those crimes without having to

13 serve a day in jail once you cooperated with the government.

14 Isn't that correct, sir?

15 A.  Yes, it is.

16 Q.  And as you've told us yesterday, you came in and met with

17 the police and gave a videotaped statement, I think it was in

18 2000.  Correct?

19 A.  Yes.

20 Q.  Okay.  And three of those -- and they released you.  Right?

21 A.  Yes.

22 Q.  They didn't hold you.  Right?

23 A.  Yes.

24 Q.  And they released you because you had cooperated and given a

25 statement.  Right?

Page 7843

1 Q.  All right.  Now, when you went -- we're going to shift gears

2 again, sir.

3        You were brought in -- well, 1998 you went to the grand

4 jury.  Correct?  June 17th?

5 A.  Yes.

6 Q.  And that's when three innocent men were accused and charged

7 with a murder that you and two other people had committed.

8 Correct?

9 A.  Yes.

10 Q.  Now, when you met with -- Oscar Mayer, I think that was his

11 name; Mayer was the prosecutor.  Right?

12 A.  Yes.

13 Q.  And he met with you before you went in front of the grand

14 jury.  Correct?

15 A.  Yes.

16 Q.  And he advised you of your rights in front of the grand

17 jury.  Right?

18 A.  Yes.

19 Q.  And he told you you didn't have to answer questions.  Right?

20 A.  Yes.

21 Q.  Told you you could have a lawyer if you wanted one.  Right?

22 A.  Yes.

23 Q.  And he told you if a truthful answer might incriminate you,

24 then you could assert a privilege, a Fifth Amendment privilege.

25 Right?

Page 7844

1 A.  Yes.

2 Q.  You chose not to do any of that, did you?  Right?

3 A.  Right.

4 Q.  Even though you knew you had committed this murder, or at

5 least been a part of it.  Right?

6 A.  Right.

7 Q.  Even though you knew two -- three innocent men were accused

8 of it.  Right?

9 A.  Right.

10 Q.  You figured you would just lie your way through it.  Right?

11 A.  No.

12 Q.  Well, did you tell the truth in there?

13 A.  No, I didn't.

14 Q.  Were you confused?

15 A.  No, I wasn't.

16 Q.  Well, you admit that you didn't tell the truth.  Right?

17 A.  Yes.

18 Q.  And you admit you weren't confused.  Right?

19 A.  Yes.

20 Q.  But you weren't lying?

21 A.  Yes, I was.

22 Q.  Oh, you were lying?

23 A.  Yes.

24 Q.  Well, a minute ago when I said, "Didn't you lie in there,"

25 you said, "No."  Right?

1 A.  Yes.

2           MS. PETALAS:  Objection, Your Honor.  That misstates

3 the testimony.

4           THE COURT:  Sustained.

5 BY MR. ZUCKER:

6 Q.  Did you not, within the last two minutes when I said, "You

7 figured you would lie your way through it," you said, "No."

8 Right?

9 A.  Yes.

10 Q.  You said you weren't lying in there initially, didn't you?

11           MS. PETALAS:  Objection, Your Honor.

12           THE COURT:  Sustained.

13 BY MR. ZUCKER:

14 Q.  Sir, do you know the difference between a lie and the truth?

15 A.  Yes, I do.

16 Q.  What is it?

17 A.  The truth is, you tell the truth and that's it.  A lie, you

18 keep on lying.

19 Q.  Well, which were you doing when you went in front of the

20 grand jury in 1998?

21 A.  I was lying.

22 Q.  And that was the grand jury that was investigating these

23 other three men accused of the murder you committed.  Right?

24 A.  Yes.

25 Q.  Now, that murder happened on June 29th, 1998.  Correct?

Page 7846

1 A.  No.

2 Q.  When did it happen?

3 A.  January of '98.

4 Q.  I'm sorry, did I say June by accident?  I apologize.

5 A.  Yes, you did.

6 Q.  Thank you for the correction.  1/29/98.  January 29th, '98.

7 Right?  Right?

8 A.  January of '98.  I don't recall the date.

9 Q.  Fair enough.  And you said that was connected with the death

10 of your friend Meatball.  Right?

11 A.  Yes.

12 Q.  Now, Meatball was killed in 1996, wasn't he?

13 A.  Yes.

14 Q.  Almost two years earlier?

15 A.  Yes.

16 Q.  And you lived in that neighborhood your whole life.  Right?

17 A.  No.

18 Q.  I'm sorry, from the point -- well, how old were you when you

19 moved there?

20 A.  Probably 15, 16.

21 Q.  From 15 -- well, certainly through whatever date this

22 happened in '98.  Right?

23 A.  Yes.

24 Q.  And 10th Place was two or three blocks away.  Right?

25 A.  Yes.

1 Q.  Meatball was killed nearly two years earlier, and suddenly,

2 on January 29th, 1998, you decide that's the day you're going to

3 go retaliate?

4 A.  Yes.

5 Q.  Between the time of Meatball's murder and your murder of

6 D-Lock, how many times had you been on 10th Place?

7 A.  Have I been on 10th Place?

8 Q.  Yeah.  In that interim period, how many times had you been

9 through 10th Place?

10 A.  A lot of times.

11 Q.  Jack was out there, wasn't he, sometimes?

12 A.  Yes, he was.

13 Q.  James was out there, wasn't he?

14 A.  Yes, he was.

15 Q.  You know who I'm talking about, Jack and James Davis.

16 Right?

17 A.  Yes.  Yes.

18 Q.  And those are the twins.  Right?

19 A.  Yes.

20 Q.  And you didn't know which of them -- actually, neither of

21 them were involved in the murder of Meatball, were they, as far

22 as you know?

23 A.  Not that I know of.

24 Q.  Okay.  But you decided that was the day you would retaliate

25 some two years later, even though you had seen them so many

Page 7848

1 other times.  Right?

2 A.  Yes.

3 Q.  And of course, on none of those occasions had they attempted

4 to murder you, had they?

5 A.  No, they hadn't.

6 Q.  And on no other occasion had you attempted to kill them.

7 Right?

8 A.  Right.

9 Q.  Same thing with D-Lock, too.  Right?

10 A.  Yes.

11 Q.  You had seen him a number of times on 10th Street, and in

12 the neighborhood.  Right?

13 A.  No, I haven't.

14 Q.  Well, between the time of Meatball's death in '96 and your

15 murder of D-Lock in '98, had you seen D-Lock around the way?

16 A.  No, I haven't.

17 Q.  That was the first time you had seen him, that night?

18 A.  Naw, I wasn't looking for him.

19 Q.  When you went in front of the grand jury in '98 and lied,

20 you made up a pretty elaborate lie, didn't you?

21 A.  Yes, I did.

22 Q.  You told him -- they asked you how you found out about the

23 murder of D-Lock.  And you made up this story about how you were

24 driving down Mississippi, and you saw the police.  You knew

25 someone was killed, and later you found out it was D-Lock, and

1 maybe it was an hour after it happened.

2          Those were all lies, weren't they, sir?

3 A.  Yes, they was.

4 Q.  Okay.  So you knew how to elaborate to make a lie look good.

5 Right?

6 A.  Yes.

7 Q.  So you're a good liar?

8 A.  No, I wouldn't say that.

9 Q.  Well, you were pretty skilled at it in the grand jury,

10 weren't you?

11 A.  Yes.

12 Q.  That certainly wasn't the first time you lied.  Right?

13 A.  No, it wasn't.

14 Q.  It certainly wasn't the last time either, was it?

15 A.  No, it wasn't.

16 Q.  And they asked you about a gray station wagon.  Right?

17 A.  Yes.

18 Q.  You knew what station wagon they were talking about, didn't

19 you, sir?

20 A.  Yes, I did.

21 Q.  It was the station wagon that was used in the murder.

22 Right?

23 A.  Yes.

24 Q.  The station wagon you owned.  Right?

25 A.  Yes.

1          (Recess taken at 2:36 p.m.)

2          THE COURT:  Mr. Zucker, are you ready for the jury?

3          MR. ZUCKER:  Yes, sir.

4          (Jury in at 2:56 p.m.)

5          THE COURT:  Good afternoon, ladies and gentlemen.

6 Welcome back.  We're ready to resume.  Counsel?

7          MR. ZUCKER:  Thank you, Judge.

8 BY MR. ZUCKER:

9 Q.  I want to turn -- we've covered a little bit your first

10 statement to the grand jurors when the other people were accused

11 of the D-Lock murder.

12          You subsequently met with the police and gave a

13 videotaped statement on February 4th, 2000.  Do you recall that?

14 A.  Yes.

15 Q.  And you've seen that and read the transcript of that, have

16 you not?

17 A.  Yes, I did.

18 Q.  Was that statement -- were you still lying or were you

19 telling the truth in that statement?

20 A.  I was telling the truth.

21 Q.  Everything you said in that statement was true?

22 A.  I don't recall if everything was, I was talking about.

23 Q.  Well, how do you know?  Were you still planning on trying to

24 lie your way out, or were you being truthful with the police at

25 this point?

1 A.  I was being truthful.

2 Q.  And you told us yesterday about -- well, Munya almost burned

3 his own self up in that car.  Right?

4 A.  Yes.

5 Q.  And that was to destroy the evidence.  Right?

6 A.  Yes.

7 Q.  And you were with him.  You drove to a different location,

8 or you followed him.  He was in the gray car.  Right?

9 A.  Yes.

10 Q.  And then you watched him get gas, spill it all over.  Right?

11 A.  Yes.

12 Q.  And then he lit it on fire and almost burned himself because

13 he's not the brightest guy in the world.  Right?

14         MS. PETALAS:  Objection, Your Honor.

15         THE COURT:  Sustained.

16 BY MR. ZUCKER:

17 Q.  He almost set himself on fire in that car, didn't he?

18 A.  Yes.

19 Q.  So you knew what happened to the car.  Right?

20 A.  Yes.

21 Q.  But when you were telling the police the truth, you lied to

22 them and said you didn't know.  Isn't that correct?

23 A.  Yes.

24 Q.  So you were still lying on February 4th, 2000, when you

25 started to talk with the police?

1 A.  Yes.

2 Q.  But I thought a minute ago you said at that point you were

3 truthful, you were being truthful?

4 A.  Because I admitted my role in that murder.  That was the

5 truth.

6 Q.  Okay.  So you told them some things that were true, and some

7 things were a lie.  Right?

8 A.  Yes.

9 Q.  And that's your idea of being truthful.  Right?

10 A.  Yes.

11 Q.  So as long as you mix some truth in with some lies, that's

12 true.  Right?  That's the truth?

13        MS. PETALAS:  Objection, Your Honor.  Misstates the

14 testimony.  He testified he couldn't remember if he told the

15 whole truth.

16        THE COURT:  Sustained.

17 BY MR. ZUCKER:

18 Q.  When this -- when you agreed to go down -- you were

19 resistant to going down to 10th Place.  Right?  That night with

20 D-Lock?

21        Do you know what I mean by resistant?

22 A.  Can you explain?

23 Q.  Sure.  That you weren't 100 percent with it.  You preferred

24 not to go, and they pressed you.  Right?  That's what you told

25 this jury?

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 919 of 1954

1 A.  (Witness complies.)

2 Q.  Your answer to the last question was, "Okay, before the

3 elbow, before you got to Boat Alley," which is the spot where

4 you told us you were with Munya yesterday.  Right?

5 A.  Yes.

6 Q.  Next page, "Answer:  Yes."

7        "Okay.  Now put that down for a second.  Did both LT

8 and Munya get into your car at that location?"  Referring to the

9 elbow before the alley turns into Boat Alley.  Right?

10 A.  Yes.

11 Q.  And that's what you said.  Right?  You said yes?

12 A.  In this?

13 Q.  Yeah, right there.

14 A.  Yes.  Yeah.

15 Q.  So yesterday, when you told us Munya got in the car and you

16 drove over to Savannah Street and picked up LT there, was that a

17 lie yesterday, or were you confused?

18 A.  That wasn't no lie yesterday.

19 Q.  Well, what was true?  What you told the grand jury -- I

20 mean, you acknowledge you've given two different versions.

21 Right?

22 A.  Yes.

23 Q.  You gave one version yesterday, one version to the grand

24 jury in 2005.  Right?

25 A.  Yes.

1 Q.  Which version is true, yesterday's, 2005, or do you not

2 know?

3 A.  Yesterday's.

4 Q.  So you lied to the grand jury in 2005?

5 A.  Yes, I did.

6 Q.  After you -- and that was two years after you started

7 cooperating.  Right?

8 A.  Yes.

9 Q.  Two years after you cut a deal with the government, swearing

10 to tell the truth.  Right?

11 A.  Yes.

12 Q.  And of course, it was after they proffered you as a witness

13 to a grand jury, asking for you to testify in what you knew was

14 a serious matter.  Right?

15 A.  Yes.

16 Q.  And you still deliberately lied to them.  Right?

17 A.  Yes.

18 Q.  Have you been charged with perjury?

19 A.  No, I haven't.

20 Q.  Well, you know lying to a grand jury -- I mean, you've told

21 us, I think in your direct, you can get charged with perjury for

22 that.  Right?

23 A.  Yes.

24 Q.  Have you told the prosecutors prior to today that you lied

25 in that grand jury?

1 A.  Yes, I have.

2 Q.  So you told them you lied in the past, on February 4th -- or

3 I forget the date.  I'm sorry.  October 25th, 2005?

4 A.  Yes, I have.

5 Q.  And you're still here testifying.  Right?

6 A.  Yes.

7 Q.  You still expect to get a deal.  Right?

8 A.  Yes.

9 Q.  So even though you told them you lied to the grand jury that

10 was investigating this case, I thought you said they take back

11 your deal then.  Right?

12 A.  Yes.

13 Q.  But they haven't done that, have they?

14 A.  No, they haven't.

15 Q.  So even if you lie to them, you still expect to get a deal.

16        MS. PETALAS:  Objection, Your Honor.  To form.

17        THE COURT:  Asked and answered.  Sustained.

18 BY MR. ZUCKER:

19 Q.  Now, you told the grand jury initially in 2005 that you

20 really thought you were going down to get weed on 10th Street.

21 Right?

22 A.  Yes.

23 Q.  Was that a lie, too?

24 A.  Yes, it was.

25 Q.  Incidentally, you had gone down to 10th Street to buy weed.

Page 7873

1 Right?  Not that night, but other nights?

2 A.  Yes.

3 Q.  How many times between the murder of Meatball and this night

4 had you gone down to buy weed?

5 A.  None.

6 Q.  When did you stop going down to buy weed on 10th Street?

7 A.  When Meatball got killed.

8 Q.  But you told the grand jury that's what you were going to do

9 that night.  Right?

10 A.  Yes, that was the -- initially what was planned to do.

11 Q.  The plan was originally to go down to 10th Street to get

12 some weed?

13 A.  Yes.

14 Q.  Was that true or not true?

15 A.  That was true.

16 Q.  I thought you had stopped going down to 10th Street after

17 Meatball was killed.

18 A.  I did, until that day.

19 Q.  Until that night, you decided to go down and get some weed?

20 A.  Like I said, that's what the plan was, to go get some weed

21 at first.  But it quickly changed to going down there and

22 murder, handling the murder.

23 Q.  All right.  Turn to page 10, if you will.

24 A.  (Witness complies.)

25 Q.  Beginning on line nine, same grand jury, your testimony.

1 Q.   Now, at no point yesterday did you claim you saw LT and

2 Munya switch guns in the car, did you?

3 A.   Naw, they ain't switch guns in the car.

4 Q.   They did not switch guns in the car?

5 A.   Naw.

6 Q.   At any time that night, did they switch guns, that you saw?

7 A.   Naw, not that I seen.

8 Q.   And you were with them from the time of the alley, through

9 the shooting, up to Berry Farms.  Right?

10 A.   Yes.

11 Q.   And you never saw them switch guns either before nor after

12 the shooting.  Correct?

13 A.   Correct.

14 Q.   Now, you told us yesterday that you saw LT stand over D-Lock

15 and shoot D-Lock.  Correct?

16 A.   Yes.

17 Q.   But in your videotaped statement to the police in 2000, you

18 never made that claim, did you?

19 A.   Not that I recall.

20 Q.   Do you want to take a look at your transcript to be certain?

21 A.   Yes.

22 Q.   Please feel free.  If you don't have it in front of you,

23 I'll give you another copy.  It's 19-F.

24 A.   This one right here?

25 Q.   No, this one.  It's much shorter.

 1 A.  Where you say this at?

 2 Q.  I said it wasn't.  And correct me if I'm wrong, that at no

 3 point did you make the claim, in your videotaped statement in

 4 2000, that LT stood over D-Lock after he was down and shot him?

 5 A.  Naw, I said where was it at in here, where you show me at?

 6 Q.  My question is, you never made that statement in there, did

 7 you?

 8 A.  Oh, no.  No, I didn't.

 9 Q.  And you're certain of that.  You've had a chance to review

10 it, and in fact you did not make that claim in 2000.  Right?

11 A.  That LT stood over top of him?

12 Q.  Right.

13 A.  Right.

14 Q.  And the first time you made that claim was in the grand jury

15 in 2005.  Correct?

16 A.  Yes.

17 Q.  And you've been incarcerated since 2003.  Correct?

18 A.  Yes.

19 Q.  And much of that time you've been on the fourth floor of

20 CTF.  Correct?

21 A.  No.

22 Q.  Where have you been?

23 A.  In Arlington.

24 Q.  Okay, you were at Arlington.

25          Bobby Capies was incarcerated at Arlington too, wasn't

1 he?

2 A.  Yes, he was.

3 Q.  And you recognized -- when you went out to Arlington, you

4 were not -- you were not a Virginia prisoner.  Right?

5 A.  Right.

6 Q.  You were there as a D.C. prisoner.  Right?

7 A.  Yes, I was.

8 Q.  And D.C. prisoners in Arlington are frequently there, you

9 know, because they are cooperating.  Right?

10 A.  Yes.

11 Q.  And you saw Capies and knew he was a D.C. prisoner, as well.

12 Right?

13 A.  Yes.

14 Q.  And you had contact with Capies, did you not?

15 A.  Yes.

16 Q.  Were you on the same unit for a while?

17 A.  Yes, we was.

18 Q.  You recognized him from the street?

19 A.  Yes.

20 Q.  He recognized you?

21 A.  Yes.

22 Q.  There was no hostilities between you, was there?

23 A.  No, it wasn't.

24 Q.  And you greeted him as a friend, as -- you regarded him as a

25 friend, or at least a friendly acquaintance, as he did you.

1 Correct?

2 A.  Yes.

3 Q.  And within the jail, within Arlington, you guys are kind of

4 homeboys to each other, as opposed to the other guys.  Right?

5 A.  As opposed to other guy?

6 Q.  Yeah.

7 A.  Yes.

8 Q.  Did you discuss -- well, it was pretty clear to you that

9 Capies was likely cooperating in this case.  Isn't that correct?

10 A.  Repeat your question.

11 Q.  Sure.  It was clear to you, you inferred or assumed when you

12 saw Capies in Arlington, that he like you was there because he

13 was cooperating?

14 A.  Yes.

15 Q.  And he, like you, was from Congress Park.  Right?

16 A.  Yes.  Yes.

17 Q.  And you assumed he was probably cooperating in this

18 investigation, as well.  Correct?

19 A.  Yes.

20 Q.  How long were you locked up with Capies?

21 A.  In Arlington?

22 Q.  Well, Arlington or anywhere.

23 A.  I was locked up with Capies in Arlington for about

24 20 months.

25 Q.  Were you both also incarcerated anywhere else?  Did you

1 overlap at the fourth floor of CTF?

2 A.  No, we didn't.

3 Q.  Did you overlap anywhere else?

4 A.  No, we didn't.

5 Q.  So it's only after you're incarcerated with Capies in 2005

6 you come in and tell -- and recall seeing D-Lock -- I'm sorry,

7 LT standing over D-Lock and shoot.  Right?

8 A.  Yes.

9 Q.  But of course you two didn't discuss it, did you?

10 A.  No, we didn't.

11 Q.  You and Capies at some point are both going to be sentenced.

12 I mean, you know that for him as well as you.  Right?

13 A.  Yes.

14 Q.  LT is not going to be sentenced.  Right?

15 A.  Right.

16 Q.  Because LT is dead.  Right?

17 A.  Yes.

18 Q.  Okay.  Someone stood over D-Lock and emptied a clip in him

19 that night.  Isn't that correct?

20 A.  Yes.

21 Q.  Now, when you met with the police in 2002 and gave your

22 videotaped statement, you never mentioned that detail, did you?

23 A.  No, I haven't.  No, I didn't.

24 Q.  Particularly you never mentioned LT being the person that

25 did that.  Correct?

1 A.  No, I didn't.

2 Q.  Then after you're incarcerated with Mr. Capies for

3 20 months, you put that in front of the grand jury.  Correct?

4 A.  Yes.

5 Q.  For the first time?

6 A.  Yes.

7 Q.  Because somebody has got to look -- well, I guess let me put

8 it this way:  That's going to look pretty bad for whoever did

9 that when they come to sentencing.  Right?

10        MS. PETALAS:  Objection, Your Honor, speaking to what's

11 going to look bad at sentencing, especially with respect to

12 Capies or anybody else.

13        MR. ZUCKER:  I'll rephrase.

14 BY MR. ZUCKER:

15 Q.  In your opinion, standing over a man who is helpless,

16 defenseless, and unloading a clip into them of however many

17 bullets are inside of that clip is going to look pretty bad for

18 whoever ends up getting sentenced for that.  Would that be a

19 fair assumption on your part?

20        MS. PETALAS:  Your Honor, I'm going to object --

21 objection to the form of the question.

22        THE COURT:  I'll allow it.

23 A.  Yes.

24 BY MR. ZUCKER:

25 Q.  And it certainly would look better for your friend Capies

1 and you if it was the dead guy who did that rather than one of

2 you?

3 A.  Repeat your question.

4 Q.  Sure.  Knowing that both you and Capies are going to be

5 sentenced at some point for this murder, it certainly would be

6 better if the person who did that heinous act was believed to be

7 LT rather than one of you?

8          MS. PETALAS:  Objection.

9          THE COURT:  Sustained.

10          (BRIEF PAUSE IN THE PROCEEDINGS.)

11 BY MR. ZUCKER:

12 Q.  Do you remember the last question?  I remember the subject,

13 I can't remember the phrasing, though.

14 A.  Was me and Munya friends.

15 Q.  Okay.  We'll start there.  What's the answer to that

16 question?

17 A.  Naw, I never --

18 Q.  You never considered him a friend?

19 A.  Naw.

20 Q.  But he was somebody close enough to, like, go kill with?

21 A.  Yeah.

22 Q.  Somebody close enough to get high with, for sure.  Right?

23 A.  Yeah.

24 Q.  Somebody close enough to buy and sell drugs with.  Right?

25 A.  Yeah.

Page 7888

1 Q.  But not a friend?

2 A.  Naw.

3 Q.  And where we left was, come time of sentencing regarding

4 that murder, it would benefit -- in your opinion, it would

5 benefit both you and Munya if it was believed that gun was in

6 LT's hands rather than either of yours?

7          MS. PETALAS:  Objection, Your Honor.

8          THE COURT:  Sustained.

9 BY MR. ZUCKER:

10 Q.  Now, you told us yesterday that you -- returning to when

11 Meatball was killed, Tony was shot in that incident too.  Right?

12 A.  Yes.

13 Q.  And in response to one of the prosecutor's questions, you

14 said you never went to the hospital to see Tony.  Is that

15 correct?

16 A.  Yes.

17 Q.  Is that true?

18 A.  Yes.

19 Q.  But you did tell the grand jury that you did go to see Tony

20 in the hospital, did you not?

21 A.  No, I seen Tony when he came out the hospital.

22 Q.  Not in the hospital?

23 A.  Right.

24 Q.  So it was only after you saw Tony on the street that you

25 learned what had happened to Meatball from Tony?

1 A.  Yes.

2 Q.  All right.  Showing you what's been marked as 19-H, this is

3 the -- your grand jury testimony on October 25th, 2005 in this

4 case.

5           Directing your attention to page 20, beginning with the

6 questioning on line 15, page 20, in relation to Meatball:  "Do

7 you know who killed him?"

8           Your answer:  "No, I don't know who killed him, but my

9 other friend Tony Forte got shot with him in the alley.  And the

10 next day after I learned about the shooting, I went to the

11 hospital, seen Tony, and Tony had told me that D-Lock had killed

12 him."

13           That's what you said that day?

14 A.  Yes.

15 Q.  So were you lying to the grand jury or were you confused?

16 A.  I was lying to the grand jury.

17 Q.  I see.  Now, what did you do after -- the night that

18 Meatball was killed, after you heard the shots, what did you do?

19 A.  That night when he got killed, what did I do?

20 Q.  Uh-huh.

21 A.  I went in the house.

22 Q.  Did you go to bed?

23 A.  Did I go to bed?

24 Q.  Uh-huh.

25 A.  I was in the house.

1 Q.  The question was, did you go to bed after hearing the shots?

2 A.  I don't know whether I went to bed or not, but I was in the

3 house.

4 Q.  All right.  Page 34 -- turning back to the hospital, you

5 were asked, bottom of page 34, line 25, question from the

6 prosecutor:  "So did you not find out what happened until the

7 next day?"

8          Answer:  "Yes."

9          Question:  "How did you find out?"

10          Answer:  "I went -- I went to the hospital because

11 they -- because I found out that Tony was still alive or

12 whatever.  So I went to the hospital to see Tony, and that's

13 when Tony told me everything that happened."

14          Was that also another lie to the grand jury about going

15 to the hospital?

16 A.  Yes, it was.

17 Q.  Why did you lie to the grand jury about that point?

18 A.  Because I didn't recall previous of what happened.  Tony had

19 come home and told me the situation.  I didn't go to no

20 hospital.

21 Q.  The question was this:  Why did you lie about that point to

22 the grand jurors?

23          MS. PETALAS:  Objection, Your Honor.  I think it was

24 asked and answered.

25          THE COURT:  Overruled.

1 A.  A mistake, probably.

2 BY MR. ZUCKER:

3 Q.  Was it a lie or was it a mistake, or don't you know?

4 A.  It was a mistake.

5 Q.  Not an intentional lie?

6 A.  No.

7 Q.  Now, returning back to the night D-Lock was shot, you said

8 you went to Berry Farms.  Right?

9 A.  Yes.

10 Q.  And you left those guys there, Munya and LT.  Right?

11 A.  Yes.

12 Q.  And you took the subway home.  Right?

13 A.  Yes.

14 Q.  And you were actually surprised, because you took the subway

15 to Congress Park and they actually beat you there, didn't they?

16 A.  Yes.

17 Q.  Because they got a ride.  Right?

18 A.  Yes.

19 Q.  Are you sure of that?

20 A.  Yes.

21 Q.  As sure as you are of everything else?

22 A.  Yes.

23 Q.  Well, sir, that was in 19 -- what year was that, do you

24 recall, that murder?

25 A.  1998.

1 Jazz to give to you?

2 A.   Because I ain't know how much coke it really was, so I just

3 estimated.

4 Q.   So in 2005 you estimated and said 250 dimes.  Right?

5 A.   Yes.

6 Q.   But today you're saying it's 60, 70, and you're positive.

7 Right?

8 A.   Yes.

9 Q.   What happened to the dimes?

10 A.   I sold them.

11 Q.   So you couldn't go back and count them between 2005 and

12 today.  Right?

13 A.   Right.

14 Q.   So why are you now positive in 2007 it was 70 rather than

15 the 250 you estimated back in 2005?

16 A.   I don't know.

17 Q.   You're not just making it up as you go along, are you, sir?

18 A.   No, sir.

19 Q.   It's hard to keep the details straight, isn't it?

20 A.   No, it's not.

21 Q.   Let's turn to the robbery on 6th and Florida Avenue.  You

22 told us yesterday that that was something you did with Dazz.  Is

23 that correct?

24 A.   Yes.

25 Q.   And you told us yesterday how you went up to 6th and

1 Florida, Mike wasn't there, who you usually bought from, so you

2 bought from some other guys.  Right?

3 A.  Yes.

4 Q.  Mike usually sets up in the alley; these other guys, or some

5 young-uns, had set up right on the street.  Is that right?

6 A.  Yes.

7 Q.  And they had a trash bag full of marijuana.  Right?

8 A.  Yes.

9 Q.  And you bought some.  Right?

10 A.  Yes.

11 Q.  And on the way back to Congress Park, were you thinking

12 about robbing them?

13 A.  Yes, I was.

14 Q.  Because it was pretty sweet.  Right?

15 A.  Yes.

16 Q.  And you came back and you saw Dazz.  Right?

17 A.  Yes.

18 Q.  And you told him what happened.  Right?

19 A.  Yes.

20 Q.  And then you and he went back up there to rob them.  Right?

21 A.  Yes.

22 Q.  You didn't go up there to buy weed with Dazz, did you?

23 A.  No, I didn't.

24 Q.  So those are two separate events.  One was you went and

25 bought the weed, concocted the plan, went and got Dazz and

1 executed the robbery.  Right?

2 A.  Yes.

3 Q.  And you said Dazz took the money and then you both split the

4 weed.  Right?

5 A.  Yes.

6 Q.  How much weed did you take?

7 A.  I don't recall how much weed it was.

8 Q.  Did you recall yesterday?

9 A.  It was a couple of bags -- it was like 30 bags, 40 bags,

10 dime bags.

11 Q.  Do you recall saying 40 bags yesterday?

12 A.  Yes.

13 Q.  But you told the grand jury -- first off, what did you do

14 with those bags?

15 A.  We smoked them.

16 Q.  Right.

17 A.  While we was together.

18 Q.  Right.  And then what did you do with the rest?

19 A.  Then we went our separate ways, he kept some and I kept

20 some, half and half of whatever we had left.

21 Q.  And what did you do with those 15 -- you would have had

22 about 15 left.  Right?

23 A.  Yes.

24 Q.  And he would have had an equal number?

25 A.  About 15.

Page 7903

1 Q.  What did you do with those, the 15?

2 A.  What I did with mine?

3 Q.  Yes.

4 A.  I smoked most of them and I sold most of them.

5 Q.  You did not share them with all the other supposed members

6 of the Congress Park crew, did you?

7 A.  No, I didn't.

8 Q.  You kept them for yourself, and what you didn't smoke, the

9 money you sold went to you.  Right?

10 A.  Yes.

11 Q.  It had nothing to do with anybody in Congress Park except

12 you and Dazz.  Right?

13 A.  Yes.

14 Q.  Now, you told a different version of events to the grand

15 jury, didn't you, sir?

16 A.  Repeat your question.

17 Q.  Sure.  You told the grand jury -- when you told them about

18 the incident, you told them a different version of events, did

19 you not?

20 A.  I don't recall.

21 Q.  Do you recall telling them that you and Dazz both went up

22 there to buy weed, and decided to rob the guys instead?

23 A.  No, I don't.

24 Q.  Turn to page 52 of the grand jury transcript, please.

25 A.  (Witness complies.)

1 Q.  Beginning on line five, question from Mr. Beatrice to you:

2 "Okay.  Were you involved in another robbery that you committed

3 with the person you previously identified as Dazz?"

4          Answer:  "Yeah, up 6th and Florida, some weed boys.  I

5 mean, we went up there to buy some weed, but at the same time,

6 the dudes just showed us too much, and me and Dazz got out of

7 the car and got them, meaning got them, meaning Dazz whipped out

8 and I took the weed and got in the car and left."

9          That's what you told the grand jury.  Right?

10 A.  Yes.  That was a lie.

11 Q.  That was a lie?

12 A.  Yes, it was.

13 Q.  Why did you tell the grand jury that lie?

14 A.  Because I went up there first and I bought weed first, then

15 I left and came back to pick Dazz up, then we went up there to

16 rob them.

17 Q.  The question was, why did you lie to the grand jury about

18 that?

19 A.  It probably was a misunderstanding.

20 Q.  Well, a misunderstanding or a lie?

21 A.  A misunderstanding.

22 Q.  So it wasn't a lie, or was it a lie, or do you know?

23          MS. PETALAS:  Objection, Your Honor.  Asked and

24 answered.

25          THE COURT:  Sustained.

Page 7905

1 BY MR. ZUCKER:

2 Q.  Now, you told us that Dazz kept the money.  Right?

3 A.  Yes.

4 Q.  Did you tell the grand jurors that you and he just wanted

5 the weed and left the money?

6 A.  Repeat your question.

7 Q.  Sure.  Did you tell the grand jurors that you and he just

8 wanted the weed and left the money?

9          MS. PETALAS:  Objection, Your Honor.  May I get a page

10 and line number?  Your Honor, I would request a page and line

11 reference.

12          MR. ZUCKER:  Right now I'm just asking a question.  If

13 we get to that, I would be glad to.

14          THE COURT:  Provide the page and line number.

15          MR. ZUCKER:  All right.  52, lines 22 up until the next

16 page.

17 BY MR. ZUCKER:

18 Q.  Starting with line 22, same questions from Mr. Beatrice, or

19 later on in the sequence:  "When you say they showed you too

20 much, what do you mean?  They showed too much weed or too much

21 money or both or -- "

22          Answer:  "Just the weed.  They -- they showed the

23 money, but we didn't want the money.  We just wanted the weed."

24          Question:  "And is that what you robbed them of, weed?"

25          Answer:  "Yeah."

1          You made those statements to the grand jury.  Right?

2 A.  Yes, I did.

3 Q.  That you took just the weed -- both of you took just the

4 weed and left the money.  Right?

5 A.  Yes.

6          MS. PETALAS:  Objection, Your Honor.  Misstates what he

7 testified to.

8          THE COURT:  Sustained.

9 BY MR. ZUCKER:

10 Q.  You told us 30 or 40 dimes.  Right?

11          MS. PETALAS:  Objection, Your Honor.  Asked and

12 answered.

13 A.  To what?

14 BY MR. ZUCKER:

15 Q.  You told us here this morning -- or yesterday you said you

16 estimated it was 40 dimes you took; today when I asked you

17 again, you said it was 30 or 40.  Right?

18 A.  Now you're talking about another?

19 Q.  No, I'm talking about the 6th and Florida.

20 A.  Naw, we didn't get --

21 Q.  What -- go ahead.

22 A.  You talking about dimes of weed or dimes of coke?

23 Q.  Weed.

24 A.  Yeah, about 30 or 40 dimes of weed.

25 Q.  If I confused you, I meant to say dimes of weed, not dimes

1 of coke.

2          And that's what you estimate you took.  Right?

3 A.  Yes.

4 Q.  Now, you told us this morning, in reference to some purchase

5 with Ms. Petalas, that you paid $850 for a half a pound of weed.

6 Right?

7 A.  Yes.

8 Q.  Okay.  And how many dimes -- if you're paying 850 for a half

9 a pound of weed, approximately how many dimes would be in a half

10 pound?

11 A.  I can't recall right now offhand.

12 Q.  Well, generally you expect to at least double your money

13 when you take a wholesale quantity and break it up into street

14 value.  Correct?

15 A.  Yes.

16 Q.  So if you spend 850 for half a pound, you have to get at

17 least 1700 back after you break it up.  Right?

18 A.  Yes.

19 Q.  So that would be at least 170 dimes off of a half pound.

20 Correct?

21          MS. PETALAS:  Objection, Your Honor.  I would ask for

22 clarification if we're talking wholesale amounts or street

23 value, or what he's referring to.

24          THE COURT:  Overruled.

25 A.  Repeat your question.

1 BY MR. ZUCKER:

2 Q.  Sure.  If you're going to get 1700 back off of an $850

3 investment, then you have to take that half pound of weed and

4 break it down into at least 170 dimes to get $1,700 back.

5 Right?

6 A.  Yes.

7 Q.  And does that sound about right, what you expect, 170 dimes

8 out of a half pound, or maybe a little more?

9 A.  Probably a little more.

10 Q.  About 200?

11 A.  Somewhere between there.  I don't know right offhand.

12 Q.  But you sold weed.  Right?

13 A.  Yeah.

14 Q.  When you take a half pound, how many dimes do you expect to

15 get out of it when you break it down?

16 A.  I wasn't selling dimes, I was selling twenties.

17 Q.  How many twenties, maybe 100?

18 A.  Maybe 100, maybe 90.

19 Q.  And a 20 is roughly double what a dime is.  Right?

20 A.  Yes.

21 Q.  So off of a pound, one would expect to get how many twenties

22 or how many dimes, either way you want to do it?

23 A.  Off a pound?

24 Q.  Yeah.

25 A.  I don't know.

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 943 of 1954

1 Q.  You said off a half you expect to get somewhere around 90 or

2 100 twenties, or around 200 dimes.  Right?

3 A.  Yes.

4 Q.  So if we take a pound, we expect to get double that.  Right?

5 A.  Or probably a little more.

6 Q.  A little more.  So somewhere in the neighborhood of

7 400 dimes.  Right?

8 A.  Something like that.

9 Q.  That's a lot more than 40 dimes that you estimated were

10 taken in this robbery.  Isn't that correct?

11 A.  Yes.

12 Q.  What did you tell the grand jurors in terms of how much

13 marijuana you estimate you stole?

14 A.  That I sold or that I stole?

15 Q.  Stole, robbed.

16 A.  About 40 bags.

17 Q.  Take a look at your transcript.

18 A.  (Witness complies.)

19 Q.  Question, line 10:  "Okay.  And how much weed did you get

20 away with?"

21        Answer:  "About a pound."

22        That's what you told the grand jury, isn't it?

23 A.  Yeah.

24 Q.  Which is the truth, which is the lie, or don't you know?

25 A.  It was a lie.

1 Q.  Why did you lie about the amount you stole?

2 A.  Because it was in bags, it wasn't no just a pound.  It was

3 in -- we got bags.

4 Q.  The question was, why did you lie?

5 A.  Just a misunderstanding.

6 Q.  Well, basically what you've told this jury was about

7 40 dimes; what you told the grand jury was roughly 400 dimes

8 worth.  Right?

9 A.  Yes.

10 Q.  A pound.

11       Did this robbery ever happen?

12 A.  Yes, it did.

13 Q.  Who was robbed?

14 A.  Repeat your question.

15 Q.  Who was robbed?

16 A.  Two dudes.

17 Q.  You can't identify them, can you?

18 A.  No, I can't.

19 Q.  So we can't bring them in here, can we?

20       MS. PETALAS:  Objection, Your Honor.

21       THE COURT:  Sustained.

22 BY MR. ZUCKER:

23 Q.  How do I find these two dudes?

24       MS. PETALAS:  Objection, Your Honor.

25       THE COURT:  I'll allow it, if he knows.

1 A.   I don't know.

2 BY MR. ZUCKER:

3 Q.   Of course you can't tell us any other witnesses to this

4 robbery, can you?

5 A.   No, I can't.

6 Q.   So all we have is your word.  Right?

7 A.   Yes.

8          MS. PETALAS:  Objection, Your Honor.  I'll withdraw.

9          THE COURT:  Beg your pardon?

10          MS. PETALAS:  I withdrew the objection.  I think he

11 answered.

12 BY MR. ZUCKER:

13 Q.   Is there any way, other than your testimony, that we can

14 corroborate this actually occurred?

15          MS. PETALAS:  Objection, Your Honor.  Calls for

16 speculation as to he doesn't know if there's any way to

17 corroborate.

18          THE COURT:  You can ask whether he knows about whether

19 of any --

20 BY MR. ZUCKER:

21 Q.   Can you tell --

22          MR. ZUCKER:  I'm sorry, I didn't mean to interrupt you.

23 BY MR. ZUCKER:

24 Q.   Can you tell us any other way we could corroborate that this

25 occurred besides your say-so?

1 A.   Naw.  You said fake cocaine.

2 Q.   You know what I mean by fake cocaine.  Right?

3 A.   Yes.

4 Q.   And Phil, from what you could observe, was packaging up that

5 fake cocaine and selling it on the street.  Right?

6 A.   Yes.

7 Q.   Did he share whatever he got with everybody else in the

8 neighborhood?

9 A.   No.

10 Q.   He kept that money for himself?

11 A.   Yes.

12 Q.   When you sold drugs, did you share your profits with

13 everybody else in the neighborhood?

14 A.   No, I didn't.

15 Q.   What did you do with your money?

16 A.   I kept my own money.

17 Q.   From what you observed, everybody else follows suit, do the

18 same thing?

19 A.   Yes.

20 Q.   And when you testified, you told us -- you never mentioned

21 buying or selling drugs -- buying drugs from my client,

22 Mr. Thurston, did you?

23 A.   No, I didn't.

24 Q.   You never bought drugs from him, did you?

25 A.   No, I didn't.

1 Q.  And Munya asked you to go with him to take care of that.

2 Right?

3 A.  Yes.

4 Q.  And you told him you had to wait for your brother's car.

5 Right?

6 A.  Yes.

7 Q.  And you had to wait for your brother to come around the way

8 to bring him his car.  Right?

9 A.  Yes.

10 Q.  And then your brother -- you only have one brother.  Right?

11 A.  Yes.

12 Q.  Kevin?

13 A.  Yes.

14 Q.  And Kevin brought you that car that night.  Right?

15 A.  Yes.

16 Q.  And then you followed Munya up to where you burned the car

17 and you drove it back.  Right?

18 A.  Yes.

19 Q.  And that was a day after D-Lock was killed.  Right?

20 A.  Yes.

21 Q.  And D-Lock was killed I think January 31st, '98?

22        MS. PETALAS:  Objection, Your Honor.

23 BY MR. ZUCKER:

24 Q.  When was the date of that murder?

25 A.  I think the 19th or the 18th.

1 Q.  Okay.  I might have the date wrong.  But it was January of

2 '98.  Correct?

3 A.  Yes.

4 Q.  So it was after the murder, you took -- you waited for your

5 brother, you got his car, and you followed Munya.  Right?

6 A.  Repeat the question.

7 Q.  Sure.  That was a day or two after the murder in January of

8 '98.  Right?

9 A.  Yes.

10 Q.  And you got your car from -- you got your brother's car from

11 your brother and you followed Munya?

12 A.  Yes.

13 Q.  Sir, your brother was locked up August 15th, 1997, and

14 remained locked up for a few years, didn't he?

15 A.  I don't recall.

16 Q.  His name is Kevin Barnett?

17 A.  Yes, it is.

18 Q.  Do you recall him being locked up for something at a gas

19 station, I think it was a robbery?

20 A.  Yes.

21 Q.  And it was August 15th, 1997 he was incarcerated.  Right?

22 Summer of '97, you recall that.  Right?

23 A.  Yes.

24 Q.  And he remained incarcerated for how many years?

25 A.  About four or five.

1 Q.  So there is absolutely no way in January of '98 you could

2 have gotten your brother's car from him to do what you said you

3 did.  Right?

4 A.  Right.

5 Q.  So you're lying again.  Right?

6 A.  Yes.

7        MS. PETALAS:  Objection, Your Honor.  Objection to

8 form.

9        THE COURT:  Overruled.

10 BY MR. ZUCKER:

11 Q.  Yes?

12 A.  Yes.

13 Q.  And that was yesterday in this courtroom.  Yes?

14 A.  Yes, it was.

15 Q.  Now, returning for a moment to what I started talking with

16 you about right before the break, the fight with LT that you

17 talked about yesterday.  Do you remember that?

18 A.  Yes.

19 Q.  You said yesterday that was in '96 or '97.  Right?

20 A.  Yes.

21 Q.  Was that correct?

22 A.  Yes.

23 Q.  Is that true?

24 A.  Yes.

25 Q.  And there was a time that you punched him in the face and

Page 7928

1 videotaped statement.

2 Q.  Well, at that point you hadn't been arrested in the drug

3 case.  Correct?

4 A.  Correct.

5 Q.  That was in October 2001.  Correct?

6 A.  Yes.

7 Q.  The day that you gave the videotaped statement was

8 February 4th, 2000.  Correct?

9 A.  Yes.

10 Q.  And subsequent to that, in October of 2001, you were

11 arrested for a crime.  Correct?

12 A.  Yes.

13 Q.  And you're testifying now -- are you saying that before you

14 got arrested or after you got arrested was the first time that

15 you sat down with an attorney and debriefed with the government?

16 A.  After.

17 Q.  Do you recall how long after you were arrested in October of

18 2001 that you sat down and debriefed with the government?

19 A.  I don't recall.

20 Q.  And that -- well, at some point, with that lawyer in that

21 case, you stopped debriefing.  Correct?

22 A.  Yes.

23 Q.  And was that before or after you were arrested in January of

24 2003?

25 A.  Before.

1 Q.  Well, sitting here today, do you recall if you lied or told

2 the truth to the government when you met with them in those

3 debriefings after your arrest in October of 2001?

4 A.  I lied.

5         MS. PETALAS:  Objection to the form of the question.

6         THE COURT:  Overruled.

7 BY MS. WICKS:

8 Q.  You lied?

9 A.  I lied.

10 Q.  And this watch -- and again, the watch that we're talking

11 about was in the picture that we saw yesterday.  Correct?

12 A.  Yes.

13 Q.  And that watch, do you recall -- well, today you're saying

14 that you essentially gave that watch to Mr. Wilson to borrow

15 sometimes.  Correct?

16 A.  Yes.

17 Q.  And when I'm saying Mr. Wilson --

18         MS. WICKS:  If you could stand up, Mr. Wilson.

19 BY MS. WICKS:

20 Q.  This is the person that you called Wop.  Correct?

21 A.  Yes.

22 Q.  You know his name is David Wilson.  Correct?

23 A.  Yes.

24 Q.  I'm going to refer to him as Mr. Wilson.

25         This watch that you sometimes let Mr. Wilson use, at

# Tab 27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : April 23, 2007 |
| DOMINIC SAMUELS, | : 9:20 a.m. |
| Defendants. | : |

VOLUME 38 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

---

APPEARANCES (Cont.)

For Defendant        TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:        TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant        LAW OFFICE OF JENIFER WICKS
David Wilson:        Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant        LAW OFFICE OF JAMES W. BEANE
Gregory Bell:        James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant        LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:    Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant        LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:        Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

---

APPEARANCES (Cont.)

For Defendant        LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:     A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:      Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

1    **MORNING SESSION, APRIL 23, 2007**

2    (9:12 a.m.)

3        THE COURT:  All right, Ms. Wicks.  Ready for the jury?

4        MS. WICKS:  Yes, Your Honor.  Thank you.

5    (Jury in at 9:14 a.m.)

6        THE COURT:  Good morning, ladies and gentlemen.

7        THE JURY PANEL:  Good morning.

8        THE COURT:  Welcome back.  Hope you enjoyed your break.

9    We're ready to resume.

10       Ms. Wicks.

11       MS. WICKS:  Thank you.

12       CONTINUED CROSS-EXAMINATION OF KEITH BARNETT

13   BY MS. WICKS:

14   Q.    Good morning, Mr. Barnett.

15   A.    Good morning.

16   Q.    Now, I think when we left off on Thursday, I was asking

17   you some questions about RE.  Do you remember those questions?

18   A.    Yes.

19   Q.    And RE is Rare Essence, correct?

20   A.    Yes.

21   Q.    And Rare Essence is a go-go band that plays in the

22   Washington, DC area?

23   A.    Yes.

24   Q.    And do you recall, when you're talking about going out to

25   see -- going out to the clubs three times a week, what years are

*7969*

1  Do you see that?
2  **A.**  Yes, I do.
3  **Q.**  And drawing your attention to this piece of paper in the
4  court jacket, this indicates it's a bench warrant, correct?
5  **A.**  Yes, it is.
6  **Q.**  Okay.  And it indicates this bench warrant was issued on
7  August 29th, 2000, correct?
8  **A.**  Yes.
9  **Q.**  And do you recall getting a court order to come to court
10  on August 29th of 2000 for the violations of probation that are
11  listed here?
12  **A.**  I think I was incarcerated then.
13  **Q.**  You were incarcerated in August of 2000 where?
14  **A.**  You said "where"?
15  **Q.**  Yeah.
16  **A.**  In Upper Marlboro.
17  **Q.**  Well, there was a bench warrant issued on August 29th,
18  correct?
19  **A.**  Yes, there was.
20  **Q.**  And on that date, you're saying you were incarcerated?
21  **A.**  I'm not sure.
22      MS. WICKS:  Court's indulgence.
23  BY MS. WICKS:
24  **Q.**  So -- well, back in 2000, you were in violation of your
25  probation, correct?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*7970*

1  **A.**  Not that I recall.
2  **Q.**  You don't recall?
3  **A.**  No, I don't.
4  **Q.**  You don't recall going to court for the violations of
5  probation?
6  **A.**  No, I don't.
7  **Q.**  You don't recall -- you recall being locked up in August
8  and September of 2000, correct?
9  **A.**  Yes.
10  **Q.**  And you recall that you had tested positive during
11  probation, correct?
12  **A.**  I don't recall.
13  **Q.**  You don't recall?
14      MS. WICKS:  Court's indulgence.
15  BY MS. WICKS:
16  **Q.**  Would it refresh your recollection to look at the report
17  written by the probation officer that was sent to the judge?
18  **A.**  Yes.
19      MS. WICKS:  Court's indulgence.
20  BY MS. WICKS:
21  **Q.**  Well, just starting with what we were just looking at,
22  this indicates the violations of probation on it, correct?
23      THE COURT:  You're handing him 19 S?
24      MS. WICKS:  I'm showing him 19 S again, Your Honor.
25  BY MS. WICKS:

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*7971*

1  **Q.**  The same piece of paperwork lists the conditions of
2  probation that you violated, correct?
3  **A.**  Yes.
4  **Q.**  And you're saying -- do you recall or do you not recall
5  going to court on these violations?
6  **A.**  I don't recall.
7  **Q.**  You don't recall.  Okay.
8      And I'm showing you the next sheet of paper, which is the
9  request from your probation officer.  Do you see that?
10  **A.**  Yes, I do.
11  **Q.**  Okay.  And here, dated August 10th, 2000, it lists the
12  violations.  Do you see that?
13  **A.**  Yes.
14  **Q.**  One violation was that you tested positive for marijuana
15  on May 12th and May 25th, 2000, correct?
16  **A.**  Yes.
17  **Q.**  And one violation is you failed to report for testing on
18  May 1st, 2000.  Do you see that?
19  **A.**  Yes.
20  **Q.**  And one violations is that you failed to pay the
21  restitution you owed to Up Against the Wall of $540; do you see
22  that?
23  **A.**  Yes, I do.
24  **Q.**  Do you recall paying the restitution?
25  **A.**  I don't recall.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*7972*

1  **Q.**  Ever?
2  **A.**  Yes, yes, I paid it.
3  **Q.**  You paid it after August of 2000, right?
4  **A.**  Yes.
5  **Q.**  After you went to court, correct?
6  **A.**  Yes.
7      MS. WICKS:  Court's indulgence.
8  BY MS. WICKS:
9  **Q.**  And Mr. Zucker was asking you some questions going back
10  in the case.  Mr. Zucker was asking you some questions about
11  employment.  Do you remember those questions?
12  **A.**  Yes.
13  **Q.**  Now, when you were in jail, you were originally sentenced
14  in September '99, correct.
15  **A.**  Yes.
16  **Q.**  And you got -- you ended up with a year sentence at that
17  point, correct?
18  **A.**  Yes.
19  **Q.**  And then your lawyer filed a motion because you wanted --
20  you didn't want to have to do the year, correct?
21  **A.**  Yes.
22  **Q.**  And asked for your time to be reduced, correct?
23  **A.**  Yes.
24  **Q.**  And when you asked for your time to be reduced, one of
25  the reasons that you asked for your time to be reduced was

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**7973**

1    because before you got sentenced, you had gotten a job, correct?

2    **A.**    I don't recall.

3        MS. WICKS:  May I approach again, Your Honor, and show him

4    19 S.

5        THE COURT:  Yes.

6        MS. PETALAS:  Your Honor, may I just inquire to see

7    what --

8        MS. WICKS:  Sure.

9    BY MS. WICKS:

10    **Q.**    And showing you again 19 S, this is the defense motion to

11    reconsider your sentence that's in that court jacket.  Do you

12    see that?

13    **A.**    Yes, I do.

14    **Q.**    And attached to that is a pay stub, correct?

15    **A.**    Yes, it is.

16    **Q.**    And that's for Keith Barnett, correct?

17    **A.**    Yes, it is.

18    **Q.**    And that's your pay stub, correct?

19    **A.**    Yes.

20    **Q.**    And in this motion, your lawyer talks about the

21    employment that you got when released from detention in June of

22    1999, in paragraph 4.  Do you see that?

23    **A.**    Yes, I do.

24    **Q.**    Okay.  And so you were able to get employment when on

25    release in court in Maryland, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7974**

1    **A.**    Yes.

2    **Q.**    And one of the reasons that you stated for getting out of

3    prison was this job that you had gotten before, correct?

4    **A.**    Yes.

5    **Q.**    And was that the job working with your stepfather?

6    **A.**    No, it wasn't.

7    **Q.**    What was the name again of your stepfather's company?

8    **A.**    Family Furniture in Rockville.

9    **Q.**    Okay.  So this is actually another job that you did have

10    at American Flag Construction or American Flag Movers?

11    **A.**    Yes.

12    **Q.**    So there's two jobs that you had, correct?

13    **A.**    Yes.

14    **Q.**    Currently you're housed at CTF?

15    **A.**    Yes.

16    **Q.**    And you're on a unit with Burke Johnson?

17    **A.**    Yes, I am.

18    **Q.**    And you're on a unit with Quincy Thomas?

19    **A.**    Yes, I am.

20    **Q.**    And you're on a unit with Antwuan Proctor?

21    **A.**    Yes, I am.

22    **Q.**    And you're on a unit with Dion Redwood?

23    **A.**    Yes, I am.

24    **Q.**    When you were at Arlington, you said that Bobby Capies,

25    also known as Munya, was there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7975**

1    **A.**    Yes, he was.

2    **Q.**    Was Larry Browne there?

3    **A.**    Yes, he was.

4    **Q.**    Was Kairi Kellibrew there when you were at Arlington?

5    **A.**    Yes, he was.

6    **Q.**    And do you know an individual by the name of Cat Eye

7    Tony?

8    **A.**    Yes, I do.

9    **Q.**    Was he at Arlington when you were there?

10    **A.**    Yes.

11    **Q.**    When you lived in Congress Park -- I believe you

12    testified about an individual named Terrance?

13    **A.**    Yes.

14    **Q.**    Okay.  To your knowledge, are Terrance and David Wilson

15    brothers?

16    **A.**    No.

17    **Q.**    Would people in Congress Park think that they were

18    brothers?

19        MS. PETALAS:  Objection, Your Honor.

20        THE COURT:  Sustained.

21    BY MS. WICKS:

22    **Q.**    Well, would people -- okay.  Would people in Congress

23    Park -- would you see people in Congress Park confusing one for

24    the other?

25    **A.**    No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**7976**

1    **Q.**    You never saw that?

2    **A.**    No.

3    **Q.**    And what years did you live in Congress Park?

4    **A.**    From like '93 till I got locked up, 2003.  '93-94.

5    **Q.**    Were you friends with Terrance?

6    **A.**    Yes, I was.

7    **Q.**    And you're saying you were friends with David Wilson,

8    too, correct?

9    **A.**    Yes, I was.

10    **Q.**    Do they look alike?

11    **A.**    No, they don't.

12    **Q.**    They don't look at all alike?

13    **A.**    No, they don't.

14    **Q.**    To your knowledge, no one ever confused them?

15        MS. PETALAS:  Objection, Your Honor.  Asked and answered.

16        THE COURT:  Sustained.

17    BY MS. WICKS:

18    **Q.**    When -- I think Ms. Petalas asked you some questions

19    about your testimony in the grand jury.  You knew -- when you

20    testified in the grand jury in 1998, you were testifying in a

21    grand jury that was investigating the homicide of D-Lock,

22    correct?

23    **A.**    Yes.

24    **Q.**    And at that point you knew that Donte Jenkins, Jasmine

25    Bell and Taneal Wilson had been locked up, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7977*

1   **A.**   Yes.
2   **Q.**   And you knew they were still incarcerated, correct?
3   **A.**   Yes.
4   **Q.**   And so when you were testifying and you told the grand
5 jury that you didn't know anything about it, you were lying,
6 correct?
7   **A.**   Yes.
8   **Q.**   And you knew that there were these three innocent men
9 locked up for a homicide they had not committed, correct?
10   **A.**   Yes.
11   **Q.**   But you didn't want to get charged, correct?
12   **A.**   No.
13   **Q.**   You didn't want to go to jail, correct?
14   **A.**   Correct.
15   **Q.**   And that's why you lied, correct?
16   **A.**   Yes.
17       MS. WICKS:  Court's indulgence.
18 BY MS. WICKS:
19   **Q.**   You were never charged for perjury in that grand jury,
20 correct?
21   **A.**   Correct.
22   **Q.**   And you're not going to be charged because of your plea
23 agreement, correct?
24   **A.**   Correct.
25   **Q.**   When you talked to the police in 2000, that's when you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7978*

1 first told the police that you had been driving the station
2 wagon when D-Lock was killed, correct?
3   **A.**   Yes.
4   **Q.**   And after making that statement in 2000, you were not
5 charged, right?
6   **A.**   Right.
7   **Q.**   You were not even arrested that day, correct?
8   **A.**   Correct.
9   **Q.**   You were let go home, correct?
10   **A.**   Yes.
11   **Q.**   And one of the things the police told you -- well, one of
12 the things the police said to you before you indicated you were
13 driving the car was that they thought there were innocent people
14 that had been charged, correct?
15   **A.**   I don't recall.
16   **Q.**   You don't recall?  Do you recall them telling you that
17 other people had implicated you already?
18   **A.**   Yes.
19   **Q.**   And when you talked to them that day, you told them that
20 both LT and Munya opened fire at D-Lock, correct?
21   **A.**   No, I didn't.
22   **Q.**   You didn't?
23   **A.**   No, I didn't.
24   **Q.**   You never told them that?
25   **A.**   No, I didn't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7979*

1   **Q.**   Did you tell them that you were only able to see Munya's
2 dark-colored small auto-loading pistol when they were shooting?
3   **A.**   No, I didn't.
4   **Q.**   You never told them that?
5   **A.**   Not that I recall.
6   **Q.**   Now, in terms of your recollection of what happened on
7 the date that D-Lock got shot, both Munya and LT were not
8 wearing masks, correct?
9   **A.**   Yes, I think they had bandanas on their face.
10   **Q.**   You think they had bandanas on their face?
11   **A.**   Yes.
12   **Q.**   Do you remember seeing them putting on bandanas or did
13 they have bandanas when they got in your car?
14   **A.**   No, they didn't have them -- I mean, I didn't see them.
15   **Q.**   You testified in the grand jury in October 2005 after you
16 took the plea in your case, correct?
17   **A.**   Yes.
18   **Q.**   And page 26, one of the grand jurors asked you --
19       Well, you were under oath on that day, correct?
20   **A.**   Yes, I was.
21   **Q.**   And one of the conditions of your plea agreement is that
22 you tell the truth, correct?
23   **A.**   Yes.
24   **Q.**   And you were asked the following question by a grand
25 juror and gave the following answer:  "Did they have on masks or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7980*

1 did they just jump out of the car and started shooting?
2       "Witness:  They just jumped out, starting shooting.
3       "No -- no masks or nothing?
4       "Answer:  No masks."
5       Do you remember giving that answer -- those answers?
6   **A.**   Yes, I do.
7   **Q.**   Did you indicate to the grand jury that they were wearing
8 bandanas?
9   **A.**   No, I didn't.
10   **Q.**   Did you think they would want to know the details of what
11 happened?
12       MS. PETALAS:  Objection.
13       THE COURT:  Sustained.
14 BY MS. WICKS:
15   **Q.**   Well, you were given the opportunity then to explain if
16 they had anything covering their face, right?
17   **A.**   Yes.
18   **Q.**   You didn't tell the grand jury, correct?
19   **A.**   Because they didn't put on no masks or nothing getting
20 out the car.  They just was holding something on they face when
21 they jumped out the car.  It wasn't like they tied it on their
22 face or nothing.
23   **Q.**   I see.  So they jumped out of the car and they're holding
24 a bandanna over their face while they're shooting?
25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7981*

1 **Q.** That's what you saw?

2 **A.** Yes.

3 **Q.** An individual holding something over their face and

4 shooting at D-Lock?

5 **A.** Shooting at whoever they was shooting at, yes.

6 **Q.** Well, you testified here it was D-Lock, correct?

7 **A.** Right. One of them was shooting at D-Lock and the other

8 one was shooting in the crowd where everybody else was at.

9 **Q.** Pardon me?

10 **A.** I said one was shooting at D-Lock and one was shooting

11 where the crowd was at.

12 **Q.** Okay. So D-Lock was not with the other people that day,

13 correct?

14 **A.** I mean, when I first pulled up, everybody was standing in

15 the same -- in the front of the building. So when I pulled up,

16 the doors opened, gunshots. So D-Lock tried to run in the

17 building. They closed the door on him, so then he ran to the

18 side. So as he running to the side, one shooting at him while

19 the other was still shooting towards the building.

20 **Q.** Okay. And did -- now, you also indicated one of the

21 twins was on the street that day, correct?

22 **A.** Yes.

23 **Q.** And you don't know which twin it was, correct?

24 **A.** Correct.

25 **Q.** Can you tell the twins apart when you see them?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7982*

1 **A.** Yes, I can.

2 **Q.** But sitting here today, you don't know which one was

3 there, correct?

4 **A.** Correct.

5 **Q.** And whichever twin was -- and there was only one twin

6 there, correct?

7 **A.** Yes.

8 **Q.** One of the two twins, either Jack or James, right?

9 **A.** Yes.

10 **Q.** And so the twin that was there went into the building,

11 correct?

12 **A.** Yes.

13 **Q.** That twin didn't run around the side of the building, did

14 he?

15 **A.** Repeat your question.

16 **Q.** The twin that was there did not run around the side of

17 the building, right?

18 **A.** Right.

19 **Q.** And that twin did not jump over a fence, right?

20 **A.** Right.

21 **Q.** When you drove down to Trenton Place that day, you didn't

22 drive through the strip and circle back around, right?

23 **A.** Yes, I did.

24 **Q.** You did? Okay.

25     Well, when you testified in the grand jury, you indicated

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7983*

1 you didn't circle and go back, right?

2 **A.** Not that I recall.

3 **Q.** Not that you recall.

4     MS. WICKS: Court's indulgence.

5     Page 14.

6 BY MS. WICKS:

7 **Q.** You were asked -- back in the same grand jury in October

8 2005, you were asked the following question and gave the

9 following answer: "To the best of your recollection, was that

10 the first time through the neighborhood or you came and drove

11 through once before?

12     "Answer: No, I'm pretty familiar with the neighborhood.

13     "Question: No, but I mean that particular day, had you

14 driven down the street once and come back around? Are you

15 pretty sure that you just came through that one time?

16     "Answer: No, I just came through one time."

17     That was what you testified to be the truth in October of

18 2005, correct.

19 **A.** Yes.

20 **Q.** Was that the truth or is the truth that you circled

21 around?

22 **A.** The truth is what I testified.

23 **Q.** What you testified in 2005?

24 **A.** Yes.

25 **Q.** So the truth was you didn't circle around, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7984*

1 **A.** Right.

2     MS. WICKS: Court's indulgence.

3 BY MS. WICKS:

4 **Q.** When you spoke to the police in February of 2000, do you

5 recall telling them that LT got into the car first and shortly

6 thereafter, Munya got into the car?

7 **A.** You said do I recall telling them that?

8 **Q.** Yes.

9 **A.** Yeah, I probably did.

10 **Q.** Okay. Is that the truth or is that a lie?

11 **A.** That's a lie.

12 **Q.** That was a lie you told to them in 2000, right?

13 **A.** Yes.

14 **Q.** And today you're saying that -- well, in this testimony

15 in 2007, you're saying the truth is Munya got in first, correct?

16 **A.** Yes.

17 **Q.** Now, I believe in your testimony last week you testified

18 when they -- when Munya and LT first got out of the car, you

19 just looked straight ahead, correct?

20 **A.** Yes.

21 **Q.** And there came a point when Munya is getting back in the

22 car when then you looked over and you see LT shooting, correct?

23 **A.** Correct.

24 **Q.** Before that, though, apparently there's a point when

25 you're observing what's happening on the side of the car,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

7985

1  correct?
2  **A.**  Yes.
3  **Q.**  And that's when you see the twin go in the building,
4  correct?
5  **A.**  Yes.
6  **Q.**  And that's when you see D-Lock trying to get around the
7  side of the building?
8  **A.**  Yes.
9  **Q.**  So you -- essentially, the last point that you see before
10 LT gets back in the car, you say he was shooting at D-Lock,
11 correct?
12 **A.**  Yes.
13 **Q.**  Last week you testified during the time you were living
14 in Congress Park in the time period that you testified about,
15 you never bought crack from Wop, correct?
16 **A.**  Correct.
17 **Q.**  And you never sold crack to Wop, correct?
18 **A.**  Correct.
19 **Q.**  And that's the truth, correct?
20 **A.**  Correct.
21 **Q.**  Now, when you pled guilty, in your proffer, you
22 indicated --
23      MS. WICKS:  Court's indulgence.
24 BY MS. WICKS:
25 **Q.**  -- that you obtained small, generally prepackaged dime

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7986

1  bags, but wholesale amounts of crack cocaine from a number of
2  people, correct?
3  **A.**  Correct.
4  **Q.**  And one of the people that you indicated you got that
5  crack cocaine from was David Wilson, correct?
6  **A.**  Correct.
7  **Q.**  That was a lie, correct?
8  **A.**  Correct.
9  **Q.**  The truth is you never bought any crack cocaine from Wop,
10 correct?
11 **A.**  Correct.
12 **Q.**  And you never sold crack cocaine to Wop?
13 **A.**  Correct.
14 **Q.**  When you testified last week that you sold cocaine with
15 Wop, you were talking about you were standing on the street and
16 he was standing on the street selling cocaine, correct?
17 **A.**  Correct.
18 **Q.**  He didn't get his cocaine from you, correct?
19 **A.**  Correct.
20 **Q.**  He didn't share his profits with you, correct?
21 **A.**  Correct.
22 **Q.**  You said there were some times if you needed money, he
23 would let you sell to one of his regular customers, right?
24 **A.**  Correct.
25 **Q.**  He wasn't greedy about that, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7987

1  **A.**  Correct.
2  **Q.**  But he didn't play this uno *dos game*, correct?
3  **A.**  Yes.
4  **Q.**  And your testimony was at various points you saw him make
5  sales in the alley, in the Lincoln, in the circle, on Savannah
6  and 14th Place, correct?
7  **A.**  Correct.
8  **Q.**  Do you recall what -- were there specific years when he
9  was making sales in certain areas or what?
10 **A.**  No, I don't.
11 **Q.**  You just know that at some point between 1993 or '94 and
12 2003 when you got locked up, that at some point you saw
13 Mr. Wilson sell crack cocaine in those locations, right?
14 **A.**  Correct.
15 **Q.**  You testified about what I think you've referred to as
16 the taxicab shooting?
17 **A.**  Yes.
18 **Q.**  And you're saying that happened -- the car that the shots
19 came out of was on Congress Street headed back towards 13th
20 Street, correct?
21 **A.**  Yes.
22 **Q.**  And what side of the car did the shots come out of?
23 **A.**  I don't know.
24 **Q.**  Where were the individuals that got shot?
25 **A.**  Standing on the corner of Savannah Place, 14th Place.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

7988

1      MS. WICKS:  Court's indulgence.
2      Your Honor, I'm asking 100.1 to be displayed.  It's in
3  evidence.
4  BY MS. WICKS:
5  **Q.**  And if you could indicate on 100.1 where it was that you
6  observed the individuals located that got shot during the
7  taxicab shooting.
8  **A.**  (Indicating.)
9  **Q.**  And for the record, you marked a dot above the V in
10 "Savannah Place."  That location is actually on Congress Street,
11 correct?
12 **A.**  Yes.
13 **Q.**  And that's essentially on the north side of the
14 intersection of Savannah Place and Congress Street; is that
15 correct?
16 **A.**  It's right there on that -- where that building at, on
17 that corner.
18 **Q.**  So there's a corner of the intersection right where that
19 dot is?
20 **A.**  Like where the A and the N at.
21 **Q.**  Okay.  And do you know the address of the buildings right
22 at that intersection?
23 **A.**  No, I don't.
24 **Q.**  The individuals, were they on the Savannah Place side or
25 the other side of the street?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** On the Savannah Place side.

**Q.** And the car was travelling essentially from Savannah Street down Congress Street towards 13th Street?

**A.** Yes, it was.

**Q.** And if you could indicate just essentially the direction the car was traveling before it came to a stop.

**A.** (Indicating.)

**Q.** Okay. And so again for the record, you're drawing -- essentially, starting almost at the intersection of Savannah Street and Congress coming down past Savannah Place. The car did stop when the shots were fired or was it traveling?

**A.** It slowed down.

**Q.** It slowed down, but it never came to a complete stop?

**A.** Not that I recall.

**Q.** And when you saw -- did you see the people hit?

**A.** Repeat your question.

**Q.** The people -- there were people that got shot that day, right?

**A.** Yes, yes.

**Q.** There were children?

**A.** Yes.

**Q.** Did you see them with injuries?

**A.** Yes. When I came -- when I finally came from around that side, I seen them.

**Q.** Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** One got shot in the arm, one got shot in the leg.

**Q.** Okay. But you never called for medical assistance, correct?

**A.** No, I didn't.

**Q.** And you didn't call the police to let them know there had been a shooting, right?

**A.** No, I didn't.

**Q.** Were there other people in the area that you saw?

**A.** Yes. They family was on the front. They called for medical assistance.

**Q.** Okay. And your concern at that point was to go back and get your car so you could make drug sales, correct?

**A.** Naw. I just got away from the scene.

**Q.** You just got away?

**A.** Yes.

**Q.** So when you testified last week about going to get your car, was that the truth or was that a lie?

**A.** That was the truth. I got my car. I didn't go to make no sales, though. I just got in my car and rode back around on 13th Place side.

**Q.** And what were you trying to do on 13th Place?

**A.** Just get away from that side of the street.

MS. WICKS: Court's indulgence.

BY MS. WICKS:

**Q.** When you -- Ms. Petalas had asked you some questions

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

about debriefing with the government and I believe you answered that that was in 2001, after you were arrested, correct? Your first set of debriefings with the government?

**A.** I don't recall.

**Q.** Well, you were arrested in the distribution of cocaine case in October of 2001, correct?

**A.** Yeah, correct.

**Q.** And it was with the lawyer in that case that you first debriefed with the government, correct?

**A.** I don't recall.

**Q.** You don't recall. Well, prior to getting arrested in 2003, you had debriefed with the government, correct?

**A.** Yes.

**Q.** And I believe you indicated when you debriefed with the government the first time, you went to the debriefings high, correct?

**A.** Yes.

**Q.** How many times did you go to the debriefings high?

**A.** Twice.

**Q.** And do you recall signing a letter about the debriefing, what may be called a debriefing agreement?

**A.** No, I don't.

**Q.** You don't recall that? Do you recall it ever being explained by your lawyer that you needed to tell the government the truth at these debriefings?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**A.** Yes, I do.

**Q.** And you recall that the prosecutor that you met with also told you that you had to be truthful, correct?

**A.** Yes.

**Q.** You were high at the time, though?

**A.** Yes.

**Q.** And you lied to the government, correct?

**A.** Yes.

**Q.** When you testified last week, you indicated that you would buy nice clothes probably every other day? Do you remember that?

**A.** Yes, I do.

**Q.** Okay. And what period of time was it that you were buying nice clothes probably every other day?

**A.** What you mean? Like what year?

**Q.** Yeah, what year?

**A.** I mean, from like '98 all the way to I got locked up.

**Q.** In '98 and '99 is when you first started stealing clothes with the dudes from 15th Place, correct?

**A.** In '99, yes. Not '98.

**Q.** So that was only in '99?

**A.** That I can recall.

**Q.** Now, the two incidents that you testified about here, neither of those was the time that you were arrested in Maryland, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*7993*

1  **A.**  Repeat your question again.
2  **Q.**  There were two -- in your direct testimony last week,
3  there were two times that you talked about stealing clothes with
4  the dudes from 15th Place?
5  **A.**  Yes.  Yes.
6  **Q.**  Okay.  Neither of those two times is this time that you
7  were arrested in Maryland, correct?
8  **A.**  Correct.
9  **Q.**  That's a third time, correct?
10  **A.**  Correct.
11  **Q.**  How many other times do you think it was that you stole
12  clothes with the dudes from 15th Place?
13  **A.**  It wasn't no other times.  It was the time I got locked
14  up and the times when we got them jackets.
15  **Q.**  Okay.  So just those three times?
16  **A.**  Right.
17  **Q.**  And after you -- after you got locked up in March 1999
18  for stealing the jackets out of Up Against the Wall, you didn't
19  go on one of these moves with the 15th Place dudes again?
20  **A.**  No, I didn't.
21  **Q.**  Now, I believe on direct you indicated --
22         MS. WICKS:  Court's indulgence.
23  BY MS. WICKS:
24  **Q.**  -- that you had been locked up since January 28th, 2003?
25  Do you remember that answer?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7994*

1  **A.**  Yes.
2  **Q.**  Okay.  You were actually locked up on January 9th,
3  correct?
4  **A.**  Correct.
5  **Q.**  And you've been held since January 9th, 2003, correct?
6  **A.**  Naw.  I came home on the 22nd.  I came home on the 22nd
7  and they gave me a court date for the 28th.  And then I went to
8  court and they stepped me back on the 28th.
9  **Q.**  So you're saying you were arrested for the robbery --
10         MS. WICKS:  Court's indulgence.
11  BY MS. WICKS:
12  **Q.**  You were on release for the distribution of cocaine; you
13  were arrested for the robbery and the drugs that they found in
14  your house and you got out before you came back to court?
15  **A.**  Yes.
16  **Q.**  Okay.  When you testified in the grand jury in 2005, you
17  told the grand jury that prior to January of 2003, when you got
18  locked up in this case, that you had never been locked up for
19  longer than a week.  Do you remember telling the grand jury
20  that?
21  **A.**  No, I don't.
22         MS. WICKS:  Court's indulgence.
23  BY MS. WICKS:
24  **Q.**  Page 87.  One of the grand jurors asked you:  "I just
25  want to ask:  You say 2003, that was the first time you were

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7995*

1  locked up?  Was it 2003?"
2         And you answered:  "Yes.  That's the first time I've been
3  locked up that I've been in for a while."
4         And the grand juror said:  "Oh."
5         And you continued to answer:  "Every other time I got
6  locked up, I did just like three days, five days, a week, not
7  longer than a week."
8         That's what you told the grand jury back on October 25th
9  of 2005, correct?
10  **A.**  Correct.
11  **Q.**  The truth was you had been locked up in Maryland for
12  months back in 1999, correct?
13  **A.**  Right.  Eight months.
14  **Q.**  Like eight months, correct?
15  **A.**  Yes.
16  **Q.**  And then you had gotten out and then you had been locked
17  up for at least a couple of weeks back in 2000, correct?
18  **A.**  I don't recall.
19  **Q.**  You don't recall.  This morning I asked you about -- and
20  we looked at your court jacket in Maryland.  There were
21  probation violations when you were in Upper Marlboro, correct?
22  **A.**  Correct.
23  **Q.**  Ask that was for a couple weeks, correct?
24  **A.**  Correct.
25  **Q.**  So you lied to the grand jury in 2005 merely about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*7996*

1  whether or not you had ever been locked up for more than a week,
2  correct?
3  **A.**  I just didn't --
4  **Q.**  You forgot about the eight months you were locked up in
5  Upper Marlboro?
6  **A.**  I didn't forget about the eight months, but the other two
7  weeks you're talking about.
8  **Q.**  Well, you didn't tell them about the eight months,
9  correct?
10  **A.**  Correct.
11  **Q.**  You told them you had never been locked up before for
12  more than a week, correct?
13  **A.**  Yeah, that's what I told them.
14  **Q.**  And that was a lie, correct?
15  **A.**  Correct.
16         MS. WICKS:  Court's indulgence.
17  BY MS. WICKS:
18  **Q.**  You testified last week about an incident where you were
19  shot by Jasmine Bell.  Do you remember those questions and your
20  answers?
21  **A.**  Yes, I do.
22  **Q.**  And when you testified last week, you said that Wop was
23  out there, correct?
24  **A.**  No, I don't.
25  **Q.**  No, you don't?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8005*

1  in the proffer that were not true, correct?
2  **A.**  Correct.
3  **Q.**  You didn't write that proffer up, did you?
4  **A.**  No, I didn't.
5  **Q.**  Did you read it before you signed it?
6  **A.**  Yes, I did.
7  **Q.**  And when you signed it saying it was true, you knew it
8  had false stuff in it, right?  You knew it had false statements,
9  right?
10  **A.**  Yes.
11  **Q.**  Now, you said in your testimony that you never sold or
12  bought drugs from Santuce Bell, right?
13  **A.**  Yes, I bought drugs from him.
14  **Q.**  You bought drugs from Santuce?
15  **A.**  Yes.  Wholesale quantities.
16  **Q.**  Wholesale quantities?
17  **A.**  Yes.
18  MR. BEANE:  Okay.  Court's indulgence.
19  BY MR. BEANE:
20  **Q.**  You also talked about going into someone's apartment and
21  seeing people cut up drugs, right?
22  **A.**  Yes.
23  **Q.**  Okay.  And you said you went into that apartment.  Do you
24  remember whose apartment it is?
25  **A.**  I mean, it's -- I think Kena's apartment.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*8006*

1  **Q.**  Kena's apartment?
2  **A.**  Yes.
3  **Q.**  And you talked about people being in Kena's apartment
4  playing a game.  You meant the PlayStation game, right?
5  **A.**  Yes.
6  MR. BEANE:  Okay.  So -- okay.  That's all I have.  Thank
7  you.
8  THE COURT:  All right.
9  Mr. Martin.
10  MR. MARTIN:  Thank you, Your Honor.
11  <u>CROSS-EXAMINATION OF KEITH BARNETT</u>
12  BY MR. MARTIN:
13  **Q.**  Good morning, Mr. Barnett.
14  **A.**  Good morning.
15  **Q.**  My name is Anthony Martin and I represent Joseph Jones.
16  Now, Mr. Barnett, would it be fair to say that you have
17  met with the government several times now since your arrest?
18  **A.**  Yes.
19  **Q.**  And you've debriefed a number of times with the
20  government and its agents, right?
21  **A.**  Yes.
22  **Q.**  And you know what I mean by "debrief," right?
23  **A.**  Yes.
24  **Q.**  You've told them what you know?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*8007*

1  **Q.**  And in addition to the agents, you've also met with some
2  of the prosecutors; would that be a fair statement?
3  **A.**  Yes.
4  **Q.**  And when were you arrested initially in this case?  Do
5  you remember the date you were arrested?
6  **A.**  I came in January the 9th.  I went home the 22nd and they
7  gave me a court date for the 28th.  And when I went on the 28th,
8  they stepped me back.
9  **Q.**  Okay.  But what year?
10  **A.**  2003.
11  **Q.**  So you've been locked up from 2003 to the present and
12  continuing?
13  **A.**  Yes.
14  **Q.**  And I think also, if I heard you correctly last week and
15  again this morning, you were at Arlington at one point?
16  **A.**  Yes.
17  **Q.**  And you were at CTF at another point?
18  **A.**  Yes.
19  **Q.**  And you referred to CTF as CCA, right?
20  **A.**  Yes.
21  **Q.**  CCA is the corporation that runs the CTF, right?
22  **A.**  Yes.
23  **Q.**  And over at the CTF, you came in contact with several
24  people from Congress Park; is that correct?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*8008*

1  **Q.**  And some of those people included -- was it Munya?
2  **A.**  No.
3  **Q.**  Tell us again who it was you were in contact with over at
4  the CTF.
5  **A.**  Quincy Thomas, Burke Johnson, Season Wood.  That's it.
6  **Q.**  That's about all you can remember right now?
7  **A.**  Right.
8  **Q.**  What about over at Arlington?  Who were you in contact
9  with at Arlington?
10  **A.**  Larry Browne, Munya, Kairi.
11  **Q.**  With respect to Munya, how long were you at Arlington
12  with him?
13  **A.**  About 20 months.
14  **Q.**  20 months?  And who was the other person you named?  You
15  said Larry Browne?
16  **A.**  Yes.
17  **Q.**  How long were you at the CTF with Mr. Browne?
18  **A.**  He came to Arlington.  He was out there about a month
19  after I left.
20  **Q.**  About a month?  And who was the third person you just
21  named?
22  **A.**  Kairi Kellibrew.
23  **Q.**  And how long were you out at Arlington with Kairi?
24  **A.**  He stayed for about a week and he left.
25  **Q.**  And would it be inaccurate for me to refer to them as

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8009

1  your "homeboys"?
2  **A.**  Naw.  I knew them.  That was it.  I faced them because I
3  knew them from the street and -- you know.
4  **Q.**  So "homeboy" is somebody who's a lot closer?
5  **A.**  Yes.
6  **Q.**  And just because you know somebody on the street doesn't
7  mean that that's your homeboy?
8  **A.**  Right.
9  **Q.**  It doesn't mean that that's somebody you hang out with,
10  right?
11  **A.**  Right.
12  **Q.**  Because a "homeboy" would be somebody that you party
13  with, somebody who you might go over to their house?
14  **A.**  Yes.
15  **Q.**  Well, tell me, what is your definition of "homeboy."  I
16  don't want to put words in your mouth.  What is a "homeboy"?
17  **A.**  A "homeboy" is a person that -- you know, that you cool
18  with, you close with.
19  **Q.**  So it's more than just somebody you see on the street and
20  say "Hi" to, right?
21  **A.**  Yes.
22  **Q.**  And a homeboy, you might have his or her phone number so
23  you can get in contact with them?
24  **A.**  Yes.
25  **Q.**  And you might have frequent contacts with them?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8010

1  **A.**  You might.
2  **Q.**  And it's your testimony that Munya was not really your
3  homeboy, right?
4  **A.**  Naw.  Naw, he wasn't.
5  **Q.**  You just knew him from Congress Park?
6  **A.**  Yes.
7  **Q.**  So he was not really a friend, right?
8  **A.**  Naw.
9  **Q.**  He wasn't really like family, right?
10  **A.**  Naw.
11  **Q.**  He want like a frat brother or anything like that, right?
12  **A.**  See, the situation between Munya -- him and my brother
13  had a close relationship.
14  **Q.**  I see.  And the same is true of Black; Black wasn't
15  really your friend, right?
16  **A.**  Naw.
17  **Q.**  And he wasn't like family either, was he?
18  **A.**  Naw.
19  **Q.**  And in fact, you didn't want to have anything to do with
20  him, right?
21  **A.**  Right.
22  **Q.**  You just knew him from around the neighborhood, right?
23  **A.**  Right.
24  **Q.**  And that's true of a lot of people you knew in Congress
25  Park?  You'd see them, but they weren't really close to you,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8011

1  right?
2  **A.**  Correct.
3  **Q.**  Now, some of these people in Congress Park that you knew,
4  you might have interactions with them, but you didn't
5  necessarily sell drugs with them, right?
6  **A.**  Yes.
7  **Q.**  And you didn't buy drugs from them, correct?
8  **A.**  Correct.
9  **Q.**  In fact, some of the people in Congress Park that you
10  associated with played on a basketball team with you, didn't
11  they?
12  **A.**  Yes, they did.
13  **Q.**  Do you remember what year that basketball team was
14  together?
15  **A.**  No, I don't.
16  **Q.**  Do you remember the name of the team?
17  **A.**  I think it was Untouchables.  I don't recall.
18  **Q.**  You don't recall.  Do you remember whether or not you had
19  uniforms?
20  **A.**  Yes.
21  **Q.**  Do you remember what color the uniforms were?
22  **A.**  Black and silver.
23  **Q.**  Black and silver?
24  **A.**  Yes.
25  MR. MARTIN:  Mr. Mazzitelli, would you be so kind to bring

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8012

1  up 108.95, please.
2  BY MR. MARTIN:
3  **Q.**  Now, was Lonnie a member of that team?
4  **A.**  Yes, he was.
5  **Q.**  Who is Lonnie?
6  **A.**  Lonnie Harrell.
7  **Q.**  Did Lonnie play for Georgetown at one point?
8  **A.**  Yes, he did.
9  **Q.**  And was Keith on that team as well?
10  I'm sorry.  You're Keith.  Was Kevin on that team?
11  **A.**  Yes, he was.
12  **Q.**  Was Jo-Jo on the team?
13  **A.**  Yes, he was.
14  **Q.**  Was Boy-Boy on the team?
15  **A.**  Yes, he was.
16  **Q.**  Who else was on the team?
17  **A.**  It was a lot of us on that team.
18  **Q.**  Let's see.  Can you see that up there, sir --
19  **A.**  Yes, I can.
20  **Q.**  -- on the monitor?
21  Can you see Mr. Jones there on the left?
22  **A.**  Yes, I do.
23  **Q.**  What is he wearing there on his head?
24  **A.**  Congress Park headband.
25  **Q.**  Do you recognize that headband from the days when you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8013

1    guys had the basketball team?
2    **A.**    Yes.
3    **Q.**    Did other members of the team have a headband like that?
4    **A.**    Yes.
5    **Q.**    Okay. And was that something that was distributed
6    throughout the neighborhood?
7    **A.**    No, it wasn't.
8          MR. MARTIN: Okay. Thank you. You can take that down,
9    Mr. Mazzitelli.
10   BY MR. MARTIN:
11   **Q.**    Getting back to your debriefings, you said you had
12   debriefed with the government several times. When did you first
13   learn that Mr. Jones was on trial in this case?
14   **A.**    In '05.
15   **Q.**    2005? Do you remember if it was the latter part of 2005,
16   like October, November, December?
17   **A.**    I don't recall. I just know it was '05.
18   **Q.**    You don't recall? Okay. And you were locked up since --
19   was it 2003, you said?
20   **A.**    Yes.
21   **Q.**    So for two years, you didn't hear anything about Joseph
22   Jones being in this case, right?
23   **A.**    Correct.
24   **Q.**    And tell me, what was the circumstance that brought to
25   your realization that Mr. Jones was now involved in this case?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8014

1          MS. PETALAS: Objection, Your Honor. Calls for hearsay.
2          MR. MARTIN: I didn't ask what anybody said. I just asked
3    him, what was the circumstance? Was it a debriefing? Was it an
4    overheard conversation at Arlington or CTF? I didn't ask him
5    what anybody said, Your Honor.
6          THE COURT: All right. I'll allow you to ask it.
7          THE WITNESS: I think it was a conversation I overheard.
8    BY MR. MARTIN:
9    **Q.**    And where was that conversation, sir?
10   **A.**    I was in -- I was back in -- I was in Arlington.
11   **Q.**    You were in Arlington. Do you remember, without saying
12   what was said, do you remember who was taking part in those
13   conversations?
14   **A.**    No, I don't recall.
15   **Q.**    Well, it wasn't the correctional officers at Arlington?
16   **A.**    Naw.
17   **Q.**    And would it be safe to say it was people from Congress
18   Park who were talking about that?
19   **A.**    Naw. I don't recall.
20   **Q.**    You don't recall?
21   **A.**    I don't recall who was talking about it.
22   **Q.**    No, I didn't ask you who specifically was talking, but
23   would it be safe to say it was people who knew Joseph Jones?
24   **A.**    Who was talking about him?
25   **Q.**    Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8015

1    **A.**    Yeah.
2    **Q.**    Okay. And those people would have been from Congress
3    Park, correct?
4    **A.**    Naw. It's -- it's like they ain't -- it wasn't only just
5    Joseph Jones. I mean, they said everybody who had got locked up
6    in '05.
7    **Q.**    In '05?
8    **A.**    Even including everybody upstairs with me right now.
9    **Q.**    Okay. Let's go back to 2005, when you heard this
10   conversation.
11   **A.**    Right.
12   **Q.**    As best you can recall, who was in Arlington in 2005?
13   **A.**    Me, Larry Browne, Munya. Us three.
14   **Q.**    The three of you? And not being in Arlington at any
15   given time, I really don't know how the rec situation is over
16   there. How often do you get recreation privileges?
17   **A.**    All day, every day.
18   **Q.**    All day, every day? So if you're in general population,
19   you're not in your cell all day? You're able to go about and
20   mingle?
21   **A.**    Right. But at the time, all of us wasn't in the same
22   block.
23   **Q.**    I understand.
24   **A.**    I was working, so I was moving around the whole jail.
25   **Q.**    All right. So you had access to the entire jail during

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8016

1    2005?
2    **A.**    Yes.
3    **Q.**    Okay. But you still got your rec time as well, right?
4    **A.**    Yes.
5    **Q.**    And when you say you had access to the entire jail, that
6    meant you were able to go from one block to the other, correct?
7    **A.**    Yes.
8    **Q.**    What was your detail? What exactly did you do?
9    **A.**    Commissary, central laundry, kitchen.
10   **Q.**    And all -- well, the kitchen, that allowed you to have
11   access to all the blocks as well?
12   **A.**    Yes.
13   **Q.**    Okay. Now, again, staying with the debriefings, was
14   there a time when you were shown a photo of Joseph Jones?
15   **A.**    Yes.
16   **Q.**    And do you recall when that was?
17   **A.**    No, I don't recall when it was.
18   **Q.**    Do you recall who showed you the photo?
19   **A.**    No, I don't.
20   **Q.**    Well, let's see if we can help you remember. Was it
21   before or after you heard the conversations about Joseph Jones
22   in Arlington?
23   **A.**    Before.
24   **Q.**    All right. And do you remember who showed you the photo?
25   **A.**    No, I don't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8029

1  **A.**   Yes.
2  **Q.**   And when they supplied you crack cocaine, you were
3  fronted; is that correct?
4  **A.**   Yes.
5  **Q.**   And when you're fronted -- can you explain how that
6  works?
7  **A.**   If you being fronted some drugs, they give you -- they
8  give it to you up front without no money.
9  **Q.**   Right. And when are you expected to pay back the money
10 that you owe for those drugs?
11 **A.**   Whenever you finish.
12 **Q.**   Whenever you're finished?
13 **A.**   Yes.
14 **Q.**   Okay. What if you don't finish or don't get it back to
15 them in a short period of time? What happens?
16 **A.**   Nothing happens.
17 **Q.**   Nothing happens to you --
18 **A.**   You just --
19 **Q.**   -- is that right?
20 **A.**   You just -- you know, you a slow beginner, so they have
21 patience with you.
22 **Q.**   Have you personally observed in, let's say, the period
23 '95-96 where people messed up their money or messed up their
24 sales and did not pay back the money that they owed?
25 **A.**   Me?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8030

1  **Q.**   No, anyone. Anyone --
2  **A.**   Not that I recall.
3  **Q.**   So you never saw anyone having problems being -- payback
4  to people?
5  **A.**   Not that I recall.
6  **Q.**   You never saw anyone having problems getting -- someone
7  trying to collect money because they were fronted and didn't pay
8  them back; is that right?
9  **A.**   Not that I recall.
10 **Q.**   Okay. Now, when you obtained crack cocaine, '96 and
11 thereafter, were you required to sell in a particular area?
12 **A.**   No, I wasn't.
13 **Q.**   And were you required to pay a kickback for a particular
14 area that you sold at?
15 **A.**   No, I wasn't.
16 **Q.**   And were you required to sell at a particular time?
17 **A.**   No, I wasn't.
18 **Q.**   And were you required to sell with a certain group of
19 people?
20 **A.**   No, I wasn't.
21 **Q.**   Were you required to sell on certain days?
22 **A.**   No, I wasn't.
23 **Q.**   Or in a certain shift?
24 **A.**   No, I wasn't.
25 **Q.**   And if you wanted to sleep late on Sunday, you could

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8031

1  sleep late and you didn't have to sell; is that right?
2  **A.**   Yes.
3  **Q.**   Okay. Now, you had mentioned that you had gone to Barry
4  Farms when there was the death of D-Lock. Do you remember that?
5  **A.**   Yes.
6  **Q.**   And were you familiar with Barry Farms?
7  **A.**   Yes, I was.
8  **Q.**   How were you familiar with Barry Farms?
9  **A.**   I used to play on a basketball team in a tournament down
10 there.
11 **Q.**   What year was that?
12 **A.**   I don't recall. I was real young back then.
13 **Q.**   Okay. And how about Bobby Capies? Was he familiar with
14 Barry Farms, to your knowledge?
15 **A.**   Not to my knowledge.
16 **Q.**   Was he the one that suggested that you go to Barry Farms
17 to get rid of the car?
18 **A.**   Not that I recall.
19 **Q.**   Okay. What about Trenton Place? You were pretty
20 familiar with Trenton Place, weren't you?
21 **A.**   Yes, I was.
22 **Q.**   And how familiar were you with that area for the period
23 of '95 to 2001? Very familiar or just so-so?
24 **A.**   Very familiar.
25 **Q.**   And were you familiar with an individual from Trenton

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8032

1  Place by the name of Paul Tyler?
2  **A.**   Naw.
3  **Q.**   Did you know someone by the name of Charles Thompson?
4  **A.**   No.
5  **Q.**   Did you know someone by the name of Tony Lupus?
6  **A.**   No.
7  **Q.**   Arvid Thomas?
8  **A.**   No.
9  **Q.**   Tony Royer?
10 **A.**   No.
11 **Q.**   Delroy Greene?
12 **A.**   No.
13 **Q.**   Did you ever rob anybody on Trenton Place?
14 **A.**   No, I didn't.
15 **Q.**   In fact, you went out and robbed with those individuals,
16 did you?
17        MS. PETALAS: Objection, Your Honor. What individuals?
18 BY MR. CARNEY:
19 **Q.**   With individuals from Trenton Place.
20 **A.**   Have I went out and robbed with them?
21 **Q.**   Yes.
22 **A.**   No, I haven't.
23 **Q.**   You were familiar with 15th Place; is that right?
24 **A.**   Yes, I was.
25 **Q.**   And how familiar were you familiar with 15th Place?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8033

1    **A.**    We had -- our basketball tournament used to be up there.

2    **Q.**    And you had friends also that sold drugs on 15th Place;

3    is that right?

4    **A.**    No, I didn't have no friends on 15th Place.

5    **Q.**    Did you ever rob with individuals from 15th Place or 15th

6    Street?

7    **A.**    Yeah, we took -- we took leather coats together.

8    **Q.**    Who are these people?  What are their names?

9    **A.**    Man, Tony.

10   **Q.**    Tony is -- do you know his full name?

11   **A.**    No, I don't.

12   **Q.**    And how did that work when you did the first robbery with

13   them?  Could you explain that to us.

14   **A.**    I seen them at the -- at the Lee's store and they had

15   some A Records, so they were selling them.  So they had told me

16   they were snatching them.  So I wanted a coat.  And they said,

17   "You can drive with us and we're going to go in and snatch some,

18   and just drive."

19   **Q.**    Did you talk about how you were going to do it before you

20   went?

21   **A.**    Yes.

22   **Q.**    And did you take measurements, like I'm a size 40 or 42?

23   **A.**    No, we didn't.

24   **Q.**    How did you figure out what coats to take?

25   **A.**    We just snatched them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8034

1    **Q.**    And who made the plan to drive the car?

2    **A.**    I did.

3    **Q.**    Okay.  And what year was this?

4    **A.**    I don't recall.  '98, '99.  I don't recall.

5    **Q.**    Could it be '97?

6    **A.**    I don't recall.

7    **Q.**    Do you recall whether this was the only time or other

8    times that you did this with them?

9    **A.**    It was in the same year.

10   **Q.**    So in the same year, you did other robberies with them?

11   **A.**    It was two, two times.

12   **Q.**    So you did this just twice?

13   **A.**    And the one time when I got locked up in P.G.

14   **Q.**    So is that three times?

15   **A.**    Yes, it's three times.

16   **Q.**    Okay.  And when we talk about robberies, you mentioned

17   that an individual by the name of Black just about robbed

18   everybody on Congress Park; is that right?

19   **A.**    I mean, not only in Congress Park.  Everywhere.

20   **Q.**    Well, when you say "everywhere," where else?

21   **A.**    Everywhere.

22   **Q.**    Did you go with him on these?

23   **A.**    Naw.

24   **Q.**    And is that true about Congress Park, that individuals

25   would rob each other?  Is that what happened?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8035

1    **A.**    Yes.

2    **Q.**    And was that for the entire period of time that you were

3    out there?

4    **A.**    No, it wasn't.

5    **Q.**    When did that start?

6    **A.**    I can't give you no time frame, but whenever.

7    **Q.**    Well, if --

8    **A.**    I guess whenever they felt like they could take something

9    from the next man.

10   **Q.**    When these robberies were taking place, was this to

11   collect money that was owed?

12        MS. PETALAS:  Objection, Your Honor.  He can't say why

13   other people are committing robberies.

14        THE COURT:  Sustained, but I'll let you rephrase.

15   BY MR. CARNEY:

16   **Q.**    The individuals that you know that were doing robberies

17   on Congress Park, were they doing this to collect money that was

18   owed to them?

19        MS. PETALAS:  Same objection.

20        THE COURT:  Sustained.

21   BY MR. CARNEY:

22   **Q.**    You indicated that there were robberies that were taking

23   place in Congress Park.  What year was this?

24   **A.**    I don't recall what year.

25   **Q.**    Can you give us a rough estimate as to whether it was a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8036

1    two-year period, a five-year period?

2    **A.**    I mean, I got robbed numerous of times in Congress Park.

3    **Q.**    Okay.  When you were robbed numerous times in Congress

4    Park, these were by individuals that were regulars on Congress

5    Park?

6    **A.**    Yes, it was.

7    **Q.**    And you knew who they were?

8    **A.**    Yes.

9    **Q.**    And when they were robbing you, was this to collect money

10   that you owed to them?

11   **A.**    No, it wasn't.

12   **Q.**    It was just straight out taking your money?

13   **A.**    Yes.

14   **Q.**    Taking your drugs?

15   **A.**    Yes.

16   **Q.**    And did you observe other individuals being robbed on

17   Congress Park like you?

18   **A.**    I never observed it.  No, I didn't.

19   **Q.**    Now, when you went to 10th Place to -- in involvement

20   with the shooting of D-Lock, were you friend with Capies at that

21   time?

22   **A.**    No, I wasn't.

23   **Q.**    And yet you went and did this murder; is that right?

24   **A.**    Yes.

25   **Q.**    And were you friends with LT at the time?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8069

1   THE WITNESS: No, I didn't.
2   BY MS. PETALAS:
3   Q.   When you talked about the next day, when Dazz gave you
4   the crack cocaine, were you high at that point?
5   A.   No, I wasn't.
6   Q.   And do you recall questions from Mr. Beane, when he was
7   talking about the fake cocaine that Phil sold, do you recall
8   that?
9   A.   Yes.
10  Q.   And I believe earlier -- well, did you ever sell fake
11  crack cocaine?
12  A.   Yes, I did.
13          MR. ZUCKER: Objection, relevance.
14          MS. WICKS: Asked and answered.
15          THE COURT: Overruled.
16          THE WITNESS: Yes, I did.
17  BY MS. PETALAS:
18  Q.   And what happened when you sold fake crack cocaine?
19          MR. ZUCKER: Objection, relevance.
20          THE COURT: Overruled.
21          THE WITNESS: Uhm, I sold the fake crack cocaine to get
22  the money to buy some real cocaine.
23  BY MS. PETALAS:
24  Q.   Why didn't you just continue to sell fake crack cocaine?
25          MS. WICKS: Objection, assumes facts not in evidence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8070

1   THE COURT: Sustained. Rephrase.
2   BY MS. PETALAS:
3   Q.   Well, did you -- you said you bought -- the money you got
4   from the fake cocaine, you bought real cocaine. Why isn't it
5   that you just didn't make more fake cocaine and sell that?
6   A.   I didn't want to chance one of them crackheads doing
7   nothing to me.
8   Q.   The time that you bought the fake cocaine --
9          MR. ZUCKER: Objection --
10  BY MS. PETALAS:
11  Q.   I'm sorry.
12          The time that you sold fake crack cocaine, did you have
13  any other of your customers come back and tell you it was fake
14  crack cocaine?
15          MR. BEANE: Objection, Your Honor, hearsay.
16          THE COURT: Overruled.
17          THE WITNESS: Yes.
18  BY MS. PETALAS:
19  Q.   And what, if anything, did you do then?
20  A.   I reimbursed them with the real cocaine.
21  Q.   So, did you end up making -- did you end up making a lot
22  of money by selling the fake crack cocaine?
23  A.   No, I didn't.
24  Q.   And when you were selling the fake crack cocaine, did you
25  know, looking at it, that it was fake crack cocaine?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8071

1   A.   No.
2          MR. ZUCKER: Objection.
3          THE COURT: Overruled.
4          THE WITNESS: No, you couldn't.
5          MS. PETALAS: Your Honor, I'm calling up Government's
6   Exhibit 108.95. If I could ask -- if we could switch back to the
7   computer.
8          THE DEPUTY CLERK: It's in evidence?
9          MS. PETALAS: Yes.
10  BY MS. PETALAS:
11  Q.   Mr. Barnett, looking at Government's Exhibit 108.95, do
12  you see that?
13  A.   Yes, I do.
14  Q.   And do you see Joseph Jones, Jo-Jo, in that picture?
15  A.   Yes.
16  Q.   And the shirt that he's wearing, was that part of the
17  Congress Park basketball uniform?
18  A.   No, it wasn't.
19  Q.   And did you have a Congress Park headband?
20  A.   Yes, I did.
21          MS. PETALAS: Court's indulgence.
22  BY MS. PETALAS:
23  Q.   Mr. Barnett, you testified about your brother, Kevin. Do
24  you recall that?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8072

1   Q.   How do you feel about your brother? Do you love your
2   brother?
3   A.   Yes, I do.
4   Q.   Are you trying to put your -- are you trying to put your
5   brother into a murder that he wasn't involved in?
6   A.   No, I'm not.
7          MS. WICKS: Objection, relevancy.
8          THE COURT: Sustained as to form.
9   BY MS. PETALAS:
10  Q.   Do you love your brother?
11  A.   Yes, I do.
12          MR. ZUCKER: Asked and answered.
13          MR. MARTIN: Objection, beyond the scope.
14          MR. ZUCKER: And asked and answered.
15          THE COURT: Sustained.
16  BY MS. PETALAS:
17  Q.   Is there any reason that you would -- is there any reason
18  you would lie and put your brother in a murder?
19          MR. ZUCKER: Objection.
20          THE COURT: I'll allow it.
21          THE WITNESS: No.
22  BY MS. PETALAS:
23  Q.   Were you trying to mislead the jury when you talked about
24  your brother the day after the D-Lock murder?
25  A.   No, I wasn't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8073**

1  MS. PETALAS: No further questions, Your Honor.

2  THE COURT: All right. The witness may be excused.

3  MR. MARTIN: Your Honor, before the witness is excused,

4  may I approach?

5  THE COURT: Yes.

6  MR. MARTIN: Thank you, sir.

7  (Following sidebar discussion had on the record:)

8  MR. MARTIN: Your Honor, Ms. Petalas cross-examined the

9  witness -- I'm sorry, redirected the witness, with respect to the

10  proffer of Joseph Jones. I don't want to leave the jury with the

11  impression that I tried to mislead them. My question was

12  specifically, "did you buy drugs from Joseph Jones? Did you sell

13  drugs to Joseph Jones," and vice versa? And he said "no." And I

14  said in the proffer and in the grand jury, "you never said he did

15  those things?" He said "No." And then Ms. Petalas came back and

16  called his attention to the proffer that specifically references

17  the RICO, but there's a second portion of the proffer, which does

18  talk about people that this witness bought and sold drugs from,

19  and actually broke it down and sold it on the street level.

20  And I would like to recross him, just on that specific

21  point, because I don't want the jurors left with that impression,

22  that I tried to pull something over on them. It's a very, very

23  narrow recross, Your Honor, just to show them that portion of the

24  proffer.

25  MS. PETALAS: And the proffer is in evidence and the later

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8074**

1  parts of that proffer did not say who he sold drugs to. They

2  say -- it has the minimum statement of facts and it lists some of

3  the people that he bought drugs from. It is going to be in

4  evidence. If he's going cross-examine on that, then it's only

5  fair to come back and point to the minimum statement of facts,

6  but I think the proffer is in evidence and I think that this is

7  something -- he had the proffer and could have anticipated on my

8  redirect and that -- I don't see where I opened the door in any

9  way for a recross.

10  THE COURT: All right. The request is denied. You can

11  certainly argue it on closing.

12  MR. TABACKMAN: Your Honor, I would --

13  THE COURT: Yes.

14  MR. TABACKMAN: We don't have to hear it now, but at one

15  point, I would like to have just two minutes of the Court's time

16  to talk about what I think is a misleading nature of the way the

17  government uses the plea agreement and the perjury -- and this

18  issue of perjury.

19  THE COURT: As you said, we don't have to take this up

20  now, with this witness on the stand. We'll take it up later.

21  MR. TABACKMAN: I want to lodge an objection to that.

22  (Sidebar discussion concluded.)

23  THE COURT: All right. The witness may be excused.

24  Announce your next witness.

25  MR. GUERRERO: Your Honor, the government calls Cedric

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8075**

1  Conner.

2  (CEDRIC CONNER, GOVERNMENT'S WITNESS, SWORN)

3  DIRECT EXAMINATION OF CEDRIC CONNER

4  BY MR. GUERRERO:

5  **Q.** Good morning, sir.

6  **A.** Good morning.

7  **Q.** Would you please tell us your first name and your last

8  name and spell each, please.

9  **A.** Cedric Conner. C-E-D-R-I-C, C-O-N-N-E-R.

10  **Q.** And Mr. Conner, do you have a nickname?

11  **A.** Rodey.

12  **Q.** Can you spell that, please.

13  **A.** It's R-O-D-E-Y.

14  **Q.** I'm going to ask you, Mr. Conner, if you can just adjust

15  that mic so we can hear you.

16  **A.** Okay.

17  **Q.** Okay. How old are you, sir?

18  **A.** Thirty-six.

19  **Q.** And where were you born?

20  **A.** Washington, D.C.

21  **Q.** Where did you grow up?

22  **A.** Southeast Washington, D.C., Congress Street area.

23  **Q.** And do you have any brothers, sisters?

24  **A.** One brother, one sister.

25  **Q.** Your brother, older or younger than you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8076**

1  **A.** Both younger.

2  **Q.** Sister also younger?

3  **A.** That's correct.

4  **Q.** Is your brother still alive?

5  **A.** He's deceased.

6  **Q.** When you were growing up, did you say -- what was the

7  name of the street you were growing up on?

8  **A.** Congress Street.

9  **Q.** Who did you live on Congress Street with?

10  **A.** My mother, my brother and my sister.

11  **Q.** And how long did you -- well, let me rewind a little bit

12  here.

13  Where did you go to school?

14  **A.** I went to elementary school, at Green, went to middle

15  school, Johnson Junior High, Winston, and I finished -- I went

16  to high school, Anacostia, Ballou, and I finished in Orville,

17  Alabama.

18  **Q.** Let's focus on that time period. Where were you living

19  while you were going to school?

20  **A.** 3324 13th Street, Congress Street.

21  **Q.** Is that an apartment or a house?

22  **A.** It's an apartment.

23  **Q.** Was that your mother's address?

24  **A.** That's correct.

25  **Q.** If you saw a map of that area, would that help in your

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8077

1  testimony?
2  **A.**    Yes, sir.
3        MR. GUERRERO:  Your Honor, may we pull up 100.1 marked and
4  entered.
5  BY MR. GUERRERO:
6  **Q.**    All right, Mr. Conner, do you see Government's Exhibit
7  100.1?
8  **A.**    Yes, I do.
9  **Q.**    And what does that map show?
10 **A.**    A map of the area.
11 **Q.**    A map of what area?
12 **A.**    A map of the area that I grew up in.
13 **Q.**    Do you see the street where you used to live?
14 **A.**    Yes, I do.
15 **Q.**    And why don't you point to it so we can see the
16 approximate location where you used to live, on this 100.1.
17 **A.**    (Indicating).  That is 13th and Congress.  Actually, I'm
18 saying it's kind of parallel to each other.
19 **Q.**    Okay.  Just for the record, on 100.1, you marked Congress
20 Street, first to the left Of 13th Street?
21 **A.**    Right.
22 **Q.**    And then you continued to mark it a little bit further to
23 the right, actually On 13th Street?
24 **A.**    Right.
25 **Q.**    Which area were you trying to point to?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8078

1  **A.**    Congress Street, 3324 -- Actually, 13th Street.  So, it's
2  like it crosses.  So it's --
3  **Q.**    Would it be right at the intersection of 13th and
4  Congress Street?
5  **A.**    That's correct.
6  **Q.**    That's what you were trying to do there?
7  **A.**    Yeah.
8  **Q.**    Okay.  Why don't you touch the right-hand corner of the
9  screen, just to clear it.  Right-hand corner; lower, right-hand
10 corner.  There you go.
11       You said you went to Ballou High School?
12 **A.**    Correct.
13 **Q.**    Did you finish Ballou High School?
14 **A.**    No, just to the 11th grade.
15 **Q.**    And what happened in the 11th grade?
16 **A.**    After the 11th grade, I finished the school year and then
17 I moved to Alabama for a year.
18 **Q.**    You moved to Alabama?
19 **A.**    That's correct.
20 **Q.**    Why?
21 **A.**    Per my mom.
22 **Q.**    Your mom?
23 **A.**    Yep.
24 **Q.**    How old were you when you went Alabama?
25 **A.**    Seventeen.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8079

1  **Q.**    Why did your mom want you to go to Alabama?
2  **A.**    She wanted me to see a different school environment.
3  **Q.**    Did you have any family in Alabama?
4  **A.**    Yes, I did.
5  **Q.**    Who is that?
6  **A.**    My father's older sister.
7  **Q.**    So when you went to Alabama, who did you live with?
8  **A.**    I lived with his older sister.
9  **Q.**    What did you do while in Alabama?
10 **A.**    Finished high school.
11 **Q.**    Which high school did you go to?
12 **A.**    Keith High.
13 **Q.**    Can you spell that for the court reporter.
14 **A.**    K-E-I-T-H High School.
15 **Q.**    Did you finish high school?
16 **A.**    Yes, 1998 -- I mean '88.
17 **Q.**    1988?
18 **A.**    1988.
19 **Q.**    Did you graduate?
20 **A.**    Yes, I did.
21 **Q.**    When you finished in 1988, what did you do?
22 **A.**    After I graduated, I came back to Washington D.C.  I got
23 a job at the National Rehabilitation Hospital.
24 **Q.**    Who did you live with when you came back in 1988?
25 **A.**    My mother.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8080

1  **Q.**    And where was your mother living then?
2  **A.**    Same address.
3  **Q.**    Over on 13th and Congress?
4  **A.**    That's correct.
5  **Q.**    I want to now go from, like, '88 -- from 1988 to, like,
6  1992.  Were you employed then?
7  **A.**    Yes, I was.
8  **Q.**    Who was your employer?
9  **A.**    In '88 to about -- seven months after that, I was working
10 for the National Rehabilitation Hospital.
11 **Q.**    Is that what you said, the NRH?
12 **A.**    NRH.  Yep.
13 **Q.**    What were you doing for them?
14 **A.**    I did cafeteria work.  I was a -- I guess you could put
15 it, like a cook.
16 **Q.**    Why did you stop working for them?
17 **A.**    Uhm, they changed my shift.  I was uncomfortable with the
18 shift they gave me.
19 **Q.**    During that time period, how old were from, like, that
20 first job you had with NRH?
21 **A.**    Eighteen.
22 **Q.**    And were you doing anything else for money?
23 **A.**    At that time, I began selling drugs.
24 **Q.**    What kind of drugs did you begin selling?
25 **A.**    Small quantity, eight-balls.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8097

1  **Q.**   How much money were you making during that time period
2  selling crack cocaine?
3  **A.**   It varied.  It varied.  Sometimes 3, 400 a night,
4  sometimes more.
5  **Q.**   You said sometimes "3 or 400 a night"?
6  **A.**   On the week, yeah.  During the week and a little bit more
7  during the weekend.
8  **Q.**   What kind of money would you make during the weekend?
9         I need you to speak just a little louder, sir.
10 **A.**   It was never the same.  I mean, it varied.  Sometimes you
11 might make close to a 1,000.  It depends how many hours you put
12 in out there.
13 **Q.**   I would like you now to tell us about Conrad Management.
14 Were you still employed during that time period?
15 **A.**   Yes, I was.
16 **Q.**   And what were you doing for them, then?
17 **A.**   Still as an office clerk.  Stayed an office clerk for
18 about four years.
19 **Q.**   Where were you living then, '92, '93?
20 **A.**   We had moved, then, to Maury Avenue, Oxon Hill, Maryland.
21 **Q.**   Who had moved to Maury Avenue?
22 **A.**   Myself, my mother and my sister.
23 **Q.**   Where is Maury Avenue located?
24 **A.**   Off of Southern Avenue.  It's across the border line of
25 Maryland and DC, near Eastover.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8098

1  **Q.**   I'm sorry?
2  **A.**   Near Eastover.
3  **Q.**   Is it in Maryland or D.C.?
4  **A.**   It's in Maryland.
5  **Q.**   You said you and your sister had moved there?
6  **A.**   Myself, my sister and my mother.
7  **Q.**   Was your brother still around at the time?
8  **A.**   No.
9  **Q.**   Did you maintain employment once you moved to Maury
10 Avenue?
11 **A.**   Yes, I did.
12 **Q.**   Who were you work for then?
13 **A.**   Conrad Management Associates.
14 **Q.**   When you moved to Maury Avenue, now '94 and '95, did you
15 continue to sell crack cocaine?
16 **A.**   Yes, I did.
17 **Q.**   And where were you selling your crack cocaine?
18 **A.**   Same area.
19 **Q.**   Which area was that?
20 **A.**   Congress Street, 13th Place.
21 **Q.**   The Circle again?
22 **A.**   Yes.
23 **Q.**   Did you ever go into -- did you ever sell crack cocaine
24 anywhere else in Congress Park during that time period?
25 **A.**   I mean -- yeah, different areas, like the Boat Alley or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8099

1  something like that.
2  **Q.**   You mentioned the Boat Alley?
3  **A.**   That's correct.
4  **Q.**   Do you see the Boat Alley on Government's Exhibit 100.1?
5  **A.**   Yes, I do.
6  **Q.**   And can you please point to it?
7  **A.**   It's not going on.
8  **Q.**   And for the record, on 100.1, you pointed to an area to
9  the left of 13th Street and to the right of Savannah Place.
10        THE COURT:  Say that again.
11 BY MR. GUERRERO:
12 **Q.**   I'm sorry, to the right of 13th Street, but to the left
13 of Savannah Place.
14        Did I say that right?
15 **A.**   Yeah, correct.
16 **Q.**   And what area is depicted there?  What does it look like?
17 **A.**   It's an alley.
18 **Q.**   A parking lot?
19 **A.**   A big parking lot, alley.  You have to go through the
20 alley to get kind a to the parking lot.
21 **Q.**   Why do they call it "Boat Alley"?
22 **A.**   They used to distribute -- what do they call it -- PCP
23 out the alley.
24 **Q.**   Does PCP and the term boat have any meaning?
25 **A.**   They're related, same drug.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8100

1  **Q.**   So boat means PCP?
2  **A.**   Correct.
3  **Q.**   Did you ever sell any boat or PCP?
4  **A.**   No, I did not.
5  **Q.**   How often would you go into Boat Alley to sell crack
6  cocaine?
7  **A.**   Often.  Quite often.
8  **Q.**   We're talking '94, '95 now?
9  **A.**   Yeah.
10 **Q.**   Yes?
11 **A.**   Yes.  We're talking '94, '95?
12 **Q.**   Yes.
13 **A.**   Yes.
14 **Q.**   Who would you see in Boat Alley selling crack cocaine in
15 '94, '95?
16 **A.**   A lot of people were being incarcerated, so it was new
17 faces coming up there.
18        MS. WICKS:  Objection, non-responsive.
19        THE COURT:  Sustained.
20 BY MR. GUERRERO:
21 **Q.**   Do you recall or not recall?
22 **A.**   I don't recall everyone, no.
23 **Q.**   Who do you recall?
24 **A.**   Myself, mainly.
25 **Q.**   Anybody else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8101

1   **A.**   Let me see.  Younger guys started hanging out there, but
2   like I said, I can't say that they were out there doing what I
3   was doing.  I wasn't around anyone when I was mainly out there.
4   **Q.**   And now in '94 and '95, are you still being supplied by
5   Lamont Lewis or Vernon Lamont Lewis?
6   **A.**   No, I'm not.
7   **Q.**   Who are you getting your crack cocaine from?
8   **A.**   '93, '94, from a Joe Best.
9   **Q.**   And where did you know Joe Best from?
10  **A.**   13th and -- On 13th Street.  He lived off of 13th Street.
11  **Q.**   How long did you know Joe Best?
12  **A.**   From that time -- he moved around there about '92, '93,
13  somewhere in that neighborhood.
14  **Q.**   What kind of quantities were you getting from Joe Best in
15  '93, '94?
16  **A.**   I started out buying 31s from him, and I purchased as
17  much as a half a key from him.
18  **Q.**   All right.  Thirty-one.  We're talking about 31 grams of
19  what?
20  **A.**   Crack cocaine.
21  **Q.**   Crack cocaine?
22  **A.**   That's correct.
23  **Q.**   And a half a key of what?
24  **A.**   Half a key of crack cocaine as well.
25  **Q.**   Did it take you some time to build up to the half a key

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8102

1   purchase?
2   **A.**   Yes, it did.
3   **Q.**   And the half a key you bought from Joe Best, how much did
4   you pay for it?
5   **A.**   I paid half and he fronted me half, so I put up 7500 and
6   he fronted the other half to owe him 7500.
7   **Q.**   What does "fronting" mean?
8   **A.**   In other words, he gave it to me on consignment basis.
9   He expected me to pay him for it.  He gave it to me on
10  consignment and expected me to pay him for it.
11  **Q.**   So crack on credit?
12  **A.**   That's correct.
13  **Q.**   Was it in a particular time period you had to pay him
14  back?
15  **A.**   Yeah, as far as I distributed the drugs.
16  **Q.**   Was that the only time that you got fronted by Joe Best?
17  **A.**   At that particular time, yes.
18  **Q.**   Now, a half a key of crack cocaine that you bought from
19  him, how did you sell it?
20  **A.**   Small quantities.  Anywhere from a quarter to like
21  ounces.
22  **Q.**   And what's going on with you at this point?  Are you
23  still selling yourself, or are you supplying other people?
24  **A.**   At that time, I'm selling myself, and I'm supplying other
25  people as well.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8103

1   **Q.**   So, where were you selling your crack cocaine then, '93,
2   '94?
3   **A.**   Still in the same area, but I had other people from
4   different areas as well, and I was also fronting out to other
5   people as well.
6   **Q.**   Who were you starting to supply during that time period,
7   '93, '94?
8   **A.**   1994, some of my customers at that time was Joe Langley,
9   Fat Ju-Ju, and another guy named Ju-Ju that was from Charles
10  County.  Let's see, sometimes it would be Christopher Henley or
11  Torran.  It was various people.  I don't recall everyone.
12  **Q.**   How long did you know Joe Langley back then, '93, '94?
13  **A.**   I don't remember how long I knew him before that, but it
14  was a short while, when I started selling him.
15  **Q.**   And what kind of quantities were you selling to Joe
16  Langley?
17  **A.**   I was selling him ounces.
18  **A.**   How much would you sell an ounce of -- well ...
19  **A.**   I would sell him an ounce of crack cocaine.
20  **Q.**   For what price?
21  **A.**   $4,000.
22  **Q.**   How often would you sell an ounce of crack cocaine to Joe
23  Langley?
24  **A.**   Probably -- maybe two times a week.
25  **Q.**   Did you see where it was Joe Langley was selling the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8104

1   crack cocaine that you sold him?
2   **A.**   At that time, from the conversations he and I had, he was
3   telling me --
4         MR. ZUCKER:  Objection.
5         THE COURT:  Sustained.
6       MR. GUERRERO:  In furtherance of, Your Honor.
7         THE COURT:  Beg your pardon?
8         MR. GUERRERO:  In furtherance of.
9         THE COURT:  Mr. Zucker, anything further?
10        MR. ZUCKER:  The Court's recollection controls of who is
11  and who isn't a member at this point.
12        MR. GUERRERO:  In furtherance of, Your Honor, we would
13  proffer.
14        THE COURT:  I'll allow it.
15  BY MR. GUERRERO:
16  **Q.**   Joe Langley would tell you that he was selling your crack
17  cocaine where?
18  **A.**   I think at that time, he was going back and forth to
19  North Carolina, and some around the park, around Congress Park.
20  **Q.**   Did Joe tell you where around Congress Park he was
21  selling?
22  **A.**   No, he did not.
23  **Q.**   Did you see Joe Langley sell around Congress Park?
24  **A.**   I did not.
25  **Q.**   Fat Ju-Ju, what kind of quantities were you selling Fat

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8105

1  Ju-Ju?
2  **A.**  I was fronting Fat Ju-Ju an ounce at a time.
3  **Q.**  So now you're actually providing crack cocaine on
4  consignment, is that what you said?
5      MR. ZUCKER:  Objection.
6      THE COURT:  Sustained.
7  BY MR. GUERRERO:
8  **Q.**  When you said "fronting," what are you referring to?
9  **A.**  I'm referring to providing drugs to someone and expecting
10  pay from them at a later time.
11  **Q.**  How much would you front Fat Ju-Ju?
12  **A.**  Anywhere from a half ounce to an ounce.
13  **Q.**  And we're talking half an ounce to an ounce of what?
14  **A.**  Crack cocaine.
15  **Q.**  And how long would it take Fat Ju-Ju to pay you back?
16  **A.**  A couple days; sometimes the same day.
17  **Q.**  How often would you supply him?
18  **A.**  It was regularly.  I don't remember exactly how many
19  times, but it was regularly.
20  **Q.**  More than once a week?
21  **A.**  That's correct.
22  **Q.**  Ju-Ju?
23  **A.**  That's correct.
24  **Q.**  What kind of quantities were you selling Ju-Ju?
25  **A.**  The other Ju-Ju, he would come down from Charles County,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8106

1  he was buying two ounces at a time.
2  **Q.**  Were you fronting it or selling cash?
3  **A.**  I was selling him cash money.
4  **Q.**  How about Christopher Henley?
5  **A.**  He would buy half ounces from me at that time.
6  **Q.**  Half ounces of what?
7  **A.**  Crack cocaine.
8  **Q.**  How about Torran?
9  **A.**  Torran same, it varied, quarter, half ounce.
10  **Q.**  And would you be fronting it to him or selling it cash
11  up-front to Torran?
12  **A.**  Some in cash.
13  **Q.**  Did you see where Torran was selling your crack cocaine?
14  **A.**  No, I didn't.
15  **Q.**  You said that now you were also still selling out there.
16  **A.**  That's correct, every now and then.
17  **Q.**  And how often would you be selling out there?
18  **A.**  Being that I would get a higher amount weight, it was
19  less.  I would basically just go around and distribute whatever
20  people wanted at that time and then leave.
21  **Q.**  And when I say "out there," I'm referring to Congress
22  Park.  You said The Circle area?
23  **A.**  Circle, 13th Place.
24  **Q.**  Boat Alley?
25  **A.**  Circle, Boat Alley, wherever I had to be.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8107

1  **Q.**  And you said that you were getting higher weight.  And
2  why did that make a difference between you actually out there
3  selling versus supplying?
4  **A.**  Because I didn't have to stand out on the corner and go
5  hand to hand anymore.  I could redistribute my drugs a different
6  way because I was getting a higher volume.
7  **Q.**  And where were you living back then?
8  **A.**  Maury Avenue.
9  **Q.**  Were you still employed?
10  **A.**  Yes, I was.
11  **Q.**  Why were you selling crack cocaine if you were still
12  employed?
13  **A.**  After a while it becomes a habit.
14  **Q.**  Were you a user yourself?
15  **A.**  No, sir.
16  **Q.**  Did you ever use marijuana at all?
17  **A.**  I have at times.
18  **Q.**  But crack cocaine, you did not?
19  **A.**  Correct.
20  **Q.**  Now, moving into '95, were you still working with Joe
21  Best?
22  **A.**  No, I was not.
23  **Q.**  Who did you get your crack cocaine from?
24  **A.**  In '95, I didn't have a consistent person I would
25  purchase from.  Joe Best had got arrested.  He did a couple

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8108

1  years, few years in prison, so I didn't have a direct connect.
2  It probably would come from various sources.
3  **Q.**  Who were some of the sources that you were getting crack
4  cocaine from in '95?
5  **A.**  Mainly, Quincy Thomas.
6  **Q.**  What kind of weight were you buying from Quincy Thomas?
7  **A.**  Not more than a 62.
8  **Q.**  A 62 of what?
9  **A.**  Crack cocaine.
10  **Q.**  How often would you buy a 62 of crack cocaine from Quincy
11  Thomas back in '95?
12  **A.**  Probably two, three times a week.
13  **Q.**  And where would you meet Quincy Thomas to make this
14  purchase?
15  **A.**  Sometimes at my house or we had a barber who we were
16  mutual friends with, Melvin Cherry.  We would meet at Melvin's
17  house sometimes.
18  **Q.**  And where would you sell your crack cocaine you would get
19  from Quincy Thomas?
20  **A.**  Like I said, I would redistribute it.  Like I said, I
21  would farm it out to some of my customers and I would
22  redistribute to a small group of people that was around me at
23  the time.
24  **Q.**  So a 62, you would repackage to make what?
25  **A.**  I would break it down into about 3.2 grams or something,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

Page 8139

1 getting in trouble with the law?

2 A.  I had a few run-ins with the law, yes.

3 Q.  Are you the same Cedric Conner who was convicted of unlawful

4 ammunition in August of 1993?

5 A.  That's correct.

6 Q.  And even before that, in '89, when you first started selling

7 crack cocaine, you told us, are you the same Cedric Conner who

8 was convicted of theft over $300 out in Maryland?

9 A.  Yes.

10 Q.  And the same Cedric Conner who was convicted of attempted

11 UUV in '89 in District of Columbia?

12 A.  That's correct.

13 Q.  And how can you recall that this was between '93 and '95,

14 this incident that we're talking about with Coodie, or Wop?

15 A.  I know they were a little younger than me.  I'm thinking,

16 because my brother was six years younger than me, so I'm

17 thinking it was around -- they had to be about 17 or 18 because

18 they were close to my brother's age.

19 Q.  And that would have been about what time period?

20 A.  If it was between '93 and '95, they had to be somewhere

21 between 17 and 18.  You said between what time period?

22 Q.  Let's go back to Coodie, or Wop.

23 A.  Okay.

24 Q.  Up until that point, this incident happened, had you ever

25 sold any crack cocaine to Wop, or Coodie?

1 A.  Not at that time, no.

2 Q.  And now I want to go a little bit ahead to around '95 or so.

3 Did there come an incident at a basketball court where you had a

4 conversation with Antwuan Ball?

5 A.  Yes.

6 Q.  And when do you think that happened?

7 A.  It was near the passing of his brother, Kairi.

8 Q.  Did you know Kairi?

9 A.  Yes, I did.

10 Q.  How did you know Kairi?

11 A.  From being around the same neighborhood.

12 Q.  And what if any relation did you know Kairi to have to

13 Antwuan?

14 A.  Brother.

15 Q.  Do you know who Kairi Kellibrew is?

16 A.  I think that's the cousin or nephew or something.

17 Q.  And do you know him by something else?

18 A.  Baby Ki.

19 Q.  When we're talking about Kairi, Antwuan's brother, is that

20 the same or somebody different from Baby Ki?

21 A.  Different.

22 Q.  Did Kairi, Antwuan's brother, have some sort of nickname?

23 A.  I just know him by Kairi.

24 Q.  Tell us about that incident.  Where did it happen?

25 A.  Malcolm X basketball court.

1 Q.  What time of day was it?

2 A.  Midday, a little bit later, afternoon, somewhere between --

3 I would say between 1:00 and 3:00, somewhere in there.

4 Q.  And who was out there?

5 A.  Quite a few people.  We were playing basketball on the

6 basketball court.

7 Q.  And did something happen that particular afternoon with

8 another person who was playing basketball?

9 A.  Yes.

10 Q.  Who was that?

11 A.  Antwuan's brother, Aman.

12 Q.  Did you know Aman by another nickname?

13 A.  Bird.

14 Q.  What happened between you and Bird?

15 A.  He and I got into an argument.

16 Q.  Over what?

17 A.  Later I learned it was because he personally just didn't

18 like me.

19 Q.  And where did this argument happen?

20 A.  On the basketball court.

21 Q.  What happened between you and Bird?

22 A.  We just exchanged a few words, and afterwards his brother

23 pulled up.

24 Q.  Which brother pulled up?

25 A.  Antwuan Ball.

Page 8142

1 Q.  And if you saw Antwuan again, would you recognize him?

2 A.  Yes.

3 Q.  Please stand up for us and tell us if you see Antwuan.

4 A.  Tan shirt.

5 Q.  Could you point to him?

6 A.  Sitting in front of the gentleman in the blue shirt.

7 Q.  And what kind of hair does he have?

8 A.  Dreads, plats.

9       MR. GUERRERO:  Note an in-court identification of

10 Mr. Ball for the record.

11       MR. CARNEY:  No objection.

12       THE COURT:  Request is granted.

13 BY MR. GUERRERO:

14 Q.  When you saw Mr. Ball at -- well, tell us:  Where were you

15 when you saw Mr. Ball?

16 A.  We was still playing basketball.

17 Q.  And had the argument with Bird, Antwuan's brother, stopped

18 yet?

19 A.  Yes.

20 Q.  Did you see -- after the argument with Bird, did you see

21 where Bird went?

22 A.  He went towards his brother.

23 Q.  Which brother?

24 A.  Antwuan.

25 Q.  The defendant, Antwuan Ball?

1 Q.  And had you seen Antwuan in any area in specific, over in

2 Congress Park, right up until that point?

3 A.  Yeah.

4 Q.  Where had you seen him around?

5 A.  Same places, riding through 13th Place, 14th Place,

6 Boat Alley.

7 Q.  And when you saw Antwuan in those areas, what did you see

8 with respect to how he interacted with other people?

9 A.  Same demeanor.  I mean, to me, my observation of him, he was

10 always a serious individual.

11 Q.  Did you ever see any of the other individuals show him some

12 respect?

13 A.  Yeah.

14        MR. MARTIN:  Objection.  Leading.

15        MS. WICKS:  Objection.

16        THE COURT:  Sustained.

17 BY MR. GUERRERO:

18 Q.  Give us some more detail about the interactions you observed

19 of Antwuan with other people from Congress Park.

20 A.  Kind of like, like I said, he just demanded respect.  It's

21 like, say, for instance, if people were around and he come up,

22 like if you were around --

23        MR. BALAREZO:  Your Honor, objection to -- it seems to

24 be some kind of example, not some sort of fact that this witness

25 witnessed.

Page 8147

1            THE COURT:  Overruled.

2 BY MR. GUERRERO:

3 Q.  Tell us, please.

4 A.  For instance, if it was like -- if we were outside giggling,

5 running around, playing, if he came up, it got a little more

6 serious.  Everybody would kind of cut out the playing.

7 Q.  How often did you see that?

8 A.  A few times.

9 Q.  Now, in '95, back to you, who were you receiving your crack

10 cocaine from?

11 A.  '95, it was off and on with Quincy Thomas, mostly.

12 Q.  How about in '96?

13 A.  '96, I had a brief moment where I didn't do anything for

14 about six to eight months, something like that.

15 Q.  Why did you not do anything?

16 A.  I'd received a significant raise from my job.

17 Q.  And when you say didn't do anything, what are you talking

18 about?

19 A.  Distribute any drugs.

20 Q.  What kind of raise did you get from your work?

21 A.  I went from about 16 bucks an hour to about 22.50.

22 Q.  Was it a promotion or a financial increase?

23 A.  A promotion.

24 Q.  What kind of job did you get promoted to?

25 A.  Office manager.  And I overseen a naval warfare contract.

1 Q.  What happened when you received that amount of money?

2 A.  October of '97, I invested 13,500 in a half a key of crack

3 cocaine.

4 Q.  I need you to speak up.  I can't hear you.

5 A.  I said, in '97, October of '97, I invested 13,500 in a half

6 a key of crack cocaine.

7 Q.  And who did you give that money to?

8 A.  Joe Best.

9 Q.  And who is Joe Best?

10 A.  Same person that was supplying me around '93, '94.

11 Q.  Is that the person you said earlier that got locked up, went

12 away for a while?

13 A.  Correct.

14 Q.  And how much cocaine did you want to get from Joe Best?

15 A.  I wanted to purchase a half a key.

16 Q.  Did you pool your money together with anyone else?

17 A.  No.

18 Q.  And where was Joe Best supposed to get you the crack

19 cocaine?

20        MR. ZUCKER:  Objection.  Basis.

21        THE COURT:  Response?

22        MR. GUERRERO:  If he knows, Your Honor, just yes or no.

23 I'm not asking for anything more than that.

24        MR. ZUCKER:  The question was "where," not, "do you

25 know."

Page 8161

1          THE COURT:  Right.  That was the question.

2          MR. GUERRERO:  I'm sorry.  I'll withdraw that question.

3 BY MR. GUERRERO:

4 Q.  Just yes or no, did you know where it was that Joe Best was

5 going to get the crack cocaine for you?

6 A.  Yes.

7 Q.  And without telling us the substance there, how did you

8 learn that information, from whom?

9 A.  A conversation with Mr. Best.

10 Q.  Now, when you handed the $13,500 to Joe Best, what if

11 anything did you get in return?

12 A.  A day and a half later I got a half a key of crack cocaine.

13 Q.  Who gave it to you?

14 A.  Mr. Best.

15 Q.  And where were you living at the time?

16 A.  At that time, in my mom's house.

17 Q.  And now your mom, was she alive or she passed away by then?

18 A.  She was deceased.

19 Q.  So what was the residence?  Where was that located?

20 A.  641 Maury Avenue.

21 Q.  Who else was living there with you?

22 A.  Myself and a cousin.

23 Q.  Which cousin?

24 A.  Bobby.

25 Q.  What happened to your little sister?

Page 8162

1 A.  I gave custody to her dad.

2 Q.  And where did you take this crack cocaine once you received

3 it from Joe Best?

4 A.  I picked it up at his house, took it back to my residence,

5 which was 641 Maury Avenue.

6 Q.  And what did you do wit?

7 A.  Broke it down and distributed it.

8 Q.  What did you break down this -- how much was it, again?

9 A.  500 grams.

10 Q.  A half a kilo?

11 A.  Yes.

12 Q.  What did you break it down into?

13 A.  All quarters and halves and whatever, ounces.

14 Q.  We're talking now '97, '98 or so?

15 A.  Yep.

16 Q.  And where did you go to sell this crack cocaine?

17 A.  At that time, Congress Place.

18 Q.  Is that down in Congress Park?

19 A.  Correct.

20 Q.  Who did you sell to?

21 A.  Let me see.  Fat Harry, Bootsy, Chow-Wow, Santu, Jazz, I

22 think Mr. Bell.

23 Q.  Which Mr. Bell?

24 A.  Gregory Bell.

25 Q.  Is that Boy-Boy?

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 981 of 1954

1 A.   Yes.   Quite others, I just don't recall everyone at that

2 time.

3 Q.   What kind of quantities did you sell to Boy-Boy during that

4 time period when you got that half a kilo from Joe Best?

5 A.   Like half ounces at that time.

6 Q.   Did you see where Boy-Boy was selling it?

7 A.   No.

8 Q.   How about Jazz?   What kind of quantities were you selling to

9 Jazz?

10 A.   Quarters.

11 Q.   Quarters of what?

12 A.   Crack cocaine.

13 Q.   Did you see where Jazz was selling it?

14 A.   Didn't see where, no.

15 Q.   How about Santu?

16 A.   Same thing.

17 Q.   What amount?

18 A.   Quarters, halves.

19 Q.   Did you see where he was selling it?

20 A.   No.

21 Q.   How about Chow-Wow?

22 A.   Quarters, halves.

23 Q.   Quarters or halves of what?

24 A.   Crack cocaine.

25 Q.   How about Bootsy?

1 A.  Quarters and halves.

2 Q.  Of what?

3 A.  Crack cocaine.

4 Q.  And how about Fat Harry?

5 A.  Quarters, halves of crack cocaine.

6 Q.  Did you receive another -- well, after that first shipment

7 from Joe Best, did you ever buy any more from him during that

8 period?

9 A.  Yes, I did.

10 Q.  What amount did you try to buy next?

11 A.  I tried to purchase another half a key.

12 Q.  From whom?

13 A.  The same person, Joe Best.

14 Q.  And what if anything did you get in return?

15 A.  Nothing.

16 Q.  You got nothing back?

17 A.  Correct.

18 Q.  Did you talk to Joe Best about it?

19 A.  Yes.

20 Q.  And did you ever get anything back at all from Joe Best?

21 A.  No.

22 Q.  Did you confront him about it?

23 A.  Yes.

24 Q.  And even after you confronted him, did you ever get anything

25 back?

1 A.  No.

2 Q.  Did that make you angry?

3 A.  Yeah, I was heated.

4 Q.  You were heated?

5 A.  I was very heated.

6 Q.  Did you do anything about it?

7 A.  No.

8 Q.  Why not?

9 A.  Let it go.  I knew him, thought I knew him.

10 Q.  You, financially at that point, '97, '98, how were you

11 gathering your income?

12 A.  I was still working, and I was still hustling.

13 Q.  How much were you making at your legitimate job?  Was that

14 with Conrad Management?

15 A.  Yeah, it was still 27.50 an hour, something like that.

16 26.50 an hour.

17 Q.  How much money were you making selling crack cocaine during

18 that time?  We're talking '97, '98.

19 A.  That little bit of time, like I said, after that first one,

20 it didn't happen again for a while.

21 Q.  So do you recall how much you were making or not?

22 A.  I don't recall.

23 Q.  And what were you spending your money on, the money that you

24 got from crack cocaine sales?

25 A.  I don't recall.

1  Q.  Did you ever go to the clubs?

2  A.  Yeah, I went to clubs.

3  Q.  How often would you go to a club?

4  A.  Weekends, every weekend, just about.

5  Q.  And what kind of money would you spend at a club?

6  A.  Depends on -- sometimes I spent as much as 1,800 in a club.

7  Q.  $1,800 cash?

8  A.  Correct.

9  Q.  Credit card or cash money?

10  A.  Cash money.

11  Q.  How about cars?  Did you have any cars back then?

12  A.  At that time I think I was driving a Q45.

13  Q.  A Q45?

14  A.  Correct.

15  Q.  And tell us what that is.

16  A.  An Infiniti Q45.

17  Q.  And how did you pay for that?

18  A.  I financed it.

19  Q.  This half a key of crack cocaine, how much did you pay for

20  it?

21  A.  13,5.

22  Q.  And how much money did you get from the sale of that crack

23  cocaine?  How much profit did you get?

24  A.  I do not recall.  Because I put -- I don't remember what

25  profit, because I wasn't really finished when he went back.  But

1 I took the same thirteen-five and sent it back with him.

2 Q.  Did you barely break even?  Did you double?  Did you make

3 more than double?

4 A.  I think I lost.

5 Q.  You lost some?

6 A.  Correct.

7 Q.  And why was that?

8 A.  I was trying to rush to get rid of it.

9 Q.  Now, you said earlier that when you were selling to

10 Fat Harry and Bootsy, and Chow-Wow, you used a reference, a

11 quarter and a half?

12 A.  Correct.

13 Q.  What are we talking about, a quarter and a half of what?

14 A.  Crack cocaine.

15        MR. GUERRERO:  Now if we can pull up, Mr. Mazzitelli,

16 Government's Exhibit 108.1.

17        I believe that's marked and entered, Your Honor, if we

18 can publish.

19 BY MR. GUERRERO:

20 Q.  Do you see 108.1 in front of you?

21 A.  Yes.

22 Q.  Do you recognize anybody there?

23 A.  Yes.

24 Q.  Let's start with the top row, the people standing, on the

25 left, starting from the left.

1 A.  Dazz, Chow-Wow.

2 Q.  Let's stop right there.  Point to Dazz.

3 A.  (Witness complies.)

4 Q.  And spell Dazz.

5 A.  D-A-Z (sic).

6 Q.  Is that someone different from the person you referred to

7 earlier as Jazz?

8 A.  Yes.

9 Q.  And you pointed, for the record, the person standing in the

10 far left corner of the exhibit?

11 A.  Yes.

12 Q.  And up until like between -- up until '1996, '97, when

13 you're working with Joe Best, had you ever sold any crack

14 cocaine to Dazz?

15 A.  Yes, I did.

16 Q.  And that's Dazz, with a D?

17 A.  Correct.

18 Q.  If you saw Dazz again, would you recognize that person?

19 A.  Correct.

20 Q.  Would you please stand up, show us if you see Dazz.

21 A.  Gentleman leaning back next to the gentleman in the blue,

22 tan shirt.

23 Q.  What's he wearing?

24 A.  Tan shirt, back row.

25 Q.  Describe the tan shirt a little bit more.

1 A.  He has his hand on his chin.  Oh, that's Boy-Boy's head.

2 I'm sorry, I didn't see his head.  Sitting behind --

3         THE COURT:  Speak up, please.

4 A.  He's sitting behind Mr. Bell.

5 BY MR. GUERRERO:

6 Q.  He's sitting behind Mr. Bell, the person you identified as

7 Boy-Boy earlier?

8 A.  Correct.

9         MR. GUERRERO:  I would note an in-court identification

10 of Dazz.

11         MR. ZUCKER:  Approach for a second, please, Judge.

12         (BENCH CONFERENCE ON THE RECORD.)

13         MR. ZUCKER:  The initial description, and I looked at

14 Mr. Beane, was the man with the hand on the chin, which was

15 someone else.  And then Mr. Guerrero looked at him and then he

16 said, no -- I don't know if he said no.  I couldn't hear exactly

17 what he said, but it seemed he pointed to someone else.

18         THE COURT:  Well, at the time that I heard him say,

19 "The man with his hand on his chin," the only one I saw with his

20 hand on his chin was not Mr. Thurston.  And when I was looking

21 at Mr. Thurston, he, Mr. Thurston, did not have his hand on his

22 chin.  So I take that to be an objection to the in-court

23 identification?

24         MR. ZUCKER:  Right.  And my recollection, I'm pretty

25 sure Mr. Wilson had his hand on his chin.  But I don't know if

1 anybody else did.

2          MR. BEANE:  It was only Mr. Wilson with his hand on his

3 chin at the time.  I was watching.

4          THE COURT:  Well, I saw Mr. Ball with his hand on his

5 chin, and he removed it shortly afterwards.  I wasn't able to

6 see Mr. Wilson at that time.

7          So I will sustain the objection, but I'll permit

8 counsel to continue his questioning if he wants to.

9          MR. ZUCKER:  I would like the record -- no quarrel with

10 the ruling.  Mr. Ball also has what looks like a tan shirt to

11 me.

12          THE COURT:  That's correct.

13          MR. GUERRERO:  I would just note for the record, Judge,

14 I just want to document that the witness, Mr. Conner, was quick

15 to correct himself.  And he made a very specific point to say

16 that the person he was referring to as Dazz was seated behind

17 Mr. Bell.

18          So I want to make sure that that's on the record, as

19 well.  There's only one person sitting behind Mr. Bell, and I'm

20 looking right at Mr. Thurston.

21          THE COURT:  That's correct.  But I'm going to ask you

22 to continue the questioning and establish a more solid

23 identification before I rule on the request.

24          MR. ZUCKER:  I guess my request would be that it would

25 be an accurate reflection of the record, or an accurate

1 statement to say that he initially pointed to someone other than

2 Desmond Thurston.  And then it seems clear to me he has changed

3 now to say Desmond Thurston is Dazz.

4        The initial identification of the person as Dazz had to

5 have been, based on the hand on the thin, Mr. Wilson and

6 Mr. Ball, both.  I saw Mr. Wilson with his hand on his chin.

7 The Court saw Mr. Ball, which makes more sense because he also

8 had the tan shirt on.  But he initially identified someone.  And

9 I will concede Mr. Guerrero is correct:  He then changed it to

10 say Mr. Thurston.

11        MR. GUERRERO:  I disagree with Mr. Zucker's

12 representation of the record.  But I'll clarify it.

13        THE COURT:  Go ahead.  What do you disagree with?

14        MR. GUERRERO:  I'm not quite sure it was clear that

15 when what Mr. Conner said reference to someone with his hands on

16 his chin, whether he meant to say that was Dazz or the person

17 that he saw as Dazz was seated behind him.  And I think he tried

18 to make that point by saying, "The person that I see as Dazz is

19 seated behind Gregory Bell."

20        So I don't think it's that crystal clear that he was

21 pointing to someone else first.

22        THE COURT:  Well, for purposes of ruling on your

23 request to confirm that there was an in-court identification,

24 I'll defer until you do some more.

25        (END BENCH CONFERENCE.)

Page 8172

1 BY MR. GUERRERO:

2 Q.   Mr. Conner, I just want you to -- this person that you've

3 identified on 108.1 as Dazz, I just want you to stand up for us

4 and point to us with some -- and be specific as to who it is

5 that you see in this courtroom as Dazz.

6 A.   Okay.  There's a gentleman all the way in the back with a

7 black coat on.  He's sitting in front of the gentleman in the

8 back.

9 Q.   All right.  The person in the black coat on, is that person

10 white or black?

11 A.   White.

12 Q.   And you said that the person you know as Dazz was seated

13 where in reference to that person, that white male with the

14 black coat.

15 A.   In front of him.

16 Q.   Is that person seated or standing?

17 A.   Seated.

18 Q.   And what's that person wearing?

19 A.   Tan or white shirt.

20 Q.   And who is seated to that person's left?

21 A.   A white gentleman in a gray suit.

22 Q.   And who is seated to the -- to the person that you've

23 identified as Dazz, who is seated to his right?

24 A.   Don.

25 Q.   Don?

Page 8173

1 A.  Yes.

2 Q.  Is there anyone seated immediately to -- the person that you

3 see as Dazz, immediately seated to his right?

4         When you look at Dazz, is there anyone immediately

5 seated next to him on his right?

6 A.  His attorney, and whoever is in the first row of the bench

7 right there.

8 Q.  I just need you to --

9 A.  To his right or to his left?

10 Q.  To Dazz's left.  Who is seated to Dazz's left?

11 A.  No one.

12 Q.  Did you see someone seated next to Dazz's left?

13 A.  No.  You said, do I see someone?

14 Q.  Yes.

15 A.  His left, this side, his attorney.

16 Q.  Is that person white or black?

17 A.  He's white.  Gray suit.

18 Q.  Now, to Dazz's right, who is seated to Dazz's right?

19 A.  No one.

20         MR. GUERRERO:  With the Court's permission, if it's

21 necessary, I would like for this witness to go and personally

22 point at him, if he can step down.

23         THE COURT:  Okay.

24 BY MR. GUERRERO:

25 Q.  Step down, please.  The person you know as Dazz?

Page 8174

1 A.  Right there, on the right.

2 Q.  In front of the white gentleman?

3       MR. GUERRERO:  I would note an in-court identification

4 of Dazz, for the record.

5       MR. ZUCKER:  He has now pointed to Mr. Thurston.

6       THE COURT:  I couldn't hear you.

7       MR. ZUCKER:  Moment to consult.

8       He has now identified Mr. Thurston.

9       THE COURT:  All right.  The request is granted.

10 BY MR. GUERRERO:

11 Q.  Then you also mentioned Don at some point when you were just

12 talking.  Let's just talk about that person.  How long did you

13 know this person Don?

14 A.  Same length of time as everyone else.

15 Q.  All right.  And how long would that be?

16       MR. BALAREZO:  I'm sorry, Your Honor, we can't hear.

17       THE COURT:  Pull that microphone closer to you.

18       THE WITNESS:  I'm sorry.

19 BY MR. GUERRERO:

20 Q.  How long did you know Don?

21 A.  Same amount of time that I knew everyone else.  I mean,

22 they're not personal friends of mine.

23 Q.  Which is how long?  How long did you know Don?

24 A.  Let's see.  '91, '92.  Since '91, '92.  They were little

25 kids, probably about 14, 12, somewhere in there.  I don't know.

1 Q.  And up until the point where we were talking about '96, '97,

2 had you ever sold to Don at all?

3 A.  No.

4 Q.  Did you ever know Don's real name?

5 A.  No.

6 Q.  If you saw Don again, would you recognize him?

7 A.  Yes, I would.

8 Q.  Stand up for us again and show us who it is that you know as

9 Don.

10        MR. BALAREZO:  Your Honor, we'll stipulate that this is

11 Mr. Samuels.

12 A.  Don is the gentleman in the blue shirt.

13 BY MR. GUERRERO:

14 Q.  For the record, the person who is standing up right now?

15 A.  Yes.

16        MR. GUERRERO:  I note by way of stipulation and

17 testimony an in-court identification, for the record.

18        THE COURT:  The request is granted.

19 BY MR. GUERRERO:

20 Q.  Back to this photo, 108.1.  The person that you see as Dazz

21 in the photo, who is the person to Dazz's left?

22 A.  Chow-Wow.

23 Q.  And point to Chow-Wow.

24 A.  (Witness complies.)

25 Q.  What's Chow-Wow wearing?

1 A.  He has a key chain around his neck.

2 Q.  I note for the record you pointed right to the person that's

3 standing to the left of Dazz?

4 A.  Yes.

5 Q.  Is that the Chow-Wow that you mentioned earlier that you had

6 sold crack cocaine to?

7 A.  Yes.

8 Q.  And how often had you served crack cocaine to Chow-Wow back

9 in '97, '98?

10 A.  '97, it wasn't that long in '97.  It was during that half a

11 key that I had got from New York.

12 Q.  From Joe Best?

13 A.  Joe Best.

14 Q.  Do you recognize anybody else in 108.1?

15 A.  Geech Ball.

16 Q.  And where is Geech Ball?

17 A.  To Chow-Wow's left.

18 Q.  And point to Geech Ball.

19 A.  (Witness complies.)

20 Q.  And I note for the record there were two previous attempts.

21 The pen kind of slid.

22 A.  The pencil is not -- I'm pointing to the screen, but it's

23 going elsewhere.

24 Q.  And on this attempt you pointed to the person standing to

25 the left of Chow-Wow?

1 A.  Correct.

2 Q.  And that was Geech Ball?

3 A.  Correct.

4 Q.  And did you ever sell any crack cocaine to Geech Ball?

5 A.  Yes, I did.

6 Q.  And what kind of quantities did you sell to him in '97, '98?

7 A.  It wasn't quantities.  He was actually buying dimes, or

8 sometimes I just give it to him because he ran errands for me.

9 Q.  You need to speak louder.

10 A.  I said he would buy like $10 pieces or something, or

11 sometimes he ran errands for me, and I would just give it to

12 him.

13 Q.  And how about to the left of Geech Ball?  Do you see anybody

14 you recognize?

15 A.  Yes.

16 Q.  Who is the first person to the left of Geech Ball that you

17 recognize?

18 A.  His son, Wop.

19 Q.  And what do you mean, by, "His son, Wop"?

20 A.  Coodie is his son.

21 Q.  Coodie is --

22 A.  Geech Ball's son.

23 Q.  So Coodie is the same as Wop?

24 A.  Yes.

25 Q.  And that person who you know as Coodie or Wop is the son of

1 Geech Ball?

2 A.  Correct.

3 Q.  And where is Coodie or Wop in 108.1?

4 A.  Sitting on the car, black cap on.

5 Q.  And point to him, please.

6 A.  (Witness complies.)

7 Q.  You pointed to the left of the person you identified as

8 Geech Ball?

9 A.  Correct.

10 Q.  And to the left of Coodie, or Wop, do you recognize anybody?

11 A.  Jojo.

12 Q.  And point to that person.

13 A.  (Witness complies.)

14 Q.  And you've pointed, for the record, to the person left of

15 Wop?

16 A.  Yes.

17 Q.  In 108.1.

18        And who is to the left of Jojo?

19 A.  Nick.

20 Q.  Point to that person.

21 A.  (Witness complies.)

22 Q.  And you've pointed to the person on the far right-hand

23 corner of the -- well, far right of the men who are standing

24 wearing all black?

25 A.  Correct.

1 Q.  And Nick, is that a person that you had sold to before?

2 A.  Yes.

3 Q.  What time period?

4 A.  '97, 2000.

5 Q.  And was Nick somebody that you sold to when you got your

6 half a key from Joe Best?

7 A.  Yes.

8 Q.  And what kind of quantities did you sell Nick?

9 A.  Quarters and halves.

10 Q.  Quarters and halves of what?

11 A.  Crack cocaine.

12 Q.  And how about on the front row, the guys who are leaning

13 down, again starting from left to right?

14 A.  White T-shirt, Little Terrence.

15 Q.  That's Little Terrence?

16 A.  Yes.

17 Q.  And had you ever sold crack cocaine to Little Terrence?

18 A.  Yes.

19 Q.  And what time period?

20 A.  I would say 2000.  '99, 2000, somewhere in that

21 neighborhood.

22 Q.  We'll get to him in a second.

23        And who is to the left of Little Terrence?

24 A.  I can't identify him.

25 Q.  And do you recognize anyone at all to the left of

Page 8180

1 Little Terrence?

2 A.  The very first person, kneeling down, I seen his face but I

3 don't know what his name is.

4 Q.  So the remainder of the persons who are 108.1 --

5 A.  I'm sorry, that's Paul.  That's Elway.

6 Q.  Point to that person that you know as Elway.

7 A.  (Witness complies.)

8 Q.  What was it that you referred to him by?

9 A.  Called him Elway.

10 Q.  Elway?

11 A.  Correct.

12 Q.  And had you ever served him with any crack cocaine?

13 A.  Yes.

14 Q.  What kind of quantities did you sell to him?

15 A.  Eight-balls and quarters.

16 Q.  During what time period?

17 A.  I think back to the early 90s.

18 Q.  So we're talking --

19 A.  From about '94.  '94, probably, in that time span.

20 Q.  So that would have been during around the time that you were

21 buying from Lamont?

22 A.  After Lamont, during Joe era, Joe Best.

23 Q.  And what kind of quantities did you sell to Elway?

24 A.  Eight-balls and quarters.

25 Q.  Eight-balls and quarters of what?

Page 8181

1 A.  Crack cocaine.

2 Q.  All right.  If you can here the screen there, Mr. Conner,

3 please, touching the lower right-hand corner.

4 A.  (Witness complies.)

5           MR. GUERRERO:  And if we can go to 108.105, just for

6 the witness, Ms. Romero, please.

7 BY MR. GUERRERO:

8 Q.  Do you see Government's Exhibit 108.105?

9 A.  Yes.

10 Q.  Do you recognize anybody who is depicted in 108.105?

11 A.  Yes.

12 Q.  And who do you know those persons from?

13 A.  Congress Park area.

14 Q.  Does it fairly and accurately depict the guys that you knew

15 from Congress Park?

16 A.  Yes.

17           MR. GUERRERO:  Your Honor, we would move to enter

18 108.105.

19           THE COURT:  Without objection, it's received.

20           (Government's Exhibit 108.105 was moved into evidence.)

21           MR. GUERRERO:  Permission to publish?

22           THE COURT:  Yes.

23 BY MR. GUERRERO:

24 Q.  Do you see 108.105, Mr. Conner?

25 A.  Yes.

1 Q.  And let's start in the back row standing, again, from left

2 to right.  Do you recognize anybody?

3 A.  Yes.

4 Q.  Let's start with the first person you recognize.  Point to

5 that person.

6 A.  (Witness complies.)

7 Q.  And you've pointed to the far left-hand side of the exhibit,

8 the person standing leaning against the fence?

9 A.  Yes.

10 Q.  What is that person wearing?

11 A.  Black jacket.

12 Q.  And who do you recognize that person to be?

13 A.  Deon.

14 Q.  Deon?

15 A.  Yes.

16 Q.  And did you ever sell any crack cocaine to Deon?

17 A.  Yes.

18 Q.  During what time period?

19 A.  '97, 2000.

20 Q.  And what kind of quantities did you sell to Deon?

21 A.  I used to front him half ounces.

22 Q.  You used to front Deon half ounces?

23 A.  Correct.

24 Q.  And fronting to Deon half ounces meant what?

25 A.  Providing him crack cocaine on consignment, expecting him to

1 pay me.

2 Q.  And how long did you have to wait before Deon paid you back?

3 A.  Two, three days at tops.

4 Q.  And why was it, Mr. Conner, that you would front some

5 people, and other people you would expect cash up front?

6 A.  I would front people I generally trusted at the time.

7 Q.  So Deon was somebody you trusted?

8 A.  Correct.

9 Q.  How often did you front Deon crack cocaine?

10 A.  Off and on.

11 Q.  How many times a week would you supply him with crack

12 cocaine, Deon?

13 A.  Two, maybe three times a week.

14 Q.  What kind of quantities?

15 A.  No more than a half ounce.

16 Q.  And who is standing to the left of Deon?

17 A.  Munya.

18 Q.  And can you please point him out?

19 A.  (Witness complies.)

20 Q.  And you pointed to someone standing to the left of Deon,

21 apparently wearing a black jersey with the number two and

22 possibly a four?

23 A.  Correct.

24 Q.  And how did you know Munya?

25 A.  From the Congress Park area.

1 Q.  Did you ever sell crack cocaine to Munya?

2 A.  At a minimum, three, four times.

3 Q.  What kind of quantities did you sell to Munya?

4 A.  Wholesale.

5 Q.  What does that mean?

6 A.  A broken down portion of crack cocaine that you redistribute

7 at a lower price.

8 Q.  And how often would you provide wholesale amounts of crack

9 cocaine to Munya?

10 A.  Like I say, a minimum, three or four times.

11 Q.  Did you front it to him or did you expect cash up front?

12 A.  Cash up front.

13 Q.  The next person that you recognize there, again left to

14 right, after Munya?

15 A.  Yep.  That's Boy-Boy, Gregory Bell.

16 Q.  And where is he?

17 A.  (Witness complies.)

18 Q.  And you've pointed to the person who is standing to the left

19 of Munya?

20 A.  Correct.

21 Q.  And we've talked about Boy-Boy.  Did you continue to sell

22 crack cocaine to Boy-Boy in '97 to '98?

23 A.  Between '99, 2000.

24 Q.  So later on?

25 A.  Correct.

1 Q.  We'll get to that.

2         Who is to the left of Boy-Boy?

3 A.  DC.

4 Q.  And would you please point to DC?

5 A.  (Witness complies.)

6 Q.  And you've pointed to the person standing to the left of

7 Boy-Boy?

8 A.  Correct.

9 Q.  What is DC wearing?

10 A.  Like a gray hoodie with a black skull cap.

11 Q.  Did you ever sell to DC, crack cocaine, '97, '98?

12 A.  Yes, I did.

13 Q.  What kind of quantities?

14 A.  Halves, quarters.

15 Q.  Halves and quarters of what?

16 A.  Crack cocaine.

17 Q.  How often would you sell crack cocaine to DC during '97,

18 '98?

19 A.  '97, '98, not that often.

20 Q.  And who is to the left of DC?

21 A.  Jojo.

22 Q.  Point him out, please.

23 A.  (Witness complies.)

24 Q.  And you've just pointed to the person who is standing right

25 to the left of DC, who you identified earlier.  And now you've

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1004 of 1954

1 pointed to Jojo, who is standing to the left of DC?

2 A.  Correct.

3 Q.  And how did you know Jojo?

4 A.  Jojo is my daughter' mom's first cousin.

5 Q.  Say that again for us.

6 A.  He's my daughter's mom first cousin.

7 Q.  So your daughter's mother's --

8 A.  First cousin.

9 Q.  Is related to Jojo?

10 A.  Yes.

11 Q.  They are first cousins?

12 A.  Yes.

13 Q.  And up until '97 and '98, up until that point, had you ever

14 sold any crack cocaine to Jojo?

15 A.  No.

16 Q.  Did there come a point where you actually gave Jojo some

17 crack cocaine?

18 A.  Yes.

19 Q.  And when was that?

20 A.  '99, 2000, somewhere in that neighborhood.

21 Q.  And what quantity of crack cocaine did you give to Jojo?

22 A.  I gave him 31 grams of crack cocaine.

23 Q.  You gave him 31 grams of crack cocaine?

24 A.  Correct.

25 Q.  Why?

1 A.  For a motorcycle.  I offered it to him.

2 Q.  What kind of motorcycle did you get in return for the

3 31 grams of crack cocaine?

4 A.  It was -- I don't remember what kind of motorcycle it was.

5 Q.  Describe it.

6 A.  It was red.  That's all I remember.  I don't know what kind.

7 I can't remember.

8 Q.  Is it one of those racing bikes?

9 A.  Yeah, street bike, racing bike.

10 Q.  And who did you give the 31 grams of crack cocaine to?

11 A.  Mr. Jones.

12 Q.  Joseph Jones?

13 A.  Correct.

14 Q.  Did you personally hand him the 31 grams?

15 A.  Yes.

16 Q.  And in exchange, you got what?

17 A.  A motorcycle.

18      MR. MARTIN:  Asked and answered, Your Honor.

19 Objection.

20      THE COURT:  Sustained.

21 BY MR. GUERRERO:

22 Q.  Did you keep the motorcycle?

23 A.  No.

24 Q.  Why not?

25 A.  No paperwork with the motorcycle.

1 Q.  What does that mean?

2 A.  It wasn't legally registered to anyone.

3 Q.  What did you do with the motorcycle?

4 A.  Gave it back to Mr. Jones.

5 Q.  Did you ever get your 31 grams back?

6 A.  No.

7 Q.  Did you ask Joseph Jones for your 31 grams back?

8 A.  No.

9 Q.  Why not?

10 A.  Just gave it to him.

11 Q.  I'm sorry?

12 A.  I just let him have it.

13 Q.  Did he ever give you -- did Jojo ever give you any money in

14 return?

15 A.  No.

16        MR. GUERRERO:  Court's indulgence.

17 BY MR. GUERRERO:

18 Q.  All right.  Person to the left of Jojo?

19 A.  Okay.

20 Q.  Do you recognize anybody standing to the left of Jojo on

21 108.105?

22 A.  Yes.

23 Q.  And point to the person that you next recognize.

24 A.  (Witness complies.)

25 Q.  And you've pointed to someone standing to the left of the

1 person you identified as Jojo.  Who is the person you've just

2 identified?

3 A.  Bootsy.

4 Q.  Bootsy?

5 A.  Bootsy.

6 Q.  Is that the person that you talked earlier that you sold

7 crack cocaine to?

8 A.  No.

9 Q.  This is a different Bootsy?

10 A.  Correct.

11 Q.  The Bootsy who is in 108.105, did you ever sell crack

12 cocaine to that person?

13 A.  No.

14 Q.  Anybody else you recognize?

15 A.  Yes.

16 Q.  Who?

17 A.  Gentleman right there (indicating).

18 Q.  You've pointed to the person standing up on the far

19 right-hand corner of Government's Exhibit 108.5.  What is that

20 person wearing?

21 A.  Black jacket, blue jeans.

22 Q.  And who do you recognize that person to be?

23 A.  Dom.

24 Q.  And could you spell that name?

25 A.  I think it's D-O-M, Dom.  I'm not sure.

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013      Page 1008 of 1954

1 Q.  D-O-M, M as in Mary?

2 A.  M as in Mary.

3 Q.  As in Mary?

4 A.  Correct.

5 Q.  And how long did you know Dom?

6 A.  A short while.  I mean, same as everyone else.

7 Q.  Explain that.

8 A.  I'm sorry, '93, '94.  So about the same amount of time as

9 everyone else.

10 Q.  From '93 and '94, up until what time period?

11 A.  Present.

12 Q.  And did you ever sell any crack cocaine to Dom?

13 A.  Yes.

14 Q.  During what time period?

15 A.  Between '97 and 2000.

16 Q.  What kind of quantities did you sell to Dom?

17 A.  Not less than a quarter, not more than an ounce.

18 Q.  No less than a quarter?

19 A.  Not more than an ounce.

20 Q.  And not more than an ounce.  And a quarter of what?

21 A.  Crack cocaine.

22 Q.  And an ounce of what?

23 A.  Crack cocaine.

24 Q.  How often would you sell Dom that type of quantity during a

25 week?

1 A.  It wasn't that frequent.  It was off and on.

2 Q.  And would you front it to Dom, or would you get cash up

3 front?

4 A.  Cash up front.

5 Q.  And when you actually served Dom the crack cocaine, did you

6 ever see him hanging around with anybody else?

7 A.  Yes.

8 Q.  Who did you see Dom hanging around with?

9 A.  Mainly DC and EB.

10 Q.  Who is EB?

11 A.  He's not pictured in this frame.

12       MS. WICKS:  Objection.  Nonresponsive.

13       THE COURT:  Go ahead.  Put your next question.

14 BY MR. GUERRERO:

15 Q.  How did you know EB?

16 A.  From same neighborhood, Congress Park area.

17 Q.  Did you ever sell crack cocaine to EB?

18 A.  Yes, I did.

19 Q.  And during what time periods?

20 A.  Between '97 and 2000.

21 Q.  And you said that you also saw Dom in the company of DC?

22 A.  Correct.

23 Q.  Is that the DC that you've identified for us in 108.105?

24       MR. BALAREZO:  I'm going the object to the

25 characterization in the testimony that he was around DC, not in

1 the company of.

2          THE COURT:  Rephrase.

3 BY MR. GUERRERO:

4 Q.  When you saw Dom, I asked you, "Did you see him hanging

5 around other guys?"

6 A.  Correct.

7 Q.  And do you recall?

8 A.  Yes.

9 Q.  Where did you ever -- well, with whom did you see Dom

10 hanging out with, or in the company of?

11 A.  EB and DC.

12 Q.  And where did you see Dom, EB, and DC together?

13 A.  Mostly on 13th Place.

14 Q.  And 13th Place is what?

15 A.  Congress Street.  13th Place, Congress Street.

16 Q.  Is that the area by the circle?

17 A.  The circle, yes.

18 Q.  And what would you see Dom, EB, and DC do at the circle?

19          MR. BALAREZO:  Objection.  Assumes facts not in

20 evidence, Your Honor.

21          THE COURT:  You can rephrase.  Sustained, rephrase.

22 BY MR. GUERRERO:

23 Q.  When you saw Dom at that circle, what did you see?

24 A.  Distributing of crack cocaine.

25 Q.  What does that mean, "distributing crack cocaine"?

1 A.  Hand in hand, distributing crack cocaine to people that

2 smoke crack cocaine.

3 Q.  Did you ever see -- do you know a person named Gail?

4 A.  Yes.

5 Q.  Who is Gail to you?

6 A.  She was someone considered a customer to me.

7 Q.  How often did you sell to Gail?

8 A.  Quite often.

9 Q.  You sold what to Gail?

10 A.  Crack cocaine, small amounts.

11 Q.  And where did Gail live?

12 A.  First building on 13th Place.

13 Q.  Did you ever serve Gail crack cocaine in her apartment?

14 A.  Yes.

15 Q.  And when you served Gail crack cocaine in her apartment, did

16 you see anybody else in the apartment?

17 A.  Yes.

18 Q.  On some occasions, or all the time?

19 A.  On some occasions.

20 Q.  On the occasions that you saw somebody there, who did you

21 see?

22 A.  Dom, DC, EB.

23 Q.  Did you know where Dom used to live?

24 A.  No, I didn't.

25 Q.  Back then?

1 A.  No.

2 Q.  All right.  Do you recognize anybody else in 108.105?

3 A.  Yes.

4 Q.  Who is that?

5 A.  Kneeling down is Keith Barnett.

6 Q.  Point to the person kneeling down.

7 A.  (Witness complies.)

8 Q.  You've pointed to the person who is the only person crouched

9 down in the front of 108.105.  What is that person wearing?

10 A.  Blue gene jacket, blue jeans, kneeling down with a glove

11 with his middle finger up under his chin or something.

12 Q.  How long did you know Keith Barnett?

13 A.  The same amount of time as anyone else.

14 Q.  Which is what?  Again, you've got to elaborate for us.

15 A.  Early '90s to present.

16 Q.  In the early '90s, did you sell crack cocaine to Keith

17 Barnett?

18 A.  No.

19 Q.  Did you ever sell crack cocaine to Keith Barnett?

20 A.  Very few times.

21 Q.  What time period?

22 A.  Between '97 and 2000.

23 Q.  What kind of quantities did you sell to Keith Barnett?

24 A.  Mainly wholesale.

25 Q.  How often would you give him wholesale quantities during a

1 week?

2 A.  Not that often.

3 Q.  And just to be clear on the record here, what does wholesale

4 mean exactly with respect to quantity?

5          MS. WICKS:  Objection.  Asked and answered.

6          THE COURT:  Of this witness?

7          MS. WICKS:  Yes, Your Honor.

8          MR. GUERRERO:  I can be more specific.

9          THE COURT:  Go ahead.

10 BY MR. GUERRERO:

11 Q.  With respect to weight, quantity of weight, when you say

12 wholesale quantities, what kind of weight are you talking about?

13 A.  You're talking about cocaine distributed at small amounts,

14 considered like dimes and twenties.

15 Q.  And a dime is worth how much?

16 A.  $10.

17 Q.  And a 20 is?

18 A.  20 bucks.

19 Q.  So that's what you mean when you talk about wholesale sales?

20 A.  That's correct.

21 Q.  All right.  Now, I would like to move on now to the time

22 period after you were getting some crack cocaine from Joe Best.

23 You said that on one occasion he got you a half a key.  On the

24 second occasion you didn't get anything?

25 A.  That's correct.

1 A.  I picked up a box that contained three kilos of cocaine,

2 then took it back and met up with Jack.

3 Q.  And how long did it take for that shipment to get from

4 California to Maryland?

5 A.  We overnighted it.

6 Q.  When you picked it up at Dexter's, what did you do with it?

7 A.  Took it back to the apartment where I -- the residence I was

8 staying at that time, which was with Carolyn Edwards.

9 Q.  So did you still have the residence at Maury Avenue?

10 A.  Yes, I did.

11 Q.  Who was living there?

12 A.  Sheila Teasley.

13 Q.  And who is Sheila Teasley?

14 A.  That's my daughter mom.

15 Q.  But you weren't living at Maury Avenue?

16 A.  Correct.

17 Q.  Where were you physically living?

18 A.  In Whitehall Square with Carolyn Edwards.

19 Q.  White?

20 A.  Whitehall Square apartments, with Carolyn Edwards.

21 Q.  And who is Carolyn Edwards?

22 A.  It was a girlfriend at the time.

23 Q.  And where was -- I'm sorry, the name of the apartment

24 complex?

25 A.  Whitehall Square.

1 Q.  Whitehall Square?

2 A.  Yes.  Correct.

3 Q.  Was that in D.C. or Maryland?

4 A.  That was in Suitland, Maryland.

5 Q.  You took the three kilos back to Whitehall Square?

6 A.  That's correct.

7 Q.  What did you do with it when you got there?

8 A.  Then contacted Mr. Davis, and he then came and picked up two

9 of the kilos.

10 Q.  What did you do with your powder cocaine?

11 A.  Kept it, cooked it up, and then distributed it.

12 Q.  Did you convert it to crack cocaine or did you sell it in

13 powder?

14 A.  Sold it in -- sold partial of it in powder and the rest in

15 crack cocaine.

16 Q.  And what year is this about, now?

17 A.  This is about summer '99, late summer, '99.

18 Q.  Where did you go to sell your crack cocaine or your powder

19 cocaine?

20 A.  The Congress Park area.

21 Q.  And right around that time in '99 to 2000, let's look at

22 that time period.

23 A.  Okay.

24 Q.  Who became some of your regular clients back in '99, 2000?

25 A.  '99, 2000 --

1 Q.  We're talking now this LA trip.

2 A.  Correct.  I distributed my drugs regularly to Boy-Boy,

3 Santu, Jazz, Dazz on a few occasions, Dom.  Let's see, Bootsy,

4 Harry, Deon, quite a few other people as well.

5 Q.  How about Coodie, or Wop?

6          MS. WICKS:  Objection as to leading.

7          THE COURT:  Overruled.

8 BY MR. GUERRERO:

9 Q.  During that time period, the beginning of these LA trips.

10 A.  I served Coodie at a later date, around 2000.

11 Q.  You hadn't served him anything before that?

12 A.  No.

13 Q.  All right.  Boy-Boy.  Now, during this LA time period, how

14 often would you serve Boy-Boy?

15 A.  Quite often, probably...

16 Q.  How many times a week?

17 A.  Two or three times a month.

18 Q.  Two or three times a month?

19 A.  Yes.

20 Q.  What kind of quantities would you sell to Boy-Boy in '99,

21 2000?

22 A.  Somewhere in the range of a 31 to a 62.

23 Q.  Crack or powder cocaine?

24 A.  Crack cocaine.

25 Q.  Fronted or cash up front?

1 A.   Cash up front.

2 Q.   Santuce, how many times did you sell to him in a week or a

3 month?

4 A.   Multiple.

5 Q.   Multiple?

6 A.   Yes.

7 Q.   During a week, or multiple during a month?

8 A.   Multiple during a week.

9 Q.   What kind of quantities would you sell to Santuce during a

10 week?

11 A.   Anywhere from seven to 14 grams of crack cocaine.

12 Q.   Fronted or cash up front?

13 A.   Cash up front.

14 Q.   How about Jazz?

15 A.   Seven to 14 grams, cash up front, crack cocaine.

16 Q.   How many times a week?

17 A.   Multiple.

18 Q.   You mentioned Dazz, with a D?

19 A.   Yes.

20 Q.   What kind of quantities would you sell to him, '99, 2000?

21 A.   Not more than an ounce, not less than a quarter, not that

22 many times.

23 Q.   A quarter ounce?

24 A.   Yeah, seven grams to 28 grams.

25 Q.   Seven grams of what?

1 A.  Crack cocaine.

2 Q.  Or an ounce of crack cocaine?

3 A.  Crack cocaine.

4 Q.  Somewhere in that window?

5 A.  Yes.

6 Q.  How many times a week?

7 A.  It was minimal, not more than four or five times that I sold

8 him, ever.

9 Q.  And was that cash up front or fronted?

10 A.  Cash up front.

11 Q.  How about Dom?

12      MR. BALAREZO:  Your Honor, objection.  This has already

13 been asked and answered.

14      THE COURT:  Overruled.

15 BY MR. GUERRERO:

16 Q.  Talking now in this time period during the LA trip, how

17 often would you sell to Dom during that time period?

18      MR. BALAREZO:  Your Honor, objection.  The prior time

19 frame was 1997 to 2000, which encompasses this.

20      THE COURT:  Overruled.

21 A.  '97, not many times; '99 to 2000, it wasn't that often as

22 well.  I can't put an amount.  I can't put a specific number on

23 it, but I did sell cocaine to Dom.

24 BY MR. GUERRERO:

25 Q.  All right.  And what kind of quantities did you sell to Dom?

1 A.  Anywhere from a quarter to an ounce.

2 Q.  A quarter to an ounce of what?

3 A.  Crack cocaine.

4 Q.  Would you front that to him or sell it to him cash up front?

5 A.  Cash up front.

6 Q.  How about Bootsy?

7 A.  I think when Bootsy first came home from jail, I fronted him

8 like a half-ounce or something, but he never paid me.

9 Q.  We're talking about the same time period, right, '99, 2000?

10 A.  Yeah, somewhere in that neighborhood.

11 Q.  You fronted him how much?

12 A.  A half-ounce.

13 Q.  Harry?

14 A.  Harry, multiple.

15 Q.  Multiple times during the week or month?

16 A.  During the week.

17 Q.  What kind of quantities?

18 A.  Not more than a half-ounce.

19 Q.  Did you front that to him or did you get the cash up front?

20 A.  Cash up front.

21 Q.  How about Deon?

22 A.  Half ounces up front.  I fronted him a half an ounce

23 probably two or three times a week.

24 Q.  Did you say you fronted that to him?

25 A.  Yes.

1 Q.  Two or three times a week?

2 A.  Correct.

3 Q.  Half ounces of what?

4 A.  Crack cocaine.

5 Q.  And who was the last person you said?

6 A.  I don't recall.

7 Q.  Now, in '99 and 2000, were you also going into Congress Park

8 to store your crack cocaine?

9 A.  Yes.

10       MR. ZUCKER:  Objection.  Leading.

11       THE COURT:  Sustained.

12 BY MR. GUERRERO:

13 Q.  Where were you storing your crack cocaine?

14 A.  I had two stash houses where I kept my cocaine.

15 Q.  Where were the stash houses?

16 A.  One was on Congress, the other one was in 13th Place.

17       MR. GUERRERO:  Mr. Mazzitelli, may we pull up 100.1,

18 please, marked and entered?

19 BY MR. GUERRERO:

20 Q.  Can you clear the screen there, Mr. Conner, lower right-hand

21 portion of the screen?

22 A.  (Witness complies.)  Can you blow it up a little bit bigger?

23 Q.  We can blow up 100.1 a little bit more.

24       What area are we referring to, Mr. Conner?

25 A.  Trying to go in from Congress Street.

# Tab 28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| v. | : | |
| ANTWUAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | April 24, 2007 |
| DOMINIC SAMUELS, | : | 9:25 a.m. |
| Defendants. | : | |
| | : | |

VOLUME 39 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:  UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant
Antwuan Ball:  CARNEY & CARNEY
John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8236

APPEARANCES (Cont.)

For Defendant
Antwuan Ball:  TIGHE, PATTON, ARMSTRONG,
TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant
David Wilson:  LAW OFFICE OF JENIFER WICKS
Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant
Gregory Bell:  LAW OFFICE OF JAMES W. BEANE
James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant
Desmond Thurston:  LAW OFFICE OF JONATHAN ZUCKER
Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant
Joseph Jones:  LAW OFFICE OF ANTHONY MARTIN
Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8237

APPEARANCES (Cont.)

For Defendant
Dominic Samuels:  LAW OFFICES OF A. EDUARDO BALAREZO
A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:  Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8238

**MORNING SESSION, APRIL 24, 2007**

1
2   (9:28 a.m.)
3       THE COURT:  All right.  Mr. Guerrero, are you ready for
4   the jury?
5       MR. GUERRERO:  Yes, Your Honor, we are.
6   (Jury in at 9:29 a.m.)
7       THE COURT:  Good morning, ladies and gentlemen.
8   THE JURY PANEL:  Good morning.
9   THE COURT:  Welcome back.  We're ready to resume.
10  Counsel.
11  MR. GUERRERO:  Thank you, Your Honor.
12      CONTINUED DIRECT EXAMINATION OF CEDRIC CONNER
13  BY MR. GUERRERO:
14  Q.   Good morning, sir.
15  A.   Good morning.
16  Q.   Would you please introduce yourself once again for the
17  record.
18  A.   Cedric Conner.
19  Q.   And, Mr. Conner, yesterday afternoon we left off with the
20  topic of your stash houses down in Congress Park and we were
21  about to start talking about a person named Kiki.  Do you
22  remember that?
23  A.   That's correct.
24      MR. GUERRERO:  Mr. Mazzitelli, if we may pull up 100.1,
25  please.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8243

1  A.   Correct.

2  Q.   At Kiki's, would that be in powder form or crack form?

3  A.   Crack cocaine.

4  Q.   All right.  In 1999, are you the same Cedric Conner who

5 was convicted of solicitation of a prostitute down in Fairfax,

6 Virginia?

7  A.   Yes.

8  Q.   And in '99 and 2000, did you continue to go to L.A. and

9 get more crack cocaine or powder cocaine?

10  A.   Yes.

11  Q.   Back in -- before we get into how many times you went, in

12 '99 or 2000, was there an incident that happened down in the

13 circle area between you and a person named DC?

14  A.   Yes.

15  Q.   When do you think that occurred?

16  A.   Somewhere near September, before I went to Cancun, so it

17 was after my first trip to L.A.

18  Q.   And DC we saw in one of the pictures yesterday, one of

19 those photos?

20  A.   That's correct.

21  Q.   And who was DC, again, to you?

22  A.   Just somebody that -- partially bought drugs from me at

23 times.

24  Q.   And where did this incident take place with you and DC?

25  A.   Right on 13th Place near where Kiki's house was.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8244

1  Q.   Close to The Circle?

2  A.   Yes.

3  Q.   And what were you doing out there on that day?

4  A.   That particular day, I was outside going hand-to-hand,

5 which I called hand-to-hand, selling drugs, small quantities.

6  Q.   What kind of quantities were you selling?

7  A.   Dimes and twenties.

8  Q.   And why were you out there doing hand-to-hand if you had

9 been bringing in larger amounts of crack cocaine?

10  A.   To make extra money to take to Cancun.

11  Q.   Who were you going to go to Cancun with?

12  A.   Jimmy Wingate, a friend of mine.  Scooter.

13  Q.   So tell us what happened when you were out there?

14  A.   Incident occurred.  I was out there, out there probably a

15 good 30 minutes, and I was getting a lot of sales and --

16  Q.   Let me stop you right there.  When you're out there for

17 30 minutes getting a lot of sales, did you see anyone else out

18 there doing the same?

19  A.   Yes.

20  Q.   Who did you see out there doing the same?

21  A.   The only one I recall that was out there at that time --

22 a few other people.  I don't recall everybody, but the main two

23 that I recall was Dazz and DC.

24  Q.   Dazz and DC?

25  A.   Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8245

1  Q.   Dazz with a D?

2  A.   Dazz with a D.

3  Q.   And what did you see DC doing?

4  A.   They were across the street from where I was standing in

5 an alley.

6  Q.   Can you see the alley that they were in on Government's

7 Exhibit 100.1?

8  A.   Yes.

9  Q.   And please point it out.

10  A.   (Indicating.)

11  Q.   I note for the record you just pointed to the bottom

12 there.  Would you clear the screen and --

13  A.   (Indicating.)  Do you see where the 3 is, directly where

14 the 3 is, kind of across the street, there's an open space like

15 there?  It's an alley because it's not a --

16  Q.   All right.

17  A.   At the end of that building where I just pointed the

18 arrow to.

19  Q.   And just for the record so hat we document it, you tried

20 to mark that area a couple attempts, but it wasn't at the right

21 area?

22  A.   Right.

23  Q.   So now you've got an arrow to the right of 13th Place.

24 It looks to be -- the point of the arrow is right on the right

25 side of T, of 1-3 and T, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8246

1  A.   Correct.

2  Q.   There's an alley there in front of that building?

3  A.   Yes.

4  Q.   Is that the alley that you're referring to?

5  A.   Yes.

6  Q.   And what did you see DC doing in that alley?

7  A.   They were just over there, just a group of guys.  Like I

8 say, I don't remember everyone that was over there, but two that

9 I do recall that was over there.

10  Q.   And what do you particularly recall DC doing?

11  A.   Just being outside at that time.

12  Q.   And you said you were doing hand-to-hands?

13  A.   That's correct.

14  Q.   Did you see DC doing hand-to-hands?

15  A.   No, I didn't.  I wasn't paying attention, but I mean -- I

16 was paying attention, but I wasn't focussed on what they were

17 doing.  I was just on my side of the street.  They were on a

18 different side of the street.

19  Q.   And where was the side of the street that you were?  Can

20 you point for us?  Or would it be right across the street?

21  A.   Right near the building that I pointed to earlier.

22  Q.   All right.  So would that be to the left of where it says

23 13th Place, the number 13?

24  A.   Correct.

25  Q.   All right.  Now, you said you also saw Dazz there, too,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1024 of 1954

1   in that alley?
2   **A.**   That's correct.
3   **Q.**   What did you see Dazz doing?
4   **A.**   They were over there.  They were just having a
5   conversation, about what I do not know.
6   **Q.**   And after the 30 minutes, you said you were making some
7   sales.  Sales of what?
8   **A.**   Crack cocaine.
9   **Q.**   And approximately how much money do you recall making?
10  **A.**   I don't recall at that time.
11  **Q.**   What happened after you made the sales?
12  **A.**   I was getting a lot of sales.  A lot of people were, you
13  know, requesting my drugs at that time.  A few minutes later, I
14  was approached by DC.
15  **Q.**   And DC said what to you?
16  **A.**   He told me that I couldn't come around there and take all
17  the money because I don't be out there with them, you know, when
18  they beefing and stuff like that.
19  **Q.**   And what -- did DC say anything with reference to that
20  particular strip?
21  **A.**   The only thing --
22       MS. WICKS:  Objection --
23       MR. ZUCKER:  Objection to form, leading.
24       THE COURT:  Sustained.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **Q.**   What else, if anything, did he say?
2   **A.**   He told me they built that strip.
3   **Q.**   DC said they built that strip?
4   **A.**   That's correct.
5   **Q.**   What did you understand he meant when he said they built
6   that strip?
7   **A.**   I guess him and --
8       MR. ZUCKER:  Objection, speculation.
9       THE COURT:  Overruled.
10  BY MR. GUERRERO:
11  **Q.**   Go ahead.  You may answer, sir.
12  **A.**   Okay.  I guess he meant by that was that --
13       THE COURT:  Sustained.
14       THE WITNESS:  Okay.
15       THE COURT:  Hold on.  You have to put the question.
16  BY MR. GUERRERO:
17  **Q.**   What you understood.  Don't guess for us.  What did you
18  understand DC meant when he said they built that strip?
19       THE COURT:  Well, sustained.
20  BY MR. GUERRERO:
21  **Q.**   What did you respond to DC?
22  **A.**   I did not make a comment at that.  A few minutes later --
23  **Q.**   Well, what had you just been doing before DC approached
24  you?
25       MR. ZUCKER:  Objection, asked and answered.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1       THE COURT:  Overruled.
2   BY MR. GUERRERO:
3   **Q.**   What had you just been doing before DC approached you?
4   **A.**   Distributing drugs.
5   **Q.**   What kind of drugs?
6   **A.**   Crack cocaine.
7   **Q.**   Where?
8   **A.**   Small quantities, right on 13th Place.
9   **Q.**   And when DC approached you, he had that conversation.
10  What happened next?
11  **A.**   He then returned to the side of the street that he was
12  on.
13  **Q.**   The same alley you pointed to us earlier?
14  **A.**   That's correct.
15  **Q.**   What did you see in that alley?
16  **A.**   Small group of guy that was across the street from where
17  I was.
18  **Q.**   Who do you recall being in that alley at that time?
19  **A.**   The two people I mainly recall was Dazz and DC.
20  **Q.**   What happened next?
21  **A.**   A few minutes later, maybe half -- not a few minutes, but
22  20 to 25 minutes later, Mr. Ball pulled up.
23  **Q.**   Antwuan Ball?
24  **A.**   That's correct.
25  **Q.**   During the 25-minute period that you wait until Antwuan

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   Ball shows up, what are you doing?
2   **A.**   Still distributing my drugs.
3   **Q.**   What kind of drugs?
4   **A.**   Crack cocaine.
5   **Q.**   Where?
6   **A.**   On 13th Place, in front of Kiki's building.
7   **Q.**   Were you making sales?
8   **A.**   Yes.
9   **Q.**   How much, do you recall?
10  **A.**   No, I don't.
11  **Q.**   Was it a lot or a little?
12  **A.**   It wasn't that much.
13  **Q.**   What kind of quantities were you selling?
14  **A.**   I was selling all dimes.
15  **Q.**   Now, after the 25 minutes passed by, you saw Antwuan?
16  **A.**   That's correct.
17  **Q.**   Where did you see Antwuan?
18  **A.**   When he pulled up, he pulled into the back of the alley
19  across the street from where I was standing and he got out and
20  he conversed with the gentlemen that were standing over there.
21  **Q.**   You saw Antwuan converse with who?
22  **A.**   DC, Dazz and the other group of members that were over
23  there at that time.
24       MR. ZUCKER:  Objection.
25       THE COURT:  Basis?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*8251*

1  MR. ZUCKER: I must have misunderstood. I think he said
2  the "other members" or "men"?
3      THE COURT: "Group of men." Overruled.
4      MR. ZUCKER: All right.
5  BY MR. GUERRERO:
6  Q.    Where did you see Antwuan talk to Dazz and DC and the
7  other group of men?
8  A.    Generally across the street, where they were standing.
9  Q.    Was that in the same alley that you pointed to us
10  earlier?
11  A.    That's correct.
12  Q.    Right to the right of the 13th Place building?
13  A.    That's correct.
14  Q.    How long did you see Antwuan talk to Dazz and DC?
15  A.    I don't recall how long. I don't recall exactly how long
16  it was.
17  Q.    What did you continue to do while Antwuan was talking to
18  Dazz and DC?
19  A.    I stayed on my side of the street.
20  Q.    Doing what?
21  A.    Distributing my drugs, but I wasn't getting any sales at
22  that time.
23  Q.    Distributing what kind of drugs?
24  A.    Crack cocaine.
25  Q.    Were you working with anybody then?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8252*

1  A.    No.
2  Q.    What happened after you see Antwuan talk to Dazz and DC?
3  A.    He then approached me and he and I had a conversation.
4  Q.    Who approached you?
5  A.    Mr. Ball.
6  Q.    Antwuan Ball?
7  A.    Yes.
8  Q.    And where did Antwuan Ball and you have this
9  conversation?
10  A.    At the end of Sheila's mother because they have a fence
11  like gated around that community. It was Sheila's mother -- my
12  daughter's mother's building is in the middle of that complex
13  and we were standing at the tip of the walkway.
14  Q.    Point to us, please, on 100.1.
15  A.    It's kind of hard to point to it because it's --
16  Q.    If you just point directly to the general area, maybe
17  that will work.
18  A.    (Indicating.) That's as close as I can get it.
19  Q.    Just for the record, you made several attempts to mark
20  100.1, but they weren't successful?
21  A.    That's correct.
22  Q.    And now you've pointed to, on 100.1, again, to the left
23  of 13th Place, it looks like a building that's right to the left
24  of "P-L" of 13th Place?
25  A.    Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8253*

1  Q.    Okay. In that general area, you and Antwuan Ball met?
2  A.    Had a conversation.
3  Q.    Did he approach you or you approached Antwuan?
4  A.    He approached me.
5  Q.    Antwuan approached you?
6  A.    That's correct.
7  Q.    Were you with anyone?
8  A.    No.
9  Q.    And did Antwuan approach you with anyone else?
10  A.    No.
11  Q.    And when Antwuan approached you, what was his demeanor
12  like? How was he acting?
13  A.    It was a cool demeanor. It wasn't anything volatile or
14  anything like that.
15  Q.    What did he say to you?
16  A.    We had a conversation and the basis of the conversation
17  was that I didn't really have to be out there and that was the
18  way that they made their livelihood.
19  Q.    You didn't need to be out there; that's the way they made
20  their livelihood?
21  A.    Correct.
22      MR. BALAREZO: Objection, Your Honor, as to vague,
23  "livelihood."
24      THE COURT: Overruled.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8254*

1  Q.    What else did Antwuan say?
2  A.    That was mainly the basis of it and he left.
3  Q.    And what happened to you? What did you do?
4  A.    I then kind of saw that they went back to where he was
5  and I took that as a warning and I left.
6  Q.    Why'd you take that as a warning?
7      MR. ZUCKER: Objection.
8      MR. GUERRERO: Goes to state of mind, Judge.
9      THE COURT: Overruled.
10      THE WITNESS: I felt uncomfortable after that.
11  BY MR. GUERRERO:
12  Q.    You felt uncomfortable why?
13  A.    Best way to put that is that it could have got ugly.
14  Q.    It could have got ugly?
15  A.    If I would have continued to stay out there and do what I
16  was doing.
17  Q.    What does that mean, "It could have got ugly"?
18  A.    I don't want to speculate.
19      THE COURT: Sustained.
20  BY MR. GUERRERO:
21  Q.    When you say, "It could have got ugly," it could have got
22  ugly between --
23      MR. ZUCKER: Objection.
24      THE COURT: Sustained.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8255

1  Q.    The area that you pointed to, do you know what they call
2  that area there on 13th Place?
3  A.    The Circle.
4  Q.    And how often had you been out in that circle selling
5  crack cocaine, you personally?
6  A.    Off and on?  Years.
7  Q.    Who else did you see in The Circle selling crack cocaine?
8  I'm just talking The Circle now, '99 to 2000.
9  A.    '99 to 2000?  Just about everybody I named.  Same people.
10  Q.    Give me the names, please.
11  A.    Santu, Jazz, Boy-Boy, Dom, Dazz, Little Phil, JT, Baby
12  Kai, Dip.
13  Q.    How often would you see, '99 and 2000, Santu selling
14  crack cocaine in The Circle?
15  A.    I can't say verbatim that I saw them, but after I served
16  they, they dispersed and went and did what they did.  Sometimes
17  I didn't stick around and watch anybody just distribute drugs.
18  Q.    All right.  Now, you mentioned a couple of people and I
19  would like to show you some photographs.
20        MR. GUERRERO:  If we can pull up, Mr. Mazzitelli --
21  BY MR. GUERRERO:
22  Q.    If you can clear the screen there.
23        Thank you, Mr. Conner.
24        MR. GUERRERO:  -- 108.70 just for the witness, with the
25  Court's assistance.  108.70, please.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8256

1  BY MR. GUERRERO:
2  Q.    Can you see Government's Exhibit 108.70, Mr. Conner?
3  A.    Yes.
4  Q.    And do you recognize the persons depicted in 108.70?
5  A.    Yes.
6  Q.    And where do you know those persons from?
7  A.    Congress Park.
8  Q.    Does the photo contain some of the people we've been
9  talking about?
10  A.    Yes.
11  Q.    Does it fairly and accurately depict the persons you
12  recognize from Congress Park?
13  A.    Yes.
14        MR. GUERRERO:  Your Honor, we would move to enter 108.70
15  at this time.
16        THE COURT:  Without objection, it's received.
17        (Government's Exhibit 108.70 admitted into the record.)
18        MR. GUERRERO:  Permission to publish, Your Honor?
19        THE COURT:  Yes.
20  BY MR. GUERRERO:
21  Q.    All right.  Mr. Conner, can you see 108.70 on the screen?
22  A.    Yes.
23  Q.    Let's start again.  From left to right is the easiest
24  way.  Left to right, point to the first person you recognize.
25  A.    JT.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8257

1  Q.    And what is JT wearing on 108.70?
2  A.    Kind of a brown sweater with a Sox hat on.
3  Q.    You just pointed to the person to the far left-hand
4  corner of 108.70?
5  A.    That's correct.
6  Q.    Is that the JT you said you saw in The Circle selling
7  crack cocaine, '99 and 2000?
8  A.    Yes.
9  Q.    Who's the next person you recognize?
10  A.    (Indicating.)
11  Q.    You just pointed to the person standing to the left of
12  JT.  Who is that?
13  A.    That's Mr. Bell, Boy-Boy.
14  Q.    Are you sure that's Mr. B -- Boy-Boy?
15        MR. ZUCKER:  Objection.
16        MS. WICKS:  Objection.
17        THE WITNESS:  Yes, I am.
18  BY MR. GUERRERO:
19  Q.    You think that's him?
20  A.    Yes.
21  Q.    And who is to the left of Boy-Boy?
22  A.    (Indicating.)  Baby Kairi.
23  Q.    Baby Kairi.  We've heard about Baby Kairi.  You just
24  mentioned that you had seen Baby Kairi out in The Circle selling
25  crack cocaine?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8258

1  A.    That's correct.
2  Q.    And how often did you sell crack cocaine to Baby Kai, if
3  ever?
4  A.    A few.  Not too many.  Not too many.
5  Q.    What kind of quantities did you sell to him?
6  A.    Mainly wholesale.
7  Q.    And again, what do you mean by "mainly wholesales"?
8  A.    Small quantities broken down into dimes and twenties.
9  Q.    And how long did you know Baby Kai?
10  A.    The least of everyone.  I can't recall how many years.
11  Probably from whatever time he started appearing around there,
12  late '90s.
13  Q.    Did you ever talk to him personally?
14  A.    Small talk.
15  Q.    Do you know if he was related to anyone?
16  A.    Yes.
17  Q.    Who was he related to?
18  A.    Mr. Ball, Antwuan Ball.
19  Q.    How so?
20  A.    I don't know.  Cousin, something like that.
21  Q.    Who's standing to the left of Baby Kai?
22  A.    I do not know who that is.
23  Q.    And anyone else you recognize there?
24  A.    Yes.
25  Q.    Who else do you recognize?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8275

1   **Q.**   Who else brought money?

2         Mr. Davis, Jack Davis.

3   **Q.**   How much did you see that Jack brought?

4   **A.**   I did not see because we never made the transaction.

5   **Q.**   Did you -- well, did something happen that caused Jack

6   Davis to come back without you?

7   **A.**   Yes.

8   **Q.**   And where did you stay at that point?

9   **A.**   Well, we stayed at this hotel. I can't remember what the

10   name of it was, but it was somewhere near Sunset Boulevard,

11   something like that.

12   **Q.**   What did you do with your money after Jack left?

13   **A.**   I stayed behind. After Mr. Davis -- after Davis and

14   Curlytop Bob came back, I stayed behind.

15         MS. WICKS: Object as non-responsive.

16         THE COURT: Go ahead, put your next question.

17   BY MR. GUERRERO:

18   **Q.**   What did you do with your money after you stayed behind?

19   **A.**   I called my connection, which was Courtney McLean.

20   **Q.**   Did you make any arrangements for more crack cocaine?

21   **A.**   Yes. I tried to purchase two more kilos of cocaine.

22   **Q.**   Were you successful?

23   **A.**   No.

24   **Q.**   Did you later go back yourself, like in November of '99?

25         MR. ZUCKER: Objection, leading.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8276

1         THE COURT: Overruled.

2         THE WITNESS: Yes.

3   BY MR. GUERRERO:

4   **Q.**   Okay. And who did you go back with?

5   **A.**   I went by myself.

6   **Q.**   And what happened on that occasion?

7   **A.**   I went to L.A. to get the cocaine. It wasn't ready so we

8   drove from L.A. to Vegas.

9   **Q.**   And did you make any arrangements afterwards to get more

10   cocaine?

11   **A.**   Yes, I did.

12   **Q.**   How -- what arrangements did you make?

13   **A.**   After I flew home from Vegas, I went and I mailed out

14   some money to Mr. McLean, M-C-L-E-A-N.

15   **Q.**   Is that the same Courtney McLean that we were talking

16   about yesterday?

17   **A.**   That's correct.

18   **Q.**   What, if anything, did you get in return?

19   **A.**   A shipment of cocaine was supposed to be shipped to me,

20   but the package got intercepted.

21   **Q.**   Where did you have that shipment shipped to?

22   **A.**   My mother's house, 641 Maury Avenue.

23   **Q.**   And what happened when it was shipped to Maury Avenue?

24   **A.**   Sheila Teasley was arrested for one kilo of cocaine.

25         MR. ZUCKER: I'm sorry. I couldn't hear.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8277

1         THE COURT: Could you repeat the answer.

2         THE WITNESS: Ms. Sheila Teasley was arrested for

3   receiving one kilo of cocaine.

4   BY MR. GUERRERO:

5   **Q.**   And that's the Sheila Teasley that's the mother of your

6   child?

7   **A.**   That's correct.

8   **Q.**   Now, before that happened -- we'll talk about that in a

9   second, but before that happened, had you been receiving powder

10   cocaine through the mail?

11   **A.**   Yes.

12   **Q.**   From L.A.?

13   **A.**   Yes.

14   **Q.**   And where had you been receiving it?

15   **A.**   The cocaine I was getting, it was going to -- it was

16   going somewhere up near Baltimore.

17   **Q.**   And why Baltimore? What did you have up there?

18   **A.**   I had an associate, Dexter Powell, who was an apartment

19   manager who could receive the packages.

20   **Q.**   Did you ever have it shipped anywhere else?

21   **A.**   Not the cocaine, no.

22   **Q.**   All right. Now, after Sheila got arrested, what happened

23   to you? What did you do?

24   **A.**   I then had to hire an attorney and everything and get her

25   bailed out.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8278

1   **Q.**   And how about your cocaine connection now with L.A.?

2   What happened to it?

3   **A.**   We -- we discontinued communication for about eight

4   months.

5   **Q.**   Why?

6         MR. BALAREZO: Your Honor, excuse me. Could I approach

7   for one second?

8         THE COURT: Yes.

9         (Following sidebar discussion had on the record:)

10         MR. BALAREZO: Your Honor, it just came to my attention

11   that Ms. Teasley apparently is in the courtroom, the lady that

12   the witness is testifying about. And she -- given what I think

13   is about to come out, she may end up being a witness. I don't

14   think she's on our list, but given that we didn't know about it,

15   it may be somebody that we may be interested in calling.

16         So I just want to let the Court be aware of that. I don't

17   have a problem with what the testimony is, but --

18         MR. GUERRERO: I don't have a problem with her stepping

19   out and she should step out if she is here.

20         MR. ZUCKER: She is. Do you recognize her? Do you know

21   who she is?

22         MR. GUERRERO: I don't recognize her personally, but --

23         MR. BALAREZO: She's right outside of the courtroom.

24   Light skin, dark hair.

25         MR. MARTIN: I see who counsel's referring to and she's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8279**

1    been here before, Your Honor.

2    MR. GUERRERO: She has been here.

3    MR. MARTIN: And she's been here many times.

4    THE COURT: And she's seated to my left as I look out?

5    MR. MARTIN: Right.

6    THE COURT: In which row?

7    MR. MARTIN: She's the fair-skinned -- she's the one --

8    THE COURT: With a tan top?

9    MR. ZUCKER: Exactly.

10    THE COURT: All right. Where's Mr. Leon?

11    MR. GUERRERO: Or Ms. Petalas is here.

12    THE COURT: Ms. Petalas, can you hear me?

13    All right. Would you ask Ms. Teasley, who's seated to my

14    left in approximately the second row -- or maybe we should ask a

15    marshal -- we'll just have Ms. Petalas invite --

16    I just wanted to ask if you would you would ask the person

17    who's seated in the audience to my left in the second row behind

18    the defense side, in a tan top with black hair, a black woman --

19    I'm not going to guess her age, but she's seated -- can you ask

20    her to step out of the courtroom as a request of the lawyers, who

21    may at some point want to have her as a witness in the case. If

22    she's asked at some point to be a witness if the case, that means

23    she's not allowed to sit in during the course of the trial

24    testimony to hear other testimony. So explain that as to why

25    you're asking her to step out.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8280**

1    Okay. Thanks.

2    MS. WICKS: Your Honor, I just wanted to put on the record

3    from my recollection that she attended part of the proceedings

4    against James Davis. I can look at my notes to figure out what

5    portion of the testimony. I don't specifically remember if it

6    was during Mr. Conner's testimony or not. I just wanted to put

7    that on the record.

8    THE COURT: You mean during Mr. James Davis' trial.

9    MS. WICKS: Yes, James Davis' trial, whom I represented.

10    THE COURT: Okay. I can't -- I can't say I have a

11    recollection of her presence during that proceeding, but I'll

12    take your representation.

13    MS. WICKS: I can double-check my notes, but I recall that

14    she was here, so --

15    THE COURT: All right.

16    (Sidebar discussion concluded.)

17    BY MR. GUERRERO:

18    Q.  All right. I think, Mr. Conner, we left off with you

19    talking about the arrest of Sheila Teasley.

20    A.  That's correct.

21    Q.  And then you said something about your connection with

22    L.A. kind of stopped?

23    A.  Yeah, it discontinued.

24    Q.  And what were you doing for money then?

25    A.  At that time I was looking for work. I had blew through

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8281**

1    a large portion of my money as well, but -- I blew through a

2    large part of my money, but I still had bills and stuff to

3    cover.

4    Q.  So what did you eventually end up doing?

5    A.  Filing bankruptcy about a year later.

6    Q.  What happened to the house?

7    A.  Filed in bankruptcy.

8    Q.  What did you do for money after filing for bankruptcy?

9    A.  Got a job.

10    Q.  Doing what?

11    A.  Working for DC Public Schools.

12    Q.  And when you were working for DC Public Schools, what

13    were you doing?

14    A.  I was an accounts payable specialist.

15    Q.  What year are we talking about now?

16    A.  We're talking about late '99, early 2000.

17    Q.  And at that point, what happens with this L.A.

18    connection, if anything?

19    A.  At that time, Ms. Teasley went to trial. After her

20    trial, I did get back in touch with my connection and they began

21    fronting me cocaine.

22    Q.  And was that like in the summer of 2000?

23    A.  Yep.

24    Q.  And which connection were you using out in -- well,

25    without me asking, you tell me, which connection were you using?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8282**

1    A.  Courtney McLean.

2    Q.  You said fronting now?

3    A.  Yes.

4    Q.  Had been fronted by Courtney McLean before?

5    A.  No.

6    Q.  And what kind of quantities were you getting fronted?

7    A.  A kilo of cocaine, powder.

8    Q.  How often would you get a kilo of cocaine powder fronted?

9    A.  On three occasion.

10    Q.  On three separate occasions you got it?

11    A.  Correct.

12    Q.  And what arrangements did you make to get this powder

13    cocaine?

14    A.  The very first kilo of cocaine I had delivered to my job

15    at DC Public Schools, 2500 North Capitol Street, Northeast.

16    Q.  You had it delivered to your job at DC Public Schools?

17    A.  That's correct.

18    Q.  And in what form? How did it get delivered?

19    A.  Powder cocaine, through U.P.S.

20    Q.  And did you receive the package?

21    A.  Yes, I did.

22    Q.  What did you do with it?

23    A.  After I got off work, I took it home. I had an apartment

24    on South Capitol Street.

25    Q.  Do you remember the address of the apartment on South

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8283**

1   Capitol Street you had?

2   A.   Yep.  4509 South Capitol Street, apartment -- I think

3   it's 101 or 102.

4   Q.   Can you just repeat the address.  I'm sorry.

5   A.   It's 4509 South Capitol Street, Southwest, apartment 101

6   or 102.  I'm not sure what it was.  It was the first apartment

7   on the right when you go in the building -- on the left when you

8   go in the building.

9   Q.   How long had you had that apartment?

10  A.   That apartment was registered to me.  At that time, my

11  girlfriend at the time was living there, but I was staying with

12  another female, Carolyn Edwards.

13  Q.   And when you said you took your first shipment to that

14  apartment, what did you do at that apartment with the shipment?

15  A.   I cooked it up and started distributing it.

16  Q.   Did you say -- what quantity did you get the first

17  shipment?

18  A.   A kilo.  One kilo of cocaine.

19  Q.   And you cooked it up to what?

20  A.   I cooked it up an eighth at a time, one eighth at a time.

21  And I also fronted some of it out.

22  Q.   And where were you selling this crack cocaine?

23  A.   4th Street and Congress block -- Congress Street.

24  Q.   On that occasion, do you recall if you sold any eighth of

25  a key to anyone in particular?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8284**

1   A.   Yes.

2   Q.   And who do you recall selling an eighth of a key?

3   A.   I sold Mr. -- I sold Wop, Cootie, an eighth of a key.

4   Q.   And what arrangements did you make for the -- with Wop or

5   Cootie for that eighth of a key?  How did he pay you?

6   A.   He paid me in cash.

7   Q.   How much did you charge him?

8   A.   3,500.

9   Q.   Had you ever sold that quantity before to Cootie or Wop?

10  A.   No.

11  Q.   Had you ever sold any quantity at all of crack cocaine to

12  Cootie or Wop before the summer of 2000?

13  A.   Like I said, I recall one or two times, a small amount.

14  Q.   What kind of small amount do you recall before that

15  eighth of a key sale?

16  A.   It would be between a quarter and a half.

17  Q.   Between a quarter and a half?

18  A.   Correct.

19  Q.   A quarter and a half of what?

20  A.   Seven grams to 14 grams of crack cocaine.

21  Q.   Do you recall what kind of vehicle, if any, Cootie or Wop

22  had during that time that you sold him the eighth of a key?

23  A.   Yes.

24  Q.   What did you see?

25  A.   A Cadillac Escalade.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8285**

1   Q.   All right.  Now, after that first -- you said you got

2   three shipments in the mail at that point?

3   A.   That's correct.

4   Q.   Or in that time period?

5   A.   Yes.

6   Q.   And the second shipment was for what quantity?

7   A.   Another kilo of cocaine.

8   Q.   Was that fronted or was that paid up front?

9   A.   That was fronted.

10  Q.   And where did you have that second shipment shipped to?

11  A.   I can't remember where I had that one shipped to.

12  Q.   Where did you -- was it powder or crack?

13  A.   It was powder.

14  Q.   And did you convert it to anything?

15  A.   I tried to transform it to cocaine base, but it was a bad

16  package.  The drugs was bad.

17  Q.   Where did you try to transform it to cocaine base?

18  A.   At my apartment on South Capitol Street.

19  Q.   Were you living at South Capitol Street yourself?

20  A.   No.

21  Q.   Would you store any crack cocaine there on South Capitol

22  Street?

23  A.   I wouldn't leave it overnight, but I did -- it was one of

24  my little apartments I had as a stash house.

25  Q.   I'm sorry, I didn't hear that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8286**

1   A.   It was an apartment I used as a stash house.

2   Q.   What kind of quantities did you leave at that apartment?

3   A.   Very little.  Mainly my scale, cooking equipment.

4   Q.   Did you ever serve anyone from that apartment at 4509

5   South Capitol Street?

6   A.   Yes.

7   Q.   Who did you serve at that apartment?

8   A.   James Davis.

9   Q.   Now, did you -- well, before we go to that, the third

10  shipment, what kind of quantity did you get on the third

11  shipment?

12  A.   On the third shipment, I got another kilo of cocaine.

13  Q.   Was that powder or crack?

14  A.   Powder.

15  Q.   And where did you have that one shipped?

16  A.   I do not recall.

17  Q.   What did you do with it when you got it?

18  A.   Same thing.  Cooked it up, distributed it.  But an

19  incident occurred at the apartment on South Capitol.

20  Q.   So that's another one that -- another kilo that you

21  cooked up to crack cocaine over at 4509 South Capitol?

22  A.   That's correct.

23  Q.   During that time period, if you were not living at that

24  apartment, do you recall who was?

25  A.   Yes, I do.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8331**

1   screen?
2   A.   Yes.
3   Q.   All right.  And the left-hand column, where it says
4   "item" and it has typed-written words there.  Let's start with a
5   dime bag.  We talked about a dime bag before, and when you say
6   dime bag, you meant a dime bag of what?
7   A.   Crack cocaine.
8   Q.   And then all the way down through that -- we won't go
9   through it again -- but are those the items that we were talking
10  about just a few minute ago, with respect to crack cocaine?
11  A.   Yes.
12  Q.   And then the approximate quantity to the right of the
13  column contains what?
14  A.   The approximate price.
15  Q.   And how about the center column, what does it contain?
16  A.   The approximate quantity.
17  Q.   Or the approximate weight?
18  A.   Yes.
19  Q.   Now, let's talk about you in particular.  What happened
20  to you in August of 2003?
21  A.   I was arrested in August 2003.
22  Q.   And you were arrested; and when you were arrested, what
23  happened?
24  A.   I was -- I went to prison -- I mean, went to jail.
25  Q.   At a subsequent date did you decide --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8332**

1        MR. ZUCKER:  Objection to form.
2   BY MR. GUERRERO:
3   Q.   At a subsequent date -- I'll rephrase -- what did you
4   decide to do?
5   A.   Cooperate.
6   Q.   And what, if anything, did you do once you decided to
7   cooperate?
8   A.   Enter a plea agreement.
9        MR. GUERRERO:  Court's indulgence.
10  BY MR. GUERRERO:
11  Q.   All right, Mr. Conner.
12       Mr. Conner, I've handed you what's been marked as
13  Government's Exhibit 1106.  Do you see that?
14  A.   Yes.
15  Q.   And what is Government's Exhibit 1106?
16  A.   It's a -- my plea agreement.
17  Q.   And I'd like you, sir, to turn to page number 10 of
18  Government's Exhibit 1106.
19  A.   Okay.
20  Q.   And what do you see on page 10?
21  A.   My signature.
22  Q.   Whose signature do you see?
23  A.   Mine.
24  Q.   Cedric Conner?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8333**

1   Q.   What's the date of your signature?
2   A.   9-17-2003.
3   Q.   Do you see anyone else's signature?
4   A.   My attorney.
5   Q.   And what's your attorney's name?
6   A.   Andrea Antonelli.
7   Q.   What's the date of her signature?
8   A.   9-17-2003.
9   Q.   And when did you enter this -- well, how much time had
10  gone by after your arrest before you entered this plea
11  agreement?
12  A.   Almost 16, 17 days, somewhere -- 20 days.  I don't know,
13  almost a month.
14  Q.   And now, the second portion of Government's Exhibit 1106.
15  Turn the page.  Do you see what it's titled?
16  A.   Yes.
17  Q.   And go to, of that portion of Government's Exhibit 1106,
18  page number 4 -- actually, if you can turn to page 5, it will be
19  better.  Next page.
20  A.   Okay.
21  Q.   Do you see anything there that you recognize?
22  A.   Yes.
23  Q.   What do you see?
24  A.   The acceptance.
25  Q.   And do you recognize anyone's signature?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8334**

1   A.   Yes.
2   Q.   Whose signature do you see?
3   A.   Mine, myself.
4   Q.   And what's the date of your signature?
5   A.   9-17-2003.
6   Q.   And do you recognize anybody else's signature?
7   A.   My attorney.
8   Q.   What's your attorney's name?
9   A.   Andrea Antonelli.
10  Q.   And what's the date of her signature?
11  A.   9-17-2003.
12  Q.   Have you had a chance to look at Government's Exhibit
13  1106?
14  A.   Yes.
15  Q.   Does it fairly and accurately contain your plea agreement
16  and your proffer in support of your plea agreement?
17  A.   Yes.
18       MR. GUERRERO:  Your Honor, we would move to enter 1106 at
19  this time.
20       MS. WICKS:  Same objection as the second portion, Your
21  Honor.
22       THE COURT:  Same objection as?
23       MS. WICKS:  As to the second portion of the document.
24       THE COURT:  All right.  That's overruled, and 1106 will be
25  received.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8335

1    (Government's Exhibit 1106 admitted into the record.)
2    MR. GUERRERO: Permission to publish?
3    THE COURT: Yes.
4    MR. GUERRERO: Court's indulgence.
5    THE COURT: Yes.
6 BY MR. GUERRERO:
7 **Q.** All right. Mr. Conner, can you see Government's Exhibit
8 1106 up on the screen?
9 **A.** Yes.
10 **Q.** I'm going to zoom in to paragraph 1. Do you see that?
11 **A.** Yes.
12 **Q.** Can you see Paragraph Number 1?
13 **A.** Yes.
14 **Q.** And do you see your name anywhere written there?
15 **A.** Yes, I do.
16 **Q.** And on the third line of Paragraph Number 1, do you see
17 what it is that you pled guilty to?
18 **A.** Yes.
19 **Q.** And what did you plead guilty to?
20 **A.** Cocaine, cocaine base, and marijuana.
21 **Q.** And what is -- what are your -- what kind of prison
22 exposure do you have under this plea agreement?
23 **A.** Ten to life.
24 **Q.** Ten what?
25 **A.** Ten years to life.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8336

1 **Q.** Where?
2 **A.** What do you mean?
3 **Q.** What does that mean?
4 **A.** Ten years to life in prison.
5 **Q.** And have you been in prison, though, during this time?
6 **A.** I was jailed. I wasn't in prison.
7 **Q.** Where have you been -- well, without telling us a
8 location, are you in or out of jail right now?
9 **A.** I'm not in prison -- I'm not in jail right now.
10 **Q.** You've been on release, then?
11 **A.** Yes.
12 **Q.** And I'm going to turn to page 2, Paragraph Number 2. Do
13 you see that?
14 **A.** Yes.
15 **Q.** And under your plea agreement, you pled guilty to
16 distributing what amount of cocaine powder?
17 **A.** 15 kilograms of cocaine powder -- 15 kilograms or more,
18 I'm sorry.
19 **Q.** And what amount of crack cocaine or cocaine base did you
20 plead guilty to?
21 **A.** 1.5 grams or more.
22 **Q.** And do you have an understanding -- an understanding of
23 what your level is under sentencing guidelines? Have you heard
24 of that before?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8337

1 **Q.** And what is a "sentencing guideline" to you?
2 **A.** Sentence guidelines, the level -- the amount of time that
3 you can receive from the acts that you committed.
4 **Q.** And what do you think -- what's your understanding of
5 what your level is?
6 **A.** I'm a level 38, which is the highest.
7 **Q.** And can it get any higher than level 38 --
8    MR. BALAREZO: Objection.
9    THE WITNESS: No.
10 BY MR. GUERRERO:
11 **Q.** -- in your understanding?
12    THE COURT: Was there an objection?
13    MR. BALAREZO: Asked and answered. Thirty-eight is the
14 highest, is his testimony.
15 BY MR. GUERRERO:
16 **Q.** I'll rephrase the question. In your understanding, if
17 you had -- where it says 15 kilograms or 1.5, if it was more
18 than 15 kilograms or more than 1.5 kilograms of cocaine base,
19 would that raise or lower your level 38?
20 **A.** It wouldn't do anything to it, because I'm at the
21 highest.
22 **Q.** Now, did you sell more than 15 kilograms of cocaine
23 powder during your time out in Congress Park?
24 **A.** I can't say I did. I could have, possibly.
25 **Q.** Did you sell more than 1.5 kilograms of crack cocaine?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8338

1 **A.** I can't admit that I did, but it could have been,
2 possibly.
3 **Q.** I'll turn to page number 5. Do you see that? Actually,
4 it's page number 3, counsel, paragraph 5.
5 **A.** Okay.
6 **Q.** Do you see paragraph 5?
7 **A.** Yes, I do.
8 **Q.** Now, when you said you decided to cooperate, under your
9 plea agreement, under that paragraph, that means what to you?
10 **A.** Cooperate and testify truthfully.
11 **Q.** What happens to your plea agreement if you are not
12 truthful in what you provide?
13 **A.** I commit perjury and will not receive a 5K letter.
14 **Q.** What's a 5K Letter?
15 **A.** It's an agreement -- between -- which I'm hoping to get.
16 A letter from the government, which I'm hoping to receive, to
17 lessen my sentence.
18 **Q.** Do you automatically get a 5K Letter for cooperating?
19 **A.** No, I do not.
20 **Q.** And who gives you the 5K Letter, if you get one?
21 **A.** The states office.
22 **Q.** The government's state office.
23 **A.** Yes.
24 **Q.** That's us, right, the government?
25 **A.** That's correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8339

1  Q.   And if you get a 5K Letter, what's your understanding as
2  to what happens to the 5K Letter?  Who gets it next?
3  A.   Then -- my understanding of the 5K Letter, it's
4  definitely earned by telling the truth.
5  Q.   And if you earn one, where does it go next?
6  A.   To the judge.
7  Q.   And what's your understanding as to whether or not --
8  well, what happens to a letter once the judge gets it?
9  A.   It's under the judge's decision to sentence me anywhere
10  from zero to how much time he feels I need.
11  Q.   Does the judge have to follow the 5K Letter?
12  A.   No, he does not.
13  Q.   Why is it that you decided to actually plead guilty?
14  A.   It was the most appropriate thing for me at the time to
15  do.  I didn't feel like I could win my case.
16  Q.   Your statement of your proffer on page 2, do you see
17  Paragraph Number 4?
18  A.   Yes.
19  Q.   Paragraph Number 4 says what?  Read it for us.
20  A.   "Conner broke down larger quantities of cocaine into
21  smaller amounts and distributed crack cocaine to other members
22  of the conspiracy, both known and unknown to the government, who
23  then redistributed the cocaine to other sellers and customers of
24  the cocaine located in Washington, D.C., including the Congress
25  Park neighborhood of southeast, Washington, D.C., and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8340

1  elsewhere."
2  Q.   What's your understanding of what that means with respect
3  to Congress Park?
4  A.    That I basically distributed drugs in that particular
5  area and sold drugs to other members.
6  BY MR. GUERRERO:
7  Q.   You sold what kind of drugs?
8  A.   Cocaine -- cocaine base, I'm sorry.
9  Q.   Where?
10  A.   Congress Park area.
11  Q.   And those other persons that you sold to Congress Park,
12  cocaine base, are those persons we've been talking about in your
13  testimony for the last two days?
14  A.   Yes.
15  MS. WICKS:  Your Honor, can we approach?
16  THE COURT:  Yes.
17  (Following sidebar discussion had on the record:)
18  MS. WICKS:  My concern is when he displayed the portion of
19  the plea agreement, the proffer, on the ELMO, my paragraph 4 does
20  not compare to the paragraph 4 displayed to the jury.  The copy I
21  received, the portion that is redacted, is actually edited out of
22  what I got.
23  THE COURT:  Do you want to confer with the government
24  about it?
25  MR. GUERRERO:  I think what Ms. Wicks is saying, if I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8341

1  understand her right, is both 1106 and the copy that Ms. Wicks
2  has does not contain the language that she's identified.  In 1106
3  it's blackened out.  In her copy, it's just simply not there.
4  But either way it's -- the language that's been presented to the
5  jury is the same.
6  MS. WICKS:  Right, I haven't gone over the one that's now
7  in evidence because I'm told in discovery that I'm getting a copy
8  of the one that they're going to seek to put into evidence, so my
9  concern is -- I could look at it over the lunch break, but I'm
10  very concerned about getting something and being told this is
11  what the exhibit is going to be, and in the middle of court and
12  looking up and it's not what I have.
13  THE COURT:  That's why I was asking, do you want to confer
14  with the government?
15  MS. WICKS:  I can wait and look it over lunch.  This
16  should not be happening.
17  MR. BEANE:  My question is, are both copies signed by the
18  defendant?  Do we have two different versions?
19  THE COURT:  Do you want to confer with the government?
20  That's not a question to me.  You all don't need to be up here to
21  ask questions of the government in my presence.  If you want to
22  confer, just ask and I'll let you do it.  Do you want to do that
23  now?
24  MS. WICKS:  Yes.
25  THE COURT:  Go ahead.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8342

1  (Sidebar discussion concluded.)
2  BY MR. GUERRERO:
3  Q.   All right.  Mr. Conner, we were talking about -- we've
4  already seen it, which is page 2, Paragraph Number 4, about
5  where you were selling your crack cocaine in Congress Park.
6  And I just want to touch upon that very quickly.  During
7  the time period that you were out there in Congress Park, where
8  is it that you personally sold your crack cocaine?
9  A.   Mainly --
10  MS. WICKS:  Objection, asked and answered.
11  THE COURT:  Sustained.
12  BY MR. GUERRERO:
13  Q.   In the areas that you sold your crack cocaine, in your
14  own experience, was anybody allowed just to walk in the Congress
15  Park and sell there, too?
16  MR. ZUCKER:  Objection.
17  MR. GUERRERO:  In his experience, Judge.
18  THE COURT:  I'll allow it.
19  THE WITNESS:  No.
20  BY MR. GUERRERO:
21  Q.   Explain that.
22  A.   Just -- I mean, you had to really be from the area.  I
23  mean, it just wasn't anybody.  That was just about any place you
24  go, you just couldn't walk up and sell drugs on anybody's strip.
25  Q.   What was your connection to the area?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8343**

1  **A.**  Basically, my involvement from being around there all the
2  years.
3       MR. GUERRERO:  Court's indulgence.
4  BY MR. GUERRERO:
5  **Q.**  Okay.  Another topic I want to talk to you about, Mr.
6  Conner, is you say you've been on release, right?
7  **A.**  Correct.
8  **Q.**  And without telling us where you presently reside, are
9  you in any type of program right now?
10  **A.**  Yes.
11  **Q.**  What type of program are you in?
12  **A.**  Witness protection.
13  **Q.**  And as part of the witness protection program, have you
14  received some financial assistance?
15  **A.**  Yes, I have.
16  **Q.**  Do you have an understanding as to how much that is?
17  **A.**  Yes.
18  **Q.**  And what do you think it is?
19  **A.**  About 187,000.
20  **Q.**  How long have you been in the program?
21  **A.**  Approximately three -- three and a half years.
22  **Q.**  And this money you received through the witness
23  protection program, how have you received it?
24  **A.**  Housing assistance, employment, funding for -- let's see,
25  to evaluate me to my new environment, to get me settled to where

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8344**

1  I am.
2  **Q.**  Have you ever been paid to testify?
3  **A.**  No, I have not.
4  **Q.**  Has anyone ever told you what to say?
5  **A.**  No.
6  **Q.**  How many times have you met with the government in order
7  to prepare for this case?
8  **A.**  Quite a few.
9  **Q.**  One of those occasions was with me?
10  **A.**  Yes.
11  **Q.**  And you've met with me twice?
12  **A.**  That's correct.
13       MR. ZUCKER:  Objection.
14       THE COURT:  Sustained.
15  BY MR. GUERRERO:
16  **Q.**  And in those meetings that we had, who was present?
17  **A.**  Me, yourself, and two people with you, an officer and
18  another assistant of the Court.
19  **Q.**  And in those conversations, were you ever told what to
20  say?
21  **A.**  No.
22  **Q.**  Were you ever told what not to say?
23  **A.**  No.
24  **Q.**  Are you currently employed?
25  **A.**  Yes, I am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8345**

1  **Q.**  What do you do for a living, without telling us who your
2  employer is?
3  **A.**  I'm a driver right now.
4  **Q.**  And you drive in what kind of business?
5  **A.**  Appliance business.
6  **Q.**  How long have you had that job?
7  **A.**  One week.
8  **Q.**  What did you do before driving?
9  **A.**  Satellite installation.
10  **Q.**  How about schooling, did you get any further schooling
11  while in the program?
12  **A.**  Yes.  Well, yes and no.
13  **Q.**  What kind of schooling on the yes side did you get?
14  **A.**  Yes, installation.
15  **Q.**  Installation for what?
16  **A.**  Satellites.
17  **Q.**  You mentioned you have a child?
18  **A.**  Yes, I do.
19  **Q.**  Without telling us the child's gender, how old is the
20  child?
21  **A.**  Seventeen.
22  **Q.**  Are you married?
23  **A.**  No.
24  **Q.**  And you've mentioned the 5K Letter, something that you
25  hope to get out of this?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8346**

1  **A.**  Yes.
2  **Q.**  And part of your 5K Letter, does that include at some
3  point hopefully seeing your child?
4  **A.**  Yes.
5  **Q.**  You've testified before?
6  **A.**  Yes.
7  **Q.**  In Jack Davis' trial?
8  **A.**  Yes.
9  **Q.**  And James Davis?
10  **A.**  That's correct.
11  **Q.**  Were you ever told what to say in those cases?
12  **A.**  No.
13       MR. GUERRERO:  Court's indulgence.
14       Your Honor, I don't believe I have anything further.
15  Thank you.
16       THE COURT:  All right.
17       MR. GUERRERO:  Court's indulgence.  I'll be right out of
18  your way.
19       THE COURT:  All right.  Mr. Balarezo.
20       MR. BALAREZO:  Yes, thank you.
21       CROSS-EXAMINATION OF CEDRIC CONNER
22  BY MR. BALAREZO:
23  **Q.**  Sir, going back to the earlier testimony that you had
24  about your criminal history, you have a pretty extensive
25  criminal history, going back several years, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 8347

1  **A.**  Yes.
2  **Q.**  Beginning in 1989; is that correct?
3  **A.**  That's correct.
4  **Q.**  How old were you then?
5  **A.**  Nineteen.
6  **Q.**  So when you were 19, you began stealing cars, basically,
7  right?
8  **A.**  Yes.
9  **Q.**  And you stole a car.  At least you got convicted for
10  stealing a car in 1989 in the District of Columbia, right?
11  **A.**  Yes.
12  **Q.**  And the District wasn't enough, you went to Maryland and
13  stole cars there, too, right?
14  **A.**  No, it's the same charge.
15  **Q.**  Same charge in the district and in Maryland?
16  **A.**  I got arrested -- the car was stolen from Maryland, but I
17  got arrested to D.C. and they transferred me to Maryland,
18  Rockville.
19  **Q.**  Well, would you happen to -- May 12th, '89, this is a
20  list of your conviction provided by the government to the
21  defense.  You were convicted in Maryland of theft, over $300,
22  for auto.  That's a separate conviction, is it not?
23  **A.**  It could be.  I don't know.
24  **Q.**  You got convicted, don't you know?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 8348

1  **Q.**  So it is right?
2  **A.**  I believe so, yes.
3  **Q.**  So there's no doubt?
4  **A.**  There's no doubt.
5  **Q.**  So you got two theft -- auto theft convictions.  One in
6  Maryland and one in D.C.?
7  **A.**  I only stole one car.
8  **Q.**  But you got two convictions, right?
9  **A.**  I guess that's how it happened.  I didn't understand it,
10  to my knowledge, that way.  It wasn't explained to me.
11  **Q.**  All right.  We'll leave those.  In '93, you had that
12  ammunition charge in '93, right?
13  **A.**  That's correct.
14  **Q.**  And then you went to Virginia in '99 and you solicited a
15  prostitute, right?
16  **A.**  That's correct.
17  **Q.**  And then you got the 2003 federal conspiracy that you
18  pled guilty to, correct?
19  **A.**  That's correct.
20  **Q.**  So you're a convicted theft and a convicted drug dealer;
21  is that right?
22      MR. GUERRERO:  Objection, improper impeachment.
23      THE COURT:  Say that again.
24      MR. GUERRERO:  Improper impeachment.
25      THE COURT:  Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 8349

1  BY MR. BALAREZO:
2  **Q.**  Did you hear my question?
3  **A.**  Yes.
4  **Q.**  You're a convicted thief, correct?
5  **A.**  Correct.
6  **Q.**  For stealing cars?
7  **A.**  Yes.
8  **Q.**  And you're a convicted drug dealer, because you've pled
9  guilty to this agreement that the government has just talked to
10  you about, correct?
11  **A.**  That's correct.
12  **Q.**  And you moved around.  You went to Maryland, D.C.,
13  Virginia, right?
14  **A.**  Yes.
15  **Q.**  To commit your crimes, right?
16  **A.**  Yes.
17  **Q.**  And of course, those convictions don't really represent
18  the extent of your criminal activity, because you were doing
19  some things that you never got convicted for, correct?
20      MR. GUERRERO:  Objection, form.
21      THE COURT:  Why don't you rephrase.
22  BY MR. BALAREZO:
23  **Q.**  Well, every car that you stole, you didn't get convicted
24  for?
25      MR. GUERRERO:  Same objection, form.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 8350

1      THE COURT:  Approach.
2      (Following sidebar discussion had on the record:)
3      MR. GUERRERO:  I just object.  The question was: Every
4  car that you stole, you never got caught.  That assumes a fact
5  not in evidence.  Every car.  He's only been convicted of one.
6  He has to have a good faith basis.  It's a violation to make that
7  type of accusation.  There's been no evidence at all on the
8  record that this person has stolen a whole bunch of other cars.
9      MR. BALAREZO:  I'll rephrase, but my good faith basis is
10  my experience doing criminal cases, where I really highly doubt
11  that this guy got arrested on the first time he stole cars in
12  Maryland and Virginia, but I'll rephrase.
13      (Sidebar discussion concluded.)
14  BY MR. BALAREZO:
15  **Q.**  Sir, the car that you stole in D.C., that wasn't the
16  first car you stole, was it?
17  **A.**  Yes, it was.
18  **Q.**  So, your bad luck.  First car you took you got caught?
19  **A.**  I stole a car from Maryland.  It wasn't D.C.
20  **Q.**  Well, the car in Maryland that you stole --
21  **A.**  Yes.
22  **Q.**  -- you're telling us that's the only car you ever stole?
23  **A.**  That's the only car I ever stole.
24  **Q.**  And the ammunition from 1993, that was the only time you
25  ever carried ammunition?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8351**

1  **A.**  No.
2  **Q.**  All right.  So you were committing criminal acts at other
3  times besides 1993 with ammunition, right?
4  **A.**  No, I didn't rob anybody or anything of that nature.  No.
5  **Q.**  I'm not asking you about robberies.  I'm asking about
6  ammunition.
7  **A.**  I've carried a gun before, yes.
8  **Q.**  And of course you carried it loaded?
9  **A.**  Yes.
10  **Q.**  You're not going to a drug dealer and carry an unloaded
11  weapon, right?
12  **A.**  That's correct.
13  **Q.**  And the solicitation charge, was that the first time you
14  went up to a hooker?
15  **A.**  Yes.
16  **Q.**  And you just happened to get caught, then, the first
17  time?
18  **A.**  Yes.  I was in the company with someone as well.
19  **Q.**  I see, but I'm talking about you.
20  **A.**  Okay.  That's fine.
21  **Q.**  I'm not interested in anyone else.
22  **A.**  That's fine.
23  **Q.**  And the conspiracy, that was the first time you dealt
24  drugs?
25  **A.**  No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8352**

1  **Q.**  But you were dealing drugs for a long time before that?
2  **A.**  Yes, I was.
3  **Q.**  Okay.  So you've had an extensive and wide ranging
4  criminal history -- "wide ranging," meaning geographically,
5  Maryland, D.C., Virginia.
6      MR. GUERRERO:  Objection, asked and answered.
7      THE COURT:  Sustained.
8  BY MR. BALAREZO:
9  **Q.**  And notwithstanding these convictions and your wide-range
10  criminal history, you've never really done any time in prison,
11  have you?
12  **A.**  No.
13  **Q.**  In fact, in relation to your pleading guilty in this case
14  that you're testifying -- well, to your pleading guilty to the
15  conspiracy that you pled guilty to, you served what, ten days in
16  jail?
17  **A.**  Almost 20, something like that.  I'm not sure.
18  **Q.**  Almost 20?
19  **A.**  Almost 20.
20  **Q.**  And that's the most jail time you've ever done, right?
21  **A.**  No, there's been a few other times.  Off the UUV, I did
22  about four or five days so, yes.  I haven't done much time, no.
23  **Q.**  So my question was:  That's the most jail time you've
24  ever done, the 20 days, right?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8353**

1  **Q.**  And that's more than the four days from the UUV, right?
2  **A.**  Correct.
3  **Q.**  So the answer to the question is "yes"?
4  **A.**  Yes.
5  **Q.**  Twenty days is the most jail time you've ever done?
6  **A.**  Yes.
7  **Q.**  Notwithstanding the fact that you're stealing cars,
8  dealing drugs, visiting hookers in three states, 20 days is the
9  most you've ever done?
10      MR. GUERRERO:  Objection.
11      THE WITNESS:  Yes.
12      MR. GUERRERO:  Asked and answered.
13  BY MR. BALAREZO:
14  **Q.**  And as a result of you pleading guilty with that deal
15  that you got from the government, you've indicated that you're
16  looking at a 10-year mandatory minimum sentence under the
17  statute, right?
18  **A.**  No, I didn't say that.
19  **Q.**  Do you have your plea agreement up there?
20  **A.**  No.
21      MR. BALAREZO:  If I could put up Government's Exhibit
22  1106.  Do you see that, sir?
23      THE WITNESS:  Yes.
24  BY MR. BALAREZO:
25  **Q.**  And that's your attorney's name, and your name, right

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8354**

1  there, correct?
2  **A.**  Correct.
3  **Q.**  And you reviewed this before you signed it?
4  **A.**  Yes.
5  **Q.**  You understood it?
6  **A.**  Yes.
7  **Q.**  You've done 18 months in college, so you understand the
8  English language, right?
9  **A.**  Yes.
10  **Q.**  And you've gone to college for 18 months at least, right?
11  **A.**  Yes.
12  **Q.**  And you read English?
13  **A.**  Yes.
14  **Q.**  And you understand what I'm asking you?
15  **A.**  Okay.  Can you repeat your question then, I'm sorry.
16  **Q.**  Well, I'm asking you if you understand what I'm asking
17  you?
18  **A.**  Yes.
19  **Q.**  And you understood what your lawyer was explaining to you
20  when she went over this plea agreement, right?
21  **A.**  Yes.
22  **Q.**  The lady back here in the audience.
23  **A.**  Yes.
24  **Q.**  All right.  And you had no -- you understood what you
25  signed?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8355

1  **A.**  I understood.

2        MR. BALAREZO:  Can I put this up?

3  BY MR. BALAREZO:

4  **Q.**  1106, can you see that?  Is it showing?  Do you

5  understand that pursuant to the statute, the charge carries a

6  term of imprisonment of not less than ten years or more than

7  life, right?

8  **A.**  That's correct.

9  **Q.**  So, when I just asked you that, what you're looking at

10  right now is a mandatory -- at least a mandatory ten-year

11  sentence in prison, that's what you're facing right now, right?

12  **A.**  Yes.

13  **Q.**  And it could go as high as life, right?

14  **A.**  Life, correct.

15  **Q.**  And Mr. Guerrero, the prosecutor, also asked you a

16  question about the guidelines, and you're very familiar with the

17  guidelines, right?

18  **A.**  Yes.

19  **Q.**  You understood them, you're a smart man, correct?

20  **A.**  Yes.

21  **Q.**  Your guidelines at the level 38 that you're talking

22  about, I believe is about 168 to 235 months, correct?

23  **A.**  Correct.

24  **Q.**  Which is substantially more than the ten-year mandatory

25  minimum that the statute provides for, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8356

1  **A.**  Yes.

2  **Q.**  And, of course, you don't want to do any of that time,

3  right?

4  **A.**  That's correct.

5  **Q.**  And you've already done ten -- excuse me, 20 days, that's

6  enough for you, right?

7  **A.**  Yes.

8  **Q.**  And by your testimony here today, you're hoping to avoid

9  any prison time?

10  **A.**  Yes.

11  **Q.**  And you've been out since -- at least since around the

12  time that you pled guilty in 2003, right?

13  **A.**  That's correct.

14  **Q.**  And you have not been sentenced yet?

15  **A.**  That's correct.

16  **Q.**  Because basically, the government was waiting for you to

17  testify here, right?

18        MR. GUERRERO:  Objection form.

19        THE COURT:  Sustained.

20  BY MR. BALAREZO:

21  **Q.**  Well, part of your cooperation required that you testify,

22  right?

23  **A.**  Yes.

24  **Q.**  And that's what you're doing here today --

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8357

1  **Q.**  -- against these gentlemen over here, right (indicating)?

2  **A.**  Yes.

3  **Q.**  All right.  Now, yesterday you testified about an

4  individual by the name of Don.  I think you spelled it at one

5  time, D-O-N?

6  **A.**  Yeah, Dom, Don.  I wasn't sure.

7  **Q.**  Right.  Or D-O-M?

8  **A.**  Correct.

9  **Q.**  And to you, D-O-N -- or the person that goes by D-O-N or

10  on goes by D-O-M, like Mary, is one person, right?

11  **A.**  Correct.

12  **Q.**  And I think you pointed him out, the gentleman here with

13  the brown tie?

14  **A.**  That's correct.

15  **Q.**  And you've -- you're close friends with him?

16  **A.**  No, I'm not.

17  **Q.**  But yesterday, you said you grew up with him?

18  **A.**  Well, grew up in the same vicinity.

19  **Q.**  Well, you said you grew up with him.  Do you remember

20  that?

21  **A.**  I probably said that.

22  **Q.**  Okay.  Are you changing that today?

23  **A.**  Oh, no, I'm not.

24  **Q.**  You were testifying under oath yesterday, right?

25  **A.**  That's correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8358

1  **Q.**  And are you testifying under oath today?

2  **A.**  Yes, I am.

3  **Q.**  Now yesterday you were asked by the prosecutor -- well,

4  one of the things you said is, to get the 5K you had to tell the

5  truth, right?

6  **A.**  That's correct.

7  **Q.**  And the truth shall set you free, basically.

8        MR. GUERRERO:  Objection form.

9        THE COURT:  Sustained.

10  BY MR. BALAREZO:

11  **Q.**  Well, in your mind, you're hoping that the truth will set

12  you free, right?

13        MR. GUERRERO:  Same objection.

14        THE COURT:  I'll allow that.

15        THE WITNESS:  Yes.

16  BY MR. BALAREZO:

17  **Q.**  And this is the truth that you're telling this jury here

18  today?

19  **A.**  Yes.

20  **Q.**  And the truth, of course, is the truth, right?

21  **A.**  Yes.

22  **Q.**  It doesn't change because it's the truth?

23  **A.**  That's correct.

24  **Q.**  Is that correct?  Now, you were asked yesterday by the

25  prosecutor, how long did you know Don, D-O-N?  Do you remember

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8371**

1 for him -- from you, he never came back with the money that he
2 made from selling these drugs, supposedly, and gave you a cut,
3 right?
4 **A.** No.
5 **Q.** And these two stash houses that you kept at various
6 women's houses, he didn't stash his drugs there with you, right?
7 **A.** No.
8 **Q.** He never shared any weapons with you, right?
9 **A.** No.
10 **Q.** He had nothing to do with you, basically?
11 **A.** Basically.
12 **Q.** Yesterday, the prosecutor asked you some questions about
13 when you saw Don dealing drugs in The Circle, whether or not you
14 saw other people around him? Do you remember that?
15 **A.** Yes.
16 **Q.** And you basically said you saw him with EB and with DC;
17 is that correct?
18 **A.** Correct.
19 **Q.** Well, again, DC might have been dealing drugs, but he
20 wasn't dealing with Don, right?
21 MR. GUERRERO: Objection, speculation.
22 THE COURT: If he knows, I'll let him answer.
23 THE WITNESS: I saw them together, that's correct.
24 BY MR. BALAREZO:
25 **Q.** Well, you know that they were friends, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8372**

1 **A.** That's correct.
2 **Q.** And just because they were friends doesn't mean they were
3 doing things together, right?
4 **A.** That's correct.
5 **Q.** Friends tend to hang out together sometimes, right?
6 **A.** Yes.
7 **Q.** So, when you said, "I saw him with EB or with DC," were
8 you trying to mislead the jury to thinking they were dealing
9 together?
10 MR. GUERRERO: Objection, form.
11 THE COURT: Overruled.
12 THE WITNESS: No, I was not.
13 BY MR. BALAREZO:
14 **Q.** Well, you didn't clarify that, right? You didn't tell
15 them that they were friends?
16 **A.** I did not.
17 **Q.** And you'd seen them on prior occasions when they weren't
18 dealing drugs, correct?
19 **A.** That's correct.
20 **Q.** And the same thing when the prosecutor asked you
21 questions about if you had ever dealt to Gail, do you remember
22 that?
23 **A.** Yes.
24 **Q.** You threw in there that Don was in her apartment when you
25 were dealing to Gail, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8373**

1 **A.** Yes.
2 **Q.** But when you were dealing to Gail in her apartment, you
3 weren't dealing to Don, were you?
4 **A.** There was times when I served to Don in that apartment.
5 **Q.** And you didn't say that yesterday?
6 **A.** I thought I did say that yesterday. I may have not.
7 **Q.** And you remember when that was or how much or anything if
8 that nature, right?
9 **A.** I don't recall all that.
10 **Q.** So all we have is this truth from you right now?
11 MR. GUERRERO: Objection, form.
12 THE WITNESS: Yes.
13 THE COURT: Sustained.
14 BY MR. BALAREZO:
15 **Q.** Yesterday you also testified that you -- well, you've
16 been dealing drugs since when?
17 **A.** '89.
18 **Q.** Since '89. That was 18 years ago, right?
19 **A.** Yep.
20 **Q.** And you're how old?
21 **A.** Thirty-six.
22 **Q.** So you started when you were 19?
23 **A.** Nineteen.
24 **Q.** I'm sorry. And during that time, your drug career,
25 you've sold fairly large quantities of drugs, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8374**

1 **A.** Yes.
2 **Q.** I mean, you purchased kilo quantities?
3 **A.** Yes.
4 **Q.** And you sold kilo quantities, half kilos, that kind of
5 thing, right?
6 **A.** Yes.
7 **Q.** And then at some point, because you wanted to make extra
8 money to go on a trip, you said you were doing hand-to-hand?
9 **A.** Yes.
10 **Q.** Now, one of your suppliers was someone by the name of
11 Courtney McClean, right?
12 **A.** That's correct.
13 **Q.** And he mainly dealt large quantities of marijuana to you,
14 right?
15 **A.** Yes.
16 **Q.** Did he also deal cocaine to you at some point?
17 **A.** At a later point, yeah.
18 **Q.** Large quantities, kilo quantities of cocaine?
19 **A.** Yes.
20 **Q.** And Courtney McClean was your supplier, right?
21 **A.** Yes.
22 **Q.** You never introduced Courtney McClean to Dom, right?
23 **A.** No.
24 **Q.** Or to any of these guys, right?
25 **A.** No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*8379*

1   A.   Anyone else.

2   Q.   -- or --

3   A.   Nobody else.

4   Q.   -- or with Vernon, right?

5   A.   Right.

6   Q.   So, you basically had your own separate dealings with

7   each one of those three guys that we talked about, right?

8   A.   Yes.

9   Q.   And during your 19-year drug career, you probably had

10  more suppliers than just those three guys, correct?

11  A.   Correct.

12  Q.   About how many more did you have?

13  A.   Don't recall.

14  Q.   Too many to remember or --

15  A.   Yeah.

16  Q.   All right.  And your dealings with all these separate

17  suppliers, they were all kept separate, correct?

18  A.   Yes.

19  Q.   You were just buying from them?

20  A.   Yes.

21  Q.   Now, your plea agreement, Government's 1106, you pled

22  guilty in paragraph 1 to conspiracy to distribute and possess

23  with intent to distribute cocaine, cocaine base, and marijuana.

24  A.   That's correct.

25  Q.   That's the charge that you're facing, that mandatory ten

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8380*

1   years under the statute?

2   A.   Correct.

3   Q.   And under the guidelines, the amount that we mentioned?

4   A.   Correct.

5   Q.   Well, which conspiracy did you plead guilty to?  The one

6   with Joe, the one with Vernon, the one with Courtney, the one

7   with your many other suppliers you don't remember?  What did you

8   plead guilty to?

9   A.   Conspiracy.

10  Q.   With whom?

11  A.   Whoever was involved.  Whoever I had to identify.

12  Q.   Whoever they wanted you to identify, right?

13       MR. GUERRERO:  Objection, form.

14       THE COURT:  Sustained.

15  BY MR. BALAREZO:

16  Q.   Well, you know Dom is sitting here on trial for

17  conspiracy, right?

18  A.   Yes.

19  Q.   And you know the other gentlemen are sitting here on

20  trial also?

21  A.   That's correct.

22  Q.   And you know your testimony -- and I'll talk about Dom,

23  because he's my client -- your testimony against him helps the

24  government, right?

25       MR. GUERRERO:  Objection, form.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8381*

1        THE COURT:  Sustained.

2   BY MR. BALAREZO:

3   Q.   Well, do you think that your testifying here that you

4   sold drugs to Don helps or hurts the government?

5        MR. GUERRERO:  Objection, form.

6        THE COURT:  Sustained.

7        MR. BALAREZO:  Can I approach, Your Honor?  I don't

8   understand.

9        (Following sidebar discussion had on the record:)

10       MR. GUERRERO:  Your Honor, my objection is that Mr.

11  Balarezo is going to a topic that other defense counsel will also

12  go into, which is these witnesses under these plea agreements

13  don't have to help the government do anything.  All they have to

14  do is cooperate and tell the truth, and whatever happens with the

15  case happens with the case.

16       But for the witness to be posed a question that he has to

17  help the government, that language is just -- it's not good form,

18  so we object to that.

19       MR. BALAREZO:  That's not what I'm asking.  I'm asking, if

20  in his mind, whether his testimony against my client, that he

21  dealt drugs to my client, does he think it helps or hurts the

22  client?

23       THE COURT:  Neither of you actually asked the question the

24  way you asked it.  That question I'll allow.

25       MR. BALAREZO:  Okay.  I don't remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8382*

1        THE COURT:  Is there something else?

2        MR. GUERRERO:  No, sir.

3        (Sidebar discussion concluded.)

4   BY MR. BALAREZO:

5   Q.   Sir, as you're sitting here -- first of all, you're

6   testifying as a result of this deal you got from the government,

7   right?

8   A.   Yes.

9   Q.   And testifying, as you already said, is part of your

10  cooperation?

11  A.   Correct.

12  Q.   Right.  As you sit here today testifying, and again in

13  particular only to Dom, you've testified that you dealt drugs to

14  him, right?

15  A.   Yes.

16  Q.   In your mind, does that testimony, does it help or hurt

17  the government?

18  A.   I'm testifying truthfully to help myself.

19  Q.   Sir, you said here already that you understood the

20  English language and you understood me.

21       My question is:  Do you think it helps or hurts the

22  government?

23       MR. GUERRERO:  Asked and answered.

24       THE COURT:  Sustained as to argumentative.  You may

25  rephrase.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8383

1 BY MR. BALAREZO:
2 **Q.** Your testimony that you've given here, where you
3 testified that you sold drugs to Don, right?
4 **A.** Yes.
5 **Q.** Either beginning in '96 or '97 or whenever, in your mind,
6 do you think it helps or hurts the government? I'm not asking
7 you about you. I'm not asking the truth. I'm asking: Do you
8 think it helps their prosecution of my client?
9         MR. GUERRERO: Objection, form.
10         THE COURT: As compound?
11         MR. GUERRERO: And compound, yes.
12         THE COURT: I'll let you rephrase.
13         MR. BALAREZO: Let me think over that one for one second.
14 I'll give it one more shot.
15 BY MR. BALAREZO:
16 **Q.** All right. Do you think your testimony here today, that
17 my client -- that you sold drugs to Mr. -- to Dom, do you think
18 it helps the government's case?
19 **Q.** Do I think it helps? Yes.
20 **Q.** And that's because you're providing evidence against him,
21 right?
22 **A.** Yes.
23 **Q.** And the evidence you're providing against him, are your
24 words?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8384

1 **Q.** And according to you, your words here is -- or are the
2 truth?
3 **A.** That's correct.
4 **Q.** And under your plea agreement, do you know who determines
5 whether or not you're telling the truth?
6 **A.** Yes.
7 **Q.** Who, in your mind, under your plea agreement --
8 **A.** Under my plea agreement?
9 **Q.** Yes.
10 **A.** I guess the jury, the Judge.
11 **Q.** Let me --
12         MR. BALAREZO: Can I approach, Your Honor?
13         THE COURT: Yes.
14 BY MR. BALAREZO:
15 **Q.** I'm showing you Exhibit 1106. And I'll point -- well,
16 let me ask you another question first and then I'll point you to
17 a specific point.
18         What you're trying to do here today is get that 5K Letter
19 that you talked about, right?
20 **A.** That's correct.
21 **Q.** And you know that the 5K Letter or motion is the only way
22 that the Judge will be able to sentence you below that ten-year
23 mandatory minimum?
24 **A.** That's correct.
25 **Q.** You agree with that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8385

1 **A.** Yes.
2 **Q.** So, the government has to file that motion or that letter
3 with the Judge, right?
4 **A.** Yes.
5 **Q.** And you said that the Judge can take it or leave it after
6 that, right?
7 **A.** Yes.
8 **Q.** But you're hoping that the Judge will go below the ten
9 years?
10 **A.** Yes.
11 **Q.** Now, the way you get the 5K Letter is if the government
12 determines that you've provided substantial assistance to them,
13 right?
14 **A.** Yes.
15 **Q.** And substantial assistance means a whole heck of a lot of
16 help to their case, right?
17 **A.** Correct.
18         MR. GUERRERO: Objection, form.
19         THE COURT: Overruled.
20 BY MR. BALAREZO:
21 **Q.** What's your answer?
22 **A.** That's correct.
23 **Q.** And you already indicated here today that your testimony
24 here today helps the government's case, right?
25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8386

1 **Q.** Now, let me point your attention to page 4, paragraph 6
2 of your plea agreement, which states "Your client understands
3 that the determination of whether your client has provided
4 substantial assistance pursuant to either Section 5K1.1 of the
5 sentencing guidelines or 18 U.S.C. Section 3553 E, is within the
6 sole discretion of the United States Attorney's Office for the
7 District of Columbia and is not reviewable by the Court."
8         Do you see that?
9 **A.** Yes.
10 **Q.** You understand what that means, right?
11 **A.** Yes.
12 **Q.** Basically, they're the ones that are going to say, did
13 you or did you not provide substantial assistance, right?
14 **A.** Correct.
15 **Q.** The jury has nothing to do with that, correct?
16 **A.** That's correct.
17 **Q.** So if they think you're telling the truth, that could be
18 substantial assistance, as you testify here today, right?
19 **A.** Yes.
20 **Q.** Because it's their discretion?
21 **A.** That's correct.
22 **Q.** Not the Judge's. Again, not reviewable by the Court, you
23 understand that?
24 **A.** I understand that.
25 **Q.** So, again, they're the ones that you have to satisfy in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1                    P R O C E E D I N G S

2              MR. ZUCKER:  Quick point, with the Court's permission.

3 You were given a list of the order of examination.  We would

4 like to modify it slightly.  Ms. Wicks will go before me.

5              THE COURT:  Ms. Romero?

6              MR. ZUCKER:  Thank you.

7              (Jury in at 2:14 p.m.)

8              THE COURT:  Good afternoon, ladies and gentlemen.

9 Welcome back.  We're ready to resume.  Counsel?

10             MR. BALAREZO:  Thank you, Your Honor.

11                     CONTINUED CROSS-EXAMINATION

12 BY MR. BALAREZO:

13 Q.  Mr. Conner, before we broke, we were talking about all the

14 benefits, compensation you had gotten from the protection

15 program.  Do you remember that?

16 A.  Correct.

17 Q.  Now, you know that the amount that you got total was

18 $187,217.  Correct?

19 A.  Yes.

20 Q.  And that was over just a couple of years.  Right?

21 A.  Yes.

22 Q.  And you don't remember the specific amounts.  Is that right?

23 A.  Correct.

24 Q.  Would looking then at a witness background financial

25 information form refresh your recollection as to the amounts

1 that you got?

2 A.  Yes.

3        MR. BALAREZO:  Your Honor, could I approach the

4 witness?  I'll show him what I've marked as Defendant Exhibit

5 Number 45.

6 BY MR. BALAREZO:

7 Q.  Why don't you take a look at that, sir.  Let me know when

8 you've had a chance to review it, please.

9        Have you had a chance, sir?

10 A.  Yes.

11 Q.  Now, you said that you began getting these benefits in 2004.

12 Right?

13 A.  That's correct.

14 Q.  Now, we were talking specifically about the $1,468 that you

15 got for employment, at least the way they disbursed it to you.

16 Is that right?

17 A.  Yes.

18 Q.  Now, you weren't out there digging ditches or putting up

19 brick walls or building anything for that money, were you?

20 A.  No.

21 Q.  You weren't doing any work for it.  Correct?

22 A.  No.

23 Q.  And same thing, if you look at 2005, you good $5,530 for

24 employment.  You weren't doing any work for that, were you?

25 A.  No.

1 Q.   2007 you got over $1,000 for employment.  Once again, you

2 weren't doing any work for that, were you?

3 A.   No.

4 Q.   Now, you've had a job during this period, though, have you

5 not?

6 A.   Depends on what period you're speaking of.  Yes, I have had

7 jobs.

8 Q.   I'm sorry.  Let's say since 2003, since you pled guilty,

9 have you had employment, first of all?  Let's start there.

10 A.   Yes.

11 Q.   Did you have continuous employment?

12 A.   No.

13 Q.   What was the break of employment that you had?

14 A.   Breach of security.

15 Q.   No, my question was, what time did you not have employment?

16 A.   During my breaches of security.

17 Q.   Your breaches of security?

18 A.   Yes.  I had maybe two breaches of security.

19 Q.   All right.  And how long did those periods last?

20        MR. GUERRERO:  Objection.  Relevance.  May we approach?

21        THE COURT:  Yes.

22        (BENCH CONFERENCE ON THE RECORD.)

23        MR. GUERRERO:  Just to state our earlier objection,

24 which is our position that we had right before the break, which

25 was the Court's concern as well, is that I don't know what

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1043 of 1954

1 A.  That's correct.

2 Q.  But nevertheless, while you were in the program, and I'll

3 draw your attention to fiscal year 2004 again, you received over

4 $11,000 for housing.  Is that correct?

5 A.  Yes.

6 Q.  Correct?

7 A.  That's correct.

8 Q.  And although you may or may not have been working during

9 that period and didn't have to turn over a paycheck, you were

10 still getting close to $8,000 in what they call subsistence.

11 Right?

12 A.  Yes.

13 Q.  Now, you got money in cash from these people.  Right?

14 A.  Yes.

15 Q.  You basically came, "I need money," you sign for it, and you

16 got the money.  Right?

17 A.  Correct.

18 Q.  You didn't have to provide receipts for anything.  Right?

19 A.  Correct.

20 Q.  If you went to the grocery store, to Safeway, and got a nice

21 fat steak, you didn't have to bring receipt for that nice fat

22 steak.  Right?

23 A.  Right.

24 Q.  They basically took your word for it.  Right?

25 A.  Yes.

1 Q.   Kind of like an ATM machine.  Right?

2          MR. GUERRERO:  Objection as to form.

3          THE COURT:  Overruled.

4 BY MR. BALAREZO:

5 Q.   Let's look at 2005.  That year you doubled your subsistence

6 allowance, 15,000, over $15,000.  Right?

7 A.   Yes.

8 Q.   And over $15,000 for housing.  Is that right?

9 A.   Yes.

10 Q.   2006, over $13,000 for this subsistence, whatever that is.

11 Right?

12 A.   Yes.

13 Q.   2007, over $9,000 for subsistence.  Right?

14 A.   Yes.

15 Q.   And all the while, you're getting benefits for housing, for

16 medical, something called documents, production, HH -- you don't

17 even know what those things are for.  Right?

18 A.   Some of them, I do, yes.

19 Q.   Do you know what HHG is?

20 A.   No, I do not.

21 Q.   Whatever it is, you got $19,464 for it.  Is that correct?

22 A.   Yes.

23 Q.   For "Documents," over $3,000 total.  Right?

24 A.   Yes.

25 Q.   Did you have to write out something in longhand or

1 something, or what?

2 A.  No.

3 Q.  Do you know what that's for?

4 A.  No.

5 Q.  There's something called "Relocation and Travel."  Do you

6 see those two separate columns?

7 A.  Yes.

8 Q.  You've got a total of almost $45,000 for those two.  Right?

9 A.  Yes.

10 Q.  For housing, your total was over 49,000.

11 A.  Yes.

12 Q.  And for the subsistence, once again it was over 45,000.

13 Right?

14 A.  Correct.

15 Q.  And for the employment, it was over $8,000 that again you

16 didn't have to do anything for.  Right?

17 A.  Correct.

18 Q.  Now, you also testified earlier that -- or yesterday that at

19 some point in the past your mother passed away.  Correct?

20 A.  Correct.

21 Q.  And she left you a very large sum of money, over $140,000?

22 A.  That's correct.

23 Q.  And during this time, although your mother had passed away

24 and left you that money and her house, also.  Correct?

25 A.  Correct.

Page 8416

1 A.  That's correct.

2 Q.  And you had gone through that $147,000 that your mother left

3 you?

4 A.  That's correct.

5 Q.  And you claim that you lost the house also.  Right?

6 A.  That's correct.

7 Q.  So you had nothing?

8 A.  That's correct.

9 Q.  So when you have nothing, $187,000 is a lot, is it not?

10 A.  That's correct.

11 Q.  And in fact, you already testified that -- well, I forgot

12 one thing, actually.

13        Do you remember when you testified in the case of Jack

14 Davis?

15 A.  Yes.

16 Q.  You got money when you testified in relation to that case

17 also, did you not?

18 A.  Did I get money?  What do you mean?

19 Q.  Sorry?

20 A.  You've got to rephrase that.  What do you mean, did I get

21 money for testifying?

22 Q.  Did you understand my question?

23 A.  You said I got money for testifying in that case.

24 Q.  Did you get money?

25 A.  What do you mean?

1 Q.  Let me show you Defense Exhibit Number 46.

2 A.  I was getting assistance.

3 Q.  Do you see that?

4 A.  Yes.  That's lodging and assistance.

5 Q.  Okay.  You did get over $8,000 in lodging and assistance, as

6 you call it?

7 A.  That's correct.

8 Q.  And that was as part of your testimony in that case?

9 A.  The whole trial.

10 Q.  Jack Davis case?

11 A.  Yes.

12 Q.  And you were indicted actually with Jack Davis, were you

13 not?

14 A.  Correct.

15 Q.  You were not indicted with Dom Samuels.  Right?

16 A.  Correct.

17 Q.  Or anyone in this case?

18 A.  Correct.

19 Q.  So what you pled guilty to was a conspiracy involving Jack

20 Davis.  Correct?

21 A.  Correct.

22         MR. GUERRERO:  Objection, Your Honor.  Misstates the

23 plea agreement.  Misstates the plea agreement.  Proffer.  It's

24 all-encompassing.  May we approach?

25         THE COURT:  Yes.

Page 8421

1 BY MR. CARNEY:

2 Q.  Good afternoon, Mr. Conner.

3 A.  Good afternoon.

4 Q.  Mr. Conner, I would like to just go through two parts of

5 your plea agreement, which is Government's Exhibit Number 1106.

6 And particularly, it's paragraph 26.

7         In your agreement with the government, in paragraph 26,

8 do you recall that this agreement only binds the U.S. Attorney's

9 Office for the District of Columbia?  Do you recall that, that

10 that's part of your agreement?

11 A.  Yes.  Yes.

12 Q.  Okay.  You agree that you picked up drugs in California.  Is

13 that right?

14 A.  Yes.

15 Q.  You had them delivered to Baltimore, I think you said at one

16 time?

17 A.  Yes.

18 Q.  And other places in Maryland?

19 A.  Yes.

20 Q.  And under your agreement, is it your understanding that

21 you're not going to be prosecuted in state courts in those

22 various jurisdictions?

23 A.  Yes.

24 Q.  And that's because the government agrees to talk to those

25 state agencies to make sure that you're not prosecuted.  Is that

1 right?

2 A.  I don't recall the conversation about that.

3 Q.  If you could take a look again at your agreement.

4 A.  (Witness complies.)  Okay.  Yes, I see where you're saying

5 that.  Yes.

6 Q.  So that's your understanding, that you're not going to be

7 prosecuted at least in state court.  Is that right?

8 A.  That's correct.

9 Q.  And what about federal court in Greenbelt or Baltimore or

10 California?  Is it your understanding also that you're not going

11 to be prosecuted there for any federal charges?

12 A.  Yes.

13 Q.  Okay.  Now, also part of your agreement is that the IRS is

14 still free to prosecute you.  Is that right?

15 A.  I believe so, yes.

16 Q.  And have you filed tax returns every year since, I guess

17 let's start 1993 onward?

18 A.  Yes, I have.

19 Q.  Okay.  And were those tax returns accurate?

20 A.  I don't recall.

21 Q.  Did you report the income that you had from selling drugs?

22 A.  No, I did not.

23 Q.  Okay.  And is it your understanding -- well, have you yet

24 been asked to file a disclosure form with IRS regarding whatever

25 your assets were, any changes to your tax returns?

1 A.  No.

2 Q.  And is it your understanding that that's not going to

3 happen?

4 A.  I haven't been asked yet.

5 Q.  And it's been -- since you did this agreement, it's been

6 since 2003, several years now?

7 A.  That's correct.

8 Q.  So it's really your understanding you're not going to be

9 prosecuted for tax violations.  Is that right?

10 A.  Yes.

11 Q.  And now, you indicated to us --

12       MR. CARNEY:  You can turn that off for a second.

13 BY MR. CARNEY:

14 Q.  You indicated to us that you filed bankruptcy in late

15 September '99 or thereafter?

16 A.  Yes.

17 Q.  Actually, it was more close to November 27th of 2000.  Is

18 that right?  Does that sound about right?

19 A.  Yeah, it sounds about right.

20 Q.  And you were represented by a Ronald Roland.  Is that right?

21 A.  Yes.

22 Q.  And in completing the forms for your petition for

23 bankruptcy, did you sit down with a lawyer and discuss your

24 assets and what was going on?

25 A.  Yes.

1 Q.  And you were asked to file a number of schedules related to

2 your assets and your income.  Is that right?

3 A.  Yes.

4 Q.  And you were also asked to do what's called a verified

5 petition, where you swear that what you're filing with the

6 bankruptcy court is true and accurate.  Correct?

7 A.  Yes.

8 Q.  And you agree that you did not report the fact that you had

9 income from other sources with respect to drug dealing.  Is that

10 right?

11 A.  Yes.

12 Q.  And so your petition for bankruptcy was false.  Is that

13 right?

14 A.  Yes.

15 Q.  Turning now back to your plea agreement, this would have

16 been page three, 3-C, I believe it is.  Okay.

17        On 5-C it states that "Your client shall submit a full

18 and complete accounting of your client's financial assets,

19 whether such assets are in your client's name or in the name of

20 a third party."  Is that correct?

21 A.  Yes.

22 Q.  Up until the present time, since you've signed this

23 agreement in 2003, have you ever been asked to sit down and

24 complete disclosure forms of what your assets were and what you

25 have now?

1 A.  No.

2 Q.  Were you ever asked to fill out waivers of bank records,

3 disclosures relating to assets that you had, that kind of thing?

4 A.  No.

5 Q.  So, no form have you ever completed with respect to 5-C.  Is

6 that correct?

7 A.  Correct.

8 Q.  And I'm sorry, 3-C.

9        And it's your understanding that the government is not

10 going to ask you to do that, given that it's now since 2003.  Is

11 that right?

12        MR. GUERRERO:  Objection.  Calls for his understanding.

13 Speculation.

14        THE COURT:  Repeat the question.

15 BY MR. CARNEY:

16 Q.  Is it your understanding that you will not be asked, as part

17 of this agreement, not to have to do this?

18        THE COURT:  I'll allow it.

19 A.  Yes.

20 BY MR. CARNEY:

21 Q.  Okay.  And is it your understanding that the government is

22 just relying on your assertion that you have no assets?

23        MR. GUERRERO:  Objection as to what the government is

24 relying on.

25        THE COURT:  Overruled.

1 Q.  And you agree that you haven't told us verbatim what was

2 said to you and what you said to him.  Is that right?

3 A.  That's correct.

4 Q.  And so you're going to, basically, on a general sense of

5 what you recall happened?

6 A.  I'm going on what I believe was, yeah, the most consistent

7 things that I recall, was basically I was threatened.

8 Q.  Okay.  Now, Aman Ball was the brother, and is the brother,

9 of Antwuan Ball.  Is that right?

10 A.  That's correct.

11 Q.  And you agree, your former -- well, you played

12 semi-professional football.  That's right?

13 A.  That's correct.

14 Q.  And you're kind of a physical guy, aren't you?

15 A.  That's correct.

16 Q.  And Aman Ball at that time was a slender, thin kind of guy,

17 wasn't he?

18 A.  That's correct.

19 Q.  And you agree that there was something that you said to Aman

20 Ball that made him nervous.  Is that right?

21 A.  I could have.

22 Q.  Could have.  And you agree that Mr. Antwuan Ball came up to

23 you in reaction to something that you said to Aman Ball.  Is

24 that right?

25 A.  That's correct.

1 A.  She made a comment when I was on the basketball court and --

2 when I got shot.  And when I saw her, I struck her in the face.

3 Q.  And you hurt her badly, didn't you?

4 A.  No, I did not.

5 Q.  You hit her in the face, hit her mouth?

6 A.  Yes.

7 Q.  You've been asked about a number of people that you were

8 supplied by, and among them you started off with Joe Best.  Is

9 that right?

10 A.  That's correct.

11 Q.  Was there an individual by the name of Pugh that you dealt

12 with too?

13 A.  Pugh?

14 Q.  Pugh.

15 A.  Cheryl Pugh, female?

16 Q.  Were there a couple that supplied you crack cocaine?

17 A.  I don't know a Pugh.

18 Q.  You don't know a Pugh that in 1997 supplied you a half a

19 kilo?

20 A.  Pooh?

21 Q.  Pooh, is it?

22 A.  Yes.

23 Q.  And you also were supplied by people in New York.  Is that

24 right?

25 A.  I went to New York to purchase, yes.

1 Q.  Do you know an individual by the name of Bobby, Curly Top?

2 A.  Yes.

3 Q.  And did you ever get drugs from him?

4 A.  I sold him marijuana.

5 Q.  You sold him marijuana.  Did he ever supply you with crack?

6 A.  No.

7 Q.  Now, you were asked to identify Government's Demonstrative

8 Exhibit Number 68?

9         MR. CARNEY:  Could I borrow that from you?

10         Your Honor, may I approach the witness?

11         THE COURT:  Yes.

12         MR. CARNEY:  This is Government's Exhibit 107.1.

13 BY MR. CARNEY:

14 Q.  Do you recognize that?

15 A.  Yes.

16 Q.  And can you tell me --

17         MR. CARNEY:  This will be defendant Ball's exhibit,

18 Demonstrative Exhibit Number 68, Your Honor, add-on.

19 BY MR. CARNEY:

20 Q.  Do you agree this is a fair and accurate copy of

21 Government's Exhibit 107.1?

22 A.  Yes.

23 Q.  Sir, you went through these various quantities of dime bags,

24 kilo, half kilo, and that.  Is it a fair and accurate statement

25 that Mr. Ball never distributed any of these drugs to you in any

1 amount?

2 A.  Yes.

3 Q.  And would you write on that -- this copy here, "No

4 distribution to Mr. Ball"?

5 A.  "No distribution to Mr. Ball"?

6 Q.  Right.  Just put your initial, please.

7 A.  (Witness complies.)  Which Ball are we talking about?

8 Q.  Antwuan Ball.

9 A.  (Witness complies.)

10 Q.  Thank you.

11       I'm sorry.  And you also agree that Antwuan Ball did

12 not distribute to you?

13 A.  That's correct.

14 Q.  And you just mentioned the name Aman Ball.  Isn't it true

15 that in '99 to 2000, that area, you were distributing to Aman

16 Ball?

17 A.  I did.  I think I specified that.

18 Q.  Yeah.  And that was at the time period that you had this

19 incident with Mr. Antwuan Ball.  Is that right?

20 A.  Yes.

21       MR. CARNEY:  Your Honor, no further questions.

22       THE COURT:  All right.  Mr. Beane?

23                   CROSS EXAMINATION

24 BY MR. BEANE:

25 Q.  Good afternoon.

1 Q.  James Davis, same thing.  You knew James as Jack's brother.

2 Right?

3 A.  Correct.

4 Q.  And you used to supply them with drugs.  Right?

5 A.  Correct.

6 Q.  And you're not telling the ladies and gentlemen of this jury

7 that you were a supplier of drugs to Joseph Jones, are you?

8 A.  Right.

9 Q.  Okay.  And you're not telling the ladies and gentlemen of

10 the jury that Joseph Jones supplied you with drugs.  Right?

11 A.  Right.

12 Q.  In fact, at some point you said that the people you

13 supplied, or had a relationship, included Willy Best?

14 A.  Correct.

15 Q.  Santuce?

16 A.  Correct.

17 Q.  Jazz, with a J?

18 A.  Correct.

19 Q.  Was it Bootsy or Moosie?

20 A.  Bootsy, I think.  I don't know how she spells it.

21 Q.  Okay.  Harry?

22 A.  Yes.

23 Q.  Deon?

24 A.  Yes.

25 Q.  All right.  Would it be fair to say that you really didn't

1          THE COURT:  Yes.

2          MR. MARTIN:  Thank you, sir.

3 BY MR. MARTIN:

4 Q.  Sir, I'm going to show you what's been marked as

5 Government's Exhibit Number 1106.

6 A.  Okay.

7 Q.  Let's start from page one.

8          MR. MARTIN:  Your Honor, I'm going to put a copy of

9 1106 on the Elmo with the Court's permission.  It is marked as

10 Defendant's Exhibit Number 55.  I hope I'm doing this right.

11              (OFF THE RECORD.)

12 BY MR. MARTIN:

13 Q.  Sir, I'm going to ask you to just look at it there.  It's

14 right in front of you.  Let's start with paragraph, page one.

15 At the -- paragraph one, page one talks about your exposure, and

16 we've already gone through that.  In addition, it also says that

17 you're subjected or you have a possible exposure of a fine of up

18 to $4 million.  Right?

19 A.  Yes.

20 Q.  Do you expect to pay that?

21 A.  No.

22 Q.  And you're hoping that by giving substantial assistance you

23 won't be fined up to $4 million.  Right?

24 A.  Yes.

25 Q.  There's also a special assessment of $100.  You know that.

1 Right?

2 A.  Yes.

3 Q.  And your attorney has told you that the Court can't waive

4 that, you have to pay that.  Right?

5 A.  Yes.

6 Q.  But you don't mind that.  Right?

7 A.  Right.

8 Q.  You'll pay the $100?

9 A.  Yes.

10 Q.  Going over to page two, go to the very top.  I think you've

11 already been asked questions about the amount of drugs that you

12 distributed, and you've agreed that you distributed more than

13 one and a half kilograms of cocaine base.  Correct?

14 A.  Correct.

15 Q.  You also testified that Level 38 was the highest that you

16 could go on the sentencing guidelines chart.  Is that correct?

17 A.  Correct.

18 Q.  But in fact, it goes down to 43, doesn't it?  No, not on

19 your plea agreement.  I'm talking about the chart itself.

20 A.  The chart goes to 38, as far as I know.  It's the highest it

21 can go.

22 Q.  Okay.  Now, looking at paragraph three, it talks about your

23 base offense level, which I think is what you're talking about

24 where you said a Level 38.  Do you see that there?

25 A.  Yes.

1 government up to that point, they can still use against you,

2 doesn't it?

3 A.  Yes.

4 Q.  So in other words, if you had cooperated up to a certain

5 point, and then for whatever reason you stopped cooperating, the

6 government can use everything you told them up to that point

7 against you.  Right?

8 A.  Yes.

9 Q.  Okay.  So once you start down that path, you can't go back

10 up that slippery slope.  Right?

11 A.  Correct.

12 Q.  You have to keep going and give them substantial assistance?

13 A.  Correct.

14 Q.  By their determination.  Correct?

15 A.  Correct.

16 Q.  And some of the other questions that I might have asked you

17 have already been asked, and I'm not going to repeat that.

18      Now, with respect to your LA connection, going back to

19 that, when did that start?  What year was that?

20 A.  It started off with marijuana in late '97.

21 Q.  And that was through a contact of --

22 A.  A girlfriend.

23 Q.  -- one of your girlfriends.  Right?

24 A.  Yes.

25 Q.  What was her name?

1 A.  Deborah Barley.

2 Q.  Deborah.  And you made that contact out there, and was that

3 this fellow Courtney?

4 A.  Yes.

5 Q.  And what Courtney would do is, he would send the drugs back

6 to you through UPS.  Right?

7 A.  That's correct.

8 Q.  But you never had the drugs sent to where you lived, did

9 you?

10 A.  Yes, I did.

11 Q.  Initially you did?

12 A.  You said, have I ever?  I said yes.

13 Q.  There came a time, though, when you decided that wasn't a

14 very smart thing to do.  Right?

15 A.  That's correct.

16 Q.  So you started sending the drugs to other addresses.  Right?

17 A.  That's correct.

18 Q.  And those addresses included the addresses of people who

19 didn't know you.  Right?

20 A.  That's correct.

21 Q.  And what you would do is, you would sit outside their house.

22 Right?

23 A.  That's correct.

24 Q.  And you would wait for the delivery to come.  Correct?

25 A.  That's correct.

1 Q.  And then you would go up to the UPS man and you would sign

2 for the package as if you lived there.  Right?

3 A.  Correct.

4 Q.  And in so doing you were placing the people who lived there

5 at risk, weren't you?

6        MR. GUERRERO:  Objection, Your Honor.  Calls for

7 speculation.

8        THE COURT:  Sustained.

9 BY MR. MARTIN:

10 Q.  Well, let me ask you about Sheila.  Who is Sheila?

11 A.  That's my daughter's mom.

12 Q.  That's your daughter's mom.  You had a package sent to

13 Sheila, too, didn't you?

14 A.  Yes.

15 Q.  And you didn't tell Sheila there were drugs in that package,

16 did you?

17 A.  I did not, no.

18 Q.  And in fact, when the package was delivered to Sheila, she

19 got arrested.  Right?

20 A.  Correct.

21 Q.  And she was locked up.  Right?

22 A.  That's correct.

23 Q.  And she went to trial, didn't she?

24 A.  That's correct.

25 Q.  And you never once stood up and said, "That is mine," did

1 you?

2 A.  She won her trial.  Didn't have to.

3 Q.  She went to trial.  Did you testify on her behalf at trial?

4 A.  I was with her, right there.

5 Q.  Did you testify on her behalf at trial?

6 A.  I did not.

7 Q.  So you never stood up and said, "My conscience is

8 overwhelming me, this lady is innocent, let me tell them what

9 really happened."  You didn't do that, did you?

10 A.  I did not.

11 Q.  Now, remember that apartment you lived at where Reggie Reed

12 subletted from you?

13 A.  Yes.

14 Q.  Who were you living in that apartment with just before you

15 subletted it to Reggie?

16 A.  Deborah Barley.

17 Q.  Deborah.  And Deborah told you she didn't want to live there

18 any more because she was uncomfortable in that apartment.

19 Right?

20 A.  That's correct.

21          MR. GUERRERO:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23 BY MR. MARTIN:

24 Q.  Well, you decided you were going to move from that apartment

25 because it wasn't safe there.  Right?

1 A.  Correct.

2 Q.  You didn't tell Reggie Reed it wasn't safe there though, did

3 you?

4 A.  No.

5 Q.  In fact, Reggie Reed got killed in that apartment, didn't

6 he?

7 A.  That's correct.

8 Q.  And even after you subleased that to Reggie Reed, you would

9 still come there and cook your coke.  Right?

10 A.  Correct.

11 Q.  Again, you did what was in your best interests at that time.

12 Right?

13 A.  That's correct.

14 Q.  Wanted to keep your girlfriend happy?

15 A.  What do you mean?

16 Q.  Well, she didn't want to live there anymore.  Right?

17 A.  We moved, yes.

18 Q.  Yeah, you moved.  And you didn't want to live there anymore

19 either because you wanted to be with her.  Right?

20 A.  I was keeping the apartment for myself to do what I was

21 doing.  But Reggie needed a place to live, so I subletted him

22 that apartment.

23 Q.  So you were doing Reggie a favor?

24 A.  That's correct.

25 Q.  Even though you knew the place was dangerous?

Page 8480

1 A.  Correct.

2 Q.  When you pled guilty, both your lawyer and the government

3 lawyer was asking for you to get out of jail.  Right?

4 A.  Yes.

5 Q.  And that's what you wanted to avoid, being in jail.

6 Correct?

7 A.  That's correct.

8 Q.  And the government told the court that you should be

9 released because you could help them in their ongoing

10 investigation.  Right?

11 A.  Yes.

12 Q.  One of the things -- after you were released, one of the

13 things you did is, you went and showed them the Washington View

14 Apartments.  Right?

15 A.  Correct.

16 Q.  And the Washington View Apartments had to do with Jack and

17 James Davis.  Correct?

18 A.  Correct.

19 Q.  When the government came to court --

20       MS. WICKS:  Court's indulgence.

21 BY MS. WICKS:

22 Q.  -- and asked for you to be released, the government lawyer,

23 Mr. Beatrice, told the court that you had been -- based on their

24 information, you had been out of the drug business for about a

25 year.  Correct?

1 A.   Correct.

2 Q.   And Mr. Beatrice also told the court that, to the

3 government's knowledge, you had never even carried a weapon.

4 Correct?

5 A.   Correct.

6 Q.   And that was based on the debriefings and the information --

7 let me withdraw that.

8        That was partially based on the debriefings that you

9 had had with the government in August and September of 2003.

10 Correct?

11 A.   Yes.

12 Q.   And at that time you never talked to them about this gun

13 that you were arrested and convicted of possession -- possession

14 of ammunition, I'm sorry, in that gun in 2003.  Correct?

15 A.   I think I did tell them about that gun.

16 Q.   Okay.  So you're saying you told them about that gun, but

17 they came into court and said you never carried a weapon.

18 Correct?

19 A.   I guess, yes.

20 Q.   Okay.  The gun -- when you were arrested in 1993 with the

21 gun, it was in the back of your car.  Correct?

22 A.   That's correct.

23 Q.   So at that point on that date, it was not on your person.

24 Correct?

25 A.   Correct.

1  Q.  But then this week you came into court and you said there

2  was a day that you had a gun on your person.  Right?

3  A.  That's correct.

4  Q.  Okay.  Was that before or after you were arrested for this

5  gun in 1993?

6  A.  I think it was after.

7  Q.  Okay.  So that gun that you had in Congress Park when you

8  were standing on Congress Street, that's a different gun than

9  the police got out of your vehicle in 1993?

10  A.  That's correct.

11  Q.  So what kind of gun was it that you had in 1993 in the back

12  of the car?

13  A.  It was a 25 automatic.

14  Q.  And when you were arrested for that gun, the police seized

15  the gun.  Right?

16  A.  Correct.

17  Q.  You didn't get the gun back.  Correct?

18  A.  Correct.

19  Q.  And apparently that gun was loaded with ammunition.  Right?

20  A.  Correct.

21  Q.  And you didn't get the ammunition back.  Right?

22  A.  Correct.

23  Q.  And after you were arrested in 1993, how long did it take

24  you to get this other gun that you then had on this day that you

25  testified you were standing on Congress Street with your gun?

Page 8483

1 A.  I don't recall.

2 Q.  Do you recall if it was that year that you stood on Congress

3 Street with the gun?

4 A.  It was '94, '95, somewhere in that neighborhood.  I'm not

5 really sure.

6 Q.  Was it while you were on probation for the possession of

7 ammunition?

8 A.  I was not on any probation at that time.

9 Q.  And your probation --

10        MS. WICKS:  Court's indulgence.

11 BY MS. WICKS:

12 Q.  Now, your probation ran from August 27th, 1993 for about a

13 year.  Correct?

14 A.  Correct.

15 Q.  And so from August 27th, 1993 until about August 26th, 1994,

16 you were on probation.  Right?

17 A.  Correct.

18 Q.  And during that time period, had you gotten the second gun?

19 A.  I don't recall when I got the second gun.

20 Q.  Well, do you recall if you were on probation or not?

21 A.  I don't believe I was.

22 Q.  It would have been a violation of your probation to get

23 another gun.  Right?

24 A.  That's correct.

25 Q.  And you did successfully complete that probation.  Correct?

1 A.  Correct.

2 Q.  You also -- now, in 1995 you were shot on the basketball

3 court.  Correct?

4 A.  '95, yes.

5 Q.  Was that when it was?  I'm asking you.

6 A.  I'm not sure.  I don't remember exactly what year it was.

7 But I was shot on the basketball court.

8 Q.  Do you know if it was before or after your probation for the

9 ammunition?

10 A.  It was after my probation.

11 Q.  And do you know if it was before or after you stood on

12 Congress Street with your gun?

13 A.  Could have been after.

14 Q.  Could have been before?

15 A.  Yes.  No, it was after.  It was definitely after, because

16 I...

17 Q.  And --

18         MS. WICKS:  Court's indulgence.

19 BY MS. WICKS:

20 Q.  Now apparently, at least in August of 2003, it's your

21 testimony -- I'm sorry, in August of 2002, it's your testimony

22 you were not selling drugs.  Correct?

23 A.  You said August 2002?

24 Q.  Yes.  You were arrested in August 2003.

25 A.  Yes, okay.  August 2002.

Page 8490

1 A.  That's possible.

2 Q.  Do you want to verify that that's what your answer was?

3 A.  That's possible.

4        MS. WICKS:  May I approach, Your Honor?

5        THE COURT:  Yes.

6        MS. WICKS:  21-I, page 720.

7 BY MS. WICKS:

8 Q.  And back when you testified against James Davis, you also

9 testified that that was actually the only gun you ever owned.

10 Correct?

11 A.  Correct.

12 Q.  Today you're testifying there's another gun that you had.

13 Correct?

14 A.  Correct.

15 Q.  You owned that gun.  Correct?

16 A.  Correct.

17 Q.  That was your gun that you're saying you stood out on

18 Congress Street with.  Correct?

19 A.  Correct.

20 Q.  Now, are there other guns, or now we're just up to two guns?

21 A.  I didn't have any other guns.  What do you mean?

22 Q.  Well, you testified back in 2004 that that was the only gun

23 you ever owned, was the one that you were arrested with in 1993.

24 Correct?

25 A.  Correct.

Page 8491

1 Q.  Since then, you've now decided there's another gun that you

2 had, and you've described the incident where you drew that gun

3 in either 1993, '94, or '95.  Correct?

4 A.  Correct.

5 Q.  When you were arrested in 2003, you didn't tell them about

6 that other gun.  Correct?

7 A.  Correct.

8 Q.  And what kind of gun was it that you had standing on

9 Congress Street in either '93, '94, or '95?

10 A.  Nine-millimeter.

11 Q.  And that nine-millimeter, I believe your testimony just

12 earlier this afternoon was you didn't get that gun while you

13 were on probation from '93 to '94.  Correct?

14 A.  Correct.

15 Q.  So it would have been after August of 1994, after you got

16 off probation, that you got the nine-millimeter.  Correct?

17 A.  That's correct.

18 Q.  But sitting here today, you don't recall if it was '94 or

19 '95 that this incident occurred.  Correct?

20 A.  Which incident are we talking about?

21 Q.  The incident where you're standing on Congress Street and

22 draw the gun out of your pocket.

23 A.  Right.  It was about 1994, 1995 somewhere.

24 Q.  Is there anything that you can think of that occurred

25 shortly before or shortly after that incident?

 1 A.  Not that I can think of, no.

 2 Q.  Sitting here today, do you recall how long you had owned

 3 that nine-millimeter gun when the incident occurred?

 4 A.  No, I do not.

 5 Q.  Now, where were you prior to getting the phone call that day

 6 from Rodney?

 7 A.  I don't recall where I was.

 8 Q.  Wherever you were, you had the nine-millimeter.  Is that

 9 correct?

10 A.  I had access to it if I brung it with me, yes.

11 Q.  Well, access.  Where was the nine-millimeter?  Was it on

12 your person or somewhere else when you got the phone call?

13 A.  I believe I went home and got it.

14 Q.  And home at that time was on 13th Street, still?

15 A.  Maury Avenue.

16 Q.  Maury Avenue.  So you got the phone call, drove out to

17 Maryland.  Correct?

18 A.  Correct.

19 Q.  Pardon me?

20 A.  Yes.

21 Q.  But you're saying you don't recall where you were when you

22 got the phone call.  Right?

23 A.  I could have been home, I could have been outside.  I don't

24 recall.

25 Q.  So actually, you could have been home where the gun was.

1 Right?

2 A.  That's correct.

3 Q.  And so you wouldn't have driven to home if you were there.

4 Right?

5 A.  I don't recall where I was when I went and got the gun.

6 Q.  But just two questions ago -- two answers ago you indicated

7 that you went and got the gun out of the house.  Right?

8 A.  I said I could have.

9 Q.  Okay.  You could have.  And I'm asking you, what do you

10 recall happening?

11 A.  All I recall happening is me getting a phone call from

12 Mr. Anderson, and then me getting my gun and just going to see

13 what he wanted.

14 Q.  Okay.  And the getting your gun, what do you recall --

15 A.  I could have been in the house.  If I was in the house, then

16 yes, I went and got my gun out of the house.  If I wasn't at

17 home, I drove and got it.  I don't recall.  It was years ago.

18 Q.  So you have no specific recollection as to what efforts you

19 made on that day to get your gun.  Correct?

20 A.  That's correct.

21          MR. GUERRERO:  Objection.  Asked and answered.

22          THE COURT:  Sustained.

23 BY MS. WICKS:

24 Q.  But you know you got a gun.  Right?

25 A.  I went and got a gun, yes.

1 Q.  And this is another gun that you didn't tell the FBI about

2 in 2003.  Correct?

3         MR. GUERRERO:  Objection.  Asked and answered.

4         THE COURT:  Sustained.

5 BY MS. WICKS:

6 Q.  When you got the gun, you then went and talked to

7 Mr. Anderson.  Correct?

8 A.  Correct.

9 Q.  And at the point that you see Mr. Anderson in the alley --

10 actually, when you spoke to the FBI back in 2003, you told them

11 that you didn't carry guns.  Correct?

12 A.  I don't think I said that.

13 Q.  Well, when you testified under oath, one of your answers

14 about guns was "I never carried guns."  Correct?

15 A.  Right.

16 Q.  And then subsequent to that, you indicated that you think

17 your exact answer to the FBI was, "I never owned a gun since

18 1993, since I got caught with one."  Correct?

19 A.  That's correct.

20 Q.  And that was your testimony against James Davis back in

21 April of 2004.  Correct?

22 A.  Correct.

23 Q.  Was that the truth or was that a lie?

24 A.  It was misconstrued, rather.

25 Q.  Pardon me?

Page 8495

1 A.   The question was misconstrued.

2 Q.   The question was misconstrued.   And what is the question

3 that was misconstrued?

4 A.   Did I carry a gun.   I never carried a gun, unless, you

5 know -- I mean, I had a gun on me before, but I was not carrying

6 a gun, like legally carrying a gun.   So...

7 Q.   So you're drawing a distinction between legally carrying a

8 gun and illegally carrying a gun?

9 A.   No, not legally carrying a gun.   What I mean is that when

10 you asked me was I carrying a gun, I didn't walk around --

11 everywhere I went, I didn't have a gun.   That's how I thought

12 the question was asked.

13 Q.   Actually, back in 2004, it was Mr. Beatrice asking you

14 questions?

15 A.   Correct.

16 Q.   Okay.   And Mr. Beatrice asked you:   "Did we ask you -- were

17 you questioned as part of your debriefings about whether you

18 ever had a gun in your possession during your involvement in

19 this conspiracy?"

20        And back under oath, your answer was yes.

21        Then Mr. Beatrice asked you:   "And what was your answer

22 to that?"

23        And your answer then was:   "I never carried guns."

24        He then questioned you:   "And is that your answer here

25 today?"

1        And back then you answered:  "Yes, I think my exact

2 answer was I never owned a gun since '93, since I got caught

3 with one."

4 A.  Okay.

5 Q.  That was your answer back then.  Correct?

6 A.  Yes.

7 Q.  And now you're testifying against David Wilson.  Correct?

8 A.  Correct.

9 Q.  And now your answer is there's another day -- well, there's

10 a whole other gun that I got, a nine-millimeter.  Correct?

11 A.  Correct.

12 Q.  And then there's a date when I go and get my nine-millimeter

13 that's in my house.  Correct?

14 A.  Correct.

15 Q.  And I drive to Congress Park, to Congress Street.  Correct?

16 A.  Correct.

17 Q.  And you go to talk to Mr. Anderson.  Correct?

18 A.  Correct.

19 Q.  When you see Mr. Anderson in the alley, you saw Markie.

20 Right?

21 A.  Correct.

22 Q.  Did you see anyone else in the alley at that point?

23 A.  No.

24 Q.  You start to walk in the direction of Markie, and Markie

25 runs across Congress Street.  Right?

1 Q.   Sitting here today, can you see the drugstore?

2 A.   Yes.

3 Q.   Can you see what type of store it is?

4 A.   It was an Eckerd's or Walgreen's, so if you say it was an

5 Eckerd's, it was an Eckerd's.

6 Q.   Well, you testified in 2004, in October, against Jack Davis,

7 and said it was an Eckerd's.  Correct?

8         MR. GUERRERO:  Objection.  Asked and answered.

9         THE COURT:  Sustained.

10 BY MS. WICKS:

11 Q.   I wasn't there.  I can't tell you what it is.  I'm asking

12 you, what was it?

13 A.   Yes, that's correct.  That's correct.

14 Q.   It was an Eckerd's.  Right?

15 A.   That's correct.

16 Q.   So yesterday when you said it was a Walgreen's, that was not

17 right.  Correct?

18 A.   That's correct.

19         MS. WICKS:  Court's indulgence.

20 BY MS. WICKS:

21 Q.   When you received probation back in 1989 in the District of

22 Columbia, you received unsupervised probation.  Correct?

23 A.   Correct.

24 Q.   And one of the conditions from your unsupervised probation

25 was that you go in the Navy.  Correct?

1 A.  That's correct.

2 Q.  And you didn't go.  Correct?

3 A.  Correct.

4 Q.  You weren't allowed in.  Correct?

5 A.  Correct.

6 Q.  But your probation wasn't violated.  Correct?

7 A.  Correct.

8 Q.  And that was a probation that you got here in the District

9 of Columbia on April 24th, 1989.  Correct?

10 A.  Correct.

11 Q.  Then you also got a year of probation in Rockville on

12 September 1st, 1989.  Correct?

13 A.  Correct.

14 Q.  And that was for theft of the auto.  Correct?

15 A.  Correct.

16 Q.  So you were on probation -- do you recall how long your

17 unsupervised probation in the District of Columbia was?

18 A.  I think one year.

19 Q.  And then -- that's in April of '89.  In September of '89,

20 you get the other probation.  Correct?

21 A.  Correct.

22       MS. WICKS:  Court's indulgence.

23 BY MS. WICKS:

24 Q.  Now, the time that you showed the FBI agents the Washington

25 apartments, that was before testifying against James Davis in

1 trial, you get a kilo; again, it's fronted to you.  Correct?

2 A.  That's correct.

3 Q.  And you are saying that you sold an eighth of a key to

4 Mr. Wilson.  Right?

5 A.  That's correct.

6 Q.  You started working at DCPS in June of 2000.  Is that

7 correct?

8 A.  I don't remember when I was working -- started working.  I

9 think it was late '99, June '99, or 2000.  I don't recall.

10 Q.  And the kilo that was sent to you from California was sent

11 to you at DCPS?

12 A.  That's correct.

13 Q.  I'm sorry, District of Columbia Public Schools.  Right?

14 A.  That's correct.

15 Q.  At the administrative offices on North Capitol Street.

16 Right?

17 A.  That's correct.

18 Q.  And do you recall, was it July or August that you got that?

19 A.  It was during that summer.

20 Q.  Do you recall which month?

21 A.  Don't really.  I think it was like July.

22 Q.  Okay.  So it would have been in July that you sold

23 Mr. Wilson -- July of 2000 that you sold Mr. Wilson an eighth of

24 a key?

25 A.  Yes.

Page 8511

1 Q.   And I believe your testimony -- when you sold Mr. Wilson the

2 eighth of a key, he was driving the Cadillac truck.  Right?

3 A.   That's correct.

4 Q.   And that was in July of 2000?

5 A.   Correct.

6 Q.   Now, when you fronted James Davis an eighth of a key, he met

7 you at the apartment.  Right?

8 A.   Correct.

9 Q.   And prior to fronting him an eighth of a key of crack

10 cocaine, you had never dealt with James Davis before.  Right?

11 A.   That's correct.

12 Q.   You knew him from growing up.  Right?

13 A.   Dating his sister, yes.

14 Q.   And you had had dealings with his brother.  Right?

15 A.   Yes.

16 Q.   And at the point that you're dealing with James, you know

17 his brother doesn't want you to deal with him.  Right?

18 A.   No, I didn't.  He told me not to tell his brother.

19 Q.   Okay.  And Jack had told you not to do anything with his

20 brother?

21 A.   I haven't talked to Jack at that time.

22 Q.   You weren't talking to Jack at that time?

23 A.   No.

24 Q.   Had you had problems with Jack?

25 A.   No.  Jack -- after Sheila got locked up, Jack thought I was

1 hot.

2 Q.  So he stayed away from you?

3 A.  Correct.

4 Q.  But back in July, when you got this kilo, James Davis knew

5 where you were living.  Right?

6 A.  That's where I told him to meet me, yes.

7 Q.  Well, that's where you were living then.  Right?

8 A.  I was not living there in 2000 -- I mean, at that time.

9 That was my stash apartment.  Deborah wanted to move out.  We

10 moved out of there probably early 2000 -- I mean, before spring

11 2000, or something like that.  But I still had the apartment.

12 Q.  Back in 2000 --

13       MS. WICKS:  Court's indulgence.

14 A.  I'm sorry, Ms. Wicks.  I was living there at that time,

15 because I leased the apartment to Reggie in November.  I

16 apologize.

17 BY MS. WICKS:

18 Q.  It wasn't just your stash house in July, August, September,

19 October of 2000.  Right?

20 A.  Correct.

21 Q.  It was where you were living with your girlfriend.  Correct?

22 A.  Correct.

23 Q.  And you moved out because she wanted to move to a different

24 place.  Right?

25 A.  That's correct.

1 Q.   The girlfriend.  Right?

2 A.   Yes.

3 Q.   Earlier today when you indicated that it was just your stash

4 house and you didn't live there, that was incorrect.  Right?

5 A.   Yes.

6 Q.   Was that a lie or were you just mistaken?

7 A.   That was mistaken.  Because I was assuming it from being

8 when I started subletting it out, when I considered myself not

9 living there, I just had it for a stash house.  Which was in

10 November.

11 Q.   And your testimony at the same time today was that Mr. Reed

12 had been living there a little bit less than a month when he was

13 killed.  Right?

14 A.   That's correct.

15 Q.   And he was killed in December of 2000.  Right?

16 A.   Correct.  December 7th, somewhere like that, I think.

17 Q.   And your recollection is that it was a Sunday morning when

18 you came and the police activity was there.  Right?

19 A.   Correct.

20 Q.   It wasn't a Wednesday morning.  Right?

21 A.   Correct.

22 Q.   When you had been dealing with Jack Davis, he knew where you

23 were living at that time.  Right?

24 A.   Yes.

25 Q.   And back in 2000, you were friends with Deon Jordan.  Right?

1 A.  Correct.

2 Q.  And Deon Jordan knew where you lived then.  Right?

3 A.  Yes.

4 Q.  When you testified --

5       MS. WICKS:  Court's indulgence.

6 BY MS. WICKS:

7 Q.  You had -- at some point you had drug dealings with

8 Deon Jordan.  Right?

9 A.  That's correct.

10 Q.  And that was between 1997 and 2000.  Right?

11 A.  Correct.

12 Q.  Now, prior to you getting locked up, Sheila Teasley had

13 gotten locked up because of one of your shipments.  Right?

14 A.  Correct.

15 Q.  You had sent another one of your shipments to your

16 girlfriend that lived on Suitland Road.  Right?

17 A.  Marijuana, yes.

18 Q.  A marijuana shipment.  Right?

19 A.  Yes.

20 Q.  How many pounds was that shipment?

21 A.  Between 10 and 25.  I don't recall.  I think it was

22 25 pounds.

23 Q.  And at least on one occasion when you got a shipment from

24 California, you brought it to that same apartment on

25 Suitland Road.  Right?

1 A.  Yes.

2 Q.  Where you were living with your girlfriend.  Right?

3 A.  Yes.

4 Q.  And you used your friend Dexter Powell to receive shipments

5 as well?

6 A.  That's correct.

7 Q.  And he ended up losing his job over that.  Right?

8        MR. GUERRERO:  Objection, Your Honor.  Calls for

9 speculation.

10        THE COURT:  Sustained.

11 BY MS. WICKS:

12 Q.  To your knowledge, he lost his job because of a shipment

13 that came to his office with a woman's name on it that you

14 picked up.  Right?

15        MR. GUERRERO:  Same objection.

16        THE COURT:  Sustained.

17        MS. WICKS:  May we approach, Your Honor?

18        THE COURT:  Yes.

19        (BENCH CONFERENCE ON THE RECORD.)

20        MS. WICKS:  I thought he had testified about this area

21 on direct, so I'm not understanding what the objection is.

22        THE COURT:  He testified on direct that he thought that

23 Dexter Powell lost his job because of the shipment that was

24 received?

25        MS. WICKS:  No, he testified about that Dexter Powell

1 information --

2          MS. WICKS:  I'm not asking him to speculate.

3          THE COURT:  There's all kinds of information you can

4 get out without that question; was he working before the package

5 arrived, was he working after the package arrived, when was it

6 that you knew he was not working anymore?  If that's what you're

7 trying to get out, that he got fired, that the guy was not

8 working anymore.

9          But your question is --

10          MS. WICKS:  All right.  I'll --

11          THE COURT:  Excuse me.  Your question had to do with

12 something like, "Did your friend Dexter lose his job because he

13 accepted the package."  So I'm not going to allow that.

14          Anything else?

15          MS. WICKS:  Not at this point.

16          (END BENCH CONFERENCE.)

17 BY MS. WICKS:

18 Q.  Packages of crack cocaine that you were being fronted or

19 buying from California were sent to Mr. Powell and his rental

20 office that was up near Baltimore.  Right?

21 A.  Yes.

22 Q.  And you paid -- your testimony is that you paid Mr. Powell

23 to essentially intercept those packages.  Right?

24 A.  Yes.

25 Q.  And you would arrange to put one of the tenant's names on

1 the package so that it wouldn't be suspicious, to a certain

2 extent.  Right?

3 A.  Yes.

4 Q.  But then the package would be intercepted there.  Right?

5 A.  Yes.

6 Q.  And after this happened a couple of times, Mr. Powell no

7 longer worked there.  Right?

8 A.  Yes.

9 Q.  Now, Reggie was a friend of yours.  Right?

10 A.  Yeah, I would consider him a friend.

11 Q.  And you did him a favor.  He needed a place to stay, and you

12 subletted him the apartment that your girlfriend wanted to move

13 out of.  Right?

14 A.  That's correct.

15 Q.  He also had a child by Ms. Teasley?

16 A.  That's correct.

17 Q.  And so you were doing Ms. Teasley a favor, to a certain

18 extent, as well.  Right?

19 A.  Correct.

20 Q.  Now, prior to Reggie moving into the apartment, he knew that

21 you sold drugs.  Right?

22 A.  Yes.

23 Q.  And he knew that you would continue to store drugs in that

24 apartment.  Right?

25 A.  No.

1 Q.  So when he came home and found you cooking cocaine in the

2 apartment, it was a surprise.  Right?

3 A.  Yes.

4 Q.  And it was a problem.  Right?

5 A.  No.  Well, we talked about it.  It was not a problem.

6 Q.  And you paid him off.  Right?

7 A.  I did not pay him.

8 Q.  You paid Mr. Powell?

9 A.  I paid Mr. Powell.

10 Q.  You paid other people to receive packages for you?

11 A.  Yes, I did.

12 Q.  You paid Jack Davis to go buy drugs in California.  Right?

13 A.  Yes.

14 Q.  But you're saying you didn't pay Reggie?

15 A.  No, I did not.

16 Q.  After he caught you cooking cocaine in the apartment, you

17 continued to cook cocaine there.  Right?

18 A.  He did not catch me cooking cocaine.

19 Q.  Well, he didn't give you permission to cook cocaine in his

20 apartment.  Right?

21 A.  Technically it was my apartment.

22 Q.  Technically he was paying you to live there.  Right?

23 A.  He had not paid me any rent yet.

24 Q.  So when you made an agreement to sublease to him, he didn't

25 give you any money?

1 A.   Correct.

2 Q.   Did he ever give you any money before he died?

3 A.   He died before he did.

4 Q.   So he was there for a whole month, and you were cooking

5 cocaine, and he never gave you any money?

6 A.   I only cooked cocaine there with him present one time.

7 Q.   The one time two days before you found out he was killed?

8 A.   That's correct.

9 Q.   The first time that you told the police that the drugs that

10 Sheila Teasley was locked up for were yours was 2003.  Correct?

11 A.   Correct.

12 Q.   You had never even told her what were in the packages that

13 she was accepting at her residence.  Right?

14 A.   That's correct.

15 Q.   When she was arrested, there was $227,000 worth of marijuana

16 in that house.  Right?

17 A.   Where did you get that from?

18 Q.   That's what the police said in PG County.  Right?

19 A.   They didn't confiscate $227,000 --

20 Q.   So you didn't hear testimony at her trial that they

21 estimated the value of that marijuana as $227,000?

22 A.   I was at the courthouse but I wasn't in the courtroom.

23 Q.   So when you were by her side during the trial, you were out

24 in the hallway?

25 A.   That's correct.

1          MS. WICKS:  Court's indulgence.

2 BY MS. WICKS:

3 Q.  Now, as to the first trip when you went to California, your

4 first story was that you gave money to Jack for the plane

5 ticket.  Correct?

6          MR. GUERRERO:  Objection as to form.

7          THE COURT:  Overruled.

8 A.  Yes, I think I said that.

9 BY MS. WICKS:

10 Q.  Then you changed it, and you indicated that you had given

11 the money to a girlfriend of yours and she was getting the

12 ticket through a friend of hers.  Right?

13 A.  I believe so.

14 Q.  And just to clarify, your girlfriend is not Jack Davis.

15 Right?

16 A.  That's correct.

17 Q.  Yesterday on direct --

18          MS. WICKS:  Court's indulgence.

19 BY MS. WICKS:

20 Q.  You indicated that you had used marijuana.  Right?

21 A.  Yes.

22 Q.  You've never used crack cocaine.  Correct?

23 A.  Correct.

24 Q.  You've never used cocaine.  Correct?

25 A.  Correct.

1 Q.  But you have used Ecstasy.  Correct?

2 A.  That's correct.

3 Q.  You also sold Ecstasy.  Correct?

4 A.  Correct.

5 Q.  When was it that you sold Ecstasy?

6 A.  '99, 2000.

7 Q.  When you moved out of the apartment on South Capitol, you

8 had been comfortable living there.  Right?

9 A.  Yes.

10 Q.  The reason why you moved out was because your girlfriend

11 wanted to move out.  Right?

12 A.  That's correct.

13 Q.  Do you recall what kind of lock there was on the front door

14 to that apartment, the door directly to the apartment?

15 A.  No, I do not.

16 Q.  Back in December of 2000, you yourself still had a key to

17 that apartment.  Right?

18 A.  That's correct.

19 Q.  And Reggie had a key to that apartment.  Right?

20 A.  That's correct.

21 Q.  Do you know if anyone else had a key to the apartment?

22 A.  I took Deborah's key, he had my old key.

23 Q.  So the answer is, as far as you know, there weren't other

24 people other than you and Reggie.  Correct?

25 A.  That's correct.

# Tab 29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,             :
            Plaintiff,                :  Docket No. CR 05-100
        v.                            :
                                      :
ANTWUAN BALL, DAVID WILSON,           :  Washington, DC
GREGORY BELL, DESMOND                 :
THURSTON, JOSEPH JONES, and           :  April 25, 2007
DOMINIC SAMUELS,                      :  9:25 a.m.
                                      :
            Defendants.               :
                                      :

VOLUME 40 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8556

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8557

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:          A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC  20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8558

MORNING SESSION, APRIL 25, 2007

1
2    (9:17 a.m.)
3         THE COURT:  All right, Ms. Wicks.  Are you ready for the
4    jury?
5         MS. WICKS:  Yes.  Thank you, Your Honor.
6    (Jury in at 9:22 a.m.)
7         THE COURT:  Good morning, ladies and gentlemen.
8         THE JURY PANEL:  Good morning.
9         THE COURT:  Welcome back.  We're ready to resume.
10        Ms. Wicks.
11        MS. WICKS:  Thank you, Your Honor.
12        CONTINUED CROSS-EXAMINATION OF CEDRIC CONNER
13   BY MS. WICKS:
14   Q.   Good morning, Mr. Conner.
15   A.   Good morning.
16   Q.   When you -- after meeting with Mr. Beatrice, then you met
17   with Mr. Guerrero?
18   A.   Yes.
19   Q.   About testifying in this case?
20   A.   Yes.
21   Q.   And I believe your testimony was that you met with him
22   two times?
23   A.   Yes.
24   Q.   Approximately how much time did you spend with Mr.
25   Guerrero with him asking -- essentially preparing for testimony

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*8559*

1  in this case?
2  **A.**  Twelve, fourteen hours.
3  **Q.**  Okay.  And that was in -- that's a total of the two
4  sessions?
5  **A.**  Yes.
6  **Q.**  And each time you met with him, he would ask you
7  questions and you would give answers, right?
8  **A.**  That's correct.
9  **Q.**  And if you recall, was that close to this week or farther
10  back?  When was that, the preparation time with Mr. Guerrero?
11  **A.**  The past -- the beginning of this week and sometime in
12  February.
13  **Q.**  Okay.  And did Mr. Guerrero or Mr. Beatrice ever make
14  suggestions on how to phrase something?
15  **A.**  No.
16  **Q.**  When -- did you ever meet with Mr. Guerrero and Mr.
17  Beatrice?
18  **A.**  No.
19  **Q.**  Now, you -- do you recall when you first met Reginald
20  Reid?
21  **A.**  Yes.
22  **Q.**  When was that?
23  **A.**  It had to be like '94, '95.
24  **Q.**  Okay.  And did you meet him because of his relationship
25  with Ms. Teasley?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*8560*

1  **A.**  Yes.
2  **Q.**  Or did you meet with him separate from that?
3  **A.**  His relationship with Ms. Teasley.
4  **Q.**  Okay.  And was he from Congress Park?
5  **A.**  No, he was not.
6  **Q.**  Back during the period that you knew him, did his mother
7  live in Congress Park?
8  **A.**  I think his mother lived On 13th Street.
9  **Q.**  And your testimony -- you grew up on 13th Street, right?
10  **A.**  Correct.
11  **Q.**  And in your mind, that's not Congress Park, right?
12  **A.**  That's correct.
13  **Q.**  You -- Mr. Guerrero asked you if you had ever sold
14  cocaine to Reggie.  You remember that from yesterday, I think?
15  **A.**  Yes.
16  **Q.**  Did you ever see him selling cocaine?
17  **A.**  He was not a drug dealer.
18  **Q.**  Had you discussed that with Mr. Guerrero?
19  **A.**  It didn't come up.
20  **Q.**  So you hadn't discussed with him the fact that Reggie, to
21  your knowledge, was not a drug dealer, correct?
22  **A.**  Correct.
23  **Q.**  And it's your testimony that the day that you came back
24  from Atlantic City was a Sunday, right?
25  **A.**  Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*8561*

1  **Q.**  Did you attend Reggie's funeral?
2  **A.**  No, I did not.
3  **Q.**  Do you recall what day the funeral was?
4  **A.**  No, I do not.
5  **Q.**  You testified yesterday morning about a time when you
6  were having a conversation with Dion.  Do you recall what time
7  of day this conversation was in Congress Park?
8  **A.**  No, I do not.  Sometime -- it's in the afternoon, though,
9  after 12.
10  **Q.**  Well, back in December of 2000, were you working?
11  **A.**  December 2000?
12  **Q.**  Yes.
13  **A.**  No, I was not.
14  **Q.**  So it could have been during the week in the afternoon?
15  **A.**  It's possible.
16  **Q.**  It could have been on the weekend in the afternoon?
17  **A.**  It's possible.
18  **Q.**  But you don't recall what day of the week it was,
19  correct?
20  **A.**  That's correct.
21  **Q.**  And your testimony was you believed it was a couple of
22  days after Mr. Reid died?
23  **A.**  A few days, yes.
24  **Q.**  Could it have been a week?
25  **A.**  Possibly.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*8562*

1  **Q.**  Could it have been the day after he died?
2  **A.**  It's possible as well.
3  **Q.**  When you -- and your testimony is it was the afternoon.
4  Do you recall if it was the early afternoon or the late
5  afternoon?
6  **A.**  I do not.
7  **Q.**  Could it have been the early evening?
8  **A.**  I mean, it's like you're asking me the same question over
9  and over again.  I don't recall the exact time.
10  **Q.**  So do you recall the sun was out?
11  **A.**  It was daytime, yes.
12  **Q.**  Okay.  And do you recall the weather outside when you're
13  standing there in Congress Park having this discussion with
14  Dion?
15  **A.**  It was a nice day.
16  **Q.**  Do you recall the temperature?
17  **A.**  No.
18  **Q.**  Do you recall whether you had to wear a jacket that day?
19  **A.**  No.  It was wintertime, though, so I'm quite sure we had
20  jackets on.
21  **Q.**  But you're making an assumption, correct?
22  **A.**  Correct.
23  **Q.**  Now, do you recall what you were discussing with Dion
24  when this -- let me withdraw that.
25  When you're standing there talking with Dion, you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

**8571**

1    **A.**    That's correct.

2    MS. WICKS:  Your Honor, I don't have any other questions.

3    THE COURT:  All right.

4    Mr. Zucker?

5    MR. ZUCKER:  Can I approach for a minute first?

6    THE COURT:  Yes.

7    (Following sidebar discussion had on the record:)

8    MR. ZUCKER:  I don't know if Mr. Guerrero can respond.

9    MR. GUERRERO:  Yes.

10    MR. ZUCKER:  Yesterday, Mr. Conner made a statement on the

11    stand that the information he received on the street from

12    Mr. Wilson and Munya that L.A. was behind murder of Reid, that

13    L.A. committed the murder of Reginald Reid -- the witness said

14    that he did nothing with that information except to convey it to

15    the investigating officers.  I've made a *Brady* request to,

16    hopefully -- I mean, my assumption is that the officers will say

17    that was never communicated to them by Mr. Reid.  It was --

18    THE COURT:  By?

19    MS. WICKS:  Conner.

20    MR. ZUCKER:  I'm sorry.  Mr. Conner.  Thank you.

21    I made a *Brady* request of Mr. Leon shortly before coming

22    in the courtroom.  He's trying to contact -- I think it's

23    Detective Frank Molina, who was the lead detective, right?

24    Thank you.  Mr. Guerrero is confirming that.

25    -- who was unavailable yesterday, and he advised me he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8572**

1    would have either Molina's jacket or Molina here today to respond

2    to an inquiry.  I don't know if Mr. -- if he's communicated

3    anything to Mr. Guerrero, but Mr. Leon isn't in the courtroom.

4    THE COURT:  Have you asked them?

5    MR. ZUCKER:  He's not here to ask.  I asked him yesterday.

6    He said he would have it this morning.

7    THE COURT:  Have you asked Mr. --

8    MR. ZUCKER:  No.

9    THE COURT:  Have you asked Ms. Petalas?

10    MR. ZUCKER:  No.

11    THE COURT:  Why are you coming up to the bench then?  What

12    are you asking from me?

13    MR. ZUCKER:  I'm asking for an opportunity to consult with

14    them and then, depending upon --

15    THE COURT:  Go ahead, then.

16    (Sidebar discussion concluded.)

17    MR. ZUCKER:  Thank you, Judge.  We're ready to proceed.

18    CROSS-EXAMINATION OF CEDRIC CONNER

19    BY MR. ZUCKER:

20    **Q.**    Good morning, Mr. Conner.

21    **A.**    Good morning.

22    **Q.**    Mr. Conner, the only time in your life that you stole a

23    car, you were caught and convicted; is that true?

24    **A.**    Yes.

25    **Q.**    And the only time in your life that you ever solicited a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8573**

1    prostitute, you were caught and convicted; is that true?

2    **A.**    Yes.

3    **Q.**    And that is as truthful as everything else you've said in

4    this trial, correct?

5    **A.**    Yes.

6    **Q.**    And you're not just trying to minimize your criminal

7    involvement by saying those things, are you, sir?  That those

8    are the only times you ever committed those crimes?

9    **A.**    Yes.

10    **Q.**    Yes, you are?

11    **A.**    Those are the only times I've committed those crimes.

12    **Q.**    My question is, are you trying to minimize your criminal

13    involvement by saying those are the only two times you ever

14    committed those crimes?

15    **A.**    No.

16    **Q.**    And once before in this courtroom under oath, you claimed

17    that the only time you ever had a gun was the one that you were

18    arrested for in 1993; isn't that correct?

19    **A.**    Yes.

20    **Q.**    That was a statement made by you in this very courtroom

21    in 2004 during the trial of Mr. Davis; isn't that correct?

22    **A.**    Yes.

23    **Q.**    Now, that was a lie, wasn't it, sir?

24    **A.**    Yes.

25    **Q.**    Okay.  So you have lied under oath in this courtroom in

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8574**

1    the past, correct?

2    **A.**    Not intentionally, no.

3    **Q.**    Well, you said yesterday you misconstrued it?

4    **A.**    Yes.

5    **Q.**    Did you not understand the questions?

6    **A.**    It was probably the way it was delivered.

7    **Q.**    Well, let's review that.  All right.  Page 715, testimony

8    of --

9    MR. ZUCKER:  May I approach, Judge?

10    THE COURT:  Yes.

11    BY MR. ZUCKER:

12    **Q.**    Showing you what's marked as 25 I, you saw this

13    yesterday, did you not, sir?

14    **A.**    Yes.

15    **Q.**    And it was your testimony given in the Jack Davis case

16    before -- in this courtroom on April 19th, 2004; is that

17    correct, sir?

18    **A.**    Yes.

19    **Q.**    Question from Mr. Beatrice:  "Were you carrying a gun in

20    1999?

21    "Answer:  No, I was not.

22    "Question:  And at any time, Mr. Conner, at any time that

23    you were associated with Jack and James Davis, did you ever have

24    a gun in your possession?

25    "Answer:  No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8575**

```
1          "Okay --
2          "Question:  Okay.
3          "Answer:  Never.
4          "Question:  Did we ask you, were you questioned as part
5  of your debriefings about whether you ever had a gun in your
6  possession during your involvement in this conspiracy?
7          "Answer:  Yes.
8          "Question:  And what was your answer to that?
9          "Answer:  I never carried guns.
10         "Question:  And is that your answer here today?
11         "Answer:  Yes.  I think my exact answer was I never owned
12 a gun since '93, since I caught -- since I got caught with one."
13         That was your testimony here, right?
14    A.   Yes.
15    Q.   Okay.  What did you misconstrue?  What were you confused
16 about?
17    A.   When you said I carried guns, like as if I always had a
18 gun on me.  That was my understanding of it.
19    Q.   As opposed to owning the gun?
20    A.   Right.
21    Q.   Because here you said, "I never owned a gun since '93,"
22 right?
23    A.   That's correct.
24    Q.   Those are your words, right?
25    A.   My words.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8576**

```
1     Q.   But you told us here about going back in 1995 and getting
2  your gun out of your house when Rodney called you; isn't that
3  correct?
4     A.   That's correct.
5     Q.   So you lied, didn't you, sir?
6     A.   Yes.
7     Q.   And that wasn't the only time you lied about that in that
8  trial, did you, sir?
9     A.   I don't say I lied.  I probably just --
10    Q.   Didn't you just admit that you lied?
11    A.   Yes, I did.
12    Q.   It was a lie, right?
13    A.   Okay.
14    Q.   You weren't confused?
15    A.   It was misunderstood.
16    Q.   You misunderstood your words, "I never owned a gun"?
17    A.   Okay.
18    Q.   You lied.
19    A.   Okay.
20    Q.   And you were asked a couple minutes later about the same
21 thing again by the prosecutor -- I'm sorry.  It's actually by
22 Ms. Wicks, one of the defense lawyers, who's here, who was in
23 that trial as well, right?  Do you remember her?
24    A.   Yes.
25    Q.   She asked you about that same point.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8577**

```
1          "Question" -- page 719, bottom -- last line.
2          "Now, your testimony is that after you got caught in '93
3  with a gun, you never carried a gun again, correct?"
4          Your answer is:  "That's correct."
5     A.   It said "carried a gun."
6     Q.   Well, what's the difference between -- oh, I see.
7          But then the next question is:  "What about before that?"
8          Your answer is:  "No, that was the only gun I ever
9  owned."
10         That was a lie, wasn't it, sir?
11    A.   It was misunderstood.
12    Q.   Sir, how many times were you asked and how many times did
13 you say under oath in that trial you never had any other gun
14 except the gun in '93?
15    A.   Okay.  So --
16    Q.   We've gone over three or four, haven't we, sir?
17    A.   Yes.
18    Q.   You lied in that trial, didn't you, sir?
19         MR. GUERRERO:  Asked and answered.
20         THE COURT:  Sustained.
21 BY MR. ZUCKER:
22    Q.   You had told the government about the incident with
23 Rodney and going getting the 9 millimeter out of your house
24 prior to the trial, hadn't you, sir?
25    A.   I told them at some point.  I don't remember when.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8578**

```
1     Q.   Well, it was during your debriefings, right?
2     A.   Yes.
3     Q.   And your debriefings were prior to the trial, right?
4     A.   Yes.
5     Q.   Okay.  So they knew about this other gun, right?
6     A.   I guess, yes.
7     Q.   Okay.  So they knew you were lying in that trial, didn't
8  they?
9          MR. GUERRERO:  Objection as to who knew what.
10         THE COURT:  Sustained.
11 BY MR. ZUCKER:
12    Q.   Whoever you debriefed with and gave that information had
13 knowledge that your testimony under oath in this courtroom two
14 years ago was not true?
15         MR. GUERRERO:  Same objection.
16         THE COURT:  Sustained.
17 BY MR. ZUCKER:
18    Q.   Sir, you've gone on at length yesterday about if you
19 lied, they'd pull my plea agreement and I'd go to prison and
20 there's no deal, right?
21    A.   That's correct.
22    Q.   But you have lied in this courtroom and you're still here
23 testifying, aren't you, sir?
24         MR. GUERRERO:  Objection, asked and answered.
25         THE COURT:  Sustained.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8579

BY MR. ZUCKER:
2  **Q.** Has your deal been pulled?
3  **A.** No.
4  **Q.** You're here testifying to get benefits, right?
5  **A.** That's correct.
6  **Q.** You expect to get benefits, right?
7  **A.** That's correct.
8  **Q.** So all this talk about if I lie, they pull my agreement
9  and I go to prison, that's just something you tell the jurors,
10  right?
11      MR. GUERRERO: Objection, form.
12      THE COURT: Overruled.
13      THE WITNESS: That's not -- that's not --
14  BY MR. ZUCKER:
15  **Q.** Well, it didn't happen, did it?
16  **A.** Well, it's not over yet.
17  **Q.** Has your agreement been pulled?
18  **A.** Not at this time.
19      MR. GUERRERO: Objection, asked and answered.
20      THE COURT: Sustained.
21  BY MR. ZUCKER:
22  **Q.** You're here because you expect to get benefits, right?
23  **A.** Correct.
24      MR. GUERRERO: Same objection.
25      THE COURT: Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8580

BY MR. ZUCKER:
2  **Q.** You spent the last almost four years on the street,
3  haven't you, sir?
4  **A.** Yes.
5  **Q.** And in addition to getting the benefit of your not having
6  to be incarcerated, you've also gotten substantial financial
7  benefits, right?
8  **A.** Yes.
9  **Q.** Approximately over 187,000 to date, right, according to
10  the records?
11  **A.** Yes.
12  **Q.** And you're here today -- I don't want to know where
13  you're staying and I don't want to know where you live. I'm not
14  asking about those questions, okay. But wherever you came from,
15  you were transported here at government expense, correct?
16  **A.** Yes.
17  **Q.** You're staying here at a hotel at government's expense,
18  correct?
19  **A.** Yes.
20  **Q.** Your meals are at a restaurant at government's expense,
21  right?
22  **A.** Yes.
23  **Q.** Any entertainment you get is at government's expense
24  while you're here, correct?
25  **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8581

**Q.** And that's not included in the 187,000 you've already
2  received, right?
3      MR. GUERRERO: Objection, misstates the evidence.
4      THE COURT: Mr. Zucker?
5  BY MR. ZUCKER:
6  **Q.** Well, the 187,000 you've already received is documented
7  in the documents one of the other counsel showed you as benefits
8  you've received up till, I think, last month, right?
9  **A.** Say that again.
10  **Q.** Whatever they paid the last week or two for you isn't
11  included, is it, as far as you know?
12  **A.** In what?
13  **Q.** Showing you what's been marked as Defendant Samuels
14  Exhibit 45. This was the document you were shown by
15  Mr. Balarezo, right?
16  **A.** Yes.
17  **Q.** Prepared April 19th, correct?
18  **A.** Yes.
19  **Q.** So it certainly could not have been included expenditures
20  incurred since that date, right?
21  **A.** Correct.
22  **A.** I'll take that away.
23      So you were pretty unlucky as a car thief and as -- I
24  don't know -- a solicitor, but you were very lucky as a drug
25  dealer in terms of avoiding detection; isn't that correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8582

**A.** Yes.
2  **Q.** You went 14, 15 years before you were caught; is that
3  correct?
4  **A.** 11, 12.
5  **Q.** Huh?
6  **A.** 11, 12.
7  **Q.** '89 to 2003 or 2002? When were you arrested? 2003,
8  right?
9  **A.** 11, 12, approximately 13.
10  **Q.** 2003 minus '89 is 14?
11  **A.** 14. Okay. And I --
12  **Q.** So 13 for a --
13  **A.** 2002 -- 2001.
14  **Q.** All right. And during that time, you were traveling
15  cross country, shipping -- traveling cross country to make
16  purchases, right?
17  **A.** Yes.
18  **Q.** Sending kilos cross country, right?
19  **A.** Yes.
20  **Q.** The usual -- regular shipments of 25 pound of marijuana,
21  right?
22  **A.** 10 to 25 pound of marijuana, yes.
23  **Q.** All right. All right. And you were involved in
24  thousands of drug transactions over those 13, 14, 12 years,
25  right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8619

1  I'm a little worried about the ongoing cooperation, the
2  extent to which you are asking him to reveal matters that may not
3  be relevant and may intrude upon additional -- an additional
4  legal investigation.
5        I'm also a little worried that it's an inaccurate
6  question, saying he's never cooperated against suppliers when
7  he's already testified about people he got drugs from.  So it's
8  really not a fair question.  He has testified about people he got
9  drugs from.
10       So those are the worries.  I understand the direction
11  you're going and it's a fair direction, but that question I have
12  a problem with.  So unless you have a fix, I'll sustain the
13  objection.
14       MR. ZUCKER:  I don't want to interrupt you.  I didn't want
15  to interrupt you.  I'll respond later.
16       THE COURT:  I'll sustain the objection for the reasons
17  I've stated, but I'll let you, you know, explore this proper area
18  to explore if you can do it without running afoul of those
19  concerns.
20       MR. ZUCKER:  I'm thinking.  I'll try.  I mean, I guess --
21  I guess the first question would be to say never -- what we can
22  be clear about is he's never testified against anybody above him.
23  But I understand the government's objection to that is he doesn't
24  control who he testifies against.
25       THE COURT:  What is your good faith basis for knowing that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8620

1  there was a trial against all of the people that he's testified
2  about so far in this courthouse and, you know, he refused to say
3  anything about them or something like that?
4        That's just not -- I don't think that's the case.  It's
5  not in the record.  So that's my concern.  To ask him if he
6  hasn't cooperated against the suppliers is inaccurate.  It's not
7  inconsistent with what he's said.  So it's a close line to call.
8        MR. ZUCKER:  Yeah.  I'm trying to figure out how to walk
9  it and not step afoul.
10       THE COURT:  If you want to pick up a new area and come
11  back to that to give you time to think, you can.  I'm not trying
12  to tell you how to try your case.
13       MR. ZUCKER:  All right.
14       (Sidebar discussion concluded.)
15  BY MR. ZUCKER:
16  Q.   All right, sir.  Let's turn for a moment -- you testified
17  about a couple of trips you made up to Spanish Harlem to buy
18  drug, right?
19  A.   Yes.
20  Q.   Particularly to buy cocaine, right?
21  A.   Right.
22  Q.   Now, when you went up there, you said you didn't know
23  anyone up there, right?
24  A.   That's correct.
25  Q.   So you went up as a complete stranger, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8621

1  A.   Yes.
2  Q.   And you had -- you were with someone else, right?
3  A.   Yes.
4  Q.   Who was that again?
5  A.   Dexter Powell.
6  Q.   And you both had money on you to make purchases, correct?
7  A.   It was my purchase.
8  Q.   Okay.  He didn't have any money on him?
9  A.   Not to buy drugs.  Not to buy drugs.
10  Q.   All right.  And you said -- you told us you had $10,000
11  in cash on you, minimum?
12  A.   Yes.
13  Q.   And you stood out on the corner or on the street and
14  waited for somebody -- a stranger to approach you and offer to
15  sell you half a kilo of cocaine?
16  A.   No.
17  Q.   What'd you do?
18  A.   You walk up to -- in Spanish Harlem, you stick out like a
19  sore thumb, so if you come up there, they know what you're
20  coming to do.
21  Q.   What did you do?  You went to Spanish Harlem?
22  A.   Went to Spanish Harlem.
23  Q.   And you stick out like a sore thumb, right?
24  A.   You stick out like a sore thumb, yes.
25  Q.   And so you have to wait while you're sticking out like a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

8622

1  sore thumb for a stranger to come up to you and offer to sell
2  you drugs?
3  A.   Well, it was established at that time that, you know, a
4  black guy was in that neighborhood, he was there to buy drugs.
5  Q.   Was that in the news?
6  A.   No.  The ghetto media.
7  Q.   Where is that established?
8  A.   The ghetto media.
9  Q.   Ghetto media?
10  A.   Yeah.
11  Q.   Do they have black cops in New York?
12  A.   I'm quite sure they do.
13  Q.   So complete strangers don't know if you're a cop or
14  somebody who's a tourist --
15  A.   That's correct.
16  Q.   -- or somebody who's there to buy drugs, right?
17  A.   That's correct.
18  Q.   So you do -- you stick out like a sore thumb, waiting for
19  a stranger who you don't know and doesn't know you, hoping that
20  they'll offer to sell you drugs?
21  A.   Yes.
22  Q.   And of course you have to tell them -- how many strangers
23  came up and offered to sell you drugs?
24  A.   Hm.  You give your money to one person, they speak the
25  language, blah, blah, blah, blah.  They go off.  Next thing you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8623

1   know, they come back in about a half hour, 30 to 45 minutes with
2   your drugs.
3   **Q.**   Wait a second.
4   **A.**   Give your money to one person.
5   **Q.**   Huh?
6   **A.**   Give your money to one person.
7   **Q.**   I see.  So you're standing on a corner or a street
8   somewhere in Spanish Harlem --
9   **A.**   Once you go up and meet with someone --
10  **Q.**   No, no, no.  Please answer the question I ask you.
11        You're telling us you went up there, not knowing anyone?
12  **A.**   That's correct.
13  **Q.**   A guy you don't know comes up to you; you give a guy you
14  don't know $10,000 and hope that 45 minutes later, he comes back
15  with a half a kilo?
16  **A.**   Yes.  That's the way it happened.
17  **Q.**   And you weren't worried about him ripping you off, right?
18  **A.**   Nope.
19  **Q.**   And of course you can't tell us this guy's name?
20  **A.**   Nope.
21  **Q.**   You can't tell us where he lives?
22  **A.**   Nope.
23  **Q.**   You have -- if he walked away with your $10,000, there's
24  absolutely nothing you could do about it, right?
25  **A.**   That's correct.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8624

1   **Q.**   And he, of course, didn't give you a phone number?
2   **A.**   Nope.
3   **Q.**   He didn't give you a name?
4   **A.**   Nope.
5   **Q.**   So if you go --
6   **A.**   They all look alike.
7   **Q.**   -- if he goes off with your $10,000 and he doesn't come
8   back, you're kind of wandering around, trying to talk English to
9   people who speak Spanish, right?
10  **A.**   It was a gamble, I agree.
11  **Q.**   You're a big gambler, huh?
12  **A.**   Yes, I am.
13        MR. ZUCKER:  Moment to consult.
14        (Discussion had off the record.)
15  BY MR. ZUCKER:
16  **Q.**   I'm not sure.  I might have missed it.  Did you just say
17  they all look alike?
18  **A.**   They do.
19        MR. BALAREZO:  Objection, Your Honor.
20        MR. ZUCKER:  I don't know if it was Mr. Balarezo or
21  Mr. Guerrero that made the objection.
22  BY MR. ZUCKER:
23  **Q.**   So, you don't even know who to go look for for your
24  $10,000?
25  **A.**   I told you that already, yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8625

1   **Q.**   Where in Spanish Harlem were you?
2   **A.**   Spanish Harlem.  I don't know.
3   **Q.**   What street were you on?
4   **A.**   100-and-something.  I don't recall.
5   **Q.**   100 and what?
6   **A.**   I don't recall.  It was 100-and-something, though.
7   **Q.**   Was it 110?
8   **A.**   Higher than that.  It was in the mid 100s.
9   **Q.**   The mid 100s.  Like 150 is the mid 100s?
10  **A.**   Yeah, I believe.
11  **Q.**   What's the cross street?
12  **A.**   I don't recall.
13  **Q.**   How'd you get there?
14  **A.**   Taxicab.
15  **Q.**   And where did you tell the taxicab to take you to?
16  **A.**   Spanish Harlem.
17  **Q.**   You got in a cab and said "Spanish Harlem"?  How big is
18  Spanish Harlem?
19  **A.**   I don't know.
20  **Q.**   Was it on the East Side or West Side?
21  **A.**   Don't know.
22  **Q.**   You just got in a cab and said, "Take me to Spanish
23  Harlem"?
24  **A.**   Yes, I did.
25        MR. GUERRERO:  Objection, asked and answered.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8626

1        THE COURT:  Sustained.  Go ahead.
2   BY MR. ZUCKER:
3   **Q.**   Did you tell the cab driver to take you to Spanish Harlem
4   to where they sell drugs?
5   **A.**   No, I did not.
6   **Q.**   Okay.  But it was in the mid 150s, right?
7   **A.**   I believe so.
8   **Q.**   Spanish Harlem goes from about 96, 98 up to 125th.
9   **A.**   Okay.  Then you're asking me and I said I thought it was
10  150s or something.  I don't know.
11  **Q.**   You weren't even in Spanish Harlem, were you, sir?
12  **A.**   Yes, I was.
13  **Q.**   You don't even know where Spanish Harlem is?
14  **A.**   You're asking me ten, 15 -- almost ten, 15 years ago
15  where Spanish Harlem is.  I haven't been there since.
16  **Q.**   I thought you went back there?
17  **A.**   In the early 90s, sir.
18  **Q.**   Sir, this story about going up to the mid 150s and you
19  can't tell us West Side, East Side, Lexington, Broadway,
20  nothing, right?
21  **A.**   Can't tell you.
22  **Q.**   And giving a complete stranger $10,000 and him coming
23  back with half a kilo of cocaine 45 minutes later -- this is as
24  truthful as the rest of your testimony, isn't it?
25  **A.**   That is the truth, sir.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

8631

```
1    Q.    How did he pay you?
2    A.    Cash money.
3    Q.    How much?  What quantities?
4    A.    Like I said, I don't recall what he bought that time.
5    Q.    What was the second time he bought from you?
6    A.    It was like -- the question you're asking me is like
7    asking me how many times I've been to the grocery store and how
8    much money have I spent.  I mean, I can't recall that.
9    Q.    Well, wait.  You just told us you only sold to Dazz a few
10   times, right?
11   A.    And I know I went to the grocery store before as well.
12   Q.    You've been to the grocery store more times, right?
13   A.    I've been to the grocery store more times than I've
14   served Dazz, yes.
15   Q.    And yesterday when the prosecutor was asking you -- or
16   two days ago, you were able to recall each sale, weren't you?
17   A.    I don't think I recalled each sale.  I said a few, a few
18   times.  I said not many, I believe.
19   Q.    You can't recall the quantity the first time.  Can you
20   recall the quantity the second time?
21   A.    Anywhere between a quarter and a half.
22   Q.    How about a third time?
23   A.    I don't recall.
24   Q.    Was there a third time?
25   A.    Could have been, could have not been.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8632

```
1    Q.    It might have been --
2    A.    It could have been maybe one to five times, at a max.
3    Q.    And you can't tell us the quantities on any given
4    occasion except between a quarter and an ounce?
5    A.    That's correct.
6    Q.    Are you sure?
7    A.    That's correct.
8    Q.    Never more than a half?
9          MR. GUERRERO:  Objection, asked and answered.
10         THE COURT:  Sustained.
11   BY MR. ZUCKER:
12   Q.    Didn't you testify that he bought up to 28 grams from
13   you?
14   A.    I don't recall.  It could have been.
15   Q.    And you said you received shipments of cocaine at the DC
16   Public Schools when you were employed there; is that correct?
17   A.    Yes.
18   Q.    Do you remember the quantity?
19   A.    It was a kilo of cocaine.
20   Q.    How many times?
21   A.    One time.
22   Q.    And you were -- only one time at DC Public Schools?
23   A.    Yes.
24   Q.    And you're an accounts payable specialist, right?
25   A.    Yes.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8633

```
1    Q.    Use a DC account to pay for the shipment?
2    A.    No.
3    Q.    Now, you also talked about making fake high school
4    diplomas; is that correct?
5    A.    Yes, I have.
6    Q.    And making fake check stubs, right?
7          MR. GUERRERO:  Objection, asked and answered, the topic.
8          THE COURT:  Overruled.
9          THE WITNESS:  Yes.
10   BY MR. ZUCKER:
11   Q.    And these were favors you did for friends, not for
12   financial reward?
13   A.    That's correct.
14   Q.    Now, the friends took the pay stubs to provide to courts
15   as proof of their employment, correct?
16         MR. GUERRERO:  Objection, assumes what someone else was
17   doing with them.
18         THE COURT:  Sustained.
19   BY MR. ZUCKER:
20   Q.    What did you know them to be doing with them?
21         MR. GUERRERO:  Same objection; calls for hearsay.
22         THE COURT:  Sustained.
23   BY MR. ZUCKER:
24   Q.    What was your understanding of what those fake check
25   stubs were to be used for?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8634

```
1          MR. GUERRERO:  Same objection.
2          THE COURT:  Sustained.
3    BY MR. ZUCKER:
4    Q.    Did you have an understanding of what they were to be
5    used for?
6    A.    Apartments, things of that nature.
7    Q.    And the high school diplomas?
8    A.    Gain employment.
9    Q.    How many of them did you make?
10   A.    One, for Sheila Teasley.
11   Q.    I'm sorry?
12   A.    One, for Sheila Teasley.
13   Q.    Just one?
14   A.    For Sheila Teasley.  That's the only one I needed to make
15   one for.
16   Q.    No one else?
17   A.    Not that I recall.  It could have been maybe two or
18   three, but I don't recall who.
19   Q.    Were these diplomas you took from the school system that
20   you filled out?
21   A.    From something that I corrected.  Not from DC Public
22   Schools.  I don't have access to diplomas.
23   Q.    Where'd you get them from?
24   A.    Copied diplomas from my only personal youth -- from my
25   high school diploma, I mean.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8635

1  **Q.**  So you copied your own high school diploma and put
2  somebody else's name on it?
3  **A.**  Somebody else's name, yes.
4  **Q.**  Now, you said that -- and again, please don't disclose
5  where you live, where you work.
6  **A.**  Okay.
7  **Q.**  I'm not going to ask any of those questions, all right?
8  But you worked -- one of the benefits you get from going
9  into Witness Protection is a new identity, correct?
10  **A.**  That's correct.
11  **Q.**  You get a new name, right?
12  **A.**  That's correct.
13  **Q.**  And with that new name comes a new history, right?
14  **A.**  That's correct.
15  **Q.**  And for the sake of argument, let's just use the name Joe
16  Blow as your new name.  I'm not asking your name and it's not
17  Joe Blow, right?
18  **A.**  That's correct.
19  **Q.**  All right.  When you -- one of the things you get from
20  Witness Protection is that when you go to apply for a job, for
21  instance, you apply in the name of Joe Blow, right?
22  **A.**  That's correct.
23  **Q.**  And so Joe Blow has no criminal record, right?
24  **A.**  That's correct.
25  **Q.**  So the employer thinks they're hiring somebody with no

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8636

1  record, right?
2  MR. GUERRERO:  Objection as to what the employer thinks.
3  THE COURT:  Sustained.  You may rephrase.
4  BY MR. ZUCKER:
5  **Q.**  All right.  An employer who checks Joe Blow's record will
6  come up with a clean record for Joe Blow, right?
7  MR. GUERRERO:  Objection, speculation.
8  THE COURT:  Sustained.
9  BY MR. ZUCKER:
10  **Q.**  What is your understanding of what happens --
11  THE COURT:  Mr. Zucker, forgive me.  I said "Sustained,"
12  meaning overruled.  I meant overruled.  Go ahead and ask your
13  question.
14  MR. ZUCKER:  I forgive you.
15  THE COURT:  Thank you.
16  BY MR. ZUCKER:
17  **Q.**  You can answer the question.
18  **A.**  Okay.  Ask the question again, please.
19  **Q.**  Okay.  Your understanding is that when an employer does a
20  record check on Joe Blow, it comes back with no record, right?
21  **A.**  That's correct.
22  **Q.**  Okay.  So for instance, you worked as a satellite
23  installer for a while, right?
24  **A.**  That's correct.
25  **Q.**  How long did you work in that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8637

1  **A.**  About eight months.
2  **Q.**  Okay.  And satellite installer, you installed satellite
3  TV dishes; is that right?
4  **A.**  That's correct.
5  **Q.**  You install them in people's homes, correct?
6  **A.**  That's correct.
7  **Q.**  And so when an employer hires you and puts you in a
8  position where you're going into people's homes installing TV
9  satellites, he thinks he's sending in somebody with no record,
10  right?
11  MR. GUERRERO:  Objection, Your Honor as to what that
12  person thinks.
13  THE COURT:  You can rephrase.
14  BY MR. ZUCKER:
15  **Q.**  His understanding is that -- assuming he did a criminal
16  records check, it comes back clean; that employer has no way of
17  knowing that they are sending someone into people's homes who's
18  been convicted of weapons offenses, drug conspiracies, car
19  theft, all that stuff, right?
20  MR. GUERRERO:  Same objection, speculation as to other
21  people.
22  THE COURT:  You can answer to your understanding.
23  THE WITNESS:  As to my understanding, yes.
24  BY MR. ZUCKER:
25  **Q.**  Now, incidentally, you said something about -- based on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8638

1  your plea agreement, you're hoping that at some point you'll be
2  able to see your child again, right?
3  **A.**  Yes.
4  **Q.**  Your child actually came out to live with you and chose
5  not to stay there; isn't that correct?
6  MR. GUERRERO:  Objection, assumes a fact not in evidence.
7  THE COURT:  We're actually at the break point.  Did you
8  want to complete this?
9  MR. ZUCKER:  If I could, yeah.
10  THE COURT:  All right.  Go ahead.
11  THE WITNESS:  That's not correct.
12  BY MR. ZUCKER:
13  **Q.**  Well, your child traveled -- and again, I don't want to
14  know where you live.  Your child traveled to where you live and
15  chose not to live with you?
16  MR. GUERRERO:  Objection, Your Honor.  Can we approach?
17  THE COURT:  Yes.
18  (Following sidebar discussion had on the record:)
19  MR. GUERRERO:  Your Honor, this is one of those areas of
20  security.  Now we're putting on the public record that a child is
21  traveling to see him and she may or may not want to decide to
22  live with him.  It's all going on the public record.  That
23  child -- Sheila Teasley has been here, who's the mother of the
24  child, and it's opening up doors for compromising the whole
25  security program and I just don't want to go there.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8647**

1  **A.**  Yes.

2  **Q.**  And you got even more sophisticated in how you arranged

3  your shipments, right?

4  **A.**  Yes.

5  **Q.**  One of the things you did was you went around and you

6  found -- you went to respectable neighborhoods that would not be

7  suspicious, right?

8  **A.**  Yes.

9  **Q.**  You found houses that looked like they were unoccupied

10  during the day, right?

11  **A.**  Correct.

12  **Q.**  You staked them out to see what the activity was, right?

13  **A.**  Yes.

14  **Q.**  And then you used those addresses for the shipments of

15  drugs?

16  **A.**  Correct.

17  **Q.**  So that if anybody got caught, those people wouldn't even

18  know who you were?

19  **A.**  That's correct.

20  **Q.**  And you were even so sophisticated as to stake the houses

21  out the days the deliveries came, right?

22  **A.**  Yes.

23  **Q.**  So you could watch either -- what did you use UPS,

24  Federal Express, all of them?

25  **A.**  UPS

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8648**

1  **Q.**  You got to watch -- so for instance, if I'm staking out a

2  house and I see it's unoccupied, if there's a UPS delivery that

3  comes -- truck that comes through, I see who drives that route,

4  right?

5  **A.**  I didn't pay attention to the driver, no.

6  **Q.**  Well, you paid attention to the drivers on the days the

7  deliveries were made, right?

8  **A.**  Correct.

9  **Q.**  And one of the things you looked for was you made sure it

10  was a driver who had -- if you could -- stopped at other places,

11  so you knew it was a real delivery driver, right?

12  **A.**  No.  All I did was provide an address to have the drugs

13  shipped to.

14        MR. ZUCKER:  Court's indulgence.

15  BY MR. ZUCKER:

16  **Q.**  Didn't you stop to watch the delivery drivers and you

17  knew if they made other stops, you knew they were real drivers?

18  **A.**  I don't recall that.

19        MR. ZUCKER:  Court's indulgence.

20  BY MR. ZUCKER:

21  **Q.**  You're the same --

22        MR. ZUCKER:  Approach, please.

23        THE COURT:  Yes.

24  BY MR. ZUCKER:

25  **Q.**  You're the same Cedric Conner who testified in U.S.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8649**

1  *versus Jack Davis* in this courtroom on October 6th 2004, right?

2  **A.**  Yes.

3  **Q.**  And you were asked questions about how you did this back

4  then, right?  Am I correct?

5  **A.**  Yes.

6  **Q.**  Okay.  And page 6, line 19.

7      "Question:  And how would you know if this delivery was

8  safe?  In other words, at what point would you know you would be

9  able to take possession of it?"

10      "Answer:  You pretty much go out -- you pretty much go

11  scope out the neighborhood.  You just make sure you don't see

12  anything irregular and then you take possession."

13      "Question:  Would you try to observe the delivery people

14  making the delivery."

15      "Answer:  Yes, you would."

16      "Question:  What, if anything, would you look for as the

17  delivery was being made?"

18      "Answer:  The like -- prior deliveries.  If he was

19  delivering at other addresses or it was the first house that he

20  hit on the block.  Things of that nature."

21  **A.**  All right.

22  **Q.**  All right.  So that was one of the things you were sharp

23  enough to do was to stake out not only the house but the

24  delivery driver, right?

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**8650**

1        THE COURT:  What was the exhibit number you showed him?

2        MR. ZUCKER:  21 K, Wilson.  I'm sorry, Judge, if I didn't

3  say that.  Testimony of October 6th 2004, *U.S. versus Jack Davis.*

4  BY MR. ZUCKER:

5  **Q.**  Because, you know, if it's a set-up, the guy probably

6  would just come to the house and bring the set-up delivery,

7  versus if it's a real UPS driver, he's going to be making other

8  stops, right?

9  **A.**  That's correct.

10  **Q.**  And you also used other people to insulate yourself,

11  didn't you?

12  **A.**  Yes.

13  **Q.**  You used, for instance, Dexter Powell?

14  **A.**  Yes.

15  **Q.**  And he was the guy who was in that -- I think he was a

16  maintenance person or worked in an apartment building?

17  **A.**  He was a property manager.

18  **Q.**  I'm sorry?

19  **A.**  Assistant property manager.

20  **Q.**  For an apartment building?

21  **A.**  Yes.

22  **Q.**  That's the one Ms. Wicks asked you about, right?

23  **A.**  Yes.

24  **Q.**  And it was shortly after one of your shipments that he

25  lost his job, correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8651

1   A.   I don't know.  I never found out the reason why he lost
2   his job.
3   Q.   All right.
4   A.   But to my knowledge -- that's what he told me, that's why
5   he lost his job.  But I learned later it was other reasons.
6   Q.   Well -- and there were other people you set up to take
7   the fall for you as well, weren't there?
8   A.   Yes.
9   Q.   Several of your girlfriends, right?
10  A.   Uh, Sheila Teasley, yes.
11  Q.   There were other ones as well, weren't there, yesterday?
12  A.   Well, when Sheila got her delivery, I had the delivery
13  come to Carolyn Edward's house, yes.
14  Q.   So when Sheila was -- well, actually, Sheila was the
15  mother of your child, right?
16  A.   That's correct.
17  Q.   So when she gets arrested for one of your deliveries,
18  then you start using another girlfriend, right?
19  A.   No.  This was the same day, same day she got arrested, I
20  was getting 25 pounds of marijuana shipped to me at the address
21  that I was staying at.
22  Q.   So you had 25 pounds coming in at your house, and how
23  much coming into Sheila's house?
24  A.   A kilo of cocaine.
25  Q.   So 25 pounds of marijuana, wholesale.  600, that's about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8652

1   $30,000, right?  Twenty-five times 600?
2   A.   That's correct.
3   Q.   Okay.  And at the same time, you got about 20, $25,000 of
4   cocaine coming in at another address?
5   A.   That's correct.
6   Q.   You were bumping, weren't you?
7   A.   If that's what you want to say.
8   Q.   What I want to say?
9   A.   You said I was bumping.  If that's the words you want to
10  say, yes.
11  Q.   Well, you got 50, $60,000 worth of drugs coming in on one
12  day?
13  A.   Yes.
14  Q.   And you were going to roll them over in a matter of days,
15  right?
16  A.   Yes.
17  Q.   So you're making -- what did we say, 9,000 or so off the
18  marijuana, cocaine.  What are you making?  Are you doubling your
19  money?
20  A.   Pretty much, yes.
21  Q.   So that's roughly $30,000, one day.  God, that's a lot
22  clubbing, isn't it?
23       MR. GUERRERO:  Objection.
24       THE COURT:  Sustained.
25  BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8653

1   Q.   All right.  Now, Sheila Teasley ended up getting arrested
2   for your cocaine, correct?
3   A.   Yes.
4   Q.   And that's the mother of your child, correct?
5   A.   Yes.
6   Q.   Now, she was held in jail for a time, was she not, when
7   she was charged?
8   A.   Not more than a week or two.
9   Q.   Okay.  And where was that case prosecuted?
10  A.   In PG County.
11  Q.   So it's Maryland State Court?
12  A.   Yes.
13  Q.   So what was she looking at if she lost, 20 years?
14  A.   I don't know.
15       MR. GUERRERO:  Objection, Your Honor, speculation.
16       THE COURT: Overruled.  If he knows.
17       THE WITNESS:  I don't know.
18  BY MR. ZUCKER:
19  Q.   Do you have any idea -- well, you know it's a felony,
20  right?
21  A.   Yes.
22  Q.   You know it's a serious offense, right?
23  A.   Yes.
24  Q.   You know that cocaine, a kilo of cocaine is likely to get
25  somebody a substantial sentence in prison if they're convicted,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

8654

1   right?
2   A.   Powder cocaine, yes.
3   Q.   And you never stood up and said no, that's not the mother
4   of my child's drugs, that's mine, did you?
5   A.   Not at that time, no, I did not.
6   Q.   Not at that time.  At what time did you?
7   A.   I never had to.
8   Q.   You never had to?
9   A.   Right.
10  Q.   That's because she took the risk, right?
11  A.   I put her in jeopardy, yes.
12  Q.   You put her in jeopardy, the mother of your child?
13  A.   That's correct.
14  Q.   And that was her crime -- you didn't even tell her what
15  was in that package, did you?
16  A.   I did not.
17  Q.   Okay.  So you set her up and then you let her go to trial
18  looking at a substantial period of time; is that correct?
19  Q.   How old was your child at that time?
20  Q.   How old was your child at that time?
21  A.   Ten.
22  Q.   Ten?  So you took the risk that your ten-year-old child
23  would grow up with their mother in jail because of a crime you
24  committed, right?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8655**

1  Q.  And I think yesterday at one point, you said you were
2  with her every step of the way?
3  A.  Yeah, I paid for her lawyer.
4  Q.  You paid for her lawyer?
5  A.  I paid for her bond, as well.
6  Q.  You paid for her bondsman, correct?
7  A.  Yes.
8  Q.  And you went with her to court?
9  A.  Yes, but I was not in the courtroom.
10  Q.  Not in the courtroom.  But you went with her to court
11  every time she went, right?
12  A.  Correct.
13  Q.  And you paid for her lawyer, right?
14  A.  Correct.
15  Q.  And that was to make sure that she did not roll over on
16  you?
17  A.  She did roll over on me.
18  Q.  She testified on you?
19  A.  The DEA was impatient.  They didn't wait for me to come
20  pick the package up, so it's not my fault.
21  Q.  Wait a second.  She went to trial looking at a
22  substantial period of incarceration and you told us you never
23  came forward and --
24  A.  I --
25  Q.  One at a time.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8656**

1  A.  I'm listening.
2  Q.  You never came forward and said the drugs that woman is
3  charged with are not hers, they are mine, right?
4  A.  That's correct.
5  Q.  And you're saying -- I mean, that trial, between the day
6  of her arrest and the day of her trial was a period of months,
7  wasn't it, if not years?
8  A.  Yeah, almost six months.
9  Q.  Six months.  And at no time did you come forward, right?
10  A.  At that time, no.
11  Q.  You keep saying "at that time."
12  A.  Right, I never came forward.  I didn't have to.  She won
13  her trial.
14  Q.  And if she lost that trial, who went to prison?
15  MR. GUERRERO:  Objection, calls for speculation.
16  THE COURT:  Sustained.
17  BY MR. ZUCKER:
18  Q.  If she lost that trial, who was going to be sentenced?
19  MR. GUERRERO:  Same objection.
20  THE COURT:  Overruled.
21  THE WITNESS:  Who was going to be sentenced?
22  BY MR. ZUCKER:
23  Q.  Yes.
24  A.  I was going to come forward.
25  Q.  At that point, she's already convicted, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8657**

1  A.  But I was going to come forward.  That's why I was at the
2  court building.
3  Q.  I see.  We have your word on that, right?
4  A.  Yes.
5  Q.  So after a jury has already found her convicted, then
6  you're planning on coming forward and saying no, no, no, it's
7  me?
8  A.  That's correct.
9  MR. GUERRERO:  Objection, asked and answered.
10  THE COURT:  Sustained.
11  BY MR. ZUCKER:
12  Q.  Did you provide that information to her lawyer?
13  A.  I didn't have to, he subpoenaed me.
14  Q.  Well, you didn't testify at the trial, did you?
15  A.  That's why I --
16  MR. GUERRERO:  Objection, asked and answered.
17  THE COURT:  Sustained.
18  BY MR. ZUCKER:
19  Q.  So you told her lawyer it was you, not her?
20  A.  Yeah, her lawyer knew that.
21  Q.  No, no.  What did you tell the lawyer?
22  A.  I told the lawyer that it was my package.
23  Q.  What's that lawyer's name?
24  A.  Anthony Kedler.
25  Q.  Where is he?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8658**

1  A.  I don't know.
2  Q.  You don't know?  What town is he in?
3  A.  He was in -- what was that, somewhere off of -- I don't
4  remember.  It's -- what's that city?  I'll think of it in a
5  second.  I don't know right now.
6  Q.  How do we find him?
7  MR. GUERRERO:  Objection.
8  THE COURT:  You can rephrase.
9  BY MR. ZUCKER:
10  Q.  How do I locate Mr. Kedler?
11  A.  You can rephrase.
12  MR. GUERRERO:  Objection.
13  BY MR. ZUCKER:
14  Q.  How do you spell Kedler?
15  A.  K-E-D-L-E-R, Kedler.
16  Q.  Kedler.
17  A.  Yes, Anthony Kedler.
18  Q.  And he's a lawyer in Maryland?
19  A.  Somewhere in Maryland, yes.
20  Q.  Can you tell us the town?
21  MR. GUERRERO:  Objection, asked and answered.
22  THE COURT:  Sustained.
23  BY MR. ZUCKER:
24  Q.  Can you tell us the address?
25  MR. GUERRERO:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8659**

1    THE COURT:  Overruled.
2    THE WITNESS:  Hyattsville, somewhere.
3  BY MR. ZUCKER:
4    Q.    So now you know the town?
5    A.    I said I'll think of it in a second.  It's Hyattsville, I
6  believe.
7    Q.    Now, you and Reggie both have children by Ms. Tease --
8  Teasdale or Teasley?
9    A.    Teasley.
10   Q.    You both have children by the same woman; is that
11 correct?
12   A.    Yes.
13   Q.    As a matter of fact, there had been -- or had been bad
14 blood between you and Reggie in the past, did there not?
15   A.    That's correct.
16   Q.    It even came to a fist fight at one point?
17   A.    Yes, I used to bully him.
18   Q.    You used to bully him, push him around?
19   A.    He didn't like me.  I kind of played to the advantage of
20 him.  I took advantage of him.
21   Q.    You beat him up once, at least once, right?
22   A.    Yeah, we had a fight.
23   Q.    You beat him up?
24   A.    We had a fight.  He fought back.
25   Q.    He fought back?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8660**

1    A.    Yeah, so we had a fight.  I mean -- I wouldn't say I beat
2  him up.
3    Q.    You wouldn't say you beat him up?  You played semi-pro
4  ball, football?
5    A.    Yeah, I played football.
6    Q.    Pretty tough guy, aren't you, physically?
7    A.    I'm okay.
8    Q.    Okay.  He was smaller than you, wasn't he?
9    A.    Yeah, he was smaller.
10   Q.    You kicked his butt, basically, right?
11   A.    I call it a fair fight.
12   Q.    Who won?
13   A.    No winner.
14   Q.    And at some point, you sublet your apartment to him; is
15 that correct?
16   A.    That's correct.
17   Q.    Now, as you told us, Reggie wasn't a player, in terms
18 of -- he had no involvement with illegal drugs, did he?
19   A.    That's correct.
20   Q.    He was an honest working man, wasn't he?
21   A.    Yes, he was.
22   Q.    Okay.  And you said you sublet the apartment to him.  It
23 was his apartment at that point, right?  You were no longer
24 living there?
25   A.    Well, I still had keys to the apartment, but he never

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8661**

1  gave me any rent money.
2    Q.    That wasn't the question.  There's one bedroom, right?
3    A.    Yeah, it's one bedroom.
4    Q.    You weren't sleeping in the same bedroom with him, were
5  you?
6    A.    No.
7    Q.    He was living in that apartment, right?
8    A.    Yes.
9    Q.    You had keys to his apartment, but it was his apartment,
10 correct?
11   A.    Yes.
12   Q.    And he comes home, finds you cooking cocaine in his
13 apartment, right?
14   A.    Yes.
15   Q.    Okay.  He did not -- you didn't tell him that was going
16 to happen, right?
17   A.    I don't recall if I did or not.
18   Q.    You certainly didn't tell him, "Look, I'm going to rent
19 you my apartment, but I'm going to keep running a drug operation
20 out of here," did you?
21   MR. GUERRERO:  Objection, asked and answered.
22   THE COURT:  Overruled.
23   THE WITNESS:  No, I didn't tell him that.  No.
24 BY MR. ZUCKER:
25   Q.    And as you acknowledged yesterday, he was surprised when

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**8662**

1  he comes home and finds you cooking cocaine in his apartment,
2  right?
3    A.    Yes.
4    Q.    Okay.  And not pleasantly surprised either, right?
5    MR. GUERRERO:  Objection as to the --
6    THE COURT:  Sustained.
7  BY MR. ZUCKER:
8    Q.    He did not seem joyous about finding that surprise, did
9  he?
10   MR. GUERRERO:  Objection.
11   THE COURT:  Sustained.
12 BY MR. ZUCKER:
13   Q.    What was his reaction, from your observation, to him
14 finding you cooking cocaine?
15   THE COURT:  All right, this is repetitive.  Move on to a
16 different subject.
17 BY MR. ZUCKER:
18   Q.    This was after Sheila was prosecuted for the cocaine that
19 was shipped to her by -- at your direction, right?
20   A.    Yes.
21   Q.    So, when Reggie comes home and finds you cooking cocaine,
22 he puts the pieces together and knows you're responsible for
23 Sheila's being prosecuted --
24   MR. GUERRERO:  Objection to what someone else thinks.
25   THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1            MR. GUERRERO:  He was asked, Judge.

2            THE COURT:  I'll allow it.

3 BY MR. GUERRERO:

4 Q.  Do you know what "uno/dos" means?

5 A.  Yes, I do.

6 Q.  What is uno/dos?

7 A.  Uno/dos is a game that they played where if a customer was

8 coming up, first person to say, "uno" would get the first sale,

9 the second person would get additional sales.

10 Q.  Well, let's break this down here for a second.  When did you

11 first become aware of uno/dos?

12            MR. ZUCKER:  Objection.  Scope.

13            THE COURT:  Overruled.

14 A.  During my time in Congress Park.

15 BY MR. GUERRERO:

16 Q.  And what years?

17 A.  I don't know.  '98, '99 is when it started.  Probably been

18 before.

19 Q.  Where did you see it --

20            MR. ZUCKER:  Objection.  Speculation.

21            THE COURT:  Overruled.

22 BY MR. GUERRERO:

23 Q.  Where did you see it played?

24 A.  All over.  All over Congress Park.

25 Q.  Who did you see playing uno/dos?

# Tab 30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,　　　:　　Docket No. CR 05-100
　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff　　　　:
　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　:　　Washington, DC
　　　　　　　　　　　　　　　　:
ANTWUAN BALL,　　　　　　　　　:
DAVID WILSON,　　　　　　　　　:
GREGORY BELL,　　　　　　　　　:　　April 30, 2007
DESMOND THURSTON,　　　　　　　:
JOSEPH JONES,　　　　　　　　　:
DOMINIC SAMUELS,　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　　Defendants　　　　:　　9:15 a.m.
. . . . . . . . . . . . . . . . :　 . . . . . . . . . . . .

VOLUME 42 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:　ANN H. PETALAS, ESQUIRE
　　　　　　　　　　　　GLENN S. LEON, ESQUIRE
　　　　　　　　　　　　GIL GUERRERO, ESQUIRE
　　　　　　　　　　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　555 Fourth Street, NW
　　　　　　　　　　　　Washington, D.C.  20530

For the Defendant　　　JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:　　　　　CARNEY & CARNEY
　　　　　　　　　　　　601 Pennsylvania Avenue, NW
　　　　　　　　　　　　Suite 900, South Building
　　　　　　　　　　　　Washington, DC  20004
　　　　　　　　　　　　(202) 434-8234

　　　　　　　　　　　　STEVEN CARL TABACKMAN, ESQUIRE
　　　　　　　　　　　　TIGHE, PATTON, ARMSTRONG,
　　　　　　　　　　　　　　TEASDALE, PLLC
　　　　　　　　　　　　1747 Pennsylvania Avenue, NW
　　　　　　　　　　　　Suite 300
　　　　　　　　　　　　Washington, DC  20006

　　　　　　　　　　　　(202) 454-2811

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1108 of 1954

1 A.  Yeah.

2 Q.  Do you see what's in evidence as Government's 108.115?

3 A.  Yeah.

4 Q.  Do you recognize the person depicted in that photograph?

5 A.  Yeah.

6 Q.  Who's that?

7 A.  That's me.

8 Q.  Do you have an idea when that photograph was taken,

9 approximately?

10 A.  Not approximately.  Somewhere 2000, maybe '99 or 2000.

11 Q.  And why do you say that?

12 A.  Because the clothes I have on.

13 Q.  There appears to be looks like a guitar case in that

14 photograph as well?

15 A.  Yeah.

16 Q.  Is that yours?

17 A.  Naw.

18 Q.  Are you a musician?

19 A.  Yeah.

20 Q.  What instrument do you play?

21 A.  A little bit of all of them.

22 Q.  Now, Mr. Marsh, are you currently incarcerated?

23 A.  Naw.

24 Q.  Were you previously incarcerated?

25 A.  Yeah.

1 Q.  And when is the last time you were incarcerated?

2 A.  September -- I got out September of '06.

3 Q.  September of 2006?

4 A.  Yeah.

5 Q.  And you said you got out.  How long were you in before you

6 got out?

7 A.  From May of '01.

8 Q.  So you were in for approximately a little over five years?

9 A.  Yeah.

10 Q.  What charge were you in for that you served those five years

11 for?

12 A.  Conspiracy.

13 Q.  What type of conspiracy?

14 A.  Marijuana, cocaine, crack.

15 Q.  And what jurisdiction did you pick up that charge in?  Was

16 it here in D.C. or somewhere else?

17 A.  Eastern District of Virginia.

18 Q.  And to your knowledge, is the sentence that you've received

19 in that case over?  In other words, do you expect to go back to

20 jail in connection with that charge?

21 A.  No.

22 Q.  No?

23 A.  No.

24 Q.  And are there any charges that you face right now as you sit

25 here today?

1 A.  None.

2 Q.  Now I would like to go back.  You said you moved to the

3 Virginia area about 1985 when you were about 12 years old.  I

4 would like to start about that time and just ask you some

5 questions for a few moments about that time between 1985 and

6 approximately 1992, the years that you were a juvenile.  Okay?

7        During that time while you were a juvenile, between

8 when you were 12 years old until you were about 18 years old,

9 did you commit crimes?

10 A.  Sure.

11 Q.  What kind of crimes?

12 A.  Breaking and entering, steal cars; you know, property

13 crimes.

14 Q.  Property crimes.

15        How old were you, would you say, when you first started

16 committing these property crimes?

17 A.  I would say around 14, 15.

18 Q.  And did they continue throughout your juvenile years?

19 A.  Yeah.

20 Q.  So I say 14 to 18 being your juvenile years.

21 A.  Yeah.

22 Q.  When you did these crimes, these property crimes, did you do

23 them alone or with other people?

24 A.  I usually did it with someone; you know, other people.

25 Q.  And were these property crimes in generally a certain area,

Page 9155

1 A.   18.   17, 18, 19, somewhere around there.

2 Q.   And where did you deal drugs?   What jurisdiction?

3 A.   Virginia.

4 Q.   Did you ever do -- at that time when you were 18 or 19 years

5 old, ever do that in Washington, D.C.?

6 A.   I didn't sell drugs in Washington, D.C., no.

7 Q.   Did you commit any crimes in Washington, D.C. when you were

8 about 18 or 19 years old?

9 A.   No, not to my recollection.   No.

10 Q.   And getting back to drug dealing when you were 18 or 19 in

11 Virginia, what kind of drugs did you begin to sell when you

12 began to sell drugs in Virginia at that time?

13 A.   Crack.

14 Q.   Crack cocaine?

15 A.   (Witness nods.)

16 Q.   And while you were dealing crack cocaine, were you also

17 committing the property offenses that you told us about that you

18 did while you were a juvenile?

19 A.   Yes.

20 Q.   Did you make money dealing crack cocaine in Virginia?

21 A.   Yes.

22 Q.   How much crack would you say you -- well, withdrawn.

23         When you first started dealing crack cocaine, what

24 quantities are we talking about at the very beginning?

25 A.   Street level drugs, not a lot.

1 Q.  Did there come a time as you got older that you ended up

2 selling higher weights of crack cocaine?

3 A.  Sure.

4 Q.  What weights did you ultimately get up to as you grew older

5 into your adult years?  How much was the most you would sell at

6 any one time crack cocaine?

7 A.  Kilos.

8 Q.  Kilos?

9 A.  Yeah.

10 Q.  Did you also sell powder cocaine separately from crack

11 cocaine?

12 A.  Sure.

13 Q.  And same question:  When you first started, 18, 19 years

14 old, first starting in Virginia, did you sell powder cocaine?

15 A.  No.

16 Q.  When would you say you began to sell powder cocaine?

17 A.  I guess when I was in my 20's.  I don't know.  I can't put a

18 date or time on it.  I don't know.

19 Q.  And at your height, the most crack cocaine -- excuse me,

20 powder cocaine that you would sell at any time once you started

21 selling powder cocaine would be how much?

22 A.  Quarter kilos, half a kilo at a time.  I don't know.  I

23 can't remember all that.

24 Q.  Now I would like to move now from when you were 18, 19 years

25 old, now into your early 20's, and also now that would put us in

1 the early 1990s, 1990, 1991, 1992.  Did you ever come to

2 Washington, D.C. at all?

3 A.  Sure.

4 Q.  And at that time, the early '90s, why would you come to

5 Washington, D.C.?

6 A.  We used to sell our stolen goods in the neighborhoods.

7 Q.  And when you say "we," who is we?

8 A.  Whoever I was breaking into houses with.

9 Q.  And when you say you would come to D.C. to sell your stolen

10 goods, where would you sell them?  What neighborhoods would you

11 go to sell your stolen goods?

12 A.  Robinson Place.

13 Q.  Robinson Place?

14 A.  Yeah.

15 Q.  Do you know if that's near the 1500 block of Congress Place?

16 A.  I'm sure it's in the same vicinity.

17 Q.  Okay.  What kind of things back then did you sell?

18 A.  Anything that you could steal from a house.

19 Q.  Okay.  Around this time, the early 1990s, '90, '91, '92, at

20 that time did you know someone by the name of Antwuan Ball?

21 A.  Naw.

22 Q.  Not then?

23 A.  Huh-uh.

24 Q.  You have to say yes or no.

25 A.  No.

1 Q.  When did you first get to know Cody?  You said you knew him

2 well in 1999.  When did you first get to know him?

3 A.  I mean, it wasn't long -- I mean, it wasn't a long time,

4 between '99 and maybe somewhere in '98.  It's a long time ago.

5 I mean, I know the guy.

6 Q.  Okay.  Now, in 1999, beginning in 1999, did you get to know

7 Congress Park better?

8 A.  Sure.

9 Q.  Why is that?

10 A.  Because I was hanging around Cody a lot more.

11 Q.  And why is that?

12 A.  Probably because I had an ongoing indictment in Virginia.

13 Q.  And is that the indictment in Virginia that you told us that

14 you did those five years on?

15 A.  Yeah.

16 Q.  Now, I think you said that you began serving a sentence in

17 May of -- you've been incarcerated beginning in May of 2001

18 until 2006 September.  Is that correct?

19 A.  Exactly.

20 Q.  For that Virginia charge?

21 A.  Yeah.

22 Q.  So I would like to now focus the majority of my questions

23 now, and the remainder of your testimony, on that period of time

24 between 1999, when you got to know Cody, and May of 2001, when

25 you finally got locked up in Virginia.  Okay?  Just those two or

1 three years, '99 to May of 2001.

2        I believe you testified that you got information, you

3 learned that there was an indictment for you?

4 A.  Yeah.

5 Q.  In Virginia?

6 A.  Uh-huh.

7 Q.  Yes?

8 A.  Yep.

9 Q.  And where did you live?  Just generally what jurisdiction

10 did you live in at that time when you got the information that

11 you were wanted on a Virginia charge?

12 A.  In Virginia.

13 Q.  You lived in Virginia.  And did you leave out of Virginia?

14 A.  Yes.

15 Q.  And where did you go at that time?

16 A.  I think I went to Baltimore first.  I had an apartment in

17 Baltimore, and then when I left Baltimore, I started staying in

18 Congress Park at Cody's house.

19 Q.  And do you remember where Cody lived in Congress Park in

20 1999?

21 A.  Yeah, right on the corner of like Alabama Avenue, and I

22 guess that's 13th or something.  One of those streets.

23 Q.  Okay.

24        MR. LEON:  Your Honor, could we publish what's in

25 evidence as Government's 100.1?

Page 9166

1 BY MR. LEON:

2 Q.  Do you see that in front of you, Mr. Marsh?

3 A.  Yeah.

4 Q.  First of all, do you recognize the map that's now in front

5 of you, Government's 100.1?

6 A.  Yes.

7 Q.  What do you recognize that to be a map of?

8 A.  Congress Park.

9 Q.  Can we see on that map the approximate area where you moved

10 in with Cody in 1999?

11 A.  (Witness complies.)

12 Q.  And first just yes or no, and then next I'm going to ask

13 you --

14 A.  Yeah.

15 Q.  Yes?

16 A.  Yeah.

17 Q.  Do you have a pen up there?  I'm going to see if you can

18 just tap on the portion of the screen, the approximate area, and

19 it will make a mark where you lived with Cody.

20 A.  It's right here.  (Witness complies.)

21         MR. LEON:  May I approach?

22         THE COURT:  Yes.

23 BY MR. LEON:

24 Q.  For the record, you made a mark in the upper right-hand

25 portion of Government's 100.1, which appears to be near the

1 intersection of Alabama Avenue and Congress Street, Southeast.

2 Is that correct?

3 A.  Yep.

4 Q.  Now, when you first moved to Congress Park and stayed with

5 Cody, at that time you've indicated that you were established as

6 a drug dealer.  Correct?

7 A.  Sure.

8 Q.  When you moved to Congress Park, did you start dealing drugs

9 in Congress Park?

10 A.  No.

11 Q.  Why not?

12 A.  Because that's not what I was there for.

13 Q.  Okay.  What were you there for?

14 A.  I already told you, I was running from the U.S. marshals.

15 Q.  Well, did you still try to make a living at that time?

16 A.  Sure.

17 Q.  How did you make a living?

18 A.  I still had a couple little things going on in Virginia.

19 Q.  And what kind of things?  Were those narcotics related?

20 A.  Sure.

21 Q.  Why didn't you try to do those couple of things in

22 Congress Park?

23 A.  Because I'm not from there.

24 Q.  So?

25 A.  For me to just come in somebody's neighborhood and start

1 A.  It's in Washington, D.C.

2 Q.  Okay.  Is that this case?

3 A.  No.

4 Q.  And when -- if you remember, when did you testify in the

5 Kevin Gray case?

6 A.  I can't remember.

7 Q.  Okay.  Do you remember, if you do, if that Rule 35 reduction

8 that you said you got happened before or after you also

9 testified in the Kevin Gray case?

10 A.  It was after.

11 Q.  So you got the reduction after the Kevin Gray testimony?

12 A.  Yeah.

13 Q.  Now, you said that you're not incarcerated today.  Correct?

14 A.  Yep.

15 Q.  Are there any conditions that you have on your release?  In

16 other words, are you completely free or do you have some

17 restrictions?

18 A.  I'm on probation.

19 Q.  Okay.  And what's your understanding -- well, first of

20 all -- withdrawn.

21        That is probation with respect to which case?

22 A.  The Eastern District of Virginia.

23 Q.  Okay.  And what type of restrictions, if any, or conditions,

24 if any, are there in connection with that probation?

25 A.  Urine screenings, I got to call a number every day, can't

1 leave the state.  I mean, I'm on probation.

2 Q.  And do you have an idea or an understanding as to how long

3 you're on probation?

4 A.  Five years.

5 Q.  And that began when you got released in September of 2006?

6 A.  Yep.

7 Q.  Have you -- as you sit here today, since September of 2006

8 until today, as you sit here, April 30th of 2007, have you

9 committed any violations as a result of the probation that

10 you've been on?

11 A.  No.

12 Q.  Now, you've talked about the cooperation agreement that you

13 had, the Rule 35 that you got with Ms. Bellows.  Do you have an

14 understanding as you sit here today that you can get any more

15 benefits from her?

16 A.  No.

17 Q.  As you sit here today, April 30th, 2007, do you have any

18 deals with the government at all?

19 A.  None.

20          MS. WICKS:  Objection.

21          THE COURT:  Basis?

22          MS. WICKS:  Can we approach?

23          THE COURT:  Yes.

24          (BENCH CONFERENCE ON THE RECORD.)

25          MS. WICKS:  Your Honor, I think the witness just said

Page 9176

1 Q.  Now I would like to get back, Mr. Marsh, and spend the

2 remainder of my time talking about that two to three-year period

3 from 1999 to May of 2001 in Congress Park.  Okay?

4          I asked you earlier if back in the early 1990s you knew

5 somebody by the name of Antwuan Ball.  Do you remember that

6 question?

7 A.  Repeat it.

8 Q.  Sure.  I asked you a few moments ago about whether or not

9 you knew someone named Antwuan Ball in the early '90s.

10 A.  No.

11 Q.  Okay.  Beginning in around 1999, did you get to know

12 Antwuan Ball?

13 A.  Sure.

14 Q.  And how did you meet him?

15 A.  Pretty much through Cody.  We both used to get our haircuts

16 in the same place, so our paths crossed there.

17 Q.  And when you first met him initially, just those first few

18 meetings, did you immediately become friends, or what was the

19 first few encounters you had with him?

20 A.  Acquaintances, you know.

21 Q.  Acquaintances?

22 A.  I don't remember that we went out and had drinks that day,

23 but I met him.

24 Q.  Were you introduced through Cody?

25 A.  That's what I said.

1 much fly anywhere you wanted to go.  I think we just reimbursed

2 him.

3 Q.  How long did you stay in Dallas, Texas with Antwuan Ball?

4 A.  Couple of days.

5 Q.  And from '99 to 2000 and into 2001, did you ever socialize,

6 go out socially with Antwuan Ball?

7 A.  No.  I mean, we weren't the club types.

8 Q.  You weren't the club types?

9 A.  Naw.

10 Q.  Now, I believe you said that you had -- words to the effect

11 of you had drugs you wanted to get rid of, and you thought he

12 could help you.  Words to that effect.  Correct?

13 A.  Yeah.

14 Q.  Did Antwuan Ball ever help you move drugs?

15 A.  Sure.

16 Q.  Okay.  Let's focus first on your drugs that Antwuan Ball

17 helped you move.  Okay?

18         First of all, what type of drug are we talking about?

19 A.  Cocaine powder.  I never had any crack at that time.  And

20 Ecstasy pills.

21 Q.  Okay.  You mentioned two drugs.  Let's take them one at a

22 time.  You said that you had at that time cocaine powder?

23 A.  Yeah.

24 Q.  And that you tried to get Antwuan Ball to help you move the

25 cocaine powder?

1          MR. ZUCKER:  Objection.  Leading.

2          MR. LEON:  I'm just trying to set a foundation.

3          THE COURT:  Go ahead.

4 BY MR. LEON:

5 Q.  Move the cocaine powder?

6 A.  Sure.

7 Q.  First of all, how much cocaine powder are we talking about,

8 or are you talking about?

9 A.  I mean, not a major quantity or nothing.  No kilos or

10 nothing like that.  Usually eighths of keys, which is like

11 four ounces.

12 Q.  Eighths of keys, four ounces?

13 A.  Four ounces and some change.

14 Q.  Okay.  How many times would you say you - you, Steve Marsh -

15 would use Antwuan Ball to help get rid of your powder cocaine?

16 A.  I wouldn't even -- a handful of times.

17 Q.  And each of those handful of times, was it approximately the

18 weight you just told us about, those four ounces or so?

19 A.  Yeah, I would say so.

20 Q.  Are you familiar with the term 62?

21 A.  Uh-huh.

22 Q.  Yes?

23 A.  Yeah.

24 Q.  And you've mentioned the term eighth.  Is, in your mind, if

25 you know, a 62 close to an eighth, or different --

1 A.  It's half of an eighth.

2 Q.  Half of an eighth.

3        Did you ever use Antwuan Ball to -- well, withdrawn.

4        MR. ZUCKER:  Objection.  Not to the withdrawal.

5 BY MR. LEON:

6 Q.  Just yes or no, did Antwuan Ball ever purchase 62s from you?

7 A.  Yes.

8 Q.  And yes or no, did Antwuan Ball purchase eighths from you?

9 A.  Yes.

10 Q.  Do you remember reviewing your grand jury transcript in

11 preparation for your testimony today?

12 A.  Yes.

13 Q.  Roughly when was that?

14 A.  Last week.

15 Q.  Okay.  And other than that one time last week, did you

16 review it any other times?

17 A.  No.

18 Q.  And did you notice any errors in the actual transcription,

19 the words in the grand jury transcript?

20 A.  Yeah.  On one of those pages it said something about I had

21 sold Antwuan 80 62s, and I never said that.

22 Q.  Okay.  The transcript read 80 62s?

23 A.  That's what I said.

24 Q.  And you're saying you never said that in the grand jury?

25 A.  That's what I said.

1 Q.  And did you reach any conclusions, yes or no, if that was an

2 error or -- yes or no, if that was an error?

3 A.  Had to be.

4 Q.  And as you read it and read the context of that, did you

5 reach a conclusion as to what that likely was?

6 A.  Whoever was doing the typing made a mistake.

7 Q.  And what was the mistake?

8 A.  They probably misinterpreted me saying eighth to 80.

9 Q.  Did you ever sell 80 62s to Antwuan Ball?

10 A.  Naw.

11 Q.  Did you ever sell eighths and 62s to Antwuan Ball?

12 A.  Sure.

13 Q.  Now, you also mentioned Ecstasy pills.  Correct?

14 A.  Yep.

15 Q.  And are those pills?

16 A.  Yeah.

17 Q.  And when you would sell the Ecstasy pills to Antwuan Ball,

18 how much would you sell him -- was this for personal use or was

19 this for future sales?

20        MR. ZUCKER:  Objection.

21        THE COURT:  Why don't you clarify that?

22        MR. LEON:  I'll rephrase.

23 BY MR. LEON:

24 Q.  When you sold Ecstasy pills to Antwuan Ball, how much did

25 you sell him at any one time?

1 A.  100.

2 Q.  100 pills?

3 A.  Yep.

4 Q.  How many times would you estimate that you, Steve Marsh,

5 sold Antwuan Ball 100 Ecstasy pills at any given time?

6 A.  A couple.

7 Q.  When you sold Antwuan Ball 100 Ecstasy pills, how much would

8 you charge him for those 100 pills?

9 A.  Between seven and 10 dollars a pill.

10 Q.  And were you familiar at that time -- first of all, when was

11 this, if you remember?

12 A.  In between '99 and 2001.

13 Q.  And during that period of time, were you familiar with the

14 street value - in other words, the resale value - of a single

15 Ecstasy pill?

16 A.  Yeah.

17 Q.  How much was it?

18 A.  Get from 20 to 25 dollars, I guess depending on who you were

19 selling to and where you were selling.

20 Q.  I apologize for jumping back, but I do want to quickly jump

21 back.

22      You talked about the powder that you sold to

23 Antwuan Ball a handful of times.  Correct?

24 A.  Yeah.

25 Q.  When you sold Antwuan Ball an eighth of powder cocaine, how

1 much did you charge Antwuan Ball?

2 A.  Anywhere from $3,000 to $3,500.

3 Q.  And why would there be a range?  Why would it be a price one

4 day and sometimes another price?

5 A.  That's how the drug trade goes.  I mean...

6 Q.  What do you mean by that?

7 A.  I mean, depends on what I got it for.

8 Q.  Generally speaking, were your prices -- where did your

9 prices fit, if you know, compared to what other suppliers sold

10 their drugs for?

11 A.  I mean, I don't know.  I didn't walk around and ask

12 everybody, "How much do you sell your stuff for."

13 Q.  Okay.  And same question with respect to a 62.  I asked you

14 about an eighth.  How much would you sell -- when you sold

15 Antwuan Ball a 62 of powder, how much did you sell that to him?

16 A.  Anywhere from 1,500 to I guess 1,800 dollars.

17 Q.  Now, you also mentioned earlier that you sold, and in fact

18 were indicted and charged with selling marijuana.  Did you ever

19 sell marijuana to Antwuan Ball?

20 A.  Sure.

21 Q.  And what quantities of marijuana did you sell to

22 Antwuan Ball between 1999 and 2001?

23 A.  Quarter pounds of weed.  I don't really recall it being

24 anything more than that.  Personal.

25 Q.  Now, we've talked about times that you, Steve Marsh, sold

1 A.  -- I learned it from Cody.

2          MS. WICKS:  Objection.  Move to strike.

3          MR. ZUCKER:  Renew the objection.

4          THE COURT:  The substance of what was learned with

5 respect to the person who is the subject of the question is not

6 in the record.  The objection is overruled.

7 BY MR. LEON:

8 Q.  Now, you've mentioned several times this barbershop?

9 A.  It's a house.

10 Q.  It's a house.  Just physically, what neighborhood was this

11 house in?

12 A.  Congress Park, man.

13 Q.  It was in Congress Park.

14          Now, you indicated that you sold -- well, that you gave

15 Antwuan Ball an Uzi.  Correct?

16 A.  That's what I said.

17 Q.  Did you sell it to him or just give it to him?

18 A.  I gave it to him.

19 Q.  Why did you just give Antwuan Ball an Uzi?

20 A.  He said he was having some problems and he needed a gun.

21 Q.  What problems did Antwuan Ball tell you he was having?

22 A.  He said he heard somebody was conspiring to do something to

23 him.

24 Q.  What specifically did Antwuan Ball tell you?

25 A.  Somebody was trying to kill him.

Page 9205

1 Q.  Did he tell you who was trying to kill him?

2 A.  A guy named Wop and Munya.

3 Q.  Wop and Munya?

4 A.  Yeah.

5 Q.  Did you know who Wop was?

6 A.  I already answered that.  Yeah.

7 Q.  And did you know who Munya was?

8 A.  Yes.

9 Q.  How did you know Munya?

10 A.  Neighborhood dude, running around the neighborhood selling

11 drugs.

12 Q.  Did Antwuan Ball tell you how he learned that he thought Wop

13 and Munya were going to kill him?

14 A.  Yeah.

15 Q.  How did he tell you he learned this?

16 A.  He said a little guy in the neighborhood told him.

17 Q.  Did he tell you this little guy in the neighborhood's name?

18 A.  John-John.

19        MR. ZUCKER:  Move to strike.

20        THE COURT:  Why?

21        MR. ZUCKER:  Unless it's clear that John-John is

22 somehow a member of something.

23        THE COURT:  Overruled.

24 BY MR. LEON:

25 Q.  Did you ever get that Uzi back from Antwuan Ball?

1          MR. TABACKMAN:  Your Honor, may I approach the bench?

2          THE COURT:  No.

3 BY MR. LEON:

4 Q.  Mr. Marsh, I think right before we just took this quick

5 break, the question I asked you was what did -- how did -- what

6 did Antwuan Ball tell you he did in resolving this problem about

7 Wop and Munya?

8 A.  He says he confronted them.

9 Q.  Okay.  When Antwuan Ball -- we're going to get to what he

10 told you in just a moment.  But when Antwuan Ball told this to

11 you, how did he seem?  Was he calm or not?

12 A.  He was shooken up a little bit, it looked like.

13 Q.  When you say "it looked like," were you having this

14 conversation in person?

15 A.  Yeah.

16 Q.  What did Antwuan Ball tell you about the details of exactly

17 what he did when he dealt with it?

18 A.  He said he went in there and confronted Wop and Munya.  They

19 was in there playing a video game, and I think they had a pistol

20 on the table.  He took the pistol, smacked up Munya, Wop jumped

21 out the window, and that's pretty much what he told me.

22 Q.  Did Antwuan Ball tell you if other than Wop and Munya,

23 anyone else was in the apartment?

24 A.  Phil was in there.  Phil.

25 Q.  And at the time he told you this, did you know who Phil was?

1 A.  I was familiar with him.

2 Q.  Excuse me?

3 A.  I was familiar with him.

4 Q.  And how were you familiar with Phil?

5 A.  From the neighborhood.

6 Q.  Did Antwuan Ball tell you if he took anything as a result of

7 this incident in the apartment?

8 A.  Took what money he found in there.  I believe there was some

9 drugs in there.

10 Q.  You said money and drugs.  You indicated that there was a

11 gun that he took off of a table?

12 A.  Yeah.

13 Q.  Did he indicate to you whose gun this was?

14 A.  I can't recollect.  But it was the gun on the table.

15 Q.  Did he tell you what kind of gun it was?

16 A.  May have been a Ruger, if my memory serves me well.  Ruger.

17 Q.  Did he tell you if he kept that gun or not?

18 A.  He kept it.

19 Q.  Now, did Antwuan Ball tell you what his intention was when

20 he went to that apartment to confront Wop and Munya?

21 A.  I believe Antwuan was going there to kill them that day.

22 Q.  Did Antwuan Ball tell you if he did kill anyone in that

23 apartment that day?

24 A.  Yeah, he didn't kill nobody.

25 Q.  Did Antwuan Ball tell you why he did not kill anyone in that

# Tab 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       :       Docket No. CR 05-100
                                :
            Plaintiff           :
                                :
v.                              :       Washington, DC
                                :
ANTWUAN BALL,                   :
DAVID WILSON,                   :
GREGORY BELL,                   :       May 1, 2007
DESMOND THURSTON,               :
JOSEPH JONES,                   :
DOMINIC SAMUELS,                :
                                :
            Defendants          :       9:15 a.m.
. . . . . . . . . . . . . . . . :       . . . . . . . . . . .

VOLUME 43 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:   ANN H. PETALAS, ESQUIRE
                         GLENN S. LEON, ESQUIRE
                         GIL GUERRERO, ESQUIRE
                         UNITED STATES ATTORNEY'S OFFICE
                         555 Fourth Street, NW
                         Washington, D.C.  20530

For the Defendant        JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:            CARNEY & CARNEY
                         601 Pennsylvania Avenue, NW
                         Suite 900, South Building
                         Washington, DC  20004
                         (202) 434-8234


                         STEVEN CARL TABACKMAN, ESQUIRE
                         TIGHE, PATTON, ARMSTRONG,
                             TEASDALE, PLLC
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20006

                         (202) 454-2811

1 of your time.  I know that you have other places you would

2 rather be.  If there's any question that you don't understand,

3 will you just ask me to clarify that?

4 A.  Sure.

5 Q.  Thanks.

6          Yesterday, do you recall -- Mr. Leon had asked you

7 about your criminal activity between the years of 1992 and 1999.

8 Do you recall that?

9 A.  Sure.

10 Q.  And he asked you -- well, during that time I believe your

11 answer was that you were engaged in drug dealing of various

12 sorts.  Is that correct?

13 A.  Sure.

14 Q.  And I believe he asked you, if you recall, whether you were

15 engaged in any of the property crimes that you had acknowledged

16 having been involved in at some point in your life.  Do you

17 recall him asking you that?

18 A.  Sure.  Sure.

19 Q.  And your answer was that, in the period of 1992 to 1999, you

20 had not been engaged in any property crimes.  Do you recall

21 that?

22 A.  Yes.

23 Q.  Now, it may be that there was some lack of clarity there.

24 Is it your testimony that at no period of time during -- at no

25 point during that period of time, 1992 to 1999, you were engaged

1 in the commission of property crimes?

2 A.  Not that I recall.

3 Q.  Do you recall -- let me -- does it refresh your recollection

4 if we focus on the 1992 to 1993 period?

5 A.  Sure.

6 Q.  And would your answer be the same:  That you were not

7 engaged in property crimes during that period of time?

8 A.  That I can recall.

9 Q.  Not that you can recall.

10        Do you recall -- you testified, I believe you

11 acknowledged yesterday, in a case of United States versus

12 Kevin Gray in this courthouse?

13 A.  Yes, I did.

14 Q.  And that was in front of Judge Lamberth?

15 A.  Yep.

16 Q.  And you were a government witness in that case?

17 A.  Yep.

18 Q.  And you were examined by a number of defense counsel as well

19 as the prosecutor?

20 A.  Yep.

21 Q.  And one of those was a Mr. Baugh.  Do you recall him?  I

22 think he was the first man who cross-examined you.

23 A.  No.

24 Q.  And do you recall testifying that in fact you had committed

25 numerous property crimes in the 1992 to 1993 time frame?

1 A.  I can't recall.

2            MR. TABACKMAN:  Counsel, I'm referring to page 34 of

3 the transcript, Volume 62, in United States versus Gray,

4 June 25th, 2002.

5 BY MR. TABACKMAN:

6 Q.  Mr. Marsh, do you recall being asked the following questions

7 and giving the following answer, beginning at line -- let's see,

8 which line is a good one to begin at?

9            Actually, on page 33, beginning at line 11, do you

10 recall being asked the following questions and giving the

11 following answers:

12            Question:  "And about how many burglaries did you

13 commit in 1992 and 1993?"

14            "Numerous."

15            "Approximately how many?"

16            Answer:  "I can't give you an approximate.  Numerous."

17            Question:  "Well, were you doing it every week?"

18            Answer:  "Yes."

19            Question:  "Were you doing it more than one a week?"

20            Answer:  "Yes."

21            Question:  "And were most of these in the Northern

22 Virginia area?"

23            Answer:  "Yes."

24            And then going over to page -- do you recall being

25 asked those questions and giving those answers?

1 A.  That's a long time ago, no.  I can't remember exactly what I

2 was asked in court five years ago, four or five years ago.

3 Q.  When you were testifying at that time you were under oath.

4 Is that right?

5 A.  Sure was.

6 Q.  And you were trying to be truthful.  Is that correct?

7 A.  Yes.

8 Q.  And were those truthful answers, that you in fact were

9 engaged in burglaries during that time?

10 A.  I easily could have mixed up times and dates.  I can't

11 recollect.

12 Q.  Well, I'm asking you now, were you engaged in burglaries, as

13 described here in these questions and answers in the 1992/1993

14 time frame?

15 A.  I haven't sat and thought about it.  I mean, I honestly

16 couldn't give a good answer.  I easy could have been shaken up

17 on the stand.  You said on that particular day I was

18 cross-examined by four or five different attorneys, you know.

19 Q.  What I'm asking you now, sir, is having heard your

20 testimony, was that truthful testimony?

21 A.  To the best of my knowledge.

22 Q.  And so if yesterday you said that in the 1992 to 1999 time

23 frame you hadn't committed any property crimes --

24 A.  Right.

25 Q.  -- that would have been inaccurate?

1 A.  Can I see that?

2 Q.  You certainly may.

3          MR. TABACKMAN:  May I approach, Your Honor?

4          THE COURT:  Yes.

5          MR. TABACKMAN:  In fairness to Mr. Marsh, if he would

6 like to turn over to page 34, there's more testimony on that

7 subject also.

8 A.  Thanks.

9 BY MR. TABACKMAN:

10 Q.  Thank you.  Did you have an adequate chance to read the part

11 that I had read to you?

12 A.  Sure.

13 Q.  And had I read it accurately?

14 A.  Sorry?

15 Q.  Had I read it accurately?

16 A.  Sure.

17 Q.  So again, the question is, were you or were you not engaged

18 in burglaries as described here in the 1992 to 1993 time frame?

19 A.  I may have been, sir.

20 Q.  You may have been?  You don't recall?

21 A.  It's a long time ago.

22 Q.  I understand it is.  And 2001 was closer.  This testimony

23 was given -- I'm sorry, 2002, on June 25th of 2002.  Did you

24 recall it clearly then?

25 A.  Can I recall --

Page 9286

1 Q.  Did you recall whether you were engaged in burglaries in

2 1992 and 1993 more clearly when you testified in 2002 than you

3 do today?

4 A.  I'm sure I did.

5 Q.  Right.  And you were under oath in 2002.  Correct?

6 A.  Sure.

7 Q.  And you were undoubtedly trying to be truthful.  Isn't that

8 right?

9 A.  To my best recollection.

10 Q.  Sure.  And so the question is, was that testimony truthful

11 about being involved in burglaries?

12 A.  To my best recollection.

13 Q.  And yesterday's testimony, when you were asked whether you

14 committed property crimes between 1992 and 1999, you said, and

15 taken down by the reporter as "Naw," for no, I assume.

16         Do you recall that?

17 A.  Yeah.

18 Q.  Were you engaged in property crimes in 1992 and 1993?

19 A.  I may have well been, sir.

20 Q.  You may have been or you were, sir?

21 A.  I may have well been, sir.

22 Q.  Do you recall being asked the following questions and giving

23 the following answers at page 34, beginning at line 5:  "Well,

24 I'm trying to figure out, how often did you do it?"  Referring

25 to property crimes -- to the burglaries.

1 Q.  At which point --

2 A.  You said '93, '94, '95.  I couldn't put a year and date on

3 it, you know.

4 Q.  What I'm asking you, sir, is after you moved out of your

5 father's house, after he put you out, did you continue to commit

6 burglaries, breaking and enterings?

7 A.  Let me say this:  When my drug proceeds exceeded my burglary

8 proceeds, I stopped committing burglaries.

9 Q.  And would you recall when that was?

10 A.  I couldn't put a year.

11 Q.  Roughly?

12 A.  I don't even want to try to put a year and date on it.  It

13 was a long time ago.

14 Q.  I would like you to try and see if we can't get some degree

15 of -- a little bit more precision out of it.

16          I believe you testified yesterday that your best years

17 of selling drugs was '95 to '99?

18 A.  Yeah, I would say so.

19 Q.  Okay.  So somewhere, then, around '95 is when your drug

20 proceeds would have exceeded your burglary and theft proceeds?

21 A.  I would say it's before '95.

22 Q.  Around '94?

23 A.  I mean, it's hard to put it.  I couldn't put a year on it.

24 Q.  But what you do recall is that it came -- you switched from

25 one form of criminal activity to another at the time that the

1 second one exceeded the revenue from the first one?

2 A.  Yeah, that's what I said.

3 Q.  And during that period when your drug proceeds, your drug

4 sale proceeds, began to exceed your burglary and theft proceeds,

5 what kinds of quantities of drugs were you selling?  How were

6 you selling it?

7 A.  Well, I would -- depending on the customer, you know what I

8 mean?

9 Q.  I understand --

10 A.  I started off just selling to drug heads, people who smoked

11 drugs themselves.  And you know, after that you'll break down

12 drugs, what we call selling weight.  It could be a quarter,

13 could be a half ounce, an ounce, a 62, a 31.

14 Q.  And so are you saying that at the beginning you would be

15 selling -- involved in hand-to-hand sales on the street?

16 A.  I guess you could call it that, yeah.

17 Q.  And you would do that out in Woodbridge, where you could get

18 more money for the crack that you were selling --

19 A.  Sure.

20 Q.  -- than you could in the District.  Is that right?

21 A.  Sure.

22 Q.  So that if you bought crack, say, for $300 in the District

23 in those days, approximately how much crack would that buy,

24 $300?

25 A.  Where?

Page 9295

1 Q.  In Washington.

2 A.  Quarter ounce of crack.

3 Q.  And you could then turn around and sell that quarter ounce

4 in Woodbridge for twelve, thirteen hundred dollars.  Isn't that

5 right?

6 A.  Easy.

7 Q.  Maybe more?

8 A.  Maybe.

9 Q.  And during that time, this is in the mid '90s now, your

10 sales of crack cocaine reached a point where you were making,

11 what, eight to ten thousand dollars a week?

12 A.  Easy.

13 Q.  Sometimes more?

14 A.  Easy.

15 Q.  And do you recall where you were living during those years,

16 '95 through -- and the years following that?

17 A.  Probably various different places.

18 Q.  Did you have your own place?

19 A.  No.

20 Q.  You would just stay with different people on a weekly basis?

21 A.  No.  Usually just share an apartment or a house with

22 somebody.

23 Q.  Okay.  And you had a number of relationships with women

24 during that period.  Isn't that right?

25 A.  Sure.

1 Q.   Okay.  And what was the occasion that you used the name

2 Andre Turner?

3 A.   What was the occasion?

4 Q.   Yeah.  Why did you use the name -- when did you use the name

5 Andre Turner?

6 A.   Why?

7 Q.   Why did you use the name Andre Turner?  You can answer that.

8 A.   Well, maybe because I had an outstanding parole violation in

9 Virginia.  So me using my name to buy things or get things

10 probably would have set off some red flags.

11 Q.   You said maybe that was the case.  Was that the case, sir?

12 A.   That's what I said.

13 Q.   No, you said, maybe that was the case.  I'm asking you if

14 it's:  Maybe that was the case, or if in fact --

15 A.   That was the case.  That's what I said.

16 Q.   That was the case.

17         And did you use the name Andre Turner more than once,

18 to your recollection?

19 A.   I mean, I'm sure.

20 Q.   Something that you did regularly?

21 A.   Sure.

22 Q.   And you had false identification in that name, didn't you?

23 A.   No.

24 Q.   You did not?

25 A.   No.

1 Q.  Did you ever give to the Arlington police and tell them that

2 your name was Reginald Antonio Turner?

3 A.  Yeah, I had an ID that said that.

4 Q.  You had an ID that said Reginald Antonio Turner?

5 A.  Not Turner.

6 Q.  That wasn't your name either.

7 A.  Not Turner.  Parker.

8 Q.  Reginald Antonio Parker was the name you used?

9 A.  You said Reginald Antonio Turner.

10 Q.  I believe that we can check the --

11 A.  You might need to.

12 Q.  Pardon me?

13 A.  You might need to.

14 Q.  But that wasn't your name, was it?

15 A.  No, of course not.

16 Q.  And the reason you used that name was so that the police

17 wouldn't know who you were.

18 A.  Exactly.

19 Q.  And you could continue in the activities that you were

20 involved in, that you described.  Isn't that right?

21 A.  I would say so.

22 Q.  And there was some degree of planning in that.  Isn't that

23 right?

24 A.  Can you explain a little better, planning?

25 Q.  Well, you got -- you had a false identification made.  Isn't

1 that right?

2 A.  Sure.

3 Q.  And that was in anticipation of your using it.  Isn't that

4 right?

5 A.  Usually that's what you get them for, sir.

6 Q.  So that it wasn't just a spur of the moment thing that you

7 decided to give somebody a false name?

8 A.  So are you implying that I sat down and took a week's time

9 and I thought, "Okay, I'm going to use this ID for this reason"?

10      Sir, I got a fake ID because I was evading authorities.

11 I think I answered that already.

12 Q.  And my question is, is that was -- you thought that out and

13 decided as a plan to evade authorities --

14 A.  Yes.

15 Q.  -- that you would get a false ID?

16 A.  Yes.

17      MR. LEON:  Objection.  Asked and answered.

18      THE COURT:  I'll allow it.

19 BY MR. TABACKMAN:

20 Q.  Sir, this will go faster if you will let me finish the

21 questions, and I'll let you finish the answers.  Okay?  Can we

22 have that agreement?

23 A.  Yeah, we got that.

24 Q.  Because otherwise we're talking over top of each other, and

25 then everything has to get repeated and it takes a lot longer.

1 A.  Sir?

2 Q.  Nor am I.  So that's why I was asking.

3 A.  I couldn't tell you exactly what the paperwork entailed.

4 Q.  Now on one occasion, if you recall, you were arrested by the

5 Arlington police, or perhaps the Prince William police, and you

6 gave the name of Brian Marsh.  Isn't that right?

7 A.  Yeah.

8 Q.  And you had a Social Security number of Brian Marsh, too,

9 didn't you?

10 A.  I sure did.

11 Q.  And that was your brother.  Isn't that right?

12 A.  Yes.

13 Q.  Did you think about the consequences to your brother when

14 you did that?

15 A.  I wouldn't have done it if I didn't have his permission.

16 Q.  You had his permission to give his false -- give his name

17 when it was -- when you were stopped by the police?

18 A.  Yeah.  He got the bail money to come get me out that

19 morning, using his name.

20 Q.  Uh-huh.  And you had his permission to use his Social

21 Security number?

22 A.  That's my brother.  Yeah.

23 Q.  So you together decided to trick the police?

24 A.  I didn't -- I tricked the police.

25 Q.  Pardon me?

1 A.  I tricked the police.

2 Q.  Well, you said he gave you permission to do that, to use his

3 name.

4 A.  Yeah.

5 Q.  So he knew you were going to use it for the police.  Isn't

6 that right?

7 A.  Yeah.

8 Q.  So, together you decided that you were going to trick the

9 police?

10 A.  That's fair to say.

11 Q.  Now, I believe you testified yesterday that you came -- you

12 began coming -- or you began staying at Congress Park as a

13 result of your having to evade the United States marshals.  Is

14 that right?

15 A.  That's what I said.

16 Q.  And that was truthful testimony, wasn't it?

17 A.  Yeah.

18 Q.  And I believe you testified you were on the run from the

19 United States marshals.  Is that correct?

20 A.  Yes.

21 Q.  And you were on the run from the United States marshals

22 because you had been indicted in the Eastern District of

23 Virginia.  Isn't that right?

24 A.  Yep.

25 Q.  And you realized that you couldn't stay in Virginia.  Isn't

1 first place that you went was Baltimore.  Is that right?

2 A.  Yep.

3 Q.  And your testimony was that that was in 1999?

4 A.  On or about, sometime.

5 Q.  Sometime in 1999?

6 A.  I'm not going to put a year on it, but...

7 Q.  Well, do you recall yesterday testifying that in fact you

8 fled the Eastern District of Virginia in 1999, and began

9 spending most of your time eventually in Congress Park?

10 A.  Yeah.

11 Q.  And your testimony yesterday was accurate.  Is that right?

12 A.  That's fair.

13 Q.  To the best of your knowledge?

14 A.  That's fair.

15 Q.  Right.  And so you learned of the indictment.  Correct?

16 A.  That's fair.

17 Q.  And you went to Baltimore in 1999?

18 A.  Naw, you said '99.  I know I learned of the indictment in

19 '99.

20 Q.  You learned of the indictment in '99?

21 A.  Yeah.  I'm pretty positive on that.

22 Q.  And how long did you take until you left the Eastern

23 District of Virginia after learning of the indictment?

24 A.  Not long at all.

25 Q.  Days?

 1 A.  Could have been minutes.  I don't know.

 2 Q.  But whenever you learned of the indictment --

 3 A.  I left.

 4 Q.  Shortly thereafter?

 5 A.  Yeah.

 6 Q.  Right.  And the indictment was the reason that you left

 7 Virginia?

 8 A.  That was my main motivation, yeah.

 9 Q.  Right.  And you went to Baltimore.  Is that right?  After

10 the indictment?  And you were fleeing?

11 A.  I'm pretty sure.

12 Q.  That was your testimony yesterday.  Do you recall that?

13 A.  I'm pretty sure.

14 Q.  You're pretty sure of what, sir?

15 A.  That I left and went to Baltimore, between Baltimore,

16 Maryland, Washington, D.C.

17 Q.  And you went from -- after the indictment and you learned of

18 it, after you went to Baltimore, you then came to Washington and

19 stayed in Congress Park?

20 A.  For a time.

21 Q.  And you would go back and forth between Maryland and

22 Congress Park?

23 A.  Clinton, Maryland; Baltimore, Maryland; Congress Park.

24 Q.  Okay.  Fine.  You didn't go back into the Eastern District

25 of Virginia?

Page 9319

1 A.  I'm sure I've been through there, but not to spend the night

2 or stay.

3 Q.  Because you didn't want to be any place where the police

4 might come look --

5 A.  Sure.

6 Q.  -- or the marshals might come looking for you?

7 A.  Sure.  Sure.

8 Q.  Now, turning back to the first page of the indictment, do

9 you see -- let me ask you this.  It was during that period, that

10 you were on the run from the U.S. marshals because of the

11 indictment, that you began seeing Mr. Ball more regularly.  Is

12 that right?

13 A.  Sure.

14 Q.  And it was after you learned of the indictment that the

15 events that you described yesterday about your interaction with

16 Mr. Ball took place?

17 A.  Sure.

18 Q.  And you know, but for your running -- but for the indictment

19 and your need to leave Virginia, you wouldn't have been spending

20 all that much time in Congress Park, would you?

21 A.  Say what?

22 Q.  There hadn't been -- if you hadn't had to flee from

23 Woodbridge to get away from the indictment, you would have

24 stayed where you were.  Is that right?

25 A.  That's fair.

Page 9320

1 Q.  So the events that you described all came about because of

2 the indictment, and you had to flee after the indictment was

3 returned.  Is that right?

4 A.  I mean, you make it sound as if I've never been in

5 Congress Park prior to -- that's not the case.

6 Q.  No, no, no.  I'm not suggesting that at all, sir.  All I'm

7 saying is that the frequency of your being in Congress Park, I

8 believe you testified to yesterday, was as a result of your

9 needing to be someplace other than your home.

10 A.  Yeah, that's fair.

11 Q.  And your interaction with Mr. Ball in the ways that you

12 described yesterday was because you were spending a lot more

13 time in Congress Park.

14 A.  Sure.

15 Q.  Now, do you see the first paragraph where it says, "The

16 grand jury charges that"?

17 A.  Sure.

18 Q.  And it states that "The conspiracy began in or about early

19 1996, and continued thereafter until February 4th of 2000."

20 A.  Sure.

21 Q.  And that's part of what you pled guilty to.  Is that right?

22 A.  Sure did.

23 Q.  And looking up at the top, sir, do you see a file stamp

24 there?

25 A.  Sure.

Page 9321

1 Q.  And what does that file stamp say?

2 A.  March 29th, 2001.

3 Q.  And then what does it say above that?

4 A.  "Filed in open" --

5 Q.  And what does it say below it, sir?

6 A.  "Clerk, U.S. District Court, Alexandria, Virginia."

7 Q.  So the indictment was filed in open court in 2001.  Isn't

8 that correct, sir?

9 A.  That's what it says.

10 Q.  So that's when you fled Woodbridge, Virginia.  Isn't that

11 right?

12 A.  You dead wrong.  My co-defendants were picked up in 1999.

13 That's when I learned of the indictment.

14 Q.  And your co-defendants were picked up in 1999?

15 A.  I'm pretty sure.

16 Q.  Well, sir, do you see down again in the paragraph, the first

17 paragraph that says that "The conspiracy continued until

18 February 4th of 2000"?

19 A.  I sure do.

20 Q.  And it's your testimony that there was an indictment

21 returned prior to the conclusion of the conspiracy in 1999?

22 A.  I sure do.

23 Q.  And there's another -- were you in that indictment, sir?

24 A.  Yeah, my name is on it.

25 Q.  And so there's another indictment that has you in it?

1 A.  Naw.

2 Q.  This is the only indictment?

3 A.  This is it.

4 Q.  And it's the one where the conspiracy that was charged went

5 on until February 4th of 2000?

6 A.  That's what it says.

7 Q.  And it's your testimony that the indictment, though, that

8 led to your fleeing Woodbridge, was returned in 1999?

9 A.  I didn't say that.  I said my co-defendants were picked up

10 in 1999, two of them.

11 Q.  Sir, you testified that you left the state of Virginia --

12 A.  In 1999.

13 Q.  -- in 1999 because of the return of the indictment.

14 A.  No, because of my co-defendants being picked up.

15 Q.  Oh, it's now -- you didn't testify yesterday that it was

16 because of the indictment?

17 A.  Well, we're mixing words right now.  Okay, I may have said

18 that.  But it was due to the fact that my co-defendants were

19 picked up that I got wind that there was an indictment.

20         So let me clarify that.

21 Q.  And that indictment was returned in 1999?

22 A.  My co-defendants were picked up in 1999 --

23         MR. LEON:  Objection.

24 A.  -- and they were calling --

25         THE COURT:  Excuse me.  Let me hear the objection

1 before you answer.

2          MR. LEON:  Objection.  The question misstates the

3 record and misstates the testimony, the last question.

4          THE COURT:  Rephrase your question.

5 BY MR. TABACKMAN:

6 Q.  Sir, haven't you testified to a number of questions this

7 morning that said that you -- where you said you left Virginia

8 because of the indictment?  Isn't that right?

9 A.  Yeah, that's what I said.

10 Q.  And the indictment charges that a conspiracy continued to

11 February 4th of 2000, doesn't it?

12 A.  Sure does.

13 Q.  And it's your testimony that your co-defendants -- and that

14 there is no other indictment that you're aware of?

15 A.  None.

16 Q.  And your testimony is that your co-defendants were picked up

17 on the indictment --

18 A.  In 1999.

19 Q.  Can I finish the question?

20 A.  Go ahead.

21 Q.  And so they were picked up on the indictment prior to the

22 conclusion of the conspiracy that was charged in the indictment?

23 A.  That's what I'm saying.

24 Q.  When the indictment was -- do you have any basis for

25 understanding how the indictment was returned in 1999 that

1 alleged that a conspiracy was charged until February 4th of

2 2000?

3 A.  Naw, I never saw a copy of the indictment until I was

4 actually in federal custody.  But I do recollect when -- I was

5 receiving phone calls from jail letting me know, you know, that

6 these guys were being indicted federally.  They were being

7 housed in Alexandria, Virginia, which is a federal hold.

8          And it's just kind of clear to me because I remember

9 purchasing a truck in May of 1999.  And soon after, these guys

10 got what we'll call being popped.  They was locked up, and I

11 left.

12 Q.  You testified that you didn't see the indictment until you

13 were in federal custody?

14 A.  That's what I said.

15 Q.  And that was as of May of 2001?

16 A.  Exactly.

17 Q.  And today is May the 1st of 2007.  Is that right?

18 A.  Yes, sir.

19 Q.  And so you've seen the indictment, then?

20 A.  Yeah, when I was in federal custody.

21 Q.  Right.  And the indictment says that you were involved in a

22 conspiracy that went on until February of 2000?

23 A.  That's what it says.

24 Q.  And it's your testimony that that indictment, however, was

25 in fact returned in 1999?

1 A.  Is that what I'm saying?  I already said that I didn't see

2 that.

3 Q.  Let me ask you --

4 A.  I'm using my -- go ahead.

5 Q.  Go ahead.

6 A.  I'm using my time line as -- I know when I purchased this

7 vehicle, I know, not long after me purchasing this vehicle in

8 1999, in May, these guys got locked up on this conspiracy.

9 Q.  Sir, you haven't testified until just a few moments ago that

10 you fled the jurisdiction because your co-defendants got locked

11 up, did you?

12 A.  Indictment, they got locked up.  I mean, it really all meant

13 the same to me.

14 Q.  Sir, you've testified on a number of occasions in this

15 courtroom, to many questions I've asked you, that you left the

16 jurisdiction because there was an indictment against you.  Isn't

17 that right?  Haven't you stated that, sir?

18 A.  And I think I stated that I was evading the U.S. marshals,

19 too.

20 Q.  Because there had been an indictment against you.  Isn't

21 that right?

22 A.  Sure.

23 Q.  And the indictment that was against you alleges a conspiracy

24 that continued until February 4th of 2000?

25 A.  That's what it says.

1 Q.  And you understood at the time that you entered into this

2 plea agreement that you could be prosecuted for those crimes?

3 A.  Sure.

4 Q.  You didn't have any protection, by virtue of this plea

5 agreement, against being prosecuted for those crimes.  Is that

6 right?

7 A.  According to the plea agreement, yeah.

8 Q.  Now, the plea agreement also has other provisions regarding

9 what the Eastern District of Virginia would do if another

10 jurisdiction wanted to prosecute you.  Is that right?

11 A.  It's not on the screen.

12 Q.  Do you recall that, sir?

13 A.  No.  You could refresh my memory, though.

14 Q.  Be glad to.

15        Do you see paragraph 9-A on the screen?

16 A.  Yeah.

17 Q.  And have you had a chance to read it?

18 A.  Yeah, I just did.

19 Q.  And what was your understanding of how that impacted -- what

20 impact did that have on the possibility of your getting

21 prosecuted in any other jurisdiction?

22 A.  I guess it means that whatever I said in a debriefing

23 couldn't be held against me anywhere else.

24 Q.  You understood that if another -- if another area, another

25 jurisdiction wanted to prosecute you, they could do that, but

Page 9332

1 the Eastern District of Virginia would try to tell them that the

2 deal that they had worked out with you should be enough.  Isn't

3 that right?

4 A.  That sounds fair.

5 Q.  In layman's terms?

6 A.  Yeah.

7 Q.  That any other jurisdiction should abide by the deal?

8 A.  That sounds fair, sir.

9 Q.  And in fact -- well, did that in fact occur, sir?  A

10 situation arise where that in fact occurred?

11 A.  Yes, I guess you could call it that.

12 Q.  And what situation was that?

13 A.  In anything outside of Virginia that I gave information on.

14 Q.  Well, there came a time, didn't there, where there was an

15 interest in your testifying over in the District of Columbia,

16 wasn't there?

17 A.  That's what I said, yes, sir.

18 Q.  I'm sorry.  It didn't sound that way to me, so I just wanted

19 to make certain.

20         And did you know how the conversations with the

21 prosecutor's office in the District of Columbia began?

22 A.  I'm pretty sure my attorney contacted them.

23 Q.  And was that at your suggestion?

24 A.  I'm pretty sure.

25 Q.  You told them that you thought you had information that

1 might be helpful to them?

2 A.  Yeah, initially I believe that's how it went down.

3 Q.  And you thought that if you could assist in that further --

4 by further cooperating elsewhere, that would be better for you

5 in terms of the sentence you might receive?

6 A.  Yeah, that about...

7 Q.  Because you knew that if you didn't get a good cooperation

8 letter out of the prosecutor, a 5(k) or Rule 35 motion, you were

9 looking at that mandatory 10 to life?

10 A.  Yes.

11 Q.  And so you were thinking about all the ways that you could

12 increase the likelihood and the quality of that letter?

13 A.  Sure.  That's fair.

14 Q.  And as a result of that, you entered into another agreement

15 with the United States Attorney's Office in the District of

16 Columbia, didn't you?

17 A.  I believe so.

18 Q.  Do you have an independent recollection, sir, of when that

19 occurred?

20 A.  No.

21       MR. TABACKMAN:  I'm going to mark the next exhibit,

22 Your Honor, as Defendant Ball's Number 72.  And it appears to be

23 a letter dated October 9th of 2001 to Bruce Cooper and signed by

24 Timothy Heffy (ph) and Matthew Olson.  I'm showing it to

25 Mr. Leon.

1         May I approach, Your Honor?

2         THE COURT:  Yes.

3 BY MR. TABACKMAN:

4 Q.  I'll show you, Mr. Marsh, what's been marked as Defendant

5 Ball Exhibit 72.  Do you recognize it?

6 A.  Yep.

7 Q.  And what is it?

8 A.  It is a letter to my attorney.

9 Q.  Did you see it at or about the date on which it appears to

10 have been written, October 9th of 2001?

11 A.  Did I see it this day?

12 Q.  Did you see it around the time that it was written?

13 A.  I don't know if I saw it at all.

14 Q.  Do you recall talking with your lawyer about the agreement

15 that he had worked out with respect to the District of Columbia?

16 A.  I do.

17 Q.  And what was your understanding of that?

18 A.  I believe anything that I -- anything that was said other

19 than, I think crimes of violence or -- yeah, crimes of violence.

20 Anything other than crimes of violence, if I was truthful, I

21 wouldn't be prosecuted for them.

22         MR. TABACKMAN:  Your Honor, I would move the admission

23 of Exhibit 72, Ball's Exhibit 72.

24         MR. LEON:  No objection.

25         THE COURT:  72 will be received.  Defendant Ball

1 Q.  With the same obligation of truthfulness?

2 A.  Exactly.

3 Q.  And specifically, it references that in the August 28th,

4 2001 meeting, you had given specific information that would be

5 helpful in United States versus Kevin Gray.  Is that right?

6 A.  Exactly.

7 Q.  It indicates that they may seek to call you in regard to

8 that.  Is that right?

9 A.  That's what it says.

10 Q.  And in fact, you did testify in that case, didn't you?

11 A.  Sure did.

12 Q.  And that was before the government filed its Rule 35 motion

13 to seek your reduction in sentence?

14 A.  Yes, sir.

15 Q.  And --

16        MR. TABACKMAN:  Court's indulgence.

17 BY MR. TABACKMAN:

18 Q.  Now, you testified ultimately in the Kevin Gray trial about

19 having sold guns on a number of occasions to Mr. Gray.  Isn't

20 that right?

21 A.  Sure.

22 Q.  And you testified to having sold guns to Mr. Rodney Moore?

23 A.  Sure.

24 Q.  And you testified to having had many drug transactions with

25 Mr. Raymond Saunders?

Page 9338

1 A.  Sure.

2 Q.  And those were all crimes that you committed in the District

3 of Columbia?

4 A.  Yes, sir.

5 Q.  And you've never been prosecuted for those crimes.  Isn't

6 that right?

7 A.  No, sir.

8 Q.  And that's because of this agreement, isn't it?

9 A.  That's because --

10 Q.  Exhibit 72?

11 A.  That's because they would never have known about it if I

12 didn't tell them.

13 Q.  I asked you a question.  The reason that you were not

14 prosecuted is because you told them about --

15 A.  Yes, sir.

16 Q.  And you had this agreement that protected you?

17 A.  Yes, sir.

18 Q.  And that agreement continues to this day, doesn't it?

19        MR. LEON:  Objection.

20 A.  I wasn't aware of that.

21 BY MR. TABACKMAN:

22 Q.  What is your understanding, sir?

23 A.  I figured I'm finished with agreements and things of that

24 nature.

25 Q.  And is that because you served your time in prison?

1 A.  I would hope so.

2 Q.  But you understand that you have something called supervised

3 release.  Isn't that right?

4 A.  Yeah.

5 Q.  At the time you pleaded guilty, supervised release was

6 explained to you, wasn't it?

7 A.  Pretty much, yeah.

8 Q.  By Judge Cacheris over in the Eastern District of Virginia,

9 where you pleaded guilty?

10 A.  Yeah, I'm pretty sure.

11 Q.  And he explained to you that if you violated the law in any

12 way, after you were released from prison and were on supervised

13 release, you could be sent back to prison.  Isn't that right?

14 A.  Sure.  If I violated the law and I was just a regular

15 citizen, I'll go back to prison, too.

16 Q.  Well, you had a number of restrictions placed on you by

17 supervised release.  Isn't that right?

18 A.  Most probation, yeah.  Standard.

19 Q.  And that continues for five years.  Isn't that right?

20 A.  Two and a half, if I'm good.

21 Q.  The term that was imposed by Judge Cacheris was for

22 five years.  Is that right?

23 A.  Two and a half if I'm good.  Good behavior, I get off.

24 Q.  And that's something that someone has told you, sir?

25 A.  Sure.

1 Q.   And when was that?

2 A.   It's standard.

3 Q.   And you went on supervised release, I believe you said last

4 September?

5 A.   Yep.

6 Q.   So you're still on supervised release as of today?

7 A.   Yeah.

8 Q.   And that has -- and that set out -- the conditions of your

9 supervised release are set out in the judgment of conviction

10 that was entered in your case, wasn't it?

11 A.   Sure was.

12 Q.   And it requires that you get permission from the Probation

13 Office to leave the jurisdiction in the Eastern District of

14 Virginia?

15 A.   Yes, sir.

16 Q.   That you had to give a report to the probation officer on

17 the first day of each month?

18 A.   Yes, sir.

19 Q.   It states that you had to answer any inquiries that he would

20 make?

21 A.   Sure.

22 Q.   And follow the instructions that he gave you?

23 A.   Sure.

24 Q.   You had to meet your responsibilities to your family and

25 dependents?

1 A.  Of course.

2 Q.  And you have a number of children.  Isn't that right?

3 A.  Sure.

4 Q.  And do you meet those responsibilities?

5 A.  Without a doubt.

6 Q.  Pardon?

7 A.  Without a doubt.

8 Q.  And you're working at this time?

9 A.  Sure am.

10 Q.  What kind of work are you doing?

11        MR. LEON:  Objection.

12        THE COURT:  Sustained.

13 BY MR. TABACKMAN:

14 Q.  Do you have to notify the Probation Office if -- the

15 supervised release probation officer if you want to change your

16 residence?

17 A.  Of course.

18 Q.  That you're not allowed to go to places where there might be

19 controlled substances?

20 A.  Of course.

21 Q.  Now, you say that a regular person, if they violate the law,

22 can be sent to prison.  Isn't that right?  Is that what you

23 testified to a few minutes ago?

24 A.  Sure.  Sure.

25 Q.  But you can be sent back to prison for a whole lot of other

1 things other than just violating the law.  Isn't that right?

2 A.  Sure.

3 Q.  You can be sent back to prison for violating any of these

4 conditions?

5 A.  Sure.

6 Q.  You're not allowed to associate with any persons who have

7 engaged in criminal activity?

8 A.  Yep.

9 Q.  You have to allow the probation officer to visit your home

10 at any time?

11 A.  Sure.

12 Q.  You're not allowed to enter into -- you have to tell them if

13 you get arrested or even questioned by a law enforcement

14 officer?

15 A.  Standard.

16 Q.  Standard for what, sir?

17 A.  Probation.

18 Q.  But those are conditions that apply to you?

19 A.  All conditions.

20 Q.  Those are all conditions --

21 A.  The whole list.

22 Q.  Pardon?

23 A.  The whole list, yes, sir.

24 Q.  Right.  You have to tell them if you're going to an agency

25 wants to use you as an informer or a special employee.  Isn't

1 that right?

2 A.  Certainly.

3 Q.  And you have to tell third parties of risks about dealing

4 with you.  Isn't that right?  Let me read it to you.

5        "As directed by the probation officer, the defendant

6 shall notify third parties of risks that may be occasioned by

7 the defendant's criminal record or personal history or

8 characteristics, and shall permit the probation officer to make

9 such notifications and to confirm the defendant is compliant

10 with such notification requirement."

11 A.  Sure.  If I was to get a job somewhere, I would have to let

12 my employer know that I have a criminal record.

13 Q.  Right.

14 A.  Yeah.

15 Q.  And that also is not something that, as I think you put it,

16 a regular person --

17 A.  Standard probation.  Standard probation stuff.

18 Q.  So the court still has active supervision of you?

19 A.  That's obvious.

20 Q.  Thank you.

21 A.  Thank you.

22 Q.  And you were requested to come testify in this trial.  Is

23 that right?

24 A.  I'm here.

25 Q.  So the answer is yes?

1 A.  Obviously.

2 Q.  And you had -- did anyone tell you that your agreement to

3 cooperate, Exhibit 72 that you signed with this office, you

4 weren't obliged to follow that?

5 A.  I wasn't obliged?

6 Q.  Did anyone -- I'm sorry, let me rephrase that.

7        Were you ever told that your agreement didn't apply?

8 A.  Not that I can recall.

9 Q.  And did you ask for a subpoena in this case?

10 A.  No.

11 Q.  How -- you were contacted either by the U.S. Attorney's

12 Office or the police, law enforcement in some way.  Isn't that

13 right?

14 A.  Yeah.

15 Q.  And they told you they wanted you to come and testify in the

16 case.  Isn't that right?

17 A.  Exactly.

18 Q.  And they told you that you had an agreement that you would

19 do that.  Isn't that right?

20 A.  I don't believe it went down like that.  I believe it was

21 more or less, I wasn't going to show up.  I didn't want to come

22 here.  And if you get an official subpoena -- I talked to my PO

23 about it, and she said if I don't follow the subpoena, she has

24 no choice but to violate me because I broke the law.

25 Q.  And you wanted it known that you were doing this pursuant to

1 subpoena, as opposed to just voluntarily coming in.  Isn't that

2 right?

3 A.  Sure.  I didn't want to be here.

4 Q.  Well, you also didn't want it known -- or people to believe

5 that you were somehow cooperating voluntarily.  Isn't that

6 right?

7 A.  I can care less.

8 Q.  You could care less about -- pardon me?

9 A.  I could care less what people think.

10 Q.  Isn't it a fact, sir, that among the reasons that you asked

11 for a subpoena was because you wanted it clear, or at least to

12 appear clear, that you weren't volunteering to testify?

13          MR. LEON:  Objection.  Asked and answered.

14          THE COURT:  Sustained for other reasons.

15 BY MR. TABACKMAN:

16 Q.  Did you in fact, sir -- you asked for the subpoena?

17 A.  No.

18 Q.  Well, let me rephrase that.  When you were told that -- when

19 the request came to you to come and testify, you said, "I'll

20 only do it if I get a subpoena."  Isn't that right?

21 A.  I asked not to be here at all.  That's what I asked.

22 Q.  I understand.  Very well.  And you were told that you would

23 be subpoenaed?

24 A.  I'm subpoenaed.

25 Q.  Well, and how did it come about that you were subpoenaed,

1 with the government was done.

2 Q.  You figured -- but the government didn't agree with you.

3 Isn't that right?

4 A.  Yeah, I got a subpoena.

5          MR. LEON:  Objection.  Objection.

6          THE COURT:  Sustained.

7 BY MR. TABACKMAN:

8 Q.  Based upon the -- you came to the understanding in your mind

9 that there was a disagreement between you and the government

10 about whether or not you were obliged to testify.  Isn't that

11 right?

12 A.  Sure.  That's fair.

13 Q.  And as a result of that disagreement, your position was:

14 I'm not going to do it?

15 A.  That's fair to say.

16 Q.  And you came to an understanding in your mind that they were

17 going to make you do it.  Isn't that right?

18 A.  That's what happened.

19 Q.  That's what happened.  And that's how the subpoena came

20 about.  Is that right?

21 A.  I think I answered that, sir.

22 Q.  And since you have been subpoenaed, you have requested

23 assistance from the government.  Isn't that right?

24 A.  Well, assistance, what do you mean?

25 Q.  Are you moving?

1 A.  I haven't yet.

2 Q.  But you will be?

3 A.  I will hope to.

4 Q.  Right.  And the government is going to assist you in that.

5 Is that right?

6 A.  I believe with the first month's rent and moving costs,

7 yeah, a couple, two/three thousand dollars.

8 Q.  Nothing from the government?

9        MR. LEON:  Objection.

10 A.  Nothing --

11        THE COURT:  Sustained.

12 A.  -- period.

13 BY MR. TABACKMAN:

14 Q.  I was just trying -- your body language suggests that you

15 don't regard it as a very significant contribution to you.

16 A.  I mean, it's a couple thousand dollars.

17 Q.  But it's a couple of thousand dollars that's coming to you?

18 A.  Maybe.  I didn't sign no papers.  It's nothing in stone.

19 Q.  You've requested this assistance.  Is that right?

20 A.  I sure did.

21 Q.  And you requested it because you felt that you were entitled

22 to it because of your testifying?

23 A.  No.

24 Q.  You requested -- you requested it because of the

25 agreement -- you thought it was fair under the agreement that

Page 9349

1 you had.  Isn't that right?

2 A.  No.

3 Q.  But there's no doubt that you requested it?

4 A.  I think I answered that already.

5 Q.  They didn't come forward and volunteer to give you the two

6 or three thousand dollars?

7 A.  No, sir.

8 Q.  And you understood that, in the face of a subpoena, your

9 supervised release could be violated?

10 A.  I think I answered that too, sir.

11 Q.  And the answer is yes, you understood that?

12 A.  Same answer.

13 Q.  Pardon?

14 A.  Same answer I gave you already.  I think I answered that.

15       THE COURT:  We've actually reached a break point.  Did

16 you want to put one more?

17       MR. TABACKMAN:  No, that's fine, Your Honor.

18       THE COURT:  Ladies and gentlemen, we'll take our mid

19 morning break.  It's 11:00 o'clock.  Please be back at 11:15.

20 Remember not to talk about the case, and take your notes back

21 into the jury room.  Enjoy your break, and we'll see you back at

22 11:15.

23       (Jury out at 10:59 a.m.)

24       THE COURT:  Mr. Marsh, you may take a break as well.

25 Please be back in your seat at 11:15.

1            (RECESS AT 11:00 a.m.)

2            THE COURT:  All right.  I think everybody is back.

3 Mr. Tabackman, are you ready for the jury?

4            MR. TABACKMAN:  Yes, Your Honor.

5            (Jury in at 11:17 a.m.)

6            THE COURT:  Good morning again, ladies and gentlemen.

7 Welcome back.  We're ready to resume.

8            Mr. Tabackman?

9            MR. TABACKMAN:  Thank you, Your Honor.

10 BY MR. TABACKMAN:

11 Q.  Yesterday, Mr. Marsh, you acknowledged in questions to

12 Mr. Leon that you had committed a number of juvenile offenses,

13 also.  Is that correct?

14 A.  Sure.

15 Q.  Those would be burglaries, larcenies, crimes of that sort.

16 Right?

17 A.  Sure.

18 Q.  And there were a lot of them?

19 A.  Sure.

20 Q.  And were you also the same Steven Marsh who was convicted in

21 1988, January 15th, of breaking and entering in Prince William

22 County?

23 A.  That would be me.

24 Q.  And on July 15th, 1988 of grand larceny, statutory burglary

25 in Prince William County?

1 A.  I believe that would be me.

2 Q.  Okay.  And you're also the same Steven Marsh who on

3 April 15th, 1988 was convicted in Prince William County of a

4 different grand larceny?  There were a number of grand larcenies

5 that you were convicted of in 1988.  Is that fair to say?

6 A.  Sure.

7 Q.  And that's because you were doing property crimes at the

8 rate of a couple a week.  Isn't that right?

9 A.  I guess that's fair.

10 Q.  Breaking into places, taking things, selling whatever could

11 be sold?

12 A.  That's fair.

13 Q.  Including the guns that you talked about.  Is that right?

14 A.  That's fair.

15 Q.  Now, in this case, when you were arrested in May of 2001,

16 where were you housed?

17 A.  In Alexandria.

18 Q.  Alexandria Detention Center?

19 A.  Sure.

20 Q.  Down off of Mill Street?

21 A.  Same one.

22 Q.  Were you ever in Arlington?

23 A.  A night.  I think I spent a night in Arlington.

24 Q.  Just one night, though?

25 A.  Yeah.

Page 9361

1 Q.  Michael Lewis.  Michael Davis.  I'm sorry, Michael Davis was

2 locked up on February 28th of 2001?

3 A.  Sure was.

4 Q.  So he couldn't have called you in 1999, could he?

5 A.  I didn't say he did.  I said Cherrard Odom called --

6 Q.  Well --

7 A.  -- made the phone calls.

8        MR. LEON:  Objection, Your Honor.  The witness is not

9 finishing his answer.

10        THE COURT:  Sustained.  Did you finish?

11 A.  Cherrard Odom made those phone calls.

12 BY MR. TABACKMAN:

13 Q.  And Cherrard Odom was in jail in 1999?

14 A.  I believe so.

15 Q.  And he was locked up at that time?

16 A.  Cherrard Odom and my other co-defendant, Luis Barrientos.

17 Q.  Uh-huh.  And when were they locked up?

18 A.  I don't know.  You're going to have to tell me.

19 Q.  Well, sir, they weren't the people listed on your

20 indictment, were they?

21 A.  No.  But those are the guys that you were saying I was

22 selling these drugs to in the indictment.

23 Q.  But they weren't the guys that were listed as your

24 co-defendants that you said called you from the jail.

25 A.  They're what you would call unindicted co-conspirators.

1 father is alive and kicking very well.

2 Q.  Okay.  I understand that's you're testimony today.  So

3 you're thinking the court reporter got mother -- wrote "father"

4 instead of "mother"?

5 A.  Somewhere along those lines it got twisted.

6 Q.  You weren't confused about that.  Correct?

7 A.  Naw.  Why would I be?

8        MS. WICKS:  Court's indulgence.

9 BY MS. WICKS:

10 Q.  Now, I believe your testimony from yesterday was that you

11 started selling drugs back in '89 and '90 out in Virginia.

12 Right?

13 A.  I don't know if I said '89 or '90.  I think I might have

14 been incarcerated in '89 and '90 for a nice little spell.

15 Q.  Was that for a juvenile charge or for an adult charge?

16 A.  It may have started out as a juvenile charge, but I may have

17 been certified as an adult before the case was actually dealt

18 with.

19 Q.  Well, yesterday you were asked the following question by

20 Mr. Leon and gave the following answer, on page 9154:

21        "When would you say you first started dealing drugs?"

22        Answer:  "Wow, probably '89, '90, somewhere around

23 there."

24        That's what you said yesterday.  Right?

25 A.  If it's there.

1 Q.  Now, when you testified against Kevin Gray and Rodney Moore

2 and other people from Robinson Place, you testified that in '89,

3 '90, '91, '92, and '93, you weren't selling drugs.  Correct?

4 A.  You need to refresh my memory.

5        MS. WICKS:  Court's indulgence.  I'm sorry.

6 BY MS. WICKS:

7 Q.  I'm sorry.  When you testified against your co-defendants in

8 Virginia, Michael Davis and James Blanco, you testified that you

9 weren't selling drugs in '89, '90, '91, '92, and '93.  Correct?

10 A.  If it's in the paperwork.  I don't recall.

11        MS. WICKS:  Page 207.

12        May I approach the witness, Your Honor?

13        THE COURT:  Yes.

14 BY MS. WICKS:

15 Q.  I'm showing you 24-C.  That's one of the trial transcripts

16 from the United States versus Michael Davis and James Blanco in

17 Virginia.  Correct?

18 A.  Yeah.

19 Q.  Okay.  And this transcript indicated that you were a witness

20 starting on page 168.  Right?

21 A.  Right.

22 Q.  And drawing your attention to page 207, you were asked,

23 question:

24        "When you became -- when you became legitimately

25 employed and no longer selling drugs?"

1          And your answer was:  "I wasn't selling drugs in '89,

2 '90, '91, '92, and '93."  Correct?

3 A.  Yeah, that's what I said.

4 Q.  Okay.  After you testimony in the Eastern District of

5 Virginia -- and actually, just for the record, that testimony

6 was on June 20th of 2001.  Correct?

7 A.  Correct.

8 Q.  After the testimony in that case, then you met with the

9 federal prosecutors from the District of Columbia.  Correct?

10 A.  Correct.

11 Q.  And then you were called in 2002 as a witness in the

12 Kevin Gray case.  Correct?

13 A.  Correct.

14 Q.  And when you were called as a witness in the Kevin Gray

15 case, you indicated that you were selling drugs in '92 and '93.

16 Correct?

17 A.  Yes.

18 Q.  And one of the things you testified to in the Kevin Gray

19 case was actually buying drugs from Mr. Saunders on

20 Robinson Place.  Correct?

21 A.  Correct.

22 Q.  And selling guns to Kevin Gray and Rodney Moore in '92 and

23 '93.  Correct?

24 A.  Correct.

25 Q.  And selling other stolen merchandise in '92 and '93 on

Page 9388

1 Q.  And when you come to Congress Park, you're not there to --

2 you're not there to plant flowers in the community or pick up

3 litter, are you?

4 A.  Naw.

5 Q.  You're there to hide out, number one.  Right?

6 A.  Yeah.

7 Q.  Because this roll is good.  You don't want to break that

8 roll up.  Right?

9 A.  No, I'm ducking authorities.

10 Q.  Right.  And by getting arrested, that roll stops?

11 A.  Pretty much.

12 Q.  Not pretty much.  It stops, right, boom?

13 A.  You said it.

14 Q.  Right.  So in Congress Park, you're also dumping some drugs

15 into the community, too.  Right?

16 A.  Little bit.

17 Q.  Little bits.  Little bits of powder cocaine.  Right?

18 A.  I mean, I don't think I was, me personally, dumping no

19 powder cocaine in --

20 Q.  How about wholesale?  Were you wholesaling to people?

21 A.  Only other than me and Antwuan, no.

22 Q.  You also mentioned E pills.  Right?

23 A.  Yeah, E pills.

24 Q.  Uh-huh.  Uh-huh.  And you weren't out on the street selling

25 $10 worth, were you?

1 A.  Naw.

2 Q.  You also indicated, I think you put a gun or two on the

3 street, too, according to your testimony.  Right?

4 A.  That's fair.

5 Q.  And what's also fair is you're not sitting over here with

6 these gentlemen, are you?

7 A.  Yeah, that's fair.  It's obvious.

8 Q.  You didn't get arrested federally for your activities in

9 Congress Park, did you, sir?

10 A.  That's obvious.  No.

11 Q.  And you don't anticipate ever getting arrested like these

12 gentlemen for any activities in Congress Park, do you, sir?

13 A.  That's fair.

14 Q.  Is it fair?

15 A.  Sure.

16        MR. PURPURA:  No further questions.

17        THE COURT:  You said no further questions?

18        MR. PURPURA:  That's right.

19        THE COURT:  Anything further?

20        MS. WICKS:  Your Honor, may we approach briefly?

21        THE COURT:  Yes.

22        (BENCH CONFERENCE ON THE RECORD.)

23        MS. WICKS:  Your Honor, checking my notes, there's

24 actually two or three questions that I forgot to ask.  So I just

25 ask to be able to do that now so I won't have to recall him.

1 "indictment," counsel's use of the indictment is fair area of

2 inquiry.

3          MR. LEON:  Thank you.

4          (END BENCH CONFERENCE.)

5          THE COURT:  You can resume your seat.

6 BY MR. LEON:

7 Q.  Mr. Marsh, you testified with Mr. Tabackman back and forth

8 regarding whether or not your understanding in 1999 was whether

9 there was an indictment against you or your co-defendants, or

10 whether your co-defendants were, I think your words were "picked

11 up."  Do you remember those questions?

12 A.  Sure.

13 Q.  I want to focus on your state of mind in 1999.

14          Well, first of all, what do you mean, and what did you

15 mean when you said you learned that your co-defendants were

16 picked up?  What did you mean by "picked up"?

17 A.  They got picked up by the federal agents.

18 Q.  And just so we're clear, back then, who was picked up?  In

19 other words, in your mind, who of your co-defendants were picked

20 up in '99?

21 A.  Lewis Barrientos and Cherrard Odom.

22 Q.  Now, do you know the exact time or date that either of them

23 were picked up?

24 A.  No.  I know it was somewhere in '99.

25 Q.  Would reviewing a court docket from their cases refresh your

1 recollection as to when they were picked up?

2 A.  I'm sure.

3          MR. TABACKMAN:  Objection, Your Honor.  May we

4 approach?

5          THE COURT:  Yes.

6          Let me invite you to have a seat in that chair over

7 there again.

8          (BENCH CONFERENCE ON THE RECORD.)

9          MR. TABACKMAN:  First of all, I don't believe this is

10 refreshing his recollection, I think this is giving him a

11 recollection by showing him this document.  Because now -- he

12 has never indicated that he has a sense of when -- or it's

13 changed now through further questions to late '99.  It began

14 with "I don't know when it is in '99," and now we're going to

15 give him a precise date.

16          I don't think it's going to refresh his recollection, I

17 think it's going to wind up giving him some recollection from a

18 court docket that he's now going to be able to say "That was

19 what my state of mind was."

20          The second point, Your Honor, goes to my comments

21 before --

22          THE COURT:  Let me rule on the first point.  You can

23 argue that.

24          Go ahead, tell me the second point.

25          MR. TABACKMAN:  The second point is he testified

1 yesterday -- and this is why I don't think it's fair for

2 Mr. Leon to be able to go into the pickup point.  He says --

3 this is in response to Mr. Leon:

4          "I was hanging around Cody a lot more."

5          "And why is that?"

6          "Probably because I had an ongoing indictment in

7 Virginia."

8          "And is that the indictment that you told us you did

9 those five years on?"

10          "Yeah."

11          That's the reason that he runs.  He also says on

12 page -- and he says a similar effect on the next page.

13          So now, because he backs off of that and says, oh, you

14 know, it's pick up, not that -- which he never mentions

15 yesterday, and now Mr. Leon can come forth on redirect

16 examination and say -- and I get no further shot, as far as I

17 know.  That somehow because I injected indictment into this

18 thing, he's now allowed to bolster the change from the testimony

19 that he gave today, where -- I know I'm not articulating this

20 well, but it seems to me that we're now creating -- we're

21 bootstrapping this effort to try to get him to say, well, you

22 know, I always thought it was pickup, when he didn't.

23          THE COURT:  You properly took advantage of the use of a

24 word that this witness gave.  The prosecution is able to explore

25 what the guy means when he says it.  You can always argue this

1 in closing, but there's nothing inappropriate about exploring

2 the area.

3          And as far as refreshing recollection is concerned, the

4 Irving Younger story is you can refresh people's recollection

5 with spaghetti, with anything.  So I'm going to allow it.

6          (END BENCH CONFERENCE.)

7          MR. LEON:  May I approach, Your Honor?

8          THE COURT:  Yes.

9 BY MR. LEON:

10 Q.  Let me break them down.  I think you said you had two

11 co-defendants.  One was Mr. Odom?

12 A.  Sure.

13 Q.  I'm going to hand you what's marked for identification as

14 Government's 806, and ask you to review that.

15          First of all, do you know or have an idea what that is?

16 Do you recognize it at all?

17 A.  Criminal docket.

18 Q.  For whom?

19 A.  For my unindicted co-conspirators.

20 Q.  And for the record, what name is that person?

21 A.  Cherrard Nelson Odom.

22 Q.  I'm going to ask you to review that document,

23 Government's 806, and tell us if that refreshes your

24 recollection as to the date or the approximate date when

25 Mr. Odom was picked up in his case.

1         MR. TABACKMAN:  Your Honor, I would not object to this,

2 but I would object to counsel's use of the term of Mr. Odom as a

3 co-defendant.  Because a co-defendant is someone who is charged

4 in a case.  Mr. Odom was not his co-defendant at any time, as

5 far as we know.

6         MR. LEON:  I was using the words the witness was using,

7 Your Honor.

8         THE COURT:  Overruled.

9 BY MR. LEON:

10 Q.  I would ask you to look at the document and see if any

11 portion of it refreshes your recollection as to the approximate

12 time when he was picked up.

13 A.  Sure.  The date.

14 Q.  What is your -- did that refresh your recollection?

15 A.  Sure.

16 Q.  What is your recollection as to when Mr. Odom picked up his

17 charge?

18 A.  1999.

19 Q.  And my question is, will reviewing that document allow you

20 to refresh your recollection as to when within 1999?

21 A.  September.

22 Q.  I'm going to hand you what's marked for identification as

23 Government's 805.  First, do you recognize Government's 805?

24 A.  Sure.

25 Q.  What do you recognize Government's 805 to be?

1 A.   The criminal docket for Luis Barrientos.

2 Q.   And do you know who that person is?

3 A.   Sure.

4 Q.   Who is that person?

5 A.   He's another one of my unindicted co-conspirators.

6 Q.   And does reviewing Government's 805 refresh your

7 recollection as to when that unindicted co-conspirator,

8 Mr. Barrientos, picked up his charge?

9 A.   Sure.

10 Q.   When?

11 A.   August of 1999.

12        THE COURT:  Mr. Leon, could you spell for the record

13 the name of the individual about whom you just asked the

14 witness?

15        MR. LEON:  Yes.  Barrientos is spelled

16 B-A-R-R-I-E-N-T-O-S, and it appears that Lewis, or Luis, is

17 L-U-I-S.

18 BY MR. LEON:

19 Q.   Do you know what the term -- I think you -- well, withdrawn.

20        I think during your testimony, during the questions you

21 were asked, you used the term "popped."  Do you remember that?

22 A.   Sure.

23 Q.   What did you mean by the word "popped"?

24 A.   Incarcerated, locked up.

25 Q.   Okay.  Do you know, just yes or no first, what the word

1 "flip" means?

2 A.  Flip?  Sure.

3 Q.  What is your understanding as to what it is when somebody

4 flips.

5 A.  They don't sit at the table that those guys are sitting at.

6 Q.  You just have to make a little more of a record.  What

7 exactly do you mean by that?

8 A.  The ones who flip cooperate with the government.

9 Q.  What in your mind, Steve Marsh, in whether it was August or

10 September of 1999, whenever it was in '99, what did you think in

11 your mind might happen to you, Steve Marsh, when Mr. Barrientos

12 and Mr. Odom were picked up?

13          MR. TABACKMAN:  Objection.  Leading.

14          THE COURT:  Overruled.

15 A.  What did I think?

16 BY MR. LEON:

17 Q.  What might happen to you, yes.

18 A.  That I was next.

19 Q.  What do you mean by that?

20 A.  They was going to tell on me.

21 Q.  Did you commit crimes with those two men?

22 A.  Sure.

23 Q.  Did you sell drugs with those two men?

24 A.  Sure.

25 Q.  Did you carry guns in the presence of those two men?

1 A.  Sure.

2 Q.  A lot of drugs or a little drugs?

3 A.  With those guys it was a little bit.

4 Q.  Okay.  Now, let's get to that.

5      I believe on cross-examination you talked about words

6 to the effect of -- Mr. Tabackman was showing you what's now in

7 evidence as Defendant's Exhibit 69, your indictment, do you

8 remember, in that case?

9 A.  Sure.

10 Q.  And I believe you answered, in response to a question that

11 Mr. Tabackman asked you, something along the lines of, "Well,

12 kilos aren't really in this indictment."  Do you remember that?

13 A.  Sure.

14 Q.  What did you mean by that?

15 A.  These particular guys who were indicted prior to us were

16 just low level street dealers buying small quantities, selling

17 directly to, like, people who were going to smoke the drugs or

18 snort them, whatever they choose to do with them.

19 Q.  Let's just break that down and be clear.  When you said "the

20 people that were indicted before us," who were the people who

21 were indicted before you?  Who do you mean?

22 A.  Cherrard Odom and Luis Barrientos.

23 Q.  So in your mind, those people are higher level, same level,

24 or lower level drug dealers than you were in 1999?

25 A.  No, they were under me.

# Tab 32

Page 9528

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :    Docket No. CR 05-100
                             :
            Plaintiff        :
                             :
v.                           :    Washington, DC
                             :
ANTWUAN BALL,                :
DAVID WILSON,                :
GREGORY BELL,                :    May 2, 2007
DESMOND THURSTON,            :
JOSEPH JONES,                :
DOMINIC SAMUELS,             :
                             :
            Defendants       :    9:15 a.m.
. . . . . . . . . . . . . . . :    . . . . . . . . . . . .

VOLUME 44 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:   ANN H. PETALAS, ESQUIRE
                         GLENN S. LEON, ESQUIRE
                         GIL GUERRERO, ESQUIRE
                         UNITED STATES ATTORNEY'S OFFICE
                         555 Fourth Street, NW
                         Washington, D.C.  20530

For the Defendant        JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:            CARNEY & CARNEY
                         601 Pennsylvania Avenue, NW
                         Suite 900, South Building
                         Washington, DC  20004
                         (202) 434-8234

                         STEVEN CARL TABACKMAN, ESQUIRE
                         TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                         1747 Pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20006

                         (202) 454-2811

1 Q.   I'm not asking you to say it.   I'm saying it's extremely

2 unlikely that they did, isn't it?

3          THE COURT:  I think he's answered.

4          MR. PROCTOR:  And I think I'm done.  Thank you, Your

5 Honor.

6          THE COURT:  Mr. Beane?

7          MR. BEANE:  No questions, Your Honor.

8          THE COURT:  Mr. Zucker?

9          MR. ZUCKER:  Nothing, thank you.

10          THE COURT:  Mr. Martin?

11          MR. MARTIN:  Briefly, Your Honor.

12                    CROSS EXAMINATION

13 BY MR. MARTIN:

14 Q.   Good morning, Mr. Reel.

15 A.   Good morning.

16 Q.   When you tested these substances that were presented to you,

17 you weighed them as well.  Right?

18 A.   Yes, definitely.

19 Q.   And initially when you weighed them, you considered the

20 packaging and you also weighed the substance itself.  Right?

21 A.   Yes.  I weighed the substance in the packaging; I emptied it

22 out of the packaging, and then weighed the packaging itself and

23 subtracted.

24 Q.   Now, with respect to, I think it was 310.3, do you remember

25 that one?

Page 9554

1 A.  I know the one you're referring to.

2        MR. MARTIN:  Your Honor, may I approach the witness,

3 please?

4        THE COURT:  Yes.

5 BY MR. MARTIN:

6 Q.  Sir, if I could just show it to you.  Would you please tell

7 the ladies and gentlemen of the jury how much weight that was,

8 the substance, not the packaging.  Just the substance.

9 A.  The rock-like solid that was present there was 0.27 grams.

10 Q.  0.27 grams.  Now sir, have you ever eaten at a fast food

11 restaurant?

12 A.  Certainly.

13 Q.  And have you ever seen the packages of sugar and salt and

14 pepper?

15 A.  Yes.

16 Q.  Okay.  Now, the packages of sugar are a little bigger than

17 the salt and pepper.  Correct?

18 A.  Yes.

19 Q.  With respect to 0.27 grams, in terms of weight, would that

20 weight be closer to the sugar package or would that weight be

21 closer to the salt and pepper package?

22 A.  Well, I would say closer to the salt or pepper package.

23 Q.  And you're also familiar with kilos.  Correct?

24 A.  Yes.

25 Q.  And a kilo is what, about -- how many pounds is that?

1          MR. GUERRERO:  Objection.  Scope.  Objection.  Scope.

2          THE COURT:  I'll allow it.

3 BY MR. MARTIN:

4 Q.  How many pounds is a kilo?

5 A.  I don't remember the exact amount.  I believe it's 2.2 --

6 it's either 2.2 kilograms per pound or 2.2 pounds per kilogram,

7 one or the other.  I don't remember off the top of my head.

8 Q.  2.2 pounds, that's about half the size of a box of sugar in

9 the supermarket?

10 A.  Yeah, it's less than a five-pound box of sugar, yes.

11 Q.  And usually when you see a kilo, that's pure cocaine.

12 Right?

13          MR. GUERRERO:  Objection.  Speculation.

14          THE COURT:  Sustained.

15          MR. MARTIN:  Nothing further, Your Honor.  Thank you,

16 sir.

17          Your Honor, may I approach and get the exhibit?

18          THE COURT:  Yes.

19          MR. MARTIN:  Thank you, sir.

20          THE COURT:  All right.  Mr. Balarezo?

21          MR. BALAREZO:  Your Honor, we have no questions.

22          THE COURT:  Anything further?

23          MR. GUERRERO:  No, Your Honor, nothing further.

24          THE COURT:  Thank you.  You may be excused.

25          THE WITNESS:  Thank you.

1        MR. GUERRERO:  Your Honor, may I withdraw the exhibit?

2        THE COURT:  All right.  Announce your next witness.

3        MS. PETALAS:  United States calls Officer Peter

4 Schumacher to the stand.

5            (Oath administered by Courtroom Deputy.)

6 (OFFICER PETER SCHUMACHER, GOVERNMENT witness, having been duly

7              sworn, testified as follows:)

8                   DIRECT EXAMINATION

9 BY MS. PETALAS:

10 Q.  Good morning, Officer.  Could you please state and spell

11 your name for the record?

12 A.  It's Peter Schumacher, S-C-H-U-M-A-C-H-E-R.

13 Q.  And where do you work?

14 A.  Metropolitan Police Department.

15 Q.  How long have you worked at the Metropolitan Police

16 Department?

17 A.  It will be 15 years this Friday.

18 Q.  And what you are your current duties?

19 A.  I'm assigned to our Emergency Response Team, Special

20 Operations Division.

21 Q.  And how long have you been assigned to the Emergency

22 Response Team?

23 A.  Eight years.

24 Q.  And prior to your assignment to the Emergency Response Team,

25 what were your duties with the Metropolitan Police Department?

1 A.  I was assigned to a motor tac unit in Patrol Division, First

2 District.

3 Q.  I'm sorry, motor tac unit?

4 A.  Motor tac.  Motorcycle unit in the 1st District, in a patrol

5 division.

6 Q.  And what were your duties there?

7 A.  Regular patrol duties of a -- just regular patrol.

8 Q.  In conjunction with your duties as a patrol officer in motor

9 tac, did you assist in traffic stops?

10 A.  Yes, ma'am.

11 Q.  Approximately how many traffic stops do you think you

12 assisted in?

13 A.  Numerous.

14 Q.  And directing your attention back to June 14th, 1996, around

15 12:20 a.m.  Were you working at that time?

16 A.  I was.

17 Q.  And what were your duties at that time?

18 A.  Patrol, that evening.  We were just patrolling the

19 1st District.

20 Q.  In conjunction with those duties, did you have the

21 opportunity to assist in a traffic stop at the 1300 block of

22 Southeast Freeway, Washington, D.C.?

23 A.  I did.

24 Q.  And how did it come about that you assisted in that traffic

25 stop?

1 BY MR. BALAREZO:

2 Q.  It was only after several attempts by Mr. Carney to get an

3 answer to a simple question that you were finally able to

4 answer.  Is that correct?

5          MS. PETALAS:  Objection, Your Honor.

6          THE COURT:  Sustained.

7          MR. BALAREZO:  No further questions, Your Honor.

8          THE COURT:  Anything else?

9          MS. PETALAS:  No, Your Honor.

10          THE COURT:  You may be excused.

11          Announce your next witness.

12          MR. GUERRERO:  Your Honor, the government calls

13 Agent Rob Lockhart.

14          THE COURT:  I'll remind you that you're still under

15 oath.

16          THE WITNESS:  Yes, judge.

17 (SPECIAL AGENT ROBERT LOCKHART, GOVERNMENT witness, having been

18          previously duly sworn, testified as follows:)

19                    DIRECT EXAMINATION

20 BY MR. GUERRERO:

21 Q.  All right, sir.  Please reintroduce yourself to the jury.

22 A.  Yes.  Again, I'm Robert, middle initial C, last name

23 Lockhart, L-O-C-K-H-A-R-T.

24 Q.  And Agent, you've testified already previously in this case?

25 A.  Yes.

1 Q.  Agent, I would like to focus your attention to an address at

2 5107 Fitch street, Southeast, Apartment Number 301, and think

3 back with respect to that address to April 14th of 2004.  Were

4 you there at that location?

5 A.  Yes.

6 Q.  Agent, tell us, why were you there on that date?

7 A.  I was there, along with members of my squad, the Safe

8 Streets Task Force, along with Detective Williams of MPD

9 homicide, and we were there to execute an arrest warrant and

10 search warrant that Detective Williams had.

11 Q.  Agent, who did you go to that location with, do you recall?

12 A.  Who did I go with?

13 Q.  Yes, if you can recall.

14 A.  Again, I remember Detective Williams was there, and a number

15 of individuals from my squad.  I would have to look at the 302

16 that I prepared to actually get all the names.

17        MR. GUERRERO:  Court's indulgence.

18 BY MR. GUERRERO:

19 Q.  And your purpose there, Agent, when you arrived, was to do

20 what?

21 A.  We were planning to arrest Mr. Ball, and then we were going

22 to do a search of the residence.  We also were planning to seize

23 his vehicle and also conduct a search at a later time on that

24 vehicle.

25 Q.  And when you arrived at that location, tell us what you did.

1 A.  We did our standard procedure in terms of conducting a

2 knock-and-announce, didn't receive any response, made entry into

3 the residence.  Mr. Ball was located right in the front living

4 room area; he was placed under arrest at that time.

5         The residence was made secure, and then we basically

6 went through our standard search procedures.

7 Q.  And when you say you went through your basic search

8 procedure, what exactly did you do?  Tell us.

9 A.  I was the seizing agent, so I basically had given out the

10 assignments.  As I recall, Detective Williams and another

11 detective from MPD homicide, they transported Mr. Ball away from

12 the scene to Violent Crimes Branch.  We then stayed on the

13 scene.  We had a sketch prepared of the residence, labeled each

14 room, took pre-search photographs, and once that was completed,

15 then we did a search of the residence and several items were

16 seized.

17 Q.  You said a sketch was done of the actual room itself?

18 A.  Of the residence itself, yes.

19 Q.  The residence.

20         MR. GUERRERO:  May I approach, Your Honor?

21         THE COURT:  Yes.

22 BY MR. GUERRERO:

23 Q.  This is Government's Exhibit 705.4.  Do you recognize what

24 that is?

25 A.  Yes.

1          MR. GUERRERO:  No, Your Honor.

2          THE COURT:  All right.

3          (END BENCH CONFERENCE.)

4  BY MR. GUERRERO:

5  Q.  Agent, let me show you Government's Exhibit 705.13.  And I

6  would like you to just pull out each individual item to yourself

7  so that we can catalog how many pieces of evidence are inside

8  this.

9          The first item that you just pulled out is what?

10 A.  It's a white shirt.

11 Q.  Next item?

12 A.  It's a black shirt.  I guess I should add, these are more

13 what I would call dress shirts.  And to differentiate, this is a

14 black T-shirt.

15 Q.  So we're up to item number four now?

16 A.  Yes.  This is a gray T-shirt.

17 Q.  Now item number five?

18 A.  A gray sweatshirt.

19 Q.  Item number six?

20 A.  A black T-shirt.

21 Q.  Item number seven?

22 A.  A white T-shirt.

23 Q.  Item number eight?

24 A.  These are black sweatpants.

25 Q.  Item number nine?

1 A.  Looks like the black sweatshirt that matches those

2 sweatpants, another pair of black sweatpants.

3 Q.  That's the 10th item.

4 A.  And the last item is a black sweatshirt.

5 Q.  So I counted 11 pieces of clothing in total?

6 A.  I believe that was the count.

7 Q.  Okay.  And where were these items recovered from?

8 A.  They were all recovered at 5107 Fitch, the day of the search

9 warrant.

10 Q.  And do you recall where in the apartment they were

11 recovered?

12 A.  I would have to look at the seizure list.

13 Q.  Is that part of your 302?

14 A.  No, it would be the separate FD-597.

15 Q.  And this is Government's Exhibit 705.1.

16      MR. CARNEY:  Your Honor, while he's reviewing that, can

17 I approach the bench for a second?

18      THE COURT:  Yes.

19      (BENCH CONFERENCE ON THE RECORD.)

20      MR. CARNEY:  Your Honor, out of an abundance of caution

21 and to err on the side of my client, I would rather -- I'm going

22 to object to an instruction being given.  Given that no other

23 special instructions have been given during the trial, it seems

24 to me this unfairly prejudices my client, focusing in on just

25 his -- as an admission of some type against him.

1          So I just want the record to reflect that I am opting

2 out that the instruction be given at this time.

3          THE COURT:  All right.  If any other counsel want to be

4 heard on that, come up now.  If not, that's fine.

5          MR. MARTIN:  On behalf of Mr. Jones, I would like the

6 instruction given now, Your Honor.

7          MR. BALAREZO:  Your Honor, on behalf of Mr. Samuels, I

8 suppose we object to the objection.  We would prefer the

9 instruction now for the reasons that were already stated.

10          MR. BEANE:  Yeah, I would like the instruction as well,

11 for the reasons that have already been stated by prior counsel.

12          MR. ZUCKER:  Same representation on behalf of

13 Mr. Thurston.

14          MS. WICKS:  Your Honor, assuming for the moment that

15 the next thing we're going to do is a search of Ayo Blakney's

16 apartment, I would actually join in with Mr. Carney.

17          THE COURT:  Okay.

18          MR. CARNEY:  Thank you, Your Honor.

19          (END BENCH CONFERENCE.)

20 BY MR. GUERRERO:

21 Q.  Agent, is your memory refreshed after looking at -- I'm

22 sorry, what exhibit did I just pass up to you?

23 A.  It's Exhibit 705.1, it's the seizure list that I prepared

24 that day.

25 Q.  And after reviewing 705.1, is your memory refreshed as to

1 where this clothing was recovered?

2 A.  Not really.

3 Q.  Was it recovered from the actual apartment, though?

4 A.  Yes.  The reason I state that is, normally the way I prepare

5 my seizure list, I'll put the specific room.  Most of these

6 items actually had the room/whatever agent found the item.

7         I just have listed as number two, Omerta clothing, and

8 I believe it was located throughout the apartment.  I treated it

9 as one exhibit.  I know it came from there.  I'm sitting there

10 taking all the seized evidence in, and basically we piled it up

11 in one big bag and seized it as just one item from the

12 apartment.

13         So that's why I can't state the exact location, but to

14 say that it was all taken from the apartment.

15 Q.  The items that you've just looked at inside 705.13, do they

16 appear to be in the same or substantially the same condition as

17 they were when you recovered them?

18 A.  Yes.

19         MR. GUERRERO:  Your Honor, we would move at this time

20 for the admission of 705.3 in its entirety, the pieces of

21 clothing.

22         THE COURT:  705. what?

23         MR. GUERRERO:  705.13.  I'm sorry, I misspoke.  705.13.

24         MR. CARNEY:  With the objections noted, Your Honor.

25         THE COURT:  All right.  The objections have been noted

1 previously in previous proceedings.  Is that correct?

2          MR. CARNEY:  Yes.

3          THE COURT:  Are those the objections to which you're

4 referring?

5          MS. WICKS:  And cumulative, Your Honor.

6          THE COURT:  Over objection, 705.13 will be received.

7          (Government Exhibit 705.13 was moved into evidence.)

8          THE COURT:  Ladies and gentlemen, the exhibits that are

9 in 705.13 are being received in connection with your

10 consideration of the charges pending against Mr. Antwuan Ball

11 only, and not any of the other defendants at the moment.

12 BY MR. GUERRERO:

13 Q.  All right.  Agent, let's start with the top item there, and

14 just hold that up so the jury can see it.  What are we looking

15 at first, there?  That first item, describe it.

16 A.  It's a black hooded sweatshirt, it's got the word "Omerta"

17 in black, and in various colors it's got the words "Honor,

18 Principals, Strength, Respect."  Those are the main ones I can

19 make out.  Several different places with the word "Omerta," it

20 says, "Honor, Principals and Strength" kind of overlaid over

21 that sweatshirt.

22 Q.  And we're looking at a black sweatshirt with the words that

23 you just mentioned.  Can you spell Omerta for us that's on

24 there?

25          MR. BALAREZO:  Objection.  I think it's pretty evident.

1          THE COURT:  Overruled.

2  A.  O-M-E-R-T-A.

3  BY MR. GUERRERO:

4  Q.  If you can just turn to the backside.  Is there anything on

5  the backside of that sweatshirt?

6  A.  No.

7  Q.  If you can just set that right back in the box there.

8          The second piece, will you just hold that up and

9  describe what we're looking at?

10  A.  This appears to be a pair of black sweatpants that may go

11  with that sweat jacket.

12          MR. MARTIN:  Objection.

13          THE COURT:  Sustained.

14  BY MR. GUERRERO:

15  Q.  Is there anything that's similar in that black sweatpants

16  along with the first black sweatshirt that you saw?

17  A.  Yes.

18  Q.  What's that?

19  A.  It has the same smaller version of that same Omerta label on

20  the left leg of the sweatpants.

21          MR. BALAREZO:  Objection, Your Honor.  Can we approach?

22          THE COURT:  Yes.

23          MR. BALAREZO:  Could we have the exhibit?

24          (BENCH CONFERENCE ON THE RECORD.)

25          MR. BALAREZO:  Your Honor, I apologize.  I was

1 mistaken.  I thought that the agent was talking about the

2 emblem.  I didn't realize that the word was within there in the

3 black lettering.  I didn't see that previously.  That was my

4 objection, so I withdraw.

5           (END BENCH CONFERENCE.)

6 BY MR. GUERRERO:

7 Q.  And just so we've got a record here, the emblem that you say

8 says "Omerta," just describe what it looks like.

9 A.  It's black cursive lettering sewn into the sweatpants, and

10 it has a silver oval shape around it with a little piece

11 protruding down.

12 Q.  And the next item, please, Agent, what are we looking at

13 there?

14 A.  This is a black sweatshirt.

15 Q.  If you can hold up the front side so the jury can see it.

16 A.  (Witness complies.)

17 Q.  And are you able to read anything off the front side of that

18 black sweatshirt?

19 A.  Yeah.  It appears to have a face, drawing of a face in the

20 middle, appears to me to have a finger or hand --

21           MR. BALAREZO:  Objection.

22           THE COURT:  Overruled.

23 BY MR. GUERRERO:

24 Q.  You can describe what you see.

25 A.  To me it's clear that this is an individual's face, and

1 what's represented as a finger up, like -- to me, I take that as

2 whispering.

3          MR. BALAREZO:  Objection.

4          THE COURT:  Sustained.

5 BY MR. GUERRERO:

6 Q.  Just so that I can document the record there, Agent, when

7 you raised up your finger, you placed it in front of your two

8 lips?

9 A.  That's correct.

10 Q.  And is that what you're seeing on that black sweatshirt?

11 A.  Yes.  The picture portion, yes.

12 Q.  What else?  Can you read anything off of that black

13 sweatshirt?

14 A.  The words say again "Omerta, Sucka Free, Thorough to the

15 Bone."

16 Q.  Anything else on the front side?  How about the backside?

17 A.  That's it.  The back is plain.

18 Q.  Thank you, Agent.  Next item of clothing.

19 A.  Pair of black sweatpants.  On the left leg it has that exact

20 same decal with the same words, with the face, just a smaller

21 version imprinted on the left leg.

22 Q.  Is that the face with the finger over the two lips?

23 A.  Yes.

24 Q.  Any writing that you can read off of that logo?

25 A.  Just the same words, "Omerta, Sucka Free, Thorough to the

Page 9632

1 Bone."

2 Q.  Next please, Agent, please.  What are we looking at there,

3 first, for the record?

4 A.  A white T-shirt.

5 Q.  Can you tell us what's printed on the white T-shirt, the

6 front side?

7 A.  Looks like a drawing of a scroll, has the word "Omerta," and

8 then has the writing, "A Friend and a Favor Should Always Be

9 Honored."  And it says "Omerta" again at the bottom.

10 Q.  And anything on the backside of that white T-shirt?

11 A.  No.

12 Q.  All right.  Next piece of clothing, please?

13 A.  It's a black T-shirt with a photograph of an individual.  It

14 just says, "You Will Be Missed, We Love You."

15 Q.  Anything on the backside of that T-shirt?

16 A.  No.

17 Q.  Next piece of clothing, please?

18 A.  Gray sweatshirt.

19 Q.  We're looking at the front side of the gray sweatshirt?

20 A.  Yes.

21 Q.  Can you tell us what it reads on the front side of the gray

22 sweatshirt?

23 A.  It says "Omerta" on the top portion, the letters "COS," and

24 then below that, "Secrecy."

25 Q.  And can you describe the logo that's on that gray

1 sweatshirt?

2 A.  I would describe it as a black triangle with the "Omerta"

3 and "COS" and "Secrecy" overlaid in white and blue over that

4 black triangle.

5 Q.  And how about the back of that gray sweatshirt?

6 A.  It has the script "Code of Silence."

7 Q.  All right.  Next piece of clothing, Agent, please.

8 A.  It's a gray T-shirt with different colored letters spelling

9 out the word "Omerta," and there is a bull's eye on a rat.

10 Q.  And the rat is where in reference to the bull's eye?

11 A.  In the center.

12 Q.  Dead center?

13 A.  I would say dead center, yes.

14 Q.  Next piece of -- well, is there anything on the back?

15 A.  No.

16 Q.  Next piece of clothing?

17 A.  It's a black T-shirt, got letters across the top spelling

18 out "Omerta," it has a cartoon individual holding a red stop

19 sign, and it has the words "Don't Be a Rat."  The individual is

20 wearing a shirt that says "Sucka Free," and appears to have a

21 rat in a choke hold in his right hand.

22 Q.  Anything on the back of that black shirt?

23 A.  No.

24 Q.  And the next piece of clothing, Agent, please?

25 A.  This is the black dress shirt.

1 Q.   We're looking at the front side now?

2 A.   This is the front side.

3 Q.   Can you make anything out on the front side?

4 A.   Yes.  It has the letters "COSU," with a red design

5 underneath it.

6 Q.   And the backside of that black dress shirt, anything on it?

7 A.   Yes.  Again it has the letters "COSU" with a design that's

8 underlaid under the letters "COSU," and underneath the letters

9 in white it says "Code of Silence" and has the word "Universal."

10 Q.   Okay, Agent, next item, what are we looking at there?

11 A.   This is a white dress shirt, has those same letters, "COSU,"

12 in gray and red, with a red design on the front.

13 Q.   And on the back of this white dress shirt?

14 A.   It has a black mask with the letters "COS," and then along

15 the right-hand side within an intertwined design, it says

16 "Understood."  The word understood in green.

17 Q.   Thank you, Agent.  Let me retrieve this exhibit.

18        MR. GUERRERO:  Court's indulgence.

19 BY MR. GUERRERO:

20 Q.   Agent, take a look at 108.25.  Do you recognize that?

21 A.   Yes.

22 Q.   What do you recognize it to be?

23 A.   That's a group photograph of a number of individuals,

24 including Mr. Bell, Mr. Jones, Mr. Ball, Mr. Wilson, and other

25 individuals from Congress Park.

1 center is Antoine Draine, and to his right in the white T-shirt

2 is Aman Ball.

3 Q.  Now if we can publish off the computer.

4        And 108.44, do you recognize anybody there, Agent?

5 A.  Yes.

6 Q.  Start with the bottom row, persons that are kneeling.

7 A.  I don't believe I know who that is on the far left.  In the

8 center with the red hat is Antonio Roberson, and to the far

9 right kneeling without a shirt on is Terrence Cooper.  I don't

10 know the individual behind him in the blue hat.

11 Q.  Now, the person standing?

12 A.  Starting from the left, with the white T-shirt, something in

13 his right hand is Antoine Draine; immediately next to him, Aman

14 Ball; in the center with the shirt over his shoulder is Antwuan

15 Ball; the individual in the white tank top with the white

16 fisherman's hat is Kairi Kellibrew; and behind him to his right,

17 or over his shoulder with the hat, the black hat, is Joseph

18 Jones.

19 Q.  108.45, do you see that, Agent?

20 A.  Yes.

21 Q.  What are we looking at there, 108.45?

22 A.  That's David Wilson on the left and Bobby Capies on the

23 right.

24 Q.  Just so that we have a clear record there, the person that

25 you identified as Wilson, what is he wearing?

9730

1   relevance.
2       THE COURT:  Approach please.
3       (Following sidebar discussion had on the record:)
4       MR. BALAREZO:  Your Honor, the government introduced that
5   picture.  I think I'm allowed to explore who the person next to
6   the brother is, clearly in a friendly --
7       THE COURT:  I didn't look that closely, is that Kairi?
8       MR. BALAREZO:  Yes, as far as I know.
9       THE COURT:  I'll allow it.
10      MS. PETALAS:  That's fine, if that's what his question
11  was.  I think he was asking, did you know his friends, and she
12  testified no, she didn't.  And his follow-up question was, have
13  you heard of an individual, Kairi?  It seemed to me he was
14  getting into an area what she heard about Kairi.  If you want to
15  say that's Kairi in the photo, yes, but as far as my -- my
16  concern was that he was going into -- trying to elicit hearsay of
17  what he had heard about Kairi, and there's no basis for that.
18      THE COURT:  He may well, but he hasn't yet, so it's
19  overruled.
20      MR. BALAREZO:  Thank you.
21      (Sidebar discussion concluded.)
22  BY MR. BALAREZO:
23  Q.    Ma'am, do you know if -- did your brother have -- do you
24  know whether or not your brother had a friend that went by
25  Kairi, Kay-Baby, or Baby Kai?  Have you ever heard those names?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9731

1   A.    I've never heard this guy's name until I called my
2   brother's phone when he was deceased.  I never heard his name
3   before.  He had my brother's phone.
4   Q.    Can you just tell me just briefly, and I'll be short, how
5   did you come to hear this guy's name when you called your
6   brother's phone?
7       MS. PETALAS:  Objection, Your Honor.
8       THE COURT:  Sustained.
9   BY MR. BALAREZO:
10  Q.    Did he answer the phone?
11  A.    Yes, he did.
12      MS. PETALAS:  Objection, Your Honor.
13      THE COURT:  Sustained.
14      MR. BALAREZO:  Nothing further.
15      THE COURT:  All right.  Anything else?
16      MS. PETALAS:  No, Your Honor.
17      THE COURT:  Thank you very much, ma'am.  You may be
18  excused.
19      Announce your next witness.
20      MR. GUERRERO:  Your Honor, the government calls Shanay
21  Glenn.
22      (SHANAY GLENN, WITNESS IN THE CASE, SWORN)
23      DIRECT EXAMINATION OF SHANAY GLENN
24  BY MR. GUERRERO:
25  Q.    Good afternoon, ma'am.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9732

1   A.    Good afternoon.
2   Q.    If you can just put this mic a little bit closer to you
3   so everybody can hear you, that way you don't have to yell.
4       Can you tell us your first name and your last name and
5   spell each, please.
6   A.    Shanay Glenn.  S-H-A-N-A-Y, G-L-E-N-N.
7   Q.    Ms. Glenn, how old are you?
8   A.    Nineteen.
9   Q.    Did you go to school?
10  A.    Yes.
11  Q.    What high school did you go to?
12  A.    Ballou Senior High School.
13  Q.    Did you graduate?
14  A.    Yes.
15  Q.    After high school, did you do -- did you go straight to
16  work or did you do some other course work?
17  A.    I became a mother.
18      MR. BALAREZO:  I didn't hear the answer.
19  BY MR. GUERRERO:
20  Q.    Can you repeat your answer, ma'am, please.
21  A.    I became a mother after I graduated out of high school.
22  Q.    And did you start to work after that, Ms. Glenn?
23  A.    Yes.
24  Q.    You don't have to tell me what you do for a living, but
25  are you employed right now, just generally, yes or no?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9733

1   A.    Yes.
2   Q.    Ms. Glenn, when you were growing up, and I would like
3   to -- right now you're 19, so I would like to go back, like,
4   five years when you were like 14 and 15.  I want to focus on
5   that.  Which neighborhood did you grow up in?
6   A.    Congress Park.
7   Q.    Is that in southeast D.C.?
8   A.    Yes.
9   Q.    And are you familiar with Congress Park?
10  A.    Yes.
11  Q.    How many years did you live in that neighborhood?
12  A.    Probably, like, five years.
13  Q.    And around the time that you were 14 -- 13, 14, were you
14  living in Congress Park?
15  A.    Yes.
16  Q.    Back then, what was your address?
17  A.    Oh, you said around the time I was 13 or 14 -- no, I
18  wasn't living around there then.
19  Q.    Oh, you were not?
20  A.    No.
21  Q.    Where were you living back then, when you were about 13
22  or 14 years old?
23  A.    I was living on Atlantic Street.
24  Q.    Can you spell that, please.
25  A.    A-T-L-A-N-T-I-C, Street, Southeast, Washington, D.C..

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9746

1  Q.    And I note for the record, you put a second marking below
2  your first, that marked where your car was.  And the second
3  marking appears to be below it, towards the left of your first
4  mark, closer to the inside angle of the building.
5        Were you able to see if anyone was in that car?
6  A.    No, I wasn't able to see who was in the vehicle.  The
7  vehicle had tinted windows, so I wasn't able to see who was in
8  the car.
9  Q.    And you said Kairi's car.  Had you seen Kairi up to that
10 point?
11 A.    No.
12 Q.    Tell us what happened next, Ms. Glenn.
13 A.    Uhm, I turned around and I seen a man walking -- well,
14 I'm not going to say a man.  I seen a person walking from, I
15 guess, the side of the building.
16 Q.    All right.  Why don't you clear the screen for us at this
17 point, at the lower right-hand corner, just touch it.  And
18 instead of clearing it, you've made a marking on the building
19 that's the -- right now it looks like an L, the two that are
20 connected, the portion on the horizontal side that's next to the
21 bushes.  It's somewhere to the middle, lower right-hand corner
22 of this exhibit that's been blown up, 101.1.
23       You said you saw a person come from that area?
24 A.    Yes.
25 Q.    And what did you see this -- where did you see this

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9747

1  person walk to?
2  A.    Like walking towards -- I want to say walking towards the
3  vehicle, but I actually don't know, because I seen the gun and
4  my first instinct is to duck.
5  Q.    Okay.  Let's take it slow.  When you saw this person, did
6  you see this person turn that corner into the parking lot?
7  A.    See what person turn the corner into the parking lot?
8  Q.    You said you saw the person?
9  A.    You're saying, did I see the person walk around?
10 Q.    Yes.
11 A.    Yes, I seen him like -- yeah, walking, I guess.  I don't
12 know where they was coming from, but --
13       MR. BALAREZO:  Objection.
14       THE COURT:  Let her finish.  Overruled.
15 BY MR. GUERRERO:
16 Q.    Go ahead.  You may answer.
17 A.    I seen the person, like, walking from the side of the
18 building to -- I guess to the vehicle.
19 Q.    Which vehicle are you talking about?
20 A.    I mean, obviously it was Kairi's vehicle.
21 Q.    And when you saw this person, describe what this person
22 looked like.
23 A.    Uhm, tall, like -- I can't really describe the face,
24 because the face was covered up.
25 Q.    Okay.  Let's start with that.  Tall, and the face was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9748

1  covered up.  What was the face covered up with, that you saw?
2  A.    Like a T-shirt or something, like a stocking cap for your
3  head or something, and like the face was covered.  You couldn't
4  see nothing but eyes, so -- I really didn't get a -- I didn't
5  get a chance to see too much because shots was fired and I was
6  down.
7  Q.    Okay.  Let's take it slow.  Okay?  The -- you said that
8  the face had a mask on it?
9  A.    Yes.
10 Q.    And shots were fired.  Did you see this man holding a
11 gun?
12 A.    Yes.
13 Q.    One or more?
14 A.    One.
15 Q.    And when you saw this person with the gun, did you hear
16 shots?
17 A.    I misunderstood your question.
18 Q.    You said you heard gunshots.
19       MR. BALAREZO:  Objection, leading.
20       THE COURT:  Overruled.
21 BY MR. GUERRERO:
22 Q.    I think you said earlier you heard shots, right?
23 A.    Yes.
24 Q.    How many shots did you hear?
25 A.    I can't recall how many, but it was several shots.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9749

1  Q.    And at that point, you did what?
2  A.    Ducked.
3  Q.    And did the shots continue?
4  A.    Yes, they continued, but eventually they stopped.
5  Q.    And this person that you saw with the gun, did you see
6  the person shoot it?
7  A.    No, I didn't see the person shoot it, because I was down
8  good.
9  Q.    Did you see anybody else with a gun before you ducked
10 down?
11 A.    No.
12 Q.    And when you -- once the shots stopped, what did you do?
13 A.    Once the shots stopped, I raised up and I left the scene.
14 Q.    Before you left, did you see Kairi's car?
15 A.    Yes.
16 Q.    What did it look like?
17 A.    It -- hum.  It had crashed into another car or something,
18 and I don't know -- I'm not really for sure.  I know I left.
19 Q.    Okay.  And how about Tenay, was Tenay inside the car with
20 you or not, during this period of the shots?
21 A.    When I got up, the door was open and Tenay was gone.
22 Q.    Did Tenay ever make it back to your car?
23 A.    No.
24 Q.    How about Kairi's car, now, did you ever see anyone when
25 you lifted up your head?  Did you ever see anyone get out of the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**9750**

1 car?

2 **A.** I didn't see no one get out. I didn't even want to look.

3 I left.

4 **Q.** And before you left, going back to before you left, once

5 the shooting started, did you see anybody get out of Kairi's

6 car?

7 **A.** No.

8 **Q.** Now, this person that had on a mask and a gun, describe

9 his physical build, body.

10 **A.** I can say he was like tall and like -- built-like, tall.

11 That's the most I can describe, because it's not too much I

12 seen.

13 **Q.** Okay. And how about the skin complexion, were you able

14 to see that?

15 **A.** Probably from the forehead on down to the eyes, I could

16 say more so like my complexion, sort of, kind of.

17 **Q.** Okay. And how about his weight? Was he thin, heavy?

18 **A.** Thin.

19 **Q.** And when you saw that person with that body type, did you

20 draw your own conclusions as to who it was?

21 MR. BALAREZO: Objection.

22 THE COURT: Sustained.

23 MR. BALAREZO: Move to strike the question, Your Honor.

24 THE COURT: Go ahead.

25 BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**9751**

1 **Q.** Do you remember making a determination as to who you

2 thought it was?

3 MR. BALAREZO: Objection.

4 THE COURT: Sustained, but you can rephrase.

5 BY MR. GUERRERO:

6 **Q.** When you saw that person with the mask and the gun, who

7 did you think it was?

8 MR. BALAREZO: Objection.

9 THE COURT: Well, come on up.

10 (Following sidebar discussion had on the record:)

11 THE COURT: What are you trying to elicit?

12 MR. GUERRERO: Your Honor, based on the body build and the

13 weight, the height, the general body characteristics, she made a

14 determination at that point that the person who was with the gun

15 shooting was Dom.

16 THE COURT: What does that mean?

17 MR. GUERRERO: That it was Dominic Samuels who was --

18 well, just Dom, who was the person who was the shooter.

19 THE COURT: I guess my question is: Had she made -- how

20 did she reveal this? What is she going to say?

21 MR. GUERRERO: Exactly that, that she thought it was Dom,

22 but she couldn't be 100 percent sure because she couldn't see his

23 face, because it was put up -- it had a mask to it.

24 MR. BALAREZO: Right there, I have a problem.

25 Mr. Guerrero just said two things. The first thing he said was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**9752**

1 she based on the body type and build would say it's Dom, that's

2 the first statement he made. The second statement was that it

3 was that she thinks it was Dom. Everything that I read in *Jencks*

4 that this witness had said indicates that she never saw the guy's

5 face and it was only based on the general body type that she

6 thought it was Dom. But she does not identify my client at all,

7 so I don't know what the government at this point is trying to

8 elicit. They know she does not identify him, and quite frankly,

9 who she thought it may have been, given that she can't identify

10 the shooter, I think is irrelevant and I think it's highly

11 prejudicial.

12 THE COURT: Well, it's certainly not irrelevant if she's

13 able to testify or had said before who she thinks it looks like.

14 And you can cross-examine her with respect to certainty, if at

15 all, there is a problem with identification.

16 But I was just a little troubled by the questions because

17 I didn't know what you were trying to bring out, but you can ask

18 her who the person looked like, and you can cross on that.

19 MR. BALAREZO: Whom?

20 THE COURT: I guess it would be whom -- who the person --

21 who the person looked like.

22 MR. BALAREZO: That's my second language so I don't know.

23 THE COURT: And you corrected me. You're better than I

24 am. Did we finish that?

25 MR. BALAREZO: Exactly.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**9753**

1 THE COURT: All right.

2 (Sidebar discussion concluded.)

3 BY MR. GUERRERO:

4 **Q.** Okay. Ms. Glenn, I wanted to ask you, the person with

5 the gun and the mask, who did that person look like to you?

6 **A.** Uhm, to myself I was -- I pictured someone, but I wasn't

7 for sure who it was. I mean, I don't know who it was.

8 **Q.** All right, but you said you pictured someone, and who was

9 it that you pictured?

10 **A.** A person.

11 **Q.** And what was that person's name?

12 **A.** Don.

13 **Q.** Can you spell that for us?

14 **A.** D-O-N.

15 **Q.** And what was it that made you conclude it was this person

16 Don, D-O-N?

17 MR. ZUCKER: Objection.

18 THE COURT: Sustained. You can rephrase.

19 BY MR. GUERRERO:

20 **Q.** Why did you think it was Don?

21 MR. ZUCKER: Objection.

22 THE COURT: Sustained, but you can rephrase.

23 BY MR. GUERRERO:

24 **Q.** You said you thought the person you saw was Don?

25 THE COURT: No, that's not what she said.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

9754

1    MR. ZUCKER:  Misstates the evidence.

2    THE COURT:  Not what she said.

3  BY MR. GUERRERO:

4    Q.    Let me just ask you, if I can get a repetition of her

5  answer so I can quote it correctly through the Court's

6  assistance.

7    (Court reporter read back as requested.)

8  BY MR. GUERRERO:

9    Q.    This person named Don, you think that person you saw

10  doing what?

11    MR. ZUCKER:  Objection.

12    MR. BALAREZO:  Objection.

13    THE COURT:  Sustained.

14  BY MR. GUERRERO:

15    Q.    Who is this person, Don, that we're talking about?  What

16  was it that you saw?

17    MR. BALAREZO:  Objection.

18    MR. ZUCKER:  Objection, compound.

19    THE COURT:  Compound.  Sustained.

20  BY MR. GUERRERO:

21    Q.    What was it that you saw Don do?

22    MR. ZUCKER:  Objection.

23    MR. MARTIN:  Objection.

24    THE COURT:  Sustained.

25    THE WITNESS:  Uhm.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

9755

1    THE COURT:  Hold on, when I sustain it that means you

2  don't have to answer.

3    MR. GUERRERO:  Your Honor, can we approach?

4    THE COURT:  Yes.

5    (Following sidebar discussion had on the record:)

6    THE COURT:  There's one question that you asked -- there

7  was an initial question that you asked, whom did he look like?

8  She answered that.  You can go based on that.  There's another

9  answer she gave that I had someone pictured.  And you asked whom

10  did you picture and she gave an answer.  You can use that, but

11  the other formulations that you gave are not right.

12    MR. GUERRERO:  I understand that is correct, Your Honor, I

13  think -- unless I'm missing something here, I think if the record

14  is clear, that the person that she pictured as Don was the person

15  that she saw with the gun.

16    THE COURT:  Correct, but you're converting what she said

17  in the format of your question into a positive identification,

18  which she has not made.  You may ask her about, you know, whom

19  she pictured or whom she thought he looked like.  Premise your

20  questions that way.

21    But your questions were more premised as if she had made a

22  positive ID and she has not, so you must use her testimony.  Use

23  her language.

24    MR. GUERRERO:  That she was unsure.

25    THE COURT:  Well, the point is, you asked whom did he look

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

9756

1  like?  That's not, who was it?  And the answer she gave was, I

2  had someone pictured, or I pictured someone.  So you may ask

3  something about whom she pictured, but you can't say -- phrase

4  the question as if she has given a positive identification.  You

5  have to use her language.  I'm not trying to be obtuse, but I'm

6  trying to...

7    MR. GUERRERO:  I understand, I just wasn't following it

8  originally when I was at the podium.

9    THE COURT:  Okay.  Does that clarify it?

10    MR. GUERRERO:  I hope so.

11    THE COURT:  All right.

12    (Sidebar discussion concluded.)

13  BY MR. GUERRERO:

14    Q.    All right, Ms. Glenn.  This person that said looked

15  like Don, but you weren't sure?

16    A.    Yeah, I never said that it was him.  I never told nobody

17  that it was him, because how can I say it was him if I don't

18  know who it was, if they was covered up.  I never said that it

19  was him.

20    Q.    I understand that.  You said it looked like him and I'm

21  being corrected here -- and this person that looked like Don,

22  what was it that you saw that person do?

23    A.    What you mean, what is it that I saw him do?

24    Q.    Tell us, that person that looked like Don, was the person

25  that did what on the --

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

9757

1    A.    Fire the gun.

2    Q.    And what was -- what else did you see him do?

3    A.    Nothing else, because I was down.

4    Q.    All right.  At that point, Ms. Glenn, what did you do?

5  You said you left the area?

6    A.    Yes, I did.

7    Q.    Where did you go?

8    A.    I went to my friend's house.

9    Q.    And who was that?  Which friend?

10    A.    Toya.

11    Q.    Is that the same person that goes by Onion?

12    A.    Yes.

13    Q.    Did you ever reach up with Tenay at that point?

14    A.    What you mean?  After the situation, did I ever meet back

15  up with her?

16    Q.    Yeah.

17    A.    No, I did not.

18    Q.    And let me just rewind here a little bit before we go

19  into another topic here.

20    When you were in that parking lot, was there anything

21  blocking your view, at all, of the person who was shooting?

22    A.    No.

23    Q.    Describe your view.  What was the lighting conditions

24  like?

25    A.    I misunderstood your question.  What you say?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

# Tab 33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      :      Docket No. CR 05-100
                               :
            Plaintiff          :
                               :
v.                             :      Washington, DC
                               :
ANTWUAN BALL,                  :
DAVID WILSON,                  :
GREGORY BELL,                  :      May 3, 2007
DESMOND THURSTON,              :
JOSEPH JONES,                  :
DOMINIC SAMUELS,               :
                               :
            Defendants         :      9:15 a.m.
. . . . . . . . . . . . . . . . :      . . . . . . . . . . . .

VOLUME 45 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234
                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300

                          Washington, DC  20006

                          (202) 454-2811

1 A.  Uh-huh.

2 Q.  And I'll just orient you to that number.  Do you recognize

3 it now?

4 A.  Oh, yes.

5 Q.  What do you recognize Number 54 to be?

6 A.  My building, and my new building.

7 Q.  And the area between the buildings, what do you recognize

8 that area to be?

9 A.  Parking lot.

10 Q.  Is that the parking lot where the shooting took place?

11 A.  Yes.

12 Q.  I'll come back to you with that.

13        Now, on August 27th --

14        MR. BALAREZO:  If I could have one second, Your Honor.

15            (OFF THE RECORD.)

16 BY MR. BALAREZO:

17 Q.  Ma'am, back on August 27th of 2002, when this shooting took

18 place, you were 14 years old.  Is that right?

19 A.  Yes.

20 Q.  And at that time you knew this individual by the name of

21 Kairi Kellibrew.  Is that right?

22 A.  Yes.

23 Q.  Now, will show you Government's Number 503.10.  And for now

24 I'll leave up those red marks.  Do you see the picture?

25 A.  Yes.

Page 9881

1 who has been described as the shooter, you said he came out of a

2 building?

3 A.  Yes.

4 Q.  Can you put an X with a circle around it at the point where

5 you saw the individual come out of that building?

6 A.  (Witness complies.)

7 Q.  And you've marked an X -- thank you.  It appears at a door,

8 an exit of the building that's marked as 3406?

9 A.  Yes.

10 Q.  13th Place.

11       So you saw this person come out of the building.

12 Right?

13 A.  Yes.

14 Q.  And at the time that you saw him come out of the building,

15 you did not see any weapons in this person's hands.  Right?

16 A.  When he came out the building?

17 Q.  Right.

18 A.  Yes.

19 Q.  You did see weapons or you did not see weapons?

20 A.  I did.

21 Q.  And you saw two weapons at that time?

22 A.  Yes.

23 Q.  And that's when Shanay started pushing your head down?

24 A.  I went and got in the car.

25 Q.  You went back to get into Kairi's car?

Page 9882

1 A.  Shanay car.

2 Q.  I'm sorry.  I'm confused.  I apologize.

3      MR. BALAREZO:  I keep I think hearing things in my ear,

4 Your Honor.

5 BY MR. BALAREZO:

6 Q.  You got out of your car, and you came back to Shanay's car.

7 Right?

8 A.  I got out of the car with Shanay, I walked over, came back,

9 got back in the car.

10 Q.  And you were walking over towards Kairi's car?

11 A.  Yes.

12 Q.  And you knew Kairi very well?

13 A.  Yes.

14 Q.  And you're sure you didn't see Kairi at all up until that

15 point.  Is that right?

16 A.  Yes.

17 Q.  You didn't see him in his car?

18 A.  Nope.  No.

19 Q.  You didn't see -- and I'm talking about, you didn't see him

20 in the blue car with Black?

21 A.  No.

22 Q.  And you didn't see him get out of that blue car and go into

23 any of those buildings immediately around the parking lot.

24 Right?

25 A.  No.

1 Q.  Now, you came back to Shanay's car, and shooting started.

2 Right?

3 A.  Yes.

4 Q.  And then that's when Shanay started pushing you down --

5 A.  Yes.

6 Q.  -- saying "Get down, get down, get your head down."  Right?

7 A.  Yes.

8 Q.  And you wanted to see what was going on.  You were a little

9 curious, though.  Right?

10 A.  I was getting up -- I just wanted to run.

11 Q.  Okay.  So you wanted to run.  That's why you were looking

12 up?

13 A.  Yes.

14 Q.  Now, at no point when the shooting was going on did you see

15 Kairi Kellibrew, Kay-Bay, or Kay-Baby --

16 A.  No.

17 Q.  -- out in that parking lot.  Right?

18 A.  No.

19 Q.  You didn't hear his voice?

20 A.  No.

21 Q.  At any time?

22 A.  No.

23 Q.  Now, you did indicate that at some point you saw Black get

24 out of the blue car, the blue Lincoln, and try to run away and

25 shoot back.  Is that right?

Page 9884

1 A.  Yes.

2 Q.  So you do recognize that, at this point, that he had weapons

3 on him, or at least one weapon, and was also firing.  Is that

4 right?

5 A.  I don't remember.

6 Q.  But Mr. Guerrero showed you --

7 A.  I still don't remember.  He showed me, but I don't remember.

8 Q.  So you don't remember that at all?

9 A.  I remember him getting out the car.  I don't remember.

10 Q.  Which part don't you remember?

11 A.  I just remember him trying to get out the car.

12 Q.  You don't remember the shooting?  Okay.

13       Now, let me ask you this.  This happened when you were

14 14 years old?

15 A.  Yes.

16 Q.  And this was about five years ago?

17 A.  Yes.

18 Q.  A lot of things have happened in your life since then.

19 Right?

20 A.  Yes.

21 Q.  And this was probably something you want to forget.  Is that

22 right?

23 A.  Yes.

24 Q.  Now, when you say you don't remember, is it because you

25 really don't remember or because you're trying to lie to the

*10006*

1 Ant is?

2 **A.** Like -- I don't know, 30-something.

3 **Q.** 30-something?

4 **A.** I don't know.

5 **Q.** Okay. Now, back after the shooting, back in August of

6 2002, did you -- just, let's start with you, first -- you,

7 Toya Ryals, ever talk to Antwuan or Big Ant about this shooting

8 that we've been talking about here today?

9 **A.** Yes.

10 **Q.** Okay. How many times would you say you talked to Antwuan

11 or Big Ant about this shooting?

12 **A.** I can't really remember.

13 **Q.** Was it more than once?

14 **A.** It could have been, maybe. I can't --

15 **Q.** Could I ask you to turn to page 26, the very first couple

16 lines of page 26 of your grand jury transcript.

17 Actually, if you could start on the very last page of

18 page 25, the very bottom of page 25, beginning on line 20, and

19 then if you could carry up on the page 26?

20 **A.** "More than one time, three."

21 **Q.** Okay. Does that sound about right? Is that your memory

22 now, how many times?

23 **A.** It could have been.

24 **Q.** Yes?

25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10007*

1 **Q.** Now, were you present -- first, just yes or no -- at a

2 time when -- during one of these conversations that you had with

3 Big Ant when Tanay or Shanay was also present, when you were all

4 talking about the shooting?

5 **A.** Yes.

6 **Q.** First of all, do you remember where this conversation --

7 let's start with the first one you remembered.

8 Do you remember where the conversation was? Was it

9 inside? Was it outside? Was it -- do you remember?

10 **A.** Uhm -- outside.

11 **Q.** Okay.

12 **A.** I don't know.

13 **Q.** And was this on -- was this on a telephone or this is

14 outside in person?

15 **A.** In person.

16 **Q.** In person?

17 And what, if anything, do you remember -- you yourself

18 remember Big Ant saying during this conversation?

19 **A.** He just was asking us are we okay and just don't say

20 nothing. Just don't say nothing.

21 **Q.** Don't say nothing?

22 **A.** Yes.

23 **Q.** What did you understand that to mean?

24 **A.** What did I understand?

25 **Q.** Right. What did you think, in your own mind, that meant,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10008*

1 when Big Ant said don't say nothing?

2 **A.** I wasn't thinking -- I wasn't thinking nothing. I was

3 just -- he said don't say nothing, so -- maybe he was just

4 saying that just to tell us so no one won't get hurt, I guess.

5 I don't know, he was just saying don't say nothing because we

6 talk to him, so he was just telling us.

7 **Q.** And when this conversation, this first conversation

8 happened, you were there, obviously? You heard this with your

9 own ears?

10 **A.** Yes.

11 **Q.** Okay. Was Shanay there?

12 **A.** Yes.

13 **Q.** Do you remember if Tanay was there as well, this first

14 conversation?

15 **A.** Yeah, I think, yeah.

16 **Q.** Okay. Do you remember anything else that Big Ant said

17 during this first conversation with you, Shanay and Tanay?

18 **A.** No.

19 **Q.** I'm going to ask if you can just look to the page 27, and

20 I'd ask you just to look at line 1, and read down through line

21 17.

22 Read that to yourself if you could and just tell us when

23 you're done.

24 MR. TABACKMAN: Your Honor, I would object.

25 THE COURT: Hold on one second.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10009*

1 MR. TABACKMAN: I would object to the form of refreshing.

2 One of the things that hasn't been established is that she has a

3 better recollection at some prior point that can be refreshed.

4 THE COURT: Overruled.

5 BY MR. LEON:

6 **Q.** Have you had a chance to read those lines?

7 **A.** Yes.

8 **Q.** Do you -- as you sit here now, after having reviewed your

9 transcript, do you remember anything more about what Big Ant

10 said to you during that first conversation?

11 **A.** No, I read it, but I don't -- I don't know. I don't

12 remember.

13 **Q.** You don't remember?

14 **A.** (Witness shook head negatively.)

15 **Q.** Counsel, page 20, line 1 -- excuse me, 27, line 1.

16 Ms. Ryals, read along with me if you could. I'm going to

17 start on line 1 and end on line 17 and just tell me if I'm

18 reading this correctly.

19 "Question: Okay. And what did Big Ant say to Shanay

20 when you were listening?"

21 "Answer: He asked her if she -- did she see who it was

22 and he was telling her, well, just" --

23 MR. TABACKMAN: Your Honor, I'm going to object. This

24 is not impeachment, this is not an inconsistent statement. She's

25 testified to this. If the Court wants to see the transcript.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10014

1    MR. TABACKMAN: And that's my point.
2    THE COURT: Anything else?
3    MR. LEON: No.
4    THE COURT: The point there is there's nothing wrong with
5    you going back and saying, just impeaching with, did he say X,
6    did he ask X. Either he did or he didn't. Either she remembers
7    or she doesn't. Either she admits it or she denies it and then
8    you can -- then you can follow up, if necessary, after that.
9         But there's nothing wrong -- I think Mr. Tabackman's point
10   is simply that the broad question, did he say anything else
11   doesn't fairly allow her an opportunity to be confronted with her
12   prior statement that he also said to me, or he also said to
13   Tanay, did you see the -- whatever that says. Is that a fair --
14   MR. TABACKMAN: Yeah, and --
15   THE COURT: So, put your -- put the question with greater
16   specificity, then simply, did he say anything else?
17   MR. TABACKMAN: The question is, to say that -- there's no
18   answer to what did Shanay tell him.
19   THE COURT: I know that.
20   MR. TABACKMAN: Okay.
21   MR. LEON: Okay.
22   (Sidebar discussion concluded.)
23   BY MR. LEON:
24   Q.   Ms. Ryals, during this first conversation that -- after
25   the shooting that you and Shanay and Tanay had with Big Ant,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10015

1    still on that first conversation, do you remember if Big Ant
2    asked Shanay, in your presence, whether or not she, Shanay, saw
3    the shooting?
4    A.   Yes.
5    Q.   And did Big Ant ask Shanay if she witnessed the shooting?
6    A.   Yes.
7    Q.   And was this the same conversation when Big Ant told you
8    and Shanay and Tanay not to talk to nobody?
9    A.   Yes.
10   Q.   Did -- I believe the record's clear, but let me make sure
11   it is. Did you, yourself, eyewitness this shooting?
12   A.   No.
13   Q.   Do you remember if you said that to Big Ant at any point?
14   A.   Yes.
15   Q.   And you told him you didn't see the shooting?
16   A.   Yes.
17   Q.   Now, do you remember approximately the next day having
18   another conversation with Big Ant and Tanay and Shanay regarding
19   the shooting?
20   A.   I don't know, maybe.
21   Q.   Okay. I'm going to ask if you can turn to page 28 of
22   your transcript. And I'm going to ask you to look first at page
23   28, line 16, and if you could look, start there and read all the
24   way down to the end of page 29.
25   A.   All the way to which number?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10016

1    Q.   If you can keep reading all the way down to the end of
2    page 29, and then actually also read to page 30 and through page
3    30, if you could.
4         Okay. Are you done? Do you remember during this
5    conversation, the second conversation that you had with Big
6    Ant -- first of all, do you remember who else was present during
7    this conversation?
8    A.   Me and Shanay and Tanay.
9    Q.   Okay. And was this a conversation that happened in
10   person? In other words, not over the phone, but where
11   everyone's looking and listening at each other?
12   A.   Yes.
13   Q.   Okay. And during this conversation, do you remember
14   Big Ant saying something to you, you Toya?
15   A.   Uhn-uhn, no.
16   Q.   Okay. I'm going to ask if you could turn to page 29.
17   A.   I'm on page 29.
18   Q.   Okay. And I'm going to start reading on line 13. And
19   tell me if I'm reading correctly.
20   MR. TABACKMAN: Which page is this?
21   MR. LEON: Counsel, 29, line 13.
22   BY MR. LEON:
23   Q.   "Question: Well, do you remember, did she -- did he ever
24   say to you, you know, don't say anything?"
25        "Answer: He was telling me -- yeah, he told -- yeah, he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10017

1    was telling her -- all of us, just don't -- just be quiet, don't
2    talk to people. Yeah, like that, don't talk to people."
3         "Question: Okay. Did he say people as a whole or police
4    or prosecutors or just don't talk to anybody?"
5         "Answer: No, he said 'don't talk to nobody'."
6         "Question: Okay. And when he was telling that to you,
7    it sounds like Shanay was with you; is that right?"
8         "Um-hmm."
9         "Question: Is that "yes"?"
10        "Answer: Yes."
11        "Question: And were other people standing there with you
12   at that time?"
13        "Answer: No. Probably me, Shanay and Tanay."
14        "Question: Okay. So you think Tanay was present as
15   well?"
16        "Answer: Yes." And then there's a final question.
17        "Question: Okay. Did he actually ask Shanay and Tanay if
18   they saw the shooting?"
19        "Answer: I don't remember."
20        And that finished up on page 30, line 8. Did I read that
21   correctly?
22   A.   Yes.
23   Q.   And that was your grand jury testimony? Yes?
24   A.   Yes.
25   Q.   Now, during this second conversation when Big Ant said

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10018

1 those things to you, you Toya, were you upset?
2 **A.** No.
3 **Q.** Why not?
4 **A.** I don't know, maybe because I just wasn't there. I
5 don't -- I wasn't --
6 **Q.** You weren't there meaning where?
7 **A.** Present on the scene. I wasn't there, so I wasn't
8 feeling no type of way. I don't know. I was --
9 **Q.** When you say there at the scene, you mean the scene of
10 the shooting?
11 **A.** Yes.
12 **Q.** If you had been at the scene of the shooting, would you
13 have felt upset?
14   MR. TABACKMAN: Objection.
15   THE COURT: Sustained.
16 BY MR. LEON:
17 **Q.** Same question, but now with respect to Shanay and Tanay.
18 Do you know -- first just yes or no -- if Shanay or Tanay were
19 upset after --
20   MR. TABACKMAN: Objection.
21 BY MR. LEON:
22 **Q.** -- hearing what Big Ant said?
23   MR. TABACKMAN: Objection. It's effectively a hearsay.
24 He's asking her for hearsay.
25   MR. ZUCKER: Plus speculation.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10019

1   MR. TABACKMAN: And speculation.
2   THE COURT: One at a time.
3   MR. TABACKMAN: And speculation.
4   MR. ZUCKER: Same thing, speculation.
5   THE COURT: All right. Mr. Purpura, do you have
6 something?
7   MR. PURPURA: I don't, Your Honor, but I'll join the
8 objection.
9   THE COURT: Oh, all right.
10   MR. LEON: I do have a good faith basis for the question,
11 which I could explain at the bench.
12   THE COURT: Well, come on up.
13   (Following sidebar discussion had on the record:)
14   THE COURT: I think that the vocabulary you used was,
15 "Were they upset?" What is it that you're trying to elicit?
16   MR. LEON: I could have asked, as often, a better
17 question.
18   THE COURT: Are you trying to get her observation or
19 perception or demeanor or are you trying to get something
20 different?
21   MR. LEON: This is what I'm trying to get. This witness
22 said in the grand jury that she believed that Shanay and Tanay
23 thought that they did have to keep their mouths shut. The reason
24 she said that is after Big Ant, Mr. Ball, said these things to
25 her, Shanay said, let's stop going around Congress Park and they

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10020

1 did stop going around Congress Park. That's what I'm trying to
2 elicit. And this witness is -- perhaps my predicate question
3 could have been clearer as is often the case, but that's all I'm
4 trying to go to. She observed and she heard Shanay say, let's
5 not go back to Congress Park for a while, and that's where I'm
6 trying to go.
7   So that's where I'm trying to go. So I think it is fair
8 to say, do you know if -- I could say it like, do you know if
9 they took that instruction seriously? I mean, anyway I ask it,
10 it's going to be objected to. I'm trying to think -- that's
11 where I'm trying to go.
12   THE COURT: I think I'll allow you to ask a question that
13 would elicit from her, her perception of their demeanor, like
14 were they happy, sad, frightened, blah-blah-blah, rather than
15 their comment. If you can do that, I'll let you do that.
16   MR. TABACKMAN: Your Honor, that is grossly unfair.
17   THE COURT: To elicit perception of their demeanor?
18   MR. TABACKMAN: They had those witnesses on the stand.
19 They never asked them a question about Mr. Ball and their
20 interaction with Mr. Ball because they knew those witnesses were
21 not saying, you know, anything about this.
22   THE COURT: There's no improper evidentiary basis for him
23 to ask this witness about their perception with these two other
24 witnesses.
25   MR. TABACKMAN: But, Your Honor --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10021

1   THE COURT: Anything else? Overruled.
2   (Sidebar discussion concluded.)
3 BY MR. LEON:
4 **Q.** Okay, Ms. Ryals. During this second conversation that
5 you had with Big Ant where Shanay and Tanay were present, after
6 Big Ant, Antwuan, said those things to you and them, how did
7 Shanay seem to you?
8 **A.** Uhm, she was just -- she was the same as she was. She
9 was just scared.
10 **Q.** I couldn't --
11 **A.** Scared.
12 **Q.** And why do you say that?
13 **A.** I don't know, maybe because she was back there. I don't
14 know. And people knew she was back there.
15 **Q.** And what about Tanay, how did Tanay seem to you after
16 Big Ant said that?
17 **A.** The same way.
18 **Q.** Which is what?
19 **A.** Scared.
20 **Q.** After Big Ant, Antwuan, said these things to the three of
21 you, did -- do you know -- first just yes or no -- if Shanay
22 kept coming back to Congress Park?
23 **A.** Kept coming back?
24 **Q.** If you don't understand the question, I can ask a better
25 one.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Docket No. CR 05-100 |
| v. | : | |
| ANTWAN BALL, DAVID WILSON, | : | Washington, DC |
| GREGORY BELL, DESMOND | : | |
| THURSTON, JOSEPH JONES, and | : | May 7, 2007 |
| DOMINIC SAMUELS, | : | 9:20 a.m. |
| Defendants. | : | |

VOLUME 46 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE<br>Glenn S. Leon, Assistant United States Attorney<br>Ann H. Petalas, Assistant United States Attorney<br>Gilberto Guerrero, Assistant United States Attorney<br>555 4th Street<br>Washington, DC 20001<br>202.305.0174 |
| For Defendant<br>Antwuan Ball: | CARNEY & CARNEY<br>John James Carney, Esq.<br>South Building<br>601 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>202.434.8234 |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Antwuan Ball: | TIGHE, PATTON, ARMSTRONG, TEASDALE, PLLC<br>Steven Carl Tabackman, Esq.<br>1747 pennsylvania Avenue, NW<br>Suite 300<br>Washington, DC 20036<br>202.454.2811 |
| For Defendant<br>David Wilson: | LAW OFFICE OF JENIFER WICKS<br>Jenifer Wicks, Esq.<br>503 D Street NW, Suite 250A<br>Washington, DC 20001<br>202.326.7100 |
| | GARY E PROCTOR, LLC<br>Gary E. Proctor, Esq.<br>6065 Harford Road<br>Baltimore, MD 21214<br>410.444.1500 |
| For Defendant<br>Gregory Bell: | LAW OFFICE OF JAMES W. BEANE<br>James W. Beane, Jr., Esq.<br>2715 M Street, N.W.<br>Suite 200<br>Washington, DC 20007<br>202.333.5905 |
| For Defendant<br>Desmond Thurston: | LAW OFFICE OF JONATHAN ZUCKER<br>Jonathan Seth Zucker, Esq.<br>514 10th Street, NW<br>9th Floor<br>Washington, DC 20004<br>202.624.0784 |
| For Defendant<br>Joseph Jones: | LAW OFFICE OF ANTHONY MARTIN<br>Anthony Douglas Martin, Esq.<br>7841 Belle Point Drive<br>Greenbelt, MD 20770<br>301.220.3700 |
| | LAW OFFICE of ANTHONY ARNOLD<br>Anthony Darnell Arnold, Esq.<br>One Research Court<br>Suite 450<br>Rockville, MD 20852<br>301.519.8024 |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Dominic Samuels: | LAW OFFICES OF A. EDUARDO BALAREZO<br>A. Eduardo Balarezo, Esq.<br>400 Fifth Street, NW<br>Suite 300<br>Washington, DC 20001<br>202.639.0999<br>and<br>William B. Purpura, Esq.<br>8 East Mulberry Street<br>Baltimore, MD 21202<br>410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR<br>Official Court Reporter<br>Room 6814, U.S. Courthouse<br>Washington, DC 20001<br>202.326.0566 |

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**MORNING SESSION, MAY 7, 2007**

1
2    (9:21 a.m.)
3         THE COURT:  Counsel, is your witness here?
4         MR. LEON:  She's not, Your Honor.
5         (Pause in proceedings.)
6         MR. LEON:  Your Honor, the witness is still not here.
7    Ms. Ryals is not here.  We tried both contact numbers we have for
8    her, left a message on one; the other we couldn't even leave a
9    message.
10        The only other thing we could tell the Court is the next
11   witness we expect to call is Mr. Kelliebrew, who we expect to
12   be -- in all likelihood, take up the rest of the week, so it's a
13   bit impractical -- I suggest we wait, hopefully just a few more
14   minutes, and see where we are, but that's where we are right now.
15        THE COURT:  All right.  I'll wait a few minutes.  We'll be
16   at ease.
17        (Thereupon, a break was had from 9:26 a.m. until 9:46
18   a.m.)
19        THE COURT:  Any updates?
20        MR. LEON:  No.  We're in the same position we are.  We
21   haven't heard from the witness at all.
22        THE COURT:  Ms. Romero, the mute button is on.  Can you
23   turn that off.
24        Any proposals?
25        MR. LEON:  The only other witness we have ready to go

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1  quickly communicate that to you.  Then you bring to my attention

2  all the facts that you know and I will make a judgment at that

3  point as to whether I want to lift the stay.

4      MR. LEON:  Okay.  Okay.  Thank you.

5      THE COURT:  All right.  Is your next witness here?

6      MR. LEON:  Yes.

7      THE COURT:  All right.  Let's just bring the jurors in.

8      (Jury in at 9:55 a.m.)

9      THE COURT:  Good morning, ladies and gentlemen.  Welcome

10  back.  Hope you had a restful break.

11      Thank you very much for your patience and indulgence this

12  morning.  We're going to have to reorder the witness presentation

13  this morning, but we're ready now to resume.  But again, thank

14  you for your indulgence.

15      Announce your next witness.

16      MS. PETALAS:  Yes, Your Honor.  The government calls Kairi

17  Kelliebrew to the stand.

18      (KAIRI KELLIEBREW, GOVERNMENT'S WITNESS, SWORN)

19      DIRECT EXAMINATION OF KAIRI KELLIEBREW

20  BY MS. PETALAS:

21  Q.   Good morning, Mr. Kelliebrew.  Could you please state

22  your name and spell your name for the record.

23  A.   My name is Kairi Amon Kelliebrew.  The first name is

24  Kairi, K-A-I-R-I, middle name is Amon, A-M-O-N, last name is

25  Kelliebrew, K-E-L-L-I-E-B-R-E-W.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   And, Mr. Kelliebrew, when you were -- were there any

2  other names that you go by or used to go by?

3  A.   Baby Kairi, Kay-Bay, Blade.

4  Q.   And how old are you?

5  A.   Twenty-six.

6  Q.   And are you familiar with an area called Congress Park?

7  A.   Yes, ma'am.

8  Q.   How are you familiar with Congress Park?

9  A.   I used to live around there.  I used to hang around

10  there.

11  Q.   You said you used to live around there and hang around

12  there?

13  A.   Yes, ma'am.

14  Q.   And when did you start living there?  When did you first

15  move to Congress Park?

16  A.   It had to be like -- it had to be like maybe six, seven,

17  maybe eight, something like that.  I stayed at 1313, me, my

18  father, my Aunt Webaby, her six kids, and my mother and her

19  daughter.

20      MS. WICKS:  Objection, non-responsive.

21      THE COURT:  Put your next question.

22  BY MS. PETALAS:

23  Q.   When you say you moved to 1313, where is that?

24  A.   It's on Congress Street in Congress Park.

25  Q.   And who did you move there with?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  A.   My father.  That's who I was staying with, my father.

2  Q.   And were there other people living at 1313?

3  A.   Yes.

4  Q.   Who was living there?

5  A.   My Aunt Webaby.

6  Q.   I'm sorry.  Who?

7  A.   My Aunt Webaby.

8  Q.   That's your aunt?

9  A.   Yes.

10  Q.   How do you spell that name?

11  A.   W-E-B-A-B-Y.

12      MR. ZUCKER:  Your Honor, if I could ask of the Court for

13  him to move the mic close.

14      THE COURT:  All right.  Can you speak a little louder and

15  pull the mic closer to your mouth.

16      THE WITNESS:  Yes, sir.

17  BY MS. PETALAS:

18  Q.   Anybody else live at that apartment?

19  A.   My Uncle Slim, my Aunt Boogie, her six -- Webaby's six

20  kids.  That was Shamar, Sharrah, Queela, Kairi, Antwuan and Aman

21  and me.  And I can't remember my sister was staying there, but I

22  think she was staying there with my mother.  But we all stayed

23  at 1313 when we first moved around Congress Park.

24  Q.   And you said Shamar, Kairi, Antwuan and who else?

25  A.   Shamar, Queela, Sharrah, Kairi, Antwuan, Aman.  That was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  my aunt's kids.  When we moved around the park, we all of us

2  moved in that one -- in 1313, 204.

3  Q.   And you talked about your aunt's kids, Kairi, Antwuan,

4  Shamar?  Did they have the last name, Kelliebrew?

5  A.   No.

6  Q.   What's their last name?

7  A.   Ball.

8  Q.   So what is your relation to Antwuan Ball?

9  A.   That's my cousin.

10  Q.   And once you moved into 1313, did you live there

11  continuously or did you have other places that you lived as

12  well?

13  A.   I had other places -- I was back and forth.

14  Q.   And did there come a time when you began selling drugs?

15  A.   Yes.

16  Q.   Approximately how old were you then?

17  A.   Like 13.  I was selling drugs on Marlboro Pike in

18  Maryland.

19  Q.   You said you were selling drugs in Maryland.  Were you

20  living in Maryland at that time?

21  A.   I was staying in Fox Club.

22  Q.   I'm sorry?

23  A.   I was staying in Fox Club Apartments with my mother and

24  my sister.

25  Q.   And how long did you sell drugs out of Maryland?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10086**

1  at 14th Place?
2  **A.**    I mean -- okay.  When we -- when they first moved --
3  okay.  My Aunt Webaby, she was doing her -- I mean she was
4  selling her drugs and stuff, but as far as us, we was still kids
5  and stuff.  We wasn't -- we wasn't too much in the drug field
6  then.  I mean, I wasn't in the drug field then.  Twan wasn't in
7  the drug field then.  We was still kids.
8         And then my Aunt Webaby got locked up on some drugs and
9  that's when everything changed.
10  **Q.**    And what do you mean, "everything changed"?
11  **A.**    That's when my cousins was left alone.  They was just by
12  themselves.  My Aunt Boogie was there, but basically, it was
13  just them, you know.
14  **Q.**    And what happened when it was just them?  What would you
15  see when it was just them?
16       MS. WICKS:  Objection, relevancy.
17       MS. PETALAS:  Your Honor, may we approach?
18       THE COURT:  Yes.
19       (Following sidebar discussion had on the record:)
20       MS. PETALAS:  Your Honor, the relevance is this is how he
21  got his start in the drug game and this is his relationship with
22  Kairi and Antwuan and how he meets Boy-Boy and all the
23  individuals.  This apartment is where everybody would meet and do
24  their drugs, where he first learned the drug trade.  And it
25  describes the relationship that formed between him and Antwuan

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10087**

1  and Kairi as well as Boy-Boy.
2       THE COURT:  Anything else?
3       MR. BEANE:  Yeah.  Is this during the course of the
4  conspiracy?  Because if it's not, then you're really getting into
5  an area where they're just dumping in information for the purpose
6  of just dumping in.  They've established he knew the people and
7  they've established how he came to know them.  All this business
8  about drug dealing and things like that prior to the conspiracy
9  beginning is irrelevant to what's going to here.
10       MR. CARNEY:  Same objection, Your Honor.
11       THE COURT:  Overruled.
12       (Sidebar discussion concluded.)
13  BY MS. PETALAS:
14  **Q.**    Mr. Kelliebrew, I think we were talking about what you
15  would see them doing after your aunt gets locked up.  What do
16  you see going on at the apartment?
17       MR. ZUCKER:  Objection.  Ask that they clarify who the
18  "they" is.
19       THE COURT:  Overruled.
20       THE WITNESS:  It was just no parents.  Chaos, basically.
21  I mean, I loved it because it was no parents, I could go over
22  there and just -- you know.
23       MR. PURPURA:  Objection, clearly non-responsive at this
24  point.
25       THE COURT:  Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10088**

1  BY MS. PETALAS:
2  **Q.**    You can continue.
3  **A.**    All right.  Well, when my Aunt Webaby got locked up,
4  that's when I -- everything flipped, you know what I'm saying?
5  They was -- they -- basically, 14th Place was a known house to
6  be at, you know what I'm saying?  They -- all the drug
7  transactions was right out front, like if you wanted to cook
8  your coke, you can go upstairs, cook your coke.
9         You know, dogs running around, chasing people.  It was
10  just chaos right there, but that was the known spot to be at
11  that particular time.
12       THE COURT:  All right.  Let me ask you to put another
13  question.
14  BY MS. PETALAS:
15  **Q.**    And we're talking about Gregory Bell.  When did you meet
16  Gregory Bell?
17  **A.**    I mean, I always known Boy-Boy since I was a little --
18  since I was a youngin, since I was probably -- to my best of
19  memories, you know what I'm saying?  I've known Boy-Boy for
20  years, like -- I can say 12 -- I can go from 12 to my memory,
21  you know, but probably longer than that.
22  **Q.**    And back when you were at 14th Place, did you ever see
23  Antwuan Ball selling drugs?
24  **A.**    Yes.
25  **Q.**    Did you ever see Kairi Ball selling drugs?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10089**

1  **A.**    Yes.
2  **Q.**    Did you ever see Antwuan Ball cooking up drugs?
3  **A.**    I can't remember.  I can't remember actually seeing him
4  at the stove cooking, but, you know, I used to see him cutting
5  up and selling.
6  **Q.**    Did you ever see any weapons there?
7  **A.**    Yes, they always had guns.
8  **Q.**    Now, I have to jump back.  You were talking about a time
9  when you and your father came around Congress Park.  When was
10  that, again?
11  **A.**    Like '94.
12  **Q.**    And what time of year was it?
13  **A.**    It was the time to go back to school, like I was saying.
14  My father was going around the way to get some money from Kairi
15  and Antwuan to take me school shopping.
16         So when we get around the way, he was like -- we was
17  looking for Twan and Kay-Bay --
18  **Q.**    Let me stop you right there.  You said, "looking for Twan
19  and Kay-Bay."  Who is Twan?
20  **A.**    My cousin.
21  **Q.**    Which cousin?
22  **A.**    You're confusing me.
23  **Q.**    You call him Twan.  Is that short for --
24  **A.**    Yes, Antwuan.  Short for Antwuan.
25  **Q.**    And you also say Kay-Bay.  Is that a nickname for who?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10090

1  **A.**    Big Kai. And they was calling me that late in the
2  rounds, too.
3  **Q.**    Okay. So you were looking for Antwuan and Kairi. What
4  happened?
5  **A.**    Well, we were looking for them. My father -- he was on a
6  mission trying to get high, basically, from my eye. And so he
7  was like -- I was like -- I seen Bird and Boy-Boy and I was
8  like -- that's who normally I use to run with was Bird, like
9  hanging with Bird when was kids and stuff.
10    So when I seen Bird, we got together and we hooked up.
11  So I was riding around with Boy-Boy and Bird all day, waiting
12  for my father to finish doing what he was doing or whatever. So
13  I got --
14  **Q.**    You were riding around with Boy-Boy and you also
15  mentioned Bird. Who's Bird?
16  **A.**    My other cousin.
17  **Q.**    Do you know his proper name?
18  **A.**    Aman Ball.
19  **Q.**    And you said he's your other cousin. Is he related --
20  how is he related to Kairi and Antwuan?
21  **A.**    That's they brother.
22  **Q.**    And what are the ages? How old is Antwuan, if you know?
23  In relation to you, is he older?
24  **A.**    He was way older than me.
25  **Q.**    And what about Kairi?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

10091

1  **A.**    Older than me. And Aman was older than me.
2  **Q.**    Who was closer in age to you?
3  **A.**    I would say Aman, but that's years.
4  **Q.**    What happened when you were riding around with Bird and
5  Boy-Boy?
6  **A.**    We was just riding around and smoking.
7  **Q.**    What were you smoking?
8  **A.**    Some weed. So I asked Boy-Boy, you know, "Give me some
9  dimes." And he gave me some dimes. He gave me like 14, 15
10  rocks and I sold them. That's when my drug trade -- that's
11  where I started from. That's when I started banging in Congress
12  Park.
13    And then my father --
14    MR. PURPURA: Objection, your Honor, narrative. These are
15  non-responsive.
16    THE COURT: Sustained.
17  BY MS. PETALAS:
18  **Q.**    You said that's when you "started banging in Congress
19  Park." What do you mean by that?
20  **A.**    That's when I started selling drugs and hanging around
21  Congress Park.
22  **Q.**    And you said you asked Boy-Boy for -- to give you what?
23  **A.**    I asked him, "Give me some dimes." Let me get some coke.
24  **Q.**    When you say "dimes," what are you referring to?
25  **A.**    Ziploc baggies with white rock substance in it.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

10092

1  **Q.**    And you said he gave you 14 or 15 dime bags?
2  **A.**    Yes, yes.
3  **Q.**    Did he just give them to you? Did you have to pay him
4  any money?
5  **A.**    He just gave them to me. He ain't ask for nothing back.
6  **Q.**    Are you familiar with the term "fronting"?
7  **A.**    Yes.
8  **Q.**    What's "fronting"?
9  **A.**    When another drug dealer give you some drugs and you have
10  to pay him his money back.
11  **Q.**    Was he fronting it to you or did he expect anything back?
12  **A.**    He wasn't pretty much expecting nothing back.
13  **Q.**    And these 14 or 15 dime bags that he gave you, were you
14  able to sell them that day?
15  **A.**    Yeah, I sold them that day. And my father brought
16  back --
17    MR. PURPURA: Objection, Your Honor.
18    THE COURT: Sustained.
19  BY MS. PETALAS:
20  **Q.**    And did you see your father again that day?
21  **A.**    Yeah. He came -- next time when I seen my father, I was
22  at -- like at the Boat Alley. And I jumped out and got in his
23  car. And he was like, "Yeah, I got some" --
24    MR. PURPURA: Objection, objection.
25    THE COURT: I don't know what the declarant was.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

10093

1    MS. PETALAS: I think it's him talking to his father.
2    THE COURT: Let me ask you to put a question and make it
3  clear.
4  BY MS. PETALAS:
5  **Q.**    What happened? When you saw your father, you said you
6  got back in the car with him. What happens? Did he give you
7  any money for school clothes at that point?
8    MR. ZUCKER: Objection. Objection, leading.
9    THE COURT: Sustained. Rephrase.
10  BY MS. PETALAS:
11  **Q.**    What happens when you get back in the car with your
12  father?
13  **A.**    My father was like, "I seen your cousins" --
14    MS. WICKS: Objection.
15    THE COURT: Sustained.
16    MS. PETALAS: Your Honor, it's not offered for the truth
17  of the matter asserted.
18    MS. WICKS: Objection on relevance.
19    THE COURT: What?
20    MS. WICKS: I object on relevancy grounds.
21    THE COURT: Come on up.
22    (Following sidebar discussion had on the record:)
23    THE COURT: This is going to be a long session with
24  someone who is so free with information. What are you eliciting
25  from the father at this point?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

**10094**

1    What's he going to say about the father?

2    MS. PETALAS: Nothing that his father -- I think I can get

3  it without what his father said. His father -- well, now, it's

4  basically, the father said that they were just going to get

5  school clothes. He's just finishing the story about getting

6  school clothes from Antwuan and Kairi Ball rather than -- there

7  was no money handed them.

8    It's not offered for the truth of the matter asserted.

9  He's just telling the story about they went in to get school

10  clothes and I'm having him finish the story of what happened.

11  It's simply that his father didn't give him any money and the

12  school clothes were from Antwuan and Kairi.

13    THE COURT: I think it's going to be a lot easier if you

14  are able to avoid having him talk about what others have said

15  even if it's not offered for the truth, just to avoid objections

16  that would call for coming up to the bench to explain it. So

17  feel free to sprinkle freely into your questions "without telling

18  us what your father said, what did he do" or "what happened next"

19  or "what did you see" or something like that, unless it's

20  absolutely necessary for you to get out something.

21    I don't think this comment from the father is going to be

22  all that critical to your case. So just to keep the case moving

23  more smoothly, I would invite you to sprinkle freely into your

24  questions directions to him to not to say what someone else said.

25    MS. PETALAS: I think I understand, Your Honor. Prior, I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10095**

1  did say, "Did you get school clothes from your father" and it was

2  objected to as a leading. I don't think it was a yes or no

3  answer, whether he got the school clothes from his father.

4    But I'll just stay with that. I understand the Court's

5  direction on that.

6    THE COURT: And it's also not -- I'm having some

7  difficulty following the whole story and the sequence, so it

8  makes it a little difficult for me to be able to rule without

9  calling you up to the bench --

10    MS. PETALAS: Right.

11    THE COURT: -- and understanding the sequence of the

12  purpose. So that's why I invite you to tailor it better, because

13  it's a little difficult for me to be able to rule, given my

14  slight difficulty following the sequence.

15    MS. PETALAS: Yes, Your Honor.

16    (Sidebar discussion concluded.)

17  BY MS. PETALAS:

18    Q.  Mr. Kelliebrew, let's take a step back. You said --

19  earlier you talked about you had gone to Congress Park with your

20  father to get school clothes and you ended up riding around with

21  Boy-Boy and Bird. Do you recall that?

22    A.  Yes, ma'am.

23    Q.  Now, is it the same day that you see your father again

24  when you went to Congress Park with your father?

25    A.  It was all in the same day.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10096**

1    Q.  And did you get school -- did you get money for school

2  clothes from your father?

3    A.  No. I got hand-me-downs from Twan and Kay-Bay -- I mean

4  Twan and Kairi. I -- it was a big white clear bag.

5    MR. PURPURA: Objection.

6    THE COURT: Hold on a second.

7    You can finish. Go ahead.

8    THE WITNESS: Big white clear bag. I couldn't fit nothing

9  in the bag.

10  BY MS. PETALAS:

11    Q.  You said you couldn't fit nothing -- how big are you?

12    What, 4-8 maybe, almost five foot.

13    Q.  And I'm sorry. The question wasn't clear. Is this how

14  big you were back in 1994 when this incident happened?

15    A.  Yes.

16    Q.  You said 4-8. How much did you weigh?

17    A.  I can't remember how much I weighed, but I was a little

18  guy. My -- all my cousins was six foot or 5-11. I couldn't

19  fit -- I used to always try to get in they clothes and stuff. I

20  never could fit them, but they always had fly gear so I would

21  try to steal a shirt, put a shirt on. But when my father gave

22  me the bag, I couldn't fit nothing in there.

23    Q.  And you said you sold -- that day you sold the 14 or 15

24  dime bags that Boy-Boy gave you. What did you do with that

25  money?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10097**

1    A.  I can't remember what I did with that money. I can't

2  even remember what I did with that money.

3    Q.  Did you have to pay Boy-Boy back anything?

4    A.  Uhn-uhn, not that I can remember. If I ain't mistaken,

5  my mother took me to Payless, bought me some Pro Wings.

6    THE COURT: Hold on a second. Wait for the next question.

7  BY MS. PETALAS:

8    Q.  Once you sold those 14 or 15 rocks on that day, did you

9  continue selling drugs in Congress Park?

10    A.  Yes, ma'am.

11    Q.  And did there come a time -- well, when is the last time

12  you were arrested in Washington, DC?

13    A.  2002 on 10th Place. On a UC buy, I served to an

14  undercover.

15    Q.  Okay. And when you were arrested in 2000 -- from the

16  time that you started selling in Congress Park at 14, which you

17  just talked about, to 2002, did you continue selling drugs in

18  Congress Park for that time period?

19    A.  Yes, ma'am. Only the times I wasn't locked up.

20    Q.  You said other than the times you were locked up. Are

21  you the same Kairi Kelliebrew that was convicted of possession

22  with intent to distribute marijuana and cocaine and felony

23  3029-99?

24    A.  I don't understand what you're saying.

25    Q.  Were you convicted of having marijuana and cocaine in a

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  felony case in 1999?
2  **A.**    Yes.
3  **Q.**    And were you convicted of having a gun in your house, a
4  misdemeanor, 11055-99, in 1999?
5  **A.**    Yes.
6  **Q.**    You also were convicted of having cocaine from a traffic
7  stop in 2000?
8  **A.**    Yes.
9  **Q.**    And were you convicted of escape from -- leaving a
10  halfway house, in F-7100, in 2000?
11  **A.**    Yes.
12  **Q.**    And you talked about times that you were in jail.  Were
13  there other times that you were also in a halfway house?
14  **A.**    Yes.
15  **Q.**    And when you were in a halfway house, were you still
16  selling drugs in Congress Park?
17  **A.**    Yes.
18  **Q.**    You talked about your 2002 arrest over on 10th Place, I
19  believe you said.  After that, when you were arrested in 2002,
20  did you make a decision to plead guilty?
21  **A.**    Yes.
22  **Q.**    And at that time, what did you plead guilty to back in
23  2002?
24  **A.**    I pled guilty to the drug sale, if I'm not mistaken, and
25  I think they threw the weed out and I pled to the coke, because

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  I had a probation case and --
2  **A.**    You said --
3  **A.**    I pled guilty in Motley court with the 10th Place and I
4  was on probation in Campbell case.
5  **Q.**    And that guilty plea, was that here in this court back in
6  2002 or was that over in Superior Court?
7  **A.**    It was in Superior Court.
8  **Q.**    Did you have a lawyer in that Superior Court matter?
9  **A.**    My first lawyer was -- what's his name?  Something
10  Hamilton.  I forget his name.  But I fired him and Motley gave
11  me Teressa Clanly.
12  **Q.**    But you did have a lawyer back there when you pled guilty
13  in Superior Court?
14  **A.**    Yes.
15  **Q.**    And as part of that plea agreement -- I'm talking about
16  the plea agreement over in Superior Court -- did you agree to
17  cooperate?
18  **A.**    Yes, I did.
19  **Q.**    Did you -- was there anything in particular at that time
20  that you agreed to cooperate on?
21  **A.**    That particular time, I chose to cooperate against Don on
22  the Black murder.
23  **Q.**    You said you cooperated on Don with the Black murder?
24  **A.**    Yep.  Yes.
25  **Q.**    And at that time, is that all you agreed to talk about?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    That's all I agreed to talk about.  I wouldn't talk about
2  nothing else.  That's -- that was it.
3  **Q.**    Now, did there come a time after you entered that plea
4  that you were visited with your attorney and some agents?
5  **A.**    Yes, ma'am.
6  **Q.**    And after you're visited by these agents, which attorney
7  did you have at this point?
8  **A.**    Teressa Clanly.
9  **Q.**    Did you have your attorney present there when the agents
10  came to visit you?
11  **A.**    Yes, ma'am.
12  **Q.**    And at that point, did they indicate they wanted you to
13  talk about more?
14        MR. ZUCKER:  Objection, leading.
15  BY MS. PETALAS:
16  **Q.**    Well, what did they say to you at that point?
17        MS. WICKS:  Objection, hearsay.
18        MS. PETALAS:  I'll rephrase, Your Honor.
19  BY MS. PETALAS:
20  **Q.**    And after you -- did you meet with your attorney and
21  these agents?
22  **A.**    Yes.  They called me for a legal visit.  And I was like,
23  "Legal visit?"
24        And when the escort came and got me, instead of going to
25  like the visiting hall for the legal visit, they took me all

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  way downstairs in CTF.  And I was wondering what the hell was
2  going on, so I kept asking the escort, "Man, like where am I
3  going?"  And he like, "Legal visit."  And I'm like, "Legal visit
4  down here?"
5        He was like -- so they took me through -- through some
6  door and the administrative office was right there.
7  **Q.**    Let me stop you right there.  So were you in jail at this
8  point?
9  **A.**    Yes.  I was on the fourth floor in CTF.
10  **Q.**    And the meeting took place, then, at the jail?
11  **A.**    Yes.  It took place in CTF in some back room.  I don't
12  know.
13  **Q.**    And without telling us what was said, after you met with
14  the agents and your attorney, again without telling us what you
15  said, did you talk to your attorney about that meeting?
16  **A.**    Yes.
17  **Q.**    And after you spoke to your attorney, did you come to a
18  decision to plead guilty to anything else?
19        MR. ZUCKER:  Objection, leading.
20        THE COURT:  I'll allow it.
21  BY MS. PETALAS:
22  **Q.**    After you met with your attorney, did you -- were you
23  able to make a decision regarding pleading to anything else?
24  **A.**    Within three minutes.  We sat right there and we talked
25  and they stepped out.  Me and my lawyer talked about the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10102**

1  situation and that's when I chose to be full-blood cooperator
2  with whatever they came to me with there.
3  **Q.**    And did you eventually enter a plea -- another plea?
4  **A.**    Yep.  I ended up pleading in this courtroom.
5  **Q.**    You said a plea in this courtroom?
6  **A.**    Yes, ma'am.
7  **Q.**    And who was the judge?
8  **A.**    Judge Robertson [sic].
9  **Q.**    And what did you plead guilty to?
10  **A.**    30 to life.
11  **Q.**    And what was the charge?
12  **A.**    RICO Act conspiracy.
13  **Q.**    And after you pled guilty to the RICO plea, do you know
14  what happened to that Superior Court plea?
15  **A.**    To my knowledge, everything was just combined in this
16  courtroom in this case here.
17  **Q.**    You said everything was combined in this case here in
18  District Court?
19  **A.**    Yes.  Me and my lawyer -- she was like all -- the
20  Superior case will be --
21          MR. PURPURA:  Objection, Your Honor.  Response by the
22  attorney at this point.
23          THE COURT:  Beg your pardon?
24          MR. PURPURA:  I'm objecting to the hearsay statement of
25  the attorney.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10103**

1          THE COURT:  Okay.  Rephrase the question.
2  BY MS. PETALAS:
3  **Q.**    I'm not asking what your attorney told you, but after
4  speaking to your attorney, what was your understanding of what
5  happened?
6  **A.**    That my case -- my cases and stuff in Superior Court will
7  all be under federal guidelines in District Court now, and so
8  I'll be under one case now.
9  **Q.**    So you're -- do you have an understanding whether or not
10  you have to go back to Superior Court or whether or not that
11  Superior Court matter is done?
12  **A.**    Superior Court matter is done and everything is in front
13  of Judge Robertson.
14  **Q.**    And do you have an understanding in your mind, what was
15  the more serious charge, the Superior Court or the RICO charge?
16  **A.**    RICO.
17          MS. PETALAS:  Court's indulgence.
18          May I approach, Your Honor?
19          THE COURT:  Yes.
20  BY MS. PETALAS:
21  **Q.**    Mr. Kelliebrew, I'm handing you what's been marked as
22  Government's Exhibit 1119.  I'll have you look through it and
23  tell me whether or not you recognize it.
24          Look through that and tell me whether or not you
25  recognize that.  To be more specific, you can turn to page 10.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10104**

1          Is that your signature on that?
2  **A.**    Yes, ma'am.
3  **Q.**    And do you recognize that?  You have to answer yes or no
4  for the record.
5  **A.**    Yes, ma'am.
6  **Q.**    Is that your plea agreement?
7  **A.**    Yes, ma'am.
8  **Q.**    And I'll also have you turn towards the middle.  Do you
9  see where it says "Proffer of Facts"?
10          You can turn again.  Does that say "Proffer"?
11  **A.**    Yes.  Yes.
12  **Q.**    You can turn a couple pages after that and see if you see
13  your signature.
14  **A.**    Yes.
15  **Q.**    Is that your signature?
16  **A.**    Yes.
17          MS. PETALAS:  Your Honor, at this time I move Government's
18  Exhibit 1119 into evidence.
19          MS. WICKS:  I'm sorry, Your Honor.  The same objection to
20  this exhibit as the previous in this series.
21          THE WITNESS:  All right.  Over objection, the exhibit will
22  be received.
23          (Government's Exhibit 1119 admitted into the record.)
24  BY MS. PETALAS:
25  **Q.**    As part of that agreement, did you agree to cooperate?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10105**

1  **A.**    Yes, ma'am.
2  **Q.**    What did you agree to cooperate about?
3  **A.**    Any and everything.
4  **Q.**    And what was the main obligation?  What's the main thing
5  you had to do as part of your cooperation?
6  **A.**    Tell the truth.
7  **Q.**    And what is your understanding that the government might
8  do if you tell the truth?
9  **A.**    I don't -- repeat that again.
10  **Q.**    In return for you telling the truth and cooperating, what
11  is your understanding that the government might do?
12  **A.**    I mean, I was never promised nothing.  I mean, the
13  government never promised me nothing.  It was just like, "Tell
14  the truth, tell the truth."  And that's when --
15  **Q.**    What are you hoping the government does if you tell the
16  truth?
17  **A.**    I'm hoping to get a 5K1 and maybe a sentence reduction,
18  maybe go home to my family, but --
19  **Q.**    You say --
20  **A.**    -- I don't know.
21  **Q.**    Okay.  Let me take a step back there.  You threw out a
22  lot of terms.  You said you were hoping to get a 5K1 and a
23  sentence reduction.  What do you mean by that?
24  **A.**    Okay.  I mean -- I never knew what a 5K1 was until I got
25  on the fourth floor and all that about -- the whole cooperate

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10106

1 and whatever, you get a 5K1. I guess the 5K1 is a sentence
2 reduction, a hand -- I don't -- I don't really know too much
3 about it. You know what I'm trying to say? I just heard about
4 it from a few guys, but that wasn't even on my cup of tea. I
5 was just --
6    **Q.** You said you didn't know too much about it or you don't
7 know too much about it?
8    **A.** I didn't at the time, but you know, from my time being up
9 on the fourth floor and -- you know.
10    **Q.** Did you talk to your attorney before you entered that
11 plea?
12    **A.** Yeah, I talked to my attorney about this.
13    **Q.** Did you talk to your attorney about the 5K and sentence
14 reduction?
15    **A.** Yes.
16    **Q.** And when you say a 5K, a sentence reduction, you're
17 honing that the government does that. What exactly are you
18 hoping the government does?
19    **A.** I don't -- I'm hoping I get a 5K1 at the end of the day,
20 but it's not -- it's not promised. I was never promised
21 nothing. Nobody never promised me I'm going home or I'm
22 promised to get a 5K1. I was --
23    **Q.** And if the government -- well, let me just take you back.
24 When you say "5K," what specifically are you talking about?
25 What does the government do?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10107

1    **A.** They -- to my knowledge they, I guess, go into a meeting
2 and reconcile about should I have a 5K1. I don't know. I never
3 been -- I don't know.
4    **Q.** And if the government gives you the 5K, does that mean
5 you --
6       MR. ZUCKER: Objection to form.
7       MR. MARTIN: Objection, leading.
8       THE COURT: Sustained.
9 BY MS. PETALAS:
10    **Q.** What is your understanding -- do you have an
11 understanding of whether or not, if the government gives you a
12 5K, whether or not the judge has to give you a sentence
13 reduction?
14    **A.** Okay. At the end of the day, it's all up to Judge
15 Robertson, what he does with my life, okay. So if I get a 5K1
16 or whatever the government -- if the government choose to see
17 fit that I get a 5K1, Judge Robertson don't have to accept it.
18 He could, you know -- that's on him if he want to accept the 5K1
19 or do whatever in his power. That's up to him at the end of the
20 day. I don't -- I don't know.
21    **Q.** So who ultimately decides, then, what your sentence is
22 going to be?
23       MR. ZUCKER: Objection -- withdrawn.
24       THE COURT: You can answer.
25       THE WITNESS: Judge Robertson.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10108

1 BY MS. PETALAS:
2    **Q.** And you talked about, you know, telling the truth. What
3 happens -- what's your understanding, what happens if you lie
4 here today?
5    **A.** I do 30 to life.
6    **Q.** Now, when you were locked up back in 2002, did you remain
7 in jail for some period of time?
8    **A.** Yes.
9    **Q.** Approximately how long?
10    **A.** I think 30 months. I ain't sure.
11       MR. ZUCKER: Judge, I didn't hear the answer.
12       THE WITNESS: I said I think 30 months, sir. I know it's
13 from 2002 to --
14 BY MS. PETALAS:
15    **Q.** Well, let me --
16    **A.** -- 2005.
17    **Q.** I'm sorry. What?
18    **A.** I said from 2002 to 2005.
19    **Q.** 2002 was when you were locked up?
20    **A.** Um-hmm.
21    **Q.** You have to answer yes or no.
22    **A.** Yes.
23    **Q.** And then when were you released?
24    **A.** 2005.
25    **Q.** And was that before or after or at the same time you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10109

1 entered the plea here in District Court?
2    **A.** You said was it before?
3    **Q.** Did -- was that -- were you released after you entered
4 the plea here in District Court?
5    **A.** Yes.
6    **Q.** And without telling us where you're located, what were
7 you released to go do?
8    **A.** I was released to go to a program.
9    **Q.** And what kind of program?
10    **A.** A drug and vocational program -- yeah, a drug program and
11 vocational program. It was under one.
12    **Q.** I'm sorry. Drug treatment and what else?
13    **A.** Vocational.
14    **Q.** Vocational?
15    **A.** Um-hmm.
16    **Q.** Is that job training?
17    **A.** Um-hmm.
18    **Q.** You have to answer yes or no.
19    **A.** Yes, yes.
20    **Q.** And are you in that program today?
21    **A.** No, ma'am.
22    **Q.** When did you leave the program?
23    **A.** January 26th, '06.
24    **Q.** And any other requirements other than the program? Did
25 you have to check in with anybody?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10110**

1   **A.**    Oh, I have to call Pre-trial Services once a week, and I

2    have to call an FBI agent twice a week.

3   **Q.**    Okay. You said you left the program. Were you supposed

4    to leave the program?

5   **A.**    No, I wasn't.

6   **Q.**    And do you have an understanding whether or not the

7    government's filed a motion for a modification -- change in your

8    conditions of release before the judge?

9   **A.**    Say that again.

10   **Q.**    Do you have an understanding of whether or not you may

11    have to go before the judge about the fact that you left the

12    program?

13   **A.**    Yes.

14   **Q.**    Do you know what the judge is going to do?

15   **A.**    I don't -- I don't know what the judge is going to do. I

16    have to deal with that on sentencing or -- if my motion get --

17    if the motion -- you know, if I get a court date, I have to deal

18    with that on a court date or at sentencing.

19   **Q.**    Are you working now?

20   **A.**    Yes.

21   **Q.**    Where are you working?

22   **A.**    I work under the table for some -- for Reggie.

23   **Q.**    Who's Reggie?

24   **A.**    My wife's uncle. He do maintenance work. And like three

25    times out the week, I go paint with him, pull up carpet, stuff

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10111**

1    like that, just like basically maintenance work through the

2    neighborhood, because the guy, he work for a Jewish guy and he

3    own a lot of buildings where I live at. So that's what I been

4    doing.

5   **Q.**    Are you getting paid for your work?

6   **A.**    Yeah. I get paid cash every Friday.

7        MR. ZUCKER: I'm sorry. I couldn't hear the last part of

8    the answer.

9        THE WITNESS: I get paid cash every Friday.

10   BY MS. PETALAS:

11   **Q.**    Are you still checking in with Pre-trial?

12   **A.**    Every week.

13   **Q.**    Has anybody made any promise to you what the judge is

14    going to do at a hearing on your conditions of release?

15   **A.**    Nope.

16   **Q.**    Are you still in drug treatment at this time?

17   **A.**    No, ma'am, but I'm currently waiting on the waiting list

18    for outpatient program. I went there, I think like two,

19    three -- two or three weeks ago, but --

20   **Q.**    Are you under the influence of drugs right now?

21   **A.**    No. They --

22   **Q.**    Let me -- when was the last time you used drugs?

23   **A.**    Probably like two months ago.

24   **Q.**    And what did you use?

25   **A.**    I smoked some weed.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10112**

1   **Q.**    Was that a violation of your conditions of release?

2   **A.**    Yes, it was.

3   **Q.**    Have you used any other drugs, other than smoking weed?

4   **A.**    Nope.

5   **Q.**    And jumping back, talking about -- you talked about

6    getting drugs from Boy-Boy back in 1994. What happened then?

7    How -- did you continue to sell drugs? How often did you

8    continue to sell drugs after that time?

9        Once you got that drugs the first time from Boy-Boy, tell

10    us about your drug dealing after that. How often?

11   **A.**    I mean, every day I just sold drugs around the park.

12   **Q.**    You said every day you sold drugs around the park?

13   **A.**    Like I say, not every day because one day I might not

14    have had nothing. I might have been broke or -- but basically,

15    I was trying to come up in the drug world.

16   **Q.**    And in 1994, how old are you?

17   **A.**    Fourteen. It's either --

18        MR. PURPURA: Objection.

19        THE WITNESS: -- 13 or 14, because my birthday is on

20    September 3rd, so it depends on if it was early or if it was

21    late.

22   BY MS. PETALAS:

23   **Q.**    You said you were either 13 or 14th because your birthday

24    is on September 3rd. That's right around your birthday that you

25    started?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10113**

1   **A.**    Hum?

2   **Q.**    That you started getting the drugs from Boy-Boy?

3   **A.**    Okay. Let me see. My birthday -- if I was going back to

4    school, my birthday was coming up at least two to three days

5    after that, or something like that, going back to school.

6   **Q.**    So --

7   **A.**    Because my birthday is like -- ain't that Labor Day on

8    the September 2nd or something? Or whatever holiday that is, my

9    birthday on the 3rd, so --

10   **Q.**    And so I just want to clarify. Was this right around

11    when you turned -- either right before you turned 14 or right

12    after you turned 14? Is that what you're trying to say?

13   **A.**    Yes, yes.

14   **Q.**    And who did you get drugs from after that first time you

15    got from Boy-Boy?

16   **A.**    Boy-Boy -- I mean, everybody, like it's -- I have to name

17    names?

18   **Q.**    Yes.

19   **A.**    Okay.

20   **Q.**    When you say "everybody," who do you mean?

21   **A.**    Up, Boy-Boy, Twan, Wop, Jo-Jo -- Twan, Jo-Jo, Wop --

22   **Q.**    Let me stop you right there.

23   **A.**    Hold on. Hold on. I'm going to go -- it's just so many

24    names.

25        THE COURT: I think she wants you to hold on because she

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10114**

1 wants to ask you another question.
2 BY MS. PETALAS:
3 Q. Right. Because that wasn't a fair question. I didn't
4 put enough of a time reference on there.
5 At some point, then, after you're 14, as a juvenile, do
6 you get locked up?
7 A. Yes.
8 Q. And when was that, approximately?
9 A. I can't remember approximately what day I got locked up,
10 but --
11 Q. What year?
12 A. I think it was like '96, I think. Either '95 or '96, one
13 of them. I got locked up on the -- my first charge was an armed
14 robbery charge. It got dismissed.
15 Q. Okay. And so that -- you said it got dismissed. So did
16 you spend any time locked up for that armed robbery?
17 A. Uh-uh.
18 Q. You have to answer yes or no.
19 A. Oh, no, ma'am.
20 Q. Okay. At some point, then, do you --
21 MR. ZUCKER: Objection, form.
22 THE COURT: Overruled.
23 BY MS. PETALAS:
24 Q. At some point, then, do you end up actually in jail as a
25 juvenile or locked up as a juvenile?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10115**

1 A. Yes.
2 Q. And when did -- when was that? How old were you?
3 A. I was 16 going on 17. I did like 14 months. I did -- I
4 was down Oak Hill for I think like either a month -- like a
5 month and a week, because after I -- when I initially got
6 sentenced in the juvenile case in DC for, I think it was some
7 dimes I got caught with, they gave me a seven-day commitment
8 because Maryland had a warrant for me.
9 Q. You said Maryland had a warrant for you?
10 A. Yes.
11 Q. What was the warrant for?
12 A. For grand theft. So the judge was like, "I'm going to
13 give you a seven-day commitment, and if Maryland come get you,
14 they come get you, cause they hollerin everyone juvenile life,
15 so I was like --
16 Q. They gave you a seven-day commitment. What do you mean
17 by that?
18 A. A seven-day sentence. They gave me a seven-day sentence
19 and Maryland had the option to come pick me up.
20 Q. And did Maryland come pick you up?
21 A. Yep. Yes.
22 Q. And did you do some other time in jail then?
23 A. Yep. I did the rest of the the 14 months in Maryland. I
24 did the rest of my time in Maryland.
25 Q. And so from the time -- I'm now going back to who you got

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10116**

1 drugs from. Who were the main people you got drugs from that
2 time that you were 14 until the time you got locked up when you
3 said you were 16 or 17 as juvenile?
4 A. I was getting coke from Boy-Boy, Meat, Jo-Jo sometimes,
5 if he had some, and Twan if -- if he would fuck with me or if I
6 ain't fucked his money up prior to that, he might fuck with me.
7 Q. You said Boy-Boy. You talked about Boy-Boy before. How
8 often from --
9 A. I got coke from Burke then.
10 Q. I'm sorry. You said who else?
11 A. I said I got coke from Burke too.
12 Q. We need to make sure we don't talk at the same time
13 because the court reporter --
14 A. I'm sorry.
15 Q. -- because the court reporter needs to take everything
16 down, so they can only take down what one person is saying at a
17 time.
18 I believe you said something about Burke. Who's Burke?
19 A. Just another guy in Congress Park I got coke from.
20 Q. Okay. So you mentioned some names, Boy-Boy, Meat, Jo-Jo,
21 Twan and Burke; is that correct?
22 A. Yes.
23 Q. And you talked about Boy-Boy before. How often would you
24 get from Boy-Boy back -- I'm going back in this time period from
25 '94 to when you were locked up as a juvenile?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10117**

1 A. Like -- okay. At first Twan wouldn't fuck with me. Twan
2 was on my heels about going to school. So like if I wouldn't --
3 if Twan caught me out of school or something, it was like all of
4 us at that period of time, so if he caught us not going to
5 school, they used to fuck us up and beat our body and shit like
6 that.
7 But after school, it was cool to do whatever, so --
8 Q. Okay. We'll go back to that in a minute. Right now, I'm
9 on Boy-Boy. How often would you get from Boy-Boy?
10 A. Periodically, like if I bought a wholesale, if I asked
11 him to hold some dimes or something like that. Like when I
12 first -- '94, going on up, I wasn't really doing too much in
13 that. I was in some bummy shit like wearing Boy-Boy clothes,
14 shit like that, you know, getting dimes from Boy-Boy.
15 MR. MARTIN: Objection, Your Honor. Non-responsive,
16 narrative.
17 THE COURT: Sustained. Put your question.
18 BY MS. PETALAS:
19 Q. Well -- and when you said -- so you did say -- yes or no,
20 you were actually -- you did get drugs from Boy-Boy during this
21 period?
22 MR. BEANE: Objection, your Honor. Asked and answered.
23 THE COURT: Sustained.
24 BY MS. PETALAS:
25 Q. And if you could please estimate what the amounts were, how

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10118

1  often would you -- would it be a weekly occurrence? Monthly
2  occurrence? How often could you get from Boy-Boy? Or would you
3  get from Boy-Boy?
4       MR. BEANE: Objection, Your Honor. Asked and answered.
5       THE COURT: I'll allow it.
6       You can answer it.
7       THE WITNESS: It might be every day, every other day. If
8  I had some money or if he wanted to give me something, he'd throw
9  me some dimes or --
10  BY MS. PETALAS:
11  Q.   You said if he wanted to give you something. Would there
12  be times when he would give you coke?
13  A.   Yeah -- yes.
14  Q.   You also mentioned an individual named Meat. Who's Meat?
15  A.   A friend of all of ours from Good Hope Road.
16  Q.   And how was it that you met Meat?
17  A.   I met Meat like years ago on Good Hope Road, going down
18  there with Aman.
19  Q.   And what amounts of crack cocaine did you get from Meat?
20       MR. ZUCKER: Objection -- withdrawn.
21  BY MS. PETALAS:
22  Q.   You can answer the question.
23  A.   I used to get ounces from him.
24  Q.   And do you know Meat's proper name?
25  A.   Dimitrius Spencer.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10119

1  Q.   I'm sorry.
2  A.   Dimitrius Spencer.
3  Q.   And just for clarification, do you know an individual
4  named Meatball?
5  A.   Yes.
6  Q.   Is Meatball a different person from Meat?
7  A.   Yes.
8  Q.   You also talked about getting drugs from Antwuan and you
9  mentioned something about school, going to school and him not
10  messing with you. Explain what you meant by that. When did you
11  start getting from Antwuan?
12  A.   I can't recall -- I can't recall what year I started
13  getting from Antwuan or what specific date, but -- I'm trying to
14  remember. Was it after my juvenile? Before I did the --
15       It was before I did the 14 months.
16  Q.   And what amounts would you get from Antwuan before -- I'm
17  talking about time period before you did the 14 months?
18  A.   Like quarters.
19  Q.   When you say "quarters," you mean quarter of what?
20  A.   Quarter ounce, seven grams. There was one particular
21  time, he gave me and Little Benny some quarters.
22  Q.   Let me stop you there. We'll get to that in a minute.
23       Because you talked about going to school, explain what
24  you meant when you said they were trying to get you to go to
25  school.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10120

1  A.   All right. My mother had put me out, so I moved to
2  Sharrah house, so I was going to Johnson.
3  Q.   You moved to who's house?
4  A.   My cousin Sharrah house. So I moved there. I was going
5  to Johnson. So like if I could -- it was just known in the
6  hood, like if you hook school, stuff like that, maybe Kairi and
7  Antwuan, Jo-Jo -- Boy-Boy, all them niggas would chase you
8  around the hood and tell you to go to school or beat you up, you
9  know what I'm saying, because you wasn't in school.
10  Q.   And once you got out of school, what could you do?
11  A.   Whatever you wanted to do. I mean, you know, to this
12  day -- I mean, right now --
13       MR. PURPURA: Objection.
14       THE COURT: Sustained.
15  BY MS. PETALAS:
16  Q.   During this time period -- you talked about getting
17  quarter ounces from Antwuan before you went in. Did -- would
18  you pay for them? Did he front you? How did that work?
19  A.   I might -- if I had some money, I'd buy it. If I didn't,
20  he'd front me, you know. But a lot of times, I used to fuck
21  Antwuan money up, so he really didn't like to fuck with me.
22  Q.   And what do you mean, you would screw up his money?
23  A.   Like he front me and I wouldn't pay him or I took too
24  long to pay him and then there'd be a problem between me and him
25  about the money.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10121

1  Q.   What do you mean, it would take too long to pay him?
2  Explain how that worked.
3  A.   Like because -- I mean, I used to be tripping. Like they
4  give niggas something, a like -- they give niggas a quarter
5  and be like ride around, ride around, ride around, ride around.
6  They pull up on you, like, "When am I going to get my money?"
7  Like, "Damn, I ain't make no money," you know.
8  Q.   And how long would they give you to sell a quarter?
9       MR. ZUCKER: Objection.
10       MR. MARTIN: Objection to the "they," Your Honor.
11       THE COURT: Sustained.
12  BY MS. PETALAS:
13  Q.   How long -- we're talking about Antwuan. How long would
14  it be before he would come back to get the money?
15  A.   ASAP. A-S-A-P.
16  Q.   What do you mean by "ASAP"?
17  A.   He want his money as soon as possible. And if you didn't
18  have his money as soon as possible, he put his hands on you.
19  Q.   And you talked about -- you started to tell a story about
20  Little Benny, something that happened with Little Benny. Could
21  you -- what happened -- what were you saying there?
22  A.   Well, one particular time, Twan had gave me and Little
23  Benny a quarter a piece.
24  Q.   And who's Little Benny?
25  A.   This is Lona's son.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10122**

1  Q.  And who's Lona?

2  A.  My Aunt Webaby, good friend of hers, son.

3  Q.  Was Little Benny -- did Little Benny live in Congress

4  Park?

5  A.  He didn't live in -- he came around the park. He wasn't

6  staying around the park.

7  But he gave me and Little Benny some quarters.

8  Q.  Who gave you and Little Benny some quarters?

9  A.  Antwuan gave me and Little Benny some quarters, so he was

10  like -- it was like some minutes later, he was like, "Where my

11  money? Y'all got my money?"

12  Q.  Who said that?

13  A.  Twan. I was like, "Damn, I ain't sold nothing yet."

14  He said, "Don't let me have to fuck y'all about my

15  money."

16  So me and little Benny went to, I think, one of those

17  stores to get a beer and came back and they said Twan was

18  looking for us. So I was like, "Damn."

19  I forget where I went at, but Little Benny went in front

20  of the Lincoln and Twan had plucked him in his eye. So when I

21  seen Little Benny early that day, he was like, "Man, you better

22  pay him his money, man. He plucked me in my eye, man,

23  da-da-da-da. I paid him his money. You better pay him his

24  money."

25  And before that, he was like, "I'm going to fuck you up

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10123**

1  if you and Little Benny don't pay me my money."

2  Q.  I'll take you back -- you need to tell us who's speaking

3  at this time.

4  A.  All right. Before Twan plucked Benny in his eye, he told

5  me, "You and Little Benny better give me my money before I fuck

6  y'all up."

7  Q.  Who said that?

8  A.  Twan.

9  Q.  Who --

10  A.  So after that, like me and Little Benny was still

11  together. We went and got beers and shit. I stepped off from

12  Little Benny. Little Benny was in the Lincoln and that's when

13  Twan plucked him in the eye and his eye was red as shit. And he

14  said, "I was worried you ain't going to pay him his money. I

15  ain't going through that shit."

16  Q.  Who's talking now?

17  A.  Little Benny. So that's when we --

18  Q.  And who was he talking to?

19  A.  He was talking to me at the time about paying Antwuan his

20  money.

21  Q.  And was this all in the same day that you had talked to

22  Twan earlier?

23  A.  Yeah, this was all in the same day. It was either in the

24  same day or like two days. It was like in the -- he gave it to

25  us and then maybe that next day or something like that. It was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10124**

1  within two days. It was like within -- it was crazy.

2  Q.  So what happened after you had the conversation with

3  Little Benny?

4  A.  Huh?

5  Q.  What happened after you had this conversation with Little

6  Benny when he indicates you should pay Antwuan?

7  A.  Shit, I was scared as shit. I mean --

8  Q.  So what did you do? Did you see Twan again?

9  A.  I can't remember if I paid Twan or I didn't pay him or if

10  he fucked me up about that quarter or not. I can't remember,

11  you know.

12  Q.  And at this time, just yes or no, if you know: Was

13  Antwuan giving other people crack cocaine?

14  MR. ZUCKER: Objection, basis.

15  THE COURT: If you know, you may answer yes or no.

16  THE WITNESS: Yes.

17  BY MS. PETALAS:

18  Q.  And how do you know Antwuan was giving crack cocaine to

19  other people?

20  A.  I used to see him give crack to Boy-Boy.

21  Q.  Yes or no, if you know: Do you know if Antwuan was

22  fronting anybody else at that point in the neighborhood?

23  A.  Yes.

24  Q.  And again, how do you know?

25  A.  Well -- okay. It was like this --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10125**

1  Q.  Don't tell us -- just tell us how you know whether or not

2  Antwuan was fronting anybody.

3  A.  How do I know? Because Wop and them used to be always

4  talking about they need to pay Twan his money and they was going

5  to get some Bubblegums all the time and going to get boots and

6  shit.

7  Q.  You said Wop used to -- who's Wop?

8  A.  David Wilson.

9  Q.  Okay. And what did he tell you?

10  A.  He was just like, "I got to pay people his money so I can

11  get me some more. We can go up top and get boots," and shit

12  like that. This was way back, I mean.

13  But yeah, that's how it was right at that particular

14  time. He was giving Wop and them coke, like -- seem like they

15  was throwing it in my face all the time.

16  Q.  What you mean, they were throwing it in your face all the

17  time?

18  Well, you said, "he was giving Wop and them coke." Who

19  is "them"?

20  A.  Well, basically, he was giving it to Wop, but Truck and

21  them all was with him. You know what I'm saying? Like they

22  hold a little --

23  MR. PURPURA: Objection, Your Honor. Again, 602, basis of

24  knowledge. We can't differentiate between hearsay and personal

25  knowledge at this point.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10126**

1    THE COURT: Well --
2    MR. PURPURA: In this narrative form.
3    THE COURT: Sustained on that.
4    BY MS. PETALAS:
5    Q.  You said -- you talked about -- you were talking about
6    Ant used to give Wop and them. First of all, who are you
7    talking about when you say "them"?
8    MR. PURPURA: Objection. Again, basis of knowledge on
9    this issue.
10    THE COURT: I'll allow it.
11    Sorry. Go ahead.
12    BY MS. PETALAS:
13    Q.  Who are we talking about when you say "them"?
14    A.  Wop, Truck -- if I'm not mistaken, that was about it
15    right there, that I can remember right now.
16    Q.  You said that you "can remember right now." Are there
17    other people that you can't recall?
18    MR. ZUCKER: Objection.
19    MR. MARTIN: Objection.
20    THE COURT: Sustained.
21    THE WITNESS: Answer the question?
22    THE COURT: No.
23    BY MS. PETALAS:
24    Q.  And you said Truck. Did you ever have conversations with
25    Truck about owing Antwuan?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10127**

1    A.  Nothing that I can remember.
2    Q.  Based on your conversations with Wop, what was Wop
3    getting from Antwuan?
4    A.  Eighths.
5    Q.  I'm sorry?
6    A.  He was getting eighths from Twan.
7    Q.  Eighths of what?
8    A.  An eighth of a key.
9    Q.  How many grams is that?
10    A.  125.
11    Q.  And Wop, is he older or younger than you?
12    A.  He was older than me.
13    Q.  And I think you indicated Wop was throwing it in your
14    face. What do you mean by that?
15    A.  He was just like, "I got to pay your people's,
16    da-da-da-da." I was like -- and I was broke back then, you know
17    what I'm saying? I ain't have too much money. So he was like,
18    "Why don't you get some coke from your people's?"
19    I was like, "My people ain't fucking with me." That's
20    why I was getting coke from Boy-Boy. And so -- and then I was
21    like --
22    Q.  Let me stop you right there.
23    A.  -- "Would you like -- we going to get some Bubblegums.
24    Going to get some Bubblegums." And then I be like --
25    MR. PURPURA: Objection, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10128**

1    BY MS. PETALAS:
2    Q.  Let me stop you there.
3    A.  Then --
4    MR. PURPURA: Objection.
5    BY MS. PETALAS:
6    Q.  Let me just -- let me ask you another question.
7    So you said you were going to get some Bubblegum. What
8    do you mean by that?
9    A.  Boots.
10    Q.  What do you mean, "boots"?
11    A.  Timberlands.
12    Q.  You also mentioned an individual, Burke. Did you get
13    drugs from Burke -- that you got drugs from back at that time;
14    is that correct?
15    A.  Yes.
16    Q.  And how much could you get from Burke?
17    A.  Back in the day, I bought 31s from him. Then late in the
18    rounds, I was buying ounces from him.
19    Q.  And who was Burke?
20    A.  He stayed around Congress Park.
21    Q.  I think you also mentioned you would get from Jo-Jo
22    occasionally?
23    A.  Um-hmm.
24    MR. MARTIN: Objection, Your Honor. That misstates the
25    testimony.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10129**

1    THE COURT: I'll allow it.
2    MS. PETALAS: I apologize. I don't think he said
3    "occasionally."
4    BY MS. PETALAS:
5    Q.  You just said you got from Jo-Jo. When did you get from
6    Jo-Jo?
7    A.  Like after Jo-Jo came home, because Joe was locked up --
8    when I came back around the way, Jo-Jo when locked up, so when
9    Jo-Jo came home, Jo-Jo was getting comb from Meat. And I got
10    coke --
11    Q.  I'm sorry. Let me -- and I didn't ask it --
12    I'm still talking about this time period when you were --
13    from the time you were 14 until the time you were locked up
14    around 16 or 17. Did you ever get coke from Jo-Jo at that
15    point?
16    A.  I can't remember. I can't remember. I just -- I don't
17    know if it was after -- I can't remember. I can't remember.
18    Q.  And you talked about that you went to jail. I'm going to
19    now move forward to the time after you got out of jail. Do you
20    recall roughly how old you were when you got out of jail, that
21    14 months?
22    A.  I was 17.
23    Q.  And do you remember what time of year it was?
24    A.  February 10th.
25    Q.  And this was after you turned 17?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10130

1  **A.**  Yes.

2  **Q.**  When you got out of jail, did you start selling drugs

3  again?

4  **A.**  Yes.

5  **Q.**  And where did you go?

6  **A.**  We was on the -- they was on the ho stroll, on the

7  Savannah side.  They was calling it the ho stroll.

8  **Q.**  Well, was this in Congress Park?

9  **A.**  Yeah, it was in Congress Park.

10  **Q.**  Okay.  And you said, "they were."  Who were you referring

11  to when you said, "they were"?

12  **A.**  All the homies.  Everybody was like from the alley to the

13  ho stroll there.

14  **Q.**  And who were the homies?

15  **A.**  Everybody around the way, Twan, Jo-Jo -- Twan didn't

16  really hang with us down there, but it was like mostly Wop and

17  us and all of us, like all the ones that was young, like teenage

18  and stuff like that.

19  **Q.**  And who were those people?

20  **A.**  Like me, Black, Tweety, Bughead, Dazz, Wop, Drano, Munya,

21  Dazz, Keith B, Kevin B.

22      MS. PETALAS:  Court's indulgence.

23      Ms. Romero, if I could show what's in evidence as

24  Government's Exhibit 100.1.

25  BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10131

1  **Q.**  Do you recognize that?  Can you see that, Mr. Kelliebrew,

2  up on your screen?

3  **A.**  Yes.

4  **Q.**  Do you recognize that?

5  **A.**  Yes.

6  **Q.**  And what is that?

7      THE COURT:  Pull that microphone as close to you as

8  you can while you're leaning.

9      THE WITNESS:  Yes.

10  BY MS. PETALAS:

11  **Q.**  And what is that?

12  **A.**  Congress Park.

13  **Q.**  And when you -- well, let me take it back.

14      When you were 14, 15 and 16 selling in Congress Park,

15  where primarily would you sell in Congress Park at that time?

16  **A.**  We was like in the alley, we used to be -- in Boy-Boy

17  alley.  And then when I came home, like I said, we was on the

18  Savannah Side -- Savannah Street.

19  **Q.**  Well, hold on a second --

20      MS. PETALAS:  May I approach, Your Honor?

21      THE COURT:  Yes.

22  BY MS. PETALAS:

23  **Q.**  I'm going to hand you -- there's a pen up there.  If you

24  could take that pen and make sure that there's no ink and just

25  point -- if you point on the screen.  And right now I want you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10132

1  to actually point, when you said "Boy-Boy's alley," where were

2  you talking about?

3  **A.**  (Indicating.)

4  **Q.**  And for the record, you put some red arrows in the alley

5  that kind of runs just underneath Savannah Street, in between

6  Savannah Street and Congress Street; is that correct?

7  **A.**  Uh-huh.  Yes, ma'am.

8  **Q.**  Okay.  You talked about when you got out of jail on

9  February 10th, when you turned 17, where then did you go?  Where

10  did you sell your drugs?

11  **A.**  Right there in this alley (indicating), from this alley

12  to the corner to the corner.

13  **Q.**  And was there anywhere else where you would sell drugs?

14  **A.**  Well, we float around the whole neighborhood selling

15  drugs, but we posted up right there, like everybody be

16  posted up right there.

17  **Q.**  Okay.  And are you familiar with The Circle?

18  **A.**  Yes.

19  **Q.**  And where is The Circle?

20  **A.**  (Indicating.)

21  **Q.**  And for the record, you put an arrow down below the "P-L"

22  in "13th Place"; is that correct?

23  **A.**  Yes.

24  **Q.**  And did you ever sell in The Circle?

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10133

1  **Q.**  And did other people ever sell in The Circle?

2  **A.**  Yes.

3  **Q.**  And when did you sell in The Circle?

4      Well, let me stop.  You talked about posting up.  Did you

5  ever post up at The Circle?

6  **A.**  Yes.

7  **Q.**  And when did you start posting up at The Circle?

8  **A.**  Really, like towards the end of the 10th Place beef.

9  **Q.**  Okay.  And you talked about -- named some people,

10  named -- talked about Antwuan.  Do you see Antwuan here in the

11  courtroom here today?

12      If you could just stand up -- just stand up and point to

13  where he is or an article of clothing he's wearing.

14  **A.**  Right there, with the pink shirt on, with the dreads.

15      MS. PETALAS:  Your Honor, may the record reflect an

16  in-court identification of Antwuan Ball?

17      MR. CARNEY:  No objection.

18      THE COURT:  Request is granted.

19  BY MS. PETALAS:

20  **Q.**  You also mentioned an individual, Boy-Boy.  Do you see

21  Boy-Boy in the courtroom today?

22      Again, if you could stand up and look around.

23  **A.**  Yes.  In the gray shirt and black tile.

24      MS. PETALAS:  Your Honor, may the record reflect an

25  in-court identification of Boy-Boy?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10134*

1  THE COURT: Any objection?
2  MR. BEANE: No objection, Your Honor.
3  THE COURT: The request is granted.
4  BY MS. PETALAS:
5  **Q.**  You also mentioned an individual named Wop. Do you see
6  Wop in the courtroom today?
7  **A.**  Yes.
8  **Q.**  Would you please identify where Wop is and an article of
9  clothing.
10  **A.**  White shirt, colorful tie.
11  MS. PETALAS: Your Honor, may the record reflect an
12  in-court identification of David Wilson?
13  MS. WICKS: No objection.
14  THE COURT: Request is granted.
15  BY MS. PETALAS:
16  **Q.**  You also indicated an individual named Dazz. Do you see
17  Dazz in the courtroom today?
18  **A.**  Yes.
19  **Q.**  Could you please identify Dazz by where he's sitting and
20  an article of clothing.
21  **A.**  Blue shirt, black glasses. I can't see the tie.
22  MS. PETALAS: Your Honor, may the record reflect an
23  in-court identification of Desmond Thurston?
24  MR. ZUCKER: No objection.
25  THE COURT: Request is granted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10135*

1  BY MS. PETALAS:
2  **Q.**  You also mentioned an individual, Jo-Jo. Do you see
3  Jo-Jo in the courtroom today?
4  **A.**  Yes.
5  **Q.**  Please identify him by where he's sitting -- article of
6  clothing.
7  **A.**  Tan coat, black shirt.
8  MS. PETALAS: May the record reflect an in-court
9  identification of Mr. Jones?
10  MR. MARTIN: We'll stipulate.
11  THE COURT: The request is granted.
12  BY MS. PETALAS:
13  **Q.**  Finally, you mentioned an individual natured Don. Do you
14  see an individual named Don in the court today?
15  **A.**  Yes.
16  **Q.**  Would you please identify an article of clothing and
17  where he's sitting.
18  **A.**  White shirt and gold tie.
19  MS. PETALAS: Your Honor, at this point -- may the record
20  reflect an in-court identification of Dominic Samuels?
21  THE COURT: Any objection?
22  MR. PURPURA: Your Honor, I have no objection. I just
23  don't think he's been identified through the testimony, but no
24  objection to the identification.
25  THE COURT: Request is granted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10136*

1  BY MS. PETALAS:
2  **Q.**  I believe you mentioned when you first started
3  cooperating, you were cooperating against Don on the Black
4  murder; is that correct?
5  **A.**  Yes.
6  **Q.**  Now, when you first get out of jail and you come back to
7  Congress Park, who do you get your drugs from at that point?
8  **A.**  When? After when I turned -- are you talking about after
9  the 14-month bit?
10  **Q.**  Yes.
11  **A.**  Who was I getting my drugs from after that?
12  **Q.**  Yes.
13  **A.**  Anybody. Burke, Twan, Wop, anybody I could get coke
14  from, really. You know what I'm saying? But that was the main
15  people in the hood.
16  **Q.**  You said anybody you could get coke from. What was the
17  last thing you said? I didn't hear your last comment.
18  **A.**  Basically, anybody I could get coke from in the hood, and
19  that fall under Boy-Boy, Twan, Burke, Wop -- let me see.
20  And anybody else like amongst us I could get wholesale
21  from if I can have it. If I was messed up and I needed
22  wholesale, that would come from anybody.
23  **Q.**  Okay. And let's talk about that. What are "wholesales"?
24  **A.**  It's when you double your money. I give you 50 dollars,
25  you give me ten dimes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10137*

1  **Q.**  And you say you double your money. How much --
2  generally, when you say "wholesales," what amount of money are
3  you spending?
4  **A.**  Like maybe 50, 70, a hundred. If you have more than a
5  hundred, you buy you an eight-ball.
6  **Q.**  And when you say "wholesales," is this, then, already cut
7  up in dime bags?
8  **A.**  No.
9  **Q.**  And if you spend -- if you buy a $50 wholesale, how much
10  cocaine do you get?
11  **A.**  Ten dimes. A hundred dollars worth of crack.
12  **Q.**  And did you ever sell wholesales?
13  **A.**  Yes.
14  **Q.**  And who -- you talked about when you were broke, you
15  would get wholesales from anybody. What do you mean by that?
16  **A.**  Just whoever had it. You run through the hood and be
17  like, "Let me get a wholesale," from anybody, like -- if they
18  had it, they'll sell you. If they didn't, they wouldn't serve
19  you. Or you had your petty ones that wouldn't sell you and they
20  had it.
21  **Q.**  And when you said you served wholesales, who would you
22  serve wholesales to?
23  **A.**  Vice versa. Everybody in the hood. I mean, I got to
24  name names?
25  **Q.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10138**

1    **A.**    Okay.  Dazz, Phil, Wop, Drano, Tweety, Don, DC, Jo-Jo,
2    Bird.  Everybody, man.
3    **Q.**    And would you sell -- did you sell wholesales to users or
4    was it other dealers?
5    **A.**    Just other dealers.  A fiend couldn't get no wholesale.
6    **Q.**    And you said -- well you said a "fiend," what's a
7    "fiend"?
8    **A.**    A crackhead.
9    **Q.**    You talk about -- before you talked about posting up.
10    Would you sell with other -- these other individuals all at the
11    same time?
12    **A.**    Um-hmm.
13    **Q.**    You have to answer yes.
14    **A.**    Yes, yes.
15    THE COURT:  We've actually reached the point I wanted to
16    take our mid-morning break.  Did you want to conclude this line
17    with one or two more questions?
18    MS. PETALAS:  No, this is fine.
19    THE COURT:  Ladies and gentlemen, we'll take our
20    mid-morning break.  It's 11:15.  Please come back at 11:30.
21    Please remember not to talk about the case and take your
22    notes back with you into the jury room.  We'll see you in 15
23    minutes.
24    (Jury out at 11:15 a.m.)
25    THE COURT:  Mr. Kelliebrew, you may take a break as well.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10139**

1    Please be back in your seat, ready to resume your testimony
2    promptly at 11:30.
3    THE WITNESS:  Yes, sir.
4    THE COURT:  All right.
5    (Thereupon, a break was had from 11:15 a.m. until
6    11:32 a.m. )
7    THE COURT:  Is the other witness here?
8    MR. LEON:  Ms. Ryals is here now.  Shall we --
9    THE COURT:  Let's bring her in.
10    MR. LEON:  Bring her in.
11    MR. TABACKMAN:  You want to interrupt Mr. Kelliebrew now
12    or after lunch --
13    THE COURT:  Say that again.
14    MR. TABACKMAN:  Are we going to interrupt Mr. Kelliebrew
15    now?
16    THE COURT:  Yes.  I should ask you, Mr. Tabackman, are you
17    ready for it?
18    MR. TABACKMAN:  My preference, since I've been thinking
19    about him, would be to do her immediately after the lunch break,
20    but if the Court wants to do it now, that's fine.
21    THE COURT:  All right.  Let's bring the jury in.
22    (Jury in at 11:34 a.m.)
23    THE COURT:  You all can be seated, if you like.
24    Good morning again, ladies and gentlemen.
25    THE JURY PANEL:  Good morning.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10140**

1    THE COURT:  Welcome back.  We're going to recall
2    Thursday's witness to the stand and complete that testimony and
3    resume with the other witness from the morning afterwards.
4    Counsel.
5    MR. TABACKMAN:  Thank you, Your Honor.
6    <u>CROSS-EXAMINATION OF TOYA RYALS</u>
7    BY MR. TABACKMAN:
8    **Q.**    Good morning, Ms. Ryals.
9    Just to introduce myself, I'm Steve Tabackman and I'm
10    Mr. Ball's lawyer.  How are you?
11    **A.**    Fine.
12    **Q.**    Good.  On Thursday afternoon, I think we were talking
13    about -- just so we can all get reoriented -- are you okay with
14    the mic?
15    **A.**    Yes.
16    **Q.**    If you just keep it down near your mouth, I think
17    everything will be okay, and I won't be very long, I promise.
18    We were talking about how long you had lived in Congress
19    Park and then how long you had known Mr. Ball.  Do you remember
20    those questions, generally?
21    **A.**    Yes.
22    **Q.**    Okay.  Now, you said that the year that Black was shot,
23    you said you were about 14 or 15; is that right?
24    **A.**    Yes.
25    **Q.**    It was 2002?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10141**

1    **A.**    Yes.
2    **Q.**    Okay.  And you said you had been -- I believe you said
3    you had been living in Congress Park for a couple of years at
4    that point?  Is my memory --
5    **A.**    Yes.
6    **Q.**    -- right on that?
7    **A.**    Yes.
8    **Q.**    Okay.  And during that couple of years, you had met
9    Mr. Ball, right?
10    **A.**    Yes.
11    **Q.**    Antwuan.  What did you call him, by the way, when you
12    would see him or when you would refer to him with other people?
13    **A.**    Big Ant.
14    **Q.**    Big Ant.  And he was somebody who knew both your mother
15    and your grandmother; is that right?
16    **A.**    Yes.
17    **Q.**    Had been to your house?
18    **A.**    Yes.
19    **Q.**    More than once?
20    **A.**    Yes.
21    **Q.**    Can you give a -- how frequently would he come by?
22    **A.**    Like every day.
23    **Q.**    Okay.  And so I take it that -- I mean, you knew him at
24    least -- you were comfortable in his presence?
25    **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10150**

1   **A.**   No.
2   **Q.**   Okay.  Did Mr. Ball ask them for a name?
3   **A.**   No.
4   **Q.**   Now, you indicated that he had said that they shouldn't
5   be talking to anybody; is that right?  Is that essentially the
6   words that he said?
7   **A.**   Yes.
8   **Q.**   Did he ever say "Don't talk to the police"?
9   **A.**   No.
10  **Q.**   Did he ever say, if the police come and want you to talk
11  to them or to the prosecutor, they shouldn't go?
12  **A.**   No.
13  **Q.**   At the time that you talked with Big Ant and the girls,
14  did -- the gossip that we talked about a few minutes ago, was
15  that already going on?
16  **A.**   Yeah, I think so.
17  **Q.**   And was he saying to you, guys, you shouldn't be
18  gossiping and talking about this on the street like that?
19  **A.**   Yes, he just said, "Don't talk."
20  **Q.**   That you all shouldn't be standing around talking about
21  this; is that right?
22  **A.**   Yes.
23  **Q.**   And did you understand why that was?
24          MR. LEON:  Objection.
25          THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10151**

1          THE WITNESS:  No.
2          THE COURT:  That means don't answer the question.
3          THE WITNESS:  Oh, okay.  I'm sorry.
4   MR. TABACKMAN:
5   **Q.**   Did you -- what understanding did you have, did you take
6   away from that?
7   **A.**   Uhm, I ain't -- well, just -- I don't know, I wasn't
8   feeling no way.  I don't know.
9   **Q.**   Okay.  Did you feel like he was threatening you in some
10  way?
11  **A.**   No.
12  **Q.**   Did you feel like he was threatening your friends in some
13  way?
14  **A.**   No.
15  **Q.**   Did you feel less comfortable around him then, than you
16  felt when you used to see him around your mother's house and
17  your grandmother's house?
18  **A.**   No.
19  **Q.**   All right.
20          MR. TABACKMAN:  Court's indulgence.  May I have a moment
21  with Mr. Carney, Your Honor?
22          THE COURT:  Yes.
23          MR. TABACKMAN:  I have no further questions, Your Honor.
24  Thank you.
25          Thank you, Ms. Ryals.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10152**

1          THE COURT:  All right.
2              REDIRECT EXAMINATION OF TOYA RYALS
3   BY MR. LEON:
4   **Q.**   Good morning, Ms. Ryals.
5          Good morning.
6   **Q.**   You were just asked some questions by Mr. Tabackman, the
7   gentleman right here, regarding what gossip is, and do you
8   remember those questions?
9   **A.**   Yes.
10  **Q.**   Okay.  Was it gossip or did it really happen that you --
11  that Antwun Ball talked to you and Shanay and Tenay after the
12  Black murder?
13  **A.**   You said, was it gossip?
14  **Q.**   Yes or did it really happen?
15  **A.**   Yes, it really happened.
16  **Q.**   And during that conversation that Antwuan had with you
17  Shanay and Tenay -- first of all, do you remember on Thursday
18  testifying about how many times Antwuan talked to you, Shanay
19  and Tenay?
20  **A.**   Yes.
21  **Q.**   How many do you remember talking about?
22  **A.**   Three.  Three times.
23  **Q.**   Okay.  And during any of those conversations that you can
24  remember that really happened, did Antwuan Ball talk about
25  gossip?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10153**

1   **A.**   No.
2   **Q.**   And finally, you were asked some questions by one of
3   Don's attorneys on Thursday.  Do you remember those questions?
4   **A.**   Yes.
5   **Q.**   And do you remember testifying -- I believe you first
6   testified -- this isn't a question, I just want to get you
7   oriented -- I believe you testified, from both attorneys, that
8   at first Shanay and Tenay told you what they were hearing in the
9   neighborhood.  Do you remember that?
10  **A.**   Yes.
11  **Q.**   Do you remember after they told you what they heard in
12  the neighborhood, do you remember them telling you specifically
13  what they saw?
14  **A.**   Uh, I don't --
15  **Q.**   If you don't remember, you can say you don't remember.
16          MR. LEON:  Your Honor, may I approach?
17          THE COURT:  Yes.
18          MR. LEON:  I'm handing the witness, Your Honor, what's
19  marked for identification as Government's 1218.
20  BY MR. LEON:
21  **Q.**   And I'm going to focus you on line 4, just here to line
22  7, but feel free to read the beginning of the page before on 20,
23  if you just want to get it in context.  Read any portion of it,
24  but I'm going to focus you to specifically lines 4 and 7.
25          When you're done reading all that, just tell us what

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10162**

1  Q.  Were you also talking about -- you were saying -- Court's
2  indulgence.
3      And if you look at your screen again, you talked about
4  when you first got back from your stint in jail.  Again you said
5  you were 17; is that correct?
6  A.  Yes.
7  Q.  And it was February, so this is February after you turned
8  17?
9  A.  I was waiting to turn 18.  I was already 17.  I was
10 waiting to turn 18.
11 Q.  And you were born in what year?
12 A.  '80.
13 Q.  And what -- I'm sorry, what month were you born?
14 A.  September.
15 Q.  Okay.  So this was 1998?
16 A.  If I'm not mistaken, yes.
17 Q.  So, when you got home in February of 1998, where did you
18 start selling?  I think you showed on the map earlier; is that
19 correct?
20 A.  Yes, on Savannah.
21 Q.  I think -- now, getting right before the break, you
22 talked about there were other people that you would sell with;
23 is that correct?
24 A.  Yes.
25 Q.  Okay.  And are you familiar with the term "doors"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10163**

1  A.  Yes.
2  Q.  And what is doors?
3  A.  It's just a terminology we used, like, on sales, gas,
4  blunts, bitches.  Excuse my language, but anything.
5  Q.  Okay.  The first thing you said was "sales."  So let's
6  talk about that.
7      What do you mean there was a term you would use on sales?
8  A.  Like, if a crackhead walking up, somebody might call uno
9  on a sale, so like throw away the key, so that means that's your
10 sale.
11 Q.  Let me have you slow down right there.  Sorry.  You're
12 starting to talk a little fast.
13     You said somebody might call *uno*, is that what you said?
14 A.  Yes.
15     MR. PURPURA:  Your Honor, objection.  Again, to make it
16 relevant, we have to know who we're talking about.
17     THE COURT:  I'm sorry?
18     MR. PURPURA:  Relevancy depends on who we're talking about
19 making the statement.
20     THE COURT:  Overruled.
21 BY MS. PETALAS:
22 Q.  And you said somebody would say "uno.*"*  What happened
23 then?
24 A.  That means you get first priorities on the sale.
25 Q.  And continue on.  Describe what would happen then.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10164**

1  A.  And if somebody else was outside, they would call
2  "doors," so that means that if it was -- whatever, how much it is,
3  you just break it down between you and him.
4  Q.  And who were some of the people you would do this with?
5  A.  Everybody.  I got to name names?
6  Q.  Well, did you ever play doors with Don?
7  A.  Yes.
8  Q.  And you also talked about wholesales.  Did you ever sell
9  wholesales to Don?
10 A.  Yes.
11 Q.  Did you ever get wholesales from Don?
12 A.  Yes.
13 Q.  What about -- I think earlier you mentioned an individual
14 named DC.  Did you ever play doors with DC?
15     MR. ZUCKER:  Objection, leading.
16     THE WITNESS:  Yes.
17     THE COURT:  Overruled.
18 BY MS. PETALAS:
19 Q.  Did you ever play doors with DC?
20 A.  Yes.
21 Q.  Do you know DC's real name?
22 A.  Daniel Collins.
23 Q.  You talked about Wop.  Did you ever play doors with Wop?
24 A.  Yes.
25 Q.  You talked about Dazz, did you ever play doors with Dazz?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10165**

1  A.  Yes.
2  Q.  How about Jo-Jo?
3  A.  Yes.
4  Q.  And again, I'm talking now, when I said "doors," I'm
5  talking about the sales of drugs, not the other doors game.  Do
6  you understand that?
7  A.  Yes.
8  Q.  Okay.  How about Boy-Boy?
9  A.  Yes.
10 Q.  How about Antwuan, did he play doors?
11 A.  No.  Me and him, we ain't never was in the uno *do*ors, not
12 on no drug sales, probably on something else, some gas or
13 something like that.
14     MS. WICKS:  Objection.
15     THE COURT:  Overruled.
16 BY MS. PETALAS:
17 Q.  Court's indulgence.  And what happened if somebody didn't
18 do doors, if somebody wouldn't break it down?
19 A.  It would be an argument.
20 Q.  Were there ever times when somebody would come to you for
21 a sale and you didn't have the amount of drugs they wanted to
22 buy?
23 A.  Yes.
24 Q.  When that happened, would you ever refer them to anybody
25 else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10166**

1  MR. ZUCKER: Objection.
2  THE COURT: Sustained.
3  BY MS. PETALAS:
4  Q.  What would you do?
5  A.  I be like, "I ain't got nothing."
6  Q.  When you say you "ain't got nothing," would you ever do
7  anything else at that point?
8  A.  Naw, it would be somebody right there to hit him.
9  Q.  You also talked about selling The Circle. I think you
10  said something towards the end of the 10th Place beef. What do
11  you mean by that? When did you start posting up The Circle?
12  A.  It was more like towards 10th Place -- like everybody
13  start really hanging in front of the Lincoln, The Circle, right
14  there in that area.
15  Q.  You said "in front of the Lincoln." Looking at the
16  screen, do you see the Lincoln on there?
17  A.  (Indicating).
18  Q.  For the record, you put an arrow --
19  A.  Tried to put it in the parking lot, but that's the
20  Lincoln, right there.
21  Q.  You said you tried to put it in the parking lot. Okay.
22  You just put another arrow on a building that's kind of a
23  backwards L; is that correct?
24  A.  Yes.
25  Q.  Is that the Lincoln?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10167**

1  A.  Yes.
2  Q.  You talked about that in relation to the 10th Place.
3  What, if anything, did the 10th Place beef -- what connection,
4  if anything, did the 10th Place beef have to posting up in The
5  Circle or around the Lincoln?
6  A.  I don't understand what you're saying.
7  Q.  You talked about toward the end of the 10th Place beef,
8  you were selling The Circle and the Lincoln. What's the
9  connection there? Why do you relate it to the 10th Place beef?
10  A.  Because that's like -- like the time -- when we came from
11  the Parasucco Jam or whatever.
12  Q.  Let me stop you right there. I'm not asking you about
13  the 10th Place beef right now, we'll get to that in a little
14  bit. But when I -- what, if anything -- is there anything about
15  that 10th Place beef, yes or no, that caused you guys to start
16  selling around The Circle or the Lincoln?
17  A.  They was firing down on Savannah. Little Meatball got
18  killed around there.
19  Q.  You said they were firing down on the Savannah side. Who
20  was firing down on the Savannah side?
21  A.  10th Place used to fire down on the Savannah side all the
22  time. That's where we was hanging at, so that's where every --
23  like, all the -- most the shootings and stuff occur, whatever.
24  But everybody used to be floating around the neighborhood.
25  So when I came home, it was more like, you know, they was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10168**

1  on Savannah, then, you know, you might have some here, some
2  there, but everybody on the majority of the Savannah side. Then
3  towards the end of the 10th Place beef, everybody was more on
4  the like -- more like on the Lincoln and The Circle, you know
5  what I'm saying? You still had Boy-Boy stayed in the alley,
6  rolled around, did his thing, you know, but us, we was in front
7  of the Lincoln or in The Circle, like we always stood in front
8  of the Lincoln, but we was there. If you wanted some coke, we
9  were either in front of the Lincoln or in The Circle. Nobody
10  was hanging around the Savannah side no more.
11  Q.  And you mentioned before, you said everybody used to
12  float through the neighborhood. Did people sell in The Circle
13  prior to this?
14  A.  Yeah.
15  Q.  And how about the Lincoln?
16  A.  Yeah. Yes.
17  Q.  Prior to this, I meant prior to this time you're talking
18  about, where you're now posting up in The Circle.
19  A.  Yes.
20  Q.  You used to, a lot of the time -- when you were talking
21  earlier, you talked about -- you said towards the end of 10th
22  Place, we were in front of the Lincoln and The Circle. Who are
23  you talking about when you say "we"?
24  A.  Uhm, all the rest of the people in Congress Park, like
25  Wop, Drano, Don, DC, me, JT. Jo-Jo may post up for a minute,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10169**

1  but he would go back around the alley. Dazz, Phil, all of us,
2  we was just right there. We would circle the Lincoln.
3  Q.  Okay. And you said -- you talked about Jo-Jo. You said
4  he used to post up, but then he'd go back around the alley.
5  Where are you talking about there?
6  A.  It's right there. (Indicating.) They would be standing
7  right there.
8  MR. ZUCKER: I'm sorry, we couldn't hear.
9  BY MS. PETALAS:
10  Q.  You need to talk in the microphone.
11  A.  They would be standing like -- they be posted up right
12  there, like they be sitting right there, drinking and just
13  chilling.
14  Q.  And you said -- for the record, you put a dot kind of --
15  A.  It's the alley.
16  Q.  The alley that's below Savannah Street, in-between
17  Savannah Street and Congress Street; is that correct?
18  A.  Yes.
19  Q.  And the dot you put was kind of at the end of that alley,
20  just kind of down below the two Ns in Savannah Street; is that
21  correct?
22  A.  Yes, like -- I'll see if I can press it again.
23  (Indicating). Right there.
24  Q.  And earlier you had mentioned -- you talked about getting
25  drugs from Jo-Jo. Roughly, what time was it that you got drugs

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10170

1 from Jo-Jo?

2 **A.** Time frame? As far as how long I was getting drugs from

3 him?

4 **Q.** Yes.

5 **A.** Uhm, I got drugs from him a couple of times. Like I

6 could say maybe three, four times I bought a half from him. He

7 said he was getting the coke from Meat.

8 **Q.** You said three or four times you bought a half of what?

9 MR. MARTIN: Objection, Your Honor, non-responsive to the

10 question, which called for a time frame.

11 THE COURT: She's putting a new question then.

12 Go ahead.

13 BY MS. PETALAS:

14 **Q.** You said three or four times you bought a half from him.

15 How old were you, roughly, in this instance?

16 **A.** I can't remember how old that was. It was in the time

17 when I was dealing with Meat, so you can say -- I had to be

18 either 16 -- either I was 15, 16, right -- juvenile, and then

19 when I got out. -- naw, when I got out, Jo-Jo was working with

20 the STEP Foundation and shit, so it was when -- before the

21 juvenile, before I did the -- like in the course of that, he was

22 getting the coke from Meat.

23 **Q.** Okay. So this was before you got locked up as a

24 juvenile?

25 **A.** To be positive, I can't confirm when -- how old I was. I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10171

1 can just leave it at that.

2 **Q.** Okay. But can you recall getting drugs from Jo-Jo?

3 **A.** Yes.

4 **Q.** And you said three or four times?

5 **A.** Yes.

6 **Q.** And how much would you get from him?

7 **A.** A half.

8 **Q.** A half of what?

9 **A.** Half ounce.

10 **Q.** How many grams is that?

11 **A.** Fourteen.

12 **Q.** You said you also sold to him?

13 **A.** Yes.

14 **Q.** When was that?

15 **A.** I mean, I done sold Jo-Jo wholesales.

16 **Q.** Was this right around the same time you were getting from

17 him, or before or after?

18 **A.** Naw, this was after, like, you know, Joe might even get a

19 wholesale. He wasn't -- after a while, Jo-Jo wasn't hustling

20 like that. He was working with the STEP Foundation.

21 **Q.** So when did you sell him wholesales?

22 **A.** I used to sell him wholesales when he was working with

23 the STEP Foundation too, but he wasn't really out there, out

24 there banging, but he may sling a couple dimes here and there.

25 **Q.** When you said he was with the STEP Foundation. We'll get

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10172

1 to that later, but roughly what time period is this?

2 **A.** You can say in 2000. In 2000 -- when I got locked up in

3 2002.

4 **Q.** 2000 -- I'm just trying to parse out what you said. You

5 said 2000 and 2002?

6 **A.** Um-hmm.

7 **Q.** You have to answer "yes" or "no."

8 **A.** Yes.

9 **Q.** You said when you got locked up. Were you locked up in

10 that period between 2000 and 2002?

11 **A.** Um-hmm. Yes. I got locked up with the drug case that --

12 the course of time I did a year for. I got locked up November

13 17th and came home the same date, November 17th.

14 **Q.** You got locked up November 17th of what year?

15 **A.** If I'm not mistaken, it was 2000 and I came home 2001.

16 **Q.** Okay. And when you were dealing with Jo-Jo, you said

17 2000, do you mean prior to the time you got locked up?

18 **A.** Yes.

19 **Q.** And then you also mentioned 2002. Did you sell to him

20 after you got out in 2001?

21 **A.** Yeah.

22 **Q.** You also mentioned an individual named Phil, who's Phil?

23 **A.** Dazz' little brother.

24 **Q.** Did you ever sell drugs with Phil?

25 **A.** Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10173

1 **Q.** Did you ever sell drugs to him?

2 **A.** Yes.

3 **Q.** Did you ever get drugs from him?

4 **A.** Yes.

5 **Q.** You also mentioned an individual JT. Who's JT?

6 **A.** A friend of mine. I mean, he was amongst us, but he used

7 to hang with me.

8 **Q.** Did you ever sell drugs with JT?

9 **A.** Yes.

10 **Q.** What's JT's real name, if you know?

11 **A.** Jacques Powell.

12 **Q.** Did you ever sell drugs to JT?

13 **A.** Yes.

14 **Q.** Did you ever get drugs from JT?

15 **A.** Yes.

16 **Q.** You also mentioned an individual named Drano. Who's

17 Drano?

18 **A.** A friend amongst us, around the way.

19 **Q.** Did you ever sell drugs with Drano?

20 **A.** Yes.

21 **Q.** You talked about Don. Did you ever sell drugs to Don?

22 **A.** Yes.

23 MS. WICKS: Objection, asked and answered, Your Honor.

24 THE COURT: I'll allow it.

25 BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10174

1   **Q.**   What amounts of drugs did you sell to Don?

2   **A.**   Wholesales, maybe. I might have sold him a ball, maybe

3 got an ounce of bulk from him.

4       MR. PURPURA: Objection to maybe and might.

5       THE COURT: I'll allow it.

6 BY MS. PETALAS:

7   **Q.**   You can continue.

8   **A.**   Well, wholesales, maybe I might have sold him an

9 eight-ball, quarter. If was up, you know what I'm saying, or

10 I take his money and go holler at Burke, if I was going to

11 Burke.

12   **Q.**   You said you would take his money and go holler at Burke.

13 What do you mean by that?

14   **A.**   Because Burke -- like sometimes Burke wouldn't serve

15 amongst us. He wouldn't serve -- today, he wouldn't serve Wop

16 or Dazz, but he would serve me and DC or somebody, but wouldn't

17 serve Don and somebody else or Boy-Boy, and then they be like,

18 take my money around there. You know what I'm saying? I take

19 they money and go get an O from them.

20       THE COURT: Hold on a second. Counsel, come on up.

21       (Following sidebar discussion had on the record:)

22       THE COURT: I recognize that the use of the term maybe is

23 a colloquialism, but you shouldn't let the record stand that way,

24 and I hope you follow up and clear it up to distinguish it as a

25 colloquialism, as opposed to speculation. If it's speculation,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10175

1 it shouldn't come in. If it's colloquialism, I understand that.

2 But don't let it stay there as an ambiguous.

3       MS. PETALAS: Right.

4       (Sidebar discussion concluded.)

5 BY MS. PETALAS:

6   **Q.**   Let me step back. Before you said -- I think you said

7 you might have sold him an eight-ball or some other amounts.

8 What do you mean by you might have sold him?

9   **A.**   I have. I'm saying I have. Don, yes. We have, like --

10 if I was -- like, if he were right there, he might need a ball.

11 If I had it, huh, (indicating), and if I didn't -- if I had

12 wholesale, I would sell him wholesale. It was vise-versa with

13 everybody. If you was up, you was up. If he was down, he was

14 down. If you were down, you buy wholesale from Wop or me or

15 whoever was up at the time, and if Twan had weight, you buy

16 weight from Twan. If Burke had weight, you bought weight from

17 him. That's just how it went.

18   **Q.**   So when you said "might," do you specifically recall

19 selling to Don?

20   **A.**   Yes.

21   **Q.**   And I believe you testified that -- you were talking

22 about Burke, and you said you would get an O from him. What's

23 an "O"?

24   **A.**   An ounce.

25   **Q.**   How many grams is an ounce?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10176

1   **A.**   Twenty-eight.

2   **Q.**   And again, just for the record, this is an ounce of what?

3   **A.**   Crack cocaine.

4   **Q.**   And when you say -- are you familiar with powder cocaine?

5   **A.**   Yeah, but I ain't never -- that was never around, it was

6 always hard.

7   **Q.**   You said that was never around that was always hard. You

8 have to answer "yes" or "no."

9   **A.**   Yes.

10   **Q.**   So when you're talking about the grams, are you referring

11 to this hard form of cocaine, crack cocaine?

12   **A.**   Yes.

13   **Q.**   And you were talking -- I believe you testified that

14 Burke would sometimes not sell it to other people. Were there

15 other times when Burke wouldn't sell it to you?

16   **A.**   Yes.

17   **Q.**   Did you ever give your money to other people to get from

18 Burke?

19   **A.**   I can't remember. I probably did, I probably did.

20       MR. ZUCKER: Objection.

21 BY MS. PETALAS:

22   **Q.**   If you can't remember, then I don't want you to testify

23 to it.

24       THE WITNESS: Okay.

25       THE COURT: We've reached the lunch break point. Did you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10177

1 need to take one or two more questions?

2       Ladies and gentlemen, we're going break for lunch because

3 there's a matter I'm going to need to take up. I'm going to

4 extend your lunch break a little bit, so please come back at

5 2:00.

6       Remember not to talk about the case and take your notes

7 back into the jury room with you. Enjoy your lunch break.

8       (Jury out at 12:30 p.m.)

9       THE COURT: All right, Mr. Kelliebrew, you may step down,

10 but please be back in your seat ready to resume your testimony at

11 2:00.

12       THE WITNESS: Yes, sir.

13       THE COURT: All right.

14       THE WITNESS: All right.

15       THE COURT: All right. Counsel, we'll see you back at 2.

16       (Thereupon, a luncheon recess was had beginning at

17 12:30 p.m.)

18

19         **C E R T I F I C A T E**

20       I, Scott L. Wallace, RDR-CRR, certify that the

21 foregoing is a correct transcript from the record of proceedings

in the above-entitled matter.

22

      ----------------------------

23       **Scott L. Wallace, RDR, CRR**

      **Official Court Reporter**

24

25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 crack from Burke when Burke wasn't selling to you?

2 A.  If he was serving Wop, I give the money to Wop.  If he's

3 serving Boy-Boy, I give the money to Boy-Boy.  If he serving

4 Dazz, I give money to Dazz.  If he was serving DC, I give the

5 money to DC.  It just went back and forth.

6 Q.  You talked about Wop.  Did you ever -- you talked about --

7 did you ever get crack cocaine from Wop?

8 A.  Yes.

9 Q.  And what amounts would you get?

10 A.  This was wholesale.  I bought a couple ounces off of him

11 before.

12 Q.  You said wholesales and a couple of ounces.  When was it

13 that you bought a couple ounces?  Was that at one time, or just

14 various times?

15 A.  I can say like probably three or four times.

16 Q.  Three or four times that you bought how much?

17 A.  An ounce.

18 Q.  Was it an ounce each time?

19 A.  Yes.  He charged me 1,200.

20 Q.  And when was it that you bought -- these three or four times

21 that you bought an ounce, when was that?

22 A.  This was when -- I can't recall what year, but it was not

23 too long after Wop came up.

24 Q.  You said not too long after Wop came up?

25 A.  Yes.

1 something like that.  I was tight.

2 Q.  You said you were tight.  What do you mean, you were tight?

3 A.  I was mad.

4 Q.  And why were you mad?

5 A.  I mean, come off on 170 pounds and you give me four blunts?

6        MR. ZUCKER:  Objection.

7        THE COURT:  Basis?

8        MR. ZUCKER:  Basis for the response of 170 pounds.

9        THE COURT:  Overruled.

10 BY MS. PETALAS:

11 Q.  You said 170 pounds.  Did you talk to -- just yes or no, did

12 you talk to anybody about the amount of marijuana that was

13 taken?

14 A.  I talked to Wop.

15 Q.  And what did Wop tell you?

16 A.  He was like they came off with 170 pounds, 70,000, and

17 an AK.

18 Q.  You said 70,000.  What do you mean, 70,000?

19 A.  Cash.

20 Q.  And what else?

21 A.  And an AK.  So...

22 Q.  And going back to the times, then, that you bought the

23 ounces from Wop, was that before or after this incident?

24 A.  That was after.

25 Q.  Do you know an individual, Harry Settles?

1 A.  Yes.

2 Q.  And who is Harry Settles?

3 A.  A guy that stayed around the park.

4 Q.  Did you ever see Harry Settles sell drugs?

5 A.  Yes.

6 Q.  And did you ever rob Harry Settles?

7 A.  Couple times.

8 Q.  What did you rob -- who did you rob Harry Settles with?

9 A.  With Black, and with JT and Terrence, one day.

10        MR. PURPURA:  I'm sorry, I can't hear him.

11        THE COURT:  Would you repeat the answer?

12        THE WITNESS:  Oh.  With Black, and with JT and

13 Terrence.

14 BY MS. PETALAS:

15 Q.  And Harry -- you said Harry Settles, you saw him sell drugs

16 in Congress Park.  Did he ever play doors with you?

17 A.  No.

18 Q.  Was he ever somebody that you would sell drugs with when you

19 were posting up at the various places?

20 A.  No.

21 Q.  And did you ever have a conversation with Antwuan Ball about

22 robbing Harry Settles?

23 A.  Yes.

24 Q.  And what happened -- well, tell us about the robbery that

25 you did of Harry Settles before you had this conversation.

1 A.  Me, JT, and Terrence was riding around in my car.

2 Q.  I'm sorry.  You and who else?

3 A.  Me, JT, and Little Terrence was riding around in my car, and

4 we seen Harry sitting on his porch.  So we park, and we seen him

5 serve Portia.  So that's when we jumped out, went up there, was

6 like, "Let us get that money."

7 Q.  Okay, let me stop you there.  You saw Harry serve who?

8 A.  Portia.

9 Q.  Who is Portia?

10 A.  Bughead mother, Little Tony mother.

11 Q.  You said Little Tony's mother.  Is that somebody who lived

12 in Congress Park?

13 A.  Yes.

14 Q.  And where was it that you saw him serve Portia?

15 A.  Right at the bottom of the steps.

16 Q.  Bottom of whose steps?

17 A.  Harry's steps.

18 Q.  And what happens when you see Harry serve Portia at the

19 bottom of the steps?

20 A.  We jumped out, and we was like, "Let us get that money and

21 that coat."  And if I'm mistaken, he grabbed Little Terrence.

22 No, he grabbed JT.

23 Q.  Who grabbed JT?

24 A.  Harry.  He grabbed JT, and we got to beating him up, and

25 Terrence snatched his coat off of him.  And we jumped back in

1 the car, you know, went to the liquor store, got some weed,

2 continued on what we was doing, which was nothing.

3        And little while after that, Twuan ran up on me and was

4 like, "Man, fuck, why you do that bad shit, man?  Why you rob

5 Harry, man?  He talking about calling the police, some of this

6 shit.  I told you about doing that dumb shit, man."

7 Q.  Let me stop you there.  You said Antwuan said -- who is

8 talking about calling the police?

9 A.  Harry.  I mean, Bootsie was talking about calling the

10 police.

11 Q.  Who is Bootsie?

12 A.  Harry girlfriend.  She was talking about calling -- because

13 she said we took her rent money.  So I was like, "All right, the

14 money gone.  We spent the money."  We was like -- he was like,

15 "Just give me the coat and I get the coat back to him."

16        So we gave him the coat back.

17 Q.  You gave who the coat back?

18 A.  We gave the coat to Twuan.  And that was about it on that.

19 Q.  And to your knowledge, were the police ever called on that

20 robbery?

21 A.  No.

22 Q.  Other than the robbery of Harry, were there other robberies

23 you committed?

24 A.  Yes.

25 Q.  And who were some of the people -- did you commit robberies

Page 10196

1 by yourself or with other people?

2          MR. PURPURA:  Objection as to time frame, and relevance

3 of time frame.  I'm not sure what time frame we're in.

4          THE COURT:  Do you want to establish time frame?

5 BY MS. PETALAS:

6 Q.  Actually, right now I'm talking about the time from 1994,

7 when you first started selling drugs in Congress Park, up until

8 2002 when you were locked up.

9          Did you commit robberies during that time period?

10 A.  Yes.

11 Q.  And were you by yourself or with other people?

12 A.  I was with other people.  Like, me --

13 Q.  I'm sorry.  Who were some of the other people that you

14 committed robberies with?

15 A.  Me, Black, Jojo, Wop, Dazz, Drano, Head, Tweety.  Who else?

16 I can't remember if I even robbed with Don or none of that, but

17 that was basically us.

18 Q.  And you named a lot of people.  How would that work?  Who

19 would you rob?

20 A.  Drug dealers.

21 Q.  Is that outside Congress Park, inside, both?

22 A.  In, out.

23 Q.  And why would you rob drug dealers?

24 A.  Because we was broke, or they was just sweet at the time, or

25 we just robbed them.

1 Q.  You said sometimes you would rob inside Congress Park?

2 A.  Yeah.

3 Q.  Did you ever check with other people in Congress Park before

4 you robbed somebody in Congress Park?

5        MR. ZUCKER:  Objection.  Leading.

6        THE COURT:  Sustained.

7 BY MS. PETALAS:

8 Q.  Who around Congress Park would you rob?

9 A.  People that wasn't amongst us.

10        MR. ZUCKER:  I'm sorry, Judge, I couldn't hear.

11 A.  People that wasn't amongst us.  Because, I mean, we --

12 BY MS. PETALAS:

13 Q.  When you said, "people who weren't amongst us," how did you

14 know they weren't "amongst us"?

15 A.  Because, man, we was just cruddy.  We rob each other, you

16 know what I'm saying?  And if you was like Harry or one of them,

17 you'll get robbed, too.  We used to steal from each other, all

18 that.

19 Q.  You said, "If you were like Harry and one of them, you would

20 get robbed, too."  What did you mean by that?

21 A.  Because Harry really wasn't like -- like Harry or a person

22 like that, that didn't hang on the block with us like that, like

23 they get robbed, if it came down to it.

24 Q.  You said you used to steal from each other.  Did you ever

25 rob Wop?

1 A.  No.

2 Q.  How about Don?

3 A.  I took a quarter pound of weed out JT's house from him.

4 Q.  And where was that?  I'm sorry, you said you took a quarter

5 pound of weed from where?

6 A.  Out of JT house.

7 Q.  Was he there at the time?

8 A.  Yeah, he was there.  All of us -- it was me, JT, Don, I

9 think.  I forget -- I think DC was there, too.  I can't remember

10 if DC was there, but I took the weed.

11 Q.  And you said this was at JT's house?

12 A.  Yes.

13 Q.  Where was the weed in JT's house?

14 A.  I can't remember exactly where it was at.

15 Q.  Was it on Don or someplace in the house?

16 A.  From my understanding, I think it was on the speaker or

17 something.  I can't remember exactly where the weed was at, but

18 I think it was on the speaker.  I ain't sure.

19 Q.  And did you ever get robbed?

20 A.  I stashed my stuff in Wop car one time, and they bust the

21 window out and took the stuff.

22 Q.  You said you stashed your stuff in whose car?

23 A.  Wop car.

24 Q.  What do you mean "stuff"?  What was the stuff?

25 A.  It was a 31 and 100 dimes.  And I asked, can I put it in his

Page 10199

1 Cougar.  So I put it in his Cougar, and I went home.  And Bird

2 had called me and he was like, "Come around the way, come around

3 the way."

4         So I get around the way, I pulled around the back and

5 the window and shit was bust open.  I was like, "What the" -- I

6 was like, you know, "What's going on?"  And then Twuan pulled

7 down and was like, "Just chill out, Shorty.  Let me get your

8 shit back."

9         I was like, "Man, fuck them.  Give me my gun."  He

10 like, "Nigga, chill out.  I'm going go get your shit back, man,

11 I got this.  Not nobody going to take off my little cousin."

12         And I was like, "All right."  And he was like, "Man,

13 why don't you go to Dave & Busters and chill out, man.  By the

14 time you get back, I'll have your shit back."  I was like, "All

15 right."

16         So me and Bird road around, getting high.  Then when I

17 got back, came back around the way, LT gave me some coke back.

18 I think Terrence gave me some coke back, but I ain't get all my

19 coke back.  I got majority of it back.

20 Q.  Why did you store your stuff in Wop's car?

21 A.  I felt it was comfortable.  That was supposed to be my man.

22 Q.  I think earlier you had mentioned Keith B.  Did you ever --

23 well, strike.

24         You mentioned JT.  Was there ever a time that you went

25 with JT and Keith B to do a robbery?

1 Q.   You gave who coke?

2 A.   Crystal Tyler.

3 Q.   And who was Crystal Tyler?

4 A.   My girlfriend.

5 Q.   You said, "We got pulled over."  I take it you were in a

6 car?

7 A.   Yeah, it was me and her.  I was in my Lincoln.

8 Q.   And who was driving?

9 A.   I was driving.

10 Q.   And what happens -- what do you do when the police pull you

11 over?

12 A.   I pass the coke to Crystal.  And I had some weed.  I passed

13 it to Crystal and put it in her drawers.

14 Q.   And did she do that?

15 A.   Yeah, she put it in her drawers.  But she took it right back

16 out when the police got there.

17 Q.   You said she took it out when the police got there?

18 A.   Yes.

19 Q.   Did she give it to the police?

20 A.   Yes.  Well, they pulled us --

21 Q.   Let me just ask the next question.  After she gave it to the

22 police, do you get arrested?

23 A.   Yeah.

24 Q.   And did Crystal get arrested?

25 A.   Yes.

1 Q.  And did you -- what happened?  Do you plead guilty in that

2 case, or did you go to trial, or what happened?

3 A.  No, I pled guilty.  I took the charge.

4 Q.  And where had you gotten that crack cocaine?

5 A.  From Twuan.

6 Q.  And at the time that you were out driving with Crystal,

7 where were you residing at that time period?

8 A.  Congress Park.

9 Q.  Were you free or were you in a halfway house at that time?

10 A.  I was in a halfway house.

11 Q.  And prior to that time, after you pled guilty, did you go to

12 jail?

13 A.  Yes.  I did a year for that case.

14 Q.  And now I'm jumping back a little bit.  Other than that --

15 well, you said you got that crack cocaine from Twuan.  How long

16 prior to this traffic stop -- when had Twuan given you that

17 crack cocaine?

18 A.  I think, if I'm not mistaken, it was that day or the day

19 before that.  As a matter of fact, it was that day.  I had black

20 long johns on, and it was 95 degrees.  Because I was standing in

21 the circle, and the coke fell down -- it fell down my long

22 johns.  So I got out of my long johns, and when I got locked up,

23 one of the bags that she had on her fell out my boot.  That's

24 how we got co-defendants.

25 Q.  One of the bags that who had on?

1 A.  That Crystal had on.  Because originally, when she had it in

2 her drawers and stuff, they locked us up and stuff.  I was like,

3 "I don't know.  Babe, where you get it from?"

4        "I don't know."

5        MR. PURPURA:  Judge, objection.  I can't understand a

6 word that's being said.  Maybe I should...

7 BY MS. PETALAS:

8 Q.  When you get locked up -- let's go back to -- let's take it

9 down into baby steps.

10       You said that you had some -- you talked about having

11 some drugs on you?

12 A.  Okay.  Before --

13 Q.  Just answer yes or no:  Did you have some drugs on you?

14 A.  Yes.

15 Q.  And what amount of drug did you have on you when you got

16 pulled over by the police?

17 A.  I had all the drugs that she had on her.

18 Q.  Okay.  So you testified you gave those drugs to Crystal.  Is

19 that correct?

20 A.  Yes.

21 Q.  Okay.  After you gave the drugs to Crystal, did you still

22 have any drugs on you?

23 A.  Not to my recollection.  I thought I gave everything to her,

24 but when I got to the precinct and they searched me, a dime fell

25 out of my boot.

1 Q.  You said a dime fell out of your boot.  So you still had a

2 dime on you?

3 A.  Yes.

4 Q.  And you said prior to the time that they searched you at the

5 station, had you said anything about the drugs being yours?

6 A.  No.  I was saying to her, like, "You got drugs?  Where did

7 you get that from?"

8 Q.  And at some point did you then say the drugs were yours?

9 A.  The dude kept trying to press me.  He was like, "Man, you

10 going to let her take this hit for that?"  I was like, "I don't

11 know nothing about them drugs."

12      He was like, "You really going to let her take that

13 hit?"  And I was like (indicating).

14      MR. ZUCKER:  Whatever the last sentence was, I couldn't

15 hear it, Judge.

16      THE COURT:  What did you say?

17      MR. ZUCKER:  Whatever the witness' last statement was,

18 I just couldn't hear it.

19      THE COURT:  It was a look, not a verbal statement.

20 That's why you didn't hear it.  There wasn't one.

21      MR. ZUCKER:  I heard a sound, I guess.

22      THE COURT:  Go ahead.

23 BY MS. PETALAS:

24 Q.  At some point did you plead guilty to this charge?

25 A.  Yes.

1 Q.   And did you admit that all the drugs were yours, then?

2 A.   Yes.

3 Q.   Now I'm going to step back before that day that you got the

4 crack cocaine from Twuan that you were locked up on.

5         From '98 to that time that you got locked up in 2000,

6 had there been times that you had gotten crack cocaine from

7 Antwuan in that time period?

8 A.   You say from '98?

9 Q.   To 2000.

10 A.   I probably did, but I can't remember.

11         MR. ZUCKER:   Objection.   "Probably did but can't

12 remember."

13         THE COURT:   Overruled.

14 BY MS. PETALAS:

15 Q.   When you got crack cocaine from Antwuan on that day -- well,

16 at that time in July, just yes or no, had you heard anything in

17 Congress Park about the quality of Antwuan's coke during that

18 time period?

19 A.   He had some bullshit.

20 Q.   Well, who did you hear that from?

21 A.   The fiends, the crackheads.   Like if you got coke from

22 Twuan, it was nine times out of 10 some bullshit.   When I was

23 doing the year, that's when I was getting word that he had --

24 him and Wop had the good coke.

25 Q.   You said -- so when you did the year, when do you get out?

1 A.  Same day I got locked up, November 17th.

2 Q.  This was one year later, so 2002?

3 A.  Yes, ma'am.

4 Q.  I'm going to focus on that time period for right now.  When

5 you get out, do you start dealing with Antwuan at all?

6 A.  We start doing business.

7         MS. PETALAS:  Court's indulgence.

8 BY MS. PETALAS:

9 Q.  I'm sorry, I misspoke.  You said it was 2000 that you got

10 locked up, so I'm talking November of 2001.  Is that correct?

11 A.  When I got out?

12 Q.  Yes.

13 A.  Yes.  Same day I got locked up, same day I got released.

14 Q.  And how was it that you started dealing with Antwuan when

15 you get out of jail?

16 A.  I was at my -- all right.  How we started out dealing back

17 and forth then, he called me to his house and was like, "Ki, the

18 police raid run in here, the police raid run in here."

19 Q.  Let me stop you right there.  Who called you?

20 A.  Twuan.

21 Q.  And where was his house at that time?

22 A.  On Benning Road.

23 Q.  So when he called you, did you go over to his house?

24 A.  Yes.

25 Q.  And what happened when you got to his house?

Page 10216

1 A.  He was like, "Take this coke."  So he gave me two ounces.

2        And I was like, "You want me to take this gun?"  He was

3 like, "No, no, no, it's cool.  It's cool.  The gun cool."  I was

4 like...

5 Q.  So when you said, "You want me to take this gun," was there

6 a gun there?

7 A.  Yeah, he had a -- it was a 357, silver with a brown handle.

8 Q.  I'm sorry, what?

9 A.  It was silver with a brown handle.

10 Q.  Did you think it was unusual he didn't want you to take the

11 gun?

12 A.  Yeah.  I just run with the flow.

13 Q.  So did you take the two ounces?

14 A.  Uh-huh.

15 Q.  You have to answer yes or no, for the record.

16 A.  Yes.

17 Q.  And what did you do with those two ounces?

18 A.  I took them home.

19 Q.  And where was home?

20 A.  44 Falls Terrace.

21 Q.  Falls Terrace, where is that?

22 A.  In Simple City, right off Alabama Avenue.

23 Q.  And were you living there at the time?

24 A.  Yes.

25 Q.  Who were you living with?

1 A.   Me, my baby mother, and my mother.

2 Q.   And after you took this home, at some point do you go to

3 sell those two ounces?

4           MS. WICKS:  Objection.

5           THE COURT:  Sustained.

6 BY MS. PETALAS:

7 Q.   What do you do with the two ounces after that?

8 A.   That morning, I went back around the way.  And I'm like,

9 "You want your shit?"  He was like, "Shit, you might as well

10 sell them joints.  You might as well hold them joints."

11 Q.   Okay, let me stop you right there.  You said you went back

12 around the way.  When did you go back around the way?

13 A.   The next morning.

14 Q.   And when you say, "went back around the way," where were you

15 going?

16 A.   Congress Park.  So went back around the way, asked him did

17 he want his coke back.

18 Q.   Who were you talking to?

19 A.   Twuan.  He was like, "Dude, might as well keep it, Shorty.

20 You might as well sell it, Shorty.  You can get it off, you got

21 the money for it."

22           So I was stuck with two ounces.  So I sold the

23 two ounces.

24 Q.   You said you were stuck with two ounces?

25 A.   I wasn't stuck with them, but I sold them.

1 Q.  And when you went back around the way and he told you to

2 keep them, did you have to give him any money at that time

3 period?

4          MR. CARNEY:  Objection.  Leading, Your Honor.

5          THE COURT:  Sustained.

6 BY MS. PETALAS:

7 Q.  During that first conversation when you went back around the

8 way, that you just talked about, was there any money exchanged

9 at that point?

10 A.  I think I paid him for one, and I owed him for one.  No.

11 Did I pay him for one right there?  I can't remember.  I can't

12 remember if I -- I can't remember.

13          MS. PETALAS:  Court's indulgence.

14 BY MS. PETALAS:

15 Q.  Were you able to sell those two ounces?

16 A.  Yes.

17 Q.  And what happened when you sold the two ounces?

18 A.  He gave me some more.

19 Q.  He gave you two more what?

20 A.  O's, two more ounces.  I owed him -- no, I think I sold him.

21 He gave me -- I think he gave me two more or one more, then he

22 gave me another one, and I owed him like 24.

23 Q.  Okay.  Let me stop you right there.

24          MS. PETALAS:  Court's indulgence.

25 BY MS. PETALAS:

1 Q.  You said you can't remember how much -- if you paid him

2 after those first two ounces?

3 A.  No.

4 Q.  You have to answer yes or no.

5 A.  No.

6 Q.  Do you remember testifying in the grand jury about this?

7 A.  Yes, ma'am.

8 Q.  Would looking at the grand jury refresh your recollection?

9 A.  Yes.

10      MS. PETALAS:  I'm referring to February 1st, 2005,

11 page 40.

12      Actually, Your Honor, may we approach briefly?

13      THE COURT:  Yes.

14      (BENCH CONFERENCE ON THE RECORD.)

15      MS. PETALAS:  The reason I approached, I can place more

16 on the record because I haven't placed any on the record.  But

17 through his prior testimony, after talking to this witness, he

18 has some literacy problems.  So I can refresh his recollection,

19 but he has some reading issues.

20      So I can show it to him, kind of run into it

21 technically.  I don't know if there's a way I can place the

22 husher on and I can quietly read it to him, or -- his grand jury

23 testimony will refresh his recollection.  There's just kind of a

24 physical problem with him being able to read it.  And I don't

25 want to read it all out so the jury can hear it, but it is

1 Q.  Mr. Kellibrew, did that refresh your recollection?

2 A.  Yes.

3 Q.  Now I need my memory refreshed on what I asked you.

4        MS. PETALAS:  Could you read back the last question?

5        THE REPORTER:  Before the bench conference?

6        MS. PETALAS:  Yes.

7                    (The record is read.)

8 BY MS. PETALAS:

9 Q.  Well, after you -- let's just step back.  You testified

10 Antwuan Ball gave you two ounces.  When you sold those two

11 ounces, did you pay Antwuan anything?

12 A.  Paid him for one, he gave me another one, made it 22.

13 Q.  You said made it 22 what?

14 A.  2200 that I owed him.

15 Q.  You owed him $2,200?

16 A.  Yeah.  Yes.

17 Q.  And what happened then?

18 A.  He gave me another one.  I paid him for one, he gave me

19 another one.  It went 22, 22, then he gave me -- then he was,

20 like, "Oh, I'm almost done, I'm almost done.  Take these last

21 two."  I was, like, all right.  So I owed him 4400.

22 Q.  You said "take these last two."  What are you talking about

23 there?

24 A.  Ounces.

25 Q.  And you owed him how much?

1 A.   I owed him 4400.  So like a couple days, like I think maybe

2 two, three days, he was going to Philly --

3 Q.   Let me stop you there.  So you said you owed him $4,400?

4 A.   Yes.

5 Q.   And at some point after you owe him $4,400, do you go on a

6 trip with Antwuan Ball?

7          MR. ZUCKER:  Objection.  Leading.

8          THE COURT:  Sustained.

9 BY MS. PETALAS:

10 Q.   Well, do you see Antwuan Ball again after you owe him this

11 $4,400?

12 A.   Yes.

13 Q.   And when do you see Antwuan Ball?

14 A.   I seen him in the circle.

15 Q.   And what happened when you saw him in the circle?

16 A.   He was saying he was ready to go to Philly or whatever for

17 this Prepaid Legal event or whatever.  I was, like, yeah --

18 Q.   Let me stop you right there.  You said he was getting ready

19 to go to Philly for a Prepaid Legal event.  What do you mean, a

20 Prepaid Legal event?

21 A.   I mean, that's what he was doing.  I know he was doing the

22 Prepaid Legal stuff by the girl, Micola (ph), and he said he was

23 going to a convention out there.  That's what he said, he was

24 going to a convention with the Prepaid Legal.

25          So it was me, Bird, and Black in my car, and I was,

1 like, "Damn, I should go."  They was, like, "Shit, you should

2 go, might as well go."  I was, like, "Fuck it, I might as well

3 go.  I ain't doing nothing.  I ain't been nowhere."

4 Q.  Let me stop you there.  So at some point do you go to

5 Philadelphia with Antwuan?

6 A.  Yes.

7 Q.  And did you actually go up to Philadelphia with him?

8 A.  Yes.

9 Q.  Was there anybody else there?

10 A.  No.  It was me and Twuan.

11 Q.  And how do you get up there?

12 A.  We drove.

13 Q.  And when you get to Philadelphia, did you go to this

14 convention?

15 A.  Yeah.  Like we was together.

16 Q.  Were you involved at all with any Prepaid Legal work?

17 A.  Naw.

18 Q.  So what did you do when you got up to Philadelphia?

19 A.  Shop.

20 Q.  I'm sorry, what?

21 A.  You said what did I do when I went to Philly?

22 Q.  Yes.

23 A.  Shop and got high and chilled.

24 Q.  Did you spend any money up there?

25 A.  I spent every dollar I had.

1 Q.  And did you still owe Antwuan the 4400 at this point?

2 A.  Yes, I did.

3 Q.  And approximately how long were you up in Philadelphia?

4 A.  I can't remember how long we was in Philly.  I think two,

5 three days, something like that.

6 Q.  And was Antwuan up in Philadelphia the entire time you were

7 there?

8 A.  Yes.

9        MR. CARNEY:  Objection.  Personal knowledge, 602.

10        THE COURT:  Sorry?

11        MR. CARNEY:  Objection.  Personal knowledge, 602.

12        THE COURT:  I'll allow it.

13 BY MS. PETALAS:

14 Q.  How did you get back from Philly back to D.C.?

15 A.  We rode back down.

16 Q.  Who is we?

17 A.  Me and Twuan.

18 Q.  And what happened when you got back to D.C.?

19 A.  He wanted his money.

20 Q.  And did you have his money?

21 A.  I had a couple dollars in the house, but I ain't have his

22 4400.  I was like, "I got you."  All right.  We fell out in the

23 room --

24 Q.  You said you fell out in the room.  What room?

25 A.  In the hotel.  Because I was shopping.  You know, we both

1 was shopping, but Twuan wasn't really too much, you know, doing

2 too much shopping.  I was spending my money, you know what I'm

3 saying?  I was spending, spending, spending.  He was, like,

4 "Man, you better watch it, because I want my mother-fucking

5 money when we get back."  I was like, "I got you, man."  I was

6 like, damn, we in Philly and he still asking me for his money.

7          So I was, like, "All right, I got you when I get back."

8 So I was in the back of my mind saying, man, I'm going to spend

9 every dollar.  And that's what I did, I spent every dollar.  I

10 ain't had no money to get no food or no weed.  I was like, as

11 long as I got me some weed to smoke, I'm good.  Because I was

12 like, I was spending, spending, spending, and he was like,

13 "Damn, you going to spend all your money?"  I was like, "Shit,

14 long as I got something to smoke, I'm good."

15 Q.  So when you get back to Philadelphia, now have you spent all

16 your money?

17 A.  Have I spent all my money in Philly?

18 Q.  Yes.

19 A.  No.

20 Q.  Did you give him any of his money back when you got to

21 Philadelphia?

22 A.  No.

23 Q.  I mean, when you got back from Philadelphia.

24 A.  I don't think I did.  I don't think I gave him the money as

25 soon as we got back from Philly.  I think I gave him some money

1 like later on or something.  But we fell out.  We fell out from

2 the hotel about that 4400.

3 Q.  You say you fell out.  Did you deal with Antwuan again after

4 that with crack cocaine?

5 A.  Naw.  I doubted he would ever fuck with me again after that.

6 Q.  And approximately how long was this prior to that last

7 arrest in 2002?

8 A.  I finished -- when I finished paying him off, I got locked

9 up like right after that.  Like not too long before that.

10 Q.  You talked earlier about Boy-Boy.  Did he have any other

11 nicknames that you know about?

12 A.  Bonga and Stashman.

13         MS. PETALAS:  Court's indulgence.

14 BY MS. PETALAS:

15 Q.  Do you know an individual named Cody?

16 A.  Cody?

17 Q.  Yes.

18 A.  Used to cut our hair.

19 Q.  How about an individual named Bo?

20 A.  Used to be in Cody house.

21 Q.  Did you ever see Bo and Antwuan together?

22 A.  Yep.  That was his son.

23 Q.  What do you mean, that was his son?

24 A.  Uh...

25 Q.  Was there a father-son relationship there?

1 Wilson got his crack cocaine from.  Just yes or no, whether or

2 not you know.

3 A.  Yes.

4 Q.  How do you know?

5 A.  I done seen firsthand my eyes.

6 Q.  And who did you see David Wilson get crack cocaine from?

7 And again, just to clarify, I'm not talking about just

8 wholesales, I'm talking about larger amounts.

9 A.  Quincy, Burke --

10        MS. WICKS:  Objection to leading.

11        THE COURT:  Hold on one second.  Rephrase.

12 BY MS. PETALAS:

13 Q.  Well, what kind of amounts would you see David Wilson get

14 crack cocaine?

15 A.  Like ounces, 31s, halves.

16 Q.  And are you familiar with the term "weight"?

17 A.  Yes.

18 Q.  And what does the term "weight" mean?

19 A.  Weight is a large quantity -- like if you selling weight,

20 that means you selling like seven grams, halves, ounces, in that

21 category.

22 Q.  And did you ever see David Wilson, Wop, buy weight?

23 A.  Yes.

24 Q.  And who were some of the people you would see him buy weight

25 from?

1 A.  Burke, Boy-Boy, Quincy, Roadie, Reggie King, Twuan.  That's
2 about it.

3 Q.  Just yes or no, did you ever have any conversations with Wop
4 about him owing money or who he got crack cocaine from?  Just
5 yes or no at this point.

6 A.  You said did me and Wop ever have conversations about who he
7 was getting his coke from?

8 Q.  Yes.

9 A.  It's like a kind of yes and no, because it's like --

10 Q.  Well, tell us about the conversations you had with Wop.
11 When you say yes or no, what do you mean?

12      MS. WICKS:  Objection.  I don't object to that
13 question.

14      THE COURT:  Sustained.  Rephrase.

15 A.  Like --

16 BY MS. PETALAS:

17 Q.  Wait, I'm sorry.

18      MS. WICKS:  I don't object to "explain what you mean by
19 yes and no."

20      THE COURT:  You say you do or don't?

21      MS. WICKS:  I do not object to him explaining his
22 previous answer.

23      THE COURT:  Let's just start clean.  Rephrase your
24 question.

25      MS. PETALAS:  Now I want to understand the Court's

# Tab 35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
    Plaintiff,                     :  Docket No. CR 05-100
    v.                             :
ANTWUAN BALL, DAVID WILSON,        :  Washington, DC
GREGORY BELL, DESMOND              :
THURSTON, JOSEPH JONES, and        :  May 8, 2007
DOMINIC SAMUELS,                   :  9:20 a.m.
    Defendants.                    :
                                   :
                                   :
                                   :
                                   :
                                   :

VOLUME 47 – MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

10308

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD 21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                          2715 M Street, NW
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

10309

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

10310

**MORNING SESSION, MAY 8, 2007**

1
2   (9:15 a.m.)
3       THE COURT:  Ms. Petalas, is your witness here?
4       MS. PETALAS:  Yes, Your Honor.
5       THE COURT:  All right.  Let's bring him in.
6       MR. BEANE:  The defendants are just coming up.  Can I have
7   a second to tie their ties?
8       THE COURT:  Okay.
9       (Brief pause in proceedings.)
10      THE COURT:  All right.  Ms. Petalas, are you ready for the
11  jury?
12      MS. PETALAS:  Yes, Your Honor.
13      (Jury in at 9:20 a.m.)
14      THE COURT:  Good morning, ladies and gentlemen.
15      THE JURY PANEL:  Good morning.
16      THE COURT:  Welcome back.  We're ready to resume.
17      Ms. Petalas.
18      MS. PETALAS:  Thank you, Your Honor.
19      CONTINUED DIRECT EXAMINATION OF KAIRI AMON KELLIEBREW
20  BY MS. PETALAS:
21      Q.    Good morning, Mr. Kelliebrew.  I just want to remind you
22  that you're still under oath.  Do you understand that?
23      A.    Yes, ma'am.
24      Q.    And where we left off yesterday, we were talking about an
25  incident where you were talking to Black about going back to the

Scott L. Wallace, RDR, CRR
Official Court Reporter

10315

1  A.   I had the phone.

2  Q.   And why did you have his phone?

3  A.   'Cause my girl had her phone and I didn't have a cell

4  phone then.

5  Q.   Okay.  And when he came and got his phone, is this when

6  you had the conversation about a halfway house or is this later

7  that you had the conversation?

8  A.   No, we had the conversation on the phone.  Then he came

9  down and was like, "I'm getting my phone."  And I was like,

10  "Young, you really going to let this bitch talk you out of not

11  going back to the halfway house?"  I was like, "I'm going to

12  smack this bitch."

13  Q.   Let me stop you right there.  This conversation that

14  you're having, is it on the phone now or is it in person?

15  A.   Naw, this was in person.  He was like, "Naw, Kai.  I

16  ain't going out like that."

17  Q.   Where is this conversation?  Is this in Congress Park?

18  A.   Yeah.  Actually, I was parked right here (indicating.)

19  Q.   Okay.  For the record, you put a red dot kind of in the

20  entrance to the parking lot of what you previously said was the

21  Lincoln; is that right?

22  A.   Yes.

23  Q.   When you have this conversation and you're referring to a

24  woman, who is this woman you were referring to?

25  A.   His little girlfriend.  I don't remember her name or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10316

1  nothing.

2  Q.   Is this the same -- is this the same girlfriend you

3  talked about before, back in the incident in 1996, or a

4  different girl?

5  A.   No.  Some different chick.

6  Q.   And what happens after you tell him not to go back to the

7  halfway house?

8  A.   He went to her house.

9  Q.   Now, taking you to August 27th, 2002, the day of the

10  murder, when did you first see Black on that day?

11  A.   That morning.

12  Q.   And what happened?  Where did you see him?

13  A.   I picked him up from V Street.

14  Q.   And what's at V Street?

15  A.   That's where his girlfriend was staying at.

16  Q.   And what happens -- where do you go once you pick him

17  up -- well, let me take a step back.

18       What are you driving at this point when you pick him up?

19  A.   I was driving my Lincoln.

20  Q.   And what happens when you pick Black up from V Street?

21  Where do you guys go?

22  A.   We went around the way, but me and him got in a little

23  argument because I was blowing some dope.

24  Q.   Okay.  You said you went around the way and you got in an

25  argument.  First of all, when you say you "went around the way,"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10317

1  what are you talking about there?

2  A.   Congress Park.

3  Q.   And then you talk about getting into an argument because

4  you were blowing some dope.  What were you doing?

5  A.   I was snorting some heroin.

6  Q.   And why were you getting into an argument about that?

7  A.   He didn't like it.  And he was like, "That ain't you.

8  What the fuck you blowing that dope for?"  And I was like, "Man,

9  get the fuck out of my face."  And we went around the way and we

10  was looking for some weed.

11  Q.   So how much -- when you say you were snorting some

12  heroin -- well, what were you doing with the heroin?

13  A.   I was snorting it.  I was getting high.

14  Q.   And how much did you use?

15  A.   I only did it one-on-one.

16  Q.   What does that mean?

17  A.   Like two bumps, small amounts, both nostrils.

18       MR. PURPURA:  I'm sorry.  I missed that.

19       THE COURT:  Could you repeat your answer?

20       THE WITNESS:  I snorted some in both nostrils.  It's

21  called a one-on-one.  You hit one nostril, you hit another

22  nostril.

23       MR. PURPURA:  Thank you.

24  BY MS. PETALAS:

25  Q.   And approximately how much heroin was it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10318

1  A.   Nothing.  It really wasn't too much of nothing.  You

2  could have blown it away.  It was one-on-one.  It wasn't too

3  much of nothing.

4  Q.   And approximately what time was it that you were snorting

5  this heroin?

6  A.   This had to be probably 8, 9 in the morning, something

7  like that.

8  Q.   And then when you get in this argument, where do you guys

9  go?

10  A.   Well, let me stop you right there.  When I picked him up

11  or whatever, he was taking too long to come down, so I kept

12  blowing the horn, blowing the horn.  So when he finally came

13  down, I was like, "Where your gun at?"

14       MR. PURPURA:  Objection.  This becomes a narrative again.

15  BY MS. PETALAS:

16  Q.   When he comes down, then what does -- how long does it

17  take him to come down?

18  A.   Like five to ten minutes.

19  Q.   And what happens when he comes down?

20  A.   I was beefing because he took too long.  And then I was

21  like, "You bring your gun?"  He was like, "Naw."  I was like,

22  "Why you ain't bring your gun?"

23       MR. PURPURA:  I apologize.  I can't hear the witness.

24  He's talking too fast.

25       THE COURT:  Repeat that answer and get as close to the mic

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10319*

```
1   as you can.
2          THE WITNESS:  Okay.  I was like, "You bring your gun?"  He
3   was like, "Naw."  I was like, "Why not?"  He was like, "Fuck it."
4   I was like, "Don't worry about it.  I got a gun right here."
5   BY MS. PETALAS:
6   Q.    And did you have a gun?
7   A.    Yes.
8   Q.    What gun did you have?
9   A.    I had the gun, the D-Lock murder.
10  Q.    You say you had the gun from the D-Lock murder.  Where
11  had you gotten this gun?
12  A.    From Geeka.
13  Q.    And where was the gun?
14  A.    Right in the middle of us.
15  Q.    You said it was in the middle of you.  Was it in the
16  front seat of the car?
17  A.    Yes.
18  Q.    Was it contained in anything or out in the open?
19  A.    Naw, it was in the middle of a towel.
20  Q.    And when you got Black, then where do you go?
21  A.    Okay.  I pulled over right there.
22  Q.    Pulled over right where?
23  A.    I turned around on his street, pulled right there on V
24  Street, hit the dope.  He got to spasing -- well, he got to
25  arguing with me.  And I was like, "Man, I ain't trying to hear
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10320*

```
1   that shit."  So I pushed around the way.  I pushed around
2   Congress Park, drove around Congress Park.
3          So when we got around Congress Park, we was riding
4   around.
5   Q.    Where were you riding around?  Was this inside -- right
6   around Congress Park or other areas?
7   A.    It was right around Congress Park.  So we seen DC on the
8   porch and he was like, "I should jump out and kill this nigga
9   right now."
10         I said, "Nigga, you ain't doing that shit in my car.  You
11  ain't doing that shit."  So I sped up.
12  Q.    Okay.  Let me stop you right there.  You said you saw DC
13  on the porch.  Do you see where you saw DC on the map that's up
14  right now?
15         (Indicating.)
16  Q.    For the record, you have placed a red dot on the
17  building, the first building as you look at the map on the left
18  at the top of The Circle; is that right?
19  A.    Yes.
20  Q.    And where did you see DC?
21  A.    He was on the porch, sitting in the chair.
22  Q.    The original dot was kind of at the back of the building.
23  Was he in the back or the front of the building?
24  A.    He was in the front.  He was setting on the front.  He
25  was leaning in the chair like this, on the wall (indicating).
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10321*

```
1   Q.    And for the record, you just kind of leaned back,
2   demonstrating how DC was sitting on the porch; is that correct?
3   A.    Yes.
4   Q.    And what happens when you see DC on the porch?  Where are
5   you?  Are you on Congress Street?  Are you on 13th Place?
6   A.    We were on Congress Street and I was turning in The
7   Circle.  And he was like, "I should jump out and kill this nigga
8   right now."
9          And I was like, "Fuck, no.  Not in my car, you ain't
10  doing that shit.  Look, I ain't got nothing to do with it.  You
11  ain't doing that shit in my car."  So I sped up around The
12  Circle and went down 10th.
13  Q.    And why did you go down 10th?
14  A.    I mean, I was hustling down 10th.  I was like chilling
15  down there at the top of 10th.
16         So we was looking for some weed.  We couldn't find no
17  weed, but in the same process, we looking to rob somebody, too.
18  So we was riding around, riding around.  Then I was like, "You
19  know what?  Let's go over Quarles."  And you know, like we going
20  to holler at JT while we're over there.
21  Q.    Let me stop you right there.  You said you were going
22  over to Quarles.  Why were you going over to Quarles?
23  A.    To find some weed and to rob somebody.
24  Q.    And where is Quarles?
25  A.    It's in -- I think it's Northeast.
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10322*

```
1   Q.    Okay.  And you said on the way over, you're going to stop
2   and get who?
3   A.    We was going to stop and holler at Little JT.
4   Q.    Okay.  And did you go over Quarles?
5   A.    Yeah, we went over to Quarles.  Wasn't nobody outside, so
6   that's when I went to JT house and I banged on his door.  He
7   ain't answer the door.
8          So we shot back around.  We shot back around the park.
9   Then we came back to Quarles from around the park, like I was
10  riding around again.  We came back around Quarles.  Wasn't
11  nobody out there.
12  Q.    Okay.  Let me stop you there.  You said you came back
13  around Quarles.  Now, was this the second time that day you'd
14  been around Quarles?
15  A.    Yes.
16  Q.    And again, why are you going to Quarles at this point?
17  A.    To buy some weed and to rob somebody.  So wasn't nobody
18  right there.  We went back over to JT house.
19         MR. MARTIN:  Your Honor, no question pending.  He answered
20  the question, Why are you going back to Quarles?  This is
21  narrative at this point.
22         THE COURT:  Put your next question.
23  BY MS. PETALAS:
24  Q.    What happened after you went back to Quarles.  What did
25  you do next?
```

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10323**

1  A.    We went to JT house.

2  Q.    And what happened when you went to JT's house?

3  A.    Nobody answered the door.

4  Q.    So where did you go after you went to JT's house and

5  nobody answered the door?

6  A.    Naw, we was sitting right there.

7  Q.    Sitting right where?

8  A.    Sitting right outside JT house. And Black had called his

9  sister and we supposed to been over there, but we end up going

10  back around the park.

11  Q.    Why, if you know, did you not go over to Black's sister?

12  A.    I don't know. We just didn't go. So --

13  Q.    So you said you went back around the park?

14  A.    Yes.

15  Q.    So what happened when you got back around the park?

16  A.    Well, I was coming off Suitland Parkway, I seen this

17  little broad, so I hit the horn at her and I was like, "What's

18  up, Shorty?"

19  Q.    Let me stop you there. You said you're coming off

20  Suitland Parkway. Where are you now? Had you gotten to the

21  park yet?

22  A.    Naw, I ain't got to the park yet.

23  Q.    And you said you see a broad. Where do you see her?

24  A.    She was coming out of Stanton Oaks.

25  Q.    Stanton Oaks? What's that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10324**

1  A.    An apartment complex that's right there coming off

2  Suitland Parkway.

3  Q.    And did you know this woman?

4  A.    Nope.

5  Q.    Had you ever seen her before?

6  A.    Nope.

7  Q.    So what do you do when you see this woman?

8  A.    Tell her, "Come here, let me holler at you."

9  Q.    And how was it that you were able to get her attention?

10  A.    I hit the horn at her. She looked. I said, "What's up?

11  (Indicating) come on." She walked across -- I pulled on Jasmine

12  Street, she pulled right there. And I was like, "What's up with

13  you?" She was like, "What's up with y'all?" "What you trying

14  to do?" "Whatever y'all trying to do."

15  Q.    Okay. Let's go back. What are you saying to her and

16  what is she saying?

17  A.    I asked her, "What's up with you?" She's like, "What's

18  up with a y'all?" And I was like, "What you trying to do?" She

19  was like, "Whatever y'all trying to do." So I was like, "Psst.

20  That. Get in."

21  Q.    And what were you trying to do then?

22  A.    We was trying to -- we were going to G her out. Me and

23  my man was going to fuck her, and whoever else wanted to fuck

24  her while we had her, they was going to fuck her, too.

25  Q.    And your understanding, is that what she understood you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10325**

1  to mean as well?

2  A.    Yes.

3  Q.    Okay. So what happened? And did she get in the car?

4  A.    Yes.

5  Q.    And where do you go once she gets in the car?

6  A.    I pulled into the -- I drove around the park and I pulled

7  in the Lincoln.

8  Q.    And I'm going to ask you to go ahead and clear the screen

9  right now.

10        And now, if you could just indicate on that map -- you

11  said you pulled into the Lincoln. Just show us where you pulled

12  in.

13  A.    I pulled right here (indicating).

14        Oh, damn.

15        MS. PETALAS: Bear with us for a moment.

16  BY MS. PETALAS:

17  Q.    There you go.

18  A.    A parking space right there (indicating.)

19  Q.    Okay. And for the record, you placed a red arrow kind of

20  near the entrance -- the top entrance of that Lincoln parking

21  lot; is that correct?

22  A.    Yes.

23  Q.    Okay. And what happened when you -- what did you do when

24  you pulled into the Lincoln?

25  A.    I told Black, "I'll be right back. I'm going to go to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10326**

1  the truck and get some rubbers."

2  Q.    Let me stop you there. You said you're going to go to

3  the truck and get some rubbers. What truck are you referring

4  to?

5  A.    Ice cream truck.

6  Q.    And where was the ice cream truck?

7  A.    In The Circle.

8  Q.    You call it the ice cream truck. Did it sell more than

9  ice cream?

10  A.    Not that I know of. I just knew it sell ice cream; ice

11  cream, chips, soda, you know, soda, bread.

12  Q.    So, there are other items other than ice cream, the other

13  items that you named?

14  A.    Yes, but it was called the ice cream truck.

15  Q.    And you said you were going there to get rubbers. What

16  are you referring to there?

17  A.    Condoms.

18  Q.    And could you get condoms at the ice cream truck?

19  A.    Yes.

20  Q.    So what happened? Did you go to the ice cream truck?

21  A.    Yeah, I went to the eye cream truck and I seen Boy-Boy.

22  And I was like, "Boy-Boy, we got this little bitch. I was like,

23  "Let me get the keys to Kena house." I was like, "Let me get

24  some rubbers."

25  Q.    You said -- you asked him to get the keys to Kena's

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1  house. Who is Kena?
2  A.   This lady who stayed in The Circle.
3  Q.   And how did you know Kena?
4  A.   From staying around there.
5  Q.   Staying around where?
6  A.   Congress Park.
7  Q.   Did you ever sell drugs to Kena?
8  A.   Yes, I did.
9  Q.   Why was it that you were asking Boy-Boy for the keys to
10  Kena's place?
11  A.   He had the keys to Kena house.
12  Q.   But how did you know that?
13  A.   We used to be in there.
14  Q.   You said, "We used to be in there." Who used to be in
15  there? Who do you mean by "we"?
16  A.   Me and Boy-Boy and a couple other -- we used to sit in
17  there and play the game and smoke.
18  Q.   You said, "play the game." What game are you referring
19  to there?
20  A.   PlayStation.
21  Q.   And did you get the keys to Kena's from Boy-Boy?
22  A.   Um-hmm.
23  Q.   You have to answer yes or no.
24  A.   Yes. Then I walked back to the Lincoln. Boy-Boy was
25  calling the trailers. He was like, "Doors, doors, doors" to the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  little bitch. I was like, "All right, Black, man. We got Kena
2  house, so she can come up Kena house."
3        So I walked back, walked back to the Lincoln, jumped in
4  the car, pulled in the back, in the back of Kena joint -- in the
5  back of Kena building.
6  Q.   So you pulled in the back of Kena's building. Do you see
7  Kena's building on the map?
8  A.   Yes.
9  Q.   Can you point to it?
10  A.   (Indicating.)
11  Q.   For the record, you placed a red dot at the building
12  that's just -- while looking at the map, it's just to the bottom
13  and left of the backwards L; is that correct?
14  A.   Yes.
15  Q.   And where did you pull into? You said you pulled in the
16  back. Can you point to where you pulled into?
17  A.   I pulled right here. I pulled right here (indicating).
18        Oh, oh, damn. I pulled right here (indicating).
19  Q.   And for the record, you --
20        MR. ZUCKER: Objection. It's one spot and two arrows he
21  pulled down simultaneously, saying, "I pulled right here." I
22  don't --
23        THE WITNESS: I just put them back up there because they
24  were down.
25        THE COURT: Hold on one second.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1        MS. PETALAS: I'm sorry. I'm about ready to clarify, Your
2  Honor.
3        THE COURT: You may go ahead.
4  BY MS. PETALAS:
5  Q.   For the record, you had placed now -- you cleared the
6  screen and placed three more -- two arrows and a dot. And it
7  looks like you placed two arrows -- an arrow at the entrance of
8  the Lincoln, where you had previously marked as where you first
9  pulled in; is that correct?
10  A.   Yes.
11  Q.   And you placed a dot on what area you previously marked a
12  dot on the building --
13        MR. ZUCKER: Objection to form.
14        THE COURT: Overruled.
15  BY MS. PETALAS:
16  Q.   You placed a dot where you previously marked a dot on the
17  building just to the bottom and the left of the L -- backwards
18  L, where you said Kena -- you previously identified as Kena's
19  building; is that correct?
20  A.   Yes.
21  Q.   And finally, you placed another arrow right to the right
22  of a building that -- the building on the map that's just to the
23  right of 13th Place in The Circle; you placed an arrow directly
24  to the right behind that building; is that correct?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   And is that where you parked?
2  A.   Yes.
3  Q.   And what -- when you pulled into there, where are you in
4  the car?
5  A.   I'm in the driver's seat.
6  Q.   And where is Black?
7  A.   In the passenger seat.
8  Q.   And where is the woman that you had picked up?
9  A.   She was sitting behind me.
10  Q.   Do you recall that woman's name?
11  A.   No, I don't.
12  Q.   Do you recall how old she was?
13  A.   No, I don't.
14  Q.   Was she older? In her 30s? Teens? 20s?
15  A.   She probably was in her teens or her 20s.
16  Q.   And what happens then whether you pull in behind that
17  building -- that arrow you just pointed out?
18  A.   When I pulled back there, Black kept hitting repeat on
19  the CD. So I was like, "Man, stop playing that mothafucking
20  song, man." He like, "Nigga, this is my song. Nigga, this my
21  song." I'm like, "Man, look, I'm ready to go open the door to
22  Kena house. Watch your ass. There's a gun right here. This
23  nigga out here, man, so watch your ass."
24        So I jumped out of my car. I was like -- I can't say I
25  was running, but like -- I can't say I was jogging, but I was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10331*

1  stepping fast.

2  Q.    Let me stop you there. Where were you going at this

3  point?

4  A.    I was going to open the door to Kena house.

5  Q.    And what was your plan to do when you got to Kena's

6  place?

7  A.    I was going to fix up the room so we can go fuck the

8  little broad.

9  Q.    So what happens. You said you were going towards Kena's

10 building?

11 A.    Yes.

12 Q.    And what happens as you're going -- when you're -- after

13 you start going towards Kena's building?

14 A.    Like I say, I was stepping fast when I got out my car. I

15 went in Kena house, unlocked the door, hit Kena. I was like,

16 "Boy-Boy be around here. We going to give you something when I

17 get around here. I'm going to go straighten up a room. Me and

18 Black got this broad and when Boy-Boy come around --"

19       She goes, "Black who?" I'm like, "My man, Black, you

20 know Black?"

21       MR. PURPURA: Objection to what anyone else is saying.

22 Again, we're getting into narrative form at this point and I

23 object to a narrative form.

24 BY MS. PETALAS:

25 Q.    Let me take a step back. You were talking about what you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*10332*

1  said. You said that Boy-Boy would be around here and give you

2  something. What do you mean by that, "would give you

3  something"?

4  A.    Give her something to smoke for letting us stay in the

5  room.

6  Q.    And once you have that conversation with Kena, were you

7  able to continue on with your plan to get the room ready?

8  A.    Yes.

9  Q.    And what happened? What did you do?

10 A.    I went to the back room. And as soon as -- as soon as I

11 grabbed the sheet and I flipped it open and something -- boom,

12 boom, boom, boom. And I ran to the door. And Kena grabbed me,

13 so I pushed Kena out of the way and I went down the steps.

14 Q.    Okay. Let me stop you there. You said you heard shots

15 and you ran to the door --

16       MR. BEANE: Objection, Your Honor. That's not what he

17 said. He said, "I heard boom, boom, boom."

18       THE COURT: Overruled.

19 BY MS. PETALAS:

20 Q.    You said you ran down the steps. Where -- what floor was

21 Kena's apartment on?

22 A.    Second floor.

23 Q.    So what happens after you run down the steps?

24 A.    I ran down -- all right. When I ran down the steps, it

25 was -- it's like an old lady sitting or something right there.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*10333*

1  And they were trying to come out the door. I pushed them in the

2  door and closed the door and I ran out front -- I mean I ran out

3  back where my car was at and I seen -- well, Black was doing

4  like this (indicating). When I looked out, he was hitting -- he

5  was grabbing his side, spinning around the corner.

6  Q.    Let me stop you right there. You just said, "Black was

7  going like this." Just describe -- where are you when you see

8  Black?

9  A.    I was coming towards the door. I was looking -- okay.

10 Kena joint -- Kena house right here, the back door right here

11 (indicating). When I was coming out at the door, Shorty was

12 bending the corner right here. He was bending the corner right

13 here, holding his side.

14 Q.    Let me stop you right there and just place that on the

15 record. You placed a red dot just above the -- just towards the

16 back of the building that you previously identified as Kena's,

17 correct?

18 A.    Yes.

19 Q.    And you also placed a red dot and arrow kind of in

20 between the two buildings that are to the right of 13th Place in

21 The Circle, where there's a driveway; is that correct?

22 A.    Yes.

23 Q.    And you said you saw Shorty. Who do you mean by

24 "Shorty"?

25 A.    Black.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*10334*

1  Q.    Okay. And let me just stop you right there.

2       MS. PETALAS: Court's indulgence.

3       May I approach, Your Honor?

4       THE COURT: Yes.

5  BY MS. PETALAS:

6  Q.    I'm going to show you what's marked as Government's

7  Exhibit 122.3.

8       MS. PETALAS: I believe this is an add-on, Your Honor.

9       MR. PURPURA: Your Honor, may I also have permission to

10 move so I can see --

11      Thank you.

12 BY MS. PETALAS:

13 Q.    Mr. Kelliebrew, do you recognize this?

14 A.    Yes.

15 Q.    And what is that?

16 A.    The Circle, the Lincoln, 13th Hill, Congress.

17 Q.    And is that a fair and accurate picture of that area that

18 you just said it was?

19 A.    Yes.

20      MS. PETALAS: Your Honor, at this time I move Government's

21 Exhibit 122.3 into evidence.

22      MS. WICKS: No objection.

23      MR. ZUCKER: No objection.

24      THE COURT: It will be received.

25      (Government's Exhibit 122.3 admitted into the record.)

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

10335

1  MS. PETALAS: Permission to publish?
2  THE COURT: Yes.
3  BY MS. PETALAS:
4  Q.  And you talked about how you ran out the door.  I'm just
5  going to actually hand you a hand-held microphone and ask the
6  Court's permission if you could step down and point to certain
7  places on that photograph.
8  THE COURT: Yes.
9  MS. PETALAS: Thank you.
10  BY MS. PETALAS:
11  Q.  Mr. Kelliebrew, if you could just -- do you see on that
12  picture where you came out of the building?
13  A.  Yes.  Right here (indicating).
14  Q.  And for the record, you placed -- you're pointing to the
15  back of a building that is kind of sticking straight out towards
16  you at the picture that's kind of at the bottom of that L, the
17  backwards L of the Lincoln; is that correct?
18  A.  Yes.
19  Q.  Okay.  And could you also just point on there for the
20  jury where you saw Black bending the corner?
21  A.  Right here (indicating.)
22  Q.  And for the record, you placed -- you've pointed --
23  you're pointing to a building, the end of a building that's on
24  13th Place that kind of forms an L with that building that you
25  just came out of; is that correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10336

1  A.  Yes.
2  Q.  And what -- when you come out of the building, how far
3  out of the building do you get?
4  A.  It's a rail right here; right at this building, there's a
5  rail.  I came all the way out like this (indicating) and Shorty
6  was like -- hold on.  Let me slow up because I'm speeding.
7  When I came out -- when I came out the building, Shorty
8  was doing like this (indicating), bending the corner.
9  Q.  All right.  Let me stop you right there.  You just kind
10  of did a demonstration I have to place on the record.
11  You said when you came out of the building, you said
12  Shorty -- and again, are you referring to Black?
13  A.  Yes.
14  Q.  And for the record, you placed your hand on your side; is
15  that correct?
16  A.  Yes.  He was grabbing his side.
17  Q.  And you also kind of turned around.  Was he turning
18  around when you saw him?
19  A.  Yes.
20  Q.  Okay.  And what was he doing?  Was he -- you said he was
21  turning around.  Was he --
22  A.  He was running.
23  Q.  Okay.  In what direction was he running?
24  A.  He was running out this way (indicating.)
25  Q.  And for the record, you kind of pointed out towards 13th

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10337

1  Place; is that correct?
2  A.  Yes.
3  Q.  And what, if anything else, did you see -- well, let me
4  take a step back.
5  You said there's a railing when you go out of that
6  building -- the building, Kena's building; is that correct?
7  A.  Yes.
8  Q.  And how far out of that building did you get then?  How
9  far into the parking lot did you get?
10  A.  I didn't go in the parking lot.
11  Q.  Okay.  So did you stay by the building?
12  A.  I came out -- I came out the door to the rail.
13  Q.  Okay.  And that -- what do you mean by "railing"?
14  A.  It's a rail right there.  It goes all the way up, because
15  it's like for wheelchairs; you know what I'm saying?  You roll
16  your wheelchair right there.  It's a rail right there.
17  I came out to the rail like this.  I seen Shorty and I
18  looked this way and he -- (indicating.)
19  Q.  Okay.  Let me stop you right there.  You said you saw
20  Shorty and you looked this way, and it looked like you looked to
21  the right; is that correct?
22  A.  Yes.
23  Q.  Which direction were you looking, if you could just show
24  on the map?
25  A.  Well, I was looking in this direction (indicating).

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10338

1  Q.  And for the record, you're pointing kind of to the end --
2  what's kind of at the bottom -- the closest point, looking at
3  the photograph of that building, Kena's building; is that
4  correct?
5  A.  Yes.
6  Q.  And what did you see when you looked to the right?
7  A.  I seen Don.
8  Q.  And what was Don doing when you saw him?
9  A.  He had two guns in his hand.
10  Q.  And --
11  A.  And he had a T-shirt over his face.  He must have been
12  pulling it down in the process because it was right here
13  (indicating.)
14  Q.  Okay.  And you can -- I'll probably ask you to step down
15  in a little bit, but you can resume the stand right now, for the
16  moment.
17  A.  Do you want this back?
18  Q.  Yes.  Thank you.
19  And you said you saw Don and you talked about a mask.
20  Well, first of all, when you were telling the story, you
21  demonstrated, you had two arms out.  What were you showing
22  me?
23  A.  He had two guns in his hand.
24  Q.  Okay.  And what was he doing with those two guns?  How
25  were his arms?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    They was still up. He was back-trailing.

2  **Q.**    Okay. You said they were still up and he was

3  backtracking. For the record, you held up both your arms

4  straight up -- straight out from you; is that correct?

5  **A.**    Yes.

6  **Q.**    And what do you mean, "He was backtracking"?

7  **A.**    He was back-trailing around the building. And I was

8  like, "You bitch-ass nigga, you bitch-ass -- I'm going to kill

9  your mothafucking ass, you bitch-ass nigga."

10      And he did like this (indicating) and I jump back in the

11  building and I put my back against the wall in the building, and

12  I said, "This nigga might come in here." And I hit the front

13  door.

14      And when I hit the front door, he was coming like this

15  and he did it like this (indicating).

16      MR. PURPURA: Objection. He's speaking too fast for me to

17  hear and I would ask for him to repeat it to be relevant.

18      THE COURT: Sustained as to narrative.

19  BY MS. PETALAS:

20  **Q.**    Okay. We'll break that down. You just told us a lot of

21  information.

22      You saw -- so you saw Black (sic); he was backtracking.

23  Which direction was he backtracking?

24      When you say "backtracking," what was he -- was he

25  backtracking into a building? Where was he going?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    Don was back-trailing around the building.

2  **Q.**    Okay. If you could just kind of point, if you would get

3  up and just point.

4  **A.**    Right here (indicating.)

5  **Q.**    Okay. And you can just -- if you could just kind of --

6  for the record, you kind of placed a -- you pointed to, again,

7  kind of the bottom of the building. Are there woods there? Was

8  he going towards the woods?

9  **A.**    Yes.

10  **Q.**    Okay. And you can resume the stand again.

11      And you said then that you were yelling at Don?

12  **A.**    Yes.

13  **Q.**    And what, if anything, did Don say when you were yelling

14  at him?

15  **A.**    He didn't say nothing.

16  **Q.**    And what, then, did you do? You said -- I believe you

17  said something about pressing back against the building. What

18  did you do?

19  **A.**    I went back in the building because he did -- he point

20  his guns my way and I went back in the building and put my back

21  against the wall.

22  **Q.**    Okay. So let me stop you there. You said he -- did he

23  point the guns at you?

24  **A.**    Yes.

25  **Q.**    Okay. Did he fire at you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    Naw, he didn't fire at me. That's what made me run back

2  in the building.

3  **Q.**    Okay. So you run back into the building. Where do you

4  go when you run back into the building?

5  **A.**    In the building, it's like -- I told you, the old lady

6  joint was right here (indicating.) It's a wall right here, then

7  it's another wall and it's an apartment building. I put my back

8  on the wall like in the building. I came in the building, it's

9  a wall right here. You come around the back of the wall right

10  there.

11      And I stood there and I said, "Oh, shit, he might come in

12  here." And I went to go through the front door. And when I hit

13  the front door, he was right there and he did like this

14  (indicating.) And I slammed the front door back.

15  **Q.**    Okay. So let's go through that. You talked about you

16  went back into the building and what did you do when you got in

17  the building?

18  **A.**    I put my back against the wall.

19  **Q.**    And how long did you stay there with your back against

20  the wall?

21  **A.**    I didn't stay there that long. I did just like

22  (indicating) I said, "Oh, shit, he might come," and did like

23  that (indicating.)

24  **Q.**    Okay. So what made you decide not to stand there anymore

25  with your back against the wall?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **A.**    I just seen -- he wasn't going to kill me in that

2  hallway.

3  **Q.**    So you say he wasn't going to kill you in that hallway.

4  So what does that mean? Why were you moving, then?

5  **A.**    I had nowhere to go there. If he had come in the

6  hallway, I had nowhere to go. So I ran towards the front door.

7  That's when I seen him again and I slammed the door back.

8  **Q.**    Okay. And you said you saw him again. Where did you see

9  him when -- where were you when you saw him again? Were you in

10  the building or out of the building?

11  **A.**    I was at the front door of the building. I opened the

12  front door.

13  **Q.**    Okay. And once you opened the front door, where did you

14  see him?

15  **A.**    He was --

16  **Q.**    Here. I'm going to hand you this as well.

17  **A.**    Don was right here (indicating.)

18  **Q.**    For the record now, you placed -- you're pointing to --

19  you might want to just kind of move to the side so the jury can

20  see.

21      And if you could just kind of wrap around and point to

22  that place again.

23  **A.**    (Indicating.)

24  **Q.**    So you're pointing to the woods, kind of now to the front

25  and left of what you previously described as Kena's building; is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 10343

1  that correct?
2  A.   Yes.
3  Q.   Okay.  And where were you?
4  A.   I was hitting the front door, right there (indicating).
5  Q.   Okay.
6       MS. PETALAS:  Court's indulgence.
7  BY MS. PETALAS:
8  Q.   Mr. Kelliebrew, I now have gotten some dots, so I'm just
9  going to have you -- I'm going to have you -- give you some red
10 dots and have you kind of put the dots on the map, on the places
11 where you previously indicated.  Okay?
12 A.   Yes, ma'am.
13 Q.   I'm going to mark them first.
14      No, I'll have you mark them.
15 A.   I need to mark the red dots?
16 Q.   Not right now.  If you could just put the -- you talked
17 about a few -- you pointed to a few locations.  I think the
18 first location you pointed to was where you first saw Black when
19 he was running -- when he was bending the corner.  If you could
20 just place a red dot there.
21 A.   (Complied.)
22 Q.   Okay.  And you also pointed to an area where you came out
23 of the building --
24 A.   (Complied.)
25 Q.   -- Kena's building originally.  Okay.  And you just

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 10344

1  placed a dot there.
2       So if you could just place a dot where you first -- when
3  you first came out that building, where you saw Don.
4  A.   (Complied.)
5  Q.   And then the last two places that I just had you point,
6  where, when you first came out the building the second time,
7  where you saw Don.
8       And again, you're placing a red dot right there.
9  A.   (Complied.)
10 Q.   And finally, where you were the second time you saw Don.
11      Now I'm going to have you write, kind of mark -- that's
12 why I gave you that pen.  If you could just mark on those dots,
13 if you could just write "Black" on that first one.
14 A.   (Complied.)
15 Q.   Then put a K for Kairi and a 1 for the first time.  And
16 then a D for Don and a 1 on the first time you saw him.
17 A.   (Complied.)
18 Q.   And then do that the with other two dots, a D2 and a K2.
19 A.   (Complied.)
20 Q.   Okay.  You can resume the stand for right now.
21      And when you come out of that building the second time
22 and you see Don, what do you do?
23 A.   I slam the door back.
24 Q.   Now let's go back a step.  I think before, when you were
25 talking about the first time you came out of the building and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 10345

1  you saw Black and then saw Don, you talked something about Don
2  having something on his face.  What did he have on his face?
3  A.   A white T-shirt.
4  Q.   And how did he have the white T-shirt on his face?
5  A.   When I seen it, it was here and here (indicating.)
6  Q.   Okay.  And for the record, you had -- you pointed
7  directly below your lips and just above your eyes; is that
8  correct?
9  A.   Yes.
10 Q.   And was it -- how was it that he had his face --
11 A.   It looked like he was pulling it down because the T-shirt
12 was stretched.
13 Q.   Okay.  You said, "It looked like he was pulling it down
14 because the T-shirt was stretched."  Let me just have you
15 explain, did it looks like it was one T-shirt or two T-shirts?
16 A.   I can't say if it was one or two T-shirts.
17 Q.   Okay.  How was it -- how was it that his eyes and face
18 were able to be exposed?
19 A.   Like I said, it looked like he was pulling the T-shirt
20 down.  Either it was coming up over his eyes at the process of
21 him doing what he was doing, because when I hit the building,
22 when I seen Don, I seen Don.
23 Q.   Okay.  Well, how was the T-shirt tied on his face?
24 A.   Like (indicating.)
25 Q.   If you could just describe it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

### 10346

1  A.   Like from the neck part, from the neck park like this,
2  all the way over like this (indicating.)
3  Q.   And for the record, now you kind of pulled up -- you're
4  wearing a white T-shirt, correct?
5  A.   Yes.
6  Q.   And you kind of pulled up your white T-shirt so that the
7  neck of your T-shirt was where the eyes and nose was; is that
8  correct?
9  A.   Yes.
10 Q.   And did that appear how Don had his shirt tied on that
11 day?
12 A.   Yes.
13 Q.   So I think you testified that Don was kind of pulling it
14 down.  What part of the T-shirt was he pulling on?
15 A.   At his -- to me, it seemed like he was pulling it down
16 because it was stretched out.  The neck -- where he tied the
17 T-shirt, this was stretched out then.  It was more like this.
18 It was more like this.  It was tight right here and it was like
19 this.  And the T-shirt was like this (indicating), because it
20 seemed like he was pulling it.
21 Q.   Okay.  And for the record, you now had your T-shirt up so
22 the top kind of -- the back of the neck --
23 A.   Because if you tie your T-shirt around your face -- if
24 you tie it around your face, right, it hits your eyes right
25 here, you know what I'm saying?  And it will go up (indicating),

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10347**

1 so you have to pull it down.
2     I have did it before in robberies, you know what I'm
3 saying? You have to pull it down.
4 **Q.** Okay. So have you tied T-shirts around your head before?
5 **A.** Yes.
6 **Q.** Okay. And so when you did that, you would have the neck
7 around your face?
8 **A.** Yes.
9 **Q.** And then what would you tie?
10 **A.** The arms. You tie the arms.
11 **Q.** And where would they be tied?
12 **A.** In the back of your head, right here (indicating).
13 **Q.** Okay. And just to go back, for the record, when you were
14 kind of demonstrating for the jury -- I just have to place this
15 on the record -- what you saw when Don was pulling down --
16 pulling the shirt down. And you demonstrated that you had your
17 T-shirt up around your head; neck was kind of displaying the
18 face and you were kind of pulling down the bottom so that it was
19 below your lips, down to your chin; is that correct?
20 **A.** Yes.
21 **Q.** When you came out of the building that first time and you
22 saw Don with the two guns, did you make eye contact with Don?
23 **A.** Yes. I cussed him out.
24 **Q.** Did you recognize -- how was it that you were able to
25 recognize that it was Don?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10348**

1 **A.** I mean, like friends for years. I know how he walk. I
2 know it was Don. I just knew it was him. I couldn't miss --
3 you can't miss him.
4 **Q.** How sure are you that it was Don?
5 **A.** I seen his face. I seen his face.
6 **Q.** Is there any doubt in your mind that it was Don?
7 **A.** Ain't no doubt in my mind. It was Don.
8 **Q.** And then when you came out -- now I'm going to the second
9 time.
10     When you came out of the building the second time and you
11 saw Don, what part of his face, if any, were you able to see at
12 that point?
13 **A.** The T-shirt was still the same. It was still the same.
14 I hit the door and I was like -- boom, and I came to the front
15 porch. And I pushed the door back.
16 **Q.** Okay. And you said -- again, you were demonstrating for
17 the jury, you came out that second time. When you saw Don, what
18 did Don do?
19 **A.** He pointed the gun.
20 **Q.** He pointed the gun where?
21 **A.** Towards my way.
22 **Q.** Did you see what direction Don was moving at that point?
23 **A.** Naw. I shut the door back.
24 **Q.** When you shut the door back -- well, how long -- that
25 second time, how long from the time -- the second time you come

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10349**

1 out of the building and you see Don, how long from the time you
2 see Don until the time you shut the door back?
3 **A.** I can't give you no exact time. Seconds, maybe, but I
4 can't -- I don't know exact time. The time frame from me in the
5 building and me hitting the door, I don't know, but it was
6 like -- (indicating).
7 **Q.** And just for the record, you're snapping --
8 **A.** Yes.
9 **Q.** -- so it was quick?
10 **A.** Yes.
11 **Q.** That second time when you opened the door, did you ever
12 step out of the building or did you just close the door without
13 getting out of the building?
14 **A.** No, I hit the building, my foot hit the pavement and Don
15 was right there. And he did like this (indicating) and I shut
16 the door back.
17 **Q.** Okay. And once you shut the door back, where did you go?
18 **A.** I think I went up Tawanna house or I went to Kena house.
19 One of them. I can't remember exactly which one I went in, Kena
20 or Tawanna house.
21     And then when I came outside, I was like, "My
22 motherfucking car, my fucking car."
23 **Q.** Let me stop you right there. You said you went to either
24 Kena or Tawanna's house. Why did you do that?
25 **A.** Oh, my bad. Let me see.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10350**

1     When I got -- all right. I got the gun out of my car and
2 took it in Kena house and put it under a couch.
3 **Q.** Okay. Well, we'll get to that in a minute. But when you
4 originally -- before you got the gun out of your car, where did
5 you go?
6 **A.** I remember staying -- I think it was Tawanna's house.
7 **Q.** Okay. And why did you go there?
8 **A.** I can't remember why I went in there. I think I was just
9 scared. I don't know. I can't remember.
10 **Q.** And how long did you stay up in Tawanna's house?
11 **A.** I didn't stay that long.
12 **Q.** Okay. And where did you go after you went up to
13 Tawanna's house?
14 **A.** Back down.
15 **Q.** Back down to where?
16 **A.** To the parking lot.
17 **Q.** Okay.
18 **A.** And that's when I seen Boy-Boy and a couple other people.
19 And I was like, "Look at my motherfucking car, man. My fucking
20 car."
21 **Q.** Okay. Let me stop you right there. Let me stop you
22 right there.
23     You go back to the parking lot. Do you go out of the
24 back of the building again?
25 **A.** Yeah. I came out the back of the building.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10351

1   Q.   And you said you're yelling about your car. Why? What
2   is --
3   A.   Because it was moved. I pulled in the parking lot like
4   that. When I got back out, it was like this (indicating.)
5   Q.   Okay. And for the record, you've kind of had your hands
6   in different positions. You had your hand where you pulled into
7   the parking lot and then when you came out, it was more at a
8   angle?
9   A.   Yes.
10  Q.   Okay. And did you notice any damage on the car at that
11  point?
12  A.   No, it -- it was on -- the car that was beside it, it was
13  on the car, because it was a red car parked beside my car. And
14  my car -- I guess Black tried to pull the car off and my car was
15  stuck on the car like this (indicating.)
16  Q.   Okay. So you now -- your car is at an angle, almost
17  touching your hand, which is, I think you're going to show,
18  another car, the red car?
19  A.   Yes.
20  Q.   And when you're screaming about your car -- well, you
21  talked about getting your gun. When do you get your gun?
22  A.   As soon as I came back outside.
23  Q.   Okay. So you come back outside. What do you do?
24  A.   I put the gun in Kena house. I told you, I came out, put
25  the gun in Kena house, came out, got to yelling about my car,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10352

1   like "Where the fuck Black at?"
2        Went around the same way, around the same way I seen Don
3   at, back in. I was like, "Black, Black."
4   Q.   Okay. Let me stop you again right there. That was a lot
5   of information in a small period of time. So you went -- you
6   went and got the gun. Where was the gun?
7   A.   It was in the same -- it was in the same spot that it was
8   at the whole morning, under the towel in between me and Black.
9   Q.   Okay. And so did it appear to you that it had been moved
10  at all?
11  A.   No.
12  Q.   And just taking a step -- a few steps back again, that
13  first time you came out of the building and you saw Don, did you
14  see Don -- when you saw Don with the guns, did you see him
15  firing guns?
16  A.   Uhn-uhn.
17  Q.   You have to answer yes or no.
18  A.   No.
19  Q.   Did you see anybody else with any guns at that point?
20  A.   No.
21  Q.   Did you see Black with any gun?
22  A.   No.
23  Q.   And what happened -- when you say you got the gun, what
24  did you do with the gun?
25  A.   I put it in Kena couch.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10353

1   Q.   What do you mean, "in Kena's couch"?
2   A.   Under her -- under her cushion in the couch.
3   Q.   And once you do that, what -- at some point, do you move
4   the car?
5   A.   Yes.
6   Q.   Okay. When is it that you move the car?
7   A.   I moved the car. Then we went -- that's when Myron I
8   moved -- after I moved the gun, I moved the car, and Myron was
9   like, "Black ran down the hill."
10  Q.   Okay. Let's go over that sequence. You now moved the
11  gun. You put in Kena's. Where do you go after you put the gun
12  in Kena's?
13  A.   I came back outside. I was yelling for Black. Then --
14  who was that telling me, move my car? I can't remember who was
15  telling me, move my car, like "Move your car, Shorty." Somebody
16  telling me he needed to go home, so I moved my car back here.
17  Q.   Let's make sure everybody can hear you. I'm going to
18  hand you this microphone again.
19  A.   I moved my car from back here. It was at a diagonal on
20  the red car, so I moved it this way (indicating) so I could park
21  it back here (indicating.)
22  Q.   Okay. And for the record, you kind of pointed to that
23  parking lot back -- that you described before, kind of out 13th
24  Place, around the building and behind another building; is that
25  correct?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10354

1   A.   Yes, ma'am.
2   Q.   Okay. I'm going to hand you this -- if you could --
3   you've got some dots up there. If you could just place a dot on
4   where you parked the car. Can you see the parking lot on that
5   photo or were there trees in the way?
6   A.   There's trees in the way, but I parked my car right here
7   (indicating.)
8   Q.   Okay. And if you could just write on there "car" -- or
9   actually just write "park."
10  A.   (Complied.)
11  Q.   Okay. And why did you move your car?
12  A.   They was saying, "Move your car."
13  Q.   And why did you move your car back in that parking lot as
14  opposed to putting it back in the original parking space?
15  A.   I don't know. I just -- I don't know. I just -- I was
16  bugged out. I was trying to find Shorty. I was trying to find
17  Black and I was like somebody was like -- he ran down the hill,
18  down the side.
19  Q.   Okay. Let me take you back a step. So you can resume
20  the stand for now. Why don't you keep that because you may need
21  that later.
22        So after you parked the car, you talked about an
23  individual named Myron. Who's Myron?
24  A.   A friend of mine.
25  Q.   And where was Myron?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10383

1  Q.   So what happens then, when the police -- you say they
2  take you to the crime scene.  Is this the parking -- are you
3  referring to the parking lot where the shooting occurred?
4  A.   Yeah, where the shooting occurred.
5  Q.   Okay.  And how long do you remain on that crime scene?
6  A.   For about ten, like ten minutes.
7  Q.   Okay.  At some point, do they take you to the station?
8  A.   Yep.  He asked me, do I have --
9       MR. CARNEY:  Objection.
10      THE COURT:  Overruled.
11      THE WITNESS:  He asked me, did I have ID.  And I was like,
12  "Naw, I ain't got ID."  So he was like, "I guess you going to
13  central cell block."  And I said "All these 45 people right here
14  can identify me right now."  And he was like, "Well, so, you
15  going in cuffs or you going" --
16      MR. PUPURA:  Objection, it's a narrative.
17      THE WITNESS:  -- "willingly?"
18      THE COURT:  Hold on one second.  When there's an
19  objection, I need to hear it.
20      It's sustained.
21  BY MS. PETALAS:
22  Q.   After you say "These 45 people can ID me right here,"
23  does he still take you down to the station?
24  A.   I can't -- he asked me, "Do you want to go willingly or
25  do you want to go in cuffs?"

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10384

1       I said, "Man, I'll just go, man," and I jumped in the
2  car.
3  Q.   And when they brought you down to the station, did you
4  give a written statement?
5  A.   Yes, I said a mask and two guns.
6  Q.   Did you tell them at all it was Don?
7  A.   No.
8  Q.   Did you give them any description?
9  A.   Nope.  I said "A mask and two guns."
10  Q.   At that point did you have any intention of helping out
11  the --
12      MR. PUPURA:  Objection to the form of the question.
13  BY MS. PETALAS:
14  Q.   At that point did you have any intention of helping out
15  the police at that point in time?
16  A.   Nope.
17  Q.   Why not?
18  A.   Because I wanted to kill Don myself.
19  Q.   And did you give them -- do you recall whether or not you
20  gave them a physical description at all?
21  A.   To my recollection, I said "Mask and two guns."
22  Q.   And would looking at that statement -- you said to your
23  "recollection."  Would looking at that statement help refresh
24  your recollection?
25  A.   Yes, if you've got it on hand.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10385

1       MS. PETALAS:  Court's indulgence.
2       Your Honor, may I approach?  I'm going to show him
3  Government's Exhibit 513.12.  It's an add-on.
4  BY MS. PETALAS:
5  Q.   Mr. Kelliebrew, I'm showing you what's been marked as
6  Government's Exhibit 513.12.  Do you recognize that?
7  A.   Yes.
8  Q.   Is that your statement?
9  A.   Yes .
10      MS. PETALAS:  Your Honor, at this time I would request
11  that I be permitted to refresh his recollection.
12      MR. PUPURA:  No objection to the admission of the
13  statement, Your Honor.
14      THE COURT:  There was no such motion.
15      THE CLERK:  Your Honor, I can't get --
16      THE COURT:  Oh, are your batteries functioning?
17      MS. PETALAS:  This officer is investigating the shooting
18  death of Jamel Sills.
19      THE COURT:  Hold on, can you turn that up?
20      (Discussion had off the record between Ms. Petalas and
21  witness.)
22  BY MS. PETALAS:
23  Q.   Does that refresh your recollection -- you can pull the
24  microphone toward you again.
25      Does that refresh your recollection of whether or not you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10386

1  gave a description of height or weight of the shooter?
2  A.   Yes.
3  Q.   Did you give a description of height or weight of the
4  shooter?
5  A.   Yes.
6  Q.   And what was that description?
7  A.   Dark skin, skinny, mask on face, two automatic guns.
8       MS. PETALAS:  Court's indulgence.
9  BY MS. PETALAS:
10  Q.   You said, "dark skin, skinny, with two automatic guns."
11  Do you recall -- Court's indulgence.
12      You said dark skin with two automatic guns.  Do you
13  recall -- well, at any point did you say that it was Don,
14  though?
15  A.   Uhn-uhn.
16  Q.   At any point did you say that -- did you tell them -- do
17  you recall them asking you whether or not Black had a gun?
18  A.   Yes.
19  Q.   And did you tell them that Black had a gun?
20  A.   I said no.
21  Q.   And back when you told them that you didn't know who the
22  shooter was, was that the truth?
23  A.   I lied.
24  Q.   Back then when you told them that you didn't have -- that
25  Jamel didn't have a gun, was that the truth?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10403

1   **Q.**   What did you say?
2   **A.**   I told him I give him -- I told him I give him the Black
3 case on a silver platter if he let me walk out of this district,
4 out of the precinct.
5   **Q.**   And was he willing to let you walk out of the precinct?
6   **A.**   Naw.
7       MS. WICKS: Objection.
8       THE COURT: Rephrase.
9 BY MS. PETALAS:
10   **Q.**   Did he take you up on that offer? Were you able to walk
11 out of the precinct?
12   **A.**   No.
13   **Q.**   At that point, though, did you -- on that day, did you
14 tell them who -- did you say who the shooter was?
15   **A.**   No.
16   **Q.**   And why not?
17   **A.**   I don't know. I can't really -- he wasn't trying to do
18 what -- he wasn't trying to meet my demands, so I wasn't going
19 to meet his. That's basically how it went.
20   **Q.**   And at that point, did you ever have any intention of
21 testifying against Don?
22   **A.**   Yeah, I was -- I was already talking to my mother about
23 it. I was like, "I'll just do it."
24       MR. PUPURA: Objection.
25       THE COURT: Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10404

1       THE WITNESS: I was like, "I'll tell him on my own because
2 they ain't going to leave me alone if I don't." So I was like,
3 "Fuck, I'm stuck. I'm just going to tell them and leave it at
4 that."
5 BY MS. PETALAS:
6   **Q.**   And your conversations -- so on that night that you're
7 arrested, is there any time that you mention the name Don?
8   **A.**   After -- after -- after I signed the briefing papers and
9 went on board with the Black case.
10       MR. ZUCKER: Objection.
11       THE COURT: Hold on one second. When there's an
12 objection, I need to hear it.
13       MR. ZUCKER: Non-responsive. The question was "that
14 night."
15       THE COURT: All right. Sustained.
16       Put your next question.
17 BY MS. PETALAS:
18   **Q.**   I'm just asking you about that night, when you were at
19 the homicide with Detective Worrell -- or Detective Wores, as
20 you call him. Did you say the name Don on that night, prior to
21 when you got your attorney?
22   **A.**   I can't remember. I can't remember.
23   **Q.**   You talked about a time where you did tell the police it
24 was Don. Prior -- I'm going back.
25       Before the time you told the police that it was Don, at

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10405

1 that point had anybody ever suggested to you -- had any of the
2 officers or Detective Worrell, had he ever told you to say it
3 was Don?
4   **A.**   No. They didn't know who did it.
5       MR. ZUCKER: Objection, request the last comment be
6 struck.
7       THE COURT: Sustained.
8 BY MS. PETALAS:
9   **Q.**   Now, when you're arrested that night, are you held in the
10 jail?
11   **A.**   Yes.
12   **Q.**   When you're at the jail, do you make any phone calls?
13       Let me be more specific: Do you call Antwuan?
14   **A.**   Yes.
15   **Q.**   And what happens when you call Antwuan? What does
16 Antwuan say?
17   **A.**   He said, I hope you ain't doing that Munya shit." And I
18 said, "I ain't doing that shit, man. I ain't telling, man."
19   **Q.**   Let me stop you there.
20       He said, "I hope you're not doing that Munya shit." What
21 did you take that to mean when he said "that Munya shit"?
22   **A.**   Because -- telling, testifying, because the word on the
23 streets was that Munya had turned states.
24   **Q.**   And what did you say to Twan?
25   **A.**   I was like, "Naw, I ain't doing that Munya shit." I'm

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10406

1 like man, I'm going do my time. I'm going to take the shit to
2 trial."
3   **Q.**   And at that point, in your mind, what were you thinking?
4 Was that true or were you thinking about turning states
5 evidence?
6   **A.**   At that time, I wasn't -- I wasn't too much sure I was
7 turning states then.
8   **Q.**   And what, if anything else, did you say to Antwuan in
9 that conversation?
10   **A.**   I can't remember if that was that conversation, but we
11 had several conversations. I don't know if it was -- I can't
12 remember if we had any more conversations with -- on that phone
13 call.
14   **Q.**   Okay. You said you had several conversations.
15 Approximately how many conversations did you have?
16   **A.**   Maybe six or seven conversations the whole time I was
17 locked up.
18   **Q.**   Okay. During the course of these conversations with
19 Antwuan, did you ever give him any warnings?
20   **A.**   Yes.
21   **Q.**   And what did you warn him of?
22   **A.**   I warned him that they was coming for him. The police
23 was coming. Dudes was testifying. The dudes already made
24 statements on him. And he was like, "You going to let people
25 put words in your mouth?"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10407

1    And I was like, "Man, I ain't saying --
2  Q.   Let me stop you right there.
3       When he said you "going to let people put words in your
4  mouth," what is he talking about?
5  A.   He was talking about the government.
6  Q.   And what did you say at that point?
7  A.   I was like, "They ain't putting no words in my mouth. I
8  ain't even speaking to them." I was like -- at the time of this
9  conversation, I was doing -- I was on the Black case.
10 Q.   When you say you were "on the Black case," what do you
11 mean by that?
12 A.   That's all I was doing was the Black case. It was
13 between me and Don. I ain't indicate nobody else, nobody, but
14 it was between me and him, you know what I'm saying?
15 Q.   And had you -- at some point did you tell Antwuan that
16 you were --
17      MR. CARNEY:  Objection to the form of the question.
18      THE COURT:  Sustained.
19 BY MS. PETALAS:
20 Q.   Did you ever tell Antwuan that you were going to testify?
21      MR. CARNEY:  Objection.
22      THE COURT:  Finish the question.
23 BY MS. PETALAS:
24 Q.   Did you ever tell Antwuan that you were going to
25 cooperate on the Don case?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10408

1       THE COURT:  I'll allow it.
2       THE WITNESS:  Uhm, I can't remember if I told him. I
3  think I -- I can't remember -- I can't flat out -- to be honest,
4  I can't flat out remember if I told him I was cooperating, but I
5  told him dudes was cooperating on him.
6       MR. CARNEY:  Your Honor, objection, narrative answer.
7       THE COURT:  I'll allow it.
8       THE WITNESS:  And I was telling him the dudes was
9  cooperating on him. And he was like --
10 BY MS. PETALAS:
11 Q.   After you told him that the people were cooperating on
12 him, what did he say?
13 A.   He was like, "You letting them people put words in your
14 mouth, you bitch ass nigga, I hope you die. I'll blow your head
15 off when I see you."
16 Q.   Is this what he was saying to you on the phone?
17 A.   Yeah, "Don't call me no more. You fucking with them
18 peoples." And I was like, "Twan, man, I ain't even fucking with
19 the people. I ain't saying nothing about you man." He was
20 like, "Fuck you, die." Click. "Don't ever call me no more."
21 And that conversation, he blocked his number.
22 Q.   When you say "blocked his number," what do you mean by
23 that?
24 A.   I couldn't call his house no more.
25 Q.   And when you couldn't call his house anymore, did you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10409

1  call anybody else to try to talk to him?
2  A.   I called Geeka.
3  Q.   And when you called Geeka, what did Geeka say?
4  A.   Geeka was like --
5       MR. PUPURA:  Objection. This is a proffer, Your Honor.
6  I'm not sure if it's 801(d)(2)(E).
7       THE COURT:  Come on up.
8       (Following sidebar discussion had on the record:)
9       MS. PETALAS:  I can proffer more. This witness was -- I
10 was trying to recall. I know there has been testimony about
11 Geeka on the record with other witnesses, that's why I was
12 conferring with my counsel.
13      From my own witnesses, I know Keith Barnett talked about
14 Geeka is an individual that he sold with originally. They had
15 problems. Geeka --
16      THE COURT:  Let me just get to the bottom line. Are you
17 asserting that Geeka is a co-conspirator -- uncharged
18 co-conspirator in the conspiracies charged in this case?
19      MS. PETALAS:  Yes, Your Honor.
20      THE COURT:  Go ahead.
21      MS. PETALAS:  And for one, I also note for the record,
22 that Geeka is one of the individuals charged in the
23 indictment as an unindicted co-conspirator as far as the
24 obstruction, because Geeka, Steve Sutton, is one of the
25 individuals who went in the Grand Jury, along with Antwuan Ball

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10410

1  and Joseph Jones.
2       THE COURT:  Is that Geeka's name?
3       MS. PETALAS:  Yes. Steve Sutton. Steve Sutton. And so,
4  he is somebody that's alleged in the indictment as an alleged
5  co-conspirator. Going back, I do believe that -- I know through
6  my own witnesses, Mr. Barnett testified that Geeka, Steve Sutton,
7  was somebody that he sold drugs with. They originally had some
8  problems where he was pistol whipped by Geeka and then Geeka came
9  back and apologized to him and said I didn't know who you were.
10 And they later did sell drugs together. And for the record,
11 there will be further -- I believe there's been other testimony
12 about Geeka. I'm trying to recall. But also that he's an
13 alleged co-conspirator regarding that obstruction charge.
14      THE COURT:  Anything else?
15      MR. PUPURA:  I accept the proffer. The only point I note,
16 I'm not sure at this point if Kairi Kelliebrew is still a
17 co-conspirator at this point. He's cooperating with the
18 government, so he would not be a co-conspirator.
19      THE COURT:  The objection was as to him testifying about
20 Geeka's comment when he, Kelliebrew, called Geeka. Is that the
21 question?
22      MR. PUPURA:  Yes.
23      THE COURT:  Anything else?
24      MR. PUPURA:  That's it.
25      THE COURT:  All right. I'll allow it.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 A.  Yes.

2 Q.  And from your observations, what was their relationship?

3 A.  Wop and Truck?

4 Q.  Yes.

5 A.  They was tight.

6 Q.  Now, at some point did you ever -- well, did you ever have a

7 conversation with Wop about an individual named Squid?

8 A.  Yes.

9 Q.  And who is Squid?

10 A.  He hung up on 15th -- I mean, on Congress Street.

11 Q.  You said on Congress Street?

12 A.  Yes.

13 Q.  Now, is that different from Congress Place?

14 A.  Yes.  No, hold on.  It's one of them, but it's up there with

15 15th Place.  It's Congress Street or Congress Place.  I can't

16 remember right now.  It's one of them streets.

17        MS. PETALAS:  Court's indulgence.

18        Court's permission to call up what's already in

19 evidence as Government's Exhibit 103 -- 103.1, I apologize.

20 BY MS. PETALAS:

21 Q.  And if I could ask you to clear the screen, Mr. Kellibrew.

22 A.  (Witness complies.)

23 Q.  Do you see that map?

24 A.  Yes.

25 Q.  Do you recognize that?

1 A.  Yes.

2 Q.  You've been talking about -- when you say -- well, what area

3 was Squid from?

4 A.  (Indicating.)

5 Q.  For the record, you've drawn a red arrow on kind of a

6 diagonal street that's labeled "Congress Place."  Is that

7 correct?

8 A.  Yes.

9 Q.  Just yes or no:  Do you know whether or not Squid is alive

10 or dead today?

11 A.  He's dead.

12 Q.  Did you ever have a conversation with Wop about Squid dying?

13 A.  Yes.

14 Q.  And tell us about that conversation.  When was that?

15 A.  I don't know exactly where it took place at.  I can't

16 remember where it took place at.  But he was telling me how he

17 got the call that Squid was up there, and they went up there.

18 Q.  You said he got a call that Squid was up there.  Where?  Up

19 where?

20 A.  On Congress, Congress Place.

21 Q.  And did he say who he got the call from?

22 A.  Huh-uh.

23 Q.  You have to answer yes or no for the record.

24 A.  No.

25 Q.  And you said that Wop indicated that they went up there.

1 Did he say who "they" is?

2 A.  Drano and LT.

3 Q.  Did he indicate how they got up there?

4 A.  He drove.

5 Q.  And what else did he say about that?

6         MS. WICKS:  Objection.  Leading.

7         THE COURT:  Overruled.

8 BY MS. PETALAS:

9 Q.  What else if anything did he say about -- what did he say,

10 if anything happened, once they drove up there?

11 A.  He was like, when they got up there, he didn't know that

12 Squid baby mother was going to be there.

13 Q.  Who didn't know that Squid's baby's mother was going to be

14 there?

15 A.  Wop.

16 Q.  And what did he say then?

17 A.  He was like, "We rolled up there.  When we got there, they

18 was standing right there."  He was like, "They jumped out, wore

19 them out, jumped back in."

20         I was like, "The bitch, too?"

21         He was like, "Fuck that bitch."

22 Q.  Okay.  He said, "They jumped out."  Who jumped out?

23 A.  Drano and LT.

24 Q.  Did Wop say whether or not he got out of the car?

25 A.  No.

1 Q.  And what if anything then -- what did he say after that?

2 A.  He was like, "They jumped out."  He was like, "The broad was

3 there."  I was like, "They hit the broad, too?"  He was like,

4 "Fuck that bitch.  The bitch shouldn't have been there."

5 Q.  Who said that?

6 A.  Wop.

7 Q.  Do you know Squid's baby's mother's name?

8 A.  Nope.

9 Q.  And earlier you had testified about your other cousin,

10 Kairi.  Is that correct?

11 A.  Yes.

12 Q.  Are you named after Kairi?

13 A.  Yes.

14 Q.  And is Kairi alive or dead today?

15 A.  He's dead.

16 Q.  And how old were you when Kairi died?

17 A.  I think I was 15, 16, something like that.

18 Q.  And did you ever have any conversations with Antwuan, after

19 Kairi died, about Kairi's death?

20 A.  Basically it was like I was on my leave, so I didn't

21 really --

22          MR. PURPURA:  Objection.

23 BY MS. PETALAS:

24 Q.  Just answer yes or no at this point.

25 A.  Could you repeat your question, please?

1 Q.  You were talking about -- I believe we left off with you

2 talking about a conversation you had with Antwuan regarding your

3 cousin Kairi's murder.  Do you recall that?

4 A.  Yes.

5 Q.  And what did Antwuan say during that conversation?

6 A.  He was saying, "I got my young-uns to murder anything for

7 me."

8         THE COURT:  Could you repeat that, please?

9         THE WITNESS:  When Big Ki got killed --

10 BY MS. PETALAS:

11 Q.  Well, let me take you there.  I don't think we could hear

12 what you said last time.  So I'll have you explain it, but could

13 you just repeat what you just said?

14 A.  He said, "I got my young-uns that will murder anything for

15 me."

16         MS. WICKS:  Objection as nonresponsive, I think, Your

17 Honor.  I still can't hear exactly what the witness is saying.

18 A.  He used to say he had his young-uns to murder anybody for

19 him.

20         MS. WICKS:  Objection.  Nonresponsive.

21         THE COURT:  Overruled.

22 BY MS. PETALAS:

23 Q.  And when he said that -- well, explain that.  What were you

24 saying that led Antwuan to say that?  What was the conversation

25 about?

1          MR. ZUCKER:  Objection to the form of that, Your Honor.

2          THE COURT:  Overruled.

3 BY MS. PETALAS:

4 Q.  What were you saying at this point?  When Antwuan said that,

5 what was the conversation about?  What were you talking about?

6 A.  Okay.  This specific conversation, I remember it so vivid.

7 It was right there in the cut.  As a matter of fact, it probably

8 was like two, maybe two or three days after Big Ki got killed.

9 We was all standing right there --

10          MR. CARNEY:  Objection, Your Honor.

11          THE COURT:  Sustained.  Hold on.  Put your question.

12 BY MS. PETALAS:

13 Q.  I believe you testified, when did this conversation take

14 place in relation to when Big Ki got killed?

15 A.  It was like two or three days after Big Ki got killed.

16 Q.  Let me stop you right there.  Where was this conversation?

17 A.  Where Ass Curl (ph) live at, we was standing right, right

18 there.  We would like, we would come up and stuff, and there's

19 like a long stretch right there.  We was all standing right

20 there.

21 Q.  Okay, let me stop you right there.  You're talking very

22 fast, and I think so am I, and we need to make sure the court

23 reporter can keep up and that everybody can understand.

24          Were you in Congress Park?

25 A.  Yes.

1 Q.  If you could clear the screen, I'm going to just have

2 Mr. Mazzitelli move in on the Congress Park area.

3       Now, do you see your screen, Mr. Kellibrew?

4 A.  Yes.

5 Q.  And just let me know, yes or no, whether or not the place

6 that you're referring to, is that on that map?

7       THE COURT:  Identify the exhibit.

8       MS. PETALAS:  I'm sorry.  It's Government's

9 Exhibit 103.1.

10       And for the record, we've zoomed in on the area that

11 has 13th Street on the left.  15th Street is on the right, and I

12 believe Alabama is just at the top left corner, and then moves

13 up off the screen.

14 BY MS. PETALAS:

15 Q.  Do you see that?

16 A.  Yes.

17 Q.  And the place that you were referring to before, where you

18 had this conversation, just yes or no, is that depicted here on

19 this map?

20 A.  Yes.

21 Q.  Could you please point to that on the screen?  Again, make

22 sure you don't have the ink showing on the pen.

23 A.  (Witness complies.)

24 Q.  And for the record, you've placed a red dot --

25 A.  It was in that court right there.

1 Q.  And along -- and it looks like it's on Congress Street, just

2 below -- it's at the intersection with Savannah Place in the

3 little court right there, on the bottom part of Congress Street.

4 Is that right?

5 A.  Yes.

6 Q.  And when you had this conversation, who was there?

7 A.  Everybody.

8 Q.  Well, who were the people you recall being there?

9 A.  Twuan.  Twuan, Jojo, Bird, Wop, Truck, Tweety, me.  Who

10 else?  If I'm not mistaken, Drano.

11 Q.  Let me stop you right there.  Were there other people there?

12 A.  Yes.

13 Q.  I mean, approximately how many people were there?

14 A.  Basically, it was all of us right there.  I can't like

15 recall the number of us that was right there, but it was all of

16 us right there.

17 Q.  And when you had this conversation, who are you talking to?

18        MR. PURPURA:  Your Honor, objection.  He didn't

19 complete his answer.  He was naming all the people that are

20 being there, and he didn't finish who all the people were, and

21 there was an interruption.

22        I'm asking that he complete his answer as to who all

23 the people were, "all of us."

24        THE COURT:  Have you finished your answer about who was

25 present?

1          THE WITNESS:  Yes.  Yes.

2          MR. PURPURA:  Fine.  Thank you.

3 BY MS. PETALAS:

4 Q.  And who were you talking to when you had this conversation?

5 A.  I was talking to Twuan because I wanted to ride on the

6 situation.  I wanted to put in some work on the situation.

7 Q.  You said you wanted to "ride on the situation and put in

8 some work."  What do you mean by that?

9 A.  I wanted to bust my gun about my cousin.

10 Q.  And did Antwuan agree to this?

11 A.  Naw.  He was like, "Chill, Shorty.  I got my young-uns that

12 will murder anything."

13          MR. CARNEY:  Your Honor, I would ask that it be

14 repeated.  I couldn't hear that.  I could not hear that, Your

15 Honor.

16          THE COURT:  Could you repeat it?

17 A.  He was like, "Chill, Shorty.  I got my young-uns that will

18 murder anything."

19 BY MS. PETALAS:

20 Q.  When he said, "I've got my young-uns who will murder

21 anything," who in your mind was he referring to?

22          MS. WICKS:  Objection.

23          THE COURT:  Sustained.

24 BY MS. PETALAS:

25 Q.  What did you say when he said, "I've got my young-uns who

1 will murder anyone?"

2 A.  I didn't have no response for it.  I was like, "I want to

3 go."  He was like, "No, I got my young-uns for that."  And that

4 same day they rolled out.  I stayed around the park.

5 Q.  Who did you see roll out?

6 A.  Twuan.  As a matter of fact, Davon was around there that

7 day.

8 Q.  Who is Davon?

9 A.  Jojo, Wop, Truck --

10 Q.  Let me stop you --

11 A.  -- Drano, Tweety.

12 Q.  Okay.  You mentioned Davon.  Who is Davon?

13 A.  Used to hang down Good Hope Road.

14 Q.  So yes or no, did you go with them when they left?

15 A.  No.

16 Q.  And just yes or no, do you know where they went when they

17 left?

18 A.  No.

19 Q.  Do you know an individual named Troy Lewis?

20 A.  Yes.

21 Q.  And who is Troy Lewis?

22 A.  That was Sherry baby father.

23         MS. WICKS:  Your Honor, I'm sorry, I didn't hear the

24 answer.

25         THE WITNESS:  Sherry baby father.

1 say?

2 A.  He continued on what he was talking about.

3 Q.  What did he say?

4 A.  He was explaining how he killed Troy.

5 Q.  And what specifically was he saying?

6 A.  He was saying how he put two through the windshield and went

7 to the other side.  And when he hitting it, he said he stuck his

8 hand through the glass.  He kept saying, "I stuck my hand

9 through the glass."

10 Q.  And he said he stuck his hand through the glass.  Did he say

11 what glass he was talking about?

12 A.  The driver's side.

13        MR. ZUCKER:  I'm sorry, I couldn't hear the answer.

14        THE WITNESS:  The driver's side.

15 BY MS. PETALAS:

16 Q.  Did he say to you why he did this?

17 A.  No.

18        MS. PETALAS:  Court's indulgence.

19 BY MS. PETALAS:

20 Q.  Turning now -- I think earlier you had -- yesterday in your

21 testimony you had talked about something, the 10th Place beef.

22 Do you recall that?

23 A.  Yes.

24 Q.  Did you ever have -- well, when did this 10th Place beef

25 start, if you know?

1          MR. PURPURA:  Objection, Your Honor.  Again, it's

2 basis.

3          THE COURT:  I'll allow you to establish foundation.

4 BY MS. PETALAS:

5 Q.  Just yes or no:  Do you know when this 10th Place beef

6 started?

7 A.  Yes.

8 Q.  Not telling us when, how do you know when it started?

9 A.  How do I know it was started?

10 Q.  Yes.  How do you know when it started?

11 A.  Head got killed.

12 Q.  And who is Head?

13 A.  A friend of ours, David Scott.

14 Q.  And you said he was a friend of yours.  Did he hang around

15 Congress Park?

16 A.  Yes.

17 Q.  And when did Head get killed?

18 A.  I forget what year Head got killed.  I know he died on

19 September 6th.  I don't know what year, though.  Three days

20 after my birthday.  Three days.

21 Q.  Do you know an individual, Jack Davis?

22 A.  Who?

23 Q.  Jack Davis.  Well, do you know an individual that goes by

24 Twin?

25 A.  Yes.

Page 10480

1 Q.   And who is Twin?

2 A.   They hung with 10th Place and Trenton.

3 Q.   And you said Head got killed.  What happened after Head got

4 killed?

5          MR. PURPURA:  Your Honor, objection.  Again, basis of

6 knowledge, Rule 602.

7          THE COURT:  Overruled on that point.

8          MR. PURPURA:  Relevance.

9          MS. WICKS:  Leading.

10          THE COURT:  Overruled.  But it's a rather vague

11 question.

12          MS. PETALAS:  I'll clarify, Your Honor.

13          MR. PURPURA:  That was my next objection.

14 BY MS. PETALAS:

15 Q.   Once Head gets killed -- well, prior to Head getting

16 killed -- once Head gets killed, are you able to go down on

17 10th Place?

18 A.   No.

19 Q.   And describe the relationship then between Congress Park and

20 10th Place after Head got killed?

21          MR. PURPURA:  Your Honor --

22 A.   It was a beef.

23          MR. PURPURA:  I object.  Again, basis of knowledge.

24 The court used "vague" before.  This would be extremely vague,

25 and I'm not sure what the basis of knowledge would be, whether

1 it's hearsay or not.

2          THE COURT:  Can you rephrase it to add a bit more

3 particularity?

4 BY MS. PETALAS:

5 Q.  After Head gets killed, what is your relationship with

6 people down on 10th Place?

7 A.  There was no relationship.

8 Q.  And if you know, where was Head when he got killed?

9 A.  On 10th Place.

10          MR. ZUCKER:  Objection.  Foundation.

11          MS. WICKS:  Objection.

12          THE COURT:  Overruled.

13 BY MS. PETALAS:

14 Q.  Where was he?

15 A.  On 10th Place.

16 Q.  And how do you know Head was on 10th Place when he got

17 killed?

18 A.  Me and Santu was sitting on the ho stroll.

19 Q.  And what is the ho stroll?

20 A.  Savannah Street.

21 Q.  If you could just point to where you're talking about when

22 you said the ho stroll.

23 A.  (Witness complies.)

24 Q.  For the record, you placed a dot at 13th and Savannah.  Is

25 that correct?

1 A.  Yes.

2 Q.  And why is it called the ho stroll?

3 A.  That's where the crackheads used to trick at.  I mean, you

4 know, that's where they used to turn their tricks at, so we

5 called it the ho stroll.

6 Q.  And what happens when -- well, who is Santu?

7 A.  Boy-Boy brother.

8 Q.  And what happens when you and Santu are sitting there at

9 13th and Savannah?

10 A.  Tina walked up on us and was like --

11 Q.  Let me stop you right there.  You said Tina?

12 A.  Tina, Crackhead Tina.  Crackhead Tina walked up on the car

13 like this --

14        MS. WICKS:  Objection.  I thought he was going to say

15 what Tina said.  I was objecting to what Tina said.

16        THE COURT:  I see.  Put the question.

17        MS. PETALAS:  I'm sorry, Your Honor.

18 BY MS. PETALAS:

19 Q.  Without telling us what Tina said, did you have a

20 conversation with Tina?  Just yes or no.

21 A.  Yes.

22 Q.  And what if anything did you do after this conversation you

23 had with Tina?

24 A.  We went to check, to see.

25 Q.  Who is "we"?

 1 A.  Me and Santu.

 2 Q.  And where did you and Santu go?

 3 A.  We drove down the street, and they had it blocked off at the

 4 top.

 5 Q.  You drove down what street?

 6 A.  Savannah.

 7 Q.  Towards what direction?

 8 A.  Towards 10th Place.

 9 Q.  And you said the police had it blocked off.  What did they

10 have blocked off?

11 A.  10th Place.

12 Q.  Could you see Head at that point?

13 A.  Naw, I never seen his body on the ground or none of that.

14 Q.  Are you familiar with an individual named D-Lock?

15 A.  I know him.

16 Q.  And where is D-Lock from?

17 A.  10th Place.

18 Q.  Did you ever have a conversation with LT about D-Lock?

19 A.  Yes.

20 Q.  And what did LT tell you about D-Lock?

21 A.  That he emptied on his face.

22 Q.  How about Keith Barnett?  Did you ever have a conversation

23 with Keith Barnett about D-Lock?

24 A.  Yes.

25 Q.  And what did Keith Barnett tell you?  Well, first of all,

1 where did this conversation take place?

2 A.  I can't remember where the conversations took place at.

3 Q.  Was it in Congress Park, outside Congress Park?

4 A.  I can't remember.  I don't want to speculate.  I can't

5 remember.

6 Q.  And what did Keith Barnett tell you?

7 A.  He didn't want to go.

8 Q.  You said he didn't want to go.  When you had this

9 conversation with Keith Barnett, was this before or after you

10 got locked up in 2002 for the UC buy?

11 A.  This was before I got locked up.

12 Q.  And you said Keith Barnett said he didn't want to go.  What

13 do you mean?  What did he say to you about D-Lock?

14 A.  He was saying he ain't want to go.  He was like, "Man, I

15 never want to go be with that shit.  These lawyers, they trying

16 to run up on me, trying to put me with that shit."

17 Q.  You said he said something, "They're trying to run up on me

18 and put me on that shit."  Who is he talking about there?

19          MR. ZUCKER:  Objection.

20 BY MS. PETALAS:

21 Q.  In your mind.

22 A.  The police.

23 Q.  Do you know an individual named Linwood Carpenter?

24 A.  Yes.

25 Q.  And who is Linwood Carpenter?

1 A.  He was from down 10th Place.

2 Q.  Did you ever have a conversation with Dazz about Linwood

3 Carpenter?

4 A.  Yes.

5 Q.  And what did Dazz tell you about Linwood Carpenter?

6 A.  He hit him with a .44 in a tow truck.

7 Q.  You need to lean forward a little bit so we can hear you

8 better.

9 A.  Sorry about that.

10 Q.  Where were you when you had this conversation with Dazz?

11 A.  In the circle.

12 Q.  And you said he hit him with a .44 in a tow truck.  What do

13 you mean, a tow truck?

14 A.  I mean that he said that he shot him in a tow truck.

15 Q.  Did Dazz indicate whether or not he was by himself or with

16 anybody else?

17          MR. ZUCKER:  Objection.  Leading.

18          THE COURT:  Overruled.

19 A.  If I'm not mistaken, LT drove.  They left in LT car.

20 BY MS. PETALAS:

21 Q.  You said they left in LT's car.  Did you see them leave in

22 LT's car?

23 A.  Yeah.

24 Q.  And this conversation that you had with Dazz, did he give

25 you any indication of when this happened, when he shot Linwood?

1 Was it the same day of the conversation, a different day?

2 A.  I can't remember if it was the same day or a different day.

3 He just was like, "I caught Linwood and hit him with a .44."

4 Q.  And do you recall when this conversation took place?

5 A.  I can't recall when this conversation took place.

6 Q.  Well, let me ask you, do you recall an incident when you

7 were in Congress Park when you saw a taxi cab come through and

8 heard some gunshots?

9 A.  Yes.

10       MR. PURPURA:  Objection.  Obviously, I believe it's

11 leading now again.

12       THE COURT:  Overruled.

13 BY MS. PETALAS:

14 Q.  And tell us about --

15       MS. PETALAS:  Court's indulgence.

16       If I could ask you just to clear the screen, and if we

17 could bring up Government's Exhibit 100.1.

18 BY MS. PETALAS:

19 Q.  And before we begin, do you recall roughly when this

20 incident occurred?

21 A.  I know it was daytime.

22 Q.  I believe yesterday you testified that you were in jail for

23 a year, from 2000 to 2001.  Did this occur before you went into

24 jail that time?

25 A.  Yes.

1 A.  Naw, I walked.  Me and JT walked right there.

2 Q.  And when you walk down to Savannah, do you see the taxi cab

3 anymore?

4 A.  Huh-uh.

5 Q.  You have to answer yes or no.

6 A.  No.

7 Q.  What do you see as you walk down to Savannah Place?

8 A.  A bunch of kids shot on the corner.

9 Q.  And where were they when you saw them?

10 A.  On the ground.

11 Q.  And did you know those kids?

12 A.  Yeah, I knew them.

13 Q.  Were they older or younger than you?

14 A.  They was young.

15 Q.  Had you ever seen them selling drugs?

16 A.  Never.

17 Q.  And at some point do you have a conversation with -- do you

18 have a conversation with Antwuan about squashing the beef

19 between 10th Place and Congress Park?

20      MS. WICKS:  Objection to the leading.

21      THE COURT:  Overruled.

22 A.  May I answer?

23 BY MS. PETALAS:

24 Q.  Yes, I'm sorry, you can answer.

25 A.  Yes.

1 Q.  And was this before or after that time you went into jail

2 from November 2000 to November 2001?

3 A.  It was before I did the year.

4 Q.  Okay.  And do you remember roughly how long before you did

5 the year?

6 A.  I can't remember roughly how long it was.

7 Q.  And tell us about that conversation you had with Antwuan.

8 A.  Well, he was like, "Clyde, Clyde going to bring Patrick and

9 Steve up here, and we going to squash the shit."

10 Q.  Let me stop you there.  You talked about a person named

11 Clyde.  Did you know who Clyde was?

12 A.  Yes.

13 Q.  And who was Clyde?

14 A.  He hung down 10th Place.

15 Q.  Had you ever seen Clyde with Antwuan Ball before?

16 A.  Yes.

17 Q.  And when had you seen Clyde with Antwuan Ball?

18 A.  I mean, a couple of times.  That was Twuan's son.

19 Q.  You said that was Twuan's son.  From your observations, what

20 was their relationship?

21 A.  It was cool.

22 Q.  Did you ever have any conversations with Antwuan Ball about

23 Clyde?

24 A.  Yeah, when Clyde stuck me in my ass on 10th Place with a

25 knife.

1 Q.  And when was that?

2 A.  I can't remember when it was, but it was just a time me and

3 Tweety and them went down to 10th Place, and Clyde was playing

4 and poked me with the knife, and I said something to Twuan about

5 it.  And he was like, "Man, leave that shit alone.  He just

6 playing."

7 Q.  And you said when you and Tweety went down to 10th Place?

8 A.  Yeah, we was going to get some weed.

9 Q.  How old were you at this point?

10 A.  Damn, I can't remember how old I was.

11 Q.  Was this close in time to this conversation now that we're

12 talking about, where Clyde is bringing up Patrick and Steve, or

13 was this well before?

14 A.  No, this was before.  When Clyde did that, the 10th Place

15 beef was like really -- it was starting to escalate, because we

16 was wrong for going down there to get some weed --

17        MR. PURPURA:  Objection to the narrative.  There's no

18 question posed.

19        THE COURT:  Put your next question.

20 BY MS. PETALAS:

21 Q.  So when you said this was before the conversation now you're

22 having with Antwuan about Clyde bringing up Steve and Patrick,

23 are we talking months before or years before?

24 A.  I'm not sure.  I'm not sure if it was months, years.

25 Q.  Was it towards the beginning of the 10th Place beef or the

1 end?

2 A.   It was at the end.

3 Q.   Which was at the end, the conversation with Clyde about

4 Patrick and Steve?

5 A.   Yeah.

6 Q.   What I'm referring to is, this time you talked about you and

7 Tweety going down to 10th Place, was this towards the beginning

8 of the 10th Place beef --

9 A.   That was the beginning.   It was the beginning.

10 Q.   Yes or no, do you know whether or not there was a financial,

11 money relationship between Antwuan Ball and Clyde?

12 A.   Yes.

13 Q.   And how do you know that?   Just tell us how you know.

14 A.   From Twuan.

15 Q.   And what did Twuan tell you about this money relationship

16 between him and Clyde?

17 A.   Basically, something about getting Clyde to pay my rent.

18 Q.   Twuan told you that Clyde would pay his rent?

19 A.   Uh-huh.

20 Q.   You have to answer yes or no.

21 A.   Yes.

22 Q.   And was this -- now, going back to the conversation you had

23 with Antwuan, where he's telling you about Clyde bringing up

24 Steve and Patrick, who are Steve and Patrick?

25 A.   Some guys that hung down 10th Place.

1 Q.  And when you have this conversation, do you then -- after

2 you have this conversation with Antwuan, do you see Steve and

3 Patrick?

4 A.  Yeah, they pulled around there.  We was all in the back of

5 the circle.

6 Q.  Who pulled around there?

7 A.  Clyde, Steve, Patrick, and if I'm not mistaken, Kamal.

8 Q.  And who is Kamal?

9 A.  He hung down there.  I forget -- I can't think of his

10 brother name right offhand, right now.

11 Q.  You said Kamal hung down there.  Where did Kamal hang?

12 A.  He hung on 10th Place, 10th Place and Trenton.  That was

13 they little area.

14 Q.  And when Steve and Patrick and Clyde and Kamal come up to

15 the circle, what if anything happens when they come up to the

16 circle?

17 A.  They jumped out.

18 Q.  Who jumped out?

19 A.  Clyde, Steve, and Patrick, and Kamal.  They jumped out.  And

20 we just talked, we just squashed it.  I mean, we -- I think it

21 was me and Steve, one of us had words.  He was like, "I was

22 faking."  And I was like, "Man, I wasn't faking.  You-all pulled

23 knives out on me."

24 Q.  Okay.  You said they told you you were faking.  And you

25 responded about them pulling knives out on you.  What are you

1 talking about?  Are you talking about a specific incident at

2 that time?

3 A.  Yes.  It was Bird birthday.  We went to the purswhogo (ph)

4 jam at the bowling alley.

5 Q.  Okay.  Whose birthday was it?

6 A.  Bird.  I mean, Aman.

7 Q.  And what's the purswhogo jam?

8 A.  At that time -- it's genius.  It was the happening thing,

9 pursugoes.  So they was having a purswhogo jam.  I guess, you

10 know, ladies walk in there with a fresh purse, who goes on?

11 Q.  Did you go to this?

12 A.  Yes.

13 Q.  Did you run into Steve or Patrick at this jam?

14 A.  Yes.

15 Q.  And what happened?

16 A.  I was coming back from the bar, I had some beers in my hand.

17 And when I spinned, they was right there.

18 Q.  You said, "They was right there."  Who was right there?

19 A.  Steve, Patrick, Kamal, and somebody else.  It was like four,

20 and they surrounded me.  I was just right there mugging, and I

21 heard the knives and shit click down.

22         And I was like, "Yeah?"  And EB grabbed me and was

23 like, "Come on, Shorty.  Come on, Shorty."  We walked to the

24 back, we went back.

25         Then we was like, "Them niggers in here, them niggers

1 in here."

2 Q.  Who said this?

3 A.  I was saying that.

4 Q.  Okay.  What happened after that?

5 A.  We all got to leaving out.

6 Q.  Did you have other confrontations with the 10th Place on

7 that day, at the jam?

8 A.  Huh-uh.

9 Q.  You have to answer yes or no.

10 A.  No.

11 Q.  And this took place prior to when Clyde and Steve and

12 Patrick come up to the circle?

13 A.  Yeah.  Right after that, that's when the whole Clyde and him

14 coming up and squashing it.

15 Q.  Okay.  And this incident that happened at the circle, where

16 they come up to squash, was D-Lock alive or dead at this point?

17 A.  Dead.

18 Q.  Do you know an individual named Meatball?

19 A.  Yes.

20 Q.  And who is Meatball?

21 A.  He used to be around the park.

22 Q.  And is Meatball alive or dead today?

23 A.  Dead.

24 Q.  And the time that you had this -- they came up to squash it,

25 was Meatball alive or dead?

1 A.  Dead.

2 Q.  And you're familiar with an individual named D-Lock.  You

3 already talked about that.  At the time that this happened, was

4 D-Lock alive or dead?

5 A.  He was dead.

6         MS. WICKS:  Objection.  Asked and answered.

7         THE COURT:  Overruled.

8 BY MS. PETALAS:

9 Q.  At the time this happened, was D-Lock alive or dead?

10 A.  He was dead.  He was dead.

11 Q.  I'm sorry.  We have to make sure that -- I know we've been

12 talking awhile.  We just have to make sure that we don't talk

13 over each other, for the Court Reporter.

14         THE COURT:  We've reached the mid afternoon break

15 point.  Did you need to complete this line?

16         MS. PETALAS:  No, Your Honor.

17         THE COURT:  Ladies and gentlemen, we'll break for the

18 mid afternoon break.  It's 3:05.  Please come back at 3:20, and

19 please take your notes with you, and don't talk about the case.

20 Enjoy your break.

21         (Jury out at 3:05 p.m.)

22         THE COURT:  You may step down and take a break until

23 3:20.  Be back in your seat at 3:20.

24         (Recess taken at.3:05 p.m.)

25         THE COURT:  Are you ready for the jury?

1          MS. PETALAS:  Yes, Your Honor.  Actually, may we

2 approach just for a very brief matter?

3          THE COURT:  All right.

4          (BENCH CONFERENCE ON THE RECORD.)

5          MS. PETALAS:  I just wanted to check.  I was informed

6 that Antwuan Ball's mother is in the courtroom.  At this point

7 we don't anticipate calling her as a witness, but I just wanted

8 to check to make sure that she was not going to be a witness for

9 the defense at all.

10         So if she was, we would be invoking the rule on

11 witnesses.

12         MR. CARNEY:  I'm not calling her as a witness.

13         MR. PURPURA:  I'm not either.

14         THE COURT:  If any of the defense counsel will be

15 calling her, come up and put that on the record.

16         (END BENCH CONFERENCE.)

17         MR. CARNEY:  Your Honor, can I have the Court's

18 indulgence?

19         I'm sorry, it will be just one more moment, Your Honor.

20         Your Honor, I can answer the Court's question now.

21         THE COURT:  Okay.  Go ahead.

22         MR. CARNEY:  With respect to Antwuan's mother, a

23 decision will be made within two days as to whether another

24 counsel will be calling her as a witness, and that's about it.

25         THE COURT:  Has she stepped out of the courtroom, then?

1        MR. CARNEY:  Yes, Your Honor.

2        I'm sorry, I should say for the record, her name is

3 Violet Ball.

4        THE COURT:  All right.  Let's bring the jury in.

5        (Jury in at 3:30 p.m.)

6        THE COURT:  Good afternoon, ladies and gentlemen.

7 Welcome back.  We're ready to resume.

8        Counsel?

9        MS. PETALAS:  Thank you, Your Honor.

10 BY MS. PETALAS:

11 Q.  I believe before the break we were talking about the time

12 that Clyde and Steve and Patrick had come up to the circle.  Do

13 you recall that?

14 A.  Yes.

15 Q.  I believe where we left off, I had asked you if that took

16 place after D-Lock was murdered?

17 A.  Yes.

18 Q.  And did this take place before -- did Steve and Patrick, did

19 they come up to circle before or after that incident you

20 described earlier where the taxi came through Congress Park?

21 A.  That was after.

22 Q.  What was after?

23 A.  When they came up.  They came up after the taxi cab stuff.

24 Q.  Steve and Patrick came up to the circle after the taxi cab?

25 A.  Uh-huh.

1 Q.  You have to answer yes or no for the record.

2 A.  Yes.

3 Q.  And when they come there, what happens when they get to the

4 circle, Steve and Patrick and Clyde and Kamal, I believe?

5 A.  I mean, nothing.  They was like, it was over.  Like, you

6 know, like I said, I think it was me and Patrick, he was like,

7 "Nigger, you was faking." I was like, "Nigger, you was faking."

8 We had a couple of words.  It was dead.  It was deaded (sic),

9 and the beef was squashed.  Everybody shook hands, that was it.

10 Q.  And let me take you back.  You said -- I didn't understand

11 what you said.  You said you had some words with Steve and

12 Patrick about faking?

13 A.  No, I had some words with Steve.  Not Pat, Little Pat.  It

14 was with Steve.

15 Q.  And I think you said something, "it was" something.  I just

16 didn't hear what it was.

17 A.  It was just deaded.  He was like he was faking.  I was like,

18 "Nigger, you faking."  And he was like, "Nigger, y'all go ahead

19 with that."

20 Q.  No, I didn't understand the word you said.  It was debted?

21 What was the word you used?

22 A.  The argument was dead, like the argument was stopped.

23 Q.  Was dead?

24 A.  Yes.

25 Q.  And you said you shook hands.  In your mind, was the beef

1 his presence be known.

2 Q.  Then you talked about a time that you saw him two days

3 later, after that.  Is that correct?

4 A.  Yep.

5 Q.  And did you talk to Rob two days later?

6 A.  Yep.  We had words.

7 Q.  Did you have a weapon?

8 A.  No.

9 Q.  Did he have a weapon at that point?

10 A.  Yes.

11 Q.  Did he point it at you?

12 A.  At my head.

13         MR. PURPURA:  Objection as to the form of the question.

14         THE COURT:  Sustained.

15 BY MS. PETALAS:

16 Q.  Well, what happened when you saw Rob two days later?

17 A.  We was sitting -- it was me, JT, DC, Don was sitting in Don

18 car.  Everybody was at the front of the Lincoln.  We was in

19 there rolling up ready to smoke some weed.  I had the Backwood

20 like this.

21 Q.  And where are you?  You said you were at the front of the

22 Lincoln.  Were you in the parking lot or were you on

23 Congress Street or where?

24 A.  No, we was in the Lincoln.  We was parked in the Lincoln

25 parking lot.

1 Q.   Okay.  And what happened?

2 A.   What happened, Rob opened the door and put a Glock to my

3 head.

4 Q.   And when Rob put the Glock to your head, what if anything

5 did DC do?

6 A.   They act like they ain't see nothing.  JT, DC, and Don act

7 like they ain't know what the fuck was going on.

8 Q.   And did Rob -- when Rob put the gun to your head, what did

9 you do?

10 A.   I ain't do shit.  He was like, "Baby Ki, you try and see me,

11 nigger?"  I was like, "Fuck yeah, I'm trying to see you,

12 nigger."  And he smooshed me with the joint like that.

13 Q.   You said he smooshed you.  Did he hit you in the head?

14 A.   He tried to.  He smooshed it with the barrel of the gun like

15 this (indicating).  I grabbed -- and I grabbed him, and I had

16 his arm like this with the gun when he snatched away --

17          MR. PURPURA:  Excuse me.  Judge, I can't hear the

18 witness or keep up with him.  Could you ask him please to slow

19 down his narrative at this point?

20          THE COURT:  Overruled as to narrative, but slow down so

21 everybody can understand what you're saying, please.

22          THE WITNESS:  Yes, sir.

23 BY MS. PETALAS:

24 Q.   You said he grabbed you.  What did you do when he grabbed

25 you?

1 A.   I grabbed him.  I had Little Rob like this (indicating).

2 The gun was in this hand, I had him like this (indicating).  We

3 was tussling.  He punched me, we was tussling.  He yanked away

4 from me, and when he was ready to stick his hand back in with

5 the gun, Munya grabbed him.  And Munya was like, "What the fuck

6 you doing, nigger?" And that's when I scooted out the other side

7 of the car and ran through the back.

8 Q.   Did you get out of the car at that point?

9 A.   Matter of fact, hold on.  I missed something.  When Munya

10 grabbed him, he was like, "Nigger, what the fuck you doing" --

11 Q.   I'm sorry --

12 A.   Look, when Munya grabbed Little Rob --

13 Q.   Yes.

14 A.   -- and was like, "What the fuck you doing, nigger?" He was

15 like, "Get out my mother-fucking business, nigger."

16 Q.   Okay.  Who said what?  I just want to be clear on who's

17 saying what in your story.

18 A.   Okay.

19 Q.   Munya grabs Little Rob?

20 A.   And was like, "What you doing?"

21 Q.   Who said, "What are you doing?"

22 A.   Munya.

23 Q.   Okay.  And then who is the next speaker?

24 A.   Little Rob is like, "Get out my business."

25 Q.   Okay.  And what happens after that?

Tab 36

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :

        Plaintiff,                 :   Docket No. CR 05-100

        v.                         :

ANTWUAN BALL, DAVID WILSON,        :   Washington, DC
GREGORY BELL, DESMOND
THURSTON, JOSEPH JONES, and        :   May 9, 2007
DOMINIC SAMUELS,                       9:15 a.m.
                                   :
        Defendants.
                                   :
                                   :
                                   :

VOLUME 48 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

---

APPEARANCES (Cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:            Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:            James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:        Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:            Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

                          LAW OFFICE of ANTHONY ARNOLD
                          Anthony Darnell Arnold, Esq.
                          One Research Court
                          Suite 450
                          Rockville, MD  20852
                          301.519.8024

---

APPEARANCES (Cont.)

For Defendant             LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:         A. Eduardo Balarezo, Esq.
                          400 Fifth Street, NW
                          Suite 300
                          Washington, DC  20001
                          202.639.0999
                          and
                          William B. Purpura, Esq.
                          8 East Mulberry Street
                          Baltimore, MD  21202
                          410.576.9351

Court Reporter:           Scott L. Wallace, RDR, CRR
                          Official Court Reporter
                          Room 6814, U.S. Courthouse
                          Washington, DC 20001
                          202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

---

**MORNING SESSION, MAY 9, 2007**

1
2       (9:15 a.m.)
3           THE COURT:  Ms. Petalas, is your witness here?
4           MS. PETALAS:  Yes, Your Honor.
5           THE COURT:  All right.  Bring him in.
6           (Brief pause in proceedings.)
7       (9:19 a.m.)
8           THE COURT:  Ms. Petalas, you ready for the jury?
9           MS. PETALAS:  Yes, Your Honor.
10          (Jury in at 9:20 a.m.)
11          THE COURT:  Good morning, ladies and gentlemen.
12          THE JURY PANEL:  Good morning.
13          THE COURT:  Welcome back.  We're ready to resume.
14          Ms. Petalas.
15          MS. PETALAS:  Thank you, Your Honor.
16      CONTINUED DIRECT EXAMINATION OF KAIRI AMON KELLIEBREW
17      BY MS. PETALAS:
18      Q.   Mr. Kelliebrew, again, I'm just going to remind you
19      you're still under oath.  Do you understand that?
20      A.   Yes.
21      Q.   Just going back to where we left off yesterday --
22      actually, I'm going to take a step back there and show you again
23      what's in evidence as Government's Exhibit 1119.
24          MS. PETALAS:  I would ask Mr. Mazzitelli to call that up.
25      BY MS. PETALAS:

10583

1   **Q.**   Did you tell them where it occurred?

2   **A.**   Yes.

3   **Q.**   And I just want to step back and talk about -- yesterday

4   you talked about a meeting -- strike that.

5        You talked about a conversation you had out in an alley

6   once about cooperators.  Do you recall that?

7   **A.**   Yes.

8   **Q.**   And do you recall who was at that conversation?

9        MR. CARNEY:  Objection, Your Honor.  Asked and answered.

10   THE COURT:  Wasn't it?

11   MS. PETALAS:  It was.  I was just going to ask a few more

12   questions.

13   BY MS. PETALAS:

14   **Q.**   What, if anything, did you say at that conversation?

15   **A.**   I was with it.  I can't remember exactly what I said, but

16   I know I was with it.

17   **Q.**   And I believe yesterday you already testified about what

18   Antwuan Ball said.  Did anybody else say anything at that

19   meeting -- at that conversation?

20   **A.**   I can't --

21   MR. ZUCKER:  Objection, asked and answered.

22   THE COURT:  Overruled.

23   THE WITNESS:  I can't -- I can't remember who -- everybody

24   was with it.  That was the whole thing.  Everybody was with it.

25   BY MS. PETALAS:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10584

1   **Q.**   And are you familiar with an individual named Stephanie

2   Carre -- Carre?

3   **A.**   No.

4   **Q.**   And without telling us where you are, are you in the

5   DC -- do you reside in the DC area at this time?

6   **A.**   No.

7   **Q.**   And yesterday you talked about when you -- when you got

8   locked up on that UC buy-bust case.  Do you recall that?

9   **A.**   Yes.

10   **Q.**   And do you remember what day you got locked up on the UC

11   buy-bust case?

12   **A.**   Naw, I can't remember what day I got locked up.

13   **Q.**   Do you remember testifying about it in the grand jury?

14   **A.**   Yes.

15   **Q.**   Would looking at the grand jury refresh your

16   recollection?

17   **A.**   Yes.

18        MS. PETALAS:  May I approach, Your Honor?

19        THE COURT:  Yes.

20        MS. PETALAS:  For the record, I'm showing the witness

21   what's been marked as Government's Exhibit 1220.

22   BY MS. PETALAS:

23   **Q.**   Do you recognize that?

24   **A.**   Yes.

25   **Q.**   Is that your grand jury testimony on November 27th, 2002?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10585

1   **A.**   Yes.

2        MS. PETALAS:  Your Honor, at this time I would request

3   permission to refresh his recollection.

4        (Discussion had off the record between Ms. Petalas and the

5   witness.)

6   BY MS. PETALAS:

7   **Q.**   Does that refresh your recollection of what day you were

8   arrested?

9   **A.**   Yes.

10   **Q.**   What day were you arrested?

11   **A.**   September 17th.

12   **Q.**   September 17th?

13   **A.**   Yes.

14   **Q.**   And what year was that?

15   **A.**   2002.

16   **Q.**   And I believe you testified that on that date, you

17   remained held for some period of time; is that correct?

18   **A.**   Yes.

19   **Q.**   And then you were released.  When were you released?

20   **A.**   February 1st, '05.

21   **Q.**   Okay.  And when you were released, at that point when you

22   were released, did you remain in the DC area or did you leave

23   the general DC area immediately?

24   **A.**   I left the DC area.

25   **Q.**   And since the day that you -- well, actually since the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10586

1   day you were arrested, have you been back to Congress Park at

2   all?

3   **A.**   No.

4   **Q.**   Are you married?

5   **A.**   Yes.

6   **Q.**   And other than the times that you've come down to meet

7   officers or agents or come to court, have you been back to DC at

8   all?

9   **A.**   No.

10   **Q.**   Now, the times that you came down to meet the agents or

11   come down for court, did our office pay for your hotel and some

12   expenses?

13   **A.**   Yes.

14   **Q.**   And other than that, did our office give you any money?

15   **A.**   No.

16   **Q.**   Did our office give you any money to go into that program

17   you were in before?

18   **A.**   Nope.

19   **Q.**   And other than -- you've met with us a few times.  Have

20   we occasionally paid for your lunch?

21   **A.**   Say that again.

22   **Q.**   You met with us a few times to prepare, correct?

23   **A.**   Yes.

24   **Q.**   And when you have, have we occasionally bought you lunch?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10591

1   clothes, Mr. Ball was giving you whatever he could get from
2   other kids in the family; is that right?
3   **A.**   Yes.
4   **Q.**   Right.  And Mr. Ball at that time -- also you said the
5   place was in chaos.  What you mean by "chaos" was that they
6   didn't have lights in that apartment; is that right?
7   **A.**   For a period of time, they didn't.
8   **Q.**   Right.  They were using lights from outdoors; is that
9   right?  Street lights at night?
10  **A.**   Yes.
11  **Q.**   And it's true that they had running water every so often?
12  **A.**   Yes.
13  **Q.**   And you said that he insisted on you going to school; is
14  that right?
15  **A.**   Yes.
16  **Q.**   And he also insisted on the other kids going to school;
17  isn't that right?
18  **A.**   Yep.
19  **Q.**   And part of that was to make sure that they got a meal a
20  day; isn't that right?
21  **A.**   You said what?
22  **Q.**   Part of the reasons for making you and others go to
23  school was so that you could get a meal a day?
24  **A.**   I don't remember that.
25  **Q.**   You did go to school, didn't you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10592

1   **A.**   Yeah.
2   **Q.**   Now, you started using cigarettes and marijuana about age
3   9; is that right?
4   **A.**   Yes.
5   **Q.**   And smoked marijuana every day from -- I guess from
6   12 to 13 on; is that right?
7   **A.**   Yes.
8   **Q.**   And you also used PCP, right?
9   **A.**   Yes.
10  **Q.**   And you were smoking dippers every day for several years,
11  from about 13 all the way up to about 19, right?
12  **A.**   Naw, it wasn't -- I wasn't doing the dippers.  I used to
13  like boat.
14  **Q.**   Well, if I may, you were smoking sacks; is that what you
15  were doing?
16  **A.**   Yes.
17  **Q.**   That's sort of the same thing, isn't it?
18  **A.**   It's not the same thing.  A dipper, you dip the cigarette
19  in the water and smoke it.  The other one is mixed up and you
20  roll it.
21  **Q.**   But you're still --
22  **A.**   It's still PCP, yes.
23  **Q.**   Right.  And the effect of using PCP on you caused
24  hallucinations, didn't it?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10593

1   **Q.**   And in fact, some of the hallucinations you had, you used
2   to talk to the dead, didn't you?
3   **A.**   Yes.
4   **Q.**   And you agree that on November 27th, 2002, when you were
5   asked in the grand jury about PCP and its effects, you lied
6   about whether you used PCP; is that correct?
7   **A.**   Repeat that again.
8   **Q.**   You agree that when you testified in the grand jury on
9   November 27th, 2002, you lied about PCP and its effects and
10  about you using it?
11  **A.**   Are you saying when I testified in the grand jury, that I
12  didn't say I was using PCP?
13  **Q.**   Right.  You denied that you ever used PCP or that you
14  even knew what Boat Alley was -- or what boat was, really?
15  **A.**   You're talking about my first grand jury statement?
16  **Q.**   Your first grand jury.
17  **A.**   Oh, yes.
18  **Q.**   Now, you also stated that you started using heroin.
19  About what age was that?
20  **A.**   18, 19.
21  **Q.**   And you used that all the way up until the time you were
22  arrested in 2002, right?
23  **A.**   Off and on.
24  **Q.**   Right.  And how much were you using a day?
25  **A.**   I used to get a 20 bag of raw and it'd last me probably

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10594

1   two, three days.
2   **Q.**   Right.  And where were you getting that from?
3   **A.**   From Lincoln Heights.
4   **Q.**   From where?
5   **A.**   From Lincoln Heights.
6   **Q.**   And where is that located?
7   **A.**   Off -- what's that?  South Dakota Avenue or -- off like
8   Benning Road and the other side of Southeast.
9   **Q.**   Right.  And how often would you go there a day?
10  **A.**   Maybe twice a week, something like that.
11  **Q.**   And about how much were you spending per week on heroin?
12  **A.**   Like $60.
13  **Q.**   Each time you went or twice a week or --
14  **A.**   No.  I told you, when I used to go over there, I used to
15  get me a bag of raw.  So that's one bag, $20.  It used to last
16  me -- I blow right there, be highed up, and then I might have
17  some tomorrow.  It might last me two, three days.
18  **Q.**   And the effects on using heroin made you high?
19  **A.**   It's a kite.
20  **Q.**   Did it affect your perception?
21  **A.**   Naw, I was still the same.  I just zoned out from time to
22  time.
23  **Q.**   And what about PCP?  Did that affect your perception and
24  memory?
25  **A.**   It made me hallucinate, but I don't -- I don't think it

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1325 of 1954

**Page 10595**

1  affected my memory or none of that.
2  Q.  How about Ecstasy pills?  How often were you using
3  Ecstasy pills?
4  A.  I was using Ecstasy pills often.
5  Q.  When you say "often," is that every day or every other
6  day?
7  A.  Every day sometimes.  And then sometimes it be every
8  other day or whenever they around or if I'm chasing a high.
9  Q.  And when you were using PCP or Ecstasy or heroin and this
10  is going on for a long period of time, you're also drinking,
11  too, weren't you?
12  A.  Yep.
13  Q.  And how often would you drink a day?
14  A.  Every day.
15  Q.  And how much?
16  A.  A couple bottles, maybe three or four bottles.
17  Q.  Now, you've testified essentially that you're an addict;
18  is that right?
19  A.  Yes.
20  Q.  And the events that you testified to about Black being
21  shot -- that's Jamel Sills -- you agree before that event you
22  were using heroin, weren't you?
23  A.  Yes.
24  Q.  And you used heroin the night before?
25  A.  Um-hmm.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 10596**

1  Q.  And you used heroin the next day?
2  A.  Yes.
3  Q.  Your friend Black was using PCP that day?
4  A.  I don't think he got wet that day.  He was trying to get
5  wet.
6  Q.  Well, your plan that day was to go and get some marijuana
7  on Quarles Street and rob some people; wasn't that it?
8  A.  Yes.
9  Q.  And you agree that you were also drinking that day?
10  A.  Yes.  That was --
11  Q.  And you indicated that there was a fifth of Remy
12  involved?
13  A.  Yes.
14  Q.  And you also agree that after the event, you started
15  drinking again, too?
16  A.  You just --
17  Q.  I'm confusing you?
18  A.  You just twisted it all up.  I didn't drink -- I drank
19  after Black got killed.
20  Q.  Let's see.  Did you also drink some "off-the-wall shit"
21  that you got from somebody on the street?  And that was after
22  the shooting?
23  A.  Yeah.  I was drinking some Remy.
24  Q.  Okay.  This is question and answer on November 27th,
25  2002, page 74, beginning line 18.  This is by Mr. Waxman: "So

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 10597**

1  I'm sorry, Mr. Kelliebrew.  You said that you -- Detective
2  Worrell stopped you and said you could -- well, 'We'll be seeing
3  you soon,' or something to that effect.  And then what happened?
4      "Answer: I mean, he rode out.  I got a drink from an old
5  head right there.  They were drinking some off-the-wall shit.  I
6  don't even drink."
7  Q.  Did you tell the grand jury that?
8      MS. PETALAS:  Objection, Your Honor.  This is after the
9  shooting, so I don't understand --
10      MR. CARNEY:  I thought I was clarifying.
11      THE COURT:  Overruled.
12  BY MR. CARNEY:
13  Q.  Did you tell that to the grand jury?
14  A.  Yes.
15  Q.  And you:  "Took a drink of that shit.  I was just walking
16  around, went in the house, wouldn't eat nothing.  Wouldn't eat
17  for a week or nothing -- or a week."
18      So, is that correct?
19  A.  Yes.
20  Q.  And before, that morning, were you also drinking with
21  Black?
22  A.  No, we didn't -- no, we didn't drink that morning.
23  Q.  You can't recall?
24  A.  We didn't have a drink.  I snorted some dope.  He was mad
25  I was snorting the dope.  He was mad we was looking for the weed and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 10598**

1  looking to rob somebody.
2  Q.  Okay.  So that day, you were at least high, using heroin,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And you stated that you had conversations with
6  Mr. Ball at Malcolm X, correct, in The Circle, correct, and in
7  the alley, is that right, after the event?
8  A.  Yes.
9  Q.  And you had heroin already and now you had been drinking;
10  is that right?
11  A.  Yes.
12  Q.  Yesterday you talked about Little Rob and him trying to
13  run you over.  Do you remember that?
14  A.  Yes.
15  Q.  And you testified to some conversations that you had
16  after that happened; is that right?
17  A.  Yes.
18  Q.  And do you recall, you said that before Little Rob tried
19  to run you over, you were taking E pills.  Do you remember that?
20  A.  Yes.
21  Q.  Did you take E pills that day?
22  A.  That night.
23  Q.  Were you using heroin that day?
24      MS. PETALAS:  Objection, Your Honor.  Actually, I'm just
25  asking for clarification.  I don't know which day he's talking

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10599*

1  about, the Jamel Sills or the incident before.

2  THE COURT:  Why don't you clarify.

3  BY MR. CARNEY:

4  Q.  We've moved on to Little Rob.  You testified you used

5  E pills in the afternoon.  During that day, before this incident

6  with Little Rob, did you use heroin?  PCP?

7  A.  You just twisted your question all up just now.

8  No.  I was high that night off the Ecstasy.

9  Q.  So this is the day before the incident with Little Rob,

10  you were high that night?

11  A.  Right.

12  Q.  Okay.  So you're still high into the next day; is that

13  right?

14  A.  Yes.

15  Q.  Okay.  Now, in 2005, you were released to go into some

16  type of program for education and drug rehabilitation; is that

17  right?

18  A.  Yes, sir.

19  Q.  And what was the name of that program?

20  A.  I can't disclose that.

21  Q.  Pardon?

22  A.  I can't disclose that.

23  MS. PETALAS:  Your Honor, objection.  May we approach?

24  THE COURT:  Yes.

25  (Following sidebar discussion had on the record:)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10600*

1  MS. PETALAS:  There are security concerns here.  I

2  understand -- I'm not sure whether or not the name of the

3  program -- he's out of the area.  He's not in any kind of Witness

4  Security Program, but he's out of the area.

5  He can certainly inquire about him being kicked out of the

6  program.  I have concerns about that particular program leading

7  to where he went when he went out of the area.  That's my

8  concern.

9  MR. CARNEY:  Your Honor, the little information that I've

10  been given in discovery and requests regarding whether there's

11  been a motion to change his conditions of release or whatever --

12  the little information that I have, I was told it's a third-party

13  custodian and I just assumed that it's something like RAP or

14  Second Genesis.  I have no clue what this is about.  I haven't

15  been given full information.

16  So if it is witness security, I can understand it.  If

17  it's not witness security, I just want to go on the fact it's a

18  legitimate program, it's a fine program and different things

19  about it, and then he just threw it away.  So that's where I'm

20  headed.

21  THE COURT:  Can you do that without eliciting the name of

22  the program?

23  MR. CARNEY:  I can try.  I can try.

24  (Discussion had off the record.)

25  BY MR. CARNEY:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10601*

1  Q.  This program, was it a good program?

2  A.  Yes.

3  Q.  Special program where they teach you how to do certain

4  skills?

5  A.  Yes.

6  Q.  And vocational type training?

7  A.  Yes.

8  Q.  And they also -- did they do like rehabilitation for drug

9  usage and that kind of thing?

10  A.  Yes.

11  Q.  And was that one of the purposes why you were released?

12  This was some way for you to be released and do something?

13  A.  Yes.

14  Q.  Okay.  And this was something that was set up between

15  you, the government and the court, right?

16  A.  Yes.

17  Q.  They went to the court and they said to the court, "He's

18  going to do these things.  We trust him.  Release him into this

19  program," right?

20  A.  Yes.

21  Q.  And then, you were in that program for how long?

22  A.  I think ten months, something like that.

23  Q.  And were you being drug tested and that kind of thing as

24  part of the program?

25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10602*

1  Q.  And then you've been dropped from the program?

2  A.  No.  I dropped from the program.

3  Q.  So you did not complete the full program; is that right?

4  A.  No, I didn't, sir.

5  Q.  And when you were -- you dropped from the program, was

6  that in some situation where you violated some rules or

7  regulations relating to the program?

8  A.  Yes.  And I have to deal with that on sentencing.

9  Q.  Pardon?

10  A.  I have to deal with that on sentencing with my judge.

11  Q.  I understand that you may have to deal with that with the

12  judge at sentencing.  But were you -- in other words, you were

13  asked to leave unless you did certain things; is that what

14  happened?

15  A.  Say that again.

16  Q.  Were you asked to get out of the program because you

17  weren't compliant with their rules and regulations and what they

18  were doing?

19  A.  No.  They didn't kick me out.  The program did not kick

20  me out.

21  Q.  You just left on your own?

22  A.  Yes.

23  Q.  And the basis for you being released was for you to do

24  that program.  You haven't done that program.  Have you -- you

25  have not been locked up since that occurred, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10603**

1    A.    No.
2    Q.    That's been what, 16 months, maybe?
3    A.    Probably so.  I don't know the exact time.
4    Q.    When were you dropped from -- when did you quit the
5    program?
6    A.    January 26th.
7    Q.    Of 2006?
8    A.    Yes.
9    Q.    And so we've already gone through 2006 and we're into
10   2007, so it's been quite a while since you've been out on the
11   street without being locked up; is that right?
12   A.    Yes.
13   Q.    And is there an understanding between you and the
14   government that you're not going to be locked up while you're a
15   witness; is that right?
16   A.    No.
17   Q.    Has your lawyer written to the court saying you've
18   violated the conditions of release?
19   A.    I don't know.
20   Q.    Did you advise the court or Pre-trial Services that you
21   are not doing that program?
22   A.    No.  I just check in with Pre-trial Services every week,
23   like I'm supposed to.
24   Q.    Did the government do something on your behalf to report
25   this to the court and say that you violated it, but not to do

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10604**

1    anything?
2    A.    From my understanding, the government filed a motion for
3    me to be seen in front of the judge.
4    Q.    Okay.  And that has not happened, has it?
5    A.    No, sir.
6    Q.    In this intervening time period from when you dropped the
7    program to right now, have you gone through drug testing and
8    treatment?
9    A.    No, sir.
10   Q.    And you've indicated to us that, at least in the last two
11   weeks, you've been using marijuana; is that right?
12        MS. PETALAS:  Objection, Your Honor.  Misstates his
13   testimony.
14        THE COURT:  I'll allow it.
15   BY MR. CARNEY:
16   Q.    Within the last couple weeks, have you not testified that
17   you used marijuana?
18        THE COURT:  All right.  Sustained.
19   BY MR. CARNEY:
20   Q.    When was the last time you used?
21   A.    About two months ago.
22   Q.    So it's a question of two weeks.  Have you used since
23   those two months?
24   A.    No.
25   Q.    And you understand --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10605**

1        MR. CARNEY:  Can I have Government's Exhibit 1119.
2    BY MR. CARNEY:
3    Q.    -- that part of your agreement with the government,
4    you're not to violate any of the laws of the United States,
5    including use of any drugs or possession of any drugs; is that
6    correct?
7    A.    Yes.
8    Q.    And that's a breach of your agreement; is that not true?
9    A.    Yes.
10   Q.    Has the government indicated to you that while you
11   continued to use drugs up until two months ago, that they're
12   going to tear this agreement up, revoke it and have you
13   sentenced?
14   A.    Would you repeat that again?
15   Q.    Have you understood from the government that they intend,
16   based on your most recent use of drugs, to tear this agreement
17   up and have you go forward with sentencing?
18   A.    I don't -- I never talked to them about ripping nothing
19   up or none of that sort, what you're saying.
20   Q.    In other words, you're in violation of the agreement not
21   to commit any more violations of the law as long as you're a
22   cooperating witness and you violated the law, right?
23   A.    Yes, I did.
24   Q.    And you have not been -- it's not been indicated to you
25   that this agreement is going to be ripped up and thrown away,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10606**

1    right?
2    A.    No.
3    Q.    And you also agree that your release conditions, part of
4    the agreement was that you weren't to violate the law any
5    further, right?
6    A.    Yes, sir.
7    Q.    And you violated that trust given to you, correct?
8    A.    Yes.
9    Q.    Now, you indicated that -- well, let me ask you this:
10   Part of the hallucination that you had with PCP, often you used
11   the phrase -- it's called "lurching" or "lunching"?
12   A.    Yes, "lunching."
13   Q.    What is that?
14   A.    When you trip out off the boat.
15   Q.    And that has happened to you even when you're not using
16   boat; isn't that true?  In other words, a couple days can go by
17   after you use PCP and you just start tripping out anyway?
18   A.    That's if you just blanked out off the boat.  That's if
19   you ain't came back off the boat --
20   Q.    Um-hmm.
21   A.    -- and you just stay lunching.
22   Q.    Right.  And that's happened to you in the past, hasn't
23   it?
24   A.    I been out with the boat for like two or three days.
25   Q.    That's all over a period of time, it was just two or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  three days?
2  A.   Yeah, I done hit some good boat before and was high that
3  day.  Then the next day, if I smoked a cigarette, I felt the
4  effects of the boat.
5  Q.   Let me ask you this.  When you were locked up, was there
6  concern over your drug usage such that you had a neurological
7  exam?
8  A.   Say that again.
9  Q.   When you were locked up over at CTF, was there such
10  concern over your drug usage that they did a neurological exam
11  of you?
12  A.   I can't recall if they did a neurological exam.  I don't
13  know.  I don't remember that.  I don't know.
14  Q.   Were you tested when you were at CTF?
15  A.   Tested?  Drug tested?
16  Q.   No, tested for psychological things.
17  A.   Yes.
18  Q.   And was there a --
19  A.   You talking about the little blocks and stuff?
20  Q.   Yes.
21  A.   Yeah.  I think that was in my Youth Facts study.  That's
22  what it was, the neurological and the other joint?
23  Q.   Um-hmm.
24       That was in my Youth Facts study.
25  Q.   Okay.  And you agree that in 2000, you were arrested and

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  you were interviewed by Pre-trial Services?
2       Every time you've been locked up, you get interviewed by
3  Pre-trial Services to do a Pre-trial Services report; is that
4  correct?
5  A.   Yes, sir.
6  Q.   And in 2000, you were locked up on a case, F-709900,
7  correct?
8  A.   Yes, sir.
9  Q.   And you were interviewed by an individual by the name of
10  Thomas McGriff.  Do you recall that?
11  A.   I can't remember who interviewed me.  I don't remember
12  his name.
13  Q.   You remember being interviewed by someone from Pre-trial
14  Services; is that right?
15  A.   Yes.
16  Q.   And you were first placed under oath, said that you were
17  going to tell the truth, right?
18  A.   On the pre-trial?
19  Q.   On the pre-trial.
20  A.   I don't remember -- I don't never remember that on no
21  pre-trial.
22  Q.   They didn't tell you that what you were telling them was
23  to be confidential, but that it was going to be held -- that you
24  had to be truthful because it was being used by the court?
25  A.   It was never a swear, like you just said.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   Okay.  So you didn't swear, but you do at least remember
2  the interview; is that right?
3  A.   Yes.
4  Q.   And you were asked questions about education, where you
5  work and things like that.  Do you recall that?
6  A.   Yep.
7  Q.   And you also recall you were asked if you -- the question
8  was -- do you recall the question being asked:  "Do you or have
9  you ever used any illegal drugs?"
10      Do you recall that being asked of you?
11  A.   Yes.  They ask you that in every pre-trial sentence.
12  Q.   Right.  And do you recall that your answer to the
13  Pre-trial Services representative was that -- you indicated you
14  have never used any illegal drugs; is that right?
15  A.   If I said that then, then yes.
16  Q.   And that was a lie, wasn't it?
17  A.   Totally.
18  Q.   Now, when you're arrested in 2002 with a new drug charge,
19  you're under the influence of heroin that day, weren't you?
20  A.   Yes.
21  Q.   And in fact, you're in such a state when you're arrested
22  that the police had to subdue you; isn't that true?
23  A.   Had to what?
24  Q.   Subdue you.  Get you under control.
25  A.   No.  I tried to run.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   You tried to run.  And what happened then?
2  A.   They restrained me.
3  Q.   And you claimed that the police beat you up; is that
4  right?
5  A.   I didn't -- I don't -- I can't remember if I -- I can't
6  remember if I claimed they beat me up, but I know I ran.  I
7  tried to run.  I went to grab my sock and I hit him with the
8  "ugh-ugh" (indicating).  And he went this way and clipped me up
9  and that's when he popped my ankle.
10      MR. CARNEY:  Court's indulgence.
11  BY MR. CARNEY:
12  Q.   There was a question in the grand jury on November 27th,
13  2002.  This is page 122, beginning at line 6:  "Mr. Waxman:
14  Okay.  When we left off, we were discussing some claims you were
15  making about the night you were arrested and there was some
16  physical abuse by some officers towards you.  Do you remember
17  that?
18      "Witness:  Yes, sir."
19      Do you remember that question?  You were claiming that
20  you were being physically beaten abused?
21  A.   Read it again.  Read on.
22  Q.   Sure.
23      "Mr. Waxman" -- this is the prosecutor in the grand
24  jury -- "Okay.  And when we left off, we were discussing some
25  claims that you were making about the night you were arrested

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10615*

1   you." And I was like, "Man, I told them.

2       So it was time to lock in. We locked in. And like they

3   popped my door and said, "Pack your bags." "Pack my bags for

4   what?" They said, "You'll see when you get up there."

5       I was like, "I don't know what the fuck going on."

6   BY MR. CARNEY:

7   Q.   I'm more interested in -- the procedure is you --

8   A.   I'm giving it all to you, how it went from me over to the

9   jail to me going in the hole and then me going to CTF. You

10  wanted the event, I'm giving it to you in events.

11  Q.   Go ahead, sir.

12  A.   Okay. I -- they took me to the hole right next door to

13  the block I was in. And I was asking them, "Why am I -- what

14  I'm in the hole for?" They was like, "Release." I was like,

15  "Release?" I was I was like, "What the fuck."

16      So I was sitting in the hole and the next thing I know,

17  they came, transported me to CTF and took me up to the fourth

18  floor.

19  Q.   In the grand jury, did Mr. Waxman indicate to you that he

20  was having you transferred to CTF that day?

21  A.   I didn't even know I was going to -- it was in -- we

22  talked about putting me up there and I was like, "Man, don't put

23  me up there," da-da-da-da. And then I ended up going up there.

24  Q.   Now, going back to my question, the procedure, when

25  you're taken from CTF, you're taken down to a bullpen and from

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10616*

1   the bullpen on a bus to the court; is that pretty much how it

2   works?

3   A.   Okay. Are trying to indicate where me and DC had this

4   conversation? I just --

5   Q.   I just want to know -- sir, I want to know the procedure.

6   You go from CTF. Where do you go after that?

7   A.   All right. If you go to court from CTF, they bring you

8   downstairs in -- the same thing, like R & D. They got their big

9   rooms. They put their cooperators separate from anybody.

10  Q.   Fright. So at that point when you're brought down,

11  you're put together with other cooperators, right?

12  A.   Yes.

13  Q.   And then while you're waiting to be transported from CTF

14  to go to the grand jury -- because you've been to the grand jury

15  several times, right?

16  A.   Yes.

17  Q.   You're there with other people that are being brought

18  over to the grand jury; is that right?

19  A.   They either was getting debriefed or going to grand jury,

20  yes.

21  Q.   Right. And during that time period, you have a chance to

22  chitchat with these guys, right?

23  A.   We didn't discuss our cases.

24  Q.   I see. So you never discussed your cases that you're

25  going over to see Mr. Waxman?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10617*

1   A.   All you say, "I'm going to his them people today. You

2   too?" "Yeah." "Damn."

3   Q.   So except for this one conversation you remember when you

4   were going over to the grand jury to see Mr. Waxman -- and this

5   was on November 27th, 2002, correct? -- that that's the only

6   conversation you had down in the bullpen with someone, DC,

7   relating to Congress Park? Is that what you're telling us?

8   A.   No, that's not what I'm telling you. Like, if me and

9   other guys on the fourth floor from Congress Park had

10  conversation, we'd reminisce about what we used to do. Like,

11  "Damn, Young, we used to have fun back in the day; whoa, damn,

12  fucked up now." "Yeah."

13  Q.   You never talked --

14  A.   I don't mean to cut you off, but we never sat around and

15  was like, "Say, what you say? You said you" -- no, we never did

16  that.

17  Q.   But you listened to the stories that were being told

18  about the good old days, right?

19  A.   I was involved, too.

20  Q.   Right. But you listened to these stories, right?

21  A.   Yes.

22  Q.   And who was present at some of these? Can you recall

23  anybody, like -- how about -- let's go through a couple names.

24      Munya. Was Munya over there with you?

25  A.   Yes, Munya was over there with me. Do you want to know,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10618*

1   did me and Munya fuck with each other? No.

2   Q.   I'm not quite sure what you mean.

3   A.   Excuse me language. Do you want to know, was me and

4   Munya talking or associating with each other? No.

5   Q.   So you never talked to Munya --

6   A.   We talked like, "What's up?" "What's up, Baby Kai?" But

7   like how we was on the streets? No, Munya kept his distance.

8   Q.   I see. Were you on the same floor and unit as him?

9   A.   Naw. He was -- I was with -- hold on. How it went? A,

10  B, C -- it was A, B, C. He was on the C side.

11  Q.   This is on 7C? Is that what you're talking about?

12  A.   Naw. That's -- that's how the blocks went. When you

13  went in the fourth floor, it was three units. It was the A

14  side, the B side and the C side.

15  Q.   Well, you got to see individuals -- they have rec, don't

16  you?

17  A.   Yeah, we had rec.

18  Q.   Did you have rec together with Munya?

19  A.   Yeah.

20  Q.   How often was that?

21  A.   Every -- like, we had gym. Every day we had gym or every

22  other day, something like that.

23  Q.   Okay. And did Munya have a little job walking around

24  over at the unit, going cell to cell like -- I'm not sure of the

25  word? "Trustee"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10619

1  **A.**  Never.

2  **Q.**  How about an individual by the name of Robert Jackson?

3  Do you know him? Bo -- I'm sorry. Not Bo. Rob, Rob Jackson.

4  Do you know him?

5  **A.**  I don't recall that name.

6  **Q.**  Did you ever talk to Steve Marsh when you were locked up?

7  **A.**  I don't even recall that name either. If you got a

8  nickname --

9  **Q.**  Bo or Big Daddy or D.

10  **A.**  Who? Bo?

11  **Q.**  Yeah.

12  **A.**  Yeah, I talked to Bo.

13  **Q.**  And he was in Congress Park; is that right?

14  **A.**  Yes.

15  **Q.**  And he's one of the people that you reminisced with; is

16  that right?

17  **A.**  Me and Bo didn't really reminisce. Bo was still in the

18  same shit like he was on the street. Distant. He was up 96

19  unit.

20  **Q.**  So one of the things you talked about when you were

21  locked up with all the guys was about your plea agreement; isn't

22  that right?

23  **A.**  No.

24  **Q.**  Didn't you complain that your lawyer didn't explain how

25  it worked with the 5K and the plea agreement and that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10620

1  **A.**  Yes.

2  **Q.**  And they explained to you the ins and outs of how the

3  plea agreement worked?

4  **A.**  That was just -- let me tell you about that. That's just

5  cooperator talk. That's just cooperator talk up there, like --

6  **Q.**  Can you tell me what cooperator talk is like? What it's

7  about.

8  **A.**  Okay. It be like, "Young, you think you going to get

9  your 5K1?" I'm like, "I don't know, man; like, Man, what's

10  5K1?" And they was like, "That's what cooperators get."

11  And then a lot of cooperators used to be on they law

12  books, like what can they get? This? That? I wasn't on that

13  stuff. That used to be them guys.

14  **Q.**  Well, part of your plea agreement is what you're pleading

15  guilty to, right?

16  **A.**  I pled guilty to 30 to life.

17  **Q.**  Right. But you also pleaded to -- just when you ended

18  with Ms. Petalas, you ended with a particular charge, an event.

19  So that's part of your plea agreement, what you pled and said

20  you were involved in; is that right?

21  **A.**  Yes.

22  Repeat that question.

23  **Q.**  Ms. Petalas ended with going through what you pled guilty

24  to, one of your charges, right? Remember that, about Meat?

25  **A.**  Oh, yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10621

1  **Q.**  And that was part of your plea agreement that you would

2  be discussing with the individuals, all you guys over there,

3  right?

4  **A.**  I don't understand what you're saying. You -- repeat

5  that again.

6  **Q.**  That's okay. I'll go on.

7  Now, you were in CTF for how long?

8  **A.**  I think like 30 months, something. Or 29 months.

9  **Q.**  Right. And if you're locked up at the jail or CTF and

10  you don't want to talk to anyone, right, you don't want to have

11  any dealings with anybody, is there a mechanism for you to have

12  that done?

13  **A.**  Yeah. You can go into protective custody.

14  **Q.**  Right. You go and you talk to your C and P officer,

15  right?

16  **A.**  Yes.

17  **Q.**  And you ask them, "I don't want to have any dealings with

18  anybody. I don't want to talk to anybody." And you fill out a

19  form that says, "Separate me." It's a separation form, right?

20  **A.**  Yes.

21  **Q.**  So if you didn't want to talk, be involved, you could get

22  yourself separated, right?

23  **A.**  Yeah. They lock you in the hole.

24  **Q.**  Well, there's different levels of the hole, isn't there?

25  They have PCP -- I'm sorry -- PC, protective custody, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10622

1  **A.**  Yes.

2  **Q.**  And then they have 24-hour lockdown? You know that,

3  right?

4  MS. PETALAS: Objection, Your Honor.

5  THE WITNESS: Okay.

6  MS. PETALAS: Relevance. And I think we're going a little

7  far afield here. Objection on relevance.

8  THE COURT: I'll allow it.

9  THE WITNESS: If you in the hole, you in the hole with 24

10  lockdown, whether you PC or you broke a rule upstairs and get

11  sent to the hole. It's 24-hour lockdown. It's 23 and one

12  because you get one hour rec.

13  BY MR. CARNEY:

14  **Q.**  So there's difference, right?

15  **A.**  It's no different. It's 23 and one in the hole, whether

16  you PC or you get into trouble up there.

17  **Q.**  Well, that would be why you wouldn't want to get into

18  that, right? Because then you would be locked down, right?

19  **A.**  Right.

20  **Q.**  And did you ever request at any time to be moved to a

21  different institution?

22  **A.**  Yes.

23  **Q.**  And did they move you?

24  **A.**  Yes. I got moved to Arlington.

25  **Q.**  So how long were you in Arlington?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10623**

1  A.    Dag, I can't remember how long I was in Arlington.

2  Q.    Who were you over in Arlington with?

3        MS. PETALAS:  Objection, Your Honor, based on prior

4  objection.

5        THE COURT:  Come on up.

6        (Following sidebar discussion had on the record:)

7        THE COURT:  Which part is your objection?

8        MS. PETALAS:  Before he said -- we've had issues with who

9  were you with over at CTF, over at Arlington, just the general

10 open-ended questions, because there may be other cooperators that

11 are not related.  So in the past we've done what Mr. Carney had

12 done before, kind of asked about specific people, not in general,

13 "Who were you over there with?"

14       That was the basis of my objection, that I'm not sure what

15 that might elicit and it might -- that's the basis.

16       MR. CARNEY:  Your Honor, I can -- I wasn't aware that he

17 went to Arlington so I was taken a little back.  I guess I can

18 try and at least do the witnesses that I know that have testified

19 and maybe one that's coming up.

20       THE COURT:  All right.

21       (Sidebar discussion concluded.)

22       MR. CARNEY:  Your Honor, can I have the Court's indulgence

23 for a second?

24       THE COURT:  Yes.

25 BY MR. CARNEY:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10624**

1  Q.    Going back to the question about Arlington, was Munya

2  over there with you when you were there?

3  A.    Was Munya over there?  I can't remember.  I know Keith B

4  was over there.

5  Q.    Keith B is Keith Barnett?

6  A.    Yes.

7  Q.    Okay.  How about Bo?  Was Bo over there with you?

8  A.    I can't recall if Bo was over there.

9  Q.    And what about Larry Browne?

10 A.    When I left and went to Arlington, Larry Browne was on

11 the fourth floor.

12 Q.    He was still over at CTF?

13 A.    CTF.

14 Q.    And that's someone who was over at CTF with you at one

15 time?

16 A.    Yes.

17 Q.    Now, when you want to use a phone to make calls from CTF,

18 how do you use a phone?

19 A.    Collect call.

20 Q.    Okay.  And when you make a collect call, this is from a

21 pay phone, I take it?

22 A.    Yes.

23 Q.    Okay.  When you make a collect phone call, there's an

24 immediate warning that your calls are being monitored and

25 recorded, isn't there?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10625**

1  A.    Yep.

2  Q.    Right.  And you recall that you said you had several

3  conversations with Mr. Ball, correct?

4  A.    Yes.

5  Q.    As many as seven; is that right?

6  A.    Huh?

7  Q.    As many as seven phone conversations --

8  A.    I can't say seven.

9  Q.    Let me finish, please.

10       As many as seven phone conversations relating to sometime

11 after 202?

12 A.    202?  What?

13 Q.    2002.

14 A.    Okay.  I can't say seven phone calls, but I called

15 Antwuan.

16 Q.    Right.  And this message when you called him collect came

17 on:  "These calls are being recorded," correct?

18 A.    Recorded and monitored.

19 Q.    And he's talking to you about the events that happened;

20 is that right?

21 A.    The events that happened on what?

22 Q.    Jamel Sills; is that right?

23 A.    No.

24 Q.    Now, you stated that you were untruthful to the grand

25 jury about the gun in 2002 when you appeared before then; is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**10626**

1  that right?

2  A.    Yes.

3  Q.    And you agree that you've lied in the past to Pre-trial

4  Services on various things to get released from jail?

5  A.    Yes.

6  Q.    And it's also true, is it not, that you're hoping to get

7  released in this case, isn't it?

8  A.    You said am I hoping that I get released?

9  Q.    Right.  You don't want to get 30 to life, do you?

10 A.    No, sir.

11 Q.    And you agree that you would lie if a lie would get you

12 out of spending the rest of your life in prison?

13 A.    You said what now?

14 Q.    I'm going to say it again.  You agree that you would lie

15 if a lie would get out of spending the rest of your life in

16 prison?

17 A.    I never agreed to lie to get me out of prison.

18 A.    I didn't --

19 A.    Listen, can I finish?  If I lied to them today -- today,

20 right now on this stand -- I'm telling the truth because if I

21 lie right now, today, on the stand, Judge -- this my judge right

22 here -- will give me 30 to life with no problem.

23 Q.    Do you recall testifying in the matter of U.S. *versus*

24 *Miller*, April 13th, 2006, volume -- let's see, page -- 110, line

25 14:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10627

1  "Question: No, that's my question -- that's not my
2  question. My question is this: Would you lie if a lie would
3  get you out of spending the rest of your life in prison?"
4      Your answer: "Yes, I would."
5      So today now, this is almost a year later. You're saying
6  you would tell the truth?
7      MS. PETALAS: Objection, Your Honor. It's improper
8  impeachment. That's not what he said.
9      THE COURT: Sustained. You can approach it again.
10 BY MR. CARNEY:
11 Q.   "Question: No. That's my question -- that's not my
12 question. My question is this: Would you lie if a lie would
13 get you out of spending the rest of your life in prison?
14     "Answer: Yes, I would.
15     "Question: Of course you would.
16     "Mr. Zucker: One moment. Now" --
17     Do you want me to go on further? Is that what you said?
18     MS. PETALAS: May we approach? Objection.
19     THE COURT: Yes.
20     (Following sidebar discussion had on the record:)
21     MS. PETALAS: The answer that he -- the question that he
22 answered was not the same that he's impeaching him on. And I
23 think it's very specific, even if you look at the entire
24 transcript, because when he said, "Would you lie" -- here today,
25 when he said, "If you -- would you lie here today -- would you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10628

1  lie to get yourself out of the rest of your life in prison," his
2  answer was, "I wouldn't lie here today because that's not going
3  to get me out of prison."
4      And if you look at what -- the entire transcript of what
5  he's impeaching on, the question was: "You wouldn't lie to get
6  out of spending the rest of your life in prison?"
7      And here, the answer first is: "If I lie here today?"
8  And Mr. Zucker then says: "No, that's not my question. That's
9  not my question. My question is in general. My question is
10 would you lie if a lie would get you out?"
11     So clearly, it's improper impeachment because what he
12 answered here was "Lying today will not get me out of jail." And
13 that's clearly not the question that was asked back then because
14 he even clarified back then, "Do you mean if I lie here today?"
15 And Mr. Zucker said, "No, that's not my question."
16     So if he's going to impeach him, at least -- so I think
17 it's improper impeachment because they are two different answers.
18     THE COURT: Well, I think you objected at the point that
19 Mr. Carney was about to read part of the transcript that you just
20 pointed out to me.
21     MS. PETALAS: And my -- what was cut out was before that
22 period. That's my objection. He actually -- he started with:
23 "My question is this: Would you lie?" He left out -- what I'm
24 objecting -- what I say is there -- what I'm pointing to is
25 actually before that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10629

1      So if he would have read further, it doesn't include what
2  I'm talking about, because what I'm talking about is the lead-up
3  to the question, which clarifies that these are two different
4  questions.
5      MR. CARNEY: Your Honor, I read this specifically to him:
6  Would you lie if a lie would get you out of spending the rest of
7  your life in prison?" And he answered, "No." And then I said:
8  "Isn't it true that you testified before that you would do
9  something like that?" That's what I read.
10     And then I went back and I reread all the way down
11 starting here (indicating), down to here (indicating.) And I
12 think it's proper because it was specifically asked the way it
13 was said -- the question asked and his answer then.
14     Now, whether he should have -- whether the government or
15 somebody should have corrected that up here or whether they want
16 to correct it later, this is what I asked.
17     MS. PETALAS: And just -- I'm sorry.
18     THE COURT: I'm going to allow it.
19     (Sidebar discussion concluded.)
20 BY MR. CARNEY:
21 Q.   So again, the question posed to you: "Would you lie if a
22 lie would get you out of spending the rest of your life in
23 prison," generally?
24 A.   Are you asking me, did I say that?
25 Q.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10630

1  A.   Yes.
2  Q.   Now, you also made some promises to Judge Wertheim
3  several years ago regarding a case about getting released for
4  Extended House. Do you remember that, that case with Judge
5  Wertheim?
6  A.   I don't remember the judge, but I went to the Extended
7  House, yes.
8  Q.   And you promised him that you would also do schooling and
9  drug treatment and that kind of thing?
10 A.   Yes.
11 Q.   And within a short period of time after those promises,
12 you escaped from the Extended House; is that right?
13 A.   Yes.
14 Q.   Now, you have two -- at least two prior felony drug --
15 I'm sorry -- felony convictions; is that right?
16 A.   You say what, now, sir?
17 Q.   You have two prior felony convictions, right?
18 A.   Two?
19 Q.   Yes.
20 A.   I think I have more convictions than two.
21 Q.   Can you tell us what your convictions are?
22 A.   The gun -- prior to this, on my charges, I never went to
23 court. I always copped out on my charges, so -- they're my
24 convictions.
25 Q.   You have an escape conviction, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852

1   **A.**   Yes.
2   **Q.**   You have a PWID cocaine; is that right?
3   **A.**   Yes.
4   **Q.**   PWID is possession with intent to distribute cocaine.
5   That's a felony, right?
6   **A.**   Yes.
7   **Q.**   And you also have a possession with intent to distribute
8   marijuana; is that right?
9   **A.**   Yep.
10   **Q.**   You also have a carrying a pistol without a license; is
11   that right?
12   **A.**   Yes.
13   **Q.**   Now, you agree that part of your thinking in doing the
14   plea agreement with the government in this case was that this
15   was a third felony conviction, right?  Third felony means three
16   strikes, you're out?
17   **A.**   Isn't it more like five convictions?
18   **Q.**   Five felonies and you're out?  Okay.
19   If you don't get a 5K Letter, can you do anything about
20   that?
21   **A.**   Nope.
22   **Q.**   And the only person or the only persons that can do
23   anything about a 5K Letter is the government; is that right?
24   **A.**   Yes.
25   **Q.**   And you can't appeal if they say no.  If in their

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

Filed: 07/10/2013    Page 1333 of 1954

1   discretion, they say that's it, there's nothing you can do about
2   it; isn't that true?
3   **A.**   True.
4   **Q.**   So now it's important for you to perform well for the
5   government in this case; is that right?
6   **A.**   It's important for me to tell the truth and nothing but
7   the truth.
8   **Q.**   But if you don't perform well, how does that --
9   **A.**   If I don't tell the truth.
10   **Q.**   Okay.  Now, you talked about Phil shooting himself in the
11   foot.  Do you remember that?
12   **A.**   Yes.
13   **Q.**   And do you recall, you said that that occurred sometime
14   after the incident with Capies, Bobby Capies, and -- I'm
15   sorry -- Munya and Wop; is that right?
16   **A.**   Yes.
17   **Q.**   And you indicated that this occurred in an alleyway; is
18   that right?
19   **A.**   I said I don't remember where it happened at.
20   **Q.**   So you -- so now you don't remember saying just the other
21   day that it occurred in the alleyway with Wop -- I'm sorry --
22   with -- excuse me -- with Phil removing a gun and shooting
23   himself in the foot?
24   **A.**   Sir, to my --
25   **Q.**   Sir, did you say that yesterday or -- yes?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **A.**   Yes.
2   **Q.**   Today you're saying you're not sure where it occurred; is
3   that correct?
4   **A.**   You -- excuse me.  You twisting it up.  That's what
5   you're doing.
6   **Q.**   Okay.  Explain it.
7   **A.**   Because I said Twan walked up on the car and Phil shot
8   himself in the foot.
9   **Q.**   Okay.  And where was Phil?
10   **A.**   I don't know.
11   **Q.**   Was he in a car?
12   **A.**   I said he walked up on the car, if I'm not mistaken.  If
13   I said he was in the alley, that's what I said.
14   **Q.**   Well, my question was:  Was Phil in a car when he shot
15   himself in the foot?
16   **A.**   Yes.  He was in the car with Dominique, his sister.
17   **Q.**   I'm sorry.
18   **A.**   He was in the car with his sister.
19   **Q.**   He was in the car with his sister.  Okay.  And you're
20   certain about that?
21   **A.**   Positive.
22   **Q.**   Did you see this or --
23   **A.**   No, I didn't see it.  That's what I heard.
24   **Q.**   Okay.  So --
25   **A.**   That's what Twan told me and that's what Phil told me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   **Q.**   So both Twan and Phil told you that he was being driven
2   by his sister and he shot himself in the foot?
3   **A.**   No.  Phil was in the driver's side.
4   **Q.**   I see.
5   **A.**   That's what -- and he walked up on the car and Phil
6   was -- Phil said he was trying to make sure -- he was like,
7   "Twan ain't got a gun," and the gun went off.
8   **Q.**   Well, let's go on to the incident with Bobby Capies.
9   Now, you said that there was a plan out there that was
10   overheard by Little John; is that right?
11   **A.**   Yes.
12   **Q.**   And Little John had said he overheard someone saying
13   they're going to try and kill Twan and you; is that right?
14   **A.**   Yes.
15   **Q.**   And you were one of the biggest dealers, one of the
16   biggest runners, whatever you want to call it, down in Congress
17   Park at the time; is that right?
18   **A.**   No.  I was pumping.  I wasn't the biggest dealer, but out
19   amongst the youngins, I was getting some money.
20   **Q.**   Right.  And so there was this plan to get you and Twan
21   and -- let's see -- had you committed any murders to that point?
22   **A.**   Not to my knowledge.
23   **Q.**   Had you done any acts of violence on individuals in
24   Congress Park at that time?
25   **A.**   Acts of violence on people in Congress Park?  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10635*

1    Q.    Okay.  And what were those?

2    A.    Robberies, beatings.

3    Q.    Okay.  Let's do the robberies.  Who did you rob?

4    A.    I robbed Bug Head.  I robbed so many people, I can't get

5    into the specifics of who I robbed and how many people I robbed.

6    Q.    I'm sorry.  What do you mean, you did so many robberies

7    you can't recall?

8    A.    Man, it was so many of them, it was just something we

9    did.

10    Q.    Something you did?

11    A.    Something we did.

12    Q.    And something you did, right?

13    A.    Yes.

14    Q.    And when was the first robbery you did, beginning, I

15    guess, about '94?  Who did you rob?

16    A.    I don't know.

17    Q.    How about '95?  Do you have any recollection of who you

18    robbed?

19    A.    My first charge -- my first charge was armed robbery.  A

20    crackhead owed me some money and I was telling him, "Give me my

21    money."  We was right there on Teka joint.  I was like, "When

22    I'm going to get my money?"  I grabbed his wallet and Doo-Doo

23    walked up and put the gun to him, was like, "Give me that shit,

24    Give me that shit."  I was like, "Man, he owe me money.  What

25    you doin'?"

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10636*

1    And the dude took off running.  And the next thing I

2    know, I got locked up for armed robbery.  And that was my first

3    charge.

4    Q.    If I understand you correctly, you had fronted a

5    crackhead some drugs to sell or something?

6    A.    No, I fronted him some crack so he could pay me in the

7    morning.

8    Q.    I see.

9    A.    He said in the morning, he was going to go to the bank,

10    pay me my money.  That didn't happen.

11    Q.    Is that something that was your experience on being

12    fronted, if you didn't pay back money, someone might do that?

13    A.    Do what?

14    Q.    Go and say, "Pay me my money," and if they don't, then

15    something would happen, they'd get robbed or whatever?

16    A.    Different strokes for different folks.

17    Q.    So there were people that did front people and they would

18    have a penchant -- a reason to go and collect it, using a gun or

19    something?

20    A.    Naw, not if you fronted somebody some coke, you ain't

21    bringing your gun to get your money.  You just coming to get

22    your money.

23    Q.    How about other individuals?  Let's say someone like Troy

24    Lewis.  Do you remember Troy Lewis?

25    A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10637*

1    Q.    And is that what he did?  He'd go and confront people

2    about being owed money?

3    A.    The only incident I remember, like prior to Troy getting

4    killed, was when he shot at Wop foot in the alley and said,

5    "Give that to your man," and pulled off.

6    Q.    And were you present at another incident where this

7    happened with a guy named Smoke?  Do you know somebody named

8    Smoke?

9    A.    Yeah, I know Smoke.

10    Q.    His name is William Truesdale?

11    A.    I don't know his real name.

12    Q.    But Smoke, you know who he is, right?

13    A.    Yes.

14    Q.    He was a friend of Truck's; is that right?

15    A.    Smoke?

16    Q.    Right.

17    A.    Was a friend of Truck's?  I mean, Smoke was a friend of

18    everybody's.

19    Q.    Right.  Well, anyway, did you witness an event where

20    Smoke was shot at by Troy Lewis fronting something?

21    A.    Naw, I don't remember that.  The only incident I remember

22    with Smoke shooting was when he shot at Twan in The Circle with

23    the AK.

24    Q.    Okay.  Well, are you sure it was Wop that was shot at, at

25    his foot and not somebody else?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10638*

1    A.    Listen, they was sitting in the car in the alley.  And

2    they said, "We was sitting in the car, Troy pulled up, shot at

3    the ground and said, 'Give that to your man'."  He pulled off.

4    And then right after that, Troy got killed.

5    Q.    I see.  Well, back to where we were with Little John and

6    you -- let's finish the robberies.  You -- '94, '95, you're

7    doing robberies every other day?

8    A.    I can't say every other day or -- like it just happened.

9    Q.    It just happened.  How about maybe twice a week?

10    A.    I just said I don't know.  Like it just would happen.

11    Q.    Just a lot.  And would you always go to Congress Park to

12    do the robberies during this time period or would you do it

13    elsewhere?

14    A.    Naw, we did it outside the hood.

15    Q.    When you did it outside of the neighborhood, that was for

16    your own personal gain, right?

17    A.    Personal?  Whoever was in the car benefited.  And when

18    you got back, niggas used to be like, "Get me."  "Oh, you guys

19    in the mood?"  "Get me, get me, get me."

20    Q.    What does that mean?

21    A.    Break everybody off; break me off of whoever you robbed.

22    Q.    And when you did the robberies in other neighborhoods,

23    how did you select people?

24    A.    I mean, it wasn't no really select like.  We be riding

25    and see him or -- look like he had some money, jump out on him.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10639

1 Or sometimes we might be at a store and somebody might just pull
2 out some money and we rob him right there in the store.
3    Q.    So you just actually went in the stores and robbed; is
4 that right?
5    A.    People, not stores.
6    Q.    Okay.  But you went in the store and robbed somebody in a
7 store; is that right?
8    A.    Yes.
9    Q.    And how often did that happen?
10    A.    I was just giving you events.  I don't know how often it
11 happened.
12    Q.    I'm asking just about you and your memory.
13    A.    I don't know.  I don't know how often it happened, but it
14 happened.
15    Q.    Can you at least give us a ballpark range?  Five?  Ten
16 times?  20?
17         Just so many you can't remember; is that correct?
18    A.    Let me see.  Stores, robbing people in stores.  I can't
19 give you a number on that.  I can't give you a number.  I
20 don't have a number.
21    Q.    Just going back one last time to the shooting at Wop.
22 Were you there when this happened?
23    A.    No.
24    Q.    This was just some little gossip that you heard about in
25 the neighborhood?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10640

1    A.    Yeah.  Actually, I heard out of Wop mouth.
2    Q.    So --
3    A.    He was telling Twan.
4    Q.    So is there -- between the time period between '94 to
5 when you were locked up 2002, there were a lot of conversations
6 and gossip, right?
7    A.    Yes, we had a lot of conversations.
8    Q.    Right.  And a lot of times, these conversations were
9 speculation?
10    A.    Wasn't no speculation.  It was true facts.
11    Q.    Were you present at all these events that were discussed?
12    A.    We all hung together, so we sit around Moms' back or on
13 the block, talking about various events.
14    Q.    Right.  But you weren't present at all of these events;
15 is that right?
16    A.    Naw, I wasn't present at all of the events because we all
17 didn't ride out at the same time.
18    Q.    Right.  So you would talk about these events and you
19 would throw in your two cents about what you thought, right?
20    A.    Yeah, I throw in my two cents.
21    Q.    So --
22    A.    I was with it.
23    Q.    So when you were talking about this incident in the
24 alleyway where Tommy Edelin is discussed -- do you remember that
25 conversation that you testified to yesterday?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10641

1    A.    When they burnt the picture and stuff and was stepping on
2 the CDs?
3    Q.    Did you ever tell the grand jury about that burning of
4 Tommy Edelin's picture in the alleyway?
5    A.    Naw.
6    Q.    Is that something you just came up with yesterday?
7    A.    Naw, that's something that was in my memory.  You know
8 how I remember?  Because I was messing with Tanya Coleman and I
9 went over her mother house I went over there to fuck her and she
10 had the picture in the joint, and I was like, "What you got this
11 picture for?"  She was like, "Oh, he tryin to holla at me.  I
12 was at the studio with my brother and them."
13         She was like -- she was at the studio with her brother
14 and them and that when she met him, and he tried to holler at
15 her and he gave her the picture with his number on it.
16    Q.    I see.  And so you brought this picture with you down to
17 the alleyway?
18    A.    I took it from her.
19    Q.    Okay.  And you brought it down the alleyway and you all
20 stood around and you said, "Let's set this on fire."  Is that
21 what happened?
22    A.    I was with it.  Yes, I was with it.
23    Q.    Right.  And did you ever tell the grand jury in 2002
24 about this?
25    A.    No, I don't think I did.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10642

1    Q.    Did you ever tell the grand jury in 2005 about this
2 burning of Tommy Edelin in effigy?
3    A.    No, I didn't.
4    Q.    When was the first time you mentioned this to the
5 government, that you can recall?
6    A.    It popped in my -- it popped up right here.
7    Q.    Just right there on the stand, it just came up, right?
8 Is that right?
9    A.    Yes, sir.
10    Q.    And you've had at least 20 interviews, haven't you, with
11 law enforcement and that?
12    A.    Yes.
13    Q.    Never told them about that incident?
14    A.    It didn't never come into play.
15    Q.    Now, I got sidetracked.  We're dealing with this incident
16 with Capies and -- I'm sorry -- Munya and you said Phil was in
17 the apartment and also Wop; is that right?
18         Do you remember that discussion?
19    A.    Yes.
20    Q.    Okay.  You indicated that you were one of the targets of
21 this plan to kill somebody, right?
22    A.    You said what now?
23    Q.    You were a target, both you and Twan; is that right?
24    A.    That's what Twan told me.
25    Q.    So you were quite concerned about that, weren't you?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10643

1   **A.**   Yes, I was.

2   **Q.**   Right.  And what actions did you do, separate and apart

3   from Twan -- did you take to protect yourself?

4   **A.**   Say that -- I didn't do nothing.

5   **Q.**   So someone, you believe, is trying to kill you and you

6   don't do anything; is that right?

7   **A.**   Because Twan had it.

8   **Q.**   So you turned it over and said, "Let Twan handle it"; is

9   that right?

10   **A.**   He said he got that.

11   **Q.**   Okay.

12   "Shorty, be cool.  I got this.  Do what you do.  Just do

13   the same thing you been doing."

14   **Q.**   This incident -- do you remember what time of day it

15   occurred?

16   **A.**   When he slapped Munya in the mouth?

17   **Q.**   Right.

18   **A.**   It was at night.

19   **Q.**   It was at nighttime; is that right?

20   **A.**   Yes.

21   **Q.**   Was it early evening or late evening?

22   **A.**   It was late.  I was going home.

23   **Q.**   Well, you weren't exactly going home.  You were

24   going to get Domo out of the apartment, weren't you?

25   **A.**   My destination was home.  My destination was to get Domo,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10644

1   get him out of the house, and me and Domo went back to my house.

2   **Q.**   Okay.  And you go into the apartment and you saw Wop

3   there; is that right?

4   **A.**   Yes.

5   **Q.**   And you saw Munya there?

6   **A.**   Yes.

7   **Q.**   And you saw Phil there?

8   **A.**   Yes.

9   **Q.**   Did you talk to either one of them?

10   **A.**   Yeah, we chopped.  I hit the blunt and everything.  I

11   helped him with the game.

12   **Q.**   Okay.  You then state that you left the apartment.  Did

13   Domo go with you or before you?

14   **A.**   I think Domo left out before me, if I'm not mistaken.

15   She left out before me because she was sitting in my car.

16   **Q.**   And you didn't go up to the apartment with Twan?

17   **A.**   No.

18   **Q.**   Okay.  And you stated that the next day after this

19   occurred, Twan, Antwuan, took you over to the building where

20   this occurred; is that right?

21   **A.**   Yes.

22   **Q.**   And you indicated that he wanted to show you exactly

23   where Wop jumped from the building and landed on the ground,

24   right?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10645

1   **Q.**   And he showed you the knee prints in the ground?

2   **A.**   Yes.

3   **Q.**   And this is a three-story building, right?

4   **A.**   Right.

5   **Q.**   And there's what, between 12 to 15 feet per story?

6   **A.**   I don't know how many feet, but that's what the man said.

7   He said the man jumped out the window and he was laughing about

8   how he jumped out the window.

9   **Q.**   And we're talking about between -- let's say it's 12 to

10   15 feet per story; this is like a 60-foot drop; is that right?

11   **A.**   I don't know how the drop is.  I don't know.  Let me tell

12   you like this:  I don't know if he jumped out the window.

13   That's what Twan told me.

14   THE COURT:  We reached the mid-morning break.  Did you

15   want to complete this with a few more questions?

16   MR. CARNEY:  This is fine, Your Honor.

17   THE COURT:  Ladies and gentlemen, we are going to take our

18   mid-morning break.  Please remember not to talk about the case.

19   Take your notes back in the jury room and we'll see you back at

20   11:05.  Enjoy your break.

21   (Jury out at 10:51 a.m.)

22   THE COURT:  You may take a break.  Please be back in your

23   seat at 11:05.

24   (Thereupon, a break was had from 10:52 a.m. until

25   11:09 a.m.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10646

1   (Jury in at 11:09 a.m.)

2   THE COURT:  Good morning again, ladies and gentlemen.

3   THE JURY PANEL:  Good morning.

4   THE COURT:  Welcome back.  We're ready to resume.

5   BY MR. CARNEY:

6   THE COURT:  Mr. Carney.

7   BY MR. CARNEY:

8   **Q.**   Mr. Kelliebrew, are you ready?

9   **A.**   Yes.

10   **Q.**   Mr. Kelliebrew, yesterday you were constantly taking off

11   your shirt and putting it back on.  You had a T-shirt on and

12   then you put on another shirt.  Just a few moments ago now, you

13   put on a jacket, why are you doing that?

14   **A.**   Hot flashes, nervousness.

15   **Q.**   I see you're having hot flashes, and what is that from?

16   **A.**   Being nervous.

17   **Q.**   I'm making you nervous, or is something else going on

18   here?

19   **A.**   No, I'm nervous in general.  That is my family right

20   there, them were my friends.  How would you feel?

21   **Q.**   I see.  So it's nothing else; is that right?

22   **A.**   No.

23   **Q.**   We were talking about jumping from the third story

24   building by Wop, and you were taken to see the knee prints, and

25   you did see Wop a couple days later; is that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10655**

1  **A.**   Yes.

2  **Q.**   And did you ever go after just individuals that weren't

3  drug dealers?

4  **A.**   Never.

5  **Q.**   Never.  Okay.  Now going to the Troy Lewis -- I just have

6  one last question on Sherri.  Did Troy Lewis have a baby by

7  Sherri?

8  **A.**   Little Troy.

9  **Q.**   And was there friction about that between Troy and Munya?

10         MS. PETALAS:  Objection, Your Honor, outside of the scope,

11  basis of knowledge.

12         THE COURT:  Sustained.

13  BY MR. CARNEY:

14  **Q.**   Again, going back to Troy Lewis.  Troy Lewis, would

15  you -- if the government could pull up, I believe it's 500.2.

16         MR. CARNEY:  Your Honor, it's been admitted.  I ask that

17  it be published.  It's 500.2.

18         THE COURT:  It's in evidence?

19         MR. CARNEY:  Yes, Your Honor.

20  BY MR. CARNEY:

21  **Q.**   Do you recognize that picture?  Do you recognize that

22  person?

23  **A.**   It's Troy.

24  **Q.**   Thank you.  Now, this individual, Troy Lewis, you stated

25  that you did not actually observe him being killed; is that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10656**

1  right?

2  **A.**   No, sir.

3  **Q.**   Where were you -- well, you also stated that you came to

4  the scene where he was killed after he had already been shot; is

5  that right?

6  **A.**   Yes.

7  **Q.**   Okay.  And where were you before that event, before he

8  was shot?

9  **A.**   I was walking around the way.

10  **Q.**   You were in that direction?

11  **A.**   I said "I was walking around the way."

12  **Q.**   Okay.

13  **A.**   Walking around Congress Park.

14  **Q.**   Okay.  And in that general vicinity, had you just gone

15  somewhere?

16  **A.**   Just gone somewhere?

17  **Q.**   Yeah, if you're walking that way or around that way,

18  where were you before you were walking around?

19  **A.**   I can't remember where I was at.  I know everybody was --

20  everybody was still standing at the Lincoln.

21  **Q.**   Had you gone to the Boat Alley?

22  **A.**   I can't remember if I went to the Boat Alley, sir.  I was

23  walking around.

24  **Q.**   Did you -- were you using PCP that night?

25  **A.**   I don't know if I was wet or not.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10657**

1  **Q.**   But more than likely, because you were using it every

2  day; is that right?

3  **A.**   I might have been high.

4  **Q.**   Okay.  And you indicated that you went over to where this

5  happened.  And exactly what street was this on?

6  **A.**   Congress Street.

7  **Q.**   Okay.  And you walk up on this place where the van is,

8  right?

9  **A.**   I didn't walk up on it.

10  **Q.**   Why don't you walk us through -- you're walking around,

11  you said you heard shots.

12  **A.**   I heard shots.

13  **Q.**   Then what?

14  **A.**   Next thing I know, I was just -- walking around and they

15  was saying Troy was dead, right there.  He was sitting in the

16  van.

17  **Q.**   Who told you that that --

18  **A.**   That was just word in the hood.

19  **Q.**   I'm sorry, that's --

20  **A.**   It was word in the hood.

21  **Q.**   So just people were saying that, that he was shot.  You

22  don't know who in particular?

23  **A.**   I didn't know in particular who shot him right there.

24  **Q.**   No, I'm saying you don't know who told you, in

25  particular, who shot him?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**10658**

1  **A.**   No.

2  **Q.**   Okay.  So you walk up on this area where Troy Lewis is

3  dead, right?

4  **A.**   Yes.

5  **Q.**   Okay.  Who else was out there that you saw, and that you

6  remember?

7  **A.**   I can't remember who all was out there that day, but the

8  fellows was standing in the Lincoln.

9  **Q.**   So you don't recall a single individual that was there

10  when you arrived -- that was there; is that right?

11  **A.**   Naw, I can't remember all who was right there.

12  **Q.**   Was there a crowd of people there?

13  **A.**   Yes.

14  **Q.**   Were the police there when you arrived?

15  **A.**   Yes.

16  **Q.**   Okay.  And you indicated that --

17  **A.**   Everybody was outside when Troy got killed.

18  **Q.**   When you say "everybody was outside" -- you just said

19  that you don't remember who was out there; is that right?

20  **A.**   I said I don't remember specifically who was standing in

21  the Lincoln, remember that?

22  **Q.**   All right.  I remember that.

23         Now, where were the people around the car, and who were

24  they?

25  **A.**   Police.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10659*

1    Q.   Okay. People from Congress Park, who was there?

2    A.   I can't remember who was all standing at the Lincoln,

3 right there.

4    Q.   Okay. So you say everybody out there, but you don't

5 recall specific names?

6    A.   Yes, sir.

7    Q.   All right. Now, you also indicated that this occurred in

8 broad daylight; is that right?

9    A.   Yes, sir.

10    Q.   Okay. And you stated that -- by the way, was there snow

11 on the ground, do you remember?

12    A.   Naw, wasn't no snow on the ground.

13    Q.   Okay. And do you recall what year this was?

14    A.   I can't recall what year this was.

15    Q.   Would you disagree with '96?

16    A.   I can't recall what year it was.

17    Q.   Okay. How old were you?

18    A.   I can't remember how old I was when Troy got killed.

19    Q.   Okay. Now, you indicated walking in broad daylight, and

20 then you saw the police arrive while you were there, or they

21 were already there?

22    A.   When I got there, they was opening the door and his brain

23 was falling out.

24    Q.   Let me stop you there.

25     They were opening the door, and then you saw Troy; is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10660*

1 that right?

2    A.   No, this is exactly where I was coming from, sir. I was

3 coming from this way, right there. Troy was -- (Indicating.)

4    Q.   Your Honor, could we have the exhibit number that he's

5 pointing to?

6     MR. ZUCKER: And the mic, please.

7     MR. CARNEY: I'm sorry, Your Honor, can I approach? Your

8 Honor, this is Government's Exhibit 122.3.

9 BY MR. CARNEY:

10    Q.   I'm not sure what a good position would be to put this

11 in, but -- okay, so, show us where you were.

12    A.   (Indicating.)

13    Q.   You're pointing to?

14    A.   Because you couldn't come down there. You couldn't come

15 down there, when they opened up Troy's joint --

16    Q.   Okay. You're pointing down to -- what street is this?

17    A.   Congress.

18    Q.   Okay. And which direction were you headed on, in this

19 photograph?

20    A.   I was coming on Congress.

21    Q.   Okay.

22     MR. ZUCKER: Your Honor, I would ask --

23     THE COURT: Let me ask you to get the portable microphone

24 and share it.

25 BY MR. CARNEY:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10661*

1    Q.   Tell us where -- what street you were coming off or where

2 you were coming off on Congress?

3    A.   I was coming out this small alley right here onto

4 Congress. You couldn't get down there.

5    Q.   Okay. Now, let me stop you there.

6     When you say you couldn't get there, was the street

7 blocked off by the police?

8    A.   The police was at his truck. I stopped right there.

9 (Indicating.)

10    Q.   Okay. I'm asking you now --

11    A.   I can't remember if the street was blocked off or not,

12 but I stopped right there, where the police was at his truck.

13    Q.   So you're pointing where the red vehicle is on

14 Government's Exhibit 122.3, lower right-hand corner, and you

15 stopped about there, where the red car is?

16    A.   I came out, bam, stopped, and they were over at Troy's

17 joint.

18    Q.   And you walked over towards where the van was; is that

19 correct?

20    A.   No siree.

21    Q.   Okay. What'd you do?

22    A.   I stopped.

23    Q.   Okay. And then you say at that point, you were able to

24 see the police open the car doors; is that right?

25    A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10662*

1    Q.   And so the door was open; is that right?

2    A.   The police opened the door.

3    Q.   Okay. The police opened the door. Then the police

4 opened the door. You can see this, right?

5    A.   Yes.

6    Q.   It's daylight. And then the body of Troy Lewis falls

7 out, right?

8    A.   Yep, Sherri came down the street, "Y'all mothafuckas

9 killed my baby father."

10    Q.   I'm sorry?

11    A.   That's when Sherri came outside and said "y'all

12 mothafuckas killed my baby's father."

13    Q.   So Sherri was present?

14    A.   She came outside screaming.

15    Q.   So you recall at least Sherri being present, right?

16    A.   Yeah. I remember -- yeah.

17    Q.   Okay. And then tell us how Troy Lewis appeared to you?

18    A.   Dead.

19    Q.   Well, that's good. But how did he look as far as the

20 shots and that kind of thing?

21    A.   He was dead. What you -- how you -- I don't get what

22 you're trying to say.

23    Q.   Describe how he looked.

24    A.   Dead.

25     MR. CARNEY: Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10663

BY MR. CARNEY:

1    **Q.** And referring to November 22nd, Grand Jury, page 13, line
2    18.
3    "Answer: After the shots and all that, I walked around
4    the front part, and they was opening up Troy's door"; is that
5    correct?
6    **A.** Yes.
7    **Q.** "And when they opened up the door," correct, you said
8    that?
9    **A.** Yes.
10    **Q.** "His brains fell out and his gun fell out in his left
11    hand" do you remember testifying to that?
12    **A.** Yes.
13    **Q.** And that's what you saw, right?
14    **A.** Yes.
15    **Q.** Not just that he was dead, you saw actually him slumping
16    out, his brains coming out and a gun on the ground and you said
17    it came out of his left hand.
18    Do you remember testifying to that?
19    **A.** Yes.
20    **Q.** Okay. You're absolutely certain?
21    **A.** Yes, sir.
22    **Q.** Okay.
23    MR. CARNEY: Court's indulgence.
24    BY MR. CARNEY:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10664

1    And you said that after -- what did you do after you saw
2    this?
3    **A.** If I'm not mistaken, me and Boy-Boy was together after
4    that.
5    **Q.** And so you and Boy-Boy -- Boy-Boy is now out there; is
6    that right?
7    **A.** I said -- if I'm not mistaken, I think me and Boy-Boy was
8    together after that.
9    **Q.** So now you recall that Sherri was out there, Boy-Boy was
10    out there, and do you remember standing next to anyone else?
11    **A.** I didn't say I was standing next to Sherri or none of
12    that. You just said that.
13    **Q.** Was Cool Wop out there?
14    **A.** Like I said just a few minutes ago, I can't remember who
15    was out there, sir.
16    **Q.** Well, you seem to have a memory coming back, so I just
17    want to go through a few names. Was Dazz there?
18    **A.** Look, sir, I can't remember, okay?
19    **Q.** Okay.
20    **A.** Thank you.
21    **Q.** But Twan wasn't there, that's for certain?
22    **A.** No.
23    **Q.** Okay. Now, you indicated that you stood there a little
24    bit and then what'd you do?
25    **A.** What you mean?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10665

1    **Q.** What'd you do after the police came? Troy's taken out,
2    what did you do next?
3    **A.** I said if I'm not mistaken, I was with Boy-Boy.
4    **Q.** What did you do after you were with Boy-Boy?
5    **A.** I can't remember all that.
6    **Q.** So, you can't remember where you went after that? You
7    can't remember what time you left; is that right?
8    **A.** Yes, sir.
9    **Q.** And were you there after the car was removed?
10    **A.** No, sir.
11    **Q.** Were you there after the body was removed?
12    **A.** No, sir.
13    **Q.** The body was removed before you left or after you left?
14    **A.** After I left.
15    **Q.** Did you see the ambulance come?
16    **A.** Naw, I wasn't there.
17    **Q.** Okay. You stated that about two to three weeks later,
18    you come into the alleyway, and the guys are out there, right?
19    **A.** Yes, sir.
20    **Q.** And they're playing knuckles; is that right?
21    **A.** No. Me and Fat Tony was playing knuckles.
22    **Q.** I'm sorry, you and Fat Tony were playing knuckles.
23    And you indicated that Antwuan comes in the alleyway; is
24    that right?
25    **A.** They was already down there. I was walking up on them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10666

1    **Q.** So you weren't playing, you were going to play knuckles,
2    is that it?
3    **A.** Do you want me to break it down?
4    **Q.** Would you please.
5    **A.** Okay. When I walked down the alley, I walked up on Twan
6    telling everybody about how he killed Troy, and he stopped.
7    **Q.** Let me stop you.
8    You said "everybody." So, who do you remember was out
9    there?
10    **A.** Wop, Truck, if I'm not mistaken, Head, Dazz. If I'm not
11    mistaken, it was -- Geeka was down there, Fat Tony. Who else?
12    **Q.** Okay. So, this is two or three weeks later, these guys
13    are out in the alleyway, they're playing card games, and then
14    Antwuan gets up there, or you see him there and he explains how
15    this happened; is that right?
16    **A.** I walked up on them, and they stopped talking. And he
17    was like naw, that's my little cousin, that's my little cousin.
18    And then he continued on with the story.
19    **Q.** Okay. Tell us again what he said to you.
20    **A.** He put two through the windshield and went to the other
21    side.
22    **Q.** Okay. For the record, let's state that -- let me borrow
23    something.
24    Why don't we use this here? Why don't we just imagine
25    that this exhibit is the car window. So he explained to you how

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10667*

1 he used a car window; is that right, put the gun through a car
2 window?
3 **A.** Yeah, that's what he was bragging about.
4 **Q.** Talk into the microphone.
5 **A.** That's what he was bragging about.
6 **Q.** Right. And he showed you how he did it, right?
7 **A.** Yes, sir.
8 **Q.** Why don't you show us how he did it.
9 **A.** (Indicating).
10 **Q.** He put it right through the window; is that right?
11 **A.** He was saying how the glass dropped out of his hand, he
12 wore him out.
13 **Q.** So when he put his hand through the window, the glass
14 broke; is that right?
15 **A.** Yes.
16 **Q.** And then he put the gun up to Troy's head?
17 **A.** He was shooting, that's how the window broke.
18 **Q.** No, tell us what --
19 **A.** He was -- that's what he said, he came, put two
20 in the windshield, put his hand through the window and finished
21 him.
22 **Q.** Right. And he shot him where?
23 **A.** I don't know. That's --
24 **Q.** Did you testify the other day that he shot him in the
25 head?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10668*

1 **A.** That's from -- when the police opened the door, that's
2 what Troy did, like this, and blood and shit came out and shit.
3 (Indicating).
4 **Q.** Did you not testify in the Grand Jury that he was shot in
5 the head, shot in the mouth. That's what Antwuan said to you,
6 right?
7 **A.** Yes, if it's in my transcript, that's what I said, sir.
8 **Q.** Okay. "Answer: We're playing knuckles and we're
9 explaining how he" -- I'm sorry, this is Grand Jury, November
10 22nd, 2005, page 15.
11 "We're playing knuckles and Twan is explaining how, how
12 he killed Troy."
13 MS. PETALAS: Your Honor, I object. I don't understand.
14 THE COURT: Beg your pardon?
15 MS. PETALAS: If this is impeachment, I don't understand
16 the impeachment.
17 MR. CARNEY: His answer was --
18 THE COURT: Come on up.
19 (Following sidebar discussion had on the record:)
20 MR. CARNEY: I'm sorry, Your Honor, what his answer was
21 that's what it says Grand Jury transcript, then that's what it
22 is, but he doesn't know --
23 THE COURT: Lower your voice.
24 MR. CARNEY: I'm sorry. He doesn't know what's in the
25 Grand Jury transcript. He hasn't answered "yeah, this is what I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10669*

1 said." So I can -- if the issue is refreshing recollection to
2 get him to say that, I can do it that way, but I think since he
3 doesn't read it, it just makes more sense to read it this way
4 since it's a brief portion.
5 MS. PETALAS: I just didn't understand that he had said
6 that, so that's why I didn't understand.
7 THE COURT: I'll allow it.
8 (Sidebar discussion concluded.)
9 BY MR. CARNEY:
10 **Q.** So I'll finish up with the answer.
11 "He walked around to the driver's side and shot once and
12 stuck his whole hand in the window and he was, like, how glass
13 fell in his hand and busted in his face and how he emptied the
14 clip in his face and mouth, right?"
15 **A.** Yes, sir.
16 **Q.** That's what you told the Grand Jury Mr. Ball told you --
17 **A.** Yes, sir.
18 **Q.** -- two or three weeks later, right?
19 **A.** Yes, sir.
20 **Q.** Now, when you talk about the individuals that were there,
21 you said Truck was one of them, correct?
22 **A.** If I'm not mistaken, Truck was back there. If some
23 people wasn't back there that I named, then --
24 **Q.** Well, you testified both in the Grand Jury -- that Truck
25 was there yesterday, today, and if we can go back to -- you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10670*

1 talked about how PCP makes you see dead people; is that right?
2 **A.** Yes.
3 **Q.** Truck was dead three days after Troy Lewis was killed;
4 isn't that correct?
5 **A.** You say what now?
6 **Q.** Truck was killed three days after Troy Lewis was killed.
7 Is this one of your situations where you're hallucinating?
8 **A.** Like I just said to you, sir, if I named some names that
9 was back there, we all used to just hang together, pow-wow
10 together. We all sat and conversate various occasions together.
11 So if somebody wasn't there and he wasn't there and this and
12 that, then that's just what we did all the time, and various
13 groups with various peoples.
14 **Q.** In other words, you're testifying on many incidents where
15 you're uncertain and just running your mouth; is that right?
16 **A.** No, sir.
17 **Q.** You just testified earlier that Truck was there and he
18 wasn't.
19 **A.** Okay. If he wasn't there, then that's my mistake. What,
20 you want to ask me, did that occur? Yes, that did.
21 **Q.** Sir, I would like you to help me do just a little chart
22 of various dates that you've had something significant. You
23 agree that the Government's Exhibits -- February 1, 2005, you
24 testified before the Grand Jury; is that right?
25 **A.** Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10675

1  actually beginning, I guess, right before your plea agreement,
2  that you started having a number of debriefings and meetings
3  with the U.S. Attorney's Office and FBI?
4  **A.**    You say when?  After August 25th, '04?
5  **Q.**    Right, how many meetings do you recall?
6  **A.**    I can't recall.
7  **Q.**    Let's see, did you meet with them on July 21st, 2004?
8  **A.**    July when?
9  **Q.**    July 21st, 2004, did you meet with them?
10  **A.**    I guess I did.
11  **Q.**    But you can't remember.
12  **A.**    I don't remember every date.  If I did -- if it's on
13  paperwork, yes, I did meet with them.
14  **Q.**    August 10th, 2004.
15  **A.**    Yes, I did.
16  **Q.**    August 17th, 2004?
17  **A.**    If I did, yes, I did.
18  **Q.**    August 23rd, 2004.
19  **A.**    If you have it on record, that's what I did.
20  **Q.**    August 25th, 2004.  Do you remember?
21  **A.**    Yes -- if you.
22  **Q.**    I'm asking if you recall?
23  **A.**    If you have it on paperwork that I met with the FBI and
24  the prosecutors, then yes, I did.
25  **Q.**    January 19th, 2005.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10676

1  **A.**    What?
2  **Q.**    January 19th, 2005.
3  **A.**    Yeah.
4  **Q.**    Right before your Grand Jury testimony in February,
5  correct?
6  **A.**    Yes.
7  **Q.**    January 21st, 2005.
8  **A.**    January what?
9  **Q.**    January 21st, 2005?
10  **A.**    Yes.
11  **Q.**    How many other meetings --
12  **A.**    I don't know.
13        MR. CARNEY:  Let me ask you if I can have this marked as
14  Defense Exhibit 74.
15        (Defendant's Exhibit 74 marked.)
16        MR. CARNEY:  Your Honor, may I approach the witness?
17        THE COURT:  Yes.
18  BY MR. CARNEY:
19  **Q.**    I'm showing you what's been marked as Defense Exhibit
20  Number 74 and I'll ask if you can just read the paragraph here
21  and if that refreshes your --
22  **A.**    I'm not going to read it.
23  **A.**    I apologize.
24  **A.**    Can you read it for me?
25  **Q.**    If you want the husher on, Your Honor?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10677

1        THE COURT: Any objection?
2        MS. PETALAS:  Your Honor, at this point I think he agreed
3  to the dates.  I think we can stipulate to the dates.
4        MR. CARNEY:  Thank you, Your Honor.
5  BY MR. CARNEY:
6  **Q.**    The government has agreed to stipulate that those dates I
7  read, July 21st, 2004, August 2nd, 2004, August 10th, 2004,
8  August 17th, 2004, August 23rd, 2004, August 25th, 2004, January
9  19th, 2005, January 21st, 2005, you had meetings with law
10  enforcement or FBI or U.S. Attorney's Office, okay?
11  **A.**    Okay.
12  **Q.**    Okay.  If we -- I'm not going to do this, but if we went
13  through each one of these dates, you would not be able to say
14  who was present, correct?
15  **A.**    Same people.
16  **Q.**    Always the same people?
17  **A.**    If somebody came in different, then they identified
18  themselves as somebody different, but --
19  **Q.**    But you can't recall?
20  **A.**    I can't recall every single time, was it the same -- was
21  it somebody else that popped in, was it another officer that
22  popped in.  Come on now, you have Baby Kai talking.  Everybody
23  wanted to hear what I had to say.
24  **Q.**    And it would be fair to say you could not recall
25  everything that you said at each of these meetings; is that

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10678

1  right?
2  **A.**    No.
3  **Q.**    Is that correct?
4  **A.**    You say what now?
5  **Q.**    Is it fair to say that at each one of these meetings that
6  you had with law enforcement or FBI, you could not recall the
7  exact subject matter of the discussion?  For example, July 21st
8  2004, what did you talk about?
9  **A.**    I can't remember exactly what we was talking about.
10  **Q.**    My question now to you is:  On each one of these dates
11  that we mentioned to you, you cannot exactly recall what was
12  said, who was present in each of these meetings; is that right?
13  **A.**    Right, sir.
14  **Q.**    Okay.  And these events and these conversations took
15  place just recently, within the last three or four years, right?
16  **A.**    Yes, sir.
17  **Q.**    And you've been testifying about events that go back 10,
18  15 years; is that right?
19  **A.**    Yes, sir.
20  **Q.**    Now, you stated that in your Grand Jury testimony on
21  November 27th, 2002, you weren't fully forthcoming with the
22  Grand Jury and you lied to them, right?
23  **A.**    When?
24  **Q.**    On November 27th, 2002, you went in the Grand Jury, you
25  lied about the gun, you withheld -- that's my question, you lied

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*10679*

1  to them, right?

2  **A.**  Yes.

3  **Q.**  You said that you did not tell them about other people

4  that you've testified about, relating to the Jamel Sills murder,

5  because you didn't want to get them involved; is that right?

6  **A.**  Yes.

7  **Q.**  Didn't you, in that Grand Jury, tell them about JT?

8  Wasn't that one of the persons that you talked about?

9  **A.**  What, that I went over to his house.

10  **Q.**  You mentioned JT, right?

11  **A.**  Yes.

12  **Q.**  So, the questions were posed to you in the Grand Jury

13  that you could answer questions about other people, right?  And

14  you did.

15  **A.**  I don't understand what you're saying.

16  **Q.**  Well, your testimony was that you didn't talk about

17  anybody but Dom?

18  **A.**  Right.

19  **Q.**  And I'm giving you a question.

20  Didn't you talk about JT in that Grand Jury?

21  **A.**  I said I went over to his house, that's not talking about

22  him.

23  **Q.**  So you talked about JT, you mentioned him, right?

24  **A.**  Yes.

25  **Q.**  So in answering your questions to the Grand Jury, you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10680*

1  could have been more forthcoming about people relating to the

2  subject matter of that homicide, right?

3  **A.**  Yes.

4  **Q.**  And you weren't?

5  **A.**  I wasn't.

6  **Q.**  You stated that the reason you did this was because you

7  sort of wanted -- it was your beef, nobody else's, right?

8  **A.**  Right.

9  **Q.**  Okay.  Now, if you go all the way up to 2005, you stated

10  at that point, you were being truthful to the Grand Jury telling

11  them everything that you knew about people related to Congress

12  Park; is that right?

13  **A.**  To my best of memories.

14  **Q.**  To the best of your memory.

15  And at times you were asked questions about Antwuan Ball

16  dealing with -- for example, Sills, correct, Black?  You were

17  asked about Antwuan Ball and anything you knew about him and

18  Sills, right?  That's one of the topics in the Grand Jury,

19  right?

20  **A.**  Yes, sir, I guess.

21  **Q.**  You did not talk about the conversations that you had in

22  2005 with Mr. Ball relating to meeting in the alleyway with your

23  mother, going to talk to him about this event, did you?

24  MS. PETALAS:  Your Honor, I apologize, I'm just looking

25  for a line and page number where he's asked about this.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10681*

1  MR. CARNEY:  Your Honor, to do this, I need to approach

2  the bench.

3  THE COURT:  All right.

4  (Following sidebar discussion had on the record:)

5  MR. CARNEY:  Your Honor, there's only two ways I can do

6  this.  I can either recess and have him read his entire Grand

7  Jury transcript, where he does not mention these conversations in

8  response to any questions related to Sills, or I could ask the

9  government to stipulate that he did not testify in the Grand Jury

10  about these conversations, in which case, I would ask for a

11  recess to read -- go through and read each page where he didn't

12  say it.  That's why I can't cite a line.  He didn't talk about

13  it, when he had several opportunities.  So I don't know how else

14  to do it.

15  MS. PETALAS:  Your Honor, my only problem with that is

16  that I don't know -- I don't see any place in the Grand Jury

17  where he was actually asked about Antwuan Ball and Jamel Sills.

18  In fact, there's a place in the Grand Jury where we say "you've

19  already been asked about that murder, so we're not going to go

20  into too much detail here."

21  That is my problem.  I don't believe this is the place --

22  I would just ask him for a reference in the Grand Jury where he

23  is asked, as the question suggests, about Antwuan and the Jamel

24  Sills murder.  That's my problem.

25  MR. CARNEY:  Your Honor, one thing, that would be

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*10682*

1  redirect, but I can point to a passage where he talks at least

2  about the conversation before he goes to the police station, so

3  it did come up as a subject matter of conversations with Antwuan

4  Ball in response to the Sills murder, and there was no mention of

5  any other conversations subsequent to that other conversation.

6  THE COURT:  What is the context?  What was said, so that I

7  can know that there's a fair -- for him -- or to have taken an

8  opportunity to say what you say he didn't.

9  MR. CARNEY:  Can I be excused to get --

10  THE COURT:  Yes.

11  MR. CARNEY:  Thank you.

12  (Sidebar discussion concluded.)

13  THE WITNESS:  Judge Roberts, can I use the bathroom?

14  THE COURT:  All right.  Go ahead and then come right back.

15  (Witness excused from the witness stand.)

16  (Discussion had off the record.)

17  MR. CARNEY:  Your Honor, can I approach the bench?

18  THE COURT:  Yes.

19  (Following sidebar discussion had on the record:)

20  BY MR. CARNEY:  Your Honor, I'm going on memory that there was a

21  conversation where he's asked about the guns and Black and he's

22  saying that Twan had his gun taken and gives to Little One --

23  Little somebody, and that at that point, the gun was given to DC

24  and DC took it in payment.  And I'm fairly certain that that was

25  in the 2005 Grand Jury.  The best that I can do is, rather than waste

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1   correct?
2   **A.**   Uhm, ain't it a November date before that or something?
3   Ain't it another --
4   **Q.**   You think you testified on the Grand Jury on a date not
5   listed here?
6   **A.**   I'm asking you.
7   **Q.**   The question to you is:  The first time you said under
8   oath anything about Congress Park is nearly two years later,
9   right?
10  **A.**   You said what now?  After -- after the -- so you're
11  saying from -- you said 2005, that's my transcript, right, my
12  testimony in the Grand Jury, right?
13  **Q.**   Yes.
14  **A.**   Yes.
15  **Q.**   Thank you.
16  **A.**   You were just confusing me.
17  **Q.**   I would like to go through one last event with you, which
18  is the little robbery incident.  Do you remember testifying
19  about that yesterday?
20  **A.**   Yes, sir.
21  **Q.**   And in that incident, you stated that you were sitting on
22  a curb; is that right?
23  **A.**   Yes.
24  **Q.**   And he came up in a car; is that right?
25  **A.**   Yes, a blue 5.0.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   And you were actually sitting down on the curb?
2   **A.**   I was like this (indicating).
3   **Q.**   Your Honor, for the record, could it reflect that he got
4   off the witness chair, stepped down on the first step there,
5   bowed his head over, put his arms over his head.
6           THE WITNESS:  That's exactly how I was sitting on the
7   curb.
8   BY MR. CARNEY:
9   **Q.**   The next thing is the moving of this car.  Did you lift
10  up your head?  What happened?
11  **A.**   No, the car tapped me.
12  **Q.**   The car tapped you?  What do you mean?
13  **A.**   It was like zoom, the joint said -- I was like, what the
14  fuck you doing?  And he kept hitting the gas and that's when I
15  jumped up off the curb.
16  **Q.**   So he tried to drive up on you and run you over, is that
17  what you're saying?
18  **A.**   Basically, yes.
19  **Q.**   Okay and what happened next?
20  **A.**   He punched me in my face.
21  **Q.**   Did he park the car?  Did he turn the engine off?  What
22  did he do?
23  **A.**   When I was, like, "What the fuck you doing?"  And I
24  jumped up on the curb.  The car was there.  He opened the door
25  and jumped out and punched me in my face.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10693

1   **Q.**   Okay.  Is he a bigger guy than you?
2   **A.**   He was taller than me.  I don't know about mass size, but
3   he was taller than me.
4   **Q.**   And then what happened?  He punched you in the face and
5   what did you do?
6   **A.**   Grabbed him.
7   **Q.**   And then what?
8   **A.**   As I said yesterday, he had the aggressive side, I was
9   scared.
10  **Q.**   Now, you wrestled with him and you went in the car, you
11  said?
12  **A.**   We fell back in the car, fell on the gate, ended up in
13  the back of the car, and that's when I ran up the street and
14  that's when he went back to his car and grabbed the Glock.
15  **Q.**   Before you are on the street, he's still in the car,
16  right?
17  **A.**   When?  When I ran up the street?
18  **Q.**   You said you went into the car, you said you're wrestling
19  with him --
20  **A.**   Um-hmm.
21  **Q.**   -- and you said he had a gun in the car, right?
22  **A.**   Yes.
23  **Q.**   Did he reach for the gun?
24  **A.**   That's why I ran.
25  **Q.**   And he didn't shoot at you; is that right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10694

1   **A.**   No.
2   **Q.**   But he's trying to run you over with the car and he does
3   not shoot at you; is that right?
4   **A.**   You -- say that again.
5   **Q.**   He just tried to run over you with the car?
6   **A.**   Yes.
7   **Q.**   And he reached for the gun, and he doesn't shoot at you;
8   is that right?
9   **A.**   He tried to run me over first.
10  **Q.**   Right.
11  **A.**   We fought.
12  **Q.**   Right.
13  **A.**   Then he ran and got the gun.  I ran up the street.
14  **Q.**   He has the gun, you're starting to run off and he doesn't
15  shoot at you, is that what you are saying?
16  **A.**   Right.  He didn't shoot at me.
17  **Q.**   You had a second incident with him that you testified
18  about where there are three people in a car and you, you're the
19  fourth person; is that right?
20  **A.**   Yes.
21  **Q.**   He comes up to you and he puts a gun to your face; is
22  that right?
23  **A.**   Yes.
24  **Q.**   And you grab this gun and you wrestle with him; is that
25  right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10695

1    **A.**   Yes.

2    **Q.**   You grabbed that gun and he didn't shoot you; is that

3  right?

4    **A.**   He did not shoot me.

5        MR. CARNEY:   Thank you, Your Honor.   I have no further

6  questions.

7        THE COURT:   All right.

8        Ms. Wicks or Mr. Proctor.

9        MS. WICKS:   Thank you, Your Honor.

10       <u>CROSS-EXAMINATION OF KAIRI AMON KELLIEBREW</u>

11  <u>BY MS. WICKS</u>:

12    **Q.**   Good morning, Mr. Kelliebrew.

13    **A.**   Good morning.

14    **Q.**   Now -- Court's indulgence -- I believe it was yesterday

15  you were asked some questions about a conversation that you had

16  with Wop about when Squid got killed.   Do you remember those

17  questions?

18    **A.**   Yes.

19    **Q.**   Okay.   And you testified that you -- you, yourself, had

20  talked to Wop about when Squid got killed, right?

21    **A.**   Yes.

22    **Q.**   And you believed Wop when Wop talked to you, right?

23    **A.**   You said what?

24    **Q.**   Did you believe Wop when Wop told you about Squid getting

25  killed?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10696

1    **A.**   Yes.

2    **Q.**   Okay.   He wasn't lying to you, right?

3    **A.**   No.

4    **Q.**   And he told you that he, Drano and LT rolled up there,

5  right?

6    **A.**   Yes, ma'am.

7    **Q.**   And the place that he -- they rolled up to was up on

8  the other side of Alabama Avenue, correct?

9    **A.**   Yes, ma'am.

10    **Q.**   And he told you that when they got there, they were

11  standing right there, and by the "they," he meant Squid and his

12  baby's mother, right?

13    **A.**   Yes.

14    **Q.**   And they were standing there on the street, right?

15    **A.**   Yes.

16    **Q.**   And then he told you that Drano and LT jumped out of the

17  car, right?

18    **A.**   Yes.

19    **Q.**   And that Drano and LT were both shooting at Squid and his

20  baby's mother, right?

21    **A.**   Yes.

22    **Q.**   And did you learn what kind of gun Drano had?

23    **A.**   I don't know what kind of guns they had, what car they

24  drove, none of that.

25    **Q.**   Okay.   But you do know that they both had guns, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10697

1    **A.**   To my recollection, that's --

2    **Q.**   Well, you were told they "jumped out, wore them out and

3  jumped back in," right?

4    **A.**   Yes, ma'am.

5    **Q.**   And when he's telling you "they wore them out," you took

6  that to mean that both of them -- both Drano and LT are

7  shooting, right?

8    **A.**   Yes.

9    **Q.**   Do you recall when that conversation happened with Wop?

10    **A.**   No, ma'am.

11    **Q.**   Do you recall where you were?

12    **A.**   No, ma'am.

13    **Q.**   And when you had that conversation, you were -- well,

14  when you had that conversation, Wop was telling you, was Drano

15  or LT there?

16    **A.**   No.

17    **Q.**   So it was just you and Wop?

18    **A.**   I can't recall where we had the conversation at.

19    **Q.**   Well, my question right now is not where it was.   My

20  question is who was present when you had that conversation?

21    **A.**   I can't remember who was present when we had this

22  conversation.   If I'm not mistaken, we were in Jumah over in the

23  jail.

24    **Q.**   Okay.   So, when you have this conversation with him --

25  Squid gets killed back in '98, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10698

1    **A.**   I guess so, yes.

2    **Q.**   And in '98, you're on the streets, right?

3    **A.**   Yep.

4    **Q.**   So, you're saying -- the conversation that you had with

5  Wop at the jail was in 2002, right?

6    **A.**   Yes.

7    **Q.**   And he hadn't discussed this with you until 2002, right?

8    **A.**   I can't -- I can't remember -- like my last conversation

9  with Wop, when we was kicking it about who did what and who did

10  what, we was in Jumah that's to the best of my knowledge.

11    **Q.**   Well, I'm sitting here asking you today about one

12  particular conversation -- let me withdraw.

13        That the conversation that you had with Wop about Squid

14  getting killed, did you have one conversation or more than one

15  conversation with Wop?

16    **A.**   One.

17    **Q.**   Okay.   And sitting here today, I'm asking you to just sit

18  there for a moment and think about where you were when you had

19  this conversation with Wop.

20    **A.**   I just told you, I think we was in Jumah.

21    **Q.**   Okay.   So now -- in 2002, was that before or after --

22  when you had that conversation with him in Jumah in 2002, was

23  that before or after your plea agreement?

24    **A.**   I wasn't a government witness then.

25        MS. WICKS:   Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

10699

1  THE WITNESS: When I talked to Wop in Jumah that day, I
2  wasn't cooperating.
3  BY MS. WICKS:
4  Q.    Mr. Kelliebrew, I haven't asked you another question.
5  Hold on a second.
6        And by Jumah, that's a Muslim prayer on Friday afternoon,
7  right?
8  A.    Yes.
9  Q.    And -- now, back in November of 2002 is when you signed
10 your first plea agreement with the government, right?
11 A.    Yes.
12 Q.    And under your first plea agreement with the government,
13 you agreed to provide truthful and complete information to the
14 U.S. Attorney's Office and law enforcement authorities
15 concerning any matter about which you have direct or indirect
16 knowledge, right?
17 A.    Yes.
18 Q.    And specifically, to provide true and complete answers
19 regarding the death of Jamel Sills, correct?
20 A.    Yes.
21 Q.    And to testify fully and truthfully before any Grand
22 Jury, correct?
23 A.    Yes.
24 Q.    And pursuant to that plea agreement that you signed on
25 November 27th of 2002, you then testified in the Grand Jury on

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10700

1  November 27th of 2002, right?
2  A.    Yes.
3  Q.    And in your Grand Jury on November 27th of 2002, you were
4  asked about -- well, you were asked about some incidents that
5  occurred back in the '90s, right?
6  Q.    Yes.
7  Q.    And when you testified here this week, you testified that
8  you thought that it was Wop's Glock that had gotten stolen out
9  of the truck, correct?
10 A.    Yes.
11 Q.    When you testified back in November of 2002, you
12 testified that it was Black's gun, correct?
13 A.    Yes.
14 Q.    And sitting here today, you're saying that was a lie,
15 correct?
16 A.    What was a lie?
17 Q.    That it was Black's gun?
18 A.    Yes.
19 Q.    So, the whole incident back in the '90s, you're saying
20 Black is getting upset because it's Wop's gun that got stolen
21 out of the truck?
22 A.    Yes. When Wop -- when Wop said, "You better give me my
23 mothafucking gun back."
24 Q.    Wop said that to Jamel?
25 A.    Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10701

1  Q.    And also when you testified in the Grand Jury back in
2  November 27th of 2002, literally there's -- well, have you
3  reviewed your transcript with the prosecutors?
4  A.    Yes, I went over my transcript.
5  Q.    With the Grand Jury?
6  A.    Yes.
7  Q.    It's a 136-page transcript, correct?
8  A.    I think so, yes. How many pages -- I don't know exactly
9  how many pages it is.
10       MS. WICKS: May I approach the witness, Your Honor?
11       THE COURT: Yes.
12 BY MS. WICKS:
13 Q.    I'm going to show you 27 C, this is the testimony of
14 Kairi Aman Kelliebrew on November 27th 2002 in the Grand Jury;
15 is that correct, is that what it says here?
16 A.    Yes.
17 Q.    And the last page is page 136, right?
18 A.    Yes.
19 Q.    And nowhere on any page did you ever talk about David
20 Wilson, correct?
21 A.    No, ma'am.
22 Q.    And nowhere on any page did you talk about Wop, correct?
23 A.    No, ma'am.
24 Q.    And nowhere, anywhere, did you talk about Cool Wop,
25 right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10702

1  A.    No, ma'am.
2  Q.    But you are asked about this incident regarding the gun
3  taken out of the truck, correct?
4  A.    Yes.
5  Q.    And you told the Grand Jury that Black put his gun in
6  there, correct?
7  A.    Yes.
8  Q.    And you told the Grand Jury that Black said -- Black was
9  like, "I think he took my gun," correct?
10 A.    Yes.
11 Q.    And you're saying both of those are lies, right?
12 A.    Yes.
13 Q.    Now, also, when you describe the conversation, I believe
14 your testimony this week was -- the conversation that you
15 observed Black having with DC and Dom, you're saying Wop was
16 right there, right?
17 A.    Yes.
18 Q.    And when you testified in the Grand Jury back in November
19 of 2002, you never told them Wop was there, right?
20 A.    Right.
21 Q.    When you were interviewed by law enforcement prior to
22 testifying in the Grand Jury, you never told them Wop was there,
23 right?
24 A.    Right.
25 Q.    You lied to them, right?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

10703

1   **A.**    Right.

2   **Q.**    So, before you got the plea agreement back in 2002, you

3 lied to the police, right?

4   **A.**    Right.

5   **Q.**    And after you got the plea agreement, when you testified

6 in the Grand Jury, you lied to the Grand Jury, correct --

7   **A.**    Correct.

8   **Q.**    -- about a couple things, right?

9   **A.**    Yes.

10   **Q.**    Okay.  You lied about -- you lied when you didn't tell

11 them who was there, right?

12   **A.**    Right.

13   **Q.**    You lied to them when you told them what Black said about

14 that it was his gun, right?

15   **A.**    Right.

16   **Q.**    You lied when you told them that Black put his gun in the

17 truck, right?

18   **A.**    Right.

19   **Q.**    You lied to them when you told them the gun was either a

20 380 or a 9 millimeter, right?

21   **A.**    Right.

22   **Q.**    You lied to them when you told them you don't smoke PCP,

23 right?

24   **A.**    Right.

25      THE COURT:  We'll be breaking in about a minute.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10704

1      MS. WICKS:  This is fine, Your Honor.

2      THE COURT:  Okay.  Ladies and gentlemen, we're going to

3 take our lunch break.  It's 12:30.

4      Please be back at 1:45.  Don't talk about the case, but

5 leave your notes in the jury room.  Have a good lunch.

6      (Jury out at 12:29 p.m.)

7      THE COURT:  All right, sir, you may break for lunch.

8 Please be back in your seat at 1:45.

9      THE WITNESS:  Yes, sir.

10      THE COURT:  All right.  All right.  We'll be back at 1:45.

11      (Thereupon, a luncheon recess was had beginning at

12 12:30 p.m.)

13

14      **C E R T I F I C A T E**

15      I, Scott L. Wallace, RDR-CRR, certify that the

16 foregoing is a correct transcript from the record of proceedings

in the above-entitled matter.

17      ----------------------------

18      **Scott L. Wallace, RDR, CRRR**
     **Official Court Reporter**

19

20

21

22

23

24

25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

10705

1

2

3

          **I N D E X**

**EXAMINATIONS**          **Page**

4

5 CONTINUED DIRECT EXAMINATION OF KAIRI AMON  10574
   KELLIEBREW

6 BY MS. PETALAS

7 CROSS-EXAMINATION OF KAIRI AMON KELLIEBREW 10587
   BY MR. CARNEY

8

9 CROSS-EXAMINATION OF KAIRI AMON KELLIEBREW 10695
   BY MS. WICKS:

10      **EXHIBITS**

11

   **DESCRIPTION**

12 Defendant's Exhibit 74 marked         10676

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$20** [1] - 10594:15
**$60** [1] - 10594:12

## '

**'02** [1] - 10688:6
**'04** [2] - 10671:10; 10675:4
**'05** [1] - 10585:20
**'89** [1] - 10590:6
**'90s** [2] - 10700:5, 19
**'94** [8] - 10635:15; 10638:6; 10640:4; 10648:6; 10649:1; 10651:10, 25; 10652:1
**'95** [1] - 10635:17; 10638:6
**'96** [1] - 10659:15
**'97** [1] - 10590:6
**'98** [2] - 10697:25; 10698:2
**'99** [5] - 10649:1; 10651:11, 25; 10652:3, 5
**'Give** [1] - 10638:3
**'We'll** [1] - 10597:2

## 0

**05-100** [1] - 10571:4

## 1

**1** [2] - 10575:6; 10670:23
**10** [1] - 10678:17
**10574** [1] - 10705:5
**10587** [1] - 10705:7
**10676** [1] - 10705:12
**10695** [1] - 10705:8
**10:51** [1] - 10645:21
**10:52** [1] - 10645:24
**10th** [3] - 10572:17; 10675:14; 10677:7
**110** [1] - 10626:24
**1119** [3] - 10574:23; 10605:1; 10671:23
**11:05** [2] - 10645:20, 23
**11:09** [2] - 10645:25; 10646:1
**12** [4] - 10587:18; 10592:6; 10645:5, 9
**122** [1] - 10610:13

**122.3** [2] - 10660:8; 10661:14
**1220** [1] - 10584:21
**12:29** [1] - 10704:6
**12:30** [2] - 10704:3, 12
**12th** [1] - 10671:6
**13** [4] - 10587:18; 10592:6, 11; 10663:2
**1313** [3] - 10588:12, 20; 10589:24
**136** [1] - 10701:17
**136-page** [1] - 10701:7
**13th** [3] - 10588:9; 10626:24; 10671:7
**14** [1] - 10626:25
**14th** [3] - 10588:8; 10589:24; 10590:8
**15** [4] - 10645:5, 10; 10668:10; 10678:18
**16** [1] - 10603:2
**1747** [1] - 10572:4
**17th** [9] - 10585:11; 10671:9, 12; 10672:5; 10673:5; 10675:16; 10677:8; 10690:16
**18** [3] - 10593:20; 10596:25; 10663:3
**180** [1] - 10611:18
**19** [2] - 10592:11; 10593:20
**1999** [2] - 10575:12; 10582:16
**19th** [3] - 10675:25; 10676:2; 10677:9
**1:45** [3] - 10704:4, 8, 10
**1st** [9] - 10585:20; 10671:4; 10672:13; 10673:13, 17-18, 25; 10690:2, 25

## 2

**2** [1] - 10575:5
**20** [3] - 10593:25; 10639:16; 10642:10
**200** [2] - 10572:14; 10611:18
**2000** [4] - 10607:25; 10608:6; 10652:6; 10689:5
**20001** [4] - 10571:19; 10572:8; 10573:4, 9
**20004** [2] - 10571:23; 10572:18
**20007** [1] - 10572:14
**2001** [6] - 10652:3, 5,

9, 12; 10672:5; 10673:5
**2002** [45] - 10584:25; 10585:15; 10593:4, 9, 22; 10596:25; 10609:18; 10610:13; 10611:24; 10617:5; 10625:13, 25; 10640:5; 10641:23; 10653:8; 10672:10, 14; 10673:13, 17, 25; 10674:25; 10678:21, 24; 10683:22; 10688:2, 14; 10689:11, 23; 10690:9, 15; 10698:5, 7, 21-22; 10699:9, 25; 10700:1, 3, 11; 10701:2, 14; 10702:19; 10703:2
**20036** [1] - 10572:5
**2004** [18] - 10671:12, 14, 24; 10675:7, 9, 14, 16, 18, 20; 10677:7; 10678:8; 10689:6; 10690:16
**2005** [31] - 10599:15; 10642:1; 10653:8; 10668:10; 10670:23; 10671:1, 4, 7; 10675:25; 10676:2, 7, 9; 10677:9; 10680:9, 22; 10682:25; 10683:16; 10684:14; 10685:13, 24; 10688:3, 6-8; 10689:9, 13; 10690:2, 25; 10691:11
**2006** [1] - 10603:7, 9; 10626:24
**2007** [3] - 10571:7; 10574:1; 10603:10
**202** [2] - 10625:11
**202.305.0174** [1] - 10571:20
**202.326.0566** [1] - 10573:10
**202.326.7100** [1] - 10572:8
**202.333.5905** [1] - 10572:15
**202.434.8234** [1] - 10571:23
**202.454.2811** [1] - 10572:5
**202.624.0784** [1] - 10572:18
**202.639.0999** [1] - 10573:4
**20770** [1] - 10572:21

**20852** [1] - 10572:24
**21202** [1] - 10573:6
**21214** [1] - 10572:11
**21st** [7] - 10675:7, 9; 10676:7, 9; 10677:7, 9; 10678:7
**22nd** [6] - 10663:2; 10668:10; 10671:1; 10685:23; 10686:7; 10688:2
**23** [2] - 10622:11, 15
**23rd** [2] - 10675:18; 10677:8
**24** [1] - 10622:9
**24-hour** [2] - 10622:2, 11
**250A** [1] - 10572:7
**25th** [6] - 10671:14, 24; 10675:4, 20; 10677:8; 10685:15
**26th** [1] - 10603:6
**27** [1] - 10701:13
**2715** [1] - 10572:13
**27th** [22] - 10584:25; 10593:4, 9; 10596:24; 10610:12; 10617:5; 10672:10; 10673:13, 17; 10674:20; 10678:21, 24; 10685:13; 10688:6; 10689:23; 10690:9, 14; 10699:25; 10700:1, 3; 10701:2, 14
**29** [1] - 10621:8
**2nd** [1] - 10677:7

## 3

**3** [1] - 10575:8
**30** [4] - 10620:16; 10621:8; 10626:9, 22
**300** [2] - 10572:4; 10573:3
**301.220.3700** [1] - 10572:21
**301.519.8024** [1] - 10572:25
**31** [2] - 10581:16; 10651:20
**380** [1] - 10703:20

## 4

**4** [1] - 10575:6
**400** [1] - 10573:3
**410.444.1500** [1] - 10572:11
**410.576.9351** [1] -

10573:7
**450** [1] - 10572:24
**48** [1] - 10571:11
**4th** [1] - 10571:19

## 5

**5.0** [1] - 10691:25
**500.2** [2] - 10655:15, 17
**503** [1] - 10572:7
**514** [1] - 10572:17
**555** [1] - 10571:19
**57** [1] - 10683:17
**5K** [1] - 10619:25; 10631:19, 23
**5K1** [2] - 10620:9

## 6

**6** [3] - 10575:8; 10610:13
**6-4** [1] - 10611:18
**60-foot** [1] - 10645:10
**601** [1] - 10571:22
**6065** [1] - 10572:10
**62** [1] - 10650:17
**6814** [1] - 10573:9

## 7

**73** [4] - 10672:17, 20, 22; 10673:8
**74** [5] - 10596:25; 10676:14, 20; 10705:12
**7841** [1] - 10572:20
**7C** [1] - 10618:11

## 8

**8** [1] - 10573:6
**8-25** [2] - 10690:1
**85** [1] - 10683:7

## 9

**9** [4] - 10571:7; 10574:1; 10592:3; 10703:20
**96** [1] - 10619:18
**9:15** [2] - 10571:7; 10574:2
**9:19** [1] - 10574:7
**9:20** [1] - 10574:10

**9th** [1] - 10572:17

## A

**a.m** [8] - 10571:7; 10574:2, 7, 10; 10645:21, 24-25; 10646:1
**able** [2] - 10661:23; 10677:13
**above-entitled** [1] - 10704:16
**absolutely** [1] - 10663:21
**abuse** [2] - 10610:16; 10611:1
**abused** [1] - 10610:20
**Act** [1] - 10575:6
**actions** [1] - 10643:2
**acts** [1] - 10634:23
**Acts** [1] - 10634:25
**add** [1] - 10672:17
**addict** [1] - 10595:17
**address** [1] - 10588:20
**admitted** [1] - 10655:16
**adult** [2] - 10590:15, 18
**advise** [1] - 10603:20
**affect** [2] - 10594:20, 23
**affected** [1] - 10595:1
**afield** [1] - 10622:7
**afternoon** [2] - 10599:5; 10699:6
**afterwards** [1] - 10577:23
**age** [3] - 10587:18; 10592:2; 10593:19
**agents** [5] - 10581:18; 10582:12, 24; 10586:7, 10
**aggressive** [1] - 10693:8
**ago** [7] - 10604:21; 10605:11; 10630:3; 10646:12; 10664:14; 10685:16, 24
**agree** [18] - 10587:17; 10593:4, 8; 10595:21; 10596:9, 14; 10606:3; 10607:25; 10611:23; 10612:3; 10626:3, 11, 14; 10631:13; 10670:23; 10684:14;

10686:25; 10689:16
**agreed** [4] - 10626:17; 10677:2, 6; 10699:13
**agreement** [30] - 10605:3, 8, 12, 16, 20, 25; 10606:4; 10619:21, 25; 10620:3, 14, 19; 10621:1; 10631:14; 10671:9, 12; 10672:1; 10675:1; 10688:14, 16, 20, 22; 10689:8; 10690:15; 10698:23; 10699:10, 12, 24; 10703:2, 5
**ahead** [3] - 10615:11; 10671:25; 10682:14
**aided** [1] - 10573:11
**ain't** [9] - 10577:19; 10579:2; 10606:19; 10634:7; 10636:20; 10651:21; 10687:4; 10691:2
**Ain't** [4] - 10577:19; 10578:20, 25; 10691:3
**AK** [1] - 10637:23
**AKA** [1] - 10575:16
**Alabama** [1] - 10696:8
**alley** [7] - 10583:5; 10598:7; 10633:13; 10637:4; 10638:1; 10661:3; 10666:5
**Alley** [3] - 10593:14; 10656:21
**alleyway** [13] - 10632:17, 21; 10640:24; 10641:4, 17, 19; 10665:18, 23; 10666:13; 10680:22; 10685:21; 10686:1, 11
**allow** [6] - 10604:14; 10614:15; 10622:8; 10629:18; 10650:3; 10669:7
**almost** [3] - 10581:4; 10627:5; 10690:16
**Aman** [3] - 10589:14; 10590:10; 10701:14
**ambulance** [1] - 10665:15
**AMERICA** [1] - 10571:3
**AMON** [6] - 10574:16; 10587:13; 10695:10; 10705:5, 7

**amount** [2] - 10650:16; 10651:15
**ankle** [1] - 10610:9
**Ann** [1] - 10571:17
**Answer** [4] - 10597:4; 10627:14; 10663:4; 10668:8
**answer** [11] - 10596:24; 10609:12; 10627:4, 21; 10628:2, 7; 10629:13; 10668:17, 20; 10669:10; 10679:13
**answered** [7] - 10583:9, 21; 10627:22; 10628:12; 10629:7; 10650:2; 10668:25
**answering** [1] - 10679:25
**answers** [2] - 10628:17; 10699:18
**ANTHONY** [2] - 10572:19, 22
**Anthony** [2] - 10572:20, 23
**ANTWUAN** [1] - 10571:6
**Antwuan** [20] - 10571:21; 10572:3; 10583:18; 10590:10; 10625:15; 10644:19; 10665:23; 10666:14; 10668:5; 10680:15, 17; 10681:17, 23; 10682:3; 10683:6, 14-15; 10684:6; 10685:25; 10686:10
**Antwuan's** [1] - 10589:6
**anyway** [2] - 10606:17; 10637:19
**apart** [1] - 10643:2
**apartment** [21] - 10575:16, 24; 10576:1, 12, 17, 19; 10577:2, 4, 14; 10578:1, 15-17, 19; 10591:6; 10642:17; 10643:24; 10644:2, 12, 16; 10647:20
**Apartment** [1] - 10577:15
**Apartments** [1] - 10588:6
**apologize** [2] - 10676:23; 10680:24
**appeal** [1] - 10631:25
**APPEARANCES** [3] -

10571:14; 10572:1; 10573:1
**appeared** [2] - 10625:25; 10662:17
**approach** [10] - 10584:18; 10599:23; 10627:9, 18; 10660:7; 10671:17; 10676:16; 10681:1; 10682:17; 10701:10
**April** [3] - 10626:24; 10671:6
**Aquellah** [1] - 10589:19; 10590:10
**AQUELLAH** [1] - 10589:21
**area** [11] - 10578:13; 10584:5; 10585:22-24; 10587:7; 10600:3, 7; 10654:18; 10658:2
**Arlington** [22] - 10622:24; 10623:1, 9, 17; 10624:1, 10; 10653:11; 10688:8, 10, 12-13, 19, 22, 25; 10689:1, 4-5, 9, 14
**armed** [2] - 10635:19; 10636:2
**arms** [1] - 10692:5
**ARMSTRONG** [1] - 10572:2
**ARNOLD** [1] - 10572:22
**Arnold** [1] - 10572:23
**arrest** [1] - 10611:20
**arrested** [10] - 10585:8, 10; 10586:1; 10593:22; 10607:25; 10609:18, 21; 10610:15, 25; 10611:24
**arrive** [1] - 10659:20
**arrived** [2] - 10658:10, 14
**aside** [1] - 10690:3
**ass** [1] - 10580:14
**assembled** [1] - 10576:6
**assistance** [1] - 10576:10
**Assistant** [4] - 10571:16-18; 10674:8
**associates** [1] - 10576:9; 10578:9, 11
**associating** [1] - 10618:4
**assumed** [1] - 10600:13

**attorney** [1] - 10684:10
**Attorney** [3] - 10571:16
**Attorney's** [3] - 10675:3; 10677:10; 10699:14
**ATTORNEY'S** [1] - 10571:15
**Attorneys** [1] - 10674:8
**August** [15] - 10671:14, 24; 10672:10; 10673:13; 10674:19; 10675:4, 14, 16, 18, 20; 10677:7
**Aunt** [1] - 10589:1
**aunt** [1] - 10589:4
**aunts** [2] - 10588:21, 23
**authorities** [1] - 10699:14
**Avenue** [4] - 10571:22; 10572:4; 10594:7; 10696:8
**aware** [1] - 10623:16
**AWIK** [1] - 10582:10

## B

**Baby** [4] - 10580:11; 10581:5; 10618:6; 10677:22
**baby** [8] - 10582:23; 10654:6-8, 10-11; 10655:6; 10662:9
**baby's** [4] - 10654:9; 10662:12; 10696:12, 20
**backing** [1] - 10579:25
**bag** [3] - 10593:25; 10594:15
**bags** [2] - 10615:3
**BALAREZO** [1] - 10573:2
**Balarezo** [1] - 10573:2
**ball** [1] - 10651:21
**BALL** [1] - 10571:6
**Ball** [21] - 10571:21; 10572:3; 10583:18; 10588:8; 10589:2; 10590:5, 10, 21; 10591:1, 4; 10598:6; 10625:3; 10669:16; 10680:15, 17, 22; 10681:17; 10682:4;

10684:6; 10685:25; 10686:10

**ballpark** [1] - 10639:15

**Baltimore** [2] - 10572:11; 10573:6

**bam** [1] - 10661:16

**bandages** [1] - 10577:1

**bank** [1] - 10636:9

**Barnett** [1] - 10624:5

**based** [2] - 10605:16; 10623:3

**basis** [6] - 10602:23; 10623:14; 10655:11; 10684:8, 21

**bathroom** [1] - 10682:13

**BEANE** [2] - 10572:12; 10653:16

**Beane** [1] - 10572:13

**beat** [3] - 10610:3, 6; 10611:7

**beaten** [1] - 10610:20

**beatings** [1] - 10635:2

**became** [1] - 10689:17

**beef** [1] - 10680:7

**BEFORE** [1] - 10571:12

**Beg** [1] - 10668:14

**beginning** [5] - 10596:25; 10610:13; 10635:14; 10673:5; 10675:1; 10704:11

**behalf** [1] - 10603:24

**Bell** [2] - 10572:13; 10648:10

**BELL** [1] - 10571:6

**Belle** [1] - 10572:20

**belonged** [2] - 10647:21, 24

**bench** [3] - 10681:2; 10682:17; 10684:22

**benefited** [1] - 10638:17

**Benning** [1] - 10594:8

**best** [4] - 10680:13; 10682:25; 10698:10

**better** [3] - 10611:6; 10614:25; 10700:22

**between** [14] - 10585:4; 10601:14; 10603:13; 10640:4; 10645:5, 9; 10655:9; 10673:16, 18; 10685:15, 23;

---

10689:8; 10690:14

**Big** [2] - 10619:9; 10649:10

**big** [2] - 10611:17; 10616:8

**bigger** [1] - 10693:1

**biggest** [3] - 10634:15, 18

**bit** [2] - 10654:18; 10664:24

**bitch** [1] - 10580:14

**bitch-ass** [1] - 10580:14

**Black** [23] - 10595:20; 10596:3, 19; 10597:21; 10612:18; 10680:16; 10682:21; 10683:10, 19, 25; 10684:19; 10685:2, 21; 10689:23; 10690:4; 10700:20; 10702:5, 8, 15; 10703:13, 16

**Black's** [2] - 10700:12, 17

**blanked** [1] - 10606:18

**block** [2] - 10615:13; 10640:13

**blocked** [2] - 10661:7, 11

**blocks** [2] - 10607:19; 10618:12

**blood** [1] - 10668:2

**blow** [1] - 10594:16

**blue** [1] - 10691:25

**blunt** [1] - 10644:10

**Bo** [10] - 10619:3, 9-10, 12, 17; 10624:7

**boat** [9] - 10592:13; 10593:14; 10606:14, 16, 18-19, 24; 10607:2, 4

**Boat** [3] - 10593:14; 10656:21

**Bobby** [2] - 10632:14; 10634:8

**body** [3] - 10662:6; 10665:11, 13

**Boogie** [1] - 10589:1

**book** [1] - 10687:21

**books** [1] - 10620:12

**boom** [1] - 10580:23

**borrow** [1] - 10666:22

**bottles** [1] - 10595:16

**bottom** [2] - 10575:11; 10577:15

**bought** [7] -

---

10586:24; 10649:8; 10650:8; 10651:15, 20; 10652:12

**bowed** [1] - 10692:5

**Boy** [20] - 10653:14; 10654:8, 10; 10664:3, 5, 7, 9; 10665:3

**Boy-Boy** [10] - 10653:14; 10654:8, 10; 10664:3, 5, 7, 9; 10665:3

**bragging** [2] - 10667:3, 5

**brain** [1] - 10659:22

**brains** [2] - 10663:11, 17

**breach** [1] - 10605:8

**Break** [1] - 10638:21

**break** [9] - 10645:14, 18, 20, 22, 24; 10666:3; 10704:3, 7

**breaking** [1] - 10703:25

**Brief** [1] - 10574:6

**brief** [1] - 10669:4

**bring** [1] - 10616:7

**Bring** [1] - 10574:5

**bringing** [1] - 10636:21

**broad** [2] - 10659:8, 19

**Brody** [3] - 10648:9, 11

**BRODY** [1] - 10648:9

**broke** [3] - 10622:10; 10667:14, 17

**brother** [2] - 10641:12

**brought** [5] - 10614:6; 10616:10, 17; 10641:16, 19

**Browne** [1] - 10624:9

**brung** [1] - 10576:25

**Bug** [1] - 10635:4

**Building** [1] - 10571:22

**building** [4] - 10644:19, 23; 10645:3; 10646:24

**bullpen** [13] - 10612:10, 12, 14, 24; 10613:1, 17-19, 25; 10614:6; 10615:25; 10616:1; 10617:6

**Burke** [15] - 10651:6, 12-13, 23; 10652:2, 4, 11-12, 24; 10653:5, 9-10; 10654:1

**burning** [2] -

---

10641:3; 10642:2

**burnt** [1] - 10641:1

**bus** [1] - 10616:1

**bust** [2] - 10584:8, 11

**busted** [1] - 10669:13

**buy** [9] - 10584:8, 11; 10650:12, 15, 17; 10651:14, 23

**buy-bust** [2] - 10584:8, 11

**buying** [4] - 10650:14; 10651:12; 10652:11

**BY** [50] - 10574:17, 25; 10579:6; 10582:2; 10583:13, 25; 10584:22; 10585:6; 10587:14; 10597:12; 10599:3; 10600:25; 10604:15, 19; 10605:2; 10610:11; 10615:6; 10622:13; 10623:25; 10627:10; 10629:20; 10646:5, 7; 10647:10, 13; 10650:5; 10653:19; 10655:13, 20; 10660:9, 25; 10663:1, 25; 10669:9; 10671:22; 10673:3; 10674:13; 10676:18; 10677:5; 10682:20; 10684:13; 10685:12; 10687:25; 10692:8; 10695:11; 10699:3; 10701:12; 10705:6, 9

---

## C

**Campbell** [2] - 10672:4, 6

**cane** [1] - 10647:4

**cannot** [1] - 10678:11

**Capies** [4] - 10632:14; 10634:8; 10642:16

**car** [42] - 10579:19; 10580:22; 10581:6, 8; 10633:7, 11-12, 14, 16, 18-19; 10634:5; 10638:1, 17; 10644:15; 10658:23; 10661:15, 24; 10665:9; 10666:25; 10667:1; 10686:5; 10691:24; 10692:9, 11-12, 21, 24;

---

10693:10, 12-15, 18, 21; 10694:2, 5, 18; 10696:17, 23

**card** [1] - 10666:13

**care** [1] - 10590:21

**careful** [1] - 10683:18

**carefully** [1] - 10690:9

**Carl** [1] - 10572:3

**CARNEY** [77] - 10571:21; 10583:9; 10587:12, 14; 10597:10, 12; 10599:3; 10600:9, 23, 25; 10604:15, 19; 10605:1; 10610:10; 10614:13; 10615:6; 10622:13; 10623:16, 22, 25; 10627:10; 10629:5, 20; 10645:16; 10646:5, 7; 10647:10, 13; 10650:5; 10653:19; 10655:13, 16, 19-20; 10660:7, 9, 25; 10662:25; 10663:1, 24-25; 10668:17, 20, 24; 10669:9; 10671:17, 22; 10672:16, 20, 22, 25; 10673:3; 10674:13; 10676:13, 16, 18; 10677:4; 10681:1, 5, 25; 10682:9, 11, 17, 20; 10684:13; 10685:1, 8, 10, 12; 10687:25; 10692:8; 10695:5; 10705:7

**Carney** [6] - 10571:21; 10587:11; 10623:11; 10628:19; 10646:6; 10684:9

**Carre** [2] - 10584:2

**carrying** [1] - 10631:10

**case** [13] - 10584:8, 11; 10608:6; 10612:18; 10626:7; 10630:3; 10631:14; 10632:5; 10645:18; 10672:6; 10681:10; 10704:4

**cases** [2] - 10616:23

**cast** [1] - 10647:2

**caused** [1] - 10592:23

**CDs** [1] - 10641:2

**cell** [2] - 10618:24

**cents** [2] - 10640:19

**certain** [8] - 10601:3; 10602:13; 10611:7; 10633:20; 10648:3; 10663:21; 10664:21; 10682:24
**certainly** [1] - 10600:5
**certify** [1] - 10704:15
**chair** [1] - 10692:4
**chance** [1] - 10616:21
**change** [3] - 10577:1; 10600:11; 10687:14
**chaos** [3] - 10588:9; 10591:5
**charge** [5] - 10609:18; 10620:18; 10635:19; 10636:3
**charges** [3] - 10620:24; 10630:22
**chart** [7] - 10670:21; 10688:1, 3, 6; 10689:12, 22; 10690:9
**chased** [2] - 10580:13, 21
**chasing** [2] - 10580:15; 10595:8
**check** [1] - 10603:22
**children** [2] - 10589:8; 10590:22
**chitchat** [1] - 10616:22
**chop** [2] - 10687:9
**chopped** [1] - 10644:10
**cigarette** [2] - 10592:18; 10607:3
**cigarettes** [1] - 10592:2
**Circle** [3] - 10598:6; 10637:22; 10686:1
**cite** [1] - 10681:12
**city** [2] - 10587:23; 10588:1
**claimed** [2] - 10610:3, 6
**claiming** [2] - 10610:19; 10611:7
**claims** [2] - 10610:14, 25
**Clarification** [1] - 10671:20
**clarification** [1] - 10598:25
**clarified** [1] - 10628:14
**clarifies** [1] - 10629:3

**clarify** [2] - 10578:22; 10599:2
**clarifying** [1] - 10597:10
**clear** [1] - 10671:21
**clearer** [1] - 10673:6
**clearly** [2] - 10628:11, 13
**CLERK** [2] - 10672:19, 21
**clicking** [1] - 10580:12
**client** [2] - 10687:9, 12
**clip** [2] - 10581:12; 10669:14
**clipped** [1] - 10610:8
**close** [1] - 10649:15
**Closed** [1] - 10687:21
**closed** [1] - 10687:21
**clothes** [2] - 10588:9; 10591:1
**Club** [2] - 10588:2, 6
**clue** [1] - 10600:14
**cocaine** [4] - 10575:14; 10631:2, 4; 10648:7
**coke** [8] - 10636:20; 10647:17, 23; 10649:5, 10; 10650:11; 10653:15
**Coleman** [1] - 10641:8
**Collect** [1] - 10624:19
**collect** [4] - 10624:20, 23; 10625:16; 10636:18
**COLUMBIA** [1] - 10571:1
**combination** [1] - 10650:7
**coming** [10] - 10623:19; 10636:21; 10660:2, 20; 10661:1-3; 10663:17; 10664:16
**commit** [1] - 10605:21
**committed** [1] - 10634:21
**community** [1] - 10689:3
**complain** [1] - 10619:24
**complete** [4] - 10602:3; 10645:15; 10699:13, 18

**compliant** [1] - 10602:17
**computer** [1] - 10573:11
**computer-aided** [1] - 10573:11
**concern** [3] - 10600:8; 10607:6, 10
**concerned** [1] - 10642:25
**concerning** [1] - 10699:15
**concerns** [2] - 10600:1, 6
**concluded** [6] - 10623:21; 10629:19; 10669:8; 10682:12; 10684:12; 10685:11
**conditions** [3] - 10600:11; 10603:18; 10606:3
**conferences** [1] - 10611:23
**confidential** [1] - 10608:23
**confront** [1] - 10637:1
**confusing** [2] - 10596:17; 10691:16
**Congress** [32] - 10586:1; 10588:12, 17; 10612:4; 10613:21, 24; 10614:2; 10617:7, 9; 10619:13; 10634:16, 24-25; 10638:11; 10654:18; 10656:13; 10657:6; 10659:1; 10660:17, 20; 10661:2, 4; 10680:11; 10684:15; 10685:3; 10689:17, 25; 10690:3, 11, 25; 10691:8
**constantly** [2] - 10646:10; 10652:2
**Cont** [2] - 10572:1; 10573:1
**contacts** [1] - 10614:14
**context** [3] - 10682:6; 10683:6, 11
**CONTINUED** [2] - 10574:16; 10705:5
**continued** [2] - 10605:11; 10666:18
**control** [5] - 10609:24; 10611:15
**conversate** [1] - 10670:10

**conversation** [34] - 10583:5, 8, 14, 19; 10616:4; 10617:3, 6, 10; 10640:25; 10682:2, 5, 21; 10683:5, 14; 10684:4; 10695:15; 10697:9, 13-14, 18, 20, 22, 24; 10698:4, 8, 12-15, 19, 22; 10702:13
**Conversations** [1] - 10685:22
**conversations** [20] - 10598:5, 15; 10612:3; 10625:3, 7, 10; 10640:5, 7-8; 10673:23, 25; 10678:14; 10680:21; 10681:7, 10; 10682:3, 5; 10685:20, 25; 10686:10
**conviction** [2] - 10630:25; 10631:15
**convictions** [6] - 10630:15, 17, 20-21, 24; 10631:17
**cool** [2] - 10643:12; 10648:20
**Cool** [6] - 10647:17, 21, 25; 10648:1; 10664:13; 10701:24
**cooperating** [2] - 10605:22; 10699:2
**cooperator** [3] - 10620:5
**cooperator's** [1] - 10690:21
**cooperators** [6] - 10583:6; 10616:9, 11; 10620:10; 10623:10
**copped** [2] - 10630:23; 10649:5
**corner** [1] - 10661:14
**correct** [54] - 10575:24; 10576:2; 10579:10; 10582:7, 18; 10585:17; 10586:22; 10593:6; 10597:18; 10598:3, 6; 10605:6; 10606:7; 10608:4, 7; 10617:5; 10625:3, 17; 10629:16; 10633:3; 10639:17; 10661:19; 10663:6, 8; 10669:21; 10670:4; 10671:15; 10672:14; 10673:9, 13, 24; 10676:5; 10677:14; 10678:3; 10680:16; 10684:16,

20; 10691:1; 10696:8; 10699:19, 22; 10700:9, 12, 15; 10701:7, 15, 20, 22; 10702:3, 6, 9; 10703:6; 10704:15
**Correct** [1] - 10703:7
**corrected** [1] - 10629:15
**correctly** [1] - 10636:4
**County** [1] - 10587:25
**couple** [9] - 10595:16; 10604:16; 10606:16; 10613:2; 10617:23; 10646:25; 10651:20; 10688:23; 10703:8
**course** [1] - 10627:15
**court** [15] - 10586:7, 11; 10589:9; 10601:15, 17; 10603:17, 20, 25; 10608:24; 10612:15; 10614:4; 10616:1, 7; 10630:23
**Court** [6] - 10572:23; 10573:8; 10672:5; 10683:22; 10704:18
**Court's** [8] - 10587:9; 10610:10; 10623:22; 10662:25; 10663:24; 10683:1; 10695:14; 10698:25
**Courthouse** [1] - 10573:9
**cousin** [2] - 10666:17
**covered** [1] - 10684:3
**CR** [1] - 10571:4
**Crack** [1] - 10650:8
**crack** [7] - 10575:14; 10636:6; 10648:6; 10649:22, 25; 10650:6; 10653:20
**crackhead** [2] - 10635:20; 10636:5
**CROSS** [4] - 10587:13; 10695:10; 10705:7
**CROSS-EXAMINATION** [4] - 10587:13; 10695:10; 10705:7
**crowd** [1] - 10658:12
**CRR** [2] - 10573:8; 10704:15

**CRRR** [1] - 10704:17
**CTF** [29] - 10581:18; 10607:9, 14; 10614:8, 12; 10615:9, 17, 20, 25; 10616:6, 13; 10621:7, 9; 10623:9; 10624:12-14, 17; 10653:6, 8; 10688:3, 7; 10689:6, 14, 20; 10690:17, 19
**cuffed** [1] - 10611:13
**curb** [5] - 10691:22; 10692:1, 7, 15, 24
**current** [1] - 10683:22
**custodian** [1] - 10600:13
**custody** [2] - 10621:13, 25
**cut** [2] - 10617:14; 10628:21

---

**D**

---

**D.C** [1] - 10653:8
**da-da-da-da** [1] - 10615:23
**Daddy** [1] - 10619:9
**Dag** [1] - 10623:1
**Dakota** [1] - 10594:7
**Damn** [3] - 10614:22; 10617:2, 11
**damn** [1] - 10617:11
**Darnell** [1] - 10572:23
**date** [7] - 10585:16; 10675:12; 10685:15; 10686:12, 14; 10691:2, 4
**dated** [2] - 10671:14, 24
**dates** [8] - 10670:22; 10673:4, 7; 10677:3, 6, 13; 10678:10
**daughter** [1] - 10582:23
**DAVID** [1] - 10571:4
**David** [2] - 10572:7; 10701:19
**daylight** [3] - 10659:8, 19; 10662:6
**days** [9] - 10594:1, 17; 10606:16, 24; 10607:1; 10617:18; 10646:25; 10670:3, 6
**Dazz** [2] - 10664:17; 10666:10
**DC** [38] - 10571:6, 19, 23; 10572:5, 8,

14, 18; 10573:4, 9; 10584:5; 10585:22-24; 10586:7; 10587:3, 7, 21; 10612:8, 10, 13, 24; 10613:2, 22-23; 10616:3; 10617:6; 10682:23; 10683:6, 8-9, 12; 10684:4; 10702:15
**dead** [7] - 10593:2; 10657:15; 10658:3; 10662:21; 10663:16; 10670:1, 3
**Dead** [2] - 10662:18, 24
**deal** [6] - 10602:8, 10-11; 10652:20, 23
**dealer** [1] - 10634:18
**dealers** [5] - 10576:6; 10634:15; 10654:21; 10655:3
**dealing** [5] - 10642:15; 10652:2, 25; 10680:16; 10685:3
**dealings** [2] - 10621:11, 17
**death** [1] - 10699:19
**debriefed** [3] - 10614:10, 17; 10616:19
**debriefing** [4] - 10612:22; 10672:13; 10674:15; 10686:7
**debriefings** [6] - 10673:12, 15-16; 10675:2; 10685:14; 10686:18
**December** [1] - 10689:12
**declarant** [1] - 10578:23
**Defendant** [7] - 10571:21; 10572:2, 6, 12, 16, 19; 10573:2
**defendant's** [1] - 10672:17
**Defendant's** [2] - 10676:15; 10705:12
**Defendants** [1] - 10571:8
**Defense** [3] - 10673:8; 10676:14, 19
**Demonstrative** [1] - 10673:8
**demonstrative** [1] - 10672:23
**denied** [1] -

10593:13
**DEPUTY** [2] - 10672:19, 21
**Describe** [1] - 10662:23
**describe** [1] - 10702:13
**DESCRIPTION** [1] - 10705:11
**DESMOND** [1] - 10571:6
**Desmond** [1] - 10572:16
**destination** [2] - 10643:25
**detail** [1] - 10681:20
**Detective** [3] - 10597:1; 10674:18, 21
**difference** [2] - 10588:16; 10622:14
**different** [9] - 10600:18; 10621:24; 10622:15, 21; 10628:17; 10629:3; 10636:16; 10677:17
**Different** [1] - 10636:16
**dig** [1] - 10611:14
**dip** [1] - 10592:18
**dipper** [1] - 10592:18
**dippers** [2] - 10592:10, 12
**direct** [1] - 10699:15
**DIRECT** [2] - 10574:16; 10705:5
**direction** [2] - 10656:10; 10660:18
**disagree** [1] - 10659:15
**disclose** [2] - 10599:20, 22
**discovery** [1] - 10600:10
**discretion** [1] - 10632:1
**discuss** [2] - 10616:23; 10685:20, 25
**discussed** [5] - 10614:1; 10616:24; 10640:11, 24; 10698:7
**discussing** [3] - 10610:14, 24; 10621:2
**discussion** [16] - 10599:25; 10623:6, 21; 10627:20; 10629:19; 10642:18;

10668:19; 10669:8; 10678:7; 10681:4; 10682:12, 19; 10684:12, 24; 10685:11; 10690:24
**Discussion** [3] - 10585:4; 10600:24; 10682:16
**discussions** [1] - 10684:22
**dispute** [1] - 10674:24
**distance** [1] - 10618:7
**Distant** [1] - 10619:18
**distribute** [1] - 10631:4, 7
**DISTRICT** [3] - 10571:1, 13
**Docket** [1] - 10571:4
**Dog** [9] - 10576:9; 10578:2, 5, 7-8, 24; 10579:18
**doin'** [1] - 10635:25
**Dom** [3] - 10613:11; 10679:17; 10702:15
**Dominic** [1] - 10573:2
**DOMINIC** [1] - 10571:7
**Dominique** [1] - 10633:16
**Domo** [5] - 10643:24; 10644:1, 13
**Don** [6] - 10613:9; 10683:9, 11, 19, 23, 25
**done** [7] - 10602:24; 10607:2; 10621:12; 10623:11; 10634:23; 10683:18
**Doo** [3] - 10635:22
**Doo-Doo** [1] - 10635:22
**door** [12] - 10615:3, 12; 10659:22, 25; 10662:1-4; 10663:5, 8; 10668:1; 10692:24
**doors** [1] - 10661:24
**dope** [2] - 10597:24
**Douglas** [1] - 10572:20
**down** [32] - 10579:18, 25; 10586:6, 10-11; 10587:5; 10588:9; 10590:25; 10614:6, 24; 10615:25; 10616:10; 10617:6;

10622:18; 10629:10; 10634:16; 10641:16, 19; 10648:21; 10649:17; 10660:14-16; 10661:4; 10662:8; 10665:25; 10666:3, 5, 11; 10692:1, 4
**downstairs** [2] - 10612:15; 10616:8
**drank** [1] - 10596:18
**Drano** [8] - 10653:22; 10696:4, 16, 19, 22; 10697:6, 14
**drink** [8] - 10595:13; 10596:18, 20; 10597:4, 6, 15, 22, 24
**drinking** [7] - 10595:10; 10596:9, 15, 23; 10597:5, 20; 10598:9
**drive** [3] - 10579:16; 10692:16
**Drive** [1] - 10572:20
**driven** [1] - 10634:1
**driver's** [1] - 10634:3; 10669:11
**drop** [2] - 10645:10
**dropped** [6] - 10602:1, 5; 10603:4; 10604:6; 10667:11
**drove** [1] - 10696:24
**Drug** [1] - 10607:15
**drug** [13] - 10576:6; 10599:16; 10601:8, 23; 10604:7; 10607:6, 10; 10609:18; 10630:9, 14; 10654:21; 10655:3
**drugs** [13] - 10587:17, 20, 24; 10605:5, 11, 16; 10609:9, 14; 10636:5; 10647:6, 11, 16
**Drugs** [1] - 10647:15
**dude** [6] - 10576:14; 10577:7; 10580:12, 21; 10636:1
**dudes** [2] - 10577:7; 10579:1
**during** [5] - 10614:14; 10616:21; 10638:12; 10673:20; 10674:24
**During** [2] - 10599:5; 10690:14

# E

**early** [1] - 10643:21
**East** [1] - 10573:6
**eat** [2] - 10597:16
**Ecstasy** [5] - 10595:2-4, 9; 10599:8
**Edelin** [2] - 10640:24; 10642:2
**Edelin's** [1] - 10641:4
**EDUARDO** [1] - 10573:2
**Eduardo** [1] - 10573:2
**education** [2] - 10599:16; 10609:4
**effect** [2] - 10592:23; 10597:3
**effects** [4] - 10593:5, 9; 10594:18; 10607:4
**effigy** [1] - 10642:2
**Either** [1] - 10685:6
**either** [6] - 10616:19; 10619:7; 10644:9; 10653:8; 10681:6; 10703:19
**elicit** [1] - 10623:15
**eliciting** [1] - 10600:21
**elsewhere** [1] - 10638:13
**Emmet** [1] - 10611:11
**employed** [1] - 10575:13
**emptied** [2] - 10581:16; 10669:13
**end** [2] - 10649:7; 10689:6
**ended** [6] - 10615:23; 10620:17, 23; 10623:10; 10693:12
**enforcement** [16] - 10611:24; 10642:11; 10672:14; 10673:16, 20; 10674:1, 7, 15; 10677:10; 10678:6; 10685:15, 17, 20; 10686:18; 10699:14; 10702:21
**engine** [1] - 10692:21
**Enjoy** [1] - 10645:20
**enlisted** [1] - 10576:9
**enterprise** [2] - 10575:15

**entire** [3] - 10627:23; 10628:4; 10681:6
**entitled** [1] - 10704:16
**escape** [1] - 10630:25
**escaped** [1] - 10630:12
**Esq** [10] - 10571:21; 10572:3, 7, 10, 13, 16, 20, 23; 10573:2, 5
**essentially** [1] - 10595:17; 10689:11
**evening** [1] - 10643:21
**event** [11] - 10595:21; 10596:14; 10598:7; 10615:10; 10620:18; 10637:19; 10656:7; 10673:7; 10680:23; 10688:1; 10691:17
**events** [15] - 10595:20; 10613:11; 10615:10; 10625:19, 21; 10639:10; 10640:11, 13-14, 16, 18; 10678:14, 17; 10684:15; 10690:25
**evidence** [3] - 10574:23; 10575:3; 10655:18
**exact** [2] - 10603:3; 10678:7
**exactly** [9] - 10583:15; 10643:23; 10644:22; 10657:5; 10660:2; 10678:9, 11; 10692:6; 10701:8
**exam** [3] - 10607:7, 10, 12
**EXAMINATION** [6] - 10574:16; 10587:13; 10695:10; 10705:5, 7
**EXAMINATIONS** [1] - 10705:3
**example** [3] - 10612:8; 10678:7; 10680:16
**except** [1] - 10617:3
**exchanged** [2] - 10580:18, 20
**Excuse** [1] - 10618:3
**excuse** [4] - 10632:22; 10633:4; 10652:15, 18
**excused** [2] - 10682:9, 15
**Exhibit** [13] - 10574:23; 10584:21;

10605:1; 10660:8; 10661:14; 10671:18, 23; 10672:22; 10673:8; 10676:14, 19; 10705:12
**exhibit** [4] - 10660:4; 10666:25; 10672:17, 23
**Exhibits** [1] - 10670:23
**EXHIBITS** [1] - 10705:10
**expenses** [1] - 10586:12
**experience** [2] - 10614:9; 10636:11
**Explain** [1] - 10633:6
**explain** [3] - 10582:3; 10612:14; 10619:24
**explained** [2] - 10620:2; 10666:25
**explaining** [2] - 10668:9, 11
**explains** [1] - 10666:14
**explanation** [1] - 10614:13
**Extended** [3] - 10630:4, 6, 12
**extra** [2] - 10611:13

# F

**F-709900** [1] - 10608:6
**face** [6] - 10669:13; 10692:20, 25; 10693:4; 10694:21
**fact** [6] - 10593:1; 10600:17; 10609:21; 10681:18; 10683:16, 20
**Facts** [2] - 10607:21, 24
**facts** [1] - 10640:10
**fair** [3] - 10677:24; 10678:5; 10682:7
**fairly** [1] - 10682:24
**falling** [1] - 10659:23
**falls** [1] - 10662:6
**familiar** [1] - 10584:1
**family** [4] - 10589:24; 10590:4; 10591:2; 10646:19
**far** [2] - 10622:7; 10662:19
**Fat** [2] - 10665:21; 10666:11

**father** [5] - 10588:15, 18; 10590:19; 10662:9, 12
**FBI** [7] - 10581:18; 10675:3, 23; 10677:10; 10678:6; 10685:17, 20
**February** [10] - 10585:20; 10670:23; 10671:4; 10676:4; 10688:7; 10689:8, 12-13; 10690:2, 25
**feet** [3] - 10645:5, 10
**fell** [5] - 10663:11; 10669:13; 10693:12
**fellows** [1] - 10658:8
**felonies** [1] - 10631:18
**felony** [6] - 10630:14, 17; 10631:5, 15
**felt** [1] - 10607:3
**few** [7] - 10583:11; 10586:19, 22; 10645:15; 10646:12; 10664:14, 17
**fifth** [1] - 10596:11
**Fifth** [1] - 10573:3
**filed** [1] - 10604:2
**fill** [1] - 10621:18
**fine** [3] - 10600:18; 10645:16; 10704:1
**finish** [4] - 10625:9; 10626:19; 10638:6; 10669:10
**finished** [1] - 10667:20
**fire** [2] - 10580:13; 10641:20
**firearm** [1] - 10575:13
**fired** [1] - 10581:6
**first** [26] - 10581:17, 19; 10593:15; 10608:16; 10614:6; 10628:7; 10635:14, 19; 10636:2; 10642:4; 10649:4; 10674:15; 10686:9, 12, 14; 10689:23; 10690:2, 24; 10691:7; 10692:4; 10694:9; 10699:10, 12
**five** [2] - 10588:14; 10631:17
**Five** [2] - 10631:18; 10639:15
**flashes** [2] - 10646:14
**Floor** [1] - 10572:17

**floor** [7] - 10577:15; 10615:18; 10617:9; 10618:8, 13; 10624:11; 10688:18
**focus** [1] - 10575:8
**folks** [1] - 10636:16
**Following** [7] - 10599:25; 10623:6; 10627:20; 10668:19; 10681:4; 10682:19; 10684:24
**foot** [4] - 10632:11, 23; 10633:8, 15; 10634:2; 10637:4, 25
**FOR** [1] - 10571:1
**foregoing** [1] - 10704:15
**Forestville** [1] - 10575:12
**forget** [2] - 10578:7; 10674:23
**form** [1] - 10621:19
**forth** [1] - 10588:15
**forthcoming** [2] - 10678:21; 10680:1
**forward** [1] - 10605:17
**fought** [1] - 10694:11
**four** [2] - 10595:16; 10678:15
**fourth** [6] - 10615:17; 10617:9; 10618:13; 10624:11; 10688:18; 10694:19
**Fox** [1] - 10588:2, 6
**frequent** [2] - 10650:10; 10651:3
**friction** [1] - 10655:9
**Friday** [1] - 10699:6
**friend** [5] - 10596:3; 10637:14, 17; 10649:15
**friends** [1] - 10646:20
**Fright** [1] - 10616:10
**front** [7] - 10576:13; 10604:3; 10636:17; 10650:19; 10651:8; 10653:13; 10663:5
**fronted** [5] - 10636:4, 6, 12, 20; 10650:25
**fronting** [1] - 10637:20
**Fuck** [1] - 10614:23
**fuck** [8] - 10576:16; 10615:5, 15; 10618:1; 10641:9; 10662:15; 10692:14, 23
**fucked** [1] -

10617:12
**fucking** [1] - 10614:22
**full** [2] - 10600:15; 10602:3
**fully** [2] - 10678:21; 10699:21
**fun** [1] - 10617:11

## G

**gain** [1] - 10638:16
**game** [1] - 10644:11
**games** [1] - 10666:13
**GARY** [1] - 10572:9
**Gary** [1] - 10572:10
**gas** [1] - 10692:14
**gate** [1] - 10693:12
**gathered** [1] - 10576:5
**Geeka** [1] - 10666:11
**general** [7] - 10585:23; 10612:6; 10623:9, 12; 10628:9; 10646:19; 10656:14
**generally** [1] - 10629:23
**Genesis** [1] - 10600:14
**gentlemen** [4] - 10574:11; 10645:17; 10646:2; 10704:2
**George's** [1] - 10587:25
**Gilberto** [1] - 10571:18
**given** [6] - 10587:1; 10600:10, 15; 10606:7; 10682:22
**glass** [3] - 10667:11, 13; 10669:12
**Glenn** [1] - 10571:16
**Glock** [2] - 10693:14; 10700:8
**gossip** [2] - 10639:24; 10640:6
**government** [18] - 10601:15; 10603:14, 24; 10604:2; 10605:3, 10, 15; 10629:14; 10631:14, 23; 10632:5; 10642:5; 10655:15; 10677:6; 10681:9; 10698:24; 10699:10, 12
**Government's** [8] - 10574:23; 10584:21; 10605:1; 10660:8;

10661:14; 10670:23; 10671:18, 23
**grab** [2] - 10610:7; 10694:24
**Grabbed** [1] - 10693:6
**grabbed** [4] - 10579:8; 10635:22; 10693:14; 10695:2
**Grand** [53] - 10663:2; 10668:4, 9, 21, 25; 10669:16, 24; 10670:24; 10671:1; 10673:20; 10674:25; 10676:4; 10678:20, 22, 24; 10679:7, 12, 20, 25; 10680:10, 18; 10681:6, 9, 16, 18, 22; 10682:25; 10683:16, 21-23, 25; 10684:7, 15; 10685:13, 24; 10686:15; 10689:18; 10690:10; 10691:4, 12; 10699:21, 25; 10700:3; 10701:1, 5, 14; 10702:5, 8, 18, 22; 10703:6
**grand** [27] - 10584:13, 15, 25; 10593:5, 8, 11, 15-16; 10597:7, 13; 10610:12, 23; 10612:20; 10613:5; 10614:5; 10615:19; 10616:14, 18-19; 10617:4; 10625:24; 10641:3, 23; 10642:1
**grandmother's** [1] - 10588:18
**great** [2] - 10683:19, 24
**Greenbelt** [1] - 10572:21
**Greg** [6] - 10578:6; 10579:19; 10580:11, 13, 21
**Gregory** [1] - 10572:13
**GREGORY** [1] - 10571:6
**Griff** [4] - 10578:6; 10580:22; 10581:4
**ground** [7] - 10611:12; 10638:3; 10644:23; 10645:1; 10659:11; 10663:17
**groups** [1] - 10670:13
**Guerrero** [1] -

10571:18
**guess** [7] - 10592:5; 10623:17; 10635:15; 10675:1, 10; 10680:20; 10698:1
**guilty** [4] - 10620:15, 23; 10672:4
**gun** [47] - 10576:21; 10577:19; 10580:6, 10, 12-13; 10581:4; 10625:25; 10630:22; 10632:22; 10634:7; 10635:23; 10636:18, 21; 10647:15-17; 10663:11, 17; 10667:1, 16; 10678:25; 10682:22; 10683:6, 9; 10686:5; 10693:21, 23; 10694:7, 13-14, 21, 24; 10695:2; 10696:22; 10700:12, 17, 20, 23; 10702:2, 5, 9; 10703:14, 16, 19
**guns** [4] - 10648:1; 10682:21; 10696:23, 25
**guy** [2] - 10637:7; 10693:1
**guys** [10] - 10611:18; 10614:1; 10616:22; 10617:9; 10619:21; 10620:13; 10621:2; 10638:18; 10665:18; 10666:12
**gym** [2] - 10618:21

## H

**half** [1] - 10651:22
**hallucinate** [1] - 10594:25
**hallucinating** [1] - 10670:7
**hallucination** [1] - 10606:10
**hallucinations** [2] - 10592:24; 10593:1
**hand** [10] - 10588:9; 10590:25; 10661:14; 10667:11, 13, 20; 10669:12
**hand-me-down** [2] - 10588:9; 10590:25
**handle** [1] - 10643:8
**hang** [1] - 10670:9
**Harford** [1] - 10572:10

**hat** [1] - 10581:7
**head** [7] - 10597:5; 10667:16, 25; 10668:5; 10692:5, 10
**Head** [2] - 10635:4; 10666:10
**headed** [2] - 10600:20; 10660:18
**hear** [3] - 10577:5; 10611:12; 10677:23
**heard** [8] - 10577:16; 10633:23; 10639:24; 10640:1; 10657:11; 10683:21, 25
**Heights** [2] - 10594:3, 5
**held** [2] - 10585:17; 10608:23
**Hell** [1] - 10650:20
**help** [1] - 10670:21
**helped** [1] - 10644:11
**heroin** [13] - 10593:18; 10594:11, 18; 10595:9, 22, 24; 10596:1; 10598:2, 9, 23; 10599:6; 10609:19; 10611:21
**high** [8] - 10594:18; 10595:8; 10598:2; 10599:8, 10, 12; 10607:2; 10657:3
**highed** [1] - 10594:16
**Hill** [1] - 10575:12
**himself** [5] - 10632:10, 23; 10633:8, 15; 10634:2
**hit** [14] - 10580:23; 10581:2, 7, 10-11, 14, 21; 10582:4; 10607:2; 10610:7; 10611:11; 10644:10
**hitting** [2] - 10653:3; 10692:14
**hmm** [4] - 10595:25; 10606:20; 10607:23; 10693:20
**hold** [1] - 10618:9
**Hold** [2] - 10581:5; 10699:5
**holding** [3] - 10579:25; 10580:3, 9
**hole** [10] - 10615:9, 12, 14, 16; 10621:23; 10622:9, 11, 15
**holla** [1] - 10641:11
**holler** [1] - 10641:14
**home** [6] - 10576:5, 7; 10643:22, 25;

10652:19
**homicide** [3] - 10672:9, 11; 10680:2
**Honor** [57] - 10574:4, 9, 15; 10583:9; 10584:18; 10585:2; 10587:10; 10597:8; 10598:24; 10599:23; 10600:9; 10604:12; 10614:11; 10622:4; 10623:3, 16, 22; 10627:7; 10629:5; 10645:16; 10647:8, 14; 10650:2; 10653:16; 10655:10, 16, 19; 10660:4, 7-8, 22; 10668:13, 20; 10672:16; 10672:16, 22; 10673:2; 10674:10; 10676:16, 25; 10677:2, 4; 10680:24; 10681:1, 5, 15, 25; 10682:17, 20; 10684:21; 10687:22; 10692:3; 10695:5, 9; 10701:10; 10704:1
**HONORABLE** [1] - 10571:12
**hood** [1] - 10638:14; 10657:18, 20
**hoping** [2] - 10626:6, 8
**Hot** [1] - 10646:14
**hot** [1] - 10646:15
**hotel** [1] - 10586:11
**hour** [1] - 10578:14; 10622:12
**House** [3] - 10630:4, 7, 12
**house** [11] - 10577:1, 14; 10578:20; 10588:19; 10597:16; 10641:9; 10644:1; 10649:10; 10679:9, 21
**hung** [1] - 10640:12
**hurt** [1] - 10582:11
**husher** [1] - 10676:25

## I

**identified** [1] - 10677:17
**illegal** [2] - 10609:9, 14
**imagine** [1] - 10666:24
**immediate** [1] -

10624:24
**immediately** [1] - 10585:23
**impeach** [1] - 10628:16
**impeaching** [2] - 10627:22; 10628:5
**impeachment** [5] - 10627:8; 10628:11, 17; 10668:15
**important** [2] - 10632:4, 6
**improper** [3] - 10627:7; 10628:11, 17
**in-between** [1] - 10673:18
**incarcerated** [5] - 10590:5, 7-9; 10612:4
**incident** [20] - 10575:19; 10599:1, 5, 9; 10632:14; 10634:8; 10637:3, 6, 21; 10640:23; 10642:13, 15; 10643:14; 10647:7, 14; 10691:18, 21; 10694:17; 10700:19; 10702:2
**incidents** [3] - 10670:14; 10685:3; 10700:4
**include** [1] - 10629:1
**included** [1] - 10683:14
**including** [1] - 10605:5
**indicaring** [1] - 10611:12
**indicate** [2] - 10615:19; 10616:3
**indicated** [19] - 10579:9; 10596:11; 10604:10; 10605:10, 24; 10606:9; 10609:13; 10632:17; 10642:20; 10644:22; 10647:6; 10648:5; 10650:9; 10657:4; 10658:16; 10659:7, 19; 10664:23; 10665:23
**Indicating** [1] - 10660:3
**indicating** [3] - 10629:11; 10687:21
**indicating)** [2] - 10610:8; 10692:2
**Indicating)** [5] - 10660:12; 10661:9;

10667:9; 10668:3; 10687:19
**indirect** [1] - 10699:15
**individual** [10] - 10575:13; 10576:5, 21; 10584:1; 10608:9; 10612:24; 10619:2; 10648:9; 10655:24; 10658:9
**individuals** [15] - 10575:23; 10577:8, 10, 17; 10578:12; 10613:2; 10618:15; 10621:2; 10634:23; 10636:23; 10648:6; 10654:19; 10655:2; 10669:20; 10683:8
**indulgence** [7] - 10587:9; 10610:10; 10623:22; 10662:25; 10663:24; 10695:14; 10698:25
**influence** [2] - 10609:19; 10611:21
**information** [5] - 10600:9, 12, 15; 10613:4; 10699:13
**inquire** [1] - 10600:5
**inside** [1] - 10578:24
**insisted** [2] - 10591:13, 16
**institution** [1] - 10622:21
**intend** [1] - 10605:15
**intent** [2] - 10631:4, 7
**interested** [1] - 10615:7
**intervening** [1] - 10604:6
**interview** [2] - 10609:2; 10674:19
**interviewed** [7] - 10608:1, 9, 11, 13; 10672:9; 10702:21
**interviews** [1] - 10642:10
**involved** [6] - 10596:12; 10617:19; 10620:20; 10621:21; 10673:12; 10679:5
**issue** [2] - 10669:1; 10684:5
**issues** [1] - 10623:8
**it'd** [1] - 10593:25

**J**

**jacket** [1] - 10646:13
**Jackson** [2] - 10619:2
**Jacques** [1] - 10575:16
**jail** [11] - 10581:18; 10612:13; 10614:8, 12; 10615:9; 10621:9; 10626:4; 10628:12; 10653:9; 10697:23; 10698:5
**Jamel** [15] - 10595:21; 10599:1; 10625:22; 10672:10; 10679:4; 10681:17, 23; 10683:15; 10684:6, 20; 10685:2; 10686:12; 10690:11; 10699:19; 10700:24
**James** [2] - 10571:21; 10572:13
**JAMES** [1] - 10572:12
**January** [10] - 10603:6; 10672:5; 10673:5; 10675:25; 10676:2, 7-9; 10677:8
**JENIFER** [1] - 10572:6
**Jenifer** [1] - 10572:7
**job** [1] - 10618:22
**John** [4] - 10571:21; 10634:10, 12; 10638:5
**Johnson** [1] - 10653:5
**joint** [6] - 10607:22; 10635:21; 10641:10; 10660:15; 10661:17; 10692:13
**JONATHAN** [1] - 10572:16
**Jonathan** [1] - 10572:16
**JONES** [1] - 10571:7
**Jones** [1] - 10572:20
**Joseph** [1] - 10572:20
**JOSEPH** [1] - 10571:7
**Jr** [1] - 10572:13
**JT** [13] - 10575:16; 10576:14, 25; 10579:16, 25; 10581:23; 10649:14, 17; 10679:7, 10, 20, 23

**Judge** [5] - 10626:21; 10630:2, 4; 10672:4; 10682:13
**judge** [5] - 10602:10, 12; 10604:3; 10626:21; 10630:6
**JUDGE** [1] - 10571:13
**July** [5] - 10675:7-9; 10677:7; 10678:7
**Jumah** [6] - 10697:22; 10698:10, 20, 22; 10699:1, 6
**jump** [1] - 10638:25
**jumped** [15] - 10576:15; 10581:6, 12-13; 10644:23; 10645:7, 12; 10692:15, 24-25; 10696:16; 10697:2
**jumping** [1] - 10646:23
**jury** [30] - 10574:8; 10584:13, 15, 25; 10593:5, 8, 11, 15-16; 10597:7, 13; 10610:12, 24; 10612:20; 10613:5; 10614:5; 10615:19; 10616:14, 18-19; 10617:4; 10625:25; 10641:3, 23; 10642:1; 10645:19; 10704:5
**JURY** [4] - 10571:12; 10574:12; 10646:3
**Jury** [57] - 10574:10; 10645:21; 10646:1; 10663:2; 10668:4, 9, 21, 25; 10669:16, 24; 10670:24; 10671:1; 10673:20; 10674:25; 10676:4; 10678:20, 22, 24; 10679:7, 12, 20, 25; 10680:10, 18; 10681:7, 9, 16, 18, 22; 10682:25; 10683:16, 21-23, 25; 10684:7, 15; 10685:14, 24; 10686:15; 10689:18; 10690:10; 10691:4, 12; 10699:22, 25; 10700:3; 10701:1, 5, 14; 10702:5, 8, 18, 22; 10703:6; 10704:6

**K**

**Kai** [4] - 10580:11; 10581:5; 10618:6;

10677:22
**Kairi** [3] - 10589:12; 10590:10; 10701:14
**KAIRI** [6] - 10574:16; 10587:13; 10695:10; 10705:5, 7
**keep** [1] - 10614:24
**Keith** [3] - 10624:3, 5
**KELLIEBREW** [6] - 10574:16; 10587:13; 10695:10; 10705:5, 7
**Kelliebrew** [12] - 10574:18; 10575:1, 14-15; 10587:15, 17; 10597:1; 10646:8, 10; 10695:12; 10699:4; 10701:14
**kept** [2] - 10618:7; 10692:14
**kick** [2] - 10602:19
**kicked** [1] - 10600:5
**kicking** [1] - 10698:9
**kicks** [1] - 10611:13
**kids** [2] - 10591:2, 16
**Kiki** [1] - 10649:10
**kill** [4] - 10634:13; 10642:21; 10643:5; 10683:10
**killed** [23] - 10596:19; 10614:23; 10637:4; 10638:4; 10655:25; 10656:4; 10658:17; 10659:18; 10662:9, 12; 10666:6; 10668:12; 10670:3, 6; 10684:20; 10685:21; 10686:12; 10695:16, 20, 25; 10697:25; 10698:14
**kind** [8] - 10600:3; 10601:9, 23; 10623:12; 10630:9; 10662:20; 10696:22
**kitchen** [2] - 10577:12
**kite** [1] - 10594:19
**knee** [2] - 10645:1; 10646:24
**knowledge** [6] - 10634:22; 10653:22; 10654:16; 10655:11; 10698:10; 10699:16
**known** [2] - 10575:13; 10576:9
**knows** [1] - 10683:9
**knuckles** [6] - 10665:20-22; 10666:1; 10668:8, 11
**Krisna** [6] - 10576:14; 10577:23,

25; 10579:16; 10580:8

## L

**ladies** [2] - 10574:11; 10646:2
**Ladies** [2] - 10645:17; 10704:2
**landed** [1] - 10644:23
**language** [3] - 10618:3; 10652:16, 18
**largest** [2] - 10650:16; 10651:15
**Larry** [2] - 10624:9
**last** [16] - 10588:16; 10593:25; 10594:15, 17; 10604:10, 16, 20; 10614:19; 10639:21; 10649:8; 10655:6; 10678:15; 10691:17; 10698:8; 10701:17
**late** [3] - 10643:21; 10649:9
**laughing** [1] - 10645:7
**LAW** [6] - 10572:6, 12, 16, 19, 22; 10573:2
**law** [20] - 10605:21; 10606:4; 10611:24; 10620:11; 10642:11; 10672:14; 10673:16, 19, 25; 10674:7, 14; 10677:9; 10678:6; 10685:15, 20; 10686:18; 10699:14; 10702:21
**laws** [1] - 10605:4
**lawyer** [3] - 10603:17; 10619:24; 10674:3
**lead** [1] - 10629:2
**lead-up** [1] - 10629:2
**leading** [1] - 10600:6
**learn** [1] - 10696:22
**least** [12] - 10598:2; 10604:10; 10609:1; 10623:18; 10628:16; 10630:14; 10639:15; 10642:10; 10674:15; 10682:1; 10689:5
**leave** [7] - 10576:22; 10578:1, 17, 19; 10585:22; 10602:13; 10704:5

**left** [20] - 10574:21; 10575:20, 22; 10585:24; 10602:21; 10610:14, 24; 10624:10; 10628:23; 10644:12, 14-15; 10663:11, 18; 10665:7, 13-14; 10686:4
**legitimate** [1] - 10600:18
**length** [2] - 10683:19, 24
**Leon** [1] - 10571:16
**letter** [3] - 10671:14, 20, 24
**Letter** [2] - 10631:19, 23
**levels** [1] - 10621:24
**Lewis** [15] - 10636:24; 10637:20; 10653:13, 20; 10655:5, 14, 24; 10658:2; 10662:6, 17; 10670:3, 6
**license** [1] - 10631:10
**lie** [27] - 10609:16; 10626:11, 14-15, 17, 21; 10627:2, 12, 24-25; 10628:1, 5, 7, 10, 14, 23; 10629:6, 21-22; 10700:14, 16
**lied** [16] - 10593:5, 9; 10626:3, 19; 10678:22, 25; 10702:25; 10703:3, 6, 10, 13, 16, 19, 22
**lies** [1] - 10702:11
**life** [11] - 10620:16; 10626:9, 12, 15, 22; 10627:3, 13; 10628:1, 6; 10629:7, 22
**lift** [1] - 10692:9
**lights** [3] - 10591:6, 8
**likely** [1] - 10657:1
**Lincoln** [6] - 10594:3, 5; 10656:20; 10658:8, 21; 10659:22
**line** [8] - 10596:25; 10610:13; 10626:24; 10663:2; 10680:25; 10681:12; 10685:6; 10689:13
**listed** [2] - 10673:12; 10691:5
**Listen** [2] - 10626:19; 10638:1
**listened** [2] -

10617:17, 20
**literally** [1] - 10701:2
**live** [1] - 10577:13
**lived** [1] - 10588:17
**living** [9] - 10588:8, 12, 20-21; 10589:2, 8; 10590:8, 11, 15
**LLC** [1] - 10572:9
**local** [1] - 10576:6
**located** [1] - 10594:6
**location** [1] - 10588:5
**lock** [2] - 10615:2; 10621:23
**lockdown** [3] - 10622:2, 10
**locked** [28] - 10584:8, 10, 12; 10602:25; 10603:11, 14; 10607:5, 9; 10608:2, 6; 10612:5; 10614:5; 10615:2; 10619:6, 21; 10621:9; 10622:18; 10636:2; 10640:5; 10652:6; 10653:10; 10688:3; 10689:6, 11, 19; 10690:17, 19
**look** [5] - 10611:10; 10627:23; 10628:4; 10638:25; 10662:19
**Look** [3] - 10664:18; 10689:22; 10690:9
**looked** [1] - 10662:23
**looking** [4] - 10584:15; 10597:25; 10598:1; 10680:24
**lower** [1] - 10661:14
**Lower** [1] - 10668:23
**LT** [5] - 10696:4, 16, 19; 10697:6, 15
**lunch** [5] - 10586:20, 24; 10704:3, 5, 7
**luncheon** [1] - 10704:11
**lunching** [3] - 10606:11, 21
**lurching** [1] - 10606:11
**lying** [1] - 10696:2
**Lying** [1] - 10628:12

## M

**ma'am** [8] - 10696:6, 9; 10697:4, 10, 12; 10701:21, 23; 10702:1

**machine** [1] - 10573:11
**machines** [1] - 10686:20
**Mack** [11] - 10576:15; 10577:20, 22-24; 10579:8; 10580:1, 4-5, 7
**mad** [1] - 10597:24
**major** [1] - 10674:15
**Malcolm** [3] - 10598:6; 10686:1, 11
**man** [5] - 10620:9; 10637:5; 10645:6; 10687:24
**Man** [9] - 10579:2, 17; 10614:24; 10615:1, 22; 10620:9; 10635:8, 24
**man'** [1] - 10638:3
**marijuana** [6] - 10592:2, 5; 10596:6; 10604:11, 17; 10631:8
**marked** [6] - 10584:21; 10672:16; 10676:13, 15, 19; 10705:12
**Marlboro** [3] - 10588:3, 6
**married** [1] - 10586:4
**Marsh** [1] - 10619:6
**MARTIN** [1] - 10572:19
**Martin** [1] - 10572:20
**Maryland** [3] - 10575:13; 10587:18, 24
**mass** [1] - 10693:2
**matter** [6] - 10626:23; 10678:7; 10680:2; 10682:3; 10699:15; 10704:16
**MAY** [1] - 10574:1
**Mazzitelli** [1] - 10574:24
**McGriff** [1] - 10608:10
**MD** [4] - 10572:11, 21, 24; 10573:6
**meal** [2] - 10591:19, 23
**mean** [18] - 10579:20; 10580:19, 24; 10581:2; 10591:5; 10597:4; 10617:14; 10618:2; 10628:14; 10635:6; 10637:17; 10638:20, 24; 10648:20; 10653:3;

10664:25; 10692:12; 10697:6
**means** [2] - 10631:15; 10652:17
**meant** [1] - 10696:11
**Meanwhile** [1] - 10576:6
**Meat** [18] - 10575:14; 10576:5, 8, 14, 25; 10577:12; 10578:4, 9, 11; 10579:4, 7, 10, 14, 16; 10620:24
**Meat's** [10] - 10575:16, 23; 10576:1, 5, 12, 17, 19; 10577:2, 4, 13
**mechanism** [1] - 10621:11
**meet** [5] - 10586:6, 10; 10675:7, 9, 13
**meeting** [4] - 10583:4, 19; 10674:11; 10680:22
**meetings** [13] - 10673:16, 18-19, 23; 10675:2, 5; 10676:11; 10677:9, 25; 10678:5, 12; 10685:16, 19
**member** [1] - 10575:15
**members** [1] - 10613:25
**memories** [1] - 10680:13
**memory** [8] - 10594:24; 10595:1; 10639:12; 10641:7; 10664:16; 10680:14; 10682:20; 10683:4
**mention** [2] - 10681:7; 10682:4
**mentioned** [5] - 10642:4; 10678:11; 10679:10, 23; 10683:17
**mentions** [1] - 10683:9
**message** [1] - 10625:16
**messing** [1] - 10641:8
**met** [7] - 10581:17, 19; 10586:19, 22; 10641:14; 10653:5; 10675:23
**mic** [1] - 10660:6
**microphone** [2] - 10660:23; 10667:4
**mid** [2] - 10645:14, 18

**mid-morning** [2] - 10645:14, 18
**middle** [1] - 10588:17
**might** [9] - 10590:16; 10594:16; 10623:15; 10636:12; 10639:1; 10657:3
**Miller** [2] - 10626:24; 10671:6
**millimeter** [1] - 10703:20
**mind** [1] - 10582:9
**minute** [1] - 10703:25
**minutes** [1] - 10664:14
**mischaracterizes** [1] - 10647:8
**Misstates** [1] - 10604:12
**misstating** [1] - 10647:21
**mistake** [1] - 10670:19
**mistaken** [10] - 10633:12; 10644:14; 10664:3, 7; 10665:3; 10666:10; 10669:22; 10672:18; 10697:22
**mixed** [1] - 10592:19
**moment** [3] - 10627:16; 10684:10; 10698:18
**moments** [1] - 10646:12
**momma** [2] - 10654:8, 10
**Moms'** [1] - 10640:14
**money** [25] - 10586:14, 16; 10587:1; 10634:19; 10635:20-22, 24; 10636:10, 12, 14, 21-22; 10637:2; 10638:25; 10639:2; 10647:6, 11, 15, 17, 19, 23; 10650:15; 10651:14; 10654:24
**monitored** [2] - 10624:24; 10625:18
**months** [8] - 10601:22; 10603:2; 10604:21, 23; 10605:11; 10621:8; 10688:23
**mood** [1] - 10638:19
**morning** [14] - 10574:11; 10587:15; 10597:20, 22;

10636:7, 9; 10645:14, 18; 10646:2; 10695:12
**MORNING** [2] - 10571:11; 10574:1
**most** [1] - 10605:16
**mothafuckas** [2] - 10662:8, 12
**mothafucking** [1] - 10700:23
**mother** [10] - 10588:15; 10589:6; 10590:18; 10641:9; 10654:9; 10680:23; 10686:1, 11; 10696:12, 20
**motion** [2] - 10600:11; 10604:2
**mouth** [5] - 10640:1; 10643:16; 10668:5; 10669:14; 10670:15
**move** [1] - 10622:23
**moved** [9] - 10588:18; 10589:24; 10590:4; 10599:4; 10622:20, 24; 10688:19, 25; 10689:14
**moving** [1] - 10692:9
**MR** [81] - 10578:22; 10583:9, 21; 10587:12, 14; 10597:10, 12; 10599:3; 10600:9, 23, 25; 10604:15, 19; 10605:1; 10610:10; 10614:13, 19; 10615:6; 10622:13; 10623:16, 22, 25; 10627:10; 10629:5, 20; 10645:16; 10646:5, 7; 10647:10, 13; 10650:5; 10653:16, 19; 10655:13, 16, 19-20; 10660:6, 9, 22, 25; 10662:25; 10663:1, 24-25; 10668:17, 20, 24; 10669:9; 10671:17, 22; 10672:16, 20, 22, 25; 10673:3; 10674:13; 10676:13, 16, 18; 10677:4; 10681:1, 5, 25; 10682:9, 11, 17, 20; 10684:13; 10685:1, 8, 10, 12; 10687:25; 10692:8; 10695:5; 10705:7
**MS** [58] - 10574:4, 9,

15, 17, 24-25; 10579:6; 10581:25; 10582:2; 10583:11, 13, 25; 10584:18, 20, 22; 10585:2, 6; 10587:9; 10597:8; 10598:24; 10599:23; 10600:1; 10604:12; 10614:11; 10622:4, 6; 10623:3, 8; 10627:7, 18, 21; 10628:21; 10629:17; 10647:8; 10650:2; 10655:10; 10668:13, 15; 10669:5; 10671:16, 20; 10673:2; 10674:10; 10677:2; 10680:24; 10681:15; 10683:4; 10684:21; 10687:22; 10695:9, 11; 10698:25; 10699:3; 10701:10, 12; 10704:1; 10705:6, 9
**Mulberry** [1] - 10573:6
**Munya** [19] - 10617:24; 10618:1, 4-5, 7, 18, 23; 10624:1, 3; 10632:15; 10642:16; 10643:16; 10644:5; 10647:6, 18; 10654:11; 10655:9
**murder** [8] - 10679:4; 10681:19, 24; 10682:4; 10683:11, 19, 23, 25
**murders** [1] - 10634:21
**Muslim** [1] - 10699:6

## N

**N.W** [2] - 10571:22; 10572:13
**name** [17] - 10578:6-8; 10589:22; 10599:19; 10600:2, 21; 10608:9, 12; 10614:20; 10619:2, 5, 7; 10637:10; 10674:22
**named** [5] - 10584:1; 10637:7; 10669:23; 10670:8
**names** [6] - 10588:25; 10617:23; 10659:5; 10664:17; 10670:8; 10674:14
**narrative** [1] -

10683:13
**naw** [1] - 10666:17
**Naw** [20] - 10579:24; 10581:11; 10584:12; 10592:12; 10594:21; 10618:9, 12; 10636:20; 10637:21; 10638:14; 10640:16; 10641:5, 7; 10647:3; 10649:24; 10652:23; 10653:10; 10658:11; 10659:12; 10665:16
**nearly** [1] - 10691:8
**need** [2] - 10582:3; 10681:1
**neighbor** [1] - 10581:24
**neighborhood** [3] - 10577:7; 10638:15; 10639:25
**neighborhoods** [1] - 10638:22
**nervous** [3] - 10646:16, 19
**nervousness** [1] - 10646:14
**neurological** [4] - 10607:6, 10, 12, 22
**Never** [6] - 10619:1; 10642:13; 10651:9; 10654:2; 10655:4
**never** [11] - 10605:18; 10608:20, 25; 10609:14; 10616:24; 10617:13-15; 10618:5; 10626:17; 10630:22; 10642:14; 10650:8; 10651:21; 10654:4; 10684:7; 10702:19, 22
**new** [1] - 10609:18
**next** [14] - 10596:1; 10599:12; 10607:3; 10615:12, 16; 10636:1; 10644:18; 10664:10; 10665:2; 10674:19; 10687:21; 10692:9, 19
**Next** [1] - 10657:14
**nickname** [1] - 10619:8
**nigga** [1] - 10580:14
**niggas** [2] - 10577:18; 10638:18
**night** [11] - 10591:9; 10595:24; 10598:22; 10599:8, 10; 10610:15, 25; 10611:20; 10643:18;

10683:13
**nighttime** [1] - 10643:19
**nobody** [8] - 10578:20, 25; 10579:2, 24; 10581:11; 10582:11; 10652:23; 10680:7
**Non** [1] - 10653:16
**non** [2] - 10581:25; 10653:17
**Non-responsive** [1] - 10653:16
**non-responsive** [2] - 10581:25; 10653:17
**none** [4] - 10595:1; 10605:19; 10664:11; 10696:24
**note** [1] - 10683:4
**notes** [7] - 10645:19; 10686:22; 10687:3, 12-13; 10704:5
**Nothing** [1] - 10577:18
**nothing** [10] - 10577:19; 10580:14; 10581:11; 10597:16; 10605:18; 10632:1, 6; 10643:4; 10646:21
**November** [41] - 10575:12; 10582:15; 10584:25; 10593:4, 9; 10596:24; 10610:12; 10617:5; 10663:2; 10668:9; 10671:1, 9, 12; 10672:13; 10673:16-18, 25; 10678:21, 24; 10685:13, 15, 23; 10686:7, 15; 10688:2, 6; 10689:12, 22; 10690:9, 14-15; 10691:2; 10699:9, 25; 10700:1, 3, 11; 10701:2, 14; 10702:18
**nowhere** [3] - 10701:19, 22, 24
**number** [8] - 10639:19; 10641:15; 10660:4; 10672:17; 10675:2; 10680:25
**Number** [1] - 10676:20
**numerous** [1] - 10684:15
**NW** [4] - 10572:4, 7, 17; 10573:3

# O

**oath** [9] - 10574:19; 10608:16; 10689:18, 24; 10690:3, 10, 24; 10691:8
**object** [3] - 10614:11; 10668:13; 10674:10
**objected** [1] - 10628:18
**objecting** [1] - 10628:24
**objection** [10] - 10599:23; 10623:4, 7, 14; 10628:22; 10671:19; 10672:24; 10673:1; 10674:11; 10677:1
**Objection** [20] - 10578:22; 10581:25; 10583:9, 21; 10597:8; 10598:24; 10604:12; 10622:4, 7; 10623:3; 10627:7, 18; 10647:8; 10650:2; 10653:16; 10655:10; 10671:16; 10684:21; 10687:22
**observe** [1] - 10655:25
**observed** [1] - 10702:15
**occasionally** [3] - 10586:20, 24; 10649:24
**occasions** [1] - 10670:10
**occur** [4] - 10670:20; 10687:8; 10689:18
**occurred** [13] - 10576:8; 10582:24; 10583:1; 10602:25; 10632:13, 17, 21; 10633:2; 10643:15; 10644:19; 10659:7; 10700:5
**October** [2] - 10575:12; 10582:15
**OF** [14] - 10571:1, 3, 12; 10572:6, 12, 16, 19; 10573:2; 10574:16; 10587:13; 10695:10; 10705:5, 7
**off-the-wall** [2] - 10596:20; 10597:5
**Office** [3] - 10675:3; 10677:10; 10699:14
**office** [4] - 10586:11, 14, 16; 10587:5

**OFFICE** [6] - 10571:15; 10572:6, 12, 16, 19, 22
**officer** [2] - 10621:14; 10677:21
**officers** [5] - 10586:7; 10610:16; 10611:1; 10672:9; 10674:5
**OFFICES** [1] - 10573:2
**Official** [2] - 10573:8; 10704:18
**often** [15] - 10591:11; 10594:9; 10595:2, 4-5, 13; 10606:10; 10618:20; 10639:9, 13; 10648:16, 25; 10651:10, 23
**old** [7] - 10588:12; 10590:2; 10597:4; 10617:18; 10659:17
**once** [9] - 10578:17; 10580:23; 10581:2-4; 10583:6; 10652:13; 10669:11
**One** [4] - 10572:23; 10627:16; 10682:22; 10698:16
**one** [40] - 10577:19; 10580:21; 10581:7; 10590:4; 10592:19; 10594:15; 10601:11; 10617:3; 10619:15, 20; 10620:24; 10622:11, 15; 10623:19; 10624:14; 10634:15; 10639:21; 10642:20; 10644:9; 10655:6; 10669:21; 10670:7; 10677:13; 10678:5, 10; 10679:8; 10680:18; 10681:25; 10683:13, 16; 10684:2; 10685:9; 10691:17; 10698:11, 14
**onwards** [1] - 10648:6
**open** [3] - 10623:10; 10661:24; 10662:1
**open-ended** [1] - 10623:10
**opened** [7] - 10660:15; 10662:2-4; 10663:8; 10668:1; 10692:24
**opening** [3] - 10659:22, 25; 10663:5

**opportunities** [1] - 10681:13
**opportunity** [1] - 10682:8
**Ounce** [3] - 10651:16, 18, 20
**ounce** [1] - 10651:19
**ounces** [1] - 10651:21
**outdoors** [1] - 10591:8
**outs** [1] - 10620:2
**outside** [18] - 10576:6, 19; 10577:5, 10, 17; 10578:21, 25; 10579:2; 10638:14; 10654:18; 10655:10; 10658:17; 10662:11, 14
**overheard** [2] - 10634:10, 12
**Overruled** [4] - 10583:22; 10597:11; 10674:12; 10687:23
**owe** [1] - 10635:24
**owed** [2] - 10635:20; 10637:2
**own** [2] - 10602:21; 10638:16

# P

**p.m** [2] - 10704:6, 12
**Pack** [2] - 10615:3
**page** [15] - 10575:5, 8; 10596:25; 10610:13; 10626:24; 10663:2; 10668:10; 10680:25; 10681:11; 10683:7, 17; 10701:17, 19, 22
**Page** [1] - 10705:3
**pages** [2] - 10701:8
**paid** [2] - 10586:20; 10650:24
**PANEL** [2] - 10574:12; 10646:3
**paperwork** [3] - 10675:13, 23; 10687:12
**paragraph** [4] - 10575:6, 8-9; 10676:20
**paralyzed** [1] - 10579:10
**Pardon** [3] - 10599:21; 10602:9; 10650:21
**pardon** [1] -

10668:14
**Park** [26] - 10586:1; 10588:17; 10612:4; 10613:21, 24; 10614:2; 10617:7, 9; 10619:13; 10634:17, 24-25; 10638:11; 10654:19; 10656:13; 10659:1; 10680:12; 10684:16; 10685:3; 10689:17, 25; 10690:3, 12, 25; 10691:8
**park** [1] - 10692:21
**parking** [2] - 10580:2; 10581:12
**Part** [2] - 10591:22; 10606:10
**part** [12] - 10582:6; 10591:19; 10601:24; 10605:3; 10606:3; 10620:14, 19; 10621:1; 10623:7; 10628:19; 10631:13; 10663:5
**particular** [8] - 10588:1; 10600:6; 10620:18; 10657:22, 25; 10686:6; 10698:12
**partner** [1] - 10674:21
**partner's** [2] - 10674:22
**party** [1] - 10600:12
**pass** [1] - 10683:1
**passage** [1] - 10682:1
**past** [4] - 10606:22; 10623:11; 10626:3; 10690:15
**PATTON** [1] - 10572:2
**Pause** [1] - 10611:10
**pause** [1] - 10574:6
**Pay** [1] - 10636:14
**pay** [8] - 10586:11; 10587:5; 10624:21; 10636:6, 10, 12; 10651:4
**paying** [1] - 10651:1
**payment** [1] - 10682:24
**PC** [3] - 10621:25; 10622:10, 16
**PCP** [18] - 10592:8, 22-23; 10593:5, 9, 12-13; 10594:23; 10595:9; 10596:3; 10599:6; 10606:10,

17; 10621:25; 10656:24; 10670:1; 10703:22
**penchant** [1] - 10636:18
**Pennsylvania** [1] - 10571:22
**pennsylvania** [1] - 10572:4
**People** [2] - 10639:5; 10659:1
**people** [34] - 10576:22; 10578:9; 10581:6; 10596:7; 10612:3, 5; 10613:19; 10614:25; 10616:17; 10617:1; 10619:15; 10623:12; 10634:25; 10635:4; 10636:17; 10637:1; 10638:23; 10639:18; 10653:3; 10657:21; 10658:12, 23; 10669:23; 10670:1; 10677:15; 10679:3, 13; 10680:1, 11; 10689:17; 10694:18
**peoples** [2] - 10614:22; 10670:13
**per** [3] - 10594:11; 10645:5, 10
**perception** [2] - 10594:20, 23
**perform** [2] - 10632:4, 8
**period** [22] - 10585:17; 10591:7; 10595:10; 10604:6; 10606:25; 10616:21; 10628:22; 10630:11; 10638:12; 10640:4; 10649:1; 10651:10, 25; 10652:3, 24; 10653:9; 10673:21; 10674:25; 10685:23; 10690:14, 19
**permission** [1] - 10585:3
**person** [3] - 10631:22; 10655:22; 10694:19
**personal** [1] - 10638:16
**Personal** [1] - 10638:17
**persons** [2] - 10631:22; 10679:8
**Petalas** [7] - 10571:17; 10574:3, 8, 14; 10585:4;

10620:18, 23
**PETALAS** [49] -
10574:4, 9, 15, 17,
24-25; 10579:6;
10582:2; 10583:11,
13, 25; 10584:18, 20,
22; 10585:2, 6;
10587:9; 10597:8;
10598:24; 10599:23;
10600:1; 10604:12;
10614:11; 10622:4, 6;
10623:3, 8; 10627:7,
18, 21; 10628:21;
10629:17; 10647:8;
10650:2; 10655:10;
10668:13, 15;
10669:5; 10671:16,
20; 10673:2;
10674:10; 10677:2;
10680:24; 10681:15;
10683:4; 10684:21;
10687:22; 10705:6
**Phil** [12] - 10632:10,
22; 10633:7, 9, 14,
25; 10634:1, 3, 5-6;
10642:16; 10644:7
**phone** [7] -
10624:17, 21, 23;
10625:7, 10, 14
**photograph** [1] -
10660:19
**phrase** [1] -
10606:11
**phrased** [1] -
10684:5
**physical** [2] -
10610:16; 10611:1
**physically** [1] -
10610:20
**pick** [1] - 10683:1
**picture** [7] - 10641:1,
4, 10-11, 15-16;
10655:21
**Pike** [3] - 10588:3, 6
**pills** [6] - 10595:2-4;
10598:19, 21;
10599:5
**pistol** [1] - 10631:10
**Place** [2] - 10588:12;
10589:24
**place** [8] - 10590:5;
10591:5; 10657:7;
10678:15; 10681:16,
18, 21; 10696:7
**placed** [4] -
10608:16; 10684:14;
10690:2, 10
**Plaintiff** [1] - 10571:4
**plan** [6] - 10596:6;
10634:9, 20;

10642:21; 10649:17,
19
**play** [2] - 10642:14;
10666:1
**playing** [7] -
10665:20-22;
10666:1, 13; 10668:8,
11
**plea** [25] - 10619:21,
25; 10620:3, 14, 19;
10621:1; 10631:14;
10671:9, 12, 24;
10672:1, 4; 10675:1;
10688:14, 16, 20-21;
10689:8; 10690:15;
10698:23; 10699:10,
12, 24; 10703:2, 5
**plead** [1] - 10582:10
**pleaded** [1] -
10620:17
**pleading** [1] -
10620:14
**pled** [4] - 10582:6;
10620:16, 19, 23
**PLLC** [1] - 10572:3
**point** [18] - 10576:1,
19; 10579:23;
10581:9, 14; 10582:4;
10585:21; 10589:25;
10590:9; 10616:10;
10628:18; 10634:21;
10661:23; 10677:2;
10680:10; 10682:1,
23; 10683:16
**Point** [1] - 10572:20
**pointed** [2] -
10576:15; 10628:20
**pointing** [6] -
10580:12; 10628:24;
10660:5, 13, 16;
10661:13
**Police** [1] - 10658:25
**police** [15] -
10609:22; 10610:3;
10658:14; 10659:20;
10661:7, 12, 24;
10662:2; 10665:1;
10668:1; 10682:2;
10703:3
**popped** [7] -
10580:22; 10610:9;
10615:3; 10642:6;
10677:21
**porch** [3] - 10576:14,
16; 10581:24
**portable** [1] -
10660:23
**portion** [1] - 10669:4
**posed** [3] -
10629:21; 10679:12;

10684:7
**position** [1] -
10660:10
**Positive** [2] -
10633:21; 10648:4
**possession** [3] -
10605:5; 10631:4, 7
**Pound** [5] - 10576:9;
10578:2, 5, 24
**pounds** [1] -
10611:18
**pow** [1] - 10670:9
**pow-wow** [1] -
10670:9
**powder** [2] -
10650:6, 8
**Powell** [2] -
10575:16; 10576:5
**prayer** [1] - 10616:8
**Pre** [8] - 10603:20,
22; 10608:1, 3, 13;
10609:13; 10626:3
**pre** [4] - 10608:18,
21; 10609:11
**Pre-trial** [8] -
10603:20, 22;
10608:1, 3, 13;
10609:13; 10626:3
**pre-trial** [4] -
10608:18, 21;
10609:11
**prepare** [1] -
10586:22
**presence** [1] -
10654:1
**present** [16] -
10617:22; 10637:6;
10640:11, 14, 16;
10662:13, 15;
10674:2, 5, 8, 15;
10677:14; 10678:12;
10685:15; 10697:20
**presumably** [1] -
10576:7
**pretty** [3] - 10614:4;
10616:1; 10687:5
**Prince** [1] - 10587:25
**prints** [2] - 10645:1;
10646:24
**prison** [10] -
10626:12, 16-17;
10627:3, 13; 10628:1,
3, 6; 10629:7, 23
**problem** [4] -
10626:22; 10681:15,
21, 24
**problems** [1] -
10674:7
**procedure** [3] -
10615:7, 24; 10616:5

**procedures** [1] -
10614:14
**proceed** [1] -
10672:25
**Proceedings** [1] -
10573:11
**PROCEEDINGS** [2] -
10571:12
**proceedings** [2] -
10574:6; 10704:15
**PROCTOR** [1] -
10572:9
**Proctor** [2] -
10572:10; 10695:8
**produced** [1] -
10573:11
**proffer** [2] - 10575:3;
10582:7
**Program** [1] -
10600:4
**program** [28] -
10586:16; 10599:16,
19; 10600:3, 6, 18,
22; 10601:1, 3, 19,
21, 24; 10602:1-3, 5,
7, 16, 19, 24;
10603:5, 21; 10604:7;
10689:4
**promised** [1] -
10630:8
**promises** [2] -
10630:2, 11
**prone** [1] - 10683:13
**proper** [1] -
10629:12
**prosecutor** [5] -
10588:10; 10610:23;
10611:6; 10612:18
**prosecutors** [4] -
10611:24; 10674:14;
10675:24; 10701:3
**protect** [1] - 10643:3
**protective** [2] -
10621:13, 25
**provide** [2] -
10699:13, 18
**psychological** [1] -
10607:16
**publish** [1] -
10672:23
**published** [1] -
10655:17
**pull** [3] - 10580:1;
10639:1; 10655:15
**pulled** [5] -
10576:13, 21;
10637:5; 10638:2
**pump** [4] - 10579:19
**pumping** [1] -
10634:18

**punched** [3] -
10692:20, 25;
10693:4
**punches** [1] -
10611:14
**purposes** [1] -
10601:11
**Purpura** [1] -
10573:5
**pursuant** [1] -
10699:24
**put** [20] - 10579:16;
10588:8, 18;
10615:22; 10616:9,
11; 10635:23;
10646:12; 10660:10;
10666:20; 10667:1,
10, 13, 16, 19-20;
10692:5; 10702:5;
10703:16
**puts** [1] - 10694:21
**putting** [2] -
10615:22; 10646:11
**PWID** [2] - 10631:2,
4

---

# Q

**Quarles** [1] -
10596:7
**quarter** [1] -
10651:22
**questions** [20] -
10583:12; 10587:10;
10588:8, 10; 10609:4;
10623:10; 10629:4;
10645:15; 10679:12,
25; 10680:15;
10681:8; 10684:6, 8,
18; 10685:2; 10695:6,
15, 17
**quit** [1] - 10603:4
**quite** [3] - 10603:10;
10618:2; 10642:25

---

# R

**Racketeering** [1] -
10575:6
**ran** [6] - 10610:6;
10693:13, 17, 24;
10694:13
**range** [1] - 10639:15
**RAP** [1] - 10600:13
**rather** [1] - 10682:25
**raw** [2] - 10593:25;
10594:15
**RDR** [3] - 10573:8;
10704:15, 17

**RDR-CRR** [1] - 10704:15

**reach** [1] - 10693:23
**reached** [2] - 10645:14; 10694:7
**read** [17] - 10628:19; 10629:1, 5, 9; 10669:3; 10676:20, 22, 24; 10677:7; 10681:6, 11; 10686:22, 25; 10687:5, 13
**Read** [2] - 10610:21
**reading** [3] - 10576:4; 10683:21; 10684:7
**ready** [4] - 10574:8, 13; 10646:4, 8
**real** [1] - 10637:11
**really** [4] - 10593:14; 10619:17; 10638:24; 10652:19
**reason** [3] - 10636:18; 10650:23; 10680:6
**reasons** [2] - 10590:4; 10591:22
**rec** [4] - 10618:15, 17-18; 10622:12
**recent** [1] - 10605:14
**recently** [1] - 10678:15
**recess** [3] - 10681:6, 11; 10704:11
**recognize** [3] - 10584:23; 10655:21
**recollection** [6] - 10584:16; 10585:3, 7; 10635:17; 10669:1; 10697:1
**record** [16] - 10579:9; 10584:20; 10585:4; 10599:25; 10600:24; 10623:6; 10627:20; 10666:22; 10668:19; 10675:19; 10681:4; 10682:16, 19; 10684:24; 10692:3; 10704:15
**recorded** [3] - 10624:25; 10625:17; 10686:17
**Recorded** [1] - 10625:18
**Red** [2] - 10578:6
**red** [2] - 10661:13, 15
**redirect** [1] - 10682:1
**reference** [2] - 10652:1; 10681:22

**referring** [1] - 10663:2
**reflect** [1] - 10692:3
**refresh** [3] - 10584:15; 10585:3, 7
**refreshes** [1] - 10676:21
**refreshing** [1] - 10669:1
**regarding** [5] - 10600:10; 10630:3; 10672:10; 10699:19; 10702:2
**regulations** [2] - 10602:7, 17
**rehabilitation** [2] - 10599:16; 10601:8
**related** [4] - 10623:11; 10680:11; 10681:8; 10689:25
**relating** [7] - 10602:7; 10617:7; 10625:10; 10679:4; 10680:1, 22; 10684:15
**relationship** [1] - 10648:18
**release** [3] - 10600:11; 10603:18; 10606:3
**Release** [3] - 10601:18; 10615:14
**released** [15] - 10585:19, 21-22; 10599:15; 10601:11; 10602:23; 10626:4, 7-8; 10630:3; 10652:9; 10689:2, 4
**Relevance** [2] - 10622:6; 10674:11
**relevance** [3] - 10614:11; 10622:7; 10674:10
**remain** [1] - 10585:22
**remained** [1] - 10585:17
**Remember** [1] - 10620:24
**remember** [89] - 10583:15, 23; 10584:10, 12-13; 10588:10; 10590:3; 10591:24; 10598:13, 19; 10607:13; 10608:11, 13, 20; 10609:1; 10610:5, 16, 19; 10611:2, 4, 6; 10613:8, 18, 20, 24; 10614:1; 10617:3;

10623:1; 10624:3; 10630:4, 6; 10632:11, 19-20; 10636:24; 10637:3, 21; 10639:17; 10640:24; 10641:8; 10642:18; 10643:14; 10645:18; 10649:9; 10653:23; 10656:19, 22; 10658:6, 11, 19-22; 10659:2, 11, 18; 10661:11; 10662:16; 10663:12, 19; 10664:10, 14, 18; 10665:5-7; 10666:8; 10672:11; 10673:22; 10674:2, 5; 10675:11, 20; 10678:9; 10686:14, 16; 10688:13, 21; 10691:18; 10695:16; 10697:21; 10698:8
**remembering** [1] - 10674:7
**remind** [1] - 10574:18
**reminisce** [2] - 10617:10; 10619:17
**reminisced** [1] - 10619:15
**removed** [3] - 10665:9, 11, 13
**removing** [1] - 10632:22
**Remy** [2] - 10596:11, 23
**Repeat** [2] - 10593:7; 10620:22
**repeat** [4] - 10605:14; 10621:4; 10650:4; 10689:7
**rephrasing** [1] - 10647:14
**report** [2] - 10603:24; 10608:3
**reported** [1] - 10573:11
**reporter** [1] - 10589:9
**Reporter** [3] - 10573:8; 10704:18
**representative** [1] - 10609:13
**reputation** [1] - 10650:25
**request** [2] - 10585:2; 10622:20
**requests** [1] - 10600:10
**reread** [2] -

10629:10; 10683:22
**Research** [1] - 10572:23
**reside** [1] - 10584:5
**resolves** [1] - 10684:11
**response** [2] - 10681:8; 10682:4
**responsive** [3] - 10581:25; 10653:16
**rest** [8] - 10626:12, 15; 10627:3, 13; 10628:1, 6; 10629:6, 22
**restrained** [1] - 10610:2
**resume** [2] - 10574:13; 10646:4
**retaliate** [1] - 10576:7
**reviewed** [1] - 10701:3
**revoke** [1] - 10605:12
**Rhoddy** [15] - 10648:11-14, 19-20, 23; 10649:2, 4, 6-7, 22; 10650:17, 19
**RHODDY** [1] - 10648:12
**RICHARD** [1] - 10571:12
**ride** [1] - 10640:17
**riding** [1] - 10638:24
**right-hand** [1] - 10661:14
**ring** [1] - 10648:10
**ripped** [1] - 10605:25
**ripping** [1] - 10605:18
**Road** [3] - 10572:10; 10575:12; 10594:8
**rob** [10] - 10596:7; 10598:1; 10635:3, 15; 10639:2; 10649:10, 12, 14, 21; 10654:21
**Rob** [7] - 10598:12, 18; 10599:4, 6, 9; 10619:3
**robbed** [10] - 10575:23; 10635:4, 18; 10636:15; 10638:21; 10639:3, 6
**Robberies** [1] - 10635:2
**robberies** [7] - 10635:3, 6; 10638:6, 12, 22; 10654:17
**robbery** [6] - 10576:7; 10635:14,

19; 10636:2; 10649:17; 10691:18
**robbing** [2] - 10639:18; 10654:19
**Robert** [1] - 10619:2
**Roberts** [1] - 10682:13
**ROBERTS** [1] - 10571:12
**Robinson** [2] - 10614:18, 21
**Rockville** [1] - 10572:24
**rode** [1] - 10597:4
**roll** [1] - 10592:20
**rolled** [2] - 10696:4, 7
**room** [2] - 10645:19; 10704:5
**Room** [1] - 10573:9
**rooms** [1] - 10616:9
**rounds** [1] - 10649:9
**Ruger** [2] - 10647:23
**rule** [2] - 10622:10; 10685:7
**rules** [2] - 10602:6, 17
**ruling** [1] - 10685:5
**run** [10] - 10598:13, 19; 10609:25; 10610:1, 7; 10692:16; 10694:2, 5, 9, 14
**runners** [1] - 10634:16
**running** [4] - 10581:12; 10591:11; 10636:1; 10670:15

**S**

**sacks** [1] - 10592:14
**Samuels** [1] - 10573:2
**SAMUELS** [1] - 10571:7
**sat** [4] - 10617:14; 10649:17; 10670:10; 10688:13
**saw** [10] - 10577:10; 10644:2, 5, 7; 10658:5; 10659:20, 25; 10663:14, 16; 10664:1
**scared** [1] - 10693:9
**scene** [1] - 10656:4
**school** [5] - 10588:18; 10591:13, 16, 23, 25
**schooling** [1] -

10630:8
**scope** [1] - 10655:10
**Scott** [3] - 10573:8;
10704:15, 17
**screaming** [1] -
10662:14
**screen** [2] - 10575:1;
10673:6
**seat** [2] - 10645:23;
10704:8
**second** [5] -
10611:10; 10623:23;
10683:16; 10694:17;
10699:5
**Second** [1] -
10600:14
**security** [3] -
10600:1, 16
**Security** [1] -
10600:4
**see** [54] - 10575:1, 5,
9, 11, 17; 10579:23;
10581:9, 11;
10596:20; 10611:17;
10612:16; 10614:10,
16; 10615:4;
10616:24; 10617:4;
10618:8, 15;
10626:24; 10633:22;
10634:4, 21; 10636:8;
10638:5, 25;
10639:18; 10641:16;
10645:19; 10646:15,
21, 24-25; 10649:20,
22; 10651:23;
10653:9; 10654:3, 24;
10661:24; 10662:4;
10665:15; 10666:14;
10670:1; 10671:9;
10673:6; 10675:7;
10681:16; 10686:17,
20; 10687:11;
10690:6
**seeing** [2] - 10597:2;
10683:13
**seem** [1] - 10664:16
**select** [2] - 10638:23
**sell** [2] - 10636:5;
10649:25
**selling** [3] -
10587:17, 20, 23
**sense** [1] - 10669:3
**sent** [2] - 10622:11;
10689:9
**sentence** [1] -
10609:11
**sentenced** [1] -
10605:13
**sentencing** [4] -
10602:8, 10, 12;

10605:17
**Separate** [1] -
10621:19
**separate** [2] -
10616:9; 10643:2
**separated** [1] -
10621:22
**separation** [1] -
10621:19
**September** [3] -
10585:11; 10673:13
**serve** [1] - 10650:18
**served** [1] -
10652:13
**Services** [8] -
10603:20, 22;
10608:1, 3, 14;
10609:13; 10626:4
**serving** [1] - 10653:4
**SESSION** [2] -
10571:11; 10574:1
**set** [2] - 10601:14;
10641:20
**Seth** [7] - 10572:16;
10612:16, 23;
10614:10, 16;
10674:16
**seven** [5] - 10625:5,
7-8, 10, 14
**several** [6] - 10588:7;
10592:10; 10616:15;
10625:2; 10630:3;
10681:13
**Shamar** [2] -
10589:9; 10590:11
**SHAMAR** [1] -
10589:9
**SHARA** [1] -
10589:18
**share** [1] - 10660:24
**Sharra** [2] -
10589:16; 10590:10
**Sherri** [12] - 10654:6,
12-13; 10655:6;
10662:8, 11, 13, 15;
10664:9, 11
**shirt** [2] - 10581:7;
10646:11
**Shit** [1] - 10577:19
**shit** [10] - 10596:20;
10597:5, 15;
10614:23; 10619:18;
10635:23; 10668:2
**shoot** [7] - 10693:25;
10694:3, 7, 15-16;
10695:2, 4
**shooting** [13] -
10580:22; 10582:10;
10596:22; 10597:9;
10612:8; 10632:10,

22; 10637:22;
10639:21; 10667:17;
10683:10; 10696:19;
10697:7
**short** [1] - 10630:11
**shorthand** [1] -
10573:11
**Shorty** [1] - 10643:12
**shot** [21] - 10581:4;
10595:21; 10633:7,
14; 10634:2; 10637:4,
20, 22, 24; 10638:2;
10656:4, 8; 10657:21,
23, 25; 10667:22, 24;
10668:4; 10669:11
**shotgun** [1] -
10579:22
**shots** [7] - 10580:18;
10581:16; 10657:11;
10662:20; 10663:4
**show** [5] - 10574:22;
10644:22; 10660:11;
10667:8; 10701:13
**showed** [2] -
10645:1; 10667:6
**showing** [2] -
10584:20; 10676:19
**sic]** [1] - 10589:18
**side** [11] - 10581:4;
10594:8; 10618:10,
14; 10634:3;
10666:21; 10669:11;
10693:8; 10696:8
**Sidebar** [6] -
10623:21; 10629:19;
10669:8; 10682:12;
10684:12; 10685:11
**sidebar** [7] -
10599:25; 10623:6;
10627:20; 10668:19;
10681:4; 10682:19;
10684:24
**sidetracked** [1] -
10642:15
**sign** [3] - 10687:3,
12; 10690:15
**signed** [6] -
10671:12; 10687:4;
10688:16, 21;
10699:9, 24
**significant** [2] -
10670:22; 10673:7
**Sills** [20] - 10595:21;
10599:1; 10612:9;
10625:22; 10677:10;
10679:4; 10680:16,
18; 10681:8, 17, 24;
10682:4; 10683:15;
10684:6, 20; 10685:2;
10686:12; 10690:11;

10699:19
**Silver** [1] - 10575:12
**single** [3] - 10658:9;
10674:11; 10677:20
**siree** [1] - 10661:20
**sister** [4] - 10633:16,
18-19; 10634:2
**sit** [2] - 10640:12;
10698:17
**sitting** [12] -
10576:14; 10615:16;
10638:1; 10644:15;
10657:15; 10691:21;
10692:1, 6; 10698:11,
17; 10700:14
**situation** [1] -
10602:6
**situations** [1] -
10670:7
**six** [3] - 10588:14;
10611:18
**size** [1] - 10693:2
**skills** [1] - 10601:4
**slapped** [1] -
10643:16
**slumping** [1] -
10663:16
**small** [1] - 10661:3
**smallest** [1] -
10651:17
**smoke** [2] -
10592:19; 10703:22
**Smoke** [10] -
10637:7-9, 12, 15, 17,
20, 22; 10653:25;
10654:3
**smoked** [1] -
10592:5; 10607:3
**smoking** [2] -
10592:10, 14
**snorted** [1] -
10597:24
**snorting** [1] -
10597:25
**snow** [2] - 10659:10,
12
**sock** [1] - 10610:7
**sold** [1] - 10649:24
**someone** [8] -
10608:13; 10617:6;
10624:14; 10634:12;
10636:12, 23;
10643:5; 10653:5
**Sometime** [1] -
10689:8
**sometime** [3] -
10625:10; 10632:13;
10689:5
**sometimes** [3] -
10595:7; 10639:1

**somewhere** [2] -
10656:15
**Somewhere** [1] -
10689:13
**soon** [1] - 10597:3
**sorry** [19] - 10597:1;
10614:19; 10619:3;
10621:25; 10629:17;
10630:15; 10632:15,
21; 10633:17;
10635:6; 10642:16;
10657:19; 10660:7;
10662:10; 10665:22;
10668:9, 20, 24;
10672:19
**sort** [1] - 10592:17;
10605:19; 10680:7
**sounds** [1] - 10685:4
**South** [1] - 10571:22;
10594:7
**Southeast** [1] -
10594:8
**speaking** [1] -
10652:1
**Special** [1] - 10601:3
**specific** [4] -
10623:12; 10627:23;
10659:5; 10684:8
**specifically** [4] -
10629:5, 12;
10658:20; 10699:18
**specifics** [1] -
10635:5
**speculation** [3] -
10640:9; 10687:22
**spell** [1] - 10589:22
**spending** [8] -
10594:11; 10626:12,
15; 10627:3, 13;
10628:6; 10629:6, 22
**spinned** [1] -
10581:7
**Squid** [7] - 10695:16,
20, 24; 10696:11, 19;
10697:25; 10698:13
**stand** [4] - 10626:20;
10642:7; 10682:15
**standing** [11] -
10577:12; 10579:18;
10648:18; 10656:20;
10658:8, 20; 10659:2;
10664:10; 10696:11,
14
**start** [4] - 10606:17;
10649:4; 10673:11;
10689:22
**started** [6] -
10587:20; 10592:2;
10593:18; 10596:14;
10628:22; 10675:2

**starting** [3] - 10629:11; 10688:2; 10694:14

**state** [3] - 10609:21; 10644:12; 10666:22

**statement** [1] - 10593:15

**STATES** [4] - 10571:1, 3, 13, 15

**States** [5] - 10571:15-18; 10605:4

**station** [1] - 10682:2

**stay** [1] - 10606:21

**stayed** [2] - 10577:15; 10590:13

**staying** [2] - 10588:2, 6

**step** [3] - 10574:22; 10583:3; 10692:4

**Stephanie** [1] - 10584:1

**stepped** [5] - 10580:22, 24-25; 10581:1; 10692:4

**stepping** [1] - 10641:1

**Steve** [1] - 10619:6

**Steven** [1] - 10572:3

**still** [15] - 10574:19; 10578:15; 10580:17; 10592:21; 10594:21; 10599:12; 10619:17; 10624:12; 10652:4; 10653:3; 10656:20; 10688:7; 10693:15

**stipulate** [3] - 10677:3, 6; 10681:9

**stolen** [2] - 10700:8, 20

**stood** [2] - 10641:20; 10664:23

**stop** [6] - 10611:10; 10612:17; 10614:25; 10659:24; 10661:5; 10666:7

**stopped** [9] - 10597:2; 10653:2; 10661:8, 12, 15-16, 22; 10666:6, 16

**store** [4] - 10639:1, 6

**stores** [4] - 10639:3, 5, 18; 10654:19

**Stores** [1] - 10639:18

**stories** [2] - 10617:17, 20

**story** [5] - 10645:3, 5, 10; 10646:23; 10666:18

**Street** [11] - 10571:19; 10572:7,

13, 17; 10573:3, 6; 10588:8; 10591:9; 10596:7; 10657:6

**street** [18] - 10580:9, 13, 15; 10596:21; 10603:11; 10619:18; 10654:20; 10657:5; 10660:16; 10661:1, 6, 11; 10662:8; 10693:13, 15, 17; 10694:13; 10696:14

**streets** [2] - 10618:7; 10698:2

**strike** [1] - 10583:4

**Strike** [1] - 10673:24

**strikes** [1] - 10631:16

**strokes** [1] - 10636:16

**stuck** [1] - 10669:12

**studio** [2] - 10641:13

**study** [2] - 10607:21, 24

**stuff** [3] - 10607:19; 10620:13; 10641:1

**subdue** [1] - 10609:22

**Subdue** [1] - 10609:24

**subject** [4] - 10678:7; 10680:2; 10682:3

**subsequent** [3] - 10672:13; 10673:7; 10682:5

**suggests** [1] - 10681:23

**Suite** [5] - 10572:4, 7, 14, 24; 10573:3

**Superior** [2] - 10672:4; 10683:22

**supplied** [6] - 10648:5, 13-14; 10649:22; 10651:10; 10653:25

**supply** [3] - 10648:22; 10653:20, 22

**supplying** [2] - 10575:14; 10613:4

**supposed** [1] - 10603:23

**Sustained** [6] - 10582:1; 10604:18; 10627:9; 10647:12; 10653:18; 10655:12

**swear** [2] - 10608:25; 10609:1

**sworn** [1] - 10689:18

# T

**T-shirt** [1] - 10646:11

**Tabackman** [1] - 10572:3

**talks** [1] - 10682:1

**taller** [1] - 10693:2

**Tanya** [1] - 10641:8

**tape** [1] - 10686:17

**tapped** [2] - 10692:11

**target** [1] - 10642:23

**targets** [1] - 10642:20

**teach** [1] - 10601:3

**tear** [2] - 10605:12, 16

**TEASDALE** [1] - 10572:3

**Teka** [1] - 10635:21

**ten** [1] - 10601:22

**Ten** [1] - 10639:15

**Tested** [1] - 10607:15

**tested** [1] - 10601:23; 10607:14

**testified** [36] - 10583:17; 10585:16; 10593:8, 11; 10595:17, 20; 10598:15; 10599:4; 10604:16; 10611:20; 10623:18; 10629:8; 10640:25; 10647:11; 10654:17; 10669:24; 10670:17, 24; 10671:1, 4, 6; 10673:4; 10679:4; 10683:19, 24; 10691:4; 10694:17; 10695:19; 10699:25; 10700:7, 11-12; 10701:1; 10702:18; 10703:5

**testify** [6] - 10614:5; 10667:24; 10668:4; 10681:9; 10684:15; 10699:21

**testifying** [9] - 10584:13; 10626:23; 10663:12, 19; 10670:14; 10678:17; 10685:13; 10691:18; 10702:22

**testimony** [11] - 10584:25; 10604:13; 10647:9; 10674:25; 10676:4; 10678:20; 10679:16; 10689:16;

10691:12; 10701:13; 10702:14

**testing** [1] - 10604:7

**themselves** [1] - 10677:18

**Thereupon** [2] - 10645:24; 10704:11

**they've** [1] - 10683:21

**thinking** [1] - 10631:13

**third** [3] - 10600:12; 10631:15; 10646:23

**Third** [1] - 10631:15

**third-party** [1] - 10600:12

**Thomas** [1] - 10608:10

**three** [16] - 10576:8; 10594:1, 17; 10595:16; 10606:24; 10607:1; 10618:13; 10631:15; 10645:3; 10665:17; 10666:12; 10669:18; 10670:3, 6; 10678:15; 10694:18

**three-story** [1] - 10645:3

**threw** [1] - 10600:19

**throw** [2] - 10640:19

**thrown** [1] - 10605:25

**Thurston** [1] - 10572:16

**THURSTON** [1] - 10571:7

**TIGHE** [1] - 10572:2

**today** [15] - 10617:1; 10626:19, 21; 10627:5, 24-25; 10628:2, 7, 12, 14; 10669:25; 10698:11, 17; 10700:14

**Today** [1] - 10633:2

**together** [8] - 10616:11; 10618:18; 10640:12; 10664:3, 8; 10670:9

**Tommy** [3] - 10640:24; 10641:4; 10642:2

**tomorrow** [1] - 10594:17

**Tony** [3] - 10665:21; 10666:11

**took** [11] - 10576:25; 10615:12, 17; 10636:1; 10641:18; 10644:19; 10647:22; 10678:14; 10682:24;

10697:5; 10702:9

**Took** [1] - 10597:15

**top** [1] - 10579:19

**topics** [1] - 10680:18

**Totally** [1] - 10609:17

**towards** [3] - 10610:16; 10611:1; 10661:18

**trailing** [1] - 10580:1

**training** [1] - 10601:6

**transcript** [13] - 10573:11; 10627:24; 10628:4, 19; 10668:7, 21, 25; 10681:7; 10691:11; 10701:3, 7; 10704:15

**TRANSCRIPT** [1] - 10571:12

**transcription** [1] - 10573:11

**transferred** [1] - 10615:20

**transported** [2] - 10615:17; 10616:13

**traveled** [1] - 10575:16

**treatment** [2] - 10604:8; 10630:9

**TRIAL** [1] - 10571:12

**trial** [12] - 10603:20, 22; 10608:1, 3, 13, 18-19, 21; 10609:11, 13; 10626:3

**tried** [9] - 10598:18; 10609:25; 10610:1, 7; 10641:14; 10650:17; 10692:16; 10694:5, 9

**trip** [1] - 10606:14

**tripping** [1] - 10606:17

**trouble** [1] - 10622:16

**Troy** [32] - 10636:23; 10637:3, 20; 10638:2, 4; 10653:13, 20; 10654:3, 5; 10655:5, 8-9, 14, 23-24; 10657:15; 10658:2, 17; 10659:18, 25; 10660:3; 10662:6, 17; 10666:6; 10668:2, 12; 10670:3, 6

**Troy's** [5] - 10660:15; 10661:16; 10663:5; 10665:1; 10667:16

**truck** [6] - 10661:8, 12; 10700:9, 21; 10702:3; 10703:17

**Truck** [7] - 10666:10;
10669:21, 24;
10670:3, 6, 17
**Truck's** [2] -
10637:14, 17
**true** [9] - 10591:11;
10605:8; 10606:16;
10609:22; 10626:6;
10629:8; 10632:2;
10640:10; 10699:18
**True** [1] - 10632:3
**Truesdale** [1] -
10637:10
**trust** [2] - 10601:18;
10606:7
**Trustee** [1] -
10618:25
**truth** [6] - 10608:17;
10626:20; 10627:6;
10632:6, 9
**truthful** [3] -
10608:24; 10680:10;
10699:13
**truthfully** [1] -
10699:21
**try** [4] - 10600:23;
10623:18; 10634:13
**tryin** [1] - 10641:11
**trying** [9] - 10590:21;
10596:4; 10598:12;
10614:23; 10616:3;
10634:6; 10643:5;
10662:22; 10694:2
**turn** [3] - 10575:5, 8;
10692:21
**turned** [1] - 10643:8
**Twan** [25] -
10614:18, 21;
10633:7, 25; 10634:1,
7, 13, 20; 10637:22;
10640:3; 10642:23;
10643:3, 7-8;
10644:16, 19;
10645:13; 10647:18,
22; 10664:21;
10666:5; 10668:11;
10682:22; 10683:10
**twice** [6] - 10594:10,
13; 10638:9;
10651:24; 10652:13
**twisted** [2] -
10596:18; 10599:7
**twisting** [1] -
10633:4
**two** [32] - 10575:23;
10577:11; 10588:21;
10594:1, 17;
10604:10, 21-23;
10605:11; 10606:24;
10628:17; 10629:3;

10630:14, 17, 20;
10640:19; 10665:17;
10666:12, 20;
10667:19; 10669:18;
10673:15; 10681:5;
10689:20; 10690:16,
19; 10691:8
**Two** [2] - 10588:23;
10630:18
**two-year** [1] -
10690:19
**type** [2] - 10599:16;
10601:6
**typical** [1] - 10614:4

---

## U

**U.S** [6] - 10573:9;
10626:23; 10671:6;
10675:3; 10677:10;
10699:14
**UC** [2] - 10584:8, 10
**ugh** [2] - 10610:8
**ugh-ugh** [1] -
10610:8
**Um-hmm** [4] -
10595:25; 10606:20;
10607:23; 10693:20
**uncertain** [1] -
10670:15
**under** [13] -
10574:19; 10608:16;
10609:19, 24;
10611:20; 10689:18,
24; 10690:3, 10, 24;
10691:7; 10699:12
**understood** [2] -
10590:21; 10605:15
**unit** [3] - 10618:8,
24; 10619:19
**UNITED** [4] -
10571:1, 3, 13, 15
**United** [5] -
10571:15-18; 10605:4
**units** [1] - 10618:13
**unless** [1] -
10602:13
**unloaded** [2] -
10581:8, 11
**unnecessary** [1] -
10611:14
**untruthful** [1] -
10625:24
**Up** [1] - 10688:19
**up** [117] - 10574:24;
10576:13; 10580:13,
15, 21, 23-25;
10584:8, 10, 12;
10588:14; 10592:11,

19; 10593:21;
10594:16; 10596:18;
10599:7; 10601:14;
10602:25; 10603:11,
14; 10605:11, 17, 19,
25; 10607:5, 9;
10608:2, 6; 10610:3,
6, 8; 10611:7;
10612:5; 10614:5;
10615:4, 17, 22-23;
10617:12; 10618:6;
10619:6, 18, 21;
10620:5; 10621:9;
10622:16; 10623:5,
19; 10629:2, 15;
10633:4, 7, 12;
10634:5; 10635:23;
10636:2; 10638:2;
10640:5; 10641:6;
10642:6; 10644:16;
10648:21; 10649:20;
10651:11; 10652:6;
10653:10; 10655:15;
10657:7, 9; 10658:2;
10660:15; 10663:5, 8;
10665:25; 10666:5,
14, 16; 10667:16;
10668:18; 10669:10;
10680:9; 10682:3;
10683:2; 10684:23;
10685:16, 24;
10687:9; 10688:3;
10689:6, 11, 19;
10690:17, 19-20;
10691:24; 10692:10,
15-16, 24; 10693:12,
17; 10694:13, 21;
10696:4, 7
**upset** [1] - 10700:20
**upstairs** [1] -
10622:10
**US** [1] - 10674:8
**usage** [3] - 10601:9;
10607:6, 10

---

## V

**van** [17] - 10576:25;
10579:4, 7-8, 15-18,
25; 10580:1, 17;
10581:1, 13; 10657:7,
16; 10661:18
**various** [7] -
10626:4; 10640:13;
10648:6; 10670:10,
12-13, 22
**vehicle** [1] -
10661:13
**verbatim** [2] -
10687:6, 20

**versus** [2] -
10626:23; 10671:6
**vicinity** [1] -
10656:14
**video** [1] - 10686:20
**violate** [1] - 10605:4;
10606:4
**violated** [5] -
10602:6; 10603:18,
25; 10605:22;
10606:7
**violation** [1] -
10605:20
**violations** [1] -
10605:21
**violence** [1] -
10634:23, 25
**Violet** [3] - 10589:2;
10590:5
**Virginia** [1] -
10688:10
**vocational** [1] -
10601:6
**voice** [1] - 10668:23
**VOLUME** [1] -
10571:11
**volume** [1] -
10626:24

---

## W

**waiting** [2] -
10578:16; 10616:13
**walk** [5] - 10579:17;
10657:7, 9-10;
10658:2
**walked** [10] -
10633:7, 12; 10634:5;
10635:23; 10661:18;
10663:4; 10666:5, 16;
10669:11
**Walking** [1] -
10656:13
**walking** [15] -
10579:24; 10580:1,
17; 10597:15;
10618:23; 10656:9,
11, 17-18, 23;
10657:10, 14;
10659:19; 10665:25
**wall** [2] - 10596:20;
10597:5
**Wallace** [3] -
10573:8; 10704:15,
17
**wallet** [1] - 10635:22
**warning** [1] -
10624:24
**Washington** [10]

10571:6, 19, 23;
10572:5, 8, 14, 18;
10573:4, 9; 10587:21
**waste** [1] - 10682:25
**watch** [2] - 10580:11
**water** [2] - 10591:11;
10592:19
**Waxman** [7] -
10596:25; 10610:13,
23; 10612:16, 23;
10614:10, 16;
10615:19; 10616:25;
10617:4; 10674:16
**ways** [1] - 10681:5
**weapon** [1] -
10683:11
**wearing** [1] -
10647:2
**Webaby** [1] -
10589:1
**weed** [2] - 10597:25;
10649:24
**week** [11] - 10594:10,
13; 10597:17;
10603:22; 10638:9;
10685:16, 24;
10700:7; 10702:14
**weeks** [6] -
10604:11, 16, 22;
10665:17; 10666:12;
10669:18
**Welcome** [2] -
10574:13; 10646:4
**Wertheim** [2] -
10630:2, 5
**wet** [3] - 10596:4;
10656:25
**What'd** [2] -
10661:21; 10665:1
**what'd** [1] - 10664:24
**wheelchair** [1] -
10579:12
**whoa** [1] - 10617:11
**whole** [3] - 10583:24;
10669:12; 10700:19
**WICKS** [10] -
10572:6; 10581:25;
10695:9, 11;
10698:25; 10699:3;
10701:10, 12;
10704:1; 10705:9
**Wicks** [2] - 10572:7;
10695:8
**wife** [3] - 10587:3, 5,
7
**William** [2] -
10573:5; 10637:10
**WILSON** [1] -
10571:6
**Wilson** [2] - 10572:7;

10701:20

**window** [14] - 10577:12; 10579:1; 10645:7, 12; 10666:25; 10667:1, 10, 13, 17, 20; 10669:12

**windshield** [2] - 10666:20; 10667:20

**wing** [1] - 10690:21

**withdraw** [3] - 10684:9; 10685:6; 10698:12

**withheld** [1] - 10678:25

**Witness** [4] - 10600:3; 10610:18; 10611:3; 10682:15

**WITNESS** [12] - 10578:24; 10583:23; 10614:16, 21; 10622:5, 9; 10650:4; 10682:13; 10687:24; 10692:6; 10699:1; 10704:9

**witness** [16] - 10574:3; 10584:20; 10585:5; 10600:16; 10603:15; 10605:22; 10637:19; 10671:17, 23; 10676:16; 10682:15; 10683:12; 10692:4; 10698:24; 10701:10

**witnesses** [1] - 10623:18

**Wop** [41] - 10632:15, 21; 10637:4, 24; 10639:21; 10640:1; 10642:17; 10644:2, 23; 10646:24; 10647:7, 17, 21, 25; 10648:1; 10664:13; 10666:10; 10695:16, 20, 22, 24; 10697:9, 14, 17; 10698:5, 9, 13, 15, 19; 10699:1; 10700:22, 24; 10701:22, 24; 10702:15, 19, 22

**Wop's** [2] - 10700:8, 20

**word** [3] - 10618:25; 10657:18, 20

**words** [8] - 10602:12; 10605:20; 10606:16; 10612:4; 10613:5; 10650:6; 10670:14; 10685:23

**wore** [3] - 10667:12;

10697:2, 5

**Wores** [1] - 10674:18

**works** [1] - 10616:2

**Worrell** [3] - 10597:2; 10674:18, 21

**wow** [1] - 10670:9

**wrestle** [1] - 10694:24

**wrestled** [1] - 10693:10

**wrestling** [1] - 10693:18

**Write** [1] - 10687:17

**write** [1] - 10687:17

**written** [1] - 10603:17

**wrote** [1] - 10687:18

## Y

**y'all** [2] - 10578:25; 10662:11

**Y'all** [1] - 10662:8

**year** [10] - 10585:14; 10627:5; 10652:13, 19; 10653:1; 10659:13, 16; 10690:19

**years** [9] - 10592:10; 10630:3; 10650:7; 10678:15, 18; 10689:20; 10690:16; 10691:8

**yelling** [1] - 10579:2

**Yesterday** [1] - 10598:12

**yesterday** [14] - 10574:21; 10575:20; 10579:9; 10583:3, 17; 10584:7; 10632:25; 10640:25; 10641:6; 10646:10; 10669:25; 10691:19; 10693:8; 10695:14

**Young** [2] - 10617:11; 10620:8

**youngins** [1] - 10634:19

**yourself** [5] - 10621:22; 10628:1; 10643:3; 10649:13; 10695:19

**Youth** [2] - 10607:21, 24

## Z

**zoned** [1] - 10594:21

**zoom** [1] - 10692:13

**ZUCKER** [6] - 10572:16; 10578:22; 10583:21; 10614:19; 10660:6, 22

**Zucker** [4] - 10572:16; 10627:16; 10628:8, 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | May 9, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:45 p.m. |

. . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

VOLUME 48 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234

                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006

                          (202) 454-2811

A P P E A R A N C E S   C O N T I N U E D

```
For the Defendant          JENIFER WICKS, ESQUIRE
David Wilson:              LAW OFFICES OF JENIFER WICKS
                          The Webster Building
                          503 D Street, NW
                          Suite 250A
                          Washington, DC  20001-2728
                          (202) 326-7100

                          GARY E. PROCTOR, ESQUIRE
                          6065 Harford Road
                          Baltimore, MD  21214
                          (410) 444-1500


For the Defendant          JAMES W. BEANE, JR., ESQUIRE
Gregory Bell:             2715 M Street, NW
                          Suite 200
                          Washington, DC  20007
                          (202) 333-5905


For the Defendant          JONATHAN SETH ZUCKER, ESQUIRE
Desmond Thurston:         514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          (202) 624-0784


For the Defendant          ANTHONY DOUGLAS MARTIN, ESQUIRE
Joseph Jones:             7841 Belle Point Drive
                          Greenbelt, MD  20770
                          (301) 220-3700


For the Defendant          A. EDUARDO BALAREZO, ESQUIRE
Dominic Samuels:          LAW OFFICES OF A. EDUARDO BALAREZO
                          400 Fifth Street, NW
                          Suite 300

                          Washington, DC  20001-2719

                          (202) 639-0999
```

A P P E A R A N C E S   C O N T I N U E D

For Defendant Samuels:      WILLIAM B. PURPURA, ESQUIRE

                            8 East Mulberry Street

                            Baltimore, MD  21202

                            (410) 727-8550


Court Reporter:             REBECCA STONESTREET, RPR, CRR

                            Official Court Reporter

                            Room 6415, U.S. Courthouse

                            Washington, D.C. 20001

                            (202) 354-3249


Proceedings reported by machine shorthand, transcript produced

by computer-aided transcription.

C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| KAIRI KELLIBREW | | | | |
| By Ms. Wicks | -- | 10715 | -- | -- |

E X H I B I T S

| NUMBER | ADMITTED |
|--------|----------|

(NO EXHIBITS MOVED INTO EVIDENCE.)

1               P R O C E E D I N G S

2          THE COURT:  Go ahead.

3          MS. WICKS:  Mr. Kellibrew's grand jury transcripts,

4 there are a number of places that the government apparently

5 thinks the transcript incorrect.  There's one significant one

6 where they're saying he said Wop, but the transcript reflects --

7          THE COURT:  I'm going to have to interrupt you.  There

8 is a juror who wants to raise a matter, and I'm just going to

9 have her come forward.  Put on your headsets.

10          (BENCH CONFERENCE ON THE RECORD.)

11          THE COURT:  Good afternoon, Juror 15.  I understand

12 there's a problem that you've encountered you want my help with?

13          JUROR:  I don't know if I want your help, I just wanted

14 to let you know what was going on.  They told me I needed to

15 come over.  I know we have tomorrow off, and I talked to the

16 clerk and she said I could come first thing in the morning

17 tomorrow.

18          THE COURT:  Okay.

19          JUROR:  But I just didn't know what was going to happen

20 when I went over there.  I was frankly concerned, so I just

21 wanted to let you know what was going on.

22          THE COURT:  Well, I understand it's some kind of a

23 traffic court matter that's pending --

24          JUROR:  Right.

25          THE COURT:  -- where you had a date that was for a day

1 or two ago that slipped your mind?

2          JUROR:  Right.  It was for yesterday morning, but I

3 just happened to go home and look at the paperwork and -- so I

4 called first thing this morning, and they told me to come at

5 lunchtime, which I did.

6          THE COURT:  Okay.  And they want you to come back

7 tomorrow?

8          JUROR:  Yes.

9          THE COURT:  Did you take with you any letters from here

10 or summonses from here to show them that you're in the middle of

11 a trial as a juror?

12          JUROR:  I told them, but they didn't ask me for any

13 paperwork or anything like that.  I just talked to the clerk, I

14 guess in the records room, and she just pulled up my record on

15 the computer and told me.

16          THE COURT:  And when you go back over there, are you

17 supposed to go back into a courtroom to a particular judge, or

18 just to the clerk, or where?

19          JUROR:  She told me to go to an office on the

20 fourth floor.  I'm not sure what the name of the office is, but

21 it's just down the hall from the records room.

22          THE COURT:  Okay.  Well, thank you for letting me know.

23 If you think there is any paperwork you need from us or any

24 other assistance you need from me, just let me know.

25          JUROR:  Okay.

1          THE COURT:  It may be that when you tell them it

2 slipped your mind while you were serving on the jury, that will

3 suffice.  If it doesn't, let us know.

4          JUROR:  Okay.

5          THE COURT:  Do you think that there will be any

6 problem, given this incident, with your continuing to sit today

7 or later on as a juror, paying attention?

8          JUROR:  No.

9          THE COURT:  Won't affect your ability to keep an open

10 mind about the case here?

11          JUROR:  No.

12          THE COURT:  Well, if there's anything that you think

13 you need to bring back to my attention in connection with that

14 matter, please let me know.  And if there's anything you need

15 for me or us to do in that regard as well, let me know.

16          JUROR:  Okay.  Do I need to let you know what happened,

17 I guess when we come back on Monday?  Or just only if I need

18 some further assistance?

19          THE COURT:  Only if you need it.  I suspect that there

20 may not be any need to let us know.  But if there is a need to

21 let us know for any reason, please feel free.  But you're under

22 no obligation if everything is taken care of otherwise.

23          JUROR:  Okay.  Thank you.

24          THE COURT:  All right.  Thank you.

25          (END BENCH CONFERENCE.)

1          THE COURT:  Is this something that needs to be resolved

2 now, or can it be resolved at the end of the day?

3          MS. WICKS:  It does, Your Honor.

4          THE COURT:  It does what?  Need to be resolved now?

5          MS. WICKS:  It needs to be resolved to the extent of,

6 assuming I finish today -- essentially the issue is, the Jencks

7 that I've been provided, apparently the government doesn't think

8 it's an exact, precise rendition of what Mr. Kellibrew said in

9 the grand jury.

10         So there's one area of cross that at this point, given

11 that situation and the uncertainty, I'm not going to do.  But

12 once I get the tapes of his grand jury, I will listen to them.

13         So I just want the Court's permission to, if I'm going

14 to end today, to be able to come back.  Because we haven't

15 gotten those tapes yet, and there's apparently -- as I'm sure

16 the Court can tell from his testimony, it was hard for that

17 court reporter, apparently, to get down exactly what he was

18 saying.

19         THE COURT:  Anything else?

20         MR. BEANE:  Yes, Your Honor.

21         THE COURT:  On that point?

22         MR. BEANE:  Yes, on that point.  I'm scheduled to go

23 next, and a lot of my cross will be on the grand jury testimony.

24 And given that the government thinks part of it is inaccurate, I

25 would like the transcripts, those grand jury transcripts, before

1 I start my cross.  Because, as the Court knows, we sectioned off

2 our elements of the cross-examination, and mine is going to

3 focus on his inaccuracies in his grand jury transcripts compared

4 to his transcripts here and now.  So I need those tapes before I

5 can do my cross.

6          THE COURT:  What is your request, then?

7          MR. BEANE:  That I not be required do my

8 cross-examination until I have those tapes.

9          THE COURT:  All right.  Well, anybody else on this?

10         Ms. Petalas, who has got the tapes?  I don't even know

11 if the same court reporting company has got the contract

12 anymore.

13         MS. PETALAS:  Your Honor, it's Freestate Reporting, and

14 it's just one transcript that's from the February 1st, 2005.

15 And there's just a few things, mostly just some names that were

16 in there.

17         THE COURT:  Can you just answer me, when will the tapes

18 be available, do you know?

19         MS. PETALAS:  I don't know.  I was told it was going to

20 be available on Monday, last Monday, and it wasn't.  And we've

21 been placing calls and following up, and keep getting the

22 runaround from them from Monday through Tuesday.

23         My secretary, I haven't been able to check with her

24 today, each morning she tells me it will be available today, and

25 each morning I don't have it.  That's all I can -- I was told we

1 were going to have it on Monday.  We ordered it, actually about

2 a week and a half ago.

3        THE COURT:  Well, with respect to Ms. Wicks' and

4 Mr. Beane's request, I think it's fair to let Ms. Wicks complete

5 her cross without the portions that she had planned to cross on

6 absent the problem, and I'll let you come back to complete that,

7 if necessary.

8        Mr. Beane, I can take you out of order if you like, but

9 I plan to go with everybody else, however, rather than just

10 stopping this cross-examination entirely and calling some other

11 witness.  So we'll do that.

12        All right.  Shall we bring the jury in?  Ms. Wicks, you

13 ready?

14        MS. WICKS:  Yeah.  Although I need a witness.  I don't

15 really need him, but...

16        THE COURT:  I think you do.

17        MS. WICKS:  That chair might give me better answers.

18        (Jury in at 2:07 p.m.)

19        THE COURT:  Good afternoon, ladies and gentlemen.

20 Thank you very much for your indulgence.  I had to attend a

21 court meeting during the lunch break that lasted longer than

22 anticipated, so I was delayed in getting back.  But again, thank

23 you for your patience, and we're ready to resume.

24        Ms. Wicks?

25        MS. WICKS:  Thank you, Your Honor.

1                 CONTINUED CROSS EXAMINATION

2 BY MS. WICKS:

3 Q.  Mr. Kellibrew, you were locked up on September, I believe it

4 was 17th, 2002?

5 A.  Yes.

6 Q.  And that's when you were selling drugs on 10th Place.  Is

7 that correct?

8 A.  Yes.

9 Q.  And you were moved to CTF on November 27th, 2002?

10 A.  I don't remember what date it was that I got moved.

11 Q.  It was right around your grand jury appearance back in 2002.

12 Right?

13 A.  I guess so.  I'm not sure on the date I got moved.

14 Q.  Well, I believe your testimony, you talked about getting

15 locked down at the jail.  Right?

16 A.  Yes.

17 Q.  And after you were locked down at the jail in 2002, then you

18 were moved to CTF.  Right?

19 A.  Yes.

20 Q.  And it was right around the time of your grand jury

21 appearance in 2002, when you went in and lied to the grand jury

22 that you had just been locked down at the jail.  Right?

23         MS. PETALAS:  Objection, Your Honor.

24 A.  Huh?

25         THE COURT:  Overruled.

Page 10717

1 BY MS. WICKS:

2 Q.  Prior to testifying --

3          MS. WICKS:  I'll break it down, Your Honor.

4 BY MS. WICKS:

5 Q.  Prior to testifying in 2002 regarding Black.  Right?  Well,

6 okay.

7          You testified on November 27th, 2002.  You testified

8 concerning Black.  Right?

9 A.  Right.

10 Q.  Just prior to testifying, you had been locked down at the

11 jail?

12 A.  Yes.

13 Q.  Mr. Waxman asked you questions about that in the grand jury.

14 Correct?

15 A.  About me being locked down?

16 Q.  Yes.

17 A.  Yes.

18 Q.  And in the grand jury, he's explaining to you that the

19 process is, he's having you moved over to CTF.  Right?

20 A.  Yes.

21 Q.  And so sitting here today, do you recall if it was that date

22 or the next date or soon thereafter that you're moved from the

23 jail to CTF?

24 A.  I was in the hole maybe three to four days, something like

25 that.

Page 10718

1 Q.  Okay.  And you're talking about the hole at D.C. Jail.

2 Right?

3 A.  Yes.

4 Q.  After the hole at D.C. Jail for three or four days, where

5 did you go?

6 A.  CTF.

7 Q.  Okay.  So soon after the grand jury appearance in 2002,

8 you're moved to CTF.  Right?

9 A.  I don't think I went to the grand jury.  I think -- I got

10 moved first to CTF, then I went to the grand jury, if I'm not

11 mistaken.  I'm not sure on the dates on that note.  I'm not sure

12 of the time sequence I went down.  I know I went to the hole,

13 went to CTF.

14 Q.  Okay.  And sitting here today, you don't have any

15 recollection.  It could have been before the grand jury, it

16 could have been after the grand jury.  Right?

17 A.  It could have -- I'm not sure.  I'm not sure of the dates,

18 time, when all that occurred.

19 Q.  It's around the time of the grand jury appearance.  Right?

20 A.  I was in CTF when I did my grand jury statement.

21 Q.  Okay.  So between September 17th, 2002 and November 27th,

22 2002 is when you were at the jail.  Right?  During that time

23 period is a time period in your life when you were held at D.C.

24 Jail.  Right?

25 A.  Yes.

Page 10719

1 Q.  And you're saying it's one of those Fridays when you went to

2 jum'ha at D.C. Jail and you talked to Mr. Wilson.  Right?

3 A.  Yes.

4 Q.  And you know you can't go to jum'ha unless you're Muslim.

5 Right?

6 A.  Yes.

7 Q.  So back then you were a practicing Muslim.  Right?

8 A.  Yes.

9 Q.  And back then you were saying Mr. Wilson was a practicing

10 Muslim.

11 A.  I'm not sure he was.  I don't know.

12 Q.  Well, you just said you can't go to jum'ah unless you're

13 Muslim.  Right?

14 A.  Yes.

15         MS. PETALAS:  Objection, Your Honor.

16 BY MS. WICKS:

17 Q.  And you're saying Mr. Wilson was at jum'ha.  Right?

18 A.  Yes.

19 Q.  And that's when you talked to him about Squid getting

20 killed.  Right?

21 A.  And the halfway house joint.

22 Q.  Okay.  I didn't ask you about that, did I?

23         The question was, that's when you talked to him about

24 Squid getting killed.  Right?

25 A.  To my memory, yes.

Page 10720

1 Q.  Okay.  And so you're saying -- do you recall -- sitting here

2 today, do you recall what year it was when Squid got killed?

3 A.  I don't know.  I can't remember.

4 Q.  You have no idea?

5 A.  I can't remember.

6 Q.  I'm asking you, do you have any idea what year it was?

7 A.  No.  No, ma'am.

8 Q.  Okay.  So for all you know, it was 2002.  Right?

9 A.  What?

10 Q.  Was it the year that you got locked up for selling drugs on

11 10th Place that Squid got killed?

12 A.  No.  I don't get what you saying.  You like flip-flopped

13 that.  Repeat that again.

14 Q.  The year that you got locked up for selling drugs on

15 10th Place was 2002.  Right?

16 A.  Uh-huh.

17 Q.  Was that the year that Squid got killed?

18 A.  Skid was already dead.  They had bears and stuff all right

19 there, and balloons and stuff.

20 Q.  Do you recall when you first saw the bears and balloons

21 where Squid got killed?

22 A.  It was in 2000, used to ride through there.

23 Q.  It was in 2000 when you first saw them?

24 A.  I mean, 2002, when I was home, I was riding around.  I mean,

25 the bears, that's where they got hit at, right there.  They had

Page 10721

1 a lot of Remy bottles, Moe bottles, and teddy bears, "We miss

2 you, Squid."

3 Q.  Okay.  And my point -- well, you got locked up from

4 November 2000 until November 2001.  Right?

5 A.  Yes.

6 Q.  Before you got locked up for that year, did you see the

7 bears and the balloons out there?

8 A.  I can't remember.  I can't remember.  I can't remember.

9 Q.  You can't remember?

10 A.  No, ma'am.

11 Q.  Do you remember when you got locked up and did that year

12 knowing that Squid was dead or that Squid was alive, or did you

13 care?

14 A.  I really didn't care, really.

15 Q.  Okay.  And sitting here today, the first time that you

16 talked to Mr. Wilson about the death of Squid was at D.C. Jail

17 on a Friday, in jum'ha, in 2002.  Correct?

18 A.  Correct.

19 Q.  Now, the plea agreement that you had with the government

20 back in 2002 --

21          MS. WICKS:  May I approach, Your Honor?

22          THE COURT:  Yes.

23 BY MS. WICKS:

24 Q.  For the record, I'm showing you 27-T.  Is that your --

25          THE COURT:  27 what?

1        MS. WICKS:  27-T.

2        THE COURT:  T, as in Thomas?

3        MS. WICKS:  T, as in Thomas.  It's an addition.  We

4 just got it.

5 BY MS. WICKS:

6 Q.  Is that your plea agreement from November 27th, 2002?

7 A.  Yes.

8 Q.  Okay.  And that was a cooperation agreement that you had

9 before you -- that's in the case that got dismissed when you

10 pled guilty over here in this courtroom.  Right?

11 A.  You said the what?

12 Q.  The plea agreement that you signed on November 27th, 2002

13 was in F6067-02.  Right?

14 A.  Yes.

15 Q.  And that's the case that ultimately was dismissed over in

16 Superior Court before you pled guilty over here.  Right?

17 A.  If I'm not mistaken, it all moved under the federal court.

18 Q.  Right.  But you don't have to go back to court over there.

19 Right?

20 A.  Naw.  It's all under this case.

21 Q.  Okay.  This is the only judge that you have to go to

22 sentencing in front of now.  Right?

23 A.  Yes.

24 Q.  And back before you pled guilty -- well, before you pled

25 guilty in this case, you had a sentencing that you were facing

1 over there.  Right?

2 A.  Yes.

3 Q.  And you no longer have to go to that sentencing.  Right?

4 A.  No.

5 Q.  Okay.  But your obligations under that plea agreement were

6 similar to the obligations under this plea agreement.  Right?

7 A.  Yes.

8 Q.  You had to testify truthfully.  Right?

9 A.  Yes.

10 Q.  And you lied in the grand jury back in 2002.  Correct?

11 A.  Yes.

12 Q.  And that was after you had signed the agreement saying you

13 were going to cooperate with the government.  Right?

14 A.  Right.

15 Q.  And that was after you told the government you're going to

16 go into the grand jury and, pursuant to this agreement, you were

17 going to testify truthfully.  Right?

18 A.  Yes.

19 Q.  And that's the day that you went to the grand jury and you

20 lied -- well, you're sitting here saying that you lied about

21 certain events.  Right?

22 A.  Right.

23 Q.  And you're saying that you purposely deceived the police

24 when you talked to them about the incident about the gun in the

25 truck.  Right?

 1 A.  Huh?

 2 Q.  Well --

 3 A.  What incident?  Which incident you talking about?

 4 Q.  You said -- back in 2002 you told the police that Black put

 5 his own gun --

 6 A.  Oh.  Yes, I lied.

 7 Q.  -- in the truck --

 8 A.  Yes, I lied.

 9 Q.  -- right?

10 A.  Yes.

11 Q.  And that was a lie?

12 A.  Yes.

13 Q.  And you told the police that Black told you it was his gun.

14 Right?

15 A.  Yes.

16 Q.  And you were deceiving the police when you told them that

17 back in 2002.  Right?

18 A.  Yes.

19 Q.  And you were deceiving the grand jurors that were

20 investigating a homicide when you told them the same thing.

21 Right?

22 A.  Yes.

23 Q.  And your agreement that you had back in 2002 specifically

24 said that you had to provide true and complete answers to any

25 questions put to you.  Right?

1 A.  Yes.

2 Q.  And that's questions put to you both outside of the grand

3 jury and inside the grand jury.  Right?

4 A.  Right.

5 Q.  And that's questions -- when the police are asking you

6 questions, you have to tell them everything you know.  Right?

7 A.  Right.

8 Q.  And so you're sitting here today saying you didn't do that

9 back in 2002.  Correct?

10 A.  Right.  Yes.

11 Q.  Did you also continue to lie to them in 2003?

12 A.  Yes, probably so.  Yes.

13 Q.  Probably so.  You didn't plead guilty until February 1st,

14 2005.  Correct?

15 A.  Correct.

16 Q.  And do you recall, when was the first time that you told

17 them it was Wop's gun?

18 A.  I can't recall.  I can't recall that.

19 Q.  Okay.  When you testified -- now, when you testified in the

20 grand jury back in 2002, you also -- it wasn't just the identity

21 of a person, but you lied to them about what type of gun that

22 this problem was over.  Right?

23 A.  I said it was either a 380 or a nine.

24 Q.  And when you testified this week before these ladies and

25 gentlemen under oath again, you said you thought it was a Glock.

1          MS. PETALAS:  Objection, Your Honor.  Misstates.

2          MS. WICKS:  I'm asking a question to clarify what the

3 witness is saying.

4          THE COURT:  Rephrase the question.

5 BY MS. WICKS:

6 Q.  Where did the gun come from?

7 A.  Black stole it out of Ronnie T truck, around Robinson.

8 Q.  Okay.  And gave it to Wop.  Is that what you're saying?

9 A.  Yes.

10 Q.  But Black stole the gun?

11 A.  Yes.

12 Q.  Out of someone else's truck, Ronnie T?

13 A.  Yes.

14 Q.  Not from Congress Park.  Right?

15 A.  No.

16 Q.  And you're saying Black gave the gun to Wop?

17 A.  Yes.

18 Q.  And what kind of gun was it?

19 A.  It was a Glock.

20 Q.  Okay.  So that's another thing that you lied about when you

21 testified in the grand jury back in 2002.  Right?

22 A.  What you mean, I lied about that?  I never said nothing

23 about it.

24 Q.  Well, you didn't tell the grand jury it was a Glock, did

25 you?

1 A.  No.

2 Q.  And that's not about a person.  Right?

3 A.  You just confused me.  Repeat that again.

4 Q.  Well, why did you lie to the grand jury about what type of

5 gun this was about?

6 A.  I don't know.  I just lied, ma'am.

7 Q.  You just lied to be lying.  Right?

8 A.  I lied.

9 Q.  You wanted to get a benefit from the government in your drug

10 case, and you didn't care what you were saying.  Right?

11 A.  No, it was between me and Don.  I ain't indicate (sic)

12 nobody.  It was between me and Don, that's it and that's all.  I

13 ain't indicate (sic) nobody else.

14 Q.  So why are you lying about what Black said?

15 A.  Huh?

16 Q.  Why did you lie about what Black said?

17 A.  When?

18        MS. PETALAS:  Objection, Your Honor.

19        THE COURT:  Sustained.

20 BY MS. WICKS:

21 Q.  Well, why did you lie about what type of gun it was?

22 A.  I don't know.  I lied.  I don't know, ma'am.  You asking

23 questions I can't answer.  I don't know.  I just lied.

24 Q.  And you're saying Black -- you know Black didn't steal a 380

25 or a nine-millimeter.  Right?

1 A.  Right.

2 Q.  And you never told -- well, you never told the grand jury

3 back in 2002 that Black had stolen this gun to begin with.

4 Right?

5 A.  Right.

6 Q.  All you talked about was that the gun was -- that Black --

7 it was his gun.  Right?

8 A.  Right.

9 Q.  And he put it in the truck.  Right?

10 A.  Right.

11 Q.  And it disappeared.  Right?

12 A.  Right.

13 Q.  And you and he suspected that Dom and DC had something to do

14 with it.  Right?

15 A.  Right.

16 Q.  And you never said that Wop name had anything to do with

17 anything.  Right?

18 A.  Right.

19 Q.  His name never came up when you talked to the police in

20 2002?

21 A.  Never.  Nobody name ever came up but Don.

22 Q.  Well, you never offered it.  Right?

23 A.  Right.

24 Q.  Back in 2002, when you're supposed to be providing truthful,

25 complete, and accurate information, you never brought up Wop.

1 A.  No, he didn't point it at me.

2 Q.  So he didn't even point it at you, and he certainly didn't

3 shoot it at you.  Right?

4 A.  Right.

5 Q.  And you're upset because you think that Mr. Wilson had a gun

6 that day and didn't give it to you so you could kill him.  Is

7 that what you're saying?

8 A.  No, he had a gun on him that day.  He pulled it off his

9 hip --

10 Q.  We have your word that he had a gun that day.  Right?

11 A.  Yes.

12       THE REPORTER:  I'm sorry, I didn't hear the question.

13 BY MS. WICKS:

14 Q.  We have your word --

15       THE COURT:  Let him finish his answer so it can be

16 transcribed.

17       MS. WICKS:  Sure, I'm sorry.

18 A.  Yes, he had a gun on him that day.  He pulled it off his hip

19 in the back of Doo-Doo house.

20 BY MS. WICKS:

21 Q.  Okay.  And we have your word that he had his gun that day.

22 Right?

23 A.  Right.

24 Q.  And we have your word that you went to go get the gun from

25 Doo-Doo.  Right?

1 A.  Right.

2 Q.  And did you get a gun from Doo-Doo?

3 A.  Nope.

4 Q.  He wouldn't let you have a gun.  Right?

5 A.  Right.

6 Q.  But you're saying Doo-Doo had a gun?

7 A.  Right, he had Twuan's Beretta.

8 Q.  Okay.  You saw him standing there with Antwuan's Beretta out

9 in Congress Park on that day.  Right?

10 A.  He didn't have it on him.  It was in his house.

11 Q.  It was in his house?

12 A.  It was in Doo-Doo house.

13 Q.  Okay.

14      MS. WICKS:  Court's indulgence.  Court's indulgence.

15 BY MS. WICKS:

16 Q.  Do you -- you remember talking to the FBI about this

17 incident regarding Little Rob before.  Right?

18 A.  Right.

19 Q.  And when you talked to them before, you told them that

20 Doo-Doo told you that he had to call Antwuan.  Right?

21 A.  If I'm not mistaken, yes.

22 Q.  And you told them that you ran up to Cody's apartment

23 looking for Antwuan.  Right?

24 A.  Yes.

25 Q.  And you told them that Antwuan wasn't there.  And when you

1 came back, Rob was gone.  Right?

2 A.  Right.

3 Q.  And you told them that the guys in the neighborhood were

4 making fun of you.  Right?

5 A.  Right.

6 Q.  When you testified here, you said it was just Wop.  Right?

7 A.  That was when we was in the back of Doo-Doo house.  It was

8 me, Doo-Doo, and Wop.

9 Q.  Okay.  But the truth was, there were lots of people making

10 fun of you for running away from the fight.  Right?

11 A.  See, you twisting it up.  That happened when we walked out

12 front of the Lincoln.  That's when Munya was like, "Nigger, why

13 you ain't even fight him, nigger?  Oh, you can't fight now,

14 nigger?"

15 Q.  Were Wop and Munya the only people making fun of you for

16 running away --

17 A.  Naw.

18 Q.  -- from the fight?

19 A.  Naw.

20 Q.  Okay.  Mr. Kellibrew, you have to let me finish my question

21 before you start answering it.  Okay?

22 A.  Yes.

23 Q.  And my question to you is, were Munya and Wop the only

24 people in the neighborhood making fun of you for running away

25 from a fight?

Page 10734

1 A.  No.

2 Q.  You talked about an incident where you went out to Meat's in

3 Maryland.  What time of day was it when you robbed the -- I

4 think it was a gambling game out at Meat's?

5 A.  Yes.

6 Q.  What time of day was that?

7 A.  It was daytime.

8 Q.  It was daytime?

9 A.  Yes.

10 Q.  Do you remember what time of day?

11 A.  I don't remember -- it was daytime.  I don't remember --

12 Q.  You remember if the sun was out?

13      THE COURT:  Let him finish his answer before you start

14 your next question.

15      MS. WICKS:  I'm sorry.

16 A.  I don't remember the late afternoon or mid afternoon.  It

17 was light outside.

18 BY MS. WICKS:

19 Q.  Okay.  And it was light outside, just like it was light

20 outside when you saw Troy Lewis hanging out of the truck after

21 he had been shot.  Right?

22 A.  Right.

23 Q.  And when you saw Troy Lewis hanging out of the truck, I

24 think your testimony is, his brains were coming out of his head.

25 Right?

Page 10735

1 A.  Right.

2 Q.  Because he had been shot in the head.  Right?

3 A.  Right.

4 Q.  And that's what Antwuan told you, too.  Right?

5 A.  Right.

6 Q.  Now, when you went out to Maryland --

7          MS. WICKS:  Court's indulgence.

8 BY MS. WICKS:

9 Q.  Now, prior to being released in 2005, you had never had a

10 real job.  Right?

11 A.  Right.

12 Q.  And so the first job you had was the job essentially working

13 that you got when you went to this program after you got

14 released from CTF in 2005.  Right?

15 A.  Right.

16 Q.  But almost -- well, every time that you've been arrested, in

17 1999, 2000, and 2002, when interviewed by pretrial services,

18 you've told them you're employed.  Right?

19 A.  Right.

20 Q.  And every time you went to a halfway house, you lied to them

21 and told them you had a job.  Right?

22 A.  Right.

23 Q.  And you never had a job any of those times.  Right?

24 A.  No.

25 Q.  And every single day that you were in a halfway house, you

1 would sign out saying you're going to the job.  Right?

2 A.  Right.

3 Q.  And every single day you would be lying to the people in the

4 halfway house.  Correct?

5 A.  Correct.

6 Q.  And every single time you got arrested you would be lying to

7 try to get out of jail?

8 A.  Correct.

9 Q.  And it's the same thing at the halfway house.  You were

10 lying to get out of the halfway house, and telling them you have

11 a job.  Right?

12 A.  Yes, ma'am.

13 Q.  And so when you were --

14          MS. WICKS:  Court's indulgence.

15 BY MS. WICKS:

16 Q.  Now, when you were arrested in your first case, in June of

17 1999, you were released.  And one of the conditions of your

18 release was that you not be rearrested.  Correct?

19 A.  Correct.

20 Q.  And you broke that promise.  Correct?

21 A.  Yes.

22 Q.  You broke the law.  You were out there selling drugs when

23 you were on release in 1999.  Correct?

24 A.  Correct.

25 Q.  And you had a gun -- well, did you have one gun or two guns

1 when you were locked up in September '99?

2 A.  Two guns.

3 Q.  Okay.  And it was a violation of the conditions of your

4 release from June of '99 for you to have those guns in September

5 '99.  Right?

6 A.  Yes.

7 Q.  And from September '99 -- once you got arrested in

8 September '99, you were locked up for about 10 days at the jail.

9 Right?

10 A.  Right.

11 Q.  And then you were placed in a halfway house.  Right?

12 A.  Right.

13 Q.  And that's your first time in the halfway house.  Correct?

14 A.  Correct.

15 Q.  And you're saying, in October or November '99, while you're

16 in the halfway house, in two cases pending in Superior Court,

17 you go out and commit this robbery in Maryland.  Right?

18 A.  Yes.

19 Q.  And that's what you pled to in your plea agreement.  Right?

20 A.  Right.

21 Q.  And it was a violation of the orders in both of those cases

22 for you to be breaking the law committing that robbery.  Right?

23 A.  Hold on.  Time out.  I don't know if I was in the halfway

24 house when I committed that robbery.

25 Q.  You don't know?

1 A.  I can't remember if I was in the halfway house or not when I

2 did that.  I can't remember.  You just trying to flip-flop me

3 just now.

4 Q.  I'm not trying to flip-flop you.  Let me show you the court

5 jacket, 27-J.

6            MS. WICKS:  May I approach, Your Honor?

7            THE COURT:  Yes.

8            MS. WICKS:  I'm going to show him actually 27-J and

9 27-K.

10            Your Honor, may I approach?

11            THE COURT:  Yes.

12 BY MS. WICKS:

13 Q.  First looking at 27-K, this is -- if you look up here in the

14 upper left-hand corner, this is United States versus

15 Kairi Kellibrew.  That's your case.  Right?

16 A.  Yes.

17 Q.  And this is an order in that case on September 17th, 1999.

18 This is a work release order.  Right?

19 A.  Yes.

20 Q.  And it's the same as in M11055-99, which is 27-J.  That's

21 another one of your cases.  Right?

22 A.  Yes.

23 Q.  And this is an order releasing you to the halfway house on

24 September 17th, 1999.  Right?

25 A.  Yes.

1 Q.  And telling you to come back on November 4th of '99.  Right?

2 A.  Right.

3 Q.  So back in September, you were released from the jail to the

4 halfway house.  Correct?

5 A.  Correct.

6 Q.  And came back to court in November and then December.

7 Correct?

8 A.  Correct.

9 Q.  And at that point you're still in the halfway house.  Right?

10 A.  Yes.

11 Q.  And you plead guilty in November, and then you're sentenced

12 initially in December.  Right?

13 A.  Yes.

14 Q.  '99.  And so all that fall you're in the halfway house.

15 Right?

16 A.  Yes.  I think, didn't I catch an escape charge with that,

17 too?

18 Q.  That's a good question.

19          MS. WICKS:  Court's indulgence.

20          THE COURT:  Yes.

21 BY MS. WICKS:

22 Q.  Well, in July 2000 is when you were arrested with

23 Crystal Tyler.  Right?

24 A.  Right.

25 Q.  July 18th, 2000.  Right?

Page 10740

1 A.  Right.

2 Q.  And you're in the halfway house then, as well.  Right?

3 A.  Right.

4 Q.  And you're actually placed on escape, but they figure out

5 you had been arrested.  Correct?

6 A.  No.  I ran from the halfway house -- okay.  That was, yeah,

7 when I got locked up, yeah.

8 Q.  And then after that, after that arrest, you're placed back

9 in the halfway house.  Right?

10 A.  Right.

11 Q.  After a period of time at the jail.  Right?

12 A.  Right.

13 Q.  And then you escape on October 8th, 2000.  Right?

14 A.  I guess so, yes.

15 Q.  And then you're locked up on the escape on November 17th,

16 2000.  Right?

17 A.  Right.

18 Q.  And that's when you do the year.  Right?

19 A.  Right.

20 Q.  Now, the --

21        MS. WICKS:  Court's indulgence.

22 BY MS. WICKS:

23 Q.  And in your plea agreement, and this is 1119,

24 Government's 1119, in your plea agreement, in the proffer -- and

25 you agreed everything in your proffer is true and accurate.

1 Right?

2 A.  Right.

3 Q.  In your proffer you say that this robbery occurred -- on

4 page three -- on or about October or November '99.  Right?

5 A.  Right.

6 Q.  So that's the period of time that I think we've talked

7 about, and established that you were in the halfway house for

8 the two pending cases in '99.  Right?

9 A.  Right.

10 Q.  And --

11       MS. WICKS:  Court's indulgence.

12 BY MS. WICKS:

13 Q.  Before you escape in 2000, you had spent about nine months

14 in the halfway house.  Is that correct?

15 A.  Yes.

16 Q.  And that was during the period of your probation to

17 Judge Morin over in Superior Court.  Right?

18 A.  Right.

19 Q.  So then, during the period of probation to Judge Morin,

20 during probation, you had promised not to break the law.

21 Correct?

22 A.  Correct.

23 Q.  And during that period of time in the halfway house, you

24 continued to violate the rules, and lie, and say you were going

25 to work.  Right?

1 A.  Right.

2 Q.  And you lied to your probation officer and told your

3 probation officer you were going to work.  Right?

4 A.  Right.

5 Q.  And you didn't have a job.  Right?

6 A.  No, I didn't.

7 Q.  And one of the lies that you told the halfway house was that

8 you were employed for Red Team Landscape at 3402 13th Place,

9 Northeast, apartment 101.  Right?

10 A.  Right.

11 Q.  And that was a lie.  Right?

12 A.  Yes.

13 Q.  You completely made that up.  Right?

14 A.  Yes.

15 Q.  You also lied to the halfway house and told them you worked

16 at King Pool Service.  Right?

17 A.  Yes.

18 Q.  And that was another lie?

19 A.  Yes.

20 Q.  Also, when you were arrested in September '99, you told

21 pretrial services that you worked as a janitor.  Right?

22 A.  Yes, I guess -- yes.

23 Q.  And that was a lie.  Right?

24 A.  Yes.

25 Q.  And you actually told them that you were a lifeguard, right,

1 at King Swimming Pool?  Right?

2 A.  Okay.  It was like, I did work for King Swimming Pool before

3 with my father, but I was lying then.

4 Q.  Okay.  So when you testified --

5        MS. WICKS:  Court's indulgence.

6 BY MS. WICKS:

7 Q.  You testified last year against Corey Moore.  Right?

8 A.  Yes.

9 Q.  And when you testified against Corey Moore, you were asked

10 the following question and gave the following answer.

11        Page 46.  And this is Defendant's 27-F.

12        Question:  "Did you have a job, a legitimate job at

13 that time?"

14        Answer:  "No, I never had a job since I'm -- back then,

15 never."

16        That was your answer just a year ago, in April 2006.

17 Correct?

18 A.  Right.

19 Q.  Now you're saying you actually did work at a swimming pool?

20 A.  I didn't get -- I never got a check.  I got paid -- he used

21 to pay me cash.

22 Q.  So that's similar to the job you have now, where you're

23 getting paid under the table.  Right?

24 A.  Yes.

25 Q.  And when you're getting paid under the table, you mean taxes

1 aren't being taken out.  Right?

2 A.  Right.

3 Q.  So you're deceiving the government by not paying taxes on

4 the money that you're making.  Right?

5 A.  I guess I am.

6 Q.  Well, are you paying taxes?

7 A.  No.

8 Q.  But you say you have a job.  Right?

9 A.  Yes.

10 Q.  And you're making money to support your family.  Right?

11 A.  Yes.

12 Q.  But none of that money is going to the government.  Right?

13 A.  No.

14 Q.  And how long have you had that job?

15 A.  Which job?

16 Q.  The job you have now, getting paid under the table by

17 Reggie.

18 A.  Ever since I got out I been working for Reggie off and on.

19 Q.  And you're talking about ever since you left the program in

20 January 2006?

21 A.  No, I was working with him off and on during the program,

22 whenever I can get a chance.

23 Q.  So wherever it is that you're in this program, that's where

24 Reggie is.  Right?

25 A.  No.  Reggie wasn't in the program.

1 Q.  Well, the program is not here in the Washington, D.C. area.

2 Correct?

3 A.  Correct.

4 Q.  But you're saying when you were in the program, wherever it

5 is, Reggie is near the program.  Is that correct?

6 A.  Yes.

7 Q.  And so you're saying while you were in the program, between

8 2005 until you left in 2006, you were working for Reggie?

9 A.  I still work with Reggie today.

10 Q.  And my question is, back when you were in the program, from

11 2005 to 2006, you were working for Reggie.  Right?

12 A.  Yes.

13 Q.  Okay.  So back in 2005, you made money.  Right?

14 A.  Yes.

15 Q.  And in 2006, you didn't file your taxes for 2005.  Correct?

16 A.  Correct.

17 Q.  And in 2007, you haven't filed your taxes for 2006.

18 Correct?

19 A.  Correct.

20        MS. WICKS:  Court's indulgence.

21 BY MS. WICKS:

22 Q.  Well, when you worked -- so you're saying, at some point in

23 your life, you worked for your father at King Swimming Pool?

24 A.  Yes.

25 Q.  And so when you testified last year against Mr. Moore and

1 A.  Right.

2           MS. WICKS:  Court's indulgence.

3 BY MS. WICKS:

4 Q.  Now, the plea agreement that you had back in 2002, one of

5 the --

6           MS. WICKS:  Court's indulgence.

7 BY MS. WICKS:

8 Q.  One of the benefits that you've already gotten is -- well,

9 back in 2001, Judge Campbell placed you on probation.  Correct?

10 A.  Yes.

11 Q.  And this was a case that you had -- this is the case that

12 you picked up on July 18th when you were arrested with

13 Crystal Tyler.  Right?

14 A.  Yes.

15 Q.  And back on March 7th of '01, you got four years of

16 probation.  Right?

17 A.  March when?

18 Q.  March 7th, 2001.

19 A.  Yes.

20 Q.  And it was a violation of that probation when you got

21 arrested in September of 2002.  Right?

22 A.  Yes.

23 Q.  And one of the things in your first plea agreement that the

24 government agreed to do is essentially let that Judge Campbell

25 know about your cooperation pursuant to that agreement.  Right?

1 A.  Yes.

2 Q.  And ultimately, in 2004, your probation was terminated as

3 unsuccessful.  Right?

4 A.  Yes.

5 Q.  And so when you had gotten probation, Judge Campbell had

6 given you two to six years in jail.  Right?

7 A.  Yes.

8 Q.  And essentially -- but essentially didn't give you that

9 time, suspended that time and placed you on probation.  Right?

10 A.  Right.

11 Q.  And when the probation was terminated as unsuccessful, you

12 don't have to do that two to six years.  Right?

13 A.  Right.

14 Q.  Even though you had violated probation.  Right?

15 A.  Right.

16 Q.  So that's a benefit that you got from this agreement that

17 you had back in 2002.  Right?

18        MS. PETALAS:  Objection, Your Honor.  Misstates the

19 agreement.

20        THE COURT:  Beg your pardon?

21        MS. PETALAS:  It misstates the facts, and assumes facts

22 not in evidence.  It misstates the plea agreement.

23        MS. WICKS:  I'm just saying it's a benefit that he's

24 gotten.  I'll change the question.

25 BY MS. WICKS:

1 Q.  Because of your cooperation since 2002, that's a benefit

2 that you've already gotten.  Right?

3 A.  What, that the case was dismissed?

4 Q.  You don't have to do the two to six years.  Right?

5 A.  Because it's all transferred into this court.

6 Q.  Well, the case that was transferred into this court is the

7 arrest from September 2002.  Right?

8 A.  The Campbell case is still -- all my cases revolves around

9 Congress Park, so it came under federal court.  As my lawyer

10 said, "All your charges will be moved to federal court."

11 Q.  Okay.  Well, you didn't plead guilty in this case in federal

12 court until February 1st, 2005.  Right?

13 A.  Right.

14 Q.  But back on December -- I'm sorry, December 17th, 2004, the

15 probation was terminated in F4366-00.  Right?

16 A.  Right.

17 Q.  So before you even pled guilty over here, this case, you

18 don't have to do the time.  Right?

19 A.  Right.

20        MS. WICKS:  Court's indulgence.

21 BY MS. WICKS:

22 Q.  Now, we talked about, you did about nine months between '99

23 and 2000 in the halfway house.  Right?

24 A.  Right.

25 Q.  And then, when you picked up --

1          MS. WICKS:  Court's indulgence.

2  BY MS. WICKS:

3  Q.  Then, when you picked up the case in July 2000, you were

4  held for a period of time and then released to the halfway

5  house, and then apparently escaped on October 8th, 2000.  Right?

6  A.  Right.

7  Q.  And then once you were picked up in November, I believe it

8  was November 17th, 2000, then you did a year on the old case.

9  Right?

10  A.  Right.

11  Q.  Okay.  And that's from November 2000 to November 2001.

12  Right?

13  A.  You said what, now?

14  Q.  From November 2000 until November 2001, you were locked up.

15  Right?

16  A.  Right.

17  Q.  And you testified about an incident where you're at the

18  halfway house, and you say -- you have a conversation with

19  Mr. Wilson about going to make a move.  Right?

20  A.  Right.

21  Q.  And essentially you get upset, because apparently, according

22  to you, he goes and does it without you.  Right?

23  A.  Right.

24  Q.  And there's a day when you come to Congress Park and, I

25  think your testimony is, you're on the bus and you smell the

1 weed.  Right?

2 A.  Right.

3 Q.  And then you get off the bus, and you can still smell the

4 weed.  Right?

5 A.  I said, when I got off the bus I smelled the weed.

6 Q.  So you didn't smell it when you were on the bus.  Right?

7 A.  No.

8 Q.  You get off the bus and you smell the weed.  Where was it

9 that you got off the bus that day?  Is it on the exhibit?  For

10 the record, you're looking back at the government's exhibit.

11          MS. WICKS:  May I approach, Your Honor?

12          THE COURT:  Yes.

13 BY MS. WICKS:

14 Q.  And for the record, this is Government 122.3.  Do you see on

15 Government 122.3 where it was that you got off the bus in that

16 area of Congress Park?

17 A.  I can't remember what exact stop I got off at.

18          MR. ZUCKER:  Sorry, I can't hear the witness, Judge.

19 BY MS. WICKS:

20 Q.  You have to speak into the microphone.

21 A.  I don't remember exactly what bus -- I mean, what bus stop I

22 got off at.  I can't remember exactly what bus stop.  I ain't

23 even going to point to nothing and get into that.  I don't

24 remember.

25 Q.  Well, can you point on this exhibit to the area where you

1 had when you were smoking sacks of PCP?

2 A.  Yes.

3 Q.  And you indicated that you would talk to dead people when

4 you had these hallucinations?

5 A.  That happened one time.  I lunched off the boat behind Moms'

6 building, and I was crying to Twuan saying -- I was like --

7        THE COURT:  Come up to the mic.

8 A.  I was saying, "Where my big cousin?  Where my big cousin

9 at?"

10        And he was like, "You lunching.  You lunching off the

11 boat, Shorty."

12 Q.  And you were talking to your dead cousin.  Right?

13 A.  Yes.

14 Q.  Now, you also would zone out sometimes on the PCP.  Right?

15 A.  Zone out how?  Explain that.

16 Q.  Well, would there be periods of times when you didn't know

17 what had happened?

18 A.  Yeah.  You lunching off the boat, you black out.  Then when

19 you come back to, you lunching.

20 Q.  And these blackout times, you have no idea what was going

21 on.  Right?

22 A.  No.

23 Q.  How often did that happen during the period of time that you

24 were smoking sacks between when you were 13 and 19?

25 A.  Let me see how many times I lunched out.  That time behind

1 Moms' building.

2          Another time when I came out -- I was coming out

3 Boy-Boy house from getting out the shower, and I walked up on

4 Tight Al, and he had a big-ass bundle of some boat.  I hit the

5 boat.  'Bout time I got to the corner, I was like this

6 (indicating).

7          And Fat Tony was like, "I'm taking you to your cousin

8 right now.  And I was like, "Naw, don't take me to my cousin,

9 man.  Please, man, don't take me to my cousin."  That's why I

10 got this burn right here on my hand.  He put a white boy out on

11 my hand.

12 Q.  You have a burn from where he put a white boy out on your

13 hand?

14 A.  Yes.

15 Q.  And by "white boy," you mean a --

16 A.  Joint.

17 Q.  -- rolled-up joint with white paper.  Right?

18 A.  Yes.

19          MS. WICKS:  Court's indulgence.

20 A.  The first time I lunched off the boat, I was Trenton --

21 BY MS. WICKS:

22 Q.  Mr. Kellibrew, I'm not asking you a question yet.

23 A.  I mean, you asked me events that I lunched out --

24          MR. MARTIN:  Objection, Your Honor.

25          THE COURT:  Sustained.  Hold on.  Let her put a

1 A.  Yes.

2 Q.  And that was when you were 13.  Right?

3 A.  I don't know if I was 13.  I was on Trenton Place.

4 Q.  Pardon me?

5 A.  I say, I wasn't 13.  I had to be 14, maybe 15, back around

6 the way.

7 Q.  I'm sorry?

8 A.  I said, I was back around the park, so I had to be 14, 15.

9 Q.  Okay.  So you're saying, when you were out in Maryland --

10 A.  I didn't get wet out in Maryland, I got wet around the park.

11 Q.  When you moved back around the park?

12 A.  Yes.

13 Q.  Okay.  So my question is, when you were out in Maryland, 12

14 or 13, you're smoking marijuana.  Right?

15 A.  Yes.

16 Q.  And then when you moved back around the park, you're 13 or

17 14.  Right?

18 A.  Yes.

19 Q.  And that's when you first smoked PCP.  Right?

20 A.  Yes.

21 Q.  And the first time -- well, sitting here today, I believe

22 earlier this afternoon you recalled the first time that you

23 smoked PCP and indicated that you lunched out.  Right?

24 A.  Yes.

25 Q.  And up until what age were you smoking PCP?

1 A.   22.

2 Q.   So up until the point that you were arrested in 2002, you

3 were smoking PCP.  Right?

4 A.   Yes.

5 Q.   And you were smoking PCP pretty much every day for a while

6 during that time period.  Right?

7 A.   Yes.

8 Q.   And after smoking PCP, you also tried Ecstasy pills.  Right?

9 A.   Yes.

10 Q.   And you were doing that regularly in '99 and 2000.  Right?

11 A.   Yes.

12 Q.   And in 2001?

13 A.   You talking about after I came home?

14 Q.   After you came home from jail.

15 A.   I was popping off.

16 Q.   Pardon me?

17 A.   Yes, I was taking Ecstasy.

18 Q.   And in 2002.  Right?

19 A.   Hold on.  After I came home, I really wasn't popping off

20 like that.  I was blowing dope.

21 Q.   Well, you had started blowing dope a couple of years before

22 that.  Right?

23 A.   Yes.

24 Q.   And that's in '98 or '99?

25 A.   Yes.

Page 10788

1 Q.  And from '98 or '99, until you're locked up in 2002, you're

2 blowing dope each week.  Right?

3 A.  Yes.

4 Q.  And now, I believe your testimony was, when you were in the

5 program in 2005, you were able to get marijuana.  Right?

6 A.  Yes.

7 Q.  And while you were locked up -- at various points when

8 you're locked up, either in the halfway house or in jail, you

9 could get drugs.  Right?

10 A.  Yes.

11 Q.  So during the time period that you're locked up in 2000 and

12 2001, you're still using drugs while you're locked up.  Right?

13 A.  Yes.

14 Q.  But just not as often.  Right?

15 A.  Naw.

16 Q.  It's harder to get when you're locked up.  Right?

17 A.  Yes.

18 Q.  And since you were locked up between 2002 and 2005, you used

19 drugs during that time period as well.  Right?

20 A.  Off and on.  I wasn't getting in it like I was on the

21 streets.  But if it came through, yes, I smoked.

22 Q.  If you could get ahold of it, you smoked it.  Right?

23 A.  Yes.  And if it came through, yes, I blowed it.

24 Q.  And specifically, we're talking about marijuana and PCP --

25 I'm sorry, marijuana and heroin.  Right?

1 effect of drugs on your body and on your life, you'll stop

2 using.  Right?

3 A.  Yes.

4          MS. PETALAS:  Objection, Your Honor.

5          THE COURT:  Sustained.

6 BY MS. WICKS:

7 Q.  Well, you learned about the effects of drugs on a person's

8 ability to recall events accurately.  Right?

9 A.  Yes.

10 Q.  And you learned that it affects memory adversely.  Right?

11          MS. PETALAS:  Objection, Your Honor.

12          THE COURT:  Sustained.

13 A.  Well, they say --

14          THE COURT:  That means you don't answer the question.

15          THE WITNESS:  Okay.

16 BY MS. WICKS:

17 Q.  Well, when you were using drugs, did it affect your

18 perception?

19 A.  Can you break that down a little, the word perception?  Can

20 you...

21 Q.  Okay.  When you were using drugs, would it affect your

22 ability to remember things?

23 A.  Not really.

24 Q.  Not really?

25 A.  It wouldn't affect my mind like that, I would just be high.

1 I might could do something when I'm highed up, and tell you

2 about it the next morning, and then tell you about it next week.

3 Q.  Would you do things when you were high that you wouldn't do

4 when you weren't high?

5 A.  Say what, again?  Were there things that I would do --

6 Q.  Were there things that you would do when you were high that

7 you wouldn't do when you weren't high?

8          MS. PETALAS:  Objection, Your Honor.  Vague.

9          THE COURT:  Do you understand the question?

10          THE WITNESS:  A little bit.

11 A.  You said, is it things I would do if I was high, and if I

12 wasn't high, was there things that I would do if I was high that

13 I wouldn't do if I was sober?

14 BY MS. WICKS:

15 Q.  Exactly.

16          MS. PETALAS:  I'm just going to object.  Calls for

17 speculation.

18          THE COURT:  I'll allow it.  You can answer.

19 BY MS. WICKS:

20 Q.  You can answer.

21 A.  Oh.  Yeah, it change you.

22 Q.  And one of the things that happens when you smoke the PCP

23 is, you have hallucinations.  Right?

24 A.  Yes.

25 Q.  And the PCP, when you smoked the PCP, it affected you.

1 Right?

2 A.  Yes.

3 Q.  And when you snorted the heroin, it affected you.  Right?

4 A.  Yes.

5        MS. WICKS:  Court's indulgence.

6 BY MS. WICKS:

7 Q.  And now, there are certain things that you can remember and

8 certain things that you can't remember.  Right?

9 A.  Right.

10 Q.  And there are certain periods of times when you don't know

11 what happened.  Right?

12 A.  When?  When you lunching off the boat?

13 Q.  Yes.  Well, when you're lunching off the boat.

14 A.  Well, let me explain it to you.  If you lunching off the

15 boat, like, you not going to remember what you doing until you

16 come through, until you come back.

17        So no, I wouldn't remember what I did when I was

18 lunching until I came back.  Now --

19 Q.  And --

20        MS. PETALAS:  Objection, Your Honor.  I don't think he

21 was finished with his answer.

22 BY MS. WICKS:

23 Q.  I'm sorry.  Were you done?

24 A.  Now, with the dope, I remember everything.  Like, I can sit

25 right here and be like this and hear your whole conversation and

1 A.  Maybe two.

2 Q.  Okay.  So then there was about a year out in Maryland.

3 Right?

4 A.  Yes.

5 Q.  And when you were down at Oak Hill, Munya was not there.

6 Right?

7 A.  I can't remember was Munya there or not.  Only person I

8 remember was there was Little Dale.

9 Q.  Dale Rhea, you're talking about?

10 A.  I don't know his last name.

11 Q.  Dale Rhea, R-H-E-A, from Stanton Road?

12 A.  I forget where he from, but I just remember his name.

13 Q.  He's from Southeast.  Right?

14 A.  Yes.

15        MS. PETALAS:  Objection, Your Honor.  Outside the

16 scope.

17        THE COURT:  Sustained.

18 BY MS. WICKS:

19 Q.  Is there anyone else in this courtroom today that you

20 remember being at Oak Hill when you were there for two months?

21 A.  I can't remember.

22        MS. WICKS:  Court's indulgence.

23 BY MS. WICKS:

24 Q.  Now, back when you were -- between '94 and 2002, you were

25 selling cocaine in Congress Park.  Right?

1 A.  Yes.

2 Q.  Okay.  And during that time period, you would -- whoever you

3 could get coke from, you would.  Right?

4 A.  Right.

5 Q.  And whoever you could sell coke to, you would?

6 A.  Right.

7 Q.  And if you needed some coke and you heard that somebody had

8 it, you would try to get it from them.  Right?

9 A.  Yes, ma'am.

10 Q.  But there were some people in the neighborhood who sometimes

11 wouldn't sell to you.  Right?

12 A.  I can't recall that.

13 Q.  Didn't you testify that there were sometimes petty people

14 that wouldn't sell coke?

15 A.  That was like wholesales.  That would be like wholesales

16 among us, that's all.  Like, "Let me get a wholesale."

17          "Naw, I ain't got it," knowing he got like 100 rocks on

18 him.

19 Q.  Okay.  And one person that was selective about who he sold

20 drugs to was Burke.  Right?

21 A.  Yes.

22 Q.  And even if Burke sold to you one day, the next day, even if

23 you knew he had it, he might not sell it to you.  Right?

24 A.  Right.

25 Q.  And he was a guy -- well, he lived in Congress Park.  Right?

1 A.   Like clockwork.

2 Q.   And Keith Barnett was another individual that played this

3 game.  Right?

4 A.   Everybody played dos and tres and quatro.

5 Q.   I'm not asking about everybody, I'm talking about

6 Keith Barnett.

7 A.   Yes.

8 Q.   He played the game.  Right?

9 A.   Yes.

10 Q.   And there would be times when you would see Keith Barnett

11 and Wop playing the game.  Right?

12 A.   Yes.  I don't know about together, but...

13 Q.   Well, you would see Keith Barnett selling drugs, playing the

14 game.  Right?

15 A.   Hold on.  Stop one second.  Keith Barnett ain't really

16 hustle around us like that.

17 Q.   He didn't hustle around you like that?

18 A.   Okay, like Keith and Kevin used to be on their own thing,

19 like you know what I'm saying?  They hustled around the park,

20 but like we be in the circle posted up, he be on the Savannah

21 side, you know what I'm saying?

22 Q.   And when you're saying on the Savannah side, that's like a

23 block or two away.  Right?

24 A.   Right.

25 Q.   So you're saying -- well, did you ever see Mr. Wilson and

# Tab 37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :     Docket No. CR 05-100
                                   :
               Plaintiff           :
                                   :
v.                                 :     Washington, DC
                                   :
ANTWUAN BALL,                      :
DAVID WILSON,                      :
GREGORY BELL,                      :     May 14, 2007
DESMOND THURSTON,                  :
JOSEPH JONES,                      :
DOMINIC SAMUELS,                   :
                                   :
               Defendants          :     9:15 a.m.
. . . . . . . . . . . . . . . . . :     . . . . . . . . . . . .

VOLUME 49 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the United States:    ANN H. PETALAS, ESQUIRE
                          GLENN S. LEON, ESQUIRE
                          GIL GUERRERO, ESQUIRE
                          UNITED STATES ATTORNEY'S OFFICE
                          555 Fourth Street, NW
                          Washington, D.C.  20530

For the Defendant         JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:             CARNEY & CARNEY
                          601 Pennsylvania Avenue, NW
                          Suite 900, South Building
                          Washington, DC  20004
                          (202) 434-8234


                          STEVEN CARL TABACKMAN, ESQUIRE
                          TIGHE, PATTON, ARMSTRONG,
                              TEASDALE, PLLC
                          1747 Pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20006

                          (202) 454-2811

1 14 years old.  Right?

2 A.  Yes.

3 Q.  And actually, at 13 you started selling what, marijuana?

4 A.  I was selling crack cocaine.

5 Q.  At 13?

6 A.  Yes.

7 Q.  But you didn't start really selling, I mean in larger

8 quantities, until you were about 14.  Right?

9 A.  Yes.

10 Q.  And you spent some time at your aunt's house, you said?

11 A.  Yes.

12 Q.  Did you actually live there or did you just visit?

13 A.  Visit.

14 Q.  You used to visit in the summer.  Right?

15 A.  When I was small, yes.

16 Q.  When you were small.  But you didn't actually live with her,

17 did you?

18 A.  No.

19 Q.  Oh, okay.  Just trying to clear up the record.

20       And when you started dealing, you were dealing

21 primarily in Congress Park at around 14.  Right?

22 A.  Yes.

23 Q.  And I believe it was your testimony that you were doing

24 everything except shooting and robbing people.  Right?

25 A.  Yes.

1 Q.  And you weren't going to school at that time?

2 A.  Yes, I was going to school.

3 Q.  But not all the time.  Right?  You would go when you felt

4 like it.  Right?

5 A.  I would go every day, but I might leave.

6 Q.  Well, wasn't it your testimony that your big cousin would

7 sometimes chase you --

8 A.  That's like the days I didn't go to school, yes, he would

9 chase me.  But I would get up and go to school every morning.

10 Q.  And sometimes Jojo would chase you too, when you didn't go

11 to school.  Right?

12 A.  Yes.

13 Q.  And so you learned at an early age how to hustle on the

14 street.  Right?

15 A.  Yes.

16 Q.  And you were a successful hustler, weren't you?

17 A.  Yes.

18 Q.  And hustling including selling drugs?

19 A.  Yes.

20 Q.  Hustling included robbing people.  Right?

21 A.  Yes.

22 Q.  And hustling included lying when necessary?

23 A.  Yes.

24 Q.  And hustling included cheating people out of their money

25 when they would front you drugs sometimes?

Page 10869

1 A.  Yes.

2 Q.  And successful hustlers stay alive, don't they?

3 A.  No.  They either be dead or in jail.

4 Q.  Successful hustlers?

5 A.  The only ones I know.

6 Q.  So that's what you strive for when you're a hustler, to go

7 to jail or wind up dead?

8 A.  No, you strive to get that paper.  You strive to be the

9 biggest drug dealer and have the most money that you can grab.

10 Q.  Well, you're not striving to go to jail.  Right?

11 A.  No, sir.

12 Q.  And you're not striving to get killed.  Right?

13 A.  No, sir.

14 Q.  So to the extent that you're not dead or you're not in jail,

15 you're successful.  Right?

16 A.  Yes, sir.

17 Q.  So you would agree with me, then, that not only do

18 successful hustlers stay alive, a successful hustler also stays

19 out of jail.

20 A.  Yes, sir.

21 Q.  And your education was primarily a street education.  Right?

22 A.  Yes, sir.

23 Q.  You're good at what you did?

24 A.  Yes, sir.

25 Q.  But now you're going to turn over a new leaf.  Right?

1 Q.   You're not proud of that, are you?

2 A.   No.

3 Q.   But that was part of the hustle?

4 A.   Right.

5 Q.   So you hustled your mom?

6 A.   Yes.

7 Q.   And as I recall correctly, and correct me if I'm wrong, your

8 sentence included 18 months probation.  Right?

9 A.   Yes.

10 Q.   And you were sent to a halfway house for nine months.

11 Right?

12 A.   Yes.

13 Q.   And you were released from time to time to go looking for a

14 job.  Right?

15 A.   Yes.

16 Q.   And you didn't return when you promised to do so, did you?

17 A.   To the halfway house?

18 Q.   Yeah.

19 A.   Did I return on my set time I supposed to came back?

20 Q.   Well, you returned, but eventually what you did was you

21 escaped by running across the roof.  Right?

22 A.   Oh, yes.

23 Q.   So that was part of the hustle too.  Right?

24 A.   Yes.

25 Q.   Because you fooled them.  You made them think that you

1 returned when in fact you were leaving.  Right?

2 A.  Right.

3 Q.  So you hustled the folks at the halfway house?

4 A.  Yes.

5 Q.  And you got a third charge, a coke case.  Remember that?

6 That was the escape from --

7          It was a third charge, where you got -- you had a coke

8 case that was your third charge.  Remember that?  After you left

9 the halfway house?  You were dealing?

10 A.  Yes.

11 Q.  And then you got a fourth charge, which was the escape from

12 the halfway house.  Do you recall that?

13 A.  Yes, I recall my escape.

14 Q.  Okay.  And the escape from the halfway house was only part

15 of your violations.  You also failed to look for work.  Right?

16 A.  Yes.

17 Q.  And one of the conditions of you being on probation and at

18 the halfway house was that you looked for work.  Correct?

19 A.  Correct.

20 Q.  And you promised the judge who was presiding in that case

21 that you would comply with all the conditions of your release,

22 didn't you?

23 A.  Yes, sir.

24 Q.  You took an oath at the time when you hold His Honor that

25 you were going to do that.  Right?

1 A.  Yes, sir.

2 Q.  And you also promised that you wouldn't use any drugs.

3 Right?

4 A.  Yes, sir.

5 Q.  And you used drugs during that period of time, too, didn't

6 you, Mr. Kellibrew?

7 A.  Which was the same time, or whatever -- yes.  Yes.

8 Q.  In fact, Mr. Kellibrew, you use several different types of

9 drugs, don't you?

10 A.  I have used several different types of drugs, yes, sir.

11 Q.  And those different types of drugs would include marijuana?

12 A.  Yes.

13 Q.  PCP?

14 A.  Yes.

15 Q.  Ecstasy?

16 A.  Yes.

17 Q.  Heroin?

18 A.  Yes.

19 Q.  But you don't like coke.  Right?

20 A.  Naw.

21 Q.  Have you ever used coke?

22 A.  Never.

23 Q.  How do you know you don't like it?

24 A.  Because I never used it.  I would never use coke.  I sold

25 it.  I wouldn't use it.

Page 10874

1 Q.  Why not?

2 A.  I see what it do.

3 Q.  But it was around you all the time?

4 A.  Never used coke a day in my life.

5 Q.  And you used heroin, though.  Right?

6 A.  Yes.

7 Q.  And you could see -- and you saw what heroin would do to

8 people, as well.  Right?

9 A.  Yes.

10 Q.  And it's your testimony that, notwithstanding seeing what

11 heroin does to people, you would still use that?

12 A.  I used heroin out of the curiosity of my father.  That's why

13 I used heroin.

14 Q.  And you were never curious about coke?

15 A.  I was never curious about coke.

16 Q.  Well, your curiosity was picked when you saw your father

17 using heroin.  Right?

18 A.  Yes.

19 Q.  You know what I mean by "picked"?  It was aroused.  The

20 interest was there because you saw your dad getting high with

21 it.  Right?

22 A.  No, can I explain to you on that?

23 Q.  Yeah, go ahead.  Please.

24 A.  It wasn't like a curiosity.  I wanted to see why my father

25 was -- why my father always left me, why he always abandoned me.

1 What was so big about the dope?  So I hit it.

2          And I said, "This why he leaving me?  This shit right

3 here?  Come on, now."

4 Q.  So that's why you started using heroin?

5 A.  That's why I started snorting dope.

6 Q.  And you saw other people using coke, and it's your testimony

7 you never had any curiosity about that?

8 A.  Never.

9 Q.  Well, getting back to the conditions of release, the use of

10 these different drugs that you have admitted to, that was also a

11 violation.  Right?

12 A.  Yes.

13 Q.  And the sale of drugs was a crime, and that was also a

14 violation of your conditions of release.  Right?

15 A.  Yes, sir.

16 Q.  So you didn't break one promise that you made to the judge,

17 you broke several, didn't you?

18 A.  Yes, sir.

19 Q.  And during the time that you were selling drugs, you had to

20 protect yourself.  Right?

21 A.  Yes, sir.

22 Q.  And to protect yourself, you would do that in several ways.

23 But one of the ways you did that was by getting a gun.  Right?

24 A.  Yes, sir.

25 Q.  And that too was a violation, wasn't it?

Page 10876

1 A.  Yes, sir.

2 Q.  Because at the time, you were living in D.C.  Right?

3 A.  Yes.

4 Q.  So it was a crime for you to have a gun in the District,

5 wasn't it?

6 A.  Yes, sir.

7 Q.  And you were a convicted felon at that time, weren't you?

8 A.  Yes, sir.

9 Q.  So that was an additional crime, and you had the gun.

10 Right?

11 A.  Yes.

12 Q.  So you were breaking the law even though you promised the

13 judge you weren't going to break the law anymore, that you were

14 going to abide by the law.  Right?

15 A.  Right.

16 Q.  And the fact of the matter is that you knew, even as you

17 raised your hand and promised, made all of these promises to the

18 court, that as soon as you hit the street, you were going to go

19 back to the hustle.  You knew that.  Right?

20 A.  Yes.

21 Q.  So at the time you took this oath, and you said and made

22 these representations to the court, the fact of the matter is,

23 your word was no good.  Right?

24 A.  Right.

25 Q.  And you've lied to numerous other people besides the judge,

Page 10877

1 haven't you?

2 A.  Yes.

3 Q.  Who is Mrs. Gross?

4 A.  Gross?  I don't know.

5 Q.  Do you know Tawanna Gross?

6 A.  Oh, yes.

7 Q.  You know Tanay's mother.  Right?

8 A.  Yes.

9 Q.  And you regard her as your godmother.  Right?

10 A.  Who, Tawanna?  Yes.

11 Q.  Yeah.  You regard her as a godmother, right?

12 A.  Huh?

13 Q.  You regard her as a godmother, don't you?

14 A.  Oh, yes.

15 Q.  She's like a member of your family.  Right?

16 A.  She's cool.  She wasn't a member of my family, but she was

17 good peoples.

18 Q.  She was good people.  In fact, she let you stay at her

19 house, didn't she?

20 A.  Yes.

21 Q.  You kept your clothes there.  Right?

22 A.  Yes.

23 Q.  And she had a daughter named Tanay.  Right?

24 A.  Yes.

25 Q.  Tanay is what, eight years younger than you.  Correct?

1 A.   I believe so.  I don't know exact years, but yes.

2 Q.   And while you were living there, Mrs. Gross gave you certain

3 rules to abide by.  Correct?

4 A.   No, I don't remember no rules she gave me.

5 Q.   Do you remember her telling you that she didn't want you in

6 Tanay's bedroom?

7 A.   Never.

8 Q.   Are you denying that you seduced Tanay?

9 A.   Huh?

10        MS. PETALAS:  Objection, Your Honor.

11        THE COURT:  Overruled.

12 BY MR. MARTIN:

13 Q.   Are you denying that you were intimate with Tanay?

14 A.   No, I'm not denying -- yes, I was intimate with Tanay.

15 Q.   And by being intimate with Tanay -- well, let me stop right

16 there.  At the time you were at Mrs. Gross' house, you were

17 22 years old, weren't you?

18 A.   Yes.

19 Q.   That meant that Tanay was 14 at the time.  Correct?

20 A.   Yes.

21 Q.   So you betrayed Mrs. Gross' trust by seducing her daughter?

22 A.   No, you got it the wrong way.  I didn't seduce her, I didn't

23 break her trust.

24 Q.   Did Tanay seduce you?

25 A.   Okay, hold on.  Like, how can I put this?  I can say I

1 seduced her.  I can't really say too much --

2 Q.  Can't say too much there?

3 A.  I mean, it was like both parties.  That's all she knew, was

4 Baby Kairi.  Like, it wasn't like I molested the little girl or

5 nothing.

6 Q.  So you seduced this 14-year-old who was the daughter of the

7 woman you regarded like family.  Correct?

8 A.  No, you keep indicating her as family.  She was cool

9 peoples.  Tawanna was all right.  She was cool peoples.  She

10 knew everything that was going on between me and her daughter.

11 Q.  And she approved of that.  Is that your testimony?

12 A.  Yes.

13 Q.  Mrs. Gross put you out of her house shortly after finding

14 out that you and Tanay were intimate, didn't she?

15 A.  When?

16 Q.  She put you out shortly after her brother reported to her

17 that you and Tanay were intimate, you were boyfriend and

18 girlfriend.  She put you out after that, didn't she?

19 A.  I don't recall that.  I recall Tanay giving her mother a

20 letter telling her we was fucking, and Tanay mother told me,

21 "That's your responsibility."

22 Q.  That's what she told you, that her 14-year-old daughter was

23 your responsibility?

24 A.  No.  Excuse me, sir, but that's just how it played out.  She

25 wrote her mother a note; her mother called me on the phone and

1 said, "Baby Ki, come here."  I'm like, "What you want?"  Tanay

2 was coming outside, telling me, "My mama want you, my mama want

3 you."

4        We went upstairs, she was like, "Oh, you messing with

5 my daughter?"  I was like, "Uhhh..."  She like, "I already know.

6 But you going to take care of her," da, da, da, da, da.

7        So that's how that went.

8 Q.  I see.  So your testimony is that Mrs. Gross never told you

9 that you were too old for Tanay?

10 A.  When?

11 Q.  At any time.

12 A.  When?

13 Q.  At any time.

14 A.  No time.

15 Q.  So up to this day, your testimony is that she approves of

16 that as long as you take care of Tanay?

17 A.  She never had a problem with me messing with Tanay, never.

18 Like come on, now.  I was staying there.

19 Q.  And you also kept a gun in Mrs. Gross' house, didn't you?

20 A.  Yes, sir.

21 Q.  In fact, you kept that gun under Tanay's bed.  Right?

22 A.  Yes, sir.

23 Q.  And you didn't have Mrs. Gross' consent to do that, did you?

24 A.  No, I didn't have her consent on that.

25 Q.  And in fact, you didn't want her to know about it, did you?

1 A.  Right.

2 Q.  So you deceived her?

3 A.  Yes, I deceived her.

4 Q.  And when you and Crystal Tyler got stopped by the police,

5 you denied knowing anything about the drugs that were seized

6 from Crystal Tyler.  Right?

7 A.  Right.

8 Q.  And in fact, those were your drugs.  Right?

9 A.  Right.

10 Q.  And so you also shifted the responsibility to Crystal?

11 A.  Right.

12 Q.  And when the police picked you up and questioned you about

13 the Black killing, you told the police that at the time of the

14 shooting Black had no gun.  Right?

15 A.  Right.

16 Q.  And that wasn't true either, was it?

17 A.  Right.  I lied.

18 Q.  You lied.  In fact, that was your gun, wasn't it?

19 A.  Right.

20 Q.  Now, when did you first contract your herpes?  How old were

21 you?

22 A.  I can't remember how old I was.  I got it from Crystal, when

23 I was messing with Crystal.  That was, what, '99, 2000, maybe.

24 Q.  2000.  And we're now in 2007.  Right?

25 A.  Yes.

1  Q.   And your testimony is, you're 27 years old?

2  A.   26.

3  Q.   You're 26.  So at the time you got it from Crystal, that

4  would have been, what?  You would have been 21?

5  A.   Yes.

6  Q.   Right.  And you were staying in Mrs. Gross' house when you

7  were 22?

8  A.   Yes.

9  Q.   Did you tell Tanay that you had a sexually transmittable

10  disease?

11  A.   I don't think I did.

12  Q.   So you misled Tanay as well, or you didn't think it was

13  important.  Which was it?

14  A.   I mean, I used to be embarrassed about that, but I ain't

15  embarrassed about it today.

16  Q.   Why is it you didn't tell her?

17  A.   Why didn't I tell her?

18  Q.   Yeah.

19  A.   I mean, how would you tell somebody your dick broke out?  I

20  just didn't tell her.  It was irrelevant for me to tell her.

21  Q.   It was irrelevant?  You didn't think you were putting her at

22  risk?

23  A.   I didn't know what I know now, as far as about contracting

24  the disease.  I didn't have no knowledge.  I didn't know,

25  like -- all I knew is, I take the pills, I'm cool.  If I'm not

1 having an outbreak, I can't pass it off.  That's all I knew from

2 there.

3 Q.  So when did you start treating for your STD?

4 A.  That morning I woke up my and my penis is broke out.

5 Q.  And that was in 2001.  Right?

6 A.  Yes.

7 Q.  And where did you go?

8 A.  Actually, I went to my mother.  My mother had herpes.

9        MS. PETALAS:  Objection, Your Honor.  Relevance.

10        MR. MARTIN:  I'll move on, Your Honor.  I'll move on.

11 BY MR. MARTIN:

12 Q.  Now, is it safe to say that you've been using drugs since

13 you were about 13?

14 A.  Yes.

15 Q.  And we've already established that you've used PCP, Ecstasy,

16 marijuana, and heroin.  Right?

17 A.  Yes, sir.

18 Q.  Tell me, when did you first start using PCP?

19 A.  I don't know how old I was.  I can't remember.  When was

20 that I first got that?  How old was I first time?

21 Q.  You don't remember the first occasion?

22 A.  Naw, I just remember the scene.  I can't remember, like, how

23 old I was.  I lunched out.

24 Q.  What are some of the -- what are some of the effects of the

25 high you get from PCP?  Let's start with the physical effects.

Page 10884

1 Does it make you hot, does it make you cold?  Does it make you

2 sleepy?  Does it make you hyper?  Tell us a little about, how do

3 you feel physically when you take PCP?

4 A.   When I take PCP?

5 Q.   Yeah, when you take PCP.  When you've experienced PCP

6 physically, what does it do to you?

7 A.   I mean, you just black out.  I mean, for me, I hit the

8 boat -- I mean, I hit the boat, I say like about the fifth,

9 sixth pull.

10          MR. ZUCKER:  I'm sorry, I couldn't understand the last

11 thing he said there.

12 A.   Right.  By the fifth, sixth pull, everything started to

13 close in.  Vision getting blurry, getting a little heated, body

14 getting a little hot; then, blackout.

15 Q.   Then blackout?

16 A.   Then you in the matrix.

17 Q.   In the matrix?

18 A.   Yeah.

19 Q.   Do you see things?

20 A.   Have I seen things?  Yes, I have seen things lunching off

21 the boat.

22 Q.   Do you see people?

23 A.   Like, I don't know.  I just lunch out.  Like when I'm

24 lunching off the boat, I'm lunching.  When I come to, I come to.

25 Q.   Do you see animals?

Page 10885

1 A.  I ain't never seen no animals or none of that.  Like, you be

2 in the matrix.  When I say the matrix, it be like, you be

3 literally walking like (indicating) and you be like, "Damn, look

4 at this."

5        MR. ZUCKER:  Can he use the mic?  It's hard to hear.

6 BY MR. MARTIN:

7 Q.  Bring the mic a little bit closer to you, Mr. Kellibrew.

8        You're talking to us now about the psychological

9 effects.  I'm more interested in the physical effects.  Does it

10 make you -- have you ever been naked?

11 A.  Yeah, you would take your clothes off if you really in it,

12 be in on the boat.  I don't think I never got buck naked off the

13 boat.

14 Q.  Does it make you hot?

15 A.  Yes, it make you hot.

16 Q.  Does it make you sweat?

17 A.  I don't know if I was sweating off the boat.  I can't tell

18 you, was I sweating off the boat.

19 Q.  Do you ever communicate with people when you're on PCP?

20 A.  Yeah, you can communicate with somebody.

21 Q.  So you're conscious of where you are and who they are?

22 A.  After awhile, but not right offhand.

23 Q.  Not offhand?

24        Have you ever seen other people on PCP?

25 A.  Yes.

1 Q.  Do they talk fast, do they talk slow, do they slur their

2 speech?  How do they sound?

3 A.  They just be hype.  You just be in another world.  You be

4 hype.

5 Q.  How do they sound when you see other people on PCP?

6        MS. PETALAS:  Objection, Your Honor.  Relevance.

7        THE COURT:  Sustained.  That means you don't have to

8 answer the question.

9 BY MR. MARTIN:

10 Q.  Stop there, Mr. Kellibrew.

11        What about Ecstasy?  What are some of the physical

12 effects you have with Ecstasy?

13 A.  Like, how do it make me feel?

14 Q.  Yeah, physically how does it make you feel?

15 A.  Beautiful.

16 Q.  Again, physically.  You say beautiful, but can you give us

17 some descriptors?  Does it make you feel hot, does it make you

18 feel cold, does it make you feel sweaty, does it make you feel

19 numb?  How do you feel?

20 A.  Okay.  After awhile you take the pill, when it kicks in, you

21 get hot.  And it will pass you out.  Like it depends on how

22 strong the pill is.  It will pass you out.  Like, you'll eat it,

23 your hands get to sweating, you be sitting right there, you be

24 like, I'm hot, breathing heavy, and you just roll out.

25 Q.  Can you carry on a conversation if you're under the

1 influence of Ecstasy?

2 A.  Like, you won't stop talking.

3 Q.  So you gab a lot?

4 A.  Uh-huh.

5 Q.  Hyper?

6 A.  Yeah, you could say you would be hype.

7 Q.  Now, when you used to hang out in Congress Park, you would

8 drink when you hung out with your friends.  Right?

9 A.  Yes.

10 Q.  And you would smoke marijuana?

11 A.  Yes.

12 Q.  And would you use Ecstasy or PCP when you were hanging out

13 with your friends?

14 A.  Yes.

15 Q.  Okay.  And how often would you use Ecstasy while hanging out

16 with other people?

17 A.  I mean, if we popping pills, we popping pills.  You never

18 know.  Like, I might eat one, then later on I might eat another

19 one.  Then I might eat a half.  You never know.

20 Q.  Well, let me get to something a little more specific.

21       You talked last week about lunching.  Remember that?

22 A.  Yes, sir.

23 Q.  Which drug makes you lunch?

24 A.  The boat.

25 Q.  The boat?

1 A.   PCP.

2 Q.   PCP.  That's the one where, when you take it, you see your

3 dead cousin Kairi?

4 A.   Yes.

5 Q.   So my question is, do you ever use PCP when you're in a

6 group?

7 A.   Yes, I would smoke PCP in a group before.

8 Q.   And with respect to your addiction to these different drugs,

9 you're getting help for that.  Right?

10 A.   Well, kind of.  I'm on a list for a drug program right now.

11 Q.   When was the last time you took a urinalysis?

12 A.   I think that was '06.

13 Q.   '06.  So you haven't taken one this year.  Right?

14 A.   No, sir.

15 Q.   Now, you were also asked some questions about robberies in a

16 store.  And I think you were asked, and correct me if I'm wrong,

17 whether you remember the first time you robbed somebody.  Do you

18 remember that?

19 A.   The first time I robbed somebody?

20 Q.   Yeah.  Do you remember the first time you went into a store

21 and you saw somebody flashing money, and you decided you were

22 going to rob them?  Do you remember that testimony?

23 A.   No.  Can you refresh my memory?

24 Q.   I could, but it would take awhile for us to do that.  If you

25 don't remember, it's not important.

1 A.  Yes.

2 Q.  And you denied that.  Right?

3 A.  Yes.

4 Q.  And she didn't believe you, did she?

5        MS. PETALAS:  Objection, Your Honor.

6        THE COURT:  Sustained.

7 BY MR. MARTIN:

8 Q.  Well, you don't have a reputation for being truthful, do

9 you?

10 A.  No.

11 Q.  Do you have a reputation for being honest and truthful with

12 people?

13 A.  No.

14 Q.  Is that why she didn't believe you?

15        MS. PETALAS:  Objection, Your Honor.

16        THE COURT:  Sustained.

17 BY MR. MARTIN:

18 Q.  Well, let's get back to the people that you robbed.

19 Sometimes the people that you rob, you know them.  Right?

20 A.  Yes.

21 Q.  Sometimes you don't.  Right?

22 A.  Right.

23 Q.  And you would rob people that you thought had money.  Right?

24 A.  Yes.

25 Q.  How would you determine if somebody had money?

1 Q.  I believe you answered yes to the fact that there are

2 stabbings in jail.

3 A.  Oh, yes.

4 Q.  And you understand also that men get raped in jail.  Right?

5 A.  Yes they do.

6 Q.  And typically -- well, you can tell us, is it typical that

7 the smaller people get raped?

8        MS. PETALAS:  Objection, Your Honor.  Basis of

9 knowledge and relevance.

10        THE COURT:  Sustained, but I'll let you rephrase.

11        MR. BEANE:  I'll move on.  I think the point was made.

12        Court's indulgence.

13 BY MR. BEANE:

14 Q.  I want to go back to Keena's house for just a second.

15        You indicated that, prior to seeing Black being shot,

16 you went to Keena's house.  Correct?

17 A.  Yes, I was in Keena house.

18 Q.  And you knocked on the door or you used your key to get in

19 the door?

20 A.  I used the key Boy-Boy gave me.

21 Q.  And then you go in and the room is dirty.  Right?

22 A.  Yes, sir.

23 Q.  And so you straighten up the room, and then you hear the

24 shots.  Right?

25 A.  Didn't straighten up.  I grabbed the sheet and folded the

1 specifics of why I walked away.

2 Q.  Now, you indicated that E pills have a certain effect upon

3 people.  Right?

4 A.  Yes.

5 Q.  And the effect it has upon you is, you get hot.  Right?

6 A.  Yes.

7 Q.  And you sweat?

8 A.  Yes.

9 Q.  And you talk fast?

10 A.  I don't know about talk fast, but you talk a lot.

11 Q.  Talk a lot.  Now, do you remember testifying last week on

12 direct examination Monday, Tuesday, Wednesday?

13 A.  Do I what?

14 Q.  Do you remember testifying last week?

15 A.  Yes.

16 Q.  Do you remember talking a lot when you were testifying?

17 A.  Yes.

18 Q.  Do you remember sweating when you were testifying?

19 A.  Sweating, yes.  My hands sweating right now.

20 Q.  Do you remember taking your shirt off when you were --

21 A.  I'm getting ready to take my hoodie off right now.  I'm hot

22 as we speak right now.

23 Q.  Those are all the kinds of effects you have when you take

24 Ecstasy.  Correct?  Yes or no?

25 A.  Yes.

1 Q.  Now, has the government, these Assistant United States

2 Attorneys or any of their agents, have they ever asked to have

3 you drug-tested in the past month?

4 A.  No.

5 Q.  Have they ever asked to have you drug-tested since you

6 walked away from your court-ordered program?

7 A.  No, sir.

8 Q.  Simple City Rob.  Do you remember testifying about him last

9 week?

10 A.  Yes.

11 Q.  I think it was probably Wednesday when you testified about

12 Simple City Rob.  Do you remember that?

13 A.  Yes, sir.

14 Q.  You indicated that Simple City Rob was mad at you.  Right?

15 A.  Yes, sir.

16 Q.  He was mad at you because apparently you did something to

17 his cousin.  Correct?

18 A.  Yes.

19 Q.  What did you do to his cousin?

20 A.  He said I robbed his little cousin.

21 Q.  And you remember, you did that demonstration for us that one

22 evening or afternoon in Congress Park, you were high on E pills.

23 Right?

24 A.  Yes.

25 Q.  And you got off the witness stand last week when you showed

1 us.  You put your head down between your knees.  Do you remember

2 that?

3 A.  Yes.

4 Q.  And you said that you were rolling.  That's your word.

5 Right?

6 A.  Yes.

7 Q.  And rolling means what?

8 A.  It's just a word for when you high off the E.

9 Q.  Excuse me?

10 A.  It's a word for when you high off the E.

11 Q.  So you were high on E at that point.  Right?

12 A.  I was high from last night.

13 Q.  But you were still high.  Right?

14 A.  Yes.

15 Q.  You were rolling.  That's how high you were.  Right?

16 A.  Yes.

17 Q.  You were rolling to the extent that you had your head down

18 on your knees.  Right?

19 A.  Yes.

20 Q.  And this man Simple City Rob was mad at you.  Right?

21 A.  I didn't know until we talked about the car.

22 Q.  I'm not asking if you know or not.  But he was mad at you.

23 You found that out.  Right?

24 A.  Yes.

25 Q.  As a matter of fact, what your testimony was, "I hear like

1 vroom, and he hit me with a car."

2          Do you remember telling that to this jury?

3 A.  Yes.

4 Q.  Where did he hit you with that car?

5 A.  Right side, right here.  He bumped me with the bumper.

6 Q.  Was it a little toy car, one of those little plastic ones?

7 A.  It was a 5.0, Mustang, blue.

8 Q.  Blue Mustang.  And I would assume you had a broken arm?

9 A.  No, he did not run me over.

10 Q.  He just hit you?

11 A.  He tapped me -- when the car was coming up, it hit me.  And

12 I was like, "What the fuck you doing?"  And I get up off the

13 curb.

14 Q.  We'll get to what you said in a second, son.  Just listen to

15 the question.

16          What was the impact like when -- you testified he hit

17 you with the car.

18 A.  It was a light impact.

19 Q.  And it's truthful now to this jury, under oath, that he hit

20 you with the car.  Right?

21 A.  Yes, he hit me with the car.

22 Q.  Did you have a bruise on your arm at that point?

23 A.  You're saying -- you trying to make it seem like, did he

24 flip me with the car.  You wasn't there, you wasn't me.  You

25 didn't experience how the car tapped me.  I'm telling you how

1 the car tapped me.  It tapped me, and I jumped up.

2 Q.  He was mad at you, so he just tapped you with the car?

3 A.  Listen, I can't explain for what he's doing.  I'm not little

4 Simple City Rob, so I don't know what he was doing.  I know what

5 I did.

6 Q.  "Vroom," and then you get tapped.  That's your testimony

7 here today.  Right?

8 A.  That's it Wednesday and today.

9 Q.  And the next point was that he then gets out of the car and

10 he's got a gun.  Right?

11 A.  No.  We fought first.

12 Q.  You fought first.  Oh, that's right.  I'm sorry.

13         You fought without knives.  Right?

14 A.  Yes.

15 Q.  You fought without guns.  Right?

16 A.  Yes.

17 Q.  And there's a saying probably in the hood that -- what did

18 he do to you?  You used the word a lot in your testimony.  You

19 kind of got slapped by him a few times?

20 A.  He punched me in my face.

21 Q.  And then you ran away?

22 A.  Yeah, we tussled.  He had the better half.  I was scared.

23 Q.  But he had a gun, too.  Right?

24 A.  That's what made me run.

25 Q.  That's what made you run, the gun?

1 A.   Yeah.

2 Q.   Because you would look like a -- if you said that he slapped

3 you and you ran, you wouldn't look too tough, would you?

4 A.   If he slapped me and ran, that's what happened.

5 Q.   But the gun made you run?

6 A.   Yes.

7 Q.   And it's truthful that he had a gun.  Right?

8 A.   Yes.

9 Q.   And he didn't hit you with the car hard enough to make

10 impact on you.  Right?

11 A.   Right.

12 Q.   And he didn't shoot you with the gun, did he?

13 A.   No, sir.

14 Q.   And you know the difference between fiction and nonfiction?

15 A.   What is it?  Nonfiction is real and fiction is -- I don't

16 know.  I forget.

17 Q.   That's right.  Nonfiction is real, and fiction would be a

18 story made up.  Is this a nonfiction, a makeup story, or a real

19 story?

20 A.   It actually happened.

21 Q.   And then you meet Simple City Rob again, right, according to

22 you?

23 A.   Yes.

24 Q.   And now Don, you put Don in it?

25 A.   Yes.

1 Q.   And now Don, you're in Don's car.  Right?

2 A.   Yes.

3 Q.   And at this point --

4         MR. PURPURA:  Excuse me one second.

5 BY MR. PURPURA:

6 Q.   At this point he smooched you, your words, "smooched" you

7 with the joint.  Right?

8 A.   Yes.

9 Q.   And by that, you mean he came up to that window and he put

10 that gun, as you demonstrated, right to your head.  Right?

11 That's what you mean by smooched.  Right?

12 A.   Yes.

13 Q.   And he said something to you.  I think what he said to you

14 was, "Baby Ki, you try and see me, nigger?"

15         Do you remember your testimony?

16 A.   Yeah.

17 Q.   And that's what he said to you.  Right?

18 A.   Yeah.

19 Q.   You didn't have a gun on you at that time.  Did you?

20 A.   No, I didn't.

21 Q.   You had nothing on you.  Right?

22 A.   Right.

23 Q.   This is the guy that had already slapped you around.  Right?

24 A.   Yeah.

25 Q.   Without a gun, he slapped you around.  Right?

1 A.  Yeah.

2 Q.  Without a knife, he slapped you around.  Right?

3 A.  Yes, sir.

4 Q.  Without hitting you with a car, he slapped you around.

5 Right?

6 A.  Huh?

7 Q.  Strike that.

8         And then with that gun to your head, your response was,

9 "Fuck yeah, I'm trying to see you, nigger."  And that's the

10 truth, too.  Right?

11 A.  Yes.

12 Q.  You're a bad dude out there on those streets, aren't you?

13 A.  I don't know about bad dude, but that was my response to

14 Little Rob that day in that car.

15 Q.  Then what you did, as you testified to, you grabbed him, I

16 think you even demonstrated, you grabbed his arm like this with

17 the gun and snatched it away.

18 A.  I didn't snatch the gun away.  I grabbed him.

19 Q.  Snatched his arm away.  Do you remember saying that?

20 A.  Uh-huh.  I grabbed him, we tussled, and that's when Munya

21 grabbed him.

22 Q.  Okay, just what you did.  That's what you did:  Grabbed that

23 hand with that gun where it was smooched against your forehead.

24 Right?

25 A.  Actually, it wasn't smooched to my forehead when I grabbed

1 Q.  Well, you recall his brains hanging out of his head as he

2 was lying from the truck.  Right?

3 A.  Yes.

4 Q.  Well, what were you wearing?

5 A.  I don't remember what I was wearing.

6 Q.  Well, let's do this:  You wear a hoodie when it's

7 wintertime?

8 A.  Yes.

9 Q.  You wear shorts when it's summertime?

10 A.  Yes, sir.

11 Q.  Were you wearing shorts or a hoodie?

12 A.  I can't remember.

13 Q.  How about all the people around you?  Do you remember those

14 people around you?  You don't remember their names, do you?

15 Right, you don't remember their names.  Right?

16 A.  Repeat that.  I don't understand where you coming from.

17 Q.  The people around you, when you see Troy Lewis with his

18 brains hanging out of his head.

19 A.  No, sir.

20 Q.  That's the truth.  Right?

21 A.  I can't remember, sir.

22 Q.  No, no.  It's the truth you saw him there with his brains

23 hanging out of his head.  Right?

24 A.  Yes.

25 Q.  What were they wearing?

1 A.  Who?

2 Q.  The people standing around.

3 A.  I can't remember that.

4 Q.  Did they have shorts or hoodies?

5 A.  I can't remember that, sir.

6 Q.  And this is the truth, that you were there.  Right?

7 A.  Yes, sir.

8 Q.  But you don't remember any of these things.  Correct?

9 A.  No, sir.

10 Q.  And you wouldn't lie under oath.  Right?

11 A.  I wouldn't lie, sir.

12 Q.  Even though you've lied before under oath?

13 A.  Yes, sir.

14 Q.  Now, you are consistent because you did testify before a

15 United States grand jury on November 22nd, 2005.  And when you

16 were asked what you saw, at that time you said, "They opened the

17 door and his brains fell out."  Right?

18 A.  Yes, sir.

19 Q.  And that's Troy Lewis.  Right?

20 A.  Yes, sir.

21 Q.  And his brains -- I'm going to point to it.  What part of

22 his body would his brains come from, you think?

23 A.  Look, I don't know.  They opened the door.

24 Q.  Would it be his head?  Is that where your brains are kept?

25 A.  Yes, sir.

Page 10947

1 Q.  That's Troy Lewis' head right there.  Right?

2 A.  Yes, sir.

3 Q.  And you also told this jury, again when Mr. Carney asked you

4 the same questions, that you saw his brains hanging out of his

5 head.  Right.

6 A.  Yes, sir.

7 Q.  And you wouldn't make that up, would you?

8 A.  No.

9 Q.  You wouldn't exaggerate, would you?

10 A.  No, sir.

11 Q.  You wouldn't embellish, would you?

12 A.  No, sir.

13 Q.  And you wouldn't lie under oath, would you?

14 A.  I wouldn't lie today, sir.

15 Q.  Ah, good.  And you also told this jury that it was broad

16 daylight when you saw all this.  Right?

17 A.  Yes.

18 Q.  And you told the United States grand jury under oath when

19 the question was -- question, page 13, line 24, "Where was --

20 what time of day was this?"

21        And your answer was, line 26, "Broad daylight.  It had

22 to be, like, man, it was early -- it was -- it was -- sun was

23 still up."

24        That's what you testified under oath.  Right?

25 A.  Yes, sir.

1 Q.  And you know what you mean when you say the sun is up.

2 Right?

3 A.  It could be in between 6:00 in the morning and whatever

4 season the time it is.

5 Q.  Until the sun sets.  Right?

6 A.  Yep.  It might can set late or early.

7 Q.  What time is broad daylight to you?

8 A.  Any time the sun is up.

9 Q.  All right.  We'll stop there now.

10        Now, let me show you what is in evidence, and it is the

11 Exhibit 1008.

12        MR. PURPURA:  Your Honor, this would be the Troy Lewis

13 autopsy report.  Permission to, thank you, publish.

14 BY MR. PURPURA:

15 Q.  And we're going to put up what a doctor, a chief medical

16 examiner for the District of D.C., diagrammed the body of Troy

17 Lewis, as well as the gunshot wounds.  Do you see that?

18 A.  Yes, sir.

19 Q.  And actually, the jury is going to have this, but you get a

20 little code there at the bottom.  You see the little code where

21 it says, "GSW, gunshot wound"?  Do you see that?

22 A.  Yes.

23 Q.  Okay.  Good.

24        Now, let's look and see where the medical examiner

25 demonstrates Troy Lewis was shot.  He was shot in the shoulder.

1 Do you see that?

2 A.  Yes.

3 Q.  He was shot in the groin area.  Do you see that?

4 A.  Yes.

5 Q.  He was shot again in the groin area.  Do you see that?

6 A.  Yes.

7 Q.  He was shot in the stomach or lower groin area.  Do you see

8 that?

9 A.  Yes.

10 Q.  He was shot in the stomach area.  Do you see that?

11 A.  Yes, sir.

12 Q.  And he was shot in the wrist.  Do you see that?

13 A.  Yes.

14 Q.  And he was shot in his testicles, as well.  Do you see that?

15 A.  Yes.

16 Q.  Now, you see where he wasn't shot, Mr. Kellibrew?

17 A.  I'm just telling you, I told you what I saw.

18 Q.  No, Mr. Kellibrew, answer my question.

19 A.  Yes.

20 Q.  And where wasn't he shot, Mr. Kellibrew?

21 A.  In the head.

22 Q.  Are you telling the ladies and gentlemen of the jury the

23 truth when you say under oath you saw Troy Lewis' brains hanging

24 out, sir?

25 A.  Yes, I am, sir.  When they opened the door, blood and all

1 that shit shot out the truck, like that was my persona on that.

2      So if I was wrong on his brains, then I'm wrong for

3 that, then.

4 Q.  Wrong.  Does wrong mean you lied?  What does wrong mean?

5 A.  I'm not lying, sir.

6 Q.  Can you picture the incident?

7 A.  Yes.

8 Q.  Would you agree with me it's easier to remember the truth

9 than a lie, sir?

10 A.  I just told you just how I saw it, sir.

11 Q.  Why are you lying on Antwuan Ball?

12      MS. PETALAS:  Objection, Your Honor.

13      THE COURT:  Sustained.

14 BY MR. PURPURA:

15 Q.  All right.  January 2002, would you agree with me January is

16 the winter?

17 A.  Yes.

18 Q.  Would you agree with me that it gets dark in January in

19 Washington, D.C. sometime around 5:00 o'clock?

20 A.  I'm not sure.

21 Q.  Okay.  How about 5:30?  Is it dark, you think in January in

22 D.C., at 5:30?

23 A.  I'm not sure.

24 Q.  How about 6:00 o'clock?  Is it dark then?

25 A.  I'm not sure.

1 Q.  How about 6:30?  Do you think it's dark then in the winter

2 in January in Washington, D.C.?

3 A.  Okay.  I'm not sure, sir.

4 Q.  How many times have you seen the sun up in January in

5 Washington at 6:30 at night?

6 A.  I don't know.  I can't recall that, sir.

7 Q.  Now, let's try quarter to 8:00.  7:45.  January, dark out.

8 You know that?

9 A.  I don't know that.

10 Q.  Are we being truthful now?

11 A.  I'm being truthful.  I wouldn't know if the sun was up in

12 January at 8:30 or 5:30.  You asking a question I cannot answer.

13 Q.  Well, if the evidence shows, and it will --

14          MS. PETALAS:  Objection, Your Honor.

15          THE COURT:  Sustained.

16          MR. PURPURA:  Strike that.  It's already in evidence.

17          MS. PETALAS:  Objection, Your Honor.

18          THE COURT:  Sustained.

19 BY MR. PURPURA:

20 Q.  Troy Lewis was shot at 7:45 p.m., January.  Do you remember

21 if it was dark out then?

22 A.  I don't remember, sir.

23 Q.  When you told the United States grand jury under oath that

24 it was broad daylight, and you saw the sun up, was that a lie?

25 A.  That's what I saw, sir.

1 A.  Two guns.

2 Q.  Your guns?

3 A.  Yeah.

4 Q.  But they came in there for something else, didn't they?

5 A.  Yes.

6 Q.  Detective Faison took out charges on you, didn't he?

7 A.  Yes.

8 Q.  He took out charges of statutory rape of a 14-year-old, both

9 orally and vaginally, of a 14-year-old.  Right?

10 A.  Right.

11 Q.  Didn't make you real happy, did it?

12 A.  You said what, now?

13 Q.  With Detective Faison.  You weren't very pleased with him

14 when he arrested you for the statutory rape of a 14-year-old,

15 were you, sir?

16 A.  He was doing his job.

17 Q.  What were you doing?

18 A.  Getting locked up.

19 Q.  Doing your business as usual?

20 A.  I was getting locked up, sir.

21        MS. PETALAS:  Objection, Your Honor.

22        THE COURT:  Sustained.

23 BY MR. PURPURA:

24 Q.  The day of the -- the day that Sills was shot, August 27th,

25 2002, you already testified that you were on heroin.  Correct?

1 A.  Yes.

2 Q.  That you were looking for marijuana?

3 A.  Yes.

4 Q.  But you found a little girl instead.  Right?

5 A.  Yes.

6 Q.  You also were drinking before?

7 A.  Yes.

8 Q.  Yes or no?

9 A.  I can't recall what was I drinking.

10 Q.  Try to recall.  Think about it.

11 A.  I can't recall, was we drunk?  We wasn't drunk.

12 Q.  Were you drinking?  I think Mr. Carney, this gentleman here,

13 I think you called him Slim, he asked you that question.  He

14 says, "You weren't drinking before.  You drank after the

15 shooting."  Do you remember?

16 A.  Right.

17 Q.  Now, did you drink before the shooting too, while you were

18 high on heroin?

19 A.  I don't recall that.

20 Q.  You don't recall, do you?  But you did recall when you

21 testified before the United States grand jury November 27th,

22 2002.  You did recall when they asked you, were you drinking.

23 And you said, "Some St. Ives."  What's St. Ives?

24 A.  It's a beer.

25 Q.  Malt liquor.  Right?

1 A.   Yeah.

2 Q.   And you were drinking that, as well.  Right?

3 A.   I guess I was, yes.

4 Q.   Do you remember?

5 A.   Right now I don't remember if we be drinking or not.

6 Q.   Well, you're obviously high on -- this before you witness a

7 murder.  You're a witness to the murder.  Right?

8 A.   Yes.

9 Q.   So you're high on heroin.  Right?

10 A.   Yes.

11 Q.   You're drinking St. Ives beer.  Right?

12 A.   Yes.

13 Q.   Malt liquor, actually.  How many St. Ives malt liquor would

14 you drink?

15 A.   I would drink one 22-ounce if I got a beer.

16 Q.   Now, on that day, August 27th, 2002, after the shooting, the

17 police arrive on the scene.  They stopped you, they interviewed

18 you immediately.  And you said, "I don't know who did it."

19 That's what you said.  Right?

20 A.   Yeah.

21 Q.   And according to you, that's a lie.  Right?

22 A.   Yep.

23 Q.   You continued to lie, according to you.  Right?

24 A.   Yes, sir.

25 Q.   Detective Faison on that day, August 27th, 2002, asked you,

1 "Do you know who did it?"  And you again said no.  Right?

2 A.  Right.

3 Q.  And according to you, that's another lie.  Right?

4 A.  Right.

5 Q.  Was it easy to lie then?

6 A.  Yep.

7 Q.  Is it easy to lie for you generally?

8 A.  I mean, I lied before.  Yes, I have lied.

9 Q.  When you need to, you can lie.  Right?

10 A.  Right.

11 Q.  Ain't no big deal.  Right?

12 A.  Right.

13 Q.  Secondhand to you.  Right?

14 A.  I don't know about second hand, but I can lie.

15 Q.  Yeah, of course you can.

16        Detective Worrell, you saw him right there on the scene

17 as well.  Right?

18 A.  Yes.

19 Q.  He actually took you back to the scene.  Right?

20 A.  Yes.

21 Q.  He spent at least 10 minutes right there where Black, your

22 buddy, was shot.  Right?

23 A.  Right.

24 Q.  He asked you over and over again who did it.  Right?

25 A.  Yep.

1 Q.  And you said, "I don't know, I don't know, I don't know."

2 Right?

3 A.  Right.

4 Q.  Lies, lies, lies.  Right?

5 A.  Right.

6 Q.  No problem lying then.  Right?

7 A.  Right.

8 Q.  Down at the police station, August 27th, 2002.  You remember

9 being taken down there?

10 A.  Yes, sir.

11 Q.  And now there's a written statement.  Do you remember that?

12 A typed statement?

13 A.  Yes.

14 Q.  Government showed you that statement, 503.12.  Do you

15 remember that?

16 A.  Yes.

17 Q.  And in writing, in type, it said, "Do you know who shot

18 Jamel?"  And your response was, "No, I don't know."

19 A.  Right.

20 Q.  And according to you, that's another lie.  Right?

21 A.  Right.

22 Q.  They also asked you to describe the person.  You said

23 dark-skinned and had a T-shirt over his head.  That was another

24 partial lie.  Right?

25 A.  Right.

1 Q.  And they asked you if you or Jamel had a gun on your person.

2 And according to you -- well, we know you lied about that as

3 well.  Right?

4 A.  Right.

5 Q.  How many lies did you tell on August 27th, 2002?  Did you

6 count them?

7 A.  No, I didn't, sir.

8 Q.  What's your record for lies in one day?

9       MS. PETALAS:  Objection, Your Honor.

10       THE COURT:  Sustained.

11 BY MR. PURPURA:

12 Q.  Do you ever keep track of them?

13 A.  No, sir.

14       MS. PETALAS:  Objection, Your Honor.

15       THE COURT:  Sustained.

16 BY MR. PURPURA:

17 Q.  Now, you continued to lie about the gun, didn't you?  And

18 possession of the gun.  Right?

19 A.  Right.

20 Q.  You appeared before the United States grand jury.  Do you

21 know what a United States grand jury is?

22 A.  Yes.

23 Q.  Under oath.  Right?

24 A.  Yes.

25 Q.  You know what "under oath" means.  Right?

Page 10975

1 A.  Yes.

2 Q.  It means you ain't supposed to lie.  Right?

3 A.  Right.

4 Q.  But you lied again, about the gun at least.  Right?

5 A.  Yes.

6 Q.  Now, that was in 2002.  That's after you have a plea

7 agreement with the Superior Court where you say in that

8 Superior Court agreement, "I ain't supposed to lie," too.

9 Right?

10 A.  Right.

11 Q.  But you continued to lie.  Right?

12 A.  Right.

13 Q.  These plea agreements don't seem to stop you from lying, do

14 they?

15        MS. PETALAS:  Objection, Your Honor.

16        THE COURT:  Overruled.

17 BY MR. PURPURA:

18 Q.  Do they?

19 A.  No, sir.

20 Q.  Now, you continued to lie about the gun.  Right?

21 A.  Right.

22 Q.  As a matter of fact, the only way you stop lying is when you

23 get caught.  When you get caught in the lie, you finally say,

24 "Okay, I lied."

25        Is that what you do?  Is that how to stop you from

1 lying, to catch you?

2          MS. PETALAS:  Objection, Your Honor.  Compound,

3 argumentative.

4          THE COURT:  Sustained.

5 BY MR. PURPURA:

6 Q.  All right.  2007, that's this year, this year.  You meet

7 with the handsome bald gentleman in the back,

8 Detective Brigadini, and he asked you about the gun on

9 August 27th, 2002.

10          And you say, "I didn't have no gun, and Black didn't

11 have no gun."  Right?

12 A.  Right.

13 Q.  You lied to that detective.  Right?

14 A.  Right.

15 Q.  That was this year.  Right?

16 A.  Yeah.

17 Q.  And that's after you entered into Government Exhibit 1119,

18 your plea agreement, where you promised to be truthful.  Right?

19 A.  Right.

20 Q.  Not only do you lie -- you've lied to homicide cops before.

21 Right?

22 A.  Yes.

23 Q.  That's no big deal.  Right?  Is it a big deal to you, to lie

24 to a homicide cop?

25 A.  No.

1 Q.  How about an Assistant United States Attorney?  Is that a

2 big deal, to lie to one of these gentlemen here, Mr. Leon and

3 Mr. Guerrero?  Is that a big deal to you?

4 A.  Yes.

5 Q.  Well, 2007, they're at the same meeting with Brigadini

6 there, Mr. Guerrero and this gentleman here, Mr. Leon.  Do you

7 remember?

8 A.  Uh-huh.

9 Q.  "Uh-huh" is a yes?

10 A.  Yes.

11 Q.  And they asked you about the gun on August 27th, 2002.

12 Right?

13 A.  Right.

14 Q.  And you lied to Mr. Guerrero.  Correct?

15 A.  Correct.

16 Q.  And you lied to Mr. Leon.  Correct?

17 A.  Correct.

18 Q.  And the only way they caught this lie is when they called

19 you up and said, "Hey, this story doesn't jive with what other

20 witnesses say."

21          MS. PETALAS:  Objection, Your Honor.

22          THE COURT:  Sustained.

23 BY MR. PURPURA:

24 Q.  Was it easy to lie to Leon, Mr. Leon?

25          MS. PETALAS:  Objection, Your Honor.

1          THE COURT:  Overruled.

2 BY MR. PURPURA:

3 Q.  Was it?  Was it easy to lie to him?  He ain't a big, tough

4 guy.  Was it easy to lie to him?

5 A.  No.

6 Q.  Now, Guerrero on the other hand, was it easy to lie to him?

7 A.  No, it wasn't.

8 Q.  But you did.  Right?

9 A.  Yes.

10 Q.  We've got more lies, don't we?  Yeah, we'll get to them.

11          MS. PETALAS:  Your Honor, I'm sorry.  May we approach

12 briefly for a second?  May we approach for a second?

13          THE COURT:  Yes.

14          (BENCH CONFERENCE ON THE RECORD.)

15          MS. PETALAS:  I just want to correct the record, that

16 Mr. Purpura seems to be under the impression that I was not

17 there in New York.  I was there in New York.  Mr. Leon was not

18 in New York, and that was the information we provided.

19          It was Mr. Guerrero and I -- and me, that was at

20 New York, just to clarify the record, where we had this neutral

21 site visit.  Mr. Leon was not involved.  And that was the

22 information that we gave defense counsel, was that it was

23 Mr. Guerrero and I that was there at this meeting, not Mr. Leon.

24 I just wanted to clarify the record that there was really no

25 basis for the Mr. Leon question.

1          MR. PURPURA:  My understanding was, we received a

2 letter, and I thought it said Mr. Leon.  If I made a mistake and

3 it should be Ms. Petalas, and she would be very difficult to lie

4 to as well.  I think I'll probably ask that question next.

5          MS. PETALAS:  I just wanted to clarify that that was

6 the information we had given earlier, to correct the record.

7          (END BENCH CONFERENCE.)

8 BY MR. PURPURA:

9 Q.  Now, I don't want to leave anybody out.  Ms. Petalas, here.

10 As a matter of fact, you lied to her in January 2007 about the

11 gun too, didn't you?

12 A.  Yes.

13 Q.  She's fairly easy to lie to?

14 A.  No.

15 Q.  But you did?

16 A.  Yes.

17 Q.  Now, you testified before this jury, and you indicated that

18 the reason you didn't tell the police on August 27th, 2002 that

19 Dom did it is because you wanted to kill him yourself.  Right?

20 A.  You say what, now?  I didn't understand what you just said.

21 Q.  We'll go slow.  We'll go slow.

22          You didn't tell the police on August 27th, 2002,

23 numerous times on that day, that Dom was the shooter.  Right?

24 A.  Right.

25 Q.  And what you told this jury here is, the reason that you

1 that.

2 BY MR. PURPURA:

3 Q.  You didn't tell that United States grand jury that you

4 wanted to kill him yourself, did you, sir?

5 A.  No, sir.

6 Q.  You told them another reason:  That your heart was crushed

7 and you were tired of killing.

8 A.  Tired of killing?  I never killed a man in my life.

9 Q.  When did you come up with the story about that you wanted to

10 kill Dom yourself?  When did that come up?

11        MS. PETALAS:  Objection, Your Honor.

12        THE COURT:  Overruled.

13 BY MR. PURPURA:

14 Q.  When?  Did you just make it up recently?

15 A.  I been -- the day he killed Don, I wanted to kill Don.

16        I mean, the day he killed Black, I wanted to kill Don.

17 Come on, now.

18 Q.  Are you telling this jury here that you were not on the

19 scene in 1996 when Black, Mr. Sills, shot Dominic Samuels?

20 A.  No, I wasn't on the scene.

21 Q.  Do you remember testifying before the same grand jury,

22 November 27th, 2002, under oath, that you were on the scene?

23        MS. PETALAS:  May I have the page and line number?  I

24 apologize.

25        MR. PURPURA:  It 's going to be page 30 eventually,

1 line eight, when we get to it.

2 BY MR. PURPURA:

3 Q.  That you were on the scene, and that Black shot Dom in an

4 apartment?

5        MS. PETALAS:  Objection, Your Honor.  May we approach?

6 Mischaracterizes his testimony.

7        THE COURT:  Yes.

8        MR. PURPURA:  Strike that.  Maybe this will clear it

9 up.

10 BY MR. PURPURA:

11 Q.  That Black shot Dom --

12        THE COURT:  Excuse me.  Approach the bench.

13        (BENCH CONFERENCE ON THE RECORD.)

14        MS. PETALAS:  Your Honor, he never testified that he

15 was actually on the scene when Don was shot.  He specifically

16 says he heard it -- he specifically said that he -- that was it,

17 to my knowledge.  But he was later asked if he ever saw him

18 getting the ambulance coming, and he says no.  He specifically

19 in the grand jury says he did not see the shooting and he was

20 not on the scene.

21        MR. PURPURA:  Judge, I have the grand jury.  I think

22 I'm conducting an honest cross-examination based on my reading

23 of the grand jury.  I have this section of the grand jury, which

24 I'll point to as the questions are asked.  And specifically, he

25 says he's on the scene.  And I have it.

1        THE COURT:  Where is it?

2        MR. PURPURA:  He even does a diagram.  I'll go through

3 the whole diagram, too.

4        Question, page 30 --

5        THE COURT:  Give me a moment.

6        MR. PURPURA:  Page 30.  "And actually, to your

7 knowledge, do you know which building is it" -- this is all

8 part -- what the Court doesn't know at this point is that his

9 grand jury speaks of one incident when Dom was shot, one

10 complete incident, which I'm going to go through.  There's no

11 indication that there's a second incident in an alley where he

12 heard that Dom was shot.  There's no reference to that

13 whatsoever.

14        What happens, and I'm going to demonstrate on

15 cross-examination, is when he's eventually confronted that Dom

16 could not have been shot in building E because he's in fact

17 lying across the other side of Congress Street about three

18 blocks away, where he's shot, that he develops this new story.

19 That's the premise of the cross-examination, and I will show

20 that step by step.

21        Page 30, question:  "Actually, to your knowledge, do

22 you know which building is -- this the building that Dominic

23 Samuels was shot in?  Is it on the map?"

24        Answer:  "Yes."

25        "If you can show me on this map where I'm going to mark

1 this E as the spot.  Is this the right building I'm pointing

2 to?"

3          "Right, building E.  That's the building that Dominic

4 Samuels was shot in 1996."

5          THE COURT:  That Dominic what?

6          MR. PURPURA:  "That Dominic Samuels was shot in

7 1996."  Yeah, there's more.  One second.  Right here, right

8 here.

9          Okay.  Page 17, line 19, question:  "Why don't you tell

10 us about what happened?  What was your involvement was -- or not

11 involvement or what you saw and what you heard on that date?"

12          And on that date -- I'm sorry.  We'll go back.  It

13 starts at line nine.

14          "Okay.  Now, do you know -- is it your knowledge or do

15 you know something about what happened in June of 1996?"

16          "June, I think that's when Black shot Dom."

17          "Okay."

18          Answer:  "In the hallway, I think June or July.  I

19 think it was in June or July, one of them."  It goes on.

20          "Okay, why don't you tell us about what happened?  What

21 was your involvement, what you saw and what you heard on that

22 day?"

23          And it says, "It was" -- that day is the important

24 thing.

25          And then he goes on to answer, "Well, that night Dom

1 got shot, we was standing in front of the Lincoln.  It was me,

2 Black, Boobie, and Drano."

3        It's going to be a continuation of everything he said

4 before on direct examination, except on direct he says, "I'm not

5 sure he got shot."

6        THE COURT:  On direct, what?

7        MR. PURPURA:  He said that he wasn't sure that Dominic

8 Samuels was shot that night.  That's what he said when the

9 government put him up this time.

10        In front of this grand jury, he gave one story, and the

11 story is consistent:  That's the night he was shot.  And the

12 reason he's backing off of that story today is because he now

13 knows that Dominic Samuels wasn't shot in building E, but was

14 shot three blocks away.

15        THE COURT:  Is the point you're -- the objection had to

16 do with whether it's accurate to have him talk about having been

17 on the scene of the shooting or not.  That's where the objection

18 started.

19        So what is it that you're showing me that contradicts

20 his testimony about being on the scene?

21        MR. PURPURA:  Judge, every point that he testifies he's

22 on the scene the night Dom got shot, each page and line indicate

23 it.

24        MS. PETALAS:  Your Honor, page 31, lines one through

25 seven.  "And did you actually see the ambulance that night, or

1 you just heard that?"

2          "No, I just heard they picked him up out of the

3 hallway."

4          And then he later -- earlier says that he just heard a

5 couple of weeks later that Black was shot.  He assumed that --

6 or that Don had been shot.  He assumed that Don had been shot

7 because Black told him he shot Don.  But he never says that he

8 was on the scene of the shooting.  That was my --

9          THE COURT:  What was it that you were pointing to

10 earlier, to support your assertion that he never said he was on

11 the scene when you first came up?

12          MS. PETALAS:  I was pointing to earlier the line that

13 he was referring to, his testimony in the grand jury -- the line

14 that he was referring to --

15          THE COURT:  "He" who?

16          MS. PETALAS:  I'm sorry, defense counsel was referring

17 to.  I was referring to that point, but also my knowledge of the

18 grand jury.  He testifies he was there on a night where he

19 assumes that Black got shot.  But in his grand jury, he

20 specifically says he was not there.  He was up at the corner.

21          THE COURT:  Where does he say that?

22          MS. PETALAS:  It's more when he refers to that diagram,

23 there's a map where he points to places where he was.  When he

24 testifies that he heard shots, he was at the corner of

25 13th Place and Congress Street.  And he testified in here that

1 he did not -- it's simply that he heard the shots, and he walked

2 back in front of the Lincoln, not that he saw the shooting, that

3 he was on the scene of the shooting.

4          When he marks that building that he refers to, it is --

5 in the grand jury, where I'm talking about, when he's talking

6 about the building, he never testifies he went down to that

7 building, he never testifies that he saw the shooting.  He

8 simply, when they asked about the building says, "No, I just

9 heard they picked him up out of the hallway.

10         He specifically states, when he talks about that

11 building and they follow up, he said, "No, I just heard it, I

12 was not there."  He doesn't say, "I was not there," it was just,

13 "No, I heard they picked him up out of the hallway."

14         MR. PURPURA:  Judge, I can show you --

15         THE COURT:  Is it your contention that he was or was

16 not on the scene of the shooting?

17         MS. PETALAS:  He was not on the scene of the shooting.

18 He was at 13th and Congress.  He was not down at the bottom of

19 the circle, and he never testified that he saw the shooting.  He

20 testified that when he comes back afterwards, when Black comes

21 back afterwards, Black says that he had shot him, and he had

22 heard that it was an incident in the hallway.  But I heard they

23 took him out of the hallway.

24         He never says he was on the scene.  That was my problem

25 with him saying, "Didn't you testify earlier you were on the

1 scene?"  Not once does he say he was on that scene, in the

2 hallway or down in the building where the shooting actually took

3 place.  That's my only problem.

4          MR. PURPURA:  Perhaps my question wasn't artfully

5 phrased.  When I meant scene, I meant the whole area on the map

6 which is going to show, so that he heard the shots.  And I'm

7 going to show there's one continuous story that he told to this

8 grand jury which he didn't tell to this jury.  There was one

9 shooting of Black, that he was there -- one shooting by Black of

10 Dominic Samuels, and he was present.  And he plays --

11          THE COURT:  I don't think you have to go into all of

12 that, because the objection had to do with your question that

13 put him on the scene or not put him on the scene.

14          I don't see any reason why Mr. Purpura can't explore

15 this line, and if there's some issue about what does the scene

16 mean, you can clear it up on redirect.  I don't see any reason

17 to shut down the line of cross-examination.

18          MS. PETALAS:  Your Honor, I wasn't trying to shut down

19 the line of cross-examination.  What I was trying to do is, he

20 said -- he was impeaching him, and I thought it was improper

21 impeachment because he did not -- what he was trying to impeach

22 him with was not against what Mr. Kellibrew was saying.  That

23 was my argument.  I'm not arguing that he can't explore this

24 area.  It was improper impeachment.

25          THE COURT:  I will allow it, and I will allow you to

1 bring up any misimpressions about the meaning of the term

2 "scene" or the breadth of the geography of scene on redirect

3 exam.

4          (END BENCH CONFERENCE.)

5 BY MR. PURPURA:

6 Q.  Mr. Kellibrew, I'm going to take you to June 1996, the night

7 that you heard the five shots.  Do you remember testifying to

8 that?

9 A.  Yes.

10 Q.  Now, you actually testified not only to this jury, but you

11 testified to another United States grand jury about the same

12 incident.  Is that correct, sir?

13 A.  Yes, sir.

14 Q.  And when the Assistant United States Attorney was asking you

15 questions back in 2002 about the night that Dom was shot, you

16 answered those questions.  Is that correct?

17 A.  Yes.

18 Q.  And when I use the word "scene," I don't mean directly

19 there, because you were not present when Black actually shot

20 Dom, were you?

21 A.  No.

22 Q.  But you've testified to this jury that you heard shots being

23 fired on a particular night.  Right?

24 A.  Yes.

25 Q.  And you testified to a United States grand jury back in 2002

1 that that was the night that Dom was shot.  Is that correct,

2 sir?

3 A.  That's what Black told me.

4 Q.  Now, you actually even filled out a diagram.  Is that

5 correct, sir?

6          MR. PURPURA:  Let me have this marked.  Excuse me.

7          Your Honor, I'm going to show the government, if I may

8 for a moment, the demonstrative exhibit.  I'm going to show the

9 government first.

10          THE COURT:  Yes.

11          MR. PURPURA:  With the Court's permission, I'm going to

12 publish the demonstrative exhibit.

13          THE COURT:  Any objection?

14          COURTROOM DEPUTY:  It's marked as?

15          MR. PURPURA:  58.

16          THE COURT:  Any objection?

17          MS. PETALAS:  Court's indulgence.

18          THE COURT:  I beg your pardon?

19          MS. PETALAS:  I'm sorry, if I could just have a second.

20          No, Your Honor.

21          THE COURT:  Go ahead.

22 BY MR. PURPURA:

23 Q.  This is Defendant's Exhibit 58, which is demonstrative

24 evidence.  Do you recognize -- first of all, do you recognize

25 those initials at the bottom, the KK?

1 A.   Yes.

2 Q.   Whose initials are they?

3 A.   Mine.

4 Q.   And do you remember going through this diagram with an

5 Assistant United States Attorney back in 2002, when you were

6 under oath before a United States grand jury?

7 A.   Yes.

8 Q.   And do you remember that you marked B on the diagram, which

9 would be right here?  Do you see this where I'm pointing to?

10 A.   Yes.

11 Q.   Let's move that back just a little bit.

12         And I'm pointing to the letter B, which is on the

13 corner of Congress Street.  Do you see that?  Congress and,

14 looks like a little entrance to an apartment complex there.

15 Right?

16 A.   Yes.

17 Q.   And that is the point, and you told the same thing to the

18 jury, that's the spot where you, Drano, Boobie, and Black were.

19 Correct?

20 A.   Yes.

21 Q.   And then you testified that Black saw Dom drive by.

22 Correct?

23 A.   No.

24 Q.   Yes?

25 A.   No.

1 Q.  What did you testify to?

2 A.  He seen him coming from Congress and turned in the circle.

3 Q.  Which way are you saying he's coming from?

4 A.  From 13th Hill, 13th Street up Congress, and he made --

5 Q.  So you're saying he's coming this way?

6 A.  Right, in the circle.

7 Q.  So from down here, you're saying -- do you remember if it

8 was day or night?

9 A.  It was nighttime.

10 Q.  So from down here, this distance here, B, you recognized

11 apparently Dominic Samuels?

12 A.  We seen the car.

13 Q.  And I thought he said, "There's the guy."  Did he say

14 something?

15 A.  That's what he said, "There your man right there."

16 Q.  And then according to you, then, Dominic Samuels' car moves

17 in to the street here on 13th Place.  Is that correct?

18 A.  Yes, sir.

19 Q.  And at that point what you see, is you see Black, who is

20 Mr. Sills, go into the C building right here, and you put the C

21 on there.  Right?

22 A.  Yes.

23 Q.  And you-all move down to the D spot.  Right?

24 A.  Yes.

25 Q.  And at that point you were there, you actually drank a

1 couple of shorties there, some little liquors.  Do you remember

2 that?

3 A.  We did?

4        MS. PETALAS:  Objection, Your Honor.

5        THE COURT:  Basis?

6        MS. PETALAS:  Mischaracterizes the evidence.  Assumes

7 facts not in evidence, mischaracterizes his testimony.

8 BY MR. PURPURA:

9 Q.  Do you remember drinking?

10 A.  No.

11 Q.  Let's see.  Let's refresh your recollection.

12        Well, that night you were smoking some marijuana.

13 Right?

14 A.  Yes.

15 Q.  Okay.  One second.

16        MR. PURPURA:  Counsel, that would be page 23.

17 BY MR. PURPURA:

18 Q.  And when you say to the United States grand jury, it begins

19 on the bottom of page 22, line 25, "We got at the corner, and we

20 was standing at the corner for about a second, a second, because

21 I drunk -- I had drunk another couple of Remies.  That's when I

22 heard the shots go off."

23        Does that refresh your recollection?

24 A.  Yes.

25 Q.  So now we have you drinking some Remies.  Do you do that a

1 lot, drink Remies, little Remies?

2 A.  Yes.

3 Q.  So you're drinking some Remies, you're high on marijuana,

4 you hear the shots go off.  Right?

5 A.  Yes.

6 Q.  And then what you do, you testify both before this jury and

7 the United States grand jury is, you and the two guys you're

8 with walk back to B.  Right?

9 A.  Yes.

10 Q.  And at that point you see Mr. Black come out of C.  Correct?

11 A.  Correct.

12 Q.  And he was fumbling, trying to put what looked like a gun in

13 his dip area.  Right.

14 A.  .38.  He had a .38.

15 Q.  .38.  Right?

16 A.  Uh-huh.

17 Q.  And that's after you heard the shots.  Right?

18 A.  Right.

19 Q.  And Black told you that night that he got him in the

20 hallway.  Right?

21 A.  Yes, sir.

22 Q.  Now -- one second.

23        And then you and Black talked about what Black did

24 later.  Right?

25 A.  Yep.

1 Q.  And Black was complaining that his joint was empty.  Right?

2 A.  Right.

3 Q.  And Black told you that he should be dead.  Right?

4 A.  Right.

5 Q.  And the "he" he's talking about is Dominic Samuels.  Right?

6 A.  Right.

7 Q.  That's what you told the United States grand jury.  Right?

8 A.  Right.

9 Q.  And Black told you, at least what you told the United States

10 grand jury, was that Dominic Samuels was shot that night in, and

11 you marked it, building E.  Right?

12 A.  Right.

13 Q.  Not once, not once in the entire 100-plus pages of grand

14 jury back from November 27th, 2002 did you ever indicate to the

15 grand jury that you weren't sure that Black shot Dominic Samuels

16 that night, did you?

17 A.  No, I didn't.  I don't believe, sir.

18 Q.  It wasn't until you learned, sir, that your story was

19 impossible that you changed it.  Isn't that right, sir?

20 A.  No.

21 Q.  Didn't you learn sometime after you testified before the

22 United States grand jury that -- and we'll use Government

23 Exhibit 100.1, which is already in evidence.  And we'll just

24 acclimate the jury.

25          Take a look.  This is building E all the way back here.

1 Right?

2 A.  Yes, sir.

3 Q.  This is building C right here, where you saw Black coming

4 out with his 38.  Right?

5 A.  Yes, sir.

6 Q.  And this was the corner you were all at.  Right?

7 A.  Yes, sir.

8 Q.  It wasn't until you learned, sir, after you testified before

9 the United States grand jury in 2002, five years after the

10 shooting, that Dominic Samuels was actually shot blocks away;

11 that Dominic Samuels wasn't shot in building E, but that Dominic

12 Samuels was shot all the way on the other side of

13 Congress Street, over here?  You learned that later, didn't you,

14 sir?

15 A.  No, sir.

16 Q.  Did you ever tell the United States grand jury in 2002 that

17 Dominic Samuels was shot all the way over here on the other side

18 of Congress Street?  Did you, sir?

19 A.  I can't remember 2002 --

20 Q.  Did you?

21 A.  -- what I told them.

22 Q.  Yeah.  August 27th, 2002, the day that Mr. Sills is shot, do

23 you remember that?

24 A.  Uh-huh.

25 Q.  Government Exhibit 503.10, in evidence.

1          That's you.  Right?

2 A.  Yes.

3 Q.  That's Mr. Sills.  Is that correct?

4 A.  Yes.

5 Q.  That's the same Mr. Sills that carried a gun.  Right?

6 A.  Yes.

7 Q.  That's the same Mr. Sills that robbed people.  Right?

8 A.  Yes.

9 Q.  The same Mr. Sills that shot Dominic.  Right?

10 A.  Yes.

11 Q.  Is that the same Mr. Sills that on the date of August 27th,

12 2002, as you came into the Congress Park area, when he saw DC,

13 he said, "I should kill this mother-fucking ass."

14          Is that the same Mr. Sills who said that?

15 A.  No, actually, he said, "I should kill that mother-fucker

16 right now."

17 Q.  That's what Mr. Sills said.  Same man, right?

18 A.  Yes.

19 Q.  And he had the gun there right then.  Right?

20 A.  Yes.

21 Q.  Is that the same Mr. Sills who, sometime after the shooting

22 of Dom and before his shooting, met Dom -- strike that.

23          You saw Dom coming across from the bus stop.  Do you

24 remember that?

25 A.  Yes.  Subway station.

1 Q.   Subway station.   The same Mr. Sills who wanted to put a

2 knife in the back of Dominic Samuels' neck.   Right?   Do you

3 remember testifying to that?

4 A.   I don't know about neck.   He wanted to stab him up, but I

5 don't know about his neck and all that.

6 Q.   Do you remember saying that he wanted to stab him in his

7 neck?

8 A.   I said he had a knife.

9 Q.   Same Mr. Sills who had that knife, right?

10 A.   Yes, sir.

11 Q.   And on that day, the only thing Dominic Samuels did was walk

12 over and put out his hand to shake?

13 A.   He was being funny.

14 Q.   August 27th, after the shooting, you said you saw the

15 shooter.   Right?

16 A.   Yes.

17 Q.   You said he was walking out backwards?

18 A.   Huh?

19 Q.   Backwards, facing you?

20 A.   Yes.

21 Q.   Right?   So he's walking away from the shooting, like this.

22 Let me make sure I'm demonstrating.

23         MR. PURPURA:   If I may, Your Honor.

24 BY MR. PURPURA:

25 Q.   Walking away like this (indicating)?

1 A.  Yeah.

2 Q.  Gun up.  Right?

3 A.  Yes, sir.

4 Q.  Walking backwards.  Right?

5 A.  Yes, sir.

6 Q.  You're sure this is after the shooting.  Right?  After he

7 shot someone, you saw him walking out backwards.  That's what

8 you testified to.  Is that right or wrong?

9 A.  Yes, sir.

10 Q.  It wasn't just -- the shooter just didn't turn and run to

11 the woods?

12 A.  No.

13 Q.  He backed out so you could see his face.  Right?

14 A.  His guns was still busting when I hit the steps.

15 Q.  Uh-huh.  Uh-huh.

16      And then what you did -- and this is all the truth.

17 Right?

18 A.  Yes.  Go ahead.

19 Q.  Yes, it is the truth?

20 A.  Shoot.  Go ahead.

21 Q.  And what you did, you confronted that man who had the

22 whatever, shirt on his head, shirt coming down, two guns

23 blazing, you confronted him unarmed.  Right?

24 A.  Right.

25 Q.  And what you said at that time, unarmed is, you were

1 yelling, "Stop, you mother-fucking bitch-ass nigger."

2        That's what you were doing.  Right?

3 A.  Yes, sir.

4 Q.  Unarmed?

5 A.  Yes.

6 Q.  He's shooting somebody, the shooter, and you confront him?

7 A.  That's why I ran back in the building.  I realized what I

8 was doing.

9 Q.  And then what you did is, you ran through the other side.

10 Right?

11 A.  Yes.

12 Q.  And when you got to the other side of the building,

13 according to you, you saw the shooter again.  Right?

14 A.  Yes.

15 Q.  And the shooter, I believe your testimony before the United

16 States grand jury, was the shooter -- strike that.  Let's not

17 tell you what your testimony was.

18        What happened?

19 A.  What happened?

20 Q.  Yeah, what happened?

21 A.  When I hit the front door?

22 Q.  Truth.

23 A.  You want to know what happened?

24 Q.  Uh-huh.  What happened?

25 A.  At the front door he did like this, and I slammed the front

Page 11003

1 door back.  He brandished his gun at me, and that's what made me

2 go back in the hallway.

3 Q.  Uh-huh, okay.  Now, did you tell that to the United States

4 grand jury back in 2002?

5 A.  Read it.

6 Q.  I will.

7        MR. PURPURA:  Counsel, it's page 64, line eight to line

8 nine.

9 BY MR. PURPURA:

10 Q.  "And he just looked at me and just mugged."

11        What does it mean when someone mugs?

12 A.  Frown they face up.

13 Q.  And what did you do, unarmed?  What did you tell the grand

14 jury you did when you were unarmed?

15 A.  Slammed the door back.

16 Q.  No, no.  No, no.  What did you tell them back then in, 2002?

17 You don't remember what you told them back then, do you?

18 A.  You tell me.  You got it right there, sir.

19 Q.  I will tell you.  Is it difficult to remember things?

20 Strike that.

21        Is it more difficult to remember lies?  Is it or not,

22 do you know?  What you did was, you mugged him.  Do you remember

23 that?  You mugged back.  What does that mean when you mugged

24 back?  Give us the face you mugged the shooter with.  Show us.

25 A.  I can't remember what face I had on.

Page 11004

1 Q.  What do you mean?

2        MS. PETALAS:  Objection, Your Honor, to the compound

3 nature of that question.  I believe either he was testifying or

4 he hasn't confronted him with what he said in the grand jury.  I

5 object to the form of the question.

6        THE COURT:  Put your question.

7 BY MR. PURPURA:

8 Q.  You told the United States grand jury that you mugged him

9 back?

10 A.  Yes.

11 Q.  What do you mean by that?

12 A.  I frowned my face up at him.

13 Q.  And that's the truth too?

14 A.  Yes.

15 Q.  But you couldn't remember that yesterday -- strike that.

16        You couldn't remember that when you testified before,

17 could you?

18 A.  Huh?  You whispering.  I can't hear you.

19 Q.  Strike the question.

20        THE COURT:  Mr. Purpura, let's go ahead and break.  We

21 need to give some relief to everybody, I think.

22        It's 12:40 now, ladies and gentlemen.  There's a matter

23 I'm going to have to take care of, so I'm going to build in a

24 little bit more time for your lunch break.  Please come back at

25 2:05.  But take your notes back with you, and don't talk about

11011

1  THE COURT: I'll tell you what. When Mike comes at the
2  break, I guess, we'll just ask Mike --
3  Is he here?
4  MS. PETALAS: Mike's not here, but Shane's here.
5  THE COURT: Shane's here? Why don't we, at the
6  mid-afternoon break, have them come up and we can talk about
7  it --
8  MR. TABACKMAN: Thank you, Judge.
9  THE COURT: -- just to see what the security concerns are.
10  Are there some security concerns?
11  MS. PETALAS: No, no. I think --
12  MR. TABACKMAN: It wasn't clear to me. He said he wasn't
13  going to do it, but since it was his -- he just wanted you to
14  authorize whatever was done.
15  THE COURT: Okay. We can take it up then.
16  The other thing is to call the general counsel again,
17  because they're the ones -- they're the fixer people or she's the
18  fixer person.
19  MR. TABACKMAN: We have spoken and it just doesn't seem to
20  be happening.
21  MR. CARNEY: Your Honor, I've talked to the Assistant
22  General Counsel at least three times and she keeps saying she's
23  going to call Barbara Ward. And she says she's talked to him and
24  nothing happens. And this has been going on for more than a
25  month and it just hasn't happened. So I don't know what else I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11012

1  can do.
2  THE COURT: Well, let's take it up at the break.
3  Mr. Purpura, are you ready for the jury?
4  MR. PURPURA: Yes, sir. Thank you.
5  (Jury in at 2:20 p.m.)
6  THE COURT: Good afternoon, ladies and gentlemen.
7  THE JURY PANEL: Good afternoon.
8  THE COURT: Welcome back. We had to fix some equipment so
9  we got a little bit delayed, but it's fixed now and we're ready
10  to go. Thank you very much for your indulgence.
11  Mr. Purpura.
12  MR. PURPURA: Yes. Thank you, Your Honor.
13  CONTINUED CROSS-EXAMINATION OF KAIRI AMON KELLIEBREW
14  BY MR. PURPURA:
15  Q.  Mr. Kelliebrew, earlier today Mr. Martin -- he's the
16  gentleman over here -- asked you some questions in particular
17  about Tanay Gross. And I won't go through all those questions
18  again, but you obviously -- you admitted that you were having a
19  sexual relationship with Tanay Gross; is that correct, sir?
20  A.  Yes, sir.
21  Q.  And I think that was when she was 14; is that what you
22  testified to?
23  A.  Yes, sir.
24  Q.  And you were asked actually the same questions before the
25  United States Grand Jury back on November 27th, 2002. You were

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11013

1  asked at that time what your relationship was with Tanay Gross
2  and, sir, at that time, your response was as follows; page 83,
3  line 13: "Man, I watch out for her. I make sure she go to
4  school. You know, ain't running around like the other little
5  females, trying to fuck this nigger, fuck that nigger, you
6  know."
7  Do you remember saying that to them?
8  A.  Yes.
9  Q.  But in fact, you were the one that was with her; is that
10  correct?
11  A.  Yes.
12  Q.  Did you see Tanay Gross August 27th, 2002, immediately
13  after the shooting?
14  A.  Not -- I can't remember if I seen her after. I can't
15  remember, did I see her after the shooting and that.
16  Q.  Well, let's slow down for a second. Let's try to picture
17  August 27th, 2002. You testified to it already, right?
18  A.  Yes.
19  Q.  You testified that you eventually were outside after the
20  shooting in the parking lot, right?
21  A.  Yes.
22  Q.  Okay. And I'm asking you, can you picture who was out
23  there?
24  A.  I can't remember if Tanay was out there. I can't
25  remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11014

1  Q.  You don't remember if she was or wasn't?
2  A.  Yes, sir. I can't remember if she was out there or not.
3  Q.  How about Shanay? Was she out there?
4  A.  I can't remember if they was out there or not.
5  Q.  Do you remember talking to Tanay immediately after the
6  shooting when you come downstairs out of the apartment, out into
7  the parking lot? Do you remember talking to Tanay?
8  A.  No, I don't.
9  Q.  Do you remember talking to Shanay out there immediately
10  after the shooting?
11  A.  No, I don't.
12  Q.  Now, let me --
13  MR. PURPURA: Your Honor, may I approach the witness,
14  please?
15  THE COURT: Yes.
16  BY MR. PURPURA:
17  Q.  I'm going to approach and show you what's already been
18  marked for identification, Government's Exhibit 1220, page 83.
19  Do you have Exhibit 1220? It's the 2003 grand jury.
20  And I'm going to --
21  MR. PURPURA: Your Honor, I'm going to read this to the
22  witness very quietly, if I may.
23  THE COURT: All right.
24  (Discussion had off the record between Mr. Purpura and
25  Mr. Kelliebrew. )

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

BY MR. PURPURA:

**Q.**   I just read you a portion of your grand jury; is that correct, sir?

     MS. PETALAS:  Your Honor, I apologize to counsel.  I know you gave a page number.  I just didn't get it.

     MR. PURPURA:  I'm sorry.  Page 83.  And we read from line 20 through line 25.

     MS. PETALAS:  Thank you.

BY MR. PURPURA:

**Q.**   Does that refresh your recollection a little bit as to whether you did see Tanay and Shanay immediately after the shooting?

**A.**   Yes.

**Q.**   Okay.  And what you told the United States Grand Jury back in 2002 is that you didn't see either Tanay or Shanay immediately after the shooting; is that correct, sir?

**A.**   Yes.

**Q.**   As a matter of fact, what you told them, you didn't see them on that day until you came back from visiting with homicide; is that correct, sir?

**A.**   Yes.

**Q.**   What you told this jury about the August 27th, 2002 shooting -- part of what you told them -- is that eventually you came running down outside; is that correct?

**A.**   Yes.

**Q.**   And the first thing you yelled about was your car; is that also correct?

**A.**   Yes.

**Q.**   You yelled that your car was hit, right?

**A.**   Yes.

**Q.**   And that someone moved your car, right?

**A.**   Yes.

**Q.**   You didn't say anything out loud that someone shot Black. You didn't say that, did you?

**A.**   Not right offhand.

**Q.**   Okay.  And you certainly didn't say anything that Dom did it.  You didn't yell that, did you?

**A.**   No.

**Q.**   What you did do after you complained about your car was that you hid the gun, which was partly yours, from the car, right?

**A.**   Yes.

**Q.**   And then the next thing you did was you moved the car, your car, from the scene of the crime to another area, another parking lot; isn't that correct?

**A.**   Yes.

**Q.**   And after you complained about your car, hid the gun, moved your car, then you started looking for your friend Black; isn't that right?

**A.**   Yes.

**Q.**   The truth today, sir, is that you did not see the shooter on August 27th, 2002; isn't that correct, sir?

**A.**   No, that's not.

**Q.**   Sir, have you ever heard the story about the farmer and the snake?

     MS. PETALAS:  Objection, Your Honor.

     THE COURT:  Mr. Purpura

     MR. PURPURA:  I have no further questions, Judge.

     THE COURT:  All right.

     MR. PURPURA:  Thank you.

     THE COURT:  Mr. Zucker.

     MR. ZUCKER:  Thank you.

          CROSS-EXAMINATION OF KAIRI AMON KELLIEBREW

BY MR. ZUCKER:

**Q.**   Mr. Kelliebrew, make sure we tell you that story after the trial, if we get a chance.

     My name is Zucker.  I represented Desmond Thurston.  How are you?

**A.**   Fine.  And you, sir?

**Q.**   Good, thank you.

     Sir, several times during your testimony in this trial, you referred to the year you did for Crystal Tyler.  Do you recall that?

**A.**   Yes.

**Q.**   And that's the way you described it three or four times,

that you did a year for Crystal Tyler, right?

**A.**   Yes.

**Q.**   Now, Crystal Tyler was your girlfriend, right?

**A.**   Yes.

**Q.**   And when you said you did a year for her, the implication was that you did that year in prison so that she would not have to, right?

**A.**   Right.

**Q.**   That you took the beef for her, in street parlance, right?

**A.**   Repeat that again.

**Q.**   That you took the beef for her to protect her?

**A.**   I took my own beef in court.

**Q.**   Well, you referred to it as the year that you did for Crystal Tyler, right?

**A.**   Right.

**Q.**   Okay.  Now, what happened that day, as you've already told this jury, is you were in a halfway house, right?

**A.**   Right.

**Q.**   And of course in that halfway house, as always, you've given your word to the court that you won't be involved in drugs and won't be selling drugs or committing crimes, right?

**A.**   Right.

**Q.**   Which, of course, as you always did, was broken -- was a lie, right?

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1493 of 1954

1    A.    Right.
2    Q.    Okay.  And the police were stopping you, right?
3    A.    Right.
4    Q.    And you remember that day fairly well, right?
5    A.    Yes.
6    Q.    And what you did was you had -- it was 95 degrees even;
7    you remember you were wearing long johns, black long johns,
8    right?
9    A.    Yes, sir.
10   Q.    And as the police were stopping you, you gave Crystal
11   Tyler the drugs you had been selling; isn't that correct?
12   A.    Yes.
13   Q.    How much drugs were there?
14   A.    I got a half from Twan.  I got a half from Antwuan.
15   Q.    A half of what?
16   A.    Half ounce.
17   Q.    Okay.  Half ounce of crack cocaine, right?
18   A.    Yes.
19   Q.    Something that you know in Federal Court would have
20   gotten her a minimum five years if she was convicted, right?
21   A.    I ain't -- I don't know what circumstances --
22   Q.    Well, you were aware -- I mean, you've been involved in
23   the drug game most of your life, right?
24   A.    Yes.
25   Q.    And you know anything over five grams in Federal Court,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    five grams of crack, mandatory five, right?
2    A.    I'm not sure.  I don't know.
3    Q.    Okay.  You knew when you gave it to her it was illegal,
4    right?
5    A.    Yes.
6    Q.    For her to have them, right?
7    A.    Yes.
8    Q.    How old was she at that point?
9    A.    I think she was -- Crystal and me was the same age, I
10   think, if I'm not mistaken.
11   Q.    Same age?
12   A.    Yes.
13   Q.    So how old are you?  About 22?  21?
14   A.    I was 21.  As a matter of fact, I was 21 and she was
15   either 20 or 21, getting ready to turn 21.
16   Q.    Okay.  And when you gave it to her, it was so you would
17   not be caught with the drugs, right?
18   A.    Right.
19   Q.    And you told her to put them in her pants, right?
20   A.    Right.
21   Q.    So rather than you, she would be the one in trouble,
22   right?
23   A.    Right.
24   Q.    So you were trying to get her to take your beef, right?
25   A.    Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    Q.    And when you got to the station, one of the dimes fell
2    out of your boots, right?
3    A.    Right.
4    Q.    But before that, in front of the police, you said
5    something to her, didn't you?
6    A.    To her?
7    Q.    Yeah.
8    A.    What did I say to her?
9    Q.    Well, what you told this jury was you said something to
10   the effect of:  "Oh, baby, you got drugs on you.  Where where'd
11   you get that from?"  Right?
12   A.    Yeah.
13   Q.    Now you remember?
14   A.    Yeah.
15   Q.    You're smiling, huh?  Are you smiling?
16   A.    Yes, I am smiling.
17   Q.    Because you're happy?
18   A.    No, I'm not happy.
19   Q.    Well, you're proud of that, aren't you?
20   A.    No.  It was just a funny situation, the way you stuck
21   your arms up and reacted me.
22   Q.    Well, I was mimicking what you did, right?
23   A.    Yes.
24   Q.    Because what you were doing -- "Oh, baby, where'd you get
25   that from" -- in front of the police, so they would think it was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    hers, not yours, right?
2    A.    Right.
3    Q.    Okay.  So you were trying to deceive the police and put
4    the heat on your girlfriend?
5    A.    Right.
6    Q.    Let her go to prison for you, a crime you committed,
7    right?
8    A.    Right.
9    Q.    That's pretty much what you do all the time, isn't it?
10   Make somebody else pay for the crimes you've committed?
11   A.    No, sir.
12   Q.    Well, isn't that what you're doing here today, trying to
13   make them pay for your crimes?
14   A.    No.  I'm just testifying.
15   Q.    Okay.  Well -- and as a result of that testifying, you're
16   looking to avoid going back to prison, right?
17   A.    Yes.
18   Q.    You're looking to avoid doing 30 to life, right?
19   A.    Yes.
20   Q.    Okay.  Let's turn for a moment to the Jamel Sills murder.
21   Black's murder.  You remember that, right?
22   A.    Yes.
23   Q.    Now, I don't want to go over all the facts of that, but
24   you were interviewed by Detective Worrell, were you not --
25   A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1494 of 1954

1   to -- the case was dismissed by the government; you were allowed
2   to withdraw your plea, right?
3   **A.**   Yes.
4   **Q.**   Okay.  So that is what happened, right?
5   **A.**   Yes.
6   **Q.**   You now recalled it when I picked up the paper, but
7   forgot earlier?
8   **A.**   Excuse me, Mr. Zucker.  You're flip-flopping.
9   **Q.**   I asked you that question a few minutes ago and you said
10  no, that isn't what happened.  And you saw me go for the paper
11  and all of a sudden you remembered.
12       MS. PETALAS:  Objection, your Honor.  That's not what he
13  said.
14       THE COURT:  Beg your pardon?
15       MS. PETALAS:  Objection, Your Honor.  Mischaracterizes his
16  testimony.
17       THE COURT:  Overruled.
18  BY MR. ZUCKER:
19  **Q.**   Isn't that what just happened in the last 60 seconds in
20  this courtroom, sir?
21  **A.**   No, it isn't, sir.
22  **Q.**   Okay.  Of course, the day you were arrested in that
23  case -- well, as with every other day you were interviewed by
24  Pre-trial Services, you lied, right?
25  **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   Okay.  All right.  That was in the court next door,
2   right?
3   **A.**   Yes.
4   **Q.**   And of course you swore to the truth of those statements,
5   right?
6   **A.**   Yes.
7   **Q.**   And at that time, you told them you were working for STEP
8   Foundation as a security guard; isn't that correct?
9   **A.**   Yep.
10  **Q.**   Okay.  And you told that lie in the hopes that it would
11  help you either get out of jail or at least end up in a halfway
12  house if they believed you were really employed, right?
13  **A.**   Yes, sir.
14  **Q.**   And I'm not going to go through all of them, but that was
15  just one of the many lies you've told to courts throughout your
16  career to try to gain your freedom, right?
17  **A.**   Yes, sir.
18  **Q.**   You lied about working in some landscaping company,
19  right?
20  **A.**   Yes, sir.
21       THE COURT:  Repetitive.
22       MR. ZUCKER:  Okay.
23  BY MR. ZUCKER:
24  **Q.**   And you even lied at the halfway house, trying to get
25  them to release you so you could go out and commit other

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   robberies; isn't that correct, sir?
2   **A.**   Yes.
3   **Q.**   You recall that incident with Dex?  That's what you did
4   that day, right?
5   **A.**   Yes.
6   **Q.**   And in this court, when you pled guilty in February of
7   2005, you made some promises to Judge Roberts, did you not?
8   **A.**   Yes.
9   **Q.**   And the government, based on your entering and remaining
10  in a drug program, agreed to you being released, right?
11  **A.**   Yes, sir.
12  **Q.**   And you promised you would enter that drug program,
13  remain there, complete it, remain drug free, right?
14  **A.**   Yes, sir.
15  **Q.**   And of course you broke that promise, didn't you?
16  **A.**   Yes, sir.
17  **Q.**   And as you told us, you came out of that program in
18  January of 2006, right?
19  **A.**   Yes, sir.
20  **Q.**   A year and five months, six months ago?
21  **A.**   Yes, sir.
22  **Q.**   Now, you've also told us that you don't -- you no longer
23  lie under oath since you cut your deal, right?  And by "your
24  deal," I mean the deal in this case, right?
25  **A.**   I don't get what you're saying.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **Q.**   Well, you know what a lie is, right?
2   **A.**   Yes.
3   **Q.**   Didn't you just tell this jury for the last three days
4   that once you cut your deal, you don't lie anymore in court
5   because you know if you tell a lie, you're going to do 30 to
6   life, right?
7   **A.**   Right.
8   **Q.**   Okay.  And that -- and so that's been a change of heart
9   ever since you took this deal, this case, February '05, right?
10  **A.**   If I lie today on the stand, I go to jail for 30 to life,
11  sir.
12  **Q.**   That's not my question.  My question is the government
13  agreed to your release in February of '05 and you told us if you
14  lie on the stand since that deal, you go to prison for 30 to
15  life, right?
16  **A.**   Yes.
17  **Q.**   So that's why now you're truthful when you testify; is
18  that correct?
19  **A.**   Yes.
20  **Q.**   Of course, you've already acknowledged that subsequent to
21  that deal, you did lie grand jury, right?
22  **A.**   Yes.
23  **Q.**   And what happened to you?
24  **A.**   What do you mean?  I don't get what you mean.
25  **Q.**   Well.  You lied in the grand jury after you cut your

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11031**

1  deal. You told us that they -- the deal is if you lie again,
2  you go back to prison, right? That hasn't happened, has it?
3  **A.**    No.
4  **Q.**    And this is not the first trial you've testified in since
5  you cut your deal, is it?
6  **A.**    No.
7  **Q.**    You testified in another trial in April of '06. Do you
8  remember that?
9  **A.**    Yes, sir.
10  **Q.**    What case was that?
11  **A.**    Corey Moore trial.
12  **Q.**    And that was in this courthouse as well, wasn't it?
13  **A.**    Yes.
14  **Q.**    Okay. In front of Judge Lamberth?
15  **A.**    Yes.
16  **Q.**    Three different prosecutors?
17  **A.**    Yes.
18  **Q.**    Three different defense lawyers?
19  **A.**    Yes.
20  **Q.**    And you lied in that trial, didn't you, sir?
21  MS. PETALAS: Objection, Your Honor.
22  THE COURT: Basis?
23  MS. PETALAS: Can we approach?
24  THE COURT: Yes.
25  (Following sidebar discussion had on the record:)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11032**

1  MS. PETALAS: I'm objecting to vague, for one. Earlier,
2  when Mr. Zucker was asking questions about lying under oath in
3  2005, those questions were overly vague and I think I can clean
4  it up in direct, but that mischaracterizes the evidence, as there
5  was -- the lying in the grand jury did not happen before 2005.
6  As to this one, I don't know where he's going. I think
7  it's vague and I don't think -- I don't know his basis for asking
8  the question, if he's lying under oath in Corey Moore.
9  MR. ZUCKER: I'll get to the particulars. In that trial,
10  he claimed he was still in the drug program and he had already
11  left it, based on his testimony here today.
12  THE COURT: Anything else?
13  MS. PETALAS: No.
14  THE COURT: Overruled.
15  (Sidebar discussion concluded.)
16  BY MR. ZUCKER:
17  **Q.**    Do you remember the question, sir?
18  **A.**    You said, did I lie in the Corey Moore trial?
19  **A.**    Uh-huh.
20  **A.**    No, I didn't, sir.
21  **Q.**    You didn't? Do you recall telling that jury you were
22  still -- well, that was April 13th, 2006, was it not, sir?
23  **A.**    Yes.
24  **Q.**    So April 13th, 2006, you were already out of the drug
25  program a month and a half, two months? You said left January

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11033**

1  26, '06, right?
2  **A.**    Yes.
3  **Q.**    In that trial, that jury -- under oath, you pretended you
4  were still in the program, didn't you, sir?
5  **A.**    No. I still was going to Honor Court every Saturday. I
6  wasn't in the drug program. I wasn't going to the drug program
7  or none of that. That's still part of the program.
8  **Q.**    April 13th, 2006 --
9  MS. PETALAS: Objection, Your Honor. He wasn't finished.
10  BY MR. ZUCKER:
11  **Q.**    Are you done?
12  MS. PETALAS: I'm objecting to -- I didn't think he was
13  finished with his answer.
14  THE COURT: Have you finished your answer?
15  THE WITNESS: Yes.
16  THE COURT: Go ahead.
17  BY MR. ZUCKER:
18  **Q.**    April 13th, 2006, a.m. session, page 23, please.
19  Showing Defendant's 27 F.
20  Please turn to page 23, sir.
21  MR. ZUCKER: I'm sorry. I need the a.m. session, please.
22  Line 14, for the benefit of counsel.
23  BY MR. ZUCKER:
24  **Q.**    The question asked of you in that trial was:
25  "And how long have you been in the drug program?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11034**

1  "Answer: A year now.
2  "Question: Since you were released from the Congress
3  Park case, right?
4  "Answer: Yes, sir."
5  Isn't that correct?
6  **A.**    Yes.
7  **Q.**    Okay. Now, as you've told this jury, you walked out of
8  that drug program January 26th, 2006, almost two months before
9  you testified, right?
10  **A.**    Yes.
11  **Q.**    You never told that when you were testifying in Corey
12  Moore's trial, did you, sir?
13  **A.**    No.
14  **Q.**    As a matter of fact, you told that jury you were testing
15  every week, didn't you?
16  **A.**    I'm not sure, sir.
17  **Q.**    As a matter of fact, you told that jury if you used
18  drugs -- just if you used drugs, you would be incarcerated
19  again, didn't you?
20  **A.**    Yes.
21  **Q.**    But you had used drugs, hadn't you, sir?
22  **A.**    Yes.
23  **Q.**    And in that trial you said if you used drugs, you would
24  get incarcerated, right?
25  **A.**    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11035

1  **Q.**   But that wasn't true, was it, because you did use drugs
2  and didn't get incarcerated, right?
3  **A.**   Right.
4  **Q.**   So was that a lie?
5  **A.**   I mean, that's to my knowledge.
6  **Q.**   Or is that just more posturing for that jury?  Do you
7  know anything about posturing?
8  **A.**   No.
9  **Q.**   Pretending.
10  **A.**   No.
11  **Q.**   Page 58, turning to line 5:
12       "Question:  What was your understanding if you used drugs
13  while you were released to go to that program?
14       "Answer:  I would be incarcerated -- I would be back
15  incarcerated.
16       "Question:  Are you being tested regularly?
17       "Answer:  I get tested every week."
18       That was a lie, wasn't it, sir?
19  **A.**   That I get tested every week?
20  **Q.**   Yes.
21  **A.**   Yes.  I mean, I gave you the specifics of when I was in
22  the program and my relapse.
23  **Q.**   Sure.  When you were in the program, you were tested
24  every week, but you had been out of that program for almost two
25  months at this point.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11036

1  **A.**   Well, actually, almost three months, January to April,
2  mid April, right?
3  **A.**   Right.
4  **Q.**   So you were lying in another courtroom down the hall
5  about what you were actually doing, right?
6  **A.**   I actually wasn't lying.  They asked me and I told them.
7  **Q.**   You told them lies, sir, didn't you?
8  **A.**   Yes, I did, sir.
9  **Q.**   Okay.  And you didn't get incarcerated, did you?
10  **A.**   No, I didn't, sir.
11  **Q.**   They didn't withdraw your plea agreement, did they?
12  **A.**   No, sir.
13  **Q.**   You're here testifying, hoping to get a deal, right?
14  **A.**   Yes, sir.
15  **Q.**   Okay.  Now, had you told the prosecutors in that case you
16  were out of the drug program for over -- well, at that point, it
17  had only been two and a half months.  Did you lie to the
18  prosecutors?
19  **A.**   Yes.
20  **Q.**   So you lied to the prosecutors.  But you have told these
21  prosecutors, or other prosecutors since, that you've been out of
22  the program since January of '06, right?
23  **A.**   Yes.
24  **Q.**   So notwithstanding the fact that you lied under oath a
25  year and a half ago in this same courtroom, nothing happened,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11037

1  did it?
2  **A.**   No, sir.
3  **Q.**   So all this stuff about "if I lie or I use drugs, I go
4  back to prison for 30 to life" -- that's all nonsense, isn't it,
5  sir?
6  **A.**   No, sir.
7  **Q.**   It's not true, is it?
8  **A.**   I have to deal with that on sentencing, sir.
9  **Q.**   Well, sir, you've been out a year and a half, lying.
10  You've lied in a trial a year and a half ago.  The prosecution
11  knows it and nothing -- and you're still on the street, aren't
12  you?
13       MS. PETALAS:  Objection, Your Honor.
14       THE COURT:  Sustained.
15  BY MR. ZUCKER:
16  **Q.**   As a matter of fact -- and you've used drugs, as you've
17  admitted today, since then, right?
18       I'm sorry.  You admitted last week, right?  Isn't that
19  correct?
20  **A.**   Say that again.
21  **Q.**   Even since you left the program, you've used drugs,
22  haven't you?
23  **A.**   Yes.
24  **Q.**   And even though you were a drug addict -- I mean, you
25  used drugs, basically, every day from the time you were 12 until

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11038

1  the time you were arrested when you were 22, right?
2  **A.**   Yes.
3  **Q.**   And you were an addict by anybody's standards, weren't
4  you, sir?
5  **A.**   Yes.
6  **Q.**   And you're an addict who's been on the street a year and
7  a half since you walked out of the drug program, right?
8  **A.**   Yes.
9  **Q.**   And the prosecution knows -- well, you lied to them
10  initially, but in the interim, they didn't know that you were no
11  longer in a drug program, right?
12  **A.**   Yes.
13  **Q.**   And you're still not even drug testing, are you?
14  **A.**   No, sir.
15  **Q.**   So we have your word in this trial that the only times
16  you've used drugs in the last year and a half was two times that
17  you smoked marijuana, right?
18  **A.**   Yes, sir.
19  **Q.**   And you acknowledge -- and I think it was Mr. Purpura's
20  examination -- that the only way to test that would be with a
21  drug test, right?
22  **A.**   Yes, sir.
23  **Q.**   And of course you had to leave the program because you
24  couldn't stop using drugs, right?
25       MS. PETALAS:  Objection, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    THE COURT:  Sustained.  But you can rephrase.
2  BY MR. ZUCKER:
3    **Q.**    Why'd you leave the program?
4    **A.**    I left the program.  I just left.
5    **Q.**    The question is why.
6    **A.**    I just left the program.
7    **Q.**    So you could use drugs, right?
8    **A.**    I just left the program.
9    **Q.**    Well, didn't you tell us last week that you left the
10  program after you used drugs, right?
11    **A.**    Yes.
12    **Q.**    So you were still using drugs in the program, right?
13    **A.**    I had a relapse in the program once.
14    **Q.**    Okay.  Well, they don't throw you out of the drug program
15  for one relapse, do they, sir?
16    **A.**    No.
17    **Q.**    And they never threw you out of this program, did they?
18    **A.**    No, sir.
19    **Q.**    You voluntarily left, right?
20    **A.**    Yes, sir.
21    **Q.**    Because you didn't want to stop using drugs?
22    **A.**    I'm not going to give any specifics of why I left.
23    **Q.**    Notwithstanding whatever the reasons were, the government
24  has allowed you to remain on the streets.  What level of
25  supervision are you on now?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    MS. PETALAS:  Objection, Your Honor.  May we approach?
2    THE COURT:  Yes.
3    (Following sidebar discussion had on the record:)
4    MS. PETALAS:  I'm objecting -- he's allowed to get his
5  understanding of what it is, but to continue "the government is
6  allowing you" -- as I've informed counsel, we have filed a motion
7  with this court to modify the conditions of release.  To continue
8  that we're just letting him stay out on the street when they know
9  otherwise is -- that's what I'm objecting to, the form of the
10  question.
11    MR. ZUCKER:  Judge, we've never seen -- I have heard
12  there's a motion.  We've never been privy to it.  I don't know
13  what's going on.
14    MS. PETALAS:  We have turned over that motion.  And
15  Mr. Mazzitelli isn't here today, but I know we turned over copies
16  of that motion to defense counsel.
17    MR. ZUCKER:  I know there's a motion pending.  I certainly
18  haven't seen any factual allegations.  I think there was a motion
19  pending to change conditions, but there was nothing that I've
20  seen -- and maybe I didn't see the whole thing -- that talks
21  about modification.
22    In any event, it's been 17 or 18 months since he moved
23  away from the program and by his own admission, he's not drug
24  tested.
25    THE COURT:  So what is the point?  The question implied

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  that the government has done nothing while he's been out on the
2  street despite the fact that he has violated his conditions.
3  What is the point of your question?
4    MR. ZUCKER:  The point is he's being allowed by the
5  government to stay on the street.
6    THE COURT:  Well, then, that's sustained.
7    MR. ZUCKER:  Okay, can I ask through the Court when this
8  motion was filed?  I've never seen it.
9    THE COURT:  No.  Sustained.
10    (Sidebar discussion concluded.)
11    MR. ZUCKER:  Moment to consult.
12    (Brief pause in proceedings.)
13    MR. ZUCKER:  Could I approach with Ms. Petalas?
14    THE COURT:  Yes.
15    (Following sidebar discussion had on the record:)
16    MR. ZUCKER:  I've just been handed a copy of what I think
17  was under seal and we don't have any particulars, but according
18  to this, it was an unposed motion for a hearing regarding
19  conditions of release that was filed March 20th of 2007.
20    I would like to explore that nothing was done until that
21  date, that he was allowed to stay out, because I recognize it's
22  right up against the area.  Rather than asking in front of the
23  jury, I asked to approach.
24    MS. PETALAS:  That's fine, Your Honor.  My objection was
25  based on the fact that -- yes, that's fine.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    (Sidebar discussion concluded.)
2    MR. ZUCKER:  Excuse me.  It's under seal.  I'm at a loss
3  because I don't know what the points of authority or anything is.
4  I don't know what the request is.
5    THE COURT:  If you want to confer, you can do it away from
6  the bench.
7    MR. ZUCKER:  Moment to consult, please.
8    (Discussion had off the record.)
9    (Sidebar discussion concluded.)
10    MR. ZUCKER:  If I could proceed while the government is
11  doing that, I'll move into another area and come back.
12  BY MR. ZUCKER:
13    **Q.**    Sir, when you testified in that trial in April, you also
14  denied to that jury that you were using drugs at all; isn't that
15  correct?  That you had ever used drugs since you were released?
16    **A.**    Yes.
17    **Q.**    That was a lie, wasn't it?
18    **A.**    Yes.
19    **Q.**    Okay.  Or that was another lie you told that jury, right?
20  Right?
21    **A.**    What's the first lie?
22    **Q.**    First, second, third, which do you want?  There's the lie
23  about being in the program, the lie about using drugs while you
24  were in the program, the lie about testing weekly.
25    **A.**    Okay.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11055

1  Q.    What effect does PCP have on you after years and years of
2  abuse, sir?
3       MS. PETALAS:  I'm going to object as asked and answered by
4  other attorneys.
5       THE COURT:  Sustained.
6  BY MR. ZUCKER:
7  Q.    You also used heroin pretty regularly throughout that
8  period until you were 22, didn't you, sir?
9  A.    Yes, sir.
10 Q.    Several times a week?
11 A.    Yes, sir.
12 Q.    And you used that -- basically, you used drugs from the
13 time you were 12 or 13 every day pretty much all day until you
14 were arrested when you were 22, except when you were
15 incarcerated, right?
16 A.    Yes, sir.
17 Q.    And that included Ecstasy pills, right?
18 A.    Yes.
19 Q.    X pills?  That was the last drug you were getting into
20 before you got arrested; isn't that correct, sir?
21 A.    Dope was the last drug I was getting into before I got
22 arrested.
23 Q.    "Dope" being heroin?
24 A.    Yes.
25 Q.    Okay.  Incidentally, you told this jury you tried dope

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11056

1  because of your father, right?
2  A.    Right.
3  Q.    But you actually didn't just try it.  You didn't just
4  taste it.  You used dope -- you used heroin pretty regularly for
5  years, right?
6  A.    Yes.
7  Q.    So it wasn't a case where you just wanted to try it to
8  see what happened to your father.  You were pretty much getting
9  addicted to heroin, weren't you, sir?
10 A.    I tried it and I liked it.
11 Q.    And so you kept doing it right?
12 A.    Yes, sir.
13 Q.    Pretty much several days a week?
14 A.    Yes.
15 Q.    Several times a day?
16 A.    Yes.
17 Q.    And of course, while you're doing that, you're also
18 smoking boat, smoking weed, doing every drug in the book except
19 cocaine, right?
20       Except crack cocaine, right?
21 A.    Right.
22 Q.    Did you do powder cocaine?
23 A.    I never sniffed powder in my life.
24 Q.    All right.  Now, you already acknowledged, sir, that the
25 symptoms you've shown physically here are consistent with some

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11057

1  of the symptoms for people using Ecstasy; isn't that correct?
2       MS. PETALAS:  Objection, Your Honor.
3       THE COURT:  Sustained.
4  BY MR. ZUCKER:
5  Q.    All right.  In response to Mr. Purpura's questions, you
6  acknowledged that yes, you've been sweaty; yes, you've been
7  talking a lot; yes, you've had to take off your shirt and
8  basically feeling sweaty during the course of this trial, right?
9  A.    Do you want to feel my hands?
10 Q.    Not particularly.  But why don't you answer my question?
11 That's what you testified to, right?
12 A.    Yes.
13 Q.    And you acknowledged that those are all symptoms
14 consistent with people who are using X pills, right?
15 A.    What?  Talking?  Nervous?  I mean, what are you saying?
16 Like I don't -- what are you saying?
17 Q.    Did you understand my question?
18 A.    No.
19 Q.    All right.  When Mr. Purpura asked you, you acknowledged
20 that those are symptoms that are similar to people who are using
21 Ecstasy, right?
22 A.    Right.  If --
23 Q.    Now, Ecstasy -- I mean, the reason you feel high on
24 Ecstasy, you learned from your drug classes, Ecstasy is also a
25 diuretic, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11058

1       Do you know anything about diuretics?
2  A.    I don't know what you're talking about.
3  Q.    People on Ecstasy generally will drink a lot of water.
4  They have to keep themselves hydrated to stay high.  It makes
5  you very thirsty.
6  A.    I never -- I drunk one bottle of water and then to the
7  liquor.
8  Q.    Huh?
9  A.    I said I drink a bottle of water and then straight to the
10 liquor.
11 Q.    I'm talking about when people are using Ecstasy --
12 A.    I'm talking about me.  You're not saying me.  We're
13 talking about me here.  I drink a bottle of water with a pill
14 and then after that, liquor.
15 Q.    In your experience from people you've seen and what you
16 learned from your drug classes, people who use Ecstasy, while
17 they're using it and afterwards, have to drink a lot of water
18 and go to the bathroom a lot, don't they?
19       MS. PETALAS:  Objection, Your Honor.
20       THE COURT:  Sustained.
21 BY MR. ZUCKER:
22 Q.    Do you have any experience with yourself or other people
23 using Ecstasy and having to go to the bathroom frequently,
24 drinking lots of water?
25       MS. PETALAS:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11079

1   **A.**   I don't know about that.

2   **Q.**   You didn't know about that?

3   **A.**   I don't know nothing about that.

4   **Q.**   You didn't know he was generally regarded as someone who

5 generally cooperated with the police making undercover buys and

6 testifying for the Court back in '95 or '96?

7   **A.**   I don't know nothing about that.

8   **Q.**   You never heard that before?

9   **A.**   Never.

10   **Q.**   Okay. Let's return to the day of the Black murder. You

11 said you were riding around with Black basically neighborhood to

12 neighborhood looking for somebody to rob and looking for weed;

13 is that correct?

14   **A.**   Yes, sir.

15   **Q.**   Okay. And that's when you saw DC, right?

16   **A.**   Yes, sir.

17   **Q.**   And I don't want to go into great detail, but basically

18 Black said something to the effect of "I should jump out and

19 kill that guy right here now," right?

20   **A.**   Right.

21   **Q.**   And you told him don't do it, right?

22   **A.**   Right.

23   **Q.**   And the reason you told him was you didn't want him doing

24 it with your car, right?

25   **A.**   We was going to go to jail.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11080

1   **Q.**   You said you "didn't want him doing that shit in your

2 car," were your exact words here, right?

3   **A.**   No, my exact words: "You not doing that shit out of my

4 car."

5   **Q.**   Okay. Out of your car. So you weren't opposed to Black

6 killing DC, you just didn't want your car involved?

7   **A.**   Right. If he was going to kill DC, he wasn't going to do

8 it on my time.

9   **Q.**   And, of course, after Black was shot after you already

10 acknowledged you came out and were yelling about your car, what

11 happened to my car, right?

12   **A.**   Right.

13   **Q.**   Okay. The man who you've described as your best friend

14 was shot bleeding and dying and you said not one word about

15 that, right?

16   **A.**   Yes, I did.

17   **Q.**   Well, what you've told us when you came out and saw your

18 car shot up -- you were all upset saying "what the fuck happened

19 to my car," words to that effect, right?

20   **A.**   Correct.

21   **Q.**   Absolutely nothing about Black initially?

22   **A.**   Yes, I did. I said, "look at my motherfucking car.

23 Where the fuck Black at? Damn, where the fuck Shorty go? Look

24 at my motherfucking car."

25   **Q.**   Well, why were you saying -- let's go back a second.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11081

1 You're concerned about your car, but you've told us you had seen

2 Dom shooting Black or somebody you claim is Dom shooting Black

3 when you came out of the apartment, didn't you?

4   **A.**   Yes, sir.

5   **Q.**   And so at the same time you see your best friend in the

6 world getting shot, your car is all shot up, and the only thing

7 you're concerned about is, what the F happened to my car, right?

8   **A.**   No, sir.

9   **Q.**   Well, those are the words out your mouth at that time,

10 right?

11   **A.**   That's what first came out of my mouth, "look at my

12 motherfucking car."

13   **Q.**   Not look at my M-F'ing friend who's been shot?

14   **A.**   I said, "look at my motherfucking car. Look at this

15 shit. Fuck. Fuck. Where the fuck Black go? Damn, where the

16 fuck -- I was like Shorty, man, move --" I had his gun right

17 here. I was like, "Shorty, move the gun." Moved the gun.

18 "Move your car." Moved my car. "Where the fuck Black at?

19 Black, Black, Black, Black, Black" "He down the hill." I went

20 down the hill.

21   **Q.**   All right. Let's turn to earlier that day. You said you

22 were driving around with him and you see a woman you don't know,

23 right?

24   **A.**   Yes, sir.

25   **Q.**   And you had a conversation with her, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11082

1   **A.**   Yes, sir.

2   **Q.**   And the gist of the conversation, as you related to us in

3 this trial, is "what's up, Shorty? Let me holler at you." And

4 then you say, "What's up with you?" Her response is, "What's up

5 with you?" And then you say, "What are you trying to do?" And

6 she says, "whatever you trying to do," right?

7   **A.**   True.

8   **Q.**   And that's basically -- the whole conversation all

9 related about the conversation with her; is that correct?

10   **A.**   We really didn't have too much words.

11   **Q.**   That was pretty much it, right?

12   **A.**   Yes.

13   **Q.**   Pretty smooth rap you had going, huh?

14   **A.**   I would say I was a ladies' man.

15   **Q.**   You were a ladies' man?

16   **A.**   Yes.

17   **Q.**   Still are?

18   **A.**   No.

19     MS. PETALAS: Objection.

20     THE COURT: Overruled.

21 BY MR. ZUCKER:

22   **Q.**   And based on that exchange, this woman you've never seen

23 in the world gets in the car with you, right?

24   **A.**   Yes.

25   **Q.**   I just want to make sure. You're not only -- you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11083

1    acknowledge you're a ladies' man, but you're also a very brave
2    man based on what you've done, right, with standing up to all
3    these men with guns?
4         MS. PETALAS:  Objection, Your Honor.
5         THE COURT:  Sustained.
6    BY MR. ZUCKER:
7    Q.    Well -- and after this smooth exchange you have with this
8    woman, because you're such a ladies' man, she goes to go with
9    you to Nina's apartment, correct?
10   A.    Kena's apartment.
11   Q.    I'm sorry, did I say -- it's Kena not Nina?
12   A.    Right.
13   Q.    But that's what happened, right?
14   A.    Right.
15   Q.    And you wanted to -- your exact words to this jury was "G
16   her out," right?
17   A.    Right.
18   Q.    What does "G" mean?
19   A.    Well --
20   Q.    Gang rape, right?
21   A.    No.
22        MS. PETALAS:  Objection, Your Honor.
23   BY MR. ZUCKER:
24   Q.    G means gang, doesn't it?
25   A.    Look, I don't know the specifics of where you're going at

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11084

1    with "G her out."  "Look, it's just a term of words we use.  If
2    it's one or two men or it was three men with a broad, she trying
3    to roll, we going to G her out right fast or run a train on her.
4    Q.    So, you wanted to -- run a train means what, gang rape
5    her, right?
6    A.    Where do you keep getting this rape from?
7    Q.    What does G her out, mean?  It means gang her, right?
8    A.    Yes.
9    Q.    Did she say, you're so smooth -- I mean, her words to you
10   were "whatever you trying to do."  Did she ever say I want you
11   to gang rape me with all of your friends?
12        MS. PETALAS:  Objection, Your Honor.
13        THE COURT:  Sustained.
14   BY MR. ZUCKER:
15   Q.    Did she say anything about I want to pull a train with
16   you and all your friends?
17   A.    Uh, that we talked about in the room, like when we going
18   where we going--
19   Q.    She never got to the room, did she?
20   A.    No.
21   Q.    So you told us you were already planning on ganging her,
22   right?
23   A.    Yes.
24   Q.    You even went so far to get six or seven condoms from the
25   truck so that you could gang her with all your friends --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11085

1    A.    Yes.
2    Q.    -- or anybody you wanted to invite to the party or
3    charge, right?
4    A.    I don't know about charge.
5    Q.    Sir, she never said anything about wanting to have sex
6    with you or any of your friends, did she?
7    A.    No.
8    Q.    But that was your plan, get her up there, gang her,
9    right?
10   A.    Uh, no.
11   Q.    Isn't that what you told us?
12   A.    You're trying to make it seem like I was going to get her
13   up there and rape her.  That's what you're trying to make it
14   seem like, and that's not the situation.
15   Q.    Well, what was the situation?  What does G her out mean?
16        MS. PETALAS:  Objection, Your Honor, asked and answered
17   several times.
18        THE COURT:  Sustained.
19   BY MR. ZUCKER:
20   Q.    The girl was a teenager?
21   A.    I don't know how would she was.
22   Q.    Well, you told us --
23   A.    She might have been in her teens.
24   Q.    All right.  So, did this teenager ever say she wanted to
25   have sex with you and multiple partners?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11086

1         MS. PETALAS:  Objection, asked and answered.
2         THE COURT:  Sustained.
3    BY MR. ZUCKER:
4    Q.    Sir, the only reason that woman wasn't gang raped was
5    because of what happened with Black?
6         MS. PETALAS:  Objection, Your Honor.
7         THE COURT:  Sustained.  Move on.
8    BY MR. ZUCKER:
9    Q.    Tenay Gross, I think was the name of the 14-year old you
10   were involved with, right?
11   A.    Yes.
12   Q.    You told us her mother put you out of the house?
13        MS. PETALAS:  Objection, Your Honor, asked and answered.
14        THE COURT:  I'll allow it.
15        THE WITNESS:  You said she put me out the house?  Yeah,
16   she put me out the house.
17   BY MR. ZUCKER:
18   Q.    Because you were having sex with her 14-year-old
19   daughter, right?
20   A.    No.
21   Q.    You mentioned -- you talked to Mr. Purpura for a few
22   minutes about Detective Faison.  Do you remember him?
23   A.    Yes.
24   Q.    And he was the one that was friends with Boy-Boy, right?
25   A.    Right.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*11091*

1　　Troy Lewis murder, and I'll try not to cover areas that have
2　　been covered by other counsel.
3　　　　But preliminarily, you agree, you never saw what
4　　happened, right?
5　A.　Right.
6　Q.　And you claim you came on the scene and you saw the
7　　police open the door, right?
8　A.　Right.
9　Q.　And you actually saw Troy come out, fall out of the car
10　dead, right?
11　A.　Right.
12　Q.　And this was in broad daylight, right?
13　A.　Right, to my recollection. Did I say -- I can't remember
14　if I said broad daylight or not.
15　Q.　What did you say? I didn't hear you?
16　Q.　Repeat your question.
17　Q.　Sure. It was in broad daylight.
18　A.　Okay.
19　Q.　And you literally, with your own eyes, saw his brains
20　coming out of his head, as you've told this jury, right?
21　A.　Yes.
22　Q.　Okay. This was not an hallucination you had on the
23　scene, was it?
24　A.　I mean, I'm not -- no. I wasn't hallucinating. No, I
25　wasn't hallucinating, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11092*

1　Q.　Well, you hesitated for a moment there, didn't you?
2　A.　Huh?
3　Q.　Did you just hesitate when I asked you whether or not it
4　　was an hallucination, about seeing the brains coming out of the
5　　house -- out of the head?
6　A.　What you mean, "hesitated," like, how you trying to put
7　　it? Like, I don't get what you saying about "hesitation."
8　Q.　I said you saw this in broad daylight, the brains coming
9　　out of his head, and I said that wasn't hallucination, you
10　actually saw it, right?
11　A.　Yes.
12　Q.　You hesitated for a moment before you answered me, right?
13　A.　I'm -- like -- you're saying I answered your question,
14　you keep putting "hesitating" right there, I answered your
15　question, sir.
16　Q.　You looked at the autopsy. Do you have any explanation
17　how the medical examiner could have missed the bullets in the
18　head and the brains coming out?
19　A.　I'm not a doctor, sir. I don't -- I just seen what I
20　seen. I don't know if that was --
21　Q.　Are you done?
22　A.　No.
23　Q.　Go ahead.
24　A.　I'm not a doctor, as you were saying. I'm not sure,
25　like, what medical terms or whatever you'll use. When they

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11093*

1　opened the door, that's what they looked like it was.
2　Q.　Well, a few moments ago, you were sure you saw the brains
3　coming out of the -- as a matter of fact, prior to seeing the
4　autopsy, you claimed you were sure you had actually seen the
5　brains coming out of his head?
6　　　MS. PETALAS: Objection, Your Honor, asked and answered,
7　and I think it mischaracterizes his testimony.
8　　　THE COURT: Sustained.
9　BY MR. ZUCKER:
10　Q.　My question is: Do you have any explanation as to how
11　that could have occurred?
12　　　MS. PETALAS: Objection, Your Honor.
13　　　THE COURT: Sustained.
14　BY MR. ZUCKER:
15　Q.　Now, you had a conversation sometime later where you
16　claimed Twan was bragging to you about how he committed this
17　murder; is that correct?
18　A.　Yes.
19　Q.　When was that, do you recall? How much later?
20　A.　I can't recall. Like, sometime after the murder.
21　Q.　The day after, a week later?
22　A.　Look, you going in dates and times?
23　Q.　No, I'm asking how much after.
24　A.　I don't know. A month, two weeks, I don't know. Like,
25　two or three weeks. I don't know. Like -- I don't know all the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11094*

1　times and dates and what days was after the murder and all that.
2　Q.　And you demonstrated in this courtroom, what you claim
3　Twan demonstrated out on the street, with Mr. Carney, didn't
4　you?
5　A.　Yes.
6　Q.　And, in particular, how -- according to you, Twan told
7　you he put two in the windshield and then over to the passenger
8　window, shot through there, right?
9　A.　Driver window, not passenger.
10　Q.　Sorry. Sorry. Thank you. Driver's window, shot through
11　there, right?
12　A.　Right.
13　Q.　And then literally put his hands inside the car and shot
14　Troy in the mouth and emptied his clip in his mouth and his
15　head, right?
16　A.　That's what your -- that's what Twan was saying.
17　Q.　That he literally put his hand in the car, shot him in
18　the mouth and the head, emptied his clip in the head, right?
19　A.　Um-hmm.
20　Q.　All right. And you saw the gun on the scene. It was an
21　automatic, right?
22　A.　What gun on what scene? I never seen the shooting.
23　Q.　After the shooting, you saw a gun on the scene. Do you
24　know if that was the murder weapon?
25　A.　No, I don't.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*11095*

1  Q.    Do you know whether it was -- well, you knew it was an
2  automatic somehow, didn't you, sir?  Not a revolver?
3  A.    What automatic gun?
4  Q.    You don't know what I mean by an "automatic" --
5  A.    Yes, I do.
6  Q.    -- versus a revolver?
7  A.    Yes, sir.
8  Q.    Okay.  The kind, the clip and it ejects, right?
9  A.    Yes.
10 Q.    And that's what Twan claimed to have used that night or
11 somehow you knew he used, right?
12 A.    I don't know what gun he used.
13 Q.    You fired automatics, right?
14 A.    Yes.
15 Q.    And the shell gets ejected from the side, right?
16 A.    Yes.
17 Q.    Okay.  Did Twan ever tell you he went into the car and
18 pulled the shell casings out?
19 A.    No, sir.
20 Q.    Can you explain how the shell casings -- if somebody
21 reached through the window, how the shell casings aren't found?
22       MS. PETALAS:  Objection, Your Honor.
23       THE COURT:  Sustained.
24 BY MR. ZUCKER:
25 Q.    Did anyone ever claim they went into the car after that

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*11096*

1  shooting and took the shell casings out?
2  A.    No, I never heard that, sir.
3  Q.    Do you know whether or not there were shell casings
4  inside the car?
5  A.    I don't know.
6        MS. PETALAS:  Objection.
7        THE COURT:  He can answer yes or no.
8        THE WITNESS:  Yes.
9        THE COURT:  Now, showing you what's already -- I'm sorry.
10       MR. ZUCKER:  Ms. Romero, if I could get your help for a
11 second with the ELMO.
12       THE COURT:  What is it?
13       MR. ZUCKER:  500 F and B admitted in the government's
14 case, 500 F and B.  It's agreed that these are both admitted.
15 BY MR. ZUCKER:
16 Q.    Let me see if I can get the contrast a little better,
17 sir.
18       Can you see that, sir?
19 A.    Yes.
20 Q.    Do you recognize that as the car that was on the scene?
21 A.    I can't recognize --
22 Q.    This is 500 F.
23       Do you recognize that as the car on the scene?
24 A.    I can't recognize what type of car that is right there.
25 Q.    Let me take -- here.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*11097*

1        Let me approach and show you in person.
2        MS. PETALAS:  Your Honor, I object.  May we approach?
3        THE COURT:  Yes.
4        (Following sidebar discussion had on the record:)
5        MS. PETALAS:  He testified that he was across the street
6  from the scene afterwards.  He did not ever testify about seeing
7  the actual car and what it looked like.  So showing him pictures
8  of the car -- he testified he wasn't there for the murder.  He's
9  basically trying to impeach him on what Antwan told him.  He's
10 never claimed personal knowledge that these photographs are what
11 the car looked like after the shooting.
12       THE COURT:  But his testimony was, he saw the officers
13 open the door and saw what he described.  Why is it improper for
14 Mr. Zucker to show him a photograph of what purports to be the
15 car door, presumably that he saw the police open?
16       MS. PETALAS:  The basis is he's trying to -- that he -- he
17 never testified that he saw the police open the door.  He never
18 testified about the condition of the car and that he looked and
19 saw the condition of the car.  I guess -- my problem is that he's
20 trying to impeach him on something that's based -- his knowledge
21 of this is based on what Antwan said and he's trying to impeach
22 him on what Antwan said, and he's never claimed to have personal
23 knowledge about that.  And that's the basis of my objection.
24       THE COURT:  I'm not sure impeachment is what's going on,
25 but you can certainly clear all this up on redirect if you want

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

*11098*

1  to.
2        Anything else?
3        MS. PETALAS:  No, Your Honor.
4        (Sidebar discussion concluded.)
5  BY MR. ZUCKER:
6  Q.    Showing you what's already in evidence as 500 F.
7        You recognize that as a photograph, don't you, sir?
8  Let's start with that.
9  A.    Yes.
10 Q.    And you recognize it as a photograph of a car window, do
11 you not?
12 A.    Yes.
13 Q.    And you recognize it -- it appears to be the driver's
14 side window, does it not?
15 A.    Yes.
16 Q.    And it appears to have several holes through it
17 consistent with gun shots, correct?
18 A.    Yes.
19 Q.    But it's certainly not broken, correct?
20 A.    No.
21 Q.    And similarly -- and certainly nobody could have reached
22 through that window into a car and fired a gun, unless they
23 rolled the window back up and down afterwards, right?
24 A.    Right.
25 Q.    Okay.  And similarly, looking at 500 B, that's a

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

USCA Case #11-3031    Document #1445852

1  distance -- let me just put that on while you're looking at
2  that.
3       I'll just put 500 F on the ELMO, if I could.
4       500 B you recognize as a photograph taken from a further
5  distance away of the same car, or at least it appears to be,
6  does it not?
7  **A.**   Yes.
8  **Q.**   And that is -- you recognize that as the car that
9  Troy Lewis was killed in, don't you?
10 **A.**   Yes.
11 **Q.**   Was that a yes?
12 **A.**   Yes, sir.
13 **Q.**   And the window appears to be the same in that, does it
14 not?
15 **A.**   Yes, sir.
16 **Q.**   The one I put on the ELMO is the one you just looked at,
17 right, sir?
18 **A.**   Yes, sir.
19 **Q.**   Now, you claim that L told LT -- I'm moving off of
20 that to the D-Lock murder for a second.
21      You had conversations with LT and Munya after that; is
22 that correct?
23 **A.**   Yes.
24 **Q.**   Okay.  And you told us that Munya said he shot D-Lock,
25 right?

---

Filed: 07/10/2013    Page 1503 of 1954

1       MS. PETALAS:  Objection, Your Honor.
2       THE WITNESS:  No.
3  BY MR. ZUCKER:
4  **Q.**   Was that LT?
5       THE COURT:  Hold on a second, there's an objection.
6       MR. ZUCKER:  I'll rephrase.
7       THE COURT:  Excuse me.  Stop when there's an objection.
8  Don't keep questioning.  When there's a question, you need to
9  stop, because I need to hear what it is.  What's that?  What's
10 the objection?
11      MS. PETALAS:  It calls for hearsay.  I don't think he
12 testified prior about conversations with Munya.
13      THE COURT:  All right.  Sustained.
14      Put your next question.
15 BY MR. ZUCKER:
16 **Q.**   It was actually LT that told you Munya shot D-Lock first,
17 right?
18 **A.**   Yes, sir.
19 **Q.**   And LT told you he shot D-Lock's face off, stood over him
20 and emptied a clip into his face, right?
21 **A.**   Yes.
22 **Q.**   You're aware that D-Lock was not shot in the face, sir,
23 have you seen the autopsy?
24 **A.**   That's what he told me, sir.
25 **Q.**   Okay.  So, we have two men confessing murders to you and

---

1  giving you details about how they committed them, which is
2  inconsistent with the physical evidence in the case, right?
3       MS. PETALAS:  Objection, Your Honor.
4       THE COURT:  Sustained.
5  BY MR. ZUCKER:
6  **Q.**   Well, certainly, do you make that -- you've seen the
7  autopsy of Lewis, right?
8  **A.**   Yes.
9  **Q.**   And you're aware there's no gunshot wounds to his face
10 nor head, right?
11 **A.**   No, sir.
12      MR. ZUCKER:  Okay.  Moment to consult.
13      (Discussion had off the record.)
14 BY MR. ZUCKER:
15 **Q.**   You claim you had -- you told us, I guess it was
16 Wednesday, you had a conversation with my client about him
17 claiming to have shot Linwood Carpenter; is that correct?
18 **A.**   Yes.
19 **Q.**   Have you told us everything about what he said in that
20 conversation, as best you can recall?
21 **A.**   As best I can recall.
22 **Q.**   Why don't you review it for me one more time.  What did
23 he tell you?
24 **A.**   He shot Linwood with a .44.
25 **Q.**   Okay.  And when did this happen?

---

1  **A.**   I don't know when that happened.
2  **Q.**   You don't know when the conversation was?
3  **A.**   No, sir.
4  **Q.**   Do you know when the shooting supposedly occurred?
5  **A.**   No, sir.
6  **Q.**   How much after the shooting did the conversation occur?
7  **A.**   I can't remember.
8  **Q.**   Was it -- but it was after the fact.  Do you know if it
9  was the same day?
10 **A.**   I can't remember if it was the same day, a week from then
11 or a month from then.  I can't remember, sir.
12 **Q.**   Okay.  So sometime after the shooting, he comes up to
13 you -- you and my client were never close, were you?
14 **A.**   Me and Dazz was cool.
15 **Q.**   You've talked about all these robberies and stuff you
16 committed, you never mentioned Dazz in any of those, did you?
17 **A.**   No.  I don't know -- I might have robbed somebody with
18 Dazz.  I can't remember.
19 **Q.**   You just forgot?  I mean -- all right.  And he comes up
20 to you afterwards and he says, "I shot Linwood with a .44" -- or
21 "I hit Linwood with a .44," right?
22 **A.**   Are you saying, did he come to me?
23 **Q.**   Yeah, afterwards, and say that?
24 **A.**   Naw, it was just in general conversation with everybody.
25 **Q.**   Okay.  You were present when he has this -- he makes a

---

## 11111

1  to prison; isn't that correct, sir?

2  **A.**  Yes, sir.

3  **Q.**  I'm sorry?

4  **A.**  Yes.

5  **Q.**  Let me back up a second.  You said you were on the fourth

6  floor, right?  That's when you went to tell them?

7  **A.**  What?

8  **Q.**  Did you just say something about the fourth floor?

9  **A.**  Yes, I did.

10  **Q.**  And that's the fourth floor at CTF, right?

11  **A.**  Yes.

12  **Q.**  Fourth floor is the cooperators unit, right?

13  **A.**  Right.

14  **Q.**  Everybody in there was cooperating, right?

15  **A.**  Right.

16  **Q.**  So you had already agreed to cooperate in exchange for

17  benefits, when you decided to tell them, right?

18  **A.**  It wasn't really no benefits.  I was going to cooperate.

19  Whatever he spoke up at sentencing, that's what he spoke up at

20  sentencing.  It wasn't no -- did he promise to let me go or the

21  government promise to let me go or the judge had someone under

22  the table to let me go, none of that.

23  **Q.**  It was several years after Black was killed, wasn't it?

24  **A.**  What, that I --

25  **Q.**  You finally told them about Black.  When you cut the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 11112

1  deal, you were already on the fourth floor?

2  **A.**  Uhm, I don't know no years, maybe months.

3  **Q.**  The stuff about, you had already decided to tell them.

4  You were just waiting until you were ready, that was just

5  another crock of garbage, wasn't it, sir?

6  **A.**  Naw, I was going to tell them.

7  **Q.**  You were going to tell them, but you never got around to

8  it, until there was something in it for you, right?

9  **A.**  Let me see --

10  **Q.**  Can you pull the mic a little closer, please.

11  **A.**  Yes.

12  **Q.**  Okay.  And you're here trying to avoid going back to

13  prison for 30 to life, right?

14  **A.**  Yes.

15  **Q.**  And you know, in order to do that, you have to get a 5K

16  motion, right?

17  **A.**  Yes.

18  **Q.**  And that was, of course, something given to you by the

19  government, correct?

20  **A.**  Correct.

21  **Q.**  Not by anyone else.  Only they can give it to you, right?

22  **A.**  Right.

23  **Q.**  And that's based upon you providing substantial

24  assistance in the prosecution of someone else, isn't it, sir?

25  **A.**  I guess so.  I don't know, like, the specifics of the 5K1

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 11113

1  and all what you say.  I don't know.

2  **Q.**  You don't know all the specifics?

3  **A.**  Of a 5K1?

4  **Q.**  Yeah.

5  **A.**  A 5K1.

6  **Q.**  My question is this -- the question only is this:  They

7  decide whether or not you get it, and it's based on their

8  decision that you have provided substantial assistance in the

9  prosecution of someone else; isn't that correct?

10  **A.**  Yes.

11  **Q.**  And of course, if you don't provide substantial

12  assistance in the prosecution of someone else, then you don't

13  get a 5K from the government, do you?

14  **A.**  No.

15  **Q.**  And then the Judge has no choice but to lock you up for

16  30 to life, right?

17  **A.**  Yes.

18  **Q.**  Now, you've apologized several times for your language --

19  a few times for your language in this Court, right?

20  **A.**  Yes.

21  **Q.**  Because you recognize that it was inappropriate for a

22  court; isn't that correct?

23  **A.**  Yes, sir.

24  **Q.**  And as a matter of fact, you recognize that in part,

25  because you were chastised by Judge Lamberth in the last trial

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 11114

1  for your language in the courtroom, weren't you?

2  MS. PETALAS:  Objection, Your Honor.

3  THE WITNESS:  Yes.

4  THE COURT:  Sustained.

5  BY MR. ZUCKER:

6  **Q.**  Were you able to control yourself in this testimony as

7  far as your language, sir?

8  MS. PETALAS:  Objection, Your Honor.

9  THE COURT:  Sustained.

10  BY MR. ZUCKER:

11  **Q.**  Sir, I'm not going to go over it again, but you

12  acknowledge that for ten years straight, you basically used

13  every drug in the book, virtually every day, or almost every

14  day, right?

15  **A.**  Yes.

16  **Q.**  Okay.  Have you suffered any brain damage or neurological

17  impairment?

18  **A.**  I wouldn't know, sir.

19  **Q.**  You wouldn't know?  You've been tested, haven't you, sir,

20  by psychologists at CTF?

21  **A.**  I guess so, yes.

22  MS. PETALAS:  Objection, asked and answered, I believe, by

23  another attorney.

24  THE COURT:  Overruled.

25  BY MR. ZUCKER:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11119

1    2002, you had said, "Don't put me in CTF."
2    Q.    Do you recall that?
3    A.    Yes.
4    Q.    And why didn't you want to go into CTF?
5    A.    I didn't want to be exposed.
6    Q.    Didn't want to be exposed how?
7    A.    As a cooperator.
8    Q.    And why not?
9    A.    Because I was dead.
10   Q.    What do you mean you were "dead"?
11   A.    I was a dead man walking.
12   Q.    Do you recall the questions about the Troy Lewis murder?
13   Do you recall that?
14   A.    Yes.
15   Q.    Now, have you ever told anybody that you saw the Troy
16   Lewis murder?
17   A.    No.
18   Q.    Did you see the Troy Lewis murder?
19   A.    No.
20   Q.    I believe yesterday you testified you had came upon the
21   scene. Do you recall that?
22   A.    Yes.
23   Q.    I'm sorry, not yesterday, last week, you testified
24   that -- about where you were when you saw Troy Lewis being taken
25   out of the van. Do you recall that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11120

1    A.    Yes.
2    Q.    Did you walk up to the van?
3    A.    No.
4    Q.    Where did you stay?
5    A.    I was across the street.
6    Q.    And did you ever see the body close up?
7    A.    No.
8    Q.    Do you recall seeing any blood?
9    A.    Yes.
10   Q.    Did you ever walk up to the body to see where that blood
11   was coming from?
12   A.    No, ma'am.
13   Q.    Are you a medical examiner?
14   A.    No, ma'am.
15   Q.    And you talked about a meeting -- a conversation that you
16   walked up on, where Antwuan was talking about Troy Lewis. Do
17   you recall that?
18   A.    Yes.
19   Q.    And you testified about who was at that meeting. Do you
20   recall that?
21   A.    Yes.
22   Q.    And who specifically do you recall testifying at that
23   meeting?
24   A.    Twan.
25   Q.    And where was your attention focused when Twan was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11121

1    talking?
2    A.    I was paying attention to him.
3    Q.    Do you recall Truck saying anything at that meeting?
4    A.    I can't remember if Truck said something at that meeting
5    or not.
6    Q.    Other than Antwuan, was there -- I believe you testified
7    that Antwuan was talking about having killed Troy Lewis. At
8    that meeting, was anybody else talking about admitting to a
9    murder?
10   A.    Not to my knowledge, no.
11   Q.    And in that conversation when Antwuan was telling you
12   about what he did, did Antwuan tell you specifically where he
13   was aiming the gun?
14   A.    No, he just was, like, I put two through the windshield
15   and I came around and stuck my hand through the window. That's
16   what he was saying.
17   Q.    You also talked about robberies, I think on
18   cross-examination, that we used to do robberies. Who were the
19   people that you did robberies with?
20   A.    Black, Head, Tweety, Jo-Jo, Wop -- I don't think I robbed
21   anybody with Dazz or Twan ever. JT, Keith B, Phil.
22   Q.    And I think you also testified when somebody would make a
23   move, you'd come back and people would say "Break it off for
24   me?"
25   MR. ZUCKER: Objection, form.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11122

1    THE COURT: Overruled.
2    BY MS. PETALAS:
3    Q.    Somebody would say "Break me off." Do you recall that?
4    A.    Yes.
5    Q.    What do you mean by that? Explain that.
6    MS. WICKS: Objection, asked and answered.
7    THE COURT: Overruled.
8    BY MS. PETALAS:
9    Q.    Explain that.
10   A.    Like if you come back from a robbery and people know you
11   came back from a robbery, they be like, "get me" like -- they be
12   like -- you know, let me hold something, basically, off the
13   robbery.
14   Q.    What do you mean when they say "get me," what do you mean
15   by that?
16   A.    Give them some of the stuff that we robbed for.
17   Q.    When you said, "Let me hold something," what are you
18   talking about?
19   A.    The same term. You can use it in a different saying.
20   MR. MARTIN: Your Honor, objection.
21   THE WITNESS: Let me hold something, get me, it's all in
22   the same --
23   THE COURT: Hold on a second. When there's an objection,
24   I need to hear it.
25   MR. MARTIN: This is beyond the scope of any

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11123**

1 cross-examination.
2     THE COURT: Overruled.
3 BY MS. PETALAS:
4     Q. You can explain what you mean.
5     A. It's all in the same bracket. Get me or break me off, or
6 you passing off something you took, that's all.
7     Q. And did this happen when you committed robberies?
8     A. Yeah.
9     Q. And who were some of the people who would say that to
10 you?
11     A. Anybody, everybody.
12     MR. MARTIN: Objection, scope.
13     THE COURT: Overruled.
14 BY MS. PETALAS:
15     Q. Who were some of the people, if you can recall?
16     A. Wop -- everybody, the whole hood -- I mean, all of us.
17 You come back off a robbery, anybody be like, "Get me. Oh, you
18 came off, get me."
19     Q. And when these -- when they said this, did you give them
20 anything?
21     A. No. Like -- it be like -- like whoever you was rocking
22 with all day, that day, you was robbing, y'all broke it down or
23 like, if I went over -- me and Black robbed or whatever, I might
24 see JT and break JT off.
25     Q. You were also asked about -- do you remember the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11124**

1 testimony about John John and threats that John John overheard.
2 Do you recall that?
3     A. Yes.
4     Q. Did you ever talk to John John about that?
5     A. No.
6     Q. Who did you talk to about that, those threats?
7     A. Twan.
8     Q. And I believe you testified -- what did Twan tell you
9 about those threats?
10     A. They was trying to kill me and take over.
11     Q. You were also asked several questions about
12 Simple City Rob. Do you recall that?
13     A. Yes.
14     Q. And about how he had a gun but didn't shoot you. Do you
15 recall that?
16     A. Yes, ma'am.
17     Q. And who was your cousin at that time, when that happened?
18     A. Antwuan.
19     Q. Had you talked to Antwuan about this?
20     A. Yes.
21     Q. And what, if anything, did Antwuan say when you talked to
22 him about that?
23     A. He said he pulled up on Rob, but he was on some movie
24 shit. He was like, that dude faking, he ain't trying to do
25 nothing.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11125**

1     Q. Did Antwuan indicate to you whether or not he had talked
2 to Rob about this?
3     A. That's what he said. He said, "I seen the nigga at the
4 light and he was on some movie shit." Him and Black Jack was in
5 the car together.
6     Q. And why did you go talk to Antwuan about Rob?
7     A. Because that was my big cousin, like something -- like,
8 something go on, "Yo Twan, this what's up."
9     Q. And when you say something's going on, you go to Twan,
10 why is that?
11     A. That's something I always did, that's just something I
12 do. Like if I wanted to do something myself, I probably would
13 fucked up for it.
14     Q. I'm sorry what you did say?
15     A. I said if I probably would have initiated doing something
16 myself, I might have got boxed on, got fucked up myself.
17     Q. What do you mean by that?
18     A. Twan would flick off on me, like robbing, shooting, bust
19 off on me, you know.
20     Q. You were also asked questions by Mr. Martin about
21 successful drug dealers. Do you recall that testimony?
22     A. Yes.
23     Q. And I believe you testified -- in response to that, you
24 talk about where drug dealers end up. Do you recall that?
25     A. Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11126**

1     Q. And where are the drug dealers that you know have ended
2 up?
3     MS. WICKS: Objection, asked and answered.
4     MR. MARTIN: Objection also, Your Honor, mischaracterizes
5 my question. If we may approach?
6     THE COURT: Yes.
7     (Following sidebar discussion had on the record:)
8     MR. MARTIN: My question was specifically about hustlers.
9 Drug dealing was just one facet of it. And what counsel has done
10 now, she narrowed it down to just that one facet.
11     MS. PETALAS: I can -- my recollection is that he did talk
12 about hustlers, but in that actual instance they were -- for that
13 question they were referring to drug dealers.
14     MR. MARTIN: I was referring to hustling, which includes
15 not just drug dealing, it includes lying, deception, cheating,
16 stealing, it includes a whole bunch of things, Your Honor.
17     THE COURT: I think it's a fair line of inquiry, but do
18 you want to rephrase the question so that you can start with the
19 general and work your way down to the specifics?
20     MS. PETALAS: That's fine.
21     (Sidebar discussion concluded.)
22 BY MS. PETALAS:
23     Q. Let's take a step back.
24     Mr. Martin was talking about hustlers. Do you recall
25 that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 38

**Panel 1 (11629):**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : May 17, 2007 |
| DOMINIC SAMUELS, | : 9:15 a.m. |
| Defendants. | : |

VOLUME 52 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Panel 2 (11630):**

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:           Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:           James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:       Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:           Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Panel 3 (11631):**

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:        A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:         Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Panel 4 (11632):**

**MORNING SESSION, MAY 17, 2007**

1
2      (9:21 a.m.)
3          THE COURT:  All right.  Who's up next?
4          MR. LEON:  Your Honor, I think we just need to put that
5      stipulation on the record that we agreed to at the end of the day
6      and then we're going to call Robert Pough.
7          THE COURT:  Okay.  Are you ready for the jury?
8          MR. LEON:  Yes.
9      (Jury at 9:24 a.m.)
10         THE COURT:  Good morning, ladies and gentlemen.
11         THE JURY PANEL:  Good morning.
12         THE COURT:  Welcome back.  I wanted to inform you that for
13     scheduling issues, we're going to break for lunch at 12:30 today,
14     but the initial break will only be for 45 minutes, so I wanted to
15     let you know that for planning purposes.  It may be that you will
16     want to grab something and bring it back to eat it quickly
17     because we're going to resume testimony at 1:15.
18         What I will do to compensate for the shortened lunch break
19     is when we get to the point to take the next break, I will try to
20     expand it at that point.  I'm not sure what the timing of that
21     break will be, but in the event that any of you gets lunch, for
22     example, as a sandwich and brings it back up and you haven't had
23     a full enough time to finish it or you wanted to go out and take
24     some other break, I wanted to let you know that now.
25         So we're going to take our lunch break right at 12:30.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11633**

1 We'll come back to resume evidence at 1:15, but we'll try to make
2 up for the lost time in a more expanded break after that. All
3 right.
4     All right, counsel.
5     MS. PETALAS: Yes, Your Honor. With the agreement of the
6 parties, I'm going to move Government's Exhibit Number 807 into
7 evidence. It's the Marriott records, Oscar past guest
8 information for the Philadelphia Marriott on July 25th, 2002,
9 reservation --
10     MR. BALAREZO: Your Honor, objection. Can I approach?
11 May I approach?
12     THE COURT: Yes.
13     (Following sidebar discussion had on the record:)
14     MR. BALAREZO: Your Honor, I know the parties agreed that
15 the document should come into evidence. I don't have a problem
16 with that. But the document's in evidence. I object to the
17 government reading the document. It is what it is. Present it
18 to the jury. Put it on the ELMO.
19     But for her to read it and point out specific things, I
20 think that's inappropriate. The jury should make of it what they
21 will without any further prompting by the government.
22     THE COURT: At this point I suppose you should just read
23 into the record the stipulation the parties have reached. Once
24 the item is in evidence, you can do what you normally can do with
25 documents.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11634**

1 I take it you're objecting to more than just the
2 stipulation being read in at this point to admit the item in
3 evidence? It's not in evidence yet.
4     MR. BALAREZO: The stipulation is that this document is
5 now in evidence. I mean, what I'm objecting to is the
6 government's reading of the document and, in effect, highlighting
7 certain parts that the jury, just looking at the document, may
8 not pick up on.
9     THE COURT: The objection to the government reading from a
10 document that's already in evidence is overruled. The document
11 is not yet in evidence because all she's doing at the moment is
12 putting forward a stipulation. I still have to rule on whether
13 it's coming in. Of course, I will let it in.
14     But just tell the jury what the terms of the stipulation
15 are, move it into evidence, I'll rule on that and then you can
16 deal with what's in evidence any way you want.
17     MR. BALAREZO: Thank you.
18     (Sidebar discussion concluded.)
19     MS. PETALAS: I believe the parties have stipulated that
20 this is a true and correct business record from Philadelphia
21 Marriott, Government's Exhibit Number 807.
22     With that, we would move it into evidence.
23     THE COURT: All right. 807 will be received.
24     (Government's Exhibit 807 admitted into the record.)
25     MS. PETALAS: And for the record, it is an OSCAR past

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11635**

1 guest information for Philadelphia on July 25th, 2002, showing a
2 reservation in the name of Antwuan Ball, the guaranty to a Visa
3 card.
4     THE COURT: All right. Announce your next witness.
5     MR. LEON: United States calls Robert Pough.
6     THE COURT: All right.
7     (ROBERT LEE POUGH, GOVERNMENT'S WITNESS IN THE CASE, SWORN)
8     DIRECT EXAMINATION OF ROBERT LEE POUGH
9 BY MR. LEON:
10     Q.     Good morning, sir. In a loud voice so we can hear you
11 and for the benefit of our court reporter, can you please state
12 and spell your full name for the record.
13     A.     Robert Lee Pough, III, AKA Derrick Dorsey.
14     Q.     Why don't we take them one at a time. You said Robert
15 Pough. How do you spell Robert Pough, III?
16     A.     R-O-B-E-R-T, Lee, L-E-E, Pough, P-O-U-G-H.
17     Q.     And you also said you have an alias of Derrick Dorsey?
18     A.     Yes, sir.
19     Q.     Would you please spell that for us.
20     A.     D-E-R-R-I-C-K, D-O-R-S-E-Y, Dorsey.
21     Q.     And in addition to Robert Pough and Derrick Dorsey, do
22 you have any nicknames that you also are known by?
23     A.     Yes. Ooney, O-O-N-E-Y.
24     Q.     Ooney?
25     A.     Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11636**

1     Q.     How did you get that nickname?
2     A.     My mother gave it to me.
3     Q.     How long have you had that nickname?
4     A.     Ever since I was born.
5     Q.     And how about -- you said your true name is Robert Pough.
6 How about Derrick Dorsey? You said that's an AKA. When did you
7 get that?
8     A.     1995.
9     Q.     And how did you get that?
10     A.     Ran from a juvenile facility in Baltimore, Maryland.
11 When I came home, I used another guy's name.
12     Q.     And is the true Derrick Dorsey somebody you know?
13     A.     Yes.
14     Q.     Who?
15     A.     A good friend of mine.
16     Q.     Still a good friend of yours?
17     A.     Yes.
18     Q.     Sir, how old are you?
19     A.     28.
20     Q.     When will you be 29?
21     A.     March 22nd.
22     Q.     So next year?
23     A.     Yes.
24     Q.     Where did you grow up?
25     A.     Washington, DC.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11637**

1  Q.  And were you born in the Washington, DC area?
2  A.  Yes.
3  Q.  And what neighborhoods did you grow up in?
4  A.  The Congress Park area.
5  Q.  Congress Park?  Any other neighborhoods?
6  A.  Fourth Street.
7  Q.  Fourth Street?
8  A.  Yes.
9  Q.  Between Fourth Street and Congress Park, where did you
10 live more -- where did you live more?
11 A.  Congress Park.
12 Q.  How far did you get in school?
13 A.  10th grade.
14 Q.  And let's just go through that quickly.  Where did you go
15 to grade school?
16 A.  Malcolm X, McGogney for a short period, Johnson for about
17 a week.
18 Q.  I'm sorry.  You said Johnson.  Is that Johnson Junior
19 High School?
20 A.  Yes, sir.
21 Q.  And you said for about a week.  What happened after that?
22 A.  I got transferred to Hine Junior High School.
23 Q.  Was that about ninth grade?
24 A.  Yes.
25 Q.  So then from ninth grade to 10th grade, you were there at

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11638**

1  Hine?
2  A.  Excuse me.  That was the seventh.
3  Q.  Okay.  Sorry.  So seventh grade, you go from Johnson to
4  Hine?
5  A.  Yes.
6  Q.  And then you're at Hine for how long?
7  A.  Until the ninth grade.
8  Q.  And what happened after ninth grade?
9  A.  I went to Eastern High School.
10 Q.  And how long were you at Eastern?
11 A.  For about a year.
12 Q.  And then what happened after that?
13 A.  I was incarcerated.  I dropped out.
14 Q.  What year was that?
15 A.  I'd say '95.  That's when I went to the juvenile facility
16 that I ran from in Baltimore.
17 Q.  Okay.  So in 1995, you run as a juvenile?
18 A.  Yes.
19 Q.  And did you -- after that, did you ever go back to
20 school?
21 A.  No.  No, sir.
22 Q.  Did you ever get any equivalency diplomas?
23 A.  No, sir.
24 Q.  You said you ran as a juvenile.  Is that when you used
25 the name Derrick Dorsey?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11639**

1  A.  Yes.
2  Q.  And did you ultimately get caught?
3  A.  I was arrested a year later.
4  Q.  That would be 1996?
5  A.  Yes, under the name Derrick Dorsey.
6  Q.  And when you got arrested in 1996 under the name of
7  Derrick Dorsey, were you a juvenile or an adult?
8  A.  I was an adult.
9  Q.  When you got arrested in 1996 as an adult under the name
10 of Derrick Dorsey, where was that?  What jurisdiction?
11 A.  DC.
12 Q.  Washington, DC?
13 A.  Yes.
14    MR. LEON:  Your Honor, with the Court's permission, if we
15 could publish what's in evidence as Government's 100.1.
16    Actually, Your Honor, if we could change that, Your Honor,
17 to 105.1, which is also in evidence.
18 BY MR. LEON:
19 Q.  Now, Mr. Dorsey, you said you grew up in the Congress
20 Park neighborhood?
21 A.  Yes.
22 Q.  Would you recognize a map of Congress Park if you saw a
23 map?
24 A.  Yes, sir.
25 Q.  Before we get that up, you said you lived.  Let's take

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11640**

1  from -- when were you born?  What year?
2  A.  1979.
3  Q.  From 1979 till 1991, that block of time, where did you
4  live?  Do you remember the address?
5  A.  3324 13th Street, Southeast, Washington, DC.
6  Q.  And do you see what's now in front of you as Government's
7  105.1, Mr. Dorsey?
8     Do you see that -- excuse me -- Mr. Pough?
9     MR. LEON:  May I approach?
10    THE COURT:  Yes.
11 BY MR. LEON:
12 Q.  Do you see the map in front of you?
13 A.  Yeah.  It's kind of small.
14 Q.  Can you see -- don't use the ink part of the pen, but if
15 you could take that pen, take your time, can you point for us
16 the approximate area.
17    I think you said you lived from 1979 until 1991 at
18 3324 13th Street; is that correct?
19 A.  Yes.
20 Q.  And we can zero in.
21    MR. LEON:  And if I could ask Mr. Mazzitelli if I
22 could --
23 BY MR. LEON:
24 Q.  Mr. Pough, we're going to actually -- I'll ask you to
25 wait a moment.  We're going to try to zoom in a little bit to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*11641*

1    make it a little easier.

2        Can you see 3324 13th?

3    **A.**   Yes, sir.

4    **Q.**   Why don't you tap a portion of the screen where that is.

5    You have to tap a little harder.

6    **A.**   Did I get it?

7    **Q.**   A little harder.

8    **A.**   Did it show up?

9        THE COURT:  Why don't you try the pen.

10   BY MR. LEON:

11   **Q.**   All right.  Why don't you just tell us where it is.  I

12   don't know if the screen's working today.  Can you tell us in

13   words just what are the near cross streets.

14       I see 13th Street --

15   **A.**   13th Street right here, the building right here

16   (indicating).

17   **Q.**   What is the near cross street?

18   **A.**   It's 12th and Congress, surrounded by Congress Street,

19   13th Place, which is The Circle, the alley off of Savannah

20   Place.

21   **Q.**   Okay.  Let me stop you there.  I want to just make a

22   record of where you lived from 1979 to 1991.  Can you just tell

23   us in words, not the rest of the neighborhood, which we'll get

24   to, where did you live at that time?

25   **A.**   3324 13th Street.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11642*

1    MR. LEON:  Why don't we do it this way.  If we could use

2    the ELMO, if I could show what's also in evidence as Government's

3    105.1.

4    BY MR. LEON:

5    **Q.**   Do you see that in front of you?

6    **A.**   It's kind of blurry.

7    **Q.**   All right.  Let's see if we can --

8       Can you see that?  It's still a little blurry, but can

9    you make it out or no?

10   **A.**   I can make it out.

11   **Q.**   I'm going to point here, 13th Street (indicating)?

12   **A.**   Right.  That's 13th Street, yes.

13   **Q.**   Where along 13th Street did you live from those years?

14   **A.**   Right there, where you have the pen at.

15   **Q.**   In this general area (indicating)?

16   **A.**   Yeah.

17   **Q.**   Okay.  Just for the record, you had me stop just a little

18   north of the "13" in "13th Street" and a little to the right of

19   it, a portion of the block between Savannah Street and Congress

20   Street; is that correct?

21   **A.**   Yes.

22   **Q.**   Okay.  And that's where you lived until about 1991?

23   **A.**   Yes.

24   **Q.**   Okay.  And in 1991, how old were you?

25   **A.**   Twelve.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11643*

1    **Q.**   Now, you mentioned grade school.  You said Malcolm X?

2    **A.**   Right.

3    **Q.**   Can we see Malcolm X on this map or would it just be --

4    **A.**   It's cut off.

5    **Q.**   It's cut off.  Would it be just off the map if the map

6    continued?

7    **A.**   Yes, to the right, all the way in the back to the right.

8    **Q.**   On the top or bottom of the map?

9    **A.**   Top.

10   **Q.**   Okay.  And you went to grade school.  Did you go to grade

11   school with other people who lived in the neighborhood?

12   **A.**   Yes.  Yes, sir.

13   **Q.**   Do you know somebody by the name of Dominic Samuels?

14   **A.**   Yes.

15   **Q.**   And did you go to grade school with Dominic Samuels?

16   **A.**   Yes.

17   **Q.**   Do you know any nicknames of Dominic Samuels?

18   **A.**   Don.

19   **Q.**   Don?

20   **A.**   Yeah.

21   **Q.**   Do you see Dominic Samuels here in the courtroom today?

22   **A.**   Yes, sir.

23   **Q.**   Can you please point Dominic Samuels out, based on his

24   location and an article of clothing he's wearing.

25      MR. BALAREZO:  Your Honor, we'll stipulate.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11644*

1       THE WITNESS:  The guy standing up right there with the

2    blue tie on.

3    BY MR. LEON:

4    **Q.**   The gentleman who's just standing behind me?

5    **A.**   Yes.

6    **Q.**   Okay.  Did you keep in touch with Dominic Samuels after

7    grade school?

8    **A.**   Periodically, he was around.  He was around back and

9    forth.  He was back and forth, from where, I don't know.

10      MR. BALAREZO:  Objection, non-responsive.

11      THE COURT:  Sustained.

12   BY MR. LEON:

13   **Q.**   First just "yes" or "no", did you keep in touch with

14   Dominic Samuels after grade school?

15   **A.**   Yes.

16   **Q.**   Okay.  Did you keep -- did you know other people from the

17   neighborhood, the neighborhood being Congress Park, that you met

18   in grade school?

19   **A.**   Yes.

20   **Q.**   Do you know somebody by the name of David Wilson?

21   **A.**   Yes.

22   **Q.**   Do you know David Wilson by any other names or nicknames?

23   **A.**   Cool Wop.

24   **Q.**   Cool Wop?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11645**

1  Q.  Did you go to grade school with David Wilson?
2  A.  Yes.
3  Q.  And do you see David Wilson here in the courtroom today?
4  A.  I think he's the short -- I can't see him from where
5  you're standing.
6  Q.  You can stand up if you need to.
7  A.  The guy right there in the pink shirt (indicating).
8      MR. LEON:  Your Honor, may the record reflect the in-court
9  identification of Mr. Wilson?
10     MS. WICKS:  No objection.
11     THE COURT:  Request is granted.
12 BY MR. LEON:
13 Q.  Who were some of the other people you went to grade
14 school with in Congress Park?
15 A.  Santuce, Jazz, Dazz.  I think Dazz might have been in a
16 higher grade than me.  I don't know.  I'm not for sure on that
17 one.  His brother, Little Phil.
18 Q.  Okay.  Let's stop there.  I'll just make note that as you
19 did that, I did notice you looking around the courtroom a little
20 bit; is that fair?
21     Is that correct?
22 A.  Yes.
23 Q.  You mentioned Santuce?
24 A.  Santuce, yes.
25 Q.  Do you know if Santuce had any brothers that you know of?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11646**

1  A.  Boy-Boy.
2  Q.  Boy-Boy?
3  A.  Yes.
4  Q.  First of all, is Santuce your age or approximately your
5  age?
6  A.  He should be around my age, 28, 29.
7  Q.  You mentioned Boy-Boy.  Is Boy-Boy your age or
8  approximately?
9  A.  I think he's a little older than me.
10 Q.  So did you go to grade school with Boy-Boy?
11 A.  No, sir.
12 Q.  But did you get to know Boy-Boy?
13 A.  Yes, sir.
14 Q.  Do you see Boy-Boy in the courtroom here today?
15 A.  The guy sitting over there in the grayish blue shirt back
16 there (indicating).
17 Q.  What kind of shirt?
18 A.  Guy right here, sitting in front of Dazz.
19 Q.  Okay.  And you identified somebody in a pink shirt as
20 Cool Wop.  Where is he in relation to Cool Wop?
21 A.  He's sitting behind Cool Wop.
22     MR. LEON:  Your Honor, may the record reflect the in-court
23 identification of Gregory Bell?
24     MR. BEANE:  No objection.
25     THE COURT:  The request is granted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11647**

1  BY MR. LEON:
2  Q.  You also said that Boy-Boy is sitting in front of Dazz;
3  is that correct?
4  A.  Yes, sir.
5  Q.  Just for the record, what is Dazz wearing?
6  A.  Excuse me?
7  Q.  Just for the record, what is Dazz wearing?
8  A.  Like he's wearing a pink shirt also, sitting behind
9  Boy-Boy.
10     MR. LEON:  Your Honor, may the record reflect the in-court
11 identification of Desmond Thurston?
12     MR. ZUCKER:  No objection.
13     THE COURT:  The request is granted.
14 BY MR. LEON:
15 Q.  To your knowledge, is Dazz approximately your age?
16 A.  If not, like probably about two years older than me.
17 Q.  Okay.  You also mentioned Dominic Samuels.  To your
18 knowledge, is Dominic Samuels approximately your age?
19 A.  About the same.  About two years older, if not the same.
20 Q.  You also mentioned Cool Wop.  To your knowledge, is Cool
21 Wop, Mr. Wilson, approximately your age or is he not?
22 A.  I think Cool Wop -- yeah, he's two years older than me.
23 Q.  And I believe you also mentioned someone by the name of
24 Jazz as someone you went to grade school with?
25 A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11648**

1  Q.  Who is Jazz?
2  A.  Jazz is Boy-Boy's brother.
3  Q.  And did you keep in touch with Jazz after grade school?
4  A.  Yes.
5  Q.  Did you keep in touch with Boy-Boy after grade school?
6  A.  I didn't go to grade school with him.
7  Q.  I'm sorry.  Did you keep in touch with Boy-Boy after you
8  finished grade school?
9  A.  Yes.
10 Q.  Now, you told us that you lived at 3324 13th Street,
11 Southeast until you were eleven or so in 1991.  Where did you
12 live after that?
13 A.  From '91 -- you said '91, right?
14 Q.  Yeah, starting in 1991, let's say 1991 to 1996.
15 A.  I moved to 1212 Congress Street, which is the next street
16 over.
17 Q.  Okay.  And again, just showing you what's in evidence as
18 Government's 105.1, you said 1212 Congress Street?
19 A.  Yes.
20 Q.  This being Congress Street and this being 13th Street, do
21 you see the intersection of Congress and 13th?
22 A.  Yes, sir.
23 Q.  Is 1212 Congress Street to the left or to the right of
24 where I'm pointing?
25 A.  To the left.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11649

1  Q.   In this general area (indicating)?
2  A.   Yes.
3  Q.   Is it to the north -- is it the north part of Congress or
4  the south part?
5  A.   The north.
6  Q.   In this area (indicating)?
7  A.   Yes.
8  Q.   For the record, I am pointing to an area that is just
9  north of Congress Street and just to the left of what's
10 indicated as the intersection of 13th and Congress, correct?
11 A.   Yes.
12 Q.   Okay. Earlier in your testimony, you made reference to
13 something called The Circle, I believe?
14 A.   Yes.
15 Q.   What is The Circle?
16 A.   It's a spot in Congress Park.
17 Q.   And what, if anything, would happen at that spot?
18 A.   Excuse me?
19 Q.   Okay. You said it's a spot in Congress Park. When you
20 go to The Circle -- have you ever been to The Circle?
21 A.   Yes.
22 Q.   Did you ever go to The Circle -- let's keep our questions
23 now from 1991 to 1996. During that five or six-year period of
24 time, did you yourself ever go to The Circle?
25 A.   Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11650

1  Q.   Frequently or infrequently?
2  A.   Frequently. Enough.
3  Q.   And are you -- what was the last part of your answer?
4  You said "frequently"?
5  A.   Yes.
6  Q.   Okay. Are you familiar with a spot called the Lincoln?
7  A.   Yes.
8  Q.   And where is the Lincoln in relation to The Circle?
9  A.   It sits right beside it on the right-hand side.
10 Q.   Is it this area here (indicating) that's kind of a
11 backwards L?
12 A.   Yes.
13 Q.   Okay. Have you ever been to the Lincoln from 1991 to
14 '96?
15 A.   Yes.
16 Q.   Okay. I'm going to now start with a series of questions
17 and I'm going to try to focus in on that period 1991 to 1996,
18 okay. Starting in 1991, when you moved over to 1212 Congress
19 Street, starting that period of time, you were approximately how
20 old?
21 A.   From 1991 to '96?
22 Q.   Let's start in 1991.
23 A.   Twelve.
24 Q.   Okay. When you were 12 years old at that time, were you
25 using any drugs?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11651

1  A.   Marijuana at the time.
2  Q.   Okay. Other than marijuana, any other drugs at that
3  time?
4  A.   No.
5  Q.   Did there come a time after that that you did use other
6  drugs?
7  A.   Yes.
8  Q.   Which other drugs?
9  A.   Heroin.
10 Q.   When did you begin using heroin?
11 A.   '97, '98.
12 Q.   And was there a period of time when you became addicted
13 to heroin?
14 A.   Yes.
15 Q.   And during that time when you say you were addicted to
16 heroin, how often would you use heroin?
17 A.   Three to four times out of a week.
18 Q.   Other than heroin, were there any other drugs that you've
19 used other than heroin and marijuana?
20 A.   PCP.
21 Q.   How often would you use PCP?
22 A.   Every now -- every once in a while, probably once out of
23 a month or something, once every other month.
24 Q.   And when was this?
25 A.   In the '90s.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11652

1  Q.   Okay. And any other drugs? You mentioned heroin, PCP
2  and marijuana.
3  A.   That's it.
4  Q.   What about alcohol?
5  A.   Oh, yeah, alcohol, yes.
6  Q.   Did you ever abuse alcohol?
7  A.   Yes.
8  Q.   When did you abuse alcohol?
9  A.   '03.
10 Q.   In 2003?
11 A.   Yes.
12 Q.   And was there any reason for that?
13 A.   My sister and my mother passed back to back.
14 Q.   Now, I'll ask you, have you ever sold drugs?
15 A.   Yes.
16 Q.   When did you begin selling drugs?
17 A.   About, I'd say, '90. Maybe about '90.
18 Q.   1990?
19 A.   Yeah.
20 Q.   You would have been about 11?
21 A.   Yeah.
22 Q.   And from 1990, when you were about 11 -- let's break it
23 down. From 1990 to 1996, during that six-year period of time,
24 were you ever incarcerated?
25 A.   Like I say, I was incarcerated for like two months as a

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11653

1  juvenile in Baltimore.  After that, I went to jail for -- as an
2  adult from '96 to '99.
3  Q.  We'll get to '96 and '99 in a little bit, in a few
4  moments, but right now from '90 to '96, just for two months as a
5  juvenile?
6  A.  That's it.
7  Q.  Other than those two months, you were not incarcerated?
8  A.  No, sir.
9  Q.  During those six years, 1990 to 1996, how frequently
10  would you sell drugs?
11  A.  Every day.
12  Q.  And what kind of drugs did you sell?
13  A.  Crack cocaine, marijuana.
14  Q.  Did you during this period of time, 1990 to 1996, have
15  any other ways of making money other than selling drugs?
16  A.  Yeah, rob.  I used to rob.
17  Q.  Rob people?
18  A.  Yes.
19  Q.  Other than robbery and selling crack cocaine, did you
20  make any other legitimate money during that six-year period of
21  time?
22  A.  No, sir.
23  Q.  When you would sell -- let's focus on crack cocaine.
24  When you would sell crack cocaine from 1990 to 1996, what
25  neighborhood or neighborhoods would you sell crack cocaine in?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11654

1  A.  Congress Park area.
2  Q.  Okay.  Any other neighborhoods?
3  A.  Fourth Street.
4  Q.  Okay.  I'm not going to ask you any questions about
5  Fourth Street.  We're going to just focus on Congress Park
6  today.
7      You said Congress Park.  What -- can we see on this map
8  that we're looking at what portion or portions of Congress Park
9  you sold crack cocaine in during 1990 to 1996?
10  A.  13th, right here on the corner (indicating).
11  Q.  Okay.  Let me start as a reference point the intersection
12  of Congress and 13th you've identified?
13  A.  Yes.
14  Q.  And you identified that you lived in this area a little
15  to the left -- a little north and a little left of that
16  intersection?
17  A.  Yes, sir.
18  Q.  Where in relation to that?  To this side (indicating)?
19  Where in relation to that intersection, 13th and Congress
20  Street, did you primarily sell crack cocaine?
21  A.  Circle.  I mean -- yeah, The Circle.
22  Q.  The Circle?  You indicated that you lived in this area
23  (indicating)?
24  Q.  13th Street.
25  Q.  13th Street?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11655

1  A.  Yep.
2  Q.  And what?
3  A.  13th and 12th and Congress.
4  Q.  All right.
5  A.  That's from '91 to '96.
6      MR. ZUCKER:  I'm sorry.  I couldn't here the last answer,
7  Judge.
8      THE COURT:  Could you repeat that, please.
9      THE WITNESS:  Which question?  The last?
10     THE COURT:  Repeat your last answer, yes.
11     THE WITNESS:  You said the last question was where I sold
12  drugs from from '91 to '96, right?
13  BY MR. LEON:
14  Q.  Yes.
15  A.  13th Street, which is on the corner right here
16  (indicating), and 12th and Congress, The Circle.
17  Q.  Okay.  Are you familiar with the term "post up"?
18  A.  Yes.
19  Q.  What does it mean?
20  A.  It means you stand outside.
21  Q.  Was there a particular area in Congress Park where you
22  would post up or not during that period of time?
23  A.  Yes.
24  Q.  Where did you primarily post up in Congress Park to sell
25  crack cocaine from 1990-91 to 1996?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11656

1  A.  Corner of 13th Street.
2  Q.  13th and what?
3  A.  Congress.
4  Q.  Okay.  So in this area (indicating)?
5  A.  Yes.
6  Q.  Okay.  And for the record, I'm indicating right in the
7  middle of the intersection of 13th Street and Congress Street,
8  correct?
9  A.  Yes.
10  Q.  Okay.  When you posted up in that location from 1990 to
11  1996 selling crack cocaine, 13th and Congress, were there other
12  people who also did that at that spot?
13  A.  Yes.
14  Q.  Can you please tell us some of the other people who
15  posted up also at 13th and Congress Street.
16  A.  Gregory Ferguson, Darin Cerros, Sean Johnson, Damien.
17  Q.  Do you know Damien's last name?
18  A.  Williams.
19  Q.  Damien Williams?
20  A.  Yes.
21  Q.  You mentioned yourself, you mentioned Gregory Ferguson.
22  Does Gregory Ferguson have any nicknames?
23  A.  Yes, Ferg.
24  Q.  Ferg?
25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11657

1  **Q.**   And you mentioned -- I believe you said Darin?
2  **A.**   Yes.
3  **Q.**   Does he have a full name?
4  **A.**   Darin Cerros.
5  **Q.**   And does he have any nicknames that you know of?
6  **A.**   Naw, I don't know.
7  **Q.**   Okay.  You mentioned Sean?
8  **A.**   Yeah, Sean Johnson.
9  **Q.**   Any nicknames that Sean Johnson has?
10 **A.**   C-Low.
11 **Q.**   C-Low?
12 **A.**   Yes.
13 **Q.**   And I believe you mentioned a Damien Williams.  Did
14 Damien Williams have any nicknames that you know of?
15 **A.**   No.
16 **Q.**   Any other people that you can think of now as you sit
17 here, other than those folks?
18 **A.**   Naw, not right offhand.
19 **Q.**   Were there some other people or were those the main
20 people you're thinking of?
21 **A.**   Those were the main people.
22 **Q.**   Okay.
23 **A.**   Oh, Keyon.  Sorry about that.  Keyon.
24 **Q.**   Keyon?
25 **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11658

1  **Q.**   Do you know Keyon's full name?
2  **A.**   Keyon Melvin.
3  **Q.**   And did Keyon have any nicknames?
4  **A.**   No.
5  **Q.**   Okay.  Now you also said during this period -- and we're
6  still just focusing on 1990 to 1996 before you get locked up as
7  an adult.  During that period of time, you mentioned that you
8  did robberies, correct?
9  **A.**   Yes.
10 **Q.**   Where would you do those robberies?
11 **A.**   Wherever.
12 **Q.**   Would there be particular neighborhoods or no?
13 **A.**   No, no particular neighborhoods.
14 **Q.**   Would you do robberies in Congress Park?
15 **A.**   No.
16 **Q.**   Excuse me?
17 **A.**   No.
18 **Q.**   Why not?
19 **A.**   Because I hustled around there.  I lived around there.
20 **Q.**   And by the way, when you said you lived at 1212 Congress
21 Street, Southeast, who did you live with?
22 **A.**   My mother -- my mother and my father and my sister.
23 **Q.**   How close were you -- when you posted up at 13th and
24 Congress Street, how close were you when you hustled to where
25 you lived, 1212 Congress Street?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11659

1  **A.**   It was close.  I mean, right outside of it, basically, a
2  couple of feet away.
3  **Q.**   What neighborhoods would you -- you said not Congress
4  Park.  What neighborhoods would you commit your robberies in?
5  **A.**   Good Hope Road, Southwest, Northwest.
6  **Q.**   And when you did these -- when you did these robberies,
7  did you do them alone or with other people?
8  **A.**   Sometimes with other people, mostly by myself.
9  **Q.**   And when you did these robberies, did you sometimes carry
10 a weapon?
11 **A.**   Yes.
12 **Q.**   Did you always carry a weapon?
13 **A.**   Yes.
14 **Q.**   What kind of weapon?
15 **A.**   9 millimeters, .45s.
16 **Q.**   Those would be pistols?
17 **A.**   Yes.  .38s, .357s, whatever I can get my hand on.
18 **Q.**   And you said most of the time you did them by yourself,
19 but some of the time you did them with others.  During those
20 other -- some of the times you did do robberies with other
21 people, who were those other people?
22 **A.**   I'd say Snapper, Nathaniel Voss, an old guy named Joe.
23 **Q.**   Okay.  Now again, still focusing 1990 to 1996, that
24 period of time, you mentioned The Circle and sometimes you
25 would -- or you said -- I think more than sometimes, you would

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11660

1  go to The Circle, correct?
2  **A.**   Yes.
3  **Q.**   I believe you said in 1990 you were about 11 years old,
4  so 1996, you would be about 17, give or take?
5  **A.**   Yes.
6  **Q.**   Okay.  During that period of time when you would go to
7  The Circle, who else would you see at The Circle?
8  **A.**   Cool Wop, Antwuan, Dazz, Boy-Boy, Santuce, Jazz, Jo-Jo.
9  **Q.**   Anyone else you can think of right now?
10 **A.**   Little Phil.
11 **Q.**   Okay.  You've mentioned some names.  Let's just try to go
12 through them.  The first name you mentioned was Antwuan, I
13 believe, correct?
14 **A.**   Yes.
15 **Q.**   Is Antwuan older or younger than you?
16 **A.**   He's older than me.
17 **Q.**   Do you know how much?
18 **A.**   I don't know how much.  I think in his 30s, though, about
19 the same age as my sister.
20 **Q.**   Do you see Antwuan in the courtroom here today?
21 **A.**   Yes.  It's the guy over there with the dreads in his
22 hair.
23 **Q.**   Can you point out his -- what kind of clothing he has on.
24 **A.**   Him, right there with the dreads (indicating).
25 **Q.**   And can you --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11661**

1    A.    White shirt and tie.
2    Q.    What color tie?
3    A.    I can't really see it.
4    Q.    Who is he sitting next to?
5    A.    Cool Wop.
6          MR. LEON:  Your Honor, may the record reflect the in-court
7    identification of Mr. Ball?
8          MR. CARNEY:  No objection, Your Honor.
9          THE COURT:  The request is granted.
10   BY MR. LEON:
11   Q.    When you saw Antwuan in The Circle during that period of
12   time, between the time you were 11 and 17, who, if anyone, would
13   you see Antwuan with?
14   A.    Tommy Murphy, his brother Kairi, before he got killed,
15   Jo-Jo, Cool Wop, Dazz, Santuce, Jazz.  Same names.
16   Q.    And you mentioned Jo-Jo.  Do you see Jo-Jo here in the
17   courtroom today?
18   A.    Yes.  It's the guy back there with the glasses on
19   (indicating).
20   Q.    What color clothing is he wearing?
21   A.    Looks like purple shirt, looks like.  My eyes bad.
22         MR. MARTIN:  No objection, Your Honor.
23         MR. LEON:  May the record reflect an in-court
24   identification of Mr. Joseph Jones?
25         THE COURT:  Request is granted.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11662**

1    BY MR. LEON:
2    Q.    And is Joseph Jones, to your knowledge, the same age,
3    older or younger than you?
4    A.    He's older than me.
5    Q.    Now, when you saw Antwuan Ball hanging out with Jo-Jo and
6    the other people you mentioned, what, if anything, did you see
7    Antwuan do?
8    A.    He used to be out there --
9    Q.    In The Circle, I'm talking about.
10   A.    In The Circle?
11   Q.    Yes.
12   A.    Sell drugs.
13   Q.    What kind of drugs?
14   A.    Crack, weed, Ecstasy.
15   Q.    What impression, if any, did you get as to Antwuan Ball's
16   status in the neighborhood at that time?
17         MR. BALAREZO:  Objection.
18         MR. MARTIN:  Objection.
19         THE COURT:  Sustained.
20   BY MR. LEON:
21   Q.    Did you -- based on your observations, tell us what you
22   saw Antwuan doing in The Circle, other than selling drugs?
23   A.    He was running house, you know.  He ran Congress Park.
24   Q.    What do you mean by that?
25   A.    Basically, whatever a man -- a person -- whatever he

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11663**

1    wanted somebody to do, they'd do.  If something was going down,
2    they'd go to Antwuan.
3          MR. CARNEY:  Objection, Your Honor, 602.
4          THE COURT:  Why don't you establish foundation.
5    BY MR. LEON:
6    Q.    Okay.  You told us "running house."  First of all, in
7    your own words, what does that mean?
8    A.    Basically, running the show.  I mean, everybody looked up
9    to him around there.
10   Q.    Okay.  And when you say "everybody looked up to him
11   around there," is that based on your own observations?
12   A.    Yes, from what I could see.
13   Q.    From what you could see, tell us what you mean when you
14   said everyone looked up to Antwuan.
15   A.    They looked up to him.  He was older.  I guess he was
16   putting in most of the work around there.
17         MS. WICKS:  Objection.
18         MR. ZUCKER:  Objection.
19         THE COURT:  Sustained.
20   BY MR. LEON:
21   Q.    Don't guess.  Just tell us what you saw, how you saw
22   Antwuan interact with others and others interact with Antwuan.
23   You can tell us about that.
24   A.    From what I could see, he -- at that time, he basically
25   man.  He was in charge.  I mean, the things he used to say to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11664**

1    the guys, like --
2          MR. BALAREZO:  Objection.
3    BY MR. LEON:
4    Q.    What did you hear, with your own ears, Antwuan say to the
5    guys?
6          MS. WICKS:  Objection.
7          MR. MARTIN:  Objection.
8          THE COURT:  Overruled.
9          MS. WICKS:  Your Honor --
10         THE COURT:  Overruled.
11   BY MR. LEON:
12   Q.    You can answer.
13   A.    He used to make them give him money, weed.  Whatever he
14   can get up off of them, he would make them give it to him.
15         MS. WICKS:  Objection, non-responsive.
16         THE COURT:  Overruled.
17   BY MR. LEON:
18   Q.    Do you know someone by the name or nickname of Fat Tony?
19   A.    Yes.
20   Q.    Who's Fat Tony to you?
21   A.    He's a nobody.
22   Q.    Who's Fat Tony with respect to Congress Park, if anybody?
23   A.    He used to hang with Antwuan and Jo-Jo.
24   Q.    And to your knowledge, is Fat Tony older, younger or the
25   same age as you?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11665

1    **A.**   He should be a little older than me.

2    **Q.**   And still focusing on the period 1990 to 1996, during

3    that period of time, did you see Fat Tony also hanging out with

4    Antwuan and Jo-Jo?

5    **A.**   Yes.

6    **Q.**   Where?

7    **A.**   The alley, the Lincoln, The Circle or just riding around.

8    From 1991 to '96, right?

9    **Q.**   Yes.

10   **A.**   Also, he hung with Boy-Boy, too.  There was a period of

11   time which was in, I think, like -- let me say not think --

12   which I know was like '91, '92, Tony -- Fat Tony, Boy-Boy, Cool

13   Wop was like the lookout.  They came down the street to rob my

14   sister boyfriend at the time.

15   MR. BEANE:  Objection, Your Honor.  May we approach?

16   THE COURT:  Yes.

17   (Following sidebar discussion had on the record:)

18   MR. BEANE:  The fact that Mr. Bell allegedly was involved

19   in a robbery is others crimes evidence.  In the 404(b) motion,

20   the government did not say that Mr. Bell -- that they would

21   allege that Mr. Bell was involved in any robberies.  They laid

22   out what the other defendants did, but not Mr. Bell, so this is a

23   violation and I would ask that it be stricken because it's a

24   violation of 404(b).

25   MR. LEON:  The four corners of the indictment talk about

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11666

1    each of the six defendants committing many acts, many acts --

2    criminal acts, including drug dealing, including robberies,

3    including thefts.  And it's in the four corners of the

4    indictment.  It's not a surprise to anybody.

5    And there's been other evidence that other defendants --

6    there's already been other evidence in the trial from other

7    witnesses about Boy-Boy committing robberies.

8    MR. BEANE:  No, there --

9    MS. WICKS:  And there's also --

10   Go ahead.

11   MR. BEANE:  There has not been any evidence that

12   Boy-Boy -- that Gregory Bell committed robberies.  A lot of other

13   people, but not Gregory Bell.

14   THE COURT:  Anything else?

15   MS. WICKS:  Likewise, in terms of the time frame, it's not

16   clear from the testimony so far that it's within the time frame

17   of the conspiracy.  I think it may have been when Mr. Wilson was

18   a juvenile.  So I would join in the motion to strike that

19   portion.

20   THE COURT:  I'm sorry.  Go ahead.

21   MR. BEANE:  Just one more point.  It may be within the

22   four corners of the indictment that there were robberies, but

23   there's not in there that Mr. Bell committed robberies.

24   THE COURT:  The objection -- both objections are

25   overruled.  The testimony is not 404(b).  It is intrinsic.  And

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11667

1    with respect to time frame, it is reasonably within the time

2    frame or just outside the time frame specifically alleged in the

3    indictment, which I believe runs from what, '92?

4    MR. LEON:  (Nodded head affirmatively.)

5    THE COURT:  So a year prior to the date that was charged

6    as beginning, on or about, is not so far outside the charged time

7    frame.

8    Anything else?

9    (Sidebar discussion concluded.)

10   BY MR. LEON:

11   **Q.**   Mr. Pough, you mentioned a robbery that Boy-Boy and Cool

12   Wop were involved with?

13   **A.**   Yes.

14   **Q.**   All right.  First of all, do you know approximately when

15   this happened, approximately?

16   **A.**   I'd say it was probably like '91, '92.

17   **Q.**   Where did this happen?

18   **A.**   Congress Street.

19   **Q.**   And what?

20   **A.**   12th and Congress.

21   **Q.**   And you said you know that this happened.  How do you

22   know that this happened?

23   **A.**   I was out there that night.

24   **Q.**   All right.  Well, so you saw this?

25   **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

11668

1    **Q.**   Tell us what you saw with your own eyes at that time at

2    12th and Congress.  Tell us.

3    **A.**   Fat Tony, Boy-Boy, Cool Wop, a couple other guys came

4    down there.  It was real live outside that night.  It was

5    probably about 15 guys out there, including my sister.

6    **Q.**   I apologize for interrupting.  You did say Fat Tony,

7    Boy-Boy and Cool Wop and a couple of other guys.  I'm going to

8    ask you now if you can remember who any of those other couple

9    guys were?

10   MR. BALAREZO:  Can he let him finish the answer?  He was

11   in the middle of an answer.

12   THE COURT:  Overruled.

13   THE WITNESS:  I can't recall at this minute who the other

14   guys at this time were.

15   BY MR. LEON:

16   **Q.**   Okay.  Continue.

17   **A.**   Anyway, Fat Tony snatched a big gold chain off my

18   sister's boyfriend neck.  Boy-Boy was checking the other guy's

19   pockets.  And Cool Wop was basically the lookout.  He was still

20   a little young back then, so he was the lookout.

21   **Q.**   And you said -- let's break that down.  You said your

22   sister.  What's her name?

23   **A.**   Sheryl Fenwick.

24   **Q.**   And you said your sister's boyfriend.  What was his name?

25   **A.**   At the time, Robert Russell, AKA Boo-Boo.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1518 of 1954

1  **Q.**  AKA what?

2  **A.**  Boo-Boo.

3  **Q.**  And you said a chain was taken off of each of their

4  necks?

5  **A.**  Yes.

6  **Q.**  Boy-Boy took one chain and --

7  MR. BEANE: Objection, leading.

8  THE WITNESS: No, no.

9  THE COURT: Sustained.

10  BY MR. LEON:

11  **Q.**  Explain again. I apologize.

12  **A.**  Fat Tony snatched the chain. Boy-Boy checked their

13  pockets.

14  **Q.**  Okay. Do you know if Boy-Boy got anything out of the

15  pockets?

16  **A.**  Cash.

17  **Q.**  And did you see this?

18  **A.**  Yes.

19  **Q.**  Did he get cash out of your sister or Boo-Boo or both?

20  **A.**  Boo-Boo. He didn't rob my sister.

21  **Q.**  And were there any weapons that you saw during this

22  incident?

23  **A.**  A few handguns.

24  **Q.**  When you say "a few handguns," how many is "a few"?

25  **A.**  I'd say about a good three.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  **Q.**  Okay. Who had the guns that you saw?

2  **A.**  Boy-Boy had one in his hand, Fat Tony had one. Like I

3  said, the other guys, which I can't recall their names at the

4  time. Cool Wop, he didn't have a gun at that time.

5  **Q.**  And I believe you said that Cool Wop was the lookout.

6  Where was Cool Wop physically in relation to Boy-Boy and Fat

7  Tony? How far away -- how close away were they? You can point

8  to a spot in the courtroom.

9  **A.**  In the corner. Like I said, at the time the robbery took

10  place, it was on the 1200 block of Congress Street, which is

11  where I lived at, 1212 Congress Street at the time. And he was

12  on 13th Street, on the corner right there.

13  MR. LEON: All right. I'm going to ask, can we try the

14  computer one more time and see if we can get the markings to

15  work.

16  THE DEPUTY CLERK: Is the exhibit in evidence?

17  MR. LEON: Yes. 105.1.

18  BY MR. LEON:

19  **Q.**  See if you can tap it.

20  THE COURT: Come up and see if you can test it.

21  MR. LEON: (Attempted.)

22  THE DEPUTY CLERK: We'll probably have to get somebody to

23  look at it at the break.

24  MR. LEON: Okay. Why don't we go back --

25  May I approach, Your Honor?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  THE COURT: Yes.

2  BY MR. LEON:

3  **Q.**  Mr. Pough, I'm going to show you what's in evidence as

4  Government's 122.3. Do you see this?

5  Just "yes" or "no," do you recognize the map? Do you see

6  the circles on the map?

7  **A.**  Yes.

8  **Q.**  Why don't you -- if you can go up and -- do you have the

9  pen? Don't mark it, but just point to where you see the circle.

10  **A.**  (Indicating.)

11  **Q.**  Okay. For the record, you pointed to what appears to be

12  a circular driveway on the left center of Government's 122.3?

13  **A.**  Yes.

14  **Q.**  First of all, can we see just generally, if you can put a

15  general approximation in the general area of where this robbery

16  occurred, if you see it.

17  **A.**  Right here (indicating.)

18  **Q.**  For the record, you pointed a little right and a little

19  north on the map, correct?

20  **A.**  Yes. We were on the north side of the street right here,

21  which is 1212 Congress Street.

22  **Q.**  Okay.

23  **A.**  Cool Wop was standing approximately right here

24  (indicating.)

25  **Q.**  Okay. For the record, if I can just make a record, you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  pointed to this area where you said Cool Wop was. For the

2  record, it appears to be the north side of Congress Street,

3  correct?

4  **A.**  Yes.

5  **Q.**  And perhaps a half a block north on Congress Street from

6  the intersection of Congress and 13th?

7  **A.**  Yes.

8  **Q.**  You said you lived at 1212. Do we see 1212 on here?

9  **A.**  It's the house right here (indicating).

10  **Q.**  Okay. For the record, you pointed to the house on the

11  north side of 12th Street -- excuse me -- the north side of 13th

12  Street, the north-most house on -- north-most house on the

13  north-most side of 13th Street; is that correct?

14  **A.**  Yes.

15  **Q.**  That's 1212 Congress Street?

16  **A.**  Yes.

17  **Q.**  Okay. Where did the robbery itself happen?

18  **A.**  Right in front of the house (indicating.) Used to be a

19  crack house right next door to our house, a guy named Artie,

20  Arthur Brooks.

21  THE COURT: Just a moment. Mr. Leon, take the portable

22  microphone and bring it up there.

23  MR. LEON: I think I'm about done. But -- let's see if I

24  have any more questions.

25  BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11673**

1  Q.  Do you have that?
2  A.  Yeah.
3  Q.  You said someone by the name of Arthur Brooks, Artie; is
4  that correct?
5  A.  Yes, sir.
6  Q.  Ran a crack house right next to you.  Do you know the
7  address?
8  A.  1208 Congress Street.  I lived at 1212 Congress Street,
9  which is this house right here (indicating), which is the next
10  over.  1210 is next to me and the other house is 1208.
11  Q.  Okay.  You can sit down.
12  A.  All right.
13  Q.  Your sister who was robbed, is she older or younger than
14  you?
15  A.  She wasn't robbed.
16  Q.  I'm sorry.  Well, didn't you say something was taken from
17  her or no?  Did I misunderstand?
18  MR. BEANE:  Objection, leading.
19  THE WITNESS:  It was misunderstood.
20  BY MR. LEON:
21  Q.  Okay.  Her pockets were searched, but nothing was taken?
22  MR. BEANE:  Objection.
23  MR. ZUCKER:  Objection.
24  MR. LEON:  I'm trying to clarify, Your Honor.  That's all
25  I'm trying to do.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11674**

1  MR. BEANE:  The witness --
2  THE COURT:  Overruled.
3  THE WITNESS:  It was never searched.  It just was the baby
4  father and the other guys that was out there.
5  BY MR. LEON:
6  Q.  Okay.  She was there, but she wasn't actually -- nothing
7  was taken from her?
8  A.  Yes.
9  Q.  Okay.  Was she older -- is she older or younger than you?
10  A.  She's older.  She's 35.
11  Q.  Okay.  And how old were you at the time, approximately?
12  A.  12 or 13.
13  Q.  Did you do anything when you saw this incident happen?
14  A.  No.
15  Q.  Why not?
16  A.  I really wasn't out there like that at the time, you
17  know, as far as with the gun situation.
18  Q.  Did you see Boy-Boy or Cool Wop or Fat Tony at any point
19  after that incident, shortly after that incidents?
20  A.  Every day after.  I mean, almost every day after that.
21  Q.  And shortly after when you saw them, did you do or say
22  anything towards them?
23  A.  No.  I was still "Hi" and "Bye."
24  Q.  Why?  At that time, why?
25  MR. BALAREZO:  Objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11675**

1  THE COURT:  Overruled.
2  THE WITNESS:  Why?  Why what?
3  BY MR. LEON:
4  Q.  Why were you just "Hi" and "Bye" to them after they did
5  this to your sister and her boyfriend?
6  A.  I don't know.  It was just -- kept it "Hi."  I don't
7  know.  I can't answer that.
8  Q.  Okay.  Were they -- was Boy-Boy older or younger than
9  you -- younger or older than you or the same age when this
10  happened?
11  A.  He was older than me.
12  Q.  How much?
13  A.  I don't know.  Like I say, if not the same age as my
14  sister, a little older than her.
15  Q.  Did -- first just "yes" or "no," did you ever see --
16  start with Cool Wop.  Did you ever see Cool Wop, "yes" or "no,"
17  commit any other robberies after this?
18  A.  Yes.
19  Q.  Just yes?
20  A.  Yes.
21  Q.  Okay.  And these are -- we're just going to talk about
22  ones you've seen.  What's the next robbery you remember seeing
23  Cool Wop do?
24  A.  It was in '95.  The same street, across the street from
25  where I live at, which is the building across the street on -- I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11676**

1  don't have the exact address, but it's a building across the
2  street from where I lived at on 1212 Congress Street.
3  Three guys was standing out there at the time.  Me and my
4  sister was on the porch.  Cool Wop and Drano walked down the
5  street.  Me and my sister saw them coming down the street.
6  These guys was gambling, which was Gregory Ferguson, Sean
7  Johnson and Darin at the time was gambling.  And Cool Wop and
8  Drano robbed them for they money.
9  Q.  And when you say Cool Wop and Drano robbed them, who did
10  Drano rob?
11  A.  Gregory Ferguson, Don Sherrills and Sean Johnson.
12  Q.  And when you said "their money," did they -- who did what
13  exactly?  Let's break it down.  I withdraw that.
14  Gregory Ferguson, did he have money taken from him?
15  A.  Yes.
16  Q.  Did Sean have money taken from him?
17  A.  Yes.
18  Q.  Did Darin Cerros have money taken from him?
19  A.  Yes.
20  Q.  Do you know how much money?
21  A.  I don't remember quite how much.  A couple hundred
22  dollars, probably.  A couple hundred dollars, that's all.
23  Q.  And you said Wop and Drano.  Was anyone else with Wop and
24  Drano when they did this?
25  A.  Not that I can think of at this moment.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11677

1  Q.  And tell us exactly what you saw Wop do.
2  A.  He pulled a .44 out, had duck tape on it at the time.
3  Q.  Do you remember Wop saying anything?
4  A.  Well, like I said, I was sitting across the street from
5  them so I didn't quite hear what he said, but I know he -- once
6  he pulled the gun out, they started giving up the money, so --
7  Q.  What about Drano?  Did you see Drano with any weapons?
8  A.  Drano didn't have a weapon on him at that time.
9  Q.  Did you see Drano take money during this incident?
10 A.  Yes, he took money from them.
11 Q.  And finish up.  After they took the money, what happened
12 next?
13 A.  After they -- by the time they finished taking the money,
14 I was going -- I went in the house, got a .357.  By the time
15 they got halfway down the street, I passed the gun to Sean and
16 he shot at Cool Wop and Drano.
17 Q.  Actually fired the gun?
18 A.  Fired the gun, yes.
19 Q.  How many times?
20 A.  All six times.
21 Q.  And it was your gun you gave him?
22 A.  Yes, sir.
23 Q.  When you gave Sean that gun, what did you think Sean
24 might do with that gun?
25 A.  I thought he was going to try to kill them.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11678

1  Q.  Did Sean ask for the gun or did you offer the gun to him?
2  A.  I knew he was going to come for it once the robbery was
3  over, so I got it before and I took it to him.
4  Q.  How close was Sean to -- well, withdrawn.
5     Was he shooting at Wop or Drano or both?
6  A.  He was shooting at both.
7  Q.  And where were Wop and Drano when Sean was shooting at
8  them?
9  A.  Like at the corner of 13th.  They had made it to like the
10 corner of 13th Street by then.
11 Q.  13th?
12 A.  Yeah.  Yes.
13 Q.  Was Wop struck?
14 A.  Excuse me?
15 Q.  Was Wop hit with a bullet?
16 A.  No, he wasn't hit.
17 Q.  Was Drano hit with a bullet?
18 A.  No, sir.
19 Q.  What happened after Sean fired off those six shots?  What
20 happened to the gun?
21 A.  He brung it back to me.  Once he brung it back, I put it
22 up.
23 Q.  What do you mean by that?
24 A.  Put it back in the house.
25 Q.  Let's stay with Wop.  Just "yes" or "no," did you see

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11679

1  during this time, 1991 or so to 1996, did you see Cool Wop
2  commit any other robberies during this time?
3  A.  Give me a minute.
4     I can't recall at this particular moment.
5  Q.  Okay.  We'll move on to somebody else.  I believe you
6  mentioned someone earlier by the name of Dazz?
7  A.  Yes.
8  Q.  And again, how did you first know Dazz?
9  A.  Grew up in the same neighborhood.
10 Q.  Again, during the same period of time, 1991 to 1996, did
11 you ever see Dazz commit any robberies?
12 A.  Yes.  He robbed the same guy.
13 Q.  Which guy?
14 A.  Sean Johnson.
15 Q.  Anybody else or just Sean?
16 A.  Sean and Darin.
17 Q.  Where did this happen?
18 A.  On the corner of 13th Street.
19 Q.  And what?
20 A.  13th and Congress.
21 Q.  And did you see this?
22 A.  Yes.
23 Q.  Where were you?  How close or far were you when you saw
24 this robbery?
25 A.  Where was I?  I don't know the exact spot I was in at the

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

11680

1  time.  I can't remember.
2  Q.  Tell us what you saw.
3  A.  Dazz had a hoodie on, came down through -- out from the
4  alley part, which is -- it's a cut.  I can show you on there if
5  you want.
6  Q.  Let's see if we can do it on Government's 122.3.  Can you
7  see the alley you're referring to on that?
8  A.  This -- this cut right here, which is the building
9  (indicating).
10    THE COURT:  Hand him the microphone.
11    THE WITNESS:  This is the cut right here.  I lived in this
12 building before I moved here (indicating).  You can come through
13 the alley of Congress Park, come out here.
14    We were standing -- they were standing right here.  He
15 came out with the hoodie on, him and another guy.  I don't
16 remember the guy.  And they robbed them.
17 BY MR. LEON:
18 Q.  Okay.  And just for the record, you pointed to an area
19 which appears to be between the intersection of 13th and
20 Congress and between where you lived at 1212 Congress Street,
21 correct?
22 A.  Yes.  Yes.
23 Q.  And it appears to be an alley that runs parallel to 13th
24 Place, but between where you used to live, 1212 Congress, and
25 that intersection of 13th and Congress; is that correct?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**11681**

1  **A.**  Yes.

2  **Q.**  And that intersection's a little bit north, on the north

3  side of Congress Street?

4  **A.**  Yes.

5  **Q.**  Okay.  And I believe you said Sean was with somebody

6  else?

7  **A.**  Darin Cerros.

8  **Q.**  And first just "yes" or "no," did you see Dazz with any

9  weapons during this incident?

10  **A.**  Yeah.  It was a -- I'm trying to remember the exact -- I

11  want to say a Tec-9.  It was something fully.  I don't know.  It

12  might have been a Tec, it might have been an Uzi.

13  **Q.**  When you say "something fully," what do you mean by that?

14  **A.**  Automatic.  It shot a lot of times -- it had a clip on

15  it, a long clip, so it might have looked like a Tec-9 or an Uzi.

16  I can't remember.

17  **Q.**  Did Dazz actually fire this weapon during this incident?

18  **A.**  Did he fire?  I can't remember if he fired or not.  I

19  know that Sean fired at him afterwards.

20  **Q.**  Okay.  We'll get to that in a minute.  I just want to

21  finish with the robbery.  You said Dazz was with somebody who

22  you can't remember.  That's fine.

23      Do you remember if that person that Dazz was with had a

24  weapon or not?

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11682**

1  **Q.**  Do you know what kind of weapon?

2  **A.**  It was a handgun.  I don't know what type of handgun it

3  was.

4  **Q.**  And do you know if that person -- was that a man or

5  woman?

6  **A.**  It was a man.

7  **Q.**  Do you know if that man fired his gun?

8  **A.**  One of them fired.  I don't remember who.  One of them

9  fired a gun.  I know Sean fired back at them.

10  **Q.**  Okay.  Let's finish the robbery.  What was taken, if you

11  know?

12  **A.**  Drugs and money.

13  **Q.**  Do you know how much drugs?

14  **A.**  It was some short stuff, probably --

15      MR. ZUCKER:  Objection speculation.

16      THE COURT:  I'm not sure what's coming, but put your next

17  question.

18  BY MR. LEON:

19  **Q.**  The question is, "yes" or "no," do you know how much

20  drugs?

21  **A.**  Naw, I don't.

22  **Q.**  Do you know what kind of drugs?

23  **A.**  Crack.

24  **Q.**  Crack cocaine?

25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11683**

1  **Q.**  And "yes" or "no," do you know how much money was taken?

2  **A.**  No.

3  **Q.**  Do you know if crack was taken from Sean and Darin or

4  just one or the other?

5  **A.**  Both.

6  **Q.**  And do you know if money was taken from Sean and Darin or

7  one or the other?

8  **A.**  Both.

9  **Q.**  Okay.  After the robbery is done, tell us what happens.

10  **A.**  Sean got to shooting at them, I think.  They fired or --

11  I know Dazz had hit him with the gun and messed his head, split

12  his head open.

13  **Q.**  Whose head?

14  **A.**  Sean.  I think he got -- I know Sean fired at him.  I

15  can't recall, man, who fired first.

16  **Q.**  Did -- to your knowledge, was anyone, regardless of who

17  fired first, was anyone struck with any bullets?

18  **A.**  No, sir.

19  **Q.**  And do you know approximately when this incident

20  happened?

21  **A.**  Between -- it was '92-93.  Yeah, about '92-93.

22  **Q.**  I want to --

23  **A.**  It was '93.

24  **Q.**  Now, I'd like to show --

25  **A.**  And --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11684**

1  **Q.**  I'm sorry.  Are you done with your answer?

2  **A.**  '92-93, one of them.

3  **Q.**  I'd like to jump back just for a moment to the first

4  robbery you talked about.  This is the first incident that

5  happened around 1991 with Boy-Boy, Wop and Fat Tony.

6      MS. WICKS:  Objection.

7      THE COURT:  Basis?

8      MS. WICKS:  I think the question misstates the specific

9  evidence.

10      THE COURT:  The question what?

11      MS. WICKS:  The question misstates the evidence.

12      THE COURT:  Well, put the question.

13  BY MR. LEON:

14  **Q.**  You've mentioned a couple of incidents involving friends

15  of yours who you posted up with around 13th and Congress,

16  correct?  Is that fair?

17  **A.**  Yes.

18  **Q.**  Okay.  During that period of time, 1991 to 1996, were

19  you -- you, Robert Pough -- ever robbed by Wop?

20  **A.**  No.

21  **Q.**  Ever robbed by Dazz?

22  **A.**  No.

23  **Q.**  Ever robbed by any of the gentlemen seated behind me that

24  you've identified?

25  **A.**  No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11685

1    Q.    Did -- let's focus on Wop. During that same period of
2    time, 1991 to 1996, what was your relationship like with Wop?
3           MS. WICKS:  Assumes facts not in evidence.  Objection,
4    Your Honor.
5           THE COURT:  Speak up, please.
6           MS. WICKS:  Objection, Your Honor.  Assumes a fact not in
7    evidence.
8           THE COURT:  Why don't you rephrase.
9    BY MR. LEON:
10   Q.    What relationship, if any, did you have with Cool Wop?
11   A.    Excuse me?
12   Q.    You established that you know who Cool Wop is, correct?
13   A.    Right.
14   Q.    Did you know Cool Wop from '91 to '96?
15   A.    Yes.
16   Q.    How'd you know him?
17   A.    We went to school together, come from around the same
18   neighborhood.
19   Q.    How else did you know him?  If you can answer, you can
20   answer.  If you don't, I'll ask another question.
21   A.    I know him from man hanging around the Congress Park
22   area.
23   Q.    Okay.  When you hung around the Congress Park area, would
24   you ever hang around Cool Wop?
25   A.    Yes.  Not every day.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

11686

1    Q.    Okay.  Not every day.  How often?
2    A.    Once or twice out the week or something.
3    Q.    And when you hung out with him once in a while, once a
4    week or so, what kind of things would you do?
5    A.    Sit out there, smoke a blunt or something, get a bottle,
6    kick it for a second or two and that's about it.
7    Q.    And when you did that, what portion of Congress Park
8    would you generally do that in?
9    A.    Sometimes on the corner of 13th and Congress or The
10   Circle or the Lincoln or the alley.
11   Q.    Now, I want to get back to that incident that you talked
12   about in 1995 when you said that Wop robbed Sean and Damien.  Do
13   you remember that?
14   A.    Yes.
15   Q.    Okay.  After that incident happened, did you see Wop
16   after that?
17   A.    Yes.
18   Q.    Did you ever talk to Wop about this incident?
19   A.    Yes.  Actually, he came to me about it.
20   Q.    Okay.  So I believe you said the incident happened in
21   1995 and you said Wop approached you?
22   A.    Yes.
23   Q.    Tell us what Wop said to you about this incident when he
24   approached you about it.
25   A.    One, he was mad about the -- you know, them shooting at

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

11687

1    him, but at the same token, he was trying to squash it.
2    Q.    What did he say?
3    A.    He basically told me to tell them to leave it alone, it's
4    over with.  You know, trying to squash the beef.
5    Q.    What, if anything, did you say in response?
6    A.    "All right.  I'm going to talk to them.  It's over with."
7    Q.    And did you actually go and talk to Sean and Darin?
8    A.    Yes.
9    Q.    I'm sorry.  Darin or Damien?
10   A.    It's Darin.
11   Q.    Okay.  And after you talked to Sean and Darin, without
12   telling us what they said, did you feel as if the beef was
13   squashed in their minds?
14   A.    Yes.
15   Q.    Did you then talk to Wop after this?
16   A.    Yes.  Told him everything was all good.
17   Q.    What, if anything, did Wop say in response?
18   A.    He was like, "Okay."
19   Q.    During this same period of time -- again, let's focus a
20   little bit more towards the end of that period of time, '94,
21   '95, '96 -- do you know somebody by the name -- did you know
22   somebody by the name of Mario?
23   A.    Yeah.  Mario.
24   Q.    Who's Mario?
25   A.    A guy who came from off 10th Place.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

11688

1    Q.    Who is Mario to you during this period of time?
2    A.    Nobody.
3    Q.    Did you know him at that time?
4    A.    I knew him from hanging on the street, which is 10th
5    Place, hanging on 10th Place.
6    Q.    Did you during this period of time, '94, '95, '96, have
7    any problems with Mario?
8    A.    Yes.  He was dealing with a girl that stayed in the
9    building right there in front of where I used to hustle at '94.
10   Q.    Just -- yeah, if you could just quickly point.
11   A.    It's the building right here (indicating).
12   Q.    For the record, you're pointing on Government's 122.3 to
13   a building which appears to be on the south side of 13th -- of
14   Congress Street across from where you previously identified 1212
15   Congress Street; is that right?
16   A.    Yes, sir.
17   Q.    Okay.  So what was he doing there?
18   A.    He was trying to sell drugs there.  He was messing with a
19   female there and trying to sell drugs there.
20   Q.    Okay.  Did you know who this female was?
21   A.    A female by the name of Kena.
22   Q.    What's the name?
23   A.    Kena.
24   Q.    Okay.  And was there a problem with that?
25   A.    Yeah.  Me and him had a confrontation.  We was arguing.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

1  about what happened, I don't see how that's in furtherance of the
2  conspiracy.
3      MR. CARNEY:  Your Honor, I also agree that this statement
4  is about things that have occurred in the past, gossip.  It
5  doesn't go to get him to take a particular action at this time to
6  go forward and do certain things, and it seems to me that this is
7  really remote from saying that it could be in furtherance of the
8  conspiracy, particularly where both were locked up and you're
9  assuming that at least for a partial period of time they're
10  withdrawn from the conspiracy.
11      THE COURT:  I'm sorry.  I'd like to know what's going to
12  come out.
13      MR. LEON:  This I can answer.  LT is going to give this
14  whole Mr. Pough details of the murder about generally where it
15  occurred, who was there, specifically that Drano, Wop and LT
16  committed the murder; that LT was annoyed that Wop was bragging
17  about it because Wop was only driving the car, and that is --
18  those are the broad strokes of what I can proffer, but to get to
19  the point, LT says that he, LT, Drano and Wop did it, and that is
20  consistent with proof that we already have and proof we're going
21  to have -- stay tuned -- but proof we're going to have.
22      THE COURT:  I'm worried.  That has nothing to do with any
23  conversation where this witness displays his own bravado ability
24  to hold his own, ability to keep a secret, ability to shoot,
25  ability to sell drugs, all that stuff.  It's essentially an

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  admission by LT which implicates other people, and if he's going
2  to say what you're saying he's going to say, that may well
3  present *Crawford* problems more than it does present statements of
4  co-conspirator in furtherance of a conspiracy.
5      I don't see from the proffer you've just given how that
6  would be supportive of a recruitment theory where the prior
7  discussions would have been.
8      MR. LEON:  I understand the Court -- what the Court's
9  saying.  I would just offer one other theory.  Perhaps not a
10  recruitment theory, but certainly on the reputation theory.  The
11  sum and substance, the gist of the conversation is LT is upset
12  because somebody else is stealing his credit and he's furthering
13  his role in the conspiracy by saying I did that; not him, I did
14  it.  So that is in furtherance of the conspiracy as in the four
15  corners of the indictment.  Reputation is important to this
16  conspiracy, and that is what LT is doing right there.  He's
17  talking to somebody who knows people from the neighborhood and is
18  saying that's my work and Wop shouldn't be taking all the credit
19  for it.  So that's the other theory, is reputation.
20      MS. WICKS:  And with that, Your Honor, LT is not the
21  person on trial here, Mr. Wilson's the person on trial here, and
22  LT's basically saying Wop's lying, Wop didn't do it, I did it,
23  and he's taking credit for it.  That's not in furtherance of the
24  conspiracy.
25      THE COURT:  It would be in furtherance of the conspiracy

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  if it was offered to show there was some effort to enhance the
2  reputation of the conspirators in their effort to advance drug
3  sales or maintain control or show, you know, show some
4  enforcement power over drug sales.  But I'm not sure it does
5  that, and unless you can convince me beyond what you've
6  proffered, I'm going to sustain the presumed objection.  But
7  thank you for bringing it up.
8      MR. LEON:  That's all I have.  I mean, I can just -- I'm
9  not going to belabor the point.  I'll just put one other quick
10  proffer in on it and ask for some direction from the Court so I
11  can at least get something out on this point.  I can further
12  proffer that after they get out of jail, they being Mr. Pough and
13  LT -- I think I said this earlier -- in the middle to end of
14  2003, they do, they, Mr. Pough and LT, do start to associate and
15  hang out before LT is killed.  So there's some proof in the
16  pudding.  In other words, there is some proof that LT was --
17  well, it goes a little bit to the recruiting and it goes a little
18  bit to the reputation, but it's -- I don't have much more to give
19  on that.
20      THE COURT:  I'm afraid you're just going to have to do the
21  traditional end-run around the hearsay, and I'm going to sustain
22  an objection to having the witness testify about what LT told
23  him.  Anything else?
24      MS. WICKS:  No.  For the record, I'm objecting.
25      THE COURT:  To?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1      MS. WICKS:  I came to the bench without an objection from
2  me, and to the record I would object to all of that.
3      THE COURT:  Sustained.
4  BY MR. LEON:
5      Q.  Mr. Pough, first just a yes or no question.  Is it
6  correct, yes or no, that you said that one of the things you and
7  LT talked about was the murder of Squid and Sabrina?
8      A.  Yes.
9      Q.  Okay.  Without telling us what LT said to you, don't tell
10  us what he said, but how many times did LT talk to you about
11  this murder, once, twice, more, less?
12      A.  Once or twice.
13      Q.  And when he told you about it, first just yes or no, did
14  you know who Squid and Sabrina were?
15      A.  Yes.
16      Q.  Did you know that they had been killed?
17      A.  Yes.
18      Q.  Who did you know Squid to be, if you knew who Squid was?
19      A.  Squid was a hit man.
20      Q.  For whom?
21      A.  A guy named Tommy Edelin.
22      Q.  And did you know --
23      MR. CARNEY:  Your Honor, objection on 602 grounds.
24      THE COURT:  Put the next question.
25  BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11733**

1 withdrawn. Were you drinking alcohol the night you committed
2 that armed robbery?
3 **A.** Yeah. I had started out earlier that morning and had
4 been drinking all day.
5 **Q.** Were you drunk when you committed that armed robbery?
6 **A.** Yes. Drunk to the point I couldn't even stand up,
7 actually.
8     MR. BALAREZO: Objection.
9 BY MR. LEON:
10 **Q.** Tell us how you got caught doing that armed robbery. Who
11 caught you?
12 **A.** The guys that I was trying to rob, rushed me, got the gun
13 out my hand and held me until the police came.
14 **Q.** You were that drunk?
15 **A.** That drunk.
16     MR. LEON: May I approach, Your Honor?
17     THE COURT: Yes.
18 BY MR. LEON:
19 **Q.** Mr. Pough, I'm handing you what's marked for
20 identification as Government's 1126. Do you see this?
21 **A.** Yes.
22 **Q.** Do you, first just yes or no, do you recognize
23 Government's 1126?
24 **A.** Yes.
25 **Q.** What do you recognize that to be?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11734**

1 **A.** That's my plea agreement that I had in Superior Court.
2 **Q.** The armed robbery charge you just mentioned?
3 **A.** Yes.
4 **Q.** And is this your signature here on page -- appears to be
5 page 6 of the document?
6 **A.** Yes.
7 **Q.** Is that your signature -- your attorney's signature also?
8 **A.** Yes.
9 **Q.** And is this the signature of an Assistant United States
10 Attorney that you see on page 5?
11 **A.** Yes.
12 **Q.** And I apologize. You entered into this agreement on what
13 date?
14 **A.** On February 19th, '04.
15     MR. LEON: Your Honor, the government would move for
16 admission of 1126.
17     MS. WICKS: Objection.
18     THE COURT: Over objection, 1126 is received.
19     (Government's Exhibit 1126 admitted into the record.)
20 BY MR. LEON:
21 **Q.** Now, Mr. Pough, you said on this instance you decided to
22 enter into an agreement with the government, correct?
23 **A.** Yes.
24 **Q.** Did you do things -- were you required to do any things
25 as a result of this written agreement with the government?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11735**

1 **A.** Yes.
2 **Q.** What kind of things?
3 **A.** Cooperate with the government, whatever they needed me to
4 cooperate with. Whatever they needed me to do, I had to do.
5 **Q.** Did that include testifying at trials?
6 **A.** Yes.
7 **Q.** Did you testify at trials as a result of this agreement?
8 **A.** Yes.
9 **Q.** How many?
10 **A.** Two.
11 **Q.** And did this also include debriefings, sitting and giving
12 interviews and information not under oath?
13 **A.** Yes.
14 **Q.** Did you do that?
15 **A.** Yes.
16 **Q.** Can you think of any other cooperation you gave as a
17 result of this written agreement other than the trial testimony
18 and the debriefings? Do you remember anything else?
19 **A.** Prior to that? Prior to that -- rephrase the question.
20 **Q.** Sure. Can you -- this agreement, 1126, you said it has
21 certain obligations and you mentioned testifying at trial and
22 debriefings. Are there any other obligations that you
23 understand that you had as a result of this agreement?
24 **A.** Tell the truth.
25 **Q.** Mr. Pough, is this agreement still in effect anymore?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11736**

1 **A.** Nope.
2 **Q.** Why not?
3 **A.** I already been sentenced on that.
4 **Q.** You've been sentenced on this?
5 **A.** Yep.
6 **Q.** As you sit here today, do you have any written agreements
7 with the government at all?
8 **A.** No, sir.
9 **Q.** Who sentenced you for this agreement, this cooperation
10 agreement that you say is over?
11 **A.** Judge Winfield.
12 **Q.** Is she -- is that a man or woman?
13 **A.** Woman.
14 **Q.** And is she in this courthouse or Superior Court?
15 **A.** Superior Court.
16 **Q.** And how much time did Judge Winfield give you?
17 **A.** Ten years.
18 **Q.** And are you serving that now?
19 **A.** Yes.
20 **Q.** Are you incarcerated now?
21 **A.** Yes.
22 **Q.** Please don't tell us where you're incarcerated, but were
23 you brought here by marshals?
24 **A.** Yes.
25 **Q.** How many -- how much time do you still have to serve on

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11741**

1  **A.** No, sir.

2  **Q.** And do you know how much money it even is?

3  **A.** No, sir.

4  **Q.** When did you -- well, withdrawn.

5  Now, as you sit here today you said there's no written

6  agreement with the government, correct?

7  **A.** Right.

8  **Q.** You're doing straight four and a half to five years?

9  **A.** Yes.

10  **Q.** As you sit here today, do you hope that you may get a

11  further benefit from the government?

12  **A.** Yes.

13  **Q.** What's your hope?

14  **A.** I hope to get a time cut eventually.

15  **Q.** And do you know what a Rule 35 motion is?

16  **A.** Yes.

17  **Q.** What's your understanding as to what a Rule 35 motion is?

18  **A.** It's a motion --

19  MR. BALAREZO: Objection, objection, Your Honor.

20  MR. ZUCKER: Exception.

21  THE COURT: What is it?

22  MS. WICKS: Exception.

23  MR. BALAREZO: I'll withdraw it.

24  THE COURT: Were there two objections?

25  MR. ZUCKER: Two.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11742**

1  THE COURT: Hold it. One at a time. Mr. Balarezo.

2  MR. BALAREZO: One objection, two exceptions, I'll

3  withdraw.

4  THE COURT: All objections are withdrawn?

5  MR. BALAREZO: Yes.

6  THE WITNESS: Rule 35 is a motion that a lawyer or a

7  prosecutor can put in for a time reduction.

8  BY MR. LEON:

9  **Q.** After you get your sentence?

10  **A.** Yes, after your sentence, yes.

11  **Q.** And have I indicated that I would submit information to a

12  court, to Judge Winfield that you provided testimony in this

13  proceeding?

14  **A.** Yes.

15  **Q.** And without telling us who they are, is there at least

16  one other prosecutor who's made a similar promise to you?

17  **A.** Yes.

18  **Q.** Do you have any idea if Judge Winfield is going to give

19  you any time off?

20  **A.** No, I don't have any idea at all.

21  **Q.** You hope she does?

22  **A.** I hope she does.

23  **Q.** And if she doesn't, if she decides to not take that

24  information into account and further reduce your sentence, how

25  much time in total do you have hanging over your head as you sit

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11743**

1  here?

2  **A.** Like I say, four and a half, five years, I think, about

3  five. Four and a half at the most.

4  **Q.** Okay. Mr. Pough, now I just want to go back. You

5  established that during 1999, August, we've established that you

6  were in and out of jail a couple times from 1999, August, to

7  November of 2003, correct?

8  **A.** Yes.

9  **Q.** I want to focus you with a few final follow-ups during

10  that period of time, okay. Let's start in August of 1999 while

11  you're out, okay. We focused on when you were in; let's focus

12  now on when you were out.

13  I believe you said in August of 1999 you get released

14  from Lorton, correct?

15  **A.** Yes.

16  **Q.** And I believe you also said you self-surrendered and went

17  down to Beckley in March of 2001, correct?

18  **A.** Yes.

19  **Q.** When you got out of that limo and you saw Wop in August

20  of 1999, I think you said August 4th, 1999?

21  **A.** Yes.

22  **Q.** And you're there in the limo and you see Wop and you

23  drive away, could you go out and get a job?

24  **A.** No.

25  **Q.** What did you do to make a living?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11744**

1  **A.** Sold drugs.

2  **Q.** Where?

3  **A.** The Congress Park area.

4  **Q.** I'm sorry. What part of Congress Park?

5  **A.** 13th, 13th and Congress.

6  **Q.** You indicated you posted up at that intersection of 13th

7  and Congress. That location or other spots?

8  **A.** That location, The Circle, the alley.

9  **Q.** Did you -- you mentioned The Circle. After you got out

10  in 1999, August, were you selling drugs more frequently or less

11  frequently in The Circle than you had previously before you got

12  into Lorton?

13  **A.** I would say a little more.

14  **Q.** Same question with respect to the alley. Were you in the

15  alley selling more or less or the same from before you got into

16  Lorton?

17  **A.** About the same.

18  **Q.** And what about posting right there at the intersection of

19  13th and Congress, same, more, or less?

20  **A.** It was more.

21  **Q.** During that period of time -- excuse me, August of 1999

22  to March of 2001, just yes or no, did you see Antwuan?

23  **A.** From what year, sir?

24  **Q.** From when you got out of Lorton in '99 until 2001, March,

25  did you, just with your own eyes, see Antwuan?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1526 of 1954

1  Q.  And what relationship, if any, does he have to Kairi?
2  A.  That's his cousin.
3  Q.  That's the Amon you talked about?
4  A.  Yes.
5  Q.  Okay.  Who else do you recognize?
6  A.  Antwuan (indicating).
7  Q.  In the middle?
8  A.  Yes.
9  Q.  Who's next?
10  A.  (Indicating) Jo-Jo.
11  Q.  Where is he?
12  A.  Standing beside Ant.
13  Q.  All the way in the back, right, standing?
14  A.  Yes.
15  Q.  Who else, if anyone, do you recognize?
16  A.  LT (indicating) bending down with the red hat on.
17  Q.  Okay.  In the center down?
18  A.  Yes.
19  Q.  Who else?
20  A.  Kairi, Baby Kairi beside him.
21  Q.  With the hat?
22  A.  With the hat on and the white shorts, white and blue
23  shorts.
24  Q.  Who else, if anyone?
25  A.  Little Terrence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  Crouching on the right?
2  A.  Yes.
3  Q.  In front of the man with the blue cap?
4  A.  Yes.  I don't know this other guy.
5  Q.  You don't know the man in the blue cap?
6  A.  Naw, his face kind of blurry.
7  Q.  Can you tell approximately when this photograph was
8  taken?
9  A.  Look like about '97, '98.
10  Q.  Why do you say that?
11  A.  Because I was locked up then in Lorton, and they wasn't
12  even -- LT and them wasn't hanging around like that at the time,
13  and I hadn't seen Kairi that much either prior to my going to
14  Lorton, and just telling by the picture how young they looking.
15  Q.  Mr. Pough, have you ever heard of the term "doors"?
16  A.  Yes.
17  Q.  What's your understanding of what that means?
18      MR. ZUCKER:  Objection, basis.
19      MS. WICKS:  Objection.
20      THE COURT:  Establish a foundation.
21  BY MR. LEON:
22  Q.  Tell us a time you've heard doors.
23  A.  I was standing outside with these guys, and --
24      MR. CARNEY:  Objection.
25  BY MR. LEON:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  When you say "these guys," who were you hanging out with
2  when you heard this term?
3  A.  Cool Wop, Drano, Dazz, EB, Don.
4  Q.  And where were you?
5  A.  The Circle.
6  Q.  Okay.  Do you know when this was?
7  A.  I'm going to say somewhere around '99, 2000, something
8  like that, 2003.
9  Q.  Okay.  And when you hear this term, who used it?
10  A.  Who used it?
11  Q.  Who said it?
12  A.  Cool Wop, Dazz.  Everybody basically used it around
13  there.
14  Q.  Did you use it?
15  A.  No.
16  Q.  So, what happened if -- first of all, what's your
17  understanding as to what it means?
18  A.  It's like calling uno *or* doors like on a sale, like when
19  a crackhead come up calling for a sale, you know, I got first or
20  second on them.
21  Q.  And did you see -- you said Wop and Dazz, for example.
22  Did you see them do "doors"?
23  A.  Yes.
24  Q.  Around this time period you just told us about?
25  A.  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.  In The Circle?
2  A.  Yes.
3  Q.  You said you didn't do it.  Why not?
4  A.  I just didn't do it.  I was doing my own thing.  That was
5  they thing, you know.
6  Q.  Where were you doing your thing?
7  A.  13th and Congress on the corner.
8  Q.  And when you were up there, were any of the people you
9  mentioned, did any of them try to do it up where you posted up
10  at 13th and Congress?
11  A.  Yeah, Drano.
12  Q.  Tell us about that.
13  A.  Drano had got into a fight with Dazz, so that was in
14  2000.  So he had started hanging down there with us, and sales
15  was coming through and he was trying to, you know, bring the
16  doors thing down there, and I was like, "man, we don't do that
17  down here, we got customers already."
18  Q.  And when you said "we got customers already," what in your
19  mind -- what did you mean?
20  A.  Meaning that we don't -- we got customers already just
21  assigned to us, you know, customers, you know.  Everybody deals
22  with particular people.
23  Q.  And when you said "we've got customers," in your mind,
24  who did you mean by "we"?
25  A.  Me and the guys that were hanging down there, Darin,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**11773**

1  **A.**  Me and Little -- me and a guy named Jay, Jayvon.
2  **Q.**  Jayvon?
3  **A.**  Yeah.
4  **Q.**  Did you see LT wearing the clothes you got him?
5  **A.**  Yes.
6  **Q.**  After LT gets out, does -- do you spend time with him?
7  Starting September of '03 when he gets out, between then,
8  September '03 and November '03 when you yourself get locked up
9  on that armed robbery, those three months?
10  **A.**  Yes.
11  **Q.**  A lot or a little time?
12  **A.**  It was a lot.
13  **Q.**  And who else, if anyone, did you hang out with during
14  this time September '03 to November of '03?
15  **A.**  Antwuan.
16  **Q.**  Antwuan who?
17  **A.**  Big Ant.
18  **Q.**  Okay.
19  **A.**  Antwan Ball.
20  **Q.**  Anyone else that you hung out with during that time a
21  lot?
22  **A.**  Just basically him, him and Antwuan -- LT and Antwuan.
23  **Q.**  Okay.  Now, I think you said something about  -- did you
24  still have to test for drugs?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11774**

1  **Q.**  And how often?
2  **A.**  I was on -- I had to call in every day, and if your
3  number --
4  **Q.**  I'm asking just about urine tests.
5  **A.**  You had to call in.
6  **Q.**  For what reason?
7  **A.**  To see if I had to take a urine.
8  **Q.**  I see.  And if you learned you did, you would go take a
9  urine?
10  **A.**  Yes.
11  **Q.**  What part of the city would you have to go to to do that?
12  **A.**  It was over in Capitol Heights.  I'm not sure of the
13  exact neighborhood.
14  **Q.**  And yes or no, do you know if LT had similar drug testing
15  conditions when he got released?
16  **A.**  Well, he was in a halfway house at the time, so whatever
17  drug testing they did they did up there at the halfway house, I
18  guess.
19  **Q.**  And when you would go to drug tests, would you go alone
20  or sometimes would you go with LT or Antwuan?
21  **A.**  With LT and Antwuan.
22  **Q.**  And these would be for your own drug tests?
23  **A.**  Yes.
24  **Q.**  How often would you say you, LT and Antwuan would drive
25  together to do this test?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11775**

1  **A.**  Well, it was just one, like I said, one particular time
2  right there that I drove with them, that I drove over there with
3  them.
4  **Q.**  Okay.  Who was driving?
5  **A.**  I was driving Antwuan's truck at the time because he was
6  rolling up a joint.
7  **Q.**  Who's -- you said truck.  What kind of truck?
8  **A.**  Gray Expedition.
9  **Q.**  And it was Antwuan's truck?
10  **A.**  Yeah.
11  **Q.**  You're driving?
12  **A.**  Yes.
13  **Q.**  Where's Antwuan?
14  **A.**  He's in the back; LT in the front.
15  **Q.**  Anyone else in the truck?
16  **A.**  Just us three.
17  **Q.**  Tell us about that conversation.
18  **A.**  Basically we was riding over there to get ready to go
19  take my urine, and LT got to messing with Antwuan about the
20  bullet holes that was in his truck.
21  **Q.**  What do you mean by that, messing with him about bullet
22  holes?
23  **A.**  He was joking with him, like, asking him why he didn't
24  get it fixed.
25  **Q.**  Were there bullet holes in Antwuan's truck?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**11776**

1  **A.**  Yes.  It had duct tape over them.
2  **Q.**  Did you see this?
3  **A.**  Yes.
4  **Q.**  And when LT is joking with Antwuan about this, what does
5  Antwuan say in response?
6  **A.**  Basically LT asked him who had did it, and he was like,
7  "Man, Travon."  As soon as he get a chance, man, he was going to
8  smash him.
9  **Q.**  Who said that?
10  **A.**  Antwuan.
11  **Q.**  And he said that about Travon.  Did you know who Travon
12  was?
13  **A.**  I knew he was a little guy around the neighborhood, but
14  he was younger than me.  I didn't know him, per se.
15  **Q.**  Would you know him to see him?
16  **A.**  Nope.
17  **Q.**  When you say a little guy, do you mean physically or
18  little in age?
19  **A.**  Young, much younger than I am, or was.
20  **Q.**  And what, if anything, did you say in response when
21  Antwuan says this?
22  **A.**  I didn't say nothing.  I don't think I said nothing.
23  **Q.**  Did Antwuan say why he wanted to do that?
24  **A.**  The guy had supposedly, man -- him and guy had a --
25  MR. CARNEY:  Objection, Your Honor.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

Page 11785

1 the truck, like in the trunk part.

2 Q.  Did Antwuan Ball say why Antwuan wanted to smash Travonne?

3 A.  He said the guy jumped out there with him or something, the

4 guy wasn't respecting him, or something to that effect.

5 Q.  October/November of 2003, did you spend time with

6 Antwuan Ball?

7 A.  I would say about probably lasted up until about October.

8 Q.  October?

9 A.  Yeah.

10 Q.  And during that time, what types of things would you do with

11 Antwuan?

12 A.  Basically, go and pick LT up from the halfway house, might

13 stop and grab something to eat, lunch or breakfast.

14 Q.  Was LT always with you and Antwuan, or would you sometimes

15 spend time alone with Antwuan?

16 A.  Sometimes we would drive back by ourself from dropping LT

17 off at the halfway house.  But other than that, naw, it was

18 basically with, LT always was around.

19 Q.  First just yes or no, did you and Antwuan ever talk about a

20 conspiracy case?

21 A.  Yes.

22 Q.  And who talked about it, you or Antwuan?

23 A.  Antwuan.

24 Q.  And when -- was this just one conversation, or more than

25 one, that you had with Antwuan about this?

1 A.  I can't remember how many, but a particular day he was

2 saying to LT --

3 Q.  I'll stop you there.  I just want to establish a time frame.

4 Do you remember a particular conversation that you had with

5 Antwuan about a conspiracy case?

6 A.  Yes.

7 Q.  And was LT there?

8 A.  Yes.

9 Q.  Anyone else there other than you, LT, and Antwuan?

10 A.  No.

11 Q.  And to the best of your memory, where was this conversation?

12 Where were you physically?

13 A.  We was driving.

14 Q.  In what vehicle?

15 A.  His Expedition.

16 Q.  Was this the same conversation when Antwuan said he was

17 going to smash Travonne?

18 A.  Yes.

19 Q.  And so again, you were driving that vehicle?

20 A.  Yes.  And he basically said -- told LT to hurry up, he

21 needed to hurry up and get out the halfway house so he could

22 start getting rid of some of the guys that he thought was going

23 to flip.

24 Q.  Who said that?

25 A.  Antwuan.

1 Q.  Did Antwuan mention anyone in particular?

2 A.  Naw, he basically thought that Jazz and Santuce and Dazz and

3 them was going to be the first to flip.

4 Q.  That's what Antwuan told you?

5 A.  And Boy-Boy, yes.

6 Q.  Now, who actually -- was the word "conspiracy" or

7 "conspiracy case" used during this conversation?

8 A.  Yes.  He said a guy by the name of Munya was calling home,

9 saying that the feds was on they way, they was getting ready to

10 drop a conspiracy.

11 Q.  Do you know who Munya is?

12 A.  Yes.

13 Q.  Who is Munya?

14 A.  He's a guy that comes from around Congress Park.

15 Q.  How do you know Munya?

16 A.  Basically grew up with him too, around there.

17 Q.  Did you speak to Munya or did Antwuan speak to Munya?

18 A.  It was never said who spoke to him.  It was like he was

19 calling home saying it, to whoever, I don't know.

20 Q.  But who said that Munya is calling home?

21 A.  I don't know.  Antwuan said that he was calling out there

22 saying it, but he never said he had talked to him per se.

23 Q.  I see.  And let's focus on you.  When is the last time you

24 yourself have seen Munya?

25 A.  About two years -- yeah, about two years ago.

1 A.  They got them broken -- in D.C. Jail they have the units or

2 the blocks broken down by sections, like Northwest 3,

3 Southwest 3, stuff like that; Northeast 3.

4 Q.  Do you know what the numbers one, two, three, what they

5 correspond with?

6 A.  Excuse me?

7 Q.  Do you know what the numbers stand for, or no?

8 A.  Basically, levels of the floor.

9 Q.  So three would be third floor?

10 A.  Yeah, the third floor.

11 Q.  You said you got to Southwest 3.  Do you remember

12 approximately when you go from intake to Southwest 3?

13 A.  Probably a couple days later.  Three, four days later.

14 Q.  And when you get to Southwest 3, are you assigned to a cell?

15 A.  Yes.

16 Q.  Do you remember which cell, or approximately which cell?

17 A.  Left side, lower tier.

18 Q.  Left side, lower tier?

19 A.  Yeah.

20 Q.  Are the cells numbered?

21 A.  Early 20's.

22 Q.  When you say early 20's, do you mean low 20's?

23 A.  Yes.

24 Q.  Did you see anyone you recognized from Congress Park in

25 Southwest 3?

1 A.  Yes.  Don.

2 Q.  The same Don you've identified earlier?

3 A.  Yes.

4 Q.  And where were you in Southwest 3 when you first saw Don?

5 A.  I was in my cell.

6 Q.  And did he come to you or did you go to him?

7 A.  He came to me.

8 Q.  And did you talk?

9 A.  Yes.

10        MR. LEON:  May I approach, Your Honor?

11        THE COURT:  Yes.

12 BY MR. LEON:

13 Q.  Mr. Pough, I'm handing you what's marked for identification,

14 and I believe an add-on as Government's 123.

15        Take your time.  Do you recognize this?  Have you seen

16 this before?

17 A.  Yes.  This is a diagram of Southwest 3.

18 Q.  Floor plan or diagram of Southwest 3?

19 A.  Yes.

20 Q.  And does it fairly and accurately depict the general layout

21 of that housing unit, Southwest 3?

22 A.  Yes.

23        MR. BALAREZO:  Objection, Your Honor.  Can we approach?

24        THE COURT:  Yes.

25        (BENCH CONFERENCE ON THE RECORD.)

 1            MR. BALAREZO:  Your Honor, Government's Exhibit 123

 2    appears to be a half -- or at least half of some kind of floor

 3    plan at some facility that includes cells and a gym.  I

 4    understand that this individual said that he was incarcerated at

 5    the D.C. Jail at some point; however, I think more of a

 6    foundation needs to be laid as to how he recognizes this to be

 7    the D.C. Jail.  That's where this is going.  This could be

 8    anything, this could be any cell, any jail somewhere.

 9            THE COURT:  He said that this -- he said it fairly and

10    accurately depicts the general layout of housing unit

11    Southwest 3 at the D.C. Jail he was talking about.

12            MR. BALAREZO:  I believe he said that this was

13    Southwest 3, but my understanding from speaking with Mr. Leon

14    was that they even blocked out the particular block that this

15    was.  And as far as I know, this is not Southwest 3.

16            That's what you told us.

17            MR. LEON:  No, it isn't.

18            THE COURT:  No arguments here.  I take it you're going

19    to be moving this in evidence.  If this is going to be an

20    objection to moving it in, the objection on that basis will be

21    overruled.

22            MR. BALAREZO:  Should I object in court or just --

23            THE COURT:  You can.

24            (END BENCH CONFERENCE.)

25            MR. LEON:  Your Honor, the government would move for

1 admission of Government's 123.

2            MR. BALAREZO:  Objection.

3            THE COURT:  Over objection, Exhibit 123 will be

4 received.

5            (Government Exhibit 123 was moved into evidence.)

6            MR. LEON:  Actually, if I could approach again.

7 BY MR. LEON:

8 Q.  I'm going to display this in a moment, but can you just --

9 to speed things along, I'm going to ask you to point out a

10 couple of things, then I'm going show on the Elmo what you

11 pointed out, and make a record.  Okay?

12           Are you familiar with the term bubble?

13 A.  Yes.

14 Q.  What is the bubble?

15 A.  It's the area where the COs sit at.

16 Q.  In Southwest 3?

17 A.  Yes.

18 Q.  And where is the bubble in relation to Southwest 3?

19 A.  Like in the middle of the block.

20 Q.  And is there a gym in Southwest 3?

21 A.  Yes.

22 Q.  Where is the gym in relation to the bubble?

23 A.  To the far right.

24 Q.  Okay.  How many cells, if you know -- well, first of all, do

25 you know how many cells there are in Southwest 3, or any

1 housing -- well, withdrawn.

2          In Southwest 3?

3 A.  No.

4 Q.  Do you know how many people are housed -- you said you were

5 in one cell.  How many people were you housed with, how many

6 cell mates?

7 A.  One other cellie.

8 Q.  Okay.

9          MR. LEON:  And if we could publish off of the Elmo,

10 Ms. Romero.

11 BY MR. LEON:

12 Q.  Do you see this in front of you, sir?

13 A.  Yes.  Yes.

14 Q.  For the record -- I'm pointing over here.  What do you

15 recognize this to be?  And for the record, I'm pointing at

16 Government's 123, towards the middle, a little left of center.

17 A.  That's the bubble.

18 Q.  And over here it says, "gym."  Is that the gym you're

19 referring to?

20 A.  Yes.

21 Q.  I'm going to start here.  And just for the record, I'm

22 pointing to a series of rectangular -- rectangles, what appear

23 to be --

24          MR. BALAREZO:  Objection.

25          THE COURT:  Overruled.

Page 11799

1 BY MR. LEON:

2 Q.  What appear to be to the right of the bubble, what you've

3 identified as the bubble, and then another series to the left.

4 Do you see that?

5 A.  Yes.

6 Q.  What are those?  What do you recognize those to be on this

7 sketch?

8 A.  That's the right tier and left tier.

9 Q.  And when you say "tier," are there different tiers:  Top,

10 bottom?

11 A.  Yes.  Lower and bottom tier, yes.

12 Q.  This sketch is only two-dimensional, but are there cells on

13 both the top and the bottom on each side?

14 A.  Yes.

15 Q.  If I'm here in the bubble and this is right and this is

16 left, where were you?  You said you were somewhere in the low

17 20's.  Where were you housed?

18 A.  On the lower left side.  On the lower tier on the left-hand

19 side.

20 Q.  For the record, left being this direction?

21 A.  Yes.

22 Q.  So you're on the lower left?

23 A.  Yes.

24 Q.  So, these cells - --

25 A.  Yes.

1 Q.   -- on the lower level of this side?

2 A.   Yes.  I mean -- yeah, early 20's.

3 Q.   And then, approximately where along here would the lower

4 level 20's be, assuming we're a level below?

5 A.   Right in the middle.

6 Q.   Approximately where I'm stopping now?

7 A.   Yes.  Yes.

8 Q.   For the record -- oh, I'm sorry, I didn't see that.  Is that

9 about where you hit?

10 A.   Yes.

11 Q.   For the record, you hit on the left side of the bubble, a

12 little bit to the right and a little bit up from the word

13 "hallway"?

14 A.   Yes.

15 Q.   So somewhere on the bottom of that tier, in the middle of

16 that row.  Is that fair?

17 A.   Yes.

18 Q.   Okay.  That's where you were housed?

19 A.   Right.

20 Q.   Okay.  Did you come to learn where Don was housed?

21 A.   Yes.

22 Q.   Where?

23 A.   Top left tier, between one and two cell.

24 Q.   Okay.  And so was it on the left side or the ride side?

25 A.   Left side.

1 Q.  Actually, I won't touch it.  Can you point approximately

2 where he is?

3 A.  (Witness complies.)

4 Q.  And that's on the top tier?

5 A.  Yes.

6 Q.  And for the record, you indicated a red mark on the left

7 side of the tier of cells, closer to the bubble than the first

8 dot you made, which you indicated was where you were.  Correct?

9 A.  Yes.

10 Q.  And you indicated this is the top tier?

11 A.  Yes.

12 Q.  Okay.  When you first get -- whenever it is, when you first

13 get assigned from intake to Southwest 3, you said Don comes to

14 your cell?

15 A.  Yes.

16 Q.  Tell us what happens.

17 A.  When I first came in, he gave me a couple of packs of

18 cigarettes and some cosmetics.

19 Q.  Okay.  Is that it, or did you talk?

20 A.  We talked.

21 Q.  What did you talk about?

22 A.  Well, later on that day we talked.  Actually, he was just

23 asking me --

24          MR. BALAREZO:  Objection.

25 BY MR. LEON:

1 Q.  Well, let's break it down.  First, when he comes to you,

2 gives you the cigarettes and the cosmetics, at that time what

3 are you talking about?

4 A.  Basically asked me what I was doing back over here, and what

5 I'm back for.  Then we got into a conversation about him and

6 Black.

7 Q.  Okay.  Where physically were you and he when you had this

8 conversation about Black?

9 A.  I was in my cell.

10 Q.  Was it the same conversation or a later conversation?

11 A.  I'm going to say later on, probably.  Yeah, later on.

12 Q.  Was it the same day or a different day?

13 A.  Same day.

14 Q.  Tell us about this conversation.

15 A.  I basically was asking what he was over there for.  And he

16 was like, "Man, you know I smashed Black.  Why you ask me that?"

17 Q.  And what if anything did you say in response?

18 A.  "I told you to leave it alone."

19 Q.  You said that to him?

20 A.  Yes.

21 Q.  What did you mean by that?

22 A.  To leave it -- meaning, leave it alone, let it go.

23 Q.  Had you ever told Don to leave it alone prior?

24 A.  Yes.

25 Q.  When?

1 A.  The night right before I went to Beckley to turn myself in.

2 Q.  What if anything did Don say after you said, "I told you to

3 leave that alone"?

4 A.  He said, "I had to do what I had to do, man.  I told the

5 dude stay from around there.  Guys was going to look at me like

6 I was a sucker."

7 Q.  What if anything did you say, if you remember?

8 A.  I can't remember about that.

9 Q.  During this conversation when he says this to you and you're

10 talking to him, does Kairi come up, the name Kairi?

11 A.  Yeah.  He asked me, do I think Kairi was going to testify

12 against him.

13 Q.  And did you know anything about the possibility at that time

14 of Kairi testifying?

15 A.  Didn't even know that he was testifying.  He was, like, he

16 good if Kairi don't --

17          MR. BALAREZO:  Objection, Your Honor.  It's been

18 answered.

19          THE COURT:  Overruled.

20 BY MR. LEON:

21 Q.  What else did Don say about Kairi?

22 A.  He was basically saying that he'll be all right if he didn't

23 show up in court.

24 Q.  If who didn't show up?

25 A.  Kairi.

1 Q.  Don said that?

2 A.  Yeah.

3 Q.  What if anything did you say?

4 A.  I said, "I don't know if he's going to show up or not."

5 Q.  Did you give him your opinion at that time if you thought

6 Kairi was going to testify against him?

7          MR. BALAREZO:  Objection.

8          THE COURT:  Overruled.

9 A.  I told him I thought he would.  I mean, I didn't know.  I

10 asked him -- I told him I didn't know.

11 BY MR. LEON:

12 Q.  You told Don you didn't know?

13 A.  Didn't know if he was going to testify, and that we would

14 see when the time come.

15 Q.  Did Don talk to you about the shooting itself, tell you what

16 happened?

17 A.  Basically he said, man, that he was masked up when he hit

18 him, which was in the back of the alley around in the circle.

19 And he said -- like I say, he said he was going to be all right

20 as long as Kairi didn't testify.

21 Q.  When you heard Don say he was masked up, what did you

22 understand that to mean?

23 A.  That he had something over his face.

24 Q.  After this conversation this first night after you see Don

25 in Southwest 3, do you still see Don in Southwest 3 after that,

1 A.  What, when I used that name?  It was on a juvenile case.

2 Q.  That's not what I'm asking you.  I'm asking you what you got

3 arrested for.

4 A.  For guns.

5 Q.  All right.  You carried guns.  Right?

6 A.  Yes.

7 Q.  You were 16 years old, you're carrying guns, and you're

8 dealing drugs.  Correct?

9 A.  Yes.

10 Q.  All right.  And that wasn't the first time you were

11 arrested, was it?

12 A.  No.

13 Q.  You had been arrested previously.  Right?

14 A.  Yes.

15 Q.  And you were a juvenile, so they might have sent you over to

16 the juvenile facility away from home, and you didn't want to go

17 there.  Right?

18 A.  Right.

19 Q.  So when you get arrested in '95 and you give the name of

20 Derrick Dorsey -- and Derrick Dorsey was your best friend.

21 Right?

22 A.  Right.

23 Q.  And the reason you gave Derrick Dorsey's name was because

24 you were trying to avoid responsibility.  Is that correct?

25 A.  I was trying to avoid a warrant at the time.

Page 11828

1 Q.  You were what?

2 A.  Trying to avoid a warrant that I had out for my arrest, yes.

3 Q.  You were trying to avoid responsibility?

4 A.  Yes.

5 Q.  Because you knew that if you gave your correct name when you

6 got arrested, you were going to get -- or when you got stopped,

7 you were going to get arrested and sent away.  Right?

8 A.  Yes.

9 Q.  And being the stand-up man that you were, you gave your best

10 friend's name.  Right?

11 A.  Well, he actually let me use his name.

12 Q.  Oh, he said, "Yo, Pough" -- what's your name, anyway?  Which

13 is your correct name?

14 A.  Robert Lee Pough, III.

15 Q.  So he said, "Robert Lee Pough, III, next time you get

16 arrested, give them my name."  Right?  Is that what he said?

17 A.  Naw.  Actually, he came and got me from where I was housed

18 at; once we got back to the District area, we went downtown the

19 next morning and he offered to let me use his name.

20 Q.  But you had already been housed, so you already gave the

21 name before he came to pick you up.  Right?

22 A.  I was under the name Robert Pough then, in Maryland, yes.

23 Q.  Oh.  So you gave Robert Pough, then you took it somewhere

24 else, and then you gave Derrick Dorsey?

25            THE REPORTER:  I'm sorry.  Start over.

1        MR. BALAREZO:  I'll slow down.  I'm sorry.

2 BY MR. BALAREZO:

3 Q.  You were arrested, you gave the name of Robert Lee

4 Pough, III?

5 A.  Right.

6 Q.  And then you were sent somewhere else?

7 A.  I got locked up.  Shortly after that, that I escaped from

8 that facility.

9 Q.  All right.  So your buddy gave you his name to use when you

10 get in trouble, basically.  Right?

11 A.  Yeah.  I had the whole -- his license, his I.D.

12 Q.  I'm sorry?

13 A.  His license.

14 Q.  You sure you didn't steal it from him?

15 A.  I'm quite sure I didn't.

16 Q.  So he gave it to you, just in case you got arrested, for you

17 to give a false identification.  Right?

18 A.  Right.

19 Q.  Did you also change the picture on that license?

20 A.  Yeah.

21 Q.  Or do you really look like your friend, also?

22 A.  We favor.

23 Q.  You favor, okay.  And you had no problem giving your

24 friend's name and adding your criminal record to his name.

25 Right?

Page 11830

1 A.  I mean, like I say, I was young at the time, so, I mean, I

2 did anything to try to get out of trouble at that time, you

3 know.  I was young.

4 Q.  We were all there.  But I'm talking about you, now.  You had

5 no problem giving your friend's name and adding your criminal

6 history to his name.  Right?  You did it.  Right?

7 A.  Right.

8 Q.  And you had no problem with it?

9 A.  Right.  Yes.

10 Q.  So you were trying to escape responsibility at that point.

11 Right?

12 A.  I say yeah, I guess.

13 Q.  Kind of like what you're doing right now.  You're trying to

14 escape that remaining four-and-a-half, five-year sentence you

15 got hanging over your head.  Correct?

16 A.  Yes.

17 Q.  And that time, at least, was one of the first times -- well,

18 maybe not the first time, but you were trying to avoid jail.  Do

19 we agree on that?

20 A.  Yes.

21 Q.  Now, you testified on direct examination that you grew up in

22 Congress Park.  Right?

23 A.  Yes.

24 Q.  But I believe what you actually testified was that you grew

25 up in the Congress Park area.  Right?

1 didn't want to be held.

2 A.  Right.

3 Q.  And you provided information to the Pretrial Services

4 Offices there about you, personal information.  Do you remember

5 that?

6 A.  Yes.

7 Q.  You gave them information about your family.  Right?

8 A.  Yes.

9 Q.  You gave them information about where you lived and all that

10 stuff.  Right?

11 A.  Yes.

12 Q.  Because you wanted them to be able to take information and

13 then make a determination, or at least help the judge make a

14 determination about whether or not they were going to release

15 you?

16 A.  Correct.

17 Q.  And did you not tell the Pretrial Services Office there that

18 your current address in 1996 was 1850 U Street, Southeast?

19 A.  I can't remember if I told them that or not.

20 Q.  Did you also tell them that your prior street -- and that

21 you had been there for six months, on U Street?

22 A.  I can't remember.  I know that my son's mother lived -- not

23 my son's mother --

24 Q.  I'm not asking you about your son's mother.  I'm asking

25 you --

1 A.  My wife.

2 Q.  -- what you told Pretrial Services.

3 A.  That was 10 years ago.

4 Q.  Well, you're remembering a lot from a long time ago, but you

5 don't remember where you lived?

6 A.  When you give pretrial an address, it don't mean that you --

7 at the time, it don't mean that you staying in there --

8 Q.  So you lied to Pretrial Services?

9 A.  -- you staying there, you know?

10 Q.  Did you lie --

11 A.  I was staying back and forth between there, you know.

12 Q.  Did you lie to Pretrial Services?

13 A.  Naw.  Because at the time I was staying there.

14        MR. BALAREZO:  Could I approach the witness, Your

15 Honor?

16        THE COURT:  Yes.

17        MR. BALAREZO:  I've shown the government Number 68.

18 BY MR. BALAREZO:

19 Q.  Sir, let me point your attention, I'll circle.  Do you see

20 this document, your Pretrial Services release sheet?

21 A.  Okay.

22 Q.  Is that for you?

23 A.  I guess, yeah.  That's my name on it.

24 Q.  Robert Pough.  Correct?

25 A.  Yes.

1 Q.  Do you see the date, December 9th, 1996?

2 A.  Right.

3 Q.  Okay.  Do you see on the current address, what's the address

4 that's listed?

5 A.  1850 U Street.

6 Q.  And the prior address that's listed?

7 A.  1212 Congress Street.

8 Q.  And the street before that?

9        MR. LEON:  Your Honor, I would object.

10        THE COURT:  Sustained.

11 BY MR. BALAREZO:

12 Q.  Well, reviewing Number 68, does that refresh your

13 recollection as to what address you gave Pretrial Services when

14 you were arrested in December of 1996?

15 A.  This is what I told them.  Like I said, back and forth.

16 When you giving Pretrial your address --

17 Q.  Sir, does it refresh your recollection --

18 A.  Yes.

19 Q.  -- about the address --

20 A.  Yes.

21 Q.  -- that you gave Pretrial -- let me finish my question.  The

22 address that you gave Pretrial Services when you were arrested?

23 A.  Yes, sir.

24 Q.  And that address that you gave them at that time was

25 1850 U Street, Southeast.  Right?

1 A.  Yes.

2 Q.  Not somewhere in Congress Park.  Right?

3 A.  Yes.

4 Q.  And then, when you got arrested the second time -- well, not

5 the second time, the next time that you appeared in court, let's

6 say, in -- in 2000, remember when you picked up that federal gun

7 charge?

8 A.  Yes.

9 Q.  All right.  You were also presented to the court at that

10 time, were you not?

11 A.  Yes.

12 Q.  And you also --  you were trying to get out, to get released

13 again, were you not?

14 A.  Yes.

15 Q.  And at that time you talked to Pretrial Services again?

16 A.  Yes.

17 Q.  And you provided them information.  Right?

18 A.  Yes.

19 Q.  About your addresses and all that kind of thing?

20 A.  Yes.

21 Q.  And at that time, did you not give them the address of

22 5109 --

23 A.  F Street.

24 Q.  -- F Street, Southeast?

25 A.  Yes, sir.

1 Q.  Not an address in Congress Park.  Right?

2 A.  No, sir.

3 Q.  And in fact, you told them that you had been living at that

4 address on F Street for five months.  Do you remember that?

5 A.  Yes, sir.

6 Q.  So did you lie to Pretrial Services then, or did you lie to

7 this jury today?

8 A.  I wouldn't say I lied to Pretrial Services.  Like I said, I

9 go through a lot of changes with the females, so I'm back and

10 forth between there, you know.  I'm not quite sure you

11 understand that.

12 Q.  Well, I'm married, so I don't do that.

13         MR. LEON:  Objection, Your Honor.

14         THE COURT:  Sustained.

15 BY MR. BALAREZO:

16 Q.  So half the truth, a little bit of truth, a little bit of

17 not truth.  Is that what you're saying?

18         MR. LEON:  Objection to form.

19         THE WITNESS:  What's your question?

20         THE COURT:  Hold on one second.  When there's an

21 objection --

22         THE WITNESS:  I'm sorry.

23         THE COURT:  -- I need to hear it so I can rule on it.

24         THE WITNESS:  Apologize.

25         THE COURT:  What was it?

1          MR. LEON:  Objection.  What's his question?  Objection

2 to form.

3          THE COURT:  Put your question.

4          MR. BALAREZO:  What's my question or put my question?

5          THE COURT:  Put your question.

6          MR. BALAREZO:  Thank you, Your Honor.

7 BY MR. BALAREZO:

8 Q.  My question is, sir, when Pretrial Services asked you,

9 Mr. Robert Lee Pough, III, "What's your current address," which

10 word did you not understand of that question?

11 A.  "What's your address?"  They asked me what's my address, I

12 gave them my address.

13 Q.  But here you told us that between -- that after 1996 you

14 lived in Congress Park, but Pretrial you give an address on

15 F Street somewhere.  Right?

16 A.  1996, I went to -- I was incarcerated from 1996 to 1999.

17 Q.  And let's go back to your federal gun case that you picked

18 up.  You also gave another address that you said you lived

19 immediately before the F Street address, and that address was

20 34 Galveston street.  Do you remember that?  Do you remember

21 that?

22 A.  I'm trying to figure out who lived on Galveston.

23 Q.  I'm sorry?  What did you say, sir?

24 A.  I'm trying to figure out who lived on Galveston.  Like I

25 said, I deal with a lot of females out there, you know.

Page 11841

1 Q.  We'll talk about your females in a little bit.

2        Let me show you what I'll mark as Defense Exhibit

3 Number 69.  Does this document, Number 69, refresh your

4 recollection as to the current address and the prior address

5 that you gave Pretrial Services back in 2000 when you picked up

6 that federal gun charge?

7 A.  I see F Street.

8 Q.  Does it refresh your recollection?

9 A.  Yeah.

10 Q.  And you gave them the address of F Street, and you gave them

11 the address of Galveston street.  Right?

12 A.  Yes.

13 Q.  So once again, you told them a half truth, a little bit of

14 the truth, or whatever suited you at the time.

15        MR. LEON:  Objection.  Is that a question?

16        THE COURT:  Sustained.

17 BY MR. BALAREZO:

18 Q.  Did you give them a little bit of the truth?

19 A.  What you mean, a little bit of the truth?  I mean...

20 Q.  Did you give --

21 A.  I gave them an address, you know.  When you give somebody an

22 address, you know, at that time, like I said, I probably was

23 beefing with my baby mother, or beefing with a female that I was

24 with at the time.  But most of the time, like I said, I was in

25 the Congress Park area.

1 A.   Naw.  I mean, I did it.

2 Q.   No one put a gun to your head and said, "Hey, go" --

3 (Simultaneous conversation.)

4 A.   -- no, sir.  No, sir.  Nobody put a gun to my head.

5 Q.   You chose to do that?

6 A.   What I did was very stupid.

7 Q.   And when you were arrested in that time, in 2003, again, you

8 talked to Pretrial Services, and they asked you for your

9 address, because of course you're trying to get out again.

10 Right?  You don't want to be locked up.  Right?

11 A.   Yes.

12 Q.   And they asked you for your current address one more time.

13 Right?

14 A.   Yes.

15 Q.   And you give them one.  Correct?

16 A.   Yes.

17 Q.   Do you recall what address you gave them this time?

18 A.   No, sir.  You got the paperwork?

19 Q.   Does the address of 1430 Bangor Road, Southeast refresh your

20 recollection?

21 A.   That's my grandmother's address, yes.

22 Q.   So you did give that address.  Right?

23 A.   Yes.

24 Q.   Again, a street that is not in the Congress Park area.

25 Correct?

1 1979.  So for the last 20-some-odd years, somehow you don't

2 appear in any of these pictures.  Right?

3 A.  Actually, I am in some pictures.  They can't find them at

4 this moment, for some reason.

5 Q.  They can't find them?

6 A.  LT's mother should have had them.

7 Q.  I see.  But you don't have anything to show these people

8 right now?

9 A.  No, sir.

10          MR. LEON:  Objection.

11          THE COURT:  Sustained.

12 BY MR. BALAREZO:

13 Q.  No?  Are you in any of these 53 pictures I just showed you?

14 A.  No, sir.

15 Q.  Has the government shown you any pictures with you in them

16 and these gentlemen?

17          MR. LEON:  Objection.

18          THE COURT:  Basis?

19          MR. LEON:  What the government decides to show a

20 witness is irrelevant.

21          THE COURT:  Overruled.

22 BY MR. BALAREZO:

23 Q.  That means you can answer.

24 A.  Rephrase your question again, sir.

25 Q.  Has the government, meaning these people here, or their

Page 11854

1 BY MR. BALAREZO:

2 Q.  Let's talk a little bit about the robberies, or at least

3 your convictions that you talked about earlier.

4           1996 you were arrested, you said, for assault with

5 intent to commit robbery while armed.  Correct?

6 A.  Yes.

7 Q.  And on direct examination you told the prosecutor that you

8 did not have a deal with the government.  Right?

9 A.  '96?

10 Q.  '96.

11 A.  Right.

12 Q.  You said, no deal.  You pled straight up?

13 A.  Straight up.

14 Q.  Now, that's not entirely true, is it?

15 A.  What you mean by that?

16 Q.  Well, let me explain.  You pled guilty to assault with

17 intent to rob, not assault with intent to commit robbery while

18 armed.  Right?  Do you know the difference?

19 A.  What you say?

20 Q.  Let me say it again.

21 A.  Back that up, please.

22 Q.  Didn't your lawyer explain to you that the assault with

23 intent to rob while armed, the "while armed" at the end meant

24 that you had to do at least a five-year mandatory sentence?

25 A.  Naw, he didn't explain that to me.

1 Q.  You didn't know that?

2 A.  In '96, no.

3 Q.  But you just happened to plead guilty to a lower offense,

4 the assault with intent to rob, which doesn't carry a mandatory

5 minimum sentence.  Right?

6 A.  The guidelines have changed over the years.  So I mean,

7 where you going at?

8 Q.  Listen to my question.  You were initially charged with a

9 "while armed" offense, but somehow you pled guilty to the "not

10 armed" offense?

11        MR. LEON:  Objection.  Asked and answered.

12 BY MR. BALAREZO:

13 Q.  Is that correct?

14        THE COURT:  Sustained.

15 BY MR. BALAREZO:

16 Q.  Well, and the reason you were able to plead to that lower

17 offense was because the government agreed to dismiss the higher

18 offense with the mandatory time.  Right?

19 A.  You missing the point of it.

20 Q.  Sir, is that right or is it not right?

21 A.  What you talking about?  You missing the point of a plea

22 deal.  I did not agree to the man I worked with, the government,

23 until '03, '04.

24 Q.  I'm not talking about your first deal.  I'm talking about

25 the deal you got with the government in '96.

Page 11856

1 A.  What deal?

2 Q.  They dropped one charge, and you pled to a lower charge.  Is

3 that correct?

4 A.  I guess.  I was young then.  I don't know.  When he came to

5 me and said, "Cop the zero to 15," I took it, you know?

6 Q.  So you're forgetting what happened in 1996, at a very

7 important time in your life, that you might go to prison.  You

8 forget what happened back then?

9 A.  I know I got three years out of the deal, man.  Everything

10 else, I can't recall on --

11 Q.  And that's my point.  You didn't get the mandatory five.

12 Correct?

13 A.  I didn't get mandatory five-year; I got a three-year Youth

14 Act.

15 Q.  And in 2000, when you picked up that federal gun charge, you

16 told the prosecutor, "I didn't have a deal, I pled straight up."

17 Right?

18 A.  2000, right.

19 Q.  Well, that's not entirely true either, is it?

20 A.  Go ahead, present your evidence.

21 Q.  I'm sorry?

22 A.  Present your evidence, then, you know, if that ain't true.

23 Q.  Sir, my question to you was --

24 A.  I didn't have a deal with the government in 2000.

25 Q.  Let me finish my question, please.  My question to you is

Page 11857

1 simply:  What you said, that you didn't have a deal, is not

2 entirely true.  Correct?

3 A.  It's not true -- I mean, it is -- I didn't have a deal, put

4 it that way.  I didn't have a deal.

5 Q.  Let me show you what I will mark as Samuels Number 66.

6        Sir, let me show you Number 66.  Do you recognize that

7 as the indictment in the federal case where you picked up that

8 gun charge?

9 A.  I need to read this, though, man.  I don't know --

10 Q.  Take your time, take your time.  Let me know when you're

11 done.

12 A.  What type of deals you talking about, man?  Because this is

13 an agreement.

14 Q.  Are you finished reading that, sir?

15 A.  This is an agreement for me to plead guilty, that's all.  It

16 ain't nothing saying I'm working with the government.

17 Q.  Well, actually, it's the indictment in your case, is it not?

18 A.  Yeah, that's what it looks like.

19 Q.  See right here, the indictment?

20 A.  Okay.

21 Q.  Those are the charges against you that the government

22 brought.  Right?

23 A.  Right.

24 Q.  Do you remember what count one against you was?

25 A.  Count one should have been possession of a firearm.  Let me

1 see.

2 Q.  I'll just highlight it for you, here at the top.

3 A.  Yeah, "Unlawful possession of a firearm."

4 Q.  And that's what you pled guilty to.  Right?

5 A.  Yeah.

6 Q.  There also was a count two, was there not?

7 A.  PCP.

8 Q.  Right.  And the government indicted you on two counts, a gun

9 charge and a drug charge.  And according to you, you didn't have

10 a plea deal, but you only pled guilty to one count?

11 A.  Right.

12 Q.  So the second count, what, just disappeared?

13 A.  They dropped the case, man.  If I pleaded guilty to the gun

14 charge, man, they would drop the PCP, which wasn't nothing but a

15 half a gram of PCP.

16 Q.  That was a deal that you cut with them.  You plead to one,

17 they drop the other.  Right?

18 A.  But you saying like I had a deal with them on as far as

19 cooperating.  That's what you trying to mix me up.  You not

20 saying specifically what you saying, did I have a deal with

21 them.  You not saying that, sir.

22 Q.  Cooperation is on your mind.  All I said is "deal."  You

23 agreed to do one thing, they agreed to do something.  Right?

24 A.  You right.

25 Q.  They gave you something in exchange for you doing something.

Page 11859

1 A.  You right.

2 Q.  Right?

3 A.  You right.

4 Q.  You pled to the gun charge, they dropped the drug charge?

5 A.  You right.

6 Q.  Now, 2003, November 11 when you and, is it Ms. Fox, you were

7 driving around in that Cadillac robbing people?

8 A.  Yeah.

9 Q.  You got arrested, and you got charged in Superior Court.

10 Correct?

11 A.  Yes, sir.

12 Q.  And in fact, the government, once again -- and it was the

13 same office as these people.  Right?  United States Attorney's

14 Office for the District of Columbia.  Correct?

15 A.  It was a few -- yeah, it was the government, yeah.

16 Q.  The government, right here?

17 A.  Yes.

18 Q.  And in fact, they indicted you and Ms. Denita Fox in that

19 case.  Right?

20 A.  Yes, sir.

21 Q.  And you were indicted, filed January 6th, 2004 is when the

22 indictment was filed.

23 A.  Yes.

24 Q.  And in fact, you were indicted of -- do you remember how

25 many counts?

1 A.  Should have been nine.

2 Q.  Nine counts?

3 A.  Yes.

4 Q.  First count was armed robbery.  Right?

5 A.  Right.

6 Q.  Second count was possession of a firearm during the

7 commission of a crime of violence or a dangerous offense.

8 Correct?

9 A.  Yes.

10 Q.  And that particular charge carries a mandatory minimum

11 sentence of five years over there.  Right?

12 A.  What I'm doing, yes.

13 Q.  We'll talk about that.

14        Third count, assault with intent to commit robbery

15 while armed.

16 A.  Yes.

17 Q.  And that "while armed," once again, like the prior charge,

18 carries a mandatory five-year sentence.  Right?

19 A.  I guess.

20 Q.  Your lawyer didn't explain that to you?

21 A.  Excuse me?

22 Q.  Your lawyer didn't explain that to you?

23 A.  Yeah, he explained it to me.

24 Q.  So you know it.  You're not guessing, you know that it

25 carries a mandatory five?

1 A.  Which one, the possession of firearm, what?

2 Q.  Count three, the one I just mentioned, assault with intent

3 to commit robbery while armed.

4 A.  That's mandatory five, yes.

5 Q.  Fourth count, possession of a firearm during a crime of

6 violence or dangerous offense.  Another mandatory five-year

7 sentence.  Right?

8 A.  Yes.

9 Q.  Count five, assault with intent to commit robbery while

10 armed.  And each of these counts deal with different people that

11 you robbed or tried to rob that night.  Right?

12 A.  Yes.

13 Q.  And again, the "while armed," mandatory five.  Correct?

14 A.  Yes.

15 Q.  Count six, another possession of a firearm during the

16 commission of a crime of violence or dangerous offense, another

17 mandatory five.  Right?

18 A.  Yes.

19 Q.  Count seven, carrying a pistol without a license.  Do you

20 remember that one?

21 A.  Yes.

22 Q.  Count eight, possession of an unregistered firearm; and

23 count nine, unlawful possession of ammunition.

24        You were charged and indicted in nine counts in

25 Superior Court.  Right?

Page 11862

1  A.  Yes, sir.

2  Q.  And you agree that you did these things that they indicted

3  you for?

4  A.  Yes.

5  Q.  Right?

6  A.  Yes.

7  Q.  Or were you too drunk that you don't remember?

8  A.  Yes, I agree.

9  Q.  And this time, at least in your understanding, you did cut a

10  deal with the government.  Is that right?

11  A.  Yes, sir.

12  Q.  And this is the deal that you cut with the government

13  whereby -- which you signed on February 19th of 2004.  Do you

14  remember that?  Excuse me, February the 20th, 2004.

15  A.  Yes, sir.

16  Q.  And your lawyer at that time was a Paul Signet, Esquire.

17  Right?

18  A.  Yes, sir.

19  Q.  And the agreement was that you were going to plead guilty to

20  one count of armed robbery.

21          MR. BALAREZO:  Your Honor, I'm going to --

22          THE COURT:  Is that in evidence?

23          MR. BALAREZO:  1126, which is in evidence.

24  BY MR. BALAREZO:

25  Q.  That is your plea agreement.  Right, sir?

1 A.  Yes, sir.

2 Q.  "Mr. Pough agrees to plead to admit guilt," et cetera, "one

3 count of armed robbery."  Correct?

4 A.  Yes, sir.

5 Q.  Not armed robbery while armed, not the possession of a

6 firearm during the commission of a crime of violence.  Just

7 plain old armed robbery.  Right?

8 A.  Yes, sir.

9 Q.  And in exchange, these people over here were going to

10 dismiss the remaining eight counts of the nine-count indictment.

11 Right?

12 A.  Not them particular people there.

13 Q.  I'm sorry.  I mean the government.

14 A.  I had the deal with them.

15 Q.  I mean the government.

16 A.  Still pointing at them.  I mean, it was done with a whole

17 different prosecutor at the time.

18 Q.  The government?

19 A.  Okay.  Yes.

20        THE COURT:  We've actually reached the break point.

21 Did you need to put one or two more?

22        MR. BALAREZO:  No, Your Honor.  This is fine.

23        THE COURT:  Ladies and gentlemen, we'll take our

24 mid-afternoon break.  I think the best thing to do would be to

25 tag on to the end of the day that extra half hour I had promised

1 A.  Yes, sir.

2 Q.  You've fired at a person, haven't you?

3 A.  Yes, sir.

4 Q.  And when you fire a gun at a person, the intention is not

5 to --

6 A.  It's to do harm.

7 Q.  Let me finish.  Let me finish.  Your intention is not just

8 to fire a gun for the heck of it; the intention is to hurt them,

9 kill them, if possible.  Right?

10 A.  Yes, sir.

11 Q.  So when you gave the gun to Shawn for him to shoot Wop, your

12 understanding was that Shawn was going to kill Wop.  Right?

13 A.  I can't speak for it.  I can't speak for Shawn, you know.

14 Q.  And you understand that somebody who gives a gun to somebody

15 else to shoot a third person commits a crime?

16 A.  Yes, sir.

17 Q.  And the government has never charged you for that crime.

18 Correct?  In effect, an attempted murder?

19        MR. LEON:  Objection.

20        THE COURT:  Sustained.

21 BY MR. BALAREZO:

22 Q.  Have you been charged for that particular shooting, sir?

23 A.  No, sir.

24 Q.  And you don't anticipate or you don't expect that the

25 government is going to ever charge you for that particular

1 shooting.  Correct?

2 A.  No, sir.

3 Q.  And you also testified that you had some little run-in with

4 somebody named Mario.  Is that correct?

5 A.  Yes, sir.

6 Q.  And this was an instance in which you yourself took a gun

7 and shot at Mario.  Right?

8 A.  Yes, sir.

9 Q.  And your intention when you shot at Mario was to kill him,

10 perhaps?

11 A.  Like I say, I don't know what -- I just shot, you know, shot

12 the gun.

13 Q.  So you don't know why you shot another person?

14 A.  I didn't shoot him.

15 Q.  Let me correct that.

16 A.  I shot at him.

17 Q.  I'm sorry.  Go ahead.

18 A.  I fired the gun at him.  He never got hit.

19 Q.  So you don't know why you fired a weapon --

20 A.  Yes.

21 Q.  -- at Mario?

22 A.  Yes.  We had words, I fired the gun at him.  Yes.

23 Q.  I don't mean the reason that caused you to fire it, I mean

24 what you expected to happen when you fired on the man.

25 A.  I'm not God, so I don't know what might have happened, know

1 what I'm saying.

2 Q.  You're not God, but you know what would happen.  Right?

3 A.  I was trying to do bodily harm, yeah.

4 Q.  Bodily harm.  And, of course, you haven't been charged with

5 that particular attempted murder.  Right?

6          MR. LEON:  Objection.

7          THE COURT:  Sustained.

8 BY MR. BALAREZO:

9 Q.  You haven't been charged for that shooting, have you?

10 A.  No, sir.

11 Q.  And you don't expect the government ever to charge you for

12 that particular shooting, do you?

13 A.  No, sir.

14 Q.  And then you also discussed another situation where you had

15 a little run-in with Kay-Bay, Kairi Kellibrew?

16 A.  Yes, sir.

17 Q.  You know who I'm talking about.  Right?

18 A.  Yes.

19 Q.  When you were out there hustling, selling drugs, right?  And

20 you admit that you were dealing drugs?

21 A.  Yes, sir.

22 Q.  And you had a gun on you.  Right?

23 A.  Yes.

24 Q.  And Kairi comes up to you and buys a couple zips.  Right?

25 A.  Yes.

Page 11871

1 Q.  Couple of dimes, and gives you a 20 and he takes off.

2 Right?

3 A.  Yes.

4 Q.  And somehow you discover that the 20 that he gave you --

5 A.  He gave me two twenties.

6 Q.  I'm sorry.  The currency that he gave you, discovered that

7 it was counterfeit?

8 A.  Yes, sir.

9 Q.  So what was the total amount of that currency?

10 A.  $40.

11 Q.  $40.  And when you discovered that the currency was

12 counterfeit, you decided to get in your car and try to find him.

13 Right?

14 A.  Yes.

15 Q.  And when you finally found him when he was sitting in that

16 car rolling a J, you pulled up to him and you had a gun in

17 your -- I think your lap, you said.  Right?

18 A.  Excuse me?

19 Q.  You had a gun with you.  Right?

20 A.  Yes.

21 Q.  And what I think you told the prosecutor is you had the gun,

22 because if something was going to break out, you were going to

23 use it?

24 A.  Yes.

25 Q.  And using it means take it from your lap and pull the

1 trigger, if need be.  Right?

2 A.  Yes.

3 Q.  And you were willing to do that over $40.  Right?

4 A.  It wasn't about the $40, it was about the respect at the

5 time.

6 Q.  You had nothing else to do that day?

7 A.  You can't show no signs of weakness when you're on the

8 street, man.

9 Q.  Just like being a snitch is a sign of weakness.  Right?

10 A.  Definitely.  But I'm here, you know.

11 Q.  So are you weak?

12 A.  I'm smarter now.  Put it that way.

13 Q.  We'll get there.

14      But back to my question:  You were willing to pull the

15 trigger, if necessary, over $40, over two pieces of paper?

16 A.  I don't think it would have came down to that point.

17 Q.  I'm not asking you that.  I'm asking if it came down to

18 that, you were willing to pull the trigger.  Right?

19 A.  Yes.

20 Q.  And you know that flashing a weapon at somebody is a crime.

21 Right?

22 A.  Yes.

23 Q.  And you've never heard boo from these people about that.

24 Right?  If you didn't understand it, they've never charged you

25 for that

1 A.  No, sir.

2 Q.  And you don't expect to ever be charged for that.  Right?

3 A.  No, sir.

4 Q.  And just so I'm clear, Government's 1126, you've said you

5 don't expect to be charged for giving a gun to Shawn to shoot

6 Wop, you don't expect to be charged for shooting at Mario, and

7 you don't expect to be charged for flashing a weapon at Kairi.

8 None of that is in your plea agreement, right, 1126?

9 A.  No.

10 Q.  Right.  So then it would be fair to say that not all of your

11 understandings are written on paper.  Correct?

12         MR. LEON:  Objection.

13         THE COURT:  I'll allow it.

14 A.  You say not all my understandings?

15 BY MR. BALAREZO:

16 Q.  Your understanding that you're not going to get charged for

17 the gun that you gave to Shawn to shoot Wop, that's not written

18 on paper anywhere.  Right?

19 A.  Right.

20 Q.  But you understand that you're not going to get charged for

21 that?

22 A.  To the best of my ability.

23 Q.  Well, you said it already.

24 A.  I wasn't a target of this investigation, so I don't know.

25 Q.  I'm not talking about this investigation.  You've already

1 testified that you don't expect to be charged for that shooting.

2 A.  Yes.

3 Q.  And that's not anywhere on that sheet of paper, right, in

4 that agreement, that plea agreement?

5 A.  Yes.

6 Q.  Same thing for the Mario shooting, or shooting at Mario.

7 You've already testified you don't expect to be charged, and

8 that's not anywhere in this plea agreement.  Right?

9 A.  Yes.

10 Q.  Or the Kairi incident, that's not in this plea agreement?

11 A.  Right.

12 Q.  So there are agreements and understandings that you have

13 with the government that are not on that piece of paper.

14 Correct?

15 A.  Yes.

16 Q.  Now, you've told this jury that you're currently serving

17 your sentence that Judge Winfield gave you.  Right?

18 A.  Yes, sir.

19 Q.  And you're in a prison?

20 A.  Yes, sir.

21 Q.  But you're not in a jumpsuit.  Right?

22 A.  No, sir.

23 Q.  You have the luxury of putting on some civilian clothes and

24 feeing like you're not in prison.  Right?

25 A.  I guess so.

1 A.  That's because I ain't call for nobody to come over.

2 Q.  So for those 24, 30 months, you don't hear boo from Don.

3 Right?

4 A.  Right.

5 Q.  And you don't hear boo from anybody --

6 A.  Oh, excuse me.  Let me rephrase that.  I did talk to Don

7 once.  When my son mother was outside, I asked who was out

8 there, to give him the phone, and talked to him for a brief

9 minute.

10 Q.  And did Don confess to you during that phone call, too?

11 A.  No.

12 Q.  Why, you guys had other things to talk about?

13 A.  I guess, man.  He ain't want to talk about that over the

14 phone, you know.

15 Q.  And did you ever tell the prosecutor that you talked to Don

16 while you were at Beckley, or did that just pop into your head

17 right now?

18 A.  It just came up.  I'm trying to remember to the best of my

19 ability.

20 Q.  Just came up.  So your memory gets better as you go along.

21 Is that what you're saying, yes or no?

22 A.  Yes.

23 Q.  So from that second stay at Beckley, when did you come home?

24 A.  March 26th of 2003.

25 Q.  So March 26th, 2003, you're done, right, with prison time,

1 at least?

2 A.  Yeah.  I go to the halfway house.

3 Q.  You went there for a few months?

4 A.  Yeah.

5 Q.  And you were still under this crazy little thing that's

6 called supervised release.  Right?

7 A.  Yes.

8 Q.  Not parole, but supervised release, they call it now.

9 Right?

10 A.  Yes.

11 Q.  And you're supposed to meet with your supervision officer,

12 you're supposed to stay away from drugs.  Right?

13 A.  Yes.

14 Q.  You're supposed to become the peaceful man that you claim

15 you were at the time.  Right?  You're supposed to remain like

16 that?

17 A.  Yes.

18 Q.  You're supposed to stay out of trouble.  Right?

19 A.  Yes.

20 Q.  Not deal drugs, not use drugs, those kinds of things?

21 A.  Yes.

22 Q.  And you really didn't do that, did you?

23 A.  No, sir.

24 Q.  Because just a few short months after that, in August of

25 '03, is when this Kyle Fulmer person happened to arrest you for

1           THE WITNESS:  Oh, I'm sorry.

2           MR. BALAREZO:  If I could just have one second, Your

3 Honor.

4 BY MR. BALAREZO:

5 Q.  Now, the prosecutor asked you earlier today whether or not

6 you had received any money, and I believe you said no.  Right?

7 A.  Yes.

8 Q.  But one family member of yours has gotten at least $20,000

9 from the government.  Correct?

10 A.  Man, I never knew that, man, you know.  So that's something

11 new to me.

12 Q.  Would looking at a "Government Expenditure For Family

13 Members of Witness Robert Pough, III" refresh your recollection?

14           MR. LEON:  Objection.

15           THE COURT:  Sustained.

16 BY MR. BALAREZO:

17 Q.  So you're not aware of anybody in your family receiving

18 20 grand from the government?

19 A.  I'm aware of them receiving assistance.  I never knew how

20 much it was, you know.  They don't give you a lump sum of money,

21 so we never counted it.  Or she never counted it.

22 Q.  And you have no reason to dispute that sum.  Correct?

23 A.  Naw.  No, I don't know.  Like I said, I don't know how much

24 it was.

25           MR. BALAREZO:  Your Honor, can I have just one second?

1 A.  Yes, sir.

2 Q.  It's also your hope that you're not going to be charged,

3 right, in this case.  Right?

4 A.  In what, in this particular case?

5 Q.  Right.

6 A.  Yes, sir.

7 Q.  So that's a benefit to you also.  Right?

8        MR. LEON:  Objection.

9        THE COURT:  Overruled.

10 BY MR. CARNEY:

11 Q.  It's a benefit that you're not charged in this case with

12 conspiracy or RICO or something?

13 A.  No, I'm not.

14 Q.  It's a benefit to you also that -- you testified that you

15 were selling drugs in the Fourth Street area.  Right?

16 A.  Yes, sir.

17 Q.  You were selling with other people?

18        MR. LEON:  Objection.  Scope.

19        THE COURT:  Sustained.

20 BY MR. CARNEY:

21 Q.  Is it your anticipation that you won't be prosecuted for any

22 other drug dealing in any other locale?

23 A.  Yes, sir.

24 Q.  And so that's a benefit to you by being a witness now.

25 Right?

1 A.  I guess so.

2 Q.  So you're looking here, where you have no written agreement

3 with the government, but it's your understanding by doing these

4 things that a lot of good things can happen to you.  Right?

5 A.  I don't know about a lot, you know what I mean.  Like I say,

6 nothing guaranteed, you know.

7 Q.  But it's your hope and your expectation you won't get

8 charged on other matters.  Right?

9 A.  Yes, sir.

10 Q.  Now, when you met with Agent Fulmer in 2003 -- you were

11 arrested October 25th of 2003.  Is that right?

12 A.  Somewhere in August.  I'm not quite sure what day it was.

13 Q.  And when you met with Agent Fulmer, you -- were you

14 appointed a lawyer?  Did you have a lawyer?

15 A.  No, sir.  I waived my rights.

16 Q.  So you went with him without a lawyer.  Is that right?

17 A.  Yes, sir.  I waived my rights.

18 Q.  And when you waived your rights, you talked about that you

19 had the charge that they could bring against you.  Right?

20       In other words, he arrested you for a drug charge, he

21 says -- you waived your rights.  Correct?

22 A.  Yes, sir.

23 Q.  And he said, "I could charge you with something here."

24 Right?

25 A.  Yeah.  With the four or six bags of stuff that I had that

# Tab 39

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : May 21, 2007 |
| DOMINIC SAMUELS, | : 9:30 a.m. |
| Defendants. | : |

VOLUME 53 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney,
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant
Antwuan Ball:   CARNEY & CARNEY
John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

11940

APPEARANCES (Cont.)

For Defendant
Antwuan Ball:   TIGHE, PATTON, ARMSTRONG,
TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 Pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant
David Wilson:   LAW OFFICE OF JENIFER WICKS
Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant
Gregory Bell:   LAW OFFICE OF JAMES W. BEANE
James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant
Desmond Thurston:   LAW OFFICE OF JONATHAN ZUCKER
Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant
Joseph Jones:   LAW OFFICE OF ANTHONY MARTIN
Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

11941

APPEARANCES (Cont.)

For Defendant
Dominic Samuels:   LAW OFFICES OF A. EDUARDO BALAREZO
A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:   Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

11942

1       MORNING SESSION, MAY 21, 2007

2    (9:32 a.m.)

3       THE COURT:  All right.  Are you ready for the jury?

4       MR. CARNEY:  Yes, Your Honor.

5    (Jury in at 9:32 a.m.)

6       THE COURT:  Good morning, ladies and gentlemen.

7       THE JURY PANEL:  Good morning.

8       THE COURT:  Welcome back.  Good to see you.  We're ready

9    to resume.

10      Counsel.

11      MR. CARNEY:  Thank you.

12      CONTINUED CROSS-EXAMINATION OF ROBERT LEE POUGH

13   BY MR. CARNEY:

14   Q.    Good morning, Mr. Pough.

15   A.    Good morning.

16   Q.    Mr. Pough, when we left off, I was asking you about the

17   dismissal of your misdemeanor charge on October 25th, 2003 and

18   your subsequent armed robbery arrest in 2003.  At some point

19   after your arrest, you met with Agent Fulmer; is that correct?

20   A.    Yes, sir.

21   Q.    And I'm talking about the October 25th arrest; is that

22   right?

23   A.    Yes, sir.

24   Q.    And he mentioned to you that he would dismiss the case

25   against you if you debriefed with him, correct?

Scott L. Wallace, RDR, CRR
Official Court Reporter

*11947*

1   **Q.**   So, within a week or two weeks?
2   **A.**   I'd say within a week.
3   **Q.**   Okay.  And did your parole officer take any action at
4   that point on revoking you?
5   **A.**   No.  He said he was going to wait for the outcome of the
6   case.
7   **Q.**   Of the new arrest that you had?
8   **A.**   Yes.
9   **Q.**   And you knew that the new arrest at least had been
10  dismissed, right?
11  **A.**   For that -- at that moment.
12  **Q.**   Now.  You were then arrested for the armed robbery.
13  And when you were arrested, were you contacted by Agent Fulmer
14  when you were arrested?
15  **A.**   No, sir.
16  **Q.**   Did you try and get in contact with him to let him know
17  what the situation was?
18  **A.**   No, sir.
19  **Q.**   Did you have his -- have your lawyer, Mr. -- I think it
20  was Signett, try to get in contact with him?
21  **A.**   No, sir.
22  **Q.**   How long after your arrest did Agent Fulmer get in touch
23  with your lawyer?
24  **A.**   I don't even remember him even getting in touch with my
25  lawyer.  Someone else got in touch with him.  I can't recall who

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11948*

1   it was.
2   **Q.**   I see.  There was another agent that got in touch with
3   you?
4   **A.**   Yes, sir.
5   **Q.**   And about how long after that?  Do you have any idea?
6   **A.**   No, sir.
7   **Q.**   Well, it certainly was before when you did your plea
8   agreement on February 4th, 2004, right?
9   **A.**   Yes.
10  **Q.**   So between November 10th and February of 2004, you had at
11  least a couple meetings with the U.S. Attorney's Office, didn't
12  you?
13  **A.**   I don't want to say November.  I would say around
14  January.
15  **Q.**   So not until January did you have any type of debriefing
16  with the U.S. Attorney's Office; is that right?
17  **A.**   Yes.  That's it for a while.
18  **Q.**   Did you sign what's called a debriefing letter between
19  November and your plea agreement?
20  **A.**   Not -- I can't recall.
21  **Q.**   Do you know what a debriefing letter is?
22  **A.**   It's for your rights, right?
23  **Q.**   Did you sign any agreement where they said they would
24  talk to you informally and not use what you said against you?
25  **A.**   I can't remember, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11949*

1   **Q.**   Okay.  Now, as part of that plea agreement, you had the
2   misdemeanor charge also included and dismissed.  This is the
3   February 4th agreement, right?
4   **A.**   Yes.
5   **Q.**   Okay.
6   **A.**   It was later dismissed when I got sentenced.
7   **Q.**   Right.  And while you were still incarcerated, between
8   November and your plea agreement, you were still continuing to
9   be available for cooperation, in your mind; is that right?
10  **A.**   No, sir.
11  **Q.**   So you had made a decision you weren't going to cooperate
12  anymore after your armed robbery arrest and your plea agreement,
13  up until your plea agreement; is that right?
14  **A.**   Yes, sir.
15  **Q.**   But you did have at least one meeting prior to the plea
16  agreement?
17  **A.**   Yes, sir.
18  **Q.**   Was it more than one meeting?
19  **A.**   I can't remember.  I think it was one meeting, like I
20  said, with Mr. Albert Herring.
21  **Q.**   Okay.  When you had that meeting before your plea
22  agreement, did you discuss Antwuan Ball?
23  **A.**   No, sir.
24  **Q.**   Now, you're the same Mr. Pough that was convicted of
25  robbery in June 1999; is that right?  In June of 1999, were you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11950*

1   convicted of robbery?
2   **A.**   I was incarcerated June 1999.  I wasn't released until
3   August 4th of '99.
4        MR. CARNEY:  Court's indulgence.
5   BY MR. CARNEY:
6   **Q.**   You're not the same Robert Pough, AKA Derrick Dorsey, who
7   was convicted in June of 1999 of robbery; is that right?
8   **A.**   Yes, sir.
9   **Q.**   In December of 1996, were you convicted of an assault
10  with intent to rob?
11  **A.**   Yes, sir.
12  **Q.**   You were convicted in May of 2000, felon in possession of
13  a firearm?
14  **A.**   Yes, sir.
15  **Q.**   You're also the same Robert Pough, AKA Derrick Dorsey,
16  convicted in February of 2004 for armed robbery; is that right?
17  **A.**   Yes, sir.
18  **Q.**   And you have no other robbery conviction; is that right?
19  **A.**   No, sir.
20  **Q.**   You agree that part of the plea agreement in 2004, that
21  you were not served with life papers; is that right?
22  **A.**   I can't remember.
23  **Q.**   You had two prior felony convictions; is that correct?
24  **A.**   Yes.
25  **Q.**   And part of your plea agreement was either a waiver, or

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

11963

1    Mr. Ball was a result of LT; is that right?
2    A.    Yes, sir.
3    Q.    And when you had this conversation with Mr. Ball
4    regarding Trevon, he told you that he slapped Trevon; is that
5    correct?
6    A.    I can't remember if he said he had slapped him or not.  I
7    know that he said that they had got into an altercation.
8    Q.    And did he say when this altercation took place?
9    A.    No.
10    Q.    And he indicated to you that the bullets in the car had
11    something to do with Trevon?
12    A.    Yes.  He indicated to LT that Trevon had shot at him.
13    Q.    So Trevon -- he said that Trevon shot at him and he
14    indicated to you that he was in the vehicle when this happened?
15    A.    He didn't -- I guess he was in the vehicle.  I don't
16    know.  He didn't indicate whether he was in the vehicle or not.
17    He said he shot at him, so I mean, I'm thinking he was in the
18    vehicle.
19    Q.    Did he indicate that he was injured in any way?
20    A.    No, sir.
21    Q.    Now, you agree that at least from the period of August
22    2003 through the time of your arrest for armed robbery that you
23    have not been shown any surveillance tapes by FBI showing you
24    and Mr. Ball together; is that right?
25    A.    Yes, sir.

Scott L. Wallace, RDR, CRR
Official Court Reporter

11964

1    Q.    By the way, when you did these debriefings with the U.S.
2    Attorney's Office or law enforcement, were you tape recorded?
3    A.    I don't recall.
4    Q.    Were you videotaped?
5    A.    I have no idea.
6    Q.    When was the first time you told the U.S. Attorney's
7    Office or law enforcement about this conversation regarding
8    Trevon?
9    A.    I can't recall.
10    Q.    Is your memory better within a year or better two years
11    earlier?
12    A.    I don't know the exact date, sir.
13    Q.    Well, there is a date, then, that you say -- you
14    indicated this happened to FBI and law enforcement; is that
15    right?
16    A.    Excuse me?
17    Q.    You are indicating that you told FBI or law enforcement
18    about this conversation at some point; is that right?
19    A.    Yes, sir.
20    Q.    And yet you can't recall what month it occurred in or
21    what year; is that right?
22    A.    No, sir.
23    Q.    Is it within the last six months, maybe?
24    A.    I would probably say '06, '05, between one of those
25    years.  Since I been out of the Feds, federal correctional

Scott L. Wallace, RDR, CRR
Official Court Reporter

11965

1    institution.
2    Q.    Mr. Pough, you do agree that over the years from 1990
3    through 2003, you've been using drugs, right?
4    A.    Excuse me?
5    Q.    Between the period of 1990 through 2003, you've been
6    using drugs, right?
7    A.    Yeah.  Off and on, yes.
8    Q.    Off and on you've been using heroin?
9    A.    Started heroin in '97.
10    Q.    What about PCP?
11    A.    Use it every once in a while.
12    Q.    Was the "every once in a while" in the period of August
13    25th of 2003 and November of 2003?
14    A.    Actually, I didn't get high at all in '03.
15    Q.    You didn't get high at all, yet when you're arrested for
16    the armed robbery in 2003, you were claiming you were so drunk
17    and so high that you didn't know what you were doing?
18    A.    Yes, I was.  It was off of alcohol.  I was intoxicated.
19    I was not high at all.
20    Q.    Were you using heroin?
21    A.    No, sir.
22    Q.    And how much would you drink a day between August 25th --
23    I'm sorry -- between -- yeah, August 25th of 2003 and November
24    of 2003?
25    A.    Probably about a gallon a day.

Scott L. Wallace, RDR, CRR
Official Court Reporter

11966

1    Q.    A gallon a day?
2    A.    Yes.
3    Q.    And what would you be drinking a gallon of day of?
4    A.    Remy Martin, Bacardi, gin, Hennessy.
5    Q.    So when you went in for your drug testing, every day --
6    and you went in for drug testing once a week; is that right?
7    A.    I called in once a week.  And like I said, you had to
8    call in and see what day you had to come in and take your urine.
9    Q.    So when you called in, they were doing a spot check.
10    They'd say come in and we'll test you?
11    A.    Yes, sir.
12    Q.    And you went in for how many spot tests during that time
13    period?
14    A.    Once a week, at least once a week.
15    Q.    Once a week you went in for a spot test and you were
16    drinking during that time period, right?
17    A.    Yes.
18    Q.    Were they testing for alcohol?
19    A.    No, sir.
20    Q.    When you were locked up in 2003, did you use the
21    telephone at the jail?
22    A.    2003?
23    Q.    Right.  When you were arrested in November of 2003, did
24    you start using the phone at the jail?
25    A.    Yes.

Scott L. Wallace, RDR, CRR
Official Court Reporter

*11987*

1   **A.**   No, sir.
2   **Q.**   Okay.  And you said that -- you've never been to his
3   house, have you?  His childhood house or any other house?
4   **A.**   Yes, I have.
5   **Q.**   That was the one with his mother at 14th Place?
6   **A.**   Yes, sir.
7   **Q.**   Sir, his mother never lived at 14th Place.  Did you know
8   that?
9   **A.**   Somebody lived around there.  I was quite sure his mother
10  lived around there.
11  **Q.**   Well, you just said you were at his house and his
12  mother's house on 14th Place, right?
13  **A.**   Yes, sir.
14  **Q.**   Consistent with what you said in this courtroom last
15  week, right?
16  **A.**   '03, we pulled up --
17  **Q.**   That doesn't answer --
18       THE COURT:  Let him finish.
19       THE WITNESS:  In '03, we went around to it.  He said he
20  was going to his mother house to go pick up some more money or
21  drop off some more money.  I sat in the car while he ran upstairs
22  to get it and do whatever he had to do.
23  BY MR. ZUCKER:
24  **Q.**   Now, you just told me you'd been to his house, his
25  mother's house, didn't you?

*11988*

1   **A.**   Right.
2   **Q.**   On 14th Place, right?
3   **A.**   Yes.
4   **Q.**   Were you upstairs or did you just wait in front in the
5   car?
6   **A.**   I wait in front in the car.
7   **Q.**   So you were never actually in the house, right?
8   **A.**   Yes, sir.
9   **Q.**   All right.  And are you aware that his mother never lived
10  on 14th Place her entire life?
11  **A.**   I don't know where she lived at.  I know that he
12  indicated that he was going to drop something off at his mother
13  house.  Now, whether it was his mother at the time, I don't
14  know.
15  **Q.**   Now -- but when we first began this part of this
16  conversation, I said, "Well, had you ever been into his house?"
17  And you said, "Yes," didn't you?
18       MR. LEON:  Objection, misstates the record.
19       THE COURT:  Restate your question.
20  BY MR. ZUCKER:
21  **Q.**   Hadn't you -- when I first said to you, "Have you ever
22  been in his house," didn't you say "Yes"?
23       MR. LEON:  Objection.
24       THE WITNESS:  If I did, it was a mistake.
25       MR. LEON:  Same objection.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*11989*

1        THE COURT: Overruled.
2   BY MR. ZUCKER:
3   **Q.**   You told us that you knew Twan because he used to sell
4   drugs down -- sold weed, crack and Ecstasy down at The Circle in
5   '96?
6   **A.**   Yes.
7   **Q.**   Okay.  Sir, there was no Ecstasy in '96 in DC, was there?
8   **A.**   I never said Ecstasy -- we never said the exact year when
9   we said Ecstasy.
10  **Q.**   Wait, wait, wait.  In response to, I think it was the
11  prosecutor's question, you said you knew Twan because he sold
12  Ecstasy down in -- weed, crack and Ecstasy back in '96 and all
13  the way forward.  And that was in response to a prosecutor's
14  question last week, wasn't it, sir?
15  **A.**   Yes, but there wasn't no Ecstasy in '96.  You're right.
16  **Q.**   Okay.  So you were wrong when you testified last week
17  about that in front of the prosecutors?  It was stuff you were
18  just making up?
19  **A.**   Like I said, we never got on the exact year for the
20  Ecstasy.
21  **Q.**   Well, you did have an exact year of '92 for the dispute
22  between my client and Sean; is that correct?
23  **A.**   '92?
24  **Q.**   Yeah.  That's what you said last week.
25  **A.**   Between who?  Who is your client again?

*11990*

1        Oh, yeah, Sean.  Okay.  I mean Dazz is your client.
2   Okay.
3   **Q.**   Is Sean my client?
4   **A.**   Naw.
5   **Q.**   Is Dazz my client?
6   **A.**   It's so many of y'all over there, I'm just trying to keep
7   up.
8   **Q.**   I only represent one man, sir.
9   **A.**   Okay.
10  **Q.**   And you only testified you saw him once involved in a
11  crime; isn't that correct?
12  **A.**   Yes, sir.
13  **Q.**   How come you're having so much trouble remembering it
14  now?
15  **A.**   Remembering what?
16       MR. LEON:  Objection.
17       THE COURT:  Sustained.  Move on.
18  BY MR. ZUCKER:
19  **Q.**   Didn't you say last week that that occurred in 1992?
20  **A.**   Yes, sir.
21  **Q.**   Okay.  Was that the truth or a lie?
22  **A.**   That was the truth.
23  **Q.**   Okay.  And how do you recall it happened in 1992?  How
24  are you so certain about this year?
25  **A.**   It was about the time, as I said, that we started

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12019*

1    proffer from the government ex parte.

2       MR. MARTIN:  I beg your pardon.

3       THE COURT:  That's all right.  I just wanted to make sure

4    the record reflected your ex parte proffer concerning the

5    security concerns before I asked Mr. Zucker if he has any more

6    questions.

7       **(Following designated proceedings sealed by order of the**

8    **Court:)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12020*

1

2

3

4       **(Previously designated sealed proceedings concluded.)**

5    BY MR. CARNEY:

6    **Q.**   All right.  Thank you.

7       Mr. Zucker, anything else?

8       MR. ZUCKER:  Nothing else.  Thank you.

9       THE COURT:  Mr. Martin.

10      MR. MARTIN:  Mr. Jones has no questions for this witness.

11      THE COURT:  Ms. Wicks.

12      MS. WICKS:  Thank you, Your Honor.

13      CROSS-EXAMINATION OF ROBERT LEE POUGH

14    BY MS. WICKS:

15    **Q.**   Good morning, Mr. Pough.

16    **A.**   Good morning.

17    **Q.**   I think you indicated when Mr. Beane was asking you

18    questions about supporting your children when you were in jail,

19    do you remember that question?

20    **A.**   Yes, sir -- I mean, yes, ma'am.

21    **Q.**   It's ma'am, right?

22    **A.**   Yes, ma'am.

23    **Q.**   I'm apparently confusing to a lot of people.  You

24    indicated you were "well off" when you were locked up in jail?

25    **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12021*

1    **Q.**   How were you "well off" when you were locked up in jail?

2    **A.**   People send me money.

3    **Q.**   Okay.  So, you weren't making money in jail, were you?

4    When you say you were well off?

5    **A.**   Yes, ma'am.

6    **Q.**   How much money were you making while you were in jail?

7    **A.**   A couple thousand dollars a month.

8    **Q.**   Okay.  And you were making a couple thousand a month by

9    doing what?

10    **A.**   Selling drugs.

11    **Q.**   And during what time period in jail were you selling

12    drugs, making a couple thousand dollars a month?  Which time in

13    jail?  Every time in jail?

14    **A.**   Uh, I'd say about Lorton, '99, '96 to '99.

15    **Q.**   Okay.  '96 to '99, and then you were locked up from 2001

16    to 2003, correct?

17    **A.**   Yes.

18    **Q.**   And you were also doing something to make money then,

19    right?

20    **A.**   Yes.

21    **Q.**   What were you doing to make money, then, between 2001 and

22    2003?

23    **A.**   I was juggling inside of jail.

24    **Q.**   Pardon?

25    **A.**   Juggling.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12022*

1    **Q.**   You mean hustling, right?

2    **A.**   Yes.

3    **Q.**   Making a couple thousand dollars a month, right?

4    **A.**   Yes.

5    **Q.**   Okay.  And then you get out in 2003 and get locked back

6    up in 2003, right?

7    **A.**   Yes.

8    **Q.**   And between 2003, when you got locked up November 2003

9    and now, you continue to make money while you're locked up,

10    right?

11    **A.**   No, ma'am.

12    **Q.**   So you never made any money at D.C. jail doing anything;

13    is what you're saying?

14    **A.**   Yes, ma'am.

15    **Q.**   And you're saying since you went out to the Bureau of

16    Prisons -- well, when did you leave CTF and go to the Bureau of

17    Prisons?

18    **A.**   I left CTF November of '04 and went to Arlington County

19    jail.

20    **Q.**   Okay.  And you were there until you got sentenced in '05,

21    right?

22    **A.**   Yes, ma'am.

23    **Q.**   And then you went out to the BOP, wherever you are.  I'm

24    not asking where, but you went somewhere, right?

25    **A.**   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12067

1   that was out in Maryland, right?

2   **A.**   Yes, ma'am.

3   **Q.**   That's when you were sent to the Hickey school?

4   **A.**   Yes, ma'am.

5   **Q.**   And that's when you ran from the Hickey school, right?

6   **A.**   Naw, that was another incident.  For the robbery back

7   then, I only got probation.  When I ran from Hickey school, that

8   was another incident.  That was assault.  Assault with a deadly

9   weapon.

10   **Q.**   Was that also robbery?

11   **A.**   No, ma'am.

12   **Q.**   So that was a different robbery, but not --

13   **A.**   A fight occurred in the school at the time, ma'am.

14   **Q.**   And that was out in Maryland, right?

15   **A.**   Yes, ma'am.

16   **Q.**   So apparently there's a time period between '90 and '96,

17   when you were going to school in Maryland, right?

18   **A.**   Yes, ma'am.

19   **Q.**   And what year is it you're going to school in Maryland,

20   between '90 and '96?

21   **A.**   I don't know.  I was back and forth, so I don't know.  I

22   can't even recall.  I know I was back and forth.  I stayed out

23   there shortly.  It was a couple of months.

24   **Q.**   And the -- now, the assault that's not a robbery that

25   occurred in the school, was that before or after -- that was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12068

1   after the robbery where you got probation, right?

2   **A.**   Yes.

3   **Q.**   Okay.  And it's -- so it's the assault in the school that

4   sends you to the Hickey school, right?

5   **A.**   Yes, ma'am.

6   **Q.**   And it's the Hickey school up in Baltimore that you

7   escape from, right?

8   **A.**   Actually, it was like a halfway house, group home.

9   **Q.**   So, after you're released from the Hickey school, you go

10   to the group home and you run from the group home?

11   **A.**   Yes, ma'am.

12   **Q.**   And that's when you start using Derrick Dorsey, right?

13   **A.**   Yes, ma'am.

14   **Q.**   And Derrick Dorsey was one of your best friends back

15   then, right?

16   **A.**   Yes, ma'am.

17   **Q.**   And that robbery, the robbery that you got probation on,

18   how old were you then?

19   **A.**   Like 12, 13.  I mean -- yeah, 12, 11, something like

20   that.

21   **Q.**   So that's right around 1990, '91, right?

22   **A.**   Yes, ma'am.

23      MS. WICKS:  Court's indulgence.

24   BY MS. WICKS:

25   **Q.**   Last week you were asked some questions about --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12069

1      MS. WICKS:  Court's indulgence.

2   BY MS. WICKS:

3   **Q.**   Well, Mr. Leon asked you some questions about seeing

4   Antwuan in The Circle between when you were 11 and 17, so that's

5   1990 to '96, right?

6   **A.**   Yes, ma'am.

7   **Q.**   And your testimony was that you saw him in The Circle

8   with Jo-Jo, right?

9   **A.**   Yes, ma'am.

10   **Q.**   And when you saw him hanging out with Jo-Jo and the other

11   people in The Circle, you saw him -- your testimony last week is

12   you saw him selling crack weed and Ecstasy, right?

13   **A.**   I said crack and weed.  Ecstasy wasn't until 2000.

14   **Q.**   Okay.  So last week when you were answering questions

15   about the time period between 1990 -- I'm sorry, when you were

16   asked questions about the time period between 1990 and '96 and

17   you indicated that you saw Antwuan Ball selling crack, weed and

18   Ecstasy, that's incorrect, right?

19   **A.**   I might have been going a little too fast, ma'am, but he

20   didn't start selling Ecstasy, that I know of, until 2000.

21   **Q.**   Okay.  I'm saying -- Mr. Leon was asking you questions

22   last week about Mr. Ball, right?

23      MR. LEON:  Objection, asked and answered.

24      THE COURT:  Sustained.

25      MS. WICKS:  Court's indulgence.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12070

1   BY MS. WICKS:

2   **Q.**   You were also asked questions by Mr. Leon about a day

3   that you observed Mr. Wilson being arrested, right?

4   **A.**   Yes.

5   **Q.**   And it's your testimony that that may have been in July

6   of 2000, right?

7   **A.**   Yeah.  Actually, it was the end of July, prior to that

8   weekend.  Like I said, they had the Battle of the Bands down in

9   Aqualand at the time, so -- which was in 2000.

10   **Q.**   So you think it was the end of July?

11   **A.**   Yes, ma'am, between --

12   **Q.**   The last weekend of July of 2000?

13   **A.**   Yes, ma'am.

14   **Q.**   And I think your testimony was, you saw him just a few

15   days after that, right?

16   **A.**   Yes, ma'am.

17   **Q.**   Okay.  So that's literally right at the end of July, you

18   see him and talk about that arrest, right?

19   **A.**   I don't know if we talked about the arrest or not.

20   **Q.**   Well, you indicated that he's talking about getting a

21   truck, right?

22   **A.**   Yes, ma'am.

23   **Q.**   And when he's talking about getting the truck, he's not

24   upset about any money getting taken, right?

25   **A.**   I don't remember if he was upset about any money or not.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1 Q.  Okay.  So you're saying you're not the Derrick Dorsey that

2 was interviewed on August 7th of 1997, who said he had lived at

3 1512 Alabama Avenue, Southeast for his lifetime?

4 A.  No, ma'am.

5 Q.  Is that where the real Derrick Dorsey lived?

6 A.  Yes, ma'am.

7 Q.  Okay.  So the real Derrick Dorsey lived in the 1500 block of

8 Alabama Avenue?

9 A.  Yes, ma'am.

10 Q.  And that's not in Congress Park.  Right?

11 A.  Yes, ma'am.

12 Q.  That's essentially where Alabama Avenue intersects with

13 15th Street or 15th Place.  Right?

14 A.  Yes, ma'am.

15 Q.  And that's up on the other side, north of Malcolm X on

16 Alabama Avenue.  Right?

17 A.  Yes, ma'am.

18 Q.  When you -- the incident that you testified for the

19 government about, you testified for the government in trial in

20 July of 2002.  Right?

21 A.  Yes, ma'am.

22 Q.  The incident that you testified about occurred in December

23 of 2000.  Right?

24 A.  Yes.

25 Q.  And at that point you had been arrested in the federal court

1 case.  Right?

2 A.  Yes.

3 Q.  And you had actually pled guilty in the federal court case.

4 Correct?

5 A.  Yes, ma'am.

6 Q.  And one of the conditions of your continued release in the

7 federal court case was that you not use drugs.  Right?

8 A.  Yes, ma'am.

9 Q.  Just prior to the incident that you testified about for the

10 government, on the day in December when that occurred, you had

11 used -- well, just prior to that you had used heroin.  Correct?

12 A.  Could you back that up and say that again, please?

13 Q.  Back on December 21st, leading into the 22nd of 2002, when

14 you were on release in your federal court case, you had used

15 heroin?

16 A.  Yes, ma'am.

17 Q.  And that was a violation of the conditions of your release

18 pending sentencing in the federal court case.  Correct?

19 A.  Yes, ma'am.

20 Q.  In 2000, when you were on release in the federal court case,

21 when you used drugs and there was a positive drug test, you

22 would be sanctioned.  Right?

23 A.  Yes.  Sanctioned, yes.

24 Q.  There were times when you used drugs and you weren't

25 sanctioned.  Right?

1 A.  I think I got sanctioned most of the time that I --

2 Q.  Okay.  But there were times when you would use drugs, but

3 you used it far enough away from the drug test that it wouldn't

4 show up as a positive.  Right?

5 A.  I can't recall that.  Every time I used drugs, I got -- I

6 went over to the jail for it.

7 Q.  Well, do you recall being sanctioned for drug use at the end

8 of December in 2000?

9 A.  Yes.

10          MS. WICKS:  Court's indulgence.

11 BY MS. WICKS:

12 Q.  Well, you were arrested in May of 2000.  Right?

13 A.  Yes, ma'am.

14 Q.  And you were locked up at the jail overnight before you went

15 to detox.  Correct?

16 A.  Yes, ma'am.

17 Q.  You were sanctioned in June of 2000 for a positive drug

18 test.  Right?

19 A.  Yes, ma'am.

20 Q.  You were sanctioned in July of 2000 for a positive drug

21 test.  Right?

22 A.  Yes, ma'am.

23 Q.  And you were sanctioned in February of 2001 for a positive

24 drug test.  Right?

25 A.  Yes, ma'am.

1          MS. WICKS:  Objection.  May we approach?

2          THE COURT:  No.  Sustained.

3 BY MR. LEON:

4 Q.  You were also asked some questions regarding -- I believe

5 today regarding a beef with 10th Place.  Do you remember those

6 questions?

7 A.  Yes, sir.

8 Q.  What's your understanding as to what that beef was about?

9          MR. BALAREZO:  Objection.  602, hearsay, speculation.

10 I'll come up with some more.

11          MS. WICKS:  Beyond the scope.

12          MR. LEON:  I have a speaking response.  I could do it

13 at the bench -- could we approach?

14          THE COURT:  Yes.

15          (BENCH CONFERENCE ON THE RECORD.)

16          MR. LEON:  It's within the scope.  It came up during

17 several cross-examinations, and I think it also came in within

18 several cross-exams about that this man knew of a 10th Place

19 beef.  So I'm just trying to explore what his understanding is

20 as to what that beef was about, why it was, when it was.

21          There was aggressive cross-examination this morning

22 about the fact that, well, you got along with so-and-so from

23 10th Place and so-and-so from 10th Place.  I think it's a fair

24 area to explore what's going on in his mind.

25          THE COURT:  Address the foundational question and the

1 hearsay objection.

2         MR. LEON:  Well, hearsay, I think would be our

3 response, which we've had in other instances, that it doesn't

4 necessarily go for its truth.  If, for example -- I don't know

5 what the answer would be, but let's say the answer would be, the

6 beef was over the murder of Meatball.  Whether or not Meatball

7 was actually killed or not is beside the point; the point is, he

8 thinks now they're at war with 10th Place because he thinks they

9 killed Meatball.

10         So I think it doesn't go to its truth.  It goes to

11 state of mind and other things.

12         THE COURT:  If that's true, what's the relevance of his

13 state of mind concerning the nature of the 10th Street beef?

14         MR. LEON:  It's relevant because counsel made it

15 relevant on cross-exam when they went into the fact that "You

16 associated and hung out with certain people from 10th Place."

17         I didn't think it was relevant, but it was outside the

18 scope of my direct -- I don't know if it was outside the scope

19 of my direct, but I didn't spend much time on direct.  But a lot

20 more people did.  So I would submit that it's relevant because

21 it was made relevant on cross-exam as to what's going on in this

22 witness' mind about 10th Place.

23         I have a right, I would submit, to go into what's going

24 on in his mind about 10th Place, who he can and can't deal with,

25 why he could or couldn't.  And he has stated on cross-exam

1          THE COURT:  Yes.

2          MR. GUERRERO:  Your Honor, the Government's next

3 witness is Jacques Powell.

4              (Oath administered by Courtroom Deputy.)

5   (JACQUES POWELL, GOVERNMENT witness, having been duly sworn,

6                   testified as follows:)

7                   DIRECT EXAMINATION

8 BY MR. GUERRERO:

9 Q.  Good afternoon, sir.

10 A.  Good afternoon.

11 Q.  Can you please tell us your first name and your last name,

12 and spell each, please.

13 A.  My name is Jacques Powell.  My first name is J-A-C-Q-U-E-S,

14 last name Powell, P-O-W-E-L-L.

15 Q.  Mr. Powell, do you have a nickname?

16 A.  Yes, sir.

17 Q.  What's your nickname?

18 A.  JT.

19 Q.  How old are you, sir?

20 A.  27.

21 Q.  Where were you born?

22 A.  Patterson, New Jersey.

23 Q.  Can I ask you to just get that mic a little bit closer so we

24 can all hear you?

25 A.  Patterson, New Jersey.

1 Q.  And did there come a point in your life where you actually

2 moved to D.C.?

3 A.  Yes, sir.

4 Q.  When did that happen?

5 A.  I really can't tell you, it's so long ago.  I was in the

6 first grade, I know that much.

7 Q.  You were in the first grade?

8 A.  Yes, sir.

9 Q.  When you came to D.C., who did you come to D.C. with?

10 A.  My mother and my brother.

11 Q.  Is your brother older or younger than you?

12 A.  He's older.

13 Q.  Do you recall where in D.C. you guys started to live?

14 A.  Well, when I first came to D.C., we lived on Green Street,

15 Southeast.

16 Q.  And then you went where?

17 A.  Then from Green Street we moved to Elmy (ph), Southeast; and

18 from Elmy, we moved to South Capitol.  From South Capitol we

19 lived in a shelter for a minute, and from the shelter we moved

20 around Congress Park.

21 Q.  Do you have an idea as to what year it was when you moved to

22 Congress Park?

23 A.  It was around about between 1989 and 1990.

24 Q.  When you moved to Congress Park, who did you move there

25 with?

1 A.  Well, my brother was in the hospital when we first moved

2 around there.  It was just me and my mother.

3 Q.  Do you recall the address that you first moved into in

4 Congress Park?

5 A.  3407 13th Place, Apartment 101.

6 Q.  Are you familiar with a map of Congress Park?

7 A.  Yes, sir.

8        MR. GUERRERO:  Mr. Mazzitelli, may we pull up 100.1?

9 BY MR. GUERRERO:

10 Q.  Mr. Powell, I'm going to ask you on your monitor there, if

11 you touch the lower right-hand corner with that pen right there

12 to clear the marks.  Just tap it.

13 A.  Where do you want me to tap at?

14 Q.  The lower right-hand corner.

15 A.  Where it say "clear screen"?

16 Q.  Yes, please.  Thank you.

17        This is 100.1, for the record.  And we've just zoomed

18 it in a little bit.  Are you familiar with this map?

19 A.  Yes, sir.

20 Q.  And can you see on this map where it is, sir, that you moved

21 with your mother back in '89 to '90?

22 A.  Yes, sir.

23 Q.  And why don't you use that pen and just tap the building you

24 think reflects your building.

25 A.  Okay.  I got it.  (Witness complies.)

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1592 of 1954

1 Q.  All right.  And there's a series of arrows to the left of

2 13th Place?

3 A.  It's right here (indicating).

4 Q.  And you're marking a building that's to the left of the T-H

5 in 13th Place?

6 A.  Yes, sir.

7 Q.  What floor did you live on?

8 A.  First floor.

9 Q.  And how long did you live there before your -- well, did

10 your brother ever go to live there, too?

11 A.  Yes, sir.

12 Q.  And you said in the beginning he was sick.  Did he later

13 come and move in there?

14 A.  Yes, sir.  He broke his leg.  He eventually came.

15 Q.  What years do you think you lived over in 13th Place?  How

16 many years?

17 A.  I don't know.  Probably like -- probably around 15 years.

18 Q.  So from like 1990 to 2005?

19 A.  Naw.  Well, from, like, between 2004, 2005, yeah.

20 Q.  Do you know what they call that area where it says

21 13th Place?

22 A.  The circle.

23 Q.  Did you grow up in that area?

24 A.  Yes, sir.

25 Q.  Did you go to school?

1 A.  Yes, sir.

2 Q.  Which elementary school did you go to?

3 A.  P.R. Harris.

4 Q.  Did you go to high school or middle school after that?

5 A.  Yes, sir.

6 Q.  Which one was that?

7 A.  I went to P.R. Harris for 7th, 8th grade -- I went to

8 P.R. Harris for 7th and 8th grade, and I went to Hart in the

9 ninth.

10       MR. MARTIN:  I'm sorry, Your Honor, I didn't hear the

11 last part.

12       THE COURT:  Try to keep as close to the mic as you can

13 so everyone can hear you.

14 A.  I went to P.R. Harris in the 7th and the 8th, and I went to

15 Hart in the 9th.

16 BY MR. GUERRERO:

17 Q.  Spell the school that you went to the 9th grade.  Can you

18 spell that for us?

19 A.  H-A-R-T.

20 Q.  Did you then later go to high school?

21 A.  Yes, sir.

22 Q.  Which high school?

23 A.  I went to Ballou and I went to D.C. Academy High School.

24 Q.  Did you graduate high school?

25 A.  No, sir.

1 Q.  What was the last year of school that you finished?

2 A.  10th grade.

3 Q.  How is your reading?

4 A.  I read good enough for myself.

5 Q.  How is your writing?

6 A.  I write pretty good.

7 Q.  When you dropped out in 10th grade, how old were you?

8 A.  I was around about 17, 18.

9 Q.  Did you start to work?

10 A.  No, sir.

11 Q.  Who were you living with at the time?

12 A.  When I dropped out of school?

13 Q.  Yes.

14 A.  My mother.

15 Q.  And if you didn't work, how did you make money?

16 A.  I hustled.

17 Q.  You, I'm sorry?

18 A.  I hustled.

19 Q.  We'll get to that in a second.  Did you ever get a GED?

20 A.  No, sir.

21 Q.  Once you dropped out, did you ever have a legitimate job?

22 A.  I do now, but not soon as after I came out of school.

23 Q.  Well, tell us -- without telling us who you work for, do you

24 have a job?

25 A.  Yes, sir.

Page 12182

1 Q.  And again, without telling us who you work for, what do you

2 presently do now?

3 A.  I'm an electrician apprentice.

4 Q.  Did you get any training for that?

5 A.  I start school in September.

6 Q.  All right.  Now, back in time to when you're like 17, you

7 said that you started hustling.  What does that mean?  Tell us.

8 A.  Selling drugs.

9 Q.  What kind of drugs?

10 A.  Cocaine.

11 Q.  Powder or crack?

12 A.  Crack.

13 Q.  And at 17 years old, where would you sell the crack cocaine?

14 A.  Around Congress Park.

15 Q.  Where in Congress Park?

16 A.  Mainly in the circle.

17 Q.  You said the circle and what other area?

18 A.  Mainly in the circle.

19 Q.  Oh, mainly the circle?

20 A.  Yes, sir.

21 Q.  And were there other areas as well?

22 A.  From time to time, yeah.  Yes, sir.

23 Q.  And from time to time, you would sell crack cocaine where

24 else in Congress Park?

25 A.  On the ho stroll and sometimes in the alley.

1 Q.  Did you say the ho stroll?

2 A.  Yes, sir.

3 Q.  And why do they call it the ho stroll?

4 A.  Because that's where like all the tricks used to prostitute

5 at.

6 Q.  Can you see where the ho stroll is on this map, or is it

7 zoomed out?

8 A.  You can see it a little bit.  You really can't see it that

9 much on this map.

10 Q.  Is there a particular street that the prostitutes used to

11 frequent?

12 A.  I think it's -- I think that was Savannah Street.

13 Q.  Can you say that again?

14 A.  I think that was Savannah Street.  I'm not too sure about

15 that.

16 Q.  But that's an area where you said you used to sell crack

17 cocaine as well?

18 A.  Yes, sir.

19 Q.  And then was there any other location?

20 A.  The alley.

21 Q.  Which alley?  Can you see the alley here?

22 A.  Yes, sir.

23 Q.  And point to it with the pen.

24 A.  (Witness complies.)

25 Q.  All right.  And you've drawn two lines and an arrow in an

1 alley that's in between -- that's to the right of 13th Street

2 and to the left of the S of Savannah Place?

3 A.  Yes, sir.

4 Q.  It's like a parking lot.  Did I describe that right?

5 A.  Yes, sir.

6 Q.  All right.  Let's start first with you're 17 or so.  What

7 year do you think it was that you actually started to hustle, as

8 you call it?

9 A.  Probably like around about '95, '96.

10 Q.  And at that time, '95 -- let's go from '95 to '97.  Let's

11 take that two-year period.  Okay?

12 A.  Okay.

13 Q.  Were those years that you were hustling?

14 A.  Yes, sir.

15 Q.  And where would you get your crack cocaine from during those

16 years?

17 A.  Well, when I first started hustling, I bought my first

18 wholesale from Burke.

19 Q.  When you first started hustling, you bought your first what

20 from Burke?

21 A.  First wholesale.

22 Q.  And what's a wholesale?  Tell us.

23 A.  It's like packaged dimes for half price.

24 Q.  How many?  Do you recall how many wholesales you bought from

25 Burke?

1 A.  I think I got like 10 dimes from him for $50.

2 Q.  You paid how much for it?

3 A.  $50.

4 Q.  Did anybody else chip in with you?

5 A.  No, sir.

6 Q.  Was that your first purchase?

7 A.  Yes, sir.

8 Q.  How long did it take you to sell it?

9 A.  It ain't take me too long.  It ain't take me long to sell

10 it.  My mother used to smoke coke, a lot of tricks and stuff

11 used to be in my house, so I pretty much knew all the

12 crackheads -- well, people that used to smoke.

13 Q.  Where did you sell your first wholesales?

14 A.  I sold my first dime on the ho stroll.

15 Q.  On the ho stroll?

16 A.  Yes, sir.

17 Q.  Did you sell all of it there or did you sell any of it

18 anywhere else?

19 A.  I sold the rest of it in the circle.  But the first time I

20 actually sold a dime was on the ho stroll.

21 Q.  And the rest of it you said you sold in the circle?

22 A.  Yes, sir.

23 Q.  How long did it take you to sell the crack cocaine in the

24 circle?

25 A.  It didn't take me long.

1 Q.  Did you sell it all in one day, or did it take you more than

2 a day?

3 A.  It took me about two days.

4 Q.  And when you were out there, when you first buy this

5 wholesale from Burke, let's start first at the ho stroll.  Did

6 you see anybody else there selling crack cocaine?

7 A.  Can you repeat that question again, please?

8 Q.  When you first get your wholesale from Burke and you said

9 that first dime you sold was on the ho stroll, did you see

10 anyone else selling crack cocaine there?

11 A.  That day I bought -- that day I sold my first dime, or did

12 people actually hustle on the ho stroll?

13 Q.  That day that you're out there selling it, did you see

14 anybody else selling as well?

15 A.  No, I was out there by myself when I sold my first dime.

16 Q.  Now, we're still talking that first event.  You said some of

17 it you also sold on the circle?

18 A.  Yes, sir.

19 Q.  Did you see anybody else on the circle selling crack

20 cocaine?

21 A.  Yes, sir.

22 Q.  Who did you see at the circle?

23 A.  I'm not really too clear on what you asking me.  Is you

24 asking me did people hustle in the circle during that time, or

25 are you asking me that day I sold the rest of my coke in the

1 circle, was there anybody else out there hustling?

2 Q.  Let's take both of them one by one.

3 A.  Okay.

4 Q.  The first time you go to the circle and you start to sell

5 the crack cocaine that you got from Burke, did you see anybody

6 else out there doing the same?

7 A.  I can't remember on that particular day.

8 Q.  Okay.  And, now, after that, after that first sale, did you

9 get more crack cocaine?

10 A.  Yes, sir.

11 Q.  Do you recall who you got it from?

12 A.  Well, when I first started hustling, I was getting, like,

13 wholesales.  I was getting wholesales when I first started

14 hustling.

15 Q.  And who were you getting your wholesales from?  We've

16 already established Burke.  Who else were you getting wholesales

17 from during '95 to '97?

18 A.  Well, all right.  When I first started hustling, I got my

19 first wholesale from Burke; I think I got my second wholesale

20 from Joe Langley.  But it was other people I did get wholesales

21 from between '95 and '97.

22 Q.  And we're going to take them slow.  Okay?

23 A.  Okay.

24 Q.  Between '95 and '96, who were you friends with that also

25 sold crack cocaine?

1 A.  Jazz -- I was friends with, like, Jazz, Don, Boobie.  I was

2 friends with a lot of people.

3 Q.  All right.  Jazz.  How long, in '95 to '97, had you known

4 Jazz?  How do you spell Jazz?

5 A.  J-A-Z-Z.

6 Q.  How long had you known Jazz, with a J?

7 A.  I knew him since when I was about like, I say about 12.

8 Q.  And how long had you known Dom?

9 A.  I knew Don since around about the same age.  You know how

10 you just know people through the neighborhood?  You really --

11 just as you coming outside and getting to know people, you just

12 meet people through the neighborhood, pretty much.

13 Q.  And spell the name Dom.

14 A.  D-O-N.

15 Q.  D-O-N, as in Nancy?

16 A.  Yes, sir.

17 Q.  If you saw Don again, would you recognize him?

18 A.  Yes, sir.

19 Q.  Would you stand up and tell us if you see Don?

20 A.  Yes, sir.

21 Q.  Point him out and indicate an article of clothing.

22 A.  Black shirt, black pants, black and white tie.

23 Q.  Is that the person who is just standing right now?

24 A.  Yes, sir.

25       MR. GUERRERO:  Note an in-court identification of Don,

1 please, Your Honor.

2          MR. BALAREZO:  We'll stipulate that that's Mr. Samuels.

3          THE COURT:  Request is granted.

4 BY MR. GUERRERO:

5 Q.  All right.  Boobie, you said you knew a Boobie back then?

6 A.  Yes, sir.

7 Q.  Did you know Boobie's real name?

8 A.  I think it was Andre Wilson, I think.  I'm not for sure.

9 Q.  Did you know any of Boobie's brothers?

10 A.  Yes, sir.

11 Q.  Which brothers did you know of Boobie?

12 A.  Well, at that time I only knew one brother of his.

13 Q.  And who was that?

14 A.  Wop.

15 Q.  And if you saw Wop again, could you recognize him?

16 A.  Yes, sir.

17 Q.  Please stand up and tell us if you see Wop.

18 A.  Yes, sir.

19 Q.  And what is he wearing?

20 A.  Blue shirt, blue tie, I think blue slacks.

21 Q.  Is that the person, for the record, that's standing behind

22 me?

23 A.  Yes, sir.

24          MR. GUERRERO:  Note an in-court identification of

25 Mr. Wilson.

1          MS. WICKS:  No objection.

2          THE COURT:  Request granted.

3 BY MR. GUERRERO:

4 Q.  Let's pause and focus on '95 to '97.  During that time

5 period, did you ever sale crack cocaine with Don?

6 A.  Yes, sir.

7 Q.  And explain how that relationship started between you with

8 Don, if any relationship happened.

9 A.  Well, I had a little summer job.  When I first started

10 hustling, I wasn't consistently hustling.  I got a little summer

11 job --

12 Q.  I need you to speak up.  Okay?

13 A.  When I first started hustling, I wasn't hustling

14 consistently.  But I had got a summer job -- and, like I say, I

15 was pretty close with Jazz.  And I got a summer job, and around

16 that time I was working my summer job, Don had start coming back

17 around Congress Park.  And he was working out Boston Market,

18 and, you know, me, him, and Jazz used to hang out a lot, smoke

19 weed or whatever.

20          I had, like, my last check from my summer job, and I

21 think I got an eight-ball from Jazz, and then I was hustling,

22 you know.  It used to be me, Don, and Jazz together, so I guess

23 you can say I was hustling with them.

24 Q.  And how many times did you purchase crack cocaine from Jazz,

25 with a J?

1 A.  Well, I think like one or two times when I first started,

2 then I start putting my money with theirs.

3 Q.  You started putting your money with whom?

4 A.  Jazz and Don.

5 Q.  And how often did you put your money with Jazz and Don?

6 A.  I really can't give you a number offhand.  But it was just

7 about any time I needed coke, I put my money with them.

8 Q.  And would you three get wholesales or would you get a lump

9 sum?

10 A.  We get a lump sum.  Well, it wasn't actually like -- I put

11 my money with them, because I don't know whether it was Jazz or

12 Don, one of them had the connect.  So I put my money with them,

13 they get their coke, and they just give me what I paid for.

14 Q.  And did you ever go with Don or Jazz to go get the crack

15 cocaine?

16 A.  No, sir.  No, sir.

17 Q.  Did Jazz ever tell you where it was coming from?

18 A.  No, sir.

19 Q.  How about Don?  Did he ever tell you where it was coming

20 from?

21 A.  No, sir.

22 Q.  And when you got the crack cocaine, where would you, Jazz,

23 and Don sell it?

24 A.  In the circle.

25 Q.  And is that 13th Place, where you mentioned before?

1 A.  Yes, sir.

2 Q.  How often in '95 to '97 would you sell crack cocaine in the

3 circle with Jazz and Don?

4 A.  Just about every day.  Every time that I had coke, I sell it

5 in the circle.

6 Q.  And would that be during the night, during the evening, or

7 both?

8 A.  Both.

9 Q.  What's the largest amount that you recall of crack cocaine

10 getting in conjunction with Jazz and Don?

11 A.  Well, back then I think the largest amount I ever got was

12 like a half ounce.

13 Q.  Back then, did you ever get any crack cocaine from Burke

14 when you were dealing with Jazz and Don?

15 A.  Naw, just that first time.

16 Q.  How long did you sell crack cocaine with Jazz and Don during

17 that time period?

18 A.  It wasn't long.  It was couple of months through the summer,

19 through the fall.  I think like around about that springtime we

20 kind of went our different ways.

21 Q.  And do you recall what year this was, or was it just in that

22 general time period?

23 A.  I don't recall what year it was.

24 Q.  You said earlier that you recall that Don had just come

25 back.  Do you recall that?

1 Q.  And you said that earlier you saw a person named Wop?

2 A.  Yes, sir.

3 Q.  And relative to where Wop is, where is Boy-Boy?

4 A.  Sitting behind him.

5        MR. GUERRERO:  Note an in-court identification of

6 Mr. Bell.

7        MR. BEANE:  No objection.

8        THE COURT:  Request is granted.

9 BY MR. GUERRERO:

10 Q.  Okay.  During that time period, '95 to '97, did you ever get

11 any crack cocaine --

12        MR. BEANE:  Objection.  Leading.

13        THE COURT:  Finish the question.

14 BY MR. GUERRERO:

15 Q.  From anyone other than the persons that you just told us

16 about?

17        THE COURT:  Overruled.

18 A.  The question was kind of broken up.  I really didn't

19 understand.

20 BY MR. GUERRERO:

21 Q.  All right.  You told us that you were getting some crack

22 cocaine in conjunction with Jazz and Don.  Do you remember that?

23 A.  Yes, sir.

24 Q.  And during that same time period, '95 to '97, did you ever

25 get any crack cocaine from other persons?

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1607 of 1954

1 A.  Eventually, yes.

2 Q.  All right.  And eventually you got crack cocaine from whom?

3 A.  Boy-Boy.

4 Q.  When did that start, do you think?

5 A.  It's like around about the time that I start really putting

6 my money with Jazz and Don.

7 Q.  And how much crack cocaine do you recall getting from

8 Boy-Boy?

9 A.  Well, at that time I was getting like wholesales,

10 eight-balls.  I believe back at that time I was only getting

11 wholesales from him.

12 Q.  How often would you get wholesales from Boy-Boy?

13 A.  At that time I really can't put a number on it, but I got it

14 from him a couple of times.

15 Q.  And in your experience, was Boy-Boy a good wholesale

16 supplier?

17 A.  Yes, sir.

18        MR. BEANE:  Objection.  Speculation.

19        THE COURT:  Overruled.

20 BY MR. GUERRERO:

21 Q.  And what was your answer?

22 A.  Yes, sir.

23 Q.  And did you term him something?

24 A.  Wholesale King.

25 Q.  The Wholesale King?

1 A.  Yes, sir.

2 Q.  And you mean by that what?

3 A.  He had wholesale whenever you need it.

4 Q.  Do you recall where Boy-Boy used to live back then?

5 A.  At that time, no.

6 Q.  All right.  After you stopped hanging around with Jazz and

7 Don, who did you then start to hang around with?

8 A.  Well, after that time I start hanging with Jazz and Don, I

9 basically was like by myself.  Me and Birdman was hanging out

10 for a minute.

11 Q.  You and Birdman?

12 A.  Yes, sir.

13 Q.  And do you know Birdman's real name?

14 A.  It's Aman.

15 Q.  And do you know if Aman or Birdman had any brothers?

16 A.  Yes, sir.

17 Q.  And which were the brothers that you knew of Birdman?

18 A.  Well, one was deceased and the other one was Antwuan Ball.

19 Q.  And if you saw Antwuan Ball again, would you recognize him?

20 A.  Yes, sir.

21 Q.  Please stand up and tell us if you see him.

22 A.  Yes, sir.

23 Q.  And what is he wearing?

24 A.  I think that's a black tie, tan, black pants.

25 Q.  Is that the gentleman who is just standing behind me?

Page 12198

1 A.  Yes, sir.

2         MR. GUERRERO:  Note an in-court identification of

3 Mr. Ball.

4         MR. CARNEY:  No objection, Your Honor.

5         THE COURT:  The request is granted.

6 BY MR. GUERRERO:

7 Q.  And during that time period where you're hanging out with

8 Mr. Ball's brother -- and just coincidentally, do you know if

9 Birdman was older or younger than Mr. Ball?

10 A.  I think he's younger.  He's younger.

11 Q.  And during the time that you're hanging around with Birdman,

12 did you ever purchase any crack cocaine from Mr. Ball, Antwuan?

13 A.  No, sir.

14 Q.  Did you ever get anything fronted?

15 A.  No, sir, not at that time.

16 Q.  Not at that time?

17 A.  Yes, sir.

18 Q.  Who were -- were you still hustling during that time?

19 A.  Yes, sir.

20 Q.  And who was supplying you at that point?

21 A.  Well, at that time I was getting coke from Roadie, I was

22 getting coke from Herran, I was getting wholesales in there from

23 Joe Langley and Boy-Boy.

24 Q.  Let's that take them one by one.  Roadie, is that a person

25 you just named?

Page 12199

1 A.  Yes.

2 Q.  How did you know Roadie?

3 A.  I knew Roadie -- his daughter's mother used to stay across

4 the hall from me, so I kind of knew him from when I was like

5 real younger.

6 Q.  And what quantities were you getting from Roadie?

7 A.  Eight-balls, quarters, halves.

8 Q.  Where would you sell the eight-balls, quarters, and halves?

9 A.  Around in the circle.

10 Q.  And how often would you get from Roadie during that time

11 period?

12 A.  Like I say, I can't put a number on how often I went and got

13 stuff from nobody.

14 Q.  Did you say you were also getting crack cocaine from Herran?

15 A.  Yes.

16 Q.  And how did you meet Herran?

17 A.  I knew Herran through the neighborhood, just like anybody

18 else.

19 Q.  What quantities were you getting from Herran?

20 A.  Quarters and eight-balls.

21 Q.  When you say quarters and eight-balls, quarters and

22 eight-balls of what?

23 A.  Cocaine, crack cocaine.

24 Q.  Was it already crack form or was it powder?

25 A.  It was crack form.

Page 12200

1 Q.  And you said also Joe Langley during that time period?

2 A.  Yes, sir.

3 Q.  And how did you meet Joe Langley?

4 A.  Same way, through the neighborhood.

5 Q.  And what quantities would you purchase from Joe Langley?

6 A.  I wouldn't get nothing but wholesales from Joe Langley.  He

7 was like a wholesale king too.

8 Q.  Similar to like Boy-Boy?

9 A.  He was more of a wholesale king that Boy-Boy.

10 Q.  When you say wholesales, again, I think you told us earlier

11 that you would get 10 dimes for $50?

12 A.  As an example, yes.

13 Q.  Did you ever get larger amounts of wholesales from

14 Joe Langley?

15 A.  Yes.  Yes.

16 Q.  What was the largest amount of wholesales you got from

17 Joe Langley?

18 A.  Well, I think at most -- well, if you had 125, you can get

19 an eight-ball.  So I think the most I probably got was $100

20 worth of wholesale from him.

21 Q.  How many dime bags would you get for $100?

22 A.  Probably like 20, 21.

23 Q.  And you said Boy-Boy during that time period as well?

24 A.  Yes.

25 Q.  And was that also wholesales?

1 A.  Yes.

2 Q.  And did you ever get any solid pieces from Boy-Boy?

3 A.  Yes.

4 Q.  What quantities did you get from Boy-Boy?

5 A.  Eight-balls, quarters, halves, same thing.

6 Q.  Again, eight-balls, quarters, and halves of what?

7 A.  Crack.

8 Q.  And where would you sell the crack cocaine that you bought

9 from Roadie?

10 A.  In the circle.

11 Q.  Where would you sell the crack cocaine that you bought from

12 Herran?

13 A.  In the circle.

14 Q.  Where would you sell the crack cocaine that you bought from

15 Joe Langley?

16 A.  In the circle.  In the circle, sometimes on the ho stroll,

17 but mostly I sold my coke in the circle.

18 Q.  And how about the crack cocaine that you were getting from

19 Boy-Boy?

20 A.  Well, from Boy-Boy, Roadie, and Herran, it was most of the

21 time I served it in the circle, but there have been occasions

22 when I have went on the ho stroll and served.  Depends on how

23 fast it was moving in the circle.

24 Q.  I need you to speak nice and loud for us.  Okay?

25 A.  Okay.

1 Q.  Now we go back to the earlier question:  During this time

2 period that you're selling in the circle, did you ever see other

3 persons selling in the circle?

4 A.  Yes.

5 Q.  And who would see selling in the circle?

6 A.  Well, Don used to hustle in the circle, Wop hustled in the

7 circle, Boy-Boy, Twuan hustled in the circle at a point in time,

8 Dazz hustled in the circle, Santu hustled in the circle,

9 Baby Kairi hustled in the circle, Munya, Phil hustled in the

10 circle, Terrence hustled in the circle, LT hustled in the

11 circle.  That's about -- I'm just giving you some names of

12 people that I can recall that hustled in the circle.

13 Q.  All right.  You mentioned Dazz.  How do you spell that?

14 A.  D-A-Z-Z.

15 Q.  And if you saw Dazz again, would you recognize that person?

16 A.  Yes.

17 Q.  Stand up for us and tell us if you recognize that person.

18 A.  Yeah, I think he have on a white shirt.  He got the glasses

19 on back there.

20 Q.  And relative to Mister --

21        MR. ZUCKER:  Stipulate to the identification.

22        MR. GUERRERO:  Note an in-court identification of

23 Mr. Thurston.

24        THE COURT:  All right.  What did you ask, now?  What

25 did you ask me?

1          MR. GUERRERO:  I would just ask the record to reflect

2 an in-court identification by way of stipulation.

3          THE COURT:  All right.  The request is granted.

4          MR. GUERRERO:  Court's indulgence.

5 BY MR. GUERRERO:

6 Q.  Did you ever know a person that went by the name of Jojo

7 during that time?

8 A.  Yes.

9 Q.  How did you get to know Jojo?

10 A.  Through the neighborhood, the same way.

11 Q.  Did you ever see that person selling crack cocaine?

12 A.  I never actually seen Jojo selling crack cocaine.

13 Q.  Where would you see him in the neighborhood?

14 A.  Just out and about, drinking with everybody else.

15 Q.  If you saw that person again, would you recognize him?

16 A.  Yes, sir.

17 Q.  Please stand up.

18 A.  I think that's a gray shirt, gray slacks, glasses on.

19 Q.  Is that the gentleman who just stood up behind me?

20 A.  Yes, sir.

21          MR. GUERRERO:  Note an in-court identification of

22 Mr. Jones.

23          MR. MARTIN:  No objection.

24          THE COURT:  Request is granted.

25 BY MR. GUERRERO:

1 Q.   Okay.  Let's go back now and break this down.  You said you

2 would see Don selling in the circle?

3 A.   Yes, sir.

4 Q.   How often would you see Don selling in the circle?

5 A.   I mean, it was kind of like broken up.  I mean, everybody

6 didn't hustle in one place every day, so it was broken up.  I

7 can't tell you like I seen him hustling there for a week

8 straight, it was just like you see him throughout the

9 neighborhood.  You probably walk up on them, they making a sale.

10        So it's like I can't give you no number on that one,

11 neither.

12 Q.   Would you see him often?

13 A.   Yeah.  Yes, sir.

14 Q.   How about Wop?

15 A.   Yes, sir.

16 Q.   How often would you see him selling in the circle?

17 A.   Like I said, I can't give you no times, how many times I

18 seen somebody.  If you was to ask me how many times that I seen

19 him through the years that I known him, I could say every day.

20        But like I said, I can't give you no number of times

21 that I actually seen nobody hustling.

22 Q.   Was it often that you saw him selling crack cocaine?

23 A.   Yes, sir.

24 Q.   How about Boy-Boy?  Was it often that you saw him selling

25 crack cocaine?

1 A.  Yes, sir.

2 Q.  And we're talking about the circle?

3 A.  The circle, in the alley, throughout -- in the Lincolns,

4 throughout Congress Park.

5 Q.  What time period are we talking about now?

6 A.  Well, I'm talking about my whole time of being around there.

7 Q.  So we're --

8 A.  I'm not talking about no sections.

9 Q.  So we're going further in time now.  This is from, like, '96

10 to as far as how high, do you think?

11 A.  About 2002.

12 Q.  You said that you eventually saw Twuan also selling in the

13 circle?

14 A.  Yes, sir.

15 Q.  And what substances would you see Twuan selling in the

16 circle?

17 A.  Repeat the question.

18 Q.  What did you see Mr. Ball sell in the circle?

19 A.  What you mean by what would I see?

20 Q.  Well, what did you see him do?

21 A.  Oh, how often did I see him?

22       MR. CARNEY:  Could I have a time period, please?

23       THE COURT:  Well, what is the question?

24       MR. GUERRERO:  How often would you see him sell crack

25 cocaine in the circle.

1 A.  Well, with Twuan, Twuan didn't really hang in the circle too

2 much like that.  I mean, there was a point in time, I think it

3 was about summer, that he hung in the circle for a minute.  But

4 he really didn't hang in the circle like that.

5 BY MR. GUERRERO:

6 Q.  What summer was that, do you recall?

7 A.  I can't recall.  If I would guess, it was probably around

8 1999.

9 Q.  And how about Dazz?  Would you see him often selling crack

10 cocaine in the circle?

11 A.  Yes, sir.

12 Q.  Santuce?

13 A.  Yes, sir.

14 Q.  Baby Kairi?

15 A.  Yes, sir.

16 Q.  And how did you meet Baby Kairi?

17 A.  Well, Baby Kairi and Twuan are cousins.  So when me and

18 Birdman was hanging together, Baby Kairi was over in Oak Hill,

19 and he came home, and when he came home, me and him clicked

20 instantly.

21 Q.  And we'll get to him later.

22        How about Munya?  You mentioned that person?

23 A.  Yes, sir.

24 Q.  Would you see him selling crack cocaine often in the circle?

25 A.  Yes, sir.

1 Q.  And Phil, would you see him often selling crack cocaine in

2 the circle?

3 A.  Yes, sir.

4 Q.  Little Terrence?

5 A.  Yes, sir.

6 Q.  And LT?

7 A.  Yes, sir.

8 Q.  While you were out there -- and now I would like to go a

9 little bit further, now, after you start -- after you hang

10 around with Birdman, who did you start to get crack cocaine from

11 after Birdman, after you were hanging around with Birdman?

12        MR. MARTIN:  Time frame, Your Honor, please.  Time

13 frame.

14 BY MR. GUERRERO:

15 Q.  When you were hanging around with Birdman, around what year

16 did that stop?

17 A.  What year did me and Birdman stop hanging around each other?

18 Q.  Yeah.

19 A.  I don't know.  Me and Birdman, we always kind of hung out

20 real tough.  Because Birdman was Baby Ki older cousin, you know,

21 and Baby Ki came home, and it had to be before '98.

22        So I'm going to say around about like '97, Baby Ki came

23 home like around about '97, the winter of '97, and, you know, so

24 I kind of always hung around Birdman.

25 Q.  And you said you clicked with Baby Ki?

Page 12208

1 A.  Yes, sir.

2 Q.  And what did you guys start to do once Baby Ki came home?

3 A.  We start hustling together.  We became like best friends.

4 I'm not going to just say we hustled together, because we became

5 real good friends.

6 Q.  And did that include getting crack cocaine together?

7 A.  Yes, sir.

8 Q.  And how often would you and Baby Ki get crack cocaine

9 together?

10 A.  Oh, it got to a point where we was putting our money in

11 together all the time getting crack cocaine.

12 Q.  Did you ever go with Baby Ki to get the crack cocaine?

13 A.  No, sir.

14 Q.  Did you ever give him money?

15 A.  Yes, sir.

16 Q.  How often would you give Baby Ki money?

17 A.  Every time we needed it.

18 Q.  And what would Baby Ki give you in return, if anything?

19 A.  Well, it started off -- well, it started off, I put my money

20 with him; whatever I paid for, that's what I got back.

21       Then it got to a point whereas though everything we

22 got, we was splitting it down the middle, whether I had the

23 majority of the money or whether he had a majority of the money.

24 Q.  So let's start with the beginning.  What kind of quantities

25 were you getting from Baby Ki when you first started to hang out

Page 12209

1 with him?

2 A.  When I first started hanging out with Baby Ki, we was

3 getting like halves.

4 Q.  Halves of what?

5 A.  Halves of coke, cocaine.

6 Q.  Crack cocaine?

7 A.  Crack.

8 Q.  And where would you sell that crack cocaine?

9 A.  In the circle.

10 Q.  And you said that your relationship grew into a friendship?

11 A.  Yes.

12 Q.  And then that you also started to split up quantities that

13 you bought?

14 A.  Yes.

15 Q.  And what was the largest quantity that you bought with

16 Baby Ki?

17 A.  Through the whole time I known him?

18 Q.  Yeah.

19 A.  Probably like three to four ounces.

20 Q.  Did you ever go with him to find out where he was buying it

21 from?

22 A.  Like when we was getting coke from Burke, I was probably

23 going with him a couple of times then.

24 Q.  Did Baby Ki ever tell you where he was getting it from,

25 apart from Burke?

1 A.  Apart from Burke?  Not all the time.

2 Q.  Did Baby Ki ever reference Antwuan Ball?

3 A.  Yes, sir.

4 Q.  And what did Baby Ki say about Antwuan Ball?

5 A.  If he got his coke from Twuan, he'll say he got the coke

6 from Twuan.  If we got it fronted from Twuan, he be like, "Twuan

7 fronted this, so we need to hurry up and get him his money

8 back."

9 Q.  How often did you get crack cocaine from Twuan or Mr. Ball?

10 A.  I ain't get probably but like four times throughout.

11 Q.  Throughout the time period?

12 A.  Throughout the time period, probably like four or five

13 times.

14 Q.  And what was the largest quantity that you got from

15 Mr. Ball?

16 A.  I think it was about a half ounce.

17 Q.  Did you buy that alone or with Baby Ki?

18 A.  I bought it -- well, he got -- he fronted it to me, me and

19 Baby Ki.  He fronted it to us.

20 Q.  What does "fronted" mean?

21 A.  He gave it to us and we had to pay him back.

22 Q.  And how long did you have to pay Antwuan Ball back?

23 A.  Oh, you ain't have long to pay Twuan back.

24 Q.  Why not?

25 A.  It was just you knew to give Twuan his money ASAP.

1 Q.  I don't understand.  Explain that.

2 A.  Because, man, Twuan was like, he would press up on you for

3 his money.  So if you ain't give him his money back, you was

4 going to get pressed up for it.

5 Q.  Did he ever press you up?

6 A.  No.  Because I always got his money back.

7 Q.  Did you ever see Antwuan Ball press up anybody else?

8 A.  No, I ain't never seen him press up nobody else, but I seen

9 Baby Ki --

10        MR. CARNEY:  Objection.

11        THE COURT:  Sustained.

12 BY MR. GUERRERO:

13 Q.  Did you ever seen anyone else who was being pressed by

14 Antwuan Ball?

15 A.  I never actually witnessed him press nobody, but --

16        MR. CARNEY:  Objection.

17        MR. MARTIN:  Objection.

18        THE COURT:  Sustained.

19 BY MR. GUERRERO:

20 Q.  Did you ever talk to Baby Ki about Baby Ki being pressed?

21 A.  Yes.

22 Q.  What did Baby Ki say?

23 A.  I remember a point -- I remember this was like around about

24 2002, he came in my mother house one day and he was like -- he

25 was real nervous.  He was like, "Man, I got to get Twuan" -- he

Page 12212

1 had got all this coke from --

2          MR. BALAREZO:  Objection, Your Honor.  Objection.  I'm

3 sorry, I should have done it earlier.

4          THE COURT:  Beg your pardon?

5          MR. BALAREZO:  Objection.

6          THE COURT:  Basis?

7          MR. BALAREZO:  602.  It's hearsay, it's not in

8 furtherance.

9          THE COURT:  Overruled.

10          MR. ZUCKER:  It's also a narrative at this point.

11          THE COURT:  Overruled.

12 BY MR. GUERRERO:

13 Q.  What did Baby Ki say?

14 A.  Baby Ki, he probably got like about a six-deuce from Twuan,

15 and he was like --

16          MR. ZUCKER:  Objection.  Speculation.

17 A.  -- he got to hurry up and give Twuan his money.

18          MR. ZUCKER:  Objection, speculation, "probably got a

19 six-deuce."

20          THE COURT:  Overruled.

21 BY MR. GUERRERO:

22 Q.  I need for you to speak nice and clear for us, okay, right

23 in the mic.

24 A.  Okay.

25 Q.  Tell us what it was that Baby Ki said about owing money.

1 A.  He got about a six-deuce from Twuan, and he was, like, "Man,

2 I got to hurry up and get Twuan back his money."  I was, like,

3 "Man, better you than me," my exact words to him.

4 Q.  And what was Baby Ki's condition?

5 A.  Well, he was high, for one, and he was just real nervous.

6 Q.  Did you ever owe Antwuan Ball money for crack cocaine?

7 A.  Yes.

8 Q.  And how long did it take for you to pay him back?

9 A.  Oh, it ain't take me long, probably two days, tops.  But I

10 never really got nothing too big from him whereas though I'm

11 going to have to worry about owing him a lot of money.  Probably

12 the most I ever owed him --

13          MR. BALAREZO:  Objection.  Narrative.

14          THE COURT:  Sustained.

15 BY MR. GUERRERO:

16 Q.  How about Boy-Boy?  Did you ever owe him money?

17 A.  Yes, sir.

18 Q.  And do you still owe him money?

19 A.  I believe I do still owe him $250.

20 Q.  You owe him $250 for what?

21 A.  I don't know whether -- I want to say --

22          MR. BEANE:  Objection, Your Honor.  Speculation.

23          THE COURT:  I'll let him answer.

24 A.  I want to say it was for a quarter, but I believe it was for

25 a half.  I think I gave him 250; he gave me a half he charged me

1 500 for, and I just never gave his 250 back.

2 BY MR. GUERRERO:

3 Q.  So a quarter of what?

4 A.  Crack cocaine.

5 Q.  Or a half of?

6 A.  Crack cocaine.

7 Q.  And you haven't paid him back yet?

8 A.  No, sir.

9 Q.  Now I want to focus on that time period where you were

10 hanging around with Baby Ki.  And that's where we last left off.

11        Apart from the circle, was there anywhere else in

12 Congress Park that you would sell your crack cocaine?

13 A.  Throughout the park, in the alley, on the ho stroll.  We

14 rarely went around 14th Place, but I probably made one or two

15 sales on 14th Place.  Just guessing, but we barely went around

16 14th Place.  But in the Lincolns.

17 Q.  How often would you sell in the Lincoln?

18 A.  For a minute.  Like during, like, 2001, 2000, probably, we

19 was hanging in the front of the Lincoln, so...

20 Q.  Who was hanging in front of the Lincoln?

21 A.  Oh, me, Wop, Dazz, Santu, Jazz, Phil, Munya, Keith B, yeah.

22 DC and Don ain't hanging at the Lincolns all like that at this

23 time.

24 Q.  You said who wasn't hanging there at that time?

25 A.  DC and Don.

1          MR. BALAREZO:  Your Honor, objection.  It's a

2 narrative, it's nonresponsive.

3          THE COURT:  Sustained.

4 BY MR. GUERRERO:

5 Q.  I want to now ask you a little bit more focused on the

6 circle, and then we'll go to other areas.

7          During the time period that you were selling crack

8 cocaine in the circle, did you become aware of what uno/dos, or

9 doors, is?

10 A.  Yes, sir.

11 Q.  And how did you become aware of that?

12 A.  I mean, it was just something that was always played since

13 when I way started -- from when I first started hustling,

14 uno/dos.  It was like the way you got your sales.  It was so

15 many people hustling, you just couldn't say, "oh, it's my turn,

16 my turn."

17          So as soon as the sale come up on the scene, it's uno.

18 Whoever call uno, that's the first person get the sale.  Dos,

19 you break the sale down with dos.

20 Q.  Who did you see playing this game in the circle?

21 A.  Oh, me, Kairi, Don, Wop, Dazz, Phil, Terrence, Jazz, Santu,

22 Kay-Bay, everybody.

23 Q.  Did you ever see Antwuan playing the game?

24 A.  No.

25 Q.  Did you ever play with Wop yourself?

1 Q.  Let me talk to you about the interaction that you saw Wop do

2 over in the circle.  Did you see Wop as he interacted with other

3 people?

4 A.  I don't understand the question.

5 Q.  When you saw Wop, what would you notice him doing with the

6 other guys?

7          MS. WICKS:  Objection.

8          THE COURT:  Overruled.

9 BY MR. GUERRERO:

10 Q.  How did he carry himself?

11 A.  I mean, he carried hisself -- he had respect.  He had

12 respect amongst his friends, amongst other people in the hood.

13 He had respect.

14 Q.  How about Antwuan Ball?  How did he carry himself when you

15 saw him in the circle?

16 A.  Well, he had respect, too.  He had the most respect

17 throughout the hood.

18 Q.  What does that mean?

19 A.  He was like the man.

20 Q.  Let me show you some photographs here.  If we can pull up

21 108.70.

22          If I can ask you to clear the screen.  If you can touch

23 the lower right-hand corner.

24 A.  (Witness complies.)

25 Q.  Do you see Government's Exhibit 108.70?

1        (GOVERNMENT Exhibit 108.36 was moved into evidence.)

2        MR. GUERRERO:  Permission to publish?

3        THE COURT:  Yes.

4  BY MR. GUERRERO:

5  Q.  And who do you recognize on Government's Exhibit 108.36,

6  Mr. Powell?

7  A.  Myself.

8  Q.  And what are you wearing?

9  A.  Black jacket, gray sweat pants, black hat.

10  Q.  Try to keep that mic close to you.  Okay?

11  A.  Okay.

12  Q.  Next person that you recognize?

13  A.  (Indicating).

14  Q.  And you've pointed to the person who is sitting next to you?

15  A.  Yes, sir.

16  Q.  And who is that?

17  A.  Antwuan.

18  Q.  And what is Antwuan wearing?

19  A.  Red hat, black jeans.

20  Q.  Anyone else you recognize?

21  A.  (Indicating).

22  Q.  And you've pointed to the person that's on the screen to the

23  right of Mr. Ball?

24  A.  Yes, sir.

25  Q.  And who do you recognize that person to be?

1 A.  Callaway.

2 Q.  Say that again.

3 A.  Callaway.

4 Q.  And how do you know Callaway?

5 A.  Through the neighborhood, same way.

6 Q.  Did you ever see Callaway selling crack cocaine?

7 A.  Naw.  See, Callaway, Jojo, Twuan, all them was older than

8 me, so I really didn't hang with them like that.

9 Q.  Next person that you recognize.

10 A.  (Indicating).

11 Q.  And you've pointed to someone, and describe what that person

12 is wearing.

13 A.  I think he wearing a jersey.

14 Q.  Who is that person that you recognize that you just pointed

15 to?

16 A.  Drano.

17 Q.  Drano?

18 A.  Yes, sir.

19 Q.  And how did you know Drano?

20 A.  Through the neighborhood.

21 Q.  Did you ever see Drano selling crack cocaine?

22 A.  Yeah, I seen him selling.

23 Q.  And we'll get back to him in a second.  Who is the next

24 person you recognize?

25 A.  (Indicating).

 1 Q.  You pointed to someone that's on the right of Drano?

 2 A.  Yes, sir.

 3 Q.  What's that person wearing?

 4 A.  A red shirt.

 5 Q.  And who is that person?

 6 A.  Geeka.

 7 Q.  Geeka?

 8 A.  Yes, sir.

 9 Q.  Do you know Geeka's real name?

10 A.  Steve.

11 Q.  How about Drano?  Did you know his real name?

12 A.  No.

13 Q.  Anybody else that you recognize?

14 A.  (Indicating).

15 Q.  Who did you just point to?

16 A.  Wop.

17 Q.  And what is Wop wearing?

18 A.  White shirt.

19 Q.  Anybody else?

20 A.  (Indicating).

21 Q.  Who did you just point to?

22 A.  Joe.

23 Q.  Joe?

24 A.  Jojo.

25 Q.  Jojo?

1 A.  Uh-huh.

2 Q.  Is that the same person you identified in court earlier?

3 A.  Yes, sir.

4 Q.  And what is he wearing, Jojo?

5 A.  I think that's a white shirt, black jacket, hat on his head.

6 I can't really see what color it is.  It look like white with

7 some writing on it.

8 Q.  For the record, he is to the left of Wop?

9 A.  Yes, sir.

10 Q.  And anybody else that you recognize?

11 A.  (Indicating).

12 Q.  Who is that that you just pointed to?

13 A.  That's Little Twuan.

14 Q.  Little Twuan?

15 A.  Yeah.

16 Q.  And any relation to Antwuan Ball?

17 A.  Not that I know of.

18 Q.  All right.  Let's start with Geeka.  Did you ever see Geeka

19 selling crack cocaine?

20 A.  Yes, sir.

21 Q.  Where did you see Geeka selling crack cocaine?

22 A.  In the circle.

23 Q.  Did you ever purchase any crack cocaine from Geeka?

24 A.  No, sir.

25 Q.  How about Drano?

1 A.  Yes, sir.

2 Q.  You saw Drano do what?

3 A.  I saw him selling coke in the circle.

4 Q.  Did you ever see who it was that Drano hung around with, who

5 he was close to?

6 A.  Wop, Dazz, Phil.

7 Q.  You said Wop, Dazz, and Phil?

8 A.  Yeah, Wop, Dazz, Phil, who was it?  Wop, Dazz, Phil, LT,

9 little Terrence, yeah.

10 Q.  And how about Little Twuan?  How did you meet Little Twuan?

11 A.  I don't know.  Little Twuan, I don't know where he come

12 from.  I think he come from up 15th Place, but that's round

13 about the time he start hanging around the park, then he left.

14 I don't know who he came around there with, though.

15 Q.  All right.  There's a couple of other people I would like to

16 ask you about.

17        MR. GUERRERO:  And if we can clear the screen,

18 Mr. Mazzitelli.

19 BY MR. GUERRERO:

20 Q.  You mentioned DC earlier?

21 A.  Yes, sir.

22 Q.  If you can clear the screen, if you touch the lower

23 right-hand corner.

24 A.  (Witness complies.)

25 Q.  And how did you get to know DC?

1 A.  Through around the park, through the neighborhood.

2 Q.  Do you know DC's real name?

3 A.  Daniel Collins.

4 Q.  And earlier you said you saw DC hanging around with someone

5 in particular?

6 A.  Don.

7 Q.  And how often would you see DC and Don together?

8 A.  They hung out real often.  They was close friends.

9 Q.  And what would you see DC and Don do together?

10 A.  Hustle.  I mean, it was like I just can't say they was

11 hustling together, because they had a relationship beyond

12 hustling.  They was like real good friends.

13 Q.  So in addition to hustling, you saw that they were friends?

14 A.  Yeah.

15 Q.  How about you?  What was your relationship with Don?

16 A.  He was a good friend of mine's.

17 Q.  And then I'll try to squeeze in one last person.  Did you

18 ever hear of a person that went by the nickname Chow-Wow?

19 A.  Yes.

20 Q.  And did you know who that person was, just yes or no?

21 A.  Yes.

22 Q.  And how did you get to know that person?

23 A.  Through the neighborhood.

24 Q.  And did you ever see Chow-Wow sell crack cocaine?

25 A.  Yes.

1 Q.  Where would you see him sell crack cocaine?

2 A.  In the Lincolns, in the circle.

3 Q.  And did you ever get to see who Chow-Wow used to be close

4 to?

5 A.  Yes.

6 Q.  Who did you see Chow-Wow being close to?

7 A.  Boy-Boy.

8 Q.  How often would you see Chow-Wow with Boy-Boy?

9 A.  Pretty much often.  Pretty often.

10 Q.  And what would you see Chow-Wow and Boy-Boy do together, if

11 anything?

12 A.  I mean, together, as in with each other, it was more of a

13 friendship type thing.  But...

14 Q.  Did you ever see them hustle together?

15          MR. BEANE:  Objection.  Leading.

16          THE COURT:  Sustained.

17 BY MR. GUERRERO:

18 Q.  Let me just -- you don't have to answer that.  Okay?

19          MR. GUERRERO:  Your Honor, if we can pause for the day,

20 I would request at this point.

21          THE COURT:  Ladies and gentlemen, we'll break for the

22 day.  Please remember not to talk about the case, but leave your

23 notes back in the jury room.  Have a safe trip home, we'll see

24 you back tomorrow morning promptly at 9:00 o'clock.  Take care.

25          (Jury out at 5:00 p.m.)

Tab 40

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : |
| THURSTON, JOSEPH JONES, and | : May 22, 2007 |
| DOMINIC SAMUELS, | : 9:17 a.m. |
| Defendants. | : |

VOLUME 54 – MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
Glenn S. Leon, Assistant United
States Attorney
Ann H. Petalas, Assistant United
States Attorney
Gilberto Guerrero, Assistant
United States Attorney
555 4th Street
Washington, DC  20001
202.305.0174

For Defendant          CARNEY & CARNEY
Antwuan Ball:          John James Carney, Esq.
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC  20004
202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant          TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:          TEASDALE, PLLC
Steven Carl Tabackman, Esq.
1747 pennsylvania Avenue, NW
Suite 300
Washington, DC  20036
202.454.2811

For Defendant          LAW OFFICE OF JENIFER WICKS
David Wilson:          Jenifer Wicks, Esq.
503 D Street NW, Suite 250A
Washington, DC  20001
202.326.7100

GARY E PROCTOR, LLC
Gary E. Proctor, Esq.
6065 Harford Road
Baltimore, MD  21214
410.444.1500

For Defendant          LAW OFFICE OF JAMES W. BEANE
Gregory Bell:          James W. Beane, Jr., Esq.
2715 M Street, N.W.
Suite 200
Washington, DC  20007
202.333.5905

For Defendant          LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:      Jonathan Seth Zucker, Esq.
514 10th Street, NW
9th Floor
Washington, DC  20004
202.624.0784

For Defendant          LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:          Anthony Douglas Martin, Esq.
7841 Belle Point Drive
Greenbelt, MD  20770
301.220.3700

LAW OFFICE of ANTHONY ARNOLD
Anthony Darnell Arnold, Esq.
One Research Court
Suite 450
Rockville, MD  20852
301.519.8024

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)

For Defendant          LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:       A. Eduardo Balarezo, Esq.
400 Fifth Street, NW
Suite 300
Washington, DC  20001
202.639.0999
and
William B. Purpura, Esq.
8 East Mulberry Street
Baltimore, MD  21202
410.576.9351

Court Reporter:        Scott L. Wallace, RDR, CRR
Official Court Reporter
Room 6814, U.S. Courthouse
Washington, DC 20001
202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1    **MORNING SESSION, MAY 22, 2007**

2    (9:17 a.m.)

3         THE COURT:  All right.  Are you ready for the jury?

4         MR. GUERRERO:  Yes, Your Honor.

5         (Jury in at 9:21 a.m.)

6         THE COURT:  Good morning.

7         THE JURY PANEL:  Good morning.

8         THE COURT:  Welcome back.  We're ready to resume.

9         Counsel.

10        CONTINUED DIRECT EXAMINATION OF JACQUES POWELL

11   BY MR. GUERRERO:

12   Q.   Good morning, sir.

13   A.   Good morning.

14   Q.   Would you please reintroduce yourself again to the jury.

15   A.   My name is Jacques Powell.

16   Q.   And, Mr. Powell, yesterday we left off talking about some

17   of your crack cocaine sales on The Circle of Congress Park.  And

18   I would like to just pick up where we left off.

19        You said there came a time between 1996 to 2002 where you

20   started to hang around with a person named Baby Kairi?

21   A.   Yes, sir.

22   Q.   Did you also know Baby Kairi by another nickname?

23   A.   Kay-Bay, Kairi, Blade.

24   Q.   Baby Kai?  Have you heard that?

25   A.   Baby Kai, yeah.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12255**

1  Q.   Did he take any crack cocaine from you?

2  A.   He asked me for my coke, but I told him I ain't have no

3  more.

4  Q.   On any one of these occasions, was Baby Kairi around?

5  A.   No, sir.

6  Q.   Do you recall an incident that happened in The Circle

7  where Phil robbed you?

8  A.   Yes, sir.

9  Q.   And who was out there that day?

10  A.   It was a couple of people out there, but I can't remember

11  name for name who was out there, but I know Antwuan eventually

12  walked up on the scene.

13  Q.   Well, tell us what happened before you were robbed.  What

14  were you doing?

15  A.   I was making a sale.

16  Q.   Who was out there that day making sales in addition to

17  you?

18  A.   Phil, Jazz -- it was Phil, Jazz, me, Little Greg, Dre.

19  That night it wasn't too many people out there.  There wasn't a

20  whole lot of people out there.  I think that was one of the

21  nights when people went out to the clubs, the go-go's, whatever.

22  There wasn't a lot of people out there that night.

23  Q.   And did you say Twan was out there?

24  A.   He walked up.  I don't know where he came from, but he

25  wasn't out there while we was out there, but he came up on the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12256**

1  scene.

2  Q.   What happened with respect to the robbery?

3  A.   Well, I was making a sale and Phil was riding down the

4  street and I was getting out the car.  It was a car had pulled

5  up.  As a matter of fact, I think it was the lady that used to

6  come in the cab.

7  Q.   Where exactly were you?  Why don't you clear the screen

8  for us and then point to where you think you were.

9  A.   I was like up in here somewhere (indicating), in The

10  Circle -- in the street, because I was in the street because I

11  was getting out of the car.

12  Q.   For the record, you marked 100.1, the exhibit, a line

13  right below 13th Place, right in The Circle?

14  A.   In The Circle.  I was trying to mark in the street, but

15  it was in The Circle.

16  Q.   All right.  So tell us again, what is happening?

17  A.   Well, I'm getting out the car, and as I'm getting out the

18  car, Phil riding down the street hollering, "Doors, doors,

19  doors."  And I'm like, "Doors?  The sale is over.  How you going

20  to get doors on the sale and the sale is over?"

21  Q.   Had you already made a sale?

22  A.   The sale was done.  The lady was pulling off.  I'm

23  getting out the car, got my money back in my pocket and

24  everything.

25  Q.   What had you sold the lady?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12257**

1  A.   I think it was like a 40 sale.

2  Q.   I'm sorry?

3  A.   A 40 sale.

4  Q.   A 40 sale of what?

5  A.   Crack cocaine.

6  Q.   Okay.  And then what happened after that?

7  A.   Well, after that, I'm getting out the car, he hollering

8  "Doors" or whatever.  So he pulled off and I walk back down to

9  the corner right there in front of 3401 and he come back, him,

10  Little Jazz and I think that was Dre that was with him.  I

11  believe it was.

12  Q.   Who's "him"?

13  A.   Phil, Little Jazz and Dre.  So I knew they was going to

14  try something, but I didn't know what he was going to try.  So

15  when he jumped out of the car, he walked up on me, he pulled his

16  gun out and was like, "Give me that shit."

17       I'm like, "Man, Phil, go ahead.  I ain't going to let you

18  rob me."  So he go to try to hit me with the gun.  He try to hit

19  me with the gun.

20  Q.   Were you hit?

21  A.   I think he hit me one time in my ear or something, so I

22  just went ahead and gave him my money.  And he was like, "Give

23  me your coat, too."  And I was like, "You ain't getting my

24  coat."

25       So Twan walked through the alley --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12258**

1  Q.   Is that Antwuan Ball?

2  A.   Yes, sir.

3  Q.   The person you identified yesterday?

4  A.   Yes, sir.  He was coming through the alley like behind

5  3402.  He was coming through this alley right here (indicating).

6  Q.   And for the record, you pointed a line to the right of

7  the number "13," right above the "1" on 13th Place?

8  A.   Yeah, right above the "1," but it's more like in the

9  alley.  It won't let me point exactly where I'm trying to point

10  at.

11       But Twan was coming through the alley and, you know, a

12  whole lot of commotion was going on.  I was mad.  I was cussing

13  and I was fussing and this and that and this and that and the

14  other.  And Twan called both of us over and asked what was going

15  on.

16  Q.   Twan called both of who over there?

17  A.   Me and Phil.  And I told Twan, Phil just robbed me.  And

18  Twan was like, "Phil, you got to give him that shit back because

19  that's my shit he got."

20  Q.   What did you understand Twan was talking about when he

21  said "that shit back"?

22  A.   My -- the coke, because I had -- he had fronted me the

23  coke.

24  Q.   Who had fronted you the coke?

25  A.   Antwuan.  He had fronted me some coke and so he told --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12259

1  he told Phil to give me that shit back. And Phil was like -- he
2  asked him how much he took. Phil was like, "I only took a
3  hundred dollars from him," but he actually took 300 from me.
4  Q.  Who asked who about how much money they took?
5  A.  Twan asked Phil how much he took from me. Phil was like,
6  "A hundred dollars," but he took 300. So I tried to argue about
7  it and this, that, this and that. And Twan was just like,
8  "Leave it alone." So I left it alone.
9  Q.  Did Phil give you back the stuff?
10  A.  He gave me back the hundred dollars.
11  Q.  And that was after Antwuan told him to give it back to
12  you?
13  A.  Yes, sir.
14  Q.  How much had you gotten front from Twan before you were
15  robbed?
16  A.  I think I got like a quarter from him.
17  Q.  I'm sorry?
18  A.  A quarter.
19  Q.  A quarter of what?
20  A.  Cocaine.
21  Q.  And you said it was fronted?
22  A.  Yes, sir.
23  Q.  And again, was Baby Kairi around during that incident?
24  A.  I think he was locked up during this time, too.
25  Q.  How about LT? Did there come a point when LT actually

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

12260

1  tried to rob you?
2  MS. WICKS:  Objection, leading, Your Honor.
3  THE COURT:  I'll allow it.
4  BY MR. GUERRERO:
5  Q.  Do you know what I'm talking about?
6  A.  Yes, sir.
7  Q.  And what happened there?
8  A.  I was in the alley. I was sitting in the -- sitting in
9  the car. I think I was sitting in the car with Boy-Boy.
10  Q.  Which alley?
11  MR. BEANE:  Objection, speculation.
12  THE COURT:  Overruled.
13  BY MR. GUERRERO:
14  Q.  Which alley are we talking about? Point to it.
15  You know what? Before you do that, Mr. Powell, can you
16  just clear the screen first, on the lower right-hand corner.
17  And you're about to point to us on 100.1, the alley where you
18  were located.
19  A.  It was back in this alley right here (indicating).
20  Q.  Okay. And that's an alley between Savannah Place -- it's
21  to the left of the "S" in Savannah Place and to the right of
22  13th Street, looks to be just a parking lot?
23  A.  Yes, sir.
24  Q.  Who were you there with?
25  A.  I believe I was sitting in the car with Boy-Boy.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

12261

1  Q.  What happened?
2  A.  And LT walked up on the car and he -- I had just got a
3  quarter, but I can't remember who I got the coke from, so I'm
4  not going to say because I can't remember who I got the coke
5  from.
6  Q.  What were you doing in that alley with Boy-Boy?
7  A.  I think I was sitting back there smoking with him or
8  something.
9  Q.  Smoking what?
10  A.  Weed. And LT walked up on the car with a knife and tried
11  to poke me with the knife and took the coke from me.
12  Q.  Did he take all the cocaine or just some of it?
13  A.  Yeah, he took the whole quarter. I think I had it in my
14  hand because I had just got it.
15  Q.  All right. Now, there came a time -- well, let me just
16  ask you before I move on. Was Kairi there at that point, Baby
17  Kairi?
18  A.  No. I can't even -- this was -- no, he wasn't there.
19  Q.  Now, on the occasions that you were with Baby Kairi,
20  either before or after he comes out of jail, did you continue to
21  get robbed or did you actually start doing some robberies
22  yourself?
23  A.  I actually started doing some robberies myself. I wasn't
24  getting -- no, sir. I wasn't getting robbed. I had started
25  doing robberies for myself, yeah.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

12262

1  Q.  And did you notice that as far as you are concerned, your
2  status changed in Congress Park?
3  MS. WICKS:  Objection.
4  THE WITNESS:  I wouldn't say --
5  THE COURT:  Hold on. When there's an objection, I need to
6  hear it.
7  I'll ask you to rephrase.
8  BY MR. GUERRERO:
9  Q.  When you were with Baby Kairi, what did you notice as far
10  as how you were treated?
11  A.  I wouldn't say --
12  MR. ZUCKER:  Objection. By whom?
13  BY MR. GUERRERO:
14  Q.  Let me clarify it, by whom. I mean, when you came into
15  contact -- you tell us, when you were with Kairi, who would you
16  come into contact with?
17  A.  When I was with -- we all hung out, me, Kairi, Twan --
18  well, not Twan. Twan didn't really hang out with us because we
19  was younger than him. But being as though he was Kairi cousin,
20  we would go around him from time to time.
21  I mean, Phil, Jazz, Santu, Dazz, Wop, Don, DC -- well,
22  Don and DC always been close friends of mine. I really ain't
23  never had no problem with them.
24  Q.  And so when you were interacting with those guys you
25  mentioned and Kairi was around, what did you notice about your

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12263

1  and how you were treated?

2  **A.**  Well, it wasn't -- it was like more being accepted, I'll

3  put it that way.

4  **Q.**  And you drew that conclusion why?

5  **A.**  Because, like I say, man, I kind of had it rough coming

6  up around there, being as though I didn't have no family around

7  there.  Kairi had family around there.

8  **Q.**  Who was Kairi's family?

9  **A.**  Antwuan.  So it was just kind of -- it was kind of rough

10  on me coming up by myself.  And then I got somebody that was --

11  I guess you could say connected around there.

12  MR. BALAREZO:  Objection.

13  THE COURT:  Overruled.

14  BY MR. GUERRERO:

15  **Q.**  Now, there came a point in time then when you actually

16  got in trouble yourself with the law, right?

17  **A.**  Yes, sir.

18  **Q.**  And are you the same Jacques Powell convicted of

19  possession of cocaine in M 9934-02?

20  **A.**  Yes, sir.

21  **Q.**  And are you the same Jacques Powell in 2005, felony

22  1621-2005 convicted for fleeing a law enforcement officer and

23  two counts of destruction of property?

24  **A.**  Yes, sir.

25  **Q.**  Now, at some point later on, and we'll come back to -- as

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12264

1  you're growing up, but in 2005, at some point, you're approached

2  by an FBI --

3  MR. ZUCKER:  Objection, leading.

4  THE COURT:  Sustained.

5  BY MR. GUERRERO:

6  **Q.**  In 2005, are you approached by an FBI agent?

7  **A.**  Yes, sir.

8  **Q.**  And who was that?

9  **A.**  Agent Lockhart.

10  **Q.**  And what was the situation in which Agent Lockhart

11  approached you?

12  **A.**  I was going to court for my felony case.

13  **Q.**  Is that the 2005 case?

14  **A.**  Yes, sir.

15  **Q.**  And what were you going to court for?

16  **A.**  Felony fleeing.

17  **Q.**  What -- were you going to do something?

18  **A.**  No.  Actually, I was in drug court.  I was going for a

19  review, because in drug court you go for a review every month to

20  see what you're doing, whatever, like your status has changed,

21  if your urine is clean or whatever.

22  I was in drug court and I was going for a review and I

23  was coming up to the third floor, because they had my courtrooms

24  mixed up.  They was sending me back to my calendar judge when I

25  actually was supposed to be going down to 202, drug court, but

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12265

1  they had me on Judge Rigsby's calendar.  So I was coming

2  upstairs on the third floor, you know what I'm saying, to see

3  what was the mix-up.

4  And I didn't even get to the courtroom and Agent Lockhart

5  and two other FBI agents walked up on me.  He kind of opened his

6  jacket and flashed his badge on me.  And I was like, "What's

7  going on?"

8  He was like, "I'm Agent Lockhart."  He was like, "We know

9  about the robberies.  We got you on videotape.  You need to come

10  to my office."

11  **Q.**  What did you do?

12  **A.**  I kind of blew it off, like, "I ain't going nowhere."  So

13  the other agent with him was like, "Fuck him.  We get his ass

14  when we get the rest of them."  And he stepped off.

15  **Q.**  Did you eventually go see Agent Lockhart?

16  **A.**  Yes.

17  **Q.**  And when you went to go see Agent Lockhart, did you go

18  with anyone else?

19  **A.**  I went with my mother.

20  **Q.**  And tell us what happened on that occasion.

21  **A.**  Well, Agent Lockhart had called my mother and she was

22  kind of worried about what was going on.  So she was like, "I'll

23  go with you down there."

24  So I went down there just to see what they had on me.

25  And once I got there, they showed me in the videotape.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12266

1  **Q.**  The videotape contained what?

2  **A.**  Me making a drug sale.

3  **Q.**  Making a drug sale where?

4  **A.**  Well, it was in the -- I was -- it started like from -- I

5  was at the corner right here (indicating).  I rode a bike all

6  the way down to right here, to right here (indicating), and I

7  made a sale like right here (indicating).

8  **Q.**  All right.  And for the record, you pointed to the

9  intersection of Congress Street and 13th Place first and then

10  you pointed to the left of that at the intersection a little bit

11  north of 13th Street and Congress Street?

12  **A.**  Yes, sir.

13  **Q.**  And who was present when you were watching that video?

14  **A.**  It was me, Agent Lockhart and my mother.

15  **Q.**  And what was going on through your mind at that point?

16  **A.**  At that point I was just like -- and then it was somebody

17  in the video with me, Keith B, and Agent Lockhart was like -- I

18  wasn't saying nothing when I was watching the video and Agent

19  Lockhart was like, "Just remember, somebody in this video with

20  you."  So I was like, "They got me."

21  **Q.**  What did you decide to do?

22  **A.**  I decided to just tell them what I know, tell them about

23  myself.

24  **Q.**  Were you handcuffed at all?

25  **A.**  No, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12271

1   **A.**    Yes, sir.

2   **Q.**    Whose is that?

3   **A.**    Mr. Katzoff.

4   **Q.**    What's the date of the signature?

5   **A.**    Well, it was misprinted.  It says 10-6-06, but it's

6   supposed to be 1-6-06.

7   **Q.**    And Section 2 of 1127 is captioned what?

8   **A.**    My proffer of evidence.

9   **Q.**    And on this particular section, do you see your signature

10  anywhere on page 4?

11  **A.**    Yes, sir.

12  **Q.**    You said what's the date of your signature?

13  **A.**    1-6-06.

14  **Q.**    Anyone else's signature you recognize?

15  **A.**    Yes, sir.

16  **Q.**    Whose is that?

17  **A.**    Mr. Katzoff.

18  **Q.**    What's the date of his signature?

19  **A.**    1-6-06.

20        MR. GUERRERO:  The government would move for the admission

21  of 1127 at this time.

22        MS. WICKS:  Objection.

23        THE COURT:  All right.  Over objection, 1127 is received.

24        (Government's Exhibit 1127 admitted into the record.)

25        MR. GUERRERO:  Permission to publish on the ELMO?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12272

1        THE COURT:  Yes.

2   BY MR. GUERRERO:

3   **Q.**    You can clear the screen there, Mr. Powell.

4        All right.  We're looking at Government's Exhibit 1127,

5   on the bottom there, it's marked.  And do you recognize -- do

6   you see your name there?

7   **A.**    Yes, sir.

8   **Q.**    Let's take a look at paragraph 1.  Do you see paragraph

9   number 1?

10  **A.**    Yes, sir.

11  **Q.**    And what is it under paragraph 1 that you decided to do?

12  You said you pled guilty.  What did you plead guilty to?

13  **A.**    I pled guilty to --

14  **Q.**    Are you reading it there, for the record?

15  **A.**    Yes, sir.  Paragraph 1, this first paragraph right here,

16  at the top?

17  **Q.**    Yeah.  The one that says number 1 and your name there.

18  **A.**    Oh, number 1 and my name there.  I took a guilty plea to

19  conspiracy to distribution and possession with intent to

20  distribute.

21  **Q.**    For distribution and possession of what?

22  **A.**    Cocaine base, crack cocaine.

23  **Q.**    And under your understanding, what's the prison term that

24  you are exposed to as a result of that guilty plea?

25  **A.**    A minimum of ten years, a maximum to life in jail.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12273

1   **Q.**    Have you been in jail at all yet thus far?

2   **A.**    No, sir.

3   **Q.**    And what's the amount of cocaine base that you agreed to

4   be accountable for?

5   **A.**    150 to 500 grams.

6   **Q.**    And that's on page number -- that's still page 2,

7   paragraph 2.  Do you see that?

8   **A.**    Yes, sir.

9   **Q.**    And what years were you out in Congress Park hustling, as

10  you called it?

11  **A.**    Between '96 and 2002.

12  **Q.**    Is that all the amount of cocaine base or crack cocaine

13  that you sold, 150 to 500 grams?

14  **A.**    No, sir.

15  **Q.**    Under this plea agreement, what is it that you understand

16  you have to do?

17  **A.**    Well, under the plea agreement, I've got to -- I've got

18  to -- at that time I got the plea agreement, I was already on

19  probation, so I had to stick to the regular terms of my

20  probation, which is test daily -- I mean drug tests, clean

21  urines, check in with my P.O., do phone check-ins and cooperate

22  with the government.

23  **Q.**    Have you been doing those things?

24  **A.**    Yes, sir.

25  **Q.**    And during your cooperation with the government, what is

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12274

1   it that you understand you have to do each time you speak to the

2   government?

3   **A.**    Tell the truth.

4   **Q.**    How about when you testify in court?

5   **A.**    Tell the truth.

6   **Q.**    Are you familiar with what perjury is?

7   **A.**    Yes, sir.

8   **Q.**    What's perjury?

9   **A.**    A lie under oath.

10  **Q.**    What happens if you get caught lying under oath?

11        MR. BALAREZO:  Objection.

12        THE COURT:  Overruled.

13        THE WITNESS:  I believe it's a ten-year sentence -- a

14  ten-year charge.

15  BY MR. GUERRERO:

16  **Q.**    What happens if you get caught lying under oath and your

17  plea agreement is still out there?  What happens to your plea

18  agreement?

19        MR. BALAREZO:  Objection.

20  BY MR. GUERRERO:

21  **Q.**    That you understand.

22        THE COURT:  Overruled.

23        THE WITNESS:  I mean, it'll be no more good.  The

24  government will take it away from me.

25  BY MR. GUERRERO:

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12279

1   **A.**   He had it down to the side of his leg like this
2   (indicating).
3   **Q.**   So for the record, you're actually gripping your right
4   hand?
5   **A.**   Yes, sir.
6   **Q.**   And was the gun in the right hand?
7   **A.**   Yes, sir.
8   **Q.**   And so it was exposed?
9   **A.**   Yes, sir.
10  **Q.**   And how close was the guy who had just got robbed next to
11  Dazz?
12  **A.**   We was in the alley.  The alley was kind of like narrow
13  and the dude was like sitting up on the wall.  He was sitting on
14  the wall.  It was like a little wall -- you know how a wall come
15  out some, got the gate behind it?  He was sitting right there on
16  the wall.
17  **Q.**   Did you ever see that guy who was robbed by you and Dazz
18  try to do anything while Dazz was armed with the gun?
19  **A.**   No.
20  **Q.**   What happened next?
21  **A.**   Well, after the sales left, we got in the car and pulled
22  off.
23  **Q.**   How much did you get as far as marijuana?
24  **A.**   We got probably around 50 bags of weed, dime bags of
25  weed.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12280

1   **Q.**   How much money did you get?
2   **A.**   None, other than with the sales he made.
3   **A.**   The sales that who made?
4   **A.**   Dazz.
5   **Q.**   And did you split the sales?
6   **A.**   No, we didn't split the money, but we split the bags.
7   **Q.**   You split what bags?
8   **A.**   The dime bags of weed that we got.
9   **Q.**   Where did you go to then?
10  **A.**   Well, we left, went back around the park.
11  **Q.**   Back to Congress --
12  **A.**   Yeah.  We smoked a couple of bags and then we went our
13  separate ways.
14  **Q.**   All right.  What year do you think that was, about?
15  **A.**   That was around about '97.
16  **Q.**   And I want to focus your attention to like '98, '99, an
17  incident where you and Kay-Bay are out by The Circle and some
18  other guys are there --
19  MS. WICKS:  Objection.
20  THE COURT:  Overruled.
21  BY MR. GUERRERO:
22  **Q.**   Do you know what I'm talking about?
23  **A.**   Yes, sir.
24  **Q.**   What happened there?  First, what year do you think this
25  is?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12281

1   **A.**   This is like '98, '99, around about that time.  I ain't
2   really too good with dates, but it was around in that time
3   frame.
4   MR. GUERRERO:  And let's just pull up 100.1 again.  If we
5   can publish -- all right.
6   BY MR. GUERRERO:
7   **Q.**   Do you see 100.1?
8   **A.**   Yes, sir.
9   **Q.**   This incident that you're about to talk about, where did
10  it happen?
11  **A.**   It happened in The Circle right along here (indicating).
12  **Q.**   And you just pointed to the intersection of 13th Place
13  and Congress Street?
14  **A.**   Yes, sir.
15  **Q.**   All right.  Who was there that day?
16  **A.**   It was me and Kay-Bay standing out there that day, and it
17  was this lady who stayed in 3402, this building right here
18  (indicating).
19  **Q.**   And you pointed to the opposite side of 13th Place?
20  Again, same intersection, Congress and 13th Place, but the other
21  side of 13th Place, the street?
22  **A.**   Yes, sir.
23  **Q.**   And what happened?
24  **A.**   It was a lady who stayed in that building right there and
25  she had a brother who used to smoke coke.  They had just moved

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12282

1   around there.  And it was two other dudes out there.
2   **Q.**   Had you ever seen those two other dudes at all?
3   **A.**   No, sir.
4   **Q.**   Was that the first time you saw them?
5   **A.**   Yes, sir.
6   **Q.**   And what were you and Kay-Bay doing out there that day?
7   **A.**   We was in the opposite building I just pointed at.  We
8   were in that building hustling.
9   **Q.**   Doing what?
10  **A.**   Selling drugs.
11  **Q.**   What kinds of drugs?
12  **A.**   Cocaine.
13  **Q.**   What did you see next?
14  **A.**   We kept seeing the pipe heads go over to that building
15  over there to them.  So one of the pipe heads went over there
16  and she came across the street to where we was at and we asked
17  her what's going on, why everybody keep going over there?
18  And she was telling us they had coke.  So me and Kay-Bay
19  walked over there and we was telling the dudes, "Y'all can't
20  hustle around here."
21  **Q.**   Why did you tell those guys they all can't hustle around
22  there?
23  **A.**   Because it was our neighborhood.
24  **Q.**   And you're talking about The Circle?
25  **A.**   Just the whole neighborhood.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1642 of 1954

**12283**

1  **Q.**    Was anybody armed?
2  **A.**    Kay-Bay had a little knife on him.
3  **Q.**    What happened next?
4  **A.**    So we standing on the porch and we telling the dudes,
5  "You can't hustle around here, you can't hustle around here."
6  So one of the dudes, like, "All right, man.  All right, man.
7  All right, all right, all right."
8       So Kay-Bay whipped his knife out on the dude.  And when
9  he whipped his knife out, the dude pulled a gun out and pointed
10  it at us.
11  **Q.**    And this is happening right at the intersection of
12  13th --
13  **A.**    Naw, this happened right in front of the building.
14  **Q.**    Are we still talking about the intersection of 13th and
15  Congress Street?
16  **A.**    In front of the building 3402 I just pointed to.
17  **Q.**    Okay.  Go ahead.
18  **A.**    So the dude pulled his gun out on us.  So we sitting
19  there, we stuck now.  So Kay-Bay had his arms folded like this
20  (indicating).  I'm leaning on the gate.  And the next thing I
21  know, Kay-Bay breaks through the building.  I'm standing there
22  right by myself and I'm like, "Damn, I'm liable to get killed,"
23  you know what I'm saying?
24       So the -- when Kay-Bay break through the building, there
25  was a dude standing in the door and there was a dude standing at

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12284**

1  the bottom of the steps.  The dude with the gun, he standing at
2  the bottom of the steps.
3  **Q.**    You're still talking about 3402?
4  **A.**    Right.
5  **Q.**    That building?
6  **A.**    Right.  And the pipe head niggas -- dudes was standing
7  right beside the dude with the gun.  So the dude in the door, he
8  walked down the steps and as he walking past me, he tell the
9  other dude, "Rock that nigga."
10       So when he said that, the dude went to lift his gun up
11  and the dude -- the pipe head dude kind of hit his arm down like
12  that (indicating.)  And when he did that, it gave me a chance to
13  run, so I broke through the building.
14       So the dude came all through the building, you know what
15  I'm saying, doing like this (indicating).  I'm ducking between
16  cars and all that.
17  **Q.**    Did you eventually meet up with Kay-Bay?
18  **A.**    Yeah, I met back up with Kay-Bay.
19  **Q.**    Where did that happen?
20  **A.**    I can't remember where we met back up, but I know I was
21  walking down Congress right here (indicating).  We walking down
22  Congress right there (indicating).
23  **Q.**    And you just marked Congress Street in a direction
24  towards Savannah Place?
25  **A.**    Right.  Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12285**

1  **Q.**    And what happened when you met up with Kay-Bay?
2  **A.**    We walking down Congress and they come back in a station
3  wagon.
4  **Q.**    Who's "they"?
5  **A.**    The dudes who we just finished getting into it with.
6  They come back in a station wagon with tinted windows and they
7  dropped the back window and pointed the gun out the window
8  again.  So we break, run through the alley, run back there in
9  the alley.
10       And back in the alley, we ran into L.
11  **Q.**    Who's L?
12  **A.**    Larry.
13  **Q.**    Did you know if he was related to anybody?
14  **A.**    That was Joe cousin.
15  **Q.**    Whose cousin?
16  **A.**    Jo-Jo.
17  **Q.**    The person you identified yesterday?
18  **A.**    Yes, sir.
19  **Q.**    And when you saw L or Larry, what happened?
20  **A.**    He gave us a gun.  He gave Kay-Bay a gun.
21  **Q.**    Who gave Kay-Bay a gun?
22  **A.**    Larry did.
23  **Q.**    L?
24  **A.**    Yes, sir.
25  **Q.**    Did you see what kind of gun it was?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12286**

1  **A.**    I think it was a chrome .40.  So he gave him the gun, so
2  we go back, me and Kay-Bay, we go back and stand at the corner
3  right there on 13th Place.  And L pull up and Doo-Doo pull up,
4  but he ain't got nothing to do with it.  He was just pulling up
5  because we was standing out there.  He was just pulling up on
6  the scene.
7       So we out there talking and whatever, so I see the car
8  coming back up the hill right here (indicating).  I see the car
9  coming down the hill like this, coming down Congress again.
10  **Q.**    And you just marked Government's Exhibit 100.1 heading
11  north on 13th Street, making a right on Congress Street?
12  **A.**    Yeah, because if we standing at the corner, you can see
13  what's coming up the hill right there.  So I seen the car
14  turning down the hill right.  I said, "There those niggas go
15  right there."  So as they was coming up about right here
16  (indicating), Kairi got to shooting at them.  He got to shooting
17  at them and they turned in this circle -- they turned in this
18  alley right there, turned around and went back out.
19       And then Kairi jumped in the car with L and I jumped in
20  the car with Doo-Doo and we pulled off.
21  **Q.**    Why did you guys do that?
22  **Q.**    Why we shot back at them?
23  **Q.**    Yeah.
24  **A.**    I guess because we felt that they was coming back to
25  shoot at us.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12287**

1    MS. WICKS:  Objection.
2    THE COURT:  Overruled.
3    BY MR. GUERRERO:
4    Q.    And initially, you said they couldn't come in your
5    neighborhood --
6    MR. ZUCKER:  Objection, leading.
7    BY MR. GUERRERO:
8    Q.    -- and sell drugs?
9    THE COURT:  Overruled.
10   BY MR. GUERRERO:
11   Q.    Is that what you said initially?
12   A.    Yes, sir.
13   Q.    Could anybody just come into Congress Park in The Circle
14   and sell drugs?
15   A.    No, sir.
16   Q.    This person that you said, L -- describe what he looks
17   like.
18   A.    He was tall, he wore glasses, kind of brown skin.
19   Q.    How often had you known L.
20   A.    I knew L.  He used to come around there.  It was Joe
21   cousin, so I knew him -- that's how I knew him.  He used to be
22   up on Quarles.
23   Q.    Now, I want to now focus your attention to an incident
24   that happened inside your own apartment building.
25   A.    Okay.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12288**

1    Q.    And when do you think that happened?
2    A.    That happened like -- that's around about the same time,
3    '98, '99.
4    Q.    What were the circumstances of that?
5    Why don't you clear the screen.
6    A.    Again, me and Kay-Bay standing like right here
7    (indicating) in front of 3401, hustling, selling crack cocaine.
8    And it was somebody sitting in my mother's building, sitting on
9    the steps.  He had a gun on him.  And so --
10   Q.    Let me pause you right there.  Did you see that person?
11   A.    No, I didn't -- I didn't see him.  Geech Ball walked up
12   on him.
13   Q.    Geech Ball?
14   A.    Um-hmm.
15   Q.    Who's Geech Ball?
16   A.    Wop father.
17   Q.    And did Geech Ball tell you anything?
18   A.    Yeah, he was like -- he wasn't telling us to rob the
19   dude.  He wasn't telling --
20   MS. WICKS:  Objection, Your Honor.
21   MR. GUERRERO:  Not offered for the truth, Your Honor.
22   THE COURT:  Come on up.
23   (Following sidebar discussion had on the record:)
24   THE COURT:  What is he going to say?
25   MR. GUERRERO:  He's going to say that Geech Ball walks up

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12289**

1    to this witness, which is Mr. Powell, and Kay-Bay alerts them
2    that there's a guy holding a gun sitting in front of his
3    building.  And so that causes them to approach that person.
4    MS. WICKS:  The problem is -- I understand that it goes to
5    the witness's -- the reason why the witness goes and does
6    something, but to the extent that it corroborates, it's rank
7    hearsay and Geech is not -- it's not in furtherance.  I can't
8    imagine that my client's father is alleged to be a member of the
9    conspiracy.
10   THE COURT:  Overruled.  I'll allow it.
11   (Sidebar discussion concluded.)
12   BY MR. GUERRERO:
13   Q.    Okay, Mr. Powell.  We left off where Geech Ball tells you
14   something?
15   A.    Yeah.  He walked up on us.  He was like, "Man" -- he was
16   like --
17   Q.    Nice and loud.
18   A.    He walked up on us he was like, "Man, there's somebody sitting
19   in your mother's building and he got a gun on him.  I don't know
20   what he's trying to do."
21   So me and Kay-Bay, we walked off and went and got a .380.
22   I can't remember where we got it from.
23   Q.    A .380 handgun?
24   A.    Yes, sir.
25   Q.    You then did what?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12290**

1    A.    We came back and we was walking in the building.  The
2    dude was in the building.  You can go up the steps or down the
3    steps when you first walk in the building.
4    Q.    What's the number of the building that we're talking
5    about?
6    A.    3407.
7    Q.    3407, right in 13th Place?
8    A.    Yes, sir.
9    Q.    What happened then?
10   A.    So you can go up the steps or down the steps and the dude
11   was sitting like the second step from the last step going up.
12   So Kay-Bay walk in first, I walk in behind Kay-Bay.  And Kay-Bay
13   had the gun on him.  So when Kay-Bay walking in the building and
14   he was faking like he was going down the steps, but as he got to
15   the top of the steps, he turns around point the gun on him.
16   And once he did that, I jumped right on the dude and
17   grabbed his waist -- grabbed his waist.  And when I grabbed his
18   waist, I pulled the gun up off of him.  After we did that, we
19   search him and made him strip Butterball naked in the hallway,
20   make sure he ain't had nothing else on him.  And then we left up
21   out of there.
22   Q.    Had you ever seen that guy before?
23   A.    Yeah.  I seen him plenty of times after that.  Come to
24   find out his mother stayed in the building.
25   Q.    Well, my question was --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12315*

1  **A.**  Well, we broke it down amongst each other.
2  **Q.**  And who were the people who broke it down?
3  **A.**  Me, Dazz and Phil.
4  **Q.**  What did you do with your share?
5  **A.**  Well, later on that night, Dazz came to me and was
6  like --
7  **Q.**  Dazz with a D?
8  **A.**  Yeah.  He was like Jazz came up to him just asking for
9  his dimes back.
10  **Q.**  Break this down for a second here.  Dazz comes up to
11  you --
12  **A.**  Um-hmm.
13  **Q.**  Is that a yes?
14  **A.**  Yes.
15  **Q.**  And Dazz with a D says what?
16  **A.**  He just finished talking to Jazz and Jazz copping a plea
17  and he just going to give him his dimes back.  "I'm going to
18  give him" -- he was like, "Phil, give him the dimes back."  He
19  going to give -- Dazz going to give the dimes back and he was
20  asking me to give the dimes back, so I gave them back to him.
21  **Q.**  You gave back what to Dazz?
22  **A.**  The dime.  The cocaine and the dime.
23  **Q.**  So that Dazz could do what with it?
24  **A.**  Give it back to Jazz.
25  **Q.**  You said that Jazz was trying to -- Dazz told you that

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12316*

1  Jazz, with a J, was trying to cop a plea?
2  **A.**  Yeah.
3  **Q.**  What does that mean?
4  **A.**  Just trying to negotiate his dimes back -- his stuff
5  back.
6  **Q.**  The stuff that you had just robbed?
7  **A.**  Right.
8  **Q.**  What happened to the gun?
9  **A.**  Dazz said it was his so he kept it.
10  **Q.**  Did you ever see it?
11  **A.**  No.
12  **Q.**  Did Dazz ever tell you who he gave that gun to?
13  **A.**  No.
14  **Q.**  Did you ever hear from Keith B about that gun?
15  **A.**  Did I hear who?
16  **Q.**  Did Keith B ever tell you something about that gun?
17  **A.**  No.
18  **Q.**  Do you know a guy named Harry?
19  **A.**  Yes.
20  **Q.**  And did -- were you involved in an incident that included
21  Harry?
22  **A.**  Yeah.
23  **Q.**  And when was that?  Was this before or after what we just
24  talked about with Jazz?
25  **A.**  This was after.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12317*

1  **Q.**  What happened in this incident?
2  **A.**  Uh --
3  **Q.**  First of all, who's Harry?
4  **A.**  A dude from around the park.
5  **Q.**  I need you to speak up.
6  **A.**  A dude from around Congress Park.
7  **Q.**  How long had you known him?
8  **A.**  I knew him through the neighborhood, just like I knew
9  anybody else.
10  **Q.**  And what happened?
11  **A.**  Well, me, Baby Kai and Dre riding around smoking, off the
12  E pills, and --
13  **Q.**  Let me pause you right there.  Who's Dre?  Did you
14  mention Dre?
15  **A.**  Yes, Dre.
16  **Q.**  Who's Dre?
17  **A.**  He was -- he was like a friend of Jazz.
18  **Q.**  A friend of whose?
19  **A.**  Jazz.
20  **Q.**  Jazz with a J?
21  **A.**  Um-hmm.
22  **Q.**  Okay.  And so you, Dre, and Baby Kai are riding around?
23  **A.**  Um-hmm.
24  **Q.**  You said you were getting high?
25  **A.**  Yes.

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12318*

1  **Q.**  What were you getting high off?
2  **A.**  Weed and we had popped a pill.
3  **Q.**  What happened?
4  **A.**  And you know, we riding around smoking and off the pill,
5  in the car, talking about who's gangster and who not gangster.
6  **Q.**  What does that mean, "who's gangster"?
7  **A.**  Like who go hard and who don't go hard.  And Dre was
8  like -- we seen Big Harry walking down 13th Street -- I mean
9  Congress Street.  We seen Big Harry walking down the street.
10  And Joe (sic) was like -- he was talking to Baby Kai -- he was
11  like, "If you think you hard, rob Big Harry right now."
12  **Q.**  Why do they call him "Big Harry"?
13  **A.**  Because he was kind of big.
14  **Q.**  So what happened?
15  **A.**  So Baby Kai jumped out the car.  I had a knife on me.  I
16  had a knife that flipped out and it came out this long
17  (indicating).  And I gave Baby Kai the knife and he jumped out
18  the car and he tried to rob Big Harry.  But by Big Harry being
19  so big, he kind of like pinned Baby Kai on the fence -- had him
20  pinned over the fence like this, had his arm locked over the
21  fence like this (indicating.)
22      So I jumped out the car.  I seen he had Baby Kai pinned
23  on the fence, so I jumped out the car.  I get to punch him.  I'm
24  hitting him, hitting him, hitting him.
25  **Q.**  Who are you punching?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1645 of 1954

**Page 12319**

1   A.   Big Harry.  So I'm punching, I'm punching, I'm punching
2   and --
3   Q.   How about Dre?  What was Dre doing?
4   A.   He jumped out the car, too.  He started hitting him.  So
5   Big Harry falling down on his knees and he finally let Baby Kai
6   go.  So we ripping his coat up off him and going in his pockets,
7   but he didn't have nothing on him, so we didn't end up doing
8   nothing but taking his coat.
9   Q.   Do you know what happened to that coat?
10  A.   Yeah.  Well, Big Harry baby mother was out there when we
11  was robbing him, so she sent the police down to my house, so I
12  didn't stay home that night.  So the next morning, I went over
13  to Baby Kai house and I'm like, "Shit, Baby Kai, the police
14  looking for me.  Let me get that coat."  And he was like Twan
15  told him to give the coat back.
16  Q.   Baby Kai said that Twan told him to give the coat back?
17  A.   Yeah, the coat, the jacket.
18  Q.   Twan told Baby Kai to give the coat back?
19  A.   Um-hmm.
20  Q.   And did Baby Kai tell you who Baby Kai was supposed to
21  give the coat back to?
22  A.   Big Harry.
23  Q.   Did Baby Kai say why Twan told him to give the coat back?
24  A.   No.
25  Q.   Do you know if Baby Kai gave the coat back to Harry?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 12320**

1   A.   I eventually seen him with the coat on again, so he had
2   to give it back to him.
3   Q.   You're talking about Harry?
4   A.   Right.
5   Q.   And if we can just see where this happened, if we can
6   look at 100.1, where did this incident happen?
7   A.   This incident happened right here, in this court right
8   there (indicating.)
9   Q.   All right.  So you're pointing to what looks like a
10  reverse U apartment complex on Congress Street.  And this is the
11  apartment complex, reverse U that's closest to where it's marked
12  "Savannah Place"?
13  A.   Yes, sir.
14  Q.   Was this day or night?
15  A.   This happened at night.
16  Q.   Did Baby Kai tell you whether or not he got anything out
17  of the coat?
18  A.   No.
19  Q.   Do you know a person named Gheena?
20  A.   Yeah.
21  Q.   How do you know Gheena?
22  A.   She used to sell weed around the park.
23  Q.   And how long did you know Gheena?
24  A.   I didn't really know her like that.
25  Q.   Do you know how to spell "Gheena"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 12321**

1   A.   No.  I don't even know if that's how you pronounce her
2   name.
3   Q.   You knew her by that nickname?
4   A.   Yeah, but I think I'm pronouncing it wrong, though.
5   Q.   How would you pronounce it?
6   A.   I pronounce it Gheena, but I don't think that's what her
7   name was, though.
8   Q.   How do you pronounce its again?
9   A.   Gheena.
10  Q.   Gheena?
11  A.   Um-hmm.
12  Q.   Is that a yes?
13  A.   Yes.
14  Q.   All right.  Was there an incident that involved this
15  person Gheena that you participated in?
16  A.   Yes.
17  Q.   What happened?
18  A.   Well, like I said, I had -- like, this is right after the
19  Big Harry incident.
20  Q.   And if you can just repeat that because you put your hand
21  in front of your mouth.
22  A.   This is right after the Big Harry incident.  And I told
23  you, Big Harry baby mother sent the police down to my mother
24  house, so I wasn't staying at my mother's house.
25       So I was broke one day and I was trying to get a room so

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**Page 12322**

1   I could stay with my son mother.  So I'm riding around.  So I
2   see Gheena boyfriend getting out the -- getting in the car.  So
3   I'm in the car, I'm riding with Keith and Smoke, so I tell them,
4   stop the car.
5        So I jump out the car.  I jump out the car.  I'm walking
6   up on the car, putting my mask on and --
7   Q.   Would you point to us where you were?
8   A.   I don't really think you can see it in this picture right
9   here.  You really can't see it in this picture right here.
10  Q.   Was it still in Congress Park?
11  A.   Yeah, it's still in Congress Park.  It's back up in here
12  somewhere, up in here (indicating).  You can't see the alley in
13  this picture.
14  Q.   You pointed to -- see when I enlarge it there?  Do you
15  see how it's enlarged?
16  A.   You have to come down some.
17  Q.   Enlarge it some more?
18  A.   Yeah.
19  Q.   All right.  Let us do that for a second.
20  A.   Okay.
21  Q.   All right.  We just modified 100.1 as far as zooming it
22  in.
23  A.   Okay.  He was sitting in the parking lot right up in here
24  (indicating) and we was coming down the street right here.
25  Q.   You pointed to Savannah Street up at the top of the 100.1

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12355

1       And then you have the testimony of Kairi Kelliebrew, who
2 says, I came out and I saw his face. That patently falls against
3 what everyone else said, and I understand there's a credibility
4 issue for the jury to determine, but I think the Court should
5 consider that at the beginning. Now the statement that
6 Kelliebrew made to this witness, to Powell, and then Powell, as I
7 stated earlier, two different versions of what Kelliebrew said, I
8 think raises a really critical issue of credibility, which
9 reliability, of ambiguities, which normally would, I guess, favor
10 it going in front of the jury as evidence. But the problem is
11 that the prejudicial aspect of that information is extremely high
12 for Mr. Samuels. This is not just some, you know -- some idle
13 gossip about somebody doing something. This is about my client
14 killing somebody. I mean, that's extremely prejudicial,
15 especially given the fact that there is so much ambiguity and so
16 much contradictory testimony on the one issue, which is the
17 identification, either six people said they could not see the
18 guy's face because the face was covered and Kelliebrew said, "I
19 saw his face when I came out," so there's that issue that I think
20 the Court should also take into account.
21       THE COURT: I think considering even all of those factors
22 that you raised about all of those witnesses and all the
23 circumstances under which those witnesses testified and were
24 examined and cross-examined, there obviously is prejudice to your
25 client with respect to having this set of statements come out,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12356

1 but I don't find that it's unfairly prejudicial and that it's
2 inappropriate, even considering all of those factors, to have the
3 witness testify in the way that he's expected to. All right.
4 Anything else?
5       MR. CARNEY: Yes, Your Honor. Your Honor, I have checked
6 to my inability to cross-examine Kelliebrew based on this prior
7 consistent statement. The appropriate time for the government
8 bringing these statements in would have been when Mr. Kelliebrew
9 was on the stand, to rehabilitate him when he was on redirect.
10 By presenting this as a consistent statement, we're unable to
11 confront Mr. Kelliebrew as to whether he made these statements or
12 not. The typical situation is -- a prior consistent statement is
13 brought out by the declarant. "Didn't you say this at another
14 time," it's not usually brought through another person. So based
15 on that, my objection is allowing these statements in where
16 Mr. Ball can't confront those statements.
17       THE COURT: I think you're right, that's normally how
18 parties would present prior consistent statements through the
19 actual speaker, but Mr. Kelliebrew is not unavailable as a
20 witness. I'm sure the government would make him available if you
21 wanted him to come back. You have been able to cross him at
22 least with respect to what he's testified about so far anyway.
23 And I don't think this is a *Crawford* problem in the sense, at
24 minimum, he's still available and can be produced for further
25 testimony at some point, if it's necessary.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12357

1       MR. CARNEY: All right.
2       THE COURT: Anything else?
3       MR. BALAREZO: Thank you.
4       THE COURT: All right. Thank you.
5       (Sidebar discussion concluded.)
6       THE COURT: Are you ready for the jury?
7       MR. GUERRERO: Yes, Your Honor.
8       THE COURT: All right.
9       (Jury in at 11:53 a.m.)
10       THE COURT: Welcome back, ladies and gentlemen. Thank you
11 again very much for your indulgence. We've resolved what we had
12 to resolve and we're ready to resume.
13       Counsel.
14 BY MR. GUERRERO:
15 **Q.**   Okay, Mr. Powell, if we could pull up 100.1, which is up
16 on the screen.
17       I was about to ask you about an event that happened up in
18 the Boat Alley where you marked for us, to the upper right-hand
19 corner, 100.1, right at the right of Savannah Street. Do you
20 see that?
21 **A.**   Yes.
22 **Q.**   And who was in that alley that particular day?
23 **A.**   Uhm, me, Jo-Jo --
24 **Q.**   Speak nice and loud. We're having trouble hearing you.
25 **A.**   Me, Jo-Jo, Baby Kai and Geeka.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12358

1 **Q.**   And you, Jo-Jo, Baby Kai and Geeka --
2 **A.**   And Black.
3 **Q.**   And Black.
4       Let me show you a quick picture, if we can switch to the
5 ELMO.
6       MR. GUERRERO: Actually, before I do that, may I
7 approach? This is Government's Exhibit 503.10 marked and
8 admitted.
9 BY MR. GUERRERO:
10 **Q.**   Do you recognize anyone in 503.10?
11 **A.**   Um-hmm.
12 **Q.**   Is that a yes?
13 **A.**   Yes.
14 **Q.**   Who do you recognize?
15 **A.**   Baby Kai and Black.
16 **Q.**   What's Baby Kai wearing?
17 **A.**   White T-shirt, blue jeans.
18 **Q.**   How about Black?
19 **A.**   Black tank top, red shorts.
20 **Q.**   This is 503.10. Is this the photograph I just showed
21 you?
22 **A.**   Yes.
23 **Q.**   All right. You said Black is the one in this picture
24 wearing the black tank top?
25 **A.**   Yes, sir.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12359

1  Q.  And Baby Kai is wearing the white?
2  A.  Yes, sir.
3  Q.  On that particular afternoon -- well, was it afternoon or
4  night?
5  A.  In this picture?
6  Q.  I'm going now to that Boat Alley incident.
7  A.  Oh, okay.
8  Q.  What time of day was it?
9  A.  It was during the daytime.
10  Q.  Were these two gentlemen there?
11  A.  Yes.
12  Q.  Baby Kai and Black?
13  A.  Yeah.
14  Q.  And did anybody come up at that point into the alley?
15  A.  Eventually.
16  Q.  Who eventually came up?
17  A.  Don.
18  Q.  Don?
19      MR. BALAREZO:  Objection, Your Honor.
20      THE WITNESS:  Yes.
21      THE COURT:  Counsel, let me ask you to come up.
22      Have a seat over there for just a minute.
23      (Following sidebar discussion had on the record:)
24      THE COURT:  I'm not sure if you established the time that
25  this is occurring.  Have you done that?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12360

1      MR. GUERRERO:  Not yet.
2      THE COURT:  That's going to be very important, so if you
3  haven't, do it before any statements are elicited.
4      MR. GUERRERO:  Okay.
5      THE COURT:  If you have, I think it might be helpful to
6  just tie it down again.
7      MR. GUERRERO:  Okay.
8      THE COURT:  Because the whole premise of my ruling was
9  that this occurred after the August event and before the
10  September contact with the police.
11      MR. BALAREZO:  This particular scenario is the day before
12  the day of the murder.
13      THE COURT:  I'm sorry, so this is not one of the
14  statements --
15      MR. GUERRERO:  I'm not there yet.
16      THE COURT:  -- that were going to be elicited?
17      I'm sorry.  I still think you should -- before the
18  statements come out, make sure we have very clear on the record
19  from this witness' mouth what the time frame is.
20      MR. GUERRERO:  Understood.
21      MR. BALAREZO:  And I want to make sure we're not jumping
22  back here again, as I said, the day before.  After the incident,
23  the government is eliciting questions about right now are
24  answered, is when Kelliebrew tells him supposedly that Don pulled
25  guns on Black.  I think the government said they're not going to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12361

1  go into that, so I just want to make sure it doesn't pop out --
2      MR. GUERRERO:  I'm not going there.
3      MR. BALAREZO:  -- adding more fuel to the fire.
4      (Sidebar discussion concluded.)
5  BY MR. GUERRERO:
6  Q.  All right, now we're talking about an incident where you,
7  Geeka, Jo-Jo, Baby Kai are in the Boat Alley.
8  A.  Yes.
9  Q.  All right.  Now, without telling us -- just yes or no,
10  the following day, after this encounter that we're talking
11  about, the following day, does something happen to Black, just
12  yes or no?
13  A.  Yes.
14      MR. BALAREZO:  Objection.
15      THE COURT:  Overruled.
16  BY MR. GUERRERO:
17  Q.  And what happened to Black the following day, just yes or
18  no, does that cause him to be alive or dead now?
19      MR. BALAREZO:  Objection.
20      THE COURT:  I'll allow it.
21  BY MR. GUERRERO:
22  Q.  In other words, the next day, does he end up being alive
23  or is he dead the next day?
24  A.  He's dead.
25  Q.  All right.  And we're not going to go there, so this

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12362

1  incident that we're talking about occurs the day before?
2  A.  Yes.
3  Q.  All right.  Now, in the alley, you said eventually
4  somebody comes up, right?
5  A.  Right.
6  Q.  Who is the person that eventually comes up?
7  A.  Don.
8  Q.  And when Don shows up, is that Don the person you
9  identified yesterday in court?
10  A.  Yes.
11  Q.  Who is present in the alley?
12  A.  Me, Baby Kai, Black, Jo-Jo and Geeka.
13  Q.  What do you see Don do at that point?
14  A.  Nothing, he just walked up, gave everybody dap for Black.
15  Q.  Gave everybody "dap"?
16  A.  Yeah, shook our hands.
17  Q.  That means to shake your hand?
18  A.  Yes.
19  Q.  Did you see whether or not Don gave dap to Black?
20      MR. BALAREZO:  Objection, asked and answered.
21      THE COURT:  Sustained.
22  BY MR. GUERRERO:
23  Q.  Did Don stay at all during that time?
24  A.  No.
25  Q.  Did you talk to Don about why he didn't give dap to

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**12363**

1  Black?
2      MR. BALAREZO:  Objection.
3      THE COURT:  You can answer yes or no.
4      THE WITNESS:  No.
5  BY MR. GUERRERO:
6  **Q.**    Did Don say anything that you heard?
7      MR. BALAREZO:  Objection.
8      THE COURT:  You can answer that.
9      THE WITNESS:  No.
10 BY MR. GUERRERO:
11 **Q.**    Did Don stay or did he leave?
12 **A.**    He left.
13 **Q.**    All right.  Now, the following day -- the following day
14 after this event, did you have a conversation with Baby Kairi
15 late at night over -- after going to Malcolm X?
16 **A.**    Yes.
17 **Q.**    Let's go piecemeal, okay.  What caused you to go to
18 Malcolm X that day?
19 **A.**    Uhm, because I was getting phone calls.  Everybody
20 calling me, asking --
21 **Q.**    Let me pause you right now.  Without telling us what all
22 these other people are saying --
23 **A.**    Okay.
24 **Q.**    -- how many phone calls did you get?
25 **A.**    I got about three phone calls.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12364**

1  **Q.**    And after you -- when you received the phone calls, where
2  were you?
3  **A.**    In the house.
4  **Q.**    And where is "in the house"?  What was the address back
5  then?
6  **A.**    5103 Sheriff Road.
7  **Q.**    Was that in Congress Park or not?
8  **A.**    No, that was in northwest -- I mean, northeast.
9  **Q.**    What time of day was it that you received these calls?
10 **A.**    I'm not sure, but I know it was before 12, 12 noon.
11 **Q.**    After you received the calls, did you go somewhere?
12 **A.**    Yes.
13 **Q.**    Where did you go?
14 **A.**    Not right after I received the calls, but eventually I
15 ended up coming around Congress Park.
16 **Q.**    Was it that same day that you received the calls?
17 **A.**    Yes.
18 **Q.**    Was it day or night?
19 **A.**    Day.
20 **Q.**    And where did you go when you went to Congress Park?
21 **A.**    As soon as I got off the train, I seen Kairi and Birdman
22 off the --
23     MR. BALAREZO:  Objection non-responsive.
24     THE COURT:  Sustained.
25 BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12365**

1  **Q.**    Where did you go when you got off the train?
2  **A.**    Malcolm X.
3  **Q.**    Who did you see at Malcolm X, when you arrived?
4      MR. BALAREZO:  Objection, assumes facts not in evidence,
5  foundation.
6      THE COURT:  You can rephrase.
7  BY MR. GUERRERO:
8  **Q.**    Did you see anyone at Malcolm X after you got off the
9  train?
10 **A.**    Yes.
11 **Q.**    Who did you see?
12 **A.**    Kairi, Birdman and Officer Faison.
13 **Q.**    Did you know who Officer Faison was at the time?
14 **A.**    I knew he was a police officer.
15 **Q.**    Was he dressed in a police uniform?
16 **A.**    He had on a suit.
17 **Q.**    Was the suit a police suit or was it a casual, regular
18 suit?
19 **A.**    It was a suit like he got on, but it wasn't the same
20 color.
21 **Q.**    Did the suit have any police markings on it?
22 **A.**    No.  He had his badge and his gun on him.
23 **Q.**    Did you approach Faison and Kairi and Birdman?
24 **A.**    Yes.
25 **Q.**    And what did you see -- without telling us what they were

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

**12366**

1  talking about, what did you see Faison and Kairi and Birdman do?
2  What were they doing?
3  **A.**    They were drinking a fifth of Remy.
4  **Q.**    Where were they drinking the fifth of Remy?
5  **A.**    On Malcolm X school.
6  **Q.**    And is it kind of dark yet at this point or not?
7  **A.**    No.
8  **Q.**    Did you go over to where they were?
9  **A.**    Yes.
10 **Q.**    What did you do when you got there?
11 **A.**    I just stood right there and got in on the
12 conversation -- I was standing right there listening in on the
13 conversation.
14 **Q.**    And did there come a point where Faison left that group?
15 **A.**    Yes.
16 **Q.**    When did that happen?
17 **A.**    He got a call.  I think it was something like a murder on
18 Danberry Street.
19     MR. BALAREZO:  Objection.
20     THE COURT:  Sustained.
21 BY MR. GUERRERO:
22 **Q.**    Without telling us what you think the call was about, you
23 think there was a call to Faison?
24 **A.**    It was a call over the scanner.
25 **Q.**    And once that call over the scanner came on, did Faison

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12367

1  stay with you or did he leave?
2  **A.**   He left.
3  **Q.**   Who remained in the group at that point?
4  **A.**   Me, Kairi and Birdman.
5  **Q.**   And at that point, did you stay at Malcolm X or did you
6  walk anywhere else?
7  **A.**   We got to walking off.
8  **Q.**   Where did you walk to?
9  **A.**   Through the alley to The Circle.
10  **Q.**   All right. Let's go back to 100.1.
11  MR. GUERRERO: Mr. Mazzitelli, if we can switch to the
12  computer.
13  Ms. Romero, please.
14  THE DEPUTY CLERK: Is this an exhibit in evidence?
15  MR. GUERRERO: Yes, ma'am.
16  BY MR. GUERRERO:
17  **Q.**   Where did you walk to, point for us.
18  **A.**   We came through this alley (indicating) and eventually
19  ended up in The Circle. I can't remember the exact ways we
20  took, but we came to this alley and we eventually ended up in
21  The Circle.
22  MR. MARTIN: Your Honor, I'm sorry, I'm having trouble
23  hearing.
24  BY MR. GUERRERO:
25  **Q.**   Just repeat your answer for us.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12368

1  **A.**   We came through the alley and we eventually end up on
2  13th Place.
3  **Q.**   And you marked Government's Exhibit 100.1 with a line to
4  the right of Savannah Street?
5  **A.**   Yes, sir.
6  **Q.**   You marked the alley. And then you also put a line on
7  13th Place to indicate where you ended up, ultimately?
8  **A.**   Yes, sir.
9  **Q.**   And that's the area you called The Circle?
10  **A.**   Yes, sir.
11  **Q.**   When you arrived at that area, who were you with?
12  **A.**   Kairi and Birdman.
13  **Q.**   And when you arrived, was it night or daytime?
14  **A.**   It was still daytime, but I think it was just getting
15  dark.
16  **Q.**   Had you been drinking at all?
17  **A.**   I probably had a cup.
18  **Q.**   Cup of what?
19  **A.**   Remy.
20  **Q.**   Had Kairi been drinking, that you saw?
21  **A.**   He had a cup in his hands when I got up there.
22  **Q.**   Birdman, was he drinking?
23  **A.**   He had a cup in his hands.
24  **Q.**   Were you guys consuming anything other than alcohol?
25  **A.**   No, not at this time right here.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12369

1  **Q.**   When you get The Circle, does Kairi tell you --
2  MR. BALAREZO: Objection.
3  BY MR. GUERRERO:
4  **Q.**   -- something about what happened earlier that day?
5  MR. BALAREZO: Leading.
6  THE COURT: I'll allow it.
7  THE WITNESS: Not when we get The Circle, because as soon
8  as we got The Circle, he got arrested -- well, he got taken into
9  custody.
10  BY MR. GUERRERO:
11  **Q.**   He got taken -- well, he left somewhere?
12  **A.**   Yes.
13  **Q.**   All right. Later on that night, did he come back?
14  **A.**   No. He -- he said something to me before we got The
15  Circle, but once we got The Circle, he got taken into custody.
16  **Q.**   That's what I want to focus you on.
17  **A.**   Okay.
18  **Q.**   Before you get The Circle, what does Kairi tell you about
19  what happened that day?
20  MR. BALAREZO: Objection. Same objection.
21  THE COURT: Overruled.
22  BY MR. GUERRERO:
23  **Q.**   You can tell us, what did Kairi say?
24  **A.**   He just said "That nigga Don killed my man."
25  **Q.**   And when you heard that from Kairi, who did you

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12370

1  understand that Kairi was talking about?
2  **A.**   Black.
3  **Q.**   And that Don did what to Black?
4  **A.**   He said it, "That nigga Don killed my man."
5  **Q.**   Then you end up back at The Circle?
6  **A.**   Right.
7  **Q.**   And before Kairi leaves, does he say anything else about
8  what happened that day?
9  **A.**   No.
10  **Q.**   About a week later or so, did you have a conversation
11  with Kairi?
12  **A.**   Yes.
13  **Q.**   What was that conversation about?
14  **A.**   About the incident that happened on that day.
15  **Q.**   Did Kairi give you more details about what happened?
16  **A.**   Yes.
17  **Q.**   And tell us what Kairi said about Don --
18  MR. BALAREZO: Objection.
19  BY MR. GUERRERO:
20  **Q.**   -- shooting Black?
21  THE COURT: Sustained. You can rephrase.
22  BY MR. GUERRERO:
23  **Q.**   Tell us what he said.
24  THE COURT: Hum.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12371**

1  **Q.**  Rephrase.  Tell us what Kairi said in more detail, about
2  a week later?
3       MR. BALAREZO:  Same objection.
4       THE COURT:  Overruled.
5  BY MR. GUERRERO:
6  **Q.**  What did he say?
7  **A.**  He was like -- he was like, they came past my house that
8  morning.  They came knocking on my door that morning and I
9  didn't hear them knocking on my door.  I was upstairs, and my
10  son was just born around this time.
11       MR. BALAREZO:  Objection, non-responsive.
12       THE COURT:  Well, non-responsive.  Sustained.
13       MR. BALAREZO:  Well, non-responsive and becoming
14  narrative.
15  BY MR. GUERRERO:
16  **Q.**  Kairi gave you the full account of what happened that
17  day?
18  **A.**  Yes.
19  **Q.**  Let's just focus on what Kairi said what happened with
20  respect to Black, all right.  So just fast forward, in your
21  mind.
22  **A.**  Okay.
23  **Q.**  All right.
24  **A.**  He said, when they was on they way back around Congress
25  Park --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12372**

1  **Q.**  Let me pause you right there.
2  **A.**  Kairi said he was with who, when they were working their
3  way back to Congress Park?
4  **A.**  Him and Black.
5  **Q.**  Did Kairi say how they were traveling to that location?
6  **A.**  They was driving.  They didn't say that, but I knew they
7  was driving.
8  **Q.**  What else did they say about him and Black going back to
9  Congress Park?
10  **A.**  They are -- was coming across Suitland Parkway and
11  they ran into a female and they scooped the female up in the
12  car, and way coming through The Circle -- well, they were
13  taking the female to Kena Keen's house.
14  **Q.**  Was that the same Kena Keen that we talked about
15  earlier --
16  **A.**  Yeah.
17  **Q.**  -- the one you described as a crackhead?
18  **A.**  Yeah.
19  **Q.**  What did Kairi say his purpose was in taking the girl to
20  Kena Keen's apartment?
21       MR. BALAREZO:  Objection.  Objection, Your Honor.
22       THE COURT:  Overruled.
23  BY MR. GUERRERO:
24  **Q.**  Tell us, please, what did he say?
25  **A.**  They was about to G her.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12373**

1  **Q.**  What does that mean?
2  **A.**  Run a train on her, everybody have sex with her.
3  **Q.**  What else did Kairi say happened next?
4  **A.**  Uhm, he said when they pulled up in The Circle, he seen
5  DC on the -- they seen DC on the front, and he was, like, Black
6  was about to work DC and he gated it.
7       MR. BALAREZO:  Your Honor, objection.  Can we approach?
8       THE COURT:  Hum?
9       MR. BALAREZO:  Can we approach?
10       THE COURT:  Yes.
11       (Following sidebar discussion had on the record:)
12       MR. BALAREZO:  I apologize.  This is going to be other
13  statements by DC now, that we did not discuss at the bench.  My
14  understanding was that the government was going to elicit
15  statements from Kelliebrew.  These statements in particular, I
16  believe are -- this witness sees DC, Daniel Collins.
17  Daniel Collins has a towel on his mouth is bleeding, apparently
18  had a fight with --
19       MR. ZUCKER:  I think I will be taking an exception.
20       MS. WICKS:  I would, too.
21       MR. BALAREZO:  If it's a different one, then I complete my
22  objection.
23       THE COURT:  You didn't complete your objection, so I'm not
24  sure what anybody is taking exception to.  So complete whatever
25  objection you want to make.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12374**

1       MR. BALAREZO:  My understanding earlier is that I thought
2  he was going to repeat the discussion where DC said he had just
3  had a fight with Steve Sutton and there's some talk in relation
4  to the murder, but I'm being told my colleagues I'm wrong.  If I
5  am, I withdraw my objection.
6       MR. GUERRERO:  I'm not going there, Judge.  We might go
7  there later.
8       THE COURT:  Okay.
9       MR. PUPURA:  I withdraw my objection.
10       THE COURT:  All right.
11       (Sidebar discussion concluded.)
12  BY MR. GUERRERO:
13  **Q.**  All right.  I want to --
14       THE DEPUTY CLERK:  We're missing a juror, Mr. Guerrero.
15       MR. GUERRERO:  I'm sorry.
16       (Brief pause.)
17  BY MR. GUERRERO:
18  **Q.**  Mr. Powell, we were talking about what Kairi, Baby Kai,
19  told you had happened when Kairi and Black and this girl that
20  they were just about to go G up, pull into a parking lot.
21       What else did Kairi tell you happened when they pulled
22  into the parking lot?  First of all, did Kairi tell you which
23  parking lot they pulled up into?
24  **A.**  Yes.
25  **Q.**  Which one is that?  Can we see it here?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12375*

1  **A.**  Yes.

2  **Q.**  All right. Point to it. Why don't you clear the screen

3  first?

4  **A.**  (Indicating). In this parking lot right here.

5  **Q.**  All right. And you pointed to -- you cleared the screen.

6  And you pointed to the right of the TH above 13th Place.

7  There's a parking lot to the right of it?

8  **A.**  Yes, sir.

9  **Q.**  Kairi told you what happened when him, Black and the girl

10  pulled into the parking lot?

11  **A.**  He said he got out of the car, went up to Kena Keen house

12  to see if they could come up there, then he heard gunshots.

13  Then he said once he heard the shots --

14  **Q.**  Speak nice and loud?

15  **A.**  He said once he heard about the shots, he heard the

16  shots, he ran out the back door of this building right here.

17  (Indicating).

18  **Q.**  All right. And you pointed to the building above the PL

19  on 13th Place, that's perpendicular with the first building that

20  you marked?

21  **A.**  True. Yes, sir.

22  **Q.**  Okay. Kairi said? What happened next?

23  **A.**  He said he ran out the building. He said when he ran out

24  the building, he seen somebody standing right there. He said he

25  ran out the building. When he ran out the building, he was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12376*

1  like -- no, he ran out the building and he seen somebody

2  standing there and they made contact with each other.

3  **Q.**  Did Kairi tell you who that person was?

4  **A.**  He said it was Don.

5  **Q.**  And what did Kairi say, if anything, that Don had in his

6  hands?

7  **A.**  Two guns.

8  **Q.**  What did Kairi say happened next?

9  **A.**  He said they made eye contact with each other. They were

10  looking at each other, and then he ran one way, Kairi ran

11  through the building, and when he ran through the building, he

12  said he met right back up with him again.

13  **Q.**  Where is that on the map?

14  **A.**  In the front, in the front of this building (indicating).

15  **Q.**  All right. So you're pointing now to the right --

16  pointing to 13th Place above the L, to the right of the building

17  that's -- it's like an L apartment complex and it's right on the

18  bottom of the horizontal portion?

19  **A.**  Right.

20  **Q.**  Kairi told you that when he came out on that side, he saw

21  what?

22  **A.**  He ran into the person again.

23  **Q.**  Which person?

24  **A.**  He said it was Don. So he said he ran into him again.

25  Again, they made eye contact with each other, looking at each

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12377*

1  other, like seeing what each other was going to do. And then

2  Kairi broke back through the building. Then he said, after he

3  broke back through the building, he -- somewhere along there, he

4  went and moved his car behind here, in this parking lot right

5  there.

6  **Q.**  All right. So you've made a notation on the -- almost in

7  the center -- the bottom center of the exhibit, to the right of

8  13th Place, down in the bottom, right before it reaches --

9  **A.**  It's that parking lot, right back there.

10  **Q.**  The green area there?

11  **A.**  Right.

12  **Q.**  Did Kairi tell you that he saw Black during that

13  incident?

14  **A.**  Yeah. He said when he came out the door the first time,

15  before he made eye contact with Don, he said he seen Black jump

16  up out the car and run up the alley.

17  **Q.**  Did Kairi describe to you whether or not Black was

18  injured?

19  **A.**  Naw, he just seen him jump out the car, running through

20  the alley.

21  **Q.**  When Kairi told you about seeing Don, did Kairi tell you

22  how Don was dressed?

23  **A.**  No.

24  **Q.**  All right. Now, when did you first tell --

25  MR. BALAREZO: Objection. Assumes facts not in evidence,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12378*

1  Your Honor.

2  THE COURT: I didn't hear the full question.

3  MR. GUERRERO: I'll withdraw and rephrase, Your Honor.

4  THE COURT: All right.

5  BY MR. GUERRERO:

6  **Q.**  Did you ever tell the police about this?

7  **A.**  Yes, sir.

8  **Q.**  And was it right after you heard it from Kairi?

9  MR. BALAREZO: Objection.

10  THE WITNESS: No, sir.

11  MR. BALAREZO: Leading.

12  THE COURT: Overruled.

13  BY MR. GUERRERO:

14  **Q.**  When did you eventually decide to tell the police?

15  **A.**  Uhm, later on, like a couple weeks later.

16  **Q.**  A couple of weeks later?

17  **A.**  Yes.

18  **Q.**  After you had heard it from Kairi?

19  **A.**  Yes.

20  **Q.**  And what was it that caused you to tell the police about

21  what Kairi told you?

22  **A.**  I had got arrested.

23  **Q.**  You had gotten arrested for what?

24  **A.**  Possession of cocaine.

25  **Q.**  Is that the same case that we talked about earlier,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1        THE COURT:  All right.  Mr. Beane?

2                   CROSS-EXAMINATION

3 BY MR. BEANE:

4 Q.  Mr. Powell, I believe you indicated that you were arrested,

5 and then you went to speak with Agent Lockhart.  Right?

6 A.  No, sir.

7 Q.  How did that happen?  How did you come to speak with Agent

8 Lockhart?

9 A.  I was going to drug court for review, and Agent --

10 Q.  Say that one more time.

11 A.  I was going to drug court for review, and Agent Lockhart

12 walked up on me.

13 Q.  So you were going to drug court.  Explain to us what drug

14 court is.

15 A.  Drug court was, I had a marijuana problem and told them I

16 had a problem when I went to take my urine.  And they gave me

17 drug court, which is for a felon, it's a five-month program,

18 depending you don't have no sanctions or nothing like that.

19 Q.  Okay.  So basically you're on pretrial release for

20 something.  Right?

21 A.  Right.

22 Q.  You go take your urinalysis.  Right?

23 A.  Right.

24 Q.  And you test positive for marijuana?

25 A.  Right.

1 A.  I don't know.

2 Q.  He's older than you.  Right?

3 A.  He's older than me.

4 Q.  Okay.  But you didn't hang out with Antwuan because he's

5 older than you?

6          MR. GUERRERO:  Objection.  Asked and answered.

7          THE COURT:  Sustained.

8          MR. BEANE:  Okay.

9 BY MR. BEANE:

10 Q.  Now, you did talk about how you hung out with Baby Ki.

11 Right?

12 A.  Right.

13 Q.  And you guys were tight, I think you said?

14 A.  Right.

15 Q.  Extremely tight?

16 A.  Right.

17 Q.  Always together?

18 A.  Like best friends.

19 Q.  Okay.  And you and Baby Ki committed a lot of robberies

20 together.  Right?

21 A.  Right.

22 Q.  When did you guys start committing robberies?

23 A.  I think the first time I robbed with Baby Ki was in probably

24 like 2000.  '99, 2000, around in that time right there.

25 Q.  And how often would you rob people?

1 A.  I robbed a couple of times before.

2 Q.  Okay.  But --

3 A.  I robbed about nine times before in my whole life.

4 Q.  You robbed about nine times?

5 A.  Right.

6 Q.  When you were committing these robberies, you always carried

7 a weapon.  Right?

8 A.  I always didn't physically have a weapon, but a lot of times

9 a weapon was in on the robbery.

10 Q.  Let's talk about the robberies with you and Baby Ki.  Okay?

11 A.  Okay.

12 Q.  Are we still at the same number, nine?

13 A.  Around about that.

14 Q.  And when you and Baby Ki are robbing people, somebody has a

15 weapon.  Right?

16 A.  Right.

17 Q.  Okay.  Sometimes you?

18 A.  Right.

19 Q.  Sometimes Baby Ki?

20 A.  Right.

21 Q.  And usually these weapons are guns.  Right?

22 A.  On one occasion it was a knife.

23 Q.  Okay.  And you told Agent Lockhart, when you were talking

24 about yourself, you told him about all these robberies.  Right?

25 A.  I told him about some of them.  And as time went on, I

1 remembered more and I told him about the rest.

2 Q.  Okay.  So you've told him about as many of them as you can

3 remember?

4 A.  Right.  Right.

5 Q.  Now, Mr. Guerrero went over your plea agreement with you, or

6 at least talked to you about it.  Do you remember what you pled

7 guilty to?

8 A.  Yes.

9 Q.  What?

10 A.  Conspiracy to distribute -- conspiracy to distribute, and

11 possession with intent to distribute.

12 Q.  Okay.  Now, do you remember how much time armed robbery

13 carries?

14 A.  I don't know how much time armed robbery carries.

15 Q.  Have you ever been charged with armed robbery?

16 A.  No, sir.

17 Q.  Do you know anybody who has?

18        MR. GUERRERO:  Objection.  Relevance.

19        THE COURT:  Basis?  I'm sorry, basis for the question?

20 Are you going to answer?

21        MR. BEANE:  I'm sorry, I missed the last one.

22        THE COURT:  Yeah, I wasn't very clear.  Do you want to

23 respond to the objection?

24        MR. BEANE:  It goes to bias, because he didn't plead to

25 those robberies.

 1          THE COURT:  I'll sustain it.

 2 BY MR. BEANE:

 3 Q.  Okay.  Now, you did not plead to the robberies.  Right?

 4 A.  Right.

 5 Q.  Okay.  Now, you know that committing robbery -- well, who

 6 did you rob?  Other drug dealers?

 7 A.  Yes, sir.

 8 Q.  And you know that that's known as being really cruddy.

 9 Right?

10 A.  Being cruddy?

11 Q.  Cruddy.

12 A.  Okay.

13 Q.  Correct?

14 A.  Correct.

15 Q.  And you and Baby Ki did a lot of cruddy stuff together.

16 Right?

17 A.  True.

18 Q.  And as you sit here -- well, let me ask you this:  You were

19 talking about a time when you and Baby Ki went to rob someone,

20 and Baby Ki pulled a knife and the other person pulled a gun.

21 Right?

22 A.  We didn't go to rob him.  We didn't go to rob him.

23 Q.  What did you go to do?

24 A.  We was telling them that they had to leave.  They was out

25 there hustling in the neighborhood, and we was telling them they

1 something in exchange for something back?

2 A.  Never.

3 Q.  Never.  You're sure of that?

4 A.  Never.

5 Q.  You are the Jacques, what's your middle name?

6 A.  Terrell Powell.

7 Q.  Jacques Terrell Powell who, I think the prosecutor asked you

8 a question that you had a conviction previously for a felony,

9 fleeing law enforcement officers.  Do you remember that?

10 A.  True that.

11 Q.  I'm sorry?

12 A.  Yes.

13 Q.  True that?

14 A.  Yes, that's true.

15 Q.  And in that particular case, which was in Superior Court,

16 you were charged with more than just fleeing a police officer

17 felony.  Right?

18 A.  Right.

19 Q.  In fact, you were charged with -- the first count was

20 fleeing -- and this is in the case number F, meaning felony.

21 Right?

22 A.  Right.

23 Q.  1621-04, United States of America versus Jacques T. Powell,

24 you were charged by indictment, and the first count was "Fleeing

25 a law enforcement officer in violation of 50 D.C. code,

1  Section 2201.1."  Do you remember that?

2  A.  Right.

3  Q.  Your second count -- you did have one.  Right?

4  A.  Yes.  It had seven accounts -- seven counts.

5  Q.  All right.  Well, we'll get to them.  Don't worry.

6  A.  Okay.

7  Q.  The second count was reckless driving.  Right?

8  A.  Right.

9  Q.  And this was all in relation to that high-speed chase that

10 you led the police on.  Right?

11 A.  Right.

12 Q.  Where you crashed into several cars.

13 A.  I crashed into two cars.

14 Q.  That's more than one.  Right?

15 A.  It's not several.

16 Q.  A couple cars?

17 A.  Couple, okay.

18 Q.  All right.  And where you led them on this high-speed chase,

19 crashing into two cars with utter disregard for whoever might be

20 on the streets.  Right?

21        MR. GUERRERO:  Objection, Your Honor.

22        THE COURT:  Sustained.

23 BY MR. BALAREZO:

24 Q.  Well, when you were speeding through the streets with the

25 cops following you with their lights on, you didn't care what

1 Q.  And 2002, your son was about a year old by that time?

2 A.  In September?

3 Q.  Right.

4 A.  He wasn't quite a year yet.

5 Q.  But he was there, and you had already had that epiphany

6 about trying to change your life and that sort of thing.  Right?

7 A.  I was starting to make the change right around that time,

8 yeah.

9 Q.  Started.  And the fact that you were arrested had nothing to

10 do with the fact that you were starting to make the change that

11 day in particular?

12 A.  No, sir, that don't.  Because I was already branching away

13 from the game at that time.

14 Q.  Well, you said you were branching away from the game?

15 A.  Yes.

16 Q.  Well, you got arrested for drugs.  Right?

17 A.  Right.

18 Q.  So you hadn't branched out all the way yet?

19 A.  I said I was branching.  I had not branched away from it

20 yet.  I said I was branching away from it.  I didn't say I had

21 left it alone.

22 Q.  And you were still branching in 2005 when you led the police

23 on that high-speed chase?

24 A.  No, because it was not no drug charge.  In 2005, I didn't

25 have no drug charge, I wasn't involved with drugs, I was barely

Page 12458

1 going around Congress Park, it was just -- like I said, it was

2 an isolated incident, which I wasn't thinking at the time.

3 Q.  So in your mind, you can split up your criminality:  I'll

4 put my drugs over here, I'll put my high-speed chases over here,

5 I'll put my robberies over here.  Is that what you do?

6 A.  No, that's not what I do.

7 Q.  Okay.

8 A.  But --

9 Q.  Let's move on.

10      Now, yesterday when you testified, you mentioned that

11 you started dealing -- or you dealt drugs or you were hustling,

12 as you say -- and you understand what I'm saying.  Right?

13 A.  Yeah.

14 Q.  Hustling?

15 A.  Yeah.

16 Q.  You were hustling from like 1996 to about 2002?

17 A.  Right.

18 Q.  That's correct?  And you testified how during that period of

19 time, you told this jury about who you dealt with.  I'm not

20 going to say dealt in the drug sense.  Just dealt with person to

21 person during that period of time.  Correct?

22 A.  Right.

23 Q.  And you indicated that when you first started hustling

24 drugs, you got your first wholesale quantity from some guy named

25 Burke.  Is that right?

1 A.  Sometime after, yeah.

2 Q.  And you're not sure about the time frame.  Right?

3 A.  No.

4 Q.  And you told this jury that you would buy drugs with them.

5 Correct?

6 A.  Correct.

7 Q.  But you don't know who their source was.  Right?  Who Dom's

8 source was?

9 A.  No.

10 Q.  And you don't know who Jazz's source was.  Correct?

11 A.  No.

12 Q.  And in fact, when you said you put your money together for

13 drugs with these guys, it wasn't because you, Don, and Jazz were

14 going to share the profits of those sales.  Right?

15 A.  Right.

16 Q.  You, Dom, and Jazz were not going to, you know, take three

17 corners out of four and make that your little world.  Right?

18 A.  Right.

19 Q.  Because you just wanted to get drugs.  They were going to

20 get some, and you said, "Hey, get me some."  Right?

21 A.  Right.

22 Q.  And when they got it -- and not even they.  When Jazz got

23 it, he just gave you the drugs back that you had paid for.

24 Correct?

25 A.  Correct.

Page 12465

1 Q.  And in fact, besides that particular purchase, there was

2 nothing else that you and Jazz and Dom did as a group.  Correct?

3 A.  Naw, I wouldn't say that.  We was friends.

4 Q.  I'm talking about with the sales.

5 A.  Oh, with the sales?

6 Q.  Just the sale.

7 A.  Okay.  Rephrase your question, then.  Because I took your

8 question to be something else, but you just stopped me.

9 Q.  That's fine.  The instance that you said you bought drugs

10 through Jazz --

11 A.  The instances?

12 Q.  If you say instances, sure.  Jazz and Dom, you gave money to

13 them or Jazz, and then you got drugs back.  Right?

14 A.  Right.

15 Q.  And then when you got your drugs, you went off and dealt

16 them wherever you wanted to deal.  Right?

17 A.  No, we hung together, so we hustled together.

18 Q.  Well, hung together, I mean, you were on the same street.

19 Is that what you're saying?

20 A.  Hung together, meaning we used to be together, you know what

21 I'm saying?  We used to hang out together, chill together, smoke

22 together, whatever.

23 Q.  Right.  But the profits from your sales when, as you say,

24 you hung together, when you got those profits, you didn't share

25 them with Don, did you?

1 A.  No.

2 Q.  That was your money?

3 A.  Yeah.

4 Q.  So you could buy those nice clothes.  Right?

5 A.  No, I bought this with my work money.

6 Q.  I see.  But you wore nice clothes back then.  Right?

7 A.  Yeah.

8 Q.  And you bought it with that drug money.  Right?

9 A.  Yeah.

10 Q.  And none of the money that you made hustling did you share

11 with Jazz or with Dom.  Right?

12 A.  Right.

13 Q.  Or with Burke at that point, either.  Right?

14 A.  Right.

15 Q.  Burke was out of the picture for you?

16 A.  It ain't like he fell off the face of the earth, but I

17 wasn't getting coke from him.

18 Q.  So when you say that you, Jazz, and Dom were hustling

19 together, all you really mean is that you guys were basically on

20 the same street in the same neighborhood.  Right?

21 A.  Pretty much, yeah.

22 Q.  Now, you said that there was a second -- or strike that.

23       After you said that you were dealing with Dom and Jazz,

24 you said you started hanging out with someone named Bird.

25 Right?

1 do with your 5(k).  Right?

2           MR. GUERRERO:  Same objection.  Asked and answered.

3           THE COURT:  Sustained.

4 BY MR. BALAREZO:

5 Q.  Now, from 1996 to 2002, you're out there dealing drugs,

6 basically doing your own thing.  Correct?

7 A.  Right.

8 Q.  And during that same period of time, which is what you've

9 testified about, there are other people out there dealing drugs,

10 doing their own thing.  Right?

11 A.  Right.

12 Q.  And in fact, in Congress Park, how you define it, there are

13 various little groups of people.  Correct?  Little cliques?

14 A.  True.

15 Q.  And in fact, you know who Wop is.  Right?

16 A.  True.

17 Q.  The gentleman here with the -- right here that's holding his

18 tie?

19 A.  Yes, sir.

20 Q.  Wop used to hang out with a couple of people.  Right?

21 A.  Right.

22 Q.  He used to hang out with Dazz -- I'm sorry, the gentleman

23 over here with the green shirt?

24 A.  Right.

25 Q.  Right?

1 A.  Right.

2 Q.  And he used to hang out with Munya?

3 A.  Right.

4 Q.  With LT?

5 A.  Right.

6 Q.  Right.  And there was this group of people that you called

7 the old heads.  I think that's what you called them before.

8 Right?

9 A.  Right.  Right.

10 Q.  And I think one of the old heads was, forgive me, Mr. Ball?

11 A.  Right.

12 Q.  And, I'm sorry, Mr. Jones is one of the old heads?

13 A.  Right.

14 Q.  And one of the old heads because they were older.  Right?

15 A.  Right.  Right.

16 Q.  And you've already mentioned Mister - I didn't forget his

17 name, my client, Mr. Samuels - how he hung out with DC --

18 A.  Right.

19 Q.  -- right?

20 A.  Right.

21 Q.  Or Jazz, earlier on?

22 A.  Right.

23 Q.  And then you mentioned at some point that Boy-Boy, Mr. Bell,

24 hung out with -- did his thing with Chow-Wow.  Right?

25 A.  Right.

1 Q.  Is that correct?

2 A.  Right.

3 Q.  And there were other little groups doing their own thing out

4 there.  Correct?

5 A.  Right.

6 Q.  So as you sit here, you can see everybody at this table.

7 Right?

8 A.  Right.

9 Q.  Now, as you sit here, that means that there is one group

10 with Mr. Ball, right; you've got one group with Mr. Samuels;

11 you've got one group with Mr. Bell; and then you've got one

12 group with Mr. Wop, Mr. Wilson?

13 A.  Right.

14 Q.  So sitting here at this table alone, there's at least four

15 different little groups.  Right?

16 A.  Right.

17 Q.  Correct?

18 A.  Correct.

19 Q.  And this is in Congress Park.  Right?

20 A.  Correct.

21 Q.  And they were all doing their own little thing.  Right?

22 A.  Correct.

23 Q.  Now, let's talk about Congress Park.  You know

24 Congress Park.  Right?

25 A.  Yes, sir.

Page 12555

1 A.  We just happened to be together, you know what I'm talking

2 about?

3 Q.  Well, with respect to Smoke, did you ever observe an

4 incident where he shot up a truck?

5        MR. GUERRERO:  Objection.  Scope.

6        THE COURT:  Sustained.

7 BY MR. CARNEY:

8 Q.  Well, it's clear you never did any robberies with Mr. Ball,

9 is that right, Antwuan Ball?

10 A.  Right.

11 Q.  And it's also clear to you, isn't it, that he was in a

12 different group, older group.  Is that right?

13 A.  Right.

14 Q.  And this is for the period from when you were out there in

15 1996, all the way through 2002.  Is that right?

16 A.  Right.

17 Q.  And you indicated that -- when the government asked you to

18 identify Mr. Ball and say if you knew him, you pointed him out.

19 Is it fair to say that you knew Mr. Ball from also the fact that

20 he, if you recall, assisted your mother in getting reading

21 lessons and that?

22        MR. GUERRERO:  Objection.  Scope.

23        THE COURT:  Sustained.

24        MR. CARNEY:  It goes to how he knows him.

25 BY MR. CARNEY:

# Tab 41

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Docket No. CR 05-100 |
| v. | : |
| ANTWUAN BALL, DAVID WILSON, | : Washington, DC |
| GREGORY BELL, DESMOND | : May 23, 2007 |
| THURSTON, JOSEPH JONES, and | : 9:25 a.m. |
| DOMINIC SAMUELS, | : |
| Defendants. | : |

**VOLUME 55 - MORNING SESSION**
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

| | |
|---|---|
| For the United States: | UNITED STATES ATTORNEY'S OFFICE<br>Glenn S. Leon, Assistant United<br>States Attorney<br>Ann H. Petalas, Assistant United<br>States Attorney<br>Gilberto Guerrero, Assistant<br>United States Attorney<br>555 4th Street<br>Washington, DC 20001<br>202.305.0174 |
| For Defendant<br>Antwuan Ball: | CARNEY & CARNEY<br>John James Carney, Esq.<br>South Building<br>601 Pennsylvania Avenue, N.W.<br>Washington, DC 20004<br>202.434.8234 |

*Scott L. Wallace, RDR, RRR*
*Official Court Reporter*

---

12563

APPEARANCES (cont.)

| | |
|---|---|
| For Defendant<br>Antwuan Ball: | TIGHE, PATTON, ARMSTRONG,<br>TEASDALE, PLLC<br>Steven Carl Tabackman, Esq.<br>1747 pennsylvania Avenue, NW<br>Suite 300<br>Washington, DC 20036<br>202.454.2811 |
| For Defendant<br>David Wilson: | LAW OFFICE OF JENIFER WICKS<br>Jenifer Wicks, Esq.<br>503 D Street NW, Suite 250A<br>Washington, DC 20001<br>202.326.7100 |
| | GARY E PROCTOR, LLC<br>Gary E. Proctor, Esq.<br>6065 Harford Road<br>Baltimore, MD 21214<br>410.444.1500 |
| For Defendant<br>Gregory Bell | LAW OFFICE OF JAMES W. BEANE<br>James W. Beane, Jr., Esq.<br>2715 M Street, N.W.<br>Suite 200<br>Washington, DC 20007<br>202.333.5905 |
| For Defendant<br>Desmond Thurston | LAW OFFICE OF JONATHAN ZUCKER<br>Jonathan Seth Zucker, Esq.<br>514 10th Street, NW<br>9th Floor<br>Washington, DC 20004<br>202.624.0784 |
| For Defendant<br>Joseph Jones | LAW OFFICE OF ANTHONY MARTIN<br>Anthony Douglas Martin, Esq.<br>7841 Belle Point Drive<br>Greenbelt, MD 20770<br>301.220.3700 |
| | LAW OFFICE of ANTHONY ARNOLD<br>Anthony Darnell Arnold, Esq.<br>One Research Court<br>Suite 450<br>Rockville, MD 20852<br>301.519.8024 |

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12564

APPEARANCES (Cont.)

| | |
|---|---|
| For Defendant<br>Dominic Samuels: | LAW OFFICES OF A. EDUARDO BALAREZO<br>A. Eduardo Balarezo, Esq.<br>400 Fifth Street, NW<br>Suite 300<br>Washington, DC 20001<br>202.639.0999<br>and<br>William B. Purpura, Esq.<br>8 East Mulberry Street<br>Baltimore, MD 21202<br>410.576.9351 |
| Court Reporter: | Scott L. Wallace, RDR, CRR<br>Official Court Reporter<br>Room 6814, U.S. Courthouse<br>Washington, DC 20001<br>202.326.0566 |

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

12565

1    <u>**MORNING SESSION, MAY 23, 2007**</u>

2    (9:24 a.m.)

3        THE COURT: Mr. Balarezo, are you ready for the jury?

4        MR. BALAREZO: Yes, Your Honor, but I don't think I'm on

5    examination.

6        THE COURT: Forgive me.

7    Mr. Carney, are you ready for the jury? I'm sorry.

8    (Jury in at 9:26 a.m.)

9        THE COURT: Good morning, ladies and gentlemen.

10       THE JURY PANEL: Good morning.

11       THE COURT: Welcome back. We're ready to resume.

12    Mr. Carney.

13       MR. CARNEY: Thank you.

14    Your Honor, I'm going to show Government's Exhibit Number

15    108.36, already introduced into evidence.

16       <u>CONTINUED CROSS-EXAMINATION OF JACQUES POWELL</u>

17    BY MR. CARNEY:

18    **Q.**    Good morning, Mr. Powell. Do you recall seeing this

19    photograph the other day?

20    **A.**    Yes, sir.

21    **Q.**    And you had testified that among these individuals, an

22    individual by the name of Callaway?

23    **A.**    Yes, sir.

24    **Q.**    And who is Mr. Callaway?

25    **A.**    Right here (indicating.)

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12590

1  to his office and saw videotapes without a lawyer --
2  **A.**    Right.
3  **Q.**    -- when is the next time you met with anybody in law
4  enforcement?
5  **A.**    That involved this case right here?
6  **Q.**    Yeah.
7  **A.**    When I went to the grand jury.
8  **Q.**    So you never spoke with any agents, nor prosecutors
9  before going in the grand jury?
10  **A.**    Sure didn't.
11  **Q.**    So they put you in the grand jury cold?  No debriefing?
12  **A.**    They spoke to my lawyer, but they didn't speak to me.
13  **Q.**    Okay.  They never went through any meetings -- you know
14  what a "debriefing" is, right?
15  **A.**    No.  Explain it to me.
16  **Q.**    Okay.  When you sit down and they ask you questions and
17  you give them answers outside of the presence of a grand jury.
18  **A.**    The day I went to the grand jury.
19  **Q.**    That all happened on the same day?  No days before?
20  **A.**    Yes, sir.  Yes, sir.  I believe so.
21  **Q.**    You believe so?
22  **A.**    Yeah, I'm pretty sure it did.
23  **Q.**    It all happened on the same day or it didn't?  Or you
24  don't know?
25  **A.**    I'm pretty sure it did.  It probably did.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12591

1  **Q.**    It probably did?
2  **A.**    I know this much.  When I met my lawyer, I had not talked
3  to Agent Katzoff -- I mean Agent Lockhart, I had not seen one of
4  them prosecutors or nothing right there until I went to the
5  grand jury, because Mr. Katzoff slowed the process down.  He
6  made me -- he made it clear to me what I was doing.  He made it
7  clear to me I didn't have to take that route and he was making
8  it -- he gave me all the legal stuff that I need to know.
9  **Q.**    Okay.  I appreciate you telling us about Mr. Katzoff's
10  efforts, but my question to you a minute ago was this.  The
11  first question was -- I think your first statement was that you
12  went into the grand jury without ever being debriefed
13  beforehand, right?  That's what you said initially?
14  **A.**    Right.
15  **Q.**    And then you changed that to say no, you think you met
16  with them, but you think it was the same day, before you went
17  into the grand jury?
18          MR. GUERRERO:  Objection, misstates the evidence.
19          THE COURT:  Sustained.
20  BY MR. ZUCKER:
21  **Q.**    What was your second version?  Wasn't it that you met
22  with them, being law enforcement, prior to going in front of the
23  grand jury, but you believed it was on the same day?
24          MR. GUERRERO:  Same objection.
25          THE COURT:  Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12592

1  BY MR. ZUCKER:
2  **Q.**    You tell us.
3          THE COURT:  What is the question?
4  BY MR. ZUCKER:
5  **Q.**    What was the sequence of events in terms of meeting with
6  the prosecutors and law enforcement and going in front of the
7  grand jury?
8  **A.**    The sequence of events, I met with the prosecutor -- I
9  met with him -- as a matter of fact, I met with him the same
10  morning I went to the grand jury.
11  **Q.**    And that's the only time?
12  **A.**    Since the first time.
13  **Q.**    Which was, of course, in Lockhart's office and you had no
14  lawyer?
15  **A.**    Right.
16  **Q.**    And you never went through -- on any prior day, you never
17  went through any debriefings with either FBI agents nor
18  prosecutors prior to the day you went in front of the grand
19  jury?
20  **A.**    Correct.
21  **Q.**    Is that your sworn testimony?
22  **A.**    Correct.
23  **Q.**    And are you as certain of that as everything else you've
24  said in here?
25  **A.**    That is as accurate as I can remember.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12593

1          MR. ZUCKER:  May I have a moment to confer with the
2  prosecution?
3          THE COURT:  Yes.
4          (Discussion had off the record.)
5          MR. ZUCKER:  Thank you, Judge.
6  BY MR. ZUCKER:
7  **Q.**    Now, in your testimony here today, you've told us -- or
8  yesterday and the day before -- of your involvement in at least
9  nine robberies that you did remember, right?
10  **A.**    Correct.
11  **Q.**    Okay.  And there's some others, maybe you remembered,
12  maybe you don't; you're not a hundred percent sure one way or
13  the other, right?
14  **A.**    I wouldn't say all that, but I'll tell you what I
15  remember.
16  **Q.**    Okay.  But you can't say definitively that there weren't
17  other robberies, can you?  Do you know what I mean by
18  "definitively"?  With absolute certainty?
19  **A.**    I'm almost sure I gave you all the robberies that I've
20  been in, because I should know.  I've been in them, but I mean,
21  it was so long ago, there's probably was one that's lingering
22  out there that I completely forgot about.
23  **Q.**    How many robberies did you plead to in your plea
24  agreement?
25  **A.**    It wasn't no robberies.  They ain't charge me for no

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12594

1 robberies.

2 **Q.** So the answer is none, right?

3 **A.** Correct.

4 **Q.** So you got away with all those, right?

5 **A.** I don't know. They ain't charge me for them. They might

6 not have no evidence to charge me for them.

7 **Q.** Well, didn't you tell us that Lockhart told you in his

8 first meeting that he knew about the robberies?

9 **A.** But he didn't charge me for them, though.

10 **Q.** I understand that. That wasn't my question. He told you

11 he knew about the robberies?

12 **A.** Correct.

13 **Q.** Before you told him a thing, right?

14 **A.** Correct.

15 **Q.** Okay. So he knew about them, assuming he's telling you

16 the truth, right?

17 **A.** He could have been lying.

18 **Q.** FBI Agent Lockhart could have been lying? Why do you say

19 that?

20 **A.** I mean --

21 MR. GUERRERO: Objection, relevance.

22 THE COURT: Go ahead. Put your next question.

23 BY MR. ZUCKER:

24 **Q.** He didn't charge you with them, but he told you he knew

25 about them and you knew your best friend Kairi was already

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12595

1 cooperating with them, didn't you?

2 **A.** Correct.

3 **Q.** Okay. So you knew that Kairi -- assuming Kairi had told

4 them the truth, Kairi knew about your involvement in numerous

5 robberies, right?

6 MR. GUERRERO: Objection, speculation.

7 THE COURT: Rephrase.

8 BY MR. ZUCKER:

9 **Q.** You and Kairi participated in those robberies as crime

10 partners, most of them, didn't you?

11 **A.** Two of them.

12 **Q.** Just two?

13 **A.** I believe so. No, three -- four of them.

14 **Q.** Do you want to keep going?

15 **A.** I'm trying to remember.

16 **Q.** Take your time.

17 **A.** I think it was like four of them.

18 **Q.** All right.

19 **A.** Five of them.

20 **Q.** Take a minute.

21 **A.** Five of them.

22 **Q.** Five robberies. They had your partner in their pocket

23 helping them against you, right?

24 MR. GUERRERO: Objection, speculation.

25 THE COURT: Sustained.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12596

1 BY MR. ZUCKER:

2 **Q.** Well, you knew Kairi -- you already told us you knew

3 Kairi was cooperating with them, right?

4 **A.** Correct.

5 **Q.** I mean, Lockhart made no secret about that. That was

6 common knowledge, wasn't it?

7 **A.** No, he didn't tell me.

8 **Q.** Okay. But you knew it, right?

9 **A.** Right.

10 **Q.** So you knew they had you on at least five robberies with

11 your crime partner. And you walked away from all of them,

12 didn't you?

13 **A.** I didn't know that they had me on five robberies. I

14 don't know how many robberies they had me on.

15 **Q.** Well --

16 **A.** It could have been only one.

17 **Q.** Well, wait a second. Wait a second. You mean Kairi

18 would have lied to them?

19 MR. GUERRERO: Objection, Your Honor, to what Kairi said.

20 THE COURT: Sustained.

21 BY MR. ZUCKER:

22 **Q.** Well, didn't you tell us you knew -- Lockhart tells you

23 he knows of your involvement in robberies; you know Kairi's

24 already working with them and you know you've committed at least

25 five robberies you can remember sitting here today with Kairi,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12597

1 right?

2 **A.** Correct.

3 **Q.** That's five they got you on and you walk?

4 MR. GUERRERO: Objection.

5 THE COURT: Sustained.

6 BY MR. ZUCKER:

7 **Q.** You've looked at your plea agreement, right?

8 **A.** Yes, sir.

9 **Q.** You've looked and you've been shown the proffer of facts,

10 right?

11 **A.** Yes, sir.

12 **Q.** And 1127 --

13 MR. ZUCKER: May I approach, Judge?

14 THE COURT: Yes.

15 BY MR. ZUCKER:

16 **Q.** And this is not complete. There's a statement in there

17 that says this is not a complete recitation of all the crime

18 you're involved in, but in that proffer of evidence of what they

19 have against you that you admit to, there's not a mention of a

20 single robbery, is there?

21 **A.** Say that again.

22 **Q.** There's not mention of a single -- your involvement in a

23 single robbery, is there?

24 **A.** No, sir.

25 **Q.** So you didn't have to plead to any of them and you're not

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12614

**Q.** I'm asking you.
**A.** That's not why I did it. That's just where I hustled at.
**Q.** Okay. But you hustled -- you always hustled in one or two spots, maybe three spots within Congress Park generally, right?
**A.** Generally, yeah.
**Q.** Okay. All right. And you don't know if this was this guy's first time or this was his regular spot, do you?
**A.** We didn't go up Hobart every day so I don't know. I couldn't say I seen him every day.
**Q.** Okay. But people walked up to my client while he had a gun in his hand and handed him money in exchange for drugs while he stood there with the pistol in his hand; is that what you're telling us happened?
**A.** Sir, they do that all the time. On just about any weed strip you go on, they standing out there with a gun in they hand while you buying the weed. They do it all the time. This is just not nothing knew. That's -- you see that out there. A strip probably get robbed so much, you go up to buy the weed -- I done went up on the weed strip and a hundred people out there -- well, not a hundred, but the whole -- the whole block out there with guns in they hand.
**Q.** And you're telling us that a whole block -- what block is it you've been to where everybody's out there holding guns and selling $10 bags of marijuana?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12615

**A.** Do I have to say the block name?
**Q.** Please.
**A.** I went on --
**Q.** Is there only one?
**A.** Huh?
**Q.** Is there only one? I thought it was all over.
**A.** It happens all over. I know that.
**Q.** Name them all. Name all the blocks --
**A.** I don't know all the blocks.
MR. GUERRERO: Objection.
THE COURT: Gentlemen, gentlemen, slow down. One at a time. The court reporter cannot transcribe two voices at a time.
Go ahead.
BY MR. ZUCKER:
**Q.** Okay. My question to you is: Please name all the blocks you've been to where people have stood outside holding guns and simultaneously other people have come up and given them money in exchange for $10 bags.
**A.** I can't name all the blocks, but I can tell you the most recent one I been to, the last one I been to.
**Q.** Keep us in expense no more. Go ahead.
**A.** Over Quarles.
**Q.** Quarles Street, Northeast?
**A.** Yes, sir.
**Q.** Is that the only one?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12616

**A.** No, that's not the only one, but I told you the last one that I been to that was like that.
**Q.** I thought you said it was lots like that. Can you not recall them now?
**A.** I can't tell you what block it is. Man, I have not smoked in like 18 months. Then on top of that, when I was smoking, like the last -- from like 2000 on up, the weed was around Congress Park or close by. I didn't really have to go -- not every block you go on, they standing outside holding a gun, but a block like Quarles with an open market like that, you know that's where weed come at -- that strip -- you know what I'm saying? People are trying their hand on that strip. So that's why that strip used to --
**Q.** "Try their hand" means --
**A.** Rob them.
**Q.** -- make a move, right?
**A.** Right.
**Q.** Try to rob them, right?
**A.** Yeah.
**Q.** So on Quarles Street -- you said that was 18 months ago?
**A.** 18 months ago since I smoked, probably 18 months ago. I know it was like a year -- it's a year and some change since the last time I smoked.
**Q.** Well, you pled less than 18 months ago, didn't you?
**A.** I was already on papers. I pled in January '06. I was

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12617

already on papers then.
**Q.** Well, the last time you were on Quarles Street was about 18 months ago. Is that what you said a minute ago?
**A.** No, that's not what I said a minute ago. I said that was the last time I smoked.
**Q.** Okay.
**A.** And I said before I even stopped smoking, from like 2000 on up, the weed was in the area of Congress Park; if not around Congress Park, in a neighborhood close to it, so I didn't have to go all the way up there. That's what I said.
**Q.** We're not asking you about this right now. What I'm asking you about is --
So you smoked marijuana since you pled guilty in this case?
**A.** No, I have not.
**Q.** All right. You pled -- well, the plea agreement is dated October 7th, 2005, but you actually pled on January 6th, 2006; is that correct?
**A.** Yes, sir.
**Q.** So shortly before entering your plea agreement, you were still using drugs?
**A.** Shortly -- no, I wasn't.
**Q.** Well, this is -- you said you pled -- you smoked 18 months ago?
**A.** No, I didn't. I said I've been clean for like 18 months.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

05/23/2007 05:48:44 PM Page 12614 to 12617 of 12746 14 of 62 sheets

*12618*

1  Q.  You've been clean for 18 months?

2  A.  The last dirty urine I had --

3  Q.  I'm not asking about dirty urines.  I'm asking about the

4  last time you used drugs.

5  MR. GUERRERO:  Objection.

6  THE COURT:  Sustained.  Stop -- let him answer the

7  question.

8  Did you finish?

9  THE WITNESS:  Oh, the last dirty urine I had was in

10  December '05.

11  BY MR. ZUCKER:

12  Q.  I see.  That was the last dirty urine you had?

13  A.  Right.  That was the last dirty urine I had.

14  Q.  So clearly, the last dirty urine you had was the last

15  time you used drugs and you haven't you'd drugs since then,

16  right?

17  A.  Correct.

18  Q.  Because you only acknowledge using drugs when there's

19  proof that you were using drugs, like a dirty urine, right?

20  A.  No, I won't say that, that's the only time I used drugs.

21  And that's the only time I used drugs and that's why I'm saying

22  that.  I'm not saying that because of the urines I'm taking.

23  I'm just saying that was the last time I used drugs.  And before

24  December, I was --

25  Q.  Go ahead.  I didn't mean to cut you off.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12619*

1  A.  And in December, I was clean for like five or six months

2  before December.

3  Q.  Okay.  And your testimony, just so I understand it, is

4  that people came up to my client while he's holding a gun,

5  giving him drugs [SIC] for an illegal substance, and you didn't

6  consider that unusual?

7  A.  No.

8  Q.  Because that happens all over town?

9  A.  Correct.

10  Q.  And on most weed strips, the people hold out guns while

11  they wait on customers?

12  A.  Correct.

13  Q.  So that's more common than not on a weed strip?

14  A.  Correct.

15  Q.  That somebody will hold a gun while they make sales?

16  A.  Correct.

17  Q.  Is it almost -- well, the man you approached that day

18  wasn't holding a gun, was he?

19  A.  No, he wasn't.

20  Q.  And the guys down the block, you didn't see guns in their

21  hands when they were selling, did you?

22  A.  Just because it's common to happen on a weed strip, that

23  don't mean you'll do it every day, all day.  I'm just saying

24  that's something -- you won't get -- if you see it, you won't be

25  all scared and all shocked just because you see somebody

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12620*

1  standing out there selling weed, holding a gun.  I'm not saying

2  that's because it was common on the weed strip, it's something

3  that happens every day, all day; the whole time they was out

4  there, they holding guns.  I'm not saying that.

5  I'm saying if you was to walk on a weed strip and see

6  somebody holding a gun, there was no sense to get all shocked

7  and all scared and not buy the weed.  That's what I'm saying.

8  Q.  Didn't you tell us a minute ago it was more common than

9  not that people would hold guns while they sold weed?

10  A.  I just explained why I said that.

11  Q.  That's not my question.  Did you not tell us a minute ago

12  it was more common than not that weed sellers would stand out

13  there holding guns while they waited on customers?

14  A.  Yes, I did.  And just by saying it's more common than

15  not, is that saying that I'm saying that they stood out there

16  every day, all day?  Is that what you thinking that I'm saying?

17  Because I'm trying to explain myself.  I'm not saying just

18  because it was more common than not that people were standing

19  out there holding guns selling weed, I'm not saying that they do

20  it all day, every day.

21  What I'm saying is if you was to walk on a weed strip

22  you seen somebody out there, standing there holding a gun, it's

23  not nothing to be all shocked and surprised about.  That's how

24  I'm trying to put the answer, if I'm wording it wrong.

25  Q.  You took that marijuana and you and Dazz split it up,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12621*

1  right?

2  A.  Yes.

3  Q.  Okay.  How much of it did you give to Jo-Jo over here?

4  Any?

5  A.  No.

6  Q.  How much to Twan?  Any?

7  A.  No.

8  Q.  How much to Mr. Wilson?

9  A.  No.

10  Q.  How about Boy-Boy?

11  A.  No.

12  Q.  How about Munya?

13  A.  No.

14  Q.  Who'd give it to?  Anybody?

15  A.  I probably -- I think I smoked it all.

16  Q.  Okay.  We shouldn't be surprised by that, right?

17  A.  I was smoking weed back then.  I had a marijuana problem.

18  Q.  So there was -- how much weed did you take?  About 25

19  dimes each?

20  A.  Around about -- around about that number.

21  Q.  Okay.  And you didn't share any of it with anybody else

22  except Dazz, right?

23  A.  What you mean by "share"?

24  Q.  Give it.

25  A.  What you mean by "give it"?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1    THE COURT: I'll allow it.

2    THE WITNESS: Can you repeat the question?

3  BY MR. ZUCKER:

4    **Q.**    Sure. He did not ask you to do anything to interfere

5  with this case and these legal proceedings, did he?

6    **A.**    What you mean by "interfere"? No, no, no, no.

7    **Q.**    All right. Now, you told us that you -- the decisive

8  factor in deciding to get out of the life was when you became a

9  father, right?

10    **A.**    Correct.

11    **Q.**    Is that correct?

12    **A.**    Correct.

13    **Q.**    Because you wanted to be a dedicated father and dedicated

14  family man, correct?

15    **A.**    Correct.

16    **Q.**    Because that was your number one concern and that's why

17  you were leaving everything behind, because you were so

18  dedicated to that family you had, right?

19    **A.**    No, I just wanted to make a difference for my child. I'm

20  not going to say I was so dedicated to my family. I'm not going

21  to say I was so dedicated to my family. You want a better life

22  for your children than you actually went through for yourself.

23  I mean, I pray -- I assume every father would want that.

24    **Q.**    Okay. Well, it was because of your dedication to being a

25  good father to that -- to Jacques - your son's name is

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Jacques Hamilton?

2    **A.**    Jacques, yes, sir.

3    **Q.**    Born in 2001, right?

4    **A.**    Yes, sir.

5    **Q.**    November 5th, right?

6    **A.**    Yes, sir.

7    **Q.**    And actually his mother is whom, Ms. Hamilton?

8    MR. GUERRERO: Objection, relevance.

9    THE COURT: Sustained.

10  BY MR. ZUCKER:

11    **Q.**    Sir, didn't Ms. Hamilton have to sue you for paternity

12  and support and get a stay away order to protect the children

13  and her from you?

14    MR. GUERRERO: Objection relevance.

15    THE COURT: I'll allow it.

16    THE WITNESS: No, she didn't. Can I explain that

17  question?

18  BY MR. ZUCKER:

19    **Q.**    Well, I'll ask another one.

20    **A.**    Because she didn't sue me.

21    **Q.**    Was there an action filed in D.C. Superior Court to

22  establish paternity and to get a civil protection order to

23  protect you and -- I'm sorry, to protect her and the children

24  from you?

25    **A.**    Can I explain it?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1    **Q.**    No. Please answer, and then you can --

2    **A.**    I can't give you a yes or no.

3    **Q.**    You can explain, but please answer.

4    **A.**    Let me explain it first.

5    **Q.**    First off, you will be entitled to give whatever

6  explanation is appropriate, but the first question is: Isn't

7  that what occurred? Jacqueline Hamilton filed an action to

8  establish paternity for her children against you and to get a

9  civil protection order to protect her and the children from you?

10    **A.**    That's not all --

11    MR. GUERRERO: Objection.

12    THE COURT: I'll allow it.

13    THE WITNESS: That's not all the way true. Everything you

14  are saying is not true.

15  BY MR. ZUCKER:

16    **Q.**    Okay. So it's not all the way, but it's partially true?

17    **A.**    It's partially. That's why I say I need to explain.

18    **Q.**    Give me your explanation. So the answer is, yes,

19  partially?

20    **A.**    The answer is what you're saying is not completely true.

21  What happened was, we got into an argument. I broke her phone.

22    **Q.**    You broke what?

23    **A.**    Her phone. I broke her phone. She went down there and

24  filed for a stay away order. She didn't file for -- to find out

25  was I the father or not. That comes in with the stay away

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  order. As a matter of fact, that happened when the courts found

2  out that she was getting public assistance, once I filed -- she

3  filed for the stay away order against me, the courts found out

4  she was getting public assistance, and they came to me and said

5  I had to pay the government back for her getting public

6  assistance, because I was working and she had Medicaid and all

7  that. They filed for maternity -- they gave me the right --

8  whether or not I want to go see if the kid was mine. I denied

9  that. I said, I know they mines. So she didn't file for all of

10  that. And that happened, like, in 2000 --

11    MR. MARTIN: Objection.

12    THE COURT: Sustained.

13  BY MR. ZUCKER:

14    **Q.**    It happened when, sir?

15    **A.**    That happened around in 2005, I believe.

16    **Q.**    I think this is an add-on to Wilson Exhibit 29 O, 29

17  letter O.

18    (Defendant's Exhibit 29 O marked.)

19  BY MR. ZUCKER:

20    **Q.**    Take a look at that document, sir -- I'm sorry.

21    MR. ZUCKER: Judge, can I approach again?

22  BY MR. ZUCKER:

23    **Q.**    Flip through the pages and tell me if you recognize it?

24    THE COURT: What is it?

25    MR. ZUCKER: It's the --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12710*

1  THE COURT: What does it purport to be?

2  MR. ZUCKER: Superior Court of the District of Columbia,

3  Domestic Violence Unit, petition and then docket entries for --

4  petition to establish paternity and/or provide support --

5  THE COURT: All right, that's enough.

6  MR. ZUCKER: Okay.

7  THE WITNESS: Okay.

8  BY MR. ZUCKER:

9  **Q.**  Okay. You recognize that document, don't you, sir? It's

10  a series of documents, actually, isn't it?

11  **A.**  It's a series of documents.

12  **Q.**  It's actually a copy of the court file in D.C., Superior

13  Court, where the mother of your children filed for --

14  MR. GUERRERO: Objection, Your Honor, hearsay.

15  THE COURT: I'll allow it.

16  BY MR. ZUCKER:

17  **Q.**  The petition I was just discussing, she filed for

18  paternity, support, and civil protection order from you,

19  correct?

20  **A.**  I guess that's what the petition says.

21  **Q.**  Well, you actually were a part of those proceedings, were

22  you not?

23  **A.**  No. I wasn't there when she went down there and got the

24  stay away order, right.

25  **Q.**  Not the first time, right?

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*12711*

1  **A.**  Not neither time.

2  **Q.**  Were you served and chose not to appear?

3  **A.**  No, I was never served. They brought the paper to my

4  mother's house and I thought I didn't have to appear.

5  **Q.**  So you were aware the papers were served to your mother

6  and thought you didn't have to appear because they were served

7  on your mother?

8  **A.**  Right.

9  **Q.**  And, in fact, a civil protection order was entered

10  against you, wasn't it, for the protection of your children and

11  the mother of those children?

12  **A.**  Yes.

13  **Q.**  Now, you also told us --

14  **A.**  It also states in the protection order that, "I only

15  broke her phone."

16  MR. ZUCKER: Court's indulgence. It don't say whether or

17  not I put my hands on her or nothing like that.

18  MS. WICKS: Objection.

19  THE COURT: Overruled.

20  BY MR. ZUCKER:

21  **Q.**  Well, it prohibited you from assaulting, threatening,

22  harassing the mother and the children; is that correct?

23  **A.**  I think that's what it was saying. That's what the stay

24  away order was for, so I wouldn't do all of that, but it don't

25  say that's what I did. I believe it say --

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*12712*

1  MS. WICKS: Objection.

2  BY MR. ZUCKER:

3  **Q.**  There's no question pending right now.

4  You also said you left Congress Park primarily to get

5  away from the life, correct?

6  **A.**  Correct.

7  **Q.**  And you had been living with your mother, right?

8  **A.**  Correct.

9  **Q.**  Didn't you have to leave your mother's house because you

10  were arrested for assaulting her as well?

11  **A.**  I didn't have to leave her house.

12  **Q.**  Wasn't that part -- you do recall being arrested for

13  assaulting your mother, right?

14  **A.**  That was in 2000, probably in 2000, '99.

15  **Q.**  And it was after that that you had to leave her house as

16  well, right?

17  **A.**  No, I never had to leave her house.

18  MR. ZUCKER: Court's indulgence.

19  Another add on, if I could. -- it's not an add on, it's

20  Defendant Wilson 29 L. L as in Larry. Can I approach, Judge?

21  THE COURT: Yes.

22  BY MR. ZUCKER:

23  **Q.**  Take a look at this document, if you would, sir. It's a

24  series of documents, actually. You recognize it, don't you?

25  Well, familiarize yourself.

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

*12713*

1  **A.**  Okay. If you ask me. I don't remember the document.

2  **Q.**  It is, in fact, a copy of a court file that we were just

3  discussing when you were arrested for assaulting your mother, is

4  it not?

5  **A.**  Okay.

6  **Q.**  Am I correct?

7  **A.**  Yes.

8  **Q.**  Okay. Directing your attention to -- give me one second,

9  please.

10  **A.**  I don't even remember that.

11  **Q.**  You don't remember it?

12  **A.**  No.

13  **Q.**  Was that insignificant -- an event in your life and you

14  don't recall it?

15  **A.**  I thought this happened before 2000.

16  **Q.**  All right. Do you recognize this as the conditions under

17  which the Court agreed to release you in that case, isn't it

18  sir?

19  **A.**  I wasn't arrested in this case.

20  **Q.**  You weren't arrested?

21  **A.**  I don't think so. I don't remember having no assault

22  charges in 2000, and I didn't.

23  **Q.**  You're saying this is a false copy?

24  **A.**  I don't remember getting arrested in 2000.

25  **Q.**  You don't remember getting arrested for assaulting your

***Scott L. Wallace, RDR, CRR***
***Official Court Reporter***

1 Q.  And during that time period -- well, prior to him being

2 released from jail, you had your first child.  Right?

3 A.  No, he was home when I had my son.  He was home when I had

4 my son.

5 Q.  And when was your son born?

6 A.  November 2001.

7 Q.  What date?

8 A.  Is it relevant?

9 Q.  I'm asking what date your son was born.

10      MR. GUERRERO:  Objection.  Relevance.

11      MS. WICKS:  May we approach?

12      THE COURT:  Yeah.

13      (BENCH CONFERENCE ON THE RECORD.)

14      MS. WICKS:  I think it actually is relevant, because

15 his son was -- according to the paperwork I have, his son was

16 born November 4th, 2001.  And according to the paperwork I have

17 and Mr. Kellibrew's testimony, he wasn't released from jail

18 until November 21st, 2001.

19      THE COURT:  He who?

20      MS. WICKS:  Mr. Kellibrew.  So Mr. Kellibrew could not

21 have been home when his son was born.

22      MR. GUERRERO:  I guess if that's the point she's trying

23 to make, I think it's fair.  I would just ask that the child's

24 name not be put on the public record.

25      MS. WICKS:  I didn't ask the child's name.

1          MR. GUERRERO:  If she was going to go there, that's all

2 I'm saying.

3          THE COURT:  Anything else?

4          MS. WICKS:  No.

5          (END BENCH CONFERENCE.)

6 BY MS. WICKS:

7 Q.  Mr. Powell, you can answer the question.

8 A.  I can answer the question?

9 Q.  Yeah.

10 A.  My son was born November 5th, 2001.

11 Q.  And it's your testimony that Mr. Kellibrew was on the

12 streets, not locked up, on that date?

13 A.  Correct.  Actually --

14 Q.  Pardon me?

15 A.  I know he wasn't.

16 Q.  You know he wasn't.  You talked about a number of people

17 robbing you on direct.  You talked about Munya robbing you.

18 Right?

19 A.  Correct.

20 Q.  Phil robbed you?

21 A.  Correct.

22 Q.  LT robbed you?

23 A.  Correct.

24 Q.  Mr. Wilson never robbed you.  Correct?

25 A.  Correct.

# Tab 42

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                :
                    Plaintiff,           : Docket No. CR 05-100
        v.                               :
                                         : Washington, DC
ANTWUAN BALL, DAVID WILSON,              :
GREGORY BELL, DESMOND                    : May 24, 2007
THURSTON, JOSEPH JONES, and              : 9:24 a.m.
DOMINIC SAMUELS,                         :
                    Defendants.          :
                                         :
                                         :

VOLUME 56 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:   UNITED STATES ATTORNEY'S OFFICE
                         Glenn S. Leon, Assistant United
                         States Attorney
                         Ann H. Petalas, Assistant United
                         States Attorney
                         Gilberto Guerrero, Assistant
                         United States Attorney
                         555 4th Street
                         Washington, DC  20001
                         202.305.0174

For Defendant            CARNEY & CARNEY
Antwuan Ball:            John James Carney, Esq.
                         South Building
                         601 Pennsylvania Avenue, N.W.
                         Washington, DC  20004
                         202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

12854

APPEARANCES (Cont.)

For Defendant            TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:            TEASDALE, PLLC
                         Steven Carl Tabackman, Esq.
                         1747 pennsylvania Avenue, NW
                         Suite 300
                         Washington, DC  20036
                         202.454.2811

For Defendant            LAW OFFICE OF JENIFER WICKS
David Wilson:           Jenifer Wicks, Esq.
                         503 D Street NW, Suite 250A
                         Washington, DC  20001
                         202.326.7100

                         GARY E PROCTOR, LLC
                         Gary E. Proctor, Esq.
                         6065 Harford Road
                         Baltimore, MD  21214
                         410.444.1500

For Defendant            LAW OFFICE OF JAMES W. BEANE
Gregory Bell:           James W. Beane, Jr., Esq.
                         2715 M Street, N.W.
                         Suite 200
                         Washington, DC  20007
                         202.333.5905

For Defendant            LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:       Jonathan Seth Zucker, Esq.
                         514 10th Street, NW
                         9th Floor
                         Washington, DC  20004
                         202.624.0784

For Defendant            LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:           Anthony Douglas Martin, Esq.
                         7841 Belle Point Drive
                         Greenbelt, MD  20770
                         301.220.3700

                         LAW OFFICE of ANTHONY ARNOLD
                         Anthony Darnell Arnold, Esq.
                         One Research Court
                         Suite 450
                         Rockville, MD  20852
                         301.519.8024

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

12855

APPEARANCES (Cont.)

For Defendant            LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:        A. Eduardo Balarezo, Esq.
                         400 Fifth Street, NW
                         Suite 300
                         Washington, DC  20001
                         202.639.0999
                         and
                         William B. Purpura, Esq.
                         8 East Mulberry Street
                         Baltimore, MD  21202
                         410.576.9351

Court Reporter:          Scott L. Wallace, RDR, CRR
                         Official Court Reporter
                         Room 6814, U.S. Courthouse
                         Washington, DC 20001
                         202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

12856

**MORNING SESSION, MAY 24, 2007**

1
2    (9:24 a.m.)
3         THE COURT:  Good morning.
4         ALL PARTIES PRESENT:  Good morning.
5         MS. WICKS:  Your Honor, I think Mr. Martin is across the
6    hall.  He apparently had a 9:00 that he thought was tomorrow in
7    front of Judge Bates.
8         THE COURT:  He's not ready yet?
9         THE DEPUTY CLERK:  I thought he was just going across and
10   coming back.
11        MS. WICKS:  A Marshall came and got him.
12        THE DEPUTY CLERK:  I'll call over there.
13        MR. ZUCKER:  Here he is.  He's here.  He's here.
14        THE COURT:  Mr. Guerrero, is your next witness here?
15        MR. GUERRERO:  We're going to resume with Jacques Powell.
16        THE COURT:  Okay.
17        MR. GUERRERO:  We're ready to go.
18        THE COURT:  Okay.  Ms. Wicks, you ready for the jury?
19        MS. WICKS:  Yes, I am, Your Honor.
20        (Jury in at 9:29 a.m.)
21        THE COURT:  Good morning, ladies and gentlemen.
22        THE JURY PANEL:  Good morning.
23        THE COURT:  Welcome back.  Mr. Powell has been recalled to
24   have his testimony resumed.  So we're going to resume.
25        Ms. Wicks.

Scott L. Wallace, RDR, CRR
Official Court Reporter

12877

```
1   Q.    It's a "yes" or "no" question.
2   A.    I don't know what you're asking me.
3   Q.    In the grand jury, did you adopt the statement as
4   described in the videotape and described in the transcript as
5   part of your grand jury testimony?
6   A.    I -- I -- I didn't sit there and read every word.  I
7   didn't -- I adopted the transcript.  I didn't adopt the
8   mistakes.  I didn't adopt the misspelling.  I didn't adopt that.
9   I adopted the transcript.  They asked me, was this the
10  transcript from the videotape.
11  Q.    Right.
12  A.    I adopted that, but I ain't sit there and go through
13  every line, page by page, to see was every word spelled right or
14  was every word correct.  Like I said, if you really wanted to
15  see what I adopted, look at the videotape.  I guaranty you, the
16  videotape don't say what you're trying to point out on that
17  transcript.
18  Q.    I'm not -- I'm not --
19  A.    So it's not like I sat there on the stand and said this
20  and they said -- or I wrote it myself.  I didn't write that
21  transcript myself.
22  Q.    So you're under oath and the government handed you this
23  transcript and you said it must be accurate, right?
24  A.    Correct.
25  Q.    Thank you.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12878

```
1   Yesterday -- well, previously in your testimony, you
2   talked about a conversation you had with Kairi when you were in
3   the halfway house?
4   A.    Correct.
5   Q.    Do you -- it was in 2003 that you were in the halfway
6   house, correct?
7   A.    No.
8   Q.    What?
9   A.    No, no, no.  It wasn't.
10  Q.    Okay.  When was it you were in the halfway house?
11  A.    I think it was 2004.  I think so.
12  Q.    You think so?
13        MS. WICKS: Court's indulgence.
14  BY MS. WICKS:
15  Q.    Was it in the spring of 2004 when you were -- when your
16  probation was violated?  Was that when you were placed in the
17  halfway house?
18  A.    I think so.
19  Q.    Your probation was violated and you received a hundred
20  days?
21  A.    I think so.
22        MS. WICKS: Court's indulgence.
23  BY MS. WICKS:
24  Q.    And that was from Judge Hamilton, do you remember?
25  A.    I don't know the judge's name.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12879

```
1   Q.    Okay.  Mr. Dansey was your attorney?
2   A.    Yes.
3   Q.    And this was for the case where you pled guilty to
4   possession of cocaine and possession of marijuana?
5         I'm sorry.  Where you pled guilty to possession of
6   cocaine?
7   A.    Yes, ma'am.
8   Q.    Okay.  And that was a case that -- where you were
9   arrested in Congress Park?
10  A.    Yes, ma'am.
11  Q.    And so when you violated probation in the spring of 2004,
12  you were sent to a halfway house?
13  A.    I was -- eventually, I went to the halfway house.
14  Q.    And eventually, what halfway house did you go to?
15  A.    Hope Village.
16  Q.    Okay.  And when you were in Hope Village -- and that
17  would have been after you received your sentence on May 26th of
18  2004?
19  A.    I don't know when the date was, but it was after I
20  received my sentence.
21  Q.    Okay.  Would it refresh your recollection to look at the
22  court records to know what date it was that you received this
23  hundred days?
24  A.    It won't refresh my memory, but if you show me the date,
25  then that's going to be the date.
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

12880

```
1         MS. WICKS: Okay.  May I approach, Your Honor, and show
2   him 29 M?
3         THE COURT: Yes.
4   BY MS. WICKS:
5   Q.    And the most recent entry in 2002, CMV 9934 is from May
6   26th, 2004 and this is the United States versus Jacques Powell,
7   right?
8   A.    Yes.
9   Q.    And the most recent entry shows modification of the
10  original and confinement of a hundred days, right?
11  A.    That's what it say.
12  Q.    And that date is May 26th, 2004, right?
13  A.    Correct.
14  Q.    Okay.  And prior to --
15        MS. WICKS: Court's indulgence.
16  BY MS. WICKS:
17  Q.    Well, actually, prior to receiving that sentence, you --
18  oh, just to clarify, when you were -- no.
19        Prior to receiving that sentence, you were locked up,
20  right?
21  A.    No.
22  Q.    You weren't locked up?
23  A.    No.
24  Q.    Okay.  So the hundred days you got and started doing on
25  the day you got sentenced?
```

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

**12889**

1  Q.   Okay.  And do you know who the other two agents were?
2  A.   No.
3  Q.   Can you describe them?
4  A.   White men.
5  Q.   So it was three white men?
6  A.   Yes.
7  Q.   Stopping you in the middle of the courthouse?
8  A.   Yes.
9  Q.   And there were other people around, right?
10  A.   It was other people in the courthouse.
11  Q.   That's my question.  There were other people in the
12  courthouse that day?  You were not the only person there with
13  the two white men, right?
14  A.   Right, right.
15  Q.   And after you entered -- you entered your plea in this
16  courthouse in January of 2006?
17  A.   On this case right here?
18  Q.   Yes.
19  A.   Yes.
20  Q.   Okay.  And after you entered your plea in this case, you
21  were sentenced to probation in the Superior Court case, right?
22  A.   That's not true.
23  A.   That's not true.
24  A.   No, it's not.
25  Q.   When was it that you received probation?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12890**

1  A.   I was already on probation when I entered my -- when I
2  came here, entered my plea here, because my conditions of my
3  release here was contingent with the conditions of my release I
4  was already on with my probation.
5      MS. WICKS:  May I approach, Your Honor?
6      THE COURT:  Yes.
7      MS. WICKS:  I'm showing him 29 N.
8  BY MS. WICKS:
9  Q.   29 N is the *United States versus Jacques Powell, F*
10  *162105.*  This is the court jacket, right?  Can you see that?
11  A.   Yes.  You know what?  I'm wrong.  I'm wrong.
12  Q.   You are wrong, aren't you?
13  A.   I'm wrong.
14  Q.   Okay.  You got probation on April 11th, 2006?
15  A.   I sure did.  I sure did.
16  Q.   And when you pled guilty, you were still in drug court,
17  right?
18  A.   Correct.  I sure was.
19  Q.   And the conditions of release that you're talking about
20  that you had when you were in drug court -- I'm sorry -- the
21  conditions of release that you talked about that you had when
22  you came in here and pled guilty were the drug court
23  convictions?
24  A.   Was the drug court.  I thought it was -- that's my fault.
25  That's my fault because the same conditions applied to me when I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12891**

1  got -- you're right.  The conditions that I'm on release here
2  were the same ones I had from the previous case.  I'm wrong
3  about that.
4      MS. WICKS:  Court's indulgence.
5  BY MS. WICKS:
6  Q.   Yesterday I asked you about when your son was born on
7  November 5th of 2001, you said that you know Kairi Kelliebrew
8  was not locked up, right?
9  A.   Correct.
10  Q.   How do you know that he was not locked up?
11  A.   Because the day my son was born, I was not there because
12  me and Baby Kai was in my mother house, knocked out asleep on
13  the couch.  And he took me up to the hospital the very next day
14  to go see my son.
15  Q.   Okay.  And so he was not in jail, right?
16  A.   He was not in jail.
17  Q.   And -- so you're saying he was at your mother's house
18  asleep during the night?
19  A.   Me and him was in my mother's house.  My son -- my baby
20  mother went in labor like around about 10:30 --
21  Q.   In the morning or at night?
22  A.   -- November 4th.  She went into labor around 10:30
23  November 4th.
24  Q.   Okay.
25  A.   She called my mother house.  I wasn't in there.  Like I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12892**

1  said, my mother used to get -- no, my mother wasn't getting high
2  then.  When I came in the house that night, my mother ain't say
3  nothing about nobody calling me or nothing.  Me and Baby Kai
4  came in there around about 12, 12:30, fell asleep on the couch.
5      That morning, my mother came in there and woke me up.
6  She said, "Boy, you know you just had your son."  Woke me and
7  Baby Kai both up.  He took me up to Colombia Hospital that
8  morning in my car.  I had a gray Cavalier.
9  Q.   Okay.  And just to clarify, your son -- your -- the
10  mother of your son went into labor on the 4th at 10:30 at night?
11  A.   Around about that time, she called my mother.
12  Q.   And she was in labor and then the son -- your son was
13  born on the 5th in the morning?
14  A.   I don't know when he was born.  I don't know how long she
15  was in labor or none of that.
16  Q.   But sitting here today, your recollection is that you and
17  Baby Kai had slept that night --
18  A.   Over my mother house.
19  Q.   -- over at your mother's house?
20  A.   That's what I know for a fact.
21  Q.   And in the morning, you go up to the hospital with him on
22  the 5th?
23  A.   No.  He dropped me off up there.  I left from up there,
24  came back, got with him again.  We rode around, we celebrated,
25  got drunk, smoked some weed, took him -- me, Baby Kai and Myron

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12893**

1    went back to the hospital later on that night and dropped me off
2    up there.
3    Q.    Okay.  And this is -- again, just to clarify, this is
4    November 5th of 2001 that you're spending with Baby Kai?
5    A.    Sure was.
6    Q.    And you're confident he was not in jail?
7    A.    I'm positive.
8    Q.    When you were asked some questions about who you bought
9    drugs from, and I think your testimony in this proceeding was
10   that you bought drugs from Burke, Joe Langley, Rody, Haron and
11   Boy-Boy?  That's correct?  Those are people you bought drugs
12   from, right?
13   A.    Those are some of the people, yes.
14   Q.    I understand.  When you -- and you talked about when
15   you -- the time period that you hung with Baby Kai, I think my
16   testimony was that it started after he came home?  And when I'm
17   talking about after he came home, after he came home from
18   juvenile lockup, right?
19   A.    Right.
20   Q.    Is that correct?
21   A.    Correct.
22   Q.    And it continued, hanging out with Baby Kai continued
23   until he ultimately got locked up in 2002, right?
24   A.    I think that's when he got locked up, when he got locked
25   up for serving an undercover.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12894**

1    Q.    Okay.  And during that time period, you -- when you were
2    hanging out with him, did you all buy drugs together?
3    A.    What you mean?
4    Q.    Well, one of the things that you did was sell drugs
5    together, right?
6    A.    Right.
7    Q.    And so my question is, did you buy the drugs together?
8    A.    Yeah, sometimes we did.  Yeah.  Yes.
9    Q.    Okay.  Would he sell you drugs?
10   A.    Would he sell me drugs?
11   Q.    Yeah.
12   A.    No.
13   Q.    Okay.  And would you sell him drugs?
14   A.    No.
15   Q.    No?
16   A.    I mean, we was -- we was putting our money together, so
17   if you want to look at that as me selling to him and him selling
18   to me --
19   Q.    I'm not, I'm not -- I'm asking you how you look at it.
20   A.    Well, are you asking me, have I ever went to Baby Kai and
21   said, "Let met get an eight-ball, quarter ounce" or whatever and
22   I went and broke it up and did whatever I did it with -- is that
23   what you're asking me?
24   Q.    I'm asking you, in your mind, did Baby Kai sell you
25   drugs?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12895**

1    A.    Explain to me what you mean by "sell," because I don't
2    know how you mean because you can mean two different ways.  I
3    don't know how you're meaning it.
4    Q.    You have been asked questions on direct about who sold
5    you drugs, right?
6    A.    Correct.
7    Q.    So my question is:  Did Baby Kai sell you drugs?
8    A.    I want you to tell me how you mean, because I don't want
9    you to try to flip it on me and say, "Okay, y'all put y'all
10   money together.  Isn't that him selling you drugs?"
11   Q.    I'm not trying to flip anything on you, Mr. Powell.  My
12   question is when you answered on direct that there were people
13   that sold you drugs -- right?
14   A.    Okay.  Right.
15   Q.    My question to you is:  Did Baby Kai sell you drugs?
16   A.    No.
17   Q.    Did you sell Baby Kai drugs?
18   A.    No.
19   Q.    Earlier this week in your testimony you indicated there
20   was an individual you were friends with named Boobie?
21   A.    Correct.
22   Q.    And Boobie is Mr. Wilson's -- was Mr. Wilson's younger
23   brother, right?
24   A.    Correct.
25   Q.    And Boobie was your age, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12896**

1    A.    I thought Boobie was older than me, but --
2    Q.    Boobie is closer to your age than Mr. Wilson is, right?
3    A.    Correct.
4    Q.    And Boobie was someone that you hung out with when he was
5    alive, right?
6    A.    Boobie was a good friend of mine.  I wouldn't say we hung
7    out like me and some of my other friends, but I knew him and we
8    was -- we was cool with each other.  We was friends, okay.
9    Q.    And to clarify, when you were -- the relationship that
10   you had with Baby Kai was not like the relationship you had with
11   Boobie, right?
12   A.    Correct.
13   Q.    And the relationship that you had with Baby Kai was not
14   like the relationship you had with Mr. Wilson, right?
15   A.    Correct.  But that don't mean I hated Mr. Wilson or
16   anything like that.
17   Q.    I'm not insinuating you hated him.  I'm saying you had a
18   different relationship with Mr. Wilson, right?
19   A.    Correct.
20   Q.    And Baby Kai was someone that you hung out with
21   regularly, right?
22   A.    Correct.
23   Q.    More often than not, if someone saw Baby Kai, they saw
24   you as well, right?
25   A.    Correct.  Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12897*

1 **Q.** And that was not the relationship that you had with
2 Mr. Wilson, right?
3 **A.** Correct.
4 **Q.** You were asked about an incident where a person named
5 Larry gave you and Baby -- well, I think he gave -- did Larry
6 give you the chrome .40 or did he give Baby Kai the chrome .40?
7 **A.** He gave the gun to Baby Kai.
8 **Q.** So Larry gave a chrome .40 to Baby Kai and you
9 think this was in '98 or '99?
10 **A.** I don't know what year it was.
11 **Q.** Could it have been earlier?
12 **A.** I doubt it.
13 **Q.** Well, Baby Kai is not locked up when this happens,
14 obviously, right?
15 **A.** Right.
16 **Q.** Okay. And so it's at some point when -- whenever he got
17 out of juvenile until the point that he got locked up, right?
18 **A.** Correct.
19 **Q.** Do you recall -- now, the first time that you were locked
20 up as an adult was in --
21 MS. WICKS: Court's indulgence.
22 BY MS. WICKS:
23 **Q.** -- 1998?
24 First time I was arrested as an adult was in '98.
25 **Q.** I'm sorry?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12898*

1 **A.** The first time I was arrested as an adult was in '98.
2 **Q.** Okay. And that's my question.
3 **A.** You said "locked up."
4 **Q.** The first time you were arrested as an adult was in '98?
5 **A.** You said "locked up," though.
6 **Q.** But when you're arrested, you get locked up, right?
7 **A.** No. When you're arrested, you get took into custody. I
8 guess, looking at "locked up," to me, "locked up" is like being
9 over at the jail or something, and being arrested, going over to
10 Central Cell Block, then going down to the bullpen, then going
11 to court, then getting released -- I don't really consider that
12 as "locked up." I call that as being in custody, being
13 arrested.
14 **Q.** Then we'll use your expression. You were in custody the
15 first time as an adult in 1998, right?
16 **A.** Correct.
17 **Q.** And the -- when Mr. -- when Larry gave Kairi the chrome
18 .40 was after the first time that you were arrested in '98,
19 right? Or do you think it was before?
20 **A.** I don't know. I don't know, because I'm trying to think
21 of my first adult charge. I know I had three of them, but I
22 don't know the sequence they went in, so I can't say.
23 MS. WICKS: Court's indulgence.
24 BY MS. WICKS:
25 **Q.** When you testified on direct, I believe you indicated

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12899*

1 that your trouble with the law started in '99, but it sounds
2 like it started in '98, right?
3 **A.** My trouble with the law started in '97.
4 **Q.** In '97?
5 **A.** Yes.
6 **Q.** Were you arrested as a juvenile then?
7 **A.** Yes.
8 **Q.** Okay. And did you spend any time in custody or locked up
9 as a juvenile?
10 **A.** Yes.
11 **Q.** And you spent time at Oak Hill or locked up in Maryland?
12 **A.** I was in Oak Hill, but I was 18 when I went over to Oak
13 Hill.
14 **Q.** Okay. And what year was that?
15 **A.** '98.
16 **Q.** How long -- how much time did you spend at Oak Hill?
17 **A.** The summer. I think I probably did between two to three
18 months. I know it was in the summertime. I went in during the
19 summer. I know I stayed the whole summer and came out during
20 the fall sometime, something like that. I know -- it wasn't no
21 whole lot of time. It was like two or three months.
22 **Q.** And you think that was '98?
23 **A.** I know it was because I was 18.
24 **Q.** You know it was. Okay.
25 **A.** Because I was going to court for my adult charges while I

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12900*

1 was over at Oak Hill.
2 **Q.** Okay. Now, you had a number of charges as an adult that
3 actually ended up just being dismissed, right?
4 **A.** Correct.
5 **Q.** And so when you testified earlier this week that you
6 always cop to your charges, that's not exactly true, right?
7 **A.** Well, if they wouldn't have dismissed them, I would have
8 copped to them. I mean, I go to court, they release me. When I
9 come back to court on them three charges, they got dismissed
10 right then and there.
11 **Q.** Okay.
12 **A.** I didn't even have time for a plea bargain. If the
13 government would have presented me a plea, I'd have copped to
14 it.
15 **Q.** Well, in 1998, you were arrested for possession of
16 marijuana in May?
17 **A.** I don't know.
18 **Q.** And when you were -- once you were arrested for
19 possession of marijuana --
20 MS. WICKS: Court's indulgence.
21 BY MS. WICKS:
22 **Q.** -- you were released? Well, your first adult arrest, you
23 were in custody, but when you went to court, you got out, right?
24 **A.** Correct.
25 **Q.** Okay. And on -- when you're released as an adult, you

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

*12901*

1 promise to abide by the conditions of release, right?
2 A.    Correct.
3 Q.    And one of the conditions of release is that you don't
4 break the law, correct?
5 A.    Correct.
6 Q.    And when you were released in that first adult case, you
7 then picked up another adult case, right?
8 A.    Correct.
9 Q.    And when you were released in that second adult case,
10 then you're on release in two cases, right?
11 A.    Correct.
12 Q.    And you're arrested again, right?
13 A.    Correct.
14 Q.    And you still don't get locked up, right?
15 A.    Correct.
16 Q.    You're still free, right?
17 A.    Correct.
18        MS. WICKS:  Court's indulgence.
19 BY MS. WICKS:
20 Q.    And when you have those three cases, you're arrested a
21 fourth time, right?
22 A.    No, I don't think so.
23 Q.    I'm sorry.  So there's three arrests -- there's two
24 arrests and you're arrested a third time and all three of those
25 cases get dismissed by the government, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12902*

1 A.    Correct, eventually.
2 Q.    Eventually?
3 A.    I didn't go to court for all three of them together, but
4 eventually, all three of them got dismissed by the government or
5 whatever.
6 Q.    Okay.  And then -- but during the time that those three
7 cases are pending, there's a warrant issued for the assault
8 on -- well, the -- you're charged with an assault on your mother
9 and you're also charged with breaking the glass table, right?
10 A.    No, no, not when those cases were pending, because when
11 those cases were pending, I went to court for those cases down
12 in Oak Hill and that was in '98.  And I believe that assault
13 thing with my mother happened in what, '99, 2000, one of them,
14 something like that.
15        I went to court for all three of them cases over Oak
16 Hill.
17 Q.    Wait.  So -- well, you don't -- when you have the first
18 case, you don't go to Oak Hill because you pick up the second
19 and third cases, right?
20 A.    Correct.  I think after the third case, I got violated on
21 my -- because I was on juvenile probation and I think I got
22 violated.  I was like on the last two or three months of my
23 probation and I got violated and then they sent me down to Oak
24 Hill.  I was 18 years old.  I remember, because I remember me
25 being 18 down in Oak Hill and I was like, "How can I go down to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12903*

1 Oak Hill?  I'm 18."
2 Q.    So before you pick up your first adult case, you were on
3 probation to a different judge in a juvenile case?
4 A.    Correct.
5 Q.    And just like in an adult court, in a juvenile case,
6 you're not supposed to be breaking the law either, right?
7 A.    Correct.
8 Q.    And when you get probation as a juvenile, you also
9 promise the judge you're not going to break the law, right?
10 A.    Correct.
11 Q.    Do you recall if there were other conditions -- well, not
12 only are you not going to break the law, but you're going to
13 drug test, right?  Were you drug testing on probation?
14 A.    I can't remember.  I probably was, though.
15 Q.    And you were using drugs, right?
16 A.    Yes.
17 Q.    And so when you get arrested in your adult case, it's
18 actually a violation of the first promise to the juvenile judge,
19 right?
20 A.    I guess so.
21 Q.    Well, you -- I think your testimony just now was that you
22 would promise the judge when you got probation that you wouldn't
23 break the law, right?
24 A.    Correct.
25 Q.    Okay.  And you got arrested and broke the law in May of

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

*12904*

1 '98, right?
2 A.    Correct.
3 Q.    And at that point you had already promised a juvenile
4 judge you wouldn't break the law, right?
5 A.    Correct.
6 Q.    Okay.  And so the second time you're arrested as an
7 adult, it's not only a violation of the conditions of your
8 release in your adult case, but it continues to be a violation
9 of the probation to the juvenile judge, right?
10 A.    Correct.
11 Q.    And so at one point when you pick up the third adult
12 case, that's when you're saying you went to Oak Hill?
13 A.    Sometime after that, I got called back to court and they
14 violated me.  They violated my probation.  And later on I had to
15 do the rest of the time at Oak Hill.  It was like two to three
16 months, something like that.
17 Q.    Okay.  And I think you agree with me that the third time
18 you were arrested in '98 as an adult was on July 7th -- I'm
19 sorry -- July 3rd, '98?
20 A.    I ain't agree with you to no dates, but I know I had a
21 third charge.
22 Q.    Would it refresh your recollection to look -- well, would
23 you agree with me if the court jacket reflected that you were
24 arrested on July 3rd, '98?
25 A.    Yes.  Yes, I would agree with that.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12905*

1  MS. WICKS: May I approach, Your Honor, and show him 29 K?
2  It should be on the list.
3  BY MS. WICKS:
4  **Q.**  The first page of this is -- let me just show you. 1998,
5  CMV 9628, and over here it has two charges, possession of
6  cocaine and possession of marijuana. And the arrest date is
7  July 3rd, '98. Do you see that?
8  **A.**  Um-hmm.
9  **Q.**  So you think that may be the right date?
10 **A.**  Correct.
11 **Q.**  And so after that point in '98, at some point that summer
12 you go to Oak Hill, right?
13 **A.**  Correct.
14 **Q.**  And then in the fall, those three cases get dismissed,
15 the three adult cases?
16 **A.**  No. I was going to court while I was in Oak Hill.
17 **Q.**  I understand that. And while you were in Oak Hill --
18 I'm sorry. Go ahead.
19 **A.**  If I went to court and if I went down to Oak Hill in --
20 what? What did it say, in July?
21 **Q.**  Well, it said you were arrested in July.
22 **A.**  Okay. Well, however long I was down in Oak Hill, whether
23 it was two months or whether it was three months, I know it
24 wasn't that -- I think it was 60 days, I had 60 days, but it
25 could have been 90.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12906*

1  But anyway -- around the time I was in Oak Hill, I went
2  to court and got -- that's when my adult charges got dropped.
3  **Q.**  And you didn't like being in Oak Hill, right?
4  **A.**  No.
5  **Q.**  Oak Hill, it's maybe juvenile prison, but it's still
6  prison, right?
7  **A.**  Yes.
8  **Q.**  And it's not someplace you wanted to go back to, right?
9  **A.**  No.
10 MS. WICKS: Court's indulgence.
11 BY MS. WICKS:
12 **Q.**  You were shown some pictures --
13 MS. WICKS: If I can consult with the government, Your
14 Honor.
15 Your Honor, I'm asking the government to display 108.70
16 that's in evidence.
17 BY MS. WICKS:
18 **Q.**  Do you know when this picture was taken?
19 **A.**  No, I don't know when it was taken.
20 MS. WICKS: Your Honor, I'm asking the government to
21 display 108.10.
22 THE DEPUTY CLERK: Also in evidence?
23 MS. WICKS: Yes. Thank you. It's also in evidence.
24 BY MS. WICKS:
25 **Q.**  Do you know -- if you could just clear it, clear the

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12907*

1  screen.
2  Thank you. Do you know when this picture was taken?
3  **A.**  No, I don't. I don't even remember that picture.
4  **Q.**  And this is a picture that you're in, right?
5  **A.**  Yes.
6  **Q.**  You don't know when that was taken, right?
7  **A.**  I don't remember when it was taken.
8  **Q.**  And I'm also going to ask you to look at 108.36 that's in
9  evidence.
10 Do you know when this picture was taken?
11 **A.**  No. It was a while back because I was young in that
12 picture.
13 **Q.**  How old do you think you were in that picture?
14 **A.**  I don't know. I don't know because -- it looks like I
15 don't even have hair in that picture.
16 **Q.**  When you're talking about hair, you're talking about
17 facial hair?
18 **A.**  No, hair on my head.
19 **Q.**  Hair on your head?
20 **A.**  Because I had corn rows for a little while, but I was
21 young in that picture.
22 MS. WICKS: Court's indulgence.
23 BY MS. WICKS:
24 **Q.**  When -- I think you talked about an incident where Munya
25 robbed you and asked you for your coke. Do you remember that?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

*12908*

1  **A.**  Yes.
2  **Q.**  When he asked you for your coke, did you have any?
3  **A.**  Yes.
4  **Q.**  And you told him you didn't, right?
5  **A.**  Yes.
6  **Q.**  And you didn't give it to him, right?
7  **A.**  No.
8  **Q.**  So he's robbing you and you're actually lying to him,
9  right?
10 **A.**  Yes.
11 **Q.**  There was an incident also when Phil robbed you and asked
12 you for your coke, right?
13 **A.**  Yes.
14 **Q.**  You had coke on that day, too?
15 **A.**  Yes.
16 **Q.**  And you told him you didn't, right?
17 **A.**  I told him I wasn't giving it to him.
18 **Q.**  Oh, you told him "Naw"?
19 **A.**  I said, "Naw, you ain't taking my coke."
20 **Q.**  But Munya, you simply flat out lied to him and told him
21 you didn't have it even though you did, right?
22 **A.**  Right.
23 **Q.**  When Agent Lockhart -- well, when you -- after you're
24 approached by Agent Lockhart while you have the court case in
25 drug court, at some point you meet with him and your mother.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12909

1  Did he show you the video?
2  **A.**  Yes.
3  **Q.**  Okay.  And in the video, it's you and Keith B, right?
4  **A.**  Correct.
5  **Q.**  And this is in -- well, you were arrested in 2005 in that
6  case when you were in drug court, right?
7  **A.**  Correct.
8  **Q.**  And obviously, it's before you entered your plea in this
9  case that he's showing you the video, right?
10  **A.**  Correct.
11  **Q.**  So it's in 2005 that he's showing you the video of you
12  and Keith B, right?
13  **A.**  Correct.
14  **Q.**  And at that point, Keith B's already locked up, right?
15  **A.**  Correct.
16  **Q.**  And he's saying to you, essentially, you're in trouble
17  because there's someone else in the video?
18  **A.**  He didn't say that.
19  **Q.**  He didn't mention to you and point out to you that
20  there's someone else in the video with you?
21  **A.**  He didn't point out to me, but he did say, "Remember,
22  there's somebody else in this video with you."
23  **Q.**  And what did you take that to mean?
24  **A.**  I didn't take that to mean nothing.  I knew who it was in
25  the video with me.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12910

1  **Q.**  You described an incident where Kay-Bay had a .380 and
2  there was some dude in your mom's building?
3  **A.**  Yeah.  I didn't say he had it on him, but we went and got
4  it and he physically had it on him when we went in the hallway.
5  **Q.**  Okay.  And first my question to you is:  You didn't have
6  it on you, right?
7  **A.**  Correct.
8  **Q.**  Kay-Bay had it on him?
9  **A.**  Not the whole time.  We went and got it.
10  **Q.**  You went and got it together?
11  **A.**  Yeah.
12  **Q.**  So are you saying at some point that day you touched the
13  gun?
14  **A.**  No, I'm not saying that.
15  **Q.**  He got the gun?
16  **A.**  I took the gun from off the other dude.
17  **Q.**  I understand that.  But when you all went to get the
18  .380 --
19  **A.**  He got it.
20  **Q.**  -- he got it?
21  **A.**  He put it on his body, yeah.
22  **Q.**  And that's the day you took a gun off the other dude?
23  **A.**  Correct.
24  **Q.**  What kind of gun was that?
25  **A.**  That was a .380.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12911

1  **Q.**  So there were two .380s?
2  **A.**  Correct.
3  **Q.**  The incident where you go up to Meat's apartment, what
4  year did that occur in?  Do you know, sitting here today?
5  **A.**  No, I don't.
6  **Q.**  Do you know if it was before or after Kay-Bay did a year
7  in prison?
8  **A.**  It was before.
9  **Q.**  And when I'm talking about that, I'm talking about an
10  adult year in prison.
11  **A.**  It was before.
12  **Q.**  It was before that, right?
13  **A.**  Yeah.
14  MS. WICKS:  Court's indulgence.
15  BY MS. WICKS:
16  **Q.**  Mr. Powell, since you pled guilty in your case, you've
17  been on the street, right?
18  **A.**  Correct.
19  **Q.**  And you have still been going around Congress Park,
20  right?
21  **A.**  Correct.
22  **Q.**  And you have not -- well, someone in your family has
23  asked for assistance to move, right?
24  **A.**  Correct.
25  **Q.**  And that's not you, right?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12912

1  **A.**  Correct.
2  **Q.**  And they've -- in terms of assistance, I mean, they've
3  asked apparently for an amount of about $6,000 to help with
4  relocation?
5  **A.**  I don't know all that.  I don't know.  And I don't even
6  know how you know that, because I don't even know what she
7  asked.
8  **Q.**  Okay.  So you have not been privy to those discussions?
9  **A.**  No.
10  **Q.**  And you're not asking to be relocated, right?
11  **A.**  No.
12  **Q.**  And you have the expectation that, based on your
13  cooperation, you will not have to go back to jail?  That's what
14  you want, right?
15  **A.**  Say that again.
16  **Q.**  Based on your cooperation, you want to not have to go
17  back to jail, right?
18  **A.**  Correct.
19  **Q.**  And you actually, since 2004, when you were in the
20  halfway house, you haven't been to jail, right?
21  **A.**  Yes.
22  **Q.**  Yes, you have?
23  **A.**  Yes.
24  **Q.**  Since 2004?
25  **A.**  Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12921**

1  mention your robberies. Do you remember that?

2      MR. CARNEY: Objection, Your Honor.

3      MR. BEANE: Misstates the testimony.

4      MR. CARNEY: Misstates the question.

5      THE COURT: Overruled.

6  BY MR. GUERRERO:

7  Q.  Do you remember that?

8  A.  Yes.

9  Q.  Does that proffer contain everything that you did out in

10  Congress Park?

11  A.  No.

12  Q.  Do you see what paragraph 5 says? Read it out loud to

13  us.

14  A.  I can't do that because it say: "This proffer of

15  evidence is not intended to" --

16  Q.  Keep that mic closer to you.

17  A.  -- "not intended" -- what that say? -- "constitute a

18  complete statement of all the facts known by Jacques Powell, but

19  is a minimum statement of facts intended to provide the

20  necessary factual" -- what that say? -- "predicate for the

21  guilty plea."

22  Q.  Thank you. And you pled guilty to what?

23  A.  Conspiring -- conspiracy to distribute and possess with

24  attempt to distribute.

25  Q.  Distribute what?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12922**

1  A.  Cocaine.

2  Q.  When you first talked to Agent Lockhart and then before

3  you entered this plea in January of 2006, had you told the

4  government about all your robberies?

5  A.  Not all of them.

6  Q.  Had you talked to the government about some of your

7  robberies?

8  A.  Yes.

9  Q.  And did you continue that conversation with the

10  government to tell us about all your robberies?

11  A.  I eventually told all my robberies.

12  Q.  Let's talk about this eviction. Ms. Wicks and then also

13  Mr. Beane were talking about an eviction of your mother. Do you

14  remember that?

15  A.  Yes.

16  Q.  Did you actually ever see your mother get evicted?

17  A.  No.

18  Q.  Did you ever see at all Boy-Boy pay some money towards

19  your mother?

20  A.  No.

21  Q.  Did you ever see Wop pay any money towards your mother?

22  A.  No.

23  Q.  Yet when Ms. Wicks was asking you about this topic, you

24  mentioned you actually paid Wop some money?

25  A.  Correct.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12923**

1  Q.  Why did you do that? Tell the jury.

2  A.  Because when I came home -- when I came home, I think I

3  was in Petersburg doing some work and I was -- I be gone for a

4  week and come home on Friday evenings and leave Sunday evenings.

5  But anyway, I came home and my mother was like -- well, my

6  brother also. He had just came home from work and they was

7  like -- my mother told us that Wop just -- she was about to get

8  set out and she was like -- Wop paid the money to stop the

9  people from setting her out and she was like she got to pay him

10  back. So me and my brother put our paycheck together and paid

11  Wop the money back.

12  Q.  Did you hold a grudge against Wop for helping your mother

13  out?

14  A.  No.

15      MS. WICKS: Objection, asked and answered.

16      THE COURT: Overruled.

17  BY MR. GUERRERO:

18  Q.  I didn't hear you. The question was: Did you ever hold

19  a grudge against Wop for helping your mother?

20  A.  No.

21  Q.  Are you willing to testify and lie against him because he

22  helped your mother?

23  A.  No.

24  Q.  How much money was it?

25  A.  I don't know. Something like $650, $600, something like

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

**12924**

1  that.

2  Q.  After you paid him the money, did you ever get crack

3  cocaine from Wop?

4  A.  Yes.

5  Q.  Did you ever hang out with him?

6  A.  Yes.

7  Q.  Have a beer with him?

8  A.  No, we ain't drink beers.

9  Q.  Well, what you did drink?

10      MS. WICKS: Objection, assumes a fact not in evidence.

11      THE COURT: You can rephrase.

12  BY MR. GUERRERO:

13  Q.  Did you ever drink with him after that?

14  A.  Yes.

15  Q.  What did you drink?

16  A.  Some Remy. That's what we was drinking back then.

17  Q.  How about Boy-Boy? Did you ever hold a grudge against

18  him for supposedly helping your mother?

19  A.  No.

20  Q.  Are you mad at him because he might have helped your

21  mother?

22  A.  No.

23  Q.  I think Mr. Balarezo and then Mr. Zucker were asking you

24  about your freedom. Do you remember those questions about your

25  freedom?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12933

1    MR. BALAREZO: I'm sorry?

2    THE COURT: Why can't it wait?

3    MR. BALAREZO: Because it relates to this witness, and I

4    may require -- request recross on the issue that I'm going to

5    bring up.

6    THE COURT: You can ask for it when the witness has

7    finished his redirect.

8    MR. BALAREZO: Thank you.

9    THE COURT: Let's bring the jury in.

10    THE DEPUTY CLERK: I don't think they're all back yet.

11    (Jury in at 11:18 a.m.)

12    THE COURT: You may be seated.

13    Good morning, ladies and gentlemen.

14    THE JURY PANEL: Good morning.

15    THE COURT: Welcome back. We're ready to resume.

16    Mr. Guerrero.

17    BY MR. GUERRERO:

18    Q.    Okay, Mr. Powell, I was asking you about this incident

19    that happened in Superior Court with Agent Lockhart.

20    A.    Yes.

21    Q.    I think you said there were three white guys that

22    approached you?

23    A.    Yes.

24    Q.    Were you ever placed under arrest during that incident?

25    A.    No.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12934

1    Q.    Were you ever handcuffed in Superior Court?

2    A.    No.

3    Q.    Were you ever pinned up against that wall that you said

4    was there in Superior Court?

5    MR. TABACKMAN: Objection, leading.

6    THE COURT: Huh?

7    MR. TABACKMAN: Objection, leading.

8    THE COURT: Overruled.

9    THE WITNESS: No.

10    BY MR. GUERRERO:

11    Q.    What happened during that encounter?

12    A.    They just walked up on me. Agent Lockhart flashed his

13    badge, introduced his self, and he was, like, they need to talk

14    to me, they know about the robberies, they got me on videotape

15    and asked me, would I come down to his office? I was blowing it

16    off. He gave me his -- I was blowing it off and one of the

17    other agents that was right there was like, fuck him, we'll get

18    his ass when we get the rest of them, and Agent Lockhart gave me

19    his card and they walked off.

20    Q.    And did you walk away?

21    A.    Yes, I went to court.

22    Q.    Do you remember -- I think Ms. Wicks was asking you, that

23    you received a phone call from Kairi, where Kairi wanted you to

24    talk to the FBI about some murder?

25    A.    Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12935

1    Q.    Do you remember that? I want to take you, now, back in

2    time when you were in a robbery with Kairi up in Forestville at

3    that barbershop, do you remember that?

4    A.    Yes.

5    Q.    What do you think happened to that guy --

6    A.    I thought he got killed.

7    Q.    Did you later find out he was not killed.

8    MR. ZUCKER: Objection, hearsay.

9    MR. GUERRERO: It's in furtherance of, by Keith B.

10    THE COURT: Beg your pardon?

11    MR. GUERRERO: May we approach?

12    MR. ZUCKER: I'll withdraw based on the response of

13    Mr. Guerrero. I withdraw the objection, based on Mr. Guerrero's

14    response.

15    BY MR. GUERRERO:

16    Q.    Do you remember what I'm talking about, that robbery up

17    at the barbershop?

18    A.    Yes.

19    Q.    Did you find out what happened to that guy who was shot?

20    A.    Yes.

21    Q.    And you said initially, you thought he had died, right?

22    A.    Yes.

23    Q.    Did somebody tell you what happened to him?

24    A.    Yes.

25    Q.    Who?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

12936

1    A.    Keith B.

2    Q.    Keith B said what?

3    A.    He said that the dude who set the robbery up from out at

4    the barbershop said the dude came back and that he was just shot

5    in the collarbone.

6    Q.    But it didn't appear to you that --

7    MR. ZUCKER: Objection.

8    THE COURT: Sustained.

9    BY MR. GUERRERO:

10    Q.    Let's talk about cliques. I think you used the word

11    "cliques." Do you remember that?

12    A.    Yes.

13    Q.    And Mr. Balarezo was asking you about cliques in Congress

14    Park, and I think he went to some great extent to pinpoint a lot

15    of these gentlemen here, behind me.

16    MR. TABACKMAN: Objection.

17    THE COURT: Sustained.

18    BY MR. GUERRERO:

19    Q.    Remember that?

20    THE COURT: Sustained. Rephrase.

21    BY MR. GUERRERO:

22    Q.    Do you remember his term of "cliques"?

23    A.    Yes.

24    MR. BALAREZO: Objection, Your Honor, that was the

25    witness' own words, not my term.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 12937

1  BY MR. GUERRERO:
2  Q.  I'll rephrase.
3      THE COURT:  Go ahead.
4  BY MR. GUERRERO:
5  Q.  When the topic was raised, you used the word "cliques,"
6  do you remember that?
7  A.  Yes.
8  Q.  And what was the "click" that you saw for Wop?
9      MS. WICKS:  Objection, beyond the scope.
10      THE COURT:  Overruled.
11      MR. CARNEY:  Time period.
12      MR. TABACKMAN:  And asked and answered.
13  BY MR. GUERRERO:
14  Q.  What was the click for Wop during '96 to 2002?
15  A.  Uhm, well, him, Wop --
16  Q.  Nice and loud.  We can't hear you.
17  A.  Wop, LT, Dazz, Drano.
18      MR. BALAREZO:  Objection, 602.
19      THE COURT:  Why don't you rephrase, to clarify.
20  BY MR. GUERRERO:
21  Q.  When you say "cliques," what do you mean?
22  A.  Who he hung with.
23  Q.  Did you see who Wop hung with?
24  A.  On a regular basis, yes.
25  Q.  Who did you see?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 12938

1  A.  Well, Wop, LT, Dazz, Little Terrence, Little Phil -- uhm,
2  Drano.
3  Q.  Now, although you described that as Wop's click, did that
4  ever prevent from you getting any crack cocaine from Wop?
5  A.  Nope.
6      MS. WICKS:  Objection, beyond the scope.
7      THE COURT:  Overruled.
8      THE WITNESS:  No.
9  BY MR. GUERRERO:
10  Q.  Did it ever prevent you from getting any crack cocaine
11  from Dazz?
12  A.  No.
13  Q.  How about Munya?
14  A.  No.
15      MS. WICKS:  Objection.  May we approach?
16      THE COURT:  Yes.
17      (Following sidebar discussion had on the record:)
18      MS. WICKS:  The witness never indicated that Munya was in
19  Wop's click.
20      MR. GUERRERO:  I have it in my notes, Judge, that he said
21  Wop, Dazz, Munya, LT, when he was asked on cross-examination by
22  Mr. Balarezo.
23      MS. WICKS:  Which is A, beyond the scope of my cross, and
24  not --
25      THE COURT:  What --

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 12939

1      MS. WICKS:  Hold on a second.  And not what the -- just
2  came out of the witness' mouth on redirect.
3      THE COURT:  What does it have to do -- what does the fact
4  that it's beyond the scope of your redirect have anything to do
5  with his ability to cross-examine within the scope of somebody
6  else's redirect -- or cross, rather?
7      MS. WICKS:  It's also not what the witness just said three
8  questions ago about who's in Wop's click.
9      THE COURT:  And does that --
10      MS. WICKS:  -- and according to my notes, he didn't say
11  that before.
12      THE COURT:  Overruled.
13      (Sidebar discussion concluded.)
14  BY MR. GUERRERO:
15  Q.  You said Little Terrence?
16  A.  Yes.
17  Q.  And Little Phil?
18  A.  Yes.
19  Q.  You also, on that same topic with Mr. Balarezo, described
20  some "old heads" is what you used, do you remember that?
21  A.  Yes.
22  Q.  Who were the "old heads"?
23      MR. TABACKMAN:  Objection rule 611(a).
24      THE COURT:  Beg your pardon?
25      MR. TABACKMAN:  Rule 611(a), this is cumulative testimony,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

## 12940

1  all testified to on cross-examination and we're not eliciting any
2  new information.  We would ask the Court -- it's just repetitive.
3      THE COURT:  Overruled.
4  BY MR. GUERRERO:
5  Q.  Who are the "old heads" that you described?
6  A.  Well, "old heads," Twan, Joe --
7  Q.  You just had your hand in front of your mouth.
8  A.  Twan, Joe -- Twan, Joe.
9  Q.  Let's just pause there.
10      The fact that they were the old heads, as you determined
11  them, did that ever stop you from getting crack cocaine from
12  Twan?
13  A.  No.
14  Q.  And you said there was a click for Boy-Boy?
15  A.  Well, I wasn't really -- Boy-Boy was kind of like
16  neutral.  He hung with everybody.  Boy-Boy was like the
17  friendly --
18      MR. BALAREZO:  Objection.
19  BY MR. GUERRERO:
20  Q.  I didn't ask a question, Mr. Powell, though, were you
21  about to say something that you wanted to?
22      MR. BEANE:  Objection, Your Honor, there's no question
23  pending.
24      THE COURT:  There is now.
25  BY MR. GUERRERO:

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1690 of 1954

1  Q.   With respect to Boy-Boy, is there something that you want
2  to let us know?
3      MS. WICKS:  Objection, Your Honor.
4      MR. BEANE:  Objection, Your Honor.
5      THE COURT:  Overruled.
6      THE WITNESS:  He was friendly.  He got along with
7  everybody.  I'm talking about everybody, from kids to drug
8  dealers to old ladies.  He was real friendly.
9  BY MR. GUERRERO:
10 Q.   Was he friendly to you?
11 A.   Yes.
12 Q.   And the fact that he was friendly to all these other
13 persons, including these other cliques, ever prevent you from
14 getting crack cocaine from him?
15 A.   No.
16 Q.   Mr. Balarezo was asking you about the free style lyrics
17 that Don had and he said in front of you, do you remember that?
18 A.   Yes.
19 Q.   Was there any doubt in your mind about what the "free
20 style lyrics" were about?
21 A.   What you mean?
22 Q.   What do you mean the "free style lyrics" being about?
23     MR. BALAREZO:  Objection, it's been asked and answered
24 twice, at the very least.
25     THE COURT:  Overruled.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1      MR. ZUCKER:  It's also his interpretation, rather than
2  eliciting what the statement was.
3      THE COURT:  Overruled.
4  BY MR. GUERRERO:
5  Q.   What do you mean those free style lyrics being about when
6  he said them to you?
7  A.   What they -- in a nutshell, they were just talking about
8  what happened to him --
9  Q.   What happened to who?
10 A.   What happened to Don, and he ain't like it and he was
11 going to get him back.
12 Q.   He was going to get who back?
13 A.   Black.
14 Q.   Black had done what to Don in that --
15 A.   Shot him.
16 Q.   Mr. Carney was asking you about Congress Park.  I think
17 he used the term "open drug market."  Do you remember that?
18 A.   Did I use that term?
19 Q.   The defense lawyer.  Do you remember that?
20 A.   Yes.
21 Q.   And let's pull up 100.1 here for a second.  Do you see
22 100.1 up there?
23 A.   Yes.
24 Q.   Is that part of Congress Park?
25 A.   It's pretty much the whole thing.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   Are there other sections of Congress Park that aren't on
2  there?
3  A.   Yes.
4  Q.   Is 13th Place -- do you see 13th Place?
5  A.   Yes.
6  Q.   Put a nice big circle around 13th Place for us.
7  A.   (Indicating).
8  Q.   Could anyone just go into 13th Place and start selling
9  crack cocaine?
10     MR. ZUCKER:  Objection.
11     THE COURT:  Sustained.
12     THE WITNESS:  No.
13 BY MR. GUERRERO:
14 Q.   When you were out there, was --
15     MR. ZUCKER:  Objection.
16 BY MR. GUERRERO:
17 Q.   Was there an incident that happened in 13th Place, where
18 other people came in there to sell crack cocaine?
19     MR. BALAREZO:  Objection.
20     THE COURT:  Overruled.
21     THE WITNESS:  Yes.
22 BY MR. GUERRERO:
23 Q.   What happened when those other people came in there to
24 sell crack cocaine?
25 A.   Me and Baby Kai approached them.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1  Q.   You and Baby Kai approached them and what happened?  Tell
2  us.
3  A.   Well, me and Baby Kai approached them and told them they
4  had to leave, and one of the dudes was like, all right, we'll
5  leave.  We'll leave, he just kept saying.
6  Q.   You told them they had to leave.  Why?
7  A.   Because they was in our neighborhood.
8  Q.   They were in what neighborhood?
9  A.   Congress Park.
10 Q.   What did you see them doing in your neighborhood,
11 Congress Park?
12 A.   Well, we -- we ain't literally see them making sales, but
13 a pipe head came over there to us and told us.
14     MR. ZUCKER:  Objection.
15     THE COURT:  Basis?
16     MR. BEANE:  Hearsay.
17     MR. ZUCKER:  Hearsay.
18     MR. GUERRERO:  I can rephrase.
19     THE COURT:  Go ahead.
20 BY MR. GUERRERO:
21 Q.   Who did you see going to them?
22 A.   We seen pipe heads going over there in that building.
23 Q.   What's a pipe head?
24 A.   Someone who smokes coke.
25 Q.   And that caused you to approach them and say what?

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 43

17585

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,             :
          Plaintiff,                   : Docket No. CR 05-100
     v.                                :
                                       : Washington, DC
ANTWUAN BALL, DAVID WILSON,            :
GREGORY BELL, DESMOND                  : July 16, 2007
THURSTON, JOSEPH JONES, and            : 9:15 a.m.
DOMINIC SAMUELS,                       :
          Defendants.                  :
                                       :
                                       :
                                       :

VOLUME 79 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
                           Glenn S. Leon, Assistant United
                           States Attorney
                           Ann H. Petalas, Assistant United
                           States Attorney,
                           Gilberto Guerrero, Assistant
                           United States Attorney
                           555 4th Street
                           Washington, DC  20001
                           202.305.0174

For Defendant              CARNEY & CARNEY
Antwuan Ball:              John James Carney, Esq.
                           South Building
                           601 Pennsylvania Avenue, N.W.
                           Washington, DC  20004
                           202.434.8234

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

17585

APPEARANCES (Cont.)

For Defendant              TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:              TEASDALE, PLLC
                           Steven Carl Tabackman, Esq.
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20036
                           202.454.2811

For Defendant              LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                           503 D Street NW, Suite 250A
                           Washington, DC  20001
                           202.326.7100

                           GARY E PROCTOR, LLC
                           Gary E. Proctor, Esq.
                           6065 Harford Road
                           Baltimore, MD  21214
                           410.444.1500

                           ROBERTS & WOOD
                           Matthew F. Davies, Esq.
                           6801 Kennilworth Avenue
                           Berkshire Building, Suite 202
                           301.699.0764

For Defendant              LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                           2715 M Street, N.W.
                           Suite 200
                           Washington, DC  20007
                           202.333.5905

For Defendant              LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                           514 10th Street, NW
                           9th Floor
                           Washington, DC  20004
                           202.624.0784

For Defendant              LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                           7841 Belle Point Drive
                           Greenbelt, MD  20770
                           301.220.3700

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

17586

APPEARANCES (Cont.)     LAW OFFICE OF ANTHONY ARNOLD
                        Anthony Darnell Arnold, Esq.
                        One Research Court
                        Suite 450
                        Rockville, MD  20852
                        301.519.8024

For Defendant           LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:       A. Eduardo Balarezo, Esq.
                        400 Fifth Street, NW
                        Suite 300
                        Washington, DC  20001
                        202.639.0999
                        and
                        William B. Purpura, Esq.
                        8 East Mulberry Street
                        Baltimore, MD  21202
                        410.576.9351

Court Reporter:         Scott L. Wallace, RDR, CRR
                        Official Court Reporter
                        Room 6814, U.S. Courthouse
                        Washington, DC  20001
                        202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

Scott L. Wallace, RDR, CRR
Official Court Reporter

---

17587

1      **MORNING SESSION, JULY 16, 2007**

2      (9:26 a.m.)

3          THE DEPUTY CLERK:  Trial resumes in Criminal Case 05-100,

4      *The United States versus Antwuan Ball, David Wilson, Gregory*

5      *Bell, Desmond Thurston, Joseph Jones and Dominic Samuels.*

6          For the government, Mr. Leon, Ms. Petalas and Mr.

7      Guerrero.  For defendants, Mr. Carney, Mr. Tabackman,

8      Mr. Proctor, Mr. Davies, Mr. Beane, Mr. Zucker, Mr. Martin,

9      Mr. Balarezo.

10         THE COURT:  All right.  Good morning.

11         Are you ready for the jury?

12         MR. GUERRERO:  Yes, sir.

13         THE COURT:  All right.

14         (Jury in at 9:32 a.m.)

15         THE COURT:  Good morning, ladies and gentlemen.

16         THE JURY PANEL:  Good morning.

17         THE COURT:  Welcome back.  We're ready to resume.

18         Counsel.

19     CONTINUED DIRECT EXAMINATION OF NICHOLAS CHRISTIANSEN

20     BY MR. GUERRERO:

21     **Q.**    Good morning, sir.

22     **A.**    Good morning.

23     **Q.**    Would you please reintroduce yourself for the record,

24     please.

25     **A.**    Nicholas Christiansen, Sr.

Scott L. Wallace, RDR, CRR
Official Court Reporter

17696

1   A.   Yes.
2   Q.   And would it always be the same uniform or would it vary?
3   A.   Same.
4   Q.   What about bulletproof vests?
5   A.   Yes.
6   Q.   Yes, what?  Did you wear those?
7   A.   Yes.
8   Q.   Who would issue you those bulletproof vests?
9   A.   The company that you work for.
10  Q.   What about walkie-talkies, is that something that you
11  would have?
12  A.   Yes.
13  Q.   What would be the purpose of the walkie-talkies?
14  A.   So you would be able to communicate with the other
15  officers.
16  Q.   Are those walkie-talkies something that would also link
17  you up to --
18       MR. BALAREZO:  Objection, leading.
19  BY MR. LEON:
20  Q.   I'll rephrase.
21       Which other officers?
22  A.   The officers that you work with that's on duty with you.
23  Q.   Is working as an SPO something you get a salary for or do
24  you get paid by the hour?
25  A.   By the hour.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

17697

1   Q.   Now, I think you mentioned also the term "security
2   guard"; is that correct?
3   A.   Yes.
4   Q.   Is there a difference between an SPO and a security
5   guard?
6   A.   Yes.
7   Q.   Tell us what that difference is.
8   A.   A security guard only can observe and report, they don't
9   carry a weapon, and an SPO -- they don't have powers of arrest
10  like an SPO.
11  Q.   During that period of time, approximately 1990 until
12  September of 2002, during that 12-year period or so, did you do
13  any other line of work other than as an SPO?
14  A.   No.
15  Q.   Now, you said you worked for a company called Eagle?
16  A.   Yes.
17  Q.   And, roughly, when would you say you began working for
18  Eagle?
19  A.   I started working for Eagle around -- I've been -- '99,
20  like '99, 1999.
21  Q.   And who hired you?
22  A.   Nick Christiansen.
23  Q.   Does he have any nicknames he goes by?
24  A.   I call him Mr. C.
25  Q.   And back then, around 1999, did Eagle Security have a lot

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

17698

1   of people working for it, if you know?
2   A.   No, he was just starting out.
3        MR. BALAREZO:  Objection.
4        THE COURT:  Overruled.
5   BY MR. LEON:
6   Q.   You can answer.
7   A.   No.
8   Q.   And I think -- did you have another part to that answer?
9   A.   Yes.  I said --
10       MR. BALAREZO:  Objection.
11       THE COURT:  Overruled.
12       THE WITNESS:  I said he just started the company.
13  BY MR. LEON:
14  Q.   You can answer.
15  A.   He was just starting the company.
16  Q.   Are you familiar with the neighborhood of Congress Park?
17  A.   Yes.
18  Q.   How?
19  A.   I worked there.
20  Q.   Did you work there while you worked for Mr. C,
21  Mr. Nick Christiansen, at Eagle?
22  A.   Yes.
23  Q.   When, approximately, did you begin working security at
24  Congress Park?  Approximately when?
25  A.   Sometime in '99.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

17699

1   Q.   September?
2   A.   Sometime in '99.
3   Q.   And did there come a point when you stopped working
4   security at Congress Park?
5   A.   2002.
6   Q.   When you worked there, let's start at the beginning,
7   about 1999 when you began.  When you began, first week or so on
8   the job, did you work with anyone else or was anyone else
9   assigned to be an SPO at Congress Park at that time?
10  A.   Yes.
11  Q.   Who else do you remember working with, initially, in '99
12  or so?
13  A.   Myself, Euro Perry, Jennifer Glover, Lisa Weigh,
14  Rudolf Tillman, some other names I can't recall off the top of
15  my head.
16  Q.   Did you all work for Eagle at that time?
17  A.   Yes.
18  Q.   Did you wear uniforms?
19  A.   Yes.
20  Q.   Did you have bullet-proof vests?
21  A.   Yes.
22  Q.   Did you carry guns?
23  A.   Yes.
24  Q.   Did you have arrest powers?
25  A.   Yes.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   **A.**    Yes.
2   **Q.**    Okay.  Is that an alley?
3   **A.**    Yes.
4   **Q.**    Okay.  And what, if anything, happened as a result of
5   that?
6   **A.**    We stopped driving on the Congress Park property.
7   **Q.**    When you say "we," who's "we"?
8   **A.**    All the employees.
9   **Q.**    How did you get to work?
10  **A.**    We parked down the street and we carpooled in the
11  government vehicle, which was actually Eagle Technologies'
12  company vehicle.
13  **Q.**    And I think you said a couple of things there.  When you
14  parked down the street, would you park down the street in your
15  own personal cars?
16  **A.**    Yes.
17  **Q.**    And can we see anywhere on the map where you actually
18  parked?
19  **A.**    No.
20  **Q.**    How far did you have to walk to get to work once you
21  parked your car where you parked your car?
22  **A.**    We didn't walk it.
23        MR. ZUCKER:  Objection -- withdraw the objection.
24        THE WITNESS:  We didn't walk, we were just getting into
25  the company vehicle.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

1   BY MR. LEON:
2   **Q.**    I see.  And then the company vehicle was what?  What kind
3   of vehicle?
4   **A.**    It was a Caprice.
5   **Q.**    And did you park that on the Congress Park property?
6   **A.**    Yes.
7   **Q.**    That belonged to Eagle?
8   **A.**    Yes.
9   **Q.**    Yes or no, did you observe any vandalism to that vehicle
10  at any point?
11  **A.**    Yes.
12  **Q.**    What type of vandalism?
13  **A.**    Windows bust out, tires flattened.
14  **Q.**    How much after the time that Euro Perry's vehicle was
15  vandalized did the company, Eagle company car get vandalized?
16  **A.**    About a month or so.
17  **Q.**    How did you get to work after that?
18  **A.**    They gave us another vehicle.
19  **Q.**    Where'd you park that?
20  **A.**    We didn't.
21  **Q.**    What do you mean by that?
22  **A.**    We rode around, we always kept one person riding around
23  in it.
24  **Q.**    Why?
25  **A.**    So it wouldn't get vandalized.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

17781

1   **Q.**    Did you report the vandalism to the second car or to
2   either car to your supervisors?
3   **A.**    Yes.
4   **Q.**    Being who, Mr. Clark or somebody else?
5   **A.**    Mr. Clark, Vince Tolson, Mr. C.
6   **Q.**    What if anything did Pete Clark say to you about that --
7   I'll withdraw that.
8        You mentioned Dazz a little while ago, and you said you
9   observed him in Congress Park?
10  **A.**    Yes.
11  **Q.**    Did you ever have any personal dealings with him?
12  **A.**    Repeat.  Dealings in what?
13  **Q.**    Did you -- did he ever speak to you or say anything to
14  you?
15  **A.**    He has threatened me.
16  **Q.**    Okay.  What do you mean by that, he's threatened you?
17  **A.**    Threatened to do bodily harm, hurt me, kill me.
18  **Q.**    Tell us what he said.
19  **A.**    He just said "I'll kill you."
20  **Q.**    How many times did he say that to you?
21  **A.**    I can't name the times.
22  **Q.**    Can you remember -- well, what does that mean, you can't
23  name the times?
24  **A.**    I mean, it was so many times, but I was doing my job.
25  **Q.**    What, to the best that you can remember, did he actually

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

17782

1   say to you?
2   **A.**    He'd kill me.
3   **Q.**    How close were you to him when he said this to you?
4   **A.**    Sometimes within ten feet.
5   **Q.**    Were you alone or with anyone else?
6   **A.**    With others.
7   **Q.**    Who?
8   **A.**    Jennifer Glover, Uro Perry.
9   **Q.**    What, if anything, did you do in response?
10  **A.**    Pay no attention to it.
11  **Q.**    Why?
12  **A.**    Because I wasn't afraid.
13  **Q.**    Why?
14  **A.**    Because I was doing my job.
15  **Q.**    Was Dazz alone or with other people when he said this to
16  you?
17  **A.**    He was with other people.
18  **Q.**    Who?
19  **A.**    It be Boy-Boy around, Jo-Jo around, and others.
20  **Q.**    Were you saying or doing -- let's take it one at a time.
21  Were you saying anything to Dazz before he said these threats to
22  you?
23  **A.**    Sometimes I would be asking him to move on, they need to
24  move on if they were in front of 1313 standing around.  If they
25  was supposed to go outside of the Lincoln right at the corner, I

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

17783

1   would tell them they had to move off the sidewalk.
2   **Q.**   Why would you tell them to move if they were just
3   standing there?
4   **A.**   Because they couldn't loiter on the property.
5   **Q.**   What do you mean by that, they couldn't loiter on the
6   property.
7   **A.**   They just couldn't stand around, just a group of them.
8   **Q.**   Who said so?
9   **A.**   Pete Clark.
10  **Q.**   Were those your directions?
11  **A.**   Yes.
12          MR. ZUCKER:  Objection, hearsay.
13          MR. LEON:  Not hearsay, Your Honor, it's a directive.
14          THE COURT:  Overruled.
15  BY MR. LEON:
16  **Q.**   You also mentioned Jo-Jo, the gentleman with the glasses?
17  **A.**   Yes.
18  **Q.**   Did Jo-Jo ever say things to you?
19  **A.**   Yes.
20  **Q.**   What?
21  **A.**   Just threaten me, the same way, we'll kill y'all, y'all
22  need to get away from here, we going to do different things they
23  would say they would do to us.
24  **Q.**   He said we're going to kill you?
25  **A.**   Yes.

17784

1   **Q.**   When he would say this to you, was he alone or with other
2   people?
3   **A.**   Other people.
4   **Q.**   Who?
5   **A.**   Dazz, Boy-Boy, and others.
6   **Q.**   Did he ever make any gestures toward you when he said
7   these things?
8   **A.**   Naw, no.
9   **Q.**   How close were you to him, Jo-Jo, when he would say this
10  to you?
11  **A.**   Sometimes within ten feet.
12  **Q.**   Were you alone or with other people?
13  **A.**   With other people.
14  **Q.**   What, if anything, would you be saying to Jo-Jo before he
15  would make these threats to you?
16  **A.**   Tell him to move on, they need to move on from in front
17  of the buildings, get out of the buildings, same thing.
18  **Q.**   Focusing on that early portion again, '99 to 2002, those
19  first couple of years, in that portion, yes or no, did you ever
20  see Jo-Jo engage in what you earlier described as hand-to-hand
21  transactions?
22  **A.**   Yes.
23          MR. MARTIN:  Objection.  602.
24          THE COURT:  Overruled.
25  BY MR. LEON:

17785

1   **Q.**   Yes?
2   **A.**   Yes.
3   **Q.**   Tell us what you saw.
4   **A.**   Just a hand-to-hand transaction, a person would walk up
5   to him, he'd walk on the Lincoln property, hand the person
6   something, and the person walk off.
7   **Q.**   How often would you say you saw Jo-Jo do this?
8   **A.**   Not much.
9   **Q.**   What does that mean?
10  **A.**   It was very few times, a few.
11  **Q.**   Can you put a number on it or no?
12  **A.**   No.
13  **Q.**   Is it more than one?
14  **A.**   Yes.
15  **Q.**   I believe one of the things you said earlier that was
16  part of your job description was to deal with disorderly conduct
17  and public nuisances, something along those lines, do you
18  remember that?
19  **A.**   Yes.
20  **Q.**   Did that also include drinking in public?
21  **A.**   Yes.
22  **Q.**   Did you ever see Jo-Jo doing that?
23  **A.**   Yes.
24  **Q.**   Where?
25  **A.**   Lincoln property, the alley, wherever he was at on

17786

1   Congress Park.
2   **Q.**   Do you know somebody by the name of DC?
3   **A.**   Yes.
4   **Q.**   Who's DC?
5   **A.**   DC was a friend of Don's.
6           MR. BALAREZO:  Objection.  602.
7           THE COURT:  Overruled.
8   BY MR. LEON:
9   **Q.**   I'm sorry.  I didn't hear what you said.
10  **A.**   He was a friend of Don's.
11  **Q.**   Uhm, how do you know that?  Or how did you conclude that?
12  **A.**   Because we barred him.
13  **Q.**   You barred who?
14  **A.**   DC, Daniel Collins, from the property.
15  **Q.**   Did you ever see DC, Daniel Collins, and Don together?
16  **A.**   Yes.
17  **Q.**   How frequently?
18  **A.**   All the time.
19  **Q.**   Why'd you bar DC, Daniel Collins, from Congress Park
20  property?
21          MR. BALAREZO:  Objection.  I believe it's going to be
22  hearsay and speculation, Your Honor.
23          MR. ZUCKER:  And irrelevant.
24          MR. LEON:  He's a co-conspirator; I don't know how it's
25  not relevant.  I could proffer more at the bench.

17787

1    THE COURT: Come on up.

2    (Following sidebar discussion had on the record:)

3    THE COURT: What's the answer going to be? The question

4    was why was he barred?

5    MR. LEON: I can proffer --

6    THE COURT: Is that the question?

7    MR. LEON: Yes, that was the question.

8    THE COURT: Okay.

9    MR. LEON: I can proffer that DC personally threatened

10   this witness. I don't know if that's the reason he was barred,

11   but I can proffer that this witness does have personal knowledge

12   observing Don and DC together. But as to why was he barred, I

13   can't say that that's not based on -- I don't know if it's based

14   on personal knowledge or not, so I can -- it might be, I just

15   don't know. I can't proffer with clarity on that.

16   THE COURT: Well, then I think you better restructure --

17   or reapproach the issue.

18   MR. LEON: Right, right, right.

19   MR. ZUCKER: Your Honor, I've noticed this witness -- and

20   I don't think she's been instructed not to -- kind of staring at

21   us at every bench conference, and it seems like she's trying to

22   hear. I don't think she's been told she's not supposed to hear.

23   I would ask the Court to caution her.

24   THE COURT: Keep your whispers down then.

25   MR. BALAREZO: Your Honor, when's our next break?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

17788

1    THE COURT: 3:35.

2    MR. BALAREZO: Okay.

3    (Sidebar discussion concluded.)

4    BY MR. LEON:

5    Q.    Ms. Brown, I believe you testified previously that both

6    Dazz and Jo-Jo at different times had threatened you?

7    MR. MARTIN: Objection.

8    MR. LEON: It's just to orient the witness. It's not a

9    question.

10   THE COURT: Go ahead.

11   MR. LEON: Okay.

12   BY MR. LEON:

13   Q.    Focusing now on DC, yes or no, did DC ever threaten you?

14   A.    Yes.

15   Q.    How many times?

16   A.    A lot of times.

17   Q.    And when DC threatened you, was he alone or with other

18   people?

19   A.    With other people.

20   Q.    Who?

21   A.    Don.

22   Q.    Can you remember anyone else, or was it just Don?

23   A.    Just Don the time I recall.

24   Q.    And what, if anything, were you doing or saying to DC

25   before he threatened you?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

17789

1    A.    Asking him to move on, get off the corners.

2    Q.    Did you ever observe DC engage in the hand-to-hand

3    transactions that you previously described for us?

4    A.    No.

5    Q.    You also talked earlier about Boy-Boy, and I believe --

6    well, do you remember that?

7    A.    Yes.

8    Q.    Yes or no, did Boy-Boy ever threaten you?

9    A.    Yes.

10   Q.    How many times?

11   A.    A lot.

12   Q.    Where would these incidents happen?

13   A.    All over the property.

14   Q.    All over what property?

15   A.    Congress Park.

16   Q.    Would Boy-Boy do anything as well or was it always just

17   words?

18   A.    He would do the little hand gesture like this, out the

19   window sometimes (indicating).

20   Q.    Okay. For the record, you just held up your left hand

21   and kind of moved your thumb?

22   A.    Yes.

23   Q.    Like a what? Describe it.

24   A.    Like a gun.

25   Q.    Did you see a gun on him at that time or not?

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

17790

1    A.    No.

2    Q.    And you said out the window; out of what window?

3    A.    Out of his Impala.

4    Q.    His Impala?

5    A.    Yes.

6    Q.    Was he driving in the Impala or was the Impala parked?

7    A.    Driving.

8    Q.    Do you know if Boy-Boy had any siblings?

9    A.    Yes.

10   Q.    Who?

11   A.    Jazz and Santuce.

12   Q.    Yes or no, did you see Jazz hang out in Congress Park?

13   A.    Yes.

14   Q.    Yes or no, did you see Santuce hang out in Congress Park?

15   A.    Yes.

16   Q.    Did you see Boy-Boy hang out with Jazz and Santuce?

17   A.    Yes.

18   Q.    Do you know where Boy-Boy lived?

19   A.    His mother lived on the property, but he basically stayed

20   in the Lincoln.

21   Q.    Where did Boy-Boy's mother live? Can we see it on this

22   map, Government's 122.4?

23   A.    Yes.

24   Q.    Where did Boy-Boy live?

25   A.    (Indicating) his mother lived up in this court right

**Scott L. Wallace, RDR, CRR**
**Official Court Reporter**

---

# Tab 44

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
                                 :
        Plaintiff,               : Docket No. CR 05-100
                                 :
        v.                       :
                                 :
ANTWUAN BALL, DAVID WILSON,      : Washington, DC
GREGORY BELL, DESMOND            :
THURSTON, JOSEPH JONES, and      : August 1, 2007
DOMINIC SAMUELS,                 : 9:27 a.m.
                                 :
        Defendants.              :
                                 :
                                 :
                                 :

VOLUME 81 - MORNING SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

 For the United States:        UNITED STATES ATTORNEY'S OFFICE
                               Glenn S. Leon, Assistant United
                               States Attorney
                               Ann H. Petalas, Assistant United
                               States Attorney,
                               Gilberto Guerrero, Assistant
                               United States Attorney
                               555 4th Street
                               Washington, DC  20001
                               202.305.0174


 For Defendant                 CARNEY & CARNEY
 Antwuan Ball:                 John James Carney, Esq.
                               South Building
                               601 Pennsylvania Avenue, N.W.
                               Washington, DC  20004
                               202.434.8234

PDF created with pdfFactory trial version www.pdffactory.com

1           <u>MORNING SESSION, AUGUST 1, 2007</u>

2   (9:27 a.m.)

3      THE DEPUTY CLERK:  Criminal Case 05-100, *The United States*

4 *versus Antwuan Ball, David Wilson, Gregory Bell, Desmond*

5 *Thurston, Joseph Jones and Dominic Samuels*.

6      For the government, Mr. Leon, Ms. Petalas and Mr.

7 Guerrero.  For defendants, Mr. Carney, Mr. Tabackman,

8 Mr. Proctor, Mr. Davies, Mr. Beane, Mr. Zucker, Mr. Martin,

9 Mr. Arnold [sic], Mr. Balarezo and Mr. Purpura.

10      THE COURT:  All right.  Good morning.

11      ALL PARTIES PRESENT:  Good morning.

12      THE COURT:  We are here on the defendants' motions for

13 judgment of acquittal under Rule 29.  The government has filed

14 its opposition to those motions, but has agreed with respect to

15 some of the requests for having judgments of acquittals entered

16 on some counts and some overt acts and racketeering acts

17 stricken, so let's just start with what I understand to be the

18 agreement of the parties as to which of those ought to go.

19      Judgments of acquittal are to be entered on Counts 7, 41,

20 42, 43, 44, 45, 46, 51, 52 and 53.

21      Unless anyone has any correction to that list, I grant the

22 defendants' respective motions for judgments of acquittal on

23 those counts.

24      The defendants have also moved to strike several overt

25 acts and racketeering acts without objection from the government

PDF created with pdfFactory trial version www.pdffactory.com

# Tab 45

FILED

OCT - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Docket No. CR 05-100 |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Washington, DC |
| | : | |
| ANTWUAN BALL, | : | |
| DAVID WILSON, | : | |
| GREGORY BELL, | : | September 24, 2007 |
| DESMOND THURSTON, | : | |
| JOSEPH JONES, | : | |
| DOMINIC SAMUELS, | : | |
| | : | |
| Defendants | : | 1:15 p.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . .

VOLUME 95 - AFTERNOON SESSION
*TRANSCRIPT OF JURY TRIAL PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS,*
*UNITED STATES DISTRICT JUDGE,* and a jury

APPEARANCES:

For the United States:     ANN H. PETALAS, ESQUIRE
                           GLENN S. LEON, ESQUIRE
                           GIL GUERRERO, ESQUIRE
                           UNITED STATES ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, D.C.  20530

For the Defendant          JOHN JAMES CARNEY, ESQUIRE
Antwuan Ball:              CARNEY & CARNEY
                           601 Pennsylvania Avenue, NW
                           Suite 900, South Building
                           Washington, DC  20004
                           (202) 434-8234

                           STEVEN CARL TABACKMAN, ESQUIRE
                           TIGHE, PATTON, ARMSTRONG,
                               TEASDALE, PLLC
                           1747 Pennsylvania Avenue, NW
                           Suite 300
                           Washington, DC  20006
                           (202) 454-2811

 1     introduce some additional evidence on behalf of his client.

 2              MR. ZUCKER:  Thank you, judge.

 3              Ladies and gentlemen, there were two stipulations

 4     entered, and you'll have copies of these in writing in the back.

 5     They'll be Defendant Thurston's five and six.  The first one is

 6     number five:  "The parties in this case, the United States and

 7     all defendants, stipulate that the following matter is not in

 8     dispute:  That Desmond Thurston was never employed by Eagle

 9     Technology Security in any capacity."  That's number five.

10              Number six, again, "The parties in this case and the

11     United States agree that Desmond Thurston" -- or "that following

12     matter is not in dispute:  That Desmond Thurston was

13     incarcerated from January 24th, 1995 until January 3rd, 1996,

14     and from June 29th, 1996 until July 28th, 1997."

15              Again, these will be in writing, and you'll have copies

16     of them.

17              Move them in, please.  May I move them in formally?

18              THE COURT:  All right.  They'll be received.

19              (DEFENDANT THURSTON Exhibit Numbers 5, 6 were moved

20     into evidence.)

21              THE COURT:  All right.  Ladies and gentlemen, what

22     we're going to do is to take about a 15-minute break.  I would

23     ask that you come back at 4:30, and then we'll just have some

24     additional matters running up until 5:00.

25              Take your notes back into the jury room with you, and

# Tab 46

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                    :
          Plaintiff,                          :  Docket No. CR 05-100
     v.                                       :
                                              :  Washington, DC
ANTWUAN BALL, DAVID WILSON,                   :
GREGORY BELL, DESMOND                         :  October 3, 2007
THURSTON, JOSEPH JONES, and                   :  9:15 a.m.
DOMINIC SAMUELS,                              :
          Defendants.                         :
                                              :

VOLUME 101 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT COURT JUDGE, and a JURY

APPEARANCES:

For the United States:    UNITED STATES ATTORNEY'S OFFICE
                          Glenn S. Leon, Assistant United
                          States Attorney
                          Ann H. Petalas, Assistant United
                          States Attorney,
                          Gilberto Guerrero, Assistant
                          United States Attorney
                          555 4th Street
                          Washington, DC  20001
                          202.305.0174

For Defendant             CARNEY & CARNEY
Antwuan Ball:             John James Carney, Esq.
                          South Building
                          601 Pennsylvania Avenue, N.W.
                          Washington, DC  20004
                          202.434.8234

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (cont.)

For Defendant             TIGHE, PATTON, ARMSTRONG,
Antwuan Ball:             TEASDALE, PLLC
                          Steven Carl Tabackman, Esq.
                          1747 pennsylvania Avenue, NW
                          Suite 300
                          Washington, DC  20036
                          202.454.2811

For Defendant             LAW OFFICE OF JENIFER WICKS
David Wilson:             Jenifer Wicks, Esq.
                          503 D Street NW, Suite 250A
                          Washington, DC  20001
                          202.326.7100

                          GARY E PROCTOR, LLC
                          Gary E. Proctor, Esq.
                          6065 Harford Road
                          Baltimore, MD  21214
                          410.444.1500

                          ROBERTS & WOOD
                          Matthew F. Davies, Esq.
                          6801 Kennilworth Avenue
                          Berkshire Building, Suite 202
                          301.699.0764

For Defendant             LAW OFFICE OF JAMES W. BEANE
Gregory Bell:             James W. Beane, Jr., Esq.
                          2715 M Street, N.W.
                          Suite 200
                          Washington, DC  20007
                          202.333.5905

For Defendant             LAW OFFICE OF JONATHAN ZUCKER
Desmond Thurston:         Jonathan Seth Zucker, Esq.
                          514 10th Street, NW
                          9th Floor
                          Washington, DC  20004
                          202.624.0784

For Defendant             LAW OFFICE OF ANTHONY MARTIN
Joseph Jones:             Anthony Douglas Martin, Esq.
                          7841 Belle Point Drive
                          Greenbelt, MD  20770
                          301.220.3700

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

APPEARANCES (Cont.)        LAW OFFICE OF ANTHONY ARNOLD
                           Anthony Darnell Arnold, Esq.
                           One Research Court
                           Suite 450
                           Rockville, MD  20852
                           301.519.8024

For Defendant              LAW OFFICES OF A. EDUARDO BALAREZO
Dominic Samuels:           A. Eduardo Balarezo, Esq.
                           400 Fifth Street, NW
                           Suite 300
                           Washington, DC  20001
                           202.639.0999
                           and
                           William B. Purpura, Esq.
                           8 East Mulberry Street
                           Baltimore, MD  21202
                           410.576.9351

Court Reporter:            Scott L. Wallace, RDR, CRR
                           Official Court Reporter
                           Room 6814, U.S. Courthouse
                           Washington, DC  20001
                           202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

---

1                    **MORNING SESSION, OCTOBER 3, 2007**

2     (9:44 a.m.)

3          THE COURT:  All right.  Let's call the case.

4          THE DEPUTY CLERK:  Trial resumes in criminal Case Number

5     05-100, *the United States versus Antwuan Ball, David Wilson,*

6     *Gregory Bell, Desmond Thurston, Joseph Jones and Dominic Samuels.*

7          For the government, Mr. Leon, Ms. Petalas and Mr.

8     Guerrero.  For defendants, Mr. Carney, Mr. Proctor, Mr. Beane,

9     Mr. Zucker and Mr. Martin.

10         THE COURT:  All right.  Let's bring the jury in.

11         MR. TABACKMAN:  Your Honor, could I raise just one quick

12    matter.  I just --

13         THE COURT:  I'm bringing the jury in.  What?

14         MR. TABACKMAN:  We're missing an instruction.

15         THE COURT:  Did you e-mail that to us yesterday?

16         MR. TABACKMAN:  You discussed it yesterday and you agreed

17    on it and it's not in the -- I'm looking at the table of

18    contents.

19         THE COURT:  What instruction is it?

20         MR. TABACKMAN:  Theory of the case for the three

21    defendants.

22         THE COURT:  Did you turn to page 97?

23         MS. PROCTOR:  We apologize, Your Honor.  It's there.

24         (Jury in at.9:47 a.m.)

25         THE COURT:  Good morning, ladies and gentlemen.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

relationship, multiple sales, sales on credit or fronting, an
awareness that the drugs purchased by the buyer are to be resold,
or knowledge of a broader illegal venture.

There can be no conspiracy if the only person a defendant
conspires with is a government agent.

Additionally, where the quantity involved is sufficiently
large, an inference may be drawn that an implicit agreement
exists for the defendant to supply a co-conspirator with
narcotics for resale on an ongoing basis.

Regarding the second element, the government must show the
defendant's membership in the narcotics conspiracy. The
defendant need not know the identities or the number of all the
other members of the narcotics conspiracy, nor all the details of
the narcotics conspiracy, nor the means by which its purposes
were to be accomplished.

Each member of the narcotics conspiracy may perform
separate and distinct acts. It is necessary, however, that the
government prove beyond a reasonable doubt that the defendant was
aware of the common purpose, had knowledge that the narcotics
conspiracy existed and was a willing participant with the intent
to advance the purposes of the narcotics conspiracy.

In other words, in order to find that a defendant became a
member of the narcotics conspiracy, the evidence in the case must
prove to you beyond a reasonable doubt that the defendant
knowingly participated in the unlawful plan with the intent to

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

advance or further some objective or purpose of the narcotics
conspiracy.

Throughout these instructions, to "act knowingly" means to
do so voluntarily and intentionally and not because of mistake,
inadvertence or accident, and to "act willfully" means to do so
knowingly, intentionally and deliberately.

Although one may become a member of a conspiracy without
full knowledge of all the details, a person who has no knowledge
of or intent to join the conspiracy, but just happens to act in a
way that is a benefit to the conspiracy or to a conspirator does
not thereby himself become a conspirator. Evidence of friendship
or association, even familial relationship with alleged
conspirators, without evidence of knowing participation does not
permit an inference of guilt.

It is not necessary that the government prove that a
defendant was a member of the conspiracy from its beginning.
Different persons may become members of the conspiracy and their
participation in the conspiracy may end at different times. One
who knowingly joins an existing conspiracy is charged with the
same blame or culpability as though he had been one of the
original members of the conspiracy and you are reminded that it
is not necessary in order to convict a defendant of the charge of
conspiracy that the objectives or purposes of the conspiracy were
achieved or accomplished. The ultimate success or failure of the
conspiracy is irrelevant.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

22665

Whether a single conspiracy, multiple conspiracies or no
conspiracy at all existed is for you to decide. If you find that
the evidence at trial did not prove the existence of the single
overall narcotics conspiracy charged, or instead established
other or different conspiracies, none of which is charged in the
indictment, you must find the defendant not guilty of Count 1.

This is so even if you find that some conspiracy other
than the one charged in this indictment existed, and even though
the purposes of both conspiracies may have been the same and
there may have been some overlap in membership.

Proof of several separate conspiracies is not proof of the
single overall conspiracy charged in the indictment. What you
must determine is whether the single conspiracy charged in Count
1 existed between two or more conspirators. If you find that no
such conspiracy existed, you must acquit the defendants of this
charge.

If, however, you find that the government has proven
beyond a reasonable doubt that a defendant was involved at any
point during the period charged in the indictment in an
integrated, ongoing common effort to distribute or possess with
intent to distribute cocaine powder or crack cocaine, then you
may find him guilty of the single conspiracy charged in Count 1.

You should consider whether the conspirator shared a
common goal, such as to possess and distribute narcotics for
profit, to enrich the members of the conspiracy, to create,

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

22666

maintain, and control a marketplace for the distribution of
controlled substances, to enforce discipline among members of the
conspiracy, to collect monies owed to members of the conspiracy,
to protect the conspiracy and its members from detection,
apprehension and prosecution by law enforcement, to prevent and
retaliate against acts of violence perpetrated against members of
the conspiracy and to promote and enhance the reputation and
standing of the conspiracy and its members.

You may also consider the extent to which members of the
conspiracy depended on one another to accomplish the goal of
narcotics distribution, the overlap of participants in the
various operations of the conspiracy and the quality, frequency
and duration of each conspirator's transactions.

You may find that there is a single conspiracy despite the
fact that there were changes in either personnel or activities or
both so long as you find that two or more persons continued to
act for the entire duration of the conspiracy for the purposes
charged in the indictment.

The fact that the members of a conspiracy are not always
the same does not necessarily imply that separate conspiracies
exist.

You may also consider noncriminal acts and the statements
of any other member of the alleged conspiracy during and in
furtherance of the conspiracy as evidence against a defendant
whom you have found to be a member of the conspiracy.

*Scott L. Wallace, RDR, CRR*
*Official Court Reporter*

# Tab 47

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   : Docket No. CR 05-100-16
              Plaintiff,           :
                                   :
         v.                        :
                                   : Washington, DC
JOSEPH JONES,                      :
                                   : May 1, 2008
              Defendant.           : 11:50 a.m.
                                   :


*TRANSCRIPT OF SENTENCING PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*


APPEARANCES:

For the United States:      UNITED STATES ATTORNEY'S OFFICE
                            Glenn S. Leon, Assistant United
                            States Attorney
                            Ann H. Petalas, Assistant United
                            States Attorney,
                            555 4th Street
                            Washington, DC   20001
                            202.305.0174


For Defendant:              LAW OFFICE OF ANTHONY MARTIN
Joseph Jones                Anthony Douglas Martin, Esq.
                            7841 Belle Point Drive
                            Greenbelt, MD  20770
                            301.220.3700



Court Reporter:             Scott L. Wallace, RDR, CRR
                            Official Court Reporter
                            Room 6814, U.S. Courthouse
                            Washington, DC 20001
                            202.326.0566

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

| | |
|---|---|
| 1 | <u>**MORNING SESSION, MAY 1, 2008**</u> |
| 2 | (10:56 a.m.) |
| 3 | THE DEPUTY CLERK:  Criminal Case Number 05-100-16, United |
| 4 | States versus Joseph Jones.  For the government, Mr. Leon and |
| 5 | Ms. Petalas.  For the defendant, Mr. Martin. |
| 6 | THE COURT:  Good morning.  Let me apologize to everyone |
| 7 | for this delay.  I appreciate your indulgence.  There were some |
| 8 | missing matters in the copies of filings we got that we had to |
| 9 | get supplemented, and I wanted to make sure we took a careful |
| 10 | look at them.  I'm not sure if the government had given over to |
| 11 | the defense copies of any of the missing things we had.  I don't |
| 12 | know if, Mr. Martin, you have a full set. |
| 13 | MR. MARTIN:  Yes, Your Honor, the government was kind |
| 14 | enough to give that to me this morning and I had a chance to |
| 15 | review it. |
| 16 | THE COURT:  All right.  I also want to make sure that both |
| 17 | sides had an opportunity to see the letter that came to chambers |
| 18 | some time back.  Did you get to see that? |
| 19 | MR. LEON:  Yes, sir. |
| 20 | THE COURT:  All right.  Mr. Martin, have you and your |
| 21 | client read and discussed the presentence report? |
| 22 | MR. MARTIN:  Yes, we did, Your Honor. |
| 23 | THE COURT:  Let me hear from you, then, with respect to |
| 24 | any comments you have about it and any challenges that I will |
| 25 | need to resolve. |

1            MR. MARTIN:  May it please the Court.  As the Court knows,

2    I represent Joseph Jones and I'm appointed counsel to represent

3    him.

4            There were two issues that appear in the presentence

5    report that Mr. Jones takes exception to.  The first is with

6    respect to the acquitted conduct that is used to do the

7    calculation of his offense level.  He takes exception to that and

8    we would ask the Court to bear in mind that while you can

9    consider acquitted and uncharged and alleged misconduct, that

10   still there must be a reasonable basis for whatever sentence he

11   gets.

12           So, while Mr. Jones is distraught over that, I have told

13   him that, notwithstanding that, that reasonableness is the

14   guidepost, so I wanted the Court to know that Mr. Jones, for the

15   record, does object to the Court considering anything that he was

16   acquitted of by the jury, specifically Counts 1, 2, 39, and 40;

17   Count 1, I believe, being the conspiracy count; I think Count 2

18   was the RICO counts -- I may have them backwards -- 39 and 40

19   dealt with the stabbing of Michael Smallwood.  And again, 1 was

20   under the D.C. code, as the Court will recall, and the other one,

21   I believe, was a VICAR, a violent act in furtherance of the RICO

22   charge.

23           With respect to his career offender status, that is a more

24   troubling and sticky point for me to address.  He objects to

25   that.  Generally, I have struggled with that.  I have looked at

1    the case law, and Mr. Jones would argue that his designation as a

2    career offender overstates his criminal history.   He states he

3    was a juvenile at the time of the 1990 conviction, and it was

4    disposed of under the YRA.

5         His position is that, as a result, this particular

6    conviction is remote and it should not count toward his being

7    considered a career offender; notwithstanding any subsequent

8    convictions.   Of course, as the Court is aware by looking at the

9    chronology of events and understanding now, as I do, the law

10   regarding that, it appears that because that particular offense

11   was a felony, that it has a 15-year life, and notwithstanding

12   that, Mr. Jones still objects to it because, as I've told him and

13   I've told people in the past, the law changes, and we don't know

14   what's going to happen in the future.   We believe that this is

15   far too remote and stale to be considered in computing his

16   criminal history category, and for that reason he objects to the

17   career offender status that appears in the PSR.

18        With respect to any case law to support the Court not

19   finding him as a career offender, I have to confess to the Court,

20   I've looked and I've done a survey under both the Federal

21   Sentencing Guidelines, and I've also looked at the various

22   appellate courts, and it seems to me that absent an expungement,

23   as the law presently stands, we may very well have to face that

24   until there's some change in the law.   But nonetheless, for the

25   record, he objects to it.

1          Would the Court like me to continue now that I've

2    addressed the two issues?

3          THE COURT:  Only if you have any additional challenges

4    that you need to have me resolve or if you have any other

5    comments about the presentence report that you care to offer.

6    I'll ask you later to allocute, but I'm interested right now in

7    any challenges to the presentence report or any other comments

8    you have.

9          MR. MARTIN:  Well, those are the two challenges, Your

10   Honor, the reasonableness of considering the acquitted conduct,

11   the alleged conduct, the uncharged misconduct; anything that the

12   jury did not find beyond a reasonable doubt should not be

13   considered by this Court at the time of Mr. Jones's sentencing.

14   That's our position.  It would be unreasonable to do so.  And I

15   understand that there are different standards of proof regarding

16   that and you can find this by a lower standard than the jury did,

17   but still we object, and to the career offender status.  I've

18   already made my points on that.

19         THE COURT:  All right.  Thank you.

20         MR. MARTIN:  Thank you, sir.

21         THE COURT:  Counsel for the government, let me hear from

22   you, if you have any comments about the presentence report, and

23   whatever response you have to the objections lodged by

24   Mr. Martin.

25         MR. LEON:  Thank you, Your Honor.  Good morning again.

1          THE COURT:  Good morning.

2          MR. LEON:  With respect to the -- we do not have any

3    objections to the presentence investigation report.  I'll just

4    start there.  We think Mr. Penders took his obligations very

5    seriously.  It's a very thorough report, and we do believe that

6    Mr. Jones was correctly computed to have a base level offense of

7    36 and a criminal history 6 of 6, and we think that is the

8    starting point here.  I'm looking at paragraph 56 of the

9    report -- I'm sorry.  When I said "base level offense," the

10   "starting base level offense" and then the adjustment for

11   obstruction of justice, paragraph 16, for a total offense level

12   of 38.  We think that was correct.  And we do think that -- we've

13   also researched the issue and we've reached the same, at least,

14   result that Mr. Martin has indicated, which is there is no case

15   law to suggest that the conviction indicated on paragraph 66

16   should not be counted the way it was counted.  So, for both of

17   those reasons, we think -- we have no objections to the

18   presentence investigation report.

19         THE COURT:  May I ask you, then, are you withdrawing the

20   objection that the presentence report identifies to the failure

21   of the report to impose a two-point enhancement for weapons use

22   or possession under 2D1.1?

23         MR. LEON:  No, Your Honor, we're not.  We did see that

24   Mr. Penders put that in the -- our objections, he added that to

25   the end, so no, we are not withdrawing that.  And actually, the

1    reason -- I just forgot about that because I believe all the

2    other -- all the other defendants who the Court has, and I think

3    this is the first -- this is the first defendant to go to

4    sentencing, had that gun bump, so I omitted that.  I apologize.

5    So, we still have that objection, for the reasons stated, and I

6    outlined that in our memorandum as to the bases in the record for

7    why a gun bump should be included there.

8          I would note, though, I believe the computations, either

9    way, whether it's a total offense level of 38 or 40, the

10   guideline -- the initial guidelines range is still the same, 360

11   months incarceration to life as an initial starting point.  But

12   the Court is correct, we did make that objection.

13         With respect to Mr. Martin's general objection to

14   acquitted conduct, a few points.  One is obviously the case law,

15   including *Dorcely*, including references -- *Dorcely* and the

16   guidelines do allow for acquitted conduct to be used.  We do take

17   issue with the term "acquitted conduct" and we made this point in

18   the memorandum.  And it's -- to a certain point, it's a

19   distinction without a difference because the case law allows

20   acquitted conduct or nonacquitted or relevant conduct.  It

21   treats, to my reading, the conduct the same way, whether you call

22   it acquitted, relevant, charged, uncharged, et cetera.  But I do

23   think it is a point worth making, and even I use the term

24   "acquitted conduct" more often than actually is appropriate, and

25   I think this is a good case of that.  Very little of what is

1    before this Court for Mr. Jones is acquitted conduct.  The

2    racketeering acts, for example, were just part of the

3    racketeering -- for example, the Bradley Carter shooting.  There

4    was ample evidence in the record on the Bradley Carter shooting.

5    The jury, because it never convicted on the conspiracy and the

6    RICO -- the RICO conspiracy, never was asked, for example, to go

7    and make a finding one way or another about whether the Bradley

8    Carter shooting happened beyond a reasonable doubt.  That's an

9    example of what I'm getting at.

10        The drug amounts, which largely drives the base level

11   offense, is not acquitted conduct.  The jury was not asked for a

12   finding on these specific amounts.  That was part of the evidence

13   that was before the jury to support the two charged conspiracies,

14   but it's not acquitted conduct.  In any -- yeah.

15        THE COURT:  I guess they were told if you find not guilty,

16   there is no finding you must make about drug quantity.  But if

17   they were to find the defendant guilty, certainly of Count 1,

18   they would necessarily have had to make some kind of quantity

19   determination.  I think I heard you say the jury was never asked

20   to make any quantity determination.

21        MR. LEON:  If I said that, then I misspoke.  They were

22   asked, but they never had to reach that answer.  They never had

23   to answer that question.  Fair enough.  Fair point and that's

24   correct.

25        So, I did want to make that point just as we go forward.

1    The only true acquitted conduct that I see -- again, legally, I

2    think it's arguably -- I think an argument can be made, and I

3    will make it, it doesn't matter, as a matter of law, whether it's

4    acquitted or not acquitted or relevant conduct, but as I looked

5    at Mr. Jones and took a lot of time with this presentence

6    investigation report and put a lot of time into researching these

7    issues and looking at the record, the only true acquitted conduct

8    that I see with respect to Mr. Jones is the bump for obstruction

9    of justice. And my understanding is that in order to find that

10    he obstructed justice, the Court arguably would have to find that

11    it was in furtherance of the goals of the conspiracy; that there

12    would have to be a finding of the conspiracy.

13        Another place where arguably acquitted conduct -- the

14    Court may have to make a finding of something which was truly

15    acquitted -- well, let me leave it at that. Let me withdraw what

16    I was about to say. So, I just want to make that point.

17        And the last point, which is on the base level offense --

18    and I did make a point to put this in the sentencing

19    memorandum -- Mr. Jones, the record has ample evidence from

20    witnesses under oath before this court that Mr. Jones himself

21    personally, without any finding of a conspiracy, was responsible

22    for over 150 grams of crack cocaine, over 150, which would be, I

23    believe, a base level of 34 rather than a base level -- a level

24    of 36. Those extra 2 points would be found with respect to

25    Mr. Jones if and only if, in fairness, there was a finding of the

1    conspiracy or at least there was a finding that the actions of

2    others could be fairly attributed to Mr. Jones as well.

3         And I bring that up because I think, of the four

4    defendants that I briefed this issue on so far, I know that

5    Mr. Jones is the first of the four defendants to go to sentencing

6    where we fully briefed these issues.  Mr. Jones, I think, in

7    fairness, is the only defendant who doesn't on his own get over

8    105.5 kilograms on his own without any conspiratorial actions; on

9    his own doesn't already get to the level 36.  I just point that

10   out because I put a lot of thought into the record and also just

11   to -- I hear the term "acquitted conduct" a lot and I think in

12   fairness -- the Court has an important decision to make today

13   with respect to Mr. Jones, but we are largely, if not entirely,

14   asking this Court to make its findings based on what Mr. Jones

15   did, and with the actions that he made and the decisions he made

16   and the choices he made.  So, for that additional reason, we do

17   object to counsel's objection on acquitted conduct, what we've

18   called acquitted conduct.

19         THE COURT:  Let me ask you about one item that you

20   discussed, and that was the obstruction of justice enhancement.

21   As I understand it, the obstruction of justice enhancement that

22   you seek and that the presentence report awards, is based upon

23   testimony of three witnesses before the Superior Court Grand Jury

24   that was investigating the shooting of Jamel Sills.  Two of the

25   witnesses included Antwuan Ball and Steve Sutton, and the third

 1   witness was Mr. Jones.

 2        My understanding, from the record, is that Mr. Ball said

 3   that Kairi Kellibrew told him the shooter was a short, stocky

 4   guy, and that Mr. Sutton said to the Grand Jury Kairi Kellibrew

 5   told him the shooter was a short stocky guy, and the theory with

 6   respect to Mr. Ball and Mr. Sutton, were it an outstanding

 7   question, was that Kairi Kellibrew did not tell them that and

 8   they fabricated that to the Grand Jury to mislead them and steer

 9   them away from any evidence implicating the shooter, the real

10   shooter, who has now admitted to be Mr. Samuels.  Mr. Jones's

11   testimony was different.

12        As I understand it -- you correct necessity if I'm

13   wrong -- Mr. Jones's testimony was not that Kairi Kellibrew told

14   him anything, but rather that Antwuan Ball told him that Kairi

15   Kellibrew told Antwuan Ball that the shooter was short and

16   stocky.  Do I remember the testimony before the Grand Jury of

17   Mr. Jones essentially correctly?

18        MR. LEON:  Your Honor is correct.  You make a very -- Your

19   Honor is correct.

20        THE COURT:  Now, putting aside -- I suppose to find that

21   Mr. Jones obstructed justice, I would have to make a finding

22   based on some record evidence that Mr. Jones went into the Grand

23   Jury as a part of an orchestrated scheme involving Mr. Sutton and

24   Mr. Ball to mislead the Grand Jury, and part of his role was to

25   simply corroborate or echo what Antwuan Ball said to him, rather

1    than discrediting anything Kairi Kellibrew might have said.  I

2    guess what I'm saying is that were the government to charge

3    Mr. Jones with a perjury, false statement, what have you count,

4    Mr. Jones's likely defense would be literal truth.  From my

5    understanding of the record, I don't think there's any dispute as

6    to whether Antwuan Ball told Joseph Jones that Kairi said to

7    Antwuan Ball that the shooter was short and stocky.

8         I see that as a different kind of testimony, one that

9    would probably be subject to a literal truth defense were it to

10   be charged and to go to trial.

11        How do I work around that problem?

12        MR. LEON:  A few thoughts.  Let me first address the first

13   question the Court asked.  Your Honor is correct.  You are

14   reading the Grand Jury testimony correctly, and it is a fair

15   distinction and a fair point the Court makes.  And I believe

16   Mr. Martin made this point, I believe in the closings in this

17   case as well, and it's a fair one.  Antwuan Ball went in the

18   Grand Jury and said Kairi told me "short, stocky."  Steve Sutton,

19   also known as Geeka, also did the same.  There was a fourth

20   person actually as well, Aman Ball, Bird, Antwuan Ball's brother.

21   So I think -- and he also said Kairi said "short, stocky" and

22   that's all in Exhibit O in the government's submission to the

23   Court.

24        The Court is correct, however, that the proof on this

25   point is arguably weaker with respect to Mr. Jones because the

1    Court is quite correct that Mr. Jones testified twice in the

2    Superior Court Grand Jury that Antwuan Ball, his friend, told him

3    that Kairi said it was a short -- actually, what he said was "it

4    was a short guy with a mask." I actually double-checked that

5    this morning, and I believe it's even a little weaker still

6    arguably because Joseph Jones is the only person who didn't say

7    "short and stocky," he said, "short guy with a mask." So the

8    Court is correct. That is, of the proof of -- between Antwuan

9    Ball and Joseph Jones, I would concede that the proof is stronger

10   against Antwuan Ball. I would certainly concede that point. I

11   do think, though, that on this record the Court can certainly

12   make a fair inference that Mr. Jones went in and said short guy

13   with a mask in an effort to help his co-conspirator and friend

14   Dominic Samuels beat this pending murder charge, and I'll refer

15   to a couple of things. One is the number of people who went in.

16   It was not one or two or three, but it was four different people:

17   Aman Ball, Antwuan Ball, Joseph Jones and Steve Sutton all went

18   in, all friends and associates, friends, it was all established

19   in the record. They went in. One of the points, I don't know if

20   I made it in the brief -- well, I don't know if I made it in the

21   brief, but it's worth putting out here also in Exhibit O, Steve

22   Sutton actually said "short cocky guy."

23        THE COURT:  Who?

24        MR. LEON:  Steve Sutton in his Grand Jury testimony said,

25   "short cocky guy," and then later upon questioning, the

1    questioner, the assistant asked him, well, what does that mean.

2    And he said, you know, cocky, and he explained, cocky like a

3    thicker, stocky guy.  I think that's actually a small point but a

4    telling one.  This does suggest to the government, and we would

5    submit to the Court, rehearsal.  This does suggest that these are

6    people, friends, associates getting the same story together where

7    one of them goes in and forgets -- miss reads a script and

8    forgets -- remembers "short, stocky" and he gets in and he gets

9    the word "stocky" wrong.  I think that's a fair inference.  I

10   would also refer to the record and specifically we do refer to

11   this on page 16 and 17 of our brief, our sentencing memorandum,

12   and as part of Exhibit L in this record and the brief, the

13   testimony of Kairi Kellibrew, and this was in the -- after --

14   about 2001, 2002 time period.  He talked about Antwuan Ball in a

15   discussion in Congress Park with several people, including Joseph

16   Jones, discussing that there's a conspiracy case coming and that

17   the government is planning to bring that.

18        Now, this is a conversation about doing harm to witnesses.

19   The goal of that conversation was different, but there is

20   evidence on this record that Mr. Jones was not only a friend and

21   associate of Mr. Ball's, but he and Mr. Ball around or shortly

22   before the time that they both went in and testified falsely in

23   the Grand Jury knew they had to band together because the

24   government is looking hard at them and their -- the government's

25   words -- crew or gang or crew, whatever word we're going to use.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1721 of 1954
Case 1:05-cr-00100-RWR   Document 1281   Filed 08/29/08   Page 15 of 58

15

1    I would use the word crew.  So, there is evidence in this record,

2    but ending where I started and where the Court asked, it's a fair

3    point.  The Court's reading the Grand Jury correctly that

4    Mr. Jones technically did say Antwuan Ball told me this is what

5    Kairi said, and I would submit that that's a bit more of a leap

6    for Mr. Jones than certainly it is for Mr. Ball.  I think it's

7    certainly stronger with respect to Mr. Ball.

8         THE COURT:  All right.  Anything else?

9         MR. LEON:  No, Your Honor.  Thank you.

10        THE COURT:  Mr. Martin, let me invite you to respond, if

11   you care to, with regard to the government's objection to the

12   report's failure to award the weapons enhancement, and if you

13   have comments about any of the other items.

14        MR. MARTIN:  Your Honor, I would like to talk a little bit

15   beyond the two issues I had raised because the Court touched upon

16   two very important things.  With respect to the obstruction

17   charge, Your Honor is right, the literal truth is that Mr. Jones

18   reported what was said to him by Antwuan Ball.  You got that

19   absolutely correct, and I just want the record to reflect that

20   that is also Mr. Jones's position, and it is also correct that I

21   mentioned that in closing.

22        With respect to Kairi Kellibrew and the alleged

23   obstruction nexus, this is a man who couldn't say -- or he wanted

24   the Court to believe that he was certain that Mr. Jones was there

25   at the time there was a discussion about harming potential

1   witnesses.  But the Court will recall that Kairi Kellibrew is

2   also a man who admitted that when he uses drugs he sometimes

3   hallucinates and, in fact, sees people who are no longer alive,

4   specifically his big cousin that he was named after.

5        So, I think that the government's reliance on Kairi

6   Kellibrew in this particular instance is misplaced, and I don't

7   think the Court should find that that is a reasonable reliance,

8   if you're inclined to examine the whole question of whether or

9   not Mr. Jones had anything to do with an obstruction charge.

10       The other thing is, Your Honor, I think government trial

11   counsel misstated himself when he said that Mr. Jones went before

12   the Grand Jury twice to tell a lie.  First off, Mr. Jones denies

13   he ever told a lie to the Grand Jury.  And secondly, Mr. Jones

14   tells me he's only been before the Grand Jury once.

15       Moving on to the next question, you asked me about the gun

16   or the guns.  Mr. Jones -- one of the things I pointed out in my

17   sentencing memorandum was the fact that Mr. Jones's home, his

18   residence was never searched.  There was no car connected to him

19   that was ever searched.  There was no indication that

20   Mr. Jones -- there's no uncorroborated indication that -- I'm

21   sorry.  There is no corroborated indication that Mr. Jones has a

22   gun at any time except for what these criminal witnesses took the

23   stand and said about him on different occasions.

24       So, with respect to weapons charges and assaults and

25   things like that that may have occurred with weapons, he strongly

```
 1    denies that.  He does not carry a gun and he denies that he ever

 2    has.

 3         The government, if I may continue, Your Honor, because

 4    they talked about a number of things and I thought we were just

 5    going to address some very narrow issues, they started talking

 6    about the evidence in the case and the witnesses.  And I don't

 7    know if you're ready for me to go into that, but I intend to

 8    explore some of the testimony, not all of it, but some of these

 9    people, if Your Honor is ready for me to do that.

10         THE COURT:  Well, I'm trying to just resolve the disputes

11    that exist now or objections that exist now with respect to the

12    presentence report.  If you want to go over that to support any

13    of your arguments in objection to the presentence report or to

14    rebut the government's objections, I'll be happy to hear it.  If

15    what you wanted to do is talk about that in allocution as to what

16    sentence I ought to impose, I would ask you to wait.

17         MR. MARTIN:  Okay.  Well, then, I will wait because I want

18    to address this Brad Carter thing in greater detail, because I

19    think that's one of the basis for the government arguing that

20    Mr. Jones should get an enhancement for possession of a dangerous

21    weapon.  I just want to say this with respect to that particular

22    incident, which I think occurred back on February 20th, 19 -- I'm

23    sorry, 2004.

24         THE COURT:  '94.

25         MR. MARTIN:  Was it '94?
```

1        THE COURT:  Wasn't it?

2        MR. LEON:  (Nodded head affirmatively.)

3        MR. MARTIN:  '94?  Your Honor knows better than me.  I

4    defer to your recollection.  Yes, it was '94, with respect to

5    that incident.  Your Honor will recall there were four people in

6    that car, including Brad Carter, and I thought it of particular

7    note that the government only chose to call one of those four

8    people, and the one person was Bradley Carter, who you will

9    recall had a complete failure of memory by his testimony.  The

10   others who were in the car were never called by the government,

11   and I submit to you that you can infer that the reason that they

12   were not called by the government is that they were not going to

13   support the assumption, the charge, the allegation that

14   Mr. Jones, in fact, was the shooter; that there may have been

15   some contradiction amongst the various witnesses as to who the

16   shooter in the back was, whether it was Kairi Ball [sic], whether

17   or not it was Kairi Kellibrew, whether or not it was Mr. Jones.

18   None of the others were called, and we were not able to get their

19   cooperation to come forward.  They didn't want to have anything

20   to do with this case.  And I throw that out to the Court because

21   I think it's a significant point.

22        On the evening that this incident occurred, Bradley Carter

23   spoke to Damien Green, who was his good friend, and the Court

24   will recall that Damien Green came in here and testified and

25   never once did he say that Brad Carter told him on the evening of

1   this particular shooting that Mr. Jones was the shooter.  He

2   never said that.  I think Mr. Green's testimony was that

3   Mr. Jones was, in fact, in the car, but he never identified

4   Mr. Jones as being one of the shooters, and I submit to the Court

5   that that's significant because when the event occurred that's

6   when the victim's memory would be most fresh.  It wasn't until, I

7   guess, March 8th, 1994, almost two weeks later, that Mr. Carter,

8   after meeting with the detective, now says or identifies Joseph

9   Jones.

10          And later, I would submit to the Court, that he wants to

11  step away or step back from that, either because he has spoken to

12  the others -- and this is conjecture on my part -- or he realizes

13  that he may have made a mistake.  Whatever it is, he goes in

14  before the Grand Jury, and we know from the testimony of other

15  witnesses that these detectives get very aggressive to push

16  people forward to testify, and he goes before the Grand Jury and

17  he mentions Joseph Jones as being one of the shooters, and

18  obviously he rethinks that and wants to step away from that

19  particular statement, that declaration, and the government says,

20  "no, too late; you're locked in."

21          There's too much uncertainty in that whole sequence of

22  events and the failure of the government to call other

23  corroborating witnesses, I think, for the Court to find that

24  Mr. Jones did, in fact, have a gun on that particular evening;

25  and more importantly, ever did fire that gun at anyone.

```
 1            So, if you're just looking at those particular issues for

 2   now, then I will stop, but that's our point with respect to that.

 3   But I just want to confer with Mr. Jones before I sit down.

 4            The last point, for the record, is Mr. Jones denies that

 5   he was even in the car.  That's it, Your Honor, with respect to

 6   those issues.

 7            THE COURT:  All right.  Thank you.  I identify, I think,

 8   four things that I need to resolve.  The first is the objection

 9   by the defendant to use of what was considered to be relevant

10   conduct in fixing his base offense level.  Mr. Jones was

11   convicted of only two counts of distributing crack weighing a

12   total of less than 2 grams, but the presentence report holds him

13   accountable for over 1.5 kilograms of crack involved in the

14   narcotics conspiracy activity that the defendant was charged and

15   acquitted of, but activity which Joe Langley and seven other

16   co-defendants admitted to in guilty pleas, and that Newett

17   Ford -- N-E-W-E-T-T -- was convicted of by a jury.

18            The additional cocaine, crack cocaine can be attributed to

19   Mr. Jones only if reliable information shows by a preponderance

20   of the evidence that Mr. Jones joined in that conspiracy, that

21   the scope of what the defendant agreed to included cooperating

22   and distributing crack and that a volume of crack sales among all

23   the conspirators exceeded 1.5 kilograms and was foreseeable.

24            The evidence presented of the defendant's knowing

25   membership in a narcotics conspiracy included both direct
```

1    evidence and circumstantial evidence. There was evidence of the

2    defendant's association. The defendant, from the evidence,

3    appears to have known many of the charged conspirators and

4    associated with them in Congress Park, and that was established

5    by countless witnesses at trial who saw them together during the

6    charged period and whose accounts as to that detail were largely

7    undisputed, and the countless photographs showing Mr. Jones and

8    the others together in Congress Park venues and other locations.

9         Witnesses at trial also testified that they saw Mr. Jones

10   and charged co-conspirators selling crack in Congress Park during

11   the charged period. Among those witnesses mentioned in the

12   government's memo alone included Larry Browne, who was, I

13   understood, to be the defendant's cousin, Gail Parson, Bobby

14   Capies, Keith Barnett and Kairi Kellibrew. Some witnesses also

15   testified that they saw Mr. Jones obtain supplies of crack for

16   resale. Those witnesses included Mr. Browne, Mr. Capies, and

17   Cedric Conner. And there were witnesses such as Keith Barnett,

18   although I think the government's memorandum mis-cites the

19   transcript reference to page 7553 as testimony by Robert

20   Crawford. Barnett and Capies testified about seeing the

21   defendant cooperate with other charged conspirators in selling

22   crack in Congress Park during the charged period by participating

23   in the *unos, dose, tres* method of sharing in sales proceeds, a

24   process that, among others, Jacques Powell described. Also,

25   Cedric Conner, who was a comparative outsider to the Congress

 1   Park Group, added how a couple of the co-conspirators, Desmond

 2   Thurston and Daniel Collins, told him, told Conner that Conner

 3   couldn't sell at their sale locations in Congress Park, that they

 4   had built up that location, and also that Antwuan Ball reinforced

 5   that message by saying that this group makes its livelihood by

 6   selling there.  So, as to those details, I credit the testimony

 7   of those witnesses and I do find by a preponderance of the

 8   evidence at least two things:  One is that a conspiracy to

 9   distribute crack in the Congress Park area did exist among the

10   defendant and others, including the eight others convicted of

11   conspiracy by plea or after trial, and Antwuan Ball, David

12   Wilson, Gregory Bell, Desmond Thurston, and Dominic Samuels.

13        And I also find by a preponderance of the evidence that

14   the scope of what Mr. Jones agreed to do included buying supplies

15   of crack and selling it or helping others to resell it in

16   Congress Park.

17        The government's memo sets forth reliable evidence from

18   the testimony of at least Browne and Capies and Conner and

19   Kellibrew calculating conservatively the defendant's personal

20   involvement in the sale of roughly 400 grams of crack cocaine.

21   Given the length of time over which the testifying witnesses saw

22   Mr. Jones obtaining or selling crack, Capies said from as early

23   as a period from 1992 to 1996, to as late as a period of 1998 to

24   2001, and Browne and Conner and Kellibrew testified to periods

25   in-between, it would be reasonable to conclude by a preponderance

1   of the evidence that Mr. Jones was involved with at least another

2   100 grams of crack. The government's itemization in this filing

3   of the defendant's personal handling of crack or the amounts

4   quantified as to the co-conspirators ended short of the

5   1.5 kilograms. And from this filing I'll find that the

6   preponderance of the evidence establishes that a volume of sales

7   among the co-conspirators exceeded 500 grams and that was

8   foreseeable to Mr. Jones.

9        I will order, then, that paragraph 56 of the presentence

10  report should reflect a base offense level of 34. There is also

11  an objection with regard to the gun enhancement under 2D1.1 that

12  is not imposed, and the government objects to the report failing

13  to impose a weapons enhancement. The defendant was not convicted

14  of any weapons offense, but this enhancement can apply if the

15  preponderance of the reliable evidence shows that, as a part of

16  the narcotics conspiracy that I have found the defendant was a

17  member of as conduct relative to his counts of conviction,

18  Mr. Jones possessed a dangerous weapon.

19       Bradley Carter's sworn Grand Jury testimony in '94 and '98

20  identified Mr. Jones and Antwuan Ball as having shot at Bradley

21  on February 20th, 1994. The investigating detective, Detective

22  Garvey, testified that Carter, a competitor crack dealer, made a

23  positive photo identification of Mr. Jones as having been

24  shooting from the back of the car. Damien Green's testimony

25  about Mr. Carter's excited utterance after the shooting did place

1    Mr. Jones in the car from which the shots were fired.  But in
2    addition, the testimony of Robert Crawford was that back in 1994
3    Mr. Jones was in a car riding down 10th Place where he and other
4    competitor drug dealers were selling crack; that is, Mr. Crawford
5    was selling crack, and Kairi Kellibrew testified about the
6    dispute his Congress Park Crew was having with the 10th Place
7    crack sellers.  Mr. Crawford said that Mr. Jones was in a front
8    passenger seat when shots rung out from the passenger side toward
9    these crack sellers, and a while later he said Mr. Jones robbed
10   him of marijuana at gunpoint on 10th Place.
11          As to those details, I credit the testimony I've mentioned
12   and do find by a preponderance of the evidence that Mr. Jones
13   used a gun during and in furtherance of the narcotics conspiracy
14   that was relevant conduct to the two counts of conviction.
15          I'll order, then, that paragraph 57 apply a two-point
16   enhancement under Section 2D1.1 B1.
17          I've raised the question about the obstruction of justice
18   enhancement that appears in the presentence report.  As I said,
19   the testimony offered to the Grand Jury in support of the
20   enhancement came from Antwuan Ball and Steve Sutton, but as I
21   mentioned, it was each of those two individuals who told the
22   Grand Jury that Kairi Kellibrew said the shooter was a short,
23   stocky guy or something close to that.
24          The aim of that purportedly was to mislead the Grand Jury
25   away from thinking that Dominic Samuels was the shooter.  We know

1    that that -- Dominic Samuels indeed was the shooter.  He has

2    admitted to that.  Frankly, the testimony at trial before his

3    admission was quite compelling in that regard, notwithstanding

4    the jury's inability to reach a unanimous decision about that.

5    But what Mr. Jones said in the Grand Jury was not the same as

6    what Mr. Ball and Mr. Sutton told the Grand Jury.  Mr. Jones

7    simply purported to repeat what he had heard from Mr. Ball, not

8    what he had heard from Mr. Kellibrew.  And I do think that a

9    literal defense -- a literal truth defense could very well have

10   been imposed successfully should Mr. Jones have been charged

11   substantively with a false statement or appropriately in a jury

12   charge or so on.  I think it would require me to draw too many

13   inferences and take more leaps than I'm comfortable drawing,

14   based upon absence of additional evidence to substantiate it,

15   that what Mr. Jones did by a preponderance of the evidence was to

16   join in some scheme to lie to the Grand Jury about the shooter of

17   Jamel Sills, and I'm going to err on the side of lenity and not

18   find by a preponderance that the obstruction of justice should

19   apply as to Mr. Jones in the presentence report, and so I'll

20   order that the paragraph of the presentence report that accords

21   the two-point enhancement for obstruction of justice remove that

22   enhancement.  That's paragraph 60.  That would end up, then, with

23   an adjusted offense level, after the three adjustments that I've

24   ordered, of 36, base offense level 34, plus the weapons

25   enhancement of 2 points.  Removal of the paragraph 60 obstruction

1    enhancement totals 36, and I'll order that the presentence

2    report, paragraphs 61 and 64, reflect an offense level of 36.

3            The last item, I believe, that Mr. Martin had raised was

4    with respect to the career offender status.  He objected to that,

5    although he did concede and the government agreed that the

6    offenses that appear in the presentence report as Mr. Jones's

7    prior convictions do, indeed, qualify under the career offender

8    status guideline, and I do find that there's nothing to show that

9    the two prior offenses should not be included.  So I'll not

10   order -- I'll overrule the objection to the application of the

11   career offender status in the guideline and simply treat the

12   objection, then, essentially as a request for a downward

13   departure on the theory that the criminal history category

14   substantially overrepresents the criminal history of the

15   defendant.  Have I missed any objections that I needed to rule

16   upon before I call upon you all to allocute?  I think I've

17   covered them all.

18           MR. MARTIN:  Nothing further, Your Honor.

19           THE COURT:  All right.  If there's nothing else, then,

20   Mr. Martin, would you like to allocute on behalf of your client?

21           MR. MARTIN:  Yes, Your Honor.  Thank you, Your Honor.  I

22   know you're familiar with Joseph Jones through the presentence

23   report, but I want to highlight a few things.  First, let me

24   start by introducing to the Court his family.  That's his mom,

25   who you may have seen here during the various weeks in the trial

1    in the red; his lovely wife, LaVonya; his daughter; and that's

2    his sister, Wanda, to the far left.  That's his only sibling.

3         He's 37 years old.  He has two dependents.  He's a

4    life-long resident of D.C., and as he sits before you, he's 37

5    years old.

6         He went through school up to the 10th grade, Your Honor.

7    He did not finish high school.  He's never been in the military,

8    and his employment record, as you know, has been somewhat

9    sporadic.  Up until the time he got the job with STEP, there was

10   sort of an uncertainty in full-time employment.  He did do some

11   construction service work, but, you know, with only a 10th grade

12   education and no specific vocational training, he jumped around

13   from jobs until he got into the STEP Program.  But then on his

14   own he got a job with Wilmer, Cutler & Pickering as a courier.

15   And this is why I say that I believe that his marriage was a good

16   one for him and he started to turn the corner.  He was making

17   about $35,000 a year before overtime, and he and his wife were

18   planning to buy a house and, of course, continue with raising

19   their family.  That was, of course, interrupted by his arrest

20   back in November of 2005 and this trial.

21        In terms of his medical history, he has a problem with his

22   right knee as a result of a basketball injury.  He was shot in

23   the left leg, and that continues to bother him right up until

24   today.  And he also has a chronic neck injury which he received

25   some years ago as a result of an arrest by the police.

1        He denies any mental or personality disorders or

2    psychiatric problems.  He definitely has a problem with alcohol,

3    and I mention that to the Court because at the end when I'm

4    asking the Court to sentence him, I will make a specific request

5    that he be placed in an abuse program.  He has a problem with

6    alcohol and marijuana.

7        I want to talk a little bit about the offense.  You've

8    already made findings regarding the acquitted conduct.  Mr. Jones

9    denies that he was ever part of a conspiracy.  And, as I said

10   before, and I stated more for the record than anything else, it's

11   unreasonable to infer that.  The evidence -- I've addressed some

12   of the points in the memorandum as to why these different

13   individuals should not be believed.  I know the Court has read

14   it.  I'm not going to go through all of those again.  But suffice

15   it to say that when men are faced with losing their liberty, many

16   times they'll do whatever they have to do to stay out of jail,

17   and that was no exception in this particular trial.

18       And for those who were not in jail, on more than one

19   occasion they were actually receiving money from the government.

20   Cedric Conner is the first to come to mind.

21       The Court will recall that at the time that he testified

22   in this courtroom, he had already received some $187,000 from the

23   coffers of the federal government.

24       I've already talked to the Court about the YRA conviction

25   back in 1990, and his remaining convictions are misdemeanors and

1    traffic offenses.  He's really only got two convictions, and it's

2    unfortunate for him that they had such a long life, especially

3    that 1999 conviction.  And that's how he finds himself before you

4    here as a career offender, and he objects to that.

5        I talked about a number of things in the sentencing

6    memorandum, Your Honor, and I know you're aware of the fact that

7    the statute at 18 U.S.C. 3553 E -- I'm sorry, A, says that the

8    first of those enumerated provisions mandates that the Court

9    impose a sentence sufficient but not greater than necessary to

10   comply with the purposes set forth in that statute.  And they

11   give you a number of factors to look at, and I've discussed

12   those.

13       Mr. Jones maintains that the government has taken a string

14   of unrelated events, put them together to try to make a

15   conspiracy case.  You've already found that there is a conspiracy

16   here, and again he objects to that.  I've taught you already a

17   little bit about his history and his characteristics, but I do

18   want you to know that in addition, besides being born here in

19   Washington, D.C., he was raised in a single parent home by his

20   mom, and I know the Court is well aware that there are all kinds

21   of problems that are directly associated with young males in

22   urban sectors being raised in single family homes, and I think

23   that his circumstance is certainly an example of that.

24       Mr. Jones went to and went through what I consider to be a

25   failing school system.  Some might debate that with me.

 1   Mr. Jones tells me, and I have no reason to disbelieve this, that

 2   by the time he reached the 10th grade he realized that the

 3   teachers there didn't really care about the students, it was a

 4   job for them; they couldn't control the classroom and no real

 5   learning was taking place, so his high school experience was not

 6   a positive one, and I think that's a sad commentary to what's

 7   happening to so many of our youth in the D.C. public school

 8   system because I believe that there is a direct correlation

 9   between those who don't finish school and those who wind up in

10   the Department of Corrections and in this courtroom.

11        He had no vocational training.  His academic training was

12   almost null after the 8th grade.  As I said before, he did work

13   some odd jobs, but by that time, that is, by the time he dropped

14   out of the 10th grade, he had succumb to the temptations of the

15   street and, as you can see from his criminal history, there was

16   quite a lot going on in the streets that, at least by the PSR's

17   investigation, suggests that Joseph Jones was involved in.  But

18   there came a point in his life, and I know that the government

19   trial counsel is going to disagree with me, where I think he had

20   turned the corner; there's a certain amount of maturation that

21   had taken place, and by his mid-30s he decided he was going to

22   settle down and he married and he had a child.  And unlike so

23   many others in the urban community, he married the mother of his

24   child and he was raising the child and he went out on his own and

25   found the job at Wilmer, Cutler & Pickering, and I think the

1      Court should consider that when deciding whether or not there is

2      a real rehabilitation potential in Joseph Jones, because I think

3      he has demonstrated, even before he was arrested, that he has

4      rehabilitation potential because on his own he was trying to do

5      that.

6             Seriousness of the offense.  When I say on page 5 that,

7      you know, the only independently corroborated evidence of drug

8      dealing here was the wire with the two sales, the ones that took

9      place in August of 2000, January of 2001, I was serious in that

10     statement.  It was less than 2 grams, and it is those 2 grams and

11     that wire that has him here.  I believe that but for the wire,

12     Joseph Jones had a very good chance of walking out of this

13     courtroom.  The government says that it was just a snapshot of

14     what was going on.  That may be true, if you look at his history

15     from 1990, but I don't necessarily agree that it was a snapshot

16     of what was taking place in 2000 through 2004.  I do believe that

17     Mr. Jones had turned the corner, and it wasn't a 90-degree turn,

18     it was a gradual turn, and I believe he was on the right track.

19     He was trying to do the right thing.

20            With respect to the deterrence factor, general deterrence,

21     I disagree with the government that Mr. Jones's conviction here

22     and a long term sentence is going to do anything to deter other

23     people in the community from dealing in drugs.  If that were the

24     case, I think this whole drug war would have been successful

25     many, many years ago.

1              In terms of specific deterrence, I've already made my

2      argument in that regard.  I believe that point is moot because

3      the facts show that he has turned the corner.

4              The government gave a lot of weight to the rose gallery of

5      criminal witnesses that they called before this Court to testify.

6      I know you've already made a determination there, but still, just

7      for the record, I'm going to refer to my sentencing memorandum

8      and talk about some of these people.

9              Season Wood, for example, who said that there was no

10     conspiracy, that everybody was out there and they sold whatever

11     they wanted to sell and they didn't have to pay tribute or

12     tidings to anyone.

13             Larry Browne.  Larry Browne came in here.  You're right,

14     he was Joseph Jones or is Joseph Jones's cousin, more important.

15     He described Joseph as someone who he regarded as a friend, and

16     if I remember correctly he said somebody that he loved.  Yet,

17     this is the same Larry Browne who, after the Sam Philips murder,

18     implicated his beloved cousin Joseph Jones in the murder, and

19     that is why I said that anything that Larry Browne says with

20     respect to what was taking place in Congress Park should not be

21     believed because Larry Browne was interested in doing one thing

22     and that one thing was either reducing his jail time or getting

23     out of jail as quickly as possible.  But again, the Court has

24     found that Larry Browne, amongst others, was credible with

25     respect to the conspiracy that the Court has now found existed.

1        Earl Campbell. This is a man who was convicted of bank

2   robbery, served 25 years for that offense -- I'm sorry, received

3   25 years; I believe he served 18 for that bank robbery, and

4   admitted he would do whatever he had to do to stay out of jail,

5   and that included lying to Judge Lamberth. And I specifically

6   referenced that, which appeared in the trial transcript on

7   March 19th, 2007. So, again, anything that Earl Campbell had to

8   say about Joseph Jones to stay out of jail should not have been

9   given much weight either.

10       Robert Crawford. The Court referenced Robert Crawford in

11  deciding that there was, in fact, evidence that Joseph Jones had

12  a weapon. This is a fellow who insists that Joseph Jones robbed

13  him but couldn't remember when, couldn't remember what he was

14  wearing, couldn't remember what Joseph Jones was wearing. And

15  the reason I mention that, Your Honor, is because irrespective of

16  what he says, I think when somebody gets robbed at gunpoint,

17  there are a lot of details that are imbedded in their mind, that

18  are indelibly etched in their mind, and he couldn't even tell me

19  whether it was daylight, whether it was dark. And those

20  questions were directed to time of year. And the reason I was

21  asking him that, Your Honor, was because Mr. Jones was locked up

22  for much of that time period, but I needed to know from

23  Mr. Crawford what type of clothing he was wearing because that

24  would have gone straight to the question of whether or not this

25  was fabricated.

1              The only thing I could say in that regard is that this is

2      a very cunning witness, a man who may very well have anticipated

3      where I was going with that questioning and didn't want to lose

4      or miss his opportunity to get help from the government.  And

5      that's why, again, I think that the Court should not have

6      credited his testimony with respect to Mr. Jones having a weapon.

7              Keith Barnett.  This is a man who admitted lying to the

8      Grand Jury in 2005 about the D-Lock murder, and he did that to

9      avoid going to jail and have others not only falsely charged but

10     imprisoned.  And again, the Court has I, believe, referenced

11     Keith Barnett today, and Mr. Jones takes exception to that

12     reference.

13             Also, during his testimony, if he's the one that I recall,

14     was cross-examined by Mr. Zucker and a day later Mr. Zucker was

15     able to find an inconsistency within 24 hours of this man's

16     testimony before this jury in this courtroom.

17             Again, Keith Barnett was one of those people who I think

18     would have said anything, anything, to reduce his exposure and

19     get out of jail.

20             Cedric Conner, not only was he out of jail, he was being

21     paid by the government.  So, why would he not say what they

22     wanted to hear; that is, the government, to stay out of jail and

23     continue receiving money.

24             Kairi Kellibrew.  This is a man who takes all kinds of

25     drugs.  You saw his performance here in this courtroom.  He

1    obviously was enjoying the attention.  He admits that he sees

2    dead people when he takes drugs.  He talks about having lied to

3    others, including you, and I specifically referenced you to the

4    May 14th, 2007 trial transcript where he admits that he's lied to

5    you in the past about his own activity.  And given his poor

6    memory, his long term drug use, his status as an imbedded liar, I

7    just don't know what to say.  I just don't think that the Court

8    should attribute any weight whatsoever to Kairi Kellibrew's

9    testimony regarding the activities of Joseph Jones and Congress

10   Park, particularly when talking about this obstruction.  But be

11   that as it may, that didn't fly today.

12          Brad Carter, I already talked about him.  Oliver Garvey.

13   Suffice it to say, he wasn't there.  That's the detective.

14          Damien Green, I talked about him already, and I found he

15   was the most credible on the issue of whether or not Joseph Jones

16   shot at Brad Carter back in 1994.  He would have told, that is,

17   Brad Carter, Damien Green, if Joseph Jones had actually gone up

18   and shot him, I believe he would have told his friends that that

19   evening.

20          The government has made much ado about the Michael

21   Smallwood incident, and I don't want to belabor the point except

22   that Smallwood never said that Joseph Jones stabbed him.  What he

23   said on September 5th, 2003 had happened was there was a fight,

24   and at the end of the fight he realized he was bleeding, he was

25   stabbed.  And I know there was a young lady who testified she saw

1    Joseph Jones brandish the knife.  She's the only one who so

2    testified and she, as you will recall, was the girlfriend of the

3    deceased -- I can't remember his name now -- who blamed the older

4    guys for her deceased boyfriend's ultimate demise.  So she had a

5    motive -- well, if not a motive, she certainly was bias with

6    respect to not only Mr. Jones but Antwuan Ball.

7         So, in talking about these different witnesses, I do that,

8    Your Honor, because I think the thing we're really asking for

9    today is a reasonable sentence.  We're asking for one that is

10   based on the activities of Mr. Jones.

11        And also, I want the Court to consider that Mr. Jones

12   should not be given a disparate sentence to those similarly

13   situated, and I agree with the government on that point, at

14   least.  As I look at page 5 of the PSR, it seems to me that the

15   range is anywhere from 51 months to 141 -- I'm sorry, 146 months

16   amongst those who pled.  The only one who received any time more

17   than that was Newett Vincent Ford who, interestingly enough, also

18   went to trial and, as the Court I know would agree with me, one

19   cannot be punished for exercising their Constitutional right to a

20   jury trial, and that's what Mr. Jones did here.

21        So, I would ask the Court to consider that in determining

22   whether or not Mr. Jones's sentence is going to be disparate by

23   virtue of what the government is asking you to do.

24        Given the foregoing, but for that Youth Rehabilitation Act

25   conviction, he would not be a career offender.  We believe his

1   guideline range would have been at a level 18 with a crim-

2   history category of 4, and that would have put him in a

3   sentencing range of $47 to 51 months, if we didn't have these

4   enhancements.  But again, you've already found that there was a

5   conspiracy and you found other things, and his offense level

6   obviously is much higher than that, but I still wanted to point

7   that out to the Court as to where he stands.

8       Given all of that, Your Honor, we would ask that,

9   irrespective of what offense level you find him at, to sentence

10  him at the low end of whatever guideline range you're using as a

11  guidepost.  I would also ask the Court to consider the fact that

12  he is not a man who has a great deal of material possessions and

13  he's not in a position to pay a fine.  Indeed, he didn't own

14  anything of any value at the time of his arrest.  It is true that

15  subsequent to his arrest that his wife bought a house, but she

16  did that on her own -- she works for the American Red Cross --

17  and none of Mr. Jones's earnings was used for that, and certainly

18  the government hasn't alleged and I don't think there's any

19  indication that any proceeds of alleged criminal activity

20  contributed to the purchase of that house.  He's not in a

21  position to pay a fine.

22      As I said before, he has a serious substance abuse problem

23  with both marijuana and alcohol, and I would ask the Court to

24  consider that at the time of sentencing.  I believe that

25  Mr. Jones, if asked, would admit that he drinks too much, and

1    some of his problems stem from his drinking.

2        We would also ask the Court to consider recommendation

3    that he be sent to either Cumberland or Allenwood, as they are

4    within close -- well, reasonable proximity to Washington so that

5    his family can maintain contact with him and visit him from time

6    to time.  Before I sit down, Your Honor, I would like an

7    opportunity to just confer with Mr. Jones.

8        THE COURT:  Yes.

9        (Discussion had off the record between attorney and

10   client.)

11       MR. MARTIN:  That's all that I have, Your Honor.  Thank

12   you for listening and Mr. Jones would like an opportunity at some

13   point to address you.

14       THE COURT:  All right.  Thank you.  Mr. Leon.

15       MR. LEON:  Thank you, Your Honor.  Obviously, the

16   government put a lot of thought into not only the whole trial,

17   but the sentence.

18       THE COURT:  Let's take a brief recess.

19       MR. LEON:  Sure.

20       (Thereupon, a break was had from 12:54 p.m. until 1:13

21   p.m.)

22       THE COURT:  All right.  I should just mention, there was

23   one other small matter in the presentence report.  The paragraph

24   reflecting the fine range, I believe mentioned or identified a

25   range at the top end of 4 million.  I think that's supposed to be

1    2 million.  Paragraph 128.  But we'll have Mr. Penders check on

2    that.  But, Mr. Leon, if you would like to proceed, go right

3    ahead.

4        MR. LEON:  Thank you, Your Honor.  I'm going to try to be

5    brief, and obviously we will submit largely on the two written

6    memorandums we submitted in connection with the sentencing

7    hearing.  We obviously made and ask the Court to follow the

8    recommendation of the sentencing guidelines, and we know it's a

9    significant sentence and we didn't make it lightly and we didn't

10   make the recommendation lightly.  But the Court, based on the

11   record before the Court and based on the Court's additional

12   findings from earlier today, has found that Mr. Jones did make a

13   lot of choices and those choices over a 15-year period were the

14   wrong choices.  He chose the associates and the friends he did.

15   He chose to deal drugs on that strip for the better part of 15

16   years.  He chose to shoot at Bradley Carter in 1994.  He chose to

17   stab Michael Smallwood in 2003.  He chose to participate in the

18   "doors" game with his fellow associates and drug dealers in

19   Congress Park, as Mr. Crawford testified about.  He chose to

20   threaten security forces in 2000 and 2002, as we put in our

21   memorandum as well, according to the testimony of Donna Brown,

22   and based on those choices, Mr. Jones does stand before the Court

23   as somebody who faces, according to the starting point and

24   initial benchmark, citing *Gaul versus United States*, of a range

25   of 324 to 405 months of incarceration.

1           And with respect -- and again, we don't make this lightly

2     and we take no pleasure in asking for this sentence -- this

3     entire case, there's nothing -- one thing that's clear from the

4     testimony of last year, there's just a lot of -- there are a lot

5     of sad stories that came out of this case, and there are a lot

6     of unfortunate things that came out of Congress Park.  We understand

7     that Mr. Jones, and we've listened carefully and we read

8     carefully the issues that Mr. Jones has had throughout the last

9     15 years, but there are a lot of people who made other choices in

10    the last 15 years that weren't the same as Mr. Jones, and he

11    stands before the Court as somebody with a starting point and

12    initial benchmark of 324 to 405 months because of the choices

13    that he made, not because of what anyone else did.  And even with

14    respect to some of the things that we read and heard today, it

15    sounds as though Mr. Jones is still not accepting -- not only not

16    accepting responsibility, but blaming others, whether it's the

17    school system, even despite the Court's finding crediting the

18    testimony and the accounts of Mr. Bradley Carter, denying out

19    right to this Court that he did that, that he was even in the

20    car.

21          So, we think Mr. Jones is still somebody who is just in

22    denial about what he's been up to for the last 15 years, with

23    respect.  We do take issue with Mr. Martin's characterization

24    about the fact that he's turned the corner and that a lot of

25    these -- a lot of what the Court has before it are youthful

1    indiscretions.  I'm using my words, not his.  The paragraph 66

2    and 67 of the government's -- excuse me, of the presentence

3    report, those were offenses that earned Mr. Jones criminal

4    history points, and the second one, paragraph 67, happened in

5    1999.  The one referred to in paragraph 66, while it originated

6    in 1989, it happened in 1989, there were probation violations

7    that carried into the almost mid-1990s which is during the period

8    of the charged conspiracy.

9         We referred to the Michael Smallwood stabbing.  There's

10   record that Mr. Jones chased away Donna Brown and other members

11   of the Congress Park security force while he was a member of the

12   STEP Foundation, I might add, while he's a member of the STEP

13   Foundation.  Donna Brown took an oath in this Court and said

14   during the period of 2000 and 2002 Mr. Jones was one of several

15   people who threatened her and chased her out.  So these aren't

16   just youthful indiscretions with respect to the representations

17   made.  And again, the 324 to 405 months doesn't even include the

18   Bradley Carter shooting, doesn't even include a robbery that Rob

19   Crawford talked about from the 1990s.  It doesn't even include

20   the Michael Smallwood stabbing.  So, what we see before the

21   government is -- we don't see anything before the Court on this

22   record to justify any type of a substantial departure from this

23   initial starting point -- this starting point and initial

24   benchmark of 324 to 405 months.

25        Two final quick points.  One is the idea that Mr. Martin

 1   Court will recall, the Court presided over that trial and the

 2   Court also presided over this trial.  Newett Ford's name barely

 3   came up in this trial, a nine month RICO narcotics conspiracy

 4   trial, before this Court about Congress Park.  His name didn't

 5   come up for a reason, Your Honor.  He was a very low level -- he

 6   was essentially a flunkie for Burke Johnson.  He was a

 7   nonviolent, low level drug dealer in Congress Park, and he got

 8   262 months by this Court, and there was no record and no

 9   suggestion that he committed any violence, he stabbed anybody, he

10   threatened security or any of that.

11       So I do -- I have no problem with this Court looking at

12   and certainly the law suggests and requires that, that the Court

13   do look to disparate sentences -- to other sentences.  But with

14   respect to those on page 5, they are apples to oranges to what

15   Mr. Jones has done and stands before the Court having had done.

16       Now, I'll leave it at that, Your Honor, unless the Court

17   has any questions of the government.

18       THE COURT:  All right.  Thank you.

19       Mr. Jones, would you like to say anything.

20       THE DEFENDANT:  No, sir.

21       THE COURT:  Or Mr. Martin, did you have anything more to

22   present on behalf of the family I understood asked to comment but

23   I said would have to come through you.

24       MR. MARTIN:  No.  In fact, I spoke to Mr. Jones's mom and

25   I think she's going to echo pretty much what I had said earlier,

1   and I think his wife's sentiments are clearly expressed in the

2   letter she sent to you earlier. She miss her husband. Her son

3   misses his dad, as well as his daughter.

4       THE COURT: And Mr. Jones, did you want to say anything?

5       THE DEFENDANT: No, sir.

6       THE COURT: All right. Let me make clear several

7   principles that will cabin my sentencing discretion. One

8   argument that's lost force is that a sentence within the

9   prescribed sentencing guideline range is, per se, reasonable. In

10  some cases it may be reasonable, but in others it might not be.

11  If sentencing judges must simply sentence in lockstep with all

12  guideline ranges, we risk resurrecting the very evil that Justice

13  Stevens' substantive opinion in the *Booker* case identified,

14  especially when a sentence is enhanced based upon judicial

15  fact-finding. *Booker* still requires us to calculate and consider

16  the guidelines' ranges in reaching fair and reasonable sentences.

17  I do not read *Booker* to hold that all sentences within the

18  guideline range are, per se, reasonable.

19      As our circuit has said in the *U.S. versus Dorcely*,

20  D-O-R-C-E-L-Y, case, "a guideline sentence should be accorded

21  merely a rebuttable presumption of reasonableness," and the

22  Supreme Court made clear in the *Rita* case, R-I-T-A, decided last

23  year, that "the presumption is nonbinding and, quote, applies

24  only on appellate review. A sentencing court does not enjoy the

25  benefit of a legal presumption that the guideline should apply,"

1    closed quote.

2        Nor does the presumption require the sentencing judge to

3    impose that sentence.  That's not to say, though, that we must

4    shun any sentence within the guideline range calculated based

5    upon facts not found by a jury.  This circuit has held that the

6    error is not that a judge determines facts under the guidelines

7    which increase the sentence beyond that authorized by the jury

8    verdict or an admission by the defendant.  The error is only that

9    a judge does so in a mandatory guideline system.

10        Another theory is that the sentencing factors in 18 U.S.C.

11    3553 are already taken into account in the guidelines'

12    formulation and makes superfluous separate considerations of

13    these factors.

14        That approach renders Justice Breyer's remedial opinion a

15    nullity.  These guidelines now are advisory and not mandatory.

16    We must consider them and we must consider the other 3553

17    sentencing factors; not ignore them on the theory that

18    considering them unnecessarily duplicates what the guidelines

19    have done.  Our circuit has confirmed that in the *Pickett* case.

20    The *Rita* case also is consistent with that approach.

21        Since this is a case involving guideline enhancements

22    prompted by evidence not admitted by the defendant or found by

23    the jury, I will not irrebuttably presume that the guideline

24    range generated by that evidence is warranted, out of respect for

25    the majority opinion by Justice Stevens and the *Dorcely* opinion.

1        Mr. Jones, the law requires that I consider a number of

2   factors in determining your sentence.  One is the need for the

3   sentence imposed to promote respect for the law.  I have

4   conducted voir dire of hundreds of prospective jurors over the

5   years.  When prospective jurors have come forward in response to

6   the standard question of whether they have strong feelings about

7   punishments assigned to drug offenses that could keep them from

8   being fair and impartial, they have invariably complained of the

9   unfair disparity between punishments for crack and powder

10  cocaine, and they are not alone.  The Sentencing Commissioners

11  whose expertise the *Booker* court has said is entitled to great

12  weight have drawn the same conclusion.  They acted three times to

13  reduce or eliminate that disparity from the guidelines, and their

14  efforts were not without a basis.  And that is three times before

15  the current adjustment, that is.

16       The Commission hired professors Peter Rossi and Richard

17  Berk to conduct a study comparing the severity of sentences under

18  the guidelines with the severity of sentences deemed just by the

19  public.

20       In their 1995 study published in the 1997 book entitled

21  *Just Punishments, Federal Sentencing Guidelines and Public Views*

22  *Compared*, the very study that was cited by district Judge Cassell

23  in the District of Utah in his post-*Booker* opinion in the *United*

24  *States versus Wilson*, the professor stated, quote, "the

25  guidelines sentences for drug tasking were established by the

1    commission in a different fashion than the other crimes.

2    Congress had mandated a specific set of penalties for drug

3    trafficking crimes which were incorporated into the guidelines.

4    Unlike the procedures used in setting sentences for other crimes,

5    the commission disregarded past sentencing practices for drug

6    trafficking crimes, as well as whatever understanding the

7    Commissioners may have had concerning the preferences of the

8    American public.  Our findings show that the congressional

9    mandates departed strongly from those preferences," closed quote.

10        Specifically, Table 5.5 of the study shows that the public

11    drew virtually no distinction between crack and cocaine powder

12    trafficking and found to be fair and just those sentences far

13    closer to powder cocaine sentences under the guidelines than

14    crack sentences.

15        Later in the commissioner's May 2002 report to Congress,

16    *Cocaine and Federal Sentencing Policy,* they said that "Instead of

17    targeting serious and major traffickers in a manner similar to

18    the articulated congressional design of penalties for other major

19    drugs of abuse, crack cocaine mandatory minimum penalties

20    currently apply most often to offenders who perform low level

21    trafficking functions, wield little decision-making authority and

22    have limited responsibility.  Based solely on trafficking

23    functions the penalties appeared to overstate the culpably much

24    most crack cocaine offenders," closed quote.

25        Moreover, some of the bases upon which the crack penalties

1    were predicated have been discredited.  The report stated that

2    the, quote, "addictive nature of crack cocaine independently does

3    not appear to warrant the 100-to-1 drug quantity ratio.  Recent

4    research reports no difference between the negative effects from

5    prenatal crack cocaine and powder cocaine exposure, so no

6    differential in the drug quantity ratio based directly on this

7    particularly heightened harm appears warranted," closed quote.

8    It goes on to say, "Recent data indicate that significantly less

9    trafficking-related violence or systemic violence as measured by

10   weapon use and bodily injury documented in presentence reports is

11   associated with crack cocaine trafficking offenses than

12   previously assumed," closed quote.

13        In this case, if that corresponding guideline disparity

14   were evened, the base offense level reflected in revised

15   paragraph 56 for over 500 grams of crack cocaine would be 26

16   producing a total offense level of 28 with a criminal history

17   category of 4 before the career offender enhancement.  The

18   guideline range would be 110 to 137 months.  A sentence slightly

19   above that range in this case, in my judgment, would help promote

20   and restore respect for the drug laws and provide for proper

21   punishment, deterrence, and recognition of the severity of the

22   defendant's offense conduct.  It may not, however, avoid the kind

23   of sentencing disparity about which Congress was concerned.  The

24   career offender enhancement would adjust the offense level to 34,

25   with a criminal history category of 6 yielding a range of 262 to

1    327 months.    The basis for that enhancement in this case is one

2    nine-year-old attempt at assault for which Mr. Jones received

3    probation, and one 19-year-old $20 crack sale for which Mr. Jones

4    was sentenced under the Youth Act.   An automatic criminal history

5    category of 6 overrepresents the gravity of the history of

6    convictions.

7        Another factor I have to consider is the nature and

8    circumstances of this offense.   Mr. Jones, you were involved in

9    hustling crack with many others in a neighborhood held hostage to

10   the violence and addiction your group felt free to continue to

11   line your own pockets to live the fast life.   There is no

12   charitable view of this kind of behavior and it deserves

13   substantial punishment.

14       Another factor is your history and characteristics.   You

15   suffered from not having your father in your life, as have many

16   other young men in our community, who, nevertheless, made

17   different choices, but much of your childhood was spent

18   unsupervised, leading you, perhaps, into straying into this drug

19   dealing and perhaps into alcohol addiction.

20       You seem to have tried to settle down by getting married,

21   starting a family, and holding down lawful employment for a

22   fairly good clip.   As well, exposing you to the range that I have

23   determined of 324 to 405 months is a far cry from the far lower

24   range applicable solely to the 2 grams of crack the jury found

25   that you sold.   That gross disparity merits mitigation.

USCA Case #11-3031    Document #1445852      Filed: 07/10/2013    Page 1755 of 1954
Case 1:05-cr-00100-RWR   Document 1281   Filed 08/29/08   Page 51 of 58

51

1         The circumstances are all mitigators, although your

2    sporadic acts of violence are quite troubling. The other kinds

3    of factors are the kinds of sentences available and the kind of

4    sentences and sentencing range recommended by the sentencing

5    guidelines. As I've already determined, the guidelines recommend

6    a sentence of 324 to 405 months in prison at level 36 category 6,

7    although the law also provides for as little as one day in prison

8    to up to 30 years in prison, as well as terms in-between.

9         Another factor is any pertinent policy statement issued by

10   the U.S. Sentencing Commission, but none has been presented here.

11   Final factors are the need to avoid unwarranted sentencing

12   disparities and the need to provide restitution to any victim.

13   There is no issue about restitution here.

14        Unbridled by the sentencing guidelines, I would find here

15   a 12-year sentence to be a fair sentence that amply and promptly

16   addressed the sentencing factors and goals articulated by

17   Congress in the other subsections of Section 3553, but I am not

18   unbridled by the guidelines. The Supreme Court requires that I

19   consider the guidelines and not ignore them, just as I must

20   consider all of the Section 3553 sentencing factors in reaching a

21   sentence. Some of the factors here exert downward pressures on

22   the sentencing calculus in this case, others are neutral, and

23   still others exert upward pressures.

24        The guidelines here exert upward pressure and I am not

25   free to simply disregard that, any more than I am free to

1    disregard the Section 3553 factors exerting downward pressures.

2         I must ultimately, though, assure that the sentence is

3    sufficient but not greater than necessary to reflect the

4    seriousness of the offense, to promote respect for the law, to

5    provide just punishment and adequate deterrence, to protect the

6    public, and to provide you with any needed educational or

7    vocational training, medical care or other correctional treatment

8    in the most effective manner.

9         I will do that, but 324 to 405 months in prison does not

10   honor that command.  The sentence will be the equivalent of one

11   falling within an offense level of 31, criminal history

12   Category 5.

13        The sentence that I impose, then, will be sufficient but

14   not greater than necessary to reflect the seriousness of the

15   offense and to promote the other factors that I just mentioned.

16   It's the judgment of this Court that you, Joseph Jones, are

17   hereby committed to the custody of the Bureau of Prisons for a

18   term of 180 months on each of Counts 10 and 14 to be served

19   concurrently.  I recommend that you be designated to the facility

20   at Cumberland, Maryland or Allenwood, Pennsylvania.  I further

21   sentence you to serve a 72-month term of supervised release

22   concurrently on each of Counts 10 and 14.  I further order that

23   you pay a special assessment on each of Counts 10 and 14 in the

24   amount of $100 for a total of $200.  The special assessment is

25   immediately payable to the clerk of this court.  Within 30 days

1    of any change of your address, you must notify the clerk of that

2    change until such time as your financial obligation is paid in

3    full.

4         I find that you do not have the ability to pay a fine and,

5    therefore, I waive an imposition of a fine in your case.

6         Within 72 hours of your release from custody, you must

7    report in person to the probation office in the district to which

8    you are released.  While you are on supervision, you shall not

9    possess any firearm or other dangerous weapon.  You must not use

10   or possess any illegal controlled substance, and you shall not

11   commit another federal, state, or local crime.  You must also

12   abide by the general conditions of supervision that have been

13   adopted by the U.S. Probation Office as well as the following

14   special conditions:  You must submit to the collection and use of

15   DNA identification information while you are incarcerated or at

16   the direction of the U.S. Bureau of Prisons.

17   You must also participate in and successfully complete an

18   inpatient and outpatient substance abuse treatment program which

19   may include drug and alcohol testing and detoxification service

20   as approved and directed by the probation office.

21   You must also participate in an educational or vocational

22   skills training program as approved and directed by the probation

23   office.

24   The probation office shall release the presentence

25   investigation report to all appropriate agencies in order to

1    execute the sentence of the Court.  Treatment agencies shall

2    return the presentence report to the probation office upon the

3    defendant's completion or termination from treatment.

4         Mr. Jones, you have the right to appeal the sentence that

5    I have just imposed.  If you choose to appeal, you must do so

6    within ten days after the Court has entered judgment in this

7    case.  If you are unable to afford the costs of an appeal, you

8    may request permission from the Court to file an appeal at the

9    expense of the government.

10        Counsel, are there any other things I need to take up?

11        MR. MARTIN:  Nothing for the defense, Your Honor.

12        THE COURT:  Anything else?

13        MR. LEON:  No, Your Honor.

14        THE COURT:  All right.  Mr. Jones, I hope that the time

15   that you know you're going to have to do is time that you will

16   devote to coming upon some plan for yourself and your family that

17   will allow you when you get out to turn away from those old

18   temptations that it looks like you started to turn away from two,

19   three, four years ago.  That's what you need to do when you get

20   out.  The kind of things that you were doing for a long time

21   inflicted pain that your family doesn't deserve to have inflicted

22   on them.  They deserve better than this.  Your children deserve

23   better than to have you away for this long, so I hope you will

24   devote yourself to making sure that once you do get out, we won't

25   see you back in here anymore and your family will see you back

1    home and doing things that they can look up to you about.  Good

2    luck to you.

3            THE DEFENDANT:  Thanks.

4            (Proceedings adjourned at 1:40 p.m.)

5

6            **AFTERNOON SESSION, MAY 1, 2008**

7    (3:27 p.m.)

8            THE COURTROOM CLERK:  Criminal Case Number 05-100-16, the

9    United States versus Joseph Jones.  For the government, Mr. Leon.

10   For defendant, Mr. Martin.

11           THE COURT:  All right.  Good afternoon, and I want to

12   thank counsel for getting back here so quickly and, Mr. Jones,

13   for your patience as well.  There are a couple of things I meant

14   to take up before we left.  Under Title 21 of the U.S. Code

15   Section 851 that governs the proceedings with regard to the

16   government's filing of a prior information, I'm required under

17   Subsection B to call upon the defense to either affirm or deny

18   the existence of the prior convictions that form the basis for

19   the government filing the prior felony information under Section

20   8518.

21           Mr. Martin, I know you made comments earlier about the

22   convictions, but I didn't formally ask you to affirm or deny

23   their existence.

24           MR. MARTIN:  For the record, I have discussed both of

25   those convictions with Mr. Jones, and he does acknowledge and

1       affirm their existence.

2            THE COURT:  All right.  Thank you.  Mr. Leon, I believe

3       that's all I need to do, then, with respect to that since it is

4       an affirmation of the prior convictions.

5            MR. MARTIN:  But he maintains that he believes that it's

6       stale, that it's remote, and it shouldn't be counted.

7            THE COURT:  Right.  I'll make sure the record reflects

8       that you have not waived your objection to having it counted for

9       guidelines calculation purposes.

10           MR. MARTIN:  Okay.

11           THE COURT:  All right.  The other thing that was

12      outstanding that I noticed was the motion by Mr. Jones for

13      judgment of acquittal and new trial and arrest of trial.  Unless

14      you wanted to have argument on that, I'm prepared to rule on the

15      papers.

16           MR. MARTIN:  No further argument.  The defense stands on

17      the papers, Your Honor.

18           THE COURT:  All right.  With respect to -- I'm sorry,

19      Mr. Leon.

20           MR. LEON:  Yes.  I waive as well.

21           THE COURT:  All right.  With respect to Count 10, the

22      evidence included testimony from Sandra White that she had gotten

23      coke from Mr. Jones on October 30th, 2000.  In the course of a

24      tape recorded transaction, Agent Fulmer testified that he did

25      receive 18 small Ziplocs of white rock substance from Ms. White

1    on that same day following the controlled purchase.  Special

2    Agent Dang or Chemist Dang, the forensic expert, testified that

3    the 18 zips were 73 percent pure cocaine base in Exhibit 307.2,

4    and that all of the crack that he analyzed that came in the case

5    arrived in hard, rock-like form, all of the alleged crack.  He

6    did analyze this as being cocaine base, and there was a

7    photograph introduced of the rock-like form in which the

8    substance appeared in Government's 307.4.

9         With respect to Count 14, Gail Parson explained that she

10   smoked crack daily from 1995 while she was living in Congress

11   Park and she got four small dimes of crack from Mr. Jones for $25

12   during a taped, controlled sale.  Agent Fulmer retrieved from Ms.

13   Parsons that same day a white rock-like substance that she bought

14   on January 9th, 2001, and in that controlled buy, as introduced

15   as Exhibits 310.2 and 310.3, Agent or Chemist Reil analyzed those

16   exhibits, 310.3, as cocaine base, 54 percent pure, and a

17   photograph was introduced of 310.5.  It was introduced as 310.5

18   showing the rock-like form in which that crack was turned in.

19        All of those factors, in my judgment, would allow a

20   reasonable jury to find that, indeed, the substance that was

21   purchased from Mr. Jones on those two occasions in Count 10 and

22   Count 14 were, indeed, crack cocaine in smokeable form, and for

23   those reasons and the reasons that I mentioned when the motion

24   was made mid-trial or post- -- I guess it was mid-trial for

25   judgment of acquittal, the motion for judgment of acquittal now,

1    new trial and arrest of trial will be denied.  I think I've taken

2    care of everything that I need to take care of, and I want to

3    thank you all again for coming back in.

4         MR. MARTIN:  Thank you.

5         THE COURT:  Thank you.  You all may be excused and so may

6    Mr. Jones.

7         (Proceedings adjourned at 3:33 p.m.)

8

9

**C E R T I F I C A T E**

10

11             I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
12   proceedings in the above-entitled matter.

13

14   ------------------------------
     **Scott L. Wallace, RDR, CRR**
15   **Official Court Reporter**

16

17

18

19

20

21

22

23

24

25

# Tab 48

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**       :
                                    : Docket No. CR 05-100
      **Plaintiff,**           :
                                    :
      **v.**                   :
                                    : Washington, DC
**GREGORY BELL,**                   :
                                    : May 8, 2008
      **Defendant.**           : 2:30 p.m.
                                    :
                                    :

***TRANSCRIPT OF SENTENCING PROCEEDINGS***
***BEFORE THE HONORABLE RICHARD W. ROBERTS***
***UNITED STATES DISTRICT COURT JUDGE, and a JURY***

APPEARANCES:

For the United States:       UNITED STATES ATTORNEY'S OFFICE
                             Glenn S. Leon, Assistant United
                             States Attorney
                             Ann H. Petalas, Assistant United
                             States Attorney,
                             555 4th Street
                             Washington, DC  20001
                             202.305.0174


For Defendant                LAW OFFICE OF JAMES W. BEANE
Gregory Bell:                James W. Beane, Jr., Esq.
                             2715 M Street, N.W.
                             Suite 200
                             Washington, DC  20007
                             202.333.5905


Court Reporter:              Scott L. Wallace, RDR, CRR
                             Official Court Reporter
                             Room 6814, U.S. Courthouse
                             Washington, DC 20001
                             202.326.0566


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

USCA Case #11-3031      Document #1445852            Filed: 07/10/2013      Page 1765 of 1954

1              **AFTERNOON SESSION, MAY 8, 2008**

2      (2:36 p.m.)

3              THE COURTROOM CLERK:  This is Criminal Case 05-100, the

4      United States versus Gregory Bell.  Representing the government

5      is Glenn Leon, Ann Petalas.  Representing the defendant is James

6      Beane.  Probation officer, Michael Penders.  This is a

7      sentencing.

8              THE COURT:  Good afternoon.  Let me make sure counsel had

9      a chance to look at the letter that I left out for you to

10     examine.  Both sides have?  All right.

11             Mr. Beane, have you and your client read and discussed the

12     presentence report?

13             MR. BEANE:  Yes, we have.

14             THE COURT:  Let me hear from you, then, on any comments

15     that you have to make about it or any objections that I need to

16     resolve to the report.

17             MR. BEANE:  If I may, Your Honor.

18             The objections that we have to report are listed in the

19     back of the final report, but I will go down that list just

20     briefly.

21             The first objection that we lodged was that we objected to

22     the breadth and the scope of the actual activity that the

23     presentence report was ascribing to Mr. Bell, and I think that's

24     something that the Court will resolve during the actual

25     sentencing, if I'm not mistaken.

1     We then next challenged the testimony of individual

2   witnesses that we believed the government was relying on to

3   substantiate its claim that Mr. Bell should be subjected to a

4   much higher guideline range based on either the acquitted conduct

5   or what we call relevant conduct.

6     I think that I would prefer to go down this list when I'm

7   actually arguing the sentence as opposed to just pointing out the

8   objections.

9     THE COURT:  Say that again.

10     MR. BEANE:  I said I think I would prefer to go through

11   this during my argument to the Court regarding sentencing

12   identifying each witness that we challenge, unless the Court

13   wants me to challenge them now, which I can do.  It's up to the

14   Court.

15     THE COURT:  What I want you to do is to tell me about any

16   challenges I need to resolve.  I'm going to resolve challenges to

17   any parts of the presentence report first so we'll know what

18   remains, and after that, then I'll be happy to have you allocute

19   once you know what challenges have and have not been resolved

20   favorably or unfavorably.

21     MR. BEANE:  Okay.  Well, with that in mind, Your Honor, we

22   are going to challenge the credibility of the testimony of Gail

23   Parson, Ms. Proctor, Bobby Capies, Kairi Kellibrew, Cedric

24   Conner, and I think it's Robert Pogue, I believe is the way his

25   name is pronounced.

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 1767 of 1954

1     I think that's the extent that the government's going to

2  rely on witnesses.  But if not, we would reserve the right to

3  challenge them as they come up.

4     I guess the more substantive challenge goes to the

5  obstruction of justice, the obstruction of justice enhancement,

6  based on, I believe, the testimony of Charlette O'Brien, Brittany

7  O'Brien and Donna Brown.

8     We specifically challenge this based on the fact that

9  Brittany O'Brien and a Charlette O'Brien both indicated during

10  the proceedings that neither of them felt threatened by Mr. Bell

11  at any point.

12     Specifically, Mr. Bell went to the O'Briens' residence,

13  but the O'Briens were not at that time -- did not at that time

14  feel threatened.

15     It wasn't until Mr. Bell and the gentleman in the gray

16  hoody left the residence that the O'Briens got a phone call.  And

17  after Ms. Charlette O'Brien got the phone call, she decided to

18  pack up her family, and that's because the substance of the phone

19  call had to do with whether or not Brittany O'Brien chose to

20  cooperate in the officer's investigation of that particular

21  murder.

22     The language that the caller used was at times, I think,

23  in question during the trial, but ultimately it came out through,

24  I believe, Ms. Charlette O'Brien that the caller said

25  specifically, "tell your daughter to cooperate with the police,"

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1768 of 1954

1   not "fail to cooperate;" in other words, not to obstruct justice.

2   She was not advised to obstruct justice.  She was advised to

3   cooperate.

4       So, based on that, we don't believe that the O'Briens

5   support the claim that Mr. Bell in any way obstructed justice.

6       The second portion to that is Ms. Browne alleged during

7   the trial that Mr. Bell and other of the co-defendants taunted

8   her, and at some point someone threatened to kill her; but, in

9   the context of her testimony when it's read altogether, she never

10  indicates that the threats were in any way connected to her

11  reporting on or failing to report on criminal activity that she

12  saw.

13      So, at best, Ms. Browne's testimony establishes a charge

14  of threats, felony threats, even, but not obstruction of justice

15  under the guidelines, and so we're objecting to that particular

16  enhancement.

17      We made an objection with regards to acceptance of

18  responsibility, basically because Mr. Bell did negotiate for a

19  plea during the entire trial, and he wanted -- I think he

20  expressed a desire to take a plea but not to the conspiracy,

21  which he believes he was not a part of.

22      The problem with that is not giving him the acceptance of

23  responsibility when he was willing to accept responsibility for

24  the distribution, the three distributions that he was found

25  guilty of, the problem is that we start to punish people who

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1769 of 1954

1    don't want to lie to the Court.

2         In other words, Mr. Bell did not want to come before the

3    Court and say "I'm guilty of conspiracy."  That would be a lie to

4    the Court.  He was willing to come to the Court and tell the

5    truth, that "I'm guilty of the distribution."

6         It seems -- it's unseemly to some of us that he would be

7    denied the ability to accept responsibility because it was up to

8    the government to decide whether or not he could plead guilty to

9    individual counts, and they never permitted us to do that.

10        So -- and I don't think, at least in the past I've been

11   told by the courts that it's not up to the Court whether or not

12   Mr. Bell can plead to individual counts, it's up to the

13   government whether they're willing to let him plead to individual

14   counts and move on.

15        THE COURT:  That's certainly true with respect to the

16   ability to have a plea agreement with the government.

17        That is the case with respect to whether he can plead

18   guilty pursuant to a government plea agreement.

19        MR. BEANE:  Okay.

20        THE COURT:  But that is -- that adds in whether he can do

21   it pursuant to the government's plea agreement.  It has nothing

22   to do with whether he can do that absent a government plea

23   agreement.

24        MR. BEANE:  I think I understand.

25        The other prong to that, as I think as the Court recalls,

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 1770 of 1954

1    is that in our opening statement I, on behalf of Mr. Bell, in

2    fact, accepted responsibility for distribution of drugs.

3          In my opening statement I specifically said that Mr. Bell

4    and others did distribute drugs, so we did acknowledge that that

5    had happened, but I countered that immediately by saying he was

6    not involved in a conspiracy or the RICO.  So that's another

7    objection.

8          THE COURT:  Your closing changed tactics, however.

9          MR. BEANE:  I accept that.  I really don't recall, but I

10   accept the Court.

11         The only other objection we have that I think the

12   presentence report writer addressed was that Mr. Bell's prior

13   conviction was actually for -- was actually for a crime that was

14   committed over 17 years ago, I believe, and that he was sentenced

15   under the Youth Act.  But I think that that, too, goes to the

16   allocution more than the objection at this point, although he did

17   lodge the objection.

18         Those are the objections we have to the presentence

19   report.

20         THE COURT:  You had made an objection to the weapons

21   enhancement.  Is that still outstanding?

22         MR. BEANE:  Yes, that is.  I apologize, Your Honor.  I

23   missed that.

24         Our objection to the weapons enhancement is essentially

25   that during the trial itself Mr. Bell's -- I believe the gun that

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1771 of 1954

1    the -- that's now being listed as justification for the weapons

2    enhancement is the firearm that was recovered in Mr. Bell's --

3    Mr. Raymond Bell's apartment back in 1996.

4         Our objection to that is that Mr. Raymond Bell immediately

5    accepted responsibility for possessing that firearm and, in fact,

6    came before this Court and again accepted responsibility for that

7    firearm.  So there is no basis to enhance Mr. Bell's sentence for

8    being in possession of a firearm in 1996.

9         I think -- unless -- well, at one point I think the

10   government was relying on the allegations that Mr. Bell was in

11   some way involved in a robbery a number of years ago, that it's

12   probably outside the time of the conspiracy, although I can't say

13   that for certain.

14        But again, that testimony was, one, unsubstantiated in any

15   way.  It was given by a person who stood to benefit a great deal.

16   Our argument is that the testimony was simply unreliable.  And so

17   that's our objections to the enhancement under the weapons.

18        THE COURT:  All right.  Anything else?

19        MR. BEANE:  No.  I think that covers it, but we would

20   reserve the opportunity to object later if something comes up

21   related to them.

22        THE COURT:  Mr. Leon, do you have any comments about the

23   presentence report and any responses to the objections lodged?

24        MR. LEON:  Thank you, Your Honor.  Good afternoon.

25        THE COURT:  Good afternoon.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1772 of 1954

1        MR. LEON:  We do.  We do not have any objections to the

2   presentence report.  We do have comments with respect to

3   Mr. Gregory Bell's objections to the presentence report.  I'll

4   try to take them in order.

5        First, we do think the PSR correctly relied upon, and we

6   would respectfully submit that the Court would be more than

7   reasonable to rely upon, the credibility of various witnesses who

8   testified in this case.

9        The government -- and we did outline various government

10  witnesses.  Mr. Beane ticked off many of them, I don't think all

11  of them, but we did outline them in our sentencing memorandum.

12       As the Supreme Court case of *Gall* indicates, and we cite

13  this on page 7 of our memorandum, the sentencing judge sees and

14  hears evidence, makes credibility determinations, and has full

15  knowledge of the facts and gains insights not conveyed by the

16  record.

17       Indeed, the Court sat through a lengthy trial and heard

18  various witnesses take oaths, and we think that it would be well

19  within the Court's discretion under the rules, under the law,

20  under the sentencing guidelines, to make credibility findings to

21  support, in this case at least, taking off the first of the

22  objections, certainly the drug amount.

23       A small footnote to the drug amount.  We did not lodge an

24  objection to this, although, frankly, I considered it, and this,

25  perhaps, ties into my allocution in a few moments.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1773 of 1954

1       Of all the defendants, the one by far who I think the

2    government would have had a very fair argument to make would have

3    been, for a 4.5-kilogram argument, would have been Mr. Gregory

4    Bell.  We didn't make that here.  We stated 1.5 kilograms.

5       But the overwhelming evidence in this case was that

6    Mr. Bell was the most prolific drug dealer for the length of the

7    conspiracy.  And even over the rough numbers that the government

8    laid out, I think if you add up all those numbers that we laid

9    out, I think you're right at 4.5.  And, again, they were

10    conservative numbers.

11       So we didn't make the objection formally, but I would at

12    least note that 1.5 was a very, very conservative number that the

13    presentence writer used.  And we were using conservative numbers

14    and we came right up to 1 point -- excuse me -- 4.5 kilograms,

15    and we think it would certainly not be in any way an abuse of

16    this Court's discretion to make a finding that Mr. Bell is

17    responsible for 4.5 kilograms of crack cocaine.

18       We also -- and we submitted a memorandum yesterday, a

19    reply memorandum, where we do address -- I'm not sure if the

20    Court -- if the Court doesn't have it, I do have an extra copy.

21    We --

22       THE COURT:  I'm only looking because you said yesterday.

23    I'm not sure if what I saw was yesterday or the day before.

24       MR. LEON:  I might -- it might have been two days ago,

25    Your Honor.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1774 of 1954

1          THE COURT:  I got it.  All right.

2          MR. LEON:  We made a few points there, but one does relate

3     to Mr. Beane's objections with respect to the gun bump.  I think

4     I'm moving around now.  Let me get to that in a minute.  Let me

5     stay in order.  I apologize.

6          With respect to the obstruction, Your Honor, I think

7     Mr. Beane remembers the record incorrectly, with respect.  We did

8     lay out the relevant excerpts in our sentencing memorandum about

9     the exact testimony of Charlette O'Brien.

10         She testified that Mr. Gregory Bell, literally hours after

11    this murder happens, which she and her daughter were at least

12    direct -- witnesses to, he comes to her home in the very early

13    morning with a man with a hood over his head.

14         Mr. Gregory Bell never ever, ever came to her home, ever.

15    But on this early morning, hours after the murder, Mr. Bell comes

16    looking for Brittany, and she said she was scared, and she said

17    she was afraid, and she said that she packed her bags and they

18    left that night and they never came home to that house.  Her fear

19    is actually beside the point.

20         As the commentary correctly notes of the guidelines,

21    Section 3C1.1, commentary paragraph 4, sub A, uses the following

22    language as correctly noted by the presentence writer.

23         An example is "threatening, intimidating, or otherwise

24    unlawfully influencing a," in this case, "witness, directly or

25    indirectly, or attempting to do so."

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1775 of 1954

1        Fear is not an element, it's not a requirement.  It's what

2   the person is trying to do.  And we think certainly on that

3   record, the sworn testimony of Ms. Charlette O'Brien, a very fair

4   inference is that Mr. Gregory Bell intended to influence or

5   attempted, at least, to influence the testimony of an eyewitness

6   to a murder committed by one of his co-defendants, two of his

7   co-defendants.

8        And then the final issue I do take with Mr. Beane on that.

9   My memory -- Mr. Beane, I think, is correct that there was a bit

10  of a dispute as to how Ms. O'Brien characterized the phone call

11  she received shortly after the visit from Mr. Bell and his hooded

12  friend, but my memory of the testimony was that she was impeached

13  with an audiotape of her grand jury testimony where the audiotape

14  seemed to hear her say the person said "to snitch."

15       So Mr. Beane is correct that the impeachment involved the

16  language "to snitch," but Ms. O'Brien's testimony from that

17  witness stand under oath, under repeated cross-examination, was

18  "I was told not to snitch."

19       So there was impeachment, but upon cross-examination

20  repeatedly in this courtroom, she said "not to snitch," and

21  that's what she was told by that caller.

22       It's beside the point because that caller -- we did not

23  link that caller up to Mr. Bell, but I do make it because I

24  think, in fairness, the record should be clear.

25       With respect to the acceptance of responsibility, I think

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1776 of 1954

1    the law is clear on this.  The Court is quite right.  Mr. Gregory

2    Bell could have walked in at any point to this Court without any

3    plea agreement and said, Well, no, I didn't do this conspiracy,

4    but sure, that's me on these tapes."  And he didn't do that.  He

5    certainly didn't do that with respect to the other counts.  There

6    were a few counts where he was acquitted upon of stand-alone drug

7    counts, and he certainly didn't do that there.

8        So, for Mr. Beane to walk in and say that there should be

9    a half credit for that is not based on any law and certainly not

10   based on any common sense.

11       And I will just say, to clear up the record here, there

12   were general discussions of a plea among several defendants and

13   the government.  Those pleas were always general in nature, they

14   always involved the possibility of a global, wired plea among all

15   or a significant portion of the six remaining defendants.

16       But for Mr. Beane to make a representation that -- I don't

17   want to get personal with Mr. Beane.  That's not my point.  But I

18   will just say that at no point were these plea discussions at any

19   point where the government sat across the table with Mr. Gregory

20   Bell and he debriefed and he admitted anything.  These were

21   general conversations that happened in virtually every case in

22   this country where a responsible defense attorney makes overtures

23   to the prosecutor prior to trial.

24       And lastly, with respect to the gun bump, we think it's

25   certainly appropriate.  We think that for the reasons stated in

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1777 of 1954

 1    our reply memorandum, they're appropriate.

 2         A biased witness, such as Mr. Bell's father for the

 3    reasons stated, Mr. Raymond Bell, Sr., lays out a factual proffer

 4    that this Court can certainly consider that Mr. Bell, at minimum,

 5    possessed separate piece of ammunition in his home, in his

 6    private room with the scale and the drugs and with everything

 7    else, and that my memory of the testimony is that single piece of

 8    ammunition was not necessarily linked to the loaded gun in the

 9    home.  So, at minimum, that is suggestive of another weapon that

10    Mr. Gregory Bell had.

11         And, again -- and, in any event, all Mr. Raymond Bell, Sr.

12    said was, "I was cleaning up after a party.  I found a gun, it

13    wasn't mine, and I put it in the kitchen cabinet, and then I put

14    it in my son's closet."

15         He didn't say it was his, and he didn't say it wasn't his

16    son's, he just said, "It wasn't mine and I found it," and lo and

17    behold, it ends up in his son's bedroom the morning of the search

18    warrant the next day.

19         In any event, we outline several other reasons why it

20    would be appropriate to attribute a two point gun enhancement for

21    possession of a dangerous weapon.  We outline that on pages 18,

22    19, and 20 of our sentencing memorandum.

23         In addition, Mr. Bell's entrenchment in this conspiracy,

24    we think, and his conspiratorial arrangement and agreement with

25    other members of the conspiracy, certainly under *United States vs*

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1778 of 1954

1   *Tavron*, 437 F.3d 63, D.C. Circuit case from 2006, certainly his

2   agreement and arrangement with his armed co-conspirators

3   certainly warrants a gun enhancement.

4        And I would also just refer to the testimony of Kairi

5   Kellibrew.  I'm sure both counsel will discuss Mr. Kellibrew

6   shortly.  But we certainly submit that the Court -- or

7   respectfully suggest that the Court credit the testimony of Kairi

8   Kellibrew for various reasons.  On page 14 of our sentencing

9   memorandum, we cite Mr. Kellibrew's testimony, and I'll just read

10  it very briefly.

11       He testified that in the mid-'90s during the conspiracy

12  when Mr. Kellibrew was in his early teens -- 12, 13, 14 years

13  old -- he spent time with his older cousin Antwuan Ball and his

14  good friend Gregory Bell.

15       It's worth noting here that Gregory Bell is a 37 -- might

16  be 38 at this point -- 37, 38-year-old man, very close in age to

17  Antwuan Ball; I believe a year older than Antwuan Ball.

18       Kairi Kellibrew is about ten years younger than these men,

19  so young man, Kairi Kellibrew, coming up in the ranks learning

20  from his older cousin Antwuan Ball and his good friend Gregory

21  Bell.

22       Mr. Kairi Kellibrew testified that around 1994 or so, he

23  saw Mr. Ball selling and cutting up crack cocaine in the family's

24  house.  In addition, they, quote, "they always had guns," closed

25  quote, in the house, and that is in conjunction with other

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1779 of 1954

1   testimony that I won't recite, but in the following paragraph

2   about how Boy-Boy, Joseph Jones, and Antwuan Ball were part of

3   that core group in Mom's house and in Antwuan's home in the

4   mid-1990s.  So there's ample evidence in this record, we

5   respectfully submit, to give Mr. Bell a two-point enhancement as

6   well.

7       I think I've addressed all of the -- the other final thing

8   with respect to the criminal history.  My understanding is that

9   Mr. Bell has a criminal history of one, so while it's important,

10  perhaps, to make a ruling upon, I don't think it affects the

11  calculations for guidelines purposes.

12      But we do think on page 27 of the presentence report, the

13  presentence report writer, Mr. Penders, was correct and correctly

14  cited the guidelines at 4A1.2(e)(2) that counting that conviction

15  was appropriate.

16      I have nothing further, unless the Court has any

17  questions.

18      THE COURT:  All right.  Thank you.

19      Let me take up the objections.  The first objection was

20  the relevant conduct objection.

21      The defendant was convicted of only three counts of

22  distributing crack with each sale amounting to a weight of less

23  than five grams.  However, the presentence report holds the

24  defendant accountable for over 1.5 kilograms of crack that was

25  involved in the narcotics conspiracy activity that the defendant

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1780 of 1954

1    was charged with but acquitted of.  This is the activity that Joe

2    Langley and seven other co-defendants admitted to in guilty pleas

3    and which Newett Ford was convicted of by a jury.

4        This additional volume of crack can be attributed to the

5    defendant in only two ways:  If reliable information shows by a

6    preponderance of the evidence that either, one, the defendant

7    joined in that conspiracy, that the scope of what defendant

8    agreed to included cooperating and distributing crack, and that a

9    volume of crack sales among all conspirators exceeding 1.5 kilos

10   was foreseeable to the defendant; or, two, if the defendant's

11   uncharged crack transactions that were a part of the same scheme

12   or plan as the offense of conviction added totaled 1.5 kilos or

13   more.  The evidence presented of the defendant's knowing

14   membership in a crack distribution conspiracy foreseeably

15   involving at least 1.5 kilograms and actually handled by the

16   defendant was direct and circumstantial.

17       The defendant knew many of the charged conspirators and

18   associated with them in Congress Park.  That was established by

19   the countless witnesses at trial who saw them together during the

20   charged period and whose accounts as to that detail were largely

21   undisputed and the countless photographs showing the defendant

22   and the others together in Congress Park venues and other

23   locations.

24       Also witnesses testified that they saw the defendant and

25   charged co-conspirators selling crack in Congress Park during the

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1781 of 1954

 1    period charged.  Among them were witnesses mentioned in the

 2    government's memorandum:  Bobby Capies, Keith Barnett, Kairi

 3    Kellibrew, Jack Powell, Gail Parson, and Marilyn Proctor.

 4         Also, some witnesses said they saw the defendant obtain

 5    supplies of crack for resale, including Capies and Cedric Conner.

 6         Also, witnesses such as Capies, Barnett, and Powell

 7    testified how the charged conspirators cooperated with each other

 8    in selling crack in Congress Park during the charged period by

 9    participating in the *unos, dose, tres* method of sharing of sales

10    proceeds.

11         Capies saw the defendant participate.  Conner, a

12    comparative outsider, added how Desmond Thurston and Daniel

13    Collins told Conner that Conner could not sell at those same

14    locations in Congress Park that they had built up, and how

15    Antwuan Ball reinforced that message by saying that his group

16    made its livelihood selling there.

17         The government's memo sets forth reliable evidence from

18    the testimony of Conner, Capies, Gail Parson, Marilyn Proctor,

19    Powell and Kellibrew, from which a calculation even more

20    conservative than that outlined in the memo by the government can

21    be undertaken reflecting the defendant's personal involvement in

22    the purchase and sale of over 1.5 kilograms of crack.

23         Conner alone established supplying an estimated quantity

24    in excess of one kilo between 1999 and 2000, and Capies alone

25    established buying over 500 grams from 1992 to 2001 at a rate

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1782 of 1954

1    that would not risk double counting Conner's one- to two-year

2    supply; namely roughly four grams every now and then.

3         The remaining witnesses push the estimated amount safely

4    above an additional 100 grams.  Given the length of time over

5    which the witnesses saw the defendant obtaining and selling

6    crack:  Capies said from as early as a period from 1992 to 1996

7    to as late as a period from 1996 to 2001; Proctor saying as late

8    as a period of 2003 to 2005; with Barnett, Kellibrew, Conner, and

9    Powell testifying to periods in-between; and the frequency with

10   which the witnesses said the defendant was selling, such as

11   Barnett seeing the defendant all day for years between 1993 and

12   2003, the estimate of at least 1.5 kilos is reasonable.

13        As to these details I credit the testimony of those

14   witnesses and I find by clear and convincing evidence:

15        One, that a conspiracy to distribute crack in the Congress

16   Park area existed among the defendants and others, including the

17   eight others convicted of conspiracy by guilty plea or after a

18   trial, and Antwuan Ball, David Wilson, Desmond Thurston, Joseph

19   Jones, and Dominic Samuels;

20        Two, that the scope of what the defendant agreed to

21   included buying supplies of crack and selling it or helping

22   others to resell it in Congress Park;

23        Three, that a volume of crack sales among all conspirators

24   exceeded 1.5 kilos was foreseeable to Mr. Bell;

25        And, four, that the defendant engaged in uncharged crack

USCA Case #11-3031     Document #1445852      Filed: 07/10/2013     Page 1783 of 1954

1    transactions that were part of the same scheme or plan as the

2    offenses or convictions that added in totaled 1.5 kilos.

3         The objection then to the scope of the relevant conduct

4    included in the guideline calculation therefore is overruled.

5         With respect to the obstruction of justice objection.

6         The presentence report awards a two-point enhancement for

7    obstruction of justice based upon two events.

8         The defendant went to the home of Brittany O'Brien, a

9    juvenile who was believed to have witnessed the murder of a man

10   in whom she was interested, and the defendant asked her mother if

11   she was at home.  The visit was shortly after the murder, and the

12   mother moved herself and her daughter out of the household right

13   after that visit out of fear.  Ball and Wilson, two of

14   defendant's co-conspirators, were later charged with that murder.

15        The jury, understandably, acquitted the co-conspirators of

16   the murder, as the murder case against them ultimately rested

17   upon the testimony of O'Brien whose testimony was very

18   effectively discredited through defense cross-examination and

19   evidence put on by the defense.

20        The second event was the testimony of a security guard in

21   Congress Park, that the defendant made a threatening hand gesture

22   toward her.

23        Without more evidence of a willful motive, such as

24   intimidating words uttered to O'Brien's mother or gestures made

25   to her, or statements linking the hand gestures of the guard to

USCA Case #11-3031      Document #1445852          Filed: 07/10/2013      Page 1784 of 1954

1    the investigation of the charged offenses, I am left to speculate

2    about the defendant's intent.

3         Given the seriously-weakened state of the trial evidence

4    inculpating the defendant's co-conspirators in the murder, the

5    defendants's visit could clearly have been intended not as

6    intimidation.  In addition, his gestures toward the guard may

7    equally have been calculated to keep the guard from obstructing

8    the defendant in his carrying out the relevant conduct.  Said

9    otherwise, "Don't get in my way while I'm selling drugs," rather

10   than purposely calculated to thwart the investigation that it

11   isn't clear the defendant knew was underway.

12        I do not find by a preponderance of the evidence that the

13   obstruction of justice enhancement is established.  That

14   objection is sustained and paragraph 60 shall be revised.

15        With respect to the acceptance of responsibility

16   objection, the presentence report denies the defendant a

17   reduction for acceptance of responsibility.

18        The defendant argues that he is entitled to it because he

19   was consistently willing to enter into a plea bargain but he and

20   the government could not agree on terms.

21        But the adjustment is not intended to apply to a defendant

22   who puts the government to its burden of proof at trial by

23   denying the essential factual allegations of guilt, is convicted,

24   and only then admits guilt.

25        The defendant here argued in closing to the jury that he

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1785 of 1954

1    was not guilty of anything in the indictment, that the government

2    presented no credible witness against him, including Sandra White

3    to whom he made the tape-recorded sales, and asked the jury to

4    find him not guilty.

5         The defense did not admit at trial the sales Bell was

6    convicted of and argued to acquit him of everything else, a

7    scenario the circuit suggested in the 1998 *United States vs*

8    *Dozier* case -- D-o-z-i-e-r -- that might present an exception to

9    the ineligibility for the reduction.  That objection is

10   overruled.

11        With respect to the prior conviction objection.  The

12   presentence report scores the defendant's 1991 conviction for

13   carrying a dangerous weapon with one criminal history point.  The

14   defendant challenges counting that conviction because of its age

15   and the fact that it was a Youth Act sentence.

16        Guideline section 4A1.2(e)(2) counts any prior sentence

17   that was imposed within ten years of the defendant's commencement

18   of the offense of conviction.

19        The offenses of conviction occurred in 2000, less than ten

20   years after the prior sentence was imposed, and Youth Act

21   sentences are not ineligible to be counted.

22        In any event, counting or not counting that conviction

23   makes no difference in the criminal history category.  That

24   objection is overruled.

25        Finally, with regard to the weapons enhancement objection.

1          The defendant was not charged with or convicted of any

2    weapons offense, but the presentence report increases his offense

3    level by two points, concluding that a gun was possessed with

4    respect to the defendant's relevant conduct.  The defendant

5    challenges that enhancement.

6          One basis for the enhancement was Kellibrew's testimony

7    that, quote/unquote, "they always had guns," quote/unquote, "in

8    Antwuan Ball's house."

9          Now, that testimony did not place any guns in Bell's hands

10   or show any acquiescence by Ball's use of or possession of guns

11   in connection with the crack conspiracy.

12         The other basis was Pough's testimony -- that's

13   P-o-u-g-h -- that the defendant robbed a man of cash on the

14   street in Congress Park in 1991 or 1992 at gunpoint while another

15   assailant snatched the victim's neck chain.

16         I do not find that the preponderance of the reliable

17   evidence has established that the defendant's gun possession in

18   that incident was in connection with the offenses of conviction

19   in 2000 or the relevant conduct crack conspiracy which began in

20   1992.

21         However, the defendant's sentencing memorandum raised and

22   disputed a claim that the defendant possessed a gun, and the

23   government filed a response citing an additional basis for the

24   weapon enhancement.

25         Unrebutted trial evidence reflected that during a search

USCA Case #11-3031     Document #1445852         Filed: 07/10/2013     Page 1787 of 1954

1   of the defendant's bedroom in the home defendant shared with his

2   father in 1996, during the life of the crack conspiracy, police

3   found a loaded handgun hidden in a speaker in the closet in

4   proximity to other tools of the narcotics trade, 49 Ziploc

5   baggies of crack on the closet shelf, plus two large white crack

6   rocks, a scale that weighed in ounces, a plate and razors with

7   residue, and $1,700 in cash.

8        The defendant's father testified disclaiming knowledge or

9   ownership of these additional items but claimed, not credibly,

10  that it was he who had found the gun outside and brought it

11  inside and placed it on his son's closet floor behind the

12  speaker.

13       The preponderance of the evidence supports the conclusion

14  that the defendant possessed a weapon in connection with the

15  relevant conduct.  That objection is overruled.  That, then, will

16  produce an adjusted offense level of 38 with a criminal history

17  category of 1.

18       Mr. Beane, do you care to speak on behalf of your client?

19       MR. BEANE:  Yes, I do, Your Honor.

20       Your Honor, under some of the considerations that the

21  Court may make when imposing sentence on Mr. Bell are the nature

22  of the offense, the actual crime itself, and then the

23  characteristics of Mr. Bell, as well as the considerations that

24  the sentence will have on society as well as society's interest

25  in what sentence the Court imposes.

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 1788 of 1954

1    To that end, I would want to start out by talking about

2    the witnesses that came forth before Mr. Bell and established

3    Mr. Bell's activities in Congress Park over the years of the

4    conspiracy and even before.

5        As the Court has already indicated, there is some evidence

6    the Court has found, I think by clear and convincing evidence,

7    that Mr. Bell was in fact involved in a conspiracy.

8        However, the level or the amount of time that Mr. Bell

9    will spend incarcerated as a result of being found to be involved

10   in a conspiracy I think more than quadruples the guidelines

11   without the relevant conduct -- and without the other

12   enhancements, the weapon.

13       Essentially, as opposed to looking at, I think, six or

14   seven years, Mr. Bell is now under the 292 months, I believe

15   looking at 24, 25 years because of primarily the relevant conduct

16   or the conspiracy.

17       The conspiracy was established through a number of

18   witnesses who were, in our opinion, not credible.  The reason

19   they're not credible is because of how their testimony was

20   obtained by the government.  In other words, almost all of them

21   were testifying pursuant to some type of plea agreement where

22   they would get a benefit if they helped out the government's

23   case.  And the plea agreements were basically clear that it was

24   up to the government as to whether or not they got time off their

25   sentence.  In other words, they had to satisfy the government.

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 1789 of 1954

1           Each and every one of these people understood that, and

2    they understood what the charges were.  And so our position is

3    they colored their testimony along those lines.

4           And I think one of the things that the Court can look at

5    is how uniformly these witnesses testified about Mr. Bell.  It's

6    difficult to imagine that 14 people would get up here and say the

7    same thing about the same person repeatedly.  Even if for some

8    reason we believed it was true, how do these people all say

9    exactly the same thing?  It was almost as if they had been

10   programmed to do so.

11          If the Court recalls, at one point I made an objection

12   during the course of the testimony because the government

13   prefaced all its questions about Mr. Bell as it began to get into

14   the particular area of Mr. Bell with, "What about Boy-Boy?  What

15   about Gregory Bell?"  Never did any of these witnesses say "and

16   Mr. Bell was also involved in this."

17          The government specifically said, "What about Boy-Boy?"

18   And then once the witnesses began to testify, they did not

19   testify in specifics, they testified in these huge generalities.

20          "Well, Mr. Bell or Boy-Boy sold me weight."

21          "Well, when did he sell you weight?"

22          "Well, about this time period."

23          "Well, how often would he sell you?"

24          "It depends."

25          Witness by witness gave a different variation of how often

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1790 of 1954

1   Mr. Bell allegedly sold to them.

2        The ultimate problem for us, Your Honor, is that Mr. Bell

3   can't shoot at a moving target.  In other words, he can't mount a

4   defense to those witnesses because those witnesses won't give him

5   specifics to permit him to mount a defense.

6        By way of example, to the extent that Mr. Bell could mount

7   a defense and call witnesses in his defense, he did; and in some

8   instances, these witnesses did, in fact, contradict the witnesses

9   the government put on.

10        I would call the Court's attention to Detective Bruce

11   Faison who indicated that he knew Mr. Bell for a number of years,

12   would drive through the neighborhood repeatedly over the day or

13   from time to time, and often he would see Mr. Bell outside but

14   not engaging in narcotics transactions.

15        Detective Faison's testimony was really the only thing

16   that we could put forward to say that Mr. Bell did not sell

17   narcotics during that period, and all we could do was put forward

18   information that basically was scatter shot at that time period.

19        To the extent that Detective Faison's testimony did come

20   in, it did rebut some of the government's witnesses' testimony,

21   in particular Kairi Kellibrew, who would say that Mr. Bell was

22   out there all the time.  He was either, according to Kairi

23   Kellibrew, out there selling the drugs or inside playing Madden

24   football.

25        That simply isn't possible if Detective Faison's testimony

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1791 of 1954

```
 1    is true.  Detective Faison indicated that he would come through

 2    the neighborhood from time to time, sometimes unbeknownst to

 3    Mr. Bell, and observe Mr. Bell in the neighborhood.  That was his

 4    job as a detective, to come through sometimes when he was on duty

 5    to detect crimes, I guess is the best way to put it.

 6         In any event, Your Honor, that was the best Mr. Bell could

 7    put on to rebut the government's witnesses, and to the extent it

 8    did rebut the witnesses, it undercuts the credibility of the

 9    government's witnesses.

10         With regard to Ms. Craven and other supervisors of

11    Mr. Bell, they also, to a certain extent, undercut the

12    credibility of the government's witnesses.  They were not

13    permitted to testify to the full extent of their knowledge for

14    evidentiary reasons, but the Court was able to hear through

15    proffer some of what they would have said.

16         What they did say was that Mr. Bell was a hardworking

17    individual who came to work every day, worked overtime sometimes,

18    and also he had his own tow truck business that he operated.  All

19    of these things consumed time in Mr. Bell's life at a period when

20    the government's witnesses claimed he was selling narcotics all

21    the time or a great deal of his time.  That undercuts the

22    government witnesses' testimony regarding Mr. Bell's involvement.

23         The other thing, Your Honor, is sometimes all we have to

24    point to is evidence that something wasn't there.  In this

25    particular case the government claims that Mr. Bell sold over one
```

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1792 of 1954

1    point, I think, four kilograms of crack cocaine.

2         The overriding question that is presented at that point

3    is, where did the money go?  If all of these drugs were worth

4    what the government said they were worth during the trial, where

5    is the money?

6         Their witnesses established that Mr. Bell drives an older

7    model car.  He has one car.  He bought two tow trucks to open his

8    own business through proceeds that he got as a result of a civil

9    suit and a settlement.  There is not a lot of money out there for

10   Mr. Bell.

11        I believe one of the government's witnesses -- and I'm

12   blanking on his name -- indicated that he had made so much money

13   that he was able to buy a nice house and invest this money.

14   That's not true of Mr. Bell.

15        So the government's -- ultimately, there's a void of

16   evidence to substantiate the government's witnesses' testimony.

17   It's our position that their testimony should not be relied upon

18   to give this man an additional 15 years, 10 or 15 years on a

19   sentence based on what they said and based on their word.

20        I think many of them during the course of the trial

21   admitted that yes, they lied; yes, they would be dishonest in

22   order to get this deal; yes, this deal was something that weighed

23   heavily on their mind.

24        And I know that there are courts out there who have

25   decided that when the Court is going to look at the testimony of

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1793 of 1954

1    an informant or an addict informant, that the Court should be a

2    little more careful.  In this instance, there's another reason.

3         The government wants the Court to attribute a great deal

4    of narcotics to Mr. Bell based on these witnesses' testimony, but

5    not one of them could give the Court an actual amount.  They all

6    said an eight ball here or this amount here, but they never could

7    add up exactly what amount they claim Mr. Bell was responsible

8    for over a period of time.  So, in truth, we're left to guess

9    what that amount is.

10        The other thing we don't know is whether or not what

11   they're claiming that Mr. Bell sold them was actually crack.  We

12   don't know that.

13        At least one of the government witnesses claims that he

14   sometimes -- or other witnesses would sometimes sell --

15   essentially what was a knock-off, which was fake crack.  And so

16   we don't know what they're claiming he sold.

17        So, we believe that all of those things, the witnesses'

18   credibility, the fact that we don't know what the actual

19   substance was that they are claiming was sold, all add up to the

20   Court should not take their word on such a serious matter as to

21   how much Mr. Bell's life he should spend incarcerated.

22        So we think that as far as the conspiracy is concerned and

23   as far as his conduct is taken into consideration, the 3553, that

24   should not be a consider -- that should not be something that the

25   Court finds persuasive enough to further punish Mr. Bell.

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013      Page 1794 of 1954

1          With regards to another aspect that I think the Court

2     should consider, and that's actually what's going on in terms of

3     this case and why it was brought the way it was brought.

4          What was the government's motivation, for instance, to

5     dismiss a gun and drug charge against Mr. Bell almost ten years

6     ago in a 1996 case, but then to bring it in this conspiracy ten

7     years later.

8          What was it that caused them to dismiss other charges

9     against other co-defendants then and then bring them back now?

10          The truth of the matter is the only way that they get the

11     enhancements that they're looking for from the Court at this

12     point was to bring those charges in here now and to make those

13     allegations now after they've been dismissed because, as one of

14     the jurors -- I believe his name is Mr. Karim -- pointed out, he

15     did not believe the government would ever have brought those

16     cases unless they brought them under the umbrella of conspiracy

17     and that really is what's going on.

18          The only way the government gives the Court the permission

19     to sentence him to such a harsh level is if they bring it under

20     the theory of conspiracy.  Without the theory of conspiracy, then

21     a lot of the witnesses who the government brought in here that

22     they're relying on now never would have testified against

23     Mr. Bell, and so that information probably would not have been

24     before the Court.

25          So how, then, is the government -- what's really going on

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 1795 of 1954

1   is the government is looking for the Court to bail them out.

2   Because they couldn't prove it any other way, so they bring it as

3   a conspiracy and they count on the court to bail them out.  And

4   that's really what's going on in terms of the relevant conduct or

5   the acquitted conduct being attributed to Mr. Bell at this point.

6       It seems that it's probably more fair to punish Mr. Bell

7   for the conduct that they were able to convict him of and nothing

8   else; otherwise, it undercuts, I think, the fairness in our

9   system of punishing someone for something that they haven't been

10   convicted of doing wrong.

11       Now, I understand that the case law gives the Court the

12   discretion to do just that, to punish him for the acquitted

13   conduct or the relevant conduct, but with all due respect, just

14   because the Court of Appeals, or Congress, says the Court may do

15   it, it doesn't mean the Court should do it or has to do it.

16       And in this particular case, I think when you consider all

17   the things that are going on here, the reason this case was

18   brought this way, the evidence that this stuff is based on, and

19   on balance, it's not something that should be used to incarcerate

20   Mr. Bell for a substantial period of time.

21       Not to beat a dead horse with regard to obstruction of

22   justice and the other things that the government is going to ask

23   the Court, I believe under 3553, to consider -- the obstruction

24   of justice, the enhancement on the weapon, and the other

25   things -- I think the same argument is in place.

USCA Case #11-3031      Document #1445852           Filed: 07/10/2013      Page 1796 of 1954

1       What is the basis of the information?  What does the

2  government base its request on?  And that again is the weak

3  testimony of the informants, the government informants, which

4  again should be looked at highly suspiciously, looked at in a

5  highly suspicious manner by the Court.

6       If I may, Your Honor.  Court's indulgence.

7       The other factors that I think the Court should look at is

8  actually Mr. Bell himself and the positive aspects of Mr. Bell.

9       We've established at this point Mr. Bell's negatives, but

10  does he have any positives to offer?  Because that is something

11  that the Court will consider in its sentencing under the statute.

12  And the Court was able to hear some of Mr. Bell's positives.

13       Detective Faison was the one who could give us the most

14  testimony about Mr. Bell's youth and what went on during his

15  youth and how he came up.

16       Detective Faison indicated that he had, in fact, caught

17  Mr. Bell, I guess, misbehaving, for lack of a better word.

18  Detective Faison straightened him up and basically put him back

19  on the path, a positive path.

20       Over the years, Detective Faison testified that Mr. Bell

21  was always coming out with some scheme to make money because he

22  wanted to earn money.

23       Mr. Bell had a van that he sold clothes out of.  Mr. Bell,

24  like I said, bought the two tow trucks.  Mr. Bell worked.  So

25  there are positives to Mr. Bell.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1797 of 1954

1    The other thing that Mr. Bell did was he was engaged in

2    the STEP Foundation that the Court heard a great deal about.  And

3    initially the government said that the STEP Foundation was just

4    another way -- and I may be remembering this wrong -- but it was

5    another method that Mr. Ball and others used to control the

6    neighborhood.  But I think Mr. Ball's attorneys did a pretty good

7    job of demonstrating to the Court that the STEP Foundation was

8    not some fraudulent foundation, that it had significant support

9    from the community, and that it was an organization that was

10   doing good in the neighborhood.  Mr. Bell participated fully in

11   that.

12   Ms. Craven would have testified to the number of meetings

13   that Mr. Bell attended.  I think there was a lot of information

14   conveyed to the Court in the bench conferences about what she

15   would say, and then we had to tailor our questions to go around

16   those -- actually, what was going on at those meetings to

17   demonstrate that Mr. Bell was at the meetings and, therefore,

18   could not be out there selling drugs the way some of the

19   government witnesses were saying.

20   But the point was that those meetings were for the STEP

21   Foundation, and the community was in here talking about how to

22   better the neighborhood.  Mr. Bell participated fully in that.

23   So that is a positive that Mr. Bell has going for him

24   that's not considered in the guidelines and should be considered

25   by the Court.

USCA Case #11-3031     Document #1445852       Filed: 07/10/2013     Page 1798 of 1954

1          The other thing that Mr. Bell has going for him is he is a

2     family man.  He has 11 kids that he takes care of, that he was

3     taking care of before he was incarcerated before he was arrested

4     on this charge.

5          Those kids are now without the support of their father,

6     who was working two jobs and was vigorously pursuing his tow

7     truck business, and that was established by his supervisors who

8     all indicated that Mr. Bell would come in after he would finish

9     his normal job and start to ask to identify cars that needed to

10    be towed because that's how he could make extra money.  So there

11    are a lot of positives for Mr. Bell.

12         The other positive that I neglected to mention earlier was

13    the one conviction that happened so long ago.  Mr. Bell did

14    not -- has not been convicted of anything else since then.

15         That, I guess -- those are some of the positives.  I think

16    the Court will recall that there were other positives throughout

17    the trial that came up regarding Mr. Bell.

18         For instance, I think it was Gail Parson who indicated

19    that Mr. Bell had at one time taken her to a drug treatment

20    program to try to get her help, that he had purchased groceries

21    for her.  And I think Jacques Powell had to actually admit at

22    some points that Mr. Bell had assisted his mother in paying rent.

23         I know that Ms. O'Brien, Brittany O'Brien explained to the

24    Court that Mr. Bell was, in fact, somebody that she would go to

25    talk to sometimes and get advice about what was going on in her

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 1799 of 1954

1   life.

2        Mr. Bell was seen as one of the older people in the

3   neighborhood who could help the younger people go in the correct

4   direction.

5        And there was another witness who testified on behalf of

6   the government about a fight that broke out when some youngins

7   were throwing things at Mr. Bell and some of the other people,

8   and the witness -- I think it was Tenay Gross, I'm not certain --

9   the witness indicated it was Mr. Bell who was trying to keep the

10  peace.

11       So, those are positive things that were going on.

12       Another thing that the Court, I believe, should take into

13  consideration are the sentences that the other people who are

14  part of the alleged conspiracy received.  And I was able to find

15  some of the sentences by going on ECF, but there were other

16  sentences I couldn't locate.

17       But just by way of example.  I believe, according to the

18  ECF system, the Chow Wow, Gerald Bailey, got 51 months for his

19  involvement.

20       Gail Parson, I believe, was sentenced to one day.

21       Raymond Bell, 146 months.

22       Dominic Samuels, I believe, got 84 months.

23       Mary McClendon, all her charges were dismissed.

24       Phillip Wallace, 75 months.

25       Newett Ford, 262, I think was the highest so far that I

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1800 of 1954

1    was able to find.

2         What I could find, of the people I could find out

3    information about, was all of them had more substantial records,

4    criminal records, than Mr. Bell had.  And I don't have their

5    presentence reports, so I'm not certain of that.  But through, I

6    guess, word-of-mouth and checking with other attorneys in the

7    system, I believe that those people who had those sentences had

8    other priors.

9         I say all this to say that Mr. Bell's sentence should fall

10   somewhere in relation to those other people.  And if those other

11   people -- and I believe this to be true -- if those other people

12   had prior convictions, they pled guilty to the conspiracy itself,

13   and they received these sentences, then Mr. Bell should be

14   sentenced somewhere on the same kind of a sliding scale based on

15   what he was convicted of.

16        He was convicted of the three sales of five grams.  That's

17   it.  He didn't plead guilty to the conspiracy and the massive

18   amount of drugs.

19        So, from that standpoint, Mr. Bell's ultimate sentence

20   should be substantially lower than some of the other people who

21   had the higher records -- the heavy records who were involved in

22   violence.

23        I don't know what Dominic Samuels received, but I believe

24   he pled guilty to a manslaughter, I believe, that was part of a

25   murder, and received -- and I think it's somewhere in like 84

USCA Case #11-3031      Document #1445852         Filed: 07/19/2013      Page 1801 of 1954

1   months, is what it is.  He received a sentence of 84 months.  He

2   took a life.  I think in the scheme of things, is a life more

3   valuable than the sale of drugs?

4        And the government, I guess in the plea, waived off the

5   conspiracy, although I think the Court would have found that he

6   was, in fact, involved in the conspiracy.

7        All of those things taken together, I think, indicate that

8   Mr. Bell should receive less than what Dominic Samuels received

9   because he did not take a life in the whole scheme of the

10  government's allegations.  Mr. Bell did not take a life.

11       To sum up, Your Honor.  With regards to fashioning a

12  sentence that's appropriate for Mr. Bell, taking into

13  consideration all the things that I said prior to this, Mr. Bell

14  should be sentenced within the guideline range of, I believe it's

15  51 to 63 months because, really, that's what he's responsible

16  for, the crimes that he was convicted of.

17       I know the Court has found that he was involved in this

18  conspiracy -- not found -- but by clear and convincing evidence

19  based on the testimony that the Court heard from the government's

20  own witnesses.

21       But I would invite the Court to take into consideration

22  Mr. Bell's witnesses and then some of the information that the

23  Court was presented through Mr. Bell's witnesses as it now

24  considers, under 3553, how much of the conspiracy should Mr. Bell

25  be given credit for.  And I think when the Court does that and

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013     Page 1802 of 1954

1  recognizes just how much these other witnesses had to gain -- and

2  also remember that a lot of these witnesses -- I don't want to go

3  down the list -- but many of them are admitted to being involved

4  in robberies, admitted to being involved in shootings and

5  fightings and all kinds of violence, and it's the type of

6  violence that Mr. Bell was never even accused of.

7       Kairi Kellibrew, one of the more unsavory government

8  witnesses, talked about having sex with 14-year-olds.  In many

9  jurisdictions, that's statutory rape at the age he was, because

10  he clearly said he was driving.  He would not admit to what his

11  age was at the time, but he did say he at least had a driver's

12  license and was driving.  And I think a 16-year-old, 17-year-old

13  having sex with multiple 14-year-olds makes him a questionable

14  individual.  And that's testimony that the government relies on

15  to have the Court enhance Mr. Bell's sentence.

16       And I think, based on all those things, Mr. Bell does not

17  deserve anything near a sentence of 292 months, and we would ask

18  that he be given something substantially lower than even the 84

19  months that Dominic Samuels received.

20       Thank you.

21       THE COURT:  All right.  Thank you.

22       Mr. Leon.

23       MR. LEON:  Thank you, Your Honor.

24       I'm going to -- I may jump around about a bit.  I'll try

25  to be -- but I do want to address various points Mr. Beane made,

1    but let me see if I can start kind of with some large points.

2         As the Court knows and the case law indicates, now that

3    the Court has found a criminal history -- an offense level of 38

4    and a criminal -- and a criminal point of one, that is the

5    initial benchmark and starting point under the *Gaul* and *Kimbrough*

6    analysis.

7         And that's -- obviously, the Court can, and my sense is,

8    the court may likely depart downward from that initial benchmark

9    and starting point based on earlier ruling -- excuse me --

10   earlier sentence the Court gave, but I would -- that is the

11   starting point.

12        And I do want to at least make a few points, in part to

13   respond to Mr. Beane and in part to make them for this record

14   with this defendant, why we would respectfully submit that if the

15   Court is going to make a departure for crack powder reasons, for

16   other reasons -- which we understand the Court certainly has the

17   discretion to do -- that it consider not departing an incredibly

18   significant amount, and people can disagree as to what that

19   amount is.  Let me make the following points.

20        First, let me just clear up a couple of a factual

21   inaccuracies; I don't think they were intentional, but my memory

22   is different on a few issues than Mr. Beane's.

23        I do remember -- and these are minor, but some of them are

24   not minor -- Mr. Beane makes reference to Gail Parson getting

25   drug treatment and that his client, Mr. Bell, drove her to drug

1    treatment.

2         My memory is that there was testimony from her about that,

3    and I thought it was Antwuan Ball, not Gregory Bell.  It's a

4    minor point, but it's my memory.

5         My memory is more clear on this.  Mr. Beane made reference

6    to the fact that Mr. Gregory Bell testified -- excuse me -- there

7    was testimony in this case about a fight going on in Congress

8    Park and Mr. Gregory Bell was a peacemaker.  I'm pretty sure I

9    know the incident that he's talking about, and I think

10   Mr. Beane's memory is exactly wrong on that.

11        There was testimony in this case from Brittany O'Brien,

12   corroborated by at least one other person, whose name I forget,

13   that there was a fight in Congress Park in 2003 around the time

14   of the Michael Smallwood stabbing.  I believe shortly before, but

15   in that time period.

16        And there was a fight between Michael Smallwood and Travon

17   Shaw younger groups, the youngins, if you will, and the older

18   members of Congress Park, including Gregory Bell.

19        There was testimony on this record that Mr. Bell, Gregory

20   Bell, got up and yelled at Travon Shaw and Michael Smallwood and

21   specifically directed -- was screaming at them, telling them that

22   he's afraid of them -- excuse me -- that he is not afraid of

23   them, he's annoyed with them, tired of them trying to take over

24   the neighborhood.  There was testimony in the record about that.

25        There was testimony about an argument, and the testimony

USCA Case #11-3031      Document #1445852           Filed: 07/10/2013      Page 1805 of 1954

1   was that Mr. Bell was angry that the youngins were trying to take

2   over what he and his friends had established.  And we introduced

3   that very testimony to exactly establish the bad blood between

4   Trevon Shaw and Antwuan Ball, et cetera.  So Mr. Beane, with

5   respect, is just wrong on that.

6       He talks about the testimony of Detective Faison as

7   somehow establishing the same negative that he says the

8   government shouldn't be trying to establish.  We think that this

9   record is clear.

10      Detective Faison, he's not even a detective anymore, I

11  don't believe.  He's a two-time admitted liar.  Incredibly --

12  incredibly incredible testimony in this case.  Obviously friends

13  with Mr. Gregory Bell, considers him family.

14      And basically my memory is that Mr. Faison got up here

15  basically to discredit Kairi Kellibrew, but his main purpose was

16  to get up and talk about the reputation of Kairi Kellibrew for

17  not being an honest broker, not being an honest guy.  And then he

18  said, "Oh, yeah.  By the way, I know and I like Gregory Bell, and

19  whenever I'm around him I don't see him dealing drugs."  That's a

20  bunch of nothing, with respect.

21      That's just some of the -- one last factual thing I

22  caught, and I'll talk about Dominic Samuels in a moment when we

23  talk about -- when I refer to equal sentences.

24      But Dominic Samuels only had the murder charge left.

25  There was nothing to plead him to.  So, Mr. Beane, I think was

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1806 of 1954

1    talking about how the government could have pled Mr. Samuels out

2    to some drug charges or conspiracy charges.  That's not the case.

3        Dominic Samuels, there was acquittals on the -- I think it

4    was two drug charges, and the only thing remaining for him was a

5    very serious charge, murder, and that's what we were planning to

6    go to trial with him on, and that's what he pled to, and I'll

7    talk about that in a bit -- in a moment or two.

8        The Court, obviously, has a lot of discretion and

9    obviously the Court sat through this case.  To the

10   government's -- as we sat through the case and we sifted through

11   the evidence and we considered it, in our mind it was clear that

12   there were three defendants:  Antwuan Ball, David Wilson, and

13   Dominic -- excuse me -- and Desmond Thurston who were the most

14   violent, the most entrenched, also leadership with respect to

15   Antwuan Ball and David Wilson and committed a lots of robberies

16   and violence.

17       Of the next three, Gregory Bell certainly was at the top

18   of that next three in our judgment.  For one important reason,

19   Your Honor, more than Joseph Jones and more than Dominic Samuels,

20   Mr. Ball was entrenched in the conspiracy.

21       There was no question on this record that Mr. Ball, in the

22   words of Jacques Powell, was the wholesale king.

23       THE COURT:  You said Mr. Ball or Mr. Bell?

24       MR. LEON:  I misspoke.  I apologize.  That Mr. Gregory

25   Bell -- thank you -- was the wholesale king, in the words of

1    Jacques Powell.

2         And witness after witness after witness did testify with

3    reason that he was the guy to go to if you needed drugs.  He was

4    the guy to go to if you needed to buy drugs -- crack cocaine.

5         He was the guy to go to if you were a drug dealer in

6    Congress Park and were short.  You could go to Boy-Boy, you could

7    go to Gregory Bell, and you could get re-upped.  You could get

8    supplied.  You could get your wholesales.

9         Mr. Gregory Bell is a 38-year-old man who did quite well

10   in Congress Park, and this record is clear that he is by far --

11   was by far the most prolific drug dealer in Congress Park.  He

12   held an incredible vital role.  He was entrenched in this

13   conspiracy, and he, I think on this record, more than anyone by

14   far held this narcotics conspiracy together, kept Congress Park,

15   the dangerous neighborhood that it was.

16        And I'll just refer to the sentencing memo on a few points

17   on this.  We put the chart together on page 11.  The chart is

18   telling.  It shows -- the record is clear on this.

19        The FBI was looking at Congress Park from -- starting in

20   about 2000 and the takedown was March 22nd of 2005.  You look at

21   that chart.  June of 2000 is the first time Gregory Bell made a

22   controlled purchase that was recorded by the FBI.  The very last

23   one is March 2nd of '05, just days before the takedown and

24   everything in-between.  Gregory Bell was at it day in, day out,

25   all the time, just as the witnesses said time after time after

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1808 of 1954

 1    time.

 2          There's a reason that Kairi Kellibrew, a witness that the

 3    Court has credited now, referred to an alley as *Boy-Boy's alley*.

 4    He was doing this all the time.  He did this constantly.  And

 5    as -- I'll just leave it there for now.

 6          So, with the understanding that the Court may likely

 7    depart downward from the starting point and benchmark, we would

 8    ask the Court to at least strongly consider the fact that to our

 9    ears, and as we considered and listened to the evidence, Boy-Boy,

10    Gregory Bell, was one of the foremost entrenched members of this

11    conspiracy.  He was the most -- he had a vital role in this

12    conspiracy; certainly more than Joseph Jones, certainly more than

13    Dominic Samuels with respect to the conspiracy.

14          Mr. Bell disparages many people.  I forget the exact word

15    he used to put down Kairi Kellibrew.  It's worth noting.  Kairi

16    Kellibrew, I think we can all agree he's got a lot of problems

17    and he's done a lot of bad things.  Kairi Kellibrew has admitted

18    that as well.

19          Kairi Kellibrew was mentored by Gregory Bell.  Kairi

20    Kellibrew was mentored by Antwuan Ball.  Kairi Kellibrew is ten

21    years the junior, at least ten years the junior, I believe, of

22    Gregory Bell.

23          Kairi Kellibrew became in part the person he is, the

24    person who's now being disparaged by Gregory Bell, because of

25    Gregory Bell.  And I just think that's ironic, to say the least.

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1809 of 1954

1          But again, Kairi Kellibrew is unfortunately a poster child

2   for what the Congress Park neighborhood sometimes produced.  It

3   produced, obviously, a lot of brave citizens, it produced a lot

4   of great citizens, but the Kairi Kellibrews of the world were

5   produced by the Gregory Bells of the world, in part at least.

6          Mr. Bell referred to cooperating witness saying that the

7   government relied only on cooperating witnesses.  That's

8   certainly not true.

9          Marilyn Proctor, who's in the sentencing memorandum, was

10  not a cooperating witness.  Steve Marsh, who testified at this

11  trial, is just one of several examples of people who had no

12  cooperation agreements in this case.

13         And there's a lot of ample evidence in this record of the

14  danger of this conspiracy, and some of them are from cooperating

15  witnesses, some of them are not.

16         Another error that Mr. Beane made, but it's relevant to my

17  allocution, Your Honor, is Mr. Beane's argument, well, there was

18  too much generality, where was the specificity?  Kind of the

19  argument, *Well, I have to prove a negative here that Mr. Gregory*

20  *Bell was not a day in, day out drug dealer.*

21         I would direct the Court and Mr. Beane just -- as one

22  example to the testimony of Cedric Conner, which we cite on pages

23  17 and 18 of our memorandum.  We cited a specific place in the

24  transcript, and it's here.

25         Mr. Conner testified that when he sold to Gregory Bell he

1     often sold him in the range of a 31 to a 62 of crack cocaine,

2     approximately two or three times a month in 1999 and 2000.

3     That's specific.

4          That witness was cross-examined and he talked about it,

5     and this Court has credited that witness.  And this Court has

6     correctly said that that alone, that witness alone, for just that

7     limited period of time, is worth at least a thousand grams,

8     meaning one kilogram of crack cocaine in the hands of Gregory

9     Bell.  It's a good example of the entrenchment of how vital of

10    the role that Gregory Bell played.  So there was specificity.

11         He makes reference to the STEP Foundation.  I'm not going

12    to say much about that.  Obviously, the government has a

13    different take on the Step Foundation, but there is certainly

14    evidence on this record that the STEP Foundation, the leader of

15    the STEP Foundation, Antwuan Ball, while he was purportedly

16    protecting and trying to help the community also had an office

17    with a COSU poster and, obviously, had strong feelings about

18    cooperation and snitching.  And based on the allocution -- there

19    was a poster in the office that was admitted in this record, and

20    that's an organization that Mr. Gregory Bell apparently proudly

21    associates himself with.

22         He talks about all the good that Mr. Bell did, Gregory

23    Bell did.  I'm not here to say that he's bad in every way.  Of

24    course, no person is.  But we gave the example in our reply

25    memorandum about how, while he's working a construction job, he's

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1811 of 1954

1   trying to race off and make some real quick hard fast money

2   selling drugs to crack addicts like Sandra White.

3        At the same time he's working and trying to rebuild the

4   community working for the Step Foundation, he's threatening

5   security officers like Donna Brown.

6        At the same time he's apparently trying to rebuild the

7   community, he's associating himself with the Step Foundation and

8   dealing drugs.

9        Two other very quick things, Your Honor.

10       Just a final point on the earlier things.  The, the, the

11  off the word entrenchment, which I keep using.  Gregory Bell was

12  with this conspiracy from its inception, 1992, 1993.  That's from

13  the testimony of Kairi Kellibrew and others.  And, Bobby Capies

14  and others.  There's evidence of that on this record from various

15  witnesses.  And again, in Gregory Bell up until just days before

16  the takedown is out there hustling and selling crack cocaine.

17       Finally, with respect to other sentences -- and,

18  obviously, that is one of several considerations the Court can

19  and should and I'm sure will take into consideration -- Gail

20  Parson didn't have any prior convictions.  In some ways, it's

21  apples and oranges.  I'm not going to go through every witness

22  here.

23       I will, though, with respect to Joseph Jones, who

24  certainly is in a -- while he's in a different profile is

25  certainly in a very similar posture.  In our judgment, the

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1812 of 1954

1  government's judgment, Mr. Jones was less entrenched in this

2  conspiracy.  He was less vital to certainly the narcotics

3  conspiracy.  That's our judgment based on sitting through all the

4  evidence the way this record played out.

5       And Newett Ford, who got 262 months.  Mr. Ford, my memory

6  is that he did have two prior convictions for distribution, which

7  certainly counted against him, but he was by all measures -- his

8  name barely came up in this case for a reason.  He was a

9  nonviolent, low level flunkie for Burke Johnson, and he had 262

10 months from this court.  Again, a different posture, but in some

11 ways it's apples to oranges.

12      Could I just have one moment, Your Honor?

13      THE COURT:  Yes.

14      (Discussion had off the record.)

15      MR. LEON:  Thank you very much for your time, Your Honor.

16 I have nothing further.

17      THE COURT:  All right.  Mr. Bell, would you like to say

18 anything?  Mr. Beane.

19      MR. BEANE:  Yes.  May I just offer I guess a short

20 rebuttal to what the government said right now.

21      THE COURT:  I'll give you a moment, yes.

22      MR. BEANE:  Thank you.

23      Just briefly, Your Honor.  With regards to any

24 inaccuracies I may have said while I was up here.  I apologize.

25 That was not my intent.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1813 of 1954

1    With regards to being inaccurate about the number of

2    witnesses who were testifying under plea agreements or me

3    saying -- talking about them, I never said that all of their

4    witnesses were under plea agreements.  I said primarily the ones

5    that were supporting the conspiracy were, and primarily, not all

6    of them, so that was not an inaccuracy or wrong as Mr. Leon said.

7    With regards to detective or former Detective Faison being

8    not credible because he lied twice.  That's clearly a *What's good*

9    *for the goose is good for the gander* argument.

10    The government's witnesses, who they are saying are

11    reliable, also got up there and said that yes, they lied.

12    Detective Faison was not testifying under agreement.  But

13    more importantly, Detective Faison was a decorated detective.  He

14    testified that then-U.S. Attorney Wilma Lewis actually gave him a

15    certificate awarding him *Detective of the Year*.  So, I don't

16    think it's fair to come here now for the government to say that

17    he absolutely lied on the record simply because he knew Mr. Bell.

18    As far as Cedric Conner went with regards to the amounts

19    or the specificity.  Mr. Conner makes our point.  He gives a

20    year, a span of time, several years, as the government points

21    out, and then a significant amount of weight per sale, but he

22    doesn't give us anything that we can put up a defense against

23    other than what we did.

24    We called in the witnesses we knew who could -- who could

25    account for where Mr. Bell was at the times that we knew about,

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1814 of 1954

 1    Detective Faison and his supervisors, but other than that, we

 2    could not rebut what they said because of the lack of

 3    specificity.

 4         There is a certain amount of unfairness in that, and

 5    that's all we're asking the Court to take into consideration, is

 6    that we can't rebut what they don't give us.  In other words, if

 7    they don't give us a target we can't hit it.  To say he sold

 8    drugs over a vast period of time and say, "Now, come forward and

 9    prove you didn't," we can't do that, and we think the Court

10    should take that into consideration as you consider the fairness

11    and that's what we were saying on that point.

12         Thank you.

13         THE COURT:  Mr. Bell, would you like to say anything?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Was that a yes or a no?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Yes?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  You can come forward.

20         THE DEFENDANT:  Thank you, Your Honor, for giving me a

21    chance to say something.

22         For the record, I want to apologize to my family, my

23    mother, my girlfriend, my kids, and for taking up the Court's

24    time as far as all the money they spent on my behalf.

25         And I would like to say that as far as the Court spending

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 1815 of 1954

1    as much time and effort to prosecute me, me knowing my time and

2    effort I put into the community, I feel as though I should

3    have -- just have some type of leniency and lay my feet down to

4    the Court.

5         I was willing to go off and do a certain amount of time

6    that I should have been responsible for, but I -- from the grudge

7    of the government and how biased they were against me -- I heard

8    my lawyer several times to say, *Give me a certain amount of time*

9    *and I'll go lay down.*

10        But I don't know why they wouldn't just give me an

11   opportunity to just go do some time, and they wanted me to go

12   through this and they wouldn't let me get my time, but I don't

13   want to sit here and bicker and cry about the situation.

14        I just wanted to apologize to my family, my mother, and to

15   the Court for wasting valuable time, and it's just a

16   mis-speculation about me and who I was when they laid down the

17   pattern of who I was.

18        So, I'm just going to sit back and see what the judgment

19   going to be.  I apologize to my mother and my girlfriend and my

20   sisters and my kids.

21        Thank you.

22        (Pause)

23        MRS. BELL:  Your Honor, may I say something?

24        MR. BEANE:  Your Honor, I hear Ms. Gregory Bell's mother

25   asks to say something to address the Court.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1816 of 1954

1        THE COURT:  You may report to me whatever it is that she

2   wants to say, but I'm not going to have additional people coming

3   up.

4        (Discussion had off the record.)

5        MR. BEANE:  Thank you, Your Honor, for the opportunity to

6   speak with Ms. Bell.

7        Essentially, the message that Ms. Bell would like to

8   convey to the Court, I think goes to an issue the Court has

9   already talked about, and that's the obstruction of justice

10  charge with regards to the O'Briens.

11       I think the Court may recall from the testimony that

12  Ms. Bell lived very close to the O'Briens.  Mrs. Bell wants me to

13  convey to the Court that she knows that Ms. O'Brien -- that move

14  was not because of something that Gregory Bell did, but because

15  of some trouble Ms. O'Brien's son may have gotten into in regards

16  to the actual murder, and so I present that to the Court on

17  behalf of Ms. Bell.

18       THE COURT:  All right.  Thank you.

19       Let me make clear several principles that will cabin my

20  sentencing discretion.

21       One argument that has lost force is that a sentence within

22  the prescribed sentencing guidelines range is, per se,

23  reasonable.  In some cases it may be reasonable, but in other

24  cases it might not be.

25       If sentencing judges must simply sentence in lockstep with

1   all sentencing guideline ranges, we risk resurrecting the very

2   evil that Justice Stevens's substantive opinion in *Booker*

3   identified, especially when a sentence is enhanced based upon

4   judicial fact-finding.

5        *Booker* still requires us to calculate and consider the

6   guideline range in reaching fair and reasonable sentences.  I do

7   not read *Booker* to hold that all sentences within the guideline

8   range are, per se, reasonable.

9        As our circuit has said in *United States vs Dorcely* --

10  D-o-r-c-e-l-y -- "A guideline sentence should be accorded merely

11  a rebuttable presumption of reasonableness."

12       Indeed, the Supreme Court made clear in 2007 in *Rita vs*

13  *The United States*, that "the presumption is nonbinding and,

14  quote, applies only on appellate review.  The sentencing court

15  does not enjoy the benefit of a legal presumption that the

16  guidelines should apply.  Closed quote.  Nor does the

17  presumption, quote, require the sentencing judge to impose that

18  sentence," closed quote.

19       That is not to say, though, that we must shun any sentence

20  within any guideline range calculated based upon facts not found

21  by a jury.

22       This circuit has held that the error is not that a judge

23  determines facts under the guidelines which would increase a

24  sentence beyond that authorized by the jury verdict or an

25  admission by the defendant, the error is only that a judge does

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1818 of 1954

1   so in a mandatory guidelines system.

2         Another theory is that the sentencing factors in 18 U.S.C.

3   3553 are already taken into account in the guidelines formulation

4   and make superfluous separate consideration of those factors.

5   That approach renders Justice Breyer's remedial opinion a

6   nullity.  These guidelines now are advisory, not mandatory.  We

7   must consider them and we must consider the other 3553 sentencing

8   factors, not ignore them on the theory that considering them

9   unnecessarily duplicates what the guidelines have done.

10        Our circuit has confirmed that in *United States vs*

11  *Pickett* -- P-i-c-k-e-t-t -- the *Rita* case, too, is consistent

12  with that approach.  Since this is a case involving guideline

13  enhancements prompted by evidence not admitted by the defendant

14  or found by the jury, I will not irrebutably presume that the

15  guideline range generated by that evidence is warranted, out of

16  respect for the majority opinion by Justice Stevens and for the

17  *Dorcely* opinion.

18        Mr. Bell, would you and your lawyer come forward to the

19  podium.

20        The law requires that I consider numerous factors in

21  determining your sentence.  One is the need for the sentence

22  imposed to promote respect for the law.

23        I have conducted voir dire of hundreds of prospective

24  jurors over the years.  When prospective jurors have come forward

25  in response to the standard question of whether they have strong

1    feelings about punishments assigned to drug offenses that could

2    keep them from being fair and impartial, they have invariably

3    complained of the unfair disparity between punishments for crack

4    and powder cocaine.  They are not alone.

5         The Sentencing Commission, whose expertise the *Booker*

6    court has said is entitled to great weight, have drawn the same

7    conclusion.  They have acted now four times to try to reduce or

8    eliminate that disparity from the guidelines.  Their efforts were

9    not without a basis.

10        The Commission hired Professors Peter Rossi and Richard

11   Berk -- B-e-r-k -- to conduct a study comparing the severity of

12   sentences under the guidelines with the severity of sentences

13   deemed just by the public.

14        In their 1995 study published in the 1995 book entitled,

15   quote, *Just Punishments, Federal Sentencing Guidelines and Public*

16   *Views Compared,* closed quote, the professors stated, quote, "The

17   guideline sentences for drug trafficking were established by the

18   Commission in a different fashion than the other crimes.

19   Congress had mandated a specific set of penalties for drug

20   trafficking crimes which were incorporated into the guidelines.

21        Unlike the procedures used in setting sentences for other

22   crimes, the commission disregarded past sentencing practices for

23   drug trafficking crimes as well as whatever understanding the

24   commissioners may have had concerning the preferences of the

25   American public.

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1820 of 1954

1      Our findings shows show that the congressional mandates

2  departed strongly from those preferences," closed quote.

3      Specifically Table 5.5 of the study shows that the public

4  drew virtually no distinction between crack and cocaine powder

5  trafficking and found it to be fair and just those sentences far

6  closer to powder cocaine sentences under the guidelines than

7  crack sentences.

8      Moreover, some of the bases upon which the crack penalties

9  were predicated have been discredited.

10      In the commissioners's May 2002 report to Congress,

11  *Cocaine and Federal Sentencing Policy*, they stated that the,

12  quote, "addictive nature of crack cocaine independently does not

13  appear to warrant the 100-to-1 drug quantity ratio.  Recent

14  research reports no difference between the negative effects from

15  prenatal crack cocaine and powder cocaine exposure, so no

16  differential in drug quantity ratio based directly on this

17  particularly heightened harms appears warranted," closed quote.

18      The report added that, quote, "recent data indicate that

19  significantly less trafficking-related violence or systemic

20  violence as measured by weapon use and bodily injury documented

21  in presentence reports is associated with crack cocaine

22  trafficking offenses than previously assumed," closed quote.

23      In this case, if that corresponding guideline disparity

24  were evened, the base offense level reflected in paragraph 56 of

25  the presentence report for over 1.5 kilos of crack cocaine would

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1821 of 1954

1   be 26, producing a total offense level of 28.  With a criminal

2   history category of one, the guideline range would be 78 to 97

3   months.

4        A sentence several offense levels above that range in this

5   case in my judgment would help promote and restore respect for

6   the drug laws and provide for proper punishment, deterrence, and

7   recognition of the severity of the defendant's offense conduct.

8   It may not, however, avoid the kind of sentencing disparity about

9   which Congress was concerned.

10       Another factor, Mr. Bell, I have to consider is the nature

11   and circumstances of these offenses.

12       For over a decade you were regularly pumping poison in

13   substantial quantities into this community.  You did it with many

14   others, multiplying the number of strung-out people you helped

15   keep strung out.  You lined your own pockets and lessened the

16   lives of countless others.  And you, of all people, knew better,

17   knowing how drug abuse ruins parents and children and families.

18       And it was deplorable to hear that you, as a 24-year-old

19   man, got Kairi Kellibrew started off selling crack when he was

20   just a 14-year-old boy.  This is not community building.  It is

21   community destruction, and it deserves substantial punishment.

22       THE DEFENDANT:  It's a lie.

23       THE COURT:  Another factor is your history and

24   characteristics.

25       You suffered from not having your father in your life and

1    from pressures brought upon you to perform beyond your means and

2    abilities.  Although I am, though, a bit perplexed about that

3    claim and you telling the probation officer that you hadn't seen

4    your father in years and didn't know where he was, since your

5    father came in here and testified and he said you had lived with

6    him for a while.

7         THE DEFENDANT:  Your Honor, that's a lie, Your Honor.  I

8    would never tell -- I just seen my father.  He just testified.  I

9    just seen my father.  I did not tell him that, that I did not see

10   my father.  That is a lie, Your Honor.  That is a cold lie right

11   there, Your Honor.

12        THE COURT:  All right.  I'll take what you have said,

13   then.  But nevertheless, in mentioning other matters, you have

14   lived with parental drug abuse in your early years.  You began to

15   abuse marijuana and alcohol early in your childhood, and you

16   never finished high school.  Despite that, you did manage to

17   obtain a welding certificate, obtain a commercial driving

18   license, learn and use construction skills, and start a tow truck

19   business.

20        As well, exposing you to the applicable range I have

21   determined of 235 to 293 months is a far cry from the far lower

22   range applicable solely to the three small amounts of crack that

23   the jury found that you sold.  That gross disparity in these

24   circumstances are all mitigating factors.

25        Other factors are the kind of sentences available and the

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1823 of 1954

1  kind of sentence and sentencing range recommended by the

2  sentencing guidelines.

3       As I've already determined, the guidelines recommend a

4  sentence between 235 and 293 months in prison at level 38,

5  category one, although the law also provides for as little as one

6  day in prison to up to 20 years in prison on each count as well

7  as terms in-between.

8       Another factor is in the pertinent policy statement issued

9  by the U.S. Sentencing Commission.  The government has cited

10 section 5G1.2(d), which states that "if the total guideline range

11 punishment is greater than the highest statutory maximum, the

12 sentence on one or more other counts of conviction should be run

13 consecutive to produce a combined sentence equal to the total

14 guideline range punishment."  That does not apply here since 20

15 years falls within the guideline range.

16      The final factors are the need to provide restitution,

17 which is not applicable here, and the need to avoid unwarranted

18 sentencing disparities among defendants who have been convicted

19 of similar offenses.

20      Unbridled by the sentencing guidelines, I would find here

21 13 years to be a fair sentence that amply and properly addressed

22 the sentencing factors and goals articulated by Congress in the

23 other subsections of Section 3553.  But I am not unbridled by the

24 guidelines.

25      The Supreme Court requires that I consider the guidelines

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1824 of 1954

1  and not ignore them, just as I must consider all of the Section

2  3553 sentencing factors in reaching a sentence.

3       Some of the factors exert downward influences on the

4  sentencing calculus in this case, others are neutral, and still

5  others exert upward influences.

6       The jury has found that the government has not proven

7  beyond a reasonable doubt the charged narcotics conspiracy.  I

8  respect and abide by that verdict, but I cannot turn a blind eye

9  to the narcotics conspiracy relevant conduct that I have found

10 proven by clear and convincing evidence.

11      The guidelines here exert upward influences and I am not

12 free to simply disregard that anymore than I am free to disregard

13 the Section 3553 factors exerting downward influences.

14      I must ultimately, though, assure that the sentence is

15 sufficient, but not greater than necessary, to reflect the

16 seriousness of the offense, to promote respect for the law, to

17 provide just punishment and adequate deterrence, to protect the

18 public, and to provide you with needed educational or vocational

19 training, medical care, or other correctional treatment in the

20 most effective manner.  I will do that, but 235 to 293 months in

21 prison does not honor that command.

22      The sentence will be equivalent to one falling within an

23 offense level of 36, criminal history Category 1.

24      It's the judgment of this Court that you, Gregory Bell,

25 are hereby committed to the custody of the Bureau of Prisons for

1   a term of 192 months on each of Counts 5, 9, and 12 to be served

2   concurrently.

3          You are further sentenced to serve a 36-month term of

4   supervised release concurrently on each count, and to pay a $100

5   special assessment on each count, for a total of $300.  The

6   special assessment is immediately payable to the clerk of this

7   court.

8          Within 30 days of any change of your address, you must

9   notify the clerk of this court of that change until such time as

10  your financial obligation is paid in full.

11         You shall make payments on the special assessment through

12  your participation in the Bureau of Prisons' Inmate Financial

13  Responsibility Program.  I find that you do not have the ability

14  to pay a fine and I, therefore, waive imposition of a fine in

15  your case.

16         Within 72 hours of your release from custody you must

17  report in person to the probation office in the district to which

18  you are released.

19         While you are on supervision, you must not possess a

20  firearm or other dangerous weapon.  You must not use or possess

21  any illegal controlled substance, and you must not commit another

22  federal, state, or local crime.

23         You must also abide by the general conditions of

24  supervision adopted by the U.S. Probation Office as well as the

25  following special conditions.

USCA Case #11-3031      Document #1445852      Filed: 07/10/2013      Page 1826 of 1954

```
 1          You must submit to the collection and use of DNA

 2    identification information while you are incarcerated in the

 3    Bureau of Prisons or at the direction of the U.S. Probation

 4    Office.

 5          You must also participate in and successfully complete a

 6    residential and/or outpatient substance abuse treatment program,

 7    which may include drug testing and detoxification service as

 8    approved and directed by the probation office.

 9          You must also participate in an educational vocational

10    skills training program as approved and directed by the probation

11    office.

12          The probation office shall release the presentence

13    investigation report to all appropriate agencies in order to

14    execute the sentence of the Court.  Treatment agencies shall

15    return the presentence report to the probation office upon the

16    defendant's completion or termination from treatment.

17          Mr. Bell, you have the right to appeal the sentence that I

18    have just imposed.  If you choose to appeal, you must do so

19    within ten days after the Court has entered judgment in this

20    case.

21          If you are unable to afford the costs of an appeal, you

22    may request permission from the Court to file an appeal at the

23    expense of the government.

24          Counsel, are there any other things we need to take up?

25          MR. BEANE:  I would like to make three -- two requests,
```

1    Your Honor.

2         One, since the Court did find it would be enhancing

3    Mr. Bell's sentence on the gun possession, Mr. Bell spent a

4    significant amount of time incarcerated pending trial on that

5    case before it was dismissed, and we would ask that the Court

6    grant Mr. Bell time for the time -- time served for that amount

7    of time that he was actually incarcerated on that charge.

8         And I'm just not -- I don't recall specifically, but I

9    think I did.  I wanted to make sure that the Court -- that it's

10   in the record that we are objecting under the Sixth Amendment --

11   we're objecting to the sentence under the Sixth Amendment as well

12   as the line of cases:  *Apprendi*, *Booker*, and I wanted to make

13   sure that was on the record.

14        I did want to just mention one thing that Mr. Bell was

15   fairly adamant about, and that was the allegation of Kairi

16   Kellibrew, that he was mentored in any way by Mr. Bell.

17        Of all the things that Mr. Bell admits to, I have never

18   seen him react so negatively as to the allegation from Kairi

19   Kellibrew that he was mentored by Mr. Bell.

20        Based on the witnesses I spoke to, Mr. Bell and other

21   people in the community, Kairi Kellibrew just is not credible and

22   was not mentored by anybody but was called what is -- what was

23   referred to in the neighborhood as a *wannabe*.  He wanted to be

24   involved in almost everything and would lie to get there.  And I

25   wanted to present that to the Court and let the Court know that

USCA Case #11-3031   Document #1445852   Filed: 07/10/2013   Page 1828 of 1954

1    is what Mr. Bell was objecting to so strenuously.

2         THE COURT:  Mr. Bell, you may have a seat.

3         Mr. Leon, I guess all you have to respond to is the credit

4    for time served while Mr. Bell was detained on the charge in

5    relation to the 1996 search warrant gun case.  What was it?

6    1996?

7         MR. LEON:  It was August 1996, and we would object to that

8    for a couple of reasons.

9         One is we do think, and it's possible -- well, we believe

10   there are several reasons for the gun enhancement.  I don't know

11   if the only reason the Court gave the gun enhancement was that

12   '96 search warrant, so if there's a disconnect there --

13        THE COURT:  The answer is it was.

14        MR. LEON:  It was?  Okay.

15        The other -- the other point I'll make generally is that

16   the -- certainly that gun enhancement for that gun that day, the

17   loaded gun in the closet, which I understand the Court to have

18   attributed; based on the same findings and credibility findings

19   against Mr. Raymond Bell, Sr. and the findings of all the other

20   paraphernalia and scale and drugs in that same closet, there was

21   a bullet, separate bullet, which did not link to that armed

22   loaded pistol.  So I think on the Court's still finding on that

23   search warrant, there's certainly a reasonable conclusion that

24   there's another gun that Mr. Bell possessed.  That's a fine

25   point, but let me just make it.

USCA Case #11-3031     Document #1445852        Filed: 07/10/2013     Page 1829 of 1954

1          The other more general point, leading from the micro to

2     the macro, it's my understanding the Court certainly went through

3     a guidelines analysis, but then at the end of the day went off

4     the guidelines and factored in the guidelines, but at the end of

5     the day said, If it was up to the Court, without the guidelines,

6     there would be a 13-year sentence, the guidelines are a factor,

7     and then made it's own adjustments under 3553 and other

8     considerations.

9          So, perhaps I'm conceiving this incorrectly, and if I am,

10    I am, but the additional larger point I would make is this is not

11    a true straight guidelines sentence, and for that reason, the gun

12    bump, while relevant, is less so because the Court factored in

13    3553 factors as well as other factors that the Court made part of

14    this record.  So that's a larger point.

15         So the final point, getting back to a macro point, I don't

16    know, as I stand here -- Mr. Beane is correct that Mr. Bell was

17    arrested that day and it was an arrest that happened in District

18    Court, that's correct.  That's all I know.

19         If there was any incarceration, what the length of that

20    incarceration was, I don't know.  I know that it was dismissed by

21    the government.  I don't know the reasons or the circumstances as

22    I stand here, but it may not have been very much time at all.

23    But that's just an additional thought I had.

24         THE COURT:  Well, I would certainly have to call on

25    Mr. Beane to provide details about what kind of time he's talking

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1830 of 1954

```
 1    about.  But, as a matter of principle, if indeed -- and I have

 2    enhanced his sentence based upon attributing to him that he

 3    possessed a gun during the course of the narcotics conspiracy in

 4    1996, which is a fact that was not found by the jury or admitted

 5    by him.  The argument by Mr. Beane is that it would be fair to --

 6    it would be fair to allow the sentence to credit the time he

 7    served, if there was some time that he served in detention, for

 8    any charge against him pending in connection with his possession

 9    of that gun.  That's the principle.  If you want to add anything

10    else I was asking you to respond to.

11         MR. LEON:  I'll make one other final smaller point --

12    well, related point.  I won't characterize it as smaller.

13         I don't know until Mr. -- if the Court is inclined to

14    consider this request -- if the Court is -- certainly Mr. Beane

15    and I would have to go and look at the record and find out if

16    there was incarceration; if so, for how long.  And if so, then I

17    would respectfully submit we look at the -- we order up the

18    transcript of that hearing.

19         The reason for that is my -- I don't know, but it's

20    certainly possible that that detention, the ruling by the

21    magistrate or the judge who ruled for the detention, may likely

22    have been -- and I'm basing this on my own experiences in

23    court -- for the large amount of drugs and not for the gun as

24    well.

25         So, if we're really going to get down to brass tacks on
```

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1831 of 1954

1    this narrow issue, let's find out why he was detained.  It's

2    possible the judge may have -- or the magistrate judge made a

3    finding that because of this -- because of the large amount of

4    drugs, that triggers a rebuttable presumption because it's ten

5    years or more, so on and so forth; the gun didn't factor in

6    arguably to that detention.  I don't know.

7         But if there's homework to do, I submit that Mr. Beane do

8    it, and I would be happy to work with him and look at any record

9    or materials there are.

10        THE COURT:  Mr. Beane, it certainly does fall to you to

11   present the details I need to know.  If he was in detention, I

12   need to know what the number of the case was.  I need to know

13   what the beginning date and end date of the detention might have

14   been.  I certainly would want to know what the complaint charged,

15   if he was in detention on a complaint.  But you would carry the

16   responsibility for presenting all of that, in any event.

17        MR. BEANE:  I think Mr. Penders can help us out briefly.

18        MR. PENDERS:  Paragraph 77, Your Honor, reflects that

19   arrest, and it appears that he was arrested in August and the

20   charges were dismissed in November.  I think we're talking about

21   a three-month period.

22        If the Court would wish to -- care to take a brief recess,

23   I could run to my office and pull up the Department of

24   Corrections records and get the exact date that he was admitted

25   and the exact date that he was released for that count.

USCA Case #11-3031      Document #1445852         Filed: 07/10/2013      Page 1832 of 1954

1          THE COURT:  All right.  Well, I would want to know the

2     dates, but I would also want to know what the complaint charged.

3          MR. BEANE:  Which complaint?

4          THE COURT:  I'm sorry.  This paragraph reflects possession

5     with intent to distribute cocaine base.  The paragraph does not

6     summarize also a weapons possession charge.

7          As I understand the theory, the theory is if he's had his

8     sentence enhanced because of the gun, if he were charged with a

9     gun and detained on a gun charge, he would ask to have that time

10    credited to him, so I would want to know what the complaint

11    charged.

12         MR. BEANE:  That answer may be directly found within ECF,

13    Your Honor, under the case number as listed.

14         THE COURT:  Well, Mr. Beane, it's your responsibility to

15    get me those details.  You do it however you want.

16         What is your proposal?

17         MR. BEANE:  My proposal is that -- if it the court has

18    time -- to take a 10-minute or a 15-minute break while

19    Mr. Penders attempts to ascertain that, and I'll be more than

20    happy to --

21         THE COURT:  All right.  Well, it's your responsibility,

22    not Mr. Penders.  So you have to come back to me with

23    information, not anybody else.  So what is your proposal?

24         MR. BEANE:  My proposal, then, is -- may I have a moment

25    with Mr. Penders?

USCA Case #11-3031      Document #1445852        Filed: 07/10/2013      Page 1833 of 1954

1          THE COURT:  Yes.

2          (Discussion had off the record.)

3          MR. BEANE:  Can we break for 15 minutes, Your Honor.

4          THE COURT:  Any objection?

5          MR. LEON:  No.

6          THE COURT:  All right.  We'll be in recess for 15 minutes.

7          I would also want to know if you have any authority for

8     the proposition that that would be doable, that I can do that,

9     aside from whether it's appropriate to do it.  So, that's what I

10    need to know:  the dates, what the complaint charged.

11         MR. BEANE:  Certainly.

12         THE COURT:  We'll be in recess for 15 minutes.

13         (Thereupon, a break was had from 4:23 p.m. until 4:39

14    p.m.)

15         THE COURT:  All right.  Mr. Beane.

16         MR. BEANE:  Thank you, Your Honor.

17         Mr. Penders was kind enough to go and pull the docket

18    sheet.

19         The answer to the main question is that Mr. Bell was held

20    in District Court on the drug charge, not the weapons offense,

21    so, unless the Court factored in the drugs that were found in his

22    father's apartment, then I think that puts that issue to rest.

23         If the Court did factor in the drugs that were found in

24    this '96 case, then the authority under the Federal Sentencing

25    Guidelines would be Section 5G1.3, subsection B, which does

USCA Case #11-3031     Document #1445852     Filed: 07/10/2013     Page 1834 of 1954

1    permit the Court to fashion a sentence that accounts for the time

2    that Mr. Bell would have been held on the relevant conduct that

3    the Court has determined to be applicable to this sentence.

4         THE COURT:  Thank you.  Mr. Leon.

5         MR. LEON:  We agree, Your Honor.

6         The fair reading of the sheet we've been given by

7    Mr. Penders indicates that Mr. Gregory Bell was held because of

8    the drugs, not because of the gun.

9         He was charged on the drugs, which actually makes sense

10   because there was 77 grams of crack and that is the type of

11   weight that's brought here in District Court.  He wasn't a felon

12   in possession.  It wasn't a gun case, it was a drug case.

13        THE COURT:  I think the language I will employ will be

14   generic rather than to cite a specific period of time because the

15   docket sheet seems to reflect there was some period of detention,

16   that there was some modification of the detention order, that the

17   defendant was released.  It's unclear from the docket sheet

18   whether he was released on his personal recognizance at that

19   point.  There was some point later in the docket sheet

20   reflecting, "released to the Department of Corrections to be

21   placed in a halfway house."

22        So, when the Bureau of Prisons does its calculations, I

23   guess it will be left to them to figure out exactly how much time

24   that is.  But I will go ahead, since it does appear that the

25   previous time that Mr. Bell appeared to have been detained in

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1835 of 1954

1   1996 was in connection with narcotics seized in the August 2nd,

2   1996 search warrant, that was the subject of testimony here and

3   the findings about his having possessed with intent to distribute

4   crack or been responsible in part for it, and so I will order

5   that Mr. Bell be given credit for time served pre-trial in

6   Criminal Action Number 96-285 in this district.

7        Anything else we need to take up?

8        MR. BEANE:  No, sir.

9        THE COURT:  All right.  Anything else we need to take up?

10       MR. LEON:  No, sir.

11       THE COURT:  Thank you very much for coming in.

12       Mr. Bell, best of luck to you, sir.

13       (Proceedings adjourned at 4:43 p.m.)

14                    **C E R T I F I C A T E**

15

16              I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
17      proceedings in the above-entitled matter.

18

            ----------------------------
19          **Scott L. Wallace, RDR, CRR**
               **Official Court Reporter**
20

21

22

23

24

25

# Tab 49

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
                Plaintiff,        :    Criminal Action
                                  :    No. 05-100-3
v.                                :
                                  :
DESMOND THURSTON,                 :    October 29, 2010
                                  :    11:28 a.m.
                                  :
                                  :
                Defendant.        :    Washington, D.C.
                                  :
. . . . . . . . . . . . . . . . . . . . . . . . . :


TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:     Glenn S. Leon, Asst. U.S. Attorney
                           U.S. ATTORNEY'S OFFICE
                           Special Proceedings Section
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-7966
                           Email: Glenn.s.leon@usdoj.gov


For the Defendant:         Jonathan Seth Zucker, Esq.
                           1350 Connecticut Avenue, NW
                           Suite 202
                           Washington, DC 20036
                           (202) 624-0784
                           Email: Jonathanzucker@aol.com


Court Reporter:            Scott L. Wallace, RDR, CRR
                           Official Court Reporter
                           Room 6503, U.S. Courthouse
                           Washington, D.C. 20001
                           202.354.3196
                           swallace.reporter@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1838 of 1954

MORNING SESSION, OCTOBER 29, 2010

THE COURTROOM CLERK:  This is Criminal Case 05-100, *United States of America versus Desmond Thurston*.  Glenn Leon for the government, Jonathan Zucker for the defendant, and Michael Penders is present from the probation office.

THE COURT:  All right.  Good morning.

MR. LEON:  Good morning, Your Honor.

THE COURT:  Let me ask counsel to approach the bench, please.  Ms. Porter, would you be able to give a headset to Mr. Thurston.  Would you see if that will work.

(Following sidebar discussion had on the record:)

THE COURT:  I don't see any minors in the courtroom now, but I was alerted that Mr. Thurston may well have a minor daughter coming in at some point.

MR. ZUCKER:  His daughter, who I believe is six or seven, I can't remember exactly, Malaysia is her name, is here and the grandmother is here, and the grandmother wishes to address you.  They ran out to make a phone call.  I just wanted to alert you.  I'm not sure if you had any issues with Mr. Thurston's child being in the courtroom for the sentencing.  She's the one that wrote you a letter, I recall, a couple years ago.

THE COURT:  I'm ordinarily very leery of having minors in a courtroom at a time when a parent is being sentenced in a case, and I'd highly recommend that the parents have their minor child outside of the courtroom at the time of the sentencing rather

1    than having the child inside during sentencing.  I'm happy to

2    hear from whoever you want to have me hear from.  My normal

3    practice is to suggest that parents not have minors in here when

4    the parent is being sentenced.

5        MR. ZUCKER:  I understand the Court's concern, which is

6    why I asked them to tell you in chambers before you came out so

7    you could think about it.  I think the problem is a logistical

8    one.  The grandmother is here, the mother of the child is

9    deceased, and so there is no one but the grandmother who is

10   taking care of the child, so I'm not sure what we can do

11   logistically.

12       THE COURT:  At the time that the grandmother wants to

13   speak, I'll have to hope that she will make comments that won't

14   be too upsetting to the child, but then perhaps the grandmother

15   should go back out of the courtroom with the minor child for the

16   rest of the sentencing.

17       MR. ZUCKER:  Okay.

18       THE COURT:  That's what I recommend.

19       MR. ZUCKER:  Then that's what we'll do.  I'll tell you

20   what, if it's agreeable with the Court, whenever she walks in,

21   I'll just ask you to tell me when you want her to address you and

22   we can break so you don't have to continue the conversation.  I

23   expect her back any minute.

24       THE COURT:  Okay.  I would suggest that once she comes

25   back in, ask me to -- you can have a moment, and then you can go

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1840 of 1954

1    talk to her and tell her what we're doing, and then she can step

2    out and you can ask her to stay around until you go back out to

3    call her.  I assume she will want to speak at the point that

4    we're having allocution, not guidelines issues.

5         MR. ZUCKER:  I assume you're right.

6         (Sidebar discussion concluded.)

7         THE COURT:  All right, counsel, let me bring to your

8    attention a number of items that I have reviewed with the

9    presentence report writer that I should bring to your attention

10   about the presentence report first.  In the presentence report

11   that was revised as of October 22nd, 2010, I noted that in

12   paragraphs 5 and 7, the complete list of counts omitted Count 17,

13   so Count 17 will be added into the description of counts in

14   paragraphs 5 and 7.

15        In addition, the descriptions that begin on page 5 with

16   respect to the other co-defendants did not include about five

17   others, including Mr. Ball, Mr. Wilson, Mr. Handon, Mr. Johnson

18   and Mr. Langley.  So I'll be asking that those names be added on

19   that list.

20        On paragraph 133 that discusses probation ineligibility, I

21   believe under the statute there is probation eligibility, and so

22   I would have paragraph 133 revised to reflect that.

23        Under the punishment sections for (b)(1)(A) and (b)(1)(B)

24   narcotics offense, probation is ineligible, but as I read the

25   statute, that ineligibility does not apply to the (b)(1)(C)

1    offenses of conviction here.

2         And finally, on paragraph 139, that lists the maximum fine

3    range as $2 million.  I believe it's $1 million under the

4    statute, and that amount is not aggregated where there are two

5    offenses.

6         One other item that I thought it might be wise to ask Mr.

7    Leon to address was with respect to Count 11, and I'm not certain

8    that the Count 11 facts are included in the recitation of the

9    statement of offense here.  When the Count 11 issue arose in the

10   briefing papers for Mr. Wilson, that count was discussed by the

11   parties as referring to a sale involving Sandra White in Mr.

12   Wilson's apartment, and I did not see that discussion in this

13   presentence report.

14        Mr. Leon, can I ask you to confirm that what we're talking

15   about in Count 11, which charges both -- or charged both Mr.

16   Wilson and Mr. Thurston with an October 17th, 2000 offense, was

17   the sale to Sandra White in Mr. Wilson's apartment?

18        MR. LEON:  Good morning.

19        THE COURT:  Good morning.

20        MR. LEON:  Your Honor is correct that Count 11 was an

21   October 17th, 2000 controlled purchase involving cooperating

22   witness Sandra White, who was wearing a recording device at the

23   time in David Wilson's apartment with the defendant, Mr. Desmond

24   Thurston present, as well as another co-defendant, Jasmine Bell,

25   AKA Jazz, and the facts were essentially Ms. White came to the

1    apartment, spoke to Mr. Wilson.  Ms. White was --

2         MR. ZUCKER:  I apologize for the interruption, Your Honor,

3    but pursuant to our conversation.

4         THE COURT:  If you want to confer and take a moment, you

5    can.

6         MR. ZUCKER:  Thank you, Judge.  I apologize.

7         THE COURT:  Thank you.

8         MR. LEON:  Actually, let me take a quick half step back.

9    The government addresses the Court's specific question in one of

10   its submissions.  We actually filed two reply memorandums.  The

11   second one we styled a corrected government reply memorandum in

12   aid of sentencing for Desmond Thurston.  And the reason for the

13   correction, that is it corrected actually the very issue that the

14   Court is addressing.  I think we had one factual inaccuracy with

15   respect to our characterization of Count 11.  We corrected that

16   in the corrected reply memorandum, and we addressed the Court's

17   specific question on page 5 of that corrected reply memorandum.

18        And in that memorandum we lay out for the Court and

19   counsel the fact that this was a 2000 controlled buy and the

20   exhibits were admitted in evidence.  It's the 308 exhibits,

21   308.1, 380.2, 308.2A, 308.4 and 308.8, which are various

22   documents in evidence regarding that controlled purchase,

23   including the audiotape that was conducted by Agent Lockhart as

24   well as cooperating witness Sandra White.

25        And as we lay out in that reply -- corrected reply

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1843 of 1954

1    memorandum, in fact Mr. Thurston was, in fact, part of that

2    controlled purchase.  He did it with Mr. Wilson, and, in fact,

3    frankly we think it's an excellent example of the partnership

4    that Mr. Thurston as well as Mr. Wilson, as well as others in

5    Congress Park were part of, and how they not just individually,

6    but collectively sold drugs in Congress Park.  But this

7    particular controlled purchase does, does, in fact, involve Mr.

8    Thurston and Mr. Wilson together partnering to sell approximately

9    $200 worth of -- here I think it's $185 worth of crack cocaine to

10   cooperating witness Sandra White.  And all of that is in evidence

11   as part of the record before the Court.  So I think that

12   addresses the Court's concern, but if it doesn't, let me know and

13   I can try to address anything further.

14        THE COURT:  What I was raising was I did not see that set

15   of facts reflected in the presentence report.

16        MR. LEON:  I think that's right.  I think there is a --

17   the Court's correct really.  I don't think anywhere in the

18   presentence report those particular exhibits are referenced, and

19   certainly they likely should have been, and with hindsight I

20   probably should have made those suggested edits in my comments to

21   the report.

22        THE COURT:  All right.  Well, Mr. Zucker, it seems to me

23   that the final report ought to reflect the facts that were

24   presented at trial concerning Count 11, but I'll hear from you if

25   you think there is really no need to do anything further about

8

1  that.

2      MR. ZUCKER:  Court's indulgence.

3      I think the answer to that question depends upon what the

4  Court is basing its quantity findings on.  And if that is

5  included in the quantity findings, then I would agree with you.

6  If it's not, then it doesn't matter.  I think that's the most

7  succinct way to put it.

8      THE COURT:  Well, let me put it this way.  I think I will

9  ask that the presentence report be revised to reflect everything

10  that I've said so far with regard to those specific paragraphs

11  I've now mentioned, but that a paragraph be added for current and

12  potential future use to reflect the facts that pertain to Count

13  11.  As I read the report now, the report just doesn't talk about

14  any event occurring on October -- on that October day with regard

15  to Sandra White, and there ought to be some facts in there

16  reflecting that the indictment in Count 11 alleged that Mr.

17  Thurston made a sale, and probably should say to Sandra White in

18  Mr. Wilson's apartment, and that that was the basis for Count 11.

19      We can talk about possibly whether the evidence reflected

20  a specific quantity, and if there is some agreement about what

21  that specific quantity was.  I'd have to think back to whether

22  there was a DEA-7 that was produced that showed what the quantity

23  was.  I just don't happen to remember at the moment.  We can

24  certainly put that in.  I'd want you to have whatever opportunity

25  you would want, however, if you challenged what the DEA-7 said,

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1845 of 1954

1    or if there's no DEA-7 but rather there was simply testimony that

2    what was purchased was a certain quantity of dime bags, for

3    example, that can go in the language.  Unless you have some

4    challenge to what the evidence at trial reflected about that

5    quantity.

6        MR. ZUCKER:  My guess is because it was a controlled buy

7    there's going to be a DEA-7 somewhere, and I can't imagine that

8    we would challenge --

9        PROBATION OFFICER:  There is a DEA-7.

10        THE COURT:  Mr. Penders.

11        MR. ZUCKER:  Pulled one from the hat.

12        THE COURT:  Can you remind us then, Mr. Penders, what that

13    evidence is.  And Mr. Zucker, you can look at it, and if you

14    don't challenge it, what I'll ask Mr. Penders to do is to add a

15    paragraph in there about the evidence presented at trial alleging

16    that this sale occurred by Mr. Thurston on that date involving

17    the quantity reflected in the DEA-7.  Is that right?  What does

18    the DEA-7 say?

19        PROBATION OFFICER:  The amount of pure drugs on the DEA-7

20    was 1.1 grams of cocaine base with a net weight of 1.5.  I think

21    that included the bag.  So I believe we're dealing with 1.1 grams

22    of cocaine base in that respect.  And the probation office has no

23    problem updating with respect to what was just discussed.

24        Originally there was some confusion between myself and the

25    government as far as what testimony was reflected in Count 11,

10

1  and we will add a paragraph with respect to that testimony and
2  the exhibits that were filed with respect to that October 17th,
3  2000 offense.
4        THE COURT:  All right.  All right.  Mr. Zucker, if you
5  want to take a moment to look at that, feel free.  If you want to
6  discuss it with your client, you may do that as well.
7        MR. ZUCKER:  I think we're good, Judge.  I don't think
8  it -- that's fine.  I don't think there's much to discuss with
9  him.
10       THE COURT:  What's that?
11       MR. ZUCKER:  A moment to consult.  I don't think there is
12 anything more to discuss.
13       Judge, I apologize.
14       THE COURT:  Come on up to the mic.
15       MR. ZUCKER:  Sure.  I apologize.  I don't have better
16 recall of the facts.  Actually this file is titled Marquita
17 Giles, so I don't think this is the right one.  It would not be
18 the Sandra White one.  Marquita Giles was the other count of
19 conviction, as I recall.
20       THE COURT:  Well, look at the date.
21       MR. ZUCKER:  It's November 18th, 2003.  That's the date of
22 preparation.  They were attached together.  I apologize.  I
23 misread them.
24       THE COURT:  All right.
25       MR. ZUCKER:  Thank you.  We're not challenging that.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1847 of 1954

1    THE COURT:  All right.  Then, I'll direct that the

2    presentence report be amended to add the facts concerning the

3    October 2000 alleged sale and the quantity reflected in the DEA-7

4    exhibit that you just reviewed.

5        Having brought to your attention those amendments, then,

6    let me just ask you, Mr. Zucker, have you and your client read

7    and discussed the presentence report with the revised date of

8    October 22nd, 2010?

9        MR. ZUCKER:  Yes, thank you.

10       THE COURT:  Let me hear from you then with regard to any

11   objections or challenges that I need to resolve.

12       MR. ZUCKER:  I think they are probably much more fully

13   laid out in the pleadings than we can do here today, but they

14   involve the -- the remaining objections involve obviously the

15   acquitted slash relevant conduct determination you have to make,

16   the gun bump, 2-point -- not to speak too casually, 2-point

17   enhancement for possession of gun.

18       There is no specification of which gun the probation

19   office would have you rely on.  There were numerous allegations

20   throughout the numerous years regarding the testimony, but there

21   was never an allegation that a gun was possessed at the time of

22   either of the two convicted offenses.

23       And I think the remaining issue would be the criminal

24   history score based on our -- our position again was based on the

25   dates of the offense, they were not committed within the

1    statutory period of release, nor the end of probation.  But

2    frankly, given the change that will come into effect on Monday,

3    November 1st -- and I don't think the government is contesting

4    that that should be the statute that is applied in this case --

5    it would lead to a one-point reduction, taking Mr. Thurston down

6    to a criminal history 3 under this new application.

7         So obviously you still have to resolve the two remaining

8    issues regarding whether the offenses were committed within two

9    years of release, and of course that will be determined upon

10   whether you use the dates of the offenses of conviction or the

11   all-encompassing conspiracy, as the violation, as I understand

12   it.  And I think those are the issues remaining.

13        We would also ask -- well, those are the objections

14   remaining.  Assuming the Court follows the path that was followed

15   in the prior sentencings in this case, we would ask you to make

16   specific findings not only about the gun bump but about what the

17   basis is for any drug quantity determinations.

18        THE COURT:  The presentence report on page 32 identifies a

19   couple of other challenges, one to paragraph 103 and one to

20   paragraph 105.  Did you want to add anything about those?

21        MR. ZUCKER:  Nothing more than what we put in the

22   pleading, Judge.

23        THE COURT:  All right.

24        MR. ZUCKER:  Moment to consult.  Ms. Dawson is a member of

25   the bar and works with me.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1849 of 1954

1    Thank you, Judge, nothing.

2    THE COURT:  Nothing further?

3    MR. ZUCKER:  Nothing further, thank you, Judge.

4    THE COURT:  All right.  Mr. Leon, did you have any

5    comments about the objections and did you want to comment at all

6    about the presentence report?

7    MR. LEON:  Thank you, Your Honor.  As for the presentence

8    report itself, no, we have no further comments than what we --

9    the short answer is no.  I think the government has in its

10   pleadings addressed the points that Mr. Zucker has just raised

11   here, specifically with respect to the two-point enhancement for

12   the possession of a gun.  We'll stand on that record, and we did

13   address it in a few places in our pleading, including this

14   corrected government reply on pages 6 and 7, and I won't repeat

15   what's there.  But I just want to make an important clarification

16   off of what Mr. Zucker said.

17       I think at the end of what he said, I think what he

18   said -- I think a fair characterization was that he said -- he

19   suggested this two-point enhancement is based on a conspiracy,

20   and that's not true.  The two-point enhancement could be based on

21   the conspiracy, and we've made that point, but we go -- we tried

22   very clearly and I think we succeeded to make clear that largely

23   what we -- we largely agree with the presentence report and make

24   the recommendations to the Court that we have, not based on the

25   conspiracy but based on Mr. Thurston's own personal relevant

USCA Case #11-3031     Document #1445852         Filed: 07/10/2013     Page 1850 of 1954

1    conduct, not the conduct of other people, but what he himself

2    did, sworn testimony that the Court has credited, and we believe

3    there are other witnesses the Court could credit specifically

4    with respect to Mr. Thurston, acts that Mr. Thurston personally

5    participated in, not acts of other ones.

6         So when we talk about the 2 points for the gun, it's not

7    based upon the gun that Mr. Thurston may or may not have

8    conspired with, but it's on Mr. Thurston's repeated possession of

9    weapons during the time that he repeatedly dealt drugs in

10   Congress Park, including the two particular times that he was

11   convicted of.  We think under either theory the Court would be

12   well within its right to give the two-point enhancement, but

13   certainly with respect -- but putting aside the conspiracy theory

14   for a moment, it is a relevant conduct theory based on the

15   conduct of Mr. Thurston and Mr. Thurston alone.  And we put on

16   the record many instances where there were gun possessions by Mr.

17   Thurston particularly, and we also cite the relevant portions of

18   1B1.3, which talks about conduct in a common scheme or plan and

19   relevant conduct.  And that is our theory and we believe

20   correctly that the presentence report writer, Mr. Penders'

21   correct theory for giving that two-point enhancement, not a

22   conspiracy theory.

23        Then quickly shifting to Mr. Zucker's other point, to the

24   change of the guidelines and with respect to whether or not

25   someone on release, that additional enhancement should occur.   I

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1851 of 1954

1    think Mr. Zucker is correct, and I checked with our in-house

2    expert this morning on this.  As of Monday, as of November 1,

3    that will be the new part of the guidelines, that if Mr. Thurston

4    were sentenced next week, that would technically be correct.  And

5    just by circumstance he's not being sentenced next week, he's

6    being obviously sentenced today, so technically it's a matter of

7    a day or two.  But under the guidelines today, he's not entitled

8    to that.  But in fairness, as a matter of a day or two, he would

9    be entitled to that benefit.

10          I'm not going to take a strong position on that, but I

11   will note, at least for the record -- and again I checked with

12   someone who knows more about this than I in my office -- this is

13   not a change that's going to be retroactive.  In other words, the

14   new change in the guidelines that will be effective Monday will

15   not be allowed to allow defendants to come in and have their

16   sentences changed who have been sentenced last year or last

17   month.

18          I just want to put those facts on the record.  I don't

19   take a strong position in light of the fact that we -- based upon

20   all the other facts that are before this Court and the discretion

21   that the Court has, but as he stands here today, we do think it

22   is -- the guidelines are correct.

23          THE COURT:  Thank you.  Anything else, Mr. Zucker?

24          MR. ZUCKER:  I just wanted to respond.  Maybe I wasn't as

25   clear as I should have been with relation to the gun bump that --

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013    Page 1852 of 1954

1    other than the possession of the weapon.   There was testimony

2    about Mr. Thurston's possession of weapons during the course of

3    the period that was covered by the alleged charged conspiracy,

4    but there was never any testimony in connection with either of

5    the sales of conviction, the 10/17/2000 or the November 18th,

6    2003 sales, that there was any weapon involved.

7        Additionally, to the extent the government wants to rely

8    upon relevant conduct, my recollection of the allegations

9    regarding possession of a weapon related to unrelated conduct of

10   the drug sales.   I think there was an allegation that he

11   possessed a weapon during a robbery, and then I think there was a

12   dispute or assault or an ongoing beef that had no direct

13   connection to the relevant conduct of drug sales.   So for that

14   reason, we would oppose it.   And if the Court does impose it, we

15   would ask that you specify what the basis for that was and how it

16   was connected as relevant conduct to the drug sales.

17       THE COURT:  All right.   Thank you.   With respect to the

18   presentence report's mention of challenges to paragraphs 103 and

19   105 -- I actually think that they are currently numbered as 104

20   and 105 -- those challenges having to do with whether or not

21   there was a recovery of any cocaine in a car and whether or not

22   there was a quashed bench warrant, those two matters will not

23   affect sentencing.   I will rule, however, on the remaining

24   disputes.

25       The defendant has objected to paragraph 69 of the

1    presence report, which uses 1.5 kilograms of crack as relevant

2    conduct in calculating the base offense level for the two counts

3    of crack distribution, and that quantity came from the quantity

4    allegedly attributable to the narcotics conspiracy of which the

5    defendants were acquitted.  Relevant conduct includes not just

6    the acts committed by the defendant but all reasonably

7    foreseeable acts of others that were in furtherance of the

8    jointly undertaken criminal activity, in preparation for the

9    offense of conviction, or part of the same common scheme or plan

10   as the offense of conviction.

11       The government argues that trial testimony established

12   that Mr. Thurston and the others named as co-conspirators were

13   engaged in a concerted effort to distribute crack for over 12

14   years in Congress Park.  The government cites the testimony of

15   several witnesses in particular to show that the amount directly

16   attributable to Mr. Thurston exceeded 1.5 kilograms.  Mr.

17   Thurston argues that the conduct outside of the two sales for

18   which he was convicted were discrete identifiable units, apart

19   from the offenses of conviction and reflect no common scheme or

20   plan.

21       He also attacks as unreliable the government's estimates

22   of the amount of crack and the crack that the defendant

23   personally sold that was based upon the testimony of Capies,

24   Martin, Parsons and Conner.

25       Let me start by making clear what I do find from the

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1854 of 1954

1  evidence before me.  I do find by clear and convincing evidence

2  the following:  There was a common agreement and understanding

3  among the defendant and over a dozen named conspirators.  Its

4  scope was to engage in a concerted effort to make money by

5  selling crack and to build their market for crack sales in

6  Congress Park.  The concerted efforts were undertaken for over

7  ten years.  The two sales of which Mr. Thurston was convicted

8  were made as a part of the same common understanding and

9  agreement.  The individual retail and wholesale distributions

10  made by the named co-conspirators during that period in Congress

11  Park were acts that were in furtherance of the common

12  understanding and were reasonably foreseeable by the defendant

13  and each of the named conspirators.

14      The amounts of crack attributable to all those

15  distributions in furtherance of the agreement exceeded

16  1.5 kilograms and was reasonably foreseeable to Mr. Thurston.

17  There is reliable evidence of both a concerted effort involving

18  Mr. Thurston and the foreseeable quantity involved.

19      The defendant knew many of the named conspirators and

20  associated with them in Congress Park.  That was established by

21  the countless witnesses at trial who saw them together during the

22  charged period and whose accounts as to that detail were largely

23  undisputed, and the countless photographs showing them together

24  in Congress Park venues and in other locations.

25      The evidence also comes from the testimony of those who

1    witnessed the defendant selling crack or who bought crack from

2    him or supplied him with crack to sell.  Bobby Capies testified

3    credibly that he saw the defendant selling dimes of crack almost

4    every day over several years, that the defendant sold along with

5    other named conspirators, that he saw the defendant obtain

6    wholesale amounts of crack numerous times from Boy-Boy, and that

7    he saw the defendant buy crack from Joe Langley, who supplied

8    wholesale amounts.

9         The defendant's attack in his brief on Capies' testimony

10   goes more towards the inferences that the government drew in its

11   brief about the time periods that Capies would have been able to

12   observe selling activity when the government calculated quantity.

13   On that point, I took Capies' overall testimony to show that when

14   he and the defendant were together in Congress Park, he saw the

15   defendant selling dimes of crack almost daily.

16        Likewise, Parson's testimony that defendant sold her crack

17   many times was credible, even if the exact number of times was

18   undermined on cross-examination.  The tape recording of his sale

19   to her for a hundred dollars offered corroboration.

20        Martin, under no cooperation agreement, also testified

21   credibly that he did buy crack from Mr. Thurston countless times

22   over many years, in amounts initially costing $50 and then

23   increasing to $100 and $200, and that he once owed the defendant

24   $2,500 for crack that he had bought.

25        Martin also offered corroboration that the defendant was

1   involved in concerted activity.  Martin said that the defendant
2   brought in his brother from whom Martin bought crack a number of
3   times.  Conner credibly testified that he sold crack to the
4   defendant and other named conspirators, that he saw the defendant
5   selling, and that Collins and Ball dissuaded him from selling in
6   the circle where the conspirators made their livelihood, having
7   built up a market they wanted to protect.

8         Witnesses like Capies and Barnett and Powell testified how
9   the charged conspirators cooperated with each other in selling
10  crack in Congress Park during the charged period by participating
11  in the uno, dos, tres, or doors method of sharing in sales
12  proceeds.  Powell saw the defendant participate with others
13  during sales in the circle.  Barnett actually participated with
14  the defendant and other named conspirators while selling crack in
15  the circle and other locations.  Capies participated many times
16  with the named conspirators, including with the defendant.

17        I have already found that the 1.5 kilo crack quantity is a
18  reasonable estimate of the amount attributable to co-conspirator
19  Gregory Bell alone.  Conner alone established supplying an
20  estimated quantity in excess of 1 kilogram between 1999 and 2000,
21  and Capies alone established buying over 500 grams from 1992 to
22  2001 at a rate that would not risk double counting Conner's one
23  to two-year supply, namely roughly 4 grams every now and then.
24  Other witnesses push the estimated amount safely above an
25  additional 100 grams.

1    Given the length of time over which the witnesses saw Bell
2    obtaining and selling crack, Capies said from as early as a
3    period from 1992 to 1996, to as late as a period from 1996 to
4    2001, Proctor said as late a period as 2003 and 2005, with
5    Barnett, Kelliebrew, Conner and Powell testifying to periods in
6    between, and the frequency with which the witnesses said Bell was
7    selling, such as Barnett seeing Bell all day for years between
8    1993 and 2003, the estimate of at least 1.5 kilograms is
9    reasonable for just Bell.

10    However, my conclusion about the relevant conduct quantity
11    and the existence of the common scheme is based upon far more
12    than just the testimony of those witnesses.  Joe Langley and
13    Burke Johnson each pled guilty under oath to conspiring to
14    distribute crack for at least a decade, admitted accountability
15    for respectively between 500 grams and 1.5 kilograms, and over
16    1.5 kilograms, and named in signed proffer statements numerous
17    named conspirators in this case as customers.

18    Johnson specified selling wholesale amounts of crack to
19    Mr. Thurston, but eight other people, Gerald Bailey, Jasmine
20    Bell, Raymond Bell, Marcus Smith, Arthur Handon, Lucious Fowler,
21    the defendant's brother Philip Wallace, and Daniel Collins, which
22    includes seven with no cooperation agreements, all pled guilty
23    under oath to conspiring for many years with the defendant and
24    other named conspirators in this case to distribute crack.   In
25    signed statements adopted under oath during their pleas, all

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1858 of 1954

1    admitted that the conspirators used the method of sharing sales

2    with each other, usually referred to as doors, and two

3    specifically identified the defendant as a crack seller or crack

4    supplier in this concerted activity.

5         And all eight admitted in signed plea agreements adopted

6    under oath during their pleas that at least one 1.5 kilograms of

7    crack were involved in the participants' concerted activity

8    within the scope of the conspiracy or in his relevant conduct.

9         Now, while Mr. Thurston argues that I should treat this

10   case as no different than a typical two sales case, none of this

11   volume of information and context is present in a typical two

12   sales case, and this case should not be treated as one.  Given

13   the length of time over which the witnesses saw Mr. Thurston and

14   the named conspirators obtaining and selling crack, the estimate

15   of at least 1.5 kilograms as relevant conduct for the defendant's

16   offenses is reasonable.

17        The objection to the scope of the relevant conduct

18   included in the guideline calculation is overruled.

19        The defendant has also objected to the weapons

20   enhancement.  Mr. Thurston was not convicted of any weapons

21   offense, but paragraph 70 of the presentence report increases his

22   offense level by 2 points, concluding that a gun was possessed

23   with respect to the defendant's relevant conduct.  The defendant

24   challenges that enhancement.  The government cites testimony from

25   several witnesses to support the enhancement.  The testimony

USCA Case #11-3031    Document #1445852        Filed: 07/10/2013      Page 1859 of 1954

1    established that the defendant and others armed themselves with

2    guns, robbed people and drug dealers in other neighborhoods, and

3    hid their guns in areas of Congress Park.

4         The defendant while unarmed burglarized an apartment with

5    an armed Wilson when Wilson shot and killed the occupant.   The

6    defendant got in a shootout with 10th Place rivals Steve and

7    Patrick and shot at 10th Place rival Lynwood in an ambush.   The

8    defendant shot at One-Five rival Faison when Mr. Faison was on

9    the porch, and the defendant burglarized Jasmine Bells' home and

10   stole crack and a pistol.

11        I do not find that the preponderance of the reliable

12   evidence has found that the defendant's gun possession in those

13   incidents were in connection with the offenses of conviction in

14   2000 and 2003, or the relevant conduct crack conspiracy which

15   began in 1992, and in that regard I agree with the argument that

16   Mr. Zucker has made, and that objection is sustained and

17   paragraph 70 shall be revised.

18        With respect to the criminal history enhancements, the

19   defendant challenges the criminal history point enhancements in

20   paragraphs 87 and 88.   Paragraph 87 enhances the defendant's

21   criminal history score by 2 points under section 4A1.1(d) because

22   he was under a criminal justice sentence reflected in paragraph

23   81 when the instant offense was committed.   Application note 4 to

24   Section 4A1.1 defines instant offense as including relevant

25   conduct.

1    I have just discussed the scope of relevant conduct here.

2    Paragraph 81 reflects the defendant's September 23rd, 1996

3    sentence of probation, carrying through to March 23rd, 1998.   The

4    presentence report discusses relevant conduct that occurred

5    during that probation period.   For example, paragraph 39 recounts

6    Capies's testimony, which I credit for this point, that he saw

7    the defendant and other conspirators selling crack in Congress

8    Park in 1997.   Because that relevant conduct occurred during that

9    probation period, section 4A1.1(d) calls for 2 additional points.

10        Paragraph 88 enhances the defendant's criminal history

11   score by 1 point under section 4A1.1(e) because the instant

12   offense was committed less than two years following the

13   defendant's release from custody on an offense counted under

14   Section 4A1.1(b).   Namely, the offenses in paragraphs 81 and 83.

15   Both of those convictions are counted under Section 4A1.1(b).

16        Mr. Thurston's release from confinement in the paragraph

17   81 offense was September 23rd, 1996, and in the paragraph 83

18   offense was December 17th, 1999.   The presentence report

19   discusses relevant conduct that was committed less than two years

20   following each of those release dates, including the defendant's

21   crack selling in 1997 that I just mentioned, and the defendant's

22   crack sale in 2000 for which the defendant was convicted in Count

23   11.

24        The one additional point then is appropriate and the

25   defendant's objections to the criminal history score enhancements

USCA Case #11-3031     Document #1445052          Filed: 07/10/2013     Page 1861 of 1954

1    are overruled.

2        That then would produce a criminal history category of 4,

3    and a level 36, which yields a recommended range of 262 to 327

4    months.  For reasons I articulated in the opinion published

5    called *in re: Sealed case*, at 677 F. Supp. 47 last year in

6    response to a D.C. Circuit opinion, let me make clear that I am

7    aware of all of the fact finding that is required to be made to

8    achieve all of the offense level and criminal history scoring in

9    this Sentencing Guidelines calculation.  Since much of the

10   presentence report is undisputed, I am accepting all undisputed

11   portions of the presentence report as findings of fact under

12   Federal Rule of Criminal Procedure 32(i)(3)(A).

13       All right.  Mr. Zucker, do you care to speak on behalf of

14   your client?

15       MR. ZUCKER:  Could I have a quick moment to consult,

16   Judge?

17       THE COURT:  Yes.

18       (Discussion had off the record between attorney and

19   client.)

20       MR. ZUCKER:  Regarding the allegations of sales in '96 and

21   '97, Mr. Thurston has asked me to point out to the Court in '96

22   he was locked up, and when released on July 28th, 1997, he went

23   right to Virginia where he was held -- moment to consult.

24       I'm sorry, when released from Maryland in '96 he was

25   writted to Virginia and was not released from Virginia until July

USCA Case #11-3031    Document #1445052      Filed: 07/10/2013    Page 1862 of 1954

1    28th, 1997 and then was, upon that release, which would have been

2    basically the first day of August, he was only on the street

3    until October 7th of '97 when he was incarcerated in D.C. and not

4    released until after the new year, in terms of crediting the

5    amounts of calculations of drug sales.  He wishes to bring that

6    to the Court's attention.

7         Do you wish to be addressed just on regular allocution?

8         THE COURT:  Yes.

9         MR. ZUCKER:  All right.  Well, I think the Court is

10   familiar with the case.  I guess the only points I would want to

11   make out that the Court might not be aware of is that since he's

12   been incarcerated over the last five years, I think it's nearly

13   six years now -- he was arrested March 17th, 2005, it's over six

14   years -- his stepfather has died, the mother of his child has

15   died, and basically he's had no contact with his children.  He

16   wishes to reunite.  I understand the Court's position.  We would

17   just ask for leniency.  And that would be about it.  And I would

18   ask the Court to hear from Ms. Vereta Taylor and from Mr.

19   Thurston obviously.

20        THE COURT:  All right.  If you want to -- I'm sorry, you

21   said her name is Ms. Taylor?

22        MR. ZUCKER:  And I overlooked also his mother has died

23   during that period.  His mother also has died during that period.

24   He's been incarcerated throughout all those losses.  Yes, it's

25   Vereta Taylor.  I'll get her now if the Court permits.

USCA Case #11-3031    Document #1445052        Filed: 07/10/2013    Page 1863 of 1954

```
 1          THE COURT:  You may.

 2          She can stand right there at the podium, and it doesn't

 3   have to be under oath.  Good morning, ma'am.  If you would tell

 4   me your name, please.

 5          MS. TAYLOR:  Good morning.  Vereta Taylor.

 6          THE COURT:  I understood that you wanted to say something

 7   to me.

 8          MS. TAYLOR:  Yes, Your Honor.

 9          THE COURT:  You may speak.  Go ahead.

10          MS. TAYLOR:  I just simply wanted to say that I've been

11   knowing Desmond Thurston since the age of 15, and I'm the

12   grandmother of his six-year-old, and I have custody, permanent

13   custody, but I could use his help if he would, you know, was able

14   to get out at some time.  And it's been a while.  And I think

15   whatever it was that he's in for, I think he's had a pretty good

16   idea of what responsibility is as far as doing good deeds and so

17   forth and everyday life.  So, that's basically all.

18          THE COURT:  All right.  Thank you for coming in.

19          MS. TAYLOR:  Okay.  Thank you.

20          THE COURT:  All right.  Anything else, Mr. Zucker?

21          MR. ZUCKER:  Nothing from me, Judge.

22          THE COURT:  Mr. Leon, did you care to speak?

23          MR. LEON:  Thank you, Your Honor.  Your Honor, the

24   government will largely also submit on the record before the

25   Court.  I did want to just, for lack of a better word, frame or
```

1  at least put Mr. Thurston in the context of the larger group of

2  six defendants who the Court -- the Court obviously presided

3  through the whole trial of all six defendants.  Because the Court

4  does have discretion under 3553, and as well as all sorts of

5  other discretion the Court obviously has, once the Court has now

6  made the guidelines analysis.

7        In particular, I would just want to make this quick point.

8  The Court has obviously already made findings and sentenced two

9  defendants of the six, specifically Mr. Joseph Jones and

10  Mr. Gregory Bell.  Mr. Jones I believe received a sentence of 15

11  years from this court, and Mr. Bell received a sentence of I

12  believe 16 years.  I might be getting -- it's definitely 15 and

13  16.  It might be in reverse.  But I'm pretty sure my attribution

14  is accurate.

15        The Court has now made findings that Mr. Thurston was

16  equally part of this conspiracy and responsible on the drugs for

17  the entire -- has equal responsibility for the amount of drugs

18  over 1.5 kilograms.  Where Mr. Thurston separates himself from

19  those two defendants is with respect to violence, and we do

20  outline that in our initial sentencing memorandum, beginning on

21  page 20.  And that's why we do think under the Court's discretion

22  under 18 U.S.C. 3553, as well as other discretion the Court has,

23  the Court should, with respect, use its discretion to sentence

24  Mr. Thurston above that 15 and 16-year mark that the Court set

25  with respect to the other two defendants.

1    We understand the Court will likely not go as high as the

2    government initially recommended.  We understand why that is, and

3    the Court has made a very clear record as to why the Court

4    doesn't feel it should go that high.  But having said that, the

5    government thinks under the framework this Court has started to

6    establish with respect to these defendants under these facts in

7    this case, why Mr. Thurston should be certainly a notch above

8    Mr. Bell and Mr. Jones with respect to the sentence that he

9    receives from this Court.

10    And just very quickly, we do lay out several instances of

11    violence where Mr. Thurston was involved.  And in particular the

12    Court made credibility findings with respect to several

13    witnesses.  I want to flag two additional ones that I don't think

14    the Court has yet made any findings on or addressed.  And I could

15    be wrong.  One in particular is J.J. Faison, Mr. James Faison.

16    He's somebody who testified before this court, I think the Court

17    will remember, reluctantly, he had no cooperation agreement.  He

18    was an innocent bystander on the porch when Mr. Thurston as well

19    as Mr. J.T. Roberson drove by and did a drive-by shooting.

20    The Court will recall, and we lay this out in the

21    sentencing memorandum, that there was a second citing 9-1-1 call

22    that corroborates.  On that 9-1-1 call Mr. Faison states, "Dazz

23    is one of the people who shot at me."  That's a very clear --

24    that's probably -- it's very clear additional corroboration and

25    credible evidence that Mr. Thurston was involved in violence,

USCA Case #11-3031    Document #1445852       Filed: 07/10/2013     Page 1866 of 1954

1    attempted murders during the time of the conspiracy, shooting at

2    people on porches during the time of the conspiracy.

3         That's, I would say, probably the most compelling evidence

4    we've presented.  We presented many instances, but that I think

5    stands out because it was credible testimony, I would submit,

6    from a person who had no deal with anyone, who had a

7    corroborating 9-1-1 call.

8         But there are certainly other instances.  J.T. Powell I

9    think was, in my judgment, was one of the more credible

10   cooperating witnesses, although just to be clear, I thought all

11   the cooperating witnesses were credible.  But Mr. Powell in my

12   judgment stood out in terms of his recollection, in terms of his

13   candor and demeanor, as he testified before this Court.  And he

14   testified at length regarding a number of robberies that he --

15   armed robberies that he and Mr. Thurston committed during the

16   course of the conspiracy.

17        And we talked about the Reginald Reed murder, which Mr.

18   Thurston we submit was part of.  We talk about the Lynwood

19   Carpenter shooting.  These are instances that Mr. Capies talked

20   about, which the Court has already found credible.

21        We've already made that part of the record, but again,

22   ending with where I began, in terms of the framework the Court

23   has established, we clearly do think Mr. Thurston is in the next

24   category up and is a notch above the two defendants who have

25   already been sentenced by this Court, Mr. Jones and Mr. Bell.

USCA Case #11-3031    Document #1445852    Filed: 07/10/2013    Page 1867 of 1954

1    Thank you.

2         MR. ZUCKER:  May I respond briefly, sir?

3         THE COURT:  Yes.

4         MR. ZUCKER:  I guess the points I would want to make out

5    regarding the violence is that number 1, obviously the jury

6    rejected that testimony, rejected that claim.  Number 2, at the

7    time that happened, regarding the Faison shooting, Mr. Thurston

8    would have been, I think, 19 or 20.  And as long as we're

9    focusing on violence in this case --

10        THE COURT:  I didn't understand what you said about 19 and

11   20.

12        MR. ZUCKER:  19 or 20, his age at that time.  If it was

13   '96 or '97, I think, he would have been about 19 or 20 years old.

14   He's before the Court being sentenced at 33 for an event that --

15   people are different.  And I think if we look at Mr. Thurston,

16   since he's been locked up, there has not been one disciplinary

17   report.  There's never been an allegation of any threats, any

18   fighting or anything like that.  People outgrow the violence of

19   their youth, and I think the Court has seen that numerous times.

20   So I would ask the Court not to consider that, given especially

21   the fact that the jury rejected it.  It should have minimal

22   influence on the Court today.

23        And the other thing, as long as we're talking about

24   violence.  Within this charged conspiracy, I can't help but note

25   that the government reached an agreement with someone else who

1   pled to a murder in this case, and that person is already

2   released.  I think he got a sentence that was less than half

3   of -- by agreement with the government, I'm obviously talking

4   about Tom Samuels -- less than half of what the two people who

5   were preceded by Mr. Thurston in this case got for drugs.

6         In differentiating the two, I think the quantities of

7   drugs or drug activity by the defendant, at least one of the

8   defendants the Court has already sentenced, far exceeded that

9   which is alleged against Mr. Thurston.

10        THE COURT:  All right.  Thank you.  Mr. Thurston, would

11  you like to say anything?

12        THE DEFENDANT:  Yes, Your Honor.  I just -- I want to say

13  that I think that through what I was convicted of, with less than

14  2 grams of crack, I think that what -- I ask the Court to

15  sentence me to my guidelines, under that.  And the jury -- the

16  jury -- I was acquitted on all of the violence.  And the

17  prosecutors, they're talking about me having, possessing guns and

18  things like that.  And I just ask the Court to just go on my

19  guidelines and sentence me to that.  That's all I have to say.

20  Thank you.

21        THE COURT:  All right.  Mr. Thurston, the law requires

22  that I consider numerous factors in determining your sentence.  I

23  have to consider the nature and circumstances of these offenses.

24  For many years you were involved in hustling crack with many

25  others in a neighborhood that was held hostage to violence and to

1    addiction.  Your group felt free to spread this poison and help

2    keep people strung out.  You lined your own pockets off of their

3    misery, and lessened their lives and those of countless others.

4    And frankly, there is no charitable view of this kind of behavior

5    and it deserves substantial punishment.

6        I also have to consider your history and your

7    characteristics.  And the plain fact is you knew better.  You

8    have a long history in the criminal justice system.  On the other

9    hand, although you had a positive male role model in your life,

10   you never knew your biological father, you also were battling

11   against the odds growing up with learning disorders in a

12   community starved for helpful resources and productive outlets

13   for children.

14       This may have kept you from developing marketable

15   vocational skills and landing lawful jobs.  I acknowledge your

16   argument that were we to hold sentencing one business day from

17   today, the one criminal history point that you received under

18   section 4A1.1(e) would no longer apply.  Your category would be 3

19   rather than 4, and the applicable range would be 235 to 293.

20   Exposing you to the applicable range I determined of 262 to 327

21   months is a far cry from the far lower range applicable solely to

22   the two small amounts of crack that the jury found that you did

23   sell.

24       That gross disparity and these circumstances are all

25   mitigating factors, although the substantial evidence of your

1    repeated acts of violence and gun play is extremely troubling.

2        I also have to consider the kinds of sentences available

3    and the kinds of sentence and the sentencing range recommended by

4    the Sentencing Guidelines.  The law allows for a sentence of

5    anywhere from probation to 480 months to terms and conditions in

6    between.  The guidelines recommend that I imprison you for

7    between 262 and 327 months.  However, that range reflects

8    guidelines for crack cocaine offenses that are unduly disparate

9    and still too harsh.

10       I have to consider any pertinent Sentencing Commission

11   policy statement, and no others have been raised here that have

12   not been addressed.  And I have to consider the need to provide

13   restitution to any victims.  And that is not applicable here.

14       Finally, I have to consider the need to avoid unwarranted

15   sentencing disparity among defendants with similar records who've

16   been found guilty of similar conduct.  Now, this ordinarily

17   suggests a guidelines range sentence.

18       Unbridled by the Sentencing Guidelines, I would find here

19   14 years to be a fair sentence that amply and properly addressed

20   the sentencing factors and goals articulated by Congress in the

21   other subsections of Section 3553.  But I am not unbridled by the

22   guidelines.  The Supreme Court requires that I consider the

23   guidelines and not ignore them, just as I must consider all of

24   the Section 3553 sentencing factors in reaching a sentence.  Some

25   of the factors exert downward influences on the sentencing

1   calculus in this case, others are neutral, and still others exert

2   upward influences.

3        The jury has found that the government has not proven

4   beyond a reasonable doubt the charged narcotics conspiracy.  I

5   respect and abide by that verdict, but I cannot turn a blind eye

6   to the narcotics conspiracy relevant conduct that I have found

7   proven by clear and convincing evidence.

8        The guidelines here exert upward influence, and I am not

9   free to simply disregard that, any more than I'm free to

10  disregard the Section 3553 factors exerting downward influences.

11  I must ultimately, though, assure that the sentence is sufficient

12  but not greater than necessary to reflect the seriousness of the

13  offenses, to promote respect for the law, to provide just

14  punishment and adequate deterrence, to protect the public, and to

15  provide you with any needed educational or vocational training,

16  medical care or other correctional treatment in the most

17  effective manner.

18        I will do that.  But the 262 to 327 months in prison does

19  not honor that command.  I will add, Mr. Thurston, my apology to

20  you for the delay in resetting your sentencing.  The guilty

21  verdict against you and four others was returned on November

22  28th, 2007, after a 10-1/2 month trial.  That day I set

23  sentencing dates in February 2008 for four of you, but for

24  Mr. Wilson I set a post-trial briefing schedule instead, at his

25  request.

USCA Case #11-3031    Document #1445052        Filed: 07/10/2013    Page 1872 of 1954

1    As I recall, the probation office needed more time to

2  complete most of the presentence investigations and reports for a

3  big case like this, and your sentencing was continued until March

4  7th, 2008.  However, the final sentencing briefing in your case

5  was not completed until the close of business on March 6th, and I

6  postponed sentencing.

7    Meanwhile, Mr. Wilson filed on March 7th a brief alleging

8  discovery yet -- alleging discovery of yet additional undisclosed

9  *Brady* material.  Now, while I sentenced two co-defendants in May,

10  I worried about continuing to sentence defendants before

11  resolving whether this *Brady* issue might have broader

12  implications for the integrity of the remaining convictions.  The

13  briefing in the Wilson matter was completed this January and I

14  ruled against him in July, and resolved to my satisfaction that

15  the issues raised did not affect the integrity of the verdicts

16  against the other defendants.

17    And that is when I reset your sentencing for August,

18  although your counsel's trial schedule conflicted with that date.

19  So I postponed sentencing, ordered that your 2008 presentence

20  report be updated, and scheduled sentencing for today.

21    I also denied your motion to dismiss the indictment

22  because although the delay in sentencing has been too long,

23  mostly not due to you, and you did ask for a speedy sentencing, I

24  concluded that any prejudice to you could be appropriately

25  remedied by a reasonable reduction in the term of imprisonment,

1    based upon all of the relevant conduct, that I otherwise would

2    have imposed.

3         I will make a 12-month reduction.  The ultimate sentence

4    will be equivalent to one falling within an offense level of 33,

5    criminal history category of 3.

6         It is the judgment of this Court that you, Desmond

7    Thurston, are hereby committed to the custody of the Bureau of

8    Prisons for concurrent terms of 194 months on each of Counts 11

9    and 24.  You are further sentenced to serve concurrent terms of

10   36 months of supervised release on each of Counts 11 and 24, and

11   to pay a $100 special assessment on each of Counts 11 and 24, for

12   a total of $200.  I find that you do not have the ability to pay

13   a fine and I therefore waive an imposition of a fine in your

14   case.

15        The special assessment is immediately payable to the clerk

16   of this court.  Within 30 days of any change of your address, you

17   must notify the clerk of this court of that change until such

18   time as the financial obligation is paid in full.  You must make

19   payments on the special assessment through your participation in

20   the Bureau of Prisons Inmate Financial Responsibility Program.

21        Within 72 hours of your release from custody, you shall

22   report in person to the probation office in the district to which

23   you are released.  While you are on supervision, you must not

24   possesses a firearm or any other dangerous weapon, you must not

25   use or possess any illegal controlled substance, and you must not

1    commit another federal or state or local crime.

2        You must also abide by the general conditions of

3    supervision that have been adopted by the U.S. Probation Office,

4    as well as the following special conditions:  You must submit to

5    the collection and use of DNA identification information while

6    you are incarcerated in the Bureau of Prisons or at the direction

7    of the U.S. Probation Office.  You must participate in and

8    successfully complete a residential or outpatient substance abuse

9    treatment program, which may include drug testing and

10   detoxification service if the probation office directs you to.

11       You shall participate in an educational or vocational

12   skills training program, as approved and directed by the

13   probation office.  You shall also participate in and successfully

14   complete a mental health treatment program, which may include

15   outpatient counseling or residential placement as approved and

16   directed by the probation office.

17       The probation office shall release the presentence

18   investigation report to all appropriate agencies in order to

19   execute the sentence of the Court.  Treatment agencies shall

20   return the presentence report to the probation office upon the

21   defendant's completion or termination from treatment.

22       Mr. Thurston, you have the right to appeal the verdict and

23   the sentence.  If you choose to appeal, you must file an appeal

24   within 14 days after the Court enters judgment.  If you are

25   unable to afford the cost of an appeal, you may ask the Court to

1    appoint counsel at no cost to you.

2        Counsel, are there any other matters we need to take up?

3        MR. ZUCKER:  Your Honor, I would ask the Court to

4    recommend a residential drug program.

5        THE COURT:  Recommend a?

6        MR. ZUCKER:  Residential drug program within the Bureau of

7    Prisons.

8        THE COURT:  Is that the same as the 500-hour program?

9        MR. ZUCKER:  It is, yes.

10       THE COURT:  All right.  Mr. Leon.

11       MR. LEON:  If -- I'll defer to the Court and Mr. Penders.

12   If it is warranted in the Court and Mr. Penders's judgment, then

13   I'll defer to you and the probation office.

14       THE COURT:  Mr. Penders.

15       PROBATION OFFICER:  No objection from the probation

16   office.  It's the RDAP program.

17       THE COURT:  I have to use a new acronym for it, I guess.

18   It's called residential drug --

19       PROBATION OFFICER:  RDAP, residential drug and alcohol

20   prevention.

21       THE COURT:  Will the Bureau of Prisons know what I mean if

22   I put 500-hour program?

23       PROBATION OFFICER:  Yes.

24       THE COURT:  I haven't caught up with the latest lingo.

25   But I will recommend and I do recommend that the Bureau of

USCA Case #11-3031    Document #1445852    Filed: 07/18/2013    Page 1876 of 1954

1    Prisons enroll Mr. Thurston in the 500-hour drug treatment

2    program if he's eligible for it.

3          Anything else we need to take up?  Anything else we need

4    to take up?

5          MR. LEON:  No, Your Honor.

6          THE COURT:  All right.  Mr. Thurston, I want to impress

7    upon you that during the time that you will be serving, you will

8    be faced with an opportunity to make some choices.  When you are

9    released, you will have a family, three children, and others to

10   reunite with.  During the time you're serving, you'll have an

11   opportunity to possibly gain some vocational skills training and

12   to gain other benefits that could allow you to be equipped when

13   you are released with walking that straight and narrow path that

14   I hope you do want to walk, so that I won't have to see you in

15   here again under these circumstances.

16         There is always a risk after serving a term that you will

17   be facing temptations of the same kind that you did not resist

18   for quite a while earlier on in your life.  It is a lot easier to

19   give in to those temptations than it is to stay on the high road

20   and look beyond them.  But if you want your life to have better

21   results for you, more meaning for your children, and more hope

22   for a relationship to be built and continue with those

23   youngsters, I hope you do everything within your power during the

24   time you're serving to equip yourself with whatever you need to

25   equip yourself with to fight those temptations, if they come at

1    you, when you are released.  You're going to be better for it if

2    you do.  Your family and your children will certainly be better

3    for it if you do.

4         I suspect from what I've heard that you have it within you

5    to equip yourself so that you won't have to put your children

6    through any more absence, so you yourself won't have to suffer

7    any more absence from the lives of your young daughters.

8         Nobody here can force you to put yourself in a position to

9    make sure that when you're out you'll avoid those temptations

10   rather than give in to them.  Only you can do that.  But I've

11   seen and heard enough about you to think that you can do it.  But

12   the choice is yours, and I implore you to make the choice to

13   equip yourself so that when you get out, your life is going to

14   take a whole different trajectory.  You'll be able to be with

15   those children, give them the guidance and the fathering that

16   they have missed, and that you'll be able to give yourself the

17   kind of life that you really ought to treat yourself to.  Good

18   luck to you, sir.

19        (Proceedings adjourned at 11:55 a.m.)

20

21                    C E R T I F I C A T E

22              I, Scott L. Wallace, RDR-CRR, certify that
     the foregoing is a correct transcript from the record of
23   proceedings in the above-entitled matter.

24   _____          _____
         Scott L. Wallace, RDR, CRR               Date
25        Official Court Reporter

# Tab 50

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | Docket No. CR 05-100-01 |
| | : | |
| **v.** | : | |
| | : | |
| **ANTWUAN BALL,** | : | Washington, DC |
| | : | |
| **Defendant.** | : | March 17, 2011 |
| | : | 10:30 a.m. |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

*TRANSCRIPT OF SENTENCING PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the United States:     UNITED STATES ATTORNEY'S OFFICE
**Glenn S. Leon, Assistant United**
**States Attorney**
**Ann H. Petalas, Assistant United**
**States Attorney,**
**Gilberto Guerrero, Assistant**
**United States Attorney**
555 4th Street
Washington, DC   20001
202.305.0174

For Defendant          CARNEY & CARNEY
Antwuan Ball:          **John James Carney, Esq.**
South Building
601 Pennsylvania Avenue, N.W.
Washington, DC   20004
202.434.8234

APPEARANCES (Cont.)


Court Reporter:                Scott L. Wallace, RDR, CRR

                               Official Court Reporter

                               Room 6814, U.S. Courthouse

                               Washington, DC 20001

                               202.326.0566


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

**MORNING SESSION, MARCH 17, 2011**

(10:36 a.m.)

00:07     THE COURTROOM CLERK:  Your Honor, this morning is the

00:07 matter of the United States versus Antwuan Ball.  This is

00:07 Criminal Record 05-100-01.  Present for the government is

00:08 Assistant United States Attorneys Glenn Leon, Ann Petalas, and

00:08 Gilberto Guerrero, Jr., and also for Mr. Ball, Attorney John J.

00:08 Carney, and from the office of Probation Officer Michael Penders,

00:08 Mr. Ball is now present.

00:08     THE COURT:  All right.  Good morning.

00:08     ALL PARTIES PRESENT:  Good morning.

00:08     THE COURT:  Mr. Carney, you indicated earlier that you may

00:08 want to present some witnesses.  I thought that, although I

00:08 ordinarily start with argument about any objections to the

00:08 presentence report, rather than keeping the witnesses waiting

00:08 through that, I'd invite you to call them and put on any

00:08 testimony.

00:08     Do you still have any witnesses you might want to call?

00:08     MR. CARNEY:  I do, Your Honor.  They're willing to wait

00:08 through the proceeding.  They wish to be here for the entire

00:08 proceedings, and essentially there are three individuals, Janie

00:08 Jeffers, Edgar Cahn, Curtis Watkins.  I expect them to talk no

00:08 more than ten minutes just to give a brief presentation, and I

00:08 can call them later after Your Honor goes through the objections

00:08 or now if you wish.

| | | |
|---|---|---|
| 00:09 | 1 | THE COURT:  Why don't we take them now? |
| 00:09 | 2 | MR. CARNEY:  Yes, Your Honor. |
| 00:09 | 3 | THE COURT:  Preserve for them the option of staying or |
| 00:09 | 4 | leaving. |
| 00:09 | 5 | MR. CARNEY:  Yes, Your Honor.  Thank you. |
| 00:09 | 6 | THE COURT:  All right. |
| 00:09 | 7 | MR. CARNEY:  Your Honor, at this time, I call Edgar Cahn |
| 00:09 | 8 | to the podium. |
| 00:09 | 9 | THE COURT:  All right. |
| 00:09 | 10 | MR. CARNEY:  Professor Cahn, could you please just tell us |
| 00:09 | 11 | briefly a little bit about your background, your knowledge of |
| 00:09 | 12 | Antwuan Ball, and what plans that you have worked out with |
| 00:09 | 13 | Mr. Watkins and others with respect to reentry into the community |
| 00:09 | 14 | for Antwuan Ball. |
| 00:09 | 15 | THE COURT:  Excuse me for interrupting. |
| 00:09 | 16 | Excuse me, Mr. Carney, if you're going to ask questions, |
| 00:09 | 17 | let me invite Mr. Cahn to have a seat in the witness stand, and I |
| 00:09 | 18 | assume if you're going to ask questions, we would invite the |
| 00:09 | 19 | Government to cross if they wanted to. |
| 00:09 | 20 | MR. CARNEY:  Yes, Your Honor. |
| 00:09 | 21 | THE COURT:  So let me ask Mr. Smith to place Mr. Cahn |
| 00:09 | 22 | under oath. |
| 00:09 | 23 | (EDGAR STUART CAHN, WITNESS IN THE CASE, SWORN.) |
| 00:09 | 24 | |
| 00:10 | 25 | |

00:10 1        DIRECT EXAMINATION OF EDGAR STUART CAHN

00:10 2   BY MR. CARNEY:

00:10 3   **Q.**   Professor Cahn, could you state your full name and spell

00:10 4   it for the court reporter.

00:10 5   **A.**   My name is Edgar Stuart Cahn.  Stuart is spelled

00:10 6   S-T-U-A-R-T; Cahn is spelled C-A-H-N.

00:10 7   **Q.**   Can you tell the court a little bit about your background

00:10 8   education and training?

00:10 9   **A.**   I am presently a distinguished professor of law at the

00:10 10  University of the District of Columbia school of law.  I teach

00:10 11  the first year students.  I oversee their community service, and

00:10 12  I teach the faculty, of course, in what's called System Change.

00:10 13  I'm the founder of the Time Dollar Youth Court, which is the

00:10 14  major diversion program authorized by the Superior Court that

00:10 15  handles about 800 cases a year of kids who have committed minor

00:11 16  misdemeanors and may come before a jury of teenagers, and they

00:11 17  produce recidivism by over 50 percent.

00:11 18       It's about a ten-year old program now.  That has been

00:11 19  highly regarded.  Antwuan was involved in the conduct of that

00:11 20  program, and I'll speak to that shortly.

00:11 21       I'm also the founder of something called Time Banking,

00:11 22  which is a tax exempt community currency that people earn

00:11 23  helping each other, and that we will be working with Antwuan and

00:11 24  Curtis Watkins to bring it to Benning Terrace and to other

00:11 25  public housing complexes.

00:11  1        And I am also a co-founder of something called The

00:11  2   Homecomers Academy, which was funded by the Kellogg Foundation

00:11  3   as a prisoner reentry program for people who are coming back

00:11  4   from prison who wish to engage in a life of both learning and

00:11  5   community service, and Curtis Watkins, the head of that program,

00:12  6   is here with me today.

00:12  7        I guess that's my -- that's my involvement in the system.

00:12  8   My knowledge of Antwuan goes back to just about the year 2000

00:12  9   when I was introduced to him by Janie Jeffers because I was

00:12 10   interested in developing a time bank program where seniors could

00:12 11   make sandwiches for the kids at charter schools, and that would

00:12 12   reduce violence in Congress Park.

00:12 13        And Antwuan was there at the meeting at the food bank,

00:12 14   and that was when we met, and he agreed that he would be willing

00:12 15   to help the seniors, and he would pick up the food from the food

00:12 16   bank so the seniors could, then, work with the teenagers.  At

00:12 17   that time, he was working with the STEP Foundation that was

00:12 18   funding a community -- basically a community building,

00:13 19   anti-violence program in Congress Park.

00:13 20        And that was how I got to know him.  He was very

00:13 21   faithful, and he was the sole carrier of that food to the

00:13 22   seniors who, then, made the sandwiches, and violence went down

00:13 23   because kids apparently don't mug people who give them

00:13 24   sandwiches after school.

00:13 25        And after that, I got to know him and he knew about the

00:13  1  youth court, and so we talked about him working with the kids

00:13  2  who would be sentenced to a program called Life Skills, one of

00:13  3  the kids would be sentenced to jury duty, but also to an

00:13  4  apology, to restitution, and to Life Skills and other kinds of

00:13  5  mentoring programs, and so Antwuan agreed that he would take a

00:13  6  course to be a certified and trained Life Skills mentor.

00:13  7       He took the course.  He performed very well and we asked

00:13  8  him, then, one summer because I was the Mayor's appointee on the

00:14  9  juvenile justice advisory group, and I asked him -- there would

00:14 10  be money for a summer program, and the kids -- we wanted the

00:14 11  kids to build a computer lab in one of the vacant basements in

00:14 12  the Congress Park area.

00:14 13       He agreed to do the supervising and the training and also

00:14 14  to oversee the actual conduct of hearings, as I recollect, in

00:14 15  Congress Park.  He did so.  They did a superb job that summer,

00:14 16  and I came to know him as somebody who was well respected in the

00:14 17  community.

00:14 18       I, then, worked with the STEP Foundation, and you'll hear

00:14 19  from the person who actually oversaw that program, that was

00:14 20  Janie Jeffers, a former U.S. commissioner on the Parole

00:14 21  Commission.  And so you'll hear about that program from her, but

00:14 22  I came to know him as somebody -- Congress Park is not a place

00:14 23  where white folks are supposed to walk at night, I was told.

00:14 24       I always felt safe when I was with Antwuan, and because

00:15 25  he -- of the way in which he introduced me into that community,

00:15 1   I could go there alone at night and was -- and felt that that

00:15 2   community was a community where I was always safe and was always

00:15 3   welcome.

00:15 4   **Q.**   Dr. Cahn, could I ask you to direct your attention to

00:15 5   current plans that have been set up to have Antwuan Ball reenter

00:15 6   the community, particular with The Homeowners Academy and -- I'm

00:15 7   sorry, The Homecomers Academy plans with respect to mentoring,

00:15 8   education back into the community and whether there's work for

00:15 9   him under these plans.

00:15 10   **A.**   The Homecomers Academy -- the membership of it are people

00:15 11   who have returned from prison, some 2000 a year will be

00:15 12   returning from prison, and so the need to create something that

00:15 13   will provide them with an avenue is critical.

00:15 14       Curtis Watkins whom I've known for about ten years heads

00:16 15   it, and the work we have arranged is -- because we've been

00:16 16   meeting with the residents of different public housing complexes

00:16 17   and the authorities in the DC Housing Authority, they have given

00:16 18   us a formal letter of support to launch a joint program that

00:16 19   in -- that has the Homecomers and the resident leaders in public

00:16 20   housing set up a time bank program, which is really a neighbor

00:16 21   helping neighbor program.  It may involve mentoring, it may

00:16 22   involve home repair, it may involve a community garden.

00:16 23       It's really rebuilding a sense of community because

00:16 24   people need to learn how rich that community is in capacity and

00:16 25   how many people can help each other if they begin to trust each

00:16  1  other and can come out from whatever fear is there.  So we've
00:16  2  been welcomed, and specifically, in Benning Terrace where an
00:16  3  organization called One Economy is also going to bring the
00:17  4  Internet free within two months, and they have an agreement with
00:17  5  the housing authority.

00:17  6      Antwuan, if he were released, would be working with
00:17  7  Curtis Watkins to do a number of things.  One, he would learn
00:17  8  how to set up a time bank program which involves the use of a
00:17  9  software.  Say, if you're going into hospital and you need
00:17 10  somebody walking your dog, you need somebody who will -- who has
00:17 11  agreed to do petcare, or if you need home repair, you need to
00:17 12  look in the database and you need to really help build a spirit
00:17 13  of trust.  Well, I've seen Antwuan do that, and I know he would
00:17 14  be great.

00:17 15      We are applying for a grant for a two-year AmeriCorps
00:17 16  position, and I'm told our chances are good, and we have the
00:17 17  support of the housing authority.  But I have taken bluntly out
00:17 18  of my own pension retirement funds $10,000 as a restricted gift
00:17 19  to the Homecomers so that the minute he works out, he has
00:17 20  employment because I would not want him -- frankly want him to
00:17 21  be without a source of income.

00:17 22      That's how much I believe in Antwuan, and it's also how
00:18 23  much I believe in The Homecomers Academy.  I've seen them --
00:18 24  I've seen their commitment to paying back.  They have said and
00:18 25  Antwuan has said, "We help take this community down, we want to

00:18  1  help build this community back up," and I am fiercely committed

00:18  2  to helping that, and I see Antwuan as a major asset in that

00:18  3  endeavor.

00:18  4  **Q.**    Thank you, Professor.

00:18  5       No further questions, Your Honor.

00:18  6       THE COURT:  All right.  Thank you.

00:18  7       Any cross-examination?

00:18  8       MR. GUERRERO:  Good morning, Professor Cahn.

00:18  9       THE WITNESS:  Good morning.

00:18 10       MR. GUERRERO:  Your Honor, thank you.  We have no

00:18 11  questions.

00:18 12       THE COURT:  All right.  Thank you, sir.  You may step

00:18 13  down.

00:18 14       MR. CARNEY:  Your Honor, at this time, I call Curtis

00:18 15  Watkins.

00:18 16       THE COURT:  All right.

00:19 17       (CURTIS WATKINS, WITNESS IN THE CASE, SWORN)

00:19 18

00:18 19       DIRECT EXAMINATION OF CURTIS WATKINS

00:18 20  BY MR. CARNEY:

00:19 21  **Q.**    Mr. Watkins, thank you for coming down.

00:19 22       Could you please tell us your full name and spell it for

00:19 23  the court reporter.

00:19 24  **A.**    Yes.  It's Curtis Alonzo Watkins, W-A-T-K-I-N-S.  Alonzo

00:19 25  is spelled A-L-O-N-Z-O.

00:19 1 **Q.**  Could you tell us a little bit about your background?

00:19 2 **A.**  Well, I've been running a nonprofit since 1998 called --

00:19 3 originally, it was called East Capitol Center for Change, and we

00:19 4 actually provided services in the East Capitol dwellings.  At

00:19 5 the time, that was the largest housing development in the

00:19 6 District of Columbia.

00:19 7       Presently, we changed the name to LifeSTARTS Youth &

00:19 8 Family Services, and we provide services in two public schools.

00:19 9 We have an after-school program, and we do numerous things in a

00:20 10 lot of communities where individuals tend to shy away from.

00:20 11       We also -- recently, last year in April, I was appointed

00:20 12 to a national directorship of The National Homecomers Academy

00:20 13 looking at how do we reframe reentry for individuals who have

00:20 14 assets who want to return to the community and do the right

00:20 15 thing and create support systems that allow those individuals to

00:20 16 be what we call community change agents.

00:20 17 **Q.**  Can you tell us what plans that you have worked out with

00:20 18 The Homecomers Academy with respect to funding and housing?

00:20 19 **A.**  Well, it's the National Homecomers Academy.  Again, we

00:20 20 have this basic philosophy, individuals like Mr. Ball, if

00:20 21 released into the community, could be an asset to the community.

00:20 22       A lot of the young people in the community, they need

00:21 23 assistance with individuals like Mr. Ball in a way that he has

00:21 24 credibility, and he has credibility as that he can change the

00:21 25 direction of a young person just by talking to them, and a lot

00:21 1  of young people will say that I don't necessarily want anybody

00:21 2  preaching to me, but I want to feel someone's heart that they

00:21 3  really care about us.

00:21 4      And so what we plan to do with Mr. Ball, if the Court

00:21 5  grants permission for him to return to the community, is that

00:21 6  Mr. Ball will become a community change agent, and personally

00:21 7  speaking, I have a personal stake in this.

00:21 8      In 2006, my son was killed in this very same community,

00:21 9  Congress Park, and ever since then, I've rededicated my life to

00:21 10 the situation of making communities better, and the Homecomers

00:21 11 come from a different perspective, Your Honor.

00:21 12     They come from a perspective that we did so much damage

00:21 13 in the community or we were a part of the problem that we have

00:22 14 to put just as much time into correcting the problems in our

00:22 15 community, and Mr. Ball is one of those individuals that -- I

00:22 16 see him with those types of characteristics that he can be an

00:22 17 asset to our community.

00:22 18 Q.  Is there some relationship that's been established with

00:22 19 CSOSA?

00:22 20 A.  Yes.  I -- I've been doing groups, men's groups under the

00:22 21 violence reduction program with CSOSA since 2006.  The violence

00:22 22 reduction program is finding how do we integrate individuals

00:22 23 back into the community in a positive light.

00:22 24     I have an example of a lot of things that the Homecomers

00:22 25 actually do.  We do what we call Homecomers Makeovers where we

00:22  1  go into individuals' houses and assist them in cleaning up their

00:22  2  houses, then we mentor the children.  We do truly see work in

00:22  3  the community.

00:22  4      We also have an activity called Parents Helping Parents,

00:23  5  and we do a thing called Safe Passage in Lincoln Heights and

00:23  6  also in Clay Terrace.  In these communities -- a lot of people

00:23  7  again don't want to go to these communities.  We assure that

00:23  8  kids get safe passage to and from schools, and these are

00:23  9  individuals who have been in the criminal justice system.

00:23 10      Recently, we've been asked to go into a mixed-income

00:23 11  community.  That was a Hope VI project because they have tried

00:23 12  to attempt to correct a lot of the problems in the community

00:23 13  such as young people vandalizing, burglaries, and things of that

00:23 14  nature.

00:23 15      And so they have decided, based on spending money in

00:23 16  security, spending money with more police presence, which hasn't

00:23 17  worked, they want to give the Homecomers an opportunity to

00:23 18  change the culture within this community.  And so, Your Honor,

00:23 19  we were not only doing this in D.C. but soon to be in Michigan,

00:24 20  and also we're looking at Kansas City as another pilot site.

00:24 21      And so individuals like Mr. Ball are individuals we're

00:24 22  looking for to be one of those community change agents.

00:24 23  Q.   All right.  Thank you.

00:24 24      No further questions, Your Honor.

00:24 25      THE COURT:  All right.  Any questions?

00:24 1    MR. GUERRERO:  Good morning, Mr. Watkins.

00:24 2    Thank you, Your Honor.

00:24 3    THE WITNESS:  Good morning.

00:24 4    MR. GUERRERO:  No cross-examination.

00:24 5    THE COURT:  All right.  Thank you, sir.  You may step

00:24 6  down.

00:24 7    MR. CARNEY:  Your Honor, the last witness is Janie

00:24 8  Jeffers, please.

00:24 9        (JANIE JEFFERS, WITNESS IN THE CASE, SWORN.)

00:24 10

00:24 11        DIRECT EXAMINATION OF JANIE JEFFERS

00:24 12  BY MR. CARNEY:

00:24 13  Q.    Ma'am, could you please state your full name and spell it

00:24 14  for the court reporter.

00:24 15  A.    Sure.  First name is Janie, J-A-N, as in Nancy, I-E;

00:24 16  middle initial, L; last name, Jeffers, J-E, double F as in

00:25 17  Frank, E-R-S.

00:25 18  Q.    Could you tell the Court a little bit about your

00:25 19  background?

00:25 20  A.    Certainly.  I am a former presidential appointee to the

00:25 21  United States Parole Commission.  I was a commissioner with the

00:25 22  New York City Department of Corrections commonly known as Rikers

00:25 23  Island for nearly 20 years.

00:25 24      I worked with the Justice Department Federal Bureau of

00:25 25  Prisons for about five years, and I worked in the White House as

00:25   1   an advisor to former President -- Vice President Gore,

00:25   2   ultimately a speech writer for Mrs. Clinton, at that time,

00:25   3   Mrs. Clinton, and then worked in OMB on the budget for the

00:25   4   president.

00:25   5   **Q.**    Did there come a time in 2001, 2002 that you came to know

00:25   6   Antwuan Ball?

00:25   7   **A.**    Actually a little prior to that.  Then Mrs. Clinton made

00:26   8   a visit to an organization in Southeast Washington.  They, then,

00:26   9   asked for someone to continue that contact.  I was designated to

00:26  10   be that person, so it was in '98 that I began working with them

00:26  11   through the STEP Foundation to help improve conditions in

00:26  12   Congress Park.

00:26  13       In my role at the White House, we convened meetings with

00:26  14   the federal cabinet-level agencies and nonprofits and --

00:26  15   foundations and community people from Congress Heights to come

00:26  16   together to figure out a way how we could get the resources from

00:26  17   the federal government and the District of Columbia,

00:26  18   specifically to Congress Heights.

00:26  19   **Q.**    And with respect to Antwuan Ball, did you get a chance to

00:26  20   work closely with him on any projects?

00:26  21   **A.**    Yes.  As a matter of fact, one of the things that

00:26  22   impressed me about Antwuan -- I met a lot of young people out

00:26  23   there -- was his passion and his commitment, and I say that

00:26  24   because in my 35 years of being in criminal justice and

00:27  25   particularly with the work -- Parole Commission, I've had to

00:27  1  make decisions in terms of who was released from prison, people

00:27  2  who would be locked up for lots of time, 10, 20 years, and so

00:27  3  judgment is something that I -- in some humble way, say, I think

00:27  4  I'm capable of making those kinds of decisions.

00:27  5      He impressed me on the level of his passion and his

00:27  6  commitment to his community.  Antwuan admitted that he had been,

00:27  7  quote, a knucklehead, but that he had turned himself around

00:27  8  through a lot of different experiences and wanted to give back

00:27  9  to the community.

00:27 10      One of the things that we discovered in working -- we had

00:27 11  a basement office in Congress Park, is that the kids would

00:27 12  vandalize the laundry room for lack of having no other options

00:27 13  in terms of play.  Antwuan said, and I remember this so clearly,

00:27 14  "Wouldn't it be great if we had a playground?"

00:27 15      Well, through some resources of the Kinsey Foundation and

00:27 16  a lot of other people who were involved, we were able to get

00:27 17  KaBOOM! to come to Congress Park, build a playground, and to

00:28 18  this day, as I understand, it's still there.

00:28 19      I became very involved, CEO, actually, working with them

00:28 20  through this -- the STEP Foundation, this is after I left

00:28 21  government, to continue bringing resources in and trying to,

00:28 22  again, bring the things that we knew the community needed but

00:28 23  didn't have access to.

00:28 24      So I was in frequent contact with him, not just during

00:28 25  the day because we had -- if you're working with the community,

00:28  1  you have to go out in the evening, and I was out there all times

00:28  2  of the day and evening, sometimes announced and sometimes not

00:28  3  announced, and had to interact with many of the seniors in the

00:28  4  community who to a person held him in high regard, not the kids

00:28  5  who -- you know, judgment can vacillate.  But talking to the men

00:28  6  and women who had a bit of experience behind them to a person,

00:28  7  they said they felt that Antwuan had helped turn the

00:29  8  temperature.  That was the word that they used.

00:29  9         And I asked them, "What did you mean by that?"

00:29 10         And they said, "Well, you have several choices.  They

00:29 11  could choose to react in a way that brings fund and kind of

00:29 12  elevates things or you could try to bring something to the

00:29 13  community that would be lasting and helpful."  And they felt

00:29 14  Antwuan had been that catalyst, and I endorse that assessment.

00:29 15         In all my years, Antwuan is the only person that I have

00:29 16  spent mentoring 10, 15 -- well, no, more than 15 years because

00:29 17  of that commitment and that transparency in terms of what he was

00:29 18  trying to do, not just for himself, but for the community.

00:29 19  Q.   Just one last question.

00:29 20       Were you familiar with a program called Kids Cafe and

00:29 21  Senior Citizens?

00:29 22  A.   And Senior Citizens where they provide -- and I think

00:29 23  Professor Cahn talked to that, yes.  They did meal preparation,

00:29 24  delivery.  He also -- one of the other things that may or may

00:30 25  not be known to you, he helped organize a GED prep program.  We

00:30  1  work with the U.S. Dream Academy, and through a presentation

00:30  2  that Antwuan made, they made a commitment to come to the

00:30  3  community center and provide the computers, not just for the

00:30  4  older people who were trying to get their GED's, but for the

00:30  5  kids to learn how to become computer literate as they, you know,

00:30  6  went forward.  He supervised -- we were successful in getting a

00:30  7  grant from AmeriCorps for approximately three years.  Antwuan

00:30  8  supervised those interns who were working in the Malcolm X

00:30  9  Elementary School, and so those are the kind of things that he

00:30 10  consistently involved himself in, and I just felt honored to be

00:30 11  a part of that.

00:30 12  **Q.**    Just to follow up on that, was the school that was

00:30 13  involved Thurgood Marshall with the senior citizens in that --

00:30 14  **A.**    As well, right.  Thurgood Marshall was one of the first,

00:31 15  still traditional, but one of the charter schools that was

00:31 16  started in the communities, yes, and he played a very

00:31 17  significant role in that in terms of, again, having the

00:31 18  credibility -- and Mr. Watkins referred to that, having the

00:31 19  credibility to say, "Yes, I was a knucklehead, I've turned my

00:31 20  life around and here are some things that you can do to be a

00:31 21  positive asset in the community," and Antwuan possesses all of

00:31 22  that.

00:31 23        One of the things that I want to mention also, I own my

00:31 24  own consulting firm.  I also happen to be an adjunct professor

00:31 25  at Howard University Graduate School, and I'm committing --

00:31  1  continuing my resources to help him return to the community that

00:31  2  I believe more than ever now needs the kind of experience that

00:31  3  Antwuan possesses.

00:31  4  **Q.**  Thank you.

00:31  5  **A.**  **Thank you.**

00:31  6  THE COURT:  Any questions?

00:31  7  MR. GUERRERO:  No, Your Honor.  Thank you.

00:31  8  THE COURT:  All right.  Thank you, ma'am.  You may step

00:31  9  down.

00:31 10 Any other witnesses, Mr. Carney?

00:31 11 MR. CARNEY:  No, Your Honor.

00:31 12 THE COURT:  All right.  Well, let me ask you, have you and

00:31 13 your client read and discussed the presentence report?

00:32 14 MR. CARNEY:  Yes, Your Honor.

00:32 15 THE COURT:  Let me hear from you with respect to the

00:32 16 objections that I will need to resolve.

00:32 17 MR. CARNEY:  Your Honor, I note that the objections are

00:32 18 listed in the presentence investigation, and I'll go through them

00:32 19 as we listed them.  The first was there was a threat to witness

00:32 20 during trial.  This was Bobby Capies.  As you remember, there was

00:32 21 a finding by the marshal service that they couldn't prove it up

00:32 22 or show that it was true, and, in fact, Your Honor made a ruling

00:32 23 during trial that it was not admissible, and I would point out to

00:32 24 Your Honor that it's a standard practice for attorneys that do

00:32 25 cases over here to tell their clients not to talk, that witnesses

00:32  1   are always instructed -- particularly cooperating witnesses are

00:32  2   instructed not to say a thing, not look at them, turn the other

00:33  3   way, so that there's no claim that they've been threatened or

00:33  4   harmed, and that, it seems to me, is not a valid two points for

00:33  5   obstruction.

00:33  6       The next one was the enhancement for the gun.  Our

00:33  7   objections on that was that there wasn't a gun used in the

00:33  8   offense for that -- which he was convicted.  This is used in

00:33  9   terms -- the way the PSI writer put it in, was the enhancement

00:33 10   was because of other conduct, and we contend that the transaction

00:33 11   should be the one that the gun would relate to.

00:33 12       With respect to the criminal history, we think that that

00:33 13   was wrong also because the offense of conviction is July of 2001,

00:33 14   and the CPWL conviction, he was not on probation during the

00:34 15   offense of conviction.  I understand the argument for -- but it's

00:34 16   relevant conduct that the conspiracy goes back that far, but we

00:34 17   interpret that portion of the statute to be -- that it has to be

00:34 18   for the offense of conviction.

00:34 19       We noted an objection to acceptance of responsibility

00:34 20   given the verdict.  It makes sense that he could not admit to

00:34 21   responsibility for things that he did not do.  There's also an

00:34 22   objection --

00:34 23       THE COURT:  Well, forgive me for interrupting.

00:34 24       MR. CARNEY:  Yes.

00:34 25       THE COURT:  I noted that you objected to vocabulary, but

00:34 1   you weren't raising an objection that the two-point or

00:34 2   three-point had not been given to him; is that fair?

00:34 3       MR. CARNEY: No. We're objecting -- we think he should

00:34 4   get some credit for acceptance of responsibility. There's a

00:34 5   three-point level, and we think that given the circumstances of

00:35 6   the case, his contriteness now for his offense of conviction, we

00:35 7   believe that he should still have the three points.

00:35 8       THE COURT: What's the basis for his satisfying the

00:35 9   elements of the 3E1.1?

00:35 10       MR. CARNEY: The basic argument for that is that he was

00:35 11   convicted of the one offense, he acknowledges his guilt, abides

00:35 12   by the verdict. There is no other basis other than that.

00:35 13       THE COURT: Go ahead.

00:35 14       MR. CARNEY: The other objection, Your Honor, is

00:35 15   Paragraph 93, going to relevant conduct again or acquitted

00:35 16   conduct. The jury specifically passed upon RICO dealing with

00:35 17   five or more participants and also conspiracy, a second charge in

00:35 18   the indictment, and passed on that fact that there were no such

00:36 19   conspiracies, and they gave an enhanced role of four points for

00:36 20   Mr. Ball being a leader in this relevant conduct.

00:36 21       We contend that it's the offense of conviction which was a

00:36 22   single individual act not involving five or more people, and we

00:36 23   contend that those points are in error. With respect to the

00:36 24   two points that he was given for the -- on probation, the CPWL,

00:36 25   that actually goes to the criminal history. Instead of being

00:36   1    Criminal History 3, he would be reduced to Criminal History 2.

00:36   2        Finally, Your Honor, and I know you've seen extensive

00:36   3    pleadings by all of the lawyers in this case dealing with the use

00:36   4    of relevant conduct in this case.  If it was without the relevant

00:36   5    conduct, the basic offense level would be 24.  As it is with the

00:36   6    relevant conduct, it's relevant 36.

00:37   7        Specifically, the jury did pass upon the overt acts, that

00:37   8    the hearsay that came in under exceptions, it passed upon all of

00:37   9    the acts that were testified to by a number of individuals, and

00:37 10    they accepted the lack of credibility of that evidence, and we

00:37 11    contend that that relevant conduct should not be used in this

00:37 12    case.

00:37 13        The arguments that have been presented to Your Honor dealt

00:37 14    with, first, that it was a denial of the Sixth Amendment right to

00:37 15    have the jury passed upon what he's being sentenced on.

00:37 16        We also note that one of the things that Your Honor is

00:37 17    allowed to do is you can reject the use of acquitted conduct in

00:37 18    calculating the guideline range as unsound judgment that wasn't

00:37 19    based upon past practice or national experience, because

00:38 20    otherwise it creates an unwanted disparity and disrespect for the

00:38 21    law.

00:38 22        With respect to that, Your Honor, I tendered to the Court

00:38 23    Exhibit 1, which was a letter -- a copy has been given to the

00:38 24    Government.  This was the letter -- as Your Honor recalls, one of

00:38 25    two letters that you received from one of the jurors.  Often, the

00:38 1   Court say that we don't know what the jury was thinking about a

00:38 2   case when they issue a decision.  This is one of the few times

00:38 3   that I've had the experience, other than being allowed to talk to

00:38 4   a juror after a verdict, where we know exactly what the jury was

00:38 5   thinking.  And if you look at some of the things that are said in

00:38 6   that letter, we deliberated for over two months, four days a

00:39 7   week, eight hours a day, we went over everything in detail, and

00:39 8   if any of our fellow jurors had a doubt, a question or idea, they

00:39 9   wanted to repeat it, we all stopped, conspiracy, a crew, with the

00:39 10  evidence the prosecuted presented, not one among of us could see

00:39 11  it.  Racketeering, we dismissed that even more quickly.

00:39 12        There's further discussions in the letters that there was

00:39 13  no evidence presented that these individuals operated as a crew,

00:39 14  and basically they said, "It was a market that was out there and

00:39 15  that over the years," if you look at the last page, they said

00:39 16  that they're not being charged, they're not being sentenced on

00:39 17  charges for which they've been found guilty, but on charges for

00:39 18  which the district attorney's office would have liked to have had

00:39 19  them been found guilty.

00:39 20        Had they shown us hard evidence, the outcome might not

00:39 21  have been the same, but they said they performed their duty and

00:39 22  they did it the best they could, and then they talk about the

00:39 23  individuals.  They say one had moved to North Carolina to work in

00:40 24  a steel mill before he was arrested.  Another was involved in

00:40 25  community service to encourage district youth to stop selling

00:40 1  drugs and find jobs, and he received widespread recognition for

00:40 2  doing so.

00:40 3     The jury carefully -- very carefully considered the

00:40 4  evidence in the case, and one of the -- if Your Honor wants, I'll

00:40 5  continue, but I'm trying to address now the 3553 factors.  If you

00:40 6  want me to stop at this point, I will.

00:40 7     THE COURT:  I'm not asking you to stop, but I just want

00:40 8  you to address any objections that I need to resolve at this

00:40 9  point.  I'll be happy to hear from you in allocution right after

00:40 10 we finish those.

00:40 11    MR. CARNEY:  Well, that would be the end of my objections

00:40 12 as to the ones that are raised in the PSI and also the objections

00:40 13 to relevant conduct, Your Honor.

00:40 14    THE COURT:  All right.  Thank you.

00:40 15    Does the Government have any comments about the

00:40 16 presentence report or the objections that have been raised?

00:41 17    MR. LEON:  Good morning, Your Honor.

00:41 18    THE COURT:  Good morning.

00:41 19    MR. LEON:  I will -- with the Court's permission, I will

00:41 20 address the presentence report issues right now, and then I

00:41 21 believe Mr. Guerrero will make further allocution when the Court

00:41 22 asks for that at sentencing.

00:41 23    With respect to the presentence report, I just want to

00:41 24 address the points that Mr. Carney raised.  We submit on the

00:41 25 papers that we presented to the Court with respect to the

00:41 1   two-point adjustment for obstruction of justice.  We don't --

00:41 2   we'll submit on the paperwork on that, which we outlined in our

00:41 3   sentencing memorandum, specifically at Page -- at Pages --

00:41 4   Court's indulgence, beginning at Page 23 -- Pages 23 to 24.

00:41 5        With respect to the enhancement for a weapon, though, I do

00:42 6   want to spend -- as the Court knows, we did spend a few pages on

00:42 7   that in our sentencing memorandum, the Government sentencing

00:42 8   memorandum, Pages 20 through 23.  The Government believes that

00:42 9   is -- was and remains an appropriate adjustment under the

00:42 10   sentencing guidelines for two basic reasons.  One is the reason

00:42 11   that Mr. Carney flagged, although we disagree on this, which is

00:42 12   the conviction from 1995 for CPWL, we believe is -- since it is

00:42 13   appropriately considered for purposes of this analysis as an

00:42 14   enhancement because it is within the relevant conduct period

00:42 15   which the Court has been considering with respect to the other

00:42 16   defendants, and in addition, the period of probation carried well

00:42 17   into the period -- the relevant conduct period that we're dealing

00:42 18   with here.

00:42 19        THE COURT:  Don't -- do you concede now with that?  That

00:42 20   affects its ability and eligibility to be scored as -- in the

00:42 21   criminal history?

00:42 22        MR. LEON:  Um, meaning you can't count it twice

00:43 23   essentially?  Yes.

00:43 24        THE COURT:  Go ahead.

00:43 25        MR. LEON:  The Government does -- just before I go to the

00:43 1  second point, I frankly forget which defendant, but I believe the

00:43 2  Court made a similar analysis, just the one we're talking about

00:43 3  now, with respect to one other defendant who's been sentenced

00:43 4  before this Court in this case.  I just forget which one.

00:43 5      The other reason the Government thinks the enhancement for

00:43 6  a weapon is appropriate in this case is, and we do lay this out

00:43 7  in Pages 20 through 24, several witnesses, each of whom has been

00:43 8  credited by this court, on a high burden of proof, substantial

00:43 9  probability, Larry Brown, Bobby Capies, Robert Crawford and Steve

00:43 10 Marsh, four separate witnesses and we lay this out in our

00:43 11 sentencing memorandum, four separate witnesses testified under

00:43 12 oath before this court regarding not only Mr. Ball's drug dealing

00:43 13 which is also part of the record, but also the fact that

00:43 14 Mr. Ball, during the late '90s, 2000, 2001, 2002 time period,

00:44 15 frequently carried weapons, that they saw this, they saw him and

00:44 16 interacted with him while he was leading in Congress Park, while

00:44 17 he was dealing drugs in Congress Park.

00:44 18     He carried weapons and he -- with respect to Mr. Brown, he

00:44 19 says he actually purchased a weapon from Mr. Ball, and these all

00:44 20 are witnesses who this court has credited.  So for that

00:44 21 additional reason, we think the gun enhancement -- the weapon

00:44 22 enhancement is appropriate in this case.

00:44 23     Additionally, I don't think Mr. Carney addressed this too

00:44 24 much, but I just want to flag for the Court, we do also think,

00:44 25 under these circumstances for the reasons stated in our

00:44 1 memorandum, that it would be appropriate to give Mr. Ball an

00:44 2 adjustment for his role in the offense under the guidelines

00:44 3 Section 3B1.1(a) as a leader.

00:44 4     Indeed, I think one thing that most -- everyone here

00:44 5 agrees that Mr. Ball was and likely still is but is not relevant

00:44 6 was a leader in Congress Park. Perhaps some of that was for

00:45 7 good. The Government isn't here to say that Mr. Ball only did

00:45 8 bad things in Congress Park, but in this case, in this trial,

00:45 9 with these witnesses that the court has credited, we certainly

00:45 10 saw that during the relevant time periods, the mid and late '90s

00:45 11 into early 2000, 2001, 2002, into 2004, Mr. Ball certainly used

00:45 12 his leadership skills for elicit and criminal purposes as well,

00:45 13 whether it's a -- and again, we go into several examples for this

00:45 14 in our sentencing memorandum.

00:45 15     The pistol-whipping of Bobby Capies, because you thought

00:45 16 Mr. Capies and others were getting too big for their breaches,

00:45 17 telling people that they can't come and deal drugs in Congress

00:45 18 Park because this is our strip, and on and on and on, we give

00:45 19 several examples of that here.

00:45 20     So, indeed, Mr. Ball was a leader. In some cases, he

00:45 21 might have done that, used those skills for some good purposes,

00:45 22 but clearly the evidence -- the great evidence, we believe

00:45 23 certainly by substantial probability in this case before this

00:46 24 court is that Mr. Ball used those skills as well for criminal and

00:46 25 elicit purposes, and for that reason, we do think an enhancement

00:46 1  under the guidelines is appropriate as well.

00:46 2       For the reasons stated at previous sentencing hearings as

00:46 3  well as in the sentencing memorandum that we submitted to the

00:46 4  Court, we do think the 1.5 kilograms of crack cocaine is

00:46 5  appropriately assigned to Mr. Ball, not only on the conspiracy

00:46 6  theory, which we think would certainly get us well over that, the

00:46 7  Court well over that, but even putting that aside, simply on the

00:46 8  testimony of Mr. Capies, Mr. Marsh, Mr. Pough, Mr. Brown and

00:46 9  others, just on that alone -- that sworn testimony alone dealing

00:46 10 just with their individual, dealings with Mr. Ball, as we laid

00:46 11 out in the sentencing memorandum, we believe that clearly there's

00:46 12 an ample record before this court that Mr. Ball can and should be

00:46 13 assigned 1 .5 kilograms of crack cocaine for sentencing

00:46 14 guidelines purposes.

00:47 15      Those are the Government's only additional comments with

00:47 16 respect to the presentence report, Your Honor.

00:47 17      THE COURT:  All right.  Well, let me rule on the

00:47 18 objections that have been raised by the defendant, and there are

00:47 19 a number of them raised here in court and a number of them raised

00:47 20 also in the papers.

00:47 21      One of the earlier objections was a complaint by the

00:47 22 defendant that the preliminary presentence report selectively

00:47 23 presents only testimony that's favorable to the prosecution, and

00:47 24 not evidence showing that testimony to lack of credibility.

00:47 25      The defendant's written objections presenting detailed

00:47 1 information that he urges is favorable to him and undermines the

00:47 2 credibility of the Government's witnesses have now been included

00:47 3 in full in the revised presentence report which rectifies any

00:47 4 information gap.

00:47 5 　　　　More particularly, the defendant has objected to the

00:47 6 double hearsay in Paragraph 27 and asks that it be deleted.

00:47 7 That's the reference that reflects Season Wood's claim that Burke

00:48 8 Johnson passed on to Mr. Wood at the defendant's request a threat

00:48 9 by the defendant against Wood because Wood was cooperating with

00:48 10 the Government.

00:48 11 　　　　Hearsay can be presented at sentencing, and this

00:48 12 information has no impact upon the guidelines calculation.  In

00:48 13 any event, the paragraph will not affect a sentencing so that

00:48 14 objection is overruled.

00:48 15 　　　　In addition, the defendant objects to the statement in

00:48 16 Paragraph 28 that Wood was not significantly impeached by the

00:48 17 defense counsel.  That kind of an assessment is best left to the

00:48 18 Court and will not be considered in sentencing.

00:48 19 　　　　The defendant also objects to the use of acquitted conduct

00:48 20 in calculating the base offense level and the specific offense

00:48 21 characteristics and the Chapter 3 adjustments to the offense

00:48 22 level.

00:48 23 　　　　The D.C. Circuit has held that using acquitted conduct is

00:49 24 lawful, and that the proper guideline calculation should include

00:49 25 acquitted conduct if it appears by a preponderance of the

00:49 1  evidence that the defendant engaged in the conduct, so

00:49 2  considering acquitted conduct here is not improper.

00:49 3      The defendant has specifically objected to Paragraph 90 of

00:49 4  the presentence report which uses 1.5 kilograms of crack as a

00:49 5  relevant conduct in calculating the base offense level for the

00:49 6  one conviction of crack distribution.

00:49 7      That quantity came from the quantity allegedly

00:49 8  attributable to the narcotics conspiracy of which the defendants

00:49 9  were acquitted.  The D.C. Circuit has held that the sentencing

00:49 10 range for a particular offense is determined on the basis of all

00:49 11 relevant conduct in which the defendant was engaged, and not just

00:49 12 with regard to the conduct underlying the offense of conviction.

00:49 13     Relevant conduct includes not just the acts committed by

00:49 14 the defendant, but also all reasonably foreseeable acts of others

00:50 15 that were in furtherance of jointly undertaken criminal activity

00:50 16 in preparation for the offense of conviction, or part of the same

00:50 17 common scheme or plan as the offense of conviction.

00:50 18     Now, the Government has argued in its papers that the

00:50 19 trial testimony established that Mr. Ball and the others named as

00:50 20 co-conspirators were engaged in a concerted effort to distribute

00:50 21 crack for over 12 years in Congress Park.

00:50 22     The Government cites to the testimony of several

00:50 23 witnesses, in particular, to show that an amount directly

00:50 24 attributable to Mr. Ball exceeded 1.5 kilograms, but Mr. Ball's

00:50 25 counsel argues that the testimony on which the Government relies

00:50  1  is not credible.

00:50  2      Let me start by making clear what I do find from the

00:50  3  evidence before me.  I do find by clear and convincing evidence

00:50  4  the following:  There was a common agreement with -- and an

00:50  5  understanding among Mr. Ball and over a dozen named conspirators.

00:51  6  Its scope was to engage in a concerted effort to make money by

00:51  7  selling crack and to build and protect their market for crack

00:51  8  sales in designated locations in Congress Park.  The concerted

00:51  9  efforts were undertaken for over ten years.  The sale of which,

00:51 10  Mr. Ball was convicted, was made as a part of the same common

00:51 11  understanding and agreement.

00:51 12      The individual retail and wholesale distributions made by

00:51 13  the named conspirators during that period in Congress Park were

00:51 14  acts that were in furtherance of the common understanding and

00:51 15  were reasonably foreseeable by Mr. Ball and each of the named

00:51 16  conspirators.

00:51 17      The amounts of crack attributable to all those

00:51 18  distributions in furtherance of the agreement exceeded

00:51 19  1.5 kilograms and was reasonably foreseeable to Mr. Ball.  There

00:51 20  is reliable evidence of both a concerted effort involving

00:52 21  Mr. Ball and the foreseeable quantity involved.

00:52 22      The defendant knew many of the named conspirators and

00:52 23  associated with them in Congress Park, and that was established

00:52 24  by the countless witnesses at trial who saw them together during

00:52 25  the charged period, and whose accounts as to that detail were

00:52 1   largely undisputed, and the countless photographs showing them

00:52 2   together in Congress Park venues and other locations.

00:52 3      Witnesses such as Capies, Barnett, and Powell testified

00:52 4   how the charged conspirators cooperated with each other in

00:52 5   selling crack in Congress Park during the charged period by

00:52 6   participating in the uno, dos, tres or doors method of sharing

00:52 7   and sales proceeds.

00:52 8      Barnett and Capies participated many times with the named

00:52 9   conspirators while selling crack in the circle and in other

00:52 10   Congress Park locations.

00:52 11      Conner credibly testified that he sold crack to named

00:53 12   conspirators and that Collins and Ball dissuaded him from selling

00:53 13   in this circle in -- where the conspirators made their livelihood

00:53 14   having built up a market they wanted to protect.  That is, that

00:53 15   Collins and Ball were dissuaded by him from selling in the circle

00:53 16   where the conspirators made their livelihood having built up a

00:53 17   market they wanted to protect.

00:53 18      The evidence also comes from testimony, which I credit as

00:53 19   to these details, of those who witnessed the defendant selling

00:53 20   crack, bought crack from him or supplied him with crack to sell.

00:53 21   For example, Season Wood testified credibly that the defendant

00:53 22   sold him a half-ounce of crack, the conduct for which the

00:53 23   defendant was convicted by the jury.

00:53 24      Robert Crawford testified that between 1999 and 2001,

00:53 25   Mr. Ball made -- he made four or five sales to Mr. Ball of

00:53 1   between 62 and 125 grams of crack each and other sales to him

00:54 2   through an intermediary.

00:54 3       Parsons testified that she bought some dimes of crack from

00:54 4   Mr. Ball and once tried to cook his powder cocaine into crack.

00:54 5   Capies testified that between 1992 and 1996, he regularly

00:54 6   purchased wholesale half ounce quantities of crack from Mr. Ball,

00:54 7   and that during that same period, he observed Mr. Ball hustling

00:54 8   crack in the circle.

00:54 9       Capies also testified that two days after Mr. Ball showed

00:54 10   Capies a half kilo of cocaine powder, the defendant intended to

00:54 11   cook into crack, Capies bought a half ounce of crack from the

00:54 12   defendant.

00:54 13       In 1997 or 1998, on several occasions, Capies drove with

00:54 14   Mr. Ball in Mr. Ball's car and observed Mr. Ball front crack to

00:54 15   four individuals.  In 2001, Ball pistol-whipped Capies inside of

00:55 16   Wilson's apartment, and Capies testified that Ball stole 2 ounces

00:55 17   of crack from the apartment before leaving.

00:55 18       Marsh testified that the defendant sold him crack a couple

00:55 19   of times, that the defendant and he had sold each other supplies

00:55 20   of powder cocaine, and that he observed Mr. Ball cooking powder

00:55 21   cocaine into 50 to 60 grams of crack on one or two occasions.

00:55 22       Kellibrew, the defendant's younger cousin, testified that

00:55 23   he saw the defendant sell crack in his family's house.  When

00:55 24   Kellibrew began selling crack in Congress Park in 1994 and 1995,

00:55 25   he purchased some of it in quarter ounce quantities from

00:55 1   Mr. Ball.  Other times, Mr. Ball would front him crack.  Powell

00:55 2   corroborated that.  In 2001, Mr. Ball fronted Kellibrew 4 ounces

00:56 3   of crack to sell.

00:56 4        Given this testimony detailing substantial sales and

00:56 5   purchases from roughly 1992 to just 2001, the 1.5 kilogram crack

00:56 6   quantity is a reasonable estimate of the amount attributable to

00:56 7   the defendant alone.

00:56 8        The defendant challenges these witnesses' credibility.

00:56 9   For example, he argues that Crawford could not have observed the

00:56 10  defendant from 1999 to 2001 because he had admitted on

00:56 11  cross-examination to spending nearly all day every day during

00:56 12  that period with an individual named Jon Proctor.

00:56 13       What Crawford said was, "First, it was not every single

00:56 14  day but most days," and he wasn't sure if that pattern in 1999

00:56 15  continued into 2000, but that it was probable.  And secondly, he

00:56 16  met the defendant in 2000.  Crawford's admissions do not mean

00:57 17  that his spending time with the defendant as he did describe was

00:57 18  impossible.

00:57 19       The defendant also argues that Marsh's testimony was not

00:57 20  credible because he claimed that he fled Maryland from Congress

00:57 21  Park in 1999 after learning he was under indictment, but he was

00:57 22  not actually indicted until 2001.  However, Marsh testified that

00:57 23  several of his associates had been indicted in 1999, and he left

00:57 24  Maryland from Congress Park in 1999 assuming that he would be

00:57 25  also indicted.  The fact that he was not actually indicted until

00:57　1　2001 does not prove that Marsh could not believe that he would be

00:57　2　indicted as early as 1999.

00:57　3　　　In any event, given -- full effect to this impeachment

00:57　4　does not undermine the mutually corroborative evidence, which I

00:57　5　have identified and credited that demonstrates concerted activity

00:57　6　and the volume of crack involved in the relevant conduct.

00:57　7　　　The defendant also points to strive among the charged

00:58　8　conspirators as negating proof of any concerted effort, but

00:58　9　concerted efforts can generate strive along the way.  It does not

00:58　10　negate the reality of concerted efforts.  I've already found that

00:58　11　the 1.5 kilo crack quantity is a reasonable estimate of the

00:58　12　amount attributable to co-conspirator Gregory Bell alone.  Conner

00:58　13　alone established supplying an estimated quantity in excess of

00:58　14　1 kilo between 1999 and 2000, and Capies alone established buying

00:58　15　over 500 grams from 1992 to 2001 at a rate that would not risk

00:58　16　double counting Conner's one to two year supply, namely --

00:58　17　roughly 4 grams every now and then.

00:58　18　　　Every witnesses pushed the estimated amount safely above

00:58　19　an additional 100 grams.  Given the length of time over which the

00:58　20　witnesses saw Gregory Bell obtaining and selling crack, Capies

00:59　21　said "from as early as a period from 1992 to 1996 to as late as a

00:59　22　period from 1996 to 2001."  Proctor said, "as late a period of

00:59　23　2003 to 2005," with Barnett, Kellibrew, Conner and Powell

00:59　24　testifying to periods in between, and given the frequency with

00:59　25　which the witnesses said Bell was selling, such as Barnett seeing

00:59 1 Bell all day for years between 1993 and 2003, the estimate of at

00:59 2 least 1.5 kilos is reasonable for just Bell.

00:59 3 Additionally, my conclusion about the relevant conduct

00:59 4 quantity and the existence of the common scheme is based upon

00:59 5 more than just the testimony of those witnesses. Joe Langley,

00:59 6 Burke Johnson, and Mary McClendon each pled guilty under oath to

01:00 7 conspiring to distribute crack for at least a decade, admitting

01:00 8 accountability for, respectively, between 500 grams and

01:00 9 1.5 kilograms, over 1.5 kilograms, and between 500 grams and

01:00 10 1.5 kilograms, and they named in signed proffers numerous named

01:00 11 conspirators in this case as customers.

01:00 12 Johnson specified selling wholesale amounts of crack to

01:00 13 Mr. Ball. But eight other people, Gerald Bailey, Jasmine Bell,

01:00 14 Raymond Bell, Marcus Smith, Arthur Handon, Lucius Fowler, Philip

01:00 15 Wallace, and Danielle Collins, which includes seven with no

01:00 16 cooperation agreements, all pled guilty under oath to conspiring

01:00 17 for many years with Mr. Ball and other named conspirators in this

01:00 18 case to distribute crack.

01:00 19 In signed statements adopted under oath during their

01:01 20 pleas, all admitted that the conspirators used the method of

01:01 21 sharing sales with each other, usually referred to as doors, and

01:01 22 all eight admitted in signed plea agreements adopted under oath

01:01 23 during their pleas that at least 1.5 kilos of crack were involved

01:01 24 in the participants' concerted activity within the scope of the

01:01 25 conspiracy or in his relevant conduct.

01:01  1    The signed statements and plea agreements of all seven who

01:01  2  pled in this case, number 05-100, were entered on the electronic

01:01  3  docket after their pleas and notice of the entries was given

01:01  4  electronically to all counsel in the case.

01:01  5    Given the length of time over which the witnesses saw the

01:01  6  defendant and the named conspirators obtaining and selling crack,

01:01  7  the estimate of at least 1.5 kilos as relevant conduct for the

01:01  8  defendant's offense is reasonable.  The objection to the scope of

01:02  9  the relevant conduct included in Paragraph 90 is overruled.

01:02 10    The defendant objects to the weapons enhancement imposed

01:02 11  under Section 2D1.1 B 1 in Paragraph 91 of the presentence

01:02 12  report.  The enhancement applies if a weapon was present during

01:02 13  the offense of conviction and any relevant conduct, unless it is

01:02 14  clearly improbable that the weapon was connected with the offense

01:02 15  or relevant conduct.

01:02 16    Bobby Capies credibly testified that in January of 2001,

01:02 17  he was sitting in Wilson's apartment with Wilson and Wallace

01:02 18  while the defendant was behind them handling two pistols on a

01:02 19  table.

01:02 20    When Wilson and Wallace unexpectedly jumped up and ran out

01:02 21  of the room, Capies turned and saw Mr. Ball with both pistols in

01:02 22  his hands.  Mr. Ball told Capies to get up, forcibly hit him in

01:03 23  the mouth repeatedly with a handgun, and kicked him in the mouth

01:03 24  knocking out one front tooth and killing the nerve in another,

01:03 25  aimed both pistols at Capies' head, wracked them and threatened

01:03 1 to shoot him in the head.  When Capies asked why, the defendant

01:03 2 said, "You know what's going on.  You're all supposed to be

01:03 3 killing me."  The defendant also expressed exasperation that

01:03 4 Wilson appeared to have escaped out of the window.

01:03 5     Crawford credibly corroborated Capies.  The defendant had

01:03 6 once told Crawford concerning crack sales in the alley that the

01:03 7 alley was his spot, his strip, meaning that he controlled it.

01:03 8     One day, Crawford saw the defendant with a gun butt

01:03 9 protruding from his pocket and looking angry.  The defendant said

01:03 10 he'd just knocked Capies teeth out of his mouth because the young

01:03 11 guys around there thought they were going to take over the strip,

01:03 12 and Wilson and Capies were planning to kill the defendant.

01:03 13     Likewise, Marsh provided further corroboration.  Marsh

01:04 14 testified that Mr. Ball said he heard that Wilson and Capies were

01:04 15 planning to kill him, so he went in, took a pistol off a table,

01:04 16 and smacked up Capies, and Wilson jumped out of the window.

01:04 17     I do find by a clear preponderance of the evidence that

01:04 18 the defendant possessed a weapon in connection with perceived

01:04 19 threats to his building and protecting his market for crack sales

01:04 20 in Congress Park, conduct that I have already found that is

01:04 21 relevant to his offense of conviction.  The objection is

01:04 22 overruled.

01:04 23     The defendant objects to the four points added in

01:04 24 Paragraph 93 for the defendant's role as an organizer or leader

01:04 25 of criminal activity that involved five or more participants or

01:04 1 was otherwise extensive.  I've already found that there was

01:04 2 concerted criminal activity to make money by selling crack and to

01:04 3 build and protect the market for crack sales in Congress Park.

01:04 4 It involved the defendant and more than five other participants,

01:05 5 including Wilson, Gregory Bell, Thurston, Capies, the eight

01:05 6 people I mentioned who pled guilty to conspiracy to sell crack,

01:05 7 and others.

01:05 8      I find by a clear preponderance of the evidence that the

01:05 9 defendant was a leader of that criminal activity.  He admitted as

01:05 10 much in explaining to Crawford and Marsh why he pistol-whipped

01:05 11 Capies, to keep Capies and Wilson from taking away his control of

01:05 12 the crack sales in the strip.

01:05 13      He also demonstrated his leadership.  When Thurston and

01:05 14 Collins failed in getting Conner, an outsider, to stop selling

01:05 15 crack in their strip, they appealed to Mr. Ball whose warning to

01:05 16 Conner succeeded.

01:05 17      When Powell complained to Mr. Ball that Wallace had robbed

01:05 18 him of $300, Mr. Ball directed Wallace to give the money back and

01:05 19 Wallace did.  Numerous witnesses acknowledged during the trial

01:05 20 the defendant's claim to leadership of this criminal activity.

01:06 21 Capies said, "If Mr. Ball" -- "What he says goes."

01:06 22      Crawford saw how the defendant had a lot of respect in the

01:06 23 alley from a lot of the young guys.  Pough, that's P-O-U-G-H,

01:06 24 said about the circle that the defendant was running the house.

01:06 25 "If something was going down, they would go to Antwuan.  He was

01:06  1  in charge." Powell admitted about the defendant, that he was the

01:06  2  man.  That objection, then, is overruled.

01:06  3       The defendant objects to the two points added in

01:06  4  Paragraph 94 for obstruction of justice in connection with

01:06  5  Capies' report that Mr. Ball threatened him during the trial.

01:06  6  Evidence of other instances of threats or undue influence exerted

01:06  7  toward the witnesses may be probative of the defendant's intent

01:06  8  in whatever interaction may have occurred between Mr. Ball and

01:06  9  Mr. Capies in the courtroom.

01:07  10      Paragraph 27 of the presentence report reflects that

01:07  11  Johnson passed on to Wood -- a threat against Wood from Mr. Ball

01:07  12  for cooperating.

01:07  13      Paragraph 74 reflects that the defendant pressured three

01:07  14  teenage girls not to reveal to anyone what they saw or heard

01:07  15  about Samuels shooting and killing Sills.  Nevertheless, even

01:07  16  considering these other acts, I do not find by a preponderance of

01:07  17  the evidence that Capies's otherwise uncorroborated report

01:07  18  concerning a glare and a perceived mouthed comment establishes a

01:07  19  Section 3.- -- Section 3B1.1(a) obstruction of justice.

01:07  20  Therefore, the objection is sustained, and the Paragraph 94

01:07  21  adjustment will be removed.

01:07  22      Mr. Ball objects to the two-point enhancement to his

01:07  23  criminal history score in Section -- Paragraph 103 under

01:08  24  guideline Section 4A1.1(d) for having committed the instant

01:08  25  offense while under a prior sentence of probation for his

01:08 1  conviction for possession of a weapon on August 1st, 1995.

01:08 2  The -- and Count 22 occurred in 2001, while the defendant's

01:08 3  probation for the weapon conviction ended in 1998.

01:08 4      However, Note 4 to the guideline explains that instant

01:08 5  offense includes all relevant conduct.  Here, as I have found,

01:08 6  the relevant conduct for the instant offense stretched back

01:08 7  before 1995.  An exception to a plain enhancement prevails here,

01:08 8  however.

01:08 9      Note 1 to Section 4A1.2 explains that the enhancement may

01:08 10 be imposed only if the prior sentence was one other than one

01:08 11 imposed for conduct, that is part of the conduct relevant to the

01:08 12 instant offense.  The Government carries the burden of justifying

01:09 13 the enhancements by showing that the August 1st, 1995 weapon

01:09 14 possession was not part of the weapon -- part of the relevant

01:09 15 conduct.

01:09 16     That 1995 possession occurred less than a mile from

01:09 17 Congress Park during the life of the charged narcotics

01:09 18 conspiracy, and the Government charged the possession as Overt

01:09 19 Act 4 in the narcotics conspiracy count of the indictment.

01:09 20     Whether or not it is likely that this 1995 possession was

01:09 21 relevant conduct, it would be anomalous for me to accept an

01:09 22 argument from the Government to justify the enhancement here that

01:09 23 the 1995 offense was not relevant conduct.

01:09 24     Therefore, due to that anomaly, I do not find that the has

01:09 25 carried its burden to justify which enhancement, and the

01:09  1    objection is sustained.

01:09  2        Paragraph 103 will be deleted.

01:09  3        That, in addition, renders the criminal conviction in

01:09  4    Paragraph 100 ineligible as the Government concedes to be counted

01:10  5    for a criminal history point.  Paragraph 104, then, will be

01:10  6    revised to reflect criminal -- only one criminal history point

01:10  7    and a criminal history category of 1.

01:10  8        The defendant has objected to the listing of aliases and

01:10  9    additional dates of birth and Social Security numbers, but these

01:10 10    will not affect sentencing.

01:10 11        The defendant objects to the discussion in Paragraph 88 of

01:10 12    acceptance of responsibility and the failure to award any points

01:10 13    for that.  The language itself has no impact upon the scoring,

01:10 14    and the defendant has shown no entitlement to any decrease under

01:10 15    this section.  So that objection is overruled.

01:10 16        Mr. Carney, I know that you filed a supplement asking that

01:10 17    I apply the fair sentencing act in sentencing Mr. Ball.  I

01:11 18    suppose the upshot of the argument would be that he would no

01:11 19    longer be subject to the mandatory minimum five-year term of

01:11 20    imprisonment and would be subject to a maximum term of 20 years

01:11 21    instead of 40 years.  I have considered the argument, but I need

01:11 22    not address it as it will not affect the sentence.

01:11 23        I am accepting all undisputed portions of the presentence

01:11 24    report as Findings of Fact under Federal Rule of Criminal

01:11 25    Procedure 32(i)(3)(A) for reasons articulated in *in re: Sealed*

01:11  1  *case* reported at 677 Fed Supp. 2nd, 47, in 2009 in response to a

01:11  2  D.C. Circuit opinion, and I am aware of all the fact-finding

01:11  3  that's required to be made to achieve all of the offense level

01:11  4  and criminal history scoring in the sentencing guideline

01:11  5  calculations.

01:11  6        Mr. Carney, would you like to be heard on behalf of your

01:11  7  client in allocution?

01:11  8        MR. CARNEY:  Yes, Your Honor.

01:12  9        Your Honor, one of the final matters that I've been trying

01:12 10  to work with is to get from the jail, the type of conditions that

01:12 11  Mr. Ball was contained in for these several years, since April

01:12 12  15th of 2004, and what I've talked to Mike Manasse over there and

01:12 13  I have given to the Government, and it's Exhibit 2, and this is

01:12 14  the best I can tell you.  What their estimate is, is that he did

01:12 15  75 percent of his time in what they call Segregated Management

01:12 16  Unit which is a basically complete lockdown.  If he's released

01:13 17  for rec, it's into a separate cage area.

01:13 18        So I do note that that should be something that Your Honor

01:13 19  should take into account.  You'll see the breakdown is -- it's --

01:13 20  because what happen is they have a juvenile cell, and then they

01:13 21  converted it, North One, to another.  So based on what he can

01:13 22  represent to me, a significant period of time was in lockdown.

01:13 23  They have no other records that they keep, but you'll see

01:13 24  notations on the right side where it says the different types of

01:13 25  things, general population, but as best they can tell, they just

01:13  1  don't have a good record, but he was detained at D.C. jail up

01:13  2  until about a week before we set sentencing here when he was

01:13  3  moved to Northern Neck.

01:14  4      As Your Honor is aware over the years, D.C. jail has been

01:14  5  under trusteeship because of the horrible conditions there.  I'm

01:14  6  not sure if it was Judge Hogan or which judge was supervising the

01:14  7  conditions at the jail, but I'd ask Your Honor to take that into

01:14  8  account when you consider the sentence in terms of either a

01:14  9  variance or departure, which is -- there is a established case

01:14 10  law that allows that to be done.

01:14 11      I note also that one of the provisions of Section 3553

01:14 12  deals with treating the community at large and the general public

01:14 13  at large for the sense of -- that there's a fairness that's going

01:14 14  on in justice priors had remarked in the Watts' decision that

01:14 15  people in the public and jurors are often shocked at how things

01:14 16  that they look upon relevant conduct -- acquitted conduct can

01:15 17  still be used in terms of fashioning a sentence.

01:15 18      And it seems to me that the letter that we received from

01:15 19  Juror 6, Mr. Karen, kind of really eloquently speaks to that.

01:15 20  They saw the first two sentences in the case, and they were

01:15 21  remarkably surprised based on their evaluation of the case.

01:15 22      Under 3553, I believe it's 2A, it's a factor that Your

01:15 23  Honor can consider as to an appropriate sentence.  In addressing

01:15 24  some other factors, Your Honor, one of them is the strong family

01:15 25  support that Mr. Ball has.  I know present in court is his

01:15  1  mother, Violet Cooper, his wife, Monica.  He has three nieces

01:16  2  present here in court, his daughters, Aqueelah, nieces and

01:16  3  nephews.  A number of people here have been behind him a hundred

01:16  4  percent throughout all the proceedings.

01:16  5      Part of what Mr. Ball is about really is a reflection of

01:16  6  what they call East of the River.  Across the street, Your Honor

01:16  7  is aware that they have established a community court just for

01:16  8  Sixth and Seventh District cases and misdemeanors, and in that

01:16  9  court they address, and there's been several innovative judges,

01:16 10  there's Judge Keary, Iscoe, now Rigsby that have been working

01:16 11  with the community, Congress Park, and it's only Congress Park,

01:16 12  East of the River, Congress Heights, to address drug problems, to

01:16 13  address employment and mental health issues and -- but by then

01:16 14  it's too late.  The people are already in the system.

01:16 15      They have done wonderful things with drug treatment

01:17 16  programs, but Mr. Ball came from a neighborhood, and this is a

01:17 17  factor I asked Your Honor to really consider.  Age 9, he was

01:17 18  packaging drugs for his mother.  He was in a situation of a

01:17 19  drug-infested community.  Public assistance money was being spent

01:17 20  of his family on drugs.  He then was living in rat-infested

01:17 21  neighborhood, homes that he was evicted from, he was living on

01:17 22  the street, they moved back in, there was no running water.

01:17 23  These are all things that Mr. Ball dealt with, and by age 15, he

01:17 24  was taking care of his younger brothers and sisters.  He lost a

01:17 25  brother, Kyree Ball, who he constantly talks about, and he talks

01:17 **1**   and is reflected in even the community service work that he did

01:17 **2**   that he was always hungry.

01:17 **3**       Those were factors that are -- a horrific upbringing.  It

01:17 **4**   doesn't excuse -- I agree it doesn't excuse things -- conduct and

01:18 **5**   things, but he did try at a point and they have been people that

01:18 **6**   have started working with him.  And when given the opportunity to

01:18 **7**   perform, to do well, given a little bit of assistance, he

01:18 **8**   blossomed and you heard from people in the community that want

01:18 **9**   him back in the community, they want to work with him.

01:18 **10**      You've heard from Janie Jeffers and Edgar Cahn and

01:18 **11**   Watkins, there are programs that they have worked with and

01:18 **12**   designed to have him help the community and go back to the

01:18 **13**   community, and these individuals are visionary in the sense that

01:18 **14**   they look that you have to go to the core community.  You don't

01:18 **15**   wait to people in court to try and implement programs.  They want

01:18 **16**   to get résumé training and computers in the neighborhood, and

01:18 **17**   Mr. Ball kind of realized that at that point, and Your Honor has

01:18 **18**   heard testimony from that, and I ask that you take all of those

01:18 **19**   factors into account.

01:18 **20**      And in conclusion, Your Honor, I ask that you consider the

01:19 **21**   500-hour drug program.  It is a good program at the institutions

01:19 **22**   that he be sentenced locally, and that the judgment and

01:19 **23**   commitment orders specifically state that he should get credit

01:19 **24**   for time served from April 15th, 2004 to date.

01:19 **25**      Those are my comments, Your Honor.

01:19  1     THE COURT:  All right.  Thank you.

01:19  2     Who will speak for the Government?

01:19  3     MR. GUERRERO:  Your Honor, good morning.

01:19  4     THE COURT:  Good morning.

01:19  5     MR. GUERRERO:  Your Honor, the Government would

01:19  6  incorporate by reference the arguments that we submitted in our

01:19  7  sentencing memorandum that Mr. Leon guided the Court to consider

01:19  8  earlier this morning.

01:19  9     When it comes to Mr. Antwuan Ball, we'd like to highlight

01:19 10  a couple of things so that the Court can consider our

01:20 11  recommendation and adopt portions of that, if not all of it, in

01:20 12  its ultimate sentence.

01:20 13     Mr. Ball is sort of like a conundrum.  Mr. Cahn --

01:20 14  Professor Cahn, Ms. Jeffers, and also Mr. Watkins, all used terms

01:20 15  to describe Mr. Ball as a leader, as a person who within the

01:20 16  community showed signs of leadership, and persons with leadership

01:20 17  have choices to make.  They could use leadership for the good of

01:20 18  the community, they can use leadership for the bad of the

01:20 19  community, or they can use those leadership skills in a deceptive

01:20 20  and devious manner to obtain personal benefit, use the system.

01:20 21  Mr. Ball is that type of person.

01:20 22     For the many months that we sat here before this Court

01:21 23  presenting evidence, the Government's witnesses also said the

01:21 24  same.  Cedric Conner, Mr. Robert Crawford, Steve Marsh also saw

01:21 25  in Mr. Ball the same type of leadership potential within Congress

01:21 **1**  Park, but it was leadership potential that ran havoc.  It was

01:21 **2**  leadership potential that facilitated the flow of crack cocaine

01:21 **3**  into a community that brought pain and suffering to many people

01:21 **4**  who testified.  People's lives were destroyed at the hands of the

01:21 **5**  drug distribution where Mr. Ball was a leader.

01:21 **6**      We heard an ample amount of testimony about the circle

01:21 **7**  inside Congress Park and how members of the conspiracy sold crack

01:21 **8**  cocaine on a regular basis for years, not months, but for years,

01:22 **9**  and with that crack cocaine distribution, people suffered, and

01:22 **10**  with that crack cocaine distribution, violence also came

01:22 **11**  alongside it, violence that Mr. Ball was involved in with

01:22 **12**  possessions of firearms and possessions of crack cocaine where he

01:22 **13**  distributed them as well, and violence that he himself instilled

01:22 **14**  upon members of his own conspiracy like Bobby Capies.

01:22 **15**      Mr. Ball had the choice to use the leadership potential

01:22 **16**  for something other than crack cocaine and violence, and he chose

01:22 **17**  to use it for his own benefit, for the benefit of the drug

01:22 **18**  distribution conspiracy.  There was a common understanding.

01:22 **19**  There was an agreement.  Many of the witnesses said that.  They

01:22 **20**  respected Mr. Ball because no one was going to go against him,

01:23 **21**  not even people from within Congress Park or people from outside

01:23 **22**  Congress Park.

01:23 **23**      Mr. Ball's passion and commitment that we heard about was

01:23 **24**  the same passion and commitment that he kept for his crew, the

01:23 **25**  numbers of photographs that we presented to this court and to the

01:23  1   jury where it was obvious that the younger people in Congress

01:23  2   Park, the same co-conspirators, looked up to him because of that

01:23  3   passion and commitment, because, as Ms. Jeffers said, when they

01:23  4   were with Antwuan Ball, they felt safe.  No one was going to turn

01:23  5   on Antwuan Ball.

01:23  6       Those are the leadership qualities that Mr. Ball exhibited

01:23  7   for many years.  It's the flip side of the same coin.  It's the

01:23  8   flip side of the coin that shows a negative that he had on his

01:24  9   community.

01:24  10      What greater example of this can be shown as we have

01:24  11  indicated in our memorandum on Page 31.  When confronted with

01:24  12  protection of a co-conspirator with respect to the murder of

01:24  13  Jamal Sills, Mr. Ball went into the grand jury and lied under

01:24  14  oath.  Dominic Samuels, although this jury hung on that

01:24  15  particular murder, later pled guilty to that same murder.

01:24  16      Mr. Ball has a conscious awareness of what's right and

01:24  17  wrong, and him going into the grand jury displays an utter

01:24  18  disregard for the law, a disrespect for the judicial system, and

01:24  19  a blatant disregard for the members of Congress Park.

01:24  20      With respect to the letter by the juror, that's one

01:25  21  person's perspective, and even within that letter, and I quote on

01:25  22  Page 2, the third full paragraph, the first line says, quote, I'm

01:25  23  sure we all agree that these men sold drugs and did so from a

01:25  24  very early age.

01:25  25      That's the root of this case, that they were selling

01:25  1  drugs.  That's the relevant conduct that this court should

01:25  2  consider.  The court doesn't operate in a vacuum.  The Court is

01:25  3  entitled and has the right, as the Court has mentioned, to

01:25  4  consider all that relevant conduct, all that pain, all that drug

01:25  5  distribution, all those sales that went on for many years in

01:25  6  reaching a final sentence for Mr. Ball.

01:25  7       And finally, I would also note that the same societal

01:25  8  support mechanisms that were present for Mr. Ball during the

01:26  9  years that he was a member of the conspiracy, namely the STEP

01:26  10  Foundation, whereas some of the witnesses here have testified

01:26  11  will be awaiting him, those same support mechanisms were in place

01:26  12  back then, and even for the conviction upon which he stands

01:26  13  before this Court, that conviction occurred in 2001 during the

01:26  14  same time period that he was working for the STEP Foundation.

01:26  15       It shows an insight into what we're trying to say to the

01:26  16  Court, that he was working both sides, that even while he's

01:26  17  entrusted with his leadership potential within the STEP

01:26  18  Foundation, the STEP program, he's out on the other side dealing

01:26  19  crack cocaine.  And if that is the type of person that he was

01:26  20  back then, it shows the distrust that people should have in him,

01:27  21  because holding that position of authority, that position of

01:27  22  leadership on one side and then on the same other side putting

01:27  23  a -- putting crack cocaine back into the same community is the

01:27  24  harm that this Court should take into consideration and address

01:27  25  appropriately.

01:27  1    For all those reasons and for the reasons that we've

01:27  2  enumerated in our sentencing memorandum, we ask the Court to

01:27  3  fashion an appropriate sentence for Mr. Ball.  Thank you.

01:27  4    THE COURT:  All right.  Thank you.

01:27  5    Let me ask, Mr. Carney and Mr. Guerrero, would you come up

01:27  6  to the bench, please, and Mr. Smith, if you have a headset you

01:27  7  can give to Mr. Ball.

01:27  8    (Following sidebar discussion had on the record:)

01:27  9    THE COURT:  Are you able to hear, Mr. Ball?

01:28 10    He's shaking his head yes.

01:28 11    Mr. Carney, I'm principally directing this question to

01:28 12  you.

01:28 13    MR. CARNEY:  Yes, Your Honor.

01:28 14    THE COURT:  I see a minor child in the front row.  I don't

01:28 15  know who she is.  I know Mr. Ball may have some children --

01:28 16    MR. CARNEY:  That's one of them.

01:28 17    THE COURT:  -- minor children.  I don't know if any of his

01:28 18  minor children are present.  I ordinarily think it is much too

01:28 19  traumatic for a young child of the defendant who is about to be

01:28 20  sentenced to have to witness that.

01:28 21    MR. CARNEY:  I agree, Your Honor.

01:28 22    THE COURT:  Do you see any -- in the courtroom, any minor

01:28 23  children of Mr. Ball's or do you know if there are any?  If

01:28 24  you're not sure, please feel free to confer with him.

01:28 25    MR. CARNEY:  I'm pretty sure that's his younger daughter,

01:28  1    but let me make sure.

01:28  2         THE COURT:  All right.

01:28  3         (Discussion had off the record between attorney and

01:29  4    client.)

01:29  5         MR. CARNEY:  Your Honor, thank you for bringing that to my

01:29  6    attention.

01:29  7         Can I ask that they have her removed from the courtroom,

01:29  8    if you may?

01:29  9         THE COURT:  Go right ahead.

01:29 10         MR. CARNEY:  There's no one else who appears to be any

01:29 11    younger to you, Your Honor.  I've been looking at you and not at

01:29 12    the back.

01:29 13         Is there anyone else?  Just that young girl?

01:29 14         THE COURT:  All right.

01:29 15         MR. CARNEY:  Thank you.

01:30 16         THE COURT:  Let me ask you to come back up for a moment.

01:30 17         (Following sidebar discussion had on the record.)

01:30 18         THE COURT:  It appeared that three individuals left.

01:30 19    There is still a clearly minor child in the front row.  I don't

01:30 20    know who she is, but are you satisfied that all of the people who

01:30 21    have left are the ones who are Mr. Ball's minor children?  Did we

01:30 22    miss anybody?

01:30 23         MR. CARNEY:  I had asked to have the young child removed.

01:30 24    Let me try again.  Maybe they misunderstood me, but I thought

01:30 25    they understood that she was to leave.

53

| | | |
|---|---|---|
| 01:30 | 1 | THE COURT: Okay. I don't know if the young girl who's in |
| 01:30 | 2 | the front row is one of his minor children. |
| 01:30 | 3 | MR. CARNEY: Yes. |
| 01:30 | 4 | THE COURT: She is? |
| 01:30 | 5 | MR. CARNEY: She is. |
| 01:31 | 6 | THE COURT: All right. Do you want to go back? |
| 01:31 | 7 | MR. CARNEY: Let me try again. |
| 01:31 | 8 | (Sidebar discussion concluded.) |
| 01:31 | 9 | MR. CARNEY: Your Honor, if I could just approach again. |
| 01:31 | 10 | (Following sidebar discussion had on the record.) |
| 01:31 | 11 | MR. CARNEY: The one was the daughter and this was a |
| 01:31 | 12 | niece, and this one -- they want to be present. And I asked them |
| 01:31 | 13 | to leave and they said, no, that they want the niece present. |
| 01:31 | 14 | THE COURT: Is Mr. Ball comfortable with having his niece |
| 01:31 | 15 | here? |
| 01:31 | 16 | MR. CARNEY: Yes. |
| 01:31 | 17 | THE COURT: All right. He's shaking his head yes. All |
| 01:31 | 18 | right. |
| 01:31 | 19 | (Sidebar discussion concluded.) |
| 01:32 | 20 | THE COURT: All right. Mr. Ball, would you like to say |
| 01:32 | 21 | anything? |
| 01:32 | 22 | THE DEFENDANT: Yes. |
| 01:32 | 23 | THE COURT: All right. |
| 01:32 | 24 | THE DEFENDANT: Good morning, Your Honor. |
| 01:32 | 25 | THE COURT: Good morning. |

54

01:32  1      THE DEFENDANT:  All my life, Your Honor, people ask me

01:32  2  questions like, "What's the first thing you do when you find

01:33  3  yourself in the hole?"  And excuse these tears, Your Honor,

01:33  4  because they're not tears of weakness or sadness, it's just

01:33  5  that --

01:33  6      THE COURT:  Mr. Carney?

01:33  7      THE DEFENDANT:  Certain things that I wanted to say I

01:33  8  wanted my kids to hear because I was made out of a villain in

01:33  9  here.  I wish that I could come here and tell Your Honor that I

01:33 10  never sold drugs.  I can't do that.  They asked me questions

01:34 11  like, "What's the first thing you do when you find yourself in

01:34 12  the hole?"  And then they answer that question and say, "Stop

01:34 13  digging."  I stopped digging on my own.  While I'm sitting in

01:34 14  this hole, Your Honor, I sent invitations out to Dan Freeman

01:34 15  that -- who used to be the U.S. attorney, asking for his

01:34 16  assistance to help get out of this hole.  They had a conflicted

01:34 17  interest.  They said that -- they said they couldn't help me get

01:34 18  out of this hole.

01:34 19      I asked them several times.  I found a way how to get out

01:35 20  of this hole myself.  Bobby Capies, he didn't lie about one

01:35 21  thing.  I knocked his tooth out of his mouth.  It was not with a

01:35 22  gun, it was with medication balls -- the silver medication balls

01:35 23  because in a community -- because in the community meeting -- the

01:35 24  community said that his young brother was shooting a gun in our

01:35 25  neighborhood at night.  That's the only way I could get his gun

01:35  1  from him.  He didn't have that gun on him.

01:35  2      My computer that the Government took had everything on it

01:36  3  concerning Robert Crawford, and what I was calling him for, it

01:36  4  wasn't for drugs.  It was because Edgewood Management asked me to

01:36  5  put a package together of all the organizations that I saw coming

01:36  6  into our community, getting money that we could be getting.

01:36  7  Cleaning -- he had a cleaning company, Your Honor.  The Lord is

01:36  8  my witness.  This is the truth.  Under perjury, this is the

01:36  9  truth.

01:36 10      He would never hang in our community, Your Honor, ever.

01:36 11  Never ever he wouldn't hang in our community because the young

01:36 12  guys, Your Honor, did not want them in our community.  You know,

01:36 13  I stepped up.  I know -- I cannot tell you that I never sold

01:36 14  drugs before.  I can't do that.  But I stopped on my own, not

01:36 15  because of a threat that I was going to do the rest of my life in

01:37 16  jail, it's because somebody came along and gave me the benefit of

01:37 17  the doubt and told me that the things that I was doing in my past

01:37 18  can now be put on my résumé, makes me capable of doing the things

01:37 19  that needed to be done in my community.  And I'm not being

01:37 20  braggadocios, but I'm good at it.  That's my niche.  I came with

01:37 21  it.  That's where I am.  That's my reality.

01:37 22      Your Honor, I had no time to be this person that the

01:37 23  Government is saying I was, no time.  My days, Your Honor,

01:37 24  consisted of me the same thing every day, every day.  My kids, I

01:38 25  take them to school.  Depending on what they did the day before,

01:38 1  whether they came home and did their chores and did their

01:38 2  homework without me telling them, I woke up in the morning, made

01:38 3  them French toast. They loved my French toast, they loved my

01:38 4  oatmeal, but if they didn't, they eat cereal.

01:38 5     I take them to school. My two kids, Tania and Antwuan,

01:38 6  went to two different schools. I dropped Tania off, I dropped

01:38 7  Antwuan off, goes to my neighborhood where I have five or six

01:38 8  other young brothers that goes to Balou.

01:38 9     Now, Your Honor may not agree with this, but somehow I had

01:38 10  to use different incentives to get our people from our

01:38 11  environment to do what they needed to. So I told these young

01:38 12  guys, "If ya'll are out here when I get around here, I will let

01:38 13  you out."

01:38 14     Now, these young guys drive better than me, drive my truck

01:38 15  to school with me in the passenger seat because that's something

01:38 16  that make them look cool. But it was an incentive to get them to

01:38 17  go to school. After that, I go to two, three, maybe four

01:39 18  meetings a day about my community -- about my community that I

01:39 19  invited the Government to come help me with.

01:39 20     They had a conflicted interest, and I'm assuming the

01:39 21  conflicted interest was the first conspiracy that they brought to

01:39 22  our community that came up not guilty also. The brothers that

01:39 23  came in here and said, Your Honor, all these things about me,

01:39 24  they had reasons to do this. They're home. They're home, Your

01:39 25  Honor. Cold-blooded murderers, they're home.

01:39  1    You know, when this happened with Bob Capies, I had to

01:39  2  stop coming to my community, you know, and then I had to come

01:39  3  back because everybody -- the kids and everybody was saying that

01:39  4  I was scared to come around there.  The whole neighborhood heard

01:39  5  about this.  I had to come back because they wouldn't have faith

01:39  6  in me.  They wouldn't look at me as a strong brother to be able

01:39  7  to come up to them and say do this and do that.

01:39  8    So I had to come back -- I had to come back risk my life.

01:39  9  I'm not a coward, I'm not saying that I was scared, but I had

01:39 10  reasons not to come back because of the work that I was doing in

01:40 11  our community and other places, Your Honor.  I've been

01:40 12  everywhere.  Every -- I've been invited by people to come to the

01:40 13  Treasury Department where I had to get a police clearance and

01:40 14  everything to speak as a business owner from Ward 8 E, east of

01:40 15  the Anacostia River.

01:40 16    Your Honor, I would never jeopardize theirs.  I mean, my

01:40 17  plans was to go down in history doing what I'm good at.  I found

01:40 18  my niche.  I had never in my life seen a kilo before.  The Lord

01:40 19  is my witness on everything that I love.  Under perjury, never in

01:40 20  my life seen a kilo of cocaine in any form, in any form, Your

01:40 21  Honor, in any form.

01:40 22    I'm not saying that I have never sold drugs.  I'm not

01:40 23  saying that I have never sold drugs.  I cannot say that I have

01:40 24  never sold drugs, but I rehabilitated myself and I gave back.  I

01:40 25  set up NA/AA meetings in our community, Your Honor.  You know

01:40   1   what I'm saying, I did everything, Your Honor.  Throughout the

01:40   2   week -- every day of the week, even the weekends had something to

01:41   3   do with my community, whether on Saturdays, it's beautification

01:41   4   day.  Why walk around, I'm a Muslim.  And I took people -- when

01:41   5   the Kimsey Foundation -- matter of fact, Mike Kimsey is sitting

01:41   6   in the audience, when they sponsored to buy the kids, who parents

01:41   7   could not afford Christmas gifts for them, I took them parents to

01:41   8   the stores to buy gifts for these kids for Christmas as a Muslim,

01:41   9   as a Muslim.  And Mike Kimsey paid for it.

01:41 10      So, Your Honor, these tears were -- I promise, it was not

01:41 11   a thing to try to influence the Court in any way.  It slipped out

01:41 12   because my kids left out.  I'm no one's drug dealer, nor am I

01:41 13   anyone's murderer.  I've never murdered.  I have -- I made -- I

01:41 14   was fortunate enough to make it out of there without having to

01:41 15   kill or be killed.  That's a tough thing.  I'm ready to be

01:41 16   punished for being something that I'm not.  Before I'm punished,

01:41 17   at least tell me I did a good job for what I was doing.  I did

01:42 18   this from the heart.  You know what I'm saying, and I'm getting

01:42 19   smacked on my hand and on any my face for doing think excellent

01:42 20   doing.  I'm going to go down in history.  I want to go down in

01:42 21   history, but I want to go down in history doing the right thing

01:42 22   and I did this.  I stepped up and did this, Your Honor.  Me, not

01:42 23   with the help of no one, no one.

01:42 24      If I may, Your Honor, I heard a story.  It was on West

01:42 25   Wing, about the president, you know, the West Wing or something

01:42  1    like that.  This story, Your Honor, I had to tell it to you.  I

01:42  2    told myself I wasn't but I have to because it fits me, if you

01:42  3    don't mind.  It's a story -- one day, a man was walking down the

01:42  4    street, Your Honor, and while walking down the street, he fell in

01:42  5    this hole.  And in this hole, he could not get out because it was

01:42  6    so deep.  He was trying to get out.  He ripped his fingernails

01:42  7    up, and he fell down into exhaustion crying because he couldn't

01:42  8    get out of this hole.

01:42  9        He heard footsteps and looked up and noticed that it was a

01:43  10   preacher, and he hollered up there, "Please, could you get me out

01:43  11   of this hole?  I've been in this hole for hours.  I need to get

01:43  12   out of this hole."

01:43  13       And the preacher said, "I will never leave you in that

01:43  14   hole and I" -- "so I'll get you out of the hole."  And he pulled

01:43  15   out a pen and he started writing, and he dropped his note down in

01:43  16   this hole.  And the note, floating down in the hole, and the

01:43  17   young guy grabs it.  And he's reading it and then he looks up and

01:43  18   the preacher was gone.  So he starts losing his mind again, Your

01:43  19   Honor.  He started flipping out.  I mean, he's crying and trying

01:43  20   to get out of this hole and everything.

01:43  21       And then he hears footsteps again, and he recognized that

01:43  22   this is a doctor.  "Doctor, could you please get me out of this

01:43  23   hole?  I've been in this hole for hours.  I'm bleeding.  I need

01:43  24   to get out of this hole in order for me to survive.  I need to

01:43  25   get out of this hole."

01:43   1       And the doctor said, "I will never leave you in this hole.

01:43   2  Sure, I will get you out of this hole."  And he pulled out an ink

01:43   3  pen.

01:43   4       The young brother in the hole, "No.  No.  No more notes.

01:43   5  Don't send me no more notes."  He wrote on a note, a

01:43   6  prescription, dropped it down in there, walked away.

01:43   7       So he is at the end of his rope or he thinks he's at the

01:44   8  end of his rope and he's crying, and he's rolling around on the

01:44   9  floor.  And he hears more footsteps and he looks up, and it's a

01:44  10  brother with his hat turned backwards, his pants maybe hanging

01:44  11  down.  And he asked him, "Brother, could you please get me out of

01:44  12  this hole?  I had a preacher and a doctor came down here, and

01:44  13  they never -- they dropped me notes and never got me out of this

01:44  14  hole.  Could you get me out of this hole?"

01:44  15       And the brother told him, "Brother, before you get out of

01:44  16  this hole, you're going to need both of them.  That preacher that

01:44  17  came in and dropped that, you're going to need faith to get out

01:44  18  of this hole.  The doctor that came, you're going to need

01:44  19  physical strength.  You're going to need a prescription to get

01:44  20  over any type of addictions that this life has given you, whether

01:44  21  it's money, sex, any of that.  You're going to need a

01:44  22  prescription to get out of there."

01:44  23       And he said, "Well, brother, what do you have for me?  Are

01:44  24  you going to get me out this hole?"

01:44  25       And he said, "Yeah.  I'm going to get you out of this

01:44 1   hole."

01:44 2        "What do you have for me?"

01:44 3        And the brother jumped in the hole, he jumped down in the

01:44 4   hole.  The brother that was in the hole lost his mind.  "Excuse

01:44 5   me, brother."  Lost his mind.  And he said, "Now, both of us are

01:44 6   stuck in this hole."

01:45 7        And that brother told him, "No.  Brother, I haven't lost

01:45 8   my mind.  I've been down in this whole before, and I know the way

01:45 9   out."

01:45 10       That's who I am, Your Honor.  That's my reality.  No

01:45 11  matter what -- no one say sitting at this table, no one.  That's

01:45 12  my reality.  That's who I am.  And I believe I wrote to you in

01:45 13  this letter, and I love this saying.  I think it was Ralph Waldo

01:45 14  Emerson that said that, "If I'm not a reality, then who's with

01:45 15  them?"

01:45 16       I'm a reality, Your Honor.  I did this to myself, myself.

01:45 17  And I didn't cause no severe damage in my community, Your Honor.

01:45 18  Some damage, I must admit.  And for the record, my mother don't

01:45 19  use drugs anymore.  She's clean, clean.  You know, she can be

01:45 20  strong, I can be strong.  I wish my daughter was in here because

01:45 21  all she heard was the bad things that was said about me, Your

01:45 22  Honor, that I have to say -- that I have to say is not true.

01:45 23  It's not true.  It's not true.  I'm no one's drug dealer.  If

01:46 24  you're a drug dealer, you're a sellout.

01:46 25       And then the work that I was doing, they put it in public,

01:46  1  they put it in the newspaper.  No drug dealer would deal with me

01:46  2  with these newspapers saying about my security consulting firm,

01:46  3  my nonprofit that the Government said never existed.  They had

01:46  4  my -- they had my company checkbooks in their possession.  When I

01:46  5  saw that, when I saw the name of a company that I decided to be,

01:46  6  seen it, changed the neighborhood into a community on that

01:46  7  checkbook, never would I sacrifice that for nothing and no one.

01:46  8  No drug, no dime, no nothing, no car.  My truck was getting

01:46  9  repossessed, Your Honor, been repossessed three times.  My

01:46 10  rent -- my rent's been late months.

01:46 11      Where is all this drug money?  Where are the stash houses?

01:46 12  Where is the -- I don't know if I'm out of line for that because

01:46 13  this is not -- I understand this is not a trial, Your Honor, but

01:46 14  I'm flabbergasted about this whole situation, Your Honor, because

01:46 15  I fought -- I fought to change who I am.  I fought to change who

01:47 16  I am.  And I did it by myself, where -- with the help of

01:47 17  Ms. Jeffers and Mike Kimsey and Edgar Cahn, I did this.

01:47 18      I'm absolutely, positively proud of myself.  I want my

01:47 19  family to be proud of myself, and I want them to know that I

01:47 20  never ever -- I'm not a drug dealer.  No one's a drug dealer.  If

01:47 21  my community was in here, they would tell you.  And I didn't want

01:47 22  to keep looking back in there and disrespecting the marshals, so

01:47 23  I don't know if Trevon's mother is back there.  But if she is --

01:47 24  if she is, I want her to know that I would never ever bring her

01:47 25  pain like that to kill her son.

01:47 1     I watched -- at the age of 13, I watched her sister die
01:47 2 under my window from a stab wound. I heard that ran. Trevon's
01:47 3 mother makes a scream that I've never heard in my life. I
01:48 4 couldn't sleep for weeks, couldn't sleep for weeks. And when I
01:48 5 first got my license at the age of 16, she stopped her brother
01:48 6 from sticking a foot in my butt because I crashed his window car.
01:48 7 This is our community tie. It's basically -- we have -- these
01:48 8 are the ties that we had in our community. It may look like a
01:48 9 conspiracy to some, but it's not a conspiracy, Your Honor.
01:48 10     As Powell said, he looked at a table and said there are
01:48 11 four different groups there. I never dealt with any of these
01:48 12 young brothers. And my little cousin, baby Kyree, I would never
01:48 13 give him no drugs. We don't do that, whether we're knuckleheads,
01:48 14 whether we're anything. We don't give minors drugs. I don't.
01:48 15 I've always had any type of -- I mean, that's honor. I don't do
01:48 16 that.
01:48 17     Your Honor, I'm not going to take up too much of your
01:48 18 time, Your Honor, but I'm not a drug dealer. I have never killed
01:48 19 anybody. I've never seen a kilo in my life, in my life, Your
01:48 20 Honor, in my life. I understand Your Honor's position because
01:49 21 with all due respect, Your Honor's not from where we're from, so
01:49 22 that would appear to be -- because we grew up together and we're
01:49 23 in pictures together and this, that, and the other would appear
01:49 24 to be something that it's not.
01:49 25     But I haven't been in a conspiracy ever, and I've studied

01:49 1  it.  I've mastered it.  I've mastered conspiracy.  I've mastered

01:49 2  RICO.  This is what my life has been for the last -- since 2004.

01:49 3  I've been locked down, and for 23 hours a day, Your Honor, since

01:49 4  March of 2005, and they released me out of there in October of

01:49 5  2009.  I've put in all types of requests to the warden to try to

01:49 6  get things done, so the foolishness over at the jail -- just so I

01:49 7  can keep stay who I am.

01:49 8      This is what I do.  This is who I am.  I love who I am.

01:49 9  This is my niche and I found it.  And I may get rich doing that,

01:49 10  but that's not my plans.  My plan is to go down in history making

01:49 11  changes in a way that people would sent people to the moon --

01:50 12  into the moon, couldn't make -- couldn't make -- I had to be who

01:50 13  I was, Your Honor, in order to become who I am.  Who I was makes

01:50 14  me qualified to do the things that must be done, and I cannot do

01:50 15  them from a jail cell.  I can't do them from a jail cell, I

01:50 16  can't.  I cannot do it from a jail cell.  And I will sign consent

01:50 17  papers right now to take a lie detector before you, Your Honor.

01:50 18  You ask me, "Am I a drug dealer?  Do I kill people?"  Right now,

01:50 19  Your Honor, right now.  Do I kill people?  Am I a drug dealer?

01:50 20  Am I elite?  You can't ask me if I'm a leader because I was

01:50 21  appointed a leader by the people of my -- by the people of my

01:50 22  community in a positive way.

01:50 23      And I believe I said this to -- Ted Turner, the founder of

01:50 24  CNN, he gave his definition of a leader, and his definition of a

01:50 25  leader was one who has the ability to create infectious

01:50 1 enthusiasm.  That wasn't enough for me, so I looked up the word

01:50 2 "enthusiasm."  It generates from the root word "theos," meaning a

01:51 3 God within.  And if that's what it is, then that's what I am.

01:51 4      I'm not shooting you anything, Your Honor.  This is my

01:51 5 reality.  This is who I am.  The Lord is my witness.  I will take

01:51 6 a lie-detector test right now, right this minute, Your Honor.

01:51 7 I'm no one's drug dealer.  I'm Antwuan Dejon Ball, man.  I'm the

01:51 8 founder and CEO of two organizations that I started.  One, a

01:51 9 nonprofit organization that do -- that does beautiful work,

01:51 10 beautiful work, beautiful work, and one that's a security

01:51 11 consultant firm that goes hand-in-hand with that because I had to

01:51 12 take care of my family, and I will not do it by selling drugs no

01:51 13 matter what anybody say.  Nobody.

01:51 14      Thank you, Your Honor.  I'm not going to take too

01:51 15 much more of your time.  I just wanted to get that off, and I

01:51 16 wish my kids were here to hear that because from hearing it from,

01:51 17 you know, somebody that's -- that they know is, you know, sitting

01:52 18 in a thing of authority, there's truth to it.  You know, that's

01:52 19 the way we're taught of.  There's truth to it.  When we hear what

01:52 20 the police has to say, there's truth to it, as kids.  You know,

01:52 21 so I just didn't want them to hear this, hear that, and then look

01:52 22 at their father as some type of a drug dealer or some type of a

01:52 23 murderer.  But I also didn't want to hear them take nothing to

01:52 24 hear me get my life took away from me.

01:52 25      And once again, Your Honor, please believe me that the

01:52  1  tears was uncontrollable.  I didn't -- that wasn't -- I told

01:52  2  myself that I'm not going to come up here and cry because -- two

01:52  3  things I told myself, Your Honor.  I know I keep saying I'm going

01:52  4  to leave, but I'm fighting.  Two things I told myself when I came

01:52  5  in here, I told myself that I will not come in here and admit

01:52  6  with all due respect or apologize for being something that I'm

01:52  7  not, a drug dealer, a murderer, because there are too many people

01:53  8  that support me, that believed in me for me to come in here and

01:53  9  say, "I fooled all ya'll.  I'm a drug dealer."

01:53 10       I can't -- I wasn't -- I don't have that luxury.  The

01:53 11  other guys in our conspiracy had that luxury.  I didn't have that

01:53 12  luxury.  I cannot do it.  I fought too hard, fought too hard, too

01:53 13  hard to become who I am, to come in here and admit to being

01:53 14  something that I'm not.  I couldn't do it.  I couldn't do it and

01:53 15  it wasn't disrespect to Your Honor.  It wasn't disrespect to no

01:53 16  one.  It was just I couldn't do it.  No matter what the stakes

01:53 17  were, I couldn't do it.  Thank you, Your Honor.

01:53 18       THE COURT:  All right.  Do you need a moment?

01:53 19       THE DEFENDANT:  No, sir.  Okay.

01:53 20       THE COURT:  Mr. Ball, the law requires that I consider

01:53 21  numerous factors in determining your sentence.  I have to

01:54 22  consider the nature and circumstances of this offense and your

01:54 23  history and characteristics.  You sowed Season Wood 11 grams of

01:54 24  crack cocaine in 2001, but you did so much more than that, both

01:54 25  before and after.  The trial evidence demonstrated that for over

01:54  1   a decade, there was a concerted activity among you and others

01:54  2   who've been convicted by a guilty plea or a jury trial to promote

01:54  3   and protect a market in Congress Park for selling crack, and you

01:54  4   played a leadership role in that effort.

01:54  5        You, of all people, should have known better.  You saw how

01:54  6   addiction to that poison you were spreading freely on the streets

01:54  7   of your own community destroyed your own childhood and ravaged

01:54  8   your own mother and probably brought a violent end to your own

01:55  9   brother.  You showed no respect for human life and did not

01:55 10   hesitate to use violence.  It's painful to see how your parents

01:55 11   failed you, the school system failed you, the social services

01:55 12   agencies failed you, and every safety net there is let you fall

01:55 13   through it when you were growing up.  It's painful to know that

01:55 14   you had to scrape by so young for so long for so many.  But when

01:55 15   you got old enough to choose what to do about it all, you did not

01:55 16   choose a life of solely improving, you chose a part -- a life of

01:55 17   destroying, and you cannot blame anyone or anything else for that

01:55 18   choice.

01:55 19        I am struck that what I heard about you presents two

01:55 20   completely different people.  One, I have described; the other,

01:56 21   people described as believing in the goodness of others, as

01:56 22   having kindness, generosity of spirit, characteristic humility,

01:56 23   has committed to values that reject violence and that respect

01:56 24   everyone in the community, as always looking to be of service to

01:56 25   others, and as having turned your back on your past.  What past

01:56  1  you have left behind and when you did it is frankly unclear.

01:56  2      In 2001, you sell crack to Season Wood, steal David

01:56  3  Wilson's crack, and viciously pistol-whipped Bobby Capies so he

01:56  4  doesn't try to take over your crack market.  In 2002, you

01:56  5  pressured teenage girls not to tell anyone about the murder that

01:56  6  they saw Dominic Samuel has committed, one that he admits that he

01:56  7  committed.  In 2003, you testified in a grand jury that you don't

01:57  8  believe in reporting crimes, even murders.  In 2004, you're

01:57  9  imposing your Omerta message.

01:57 10      Whatever, if any, weight the jury here may have chosen to

01:57 11  show you, may have had some basis given the skills your witnesses

01:57 12  have testified about.  But the stark duality of your persona is

01:57 13  confounding and tragic.  I have to consider the kind of sentences

01:57 14  available and the kind of sentences and sentencing range

01:57 15  recommended by the sentencing guidelines.  The sentencing

01:57 16  guidelines recommend that I imprison you for anywhere from

01:57 17  292 months to 365 months.

01:57 18      Without applying the recent amendments to Title 21, the

01:57 19  law allows me to sentence you to anywhere from five years to

01:57 20  40 years in prison to terms in-between.  I have to consider the

01:57 21  need to promote respect for the law.  The president, the

01:58 22  Sentencing Commission, congress, courts, commentators, countless

01:58 23  academics, and prospective jurors have observed that the

01:58 24  disparity between sentences authorized for crack cocaine offenses

01:58 25  versus those for powder cocaine offenses is unwarranted and

01:58 1    diminishes respect for the law.  The Congress and the Sentencing

01:58 2    Commission have acted to reduce those disparities, but they have

01:58 3    not eliminated them.  Further reduction in the existing disparity

01:58 4    does warrants detention, and that is a basis for a departure or a

01:58 5    variance.

01:58 6        I have to consider any pertinent Sentencing Commission

01:58 7    policy statement, although no additional ones have been presented

01:58 8    here.  I have to consider the need to provide restitution to any

01:58 9    victims, although that's not applicable here.  I have to consider

01:58 10   the need to avoid unwarranted sentencing disparity among

01:58 11   defendants with similar records who have been found guilty with

01:59 12   the similar conduct.

01:59 13       That ordinarily suggests a sentence within the

01:59 14   guidelines -- recommended guidelines sentencing range.  Here, the

01:59 15   jury has found that the Government has not proven beyond a

01:59 16   reasonable doubt the charged narcotics conspiracy.  I respect and

01:59 17   abide by that verdict, but I cannot turn a blind eye to the

01:59 18   narcotics-conspiracy-relevant conduct that I have found proven by

01:59 19   a clear and convincing evidence.  The guidelines here exerted

01:59 20   upward influence, and I'm not free to simply disregard that any

01:59 21   more than I am free to disregard the Section 3553 factors

01:59 22   exerting downward influences.

01:59 23       However, mitigating circumstances can warrant a variance

01:59 24   or a departure from that range.  We have now a sentencing record

01:59 25   of numerous other participants in this same crack market during

01:59 1   this time.  Their levels of participation were broadly similar

01:59 2   overall though not qualitatively and quantitatively uniform.

02:00 3   While none of them exerted the leadership influence that you did,

02:00 4   none of them, though, received sentences of 292 to 365 months.

02:00 5       In this case, a variance or a departure would avoid

02:00 6   unwarranted sentencing disparity.  I must ultimately, though,

02:00 7   assure that the sentence is sufficient but not greater than

02:00 8   necessary to reflect the seriousness of the offense, to promote

02:00 9   respect for the law, to provide just punishment and adequate

02:00 10  deterrence, to protect the public, and to provide you with any

02:00 11  needed educational or vocational training, medical care or other

02:00 12  correctional treatment in the most effective manner.

02:00 13      I will do that, but 292 to 365 months in prison does not

02:00 14  honor that command.  I will add, Mr. Ball, my apology to you for

02:00 15  the delay in resetting your sentencing.  The guilty verdict

02:00 16  against you and four others was returned on November 28th, 2007

02:01 17  after a ten-and-one-half-month trial.  That day, I set sentencing

02:01 18  dates in February 2008 for you and -- for four of you rather, but

02:01 19  to Mr. Wilson, I set a post-trial briefing schedule instead at

02:01 20  his request.  As I recall, the probation office needed more time

02:01 21  to complete most of the presentence investigations and reports

02:01 22  for a big case like this, and your sentencing was continued until

02:01 23  March 4th -- or 14th of 2008.

02:01 24      However, that sentencing date was vacated at your

02:01 25  counsel's request because of a serious injury he suffered

02:01  1  requiring a surgery that presumably interfered with the

02:01  2  completion of a sentencing memorandum that could respond to the

02:01  3  memorandum filed by the Government on February 29th, 2008 that

02:01  4  sought a 40-year sentence.  Meanwhile, Mr. Wilson filed on

02:01  5  March 7th a brief alleging discovery of yet additional

02:01  6  undisclosed *Brady* material.

02:02  7       While I sentenced two co-defendants in May, I worried

02:02  8  about continuing to sentence defendants before resolving whether

02:02  9  this *Brady* issue might have broader implications for the

02:02 10  integrity of the remaining convictions.  Although your counsel

02:02 11  filed on September 24th, 2008 a motion to schedule your

02:02 12  sentencing on or after October 14th, 2008, the briefing in the

02:02 13  Wilson matter was not completed until January of 2010.  I ruled

02:02 14  against him in July and resolved to my satisfaction that the

02:02 15  issues raised did not affect the integrity of the verdicts

02:02 16  against the other defendants.

02:02 17       On November 3rd, 2010, I ordered an updated presentence

02:02 18  report for you, and on January 27th, 2011, reset your sentencing

02:02 19  for today.  I also denied your motion to dismiss the indictment

02:02 20  because although the delay in sentencing has been too long,

02:02 21  mostly not due to you, and you did ask for a speedier sentencing,

02:03 22  I concluded that any prejudice to you could be appropriately

02:03 23  remedied by a reasonable reduction in the term of imprisonment

02:03 24  based upon all of the relevant conducts that I otherwise would

02:03 25  have imposed.  I will make a 15-month reduction.

02:03 | 1 | It's the judgment of this court that, you, Antwuan Ball,

02:03 | 2 | are hereby committed to the custody of the Bureau of Prisons for

02:03 | 3 | a term of 225 months on Count 22. I recommend that you be

02:03 | 4 | designated to a facility near Washington, D.C. and be enrolled in

02:03 | 5 | the 500-hour drug treatment program. You shall receive credit

02:03 | 6 | for time served since April 15th of 2004. You're further

02:03 | 7 | sentenced to serve a 60-month term of supervised release and to

02:03 | 8 | pay a $100 special assessment. I find that you do not have the

02:03 | 9 | ability to pay a fine, and I therefore waive imposition of a fine

02:04 | 10 | in your case.

02:04 | 11 | The special assessment is immediately payable to the clerk

02:04 | 12 | of this court. Within 30 days of any change of your address, you

02:04 | 13 | must notify the clerk of this court of that change until such

02:04 | 14 | time as your financial obligation is paid in full. You shall

02:04 | 15 | make payments on the special assessment through your

02:04 | 16 | participation in the Bureau of Prisons' Inmate Financial

02:04 | 17 | Responsibility Program. Within 72 hours of your release from

02:04 | 18 | custody, you shall report in person to the probation office in

02:04 | 19 | the district to which you are released.

02:04 | 20 | While you are on supervision, you must not possess a

02:04 | 21 | firearm or other dangerous weapon. You must not use or possess

02:04 | 22 | any illegal and controlled substance, and you must not commit

02:04 | 23 | another federal, state or local crime. You must also abide by

02:04 | 24 | the general conditions of supervision adopted by the U.S.

02:04 | 25 | Probation Office as well as the following special conditions:

02:04 1 You must submit to the collection and use of DNA identification

02:04 2 information while you are incarcerated in the Bureau of Prisons

02:05 3 or at the direction of the probation office.

02:05 4     You shall participate in and successfully complete a

02:05 5 residential and/or outpatient substance abuse treatment program,

02:05 6 which may include drug testing and detoxification service as

02:05 7 approved and directed by the probation office.  You shall

02:05 8 participate in an educational/vocational skills training program

02:05 9 as approved and directed by the probation office.  The probation

02:05 10 office shall release the presentence investigation report to all

02:05 11 appropriate agencies in order to execute the sentence of the

02:05 12 Court.

02:05 13     Treatment agencies shall return the presentence report to

02:05 14 the probation office upon the defendant's completion or

02:05 15 termination from the treatment.  Mr. Ball, you have the right to

02:05 16 appeal the sentence that I've just imposed.  If you choose to

02:05 17 appeal, you must file an appeal within 14 days after the Court

02:05 18 enters a judgment.  If you are unable to afford the cost of an

02:05 19 appeal, you may ask the Court for information to file an appeal

02:05 20 at no cost to you.

02:06 21     Counsel, are there any other matters we need to take up?

02:06 22     MR. CARNEY:  No, Your Honor.

02:06 23     MR. LEON:  No, Your Honor.

02:06 24     THE COURT:  All right.  Well, Mr. Ball, the tragedy that I

02:06 25 just spoke of earlier about the duality of your persona continues

02:06 1  to haunt.  What I can tell you, however, is that the skills that

02:06 2  these witnesses have talked about, the letters that I read, are

02:06 3  ones that are -- ones that can be used for a life of improvement.

02:06 4      You will have to think long and hard in the coming years

02:06 5  about what road you're going to travel, whether it's going to be

02:06 6  the single road that these witnesses want to support you walking

02:06 7  down or the split road that the evidence that I've seen in this

02:06 8  trial demonstrated that you walked down.  I hope you decide for

02:06 9  yourself, for your family, for your children, and for your

02:06 10 community that there will be one single road you walk down when

02:06 11 you get out, and it's the road that these supporters are

02:07 12 welcoming you down.

02:07 13      Good luck to you, sir.

02:07 14      THE DEFENDANT:  Thank you.

02:07 15      THE COURT:  Counsel, you may be excused.

16

17      (Proceedings adjourned at 12:35 p.m.)

18                    **C E R T I F I C A T E**

19

20          I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
        proceedings in the above-entitled matter.

21

22      ----------------------------      ----------------
        **Scott L. Wallace, RDR, CRR**          **Date**

23          **Official Court Reporter**

24

25

1                          **I N D E X**

2

3

4

5     EXAMINATIONS                                          Page

6

7        DIRECT EXAMINATION OF EDGAR STUART CAHN            5

8        DIRECT EXAMINATION OF CURTIS WATKINS              10

9        DIRECT EXAMINATION OF JANIE JEFFERS               14

10

11                          EXHIBITS

12     NO.      DESCRIPTION                                 Page

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of July, 2013, I caused

a copy of the foregoing Joint Appendix Volume III of III to be served by

electronic means, through the Court's CM/ECF system, upon counsel for

the parties and the *amici*:

> Anthony D. Martin (appellant Joseph Jones)
> Jonathan Zucker (appellant Desmond Thurston)
> Stephen C. Leckar (appellant Antwuan Ball)
> Jeffrey T. Green (*amici*).

/s/ *Stratton C. Strand*
Stratton C. Strand, #464992
Assistant United States Attorney
555 Fourth Street, NW
Washington, D.C. 20530
202.252.6829
*Counsel for the United States*